1  Meiram Bendat (Cal. Bar No. 198884)
   PSYCH-APPEAL, INC.
2  8560 West Sunset Boulevard, Suite 500
   West Hollywood, CA 90069
3  Tel: (310) 598-3690, x.101
   Fax: (310) 564-0040
4  meiram@psych-appeal.org

5
   D. Brian Hufford (subject to *pro hac vice* admission)
6  Jason S. Cowart (subject to *pro hac vice* admission)
   ZUCKERMAN SPAEDER LLP
7  1185 Avenue of the Americas, 31st Floor
   New York, NY 10036
8  Tel: (212) 704-9600
   Fax: (212) 704-4256
9  dbhufford@zuckerman.com
   jcowart@zuckerman.com
10

11 Anthony F. Maul (subject to *pro hac vice* admission)
12 THE MAUL FIRM, P.C.
   68 Jay Street, Suite 201
13 Brooklyn, NY 11201
   Tel: (646) 263-5780
14 Fax: (866) 488-7936
   afmaul@maulfirm.com
15

16 *Attorneys for Plaintiffs*

17              **UNITED STATED DISTRICT COURT**
              **NORTHERN DISTRICT OF CALIFORNIA**
18               **SAN FRANCISCO DIVISION**

19 DAVID AND NATASHA WIT, on behalf of          )
20 themselves and all others similarly situated, and  )   Case No. _____
   BRIAN MUIR, on his own behalf and            )
21 on behalf of all others similarly situated,   )
                                                 )
22              Plaintiffs,                       )
                                                 )
23         v.                                     )   **CLASS ACTION COMPLAINT**
                                                 )
24 UNITEDHEALTHCARE INSURANCE            )
25 COMPANY and UNITED BEHAVIORAL         )
   HEALTH (operating as OPTUMHEALTH       )
26 BEHAVIORAL SOLUTIONS),                 )
                                                 )
27              Defendants.                       )
28 _____ )

CLASS ACTION COMPLAINT

According to the National Institute of Mental Health, an estimated 26 percent of American adults suffer from some type of mental health condition each year, with 6 percent suffering from a severe mental health condition such as schizophrenia or major depression. About 11 percent of adolescents have a depressive disorder by age 18 and nearly 3 percent of 13-18 year olds suffer from severe eating disorders, which have the highest mortality rate of any mental illness.  The seriousness of this problem is highlighted by the fact that, in 2009, suicide was the third leading cause of death for young people ages 15-24.

In addition, according to the Substance Abuse and Mental Health Services Administration ("SAMHSA"), an estimated 9 percent of Americans twelve or older were classified with a substance use disorder in 2010.  Between 2007 to 2010, about 38 percent of Americans twelve or older who needed substance abuse treatment did not receive treatment because of a lack of coverage, and could not afford the cost without coverage.  The World Health Organization reports that mental health and substance use disorders are among the leading causes of disability in the United States, and the Centers for Disease Control and Prevention reports that 25 percent of all years of life lost to disability and premature mortality are a result of mental illness.  When substance use disorders are inadequately treated, they can complicate care for co-occurring mental health disorders and medical conditions.

Despite these alarming statistics, Defendants UnitedHealthcare Insurance Company and United Behavioral Health (collectively "United" or "Defendants") are systematically and improperly denying mental health and substance abuse-related insurance benefit claims based on internal policies and practices that violate the terms of Defendants' health insurance plans and the Mental Health Parity and Addiction Equity Act of 2008 ("Federal Parity Act").  Defendants' unlawful motives are clear – to save the often high costs associated with the treatment of chronic conditions.

CLASS ACTION COMPLAINT

4466219.8

Because they have been, and are likely to continue to be, harmed by Defendants' misconduct in this regard, Plaintiffs David Wit, Natasha Wit, and Brian Muir bring this complaint against United on behalf of themselves and all others similarly situated, pursuant to the private rights of action contained in the Employee Retirement Income Security Act of 1974 ("ERISA"). In support of these claims, Plaintiffs hereby allege upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation made by and through their attorneys including review of publicly available information concerning United's policies and correspondence sent by United to Plaintiffs, as follows:

## SUMMARY OF PLAINTIFFS' ALLEGATIONS

1. Plaintiffs David Wit, his daughter Natasha Wit, and Brian Muir are each insured by health insurance plans issued and administered by Defendant UnitedHealthcare Insurance Company. The Wits' plan is "fully-insured," meaning that health care benefits are paid by Defendant UnitedHealthcare Insurance Company from its own assets. Muir's plan is "self-funded," meaning that Defendant UnitedHealthcare Insurance Company pays benefits from the assets of Muir's group plan sponsor. With regard to both plans, Defendant UnitedHealthcare Insurance Company is the designated "Claims Administrator," pursuant to which it is a plan fiduciary with discretion to determine whether any given claim is covered. Both plans are governed by ERISA.

2. With respect to claims for mental or substance abuse-related healthcare, Defendant UnitedHealthcare Insurance Company has delegated some of its claims administration-related fiduciary authority to Defendant United Behavioral Health. Pursuant to this delegation, Defendant United Behavioral Health develops "level of care" and "coverage

CLASS ACTION COMPLAINT

determination" guidelines that it uses to adjudicate mental healthcare claims on behalf of Defendant UnitedHealthcare Insurance Company.

3.      In light of their roles in the claims administration process, Defendants must conform their conduct to applicable state and federal law, including ERISA and the Federal Parity Act.

4.      Notwithstanding these obligations, Defendants have systematically made benefit determinations concerning Plaintiffs' claims that are inconsistent with the terms of Plaintiffs' health insurance plans and Defendants' obligations under ERISA and the Federal Parity Act. These violations of law take two broad forms.  First, notwithstanding that Plaintiffs' health insurance plans cover treatment for mental illnesses and substance abuse when such treatment is consistent with nationally recognized scientific evidence, medical standards, and clinical guidelines, Defendants routinely violate the terms of those plans by adjudicating Plaintiffs' claims for such treatment based upon internal practices and policies that are much more restrictive than those generally accepted by the mental health community and/or are otherwise inconsistent with the terms of Plaintiffs' plans.  Second, although Defendants generally apply prevailing medical guidelines to evaluate medical/surgical claims submitted by Plaintiffs, Defendants systematically violate the Federal Parity Act by imposing disparate and more restrictive internal policies and practices to Plaintiffs' claims for mental health and substance abuse benefits.

5.      Plaintiffs bring these class claims against Defendants under 29 U.S.C. § 1132(a), also known as ERISA § 502(a), to recover benefits wrongfully denied, to enjoin Defendants from utilizing their illegal policies and practices going forward, and to obtain other appropriate equitable relief to redress Defendants' violations.

CLASS ACTION COMPLAINT

4466219.8

**DEFENDANTS, JURISDICTION AND VENUE**

6. Defendant UnitedHealthcare Insurance Company ("UHIC") is located in Hartford, Connecticut and incorporated in Connecticut. Among other things, it is the Claims Administrator for the health insurance plans that insure Plaintiffs, meaning that it has the delegated authority to determine whether any given treatment is covered by those plans. UHIC has, in turn, delegated to United Behavioral Health the responsibility to make benefit coverage determinations for mental health and substance abuse services.

7. Defendant United Behavioral Health ("UBH") operates under the brand name OptumHealth Behavioral Solutions, is a corporation organized under California law, and its principal place of business is located in San Francisco, California. UBH is responsible for drafting and promulgating the internal level of care and coverage determination guidelines referenced herein. It also adjudicates mental healthcare and substance abuse claims on behalf of UHIC.

8. Subject matter jurisdiction exists pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).

9. Personal jurisdiction exists over Defendants, and this District is the proper venue, because they conduct significant operations in this District, they regularly communicate with insureds who reside in this district, and UBH is headquartered in this district.

**UNITED'S LEVEL OF CARE GUIDELINES
APPLICABLE TO THE WITS' CLAIMS**

10. UBH has developed its own Level of Care ("LOC") Guidelines that it uses to determine whether any given level of mental health treatment is covered by its health insurance policies. Among the LOC Guidelines authored by UBH are those for "Acute Inpatient" and "Residential Treatment."

4

4466219.8

11. Pursuant to UBH's LOC Guidelines, mental health care in a Residential Treatment Center – as opposed to Acute Inpatient Treatment – is appropriate for patients who do not require 24-hour nursing care and monitoring and who are not an imminent risk of serious harm to themselves or others.

12. UBH's LOC Guidelines for Acute Inpatient treatment (2013) provides that "[a]n acute inpatient unit is a secured and structured hospital-based service that provides 24-hour nursing care and monitoring, assessment and diagnostic services, treatment, and specialty medical consultation services with an urgency that is commensurate with the member's current clinical need." Moreover, these guidelines expressly state that an acute inpatient level of care is medically necessary when "the member is at imminent risk of serious harm to self or others," as demonstrated by suicidality, assaultiveness, psychosis, and grave disability. These guidelines further explain that acute inpatient treatment is not covered if the treatment can be "safely provided in a less intensive setting."

13. UBH's LOC Guidelines for Mental Health Conditions: Residential Treatment (2013), provides that "[r]esidential services are delivered in a facility or a freestanding Residential Treatment Center that provides overnight mental health services to members who do not require 24-hour nursing care and monitoring offered in an acute inpatient setting but who do require 24-hour structure."

14. In order to qualify for coverage under UBH's LOC Guideline for Mental Health Conditions: Residential Treatment (2013), a claimant must meet one of three criteria: (a) The member is experiencing a disturbance in mood, affect, or cognition resulting in behavior that cannot be safely managed in a less restrictive setting; (b) There is an imminent risk that severe, multiple and/or complex psychosocial stressors will produce significant enough distress or impairment in psychological, social, occupational/educational, or other important areas of

CLASS ACTION COMPLAINT

functioning to undermine treatment in a lower level of care; or (c) The member has a co-occurring medical disorder or substance use disorder which complicates treatment of the presenting mental health condition to the extent that treatment in a Residential Treatment Center is necessary.

15.     Additionally, UBH's LOC Guideline for Mental Health Conditions: Residential Treatment (2013) necessitates that a claimant "is not at imminent risk of serious harm to self or others."  It also calls for the denial of claims for this level of care if treatment "can be safely provided in a less intensive setting," without any discussion of whether the lower level of care will be effective or as effective as the higher level.

16.     Although UBH revised its LOC Guidelines for Residential Treatment in 2014, in a document labeled "2014 Level of Care Guidelines, Residential Treatment Center," these guidelines continue to require evidence that "factors leading to admission cannot be safely, efficiently *or* effectively assessed and/or treated in a less intensive setting due to acute changes in the member's signs and symptoms and/or psychosocial and environmental factors."  In effect, UBH's revised guidelines call for denial of coverage for residential treatment if a lower level of care will be safe, even if it is not as effective.  Moreover, these guidelines condition coverage for residential mental health treatment on "acute changes" in claimants' circumstances and therefore do not provide for any consideration of chronically severe impairments that similarly warrant residential care pursuant to generally accepted mental health practices.

17.     UBH's 2013 Level of Care Guidelines, Continued Service Criteria, further specifies that coverage should be denied for any level of care unless a claimant can prove that he/she will "imminent[ly]" suffer a "significant deterioration in functioning" at a lower level.

18.     Generally accepted standards of assessing the appropriate level of mental healthcare for minors' mental health, such as Plaintiff Natasha Wit, are promulgated by the

CLASS ACTION COMPLAINT

American Academy of Child and Adolescent Psychiatry ("AACAP"). AACAP's Practice Parameter for the Assessment and Treatment of Children and Adolescents With Depressive Disorders explains that the appropriate level of care is driven by a multitude of considerations, including "the subject's age and cognitive development, severity and subtype of depression, chronicity, comorbid conditions, family psychiatric history, family and social environment, family and patient treatment preference and expectations, cultural issues, and availability of expertise in pharmacotherapy and/or psychotherapy." AACAP adds that "the decision for the level of care will depend primarily on level of function and safety to self and others, which in turn are determined by the severity of depression, presence of suicidal and/or homicidal symptoms, psychosis, substance dependence, agitation, child and parents' adherence to treatment, parental psychopathology, and family environment." The Child and Adolescent Level of Care Utilization System (CALOCUS), developed by AACAP and the American Association of Community Psychiatrists, explicitly notes that "it may be desirable for a child or adolescent to remain at a higher level of care to preclude relapse and unnecessary disruption of care, and to promote lasting stability."

19. UBH's LOC Guidelines for Mental Health Conditions: Residential Treatment (2013), its LOC Guidelines for Acute Inpatient (2013), and its LOC Guidelines, Continued Service (2013) are inconsistent with these prevailing medical standards.

20. United's departure from prevailing standards of care and improper refusal to cover residential treatment is further illustrated by the fact that although such standards with respect to mental health treatment did not change between April 2012 and July 2013, the dates when UBH published its Coverage Determination Guideline for Major Depressive Disorder, United entirely excised the following language from its internal guidelines:

CLASS ACTION COMPLAINT

Intermediate or long-term residential services may be available with less intensity or less intensive staff support to members who are recovering from severe and/or chronic MDD.

Intermediate or long-term residential services for patients who are recovering from severe and/or chronic MDD may include psychotherapy, pharmacotherapy, and other interventions aimed at supporting recovery such as the development of recovery plans and advance directives, strategies for identifying and managing early warning signs of relapse, development of self-management skills, and the provision of peer support services.

In cases where there is an unsupportive or high risk living situation undermining the patient's recovery efforts, intermediate or long-term residential services may be provided for continued stabilization and treatment.

21.     UBH's Coverage Determination Guideline for Major Depressive Disorder further provides that coverage for residential treatment should be discontinued unless the claimant provides "compelling evidence that continued treatment in the current level of care is required to prevent acute deterioration or exacerbation of the [claimant's] current condition."

22.     United's aforementioned guidelines discriminate against patients with mental illness.  When adjudicating medical or surgical healthcare claims submitted under the Wits' plan, United generally covers a level of care that is supported by prevailing medical standards, only requires that a lower level of care be utilized if it will be safe and as effective, and does not condition coverage for a higher level of care on the claimant's ability to prove by "compelling evidence" or otherwise that he/she will suffer "imminent" harm or "acute" deterioration if transitioned to a lower level of care.

23.     United's Coverage Determination Guidelines, Definition of Medically Necessary, last modified in 2013, is used by United in connection with claims submitted to plans – such as the Wits' – that do not define "medically necessary" care.  This definition provides that treatment is medically necessary if it is "in accordance with Generally Accepted Standards of Medical Practice," is clinically appropriate, is not for the convenience of the patient, and is "not more costly than an alternative drug, service, or supply *that is at least as likely to produce*

8

CLASS ACTION COMPLAINT

*equivalent therapeutic or diagnostic results* as to the diagnosis or treatment of your Sickness, Injury, disease or symptoms."

24.     United has effectively superseded this definition for purposes of mental health claims by promulgating the internal policies discussed herein and others related to the most common mental health conditions/treatment.  It has not done so for most medical claims.  Although there are thousands of medical conditions, United has no publicly available internal LOC Guidelines applicable to them.  It only has approximately 100 publicly available internally developed coverage determination guidelines ("CDGs") related to medical/surgical conditions/treatment, which primarily address uncommon conditions/treatment forms.  None of these medical CDGs categorically require a less effective – but safe – lower level of care.  They do not condition coverage for a higher level of care on the claimant's ability to prove that imminent or acute harm will occur at a lower level.  They do not require a claimant to satisfy the compelling evidence standard.  Most, if not all, at least purport to be grounded in prevailing medical practices.

25.     Although the Wits have filed claims with United seeking benefits for medical/surgical services covered by their insurance plan, United has not subjected those claims to the same type of restrictive internal policies applicable to the Wits' claims for residential treatment discussed herein.

26.     United's CDG for Physical Medicine and Rehabilitation Services Inpatient and Outpatient, which was used by United at least as of 2013, explicitly acknowledges that United treats medical and mental health-related rehabilitation claims differently: "[i]f behavioral health issues are the primary focus for this patient, rehabilitation benefits may not be available."

CLASS ACTION COMPLAINT

4466219.8

**UNITED'S IMPROPER DENIAL OF THE WITS' CLAIMS**

27.    Plaintiffs David Wit, and his daughter Natasha Wit, reside in Larchmont, New York.  Natasha Wit turned 18 on August 10, 2013.

28.    David Wit is a participant in the "Insperity Group Health Plan" (the "Wits' Plan") and Natasha Wit is a beneficiary of the Wits' Plan.  This insurance plan is a large group, fully-insured healthcare policy issued by UHIC with an effective date of January 1, 2013.  It is subject to ERISA and the Federal Parity Act.

29.    According to the Certificate of Coverage ("COC") that governs the Wits' Plan, all benefits are paid pursuant to the terms of the Wits' Plan, which is "issued" and "insured" by UHIC.  The Wits' COC identifies the "Plan Sponsor" and "Named Fiduciary" as Insperity Holdings, Inc.  The COC explains, however, that the Plan Sponsor retains all fiduciary responsibilities with respect to the Plan "except to the extent the Plan Sponsor has delegated or allocated to other persons or entities one or more fiduciary responsibility with respect to the Plan." It then explains that UHIC is the "Claims Fiduciary."  In that capacity, the COC explains that the plan is "administered on behalf of the Plan Administrator by UnitedHealthcare Insurance Company" and that, as such, UHIC handles "claims processing, claims payment, and [] appeals."  It further explains that UHIC has discretion to "interpret benefits under the Policy," interpret the other terms, conditions, limitations and exclusions set out in the Policy, and "make factual determinations related to the Policy and its Benefits."  It also explains that United "may delegate this discretionary authority to other persons or entities that provide services in regard to the administration of the Policy."

30.    The Wits' insurance policy explicitly provides: "Any provision of the Policy which, on its effective date, is in conflict with the requirements of state or federal statutes or

CLASS ACTION COMPLAINT

4466219.8

regulations (of the jurisdiction in which the Policy is delivered) is hereby amended to conform to the minimum requirements of such statutes and regulations."

31.     The Wits' insurance policy pays benefits for in- and out-of-network, residential mental health treatment and nutritional counseling consistent with generally accepted medical practices.  Denied claims are subject to one internal appeal.

32.     On April 29, 2013, Natasha Wit, then 17 years old, was admitted to Monte Nido Vista for treatment of depression, anxiety, obsessive-compulsive behaviors, a severe eating disorder, medical complications (including amenorrhea, adrenal and thyroid problems, vitamin deficiency, and gastrointestinal symptoms), failure of symptom self-management (including restricting behaviors, purging, and precipitous weight loss), and a lack of psychosocial support (due to severe social isolation).

33.     Monte Nido Vista is licensed by the State of California as a Residential Treatment Facility and accredited for Behavioral Health Care by the Joint Commission of Accreditation of Hospitals Organization ("JCAHO"), which has also awarded it the "Gold Seal of Approval."

34.     Despite the extensive clinical information conveyed by Monte Nido Vista to United upon Natasha's admission, by letter dated May 3, 2013, UBH's Associate Medical Director, Theodore A. Allchin, promptly denied Natasha's claim for coverage for treatment at Monte Nido Vista from April 30, 2013 forward:

> United Behavioral Health (UBH) is responsible for making benefit coverage determinations for mental health and substance abuse services that are provided to United Healthcare Insurance Company members.
>
> [I]t is my determination that the member's treatment does not meet the medical necessity criteria for residential mental health treatment per UBH Level of care Guidelines for Residential Mental Health treatment from April 30, 2013 forward. [Natasha] is not a serious risk of harm to herself or others.  Her weight is appropriate.  There are no acute medical issues.  There's no evidence of the need for 24-hour monitoring.  It would appear that the patient could safely be treated at a less restrictive level of care such as partial hospitalization."

CLASS ACTION COMPLAINT

35.     Dr. Allchin's letter not only referenced admission criteria applicable to acute inpatient hospitalization (i.e. "serious risk of harm to herself or others" and "acute medical issues"), but it also inappropriately referenced "24 hour clinical monitoring," again a function of acute treatment in an inpatient psychiatric facility.   Moreover, Dr. Allchin denied coverage because Natasha could allegedly be "safely" treated in a less restrictive setting without giving any consideration as to whether such treatment would be equally effective.

36.     In response to an urgent appeal by Monte Nido Vista on May 1, 2013, UBH's Medical Director, Roxanne Sanders, issued a final adverse determination letter dated May 3, 2013:

> United Behavioral Health (UBH) is responsible for making benefit coverage determinations for mental health and substance abuse services that are provided to United Healthcare Insurance Company members.
>
> * * *
>
> It is my decision based on the clinical information including live review, and the UBH Level of Care Guidelines for Acute Inpatient Mental Health Treatment to uphold the denial as it appears that [Natasha] could be treated in a less restrictive setting.  [Natasha] has no documented immediate risk of harm to herself or others that requires 24-hour monitoring for treatment.   [Natasha] has no medical conditions that require 24-hour monitoring or treatment.  It appears that your child has the strengths to work cooperatively with her providers toward her recovery.  It appears that your child does not require the intensity of a residential treatment program.  Your child has access to treatment any [sic] less restrictive setting in your community such as Partial Hospitalization which would be authorized according to benefit [sic].
>
> * * *
>
> This is the Final Adverse Determination of your internal appeal.   All internal appeals through UBH have been exhausted.

37.     Unlike Dr. Allchin, who purported to apply UBH's Level of Care Guidelines for Residential Mental Health treatment, but then covertly relied upon additional criteria from UBH's LOC Guidelines for Acute Inpatient Mental Health Treatment, Dr. Sanders took the

CLASS ACTION COMPLAINT

4466219.8

opposite approach.  She acknowledged that she was applying "UBH Level of Care Guidelines for Acute Inpatient Mental Health Treatment" to deny the appeal.

38.     Thus, although UBH's mental health LOC Guidelines clearly distinguish between "Acute Inpatient" and "Residential Treatment" and their respective admission criteria, and the Wits just as clearly sought residential treatment, UBH's practice was to condition coverage on Natasha's inability to satisfy two inapplicable acute inpatient criteria: the need for 24-hour nursing care and monitoring and the requirement that the member pose an imminent risk of serious harm to themselves or others.

39.     UBH's intentional misapplication of *acute* hospitalization criteria to the *sub-acute* residential level of care is all the more legally indefensible since mentally ill patients at "imminent danger to themselves/others" or who are "gravely disabled" must, by operation of laws throughout the country (and certainly in California, where Natasha Wit was treated), be involuntarily confined to psychiatric hospitals and would in no way qualify for sub-acute levels of care like residential treatment.

40.     Moreover, although United generally covers a higher level of care to treat medical or surgical conditions that is supported by prevailing medical standards and cannot be safely and as effectively provided at a lower level, UBH's LOC Guideline for Mental Health Conditions: Residential Treatment and its LOC Guideline for Acute Inpatient, ignore prevailing medical standards, deny a higher level of coverage if a lower level of treatment will be safe -- but not necessarily as effective, and only cover a higher level of care if there is compelling evidence that imminent or acute harm will occur if a lower level is provided.

41.     Thus, United's systemic practice as illustrated by the rationale it used to deny the Wits' claims, and its related internal policies, violate the terms of the Wits' plan and the Federal Parity Act.  The Wits' plan only required that Natasha's residential care be consistent with

CLASS ACTION COMPLAINT

prevailing residential treatment-related medical practices, yet United denied her claims based on categorically inapplicable acute inpatient criteria and benefit-diluting requirements that are inconsistent with generally accepted medical practices, such as restricting access to higher levels of care because less intensive services could be safely provided even though they would not be as effective.  The Federal Parity Act requires United to apply the same criteria to medical claims that it does to mental healthcare claims, yet for the reasons discussed herein United failed to do so.

42.   Despite the illegal benefits denials and the resulting financial expense and hardship incurred by the Wits, Natasha continued to receive the prescribed course of residential treatment through June 28, 2013.

43.   After being discharged, Natasha continued to receive outpatient medical and mental health treatment, including nutritional counseling from Marjorie E. Nolan, R.D. ("Nolan") that she began on September 21, 2012.  Nolan believed that such counseling was medically necessary to address Natasha's eating disorder.

44.   UHIC, however repeatedly and improperly refused to cover Natasha's outpatient, nutritional counseling claims, stating in numerous Explanations of Benefits that were sent to her that "YOUR PLAN DOES NOT COVER SERVICES AND ASSOCIATED EXPENSES FOR NUTRITIONAL-BASED THERAPY."

45.   On March 25, 2014, Natasha faxed UHIC an appeal of the denied claims for nutritional counseling received from September 21, 2012 through December 23, 2013, explaining that, in fact, her plan did cover nutritional counseling:

> Please note that United has repeatedly and improperly denied the attached outpatient claims for nutritional counseling on the basis of an inapplicable coverage exclusion.  My plan explicitly provides for nutritional counseling, as stated in pages 35 and 36 of my Certificate of Coverage:
>
> J. Nutrition

CLASS ACTION COMPLAINT

14

4466219.8

1. Individual and group nutritional counseling.  This exclusion does not apply to medical nutritional education services that are provided by appropriately licensed or registered health care professionals when both of the following are true:

- Nutritional education is required for a disease in which patient self-management is an important component of treatment.

- There exists a knowledge deficit regarding the disease which requires the intervention of a trained health professional.

As UHC is well aware, I have suffered from a diagnosed eating disorder and resulting medical complications.  UHC/UBH's case files contain substantial clinical information about my eating disorder and the bases for nutritional counseling services.  Please reprocess my benefits accordingly.

46.     In multiple letters addressed to Natasha Wit dated March 27, 2014 and March 31, 2014, UHIC acknowledged "that we received the appeal request . . . to review our previous benefit decision" for nutritional counseling services rendered by Nolan, between February 22, 2013 and December 30, 2013.

47.     Yet, in a March 27, 2014 letter to Nolan, UHIC stated that:

Based on our review, we determined that we processed this claim accurately.

No payment is due from us because the health care service is not covered under the patient's health benefit plan.

48.     Subsequently, in an April 1, 2014 letter authored by UHIC and addressed to Natasha Wit concerning the nutritional counseling claims from February 22, 2013 through December 30, 2013, UHIC wrote:

The UnitedHealthcare Central Escalation Appeals Unit received your letter on March 25, 2014.  We understand your request to state that these services should be covered because they were medically necessary.  A letter was sent by our Central Escalation Appeals Unit, acknowledging receipt of your request, on March 27, 2014.

Upon further review of your request, we determined the questions and concerns expressed in your correspondence do not qualify as an appeal.

CLASS ACTION COMPLAINT

4466219.8

49.     Thus, based on UHIC's March 27, 2014 letter to Nolan and UHIC's April 1, 2014 response to Natasha Wit, the Wits' March 25, 2014 appeal was either exhausted or should be deemed futile.

50.     Not only are United's nutritional counseling coverage denials inconsistent with the terms of Natasha Wit's policy, but any exclusions of nutritional counseling for eating disorders, which are covered conditions by her plan, also violate the Federal Parity Act since nutritional counseling is otherwise covered for the treatment of medical disorders.

51.     Given her conditions, it is likely Natasha Wit will require outpatient and residential treatment for her mental health disorders in the future, and that she will submit such claims to United pursuant to her insurance plan.

### UNITED'S LEVEL OF CARE AND COVERAGE DETERMINATION GUIDELINES RELEVANT TO MUIR'S CLAIMS

52.     UBH has also developed level of care and coverage determination guidelines for the treatment of substance abuse.

53.     UBH's CDGs for Residential Rehabilitation for Substance Abuse Disorders, last modified in 2011 ("2011 CDG for Residential Rehabilitation for Substance Abuse Disorders"), provides that the following are "indications" that coverage exists for residential rehabilitation for substance abuse disorders:

- The patient continues to abuse substances despite appropriate motivation.

- The patient continues to use substances, and the patient's functioning has deteriorated to the point that the patient cannot be safely treated in a less restrictive environment.

- There is a high risk of harm to self or others due to continued and severe substance use which prohibits treatment from occurring safely in a less restrictive environment.

CLASS ACTION COMPLAINT

4466219.8

- There is a high risk of exacerbation of medical conditions due to continued substance use which prohibits treatment from occurring safely in a less restrictive environment.

- There is a high right of developing severe withdrawal symptoms, which cannot be safely managed in a less restrictive environment.

- The patient is experiencing withdrawal symptoms that do not compromise the patient's medical status, but in the absence or impairment of a family, social support system or other resources that might otherwise prevent the need for residential treatment are not available.

54.     UBH's 2011 CDG for Residential Rehabilitation for Substance Abuse Disorders also requires substance abuse patients to "provide **compelling** evidence that continued treatment in the current level of care is required to prevent acute deterioration or exacerbation of the member's current condition."

55.     It also unequivocally provides that coverage is excluded when it is "not consistent with United Behavioral Health's level of care or best practice guidelines modified from time to time."

56.     UBH has also promulgated a "Coverage Determination Guideline for Treatment of Substance Use Disorders," which was last modified in 2013 ("2013 Coverage Determination Guideline for Treatment of Substance Use Disorders").  This document defines "Residential Detoxification" to be "comprised of services that are provided in a residential setting other than an acute care hospital for the purpose of completing a medically safe withdrawal from alcohol or drugs."  It explains that "[r]esidential detoxification is typically indicated when withdrawal is severe enough to warrant 24-hour care, but on-site access to medical personnel is not essential."

57.     The 2013 Coverage Determination Guideline for Treatment of Substance Use Disorders defines "Residential Rehabilitation" to be "comprised of acute overnight services that are typically provided in a freestanding Residential Treatment Center for the care of a substance use disorder."

CLASS ACTION COMPLAINT

4466219.8

58.     The 2013 Coverage Determination Guideline for Treatment of Substance Use Disorders provides the following admission criteria for residential rehabilitation:

- The member's **use of alcohol or drugs is heavy and continuous**, and is associated with either of the following:

  - Current symptoms of moderate **withdrawal** that require monitoring and management;

  - Emerging symptoms or a history of use which indicates that moderate **withdrawal** is imminent and requires monitoring and management; or

- A Clinical Institute **Withdrawal** Assessment Scale (CIWA-Ar) score of 8 to 15; or

- The member has a co-occurring medical disorder or mental health condition which complicates ambulatory **detoxification** to the extent that detoxification in a Residential Treatment Center is necessary.

- The member is not at imminent risk of harm to self or others.

59.     It further requires substance abuse patients to "provide **compelling** evidence that continued treatment in the current level of care is required to prevent acute deterioration or exacerbation of the member's current condition."

60.     This guideline omitted the following admission language from UBH's prior Coverage Determination Guideline, Residential Rehabilitation for Substance Use Disorders:

A residential rehabilitation program is appropriate when a member lacks the motivation or social support system to remain abstinent, but does not require the structure and intensity of services provided in a hospital.

* * *

Patients appropriate for discharge from residential rehabilitation to the next level of care are characterized as:

• Individuals who have achieved the goals in his/her treatment plan, resolving the problem that necessitated admission and who have a demonstrated motivation to return to outpatient treatment.

• Individuals who have the ability to remain abstinent even in situations where

CLASS ACTION COMPLAINT

4466219.8

substances are potentially available and have living situations and support systems that are conducive to remaining substance free.

61. UBH has also developed level of care guidelines applicable to residential treatment for substance abuse. UBH's 2013 Level of Care Guidelines: Substance Use Disorders: Residential Rehabilitation conditions admission to residential rehabilitation on satisfaction of any of the following six criteria:

1. The member *continues to use alcohol or drugs*, and the member's functioning has deteriorated to the point that the member cannot be safely treated in a less restrictive level of care.

- OR -

2. The member *continues to use alcohol or drugs*, is at risk of exacerbating a serious co-occurring medical condition, and cannot be safely treated in a lower level of care.

- OR -

3. There is a high risk of harm to self or others due to *continued and severe alcohol or drug use* which prohibits treatment from safely occurring in a less restrictive level of care.

- OR -

4. There is a high risk that *continued use of alcohol or drugs* will exacerbate a co-occurring medical condition to the extent that treatment in a less restrictive level of care cannot be safely provided.

- OR -

5. There is a high risk of developing severe *withdrawal* symptoms which cannot be safely treated in a lower level of care.

- OR -

6. The member is experiencing *withdrawal* symptoms that do not compromise the member's medical status to the extent that treatment in Acute Inpatient is indicated, but the symptoms are of extreme subjective severity and the member lacks resources or a functional social support system needed to manage the symptoms in a lower level of care.

62. These guidelines further require claimants to demonstrate they cannot "be safely" treated in a "less intensive setting."

CLASS ACTION COMPLAINT

4466219.8

63.     UBH's 2013 Level of Care Guidelines, Continued Service Criteria, further specifies that coverage should be denied for any level of care unless a claimant can prove that he/she will "imminent[ly]" suffer a "significant deterioration in functioning" at a lower level.

64.     Strikingly, nowhere do UBH's LOC guidelines even attempt to independently account for co-occurring mental health disorders, risk of relapse, motivation barriers, availability of social support, or whether a lower level of care will be equally as effective.

65.     Moreover, taken together, UBH's CDGs and LOC Guidelines provide that residential rehabilitation for substance abuse will only be covered when the claimant is intoxicated or experiencing or likely to develop withdrawal.  They preclude treatment at the residential rehabilitation level of care in the absence of intoxication upon admission without concurrent evidence or likelihood of withdrawal.  Even with evidence of withdrawal, they require immediate discharge once detoxification or withdrawal has passed.  Moreover, they call for denial of residential treatment coverage if it is inconsistent with UBH's LOC Guidelines or CDGs, including the requirement for a lower level of care if it is safe (even if it will not be as effective as a higher level of care) and the obligation of patients to prove by "compelling evidence that continued treatment in the current level of care is required to prevent acute deterioration or exacerbation of the member's current condition."

66.     Prevailing substance abuse treatment guidelines such as those established by the American Society for Addiction Medicine ("ASAM"), however, not only support continued residential rehabilitation for purposes of "withdrawal management," a process potentially far exceeding the duration of detoxification, but also discretely account for:  "emotional, behavioral, or cognitive conditions and complications," "readiness to change," "relapse, continued use, or continued problem potential," and "recovery/living environment."  In fact,

CLASS ACTION COMPLAINT

4466219.8

ASAM does not require the presence of either withdrawal or comorbid mental health/medical conditions for admission to residential rehabilitation:

> Individuals who are appropriately placed in the clinically managed levels of care have minimal problems with intoxication or withdrawal (Dimension 1) and few biomedical complications (Dimension 2), so on-site physician services are not required. Such individuals may have relatively stable problems in emotional, behavioral, and cognitive conditions (Dimension 3), meeting the diagnostic criteria of the *Diagnostic and Statistical Manual of Mental Disorders (DSM)* of the American Psychiatric Association. Many also have significant limitations in the areas of readiness to change (Dimension 4), relapse, continued use, or continued problem potential (Dimension 5), or recovery environment (Dimension 6). Therefore, they are in need of interventions directed by appropriately trained and credentialed addiction treatment staff. Such individuals also need case management services to facilitate their reintegration into the larger community.

67.     Moreover, ASAM calls for continued treatment at the prescribed level of care if any of the following apply:

> The patient is making progress, but has not yet achieved the goals articulated in the individualized treatment plan. Continued treatment at the present level of care is assessed as necessary to permit the patient to continue to work toward his or her treatment goals;
>
>         or
>
> The patient is not yet making progress, but has the capacity to resolve his or her problems. He or she is actively working toward the goals articulated in the individualized treatment plan. Continued treatment at the present level of care is assessed as necessary to permit the patient to continue to work toward his or her treatment goals;
>
>         and/or
>
> New problems have been identified that are appropriately treated at the present level of care. The new problem or priority requires services, the frequency and intensity of which can only safely be delivered by continued stay in the current level of care. The level of care in which the patient is receiving treatment is therefore the least intensive level at which the patient's new problems can be addressed effectively.

68.     ASAM further specifies that "While the duration of treatment varies with the severity of an individual's illness and his or her response to treatment, the length of service in clinically managed Level 3 programs tends to be longer than in the more intensive medically

monitored and medically managed levels of care . . . Longer exposure to treatment interventions is necessary for certain patients to acquire basic living skills and to master the application of coping and recovery skills."

69.   Strikingly distinguished from the UBH CDG and LOC Guidelines is ASAM's instruction that "all matrices in *The ASAM Criteria* correlate risk ratings and the types of services and modalities needed, and indicate the intensity of services where the patient's needs can **best be met**."

70.   For these reasons, ASAM noted, when an insurer such as United develops its own treatment level of care guidelines "rather than adhering to nationally validated, reliable, and accepted guidelines, it may appear that decision-influencing factors such as cost considerations outweigh valid evidence-based authorization requests for medically necessary treatment."

71.   UBH's aforementioned substance abuse guidelines also discriminate against claimants with substance use disorders, such as Plaintiff Muir.  Unlike the restrictive internal practices and policies that United applies to substance abuse claims, United applies far less restrictive internal policies and practices to medical claims.  As discussed above, United's medical CDGs generally call for medical treatment to be covered when it is supported by prevailing medical standards, only require lower levels of care if equally safe **and** effective, and do not establish any particular evidentiary burdens on claimants – much less the burden of proving by "**compelling** evidence" that continued treatment in the current level of care is required "to prevent acute deterioration or exacerbation of the member's current condition."

72.   Indeed, although within the past year Plaintiff Muir has filed claims with United seeking benefits for medical/surgical services covered by his insurance plan, United has not subjected those claims to the type of substance abuse coverage restrictions identified herein (e.g., the requirement that a lower level of care be utilized if it is safe -- even if not as effective

CLASS ACTION COMPLAINT

as the higher level sought, and the obligation to prove by "compelling evidence" that continued treatment in a current level of care is necessary to prevent acute deterioration or exacerbation of his condition).

## UNITED'S IMPROPER DENIAL OF MUIR'S CLAIMS

73.     Plaintiff Brian Muir resides in Chicago, Illinois and is the beneficiary of a self-funded large group plan sponsored by Deloitte LLP and entirely subject to ERISA and the Federal Parity Act.

74.     According to Plaintiff Muir's plan, Defendant UHIC is a "named fiduciary of the Plan for purposes of denial and/or review of denied claims under the Plan.  UnitedHealthcare's decision on any claim will be final."  Consistent with this, UHIC is the designated "Claims Administrator" responsible for making benefit determinations for both medical/surgical and mental health/substance abuse claims, and adjudicating appeals under Plaintiff Muir's plan.  For all claims and appeals, Deloitte has "delegated to the Claims Administrator the exclusive right to interpret and administer the provisions of the Plan.  The Claims Administrator's decisions are conclusive and binding."

75.     Plaintiff Muir's plan provides for one urgent level of appeal for denied claims, after which plan participants are entitled to sue.  The plan expressly provides that legal action "against the Claims Administrator to recover reimbursement" cannot be brought "until 90 calendar days after [a participant has] properly submitted a request for reimbursement as described in How to File a Claim."

76.     Additionally, Plaintiff Muir's plan expressly provides that "ERISA imposes duties upon the people who are responsible for the operation of an employee benefit plan.  The people who operate your Plan, called 'fiduciaries' of the Plan, have a duty to do so prudently and in the best interest of you and other Plan participants and beneficiaries.  No one, including your

23

4466219.8

employer or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a benefit or exercising your rights under ERISA . . . If you are discriminated against for asserting your rights . . . you may file suit in a Federal court."

77.     Plaintiff Muir's health plan covers in- and out-of-network services that "must be necessary and given for the diagnosis or treatment of an accidental injury or Sickness." His plan further requires mental health and substance abuse services to be "consistent with generally accepted standards of medical practice for the treatment of such conditions."

78.     Among the covered services available to Plaintiff Muir under his plan is residential substance abuse treatment that is consistent with generally accepted standards of medical practice.

79.     On March 1, 2013, at the urging of his outpatient psychiatrist and following a detoxification that rendered concurrent travel for rehabilitation unsafe, Plaintiff Muir was admitted to Sierra Tucson, a residential treatment facility licensed by the Arizona Department of Health Services and accredited by JCAHO.

80.     Plaintiff Muir's admission to Sierra Tucson was precipitated by unremitting alcohol dependence over a period of nine months, co-occurring depressive and anxiety disorders, suicidality, and a delayed traumatic reaction to childhood abuse. His recent relapse resulted in particularly distressing symptoms and functional impairments.

81.     On March 5, 2013, UBH case manager, Anitra Stewart, communicated with Sierra Tucson and noted Plaintiff Muir's "inadequate relapse prevention strategies," "lack of social support," "problems with primary support group," and food restriction and weight loss. She also noted that "[member] had incident at airport where he was intoxicated they would [not] let [member] fly so he rent car and drove himself drunk pulled over and sent suicidal text, and contemplated crashing his car." Last, Ms. Stewart noted that Plaintiff Muir was "just started on

CLASS ACTION COMPLAINT

Campral for cravings" and was "resistant to 12 step model."  Thus, Ms. Stewart recognized that Plaintiff Muir was unable to abstain from alcohol use, resistant to 12-steps, lacked social support, had co-occurring mental health disorders, and was recently suicidal.  Nonetheless, Ms. Stewart determined that Plaintiff Muir did not meet UBH's "CDG-Substance use disorders, Residential rehabilitation" and forwarded Plaintiff Muir's file for a review by UBH's Assistant Medical Director, Jerome Kaufman.

82.     On March 6, 2013, Dr. Kaufman reviewed Plaintiff Muir's file and confirmed that Plaintiff Muir "reports inability to stop using on his own, impulsive while intoxicated, mood instability including panic attacks and increased depression/anxiety.  [Member] was being detoxed by his [outpatient] MD."  Nonetheless, in a letter dated March 7, 2013, Dr. Kaufman denied Plaintiff Muir's residential rehabilitation in its entirety:

> United Behavioral Health (UBH) is responsible for making benefit coverage determinations for mental health and substance abuse services that are provided to UBH members.
>
> * * *
>
> I have determined that benefit coverage is not available from 03/01/2013 forward. The rationale for my decision to issue a noncoverage determination is based on a review of the behavioral health and substance abuse services that you are receiving, the review of the Summary Plan Description for DELOITTE, review of **UBH Coverage Determination Guideline for Residential Rehabilitation for Substance Use Disorders**, and a review of available clinical information. Services you are receiving do not appear to be consistent with generally accepted standards of practice **based upon the applicable guideline**. Services that are not consistent with UBH Guidelines and with generally accepted standards of practice are not considered covered health services. Care could in a partial hospitalization program, which is a covered benefit and is available locally.
>
> **You are not in withdrawal** and have demonstrated an ability to not use alcohol outside of a 24 hour treatment setting.

83.     In response to an urgent internal appeal requested by Sierra Tucson, on March 7, 2013, UBH's Associate Medical Director Jed Goldart, M.D. issued a final boilerplate adverse benefit determination:

CLASS ACTION COMPLAINT

United Behavioral Health (UBH) is responsible for making benefit coverage determinations for mental health and substance abuse services that are provided to UBH members.

The rationale for my decision to issue a non-coverage determination is based on a review of the behavioral health services you are receiving, review of the Deloitte Summary Plan Document, review of *United Behavioral Health (UBH) Coverage Determination Guideline for Substance Disorder Residential Rehabilitation*, and a live telephone interview with the doctor. Services you are receiving do not appear to be consistent with generally accepted standards of practice *based upon the applicable guideline*. Services that are not consistent with United Behavioral Health (UBH) Guidelines and with generally accepted standards of practice are not considered covered health services.

There is no risk of withdrawal symptoms, medical or psychiatric co-occurring conditions that require 24 hour management. There is no severe impairment in the family or support system or severe, non-medical symptoms with the lack of functional support systems to manage the symptoms. That evidence indicates you can receive safe and effective treatment in a less intensive treatment setting such as Partial Hospital Program, which was discussed with your provider.

This is the Final Adverse Determination of your internal appeal. All internal appeals through United Behavioral Health (UBH) have been exhausted.

84.     United's systemic practice, as illustrated by the rationales used to deny Plaintiff Muir's claims, and its related internal policies upon which those denials were based, violate the terms of Plaintiff Muir's plan and the Federal Parity Act.   Plaintiff Muir's plan covered residential treatment for substance abuse that was consistent with prevailing medical practices, yet United denied his claims based on its own internal policies that are inconsistent with prevailing medical practices and its own internal practice of ignoring criteria (such as lack of motivation to maintain sobriety) that indicated that coverage existed.   Furthermore, although it is required by the Federal Parity Act to apply the same criteria to medical claims that it does to substance use claims, United denied Plaintiff Muir's substance use rehabilitation claims based on more restrictive criteria than it applies to his medical/surgical claims.

85.     Ironically, on March 8, 2013, one day after Dr. Goldart issued his final adverse determination, United case manager, Rosalyn Chambliss, updated Plaintiff Muir's case file to

reflect that **none** of the "critical goals to be accomplished during this level of care" had in fact been resolved.  According to UBH, these unfulfilled goals included addressing Plaintiff Muir's "abuse/neglect," "current substance abuse," "impulsivity," "inadequate relapse prevention strategies," "occupational/educational problems," and "social/relationship problems."

86.     As a result of United's unlawful policies and practices, Plaintiff Muir was forced to incur substantial out-of-pocket costs to complete his prescribed residential treatment.

87.     Given his conditions, it is likely Plaintiff Muir will require outpatient and residential treatment for his mental health disorders in the future, and that he will submit such claims to United pursuant to his insurance plan.

## CLASS ACTION ALLEGATIONS

88.     Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

89.     United issues and administers many other fully-insured health insurance plans that define covered mental health services in the same way as the Wits' Plan.  The policies, practices and decisions that United made with respect to the claims filed by the Wits are the same as those that have been applied by United to other similarly situated insureds seeking mental benefits under their fully-insured health plans.

90.     United also serves as the claims administrator for many other self-insured health plans that define covered substance abuse services in the same way as Muir's Plan.  The policies, practices and decisions that United made with respect to the claims filed by Muir are the same as those that have been applied by United to other similarly situated insureds seeking substance use benefits under their self-insured health plans.

CLASS ACTION COMPLAINT

91.     As such, pursuant Federal Rule of Civil Procedure 23, Plaintiffs bring their claims on behalf of three classes as noted in the counts below.   The first class (the "Residential Treatment Fiduciary Duty Class") is defined as follows:

All participants or beneficiaries in an insurance plan governed by ERISA, for which United serves as the Claims Administrator with respect to medical/surgical and mental health and substance use benefits, who sought and were denied coverage for all or a portion of residential treatment for mental health or substance use based on application of the internal policies and practices alleged herein, within the applicable statute of limitations.

92.     The second class (the "Residential Treatment Benefit Class") is defined as follows:

All participants or beneficiaries in United's fully-insured ERISA plans, who sought and were denied coverage for all or a portion of residential treatment for mental health or substance use disorders based on application of the internal policies and practices alleged herein, within the applicable statute of limitations.

93.     The third class (the "Nutritional Counseling Class") is defined as follows:

All participants or beneficiaries in United's fully-insured ERISA plans who sought and were denied coverage for nutritional counseling as treatment for an eating disorder, based on application of the internal practices alleged herein, within the applicable statute of limitations.

94.     The members of these classes can be objectively ascertained through the use of information contained in United's files because United knows who its insureds are, which plans they are insured by, what type of claims they have filed, and how those claims were adjudicated.

95.     There are so many persons within the putative classes that joinder is impracticable.

96.     Certification of the classes is desirable and proper because there are questions of law and fact in this case that are common to all members of each of the classes.   Such common questions of law and fact include, but are not limited to, the following:

A.   What legal duties does ERISA impose upon United when it is serving as a claims administrator to a self-funded insurance plan;

28

CLASS ACTION COMPLAINT

B.  Does ERISA impose different duties upon United when it is serving as the claims administrator to a fully-insured plan;

C.  What do United's mental health and substance use level of care and coverage determination guidelines provide, and when are they utilized;

D.  What do United's medical/surgical level of care and coverage determination guidelines provide, and when are they utilized;

E.  What are generally accepted medical practices with respect to level of care determinations related to residential treatment for mental health or substance abuse;

F.  Whether United's application of the policies and practices described herein violate the Federal Parity Act;

G.  Whether United's application of the policies and practices described herein violate its fiduciary duties;

H.  What remedies are available if United is found liable for the claims alleged, and do such remedies differ depending on whether United is the claims administrator to a self-insured plan or to a fully-insured plan; and

I.  Whether prejudgment interest is awardable and at what rate.

97.     Certification is desirable and proper because Plaintiffs' claims are typical of the claims of the members of the classes Plaintiffs seek to represent.

98.     Certification is also desirable and proper because Plaintiffs will fairly and adequately protect the interests of the classes they seek to represent.  There are no conflicts between the interests of Plaintiffs and those of other members of the classes, and Plaintiffs are cognizant of their duties and responsibilities to the entire class.  Plaintiffs' attorneys are qualified, experienced and able to conduct the proposed class action litigation.

CLASS ACTION COMPLAINT

4466219.8

99.     It is desirable to concentrate the litigation of these claims in this forum.  The determination of the claims of all class members in a single forum, and in a single proceeding would be a fair and efficient means of resolving the issues raised in this litigation as between United and its insureds.

100.     The difficulties likely to be encountered in the management of a class action in this litigation are reasonably manageable, especially when weighed against the virtual impossibility of affording adequate relief to the members of the classes through numerous separate actions.

## COUNT I

VIOLATION OF FIDUCIARY OBLIGATIONS
UNDER ERISA BROUGHT ON BEHALF OF
THE RESIDENTIAL TREATMENT FIDUCIARY DUTY CLASS

101.     Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

102.     This count is brought pursuant to 29 U.S.C. §1132(a).

103.     As the entities responsible for making benefit determinations under Plaintiffs' health insurance plans, and responsible for developing the internal practices and policies that are applied to such determinations, Defendants are ERISA fiduciaries.

104.     As ERISA fiduciaries, Defendants owed Plaintiffs and members of the Residential Treatment Fiduciary Duty Class a variety of fiduciary duties, including the duty to make decisions in accordance with insurance plan terms, ERISA, and the Federal Parity Act.

105.     Notwithstanding these fiduciary obligations, these defendants developed and relied upon internal practices and policies that improperly restricted coverage in contravention of Plaintiffs' health insurance plans, ERISA, and the Federal Parity Act.  In doing so, Defendants violated their fiduciary obligations.

CLASS ACTION COMPLAINT

30

106.    Plaintiffs and the members of the Residential Treatment Fiduciary Duty Class have been harmed by United's breaches of fiduciary duty because their claims have been subjected to restrictions not imposed by their health insurance plans and which are illegal under ERISA and the Federal Parity Act.

**COUNT II**

CLAIM FOR IMPROPER DENIAL OF BENEFITS
RELATING TO MENTAL HEALTH RESIDENTIAL CARE,
BROUGHT ON BEHALF OF THE RESIDENTIAL TREATMENT BENEFIT CLASS

107.    Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

108.    This count is brought pursuant to 29 U.S.C. §1132(a).

109.    Defendants wrongfully denied the claims submitted by the Wit Plaintiffs, Plaintiff Muir, and other members the Residential Treatment Benefit Class, based upon policies and practices that they developed that are inconsistent with the relevant terms of the health insurance plans, ERISA, and the Federal Parity Act.

110.    Plaintiffs and the members of the Residential Treatment Benefit Class have been harmed by Defendants' improper benefit denials because they were deprived of insurance benefits they were owed.

**COUNT III**

CLAIM FOR IMPROPER DENIAL OF BENEFITS AND/OR BREACH OF
FIDUCIARY DUTY
RELATING TO NUTRITIONAL COUNSELING FOR THE TREATMENT OF
EATING DISORDERS,
BROUGHT ON BEHALF OF THE WIT PLAINTIFFS AND THE NUTRITIONAL
COUNSELING CLASS

111.    Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

112.    This count is brought pursuant to 29 U.S.C. §1132(a).

31

CLASS ACTION COMPLAINT

4466219.8

113.    Defendants denied the claims submitted by Plaintiffs and other members of the Nutritional Counseling Class, based upon internal practices that are inconsistent with the relevant terms of the health insurance plans that cover Plaintiffs and other members of the Nutritional Counseling Class and/or exclusions found in those plans that violate the Federal Parity Act.

114.    Defendants' improper denials have caused financial damages to Plaintiffs and other members of the Nutritional Counseling Class, namely in the form of unreimbursed claims for nutritional counseling.

### REQUESTED RELIEF

WHEREFORE, Plaintiffs demand judgment in their favor against Defendants as follows:

A.      Certifying the classes and their claims, as set forth in this Complaint, for class treatment;

B.      Appointing the Wit Plaintiffs as Class Representatives for the Residential Treatment Class, the Residential Treatment Fiduciary Duty Class, and the Nutritional Counseling Class;

C.      Appointing Plaintiff Muir as Class Representative for the Residential Treatment Fiduciary Duty Class;

D.      Designating Zuckerman Spaeder LLP and Psych-Appeal, Inc. as counsel for the classes;

E.      Declaring that Defendants' application of the policies and practices complained of herein are contrary to, and in violation of, the terms of its insurance plans, ERISA, the Federal Parity Act, and Defendants' fiduciary duties;

F.      Issuing a permanent injunction ordering United to cease the improper policies and practices detailed herein;

CLASS ACTION COMPLAINT

32

G.      Ordering United to recalculate and issue unpaid benefits to members of the classes whose claims were underpaid or denied as a result of United's actions as detailed herein;

H.      Awarding Plaintiffs' disbursements and expenses for this action, including reasonable counsel fees, in amounts to be determined by the Court;

I.      Awarding taxable costs, as the law allows, and interest from the date of initial benefit reductions for Plaintiffs and members of the classes for all improperly denied amounts; and

J.      Granting such other and further relief as is just and proper.

Dated:   May 21, 2014

Respectfully submitted,

/s/ Meiram Bendat
PSYCH-APPEAL, INC.
Meiram Bendat (Cal. Bar No. 198884)
8560 West Sunset Boulevard, Suite 500
West Hollywood, CA 90069
Tel: (310) 598-3690, x.101
Fax: (310) 564-0040
meiram@psych-appeal.org

ZUCKERMAN SPAEDER LLP
D. Brian Hufford (subject to *pro hac vice* admission)
Jason S. Cowart (subject to *pro hac vice* admission)
1185 Avenue of the Americas, 31st Floor
New York, NY 10036
Tel: (212) 704-9600
Fax: (212) 704-4256
dbhufford@zuckerman.com
jcowart@zuckerman.com

THE MAUL FIRM, P.C.
Anthony F. Maul (subject to *pro hac vice* admission)
68 Jay Street, Suite 201
Brooklyn, NY 11201
Tel: (646) 263-5780
Fax: (866) 488-7936
afmaul@maulfirm.com

*Attorneys for Plaintiffs*

33

CLASS ACTION COMPLAINT

4466219.8