Meiram Bendat (Cal. Bar No. 198884)
PSYCH-APPEAL, INC.
8560 West Sunset Boulevard, Suite 500
West Hollywood, CA 90069
Tel: (310) 598-3690, x.101
Fax: (310) 564-0040
meiram@psych-appeal.org

D. Brian Hufford (admitted *pro hac vice*)
Jason S. Cowart (admitted *pro hac vice*)
ZUCKERMAN SPAEDER LLP
1185 Avenue of the Americas, 31st Floor
New York, NY 10036
Tel: (212) 704-9600
Fax: (212) 704-4256
dbhufford@zuckerman.com
jcowart@zuckerman.com

Anthony F. Maul (subject to *pro hac vice* admission)
THE MAUL FIRM, P.C.
68 Jay Street, Suite 201
Brooklyn, NY 11201
Tel: (646) 263-5780
Fax: (866) 488-7936
afmaul@maulfirm.com

*Attorneys for Plaintiffs*

**UNITED STATED DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | | |
|---|---|---|
| DAVID AND NATASHA WIT, on behalf of themselves and all others similarly situated, BRIAN MUIR, on his own behalf and on behalf of all others similarly situated, BRANDT PFEIFER, on behalf of the Estate of his deceased wife, Lauralee Pfeifer, and all others similarly situated, LORI FLANZRAICH, on behalf of her daughter Casey Flanzraich and all others similarly situated, and CECILIA HOLDNAK, on behalf of herself, her daughter Emily Holdnak, and all others similarly situated<br><br>Plaintiffs,<br><br>v. | ) | Case No. 3:14-CV-02346-JCS<br><br>**FIRST AMENDED** **<u>CLASS ACTION COMPLAINT</u>** **(CORRECTED)** |

UNITED BEHAVIORAL HEALTH (operating as OPTUMHEALTH BEHAVIORAL SOLUTIONS), )

Defendant. )

**TABLE OF CONTENTS**


INTRODUCTION ........ 1

SUMMARY OF PLAINTIFFS' ALLEGATIONS ........ 2

DEFENDANT, JURISDICTION AND VENUE ........ 7

UBH'S GUIDELINES APPLICABLE TO WIT AND HOLDNAK'S CLAIMS CONTRASTED WITH GENERALLY ACCEPTED STANDARDS ........ 8

UBH'S IMPROPER DENIAL OF THE WITS' CLAIMS ........ 14

UBH'S IMPROPER DENIAL OF HOLDNAK'S CLAIMS ........ 18

UBH'S LEVEL OF CARE AND COVERAGE DETERMINATION GUIDELINES RELEVANT TO PFEIFER, MUIR, AND FLANZRAICH'S CLAIMS ........ 30

UBH'S IMPROPER DENIAL OF PFEIFER'S CLAIMS ........ 39

UBH'S IMPROPER DENIAL OF MUIR'S CLAIMS ........ 43

UBH'S IMPROPER DENIAL OF FLANZRAICH'S CLAIMS ........ 51

CLASS ACTION ALLEGATIONS ........ 60

<u>COUNT I</u>
CLAIM FOR VIOLATION OF FIDUCIARY OBLIGATIONS BROUGHT ON BEHALF OF PLAINTIFFS AND THE CLASS ........ 62

<u>COUNT II</u>
CLAIM FOR IMPROPER DENIAL OF BENEFITS BROUGHT ON BEHALF OF PLAINTIFFS AND THE CLASS ........ 64

<u>COUNT III</u>
CLAIM FOR EQUITABLE RELIEF BROUGHT ON BEHALF OF PLAINTIFFS AND THE CLASS ........ 64

<u>COUNT IV</u>
CLAIM FOR OTHER APPROPRIATE EQUITABLE RELIEF BROUGHT ON BEHALF OF PLAINTIFFS AND THE CLASS ........ 65

REQUESTED RELIEF ........ 65

## INTRODUCTION

According to the National Institute of Mental Health, an estimated 26 percent of American adults suffer from some type of mental health condition each year, with six percent suffering from a severe mental health condition such as schizophrenia or major depression. About 11 percent of adolescents have a depressive disorder by age 18 and nearly three percent of 13-18 year olds suffer from severe eating disorders, which have the highest mortality rate of any mental illness. The seriousness of this problem is highlighted by the fact that suicide consistently ranks as the third leading cause of death for young people ages 15-24.

In addition, according to the Substance Abuse and Mental Health Services Administration ("SAMHSA"), an estimated nine percent of Americans twelve or older were classified with a substance use disorder in 2010. Between 2007 to 2010, about 38 percent of Americans twelve or older who needed substance abuse treatment did not receive treatment because they lacked insurance coverage, and could not afford the cost without coverage. The World Health Organization reports that mental health and substance use disorders are among the leading causes of disability in the United States, and the Centers for Disease Control and Prevention reports that 25 percent of all years of life lost to disability and premature mortality are a result of mental illness. When substance use disorders are inadequately treated, they can complicate care for co-occurring mental health disorders and medical conditions.

Despite these alarming statistics, Defendant United Behavioral Health ("UBH" or "Defendant") is violating legal duties it owes to health insurance plan participants and beneficiaries by improperly restricting the scope of their insurance coverage for mental health and substance abuse-related residential treatment. These restrictions are inconsistent with the terms of the relevant insurance plans and generally accepted standards of mental healthcare.

Because they have been, and are likely to continue to be, harmed by UBH's misconduct, Plaintiffs David Wit, Natasha Wit, Brian Muir, Brandt Pfeifer, Lori Flanzraich, and Cecilia Holdnak bring this complaint against UBH on behalf of themselves and all others similarly situated. In support of their claims, Plaintiffs allege upon personal knowledge as to themselves and their own acts, and upon information and belief based upon, *inter alia*, the investigation made by and through their attorneys (including review of publicly available information concerning UBH's guidelines and correspondence sent by UBH to Plaintiffs) as to all other matters, as follows:

## SUMMARY OF PLAINTIFFS' ALLEGATIONS

1. Plaintiffs David Wit, his daughter Natasha Wit, Brian Muir, Brandt Pfeifer, Lori Flanzraich, and Cecilia Holdnak are each insured by a health insurance plan that is sponsored by their (or, in the case of Natasha Wit, her father's) employer and governed by the Employee Retirement Income Security Act of 1974 ("ERISA") ("Plaintiffs' Plans").

2. Plaintiffs' Plans cover treatment for sickness, injury, mental illness and substance use disorders. All of the Plaintiffs' Plans provide that residential care is a covered benefit. All of the Plaintiffs' Plans explicitly classify residential treatment as a form of "intermediate" care, except Plaintiff Flanzraich's plan, which provides no classification at all.

3. Plaintiffs' Plans have delegated responsibility for adjudicating mental health and substance abuse-related claims to Defendant United Behavior Health ("UBH"). Pursuant to this delegation, UBH has developed "level of care" ("LOCs") and "coverage determination" guidelines ("CDGs"), which it provides to its claims representatives for use in adjudicating mental healthcare claims.

4. UBH's CDGs purport to identify, on a condition-by-condition basis, the benefits that are generally available pursuant to health plans insured and/or administered by UBH, the

"best practices" (as defined by generally accepted standards of care) that a mental healthcare provider should follow when treating the condition, and "level of care" criteria (drawn from UBH's LOCs, discussed below). UBHs CDG's instruct UBH reviewers to consult insureds' particular plan terms before deciding whether particular benefits are covered.

5. UBH asserts that its LOCs are a set of "objective" and "evidence-based" criteria used to standardize coverage determinations, promote evidence-based practices, and support members recovery, resiliency, and wellbeing." UBH's LOCs set forth criteria that its claims reviewers are supposed to apply to determine whether a particular level of mental healthcare is both covered by the terms of the Plan and that such level of care is consistent with generally accepted standards of care. Unlike UBH's CDGs, however, UBH's LOCs do not instruct UBH reviewers to consult insureds' particular plan terms before deciding whether a given benefit is covered.

6. UBH has also compiled "Best Practice Guidelines" ("BPGs") which are "developed by nationally recognized organizations" such as the American Psychiatric Association and American Academy of Child and Adolescent Psychiatry.

7. Plaintiffs' Plans have no role in the creation and promulgation of any of these guidelines, or in UBH's decision to approve or deny any claim.

8. In light of its central role in the mental health and substance abuse-related claim adjudication process, UBH is an ERISA fiduciary as defined by 29 U.S.C. Section 1104(a). As such, it is legally required to discharge its duties "solely in the interests of the participants and beneficiaries" and for the "exclusive purpose" of providing benefits to participants and their beneficiaries" and paying reasonable expenses of administering the plan. It must do so with reasonable "care, skill, prudence, and diligence" and in accordance with the terms of the plans it administers, so long as such terms are consistent with ERISA. As a fiduciary, UBH owes a duty

of loyalty to plan participants and beneficiaries. It must also refrain from any conduct that violates state or federal law.

9. UBH suffers from an inherent conflict of interest in its role as mental health and substance abuse claims administrator. Every claim denied by UBH saves money for UBH's corporate affiliates and artificially increases the profit of its parent entity, UnitedHealth Group Incorporated ("UHG"). The Wit, Pfeifer, and Flanzraich plans are "fully-insured," meaning that health care benefits are paid by Defendant UBH's corporate affiliates, UnitedHealthcare Insurance Company ("UHIC"), UnitedHealthcare Insurance Company of Illinois, Inc. ("UHIC-IL"), and Oxford Insurance Company, Inc. ("Oxford"), respectively. Thus, every residential treatment claim denied by UBH allows one of its affiliates to save money and artificially increases the profit of UHG. The same is largely true with respect to Muir and Holdnak's plans, even though they are "self-funded." Although these plans require that benefits be paid, in the first instance, from the assets of Muir and Holdnak's group plan sponsors, most self-funded plans have stop-loss provisions that obligate the insurer to pay benefits that exceed a certain threshold. Thus, every claim UBH denies makes it less likely that such a stop-loss threshold will be crossed and reduces the possible stop-loss liability of UBH's affiliates.

10. Against this backdrop, UBH has violated its fiduciary duties, as detailed herein.

11. Generally accepted standards of care are promulgated by the American Academy of Child and Adolescent Psychiatry ("AACAP"), the American Association of Community Psychiatrists ("AACP"), and the American Society for Addiction Medicine ("ASAM"). Generally speaking, these standards identify a host of criteria as being relevant to determining whether residential treatment is the appropriate level of care for any particular patient, recognize that residential treatment is an intermediate level of care between acute in-patient hospitalization (which is generally required when the patient is a risk to themselves or others) and outpatient

treatment (which is generally appropriate when the patient is capable of monitoring their own condition), and call for residential treatment when the patient's condition may be chronic in nature (i.e., non-acute) and expected to last several months.

12. Although UBH asserts in its guidelines and in communications with insureds that its LOCs and CDGs are consistent with generally accepted standards of care, and that it applies generally accepted guidelines in making benefit determinations, neither is true. UBH has promulgated LOCs and CDGs that are much more restrictive than the generally accepted standards of care in the mental health community. Indeed, in the last 3 years, UBH has been amending its LOCs to make them even more focused on the presence of acute symptoms (and therefore more restrictive), despite the fact that generally accepted guidelines highlight chronic considerations. As detailed herein, whereas UBH's guidelines restrict coverage for residential treatment to "acute" situations that can be addressed quickly, such restrictions on residential treatment are not found in any of the generally accepted standards of care, or for that matter, in any of the Plaintiffs' Plans that UBH administers. Quite the opposite, generally accepted standards recognize that residential treatment is particularly appropriate for the treatment of chronic conditions and is often appropriate for an extended period of time, and Plaintiffs' Plans contain none of the restrictions that are identified in UBH's guidelines and challenged herein.

13. Plaintiffs' Plans purport to exclude mental health and substance abuse coverage when the treatment sought is inconsistent with generally accepted standards of care and UBH's LOCs. (Plaintiff Flanzraich's plan covers such treatment so long as it is "consistent with standards of good medical practice" and does not reference UBH's LOCs). Thus, in developing its LOCs, UBH had a fiduciary duty to Plaintiffs (and to other members of plans administered by UBH) to promulgate criteria that faithfully ensure that a particular level of care is both covered by the terms of Plaintiffs' Plans and consistent with generally accepted standards of

care. UBH breached this duty by supplanting generally accepted treatment standards in the mental health field with standards that promote the self-serving, cost-cutting preferences of UBH and its corporate affiliates. By adopting guidelines that are inconsistent with, and much more restrictive than, those that are generally accepted in the medical community, UBH breached its fiduciary duty to act solely in the interests of participants and beneficiaries for the "exclusive purpose" of "providing benefits" with reasonable "care, skill, prudence, and diligence" and in accordance with Plaintiffs' Plans.

14. UBH further breaches its fiduciary duties by developing guidelines which ignore explicit state laws mandating that claims administrators such as UBH utilize ASAM standards when making medical necessity determinations. Yet, UBH developed and applied its LOCs even though those LOCs are more restrictive than ASAM's standards and those of similar national medical specialty associations. Moreover, UBH's LOCs neither state nor imply that UBH's claims representatives should consult applicable state law before applying those LOCs.

15. UBH has also violated its legal obligations under ERISA by denying residential treatment claims that were covered by Plaintiffs' Plans. These claims would have been covered based on the terms of Plaintiffs' Plans and generally accepted treatment standards, but were denied as a result of UBH's two-prong attack on benefit claimants. First, UBH promulgated improperly restrictive benefit determination guidelines, which it then relied upon to deny Plaintiffs' claims. Second, UBH denied Plaintiffs' claims even when they satisfied UBH's restrictive residential treatment guidelines, based on UBH's systematic practice of: (a) applying criteria found in its LOCs for acute inpatient treatment (such as whether the patient was a risk to themselves or others, or whether the patient necessitated 24-hour care – as opposed to 24-hour structure) to claims for residential treatment, even though UBH's LOCs for residential treatment did not list these criteria; (b) drawing factual conclusions about the medical condition of

Plaintiffs that were not supported by the evidence in UBH's possession, in order to conclude that the benefit claims fell outside the LOCs; and (c) citing additional benefit guidelines found nowhere in Plaintiffs' Plans, generally accepted standards of care, or in the UBH LOCs as a basis for denying coverage (for example, UBH denied Plaintiff Holdnak's claims based, in part, on an undisclosed internal length of stay "benchmark" that is not found in Plaintiff Holdnak's plan, generally accepted standards, or any published UBH guideline; similarly, UBH denied Plaintiff Muir and Holdnak's claims based, in part, on UBH's CDGs, despite the fact that those Plaintiffs' Plans make no mention of CDGs as a permissible basis for excluding coverage).

16. In order to remedy UBH's breach of fiduciary duty and other ERISA violations, Plaintiffs bring class claims against UBH under 29 U.S.C. § 1132(a)(1)(B), 1132(a)(3)(A) and 1132(a)(3)(B). Through this action, Plaintiffs seek appropriate equitable and injunctive relief under ERISA to compel UBH to change its policies and practices so as to comply with its fiduciary obligations and to make benefit determinations which are consistent with generally accepted medical standards.

**DEFENDANT, JURISDICTION AND VENUE**

17. Defendant United Behavioral Health ("UBH"), operating under the brand name OptumHealth Behavioral Solutions, is a corporation organized under California law with its principal place of business located in San Francisco, California. UBH is responsible for drafting and promulgating the internal level of care and coverage determination guidelines referenced herein. It also adjudicates all mental healthcare and substance abuse claims for Plaintiffs' Plans.

18. UBH, UHIC, UHIC-IL, and Oxford are all, indirectly, wholly owned and controlled subsidiaries of UnitedHealth Group Incorporated ("UHG"). These companies do not operate independently and in their own interests, but solely serve to fulfill the goals and policies of UHG and generate revenue for UHG.

19. Subject matter jurisdiction exists pursuant to 28 U.S.C. § 1331.

20. Personal jurisdiction exists over UBH, and this District is the proper venue, because UBH conducts significant operations in this District, regularly communicates with insureds who reside in this District, and is headquartered in this District.

**UBH'S GUIDELINES APPLICABLE TO WIT AND HOLDNAK'S CLAIMS CONTRASTED WITH GENERALLY ACCEPTED STANDARDS**

21. UBH has developed its own Level of Care ("LOC") Guidelines that it uses to determine whether any given level of mental health treatment is covered by the health insurance plans that it is charged with administering. Among the LOC Guidelines authored by UBH are those for "Acute Inpatient" and "Residential Treatment."

22. UBH's LOC Guidelines for Acute Inpatient treatment (2013) provide that "[a]n acute inpatient unit is a secured and structured hospital-based service that provides 24-hour nursing care and monitoring, assessment and diagnostic services, treatment, and specialty medical consultation services with an urgency that is commensurate with the member's current clinical need." Moreover, these guidelines expressly state that an acute inpatient level of care is medically necessary when "the member is at imminent risk of serious harm to self or others," as demonstrated by suicidality, assaultiveness, psychosis, and grave disability.

23. UBH's guidelines recognize that care in a residential treatment facility – as opposed to an acute inpatient hospital – is appropriate for patients who do not require 24-hour nursing care and monitoring and who are not an imminent risk of serious harm to themselves or others. Indeed, mentally ill patients at "imminent danger to themselves/others" must, by operation of laws throughout the country, be involuntarily confined to psychiatric hospitals and would in no way qualify for intermediate levels of care like residential treatment.

24. Thus, UBH's LOC Guidelines for Mental Health Conditions: Residential Treatment (2013), explains that "[r]esidential services are delivered in a facility or a freestanding Residential Treatment Center that provides overnight mental health services to members who do not require 24-hour nursing care and monitoring offered in an acute inpatient setting but who do require 24-hour structure." These guidelines make it clear that residential treatment is only appropriate if the patient "is not at imminent risk of serious harm to self or others," precisely because such patients should be admitted to a hospital.

25. In order to qualify for coverage under these guidelines, a patient must meet one of three criteria: (a) the member is experiencing a disturbance in mood, affect, or cognition resulting in behavior that cannot be safely managed in a less restrictive setting; (b) there is an imminent risk that severe, multiple and/or complex psychosocial stressors will produce significant enough distress or impairment in psychological, social, occupational/educational, or other important areas of functioning to undermine treatment in a lower level of care; or (c) the member has a co-occurring medical disorder or substance use disorder which complicates treatment of the presenting mental health condition to the extent that treatment in a Residential Treatment Center is necessary.

26. Additionally, these guidelines call for denial of coverage if treatment "can be safely provided in a less intensive setting." UBH's Level of Care Guidelines, Continued Service Criteria (2013), similarly specifies that coverage should be denied for any level of care unless a patient can prove that he will "imminent[ly]" suffer a "significant deterioration in functioning" if treated at a lower level of care.

27. Although UBH recently promulgated revised "2014 Level of Care Guidelines, Residential Treatment Center," these revised guidelines continue to require evidence that "factors leading to admission cannot be safely, efficiently ***or*** effectively assessed and/or treated

in a less intensive setting due to ***acute changes*** in the member's signs and symptoms and/or psychosocial and environmental factors."

28. UBH has also developed Coverage Determination Guidelines ("CDG") for mental health disorders, including a 2012 CDG for Residential Treatment Center for Major Depressive Disorder and a 2013 CDG for Treatment of Major Depressive Disorder and Dysthymic Disorder. These guidelines define "residential treatment facilities" in the same way as UBH's LOC Guidelines for Mental Health Conditions: Residential Treatment (2013). UBH's 2012 and 2013 CDGs further provide that coverage for residential treatment should be discontinued unless the claimant provides "***compelling evidence*** that continued treatment in the current level of care is required to prevent acute deterioration or exacerbation of the [claimant's] current condition." (emphasis added)

29. The 2012 CDG and 2013 CDG apply the same admission criteria as that identified in UBH's LOC Guidelines for Mental Health Conditions: Residential Treatment (2013), with one notable exception. Although prevailing standards of care with respect to mental health treatment did not change between April 2012 and July 2013, the dates when UBH published its 2012 CDG and its 2013 CDG, UBH entirely excised the following language from its 2012 CDG:

> Intermediate or long-term residential services may be available with less intensity or less intensive staff support to members who are recovering from severe and/or chronic MDD.
>
> Intermediate or long-term residential services for patients who are recovering from severe and/or chronic MDD may include psychotherapy, pharmacotherapy, and other interventions aimed at supporting recovery such as the development of recovery plans and advance directives, strategies for identifying and managing early warning signs of relapse, development of self-management skills, and the provision of peer support services.
>
> In cases where there is an unsupportive or high risk living situation undermining the patient's recovery efforts, intermediate or long-term residential services may

be provided for continued stabilization and treatment.

30. Generally accepted standards of assessing the appropriate level of mental healthcare for minors, such as Plaintiff Natasha Wit and Plaintiffs Holdnak and Flanzraich's daughters, are promulgated by the American Academy of Child and Adolescent Psychiatry ("AACAP") and by the American Association of Community Psychiatrists ("AACP"). Generally accepted standards of assessing the appropriate level of mental healthcare for adults are promulgated by AACP. These standards are publicly available. UBH acknowledges, in a document entitled "Guideline Evidence Base for Level of Care Guidelines," that AACAP and AACP set the generally recognized criteria for mental health residential treatment levels of care.

31. In the same document, UBH asserts that the "evidence base" that supports its Mental Health: Residential Treatment-related LOCs are the AACAP and AACP standards. Similarly, in its "Introduction to the 2014 Level of Care Guidelines," UBH asserts that its guidelines "reflect [UBH's] understanding of current best practices in care" and that using those guidelines "reduces undesirable variation from evidence-based practice." In fact, however, UBH's guidelines are inconsistent with, and much more restrictive than, evidence-based generally accepted standards of care.

32. AACAP's Practice Parameter for the Assessment and Treatment of Children and Adolescents With Depressive Disorders explains that the appropriate level of care is driven by a multitude of considerations, including "the subject's age and cognitive development, severity and subtype of depression, chronicity, comorbid conditions, family psychiatric history, family and social environment, family and patient treatment preference and expectations, cultural issues, and availability of expertise in pharmacotherapy and/or psychotherapy." AACAP adds that "the decision for the level of care will depend primarily on level of function and safety to self and others, which in turn are determined by the severity of depression, presence of suicidal

and/or homicidal symptoms, psychosis, substance dependence, agitation, child and parents' adherence to treatment, parental psychopathology, and family environment."

33. The Child and Adolescent Level of Care Utilization System (CALOCUS), now also known as CASII, is a "dimensional rating system used to determine the intensity of a child or adolescent's service needs" developed by AACAP and AACP. CALOCUS has six dimensions: (1) risk of harm; (2) functional status; (3) co-morbidity; (4) recovery environment; (5) resiliency and treatment history; and (6) acceptance and engagement. "Each dimension has a five point rating scale, from least to most severe. For each of the five possible ratings within each dimension, a set of criteria is clearly defined. Only one criterion needs to be met for that rating to be selected, and for each dimension, the ***highest rating*** in which at least one of the criteria is met is the rating that should be assigned." A rating of 4 out of 5 in ***any*** of the first three dimensions automatically necessitates placement in residential treatment, independent of any other factors. CALOCUS notes, ***"[i]n most cases, the higher level of care should be selected, unless there is a clear and compelling rationale to do otherwise."***

34. Similarly, the Level of Care Utilization System for Psychiatric and Addictive Services ("LOCUS"), developed by AACP for use in adult populations, notes: "[T]he highest score in which it is more likely than not that at least one criterion has been met should generally be assigned. ***The result will be that any errors will be made on the side of caution . . . In most cases, the higher level of care should be selected, unless there is a clear and compelling rationale to do otherwise."***

35. CALOCUS explicitly adds that "it may be desirable for a child or adolescent to remain at a higher level of care to preclude relapse and unnecessary disruption of care, and to promote lasting stability."

36. Prolonged residential treatment is in fact the normal prescribed course of treatment for children and adolescents suffering from mental illness. According to SAMHSA, the average length of stay in a residential treatment center for children with mental illness is over six months.

37. UBH's LOCs and CDGs related to residential treatment for mental illness are inconsistent with generally accepted standards of care in four key respects. First, UBH's guidelines require a patient to demonstrate by "compelling evidence" that residential treatment is necessary to prevent "acute" deterioration of condition. Generally accepted standards of care, in contrast, call for residential treatment ***unless*** there is "clear and compelling" evidence that a lower level of care is more appropriate (*i.e.*, the burden of proof is reversed), ***do not*** condition residential treatment on the acute risk of deterioration, and instead focus on the long-term benefits of residential treatment, recognizing that a multi-month regimen of such treatment is often necessary to address chronic conditions and promote lasting stability. Second, UBH's guidelines require a patient to demonstrate the she has experienced "acute changes" in her condition or circumstances that now warrant residential treatment, even though generally accepted standards articulate ***no such requirement*** and call for residential treatment when chronic symptoms are present. Third, UBH's guidelines ignore generally accepted and evidence-based assessment protocols and rating systems for determining whether residential treatment is appropriate. Fourth, UBH's guidelines do not distinguish between adult and adolescent patients, and therefore ignore generally accepted standards of care which recognize adolescents' need for different treatment consistent with their level or maturity and need for continuing development.

## UBH'S IMPROPER DENIAL OF THE WITS' CLAIMS

38. Plaintiffs David Wit, and his daughter Natasha Wit, reside in Larchmont, New York. Natasha Wit turned 18 on August 10, 2013.

39. David Wit is a participant in the "Insperity Group Health Plan" (the "Wits' Plan") and Natasha Wit is a beneficiary of the Wits' Plan. This non-grandfathered, large group plan is a fully-insured healthcare policy issued by UHIC in Texas with an effective date of January 1, 2013. It is subject to ERISA and Texas state law.

40. According to the Certificate of Coverage ("COC") that governs the Wits' Plan, all benefits are paid pursuant to the terms of the Wits' Plan, which is "issued" and "insured" by UHIC. The Wits' COC identifies the "Plan Sponsor" and "Named Fiduciary" as Insperity Holdings, Inc. The COC explains, however, that the Plan Sponsor retains all fiduciary responsibilities with respect to the Plan "except to the extent the Plan Sponsor has delegated or allocated to other persons or entities one or more fiduciary responsibility with respect to the Plan." It then explains that UHIC is the "Claims Fiduciary." In that capacity, the COC explains that the plan is "administered on behalf of the Plan Administrator by UnitedHealthcare Insurance Company" and that, as such, UHIC handles "claims processing, claims payment, and [] appeals." It further explains that UHIC has discretion to "interpret benefits under the Policy," interpret the other terms, conditions, limitations and exclusions set out in the Policy, and "make factual determinations related to the Policy and its Benefits." It also explains that UHIC "may delegate this discretionary authority to other persons or entities that provide services in regard to the administration of the Policy." Pursuant to that authority, UHIC has delegated all of its discretion to UBH for purposes of making mental health-related claims administration.

41. The Wits' insurance policy pays benefits for in- and out-of-network, residential mental health treatment consistent with generally accepted medical practices.

42. The Wits' insurance policy provides for one internal appeal prior to the exhaustion of administrative remedies.

43. On April 29, 2013, Natasha Wit, then 17 years old, was admitted to Monte Nido Vista, in Agoura Hills, California, for treatment of depression, anxiety, obsessive-compulsive behaviors, a severe eating disorder, medical complications (including amenorrhea, adrenal and thyroid problems, vitamin deficiency, and gastrointestinal symptoms), failure of symptom self-management (including restricting behaviors and precipitous weight loss), and a lack of psychosocial support (due to severe social isolation).

44. Monte Nido Vista is licensed by the State of California as a Residential Treatment Facility and accredited for Behavioral Health Care by the Joint Commission of Accreditation of Hospitals Organization ("JCAHO"), which has also awarded it the "Gold Seal of Approval." Monte Nido Vista is an in-network provider with UBH.

45. Despite the extensive clinical information conveyed by Monte Nido Vista to UBH upon Natasha's admission, by letter dated May 3, 2013, UBH's Associate Medical Director, Theodore A. Allchin, promptly denied Natasha's claim for coverage for treatment at Monte Nido Vista from April 30, 2013 forward:

> United Behavioral Health (UBH) is responsible for making benefit coverage determinations for mental health and substance abuse services that are provided to United Healthcare Insurance Company members.
>
> [I]t is my determination that the member's treatment does not meet the medical necessity criteria for residential mental health treatment per ***UBH Level of care Guidelines for Residential Mental Health*** treatment from April 30, 2013 forward. [Natasha] is not a ***serious risk of harm to herself or others***. Her weight is appropriate. There are ***no acute medical issues***. There's no evidence of the need for ***24-hour monitoring***. It would appear that the patient could ***safely*** be treated at a less restrictive level of care such as partial hospitalization."

46. Although UBH referenced its "Level of Care Guidelines for Residential Mental Health," many of the criteria it identified as a basis for denying coverage were improperly drawn from UBH's Level of Care Guidelines for Acute Inpatient Mental Health Treatment (*i.e.*, alleged lack of "serious risk of harm to herself or others," "no acute medical issues," and absence of need for "24 hour clinical monitoring"). Moreover, UBH denied coverage because Natasha could allegedly be "safely" treated in a less restrictive setting without giving any consideration as to whether such treatment would be equally effective or offering a clear and compelling rationale for not approving the prescribed higher level of care, as required under generally accepted standards. UBH also justified its denial on Natasha's allegedly "appropriate" weight, although weight is not necessarily the primary treatment consideration for eating disorders other than anorexia nervosa and Natasha was not being treated for anorexia nervosa at Monte Nido.

47. In response to an urgent appeal by Monte Nido Vista on May 1, 2013, UBH's Medical Director, Roxane Sanders, issued a final adverse determination letter dated May 3, 2013:

> United Behavioral Health (UBH) is responsible for making benefit coverage determinations for mental health and substance abuse services that are provided to United Healthcare Insurance Company members.
>
> * * *
>
> It is my decision based on the clinical information including live review, and the ***UBH Level of Care Guidelines for Acute Inpatient Mental Health Treatment*** to uphold the denial as it appears that [Natasha] could be treated in a less restrictive setting. [Natasha] has no documented ***immediate risk of harm to herself or others*** that requires ***24-hour monitoring*** for treatment. [Natasha] has no medical conditions that require ***24-hour monitoring or treatment***. It appears that your child has the strengths to work cooperatively with her providers toward her recovery. It appears that your child does not require the intensity of a residential treatment program. Your child has access to treatment any [sic] less restrictive setting in your community such as Partial Hospitalization which would be

> authorized according to benefit [sic].
>
> * * *
>
> This is the Final Adverse Determination of your internal appeal. All internal appeals through UBH have been exhausted.

48. Unlike Dr. Allchin, who purported to apply UBH's Level of Care Guidelines for Residential Mental Health treatment, but then covertly relied in part upon criteria from UBH's LOC Guidelines for Acute Inpatient Mental Health Treatment, Dr. Sanders took the opposite approach. She acknowledged that she was applying "UBH Level of Care Guidelines for Acute Inpatient Mental Health Treatment" to deny the appeal, even though that guideline is inapplicable to the residential treatment being sought.

49. Thus, although UBH's mental health LOC Guidelines clearly distinguish between "Acute Inpatient" and "Residential Treatment" and their respective admission criteria, and the Wits just as clearly sought residential treatment, UBH's practice was to condition coverage on Natasha's inability to satisfy two inapplicable acute inpatient criteria: the need for 24-hour nursing care and monitoring and the requirement that the member pose an imminent risk of serious harm to themselves or others. Moreover, contrary to prevailing medical standards, UBH failed to provide clear and compelling rationales for not approving the prescribed, higher level of care, shifted the burden to Natasha to provide compelling evidence that imminent or acute harm would occur in a lower level of care, and almost exclusively focused on the alleged absence of "acute" circumstances in denying residential treatment.

50. Despite the illegal benefits denials and the resulting financial expense nearing $30,000, the Wits paid for and Natasha received the prescribed course of residential treatment through June 28, 2013. Given her mental illness, it is likely that she will need residential treatment at some time in the future.

## UBH'S IMPROPER DENIAL OF HOLDNAK'S CLAIMS

51. Plaintiff Cecilia Holdnak and her minor daughter, "Emily,"[1] reside in Scottsdale, Arizona.

52. Plaintiff Holdnak is a participant in the self-funded, non-grandfathered, large group plan sponsored by American Express Company ("the AMEX Plan"), which is governed by ERISA. Her daughter, Emily, is an AMEX Plan beneficiary.

53. The AMEX Plan identifies American Express Company as the "Plan Administrator." According to the AMEX Plan, "American Express and the Plan Administrator are solely responsible for: Enrollment and classification changes (including classification changes resulting in [participant] enrollment or the termination of [participant] coverage); and Notifying [a participant] of the termination or modifications to the Medical and Prescription Drug Plans."

54. The AMEX Plan then identifies UHIC is the "Claims Administrator" with "the discretionary authority and fiduciary responsibility under ERISA to make claim determinations and to provide a full and fair review of appealed claims including determining any final appeals of claims." The AMEX Plan then adds that "[t]he Claims Administrators, also known as claims fiduciaries, make all claims decisions."

55. For all claims and appeals, the AMEX Plan provides that the "Claims Administrator has the sole and exclusive discretion to: (1) interpret benefits under the Plan; (2) interpret the other terms, conditions, limitations, and exclusions of the Plan, including this handbook, any summary plan description, and any summaries of material modification; and (3) make factual determinations related to the Plan and its benefits." With respect to mental health

[1] Because Plaintiff Holdnak's daughter is a minor, the pseudonym "Emily" is used throughout.

and substance abuse-related claims, UHIC has delegated all of its fiduciary authority under the AMEX plan to adjudicate claims to UBH.

56. The AMEX Plan expressly provides: "ERISA imposes duties upon the people who are responsible for the operation of an employee benefit plan. The people who operate your Plan, called 'fiduciaries' of the Plan, have a duty to do so prudently and in the best interest of you and other Plan participants and beneficiaries."

57. The AMEX Plan provides for two levels of internal appeals for denied claims, after which plan participants are entitled to sue. Pursuant to the terms of the plan, appeals may not be adjudicated by the same persons who make initial claims denials.

58. The AMEX Plan covers in- and out-of-network services, including residential mental health and substance abuse treatment "consistent with generally accepted medical practice for the treatment of such conditions."

59. Among the covered services available to Plaintiff Holdnak and her daughter through their plan is residential treatment for mental illness.

60. Now 15 years old, Emily Holdnak, a former honors student, was psychiatrically hospitalized on April 19, 2013 for cutting her wrists with a razor, following years of unsuccessful outpatient mental health treatment, including personal psychotherapy, family counseling, and psychotropic medications. Emily's depression, problems at school, and parents' divorce resulted in unmanageable symptoms according to UBH's internal case records. Subsequent to her daughter's discharge on April 25, 2013, Plaintiff Holdnak discovered numerous writings about suicide by Emily, including plans to take her life by cutting and hanging. After consultation with Emily's outpatient mental health providers, Emily was rehospitalized from October 9, 2013 through October 17, 2013.

61. Meanwhile, Emily's outpatient providers opined that Emily was not making expected progress and that her course of outpatient treatment was not working. They expressed concern that Plaintiff Holdnak's efforts to monitor and protect Emily from self-harm were not sustainable and damaging to their relationship. Residential treatment for Emily was therefore recommended in writings forwarded to UBH.

62. On December 10, 2013, Emily again attempted suicide by overdosing on narcotics prescribed to her following surgery. When Emily's outpatient providers learned of her December 11, 2013 hospital admission, Plaintiff Holdnak was advised that Emily could not remain in their care due to Emily's high risk and need for residential treatment. Emily's school, likewise, informed Plaintiff Holdnak that Emily could not return until successfully discharged from residential treatment.

63. On December 13, 2013, upon the specific recommendation of her outpatient providers, Emily was admitted to Solacium New Haven Treatment Center ("New Haven") in Spanish Fork, Utah.

64. New Haven is licensed as a residential treatment facility by the Utah Department of Human Services and is accredited by JCAHO, which has also awarded it the "Gold Seal of Approval." New Haven is an out-of-network provider with UBH.

65. Upon admission at New Haven, Emily was diagnosed with Major Depressive Disorder, obesity, problems related to the social environment, and assigned a Global Assessment of Functioning ("GAF") score of 35/100, indicative of impairment in reality testing, communication, or major impairment in several areas such as school, family relations, judgment, thinking, or mood. New Haven also assessed that conflict between Emily's divorced parents complicated her recovery environment.

66. Nonetheless, when New Haven informed UBH case manager Kenneth Young on December 19, 2013 that Emily claimed to be "suicidal all the time" on her pre-admission online postings, that "[s]he's a planner, she doesn't tell anyone," and that the estimated length of residential treatment could span 9 months, Mr. Young immediately "advised the projected [L]OS [length of stay] falls outside of the benefit for ***acute care*** MH RTC, and that if facility and family are committed to ELOS [(estimated length of stay) they] should prepare to explore secondary or self-funding once member no longer meets CDG [Coverage Determination Guideline]."

67. Thus, Mr. Young identified UBH's practice of applying "acute" care criteria by systematically classifying residential treatment as "acute care" when making benefit determinations, and thereby exempting chronic mental health conditions, irrespective of severity, from residential treatment coverage.

68. In the same vein, by January 3, 2014, UBH Associate Medical Director, Bernard Dicasimirro, D.O., had concluded that, despite Emily's continued "urges for self-harm" and New Haven "staff keeping [her] on close observations due to not trusting [her]," Emily did not "require the type of ***acute psychiatric services offered in a mental health residential program***," that Emily "may require more supervision which you can offer in your home," and her "care could continue with outpatient providers, which is a covered benefit and is available locally." Thus, as prophesied by Mr. Young, Dr. Dicasimirro conditioned Emily's continued residential treatment coverage on the need for acute psychiatric services.

69. UBH's case records reveal that when Mr. Young informed Emily's mother of UBH's denial of coverage effective January 4, 2014, Plaintiff Holdnak responded that residential treatment had been recommended by Emily's entire outpatient treatment "team because she was not improving" and "that this is not by her choice and that she wants [Emily] to

be home with her safe as soon as reasonably possible." Indeed, Mr. Young's records corroborate that Emily's mother had "been participating in family sessions" both at New Haven and online.

70. On January 6, 2014, UBH Associate Medical Director, Frank James, M.D., completed an urgent appeal and overturned Dr. Dicasimirro's denial because "the treating psychiatrist did not feel it safe for [Emily] to be treated at a lesser restrictive setting" and that the "family plans to visit the facility for intensive family therapy to assess safety and discharge planning."

71. On January 13, 2014, Mr. Young noted in the UBH case file that Emily cut herself with a blade from a pencil sharpener. Mr. Young further noted that Emily "[p]rogressed 10-15 perce[n]t 'out [of] that dark place of suicidal ideation.'" Though Emily's most recent "family session went well," Mr. Young noted that her parents were divorced and that Emily's "father [was] struggling to complete assignments."

72. On January 17, 2014, Mr. Young noted in the UBH case file that Emily had been diagnosed with Major Depressive Disorder, Generalized Anxiety Disorder, Eating Disorder NOS [Not Otherwise Specified], borderline tendencies, parent-child relational problem, and problems related to the social environment. He further noted that Emily reported continued suicidal ideation "94%" of the time, and that a New Haven psychological evaluation concluded that Emily was "in danger of taking her life." Mr. Young therefore concluded that Emily "demonstrated inability to CFS [care for self] in less structured setting."

73. By January 23, 2014, Mr. Young revised the UBH case file to reflect that Emily's suicidality was "chronic" and that "[Emily] states he[r] greatest weakness is that she doesn't want to live, her worst action has been hurting her mother by trying to kill herself." Mr. Young also noted that the recent "[p]arent weekend was 'successful', both parents present, 'Interesting interactions between mother and [Emily]. Mother very enmeshed and overinvolved, dad

disassociated or isolated.'" Mr. Young reasoned that "[a]dditional time was therefore needed to secure safe discharge options, solidify safety plan with recurring SI [suicidal ideation]."

74. On January 28, 2014, UBH medical director James Feussner, M.D., who had never interviewed, met, or treated Emily, entered the following prescriptive note in the UBH case file: "After reviewing this case I find that she may need more aggressive use of medication in order to be stable in the community . . . Patient may improve with low-dose neuroleptic in addition to her current medication."

75. The following day, Mr. Young noted in the UBH case file that Emily "has had su[i]cidal thought and intent 7x/day on average since Sunday. No SIB [self-injurious behaviors] on the unit. Thinks about getting run over by the train." He also noted Emily's "Core issues 'I'm a burden and I shouldn't whine to tell people what's happening, so then she starts planning.' Trying to pull into supporting self, mind-body connection. Passed all classes (A & A-)." Mr. Young further indicated that weekly family sessions had continued, that Emily found these very reassuring, and that while Emily's mother agreed to her own individual therapy, her father had refused."

76. Following another staffing round with Dr. Feussner on January 29, 2014, Mr. Young concluded that UBH's coverage criteria was not met since Emily's "suicidality appears to be chronic, potentially requiring long term custodial care which falls outside of the benefit." Thus, Dr. Young improperly twisted the clear need for residential care to treat Emily's chronic mental health conditions into a need for "custodial" care, so as to justify a denial of coverage.

77. On January 30, 2014, UBH Associate Medical Director Frank James, M.D. noted that Emily's "current clinical symptoms consist of chronic suicidal ideations daily requiring restrictions, 1:1 attention and no privileges." He further noted:

> Txist [therapist] is working on reducing enmeshment with mother, and improving communication style of father (not criticizing mbr [member] weight). Mother has agreed to do her own 1:1 therapy, father has refused. Facility current ELOS is through October 2014, after which mbr would return to home and OP [outpatient] providers. UR [Utilization review] states mbr still falls too easily into her suicidal mind, and due to desire to not be a burden to family would likely re-attempt.
>
> * * *
>
> I did a previous Urgent Appeal Overturn three weeks ago to cover the family intervention week for the family to attend in Utah. There has been no progress with the family since then. There have been no medication changes. There has been no progress in the member's acute suicidality and need for constant 1:1 observation.
>
> * * *
>
> Specifically:
> 1. The care provided going forward has no reasonable likelihood or resulting in significant improvement in the member's baseline behaviors so as to safely step down to a less restrictive level of care for continued improvement and eventual return to home and the community within a reasonable time frame.
> 2. Continued services are custodial in nature based on the member's benefit package for acute mental health residential rehabilitation level of care.

78. Although Dr. James recognized Emily's persistent, "acute suicidality" and her parents' continued involvement in her care, his insistence on medication changes (again, outside the purview of a non-treating insurance reviewer), and the need to see rapid progress from her deeply fractured family, and prompt, significant improvement from such a sick child, was entirely predicated on UBH's improper standards for residential treatment and misapplication of Emily's benefit package, which explicitly recognizes residential treatment as "intermediate care" and does not categorize it as "acute mental health residential rehabilitation." As with Dr. Young, Dr. James further mischaracterized the need as "custodial" in nature, thereby creating an excuse for denial.

79. Disregarding the express and unambiguous terms of the AMEX Plan, Dr. James issued the following January 31, 2014 denial:

> United Behavioral Health (UBH) is responsible for making benefit coverage determinations for mental health and substance abuse services that are provided to UBH members. The availability of benefit coverage for a service is determined by the terms of your benefit plan. To review information about your specific plan coverage, please refer to the benefit information provided by your employer group.
>
> I have determined that coverage is not available under your child's benefit plan for the following reason(s):
>
> * * *
>
> You presented to the residential rehabilitation level of care the primary disturbance in mood and anxiety in Utah on 12/13/2013. After talking with your doctor's assistant, continued treatment for your mental and behavioral health issues ***no longer require acute attention*** to the issues that brought you into this level of care, and have ***not significantly responded*** [] his intensity and frequency of ***24-hour psychiatric and nursing monitoring*** provide[d] since admission.
>
> * * *
>
> After talking with your child's doctor, your child has only been able to progress to the extent [s]he continues to demonstrate baseline mood and behaviors. In addition, there is also the report that family members back in your child's home state of Arizona are not following the facility's recommendation for treatment while your child resides in Utah.
>
> This does not mean that you could not receive further treatment. Instead, you could continue care with Mental Health Outpatient Providers in consultation with the facility providing continued custodial care and/or long-term placement.
>
> Based on our ***Coverage Determination Guideline for Residential Treatment Center Major Depressive Disorder and Dysthymic Disorder*** it is my determination that no authorization can be provided from 01/31/2014 and forward.

80. Thus, UBH denied Emily's claim because she was not experiencing an "acute" phase of her mental illness and because she was not getting better fast enough in residential treatment. These requirements are not found in the Holdnaks' plan, or in any generally accepted standards of care. Such standards recognize that residential care is appropriate to treat chronic conditions and that such care is medically appropriate for a much longer length of time than UBH's guidelines and practices allowed. Indeed, at this point Emily had been in residential

treatment for less than a quarter of the average length of residential treatment among adolescents, according to SAMHSA. Moreover, UBH denied Emily's claim based upon its own CDG, which the plan does not identify as a basis for application of any exclusions.

81. Although Plaintiff Holdnak's Plan and ERISA forbid appeals determinations by initial claims reviewers, on January 31, 2014, UBH assigned New Haven's urgent appeal of Dr. James' January 30, 2014 adverse determination back to Dr. Dicasimirro, who initially denied Emily's residential treatment on January 3, 2014 and whose decision was subsequently reversed by Dr. James on January 6, 2014.

82. According to Dr. Dicasimirro's records:

> The patient lives primarily with her mother. Her parents are divorced and she has visitation with father. Her parents are noted as supportive but overbearing. The facility indicates that mother is enmeshed and father has very negative interactions with the patient . . . The patient is noted to have had two prior inpatient admissions in 2013. She has been seeing outpatient providers two to three times a week.
>
> Course of Treatment: The patient's medications have been adjusted. She is currently taking Prozac 40 mg. q.d. and Lamictal 50 mg. q.d. Family sessions are being done by phone or Skype 90 minutes weekly. The discharge plan is for the patient to return home to family with outpatient providers. The therapist is working on reducing enmeshment with mother and improving communication with father. The family has attended family intervention week. The patient continues to endorse suicidal ideation, reporting that she has suicidal thoughts and intentions seven times a day on average. The AP [Attending Physician] indicates that the patient is no longer on one-to-one supervision. The parents have made limited progress thus far. The patient continues to express suicidal ideation and intent on a daily basis. He plans to refer the patient back to psychiatry to see if medication adjustments could be helpful. He anticipates that the patient will remain at residential treatment through the fall of 2014.

83. While Dr. Discasimirro's notes reflect that Emily's medications had, in fact, been adjusted, that her family was making limited progress, and that Emily was improving as evidenced by the fact that she no longer required on one-to-one supervision – and thus negate

each of Dr. James' internal (albeit unjustified) bases for denying Emily's continued care – Dr. Dicasimirro nonetheless denied the urgent appeal:

> United Behavioral Health (UBH) is responsible for making benefit coverage determinations for mental health and substance abuse services that are provided to UBH members. The availability of benefit coverage for a service is determined by the terms of your benefit plan. To review information about your specific plan coverage, please refer to the benefit information provided by your employer group.
>
> * * *
>
> The rationale for my decision to uphold the non-coverage determination is based on a review of the behavioral health services that your child is receiving the review of the ***Specific Plan Description for Railroad Employees***, review of your behavioral health plan's ***Coverage Determination Guidelines for the Residential Treatment for Major Depression*** and a live conversation with the doctor, Dr. Finch. The services your child is receiving ***do not appear to be consistent with generally accepted standards of practice based upon the applicable guidelines***. Services that are not consistent with your behavioral health plan's Guidelines and with generally accepted standards of practice are not considered covered health services. Care could continue with outpatient providers, which is a covered benefit and is available locally.
>
> Despite 49 days of residential treatment, ***you child has made very limited progress***. Although she may require a more structured environment than can be provided in the community, there is no indication that further ***acute treatment*** will mov[e] her close to recovery or permit her to safely return to the community. It appears that longer term custodial placement is needed which is not a covered benefit.

84. Not only did Dr. Dicasimirro fail to consult the relevant benefit document for Emily, who was covered by the AMEX Plan and who has never been a "Railroad Employees" plan beneficiary, but his assertion that "acute treatment" was a precondition to residential coverage is flatly belied by the AMEX Plan categorizing residential treatment as "intermediate" care that is covered where it is consistent with generally accepted standards of care. Moreover, his boilerplate assertion that Emily's residential treatment was not "consistent with generally accepted standards of practice" is unsupportable given that such standards call for residential treatment for chronically ill patients, recognize that such treatment is often medically

appropriate for several months, and do not require "acute" changes in a patient's symptoms or circumstances to render residential treatment medically necessary.

85. In a February 7, 2014 follow-up with New Haven regarding Emily's "discharge date," UBH case manager Kenneth Young noted that "Father is still not seeing therapist, mother is following through with all requests. [Emily] is making ***significant progress and is doing 'amazing work'***. ELOS remains 9+ months due to history and 'she has a good front'."

86. On February 21, 2014, when challenged about the failure to approve residential treatment for Emily, UBH case manager Rhoda Scott "began to offer suggestions as to alternative funding through state or local resources," confirming that UBH self-servingly attempts to shift responsibility for its insureds' mental health coverage to already strained public resources.

87. In a final exercise of futility, on March 25, 2014, Plaintiff Holdnak submitted a voluminous, second level written appeal to UBH, which was denied by Associate Medical Director Neal R. Satten, M.D. on April 7, 2014 in a "A Final Internal Non-Coverage Determination:"

> United Behavioral Health (UBH) is responsible for making benefit coverage determinations for mental health and substance abuse services that are provided to UBH members.
>
> * * *
>
> After fully investigating the substance of the appeal/ grievance, including all aspects of clinical care involved in this treatment episode I have determined that benefit coverage is not available for the following reason(s):
>
> You presented to the residential rehabilitation level of care the primary disturbance in mood and anxiety in Utah on 12/ 13/2013. After talking with your doctor's assistant, continued treatment for your mental and behavioral health issues no longer require ***acute attention*** to the issues that brought you into this level of care, and have not significantly responded the intensity and frequency of ***24-hour psychiatric and nursing monitoring*** provide[d] since admission.
>
> After talking with your child's doctor, your child has only been able to progress to the extent he continues to demonstrate baseline mood and behaviors. In addition,

> there is also the report that family members back in your child's home state of Arizona are not following the facility's recommendation for treatment while your child resides in Utah. As such, your child's providers have determined that your child will need long-term placement with an estimated length of stay of 9 months, and assistance with daily care needs, as your child are unable to maintain safety in a less restrictive level of care going forward, and in the community.
>
> This does not mean that you could not receive further treatment. Instead, you could continue care with Mental Health Outpatient Providers in consultation with the facility providing continued custodial care and/or long-term placement.
>
> Based on our ***Coverage Determination Guideline for Residential Treatment Center Major Depressive Disorder and Dysthymic Disorder*** it is my determination that no authorization can be provided from 01/31/2013 and forward.

88. Dr. Satten's boilerplate appeal denial bears a striking resemblance to Dr. James' January 31, 2014 denial letter. Both letters justified UBH's denial on the ground that Emily was not experiencing an acute condition and that she was not getting better fast enough – although Mr. Young had reported that Emily was making "significant progress" and despite there being no such requirement pursuant to generally accepted standards for residential mental health treatment. Moreover, Dr. Satten perversely relied upon the fact that Emily's non-custodial father was refusing treatment as a ground for denying her claim, even though generally accepted standards recognize that family instability weighs ***in favor*** of residential treatment, and that, in any event, Emily did not live with her father. Moreover, both denials relied upon UBH's CDG, even though her plan did not authorize UBH to exclude otherwise available coverage on the basis of this type of guideline.

89. Dr. Satten's logged case notes demonstrate the real reason that UBH denied the claim: "LOS [Length of Stay] outside benchmark for condition and treatment." No such "benchmark" appears in the AMEX Plan or UBH's LOCs or CDGs. Moreover, such an evidently short length of stay benchmark is clearly incompatible with generally accepted standards: not only do those standards make no reference to length of stay limits, the average

course of residential treatment for adolescents last several months longer than the brief residential treatment stay UBH approved for Emily.

90. As a result of UBH's improper practices described above, Plaintiff Holdnak has incurred over $100,000 of out-of-pocket costs and continues to incur substantial expenses to fund her daughter's critically needed residential treatment, which Emily continues to receive.

91. Given her condition, it is likely that Emily may require residential treatment for her mental health disorders in the future, and that she will submit such claims to UBH pursuant to her insurance plan.

## UBH'S LEVEL OF CARE AND COVERAGE DETERMINATION GUIDELINES RELEVANT TO PFEIFER, MUIR, AND FLANZRAICH'S CLAIMS

92. UBH has developed CDGs and LOCs for the treatment of substance abuse in addition to those applicable to mental health treatment.

93. UBH has promulgated a "Coverage Determination Guideline for Treatment of Substance Use Disorders," which was last modified in 2013 ("2013 Coverage Determination Guideline for Treatment of Substance Use Disorders"). This document defines "Residential Detoxification" to be "comprised of services that are provided in a residential setting other than an acute care hospital for the purpose of completing a medically safe withdrawal from alcohol or drugs." It explains that "[r]esidential detoxification is typically indicated when withdrawal is severe enough to warrant 24-hour care, but on-site access to medical personnel is not essential." It defines "Residential Rehabilitation" differently, and as a less restrictive and lower level of care. It defines such treatment to be "comprised of acute overnight services that are ***typically*** provided in a freestanding Residential Treatment Center for the care of a substance use disorder."

94. This guideline provides the following admission criteria for residential rehabilitation:

- The member's ***use of alcohol or drugs is heavy and continuous***, and is associated with either of the following:
- Current symptoms of moderate ***withdrawal*** that require monitoring and management;
- Emerging symptoms or a history of use which indicates that moderate ***withdrawal*** is imminent and requires monitoring and management; or
- A Clinical Institute ***Withdrawal*** Assessment Scale (CIWA-Ar) score of 8 to 15; or
- The member has a co-occurring medical disorder or mental health condition which complicates ambulatory ***detoxification*** to the extent that detoxification in a Residential Treatment Center is necessary.
- The member is not at imminent risk of harm to self or others.

95. It further requires substance abuse patients in residential treatment to "provide ***compelling*** evidence that continued treatment in the current level of care is required to prevent acute deterioration or exacerbation of the member's current condition."

96. Without any corresponding change in prevailing standards for the treatment of substance abuse, this guideline omitted the following admission language from UBH's 2011 Coverage Determination Guideline, Residential Rehabilitation for Substance Use Disorders:

> A residential rehabilitation program is appropriate when a member lacks the motivation or social support system to remain abstinent, but does not require the structure and intensity of services provided in a hospital.
>
> * * *
>
> Patients appropriate for discharge from residential rehabilitation to the next level of care are characterized as:
>
> • Individuals who have achieved the goals in his/her treatment plan, resolving the problem that necessitated admission and who have a demonstrated motivation to return to outpatient treatment.

• Individuals who have the ability to remain abstinent even in situations where substances are potentially available and have living situations and support systems that are conducive to remaining substance free.

97. The 2011 guideline provides that the following are "indications" that coverage exists for residential rehabilitation for substance abuse disorders:

- The patient continues to abuse substances despite appropriate motivation.
- The patient continues to use substances, and the patient's functioning has deteriorated to the point that the patient cannot be safely treated in a less restrictive environment.
- There is a high risk of harm to self or others due to continued and severe substance use which prohibits treatment from occurring safely in a less restrictive environment.
- There is a high risk of exacerbation of medical conditions due to continued substance use which prohibits treatment from occurring safely in a less restrictive environment.
- There is a high risk of developing severe withdrawal symptoms, which cannot be safely managed in a less restrictive environment.
- The patient is experiencing withdrawal symptoms that do not compromise the patient's medical status, but family, social support systems or other resources that might otherwise prevent the need for residential treatment are impaired or not available.

98. UBH's 2013 (and preceding) Level of Care Guidelines: Substance Use Disorders: Residential Rehabilitation ("2013 Level of Care Guidelines: SUD-Rehab") condition admission to residential rehabilitation on satisfaction of any of the following six criteria:

1. The member ***continues to use alcohol or drugs***, and the member's functioning has deteriorated to the point that the member cannot be safely treated in a less restrictive level of care.

- OR -

2. The member ***continues to use alcohol or drugs***, is at risk of exacerbating a serious co-occurring medical condition, and cannot be safely treated in a lower level of care.

- OR -

> 3. There is a high risk of harm to self or others due to ***continued and severe alcohol or drug use*** which prohibits treatment from safely occurring in a less restrictive level of care.
>
> \- OR -
>
> 4. There is a high risk that ***continued use of alcohol or drugs*** will exacerbate a co-occurring medical condition to the extent that treatment in a less restrictive level of care cannot be safely provided.
>
> \- OR -
>
> 5. There is a high risk of developing severe ***withdrawal*** symptoms which cannot be safely treated in a lower level of care.
>
> \- OR -
>
> 6. The member is experiencing ***withdrawal*** symptoms that do not compromise the member's medical status to the extent that treatment in Acute Inpatient is indicated, but the symptoms are of extreme subjective severity and the member lacks resources or a functional social support system needed to manage the symptoms in a lower level of care.

99. These guidelines further require claimants to demonstrate they cannot "be safely" treated in a "less intensive setting."

100. UBH's 2013 Level of Care Guidelines, Continued Service Criteria, specify that coverage should be denied for any level of care unless a claimant can prove that he/she will "imminent[ly]" suffer a "significant deterioration in functioning" at a lower level.

101. Strikingly, nowhere do UBH's pre-2014 LOCs even attempt to account independently for risk of relapse, motivation barriers, or social supports. Moreover, these guidelines call for claim denials where a lower level of care will be safe, even if it is less efficient or effective.

102. Moreover, taken together, UBH's acute-focused CDGs and LOC Guidelines provide that residential rehabilitation for substance abuse will only be covered when the claimant is intoxicated or experiencing or likely to develop withdrawal. They preclude treatment at the residential rehabilitation level of care in the absence of intoxication upon admission without concurrent evidence or likelihood of withdrawal. Even with evidence of withdrawal,

they require immediate discharge once detoxification or withdrawal has passed. Moreover, they call for denial of residential treatment coverage if it is inconsistent with UBH's LOC Guidelines or CDGs, including the requirement for a lower level of care if it is safe (even if it will not be as effective as a higher level of care) or if a patient cannot provide compelling evidence of acute deterioration or exacerbation of the condition at a lower level of care.

103. UBH promulgated new level of care guidelines for residential treatment in its 2014 Level of Care Guidelines, Residential Rehabilitation. These new guidelines implicitly recognized that UBH's prior guidelines were overly restrictive by, for example, explicitly stating that patients who were at risk for withdrawal should not be treated in a residential rehabilitation facility (because such patients should be treated in a residential detoxification or in-patient facility). The new guidelines adopt a new methodology for determining whether residential treatment will be covered – a focus on whether, in UBH's view, residential treatment is necessary at a particular time, through application of "why now" factors. However these "why now" factors continue to deviate from generally accepted standards by focusing almost exclusively on acute changes and conditions. The 2014 LOC guidelines require a patient to prove that the "why now factors leading to admission" suggest that there is an "imminent or current risk of relapse which cannot be safety, efficiently or effectively assessed and/or treated in a less intensive setting" or that the "factors leading to admission cannot be safely, efficiently or effectively assessed and/or treated in a less intensive setting due to ***acute*** changes" in the patient's symptoms or circumstances."

104. Prevailing substance abuse treatment guidelines have been promulgated by the American Society for Addiction Medicine ("ASAM") and the AACP, which are publicly available. UBH acknowledges, in a document entitled "Guideline Evidence Base for Level of Care Guidelines" that ASAM and AACP set the generally recognized criteria for substance

abuse-related residential treatment levels of care. In the same document, UBH asserts that the ASAM and AACP standards provide the "evidence base" that supports its Level of Care Guideline for Substance Use Disorders: Residential Rehabilitation. Similarly, in its "Introduction to the 2014 Level of Care Guidelines," UBH asserts that its guidelines "reflect [UBH's] understanding of current best practices in care." In fact, however, UBH's guidelines are inconsistent with, and much more restrictive than, these generally accepted standards of care.

105. AACP's guidelines are discussed above and are inconsistent with UBH's substance abuse-related guidelines. So too are ASAM's guidelines. The ASAM guidelines not only support continued residential rehabilitation for purposes of "withdrawal management," a treatment regime far exceeding the duration of detoxification, but also discretely account for: "emotional, behavioral, or cognitive conditions and complications," "readiness to change," "relapse, continued use, or continued problem potential," and "recovery/living environment." In fact, ASAM does not require the presence of either withdrawal or comorbid mental health/medical conditions for admission to residential rehabilitation (which it identifies as a "clinically managed level of care"):

> Individuals who are appropriately placed in the clinically managed levels of care have minimal problems with intoxication or withdrawal (Dimension 1) and few biomedical complications (Dimension 2), so on-site physician services are not required. Such individuals may have relatively stable problems in emotional, behavioral, and cognitive conditions (Dimension 3), meeting the diagnostic criteria of the *Diagnostic and Statistical Manual of Mental Disorders (DSM)* of the American Psychiatric Association. Many also have significant limitations in the areas of readiness to change (Dimension 4), relapse, continued use, or continued problem potential (Dimension 5), or recovery environment (Dimension 6). Therefore, they are in need of interventions directed by appropriately trained and credentialed addiction treatment staff. Such individuals also need case management services to facilitate their reintegration into the larger community.

106. ASAM also explicitly acknowledges that "***chronicity*** of the addictive disorder or the patient's cognitive limitations" may compromise "readiness to change" and necessitate residential treatment.

107. Moreover, ASAM calls for continued residential treatment if any of the following apply:

> The patient is making progress, but has not yet achieved the goals articulated in the individualized treatment plan. Continued treatment at the present level of care is assessed as necessary to permit the patient to continue to work toward his or her treatment goals;
>
> or
>
> The patient is not yet making progress, but has the capacity to resolve his or her problems. He or she is actively working toward the goals articulated in the individualized treatment plan. Continued treatment at the present level of care is assessed as necessary to permit the patient to continue to work toward his or her treatment goals;
>
> and/or
>
> New problems have been identified that are appropriately treated at the present level of care. The new problem or priority requires services, the frequency and intensity of which can only safely be delivered by continued stay in the current level of care. The level of care in which the patient is receiving treatment is therefore the least intensive level at which the patient's new problems can be addressed effectively.

108. ASAM further specifies that, with respect to residential treatment (which it describes as a Level 3 program), "[w]hile the duration of treatment varies with the severity of an individual's illness and his or her response to treatment, the length of service in clinically managed Level 3 programs tends to be longer than in the more intensive medically monitored and medically managed levels of care . . . Longer exposure to treatment interventions is necessary for certain patients to acquire basic living skills and to master the application of coping and recovery skills." Underscoring this, the American Psychiatric Association Guideline for the Treatment of Patients with Substance Use Disorders, Second Edition (2006), explicitly

states that "[r]esidential treatment of 3 months is associated with better long-term outcomes in such patients."

109. Strikingly distinguished from the UBH CDG and LOC Guidelines is ASAM's instruction that "all matrices in *The ASAM Criteria* correlate risk ratings and the types of services and modalities needed, and call for treatment where the patient's needs can ***best be met***" generally based on "[t]he dimension with the highest risk rating determin[ing] the immediate service needs and placement decision."

110. Contrary to ASAM and AACP's evidence-based guidelines, UBH's CDG and LOC Guidelines also fail to include adolescent-specific substance abuse criteria. This is especially problematic due to the special environmental factors impacting adolescent populations and the specific recommendations developed for their care. AACAP's Practice Parameter for the Assessment and Treatment of Children and Adolescents With Substance Use Disorder explains:

> Longer duration of treatment is associated with several favorable outcomes . . . Control of substance use should not be the only goal of treatment. A broad concept of rehabilitation involves targeting associated problems and domains of functioning for treatment. Integrated interventions that concurrently deal with coexisting psychiatric and behavioral problems, family functioning, peer and interpersonal relationships, and academic/vocational functioning not only will produce general improvements in psychosocial functioning but most likely will yield improved outcomes in the primary treatment goal of achieving and maintaining abstinence.

111. For these reasons, ASAM noted that when an insurer such as UBH develops its own treatment level of care guidelines "rather than adhering to nationally validated, reliable, and accepted guidelines, it may appear that decision-influencing factors such as cost considerations outweigh valid evidence-based authorization requests for medically necessary treatment."

112. This is precisely what happened here. UBH's guidelines restrict coverage only to situations in which the patient is experiencing "acute" conditions such as intoxication or

withdrawal, even though such limitations are not found in the Plaintiffs' Plans or in generally accepted substance abuse treatment guidelines.

113. Such systemic misapplication of medical necessity criteria with respect to residential rehabilitation is not limited to UBH. On July 9, 2014, the New York State Attorney General announced that it had recently settled claims against a different insurer who was engaged in almost identical misconduct to that alleged here:

> Residential treatment is a standard, recommended, evidence-based form of behavioral health treatment. Offering medication, counseling and structure, residential treatment facilities for behavioral health disorders provide a critical intermediate level of care between acute inpatient and outpatient treatment, enabling patients to transition back to living with their families. Residential treatment programs provide an intermediate level of care as compared to inpatient services, similar to skilled nursing treatment for medical/surgical conditions.
>
> * * *
>
> Emblem applies medical necessity criteria incorrectly when it reviews behavioral health-related requests and claims. For example, even though substance abuse rehabilitation is not an acute level of care, in denying requests for coverage of rehabilitation, Emblem classifies it as acute care, and in certain cases, Emblem has denied requests for coverage of substance abuse rehabilitation on the grounds that the member was not experiencing "life-threatening withdrawal," which is not a requirement for such treatment. In fact, Emblem members who are suffering from life-threatening withdrawal require a more intensive level of care than rehabilitation, such as medically managed inpatient detoxification.

Assurance of Discontinuance Under Executive Law, Assurance No.: 14-031.

114. Pursuant to that settlement, Emblem stands to pay $31 million in restitution to 15,000 customers and a $1.2 million penalty.

## UBH'S IMPROPER DENIAL OF PFEIFER'S CLAIMS

115. Plaintiff Brandt Pfeifer is the Executor of the Estate of Lauralee Pfeifer, his late wife. Brandt Pfeifer resides in Lake Forest, Illinois, where his wife also resided until her death on April 9, 2014.

116. Plaintiff Pfeifer is a participant in the "Continental Group Health Plan" (the "Pfeifers' Plan"), and Lauralee Pfeifer was a beneficiary of the Pfeifers' Plan. This non-grandfathered, large group plan is a fully-insured healthcare policy issued by UHIC-IL with an effective date of October 1, 2013. It is subject to ERISA and Illinois state law.

117. According to the Certificate of Coverage ("COC") that governs the Pfeifers' Plan, all benefits are paid pursuant to the terms of the Pfeifers' Plan, which is "offered" and "underwritten" by UHIC-IL. The COC explains that UHIC may "arrange for various persons or entities to provide administration services in regard to the Policy, such as claims processing." Pursuant to this provision, UHIC has delegated all claims adjudication-related responsibilities under the Pfeifer's Plan to UBH.

118. The Pfeifers' plan pays benefits for in- and out-of-network, detoxification and residential substance use disorder treatment "consistent with nationally recognized scientific evidence as available, and prevailing medical standards and clinical guidelines."

119. The Pfeifers' Plan defines "prevailing medical standards and clinical guidelines" as "nationally recognized professional standards of care including, but not limited to, national consensus statements, nationally recognized clinical guidelines, and national specialty society guidelines." Illinois law (215 ILCS 5/370c(b)(3)) further specifies that, with respect to all substance abuse claims submitted to an Illinois-based plan such as Pfeifer's Plan, ASAM guidelines must be used to determine medical necessity.

120. Claims denied by the Pfeifers' Plan are subject to one internal appeal prior to exhaustion of administrative remedies.

121. On October 26, 2013, Lauralee Pfeifer was admitted for alcohol detoxification at Passages-Malibu ("Passages"), in Malibu, California, a state licensed and JCAHO-accredited

residential treatment facility located near her adult children residing in California. Passages is an out-of-network facility for UBH.

122. On October 28, 2013, Passages advised UBH case manager, Leigh McCorckle, of Lauralee Pfeifer's need to "detox in a safe environment," "inability to stay sober on her own," "inadequate relapse prevention strategies," and "problems with primary support group" following a fifteen-year history of alcohol abuse that included binging on up to two bottles of hard liquor a day. UBH's case manager also noted Lauralee Pfeifer's severe withdrawal symptoms, including insomnia, racing heart, vomiting, nausea, tremors, sweats, and blackouts. Additionally, UBH's case manager noted, "poor sleep and appetite, racing thoughts, hopeless, helpless, and worthless," and confirmed use of antidepressant and anxiolytic medications.

123. On October 29, 2013, UBH case manager, Clara Williams, conducted another review with Passages and noted that, apart from detoxification, ***none*** of Lauralee Pfeifer's presenting issues, including "high risk for relapse; poor understanding of addiction; poor ability to utilize sober supports," "problems with her husband and father when she relapsed," "externally motivated for her family some internal motivation," "inadequate relapse prevention strategies," "inadequate support," "mood issues cited in Mental Status Exam," "hopelessness," "impulsivity," and "safety plan," had been resolved. She also noted Plaintiff Pfeifer's Clinical Institute Withdrawal Assessment (CIWA-Ar) score of 8.

124. When Passages requested UBH's approval for Lauralee Pfeifer's transition from residential detoxification to residential rehabilitation, Clara Williams consulted with UBH's medical director, Dr. Jones, and advised Passages that Lauralee Pfeifer did not appear to meet the 2013 Level of Care Guidelines for SUD-Rehab, "as evidenced by passive SI" (suicidal ideation) and "completed detox."

125. Although UBH's 2013 Coverage Determination Guideline for Treatment of Substance Use Disorders expressly authorizes admission to residential rehabilitation when the CIWA-Ar score is 8 and the "the member is not at imminent risk of harm to self or others," on October 30, 2013 UBH Associate Medical Director, Malik Ahmed, formally denied Lauralee Pfeifer's residential rehabilitation admission:

> United Behavioral Health (UBH) is responsible for making benefit coverage determinations for mental health and substance abuse services that are provided to United Healthcare Insurance Company members.
>
> * * *
>
> In the opinion of this reviewer, based on ***UBH Level of Care Guidelines*** and the information provided, this case does not meet ***Medical Necessity Criteria for Admission to Residential Rehabilitation Level of Care*** as requested. The patient has completed successful detoxification. She has mild post-withdrawal symptoms. Her vital signs are stable and she has no significant medical problems which would complicate treatment. She reports depressed and anxious mood. She has passive thoughts of death, but no suicidal ideation, intention or plan. She has relationship issues related to her relapse. The patient's mood is irritable, but she has no psychotic symptoms.
>
> The patient has external motivation from her family. She also has some internal motivation for recovery. It appears that the patient does require the structure and support of ongoing substance abuse treatment in order to help her understand her addiction, recognize triggers for relapse and build coping skills and sober supports. It does not, however, appear that the patient's current symptoms and behaviors require substance abuse residential rehabilitation level of care.

126. Not only did Dr. Ahmed entirely ignore UBH's own, unchanged clinical records confirming Lauralee Pfeifer's "high risk for relapse; poor understanding of addiction; poor ability to utilize sober supports," and "passive suicidal ideation" (downgraded by Dr. Ahmed to "passive thoughts of death, but no suicidal ideation"), but in basing his denial "on UBH Level of Care Guidelines" (for SUD-Rehab), Dr. Ahmed completely disregarded UBH's 2013 Coverage Determination Guideline for Treatment of Substance Use Disorders, which expressly authorizes

admission when the CIWA score is 8 and the "member is not at imminent risk of harm to self or others."

127. On November 1, 2013, following an urgent appeal by Passages, UBH Associate Medical Director, Saul Helfing, upheld UBH's denial effective October 29, 2013:

> United Behavioral Health (UBH) is responsible for making benefit coverage determinations for mental health and substance abuse services that are provided to United Healthcare Insurance Company members.
>
> * * *
>
> United Behavioral Health (UBH) received a request for an expedited appeal of a non-coverage determination for residential services for the treatment of Alcohol Dependence at Passages. Your doctor has been advised that it is my determination that the non-coverage determination of benefit coverage of residential level of care will be upheld on 10/29/2013 and forward. The rationale for my decision is based on a review of the behavioral health services that you are receiving, a review of the Certificate of Coverage for Continental Offices Ltd, a review of ***UBH Level of Care Guidelines for residential treatment of Substance Related Disorder***, and a live telephone interview with the doctor, Dr. Sirsat Khalsa.
>
> Based on the clinical information provided, you do not have any medical or emotional problems that require ***24-hour monitoring***. You have a supportive home environment and are invested in getting help. It appears you would be able to continue work on your recovery, safely and effectively, at a less restrictive level of care, such as in an outpatient program, which is a covered benefit and is available locally.
>
> * * *
>
> This is the Final Adverse Determination of your internal appeal. All internal appeals through UBH have been exhausted.

128. Like Dr. Ahmed, Dr. Helfing entirely ignored Lauralee Pfeifer's high risk for relapse, high-conflict social environment, and external motivation sources. Like Dr. Ahmed, Dr. Helfing also completely disregarded UBH's 2013 Coverage Determination Guideline for Treatment of Substance Use Disorders, which expressly authorizes admission when the CIWA score is 8 and the "member is not at imminent risk of harm to self or others." Announcing a new rationale in a final adverse determination without affording an advance opportunity to respond, a practice expressly proscribed by Plaintiff Pfeifer's plan and ERISA, Dr. Helfing also

referenced "24-hour monitoring," again a function of UBH's inpatient hospitalization or detoxification guidelines.

129. None of UBH's denials referenced ASAM's medical necessity criteria (or any other generally accepted standards of care) or applied such criteria, despite the Illinois statutory mandate.

130. As a result of UBH's self-serving policies and practices, Lauralee Pfeifer was forced to incur substantial out-of-pocket costs approaching $54,000 for her prescribed course of residential treatment.

131. After Lauralee Pfeifer's discharge from Passages, she again relapsed but was deterred from seeking any further residential treatment due to UBH's previous benefits denials.

132. On April 9, 2014, within five months of UBH's wrongful claims denials, Lauralee Pfeifer died in her home from acute alcohol intoxication.

133. On June 26, 2014, Plaintiff Brandt Pfeifer was appointed Executor of his late wife's estate.

**UBH'S IMPROPER DENIAL OF MUIR'S CLAIMS**

134. Plaintiff Brian Muir resides in Chicago, Illinois and is the beneficiary of a self-funded, non-grandfathered, large group plan sponsored by Deloitte LLP, which is subject to ERISA.

135. According to Plaintiff Muir's plan, UHIC is a "named fiduciary of the Plan for purposes of denial and/or review of denied claims under the Plan. UnitedHealthcare's decision on any claim will be final." Consistent with this, UHIC is the designated "Claims Administrator" responsible for making benefit determinations and adjudicating appeals under Plaintiff Muir's plan. For all claims and appeals, Deloitte has "delegated to the Claims Administrator the exclusive right to interpret and administer the provisions of the Plan. The

Claims Administrator's decisions are conclusive and binding." Muir's Plan further provides that UHIC "may delegate" its "discretionary authority to other persons or entities." Pursuant to this authority, UHIC has delegated to UBH all discretionary authority to adjudicate mental health and substance abuse-related claims.

136. Plaintiff Muir's plan provides for one urgent level of appeal for denied claims, after which plan participants are entitled to sue. The plan expressly provides that legal action "against the Claims Administrator to recover reimbursement" cannot be brought "until 90 calendar days after [a participant has] properly submitted a request for reimbursement as described in How to File a Claim."

137. Additionally, Plaintiff Muir's plan expressly provides that "ERISA imposes duties upon the people who are responsible for the operation of an employee benefit plan. The people who operate your Plan, called 'fiduciaries' of the Plan, have a duty to do so prudently and in the best interest of you and other Plan participants and beneficiaries."

138. Plaintiff Muir's health plan covers in- and out-of-network services that "must be necessary and given for the diagnosis or treatment of an accidental injury or Sickness." It further requires mental health and substance abuse services to be "consistent with generally accepted standards of medical practice for the treatment of such conditions."

139. Among the covered services available to Plaintiff Muir under his plan is residential substance abuse treatment that is consistent with generally accepted standards of medical practice. The plan explicitly defines residential treatment as "intermediate care."

140. On March 1, 2013, at the urging of his outpatient psychiatrist and following a detoxification that rendered concurrent travel for rehabilitation unsafe and a period of researching the most suitable dual diagnosis rehabilitation program, Plaintiff Muir was admitted to Sierra Tucson, in Tucson, Arizona, a residential treatment facility licensed by the Arizona

Department of Health Services and accredited by JCAHO. Sierra Tucson is an in-network facility for UBH.

141. Plaintiff Muir's admission to Sierra Tucson was precipitated by unremitting alcohol dependence over a period of nine months, co-occurring depressive and anxiety disorders, suicidality, and a delayed traumatic reaction to childhood abuse. His recent relapse resulted in particularly distressing symptoms and functional impairments.

142. On March 5, 2013, UBH case manager, Anitra Stewart, communicated with Sierra Tucson and noted Plaintiff Muir's "inadequate relapse prevention strategies," "lack of social support," "problems with primary support group," and food restriction and weight loss. She also noted that "[member] had incident at airport where he was intoxicated they would [not] let [member] fly so he rent car and drove himself drunk pulled over and sent suicidal text, and contemplated crashing his car." Last, Ms. Stewart noted that Plaintiff Muir was "just started on Campral for cravings" and was "resistant to 12 step model." Thus, Ms. Stewart recognized that Plaintiff Muir was unable to abstain from alcohol use, resistant to 12-steps, lacked social support, had co-occurring mental health disorders, and was recently suicidal. Nonetheless, Ms. Stewart determined that Plaintiff Muir did not meet UBH's "CDG-Substance use disorders, Residential rehabilitation" and forwarded Plaintiff Muir's file for a review by UBH's Assistant Medical Director, Jerome Kaufman.

143. On March 6, 2013, Dr. Kaufman reviewed Plaintiff Muir's file and confirmed that Plaintiff Muir "reports inability to stop using on his own, impulsive while intoxicated, mood instability including panic attacks and increased depression/anxiety," and "was being detoxed by his [outpatient] MD." Nonetheless, in a letter dated March 7, 2013, Dr. Kaufman denied Plaintiff Muir's residential rehabilitation in its entirety:

United Behavioral Health (UBH) is responsible for making benefit coverage

> determinations for mental health and substance abuse services that are provided to UBH members.
>
> * * *
>
> I have determined that benefit coverage is not available from 03/01/2013 forward. The rationale for my decision to issue a noncoverage determination is based on a review of the behavioral health and substance abuse services that you are receiving, the review of the Summary Plan Description for DELOITTE, review of ***UBH Coverage Determination Guideline for Residential Rehabilitation for Substance Use Disorders***, and a review of available clinical information. Services you are receiving do not appear to be consistent with generally accepted standards of practice ***based upon the applicable guideline***. Services that are not consistent with UBH Guidelines and with generally accepted standards of practice are not considered covered health services. Care could [continue] in a partial hospitalization program, which is a covered benefit and is available locally.
>
> ***You are not in withdrawal*** and have demonstrated an ability to not use alcohol outside of a 24 hour treatment setting.

144. Sierra Tucson immediately filed an urgent appeal. Without providing Sierra Tucson or Plaintiff Muir an opportunity to respond to new (albeit baseless) denial rationales, a practice expressly forbidden by Plaintiff Muir's plan and ERISA, on March 7, 2013 UBH's Associate Medical Director Jed Goldart, M.D. issued a final (boilerplate) adverse benefit:

> United Behavioral Health (UBH) is responsible for making benefit coverage determinations for mental health and substance abuse services that are provided to UBH members.
>
> * * *
>
> The rationale for my decision to issue a non-coverage determination is based on a review of the behavioral health services you are receiving, review of the Deloitte Summary Plan Document, review of ***United Behavioral Health (UBH) Coverage Determination Guideline for Substance Disorder Residential Rehabilitation***, and a live telephone interview with the doctor. Services you are receiving do not appear to be consistent with generally accepted standards of practice ***based upon the applicable guideline***. Services that are not consistent with United Behavioral Health (UBH) Guidelines ***and with generally accepted standards of practice*** are not considered covered health services.
>
> * * *
>
> There is no risk of withdrawal symptoms, medical or psychiatric co-occurring

> conditions that require ***24 hour management***. There is no severe impairment in the family or support system or severe, non-medical symptoms with the lack of functional support systems to manage the symptoms. That evidence indicates you can receive safe and effective treatment in a less intensive treatment setting such as Partial Hospital Program, which was discussed with your provider.
>
> * * *
>
> This is the Final Adverse Determination of your internal appeal. All internal appeals through United Behavioral Health (UBH) have been exhausted.

145. Sierra Tucson's utilization review records further reflect that UBH denied Plaintiff Muir's claim on the basis of his not having failed treatment at a lower level of care.

146. UBH's rationales for denying Plaintiff Muir's claims, and its related internal policies upon which those rationales were based, violate the terms of Plaintiff Muir's plan. Plaintiff Muir's plan covered residential treatment for substance abuse that was consistent with prevailing medical practices, yet UBH denied his claims based on its own internal practice of ignoring criteria (such as lack of motivation to maintain sobriety), conflating acute hospitalization and detoxification criteria (such as "withdrawal" and "24 hour management") with residential treatment/rehabilitation criteria relevant to "intermediate" levels of care (such as "24 hour structure"), and conditioning admission to residential rehabilitation on failing treatment at lower levels of care irrespective of medical need and without heeding ASAM's express warning against fail-first protocols:

> Another concern that guided the development of this publication is the concept of "treatment failure." This term has been used by some reimbursement or managed care organizations as a prerequisite for approving admission to a more intensive level of care (for example, "failure" in outpatient treatment as a prerequisite for admission to inpatient treatment). In fact, the requirement that a person "fail first" in outpatient treatment before inpatient treatment is approved is no more rational than treating every patient in an inpatient program or using a fixed length of stay for all. It also does not recognize the obvious parallels between addictive disorders and other chronic diseases, such as diabetes or hypertension. For example, failure of outpatient treatment is not a prerequisite for acute inpatient admission for diabetic ketoacidosis or hypertensive crisis. A "treatment failure" approach potentially puts the patient at risk because it delays a more appropriate

> level of treatment, and potentially increases health care costs, if restricting the appropriate level of treatment allows the addictive disorder to progress.

147. Ironically, on March 8, 2013, one day after Dr. Goldart issued his final adverse determination, UBH case manager, Rosalyn Chambliss, updated Plaintiff Muir's case file to reflect that ***none*** of the "critical goals to be accomplished during this level of care" had in fact been resolved. According to UBH, these unfulfilled goals included addressing Plaintiff Muir's "abuse/neglect," "current substance abuse," "impulsivity," "inadequate relapse prevention strategies," "occupational/educational problems," and "social/relationship problems."

148. Having exhausted his internal remedies, on August 22, 2013 Plaintiff Muir submitted an external appeal request to UBH. Plaintiff Muir's treating psychiatrist since 2010, Dr. Aaron S. Reichlin, explained in the appeal that:

> During the preceding nine months, Brian struggled with suicidal ideations (including means and plans), unremitting alcohol dependence (one-half of a fifth 3-4 times a week), and a delayed traumatic reaction to sexual abuse by a priest in adolescence. He also struggled with aggressive behavior, agitation, anxiety, blackouts, delusions, hallucinations, impaired judgment, appetite disturbance, decreased and increased need for sleep, decreased and increased sexual desire, difficulty concentrating and making decisions, being easily startled, feeling keyed up or on edge, feelings of hopelessness, obsessive-compulsive behaviors, panic attacks, social withdrawal, withdrawal symptoms, feelings of worthlessness, frequent crying, irritability, loss of interest, low energy, racing thoughts, trouble falling and staying asleep, weight decrease and increase. He also struggled with the following obsessive-compulsive behaviors: internet, computer games, rituals and habits, sexual thoughts and behaviors at work. ***Consequently, Brian suffered substantial functional impairments, including social withdrawal and inability to participate in his romantic relationship, decreased ability to perform at work, and difficulties attending to the activities of daily living (including self-care, hygiene, safety).***
>
> Due to extensive familial history, Brian is genetically vulnerable to alcoholism and mood disorders. He began drinking alcohol at age 12 and on a daily basis in his twenties. He completed treatment in 200[5] and was sober for 5 years. He was psychiatrically hospitalized for a week in 2005 and participated in an intensive outpatient program for 2 weeks in 2007.
>
> ***Regrettably, his most recent relapse resulted in particularly distressing symptoms and functional impairments that could not be safely addressed in an***

> ***intensive outpatient setting (especially given the lack of social support due to his partner's demanding work travel schedule).***
>
> At my urging, Brian sought treatment at Sierra Tucson, a residential dual diagnosis program where he could pursue recovery under full-time supervision. Based on program and transportation availability, it took several days for Brian to reconstitute and safely travel from his home in Chicago to Arizona.

149. Under Plaintiff Muir's plan, UBH is permitted to contract with the external review agents of its choice and must forward "all relevant medical records" and "all other documents relied on by the Claims Administrator" to so-called "Independent Review Organizations" ("IRO"s). According to the Interim Procedures for external appeals promulgated by the DOL (and published in Technical Release 2010-01), assigned external review agents "must provide written notice of the final external review decision within 45 days after the IRO receives the request for external review. The IRO must deliver the notice of final external review decision to the claimant and the plan." These Interim Procedures also require UBH's contracted IROs to "utilize legal experts where appropriate to make coverage determinations under the plan," such as when "[a]ny applicable clinical review criteria developed and used by the plan . . . are inconsistent with the terms of the plan or with applicable law."

150. On September 10, 2013, receipt of Plaintiff Muir's external appeal was acknowledged in writing by the assigned IRO, MES Solutions. The IRO, however, only reported its resolution of the appeal to its client, UBH, and UBH waited until October 29, 2013 to inform Plaintiff Muir of the result (and only did so after requests from Plaintiff Muir's attorney).

151. Since the external appeal was solely adjudicated by an unidentified psychiatrist, not only did the IRO fail to utilize legal experts to independently evaluate the expressly challenged UBH clinical review criteria, but despite acknowledging that "residential facilities provide a safe and substance-free environment in which residents learn individual and group

living skills ***for preventing relapse***,” the IRO continued to apply the same acute hospitalization, intoxication, and withdrawal/detox standards that UBH had promulgated and relied upon:

> There is no evidence in the record that the patient, if not admitted to residential treatment, ***would have continued to use alcohol*** and his functioning had not deteriorated to the point he could not be safely treated in a less restrictive level of care.
>
> * * *
>
> While he had been at risk to harm himself, there is no evidence that the patient would have been a ***high risk of harm to himself*** or others due to his alcohol use at a lower level of care [given his] desire to seek treatment and his support system including a partner and an outpatient psychiatrist. There had been no history of suicide attempts in the past.
>
> * * *
>
> He clearly did not have significant risks of alcohol ***withdrawal*** at the time of admission to the residential treatment setting as he was not placed on ***detox protocol*** and Richard Watts PA-Con 03/03/2013 noted, "The patient exhibits no evidence requiring detoxification."

152. Though it is hard to imagine how a passenger denied commercial airline boarding due to intoxication who subsequently drove under the influence while texting suicide messages would not be considered “a high risk of harm to himself or others,” nothing short of past suicide attempts would seem to have sufficed for UBH’s self-selected IRO.

153. As a result of UBH’s unlawful policies and practices, Plaintiff Muir was forced to incur nearly $30,000 of out-of-pocket costs to complete his prescribed residential treatment.

154. Given his conditions, it is likely Plaintiff Muir will require outpatient and residential treatment for his mental health disorders in the future, and that he will submit such claims to UBH pursuant to his insurance plan.

## UBH’S IMPROPER DENIAL OF FLANZRAICH’S CLAIMS

155. Plaintiff Lori Flanzraich and her daughter, Casey, reside in South Hempstead, New York. Casey Flanzraich turned 18 on June 5, 2014.

156. Lori and Casey Flanzraich are beneficiaries of the Oxford "Flanzraich Group Health Plan" (the "Flanzraichs' Plan"). This non-grandfathered insurance plan is a fully-insured group healthcare policy which is subject to ERISA.

157. According to the "ERISA Information" provided in the Oxford Member Handbook for the Flanzraichs' Plan, "Generally, the Plan Administrator or Plan Sponsor is your employer." Further, "Oxford, as the insurer, provides a Certificate of Coverage to you identifying specific benefits and administrative components of your Plan."

158. The Oxford Member Handbook for the Flanzraichs' Plan further provides a "Statement of ERISA Rights," enumerating "Prudent Actions By Plan Fiduciaries:"

> In addition to creating rights for Plan participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate your Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries.

159. Pursuant to the Certificate of Coverage ("COC") that governs the Flanzraichs' Plan, benefits are paid "in accordance with the terms and conditions of this Certificate" and "[Oxford] reserve[s] the right to provide the benefit in the manner [Oxford] determine[s] to be medically appropriate and the most cost effective." According to the COC, "[u]nless otherwise indicated in this Certificate, determinations as to Medical Necessity are made by Us, and such determinations are solely within Our discretion."

160. The COC's attached "Information About Your Oxford Coverage" explains that "[w]hen coverage is provided under Oxford's insurance company, it means Oxford Health Insurance, Inc. In addition, it can also include third parties to whom we delegate responsibility for providing administrative services relating to coverage, such as utilization management." Pursuant to this authority, Oxford has delegated responsibility for all substance abuse-related claims to UBH.

161. The Flanzraichs' Plan pays benefits for in- and out-of-network, residential mental health and substance abuse treatment. The Plan defines "medically necessary" as "appropriate with regard to standards of good medical practice" and "the most appropriate supply or level of service which can safely be provided." Denied claims are subject to one internal appeal prior to exhaustion of administrative remedies.

162. By age 16, Casey Flanzraich had been diagnosed with substance abuse, Bipolar I Disorder, Oppositional Defiant Disorder, a parent-relational problem, asthma, fibromyalgia, and brittle bone disease. She had been hospitalized in February and October of 2012 for alcohol poisoning and suicidality. She began drinking alcohol in the seventh grade, and in 2012 she began drinking more frequently (up to a bottle of vodka at once) to numb the pain in her knees. Since the ninth grade, she had also smoked cannabis on a daily basis despite several unsuccessful cessation attempts. During manic episodes, Casey reportedly hit her mother and sister, and she reported to her providers "multiple times where she excessive[ly] drank alcohol to the point where she and her family were afraid she was going to die."

163. Due to brittle bone disease, Casey broke both feet and eventually lost the ability to walk in junior high school. She had been in a wheel chair for many months in the tenth grade due to fractures, hypermobility of joints, joint pain, fibromyalgia, and migraines. Because of her substance abuse and mental illnesses, Casey was unable to regularly attend school during the year preceding her admission to residential treatment, which was uniformly recommended by all her mental health and medical providers.

164. Due to Casey's opposition to treatment (aggravated by her substance abuse and Oppositional Defiant Disorder), she quit a partial hospitalization program after just four days of treatment, starting on October 16, 2012. Therefore, on December 7, 2012, Casey was admitted to New Haven Residential Treatment Center ("New Haven") in Spanish Fork, Utah.

165. New Haven is licensed as a residential treatment facility by the Utah Department of Human Services and is accredited by JCAHO, which has also awarded it the "Gold Seal of Approval." New Haven is an out-of-network provider with UBH.

166. Psychological testing by New Haven revealed that Casey "evinces a maladaptive pattern of alcohol and/or drug abuse that has led to significant impairment of her performance and behavior." The testing also indicated that "[s]he may spend an inordinate amount of time obtaining these substances, behave in a socially unacceptable manner, and has continued to use alcohol and/or drugs even though she knows they have persistent and deleterious effects on her life." Furthermore, New Haven's analysis reported as follows: "[R]esults of Casey's profile indicate that there is a high probability that she has had a substance dependence disorder. The results also indicate that she may be part of a family and social system that promotes rather than prevents substance misuse. Therefore, she may view her problems associated with substance misuse as trivial or inevitable."

167. Despite the overwhelming evidence indicating that Casey needed residential care, UBH Associate Medical Director Satwant Ahluwalia, M.D., nevertheless denied Casey's residential coverage from the date of her admission in a retrospective February 18, 2013 Initial Adverse Determination:

> United Behavioral Health (UBH) is responsible for making benefit coverage determinations for mental health and substance abuse services that are provided to Oxford Health Insurance, Inc NY-PPO members.
>
> * * *
>
> As requested, I have completed a review of your medical record for the dates of service 12/7/12-forward. Based on my review, I have determined that coverage for the requested services was not available for the following reasons:
>
> Based on the clinical information and ***UBH Level of Care Guidelines for Mental Health Residential Care***, effective treatment could have occur[r]ed in a less restrictive partial hospital program. There is no current clinical information showing the medical necessity for this level of care. There was no evidence of

> severe psychosocial dysfunction, severe behavioral problems or serious medical conditions requiring ***24-hour care***. There was no evidence that the member would otherwise need ***acute inpatient care***.

168. Although Dr. Ahluwalia was fully aware of Casey's substance abuse, severe medical comorbidities, prior outpatient treatment failures, and familial psychopathology undermining recovery, her superficial and acute-focused review of Casey's claims failed to account for Casey's dual (mental health and substance use disorder) diagnoses, relying exclusively on the UBH Level of Care Guidelines for Mental Health Residential Care

169. Consequently, when Plaintiff Flanzraich filed an appeal with UBH on August 2, 2013, she specifically noted that Dr. Ahluwalia "was not properly assessing Casey's dual diagnosis" and that Dr. Ahluwalia had failed to consider Casey's care under the UBH Level of Care Guidelines for Substance Use Disorders: Residential Rehabilitation.

170. To her appeal, Plaintiff Flanzraich attached an October 12, 2012 report prepared by Casey's physician, Matthew S. Cohen, M.D., F.A.A.P.:

> Casey Flanzraich is a 16 year old female with a medical history including Asthma, chronic Sinusitis, Osteopetrosis, Conversion disorder, Anxiety disorder, Constipation, Hypercholesterolemia and Hyperlipidemia. She suffers from severe persistent Asthma as well as multiple sinus infections resulting in surgeries to remove both tonsils and adenoids, and repair a deviated septum. Possibly secondary to corticosteroid usage used to treat her Asthma, Casey developed Osteopenia. She has spent significant time immobilized, including the previous use of a wheelchair. This resulted in multiple lengthy absences from school. Last year, Casey was unable to walk intermittently for a period of ten months, and she was home schooled. At this time, she started suffering numerous significant panic attacks. Casey also exhibits hypermobility. It is postulated that her illnesses may be a result of a genetic autoimmune disorder. Casey has been diagnosed Bipolar and has had several manic episodes and numerous bouts of depression. This has led to excessive alcohol use and thoughts of suicide. At this time, she is presently undergoing psychiatric care at Long Island Jewish Medical Center. As her doctor, I feel it would be beneficial for Casey to be in a therapeutic school setting. Casey has been out of school for approximately two weeks prior to her hospitalization. She is incapable of attending school on a regular basis due to her illness.

171. With her appeal, Plaintiff Flanzraich also provided evidence that intensive outpatient treatment did could not support Casey's recovery, as confirmed on March 15, 2013 by Casey's psychologist, Bradford E. Jacobs, Ph.D.:

> Casey Flanzraich was seen for assessment and treatment beginning on September 27, 2012 through November 15, 2012, with the exception of two weeks when she was hospitalized due to excessive alcohol consumption and subsequent suicidal ideation.
>
> * * *
>
> ***It became clear that Casey was not a good candidate for outpatient psychotherapy and would require inpatient care and treatment, despite aggressive medication management and frequent individual and family psychotherapy sessions.*** Casey was deteriorating mentally and emotionally. She was unmotivated and did not want to get out of bed most mornings. Frequent thoughts of death and dying were evident. ***It became urgent that Casey be transferred to a residential treatment facility that could adequately address these very severe issues. Treatment was terminated on November 15, 2012 so that Casey could pursue appropriate treatment in a full time residential facility.***
>
> (Emphasis added.)

172. Additionally, Plaintiff Flanzraich included with her appeal a March 19, 2013 report from Casey's outpatient psychiatrist, Stanley M. Hertz, M.D.:

> Casey Flanzrich has been under my care for treatment of a bipolar mood disorder complicated by alcohol and substance abuse. In addition, there was school refusal. Placement at a residential school was medically necessary to prevent continued substance abuse and insure attendance at school. Intensive psychotherapy with psychiatric management on an outpatient basis did not curtail dangerous behaviors. It was only under twenty four hour supervision that Casey has controlled these dysfunctional behaviors and attended school on a regular basis.

173. Despite Plaintiff Flanzraich's clear and well-articulated arguments and supporting evidence, on August 23, 2013 UBH Associate Medical Director, Danesh Alam, M.D., denied the appeal:

> United Behavioral Health (UBH) is responsible for making benefit coverage determinations for mental health and substance abuse services provided to Oxford Health Insurance, Inc. NY /PPO members.

* * *

I have determined that benefit coverage is not available for the following reason(s):

It is my determination to uphold the previous denial of this request for mental health residential treatment cenrer benefit coverage for lack of medical necessity. The rationale for this determination is based on the clinical information and the UBH Level of Care Guidelines for Mental Health Residential care. It appeared that your child's treatment could have occurred in a less restrictive mental health partial hospitalization program. There was no evidence showing the medical necessity for a 24-hour level of care such as lack of social supports, or medical or psychiatric conditions requiring 24-hour care. There was no evidence that inpatient treatment would be needed if not for the residential care. Therefore the previous denial is upheld.

* * *

This is the Final Determination of your internal Appeal. All internal appeals through UBH have been exhausted.

174. Basing the clinically uncorroborated denial exclusively on the UBH Level of Care Guidelines for Mental Health Residential Care, not only did Dr. Alam deprive the claimants of a "full and fair review" under ERISA by ignoring applicable substance abuse criteria for a patient with dual diagnoses, but she also covertly denied the appeal based on a proscribed rationale noted in her case management records and conspicuously omitted from the denial letter: ***"There was no evidence of an imminent risk of harm to self or others."***

175. Thus, not only did UBH continue to improperly apply acute hospitalization criteria (such as "imminent risk of harm to self or others") to sub-acute residential mental health treatment, but UBH also repeatedly ignored the Flanzraich Plan's definition of medical necessity and persistently failed to apply "standards of good medical practice" such as those promulgated by ASAM or AACAP – or to consider even its deficient CDGs or LOC Guidelines for substance use disorders for an adolescent patient with a dual diagnoses.

176. Like Plaintiff Muir, Plaintiff Flanzraich submitted a request for an external review by an IRO. According to the assigned IRO, "MCMC has over 300 corporate clients, including

some of the nation's largest health insurers and managed care organizations." UBH is one of MCMC's numerous corporate clients. While MCMC is also assigned external appeals by some state insurance departments to review fully-insured cases (like Plaintiff Flanzraich's), such external appeals are nonetheless directly paid for by UBH. More importantly, MCMC's reviewers are ever mindful that their determinations in fully-insured cases directly affect insurers' bottom lines and that costly findings in favor of fully-insured claimants can impact lucrative contracts in self-funded cases entirely controlled by UBH. (For this reason, some states like California do not permit MCMC and other external review agents that directly contract with insurers in self-funded ERISA cases to adjudicate fully-insured appeals.)

177. While the IRO acknowledged Casey Flanzraich's diagnoses of alcohol abuse, cannabis abuse, and oppositional defiant disorder (among others), that her residential treatment at New Haven "gradually addressed ***core issues driving her acting out and addictive behaviors***," that "there was obvious parental conflict throughout treatment" undermining Casey's recovery, and that having recently "attended the PHP (partial hospitalization program) for only four days, the patient refused to return," MCMC, like MES Solutions, applied UBH's acute-focused guidelines to uphold UBH's denial:

> The patient was not ***acutely*** out of control in a way that required 24-hour daily structure and supervision. She had ***chronic behavioral and mood problems clearly related to a dysfunctional family***. There was no evidence of appropriately intensive outpatient therapy with a strong family component. Therefore, there was no evidence that this patient required such a restrictive level of care and would not have responded equally well to intensified outpatient treatment for her and her parents.

178. This decision was erroneous for many of the reasons that UBH's initial denial was improper. First, like UBH, the IRO failed to properly classify residential treatment as an intermediate level of care not limited to the treatment of "acute" conditions. Second, like UBH, the IRO failed to evaluate Casey's level of care pursuant to ***any*** clinical criteria for substance

abuse and instead referenced AACAP's Practice Parameter for the Assessment and Treatment of Children and Adolescents With ***Depressive Disorders*** along with an article from a journal of ***hospital*** medicine and a generic psychiatry textbook, from which nothing was quoted. Ironically, had the IRO even faithfully applied its referenced AACAP Practice Parameter for Depressive Disorders, it would have noted that "chronicity" and "family conflict" are expressly enumerated factors weighing in favor of residential treatment due to concerns with the course of the disease, since AACAP's Practice Parameter for Depressive Disorder states: "In general, greater severity, ***chronicity***, or multiple recurrent episodes, ***comorbidity***, hopelessness, presence of residual subsyndromal symptoms, negative cognitive style, ***family problems***, low socioeconomic status, and e***xposure to ongoing negative events*** (abuse, ***family conflict***) are associated with poor outcome (Birmaher et al., 2002; Lewinsohn et al., 1998)."

179. In fact, AACAP's Principles of Care for Treatment of Children and Adolescents with Mental Illnesses in Residential Treatment Centers explicitly advise that "[t]he best intervention for serious mental health issues that cannot be treated in the child's home environment is a facility that has a multidisciplinary treatment team providing safe, evidence based care that is medically monitored . . . Residential treatment might be indicated to treat adolescents with substance abuse disorders when the ***chronic nature of their problems*** has failed to respond to intensive outpatient or partial hospitalization programs." Given that Casey refused to attend a partial hospitalization program for more than 4 days prior to her admission to New Haven (in no small part due to her comorbid diagnosis of oppositional defiant disorder) and that her outpatient mental health providers terminated her care so that she would receive residential treatment, coupled with Casey's severely dysfunctional family environment (marred by divorce and her father's mental illness), it is difficult to imagine how Casey could not have met AACAP's standard had it been faithfully applied by the IRO.

180. As a result of UBH's persistent and willful violations of ERISA, Plaintiff Flanzraich incurred nearly $90,000 of out-of-pocket expenses to cover the prescribed course of Casey's residential treatment through July 15, 2013.

181. Given her conditions, it is likely Casey Flanzraich will require outpatient and residential treatment for her mental health disorders in the future, and that she will submit such claims to UBH pursuant to her insurance plan.

182. Plaintiff Flanzraich brings this action in the capacity of her daughter's Agent pursuant to a Power of Attorney executed by Casey Flanzraich following her eighteenth birthday.

## CLASS ACTION ALLEGATIONS

183. Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

184. UBH serves as the claims administrator for mental health and substance abuse treatment claims for other health insurance plans that define covered residential treatment in the same way as the Wit, Muir, Pfeifer and Holdnak plans (i.e. treatment that is consistent with generally accepted guidelines and UBH's LOCs). The policies and practices that UBH followed with respect to the claim filed by Plaintiffs Wit, Muir, Pfeifer and Holdnak are the same as those that have been applied by UBH to other similarly situated insureds seeking mental health and substance abuse treatment benefits under their health plans.

185. UBH serves as the claims administrator for mental health and substance abuse treatment claims for other health insurance plans that define covered residential treatment in the same way as the Flanzraich plan (i.e. treatment that is consistent with standards of good medical practice). The policies and practices that UBH followed with respect to the claim filed by Plaintiff Flanzraich are the same as those that have been applied by UBH to other similarly

situated insureds seeking mental health and substance abuse treatment benefits under their health plans.

186. As such, pursuant Federal Rule of Civil Procedure 23, Plaintiffs bring their claims on behalf of a putative class of similarly situated individuals as noted in the counts below. The class (the "Class") is defined as follows:

> All participants or beneficiaries in an insurance plan governed by ERISA, for which UBH has been delegated the authority to make coverage decisions with respect to claims for mental health and substance abuse-related treatment, who sought and were denied coverage for all or a portion of residential treatment for mental health or substance use, within the applicable statute of limitations.

187. The members of the Class can be objectively ascertained through the use of information contained in UBH's files because UBH knows who its insureds are, which plans they are insured by, what type of claims they have filed, and how those claims were adjudicated.

188. There are so many persons within the putative classes that joinder is impracticable.

189. Certification of the Class is desirable and proper because there are questions of law and fact in this case that are common to all members of each of the class. Such common questions of law and fact include, but are not limited to, the following:

A. What legal duties does ERISA impose upon UBH when it is serves as a claims administrator for mental health and substance abuse claims;

B. Does UBH engage in a fiduciary act when it promulgates mental health and substance use level of care and coverage determination guidelines;

C. Are UBH's level of care and coverage determination guidelines consistent with those that are generally accepted in the medical community;

D. Does UBH's promulgation of these policies constitute a breach of fiduciary duty;

E. Does UBH engage in a fiduciary act when it adjudicates a claim for benefits;

F. Does UBH have a practice of applying guidelines related to inpatient hospitalization or detoxification to claims for residential treatment;

G. Does UBH's systemic misapplication of inpatient hospitalization criteria to claims for residential treatment constitute a breach of fiduciary duty;

H. What remedies are available if UBH is found liable for the claims alleged;

190. Certification is desirable and proper because Plaintiffs' claims are typical of the claims of the members of the classes Plaintiffs seek to represent.

191. Certification is also desirable and proper because Plaintiffs will fairly and adequately protect the interests of the classes they seek to represent. There are no conflicts between the interests of Plaintiffs and those of other members of the classes, and Plaintiffs are cognizant of their duties and responsibilities to the entire class. Plaintiffs' attorneys are qualified, experienced and able to conduct the proposed class action litigation.

192. It is desirable to concentrate the litigation of these claims in this forum. The determination of the claims of all class members in a single forum, and in a single proceeding would be a fair and efficient means of resolving the issues in this litigation.

193. The difficulties likely to be encountered in the management of a class action in this litigation are reasonably manageable, especially when weighed against the virtual impossibility of affording adequate relief to the members of the class through numerous separate actions.

## COUNT I

## CLAIM FOR VIOLATION OF FIDUCIARY OBLIGATIONS BROUGHT ON BEHALF OF PLAINTIFFS AND THE CLASS

194. Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

195. This count is brought pursuant to 29 U.S.C. § 1132(a)(1)(B).

196. As the entity responsible for making mental health and substance abuse benefit determinations under Plaintiffs' Plans, and responsible for developing internal practices and policies to facilitate such determinations, UBH is an ERISA fiduciary.

197. As an ERISA fiduciary, and pursuant to 29 U.S.C. Section 1104(a), UBH is required to discharge its duties "solely in the interests of the participants and beneficiaries" and for the "exclusive purpose" of providing benefits to participants and their beneficiaries" and paying reasonable expenses of administering the plan. It must do so with reasonable "care, skill, prudence, and diligence" and in accordance with the terms of the plans it administers. It must conform its conduct to a fiduciary duty of loyalty and may not make misrepresentations to its insureds.

198. UBH violated these duties by promulgating the restrictive level of care and coverage determination guidelines discussed herein. Despite the fact that the health insurance plans that insure Plaintiffs and the Class provide for insurance coverage for residential treatment, the fact that generally accepted standards of care are widely available and well-known to UBH, and that fact that UBH asserted that its guidelines were consistent with those that are generally accepted, UBH developed guidelines that are far more restrictive than those that are generally accepted. In doing so, UBH did not act "solely in the interests of the participants and beneficiaries" for the "exclusive purpose" of "providing benefits." It did not utilize the "care, skill, prudence, and diligence" of a "prudent man" acting in a similar capacity. It did not act in accordance with the terms of Plaintiffs' Plans.

199. Instead, UBH elevated its own interests and those of its corporate affiliates above the interests of plan participants and beneficiaries. By promulgating improperly restrictive guidelines, UBH artificially decreased the number and value of covered claims thereby benefiting its corporate affiliates at the expense of insureds.

200. UBH's breach of fiduciary duties is underscored by the fact that it also ignored state laws requiring it to apply ASAM standards when making medical necessity determinations.

201. Plaintiffs and the members of the Class have been harmed by UBH's breaches of fiduciary duty because their claims have been subjected to UBH's restrictive guidelines making it less likely that UBH will determine that their claims are covered.

202. Plaintiffs and the members of the Class seek the relief identified below to remedy this claim.

## <u>COUNT II</u>

## CLAIM FOR IMPROPER DENIAL OF BENEFITS BROUGHT ON BEHALF OF PLAINTIFFS AND THE CLASS

203. Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

204. This count is brought pursuant to 29 U.S.C. §1132(a)(1)(B).

205. UBH denied the insurance claims for residential treatment submitted by Plaintiffs and other members the Class in violation of the terms of Plaintiffs' Plans and the insurance plans that insure members of the Class. UBH denied these claims, in part, based on its restrictive internal guidelines that were developed in violation of its fiduciary duties. It also denied these claims, in part, based on its systematic practice of: (i) improperly applying acute inpatient treatment criteria to residential treatment claims; (ii) ignoring the evidence presented to it; (iii)

applying undisclosed additional criteria to benefit claims, such as a length of stay "benchmark"; and (iv) relying upon its restrictive CDGs even though CDGs (as opposed to LOCs) are not a recognized basis for denying claims under Plaintiffs' Plans.

206. Plaintiffs and the members of the Class have been harmed by Defendants' improper benefit denials because they were deprived of insurance benefits they were owed.

207. Plaintiffs and the members of the Class seek the relief identified below to remedy this claim.

## COUNT III

### CLAIM FOR EQUITABLE RELIEF BROUGHT ON BEHALF OF PLAINTIFFS AND THE CLASS

208. Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

209. This count is brought pursuant to 29 U.S.C. § 1132(a)(3)(A) only to the extent that the Court finds that the injunctive relief sought to remedy Counts I and/or II are unavailable pursuant to 29 U.S.C. § 1132(a)(1)(B).

210. Plaintiffs and the Class have been harmed, and are likely to be harmed in the future, by UBH's breaches of fiduciary duty described above.

211. In order to remedy these harms, Plaintiffs and the Class are entitled to enjoin these acts and practices pursuant to 29 U.S.C. § 1132(a)(3)(A).

## COUNT IV

### CLAIM FOR OTHER APPROPRIATE EQUITABLE RELIEF BROUGHT ON BEHALF OF PLAINTIFFS AND THE CLASS

212. Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

213. This count is brought pursuant to 29 U.S.C. § 1132(a)(3)(B) only to the extent

that the Court finds that the equitable relief sought to remedy Counts I and II are unavailable pursuant to 29 U.S.C. § 1132(a)(1)(B).

214. Plaintiffs and the Class have been harmed, and are likely to be harmed in the future, by UBH's breaches of fiduciary duty described above.

215. Additionally, by engaging in this misconduct, UBH allowed it corporate affiliates to be unjustly enriched insofar as they were not required to pay benefit claims.

216. In order to remedy these harms, Plaintiffs and the Class are entitled to appropriate equitable relief pursuant to 29 U.S.C. § 1132(a)(3)(B).

**REQUESTED RELIEF**

WHEREFORE, Plaintiffs demand judgment in their favor against Defendants as follows:

A. Certifying the Class and their claims, as set forth in this Complaint, for class treatment;

B. Appointing the Plaintiffs as Class Representatives for the Class;

C. Designating Zuckerman Spaeder LLP and Psych-Appeal, Inc. as counsel for the Class;

D. To remedy Count I, or alternatively pursuant to Count III, declaring that UBH's internal guidelines complained of herein were developed in violation of UBH's fiduciary duties;

E. To remedy Count I, or alternatively pursuant to Count III, issuing a permanent injunction ordering UBH to stop utilizing the guidelines complained of herein, and instead adopt or develop guidelines that are consistent with those that are generally accepted and with the requirements of applicable state law;

F. To remedy Count II, or alternatively pursuant to Count III, declaring that UBH's denials of residential treatment coverage were improper;

G. To remedy Count II, or alternatively pursuant to Count III, ordering UBH to

reprocess claims for residential treatment that it previously denied (in whole or in part) pursuant to new guidelines that are consistent with those that are generally accepted and with the requirements of applicable state law;

H. To remedy Count II, or alternatively pursuant to Count III, ordering UBH to faithfully apply its promulgated guidelines (including any new guidelines UBH may adopt or promulgate in response to the relief sought herein) in reprocessing claims for residential treatment that it previously denied (in whole or in part), and in processing future claims for residential treatment;

I. To remedy Counts I and/or II, or alternatively pursuant to Count IV, ordering UBH to pay a surcharge to Plaintiffs and members of the Class in an amount equivalent to the revenue it generated from its corporate affiliates or the plans for providing mental health and substance abuse-related claims administration services with respect to claims filed by Plaintiffs and members of the Class, expenses that UBH's corporate affiliates saved due to UBH's wrongful denials, the out-of-pocket costs for residential treatment that Plaintiffs and members of the Class incurred following UBH's wrongful denials, and/or pre-judgment interest;

J. Awarding Plaintiffs' disbursements and expenses for this action, including reasonable counsel fees, in amounts to be determined by the Court, pursuant to 29 U.S.C. § 1132(g); and

K. Granting such other and further relief as is just and proper.

Dated: September 2, 2014

Respectfully submitted,

/s/ Meiram Bendat

PSYCH-APPEAL, INC.
Meiram Bendat (Cal. Bar No. 198884)
8560 West Sunset Boulevard, Suite 500

West Hollywood, CA 90069
Tel: (310) 598-3690, x.101
Fax: (310) 564-0040
meiram@psych-appeal.org

ZUCKERMAN SPAEDER LLP
D. Brian Hufford (admitted *pro hac vice*)
Jason S. Cowart (admitted *pro hac vice*)
1185 Avenue of the Americas, 31st Floor
New York, NY 10036
Tel: (212) 704-9600
Fax: (212) 704-4256
dbhufford@zuckerman.com
jcowart@zuckerman.com

THE MAUL FIRM, P.C.
Anthony F. Maul (subject to *pro hac vice* admission)
68 Jay Street, Suite 201
Brooklyn, NY 11201
Tel: (646) 263-5780
Fax: (866) 488-7936
afmaul@maulfirm.com

*Attorneys for Plaintiffs*