1                 UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF CALIFORNIA

3    Before The Honorable Joseph C. Spero, Magistrate Judge

4

5    DAVID WIT, et al.,            )
                                   )
6             Plaintiffs,          )
                                   )
7    vs.                           )   No. C 14-02346-JCS
                                   )
8    UNITEDHEALTHCARE INSURANCE    )
     COMPANY, et al.,              )
9                                  )
              Defendants.          )
10   _____)

11                                 San Francisco, California
                                   Wednesday, November 19, 2014
12

13   TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
             RECORDING 10:06 - 11:02 = 56 MINUTES
14

15   APPEARANCES:

16   For Plaintiffs:
                                   Zuckerman Spaeder, LLP
17                                 399 Park Avenue
                                   14th Floor
18                                 New York, New York 10022
                              BY:  JASON S. COWART, ESQ.
19
                                   Zuckerman Spaeder LLP
20                                 1800 M Street NW
                                   Suite 1000
21                                 Washington, D.C. 20036
                              BY:  ANDREW CARIDAS, ESQ.
22

23

24                 (APPEARANCES CONTINUED ON NEXT PAGE)

25

2

1   APPEARANCES:   (Cont'd.)

2   For Defendant United
       Behavioral Health:          Crowell & Moring, LLP
3                                   1001 Pennsylvania Avenue, NW
                                    Washington, D.C. 20004
4                              BY:  CHRISTOPHER FLYNN, ESQ.

5                                   Crowell & Moring, LLP
                                    275 Battery Street
6                                   23rd Floor
                                    San Francisco, California
7                                    94111
                               BY:  NATHANIEL PHILIP BUALAT, ESQ.
8
                                    Crowell & Moring, LLP
9                                   515 South Flower Street
                                    40th Floor
10                                  Los Angeles, California 90071
                               BY:  JENNIFER SALZMAN ROMANO, ESQ.
11

12  Transcribed by:                 Echo Reporting, Inc.
                                    Contracted Court Reporter/
13                                  Transcriber
                                    echoreporting@yahoo.com
14

15

16

17

18

19

20

21

22

23

24

25

3

1  <u>Wednesday, November 19, 2014</u>                    <u>10:06 a.m.</u>

2                       P-R-O-C-E-E-D-I-N-G-S

3                              --oOo--

4          THE CLERK:  Calling case number C 14-02346, Wit

5  versus UnitedHealthcare Insurance Company.

6          MR. CARIDAS:  Your Honor, would you like to hear

7  the motion to dismiss first or the case management

8  conference?

9          THE COURT:  Case management comes second.

10      Appearances, please.

11          MR. COWART:  Good morning, your Honor.  Jason

12  Cowart from Zuckerman Spaeder on behalf of the plaintiff.

13  And with me today is Andrew Caridas also on behalf of the

14  plaintiff.

15          THE COURT:  Welcome.

16      Welcome.

17          MR. FLYNN:  Good morning, your Honor.  Chris Flynn

18  from Crowell and Moring on behalf of the defendant United

19  Behavioral Health.  Along with me is Jennifer Romano and

20  Nathaniel Bualat from Crowell and Moring as well.

21          THE COURT:  Welcome.

22      All right.  Thank you.  Please bear with me for a

23  little bit while I walk through my sort of preliminary

24  questions and thinking about this.

25      My preliminary thinking is it's not a proper subject --

4

1  none of these are a proper subject for a 12(b)(6) motion.

2  They may end up being dispositive on various things, but a

3  12(b) motion, I'm a little concerned about.

4       For example, I don't know why I would decide whether or

5  not a particular type of claim or particular type of remedy

6  has to be in an (a)(3) bucket or an (a)(1) bucket.

7       It seems the kind of thing that eventually there may be

8  some necessity for either the plaintiffs to elect to stick

9  with one or the other -- they usually don't have to make

10 such an election of alternative theories at the pleading

11 stage -- or there may be, as a matter of law once I have a

12 fulsome view of the facts, that it doesn't fit in one or the

13 other.

14      But I don't know why, in this sort of a pleading stage,

15 we are -- while this is a fairly detailed complaint, it's

16 nowhere near as detailed as the evidence will be.

17      Similarly, I don't know whether it matters at this

18 stage, and I don't know whether or not I would need to

19 decide at this stage, whether there's one (a)(1) claim or

20 two.  We'll figure that out down the road.

21      I just don't understand why I would need to decide

22 whether or not the question of whether or not you can

23 challenge the guidelines under (a)(1) as a freestanding

24 matter, when there is also the rest of the other (a)(1)

25 claim.

5

1    And it sort of depends on what comes out.  If the

2 summary judgment stays, you'll know the scope of what's

3 actually being challenged in the first claim, and that will

4 inform the Court's view on what can be stated in the second

5 or cannot be stated.

6    Similarly with the surcharge.  It seems like that's in

7 some ways a fact of intensive inquiry, not the least of

8 which is to -- whether or not the defendant proffered it.

9    So that's my first thought.

10    My second thought is actually a series of questions,

11 because I don't -- I wasn't clear, but I assume the question

12 for United Behavioral Health is I assume that they agree --

13 that you agree -- but I put it in a form of a question, do

14 you agree -- that the use of inappropriate guidelines to

15 make benefit decisions would be independently actionable

16 under (a)(3) if -- assuming that it's a fiduciary act.  A

17 separate question, I understand that.

18        MR. FLYNN:  Sure.

19        THE COURT:  That's question number one.

20    Question number two is:  Is it your view under (a)(1)

21 that injunctive relief, particularly injunctive relief

22 requiring the reformation of the process or guidelines for

23 making these kinds of decisions, is that an available type

24 of remedy?  It's the actual remedy that will go into it, but

25 type of remedy of under (a)(1).

6

1          In terms of the questions for the plaintiff, I need a
2     response from the plaintiff to UBH's argument that they were
3     not acting as a fiduciary in promulgating internal
4     guidelines and that therefore those are not actionable for
5     that reason.
6          And then I need a little better explanation -- although
7     I do think it's premature, but I want to start the
8     conversation about why the (a)(3) claims and the (a)(1)
9     claims aren't duplicative.
10          I do actually have a tentative separate and apart from
11     why do I have to decide this now.  And that is to allow the
12     claims to proceed.
13          My tentative on the guidelines is that, at least as far
14     as the Court can tell as a pleading matter, falls within the
15     portion of the statute that allows people like the
16     plaintiffs in this matter to seek clarification of their
17     future rights.
18          In terms of the (a)(3) claims, I would approve it as
19     alternative pleading.
20          I also think that Verity doesn't require dismissal at
21     the pleading stage.  I think it's -- and it's not entirely
22     clear what is going to be allowed to -- left in the (a)(1)
23     claim that might otherwise, theoretically at least, limit
24     what could be done in the (a)(3) claim, so I'm not sure what
25     that is.  Maybe that's just harkening back to my thought

7

1    that it's too early.

2         On the surcharge, you know, I read <u>Gabriel</u> about 10

3    days ago and I read it again yesterday.  And I've got to

4    say, I'll be astonished if it doesn't go en banc or get

5    reversed.

6         If Justice Breyer gets a hold of that decision, he's

7    going to say what case were you looking at?  Because I do

8    think the majority in that case misread Justice Breyer's

9    decision.  But I don't think it's binding on me now.  And in

10   any event, there's factual issues that underline those

11   questions.  So I'm not inclined to, on this record, dismiss

12   the surcharge claim.

13        It's sort of going to depend on how the law develops

14   and what exactly one is seeking as a surcharge, I suppose,

15   as time goes by as to whether or not that's going to work.

16        But for the moment, I would -- plan to leave it alone.

17        So it's your motion.  Why don't you start.

18             MR. FLYNN:  Sure, your Honor.  I can start with

19   the issue of your question about whether or not, under

20   (a)(1)(B), a plaintiff is entitled to reform --

21             THE COURT:  Yes.

22             MR. FLYNN:  -- utilization guidelines.

23             THE COURT:  Yes.

24             MR. FLYNN:  Obviously, you saw our briefs.  And

25   our position is that the creation, development and revision

8

1  of those guidelines are not a fiduciary act, because they're

2  not associated with a specific ERISA plan.

3         THE COURT:  Okay.  But assume I disagree with that

4  and I think that they are.  Then the question.

5         MR. FLYNN:  Well, I don't think reformation would

6  be permitted under (a)(1)(B), because that would be an

7  equitable remedy and therefore only actionable under (a)(3),

8  if I understand that type of equitable remedy and the way

9  that courts have limited that in previous ERISA

10 jurisprudence.

11        THE COURT:  Okay.

12        MR. FLYNN:  So -- but I just do want to make the

13 point that it's an extraordinary thing to say that the mere

14 creation of the business-wide guideline has ERISA fiduciary

15 obligations and neither of us found cases on point on that

16 concept.  And I don't think that's -- I don't think we

17 didn't do good research.

18     I think the issue is, it's a novel allegation and one

19 that extends beyond what the courts have recognized as a

20 true fiduciary obligation.

21     I understand the premise of your question was assume

22 that to be true.

23        THE COURT:  Yeah, because I don't think it's -- it

24 just struck me as a question that depended too much on the

25 facts to get into, the first question, the premise that it

9

1  is -- I don't know that he is actually attacking the --

2  maybe he is.  But it's not entirely clear to me from the

3  pleadings that he's attacking the company-wide promulgation

4  of guidelines.

5      He's attacking the creation of the guidelines for

6  plans, for particular plans in this case.

7              MR. FLYNN:  And I think -- obviously, we're at the

8  pleading stage.

9              THE COURT:  Right.

10             MR. FLYNN:  But there is no such thing.  There is

11 no such thing as the development of utilization guidelines

12 for the five plaintiff plans at issue in this case.  It

13 doesn't work that way.  The way that --

14             THE COURT:  What do you mean it doesn't work that

15 way?

16             MR. FLYNN:  So there are no utilization review

17 guidelines that are developed specifically by UBH or a

18 specific ERISA plan.  They are a tool that are used for all

19 its business, whether the business is governed by ERISA or

20 not.

21             THE COURT:  So why isn't that -- we don't have to

22 get too far into this, but it's interesting to me.

23             MR. FLYNN:  No, I know.  I took you there so --

24 sorry.

25             THE COURT:  It's interesting to me, but why isn't

1  it vulnerable to the argument at least that when you create

2  a business-wide guideline that is to be used with respect to

3  specific ERISA plans, it is being created for the use of

4  those specific plans?

5          MR. FLYNN:  Well, the way that the ERISA fiduciary

6  definition is stated in ERISA is that the fiduciary

7  obligation has to arise from the language of a specific

8  ERISA plan, right?  I mean that's what an ERISA fiduciary

9  is.  And if we have pre-created -- or that's not a word

10 but --

11         THE COURT:  Simultaneously created.

12         MR. FLYNN:  Simultaneously -- although in this

13 case I think what the evidence will show is these existed

14 long before these plans came into play -- then UBH did not

15 exercise a discretionary act with respect to these specific

16 plans.

17         THE COURT:  So your view is the discretionary act

18 would be applying the guidelines?

19         MR. FLYNN:  Absolutely.  I mean that it could be.

20         THE COURT:  Could be.

21         MR. FLYNN:  Yes.  And I think we state that pretty

22 clear, that that's what -- the plan as forth in Count Two.

23 Count Two is you have these guidelines.  You applied them to

24 our clients, to the plaintiffs' claims.  And you abused your

25 discretion in doing so.

1          THE COURT:  But if they wanted to do a reformation

2    remedy or applying guidelines in the putative class members'

3    cases -- that is these five plans or whatever the number of

4    plans that are covered -- that would have to be an (a)(3)?

5          MR. FLYNN:  If it was even cognizable on its own.

6    I don't see a basis to do it under (a)(1)(B), and I'm not

7    admitting that it would be --

8          THE COURT:  I wouldn't think you would.

9          MR. FLYNN:  -- cognizable under (a)(3).  It just

10   seems like the issue of reformation as it deals with trust

11   agreements, as I remember some of the case law, it was

12   largely discussed in the context of (a)(3).

13         THE COURT:  No, and it's largely a fraud doctrine

14   so it may or may not work.  I'm just -- these are --

15   entertaining things.

16      Go ahead.  Why don't you move on to the next question.

17         MR. FLYNN:  Sure.  So that was --

18         THE COURT:  That's the (a)(1).

19         MR. FLYNN:  That's the (a)(1).

20         THE COURT:  Right.

21         MR. FLYNN:  On the issue of -- I think you asked

22   the question why now --

23         THE COURT:  Yeah.

24         MR. FLYNN:  -- on the (a)(3) claims.  Why not wait

25   until the factual record is developed.

12

1          THE COURT:  Yes.

2          MR. FLYNN:  And you pointed out that is what

3   Verity  stands for.  But I think there were cases cited in

4   our briefs from the Ninth Circuit.  I think the Wise v.

5   Verizon case, I think there was -- the Gabriel case from the

6   Northern District that said when you're looking at an

7   (a)(1)(B) and an (a)(3) claim -- and they're premised on

8   exactly the same actions.  I mean you saw, I'm sure, the

9   counts in this case.

10      Counts Three and Four don't have any independent facts.

11  They don't have any independent injuries.  They don't have

12  any independent legal obligations.  There's no dispute about

13  that.  They're three paragraphs long each.

14      What we read the courts to say, that in those

15  situations where the plaintiff has not alleged a fiduciary

16  breach separate from the fiduciary obligations that support

17  the (a)(1)(B) claim -- have not alleged, not proven -- that

18  it's appropriate to dismiss those (a)(3) claims at the

19  pleading stage.

20          THE COURT:  What about reformation?  You just said

21  it's not an (a)(1) claim and he wants to put it in his

22  (a)(3) claim.  It's premised on the same guidelines,

23  presumably application of those guidelines in some way.

24      I mean that's why my issue is, isn't this premature,

25  because I can't rule out the possibility at this point that

1 there might be some piece of the analysis of what is alleged

2 in (a)(1) that you're going to say that's got to be an

3 (a)(3), or that I might say it has to be an (a)(3), or vice

4 versa, that you can't do this under that, you have to do it

5 under what's already alleged.

6        MR. FLYNN:  I mean my response would be we take

7 the pleadings as we find them.

8        THE COURT:  I understand but I don't want to go

9 through five grounds of stuff in a vacuum when nobody's done

10 the discovery.  It just seems to me that -- and there are

11 cases that say substantially that.

12        MR. FLYNN:  Yeah.

13        THE COURT:  There's some that go one way, some

14 that go the other, as do it later.  I understand the issue

15 though.

16        MR. FLYNN:  But I think the courts have been clear

17 that (a)(3) is this catch-all, right?  It's not meant to

18 replicate the remedies available under (a)(1)(B).  It's not

19 supposed to be a repackaging of an (a)(1)(B) claim as an

20 (a)(3) claim.

21        THE COURT:  Right.

22        MR. FLYNN:  I think <u>Verity</u> was very clear about

23 that.  And obviously I've discussed the Ninth Circuit and

24 the Northern District authority that kind of follows that

25 line of thinking, that if you don't come up with some

14

1  separate fiduciary obligation under (a)(3), which is it

2  seems to me --

3          THE COURT:  Why doesn't my argument work?

4  Reformation.

5          MR. FLYNN:  Well --

6          THE COURT:  First of all, I'm not sure that it's a

7  requirement, but why doesn't my argument work, that if as

8  you say an (a)(1) can't include the following and

9  theoretically at least an (a)(3) could, it is something that

10 is pled as being sought from the same -- from the

11 guidelines, why would I say you can't do that?

12         MR. FLYNN:  I think the basis to reform the terms

13 of the plan would be extraordinarily narrow.  The

14 recollection I have in the case discussion about those was

15 when there was a fraud perpetrated on the plaintiffs in

16 certain ERISA cases.  So I just don't think that the facts

17 that give rise to this case would ever support that claim.

18         THE COURT:  Well, we don't -- my guess is the

19 facts can be pled with respect to the case are one thing and

20 that you may be right in the end, but I'm not sure.

21     Okay.  Go ahead.

22         MR. FLYNN:  Let's see, what else.  I think the

23 other point you raised was surcharge and the Gabriel case.

24 Obviously we all have read that recently.

25         THE COURT:  Yeah.  I assume there's been no

15

1  developments in that.

2          MR. FLYNN:  No, we checked last night because we

3  didn't want to --

4          THE COURT:  Yes, of course.  Yes.

5          MR. FLYNN:  We didn't want to step into the

6  courtroom and --

7          THE COURT:  Yeah, right.

8          MR. FLYNN:  -- hear that hearing en banc had been

9  granted.  But the way we read the Ninth Circuit rules was,

10 yes, you could rely on Gabriel and Gabriel has a much

11 narrower construction than Amara (phonetic) and I think

12 Skinner, some of the other cases.  And it said this is not a

13 make-whole relief provision.

14     And the surcharge remedy isn't created for the benefit

15 of individual plan members.  It's created for the benefit of

16 the plan.  It's to return a plan to kind of its status

17 before any losses.  And I think Gabriel was very clear on

18 that point.

19     Could it be overturned?  Sure, I guess it could.  But

20 as of today, it's appropriate law for you to rely on as it

21 relates to the issue of surcharge.

22          THE COURT:  I could rely on it.  I think you're

23 right, I can rely on it.

24     My concern is twofold.  One is, having read Justice

25 Breyer's decision in -- what is it -- Amara, I think it's

1  clearly wrong, that it's not -- he was talking about

2  individualized personal remedies.

3       But equally importantly, if -- it may be as we get past

4  the pleading stage, if the law develops the way you're

5  saying it's going to develop -- and it may very well -- that

6  it just shifts how plaintiff thinks about their surcharge

7  remedy.  That is to say, I want you on behalf of my

8  individuals under (a)(1) to shift money to me and under

9  (a)(3) to shift money to the plan.

10      So I'm not -- because this is not a situation where

11 they're trying to -- they're trying to get money out of the

12 administrators to put into their own pockets, admittedly.

13 But -- and maybe they do it indirectly ultimately.

14      But I'm not -- it's another one of those situations

15 where I don't feel comfortable that I know how it's going to

16 develop factually or strategically to really get -- am I

17 barking up the wrong tree with that?

18           MR. FLYNN:  Well, I just -- when you look at what

19 was asked for in the surcharge claim --

20           THE COURT:  Yeah, some of that's very personal.

21           MR. FLYNN:  And what was asked for was, "We want

22 our out-of-pocket costs."  That's clearly recoverable under

23 (a)(1)(B).

24           THE COURT:  Yeah.

25           MR. FLYNN:  And they asked for the savings that

1 the UBH affiliates realized as a result of their policies

2 vis-a-vis residential treatment decisions.

3      I mean I think the courts have been clear on that point

4 as well, which is if you're not holding what this purported

5 amount is that should not have -- or that you enjoyed some

6 amount of money because you did something wrong but you're

7 not holding that amount personally in the case of UBH,

8 that's not an appropriate remedy vis-a-vis UBH.

9      I'm not suggesting or inviting them to sue other United

10 affiliates, but essentially they're asking for relief from

11 those affiliates without bringing them before you in this

12 Court.

13      So I don't think that those are fact issues.  I think

14 those are pleading deficiencies.

15           THE COURT:  Okay.  So let me hear from the other

16 side.

17      Why aren't these claims deficient?  The (a)(1) and the

18 (a)(3) claims.  I mean they are -- as counsel says, the way

19 you pled them, they are exactly the same.  I'm not quite

20 sure why you think there's an (a)(3) claim when you've done

21 it in an (a)(1) claim.

22           MR. COWART:  Well, so let's start with -- there's

23 an important difference between Count Three and Count Four.

24      Count Three is broad, in the alternative, under

25 (a)(3)(A).  Count Four is broad, in the alternative, under

18

1  (a)(3)(B) (sic).

2      Okay.  So when we're talking about the (a)(3)(A)

3  claim --

4              THE COURT:  Right.

5              MR. COWART:  -- we're referring to a provision in

6  ERISA that explicitly says you can bring a claim for an

7  injunction to remedy a violation of ERISA.

8              THE COURT:  Right.

9              MR. COWART:  That's what this is.  At its core,

10 this is a fiduciary breach which ERISA recognizes as a

11 violation of ERISA.

12     So just as a matter of statutory interpretation, (a)(3)

13 on its face --

14             THE COURT:  Yeah.

15             MR. COWART:  -- the language of (a)(3) is most

16 directly on point to the kinds of claims we're bringing.

17             THE COURT:  Is there an injunction you're seeking

18 under your first (a)(3) claim that is different from the

19 injunction you're seeking under the first -- two (a)(1)

20 claims?

21             MR. COWART:  Well -- so let me circle back to the

22 two (a)(1) claims.

23             THE COURT:  Yes.

24             MR. COWART:  Count One, I think of it -- and I

25 think it's helpful to think of it this way -- is a facial

1 challenge to the guidelines, as your Honor recognized.  And

2 we pled that in Count One as an (a)(1) claim.

3      But we pled it aware of the fact that there is

4 authority around the country that would suggest that the

5 relief we principally seek for that Count One is an (a)(3)

6 form of relief.

7      And I point the Court to <u>Hill</u> and other cities like

8 <u>Hill</u>.

9      There's also authority suggesting that you can get that

10 kind of reformation through (a)(1).

11      And so I think our complaint, we were as transparent as

12 we could.  We think it's an (a)(1) claim, but we know that

13 there are courts out there that might think it's really an

14 (a)(3) claim, and so we pled it in the alternative.

15      But stepping back for a second, when thinking about

16 this duplication issue, I'd ask the Court to bear a couple

17 things in mind.

18      First, as you recognized, duplication concerning

19 <u>Verity</u>, first of all, it's not a pleading concern.  It's a

20 remedy concern.  It's a concern about are we going to allow

21 people to have essentially double recovery by pursuing

22 claims and getting relief under two separate provisions of

23 ERISA for what is the same act.

24      And Breyer -- what's happening in that decision is the

25 majority responding to the dissent's concern that by reading

20

1 (a)(3)(B) in this broad manner, that you will swallow up all

2 the rest of the provisions.

3          THE COURT:  Yes.

4          MR. COWART:  And so the majority is saying no,

5 don't worry about it.  If you can bring a claim and get the

6 relief you want under (a)(1), you don't need the (a)(3)

7 remedy.

8     So it's not a pleading concern.

9     But even if you take the defendants' argument on its

10 own terms and you think it's a pleading concern and you

11 think that you're obligated right now to decide, in the

12 absence of any discovery, which -- you've got to jump now.

13 And the Court has to jump now in terms of what kind of

14 relief you're going to order down the line.  And I have to

15 jump now as representing the plaintiffs as to how I -- I'm

16 going to speculate where you're going to go with that.

17     But their argument still loses even if you kind of buy

18 all of that, because in all the cases that they cite, what

19 the courts are holding is that these claims are actionable

20 under (a)(1), and I can give you all of the relief you want

21 under (a)(1).  And, therefore, as a housekeeping matter,

22 since that is clear, I will dismiss these (a)(3) claims.

23     But here, the defendants are challenging our

24 entitlement to bring the claims and get the relief under

25 (a)(1).  And they're doing that in a number of ways.

1      They do that by noting, for example, in their case

2  management statement that they intend -- they may intend to

3  revive their argument about that they're not the proper

4  defendant.

5      Well, if that's true and they're not the proper

6  defendant -- they dropped that argument -- I apologize, I'm

7  jumping ahead here.  They had their argument in their

8  opening brief.  We said they were wrong.  The Ninth Circuit

9  came down and said yeah, we know what we said previously in

10 Seare (phonetic).

11          THE COURT:  Right.

12          MR. COWART:  And so they dropped it.  Okay.

13     But in the case management statement, we're going to

14 revive that argument, we may bring that back.  They hold

15 open the opportunity to bring that back.

16     So if they're going to bring that argument back, that

17 they're not a good defendant under (a)(1), they don't have

18 that argument under (a)(3) because as the Supreme Court has

19 held in Harris Trust, under (a)(3) we're entitled to

20 remedies even against non-fiduciaries, setting aside the

21 fact that UBH here is a fiduciary.

22     And then there are the other ways in which it is

23 questionable, to say the least, whether we're actually able

24 to bring the claims and get the remedies under (a)(1).  So I

25 referenced earlier the Hill decision or the Smith decision

1 out of the Seventh Circuit or the Group Health Corp.

2 decision, all of which we cite in our brief --

3          THE COURT:  Yes.

4          MR. COWART:  -- which would suggest that these are

5 probably (a)(3) remedies.

6      And I would also say to you that your colloquy with

7 UBH's counsel a moment ago about whether we're entitled to

8 this reformation relief under (a)(1), that didn't give me a

9 lot of comfort.

10     I mean if UBH were coming here and said, "We don't have

11 any problems with Count One and Two.  They can bring those

12 counts.  They can get the relief they want.  But we have a

13 problem with Count Three because it is duplicative because

14 it's the same relief and the same remedies that we've

15 already said we concede," we'd be having a different

16 conversation.

17     But they're not.  They're trying to hold the door open

18 to down the line argue that I either can't bring those

19 claims or I can't get the relief I want under (a)(1).  But

20 they want you now to dismiss my (a)(3) claims.

21     And that just creates --

22          THE COURT:  Well, no, they want to squeeze you

23 now.

24          MR. COWART:  Well, right.  That's what I'm saying.

25 Right.

1          THE COURT:  They want you to say -- and it's not
2    illegitimate.  They want to say, you know, what you've done
3    under (a)(1), you can't do and what you've done under (a)(3)
4    you can't do, for reasons in addition to duplication.  But
5    duplication is one of them.
6        So they want to take -- the surcharge tactic is a good
7    example.  They want to squeeze that on the legal end under
8    (a)(3) and not let it appear -- and get rid of the (a)(1)
9    claims as well.
10        I'm not troubled by the tactic --
11          MR. COWART:  No, I'm not troubled by the tactic.
12          THE COURT:  -- because it may be that the law will
13   squeeze you, right?
14          MR. COWART:  That's right.  And if they're right,
15   then they're going to be able to make that argument and they
16   will prevail.
17        But I think my big message to you, your Honor, is --
18   and I was heartened by what you said when you started, which
19   is:  My message to you is this motion has no impact on
20   discovery.  It's a pure practical matter.  Because nothing
21   is going to happen in discovery that would theoretically
22   wasteful if you were to keep the (a)(3) claims alive.
23        And now you've got a big decision to --
24          THE COURT:  He's going to disagree.
25          MR. COWART:  Okay.  Well, (a)(3) is a remedy

1   provision.  So short of discovery into remedies, which I am

2   happy to delay.  If you want to do that in six months that's

3   fine.

4       But (a)(3) is all about remedies.

5           THE COURT:  Yes.

6           MR. COWART:  So anyway the point is just that

7   there are a host of disputed factual issues.  There are a

8   host of disputed legal issues and I just don't think in any

9   way now is the time for the Court to render decisions on

10  those when there is this uncertainty.  And there is.

11      There's uncertainty about whether I can prove the facts

12  that I've alleged.  And there's uncertainty as to do you

13  think -- if we think about Count One, is this facial

14  challenge to the -- is it really an (a)(1) count or is it

15  really an (a)(3) count?  And setting aside what you decide

16  on that, can I get reformation under (a)(1), or do I have to

17  get it under (a)(3)?

18      I think that ultimate decision is driven by the facts.

19  It's certainly informed by the facts.

20      And so I think this case is like Silva, which we also

21  cited in our brief, which says Verity is not worried about

22  pleading and that when you have these kinds of challenges

23  you should wait for the evidence to come in and then you

24  make a decision.

25      So I also wanted to maybe drop one flag on -- you know,

25

1   in the defense papers and in this discussion, we've combined

2   Counts Three and Four, and we refer to them as being (a)(3)

3   counts.

4           THE COURT:  Yes.

5           MR. COWART:  But they're different.  (a)(3)(A) is

6   the count for injunctive relief.  (a)(3)(B) is the count for

7   other equitable relief.

8       It's (a)(3)(B) that in <u>Verity</u>, the court's talking

9   about.  It's (a)(3)(B) that gives you the surcharge.

10      And so they stand on different places in the ERISA

11  remedial scheme.

12      I'd like to comment on two other points if I could.

13          THE COURT:  Yeah, yeah.  Go ahead.

14          MR. COWART:  One, you asked -- at the beginning of

15  your remarks, you asked for me to comment on essentially the

16  allegations relating to the facial challenge to the

17  guidelines.  Had we really alleged facts that would support

18  the theory that that is a breach of duty.

19          THE COURT:  Right.

20          MR. COWART:  In UBH's brief -- in their reply

21  brief at page four, they lay out pretty accurately what the

22  standard is, which is --

23          THE COURT:  Pretty accurate.

24          MR. COWART:  Well, they have to --

25          THE COURT:  I like that.

1            MR. COWART:  They say that what we have to do is

2    plead that they acted as a fiduciary and they recognize that

3    ERISA says that a fiduciary act is the exercise of

4    discretionary authority.  And I'll take that standard.

5        Now, everybody acknowledges our pleading is subject to

6    Rule 8 and you have to draw all reasonable inferences in our

7    favor, not in the defendants' favor.

8        So what does the complaint actually say about this

9    subject?

10        Paragraph 13 alleges that the level of care guidelines

11    are called for by the plans.  UBH has to create them

12    pursuant to the plans because the plans say we're going to

13    create these level of care guidelines and we're going to

14    subject your claims to them.

15        So it is the definition even under the defendants'

16    standard, which at argument a moment ago what they said was

17    that you can only engage in a fiduciary act if the plan

18    language explicitly requires you to do something.  That's

19    the point I quibble with.

20        I don't think that's right.  But even if that was the

21    standard, we satisfy that standard through that allegation.

22        What else do we allege?  Paragraphs three to five, we

23    allege that both the level of care guidelines and the

24    coverage determination guidelines were created for the

25    purpose of making benefit determinations under plaintiffs'

1  plans.

2      Now, maybe as a factual matter, the defendants are

3  going to contest that.  Maybe their answer will deny that.

4  And in discovery we'll find out.

5      But right now, as a matter of pleading, we have pled

6  that UBH engaged in a fiduciary act when it -- you know,

7  depending on what verb you want to use -- promulgated the

8  guidelines, decided to apply the guidelines to claims under

9  the plans.

10      I mean there's a spectrum here that begins with

11  promulgation and ends with:  I'm taking this guideline.  I'm

12  using it on this claim, and I'm denying your claim.

13      And somewhere along there our complaint plausibly

14  alleges that they engaged in a fiduciary act separate and

15  apart from the actual denial.

16      More allegations in the complaint -- and all these

17  allegations are largely ignored in the defendants' briefing.

18      More allegations in the complaint.  Paragraphs 45, 47,

19  79, 83, 87, 125, 127, 143, 144, 167, 173.  I apologize for

20  the long list.  You get the point though that all of those

21  paragraphs allege that when UBH denied the plaintiffs'

22  claims, they relied upon these guidelines.

23      What is the inference that is created by that?  Those

24  denials don't say, "We're denying your claims because plan

25  provision number 17 says X, Y or Z."  They deny the claims

28

1 based on the guidelines.

2      That creates a reasonable inference that they created

3 the guidelines for the purpose of adjudicating claims under

4 the plans.

5      And then paragraphs 50, 91, 154, and 181, the

6 plaintiffs all allege that in light of their conditions, it

7 is likely that they will seek additional benefits under

8 their health insurance plans and that UBH will apply their

9 guidelines as they have done in the past to their claims.

10     And then we get to Count One.  All that culminates in

11 Count One, which is paragraphs 194 to 202, in which we

12 allege as a standalone separate challenge to the guidelines

13 that the plaintiffs want to clarify their right to future

14 benefits which ERISA (a)(1)(A) explicitly says a plaintiff

15 is empowered to do.

16     This argument also is ignored by UBH.  They never talk

17 about the language of (a)(1)(A) and what they think that

18 clarify rights to future benefits could possibly mean if not

19 this kind of claim.

20     So we allege that in light of their condition and their

21 desire to clarify their rights, they seek to prove that

22 these guidelines were created, promulgated -- whichever word

23 you want -- in violation of fiduciary duties and they want

24 them reformed on a going-forward basis.

25     It's Count One for a reason.  That is all the counts in

29

1  the complaint matter.  Count Two matters.  We think these
2  denials in the past were wrongful.  But what really matters
3  now is that going forward, these plaintiffs are insured by
4  these plans and UBH is making decisions that are
5  inconsistent with those plans and is doing it by violating
6  the very fiduciary duties that it owes to the beneficiaries.
7       It's a standalone claim.  You have to ignore what
8  (a)(1)(A) says about clarifying rights to future benefits.
9  Defined otherwise, you have to accept the defendants'
10 argument -- they dropped a footnote.  They say here are a
11 bunch of cases where plaintiffs sought to challenge prior
12 denials and they also -- and they challenged them in part
13 based on internal guidelines.
14      And they say this proves that you have to -- that the
15 only (a)(1)(A) claim is -- or the only claim you can bring
16 under (a)(1) is a retrospective looking claim.  And that
17 even if you want to challenge guidelines, it's all
18 retrospective looking.
19      But the plaintiffs in none of those cases pursued a
20 claim on a prospective basis to reform the guidelines.
21      Now, UBH doesn't like the cases that we cite that
22 suggest that you can do this.  Angeljag (phonetic) or Lawson
23 (phonetic) or some of the other ones.  And I'll acknowledge
24 that those cases didn't talk about healthcare insurance
25 company internal guidelines, et cetera, et cetera.

1       But what they all stand for is the proposition that
2  when a fiduciary has made decisions that are causing a
3  plaintiff to be unclear about what their rights are in the
4  future, that those plaintiffs are allowed to come into
5  court, separate and apart from whether there was ever a
6  prior denial, and bring a claim.  And their cases don't
7  stand for anything -- don't stand for anything to the
8  opposite of that.

9       They just hold that in those cases, the plaintiff
10 didn't seek to challenge things on a forward looking basis
11 because they wanted the money.  Ordinarily, they just wanted
12 the benefits paid and they weren't worried about the long --
13 or the short, long or medium term.

14      And then I put sort of the finer point on this, and
15 I'll close with this on this point.

16      In the reply brief, UBH relies on the Johns case out of
17 Michigan, if you read Johns.  They use it for the (a)(3)
18 point.  They say "This proves that we win on duplication."

19      But Johns involves a facial challenge to insurer's
20 policy of classifying a certain autism treatment as
21 experimental.  And the court in Johns says that's an (a)(1)
22 claim, separate from the claim for benefits.

23      So even if you want -- you know, if this whole issue
24 boils down to what did the Johns court think about it,
25 right -- another district court sitting in Michigan, the

1  Sixth Circuit -- under <u>Johns</u>, we win.

2      We clearly win because that's the reason the <u>Johns</u>

3  court dismisses the (a)(3) claim, which -- the (a)(3) facial

4  challenge to that policy because he says you can bring that

5  claim under (a)(1).

6      And the way that court talks about it is,

7  prospective -- that court uses the phrase "prospective

8  denials," which is really just another way of saying

9  clarifying rights to future benefits.  I think that's what

10  the court means.  I think the court recognized in that case

11  that you can do both independently, challenge prior denials

12  and seek to clarify your rights to future benefits.

13      So that's -- you know, I can go on forever.  I think

14  the papers largely lay out where the arguments are.  Unless

15  the Court is concerned by anything it's heard from UBH, what

16  you said at the beginning I think is the right result here.

17          THE COURT:  Well, let me hear again from UBH's

18  counsel.

19          MR. FLYNN:  Thank you, your Honor.  A couple

20  points in rebuttal.

21      First, this idea that Counts Three and Four should

22  survive, notwithstanding the fact that they're identical,

23  cite to no legal authority, facts or injuries other than

24  those in Counts One and Two simply because they're pled

25  under 502(a)(3)(A) and (a)(3)(B).

1    I think we've already dealt with the (a)(3)(B) (sic)

2  issue, which is the claim in Count Four which is for a

3  surcharge remedy, which we do not believe that they have

4  adequately pled.

5    But as to Count Three, I'm still not hearing how the

6  injunctive relief that (a)(3)(A) permits would differ in any

7  way from what's available under (a)(1)(B).

8    And in fact, in our brief, we said as much.  We said

9  that (a)(1)(B) would provide the injunctive relief that they

10 need, would provide the benefits that could at some point be

11 ultimately due.

12    So it's not even a repackaging of a claim.  It is the

13 same claim.  There is nothing in Count Three other than the

14 reference to 502(a)(3)(A).  Nothing different.

15    So I'm still not clear on how that completely

16 duplicative claim should survive.

17        THE COURT:  Okay.

18        MR. FLYNN:  On the issue of the facial challenge

19 to the utilization management guidelines, I think -- one of

20 the ways I've looked at this is -- because it is such a

21 novel approach, is that what's the harm associated with the

22 development -- just the creation of the guidelines, because

23 remember, Count One is just based on that.

24    Notwithstanding the fact that counsel for plaintiffs

25 intermingled both the creation and then the application of

1 those guidelines in his discussion about the viability of

2 Count One.  That's not --

3          THE COURT:  Well, assume it's creation for use to

4 help decide claims in their particular plan.

5          MR. FLYNN:  Sure.  And so that by itself, in a

6 fiduciary breach claim, the plaintiff has to identify what's

7 the harm associated with that specific fiduciary breach, not

8 the application of the guidelines but the creation of the

9 guidelines themselves.

10          THE COURT:  I don't understand why you think

11 that's a distinction.

12          MR. FLYNN:  Well, let's say I create -- and I'm

13 not in any way admitting that these guidelines are faulty.

14 They're not.

15     But let's say they are faulty and we approve every

16 claim under faulty guidelines.  There's no harm to the

17 plaintiffs or to a plaintiff class in that situation.

18     The harm occurs --

19          THE COURT:  If they follow the guidelines.

20          MR. FLYNN:  -- if they follow, which is the

21 premise of Count Two, the count that is not before you

22 today.

23     And so there's this repeated discussion by Mr. Cowart

24 about how this is a facial challenge but it's not really,

25 because when plaintiffs describe the harm in the complaint

1 that arises from Count One, how do they describe it?  They

2 say that the plaintiffs were harmed by UBH's breaches of

3 fiduciary duty because their claims have been subjected to

4 UBH's restrictive guidelines.

5      That's Count Two, not Count One, but that's what they

6 say the harm is in Count One.

7      And how do they define the putative class?  The

8 putative class is all participants or beneficiaries in an

9 insurance claim governed by ERISA for which UBH has been a

10 delegated authority to make coverage decisions with respect

11 to mental health and substance abuse related treatment who

12 sought and were denied coverage.

13      Now, albeit, I understand the class definition is for

14 all counts, but it certainly applies to Count One as well.

15      So I think why plaintiff couldn't cite to any cases

16 that were a similar challenge -- a facial challenge to the

17 utilization guidelines, as we have here, is because there is

18 no harm associated with that.  It's an element required

19 under a fiduciary breach claim, and it's not been stated.

20          THE COURT:  Well, my guess is, if you said to

21 plaintiffs' counsel, everything you want to do under Count

22 One is also available under Count Two, you could reach a

23 stipulation that they dismiss it.  You probably could.  But

24 my guess is, you can't -- you wouldn't do that.

25      You're not prepared to do it right now.

35

1          MR. FLYNN:  Yeah.

2          THE COURT:  So if you want to do that, go right

3 ahead.  But I'm not -- unless you're prepared to say there

4 is nothing that is under Count One that we wouldn't say also

5 is legally available under Count Two, have at it.  Then you

6 could stipulate to that.

7      But otherwise, without that stipulation, I don't

8 understand your argument.

9          MR. FLYNN:  Well, I mean I've said it before, I'm

10 not going to belabor the point.

11          THE COURT:  Yeah, right.

12          MR. FLYNN:  But we're dealing with what they pled.

13 That's -- on the motion to --

14          THE COURT:  No, I understand that.

15          MR. FLYNN:  -- dismiss, that's what we've got to

16 do.

17          THE COURT:  Well, sort of yes.  We have to do that

18 and what they could plead and whether or not going through

19 multiple rounds makes any sense, and so that's the issue.

20      Okay.  So let's talk about the class certification

21 schedule.

22          MR. FLYNN:  And, your Honor, can Ms. Romano join

23 us for that?

24          THE COURT:  Yes.  Come on.  Let's have a team come

25 forward because I want to actually lay out some dates.

36

1      You have some time frames.  I want to star the time

2  frame from today.

3      So if we use your schedule, what are the dates?

4          MR. CARIDAS:  So, your Honor, I think the only

5  dates that we had sort of set firmly dealt with the Phase

6  One of discovery.

7      So we had anticipated -- I think we've agreed that

8  there will be a phase prior to class certification.  Then

9  however long it takes for the Court to decide class

10 certification.

11         THE COURT:  Right.  Remind me to go back to that

12 phasing issue because I'm not a big fan.

13         MR. CARIDAS:  Certainly.

14         THE COURT:  But go ahead.  What dates did you

15 agree to?

16         MR. CARIDAS:  So under that, there is a dispute as

17 to whether --

18         THE COURT:  And understand, starting today.

19         MR. CARIDAS:  So starting today, the deadline to

20 complete Phase One of discovery was going to be six months

21 out from when defendants served its answer.

22         THE COURT:  Okay.  So if they serve the answer say

23 by the end of the month, when -- six months from November

24 31st or December 1st is what?

25         MR. CARIDAS:  June --

37

1          THE COURT:  June 1?

2          MS. ROMANO:  Your Honor, with respect to the

3  answer, this complaint is I believe over 200 paragraphs.

4          THE COURT:  Well, we'll get -- I'm not worried.

5          MS. ROMANO:  Okay.

6          THE COURT:  I'm more worried about the period of

7  time than I am --

8          MS. ROMANO:  Okay.  Thank you.

9          THE COURT:  I'll give you whatever time you want

10  to answer.  Don't worry about that.

11      So we're talking about 2015, right.  There it is.

12      So discovery -- the first phase of discovery, whatever

13  that is, and May 29, 2015, Phase One.  That certainly is the

14  pre-class certification discovery.  As to what it contains,

15  we'll talk about.

16      Then what happens?

17          MR. CARIDAS:  So at that point, I think the plan

18  envisions that the motion for class certification such as

19  there may be would be due 210 days out, so I guess that will

20  be an additional 30 days for the motion.

21          THE COURT:  All right.  So you've got June 29,

22  2015, plaintiff files class cert motion.

23      Now, let me ask you a question.  Are there going to be

24  any expert witnesses in these motions?

25          MR. CARIDAS:  I don't think that we envision

38

1  experts at the first phase.  I think we envision experts

2  more likely in the second phase.

3      We haven't had a discussion with opposing counsel

4  specifically on that topic, so I don't know if that's the

5  final word, but that's our anticipation.

6          THE COURT:  Do you have a thought?

7          MS. ROMANO:  Your Honor, we cannot say with

8  certainty at this point.  It is possible we would have

9  experts at the class certification stage.

10          THE COURT:  So if you're going to have experts at

11  the class certification stage -- well, let's -- we'll have

12  to deal with that.  Write that down as something we need to

13  cover.

14      Okay.  June 29th plaintiff files the motion.  What's

15  the next step?

16          MR. CARIDAS:  So I would envision that after that

17  there would be 30 days for the reply brief and --

18          THE COURT:  The opposition brief?

19          MR. CARIDAS:  Yeah, the opposition brief and --

20          THE COURT:  So June 29th.  July 29th defendant

21  files an opposition and two weeks later, which is August the

22  12, 2015 -- August 12, plaintiff files reply brief.  Hearing

23  September 18th.

24      So let me talk to you about the experts.  If you decide

25  to have them, where are they going to fit in?  You're going

39

1  to have to do it during your six-month discovery.

2  　　　　　MS. ROMANO:  That would be the presumption, your

3  Honor.

4  　　　　　THE COURT:  Okay.  So the parties will -- if --

5  what I want you to do in the next week is stipulate to

6  expert disclosure dates for class certification and expert

7  discovery cutoff dates for class certification.  And file

8  that.  Okay?

9  　　　You don't have to use them, right?  But I want to have

10  the dates in there so that we don't get caught at the end

11  with our head down.

12  　　　Okay.  Bifurcation.  I don't want us to have any

13  squabbles about what is class cert discovery and what is

14  not.  So I'm not bifurcating.  You can take any discovery

15  you want during any -- during the class phase, during the

16  next phase.

17  　　　I caution you that you only have six months.  So don't

18  take anything that isn't important for class certification.

19  And if there turns out to be some big dispute about -- you

20  know, "The plaintiffs are really going after an area that's

21  got nothing to do with what we're doing right now.  It

22  should be put off," then I'll hear it.

23  　　　But my guess is the time frame will help focus the mind

24  because my guess is this is a slightly aggressive schedule,

25  the way things are going to work out.

                                                              40

1      Okay.  Then I'll decide class certification and then we

2  decide next steps.  Is that the --

3              MR. CARIDAS:  I think that's right, your Honor.

4              THE COURT:  That's the plan?

5              MS. ROMANO:  That was the plan, your Honor.

6              THE COURT:  Okay.  All right.  Then those dates

7  are fine.

8      How else can I help?

9              MR. CARIDAS:  So, your Honor, I think the only

10 real area of disagreement -- at least that your Honor will

11 decide at this juncture -- was whether discovery could

12 begin -- that plaintiffs urge discovery begin at the end of

13 the status hearing essentially.

14             THE COURT:  Oh, yeah.  No, no.  We're off and

15 running.

16             MR. CARIDAS:  All right.

17             THE COURT:  This is the schedule.  We're off and

18 running now.  And I'm going to get this underway.

19     But when did you -- I haven't gotten -- I'm going to go

20 refine the order and make sure that I'm not making a mistake

21 that I can at least see.

22     And then when would you like -- how long after I file

23 the order would you like to file the answer?

24             MS. ROMANO:  The answer?

25             THE COURT:  Yes.

1          MS. ROMANO:  We would ask for until December 21st.

2          THE COURT:  That's fine.  Great.  I'll put that in

3  the order.

4      All right.  Anything else?

5          MR. CARIDAS:  There are two very small and I think

6  non-disputed cleanup issues.

7      First, just with respect to the ADR procedures of the

8  Court.  I think the recommendation --

9          THE COURT:  We're waiting, right?

10          MR. CARIDAS:  Right.

11          THE COURT:  We're waiting.  Yeah, I'm not

12  surprised.

13          MR. CARIDAS:  And secondly, we would request on

14  the plaintiffs' side that during the discovery phase Carolyn

15  Reynolds, my partner in Washington, D.C. substitute as lead

16  trial counsel.

17          THE COURT:  Oh, you've read my rule.

18          MR. CARIDAS:  Well, she is basically going to be

19  in -- alone with me, but she's my boss.  She'll be in charge

20  of the discovery phase, so she's the one who is going to be

21  making the calls anyway.

22      And we are in the same city as Mr. Flynn so --

23          THE COURT:  So say -- tell me what you're

24  requesting.

25          MR. CARIDAS:  I know that under a lot of the local

42

1 rules the lead trial counsel has to be present at

2 conferences and at the meet and confers.

3            THE COURT:  Yes.

4            MR. CARIDAS:  And we're requesting that Carolyn

5 Reynolds be able to serve that function for the pendency of

6 discovery.

7            THE COURT:  So who is lead trial counsel

8 otherwise?

9            MR. CARIDAS:  So I think Jason is the --

10            MR. COWART:  Me.  I'm involved in the case all

11 along.

12      The point here is that Carolyn Reynolds who is my

13 partner in D.C., she's also going to be working on the case.

14 She would have been here today, but she just got back from a

15 trip overseas.

16      Anyway, the request is that she be allowed to sort of

17 wear the lead trial counsel hat for purposes of -- they can

18 rely on any deal she strikes as we move through the

19 discovery process.

20            MS. ROMANO:  We don't have an objection to that.

21 Mr. Flynn is in Washington, D.C. as well, so that would be a

22 more efficient way to handle meet and confers.

23            THE COURT:  Oh, then I should say no.  I should

24 say no.  Part of the point is --

25            MR. COWART:  Yes, we're aware of that.

43

1            THE COURT:  Yeah.  That was part of the point.

2       Well, I will agree to it as long as it works.

3            MR. COWART:  Very good.

4            THE COURT:  As long as it works, I'm agreeing to

5  that.

6       Okay.  So we will note -- what's your -- give me your

7  partner's name again.

8            MR. COWART:  Carolyn Reynolds.

9            THE COURT:  Lead trial counsel for discovery.

10      Okay.

11           MS. ROMANO:  Did you want to set a CMC or just set

12  it when we hear the cross cert motion?

13           THE COURT:  Oh, I think we should talk before

14  then.  You don't necessarily have to fly out from D.C.

15      Or I can get on the phone.  But -- Ms. Reynolds can as

16  well if you want.

17      But why don't we -- let's see.  This is November.

18  March.  120 days out.

19           MS. ROMANO:  How about March 20th for a further

20  CMC?

21           THE COURT:  Okay.  2:00 p.m.  And you can apply to

22  appear by phone if you want.

23      Give me an updated statement a week in advance.

24      Great.  Look forward to it.  Thank you both -- thank

25  you all.

44

1          MR. COWART:  Thank you, your Honor.

2          MR. FLYNN:  Thank you, your Honor.

3          MS. ROMANO:  Thank you, your Honor.

4          MR. CARIDAS:  Thank you, your Honor.

5          THE COURT:  Thank you all.

6      (Proceedings adjourned at 11:02 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Echo Reporting, Inc.*

45

<u>CERTIFICATE OF TRANSCRIBER</u>

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

Echo Reporting, Inc., Transcriber

Tuesday, January 20, 2015