1  Meiram Bendat (Cal. Bar No. 198884)
   PSYCH-APPEAL, INC.
2  8560 West Sunset Boulevard, Suite 500
   West Hollywood, CA 90069
3  Tel: (310) 598-3690, x.101
   Fax: (888) 975-1957
4  mbendat@psych-appeal.com

5
   D. Brian Hufford (admitted *pro hac vice*)
6  Jason S. Cowart (admitted *pro hac vice*)
   ZUCKERMAN SPAEDER LLP
7  399 Park Avenue, 14th Floor
   New York, NY 10022
8  Tel: (212) 704-9600
   Fax: (212) 704-4256
9  dbhufford@zuckerman.com
10 jcowart@zuckerman.com

11 Caroline E. Reynolds (admitted *pro hac vice*)
   Andrew Caridas (admitted *pro hac vice*)
12 ZUCKERMAN SPAEDER LLP
   1800 M Street, N.W., Suite 1000
13 Washington, DC 20036
   Tel: (202) 778-1800
14 Fax: (202) 822-8106
   creynolds@zuckerman.com
15 acaridas@zuckerman.com
16

17 *Attorneys for Plaintiffs and Linda Tillitt*

18 **UNITED STATED DISTRICT COURT**
   **NORTHERN DISTRICT OF CALIFORNIA**
19 **SAN FRANCISCO DIVISION**

20 DAVID AND NATASHA WIT, on behalf of          )
   themselves and all others similarly situated, )          Case No. 3:14-CV-02346-JCS
21 BRIAN MUIR, on his own behalf and            )
   on behalf of all others similarly situated,    )
22 BRANDT PFEIFER, on behalf of the Estate of   )
   his deceased wife, Lauralee Pfeifer, and all others )
23 similarly situated, LORI FLANZRAICH,         )
   on behalf of her daughter Casey Flanzraich and all )
24 others similarly situated, and CECILIA        )
   HOLDNAK, on behalf of herself, her daughter  )
25 Emily Holdnak, and all others similarly situated )
26                                                )
27              Plaintiffs,                        )
                                                  )
28

PROPOSED INTERVENOR COMPLAINT
CASE NO. 3:14-CV-02346-JCS

5122958.6

v.                                      )
                                        )
UNITED BEHAVIORAL HEALTH                )
(operating as OPTUMHEALTH BEHAVIORAL    )
SOLUTIONS),                             )
                                        )
                Defendant.              )
_____     )

LINDA TILLITT, on her own behalf and on behalf )
of her deceased son, Maxwell Tillitt, and all others )
similarly situated,                     )
                                        )
                Intervenor Plaintiff,   )
                                        )                **Proposed**
         v.                             )                **<u>INTERVENOR COMPLAINT</u>**
                                        )
UNITED BEHAVIORAL HEALTH                )
(operating as OPTUMHEALTH BEHAVIORAL    )
SOLUTIONS),                             )
                                        )
                Defendant.              )
_____     )

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

SUMMARY OF INTERVENOR PLAINTIFF'S ALLEGATIONS ........................ 2

DEFENDANT, JURISDICTION AND VENUE ................................................... 6

UBH'S LEVEL OF CARE AND COVERAGE DETERMINATION GUIDELINES
    RELEVANT TO TILLITT'S CLAIMS ......................................................... 7

UBH'S IMPROPER DENIAL OF MAX TILLITT'S CLAIMS ............................ 14

CLASS ACTION ALLEGATIONS ................................................................... 23

COUNT I
    CLAIM FOR VIOLATION OF FIDUCIARY OBLIGATIONS BROUGHT ON
    BEHALF OF INTERVENOR PLAINTIFF AND THE CLASS ...................... 25

COUNT II
    CLAIM FOR IMPROPER DENIAL OF BENEFITS BROUGHT ON BEHALF OF
    INTERVENOR PLAINTIFF AND THE CLASS ........................................ 27

COUNT III
    CLAIM FOR EQUITABLE RELIEF BROUGHT ON BEHALF OF INTERVENOR
    PLAINTIFF AND THE CLASS ............................................................... 28

COUNT IV
    CLAIM FOR OTHER APPROPRIATE EQUITABLE RELIEF BROUGHT ON
    BEHALF OF INTERVENOR PLAINTIFF AND THE CLASS ...................... 28

REQUESTED RELIEF ..................................................................................... 29

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

i

## INTRODUCTION

Like current Plaintiff Brandt Pfeifer, whose late wife Lauralee died after she forewent additional residential treatment for her serious alcohol addiction when it became clear that United Behavioral Health would not provide further coverage, Intervenor Plaintiff Linda ("DeeDee") Tillitt experienced United Behavioral Health's denial of coverage for her son Max's medically necessary, and potentially life-saving, residential treatment for his serious substance use disorder, based on United Behavioral Health's application of flawed and overly-restrictive coverage determination guidelines United Behavioral Health itself created. And like Lauralee Pfeifer, Max Tillitt tragically died from his substance use disorder when he relapsed soon after being forced to leave residential treatment due to United Behavioral Health's denial of coverage.

In short, Ms. Tillitt has been grievously harmed by United Behavioral Health's misconduct in promulgating flawed guidelines and then applying those guidelines to wrongfully deny her son's coverage. The harm she suffered is identical to the harm suffered by the current Plaintiffs in this case, and by the putative class members those Plaintiffs seek to represent. Ms. Tillitt accordingly seeks to intervene in this action, and join the current Plaintiffs in bringing complaint against United Behavioral Health on behalf of herself and all others similarly situated. In support of her claims, Ms. Tillitt alleges upon personal knowledge as to herself and her deceased son, and upon information and belief based upon, *inter alia*, the investigation made by and through her attorneys (including review of publicly available information concerning United Behavioral Health's guidelines and correspondence sent by United Behavioral Health to Intervenor Plaintiff) as to all other matters, as follows:

# SUMMARY OF INTERVENOR PLAINTIFF'S ALLEGATIONS

1.     Ms. Tillitt is, and her deceased son was, insured by a health insurance plan sponsored by her employer and governed by the Employee Retirement Income Security Act of 1974 ("ERISA") (the "Lockton Plan").

2.     The Lockton Plan covers treatment for sickness, injury, mental illness and substance use disorders. The Lockton Plan provides that residential care is a covered benefit.

3.     The Lockton Plan has delegated responsibility for adjudicating mental health and substance abuse-related claims to Defendant United Behavior Health ("UBH"). Pursuant to this delegation, UBH has developed "level of care" guidelines ("LOCs") and "coverage determination" guidelines ("CDGs"), which it provides to its claims representatives for use in adjudicating mental healthcare claims.

4.     UBH's CDGs purport to identify, on a condition-by-condition basis, the benefits that are generally available pursuant to health plans insured and/or administered by UBH and the "best practices" (supposedly as defined by generally accepted standards of care) that a mental healthcare provider should follow when treating the condition, and fully incorporate the "level of care" criteria found in UBH's LOCs. UBH's CDGs instruct UBH reviewers to consult the insured's particular plan terms before deciding whether particular benefits are covered.

5.     UBH asserts that its LOCs are a set of "objective" and "evidence-based" criteria used to standardize coverage determinations, promote evidence-based practices, and support members' recovery, resiliency, and wellbeing. UBH's LOCs set forth criteria that its claims reviewers are supposed to apply to determine both whether a particular level of mental healthcare is covered by the terms of the Plan and that such level of care is consistent with generally accepted standards of care.

PROPOSED INTERVENOR COMPLAINT
CASE NO. 3:14-CV-02346-JCS

5122958.6

6. The Lockton Plan has no role in the creation and promulgation of any of these guidelines, or in UBH's decision to approve or deny any claim.

7. In light of its central role in the mental health and substance abuse-related claim adjudication process, UBH is an ERISA fiduciary as defined by 29 U.S.C. Section 1104(a). As such, it is legally required to discharge its duties "solely in the interests of the participants and beneficiaries" and for the "exclusive purpose" of providing benefits to participants and their beneficiaries" and paying reasonable expenses of administering the plan. It must do so with reasonable "care, skill, prudence, and diligence" and in accordance with the terms of the plans it administers, so long as such terms are consistent with ERISA. As a fiduciary, UBH owes a duty of loyalty to plan participants and beneficiaries. It must also refrain from any conduct that violates state or federal law.

8. UBH suffers from an inherent conflict of interest in its role as mental health and substance abuse claims administrator. Every claim denied by UBH saves money for UBH's corporate affiliates and artificially increases the profit of its parent entity, UnitedHealth Group Incorporated ("UHG"). While the Lockton Plan is "self-funded," meaning that health care benefits are paid, in the first instance, from the assets of the group plan sponsors, most self-funded plans have stop-loss provisions that obligate the insurer to pay benefits that exceed a certain threshold. Thus, every claim UBH denies makes it less likely that such a stop-loss threshold will be crossed and reduces the possible stop-loss liability of UBH's affiliates.

9. Against this backdrop, UBH has violated its fiduciary duties, as detailed herein.

10. Generally accepted standards of care are promulgated by the American Association of Community Psychiatrists ("AACP"), and the American Society for Addiction Medicine ("ASAM"). Generally speaking, these standards identify a host of criteria as being relevant to determining whether residential treatment is the appropriate level of care for any

PROPOSED INTERVENOR COMPLAINT
CASE NO. 3:14-CV-02346-JCS

5122958.6

particular patient, recognize that residential treatment is an intermediate level of care between acute in-patient hospitalization (which is generally required when the patient is a risk to him- or herself or others) and outpatient treatment (which is generally appropriate when the patient is capable of monitoring his or her own condition), and call for residential treatment when the patient's condition may be chronic in nature (*i.e.*, non-acute) and treatment is expected to last several months.

11.     Although UBH asserts in its guidelines and in communications with insureds that its LOCs and CDGs are consistent with generally accepted standards of care, and that it applies generally accepted standards in making benefit determinations, neither is true. UBH has promulgated LOCs and CDGs that are much more restrictive than the generally accepted standards of care in the mental health community. Indeed, in the last 3 years, UBH has been amending its LOCs to make them even more focused on the presence of acute symptoms (and therefore more restrictive), despite the fact that generally accepted standards highlight chronic considerations. As detailed herein, whereas UBH's guidelines restrict coverage for residential treatment to "acute" situations that can be addressed quickly, such restrictions on residential treatment are not found in any of the generally accepted standards of care, or for that matter, in the Lockton Plan that UBH administers. Quite the opposite, generally accepted standards recognize that residential treatment is particularly appropriate for the treatment of chronic conditions and is often appropriate for an extended period of time, and the Lockton Plan contains none of the restrictions that are identified in UBH's guidelines and challenged herein.

12.     The Lockton Plan purports to exclude mental health and substance abuse coverage when the treatment sought is inconsistent with generally accepted standards of care and UBH's LOCs. Thus, in developing its LOCs, UBH had a fiduciary duty to Ms. Tillitt and her son (and to other members of plans administered by UBH) to promulgate criteria that

PROPOSED INTERVENOR COMPLAINT
CASE NO. 3:14-CV-02346-JCS

5122958.6

faithfully ensure that a particular level of care is both covered by the terms of the Lockton Plan and consistent with generally accepted standards of care. UBH breached this duty by supplanting generally accepted treatment standards in the mental health field with standards that promote the self-serving, cost-cutting preferences of UBH and its corporate affiliates. By adopting guidelines that are inconsistent with, and much more restrictive than, those that are generally accepted in the medical community, UBH breached its fiduciary duty to act solely in the interests of participants and beneficiaries for the "exclusive purpose" of "providing benefits" with reasonable "care, skill, prudence, and diligence" and in accordance with the Lockton Plan.

13. UBH has also violated its legal obligations under ERISA by denying residential treatment claims that were covered by the Lockton Plan. These claims would have been covered based on the terms of the Lockton Plan and generally accepted treatment standards, but were denied as a result of UBH's two-pronged attack on benefit claimants. First, UBH promulgated improperly restrictive benefit determination guidelines, which it then relied upon to deny Ms. Tillitt's son's claims. Second, UBH denied Ms. Tillitt's son's claims even when they satisfied UBH's restrictive residential treatment guidelines, based on UBH's systematic practice of: (a) applying criteria found in its LOCs for acute inpatient treatment (such as whether the patient was in withdrawal, or whether the patient necessitated 24-hour nursing care – as opposed to 24-hour structure) to claims for residential treatment, even though UBH's LOCs for residential treatment did not list these criteria; (b) drawing factual conclusions about the medical condition of Ms. Tillitt's son that were not supported by the evidence in UBH's possession, in order to conclude that the benefit claims fell outside the LOCs; and (c) citing additional benefit guidelines found nowhere in the Lockton Plan, generally accepted standards of care, or in the UBH LOCs as a basis for denying coverage.

14.     In order to remedy UBH's breach of fiduciary duty and other ERISA violations, Ms. Tillitt brings individual and class claims against UBH under 29 U.S.C. § 1132(a)(1)(B), 1132(a)(3)(A) and 1132(a)(3)(B). Through this action, Ms. Tillitt seeks appropriate equitable and injunctive relief under ERISA to compel UBH to change its policies and practices so as to comply with its fiduciary obligations and to make benefit determinations which are consistent with generally accepted medical standards.

## DEFENDANT, JURISDICTION AND VENUE

15.     Defendant United Behavioral Health ("UBH"), operating under the brand name OptumHealth Behavioral Solutions, is a corporation organized under California law with its principal place of business located in San Francisco, California. UBH is responsible for drafting and promulgating the internal level of care guidelines and coverage determination guidelines referenced herein. It also adjudicates all mental healthcare and substance abuse claims for the Lockton Plan.

16.     UBH and United Healthcare Insurance Company ("UHIC") are both wholly owned and controlled subsidiaries of UnitedHealth Group Incorporated ("UHG"). These companies do not operate independently and in their own interests, but solely serve to fulfill the goals and policies of UHG and generate revenue for UHG.

17.     Subject matter jurisdiction exists pursuant to 28 U.S.C. § 1331.

18.     Personal jurisdiction exists over UBH, and this District is the proper venue, because UBH conducts significant operations in this District, regularly communicates with insureds who reside in this District, and is headquartered in this District.

PROPOSED INTERVENOR COMPLAINT
CASE NO. 3:14-CV-02346-JCS

5122958.6

## UBH'S LEVEL OF CARE AND COVERAGE DETERMINATION GUIDELINES RELEVANT TO TILLITT'S CLAIMS

19.     UBH has developed CDGs and LOCs that it uses to determine whether any given level of mental health or substance abuse treatment is covered by the health insurance plans that it is charged with administering. UBH relied on both its LOCs and its CDGs to deny coverage for residential treatment of Max Tillitt's substance use disorder and co-occurring mental illness.

20.     UBH's 2015 LOCs for Residential Rehabilitation (the "Rehab LOCs") define residential rehabilitation as "[a] sub-acute facility-based program which provides 24-hour/7-day assessment and diagnostic services, and active behavioral health treatment services to members who do not require the intensity of nursing care, medical monitoring, and physician availability offered in Inpatient Rehabilitation for the purpose of initiating the process of assisting a member with gaining the knowledge and skills needed to prevent recurrence of a substance-related disorder."

21.     Despite this recognition, however, the Rehab LOCs expressly incorporate the LOCs' Common Criteria for all Levels of Care (the "Common Criteria"), which focus—and condition the approval of treatment at any level of care—on "acute" symptoms. Admission to, or continued stay in, a residential rehabilitation program is only permitted under the Rehab LOCs to the extent it is consistent with the acute-focused Common Criteria.

22.     The 2015 Common Criteria, which are applicable to mental health and substance abuse treatment at every level of care, require the presence of "acute" symptoms in order to obtain residential treatment, and that such residential treatment specifically address these "acute" symptoms. The 2015 Common Criteria also consider only the possibility of a patient's deterioration with respect to such "acute" symptoms. For example, the 2015 Common Criteria authorize admission to treatment only when (among other requirements):

7

- The member's current condition cannot be safely, efficiently, and effectively assessed and/or treated in a less intensive level of care due to *acute* changes in the member's signs and symptoms and/or psychosocial and environmental factors (i.e., the "why now" factors leading to admission)....

-AND-

- .... Assessment and/or treatment of *acute* changes in the member's signs and symptoms and/or psychosocial and environmental factors (i.e., the "why now" factors leading to admission) require the intensity of services provided in the proposed level of care....

23.     Similarly, he Common Criteria also require, for admission to any treatment, that "[t]here is a reasonable expectation that services will improve the member's presenting problems within a reasonable period of time," and go on to explain that "[i]mprovement of the member's condition is indicated by the reduction or control of the *acute* signs and symptoms that necessitated treatment in a level of care."

24.     UBH also relied on its CDG for Treatment of Substance-Related & Addictive Disorders to deny Max Tillitt's claim. The version of that CDG that was in effect when UBH denied Max Tillitt's claims was the October 2014 revision (the "2014 Substance Abuse CDG"). The 2014 Substance Abuse CDG defines "Residential Rehabilitation" to be "comprised of *acute* overnight services that are typically provided in a freestanding Residential Treatment Center for the care of a Substance-Related Disorder[]."

25.     The 2014 Substance Abuse CDG incorporates extensively from the 2014 version of UBH's LOCs, which contained Rehab LOCs and Common Criteria that were largely identical to the guidelines discussed above, and plagued by the same focus on "acute" factors.

26.     Thus, mirroring the 2014 Common Criteria, one requirement in the 2014 Substance Abuse CDG for selecting a level of treatment is that "[t]here is a reasonable expectation that services will improve the member's presenting problems within a reasonable

PROPOSED INTERVENOR COMPLAINT
CASE NO. 3:14-CV-02346-JCS

period of time. Improvement of the member's condition is indicated by the reduction or control of the *acute* signs and symptoms that necessitated treatment in a level of care."

27. Moreover, mirroring the 2014 Rehabilitation LOCs, the 2014 Substance Abuse CDG provides the following admission criteria for residential rehabilitation:

- The "why now" factors leading to admission and/or the member's history of response to treatment suggest that there is imminent or current risk of relapse which cannot be safely, efficiently and effectively managed in a less intensive level of care….

-OR-

- The "why now" factors leading to admission suggest that member's condition cannot be safely, efficiently and effectively treated in a less intensive setting due to acute changes in the member's signs and symptoms and/or psychosocial and environmental factors….

-OR-

- Acute impairment of behavior or cognition that interferes with activities of daily living to the extent that the member's condition cannot be safely, efficiently and effectively managed in a less intensive level of care….

-OR-

- Psychosocial and environmental problems that threaten the member's safety or undermines engagement in a less intensive level of care.

28. The 2014 Substance Use Disorder CDG also conditions continued residential rehabilitation on whether "the member is making progress in addressing the admission criteria."

29. The UBH guidelines discussed above all focus on whether, in UBH's view, residential treatment is necessary at a particular time, through application of so-called "why now" factors. However, these "why now" factors deviate from generally accepted standards by focusing almost exclusively on acute changes and conditions, even when patients are being

PROPOSED INTERVENOR COMPLAINT
CASE NO. 3:14-CV-02346-JCS

5122958.6

treated in residential rehabilitation, which even UBH's own guidelines concede is a sub-acute level of care.

30.    Generally-accepted substance abuse treatment guidelines have been promulgated by the American Society for Addiction Medicine ("ASAM") and by the American Association of Community Psychiatrists ("AACP"). These generally-accepted guidelines are publicly available. UBH acknowledges, in a document entitled "Guideline Evidence Base for Level of Care Guidelines" that ASAM and AACP set the generally recognized criteria for substance abuse-related residential treatment levels of care. In the same document, UBH asserts that the ASAM and AACP standards provide the "evidence base" that supports its LOCs for substance use disorders. Similarly, in the introduction to its 2014 and 2015 LOCs, UBH asserts that its guidelines "reflect [UBH's] understanding of current best practices in care." In fact, however, UBH's guidelines are inconsistent with, and much more restrictive than, these generally accepted standards of care.

31.    The Level of Care Utilization System for Psychiatric and Addictive Services ("LOCUS"), developed by AACP for use in adult populations, has six dimensions: (1) risk of harm; (2) functional status; (3) co-morbidity; (4) recovery environment; (5) treatment and recovery history; and (6) engagement in recovery. Each dimension has a five point rating scale, from least to most severe. For each of the five possible ratings within each dimension, a set of criteria is clearly defined. Only one criterion needs to be met for that rating to be selected, and for each dimension, the highest rating in which at least one of the criteria is met is the rating that should be assigned. In case of any ambiguity or doubt, "the highest score in which it is more likely than not that at least one criterion has been met should generally be assigned. . . . [A]ny errors should be made on the side of caution."

PROPOSED INTERVENOR COMPLAINT
CASE NO. 3:14-CV-02346-JCS

5122958.6

32.     Based on these scores, LOCUS determines whether a patient should be placed in residential treatment, as opposed to a higher or lower standard of care. For example, a rating of 4 out of 5 in any of the first three dimensions almost always automatically necessitates placement in residential treatment, independent of any other factors, as do numerous other permutations. When a choice between two available levels of care must be made, "[i]n most cases, the higher level of care should be selected, unless there is a clear and compelling rationale to do otherwise."

33.     Similarly, the ASAM guidelines also set forth six analogous dimensions for determining the appropriate level of care: (1) Acute Intoxication and/or Withdrawal Potential; (2) Biomedical Conditions and Complications; (3) Cognitive, Behavioral, and Emotional Conditions and Complications; (4) Readiness to Change; (5) Relapse, Continued Use or Continued Problem Potential; and (6) Recovery Environment. The ASAM guidelines support admission to residential treatment (which it identifies as a "clinically managed level of care") for:

> Individuals who . . . have minimal problems with intoxication or withdrawal (Dimension 1) and few biomedical complications (Dimension 2), so on-site physician services are not required. Such individuals may have relatively stable problems in emotional, behavioral, and cognitive conditions (Dimension 3), meeting the diagnostic criteria of the *Diagnostic and Statistical Manual of Mental Disorders (DSM)* of the American Psychiatric Association. Many also have significant limitations in the areas of readiness to change (Dimension 4), relapse, continued use, or continued problem potential (Dimension 5), or recovery environment (Dimension 6). Therefore, they are in need of interventions directed by appropriately trained and credentialed addiction treatment staff. Such individuals also need case management services to facilitate their reintegration into the larger community.

34.     ASAM also explicitly acknowledges that "***chronicity*** of the addictive disorder or the patient's cognitive limitations" may compromise "readiness to change" and necessitate residential treatment:

Given the current understanding of substance use disorders as having a *chronic, long-term, remitting and relapsing course, it should be expected that effective treatment should match this chronic course*. In fact, treatment should be regarded as a dynamic, longitudinal process, rather than as a discrete episode of care. While it may encompass one or several acute episodes, it also must endure over the long term. *A now outdated approach viewed discrete time-limited episodes of program enrollment as adequate "doses" of treatment.* In that view, any further care, also typically time-limited, was regarded as "aftercare" rather than ongoing care—as though the active part of treatment had ended.

The current view of addiction as a chronic disorder supports a stance of therapeutic optimism and *an attitude of persistence toward the treatment-refractory patient*. It also reinforces the need for *chronic attention and vigilance in response to a chronic vulnerability, even in the improved patient*.

35.　　Thus, ASAM calls for continued residential treatment if any of the following apply:

The patient is making progress, but has not yet achieved the goals articulated in the individualized treatment plan. Continued treatment at the present level of care is assessed as necessary to permit the patient to continue to work toward his or her treatment goals;

or

The patient is not yet making progress, but has the capacity to resolve his or her problems. He or she is actively working toward the goals articulated in the individualized treatment plan. Continued treatment at the present level of care is assessed as necessary to permit the patient to continue to work toward his or her treatment goals;

and/or

New problems have been identified that are appropriately treated at the present level of care. The new problem or priority requires services, the frequency and intensity of which can only safely be delivered by continued stay in the current level of care. The level of care in which the patient is receiving treatment is therefore the least intensive level at which the patient's new problems can be addressed effectively.

36.　　ASAM further specifies that, with respect to residential treatment (which it describes as a Level 3 program), "[w]hile the duration of treatment varies with the severity of an individual's illness and his or her response to treatment, the length of service in clinically

12

managed Level 3 programs tends to be longer than in the more intensive medically monitored and medically managed levels of care … Longer exposure to treatment interventions is necessary for certain patients to acquire basic living skills and to master the application of coping and recovery skills." Underscoring this, the American Psychiatric Association Guideline for the Treatment of Patients with Substance Use Disorders, Second Edition (2006), explicitly states that "[r]esidential treatment of 3 months is associated with better long-term outcomes in such patients."

37.     Strikingly distinguished from the UBH CDG and LOC Guidelines is ASAM's instruction that "all matrices in *The ASAM Criteria* correlate risk ratings and the types of services and modalities needed, and call for treatment where the patient's needs can ***best be met***" generally based on "[t]he dimension with the highest risk rating determin[ing] the immediate service needs and placement decision."

38.     The LOCs and CDGs discussed above are inconsistent with generally accepted standards, as illustrated by guidelines issued by AACP and ASAM in three key respects. First, UBH's guidelines require a patient to demonstrate the he has experienced "acute changes" in his condition or circumstances that now warrant residential treatment, even though generally accepted standards articulate ***no such requirement*** and call for treatment when chronic symptoms are present. Generally accepted standards also focus on the long-term benefits of residential treatment, recognizing that continued stay is often necessary to address chronic conditions and promote lasting stability. Second, UBH's guidelines ignore generally accepted and evidence-based assessment protocols and rating systems for determining whether residential treatment is appropriate. As a result, UBH entirely omits consideration of certain key factors like readiness or motivation to change. Third, unlike UBH's guidelines, generally accepted standards urge erring on the side of caution and call for residential treatment unless there is

PROPOSED INTERVENOR COMPLAINT
CASE NO. 3:14-CV-02346-JCS

5122958.6

"clear and compelling" evidence that a lower level of care is more appropriate (i.e., the burden of proof is reversed).

39.     As ASAM noted in its *Public Policy Statement on Managed Care, Addiction Medicine, and Parity* (March, 2009), when an insurer such as UBH develops its own treatment level of care guidelines, "rather than adhering to nationally validated, reliable, and accepted guidelines, it may appear that decision-influencing factors such as cost considerations outweigh valid evidence-based authorization requests for medically necessary treatment."

40.     This is precisely what happened here. UBH's guidelines restrict coverage only to situations in which the patient is experiencing "acute" changes in signs and symptoms (irrespective of chronicity or duration of illness) and do not even attempt to account for motivational impediments to recovery, even though such limitations are inconsistent with generally accepted standards of care for substance abuse treatment.

## UBH'S IMPROPER DENIAL OF MAX TILLITT'S CLAIMS

41.     Ms. Tillitt is the mother of the late Maxwell Tillitt ("Max Tillitt" or "Max"). Ms. Tillitt resides in Eden Prairie, Minnesota, where her son also resided until his death on September 26, 2015.

42.     Ms. Tillitt is a participant in the "Lockton, Inc. Welfare Benefit Plan" (the "Lockton Plan"), a self-funded, large group plan sponsored by Lockton, Inc., which is subject to ERISA. Max Tillitt was a beneficiary of the Lockton Plan.

43.     According to the Lockton Plan, UHIC is the designated "Claims Administrator" responsible for making benefit determinations and adjudicating appeals under the Lockton Plan. Under the Lockton Plan, UHIC "makes the final decision as to whether or not a particular service is covered." The Plan further provides that UHIC "may delegate this discretionary authority to other persons or entities that provide services in regard to administration of the

5122958.6

Plan." Pursuant to this authority, UHIC has delegated to UBH its discretionary authority to adjudicate mental health and substance abuse-related claims.

44. The Lockton Plan provides for two levels of internal appeals prior to exhaustion of administrative remedies, after which participants are entitled to sue. The Plan expressly provides that legal action "against . . . the Claims Administrator to recover reimbursement" cannot be brought "until 90 calendar days after [a participant] has properly submitted a request for reimbursement" as described in the Plan.

45. Additionally, the Lockton Plan expressly provides that "ERISA imposes duties on the people who are responsible for the operation of the Plan. The people who operate your Plan, called 'fiduciaries' of the Plan, have a duty to do so prudently and in the best interest of you and other Plan participants and beneficiaries."

46. The Lockton Plan covers in- and out-of-network services that are "provided for the purpose of preventing, diagnosing, or treating Sickness, Injury, Mental Illness, substance-related and addictive disorders, or their symptoms." The Plan further provides that covered services must be "consistent with . . . prevailing medical standards and clinical guidelines," meaning "nationally recognized professional standards of care including, but not limited to, national consensus statement, nationally recognized clinical guidelines, and national specialty society guidelines."

47. Among the covered services available to Max Tillitt under the Lockton Plan were substance use disorder treatment and mental health treatment at a residential treatment facility.

48. Max Tillitt struggled with substance use disorders and bipolar disorder from when he was approximately 15 or 16 years old. On June 18, 2015, Max was admitted for treatment of co-occurring substance use disorder, bipolar disorder, and sleep disorder, at Beauterre Recovery Institute ("Beauterre"), a state licensed residential treatment facility in Owatonna, Minnesota

15

that specializes in the treatment of persons with chemical substance abuse and mental health disorders. Beauterre is an out-of-network facility for UHIC.

49.    During his Comprehensive Assessment upon admission to Beauterre, Max reported that he had participated in rehabilitation programs seven or eight previous times, for periods typically ranging from one day to one week. He relapsed after each of those programs, a fact well-known to UBH. In September 2014, he successfully completed an inpatient detoxification and rehabilitation program, followed by partial hospitalization and eventually intensive outpatient therapy, which resulted in his longest period of sobriety since his substance use disorder began: just seven weeks. Max stated that his bipolar disorder and struggles with sleeping made it difficult for him to maintain sobriety.

50.    Max's Comprehensive Assessment found that he presented with severe disorders related to the use of alcohol, cannabis, opioids (including heroin), and stimulants (including amphetamines and cocaine) as well as untreated bipolar disorder, and that he had a high risk of relapse. The assessment concluded that Max had "[n]o recognition or understanding of relapse and recidivism issues and displayed high vulnerability for further substance use disorder [or] mental health problems," and that he had "[n]o coping skills to arrest mental health or addiction illnesses or prevent relapse."

51.    The initial Comprehensive Assessment further found that Max evidenced a "[s]evere lack of impulse control and coping skills" and had "[f]requent thoughts of suicide or harm to others including a plan and the means to carry out the plan." Max reported that he had attempted suicide on two prior occasions, both times by overdosing on drugs.

52.    The initial Comprehensive Assessment also noted that Max lacked employment, relied on his divorced parents for housing, and was on probation; that his recovery environment was "chronically antagonistic;" and that Max "lack[ed] insight into how to build and maintain

16

structured daily living, as well as how to nurture and access a sober support network in recovery."

53.     Additionally, the initial Comprehensive Assessment noted that Max's motivation for change was unknown, that he appeared externally motivated for treatment through probation, and that he "[d]isplay[ed] inconsistent compliance, minimal awareness of either [his] addiction or mental disorder, and [was] minimally cooperative."

54.     Upon initially evaluating Max's condition, Beauterre anticipated an August 1, 2015 discharge from residential rehabilitation.

55.     On June 17, 2015, Beauterre informed UBH's case manager, Hillary Ikner, of Max's pending admission. Ms. Ikner's notes in UBH's case file on Max corroborate UBH's awareness of the above facts. Her notes also confirm UBH's awareness that Max's most recent suicide attempt by overdose was three months earlier, that Max experienced "[p]roblems w/back vertebrae since 2010 causing chronic back pain; injection site concerns due to IV [intravenous] use hx; TBI [traumatic brain injury] suffered 4 yrs ago while playing football in 11th grade which has caused concentration problems." Her notes also reflect difficulties with Max's support structure, and that Max was expecting a baby and wanted to be a part of his life.

56.     Despite Beauterre's request for 28 days of residential rehabilitation coverage, Ms. Ikner initially approved only 6 days. Although UBH unilaterally modified Beauterre's coverage request, it did not record this modification as an adverse determination or offer any appeals rights consistent with the United States Department of Labor ("DOL") claims rule.

57.     On June 23, 2015, UBH case manager Nicholas Volenec noted in UBH's case file that Max was struggling with mania, lack of concentration, poor sleep (3 hours per night), cravings, post-acute withdrawal symptoms, poor insight and judgment, and that he was refusing medications.

17

PROPOSED INTERVENOR COMPLAINT
CASE NO. 3:14-CV-02346-JCS

58. On June 29, 2015, Mr. Volenec noted that Max's "affect [was] mixed with extreme disorganization, possibly manic, some blunted and flat features. Poor boundaries. Glamorizing and making graphic descriptions of his drug use in groups. Requires redirection often. High cravings, drug dreams . . . Insight and judgment are poor. Cognition and affected by manic like symptoms, Pressured speech and very tangential thoughts. Poor concentration and focus." Mr. Volenec also noted that Max's sleep had increased to 4 hours per night and was still troubled.

59. On July 6, 2015, Mr. Volenec noted that Max was started on a mood stabilizer and that Max was "described as manic, pressured and rapid speech, loud, tangential, disorganized."

60. On July 8, 2015 Mr. Volenec noted that none of the following "critical goals to be accomplished during this level of care" had been resolved: "mental status/issues symptoms;" "inadequate self-management;" and "next steps." Nonetheless, Mr. Volenec recommended a lower level of care, such as intensive outpatient treatment, stating in his notes that:

> The UBH CDG explains that generally accepted standards of medical practice call for Residential Rehabilitation of Substance Use Disorders according to the dominance of substance use in the patient's daily life and by the absence of a support system and a safe substance-free environment. Additional considerations that inform the choice for Residential Rehabilitation include: pervasive impairment in functioning due to continued and severe substance use; the risk of exacerbation of medical conditions due to continued substance use or severe impairment in the patient's family or social support system such that the patient is likely to use substances if not in 24-hour care.

61. Not only did Mr. Volenec completely disregard UBH's long-standing awareness of the dominance of substance use in Max's daily life over an extended period of time, the absence of sober environmental supports, and Max's pervasive impairment in functioning due to continued and severe substance use, but Mr. Volenec entirely failed to consider Max's lack of internal motivation for change as an impediment to outpatient recovery. Mr. Volenec's failure to

consider this important criterion is consistent with the UBH CDG, which does not include lack of motivation as a factor to be evaluated.

62. Furthermore, in keeping with UBH's myopic focus on "acute" factors, UBH's guidelines-driven review of Max Tillitt's claim gave no consideration to the consequences that Max's traumatic brain injury had on his need for residential rehabilitation. The ASAM criteria, on the other hand, contemplate that "the individual who suffers from chronic brain syndrome, or the older adult who has age and substance-related cognitive limitations, or the *individual who has experienced a traumatic brain injury*, or the patient with developmental disabilities *would continue to receive treatment in a [residential] program*. For such an individual, the effects of the addictive disorder or co-occurring condition are so significant, and the level of his or her impairment so great, that outpatient . . . care would not be feasible or effective."

63. UBH's internal peer-review case notes also reflect UBH's focus on a lack of "post-acute withdrawal symptoms" and "acute psychiatric symptoms" despite the former not being a generally accepted requirement for residential rehabilitation and the latter being clearly substantiated by Max's unabated manic symptoms.

64. On July 9, 2015, a coverage denial letter from UBH Associate Medical Director, Coleman H. Wheeler, MD, stated:

> United Behavioral Health (UBH) is responsible for making benefit coverage determinations for mental health and substance abuse services that are provided to UnitedHealthcare Insurance Company, Inc. members.
>
> * * *
>
> Based on the United Behavioral Health (UBH) Residential Coverage Determination Guidelines for Substance-related Disorder, benefit coverage of residential level of care is not available on 07/09/2015 and forward. You have been able to get off drugs. You have made progress in the program. You do not have *extreme health or emotional problems including from coming off of drugs*. You do not need 24-hour nursing care. Your care could go on in a less restrictive setting such as outpatient.

PROPOSED INTERVENOR COMPLAINT
CASE NO. 3:14-CV-02346-JCS

5122958.6

65.     Dr. Wheeler's glib observation that Max was "able to get off drugs" while at Beauterre and that he "made progress in the program" failed entirely to consider whether Max could *stay* off drugs in an outpatient setting. Consistent with UBH's CDG, Dr. Wheeler also failed to account for Max's lack of motivation as an impediment to outpatient recovery. Dr. Wheeler also failed to consider Max's continued mania, sleep disturbance, and traumatic brain injury as highly complicating and disruptive recovery factors. Dr. Wheeler did not adhere to generally accepted standards of care, which, as articulated by ASAM, indicate that individuals should be transferred to lower levels of care only when "they have ***established sufficient skills*** to safely continue treatment ***without the immediate risk of relapse, continued use, or other continued problems***" and that discharge is inappropriate unless "[t]he patient has achieved the goals articulated in his or her individualized treatment plan, thus ***resolving the problem(s) that justified admission to the present level of care***" such that "[c]ontinuing the chronic disease management of the patient's condition at a less intensive level of care is indicated." Instead, Dr. Wheeler improperly limited his assessment to "extreme health or emotional problems from coming off of drugs" – a focus on acute symptoms that effectively conditioned Max's continued residential rehabilitation on the presence of withdrawal, contrary to generally accepted standards of care.

66.     As of July 10, 2015, 21 days into his treatment, Max was still struggling. A progress note completed on that date reported that Max's "cravings for heroin [had] come back." It also stated that Max's mental health was "still unstable; he is quite manic and still pretty high there." Max still suffered from frequent thoughts of suicide or harm to others. He had started medication for his bipolar disorder a week earlier but had not yet noticed a

PROPOSED INTERVENOR COMPLAINT
CASE NO. 3:14-CV-02346-JCS

5122958.6

difference. According to the progress note, Max's "instability in his [mental health] are concerning and not in a good place quite yet."

67.    On July 10, 2015, Beauterre requested an urgent appeal of UBH's denial. UBH's records, prepared by one of its physician reviewers, note the absence of "any withdrawal symptoms" despite the lack of a such a requirement for residential rehabilitation; "no report of the patient being suicidal or homicidal" despite Max's continued ideations; "no report of the patient having any behavioral disturbance" despite concurrent annotations that "[t]he patient had racing thoughts and was being distracted;" and "no acute comorbid medical conditions," ignoring Max's traumatic brain injury and the chronic back pain stemming from injury to his vertebrae.

68.    In a letter dated July 13, 2015, UBH Associate Medical Director, Eugene Kwon, MD denied the urgent appeal, stating:

> United Behavioral Health (UBH) is responsible for making benefit coverage determinations for mental health and substance abuse services that are provided to UnitedHealthcare Insurance Company, Inc. members.

> * * *

> Your treatment does not meet medical necessity criteria and the Adverse Benefit Determination issued 7/9/2015 forward is upheld. I based this decision on the clinical information provided and UBH Level of Care Guidelines for Substance Use Disorder Residential Treatment Rehabilitation. More treatment in this setting does not appear medically necessary at this time. You have been able to move towards recovery by identifying triggers or issues that often lead to substance usage. Although you still need more treatment, you do not appear to need residential services. You are able to function outside of a 24-hour setting. You have been working actively with the treatment team on your recovery goals. There are no serious medical or mental health problems. You appear to be doing better. ***You do not have withdrawal symptoms***. Your mood and sleep have seemed to improve as well. Your care can occur in a less restrictive setting such as substance use disorder outpatient, which is available in your area.

> * * *

PROPOSED INTERVENOR COMPLAINT
CASE NO. 3:14-CV-02346-JCS

5122958.6

This is the Final Adverse Determination of your internal appeal. All internal appeals through UBH have been exhausted.

69. Like Dr. Wheeler, Dr. Kwon improperly focused on the absence acute "withdrawal symptoms" as a basis to deny residential rehabilitation, failed to account for Max's level of motivation as an impediment to outpatient recovery, failed to consider Max's risk of relapse in light of his extensive history of substance abuse and lack of prior treatment engagement, and utterly disregarded Max's continued mania, sleep disturbance, and traumatic brain injury as "serious medical or mental health problems" complicating Max's recovery. Rather, Dr. Kwon superficially posited that Max was "able to move towards recovery by identifying triggers or issues that often lead to substance usage" without accounting for Max's lack of skills to cope with such identified triggers.

70. Like Dr. Wheeler, Dr. Kwon also disregarded ASAM's admonishment, and the underlying generally accepted standards of care, that individuals should be transferred to lower levels of care only when "they have *established sufficient skills* to safely continue treatment *without the immediate risk of relapse, continued use, or other continued problems*" and that discharge is appropriate when "[t]he patient has achieved the goals articulated in his or her individualized treatment plan, thus *resolving the problem(s) that justified admission to the present level of care*" such that "[c]ontinuing the chronic disease management of the patient's condition at a less intensive level of care is indicated."

71. UBH's rationales for denying coverage, and its related internal policies upon which those rationales were based, violate the terms of the Lockton Plan. The Lockton Plan covered residential treatment for substance abuse and mental illness that was consistent with prevailing medical practices, yet UBH denied Max's claims based on its own internal guidelines, which ignore important criteria like motivational impediments to recovery, high risk

PROPOSED INTERVENOR COMPLAINT
CASE NO. 3:14-CV-02346-JCS

5122958.6

of relapse and unstable mental health condition; and which conflate acute hospitalization and detoxification criteria (such as "withdrawal" and "24 hour nursing") with residential treatment/rehabilitation criteria relevant to intermediate levels of care (such as "24 hour structure").

72. On July 13, 2015, Max was discharged from Beauterre. Because UBH had terminated coverage so abruptly, the facility had no discharge plan in place at that time. Max eventually entered intensive outpatient treatment on July 27, 2015, but that treatment provided too low a level of care, given the severity of Max's substance abuse and comorbid mental health conditions at that time.

73. After his premature discharge from Beauterre, Max soon relapsed. On September 26, 2015, approximately ten weeks after UBH's wrongful claims denials, Max died of a drug overdose at the age of 21.

## CLASS ACTION ALLEGATIONS

74. Ms. Tillitt incorporates by reference the preceding paragraphs as though such paragraphs were fully stated herein.

75. UBH serves as the claims administrator for mental health and substance abuse treatment claims for other health insurance plans that define covered residential treatment in the same way as the Lockton Plan (*i.e.* treatment that is consistent with generally accepted medical standards and UBH's LOCs). The policies and practices that UBH followed with respect to the claims filed by Ms. Tillitt's son are the same as those that have been applied by UBH to other similarly situated insureds seeking mental health and substance abuse treatment benefits under their health plans.

PROPOSED INTERVENOR COMPLAINT
CASE NO. 3:14-CV-02346-JCS

5122958.6

76. As such, pursuant Federal Rule of Civil Procedure 23, Ms. Tillitt brings her claims on behalf of a putative class of similarly situated individuals as noted in the counts below. The class (the "Class") is defined as follows:

> All participants or beneficiaries in an insurance plan governed by ERISA, for which UBH has been delegated the authority to make coverage decisions with respect to claims for mental health and substance abuse-related treatment, who sought and were denied coverage for all or a portion of residential treatment for mental health or substance use, within the applicable statute of limitations.

77. The members of the Class can be objectively ascertained through the use of information contained in UBH's files because UBH knows who its insureds are, which plans they are insured by, what type of claims they have filed, and how those claims were adjudicated.

78. There are so many persons within the putative class that joinder is impracticable.

79. Certification of the Class is desirable and proper because there are questions of law and fact in this case that are common to all members of the class. Such common questions of law and fact include, but are not limited to, the following:

A. What legal duties does ERISA impose upon UBH when it is serves as a claims administrator for mental health and substance abuse claims;

B. Does UBH engage in a fiduciary act when it promulgates mental health and substance use level of care and coverage determination guidelines;

C. Are UBH's level of care and coverage determination guidelines consistent with those that are generally accepted in the medical community;

D. Does UBH's promulgation of these policies constitute a breach of fiduciary duty;

E. Does UBH engage in a fiduciary act when it adjudicates a claim for benefits;

F. Does UBH have a practice of applying guidelines related to inpatient hospitalization or detoxification to claims for residential treatment;

G. Does UBH's systemic misapplication of inpatient hospitalization criteria to claims for residential treatment constitute a breach of fiduciary duty;

H. What remedies are available if UBH is found liable for the claims alleged;

80.     Certification is desirable and proper because Ms. Tillitt's claims are typical of the claims of the members of the class Ms. Tillitt seeks to represent.

81.     Certification is also desirable and proper because Ms. Tillitt will fairly and adequately protect the interests of the class she seeks to represent. There are no conflicts between Ms. Tillitt's interests and those of other members of the class, and Ms. Tillitt is cognizant of her duties and responsibilities to the entire class. Ms. Tillitt's attorneys are qualified, experienced and able to conduct the proposed class action litigation.

82.     It is desirable to concentrate the litigation of these claims in this forum. The determination of the claims of all class members in a single forum, and in a single proceeding would be a fair and efficient means of resolving the issues in this litigation.

83.     The difficulties likely to be encountered in the management of a class action in this litigation are reasonably manageable, especially when weighed against the virtual impossibility of affording adequate relief to the members of the class through numerous separate actions.

## COUNT I

### CLAIM FOR VIOLATION OF FIDUCIARY OBLIGATIONS
### BROUGHT ON BEHALF OF INTERVENOR PLAINTIFF AND THE CLASS

84.     Ms. Tillitt incorporates by reference the preceding paragraphs as though such paragraphs were fully stated herein.

85.     This count is brought pursuant to 29 U.S.C. § 1132(a)(1)(B).

25

86.     As the entity responsible for making mental health and substance abuse benefit determinations under the Lockton Plan, and responsible for developing internal practices and policies to facilitate such determinations, UBH is an ERISA fiduciary.

87.     As an ERISA fiduciary, and pursuant to 29 U.S.C. Section 1104(a), UBH is required to discharge its duties "solely in the interests of the participants and beneficiaries" and for the "exclusive purpose" of providing benefits to participants and their beneficiaries and paying reasonable expenses of administering the plan. It must do so with reasonable "care, skill, prudence, and diligence" and in accordance with the terms of the plans it administers. It must conform its conduct to a fiduciary duty of loyalty and may not make misrepresentations to its insureds.

88.     UBH violated these duties by promulgating the restrictive level of care and coverage determination guidelines discussed herein. Despite the fact that the health insurance plans that insure Ms. Tillitt and the Class provide for insurance coverage for residential treatment, the fact that generally accepted standards of care are widely available and well-known to UBH, and that fact that UBH asserted that its guidelines were consistent with those that are generally accepted, UBH developed guidelines that are far more restrictive than those that are generally accepted. In doing so, UBH did not act "solely in the interests of the participants and beneficiaries" for the "exclusive purpose" of "providing benefits." It did not utilize the "care, skill, prudence, and diligence" of a "prudent man" acting in a similar capacity. It did not act in accordance with the terms of the Lockton Plan.

89.     Instead, UBH elevated its own interests and those of its corporate affiliates above the interests of plan participants and beneficiaries. By promulgating improperly restrictive guidelines, UBH artificially decreased the number and value of covered claims thereby benefiting its corporate affiliates at the expense of plan participants and beneficiaries.

PROPOSED INTERVENOR COMPLAINT
CASE NO. 3:14-CV-02346-JCS

5122958.6

90.     Ms. Tillitt and the members of the Class have been harmed by UBH's breaches of fiduciary duty because their claims have been subjected to UBH's restrictive guidelines, making it less likely that UBH will determine that their claims are covered.

91.     Ms. Tillitt and the members of the Class seek the relief identified below to remedy this claim.

## COUNT II

### CLAIM FOR IMPROPER DENIAL OF BENEFITS
### BROUGHT ON BEHALF OF INTERVENOR PLAINTIFF AND THE CLASS

92.     Ms. Tillitt incorporates by reference the preceding paragraphs as though such paragraphs were fully stated herein.

93.     This count is brought pursuant to 29 U.S.C. §1132(a)(1)(B).

94.     UBH denied the insurance claims for residential treatment submitted by Max Tillitt and other members the Class in violation of the terms of the Lockton Plan and the insurance plans that insure members of the Class. UBH denied these claims, in part, based on its restrictive internal guidelines that were developed in violation of its fiduciary duties. It also denied these claims, in part, based on its systematic practice of: (i) improperly applying acute inpatient treatment criteria to residential treatment claims; (ii) ignoring the evidence presented to it; and (iii) relying upon its restrictive CDGs even though CDGs are not a recognized basis for denying claims under the Lockton Plan.

95.     Ms. Tillitt and the members of the Class have been harmed by Defendants' improper benefit denials because they were deprived of insurance benefits they were owed.

96.     Ms. Tillitt and the members of the Class seek the relief identified below to remedy this claim.

PROPOSED INTERVENOR COMPLAINT
CASE NO. 3:14-CV-02346-JCS

5122958.6

## COUNT III

### CLAIM FOR EQUITABLE RELIEF
### BROUGHT ON BEHALF OF INTERVENOR PLAINTIFF AND THE CLASS

97.     Ms. Tillitt incorporates by reference the preceding paragraphs as though such paragraphs were fully stated herein.

98.     This count is brought pursuant to 29 U.S.C. § 1132(a)(3)(A) only to the extent that the Court finds that the injunctive relief sought to remedy Counts I and/or II are unavailable pursuant to 29 U.S.C. § 1132(a)(1)(B).

99.     Ms. Tillitt and the Class have been harmed, and are likely to be harmed in the future, by UBH's breaches of fiduciary duty described above.

100.    In order to remedy these harms, Ms. Tillitt and the Class are entitled to enjoin these acts and practices pursuant to 29 U.S.C. § 1132(a)(3)(A).

## COUNT IV

### CLAIM FOR OTHER APPROPRIATE EQUITABLE RELIEF
### BROUGHT ON BEHALF OF INTERVENOR PLAINTIFF AND THE CLASS

101.    Ms. Tillitt incorporates by reference the preceding paragraphs as though such paragraphs were fully stated herein.

102.    This count is brought pursuant to 29 U.S.C. § 1132(a)(3)(B) only to the extent that the Court finds that the equitable relief sought to remedy Counts I and II are unavailable pursuant to 29 U.S.C. § 1132(a)(1)(B).

103.    Ms. Tillitt and the Class have been harmed, and are likely to be harmed in the future, by UBH's breaches of fiduciary duty described above.

104.    Additionally, by engaging in this misconduct, UBH allowed it corporate affiliates to be unjustly enriched insofar as they were not required to pay benefit claims.

105. In order to remedy these harms, Ms. Tillitt and the Class are entitled to appropriate equitable relief pursuant to 29 U.S.C. § 1132(a)(3)(B).

## REQUESTED RELIEF

WHEREFORE, Ms. Tillitt demands judgment in her favor against Defendants as follows:

A. Certifying the Class and the claims, as set forth in this Complaint, for class treatment;

B. Appointing Ms. Tillitt as Class Representative for the Class;

C. Designating Zuckerman Spaeder LLP and Psych-Appeal, Inc. as counsel for the Class;

D. To remedy Count I, or alternatively pursuant to Count III, declaring that UBH's internal guidelines complained of herein were developed in violation of UBH's fiduciary duties;

E. To remedy Count I, or alternatively pursuant to Count III, issuing a permanent injunction ordering UBH to stop utilizing the guidelines complained of herein, and instead adopt or develop guidelines that are consistent with those that are generally accepted and with the requirements of applicable state law;

F. To remedy Count II, or alternatively pursuant to Count III, declaring that UBH's denials of residential treatment coverage were improper;

G. To remedy Count II, or alternatively pursuant to Count III, ordering UBH to reprocess claims for residential treatment that it previously denied (in whole or in part) pursuant to new guidelines that are consistent with those that are generally accepted and with the requirements of applicable state law;

H. To remedy Count II, or alternatively pursuant to Count III, ordering UBH to faithfully apply its promulgated guidelines (including any new guidelines UBH may adopt or promulgate in response to the relief sought herein) in reprocessing claims for residential

29

treatment that it previously denied (in whole or in part), and in processing future claims for residential treatment;

I.      To remedy Counts I and/or II, or alternatively pursuant to Count IV, ordering UBH to pay a surcharge to Ms. Tillitt and members of the Class in an amount equivalent to the revenue it generated from its corporate affiliates or the plans for providing mental health and substance abuse-related claims administration services with respect to claims filed by Max Tillitt and members of the Class, expenses that UBH's corporate affiliates saved due to UBH's wrongful denials, the out-of-pocket costs for residential treatment that members of the Class incurred following UBH's wrongful denials, and/or pre-judgment interest;

J.      Awarding Ms. Tillitt's disbursements and expenses for this action, including reasonable counsel fees, in amounts to be determined by the Court, pursuant to 29 U.S.C. § 1132(g); and

K.      Granting such other and further relief as is just and proper.


Dated: January 7, 2016

                                        Respectfully submitted,


                                        /s/ D. Brian Hufford
                                        D. Brian Hufford (admitted *pro hac vice*)
                                        Jason S. Cowart (admitted *pro hac vice*)
                                        ZUCKERMAN SPAEDER LLP
                                        399 Park Avenue, 14th Floor
                                        New York, NY 10022
                                        Tel: (212) 704-9600
                                        Fax: (212) 704-4256
                                        dbhufford@zuckerman.com
                                        jcowart@zuckerman.com

                                        Meiram Bendat (Cal. Bar No. 198884)
                                        PSYCH-APPEAL, INC.
                                        8560 West Sunset Boulevard, Suite 500
                                        West Hollywood, CA 90069

Tel: (310) 598-3690, x.101
Fax: (888) 975-1957
mbendat@psych-appeal.com

Caroline Reynolds (admitted *pro hac vice*)
Andrew Caridas (admitted *pro hac vice*)
ZUCKERMAN SPAEDER LLP
1800 M Street, NW, Suite 1000
Washington, DC 20036
Tel: (202) 778-1800
Fax: (202) 822-8106
creynolds@zuckerman.com
acaridas@zuckerman.com

*Attorneys for Plaintiffs and Linda Tillitt*

PROPOSED INTERVENOR COMPLAINT
CASE NO. 3:14-CV-02346-JCS

5122958.6