1
2
3
4            UNITED STATES DISTRICT COURT

5            NORTHERN DISTRICT OF CALIFORNIA

6

7    DAVID WIT, et al.,                    Case No.  14-cv-02346-JCS
                    Plaintiffs,            Related Case No. 14-cv-05337 JCS
8
          v.                              **ORDER GRANTING IN PART
9                                         PLAINTIFFS' MOTION TO COMPEL**
     UNITED BEHAVIORAL HEALTH,
10                                         Re: Dkt. No. 98 (Case No. 14-cv-02346 JCS)
               Defendant.                  & 63 (Case No. 14-cv-05337 JCS)
11

12   GARY ALEXANDER, et al.,

13                  Plaintiffs,

14        v.

15   UNITED BEHAVIORAL HEALTH,

16              Defendant.

17

18   **I.      INTRODUCTION**

19        Plaintiffs in this putative class action allege that their health insurance plans have

20   wrongfully denied insurance coverage for mental health and substance abuse-related residential

21   treatment based on internal guidelines developed by Defendant United Behavioral Health

22   ("UBH"), which administers their insurance plans.  Presently before the Court is Plaintiffs'

23   Motion to Compel Defendant United Behavioral Health to Produce Documents Improperly

24   Redacted or Withheld as Privileged ("Motion").  The Court previously vacated the January 22,

25   2016 hearing on the basis that the Motion is suitable for determination without oral argument

26   under Civil Local Rule 7-1(b).  For the reasons stated below, the Motion is GRANTED in part.[1]

27   ───────────────

28   [1] The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28
     U.S.C. § 636(c).

*United States District Court*
*Northern District of California*

## II.    BACKGROUND

This discovery dispute relates to documents listed on Defendants' October 30, 2015 privilege log ("Privilege Log"),[2] which Defendants have either withheld or produced in redacted form based on attorney-client privilege.  *See* Reynolds Decl., Ex. F.  Plaintiffs contend UBH "does not have a supportable basis for withholding or redacting any of these documents" and ask the Court to compel production of all of the documents on the Privilege Log or, in the alternative, to conduct an *in camera* review to determine which documents must be produced.  Motion at 22-23. They challenge Defendants' withholding of the documents on the grounds that: 1) the documents are not covered by the attorney-client privilege in the first instance; and 2) even if the documents are privileged, Defendants must produce them under the fiduciary exception to the attorney-client privilege.  Defendants contend the documents are privileged and reject Plaintiffs' argument that they must be produced under the fiduciary exception.

The parties have divided the contents of the redacted documents listed on the Privilege Log into the following nine categories:[3]

> **1**. **Triana Memorandum**:  UBH has redacted a memorandum dated September 1, 2011 (or on a few of the documents, August 31, 2011) that was initially drafted by Lorenzo Triana, M.D., UBH's Senior Vice President for Medical Management ("the Triana Memo").  The Triana Memo was directed to all Medical Directors and Clinical Staff at UBH and contains the following subject: "Avoiding All Statements Implying Adverse Benefit Determinations May Be Based on 'Fail First' or 'Step Therapy' Requirements."  *See* Reynolds Decl., Ex. H.1.

> **2**. **IOP CDGs Question**: UBH has redacted portions of a discussion concerning a question about UBH's Coverage Determination Guidelines relevant to Intensive Outpatient care. *See* Reynolds Decl., Ex. H.2.

> **3**. **Calendar Entry**. UBH has redacted a request that in-house

[2] The October 30, 2015 Privilege Log is found at Reynolds Decl., Ex. F.  In referring to documents based on their Privilege Log numbers, the Court uses that version of the Privilege Log.

[3] Plaintiffs have not attempted to categorize the documents that were withheld altogether.  Thus, the documents that are identified as falling into one of Plaintiffs' categories make up only 115 of the 182 documents listed on the Privilege Log.  The remaining documents are listed in Reynolds Decl., Exs. G.3 and G.4.  As discussed below, there are discrepancies between the descriptions of the categories in the Motion, the document numbers listed in Plaintiffs' charts (Reynolds Decl., Ex. G), and the sample documents attached in Exhibit H.   The Court has described the categories as set forth by Plaintiffs in the Motion and cited to the sample documents attached in Exhibit H.

United States District Court
Northern District of California

counsel Adam Easterday and Melissa Brettingen address potential litigation exposure relating to utilization management activities, along with summaries and assessments of ongoing UBH litigation prepared by Ms. Brettingen, which were attached to the document. Reynolds Decl., Ex. H.3; Easterday Decl. ¶ 8.

4. **TMS Policy Inquiry**: UBH has redacted what it contends is "legal guidance provided by counsel" relating to transcranial magnetic stimulation ("TMS") benefits.  Opposition at 4; Reynolds Decl., Ex. H.4.  The documents contain a series of emails between UBH's medical director, Dr. Triana, and other non-attorneys at UBH.   Legal counsel is copied on at least one of the emails. According to UBH, none of the named Plaintiffs has sought TMS benefits.

5. **Parity FAQs**: UBH has redacted portions of a draft "Frequently Asked Questions" document relating to the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA") and its impact on UBH's Coverage Determination Guidelines. *See* Reynolds Decl., Ex. H.5.   According to UBH, the redacted portions of these documents "reflect legal advice relating to state[-]specific legal mandates that do not apply to any of the named Plaintiffs." Opposition at 4.

6. **CDG Implementation**: UBH has redacted a portion of an email from Maria Sekac, UBH's Vice President for Care Advocacy, concerning implementation of UBH's Coverage Determination Guidelines for determinations in notification cases. *See* Reynolds Decl., Ex. H.6. According to UBH, the redacted sentences "reflect legal advice relating to state[-]specific legal mandates that do not apply to any of the named Plaintiffs."  Opposition at 4.

7. **NAPHS Inquiry**: UBH has redacted the content of an email from Adam Easterday, UBH's in-house counsel, regarding UBH's response to an inquiry from the National Association of Psychiatric Health Systems ("NAPHS") concerning whether UBH was in compliance with MHPAEA. *See* Reynolds Decl., Exs. H.7. According to UBH, these communications addressed issues "unrelated to any of the named Plaintiffs' specific benefit plans or claims."  Opposition at 4.

8. **Care Advocate Job Aid**: UBH has redacted an email exchange with Mr. Easterday, in-house counsel for UBH, about a proposed "job aid for Care Advocates," which UBH's Parity Core Team developed "in an attempt to make the determination about Medical Necessity simpler." *See* Reynolds Decl., Ex. H.8. UBH contends these communications contain legal advice about ERISA Plans in Texas and Florida that do not apply to any of the named Plaintiffs. Opposition at 4.

9. **LOC Guideline Change**: UBH has redacted an email responding to an earlier message concerning a "[c]hange in how we determine LOC guidelines." *See* Reynolds Decl., Ex. H.9. UBH contends the document contains "legal advice from counsel that was provided with respect to fiscal intermediary or administrative service organization accounts prior to 2011 that are unrelated to the named

1    Plaintiffs' benefit plans."  Opposition at 5.

2    Motion at 5-6; Opposition at 4-5.

3    **III.    ANALYSIS**

4        **A.    Legal Standard**

5            **1.  FRCP 26 & 37**

6           Under Rule 26(b)(1) of the Federal Rules of Civil Procedure, "[p]arties may obtain

7    discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and

8    proportional to the needs of the case . . . ."  A party may bring a motion to compel disclosure or

9    discovery after attempting, in good faith, to meet and confer to resolve the dispute with the party

10   that has failed to comply with a discovery request. Fed. R. Civ. P. 37(a);  *see also* Civ. L.R. 37-2.

11   The Court has already found that the parties have attempted to resolve their discovery dispute

12   informally and have been unable to reach agreement.  Consequently, at the November 13, 2015

13   Case Management Conference the Court instructed Plaintiffs to file the instant motion to compel.

14           **2.  Attorney-Client Privilege**

15          The attorney-client privilege is the oldest common law privilege protecting confidential

16   communications.  *Upjohn Co. v. United States*, 449 U.S. 383, 389 (U.S. 1981).  The purpose of the

17   attorney-client privilege is to permit attorneys to provide sound legal advice and effective

18   advocacy by encouraging "full and frank communications between attorneys and their clients."

19   *United States v. Mett*, 178 F.3d 1058, 1062 (9th Cir. 1999) (citing *Upjohn Co. v. United States*,

20   449 U.S. at 389).  "Because it impedes full and free discovery of the truth, the attorney-client

21   privilege is strictly construed."  *Weil v. Inv./Indicators, Research & Mgmt*., 647 F.2d 18, 24 (9th

22   Cir. 1981). Thus, "[t]he fact that a person is a lawyer does not make all communications with that

23   person privileged." *United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002), as amended on

24   denial of reh'g (Mar. 13, 2002).  Rather, in order for the attorney-client privilege to shield

25   communications, the party asserting the privilege bears the burden of proving the following

26   elements:

27             (1) When legal advice of any kind is sought (2) from a professional
               legal adviser in his or her capacity as such, (3) the communications
               relating to that purpose, (4) made in confidence (5) by the client, (6)

28             are, at the client's instance, permanently protected (7) from

United States District Court
Northern District of California

1    disclosure by the client or by the legal adviser (8) unless the
     protection be waived.

2   *Id.* (citing 8 Wigmore, Evidence § 2292, at 554 (McNaughton rev.1961); *United States v. Plache*,

3   913 F.2d 1375, 1379 n. 1 (9th Cir.1990)).

4        So long as a client is seeking legal advice from his or her attorney, attorney-client privilege

5   applies to both communications by the client to the attorney and the attorney's advice in response

6   to such a request.  *In re Grand Jury Investigation*, 974 F.2d 1068, 1070 (9th Cir. 1992). However,

7   "the privilege is limited to 'only those disclosures—necessary to obtain informed legal advice—

8   which might not have been made absent the privilege.'" *Id.* (quoting *Fisher v. United States*, 425

9   U.S. 391, 403 (1976)).   The privilege does not extend to business advice or other non-legal

10  advice, even if it is provided by a client's attorney.  *United States v. ChevronTexaco Corp.*, 241 F.

11  Supp. 2d 1065, 1076 (N.D. Cal. 2002).  Further, to qualify for protection under the attorney-client

12  privilege, the party asserting the privilege must demonstrate that the communications were made

13  "*primarily* for the purpose of generating legal advice."  *United States v. Chevron Corp.*, No. C-94-

14  1885 SBA, 1996 WL 264769, at *3 (N.D. Cal. Mar. 13, 1996) amended, No. C 94-1885 SBA,

15  1996 WL 444597 (N.D. Cal. May 30, 1996) (internal quotations and citations omitted).

16       In the corporate context, courts have recognized that in-house counsel is often involved in

17  the day-to-day operation of the company.  *Id.*  Communications with in-house counsel relating

18  only to the business operations of the company are not protected by attorney-client privilege.  *Id.*

19  Therefore, a client seeking to protect communications between a corporate client and in-house

20  counsel must "make a clear showing that in-house counsel's advice was given in a professional

21  legal capacity." *Id.* at *4.

22          **3.  Fiduciary Exception**

23       The Ninth Circuit "has joined a number of other courts in recognizing a 'fiduciary

24  exception' to the attorney-client privilege."  *United States v. Mett*, 178 F.3d 1058, 1062-63 (9th

25  Cir. 1999) (citing *United States v. Doe*, 162 F.3d 554, 556-57 (9th Cir.1998); *United States v.*

26  *Evans*, 796 F.2d 264, 265-66 (9th Cir.1986)).  The exception originated with English trust law but

27  has been applied to various fiduciary relationships, including in the ERISA context.  *Id.*  "As

28  applied in the ERISA context, the fiduciary exception provides that an employer acting in the

United States District Court
Northern District of California

United States District Court
Northern District of California

1   capacity of ERISA fiduciary is disabled from asserting the attorney-client privilege against plan

2   beneficiaries on matters of plan administration."  *Id*. at 1063.

3        In *Mett*, the Ninth Circuit identified two rationales that have been offered in the case law

4   and commentary for the fiduciary exception.  178 F.3d at 1063.  The first rationale is based on "an

5   ERISA trustee's duty to disclose to plan beneficiaries all information regarding plan

6   administration."  *Id*. (citing *In re Long Is. Lighting*, 129 F.3d 268, 271-72 (2d Cir. 1997)).  Under

7   this view, the *Mett* court explained, the fiduciary exception is seen as "an instance of the attorney-

8   client privilege giving way in the face of a competing legal principle."  *Id*.  The second rationale

9   focuses instead on the "role of the trustee," "endors[ing] the notion that, 'as a representative for

10  the beneficiaries of the trust which he is administering, the trustee is not the real client in the sense

11  that he is personally being served.'"  *Id*. (quoting *United States v. Evans*, 796 F.2d 264, 266 (9th

12  Cir. 1986) (quoting *Washington-Baltimore Newspaper Guild, Local 35 v. Washington Star Co*.,

13  543 F.Supp. 906, 908–10 (D.D.C.1982)).  Under this view, the *Mett* court explained, the so-called

14  "fiduciary exception" is not an exception at all but instead "reflects the fact that, at least as to

15  advice regarding plan administration, a trustee is not 'the real client' and thus never enjoyed the

16  privilege in the first place."  *Id*.

17       "On either rationale, however, it is clear that the fiduciary exception has its limits - by

18  agreeing to serve as a fiduciary, an ERISA trustee is not completely debilitated from enjoying a

19  confidential attorney-client relationship."  *Id*.  To understand these limits, the court in *Mett* looked

20  to the "seminal English opinion from which the fiduciary exception springs," *Talbot v. Marshfield*,

21  12 L.T.R. 761, 762 (Ch. 1865) and the "leading American case," *Riggs National Bank v. Zimmer*,

22  355 A.2d 709 (Del. Ch. 1976).  *Id*.  In *Talbot*, the court required production of legal advice

23  provided to trustees "prior to any threat of suit, advising them regarding the propriety of paying

24  advances to the children of the testator."  *Id*.  On the other hand, it found that the privilege

25  protected from production legal advice to the trustees "dispensed after the commencement of suit,

26  aimed at advising them 'how far they were in peril.'"  *Id*.  In *Riggs*, the *Mett* court explained, the

27  court required production of legal advice that was prepared for the trustees in connection with

28  "potential tax litigation on behalf of the trust," not only citing the fact that the trustees were "not

the real clients" but also noting that the legal advice was *not* prepared "for the purpose of the trustees' own defense in any litigation against themselves." *Id*.   The *Mett* court noted, "[a]t the time the [the legal advice] [in *Riggs*] was prepared the litigation then pending was a petition for instructions, the very nature of which normally indicates that the trustees were not implicated in any way." *Id*. at 1064 (quoting *Riggs*, 355 A.2d at 711).

Based on *Talbot* and *Riggs*, the *Mett* court concluded that "the case authorities mark out two ends of a spectrum." *Id*. at 1064.  At one end of the spectrum, "where an ERISA trustee seeks an attorney's advice on a matter of plan administration and where the advice clearly does not implicate the trustee in any personal capacity, the trustee cannot invoke the attorney-client privilege against the plan beneficiaries." *Id*.  At the other end, "where a plan fiduciary retains counsel in order to defend herself against the plan beneficiaries (or the government acting in their stead), the attorney-client privilege remains intact." *Id*.  The court in *Mett* went on to address where on the spectrum the communications in that case fell.  *Id*.

In *Mett*, two individuals who had founded a retail art gallery appealed their convictions "arising out of certain improper transactions involving pension benefit plans administered by them" on behalf of the art gallery's employees.   *Id*. at 1060.  On appeal, the defendants challenged the district court's admission into evidence of two memoranda that were prepared for them by their attorneys addressing the criminal and civil sanctions they might face as a result of the transactions.  *Id*.  The court concluded that both the context in which the memoranda were written and their content supported the conclusion that the documents were privileged and that the fiduciary exception did not apply.  *Id*. at 1064-65.

As to the context in which the legal advice was prepared, the court in *Mett* noted that the legal advice came "in the midst of [the art gallery's] financial crisis and hard on the heels of the federal investigation that resulted in the defendants' conviction for art fraud." *Id*. at 1064.  The court reasoned, "[a]lthough no legal action was then pending against the defendants in connection with the pension plans, . . . employees had begun asking difficult questions regarding the financial condition of the plans [and] [t]rouble was in the air." *Id*.  Thus, the court found, defendants had "good reason to seek advice from [counsel] regarding their personal exposure to additional civil

1    and criminal liabilities arising from the pension plan withdrawals." *Id.*

2          Even more important to the *Mett* court was the actual content of the memoranda.  *Id.*  The

3    court explained that it is "the nature of the particular attorney-client communication that is

4    dispositive" and instructed that while this communication-by-communication analysis is "perhaps

5    untidy, [it] is crucial if the attorney-client privilege and the fiduciary exception are to coexist." *Id*

6    (citing *Long Is. Ltg.*, 129 F.3d at 272).  The content of the memoranda in *Mett* "foreclose[d] the

7    application of the fiduciary exception"  because they were "plainly 'defensive on the trustees'

8    part,' *Riggs*, 355 A.2d at 711, and aimed at advising the trustees 'how far they were in peril,'

9    *Talbot*, 12 T.L.R. at 762." *Id.*  The court explained:

10                  The first two paragraphs of the August 19 memorandum make it
11                  clear that the advice rendered was not "on a matter of plan
                    administration." The advice is certainly a far cry from advice
12                  regarding whether a trust may advance to a beneficiary from the
                    trust, see id., or whether a trust should take certain positions in tax
13                  litigation with a state department of revenue, see *Riggs*, 355 A.2d at
                    711. Rather, the August 19 memorandum is devoted entirely to
14                  advising Mett and Wiseman regarding their own personal civil and
                    criminal exposure in light of undocumented withdrawals that had
15                  already occurred.

16   *Id.*

17         In reaching the conclusion that the memoranda in *Mett* were protected by attorney-client

18   privilege, the court rejected the government's argument that the fiduciary exception applies to any

19   legal advice by an attorney to a fiduciary that relates to administration of the plan, and that

20   attorney-client privilege applies only to advice that is "*solely* related to personal, non-fiduciary

21   matters." *Id.* at 1065-66 (emphasis in original).   The court found that "[t]his conception stretches

22   the fiduciary exception far beyond its foundations, threatening to swallow the fiduciary's attorney-

23   client privilege whole." *Id.* at 1066.  The court held that the exception "has a more modest reach:

24   while the fiduciary exception does apply to advice on matters of plan administration, the attorney-

25   client privilege reasserts itself as to any advice that a fiduciary obtains in an effort to protect

26   herself from civil or criminal liability." *Id.*

27         In support of this narrower formulation, the *Mett* court pointed to the fact that "where a

28   fiduciary seeks legal advice for her own protection, the core purposes of the attorney-client

United States District Court
Northern District of California

1    privilege are seriously implicated and should trump the beneficiaries' general right to inspect

2    documents relating to plan administration." *Id*.  The court also pointed to the rule that "where

3    attorney-client privilege is concerned, hard cases should be resolved in favor of the privilege, not

4    in favor of disclosure." *Id*.  Finally, the court explained, its approach is justified from a policy

5    perspective because "an uncertain attorney-client privilege will likely result in ERISA trustees

6    shying away from legal advice regarding the performance of their duties [and] [t]his outcome

7    ultimately hurts beneficiaries." *Id*.

8            In the wake of *Mett*, district courts have continued to struggle with the "task of sorting out

9    when the exception applies in the gray areas in between" the two ends of the spectrum identified

10   in *Mett*.  *Klein Northwest Mutual Life Ins. Co*., 806 F. Supp. 2d 1120, 1131 (S.D. Cal. 2011).  A

11   number of district court decisions have addressed this question in cases involving the denial of

12   benefits sought by an individual plaintiff.   In that context, courts have found that advice sought by

13   trustees must "concern[ ] their own *imminent* criminal or civil liability" in order to be privileged.

14   *Gundersen v. Metropolitan Life Ins.* Co., No. 10-cv-50 DB,  2011 WL 48755, at * 9 (D. Utah Feb.

15   7, 2011) (emphasis added) (citing *Mett*, 178 F.3d at 1066);  *see also Neathery v. Chevron Texaco*

16   *Corp. Group Accident Policy No. OK826458*, No. 05-cv-1883 JM CAB, 2006 WL 4690828, at *2

17   (S.D. Cal. 2006) (holding that "[c]ommunications with counsel made concerning the investigation

18   and consideration of Plaintiff's appeal, before the litigation commenced, constituted pre-decisional

19   legal advice about the administration of the plan).  Thus, "most courts agree that the exception no

20   longer applies after the final denial of an administrative claim."  *Klein*, 806 F. Supp. 2d. at 1132

21   (citing cases);  *see also Sizemore v. Pacific Gas & Elec. Retirement Plan*, 952 F. Supp. 2d 894,

22   901 (N.D. Cal. 2013) (ordering production of attorney-client communications that were made

23   during the pendency of the plaintiff's second administrative appeal of the plan's denial of his

24   claim on the basis that defendants had "accepted the appeal in order to fully evaluate plaintiff's

25   claim" and thus had "voluntarily stepped back into their role as fiduciaries" during the pendency

26   of that second appeal).  On the other hand, "[c]ourts have regularly rejected the notion that *the*

27   *possibility* a claim will be denied results in a divergence of interest. . . ."  *Klein*, 806 F. Supp. 2d at

28   1132 (citing cases) (emphasis added).  As the court in *Gunderson* pointed out, in *Rigg* (the case

cited in *Mett* as the leading American case on the fiduciary exception) the court found that an opinion prepared for the trustees by counsel fell under the fiduciary exception *even though* "failure to comply with the law would have created liability and was the subject of the case before the court." 2011 WL 48755, at * 9.

The task of drawing the line is more difficult in putative class actions as there appears to be little case law that applies the fiduciary exception in that context. Clearly, an approach that draws the line at the point when the final administrative appeal is denied is unworkable where there are multiple plaintiffs. Nonetheless, the considerations articulated in the case law discussed above are equally applicable. One case in which the fiduciary exception has been applied in a class action, *Fischel v. Equitable Life Assurance*, 191 F.R.D. 606 (N.D. Cal. 2000), is instructive. In that case, members sued their employer under ERISA on the basis that it had breached its fiduciary duty by "either falsely representing that [they] would receive benefits after meeting certain production requirements, or by repudiating its promise to provide such benefits." *Id.* at 607. The court concluded that the applicable test, under *Mett*, was as follows: "while generally, the fiduciary exception applies to matters of plan administration, the attorney-client privilege reasserts itself as to any advice that a fiduciary obtains to protect itself from liability." 191 F.R.D. 606, 609 (N.D. Cal. 2000). Under this test, the court reasoned, the focus is on "the intended recipient of the advice and the purpose for which it is sought." *Id.*

In applying this test, the court in *Fischel* considered both the content and context of the documents in question. *Id.* at 609 and 610. The mere fact that a document addressed the employer's compliance with the law and had implications as to its legal exposure was not enough to avoid the fiduciary exception. In particular, the court required the defendant to produce documents in which counsel had reviewed and commented on the "structure and design of the plan, including compliance with its statutory obligations" because it was "not apparent from the content or context of the documents that the authors [were] concerned about the trustees' personal liability." *Id.* at 610. On the other hand, the court denied the plaintiffs' request as to documents containing legal advice regarding the defendant's "potential liability . . . for amending and designing the ERISA plan" where it was "apparent [from the documents] that litigation [was]

United States District Court
Northern District of California

anticipated, and the advice relate[d] to the potential exposure of the trustees in their personal capacity." *Id*.

Based on the case law discussed above, the undersigned concludes that in the class action context, as in cases involving individual claimants, an approach that focuses too heavily on litigation exposure without requiring a showing that advise was *actually* sought for defensive purposes undermines the principles that the fiduciary exception is designed to protect. In particular, the fiduciary exception recognizes that beneficiaries are entitled to information about how their benefits are administered and that when counsel is advising an ERISA trustee about plan administration, this advice is generally for the benefit of the plan members. As virtually any policy or guideline may, at some point, be the subject of litigation, merely invoking that possibility is not sufficient to avoid the exception. Rather, either the context (e.g. actual or imminent litigation on the subject of the communication) or the contents of the communications themselves must reflect that they are defensive in nature and relate to advice sought and obtained to determine how far the trustees are "in peril." *Mett*, 178 F.3d at 1064.

## B.   Whether Communications Listed on UBH's Privilege Log Are Protected

Based on the standards set forth above, the Court has found it appropriate to review at least some of the documents provided for *in camera* review to determine whether their content justifies finding an exception to the fiduciary exception to the attorney-client privilege (where such a privilege exists in the first instance). The Court's review has been complicated by what appear to be discrepancies in the charts provided by Plaintiffs in Reynolds Declaration Exhibit G, purportedly listing the documents contained in each of Plaintiffs' categories.[4] Because of the discrepancies, the Court's ruling will be based on the issues raised and *in camera* review of the specific documents offered in Exhibit H as examples of each of Plaintiffs' categories. It will be up

---

[4] For example, the Motion states that there is a single document in Category 3 (described as "Calendar Entry"). The chart at Exhibit G.1, however, lists five documents in Category 3 and none the listed documents corresponds to the document attached as Exhibit H.3 (which is described as the sole document in Category 3). That document is Bates Stamped UBHWIT 006359, which is UBH-0083 on the Privilege Log. According to Reynolds Decl. Ex. G.2, UBH 0083 is in Category 8 (described as "Care Advocate Job Aid"). The Court found discrepancies as to many of the other categories as well.

to the parties to apply the Court's rulings on a document-by-document basis to the remaining documents.  As a general matter, however, the Court finds that UBH has invoked the attorney-client privilege in a manner that is inconsistent with the standards set forth above; in particular, it has interpreted the fiduciary exception more narrowly than the case law supports by relying on the mere possibility of future litigation to withhold communications whose primary purpose was not defensive but rather, for the benefit of the ERISA plan members.

### 1. Triana Memorandum

UBH withheld the Triana Memorandum on the basis that it is a "communication reflecting legal advice from counsel regarding MHPAEA fail first compliance."  *See* UBH Privilege Log, UBH -0003.  The memorandum is from Lorenzo Triana, M.D., who is listed as "SVP of Medical Management."  It is directed to "Medical Directors and Clinical Staff."   UBH does not dispute that neither the author of the memorandum nor the recipients are attorneys.  Rather, it contends that "although it was initially drafted by Dr. Triana (a non-attorney), the memorandum includes legal advice provided by counsel regarding compliance and litigation exposure."  Opposition at 4.  In particular, UBH's Deputy General Counsel, Adam Easterday, states that he reviewed and revised a draft version of the memorandum in his capacity as UBH in-house counsel and that his comments and revisions were incorporated into the Triana Memo.  *See* Easterday Decl. ¶¶ 3-6.

In *United States v. ChevronTexaco Corp.*, Judge Chesney observed that there are two types of communications between non-attorneys that might be protected by attorney-client privilege: those in which "the employees discuss or transmit legal advice given by counsel," and those in which an employee communicates with another employee about an intent to seek legal advice.  *United States v. ChevronTexaco Corp.*, 241 F. Supp. 2d 1065, 1077 (N.D. Cal. 2002).   The court opined that the former category of communications would be protected because they would "obviously reveal privileged communications."  *Id.*;  *see also AT&T Corp. v. Microsoft Corp.*, No. 02-0164 MHP (JL), 2003 WL 21212614, at *3 (N.D. Cal. Apr. 18, 2003) ("Communications containing information compiled by corporate employees for the purpose of seeking legal advice and later communicated to counsel are protected by attorney-client privilege").  In *United States v. Chevron Texaco Corp.*, however, the dispute involved the latter scenario, that is, communications

1    between non-employees relating to an employee's intent to seek legal advice on a particular issue.

2    The court found that such communications were also subject to attorney-client privilege, likening

3    them to "notes a client would make to prepare for a meeting with her lawyer." 241 F. Supp. 2d at

4    1077.

5        UBH relies on both theories in invoking attorney-client privilege, citing the fact that Dr.

6    Triana provided a draft of the memorandum to counsel in order to receive legal advice and that the

7    memorandum that was circulated contained the legal advice he received from counsel. The Court

8    concludes that UBH has sufficiently demonstrated that the Triana Memorandum transmits legal

9    advice (and not business advice, as Plaintiffs contend) that was sought and obtained from in-house

10   counsel and therefore, under the authority cited above, that the document falls within the ambit of

11   attorney-client privilege. Next, the Court must address whether it is nonetheless subject to

12   disclosure under the fiduciary exception.

13       The context of this communication supports the conclusion that it was drafted with the

14   intent of ensuring that UBH's policies and procedures for making claims determinations were in

15   compliance with the MHPAEA, a purpose that is for the benefit of the beneficiaries of the plans

16   UBH administers. In particular, the Triana Memorandum was distributed to all medical directors

17   and clinical staff. In addition, the content of the Triana Memorandum reveals that the advice in it

18   was intended to reach even further, stating in bold letters, "**Please distribute this memo to your**

19   **medical staff and all other peer reviewers.**" Thus, the statement in the Easterday Declaration

20   that the "Dr. Triana circulated the final memorandum to a limited group of UBH employees, its

21   medical directors and clinical staff," Easterday Decl. ¶ 6, is misleading, at best. It is apparent

22   from the document itself that this memorandum was intended to reach virtually everyone at UBH

23   who was involved in the claims determination process.

24       The substantive content of the Triana Memorandum also supports the conclusion that the

25   primary goal of the author, both in drafting the memorandum and in seeking counsel's advice and

26   comments on the draft, was to assist UBH employees in making benefits determinations that

27   would comply with a newly enacted law, the MHPAEA. Although the memorandum specifically

28   references past practices that were not compliant with the MHPAEA, there is nothing in the

United States District Court
Northern District of California

13

content of the document itself that suggests that the goal of the memorandum was to advise UBH about the liability it might face as a result of those violations. Specifically, there is no mention of threatened or pending litigation even though the memorandum quotes "problematic" language that had been used in some of UBH's denial letters. Instead, the focus of the memorandum is on how to properly administer the plans going forward – which is a purpose that that is primarily in the interest of the beneficiaries.

Although UBH offers a declaration stating that it had been sued twice for violations of the MHPAEA, *see* Easterday Decl. ¶ 4, the declaration does not say that these lawsuits involved any of the specific issues raised in the Triana Memorandum. Nor is it sufficient that UBH's attorneys were "aware of and monitoring legal challenges within the managed care industry relating to mental health parity laws, including the [MHPAEA] and its implementing regulations." Easterday Decl. ¶ 4. As discussed above, potential exposure to liability where there is no imminent threat of litigation does not, by itself, demonstrate an adversity of interests that is sufficient to override the fiduciary exception.

Accordingly, UBH is ordered to produce the Triana Memorandum in its entirety and without redactions.

### 2. IOP CDGs Question

Plaintiffs challenge the redaction of sections of an email exchange that included Margaret Brennecke and UBH in-house counsel Adam Easterday. *See, e.g.,* Reynolds Declaration, Ex. H.2 (Bates Stamp Number UBHWIT0058458.) On the Privilege Log, UBH describes this communication as an "email conversation between attorney and client regarding development of guidelines with regard to MHPAEA compliance." Privilege Log, UBH-0033. UBH further contends the fiduciary exception does not apply because it contains "[l]egal advice or request for legal advice related to specific regulatory or litigation exposure matters." *Id*. Similarly, Easterday states in his declaration that the redacted portions of the document reflects "a request for legal advice about coverage determination guidelines in relation to mental health parity." Easterday Decl. ¶ 7. According to Easterday, "[t]his advice was provided as part of continuing advice

United States District Court
Northern District of California

relating to mental health parity and related litigation exposure that I, and other UBH in-house attorneys, provided UBH's clinical operations group." *Id.*

The redacted portions of this document contain a question posed by Margaret Bennecke to in-house counsel Adam Easterday and a response from Easterday.   The Court concludes the question in Margaret Bennecke's email is a request for legal advice and therefore, that these communications would be protected from disclosure under the attorney-client privilege if the fiduciary exception did not apply.   The Court concludes, however, that it does apply.

In contrast to the Triana Memorandum, it does not appear that these communications were intended to reach a broad group at UBH.   Nonetheless, UBH has not pointed to any actual or threatened litigation relating to the specific subject matter of the communications.   As discussed above, Easterday's general statements about litigation in the managed care industry – and even the two cases that were filed against UBH under the MHPAEA - are not sufficient to establish any true adversity of interests based on imminent or actual litigation.   Thus, the context does not demonstrate that the primary purpose of these communications was defensive.   More importantly, the *content* of the redacted communications does not support that conclusion and in fact points to the opposite conclusion.   Not only is there no indication that Bennecke's question was posed with the primary purpose of obtaining legal advice to protect UBH from legal liability for past misconduct;   Bennecke expressly states that her teams have been addressing the situation that is the subject of her question by *granting* requests for benefits pending resolution of the issue. Although she references "complaints" she received when a different approach was taken, there is no indication that she used the word in the legal sense and there is no evidence in the record that Bennecke's question was in response to actual or threatened litigation on this issue.   Based on both the context and content of these communications, the Court concludes that they were for the purposes of clarifying the guidelines and policies that UBH employees should use to decide claims for benefits.   As such, the communications were for the benefit of the beneficiaries, not UBH, and must be disclosed under the fiduciary exception.

### 3.   Calendar Entry

Plaintiffs ask the Court to compel UBH to produce an unredacted version of the document

attached to Exhibit H.3, listed on the Privilege Log as UBH – 0083.  According to the Privilege Log, this document was withheld on the basis that it contains "[l]egal advice or request for legal advice related to specific regulatory or litigation exposure or matters."  The redacted material reveals that in-house counsel Adam Easterday and Melissa Brettingen were added to a UBH committee that was addressing utilization management activities.  While the parties have not addressed the question of whether attorney-client privilege protects from disclosure the mere fact that counsel was asked to provide advice on a particular subject matter (as opposed to the specific questions asked and/or the advice given in response), the Court need not reach this question because any privilege that might have been afforded the redacted material in this document has been waived by UBH.  In particular, Easterday states in his declaration that the redacted portions of the document in Exhibit H.3 "reflect a request that counsel, my in-house attorney colleague Melissa Brettingen and I, provide legal advice regarding potential litigation exposure relating to utilization management activities."  Because UBH has disclosed in the Easterday Declaration all of the information contained in the redacted portion of UBH-0083 (which contains no substantive legal advice or any specific questions), this  material is subject to disclosure.  *See Weil v. Investment/Indicators, Research & Management*, 647 F.2d 18, 24 (9th Cir.1981) (voluntary disclosure of a privileged attorney communication to a third party constitutes waiver of privilege as to all communications on the same subject).  Therefore, UBH must produce this document (UBH-0083) in unredacted form.[5]

### 4.  TMS Policy Inquiry

Plaintiffs seek production of documents in which discussions of the availability of coverage for transcranial magnetic stimulation (TMS) was redacted on the basis of attorney-client privilege.  The two documents provided in Exhibit H.4, which correspond to Privilege Log numbers UBH-0051 and UBH-0078, are email exchanges about UBH's policies and guidelines for

---

[5] The Court does not rule on the discoverability of the two documents that were attached to this email, prepared by Ms. Brettingen, UBH-0084 and UBH – 0085, which were withheld in their entirety.

United States District Court
Northern District of California

determining whether this treatment is covered.  The exchanges are between non-attorneys (although in-house counsel is cc'ed on some of the emails) but UBH contends they are privileged because they "directly transmit legal advice received from counsel regarding TMS benefits." Opposition at 9.

The Court has reviewed the unredacted versions of the documents in Exhibit H.4 and finds that they are communications that transmit legal advice from counsel even if they are between non-attorneys and thus, fall within the ambit of attorney-client privilege.  On the other hand, nothing in the content of these documents suggests that the advice was for defensive purposes.  Rather, the exchange relates to *how* UBH should be making benefits determinations going forward.  Nor has UBH pointed to any actual or threatened litigation relating to the specific subject of these communications.  Therefore, the Court finds that these communications are primarily for the benefit of plan members, which points towards application of the fiduciary exception. UBH contends, however, that the fiduciary exception does not apply because none of the plaintiffs in this action sought coverage for TMS and the communications do not relate to any of the plaintiffs' "plans, claims or services." *Id*. at 17.   The Court finds no authority that supports such an approach.

As a preliminary matter, the Court notes that UBH does not dispute that the documents in Exhibit H.4 meet the relevance requirement of Rule 26(b)(1) of the Federal Rules of Civil Procedure.  As recently amended, this section provides as follows:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1).   Traditionally, the relevance requirement of Rule 26(b)(1) has been construed broadly.  *See Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) (construing language contained in Rule 26 prior to 2015 amendments) ("The key phrase in this definition—

United States District Court
Northern District of California

1   'relevant to the subject matter involved in the pending action'—has been construed broadly to

2   encompass any matter that bears on, or that reasonably could lead to other matter that could bear

3   on, any issue that is or may be in the case"). The Comments relating to the 2015 Amendments

4   explain that the purpose of the changes was to restore and reinforce the focus on proportionality in

5   discovery but that the amendments did not "change the existing responsibilities of the court and

6   the parties to consider the proportionality."

7        Given that the standard under Rule 26 is broad, the Court concludes that the documents in

8   Exhibit H.4 are relevant for the purposes of Rule 26. In particular, Plaintiffs' claims challenge the

9   way in which UBH develops and applies the coverage determination guidelines (CDGs) and levels

10  of care (LOCs) that it provides to its claims representatives for use in adjudicating mental

11  healthcare claims. *See* First Amended Complaint, Docket No. 39, ¶¶ 3-5. While Plaintiffs' claims

12  turn on the availability of residential treatment benefits rather than TMS benefits, communications

13  relating to development and application of guidelines used in connection with TMS benefits may

14  shed light on UBH's policies and practices generally and therefore meet the low threshold for

15  relevance of Rule 26. The possibility that the Court might later find that the communications are

16  inadmissible, for example, if possible prejudice resulting from their admission outweighs their

17  relevance under Rule 403 of the Federal Rules of Evidence, does not render the communications

18  undiscoverable under Rule 26. Rule 26 expressly states that "[i]nformation within this scope of

19  discovery need not be admissible in evidence to be discoverable."[6]

20       Having found that the communications are relevant under Rule 26, the Court next

21  addresses whether the authority addressing the fiduciary exception supports an approach that

22  limits its application depending on the *degree* of relevance of the communication at issue. The

23  Court concludes that it does not. As discussed above, two rationales have been have been offered

24  for the fiduciary exception – the first focusing on "an ERISA trustee's duty to disclose to plan

25  beneficiaries all information regarding plan administration" and the second on "the notion that, 'as

26

27  _____

[6] This is not, however, an invitation for Plaintiffs to ask for wholesale production of documents
28  related to guidelines with minimal relevance to the claims asserted in this case. So far, Plaintiffs'
    requests appear to be proportionate to the needs of the case and therefore do not run afoul of Rule
    26's proportionality requirement.

United States District Court
Northern District of California

1  a representative for the beneficiaries of the trust which he is administering, the trustee is not the

2  real client in the sense that he is personally being served.'"  *Mett*, 178 F.3d at 1063 (citations and

3  internal quotations omitted).  Neither rationale implies that the exception should be limited

4  according to the benefits a plan member has sought or is likely to seek.  Rather, both are premised

5  on the idea that plan members have a broad right to information about how their plans are

6  administered.  Indeed, the right of plan members to information about plan administration, without

7  regard to whether a member has a pending claim for benefits that relates to that information, is

8  recognized in ERISA itself, which entitles all plan beneficiaries to information about their plan.

9  *See* 29 U.S.C. § 1024(b)(4) (requiring plan administrators to provide, upon request from any plan

10  participant "a copy of the latest updated summary, plan description, and the latest annual report,

11  any terminal report, the bargaining agreement, trust agreement, contract, or other instruments

12  under which the plan is established or operated");  *see also* United States Department of Labor

13  Employee Benefits Security Administration FAQs about Affordable Care Act Implementation

14  (Part XXIX) and Mental Health Parity Implementation, October 23, 2015 ("The criteria for

15  making medical necessity determinations, as well as any processes, strategies, evidentiary

16  standards, or other factors used in developing the underlying [nonquantitative treatment limitation]

17  and in applying it, must be disclosed with respect to [mental health/substance use disorder]

18  benefits . . ., regardless of any assertions as to the proprietary nature or commercial value of the

19  information").  Nor has UBH cited to any case in which a court has declined to apply to the

20  fiduciary exception on the basis of the degree of relevance.  The Court therefore rejects UBH's

21  assertion that the communications in Exhibit H.4 fall outside the ambit of the fiduciary exception

22  because Plaintiffs' claims do not specifically relate to the denial of claims for TMS benefits.

23  Therefore, UBH must produce these documents in unredacted form.

24  **5.  Parity FAQs**

25  UBH has redacted portions of a memorandum entitled "FAQ for Parity Coverage

26  Determinations March 2, 2011" ("Parity Memo") as well as an email that summarizes one of the

27  answers in the memorandum, on the basis that these communications reflect legal advice relating

28  to state-specific legal mandates that do not apply to any of the named Plaintiffs.  Opposition at 5;

United States District Court
Northern District of California

1  Reynolds Decl., Ex. H.5; Privilege Log, UBH -0017 and UBH-0018 .[7]

2         The Court has reviewed the redacted portions of the documents in Reynolds Declaration

3  Exhibit H.5.  It is clear from the face of the documents that the redacted portions convey the

4  opinions of UBH's counsel.  It is equally clear, however, that the Parity Memo was intended to

5  assist claims representatives and others involved in making coverage determinations in deciding

6  when benefits are covered.  There is simply nothing in the documents that suggests that the legal

7  advice contained in the redacted sections was sought by UBH or provided by counsel to help UBH

8  defend itself against liability – except in the most general sense that failure to adhere to the law

9  could expose UBH to future liability.  As discussed above, that is not enough to avoid the

10  application of the fiduciary exception.  Nor is the Court persuaded that UBH may withhold these

11  communications on the basis that the named Plaintiffs have not sought benefits under the laws of

12  the specific states mentioned in these communications.  As discussed above, where it is

13  undisputed that the communication meets the relevance requirements of Rule 26, it need not

14  specifically address the named Plaintiffs' particular claims for benefits to be discoverable under

15  the fiduciary exception.  Therefore, the document in Exhibit H.5 must be produced without

16  redactions.

17         **6.  CDG Implementation**

18         The document offered in Reynolds Declaration Exhibit H.6, listed on the Privilege Log as

19  UBH-0135, contains one redaction, which UBH contends contains legal advice relating to state-

20  specific legal mandates that do not apply to any of the named Plaintiffs.  The Court has reviewed

21  the document and concludes that the redacted sentence conveys legal advice.  As UBH concedes,

22  however, the entire communication is about the "implementation of UBH's Coverage

23  Determination Guidelines for determinations in notification cases."  Opposition at 4.  Nothing in

24  the communication as a whole – or the redacted sentence – indicates that the legal advice was

25  _____

26  [7] On the privilege log, UBH-0018 is listed as starting at production number UBHWIT0063760.
    This document was a replacement for a previously produced document starting with production
27  number UBHWIT0058370.  They are identical except that the higher numbered document
    contains fewer redactions than the lower numbered document.  Bualat Decl. ¶ 13.  Plaintiffs have
28  included both documents in Reynolds Decl. Ex. H.5.  The Court reviews the redactions in
    UBHWIT006370.

offered for the purposes of defending against any imminent or anticipated litigation.  As discussed above, the mere fact that failure to adhere to the law may result in future litigation is not sufficient to avoid the fiduciary exception.  Nor is the Court persuaded by UBH's relevance argument, discussed above.  Therefore, UBH must produce this document without redactions.

### 7.  NAPHS Inquiry

The document contained in Reynolds Declaration Exhibit H.7, found on the Privilege Log at UBH-0029, contains a draft memorandum addressing UBH's compliance with the MHPAEA, as well as a comment on the draft by in-house counsel Adam Easterday.   Only the latter has been redacted.  UBH contends the redacted comment is not subject to disclosure because it is "unrelated to any of the named Plaintiffs' specific benefit plans or claims."  Opposition at 4.  While the comment from Easterday may be legal advice (though the legal content of the comment is minimal), there is no indication that the communications were made with the purpose of defending UBH against any specific threat of liability.  Nor is there any indication that the intended recipient of the memorandum on which Easterday commented has any enforcement authority; rather, the National Association of  Psychiatric Health Systems (NAPHS) is an advocacy association.  Further, UBH's contention that the redacted material is not subject to disclosure because it is not relevant is not persuasive.  The comment (like the draft memorandum) addresses MHPAEA compliance generally, an issue that may have bearing on Plaintiffs' claims.

This document must be produced in unredacted form.

### 8.  Care Advocate Job Aid

The sample document in Reynolds Declaration Exhibit H.8 is found on the Privilege Log at UBH-0007.  It contains an email exchange that includes in-house counsel Adam Easterday in which a number of individuals were discussing an attached draft of a "job aid for Care Advocates" that was prepared "in an attempt to make the determination of Medical Necessity simpler."  Reynolds Decl., Ex. H.8.  The subject line of the email exchange is "Determining Medical Necessity in IBAAGs."  According to UBH these communications do not fall within the fiduciary exception because they  relate only to ERISA plans in Texas and Florida and no named Plaintiffs reside in those states.  Opposition at 4.

The Court has reviewed the redacted portions of the document in Exhibit H.8, which contains a question posed to Easterday and his response.  These communications are the sort that would ordinarily be protected by attorney-client privilege.  Thus, the only question is whether they fall under the fiduciary exception.  The subject of the attachment that was being discussed supports the conclusion that the communications in this email string were for the benefit of plan beneficiaries.  Nothing in the redacted (or unredacted) portions of the exchange indicates that the attorney advice was obtained for the purpose of protecting UBH from liability, except to the extent the advice might reduce UBH's exposure to future liability.[8]  To the extent UBH contends these communications may be withheld because they relate only to plans in Texas and Florida, the Court rejects this relevance argument for the reasons discussed above.  Therefore, UBH is required to produce the document in Exhibit H.4 without redactions.

### 9.  LOC Guideline Change

The sample document in Reynolds Declaration Exhibit H.9 is found on the Privilege Log at UBH-0006.  It is an email exchange between two non-attorneys (Andrew Martorana and Lisa Moore) in which Martorana describes to Moore legal guidance he was provided regarding how to handle certain issues related to administrative appeals.   UBH asserts the communications are protected because they contain "legal advice from counsel that was provided with respect to fiscal intermediary or administrative service organization accounts prior to 2011 that are unrelated to the named Plaintiffs' benefit plans."  Opposition at 5.

Based on the Court's review of the document, the Court finds that while it conveys attorney advice, there is nothing in the document that suggests that the advice was obtained for defensive purposes.  Rather, like the advice in Category 8, it is apparent it was obtained to assist UBH claims representatives and others in making benefits determinations and deciding appeals.  These communications therefore were primarily for the benefit of plan members, not UBH, and

---

[8] The Court notes that the exchange *does* address an issue that may arise in the context of administrative appeals.  As discussed above, however, in that context the interests of the trustees and the beneficiary do not become sufficiently adverse to avoid the fiduciary exception until the appeal has actually been denied.  Thus, a generic discussion of how guidelines should be applied when an administrative appeal is being considered may fall under the fiduciary exception even if denial of an appeal may ultimately lead to litigation.

22

United States District Court
Northern District of California

1    are subject to disclosure under the fiduciary exception.  Further, for the reasons discussed above,

2    the Court rejects UBH's relevance argument.

3         The document contained in Exhibit H.9 is subject to disclosure, without redactions, under

4    the fiduciary exception.

5    **IV.    CONCLUSION**

6         For the reasons stated above, the Motion is GRANTED as to the sample documents offered

7    by Plaintiffs.  UBH shall produce, in unredacted form, the documents contained in Reynolds

8    Declaration Exhibit H.  In addition, UBH shall review the remaining documents on its privilege

9    log to determine whether, under the reasoning of the Court's Order, additional communications

10   must be produced.  Any documents UBH concludes remain protectable under the Court's Order

11   shall be listed on a revised privilege log, to be provided to Plaintiffs no later than **February 1,**

12   **2016.**  If, after meeting and conferring, the parties are unable to agree as to the discoverability of

13   any of the documents on the October 30, 2015 Privilege Logs that the Court has not specifically

14   ordered UBH to produce, they may request that the Court conduct an *in camera* review of those

15   documents.

16        **IT IS SO ORDERED.**

17

18   Dated:  January 21, 2016

19                                                   _____

20                                                   JOSEPH C. SPERO
                                                     Chief Magistrate Judge
21

22

23

24

25

26

27

28

United States District Court
Northern District of California