# EXHIBIT P

Pages: P0001-P0014,
P0024-P0065, P0068-P0074

```
 1        IN THE UNITED STATES DISTRICT COURT
 2          FOR THE DISTRICT OF CALIFORNIA
 3             SAN FRANCISCO DIVISION
 4
   DAVID AND NATASHA WIT, et      )
 5 al.,                           )
                                  )
 6                                )
                                  )
           Plaintiffs,            )
 7                                ) Case No.
      vs.                         ) 3:14-CV-02346-JCS
 8                                )
   UNITED BEHAVIORAL HEALTH,      )
 9 operating as OPTUMHEALTH       )
   BEHAVIORAL SOLUTIONS,          )
10                                )
           Defendants.           )
11 _____)
                                  )
12 GARY ALEXANDER, et al.,        )
                                  )
13     Plaintiffs,                ) Case No.
                                  ) 3:14-CV-05337-JCS
14     v.                         )
                                  )
15 UNITED BEHAVIORAL HEALTH,      )
                                  )
16     Defendant.                 )
   _____)
17
18        VIDEOTAPED DEPOSITION OF
19              JOHN BEATY
20          Portland, Oregon
21           March 18, 2016
22
23 Reported by:
24 LISA TRONCOSO, RPR, CSR, CLR
25 JOB NO. 105154
```

1   an adverse coverage determination is made that

2   the member be given the opportunity to appeal,

3   and with the appeal process there are certain

4   rights that are offered -- or that the member

5   is entitled to in terms of how they can be

6   represented and what information is available

7   to them, and also the timeliness within which

8   those decisions must be made.  So I'll stop

9   there.  That's a pretty thorough overview, I

10  think.

11      Q.    I am tempted to agree.  And so, just

12  a hit on I think three of the items that you

13  mention on your list.  So both NCQA -- I think

14  you said that both NCQA and URAC require, among

15  other things, that UBH use guidelines or some

16  other written standards in making benefit

17  determinations; is that correct?

18          MR. BUALAT:  Objection to form.

19          THE WITNESS:  That's basically

20      correct.

21  BY MR. CARIDAS:

22      Q.    And you also mention that both NCQA

23  and URAC require that UBH inform the member and

24  the provider of the reasons for an adverse

25  benefit determination; is that correct?

1      management process, committee meeting

2      minutes showing the approval of guidelines

3      relevant to the utilization management

4      process, as well as approval of policies

5      and procedures relevant to the utilization

6      management process.

7          NCQA also additionally requires that

8      we submit to them evidence that we conduct

9      a process for assuring that utilization

10     management decisions are made consistently,

11     and URAC also requires that we submit to

12     NCQA the job profile -- I mean, sorry, URAC

13     also requires that we submit to URAC the

14     job profiles of individuals involved in the

15     utilization management process.

16  BY MR. CARIDAS:

17     Q.    So you said that NCQA requires

18  documentation that shows that UBH makes

19  consistent determinations?

20     A.    Yes.

21     Q.    And is that what is -- what I've

22  seen referred to as inter-rater reliability?

23     A.    Yes.

24     Q.    And that essentially means that as

25  between the various care advocates and peer

1   reviewers that work for UBH, that consistent

2   determinations are made with regards to whether

3   or not benefits should be approved in a

4   particular case?

5          MR. BUALAT:  Objection to form.

6          THE WITNESS:  The purpose of the

7      process as its required in the standards is

8      to assure that there is consistency in how

9      UBH makes coverage determinations.  The

10     application of the process is to -- is

11     that -- at least currently, is to measure

12     the degree to which two clinicians looking

13     at the same case, following the same

14     guidelines and using their clinical

15     judgement and considering the individual

16     condition, as well as the availability of

17     community resources would come to a similar

18     coverage determination decision.

19  BY MR. CARIDAS:

20     Q.    And is one of the purposes of having

21  written guidelines be part of the -- of making

22  the coverage determination to provide higher

23  degree of inter-rater reliability?

24         MR. BUALAT:  Objection to form.

25         THE WITNESS:  You're asking about

1    Q.    So, currently, the way that UBH

2 measures inter-rater reliability is through its

3 audit process?

4    A.    Yes.

5    Q.    And that consists of an auditor

6 reviewing the same member case as the initial

7 reviewer and making a determination -- an

8 independent determination; is that correct?

9    A.    Yes.

10    Q.    And then the inter-rater reliability

11 is calculated based on whether that -- the

12 auditor's independent determination matches the

13 determination made by the original reviewer; is

14 that correct?

15    A.    Yes.

16         MR. CARIDAS:  Can we mark this as

17    Exhibit 15.

18         (Exhibit 15, marked.)

19 BY MR. CARIDAS:

20    Q.    Mr. Beaty, have you seen this

21 document before?

22    A.    Yes.

23    Q.    And what is this document?

24    A.    This is Quality Management and

25 Improvement and Utilization Management Program,

CONFIDENTIAL

Page 1

1                UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                 SAN FRANCISCO, CALIFORNIA

4

5    DAVID AND NATASHA WIT,    )
     ET AL.,                   )
6                              )
            Plaintiffs,        )
7                              )
     vs.                       )No. 3:14-CV-02346-JCS
8                              )
     UNITED BEHAVIORAL HEALTH,)
9                              )
            Defendant.         )
10                             )
     GARY ALEXANDER, ET AL.,   )
11                             )
            Plaintiffs,        )
12                             )
     vs.                       )No. 3:14-CV-05337-JCS
13                             )
     UNITED BEHAVIORAL HEALTH,)
14                             )
            Defendant.         )
15

16

17

18                   CONFIDENTIAL

19    VIDEOTAPED DEPOSITION OF MARGARET BRENNECKE

20         TAKEN ON BEHALF OF THE PLAINTIFFS

21                 JANUARY 20, 2016

22

23

24   Reporter By: TARA SCHWAKE

25   Job No: 102501

CONFIDENTIAL

1    of care guidelines?

2            A      Yes.  Yes.

3            Q      And does a peer reviewer always

4    consult either a level of care guideline or a

5    coverage determination guideline as part of the

6    peer review process?

7                   MS. ROMANO:  Objection as to form.

8            A      We would expect that to be used as

9    part of the process.

10           Q      (BY MR. CARIDAS)  So you wouldn't

11   expect a peer reviewer to conduct a peer review

12   without referencing one -- at least one UBH

13   guideline at all; is that correct?

14           A      I think if you were to look at an

15   adverse benefit determination, the -- I believe

16   that we are required to cite the basis of a

17   denial.  So if that was the basis for the denial,

18   then it would be used.  So...

19           Q      And when you say you are required

20   to cite the basis of the denial, where does that

21   requirement come from?

22           A      I know that it's an NCQA

23   requirement.  I believe it's a URAC requirement.

24   I believe it's a CMS requirement for Medicare and

25   I want to say it's a Department of Labor

CONFIDENTIAL

1       A     That's, that's correct.

2       Q     And would this case note state

3   where -- in the section that is called "Decision

4   and Rationale," would that discuss the entire

5   basis for the decision to issue a partial adverse

6   benefit determination?

7             MS. ROMANO:  Objection as to form.

8       A     Can you restate that, please?

9       Q     (BY MR. CARIDAS)  Sure.  So we --

10  previously, I believe you testified that the

11  regulations require a UBH to state its reasons

12  for making an adverse benefit determination.  And

13  the statement, the Decision and Rationale

14  statement found in the Linx notes, is that where

15  the peer reviewer would record the rationale for

16  the adverse benefit determination?

17            MS. ROMANO:  Objection as to form.

18      A     That is correct.

19      Q     (BY MR. CARIDAS)  So -- and then

20  ultimately, that rationale would be sent to the

21  provider and the member in some form of

22  correspondence; is that correct?

23      A     There is a, a team that is not my

24  team that manages the letters and the creation of

25  the letters, but my understanding is they would

CONFIDENTIAL

1    excerpt information from this note for that

2    letter.

3         Q    And that, is that team a team of

4    clinicians?  Or is that team a administrative --

5         A    That's an administrative team.

6    They don't make any decisions.  All they do is

7    create the letters, that's right.

8         Q    So they wouldn't have any authority

9    to deviate from the Decision and Rationale cited

10   by the peer reviewer in the Linx notes?

11        A    That is correct.

12             MS. ROMANO:  Objection as to form.

13        A    I don't, I don't know their process

14   for what they choose and where they put it.  But

15   they would have no authority to modify anything

16   written by our staff.

17        Q    (BY MR. CARIDAS)  So, so this

18   decision and rationale explanation in the Linx

19   notes would list all of the reasons for the

20   adverse benefit determination?

21             MS. ROMANO:  Objection as to form.

22        A    That's my understanding.

23             MR. CARIDAS:  If I could have you

24   keep that out for a minute while we mark this as

25   Exhibit 9.

CONFIDENTIAL

Page 154

```
 1          Q     And sorry, I was forgetting her
 2   name.  Was it Dr. Steer?
 3          A     Lourdes Hattrich.
 4          Q     Oh, or --
 5          A     And then we briefly talked to Dr.
 6   Steer as well.
 7          Q     Okay.  So -- all right.  And does
 8   every psychologist peer reviewer receive training
 9   on how to conduct peer reviews for UBH?
10          A     They do.
11          Q     And do they receive that training
12   when they first join UBH?
13          A     Yes.
14          Q     And is there any -- do they
15   occasionally receive new training over time?
16          A     If there are modifications to
17   guidelines or then, yes, they would be trained on
18   any changes that occur.
19          Q     And I, I could be wrong but I
20   believe that the guidelines are updated annually;
21   is that correct?
22          A     They are reviewed annually and
23   updated as needed.
24          Q     So they -- there wouldn't
25   necessarily be a training every year, it would
```

CONFIDENTIAL

Page 180

1   "Medically Necessary," and it says "If 'Medically

2   Necessary' is found," again, outside those two

3   sections that you said you weren't familiar with,

4   "apply Medical Necessity (LOC guidelines) in your

5   determination."

6            Does that -- is that statement

7   correct?

8        A    That is my understanding.

9        Q    And "If 'Medical Necessity'" --

10   sorry, "If 'Medically Necessary' is not found,

11   apply CDGs in your determination."

12            Is that, is that statement correct?

13       A    It is, that is my understanding.

14       Q    And then it says, number 3, "When

15   in doubt, default to CDGs."

16       A    That is my understanding, yes.

17       Q    And is that, is that a correct

18   statement that if there is doubt as to which to

19   apply, the peer reviewer should default to CDGs?

20       A    Yes, because the level of care

21   guidelines are embedded in the CDGs and so in

22   that way you're -- yes, that is correct.

23            THE VIDEOGRAPHER:  Excuse me,

24   counsel, we are about that -- approaching that

25   time and changing out media would be great.

CONFIDENTIAL

Page 189

1    care guideline that wouldn't have been

2    incorporated?

3         A    I would have to have it in front of

4    me and, and be able to read it and, and talk to

5    you about that.  I, from memory, I cannot.

6         Q    Does the -- can the choice between

7    using a coverage determination guideline versus a

8    level of care guideline determine the outcome of

9    a peer review?

10             MS. ROMANO:  Objection as to form.

11        Q    (BY MR. CARIDAS)  In the sense of

12   whether the review is ultimately -- the treatment

13   is ultimately approved or denied?

14             MS. ROMANO:  Objection as to form.

15        A    It is ultimately the clinical

16   judgment of the peer reviewer that leads to the

17   approval or the denial of the care.

18        Q    (BY MR. CARIDAS)  And does it -- is

19   it possible that the application of that guide,

20   that judgment, when referencing the level of care

21   guidelines, would lead to a different result in

22   application of that guideline when referencing

23   the coverage determination guidelines?

24             MS. ROMANO:  Objection as to form.

25        A    I can't think of a circumstance

CONFIDENTIAL

Page 190

1   where you would approve it in one situation and

2   deny it in another.

3        Q    (BY MR. CARIDAS)  And, and to the

4   extent that the new coverage determination

5   guidelines include the level of care criteria,

6   you would expect that it would be even less

7   likely for that -- for such a discrepancy to

8   occur; is that fair?

9             MS. ROMANO:  Objection as to form.

10       A    I don't know.

11       Q    (BY MR. CARIDAS)  We discussed

12  previously that the CDGs and LOCs are, are

13  reviewed on an annual basis and, and updated as

14  necessary; is that right?

15       A    Correct.

16       Q    And a new guideline is issued every

17  year and the level of modification would depend

18  on how much modification was viewed as necessary;

19  is that correct?

20            MS. ROMANO:  Objection as to form.

21       A    I'm not understanding the question.

22       Q    (BY MR. CARIDAS)  Is there -- do

23  you know whether there is a new CDG and/or new

24  LOC issued every year?

25       A    They may not make any edits to them

CONFIDENTIAL

Page 193

1        A    Yes.

2        Q    (BY MR. CARIDAS)  Is it -- is there

3   ever a situation where a treatment, or a benefit

4   for a treatment would be denied even though it

5   was consistent with the applicable guideline?

6        A    I cannot think of a circumstance

7   where that would happen.

8        Q    So it's fair to say that if the

9   treatment was consistent with the applicable UBH

10  guideline, that claim would be approved?

11       A    Unless it was excluded in some

12  fashion from a plan document.

13       Q    And, and such a categorical

14  exclusion is the only situation you can think of

15  where --

16       A    That I can think of, that's

17  correct.

18       Q    And if, if a claim was denied on

19  the basis of a plan exclusion, would the adverse

20  benefit determination communication reference

21  that --

22       A    Yes.

23       Q    -- specific exclusion?

24       A    Yes, it would.  It would also be

25  considered an administrative denial likely versus

1           UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3            SAN FRANCISCO DIVISION

4     ----------------------------

5   DAVID AND NATASHA WIT, et al.,

6                   Plaintiffs,

7

8   vs.                      CASE NO.

9                            3:14-cv-02346-JCS

10  UNITED BEHAVIORAL HEALTH,

11  operating as OPTUMHEALTH

12  BEHAVIORAL SOLUTIONS,

13

14                  Defendant.

15  ----------------------------

16

17

18  VIDEOTAPED DEPOSITION OF DR. LORENZO TRIANA

19            DALLAS, TEXAS

20            JANUARY 28, 2016

21

22

23

24  Reported by:  Susan S. Klinger, RMR-CRR, CSR

25  Job No. 102607

1      A.     That is correct, yes, ma'am.

2      Q.     And so a request for coverage --

3      A.     Coverage, uh-huh.

4      Q.     -- could come from a patient or from

5 a provider; is that right?

6      A.     Yes, from either a member or a

7 provider, yes, ma'am or a member's parent if

8 they're a child.

9      Q.     And so you prefer the term member?

10     A.     I will -- patient, member, consumer.

11 There is various names so I can, whichever one

12 you prefer is okay.

13     Q.     Okay.  And you use the term member

14 to refer to a member of a benefit plan?

15     A.     Yes, ma'am.

16     Q.     And UBH's role is to administer the

17 behavioral health benefits under benefit plans?

18     A.     That's correct.

19     Q.     Are you familiar with the term

20 clinical coverage determination?

21     A.     Yes, ma'am.

22     Q.     Can you tell me what that is?

23     A.     Yes.  That is where we, one of my

24 medical directors will take a look at, will

25 evaluate a request for service, and they will

1   take in the clinical information.  And as they

2   take in the clinical information and find out

3   what the need is, then also take a look at the

4   coverage determination guidelines.  And then

5   make a determination related to all of that

6   information and having those coverage

7   determination guidelines as a backdrop.

8        Q.    Okay.  So a clinical coverage

9   determination is a decision about whether or

10  not there is coverage for services?

11       A.    Right, whether there is a need for

12  or not a need for a service the type of

13  services that they're requesting, what the

14  clinical information is, and then whether there

15  is coverage within the benefit plan for that.

16       Q.    Okay.  And there is also something

17  called an administrative coverage

18  determination; is that right?

19       A.    Yes, ma'am.

20       Q.    And how is an administrative

21  coverage determination different than a

22  clinical coverage determination?

23       A.    So the clinical one takes the

24  clinical information into consideration.  The

25  administrative is usually something that is

1   terminology issue.  You said earlier that UBH

2   administers the mental health or the behavioral

3   health benefits for plans?

4         A.    Yes, ma'am.

5         Q.    Is it not correct to call that

6   claims administration?

7         A.    I'm not sure it is correct or not.

8   For me when I hear the term claims, I'm

9   thinking of when a provider submits a claim to

10  be paid for its service they provided.  So for

11  me that is what I think of when the hear the

12  word claim.

13        Q.    So you are thinking a specific, the

14  form 1500 comes in?

15        A.    That's right.

16        Q.    So apart from administering

17  behavioral health benefits for plans, are you

18  aware of any other business that UBH engages

19  in?

20        A.    No, I am not aware of any other that

21  UBH specifically engages in.

22        Q.    And UBH administers only mental

23  health and substance abuse benefits; is that

24  right?

25        A.    Yes, that I'm aware of.

1  I'm not sure about the adoption of the best

2  practice.

3      Q.    Is the adoption of the best

4  practices guidelines done by a different group

5  than the BPAC?

6      A.    No, ma'am.

7      Q.    That is all done by BPAC?

8      A.    It is all done by BPAC.

9      Q.    When you refer to United HealthCare,

10  is that United HealthCare Insurance Company?

11      A.    That is what I'm referring to, yes,

12  ma'am.

13      Q.    And does United HealthCare Insurance

14  Company play any role with respect to the

15  creation of UBH's level of care guidelines?

16      A.    No, ma'am.

17      Q.    Does it play any role with respect

18  to the creation of UBH's coverage determination

19  guidelines?

20      A.    No, no direct roles.

21      Q.    And I'm referring to the creation.

22  Does your answer change if we're talking about

23  revision of guidelines or adoption of

24  guidelines?

25      A.    All of that is under the purview of

1    the BPAC.  So BPAC is the one that oversees all

2    of those activities.

3         Q.    Got it, okay.  Let me show you what

4    has been marked as Exhibit 3.

5              (Exhibit 3 marked.)

6         Q.    Dr. Triana, do you recognize this

7    document?

8         A.    Yes, ma'am.

9         Q.    Can you tell me what it is?

10        A.    It is my organizational chart.

11        Q.    So this is -- so the blue box at the

12   top inside it says Lorenzo Triana, MD?

13        A.    That is me.

14        Q.    Okay.  So this is a chart of the

15   folks who report to you and so forth?

16        A.    Yes, ma'am.

17        Q.    So it looks like you have, if I

18   understand the chart correctly, you have nine

19   direct reports; is that right?

20             MS. ROMANO:  Objection as to form.

21        A.    No, ma'am.  I have, I have seven

22   direct reports.

23        Q.    Okay.

24        A.    And then I have two dotted line

25   reports.

1    A.    I can't -- I don't know exactly who

2  drafted this document, but the creation of this

3  document is part of what the work that the

4  national utilization management committee does.

5  So it was part of the work that is being done

6  in that, so I can't tell you exactly who typed

7  it and all of that, but that is part of the

8  work that we do.

9    Q.    Okay, right.  So you don't know the

10  specific person necessarily, but it comes from

11  that committee?

12    A.    Correct.

13    Q.    And what is the, what is the purpose

14  of this document?

15    A.    The purpose of this document is that

16  it outlines the, our processes in the

17  application of managing the behavioral health

18  benefit.

19    Q.    And who is the, who is the intended

20  audience of the document?

21    A.    Our clinicians primarily would be a,

22  a -- one of the intended audiences.

23    Q.    Okay.  Anybody else?

24    A.    Again, it is pretty complex.  And it

25  involves a lot of different areas as you can

1    see, so it will drive quality, the folks in

2    quality will be affected by this document.  So

3    there is various staff members that will be

4    affected by the contents of this document.

5         Q.    Okay.  So it is primarily for use by

6    people within UBH?

7         A.    Yes, ma'am.

8         Q.    Is it distributed to anybody outside

9    of UBH?

10        A.    Not distributed, not that I'm aware

11   of.

12        Q.    Or provided to anyone outside UBH?

13        A.    So outside of UBH the only time that

14   I'm aware of that somebody would be looking at

15   this would be, for example, NCQA, the National

16   Committee on Quality Assurance.  And they have

17   an accreditation.  When we -- as part of that

18   accreditation, they will review our

19   utilization, the utilization management program

20   description.  So they would be somebody that is

21   outside of UBH that would review the document.

22        Q.    Okay.  And what about URAC?

23        A.    And I believe URAC also takes a look

24   at it, but I'm not 100 percent sure.

25        Q.    Okay.  If you turn to, it is page 37

1     Q.     And then in addition, there are

2   common criteria and clinical best practices for

3   all levels of care; is that right?

4     A.     That is correct.

5     Q.     So if a care advocate is applying

6   level of care guidelines to a particular

7   request for service, the common criteria for

8   all levels apply; right?

9     A.     They could apply, yes.

10    Q.     And then -- well, they could or they

11  do?

12           MS. ROMANO:   Objection as to form.

13    A.     Again, they do as long as it falls

14  into the realm of a level of care guideline.

15    Q.     Got it.   In addition to that, there

16  is the specific, the one, the specific to the

17  level of care that is being requested; right?

18    A.     That is correct.

19    Q.     And then also there are continued

20  treatment, continued service criteria?

21    A.     Yes, ma'am.

22    Q.     And those apply to all levels of

23  care also; is that right?

24    A.     Yes.

25    Q.     And then on the CDG side, the

1   they've authorized, and then that information

2   is funneled back to the original care advocate

3   who then informs the provider of what the

4   decision was.

5       Q.    Okay.  And alternatively what

6   happens if the physician reviewer determines

7   that the service should not be covered?

8           MS. ROMANO:  Objection as to form.

9       A.    So they will inform the physician of

10  that.  They will also inform the physician that

11  there is appeals rights to that.  And then they

12  will, same thing, they will document very

13  clearly what the clinical information was, the

14  rationale for the decision that they made, the

15  guideline that they used as reference for that.

16  They will document what an alternative service

17  is and then they document that and then the

18  care advocate also is notified.

19      Q.    And is there a letter that is sent

20  out to the member?

21      A.    So the completion of that document

22  in LINKS triggers the letter generating

23  department to issue a letter.

24      Q.    And the information that is put into

25  the letter comes from the LINKS note that the

1    physician reviewer created?

2        A.    A portion of the letter comes from

3    that.

4        Q.    Okay.

5        A.    So letters are extensively

6    regulated, and the language in letters is

7    extensively regulated.  And it varies whether

8    it is a commercial plan or a Medicare plan,

9    etcetera.  So the basics in the standard

10   language is the medical directors don't have

11   anything to do with that.

12       Q.    Right.

13       A.    There is a portion that outlines the

14   decision and alternative services and what the

15   decision was based on.  That is the piece that

16   the letter generators will extract from the

17   note and incorporate into the letter.

18       Q.    Okay.  And that portion that gets

19   extracted has to indicate what guideline was

20   applied; right?

21            MS. ROMANO:  Objection as to form.

22       A.    That is correct.

23       Q.    Go ahead.

24       A.    That is correct.

25       Q.    And it has to state all of the

1    reasons why the claim was denied?

2            MS. ROMANO:  Objection as to form.

3        A.   So that information because that

4    letter goes to the member it has to be written

5    in a language that is understandable to the

6    member.

7        Q.   Right.

8        A.   So when you say all, it is a summary

9    in a language that is understandable.  So they

10   summarize why the decision was made in that

11   type of language.  So it is not an outline of

12   -- it is not a copy and paste of the guideline.

13   And what this meant or this, it is not that.

14       Q.   Okay.

15       A.    It is just a summary in a language

16   that is understandable that encompasses how

17   they make that decision.

18       Q.   Right.  But the letter which is

19   generated from the LINKS note has to include

20   all of the rationales; right?

21       A.   Yes.

22           MS. ROMANO:  Objection as to form,

23       give me a minute.

24       A.    Sorry.  It has, it has to include

25   the rationale that the physician used in making

1   determines either in a peer review or in an

2   appeals phase that the clinical information

3   satisfies the guidelines that are being

4   applied, is it appropriate for the medical

5   director to deny coverage?

6        MS. ROMANO:  Objection as to form.

7        A.   So would you reframe it so that I

8   can answer what you are trying to get at?

9        Q.   Let's talk about when we're -- let's

10  just take one situation at a time.  So peer

11  review, the medical director is making a

12  determination.  So if the medical director is

13  applying, let's say, the level of care

14  guidelines and finds based on the clinical

15  information that the criteria in the level of

16  care guidelines are satisfied, can he deny

17  coverage?

18        MS. ROMANO:  Objection as to form.

19        A.   So the answer is they should not

20  deny, because when they issue a denial, they

21  have to use as a backdrop the guidelines.  So

22  if after they reviewed it and they use their

23  clinical judgment and all of those things, and

24  they feel it meets the criteria then they

25  should follow that decision and authorize.  It

1  coverage for a claim.  I think of it as claims

2  administration, but understanding that claim is

3  the wrong word.  What is, what is the word you

4  use for the process of administering that

5  request for service?

6      A.    So it is really, again, the

7  application of our utilization management

8  process, which is outlined in the utilization

9  management program description.

10      Q.    Okay.

11      A.    There is training when somebody

12  joins the organization related to that and

13  actually to the guidelines themselves.

14      Q.    Okay.  So there is training on the

15  utilization management program?

16      A.    Yes.

17      Q.    Including all the processes that

18  we've been talking about?

19      A.    Uh-huh.

20      Q.    And that training includes training

21  specifically on the guidelines?

22      A.    That is correct.

23      Q.    And that training includes how to

24  select which guideline to apply?

25          MS. ROMANO:  Objection as to form.

1     A.    The training is a fairly

2  sophisticated and extensive process.  And it

3  starts off with basic reading of the materials,

4  become familiar with them, studying the

5  materials, the guidelines.  Then there is a

6  classroom type of setting, if you will, where

7  those materials are discussed.  And there is an

8  actual trainer that is walking the medical

9  directors through those.

10            Then there, there are the next phase

11  is where they will take vignettes and case

12  examples and scenarios and they will learn how

13  to apply the guidelines, practice in using

14  that.  Then there is another phase where

15  current medical directors will actually

16  participate in a also training session.  Again,

17  reviewing guidelines and reviewing case

18  scenarios and have a lot of questions.  If the

19  medical directors have any questions, they can

20  answer that.  Give them a little bit more live

21  experience of or more real experience of what

22  the job and what, what the process is like.  So

23  that sort of entails the training process and

24  that is how the medical directors are prepared

25  essentially.

1    Q.    Okay.  And how often do medical

2  directors undergo training on procedures?  Is

3  it just when they are onboarded?

4         MS. ROMANO:  Objection as to form.

5    A.    That is when the bulk of the

6  training occurs, but as guidelines are updated

7  on a yearly basis, if there is something that

8  changes in the program description on a yearly

9  basis, then there are trainings and

10  communications that come to apprise the medical

11  directors of it.

12    Q.    So are these additional classroom

13  type settings?

14    A.    It depends on how complex the change

15  is.  If it is a -- if it is a rather small

16  change, then it is a notification.  If it is

17  more than that, it could be up to a formal

18  training.  Again, classroom is virtual, right,

19  but it could be a more formalized training.

20    Q.    And you mentioned the name of the,

21  of training but I don't know where I wrote it

22  down.  Who is the person who is in charge of

23  training?

24    A.    Jennifer Klach.

25    Q.    She does the training for the

1    guidelines are specific to the treatment

2    setting.  So they're different in that

3    component.

4             As you also have noted, we've

5    incorporated some of our level of care into the

6    coverage determination guidelines.  But as far

7    as why we created the coverage determination

8    guidelines, that was the, the rationale behind

9    them.

10        Q.    So on the medical side, there were

11   coverage determination guidelines that were

12   specific to diagnosis?

13        A.    To different diagnoses and that is

14   how they made their determinations.

15        Q.    Okay.  And so on the behavioral

16   side, you needed something that was specific to

17   diagnosis?

18        A.    Right, that was more evidence based

19   and specific to a diagnosis.

20        Q.    Okay.  Any other reasons?

21             MS. ROMANO:  Objection as to form.

22        A.    Not that I'm aware of.

23        Q.    And then in terms of the purposes

24   served by the guidelines, is one of the, one of

25   the, one of the reasons that UBH has guidelines

1  to help ensure that the people making clinical

2  coverage determinations will do so in a

3  consistent way?

4       MS. ROMANO:  Objection as to form,

5     excuse me.

6     A.   Yes.  Consistency is one of the

7  things that we expect.  And the guidelines are

8  one of the things that helps us with

9  consistency.

10    Q.   And does UBH also have guidelines in

11 order to satisfy a requirement of the

12 accreditation bodies?

13    A.   So with NCQA in particular, yes, one

14 of their requirements is that there are a set

15 of guidelines, so that also satisfies that as

16 an added component.

17    Q.   When UBH first -- well, before UBH

18 introduced coverage determination guidelines,

19 were guidelines used for -- were level of care

20 guidelines used for all cases?

21       MS. ROMANO:  Objection as to form.

22    A.   So it varied.

23    Q.   Okay.

24    A.   Right, depending on state.

25    Q.   Yes.

1      Q.    Okay.  So it is important for the

2  care advocate or medical director to check this

3  document?

4      A.    That is correct.

5      Q.    To make sure they're using the right

6  guidelines?

7           MS. ROMANO:  Objection as to form.

8      A.    That is correct.

9           VIDEOGRAPHER:  Counsel, I need to

10  change tape in about five or six minutes.

11           MS. REYNOLDS:  You can do it now.

12           VIDEOGRAPHER:  Off the record at

13  2:02 p.m.

14           (Recess, 2:02 to 2:11 p.m.)

15           VIDEOGRAPHER:  Back on the record at

16  2:11 p.m.

17      Q.    You had mentioned earlier

18  inter-rater reliability.  Can you tell me what

19  that is?

20      A.    So it is a process by which we

21  ensure that the decisions that our clinicians

22  are making are reliable and consistent amongst

23  themselves.

24      Q.    And how, how does that process work?

25      A.    So it is an activity that takes

1    A.    No, UBH is solely responsible for

2    developing the guidelines.

3    Q.    All right.  And you have been

4    designated to testify about the types of

5    agreements into which UBH enters with its

6    corporate affiliates that bear on

7    administration of behavioral health benefits or

8    on creation, development, etcetera, of the

9    guidelines.

10         So UBH has produced, I think, four

11   agreements each of which has been amended

12   several times.  So I'm going to mark those as

13   exhibits, and then ask you a few questions

14   about those.  So this will take me a minute

15   just to get these out so if we can stay on the

16   record or go off the record as you would like?

17         What I'm going to do is I'm going to

18   try to mark the agreement and the amendments as

19   one exhibit together, is that acceptable?  So

20   the first one is going to be Exhibit 17, and

21   the agreement is UBHWIT0100285 through 0100317.

22   The first amendment is UBHWIT0100318 through

23   321.  And the second amendment is UBHWIT0100322

24   through 328, so that is all Exhibit 17.

25         (Exhibit 17 marked.)

```
 1          UNITED STATES DISTRICT COURT
 2        NORTHERN DISTRICT OF CALIFORNIA
 3

    DAVID AND NATASHA WIT,        )
 4  et al.,                       )
                  Plaintiffs,     )
 5                                )
                  vs.             )   3:14-CV-02346-JCS
 6                                )
    UNITED BEHAVIORAL HEALTH,     )
 7  Operating of OPTUMHEALTH      )
    BEHAVIORAL SOLUTIONS          )
 8                                )
                  Defendants.     )
 9  _____  )
10
11
12
13
14   VIDEOTAPED DEPOSITION OF SATWANT AHLUWALIA
15              New York, New York
16         Thursday, February 11, 2016
17
18
19
20
21
22
23
24  Reported by:
    PATRICIA A. BIDONDE, RPR
25  JOB #: 103668
```

1        Q.    Okay.  I'll rephrase.

2              You said you were trained to

3    always reference a UBH guideline in your

4    medical necessity determination.  Is that

5    correct?

6        A.    Correct.

7        Q.    Would you ever make a medical

8    necessity determination that was inconsistent

9    with UBH's guidelines?

10       A.    No.

11       Q.    Would you ever reference a UBH

12   guideline that you had not actually considered

13   in making your medical necessity

14   determination?

15       A.    I still don't understand what

16   that means.

17       Q.    So you said you were drawing a

18   distinction between the words "reference" and

19   "used."  Am I right?

20             MR. FLYNN:  Objection as to form.

21       Q.    When you say "reference," what do

22   you mean?

23       A.    I just want to clarify.  In the

24   final determination, we have to reference the

25   UBH guidelines.  We have to say that this

1   guideline or that guideline is met or not met.

2   And these are the reasons why.

3           However, in making a

4   determination, I look at a lot more things

5   than just the guideline.  That is the last

6   part of the review.  The review where you come

7   to a decision, all the information before

8   that, you look at the clinical notes.  You

9   look at the peer review.  You look at the past

10  treatment.  You look at all of those things

11  before you make any kind of determination.

12          And when, after reviewing all of

13  those, what we have is not consistent with the

14  guideline, then we proceed with a denial.

15      Q.    So it's accurate that you never

16  make a determination that is inconsistent with

17  the guideline?

18          MR. FLYNN:  Objection; asked and

19      answered.

20      A.    Correct.  We do approve on

21  occasion when guidelines are not met.

22      Q.    Can you give me -- in what

23  circumstances would you approve when a

24  guideline was not met?

25      A.    When I'm having a peer-to-peer

Page 1

1              UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF CALIFORNIA
2               SAN FRANCISCO DIVISION

3    DAVID AND NATASHA WIT,        )
     et al.,                       )
4                                  )
                                   )
             Plaintiff,            )
5                                  ) Case No.
        vs.                        ) 3:14-CV-02346-JCS
6                                  )
     UNITED BEHAVIORAL HEALTH,     )
7                                  )
                 Defendant.        )
8
9                      -and-
10

11          UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF CALIFORNIA
               SAN FRANCISCO DIVISION
12

     GARY ALEXANDER, et al.,       )
13                                 )
             Plaintiff,            )
14                                 ) Case No.
        vs.                        ) 3:14-CV-050337-JCS
15                                 )
     UNITED BEHAVIORAL HEALTH,     )
16                                 )
                 Defendant.        )
17

18

19   VIDEOTAPED DEPOSITION OF THEODORE A. ALLCHIN, M.D.
20              CHICAGO, ILLINOIS
21          THURSDAY, JANUARY 18, 2016
22

23   Reported by:
24   DEBORAH HABIAN, RMR, CRR, CLR
25   JOB NO. 103946

P0047

1  it's done in a -- at an easily assessable

2  reading, that we refer to the level of care

3  guidelines that we're utilizing when we make the

4  determination, things also as far as what -- you

5  know, make sure that there's a notation of when

6  the -- when the peer review occurred.

7       Q.  Is it accurate that you're required to

8  refer to one of UBH's guidelines in making a

9  determination?

10      A.  Yes.

11      Q.  Do you know if you are evaluated -- if

12  your performance is evaluated based on whether

13  or not you're making denials or approvals?

14      A.  I do not believe I am.

15      Q.  And I know you said you're evaluated in

16  part based on whether or not you actually

17  reference one of UBH's guidelines in your

18  rationale for your decision in the letter that

19  gets sent to a patient.  Are you also evaluated

20  in terms of whether or not you have referenced

21  the correct guideline?

22           MS. ROSS:  Objection.

23           THE WITNESS:  Yes.

24  BY MS. KASTURI:

25      Q.  And do you get feedback in your -- in

1    Q.   So in the instances where you don't

2    actually physically consult one of the

3    guidelines, you still always use them in making

4    your determination?

5    A.   Yes.

6    Q.   And are you required to always use the

7    guidelines in making a determination?

8    A.   Ah, we can choose to -- they're a

9    guideline, which means that, you know, it's

10   generally how we would do things, but if we see

11   something clinically that would suggest that

12   they should be in a certain level of care and

13   they're not quite meeting the guidelines for

14   that, we certainly have the ability to make

15   authorization determinations.

16   Q.   Could you ever make a denial that was

17   inconsistent with the guidelines?

18   A.   The only time I would think we would do

19   that, which would be very rare, is if we thought

20   the treatment at a particular facility was

21   experimental, dangerous, something along that

22   line, in which case we would offer an

23   alternative that might be -- that would likely

24   be the same level of care but just at a

25   different facility.  And again, that would be

1    necessity determination?

2        A.  No.  Unless I -- let me -- if we're

3    doing a retrospective review or usually a

4    non-urgent appeal, then we have access to a --

5    the medical record to look at.

6        Q.  You mentioned that IBAG would indicate

7    whether or not you should be using a level of

8    care guideline or a coverage determination

9    guideline.  Once you know which of those two you

10   should be using, how do you determine exactly

11   which guideline to apply to a given case?

12           MS. ROSS:  Objection.

13           THE WITNESS:  For a level of care

14   guideline, it's what level they're in.  For the

15   CDG, it would depend on the -- it's driven more

16   by the -- what the diagnosis is.

17   BY MS. KASTURI:

18       Q.  Is it accurate that the coverage

19   determination guidelines incorporate level of

20   care criteria?

21       A.  Yes.

22       Q.  Can the choice between using a level of

23   care guideline as opposed to a CDG ever change

24   the outcome of a review?

25       A.  Um, I don't see that.

1       A.  Yes.

2       Q.  And you mentioned there is a committee

3  that is in charge of updating the guidelines?

4       A.  Correct.

5       Q.  What is that committee called?

6       A.  I -- I don't know the exact term --

7       Q.  Okay.

8       A.  -- of what it is.

9       Q.  Do you record which guideline you've

10 considered in each medical necessity

11 determination?

12      A.  Yes.

13      Q.  And do you record that information in

14 Pulse or Linx?

15      A.  Yes.

16      Q.  Are you required to record which

17 guideline you've used in making a

18 consideration -- in making a determination?

19      A.  Yes.

20      Q.  Do you ever write that your decision

21 was based on a particular guideline when in fact

22 you did not actually consider that guideline?

23      A.  No.

24      Q.  Would that be contrary to UBH's

25 policies?

1        A.   Yes.

2        Q.   Would it be fair to say that UBH

3   requires that you make decisions consistent with

4   the guidelines?

5        A.   Yes.

6        Q.   In terms of the overall process for how

7   you make medical necessity determinations, does

8   that process differ in any way based on whether

9   or not you're dealing with a pre-certification

10  case or a concurrent review case?

11       A.   Well, we have different sort of

12  criterias for initial and concurrent, so we -- I

13  would look at the one that would apply.

14       Q.   And when you say "different criteria,"

15  what do you mean by that?

16       A.   If you look at, for instance, level of

17  care for inpatient mental health, for instance,

18  it's subdivided into sort of initial and

19  concurrent.

20       Q.   And does the overall process that you

21  use for making medical necessity determinations

22  differ in any way based on whether or not you're

23  applying a level of care guideline as opposed to

24  a coverage determination guideline?

25       A.   No.

```
 1          IN THE UNITED STATES DISTRICT COURT

 2       FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3              SAN FRANCISCO DIVISION

 4   DAVID AND NATASHA WIT,        )
                                   )
 5   et al.,                       )
                                   )
 6            Plaintiffs,          )
                                   )
 7   vs.                           )   Case No.
                                   ) 3:14-CV-02346
 8   UNITED BEHAVIORAL HEALTH,     )      JCS
                                   )
 9   operating as OPTUMHEALTH      )
                                   )
10   BEHAVIORAL SOLUTIONS,         )
                                   )
11            Defendant.           )

12

13

14     VIDEOTAPED DEPOSITION OF LESLIE MOLDAUER, M.D.

15                 Denver, Colorado

16           Wednesday, February 3, 2016

17

18

19

20

21

22

23   Reported by:

24   LISA A. KNIGHT, RDR, CRR, CLR, RSA

25   JOB NO. 103180
```

1    BY MR. CARIDAS:

2         Q.    Is it fair to say that all of those

3    resources would be things that inform your

4    clinical judgment?

5         A.    Yes, it would.

6         Q.    So it's not that you would

7    specifically turn to a particular, you know,

8    CL -- CME or document in the course of a

9    particular review; it's that you've

10   internalized that information?

11             MR. BUALAT:  Objection to form.

12        A.    Pretty much, yes.

13   BY MR. CARIDAS:

14        Q.    Do you use level-of-care guidelines

15   or coverage-determination guidelines as part of

16   every review that you construct?

17             MR. BUALAT:  Objection to form.

18        A.    That is in the back of my mind.

19   I don't usually refer to them for every review.

20   BY MR. CARIDAS:

21        Q.    Are they -- do you take them into

22   account in every review that you conduct?

23             MR. BUALAT:  Objection to form.

24        A.    Yes.

25   ///

I don't review claims.

BY MR. CARIDAS:

Q. Apologies. Strike that.

Could you remind me what the term that you would refer is?

A. Well, I make clinical determinations, I make authorization determinations.

Q. In making a clinical determination, does it -- is your process different if you're applying level-of-care guidelines versus coverage-determination guidelines?

MR. BUALAT: Objection to form.

A. I'd say the process is pretty similar. Pretty much the same.

BY MR. CARIDAS:

Q. Is the choice between level-of-care guidelines versus coverage-determination guidelines ever outcome-determinative, if -- do you understand the question?

MR. BUALAT: Objection to form.

A. Let me tell you what I think you're asking me. And that is, would the outcome be different depending upon which guideline that I use?

1    BY MR. CARIDAS:

2         Q.    Um-hum.  Yes.

3         A.    Is that what you're asking?

4              MR. BUALAT:  Objection to form.

5         A.    I'd say the outcome would generally

6     be pretty similar.

7    BY MR. CARIDAS:

8         Q.    Is there -- can you think of any

9     exceptions to that?

10             MR. BUALAT:  Objection to form.

11        A.    Not offhand, no.

12   BY MR. CARIDAS:

13        Q.    Do you find either coverage-

14    determination guidelines or level-of-care

15    guidelines easier to apply?

16        A.    I'd say they're about the same.

17        Q.    Is part of the reason why they're

18    about the same to apply and result in -- or

19    ironed out, become determinative that the

20    level-of-care guidelines and the coverage-

21    determination guidelines are similar?

22             MR. BUALAT:  Objection to form.

23        A.    They definitely have similarities,

24    yes.

25    ///

1          MR. BUALAT:  Objection to form.

2      A.    I'd say it was inconsistent with the

3  guideline, in addition to my own clinical

4  experience.  So I wouldn't say in this case the

5  guideline was specific to direct me to the

6  decision.  It was one of the things that

7  I considered.

8  BY MR. CARIDAS:

9      Q.    Was your decision consistent with

10  the guideline?

11          MR. BUALAT:  Objection to form.

12      A.    Yes.

13  BY MR. CARIDAS:

14      Q.    Have you ever made a decision on a

15  peer review that was inconsistent with the

16  applicable guideline?

17          MR. BUALAT:  Objection to form.

18      A.    Not that I can think of.

19  BY MR. CARIDAS:

20      Q.    Is the purpose of the case note for

21  you to be able to provide your rationale for

22  your decision?

23          MR. BUALAT:  Objection to form.

24      A.    Definitely an important purpose,

25  yes.

1             UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF CALIFORNIA
2               SAN FRANCISCO DIVISION
   _____
3   DAVID AND NATASHA WIT,  )
   et al.,                 )  CASE NO.
4                           )  3:14-CV-02346-JCS
              Plaintiffs,  )
5                           )
          -vs-             )
6                           )
   UNITED BEHAVIORAL       )
7   HEALTH,                 )
                            )
8               Defendant.  )
   _____  )
9   GARY ALEXANDER, et      )
   al.,                    )  CASE NO.
10                          )  3:14-CV-05337-JCS
              Plaintiffs,  )
11                          )
          -vs-             )
12                          )
   UNITED BEHAVIORAL       )
13   HEALTH,                 )
                            )
14               Defendant.  )
   _____  )
15
16
17            PHILADELPHIA, PENNSYLVANIA
                FEBRUARY 9, 2016
18                  8:59 A.M.
19
              VIDEOTAPED DEPOSITION OF
20                 LIN ZHU, PH.D.
21
22
23
24      REPORTED BY:
        DEBRA SAPIO LYONS, RDR, CRR, CCR, CPE
25      JOB NO. 103308

Page 48

1    warranted but six days meets the criteria, in that

2    instance would you authorize coverage for six days?

3         A.   Yes.

4              MR. FLYNN:  Objection, form.

5         Q.   Okay.  And then is that considered

6    an authorization or a non-coverage determination?

7         A.   It's considered an authorization.

8         Q.   An authorization.  Okay.

9              In the instance where the decision is

10   a non-coverage determination, what happens after

11   the phone call with the Facility Reviewer?

12             MR. FLYNN:  Objection, form, vague.

13        A.   Can you be more specific?

14        Q.   What do you do next?

15        A.   I finish my note.

16        Q.   Okay.

17        A.   And complete the work list item and

18    close out the case.

19        Q.   Okay.  What do you mean by "complete

20   the work list item"?

21        A.   Consider it done.

22        Q.   And how do you -- is there

23   particular information that you need to record in

24   your note to complete the note?

25        A.   Any decision that we make will need

1    to be documented in the peer review note.

2          Q.   Do you also document the rationale

3    for your decision?

4          A.   Yes.

5          Q.   Is there particular information that

6    has to be included in the rationale?

7          A.   We need to include the guidelines,

8      the diagnoses and each member's unique

9      presentation that becomes the rationale for not

10     meeting criteria.

11         Q.   And when you say "not meeting

12   criteria," which criteria are you referring to?

13         A.   It depends.

14         Q.   What does it depend on?

15         A.   Whether the level of care guideline

16     is indicated or the coverage determination

17     guideline is indicated, and possibly other

18     guidelines.

19         Q.   Do you always cite a guideline in

20   your rationale?

21            MR. FLYNN:  Objection as to form,

22        vague.

23         A.   We're required.

24            MS. REYNOLDS:  We've been going about

25        an hour --

1          A.    Not on every case.

2          Q.    And why not?

3          A.    Because I'm familiar with the

4      guidelines.

5              Can I also add?

6          Q.    Yes.

7          A.    To answer your last question, there

8      is the familiarity with the guidelines, but in

9      each individual decision that we make on peer

10     reviews, it is the unique presentation of the

11     case, the patient, what the patient brings, and

12     what the Facility Reviewer brings to the peer

13     review discussion that ultimately guide the

14     decisions.

15          Q.    As between level of care guidelines

16     and coverage determination guidelines, do you find

17     one of them easier to apply than the other?

18          A.    Not particularly.

19          Q.    Does the choice between using a

20     level of care guideline or a coverage determination

21     guideline affect the outcome of a peer review?

22          A.    Not to my knowledge.

23          Q.    Do you ever write in your rationale

24     that your decision is based on a particular

25     guideline when, in fact, you did not take those

1    guideline criteria into account?

2            MR. FLYNN:  Objection as to form.

3        A.   Can you ask it a different way?

4        Q.   We discussed earlier the fact that

5    the rationale --

6        A.   Uh-huh.

7        Q.   -- reflects or is supposed to

8    include a citation to the guideline that applied;

9    correct?

10           MR. FLYNN:  Objection,

11       mischaracterized previous testimony.

12       A.   I'm not sure how to answer that.

13       Q.   Okay.  Are you required to cite the

14   guideline that you applied in your rationale?

15       A.   The decision section will reference

16    the guidelines in the sense that the presentation

17    of the patient does not meet the guidelines.  I'm

18    not sure if that's what you meant by "cite."

19       Q.   Okay.  So using the term "reference"

20   then, do you ever reference a guideline in your

21   rationale when, in fact, you did not consider the

22   criteria contained in that guideline?

23       A.   Can you repeat the question?

24       Q.   I'll try.

25           Do you ever reference in your

1  rationale a guideline when, in fact, you did not

2  consider the criteria that are contained in that

3  guideline?

4          A.   We always consider the guidelines.

5          Q.   Do you ever write in your rationale

6  that your decision was based on a particular

7  guideline when, in fact, you were considering a

8  different guideline altogether?

9          A.   No.

10         Q.   Have you ever made a decision on a

11 peer review that's inconsistent with the applicable

12 guideline?

13         A.   No.

14         Q.   Now, we talked about the fact that

15 the -- that you notify the Facility Reviewer of

16 your decision on the telephone call unless you need

17 to consult; right?

18         A.   That's correct.

19         Q.   How is the member notified of the

20 decision?

21         A.   I believe the facility will notify

22   the member.

23         Q.   If there's a non-coverage

24 determination, do you know whether a letter is sent

25 to the member?

P0063

1   guidelines?

2           A.   Yes.

3           Q.   And are there any differences in how

4   you apply level of care guidelines versus

5   coverage -- coverage determination guidelines?

6           A.   I do not believe so.

7               MS. REYNOLDS:  Okay.  I'm going to

8           mark two documents.  This will be

9           Document 1 -- Exhibit 1, excuse me.

10              (Exhibit Zhu-1, two-page document

11          entitled BH Case Notes for Alexander,

12          Jordan bearing Bates Numbers

13          UBHALEXANDER0000809 to UBHALEXANDER0000812,

14          is marked for identification.)

15              MS. REYNOLDS:  And this will be

16          Exhibit 2.

17              (Exhibit Zhu-2, two-page document

18          entitled BH Case Notes for Alexander,

19          Jordan bearing Bates Numbers

20          UBHALEXANDER0000818 to UBHALEXANDER0000820,

21          is marked for identification.)

22              MS. REYNOLDS:  Okay.  So for the

23          record, these two exhibits are excerpts

24          from a longer document that was produced to

25          Plaintiffs by UBH.  The first Exhibit 1 is

Page 1

1           UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF CALIFORNIA
2                SAN FRANCISCO DIVISION

3    DAVID AND NATASHA WIT,
     Et al.,
4
                 Plaintiffs,
5
                 vs.          3:14-CV-02346-JCS
6

     UNITED BEHAVIORAL HEALTH,
7    Operating of OPTUMHEALTH
     BEHAVIORAL SOLUTIONS,
8
                 Defendants.
9    ----------------------------)

10

11

12   VIDEOTAPED DEPOSITION OF LORI FLANZRAICH

13           New York, New York

14        Thursday, October 15, 2015

15

16

17

18

19

20

21

22

23

24   Reported by:
     Philip Rizzuti
25   JOB NO. 97354

P0065

Page 1

1                  UNITED STATES DISTRICT COURT

2                 NORTHERN DISTRICT OF CALIFORNIA

3                   SAN FRANCISCO DIVISION

4

   DAVID AND NATASHA WIT, et al.,        )

5                                        )

             Plaintiffs,                 )

6                                        )

   vs.                                   ) No. 3:14-CV-02346-JCS

7                                        )

   UNITED BEHAVIORAL HEALTH, operating )

8   as OPTUMHEALTH BEHAVIORAL SOLUTIONS,)

                                         )

9             Defendant.                 )

                                         )

10

11                   * CONFIDENTIAL *

12

13        VIDEOTAPED DEPOSITION OF CECILIA HOLDNAK

14

15

                         Phoenix, Arizona

16                      September 22, 2015

                          9:00 a.m.

17

18

19

20

21

22   REPORTED BY:

   Kristy A. Ceton, RPR

23   AZ Certified Court Reporter No. 50200

24   Job No. 97336

25

Confidential

1        Q.    And it's through an American Express
2    plan; is that right?
3        A.    Correct.
4        Q.    And the health insurance is administered
5    through UnitedHealthcare; is that correct?
6        A.    Correct.
7        Q.    You had the same health insurance from
8    2013 through 2015; is that right?
9        A.    Correct.
10        Q.    And that's still the same health
11    insurance you have now?
12        A.    Yes.
13        Q.    Do you understand what it means for
14    UnitedHealthcare to be the administrator of the
15    health insurance?
16        A.    That's the name of the corporation,
17    right?
18        Q.    Well, my question is, what's your
19    understanding as to UnitedHealthcare's role as the
20    administrator?
21        A.    So owner of the company.
22        Q.    The insurance is through American
23    Express, though?
24        A.    Yes.
25        Q.    So what is your understanding as to

P0069

1          IN THE UNITED STATES DISTRICT COURT

2         FOR THE NORTHERN DISTRICT OF CALIFORNIA

3              SAN FRANCISCO DIVISION

4

5    DAVID AND NATASHA WIT, et al.,      )

6              Plaintiffs,      )Case No.

7         vs.                   )3:14-CV-02346-JCS

8    UNITED BEHAVIORAL HEALTH            )

9              Defendants.      )

10   GARY ALEXANDER, et al.,             )

11             Plaintiffs,      )Case No.

12        vs.                   )3:14-CV-05337-JCS

13   UNITED BEHAVIORAL HEALTH,           )

14             Defendant.       )

15

16

17           DEPOSITION OF BRIAN MUIR

18              CHICAGO, ILLINOIS

19              September 4, 2015

20

21

22   REPORTED BY:  Tina Alfaro, CSR #084-004220

23   JOB NO. 97112

24

25

1      A.  Yes.

2      Q.  Were there any other choices that you had

3  besides those three for a medical plan?

4      A.  I don't know.

5      Q.  And at that time you chose United, correct?

6      A.  Correct.

7      Q.  And that was after you filed the complaint

8  against United in May of 2014, correct?

9      A.  If I filed the complaint earlier, yes, it

10  is.

11     Q.  And do you -- do you recall the time frame

12  in which you filed the complaint last year, do you

13  recall if it was in the summer or the spring?

14     A.  No.

15     MR. CARIDAS:  Objection to form.

16  BY MR. BUALAT:

17     Q.  But you also filed an amended complaint

18  last year; do you remember that?

19     A.  Yes.

20     Q.  And the amended complaint complains about

21  UBH's level of care guidelines relating to mental

22  health and substance abuse disorders, right?

23     A.  Yes.

24     Q.  And it also complains about UBH's coverage

25  determination guidelines about mental health and

Confidential

Page 1

1                UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
2                 SAN FRANCISCO DIVISION
3      GARY ALEXANDER, et. al,
                     Plaintiffs,
4                                    Case No.
              vs.              3:14-CV-05337
5

       UNITED BEHAVIORAL HEALTH,
6      operating as OPTUMHEALTH
       BEHAVIORAL SOLUTIONS,
7                 Defendants.
       ------------------------------
8
9
10
11                  CONFIDENTIAL
12        VIDEOTAPED DEPOSITION OF DAVID HAFFNER
13                 Washington, D.C.
14            Friday, October 30, 2015
15
16
17
18
19
20
21
22     Reported by:
23     Lori J. Goodin, RPR, CLR, CRR,
24     Realtime Systems Administrator
25     JOB NO. 97721

P0072

Confidential

Page 17

1    their, and also through their, through their,

2    what do you call it -- broker.

3         Q.    And did the company do anything in

4    response to your request?

5         A.    Oh, yes.  Oh, yes.  They were very,

6    I mean -- they couldn't give me a new insurance

7    plan.  I was one of a lot of employees.

8              But, they did arrange meetings, both

9    in person and telecons, and escalated the issue

10   at UBH.

11             I also got a slightly bigger bonus

12   one year, because it was at their discretion to

13   do that.  But that was, it was not, it was not

14   much.

15        Q.    Do you currently have health

16   insurance?

17        A.    I do with UBH.

18        Q.    And still with United?

19        A.    With United and UBH.

20        Q.    Okay.  Have you discussed this

21   lawsuit with any of the other plaintiffs in

22   this matter?

23        A.    Yes, I have been in contact with

24   Corrina Kline.  Simply as kind of we are in

25   this together kind of stuff.

Confidential

1  lawsuit?

2      A.    I filed this lawsuit because I was

3  denied coverage that I felt that I was entitled

4  to have for mental health treatment of a variety

5  of things.

6          And, you know, psychiatric issues

7  that I'm sure we will get to.

8          The, I was fed up because I had

9  tried all other avenues that I was aware of to

10  get relief via appeals, and I wanted to do

11  something in my interest and -- both

12  financially and emotionally.

13          And I also wanted to do something

14  for the members of, people who were similarly

15  affected, which I guess we had called the

16  potential class.

17          And by something, I mean to change

18  guidelines, so that they are in line with

19  medical standards, and also for people who have

20  been, you know, treatment has been rejected to

21  have those claims reprocessed and paid for

22  properly, as I view it.

23      Q.    You mentioned changing guidelines

24  and having claims reprocessed.

25          Is there anything else that you hope