THOMAS F. KOEGEL (SBN 125852)
tkoegel@crowell.com
NATHANIEL P. BUALAT (SBN 226917)
nbualat@crowell.com
JOSEPH BUI (SBN 293256)
jbui@crowell.com
CROWELL & MORING LLP
275 Battery Street, 23rd Floor
San Francisco, California 94111
Telephone: 415.986.2800
Facsimile: 415.986.2827

CHRISTOPHER FLYNN (admitted *pro hac vice*)
cflynn@crowell.com
APRIL N. ROSS (admitted *pro hac vice*)
aross@crowell.com
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
Telephone: (202) 624-2500
Facsimile: (202) 628-5116

JENNIFER S. ROMANO (SBN 195953)
jromano@crowell.com
CROWELL & MORING LLP
515 South Flower Street, 40th Floor
Los Angeles, California 90071
Telephone: (213) 622-4750
Facsimile: (213) 622-2690

Attorneys for Defendant
UNITED BEHAVIORAL HEALTH

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| DAVID AND NATASHA WIT, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED BEHAVIORAL HEALTH,<br><br>Defendant. | Case No. 3:14-CV-02346-JCS<br><br>**DEFENDANT UNITED BEHAVIORAL HEALTH'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**<br><br>Action File: May 21, 2014<br><br>Judge: Hon. Joseph Spero<br>Courtroom: G<br><br>**[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]** |

| | |
|---|---|
| GARY ALEXANDER, et al.,<br>Plaintiffs,<br>v.<br>UNITED BEHAVIORAL HEALTH,<br>Defendant. | Case No. 3:14-CV-05337-JCS<br>Action Filed: December 4, 2014 |

# TABLE OF CONTENTS


I. INTRODUCTION ........ 1

II. BACKGROUND ........ 5

III. ARGUMENT ........ 13

A. Plaintiffs Fail To Satisfy Rule 23(a)(2)'s Commonality Requirement........ 13

1. Liability In This Case Turns On The Plan Language, Which Varies Significantly From Individual To Individual. ........ 14

2. Plaintiffs Challenge 169 Guidelines, Which Vary Widely. ........ 17

3. Plaintiffs' Claims Turn On Individualized Issues Of Medical Necessity. ........ 20

B. The Putative Classes Are Not Ascertainable. ........ 23

C. Plaintiffs Fail To Satisfy Rule 23(b). ........ 24

1. Certification Under Rule 23(b)(1)(A) Is Improper Because UBH Does Not Owe Uniform Legal Obligations To The Class And Plaintiffs Seek Significant Monetary Relief. ........ 24

2. Certification Under Rule 23(b)(2) Is Improper Because The Relief Plaintiffs Seek Is Neither Final Nor Appropriate For The Class As A Whole. ........ 26

3. Certification Under Rule 23(b)(3) Is Improper Because Individualized Issues Overwhelm Any Common Question. ........ 29

D. The *Wit* State Mandate Class Fails Rule 23 For Additional Reasons. ........ 32

E. Plaintiffs Cannot Rely On Issue Certification Under Rule 23(c)(4) To Evade Defects In Their Class Certification Motion. ........ 33

IV. CONCLUSION ........ 35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ....................24

*Bates v. United Parcel Serv., Inc.*,
511 F.3d 974 (9th Cir. 2007)....................25

*Bond v. Marriott Int'l., Inc.*,
296 F.R.D. 403 (D. Md. 2014)....................16

*In re Bridgestone/Firestone, Inc.*,
288 F.3d 1012 (7th Cir. 2002)....................32

*Churchill v. Cigna Corp.*,
2011 WL 3563489 (E.D. Pa. Aug. 12, 2011)....................21

*Comcast Corp. v. Behrend*,
133 S. Ct. 1426 (2013) ....................5, 29, 32

*Daniel F. v. Blue Shield of California*,
305 F.R.D. 115 (N.D. Cal. 2014) ....................3, 23, 31

*Daskalea v. Wash. Humane Soc.*,
275 F.R.D. 346 (D.D.C. 2011)....................25

*Dennis F. v. Aetna Life Ins.*,
2013 WL 5377144 (N.D. Cal. Sept. 25, 2013) ....................20, 21, 22

*Escalante v. Cal. Physician's Serv.*,
309 F.R.D. 612 (C.D.Cal. 2015) ....................21

*Evon v. Law Offices of Sidney Mickell*,
688 F.3d 1015 (9th Cir. 2012)....................13, 14

*Firestone Tire & Rubber Co. v. Bruch*,
489 U.S. 101,115 (1989) ....................15

*In re First American*,
258 F.R.D. .................... *passim*

*Gabriel v. Alaska Elec. Pension Fund*,
773 F.3d 945 (9th Cir. 2014)....................30

*Gannon v. Network Tel. Servs., Inc.*,
628 Fed. Appx. 551 (9th Cir. 2016) ....................23

*Graddy v. Blue Cross*,
2010 WL 670081 at *8 (E.D. Tenn. Feb 19, 2010) ....................20, 21, 29

*Graddy v. Blue Cross*,
2010 WL 670081 at *8 (E.D. Tenn. Feb 19, 2010) ....................21

*Heimeshoff v. Hartford Life & Accident Ins. Co.*,
134 S. Ct. 604 (2013) ....................14

*Herskowitz v. Apple, Inc.*,
301 F.R.D. 460 (N.D. Cal. 2014) ....................27

*Hodgers–Durgin v. de la Vina*,
199 F.3d 1037 (9th Cir. 1999) ....................25

*Z.D. ex rel. J.D. v. Group Health Co-op*,
2012 WL 1977962 (W.D. Wa. June 1, 2012) ....................25

*Kamakahi v. Am. Soc. for Reproductive Med.*,
305 F.R.D. 164 (N.D. Cal. 2015) ....................34

*Kanawi v. Bechtel Corp.*,
254 F.R.D. 102 (N.D. Cal. 2008) ....................25

*Kartman v. State Farm Mut. Auto. Ins. Co.*,
634 F.3d 883 (7th Cir. 2011) ....................27, 29

*Lipstein v. UnitedHealth Group*,
296 F.R.D. 279, 282-83, 86 (D. N.J. 2013) ....................14, 16, 29

*Lipstein v. UnitedHealthGroup*,
296 F.R.D. 279, 282-83, 86 (D.N.J. 2013) ....................14

*In re Live Concert Antitrust Litig.*,
247 F.R.D. 98 (C.D. Cal. 2007) ....................31

*Otomo v. Nev. Ass'n Services, Inc.*,
2013 WL 1249598 (D. Nev. March 25, 2013) ....................26

*In re Paxil Litig.*,
212 F.R.D. 539 (C.D. Cal. 2003) ....................34

*Percere v. Empire Blue Cross*,
194 F.R.D. 66 (E.D.N.Y. 2000) ....................21, 29

*Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Michigan*,
654 F.3d 618 (6th Cir. 2011) ....................24, 25

*Renton v. Kaiser Found. Health Plan, Inc.*,
2001 WL 1218773 (W.D. Wash. Sept. 24 2001) ....................21

*Ries v. Arizona Beverages USA LLC*,
287 F.R.D. 523 (N.D. Cal. 2012) .......... 25

*Skinner v. Northrup Grumman Ret. Plan B*,
673 F.3d 1162 (9th Cir. 2012) .......... 30

*Szabo v. Bridgeport Machines, Inc.*,
249 F.3d 672 (7th Cir. 2001) .......... 13

*Tasion Comm., Inc. v. Ubiquiti Networks, Inc.*,
308 F.R.D. 630 (N.D. Cal. 2015) .......... 33

*Thomas v. Cnty. of LA*,
978 F.2d 504 (9th Cir. 1992) .......... 29

*U.S. Airways, Inc. v. McCutchen*,
133 S. Ct. 1537 (2013) .......... 14

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) .......... 13, 20, 25, 26

*In re WellPoint, Inc. Out-Of-Network "UCR" Rates Litig.*,
2014 WL 6888549 (C.D. Cal. Sept. 3, 2014) .......... *passim*

*Xavier v. Philip Morris USA, Inc.*,
787 F. Supp. 2d 1075 (N.D. Cal. 2011) .......... 23

*Zinser v. Accufix Research Institute, Inc.*,
253 F.3d 1180 (9th Cir. 2001) .......... 24, 25

**Statutes**

29 U.S.C. § 1003(b) .......... 23

ERISA .......... *passim*

**Federal Rules**

Fed. R. Civ. P. 23 .......... *passim*

Fed. R. Civ. P. 65(d) .......... 4, 28, 29

**Other Authorities**

2013 Conn. Legis. Serv. P.A. 13-3, § 72 .......... 33

2011 Ill. Legis. Serv. P.A. 97-437, § 5 .......... 33

## I. INTRODUCTION

In these coordinated cases, eleven Plaintiffs seek to represent thousands of current and former members of thousands of different health plans who sought coverage for residential, outpatient or intensive outpatient treatment for a variety of mental health and substance use disorders. United Behavioral Health ("UBH"), as the claims administrator for these health plans, conducted detailed clinical reviews of each member's medical needs with each member's treating provider, reviewing treatment history, treatment plans and goals, and other relevant information to determine whether the requested treatment was covered under the member's health benefit plan. Following these detailed reviews, UBH approved the requested coverage, denied coverage, or approved coverage for alternative treatment for each of the putative class members. Dissatisfied with the results in their particular cases, Plaintiffs filed this putative class action challenging UBH's coverage determinations under §§ 502(a)(1)(B) and (a)(3)(A) of the Employee Retirement and Income Security Act of 1974 ("ERISA"). They seek class certification under Federal Rule of Civil Procedure 23(b)(1), (b)(2) and (b)(3); and, as a fallback, issue certification under Rule 23(c)(4). Plaintiffs fail to meet the requirements for certification under any of these standards.

The crux of Plaintiffs' complaint is that UBH allegedly breached the terms of the putative class members' health benefit plans by denying coverage for treatment based on "guidelines" that, in Plaintiffs' view, are overly restrictive and contrary to "generally accepted standards of care." Specifically, Plaintiffs claim that 169 of UBH's Coverage Determination Guidelines (CDGs) and Level of Care Guidelines (LOCs) are inconsistent with generally accepted standards because they allegedly (a) overemphasize the presence of acute symptoms; (b) fail to provide coverage for the treatment of chronic conditions in the absence of an acute crisis; (c) do not properly take into account co-morbid conditions, patient resiliency, age, developmental progression, and motivation to recover; (d) reverse the burden of proving that a higher level of care is necessary; (e) focus on stabilization of acute symptoms rather than long-term recovery;

and (f) preclude coverage if a member fails to show constant improvement. (Mtn., 2:10-13; 14:15-17; Plaintiffs' Supp. Responses to Rog. No. 17 [Ex. 5] [1].) Plaintiffs contend that because each guideline is "inconsistent with **generally** accepted standards of care," every time UBH denies coverage "based on the guidelines," UBH violates the member's plan terms and therefore breaches UBH's fiduciary obligations. (Mtn., 8:17-18.)

Plaintiffs' motion rests on a superficial view of UBH's coverage determination process, and of the benefit plans and clinical guidelines at issue. The evidence reveals a host of individual issues that must be addressed for each class member. Among them:

- Plaintiffs acknowledge that liability turns on the plan provisions of each individual class member (*Id.*, 6:10-11), but ignore the fact that this case involves over 3,000 different plans that vary materially among themselves and also from year-to-year.
- These plans do not provide coverage for all treatment that is consistent with generally accepted standards of care. The plans vary with respect to exclusions and limitations that apply regardless of whether the requested treatment is consistent with generally accepted standards of care. Many plans include an exclusion that expressly permits UBH to deny coverage based on its guidelines.
- Plaintiffs imply that they are challenging a single, monolithic "Guideline" which, in reality, does not exist. The *Alexander* and *Wit* actions involve 169 different guidelines covering a wide range of medical diagnoses, clinical presentations, and levels of treatment, and, equally important, Plaintiffs offer no evidence that those guidelines can be measured against a single "generally accepted standard of care."
- Plaintiffs concede that they are not entitled to treatment that is not medically necessary or clinically appropriate (*e.g.*, *Wit* Compl. ¶ 113; *Alexander* Compl., ¶ 6), but ignore the large body of evidence in this case showing that medical necessity determinations are highly individualized.
- Plaintiffs ignore the testimony of the numerous medical doctors and psychologists making these determinations, who testified that the guidelines are a tool to aid coverage determinations and do not displace their clinical judgment. (Dr. Ahluwalia Dep., 82:17-19 ("Q: Do the guidelines dictate an outcome on a request for coverage? A: Never.") [Ex. 22].)

Looking past Plaintiffs' superficial characterization of their claims, it is apparent that the

[1] Exhibits cited herein are attached to the Declaration of Jennifer S. Romano in Support of Defendant United Behavioral Health's Opposition to Motion for Class Certification. Where a document was previously filed, "Doc No." refers to the docket number for that document.

question of whether UBH breached any fiduciary duty owed to any putative class member or wrongfully denied coverage based on specific criteria in the guidelines cannot be answered on a class-wide basis. Instead, this analysis requires a complex, individualized inquiry that starts with the terms of each putative class member's plan and proceeds through a series of additional inquiries, including which guidelines were used in any particular coverage determination; whether the coverage decision had anything to do with the aspects of the guidelines challenged in this case; and whether the requested treatment was medically necessary or clinically appropriate based on the member's clinical presentation. These facts inevitably vary for each class member. Plaintiffs' motion should be denied for at least the following six reasons:

First, Plaintiffs fail to satisfy the commonality requirement of Rule 23(a)(2), or the even more demanding predominance requirement of Rule 23(b)(3), where liability turns on different plan terms, different guidelines, and the different medical needs of each class member. There is no common core unifying the claims of the class, and individualized issues predominate. Indeed, Plaintiffs fail to address (much less distinguish) the numerous decisions, including those in the Ninth Circuit, denying certification for lack of commonality and predominance in similar ERISA actions alleging improper denial of coverage.

Second, a class is not ascertainable where class members can be identified only by manual review of thousands of patient records. *Daniel F. v. Blue Shield of California*, 305 F.R.D. 115, 125 (N.D. Cal. 2014). That is the case here: the parties and the Court would need to wade through the clinical and utilization review records of nearly 30,000 members to identify each individual who was an ERISA plan member, and determine whether that individual was denied benefits as a result of one of the challenged guidelines, and if so, whether the denial relates to the complaints Plaintiffs raise in this case. This assessment cannot be done on a class-wide basis.

Third, Plaintiffs cannot satisfy the requirements for certification under Rule 23(b)(1)(A) because that rule applies only where individualized actions are likely to lead to inconsistent results that create incompatible standards of conduct for a defendant like UBH. As courts have held in similar ERISA actions, a Rule 23(b)(1)(A) class is not appropriate where different class members have different plans, present different facts and circumstances to plan administrators,

and are owed different legal obligations.

In addition, a Rule 23(b)(1) or (b)(2) class is not available when plaintiffs seek monetary relief, unless that monetary relief is merely "incidental" to injunctive relief. Plaintiffs seek individual payments ranging from $10,000 to $177,000, and almost all testified that their primary interest is recovery of out-of-pocket expenses they allegedly incurred in obtaining treatment not covered by their UBH health plan. (*E.g.*, Holdnak Dep., 26:2-7 [redacted] [Ex. 8].) Nor can Plaintiffs credibly claim that monetary recovery is secondary to their quest for injunctive relief. Because at least three Plaintiffs are no longer members of a UBH-administered health plan, they have no standing to seek prospective injunctive relief.

Fourth, certification under Rule 23(b)(2) is improper because the contemplated mandatory injunction will not provide final relief appropriate to the class as a whole. Plaintiffs ask for an order requiring UBH to develop new guidelines that are consistent with "generally accepted standards of care," and then requiring UBH to apply those new guidelines retrospectively and prospectively. No final relief will be accomplished by such an injunction – it will merely open the door for subsequent disputes as to the propriety of the new guidelines and their individualized application to prior and future coverage determinations. In addition, such an order would not necessarily lead to a different outcome for each member of the class. Many would not benefit at all from a "reprocessing" of claims, because their denials would stand under the new guidelines, because they no longer need the treatment they sought years ago, or because they never submitted claims for monetary benefits (after pre-authorization of the coverage was denied), meaning there is nothing to "reprocess." Moreover, the injunctive remedy Plaintiffs seek is too general and abstract to comply with Rule 65(d), and thus cannot satisfy Rule 23(b)(2)'s directive that the injunctive relief be appropriate respecting the class as a whole.

Fifth, Plaintiffs cannot satisfy Rule 23(b)(3) because, in addition to the individualized issues described above, there are individualized issues concerning the fact and amount (if any) of monetary relief any class member would be entitled to receive. Notwithstanding the Supreme

Court's admonition in *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013), that the moving "party must… satisfy through evidentiary proof at least one of the provisions of Rule 23(b)," Plaintiffs offer no "evidentiary proof" that monetary relief is "capable of measurement on a class-wide basis," and they offer no method for doing so. To the contrary, they admit that the monetary relief they seek relates to individually incurred and calculated out-of-pocket expenses derived from individual treatment charges, which are not subject to class-wide proof.

Sixth, there is no merit to Plaintiffs' fallback argument that the Court should certify issues pursuant to Rule 23(c)(4). Issue certification is permissible only where plaintiffs have satisfied Rule 23(a)(2), and where the issues will materially advance the litigation. The rule most commonly applies where liability, but not damages, is susceptible to class-wide resolution. That is not the situation presented here, as the liability issues Plaintiffs seek to certify under Rule 23(c)(4) involve a plethora of individualized issues.

## II. BACKGROUND

### A. UBH Administers Thousands of Behavioral Health Benefit Plans With Varying Coverage Terms And Conditions.

UBH administers behavioral health benefit plans throughout the country. (Declaration of Dr. Lorenzo Triana ("Triana Decl."), ¶ 6 [Ex. 2].) Each behavioral health plan is traditionally coupled with a plan that provides medical and surgical benefits, and covered benefits are described in one or more plan documents. (*Id.*) The plan documents set forth the terms and conditions of coverage, including designation of plan administrators and fiduciaries, eligibility information, a description of the benefits provided, the standard of review for benefit decisions, processes for coverage reviews and determinations, definitions of covered services and coverage exclusions, and the procedures for submitting claims for benefits and appealing adverse coverage determinations. (Edwards Report ¶¶ 13-14 [Ex. 4]; *see, e.g.*, Sample Plans [Ex. 72-74].)

As reflected in the sample plan documents,[2] the terms of coverage for mental health and

[2] Due to the enormous number of plans at issue, the parties stipulated to use a sample of plans from 110 different patients for purposes of class certification. (*See* Mtn., 8:23-28.)

substance use disorder treatment vary based on the unique coverage terms established by the plan sponsor (typically an employer). (Triana Decl., ¶ 6 [Ex. 2]; Edwards Report ¶ 13 [Ex. 4]). State-specific requirements may also inform plan terms, introducing even more variation. (Brennecke Dep., 115:22-116:6 [Ex. 19]; Zhu Dep., 52:5-20 [Ex. 25]; Moldauer Dep., 83:15-84:21 [Ex. 24]; Edwards Report ¶ 13 [Ex. 4].) There are over 3,000 distinct groups with varying plan terms and conditions potentially at issue in this case. (Edwards Report ¶ 17 [Ex. 4].)

### B. The Plan Terms Grant UBH Broad Discretion To Consider Many Factors When Making Coverage Determinations.

Plaintiffs claim that UBH owes uniform fiduciary obligations to each class member based on the bald assertion that all of the plans require coverage of all treatment consistent with generally accepted standards of care. That assertion is a fundamental fallacy underlying Plaintiffs' class arguments.

While the plans vary in the particulars, they generally demand more of UBH in managing health benefits than blind adherence to "generally accepted standards of care." Each plan sets out a number of additional terms UBH must consider when making coverage determinations, and in some cases, require UBH to deny treatment based on those factors <u>even if</u> the treatment is consistent with generally accepted standards of care. (*See* Plan Chart [Ex. 71]; *see also* Sample Plans [Exs. 72-74]; Edwards Report ¶¶ 15-16 [Ex. 4].) Those additional factors vary across class members and are critical for defining UBH's fiduciary duty under ERISA to administer a particular plan in accordance with its particular terms.

For example, some plans exclude coverage where treatment "do[es] not result in outcomes demonstrably better than other available treatment alternatives that are less intensive or more cost effective." (Edwards Report ¶ 16 [Ex. 4]; Plan Chart, pp. 4-5, 19, 21 [Ex. 71] (quoting plan language for Plaintiffs Holdnak and Muir, and Sample Patient Nos. 659 and 828.) Others exclude coverage for treatment that is "[n]ot consistent with [UBH's] level of care guidelines . . . ." (Edwards Report ¶ 15 [Ex. 4]; Plan Chart, pp. 4-8, 10-11, 13, 19, 25-26, 30 [Ex. 71] (quoting plan language for Plaintiffs Holdnak, Muir, Pfeifer, Tillitt, Alexander and Driscoll, and Sample Patient Nos. 659, 1010, 8988).) Others cover services only when UBH determines that the treatment is

"medically necessary" and "meet[s] the UBH coverage criteria guidelines." (Plan Chart, p. 23 [Ex. 71] (quoting plan language for Sample Patient No. 986.) UBH has not unilaterally assumed the discretion to deny coverage on these grounds; as the ERISA plan fiduciary, it is directed to do so by the terms of the plan.

### C. UBH's Medical Directors Consider a Variety of Highly Individualized Information When Making Coverage Determinations.

The benefit plans administered by UBH give UBH discretion to review requests for coverage and determine whether the treatment for which benefits are sought satisfies the terms of the member's plan. (*See* Triana Decl., ¶ 7 [Ex. 2].) The extent to which a given member's treatment is reviewed by a UBH clinician, and when that review occurs and what it entails, varies depending on the level of care, clinical circumstances, and plan terms, among other factors. (*Id.* at ¶ 10.) A review may involve live input from the member's treating provider, review of the medical records, and/or review of submitted claims for reimbursement if any have been submitted at the time of review. (*Id.* at ¶ 13.) Again, this varies depending on the level of care, the status of treatment, and the plan terms. (*Id.*) And, a member's coverage may be reviewed numerous times over a single course of treatment, with repeated evaluations of the member's clinical presentation and treatment progress informing the coverage decision at each step. (*Id.* at ¶ 14.)

For example, when a member seeks admission to a residential or intensive outpatient treatment program, either the member or the facility typically contacts UBH for preauthorization under the terms of the member's plan.[3] (*Id.*) A licensed UBH Care Advocate then conducts a clinical review with the treating provider. (*Id.*) The Care Advocate may authorize coverage, but does not have authority to deny or reduce coverage. Before any adverse determination can issue, a peer review will be offered. (*Id.* at ¶ 15.) As part of the peer review, a UBH Medical Doctor or

[3] Preauthorization is not usually required for routine outpatient treatment. However, a review of outpatient treatment may be triggered by a tool known as ALERT, a computerized system for issuing and tracking wellness assessments completed by members and their providers, which includes a series of algorithms to identify members at risk for poor clinical outcomes. (*See* Brennecke Dep., 38:3-44:16 [Ex. 19].) The triggering of an algorithm is the first step in a highly-individualized review process involving outreach to the member's provider.

Ph.D.-level clinician will confer with the member's own provider to understand the facts relating to the member and the treatment sought. (*Id.*) Along with information received from the treating provider, UBH's peer reviewers apply their own clinical judgment and the appropriate UBH clinical guideline(s) to administer the member's benefits in accordance with the terms of the member's plan. (*Id.* at ¶ 16.) In addition, there are other third-party guidelines that UBH licensed clinicians might reference, depending on the circumstances and the patient. (*Id.* ¶ 10.) For example, in certain circumstances, UBH licensed clinicians may reference the Texas Department of Insurance ("TDI") criteria when making a coverage determination. (*See* Bridge Decl., ¶ 15 [Ex. 1]; Brennecke Dep., 115:7-118:10 [Ex. 19].)

Both the CDGs and LOCs provide criteria that reviewers reference under most circumstances in determining whether treatment in a particular setting ("level of care") is consistent with evidence-based treatment and/or is medically necessary for the individual plan member. (Triana Decl., at ¶ 8; Edwards Report ¶ 5 [Ex. 4]). The CDGs focus on the member's primary diagnosis, while the LOCs focus on particular treatment settings.[4] (Triana Decl., ¶ 8 [Ex. 2].) The CDGs and LOCs are not monolithic, nor are they rote in their application. (*See id.* at ¶¶ 8, 10; Edwards Report ¶¶ 27-32 [Ex. 4].) The *Wit* and *Alexander* cases together involve 169 different CDGs and LOCs, covering a wide range of diagnoses, types of treatment, and treatment settings. (*See* Section III.A.2, below.) While the CDGs and LOCs set out basic criteria for consideration when making coverage determinations, they are not intended to – and do not – dictate those determinations. (Triana Decl., ¶ 10 [Ex. 2]; Dr. Ahluwalia Dep., 82:17-19 [Ex. 22].) Indeed, the LOCs state that the guidelines must be applied "flexibly" according to the clinician's "sound clinical judgment." (*E.g.*, 2015 LOC, 5-6 [Ex. 47].)

During peer review, UBH's clinical personnel examine an array of information unique to every member, including current and past condition, symptoms, diagnoses and treatment; family

---

[4] Consistent with federal and state parity laws, UBH's determination of whether to consult a CDG versus an LOC in a given member's coverage determination turns on how benefits are managed under the corresponding plan that provides medical and surgical benefits, introducing yet another level of individual variation. (*See* Triana Dep., 163:18-164:16 [Ex. 20].)

conditions; community support; age; co-morbidities; the specific services requested; case records; industry standards; state regulations; and any other relevant information from live discussions with the member's provider. (Triana Decl., ¶ 16 [Ex. 2]; *see also* Allchin Dep., 37:16-38:11, 43:3-18, 92:13-93:14 [Ex. 23]; Ahluwalia Dep., 43:20-44 :20, 48:3-49:10, 81:23-82:16 [Ex. 22]; Zhu Dep., 40:12-45 :1, 87:7-20, 113:2-17, 122:25-123:21 [Ex. 25]; Brennecke Dep., 115 :22-116 :6, 116:15-24 [Ex. 19]; Edwards Report ¶¶ 24-26 [Ex. 4].). The outcome depends on the unique information reviewed during this process. (*See* Triana Decl., ¶¶ 16-17 [Ex. 2]) If, after the review, UBH's peer reviewer makes a clinical determination that the requested treatment is covered under the member's plan, coverage will be authorized for a period of time. (*Id.* at ¶ 17.) Or, if the UBH peer reviewer determines that treatment is not covered under the clinical requirements in the plan at the current frequency or level of care, UBH will inform the member and provider of that determination. (*Id.*)

If a clinical review results in a denial or partial denial of coverage, a number of things may happen depending on the circumstances. (Bridge Decl., ¶ 9 [Ex. 1].) Based on the member's specific benefit plan, the member may have one or more opportunities for internal appeal to UBH, or the plan sponsor (sometimes the employer) will retain discretion to review appeals. (*Id.*) Some plans (and some state laws) also provide an opportunity to seek independent external review. (*Id.*) Regardless of whether an appeal is sought or the outcome of an appeal, the member and his/her provider will make decisions as to the member's treatment. (*Id.* at ¶ 10.) UBH does not make medical treatment decisions. (*Id.*) The member may elect to continue with the treatment and self-pay or seek coverage through a secondary insurer. (*Id.*) The member may continue with treatment under an agreement with the provider for no charge, or reduced charge. (*Id.*) The member may elect to receive different treatment (*e.g.* at a lower level of care or a lesser frequency) that may be covered by UBH. (*Id.*) In any of these scenarios, the member may choose to submit claims to UBH for monetary payment, or he may not. (*Id.*) He may also choose to forego treatment altogether. (*Id.*) All of these factors make the remedy Plaintiffs seek in this case – an order requiring UBH to "reprocess claims… that it previously denied" – complicated, individualized and, at times, inapplicable.

### D. UBH Denied Plaintiffs' Requests for Coverage After Individual Clinical Review.

In the case of the Plaintiffs, UBH denied each request for coverage because the requested treatments were not covered under the terms of their plans. (Plaintiffs' Adverse Benefit Determination ("ABD") Letters [Exs. 48, 51, 53-60]; *see also* Exs. H-J to Reynolds Decl. [Doc. Nos. 128-6; 129-3 through 129-11].) While Plaintiffs argue that the benefit denials they experienced are the result of "a single, common course of conduct" subject to class treatment, the undisputed evidence reveals that the process is highly variable, resting on individualized determinations of clinical or medical necessity. (*See*, *e.g.*, Triana Decl., ¶¶ 10, 13-17 [Ex. 2].)

[redacted]

[redacted]

This individualized focus on clinical conditions is not limited to the named plaintiffs. During discovery, UBH produced information for 110 sample members who: (1) sought coverage from UBH for residential, outpatient, or intensive outpatient treatment under their respective behavioral health benefit plans; (2) had those requests reviewed by UBH clinicians; and (3) were denied coverage, in whole or in part, based on a determination by UBH that the treatment sought did not satisfy the respective plan's coverage terms. (Romano Decl., ¶ 62, n. 1.) Like the named plaintiffs, this sample of putative class members underscores how UBH tailors its review and clinical coverage determination to each member's unique medical needs:

- [redacted]

[redacted]

- [redacted]
- [redacted]
- [redacted]

Each of the people described above, and thousands of others, are members of the putative class. The sample demonstrates that each coverage decision was based on specific information received from the member and his or her provider, and that each outcome was uniquely based on

the medical needs of each member, not on a rote or uniformly-applied set of abstract criteria.

## III. ARGUMENT

Plaintiffs bear the burden of establishing the four requirements of Rule 23(a): (1) numerosity; (2) common questions of law or fact; (3) typicality of the named plaintiffs' claims and defenses; and (4) adequacy of the named plaintiffs to fairly protect the interests of the class. *Wal-Mart Stores, Inc. v. Dukes* ("*Dukes*"), 564 U.S. 338, 349-50 (2011). Plaintiffs must also satisfy at least one provision of Rule 23(b). *Id.* The class-certification analysis must be "rigorous" and may "entail some overlap with the merits of the plaintiff's underlying claim." *Id.* at 350-51. As the moving party, Plaintiffs must produce <u>evidence</u> to support each Rule 23 requirement. *See id.* Allegations in the pleadings, or bare promises to produce common evidence at a later date, will not suffice to support class certification. *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 675-76 (7th Cir. 2001).

### A. Plaintiffs Fail To Satisfy Rule 23(a)(2)'s Commonality Requirement.

Raising allegedly common questions, "even in droves," does not satisfy Rule 23(a)(2). *Dukes*, 564 U.S. at 350. An allegedly common question is sufficient for purposes of Rule 23(a)(2) only if the answer to that question "is central to the validity of each of the claims" and is "apt to drive the resolution of the litigation" without the need for an individual inquiry. *Id.* Rule 23(a)(2) focuses on the common core or "glue" holding together all of the claims of the putative class members. *Id.* at 352. Here, Plaintiffs' core allegation is that UBH breached its obligations under the relevant ERISA benefit plans by denying coverage based on guidelines that are inconsistent with generally accepted standards of care. (Mtn., 2:10-13; 14:15-17.) There is no common core uniting these claims because Plaintiffs' theory turns upon: (1) thousands of different insurance plans, (2) 169 different coverage guidelines, and (3) the unique clinical presentation of each class member.[5]

---

[5] Plaintiffs imply there is a *per se* rule that Rule 23(a)(2) is satisfied whenever class members seek declaratory or injunctive relief. (*See* Mtn., 17:16-23.) That argument is flatly refuted by *Dukes*, which held that commonality was missing in a class action seeking injunctive and declaratory relief under Rule 23(b)(2). *See Dukes*, 564 U.S. at 342. Plaintiffs also cite *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1030 (9th Cir. 2012), for this proposition, but that case said (Continued…)

### 1. Liability In This Case Turns On The Plan Language, Which Varies Significantly From Individual To Individual.

The Supreme Court has repeatedly emphasized that liability in an ERISA action turns on the plan language. *See U.S. Airways, Inc. v. McCutchen*, 133 S. Ct. 1537, 1548 (2013) ("The plan, in short, is at the center of ERISA"); *Heimeshoff v. Hartford Life & Accident Ins. Co.*, 134 S. Ct. 604, 612 (2013) ("This focus on the written terms of the plan is the linchpin" of ERISA). As a result, there can be no commonality where different putative class members' claims are governed by different plans with materially different terms.

Courts have rejected class certification motions seeking to unite members of different health plans under the umbrella of a single ERISA action. For example, in *Lipstein v. UnitedHealth Group*, the plaintiffs alleged that defendants systematically underpaid secondary insurance benefits. In seeking class certification, they argued that a single common question can satisfy Rule 23(a)(2), regardless of whether the members of the class are governed by uniform plan terms. *See Lipstein*, 296 F.R.D. 279, 282-83, 86 (D.N.J. 2013). The district court denied certification for lack of commonality, and explained that "the question is not whether [defendant] United's policy is improper, rather, the question is whether United's policy is improper according to the terms of each plan giving rise to the claim." *Id.* at 290 (emphasis in original). Commonality is not satisfied if the allegedly "core" question "likely would not lead to the same answer for each claimant." *Id.*

The court reached a similar conclusion in *In re WellPoint*, where the plaintiff claimed violation of ERISA § 502(a)(1)(B) based on the defendant's alleged failure to reimburse subscribers for out-of-network services at a "usual, customary, and reasonable" ("UCR") rate. *In re WellPoint, Inc. Out-Of-Network "UCR" Rates Litig.*, 2014 WL 6888549 at *1 (C.D. Cal. Sept. 3, 2014) ("*In re WellPoint*"). The district court recognized that "any analysis of WellPoint's

---

nothing about the application of Rule 23(a)(2) to an injunctive relief claim. *Evon* also is distinguishable because that case involved a simple legal question (whether sending debt collection letters to a debtor's employer violated the law) that, unlike here, did not turn on individual facts unique to each class member. *Id.* at 1019.

obligations must begin with the text of its ERISA plans," because if WellPoint's method for calculating UCR rates was consistent with a given class member's plan, there was no basis for liability. *Id.* at *8, 10. Because the definition of UCR varied from one plan to another, "WellPoint's UCR obligations" could not "be determined on a class-wide basis." *Id.* at *7.

Here, Plaintiffs concede that liability depends on whether a particular coverage decision "turned on criteria that violated plan terms." (*See* Mtn., 6:12-13.) If plan terms vary among the class members such that the alleged "common" coverage guidelines do not commonly implicate those plan terms, no class can be certified. Such is the case here. This action involves over 3,000 distinct plans with varying provisions concerning the benefits at issue, which may be amended from year-to-year. (*See* Edwards Report ¶ 17 [Ex. 4].) Critically, contrary to Plaintiffs' blanket assertions, the thousands of plans at issue do not uniformly require UBH to cover all treatment that is consistent with "generally accepted standards of care." (Mtn., 8:17-18; *see* Plan Chart. [Ex. 71]; *see also* Edwards Report, ¶ 17 [Ex. 4]; Edwards Dep., 193:8-195:12; 200:2-23 [Ex. 21].)[6]

The plans at issue contain myriad exclusions and limitations that give UBH discretion to deny coverage in certain circumstances even if the treatment is consistent with generally accepted standards of care. (*See* Plan Chart [Ex. 71].) For example, certain Plaintiffs' and putative class members' plans exclude coverage when treatment is "not consistent with the Mental Health/Substance Use Disorder Designee's level of care guidelines or best practices as modified from time to time." (Edwards Report ¶ 15 [Ex. 4]; Plan Chart, pp. 6, 10, 20, 25 [Ex. 71] (quoting plan language for Plaintiffs Pfeifer and Alexander, and Sample Patient Nos. 659, 1010).) For these members, UBH's fiduciary duty to administer the plan in accordance with its terms is entirely consistent with UBH's application of its internal guidelines. Likewise, some plans

[6] Because some (if not all) of the ERISA plans at issue give UBH discretionary authority with respect to determining eligibility for benefits and construing the terms of the plan, the standard of review for Plaintiffs' denial of benefits claim under § 501(a)(1)(B) is abuse of discretion. *See, e.g.*, Plan Chart, p. 23 [Ex. 71] ("UnitedHealthcare has the discretion to determine what a medically necessary covered health service is based on Plan terms and established UnitedHealthcare medical policies"); *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101,115 (1989). Adjudicating some or all of the Plaintiffs' denial of benefits claims under an abuse of discretion standard (even if conflicts of interest need to be taken into account) necessarily requires a case by case review.

exclude coverage for treatment that does "not result in outcomes demonstrably better than other available treatment alternatives that are less intensive or more cost effective." (Plan Chart, pp. 5, 19, 21 [Ex. 71] (quoting plan language for Plaintiff Muir and Sample Patient Nos. 659 and 828).) In administering this subset of plans, UBH is acting appropriately as a fiduciary in taking into account whether treatment is being provided at the safest, most cost-effective, and least intensive level of care likely to result in better outcomes for the patient, regardless of how those criteria compare with Plaintiffs' purported "standards." Since the applicable plan terms vary with respect to UBH's duties to the putative class members, class certification is improper. *See, e.g.*, *In re WellPoint*, 2014 WL 6888549 at *7.

Other material variations among the plans affect whether any putative class member would have a viable claim against UBH. Many plans have contractual limitations periods ranging from four years to as little as six months. (*E.g.*, Sample ID 8988 Plan, at 66 [Ex. 77]; Plaintiff Driscoll's Plan, p. 76 [Ex. 73].) At least one individual in the sample set has claims that are barred by the six-month limitations period in his plan because his denial occurred on October 10, 2013, more than six months before the original *Wit* Complaint was filed. (Sample ID 8988 Plan, at 66 [Ex. 77]; Sample ID 8988 ABD Letter, [Ex. 62].) These provisions raise individualized statute of limitations defenses that vary across class members. Nor can the limitations period for a given class member's claim be determined through common evidence. A review of each class member's plan documents is required to assess whether a contractual limitations period bars the class member's claim. *See Bond v. Marriott Int'l., Inc.*, 296 F.R.D. 403, 411 (D. Md. 2014) (denying certification due to individualized statute of limitations defenses).

Given the variations in plan language defining coverage criteria, and unique defenses that vary among class members, the answers to the "critical liability questions" in this case could potentially "yield a kaleidoscope of 'yeses' and 'nos' across the class." *Lipstein*, 296 F.R.D. at 290. Even if Plaintiffs could somehow prove with common evidence that all of the guidelines are inconsistent with generally accepted standards of care (which is not the case), that fact would not "drive resolution" of this case because an individualized inquiry would still be needed to determine whether a denial based on those guidelines was improper or gives rise to any relief.

### 2. Plaintiffs Challenge 169 Guidelines, Which Vary Widely.

The supposedly "common question" of whether "UBH's Guidelines [are] consistent with generally accepted standards of care" also is premised on false assumptions: first, that "UBH's Guidelines" amount to a cohesive policy, applied to every class member; and second, that such a policy is measurable against a uniform "generally accepted standard of care." Neither is true.

First, Plaintiffs' challenge to "UBH's Guidelines" is, in truth, a challenge to 169 distinct clinical guidelines, used for different class members, at different times, for different reasons. (*See* Plaintiffs' Supp. Responses to Rog. No. 15 and Attachment A [Ex. 5].) Of those 169 guidelines, 162 are diagnosis-specific CDGs, covering 32 distinct behavioral health conditions, including autism, dementia, and substance abuse. (*See id.*) Equally important, Plaintiffs' commonality theory is premised on the notion that all 169 guidelines are equally inconsistent with generally accepted standards of care in the same respect. In their class certification motion, they focus on their complaint that the guidelines allegedly "overemphasize acute criteria and symptoms." (Mtn., 14:15-17; *see also id.* at 12:4-7.) But this case is about much more than a purported overemphasis on acute symptoms. Plaintiffs contend that there are at least six different ways in which one or more of UBH's guidelines purportedly diverge from the standard of care. (Plaintiffs' Supp. Responses to Rog. No. 17 [Ex. 5]). The relief Plaintiffs seek – to have UBH reform its guidelines – requires the court to consider how each factor relates to each guideline, plan, coverage determination, and the appropriate standard of care in each circumstance.

The evidence needed to resolve these claims refutes any theory of commonality. Take, for example, Plaintiffs' current focus on acute criteria. Plaintiffs contend that the guidelines "uniformly overemphasize acute criteria and symptoms," yet the CDGs vary widely in their emphasis on acuity, depending on the diagnosis and clinical circumstances at issue. Indeed, many CDGs emphasize the need for treating *chronic*, non-acute conditions at an appropriate level of care.[7] Many CDGs also prioritize patient-specific factors in determining whether a member's

---

[7] *See, e.g.*, 2015 CDG for Substance-Related & Addictive Disorders ("SRAD"), 13 [Ex. 42] (noting such disorders are frequently "chronic or recurrent" and require "customizing treatment to individual needs and preferences, modifying the intensity of treatment with the waxing and (Continued…)

symptoms are "acute" under the circumstances, including the member's age, other co-morbid medical conditions, resiliency, and motivation to recover.[8] Further, some CDGs vary within themselves about the meaning of an "acute" symptom, depending on the level of care.[9] UBH's LOCs likewise differ on the meaning of an "acute" symptom, depending on the member's particular circumstances and diagnosis. And while Plaintiffs emphasize the "Common Criteria" of the LOCs (*see* Mtn., 11:9-14), Plaintiffs' claims challenge the guidelines more broadly, and sweep in specific criteria that vary depending on the particular level of care being addressed. Yet even the "Common Criteria" of the LOCs provide that the appropriate level of care will depend on "[s]ignificant variables" like the member's age, readiness for change, risk factors, past response to treatment, and family/social support.[10] Moreover, each LOC must be applied "in a flexible manner" according to the clinician's "sound clinical judgment," and each allows exceptions where case-specific circumstances warrant.[11]

This variation applies equally to the other deficiencies alleged by Plaintiffs. While Plaintiffs contend that each of the guidelines fails to consider "the presence of co-morbid mental

---

waning of substance use over time"); 2015 CDG for Anorexia Nervosa, 14 [Ex. 31] (recommending different treatment goals for members with chronic anorexia); 2015 CDG for Generalized Anxiety Disorder ("GAD"), 9 [Ex. 36] ("patients with GAD focus more persistently on less specific but more chronic complaints").

[8] *See, e.g.*, 2015 CDG for SRAD, 5-6 [Ex. 42] (setting out lengthy list of patient-specific factors to consider, with emphasis on "the member's specific needs"); 2015 CDG for GAD, 5-6 [Ex. 36] (same); 2015 CDG for Bipolar Disorder, 5-6 [Ex. 32] (same); 2015 CDG for Depressive Disorders, pp. 5-6 [Ex. 34] (same); 2013 CDG for Major Depressive Disorder, 6 [Ex. 34] (special considerations for children and adolescents); 2015 CDG for Bulimia Nervosa, 10-14 [Ex. 33] (identifying co-morbid conditions and noting that "some medical complications require inpatient treatment"); 2015 CDG for Specific Phobias, 14 [Ex. 41] (assessment of patient's improvement at any level of care "must also be understood within the broader framework of the member's recovery, resiliency, and wellbeing"); 2015 CDG for SRAD, 9 [Ex. 42] (substance or addiction treatment plan should include "interventions that enhance the member's motivation").

[9] *See, e.g.*, 2015 CDG for SRAD, 30-31 [Ex. 42] (for inpatient and residential rehabilitation levels of care, problems that "undermine engagement in a less intensive level of care" amount to "acute" issues); 2015 CDG for Schizophrenia, 30, 33 [Ex. 40] (same); 2015 CDG for Disruptive Mood Dysregulation Disorder, 22, 26 [Ex. 35] (same).

[10] *See, e.g.*, 2013 LOC Common Criteria, 8 [Ex. 45]; *see also* 2014 LOC Common Criteria, 6-7 [Ex. 46] (describing individualized factors for determining appropriate treatment at every level of care.)

[11] *See, e.g.*, 2011 LOC, 3; 2012 LOC, 3-4*;* 2013 LOC, 4*;* 2014 LOC, 5; 2015 LOC, 5-6 [Exs. 43-47].

health conditions" and "the member's age and/or developmental progression . . . ." (*see* Pls. Supp. Responses to Rog. No. 17 [Ex. 5]), many guidelines expressly take a member's co-morbid health conditions into account, with some recommending a higher level of care if the member exhibits certain co-morbid conditions.[12] Other guidelines expressly require consideration of age, define levels of care differently for adults and children, or recommend different treatments for adults and children.[13] Similarly, Plaintiffs contend that the guidelines improperly fail to consider the patient's resiliency or motivation to recover (*id.*), but here again, many guidelines expressly call for consideration of these factors.[14]

Second, the lack of commonality is further established by the fact that Plaintiffs do not seek to measure the 169 guidelines against a single "generally accepted standard of care." Instead, Plaintiffs rely on a host of different sources for what they view as the standard of care, many of which are directed at specific medical conditions or types of patients. (Mtn., 14:1-10.) For example, the American Academy of Child and Adolescent Psychiatry ("AACAP") has published dozens of diagnosis-specific Practice Parameters, but Plaintiffs fail to specify which, if any, provides the "generally accepted standard of care" for all 32 diagnoses at issue or at which level of care. And while the American Psychiatric Association ("APA") used to promulgate diagnosis-specific guidelines, its only current guidelines focus on the initial psychiatric evaluation of adults. (*See* APA Practice Guidelines for the Psychiatric Evaluation of Adults.) The American Society of Addiction Medicine ("ASAM") criteria, on the other hand, apply solely to substance-related and addiction disorders, while the American Academy of Clinical Psychiatrists ("AACP")

[12] *See, e.g.,* 2015 CDG for Personality Disorders, 6 [Ex. 38] (suggesting consideration of comorbidities because "patients with co-morbid personality disorder…are less likely to respond to standard treatments"); 2015 CDG for Bulimia Nervosa, 10-14 [Ex. 33] (noting "some medical complications require inpatient treatment") (emphasis added).

[13] *See*, *e.g.*, 2013 LOC 8 [Ex. 45] (requiring consideration of member's "age, level of development and cognitive functioning" for treatment at every level of care); 2015 CDG for Oppositional Defiant Disorder, 19 [Ex. 37] (defining IOP differently for adults and children/adolescents); 2015 CDG for PTSD, 11-16 [Ex. 39] (listing separate treatments for adults and children/adolescents).

[14] *See*, *e.g.*, 2015 CDG for SRAD, 6, 9, 10, 15 18 [Ex. 42] (treatment plans must take into consideration the patient's resiliency and motivation to recover); 2015 CDG for Specific Phobias, 6, 9, 14 [Ex. 41] (treatment plans must take into consideration patient's resiliency).

publishes different level of care guidelines for adults (AACP LOCUS) and minors (AACP CALOCUS). (*See* ASAM Criteria; AACP LOCUS; AACP CALOCUS [Exs. 26-29]).

Plaintiffs fail to identify which (if any) of those dozens of third-party guidelines constitute the general standard of care for any of the 169 guidelines they challenge, let alone show how any will prove a class-wide standard of care.[15] It is Plaintiffs' burden on a motion for class certification to present evidence—not just assurances—in support of commonality. *See Dukes*, 131 S. Ct. at 2551. Here, rather than offer evidence to show that their claims are capable of class-wide answers with class-wide proof, Plaintiffs resort to hand waving with promises that they "will present expert testimony and other evidence to prove that . . . UBH's Guidelines . . . are more restrictive than generally accepted standards of care." (Mtn., 13:21-23.) Bare promises are not a substitute for evidence.[16]

### 3. Plaintiffs' Claims Turn On Individualized Issues Of Medical Necessity.

Certification also is properly denied for lack of commonality where, as here, coverage determinations involve individualized assessments of medical necessity and clinical care. *See, e.g.*, *Dennis F. v. Aetna Life Ins.*, 2013 WL 5377144 at *5 (N.D. Cal. Sept. 25, 2013). As the court explained in *Graddy v. Blue Cross*, "[a]bsent a showing that the benefits were wrongfully

---

[15] For example, Plaintiffs contend that ASAM provides a "generally accepted standard of care," but do not contend that ASAM would apply to class members who did not need substance abuse treatment. (Mtn., 14:1-10.) Likewise, Plaintiffs contend that AACP's Child & Adolescent Level of Care Utilization ("CALOCUS") furnishes a "generally accepted standard of care," but not all class members are children or adolescents. (*Id.*)

[16] Plaintiffs suggest in their motion for class certification that their claims are limited to denials caused by the application of guidelines that do not comport with "generally accepted standards of care." But, several Plaintiffs also allege entirely different theories of "wrongful" denial "based upon" the UBH guidelines. These Plaintiffs claim that UBH either misapplied its guidelines or relied on the wrong guidelines when processing their particular requests for coverage, including by applying inpatient rather than residential treatment guidelines, or by ignoring coverage criteria in the UBH guidelines that were applied. (*Alexander* Compl., ¶ 111; *Wit* FAC, ¶¶ 48, 89, 126, 128, 175). Plaintiffs seek to certify three classes, broadly defined to include any UBH member whose request for coverage was denied "based upon" the LOCs or CDGs. (Mtn., 2:10-13; 3:13-4:8; 14:15-17). Because denial resulting from misapplied guidelines or the wrong guidelines is "based on" the guidelines, the putative class encompasses such claims. Plaintiffs' decision to ignore these claims in their motion for class certification is telling. These allegations alone create individualized issues that prevent class certification.

denied . . . there can be no causal link between an alleged breach and the denial of benefits; and whether a claim for benefits is wrongfully denied depends on a number of factors particular to the claimant's case," including whether a doctor determined that the requested benefit was medically necessary in the first place. *Graddy*, 2010 WL 670081 at *8 (E.D. Tenn. Feb 19, 2010) (emphasis in original).

The Northern District of California's decision in *Dennis F.* is directly on point and, like the claims here, was based on the allegation that the defendant improperly used guidelines to deny coverage for residential treatment of mental health conditions. *Dennis F.*, 2013 WL 5377144 at *1. In *Dennis F.*, the denials were the result of the defendant's alleged misapplication of a "Level of Care Assessment Tool" ("LOCAT"), which consisted of a scoring form and guidelines for determining whether residential treatment was necessary. *Id.* Even though the LOCAT guidelines were used on a class-wide basis for all class members, Judge Conti denied certification for lack of commonality because liability turned on "medical necessity determinations that are unique to each individual class member." *Id.* at *4. The Court noted that the LOCAT guidelines were "merely a tool" that clinicians used when evaluating whether residential treatment was necessary, and they "[did] not replace [the] clinical judgment" of clinicians. *Id.* at * 1, 4. Several other courts have reached similar conclusions. *See, e.g.*, *Percere v. Empire Blue Cross*, 194 F.R.D. 66, 71-72 (E.D.N.Y. 2000) (commonality and predominance not satisfied because plaintiffs' claims hinged on whether treatment was medically necessary); *Graddy*, 2010 WL 670081 *9-10 (same); *Renton v. Kaiser Found. Health Plan, Inc.*, 2001 WL 1218773 at *5 (W.D. Wash. Sept. 24 2001) (denying certification for lack of commonality).[17]

This case falls squarely within this line of authority for two reasons:

First, Plaintiffs acknowledge that in order to be entitled to the benefits at issue, the

---

[17] This line of cases is readily distinguishable from those certifying classes challenging categorical coverage exclusions for specified treatment. *See Escalante v. Cal. Physician's Serv.*, 309 F.R.D. 612, 619 (C.D.Cal. 2015) (granting certification where defendant had "undisputedly uniform practice of categorically denying coverage for lumbar ADR procedures"); *Churchill v. Cigna Corp.*, 2011 WL 3563489 at *6 (E.D. Pa. Aug. 12, 2011) (predominance satisfied where defendant had a categorical policy of denying coverage for certain treatment for autism).

treatment must be medically necessary. (*E.g.*, *Alexander* Compl., ¶ 6; *Wit* FAC, ¶ 113.) Each patient, however, presents unique medical conditions driving treatment decisions, often complicated by other medical conditions (or "co-morbidities"). (Edwards Report, ¶¶ 24-25 [Ex. 4]; Edwards Dep., 215:15-217:3 [Ex. 21]; Dr. Ahluwalia Dep., 81:23-82:16 [Ex. 22]; Dr. Zhu Dep., 87:7-20 [Ex. 25]). If a patient previously received treatment (as is the case with several Plaintiffs), the efficacy of the prior treatment can also inform the decision about whether more treatment is warranted. (Allchin Dep., 92:7-91:2 [Ex. 23] ("if it's somebody's third inpatient hospitalization . . . that's a different clinical situation than somebody who's never been in a psychiatric hospitalization."); *see also* Edwards Report, at ¶¶ 33-41 [Ex. 4]; Edwards Dep., 257:8-258:17 [Ex. 21]; Dr. Ahluwalia Dep., 48:3-49:10; 81:23-82:10 [Ex. 22].) Moreover, patients who are denied coverage for residential or outpatient treatment often receive coverage for alternative treatment that is equally or more effective for that particular individual. (Edwards Report, at ¶¶ 53-59 [Ex. 4]; Edwards Dep., 266:5-267:24 [Ex. 21]; Dr. Ahluwalia Dep., 46:14-47:10 [Ex. 22]; Allchin Dep., 39:17-40:7 [Ex. 23].)

Second, as in *Dennis F.*, the guidelines at issue are "not meant to replace clinical judgment." (Edwards Dep., 111:18-112:13 [Ex. 21].) UBH's medical directors repeatedly testified that UBH expects them to "make a determination ultimately using their clinical judgment," and that where appropriate, they will approve coverage even if the guidelines support a denial. (Dr. Brennecke Dep., 162:7-15 [Ex. 19]; *id.* at 96:16-97:21; Dr. Ahluwalia Dep., 82:17-19 [Ex. 22] ("Q: Do the [LOC] guidelines dictate an outcome on a request for coverage? A: Never."); *see id.* at 61:15-64:1; 81:8-12; Dr. Allchin Dep., 94:13-95:10 [Ex. 23]; Dr. Triana Dep., 153:6-154:12 [Ex. 20]; Dr. Zhu Dep., 61:16-62:14[Ex. 25].) Because clinical judgment informs the guidelines, coverage rationales from one individual to another can vary when referencing the same guideline. (Edwards Report, at ¶¶ 30-31 [Ex. 4]; Edwards Dep., 248:18-254:17 [Ex. 21].) The fact that some denials are reversed on appeal also underscores that different clinical professionals can reach different conclusions based on the same set of facts and guidelines. (Edwards Report, at ¶¶ 46-51 [Ex. 4]; Edwards Dep., 264:1-266:4 [Ex. 21]; *see* Dr. Brennecke Dep., 149:17-151:18 [Ex. 19] (describing appeal process).) In short, the highly

individualized nature of clinical care—in addition to the fact that this case involves 3,000 different ERISA plans and 169 different guidelines—demonstrates that there is no commonality.

**B. The Putative Classes Are Not Ascertainable.**

Plaintiffs' class certification motion also fails because the process of trying to determine who is in the class involves thousands of highly individualized inquiries, rendering the putative class unascertainable.[18] To satisfy the ascertainability requirement, the plaintiff must show that there is an "objective" and "reliable" way to determine if a person is part of the class, without an "unmanageable individual inquiry." *Xavier v. Philip Morris USA, Inc.*, 787 F. Supp. 2d 1075, 1089 (N.D. Cal. 2011). Class certification should be denied if "it would be extremely difficult to ascertain the identities of" putative class members. *Gannon v. Network Tel. Servs., Inc.*, 628 Fed. Appx. 551, 552 (9th Cir. 2016). Hence, in *Daniel F. v. Blue Shield of Cal.*, 305 F.R.D. 115, 125 (N.D. Cal. 2014), the class was not ascertainable even though the defendant had records of coverage denials, because there was no automated means of identifying class members without an "individualized analysis of all submitted claims."

Like the plaintiffs in *Daniel F.*, Plaintiffs argue that class members are ascertainable because UBH's records identify them, but gloss over the fact that doing so would require an individual review of at least 30,000 sets of records. There is no automated process to determine which UBH health benefit plans are governed by ERISA.[19] (Bridge Decl., ¶ 18 [Ex. 1].) But that would only be the first of several individual inquiries necessary to identify potential class members. For denials before 2014, there is no automated means of determining which guideline was applied in a given case. (*Id.* at ¶ 23.) Moreover, for all denials, a manual review must be undertaken to determine whether the aspects of the guidelines challenged by Plaintiffs in this case

[18] Plaintiffs appear to contend that ascertainability is required only for a Rule 23(b)(3) class. (*See* Mtn. for Cert. 24:9-10). This is incorrect, particularly when the plaintiff seeks monetary relief in connection with a Rule 23(b)(1) or (b)(2) class. *See Xavier*, 787 F. Supp. 2d at 1088-91; *Daniel F.*, 305 F.R.D. at 121-22.

[19] In general, ERISA does not apply to group health plans established or maintained by governmental entities, churches for their employees, or plans maintained solely to comply with applicable workers compensation, unemployment, or disability laws. 29 U.S.C. § 1003(b).

played a role in a particular benefit decision. (*Id.* at ¶¶ 22-23.) Plaintiffs challenge six specific aspects of the guidelines, but UBH's databases do not track whether a member has been denied coverage because of any of Plaintiffs' particular complaints. (*Id.*) Class members were denied coverage for a multitude of clinical reasons having nothing to do with the six areas covered by Plaintiffs' claims. (*Id.* at ¶¶ 7, 23.) Some individuals in the sample of class members, for example, were denied coverage for residential treatment because they had unstable living situations and were principally in need of housing, rather than medical treatment. (Excerpts of Sample ID 12649, LINX Notes [Ex. 70]; Excerpts of Sample ID 12102 LINX Notes [Ex. 69].) Thus, it is not enough to say that someone is a class member simply because a UBH reviewer consulted one or more UBH guidelines in making the coverage determination.

### C. Plaintiffs Fail To Satisfy Rule 23(b).

Plaintiffs not only fail to satisfy the four elements of Rule 23(a), they also cannot meet the requirements for certification under Rules 23(b)(1)(A), 23(b)(2) or 23(b)(3).

#### 1. Certification Under Rule 23(b)(1)(A) Is Improper Because UBH Does Not Owe Uniform Legal Obligations To The Class And Plaintiffs Seek Significant Monetary Relief.

Plaintiffs' bid for certification under Rule 23(b)(1)(A) should be denied for two independent reasons. First, the rule is inapplicable on its face. A Rule 23(b)(1)(A) class can only be certified when "different results in separate actions would impair the opposing party's ability to pursue a uniform continuing course of conduct." *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1193 (9th Cir. 2001). "Rule 23(b)(1)(A) takes in cases where the party is obliged by law to treat the members of the class alike (a utility acting toward customers; a government imposing a tax), or where the party must treat all alike as a matter of practical necessity (a riparian owner using water as against downriver owners)." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). The rule does not apply where, as here, an ERISA administrator's "obligations differ between its plans," because in that situation "there is no risk that separate lawsuits would result in incompatible standards of conduct." *In re WellPoint*, 2014 WL 6888549 at *20; *see also Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Michigan*, 654 F.3d 618, 633 (6th Cir. 2011) (reversing certification of a Rule 23(b)(1)(A) class in an ERISA action

involving different plans). In light of the highly individualized inquiry into plans, guidelines, and clinical judgments that Plaintiffs' claims require the Court to engage in here, this case does not fall within the ambit of Rule 23(b)(1)(A).[20]

Second, given the lack of notice and opt out protections to class members in a Rule 23(b)(1) class (as well as a 23(b)(2) class), certification is improper unless the monetary relief sought is "incidental." *See Dukes*, 564 U.S. 360; *Zinser*, 253 F.3d at 1195 ("[c]ertification under Rule 23(b)(1)(A) is . . . not appropriate in an action for damages."); *see Daskalea v. Wash. Humane Soc.*, 275 F.R.D. 346, 364 (D.D.C. 2011) (denying certification under Rule 23(b)(1) because monetary relief was not incidental); *In re First Am. Corp. ERISA Litig.*, 258 F.R.D. 610, 622 (C.D. Cal. 2009) (same). "Whether the monetary relief is understood as legal damages or an equitable remedy is irrelevant to this analysis." *Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523, 541 (N.D. Cal. 2012).

Here, Plaintiffs' argument that monetary relief is "incidental" to their request for injunctive relief is disingenuous. As a preliminary matter, unless there is a "sufficient likelihood" that a plaintiff "will again be wronged in a similar way," that plaintiff lacks standing to seek injunctive relief and cannot represent an injunctive relief class. *Bates v. United Parcel Serv., Inc.,* 511 F.3d 974, 985 (9th Cir. 2007); *Hodgers–Durgin v. de la Vina,* 199 F.3d 1037, 1045 (9th Cir. 1999) ("[u]nless the named plaintiffs are themselves entitled to seek injunctive relief, they may not represent a class seeking that relief.") Here, at least three of the Plaintiffs—Gary Alexander, David Wit, and Natasha Wit—are no longer members of plans administered by UBH. (Alexander Dep., 22:22-25:6 [Ex. 14]; D. Wit Dep., 18:5-19:5 [Ex. 11]; N. Wit Dep., 17:8-19 [Ex. 12].) For

[20] Plaintiffs' argument that certification under Rule 23(b)(1)(A) is "particularly appropriate" in ERISA actions (Mtn., 21:1-3) ignores the many ERISA cases where courts denied certification under that rule. *E.g.*, *In re WellPoint*, 2014 WL 6888549 at *20; *In re First American*, 258 F.R.D. at 622; *Pipefitters*, 654 F.3d at 633. The two cases that Plaintiffs cite, *Kanawi* and *J.D.*, are both distinguishable because they involved only one retirement or health plan, not a multiplicity of different plans. *Kanawi v. Bechtel Corp.*, 254 F.R.D. 102, 111-12 (N.D. Cal. 2008); *Z.D. ex rel. J.D. v. Group Health Co-op*, 2012 WL 1977962 at *6-7 (W.D. Wa. June 1, 2012). Moreover, unlike here, the plaintiff in *J.D.* unequivocally sought "only declaratory and injunctive relief" in connection with his (b)(1) class, and the defendant in *Kanawi* "conceded" that certification under (b)(1) might be appropriate. *See id.*

these Plaintiffs and similarly situated class members, monetary damages cannot be "incidental" because it is the only relief available to them.

Nor can there be any serious argument that monetary relief is incidental with respect to the other Plaintiffs given the amounts at stake. All of the Plaintiffs allege that they spent "thousands" of dollars in out-of-pocket expenses, with most alleging that they spent between $30,000 and $177,000. (*E.g. Wit* FAC, ¶¶ 90, 130, 153; *Alexander* Compl., ¶¶ 73, 92, 121; Driscoll Dep., 100:22-101:10 [Ex. 15].) Plaintiffs are suing to recover that money, with several testifying that it is their primary (if not only) interest in this case.[21] If, as Plaintiffs contend, there are "at least 29,672" putative class members whose experience is similar to Plaintiffs' experience (which UBH denies), then there is a substantial sum at stake in this lawsuit.

Further, all of the putative class definitions are limited to those "whose request for coverage . . . was denied by UBH" in the past. (Mtn., 3:12-4:12.) Where a putative class is "defined by conduct defendants have already perpetrated upon putative class members," that fact confirms that the monetary relief is not incidental to prospective relief, and that certification under Rule 23(b)(1) is improper. *Otomo v. Nev. Ass'n Services, Inc.*, 2013 WL 1249598 at *6 (D. Nev. March 25, 2013) (denying certification under Rule 23(b)(1)).

**2. Certification Under Rule 23(b)(2) Is Improper Because The Relief Plaintiffs Seek Is Neither Final Nor Appropriate For The Class As A Whole.**

All of the arguments demonstrating that certification under Rule 23(b)(1)(A) is improper because the Plaintiffs do not seek "incidental" monetary relief apply equally to Rule 23(b)(2). *See, e.g.*, *Dukes*, 564 U.S. at 360-61. In addition, Plaintiffs fail to satisfy two independent

[21] Pfeifer Dep., 212:21-25 [Ex. 10] [redacted] ; Holdnak Dep., 26:2-7 [Ex. 8] [redacted] *see also* Alexander Dep., 15:21-16:14 [Ex. 14]; Tillitt Depo., 181:6-21 [Ex. 13]; Haffner Dep., 22:10-12 [Ex. 16]; N. Wit Dep., 179:2-180:18 [Ex. 12]; Flanzraich Dep., 198:7-21 [Ex. 7]; Muir Dep., 197:22-198:14 [Ex. 9]; D. Wit Dep., 40:18-22 [Ex. 11]; Driscoll Dep., 27:7-19; 100:22-101:10 [Ex. 15].); *Wit* FAC, Request for Relief, ¶ I; *Alexander* Compl., Request for Relief, ¶ G.

requirements of Rule 23(b)(2): the contemplated equitable relief must be "(1) 'appropriate respecting the class as a whole' and (2) 'final.'" *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 892 (7th Cir. 2011) (quoting Rule 23(b)(2)); *accord Herskowitz v. Apple, Inc.*, 301 F.R.D. 460, 481-82 (N.D. Cal. 2014) (following *Kartman*). Here, Plaintiffs seek an injunction requiring UBH to create new, unspecified guidelines consistent with "generally accepted standards of care," and then to "reprocess" unspecified "claims" for treatment that were previously denied. (*See* Mtn., 7:6-19.) Plaintiffs do not intend for the injunction to dictate the language of the new guidelines. Rather, Plaintiffs intend that UBH will be charged with the task of drafting new guidelines after the injunction issues. (*E.g.*, *Alexander* Compl., Prayer for Relief, ¶ E.) The contemplated injunctive relief is neither final nor appropriate under Rule 23(b)(2).

First, the contemplated injunction will not provide final relief. As the Seventh Circuit held in *Kartman*, "[a]n injunction is not a final remedy if it would merely lay an evidentiary foundation for subsequent determinations of liability." *Kartman*, 634 F.3d at 893. In *Kartman*, home owners alleged that a home insurance company had systematically denied coverage for damage caused by a severe hailstorm and sought an injunction requiring the insurer to reinspect all class members' roofs pursuant to a "uniform, reasonable and objective standard for evaluating hail damage." *Id.* at 886. The Seventh Circuit reversed the district court's certification because the reinspections would not necessarily lead to a different outcome, setting the stage for further individualized proceedings about breach and damages. *Id.* at 893.

The injunction Plaintiffs seek is even less certain and less final than the one rejected in *Kartman*. Plaintiffs do not (because they cannot) contend that their new, unspecified guidelines will result in different coverage determinations for all class members, nor is there any reason to believe that they will. Indeed, some putative class members never submitted formal claims for monetary benefits, meaning there is nothing to "reprocess." (*See* Bridge Decl., ¶ 10 [Ex. 1].) Plaintiffs suggest that UBH should nonetheless "reprocess" previously received requests for authorization of coverage going back four years before the suit was filed. It is baffling how UBH would even do this when the process relies on real-time clinical information and medical needs that change over time. (*See* Flanzraich Dep., 70:9-71:24 [Ex. 7]; 73:6-74:13; Dr. Leffert Dep.,

51:4-15 [Ex. 17].)

Take, for example, a putative class member who sought coverage in 2013 from UBH as a secondary insurer because his primary insurance plan did not cover residential treatment. [redacted] Because UBH was the secondary insurer, UBH does not know whether this member continued to receive treatment, or in what setting, because claims for such treatment would likely have been submitted to his primary insurer.

If UBH were ordered to craft new, retrospective coverage guidelines and "reprocess" this member's requests for residential treatment, UBH would somehow be required to reconstruct several real-time clinical assessments of this member's health condition more than three years after the fact, and long after the member received intervening treatment deemed appropriate for his condition. If that member were dissatisfied with the outcome, could he then appeal? Could he sue claiming the new guidelines were still not suitable or not applied correctly? If granted, the requested injunction will simply set the stage for further individual conflicts about whether any particular denial of benefits was permissible under the new guidelines. This is not a final remedy.

Second, the requested injunction is not "appropriate respecting the class as a whole" because it violates Rule 65(d). "Federal Rule of Procedure 65(d) mandates that every injunction 'state its terms specifically' and 'describe in reasonable detail' the 'act or acts restrained or

required' so that the enjoined party is fairly apprised of his responsibilities and the court can objectively assess compliance." *Kartman*, 634 F.3d at 893 (quoting Fed. R. Civ. P. 65(d)(1)). In *Thomas v. Cnty. of LA*, 978 F.2d 504, 509 (9th Cir. 1992), the Ninth Circuit held in a class action that a proposed injunction requiring the sheriff's department to "[f]ollow [its] own stated policies and guidelines regarding the use of force and procedures for conducting searches" was too vague to satisfy Rule 65(d). It logically follows, therefore, that an injunction requiring the defendant to create and then apply <u>hypothetical and unspecified</u> guidelines also violates Rule 65(d). Indeed, in *Kartman*, the proposed injunction requiring the insurer to reinspect roofs pursuant to a "reasonable, uniform and objective standard" was too general and abstract to comply with Rule 65(d). *Kartman*, 634 F.3d at 893. Providing more specificity, however, was unmanageable because it would "essentially require the court to write an insurance-adjustment code." *Id.*

Here, Plaintiffs similarly seek to have their claims reprocessed based on "new [and unspecified] guidelines that are consistent with those that are generally accepted and with the requirements of applicable state law." (*Wit* FAC, Req. for Relief ¶ G; *Alexander* Compl., Req. for Relief ¶ E; *see also* Supp. Response to Rog. Nos. 23-24 [Ex. 5] (Plaintiffs "do not necessarily seek an order requiring UBH to adopt a pre-existing statement of generally accepted standards of care").) Plaintiffs' proposed injunction is even less specific than the one sought in *Kartman*, as the Court would be required to enforce the creation and application of myriad clinical guidelines created from whole cloth for dozens of behavioral health conditions, and to do so under varying "applicable state laws."

### 3. Certification Under Rule 23(b)(3) Is Improper Because Individualized Issues Overwhelm Any Common Question.

"Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." *Comcast*, 133 S. Ct. at 1432. All of the arguments in Section III.A. above concerning lack of commonality apply equally to Rule 23(b)(3)'s predominance requirement. *See In re WellPoint*, 2014 WL 6888549 at *21 (differences in plans defeat commonality and predominance); *Lipstein*, 296 F.R.D. at 293 (same); *Percere*, 194 F.R.D. at 71-72 (individualized medical necessity determinations defeat commonality and predominance); *Graddy*, 2010 WL 670081 at *10 (same).

Individualized issues arising from the thousands of plans at issue and their varying coverage terms, the hundreds of guidelines at issue, the unique medical needs of each patient, and the unique factors driving the discretionary coverage determinations will overwhelm any "common" question in this case.

Certification under Rule 23(b)(3) also is improper because individualized issues predominate with respect to putative class members' entitlement to monetary relief. In addition to prospective and retrospective mandatory injunctive relief, Plaintiffs seek a "surcharge" described as:

> an amount equivalent to the revenue [UBH] generated from its corporate affiliates or the plans for providing mental health and substance abuse-related claims administration services with respect to claims filed by Plaintiffs and members of the Class, expenses that UBH's corporate affiliates saved due to UBH's wrongful denials, **the out-of-pocket costs for residential treatment that Plaintiffs and members of the Class incurred** following UBH's wrongful denials, and/or pre-judgment interest.

(*Wit* FAC Req. for Relief ¶ I (emphasis added); *Alexander* Compl. Req. for Relief ¶ G). Plaintiffs' assertion that their surcharge remedy does "not depend upon the extent of any particular class member's injury," is belied by their own Complaint, and directly contradicts the law and the facts. (*See* Mtn., 23:8-10.) Under Ninth Circuit law, "'to obtain relief by surcharge . . . a plan participant or beneficiary must show that the violation injured him or her.'" *Gabriel v. Alaska Elec. Pension Fund*, 773 F.3d 945, 957-58 (9th Cir. 2014) (quoting *Cigna Corp. v. Amara*, 563 U.S. 421, 444 (2011)) (emphasis added).[22] Recovery of a surcharge remedy thus requires individual proof of "harm and causation." *Id.* Moreover, Plaintiffs' testimony and allegations confirm that they are seeking to recover compensatory damages for out-of-pocket expenses that they individually incurred as a result of being denied coverage and the amount varies widely among the Plaintiffs. (*E.g.*, Tillitt Dep., 181:6-8 [Ex. 13] [redacted]; Driscoll Rog. Resp. No. 11 [Ex. 6] [redacted]

[22] The only case that Plaintiffs cite for the proposition that the surcharge remedy does not require injury is *Skinner v. Northrup Grumman Ret. Plan B*, 673 F.3d 1162, 1167 (9th Cir. 2012), but unlike the Ninth Circuit's later decision in *Gabriel*, *Skinner* did not address the harm and causation requirements required for the surcharge remedy. *See also Gabriel*, 773 F.3d at 957-58.

[redacted]; *see also* Section III.C.1. above.) Moreover, the portion of any out-of-pocket expenditure that UBH would have covered but for the denial will vary depending on the plan's copay, coinsurance and deductible requirements, whether the member had already fully or partially satisfied those requirements, and whether another insurer had primary responsibility for coverage for the particular treatment.

Even if individualized issues concerning the amount of damages do not always preclude certification, "if individual issues concerning [the] fact of damages predominate, class certification is precluded." *In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 135 (C.D. Cal. 2007) (emphasis added).[23] That is the case here because a denial at the authorization stage does not necessarily result in the patient paying out-of-pocket for treatment. As explained in Section II.C. above, many patients successfully appeal an adverse benefit decision, or receive coverage for alternative treatment. In addition, Plaintiffs' own testimony confirms those are not the only situations that can create individualized disputes about the existence of damages. [redacted]

Moreover, Plaintiffs fail to present any model or explanation for how the surcharge would

[23] In denying certification under Rule 23(b)(3), the *Daniel F.* court acknowledged the general rule that individualized issues about the amount of damages do not necessarily preclude certification, but held that the rule was inapplicable under the circumstances of the case. *Daniel F.*, 305 F.R.D. at 130. As the court explained, a denial of health benefits case is "considerably more complicated" than the typical lawsuit, particularly where, as here, plaintiffs seek certification of a class of individuals who were covered by different plans and where plaintiffs fail to present a uniform model for calculating each putative class member's individual damages. *Id.* at 130-31.

be calculated or allocated among class members. Under *Comcast*, certification under Rule 23(b)(3) is impermissible without "evidentiary proof" that the amount of "damages are capable of measurement on a classwide basis." *Comcast*, 133 S. Ct. at 1432-33. Without such proof, "questions of individual damage calculations will inevitably overwhelm questions common to the class." *Id.* at 1433. In lieu of expert testimony on this subject, Plaintiffs offer nothing more than assurances that a surcharge could somehow be determined from unspecified records. (Mtn., 23:7-5.) That is a far cry from meeting their burden under *Comcast*.

### D. The *Wit* State Mandate Class Fails Rule 23 For Additional Reasons.

Plaintiffs are on no better footing with respect to their putative "*Wit* State Mandate Class," which allegedly consists of approximately 296 people in plans governed by the laws of Connecticut, Illinois, Rhode Island, and Texas. According to Plaintiffs, the plans mandated the use of clinical substance abuse criteria issued by ASAM, or (in the case of Texas) by the Texas Department of Insurance. (Mtn., 6:4-6;16:7.) All of the prior arguments concerning variations in plan language and medical necessity, as well as Plaintiffs' inability to meet the requirements of Rule 23(b)(1), (b)(2), or (b)(3) apply to the State Mandate Class. There are three additional deficiencies particular to the putative State Mandate Class.

First, "no class action is proper unless all litigants are governed by the same legal rules." *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1015 (7th Cir. 2002). Here, although Illinois and Rhode Island require the use of ASAM criteria in certain circumstances, Connecticut and Texas do not. Specifically, Texas law requires the application of Texas-specific guidelines (referred to as "TDI" guidelines) for substance abuse treatment. In contrast, Connecticut law provides that "a health carrier may develop its own clinical review criteria," provided that it "is consistent with the most recent edition" of ASAM. Conn. Gen. State. Ann. § 38a-591c(a)(2), (3)(A). As shown in Section III.A.2., numerous different guidelines are at issue here, requiring an individual inquiry to determine what guideline was used in connection with a coverage decision, and whether that guideline was consistent with ASAM.

Second, each of the four state laws specifying coverage criteria were enacted at different times, with the Connecticut, Illinois and Rhode Island laws being enacted at various times after

the start of the class period (and in Rhode Island, after the *Wit* case was filed).[24] As a result, putative class members in each of those three states would be governed by different legal rules depending on when their denials occurred. In defining the *Wit* State Mandate Class, Plaintiffs entirely fail to account for this variation.

Third, the evidence shows that UBH's clinical reviewers "rely on a number of sources outside the UBH [guidelines] to help guide their coverage decision," including alternate industry or regulatory guidelines, such as the Texas Department of Insurance guidelines. (Edwards Report, ¶ 42 [Ex. 4]; Edwards Dep., 258:18-261:12 [Ex. 21]; *see also* Brennecke Dep., 115:7-118:10 [Ex. 19] (explaining UBH's use of Texas state mandated guidelines).) Indeed, in their motion, Plaintiffs acknowledge that "in two cases [from the sample set], UBH used Texas Department of Insurance criteria to adjudicate the claims as required under Texas state law . . . ." (Mtn., 13:27 (emphasis added); *see also* Plaintiffs' Ex. F, at p. 3 (noting that Texas guidelines used in coverage determination for Sample ID No. 8873).) That fact was revealed only by a review of that member's clinical records and denial letters. (Sample ID 8873 ABD Letter [Ex. 61].) Individualized inquiries are needed to adjudicate the claims of the *Wit* State Mandate Class.

### E. Plaintiffs Cannot Rely On Issue Certification Under Rule 23(c)(4) To Evade Defects In Their Class Certification Motion.

After glossing over the certification requirements under Rule 23(a) and (b), Plaintiffs make a fallback argument for carving their certification motion into discrete issues under Rule 23(c)(4). That tactic fails because "a Rule 23(c)(4) issues class must still meet the requirements of Rule 23(a)" and "issue certification must materially advance the litigation." *Tasion Comm., Inc. v. Ubiquiti Networks, Inc.*, 308 F.R.D. 630, 633 (N.D. Cal. 2015).

[24] The putative Wit State Mandate Class period starts May 22, 2011. (Mtn., 4:7-8.) Connecticut's ASAM-related requirement became effective October 1, 2013; Illinois' law became effective August 18, 2011; and Rhode Island's law did not become effective until July 10, 2015. *See* FIREARMS—OMNIBUS AMENDMENT, 2013 Conn. Legis. Serv. P.A. 13-3, § 72 (S.B. 1160) (Connecticut); INSURANCE--MENTAL HEALTH PARITY, 2011 Ill. Legis. Serv. P.A. 97-437, § 5 (H.B. 1530) (Illinois);HEALTH CARE PROVIDERS—SUBSTANCE ABUSE—AMERICAN SOCIETY OF ADDICTION MEDICINE, 2015 Rhode Island Laws Ch. 15-209, § 1 (15-S 490A) (Rhode Island).

Because Plaintiffs fail to satisfy Rule 23(a)(2)'s commonality requirement, they also cannot not satisfy Rule 23(c)(4). Nor would certification of the issues identified by Plaintiffs materially advance this litigation. Rule 23(c)(4) typically is used to permit courts to resolve liability on a classwide basis when there are individualized issues of damages. *See*, *e.g.*, *Kamakahi v. Am. Soc. for Reproductive Med.*, 305 F.R.D. 164, 176 (N.D. Cal. 2015). But separating liability and damages for purposes of certification is feasible only if the liability issues can be "accurately and efficiently" resolved on a classwide basis. *Id.* Moreover, the "use of Rule 23(c)(4) is generally rejected . . . where the common issues are inextricably tied to individual issues . . . or where the individual issues still make the case unmanageable." *In re Paxil Litig.*, 212 F.R.D. 539, 543 (C.D. Cal. 2003). Consistent with these legal principles, the court in *In re WellPoint* denied issue certification because (like here) liability depended on an individualized review of the health plans at issue. *In re WellPoint*, 2014 WL 6888549 at *21-22.

Here, the most critical issues that Plaintiffs seek to certify are: (1) whether the numerous different guidelines at issue are consistent with unspecified standards; (2) whether UBH breached its fiduciary duties by developing the various guidelines; and (3) whether UBH abused its discretion in denying claims. (Mtn., 17:1-7; 25:15.) These issues are even less susceptible to issue certification than those proposed in *In re WellPoint*, because none can be resolved without an individual inquiry into each class members' plan terms and medical needs, and the guidelines used in their particular coverage decision.

Plaintiffs also seek to certify an issue of what remedies, if any, are available to class members (*id.*), but that too involves individualized issues as to whether any given class member is entitled to injunctive or monetary relief. Certifying that issue will still leave the Court in the position of wading through myriad individualized liability issues. (*See* Sections III.A.1-3 above.) Finally, the issue of whether UBH was acting in its capacity as an ERISA fiduciary – as opposed to a settlor capacity – when it created the guidelines is not susceptible to class-wide resolution because Plaintiffs' entire argument on this question rests on the interpretation of multiple terms in each individual ERISA plan. (*See* Pltffs' Opp. to Motion to Dismiss at 13 [Doc. No. 30] ("Any internal policies or criteria UBH adopts to guide its employees in carrying out its sole function are

necessarily interpretations and application of plan terms.”).) For example, in opposition to UBH’s motion to dismiss in the *Alexander* case, in which Plaintiffs argued that UBH’s creation of guidelines was a fiduciary act, Plaintiffs repeatedly relied on specific (and varying) terms of each of the Plaintiffs’ health plans. (*See*, *e.g.*, *id.* at 14 (plan terms expressly incorporating guidelines), 15 (plan terms allowing the administrator to modify guidelines), 18-19 (plan terms regarding whether UBH funded benefits and alleged conflicts of interest), 20 (plan terms regarding integration and amendment provisions).)

In the end, Plaintiffs have not and cannot identify any common issue that, if resolved on a classwide basis, would materially advance this litigation without embroiling the Court in the individualized inquiries inevitably arising from their claims.

## IV. CONCLUSION

For the foregoing reasons, UBH respectfully requests that the Court deny Plaintiffs’ motion for class certification.

Dated: April 28, 2015

CROWELL & MORING LLP

*/s/ Jennifer S. Romano*

Christopher Flynn
Jennifer D. Romano
April N. Ross
Nathaniel P. Bualat
Attorneys for Defendant
UNITED BEHAVIORAL HEALTH