UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID WIT, et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>UNITED BEHAVIORAL HEALTH,<br><br>    Defendant. | Case No.  14-cv-02346 JCS<br>Related Case No. 14-cv-05337 JCS<br><br>**ORDER GRANTING MOTION FOR CLASS CERTIFICATION**<br><br>Docket No. 133 (Case No. 14-cv-02346 JCS)<br>Docket No. 97 (Case No. 14-cv-05337 JCS) |
| GARY ALEXANDER, et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>UNITED BEHAVIORAL HEALTH,<br><br>    Defendant. | |

## I.    INTRODUCTION

Plaintiffs in these putative class actions allege that they were improperly denied coverage for mental health and substance use disorder treatment by Defendant United Behavioral Health ("UBH"), which administers mental health and substance use disorder benefits under their health insurance plans.  In *Wit v. United Behavioral Health*, Case No. 14-cv-02346 JCS (hereinafter, "*Wit*"), Plaintiffs allege that they were wrongfully denied coverage for mental health and substance use-related residential treatment; in *Alexander v. United Behavioral Health*, Case No. 14-cv-05337 JCS (hereinafter, "*Alexander*"), Plaintiffs allege that they were wrongfully denied coverage for outpatient and intensive outpatient treatment for mental health and substance use disorders.

Presently before the Court is Plaintiffs' Motion for Class Certification ("Motion").[1]  A hearing on the Motion was held on Wednesday, September 7, 2016 at 9:30 a.m.  For the reasons stated below, the Motion is GRANTED.[2]

## II.     BACKGROUND

### A.     Factual Background

#### 1.  UBH

UBH administers behavioral health plans throughout the country and is "one of the nation's largest managed healthcare organizations."  Declaration of Jennifer S. Romano in Support of Defendant United Behavioral Health's Opposition to Motion for Class Certification ("Romano Decl."), Ex. 2 (Declaration of Lorenzo Triana in Support of Defendant's Opposition to Motion for Class Certification ("Triana Decl.")) ¶ 6;  *see also* Declaration of Caroline E. Reynolds in Support of Plaintiffs' Motion for Class Certification ("Reynolds Decl."), Ex. E (2015 Utilization Management Program Description) ("Optum[3] is a Managed Behavioral Health Care Organization designed to assist its members with the management of their behavioral health care needs. Benefits for behavioral health services are reviewed, managed and coverage is determined through offices located throughout the United States.").  Typically, the benefit plans administered by UBH give it "discretion to make coverage determinations for specific treatment for specific members based on the coverage terms of the member's plan."  Romano Decl., Ex. 2 (Triana Decl.) ¶ 7.  UBH is responsible for adjudicating mental health and substance use claims for the named Plaintiffs and all members of the putative classes.  *Wit*, Docket No. 67 (Answer) ¶ 3;  *Alexander*, Docket No. 44 (Answer) ¶ 7.

---

[1] Plaintiffs filed identical class certification motions in *Wit* and *Alexander* in which they address the issues relating to class certification in both cases.
[2] The parties have consented to the jurisdiction of a United States magistrate judge pursuant to 28 U.S.C. § 636(c).
[3] Optum and OptumHealth are brand names for United Behavioral Health.  *See* Romano Decl., Ex. 2 (Triana Decl.) ¶ 2 ("OptumHealth is a brand name of United Behavioral Health"); Reynolds Decl., Ex. E at UBHWIT0070985 ("Optum is a brand name used by United Behavioral Health and its affiliates").

United States District Court
Northern District of California

## 2.  Plaintiffs' Health Insurance Plans

The Named Plaintiffs in this action sought coverage for mental health or substance use disorder treatment under ten different health insurance plans.[4]  *See* Romano Decl., Ex. 71 (Chart entitled "Plan Terms that Require More than Adherence to 'Generally Accepted Standards of Care'").  Based on electronic data produced by UBH, however, coverage may have been denied to putative class members under as many as 3,000 different health insurance plans.  *See* Romano Decl., Ex. 4 (November 10, 2015 Expert Witness Report ("Edwards Report") at 7).

Because of the large number of claims that UBH denied during the relevant class period for the types of treatment that are at issue in this case, the parties stipulated to a sampling methodology under which health insurance plan documents ("Sample Plans"), as well as other information, were produced for 106 putative class members ("Sample Plaintiffs") who were denied coverage on claims for residential, outpatient or intensive outpatient treatment by UBH (the "Claim Sample").  *See* Reynolds Decl., Ex. Q (Joint Stipulation Concerning Sampling Methodology) ¶¶ 3, 12-14, 20, 23, 25.  UBH also produced to Plaintiffs Exel spreadsheets containing data from UBH's ARTT and LYNX data systems listing each adverse benefit determination issued for coverage requested in the relevant treatment settings between 2011 and 2015 associated with mental health and substance use disorders (hereinafter, the "ABD Data").  *Id.*, Ex. Q (Joint Stipulation Concerning Sampling Methodology), Exs. C & E attached thereto. With the exception of the Sample Plans and the Named Plaintiffs' health insurance plans, however, UBH did not produce the plan documents for the claims listed in the ABD Data.  *Id.*, Ex. Q (Joint Stipulation Concerning Sampling Methodology) ¶ 3.

UBH's expert, Mary Beth Edwards, states that she reviewed the Sample Plans[5] and the

---

[4] Although there are eleven named Plaintiffs, both David Wit and his daughter Natasha Wit assert claims based on denial of coverage for Natasha Wit, who was a minor at the time she received the treatment at issue.  Therefore, their claims are based on the same health insurance plan, of which Natasha Wit is a beneficiary.  *See Wit* Docket No. 39 (Complaint) ¶¶ 1, 39.

[5] Edwards states that she reviewed 110 Sample Plans corresponding to the individuals in the Claim Sample.  Romano Decl., Ex. 4 at 6.  As the parties' stipulation makes clear, however, four of the individuals included in the original Claim Sample were found not to meet the selection criteria to which the parties had agreed and were removed from the sample sometime after December 11, 2015, leaving only 106 individuals and relevant health insurance plans.  *See* Reynolds Decl., Ex.

United States District Court
Northern District of California

United States District Court
Northern District of California

plan documents for the Named Plaintiffs and that these documents contain "detailed and varying narrative descriptions surrounding" "a) specific covered services associated with certain treatment categories, b) specific exclusions and limitations associated with the benefit, c) any particular medical necessity criteria covered services must meet, and d) any appeal procedures available to the member." Romano Decl., Ex. 4 at 10. She opines that "the possibility of variation in the terms of coverage" is expanded by the fact that the ABD Data lists "over 3,000 distinct group names." *Id.* at 12.

Notwithstanding these variations, the evidence in the record shows that all of the Sample Plans and the health insurance plans of the Named Plaintiffs require as one (though not the only) condition of coverage that the mental health or substance use disorder treatment at issue must be consistent with generally accepted standards of care. *See* Reynolds Decl. ¶ 13 & Ex. K (Summary of Plan Term Chart).[6]   Although UBH pointed out at oral argument that some plans use somewhat

---

Q (Joint Stipulation Concerning Sampling Methodology) ¶ 25. Edwards also states that she reviewed the plans of "each of the eight Named Plaintiffs," Romano Report at 13, apparently counting Natasha and David Wit as a single Named Plaintiff; the Court had not yet permitted Plaintiffs Tillitt and Driscoll to intervene at the time Edwards completed her report.

[6]Exhibit K lists all of the Named Plaintiffs and the Sample Plaintiffs. For each, the relevant plan term documents are listed and in a separate column it is indicated whether the plan requires "[a]dherence to [g]enerally [ac]cepted [s]tandards." Reynolds Decl., Ex. K. For all of the plans listed on the chart, the answer in this column is "yes." *Id.* In the Reynolds Declaration, Plaintiffs' counsel explains that the exhibit "indicates whether the terms of the Named Plaintiffs' plans and each of the plans in the agreed-upon Plan Sample conditions coverage for mental health and substance use disorder treatment upon a finding that the services are consistent with generally accepted standards of care." Reynolds Decl. ¶ 13. Reynolds goes on to explain that "the chart answers 'yes' to this question if the plan terms (a) define Covered Services as services that are consistent with generally accepted standards of care or as services that are Medically Necessary; (b) exclude coverage for services that are *not* consistent with generally accepted standards of care or services that are *not* Medically Necessary; and/or (c) define Medically Necessary services as those that are consistent with generally accepted standards of care." *Id.*

UBH objects to Exhibit K, asserting that it is misleading to the extent Plaintiffs use it to claim that "coverage [under Plaintiffs' health insurance plans] is *solely* determined or conditioned with generally accepted standards." Defendant United Behavioral Health's Objections to Evidence Filed in Support of Plaintiffs' Motion for Class Certification ("Objections") at 3-4 (emphasis added). The Court OVERRULES all of UBH's Objections on the ground that UBH failed to adhere to Civil Local Rule 7-3(a), which requires that "[a]ny evidentiary and procedural objections to the motion must be contained within the brief or memorandum." UBH failed to include any of its objections in its Opposition brief. Even if the Court were to reach the merits on UBH's Objections it would overrule its objection to Exhibit K on the ground that Plaintiffs do not claim anywhere that adherence to generally accepted standards is the *sole* condition for coverage under Plaintiffs' plans. Moreover, UBH implicitly concedes that the health insurance plans listed

United States District Court
Northern District of California

1  different phrasing in describing this requirement, it was not able to offer any evidence that these

2  differences were material.  Nor did it suggest that the Sample Plans were unrepresentative of the

3  insurance plans of the classes as a whole.  Accordingly, the Court finds, as a factual matter, that all

4  of the putative class members' insurance plans require as a precondition for coverage that the

5  treatment at issue must be consistent with generally accepted standards of care.

6  ### 3.   The Claims Administration Process

7  In making coverage determinations, UBH Peer Reviewers apply criteria that are set out in

8  "Coverage Determination Guidelines" ("CDG Guidelines") and Level of Care Guidelines ("LOC

9  Guidelines"), hereinafter referred to collectively as "Guidelines."  Romano Decl., Ex. 2 (Triana

10  Decl.) ¶ 8; Reynolds Decl., Ex. E at E0003 (describing Peer Review Process).  The CDG

11  Guidelines "focus on the member's primary diagnosis, while the [LOC Guidelines] focus on

12  particular treatment settings."  *Id*.  There are "at least 264 CDGs and 42 LOCs that UBH reviewers

13  use or have used in making coverage determinations since 2010."  Romano Decl., Ex. 2 (Triana

14  Decl.) ¶ 8.   According to UBH's 30(b)(6) witness, Margaret Brennecke, the Guidelines are

15  "reviewed annually and updated as needed."  Reynolds Decl., Ex. P, Brennecke Dep. at 154.

16  When they join UBH, reviewers receive extensive training on how the Guidelines are to be

17  applied.  Reynolds Decl., Ex. P, Triana Dep. at 155-157.  In addition, when Guidelines are

18  updated, reviewers receive notifications of the change and may also receive additional training.

19  *Id*.

20  UBH describes the LOC Guidelines as "objective and evidence-based behavioral health

21  guidelines used to standardize coverage determinations, promote evidence-based practices, and

22  support members' recovery, resiliency, and well-being."  Reynolds Decl., Ex. B at B0001 (2016

23  Level of Care Guidelines).  According to UBH, the LOC Guidelines are "derived from generally

24  accepted standards of behavioral health practice . . . [which] include guidelines and consensus

25  statements produced by professional specialty societies, as well as guidance from governmental

26

27  in the chart incorporate generally accepted standards of care as a condition for coverage (which is exactly Plaintiffs' point) when they argue that this is *but one* of many bases to deny coverage

28  under the plans.

sources . . . ."  *Id.*  The LOC Guidelines "reflect [UBH's] understanding of current best practices in care . . . ."  *Id.* at B0006.

The LOC Guidelines begin with a set of "Common Criteria and Best Practices for All Levels of Care" (hereinafter, "Common Criteria").  Reynolds Decl., Ex. B (Excerpts of LOC Guidelines 2011-2016) at B0007-13, B0049-55, B0088-93, B0125-29, B0152, B0158-61, B0182, B0187-89, B0210-11.  These include "Admissions Criteria," "Continued Service Criteria" and "Discharge Criteria."  *See id.*  There are also specific LOC Guidelines that apply to particular levels of care, including residential treatment, intensive outpatient treatment and outpatient treatment, for both mental illness and substance use disorders.  *See id.* at B0016-41, B0058-80, B0094-118, B0130-51, B0162-81, B0191-209.  These specific LOC Guidelines expressly incorporate the Common Criteria and also set forth criteria specific to that particular level of care.  *See id.*

The CDGs are described by UBH as "a set of guidelines that standardize the interpretation and application of the terms of the benefit plan."  Reynolds Decl., Ex. E (Utilization Management Program Description 2015) at E0015.  These are organized by diagnosis and expressly incorporate the LOC Guidelines (and particularly the Common Criteria).  *See* Reynolds Decl., Ex. C (relevant CDG Guidelines for 2011-2016); *id.*, Ex. A-2 (listing all of the CDG Guidelines that Plaintiffs contend are relevant to their claims and specifying whether each of them incorporates the LOC Guidelines); *see also id.*, Ex. P, Brennecke Dep. at 180, 189-90 (deposition testimony of Margaret Brennecke, UBH 30(b)(6) witness, that Level of Care Guidelines are "embedded" in the CDGs and therefore the coverage determination will be the same regardless of whether the UBH reviewer uses the CDG Guidelines or the LOC Guidelines ), Allchin Dep. at 53 (same),  Zhu Dep. at 62 (same). [7] According to Dr. Triana, who is responsible for "the national implementation,

---

[7] UBH objects to Exhibit P on the basis that some of the deposition excerpts do not include questions and answers that UBH believes are relevant, rendering the excerpts "misleading."  The objection is OVERRULED.  First, as discussed above, UBH failed to comply with Civil Local Rule 7-3(a) as it did not include this objection in its brief.  Second, the objection has no merit. Even in its lengthy Objections to Evidence, UBH does not bother to explain why any of the omitted portions render the cited testimony misleading, simply stating that the testimony in the excerpt did not include the complete answers.  As UBH had the opportunity to submit its own

United States District Court
Northern District of California

1  supervision, oversight, and evaluation of UBH's utilization management program," the CDG

2  Guidelines were developed in 2010 or 2011 in response to the enactment of mental health parity

3  laws, which required that determinations of coverage for behavioral treatment had to be aligned

4  with determinations on the "medical side."  Romano Decl., Ex. 20 (Triana Dep.) at 163-64.

5  Because UBH used guidelines for medical treatment that were specific to particular diagnoses, it

6  needed to develop corresponding behavioral guidelines that were also specific to particular

7  diagnoses.  *Id*.

8      The Guidelines (LOC and CDG) are used by UBH Peer Reviewers in conducting clinical

9  reviews for the purposes of making coverage determinations.  Reynolds Decl., Ex. E (Utilization

10  Management Program Description 2015) at E003.  "The role of the Peer Reviewer is to exercise

11  clinical judgment in reviewing the relevant information, and to review the case against the

12  pertinent Level of Care Guidelines, Coverage Determination Guidelines, Psychological and

13  Neuropsychological Testing Guidelines, or other clinical guidelines required by contract or

14  regulation, the member's benefit plan, available community resources, and individual member

15  need."  *Id*.  Clinical denials by the Peer Reviewers are to be based on these criteria and the written

16  notification of denial must "cite to the Level of Care Guidelines, Coverage Determination

17  Guidelines, Psychological and Neuropsychological Testing Guidelines, or other clinical guidelines

18  required by contract or regulation, as appropriate, on which the denial was based, with the

19  rationale written in language that is easily understandable to the member, and that addresses the

20  member's specific clinical presentation."  *Id*. at E003-4.  According to UBH witnesses, this

21  information is conveyed to members in the form of a letter that is generated once the Peer

22  Reviewer enters the information into the member's electronic case record.  *See* Reynolds Decl.,

23  Ex. P, Brennecke Dep. at 132-33, Triana Dep. at 138-40 (describing creation of letters using

24  information and findings from peer review entered into UBH's electronic database).[8]

25

26  deposition excerpts (and did, in fact, submit additional pages of the depositions at issue), there is
no basis for striking the evidence in Exhibit P.

27      [8]Even if the Peer Reviewer finds that the treatment at issue is consistent with the applicable
criteria, coverage may be subject to administrative denial if the treatment is subject to an exclusion

28

According to UBH, while the CDGs and LOCs provide "certain criteria" for UBH clinicians to consider in making coverage determinations they do not "dictate the result."  Romano Decl., Ex. 2 (Triana Decl.) ¶ 10.  Nonetheless, one of the purposes of these Guidelines is to ensure consistency with respect to coverage determinations.  Reynolds Decl., Ex. P (Triana Dep.) at P0040-41. To verify that this goal is met, UBH conducts audits of its reviewers, which consist of a second review of the same case file by the auditor to determine whether the coverage decision of the auditor matches the decision of the original reviewer.  *See* Reynolds Decl., Ex. P, Beaty Dep. at 46, 77.  The measure of consistency that is derived from the audits is referred to as inter-rater reliability.  Reynolds Decl., Ex. P, Triana Dep. at 171.  UBH's rate of inter-rater reliability for 2013, 2014 and 2015 was 96.8%, 98 % and 98.8% respectively.  Reynolds Decl., Ex. T (UBH Inter-Rater reliability Reports for 2013, 2014 and 2015) at T0003, T0017 and T0030.

### B.    Plaintiffs' Claims

In the operative complaints, Plaintiffs assert two claims:  1) breach of fiduciary duty (the "Breach of Fiduciary Duty Claim" or "Claim One"); and 2) arbitrary and capricious denial of benefits ("the Arbitrary and Capricious Denial of Benefits Claim" or "Claim Two").  *See Wit*

---

from coverage under the member's plan.  *Id.* at E0004.  In that case, the written denial must expressly reference the "member's relevant plan documents on which the denial was based."  *Id.*; *see also* Reynolds Decl., Ex. P. Brennecke Dep. at P0014 (testifying that a denial based on a plan exclusion would be considered an administrative denial and that the basis for such a denial would be referenced in the communication to the member providing notice of the denial).  It is undisputed that the denials of coverage as to the Named Plaintiffs in this case, however, were clinical denials based on the Guidelines, as were the denials of coverage at issue in the Claim Sample.  *See* Reynolds Decl., Ex. F (chart reflecting Guidelines cited in Named Plaintiffs' and Claim Samples' denial letters).

The Court notes that UBH objected to Exhibit F on the basis that it is misleading and contains inaccuracies.  Objections at 2-3.  As discussed above, the Objections are overruled because UBH failed to adhere to the Local Rules, which require that it raise its evidentiary objections in its brief.  The objection to Exhibit F also fails on the merits.  The chart was prepared using UBH's own data, which was summarized in spreadsheets that UBH prepared and produced in discovery.  Further, Plaintiffs provided the underlying spreadsheets to the Court as an exhibit in support of its Motion.  *See* Reynolds Decl., Ex. Q.  Therefore, UBH's complaint that the chart is misleading is to no avail; nor are its objections that some of the information in the chart apparently is inaccurate given that the errors originated in the spreadsheets that UBH provided to Plaintiffs.

United States District Court
Northern District of California

Docket No. 39 ("*Wit* Compl.")  ¶¶ 198, 210; *Wit* Docket No. 123 ("*Tillitt* Intervenor Compl.") ¶¶ 88, 99 ; *Alexander* Docket No. 1 ("*Alexander* Compl.")  ¶¶ 136, 146;  *Alexander* Docket No. 87 ("*Driscoll* Intervenor Compl.") ¶¶ 86, 96.  Plaintiffs assert the Breach of Fiduciary Duty Claim under 29 U.S.C. § 1132(a)(1)(B) (Count I in all of the operative complaints) and, to the extent the injunctive relief Plaintiffs seek is unavailable under that section, they assert the claim under 29 U.S.C. § 1132(a)(3)(A) (Count III in all of the operative complaints).  Similarly, Plaintiffs assert the Arbitrary and Capricious Denial of Benefits Claim under 29 U.S.C. § 1132(a)(1)(B) (Count II in all of the operative complaints) and under 29 U.S.C. § 1132(a)(3)(B) (Count IV in all of the operative complaints).[9]

The Breach of Fiduciary Duty Claim is based on the theory that UBH is an ERISA fiduciary under 29 U.S.C. § 1104(a) and therefore owes a duty to discharge its duties "with . . . care, skill, prudence, and diligence" and "solely in the interest of the participants and beneficiaries."  According to Plaintiffs, UBH violated this duty by developing guidelines that are far more restrictive than those that are generally accepted even though Plaintiffs' health insurance plans provide for coverage of treatment that is consistent with generally accepted standards of care, and by prioritizing cost savings over members' recovery of benefits.  *See Wit* Compl. ¶¶ 198-99; *Tillitt* Intervenor Compl. ¶¶ 88-89;  *Alexander* Compl. ¶¶ 136-37; *Driscoll* Intervenor Compl. ¶¶ 86-87.   According to Plaintiffs, they "have been harmed by UBH's breaches of fiduciary duty because their claims have been subjected to UBH's restrictive guidelines making it less likely that UBH will determine that their claims are covered."  *Wit* Compl. ¶ 201;  *see also Alexander* Compl. ¶ 137 (alleging that "[b]y promulgating improperly restrictive guidelines, UBH artificially decreases the number and value of covered claims, thereby benefiting its corporate affiliates at the expense of insureds"); *Tillitt* Intervenor Compl. ¶¶ 89-90 (alleging that "[b]y promulgating improperly restrictive guidelines, UBH artificially decreases the number and value of covered claims, thereby benefiting its corporate affiliates at the expense of insureds" and that "Ms. Tillitt

---

[9] In the Motion, Plaintiffs state that both Counts III and IV are asserted under 29 U.S.C. § 1132(a)(3)(A).  *See* Motion at 5, fns. 4 & 5.  The Court assumes that this is a clerical error.

United States District Court
Northern District of California

and the members of the Class have been harmed by UBH's breaches of fiduciary duty because their claims have been subjected to UBH's restrictive guidelines, making it less likely that UBH will determine that their claims are covered").

The Arbitrary and Capricious Denial of Benefits Claim is based on the theory that UBH improperly adjudicated and denied Plaintiffs' requests for coverage by, *inter alia*, relying on the overly restrictive Guidelines.[10] *Wit* Compl. ¶ 205 ; *Tillitt* Intervenor Compl. ¶ 94;  *Alexander* Compl. ¶¶  141-142; *Driscoll* Intervenor Compl. ¶ 91.  The reliance on these Guidelines was arbitrary and capricious, Plaintiffs allege, because: 1) Plaintiffs' health insurance plans provided for coverage consistent with generally accepted standards of care; and 2) some of Plaintiffs' health insurance plans were subject to state laws that explicitly mandate the use of clinical criteria issued by the American Society of Addiction Medicine ("ASAM") or the Texas Department of Insurance ("TDI"). *See Wit* Compl. ¶ 14.  According to Plaintiffs, to prevail on this claim they must establish "1) that those Class members' plans required UBH to make clinical coverage determinations pursuant to criteria that were consistent with generally accepted standards of care; 2) that UBH's fatally flawed Guidelines were not, in fact, consistent with those required standards; and 3) that UBH adjudicated and denied the members' requests for coverage pursuant to a Guideline."  Motion at 6.

Plaintiffs seek declaratory and injunctive relief as a remedy for UBH's alleged ERISA violations.  In particular, in connection with Claim One they ask for: 1) a declaration that UBH's

---

[10] In the *Wit* and *Tillitt* Complaints, Plaintiffs also include other theories in support of their claim that UBH's denial of benefits was improper.  In particular, in the *Wit* Complaint, Plaintiffs allege that  UBH "also denied these claims, in part, based on its systematic practice of: (i) improperly applying acute inpatient treatment criteria to residential treatment claims; (ii) ignoring the evidence presented to it; (iii) applying undisclosed additional criteria to benefit claims, such as a length of stay "benchmark"; and (iv) relying upon its restrictive CDGs even though CDGs (as opposed to LOCs) are not a recognized basis for denying claims under Plaintiffs' Plans."  *Wit* Compl. ¶ 205;  *see also Tillitt* Compl. ¶ 94 ("[UBH] also denied these claims, in part, based on its systematic practice of: (i) improperly applying acute inpatient treatment criteria to residential treatment claims; (ii) ignoring the evidence presented to it; and (iii) relying upon its restrictive CDGs even though CDGs are not a recognized basis for denying claims under the Lockton Plan.").  At oral argument, Plaintiffs stipulated that if the Court certifies the proposed classes the Named Plaintiffs will drop these theories of recovery and will proceed only with the theories that apply to the entire class, described above.

United States District Court
Northern District of California

1   internal Guidelines complained of by Plaintiffs were developed in violation of its fiduciary duties;

2   and 2) an injunction ordering UBH to stop utilizing the Guidelines and instead adopt or develop

3   guidelines that are consistent with those that are generally accepted and with the requirements of

4   applicable state law.  In connection with Claim Two, the Arbitrary and Capricious Denial of

5   Benefits Claim, Plaintiffs ask the Court: 1) to declare that UBH's denial of benefits was improper;

6   2) to order UBH to reprocess claims for residential treatment, intensive outpatient treatment and

7   outpatient treatment that were denied, in whole or in part, pursuant to the Guidelines, using the

8   new guidelines; and 3) to order UBH to apply the new guidelines in processing all future claims.

9   *See Wit* Compl. at 65-66; *Alexander* Compl. at 50-51.

10         Plaintiffs also ask the Court to impose a surcharge on UBH as an equitable remedy, under

11   either Counts I and II or Count IV.  *See  Wit* Compl. at 66;  *Alexander* Compl. at 51.  In the

12   Complaints, Plaintiffs sought a surcharge in an amount "equivalent to the revenue [UBH]

13   generated from its corporate affiliates or the plans for providing mental health and substance

14   abuse-related claims administration services with respect to claims filed by Plaintiffs and members

15   of the Class, expenses that UBH's corporate affiliates saved due to UBH's wrongful denials, the

16   out-of-pocket costs for . . . treatment Plaintiffs and members of the Class incurred following

17   UBH's wrongful denials, and/or pre-judgment interest."    In their Reply brief, however, Plaintiffs

18   clarify that they are not seeking to recover out-of-pocket expenses as part of the surcharge, at least

19   as to the class members, stating as follows:

20             To the extent Plaintiffs' Motion did not make it sufficiently clear to
               UBH, Plaintiffs are not seeking to pursue, on a class basis, the
21             alternative measures of the surcharge identified in their Complaints
               and in responses to Interrogatories. Moreover, the fact that certain
22             named Plaintiffs stated that they want to recover the out-of-pocket
               costs that they incurred as a result of UBH's improper benefit
23             denials does not alter the prayer for relief set forth in Plaintiffs'
               Complaint. All Plaintiffs of course hope that when their benefit
24             claims are reprocessed, UBH will find that the previous clinical
               coverage determination was improper and Plaintiffs will recover any
25             money that they lost. But that hope is not a prayer for relief[.]

26   Reply at 16 n. 22.  At oral argument, Plaintiffs stipulated that if the proposed classes are certified,

27   they will proceed only under the theory that they are entitled to disgorgement of the revenue UBH

28   generated from its corporate affiliates or the plans for providing mental health and substance

abuse-related claims administration services in connection with processing of the class members' claims.

Finally, Plaintiffs seek an award of attorneys' fees. *Id.*

**C.    The Class Certification Motion**

Plaintiffs ask the Court to certify two classes in *Wit* and one class in *Alexander*.  Motion at 3.   The proposed classes in *Wit* are defined as follows:

**The *Wit* Guideline Class**

Any member of a health benefit plan governed by ERISA whose request for coverage of residential treatment services for a mental illness or substance use disorder was denied by UBH, in whole or in part, on or after May 22, 2011, based upon UBH's Level of Care Guidelines or UBH's Coverage Determination Guidelines.

The *Wit* Guideline Class excludes members of the *Wit* State Mandate Class, as defined below.

**The *Wit* State Mandate Class**

Any member of a fully-insured health benefit plan governed by both ERISA and the state law of Connecticut, Illinois, Rhode Island or Texas, whose request for coverage of residential treatment services for a substance use disorder was denied by UBH, in whole or in part, on or after May 22, 2011, based upon UBH's Level of Care Guidelines or UBH's Coverage Determination Guidelines and not upon the level-of-care criteria mandated by the applicable state law.

The *Wit* State Mandate Class shall only include denials governed by Illinois law that occurred on or after August 18, 2011, denials governed by Connecticut law that occurred on or after October 1, 2013, and denials governed by Rhode Island law that occurred on or after July 10, 2015.

The *Wit* State Mandate Class excludes members of the *Wit* Guideline Class, as defined above.

*Id.*;  *see also* Reply at 21 (amending proposed class definition for *Wit* State Mandate Class to take into account the dates on which the relevant state laws were enacted by adding second paragraph of definition).[11]  Plaintiffs propose that Named Plaintiffs David and Natasha Wit, Lori Flanzraich, Cecelia Holdnak, Brian Muir, and Linda Tillitt serve as Class Representatives for the *Wit*

---

[11] The *Wit* State Mandate class definition quoted above is the amended version offered in Plaintiffs' Reply brief rather than the version originally proposed in the Motion.

1    Guidelines Class.  They propose that Named Plaintiff Brandt Pfeifer serves as Class

2    Representative for the *Wit* State Mandate Class.

3         Plaintiffs propose the following class for certification in *Alexander*:

4              **The *Alexander* Guideline Class**

5              Any member of a health benefit plan governed by ERISA whose
             request for coverage of outpatient or intensive outpatient services for
6              a mental illness or substance use disorder was denied by UBH, in
             whole or in part, on or after May 22, 2011, based upon UBH's Level
7              of Care Guidelines or UBH's Coverage Determination Guidelines.

8              The *Alexander* Guideline Class excludes any member of a fully
             insured plan governed by both ERISA and the state law of
9              Connecticut, Illinois, Rhode Island or Texas, whose request for
             coverage of intensive outpatient treatment or outpatient treatment
10             related to a substance use disorder.

11   Motion at 4.  Plaintiffs propose that Named Plaintiffs Gary Alexander, David Haffner, Corinna

12   Klein, and Michael Driscoll serve as Class Representatives for the *Alexander* Guideline Class.  *Id*.

13        In the Motion, Plaintiffs contend the key facts relating to their claims can be established

14   through common, class-wide evidence.  *Id*. at 7.  Plaintiffs point to UBH's development and

15   promulgation of the Guidelines to set forth its understanding of generally accepted standards of

16   care and standardize coverage decisions, the fact that all UBH reviewers are required to adhere to

17   the clinical criteria contained in the Guidelines in making coverage determinations, and the fact

18   that all of the Named Plaintiffs' claims and all the Sample Claims were denied on the basis of the

19   Guidelines.  *Id*. at 8-12.

20        Plaintiffs also contend that they will be able to establish generally accepted standards of

21   care – and that the Guidelines are more restrictive than these standards – using common evidence.

22   *Id*. at 13-15.  In particular, they point to criteria and guidelines relating to mental health and

23   substance use disorder treatment that have been adopted by various national organizations,

24   including the American Academy of Child and Adolescent Psychiatry ("AACAP"), the American

25   Psychiatric Association ("APA") and the American Society of Addiction Medicine ("ASAM"),

26   upon which UBH itself claims to have relied in developing the Guidelines.  *Id*. at 14; *see also*

27

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1  Reynolds Decl., Ex. D (chart listing sources of generally accepted standards relevant to Guidelines

2  used by UBH, produced by UBH to show the "Evidence Base" for its Guidelines).[12]  Using these

3  criteria, Plaintiffs contend, they will be able to establish that the Guidelines used by UBH to make

4  coverage determinations are more restrictive than generally accepted standards in that they

5  "uniformly overemphasize acute criteria and symptoms, while at the same time, they omit criteria

6  for coverage of chronic conditions and ignore factors that are relevant to promoting patients' long-

7  term recovery." *Id.* at 14.

8      As one example of alleged over-emphasis on acute symptoms as a criteria for determining

9  coverage, Plaintiffs point to the Guidelines' emphasis on a patient's "presenting problems," that is,

10  the so-called "why-now factors." *Id.* (citing Reynolds Decl., Ex. A-1 ("Summary of Selected

11  Level of Care Guideline Provisions Over-Emphasizing Acute Criteria")[13] & B (LOC Guidelines)).

12  According to Plaintiffs, "UBH Guidelines make clear that the 'presenting problems' refer to the

13  specific, acute symptoms that necessitated treatment in a particular level of care, as opposed to the

14  underlying mental health condition(s)." *Id.*  As a consequence, they contend, "[a]s soon as the

15  crisis precipitating admission eases (even if the patient's underlying condition remains

16  unresolved), the Guidelines call for coverage at that level of care to cease, unless the patient can

17  prove that stepping down to a lower level of care would be unsafe." *Id.*  Similarly, they assert, the

18  Guidelines require a patient to show "constant improvement, even over relatively short timeframes

19

20  ───────────────

[12] UBH objects to Exhibit D on the basis that it is not authenticated and contains hearsay.
Objections at 2.  As discussed above, the Objections are overruled for failure to comply with Civil
Local Rule 7-3(a).  Moreover, the objection to Exhibit D has no merit.  As UBH produced this
document, it needs no further authentication at this stage of the case.  The chart does not constitute
"hearsay" because Plaintiffs are not attempting to prove the truth of any statement contained in it;
they are simply using it to demonstrate that the generally accepted standards at issue in this case
are subject to common proof.

[13] UBH objects to Exhibit A-1 on the basis that it does not include all of the provisions of the
LOCs that UBH considers to be relevant to whether the Guidelines overemphasize acute criteria
and therefore is misleading.  Objections at 1. The objection is OVERRULED.  First, as discussed
above, UBH failed to comply with Civil Local Rule 7-3(a) as it did not include this objection in its
brief.  Second, the objection has no merit.  The title of the chart makes clear that it summarizes the
criteria that Plaintiffs believe show that the Guidelines overemphasize acute criteria and does not
purport to be a comprehensive summary of every provision that might be considered relevant to
the question of whether the Guidelines overestimate acute criteria.  To the extent UBH seeks to
highlight provisions of the Guidelines that are not included in Plaintiffs' chart, it is free to do so in
its brief.

1    (every 2-3 days or each week), in order for coverage to continue, demonstrating that the

2    Guidelines' focus is on addressing short-term acute symptoms, rather than ensuring a patient's

3    long-term recovery." *Id*. at 14-15.   The Guidelines also do not cover treatment aimed at

4    preventing deterioration or maintaining a level of function, Plaintiffs assert. *Id*. at 15.

5         Rule 23 allows for certification of a class where all of the requirements of Rule 23(a)

6    (numerosity, commonality, typicality and adequacy) are satisfied and one of the requirements of

7    Rule 23(b) is met.  Here, Plaintiffs contend the classes can be certified under any of the

8    subsections of Rule 23(b), that is Rule 23(b)(1), (b)(2) or (b)(3), because the requirements for each

9    of them are met.   *Id*. at 20-24.  Even if the Court were to find that Plaintiffs have not met any of

10   the requirements of Rule 23(b), Plaintiffs ask the Court to certify any issues that it finds are

11   capable of classwide resolution under Rule 23(c)(4).

## III.    ANALYSIS

### A.    General Legal Standards Under Rule 23

14        A class action may be maintained under Rule 23 of the Federal Rules of Civil Procedure if

15   all of the requirements of Rule 23(a) are satisfied and the plaintiff demonstrates that one of the

16   requirements of Rule 23(b) is met as well.  Rule 23(a) requires that a plaintiff seeking to assert

17   claims on behalf of a class demonstrate:  1) numerosity; 2) commonality; 3) typicality; and 4) fair

18   and adequate representation of the interests of the class.  Fed. R. Civ. P. 23(a).

19        Rule 23(b)(1)(A)  allows a class to be certified where "prosecuting separate actions by or

20   against individual class members would create a risk of . . . inconsistent or varying adjudications

21   with respect to individual class members that would establish incompatible standards of conduct

22   for the party opposing the class[.]" Fed. R. Civ. P. 23(b)(1)(A).[14]  Rule 23(b)(2) allows a class

23   action to be maintained where "the party opposing the class has acted or refused to act on grounds

24   that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is

25   appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

26        Rule 23(b)(3) allows a class action to be maintained where "the court finds that the

---

[14] Plaintiffs do not invoke Rule 23(b)(1)(B) and therefore the Court does not address it here.

United States District Court
Northern District of California

1    questions of law or fact common to class members predominate over any questions affecting only

2    individual members, and that a class action is superior to other available methods for fairly and

3    efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "An individual question is one

4    where 'members of a proposed class will need to present evidence that varies from member to

5    member,' while a common question is one where 'the same evidence will suffice for each member

6    to make a prima facie showing [or] the issue is susceptible to generalized, classwide proof.'"

7    *Tyson Foods, Inc. v. Bouaphakeo*, — U.S. —, 136 S. Ct. 1036, 1045 (2016) (quoting 2 W.

8    Rubenstein, Newberg on Class Actions § 4:50, pp. 196-197 (5th ed. 2012) (internal quotation

9    marks omitted)).

10   In addition to the explicit requirements of Rule 23, courts have sometimes read into that

11   rule an ascertainability requirement. *Joyce v. City & County of San Francisco*, No. C-93-4149

12   DLJ, 1994 WL 443464, at *3 (N.D. Cal. Aug. 4, 1994) ("A threshold inquiry in determining

13   whether a proposed class is appropriately certified is whether the class is sufficiently definite so as

14   to render it 'administratively feasible to determine if a given individual is a member of the

15   class.'") (quoting *Aiken v. Obledo*, 442 F. Supp. 628, 658 (E.D. Cal. 1977) (citing 7 Wright &

16   Miller, Federal Practice and Procedure, § 1760 at 582)). In addressing ascertainability, courts

17   have considered at least three types of concerns: "1) whether the class can be ascertained by

18   reference to objective criteria; 2) whether the class includes members who are not entitled to

19   recovery; and 3) whether the putative named plaintiff can show that he will be able to locate

20   absent class members once a class is certified." *Dudum v. Carter's Retail, Inc*., No. 14-cv-00988-

21   HSG, 2016 WL 946008, at *5 (N.D. Cal. Mar. 14, 2016).

22   Ascertainability concerns relate primarily to classes certified under Rule 23(b)(3). As one

23   district court has noted, quoting the Manual of Complex Litigation:

24   > Because individual class members must receive the best notice
   > practicable and have an opportunity to opt out, and because
25   > individual damage claims are likely, Rule 23(b)(3) actions require a
   > class definition that will permit identification of individual class
26   > members, while Rule 23(b)(1) or (b)(2) actions may not.

27   *Santomenno v. Transamerica Life Ins. Co*., No. CV1202782DDPMANX, 2016 WL 1158449, at

28   *17 (C.D. Cal. Mar. 14, 2016) (quoting Federal Judicial Center, Manual for Complex Litigation,

16

Fourth, § 21.222 (2004)).  Thus, although the Ninth Circuit has not decided the question of whether the ascertainability requirement is limited to Rule 23(b)(3) classes, in *In re Yahoo Mail Litig.*, 308 F.R.D. 577 (N.D. Cal. 2015), Judge Koh, of this Court, found that the ascertainability requirement does not apply to classes that are certified under Rule 23(b)(2).

"At class certification, a court does not accept at face value a plaintiff's theory of the case; the court must engage in a 'rigorous analysis . . . [into whether] . . . the prerequisites of Rule 23(a) have been satisfied,' and 'frequently that "rigorous analysis" will entail some overlap with the merits of the plaintiff's underlying claim.'" *Rodman v. Safeway, Inc.*, No. 11-cv-03003-JST, 2014 WL 988992, at *6 (N.D. Cal. Mar. 10, 2014) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982))).  "While the trial court has broad discretion to certify a class, its discretion must be exercised within the framework of Rule 23."  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir.), *opinion amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001) (citing *Doninger v. Pac. Nw. Bell, Inc.*, 564 F.2d 1304, 1309 (9th Cir. 1977)).

## B.    Legal Standards Under ERISA

"ERISA protects employee pensions and other benefits by providing insurance . . . , specifying certain plan characteristics in detail . . . , and by setting forth certain general fiduciary duties applicable to the management of both pension and nonpension benefit plans."  *Varity Corp. v. Howe*, 516 U.S. 489, 496 (1996)).   The basic purpose of ERISA is "to protect . . . the interests of participants . . . and . . . beneficiaries . . . by establishing standards of conduct, responsibility, and obligation for fiduciaries . . . and . . . providing for appropriate remedies . . . and ready access to the Federal courts."  *Id.* at 513 (quoting  ERISA § 2(b), 29 U.S.C. § 1001(b)).  The fiduciary duties established in ERISA "draw much of their content from the common law of trusts, the law that governed most benefit plans before ERISA's enactment."  *Id.* at 496.  However, "trust law does not tell the entire story" because "ERISA's standards and procedural protections partly reflect a congressional determination that the common law of trusts did not offer completely satisfactory protection."  *Id.* (citations omitted).  "Congress painted with a broad brush, expecting the federal courts to develop a 'federal common law of rights and obligations' interpreting

17

ERISA's fiduciary standards." *Bins v. Exxon Co. U.S.A.*, 220 F.3d 1042, 1047 (9th Cir. 2000) (*en banc*) (citing *Varity*, 516 U.S. at 497).  In developing this common law, "courts may have to take account of competing congressional purposes, such as Congress' desire to offer employees enhanced protection for their benefits, on the one hand, and, on the other, its desire not to create a system that is so complex that administrative costs, or litigation expenses, unduly discourage employers from offering welfare benefit plans in the first place." *Varity*, 516 U.S. at 497.

Pursuant to ERISA § 404(a)(1)(B), a "fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).  Section 3(21)(A) provides, in part, that "a person is a fiduciary with respect to a plan to the extent . . . he exercises any discretionary authority or discretionary control respecting management" of the plan or  "has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A).

The remedial provisions of ERISA are set forth in § 502, 29 U.S.C. § 1132.  Section 502(a) governs the initiation of a civil action and provides, in relevant part, as follows:

> A civil action may be brought–
>
> (1) by a participant or beneficiary–
>
>  . . .
>
>  (B) to recover benefits due to him under the terms of his plan, to enforce his rights under  the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;
> . . .
>
>  (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan;

ERISA § 502(a)(1) & (3), 29 U.S.C. § 1132(a)(1) & (3).

United States District Court
Northern District of California

**C.    Rule 23(a)**

### 1.  Numerosity

Rule 23(a)(1) requires that the size of the proposed class be "so numerous that joinder of all the class members is impracticable."   That requirement is satisfied here.   Plaintiffs have offered evidence that there are likely hundreds of individuals who fall within the class definition for the *Wit* State Mandate Class and thousands of individuals who satisfy the requirements of the *Wit* and *Alexander* Guideline Classes (collectively, the "Guideline Classes").   *See* Reynolds Decl. ¶ 19 (describing how spreadsheets provided by UBH in connections with Joint Stipulation Concerning Sampling Methodology were used to determine that there were approximately 296 denials of coverage within the *Wit* State Mandate Class, 13,205 denials of coverage within the *Wit* Guideline Class, and 16,171 denials of coverage within the *Alexander* Guideline Class).   UBH does not dispute that the numerosity requirement is met.

### 2.  Adequacy

Rule 23(a)(4) requires that the class representatives "fairly and adequately protect the interests of the class."   "Determining whether the representative parties adequately represent a class involves two inquiries:  (1) whether the named plaintiff and his or her counsel have any conflicts of interest with other class members and (2) whether the named plaintiff and his or her counsel will act vigorously on behalf of the class." *Calvert v. Red Robin Int'l, Inc.*, No. C 11-03026 WHA, 2012 WL 1668980, at *2 (N.D. Cal. May 11, 2012) (citing *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978)).   UBH has not identified any conflicts of interest on the part of the named Plaintiffs or their counsel and the Court has no reason to doubt that they will prosecute this case diligently.  In addition, Plaintiffs' counsel have offered evidence that they are experienced in prosecuting class actions involving insurance companies and denial of mental health benefits  in particular.  *See* Reynolds Decl., Ex. U.   The adequacy requirement is satisfied.

### 3.  Commonality

The commonality requirement of Rule 23(a)(2) is met where "the class members' claims 'depend upon a common contention' such that 'determination of its truth or falsity will resolve an issue that is central to the validity of each [claim] with one stroke.'" *Mazza v. Am. Honda Motor*

*Co*., 666 F.3d 581, 588 (9th Cir. 2012) (internal citation omitted) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).  Thus, plaintiffs seeking to certify a class must "demonstrate 'the capacity of classwide proceedings to generate common answers' to common questions of law or fact that are 'apt to drive the resolution of the litigation.'"  *Id*. (quoting *Wal-Mart*,  564 U.S. at 350).  "[C]ommonality only requires a single significant question of law or fact."  *Id*. at 589 (citing *Wal-Mart*, 564 U.S. at 359).  "The commonality preconditions of Rule 23(a)(2) are less rigorous than the companion requirements of Rule 23(b)(3)."  *Hanlon v. Chrysler Corp*., 150 F.3d 1011, 1019 (9th Cir. 1998).  "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class."  *Id*.

a.   Contentions of the Parties

Plaintiffs contend the claims of the putative classes turn on a common core of factual and legal issues arising from the fact that UBH "developed and used its overly-restrictive Guidelines to make clinical coverage determinations" for all class members.  Motion at 16.  Among the "central questions" that Plaintiffs assert will be the same for all class members in the Guideline Classes are: 1) was UBH acting as a fiduciary when it adopted the Guidelines and the policy and practice of applying them to all coverage determinations; 2) are UBH's Guidelines consistent with generally accepted standards; 3) did UBH breach its fiduciary duties when it developed the Guidelines and/or when it applied them to adjudicate and deny claims; and 3) what remedies are available to the class.  *Id*. at 17.  As to the *Wit* State Mandate Class there is also an "overarching issue," according to Plaintiffs, namely, whether UBH "abuse[d] its discretion by applying its fatally-flawed Guidelines to deny claims for substance use disorder treatment where a state law mandated the use of ASAM or TDI criteria."  *Id*.   Not only are the questions the same but the answers will also be the same for all class members, Plaintiffs assert.  *Id*.  Plaintiffs also contend their request for declaratory and injunctive relief will raise common questions because they claim UBH has "acted or refused to act on grounds that apply generally to the class" and the question of whether injunctive or declaratory relief is appropriate for the class as a whole also presents a common question.  *Id*.

United States District Court
Northern District of California

20

United States District Court
Northern District of California

UBH argues that the commonality requirement is not met because Plaintiffs' claims turn on "1) thousands of different insurance plans, 2) 169 different coverage guidelines, and 3) the unique clinical presentation of each class member."  Opposition at 13.

With respect to the variations in plans, UBH contends, "Courts have rejected class certification motions seeking to unite members of different health plans under the umbrella of a single ERISA action."  *Id*. at 14 (citing *Lipstein v. UnitedHealth Group*, 296 F.R.D. 279, 282-83, 286 (D.N.J. 2013);  *In re Wellpoint, Inc. Out-of-Network "UCR" Rates Litig.*, No. MDL 09-2074 PSG,  2014 WL 6888549 at *1 (C.D. Cal. Sept. 3, 2014);  *Bond v. Marriott Int'l, Inc*., 296 F.R.D. 403, 411 (D. Md. 2014)).  Here, they argue, the class members' claims raise individualized issues because they turn on coverage determinations made under different plans with different exclusions and limitations.  *Id*. at 14-15.  Some plans expressly permit denial of coverage based on UBH's levels of care guidelines, according to UBH, and as to these plans, denial of coverage under the Guidelines was entirely consistent with its fiduciary duty to administer the plan in accordance with its terms.  *Id*. at 15.  As another example of variation in plans, UBH points out that some putative class members' plans exclude coverage for treatment that does "not result in outcomes demonstrably better than other available treatment alternatives that are less intrusive or more cost effective."  *Id*. at 16 (citing Romano Decl., Ex. 71 (Plan Chart) at 5, 19, 21).  Yet another variation in insurance plans is the contractual limitations period for pursuing a claim, UBH contends.  *Id*. (citing Romano Decl., Ex. 77 (Sample Plan 8988) at 65-66 & Ex. 73 (Plaintiff Driscoll insurance plan) at 76).  UBH argues that because of all of these variations, even if the question of whether the Guidelines are consistent with generally accepted standards of care can be resolved on a classwide basis, it will not drive the resolution of the case as a whole "because an individualized inquiry would still be needed to determine whether a denial based on those guidelines was improper or gives rise to any relief."  *Id*.

UBH also challenges Plaintiffs' characterization of the Guidelines, arguing that Plaintiffs (wrongly) suggest that the Guidelines "amount to a cohesive policy, applied to every class member" and that "such a policy is measurable against a uniform generally accepted standard of care."  *Id*. at 17.  According to UBH, Plaintiffs focus in their brief on the theory that the

Guidelines overemphasize "acute criteria and symptoms" but in fact, they contend that the

Guidelines diverge from generally accepted standards of care in at least six different ways. *Id.*

(citing Romano Decl., Ex. 5 (Plaintiffs' Supp. Responses to Rog. No. 17).[15]  Moreover, UBH

---

[15]Plaintiffs offered the following six ways in which the Guidelines are more restrictive than generally accepted standards of care in response to UBH's interrogatory:

- In contrast to generally accepted standards of care, UBH's Guidelines overemphasize acute criteria and symptoms, indicating that coverage for mental health or substance abuse treatment is only available to address specific crises and that, as soon as the crisis precipitating admission has passed, coverage is no longer available.

  - For example, the level of care criteria contained in UBH's Guidelines focus heavily on addressing the member's "presenting problems" (also called the "'why now' factors"). UBH's Guidelines make clear that the "presenting problems" refer to the specific, acute symptoms that necessitated treatment in a particular level of care, as opposed to the underlying mental health condition(s). As soon as the "presenting problems" improve enough to safely transition the patient to a lower level of care (or to cease treatment altogether), UBH's Guidelines make clear that treatment is no longer covered for the requested level of care.

- In contrast to generally accepted standards of care, UBH's Guidelines fail to provide coverage for the treatment of chronic conditions in the absence of an acute crisis precipitating admission to care. This is true with respect to residential treatment, intensive outpatient treatment and even outpatient treatment.  From at least 2012 forward, UBH's Guidelines do not provide for UBH to consider criteria that, under generally-accepted standards, should be taken into account in determining whether coverage is available for treatment at a proposed level of care, including but not limited to: (a) the presence of co-morbid mental health conditions; (b) patient resiliency; (c) the member's age and/or developmental progression; and (d) with respect to substance use disorders, the member's motivation to recover.

- UBH's Guidelines reverse the burden of proof for selection of the appropriate level of care, providing that coverage is only available at a lower level unless a member or provider can prove that a higher level of care is necessary because a lower level would be unsafe. Generally accepted standards, by contrast, err on the side of caution and call for selection [of] a higher level of care unless a lower level will be both safe and effective.

- Under UBH's Guidelines, both residential and intensive outpatient treatment must focus on rapid stabilization of the specific, acute symptoms precipitating admission (that is, the "presenting problems" or "'why now' factors") with the goal of transitioning the member as soon as possible to a lower level of care. According to generally accepted standards, however, the goals of treatment include promoting the patient's long-term recovery and resiliency and preventing deterioration or relapse.

- In contrast to generally accepted standards of care, UBH's Guidelines do not include prevention of deterioration as a goal for covered treatment. UBH's Guidelines for residential treatment incorporate an overly-expansive definition of "custodial care" that precludes coverage for continued treatment if a member fails to show constant

22

asserts, the degree to which the CDGs emphasize acuity varies widely "depending on the diagnosis and clinical circumstances at issue." *Id.* at 17-18 (citing as examples 2015 CDG for Substance-Related & Addictive Disorders ("SRAD") (Romano Decl., Ex. 42 at 5-6, 9, 13, 30-31); 2015 CDG for Anorexia Nervosa (Romano Decl., Ex.  31 at 14); 2015 CDG for Generalized Anxiety Disorder ("GAD") (Romano Decl., Ex. 36 at 9);  2015 CDG for Bipolar Disorder (Romano Decl., Ex. 32 at 5-6);  2015 CDG for Depressive Disorders (Romano Decl., Ex. 34 at 5-6); 2013 CDG for Major Depressive Disorder (Romano Decl., Ex. 34 at 6);  2015 CDG for Bulimia Nervosa (Romano Decl., Ex. 33 at 10-14);  2015 CDG for Specific Phobias (Romano Decl., Ex. 41 at 14); 2015 CDG for Schizophrenia (Romano Decl., Ex. 40 at 30, 33); 2015 CDG for Disruptive Mood Dysregulation Disorder (Romano Decl., Ex. 35 at 22, 26)).  Even the Common Criteria of the LOCs are applied flexibly according to the clinician's "sound judgment," UBH contends, taking into account the particular circumstances and diagnosis at issue and allowing "exceptions where case-specific circumstances warrant." *Id.* at 18 (citing 2013 LOC Common Criteria (Romano Decl., Ex. 45 at 8);  2014 LOC Common Criteria (Romano Decl. Ex. 46 at 6-7);  2011 LOC at 3,  2012 LOC at 3-4, 2013 LOC at 4, 2014 LOC at 5, and 2015 LOC at 5-6 (Romano Decl., Exs. 43-47)).

UBH further contends that Plaintiffs' challenges to the Guidelines raise a multitude of diverse issues that defeat commonality because they "rely on a host of different sources for what they view as the standard of care." *Id.* at 19.  According to UBH, there are "dozens of third-party guidelines" promulgated by the national organizations cited by Plaintiffs but Plaintiffs have not specified which of them constitute the standards of care for the 169 Guidelines that they challenge in this case. *Id.* at 20.  UBH argues that Plaintiffs must offer enough evidence to show that they

---

improvement. Generally accepted standards of care, by contrast, provide that "'improvement'" may include maintaining a level of function. Generally accepted standards also take into account that the process of recovery may include periods of stability or even regression, especially with respect to patients with chronic conditions or co-morbid conditions, and that such periods do not indicate that treatment is ineffective or unnecessary.

Romano Decl., Ex. 5 at 4-5.

United States District Court
Northern District of California

1    can prove a "class-wide standard of care" in order for the classes to be certified and that Plaintiffs

2    have failed to meet this burden. *Id.*

3          UBH makes several additional arguments relating to commonality as to the *Wit* State

4    Mandate Class. Opposition at 32-33. First, the members of this class will be governed by

5    different legal rules, UBH contends, because Illinois and Rhode Island require the use of ASAM

6    criteria in certain circumstances while Connecticut and Texas do not. *Id.* at 32. In particular, they

7    assert, "Texas law requires the application of Texas-specific guidelines (referred to as 'TDI'

8    guidelines) for substance abuse treatment" whereas "Connecticut law provides that 'a health

9    carrier may develop its own clinical review criteria,' provided that it 'is consistent with the most

10   recent edition' of ASAM." *Id.* (citing Conn. Gen. State. Ann. § 38a-591c(a)(2), (3)(A)). Second,

11   they argue, Plaintiffs have failed to take into account the fact that "the four state laws specifying

12   coverage criteria were enacted at different times, with the Connecticut, Illinois and Rhode Island

13   laws being enacted at various times *after* the start of the class period (and in Rhode Island, after

14   the *Wit* case was filed)." *Id.* at 32-33 (emphasis in original).[16] Third, they contend, UBH

15   reviewers look to a variety of sources for guidance and there is evidence (acknowledged by

16   Plaintiffs in their brief) that UBH did in fact look to the TDI guidelines in at least two cases from

17   the Claim Sample. *Id.* at 33 (citing Motion at 13, Reynolds Ex. F at 3 & Romano Decl., Ex. 61

18   (Sample ID 8873 ABD Letter)). This evidence demonstrates that individualized inquiries will be

19   necessary as to the *Wit* State Mandate Class, UBH asserts. *Id.*

20         Plaintiffs counter that none of the alleged variations that UBH says defeat commonality is

21   material. Reply at 2-12. First, with respect to UBH's reliance on alleged variations in class

22   members' plans, Plaintiffs contend that UBH has mischaracterized their argument by stating in its

23   Opposition brief that Plaintiffs' claims are based on the assertion that each plan requires UBH to

24   "'cover *all* treatment that is consistent with generally accepted standards of care.'" *Id.* at 2

25   (quoting Opposition at 15) (emphasis added in Reply brief). UBH then knocks down this "straw

---

[16] This argument was aimed at the original definition of the *Wit* State Mandate Class, which did not include language taking into account the dates on which the various state laws were enacted. That additional language was proposed in Plaintiffs' Reply brief.

*United States District Court*
*Northern District of California*

man," Plaintiffs contend, by pointing to the varying limitations and exclusions contained in individual plans that preclude coverage *even if* a treatment is consistent with generally accepted standards of care.  *Id*.  Plaintiffs emphasize in their Reply brief that they do not claim that compliance with generally accepted standards of care is the *only* requirement for coverage; rather, they contend such compliance is a "baseline requirement for coverage under all Class Member plans."  *Id*. at 3.  Plaintiffs argue that their Breach of Fiduciary Duty Claim is based on the theory that UBH breached its fiduciary duty by developing Guidelines that are intended to reflect generally accepted standards and that variations in class members' insurance plans are irrelevant to that theory.  *Id*.  They further contend that the variations in insurance plans are also irrelevant to Claim Two, which is based on application of the Guidelines to coverage determinations, because it is undisputed that all of the insurance plans required that coverage determinations must be consistent with generally accepted standards of care.  *Id.*

Addressing the specific variations in insurance plans that UBH highlighted in its Opposition brief, Plaintiffs reject UBH's reliance on the fact that some insurance plans expressly permit denials based on the Guidelines.  *Id*. at 2-3.  These Guidelines were supposed to be based on generally accepted standards of care, Plaintiffs contend.  *Id*.  Were the "guideline" exclusion to be read to give UBH "unfettered discretion to adopt *any* deadline it please[d]" it would conflict with the mandate, common to all of the plans, that "coverage requires compliance with generally accepted standards," Plaintiffs assert.  *Id* at 3.

Plaintiffs also reject UBH's reliance on alleged variations in limitations periods in class members' insurance plans.  *Id*. at 4.  According to Plaintiffs, of the two examples UBH offers one (Sample Plan 8988) does not even apply to coverage decisions made by UBH and the other contains a limitations period that is longer than the three-year period contained in the proposed class definition.  *Id*. at 4 (citing Opposition at 15-16 & Romano Decl., Ex. 73 (Driscoll Plan)[17] at

---

[17] The Driscoll insurance plan provides that a claim for coverage must be submitted within 15 months of receiving treatment and also sets forth a series of deadlines for pursuing internal appeals, including a six-month deadline.  Romano Decl., Ex. 73 (Driscoll Plan) at 72-77.  It further provides:

72, 77; Ex. 77 (Sample Plan 8988) [18] at 65-66).  Plaintiffs further assert that even if the limitations periods of class members' insurance plans varied, these variations would be irrelevant to the Breach of Fiduciary Duty claim because that claim is subject to a statutory limitations period under ERISA that cannot be shortened by plan terms.  *Id*. at 4 (citing 29 U.S.C. § 1113 (providing that limitations period for breach of fiduciary duty claim under ERISA is "(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation" except in cases of fraud or concealment); *Kramer v. Smith Barney*, 80 F.3d 1080, 1085 (5th Cir. 1996)).

Plaintiffs also reject UBH's reliance on variations as to the clinical presentations of class members, which UBH contends raise "individualized issues of medical necessity."  *Id*. at 5 (quoting Opposition at 20).  Plaintiffs argue that the clinical presentations of class members have

---

> If you want to bring a legal action against [the Plan Administrator] or  the Claims Administrator, you must do so within three years from the expiration of the time period in which a request for reimbursement must be submitted or you lose any rights to bring such an action against [the Plan Administrator] or the Claims Administrator.

*Id*. at 76. At oral argument, UBH conceded that this limitations period has no bearing on class certification because it is *longer* than the three-year limitations period contained in the class definitions.

[18] Sample Plan 8988 provides for a "Plan Administrator Appeals process" whereby a member can submit a coverage dispute to the "Plan Administrator."  Romano Decl., Ex. 77 at 66.  The "Plan Administrator" for Sample Plan 8988 is Metropolitan Life Insurance Company.  *Id*. at 66, 112. One of the rules that governs such appeals (highlighted by UBH in the exhibit attached to its Opposition and cited in its Opposition brief) is that "[n]o civil action can be brought challenging the denial of the claim on appeal more than six months following the date on which the written response to your Plan Administrator Appeal is sent to you."  *Id*. at 66.  Under this plan, however, Plan Administrator Appeals "cannot include review of medical determinations by the Claims Administrator," that is, UBH.  *Id*. at 65.  At oral argument, UBH conceded that the cited provision does not apply to appeals of medical determinations by the Claims Administrator and therefore is not relevant to the question of class certification.  UBH's counsel stated that the citation in its brief was incorrect and that the limitations period it had meant to cite was found on a different page of the insurance plan.  As Plaintiffs have not had an opportunity to respond to this argument, which is untimely, the Court does not address it here. In any event, this potential variation in one plan is insufficient to disprove commonality, especially in light of the common statutory statute of limitations.

United States District Court
Northern District of California

no bearing on the Breach of Fiduciary Duty Claim because that claim is based on UBH's development of the Guidelines and addresses only the validity of the Guidelines. *Id*. Similarly, they contend, individual issues relating to medical necessity have no relevance to Claim Two, the Arbitrary and Capricious Denial of Benefits Claim, because that claim is based on the use of what Plaintiffs contend are flawed Guidelines in making coverage determinations and does *not* ask the Court to "determine whether Class members were owed benefits or whether UBH should be ordered to cause its plans to pay such benefits." *Id*. Instead, Plaintiffs point out, they are only seeking as a remedy the reprocessing of claims in a manner that is consistent with generally accepted standards of care. *Id*. Consequently, they contend, they "need not prove at trial that UBH reached the wrong outcome in every single one of its coverage determinations." *Id*.

Indeed, Plaintiffs assert, courts are reluctant to usurp the role of the claims administrator and therefore, where a denial of coverage is found to be arbitrary and capricious under ERISA, the preferred remedy is to remand the claim for evaluation on the merits. *Id*. at 6 (citing *Saffle v. Sierra Pac. Power Co. Bargaining Unit Long Term Disability Income Plan*, 85 F.3d 455, 460 (9th Cir. 1996) ("[R]emand for reevaluation of the merits of a claim is the correct course to follow when an ERISA plan administrator, with discretion to apply a plan, has misconstrued the Plan and applied a wrong standard to a benefits determination.")). For this reason, Plaintiffs assert, UBH's reliance on *Dennis F. v. Aetna Life Insurance*, No. 12-cv-2819 SC, 2013 WL 5377144, at *4 (N.D. Cal. Sept. 25, 2013) and *Graddy v. Blue Cross Blue Shield of Tennessee, Inc.*, No. 09-cv-84, 2010 WL 670081 (E.D. Tenn. Feb. 19, 2010) is misplaced. *Id*. at 7. In both cases, Plaintiffs contend, the plaintiffs sought "court-ordered benefit payments," which would have required individualized inquiries as to the medical necessity of treatment for each class member. *Id*. & n. 9. Plaintiffs also distinguish *Dennis F*. on the basis that the plaintiffs in that case – unlike Plaintiffs here – did not challenge the guidelines used by the insurance company to make coverage determinations but instead only challenged the application of those guidelines. *Id*.

Plaintiffs also argue that UBH's reliance on the variations in the Guidelines themselves is misplaced. *Id*. at 8-12. While UBH emphasizes that there are "169 different CDGs and LOCs," it ignores the fact that all of the CDGs expressly incorporate the LOCs, including the Common

United States District Court
Northern District of California

United States District Court
Northern District of California

Criteria, for all Levels of Care, Plaintiffs assert. *Id.* at 8-9 (citing Reynolds Decl., Ex. A-2 (chart identifying CDGs that incorporate LOCs)).  Moreover, Plaintiffs assert, while the LOCs are updated on a yearly basis, there are only six versions of the LOCs during the class period and UBH does not even argue that the LOC criteria "differ substantively from year to year." *Id.* at 9. In fact, Plaintiffs contend, for any given year the LOCs "suffer from the same defects, which means that Plaintiffs' evidence challenging those defects will also be the same for all LOCs." *Id.* at 10 (citing Reynolds Decl., Ex. A-1).[19]  UBH's argument that the Court will be required to address the LOCs for many specific levels of care is overstated, Plaintiffs contend, because the Court will only be required to examine the levels of care that are relevant to the *Wit* and *Alexander* cases, that is, residential treatment, intensive outpatient treatment and outpatient treatment. *Id.* at 10.

---

[19] The chart in Exhibit A-1 identifies fifteen LOC requirements that Plaintiffs contend overemphasize acute care criteria for each version of the LOCs in the class period (2011 – 2016). They are as follows:

- Treatment must focus on the acute crisis precipitating admission (i.e., the "presenting problems" or the "'why now' factors");
- Coverage requires finding that member's acute symptoms cannot be treated in a lower level of care;
- Treatment must be expected to improve presenting symptoms "within a reasonable period of time";
- "Improvement" defined as reduction or control of the symptoms precipitating admission;
- Coverage requires a finding that the member's current condition cannot be safely and effectively treated in a lower level of care;
- Goal of treatment should be to improve the presenting symptoms enough so that step-down to a lower level of care is safe;
- Coverage is available only for "active" treatment;
- "Active" treatment must focus on addressing the crisis precipitating admission (i.e., the "critical presenting problems" or the "'why now' factors");
- Coverage for residential treatment is excluded if UBH deems services "custodial";
- "Custodial" defined to include services provided during any periods when the member is not making ongoing progress (i.e., member's condition is "not changing" or "not improving," or member is "maintaining a level of function");
- Preventing deterioration/relapse is not a permissible goal of treatment;
- Maintaining a level of function is not a permissible goal of treatment;
- Coverage for continued service requires that the admission criteria still be met;
- Guideline omits criteria providing for treatment of chronic conditions in the absence of an acute crisis;
- Guideline omits consideration of co-morbid conditions as a factor necessitating a more intense level of service.

Reynolds Decl., Ex. A-1 (based on Level of Care Guidelines for 2011-2016, found at Reynolds Decl., Ex. B).

Plaintiffs also contend that UBH improperly relies on the "Clinical Best Practices" sections of some of the CDGs to show that "some of the factors Plaintiffs identified as missing from UBH's level-of-care criteria are actually present in some CDGs." *Id.*  According to Plaintiffs, "the Clinical Best Practices do not provide the criteria on which UBH conditions coverage – rather, they set forth standards of practice UBH expects *treatment providers* to meet." *Id.* (emphasis in original).  Thus, for example, even if some of the Best Practices Guidelines acknowledge that certain behavioral health conditions may be chronic, coverage will not be approved under the Guidelines unless the member experiences "'acute changes in . . . signs and symptoms and/or psychosocial and environmental factors (*i.e.* the "why now" factors leading to admission).'" *Id.* (quoting Romano Decl., Ex. 31 (2015 CDG Treatment of Anorexia Nervosa) at 24 § 1.4 and contrasting with "Clinical Best Practices" section of same CDG, at pp.13-14, offering criteria for provider to determine whether member's anorexia condition is "Acute" or "Chronic").  In any event, Plaintiffs contend, to the extent there is language in the LOCs that UBH contends meets the requirements of general accepted standards with respect to  treatment of chronic, the significance of this language is a common question that may be adjudicated on a classwide basis. *Id.* at 12.

Plaintiffs argue further that the fact that the Guidelines are to be applied in a "flexible manner" does not mean that UBH does not follow a common course of conduct in applying the Guidelines to all coverage determinations. *Id.*  To the contrary, Plaintiffs contend, the evidence in the case shows that UBH requires all Peer Reviewers to apply the Guidelines and to cite to those Guidelines in their coverage decision and that any exceptions must be approved by UBH management. *Id.* (citing Romano Decl., Ex. 43 (2011 LOC Guidelines) at 3 ("It is expected that exceptions be carefully thought out, documented and approved by the responsible level of management").

Finally, Plaintiffs assert that the variations among the guidelines and criteria of such organizations as the American Academy of Child and Adolescent Psychiatry ("AACAP"), the American Association of Community Psychiatrists ("AACP") and ASAM, some of which are condition-specific, do not defeat commonality, as UBH contends. *Id.* at 13.  According to Plaintiffs, they will "submit evidence at trial from multiple sources sufficient to show that the

United States District Court
Northern District of California

1    Guidelines are inconsistent across the board with generally accepted standards." *Id*.   The sources

2    have already been identified in their complaint and their interrogatory responses, Plaintiffs

3    contend, and therefore UBH's "feign[ed] confusion" about which sources will be used in support

4    of Plaintiffs' claims should be rejected. *Id*.   Nor is UBH correct in its assertion that it is

5    Plaintiffs' burden to establish which of the third-party standards of care represent the relevant

6    generally established standards as this is a merits question, Plaintiffs assert, and at this stage of the

7    case they need only demonstrate that the requirements of Rule 23 are met. *Id*.   at 13-14.

8         Plaintiffs also reject UBH's argument specific to the *Wit* State Mandate Class that the

9    variations among the laws of the four states make certification inappropriate, arguing that these

10   variations are not material because the theory of Plaintiffs' claims for this class is that the laws of

11   the four states "prohibit UBH from using its own Guidelines and . . . common evidence can prove

12   that it did just that." *Id*. at 21.   Plaintiffs concede that the variations as to the dates on which the

13   state laws were enacted must be taken into account, however, and have proposed an amendment to

14   the class definition, as noted above. *Id*.

15             b.   Discussion

16        The Court concludes that Plaintiffs meet the commonality requirement as to both the

17   Guideline Classes and the *Wit* State Mandate Class. The theory of Plaintiffs' claims is, in essence,

18   that UBH breached its fiduciary duty and abused its discretion by developing and applying

19   Guidelines that were more restrictive than either: 1) the generally accepted standards all class

20   members' insurance plans required UBH to follow (the Guideline Classes); or 2) the applicable

21   standards under state law (the *Wit* State Mandate Class).   The resolution of these claims will turn

22   on several common legal and factual questions, including whether UBH was acting as an ERISA

23   fiduciary when it developed the Guidelines and adopted a policy of applying them to all coverage

24   determinations, whether the Guidelines are consistent with generally accepted standards, whether

25   UBH breached its fiduciary duty by using its Guidelines to adjudicate claims for coverage, and

26   what remedies are available to the classes.   These common questions of law and fact are sufficient

27   to satisfy the permissive requirements of Rule 23(a).

28        The Court is not persuaded by Defendants' assertions that variations relating to the

putative class members' insurances plans, medical necessity determinations or the Guidelines themselves defeat commonality.  These variations are not material to the theories upon which Plaintiffs' claims are based.  The harm alleged by Plaintiffs – the promulgation and application of defective guidelines to the putative class members – is common to all of the putative class members.  Similarly, whether Plaintiffs are entitled to the requested remedy – adoption of new Guidelines that are consistent with generally accepted standards and/or state law and reprocessing of claims that were denied under the allegedly defective guidelines– can be addressed on a common basis.  Of particular significance is the fact that Plaintiffs do not ask the Court to make determinations as to whether class members were *actually* entitled to benefits (which would require the Court to consider a multitude of individualized circumstances relating to the medical necessity for coverage and the specific terms of the member's plan).   Instead, Plaintiffs seek only an order that UBH develop guidelines that are consistent with generally accepted standards and reprocess claims for coverage that were denied under the allegedly faulty guidelines.   For this reason, *Dennis F. v. Aetna Life Insurance*, on which UBH relies in support of its contention that Plaintiffs have not satisfied the commonality requirement, is not on point.

In *Dennis F.*, Judge Conti found that commonality under Rule 23(a)(2) had not been established where the plaintiffs sought to certify two classes of individuals who had allegedly been denied coverage for care at residential treatment centers ("RTCs") based on incorrect tabulation of their Level of Care Assessment Tool ("LOCAT") score.  2013 WL 5377144, at *1.  The plaintiffs did not challenge the validity of the levels of care guidelines used to assign the numeric values that went into tabulating the overall score but rather, asserted that the tabulation method described on the LOCAT Scoring Form was not followed by the insurer, resulting in denials of coverage in some cases.  *Id*. at *2.  The court found that while the LOCAT scores were "strongly correlated with the level of care approved by" the insurer and that they "might be probative" of medical necessity, they were not "dispositive."  *Id*. at *4.  As a consequence, the court concluded, a classwide proceeding on the insurer's scoring practices would not "generate common answers apt to drive resolution of the litigation."  *Id*.  Although the court in *Dennis F*. did not address in any detail the remedy sought in that case, the complaint reflects that Plaintiffs sought not only an

1 injunction requiring the insurer to fix the problem with its tabulation method but also an award of

2 the class members' denied benefits. *See* Northern District of California Case No. C-12-2819,

3 Docket No. 1 (Complaint) ("This case seeks correction of Aetna's systematic misapplication of the

4 LOCAT criteria and compensation for whom coverage for mental health treatment has been

5 improperly denied."). It was the latter that would have required the court to grapple with the

6 variations in class members' specific medical circumstances.

7       Other cases cited by UBH also are distinguishable because the courts in those cases found

8 that it would have been necessary to conduct individualized inquiries as to medical necessity to

9 determine liability. For example, in *Graddy v. Blue Cross Blue Shield of Tennessee, Inc.*, the

10 court found that a breach of fiduciary duty claim based on an alleged policy of a health care plan

11 of denying coverage for Applied Behavior Analysis ("ABA") to individuals with Autism

12 Spectrum Disorder ("ASD") could not proceed on a class basis because "an individualized

13 assessment as to the ultimate propriety of the benefits decision affecting each and every class

14 member" would have had to have been conducted to resolve the plaintiffs' claims. 2010 WL

15 670081, at *9 (E.D. Tenn. Feb. 19, 2010). Similarly, in *Pecere v. Empire Blue Cross and Blue*

16 *Shield*, the court found that the plaintiffs' challenge under ERISA to an alleged policy of routinely

17 denying coverage for pain treatment without regard to medical necessity did not meet Rule 23's

18 commonality requirement because the claim "hinge[d] on whether or not the treatment for each of

19 their individual conditions was 'medically necessary.'" 194 F.R.D. 66, 71 (E.D. N.Y. 2000).

20       The Court also rejects UBH's reliance on *In re Wellpoint* in support of its position that

21 Plaintiffs have not satisfied the commonality requirement because of the multitude of insurance

22 plans at issue in this case. In *In re Wellpoint*, the plaintiffs sought to certify several classes

23 asserting claims under ERISA for wrongly withheld benefits based on the allegation that the

24 insurer failed to reimburse providers and members the "usual, customary and reasonable" rate for

25 services, as required under the plaintiffs' insurance plans. No. MDL 09-2074 PSG, 2014 WL

26 6888549, at *1 (C.D. Cal. Sept. 3, 2014). The court, however, concluded that the commonality

27 test was a "major hurdle for class certification" because of the "contractual nature" of the

28 plaintiffs' claims and in particular, the fact that there was material variation in the exemplar

ERISA plans regarding the meaning of the term "usual, customary, and reasonable." *Id*. at *4-8. As a consequence, the court concluded, the "common nature" of what the plaintiffs cited as the "overarching issue"– whether the insurer "artificially deflated" the usual, customary and reasonable rates paid to members and providers – would "fragment[ ]" because the court would first have to determine what rates the plaintiffs *should* have been paid, which varied across plans. *Id*. at *4.

The court in *In re Wellpoint* did not, however, suggest that the mere fact that class members were insured under different plans precluded commonality. To the contrary, it recognized that  it is possible to satisfy the commonality requirement when there are multiple ERISA plans, for example, where the "ERISA plans at issue had terms that were common across the proposed class." *Id*. at 11.  Under the facts of that case, however, the plaintiffs had not demonstrated "uniformity or at least substantial similarity in key plan language as to the entire ERISA Class." *Id*. at *8.  In contrast, Plaintiffs here have demonstrated, as a factual matter, that the insurance plans for the putative class members are substantially the same in a key respect, namely, that they require as a condition of coverage adherence to generally accepted standards and/or state law.

The Court also rejects UBH's reliance on the fact that some class members' health insurance plans excluded coverage for treatment that is "not consistent with the Mental Health/ Substance Use Disorder Designee's level of care guidelines or best practices as modified from time to time"  (the "guidelines exception").  *See* Romano Decl., Ex. 71 (Health plan chart) at 6, 10, 20, 25).  To the extent it is undisputed that all Named Plaintiffs' and Sample Plaintiffs' insurance plans incorporated generally accepted standards, UBH has pointed to nothing in any plan that would suggest that the "guidelines exception" would permit insurance plans to adopt rules that are inconsistent with those standards.  Nor has UBH pointed to any Sample Plan or insurance plan of a Named Plaintiff with a limitations period that would require the Court to make any individualized inquiries related to these alleged variations.

The Court also concludes that UBH's emphasis on the large number of LOCs and CDGs that are at issue in this case exaggerates the problems that will be associated with adjudicating

Plaintiffs' claims on a classwide basis.  To the extent this argument is even relevant to commonality (as opposed to predominance), Plaintiffs offer evidence that the CDGs incorporate the LOCs.  Moreover, all of the LOCs contain the same Common Criteria, which are at the heart of Plaintiffs' challenge to the Guidelines.  Because of this overlap, the challenges Plaintiffs bring to the Guidelines do not appear to be unmanageable.

Finally, while the variations in state law as to the *Wit* State Mandate Class may warrant the creation of subclasses to address possible variations in state laws (and particularly, the possible need to fashion discrete remedies that are tailored to each of the states' laws), the Court concludes that the class shares sufficient common issues to meet the commonality requirement.  At oral argument, the parties disagreed whether the *Wit* State Mandate Class will be required to prove that the Guidelines are more restrictive than the standards that must be applied under state law or simply different.  Either way, these questions may be answered on a classwide basis and do not require the Court to examine individualized issues such as the terms of class members' insurance plans or medical necessity.

### 4.  Typicality

Rule 23(a)(3) requires that "the [legal] claims or defenses of the representative parties [be] typical of the claims or defenses of the class."  Fed. R. Civ. P.  23(a)(3).  "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).  The typicality requirement is satisfied as to all of the proposed classes.  With respect to the Guideline Classes, the named Plaintiffs who seek to represent those classes (all of the named Plaintiffs except for Brandt Pfeifer), like the members of those classes, are covered by insurance plans that require coverage consistent with generally accepted standards of care but were denied coverage by UBH under Guidelines that Plaintiffs allege are more restrictive than generally accepted standards of care.  *See* Reynolds Decl., Ex. K.  Similarly, the named Plaintiff who seeks to represent the *Wit* State Mandate Class, Brandt Pfeifer, asserts a claim that UBH denied coverage under its own Guidelines instead of the allegedly broader standards mandated by State law, just as do the members of the *Wit* State Mandate Class.

UBH does not dispute that the typicality requirement is met.

### D.   Ascertainability

UBH contends the proposed classes are not ascertainable because it is not administratively feasible to determine which UBH benefits plans are governed by ERISA, which claims were denied under the Guidelines, and what specific aspects of the Guidelines were relied upon in denying the claim.  Opposition at 23-24 (citing *Daniel F. v. Blue Shield of Cal.*, 305 F.R.D. 115, 125 (N.D. Cal. 2014)).  According to UBH, none of this information can be obtained by "automated means" and therefore, manual review of thousands of records would be necessary to determine class membership.  *Id.*

Plaintiffs counter that ascertainability is not a requirement for Rule 23(b)(1) and 23(b)(2) classes.  Reply at 22.  In any event, they contend, there is evidence that will make determination of which claims were denied under the Guidelines and which plans are governed by ERISA manageable.  *Id.* at 22-23.  Nor is it necessary to determine what specific aspects of the Guidelines UBH relied upon in making its coverage determination, Plaintiffs assert, as their claims are based on the theory that taken as a whole, UBH Guidelines are overly restrictive.  *Id.*  The Court concludes that the proposed classes are ascertainable and therefore does not address whether the ascertainability requirement is limited to classes certified under Rule 23(b)(3).

"In order for a proposed class to satisfy the ascertainability requirement, membership must be determinable from objective, rather than subjective, criteria." *Xavier v. Philip Morris USA Inc.*, 787 F. Supp. 2d 1075, 1089 (N.D. Cal. 2011) (citing *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 30 (2d Cir. 2006)).  Here, it is undisputed that when a claim for coverage is denied by UBH, a determination letter is sent to the member indicating the basis for the decision.  *See* Romano Decl., Ex. 1 (Declaration of Francis R. Bridge in Support of United Behavioral Health's Opposition to Motion for Class Certification ("Bridge Decl.")) ¶ 15.  According to Bridge, "[t]ypically [the letter] will identify one or more UBH Coverage Determination Guideline ('CDG'), UBH Level of Care Guideline ('LOC'), or external guideline . . . that was referenced in making that determination." *Id.*  This information is contained in UBH's ARTT database, which contains data regarding adverse benefits determinations prior to 2014, and its LINX database,

35

which contains such information for the period starting January 1, 2014.  *Id*. ¶ 11.   Further, both databases have a field that reflects whether a CDG or LOC was referenced in the determination letter, although only the LINX system has a field that tracks the specific Guideline.  *Id*. ¶¶ 16, 23. The Court concludes that these records are sufficient to permit the identification of individuals who were denied coverage in the relevant categories for the purposes of ascertaining class membership.  *See Kamakahi v. Am. Soc'y for Reprod. Med*., 305 F.R.D. 164, 186 (N.D. Cal. 2015), leave to appeal denied (May 12, 2015) ("The fact that determining class membership would involve reviewing these records does not render the class unascertainable.").

The Court rejects UBH's contention that it would take "thousands of hours" to make this determination, s*ee id*. ¶ 24, because it is based, in part, on the understanding that each of the 30,000 member records would have to be reviewed to determine the specific rationale that was used to deny coverage.  *See id*.  ("UBH would thus need to wade through the clinical records of at least 30,000 members to determine whether each individual member was in an ERISA plan, whether that individual was denied benefits as a result of one of the challenged Guidelines, and if so, *whether the denial relates to the complaints about the guidelines Plaintiffs raise in this case*") (emphasis added).  Under that understanding, Bridge estimates that it would take 45 minutes to review each record.  *Id*.  Plaintiffs' challenge, however, and the proposed class definitions, do not require that UBH identify the specific rationale for any particular rejection;  rather, UBH simply must identify the members whose claims were rejected under the relevant Guidelines.  Given that all of this information is stored in UBH's databases, the process of identifying the claims that were denied under the Guidelines at the relevant Levels of Care is not so burdensome that it renders the classes unascertainable.

The Court also rejects UBH's contention that the class is not ascertainable because of the difficulty of determining which insurance plans are governed by ERISA.  UBH is required to adhere to specific legal obligations for the plans it administers that are governed by ERISA. Therefore, it is not surprising that this information is contained in the member records.  *See* Romano Decl., Ex. 1 (Bridge Decl.) ¶ 18 ("Both the ARTT database and the LINX database contain a field identifying the plan at issue for each coverage determination.  However, neither the

36

1   ARTT database nor the LINX database contains a field tracking whether ERISA applies to a

2   particular benefit plan or benefit request.");  *see also* Reynolds Reply Decl., Ex. W at W0007

3   (Allchin Dep. at 76) (testifying that member records indicate whether the member's insurance plan

4   is an ERISA plan).   Moreover, as Plaintiffs point out, where plans are covered by ERISA the

5   plan documents typically state as much.  *See, e.g.,* Romano Decl., Ex. 72 at WIT_PTFS_0000637;

6   Ex. 73 at UBHALEXANDER43979080; Ex. 74 at UBHWIT0042846; Ex. 77 at BHWIT0040972.

7   The Court concludes that UBH has exaggerated the difficulty of determining which members'

8   plans are governed by ERISA, which is not of a sufficient magnitude to make the classes

9   unascertainable.

10          Finally, the Court is not persuaded that Judge Hamilton's decision in *Daniel F.* supports

11   UBH's assertion that the classes here are not ascertainable.   In that case, the plaintiffs are

12   challenging a policy by Blue Shield of California of excluding coverage of residential treatment

13   for mental health conditions, arguing that it violates California's Mental Health Parity Act.  305

14   F.R.D. 115, 118-19 (N.D. Cal. 2014).[20] The plaintiffs sought to certify a class that included

15   "beneficiaries who received residential treatment for mental health and behavior disorders, whose

16   requests were denied by Blue Shield of California based on a policy exclusion for residential

17   treatment, and whose health insurance was governed by [ERISA]" and the beneficiaries' parents to

18   the extent they were financially responsible for the denied treatment.  *Id.* at 123.  The court found

19   that the class proposed by the plaintiffs was not ascertainable because "individualized analysis of

20   all submitted claims" would be required to determine class membership.  *Id.* at 125.  The evidence

21   in that case differed, however, from the evidence here.  In addition to the fact that the online

22   records of the health insurance administrator did not have a field that identified plans that were

23   subject to ERISA (as is also the case here), Blue Shield also introduced evidence that there was no

24   code or group of codes that was used by residential treatment service providers that would allow

25   claims from such providers to be easily be distinguished from claims submitted by other types of

26

27   _____

    [20] An appeal of the district court's denial of the plaintiff's motion for class certification is currently
28   pending before the Ninth Circuit.

United States District Court
Northern District of California

providers. *Id.* at 123.  As a consequence, even individualized review of the member records would not be sufficient to determine class membership.  Nor was the court persuaded that the plaintiffs' proposed method of identifying residential service providers was workable; the plaintiffs proposed that residential service providers could be identified by searching for providers with residential treatment licenses but Blue Shield presented evidence that this approach would not work because Blue Shield did not contract with out-of-state providers and California residential service providers are not required to obtain a specific license.  *Id.*

Here, in contrast to *Daniel F.*, class membership is conditioned on denial of benefits under guidelines that must be cited when they are the basis of the denial, and that information is stored in UBH's electronic databases in the member records.  Even assuming each member record would have to be reviewed to ascertain class membership – admittedly a burdensome task – determination of class membership would not entail the type of individualized analysis that would have been required in *Daniel F.* because the member records in this case (unlike in *Daniel F.*) contain the required information to determine class membership.

For these reasons, the Court concludes that the classes proposed by Plaintiffs are ascertainable.

### E.    Rule 23(b)

#### 1.    Rule 23(b)(1)(A)

##### a. Contentions of the Parties

Plaintiffs contend certification of the proposed classes is appropriate under Rule 23(b)(1)(A) because all of the class members challenge the same Guidelines, which purportedly capture the generally accepted standards that are a precondition for coverage under all of their insurance plans.  Motion at 20.  Because UBH owes the same obligation to all class members, namely, to provide coverage consistent with generally accepted standards, there is a possibility of inconsistent outcomes if the classes are not certified, Plaintiffs contend.  *Id.* (citing *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 614 (1997) for the proposition that "Rule 23(b)(1)(A) takes in cases where the party is obliged by law to treat the members of the class alike").  Plaintiffs assert that certification of ERISA class actions under Rule 23(b)(1) has been found by courts to be

United States District Court
Northern District of California

United States District Court
Northern District of California

1    particularly appropriate "because ERISA plan beneficiaries are all owed the same fiduciary

2    duties." *Id.* at 21 (citing *Kanawi v. Bechtel Corp.*, 254 F.R.D. 102, 111 (N.D. Cal. 2008);  *Z.D. v.*

3    *Grp. Health Coop.*, No C-11-1119 RSL, 2012 WL 1977962, at *7 (W.D. Wash. June 1, 2012)).

4            UBH agrees with Plaintiffs that under *Amchem*, certification under Rule 23(b)(1) is

5    appropriate where a party is obligated to treat all class members alike but contends it does not

6    apply here because UBH's obligations to the putative class members differ depending on their

7    insurance plan.  Opposition at 24 (citing *In re Wellpoint*, 2014 WL 6888549, at *20;  *Pipefitters*

8    *Local 636 Ins. Fund v. Blue Cross Blue Shield of Michigan*, 654 F.3d 618, 633 (6th Cir. 2011)).

9    UBH argues further that a class cannot be certified under Rule 23(b)(1) unless monetary relief

10   sought by the class is "incidental" to the class members' claims.  *Id.* at 25 (citing *Wal-Mart Stores,*

11   *Inc. v. Dukes*, 564 U.S. 338, 360 (2011); *Zinser*, 253 F.3d at 1195;  *Daskalea v. Wash. Humane*

12   *Soc.*, 275 F.R.D. 346, 364 (D.D.C. 2011); *In re First Am. Corp. ERISA Litig.*, 258 F.R.D. 610, 622

13   (C.D. Cal. 2009); *Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523, 541 (N.D. Cal. 2012)).

14   UBH argues that the monetary relief sought in this case is *not* incidental to Plaintiffs' claims.  *Id.*

15   UBH points to Plaintiffs' allegations in the Complaints that they spent significant amounts of

16   money paying for treatment for which UBH denied coverage and argue that they are "suing to

17   recover that money," citing the deposition testimony of "several" of the Named Plaintiffs that it

18   contends reflects that recovery of the cost of the treatment is their "primary (if not only) interest in

19   this case." *Id.* at 26 & n. 21 (listing deposition testimony).  The fact that some of the named

20   Plaintiffs are no longer members of insurance plans administered by UBH and therefore do not

21   have standing to seek injunctive relief further undermines Plaintiffs' argument that the monetary

22   relief they seek is incidental to their request for declaratory and injunctive relief, UBH argues.  *Id.*

23   at 25 (citing to deposition testimony of Named Plaintiffs David Alexander and David and Natasha

24   Wit).

25           In their Reply brief, Plaintiffs reject UBH's reliance on variations among class members'

26   plans for the same reasons they argue these differences do not defeat commonality, namely, that

27   they are not material to Plaintiffs' claims and therefore are not outcome determinative, in contrast

28   with the cases cited by UBH, such as *In re Wellpoint*, *Lipstein*, and *Pipefitters Local 636*

United States District Court
Northern District of California

1    *Insurance Fund*.  Reply at 14.  Plaintiffs also reject UBH's assertion that their request for

2    monetary relief is not incidental to their request for declaratory and injunctive relief.  *Id*. at 15-16.

3    First, they argue that all of the cases cited by UBH are distinguishable because in them the

4    plaintiffs asserted *direct* claims for monetary damages whereas Plaintiffs here do not ask the Court

5    to adjudicate any individualized claims for damages.  *Id*. at 15.  Nor are Plaintiffs' claims

6    converted to claims for money damages because the reprocessing of their claims might result in

7    the payment of benefits to some class members, Plaintiffs contend.  *Id*. at 16 (citing *Hart v.*

8    *Colvin*, 310 F.R.D. 427 (N.D. Cal. 2015)).  This is true even for the Named Plaintiffs who are no

9    longer members of UBH plans, according to Plaintiffs, regardless of whether they may receive

10   benefit payments after their claims are reprocessed.  *Id*. at 16 n. 21 (citing *Johnson v. Meriter*

11   *Health Servs. Emp. Ret. Plan*, 702 F.3d 364, 369 (7th Cir. 2012)).

12        Finally, Plaintiffs contend the surcharge they request "cannot be considered anything *but*

13   incidental," arguing that the class only seeks disgorgement by UBH of the "unjust benefit it

14   received due to its inequitable conduct."  *Id*. (citing *Skinner v. Northrop Gruman Ret. Plan B*, 673

15   F.3d 1162, 1167 (9th Cir. 2012)).  As discussed above, Plaintiffs also clarify that they do not seek

16   to use the class members' out-of-pocket payments for denied treatment as a measure of the

17   surcharge.  *Id*. n. 16.

18             b.   Discussion

19        As noted above, Rule 23(b)(1)(A)  allows a class to be certified where "prosecuting

20   separate actions by or against individual class members would create a risk of . . . inconsistent or

21   varying adjudications with respect to individual class members that would establish incompatible

22   standards of conduct for the party opposing the class[.]"   As Judge Breyer noted in *Kanawi v.*

23   *Bechtel Corp*., "[m]ost ERISA class action cases are certified under Rule 23(b)(1)."  254 F.R.D. at

24   111.  Certification under Rule 23(b)(1) is particularly appropriate in cases involving ERISA

25   fiduciaries who must apply uniform standards to a large number of beneficiaries.  S*ee Z.D. ex rel.*

26   *J.D. v. Grp. Health Co-op*., No. C11-1119RSL, 2012 WL 1977962, at *7 (W.D. Wash. June 1,

27   2012)(stating that "[t]he Court can envision few better scenarios for certification under (b)(1)(A)

28   or (b)(1)(B)" than claims that an ERISA fiduciary's internal policy or practice was illegal);  *see*

*also Douglin v. GreatBanc Trust Co*., 115 F. Supp. 3d 404, 412 (S.D.N.Y. 2015) ("The Supreme Court has observed that actions for breach of fiduciary duties are 'classic examples' of Rule 23(b)(1) cases, . . . and courts in this Circuit have indeed determined that claims for breach of fiduciary duty brought under ERISA, 29 U.S.C. §§ 1132(a)(2) . . . are well suited to Rule 23(b)(1).").

Here, as to the Guideline Classes, Plaintiffs have demonstrated that all class members' plans require as one condition of coverage that the treatment at issue must be consistent with generally accepted standards of care and that UBH Guidelines are intended to embody those standards.   Thus, regardless of any differences with respect to other aspects of the class members' insurance plans, this common requirement of all of the plans means that multiple challenges to the Guidelines by putative class members could lead to inconsistent results.   Similarly, as to the *Wit* State Mandate Class, UBH's Guidelines purportedly embody the standards that must be followed under state law as to all members whose claims fall under the laws of the relevant states.   As a consequence, challenges to the Guidelines by multiple class members could subject UBH to inconsistent legal obligations with respect to the use of its Guidelines, making certification under Rule 23(b)(1) appropriate.

The Court is not persuaded by UBH's assertion that the relief sought by Plaintiffs involves more than incidental monetary relief and therefore precludes certification under Rule 23(b)(1). The rule that classes may not be certified under Rule 23(b)(1) or (2) if they seek anything more than incidental monetary relief is grounded in the history and purpose of those subsections.   In *Wal-Mart v. Dukes*, the Supreme Court explained that "[c]lasses certified under [Rule 23(b)(1) and (b)(2)] share the most traditional justifications for class treatment—that individual adjudications would be impossible or unworkable, as in a (b)(1) class, or that the relief sought must perforce affect the entire class at once, as in a (b)(2) class."   564 U.S. at 361-62.   Certification under these sections is not appropriate "when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant" or "an individualized award of monetary damages." *Id*. at 360-61.   Nor do these types of classes offer the procedural protections of notice or an opportunity to opt out.   *Id*.   Whereas this has generally been found to be acceptable where "a

41

United States District Court
Northern District of California

class seeks an indivisible injunction benefitting all its members at once," where "a class action [is] predominantly for money damages [the Court has] held that absence of notice and opt-out violates due process." *Id.* at 362. Consequently, classes whose claims will require individualized inquiries as to money damages "belong in Rule23(b)(3)," *id.*, which carries the procedural protections of notice and an opportunity to opt out.

UBH makes much of the fact that Named Plaintiffs allege they incurred significant out-of-pocket expenses in connection with the treatment that UBH declined to cover and that many of them have testified that they hope to be reimbursed for those expenses as a result of this lawsuit. In essence, it equates a request for an injunction requiring that it reprocess the denied claims under new Guidelines with a request for an award of money damages to compensate the class members for the cost of the treatment for which UBH denied coverage. These two remedies are not equivalent, however. What is of particular significance is that even if Plaintiffs prevail on their request for an injunction requiring that all claims decided under the allegedly faulty Guidelines be reprocessed, the Court will not be required to address individualized claims for damages. Consequently, the absence of notice and an opportunity to opt out of the classes will not raise Due Process concerns and the reasons for precluding certification under (b)(1) and (b)(2) where individualized inquiries as to money damages are required do not apply. The mere possibility that some class members may recover from UBH some of the money they spent on treatment as a result of the reprocessing of their claims under new Guidelines does not mean that their claims are "predominantly for money damages" for the purposes of Rule 23(b)(1) or 23(b)(2). *See Hart v. Colvin*, 310 F.R.D. 427, 439 (N.D. Cal. 2015) (Tigar, J.) (holding that proposed class of social security disability claimants whose claims had been denied and whose consultative examinations had been conducted by a doctor who was later disqualified from conducting such examinations could be certified under Rule 23(b)(2), even though the plaintiffs sought an injunction ordering that all of their claims be reprocessed, based in part on conclusion that "[p]laintiffs do not seek monetary damages or individual disability determinations").[21]

─────────────

[21] UBH's reliance on the fact that Alexander and the Wits are no longer members of plans

The Court further notes that while Plaintiffs' attempt to recoup these expenses in the guise of a "surcharge" might raise the kind of individualized issues as to class members' monetary losses that would preclude certification under Rule 23(b)(1) or (b)(2), Plaintiffs have now stipulated that if the proposed classes are certified they will not pursue that theory as to their request for award of a surcharge.  With that modification, the surcharge that Plaintiffs request is based only on the amount UBH was paid to process the claims that were denied.   During the sealed portion of the motion hearing, the parties made representations concerning the approximate amount of money UBH is paid to administer the class members' claims; Plaintiffs' counsel also offered an estimate of the total amount of the class members' out-of-pocket costs for denied treatment, the reasonableness of which UBH did not challenge.  The latter estimate must be considered in the context of the relief requested in this action, that is, with the understanding that it is the *maximum* possible amount the class members might recover if their claims are reprocessed under the new Guidelines and *all* of them are awarded benefits under those Guidelines. Even with this understanding, though, it is significant that the surcharge Plaintiffs seek is miniscule in comparison with the amount Plaintiffs may be able to recover through the reprocessing of their denied claims.  Under these circumstances, the Court finds that the surcharge is incidental to the injunctive and declaratory relief  that Plaintiffs seek, namely, the issuance of new Guidelines and the reprocessing of their claims.

For the reasons stated above, the Court concludes that Plaintiffs have satisfied the requirements of Rule 23(b)(1).

### 2.  Rule 23(b)(2)

#### a.  Contentions of the Parties

Plaintiffs argue that the proposed classes may also be certified under Rule 23(b)(2), which permits certification where there is a "'pattern of alleged violations [that] can be remedied for all

---

administered by ERISA is also misplaced; these Named Plaintiffs, like the rest of the class members, will be entitled to have their claims reprocessed by UBH if they prevail in this action even if they likely will not submit any further claims for consideration by UBH.  This remedy is not the same as money damages and does not mean that their claims are predominantly for money damages for the reasons discussed above.

United States District Court
Northern District of California

putative class members by the same form of injunctive relief.'"  Motion at 21 (quoting *Unknown Parties v. Johnson*, No. 15-cv-00250 TUC DCB, 2016 WL 267009, at *9 (D. Ariz. Jan. 11, 2016); *Lee v. Pep Boys – Manny Moe & Jack of Cal.*, No. 12-cv-05064 JSC, 2015 WL 9480475, at *12 (N.D. Cal. Dec. 23, 2015)).  Quoting *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998), Plaintiffs point out that predominance is not required in order to certify a class under this section and that "[e]ven if some class members have not been injured by the challenged practice, a class may nevertheless be appropriate" under Rule 23(b)(2).  *Id.*  Plaintiffs contend the classes that they propose here are "paradigmatic examples of (b)(2) classes because they primarily 'seek uniform injunctive [and] declaratory relief from policies or practices that are generally applicable to the class[es] as a whole.'"  *Id.* (quoting *Parsons v. Ryan*, 754 F.3d 657, 688 (9th Cir. 2014)).  The common course of conduct that has affected all class members in the same way, according to Plaintiffs, is the development and application to all class members of faulty Guidelines, in violation of the class members' insurance plans and ERISA.  *Id.* at 22 (citing *Huynh v. Harasz*, Case No. 14-CV-02367-LHK, 2015 WL 7015567, at *10 (N.D. Cal. Nov. 12, 2015); *A.F. v. Providence Health Plan*, 300 F.R.D. 474, 484-85 (D. Or. 2013); *Berger v. Xerox Corp. Ret. Income Guarantee Plan*, 338 F.3d 755, 763-64 (7th Cir. 2003)).  They further assert that "[t]he injunctive and declaratory relief sought here – which aims to stop UBH from using its overly-restrictive criteria and to require UBH to use appropriate criteria both going forward and in reprocessing the claims it arbitrarily and capriciously denied – would offer all putative Class members uniform and complete relief from the harm caused by UBH's common course of conduct."  *Id.*

UBH argues that certification under Rule 23(b)(2), as under (b)(1), is inappropriate because Plaintiffs seek more than incidental monetary relief.  Opposition at 26.  In addition, it argues, the relief requested by Plaintiffs does not meet the requirements under Rule 23(b)(2) that the relief  sought by the class must be both  "final" and "appropriate."  *Id.* at 27.  With respect to the former, UBH argues that the injunction Plaintiffs request does not provide "final" relief because "Plaintiffs do not . . . contend that their new, unspecified guidelines will result in different coverage determinations for all class members, nor is there any reason to believe that they will."

44

1    *Id.* (citing *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 892 (7th Cir. 2011)).   UBH

2    argues that the "reprocessing" injunction requested by Plaintiffs raises a host of issues, such as

3    what happens in situations in which class members never submitted formal claims for money

4    benefits and how UBH will reprocess claims submitted years ago when the processing of claims

5    turns on "real-time clinical information and medical needs that change over time."  *Id.* at 27-28.

6    UBH also raises the possibility that claimants may want to appeal the determinations that result

7    from the reprocessing of claims, thus "set[ting] the stage for further individual conflicts about

8    whether any particular denial of benefits was permissible under the new guidelines."  *Id.* at 28.

9          UBH also argues that the requested injunctive relief is not "appropriate" because it violates

10   Rule 65(d) of the Federal Rules of Civil Procedure, which "'mandates that every injunction "state

11   its terms specifically" and "describe in reasonable detail" the "act or acts restrained or required" so

12   that the enjoined party is fairly apprised of his responsibilities and the court can objectively assess

13   compliance.'"  *Id.* at 28-29 (quoting *Kartman*, 634 F.3d at 893) (quoting Fed. R. Civ. P. 65(d)(1)).

14   According to UBH, an injunction that requires the defendant "to create and then apply

15   *hypothetical and unspecified* guidelines" violates Rule 65(d).  *Id.* at 29 (emphasis in UBH's brief)

16   (citing *Thomas v. Cnty. of LA*, 978 F.2d 504, 509 (9th Cir. 1992)).

17         Plaintiffs argue that certification under Rule 23(b)(2) is proper because UBH has

18   "breached its fiduciary duties and acted arbitrarily and capriciously *in exactly the same way* with

19   respect to *all* Class members."  Reply at 17.  They further contend the injunctive relief they

20   request is both "final" and "appropriate."  *Id.* at 17-19.  With respect to finality, Plaintiffs contend

21   the *Kartman* case on which UBH relies is distinguishable because in that case there was no duty to

22   use a particular method to evaluate the claims of the putative class members; here, in contrast,

23   "UBH had a duty under ERISA and the plans to ensure that its Guidelines did what they claimed

24   to do – capture generally accepted standards."  *Id.* at 17.  Thus, while the claim in *Kartman* was

25   found to be non-actionable, the claims here can give rise to liability on the part of the class

26   members.  *Id.*  As a consequence, Plaintiffs contend, an injunction requiring reprocessing is a final

27   remedy here even though it was not a final remedy in *Kartman.*  *Id.* at 17-18.

28         Further, Plaintiffs argue, the fact that the reprocessing of the class members' claims will

45

United States District Court
Northern District of California

United States District Court
Northern District of California

1    not result in an award of benefits for all class members does not mean that the remedy is not final.

2    *Id*. at 18.  Plaintiffs point  to *Hart v. Colvin*, in which Judge Tigar certified a class under Rule

3    23(b)(2) where the injunctive relief requested would require reprocessing of denied disability

4    claims with respect to all individuals whose consultative examinations had been conducted by a

5    subsequently disqualified doctor.  *Id*. at 429.  In certifying the class, Plaintiffs note, the court

6    acknowledged that not all class members would ultimately be awarded benefits but that this fact

7    did not preclude certification because "'the  alleged wrong . . . is one of process, not outcome.'"

8    *Id*. (quoting *Hart*, 310 F.R.D. at 438-39).

9         Plaintiffs also contend UBH's reliance on Rule 65(d) to show that the injunction they seek

10   is not "appropriate" is misplaced.  *Id*. at 19.  They argue that they are not required to "come

11   forward with an injunction that satisfie[s] Rule 65(d) with exacting precision at the class

12   certification stage."  *Id*. (citing *Parsons v. Ryan*, 289 F.R.D. 513, 524 (D. Ariz. 2013), *aff'd* 754

13   F.3d 657 (9th Cir. 2014)).    They also argue that both *Thomas* and *Kartman*, cited by UBH, are

14   distinguishable.  *Id*. As to *Thomas*, Plaintiffs argue that the court was ruling on a specific

15   injunction and made clear that its holding was limited to the facts before it; nor did it rule out the

16   possibility that it would grant a narrower injunction if the plaintiffs "more fully" developed the

17   record.  *Id*. (citing *Thomas*, 978 F.2d at 508).  Consequently, *Thomas* has no bearing on this case,

18   Plaintiffs assert.  *Id*.  With respect to *Kartman*, the court found that the insurer owed no "contract

19   or tort-based  duty . . . to use a particular standard," in contrast to the situation here.  *Id*. (quoting

20   634 F.3d at 886).  As a result, Plaintiffs contend, the court's conclusion in that case regarding the

21   requested injunctive relief is not relevant here.  *Id*.

22              b. Discussion

23        Rule 23(b)(2) allows a class action to be maintained where "the party opposing the class

24   has acted or refused to act on grounds that apply generally to the class, so that final injunctive

25   relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R.

26   Civ. P. 23(b)(2).   In *Parsons v. Ryan*, for example, the Ninth Circuit held that inmates of Arizona

27   prison facilities who were "allegedly exposed to a substantial risk of serious harm by a specified

28   set of centralized [Arizona Department of Corrections] policies and practices of uniform and

statewide application" could proceed as a class under Rule 23(b)(2).  754 F.3d at 688.  The court reasoned that even though the challenged policies and practices might not affect every member of the proposed class in exactly the same way, "they constitute[d] shared grounds for all inmates in the proposed class . . . ."  *Id*.  Therefore, the court concluded, "every inmate in the proposed class is allegedly suffering the same (or at least a similar) injury and that injury can be alleviated for every class member by uniform changes in statewide ADC policy and practice."  *Id*.

Similarly, certification under Rule 23(b)(2) is appropriate here because all of the class members have been subjected to the same Guidelines which, according to Plaintiffs, are more restrictive than the generally accepted standards that are a precondition for coverage under all of their plans (for the Guideline Classes) or the relevant state law mandates (for the *Wit* State Mandate Class).  While application of the Guidelines may not have had an identical impact on every member of the proposed classes, the Guidelines constitute "shared grounds" for all of the members of the proposed classes to proceed on a collective basis.  *See id*.  Moreover, the Plaintiffs' injury can be remedied for all class members by requiring UBH to modify its Guidelines and reprocess claims that were denied under the allegedly defective guidelines.

The Court is not persuaded by UBH's argument that the injunctive relief requested here is not "final" for the purposes of Rule 23(b)(2) because the outcome of the reprocessing of claims is uncertain.  The Ninth Circuit has held that "remand for reevaluation of the merits of a claim is the correct course to follow when an ERISA plan administrator, with discretion to apply a plan, has misconstrued the Plan and applied a wrong standard to a benefits determination."  *Saffle v. Sierra Pac. Power Co. Bargaining Unit Long Term Disability Income Plan*, 85 F.3d 455, 461 (9th Cir. 1996).  A similar remedy was approved in the class context in *Bowen v. City of New York*, 476 U.S. 467 (1986).  In that case, the district court certified a class of individuals who alleged that the Social Security Administration had applied an unlawful policy under which it presumed "that a failure to meet or equal [certain criteria] was tantamount to a finding of ability to do at least unskilled work; that the presumption led to routine denials of benefits to eligible claimants; and that such a presumption was arbitrary, capricious, and violative of the Constitution, the Social Security Act, and the applicable regulations." 476 U.S. at 473.  The plaintiffs prevailed and "[a]s

a remedy, the District Court ordered the Secretary to reopen the decisions denying or terminating benefits, and to redetermine eligibility." *Id.* at 476.  The Second Circuit affirmed and while the scope of the class was challenged on appeal to the Supreme Court, the remedy was not.  *Id.*  In *Hart v. Colvin*, the court relied on *Bowen* in certifying a class under Rule 23(b)(2) that sought to have the class members' benefits claims reprocessed where their consultative examinations had been conducted by a subsequently-disqualified  doctors and their claims had been denied. 310 F.R.D. 427, 434 (N.D. Cal. 2015)).  Based on these cases, the Court concludes that where a defendant has relied on an unlawful policy to determine eligibility for benefits, ordering the defendant to redetermine the plaintiffs' eligibility without the taint of the unlawful policy is a "final" remedy for the purposes of Rule 65(d).

The Seventh Circuit's decision in *Kartman* does not support a contrary result.   In *Kartman*, the plaintiffs were homeowners who held insurance policies issued by the defendant, State Farm Fire and Casualty Company ("State Farm").  634 F.3d at 886.  After a severe hail storm, thousands of policyholders filed claims with State Farm, and several who were dissatisfied with the insurance payment they received brought a putative class action alleging breach of contract, bad-faith denial of insurance benefits and unjust enrichment.  *Id.*  The plaintiffs sought to certify a damages class under Rule 23(b)(3) and an injunctive relief class under Rule 23(b)(2) to "determine whether State Farm should be required to reinspect policyholders' roofs pursuant to a 'uniform and objective standard.'"  *Id.* The district court declined to certify the damages class but certified an injunctive relief class under Rule 23(b)(2).  *Id.*  State Farm appealed and the Seventh Circuit concluded that the injunctive relief class should not have been certified.  *Id.* at 887.

The Court of Appeals in *Kartman* concluded that the certification of the injunctive relief class under Rule 23(b)(2) resulted from a "legal misunderstanding about the nature of the plaintiffs' claims."  *Id.* at 888.  In particular, the court explained that "[a]lthough the complaint invokes several legal theories, the plaintiffs have only one cognizable injury – underpayment of their insurance claims for hail damage to their roofs – and prospective injunctive relief is not a remedy for that kind of injury.  *Id.* at 888-889.  To obtain certification under Rule 23(b)(2), however, the "plaintiffs claimed that they suffered two separate injuries – underpayment of their

hail-damage claims *and* a violation of a distinct right to have their hail-damaged roofs evaluated under a uniform and objective standard." *Id.* at 889.  According to the Court of Appeals, "[t]his parsing of remedies gave the plaintiffs a fall-back position on the class-certification question.  If they failed to win certification of a damages class under Rule 23(b)(3) based on lack of commonality, they could still argue for an injunction class under Rule 23(b)(2) to adjudicate whether State Farm breached an obligation to use a uniform and objective standard to evaluate hail-damaged roofs." *Id.*

The plaintiff's approach "[ran] into trouble," the *Kartman* court explained, because "State Farm had no independent duty – whether sounding in contract or tort – to use a particular method to evaluate hail-damage claims." *Id*. at 890.  The court found that "[a]t bottom, the actionable claims in this case are for State Farm's alleged underpayment of the plaintiffs' hail-damage claims – nothing more, nothing less." *Id*. at 891.  As a result, the court concluded, while "the insurer's use of an ad hoc loss-assessment standard may be *evidence* that it underpaid in some cases [it] is not an independently actionable wrong." *Id*. at 891-92 (emphasis added).  For this reason, the court held that an injunction would not provide a "final" remedy under Rule 23(b)(2), reasoning that  "[a]n injunction is not a final remedy if it would merely lay an evidentiary foundation for subsequent determinations of liability."  *Id*. at 893.

The situation here differs from *Kartman* in that Plaintiffs are asserting claims to obtain injunctive relief based on an injury that is distinct from the actual denial of benefits and that is cognizable under ERISA, namely, the use of Guidelines that are more restrictive than the plans under which they are insured or the standards mandated by state law in adjudicating their claims.  As a result, the conclusion that the injunction in *Kartman* was not "final" does not apply here.  In particular, that conclusion was based on the fact that the failure to apply a "uniform and objective standard" to the assessment of roof damage in *Kartman* was not a violation of any legal duty and did not give rise liability.  Consequently, the requested injunctive relief of reassessing class members' roof damage under such a standard was not a remedy for any cognizable claim.  That is not the case here.

The Court also rejects UBH's argument that the injunctive relief sought by Plaintiffs in this

1    case does not satisfy Rule 65(d) of the Federal Rules of Civil Procedure because it would require

2    UBH "to create and then apply hypothetical and unspecified guidelines."   Opposition at 29.  First,

3    "[P]laintiffs are not 'required to come forward with an injunction that satisfies Rule 65(d) with

4    exacting precision at the class certification stage.'" *Parsons v. Ryan*, 289 F.R.D. 513, 524 (D.

5    Ariz. 2013), aff'd, 754 F.3d 657 (9th Cir. 2014).  Second, *Thomas v. County of Los Angeles,* 978

6    F.2d 504 (9th Cir. 1992), cited by UBH, sheds little light on this issue.  In that case, the Ninth

7    Circuit struck down a preliminary injunction in a civil rights case  based, in part, on the fact that

8    the injunction "direct[ed] compliance, under penalty of contempt, with all department policies and

9    guidelines for conducting searches and for the use of force" without defining "what the policies

10   are, or how they can be identified." *Id*. at 509 (citing Fed.R.Civ.P. 65(d)).  While the court found

11   the injunction in that case to be overbroad, however, it acknowledged that it may be permissible to

12   incorporate specific policies into an injunction where there is some description of the specific acts

13   to be restrained. *Id*. at 511 (citing *Davis v. City and County of San Francisco*, 890 F.2d 1438 (9th

14   Cir. 1989)).  The court further made clear that its holding was "limited to the record before it and

15   [did] not preclude the grant of narrower preliminary or permanent injunctive relief on the basis of

16   a more fully developed record." *Id*. at 508.  Nothing in *Thomas* suggests that the injunction

17   requested by Plaintiffs here could not be drafted with sufficient detail to satisfy Rule 65(d) or that

18   Plaintiffs are required to offer the specific language of such an injunction at this stage of the case.

19        UBH's reliance on *Kartman* for the proposition  that an injunction is not "appropriate"

20   under Rule 65(d) if it merely orders UBH to develop and apply unspecified guidelines is also

21   misplaced.  There, the court noted that ordering State Farm to reprocess the plaintiffs' claims

22   applying a "reasonable, uniform and objective standard" would "essentially require the court to

23   write an insurance –adjustment code."  634 F.3d  at 893.  That case differed from the facts here,

24   however, because there was no "reasonable, uniform and objective standard" in the plaintiffs'

25   insurance policies, meaning that such a standard would have had to have been created out of

26   whole cloth in order for State Farm to comply with the injunction and the court to enforce it.  In

27   contrast, Plaintiffs have pointed to several sets of standards that will provide guidance for UBH in

28   coming up with new Guidelines.  Indeed, many of them were the very standards that UBH relied

United States District Court
Northern District of California

1   upon in creating the original Guidelines, indicating that there is little or no disagreement that these

2   standards reflect generally accepted standards. [22]

3       The Court concludes that Plaintiffs have met the requirements for class certification under

4   Rule 23(b)(2).

5           **3. Rule 23(b)(3)**

6               a.  Contentions of the parties

7       Plaintiffs move in the alternative for certification under Rule 23(b)(3) if the Court declines

8   to certify the classes under Rule 23(b)(1) or (b)(2) or finds that Plaintiffs may not seek award of a

9   surcharge under those sections.  Motion at 22; Reply at 20.   Plaintiffs contend they meet both the

10  predominance and superiority requirements of Rule 23(b)(3).  Motion at 22-24.  The

11  predominance requirement is met, they assert, because UBH "breached its fiduciary duty to all

12  class members in the same way: by developing Guidelines for its use in making coverage

13  determinations that were inconsistent with generally accepted standards of care and contrary to the

14  terms of the Class members' plans."  *Id*. at 22.  Similarly, they contend, UBH acted in a manner

15  that was arbitrary and capricious – and common to all class members – by applying the Guidelines

16  to class members' coverage determinations.  *Id*. at 23.  The remedy Plaintiffs seek is also a

17  common remedy, Plaintiffs, assert, which supports a finding of predominance.  *Id*.  Plaintiffs argue

18  that the request for a surcharge remedy does not defeat predominance because the surcharge they

19  request does not depend on any particular class members' injury and would be determined "on a

20  class-wide basis on UBH's own records."  *Id*.

21      Plaintiffs argue that the superiority requirement also is met, citing the four factors listed in

22  Rule 23(b)(3)(A) – (D).  *Id*. at 24.  According to Plaintiffs, "[e]ach of these factors favor

23  certification" because "there are overriding common issues in this case that allow for a finding of

24

25  [22] Plaintiffs state that they "anticipate that they will submit a proposed injunction after trial, to be

26  briefed by the parties under Rule 65."  They further state that they "currently expect that, based
    upon the presented evidence and the Court's findings, the injunction would order UBH to propose

27  new Guidelines that remedy the specific defects that render the current Guidelines inconsistent
    with generally accepted standards of care and would set forth a process for the Court to evaluate

28  such new Guidelines.  Reply at 19 n. 24.

United States District Court
Northern District of California

1    liability against UBH under ERISA and for the application of a common remedy – injunctive

2    relief to require compliance with UBH's fiduciary duties and reprocessing of benefit claims." *Id*.

3    As a result, they assert, "certification would best serve the interest of both the individual Class

4    members and judicial economy." *Id*.

5          Plaintiffs also argue that the class is ascertainable because membership can be determined

6    from objective rather than subjective criteria. *Id*. In particular, they contend, membership can be

7    ascertained from UBH's records because UBH "maintains an electronic record of each benefit

8    denial it issues, which identifies the level of care for which coverage was sought; whether

9    coverage was sought for mental health or substance use disorder treatment; the date of the denial;

10   the governing state; and whether the denial was a clinical determination that required the use of

11   clinical criteria." *Id*. (citing Reynolds Decl., Ex. P at P0016-23).

12         UBH argues that the classes should not be certified under Rule 23(b)(3) because the

13   predominance requirement is not satisfied, pointing to the individualized inquiries that it contends

14   also defeat commonality. Opposition at 29-30. It also argues that the surcharge requested by

15   Plaintiffs involves individualized inquiries to the extent it is based on class members' out-of-

16   pocket costs for treatment. *Id*. at 30. UBH points to the deposition testimony of Named Plaintiffs

17   that they are seeking to recover the cost of treatment, arguing that the amounts vary widely among

18   class members and that in order to obtain such a surcharge Plaintiffs would have to present

19   individualized proof of harm and causation. *Id*. at 31 (citing *Gabriel v. Alaska Elec. Pension

20   Fund*, 773 F.3d 945, 957-58 (9th Cir. 2014)). Not only will there be individualized issues as to the

21   amount of damages, UBH argues, but there will also be individualized issues with respect to the

22   fact of damages. *Id*. (citing *In re Live Concert Antitrust Litig*., 247 F.R.D. 98, 135 (C.D. Cal.

23   2007)). Specifically, UBH argues that there will be individualized issues because denial of

24   coverage at the authorization stage does not necessarily result in the patient paying out-of-pocket

25   for treatment because a patient may have successfully appealed an adverse benefits determination

26   or received coverage for an alternative treatment. *Id*. In addition, UBH points out that in the case

27   of one Named Plaintiff there is evidence that the provider did not charge for the treatment that was

28   provided after UBH denied coverage. *Id*. Finally, UBH argues that the surcharge precludes

certification under Rule 23(b)(3) because Plaintiffs have not offered "any model or explanation for how the surcharge would be calculated or allocated among class members." *Id.* at 31-32. Without proof that damages are capable of measurement on a classwide basis, UBH asserts, a class cannot be certified under Rule 23(b)(3). *Id.* at 32 (citing *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432-33 (2013)).

Plaintiffs reject UBH's argument that the predominance requirement is not met because their claims involve individualized inquiries related to the requested surcharge. Reply at 20. They contend UBH's argument is based solely on Plaintiffs' theory based on entitlement to out-of-pocket costs but state that they "do not seek certification to pursue such a surcharge." *Id.* As to the theory upon which they do seek a surcharge, their entitlement to the money that UBH receives for administering class claims, Plaintiffs argue that there are no individualized issues. *Id.* Plaintiffs emphasize that the harm on which the requested surcharge is based is the defective *process* used in making coverage determinations, which is a cognizable injury under ERISA and is the same for all class members. *Id.* at 20 n. 27 (citing *Cigna Corp. v. Amara*, 563 U.S. 421 (2011)). Moreover, they assert, the amount of the surcharge is capable of being measured on a class-wide basis under *Comcast* because the surcharge can be calculated simply by multiplying the amount UBH is paid to administer class members' claims by the number of individuals in the class. *Id.* n. 28. Plaintiffs also point to evidence that UBH is paid on a per-member basis for administering claims. *Id.* n. 28 (citing Reynolds Reply Decl., Ex. X at UBHWIT0254826-37 (reflecting per member/ per month rates for UBH's services to United Healthcare Insurance Company)).

### b. Discussion

As discussed above, Rule 23(b)(3) allows a class action to be maintained where "questions of law or fact common to class members predominate over any questions affecting only individual members" and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The Court finds that the predominance requirement is satisfied for the same reasons the commonality requirement is met, namely, that the case stands or falls based on the question of whether the use of UBH's Guidelines to adjudicate the class members' claims constituted a breach of fiduciary duty or was arbitrary and capricious. Nor is the Court persuaded

by UBH's argument that the surcharge sought by Plaintiffs raises individualized issues that preclude certification under Rule 23(b)(3). UBH relies almost exclusively on Plaintiffs' theory that the surcharge should account for their out-of-pocket costs of treatment, but Plaintiffs have now dropped that theory. Moreover, to the extent Plaintiffs seek a surcharge that reflects the amount of money paid to UBH to administer the Class members' claims, Plaintiffs have offered evidence showing that that amount can be determined without the need to conduct a class-member-by-class-member inquiry.

The Court also finds that a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The factors considered in making this determination include "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A) – (D). In addition, the Ninth Circuit has explained that "[w]here recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class certification." *Wolin v. Jaguar Land Rover N. Am.*, LLC, 617 F.3d 1168, 1175 (9th Cir. 2010) (citation omitted). An overriding concern of the "superiority" inquiry is judicial economy which, in turn, is related to the question of commonality. *Id.*

Here, it is in the interest of judicial economy to adjudicate the class members' challenge to the Guidelines, which is the main issue as to all of the putative class members, in a single forum on a classwide basis. While the amounts spent on treatment by putative class members are not insignificant, they pale in comparison to the expense of bringing a legal challenge to UBH's Guidelines in an individual legal action. In any event, to the extent that the *Wit* and *Alexander* actions do not require the Court to adjudicate the individualized issues relating to the class members' coverage but leave those questions to be addressed in the course of the reprocessing of claims and any subsequent appeals, the remedy requested in this case will not directly impact the class members' ability to recover those amounts. For the same reason, the interests of individual

United States District Court
Northern District of California

54

class members in controlling the litigation does not outweigh the advantages of a class action in these related cases.

In sum, the Court concludes that Plaintiffs have met the requirements for class certification under Rule 23(b)(3).

### 4.  Rule 23(c)(4)

Plaintiffs ask the Court to consider certifying "issues" classes under Rule 23(c)(4) if it finds that the proposed classes may not be certified under Rule 23(b).  Because the Court concludes that Plaintiffs have met the requirements for class certification under Rule 23(b) it does not need to reach this issue.

## IV.    CONCLUSION

For the reasons stated above, the Motion is GRANTED.

**IT IS SO ORDERED.**

Dated:  September 19, 2016

_____
JOSEPH C. SPERO
Chief Magistrate Judge

United States District Court
Northern District of California