1    PSYCH-APPEAL, INC.
     Meiram Bendat (Cal. Bar No. 198884)
2    8560 West Sunset Boulevard, Suite 500
     West Hollywood, CA 90069
3    Tel: (310) 598-3690, x.101
     Fax: (888) 975-1957
4    mbendat@psych-appeal.com
5
     ZUCKERMAN SPAEDER LLP
6    D. Brian Hufford (admitted *pro hac vice*)
     Jason S. Cowart (admitted *pro hac vice*)
7    399 Park Avenue, 14th Floor
     New York, NY 10022
8    Tel: (212) 704-9600
     Fax: (212) 704-4256
9    dbhufford@zuckerman.com
     jcowart@zuckerman.com
10

11   Attorneys for Plaintiffs

12
                    UNITED STATES DISTRICT COURT
13                 NORTHERN DISTRICT OF CALIFORNIA
                      SAN FRANCISCO DIVISION
14

15   DAVID AND NATASHA WIT, *et al.*,          Case No. 3:14-CV-02346-JCS
                                               Action Filed: May 21, 2014
16               Plaintiffs,

17         v.                                  **PLAINTIFFS' MEMORANDUM OF
                                               POINTS AND AUTHORITIES IN
18   UNITED BEHAVIORAL HEALTH                  OPPOSITION TO DEFENDANT UNITED
     (operating as OPTUMHEALTH                 BEHAVIORAL HEALTH'S MOTION FOR
19   BEHAVIORAL SOLUTIONS),                    SUMMARY JUDGMENT**

20               Defendant.

21   GARY ALEXANDER, *et al.*,                 Case No. 3:14-CV-05337-JCS
                                               Action Filed: December 4, 2014
22               Plaintiffs,

23         v.

24   UNITED BEHAVIORAL HEALTH                  Date:        July 28, 2017
     (operating as OPTUMHEALTH                 Time:        9:30 A.M.
25   BEHAVIORAL SOLUTIONS),                    Judge:       Hon. Joseph C. Spero
                                               Courtroom:   G
26               Defendant.
                                               **REDACTED VERSION OF DOCUMENT
27                                             SOUGHT TO BE SEALED**

28

## <u>TABLE OF CONTENTS</u>

**Page**

I.      INTRODUCTION ..................................................................................................1

II.     FACTS ..................................................................................................................1

        A.      UBH Is An ERISA Fiduciary. ..................................................................1

        B.      The Named Plaintiffs' Plans Required UBH to Determine Whether
                the Requested Services Were Consistent With Generally Accepted
                Standards of Care. ....................................................................................3

        C.      The Level of Care Criteria in UBH's Guidelines Fell Below the
                Plan-Mandated Generally Accepted Standard of Care. ............................4

        D.      The Fundamental Flaws in UBH's Guidelines Infected its Denial
                of Each Named Plaintiff's Request for Coverage. ...................................6

        E.      UBH Ignored State Laws Mandating Use of Specific Criteria for
                SUD Claims. ............................................................................................9

III.    LEGAL STANDARD............................................................................................9

IV.     ARGUMENT.......................................................................................................10

        A.      The Court Has Already Repeatedly Rejected UBH's Core
                Arguments.............................................................................................10

        B.      The Instant Motion Is A Decertification Motion In Disguise And
                Should Be Denied As Such......................................................................11

        C.      UBH Caused Injury To Plaintiffs, Which They Have Standing To
                Remedy, By Denying Benefits Under The Guidelines.............................12

                1.      UBH's "Causation" Argument Ignores the Elements of
                        Plaintiffs' Claims. ......................................................................12

                2.      Plaintiffs Suffered An Injury In Fact. ...........................................16

        D.      The "Guideline Exception" Does Not Immunize the Guidelines
                from Review...........................................................................................19

        E.      Whether UBH Followed Texas Regulations Is A Disputed
                Question Of Fact. ...................................................................................23

        F.      Plaintiffs' Entitlement To A Surcharge Is Replete With Fact
                Questions For Trial. ...............................................................................24

V.      CONCLUSION...................................................................................................25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Abatie v. Alta Health Life Ins. Co.,*

5

    458 F.3d 955 (9th Cir. 2006) ....................................................................... 16, 20

6

*Biba v. Wells Fargo & Co.,*

    2010 WL 4942559 (N.D. Cal. Nov. 10, 2010) ........................................................ 16

7

*Carrier v. Aetna Life Ins. Co.,*

8

    116 F. Supp. 3d 1067 (C.D. Cal. 2015) ................................................................. 16

9

*Cent. Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, LLC,*

10

    433 F.3d 181 (2d Cir. 2005) ................................................................................. 17

11

*Cigna Corp. v. Amara,*

    563 U.S. 421 (2011) ....................................................................................... 19, 24

12

*FEC v. Akins,*

13

    524 U.S. 11 (1998) ............................................................................................... 19

14

*Graddy v. Blue Cross BlueShield of Tenn., Inc.,*

15

    2010 WL 670081 (E.D. Tenn. Feb. 18, 2010) .................................................. 14, 15

16

*Great-West Life & Annuity Ins. Co. v. Knudson,*

    534 U.S. 204 (2002) ............................................................................................ 24

17

*Hein v. F.D.I.C.,*

18

    88 F.3d 210 (3d Cir. 1996) ................................................................................... 14

19

*IT Corp. v. Gen. Am. Life Ins. Co.,*

20

    107 F.3d 1415 (9th Cir. 1997) ............................................................................. 22

21

*Lorenz v. Safeway, Inc.,*

    2017 WL 952883 (N.D. Cal. Mar. 13, 2017) ....................................................... 17

22

*Metro. Life Ins. Co. v. Glenn,*

23

    554 U.S. 105 (2008) ............................................................................................ 16

24

*Ne. Fl. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville,*

25

    508 U.S. 656 (1993) ....................................................................................... 17, 18

26

*Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.,*

    210 F.3d 1099 (9th Cir. 2000) ............................................................................ 9, 16

27

*Nolan v. Heald Coll.,*

28

    551 F.3d 1148 (9th Cir. 2009) ............................................................................. 10

*O'Connor v. Boeing N. American, Inc.*,
   197 F.R.D. 404 (C.D. Cal. 2000) ........................................................... 3

*Payne v. POMCO Grp.*,
   2011 WL 4576545 (S.D.N.Y. Sept. 30, 2011) ........................................ 16

*Reza v. Pearce*,
   806 F.3d 497 (9th Cir. 2015) .................................................................. 9

*Romberio v. Unumprovident Corp.*,
   385 F. App'x 423 (6th Cir. 2009) .......................................................... 14

*Saffle v. Sierra Pacific Power Co. Bargaining Unit Long Term Disability Income Plan*,
   85 F.3d 455 (9th Cir. 1996) ........................................................... 12, 15

*Sedlack v. Braswell Servs. Grp., Inc.*,
   134 F. 3d 219 (4th Cir. 1998) ................................................................ 14

*Shaver v. Operating Eng'rs Local 428 Pension Trust Fund*,
   332 F.3d 1198 (9th Cir. 2003) ............................................................... 13

*Slack v. Int'l Union of Operating Eng'rs*,
   2014 WL 4090383 (N.D. Cal. Aug. 19, 2014) ....................................... 17

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016) ............................................................. 17, 18, 19

*Tourgeman v. Collins Fin. Servs., Inc.*,
   755 F.3d 1109 (9th Cir. 2014) ............................................................... 17

*United States v. Alexander*,
   106 F.3d 874 (9th Cir. 1997) ................................................................ 11

*Wit v. United Behavioral Health*,
   317 F.R.D. 106 (N.D. Cal. 2016) .......................................................... 12

*Zetwick v. Cty. of Yolo*,
   850 F.3d 436 (9th Cir. 2017) .................................................................. 9

**Statutes**

2011 ILL. LEGIS. SERV. 97-437 ...................................................................... 9

2013 CONN. LEGIS. SERV. 13-3 ...................................................................... 9

2015 R.I. PUB. LAWS 15-236 (15-H 5837A) ................................................. 9

215 ILL. COMP. STAT. 5/370c (2017) ............................................................ 9

27 R.I. GEN. LAWS § 27-38.2-1 ..................................................................... 9

28 TEX. ADMIN. CODE § 3.8011 ......................................................................... 9, 23

29 U.S.C. § 1002(21)(A) ...................................................................................... 2

29 U.S.C. § 1104(a)(1)(A) ................................................................................. 13

29 U.S.C. § 1104(a)(1)(B) ................................................................................. 13

29 U.S.C. § 1104(a)(1)(D) .......................................................................... 13, 23

29 U.S.C. § 1132(a)(1)(B) .......................................................................... 13, 15

29 U.S.C. § 1132(a)(3) ............................................................................... 15, 24

29 U.S.C. § 1132(a)(3)(A) ................................................................................. 13

29 U.S.C. § 1132(a)(3)(B) ................................................................................. 13

29 U.S.C. § 1185a ...................................................................................... 2, 23

CONN. GEN. STAT. § 38a-591c (2017) ................................................................ 9

**Other Authorities**

Deborah DeMott, *Causation in the Fiduciary Realm*, 91 Boston U. L. Rev. 851 (2011) ............ 24

Restatement (Third) of Restitution and Unjust Enrichment § 49 (2011) ...................................... 24

Restatement (Third) of Restitution and Unjust Enrichment § 51 (2011) ...................................... 24

Restatement (Third) of Trusts § 71 (2007) ................................................................. 18

Restatement (Third) of Trusts § 94 (2007) ................................................................. 18

**Rules**

Fed. R. Civ. P. 56(a) ................................................................................... 9

## I.      INTRODUCTION

There is substantial record evidence that UBH's Level of Care and Coverage Determination Guidelines are far more restrictive than generally accepted standards of care and that UBH cited these defective Guidelines as the basis for denying Plaintiffs' benefits. UBH does not and could not seek summary judgment on either of those issues. *See, e.g.*, Def.'s Mot. for Summ. J. ("Mot.") 13:11-14 (conceding that there are genuine disputes of fact as to whether the Guidelines fall below generally accepted standards).

Instead, UBH recycles the same argument this Court has already rejected at least three times: that, to establish a breach of fiduciary duty or wrongful denial of benefits, Plaintiffs must show not only that the Guidelines are overly restrictive, but also that "the alleged breach caused [Plaintiffs] to lose benefits [they were] otherwise entitled to receive." Mot. 11:8-9. UBH argued previously that class certification should be denied because individual determinations would be needed with respect to this non-existent element of Plaintiffs' claims. Now, UBH argues, again based on this non-existent element, that Plaintiffs cannot establish "causation" or "standing" without making such a showing. But relabeling its losing position on class certification does not change the substance of the argument, which is just as wrong now as it was before.

It is not the law that a plaintiff, asserting a claim under ERISA for the use of invalid criteria in an adverse benefit determination, must show that he or she would have been entitled to benefits if valid criteria were used. Courts have frequently held that when the coverage determination resulted from an invalid process or standard, the appropriate remedy under ERISA, and the remedy Plaintiffs seek here, is remand to the claims administrator for *it* to redo the benefit determination using a correct standard. UBH's other arguments are either wrong as a matter of law, depend on genuinely disputed facts, or both.

## II.     FACTS

### A.      UBH Is An ERISA Fiduciary.

Throughout the Class Period, UBH administered insurance benefits for mental health and substance use disorder services ("behavioral health" services) for commercial welfare benefit

Plans.[1] *See, e.g.*, Stipulations of Fact, *Wit* ECF No. 257 at 3:5-8. As claims administrator, UBH interpreted the terms of the Plans and decided whether to approve Requests for Coverage. *Id.* at 3:9-10; 3:14-16; Mot. at 2:14-15. As such, UBH was fiduciary under the Employee Retirement and Income Security Act ("ERISA").  *See* 29 U.S.C. § 1002(21)(A). The Plan terms UBH interpreted included terms that conditioned coverage on the services being consistent with generally accepted standards of care. *See* § II.B, *infra*. To standardize its employees' interpretations of those terms, UBH developed a set of clinical coverage criteria, including its Level of Care Guidelines ("LOCGs") and Coverage Determination Guidelines ("CDGs"), which purported to summarize generally accepted standards of care. *See, e.g.*, Ex. 4 (2014 LOCG) at 1.[2]

██████████████████████████████████████████████████

██████████████  Ex. 78 (Niewenhous Tr. at 22:23-24:9; 40:5-41:22); *see also* Stipulations of Fact, *Wit* ECF No. 257 at 3-4 & Ex. A (*Wit* ECF No. 257-1).[3] Each version contains an Introduction; a set of Common Criteria for coverage at all levels of care; and additional criteria applicable to particular levels of care. Exs. 1-8; *see also* Mot. at 2:21-24.

UBH created its CDGs in implementing the Mental Health Parity and Addiction Equity Act (the "Parity Act"), 29 U.S.C. § 1185a. *See, e.g.,* UBH Ex. 3 at 78: 2-16.[4] All of the CDGs at issue in this case incorporated the LOCGs.[5] *See, e.g.,* UBH Ex. 3 at 78:22-25 (UBH's expert

---

[1] The parties entered into Stipulations of Fact, which included definitions of certain terms, including "Plan," "Request for Coverage," and "Member." *See Wit* ECF No. 257; *Alexander* ECF No. 214. As used in this Memorandum, those terms have the same meaning as in the Stipulations of Fact. Plaintiffs will cite to the Stipulations of Fact using the *Wit* ECF number.

[2] Citations to "Ex. __" in this Memorandum refer to the Exhibits to the Declaration of Caroline E. Reynolds ( "Reynolds Declaration") filed herewith. Citations to "UBH Ex. __" refer to the Exhibits to the Declaration of Jennifer S. Romano filed with UBH's Motion. *See* ECF No. 248-1.

[3] As UBH's expert testified, there are no material differences among the Level of Care Guidelines from year-to-year. Ex. 80 (Simpatico Tr. at 194:14-20). Likewise, UBH's "percipient expert," Dr. Theodore Allchin, testified that the LOCGs have been substantially the same throughout the Class Period. Ex. 70 (Apr. 26, 2017 Allchin Tr. at 70:11-17).

[4] Because UBH's affiliate, United Healthcare Insurance Company, used documents called "Coverage Determination Guidelines" to administer *medical* benefits for certain Plans, UBH determined that the Parity Act required it to use a parallel type of guideline to administer *behavioral health* benefits for those Plans. UBH Ex. 3 at 78:2-16.

[5] The parties have stipulated to the list of guidelines at issue in this case. ECF No. 257 at Ex. A.

1  agreeing that the CDGs "incorporate the Level of Care Guidelines"); *see also* ECF No. 257 at

2  7:23-9:18 & Ex. A; Ex. 72 (Brennecke Tr. at 180:14-22) (██████████████████████████

3  ███████████████████████████████████); Ex. 79 (Regan Tr. at 109:15-

4  19) (██████████████████████████). Thus, whenever UBH

5  applied its LOCGs or CDGs, the services had to meet the LOCGs' level-of-care criteria for

6  coverage to be approved. UBH's witnesses consistently testified that ██████████████

7  ██████████████████████████████████████████████████████████.

8  *See* Ex. 72 (Brennecke Tr. at 189:18-190:2); Ex. 69 (Jan. 18, 2016 Allchin Tr. at 53:18-25); Ex.

9  77 (Moldauer Tr. at 89:17-90:11); Ex. 82 (Zhu Tr. at 62:19-22, 78:3-6).

10  **B.  The Named Plaintiffs' Plans Required UBH to Determine Whether the Requested Services Were Consistent With Generally Accepted Standards of Care.**

11  As this Court previously found, each of the Named Plaintiffs' Plans required UBH to

12  decide, as one condition of coverage, whether the requested services were consistent with

13  generally accepted standards of care. Order Granting Mot. For Class Certification, *Wit* ECF No.

14  174 at 4, 33, 47.[6] Specifically:

15  • The Wit, Tillitt, ████ Alexander, ██████ and ████ Plans all defined "Covered

16  Health Services" as, among other things, services that are consistent with "prevailing medical standards and clinical guidelines," which the Plans further defined to mean

17  "nationally recognized professional standards of care . . . ." *See* Ex. 18 (Wit Plan) at 15-16; Ex. 22 (Tillitt Plan) at 10-11; Ex. 24 (Alexander Plan) at 11-12; ████████████

18  █████████████████████████████████████████████████

19

20  ────────────────

[6] UBH's reference to three absent Class Members' plans, Mot. at 3-4 (citing UBH Exs. 20, 21,

21  22), ignores this Court's ruling that the Named Plaintiffs' claims were typical of the Class Members and granting Plaintiffs' motion to certify the class and appoint Named Plaintiffs as

22  Class Representatives. *Wit* ECF No. 174 at 34-35, 55. The merits inquiry focuses exclusively on the Named Plaintiffs' cases. *See, e.g., O'Connor v. Boeing N. American, Inc.*, 197 F.R.D. 404,

23  412 (C.D. Cal. 2000) (explaining that "[t]he premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class."). UBH also

24  reprises its argument from class certification that there are a few purported variations in certain Plan language, Mot. at 3-4, but this Court has already rejected the argument in granting

25  certification: "[a]lthough UBH pointed out . . . that some plans use somewhat different phrasing in describing [the generally-accepted standards] requirement, it was not able to offer any

26  evidence that these differences were material." *Wit* ECF No. 174 at 4-5. The same is true here.

27  [7] The Court found there was no meaningful distinction between phrases like "generally accepted standards of care" and "nationally recognized professional standards of care," *Wit* ECF No. 174

28  at 33, and UBH has never attempted to prove a basis for drawing any distinction.

- ███████████████████████████████████████████
███████████████████████████████████████████
██████████████████████

- The Wit, Holdnak, Muir, Tillitt, ████ Alexander and ████ Plans all excluded coverage for behavioral health services that are "not consistent with generally accepted standards of medical practice . . . ." *See* Ex. 18 (Wit Plan) at 23-25; Ex. 20 (Holdnak Plan) at 11; Ex. 21 (Muir Plan) at 11-12; Ex. 22 (Tillitt Plan) at 7; ████████████████ at 20-22; Ex. 24 (Alexander Plan) at 18-20; ████████████ at 13.

UBH, however, reviewed Plaintiffs' Requests for Benefits and denied coverage based on its LOCGs and CDGs, which were more restrictive than the generally accepted standards required by the Plans. *See* § II.C, *infra*. UBH sent each Plaintiff a written notification of its adverse benefit determination. ██████████████████████████████
███████████████████████████████████████

## C. The Level of Care Criteria in UBH's Guidelines Fell Below the Plan-Mandated Generally Accepted Standard of Care.

Generally accepted standards of care require that many considerations beyond acuity be taken into account in determining the proper level of care for treatment, including chronicity, comorbidity, recovery environment, patient age and motivation, and history of interventions. *See, e.g.,* Ex. 50 (Expert Report of Dr. Mark S. Chenven) at 17-18; Ex. 51 (Expert Report of Dr. Marc Fishman) at 7-11; Ex. 52 (Expert Report of Dr. Eric M. Plakun) at 5-8. UBH's Level of Care criteria fell below these generally accepted standards in four principal and interconnected ways. *See* Ex. 50 (Chenven Report) at 17-30; Ex. 51 (Fishman Report) at 16-23; Ex. 52 (Plakun Report) at 8-20; Ex. 53 (Rebuttal Report of Dr. Mark S. Chenven) at 6-9; Ex. 54 (Rebuttal Report of Dr. Marc Fishman) at 1-5; Ex. 55 (Rebuttal Report of Dr. Eric M. Plakun) at 1-8. *See also* ECF No. 134-1 (more granular list of Guideline flaws).[8] These flaws made the Guidelines fundamentally more restrictive, and made it more likely that claims would be denied. *See, e.g.*, Ex. 52 (Plakun Report) at 20-21; Ex. 50 (Chenven Report) at 7; Ex. 51 (Fishman Report) at 23.

**First**, the Guidelines required a showing of acute crisis necessitating the level of care

---

[8] Of course, at this stage the Court need not find that UBH's Guidelines *in fact* fell below the standard required by Plaintiffs' plans. A reasonable factfinder (*i.e.* this Court) will have ample basis at trial for that conclusion.

requested, and once the crisis passed, the member was no longer eligible for continued coverage. This negated consideration of chronic conditions and symptoms and inherently drove members towards lower levels of care, or ensured they received no coverage at all.[9] Sometimes UBH framed the focus as on "presenting problems," other times on so-called "why now" factors.[10] This single-minded focus on treating patients' short-term, acute symptoms, rather than longer-term, underlying conditions, is far more restrictive than generally accepted standards of care. *See, e.g.*, Ex. 51 (Fishman Report) at 17-19.

**Second**, UBH's Level of Care criteria failed to consider co-occurring medical and behavioral conditions as an aggravating factor that could necessitate treatment in a more intensive level of care.  UBH took into account whether co-morbid conditions could be "safely managed." *See, e.g.*, Ex. 1 at 17; Ex. 7 at 9, § 1.6. But it omitted from its level of care criteria any evaluation of whether co-morbid conditions could be *effectively treated* in the requested level of care or whether co-morbid conditions complicated or aggravated the Member's situation such

---

[9] *See, e.g.,* Ex. 1 (2011 LOCG) at 4 § 5 ("The member's ***current condition*** cannot be effectively and safely treated in a lower level of care. . .") (emphasis added); *id.* at 5 § 7 ("***The*** goal of treatment is to improve the member's ***presenting symptoms***.") (emphasis added); Ex. 7 (2016 LOCG) at 9, § 1.4 ("The member's ***current condition*** cannot be safely, efficiently, and effectively assessed and/or treated in a less intensive level of care due to ***acute changes*** in the member's signs and symptoms and/or psychosocial and environmental factors (i.e., ***the "why now" factors*** leading to admission)) (emphasis added); *id.* at 9, § 1.5 ("Assessment and/or treatment of ***acute changes*** in the member's signs and symptoms and/or psychosocial and environmental factors (i.e., ***the "why now" factors*** leading to admission) require the intensity of services provided in the proposed level of care) (emphasis added); *id*. at 10, § 1.8.1 ("Improvement of the member's condition is indicated by the reduction or control of the ***acute signs and symptoms*** that necessitated treatment in a level of care") (emphasis added); *id*. at 10, §§ 2.1, 2.1.2, & .3 (permitting continued coverage only for "active" services, defined as treatment "focused on addressing ***the 'why now' factors***") (emphasis added).

[10] While equivalent to the concept of the "presenting problem" already in use by UBH, in 2014, ███████████████████████████████████████████████ As UBH's Chief Medical Officer testified, ██████████████████████████████████████████ Ex. 71 (Bonfield Tr. 205:21-206:22). Crisis intervention refers to short-term treatment focused on "a danger [that] threatens to overwhelm the individual and/or family and may result in suicide or new or exacerbated psychosis or other serious disability." Ex. 67 (Gerald F. Jacobson, M.D., *Emergency Services in Community Mental Health*, 64 Am. J. Pub. Health 124, 124 (1974)). "It does not concern itself with any aspect of the individual's mental health or illness which is not involved in the current crisis." *Id.* at 126.

that a safe and effective treatment plan required a more intensive level of care than might otherwise be appropriate. *See e.g.*, Ex. 52 (Plakun Report) at 6-8.

**Third**, UBH's Level of Care criteria precluded coverage for services to prevent deterioration or maintain a level of functioning, but rather required an expectation that services would cause a patient to continually progress toward recovery.[11] But skilled services are sometimes required to prevent a patient's condition from worsening. *See, e.g.*, Ex. 55 (Plakun Rebuttal) at 8.

**Fourth**, UBH failed to adopt any level-of-care criteria tailored to the unique needs of children and adolescents. *See generally* Exs. 1-8. Under generally accepted standards of care, "the significance of treating the youth in an emotionally and developmentally corrective and interactive social environment needs to be considered as a critical element of the overall treatment regimen and thus should be recognized as a part of treatment." Ex. 50 (Chenven Report) at 25.

**D.  The Fundamental Flaws in UBH's Guidelines Infected its Denial of Each Named Plaintiff's Request for Coverage.**

UBH's adjudication and denial of the Named Plaintiffs' requests for coverage illustrates the flaws in UBH's Guidelines, and the ways in which those flaws manifest themselves in UBH's coverage determinations. *See, e.g.*, Ex. 50 at 37-39; Ex. 51 at 29-36; Ex. 52 at 9, 12-15. Each Plaintiff was denied coverage (or continued coverage) at the requested levels of care based on the Guidelines. UBH's rationales for denial underscore the defects Plaintiffs described above:

- 

---

[11] *See, e.g.,* Ex. 1 at 4, § 6 ("There must be a reasonable expectation that essential and appropriate services will ***improve*** the member's presenting problems within a reasonable period of time.") (emphasis added); *id.* at 5, § 7 ("The goal of treatment is to ***improve*** the member's presenting symptoms. . ."); Ex. 7 (2016 LOCG) at 10, § 1.8-1.8.1 ("There is a reasonable expectation that services will ***improve*** the presenting problems within a reasonable period of time. . . . Improvement of the member's condition is indicated by the ***reduction or control of the acute signs and symptoms*** that necessitated treatment in a level of care. . . . ") (emphasis added); *id.* at 10, § 1.9 ("Treatment is not primarily for the purpose of providing social, custodial, recreational, or respite care."); *id.* at 46-47 § 2.2-2.2.3 (defining "custodial" services to include those "for the primary purpose of. . . maintaining a level of function."); Ex. 14 at 2 (same); *see also* Ex. 13 at 2.



---

[12] Although UBH seeks summary judgment based on the argument that Plaintiffs' cases lack any tie to the defects Plaintiffs have alleged, Mot. at 13:14-20, it failed to include any evidence from the Plaintiffs' administrative records (or anywhere else) disputing such a connection.

[13] UBH's Coverage Determination Guidelines incorporate the level of care criteria from the Level of Care Guidelines. *See* § II.A, *supra*. Thus, the CDGs UBH used to deny Haffner's requests for coverage incorporated the 2011 Level of Care Guidelines, *see* Ex. 9 at 3, 6, 8; Ex. 10 at 4; Ex. 11 at 2, 3, 15-16; the CDG UBH used to deny Muir's request incorporated the 2012 Level of Care Guidelines, Ex. 15 at 5, 15-21; the CDGs UBH used to deny Alexander's request and Holdnak's first request incorporated the 2013 Level of Care Guidelines, *see id.*, Ex 13 at 3-6; Ex. 15 at 5, 15-21; the CDGs UBH used to deny Driscoll's and Holdnak's second request incorporated the 2014 Level of Care Guidelines, Ex. 12 at 4-5, 15-19, Ex. 16 at 3, 5, 16-25; and the CDGs UBH used to deny Tillitt's requests incorporated the 2015 Level of Care Guidelines, Ex. 17 at 5, 17-31. ECF No. 257 at 6-8 & Ex. A.

[14] Withdrawal presents acute symptoms that are typically treated in a *higher* level of care than residential rehabilitation – *i.e.*, residential detoxification or hospitalization. Ex. 51 (Fishman Report) at 8-9; Ex. 7 (2016 LOCG) at 52-61 (level of care criteria for detoxification).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22



23
24
25
26
27
28

[15] With respect to **Lauralee Pfeifer** (Wit State Mandate Class), UBH was required by Illinois law to use specific criteria to administer her benefits, which it did not use. *See* § II.F, *infra*. Her case, however, also demonstrates that the fundamental defects in UBH's Guidelines impact its determinations.

**E.  UBH Ignored State Laws Mandating Use of Specific Criteria for SUD Claims.**

Several states require insurers to apply particular criteria to determine medical necessity for substance use disorder ("SUD") treatment, including for fully-insured commercial Plans. For example, since August 18, 2011, Illinois has mandated that insurers use the criteria issued by American Society of Addiction Medicine (the "ASAM Criteria"). 215 ILL. COMP. STAT. 5/370c (2017); 2011 ILL. LEGIS. SERV. 97-437. Connecticut has required insurers to use the ASAM Criteria since October 1, 2013. CONN. GEN. STAT. § 38a-591c (2017); 2013 CONN. LEGIS. SERV. 13-3. Rhode Island has mandated the use of ASAM since July 10, 2015. 27 R.I. GEN. LAWS § 27-38.2-1; 2015 R.I. PUB. LAWS 15-236 (15-H 5837A). UBH ignored these requirements by using its own Guidelines – and not the ASAM Criteria – when administering benefits under commercial plans governed by Illinois, Connecticut and Rhode Island law. *See*, *e.g.*, Exs. 34, 56.[16]

Texas also mandates particular SUD criteria, issued by the Texas Department of Insurance (28 TEX. ADMIN. CODE § 3.8011), which UBH concedes it was required to apply throughout the Class Period. Mot. 18:7-8. Yet in practice, as explained below, UBH has regularly ignored this requirement. *See* § IV.E, *infra*; Reynolds Decl. ¶ 58 & Ex. 56.

**III.  LEGAL STANDARD**

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[W]hat is required to defeat summary judgment is simply evidence 'such that a reasonable juror drawing all inferences in favor of the respondent could return a verdict in the respondent's favor.'" *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (quoting *Reza v. Pearce*, 806 F.3d 497, 505 (9th Cir. 2015)). *See also Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000) ("A moving party without the ultimate burden of persuasion at trial . . . has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment."). These "traditional rules of summary

---

[16] UBH did not seek summary judgment with respect to Mr. Pfeifer or other State Mandate Class members whose plans were governed by the law of Connecticut, Illinois or Rhode Island.

1  judgment" apply with full force in ERISA cases where, as here, any party relies on "evidence

2  outside of the administrative record." *Nolan v. Heald Coll.*, 551 F.3d 1148, 1149 (9th Cir. 2009).

3  **IV.   ARGUMENT**

   **A.   The Court Has Already Repeatedly Rejected UBH's Core Arguments.**

4      UBH's principal argument is that, to establish that UBH breached its fiduciary duties

5  and/or wrongfully denied benefits, Plaintiffs must show not only that the Guidelines are overly

6  restrictive, but also that, if UBH had applied valid Guidelines, Plaintiffs "would have received

7  benefits." Mot. 16:22-23.[17] That argument, now cloaked in Rule 56, is a rehash of the same

8  argument UBH has already made, and this Court has already rejected, several times.

9      In opposing class certification, for example, UBH argued that Plaintiffs must prove that

10  they would have obtained benefits if UBH had not adopted and applied overly restrictive

11  guidelines. *Wit* ECF No. 149 at 3:21-23. The Court rejected the argument: "Plaintiffs are

12  asserting claims to obtain injunctive relief based on an injury that is distinct from the actual

13  denial of benefits and that is cognizable under ERISA, namely, the use of Guidelines that are

14  more restrictive than the plans under which they are insured or the standards mandated by state

15  law in adjudicating their claims." *Wit* ECF No. 174 at 49:18-21. Thus, "[t]he harm alleged by

16  Plaintiffs [is] *the promulgation and application of defective guidelines* to the putative class

17  members." *Id.* at 31:3-5 (emphasis added). As the Court further explained:

18

19      Plaintiffs do not ask the Court to make determinations as to whether class mem-
       bers were *actually* entitled to benefits (which would require the Court to consider
20      a multitude of individualized circumstances relating to the medical necessity for
       coverage and the specific terms of the member's plan). Instead, Plaintiffs seek
21      only an order that UBH develop guidelines that are consistent with generally
       accepted standards and reprocess claims for coverage that were denied under the
22      allegedly faulty guidelines.

23  *Id.* at 31:8-13.

24      UBH repeated the argument in its motion for reconsideration of class certification. *Wit*

25  ECF No. 177 at 11:1-3, 14. The Court rejected the argument, as it had done previously. *Wit* ECF

26

27  [17] UBH also suggests that Plaintiffs must prove that each *class member's* benefit determination –
    not just their own – "would have been different." Mot. 1:17. As discussed above, having certified
28  these classes, the Court need not, and should not, accept UBH's invitation to delve back into
    details of class members' claims. *See* n.6, *supra*.

No. 181 at 3:9-11. UBH then made this same argument in its Rule 23(f) petition, which the Ninth Circuit also rejected. *See* Case No. 16-80164 (9th Cir.), ECF No. 1-2 at 9-10.

UBH's argument that the Plaintiffs must show that they would have been entitled to benefits under proper standards is just as wrong now as it was before, and UBH has offered no reason this Court should reach a different result this time. Under the "law of the case" doctrine, unless certain conditions are met (*e.g.*, an intervening change in the law),[18] "a court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case." *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997). Pursuant to this doctrine, the Motion should be denied.

### B.    The Instant Motion Is A Decertification Motion In Disguise And Should be Denied As Such.

This Court, after UBH's repeated failed attempt to defeat certification, made clear that UBH should not waste the Court's and parties' time moving for decertification based on the same arguments. On February 3, 2017, this Court stated, after UBH's "hint of a potential de-certification motion," "I won't let you just file it. You have to get permission to file it," by first filing a two-page "letter brief . . . [a]nd then we can talk about it." Ex. 68.

No such request was made. Nor was permission granted. Instead, UBH filed the instant motion, which is styled as for summary judgment, but in substance is a decertification motion. UBH's "causation" and "standing" arguments boil down to the arguments it made in opposition to class certification. Its "causation" argument posits that to determine whether UBH's adoption and application of overly restrictive Guidelines "caused UBH to deny benefits to the class members," the Court will need to know, as to each class member, whether he or she "was otherwise entitled to receive" the claimed benefits. Mot. 11-12. Its standing and surcharge arguments propose that a class member only has a valid ERISA claim if he or she "would have received benefits but for UBH's alleged abuse of discretion" Mot. 14-16, 19:12. Its arguments about plan exclusions, and its failure to apply Texas-specific regulations, also are thinly

---

[18] UBH waived any argument that these conditions are present by failing to assert it in its Motion.

1    disguised decertification motions. *See* Mot. 16-17 (UBH arguing, as it did in opposing class

2    certification, that an exclusion in plaintiffs' Plans grants UBH unbridled authority to apply any

3    standards it chooses in adjudicating claims); *id.* 18 (arguing that the Court should carve out from

4    the State Mandate Class members whose plans were governed by Texas law).

5        Because the Court has repeatedly considered and rejected these arguments and ordered

6    UBH not to make them again without leave of Court, it should deny the Motion on this ground

7    alone.

8    **C.  UBH Caused Injury To Plaintiffs, Which They Have Standing To Remedy, By**
     **Denying Benefits Under The Guidelines.**

9
10       UBH seeks to add an element to Plaintiffs' claims that, as this Court has repeatedly held,

     does not exist under ERISA, *i.e.*, that, in addition to Plaintiffs' proving that UBH's "applied a

11   wrong standard," *Saffle v. Sierra Pacific Power Co. Bargaining Unit Long Term Disability*

12   *Income Plan*, 85 F.3d 455, 461 (9th Cir. 1996), Plaintiffs also have to show that if UBH had

13   applied the *correct* standard, they would have been entitled to benefits. That is not the law, as

14   another Judge of this Court held just this week. *See* Order Granting Mot. for Class Cert., *Des*

15   *Roches v. Cal. Phys.' Serv.*, Case No. 16-CV-02848-LHK, ECF No. 123, at 12-14 (N.D. Cal.

16   June 15, 2017) (Koh, J.) (citing *Wit v. United Behavioral Health*, 317 F.R.D. 106 (N.D. Cal.

17   2016); *see also id.* at 31-35 (discussing the reprocessing remedy). Nor is such a showing required

18   to establish Article III standing. And even if it were, there is ample evidence from which the

19   Court could conclude that Plaintiffs have demonstrated ERISA and Article III injury and

20   causation, regardless of how those requirements are defined.

21       1.   UBH's "Causation" Argument Ignores the Elements of Plaintiffs' Claims.

22       The Court is well versed in Plaintiffs' claims. "Claim One" alleges that UBH breached its

23   fiduciary duties by developing and using Guidelines for making coverage decisions that were

24   and are much more restrictive than generally accepted standards.[19] "Claim Two" alleges that

25

26   ───────────────
     [19] *Wit* ECF No. 39 (First Am. Class Action Compl., Sept. 2, 2014) (hereafter "*Wit* Compl.") at

27   ¶¶ 198, 210; *Wit* ECF No. 123 (Intervenor Compl., Feb. 12, 2016) (hereafter "*Tillitt* Compl.") at
     ¶¶ 88, 99; *Alexander* ECF No. 1 (Class Action Compl., Dec. 4, 2014) (hereafter "*Alexander*

28   Compl.") at ¶¶ 136, 146; *Alexander* ECF No. 87 (Intervenor Compl., Feb. 12, 2016) (hereafter
     "*Driscoll* Compl.") at ¶¶ 86, 96. In each case, Count I asserts the breach of fiduciary duty claim

1   UBH improperly adjudicated and denied Plaintiffs' requests for coverage, and that the denials

2   were "wrongful" because UBH used its deficient Guidelines in making those determinations.[20]

3          **Claim One: Breach of Fiduciary Duty**. Plaintiffs allege that UBH breached several

4   fiduciary duties in developing and applying its deficient Guidelines to their benefit requests: a

5   duty of <u>due care</u>, 29 U.S.C. § 1104(a)(1)(B), a duty of <u>loyalty</u>, *id.* § 1104(a)(1)(A), and a duty to

6   <u>comply with plan terms</u>, *id.* § 1104(a)(1)(D). UBH's argument that Plaintiffs cannot establish

7   "causation" on Claim One fails for three reasons (in addition to having been previously rejected).

8          <u>First</u>, UBH's argument conflicts with the plain language of ERISA, which provides that

9   "[a] civil action may be brought" by a plan participant or beneficiary not only to "recover

10  benefits due . . . under the terms of [a] plan," 29 U.S.C. §§ 1132(a)(1)(B), but also to

11  "enforce . . . rights under the terms of [a] plan," *id.*, to "clarify . . .  rights to future benefits under

12  the terms of [a] plan," *id.*, to "enjoin any act or practice which violates any provision of this

13  subchapter," *id.* § 1132(a)(3)(A), and to "obtain other appropriate equitable relief (i) to redress

14  such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan," *id.*

15  § 1132(a)(3)(B). No provision requires that a plaintiff prove that a breach of fiduciary duty

16  "caused a[] claimant to lose benefits she was otherwise entitled to receive." Mot. 11:8-9.

17         <u>Second</u>, the non-existent element UBH seeks to write into the statute makes no sense,

18  particularly given the relief Plaintiffs seek to remedy this claim – which does not include the

19  payment of benefits. "Congress intended to make fiduciaries culpable for certain ERISA

20  violations even in the absence of actual injury to a plan or participant." *Shaver v. Operating*

21  *Eng'rs Local 428 Pension Trust Fund*, 332 F.3d 1198, 1203 (9th Cir. 2003).  *See also id.*

22

23  pursuant to 29 U.S.C. § 1132(a)(1)(B); Count III asserts the claim pursuant to § 1132(a)(3)(A),

24  only to the extent that the injunctive relief the Plaintiffs seek is unavailable under
    § 1132(a)(1)(B). In denying UBH's motion to dismiss the *Wit* complaint, the Court found that

25  Plaintiffs are entitled to plead their claims in the alternative. *Wit* ECF No. 63 at 17.

26  [20] *Wit* Compl. ¶¶ 205, 214; *Tillitt* Compl. ¶¶ 94, 101-03; *Alexander* Compl. ¶¶ 141-42, 150;
    *Driscoll* Compl. ¶¶ 91-92, 100. In each case, Count II asserts the improper denial of benefits

27  claim pursuant to 29 U.S.C. § 1132(a)(1)(B), and Count IV asserts the claim pursuant to
    § 1132(a)(3)(A), only to the extent that the injunctive relief the Plaintiffs seek is unavailable

28  under § 1132(a)(1)(B). Again, the Court has already ruled that Plaintiffs are entitled to plead
    their claims in the alternative. *Wit* ECF No. 63 at 17.

(holding that although the plaintiffs, who alleged a breach of fiduciary duty, "did not allege that any loss occurred," that "is not fatal" because "[t]he question of whether a fiduciary violated his fiduciary duty is independent from the question of loss").

Third, UBH has cited no case, either in or out of circuit, supporting its causation argument. Its reliance on *Hein v. F.D.I.C.*, 88 F.3d 210 (3d Cir. 1996), and *Romberio v. Unumprovident Corp.*, 385 F. App'x 423 (6th Cir. 2009) (unpublished), is misplaced. In *Hein*, a pension benefit case, the court focused on the plaintiff's denial-of-benefits claim and rejected it because it was *undisputed* that his denial was consistent with the terms of the plan. *Id.* at 214. As for Hein's fiduciary duty claim alleging plan mismanagement, the only remedy he sought was "damages" equal to the amount of unpaid benefits. *Id.* at 214, 222-23. Thus, the reason the court found it important that there was "no causal link between the alleged breach of fiduciary duty . . . and the denial of benefits" was that the plaintiff "claim[ed] benefits to which he [was] not entitled." *Id.* at 224. In short, the case involved a different fiduciary duty claim, a different injury, and different remedies than are at issue here.

*Romberio* was a class certification decision on ascertainability, by a divided panel, and is equally off point. The plaintiffs there sued six different entities, challenging a plethora of "loosely-defined practices that were *not* applied uniformly," 385 F. App'x at 430, such as that the defendants created case-by-case "target date[s] for cutting off future disability payments" and/or provided "financial incentives to in-house physicians," *id.* at 425, where the only common element was that the plans were "profit driven," *id.* at 430. Unlike here, where *by definition* UBH has applied its Guidelines to every member of the class, in *Romberio* there was no way to know which class members had been subjected to which of the challenged "practices." *Id.* at 430-31. That is what the court was referring to by the plaintiffs' inability to show a "causal link between an alleged breach and a denial of benefits," *id.* at 429.[21]

---

[21] UBH's other cases are also clearly distinguishable. In *Sedlack v. Braswell Servs. Grp., Inc.*, 134 F. 3d 219 (4th Cir. 1998), there was no dispute that the plaintiff's disability claim was *excluded* because it was "work-related." *Id.* at 225. In *Graddy v. Blue Cross BlueShield of Tenn., Inc.*, 2010 WL 670081 (E.D. Tenn. Feb. 18, 2010), a class certification decision involving denials of coverage for autism treatment, the plaintiffs did not identify a single policy, guideline or criterion that they were challenging, but rather simply alleged that the defendant had a

**Claim Two: Wrongful Denial of Benefits**. Claim Two alleges that UBH not only developed and adopted overly restrictive Guidelines and applied them to Plaintiffs' claims, but that Plaintiffs' claims *were denied* pursuant to those Guidelines. What makes these denials "wrongful" is UBH's application of overly restrictive Guidelines, as discussed above. This Court has already held that UBH's use of the guidelines to deny coverage caused injury to Plaintiffs. *Wit* ECF No. 174 at 31:3-5.

As with Claim One, the species of "causation" UBH demands has no basis in the statute. *See* 29 U.S.C. § 1132(a)(1)(B), (a)(3). As the Ninth Circuit held in *Saffle*, when an ERISA administrator, in adjudicating a claim, has "misconstrued" a plan, "applied a wrong standard to a benefits determination," or otherwise applied "criteria" that are more restrictive than permitted by a plan, the administrator has "wrongfully" denied the claim – and the court must "remand[]" to the administrator to "reevaluat[e]" the merits of [the plaintiff's] claim." 85 F.3d at 460-61. Insofar as ERISA requires causation, it is satisfied by showing that the administrator adopted "a wrong standard," the administrator "applied" it to the member's claim, and the claim was denied. UBH's proffered rule – that Plaintiffs must also show they would have been entitled to benefits – is not only inconsistent with this law, but also with the default remedy in wrongful denial cases – remand to the administrator for reprocessing.

UBH attempts to distinguish *Saffle* on the ground that Plaintiffs have not shown that UBH's flawed Guidelines "impacted" the denials. Mot. 13:28. *See also id.* at 13:15-16 (suggesting that there is no evidence that the "alleged flaws in the guidelines . . . had a material impact on UBH's decisions to deny coverage").[22] But there is ample evidence that the flaws in

---

"practice" of denying treatment for autism more often than it should have because there was a "growing number of children diagnosed with autism . . in America." *Id.* at *8. The court's statement that there was no "causal link between the breach and the harm" was its way of explaining that there were no "questions of law or fact common to the class." *Id.* at *9. *See also* ECF No. 174 at 27, 32 (the Court explaining why *Graddy* is inapposite).

[22] UBH goes so far as to say that "Plaintiffs have represented" that they will not show any such impact. Mot. 13:3 (citing Plaintiffs' section of a case management statement, *Wit* ECF No. 194 at [12]:2-7). UBH misstates Plaintiffs' position. There, Plaintiffs reiterated the Court's ruling regarding the elements of Plaintiffs' denial of benefit claim: "(1) that Plaintiffs' Plans required UBH to use generally accepted standards or the standards mandated by state law to administer benefit claims; (2) that UBH'[s] Guidelines were not consistent with generally accepted

the Guidelines were fundamental, and that those flaws infected UBH's denial of Plaintiffs'

requests for coverage. *See* §§ II.C-D, *supra*, and evidence cited therein. And UBH offers no

evidence that the Guidelines had no impact, and has not even attempted to show the absence of a

genuine dispute of material fact on this question, as is its burden under Rule 56. *Nissan Fire,* 210

F.3d at 1102.

Finally, UBH offers no case holding, or suggesting, that a denial of benefits, based on a

standard that is inconsistent with the plan, is "wrongful" only if the plaintiff would have been

owed benefits under the correct test. After all, if that were the rule, not only would remand for

reprocessing not be the default rule, but it also would *never* be a proper remedy. UBH's cases do

not prove otherwise. In *Payne v. POMCO Grp.*, 2011 WL 4576545 (S.D.N.Y. Sept. 30, 2011),

the court held that the plaintiff "could not plausibly claim that he had been improperly denied

benefits" because it was *undisputed* that he had not accrued the necessary "pension credits"

specified in the plan. *Id.* at *3. *Abatie v. Alta Health Life Ins. Co.*, 458 F.3d 955 (9th Cir. 2006)

(en banc), did not address causation, or what it meant for a denial to be wrongful, but rather the

proper standard of review when a fiduciary has a conflict of interest or violates procedural

requirements.[23] In *Carrier v. Aetna Life Ins. Co.*, 116 F. Supp. 3d 1067 (C.D. Cal. 2015), and

*Biba v. Wells Fargo & Co.*, 2010 WL 4942559 (N.D. Cal. Nov. 10, 2010), unlike here, the

plaintiffs requested that the district court order payment of their benefits, not remand.

### 2.   Plaintiffs Suffered An Injury In Fact.

UBH next argues that Plaintiffs lack standing because they cannot show that they "would

have received benefits but for UBH creating and applying its guidelines." Mot. 16:22-23. Article

III requires that a plaintiff "(1) suffered an injury in fact, (2) that is fairly traceable to the

---

standards or the standards mandated by state law; and (3) that UBH used its faulty Guidelines to
deny coverage to Plaintiffs." *Wit* ECF No. 194 at 12:2-7.

[23] Judge Kleinfield, in his concurrence (cited by UBH), took issue with the majority's approach.
He observed that "[t]he focus" in ERISA cases "should be on whether the claimant is entitled to
the claimed benefits." 458 F.3d at 977. But that was his way of explaining his disagreement with
the majority's approach to the standard of review – nothing remotely close to the point for which
UBH cites it. *See id.* ("Courts have fallen into the unfortunate habit in ERISA cases of focusing
entirely on the standard of review."). In any event, the Supreme Court rejected his view two
years later, in *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008).

1    challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial

2    decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016). UBH does not dispute that Plaintiffs'

3    alleged injuries are "likely to be redressed by a favorable judicial decision." And its

4    "traceability" argument (Mot. 16:17-23) simply incorporates by reference its "causation"

5    argument, refuted above. Thus, its argument boils down to the suggestion that Plaintiffs only

6    have Article III injury if they were entitled to benefits. Mot. 14:27-15:2. UBH is wrong.

7        **Claim One**. The injury Plaintiffs seek to remedy through Claim One – UBH's

8    development, adoption and application of its restrictive Guidelines in violation of its statutorily-

9    imposed fiduciary duties – is cognizable under Article III. *See Slack v. Int'l Union of Operating*

10   *Eng'rs*, 2014 WL 4090383, at *12 (N.D. Cal. Aug. 19, 2014) ("[A] plan participant may have

11   Article III standing to obtain injunctive relief related to ERISA's disclosure and fiduciary duty

12   requirements without a showing of individual harm to the participant.") (quoting *Cent. Se. & Sw.*

13   *Areas Health & Welfare Fund v. Merck–Medco Managed Care, LLC*, 433 F.3d 181, 199 (2d Cir.

14   2005)); *Tourgeman v. Collins Fin. Servs., Inc.*, 755 F.3d 1109, 1116 (9th Cir. 2014) (although

15   the plaintiff did not suffer "pecuniary loss or mental distress" from defendant's violation of the

16   Fair Debt Collection Practices Act, "the injury he claims to have suffered was the violation of his

17   right not to be the target of misleading debt collection communications," which "constitutes a

18   cognizable injury under Article III").[24]

19        UBH's argument also is irreconcilable with *Northeastern Florida Chapter of Associated*

20   *General Contractors of America v. City of Jacksonville*, 508 U.S. 656 (1993). An association of

21   contractors challenged a city ordinance that gave preferential treatment to minority-owned

22   businesses. The city argued that the association lacked standing because it could not show that

23   "one of its members would have received a contract absent the ordinance." *Id.* at 658. The

24   plaintiff there had a right not to be subjected to "a barrier that makes it more difficult for

25   members of one group to obtain a benefit than it is for members of another group." *Id.* at 666. In

26

27   ─────────────────────────

28   [24] UBH's citation to *Lorenz v. Safeway, Inc.*, 2017 WL 952883 (N.D. Cal. Mar. 13, 2017), gets it nowhere not only because the plaintiff asserted a different type of injury (diminished value of a share of a retirement fund) but because the Court held the plaintiff *did* have standing. *Id.* at *5.

1  such cases, the "'injury in fact' . . . is the denial of equal treatment resulting from the imposition

2  of the barrier, *not the ultimate inability to obtain the benefit*." *Id.* (emphasis added).

3        Finally, *Spokeo* is not to the contrary. If anything, it proves the fallacy of UBH's position.

4  In *Spokeo*, the Court explained that, in considering whether a plaintiff has asserted a concrete

5  (and therefore cognizable) "intangible injury," "the judgment of Congress" plays an "important

6  role." 136 S. Ct. at 1549. If any statute reveals a Congressional judgment to protect "intangible

7  injuries," it is ERISA. *See Wit* ECF No. 63 (order denying motion to dismiss) at 13:8-11 ("the

8  basic purpose of ERISA is to protect the interest of participants and beneficiaries by establishing

9  standards of conduct, responsibility, and obligation for fiduciaries and providing for appropriate

10 remedies and ready access to the Federal courts") (citations and alterations omitted).

11       *Spokeo* explained that "it is instructive to consider whether [the] alleged intangible harm

12 has a close relationship to a harm that has traditionally been regarded as providing a basis for a

13 lawsuit in English or American courts." *Spokeo*, 136 S. Ct. at 1549. ERISA is grounded in trust

14 law, and it has long been settled that a trust beneficiary may sue in equity to enforce the terms of

15 a trust, without showing that the trustee's departure from the trust's terms diminished the value

16 of the beneficiary's interest. *See* Restatement (Third) of Trusts § 71 cmt. a (2007) ("[A]s a

17 protection against harm that *might* be caused by a breach of trust resulting from a mistake

18 concerning the trustee's powers and duties, a beneficiary may petition to the court to instruct the

19 trustee with regard to the powers and duties of the trusteeship.") (emphasis added); *id.* § 94 cmt b

20 ("A suit to enforce a private trust ordinarily . . . may be maintained by any beneficiary whose

21 rights are *or may be* adversely affected by the matter(s) at issue.") (emphasis added).[25]

22

23

24 [25] To be sure, in *Spokeo* the Court explained that a plaintiff "cannot satisfy the demands of
Article III by alleging a bare procedural violation." *Id.* at 1550. But UBH cannot seriously
25 contend that its creation and use of substantively defective and illegal criteria to deny Plaintiffs'
benefit requests was a "bare procedural violation." In any event, even if a plaintiff only has a
26 "procedural" right, the *Spokeo* majority emphasized that "the violation of a procedural right
granted by statute can be sufficient in some circumstances to constitute injury in fact." 136 S. Ct.
27 at 1549. A plaintiff can show "injury in fact" where "there is a statute" that "seek[s] to protect
individuals . . . from the kind of harm they say they have suffered." *FEC v. Akins*, 524 U.S. 11,
28 22 (1998). "[A] plaintiff in such a case need not allege any *additional* harm beyond the one
Congress has identified." *Spokeo*, 136 S. Ct. at 1549 (emphasis in original). *See also id.* at 1553

Moreover, *Spokeo* followed on the heels of *Cigna Corp. v. Amara*, 563 U.S. 421 (2011), which made clear that, in the ERISA context, insofar as a "specific remedy" requires showing "harm," "[t]hat actual harm may . . . come from the loss of a right protected by ERISA or its trust-law antecedents." *Id.* at 444.

**Claim Two**. The injury Plaintiffs seek to remedy through Claim Two – denials based on the Guidelines – also clearly satisfies Article III's requirements.  Plaintiffs' claims were, in fact, denied. UBH's argument, therefore, that Plaintiffs' "actual injury" under Claim Two will not be "established" until "after reprocessing is complete," Mot. 15:2, has no basis in fact or law. It is true that, once the Court orders UBH to adopt valid Guidelines and to reprocess Plaintiffs' and class members' claims, UBH *might* "reach the same result" as to some of those claims, albeit "for a different reason," but that does not negate Article III standing. *Akins*, 524 U.S. at 25 ("If a reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's action and remand the case – even though the agency (like a new jury after a mistrial) might later, in the exercise of its lawful discretion, reach the same result for a different reason.").

**D.   The "Guideline Exception" Does Not Immunize the Guidelines from Review.**

As discussed above, and as this Court previously found, all of the Plaintiffs' Plans required UBH to determine whether the requested services were consistent with generally accepted standards of care. *See* § II.B, *supra*. Yet in its Motion, UBH makes the startling argument that if a Plan excludes coverage for treatment that is "[n]ot consistent with [UBH's] level of care guidelines or best practices as modified from time to time," then UBH's Guidelines – *regardless of what they say or don't say* – were "specifically permitted" by that Plan and are thus immune from challenge, even if they fall far short of the standard of care otherwise required by the Plan. Mot. 17:6. UBH's reliance on this "Guideline Exception" argument fails for numerous reasons.

First, UBH's argument is a rehash of one the Court rejected in granting class certification, when it found that Plaintiffs had "demonstrated, as a factual matter, that the insurance plans for

---

(Thomas, J., concurring) ("A plaintiff seeking to vindicate a statutorily created private right need not allege actual harm beyond the invasion of that private right.").

the putative class members. . . require as a condition of coverage adherence to generally accepted standards and/or state law." *Wit* ECF No. 174 at 33:13-16; *id.* at 33:21-24 ("UBH has pointed to nothing in any plan that would suggest that the 'guideline exception' would permit insurance plans to adopt rules that are inconsistent with those standards.").

Second, even if the Court reconsiders the merits of the issue, there is (at least) a genuine dispute as to the effect of the exclusion.[26] By relying so heavily on one phrase taken out of context, UBH overlooks other language in most of the same Plans that makes clear that UBH's Guidelines *are* supposed to be consistent with generally accepted standards. In the definition of "Covered Health Services," the Wit, Tillitt, ███ Alexander, and ███ Plans all inform their Members that UBH "maintain[s] clinical protocols that ***describe*** the . . . prevailing medical standards and clinical guidelines supporting our determinations regarding specific services." Ex. 18 at 16 (emphasis added); *see also* Ex. 22 at 11; ███ at 12; Ex. 24 at 12; ███ at 16. The Plans define the phrase "[p]revailing medical standards and clinical guidelines" to mean:

> ***nationally recognized professional standards of care*** including, but not limited to, national consensus statements, nationally recognized clinical guidelines, and national specialty society guidelines.

Ex. 18 at 16 (emphasis added); *see also* Ex. 22 at 11; Ex. 23 at 12; Ex. 24 at 12; Ex. 25 at 16. The Plans then state that services are excluded if they are inconsistent with two types of those clinical protocols: level of care and best practice guidelines. Reading the Guideline Exclusion consistently with the definition of Covered Services, then, the Court could reasonably conclude that the exclusion did not authorize UBH to adopt any guidelines it wants. Rather, the exclusion

---

[26] Even if judicial deference to UBH's interpretation of Plan terms is required at all, (UBH's brief is entirely silent on that point), UBH's interpretation of the exclusion will at least be viewed with "skepticism," or even with no deference, because UBH labored under a conflict of interest. *See Abatie*, 458 F.3d at 959. Not only ███████████████████████████████████████████ ███████████████████████████████████████████ ██████████████████████ *See*, *e.g.*, Ex. 74 (UBH 30(b)(6) designee (Catlin) Tr. 63:14-64:17); Ex. 76 (Motz Tr. 133:18-134:8, 145:22-146:12); Exs. 59-64.

[27] ███████████████████████████████████████████ ██████████████ Ex. 56 (State Mandate Class List). UBH does not argue (nor could it) that the Guideline Exclusion permits UBH to violate applicable state law.

1  merely underscores that UBH will decide whether the services meet generally accepted standards

2  by using its Guidelines, which describe those standards.

3        Nor should the Court credit UBH's argument with respect to the two Plans that omit the

4  Covered Services language above. Brian Muir's Plan does not even contain the "Guideline

5  Exclusion" – it contains a garbled paragraph that, among other things, excludes coverage for

6  services that, in UBH's reasonable judgment, are:

7          (4) Not consistent with [UBH's] level of care guidelines or best practices as
        duration of treatment, and considered ineffective for the patient's Mental Illness,

8          substance use disorder or condition *based on generally accepted standards of*
        *medical practice* and benchmarks.

9

10  Ex. 21 at 12 (emphasis added). If that exclusion means anything, it directly links UBH's level of

11  care guidelines with generally accepted standards of care. It cannot reasonably be read to

12  authorize UBH to adopt guidelines that fall below generally accepted standards. It would be

13  particularly unreasonable to adopt UBH's interpretation here when UBH itself told Mr. Muir that

14  it was denying his request for coverage because the "[s]ervices you are receiving do not appear

15  to be consistent with generally accepted standards of practice based upon the applicable

16  guideline" and, as such, were "not considered covered health services." Ex. 32 at 1 (citing UBH

17  Coverage Determination Guideline for Residential Rehabilitations for Substance Use Disorders).

18        That just leaves the Holdnak Plan. Mot. at 17. But there, too, the exclusion cannot

19  reasonably be interpreted as authorizing UBH to adopt level of care guidelines that grossly

20  restrict the coverage otherwise provided by the Plan. UBH's argument proves far too much. If

21  taken seriously, it would mean that UBH could adopt any Guidelines it chose, subject to no

22  limiting principle, even Guidelines that in effect negated all or substantially all behavioral health

23  coverage. Yet even the witness whom UBH disclosed as knowledgeable about the plans and their

24  creation agreed that UBH could not use its Guidelines to re-write the Plan and such a reading

25  would be "absurd." Ex. 75 (Dehlin Tr. 128:5-14; 147:18-25; 149:24-150:2). But in essence, that

26  is exactly what UBH is arguing: that UBH, through its Guidelines, may unilaterally dictate what

27  behavioral health services are covered.

28        Not only would UBH's proposed interpretation, that it could restrict coverage in any way

it pleases, without regard to the threshold condition of compliance with generally accepted

standards, be completely unreasonable, but it also contradicts the testimony of UBH's own

witnesses, who admitted ██████████████████████████████████

██████████████████████  *See*, *e.g.*, Ex. 78 (Niewenhous Tr. at 102:13-24); Ex. 79

(Regan Tr. at 110:13-17); Ex. 81 (Triana Tr. at 130). Further, UBH represents, in its Guidelines

and elsewhere – including in its own experts' opinions in this case – that the Guidelines *are*

consistent with generally accepted standards. *See* Ex. 66 (Def.'s Disclosure of Non-Retained

Expert Testimony).[28] To be sure, Plaintiffs dispute that representation, and that factual dispute is

driving this litigation. The point here is that UBH, a fiduciary bound to administer Plans solely in

the interests of the Members, should not be permitted to declare that its Guidelines reflect

generally accepted standards and then defeat a challenge to that representation by claiming it

really has no obligation to adhere to any standard at all.

Finally, UBH's plainly self-interested interpretation of the Guideline Exclusion runs

afoul of ERISA, as well. As an ERISA fiduciary, UBH was required to discharge its duties –

including when it developed guidelines to standardize its Plan interpretations – "solely in the

interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1). If the exclusion meant

what UBH says it does (*i.e.*, that UBH can adopt any guidelines it wants, without regard to the

interests of the Members), it would erase that fiduciary duty – and therefore be void under

ERISA.  *See* 29 U.S.C. § 1110(a) ("[A]ny provision in an agreement or instrument which

purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or

duty under this part shall be void as against public policy.").[29] And because the exclusion only

applies to mental health and SUD treatment, if it really restricted coverage in a way that did not

---

[28] *See also*, *e.g.*, Ex. 4 (2014 LOCGs) at 1 (LOCGs are "derived from generally accepted standards of care. . . ."); Ex. 5 (2015 LOCGs) at 4 (same); Ex. 6 (Jan. 2016 LOCGs) at 4 (same); Ex. 8 (2017 LOCGs) at 1 (same).

[29] *See also IT Corp. v. Gen. Am. Life Ins. Co.*, 107 F.3d 1415, 1418-19 (9th Cir. 1997) ("If an ERISA fiduciary writes words in an instrument exonerating itself of fiduciary responsibility, the words, even if agreed upon, are generally without effect . . . . If General American is a fiduciary, as defined in section 1002(2)(21)(A), 'any interpretation of the Plan which prevents [it] acting in a fiduciary capacity from being found liable as [a] fiduciar[y] is void.'").

apply to medical/surgical benefits, it would also violate the Parity Act and UBH would be precluded from relying upon it. 29 U.S.C. §1185a(a)(3)(A)(ii) (prohibiting "separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits"); *id*. § 1104(a)(1)(D) (ERISA fiduciary acts in accordance with plans only "insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter," which includes the Parity Act).

**E.    Whether UBH Followed Texas Regulations Is A Disputed Question Of Fact.**

The State Mandate Class consists of members of fully-insured Plans subject to state laws that required UBH to use specified medical-necessity criteria – and not its own Guidelines. As UBH recognizes, one of those states was Texas, which "mandated the use of state-specific Texas Department of Insurance guidelines ("TDI" guidelines) for substance use treatment." Mot. 18:8-9 (citing 28 Tex. Admin. Code § 3.8011).

UBH now claims that it is "undisputed" that "it has been UBH's policy and practice to apply TDI guidelines – not UBH guidelines – to coverage decisions for plans subject to Texas law." Mot. 18:10-11.[30] UBH cites two denials from the Claim Sample, which Plaintiffs determined should be excluded from the State Mandate Class because UBH did, in fact, apply the mandated Texas criteria.[31] Mot. at 18:13-18. UBH hides from the Court, however, the fact that the Claim Sample also included *another* individual whose request for coverage under a Plan governed by Texas law UBH denied based upon UBH's Guidelines and *not* the TDI criteria. *See* Exhibit F to Plaintiffs' Mot. for Class Certification (filed under seal) (Sample Claimant RTC-29); *see also* Ex. 57 (denial letter to RTC-29). UBH also fails to mention that UBH's own records reflect that ███████████████████████████████████████████████████████████ ████████████████████████████████████████████. *See* Reynolds Decl. ¶ 58; Ex. 56 at 1-

---

[30] As noted above, this argument is really no more than a decertification argument as to a portion of the State Mandate Class – but one based on evidence UBH could easily have raised at the class certification stage. Because UBH failed to follow the procedure the Court prescribed for seeking leave to file a decertification motion, the Court should not entertain this argument.

[31] Even one of the two cases UBH cites belies its contention that its "policy and practice" was to apply the TDI guidelines and "not UBH guidelines" to Texas plans. Mot. at 18:13-18. ███████ ████████████████████████████████████████████████████████████████ Ex. 58.

25; Ex. 73 (Bridge Tr.) at 82:21-85:6. Thus there is (at least) a genuine dispute whether UBH's *practice* was to follow the "policy" it describes.

**F.     Plaintiffs' Entitlement To A Surcharge Is Replete With Fact Questions For Trial.**

Plaintiffs seek not only declaratory and injunctive relief, but also an order of surcharge under 29 U.S.C. § 1132(a)(3), namely (as the Court explained) "disgorgement of the revenue UBH generated from its corporate affiliates or the plans for providing mental health and substance abuse-related claims administration services in connection with processing of the class members' claims." *Wit* ECF No. 174 at 11-12. UBH argues that Plaintiffs' surcharge request should be rejected as a matter of law because (1) "the surcharge they seek is not available under traditional equitable principles" and (2) there is not "sufficient" evidence that Plaintiffs were "injured." Mot. 19:11-13. These arguments fail for largely the same reasons UBH's other "causation" and "injury" arguments fail, and also because UBH offers no legal argument justifying its position that a surcharge can only be ordered if the Plaintiffs personally paid the faithless fiduciary.

As UBH concedes, an ERISA plaintiff is entitled to "appropriate equitable relief," which includes the "categories of relief" that were "typically available in equity." *Amara*, 563 U.S. at 439. A core aspect of equity courts' jurisdiction included claims for restitution, *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 214 (2002), among them "judgment[s] for money in the amount of the defendant's unjust enrichment." Restatement (Third) of Restitution and Unjust Enrichment § 49(1) (2011). One form of restitution is "disgorgement," namely an order to "eliminate [a defendant's] profit from wrongdoing." *Id.* § 51(4). In determining whether, and to what extent, a "benefit conferred" on a defendant was "wrongful," the court need only make a "reasonable approximation of the amount of the wrongful gain." *Id.* § 51(5)(d). "Residual risk of uncertainty in calculating net profit is assigned to the defendant." *Id. See also* Deborah DeMott, *Causation in the Fiduciary Realm*, 91 Boston U. L. Rev. 851, 864 (2011) ("Although a fiduciary's disloyal act may harm the beneficiary, showing that harm resulted from the disloyalty is not requisite to the restitutionary remedy of disgorgement."); *id.* at 855 ("Disgorgement of ill-gotten gain is well-established as a remedial consequence when a fiduciary obtains a benefit in

1  breach of a duty of loyalty.").

2      The surcharge amount Plaintiffs intend to prove at trial falls squarely within that black

3  letter equitable rule – and is inherently fact-intensive. From 2011 through 2016, UBH collected

4  ██████████████████████████████████████████████████ Ex.

5  65. *See also* Mot. at 21:8-11 (describing the per-member per-month rates). The core question in

6  calculating a surcharge will be how much of that revenue constitutes a "reasonable

7  approximation" of UBH's "wrongful gain" as a faithless fiduciary and thus should be disgorged.

8  Those are fact-driven questions that the parties hotly dispute. *See* §§ II.A, II.C, IV.C, *supra*.

9  **V.      CONCLUSION**

10     For the foregoing reasons, the Court should deny UBH's motion for summary judgment.

11 Dated: June 16, 2017                    Respectfully submitted,

12                                          s/ Caroline E. Reynolds
                                            D. Brian Hufford (admitted *pro hac vice*)
13                                          Jason S. Cowart (admitted *pro hac vice*)
                                            ZUCKERMAN SPAEDER LLP
14                                          399 Park Avenue, 14th Floor
                                            New York, NY 10022
15                                          Tel: (212) 704-9600

16
                                            Caroline E. Reynolds (admitted *pro hac vice*)
17                                          ZUCKERMAN SPAEDER LLP
                                            1800 M Street, NW, Suite 1000
18                                          Washington, DC 20036
                                            Tel: (202) 778-1800
19

20                                          Adam B. Abelson (admitted *pro hac vice*)
                                            ZUCKERMAN SPAEDER LLP
21                                          100 E. Pratt St., Suite 2440
                                            Baltimore, MD 21202
22                                          Tel: (410) 332-0444

23
                                            Meiram Bendat (Cal. Bar No. 198884)
24                                          PSYCH-APPEAL, INC.
                                            8560 West Sunset Boulevard, Suite 500
25                                          West Hollywood, CA 90069
                                            Tel: (310) 598-3690, x.101
26

27                                          *Attorneys for Plaintiffs*

28