PSYCH-APPEAL, INC.
Meiram Bendat (Cal. Bar No. 198884)
8560 West Sunset Boulevard, Suite 500
West Hollywood, CA 90069
Tel: (310) 598-3690, x.101
Fax: (888) 975-1957
mbendat@psych-appeal.com

ZUCKERMAN SPAEDER LLP
D. Brian Hufford (admitted *pro hac vice*)
Jason S. Cowart (admitted *pro hac vice*)
485 Madison Avenue, 10th Floor
New York, NY 10022
Tel: (212) 704-9600
Fax: (212) 704-4256
dbhufford@zuckerman.com
jcowart@zuckerman.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| DAVID AND NATASHA WIT, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED BEHAVIORAL HEALTH (operating as OPTUMHEALTH BEHAVIORAL SOLUTIONS),<br><br>Defendant. | Case No. 3:14-CV-02346-JCS<br>Action Filed: May 21, 2014<br><br>**PLAINTIFFS' OPPOSITION TO UBH'S MOTION IN LIMINE NO. 2 TO EXCLUDE EVIDENCE RELATING TO OTHER UBH CLINICAL GUIDELINES** |
| GARY ALEXANDER, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED BEHAVIORAL HEALTH (operating as OPTUMHEALTH BEHAVIORAL SOLUTIONS),<br><br>Defendant. | Case No. 3:14-CV-05337-JCS<br>Action Filed: December 4, 2014<br><br>Trial Date: October 16, 2017<br>Time: 8:30 A.M.<br>Judge: Hon. Joseph C. Spero<br>Courtroom: G<br><br>**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED** |

The evidence UBH seeks to exclude—that financial considerations tainted and in some cases drove the insurance company's decisions on creating, revising and implementing its Guidelines—is relevant to several issues in the case. *See* Pls.' Trial Brief 15, *Wit* ECF No. 299 (noting that UBH's efforts to minimize benefit expense infected its Guideline-development process). In particular, evidence of the conflict between UBH's business goal of reducing benefit expense and its legal obligation to act solely in the interest of its beneficiaries, *see* Pls.' Proposed Findings of Fact § IV.B, *Wit* ECF No. 303-4, is relevant to Plaintiffs' claims (1) that UBH breached its duty of loyalty, *see* 29 U.S.C. § 1104 (a)(1); and (2) that "the plan administrator [UBH] has abused its discretion." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008). It is also relevant because it goes directly to one of UBH's central defenses, namely, that its process for adopting the Guidelines was pristine and met the standards of the accrediting agencies. *See, e.g.*, UBH's Trial Brief, *Wit* ECF No. 300, at 2.

UBH admits that evidence showing its financial conflict of interest, and that its conflict tainted "the level of care criteria at issue," is relevant at trial. Motion *in Limine* No. 2 to Exclude Evidence Relating to UBH Guidelines & Policies Not at Issue ("Mot.") 4:15-17. But it argues that evidence showing that this same conflict was a driving force in the development of *other* clinical coverage guidelines—namely, those related to (a) transcranial magnetic stimulation ("TMS"), (b) applied behavioral analysis ("ABA"), an intensive treatment for autism-spectrum disorders, and (c) UBH's administration of Medicare plans—is irrelevant, whether considered under Federal Rules of Evidence 401 or 404(b). UBH is wrong on both scores.

**First**, the same UBH committees and the same key UBH employees considered and approved the guidelines that UBH says are "at issue" as those that it says are out of bounds for the trial. These same committees and employees had information on benefit expense budgets, targets and goals. Significantly, the evidence is uncontroverted that UBH had one procedure for the development and approval of its clinical coverage guidelines and that it offers that procedure as a basis for this Court's determining that its guidelines met generally accepted standards. Evidence that UBH's financial self-interest infects that process, and the resulting Guidelines, is plainly relevant under Rule 401.

**Second**, for these same reasons, the evidence is not being submitted to prove UBH's "bad character," but instead to shed light on the process that lies at the heart of the case. However, even if considered under Rule 404(b), the evidence would also be admissible for the additional, proper, purposes of showing knowledge, plan, lack of mistake, and *modus operandi*.

## I. EVIDENCE OF FINANCIAL CONSIDERATIONS INFECTING CLINICAL GUIDELINES IS ADMISSIBLE.

UBH acknowledges that evidence about UBH's development of other guidelines may go to a central issue in this case, because "UBH's discussions regarding the potential financial impact of coverage for ABA and TMS [may] show[] that . . . UBH acted with a conflict of interest." Mot. 2:19-22. Both categories of evidence are relevant to whether UBH permitted financial considerations to influence the coverage criteria in its clinical guidelines. A brief review of the evidence proves the point.

### A. UBH's Decision Whether to Cover TMS Treatment Illustrates Its Conflict of Interest With Respect To Clinical Guidelines And Its Process For Creating And Approving Guidelines.

Repetitive transcranial magnetic stimulation ("TMS," or "rTMS"), a less-invasive version of electroshock therapy, has been around since the 1980s. For a long time, it was considered experimental, and UBH (among others) denied coverage on the ground that such treatments were excluded under its plans. In 2008, the FDA approved TMS for mildly treatment-resistant depression. Medicare and state Medicaid programs gradually began to cover TMS.

UBH, however, maintained its position that TMS was an excluded experimental treatment for several years after 2008. In the fall of 2013, UBH's Clinical Technology Assessment Committee ("CTAC") concluded [redacted] Consol. Decl. of Jennifer S. Romano ISO UBH's Motions *in Limine* ("Romano Decl."), Ex. 15. [redacted]. *Id.* Ex. 16. Several of the CPC's members—in particular, Dr. Bill Bonfield, Carolyn Regan, Frederic Motz, Dr. Lorenzo Triana, and Gerard

Niewenhous—also served on or worked under the Behavioral Policy & Analytics Committee ("BPAC"), which developed and approved UBH's Level of Care Guidelines.

TMS can be expensive. [redacted]. *Id.* at -683. [redacted]. The Committee recognized that there was no defensible *clinical* rationale for continuing to deny TMS claims. So it did precisely what it is *not* permitted to do under ERISA: it recommended a policy solely to protect its own bottom line. [redacted] *See id.* [redacted] *Id.* Ex. 15 at -832. [redacted] *Id.* [redacted] *Id.* at -838–839. [redacted] *see id.*, -835–836, [redacted] *See id.*, -831–832 (emphasis added). [redacted] *See* accompanying Declaration of Caroline E. Reynolds, Ex. 1 (Trial Ex. 434); Ex. 2 (Trial Ex. 474); Ex. 3 (Trial Ex. 519).

There is no question that whether UBH permits financial considerations to influence the content of its clinical guidelines is "of consequence in determining the action." Fed. R. Evid.

401(b). The evidence described has a "tendency to make [that] fact more . . . probable than it would be without the evidence." Fed. R. Evid. 401(a). UBH has made clear that its witnesses intend to vigorously assert that they never let UBH's profit motive influence the clinical content of its guidelines. The TMS evidence is also directly relevant to disproving that defense.

**B. UBH's Conduct In Adopting ABA Guidelines Also Tends To Prove That UBH Lets Profit Motive Taint Its Clinical Guidelines.**

Applied behavior analysis ("ABA") is an intensive treatment for autism spectrum disorders. It involves systematically applying interventions to improve socially significant behaviors (*e.g.*, social skills, communication skills, self-control). UBH dedicates a section of its Level of Care Guidelines to ABA, as does its Coverage Determination Guideline for autism spectrum disorders. [redacted]. *See* Romano Decl. Ex. 17.

[redacted] Reynolds Ex. 4 (Trial Ex. 543). [redacted] *See* Romano Decl. Ex. 17, UBHWIT0616253. [redacted]. *Id.*

[redacted] *See* Ex. 19, UBHWIT0708532. [redacted]

[redacted] *See* Reynolds Ex. 5 (Trial Ex. 814). [redacted] Romano Decl. Ex. 19 UBHWIT0708532 (emphasis added).

UBH argues that Ms. Temple's admonition is irrelevant because ABA is not a treatment that is "at issue in this case." But that is obviously beside the point. Mot. 2:14. Not only was Ms. Temple's statement not limited to UBH's ABA guideline, but the evidence proves that UBH permitted its bottom line to drive its clinical determinations, even in the face of evidence its own high-level personnel had concluded *required* a contrary decision. UBH's attempt to downplay the evidence—by suggesting that its executives were merely "discussing the financial impact of policy changes" (*see* Mot. 4:9-10)—only highlights the relevance.

**II. THE MEDICARE-RELATED EVIDENCE UBH CITES IS ALSO RELEVANT.**

In addition to its commercial business, a significant portion of UBH's business involves administering Medicare plans. UBH only moves to exclude a single such exhibit (Romano Decl. Ex. 18), which is relevant to UBH's conflict of interest, as explained below. UBH's vaguely-worded motion seems to suggest it applies to other documents related to Medicare standards. Mot. i:15-17. If UBH seeks to exclude any other Medicare-related documents, such request should be denied, because no other exhibits were identified in its motion. But, for the avoidance of doubt: although this case does not challenge UBH's conduct in administering Medicare plans, Medicare standards are at the core of the issues in this case, for three reasons.

**First**, in administering its Medicare plans, UBH develops and applies "Medicare Coverage Summaries" (the analog to its LOCGs for commercial business). UBH has not moved to exclude those guidelines (Trial Exs. 445, 477, 494, 497, 555). And for good reason: that

evidence tends to prove that UBH's LOCGs diverge from generally accepted standards of care with respect to, *e.g.*, their "improvement" standard. The LOCGs require a "reasonable expectation that services will improve the member's *presenting problems* within a reasonable period of time," as "indicated by the reduction or control of the *acute signs and symptoms* that necessitated treatment in a level of care." Reynolds Ex. 6 (Trial Ex. 5) (2015 LOCG) (emphases added). In contrast, UBH's Medicare Coverage Summary—for which the government, not UBH, is the payor—is far more faithful to the proper standard. *See, e.g.*, Reynolds Ex. 7 (Trial Ex. 555) (UBHWIT0616153 at 7) ("For patients with long-term or chronic conditions, the control of symptoms and maintenance of functioning to avoid further deterioration or hospitalization is considered 'improvement.'").

**Second**, UBH's commercial Guidelines purport to rely on an "evidence base" – a reference list of sources that UBH represents as supporting its coverage criteria. This evidence base is supposed to reflect generally accepted standards of care. Throughout its LOCGs, UBH cites guidelines from CMS as part of its evidence base. [redacted] Reynolds Ex. 8 (UBHWIT0083457) (Trial Ex. 281). Thus, evidence and testimony related to those guidelines is directly relevant to whether UBH's Guidelines are faithful to its own evidence base.

**Third**, UBH's conduct in deciding the standards to apply to Medicare plans also is relevant, yet again, to UBH's conflict of interest. Medicare required that UBH "make determinations that are consistent with" CMS's National and Local Coverage Determination Guidelines (known as NCDs and LCDs). Romano Decl. Ex. 18 at -427. In the summer of 2013, UBH considered whether to adopt the NCDs and LCDs wholesale, "as [its] guideline set for Medicare business." *Id.* But again, the critical question raised by Mr. Niewenhous – in bold in the email UBH attaches to its motion – was how to "**estimate[e] the impact on benefit expense**." *Id.* One would think that if UBH's own guidelines were "consistent with" CMS's standards that should have been easy. Not so. UBH's senior vice president for Affordability interjected, "The financial implications for this would be enormous." *Id.* at -426.

## III. THE EVIDENCE ALSO IS ADMISSIBLE UNDER RULES 404(B) AND 403.

As discussed above, the evidence UBH moves to exclude is relevant to a core issue in the case: whether UBH permitted financial considerations to influence the coverage criteria in its clinical guidelines. UBH tries to reframe this evidence as "other act" evidence. Under Rule 404, "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). By its terms, Rule 404(b) applies *only* if the purpose for which the evidence is offered is to prove that "the person acted in accordance with the [bad] character." Plaintiffs are not submitting the evidence to prove UBH's "character." But even if the Court were to analyze the evidence under Rule 404, it would be admissible, because such evidence may be admitted "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, . . . absence of mistake, or lack of accident." Rule 404(b)(1) & (2). The evidence tends to prove that UBH was <u>motivated</u> to minimize benefit expense across its business; its senior executives <u>knew</u> of UBH's benefit expense budgets, targets and goals; and that it was certainly <u>no accident</u> that UBH repeatedly allowed benefit expense concerns to dictate its clinical guideline changes.

Finally, UBH argues that admitting this evidence would be "a waste of the Court's and the parties' time and resources," and that admitting the evidence would necessitate a "mini-trial" about how, *e.g.*, "the plans address coverage for these treatments and how UBH appropriately developed, amended, and applied coverage determination guidelines for these treatments." Mot. at 7:4-10. The aspects of the evidence on which Plaintiffs intend to rely are straightforward. It is UBH that threatens to create an unnecessary, wasteful sideshow with respect to such evidence. That is not a bar to Plaintiffs' use of appropriate evidence in the first instance.

## <u>CONCLUSION</u>

For these reasons, the Court should deny UBH's Motion *in Limine* No. 2.

Dated: September 15, 2017

ZUCKERMAN SPAEDER LLP

/s/ Caroline E. Reynolds
D. Brian Hufford
Jason S. Cowart
Carl S. Kravitz
Aitan D. Goelman
Caroline E. Reynolds
Adam B. Abelson
Sara Alpert Lawson

PSYCH-APPEAL, INC.
Meiram Bendat

*Attorneys for Plaintiffs*