```
                                    Volume 1

                                 Pages 1 - 237

                    UNITED STATES DISTRICT COURT

                    NORTHERN DISTRICT OF CALIFORNIA

           BEFORE THE HONORABLE JOSEPH C. SPERO, MAGISTRATE JUDGE

DAVID AND NATASHA WIT, et al., )
                               )
           Plaintiffs,         )
                               )
   VS.                         )   No. C 14-2346 JCS
                               )
UNITED BEHAVIORAL HEALTH       )
                               )
           Defendant.          )
_____)
GARY ALEXANDER, et al.,        )
                               )
           Plaintiffs,         )
                               )
   VS.                         )   No. C 14-5337 JCS
                               )
UNITED BEHAVIORAL HEALTH,      )
                               )
           Defendant.          )
_____)   San Francisco, California
                                    Monday, October 16, 2017
```

### TRANSCRIPT OF PROCEEDINGS

**APPEARANCES**:

```
For Plaintiffs:          ZUCKERMAN SPAEDER LLP
                         1800 M Street, NW, Suite 1000
                         Washington, DC  20036-5807
                    BY:  CARL S. KRAVITZ, ESQUIRE
                         CAROLINE E. REYNOLDS, ESQUIRE
                         AITAN D. GOELMAN, ESQUIRE


              (Appearances continued on next page)


Reported By:   Katherine Powell Sullivan, CSR #5812, RMR, CRR
               Jo Ann Bryce, CSR #3321, RMR, CRR
               Official Reporters - U.S. District Court
```

**<u>APPEARANCES (CONTINUED):</u>**

For Plaintiffs:  ZUCKERMAN SPAEDER LLP
       485 Madison Avenue, 10th Floor
       New York, New York 10022
    BY: **JASON S. COWART, ESQUIRE**

       ZUCKERMAN SPAEDER LLP
       100 East Pratt Street, Suite 2440
       Baltimore, Maryland  21202-1031
    BY: **ADAM ABELSON, ESQUIRE**

       THE MAUL FIRM, P.C.
       101 Broadway, Suite 3A
       Oakland, California 94607
    BY: **ANTHONY F. MAUL, ESQUIRE**

       PSYCH APPEAL
       8560 Sunset Bouleavard, Suite 500
       West Hollywood, California  90069
    BY: **MEIRAM BENDAT, ESQUIRE**

For Defendant:   CROWELL & MORING LLP
       515 South Flower Street, 40th Floor
       Los Angeles, California 90071-2258
    BY: **JEFFREY H. RUTHERFORD, ESQUIRE**
       **JENNIFER S. ROMANO, ESQUIRE**
       **ANDREW HOLMER, ESQUIRE**

       CROWELL & MORING LLP
       Three Embarcadero Center, 26th Floor
       San Francisco, California 94111
    BY: **NATHANIEL P. BUALAT, ESQUIRE**

       CROWELL & MORING LLP
       1001 Pennsylvania Avenue, NW
       Washington, DC 20004-2595
    BY: **APRIL N. ROSS, ESQUIRE**

## **I N D E X**

Monday, October 16, 2017 - Volume 1

|  | **PAGE** | **VOL.** |
|---|---|---|
| Opening Statement by Ms. Reynolds | 10 | 1 |
| Opening Statement by Ms. Romano | 33 | 1 |
|  |  |  |
| **PLAINTIFFS' WITNESSES** |  |  |
|  |  |  |
| **FISHMAN, MARC** |  |  |
| (SWORN) | 61 | 1 |
| Direct Examination by Mr. Goelman | 61 | 1 |
| Cross-Examination by Mr. Rutherford | 174 | 1 |
| Redirect Examination by Mr. Goelman | 212 | 1 |

## **E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 642 | | 69 | 1 |
| 661 | | 153 | 1 |
| 662 | | 69 | 1 |
| 670 | | 64 | 1 |
| 880 | 61 | | 1 |

 1    <u>**Monday - October 16, 2017**</u>                    <u>**8:31 a.m.**</u>

 2                        <u>**P R O C E E D I N G S**</u>

 3                          ---oOo---

 4        **THE CLERK:**  We're calling Case Number C 14-2346, Wit

 5    versus UnitedHealthcare Insurance Company, and the related case

 6    C 14-5337, Alexander versus United Behavioral Health.

 7        Appearances, please.

 8        **MS. REYNOLDS:**  Good morning, Your Honor.

 9    Caroline Reynolds from Zuckerman Spaeder on behalf of the

10    plaintiffs and the plaintiffs class.  And with me today are my

11    colleagues, Aitan Goelman, Carl Kravitz, Adam Abelson; and our

12    co-counsel, Meiram Bendat and Anthony Maul, are also with us in

13    the courtroom today.

14        And I'd also like to introduce to the Court several of the

15    named plaintiffs who have come to attend.  David Haffner, Linda

16    Tillitt, Brandt Pfeifer, and Gary.

17        **THE COURT:**  Okay.  Welcome, everyone.

18        And for the defense?

19        **MS. ROMANO:**  Good morning, Your Honor.  Jennifer

20    Romano from Crowell Moring.  With me are my colleagues Jeff

21    Rutherford, Nathaniel Bualat, April Ross, and Andy Holmer.

22        We also have our client representative here.  That's

23    Dr. Andrew Martorana.  He's the senior behavioral medical

24    director.

25        And we have an in-house counsel here as well, Matthew

1  Shors.  He's the senior deputy general counsel/chief litigation

2  counsel for UnitedHealth Group.

3       **THE COURT:**  Okay.  Thank you all.

4     Are we doing openings?

5       **MS. REYNOLDS:**  Yes, Your Honor.

6       **THE COURT:**  Okay.  I'll start with plaintiff.

7       **MS. ROMANO:**  Your Honor, before we do openings, we had

8  one housekeeping matter we wanted to take care of.

9       **THE COURT:**  Okay.

10      **MS. ROMANO:**  I raised this at the pretrial conference

11  and after looking at the transcript wanted to clarify one

12  thing.

13     The Court made clear at the pretrial conference that legal

14  argument, such as causation issues, are preserved for appeal;

15  but I wanted to just clarify and make clear on the record that

16  while UBH and agrees and has agreed that the individualized

17  clinical class member evidence is irrelevant for the class

18  trial, that UBH continues to contend that it is relevant for

19  class certification and decertification.

20     So we wanted to state on the record that the evidence

21  presented in connection with the class certification motion

22  continues to demonstrate class certification wasn't

23  appropriate, and the fact that UBH will not attempt to offer

24  such evidence at trial doesn't waive its arguments with respect

25  to whether the class has been certified or should be

**PROCEEDINGS**

1   decertified; and that also UBH reserves the right to present

2   this evidence as a basis for decertification and/or on appeal.

3           **THE COURT:**  Okay.

4           **MS. ROMANO:**  Thank you, Your Honor.

5           **THE COURT:**  Thank you.

6           **MR. ABELSON:**  One other housekeeping matter, if I may.

7           **THE COURT:**  Yes.

8           **MR. ABELSON:**  Adam Abelson on behalf of the

9   plaintiffs.

10          **THE COURT:**  Yes.

11          **MR. ABELSON:**  This relates to the deposition

12  designations.  It's true housekeeping, but this came up briefly

13  at the pretrial conference so --

14          **THE COURT:**  This is true housekeeping.

15          **MR. ABELSON:**  Yes.

16          **THE COURT:**  This is like Windows.

17          **MR. ABELSON:**  I didn't use the word "literally."

18      So we've cut the videos in terms of the depositions that

19  the plaintiffs plan to play.  Our portions total about seven

20  hours.  We're going to continue to try to cut those.  UBH's

21  counterdesignation portions are three hours, and we believe

22  that that is -- it's unfair for those three hours, which

23  essentially transfers three hours from us to them to testimony

24  that they want in the case is not fair.

25      We have generate -- we've generated an output from the

1   software that does it.  I don't think there's any dispute about

2   what time -- how much time what they've added as opposed to

3   what we've added, and we -- again, they have -- it's sort of

4   like direct examination/cross-examination, which clearly goes

5   back and forth.

6       And so to the extent there's -- I understand that we

7   wouldn't want Ms. Hom or anybody else to be having to turn the

8   timer on and off, but we have those numbers.  We've done that

9   administrative work.

10      I'd also like to add that UBH does have deposition

11  designations in their case.  We have counterdesignations to

12  theirs.  It's much shorter.  So if this were to come out in the

13  wash, if you will, that would be one thing, but it just

14  doesn't.  And so we're limited on time --

15          **THE COURT:**  You think it's like an hour and a half

16  unfairness instead of three hours of unfairness.

17          **MR. ABELSON:**  Well, we haven't timed those, but I

18  would guess it wouldn't be more than a half hour of our

19  counterdesignations.

20          **MR. HOLMER:**  Well, first of all, Your Honor, we

21  received estimates from plaintiffs' counsel last night, the

22  time estimates that Mr. Abelson referred to.  We have not

23  confirmed those, so we're not prepared to stipulate one way or

24  the other about those; and partly we didn't confirm those

25  because we understood the Court's ruling from the pretrial

**PROCEEDINGS**

1    conference to be that whatever -- I believe your words were,

2    "Whatever you play, that's your time."  So that's our

3    understanding of the Court's ruling.  We're okay with that.  We

4    understand.  We made some revisions to our depo designations as

5    well.

6         And part of this, I'd just like to point out, is that the

7    time estimate that plaintiffs' counsel referred to of three

8    hours includes roughly an hour of Dr. Bonfield's testimony,

9    Dr. Bill Bonfield, who the parties have already agreed the time

10   would be split.

11        And the reason for that, Your Honor, is that the parties

12   both designated significant portions of Dr. Bonfield's

13   testimony that overlapped, both in the actual testimony but

14   also in the topics that were being covered.  And so about an

15   hour of the three-hour estimate that Mr. Abelson referenced

16   comes from Dr. Bonfield, which the parties have already agreed

17   will be split 50-50.

18        So I think that the estimate is a little bit off.  We're

19   talking about roughly two hours of testimony based on

20   plaintiffs' estimate.  Again, we haven't confirmed that.

21        But the larger point, I think, Your Honor, is that we

22   think your ruling was correct.  It would be a logistical

23   nightmare for the Court for almost 20 depositions to continue

24   to add and subtract time from the parties' timers.

25        We also think it's fair --

1      **THE COURT:**  That's enough.  Next.

2          I'm not changing my ruling.  I'm not doing anything to

3   encourage two things:  One, more time in court.  You've got

4   more than enough time in court.  You've got too much time in

5   court.

6          And, two, playing of depo excerpts.  Now that I've read a

7   number of these depo excerpts, it is not in any of your

8   clients' interests to try your case by doing depo excerpts

9   because it's not -- because the problem is, in a bench trial,

10  you have the judge there and the judge can say, "I didn't

11  understand that.  Could you explain that again?"  In a depo I

12  don't get to do that.

13         So it's a mistake if you have any alternative to put on a

14  depo excerpt, but that's fine if you don't have any

15  alternative.  You should have taken a different kind of

16  deposition because I can tell you that half of it's lost in the

17  shuffle, but I'm certainly not going to encourage people to

18  either play more of those or take more time in court.  So I'm

19  not going to change my ruling.

20         Next.

21         **MR. HOLMER:**  Thank you, Your Honor.

22         **THE COURT:**  Okay.  Openings.

23                     **OPENING STATEMENT**

24         **MS. REYNOLDS:**  Good morning, Your Honor.

25         **THE COURT:**  Good morning.

1        **MS. REYNOLDS:**  Again, I'm Caroline Reynolds on behalf

2   of the plaintiffs.

3        This case is about how an ERISA fiduciary, United

4   Behavioral Health, developed fundamentally flawed clinical

5   guidelines and then used those guidelines to deny the class

6   members requests for coverage of their mental health and

7   substance use disorder treatment.

8        UBH's guidelines contain significant deficiencies and in

9   violation of the class members plans fall below generally

10   accepted standards of care.

11        The guidelines purport to follow source material that's

12   consistent with generally accepted standards; but when UBH

13   didn't like what the source materials said, it simply edited

14   the language to fit its overly restrictive, acute focused view

15   of utilization management.

16        This underscores the fact that not only was UBH

17   conflicted, its conflict was deep-seated and violated the

18   obligation of an ERISA fiduciary to administer plans solely in

19   the interests of the participants and beneficiaries.

20        The guidelines require that the member have an acute

21   crisis and then call for coverage of the acute signs and

22   symptoms at the prescribed level of care, but only if it is the

23   least restrictive alternative and only until the acute changes

24   are controlled or reduced.  At that point, coverage ends.

25        Whether the prescribed level of care at the requested

1   duration is needed to address the member's ongoing illness or

2   co-occurring conditions is not a basis for coverage under these

3   guidelines.

4        The result compelled by these guidelines as they are

5   written is that UBH will not approve coverage for the effective

6   treatment of ongoing chronic conditions once an acute crisis

7   has ended.

8        This is a major problem that makes these guidelines as a

9   whole completely incompatible with generally accepted standards

10  of care and, as a result, they're completely incompatible with

11  the class members plans.

12       The documentary evidence, which plaintiffs will present

13  through its summary witness, will show that the plans at issue

14  all cover mental health and substance use disorder treatment.

15  Generally speaking, the plans fall into two categories:  Those

16  that define coverage to extend only to treatment that is

17  consistent with generally accepted standards of care, such as

18  by defining "covered services" or "medically necessary

19  treatment" to mean consistent with generally accepted

20  standards; and, on the other hand, those that define "coverage"

21  broadly to include mental health and substance use disorder

22  treatment and then exclude services that are not consistent

23  with generally accepted standards.  This is just the flip side

24  of the coin.

25       For every one of those plans, a precondition of coverage

1   is that the treatment must be consistent with generally

2   accepted standards of care.  This is not the same thing as

3   saying that the plans provide coverage for all services that

4   are consistent with generally accepted standards.  That's not

5   plaintiffs' argument.

6       The plans contain all sorts of limitations and exclusions

7   and requirements that are just not part of this case.

8   According to UBH's policies and procedures, the first step in

9   evaluating any request for coverage is to make sure that none

10  of those administrative requirements or limitations or

11  exclusions applies.

12      If a member isn't eligible for coverage or if treatment

13  for a particular condition is expressly excluded, UBH issues an

14  administrative denial.  Administrative denials are not made

15  pursuant to UBH's clinical guidelines and are irrelevant to

16  this case.

17      By definition, all of the denials at issue were clinical

18  denials under the level of care guidelines or coverage

19  determination guidelines, both of which purport to be based on

20  generally accepted standards of care.

21      So, Your Honor, as you listen to UBH's arguments about

22  alleged differences among the plans, please remember this:  UBH

23  analyzes requests for coverage under all of these plans

24  pursuant to the same set of level of care criteria.  This is

25  powerful evidence that all of these plans contain the same

 1   threshold requirement because UBH itself has already

 2   interpreted them that way.

 3        The evidence will also show that UBH developed and used

 4   its guidelines to make clinical determinations about whether to

 5   approve the class member's request for coverage.  The

 6   guidelines themselves tell us that UBH uses them for that

 7   purpose.  The Level of Care Guidelines, for example, say that

 8   UBH's peer reviewers use the guidelines when making adverse

 9   medical necessity determinations.

10        Under UBH's accreditation standards and its own

11   established policies and procedures, which plaintiffs will

12   prove through UBH's own documents, UBH is required to cite a

13   guideline when it issues a clinical coverage determination.

14   And the evidence will show that in each one of the class

15   members cases, UBH did base its denial on either the Level of

16   Care Guidelines or a coverage determination guideline.

17        The evidence will also show that because of the exercise

18   of discretion inherent in both of these discrete tasks, both

19   developing the guidelines and using them to make clinical

20   coverage determinations were fiduciary acts.

21        Let's talk about generally accepted standards of care for

22   a moment.  There are generally accepted standards of care for

23   treating patients with mental illnesses and substance use

24   disorders.  There is no dispute on that, and there's really no

25   dispute that there are generally accepted standards of care for

1    how to make level of care placement decisions for those

2    patients.

3        In the behavioral health field, the treatment setting is

4    an integral part of effective and appropriate treatment.  As

5    the evidence will reflect, there is a continuum of care for

6    behavioral health treatment along which treatment could be

7    provided in a number of different settings with different

8    levels of service intensity within each setting.

9        At one end of the spectrum you have routine outpatient

10   treatment.  So, for example, a person may go to see a

11   psychiatrist or psychologist in an office setting once a week

12   for a period of time.

13       Slightly more intense level of services would be seeing

14   the psychiatrist more frequently, two times a week or three

15   times a week.

16       Some patients might require more intensive services, such

17   as intensive outpatient treatment where they are in a treatment

18   setting for several hours a day, several times a week.

19       Toward the other end of the spectrum, some patients may

20   need to be immersed in a treatment setting for 24 hours a day

21   in a residential treatment facility.

22       And then at the other end, patients who are an imminent

23   danger to themselves or others need to be hospitalized until

24   that imminent danger can be controlled.  That's often called

25   the acute inpatient level of care.

1       These levels of care provide very different treatment

2  settings from one another.  They address different needs, and

3  for that reason selecting the appropriate level of care for a

4  particular patient is a critical threshold decision that

5  behavioral health providers make in every case.

6       Plaintiffs will offer the testimony of experts who were at

7  the top of their respective fields, each of whom has evaluated

8  UBH's Level of Care Guidelines and will explain to the Court

9  why those guidelines fall below generally accepted standards.

10  They each have deep knowledge of what the generally accepted

11  standards of care are in their respective specialties, and each

12  will testify that UBH's guidelines violated those standards

13  because they were overly restrictive in their requirements for

14  coverage.

15       As these experts will explain to the Court, it is a

16  generally accepted standard of care in the behavioral health

17  community to provide the most effective treatment for a

18  person's mental health or substance use disorder.

19       In order to do that, it's also a generally accepted

20  standard of care to make patient-centered decisions about level

21  of care placement that are based on a thorough assessment and

22  evaluation of a wide range of factors about the whole person.

23       As plaintiffs' experts will explain, one of the key

24  factors to evaluate is whether the patient has co-occurring

25  conditions; that is, multiple diagnoses, whether those are

1   behavioral health or medical diagnoses.

2       For example, a person might be diagnosed with depression

3   or anxiety and a substance use disorder.  This happens a lot.

4   And when it happens, it's a generally accepted standard of care

5   to provide effective treatment of the co-occurring condition as

6   well.

7       It's generally accepted in the behavioral health community

8   that some patients may require treatment to maintain their

9   level of functioning or prevent deterioration, and it's

10  generally accepted to provide that treatment.

11      And it's generally accepted in the behavioral health

12  community that many behavioral health conditions are chronic

13  and that it is appropriate to provide effective treatment

14  throughout the course of a chronic illness.

15      There's really very little dispute among the parties'

16  experts about those generally accepted standards.  What the

17  experts in this case vehemently disagree about is whether UBH's

18  guidelines are consistent with those standards.

19      The evidence will show that UBH's guidelines fall far

20  short of these standards and that UBH's evidence to the

21  contrary does not withstand even modest scrutiny.

22      The guidelines fall far outside any reasonable

23  interpretation of what is generally accepted, and let me turn

24  now to the evidence of why that's true.

25      The evidence will show that UBH's guidelines are

1   pervasively biased in favor of restricting coverage.  This

2   shows up in the guidelines in several ways.

3       For one, the guidelines have an unrelenting focus on acute

4   symptoms.  This is evident throughout the class period whether

5   UBH uses words like "presenting problems" or "'why now'

6   factors" to refer to them.

7       The evidence will show that besides the guidelines

8   single-minded focus on acute symptoms, they leave out other

9   considerations that under generally accepted standards are

10  essential to making appropriate patient placement decisions:

11      What's needed for the effective treatment of the patient's

12  chronic conditions or their underlying illness?

13      What's needed to effectively treat any co-occurring

14  conditions?

15      And what may be needed to address the special

16  considerations applicable to children and adolescents?

17      I'm not going to attempt right now to walk through every

18  word of every guideline, but I do want to hopefully quickly

19  offer an overview of what is called the common criteria, which

20  are the requirements that apply across the board to every

21  diagnosis and at every level of care.

22      First I want to briefly explain the structure of UBH's

23  Level of Care Guidelines using the year 2015 as an example.

24  Exhibit 5 for identification is UBH's 2015 Level of Care

25  Guidelines.  In the Table of Contents, we can see that the

 1   different sections that make up the guidelines include an

 2   introduction; some guiding principles; there are a few pages on

 3   development, approval, dissemination, and use; and then there's

 4   the section entitled "Common Criteria and Clinical Best

 5   Practices for All Levels of Care," which we'll discuss in a

 6   moment.  Every request for coverage of any behavioral health

 7   service has to meet the common criteria.

 8        Then there are sections on each of the specific levels of

 9   care.  The Court will note that under the heading of "Mental

10   Health" there are sections on each of the levels of care at

11   issue in this case:  Residential treatment, intensive

12   outpatient treatment, and outpatient treatment.

13        And the Court will likewise note that under the heading of

14   "Substance-Related Disorders," each of these levels of care

15   also appear; and in the "Substance Use Disorder" section,

16   residential treatment is referred to as residential

17   rehabilitation.  Each of those -- the criteria in each of those

18   sections specify that the common criteria must be satisfied.

19   So let's look at them.

20        The section starting on page 8 of Exhibit 5 contains two

21   parts:  The common criteria and the clinical best practices.

22   The requirements in both sections have to be satisfied before

23   UBH will approve coverage.  The common criteria include

24   admission, continued stay, and discharge criteria.

25        I'd first like to draw the Court's attention to what is

1    arguably the most important word in these criteria, "and."

2    It's in all caps, underlined, and it appears between each and

3    every one of the common criteria.  There is no question what

4    this means.  Every one of these criteria has to be satisfied,

5    not just Section 1.7.3, which says that services have to be

6    consistent with Optum's Best Practice Guidelines.  While it may

7    be necessary for your doctor to use what UBH considers to be

8    best practices, it certainly is not sufficient under these

9    guidelines for UBH to approve coverage.

10        Nevertheless, despite the grammatical clarity, despite the

11   all caps and underlining, the Court will watch and listen as

12   some UBH witnesses in an attempt to defend these guidelines

13   argue that "and" really means "or" so that the best practices

14   section somehow makes the other criteria irrelevant, but that

15   argument just does not line up with what these guidelines

16   actually say.

17        Now I want to draw the Court's attention to Section 1.4.

18   That section says that in order to approve coverage, UBH has to

19   conclude that the member's current condition cannot be safely,

20   efficiently, and effectively assessed and/or treated in a less

21   intensive level of care due to acute changes in the member's

22   signs and symptoms and/or psychosocial and environmental

23   factors, also known as the "why now" factors.

24        This is really important.  On its face this criterion says

25   two key things.  First, that the member has to have experienced

1   an acute change in her signs and symptoms and/or psychosocial

2   and environmental factors.  If there was no acute change, this

3   criterion is not and cannot be satisfied.

4        1.4 says something else too.  Assuming there is an acute

5   change, 1.4 says that the acute change has to be severe or

6   significant enough that because of that acute change, the

7   member cannot be safely, efficiently, and effectively treated

8   in any less intensive level of care.  This centrality of acuity

9   is evident throughout the common criteria.

10       Let's look for another example at Section 1.8.  1.8 says

11   that in order for UBH to approve coverage, it has to have a

12   reasonable expectation that services will improve the member's

13   presenting problems within a reasonable period of time.

14       What does that mean?  Well, the guidelines tell us what it

15   means on the next page.  Section 1.8.1 says (reading):

16            "Improvement of the member's condition is indicated

17       by the reduction or control of the acute signs and

18       symptoms that necessitated treatment in the level of

19       care."

20       So, again, this means two things.  There have to be acute

21   signs and symptoms, and UBH has to believe that treatment will

22   reduce or control them within a period of time.

23       How does UBH measure whether the acute signs and symptoms

24   have been reduced or controlled?  Well, that's in the next

25   paragraph, 1.8.2.  In this context, it measures the improvement

1  in the acute signs and symptoms by weighing the effectiveness

2  of treatment against evidence that the signs and symptoms will

3  deteriorate without the proposed treatment within the broader

4  framework of the member's recovery, resiliency, and well-being.

5      This language is really interesting for another reason.

6  Like so many other parts of the guidelines, UBH borrowed it

7  from another source; and like it did with so many other

8  sources, it used creative editing to fundamentally change the

9  language's meaning to justify restricting coverage.

10     The reasonable expectation of improvement requirement

11 comes from the CMS Medicare Benefits Policy Manual, but the CMS

12 definition emphasizes that, particularly for patients with

13 long-term chronic conditions, control of symptoms and

14 maintenance of a functional level to avoid further

15 deterioration is an acceptable expectation of improvement.

16     UBH didn't just leave that out of its common criteria; it

17 replaced it with the language in 1.8.1 rewriting the definition

18 to make sure the focus was solely on reduction or control of

19 the acute signs and symptoms.

20     UBH took a definition that it knew was generally accepted

21 and narrowed it to suit its own purposes; and as the evidence

22 will show, this is not an isolated incident but a pattern of

23 cherry picking and manipulation of those sources on which UBH

24 pretends to rely.

25     So those are some of the common admission criteria.

**OPENING STATEMENT / REYNOLDS**

1    They're some of the hoops that the member has to jump through

2    just to get coverage on day one, and we'll talk about more of

3    them throughout the trial.

4         For now, let's look at the continued service criteria.

5    These are the criteria that apply if the member is already

6    admitted and UBH is deciding whether to continue providing

7    coverage.

8         So continuing with Exhibit 5, let's focus on Section 2.1.

9    This contains two vague requirements for continued coverage.

10   First, that the admission criteria continue to be met.  So all

11   the stuff we just talked about still applies.  There still has

12   to be an acute crisis.  UBH still has to find that you need the

13   proposed level of care because of that acute crisis and that

14   the services are expected to reduce or control the acute

15   symptoms within a reasonable period of time.

16        Every one of those threshold requirements still has to be

17   met, but now there's one more.  You have to be receiving active

18   treatment.  The guidelines define "active treatment" as, among

19   other things, services that are provided under a treatment plan

20   that is, quote, "focused on addressing the 'why now' factors,"

21   close quote.  It doesn't say "focused on addressing the

22   member's underlying mental illness or substance use disorder."

23   It doesn't say "focused on addressing the member's condition."

24   It says "focused on addressing the 'why now' factors," which we

25   know refers to the acute changes in signs and symptoms.

1          This means that once those acute changes in signs and

2     symptoms are ameliorated, there can no longer be active

3     treatment by definition; and if there is no active treatment,

4     these guidelines say there is no coverage.

5          Now let's look at part three, the discharge criteria.

6     This is how UBH decides when coverage should end.  There's

7     really just one criterion.  If UBH finds that the continued

8     stay criteria are no longer met, the guidelines say that the

9     member should be discharged and UBH should deny coverage from

10    that point forward.

11         And, of course, because the continued stay criteria

12    required the admission criteria to be met, this means the

13    moment one of those admission criteria ceases to apply, these

14    guidelines say that the member is ready for discharge.

15         And lest there be any confusion about that point, the

16    guidelines give examples of situations when the continued stay

17    criteria are no longer met.  The first one is that the "why

18    now" factors which led to admission have been addressed to the

19    extent that the member can be safely transitioned to a less

20    intensive level of care or no longer requires treatment -- or

21    no longer requires care.  Excuse me.

22         Remember the "why now" factors?  Those are the acute

23    changes.  As soon as those improve enough that it would be safe

24    to put the member in a lower level of care, never mind whether

25    the treatment would be effective at that level or the most

 1  effective at that level, these guidelines call for the denial

 2  of coverage.

 3      All of these provisions interlock and they're mutually

 4  reinforcing.  Among a number of other ways that they fall short

 5  of generally accepted standards, these criteria combine to

 6  preclude coverage in the absence of an acute crisis; and after

 7  a crisis has passed, they call for the denial of coverage even

 8  if the requested services are at the level of care that can

 9  most effectively treat the member's underlying illnesses and

10  co-occurring conditions.

11      In short, it's no surprise that Jerry Niewenhous, the UBH

12  employee who maintained the Level of Care Guidelines for more

13  than 13 years, describes UBH's approach as, quote, "acute care

14  utilization management," close quote.

15      Why does UBH have such fundamentally defective guidelines?

16  The answer is going to be a pretty familiar one to the Court.

17  It's to protect the company's bottom line.  UBH's financial

18  interests took precedence over what was clearly required by the

19  plans it was administering fidelity to generally accepted

20  standards of care.

21      There's no dispute that UBH has a structural conflict.

22  With respect to its fully insured plans, UBH bears the risk for

23  benefits paid, also known as the benefit expense, which of

24  course means that more money paid for benefits equals less

25  money in UBH's pocket.

1    But even with respect to its self-funded plans, it is in

2    UBH's economic interest to minimize benefit expense because it

3    is competing with others for the business of administering

4    health insurance benefits.

5    And because both its fully insured and its self-funded

6    plans condition coverage on services being consistent with

7    generally accepted standards, UBH needed to develop a single

8    set of clinical guidelines to make determinations under all

9    plans.

10   The conflict in this case is no mere theoretical conflict.

11   UBH's financial concerns were front and center for the people

12   involved in writing and approving UBH's guidelines.

13   Throughout the class period, UBH's senior managers, who

14   were regularly apprised of UBH's performance in relation to

15   benefit expense and utilization forecasts and targets,

16   participated in editing the guidelines and voted on whether to

17   approve the guidelines.

18   The committee that approved the guidelines at UBH --

19   called the BPAC for some of the class period and the UNC at the

20   end -- included members of UBH's Finance Department and its

21   so-called Affordability Department, which is charged with

22   developing initiatives to mitigate benefit expense.

23   And the individuals primarily responsible for maintaining

24   UBH's guidelines were reminded time and time again of the

25   centrality of UBH's financial concerns.  And the Court will see

1   over and over again how concerns about not increasing benefit

2   expense, or ben-ex, trumped considerations of what was

3   supported by the evidence of generally accepted standards.

4        The evidence of UBH's conflict goes back to 2010 when UBH

5   was faced with implementing the Mental Health Parity and

6   Addiction Equity Act.  That standard was a game changer.  Among

7   many other things, it outlawed insurance plan provisions that

8   discriminated against those with mental illness by, for

9   example, imposing day and visit limits on behavioral health

10  treatment; for example, capping the number of days of

11  residential or IOP treatment or the number of sessions of

12  outpatient treatment covered under a plan.

13       The Parity Act prohibited that kind of plan-based

14  quantitative limitation, so UBH decided on a mitigation

15  strategy in UBH's words, using, quote, "concurrent review to

16  ensure appropriate utilization," close quote.  Rather than

17  applying overt limits, UBH would keep a lid on utilization

18  through its clinical review process by authorizing days and

19  visits in bite-sized amounts, then conducting frequent

20  concurrent reviews and issuing denials under its restrictive

21  guidelines.

22       Post-parity UBH relied on its guidelines to drive denials,

23  a fact the people who wrote and approved the guidelines knew

24  very well.

25       UBH's concern for its own bottom line infected its

1  decision-making, including about its clinical guidelines

2  throughout the class period.  Like in so many cases, this

3  motive evidence can best be seen through contemporaneous

4  communications between individuals involved when they are

5  facing a fork in the road.

6      The evidence will show that when faced with such

7  decisions, this company consistently chose the path that would

8  save it the most money even where this restricted coverage in

9  violation of generally accepted standards of care.

10      Plaintiffs will present evidence of at least three

11  examples of how UBH's focus on its financial interest impacted

12  the guideline development process.

13      First is UBH's conduct when it figured out it had to cover

14  Transcranial Magnetic Stimulation or TMS.  TMS is a treatment

15  that in 2008 the FDA found effective for treatment-resistant

16  major depressive disorder.  It's more expensive than some other

17  forms of treatment, though.  So UBH's first reaction was to

18  just keep on considering TMS unproven for years after the FDA

19  approval so that TMS treatment was administratively excluded

20  under most plans as experimental.

21      Then UBH's denials started to get overturned on external

22  appeal more and more often.  So the company found it couldn't

23  really continue calling TMS unproven.  So in 2013, it finally

24  recognized that TMS was effective and a generally accepted form

25  of treatment in some circumstances.

 1        But now UBH had a new problem.  If TMS wasn't excluded,

 2   UBH was going to have to cover it because its plans covered

 3   generally accepted treatment.  Even though this was just one

 4   treatment for one diagnosis, UBH was deeply concerned about the

 5   increase in benefit expense it was going to cause; a projected

 6   4 to 9 cents in additional ben-ex per member per month

 7   amounting to a total of about 4.8 to 10.8 million per year.

 8        UBH's first solution to this problem was that it would

 9   approve coverage for TMS under self-funded plans -- meaning

10   someone other than UBH was paying -- but to continue

11   automatically denying it if UBH was footing the bill.

12        It wasn't until legal came in and said, "Listen, you can't

13   adopt different clinical policies for these plans just based on

14   who is paying," so UBH went to its fallback position.  It

15   wouldn't automatically deny claims for TMS, but to make sure it

16   didn't cost the company too much, it would, quote, "need to

17   manage it very tightly," close quote.  And that instruction was

18   conveyed directly to the people drafting the guideline.

19        Another example of how UBH reacts at a fork in the road

20   concerns Applied Behavioral Analysis or ABA, a treatment for

21   autism spectrum disorder.  UBH had Level of Care Guidelines and

22   CDGs in place for ABA, which set a hard limit on the number of

23   hours per week UBH would approve.

24        In 2016, the State of Indiana Department of Insurance

25   instructed UBH to get rid of the hard limit.  So UBH took a

 1   look at its ABA guidelines and researched the criteria and

 2   figured out that aspects of UBH's guidelines were unsupported,

 3   meaning they fell short of generally accepted standards of

 4   care.  So the guideline drafters proposed some revisions and

 5   the UMC approved them.

 6       But this alarmed the Finance Department, which worried

 7   that removing the hard limit on ABA treatment in all states

 8   would lead to a significant increase in benefit expense for

 9   this widely used treatment, and so Finance escalated this issue

10   all the way to the head of UBH, Martha Temple.

11       Ms. Temple's view was that even if UBH was required to

12   comply with the Indiana mandate, for all other states UBH

13   should not revise its guidelines for ABA even though the

14   guideline drafters had concluded that the peer-reviewed

15   evidence demanded it and even though the committee had already

16   approved it.

17       Following Ms. Temple's instructions, UBH did not make the

18   changes in its standard criteria.  And Ms. Temple issued the

19   following reminder to several members of the UMC (reading):

20          "We need to be more mindful of the business

21          implications of guideline change recommendations."

22       Nothing about medical necessity, nothing about whether

23   this complied with generally accepted standards, nothing about

24   whether this was consistent with the interests of plan

25   beneficiaries.  Just "be mindful of the business implications

**OPENING STATEMENT / REYNOLDS**

1    of changes to the guidelines."

2        Third, the Court is going to hear quite a bit about UBH's

3    decision on whether to adopt as its standard criteria for

4    substance use disorders the ASAM criteria issued by the

5    American Society for Addiction Medicine.  As the Court will

6    hear -- and this will not be seriously disputed -- the ASAM

7    criteria are by far the most widely accepted reflection of the

8    generally accepted standards for patient placement for

9    substance use disorder treatment.  It's the required criteria

10   for substance abuse treatment under Medicaid in a majority of

11   states, some states mandate it for commercial purposes as well,

12   and even some insurers have adopted ASAM as their standard

13   clinical criteria for substance use disorders.

14       Now, UBH has people on its staff that it considers subject

15   matter experts with respect to substance use disorder

16   treatment.  They're called the SUDS team.  Those clinicians

17   recommended repeatedly throughout the class period that UBH

18   adopt ASAM as its standard criteria; but UBH never did it, and

19   the reason it didn't do it is that the Finance and

20   Affordability Departments were unable to come up with a

21   reliable estimate of the potential impact on benefit expense

22   from making the switch.

23       Let's pause here for a moment.  UBH is going to tell the

24   Court throughout this trial that its criteria are fully

25   consistent with ASAM.  What UBH concluded internally, though,

1  was that it was impossible to model the benefit expense impact

2  of adopting the ASAM criteria.  UBH's criteria were so

3  different from ASAM that UBH was unable to come up with a

4  reliable prediction of what would happen to its bottom line if

5  it made the switch.

6      And so because it couldn't get comfort about how much the

7  change was going to cost UBH, the company repeatedly refused to

8  adopt ASAM as its standard criteria, notwithstanding the

9  recommendations of its own SUDS team.

10     Again, there were no substantive misgivings about ASAM, no

11 argument that the ASAM criteria didn't reflect generally

12 accepted standards.  UBH's decision was driven solely by cold,

13 calculated considerations of profit and loss.

14     This evidence and more will demonstrate to the Court that

15 time and time again when UBH was faced with a choice between

16 what was good for its own bottom line and what was good for

17 plan benefit theories, it prioritized its own interests.

18     The *modus operandi* of this ERISA fiduciary, which is

19 supposed to administer the plans solely in the interests of the

20 beneficiaries, was to put its own interests first.  Far from

21 insulating the people charged with creating its clinical

22 guidelines from financial considerations, UBH made sure those

23 decision-makers were well aware of its own financial goals and

24 the centrality of the clinical guidelines to the achievement of

25 those goals.

1      In light of this deep and widespread conflict of interest,

2   the pervasive guideline defects, and UBH's cherry picking from

3   source material, the Court should evaluate UBH's decisions

4   about the content of its guidelines and whether those

5   guidelines accurately reflect generally accepted standards with

6   a healthy dose of skepticism, to say the least.

7      The Court should also readily find that UBH breached its

8   fiduciary duties of loyalty and care.  And because UBH's

9   guidelines so grossly departed from the standards required by

10  the class members plans, UBH also violated ERISA when it used

11  those plans to deny coverage to all the class members.

12     For that reason, when all the evidence has been offered,

13  we'll ask the Court to find UBH liable on all counts and to

14  move on to the remedy phase of the case.

15     Thank you for your time.

16          **THE COURT:**  Thank you.

17      **MS. ROMANO:**  Is it fine if I am at this lectern?

18          **THE COURT:**  It's up to you.

19      **MS. ROMANO:**  We just need to do one technical change.

20                      <u>**OPENING STATEMENT**</u>

21      **MS. ROMANO:**  Good morning, Your Honor.  Jennifer

22  Romano for defendant United Behavioral Health.

23     This case is about the work that UBH does to improve the

24  health and well-being of millions of Americans across the

25  country.  Behavioral health presents serious challenges, both

1    on an individual basis, as well as on a public health basis.

2        Substance use and addiction, including an opioid crisis

3    among our young adults, continues to plague our communities.

4    Many people struggle with serious mental illnesses, sometimes

5    lasting a lifetime.  While many healthcare providers are

6    committed to high-quality treatment for these conditions, the

7    behavioral health field is faced with inconsistent practices,

8    treatment methods that are not evidence based, waste, and

9    sometimes fraud.

10       The core of UBH's business is to provide access to

11   high-quality, effective, and efficient treatment and to control

12   the cost of healthcare.

13       Many employers offer health insurance benefits to their

14   employees, including benefits for behavioral health, and that

15   includes mental health and substance use disorder treatment,

16   and these employers select a company to administer those

17   benefits for them.  UBH is one such company.

18       UBH helps connect the member to quality healthcare

19   providers to obtain treatment covered under the terms of the

20   plan that is purchased by the employer.

21       In this trial, you will hear that over the class period

22   thousands of employers turned to UBH to manage behavioral

23   health benefits for their employees and their family members.

24   UBH's job as the managed care company is to get these members

25   access to the right care for their situation with the right

1    provider for the best outcomes.

2        UBH's employees will testify that they worked to make

3    these members healthier by managing the benefits to cover

4    medically necessary and effective treatment according to the

5    terms of the plans purchased by their employers.

6        Now, what does UBH do for employers and members?  You will

7    hear testimony that UBH is a company focused solely on

8    behavioral health.  It employs over 1,000 licensed clinicians

9    and more than 70 board-certified psychiatrists who combine

10   their specialized expertise to address behavioral health

11   challenges and advance quality care for individual members.

12       UBH's mission is evidence-based medicine.  It helps its

13   members access the most effective and appropriate care for

14   their individual circumstances consistent with the coverage

15   provided in their health benefit plans.

16       UBH maintains a nationwide network of behavioral health

17   providers and assesses the quality of care received by its

18   members by monitoring certain metrics, such as readmission

19   rates, to identify gaps in care or ineffective treatment.

20       Medical necessity and evidence-based treatment are

21   requirements for health benefit plans.  You will hear that

22   although the vast majority of services are authorized for

23   coverage under the plans, the health benefit plans in this case

24   do not cover all treatments a member might seek or receive.

25   Instead, you will learn that one of UBH's responsibilities to

OPENING STATEMENT / ROMANO

1   the employers that purchase the health benefit plans and to the

2   members is to authorize benefits where services are medically

3   necessary and where the plan provides coverage.

4        The many different health benefit plans that will be

5   introduced into evidence will have at least one thing in

6   common.  They grant UBH the discretion to interpret the plans

7   and manage the behavioral health benefits under those plans;

8   and as the plans at issue provide, UBH creates clinical

9   guidelines to help its reviewers administer the benefits and

10  determine whether coverage is available.

11       You will hear that it is common for companies like UBH to

12  develop their own guidelines.  In fact, it is so common that

13  there is a nationally accredited process for doing so and UBH

14  has earned that accreditation.

15       In this class action case, plaintiffs challenge 222 of

16  UBH's guidelines on their face claiming that each one is

17  inconsistent with all of the plans UBH administers.  The

18  evidence will show that UBH's guidelines are consistent with

19  the plans and are consistent with generally accepted standards

20  of care.

21       There will be 129 different ERISA health benefit plans

22  that will be introduced into evidence in this trial.  These are

23  the plans for the named plaintiffs and randomly selected plans

24  that were selected for the class members and produced in

25  discovery in this case.

1     You will hear testimony that these are the documents, the

2   contracts, that set forth the scope of what healthcare services

3   are covered and what healthcare services are not covered for

4   each of the class members.

5     And you will hear evidence that these plans changed

6   regularly, often annually, and their language varies depending

7   on the employer.

8     Now, all of the health benefit plans at issue are managed

9   care plans.  You will learn that this means the health benefit

10  plans cover some but not all healthcare services; and as the

11  administrator, UBH works with the members and the providers to

12  help members obtain quality and efficient healthcare services

13  under those plans.

14    You will see that the health benefit plans provide that

15  coverage is not always available when a member or his treating

16  provider recommends it.

17    Barry Dehlin, UnitedHealthcare's product director, will

18  explain the health benefit plans and what UBH is hired to do

19  for the plans and the plan members, including the class members

20  in this case.  He will explain that UBH's job is to build a

21  network to ensure that the network providers are of proper

22  quality.

23    UBH's job is to coordinate the member's care among

24  multiple providers.  It's to determine whether treatment the

25  member receives is covered by the member's health benefit plan.

1          And UBH's job is also to address fraud and quality of care

2     issues.   UBH is hired by employers to manage the plans

3     efficiently, make sure necessary and effective care is covered,

4     and that unnecessary and ineffective care is not.

5          The evidence will show that the health benefit plans give

6     UBH the discretion to interpret the plans, administer the

7     benefits, and decide if the treatment is medically necessary.

8          And you will see the various ways that the health benefit

9     plans at issue in this case give UBH the discretion to

10    determine the right level of care.   For example, you will learn

11    that the health benefit plan applicable to one of the

12    plaintiffs, Gary Alexander, provided that UBH will determine

13    the appropriate setting for the treatment.

14         You will see that other health benefit plans in evidence

15    in this case gave discretion to UBH to select the location of

16    service.

17         Mr. Dehlin will also explain how the health benefit plans

18    vary in the scope and limitation of the covered benefits.

19         All of the 129 plans that will come into evidence will

20    include a requirement that treatment be consistent with

21    generally accepted standards of care or with professional

22    standards, but you will see that the plans do not say that they

23    cover all services that are consistent with generally accepted

24    standards of care.

25         For example, the evidence will show that in the benefit

1    plan for one of the plaintiffs, Natasha Wit, in the definition

2    of "covered health services," all of the following five

3    criteria need to be met of which one is consistency with

4    prevailing medical standards.

5        Similarly, in the same plan in the exclusions, the

6    evidence will show that any of the following can be reasons for

7    an exclusion, and inconsistency with generally accepted

8    standards of cares is one of the five reasons listed.

9        Mr. Dehlin will also explain that the 129 health benefit

10   plans vary in the requirements for coverage and in the

11   exclusions and limitations that apply specifically to

12   behavioral health services.  For example, you will see that

13   some of the plans in evidence exclude services that extend

14   beyond the period necessary for evaluation, diagnosis, the

15   application of evidence-based treatments, or crisis

16   intervention to be effective.

17       Others provide that benefits are only available for

18   services provided in the least costly treatment setting, which

19   in the judgment of the plan and its authorizing agent -- that's

20   UBH -- is medically necessary for the individual patient's

21   condition.

22       Some do not cover residential treatment at all and others

23   limit coverage for residential treatment to short-term

24   intervention to stabilize the presenting problem within a

25   reasonable period of time.

1          It will be Mr. Dehlin who explains this variation in the

2     plan language.  Plaintiffs' experts will offer no opinion on

3     the plans or what they mean.  And these differences in the

4     plans, they do matter because if the guidelines are consistent

5     with the plans, there is no violation of ERISA.

6          In addition to making coverage decisions, you will hear

7     testimony from UBH employee Nisha Patterson who will testify

8     about how UBH uses some of the data that's been referred to,

9     including data about benefit expenses, to address quality of

10    healthcare services and keep healthcare affordable.

11    Ms. Patterson is the head of the Affordability Department,

12    that's been mentioned this morning as well, and this department

13    is focused on quality and affordability initiatives throughout

14    the company.

15         She will explain how UBH uses data about admissions and

16    services to come up with initiatives aimed at improving care

17    and quality and outcomes for members.  For example,

18    Ms. Patterson will explain the Affordability Department's

19    efforts to tackle the challenges members face when seeking

20    treatment from some providers outside of UBH's network.

21         You will hear testimony that members suffering from

22    substance use sometimes end up in high-cost destination

23    treatment centers outside of their communities and away from

24    their support networks.  These facilities often are not part of

25    UBH's network of credentialed providers, and Ms. Patterson will

OPENING STATEMENT / ROMANO

1   explain this means UBH has not vetted them for quality and

2   effective treatment.

3       Ms. Patterson will testify that by analyzing utilization

4   and claims data, UBH is able to identify the providers that

5   have higher readmission and relapse rates than would be

6   expected.  The Affordability Department addresses these

7   situations with projects that promote in-network providers who

8   have been vetted for quality care through the credentialing

9   process and with projects that support post-discharge care for

10  members when they return home.

11      Now, as we heard this morning, plaintiffs point to the

12  role of the Affordability Department and UBH's role as a payer

13  of benefits to assert that UBH's guidelines at issue in this

14  case are influenced by a conflict of interest.

15      And we heard a little bit about the difference between

16  self-funded and fully funded plans as well.

17      Now, we will hear numerous witnesses testify about the

18  creation and approval of the UBH guidelines, and none will

19  testify that the Affordability Department or any financial

20  metrics influenced the language of the UBH guidelines at issue

21  in this case.

22      In addition, 62 percent of the class members were covered

23  by self-insured ERISA plans, and you will learn that these

24  health benefit plans are created by larger employers that

25  decide to underwrite their own health plan for their employees.

 1           THE COURT:  Why does that matter?

 2           MS. ROMANO:  Why does it matter?  It matters --

 3           THE COURT:  Yeah.  Why does it matter?

 4      Let me tell you the import of my question.  The guidelines

 5   apply across plans; right?  They're not limited to fully

 6   insured plans or employer self-insured plans; right?

 7           MS. ROMANO:  That is correct.

 8           THE COURT:  So any given guideline that is under

 9   challenge here is applicable to a fully insured plan; right?

10           MS. ROMANO:  That is correct.

11           THE COURT:  Okay.  So why isn't there a structural

12   conflict for that reason?

13           MS. ROMANO:  Your Honor, there is a potential

14   structural conflict for 38 percent of the class members.

15           THE COURT:  No, no, not 38 percent of the class

16   members.  All of the guidelines are written without regard to

17   which of the plans.  So they are written, among other things,

18   for fully insured plans.  Therefore, when deciding whether or

19   not the guidelines are consistent with generally accepted

20   medical criteria, why doesn't UBH operate under a structural

21   conflict?  Because some, those guidelines are applicable and

22   they know they're applicable to fully insured plans.  Isn't

23   that the definition of a structural conflict?

24           MS. ROMANO:  There would be a structural conflict in

25   creating the guidelines, but why does it matter that 62 percent

1  are self-insured class members?

2          **THE COURT:**  Right.

3          **MS. ROMANO:**  It's because when evaluating the

4  skepticism to be used with respect to a structural conflict, if

5  that is applied, the fact that a majority of the membership

6  is -- there is no structural conflict should be considered as

7  part of that evaluation.

8          **THE COURT:**  Got it.

9          **MS. ROMANO:**  And with respect to the 38 percent,

10  Your Honor, you will learn that UBH provides administrative

11  services for these folks, as well as having the risk for the

12  benefits; but there will be testimony from Mr. Dehlin that UBH

13  builds the cost of providing the benefits into the monthly

14  premiums it charges for providing insurance and it adjusts

15  those premiums on an annual basis to address changes in the

16  cost of benefits, which the case law has addressed and

17  considered when evaluating the structural conflict as well.

18          Now, plaintiffs challenge 222 UBH guidelines that were

19  used to determine coverage during the class period.  Let's talk

20  a little bit about what those guidelines are.

21          Eight of the 222 are the Level of Care Guidelines, and

22  only three levels of care within those guidelines are at issue

23  in this case, and Ms. Reynolds went over them.  It's

24  residential, intensive outpatient, and outpatient.

25          Now, there is a separate guideline for ABA and there is a

 1   separate guideline for TMS, and those were two specific issues

 2   that were discussed quite a bit this morning already; but it's

 3   very important to understand that those guidelines, the TMS and

 4   ABA, they're not challenged in this case and they were not used

 5   for any of the class members.

 6        These Level of Care Guidelines are updated annually from

 7   2011 to 2017 and they did change in language.  Ms. Reynolds

 8   talked about the 2015 guidelines and walked through them very

 9   carefully, but it's important that they changed.

10        And specifically the "why now" language that we heard

11   quite a bit about today and its tie to acute conditions and

12   circumstances, it was not in the guidelines in 2011 or 2012 or

13   2017.  And the words "why now" were in the guidelines in 2013

14   but with no connection to the acute changes that we heard about

15   this morning.

16        And all of the Level of Care Guidelines explicitly provide

17   that they are to be used flexibly and are intended to augment

18   but not replace sound clinical judgment.  That's in the

19   language of the guidelines.

20        And you'll see that the Level of Care Guidelines give the

21   medical directors -- and that includes every one of the doctors

22   with authority to authorize or deny coverage -- they were given

23   the discretion to make exceptions to the guidelines.  You will

24   see that many of the 129 health benefit plans in evidence also

25   provide for those exceptions.

1     Now, these Level of Care Guidelines were used for the

2  coverage decisions for approximately half of the class members.

3     The other guidelines that are challenged in this case are

4  coverage determination guidelines, and we didn't hear about

5  those too much in the opening.  There are 215 coverage

6  determination guidelines that are challenged in this case.

7  These guidelines are different because they are specific to a

8  particular diagnosis.

9     So, for example, there are some specific to

10  obsessive/compulsive disorder, some to major depressive

11  disorder, and a host of different conditions.  These guidelines

12  were also updated annually and changed from year to year for

13  the different diagnoses.

14     With one exception, the coverage determination guidelines

15  that are challenged in this case are challenged only to the

16  extent they incorporate the Level of Care Guidelines, but the

17  evidence will show that not all of the 215 coverage

18  determination guidelines that are challenged incorporate the

19  Level of Care Guidelines.  For example, while some of the

20  challenged coverage determination guidelines include the full

21  language of the Level of Care Guidelines, some include just

22  portions of the Level of Care Guidelines, others just reference

23  them or cite to them, and others don't incorporate or refer to

24  them at all.

25     Now, there will be a lot of evidence, and it will likely

1   be more in UBH's case, about the process for creating these

2   guidelines, and the primary witness talking about that will be

3   Jerry Niewenhous.  He's a master's level social worker and one

4   of the people who oversaw the updating of the guidelines from

5   2003 to 2016.  He's going to explain the formal process that

6   was used to update them and it happened every year.

7           THE COURT:  He's going to be here in person?

8           MS. ROMANO:  He will be here in person, both in

9   plaintiffs' case, as well as defendant's case.

10      Mr. Niewenhous will explain that throughout the year, he

11  and his colleague, Loretta Urban, who will not be here -- she's

12  a video -- reviewed other clinical guidelines.  They reviewed

13  evidence reviews and consensus statements created by the

14  government and professional associations to identify new

15  evidence or information to enhance the guidelines.

16      Then, typically toward the end of the year, they would

17  create a work plan for the formal annual review of the Level of

18  Care Guidelines.  Mr. Niewenhous will explain that he would

19  include in the work plan a review of all of the references that

20  were in the then current year's guidelines, including the ASAM

21  criteria which we've heard about today, including the CMS

22  guidelines, which we heard about today, and materials from a

23  variety of other professional associations, and they were

24  looking to see if those materials had been updated or changed.

25  You will see that these are some of the same sources that

OPENING STATEMENT / ROMANO

1  plaintiffs' experts will rely on as well.

2      Mr. Niewenhous will explain that at the same time that he

3  and Ms. Urban were reviewing these materials, they would send a

4  copy of the then current Level of Care Guidelines to a long

5  list of clinicians for comment.  It included at least 20

6  internal UBH doctors.  That list included 20 to 30 network

7  doctors and facilities across the country.  These are not UBH

8  doctors.  These are external facilities and providers.

9      And beginning in 2012, the list of recipients also

10  received several provider specialty associations.  They asked

11  for comments about the guidelines to the Center for Clinical

12  Social Work, to ASAM, to the American Psychiatric Association,

13  and these providers were asked specifically to comment on

14  whether the guidelines should be changed and, if so, why and

15  how.

16      The template letter seeking this input will be introduced

17  into evidence, as well as the list of providers who were sent

18  them.

19      Now, Mr. Niewenhous will testify that after the comments

20  were gathered, he would compile the comments into a

21  spreadsheet, which included the detailed comment, the person

22  who provided it, and the organization.  And he would then

23  present it to a committee called the Level of Care Work Group.

24  This work group included Chief Medical Officers Dr. Bill

25  Bonfield and Dr. Rhonda Robinson-Beale, both who we will be

1   seeing by video because they're no longer employees of UBH; and

2   the Level of Care Work Group included the chair of the

3   Behavioral Policy and Analytics Committee, Dr. Lorenzo Triana.

4   Dr. Triana will be here both in plaintiffs' case, as well as

5   defendant's.

6       And each year this Level of Care Work Group would meet by

7   phone and they would review the feedback that came in from all

8   of the different folks who were asked to comment.

9       You will see that UBH received a variety of comments over

10  the years -- the actual spreadsheets of the comments will be

11  introduced into evidence -- and those comments ranged from

12  fully supportive of the guidelines to comments on different

13  issues from the ones that the plaintiffs now raise to some

14  comments that are similar to the issues raised by plaintiffs.

15      Mr. Niewenhous will testify that the Level of Care Work

16  Group reviewed the comments on the spreadsheets, they discussed

17  whether any changes should be made, and sometimes they

18  performed follow-up research in response.  The evidence will

19  also show that UBH made changes to the guidelines in response

20  to many of the comments.

21      But this wasn't the end of the process.  After this work

22  group reviewed the comments and formed their recommendations

23  for changes to the Level of Care Guidelines on an annual basis,

24  they presented them to a separate formal committee, the

25  Behavioral Policy and Analytics Committee, for approval.  This

1  committee was led by Dr. Triana and it included several doctors

2  and clinicians, as well as some of the representatives that

3  Ms. Reynolds spoke about.

4       This committee is called the BPAC Committee.  It met twice

5  a month, and you will see the meeting minutes showing that each

6  year they reviewed the recommended changes to the Level of Care

7  Guidelines that were presented to them, they discussed the

8  recommendations, sometimes they made revisions to the

9  recommendations, and they approved the new Level of Care

10 Guidelines.

11      These meeting minutes do not reflect any conversations

12 about profits or benefit expenses in connection with approving

13 the Level of Care Guidelines at issue in this case, and the

14 testimony of Mr. Niewenhous and Dr. Triana will confirm these

15 topics were not discussed.

16      And there will be evidence this process described by

17 Mr. Niewenhous and Dr. Triana satisfies the requirements

18 prescribed by the accrediting bodies.  There were two

19 accrediting associations, the Utilization Review Accreditation

20 Committee called URAC, and the National Committee for Quality

21 Insurance, sometimes called NCQA.

22      An expert in managed care accreditation and compliance,

23 Thomas Goddard, will testify that URAC and NCQA have developed

24 widely accepted accreditation criteria for the development of

25 clinical guidelines by managed care organizations like UBH.  He

 1  will explain that these accreditation requirements were

 2  developed to establish a national standard for creating

 3  guidelines, and he will testify that UBH's process for creating

 4  the guidelines satisfied the national accreditation criteria

 5  and that its process of seeking input from all of those outside

 6  providers exceeded this national standard.

 7      And UBH's efforts to seek outside input were not limited

 8  to the annual review process.  For example, you will hear

 9  evidence that it separately sought input on its guidelines when

10  it learned of new resources, like the Parity Implementation

11  Coalition, and the Association for Ambulatory Behavioral

12  Healthcare.

13      And in 2013 when a new version of the ASAM criteria was

14  announced, UBH hired as consultant one of its co-authors,

15  Gerald Shulman, to provide his thoughts on how the UBH

16  guidelines compared to the new ASAM version and to offer his

17  recommendations to the UBH guidelines.  UBH considered the

18  comments from each of these resources and made changes to the

19  guidelines in response.

20      Now, there will be many doctors, psychiatrists, who will

21  testify in this trial about the content of the guidelines and

22  what they mean.  This will be the evidence of what they mean.

23  It will not be argument of counsel.

24      Now, some of those doctors who will testify -- and all

25  three of those will be here in person, Your Honor; one of them

 1    is already in the room -- they will be UBH doctors, and they

 2    will testify about what the words in the guidelines mean in

 3    isolation and what they mean when they are doing their jobs.

 4        Dr. Allchin is a board-certified child and adolescent

 5    psychiatrist.  He will testify about what the guidelines mean

 6    for him at UBH and what they mean for the numerous other child

 7    and adolescent psychiatrists who are called upon to use them

 8    for other members.  Dr. Danesh Alam is a board-certified

 9    psychiatrist with a specialty in addiction medicine.  He also

10    continues to practice psychiatry, and he will testify about

11    what the words mean for him and the doctors using them for

12    substance use decisions.  Dr. Martorana, who supervises

13    numerous other doctors at UBH and makes coverage decisions,

14    will testify about them as well.  These doctors will explain

15    that most care is authorized.

16        And the first step in determining whether treatment is

17    medically necessary is for the provider to speak with a

18    master's level clinician at UBH.  This master's level clinician

19    is called a care advocate.  When the care advocate speaks with

20    the provider, they discuss the information set forth in the

21    best practices section of the guidelines, and this is the long

22    list of items that are in the guidelines and set forth the

23    criteria and facts that are to be collected and considered by

24    the care advocate.  They include numerous different issues, one

25    of them is specifically co-occurring behavioral health and

1    physical conditions that the member may be experiencing, and

2    another one is developmental age and history.

3         The care advocate and the provider also talk about the

4    treatment plan that the provider has created for the member to

5    make sure that evidence-based medicine is being practiced, and

6    the care advocate takes this information down and it's

7    maintained in UBH's electronic system.

8         The care advocate considers this information and UBH's

9    guidelines for coverage, the specific guideline that applies to

10   the specific plan and diagnosis, and in most circumstances the

11   coverage is authorized by the care advocate during that

12   conversation.

13        Now, as set forth in UBH's utilization management program

14   description, which will be introduced into evidence, if it does

15   not appear to the care advocate that the services are covered,

16   he can discuss the case with a UBH doctor in scheduled rounds

17   that are held throughout the week; and if he still has

18   concerns, the next step is to send the case for a consultation

19   for the doctors to simply talk or to a peer review.  A care

20   advocate cannot deny coverage on his own.

21        You will learn that a peer review is required for any

22   denial of authorization.

23        And a peer review, we will learn, is a doctor-to-doctor

24   discussion about the member's care so that a UBH doctor can

25   learn more about the case and determine whether the requested

1  services are covered under the plan.

2      The UBH doctors who will testify in this trial will

3  explain that when they are assigned to a case for a peer review

4  the doctor reviews the information that was collected by the

5  care advocate as well as other available information about the

6  member, like their treatment history and diagnoses.

7      And then the doctor gets on the phone with the provider

8  and has a doctor-to-doctor conversation about the member and

9  the proposed treatment.

10     There is no script for this conversation.  It is a

11  case-specific conversation between doctors about the member,

12  their condition, the treatment plan, and all of the facts that

13  support the decision about the right level of care to safely,

14  effectively, and efficiently treat the member, just as it's set

15  forth in the guidelines.

16     There is no single-minded approach in this conversation to

17  focus on acute symptoms.  They are talking about all of the

18  information that has been collected in the process.  And the

19  UBH doctor considers this information and the guidelines and

20  makes a decision about whether the requested treatment is

21  covered.

22     And you will hear that if the UBH doctor decides the

23  treatment is not covered, he often offers a different level of

24  care for the member.  The provider and member are then informed

25  of their right to appeal if the authorization is not given, and

1  sometimes there's a right to a second appeal as well.

2      Now, Dr. Allchin, Dr. Alam, and Dr. Martorana will explain

3  why the guidelines used for these decisions are consistent with

4  generally accepted standards of care and are designed to

5  provide necessary, high-quality treatment to UBH's members.

6      In addition, an external expert, Dr. Thomas Simpatico,

7  will testify in UBH's case about his review and opinion of the

8  guidelines.

9      Dr. Simpatico is a board-certified psychiatrist.  He has

10  30 years of experience treating patients.  He's a professor of

11  psychiatry at the University of Vermont Medical School, former

12  medical director.  And he was the chief medical officer at the

13  Vermont Medicaid Authority.

14      Dr. Simpatico has never worked for a managed care company.

15  He has never worked for an insurance company.  And he will

16  share his opinion that the guidelines from 2011 to 2017 are

17  consistent with generally accepted standards of care.

18      Now, there will be many witnesses, doctors who will

19  testify about what are the generally accepted standards of

20  care.

21      The UBH doctors and Dr. Simpatico and plaintiffs' experts

22  are going to point to several outside sources to describe what

23  are the generally accepted standards of care in treating

24  patients.  These doctors will explain, and even the plans at

25  issue in this case recognize, there is not one static or single

1    source for standards of care.  Instead, there are many sources.

2        And while all the external guidelines and guidance are not

3    the same, Dr. Simpatico will opine that they do encompass some

4    core principles.

5        He will explain that a fundamental principle for health

6    treatment is that the behavioral health treatment is that the

7    patient should be treated in the least restrictive level of

8    care that is safe and effective.

9        If they can be safely and effectively treated in

10   outpatient treatments, it is not medically necessary to admit

11   them into a residential treatment center.

12       He will further explain that effective care should limit

13   interference with an individual's life experiences, with their

14   family and community, and minimize dependence on the treatment

15   setting to prevent atrophy during treatment.

16       And he will testify that this is essential for generally

17   accepted standards of care if the treatment can be provided in

18   a less restrictive level of care, safely and effectively.

19       And, in addition to this critical principle, Dr. Simpatico

20   will also testify that treatment should be medically necessary;

21   that generally accepted standards of care require that a

22   treatment be individualized with a unique treatment plan for

23   the patient based on their unique conditions; that the

24   treatment plan should have the goal of improving the member's

25   behavioral health; and that treatment methods should be

**OPENING STATEMENT / ROMANO**

1   evidence based.

2       And while the UBH guidelines evolved over the years, they

3   differed in numerous ways from 2011 to 2017.  Dr. Simpatico

4   will testify that all of these core principles are in UBH's

5   guidelines, and UBH's guidelines are consistent with generally

6   accepted standards of care.

7       Dr. Simpatico will also opine that there is no

8   overemphasis in the guidelines on the factors that led to the

9   patient seeking care, sometimes call the "why now factors."

10  And he will testify that there is no overemphasis on the

11  presenting symptoms in the guidelines or on trying to assure

12  that the member will improve.

13      Dr. Simpatico will explain that these considerations are

14  essential for sound clinical practice, and they're

15  appropriately set forth in the UBH guidelines.

16      Now, you will also hear testimony that the key principles

17  of the external guidelines plaintiffs rely on are also

18  reflected in the UBH guidelines.

19      You will hear evidence about the ASAM criteria.  We've

20  heard about it today already.  And Dr. Fishman, who I believe

21  is testifying today, will testify about ASAM criteria.

22      Well, in addition, in UBH's case Dr. Danesh Alam will talk

23  about the ASAM criteria.  In addition to serving as the medical

24  director for UBH and practicing psychiatry in a residential

25  setting, Dr. Alam also recently served as the president of the

OPENING STATEMENT / ROMANO

1    Illinois chapter of ASAM.  He will explain the six dimensions
2    of ASAM.  And he will explain that, yes, UBH's guidelines are
3    consistent with ASAM's six dimensions.
4        You will also hear testimony about the LOCUS and CA-LOCUS
5    tools from some of plaintiffs' other experts.  Dr. Simpatico
6    will address the LOCUS and CA-LOCUS criteria.
7        Dr. Simpatico is a member of the American Association of
8    Community Psychiatrists.  That's the organization that created
9    the LOCUS tool.  He will explain that the six dimensions of
10   both LOCUS and CA-LOCUS are consistent with UBH's guidelines,
11   and he will also offer his opinion that the LOCUS guidelines
12   are difficult to use and poorly designed to make decisions.
13       Now, when this trial is over, the Court will be tasked
14   with deciding whether plaintiffs have satisfied their burden of
15   proof on all of their elements under ERISA on a class-wide
16   basis.  And there are at least five issues that were addressed
17   by the Court on which plaintiffs will not satisfy their burden
18   of proof.
19       First, was UBH acting as a fiduciary when it promulgated
20   the 222 guidelines at issue?
21       The plan documents will show that the guidelines are not
22   part of UBH's fiduciary obligations because they are
23   incorporated into the plans.
24       Second, were the guidelines binding or could the reviewer
25   allow treatment that was inconsistent with the guidelines?

**OPENING STATEMENT / ROMANO**

1        The evidence will show that the guidelines are just that.

2    They are guidelines.  They are not an algorithm and they are

3    not a script.  UBH's doctors will testify that they are drafted

4    to permit broad clinical judgment, and they explicitly permit

5    the doctors who applied them to approve treatment even if it

6    was inconsistent with the guidelines.

7        Third, are the guidelines at issue inconsistent with the

8    plans?  This question requires consideration of 129 plans and

9    222 guidelines, which will all be in evidence in this trial.

10   The evidence will not show that each of the plans deviated from

11   each of the guidelines for each of the years.

12       Fourth, did the guidelines contain restrictions that would

13   not allow coverage for treatment within the generally accepted

14   standards of care?

15       The testimony of UBH's doctors, who helped create the

16   guidelines and who interpret the guidelines, will be that the

17   guidelines provide for coverage consistent with generally

18   accepted standards.  This testimony will be confirmed by

19   Dr. Simpatico, who will explain the clinical basis for the

20   guidelines and their alignment with accepted standards.

21       And, fifth, did UBH abuse its discretion in creating the

22   guidelines?

23       There will be no evidence that the guidelines challenged

24   in this case were influenced by a profit motive.  What the

25   evidence will show is that UBH performed its fiduciary

1    obligations with diligence, with due care, and in good faith,

2    and the guidelines are a reasonable interpretation of the plan

3    terms.

4         Thank you very much, Your Honor.

5              THE COURT:  Thank you.

6         Okay.  Call the first witness.

7              MR. GOELMAN:  Your Honor, before we call Dr. Fishman,

8    I want to note for the record, I didn't want to interrupt

9    Ms. Romano's opening, but I assume our objection to

10   Mr. Shulman's report was preserved.  That was the subject of

11   one of our motions in limine.

12             THE COURT:  I don't know.  I did whatever I did in the

13   motions in limine.  What did I do?

14             MR. GOELMAN:  We objected as undisclosed expert

15   opinion and hearsay.  And the Court denied our motion in

16   limine.

17             THE COURT:  Well, that usually preserves whatever

18   arguments made in the motion in limine.

19             MR. GOELMAN:  Thank you, Your Honor.

20             THE COURT:  Okay.

21             MS. REYNOLDS:  Your Honor, at this time, the parties

22   have agreed that we would like to move the Guidelines into

23   evidence.  All of the witnesses will be referring to them.

24        The parties have stipulated as to authenticity and

25   admissibility.  And, as a matter of convenience, it makes sense

 1   that they come into evidence now.

 2        And so the plaintiffs, therefore, move Exhibits 1 through

 3   224 into evidence.  And the defendant joins us in that motion.

 4        **MS. ROSS:**  No objection.

 5        **THE COURT:**  Okay.  1 through 224 are admitted.

 6        **MS. REYNOLDS:**  One other matter.

 7        As the Court notes, the parties entered into a stipulation

 8   concerning certain information in the guidelines, which we

 9   filed with the Court on June 9th.  And we also attached it to

10   the pretrial order.

11        The stipulation needs to be part of the trial record.  And

12   I think the most efficient way to do so will be to mark it as a

13   trial exhibit, but I wanted to make sure that, first, was

14   acceptable to the Court.

15        **THE COURT:**  Sure.

16        **MS. REYNOLDS:**  We'll prepare that and admit it.

17        **THE COURT:**  What's --

18        **MS. ROSS:**  No objection.

19        **MS. REYNOLDS:**  Thank you, Your Honor.

20        **THE COURT:**  Do you know what the next exhibit in order

21   is?

22        **THE CLERK:**  If it's the plaintiffs' exhibits, my guess

23   is 880.  Is that the next number in line for you guys?

24        **MR. ABELSON:**  That's right.

25        **THE COURT:**  All right.  What's the docket number?

1              MS. REYNOLDS:  The docket number is 257.

2              THE CLERK:  257 in the Wit one.  So that's our new

3    Exhibit 880.

4         (Trial Exhibit 880 marked for identification.)

5              MS. REYNOLDS:  Yes.  And we'll prepare a stamped

6    version.

7              THE COURT:  So 880, did you say, Karen?

8              THE CLERK:  880, yes.

9              MR. GOELMAN:  I call Dr. Marc Fisherman.

10             THE CLERK:  Dr. Fishman, please raise your right hand.

11                 FISHMAN, PLAINTIFFS' WITNESS, SWORN

12             THE CLERK:  Thank you.  Have a seat.  Make sure you

13   speak clearly into the microphone for our court reporter here.

14   There's, of course, water if you need it.

15        Could you please state your full name for the record and

16   spell your last name.

17             THE WITNESS:  Yes.  Marc Fishman, F-i-s-h-m-a-n.

18             THE CLERK:  Thank you.

19                      DIRECT EXAMINATION

20   BY MR. GOELMAN

21   Q.   Good morning, Dr. Fishman.

22   A.   Good morning.

23   Q.   Are you here to offer the court your opinions related to

24   UBH's substance abuse guidelines?

25   A.   I am.

**FISHMAN - DIRECT / GOELMAN**

1  **Q.**   Can you briefly describe your educational and professional

2  background.

3  **A.**   Sure.  I'm a psychiatrist by training and specialize in

4  addiction psychiatry and addiction medicine.

5      I went to medical school at Columbia University.  I did a

6  residency in general psychiatry at University of Johns Hopkins

7  hospital.  I did a fellowship in motivational -- motivated

8  behaviors and addiction there.

9  **Q.**   What did you do after that?

10  **A.**   After that, I was on full-time faculty of psychiatry for a

11  time.  Now, I'm a part-time faculty there and am the medical

12  director of a community treatment provider for addictions and

13  co-occurring disorders called Maryland Treatment Center.

14      I do research in addiction.  I do treatment in addiction.

15  And I do administration in addiction programming, trying to

16  develop additional program with both adolescents, young adults,

17  and adults to deliver care for addiction treatment.

18  **Q.**   Do you have any subspecialties within addiction medicine,

19  Dr. Fishman?

20  **A.**   Within addiction medicine, I've concentrated on the

21  treatment of young people, to some extent.  That's adolescents

22  and young adults.  Have specialized in the treatment of opioid

23  use disorders and the use of medications.

24      I have focused on thinking about systems of care,

25  treatment programming development, levels of care and levels of

1   care guidelines, treatment matching strategies, which patients

2   go where.

3   **Q.**   Do you still treat patients as well, Doctor?

4   **A.**   That's right.  One of the central things I do currently in

5   my career is maintain a direct clinical experience, maintaining

6   a caseload of patients, both with an outpatient clinic within

7   the Maryland Treatment Center's community treatment program

8   that I spoke about, also supervising physicians and programs

9   throughout, sometimes covering for them, treating patients at

10  all levels of care, from inpatient to residential to intensive

11  outpatient, to outpatient.

12  **Q.**   Dr. Fishman, can you look at your screen and see if Trial

13  Exhibit 670, for identification, is there.

14  **A.**   Yeah.

15  **Q.**   Is that your CV and a list of publications?

16  **A.**   It is.

17  **Q.**   And does that provide a more detailed description of your

18  professional background and research?

19  **A.**   Yes, it does.

20          **MR. GOELMAN:**  Plaintiffs' offer 670, Your Honor.

21          **MR. RUTHERFORD:**  Objection, Your Honor.

22          **THE COURT:**  Sustained.

23          **MR. GOELMAN:**  Your Honor, there was no objection

24  listed when we provided our disclosure of exhibits.

25          **MR. RUTHERFORD:**  We objected to this on hearsay

 1   grounds.

 2          THE COURT:  So, people, we're going to have to get

 3   this straight.  There will be no objecting at the trial for

 4   something that is not objected to before.

 5       Also, why do you care?  Why do you care?

 6          MR. RUTHERFORD:  I'll submit.

 7          THE COURT:  No, no, no.  Why don't you waive your

 8   objection.  Why do you care?  This is a bench trial.  I'm not a

 9   jury.

10          MR. RUTHERFORD:  Your Honor --

11          THE COURT:  I'm probably not even going to go look at

12   it again.  But if I do, who cares?  He went to John Hopkins.

13          MR. RUTHERFORD:  That's fine, Your Honor.

14          THE COURT:  Great.  It's admitted.

15       (Trial Exhibit 670 received in evidence.)

16          THE COURT:  Let's concentrate, folks.  This isn't a

17   jury trial.  And there's a temptation, when it's not a jury

18   trial, to think that just because it's a judge there's no cost

19   for objecting.  There's a cost for objecting.  I'll think

20   you're unreasonable.

21       So let's focus only on objecting to those exhibits that

22   really matter in your case.  Okay.

23          MR. RUTHERFORD:  Yes, Your Honor.

24          THE COURT:  Thank you.

25   \\\

 1   **BY MR. GOELMAN:**

 2   **Q.**   Dr. Fishman, can you describe what ASAM is.

 3   **A.**   Sure.  ASAM stands for the American Society of Addiction

 4   Medicine.  It's a professional society that pools people who

 5   specialize in the treatment of addictive disorders, substance

 6   use disorders, physicians particularly, although nonphysicians

 7   are now included.

 8        And there are some 3- or 4,000 members, and it is the

 9   premiere professional organization that represents addiction

10   medicine, addiction medicine practitioners.  It advocates for

11   patients.  It works on policy matters.  It works on treatment

12   matters.  It publishes the ASAM criteria, which we'll be

13   talking about in some detail.

14        But in broadbrush strokes, it is the professional society

15   that represents addiction medicine for the United States.

16   **Q.**   And is one of the functions of ASAM to establish the

17   state-of-the-art consensus for how to treat persons with

18   substance use disorder?

19   **A.**   Yeah.  It spent considerable effort developing a variety

20   of guidelines about different aspects of treatment for patients

21   with substance abuse disorder, that's correct.

22   **Q.**   You mentioned the ASAM criteria.  Could you tell the Court

23   what they are?

24   **A.**   Sure.  ASAM criteria is a document that has now been

25   around for two or three decades; in its evolution, now in a

1    third edition published in 2013.  Before that, a second edition

2    revised, published in 2001.

3        And this is a document that does a number of things.  It

4    establishes an assessment protocol or a system of teaching

5    practitioners how to take patients as they present for care for

6    substance use disorders and do a full multidimensional,

7    multicomponent holistic assessment -- we can talk more about

8    how that's done -- according to six particular assessment

9    dimensions.

10       It also articulates the treatment levels of care.  That is

11   where treatment gets done for patients at different kinds of

12   programs called levels of care.

13       And, then, most importantly, it -- and this is the kind of

14   meat and potatoes of the document -- it contains

15   treatment-matching strategies, particular guidelines and

16   decision rules for how to take assessment material, translating

17   that into the needs of patients, what are the particular kinds

18   of treatment they will need, and matching those treatment needs

19   to the levels of care of where they should receive that kind of

20   treatment.  So criteria for placing patients in treatment

21   levels of care.

22   **Q.**   Before we get into the substance of the ASAM dimensions

23   and levels of care, could you describe whether you had any

24   involvement in the development of the ASAM criteria?

25   **A.**   I did.

**FISHMAN - DIRECT / GOELMAN**

1   Q.   And, if so, what?

2   A.   I was recruited by the chief editor, Dr. David Mee-Lee, in

3   the late '90s to join the steering committee as a coauthor or a

4   deputy editor for the second edition revised, which was

5   published in 2001.

6        I've continued in that capacity since then, was involved

7   in the group as a deputy editor for the third edition, and

8   remain on the steering committee of the guidelines through ASAM

9   and with other broader stakeholders of the ASAM criteria.

10  Q.   Did you author any section of the ASAM criteria yourself?

11  A.   I was a co-editor for the entirety, so contributed to most

12  of the material.  That would include reviewing drafts and

13  participating with stakeholders, participating in field

14  reviews, giving input to the drafting of material.

15       In particular, I was the chair of the subsection for

16  treatment criteria for youth, for adolescents.  So I headed

17  that workgroup.

18  Q.   Dr. Fishman, please describe the process by which the ASAM

19  criteria are developed and edited and finalized.

20  A.   Well, the ASAM criteria inherited and modified an existing

21  body of work that already was articulating standards --

22  generally accepted standards of care.  Documents like the

23  Cleveland Criteria.  And others had input.

24       But at the time of its coalescence into Patient Placement

25  Criteria, editions 1 and 2, those became modified.  They

 1   evolved as standards evolved.  And the -- as I became involved,

 2   for PPC-2R, the second edition revised, that process included

 3   gathering stakeholders, getting input from a broad variety of

 4   consensus-developing practitioners, payors, policymakers,

 5   researchers, trying to bring that material together, drafting a

 6   variety of materials, reviewing that back and forth with drafts

 7   over hundreds or thousands of hours of meetings and conference

 8   calls.  Then, for each edition, putting that out to field

 9   review to an even broader group of stakeholders to get feedback

10   about did it meet certain criteria for acceptability, for

11   validity.

12        In addition, there's a large body of research that

13   empirically validates the ASAM criteria.  If you would like me

14   to talk more about that, I can.

15   **Q.**   Let's defer that.

16        I just want to show you what's been marked for

17   identification Trial Exhibit 642 and then 662, and see if you

18   will identify these exhibits as the two most recent editions of

19   the ASAM criteria.

20        Yeah.  This is the cover of the PPC-2R, or the second

21   edition, revised in 2002.

22   **Q.**   Okay.  And that came out in 2001?

23   **A.**   Yes.

24   **Q.**   And what is the current iteration of the ASAM criteria?

25   **A.**   The current edition is the third edition.  The name has

1  changed slightly.  It's now shortened to the ASAM Criteria;

2  whereas, it has previously been called the ASAM Patient

3  Placement Criteria.

4  **Q.**   And is that Trial Exhibit 662?

5  **A.**   And this is the cover of that volume, yes.

6  **Q.**   So these are the two volumes that were in place between

7  the years 2011 and 2017?

8  **A.**   That is correct.

9          **MR. GOELMAN:**  We offer Trial Exhibit 642 and 662, Your

10 Honor.

11         **MR. RUTHERFORD:**  No objection.

12         **THE COURT:**  Those are admitted.

13     (Trial Exhibits 642 and 662 received in evidence.)

14 **BY MR. GOELMAN:**

15 **Q.**   Dr. Fishman, can you describe, please, how the ASAM

16 criteria are regarded in the field?

17 **A.**   Yeah.  The ASAM criteria are really quite broadly

18 considered to be an expression or a reflection or an

19 articulation of the generally accepted standards of care for

20 how to do a comprehensive multidimensional assessment of

21 patient severity, translate that into patient treatment needs,

22 and, most importantly, how to do patient treatment matching to

23 level of care through the decision rules that are the ASAM

24 criteria.

25     And it is really, as far as I know, the primary and most

**FISHMAN - DIRECT / GOELMAN**

1   widely regarded such iteration.  That is, it's broadly

2   accepted, obviously, by ASAM but also by almost all experts in

3   the field that I've encountered.  It's referred to in most

4   places as a, really, primary articulation of what the generally

5   accepted standard of care in that realm ought to be.

6   **Q.**   What about how ASAM is regarded by any government

7   entities, state or federal.  Do you have an idea?

8   **A.**   Oh, sure.  When the government has talked about patient

9   placement matching strategies, generally ASAM is given as a

10  prime example of where state of the art work has been and what

11  the articulation of the generally accepted standard of care has

12  been.

13         An example is that the federal agency SAMHSA, Substance

14  Abuse Mental Health Services Administration, which has a

15  subagency called CSAT, Center for Substance Abuse Treatment,

16  it's the federal agency that articulates standards for

17  treatment of substance abuse.  It administers the block grant

18  which funds most state level substance abuse treatment.  It,

19  for example, publishes a variety of guidelines and teaching

20  materials.

21         One of the series of its teaching guidelines is called the

22  treatment improvement protocols, or the TIPS.  And one of those

23  was particularly on this issue of level of care, placement

24  matching, and treatment-matching strategies.  And in that, ASAM

25  was highlighted as a prime example of a placement-matching tool

FISHMAN - DIRECT / GOELMAN

1   that reflects the standard of care.

2   **Q.**   What about insurance companies, are you aware of any

3   insurance companies that use ASAM to determine matching

4   placements in substance abuse disorder?

5   **A.**   I don't know comprehensively, but I know that Aetna has

6   adopted it.  I know that Beacon, formerly Value Options, has

7   adopted it, yes.

8   **Q.**   Dr. Fishman, you testified about five minutes ago that

9   ASAM is an iteration of the generally accepted standards of

10  care.

11       Do you mean to suggest that ASAM criteria are the only

12  iteration of the generally accepted standard of care for

13  treating substance use disorders?

14  **A.**   No.  First of all, the ASAM criteria are not as broad as

15  to attempt or to be ambitious enough to describe all of the

16  aspects of the treatment of the substance use disorders.

17       But in the sub realm of treatment matching and placement

18  decision criteria, it's not the only possible articulation.  It

19  has a particular method.  It has a particular enumeration of

20  the levels of care or assessment dimensions.

21       But they could be done in a different way that would be

22  just as valid.  It's not that it's the only articulation or

23  reflects the only standard of care.  But I think it does it in

24  a very good way, in the most comprehensive way, that I have

25  seen to date.  And I think it's generally regarded as such.

1    If the material that is, you know, there articulated were

2  expressed in a different way, in a different numbering, with a

3  different set of jargon, that would be okay.  But I think it

4  would be fair to say that core principles that are contained in

5  the ASAM criteria would have to be articulated for any other

6  version of it to meet generally accepted standards of care.

7    If you didn't have those core things, it wouldn't meet the

8  generally accepted standards of care, even if it was

9  articulated in a different way.

10 **Q.**   Dr. Fishman, you testified that ASAM is the most widely

11 accepted and used of the iterations of generally accepted

12 standards of care that you're aware of.  In your opinion, is

13 there a close second?

14 **A.**   Not that I know of.  There are a lot of examples in the

15 way that many states implement, mandate, recommend, insist upon

16 the use of the ASAM criteria.

17    For example, some states just generally mandate that all

18 placement matching within the state needs to be done.  Some may

19 limit it to mandate for the public sector.  Some may mandate it

20 for state-funded programs.

21    Some may bake it into the very definitions in regulation

22 for what constitutes a particular level of care using the ASAM

23 descriptions and the enumeration in the ASAM levels.

24    Some may bake it into the requirements for substance use

25 disorder treatment professional licensure and certification of

1    therapist or substance abuse counselor.  It may be required.

2        It may be required in some states as a condition of

3    meeting certification for a program, that a program must adhere

4    to the ASAM criteria.

5        So there's a variety of different ways.  But a lot of

6    different places that I've encountered have really endorsed it

7    as a standard.

8    **Q.**  Dr. Fishman, earlier you were about to talk about

9    empirical studies that you were aware of testing the efficacy

10   of the ASAM criteria.  I stopped you then, but could you just

11   very briefly describe anything you're aware of?

12   **A.**  Sure.  And cut me off if I go, because I can go on.

13       But the idea is that, not only does it reflect a consensus

14   of experts that's been refined by testing in field review with

15   a broad, broad array of stakeholders, it's also been

16   scientifically tested.

17       And, really, all the work that I know about that has

18   explored, in a research sense, this tricky question of SUD

19   placement treatment matching has been based on the ASAM

20   criteria.  It's really the foundation for the entire scientific

21   field of SUD treatment matching.

22       So a core group of researchers have done a lot of work on

23   this over a couple of decades, much of this funded by NIDA;

24   that is, the National Institute of Drug Abuse, but also from

25   other sources.

1    Dr. David Gastfriend has been a leader in this field at

2    the time that he was at Harvard.  But other people -- Jim

3    McKay, Steve Magura from New York -- other people have

4    contributed.  And so there's a bunch of different interesting

5    empirical findings.

6        First, that the ASAM criteria has been validated as a tool

7    to provide accurate assessment of patients that is stable over

8    time; that the six assessment dimensions and the factors

9    included in the ASAM aggregation of treatment needs are stable

10   over time and can be compared to other instruments used in

11   substance use research of known psychometrics of known

12   validity, like the addiction severity index and others such in

13   the way that you compare and you see that it's valid.

14       There have also been, more importantly, good studies of

15   looking at outcomes from using the treatment matching decision

16   rules in the ASAM criteria.

17       So, first, by looking retrospectively, if we matched, did

18   patients have better outcomes than if we didn't match.  If

19   patients ended up at a level of care that was recommended by

20   the ASAM criteria, was that better for them than if they

21   didn't, better for them in terms of dates of substance use, in

22   terms of relapse, in terms of downstream hospitalization, in

23   terms of functional outcomes and the like.

24       And then there are a couple of studies, as well, that also

25   use an even further level of evidence than we use in medical

1    science, which is the prospective randomized control trial.  So

2    you randomly assign people -- and this is work that was done by

3    Dr. Gastfriend and his colleagues.

4        If you randomize people to the recommended match by the

5    ASAM decision rules, level of care placement guidelines, versus

6    randomizing them to a mismatch going to, quote, the wrong level

7    of care and seeing what happens, those that are matched to the

8    appropriate level of care have better outcomes than the people

9    who are matched to the inappropriate level of care using those

10   specific ASAM directed guidelines.

11       Again, the kinds of outcomes that you would be clinically

12   interested in; substance use, relapse, downstream

13   hospitalization, functional outcome, and the like.

14       So a very, to me, persuasive body of evidence; A, that

15   treatment matching can work; and, B, if you do it with the ASAM

16   criteria, you're likely to get good results.

17   **Q.**   Dr. Fishman, with regards to the empirical study of

18   outcomes of ASAM matches versus mismatches, are you aware of

19   any distinction in that study or the data about the superiority

20   of ASAM matches over undermatches versus overmatches?

21       Do you understand what my question is?

22   **A.**   Yes, I do.  Let me just explain.

23       So you can get mismatched in two ways, right.  You --

24   well, there are three possibilities.  You get matched to the

25   right level of care.  You get mismatched to a lower level of

1   care, so undermatching.  Or you get mismatched to a higher

2   level of care.  It'd be very interesting to compare those

3   things.

4        The consistent result in all the studies I've seen is that

5   undermatching is worse than appropriate matching.  So if you go

6   to a lower level of care than the level of care that's

7   recommended by the decision rules for ASAM level of care

8   matching, you do worse.

9        It's been somewhat more inconsistent.  There are some

10  studies that say overmatching does better for some subset of

11  patients or for all the patients in a particular study.  And

12  there are other studies that don't say that overmatching is

13  better than matching, but that matching might be better than

14  overmatching.

15       But, again, the most consistent finding is that

16  undermatching, mismatching down, always does worse than

17  appropriately matching to the appropriate level of care.

18       And that's exactly the intention of the ASAM criteria is

19  to find the right level of care, to get the best fit for

20  effective treatment of a particular patient at a particular

21  timing, of course, in their substance abuse disorder

22  trajectory.

23  Q.   Sure.  You've mentioned a couple of times the six ASAM

24  dimensions, the assessment dimensions.

25       Can you just list -- just list, please, what those six

 1  dimensions are.

 2  **A.**    Sure.  So, as I said, the ASAM method is to take this kind

 3  of broad comprehensive history and examination that a provider

 4  might do when meeting a patient who's entering substance use

 5  disorder.

 6      You take a lot of data and you get information from the

 7  patients, you get information from their past history, you get

 8  information from concerned others.  You try to put it all

 9  together.

10      And the ASAM six dimensions are just a particular way of

11  organizing to make sure that the information is appropriately

12  arranged in a way that will then facilitate the use of that

13  information to assign -- to determine treatment needs and then

14  to use them to make treatment-matching decisions.

15      So ASAM's organized it into six particular dimensions,

16  that there's multidimensional assessment, that it's holistic,

17  that is comprehensive; it's not just one track.  Could it have

18  been five?  Could it have been seven?  Sure.

19      But these six over time seems to have stood the test of

20  time, and they are, 1 through 6:

21      Dimension 1, intoxication withdrawal potential.  So is the

22  person likely to have withdrawal?  What will we need to do

23  about it?

24      Dimension 2, biomedical complications and consequences.

25  Will a person have a medical condition, either as a result of

1   the toxicity of substances or, preceding that, they might be

2   made worse or affect treatment with the substance use

3   disorders.

4        Dimension 3, emotional, behavioral, cognitive

5   complications and conditions.  That's kind of what we call

6   co-occurring disorders or co-morbidity or dual diagnosis as

7   someone from a mental hospital psychi- -- sorry, I apologize.

8        A person might have a psychiatric or a mental health

9   problem that either preceded substance use or is caused by

10   substance use or, more often, is intertwined with substance

11   use, and that has implications for their treatment needs and

12   their placement.

13        Dimension 4, treatment readiness.  So that's about

14   engaging patients and their motivation, where are they able to

15   adequately utilize, what help will they need in progressing

16   through the stages of change.

17        Dimension 5, relapse potential or continued use potential

18   or continued problem potential.  The likelihood that patients

19   will use, will return to use, will relapse, and what should we

20   do about that.

21        And, finally, Dimension 6, the recovery environment.

22   Focusing on the home, the toxicity of a neighborhood or a

23   family or exposure to substances and whether that's conducive

24   to recovery and comports with successful treatment.

25   Q.   Dr. Fishman, did you write an expert report setting forth

FISHMAN - DIRECT / GOELMAN

1   your opinions in this matter?

2   **A.**   I did.

3   **Q.**   And can you see what is marked for identification,

4   Plaintiff Exhibit 881?  Tell me if you recognize that as your

5   principal report.

6   **A.**   Yes.

7   **Q.**   And if you turn to page 5, does that report contain a

8   chart of the six ASAM assessment dimensions you just described?

9   **A.**   Yes, they're there.

10          **MR. GOELMAN:**  May I approach, Your Honor?

11          **THE COURT:**  Sure.

12  **BY MR. GOELMAN**

13  **Q.**   Showing you what has been marked for identification Trial

14  Exhibit 881A.  Is this nothing more than an enlargement of the

15  six ASAM criteria assessment dimensions that's contained at

16  page 5 of your report?

17  **A.**   Yes.

18          **MR. GOELMAN:**  With the Court's permission, I decided

19  to go old school and just ask if he could come down off the

20  stand and just walk through these dimensions in a little more

21  detail using the easel.

22          **THE COURT:**  Yeah, but you're going to put it over

23  there so that I can see it and my law clerk can see it.

24  **BY MR. GOELMAN:**

25  **Q.**   Dr. Fishman, can you come off the stand and review the six

 1   dimensions in a bit little more detail.

 2   **A.**   Yeah.   So I just wanted to highlight that it's important

 3   that the assessment of the patient and the translation of that

 4   assessment into treatment needs, needs to be multidimensional

 5   and needs to take into account at least these domains.

 6       Again, the numbering of them and the ordering of them and

 7   the names used isn't the critical thing, but all this

 8   information is really essential to being able to make a level

 9   of care placement decision.

10       So just to go through them in order, Dimension 1 is about

11   acute intoxication.   Is the person currently experiencing or

12   under the influence of substances, and what's the need that a

13   patient has because of that.

14       And then what is the likelihood that a person will be in

15   withdrawal.   Either that they're sick now from withdrawal or

16   that they're likely to go into withdrawal.

17       And then what kinds of treatment needs do they need.   And

18   then what kinds of level of care would that most effectively

19   and appropriately be presented in?

20       And the reason it's numbered 1 is because, in a triage

21   sense, there's a great deal of urgency to making acute

22   intoxication determinations or the likelihood of an immediate

23   need for withdrawal, which in some cases, although unusual, in

24   some cases would be life-threatening.   So that's number 1.

25       Number 2 is biomedical conditions and complications.   This

1   has to do with what are the impacts on medical problems from

2   substance use?  Did a person have a liver problem?  Did a

3   person have an infection from their use?

4        Or did they have an ongoing chronic medical condition that

5   substance use impacts and makes access to care difficult and

6   impacts where care should be received, and what kinds of

7   services will they need, and in what level of care will they

8   need those services.

9        Dimension 3 is about mental health and psychiatric needs,

10  emotional realm, behavioral realm, cognitive realm.  And,

11  again, just like in Dimension 2, they could be premorbid; that

12  is, they could have had them before they were using substances.

13  Depression, psychosis, trauma, and the like.  And then their

14  interactions with substances in a reciprocal way makes them

15  worse.  Or it could be that those emotional behavioral

16  conditions were caused by substances, the toxic effects of

17  intoxication over time.

18       But in either case, they're important, essential, that

19  these co-occurring or co-morbid conditions be assessed.  The

20  question is how severe are they, what treatment needs, where

21  would those best be done, and what level of care.

22       Dimension 4 is about stage of change, readiness to change.

23  That includes acceptance of treatment, willingness to

24  participate, motivation for treatment.  But it also includes

25  resistance to treatment, rejection of treatment, lack of

1    cooperation with treatment.

2        And different approaches are needed for patients at

3    different stages of change, depending on what their

4    self-assessment is, what their thought is about whether or not

5    they have a problem and whether or not they think that problem

6    is actually linked to substances.  So that definitely impacts

7    their treatment needs and where that treatment ought to be

8    done, at what level of care.

9        Dimension 5 is about relapse or about continued use; that

10   is, you have to have stopped to be able to relapse.  Some

11   people haven't stopped and they still have continued use.

12       Or not just continued use, but continued problems in other

13   domains.  So there's an interaction between the different

14   levels.  Might be a continued problem in a mental health

15   domain.  There might be a continued problem in a biomedical

16   demain.

17       The idea is, what are the needs to attenuate, to stop, to

18   prevent, return to problems or continuation of problems, and

19   what levels of care would be most appropriate for the match.

20       And then, lastly, Dimension 6.  Where does a patient live?

21   What is the environment that is most conducive or most in

22   opposition to their journey to recovery?  And where should we

23   be treating them in order to meet those treatment needs?

24       Are they in a setting in which there is endemic substance

25   abuse?  Is there a family that is supportive or in opposition?

1  Are there peers that are problematic or are supportive of

2  recovery?

3      And so those are critical issues in determining level of

4  care placement.

5  **Q.**  Dr. Fishman, do the ASAM criteria dimensions purport to be

6  in order of importance?

7  **A.**  Well, it's not so much that they're in order of

8  importance.  Actually, in a clinical interaction with a

9  patient, I sometimes am thinking that number 4 is the immediate

10 therapeutic alliance issue.

11     How is it that you're engaging a person?  How do you get

12 them to think about approaching treatment and utilizing

13 treatment and thinking about progressing along the stages of

14 change?

15     But the reason that they're ordered this way is because

16 dimension 1, if you're thinking about an emergency department

17 or potential triaging of danger, relates to the possibility --

18 although relatively infrequent, relates to the possibility of

19 danger and something that you need to do something about right

20 away.

21     Same thing with a biomedical condition that could be of

22 high lethality or very high morbidity or even mortality, say,

23 if we're talking about an overdose.  That's the thing that you

24 want to zero in on because you need to move quickly.

25 **Q.**  Does ASAM have a position on the need for practitioners to

1   consider each and every one of those six dimensions?

2   **A.**   Absolutely.   The notion is that, however you order them,

3   however you name them, however you enumerate or catalog them,

4   the content of each of these is essential to being able to do a

5   comprehensive assessment, a comprehensive enumeration of

6   treatment needs, and then using that as the basis for a level

7   of care placement matching.

8   **Q.**   And if deciding on a level of care placement without

9   considering one or more of the dimensions listed there, is that

10  a departure from the generally accepted standards of care?

11  **A.**   I think it would be safe to say that you would not be

12  meeting the generally accepted standard of care if you didn't

13  include not just information gathering about these particular

14  dimensions, or at least the content contained in these

15  enumeration of dimensions, but if you didn't use each of them

16  in establishing a treatment plan and in establishing a decision

17  process for articulating and placing the patients in particular

18  levels of care.   Yes, that's right.

19  **Q.**   Dr. Fishman, stay there.

20       Did your report also contain a chart of the ASAM levels of

21  care?

22  **A.**   Yes, it did.

23  **Q.**   And is this, which has been marked for identification

24  Trial Exhibit 881D, an enlargement of that table from your

25  report?

FISHMAN - DIRECT / GOELMAN

1   **A.**   Yes, it is.  Can we swap out?

2   **Q.**   Yeah.

3   **A.**   All right.

4   **Q.**   Can you describe to the Court what a level of care is?

5   **A.**   So a level of care is a chunk, if you will, of a place or

6   a program where treatment happens.  So within a level of care,

7   there may be various modalities that might include counseling

8   or therapy or structure or activities or physician services or

9   medication, a variety of different things, but they happen in a

10  particular program.  It might be a particular building or it

11  might not.  And they will have a variety of intensities.

12       The way ASAM catalogs it, mostly from Level 1 through 4 --

13  1, 2, 3, 4 -- I'll mention very briefly in a second what 0.5

14  is -- that you can think of levels of care as proceeding from

15  most intensive or least intensive or least intensive to most

16  intensive.  And they'll be recognized by most people as being

17  the general catalog.

18       There might be some particulars of the way ASAM catalogs

19  it that give particular meaning and, in my view, enriches the

20  meaning, but they're -- whether it's numbered this way or some

21  other way, they're relatively easily recognized by people.

22       And so the idea is that, at the most intensive level of

23  care, as ASAM calls it, level 4, we're thinking about a

24  hospital.  We call that medically managed intensive inpatient.

25       Medically managed, because all of the treatment or the

 1  core of the treatment is not just supervised and directed by

 2  clinicians, but -- and other medical personnel such as P.A.s,

 3  M.P.s, nurses and the like, but that it is actually carried out

 4  by medical personnel.

 5       And so it's a setting in which the highest intensity of

 6  medical services might be needed.  That includes oxygen coming

 7  out of the walls and IV drips being accessible, and intensive

 8  care units on floor 6 and an OR with surgeons being available

 9  for consultations.

10       It's for the most extreme, most medically dangerous, most

11  intensive needs.  It's a restrictive setting that's required.

12  In some circumstances tends to be more short-term.

13       The next kind of broad levels are the residential levels.

14  Those are also defined by being bed-based; people sleep there.

15  I'll break it down into a second, to the sub levels, 3.1, 3.3,

16  3.5, and 3.7.

17       But the core features of a residential treatment is that

18  it's a place where a person needs to be sequestered, mostly

19  away from the community, have additional structure because the

20  community isn't an effective place to conduct the treatment, it

21  wouldn't go well, and that it bring certain advantages.

22       It brings separation.  It brings an intensity of dose.  It

23  brings a bundling of a bunch of services together that might be

24  hard to do in a smorgasbord where you'd have to go to different

25  programs and have a schedule of Tuesday here and Thursday there

**FISHMAN - DIRECT / GOELMAN**

 1  and a half hour there.  It's all in an intensive dose where

 2  it's available.

 3      And within Level 3, there is this gradation from more

 4  intensive levels of care to lower intensive residential levels

 5  of care.  The ASAM catalog is that 3.7 refers to

 6  medically-monitored, high-intensity residential.

 7      Medically-monitored means that medical staff -- doctors,

 8  nurses, et cetera -- are available.  They are involved in

 9  supervising and directing the care even if they don't deliver

10  every aspect of the care in the same way that it's done in a

11  hospital.

12      So, for example, you might not see a doctor or a nurse

13  every day, but they're available.  Might be 24/7 nursing as

14  needed.  Doctors create a treatment plan and direct the care

15  and are available for intermittent delivery of the care when

16  needed, but it's somewhat less intensive.

17      3.5, and I'll talk about adults first, is the next level

18  of residential care.  It's called clinically-managed,

19  high-intensity.  Again, it's high dose.  There's a lot of

20  activity.  There's a lot of structure.

21      We tend to think of 30'ish hours of clinically-directed

22  services, say in this level of care, maybe somewhat fewer in

23  this level of care.  But the main difference is that, here, the

24  level -- the services are directed and supervised by medical

25  staff.

1        In 3.5 that's not required.  That is, we have the

2   expectation that other professionals -- therapists, counselors,

3   nonmedical staff -- are directing the care, are supervising the

4   care, are delivering the care, and that in this level of care

5   you wouldn't need 24-hour nursing.  You wouldn't need the

6   availability of a bunch of doctors, addictionologists,

7   psychiatrists, because those wouldn't be appropriate.

8        If we were here or here (indicating) it would be more

9   about the therapeutic review, about the structure, about the

10  frequency of the therapies that you're getting at a

11  psychosocial level, not so much about the medical

12  interventions.

13       Notice that for adolescents we don't talk about the

14  high-intensity clinically-managed.  We talk about the medium

15  intensity of clinical management, and that's because

16  adolescents -- and we can talk about this a little bit more in

17  detail later -- have different developmental needs and

18  sometimes are not as -- would not benefit as much from the

19  higher intensity at this level of care but might need a longer

20  duration at a medium intensity for their particular

21  developmental needs.

22       3.3 is a kind of level of care that is somewhat similar to

23  3.5.  Again, it's clinically managed, but it's

24  population-focused in the sense that patients that have special

25  needs having to do with not being able to as quickly absorb the

**FISHMAN - DIRECT / GOELMAN**

1   high intensity of a residential treatment might need a longer

2   duration.

3       Those might include patients with severe co-occurring

4   disorders, cognitive impairment that might come even from

5   preexisting conditions or from the toxicity of substances, head

6   injuries and the like.  They don't absorb it as slowly, they

7   need more repetition, they need longer durations of care.

8       One thing that's important to think about as we go down

9   through intensity is that durations tend to increase.  Less

10  duration, the highest intensity; longer durations, the lowest

11  intensity.

12  **Q.**   Dr. Fishman, can I just interrupt?  You said, I think,

13  that they don't absorb it as slowly.  Did you mean they don't

14  absorb it as quickly?

15  **A.**   I meant as quickly, my apologies.  Thank you for catching

16  that.

17  **Q.**   Thank you.

18  **A.**   And then the last, lowest-intensity residential level of

19  care is 3.1, clinically-managed low-intensity residential.  And

20  that's a very important and, I think, vital component of the

21  continuum of care in residential treatment.

22      And that is, although structure is provided and the

23  possibility of a safe refuge and separation from the community

24  is provided, there's also a great deal of focus on integration

25  into the community.

1          So a patient might stay there for longer periods of time

2    and still not just stay 24/7 in the residential treatment, but

3    go out during the day to work or to school, even to an

4    outpatient program down the street or across town to be able to

5    mix and match clinical levels of care across different

6    components of the continuum.

7          And so this is a way, if you will, of testing the waters

8    and doing community integration for longer periods of time for

9    patients that may need that extra support and longer periods of

10   time to consolidate recovery gains that they were not able to

11   consolidate elsewhere.

12         Level 2 is intensive outpatient.  Level 1 is outpatient.

13   The distinction is in terms of frequency of contact hours, the

14   number of hours per week, the number of days per week that a

15   person might need treatment contacts.

16         So in Level 2, there's two sub levels.  2.1 is intensive

17   outpatient.  2.5 is partial hospital.  In 2.1, we tend to

18   think, for adults, of about nine hours -- contact hours per

19   week.  For adolescents, maybe six hours of contact hours per

20   week.

21         Typically, somebody would go to get treatment two or three

22   or four times per week, so the need of several contacts per

23   week to get monitoring and intensity of dose such that,

24   although there is adequate, effective and safe supervision in a

25   home environment, because they're not sleeping here, they need

 1   more intensity to progress them through to the journey of

 2   recovery.

 3        And 2.5, even more contact hours.  We tend to think of it

 4   as about 20 hours contact per week with daily or near daily.

 5   Some might have weekend hours.  Some might need Monday through

 6   Friday.  But the sense is you go in every day, that you can

 7   maybe be safe and supported in your recovery effort at home for

 8   a brief time, but then you're quick back to be able to get a

 9   therapeutic benefit.

10        Outpatient is a broad range of everything else; that is, a

11   couple times a week, one time a week, once every two weeks,

12   once every month, once every three months.  For somebody who's

13   really, really stable, years later perhaps.

14        But the idea is that you're typically going to see a

15   practitioner.  That practitioner could be a therapist, could be

16   a counselor, could be a group, could be a combination of those

17   things, but it's a lower intensity.

18        It's not as much requiring what we call the milieu or the

19   organized service with a group of peers and a group of staff

20   that provide more than the individual interactions but which

21   provide, kind of, a support network and an atmosphere of

22   recovery.

23        Some patients may start here and progress up because they

24   don't do well and they need more.  Other patients may start

25   here and, as they taper down or step down, they progress in

 1  this direction.

 2      One of the things that is so important about a continuum

 3  of care with this full expression of different levels is that

 4  many patients have twists and turns and there isn't, kind of, a

 5  linear progression or one archetypical path, but that patients

 6  might lapse, might do well.

 7      This is a chronic disorder with a chronic vulnerability.

 8  It's remitting and relaxing.  It's waxing and waning.  What we

 9  hope for in generally accepted standards of care is that people

10  can flexibly move up and down a way that's adapted to their

11  particular needs.  And one time in their course they may be

12  here, another time they might be here, and they might move back

13  and forth in that way.

14      Just real quickly, intervention is like a DUI program for

15  patients that may not yet have been declared or diagnosed to

16  have a full-level disorder but might need monitoring or

17  prevention to help progress further development, needing full

18  treatment at one of these levels of care if they were to

19  develop a disorder later, but it's before they've developed the

20  first disorder.

21      Say they've had one or two consequences of dangerous use,

22  like a DUI program.

23  **Q.**  Thank you, Dr. Fishman.  If you can resume the stand,

24  please.

25  **A.**  Yeah.

1   Q.   How does the ASAM system with the levels of care work with

2   the ASAM assessment dimensions that you went through before,

3   together, to determine the appropriate treatment placement for

4   particular patients?

5   A.   So you start with an assessment, and what is the patient's

6   severity in each of the six dimensions, thinking

7   multidimensionally and comprehensively.  Translate that into

8   treatment needs.

9        What are the kinds of treatments?  What are their

10  problems?  How would you put that together in an overarching

11  treatment plan?

12       And then, finally, how do you translate that into a

13  placement level of care?  Where should they get that treatment?

14  It's kind of the question of who goes where at what time in

15  their course.

16       Imagine, if you will, a grid or a matrix with assessment

17  dimensions down the left side, levels of care across the top.

18  And you could see in each dimension a place where that

19  treatment need could be provided, a particular level of care.

20       And you see that for assessment in Dimension 1 and

21  treatment needs and matching in Dimension 1.  You proceed with

22  2, 3, 4, 5, 6.  And then you put that together in a recipe that

23  says, ah, the best place to get at all of those six assessment

24  dimensions and the ensuing treatment needs is in that

25  particular level of care, whether it's Level 1, Level 2, Level

1  3, Level 4.

2  **Q.**   Who are the intended users of the ASAM criteria,

3  Dr. Fishman?

4  **A.**   Well, it might be anybody intending to try to determine

5  where a patient is best treated.  It might be an addiction

6  physician.  It might be a counselor.  It might be a treatment

7  program.  It might be a payor.  It might be a utilization

8  management care reviewer.  It might be a policymaker or a

9  government official trying to make a resource allocation

10  decision or design a treatment continuum of care.

11       It's really intended to be quite broadly applicable to all

12  situations across the spectrum where SUD treatment is done.

13  **Q.**   Are the ASAM criteria intended to replace the use of

14  clinical judgment by providers?

15  **A.**   No, not at all.  This can't be done, I think, by robots as

16  well as it can be done by people with training and experience

17  and knowing how to take care of patient.

18       So clinical judgment is a requirement for being able to

19  carry out the treatment, for being able to think through the

20  exercise of where a person should get treatment and where it's

21  most likely to be effective.

22       But, on the other hand, it does need a framework.  And so

23  clinical judgment for this particular task, that is, level of

24  care placement, is best exercised within these guidelines.  And

25  it's giving a broad structure.

1       Clinical judgment helps implement it.  Clinical judgment

2   helps work on the gray areas.  Clinical judgment helps resolve

3   conflicts where perhaps the decision rules don't resolve them

4   to the tenth decimal place.  So they go hand and hand in there

5   synergistically.

6   **Q.**  Dr. Fishman, when you were engaged by plaintiffs in this

7   matter, what were you asked to do?

8   **A.**  I was asked to give an opinion as to whether the UBH

9   utilization management criteria were consistent with generally

10  accepted standards of care.

11  **Q.**  Was that relevant to the years 2011 to 2017?

12  **A.**  Yes, those years.

13          **THE COURT:**  And we'll get to that critical question in

14  ten minutes.

15      (Laughter)

16          **THE COURT:**  Thank you.

17              (Recess taken at 10:45 a.m.)

18          (Proceedings resumed at 11:08 a.m.)

19          **THE CLERK:**  Dr. Fishman, you're still under oath.

20          **THE COURT:**  Go ahead.

21      Have a seat, please.

22  **BY MR. GOELMAN:**

23  **Q.**  Dr. Fishman, as part of your work in this case, did you

24  review the UBH Level of Care Guidelines for the years 2011 to

25  2017?

1    **A.**    I did.

2    **Q.**    And when you did that, did you pay any particular

3    attention to any particular provisions?

4    **A.**    Yes.  I was looking specifically at the Substance Use

5    Disorder Treatment Guidelines.

6    **Q.**    Okay.  Were you also looking at something called "Common

7    Criteria" that apply to all types of diagnoses?

8    **A.**    Yes, I was.

9    **Q.**    And based on your review of the Level of Care Guidelines

10   and on your professional experience and background, did you

11   reach any conclusions or opinions about whether the Level of

12   Care Guidelines comport with the generally accepted standards

13   of care?

14   **A.**    Yes, I did.  It's my opinion that the UBH guidelines are

15   not consistent with the generally accepted standards of care

16   for placement level of care treatment matching.

17   **Q.**    Is that for all seven years that you looked at?

18   **A.**    That is for all seven years.

19   **Q.**    Were there changes in the guidelines occasionally from

20   year to year?

21   **A.**    Yes, there were changes.  From the first iteration that I

22   looked at through 2017, I thought that there were some things

23   that got better, some things that got worse; but overall, those

24   things didn't change my conclusion, and I thought in each of

25   those years in their totality the UBH guidelines were not

1  consistent with generally accepted standards of care.

2  **Q.**   Before we turn to the guidelines themselves, can you

3  please just summarize the ways that in your opinion they fail

4  to comport with the generally accepted standards of care?

5  **A.**   Sure.   So the big picture is that I think the UBH criteria

6  are overly restrictive, and by that I mean that they restrict

7  access to needed care at various different levels of care.   I

8  think they do so more at the higher levels of care,

9  residential, but they do so throughout, including outpatient.

10       And the notion is that what we want from a level of care

11  placement matching guideline are decision rules that direct a

12  user to place a patient where the treatment will be most

13  effective, where the outcomes will be best, where their journey

14  of recovery will likely be aided in the most successful way.

15       And I think that what the UBH guidelines do is, both by

16  restricting admission or restricting continued stay or by

17  promoting discharge in an appropriate way, their decision rules

18  are overly restrictive.

19       There are a couple of particulars that I think add up in

20  their totality to that conclusion.   One is that there is an

21  inordinate, in my view, overemphasis on looking for acuity in

22  determining why patients should get admitted and should stay in

23  particular levels of care.

24       And by that I mean what are the emergencies?   What are the

25  crisis-driven, precipitous reasons for admission?   And although

 1   those are certainly important, I think they are overemphasized;

 2   and I think that matters of enduring severity, matters of

 3   chronic severity, matters of cumulative severity are

 4   underemphasized and not taken into account adequately.

 5       Certainly, patients come to treatment with a problem that

 6   is here and now.  They may have a pressing reason why today,

 7   but that isn't the only thing that should be considered.  And I

 8   think that patients may have long histories in this chronic

 9   condition that is remitting relapsing in which severity can be

10   cumulative over time, and I think that that's not taken

11   adequately into account.

12       One particular set of criteria within the UBH criteria

13   that I think highlight that is in later years you see a concept

14   of the "why now" factors.  Those emerged, I think, in 2013 and

15   2014, and they are one particularly strong way of articulating

16   this focus, in my view and overemphasized focus, on acuity and

17   on crisis.

18       So patients should be admitted almost with exclusive

19   emphasis and continued to be treated with inordinate emphasis

20   on the precipitating problems that are the crisis and why they

21   came into treatment.  And once those are resolved or addressed,

22   there's not as much emphasis on other things that may be

23   problems that are enduring, problems that have emerged, or

24   other ways in which patients continue to need to need treatment

25   for ongoing recovery.

1    And there are years where "why now" is not used, but then

2    language like "presenting problems" or "the reason for

3    admission" replace it, and the concept I think is an enduring

4    one over the years.

5        Another concern I have is that I think that there is

6    inordinate emphasis on imminent danger or severe danger or

7    severe harm as a criteria for and requirement for admission and

8    for continued stay.

9        So there are, for example, numerous occasions in which the

10   criteria say that in considering a lower level of care, we

11   would go instead to a higher level of care because in the lower

12   level of care, a patient wouldn't be safe or the treatment

13   couldn't proceed safely or safety wouldn't be met.  Certainly

14   that's important, but I think there is an underemphasis on the

15   congruent -- the concurrent -- what I would think would be a

16   need for emphasis on concurrent effectiveness, not just safety.

17       There's language such as "the problems endanger" -- "the

18   problems threaten the patient's safety" or "the welfare of the

19   patient is endangered"; and although there's no one instance

20   that is maybe greater, in the totality, in the aggregate I

21   think this overemphasis on concerns about dangerousness and

22   safety add up to a narrow focus rather than considering other

23   factors, such as where treatment should be most effective.

24       Not that risk is not important.  So, for example, the ASAM

25   criteria certainly consider risk.  One of the phrases that the

1    ASAM criteria use to consider risk is the phrase "imminent

2    harm"; but there's a much broader definition or should be a

3    much broader definition, in my view, in generally accepted

4    standards of care of what the metric of risk ought to be.

5        The metric of risk ought to be one not just of high

6    lethality or grievous bodily harm or danger to life and limb.

7    It ought to be risk of relapse, imminent relapse, or risk of

8    continued problems or risk of impairment in function or risk of

9    other difficulties that stand in the way of a patient's

10   treatment needs.

11   **Q.**   Dr. Fishman, can I interrupt for a moment?

12   **A.**   Yeah.

13   **Q.**   When you were describing the ASAM dimensions, the

14   assessment dimensions --

15   **A.**   Yes.

16   **Q.**   -- did categories 2 and 3 of those dimensions involve

17   something that could be labeled comorbidity?

18   **A.**   Yes.  I think that those are things that for me are

19   concerning in their omission in the UBH criteria.  I was

20   talking about some things that are in the UBH criteria that I

21   think are problematic, but I also think that the UBH criteria

22   underemphasize consideration of comorbid medical conditions and

23   comorbid mental health or psychiatric conditions in making

24   decision determinations about where patients should be placed.

25       I also think that there is in the UBH criteria the

**FISHMAN - DIRECT / GOELMAN**

1  absence -- again another issue of omission -- of separate

2  criteria for adolescents and young adults, for young people.  I

3  mentioned it very briefly, but I'll just emphasize again that

4  adolescents have a different set of needs, they have different

5  assets and vulnerabilities.  The kinds of treatment, there may

6  be some aspects that do overlap with the adult needs but there

7  are aspects that are different, and so at some times they may

8  need more intensity, at other times they may need less

9  intensity.  Most often they will need longer duration of

10 treatment than adults.

11      And so I find it problematic and inconsistent with

12 generally accepted standards of care that the UBH criteria

13 don't have separate criteria for adolescents.

14 **Q.**  Dr. Fishman, you summarized your conclusions, your

15 opinions, but can we talk for a minute about your process?  How

16 did you go about evaluating whether the UBH Level of Care

17 Guidelines are or were consistent with generally accepted

18 standards of care?

19 **A.**  Well, I read through them and used the words of the

20 guidelines as prescriptions for how a user would make decisions

21 about who is recommended to go to what level of care at

22 admission, at continued stay, at discharge, and then compared

23 those with my understanding of the generally accepted standards

24 of care and saw that they were inconsistent.

25 **Q.**  And is your opinion that they're inconsistent based on any

1   isolated use of a particular phrase or word in the guidelines?

2   **A.**   Well, I think there are some phrases that are more

3   problematic than others, but there is no one word.  It isn't a

4   matter of better line editing or wordsmithing.  It's that each

5   of these individual criterions -- criteria come together to

6   form a whole.  And in all the ways that I mentioned -- and

7   maybe some we'll talk in more detail -- they are mutually

8   reinforcing and form an atmosphere of restrictiveness; but more

9   important than the atmosphere, they are directions in aggregate

10  to limit the pathways of access to particular levels of care

11  for particular patients.

12       So we would want to see -- in guidelines that met the

13  generally accepted standard of care, we'd want to see multiple

14  different pathways for multiple different possible patients;

15  and one patient might meet number -- criteria one and number

16  three, another patient might meet number one and number seven

17  or two and five.  But what the UBH criteria create, I think, is

18  a narrowing of possible pathways in such that at the end of the

19  day, access is restricted.

20  **Q.**   Dr. Fishman, I want to begin by directing you to the 2015

21  Level of Care Guidelines.

22  **A.**   Okay.

23  **Q.**   And they're already in evidence.  They're Exhibit 5.  And

24  you have, I believe, a binder of the guidelines.  If you're

25  more comfortable using the paper copy, that's fine, otherwise

**FISHMAN - DIRECT / GOELMAN**

1   we can also put particular pages on the screen.

2   **A.**    Either is fine.  I'll start with paper.

3   **Q.**    Okay.  Can you turn, please, to page 8 of the 2015

4   guidelines, page 8 internally.  It's also Bates stamped Trial

5   Exhibit 5-0008.

6   **A.**    Yeah, I see that.

7   **Q.**    And there's a heading there entitled "Common Criteria."

8   Do you see that?

9   **A.**    I do.

10  **Q.**    What is your understanding of what common criteria are?

11  **A.**    So later on in the guidelines there are particular

12  guidelines for individual levels of care with specific material

13  appropriate to that level of care -- outpatient, intensive

14  outpatient, residential -- but these common criteria are

15  material that is subsumed and contained in all levels of care.

16  So it's material that you would apply no matter which level of

17  care you were looking at, and you would include that and then

18  add the level-of-care specific material.

19  **Q.**    Okay.  And are there -- is this section itself broken up

20  into subsections for admission criteria, continued care

21  criteria, discharge criteria, and best practices?

22  **A.**    Yeah.  That's the way it's organized here.

23  **Q.**    All right.  Let's start with the admission criteria.

24  **A.**    Okay.

25  **Q.**    What is your understanding of the purpose of this section?

1    **A.**    So admission criteria are at the outset what are the

2    criteria based on which you would determine treatment needs

3    that would direct a user to admit a person or to approve

4    benefits for a person for this particular -- a particular level

5    of care at the outset.

6    **Q.**    Okay.  And you see that there's Sections 1.1 through 1.9?

7    **A.**    I do.

8    **Q.**    And that there is in all caps, underlined the word "and"

9    in between those sections?

10   **A.**    Yes, I do.

11   **Q.**    Is it your understanding that if someone fails to meet any

12   one of these criteria, they never get in the door, they're

13   never admitted?

14   **A.**    Yeah, that's right.  They need to meet each of these to

15   meet the overall criteria of getting into a particular level of

16   care, correct.

17   **Q.**    And can you please direct the Court to any of the

18   provisions in this section, the admission criteria, that

19   contributed to your conclusion that the UBH guidelines violated

20   the generally accepted standards of care?

21   **A.**    Well, so both 1.4 and 1.5 are examples of what I briefly

22   mentioned before as the articulation of the "why now" concept

23   and the -- and what I believe is the overemphasis on "why now."

24         So that 1.4 is about why a lower level of care would not

25   be safe or efficient or effective; and 1.5 is about why a

1   current level would be safe, efficient, or effective.  But in

2   both circumstances, the metric, the way in which the user is

3   directed to follow the instructions to make that determination

4   is to assess whether acute changes in the member's signs and

5   symptoms and/or psychosocial and environmental factors -- that

6   is, the "why now" factors leading to admission -- are meeting

7   that severity.

8       And as I briefly mentioned before, I think that such "why

9   now" factors or acute changes or the moment's crisis that

10  precipitated a particular admission, those are certainly

11  important things and those should go into the decision, but I

12  think they are necessary but not sufficient.

13      And I think to drive the user to focus there with this

14  over -- in my view, overemphasis is by omission not to direct

15  the user to review more chronic factors, more enduring factors

16  that may or may not have been the last thing that got the

17  person in.  If you will, in some cases there might be a straw

18  that broke the camel's back.  It might be the last thing that

19  drew the person into treatment:  His spouse threatened to throw

20  him out, his employer threatened to fire him, his doctor told

21  him that he had a medical condition.  I mean, there may be all

22  sorts of different kinds of things that are acute precipitants

23  and those are important, but there might be many other kinds of

24  enduring issues of greater chronicity that contribute

25  cumulative severity that I think are underemphasized with this

 1   emphasis on "why now."

 2         THE COURT:  So wait a second.  You said necessary but

 3   not sufficient?  Did you mean that?  You said that acuity may

 4   be a necessary but not sufficient --

 5         THE WITNESS:  Well, I mean it's necessary to consider

 6   it.

 7         THE COURT:  Okay.  But then you don't mean it's

 8   necessary but not sufficient?

 9         THE WITNESS:  Fair enough.  Thank you.

10   BY MR. GOELMAN:

11   Q.   Dr. Fishman, before we leave 1.4, do you see

12   Section 1.4.1?

13   A.   I do.

14   Q.   And do you have an opinion about that particular

15   subsection?

16   A.   Well, so this is an explicit rejection of what we call a

17   fail first criteria.  So "fail first" means that in order to

18   gain access to a particular level of care, you must have

19   demonstrated participating in, attending a lower level of care,

20   and failing as a reason to need the higher level of care.  And

21   that certainly is not consistent with generally accepted

22   standards of care, and here it's explicitly said that it's not

23   required by the UBH criteria.

24   Q.   And in your review of the Level of Care Guidelines for

25   other years, did you notice whether this phrase or other

**FISHMAN - DIRECT / GOELMAN**

1  contradictory clauses were included?

2  **A.**    So here in this year in the common criteria it's

3  explicitly rejected.   I think there are places in other years

4  where it is included and fail first is a requirement, yes.

5  **Q.**    So is this one of the ways you testified that the

6  guidelines sometimes got a bit better, sometimes got a bit

7  worse?   Is this one of the ways that they got better in later

8  years?

9  **A.**    Yeah, this is better.   It is appropriate to reject this.

10  In other years, there was fail first.

11  **Q.**    Okay.   Can you turn to 1.6, please.

12  **A.**    Yes.

13  **Q.**    You were testifying about comorbidities.

14  **A.**    Uh-huh.

15  **Q.**    Is that the subject of this section?

16  **A.**    It is.   And while I certainly like that it is mentioned as

17  a factor, so it's not never mentioned, here it's mentioned as a

18  way of assuring that they are not too severe to be managed at

19  this level of care.

20      So we would want co-occurring psychiatric problems, mental

21  health problems, or co-occurring medical conditions to be able

22  to be safely managed in this level of care; but what's missing

23  is that their severity would get you access to the particular

24  level of care because the treatment needs in a behavioral

25  health or a medical condition were of a sufficient severity to

1   require this level of care.

2        So they are exclusionary here for being too severe, which

3   is fine, but there's nothing that is permissive about why such

4   comorbid conditions would get you into a particular level of

5   care.

6   **Q.**   Okay.  Let's turn now to one point --

7        **THE COURT:**  I don't understand that distinction.

8   Explain to me that distinction.  If something is -- if a

9   comorbid condition cannot be safely managed at a lower level of

10  care, then it's sufficient to get you into the higher level of

11  care?

12       **THE WITNESS:**  Right, but it may not be enough, and

13  that's not exactly what this says, but it may not be enough

14  that it's just not safe at a lower level of care.  I would want

15  it that if it wasn't effective at a lower level of care, it

16  would bump you up because just being safe is not enough, in my

17  view.  You want the best outcome and the more effective

18  treatment.

19       Here, this is to say that we will let you into this level

20  of care if it can be safely managed, otherwise you would need

21  to be in a higher level of care yet because it's unsafe at this

22  level of care; but what's missing for me is a guide to the user

23  as to why you'd need this level of care to meet the needs of

24  that co-occurring disorder, not just to exclude it.

25       **THE COURT:**  Okay.  I'm not sure that's clear, but --

1           THE WITNESS:  Okay.  Sorry.

2    BY MR. GOELMAN:

3    Q.   Can you turn to 1.8, please, which deals with the

4    requirement that there be a reasonable expectation of

5    improvement in the patient's condition.

6    A.   Yes.  So this is an example of an area that comes up

7    repeatedly throughout the criteria, and it's this notion of an

8    expectation of improvement, which on its face is not a problem.

9    It's a matter of how that's defined.

10        There is a distinction that's drawn by the UBH criteria

11   and attention between the concept of active treatment and

12   custodial care.  So treatment is supposed to be active in order

13   for it to be allowed.

14        Custodial care, which is, to cartoon it, just babysitting,

15   is to be excluded.  And while that's a reasonable concept, I

16   think that the UBH criteria overly narrowly define what is

17   "active treatment" and overly broadly define what is "custodial

18   care."

19        And, again, those words aren't used here, but it's a

20   similar concept in here that improvement of the member's

21   condition is indicated by a reduction or control -- this is

22   1.8.1 -- of the acute signs and symptoms that necessitated

23   treatment at a level of care; and in my view, that's too

24   restrictive on only the acuity, on only the crisis and not

25   looking at a broader view of improvement in more chronic

1    conditions as well.

2        I also have some trouble with the focus on the reasonable

3    period of time.  Not that I'm looking for an unreasonable

4    period of time.  It's that without an operationalization, which

5    we don't have, I think that that directs the user to the notion

6    that the clock is ticking; and that if it takes too long, that

7    under scrutiny, that's a problem.

8    **Q.**    And, Dr. Fishman, in 1.8.2, it says "improvement in this

9    context."  Do you see that?

10   **A.**    I do.

11   **Q.**    And is your understanding of the phrase "in this context"

12   in the context of the reduction or control of the acute signs

13   and symptoms?

14   **A.**    Well, so in contrasting active treatment with nonactive

15   treatment or with custodial -- with custodial care or looking

16   for improvement, the generally accepted standard of care

17   includes an improvement, the prevention of deterioration, and

18   also the maintenance of an existing level of function.

19        And although there is -- the hat is tipped here in 1.8.2

20   to that, it says that improvement in this context is measured

21   by considering prevention of deterioration; and the context

22   that we're in in 1.8.1 above is a reduction or control of the

23   acute signs and symptoms.

24        So it's prevention of deterioration, to the extent that

25   it's considered, is prevention of deterioration in acute signs

 1   and symptoms but not prevention of deterioration or maintenance

 2   of function in broader, overall function and of prevention of

 3   deterioration in more chronic problems.

 4   **Q.**   And is -- the language in 1.8.2, do you recognize it as

 5   being drawn from any outside source, or at least portions of

 6   it?

 7   **A.**   Well, this general concept comes, I think, from the CMS

 8   Guidelines for care determination, and there it's not limited

 9   to the context of acute signs and symptoms, but it's more

10   broadly stated to pertain overall to include prevention of

11   deterioration and maintenance of function.

12   **Q.**   And the CMS Guidelines, those are for Medicare, the

13   government guidelines?

14   **A.**   That's right.  So CMS, the Center for Medicaid and

15   Medicare, issues a variety of instructions to the field that

16   become the -- are incorporated into the standard of care in a

17   whole host of ways, and this is one of them.

18   **Q.**   Okay.  Do you recall if there's any language in the CMS

19   Guideline relevant to this that has been omitted from the UBH

20   version?

21   **A.**   Well, it doesn't focus on the maintenance of function, and

22   in the CMS Guidelines, it does not focus on acute signs and

23   symptoms in the way that it does here, that's correct.

24   **Q.**   Okay.  Let's turn to --

25            **THE COURT:**  Well, let me ask you about that.  1.8.2, I

**FISHMAN - DIRECT / GOELMAN**

1    don't understand why you think that focuses on acute.  The word

2    "acute" doesn't appear anywhere in 1.8.2.  This context, if

3    anything, would appear to refer to 1.8, which also doesn't

4    refer to "acute."

5         The last sentence suggests that the measurement in 1.8.2

6    is broader than just acute.  Why do you -- how do you get out

7    of 1.8.2 that they're not measuring -- that they're measuring

8    improvement with an overemphasis on 1.8.2 in 1.8.2 of acute

9    care?

10         **THE WITNESS:**  Well, my interpretation is that 1.8.1

11   instructs us to do a measure of improvement by reduction of

12   acute signs and symptoms and that that's continued into 1.8.2.

13        And in the CMS language --

14         **THE COURT:**  How do you make sense of the last sentence

15   of 1.8.2 then?

16         **THE WITNESS:**  Well, I'm glad that that's there, and I

17   do think that we're indicating -- we're asked to look at

18   recovery, resilience, and well-being, but I'm concerned that

19   the metric --

20         **THE COURT:**  Isn't that broader than just the

21   indication in reduction or control of acute signs?

22         **THE WITNESS:**  Yeah, it would be, and I would want it

23   to be.

24         **THE COURT:**  So 1.8.2 is broader than just looking for

25   improvement at acute.  Wouldn't you have to reach that

**FISHMAN - DIRECT / GOELMAN**

1   conclusion?

2          **THE WITNESS:**  Well, there's a tension and a

3   contradiction, so I'm concerned by where the user is driven to

4   focus on "acute."

5          **THE COURT:**  Okay.

6   **BY MR. GOELMAN:**

7   **Q.**   Let's turn to the continued service criteria, which is

8   Section 2.

9   **A.**   Uh-huh.

10  **Q.**   2.1 says that the admission criteria continue to be met

11  and active treatment is being provided, and then has a

12  definition of "active services."  Do you see that?

13  **A.**   I do.

14  **Q.**   Can you -- do you have an opinion as to whether Section 2,

15  in particular 2.1, is consistent with the generally accepted

16  standards of care or itself leads to overly restrictive

17  standards for treatment?

18  **A.**   Well, I think consistent with the admission criteria, that

19  the focus on "why now," that is the focus of treatment that the

20  admission criteria continue to be met again, for me

21  overemphasizes these acute factors to the exclusion of more

22  chronic and cumulative severity.

23  **Q.**   And do you see the appearance of the "why now" language in

24  2.1 anywhere or 2.22?

25  **A.**   Yeah, it's in 2.1.2, it's in 2.2, and the user is drawn

**FISHMAN - DIRECT / GOELMAN**

1    repeatedly to make their almost exclusive concern be those

2    things; and what is omitted is looking at the possibility of

3    newly emerging problems, of concurrent and enduring chronic

4    problems that may not have been the crisis precipitant and for

5    other problems that would continue to be addressed in a broader

6    way, not just this narrow way.

7    **Q.**   Dr. Fishman, before we move on to the discharge criteria,

8    what is your understanding of the impact of the failure of a

9    patient to meet any single one of the continued service

10   criteria in Section 2?

11   **A.**   Well, all of these need to be met in order to sustain

12   service.  So if one is not met, the patient is to be

13   discharged.

14   **Q.**   Okay.  And can you look now at the discharge criteria?

15   **A.**   Yes.

16   **Q.**   And can you undertake the same exercise there, identify

17   those sections that contributed to your opinion in this case?

18   **A.**   Yeah.  So the continued stay criteria are no longer met.

19   Just what we've just said, if those don't continue to pertain,

20   a patient should be discharged.  And here are some examples,

21   and they are examples so they are not requirements and they are

22   not necessarily an exhaustive list but they are the ones that

23   are listed here, and this is where the user is focused to kind

24   of do the mental checklist.

25       And, again, I think there's an overemphasis on "why now."

1    In 3.1.1, as I've said before, we're talking about safe

2    transition, which is important, but I think it also has to be

3    safe and effective transition.  And I think that there should

4    be examples of other than "why now" factors -- "why now"

5    considerations being met.

6    **Q.**    Okay.  This discharge criteria, this is a list of

7    examples, a not exhaustive list; correct?

8    **A.**    Yes, that's right.

9    **Q.**    Can you turn to 3.1.5, please.

10   **A.**    Yeah.  This is another example that for me is problematic.

11   Here it gets at this issue of an overemphasized -- overemphasis

12   on the need for motivation and whether or not a patient in what

13   ASAM calls Dimension 4 is cooperative and participating and

14   going along in an eager way with the treatment goals.

15         And I think that it is not appropriate or consistent with

16   generally accepted standards of care to discharge a person for

17   lack of motivation or for unwillingness to participate.  In

18   fact, sometimes it's lack of motivation or reluctance or even

19   frank opposition to treatment that requires a certain intensity

20   of treatment to get to persuade them to get with the program

21   and to do better and to become cooperative and to become

22   motivated; and that's really the responsibility of the

23   treatment program, to ask people to be highly motivated at the

24   door.

25         And we'll come back to this, I think, in other examples

**FISHMAN - DIRECT / GOELMAN**

 1    throughout the criteria.  To ask people to be motivated at the

 2    door is to ask people to be well before they get into

 3    treatment.  I don't think it's reasonable to discharge people

 4    for uncooperation.  I mean, unless it's dangerous

 5    uncooperation.

 6    **Q.**   What does the generally accepted standard of care say

 7    about what you should do about if someone is unmotivated?  Do

 8    you lock them up and force them to undergo treatment?

 9    **A.**   No, no, and that's an unreasonable juxtaposition here and

10    sets a very high standard, I think, of what we might do in a

11    parentalistic way for somebody who's unwilling to participate.

12    Involuntary treatment or guardianship requires that the person,

13    you know, meets the regulatory standard for involuntary civil

14    commitment in a hospital.  Guardianship requires the

15    demonstration of incompetence at a very high level of evidence.

16        There's lots of gray in between being unwilling to

17    participate or unable to participate where the standard of care

18    would be that the provider would be to try to persuade them and

19    cajole them and to help them digest and to work with them in

20    what we call motivational enhancement treatment to get them to

21    try to participate short of needing involuntary treatment or

22    guardianship.

23    **Q.**   Dr. Fishman, in your 25 years of practice in the substance

24    use disorder field, have you had the experience that sometimes

25    people with very serious substance use disorders don't believe

 1   that they have a problem or need treatment?

 2   **A.**   Absolutely.  It's part of the hallmark of this disorder,

 3   that it robs people of their insight and that motivation tends

 4   to be low.  To expect otherwise, is to set ourselves up for

 5   failure.

 6        Most people come to treatment not necessarily seeing the

 7   impairment, having low self-recognition of problem, and not

 8   making the connection between even their most acute and

 9   dangerous problems to substance use, never mind their more

10   chronic and indolent problems.

11        And we sometimes call that an early stage or change or

12   precontemplation; and to get them through to contemplation and

13   preparation and action, which is some of the jargon we use for

14   the stages of change, is part of the expectation of treatment.

15        This is a chronic disorder in which people's ability to

16   recognize that focusing on quitting is good for their health is

17   problematic.  And even if they recognize that focusing on

18   quitting is good for their health, they are ambivalent at best

19   often because the problem with substances, one of the core

20   mechanisms of an addiction is that the substances are so good,

21   but in a maladaptive and dangerous kind of way, at motivating

22   the patient that they divert patients from what we would think

23   to be their more healthful motivation.

24        And so, again, to discharge them prematurely for lack of

25   motivation or lack of cooperation I think is inconsistent with

 1   the generally accepted standard of care.

 2   **Q.**   Dr. Fishman, I'm turning now to the next section, which is

 3   captioned "Clinical Best Practices."  Is there anything

 4   different about this section as compared to the previous three?

 5   **A.**   This section is less about decision rules and about the

 6   approach to making treatment level of care matching decisions

 7   than it is about instructions to the provider, say, about how

 8   to gather assessment information or about what topics to

 9   broadly and generally take into consideration, and guides more

10   of the various different subcomponents of treatment wherever

11   they might be delivered at any particular level of care.  And

12   they are essentially directions to the provider less than they

13   are directions to the care manager or to the payer or to the

14   user of the manual for making a decision about where the person

15   goes.

16   **Q.**   Is there anything in the clinical best practices section

17   that overrules the criteria for admission, continued service,

18   and discharge that you just went through the previous three

19   sections?

20   **A.**   No, none that I've identified.

21   **Q.**   So if a particular --

22   **A.**   The other way around, in fact.

23   **Q.**   What do you mean?

24   **A.**   Well, I mean that it would -- I think the decision

25   instructions in the other sections where the actual decision

1    rules for level of care placement are what I believe overrule

2    the clinical best practices.

3    **Q.**    Now, you talked earlier about your opinion that the

4    treatment of custodial care by UBH was overly broad and the

5    definition of "active treatment" was overly narrow.  Can you

6    turn to Trial Exhibit 148 in evidence, which is the 2015

7    Custodial Care and Inpatient Residential Service CDG?  Is that

8    up there?

9    **A.**    It is on the screen and I have it on paper.

10   **Q.**    Can you turn to the first substantive page, which says

11   "Key Points" at the top?

12   **A.**    I see that.  It's page 2 of 8.

13   **Q.**    Yeah.  And in bold it says (reading):

14           "Services provided in psychiatric inpatient and

15           residential treatment settings that are not active and are

16           solely for the purpose of custodial care as defined below

17           are excluded."

18           Do you see that?

19   **A.**    I do.

20   **Q.**    And does -- the term "psychiatric inpatient and

21   residential treatment settings," does that correspond to any of

22   the levels of care in ASAM that you reviewed earlier?

23   **A.**    Not exactly.  Much of this material is taken actually from

24   psychiatric inpatient or hospital care guidelines.

25   **Q.**    Okay.  Is there anything about the criteria here for

 1  defining "custodial care" -- well, withdrawn.

 2      What is your understanding of what an exclusion is in

 3  insurance jargon?

 4  **A.**   Well, so here in particular, or with any factor, if a

 5  certain criteria is met, then the coverage is excluded:  The

 6  admission, the continued stay.  And here it's if the treatment

 7  is deemed to be solely for the purpose of what is being defined

 8  as custodial care, then the coverage would be excluded.

 9      I would add that elsewhere they talk about -- the criteria

10  talk about being primarily for the purpose of custodial care

11  being excluded, but it's the same concept.

12  **Q.**   Okay.  And anything about this definition of "custodial

13  care," Dr. Fishman, that is in your opinion inconsistent with

14  generally accepted standards of care?

15  **A.**   Well, one thing that I think is, just to step back a

16  second, important to think about in the way in which the UBH

17  criteria by omission do not meet generally accepted standard of

18  care is that they don't consider broadly the full continuum, in

19  my view, of residential levels of care.

20      So before we talked about 3.7, 3.5, 3.3, and 3.1, and in

21  my view the way that the UBH criteria are written is that they

22  focus on the medically monitored highest levels of residential

23  care and don't do adequate justice to including criteria that

24  consider the lower levels of care -- 3.5, 3.3, and especially

25  3.1.

 1        And here's an example of that.  In the second main bullet,

 2   the third subbullet, "custodial care" includes a definition of

 3   services that do not require continued administration by

 4   trained medical personnel.  And that certainly should not be a

 5   requirement by generally accepted standards of care for the

 6   lower levels of residential care.

 7        In a Level 4 hospital or a Level 3.7 medically monitored

 8   residential setting, there could be the need for medical

 9   personnel to administer certain services.  But in 3.5, 3.3,

10   3.1, the lower levels of residential care, that would not be a

11   reasonable requirement.  Those levels of care are explicitly

12   for services that don't require medical personnel to deliver

13   the services at all.

14        **MR. GOELMAN:**  Can you put up the active treatment

15   definition, please.

16   **Q.**   This section purports to cite to the CMS determinations, I

17   think twice it cites that, including the CMS Benefit Policy

18   Manual.  Dr. Fishman, if something is in a CMS Manual, how

19   could it be inconsistent with the generally accepted standards

20   of care?

21   **A.**   Well, the citation here is to the psychiatric inpatient

22   coverage determinations and so, for example, in the subbullet

23   that describes that active treatment is indicated by services

24   that are all of the following, where it says it must be

25   supervised and evaluated by a physician, that might be

1  appropriate for a hospital but it would not be appropriate for

2  lower levels of residential care where they are clinically

3  managed, not medically managed or medically monitored, and

4  would not be under the supervision or evaluation or even

5  monitoring of a physician.  And so if that excludes that -- all

6  of those services, that, for me, is an overly broad definition

7  of "custodial care."

8  Q.    Okay.  Well, just taking a step back from language and

9  considering practical consequences, what would the practical

10  consequences be of the mismatching of the criteria for higher

11  level of residential care with patients who would be

12  appropriately placed in the lower levels of residential care?

13  A.    Well, I don't think that this would get patients into

14  higher levels of care.  I think it would -- because they may

15  not meet criteria, but it sets the requirement that they be in

16  higher levels of care.

17        So could you rephrase the question?

18  Q.    Yeah.  That was a poor question.

19        If a patient qualified for residential treatment under 3.1

20  or 3.5 --

21  A.    Yes.

22  Q.    -- but not under 3.7, under this guideline, would that

23  patient get any kind of residential treatment?

24  A.    I understand.

25        No, they wouldn't because the services could be construed

**FISHMAN - DIRECT / GOELMAN**

1   as not being administered, supervised, evaluated, directed by a

2   physician, and that they might be deemed to be custodial care,

3   especially when we're talking about this question that we were

4   talking about before of the metric of acute changes and the

5   metric of what I consider to be reasonable prevention of

6   deterioration and maintenance of a level of function.

7   **Q.**   Dr. Fishman, up to this point the guidelines that I have

8   shown you have been applicable to both mental health and

9   substance abuse conditions.  I want to turn back to the 2015

10  Levels of Care Guidelines and explore some of the language that

11  is specific to substance use disorder.

12  **A.**   If you don't mind, can I just make one more comment?

13  **Q.**   Oh, sure.

14          **MR. GOELMAN:**  Can you put 148 back up, please.

15          **THE WITNESS:**  At the bottom here, the second-to-last

16  main bullet and its subbullet in which the language of

17  improvement looking at and considering prevention of

18  deterioration here seems more clearly subsumed under the stem

19  bullet above it where the metric is the reduction or control of

20  the acute symptoms.

21          And so, again, I just want to emphasize that I see here

22  those things intertwined and the emphasis on reduction of acute

23  symptoms.

24          So I'm sorry to interrupt.

25  \\\

1    BY MR. GOELMAN:

2    **Q.**    No.  Dr. Fishman, I don't want to rush you.  Is there

3    anything else in this particular CDG that you'd like to draw

4    the Court's attention to?

5    **A.**    (Witness examines document.)  No.

6    **Q.**    Okay.  Let's turn to Trial Exhibit 5, which are the --

7    which is the 2015 version of the Level of Care Guidelines, and

8    I want to direct you to page 81, 5-0081, which is entitled, I

9    believe, "Residential CD."

10    **A.**    Yes.  (Witness examines document.)

11    **Q.**    "Rehabilitation Residential for Substance-Related

12    Disorders."

13    **A.**    Yes.

14    **Q.**    Do you have an opinion about whether this section complies

15    with the generally accepted standards of care, Dr. Fishman?

16    **A.**    I do.  I think it is inconsistent with the generally

17    accepted standards of care.  And if you look at the preamble

18    material and then at 1.3 and 1.4, I'm again concerned at the

19    overemphasis and overnarrow focus on "why now" factors with

20    acute signs and symptoms, acute changes, with the focus on

21    those things with the omission of adequate consideration of

22    cumulative severity for chronic and enduring problems.

23    **Q.**    Okay.  And can you turn to, let's see, Section 2.2,

24    please.

25    **A.**    Uh-huh.

**FISHMAN - DIRECT / GOELMAN**

1  **Q.**   And is that another reference to custodial -- the

2  custodial exclusion, the exclusion for custodial care?

3  **A.**   Yes.  So that material that we discussed before is echoed

4  here in 2.2.3.  Services that do not require continued

5  administration by trained medical personnel would be excluded

6  as being custodial.

7  **Q.**   Okay.  And turning back now to Section 1.3, do you see the

8  reference there, again, to the "why now" factors?

9  **A.**   I do.

10 **Q.**   Okay.  And do you have an opinion about the

11 appropriateness of that under the generally accepted standard

12 of care?

13 **A.**   That's correct.  I think both in 1.3 and 1.4 those are

14 overemphasized.

15 **Q.**   Okay.  Overall, this treatment of requirements for

16 residential treatment, do these comport with the generally

17 accepted standards of care requirements for Levels 3.1 and 3.5

18 in the residential treatment band?

19 **A.**   Well, so an example of the way that I had mentioned before

20 that 3.1, and that is an example of a lower level of -- a lower

21 level of residential care, one of the examples in 1.3 -- and,

22 again, it's an example, but because of the repeated focus on

23 imminent danger that comes up again and again, I think it's

24 problematic with such a short list of examples -- the member is

25 in immediate or imminent danger of relapse, and that would be a

1    permissive criteria for 3.7 but it would not be an appropriate

2    criteria for 3.1.

3         So 3.1, if you remember, is a longer duration, less

4    intensity, requires the availability of structure and

5    monitoring but patients are typically out into the community.

6    In fact, it is one of the purposes of 3.1 to engender community

7    reintegration.

8         And we don't say that a person needs that level of care to

9    prevent imminent relapse in hours or days but, rather, that

10   there's a gradual consolidation of recovery skills and previous

11   gains but that need to be reinforced over time with further

12   recovery skills.

13        And to use as an example the immediate or imminent danger

14   of relapse I think is narrow and overly restrictive.  So

15   another example of the way that the lower levels of residential

16   care are not contemplated.

17   **Q.**   Okay.  Can you look at clauses 1.1, 2.1, 3.1, and 4.1 --

18   or 4.11?  Do they all say "See common criteria for all levels

19   of care"?

20   **A.**   Yeah.  Yeah, that's right.  As I said before, those are

21   included, each particular level of care specific guideline.

22   **Q.**   So to be entitled to residential treatment under this part

23   of the guideline, you have to meet both the specific

24   requirements here and the ones that are common?

25   **A.**   Yes.  So that harkens back to the material about acute

 1    changes that we discussed before.

 2    **Q.**    Okay.  Can you turn to page 55, please, which is the

 3    intensive outpatient standard for substance use disorder.

 4    **A.**    I'm sorry.  Direct me again.

 5    **Q.**    Page 55.

 6    **A.**    Okay.

 7    **Q.**    Intensive outpatient, is that what we saw before on your

 8    chart?  It was shorthand IOP?

 9    **A.**    That's right.  Level 2.1 or IOP, correct.

10    **Q.**    And in your opinion does this guideline for intensive

11    outpatient program for substance-related disorders meet the

12    generally accepted standards of care?

13    **A.**    No, in my opinion, it does not meet that.

14    **Q.**    Why not?

15    **A.**    Well, so there continues in the preamble here to be the

16    emphasis on the "why now" factors, which I think is a

17    consistent theme throughout these criteria, the emphasis on

18    crisis-driven admission reasons and the reduction of acute

19    symptoms as constituting the main focus of treatment.

20    **Q.**    Let me ask you a question about that second paragraph in

21    intensive outpatient program.  It says (reading):

22            "Course of treatment in intensive outpatient programs

23        is focused on addressing the 'why now' factors that

24        precipitate admission and to the point that the member's

25        condition can be safely, efficiently, and effectively

1          treated in a less intensive level of care."

2       Is there anything wrong with that being the goal of

3   treatment, to treat -- to move them into an intensive level of

4   care?

5   **A.**   A less intensive level of care.

6   **Q.**   A less intensive level of care.

7   **A.**   Yeah.  I don't think that there is anything wrong with

8   stepping people down as meets their needs, but I think that

9   that is overemphasized here.  So that, again, as I've said,

10  "why now" is near exclusive the focus of the treatment; and the

11  point at which we're ready to move on is when these acute

12  symptoms are reduced and the user is urged to quickly get them

13  to the less intensive level of care, which is one factor but

14  there isn't the guidance that I would look for for outcomes in

15  function, in recovery, in most effective treatment, and the

16  like.

17  **Q.**   What would the generally accepted standard of care be for

18  somebody whose acute symptoms are under control but would

19  benefit in terms of their chronic symptoms or comorbidities

20  more from intensive outpatient than outpatient?

21  **A.**   Well, it would be about the frequency of contact.  It

22  would be about the intensity of dose.  It would be about the

23  bundling of services in one place to overcome barriers to get

24  to different kinds of services.  It would be about the milieu

25  in which there would be an atmosphere of a pro-recovery

1    environment both from the staff and from the other patients

2    with peers propelling each other in a way that lower levels of

3    care might not do.

4        And -- well, I'll stop there.

5    **Q.**   And would such a patient under the generally accepted

6    standards of care be directed toward IOP?

7    **A.**   Yeah, that's right, and it might be because of ongoing

8    chronic and enduring problems.  For example, to use some of the

9    examples I talked about before, the "why now" factors might

10   have been something about a spouse or about an employer or

11   about a medical problem, but there may be more indolent

12   troubles with a chronic mental health issue; and although those

13   weren't the things that got them to get into treatment, they

14   are ongoing, they remain risky, they remain problematic, and

15   the person might need ongoing intensity in this particular

16   level of care even past the point of reduction of acute

17   symptoms.

18   **Q.**   Okay.  Can you turn now, please, to page 70, which is the

19   outpatient guideline for substance-related disorders.  And,

20   again, I'm going to ask if you have an opinion based on your

21   experience whether this section complies with the generally

22   accepted standards of care.

23   **A.**   (Witness examines document.)  I do not think it is

24   consistent with generally accepted standards of care, and I

25   have the trouble with, as we've discussed repeatedly, the

1   overemphasis and the narrow consideration of "why now" factors.

2        And in 1.4, I just want to -- I want you to think with me

3   for a second about this notion of a chronic disorder with

4   enduring vulnerability, like substance use disorder is.  And

5   1.4 directs the user to think about recent changes from a

6   baseline or from a previous level of lack of problems or a

7   previous level of function, or changes in the psychosocial or

8   environmental factors, but doesn't direct them to think about

9   prevention of deterioration or maintenance of function or

10  prevention of relapse or prevention of recurrent problems.

11       For patients with this chronic disorder, many of them need

12  very long-term treatment even past the point of having

13  problems, even when they're stable, with a focus on preventing

14  relapse while they're in remission because we have no curative

15  treatments.  We don't know or can't easily predict when the

16  remission doesn't need further booster care.

17       For some patients they need indefinite ongoing outpatient

18  treatment, for some patients even lifelong, even in the absence

19  of ongoing problems.  And perhaps the analogy is to medical

20  treatments for chronic medical conditions where there's

21  enduring vulnerability but you still need to go get treatment

22  for your chronic diabetes, your chronic hypertension even if

23  it's under control for now exactly because the treatment is

24  what's keeping it under control without acute changes.

25  Q.   So this particular guideline authorizes treatment,

1    outpatient treatment, focused on addressing "why now" factors

2    to the point where the "why now" factors no longer require

3    treatment.  Do you see that?

4    **A.**   Yes.

5    **Q.**   If the acute symptoms have made somebody with substance

6    use disorder seek treatment, does that mean that that person is

7    cured and no longer requires treatment of any kind, Doctor?

8    **A.**   Well, I sure don't think so, but I think that there is the

9    implication that if there were no longer symptoms or

10   demonstrable functional impairment, that that would be the end

11   or at least reflect attenuation of the rationale for further

12   treatment.

13       And I think nothing could be further from the truth for

14   many patients who are succeeding in ongoing, enduring,

15   low-intensity treatment like outpatient treatment.  It is the

16   treatment itself and its enduring nature that is keeping them

17   in good stead, and we would be remiss to discontinue it to wait

18   for them to relapse to need further treatment.

19   **Q.**   Dr. Fishman, we've just spent the better part of an hour

20   looking at language in the Level of Care Guideline that was in

21   force in 2015.  For better or worse, we don't have time to go

22   over all eight Level of Care Guidelines in detail, but I do

23   want to direct you to the guidelines that were in force in

24   2011, which I think were the first version of the guidelines

25   chronologically that you reviewed.

1  **A.**   Can you direct me to those?

2  **Q.**   Yeah.  I'm going to ask you to start, again, with the

3  common criteria.  I'm sorry.  It's Exhibit 1, Trial Exhibit 1.

4  **A.**   Okay.

5  **Q.**   And the common criteria start on what is internal page 4

6  but it's Trial Exhibit 1-0005.

7  **A.**   Yep, I'm there.

8  **Q.**   Okay.  Similar to the 2015 common criteria, do these apply

9  to all levels of care and to both mental health and substance

10 use disorders?

11 **A.**   That's right.  They're subsumed by each of the level of

12 care specific guidelines further on.

13 **Q.**   Okay.  And can you look through this section, please, and

14 draw the Court's attention to any language that contributed to

15 your opinion that the guidelines in 2011 violated generally

16 accepted standards of care.

17 **A.**   (Witness examines document.)

18 **Q.**   I direct you to Section 6.  And I don't want you to

19 overlook anything, but you can focus on Section 6 and --

20 **A.**   Yeah.  So 6 resonates with the discussion we had before

21 about what defines improvement, and here there is again a

22 consideration of this time period.  Again, not to put too fine

23 a point on it, I wouldn't say that I would advocate for an

24 unreasonable period of time, but it's the focus on a period of

25 time that reminds us that the clock is running and the

1   atmosphere that is created, to my mind, is one of "let's get on

2   with things."  So that, for me, is problematic.

3   **Q.**   What about Section 7?

4   **A.**   And 7, although the term "why now," as was used in 2015

5   and also 2014, is not stated here, that language here is

6   "presenting symptoms," and while not quite as pointed, I think

7   it still contains the same concept, which is a focus on acuity,

8   a focus on those things that are problematic now at this

9   cross-sectional point of severity.

10       Certainly they're important to consider, but it

11   excludes -- or omits, I should rather say, reference to things

12   that are enduring.  It's one point on the curve, not the entire

13   area of cumulative severity under the curve throughout the

14   patient's prior history.

15   **Q.**   What is a presenting symptom, Dr. Fishman?

16   **A.**   Well, a presenting symptom is what brings you in the door

17   and is in many ways overlapping with the discussion we had

18   about "why now."  What is the crisis precipitant?  What is it

19   that causes you to seek treatment acutely?

20   **Q.**   And is Section 8 another version of the exclusion for

21   custodial treatment?

22   **A.**   Well, 8 for me has a different kind of problem.  It does

23   intend, I think, to exclude things in distinction to things

24   that are active treatment saying that things that are not

25   active treatment would be excluded.  The treatment should not

1    be primarily for these kinds of things.

2         The thing that is new here that I object to is to exclude

3    treatment that might primarily be for addressing antisocial

4    behavior or legal problems.  So whereas I would agree if the

5    intent were to say that just because a Court made a

6    determination, that that might or might not be a logical

7    conclusion of a treatment guideline.

8         I don't think it's reasonable to exclude antisocial

9    behavior or legal problems as clinical manifestations and

10   clinical features of substance use disorders.  In fact, just

11   the opposite.  Antisocial behavior and legal problems are very

12   common in substance use disorders.  For many people, it is a

13   core vulnerability that brings them either to using substances

14   or performing behaviors to get substances or accelerating and

15   increasing the harms associated with their substance use and

16   needs to be addressed.

17        The addressing of antisocial behavior or legal problems is

18   a central feature of what we do for some patients, not every

19   patient, but for some patients with substance abuse disorder.

20   To say that if treatment were to focus on that, it would be

21   excluded because it's somehow apart from SUD treatment I think

22   is not consistent with generally accepted standard of care.

23   **Q.**   Do you recall that in the 2015 versions of the Level of

24   Care Guidelines that we looked at before, the common criteria

25   included criteria for admission, continued service, discharge?

**FISHMAN - DIRECT / GOELMAN**

1  **A.**  I do recall that.

2  **Q.**  That is not broken out in this iteration of the

3  guidelines, but if you turn to page 77 or 78 of the exhibit

4  numbering, so it's internal page 77, but it's TX0078, I think

5  you'll find something with the heading "Continued Service

6  Criteria."

7  **A.**  That's right.  So it serves the same purpose, but it's

8  just organized in a somewhat different way at the end rather

9  than in the common criteria themselves.

10  **Q.**  Okay.  Do you have an opinion as to whether the common --

11  sorry -- the continued service criteria in 2011 met the

12  generally accepted standards of care for substance use

13  disorder?

14  **A.**  Well, I think that they are problematic and not consistent

15  with the generally accepted standard of care.  An example is

16  number four.  We talked about the issue of motivation or

17  treatment participation.  Here if a person is not actively

18  participating in treatment or is not likely to fully adhere to

19  treatment, they don't meet continued stay criteria and the

20  service wouldn't be covered.

21      It's interesting to note that there is acknowledgment made

22  that there might be an initial period of stabilization in which

23  that wouldn't happen, and there might be a period in which

24  additional motivational support might be needed.  But I'm

25  concerned that that directs the user to some kind of brevity of

 1   what that intervention would be past which, whatever the time

 2   is -- and it's not specified, which is okay -- but that past

 3   that time that we're done with this and we're done with

 4   stabilizing and we're done with motivational support, and

 5   either you've got it or you don't and then you would not meet

 6   continued stay criteria.

 7        And what I think is more consistent with generally

 8   accepted standards of care is that we keep at it and that

 9   motivational enhancement and trying to persuade a person to do

10   incrementally better at adherence over time is much more likely

11   to be the path that people follow.  Three steps forward, two

12   steps back.  To expect something different, some kind of

13   unilinear direct pathway to recovery without some opposition,

14   without some problems and participation, without problems and

15   adherence, I think is unrealistic.

16   **Q.**   And this list of 11 criteria, it says at the top that all

17   of the following criteria must be met for continued service; is

18   that right?

19   **A.**   That's correct.  Right.

20   **Q.**   So failure to meet any one of them would disqualify a

21   patient from care?

22   **A.**   No, that's right.

23   **Q.**   Can you turn to Number 8, please.

24   **A.**   Yeah.  So 8 is one that asks for the tracking of progress,

25   which in and of itself I think is reasonable, but I think that

1    the level at which that is expected, this idea of clear or

2    compelling evidence -- clear and compelling evidence, that's a

3    very high standard.  It's not really a medical term, and it

4    would be hard to know what that would exactly mean in a

5    clinical treatment except that it sounds to the user or it

6    would direct the user to think that we're watching closely and

7    if it doesn't meet that high threshold, that that's not

8    adequate and that isn't measurable progress and that the

9    treatment would be excluded.

10   Q.   So there you either have to have already achieved

11   measurable realistic progress or show by clear and compelling

12   evidence that continued treatment of this level of care is

13   required to prevent acute deterioration or exacerbation?

14   A.   Yes.  And it seems to me that that is an overly high

15   threshold that results in over-restrictiveness.

16   Q.   Can you turn now to page 55 internally, or TX1-0056, for

17   the residential treatment for substance use disorder?

18   A.   Yeah.  I'm there.

19   Q.   Okay.  And earlier you had identified in 2015 Level of

20   Care Guidelines the section that said that fail first was not

21   required.  Do you see that -- I mean, do you recall that?

22   A.   That's right.  We discussed that in 2015.

23   Q.   Okay.

24   A.   It was explicitly contradicted, yeah.

25   Q.   Is there a fail first requirement in this 2011 version?

1  **A.**    Yes.    Number 1 right off the bat is a strong fail first

2  criteria.    So the member continues to use substances despite

3  appropriate motivation and recent treatment.    That's

4  problematic to me in both ways, both because a person has to

5  have had and been in and participated in treatment in an IOP,

6  and also they have to have been motivated towards that

7  participation.

8        I think that here this is the inclusion of a fail first

9  criteria, which although later rejected, here is clearly in

10  contradiction with the generally accepted standard of care.

11  **Q.**    And was -- the fail first requirement, was that something

12  that was consistent with generally accepted standards of care

13  back in 2011?

14  **A.**    Very much so.

15  **Q.**    Fail first was consistent?

16  **A.**    No, no.    Very much not consistent.

17  **Q.**    Okay.

18  **A.**    I apologize.

19  **Q.**    I misheard you.

20  **A.**    Yeah.

21  **Q.**    What about the fifth criteria here in the list?

22  **A.**    Well, before we get to 5, I have concerns with 2, 3, and

23  4, which although it's appropriate to look at deterioration of

24  function in 2, it's appropriate to look at exacerbation of a

25  co-occurring medical condition in Number 3, and it's

1   appropriate to look at developing withdrawal symptoms in

2   Number 4, in all three of those, in 2, 3, and 4, the metric is

3   that the person cannot be safely treated in a less restrictive

4   level of care.

5       And although we certainly want to be mindful of not

6   leaving a person to an unsafe situation, that's not sufficient.

7   We also want them to not be in a level of care where they

8   cannot effectively be treated.

9       So for deterioration of function, for exacerbation of a

10  co-occurring medical condition, and for the development of

11  withdrawal symptoms, we also want that -- the level of care be

12  considered as not effective, and that should provide a pathway

13  to the higher level of care.

14      It's also interesting that although co-occurring medical

15  conditions are mentioned, there's the kind of glaring and

16  conspicuous absence of co-occurring mental health conditions

17  not mentioned as a pathway.

18  **Q.**  And that is a dimension reflected in ASAM Assessment

19  Dimension Number 3?

20  **A.**  ASAM Dimension 3.

21  **Q.**  Okay.  Do you see at the top of this list it says "Any one

22  of the following criteria must be met"?

23  **A.**  I do.

24  **Q.**  Why, then, do you find this list of inclusive criteria

25  objectionable, Dr. Fishman?

**FISHMAN - DIRECT / GOELMAN**

1   **A.**   So you're right to point out that any one not being met

2   doesn't exclude that another one might be met, but it sure

3   narrows the portal that more than one of these criterion are

4   flawed, and then in aggregate you have only a very narrow

5   portal or create only a very few number of nonflawed pathways

6   to get in.  So if a person can't reasonably meet this one or

7   this one or this one, then we're left with not enough.

8        Remember what we talked about is that we want to look for

9   the diversity, the heterogeneity, and the multiplicity of

10  different pathways as meeting the needs of different kinds of

11  individuals and there's, I think, restriction by not having

12  enough appropriate and unflawed pathways in in the ways I've

13  described.

14  **Q.**   Put it this way:  Are there patients with substance use

15  disorder who, under the generally accepted standards of care,

16  would be eligible for residential treatment that would not meet

17  any of these six criteria?

18  **A.**   Well, yeah.  I think we could come up with a hypothetical

19  patient who, in my view, by the generally accepted standards of

20  care or as -- sorry, going too fast -- by the generally

21  accepted standards of care and as also articulated in the ASAM

22  criteria would appropriately be placed in residential treatment

23  but might not find a pathway in by one of these six.

24       So, for example, a person whose co-occurring psychiatric

25  disorder, mental health problem, say it's depression or

1    psychosis, is chronic and puts the person at risk of further

2    functional deterioration and might have not relapsed to

3    substances but based on past history of the course of illness

4    might be at high risk, say they've stopped taking their

5    antidepressant, they've stopped taking their antipsychotic, and

6    we have the historical kind of pattern in previous times, that

7    that, I wouldn't go so far as to say inevitably, but likely

8    based on past behavior predicting future behavior -- based on

9    past behavior leading to future behavior predicts with some

10   probability that the person would be at risk and would need the

11   combined bundled intensity of this level of care, but that

12   wouldn't be indicated here as a particular meeting any one of

13   these.

14   **Q.**   Dr. Fishman, turning to the next section, which requires

15   that all of the criteria be met in order for the patient to be

16   eligible for residential care, can you point out language there

17   that supports your opinion that this level of care guideline

18   violates the generally accepted standard of care?

19   **A.**   I apologize for interrupting.  I just want to go back

20   because I think I didn't mention a problem with number 5, in

21   the first section.  Any one of the following criteria might be

22   met.

23        I very much like that there's a consideration of the

24   Dimension 6, home environment, recovery environment, living

25   situation.  But, once again, I think the way that this is

1   articulated in number 5, severe impairment in the member's

2   family or social support system has heightened the risk, et

3   cetera, is overly narrow because I think there are other ways

4   in which a Dimension 6 recovery environment, home environment,

5   can be problematic.

6       It might not be that the home environment is severely

7   impaired.  But it might be that enduring vulnerabilities of the

8   person through their own qualities don't allow them to digest

9   the support, or that they bring to the table a conflict with

10  the home situation that isn't because the home situation is

11  itself impaired, but because that person's own vulnerabilities

12  bring it to the table as a problem.

13      So it's that -- it's too narrow in the requirement, again,

14  for me.

15  **Q.**   Okay.  And then, again, turning to the next section, all

16  of which contain criteria, all of which have to be met.

17  **A.**   Yes.

18  **Q.**   Are there any of these criteria that you believe

19  contribute to the violation of generally accepted standards of

20  care by the 2011 version of the Level of Care Guideline?

21  **A.**   In particular number 2.a highlights, again, another way in

22  which in the UBH criteria don't encompass and consider the full

23  range of the residential levels of care.

24      So the comprehensive evaluation by a psychologist or an

25  addictionologist while absolutely appropriate for the highest

1    medically monitored 3.7 level of care, would not be necessarily

2    or typically appropriate or required for the lower levels of

3    residential care such as 3.5, 3.1, where the involvement of

4    medical personnel would not be central to the treatment.

5          In fact, there would be a comprehensive evaluation,

6    presumably by a different kind of clinician.  And so requiring

7    a therapist, a psychologist, a counselor, but a nonmedical

8    personnel clinician.  And so to require that it be medical

9    again focuses our emphasis only on the highest levels of

10   residential care.

11   Q.   And can you turn to criteria 5, please.

12   A.   Yes.

13   Q.   Does that also reflect a standard required for 3.7 and not

14   for lower levels of residential treatment?

15   A.   That's right.

16         We certainly want the near continuous, if you will,

17   revision of the treatment collaboration between the treatment

18   team or a provider and the patient.  But it might not be at a

19   lower level of residential care.  In fact, it wouldn't be at a

20   lower level of care a medical personnel.

21         The other thing, to set the clock on every five days

22   depending on which of the residential levels of care might be

23   overly burdensome and overly restrictive.

24         It would be one thing if we were talking about a level 3.7

25   medically monitored treatment where the treatment is measured

1   in one to three weeks and then every five days we could argue,

2   you know, is a reasonable criteria for a formal re-review.

3       But if we were talking about 3.1, where the treatment

4   duration might be measured in months, even 6 to 12 months, then

5   the formal requirement for a re-review every five days would

6   seem to me quite burdensome and have the effect of placing a

7   barrier to access to continued stay and treatment.

8   **Q.**   This section says you don't have to have a five-day

9   re-review if you provide, quote, compelling evidence that

10  continued treatment in the current level of care is required to

11  prevent acute deterioration or exacerbation of the member's

12  current condition?  Do you see that?

13  **A.**   I do.

14  **Q.**   Is that standard, compelling evidence, is that something

15  that has a meaning in the substance use disorder field?

16  **A.**   It isn't really something that's operationalized in the

17  medical lexicon.  I don't know what it means.  Surely, if

18  you're going to show something you want to say you have some

19  evidence for it.

20      But to say it's compelling evidence is once again to, I

21  think, create a high bar and create the notion that you're

22  under the microscope for if it's not good enough then it won't

23  do.  And I think that that is restrictive.

24  **Q.**   Dr. Fishman, I have two more sections from the 2011 Level

25  of Care Guidelines I would like to show you.

1          **MR. GOELMAN:**  I think we can do this fairly quickly.

2          **THE COURT:**  Go ahead.

3    **BY MR. GOELMAN:**

4    **Q.**   Let's turn to page 41 or TX 10042.

5    **A.**   All right.

6    **Q.**   And this is for intensive outpatient IOP?

7    **A.**   Yes.

8    **Q.**   Same drill as before.  Can you point us to any of the

9    language in here that informed your opinion that this

10   particular guideline is not consistent with generally accepted

11   standards of care?

12   **A.**   Sure.

13          Number one is a requirement for motivation.  So if a

14   person continues to use substances but they are not motivated

15   to continue to use substances or motivated to participate in

16   treatment, then this criteria wouldn't be met.

17          And, as we've discussed before, I don't think it's

18   reasonable to require motivation for admission.  Creating or

19   enhancing motivation or doing persuasion work is part of what

20   we do in treatment, and we expect people, or some people, some

21   subset of patients to be poorly motivated.

22          Number two, the treatment cannot be safely managed in the

23   less intensive level of care.

24          Again, the undue and narrow focus on the imminent danger

25   consideration.  And, certainly, we want to avoid danger, but we

FISHMAN - DIRECT / GOELMAN

1  also want to be concerned with the effectiveness of treatment

2  or the lack of potential effectiveness at a lower level of

3  care, less intensive level of care, that would then bump us up

4  and require a careful consideration of higher level of care.

5      Number 3, it puts undue focus.  Here it says, "The

6  member's mood, affect or cognition has deteriorated to the

7  extent that a higher level of care will likely be needed if

8  treatment in IOP is not provided."

9      So that focuses us that the goal of treatment is to

10 provide skipping up a level to the next higher level of care.

11 And that might not be the goal of treatment.  The goal of

12 treatment might be that this level of care is required to get

13 more effective treatment outcomes.

14 **Q.**  Okay.  Turning to the list, the "All of the following

15 list" that begins at the bottom of that page.

16 **A.**  Yes.

17 **Q.**  And turning to criterion 5, is that another reference to

18 the need for motivation and a supportive family environment?

19 **A.**  That's right.

20     So I'm all in favor of trying to bring to bear support in

21 the family or other aspects of the recovery environment.  But

22 to make it a requirement that a family or other aspects of the

23 social support system can understand and comply is not

24 reasonable.

25     There might not be such social supports.  It might be, in

**FISHMAN - DIRECT / GOELMAN**

1    fact, the family is opposed or in opposition to treatment and

2    can't or won't cooperate.  That shouldn't exclude the member

3    from getting the needed treatment.

4        An the alternative is here stated that the member is

5    likely to participate.  Again, we discussed this.  At the

6    outset, they may not be likely to adhere to the level that we

7    want, and that may take time.  And that may be the focus of

8    motivational enhancement treatments rather than expecting them

9    at the door to participate in treatment.

10   **Q.**   And what about criteria 6 and 7, and the requirement that

11   psychiatrists complete the confidential evaluation and then

12   continue to see the member?

13   **A.**   So that shouldn't be, according to generally accepted

14   standards of care, a broad requirement for all IOP treatment.

15   Certainly, some IOPs may be what we call co-occurring enhance,

16   specialty dual diagnosis programs that say our focus is going

17   to be on Dimension 3 problems, mental health, psychiatric

18   problems, they will certainly be expected to have a psychiatric

19   involvement.

20       But many IOP programs with treating patients without

21   particular problem focus in the mental health or psychiatric

22   arena would not be expected to be medically monitored or

23   treatments medically delivered.

24       And the requirement to have a psychiatrist, or else

25   patients aren't given treatment, is another way in which these

 1  are overly restrictive and provide barriers to access to this

 2  needed level of care.

 3  **Q.**  Can you look at criterion 8, please.

 4      Is that another iteration of the requirement that a

 5  treatment plan be updated every 3 to 5 days or compelling

 6  evidence that continued treatment is required to prevent acute

 7  deterioration or exacerbation?

 8  **A.**  I agree it's another iteration of a concept we talked

 9  about that we are moving an accelerated clock that's not

10  appropriate for this level of care.

11      We often think of the modal treatment duration for

12  intensive outpatient treatment being, you know, crude average,

13  from 4 to 12 weeks for patients who are successful.  It's often

14  longer within that range.

15      And so to have to provide a formal treatment plan update

16  every three to five days, I think, is overly burdensome.  If

17  the alternative is, again, this compelling evidence, again, I

18  think that that's too high a standard and difficult to meet

19  providing a barrier.

20  **Q.**  Last section in the 2011 Level of Care Guidelines, page 45

21  of the guidelines, or Trial Exhibit 1-46 Outpatient for

22  Substance Use Disorder.

23  **A.**  I see it.

24  **Q.**  What is your opinion as to whether or not this particular

25  guideline comports with generally accepted standards of care?

**FISHMAN - DIRECT / GOELMAN**

1  **A.**   Well, the thing that is so concerning to me is number 2,

2  right off the bat, that a lapse has occurred or is imminent.

3  **Q.**   Why is that concerning?

4  **A.**   So, as we discussed, in 2015, where it was phrased in "why

5  now" or changes, here it's phrased explicitly in the need for

6  a -- having occurred lapse or imminent lapse.

7       Again, the focus on problems and destabilization.  And if

8  those things occurred, for sure they are harkening to the need

9  for treatment.  But one of the purposes for low intensity

10 treatment at this level of care, outpatient treatment, is to

11 continue maintenance of stability and to continue maintenance

12 of remission if a person is in remission.  And to require that

13 they relapse or lapse in order to meet criteria for treatment

14 is to, I think, pervert a core function of outpatient

15 treatment, which might be indefinite, even lifelong checkups

16 and maintenance of function and booster sessions and the like.

17 **Q.**   Okay.  There are three different lists of criteria for

18 outpatient.  The first one says, "Any one of the following

19 criteria must be met"?

20 **A.**   Yes.

21 **Q.**   Second says, "And all of the following"?

22 **A.**   Yep.

23 **Q.**   And then the third says, "Consider whether outpatient

24 treatments needs to continue in any one of the following

25 criteria is met."

**FISHMAN - DIRECT / GOELMAN**

1    **A.**    Yes.

2    **Q.**    Do you see that?

3    **A.**    Yes, I see that.

4    **Q.**    Just globally looking at these criteria, Dr. Fishman, is

5    it your professional opinion that this level of care guideline

6    violates the generally accepted standards of care that were

7    active or accepted in 2011?

8    **A.**    Yes, that is my opinion.

9        **MR. GOELMAN:**  Okay.  Your Honor, I believe this would

10   be a good time for a break.

11       **THE COURT:**  Okay.  Then we'll break.

12       I will see you at 1:30.

13               (Recess taken at 12:34 p.m.)

14   Tuesday, October 16, 2017                     1:40 p.m.

15               **P-R-O-C-E-E-D-I-N-G-S**

16                   **---oOo---**

17       **THE COURT:**  Okay.  Go ahead.

18       **MR. GOELMAN:**  Thank you.

19   **BY MR. GOELMAN:**

20   **Q.**    Dr. Fishman, we've now looked at some of the provisions in

21   the 2011 and 2015 UBH Level of Care Guidelines.

22       Earlier you testified that it was your opinion that the

23   Level of Care Guidelines in use by UBH between 2011 and 2017

24   all violated generally accepted standards of care.

25       Do you recall that?

1   **A.**   I do.

2   **Q.**   And is that for substantively the same reasons that you've

3   just pointed out with respect to the 2011 and 2015 versions of

4   the guidelines?

5   **A.**   That's right.  I think that there is an aggregate and

6   consistent difficulty with each of the years, some to a greater

7   or lesser extent than the individual provisions.  But in their

8   totality, those are the reasons that pertain, and I agree for

9   all of those years.

10   **Q.**   Dr. Fishman, earlier you testified that one way that the

11   UBH guidelines violated the generally accepted standards is

12   that they did not contain specialized criteria applicable to

13   kids, youth, and children?

14   **A.**   Yeah, that's right.

15   **Q.**   Are there, according to ASAM, more permissive standards

16   for youths/kids to get treatment than would apply to the

17   same -- if the patient was an adult?

18   **A.**   Yes, that is true.

19       For any given level of care, the entry criteria, that is,

20   the decision rules for matching treatment severity and needs to

21   level of care, are more inclusive, more permissive for

22   adolescents.

23       So that might be because the criteria themselves are

24   specific to a lower level of severity.  An example may be, in

25   Dimension 1, not requiring as high a level of severity, not

FISHMAN - DIRECT / GOELMAN

 1   having evidence for outpatient levels of medical detox.  That's

 2   just one example.

 3        Another way is that the way that decision was for each

 4   individual dimension combined are more permissive, requiring

 5   two of the dimensions to apply to a particular level of care,

 6   perhaps, instead of three or more compared to adults.

 7        So in a variety of ways, we tend to think that youth would

 8   need higher levels of care for longer durations with lower

 9   barriers to access than adults.

10   Q.   Dr. Fishman, in addition to soliciting your opinion as to

11   whether or not the UBH guidelines were consistent with the

12   generally accepted standards of care, did plaintiffs also ask

13   you to consider the UBH guidelines against the Texas Department

14   of Insurance regulations applicable to substance use disorder?

15   A.   Yes, that's correct.

16   Q.   And did plaintiffs also ask you to review certain expert

17   reports disclosed by UBH and write a rebuttal report?

18   A.   Yes.

19   Q.   Let's turn to Texas first.  Can you look at Trial Exhibit

20   661, please.

21   A.   That is not in this book.  Is that a separate book?

22   Q.   Yeah, a book behind you.

23   A.   And you say 661.  Okay.  661.

24   Q.   Are those the State of Texas regulations that you reviewed

25   as part of your work in this case?

FISHMAN - DIRECT / GOELMAN

 1  **A.**   Yes, they are.

 2          **MR. GOELMAN:**  We offer Trial Exhibit 661, Your Honor.

 3          **MR. RUTHERFORD:**  No objection, Your Honor.

 4          **THE COURT:**  They are admitted.

 5       (Trial Exhibit 661 received in evidence.)

 6  **BY MR. GOELMAN:**

 7  **Q.**   And are these the Texas Department of Insurance

 8  regulations for chemical dependency treatment centers?

 9  **A.**   Yes.

10  **Q.**   And for IOP -- I'm sorry, intensive outpatient and

11  outpatient?

12  **A.**   Yes.

13  **Q.**   Okay.

14  **A.**   And residential, yes.

15  **Q.**   And residential.

16       Does Texas call residential "chemical dependency treatment

17  centers"?

18  **A.**   Uh-huh.

19  **Q.**   What did you do to analyze whether or not the Level of

20  Care Guidelines that UBH was using were consistent with the

21  Texas regulations?

22  **A.**   Well, I read through these Texas guidelines, and then I

23  was able to compare them, both to the UBH guidelines and then

24  to my background, knowledge, and experience of the generally

25  accepted standard of care, including the way they are

FISHMAN - DIRECT / GOELMAN

 1  articulated by the ASAM criteria.

 2  **Q.**   Okay.  Focusing for the moment on the applicability or the

 3  differences between the UBH Level of Care Guidelines and the

 4  Texas regulations, did you come to any opinion after your

 5  review?

 6  **A.**   Yes, I did.  And it was and is my opinion that the UBH

 7  criteria are not consistent with these Texas guidelines.

 8  **Q.**   And was that for essentially the same reasons that you

 9  found the guidelines to be inconsistent with the generally

10  accepted standards of care?

11  **A.**   That's right, broadly because the UBH criteria are more

12  restrictive than these Texas guidelines, do not provide

13  sufficient diversity of pathways to meet specific patient

14  needs, and provide restrictions and barriers to access to care

15  for all of the reasons that we've already talked about.

16  **Q.**   Dr. Fishman, are you familiar with the term "average

17  length of stay"?

18  **A.**   I am.

19  **Q.**   What does that mean?

20  **A.**   So average length of stay, or average length of service,

21  is the amount of time that a person spends in a particular

22  treatment context.  So it might be the number of nights or days

23  that a person spends in a residential treatment program or the

24  number of sessions a person attends an IOP or an outpatient

25  treatment.

FISHMAN - DIRECT / GOELMAN

1   Q.   Can you turn to page 14 of the Texas regs, or Trial

2   Exhibit 661-015?

3   A.   Uh-huh.

4   Q.   Is this recommended length of stay for inpatient

5   rehabilitation treatment?

6   A.   I see that.

7   Q.   Okay.  And what does the Texas Department of Insurance

8   recommend in terms of length of stay for residential treatment?

9   A.   So, in their guidelines, they make the recommendation,

10  and.  It's a range, but they've said that the recommended

11  length of stay for adult admissions to what they call

12  rehabilitation, slash, residential treatment is between 14 and

13  35 days, and for adolescents between 14 and 60 days.

14  Q.   And those are the recommended length of stay for both

15  residential treatment and for inpatient, the Level 4 level of

16  care?

17  A.   That's correct.

18  Q.   And you testified earlier that, generally, the higher the

19  level of care, the shorter the average length of stay was; is

20  that right?

21  A.   That's correct.

22  Q.   Can you turn now to page 20 of the regs, or 661-21.

23  A.   Yes.

24  Q.   Okay.  And is that similar -- does that contain similar

25  recommendations for intensive outpatient as opposed to

 1   residential?

 2   **A.**    It does.  And it gives a recommended intensive outpatient,

 3   or an ASAM, the numbering is Level 2.1.  Recommended length of

 4   service or length of stay are from 4 to 12 weeks as a range.

 5   **Q.**    Okay.  And are there different numbers there for youth

 6   versus adults?

 7   **A.**    No.  In this case, they don't give that.

 8   **Q.**    Okay.  Are you familiar with treatment episode data, or

 9   TEDS.

10   **A.**    I am.

11   **Q.**    And what is that data?

12   **A.**    So the TEDS data set, the Treatment Episode Data Set, is a

13   national data set compiled by a federal agency, SAMHSA,

14   Substance Abuse and Mental Health Services Administration.

15   It's collected from throughout the country as a report of, I

16   don't know, 1 to 2 million episodes of care annually.

17       And they report it each year with a whole host of

18   statistics.  That reporting, as I understand it, is mandated in

19   states for many providers.  And it gives a snapshot, if you

20   will, of national treatment.

21       And they might have reasons for admission.  They might

22   have drugs of choice.  They might have average length of stay.

23   So there's an annual published report about that data set.

24   **Q.**    Okay.  Do you have Trial Exhibits 699, 700, and 701?

25   There may be another binder.

1   **A.**   Okay.  Another binder.  699.

2   **Q.**   And --

3   **A.**   And this is the 2011 TEDS report.

4   **Q.**   Okay.  And is 700 the 2012?

5   **A.**   700 is the 2012.

6   **Q.**   And 701, the 2013?

7   **A.**   Yes, the 2013.

8        **MR. GOELMAN:**  Your Honor, plaintiffs offer Trial

9   Exhibits 699, 700, and 701.

10       **MR. RUTHERFORD:**  Your Honor, we would object on the

11  basis of the fact that this wasn't a basis of his opinion or

12  his rebuttal opinion.  Neither one of these documents -- none

13  of these three documents were relied upon.

14       **MR. GOELMAN:**  He is not now offering an opinion, Your

15  Honor.  You indicated that, if we wanted to admit documents we

16  had to have a sponsoring witness.  I think Dr. Fishman is

17  probably as good as we're going to get for this kind of data.

18       **THE COURT:**  That's not what I meant by sponsoring

19  witness.

20       You don't get to put something up there and just have it

21  admitted into evidence and not have somebody talk about it.

22  You have to have somebody actually explain the significance of

23  it.

24       What are you going to use this document for?

25       **MR. GOELMAN:**  To show what the TEDS data says about

1   average length of stay for --

2          THE COURT:  Who are you going to do that through?

3          MR. GOELMAN:  It's in the face of the data, Your

4   Honor.  It's in the report.

5          THE COURT:  Fine.  Sustained.

6       As I said, I am not going to sit there in chambers and go

7   through 10,000 pages of documents that you haven't gone through

8   specifically with a witness on the stand right here and explain

9   exactly the significance, nor can you do it with an expert that

10  you haven't qualified to do that.

11      So figure out some other way, but that's not what's going

12  to happen.  So it's sustained.

13  BY MR. GOELMAN:

14  Q.  Dr. Fishman, you've practiced in the field of substance

15  abuse disorder for 25 years?

16  A.  Yes.

17  Q.  And during that time have you become familiar about the

18  average ranges of time that people spend in different types of

19  treatment?

20  A.  Yes, I have.

21  Q.  Does that include different levels of residential

22  treatment?

23  A.  Yeah.  It includes residential treatment and it includes

24  outpatient treatment.

25  Q.  Okay.  And how have you become familiar with those kinds

1  of averages, Dr. Fishman?

2  **A.**    I've become familiar as an attending physician directly

3  supervising clinical care, and I've become familiar as a

4  medical director doing administration, overseeing the work of

5  other practitioners and the organization as a whole, and have

6  seen utilization of data and seen individual episodes of care.

7        So I have a feel, and I've also talked to many other

8  practitioners who shared with me their experience and their

9  particular circumstances.

10 **Q.**    And based on your professional experience, Dr. Fishman,

11 can you say what the average length of stay or a range of

12 average length of stay is for different levels of residential

13 treatment?

14 **A.**    Yeah. I think it's important to stress that it is a range.

15 Certainly, individual circumstances and individual patient

16 severity and treatment needs, as we've been discussing

17 throughout the day, those would pertain.  But you get a sense

18 of the range.  Certainly, there are outliers, but you get a

19 sense of the range.

20       And so it's worth looking at from all the different levels

21 of care.  In a hospital setting, a level 4 setting, it's

22 usually a few days to a couple of weeks except for the most

23 severe patients.

24       In a level 3.7, or a medically-monitored residential

25 treatment, it's in the range of one to four weeks.  I think in

**FISHMAN - DIRECT / GOELMAN**

1  my programs the average is somewhere around three weeks.  But,

2  again, it's a range.

3      In level 3.5, or medically-managed residential treatment,

4  that range might be 4 weeks to 12 weeks.

5      In level 3.1, or low-intensity clinically-managed

6  residential care, it's typically measured in months and might,

7  be 6 to 12 months for some patients.

8      In intensive outpatient care, or Level 2.1, per the ASAM

9  designation, it might be in the range of 4 to 12 weeks,

10  sometimes 16 weeks.  But 8 to 12 weeks is often what we're

11  shooting for, again, with variation based on individuals.

12      And, as I've said before, for level 1 outpatient care,

13  it's such a wide range because for some patients it might be

14  indefinite, and even the goal being lifetime if we can retain

15  them that long, if the patients are lucky enough to sustain

16  that engagement for that long.

17  **Q.**   Thank you, Dr. Fishman.

18      Is your rebuttal report, which I think is marked for

19  identification Exhibit 882, in that binder.

20  **A.**   I will look.

21      Fishman report, yes.

22  **Q.**   Were you asked by plaintiffs to review reports proffered

23  by UBH by Dr. Simpatico, Dr. Goddard, and Dr. Alam?

24  **A.**   I wrote a rebuttal report having read the reports of

25  Dr. Simpatico and Dr. Goddard.  I believe the report of

 1  Dr. Alam crossed paths at the time that I was writing this

 2  report.

 3  **Q.**   So you did not include in your rebuttal report your

 4  rebuttal to Dr. Alam; is that right?

 5  **A.**   That is correct.

 6  **Q.**   Did you later set forth your opinion with respect to

 7  Dr. Alam's report at your deposition in this case?

 8  **A.**   Yes, I've discussed that.

 9  **Q.**   Turning to Dr. Simpatico first, without going over ground

10  that we've already tilled, can you tell us what your opinion

11  of -- what your reaction was upon reviewing Dr. Simpatico's

12  report?

13  **A.**   Well, I disagree with Dr. Simpatico.  He contends that the

14  UBH criteria are consistent with the generally accepted

15  standards of care.  And I disagree.

16      He tried to make arguments as to why his position was

17  correct.  I'm not persuaded by them.  But I will just talk

18  about some highlights.

19      One of the things that he emphasized is that, in his view,

20  there are some key principles of the generally accepted

21  standards of care which, in his view, the UBH guidelines do

22  uphold.

23      One that he wanted to emphasize in his report was what he

24  calls least restrictive effective setting.  Meaning that it

25  would be consistent with the generally accepted standards of

 1   care to have patients treated in levels of care that are least

 2   restrictive and effective.

 3        That's a generally standard approach, and I agree that

 4   it's an important principle.  But his emphasis is really very

 5   narrowly on that component of "least restrictive and

 6   effective"; that is, least restrictive with very little focus

 7   on what I consider to be as important, or maybe more important,

 8   but certainly equally important, the component of being

 9   effective.

10        And he argues that least restrictive is so important

11   because it upholds patients' freedoms and liberties and harkens

12   back to the evolution of that standard; that is, in the

13   excesses in decades past of involuntary confinement in

14   longer-term inpatient psychiatric hospitals, before we had a

15   standard of what it was to require a due process for patients

16   to be protected, protected against involuntary commitment

17   against their will, to be protected against not being provided

18   active treatment.

19        And I thought that that really wasn't germane to the

20   argument here since none of the residential care that we're

21   talking about is involuntary.  The protection of people's civil

22   liberties in settings in which they are confined against their

23   will is not relevant.

24        These are patients who are voluntarily seeking treatment.

25   And the question is whether or not that treatment that they

FISHMAN - DIRECT / GOELMAN

1  seek, and that their treatment providers agree should be

2  sought, is covered, not whether they are being adequately

3  protected from harms.

4      And we have clear regulation for procedures for due

5  process.  And they would be protected in any case not so much

6  through the criteria but through those procedures and that

7  regulation.

8      So I thought that that was not persuasive to me.  And,

9  again, "effective" is the more important but certainly equally

10 important to "least restrictive."

11     Another thing Dr. Simpatico took issue with, with my

12 report, was his objection that he thought I maintained that the

13 ASAM criteria was the only picture of the generally accepted

14 standard of care.  And he argued that there was no single one

15 articulation of the generally accepted standard of care.

16     And I agree with him that ASAM isn't the only and the only

17 possible.  For me, it's just the best one and the one that best

18 articulates it and reflects it.  But I'm not committed or

19 wedded to the idea, as he claims, that there could be no other

20 and that the ASAM numbering and the ASAM words and the ASAM

21 organization is the only one.  As I've said before, as long as

22 the concepts are there and that they have decision rules that

23 comport with the generally accepted standard of care as we've

24 been discussing.

25     Another thing Dr. Simpatico agreed with me about is this

1  issue we've talked about, about the distinction between active

2  treatment and custodial care in which I claim, and still claim,

3  that the UBH criteria overly depict a narrow concept of active

4  care and an overly broad definition of the concept of custodial

5  care.

6      And he again went to the language, which I discussed

7  earlier, that there was an overemphasis on reduction or control

8  of acute signs and symptoms and the improvement to some higher

9  level and restoration of some higher level of function not

10 sufficiently emphasizing restoration -- I mean, not

11 sufficiently emphasizing prevention of deterioration and

12 maintenance of function.

13     And so, again, that's an area in which I disagree.  And I

14 think that he and the criteria themselves quote the CMS

15 language out of context without really going to the full

16 explanation, and overemphasizing acuity.

17 **Q.**   And, Dr. Fishman, in terms of your and Dr. Simpatico's

18 disagreement about acuity or the "why now" factors, do you ever

19 express the opinion in your report or in your testimony that

20 acute or "why now" symptoms should be ignored?

21 **A.**   No, not at all.  I do think that acute symptoms should be

22 and must be considered.  And I do think that even the way that

23 that is phrased, as "why now," those things ought to be

24 considered.

25     It's a useful clinical tool.  One of its main purposes is

1    to try to get a sense of what motivates a patient.  I certainly

2    want to know why a patient came to treatment today but not last

3    week, but not next week.

4        And the reason that's so important -- not because that's

5    the only thing to consider, not because that's the only and

6    exclusive focus of the treatment plan, but because it's

7    important for me to understand what motivates a patient.

8        And so remember what I said before when we were going

9    through the dimensions, and I said I often like to start with

10   Dimension 4.  This issue of treatment alliance and therapeutic

11   engagement is so important.  You want to know, well, what

12   motivates the patient.  I may have my reasons why I think it's

13   so important, but they may not be the same as the patient's.

14   So understanding what drew them in, what brought them in the

15   door, helps me appreciate what to focus on in meeting them

16   where they are at.

17       And it is a condition, as we talked about, that waxes and

18   wanes.  And motivation flags.  And I know later on I'm going to

19   have to come back to that well and dip in it again.  So that's

20   why I want to identify "why now," so I can come back and say

21   remember what got you here, let's focus on that when they flag

22   and they say, maybe I'm not as interested anymore.

23       So it's a vital clinical concern, but it is not the

24   sufficient exclusive focus of treatment to only focus narrowly

25   on "why now."  But I do think it's important.

1   **Q.**   Okay.  Turning to Dr. Goddard's report, did one of the

2   opinions expressed in Dr. Goddard's report have to do with the

3   existence or nonexistence of a single nationally accepted

4   description of the generally accepted standards of care?

5   **A.**   Yeah.  Dr. Goddard also makes the point that there is no

6   single nationally accepted set of criteria.  And he claims that

7   I did make that assertion.  But I disagree with him.  I think

8   that there are generally accepted standards of care.

9        Those are part of the consensus of expert practitioners in

10   the field, and I believe that they are well articulated and

11   expressed and reflected in the ASAM criteria.  But I don't

12   think that the ASAM criteria are the only possible version, the

13   Holy Bible necessarily.  I just think they're well described

14   and do a good job.

15   **Q.**   So to the extent that Dr. Goddard opines that there are no

16   generally accepted standards of care in this field, you would

17   disagree with that?

18   **A.**   I certainly disagree.  I think there clearly are generally

19   accepted standards of care that shape practice, as it should

20   be.

21   **Q.**   Turning now, finally, to Dr. Alam's report, I think that

22   is Exhibit 808, expert report of Dr. Alam?

23   **A.**   Yes, I have that.

24   **Q.**   One of Dr. Alam's opinions is that the UBH levels of care

25   guidelines do comply with the generally accepted standard of

 1   care.  You've already stated that you disagree with that, and

 2   that your opinion is that the guidelines do not comply with

 3   GAS.  And you explained the basis for your opinion at some

 4   length.  So I don't want to go over that ground again.

 5       But is there anything in addition to all the problems that

 6   you've already identified in the levels of care guidelines that

 7   you disagree with Dr. Alam on?

 8       And I would refer you to page 12, footnote 36, where he's

 9   discussing the continuum of care for residential treatment.

10   **A.**   Sure.  Well, there's a couple of points.  He again makes

11   the same point that -- asserting that I think that the ASAM

12   levels of care -- the ASAM level of care guidelines is the only

13   single nationally accepted standard.  I've explained why I

14   don't think that's the case.  So we continue to disagree.

15       He thinks that ASAM is not as broadly as disseminated and

16   well-known as I think.  I disagree with him about that.  I

17   think anybody with experience in this field, any addiction

18   physician, any addiction practitioner would be able to

19   recognize the ASAM criteria and be able to describe its

20   purposes.

21       But, in particular, the point that you refer to is on the

22   matter of my contention that the UBH criteria do not

23   appropriately consider the full range of residential care.  So

24   not just 3.7 but 3.5, 3.3, and 3.1, the lower levels of

25   residential care.

1          He dismisses that in part by saying, well, those levels of

2     care don't really exist much anyway, and they're not found very

3     frequently, and they couldn't be part of the standard of care

4     if they're so rare, and so let's not focus on them and make

5     such a fuss.

6          I disagree entirely with him about that.  I think that

7     they are very common.  I think they are found in many

8     communities.  I couldn't claim it's every community.  But just

9     to give you an example, one of the natural English descriptors

10    of what in ASAM is called 3.1, low intensity, clinically

11    managed residential treatment, is a halfway house.

12         Halfway houses are very common throughout the country as a

13    level of care that is widely used.  So I don't agree with him

14    that they are not commonly found.  I think they are commonly

15    found.  I think they ought to be commonly found.  I think they

16    ought to be covered.

17         And I think that it is part of the generally accepted

18    standard of care that a criteria that purports to do what it's

19    supposed to do to put patients in the right place ought to give

20    us instruction sets for how to do that, including those levels

21    of care.

22    **Q.**   Okay.  Turning now to page 11, paragraph 46, of Dr. Alam's

23    report.

24    **A.**   Page 11?

25    **Q.**   Yeah, page 11.  That involves a purported discussion or

1  series of discussions that, according to the report, you and

2  Jerry Shulman were involved in as part of a group of Parity

3  Implementation Coalition.

4      Do you know what the Parity Implementation Coalition is or

5  was?

6  **A.**   So I don't have as good a recollection of all these

7  details.   I do recall that I was introduced to an endeavor

8  along those lines around the time that we're talking about, by

9  Carol McDade, who's a nationally known treatment advocate and

10  specialist in parity.

11      As I recall, there was a conversation that she was trying

12  to broker between some frustrated treatment providers who

13  contended that certain managed care company or companies -- I

14  can't remember which one or ones -- were not adequately

15  providing coverage for care that they thought ought to be

16  covered.

17      They wanted to broker -- or Carol McDade wanted to broker

18  a dialogue in the conversation to try to educate reciprocally.

19  She brought ASAM members into the conversation to see if a

20  dialogue could be had, a series of conference calls.

21      I don't recall that Dr. Alam was involved.   He says he is.

22  I don't doubt that that's so.   I don't recall that Jerry

23  Shulman was involved.   I recall that it was Paul Early, who's

24  another prominent ASAM member and a member of the steering

25  coalition, steering committing for ASAM.   But, in any case,

FISHMAN - DIRECT / GOELMAN

1    yes, I do remember it happened.

2        We divided and conquered a little bit.  My particular role

3    was to bring to the group, if I remember correctly, some of the

4    background of the research that supported the ASAM criteria and

5    describe what the empirical kind of background was.

6        And it was Dr. Early's role to look at some of these cases

7    that were thrown out as examples and to review whether or not

8    they met the ASAM criteria matching.  I can't recall the

9    details.  He did most of the talking on those conference calls.

10       I remember that I agreed with what he was saying.  And we

11   agreed with some of the things and disagreed with others of the

12   things, but I can't recall more detail than that.

13   **Q.**   Okay.  So just so I understand your testimony, you don't

14   recall Dr. Alam being part of those discussions, but he may

15   have been?

16   **A.**   He may have been, sure.

17   **Q.**   Okay.  Did you ever, as part of the Parity Implementation

18   Coalition, or in any other form or context, express support for

19   the UBH Level of Care Guidelines or voice the opinion that they

20   complied with the generally accepted standard of care?

21   **A.**   No, not at all.  It wasn't part of the exercise at that

22   time to review the UBH guidelines, so I didn't do that.

23       But when we looked at the decisions made for these

24   particular cases and compared them to the ASAM criteria, they

25   were in some instances contradictory with whatever decisions

1    had been made.

2         But I would never -- knowing what I know now about the UBH

3    criteria, now that I've reviewed them, I would never have

4    endorsed the UBH criteria as meeting the generally accepted

5    standards of care.  I don't think they do.

6              **MR. GOELMAN:**  No further questions.

7              **MR. RUTHERFORD:**  Your Honor, if I may, if there are

8    references to prior deposition testimony, does the Court want a

9    mini or a larger version?

10             **THE COURT:**  I don't want any of them unless I have to

11   have them.

12             **MR. RUTHERFORD:**  Understood.

13             **THE COURT:**  Well, so maybe I ought to ask this

14   question now, rather than after cross-examination.

15        Dr. Fishman went through some portions of the Level of

16   Care Guidelines.  Who's going do the rest of all those Level of

17   Care Guidelines?  Or did you expect me to extrapolate somehow

18   even though the language is slightly different?

19             **MS. REYNOLDS:**  Your Honor, there is another expert

20   witness who will go through additional years.  Some of the

21   years have identical criteria.  And if they are identical, we

22   don't intend to go into them in depth.

23             **THE COURT:**  Well, or at all?

24             **MS. REYNOLDS:**  Hum?

25             **THE COURT:**  Or at all?

1          **MS. REYNOLDS:**  I mean I expect that the experts will

2    give their opinion on the criteria --

3          **THE COURT:**  Well, so here's my problem.

4          **MS. REYNOLDS:**  -- without repeating them --

5          **THE COURT:**  Maybe I ought to make myself clear.

6      At the end of the day, with respect to every level of care

7    guideline, and presumably by inference most of the other

8    guidelines, I'm going to go through line by line only as to

9    those sections of Level of Care Guidelines that you have

10   specifically challenged, okay.

11         And with respect to those, I'm only going to -- I'm not

12   going to figure out for myself what's wrong with them; right?

13   I mean, I certainly have my own opinions reading them, but I'm

14   just some dumb judge.  I'm going to rely on the experts on both

15   sides or people from UBH who are experts in their own way.

16      I'm not going to try to figure it out.  So if you want me

17   to draw an inference -- and I expect that is the bulk of the

18   plaintiffs' case, is each section, each particular two

19   sentences of a guideline is wrong for the following reasons,

20   okay.

21         So you have to make sure that you have somebody testifying

22   that that exact way it's worded in this context is wrong for

23   the following reasons.  If you don't, I'm not going to try to

24   figure it out for myself.

25         So I'm not going to apply the general sense of they

1    overemphasize acute care to a different kind of language about

2    urgency in some other guideline.

3         So I expect by the end of this for you to have given me

4    chapter and verse on every single one, because what I'm going

5    to, in return, do is go through the guidelines and say, this

6    one is fine here, it's not fine here, it's not fine here, it's

7    fine here, it's not fine here.  That's what I'm going to do.

8    So none of that can be done unless you have specifically

9    challenged a particular.

10        Now, if it's the identical verbiage, that's fine, but

11   you've got to make it clear it's the identical verbiage.  And

12   if I were you, I would put the identical verbiage up in front

13   of an expert and say, Here it is.  That's the same thing;

14   right?

15        Doesn't do me any good to say, oh, they're all

16   inconsistent with the guidelines.  It's almost -- almost

17   useless.  Or they're all inconsistent in the same way.  It's

18   almost useless.

19        It's got to be this section and this section and this

20   section.

21        So I'm happy to proceed with cross-examination, but you

22   may need to do some more work, because that's -- at the end of

23   this, I should have a roadmap from the testimony as to what you

24   think is wrong with every section of every guideline that you

25   think is wrong.

1        And, similarly, the defendants are going to have to

2   challenge every single one of those.  Otherwise, I won't have

3   the rebuttal to it.

4        So that's the roadmap I want.  And I can't -- this can't

5   be done on a general level.  And so we started off in the right

6   way, I thought, and then we sort of lost focus and became

7   pretty general.

8        And, you know, you would skip over some sections and then

9   Dr. Fishman would go back to some sections.  That's fine.  But

10  if he doesn't go back to some sections, I've got no testimony

11  on them.

12       So I want you to both -- both of you, focus on exactly

13  what you think is right or wrong with the guidelines.  And if

14  you don't, then the defense wins on those that you don't focus

15  on.

16       Okay.  Cross-examination.

17                   **CROSS-EXAMINATION**

18  **BY MR. RUTHERFORD:**

19  **Q.**   Good afternoon, Dr. Fishman.

20  **A.**   Hello.

21  **Q.**   You had testified about interactions you had with

22  Dr. Danesh Alam; correct?

23  **A.**   Uh-huh.

24  **Q.**   This is somebody you have collaborated with in the past on

25  studies; isn't that right?

**FISHMAN - CROSS / RUTHERFORD**

1  A.    That's correct.  Dr. Alam and I have been coinvestigators

2  on at least two that I can recall of such studies of medication

3  treatment for addiction.

4  Q.    And he's somebody you consider to be proficient at his

5  work?

6  A.    Yes.  I know him as a scientist in doing pharmacological

7  treatment of addiction.  And he seems proficient, yes.

8  Q.    And both professional and qualified?

9  A.    For that, yes.

10  Q.    You also mentioned a Mr. Jerry Shulman?

11  A.    Uh-hum.

12  Q.    Mr. Shulman is somebody that you've known for at least a

13  couple of decades; isn't that right?

14  A.    That's right.

15  Q.    He's somebody that was contributing to the ASAM criteria

16  prior to the time that you got involved, correct?

17  A.    That's right.  He's also a deputy editor.  And his

18  experience and work precedes my recruitment by Dr. Mee-Lee,

19  correct.

20  Q.    And you consider him to be a thoughtful person?

21  A.    Yes.

22  Q.    Someone who has a strong understanding of treatment

23  placement guidelines?

24  A.    Yes, that's right.  Like any couple of experts, we might

25  agree on some things and disagree on other things, but I think

1   of him as a thoughtful and proficient person.

2   **Q.**   So you testified a moment ago about the concept of a least

3   restrictive effective level of care.  Do you recall that?

4   **A.**   I do.

5   **Q.**   Your critique of defense's exhibit of Dr. Simpatico was

6   that he emphasized the restrictive aspect of that to the

7   detriment of the effectiveness aspect of that; correct?

8   **A.**   Correct.

9   **Q.**   But you would agree that the least restrictive effective

10   level of care is a concept that is consistent with the

11   generally accepted standards of care when those two

12   considerations are in balance; isn't that right?

13   **A.**   Yes, that is correct.

14   **Q.**   And you also testified that the applicability of

15   restrictiveness was -- I don't want to put words in your

16   mouth -- was either limited to involuntary situations or

17   predominantly involuntary situations; isn't that right?

18       I mean, predominantly in involuntary situations.

19       **THE COURT:**  No, he didn't say anything like that.  Try

20   again.

21   **BY MR. RUTHERFORD:**

22   **Q.**   You mentioned the limitation of -- you testified that the

23   concept of restrictiveness was limited to situations involving

24   involuntary commitments.

25       **THE COURT:**  No, that's not what he said.

1        If this is the way we're going to do cross-examination, we

2    are going to have a very short cross-examination.

3        What he said was he criticized the other experts for

4    drawing on involuntariness to justify having less restrictive

5    conditions.  That's all he said.  So move on.

6    **BY MR. RUTHERFORD**

7    **Q.**   Restrictiveness is a concept that applies across the

8    continuum of levels of care; correct?

9    **A.**   It can.  It's most applicable to the highest levels of

10   care, but it can apply to all levels of care.

11   **Q.**   And that is both in terms of voluntary and involuntary

12   levels of care; is that right?

13   **A.**   That's right.  So it can impose, say, burdens on a person

14   at all levels of care, even if voluntary.  But sometimes it

15   also implies a needed ingredient to help protect patients and

16   propel them towards good treatment outcomes.

17   **Q.**   Now, when we began this morning, you talked about the

18   various sources of generally accepted standards of care.  Do

19   you recall that testimony?

20   **A.**   Yes.

21   **Q.**   And you had mentioned, among others, the CMS, which is the

22   Center for Medicaid and Medicare Services, which is a

23   governmental organization?

24   **A.**   Yes.

25   **Q.**   And you mentioned CSAT, which is within SAMHSA, which is

**FISHMAN - CROSS / RUTHERFORD**

1    also a governmental organization?

2    **A.**    Yes.

3    **Q.**    And articles written by colleagues of yours, who include

4    Dr. Gastfriend?

5    **A.**    Yes.

6    **Q.**    There are also a number of other practice parameters that

7    are in the marketplace that are -- that would qualify as

8    generally accepted sources -- sources for generally accepted

9    standards of care; correct?

10   **A.**    Sure.

11   **Q.**    Practice parameters promulgated by the American

12   Psychiatric Association?

13   **A.**    Correct.

14   **Q.**    And as well as the -- what's termed as AACAP.

15        Are you familiar with the organization AACAP?

16   **A.**    The American Academy of Child and Adolescent Psychiatry,

17   yes.

18   **Q.**    Correct.  As well as the Commission on Accreditation and

19   Rehabilitation Facilities, CARF, are you familiar with that

20   organization?

21   **A.**    CARF.  CARF Commission might be another one.  Many

22   different ones, yes.

23   **Q.**    So directing your attention to what has been marked as

24   exhibit -- already marked as Exhibit 5 for identification, if

25   you could pull that up.

**FISHMAN - CROSS / RUTHERFORD**

1          And this is the 2015 Level of Care Guidelines.

2    **A.**    I think that's here.  Just a second.

3          Yeah, found it.

4    **Q.**    So in response to questions that were asked by

5    Mr. Goelman, you walked the Court through a number of sections

6    within the 2015 Level of Care Guidelines; correct?

7    **A.**    Yes.

8    **Q.**    You walked him through the common criteria?

9    **A.**    Yes.

10   **Q.**    And that was for admission, continued service, and

11   discharge?

12   **A.**    Yes.

13   **Q.**    As well as clinical best practices; correct?

14   **A.**    Yes.

15   **Q.**    So then directing your attention to Trial Exhibit 5, page

16   13-0013.

17   **A.**    Yes.

18   **Q.**    To the bottom portion of that, what looks like page 13 of

19   the document and page 13 of the exhibit, do you see that?

20   **A.**    I see that.

21   **Q.**    And that indicates references, does it not?

22   **A.**    There are references, yes.

23   **Q.**    And these are references that are assigned to this

24   particular level of care guideline; correct?

25   **A.**    Yes, I see that.

**FISHMAN - CROSS / RUTHERFORD**

1  Q.   And in your review of other guidelines, you saw similar

2  references to -- similar references to references; correct?

3  A.   Yes.

4  Q.   And this particular 2015 level of care guideline

5  references the American Academy of Child and Adolescent

6  Psychiatry and American Association of Community Psychiatrists,

7  CA-LOCUS instrument; correct?

8  A.   Yeah.

9  Q.   And you're familiar with CA-LOCUS, are you not?

10  A.   Some say yes.

11  Q.   And that's another source of generally accepted standards

12  of care?

13  A.   Yes.

14  Q.   As well as the American Academy of Child and Adolescent

15  Psychiatry Practice Parameter in the Assessment and Treatment

16  of Children and Adolescents; correct?

17  A.   With suicidal behavior, yes.

18  Q.   And that's another generally accepted standard of care;

19  correct?

20  A.   Yes.  They may have different emphases than the ASAM

21  criteria, but, yes, they all reflect components of documents

22  that reflect part of the standard of care.  I agree.

23  Q.   And down to number 3, the American Association of

24  Community Psychiatrists LOCUS instrument, you're familiar with

25  that; correct?

**FISHMAN - CROSS / RUTHERFORD**

1  **A.**   Uh-huh.

2  **Q.**   And that's another generally accepted -- source of

3  generally accepted standard of care?

4  **A.**   Or an articulation of what the authors have expressed of

5  the generally accepted standards of care, yes.

6  **Q.**   And then turning to page 14, at the top, there are four

7  more references --

8  **A.**   Uh-huh.

9  **Q.**   -- as well.  Three of them from the associations that you

10  just mentioned.  And the seventh is actually a reference to one

11  of your works; correct?  The ASAM criteria?

12  **A.**   That I participated in, yes.

13  **Q.**   And you are the MJ Fishman that's listed there; correct?

14  **A.**   That's me.

15  **Q.**   So, staying in this document for a moment, I'd like to

16  direct your attention in this document to the guiding

17  principles, so to Trial Exhibit 5, page 4.  And that's both

18  page 4 in the document and page 4 in the exhibit.

19      And this lists guiding principles, does it not?

20  **A.**   Yes.

21  **Q.**   And within guiding principles, there are three pillars

22  that are listed; correct?

23  **A.**   Yes.

24  **Q.**   Directing your attention to the top of page 5, the second

25  pillar is Service System Solutions.  Do you see that?

**FISHMAN - CROSS / RUTHERFORD**

1  **A.**   I see that.

2  **Q.**   And then the first sentence of the second paragraph, it

3  sets forth a statement, does it not, about recovery,

4  resiliency, and well-being.  And that is, "We develop and

5  sustain systems of care, including services to manage crises

6  and to facilitate recovery, resiliency, and well-being."  Do

7  you see that?

8  **A.**   Uh-huh.

9  **Q.**   And you would agree that it's appropriate for patient

10  placement consideration to take into consideration recovery;

11  correct?

12  **A.**   I do.

13  **Q.**   And resiliency?

14  **A.**   I do.

15  **Q.**   And the well-being of the patient?

16  **A.**   I do.

17  **Q.**   So then turning your attention to Trial Exhibit 5, page 7,

18  and that's both in the document and in the exhibit.  And I'd

19  like to direct your attention here to -- this is a section

20  indicating use and limitations.  Down to the fifth full

21  paragraph.

22  **A.**   Yes.

23  **Q.**   Now, on direct testimony you had stated that the ASAM

24  criteria does not purport to replace clinical judgment;

25  correct?

 1  **A.**   Correct.  Couldn't agree more.

 2  **Q.**   And isn't it true, as well, that the UBH criteria makes

 3  the same statement, that it does not purport to replace

 4  clinical judgment?

 5  **A.**   No, I agree.  But my contention is that the UBH doesn't

 6  adequately guide clinical judgment within a structure and

 7  instruction set to give decision rules for proper placement.

 8  **Q.**   Right.  But you recognize that the guidelines themselves

 9  indicate that they are to be used flexibly and are intended to

10  augment but not replace sound clinical judgment?

11           **MR. GOELMAN:**  Objection to form, Your Honor.

12           **THE COURT:**  Overruled.

13  **BY MR. RUTHERFORD:**

14  **Q.**   Now, directing your attention to page 10 of the exhibit --

15  and, again, that's 10 of the document and 10 of the exhibit --

16  it's entitled "Clinical Best Practices"; correct?

17  **A.**   Correct.

18  **Q.**   And you testified about the clinical best practices

19  earlier today; correct?

20  **A.**   Yes.

21  **Q.**   Now, taking a step back, when you were describing the way

22  that the ASAM criteria work, you described a process by which

23  you began with collecting the information through the

24  dimensions; correct?

25       And then, through those dimensions, formulating a

**FISHMAN - CROSS / RUTHERFORD**

1   treatment plan, and then using that treatment plan determining

2   a level of service?

3   **A.**   Yes.

4   **Q.**   Do you recall that testimony?

5   **A.**   I do.

6   **Q.**   So the UBH guidelines have somewhat of the same process,

7   don't they?

8        **MR. GOELMAN:**  Objection to form.

9        **THE WITNESS:**  Well, I think there's something

10  missing --

11       **THE COURT:**  By the way, objection to form is not an

12  objection under the Evidence Code.

13       **MR. GOELMAN:**  Objection, compound, Your Honor.

14       **THE COURT:**  Overruled.

15       **THE WITNESS:**  Well, I think that there's something

16  missing.  I think that these clinical best practices section do

17  direct a broad series of areas in which data should be

18  collected.  And I logged that.

19       But all of the material we've been talking about in these

20  opening sections, in their general orientation to principle and

21  here in the description of information to be gathered, I

22  believe, don't adequately give instruction set and decision

23  rules as to how to use these principles and information in

24  actually assigning people to levels of care.

25  \\\

1  BY MR. RUTHERFORD:

2  **Q.**   So let's walk through, now, beginning with section 4 on

3  page 150 of Trial Exhibit 5.

4  **A.**   Yes.

5  **Q.**   Clinical best practices, as you testified earlier, guides

6  the provider to collect certain information about the patient;

7  correct?

8  **A.**   Correct.

9  **Q.**   And you would agree that the information that is listed

10  here in section 4 is the type of information that is collected

11  pursuant to clinically -- pursuant to generally accepted

12  standards of care; correct?

13  **A.**   I think it's a good list of material to be included in a

14  data set, yeah.

15  **Q.**   Then within the same section 4 on page 11 of that

16  document, beginning at 4.1.4, the UBH guidelines then direct

17  that that information be applied to a treatment plan; correct?

18  **A.**   Correct.

19  **Q.**   And then within the succeeding paragraphs on page 11,

20  there are different pieces of guidance provided to the provider

21  in order to formulate a treatment plan; correct?

22  **A.**   What should those components be.

23  **Q.**   Correct.  And that information is then applied to the

24  common criteria, is it not?

25  **A.**   Well, it doesn't tell us how to use -- the common criteria

**FISHMAN - CROSS / RUTHERFORD**

1  don't tell us how to use this material except in the ways that

2  I've described as being overly restrictive.

3  **Q.**  My question is different.

4      The treatment plan and the information are then -- are

5  then considered within the analysis that is set forth under the

6  common criteria for admissions criteria; correct?

7  **A.**  This would be the data that would be considered to use the

8  common criteria and the level of care specific criteria to

9  apply decision rules, yes.

10  **Q.**  Right.  And, in fact, the admission criteria at 1.7, which

11  is at the bottom of Trial Exhibit 5, page 0008, specifically

12  require that that information collected under clinical best

13  practices be considered; correct?

14  **A.**  That they be considered.  And the way that they are

15  directing the user to consider them are in the specific

16  language of the common criteria and the level of care specific

17  criteria.

18  **Q.**  And directing your attention to 1.7.3, one of the ways

19  that they are to be considered is that they must be applied,

20  quote, consistent with Optum's best practice guidelines;

21  correct?

22  **A.**  Yes.  And it would be my opinion that the interpretation

23  of how to do that is here on the page.

24  **Q.**  Words on the page, though, read that the services are

25  consistent with Optum's best practice guidelines; correct?

1   **A.**   Uh-huh, yes.

2   **Q.**   And that the services are consistent with generally

3   accepted standards of clinical practice as well; correct?

4   **A.**   Yes, that's right.

5          But to the extent that certain rules for how patients gain

6   access to particular levels of care contradict the specific

7   instruction set in the admission criteria, continued service

8   criteria, and discharge criteria, I think that those would lead

9   someone to say that those rules trump.  And if that weren't

10  clear, there would at least be an unresolved conflict.

11  **Q.**   The admission criteria, under the common criteria and

12  clinical best practices of all levels of care, require that the

13  admission criteria, quote, be consistent with Optum's best

14  practice guidelines; correct?

15  **A.**   It does say that.  And I'm only pointing out how I think

16  that there's a contradiction.

17  **Q.**   Now, turning your attention to the admission criteria,

18  section 1.4, a little higher up on the page.  Do you see that?

19  **A.**   Yes, I see it, uh-huh.

20  **Q.**   You testified earlier about aspects of 1.4 and as well as

21  1.5, which is just below it.  Do you recall that testimony

22  generally?

23  **A.**   Yes.

24  **Q.**   And you had indicated that one of your concerns, and

25  certainly one of your overriding concerns with the guidelines,

**FISHMAN - CROSS / RUTHERFORD**

 1   is its focus on safety; correct?

 2   **A.**   No.  It's on the overemphasis on safety without due

 3   consideration of effectiveness.  I have no objection to

 4   patients being safe, I assure you.

 5   **Q.**   And in criteria 1.4, it states, does it not, that the

 6   member's current condition cannot be safely, efficiently, and

 7   effectively assessed and/or treated in a less intensive level

 8   of care due to acute changes in the member's signs and symptoms

 9   and/or psychosocial and environmental factors, i.e., the "why

10   now" factors leading to admission.

11        That's what it states; correct?

12   **A.**   Correct.

13   **Q.**   And it gives no more weight in that sentence to "safely

14   and efficiently" than it does to "effective"; correct?

15        **MR. GOELMAN:**  Objection.

16        **THE WITNESS:**  No, that's right.  Here in this

17   particular wording there isn't a differentiation made.  There

18   were other instances, that I think I pointed out, where the

19   word "safety" appeared alone, without "efficiently" or

20   "effectively."  But I agree with you here, safely, efficiently,

21   and effectively.

22   **BY MR. RUTHERFORD:**

23   **Q.**   And that same would apply for 1.5 --

24   **A.**   Yeah.

25   **Q.**   -- below it?

1   **A.**   That's right.  As long as that is predicated on the

2   treatment of the acute changes "why now" factors.

3            **MR. RUTHERFORD:**  One moment, Your Honor.

4            **THE COURT:**  Uh-huh.

5   **BY MR. RUTHERFORD:**

6   **Q.**   Another one of your critiques of the 2015 Level of Care

7   Guidelines was the emphasis on acuity, which you just spoke

8   about, and a lack of emphasis on chronicity; correct?

9   **A.**   Yes.

10  **Q.**   So, focusing your attention back to page 11, which are the

11  clinical best practices --

12  **A.**   Yes.

13  **Q.**   I mean, I'm sorry, page 10, which are the clinical best

14  practices.

15  **A.**   Yes.

16  **Q.**   In terms of the information that is required to be

17  gathered by the provider, a number of these factors speak to

18  chronicity; correct?

19  **A.**   Yes.  Some of these factors could certainly have enduring

20  persistence.

21  **Q.**   So, for instance, the history of Behavioral Health

22  Services; correct?

23  **A.**   Correct.

24  **Q.**   The history of trauma?

25  **A.**   Correct.

**FISHMAN - CROSS / RUTHERFORD**

1  **Q.**  The member's medical history and current physical health

2  status?

3  **A.**  Correct.

4  **Q.**  The member's developmental history?

5  **A.**  Correct.

6  **Q.**  The patient's pertinent current and historical life

7  information, including the member's age; correct?

8  **A.**  Correct.

9  **Q.**  And gender?

10  **A.**  Correct.

11  **Q.**  Educational history?

12  **A.**  Yes.

13  **Q.**  On the next page, living situation?

14  **A.**  Yes.

15  **Q.**  Any number of these would speak to chronicity; isn't that

16  right?

17  **A.**  And I logged the collection of the data that is of

18  complete history so that the data set is there.

19      My concern is that the decision rules that are applied to

20  that data set don't sufficiently guide the proper emphasis and

21  the use of the information that specifies chronicity and

22  cumulative severity to influence the placement.

23  **Q.**  So, again, back to the admission criteria on page 8 of

24  Trial Exhibit 5, one of the requirements under the admission

25  criteria is to consider, at 1.6, co-occurring behavioral health

1   and medical conditions; correct?

2   **A.**   Correct.

3   **Q.**   And, again, at 1.7.3, provide services consistent with the

4   best practices guidelines; correct?

5   **A.**   Correct.  And so 1.6, although it mentions a co-occurring

6   behavioral health and medical condition, which is completely

7   appropriate, doesn't give us a way to understand what about the

8   severity of those conditions and the treatment needs

9   commensurate with those conditions would require placement at

10  the current level of care other than that it would be safe to

11  do so, which is good but not enough.

12  **Q.**   But it's good; correct?

13  **A.**   I want patients to be safe.

14  **Q.**   Now, with respect to the mention of "why now," you had

15  provided testimony earlier today, and we'll focus you on

16  section 1.4, regarding "why now"; correct?

17  **A.**   On page 8?

18  **Q.**   I'm sorry, on page 8.

19  **A.**   Yes.

20  **Q.**   Thank you.  1.4 on page 8.

21       And you had also provided testimony earlier today

22  regarding acuity; correct?

23  **A.**   Yes.

24  **Q.**   Now, the "why now" concept, which you testified is a

25  potentially rich concept --

**FISHMAN - CROSS / RUTHERFORD**

1    **A.**    Agreed.

2    **Q.**    -- could include information beyond acute factors; isn't

3    that right?

4    **A.**    It generally would focus on shorter-term acute and

5    cross-sectional and crisis precipitant factors.  Tell me what

6    you mean.

7    **Q.**    Well, so when you talked about it earlier -- when you

8    testified earlier, you testified about the concept of

9    motivation?

10   **A.**    Yes.

11   **Q.**    And what motivated a patient to come to me today?

12   **A.**    Yes.

13   **Q.**    As opposed to yesterday?

14   **A.**    Yes.

15   **Q.**    As opposed to tomorrow; correct?

16   **A.**    Yes.

17   **Q.**    And a patient could be presenting to a physician with the

18   description of a chronic problem; isn't that right?

19   **A.**    Well, it's interesting.  Patients usually seek treatment

20   because of something new.  And that's one of the values of the

21   "why now" concept clinically, as I described.

22         It's often part of the art of clinical therapeutic

23   alliance to draw out of patients "why now," because they may

24   sometimes say, well, I'm just chronically miserable or I've

25   been like this or, as they may phrase it, I'm sick and tired of

**FISHMAN - CROSS / RUTHERFORD**

 1  being sick and tired.

 2      But that doesn't have rich enough information to do the

 3  kind of motivational thing that I find valuable, which is to

 4  talk about why today.  And so that is part of what does

 5  distinguish "why now" from enduring chronicity.  And, as I

 6  said, both are vital.

 7  **Q.**   But it's also what distinguishes it from acuity, correct,

 8  because the "why now" requires the context of why now and not

 9  yesterday; isn't that right?

10  **A.**   Yeah.  That is the acute change.

11      **THE COURT:**  Did you just say yes or no to that

12  question?

13      **THE WITNESS:**  I said that "why now" is the acute

14  change and is different from the chronicity.  And I apologize

15  if I'm not remembering the question accurately enough.

16      **THE COURT:**  Okay.

17  **BY MR. RUTHERFORD:**

18  **Q.**   On direct examination you were asked a number of questions

19  about lengths of stay.  Do you recall that testimony?

20  **A.**   Yes, I do.

21  **Q.**   Now, the -- there has been an -- do you know the concept

22  of a fixed length of stay?

23  **A.**   I do know that concept.

24  **Q.**   Isn't it true that there is an evolution away from fixed

25  lengths of stay?

**FISHMAN - CROSS / RUTHERFORD**

1  **A.**   Yes.

2  **Q.**   That that's too rigid a concept to appreciate the variety

3  and complexity of conditions that a patient brings to a

4  service; correct?

5  **A.**   I agree.  That's why a range is a much more useful tool.

6  **Q.**   So, for instance, a treatment facility that would have a

7  minimum 30-day stay, that would be inconsistent with generally

8  accepted standards of care; correct?

9  **A.**   Unless there were reason in a particular case to

10  articulate and argue why that particular person needed a

11  particular dose, a range would be relevant.

12      But something as specific as to say 30 days would not be

13  consistent with generally accepted standards of care.

14  **Q.**   Right.  A range or an opportunity to adjust?

15  **A.**   Correct.  Because rigidity, I think, is not helpful, and

16  flexibility is better.

17  **Q.**   With respect to making placement decisions; correct?

18  **A.**   With respect to lengths of stay.

19  **Q.**   Now, with respect to the promulgation or the introduction,

20  I guess, of the word "why now" in the Level of Care Guidelines,

21  you don't know what UBH's purpose was in including the "why

22  now" concept in the Level of Care Guidelines; correct?

23  **A.**   I can't speculate as to motive.  I can only tell you what

24  I read in the instruction set.  But I don't know what the

25  authors were thinking at the time.

**FISHMAN - CROSS / RUTHERFORD**

1   Q.   Now, changing gears a little bit here, with respect to the

2   opinions that you're rendering, just to be clear, you had

3   mentioned earlier today some ideas that you had that might

4   change the language -- if the language of the guideline were

5   changed, then you might be more comfortable with it?

6        **MR. GOELMAN:**  Objection.  Misstates his testimony.

7        **THE COURT:**  He can answer.

8   BY MR. RUTHERFORD:

9   Q.   Do you generally recall that testimony?

10  A.   Today?

11  Q.   Yes.

12  A.   I don't, but I can answer.  I can say that --

13       **THE COURT:**  Why don't you have him ask a specific

14  question.

15       **MR. RUTHERFORD:**  I'll ask it differently, Your Honor.

16       **THE WITNESS:**  Okay.

17  BY MR. RUTHERFORD:

18  Q.   You're not here to opine regarding specific changes that

19  need to be made in the UBH Level of Care Guidelines; correct?

20  A.   Correct.  That was not my scope, to rewrite them.  I am

21  only commenting on ways in which they are consistent or not

22  consistent.

23       And I may have given some general information about where

24  I think there ought to be movement.  And it may even, in our

25  conversation, have gotten to the specifics of a particular

**FISHMAN - CROSS / RUTHERFORD**

1  word.  But, again, that was not the scope.  And I don't think

2  that any one or even several words or wordsmithing accomplishes

3  the task.

4  **Q.**  Now, you understand that the scope of coverage for

5  benefits for -- both for the substance abuse disorders that

6  you've discussed and for mental health treatment is contained

7  in health benefit plans for the members at issue in this case;

8  correct?

9  **A.**  It may vary.

10  **Q.**  And you didn't review the health benefit plan documents in

11  preparation for trial today?

12  **A.**  I did not.

13  **Q.**  And so you're not offering an opinion on any of the

14  language that might or might not be in those health benefit

15  plans; correct?

16  **A.**  Correct.

17  **Q.**  And you don't have information regarding whether or not

18  plan restrictions cover, for instance, residential treatment;

19  correct?

20  **A.**  I don't have that information.

21  **Q.**  Or whether health plans in this case have a particular

22  definition of custodial care; correct?

23  **A.**  I don't have that information.

24  **Q.**  Or whether specific plans in this case exclude treatment

25  that's primarily court ordered or for legal purposes; correct?

**FISHMAN - CROSS / RUTHERFORD**

1   **A.**    I don't have that information.

2        I only have information about how the generally accepted

3   standards of care are consistent or not with such exclusions,

4   and that a set of criteria that purport to be a standard

5   instrument for decision-making should or should not contain

6   those elements.

7   **Q.**   So back to Trial Exhibit 5, at page 8, under the admission

8   criteria, directing your attention to 1.1, you understand that

9   the first factor that is considered when determining whether

10  the criteria is met is whether the member is eligible for the

11  benefits; correct?

12  **A.**    Makes sense.

13  **Q.**   And there may be some benefits that are not available

14  under the plan?

15  **A.**    Contractually.  Makes sense.

16  **Q.**   Correct.  So now directing your attention to Exhibit 148,

17  which should be in the binder that you had earlier with

18  Mr. Goelman.

19  **A.**    Okay.

20  **Q.**   And now directing your attention within that document to

21  page 3, Trial Exhibit 3, but it says 2 of 8 on the document

22  itself.

23  **A.**    "Key Points," yes.

24  **Q.**   And you provided some testimony this morning regarding

25  custodial care, and specifically the fourth point under that --

1    I mean, the third point under that provision:  "Services do not

2    require continued administration by trained medical personnel

3    in order to be delivered safely and effectively."

4        Do you see that?

5    **A.**   I do.

6    **Q.**   Now, looking above at the first large bullet point, it

7    references something called a certificate of coverage.

8    **A.**   I see that.

9    **Q.**   And you understand that a certificate of coverage is one

10   of the documents in the health benefit plan; correct?

11   **A.**   Okay.

12   **Q.**   And you understand that this is a definition set forth in

13   the certificate of coverage; correct?

14           **MR. GOELMAN:**  Objection.  Foundation.

15           **THE COURT:**  Sustained.

16   **BY MR. RUTHERFORD:**

17   **Q.**   Well, do you know one way or the other?

18   **A.**   I don't know.

19   **Q.**   You also don't know how, with respect to custodial care,

20   the health benefit plans document -- the health plan documents

21   in this case define custodial care; correct?

22       You don't know what that definition is, do you?

23   **A.**   I wouldn't know the variations of the individual plans.

24   But to the extent that there are benefits that are covered,

25   it's my surmise that this should guide how the clinical

**FISHMAN - CROSS / RUTHERFORD**

1  treatment needs of patients should or should not be allowed to

2  the extent that this document is used as a set of instructions

3  to make that determination.

4  **Q.**  Well, you understand that the custodial care coverage

5  determination guideline here at Exhibit 148 would only apply if

6  it's consistent with a particular health benefit plan; isn't

7  that right?

8  **A.**  Makes sense.

9  **Q.**  And if I direct your attention then to instructions for

10  use, on Trial Exhibit 148, page 0002, in the second half of the

11  first full paragraph, it sets forth, does it not, that the

12  terms of an enrollee's documents, e.g. the Certificates of

13  Coverage, COCs, Schedule of Benefits, SOBs, or Summary Plan

14  Descriptions, SPDs, may differ greatly from the standard

15  benefit plans upon which this guideline is based?

16      In the event that the requested service or procedure is

17  limited or excluded from the benefit, is defined differently or

18  is, therefore, otherwise a conflict between this document and

19  the Certificate of Coverage, COC, or Schedules of Benefit, SPD,

20  that the enrollees -- I'm sorry, that the Summary Plan

21  Descriptions, the SPD, the enrollee's specific benefit document

22  supercedes these guidelines.

23  **A.**  All right.  That makes sense.  But let's hypothetically

24  say --

25          **THE COURT:**  Well, let's just let him ask the question.

 1           THE WITNESS:  Fair enough.

 2           THE COURT:  Don't squabble.

 3           THE WITNESS:  Okay.

 4  BY MR. RUTHERFORD:

 5  Q.   Now, you also testified on direct examination about

 6  certain Texas regulations; correct?

 7  A.   Yes.

 8  Q.   That was in connection with -- I believe it was Exhibit

 9  570.

10       You didn't investigate -- I'm sorry, that's the wrong one.

11           MR. RUTHERFORD:  One moment, Your Honor.  I wrote down

12  the wrong exhibit number.

13  BY MR. RUTHERFORD:

14  Q.   Dr. Fishman, I'll ask you the question without the

15  exhibit.

16  A.   Okay.

17  Q.   So you testified earlier today about various ranges of

18  length of stay within the Texas Department of Insurance

19  Guideline; correct?

20       But you didn't investigate whether UBH uses the guidelines

21  in the state of Texas, correct, or for plans based in the state

22  of Texas?

23  A.   No, I wouldn't know that.  Only the guidelines as written

24  in both cases, the UBH guidelines and the Texas guidelines.

25  Q.   Right.  So you're not opining on whether UBH is required

 1  to use the Texas guidelines in Texas or not required to use the

 2  Texas guidelines in Texas?

 3  **A.**    Correct.  Nor whether UBH's length of stay data comes from

 4  Texas or not.  Only that I was -- I had seen UBH length of stay

 5  data that was shorter than the recommendations, but I wouldn't

 6  know from where.

 7           **MR. RUTHERFORD:**  One moment, Your Honor.

 8  **BY MR. RUTHERFORD:**

 9  **Q.**   Now, on direct examination you were also asked some

10  questions about child and adolescent care.

11  **A.**   Yes.

12  **Q.**   Child and adolescent care is different from the care of

13  adults; correct?

14  **A.**   Many aspects of it are different, yes.

15  **Q.**   And one of your criticisms of the Level of Care Guidelines

16  for 2015 was its absence of specific criteria that set forth

17  either information gathering, treatment plans, or the

18  application of criteria for child or adolescent members;

19  correct?

20           **MR. GOELMAN:**  Objection.  Misstates his testimony.

21           **THE COURT:**  That's correct.  Go ahead.

22  **BY MR. RUTHERFORD:**

23  **Q.**   Now, directing your attention back to Trial Exhibit 5,

24  page 9 -- I'm sorry, page 10.

25       Now, under clinical best practices there are a number of

1    questions, again, that the provider is required to ask of a

2    patient when the patient has presented him or herself; correct?

3    **A.**    Correct.

4    **Q.**    And in order to -- I guess one of those at 4.1.2.13.1 is

5    the member's age; correct?

6    **A.**    Yes.

7    **Q.**    As well as 4.1.2.12, which is the member's developmental

8    history; correct?

9    **A.**    Correct.

10   **Q.**    And then, turning to the next page, the provider is

11   requested to inquire as to the patient's living situation;

12   correct?

13   **A.**    Correct.

14   **Q.**    Family history?

15   **A.**    Correct.

16   **Q.**    Relationships with family, friends, and others; correct?

17   **A.**    Correct.

18   **Q.**    Barriers to care?

19   **A.**    Correct.

20   **Q.**    Okay.  All of which, with an adolescent or a child, would

21   elicit information different from information that would be

22   getting elicited from an adult; correct?

23   **A.**    That's right.  So the information gathering here might be

24   able to pertain to youth, adolescents, young adults, and the

25   like, but wouldn't direct a person, a user, how to specifically

**FISHMAN - CROSS / RUTHERFORD**

1  use that data set to make the differential kinds of treatment

2  recommendations and specifically level of care placement

3  decisions that adolescents would need that are different from

4  adults.

5  **Q.**  And in the clinical best practices section, as we

6  discussed earlier, there is a requirement that a treatment plan

7  be devised; correct --

8  **A.**  Correct.

9  **Q.**  -- based upon the clinical information provided by the

10  member?

11  **A.**  Correct.

12  **Q.**  That takes into consideration each of the factors that I

13  just mentioned; correct?

14  **A.**  Correct.

15  **Q.**  And is individualized; correct?

16  **A.**  Correct.

17  **Q.**  Because it's not a cookie-cutter treatment plan; correct?

18  **A.**  I would hope not.

19  **Q.**  Right.  And then that is then provided to UBH and applied

20  to the criteria by one of the UBH clinicians; correct?

21          **MR. GOELMAN:**  Objection.  Your Honor --

22          **THE WITNESS:**  As --

23          **THE COURT:**  Wait.  There's an objection.

24          **MR. GOELMAN:**  Foundation.

25          **THE COURT:**  Sustained.

1  BY MR. RUTHERFORD:

2  Q.   As articulated by the document itself; correct?

3          MR. GOELMAN:  Same objection.

4          THE WITNESS:  Well, the rules for placement would be

5  articulated in the admission criteria, the continued service

6  criteria, and the discharge criteria.

7  BY MR. RUTHERFORD:

8  Q.   Right.  And the admission criteria require that the UBH

9  clinician take into consideration the information gathered

10 through the clinical best practices; correct?

11         THE COURT:  Have you got a citation for that?

12         MR. RUTHERFORD:  1.7.

13         THE COURT:  That doesn't say that.  That just says it

14 has to be consistent with the information.

15 BY MR. RUTHERFORD:

16 Q.   So the services need to be -- there needs to be a

17 determination made, correct, that the services are consistent

18 with the clinical best practices of Optum; correct?

19 A.   But we're back, for me, to the same contradiction with the

20 specific rules of what the admission criteria are and the

21 potential conflict.

22         THE COURT:  Putting an awful lot of emphasis on that

23 1.7.

24 BY MR. RUTHERFORD:

25 Q.   Now, directing your attention to what was previously

**FISHMAN - CROSS / RUTHERFORD**

1  marked and admitted as Exhibit 662, specifically to page 137 of

2  Exhibit 662, which is the ASAM criteria.

3  **A.**   Hang on one sec.  Yes.

4  **Q.**   Do you have that in front of you?

5  **A.**   I do.  What page -- you want page 137?

6  **Q.**   Of the exhibit, Dr. Fishman, I would direct your attention

7  to page 0137, and of the document itself, 116.

8  **A.**   Yes.

9  **Q.**   Second full paragraph, beginning with the word

10  "similarly"?

11  **A.**   Yes.

12  **Q.**   The ASAM criteria contains a section, as you testified

13  earlier, on adolescent-specific approaches to sub levels of

14  care?

15  **A.**   Uh-huh.

16  **Q.**   Correct?

17  **A.**   Yes.

18  **Q.**   That's the title at the top of that section?

19  **A.**   Yes.

20  **Q.**   And the second full paragraph indicates:  "Similarly, the

21  definition of intensive outpatient services refers to a minimum

22  of six hours of treatment per week for adolescents as opposed

23  to nine hours per week for adults."

24  **A.**   Yes.

25  **Q.**   "The difference reflects the developmental and attention

1    capacities of adolescents for whom six hours of treatment,

2    generally delivered in two sessions of three hours each or

3    three sessions of two hours each, falls more closely within the

4    spectrum of Level 2 intensive outpatient services than Level 1

5    outpatient services."

6         Do you see that?

7    A.   Yes.

8    Q.   Now, directing your attention to Exhibit 7, page 0062.

9    And this is a 2016 UBH Level of Care Guideline.

10   A.   Okay.

11   Q.   Do you have that in front of you?

12   A.   I do.

13   Q.   This is the intensive outpatient program for

14   substance-related disorders, the 2016 Level of Care Guideline;

15   correct?

16   A.   Yes.

17   Q.   And as you can see in the first paragraph, much like the

18   ASAM criteria, it sets forth specific hours and differentiates

19   between the hours of service for adults and the hours of

20   service for children and adolescents; correct?

21   A.   Correct.

22   Q.   It indicates that, "A structured program that maintains

23   hours of service generally 9 to 19 hours per week for adults

24   and generally 6 to 19 per week for child and adolescents during

25   assessment and diagnostic services and active behavioral health

**FISHMAN - CROSS / RUTHERFORD**

1  treatment provided to members who are experiencing moderate

2  signs and symptoms that result in significant personal distress

3  and/or significant psychosocial and environmental issues."

4      Do you see that?

5  **A.**   I do.

6      So here's a way that the difference is taken into account

7  but the decision rules don't take into account the way that the

8  decision to get into the level of care with either the six-hour

9  threshold or the nine-hour threshold would be different.

10  **Q.**   The hours differentiation is similar between ASAM and the

11  UBH criteria; correct?

12  **A.**   Correct.

13  **Q.**   And the UBH criteria do specifically delineate a range of

14  hours for children and adolescents that's different from the

15  range for adults; correct?

16  **A.**   That is correct.

17         **MR. RUTHERFORD:**  One moment, Your Honor.

18  **BY MR. RUTHERFORD**

19  **Q.**   Now, directing your attention to Trial Exhibit 5, page 70,

20  which is the 2015 Level of Care Guidelines.  And it's the

21  section on outpatient Substance-Related Disorders.

22      Do you have that in front of you?

23  **A.**   I do.

24  **Q.**   And you testified this morning about section 1.4 of this

25  particular guideline.  Do you recall that testimony generally?

**FISHMAN - CROSS / RUTHERFORD**

1   **A.**   I do recall that generally.

2   **Q.**   And you indicated during that testimony that this

3   guideline implies that when the acute signs and symptoms end,

4   treatment ends; correct?

5   **A.**   That the emphasis is on those acute symptoms, and that

6   when they are reduced -- when those signs and symptoms are

7   reduced, the user is directed to think -- is directed to think

8   that there is less rationale, yes, for that level of care.

9   **Q.**   That's how you're reading it; correct?

10  **A.**   It is.

11  **Q.**   That is an implication that you have drawn in your

12  analysis of that section; correct?

13  **A.**   Well, they are connected by "and," so I don't think it's a

14  big stretch.  So my read and, I think, a read that many would

15  take, or most would take, is that it is acute changes and

16  changes in psychosocial environmental factors have occurred.

17  **Q.**   Did you conduct a survey on what many people would read

18  that language to be?

19  **A.**   I can only --

20          **MR. GOELMAN:**  Objection.

21          **THE WITNESS:**  I can only tell you what it says.  I'm

22  reading English here.

23  **BY MR. RUTHERFORD**

24  **Q.**   So you didn't inquire as to what most people would think

25  as part of forming your opinion for today's testimony; correct?

1   **A.**   Poll-taking was not part of my scope, no.

2   **Q.**   This is your opinion as what the language says; correct?

3   **A.**   It is my opinion about what this says, yes.

4        **MR. RUTHERFORD:**  Your Honor, I may be close to

5   concluding if I could just take a look at my notes.

6        **THE WITNESS:**  Okay.

7        **MR. RUTHERFORD:**  I'm sorry, Your Honor.  I seem to

8   have lost my one exhibit that I've been using.  Give me like --

9   it's here someplace.

10        **THE COURT:**  Find it.  That's fine.  Okay.

11  **BY MR. RUTHERFORD:**

12  **Q.**   Okay.  So now directing your attention to what has already

13  been admitted as Trial Exhibit 6.

14  **A.**   Yes.

15  **Q.**   And specifically page 10 of the trial exhibit, page 10 of

16  the document.

17  **A.**   2016; correct.

18  **Q.**   2016.  If I said 2006, I misspoke.

19  **A.**   No, no.  Just to clarify.

20  **Q.**   And the 2016 Level of Care Guidelines are another one of

21  the documents that you reviewed in preparation for your

22  testimony today; correct?

23  **A.**   That's correct.

24  **Q.**   And like the 2015 Level of Care Guidelines, the 2016 Level

25  of Care Guidelines contains a section on common criteria and

FISHMAN - CROSS / RUTHERFORD

1   clinical best practices?

2   **A.**   Correct.

3   **Q.**   And within that contains admissions criteria; correct?

4   **A.**   Yes.

5   **Q.**   Continued service criteria?

6   **A.**   Yes.

7   **Q.**   Discharge criteria?

8   **A.**   Yes.

9   **Q.**   And clinical best practices?

10  **A.**   Yes.

11  **Q.**   And within the continued service criteria it indicates,

12  does it not, that the -- under 2.1, that "The admission

13  criteria continue to be met, and active treatment is being

14  provided.  For treatment to be considered active, services must

15  be as follows."  And 2.1.2 provides, "Provided under an

16  individualized treatment plan that is focused on addressing the

17  'why now' factors and makes use of clinical best practices."

18       Do you see that?

19  **A.**   I do.

20  **Q.**   And that clinical best practices refers to the clinical

21  best practices on page 11 of the same document, does it not?

22  **A.**   It does.

23  **Q.**   And the treatment plan that is promulgated through the

24  clinical best practices under section 4, on page 11, are the

25  same document; correct?

1    **A.**   Yes, as long as "why now" factors continue to be met and

2    the focus is on the reduction of acute symptoms.

3    **Q.**   And then further down in that same section, at 2.3, the

4    2016 Level of Care Guidelines indicate, do they not, the

5    clinical best practices are being provided with sufficient

6    intensity to address the member's treatment needs; correct?

7    **A.**   Correct.

8         **MR. RUTHERFORD:**   One moment, Your Honor.  I think I

9    might be done.

10        One more question, Your Honor.  I do have one more

11   question.  I just need to find it and I'll be finished, Your

12   Honor.  So beg your indulgence.

13   **BY MR. RUTHERFORD**

14   **Q.**   So now directing your attention to, finally, Dr. Fishman,

15   to Exhibit 662, page 0131.  This is the ASAM criteria of which

16   you are one of the authors; correct?

17   **A.**   Page which?

18   **Q.**   Page 110 within the document.  It's going to be page 0131

19   within the exhibit.

20   **A.**   Yes, I'm there.

21   **Q.**   The title paragraph in the upper right-hand corner of this

22   page is Progress Through Levels of Service?

23   **A.**   Yes.

24   **Q.**   Do you see that?

25   **A.**   Yes.

**FISHMAN - REDIRECT / GOELMAN**

1  **Q.**   And then there's a call-out.  That's what I call it, but a

2  sort of section in different formatting just under that.  Do

3  you see that?

4  **A.**   I do.

5  **Q.**   And in the third paragraph of that section, it reads as

6  follows:  The -- and correct me if I'm wrong.

7     "The ASAM criteria multidimensional assessment helps

8  ensure comprehensive treatment.  In the process of patient

9  assessment, certain problems and priorities are identified as

10  justifying admission to a particular level of care.  The

11  resolution of those problems and priorities determines when a

12  patient can be treated at a different level of care or

13  discharged from treatment."

14     That's what it states; correct?

15  **A.**   Uh-huh.  Yes.  And it goes on to say that the appearance

16  of new problems may require services that can be effectively

17  provided at the same level of care or require more or less

18  intensive levels.

19        **MR. RUTHERFORD:**  Correct.

20     No further questions, Your Honor.

21        **MR. GOELMAN:**  Your Honor, may I have one moment to

22  confer with my colleagues about redirect?

23     (Pause)

24              **REDIRECT EXAMINATION**

25  BY MR. GOELMAN:

1    **Q.**   Dr. Fishman, you were asked on cross-examination about

2    what the generally accepted standards of care say when

3    effective and least restrictive are in balance.  I think that

4    was the question.  Do you recall that?

5    **A.**   I do.

6    **Q.**   In your 25 years of practice, how often have you seen

7    cases where effective and least restrictive are perfectly in

8    balance?

9    **A.**   That's right, it's a hypothetical that may rarely occur.

10   But it's certainly infrequent.  I think that what typically

11   drives decisions are most -- what typically drives decisions

12   are most effective.

13       So if they were in exact balance and two levels of care

14   were identically effective, it would make sense to choose the

15   lesser restrictive because of the burdens that it might confer.

16       But usually it is that one is likely to be more effective,

17   or the hypothesis is that one is more likely to be effective,

18   and that's the one that you choose and try.

19   **Q.**   Do the generally accepted standards of care say which

20   value, effectiveness versus least restrictive, trumps when

21   there is a conflict?

22   **A.**   Yes.  In general, the approach is, if the most effective

23   level of care is not available or there's a gray area between

24   two levels of care, one should take the conservative position

25   and round up, as it were, or go to the next highest level of

 1   care.

 2       But even that is not as important as trying to make the

 3   determination in clinical judgment of what is the most

 4   effective.

 5           THE COURT:  So let me ask you a question.

 6       Isn't that a false dichotomy?

 7           THE WITNESS:  Ask again?

 8           THE COURT:  Isn't that a false dichotomy?

 9       Isn't part of effectiveness in evaluation of the

10   restrictiveness of the setting, the restrictiveness of the

11   setting will have positive effects or it will have negative

12   effects on the patient and on the treatment of the patient, and

13   it's taken into account in deciding effectiveness?

14           THE WITNESS:  Point well taken.  I think that's well

15   put.  And so, in that way, effectiveness sometimes counts

16   towards your clinical aims and sometimes counts against your

17   clinical aims.  And then they're best when integrated in the

18   way you describe.  I agree with that.

19   BY MR. GOELMAN:

20   Q.   You were shown Trial Exhibit 5.  I think it was page 13.

21   It's a list of sources that were cited, Practices.  Do you see

22   that?

23   A.   I do.

24   Q.   And counsel asked you some questions about these

25   references and the organizations that were behind these

FISHMAN - REDIRECT / GOELMAN

1  references.

2      Do you know whether these references actually support the

3  guidelines that they purportedly are cited for?

4  **A.**   Well, I think putting these in a bibliography doesn't tell

5  us the ways in which the information was incorporated, so just

6  because they're cited doesn't mean that they're followed.

7      I don't think that the UBH guidelines are consistent with

8  the LOCUS and CALOCUS either, but that was outside of the scope

9  of the conversation.

10      The practice parameter for the assessment and treatment of

11  children and adolescents with suicidal behaviors would have

12  some but not a lot of intersection here and might focus on

13  areas where there is high acuity, and there I think that there

14  would likely be permissive consistency; that is, if there was

15  dangerousness, if there were suicidal youngsters that needed a

16  level of care, I think that this probably gives information but

17  I don't think, for example, as I've discussed at the citation

18  for the ASAM criteria imbues this with the authority of the

19  ASAM criteria.  And we've been discussing at length the ways it

20  is inconsistent with the ASAM criteria and I think putting it

21  in a bibliography doesn't make it not so.

22  **Q.**   You were asked a number of questions about the best

23  practices section of the guidelines -- I think it was in

24  Exhibit 5 for 2015 -- and you were also asked --

25      **MR. GOELMAN:**  Can you bring up the first page of the

**FISHMAN - REDIRECT / GOELMAN**

1   common criteria for 2015?

2         **THE WITNESS:**  That's Number 5, I think.

3   **BY MR. GOELMAN:**

4   **Q.**   Yeah, Number 5 and it's page 8.  There it is.

5   **A.**   Yeah.  So the best practices are 10 and 11.

6   **Q.**   Yeah.  And you were asked a number of questions about I

7   think it was Section 1.7.3, which says "Consistent with Optum's

8   Best Practice Guidelines."  Do you see that?

9   **A.**   I do.

10  **Q.**   You noted earlier that the word "and" appears in between

11  each of these sections?

12  **A.**   Yes.

13  **Q.**   And what does that signify to a reader?

14  **A.**   Well, it signifies that it wouldn't be enough that 1.7.3

15  is met but the others would also have to be met, and that's the

16  reason why I continue to say that it's the admission criteria

17  as instruction rules for placement that are so critical to

18  assessing whether or not it's consistent with generally

19  accepted standards of care; but it would have to be that it

20  meet these criteria as well is what it means.

21  **Q.**   So if a provider had done a great job complying with the

22  best practices and gotten information about every detail of a

23  patient's life, would that help that patient get coverage if

24  that patient didn't comply with each and every one of the other

25  sections here?

 1   **A.**   They would still have to --

 2          **MR. RUTHERFORD:**  Objection, Your Honor.  Compound.

 3          **THE COURT:**  Overruled.

 4          **THE WITNESS:**  No matter how good the richness of the

 5   information gathered, the decision rules about access to the

 6   level of care and the pathway to get coverage for a level of

 7   care come from the other criteria connected by "ands."

 8   **BY MR. GOELMAN:**

 9   **Q.**   Dr. Fishman, what I now hope to do is to just have you

10   walk through the core -- the common criteria and the applicable

11   criteria for IOP, OP, and residential treatment for the years

12   that we didn't focus on them earlier.

13          **MR. RUTHERFORD:**  Objection, Your Honor.  Beyond the

14   scope.

15          **THE COURT:**  Overruled.

16   **BY MR. GOELMAN:**

17   **Q.**   So I want to start with I think it's 2012, which would be

18   Trial Exhibit 2.

19   **A.**   Exhibit 2?

20   **Q.**   Yeah.  And, Dr. Fishman, to the extent that you see

21   identical verbiage in the sections here that you have pointed

22   out in other years, there's no need to go back into the

23   substance of your criticism.  You can just point that out.

24   Thank you.

25   **A.**   Okay.  (Witness examines document.)

**FISHMAN - REDIRECT / GOELMAN**

1  Q.   Looking at Exhibit 2, page 006, do you see the common

2  criteria which argues for all levels of care for mental health

3  conditions and for substance use disorders?

4  A.   I do.

5  Q.   And it says (reading):

6       "These criteria should be used in conjunction with

7       the criteria for the current level of care."

8  A.   That's right.  So they would be combined with the level of

9  care specific criteria further on.

10  Q.   Do you see anything in here that is identical or

11  substantially identical to the common criteria from 2011,

12  Dr. Fishman?

13  A.   I think 6 is problematic.  Again, there's the focus on the

14  reasonable period of time, the clock is ticking.  We have

15  discussed this.  And the definition of reduction or control of

16  the acute symptoms that necessitated the admission as the

17  definition of "improvement."

18  Q.   And consistent with your testimony about years 2011 and

19  2015, is that consistent with generally accepted standards of

20  care?

21  A.   It is not.  And, again, whereas there's lip service paid

22  to the prevention of deterioration, it's my concern that the

23  context is defined here as control of acute symptoms.

24  Q.   Okay.  What about criteria 7?

25  A.   Again, it narrowly defines the goal of treatment as

FISHMAN - REDIRECT / GOELMAN

1    improving the member's presenting symptoms, which has

2    similarity to the later-introduced phrasing for "why now" but,

3    again, focuses on crisis and precipitating presentation, and I

4    think that that's narrow as discussed before.

5    **Q.**   And does criteria 8 -- criterion 8 include the language

6    that you objected to earlier regarding antisocial behavior and

7    legal problems?

8    **A.**   It is essentially the same concept and would exclude what

9    I think is much needed treatment for antisocial or legal

10   problems if for a particular person they were central to the

11   pathology of a substance use disorder.

12   **Q.**   If you want to call the Court's attention to anything else

13   that you see in the common criteria in 2012 that is

14   inconsistent in your opinion of generally accepted standards,

15   please do.

16   **A.**   Number 10, "treatment plan stems from the member's

17   presenting condition," that's good but it should not be

18   sufficient.  It could also stem from nonacute, nonpresenting

19   chronic issues.

20        (Witness examines document.)  Those are my comments.

21   **Q.**   Sorry?

22   **A.**   Those are my comments.

23   **Q.**   Okay.  And can you look at the continuing stay criteria

24   also part of the common criteria for 2012?

25   **A.**   I think there's a separate section, if I recall correctly,

FISHMAN - REDIRECT / GOELMAN

1   at the end and that would be on page --

2   **Q.**   81?

3   **A.**   -- 81.

4   **Q.**   Or Trial Exhibit 2-0082.

5   **A.**   82.

6   **Q.**   And so we saw something similar to this in 2011

7   guidelines, did we not?

8   **A.**   That's correct.

9   **Q.**   Are the aspects of the continuing service criteria that in

10  your opinion were inconsistent with generally accepted

11  standards of care in 2011 also present in the 2012 version of

12  the same section?

13  **A.**   (Witness examines document.)   In Number 5, the reasonable

14  expectation of improvement, I remain concerned that these

15  criteria don't sufficiently emphasize the broad definition of

16  "improvement" that includes prevention of deterioration.

17      I do like that there is mention to addressing

18  interventions to engage.

19  **Q.**   What about criteria 6 where current symptoms and/or

20  history provides evidence that relapse or a significant

21  deterioration in functioning would be imminent if the member

22  was transitioned to a lower level of care?

23  **A.**   Yeah, I think the emphasis on the time course of imminent

24  is appropriate for higher levels of care but it is

25  inappropriate for lower levels of care; and so for the lowest

1   levels of residential care and for outpatient levels of care,

2   that deterioration would not necessarily have to be imminent as

3   in hours to days.

4   Q.   So if you are a substance use disorder patient and you

5   still had the underlying condition, would it be within the

6   generally accepted standards of care to discharge you unless a

7   significant deterioration was imminent?

8   A.   No.  It ought to be broader that a significant

9   deterioration in functioning was predictable, but it is too

10  restrictive to require it to be imminent.

11  Q.   Okay.  Anything else in this list of criteria, Doctor?

12  A.   (Witness examines document.)  No.  Those are my comments.

13          MR. GOELMAN:  All right.  Do we have the discharge

14  or --

15               (Pause in proceedings.)

16  BY MR. GOELMAN:

17  Q.   So let's turn to the residential guidelines for 2012.

18  A.   Can you direct me to the page?

19  Q.   I would love to.

20  A.   (Witness examines document.)  Page 61.

21  Q.   So for the record that's Trial Exhibit 2-0062, also

22  page 61 on the internal pages.

23       And is that the residential rehabilitation guideline for

24  substance use orders for 2012?

25  A.   Yes.

FISHMAN - REDIRECT / GOELMAN

1  **Q.**  It seems to have similar structure to the guideline that

2  we looked at from 2011.

3  **A.**  Correct.

4  **Q.**  Please point out any substantially identical language or

5  other portions of this guideline that inform your opinion that

6  this guideline does not conform with generally accepted

7  standards here?

8  **A.**  The language is not exactly the same, but as I've

9  discussed, I think these individual criterions -- criteria

10  overemphasize the extent to which treatment in a lesser level

11  of care would have to be deemed not safe, and I would recommend

12  a broader standard of not effective.

13      So Number 1, use of substances with deterioration to the

14  point that a member cannot safely be treated in a less

15  restrictive level of care but it needs to be "safely and

16  effectively."

17      Risk of exacerbating a serious co-occurring medical

18  condition in Number 2 and cannot safely be treated in a lower

19  level of care rather than "safely and effectively."

20      The absence of the corresponding co-occurring mental

21  health or psychiatric condition that we saw in another year.

22      The emphasis in Number 3 on the high risk of harm to self

23  or others.  So it's pushing the threshold to the standard of

24  lethality or approaching that rather than thinking about

25  broader deterioration, risk of relapse, and risk of functional

 1   problems.

 2       Number 4, again, "safely" rather than "safely and

 3   effectively."

 4       Number 5, "safely" rather than "safely and effectively" as

 5   relates to Dimension 1 withdrawal and withdrawal management.

 6       (Witness examines document.)  In Number 2a, this is

 7   exactly the same language that we saw before requiring the role

 8   of a psychiatrist or addiction physician even in lower levels

 9   of residential care that would not under generally accepted

10   standards of care be usually or typically required to have

11   medical supervision or medical service delivery.

12       Number 3, the implication that psychiatric, that is -- or

13   addictionology, that is, medical services are available at this

14   level of intensity, that would be appropriate for 3.7 but it

15   would not be appropriate for 3.5, 3.3, and 3.1.  That is the

16   ASAM numbering for the lower levels of residential care.

17       (Witness examines document.)  For Number 4, whereas it

18   would be reasonable -- and I don't want to nit-pick too much.

19   When it says that they are available, oftentimes medical

20   services might be available by referral, but to imply that they

21   would be provided through the program is too restrictive again

22   for the lower levels of residential care that would not be

23   expected to have their own medical services.

24       5, as we've discussed before, the choice between an every

25   five-day review versus this higher standard of compelling

**FISHMAN - REDIRECT / GOELMAN**

 1    evidence, which is hard to know how to meet and gives the

 2    impression that we're looking for reasons to not allow access

 3    to the treatment level of care.

 4        Number 5a gives a different way in which the broad basis

 5    for the definition here of custodial care I think is overly

 6    broad.

 7        I would say that there is an exclusion that is concerning

 8    to me.  Especially for youth treatment, interventions are

 9    excluded or considered custodial if they are solely to prevent

10    runaway, truancy, or legal problems.  And for some youngsters

11    with SUD and concurrent psychiatric problems, their inability

12    to sustain stable living situations, their running away puts

13    them at enormous risk and exposes them to a variety of dangers.

14    They may be trafficking drugs.  They may be victims of violent

15    crime.  They may be not able to care for themselves.  They may

16    be trading sex for drugs.  And that is often central to the

17    treatment goals of a particular level of care, and to make a

18    distinction and a false dichotomy away from active treatment

19    that is central to SUD treatment I think is not consistent with

20    the generally accepted standards of care.

21        And I've talked about legal problems before sometimes

22    central.

23        The presenting signs and symptoms have been stabilized is

24    again an overly broad definition because there may be chronic

25    nonpresenting signs and symptoms that still pertain and are

1    still responding to treatment or could respond to treatment

2    with further effort.

3    **Q.**    I'm sorry.  Where are you Dr. Fishman?

4    **A.**    I'm now on 5a, little ii.

5    **Q.**    Okay.  I just wanted to make sure.

6    **A.**    No, that's not right.  5a, small i is what I was talking

7    about.

8         5b again narrowly constrains the consideration of

9    residential care to only the highest level of residential care,

10   the medically monitored levels of residential care numbered 3.7

11   by the ASAM criteria.  Again, it doesn't matter how you number

12   them, but that not all residential levels of care -- most

13   especially, say, 3.1 but also 3.3 and 3.5 -- would not be

14   medically monitored or supervised or directed.

15        Those are my comments.

16   **Q.**    Okay.  Let's turn to the guideline for intensive

17   outpatient, IOP, for 2012, which is Trial Exhibit 2-0047.

18   **A.**    (Witness examines document.)

19   **Q.**    Again, it appears to be at least substantially similar to

20   the 2011 version but, Dr. Fishman, if you could go through

21   there and identify, again, substantially verbatim sections or

22   other sections that you believe supports your opinion that the

23   IOP guideline for 2012 violates generally accepted standards of

24   care.

25   **A.**    Okay.  I think that Number 1 leads the user to make

1    decisions about alternative lower levels of care only on the

2    basis of safety but not on the basis of being effective.  We've

3    discussed that concept before.  Here it is again.

4         Number 2 focuses the user to think of the purpose of this

5    particular level of care, IOP, as being to prevent admission to

6    a higher level of care, say residential treatment or hospital,

7    and that is not by any means the only or even the main purpose

8    of this level of care.

9         "Imminent" is too restrictive.  Number 3, "imminence of

10   relapse" is too restrictive, a modifier for the likelihood of

11   relapse.  I agree that it's an appropriate pathway to think

12   about the likelihood of relapse if treatment is not provided,

13   but "imminent" is too strong a term or restrictive a term.

14        (Witness examines document.)  4 is a reasonable pathway

15   from stepdown.  I have no objection.

16        (Witness examines document.)  And 5, we've discussed this

17   before.

18        It's good that there is consideration of Level 6 recovery

19   environment, home environment, living situation factors, but

20   it's overly narrowly construed to require that they be a

21   nonsupportive or unstable living situation because there might

22   be situations that it's not so much that there are problems

23   with the home but there are problems or vulnerabilities of the

24   person that is unable to make use of or even openly opposes or

25   rejects that support, and I would want to reject that as well.

1  **Q.**   Dr. Fishman, I think you may have misspoken.  You said

2  something about Level 6.  Did you mean Dimension 6 of ASAM

3  assessment criteria?

4  **A.**   I apologize.  That was an error.  That would be

5  Dimension 6, recovery environment.  There is no Level 6.

6  Thanks for catching that.

7  **Q.**   And just referring back to the list of criteria which

8  follow the clause "any one of the following criteria must be

9  met," are there patients who, in your professional opinion,

10  should qualify for intensive outpatient that would meet none of

11  those five criteria?

12  **A.**   Yes, I do, and it's similar to a case that we talked about

13  before.  By omission we don't see sufficient emphasis on

14  co-occurring psychiatric or mental health disorders.  A person

15  who has had worsening, say, of a concurrent depression or a

16  concurrent psychosis, it wouldn't be that they would not be

17  safe but that they would be at risk of relapse; and that is a

18  person who would need the intensity of services at this level

19  of care, the increased dose, the frequency of monitoring, the

20  support for depression, treatment, adherence.  And this set of

21  five criteria would not provide a pathway in.

22  **Q.**   Okay.  And then there is a list of criteria all of which

23  are required to be met.

24  **A.**   I see that.

25  **Q.**   Okay.  Can you go through the same exercise with these

1  criteria, Dr. Fishman?

2  **A.**   (Witness examines document.)  So for 3 and 4, again, we

3  have said that if they are not safe at this level of care, that

4  we wouldn't want to include them and we'd want to jump to a

5  higher level of care.  That's certainly laudable, but we're

6  missing the reasons especially for a co-occurring mental health

7  condition because co-occurring medical is mentioned in the

8  section above but co-occurring mental is not.

9       One of the reasons of severity and treatment needs that a

10  person would be matched to this level of care for, not just

11  what they would be excluded for but why they would be included,

12  and we want to see that -- as in the case I described of a

13  person with chronic but exacerbating depression, we would want

14  to see that as a pathway in and that's absent.

15       In Number 5, this is essentially similar language in

16  another year we looked at, that the family can comply with the

17  requirements of an IOP or the member is likely to participate.

18  Again, we wouldn't require motivation or adherence on either

19  the part of the family or the member.  That would be a goal of

20  treatment.

21       We would expect that there would be some people with low

22  motivation, even frank opposition to treatment, either at the

23  level of the family or the patient.  That should not be an

24  exclusion.  It should be, rather, grounds for the use of

25  motivational enhancement treatment techniques.

1          If it were -- Number 6, if it were what we call a

2     co-occurring disorder enhanced or specialty dual diagnosis

3     program, it might certainly have a psychiatrist that would do a

4     comprehensive evaluation within three days, but that shouldn't

5     be at this nonmedical level of care a requirement.  It creates

6     a barrier to access in a way that would not be typical of all

7     iterations or appropriate all iterations in this level of care.

8     Q.   Is that true with the other time limits, the treatment

9     plan with inclusion of mild recovery within the first eight

10    sessions, within the first -- following the 48 hours of

11    admission, the contact of recent provider and family members?

12    A.   I don't object to those as strongly.  Those don't require

13    that they be medical providers.  Eight sessions is not so

14    unusual, and the attempt to contact the member's family and the

15    outpatient provider is not unduly unreasonable.

16    Q.   Okay.

17    A.   (Witness examines document.)  Though in 8, again, there is

18    a time clock that I think is overly restrictive and it reminds

19    me of the paragraph that we were looking at previously in the

20    ASAM criteria.  Three to five treatment days is probably only

21    two or three, at most, sessions of IOP.  That's probably too

22    frequent and is overly burdensome and, therefore, creates a

23    barrier to access to require a formal treatment plan review at

24    that level of frequency.  Every two or three weeks I think

25    would be more reasonable and more consistent with generally

1  accepted standards of care.

2      And here, again, the alternative is this very high level

3  of evidence, which I don't know what the medical definition of

4  is, but compelling evidence seems like it says to the user,

5  "This is unlikely to be accepted unless it's that compelling,"

6  whatever "that" is.

7  **Q.**   Dr. Fishman, you referred in your answer to that question

8  to a paragraph that we'd been looking at in ASAM?

9  **A.**   Yeah, that's right.  I thought that at Trial

10  Exhibit 662-0131, that I just by accident happen to have still

11  open, there's a definition of the appropriate frequency of

12  treatment reviews about every six sessions; and as that applies

13  to IOP, the recommendation is approximately two weeks.

14  **Q.**   Okay.  So that's the way that this guideline is

15  inconsistent with ASAM?

16  **A.**   Correct.

17  **Q.**   Okay.  Please go on.

18  **A.**   (Witness examines document.)  Those are my comments.

19  **Q.**   Okay.  Let's go to outpatient 2012, Trial Exhibit 2-0051.

20  **A.**   Yeah.  My main objection here is identical to the one that

21  we looked at in 2011.  It's Number 2.  The requirement that

22  lapse has occurred or is imminent as a criteria for outpatient

23  treatment at this lower, less intensive level of care, as I've

24  discussed; indefinite maintenance treatment, even lifelong

25  maintenance treatment despite stabilization as a method of

1  preventing relapse without it actually having occurred as a

2  method to continue support for stability despite the absence of

3  symptoms or lapses I think would be consistent with the

4  accepted level -- accepted -- the generally accepted standards

5  of care, and this is inconsistent.

6           MR. GOELMAN:  One moment, Your Honor.

7                  (Pause in proceedings.)

8  BY MR. GOELMAN:

9  Q.   Let's move on to 2013 and start again with the common

10  criteria.  I think this is Trial Exhibit 3.

11  A.   Exhibit 3.

12           THE COURT:  Okay.  So we're stopping at 4:00.  Figure

13  out how you want to do that.

14           THE WITNESS:  Uh-huh.  Same exercise?

15  BY MR. GOELMAN:

16  Q.   Yes, sir.

17  A.   So in the common criteria beginning on page 6 or 3-0007,

18  3a overemphasizes -- oh, no.  I'm sorry.  This is collecting

19  information.  That's okay.  My apologies.

20      (Witness examines document.)  Number 7 is the same

21  distinction that we've made between the definition of

22  "improvement" that is narrow and does not adequately include

23  prevention of deterioration and maintenance of function.  The

24  metric used is the reduction or control of the acute symptoms

25  that necessitated treatment, and the nod to prevention of

1    deterioration is still predicated on the context in my read of

2    the control of acute symptoms.

3        Number 8, again, the goal treatment is to include the

4    presenting symptoms rather than also including chronic,

5    enduring, and persistent and cumulative symptoms that still

6    continue to present severity and treatment need for a

7    particular level of care.

8        Number 9, the same language.  There's an exclusion for the

9    addressing of antisocial behavior or legal problems.  No need

10   to discuss that all over again.

11       (Witness examines document.)

12   **Q.**  So go back up to criterion 6, please.  I'm not sure that

13   this verbiage is familiar (reading):

14           "Member's current condition cannot be effectively and

15           safely treated in a lower level of care even when

16           treatment plan is modified."

17   **A.**  I think this is better than we've seen it in other years.

18   I don't particularly object.

19   **Q.**  Okay.

20   **A.**  (Witness examines document.)  Those are my comments.

21   **Q.**  Okay.  Let's turn now to continued service criteria, which

22   I believe is Trial Exhibit 3-0059, or 89.  I think it's 89.

23   **A.**  Yes.  I see it.

24   **Q.**  All right.  And if you can take a look at this and tell us

25   if this is again substantially the same as the previous year's

1    version; and if not, if you see anything in the differences

2    that you want to call the Court's attention to.

3    **A.**    (Witness examines document.)  Oh, so, Number 5 is, as

4    we've discussed, similar, although the wording is different but

5    it's the definition and the tension between the narrower

6    definition of "active treatment" versus "custodial care,"

7    although the term "custodial care" is not here, and the

8    reasonable expectation that the member's condition will improve

9    but without drawing the user to include prevention of

10   deterioration and maintenance of function in the definition of

11   "improvement."

12       (Witness examines document.)  Those are my comments.

13   **Q.**    Okay.  Turning now to the residential treatment guideline

14   for 2013, Trial Exhibit 3-0067.

15   **A.**    (Witness examines document.)  Numbers 1, 2, and 3 reflect

16   similar inconsistencies with the generally accepted standard of

17   care by overemphasizing the consideration of not allowing

18   people to be in levels of care they're not safe but without not

19   allowing them to be in levels of care that are not effective.

20   It's the same issue that we've talked about.

21       (Witness examines document.)  Number 4 does the same.

22   It's "safely" with not consideration -- without consideration

23   of effective.

24       (Witness examines document.)  Number 5, the same,

25   "safely," not "safely and effective."

1          (Witness examines document.)  In the next section, "All

2    the following criteria must be met," Number 2, we've discussed

3    this before, the requirement for the presence of medical

4    services but at the lower level of residential levels of care

5    where medical monitoring, supervision, and evaluation should

6    not typically be required, that is over-restrictive and

7    prevents access.

8          (Witness examines document.)  Number 3 is similar, the

9    expectation of medical personnel beyond the scope of the lower

10   levels of residential care, 3.1, 3.3, 3.5.

11         (Witness examines document.)  5 again refers to the

12   exclusion for custodial care, services that do not seek to cure

13   or are not during periods of changing.  That harkens back to

14   acute.

15         (Witness examines document.)  I've mentioned before that

16   for some patients, especially young patients with high

17   severity, the focus on runaway behaviors is part and parcel and

18   often central to the pathology that requires treatment and

19   should not be excluded as being merely custodial, which it is

20   not.

21         5c, again, says "safely" but does not say "safely and

22   effectively" provided in a less intensive care.  Part of the

23   planning ought to be defined a less intensive level of care

24   which can effectively carry out active treatment.

25         6a requires supervision and evaluation by a physician

 1   that's appropriate for the higher levels of residential care

 2   such as ASAM Level 3.7 but not for the lower levels of

 3   residential care.

 4        (Witness examines document.)  Those are my comments.

 5   **Q.**   Okay.  Turning now to intensive outpatient for 2013, Trial

 6   Exhibit 3-0052.

 7   **A.**   (Witness examines document.)  I'm there.

 8        (Witness examines document.)  Number 4 is essentially

 9   identical to language that we've discussed previously requiring

10   higher levels of motivation or adherence from family and/or

11   from the patient.  That should not be required.  We would want

12   the treatment program to take on itself the LOCUS of burden as

13   to using motivational enhancement techniques to improve

14   motivation, adherence participation, compliance.

15        (Witness examines document.)  In other years we've also

16   talked about the requirement for medical services and

17   supervision, such as in 5a the psychiatrist or addictionologist

18   completes a comprehensive evaluation.  That's overly

19   restrictive.

20        (Witness examines document.)  7a, the same pertains.

21   Whereas, it might be an admirable add-on for a specialty

22   co-occurring enhanced program that does feature psychiatric

23   services, not all IOPs, intensive outpatient treatments, ASAM

24   Level 2.1 would be expected to do that and to require that is

25   to provide a barrier to access to this level of care.

1        Those are my comments.

2    **Q.**    Okay.  Turning now to outpatient for 2013, Trial

3    Exhibit 3-0056.

4    **A.**    Main objection is exactly the same as we've discussed in

5    the previous two years.  That is, 2 in the first section, the

6    requirement that lapse has occurred or is imminent when, in

7    fact, we may be focused on indefinite or even lifelong

8    maintenance treatment for the maintenance of function and

9    booster services for the prevention of relapse without

10   requiring that it have occurred for services to be provided.

11   **Q.**    Anything else?

12   **A.**    (Witness examines document.)  Yeah.  The suggestion in the

13   top of page 57 or 3-0058 has factors that may lead one to

14   consider whether outpatient should be continued versus

15   discontinued.

16       This suggestion about discontinuation if the member

17   refuses -- and if they totally refuse treatment, of course, we

18   can't make them involuntary access treatment -- but the "or

19   repeatedly does not adhere with recommended treatment despite

20   attempts to enhance the member's engagement," I am very much in

21   favor of the urge to attempt to enhance the member's

22   engagement, but even if those attempts are unsuccessful, that's

23   not a reason to give up and fire patients.  It's a fact -- it's

24   a factor that should get us to push on and try other things and

25   keep trying because we want to be therapeutically optimistic

**FISHMAN - REDIRECT / GOELMAN**

1  not annalistic, not pessimistic, but therapeutically optimistic

2  that all patients can recover, and that we don't want to blame

3  them for not doing well in treatment; that we just have to try

4  something different and keep at it.

5       Those are my comments.

6  **Q.**   Okay.  Let's turn to 2014?

7            **THE COURT:**  Let's turn to 2014 tomorrow.

8            **MR. GOELMAN:**  Tomorrow.

9            **THE COURT:**  So thank you all.  I'll see you right here

10  bright and early 8:30 tomorrow morning.

11       (Proceedings adjourned at 4:01 p.m.  Proceedings to resume

12  on Tuesday, October 17, 2017.)

13                        -   -   -   -

CERTIFICATE OF REPORTERS

        We certify that the foregoing is a correct transcript
from the record of proceedings in the above-entitled matter.


DATE:   Monday, October 16, 2017



_____

Katherine Powell Sullivan, CSR #5812, RMR, CRR
                U.S. Court Reporter



_____

        Jo Ann Bryce, CSR #3321, RMR, CRR
                U.S. Court Reporter