**Volume 2**

**Pages 238 - 440**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JOSEPH C. SPERO, MAGISTRATE JUDGE

DAVID AND NATASHA WIT, et al., )
                                 )   **No. C 14-2346 JCS**
          Plaintiffs,   )
                                 )   **Pages 425 - 428**
VS.                          )   **FILED UNDER SEAL BY**
                                 )   **ORDER OF THE COURT**
UNITED BEHAVIORAL HEALTH,   )
                                 )
          Defendant.   )
_____)

                                 San Francisco, California
                                 Tuesday, October 17, 2017

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:
For Plaintiffs:           ZUCKERMAN SPAEDER LLP
                        1800 M Street, NW, Suite 1000
                        Washington, DC  20036-5807
         BY:  **CARL S. KRAVITZ, ESQUIRE**
               **CAROLINE E. REYNOLDS, ESQUIRE**
               **AITAN D. GOELMAN, ESQUIRE**

                        ZUCKERMAN SPAEDER LLP
                        485 Madison Avenue, 10th Floor
                        New York, New York 10022
         BY:  **JASON S. COWART, ESQUIRE**

(Appearances continued on next page)

Reported By:     Katherine Powell Sullivan, CSR #5812, RMR, CRR
               Jo Ann Bryce, CSR #3321, RMR, CRR
               Official Reporters - U.S. District Court

**APPEARANCES (CONTINUED):**

For Plaintiffs:            ZUCKERMAN SPAEDER LLP
                           485 Madison Avenue, 10th Floor
                           New York, New York 10022
                    BY:    **JASON S. COWART, ESQUIRE**

                           ZUCKERMAN SPAEDER LLP
                           100 East Pratt Street, Suite 2440
                           Baltimore, Maryland  21202-1031
                    BY:    **ADAM ABELSON, ESQUIRE**

                           THE MAUL FIRM, P.C.
                           101 Broadway, Suite 3A
                           Oakland, California 94607
                    BY:    **ANTHONY F. MAUL, ESQUIRE**

                           PSYCH APPEAL
                           8560 Sunset Bouleavard, Suite 500
                           West Hollywood, California  90069
                    BY:    **MEIRAM BENDAT, ESQUIRE**

For Defendant:             CROWELL & MORING LLP
                           515 South Flower Street, 40th Floor
                           Los Angeles, California 90071-2258
                    BY:    **JEFFREY H. RUTHERFORD, ESQUIRE**
                           **JENNIFER S. ROMANO, ESQUIRE**
                           **ANDREW HOLMER, ESQUIRE**

                           CROWELL & MORING LLP
                           3 Embarcadero Center, 26th Floor
                           San Francisco, California 94111
                    BY:    **NATHANIEL P. BUALAT, ESQUIRE**

                           CROWELL & MORING LLP
                           1001 Pennsylvania Avenue, NW
                           Washington, DC 20004-2595
                    BY:    **APRIL N. ROSS, ESQUIRE**

<u>**I N D E X**</u>

Tuesday, October 17, 2017 - Volume 2

<u>**PLAINTIFFS' WITNESSES**</u>                                    <u>**PAGE**</u>   **VOL.**

<u>**FISHMAN, MARC (RECALLED)**</u>
(PREVIOUSLY SWORN)                                          248     2
Redirect Examination resumed by Mr. Goelman                 248     2
Recross-Examination by Mr. Rutherford                       283     2

<u>**NIEWENHOUS, GERARD**</u>
(SWORN)                                                     296     2
Direct Examination by Ms. Reynolds                          296     2
Cross-Examination by Ms. Romano                             431     2

<u>**E X H I B I T S**</u>

<u>**TRIAL EXHIBITS**</u>                             <u>**IDEN**</u>   <u>**EVID**</u>   **VOL.**

264                                                         312     2

265                                                         314     2

268 through 278                                             391     2

281                                                         310     2

307                                                         338     2

322                                                         412     2

335                                                         348     2

342                                                         417     2

378                                                         396     2

402                                                         399     2

437                                                         382     2

445                                                         373     2

450                                                         385     2

477                                                         373     2

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 493 | | 394 | 2 |
| 494 | | 373 | 2 |
| 497 | | 373 | 2 |
| 506 | | 408 | 2 |
| 512 | | 301 | 2 |
| 522 | | 314 | 2 |
| 540 | | 299 | 2 |
| 555 | | 373 | 2 |
| 592 | | 345 | 2 |
| 654 | | 371 | 2 |
| 655 | | 358 | 2 |
| 656 | | 329 | 2 |
| 735 | | 308 | 2 |
| 768 | | 305 | 2 |
| 786 | | 415 | 2 |

```
 1   Tuesday - October 17, 2017                          8:27 a.m.

 2                        P R O C E E D I N G S

 3                            ---o0o---

 4        THE CLERK:  So we are calling Case Number C 14-2346,

 5   Wit/Alexander versus UBH.  The Alexander case has been

 6   consolidated into the Wit matter.

 7        THE COURT:  Right.

 8     Okay.  Everybody is here.

 9     So you had some --

10        MR. GOELMAN:  Your Honor, we're just waiting for

11   Ms. Reynolds, who's going to be arguing the objections and

12   putting Mr. Niewenhous on.

13        THE COURT:  Oh.

14        MR. GOELMAN:  She was here 30 seconds ago.

15        THE COURT:  Sweet.

16        MR. GOELMAN:  She will be here in 30 seconds.

17        THE COURT:  Okay.  I'll give her 30 seconds then.

18     So we're going through some documents that Mr. Niewenhous

19   is dealing with.  Does somebody have a notebook?  Is there a

20   witness notebook for Niewenhous?

21        MR. ABELSON:  Yeah.  They're just putting it together.

22        MR. GOELMAN:  Putting the binder together?

23        MR. ABELSON:  They were just checking on it.

24        THE COURT:  Yeah.  Why don't you grab that so I can

25   have what you're talking about.
```

```
 1                     (Pause in proceedings.)

 2          THE COURT:  Okay.

 3          MS. REYNOLDS:  We're just waiting for the witness

 4   binders.

 5          THE COURT:  Ah.

 6          MS. ROMANO:  Your Honor, it's 15 -- good morning,

 7   first of all.

 8          THE COURT:  Good morning.  Good morning.

 9          MS. REYNOLDS:  Good morning.

10          MS. ROMANO:  Hi.

11       It's 15 exhibits here and it's the same topic, so do you

12   want me --

13          THE COURT:  Sure.  Start.

14          MS. ROMANO:  I can start by explaining.

15       There are 15 exhibits that were listed on plaintiffs' list

16   for Mr. Niewenhous' testimony, which I understand will be after

17   Dr. Fishman's, and these 15 we have objected based on the fact

18   that they relate to guidelines not at issue in this case.

19       This was an issue raised on the *motion in limine*, which

20   was denied, and we wanted to state our objections based on

21   relevance and see if Your Honor wanted to address them together

22   this morning before the testimony begins as opposed to

23   throughout the testimony.  Again, it's all based on relevance.

24       And I can read the exhibit numbers if Your Honor would

25   like.
```

1          **THE COURT:**  Is this an objection that's different from

2    the one that I denied in the *motion in limine*?

3          **MS. ROMANO:**  It is not, Your Honor.

4          **THE COURT:**  Okay.  So why don't you just point me out

5    an example.

6          **MS. ROMANO:**  Okay.  Can I have a copy of the...

7                    (Pause in proceedings.)

8          **THE COURT:**  The Court needs two.

9          **MS. REYNOLDS:**  We have it.

10          **THE COURT:**  Great.  One goes over to the jury box.

11          **MS. ROMANO:**  Your Honor, 749.

12          **THE COURT:**  749.

13          **MS. ROMANO:**  I'm not seeing 749 in my binder.

14          **MS. REYNOLDS:**  Yeah.  I'm actually not planning to use

15    749 today.

16          **MS. ROMANO:**  Okay.  Eliminate it from the list.

17      All right.  I can come up with a different example, then,

18    perhaps?

19          **THE COURT:**  Okay.

20          **MS. ROMANO:**  Let's go with 758.  That's not on there

21    either.

22          **THE COURT:**  768 is on.

23          **MS. REYNOLDS:**  This may end up not being -- no, 758

24    should be there.

25          **THE COURT:**  758 is not in the binder.

 1          **MS. ROMANO:**  758?

 2          **MS. REYNOLDS:**  758 should be in the binder.

 3          **THE COURT:**  No.  Wait.  I see --

 4          **MS. REYNOLDS:**  Oh, 458.  Let me -- why don't I point

 5    you to one, Your Honor.  That might be the simplest way to go.

 6          **THE COURT:**  Yeah.  758 doesn't seem to be in here.

 7          **MS. REYNOLDS:**  Well, one example is --

 8          **MS. ROMANO:**  How about 493, Your Honor?  I see that in

 9    the binder.

10          **THE COURT:**  Okay.  Got it.  493.  It's e-mails.

11          **MS. ROMANO:**  This one relates to -- and I'm looking to

12    see -- yes, this one relates to the Applied Behavior Analysis,

13    Your Honor, which is -- we heard about it in the openings

14    yesterday as well; and there is a clinical policy committee

15    document relating to -- attached to this e-mail relating to

16    Applied Behavioral Analysis, which is a treatment for autism.

17    It has its own unique guideline within the Level of Care

18    Guidelines that is not one of the Level of Care Guidelines

19    challenged in the case.

20        So the objection is relevance.  Again, it's for the same

21    reasons that were raised in the *motion in limine*.

22          **THE COURT:**  Okay.  All right.

23          **MS. REYNOLDS:**  And, Your Honor, we're actually not

24    offering it for the purpose of that attachment.  There's

25    information in the e-mail that we intend to ask Mr. Niewenhous

 1   about that doesn't relate to ABA.

 2        But, in general, our --

 3        **THE COURT:**  No, the response was it's the same

 4   theoretical conflict.  I'm sure that's what this is going to.

 5        **MS. REYNOLDS:**  Right.  It goes to motive and lack of

 6   mistake, and so forth.

 7        **THE COURT:**  So the objections are overruled, but why

 8   don't you just list the exhibits that you're objecting to so we

 9   have a record of those.

10        **MS. ROMANO:**  Great.  Thank you, Your Honor.

11        And I see some of the other ones are not in the binder

12   either, but I'll just list all the ones that we had.

13        **THE COURT:**  Yes.  That's all right.

14        **MS. ROMANO:**  384, 388, 397, 405, 429, 445, 447, 477,

15   493, 494, 497, 555, 560.  And the last two have been taken off,

16   so that's it.

17        **THE COURT:**  Okay.  So for future reference, if you've

18   raised something in a *motion in limine* and I denied it and it's

19   an objection that's been included in your list of objections to

20   the exhibits, you don't have to reraise it during the trial.  I

21   consider that preserved.

22        **MS. ROMANO:**  Okay.  Thank you very much.

23        **THE COURT:**  Okay.

24        **THE CLERK:**  Judge, I'm having technical difficulties.

25   Like, the sound system just went down, so I have to reboot

```
 1    everything.  Sorry.

 2            THE COURT:  Go for it.

 3            THE CLERK:  I can't just restart everything.

 4            THE COURT:  Okay.

 5                        (Pause in proceedings.)

 6            THE COURT:  Technical problems, at least temporarily,

 7    solved.  Let's go.

 8            THE CLERK:  All right.

 9            THE COURT:  Okay.

10        MR. GOELMAN:  Your Honor, Aitan Goelman for the

11    plaintiffs.

12        Just one more housekeeping issue.  Yesterday I showed

13    Dr. Fishman a report by Dr. Alam which was marked for

14    identification 880.  At that point we didn't know that the

15    guideline stipulation of the parties was marked as 880, so we

16    are renumbering that 891.

17            THE COURT:  Which is 891?

18        MR. GOELMAN:  Dr. Alam's report, the new 891, I will

19    have Dr. Fishman just identify it so the record is clear.

20            THE COURT:  Okay.

21        MR. GOELMAN:  And also I wanted to introduce to the

22    Court, there are two plaintiffs here who were not here

23    yesterday, Lori Flanzraich and Brian Muir.

24            THE COURT:  Okay.  Welcome.  Welcome.

25        Okay.  Dr. Fishman.
```

FISHMAN - REDIRECT / GOELMAN

1              **MARC FISHMAN**,

2    called as a witness for the Plaintiffs, having been previously

3    duly sworn, testified further as follows:

4              **THE COURT:**  Okay.

5              **THE WITNESS:**  Good morning.

6              **THE CLERK:**  Mr. Fishman, just to remind you, you're

7    still under oath.

8              **THE WITNESS:**  Thank you.

9              **THE COURT:**  Okay?  All right.

10             **THE WITNESS:**  Uh-huh.

11             **REDIRECT EXAMINATION**   **(resumed)**

12   **BY MR. GOELMAN:**

13   **Q.**   Good morning, Dr. Fishman.

14   **A.**   Good morning.

15   **Q.**   Before we delve back into the guidelines, I want to show

16   you an exhibit that you identified yesterday that has been

17   renumbered.  Do you remember you talked about the rebuttal

18   report of Dr. Alam that you considered?

19   **A.**   I do.

20   **Q.**   Okay.  Can you look on your screen and you'll be shown

21   Trial Exhibit 891 for identification?  That was numbered 880

22   yesterday.  The new one is 891.

23                   (Pause in proceedings.)

24   **BY MR. GOELMAN:**

25   **Q.**   We'll return to that.

1    **A.**    Okay.

2    **Q.**    All right.  Let's take up where we left off yesterday with

3    the 2014 Level of Care Guidelines.

4              **THE COURT:**  What exhibit number is that?

5              **MR. GOELMAN:**  I'm sorry.  Exhibit Number 4.

6    **Q.**    And I'm going to refer you to page 4-0007, internally

7    numbered 6.

8              Now, this has a different format --

9    **A.**    Yes, it does.

10   **Q.**    -- than the guidelines that we had been looking at

11   yesterday.  Can you explain how this format differs from the

12   one that we saw yesterday with the common criteria?

13   **A.**    Yes.  Although the format change itself doesn't alter the

14   structure or the content of the guidelines or the decision

15   rules or the way they're applied, they read a different way.

16   So that admission criteria, continued service criteria, and

17   discharge criteria previously were in a sequence one page

18   following the next.  Now they're in a new format where they

19   read across the page in parallel.  And so admission, continued

20   service, discharge, evaluation and treatment, and discharge

21   planning as part of the clinical best practices -- what used to

22   be a Part 1, Part 2, Part 3, Part 4 -- is all in a landscape

23   view as a chart but it doesn't change, as far as I'm concerned,

24   the way one uses them or reads them.

25   **Q.**    So the different criteria for admission, which is now in

1   the first column on the left, is still connected with "ands"?

2   **A.**   Yes, that is correct.

3   **Q.**   And we no longer have the nomenclature of the different

4   numbers for the different clauses that you pointed out

5   yesterday, 1.4, 1.6?

6   **A.**   No, that's right.  That's also a different labeling

7   system.  They don't have the numbers and the subnumbers.

8   **Q.**   Okay.  Could you, starting with page 4-007, walk the Court

9   through the language that was significant in coming to the

10  opinion that these guidelines do not comply with the generally

11  accepted standards of care?

12       **THE COURT:**  Well, just so I don't get lost, would you

13  go through all of the admission criteria first and then the

14  continued service and then discharge?

15       **THE WITNESS:**  Sure.

16       **THE COURT:**  Thank you.

17       **THE WITNESS:**  Yeah, I'll follow the order that we

18  followed before.

19       And just to preface, the contents are substantially

20  similar, and so I'll try to be brief.  Please ask me to

21  elaborate if I'm not articulating changes.

22       But the -- beginning with the second full bullet on

23  page 6, there is again, in my view, an overly restrictive and

24  narrow emphasis on acute changes as labeled "why now" factors

25  leading to admission.

1       And, again, as we've discussed before, this is an

2   overemphasis on only acute changes, on the precipitating crisis

3   factors that lead to admission, and not broadly enough

4   considering things that might be important but weren't

5   precipitating of this particular admission but still carry

6   persistent, enduring, severity or chronic severity or

7   cumulative severity.

8       (Witness examines document.)  On page 8, the same language

9   is used about the definition of "improvement" harkening back to

10  the discussion we've had and the tension between an overly

11  narrow definition of "active treatment" versus what I think is

12  an overly broad definition of "custodial care"; but here,

13  again, "improvement" is using the metric of reduction or

14  control.  This is the second -- this is the bullet towards the

15  bottom of the left-hand column on page 8 (reading):

16          "Improvement of the member's condition as indicated

17      by the reduction or control of the acute signs and

18      symptoms that necessitated treatment."

19      It's both that the symptoms and signs are acute and that

20  it's only the ones that necessitated treatment initially.

21  **BY MR. GOELMAN:**

22  **Q.**  Dr. Fishman, that's on internal page 8 and Trial

23  Exhibit 4-009?

24  **A.**  That's correct.

25          (Witness examines document.)  On the next page, 0010 or

**FISHMAN - REDIRECT / GOELMAN**

1  page 9 in the internal numbering, the last bullet at the bottom

2  there is, again, reference to the exclusion for custodial care,

3  and we've discussed how other documents define "custodial care"

4  in a way that I think is overly broad.

5      (Witness examines document.)  Turning to 0013 --

6  **Q.**  I'm sorry.  Before we do that, Dr. Fishman, can I call

7  your attention to something else on page 9 internal?  The

8  bullet point at the top, the improvement in this context, do

9  you see that?

10  **A.**  I do.

11  **Q.**  Is that what was labeled 1.8.2 yesterday?

12  **A.**  It is.  And exactly as before, I believe it reads, in

13  referring to the context where there is a tip of the hat to the

14  prevention of deterioration, the context is as defined above on

15  the previous page with a reference to the change in acute signs

16  and symptoms so that it narrows the meaning of what it is to

17  prevent deterioration.

18  **Q.**  And is there anything about this new format that, in your

19  view, supports that conclusion?

20      **MR. GOELMAN:**  Can you go up one page, please.

21      **THE WITNESS:**  (Witness examines document.)  So it's --

22  it's a subbullet to the stem on the previous page of the

23  reasonable expectation of improvement, and below are the

24  different ways in which "improvement" is defined and

25  "improvement" is defined by acute signs and symptoms --

1    reduction in acute signs and symptoms.

2    BY MR. GOELMAN:

3    Q.    Okay.  Then you were turning to page 13; is that right?

4    A.    (Witness examines document.)  0013, internal 12.

5    Q.    Is that the 23-hour observation?

6    A.    Oh, I've gone too far.

7    Q.    It's not common criteria.

8    A.    Thank you.

9          All right.  So those are the admission criteria.

10   Q.    Can you move to the continued service criteria, please.

11   A.    Going back to 0007, second subbullet, the focus on

12   addressing the "why now" factors.  Again, as before,

13   overconcern on acute changes.

14       On the next page 0008, the requirement for stabilization

15   of the precipitating "why now" factors within a reasonable

16   period of time, or the reminder that the clock is ticking and

17   an overconcern on duration, and the focus of the treatment plan

18   on these "why now" acute change/acute precipitating factors.

19       (Witness examines document.)  Then that takes us to the

20   end of the continued service criteria.

21       Going back to 0007, the discharge criteria are that the

22   continued stay criteria are no longer met, so that brings

23   forward the difficulties in the continued service criteria.

24   And then some examples focus the user on thinking, in the first

25   two subbullets, about the same acute precipitating "why now"

1   factors.

2       There is the term "the transition to the less intensive

3   level of care" is predicated on it being safe but not

4   predicated on it being effective.

5       (Witness examines document.)  Then on 0008, we have the

6   same language we've discussed before about what I summarize as

7   low motivation -- that is, the unwillingness to participate,

8   the inability to participate, problems with adherence -- as not

9   being a reasonable exclusion from care or a reason for

10  discharge from care.

11      And contrasting that at the very high standard with

12  involuntary treatment or guardianship with no gray in between

13  delineates for the user what a very broad meaning of

14  "unwillingness" would be.

15  Q.   Dr. Fishman, if you are done with the common criteria, I'd

16  like to turn to the intensive outpatient program for

17  substance-related disorders --

18  A.   All right.

19  Q.   -- which is on 4-0059.  I'm sorry.  That's -- yeah,

20  intensive outpatient program.

21  A.   (Witness examines document.)  So on 0059, we start with

22  the preamble.  Level of care is initially described as being

23  primarily focused on addressing "why now" factors that

24  precipitate an admission.  That's overly narrow.

25      Starting at the left-hand column, the admission criteria

1    we discussed before, the reference to co-occurring behavioral

2    health or physical conditions refers only to that they can be

3    safely managed; but by omission, I'm concerned that there are

4    not criteria for why the treatment --

5              THE COURT:  What page?

6              THE WITNESS:  0060 -- apologies -- at the top.

7         -- that there should be inclusion criteria for why

8    severity or treatment needs in those categories would require

9    the treatment that would be effective at the current level of

10   care.

11        (Witness examines document.)  All right.  Those are the

12   admission criteria.

13        And there's nothing new under continued service or

14   discharge criteria, so those are my comments.

15   BY MR. GOELMAN:

16   Q.   Okay.  Will you please turn, please, to 4-0066, which is

17   the outpatient substance-related disorders criteria?

18   A.   (Witness examines document.)  This is essentially

19   identical to language we've looked at before.  First of all,

20   the preamble focus us again that the goals of treatment is on

21   "why now" factors that precipitated admission, overly narrow.

22        And the requirement on page 0067 that there be acute

23   changes in signs and symptoms and/or psychosocial environmental

24   factors -- that is, the "why now" factors -- so that

25   precipitating crises are required to necessitate outpatient

1    treatment, which is not consistent with the generally accepted

2    standard of care, which should include ongoing maintenance,

3    prevention of relapse, and even indefinite and in some cases

4    lifelong maintenance even during periods of stabilization to

5    prevent destabilization.

6        Here, both discharge and continued service criteria refer

7    back only to the common criteria, and there's nothing new.  So

8    those are my comments.

9    **Q.**   Okay.  Residential rehabilitation, which begins 4-0077.

10   **A.**   (Witness examines document.)

11   **Q.**   It's the residential for SUD disorders.

12   **A.**   Reminiscent again of language we've seen, the preamble

13   focuses the goals of treatment on "why now" factors that

14   precipitated admission in an overly narrow way.

15       And although they're not numbered, we have, on 0077, the

16   first page, the third bullet in the left-hand column focus on

17   "why now" factors and the notion of safe provision of care but

18   not effective provision of care.

19       On 0078, overly emphasizing "why now" factors, and a

20   concern that the call for risk of -- no.  There's an "or," so

21   it's "imminent or current risk which cannot be imminent or

22   current."  That's better.

23       (Witness examines document.)  But the example on the next

24   page, 0079, of immediate or imminent danger of relapse narrows

25   our focus to the highest levels of residential care and would

1  not be appropriate at low-intensity residential care, such as

2  an ASAM 3.1 residential program.

3  **Q.**   All right.  Dr. Fishman, you described ASAM 3.1

4  residential facilities.  Yesterday you used the example of a

5  halfway house.

6  **A.**   That's one example, yes.

7  **Q.**   Would just a house without any therapeutic care capability

8  qualify under ASAM 3.1?

9  **A.**   Oh, no.  So in the continuum of recovery support

10  resources, we do talk about recovery housing as being an

11  important tool.  So a recovery residence, a boarding house, and

12  the like, would fall under what you may be describing.  Those

13  wouldn't necessarily have a great deal of supervision.

14      But to be an actual certified treatment program, a level

15  3.1, a low-intensity, clinically managed residential program,

16  there would have to be professional staff.  There would have to

17  be 24/7 structure and supervision available.  Patients might

18  not avail themselves of it during the day if they were out

19  working or out going to outpatient treatment or going to

20  school, but it would certainly be available and they would have

21  that supervision in the evening.

22      And then there's a requirement for some small

23  low-intensity amount of professional therapeutic services.

24  Typically that's been operationalized as about five hours a

25  week of professional services.  So not just a boarding house.

1   There are people in outpatient care who might have boarding

2   house, what we call, recovery resident support, but that's a

3   different thing.

4   **Q.**   Okay.  Please continue.

5   **A.**   So on page 0079, another of the criteria is -- again, a

6   focus on at the bottom bullet -- the "why now" factors cannot

7   be safely, efficiently, or effectively assessed or treated in a

8   less intensive setting.  Again, a narrow focus on "why now"

9   without the broader consideration of enduring and persistent

10  and chronic conditions.

11      (Witness examines document.)  On page 0077 starting with

12  the continued service criteria, the reference to the exclusion

13  of custodial care, we've discussed the dichotomy between

14  custodial care and active treatment, and my view that the

15  overly broad definition of "custodial care" excludes too much.

16      (Witness examines document.)  That's the end of the

17  continued service criteria.

18      (Witness examines document.)  The exclusion under the

19  discharge criteria for custodial care with some examples of

20  custodial care being that baseline level of functioning has

21  been achieved, I'm concerned that that's another indication of

22  the overly broad definition used here of "custodial care"

23  because it should be at times included in improvement and

24  active treatment, the maintenance of function.

25      (Witness examines document.)  And then going on the same

1    page to 0077 looking at evaluation and treatment planning,

2    we've discussed this before so it's the same point.

3         The requirement for medical services would pertain

4    certainly to the highest medically monitored levels of

5    residential treatment numbered in ASAM as Level 3.7 but would

6    not pertain to Levels 3.1, 3.3, and 3.5, the clinically managed

7    levels of residential.

8         That's another example, I think, of how these criteria

9    don't consider or encompass the gradations and the full range

10   in the continuum of care of residential treatment, which is

11   more than just the most intensive residential treatment.

12        THE COURT:  Is that number 77?  77?

13   BY MR. GOELMAN:

14   Q.   077.

15   A.   077 -- one, two, three, four -- the fourth column from the

16   left, the second bullet.

17   Q.   Okay.  Under best practices.

18        And is that all for the residential SUD 2014?

19   A.   Yes.  I would just make the point that this continuum of

20   care that we've talked about within residential subtypes, if I

21   hadn't clarified before, can certainly be separate programs,

22   separate buildings, but doesn't have to be.  There's the

23   possibility that one program, one provider, one building could

24   provide different sublevels of residential care as program

25   tracks with perhaps different structure, different personnel,

1    and demark it as a transition.

2        And so that could be done in a seamless continuum or it

3    could be done at a building across town with a formal transfer.

4    Both would apply.

5    **Q.**   Okay.  Thank you.

6        We dealt at some length yesterday with the 2015 Level of

7    Care Guidelines, so I'm going to ask you now to turn to the

8    2016, Trial Exhibit 6.

9        And you notice that the first page, 6-0001, says "2016

10   Level of Care Guidelines Approved January 2016."  Do you see

11   that?

12   **A.**   I do see that.

13   **Q.**   Okay.  Are there actually two different versions of the

14   Level of Care Guidelines for 2016?

15   **A.**   Yes.  My understanding is that there were two, one in

16   January and one in June.

17   **Q.**   And this is the January one?

18   **A.**   That's correct.

19   **Q.**   Okay.  I'm going to ask you to begin again with the common

20   criteria, which starts at page 6-0009.  And as we can see, this

21   is a return to the format used in 2015 and basically all years

22   except 2014; is that right?

23   **A.**   That is right.

24   **Q.**   So, again, we have the numbers to refer to of the

25   different sections and subsections?

1  **A.**   We have the portrait look, we have the structure of

2  admission followed by continued stay, followed by discharge in

3  the old way, and we have the numbering, correct.

4  **Q.**   Okay.  Can you go through the admission criteria for

5  common criteria for 2016, please.

6  **A.**   Again, much familiar language without a great deal of

7  substantive change, so I'll try to go quickly.

8      1.4 on page 009, overly narrow focus on the "why now"

9  acute precipitants.

10      1.5, the same issue, overly narrow focus on "why now" that

11  produces restrictions to access.

12      A reference in 1.6 to co-occurring behavioral health and

13  medical conditions but only to exclude people who aren't safe

14  in the current level of care but not to describe the rules

15  under which patients who need the level of care for those

16  conditions in what ASAM would call Dimension 3 and Dimension 2

17  would not be excluded but would be included and would need the

18  level of care.

19      The next page, 0010, we've talked about these, the 1.8,

20  the reasonable expectation that services will improve with the

21  definition of "improvement," the metric being reduction or

22  control of the acute signs and symptoms with precipitating

23  factors leading to treatment in 1.8.1, as well as the focus on

24  the clock running; and the context in which prevention of

25  deterioration is mentioned being the context as I think it

1   defining "improvement" as control or reduction of acute signs

2   and symptoms as we've discussed.

3        Moving to continued service criteria, in 2.1.2 on 0010,

4   the overly narrow focus on the "why now" factors.

5        2.1.3, harkening back to the definition of "improvement"

6   with active treatment as being too narrow and the focus on the

7   reasonable period of time.

8        2.2, the focus of the treatment and the treatment plan and

9   the discharge plan is about the "why now" factors in an overly

10  narrow way.

11       And on the discharge criteria, 3.1.1 and 3.1.2, just as in

12  the previous year, overly narrow focus on "why now" factors.

13       And 3.1.5, exclusion for lack of willingness or ability to

14  participate as being a reference to low motivation or poor

15  adherence, that should not, under generally accepted standards

16  of care, be a cause for exclusion or discharge.

17       Those are my comments.

18  Q.   Okay.  Moving to the intensive outpatient program for

19  substance-related disorders, which is on -- begins on 6-0062.

20  A.   (Witness examines document.)  The preamble focuses the

21  user on the goals of the level of care from the very beginning

22  as having an overly narrow focus on the "why now" factors that

23  precipitate admission.

24       (Witness examines document.)  Those are my comments only

25  to say that additionally, since it includes the common

 1   criteria, it incorporates the flaws that we've just discussed;

 2   but those are my comments for IOP.

 3   Q.   And is that true for any section that incorporates the

 4   common criteria?

 5   A.   Throughout, yes.

 6   Q.   Okay.  Can you turn to 0079, which is the first page of

 7   outpatient criteria for substance-related disorders, please.

 8   A.   (Witness examines document.)  The preamble defines the

 9   focus of the purpose of the treatment level of care as overly

10   narrowly focusing on "why now" factors that precipitated

11   admission.

12        And 1.4, as in prior years, requires destabilization, that

13   is, acute changes in the member's signs and symptoms and/or

14   psychosocial or environmental factors -- that is, the "why now"

15   factors leading to admission -- as a crisis precipitant for

16   outpatient care, which is too narrow and too restrictive and

17   prevents a barrier to access.

18        Again, the generally accepted standard of care is that

19   outpatient treatment can be for maintenance and prevention of

20   relapse with an indefinite and sometimes even lifelong course.

21        Those are my comments.

22   Q.   Okay.  And, finally, I think the residential treatment for

23   substance use disorders starts on page 0090 of that exhibit.

24   A.   (Witness examines document.)  Residential rehab, the

25   preamble focusing the purpose of the level of care overly

 1    narrowly on "why now" factors then precipitate that

 2    precipitated admission.

 3         1.3, the focus on the "why now" factors.

 4         (Witness examines document.)  And although they're

 5    examples and not exhaustive, 1.3.2, as I've said before, is an

 6    overly high bar as looking for immediate or imminent danger of

 7    relapse for the lowest level of residential care; that is, the

 8    low-intensity, clinically managed 3.1 level of care.

 9         1.4, the focus on "why now" factors without the broader

10    inclusion of more chronic and persistent factors.

11         (Witness examines document.)  In the continued service

12    criteria, 2.2.2, is concerning because it seems to explicitly

13    include in the broad and, as I see it, overly broad definition

14    of "custodial care," an exclusion for services that are

15    provided for the primary purpose of maintaining a level of

16    function even if those services are skilled services.  And I

17    think the generally accepted standard of care would tell us

18    that maintaining a level of function through skilled service

19    is, in fact, active treatment.

20         Those are my comments.

21         **MR. GOELMAN:**  Okay.  Can you bring up Trial Exhibit 7,

22    please, the first page.

23    **Q.**   Is this the version of the 2016 Level of Care Guidelines

24    that was revised in June 2016 that you previously mentioned,

25    Dr. Fishman?

1   **A.**   It is.

2   **Q.**   And have you been through this to compare the relevant

3   sections with the version from earlier in 2016?

4   **A.**   I have.  And I would say that for the levels of care that

5   we've been looking at -- the common criteria outpatient,

6   intensive outpatient, and residential -- they are really

7   essentially verbatim the same, except for maybe a sentence or

8   two about the definition of the service hours for IOP, which

9   are not in question.

10  **Q.**   Okay.  Does that change affect your conclusion that the

11  2016 Level of Care Guidelines are in violation of the generally

12  accepted standards of care in the ways that you have described?

13  **A.**   No.  I would make exactly the same comments.  Do you want

14  me to go through them, or --

15          **THE COURT:**  No, no.

16          **THE WITNESS:**  Okay.

17          **MR. GOELMAN:**  Okay.  Can you bring up Trial Exhibit 8,

18  please, the Level of Care Guidelines from 2017.

19  **Q.**   And, Dr. Fishman, you can see that the formatting has

20  changed once again here?

21  **A.**   That's correct.

22  **Q.**   Okay.  Can you talk about how, if at all, the substance of

23  these guidelines are different from previous years?

24  **A.**   So the formatting is just a little bit different in that

25  we don't have the numbering, that it's broken into subsections

1  for mental health and substance use disorders.  There are three

2  sets of common criteria.  One is an overall introduction, one

3  for mental health, and one for SUD, although all three are

4  substantially the same.

5       And I would say that at a 30,000-foot view, there are a

6  couple of changes.  Do you want me to go through them from the

7  top, or do you want me to show them in detail as we go through?

8  **Q.**   Why don't we just talk about them as we go through the

9  common criteria.

10      The common criteria start on page 8-0006 and they continue

11  on to -- for the next several pages.  You mentioned that there

12  are now admission discharge -- admission critical care and

13  discharge criteria as part of the common criteria, but then

14  there are also those that are included as part of the

15  SUD-specific section of the guidelines?

16  **A.**   That is correct.  And I can go through the common criteria

17  at the introduction or I can go through the common criteria for

18  the SUD section or both.

19  **Q.**   Let's do the first one, the introduction.

20  **A.**   Okay.  All right.  So that would be on 0006.

21      (Witness examines document.)  And one of the things that

22  is different here is that the term "why now" no longer is used

23  and in general we have replaced it with language looking at the

24  top of 007 in the -- one, two, three, four, five -- sixth line,

25  for example, of the factors leading to admission.  And this

 1    will be a theme that we see throughout in this year.

 2         "Why now" is no longer featured, and so there's not quite

 3    as narrow an exclusion, but the emphasis I still believe is

 4    narrow and overly narrow in focusing exclusively on factors

 5    leading to admission with the implication of only the

 6    precipitating factors that got a person in the door but not a

 7    broader set of factors and conditions that might not be

 8    directly related to the precipitating events leading to

 9    admission.  So that's an objection.

10         And although they're not numbered the way it was before,

11    similar to the 1.8 criterion that we saw, the last bullet in

12    the section for admission criteria again is the same language

13    about reasonable expectation of what improvement is.

14         The definition is somewhat different.  Instead of saying

15    that it's measured by the reduction or control of the acute

16    signs and symptoms, it's now the signs and symptoms that

17    necessitated treatment in the level of care.

18         So the focus isn't as narrowly on "acute" but it is,

19    again, overly narrow on the symptoms that precipitated

20    treatment to the exclusion of those that might be more broad.

21         And, again, in the next subbullet, the definition of the

22    context of the prevention of deterioration is with the focus on

23    those particular signs and symptoms.

24         (Witness examines document.)  In the common criteria just

25    below it, "why now" factors are replaced by factors leading to

1   admission and are overly narrow in the same way by focusing

2   there without looking more broadly.

3   **Q.**   Are you referring to the continued service criteria

4   section?

5   **A.**   I am.

6        And in the discharge criteria, second subbullet -- I'm

7   sorry, first subbullet, the factors that led to admission have

8   been addressed; whereas, a broader view would include other

9   more chronic, more persistent, cumulative, severity, and the

10  like; and that we would not be thinking just about the extent

11  to which a member can be transitioned for safety, but also

12  transitioned for effective treatment to a less intensive level

13  of care.

14       And then the last subbullet, just as we've discussed

15  before, this language is identical.  The exclusion requiring --

16  well, not requiring but an example of giving a reason for

17  discharge that a patient has low motivation or poor adherence

18  contrasted with the need for involuntary treatment or

19  guardianship, which is not consistent with generally accepted

20  standards of care.

21       (Witness examines document.)  Those are my comments.

22  **Q.**   Can you turn now, Dr. Fishman, to 8-0023?

23  **A.**   (Witness examines document.)

24  **Q.**   It's at the beginning of the section that is specific for

25  substance-related disorders.

1    **A.**    Yes.

2    **Q.**    And as you mentioned, is there also a common criteria for

3    all levels of care for this section as well?

4    **A.**    Yes.

5    **Q.**    Anything different about those common criteria that is

6    material?

7    **A.**    No.

8    **Q.**    Okay.  Can you turn, then, to the outpatient guidelines,

9    which I believe are on 8-0026?

10   **A.**    (Witness examines document.)  So the change -- one of the

11   changes here is that the purpose of the level of care, as

12   summarized in the preamble, is the focus on addressing the

13   factors that precipitated the admission; for example, changes

14   in the member's signs and symptoms, psychosocial environmental

15   factors, or level of functioning.  So the "why now" terminology

16   has been changed.  That's an improvement, but it is still

17   overly narrow in the focus exclusively on factors that

18   precipitated admission as described by being changes from a

19   baseline.

20        And even though the word "acute" isn't used, it focuses a

21   user on thinking about the kinds of changes that are likely to

22   be acute as different from baseline where even problems that

23   are significant but not a change, that are chronic and

24   enduring, in my view, ought to also be a focus of treatment.

25        There's another new element, which is a granularity, if

1  you will, of defining different kinds of outpatient sessions,

2  those that are extended versus those that are, I guess, by

3  contrast, regular or nonextended.  And I think that the

4  substantive difference is their duration, a 45-minute session

5  versus a longer session.  And so that there are new criteria

6  for what gives access to the longer or extended sessions, and

7  that's a new element.

8  Q.   I'm sorry, Dr. Fishman, do you see it says "coverage for

9  extended outpatient sessions lasting up to 60 minutes"?

10 A.   Yes.

11 Q.   So are extended sessions, then, between 45 and 60 minutes

12 long?

13 A.   That's the definition as given here, and they're talked

14 about as being nonroutine so that 45-minute sessions would be

15 routine, 60-minute sessions would be the exception.

16 Q.   Okay.  And are there additional criteria that have to be

17 met in order to be eligible for these extended sessions?

18 A.   So this is a new thing, but to be eligible for extended

19 sessions, criteria include experiencing an acute crisis.  So

20 back to thinking about the big dramatic crisis-driven changes

21 rather than more broadly about other kinds of conditions or

22 problems or impairments in function that might warrant an

23 extended session.

24      (Witness examines document.)  The third bullet gives, as

25 an indication for that, appropriately the involvement of family

1   members, which is sometimes a very important method and goal in

2   treatment; but I'm not sure what the rationale is for only

3   focusing on children, adolescents, or geriatric members.

4   Certain family involvement for that middle-of-the-lifespan

5   adults that are neither younger nor older, a family involvement

6   would certainly be an expected and important goal.

7        (Witness examines document.)  And those are my comments.

8   **Q.**   And that treatment of that section of the distinction

9   between regular and extended sessions, is that consistent with

10  the generally accepted standards of care, Dr. Fishman?

11  **A.**   I don't think -- no, it is not consistent.  The notion

12  that the granularity of a 15-minute addition to the duration of

13  psychotherapy at any particular given session or block of

14  sessions I think is not a generally accepted distinction, and

15  that the requirement for something as severe as an acute crisis

16  to require such a small increment of additional dose of

17  treatment I think is overly restrictive.

18  **Q.**   Can you turn now, please, to 0032, which is the intensive

19  outpatient program for substance abuse.

20  **A.**   (Witness examines document.)  The preamble directs the

21  user to the focus of addressing the factors that precipitated

22  admission, the changes in the member's signs and symptoms,

23  et cetera, which is too narrow.

24       (Witness examines document.)  And then harkening back to

25  the common criteria of the flows that we discussed remaining in

1   large part as in other years.  So those are my comments.

2   **Q.**   Okay.  Residential treatment for SUD, 8-0035 at the bottom

3   of the page.

4   **A.**   Uh-huh.

5        (Witness examines document.)  The preamble narrows the

6   focus of the purpose of the level of care on addressing the

7   factors that precipitated admission as we've discussed in the

8   other levels of care in this year.

9        (Witness examines document.)  The requirement for imminent

10  risk of relapse, although modified by "or current," which is

11  good, is still concerning for the lower levels of residential

12  care, the 3.1, where there would be the expectation of a more

13  enduring duration of treatment even without the risk of

14  near-term relapse for the consolidation of recovery skills.

15  So, again, we're seeing a focus -- a narrow focus on the higher

16  levels of residential care.

17       And the example below is, again, immediate or imminent

18  danger of relapse.  It's essentially the same language that

19  we've looked at before.

20       (Witness examines document.)  The first bullet on the top

21  of 0036, here we've retained -- when we're talking about the

22  factors leading to admission, we've retained the "due to acute

23  changes in the member's signs and symptoms."  So both that were

24  narrowly focusing on the factors leading to admission and we

25  see the direct link in the implication between those factors

1   leading to admission and the old language of "due to acute

2   changes."  So I see those concepts as inextricably linked.

3        (Witness examines document.)  In the continued service

4   criteria, again, language around the exclusion of custodial

5   care, and the second subbullet in defining the overly broad

6   definition of "custodial care" again includes the language that

7   "maintaining a level of function even if the services are

8   considered to be skilled services," those will be excluded as

9   meeting that overly broad definition of "custodial care."

10       (Witness examines document.)  And those are my comments.

11  **Q.**   So is that all of your comments for the 2017 Levels of

12  Care Guidelines, Dr. Fishman?

13  **A.**   Yes.

14  **Q.**   You mentioned that there were some changes between the

15  2016 and 2017 guidelines.  Any of those changes change your

16  opinion that the guidelines were not in compliance with the

17  generally accepted standards of care in 2017?

18  **A.**   No.  That opinion remains the same.  As we said at the

19  outset, some years there are changes all the way from 2011 to

20  2017, some improvements, some worsening; but in totality, all

21  of these years, in many of the same ways that I won't go

22  through it again, convince me that each of the years, including

23  2017, are not consistent with the generally accepted standards

24  of care, that is correct.

25  **Q.**   So is it fair to say, Dr. Fishman, that it's your

FISHMAN - REDIRECT / GOELMAN

1   professional opinion that even now the Levels of Care

2   Guidelines used by UBH are in violation of the generally

3   accepted standards of care for the reasons you stated?

4   **A.**   I agree.

5   **Q.**   Yesterday you commented at some length on Trial

6   Exhibit 148, which was the 2015 version of the CDG for

7   custodial care and inpatient services.  Do you recall that?

8   **A.**   I do.

9   **Q.**   I want to show you the versions of the same CDG from other

10  years beginning with 2000 -- one that was enforced in 2011 and

11  approved in August 2010, which is Trial Exhibit 10.

12  **A.**   (Witness examines document.)

13  **Q.**   And if you turn to 10-0003 and see the section entitled

14  "Key Points," is that the same -- is there also a section

15  entitled "Key Points" in Trial Exhibit 148 that you commented

16  on yesterday?

17  **A.**   Correct.

18  **Q.**   Okay.  And can you identify for the Court those clauses in

19  the key points --

20        **MR. RUTHERFORD:**  I'm sorry, Your Honor.  Can I get

21  that citation again?

22        **THE COURT:**  3.

23        **MR. RUTHERFORD:**  I'm sorry?

24        **THE COURT:**  3.

25        **MR. GOELMAN:**  It's internal page 2.  It's 10-0003.

1            MR. RUTHERFORD:  Thank you.

2            THE WITNESS:  I think it would be fair to say that

3    substantively the points that I would make about this are

4    materially -- are the same as I made about the 2015.  There are

5    some wordings that are different and the citations maybe are

6    not embedded in the language, but the core concept is, again,

7    the overly narrow definition of "active treatment" contrasted

8    with what is here, an overly broad definition for the

9    exclusions for custodial care.

10           And the concerns I have, just to summarize, are that there

11   is insufficient emphasis on improvement under active treatment,

12   also including prevention of deterioration and maintenance of

13   function; and as we've discussed before, the requirement that

14   active treatment involve the supervision, evaluation, or

15   delivery of services by physicians or other medical personnel,

16   when that should not pertain to the lower levels of residential

17   care that are not medically monitored; that is, the medically

18   managed, high-intensity and low-intensity residential levels,

19   3.5, 3.3, and 3.1.

20           There is also at the second bullet from the bottom a

21   further definition of "improvement" harkening back to the idea

22   of reduction or control of acute symptoms that necessitated

23   hospitalization or residential treatment.  So that's even a

24   more narrowing of the definition of "active treatment" by

25   limiting it to acute symptom reduction.

1  Q.  Anything else you want to draw our attention to in the key

2  points section?

3  A.  No.

4  Q.  What about the rest of this CDG?

5  A.  I think it's well summarized by the key points.

6  Q.  Okay.  Let's turn to Trial Exhibit 47, which is the 2011

7  version of the same CDG.

8  A.  (Witness examines document.)

9        THE COURT:  I thought that was 2011.

10        MR. GOELMAN:  Oh.  That was enforced in 2011 but

11  approved in 2010.  I think there was a change in the middle of

12  2011, and we can confirm that.

13        THE WITNESS:  Revised date December 2011.  So the end

14  of 2011.

15              (Pause in proceedings.)

16  BY MR. GOELMAN:

17  Q.  And same drill, Dr. Fishman.

18  A.  So on 0003, the substantive critique is really exactly the

19  same.  It's the overly broad definition of "custodial care,"

20  which is excluded, and the overly narrow definition of "active

21  care," and those issues have to do with the underemphasis on

22  prevention of deterioration and maintenance of function.

23        There is, as we've talked about in other language, for

24  example, an exclusion as being part of this overly broad

25  definition of "custodial care treatment" that focuses on

1    runaway behavior.  We've discussed why I believe that that's

2    not consistent with generally accepted standards of care for

3    youth treatment where that's such a high risk and dangerous

4    core component for some youngsters of their substance use

5    disorder and requiring of treatment, active treatment.

6         There's the requirement for the supervision and

7    involvement and delivery by medical personnel.

8         And there is the second bullet from the bottom, the

9    inclusion in the definition of "active treatment" that it is

10   indicated by the reduction or control of the acute symptoms

11   that necessitated hospitalization.  So it's both the

12   precipitating events leading to admission, which we've seen in

13   some years in the LOCs, but also the reduction or control of

14   acute symptoms that we've seen in some years in the LOCs here,

15   both together and synergizing for an overly narrow definition

16   of what is active treatment.

17   Q.   Okay.  Anything else on Exhibit 47, Doctor?

18   A.   No.  Those are my comments.

19   Q.   Okay.  Can you turn to Exhibit 84, I believe the next

20   iteration of the CDG from 2013?

21   A.   (Witness examines document.)

22         MR. GOELMAN:  Call up the key points section, please.

23         THE WITNESS:  Exhibit 108?

24   BY MR. GOELMAN:

25   Q.   I think it's 84.  Do you not have 84?

1  **A.**    Yeah, yeah, I do.  I'm just in the wrong place.  I'm just

2  trying to get my bearings.

3      (Witness examines document.)  It is my belief that these

4  are verbatim -- well, not verbatim but substantially the same,

5  and I don't know that you want me to go through it again.  My

6  comments are exactly the same.

7  **Q.**    Okay.  Can you turn to 108 now, which is the 2014 version

8  of the same CDG?

9  **A.**    (Witness examines document.)  So on 0003, the key points,

10  the overly broad definition of "custodial care."

11      In the second big bullet, the first subbullet is the

12  overly narrow focus on presenting signs and symptoms with the

13  achievement of a baseline level of function without concern for

14  what ought to be a component of active treatment and the

15  definition of "improvement" that active treatment includes

16  maintaining a level of functioning.

17      And in the third subbullet, that the intensity of the

18  treatment is no longer required but could be safely provided in

19  a less-intensive setting where "safely" is not enough.  It

20  should be "safely and effectively."

21      The third bullet, the exclusion for runaways we discussed.

22  No need to go over it again.

23      The requirement for supervision, evaluation, and

24  involvement of medical personnel, same comments.

25      And improvement in the third bullet from the bottom as

1    defined by reduction or control of acute symptoms that

2    necessitated hospitalization or residential treatment as we

3    discussed.

4    **Q.**    Okay.  Moving to Exhibit 195, the same CDG.

5    **A.**    195?

6    **Q.**    195 from 2016.

7    **A.**    (Witness examines document.)  Comments essentially

8    similar, but on the second big bullet, second subbullet, the

9    overly broad definition of "custodial care," which is excluded,

10   is explicitly noted to exclude services for maintaining a level

11   of function as opposed to improving function.  So this, again,

12   as we discussed before, highlights the noninclusion of

13   maintaining a level of function in the UBH definition of

14   "improvement," but we've seen this again and again.

15       The requirement for trained medical personnel for their

16   delivery, supervision, and evaluation by a physician -- that's

17   in the third bullet, first subbullet in the middle of the

18   page -- where that would not be appropriate for the lower

19   levels of residential care that are not medically monitored.

20       And the definition of "improvement" by the overly narrow

21   metric of reduction or control of acute symptoms that

22   necessitated hospitalization or residential treatment.

23       Those are my comments.

24   **Q.**    Okay.  Moving to Exhibit 221.

25   **A.**    (Witness examines document.)

 1   **Q.**   And effective date March 27, 2017.  Is it your

 2   understanding, Dr. Fishman, that this is the CDG that is

 3   currently in force?

 4   **A.**   It is.

 5   **Q.**   Or a version of the CDG.

 6        And it has a somewhat different format as the Level of

 7   Care Guideline for 2017 also had a different format.  Can you

 8   talk about any differences in substance, to the extent that

 9   there are?

10   **A.**   The format is different and it doesn't pull out in the

11   gray highlight box key points in the same way, but the language

12   and the content is not substantially different.

13        So looking under "Coverage Rationale" under 0003, you see

14   exactly the same language in the second bullet; exclusion in

15   the overly broad definition of "custodial care" for services

16   maintaining a level of function and defined as diametrically

17   opposed to the definition of "improvement," which ought to

18   include but not be opposed to maintaining a level of function.

19        In that third subbullet and down below under the

20   definition of "active treatment," the requirement of

21   involvement, supervision, evaluation, delivery by medical

22   personnel as pertaining -- what should only pertain to the

23   highest levels of residential care, those that are medically

24   monitored, but should not pertain to the lower levels of

25   residential care, those that are clinically managed.

FISHMAN - REDIRECT / GOELMAN

1    And the definition as we've seen repeatedly of

2    "improvement" being measured by the reduction or control of

3    acute symptoms that necessitated hospitalization or residential

4    treatment.  So I would say that this is substantially the same

5    and, in my view, not consistent with generally accepted

6    standards of care for all the same reasons.

7    **Q.**   Dr. Fishman, to the extent that there is verbatim

8    identical or substantially identical language that you have not

9    touched on, would your opinions about the compliance of those

10   clauses with the generally accepted standards of care be the

11   same as the ones that you have indicated with the same

12   language?

13   **A.**   It would be.

14        **MR. GOELMAN:**  May I have one moment, Your Honor?

15        **THE COURT:**  Yes.

16             (Pause in proceedings.)

17   **BY MR. GOELMAN:**

18   **Q.**   You have talked a great deal the last two days about

19   provisions in the UBH Level of Care Guidelines that in your

20   view are inconsistent with the generally accepted standards of

21   care and why.  Were all of these deviations from the generally

22   accepted standards in one direction?

23        **MR. RUTHERFORD:**  Objection, Your Honor.  Vague.

24        **THE WITNESS:**  Well, I would say that I would --

25        **THE COURT:**  You have to wait until I rule.

 1      Overruled.  Go ahead.

 2          **THE WITNESS:**  I would say that to summarize the way

 3   that I've seen them deviating from the generally accepted

 4   standards of care is that the UBH guidelines are consistently

 5   overly restrictive.

 6          So as I first summarized, each of the things that we've

 7   discussed act in a synergistic and mutually reinforcing way to

 8   act as barriers to access to care.  So, no, I don't see any of

 9   them as liberalizing access to care.  I see them as repeatedly

10   and consistently restricting access to care such that, as I've

11   talked about, different pathways for different types of

12   patients, not enough of those are provided to meet the needs of

13   many patients.  So I see them, again to summarize, as overly

14   restrictive, yes.

15          **THE COURT:**  Well, did you look at that question?  Did

16   you look at the guidelines with an eye towards seeing which of

17   them were more liberal than the generally accepted standard of

18   care, or are you just saying the ones you've now identified are

19   more restrictive and more restrictive, of course?

20          So my question is:  Did you actually look through all of

21   the provisions of the guidelines that were at issue here and

22   try to see whether there were any provisions that were more

23   liberal than the standard of care in terms of allowing for

24   treatment?

25          **THE WITNESS:**  Yes.  As I was looking at them, it was

**FISHMAN - RECROSS / RUTHERFORD**

1    my initial intent to try to see do they fit the overall

2    approach that I'm used to, that is part of the generally

3    accepted standard of care, that would provide the kinds of

4    appropriate pathways for patients, and I think some of them

5    were okay.  I thought some of them met the generally accepted

6    standard of care and did provide a particular pathway for a

7    particular subtype of patient; and I thought that others

8    provided a block, if you would, for a particular hypothetical

9    subtype of patient.

10        I did look for where there would be places where patients

11   would perhaps get into standard -- into levels of care that

12   they shouldn't because it was more permissive, because that's

13   also a potential problem with a particular set of guidelines,

14   and I didn't see that.

15        **THE COURT:**  Okay.  Thank you.

16        **MR. GOELMAN:**  Nothing further.  Thank you,

17   Dr. Fishman.

18        **THE COURT:**  Cross -- recross.

19        **MR. RUTHERFORD:**  Yes, Your Honor.  May I just ask a

20   question at the table here?

21        **THE COURT:**  Oh, yes.  Yes.  Yes.

22                    (Pause in proceedings.)

23                  **<u>RECROSS-EXAMINATION</u>**

24   **BY MR. RUTHERFORD:**

25   **Q.**   Good morning.

1    **A.**    Good morning.

2    **Q.**    Now, in redirect testimony you indicated that -- or you

3    testified as to your observation that the "why now" phrase had

4    been removed from the 2017 guidelines?

5    **A.**    Yes.

6    **Q.**    And that except for the residential treatment substance

7    use disorder section at Exhibit 8-0036, that "acuity" as a

8    modifier to "changes" had been removed from the 2017

9    guidelines?

10   **A.**    Could you slow down one second and send me to the

11   reference you just made?

12   **Q.**    Yes.  Maybe I'll ask the question the flip side.  So if I

13   could direct your attention to Trial Exhibit 8 --

14   **A.**    Okay.

15   **Q.**    -- page 36, so 0036.

16   **A.**    (Witness examines document.)

17   **Q.**    Let me know when you have that in front of you.

18   **A.**    I do.

19   **Q.**    Okay.  You testified on redirect examination that the

20   "acute" -- the word "acute" as modifying "changes" remained in

21   the 2017 Level of Care Guidelines; correct?

22   **A.**    Correct.

23   **Q.**    But that it had been removed in the common criteria?

24   **A.**    Correct.

25   **Q.**    Now, directing your attention to Exhibit 1, which is the

FISHMAN - RECROSS / RUTHERFORD

1    2011 Level of Care Guidelines.

2    **A.**   Okay.

3    **Q.**   Let me know when you have that in front of you.

4    **A.**   (Witness examines document.)  I have one, and I'll go to

5    the common.  I'm on page 0005.

6    **Q.**   I'm going to actually ask you to -- yes, 0005, which is

7    internal page 4.

8    **A.**   Yes.

9    **Q.**   So for the year 2011, the phrase "why now" does not appear

10   in the Level of Care Guidelines; correct?

11   **A.**   Correct.

12   **Q.**   And within the common criteria, the various factors are

13   not connected by the word "and"; correct?

14   **A.**   (Witness examines document.)  I'm not sure I understand

15   the distinction.  I think all of them pertain.

16          **THE COURT:**   Is that what you think, that all of them

17   have to be met?  I mean, don't you think all of them have to be

18   met?  For example, can you skip one, that the member is

19   eligible for benefits?

20          **MR. RUTHERFORD:**   Well, that's a question for the

21   witness.

22   **Q.**   Do you believe that even though --

23          **THE COURT:**   Well, I'm just asking your position.  Is

24   it your position that these criteria are just a list of things

25   to be considered and not that all of them have to be met?  For

1  example, eligibility for benefits; well, it might be one thing

2  to consider and in another case not.

3      I mean, I just don't understand how you can go through

4  this list and treat it any differently the ones that are

5  connected with "and."

6      Is it your position that these are not all required?  Is

7  that your position?  Is that UBH's position?

8          **MR. RUTHERFORD:**  No, Your Honor.  My -- he had

9  testified earlier as to the significance of the word "and."

10          **THE COURT:**  I'm not actually asking what you're asking

11  him.

12          **MR. RUTHERFORD:**  No.  You can have eligibility --

13          **THE COURT:**  Do you need to have all these 1 through

14  10, or whatever it is -- do you agree that you have to have all

15  of those things just like in the previous iterations where the

16  word "and" is?

17          **MR. RUTHERFORD:**  Yes.

18          **THE COURT:**  Okay.  Then what's the significance of

19  this question?

20          **MR. RUTHERFORD:**  Because the significance of the

21  questioning, Your Honor, is that he placed particular

22  importance on the presence of the word "and" when testifying

23  about the 2014 guidelines and on --

24          **THE COURT:**  Yeah.

25          **MR. RUTHERFORD:**  -- and I wanted clarity on what was

1   the significance or absence of the word.

2          **THE COURT:**  Okay.  Move on.  Next question.  Since

3   you've just admitted that they work the same way, I'm not

4   letting you answer that question.

5   **BY MR. RUTHERFORD:**

6   **Q.**   And directing your attention to Exhibit 2, which is the

7   2012 Level of Care Guidelines.

8   **A.**   (Witness examines document.)  Yes.

9   **Q.**   In 2012, the Level of Care Guidelines also did not contain

10  the phrase "why now"; correct?

11  **A.**   Correct.

12  **Q.**   Nor did "acute" in 2012 modify the word "changes" with

13  respect to the common criteria?

14  **A.**   (Witness examines document.)  No, that's right.  The

15  phrasing and the emphasis was on "presenting symptoms" and did

16  not use the word "acute"; and I'm concerned that the focus on

17  "presenting symptoms" is also overly narrow, but the lack of

18  the word "acute" I think is a good thing.

19  **Q.**   And then directing your attention to Exhibit 3, which is

20  the 2013 Level of Care Guidelines, and specifically to

21  page 0007.

22  **A.**   (Witness examines document.)

23  **Q.**   And this is the first -- directing your attention to

24  the -- to paragraph 3a.

25  **A.**   Yes.

FISHMAN - RECROSS / RUTHERFORD

1   Q.   This is the first time that the phrase "why now" appears

2   in the Level of Care Guidelines; correct?

3   A.   Correct.  And because it's defined -- in part, because

4   it's defined as a shorthand for presenting problems and events

5   that precipitated the admission, that's why I've said that I

6   think that the essence is very similar even when the words "why

7   now" don't appear, correct.

8   Q.   And the phrase "why now" does not appear anywhere else in

9   the 2013 Level of Care Guidelines, does it?

10  A.   I don't remember whether it never appears; but as I look

11  quickly, I certainly see it in 3a, but I don't see it on

12  page 008 or 009.

13       I do see "reduction or control of acute symptoms" in

14  number 7 of 008.

15  Q.   The phrase "why now" only appears in that one place in

16  2013, paragraph 3.a.;correct?

17  A.   Give me a second.

18       That is the only time I see the phrase, but not the only

19  time I see its meaning.

20  Q.   I'm sorry, Dr. Fishman?

21  A.   That's the only time I see the phrase, I agree.  It is not

22  the only time I see its broad meaning.

23  Q.   But it's the only time the phrase appears; correct?

24  A.   Correct.

25  Q.   Correct, that's the only mention of the phrase in 2013,

1    just to make the record clear?

2    **A.**    It's the only mention I see, yes.

3    **Q.**    Okay.  Now, directing your attention to Exhibit 148, this

4    is the Custodial Care Guideline that you were just asked

5    questions about.

6    **A.**    Yes.

7    **Q.**    Yesterday I asked you a question directing your attention

8    to Trial Exhibit 148, page 0002.  I directed your attention to

9    the last half of the first full paragraph, with the sentence

10   that begins "When deciding coverage, the enrollee," and then

11   the succeeding sentence is to the end of the paragraph.

12       Do you remember my questions, just very generally my point

13   with respect to that language?

14   **A.**    Remind me.

15   **Q.**    That the -- actually, beginning with the phrase, "The

16   terms," with respect to Exhibit 148, which is the revised

17   March 2015 Custodial Care Coverage Determination Guideline, the

18   Instructions for Use read as follows:

19       "The terms of an enrollee's document, e.g. Certificates of

20   Coverage, COCs, Schedules of Benefits, SOBs, or Summary Plan

21   Descriptions, SPDs, may differ greatly from the standard

22   benefit plans upon which this guideline is based.

23       "In the event that the requested service or procedure is

24   limited or excluded from the benefit, is defined differently or

25   there is otherwise a conflict between this document and the

FISHMAN - RECROSS / RUTHERFORD

1    COC/SPD, the enrollee's benefit document supercedes these

2    guidelines."

3         Do you see that language?

4    A.   I do.

5    Q.   Now, directing your attention to Exhibit 10, at page 0002,

6    to the Instructions for Use?

7    A.   Yes.

8    Q.   To the second full paragraph, it contains the same

9    language, does it not?  Beginning with the second sentence.

10   A.   Yes.

11   Q.   Okay.  And then directing your attention to Exhibit 47,

12   page 0002, second paragraph, beginning with the second

13   sentence.  And that contains the same language, does it not?

14   A.   Yes.

15   Q.   Okay.  Directing your attention to Exhibit 84-0002, under

16   the Instructions for Use.  First paragraph, beginning with the

17   third sentence.  And that contains the same language, does it

18   not?

19   A.   Yes.

20   Q.   And then, within that document, directing your attention

21   to the key points on the next page, which is 84-0003.

22   A.   Yes.

23   Q.   The second bullet point.

24   A.   Yes.

25   Q.   To the phrase, "Custodial care in this context is care

1   comprised by the following," and then, in parentheses "COC,

2   2001."

3        Do you see that?

4   **A.**   I do.

5             **THE COURT:**   I think you meant 2011.

6             **MR. RUTHERFORD:**   I'm sorry, Your Honor.

7             **THE COURT:**   No problem.

8   **BY MR. RUTHERFORD:**

9   **Q.**   2011?

10  **A.**   Yes.

11  **Q.**   Okay.  And COC was defined as Certificate of Coverage;

12  correct?

13  **A.**   Yes.

14  **Q.**   And directing your attention to Exhibit 108, at page 0002,

15  beginning with the sentence, "The terms of an enrollee's

16  document."  I think it's the third sentence there.

17       Do you see that?

18  **A.**   I do.

19  **Q.**   And that is the same language as the prior Coverage

20  Determination Guidelines; correct?

21  **A.**   Yes.

22  **Q.**   And then directing your attention to Key Points?

23  **A.**   Yes.

24  **Q.**   Where it indicates that "Custodial care," second bullet

25  point, "in this context is characterized by the following," and

1    then, within parentheses "COC, 2001, 2007, 2009, 2011."

2         Do you see that?

3    **A.**   I do.

4    **Q.**   And then directing your attention to Exhibit 195.

5    **A.**   Yes.

6    **Q.**   At 0002.

7    **A.**   Yes.

8    **Q.**   First full paragraph.

9    **A.**   Instructions for Use?

10   **Q.**   Correct.

11        The third sentence then contains the same information as

12   the prior Coverage Determination Guidelines; correct?

13   **A.**   Correct.

14   **Q.**   Okay.  And then Exhibit 221?  Okay, the first paragraph.

15   Okay.

16        The language here is changed somewhat; correct?

17   **A.**   Correct.

18   **Q.**   Okay.  It reads, does it not:

19        "This Coverage Determination Guideline provides assistance

20   in interpreting and administering behavioral health benefit

21   plans that are managed by Optum and U.S. Behavioral Health

22   Plan, California, doing business as OptumHealth Behavioral

23   Solutions of California, or Optum CA.

24        "When deciding coverage, the member-specific benefit plan

25   document must be referenced.  The terms of the member-specific

FISHMAN - RECROSS / RUTHERFORD

1    benefit plan document, e.g. Certificate of Coverage, COC,

2    Schedule of Benefits, SOB, and/or Summary Plan Description,

3    SPD, may differ greatly from the standard benefit plan upon

4    which this coverage determination guideline is based.  In the

5    event of a conflict, the member-specific benefit plan document

6    supercedes this coverage determination guideline."

7        Do you see that?

8    A.   I do.

9    Q.   And then directing your attention to Trial Exhibit

10   221-0003, under the heading Coverage Rationale, second full

11   paragraph, first sentence reads, does it not:

12       "Custodial care in a psychiatric inpatient or residential

13   setting is any of the following:" and, within parentheses,

14   "Certificate of Coverage, 2011."

15       That's what it states; correct?

16   A.   Correct.

17       MR. RUTHERFORD:  One moment, Your Honor.

18       No further questions.

19       MR. GOELMAN:  No redirect.

20       Before we release Dr. Fishman, can I show him the remarked

21   Dr. Alam exhibit and have him identify it?

22       THE COURT:  I think we'll just remark it.

23       MR. GOELMAN:  Thank you.

24       THE COURT:  Thanks.

25       Thank you, sir.

**PROCEEDINGS**

```
1              THE WITNESS:  Thank you.

2         (Witness steps down.)

3              THE COURT:  We're going to take a 10-minute break

4    before the next witness.

5              THE CLERK:  The Court stands in recess.

6         (Recess taken from 10:09 a.m. to 10:34 a.m.)

7              THE CLERK:  We're back on the record in case number

8    C14-2346, which is Alexander and Wit versus UBH.  And the

9    Alexander matter has been consolidated into the Wit matter.

10             THE COURT:  Okay.  So there's an issue with sealing

11   for this next witness?

12             MS. REYNOLDS:  That's right, Your Honor.

13        Plaintiffs are going to call Jerry Niewenhous to the

14   stand, and we are likely to use one document that was subject

15   to the joint motion to seal, which the Court granted, I

16   believe.

17             THE COURT:  Yeah.  What's that?

18             MS. REYNOLDS:  It's an email that contains legal

19   advice from UBH's in-house counsel.

20             THE COURT:  So this is in the joint --

21             MS. REYNOLDS:  Yes.

22             THE COURT:  Which -- what number is that?

23             MS. REYNOLDS:  Exhibit 372.

24             THE COURT:  Okay.  That's different than the ones that

25   have been presented by you; right?
```

**PROCEEDINGS**

1     **MR. BUALAT:**  Yes, Your Honor.  Those are ones that

2     were part of the larger list.  But we've learned, since

3     preparing those declarations which were for documents not

4     subject to the motion to seal, that plaintiffs are not going to

5     use those exhibits.  So it's, I think, unnecessary to rule on

6     those.

7            **THE COURT:**  Which ones is it not necessary to rule on?

8            **MR. BUALAT:**  The ones that were for 351, 458, and 525,

9     which were those declarations that I handed to Ms. Hom on the

10    break.

11           **THE COURT:**  Okay.  Well, okay.  How long is the

12    testimony about that document going to take?

13           **MS. REYNOLDS:**  I think it will be very brief, Your

14    Honor.

15           **THE COURT:**  Like what does "very brief" mean?  Does it

16    mean --

17           **MS. REYNOLDS:**  Six questions or something.  It's a

18    one- or two-page email.

19           **THE COURT:**  Okay.  So let's do it this way.  Let's go

20    through all of Mr. -- can we do it at the end?

21           **MS. REYNOLDS:**  It is at the end, yes.

22           **THE COURT:**  Good.  So what we'll do is, at the end of

23    his testimony, you can say, We're now going to address the

24    sealed exhibit.  And subject to objections from the audience,

25    we'll seal the courtroom, take your six questions and the

1  cross-examination on those six questions, if you're going to do

2  it, and then reopen the courtroom.  And, hopefully, that will

3  be done in a matter of minutes.  Okay.

4          **MR. BUALAT:**  Thank you, Your Honor.

5          **MS. REYNOLDS:**  Thank you, Your Honor.

6          **THE COURT:**  Yeah.  Okay.

7          **MS. REYNOLDS:**  Your Honor, plaintiffs call Gerard

8  Niewenhous.

9          **THE CLERK:**  Mr. Niewenhous, before you have a seat,

10  could you please raise your right hand.

11          **GERARD NIEWENHOUS, PLAINTIFFS' WITNESS, SWORN**

12          **THE CLERK:**  Thank you.  Have a seat.

13      Make sure you speak clearly into our microphone for our

14  court reporter.  And if you need water, it's there for you.

15      Could you please state your full name for the record and

16  spell your last name.

17          **THE WITNESS:**  My name is Gerard Niewenhous, spelled

18  N-i-e-w-e-n-h-o-u-s.

19          **THE CLERK:**  Thank you.

20                  **DIRECT EXAMINATION**

21  BY MS. REYNOLDS:

22  **Q.**  Good morning, Mr. Niewenhous.  Do you sometimes go by

23  Jerry?

24  **A.**  I do.

25  **Q.**  You're an employee of United Behavioral Health?

**NIEWENHOUS - DIRECT / REYNOLDS**

1   **A.**   I am.

2   **Q.**   Sometimes called UBH?

3   **A.**   That's correct.

4   **Q.**   You've been employed by UBH since 2003?

5   **A.**   Since 2003, that's correct.

6   **Q.**   Okay.  From 2003 to the middle of 2016, one of your

7   responsibilities was maintaining UBH's Level of Care

8   Guidelines?

9   **A.**   That is correct.

10  **Q.**   And those are sometimes called LOCGs?

11  **A.**   That is correct.

12  **Q.**   And from 2010 until the middle of 2015, you were also

13  responsible for drafting and maintaining UBH's Coverage

14  Determination Guidelines?

15  **A.**   That is correct.

16  **Q.**   And those are sometimes called CDGs?

17  **A.**   That is correct as well.

18  **Q.**   And in mid 2016, your LOCG and CDG responsibilities

19  transferred to Erik Rockswold?

20  **A.**   That is correct, yes.

21  **Q.**   The Level of Care Guidelines are for making clinical

22  decisions about coverage; right?

23  **A.**   The level of care guidelines are used in a variety of

24  fashions.  One is to make coverage determinations.  Another is

25  to inform conversations with providers about the proposed

1    treatment plan.  And a third use is to inform discussions about

2    discharge planning.

3    **Q.**    And the LOCGs are for determining whether services at a

4    proposed level of care are appropriate; right?

5    **A.**    That is correct, yes.

6    **Q.**    The CDGs are also used for making clinical coverage

7    determinations?

8    **A.**    As I testified a minute ago, that's one of the usages of

9    the guidelines.

10   **Q.**    And when UBH applies its CDGs, it also evaluates whether

11   or not the proposed level of care is appropriate?

12   **A.**    That is correct, yes.

13   **Q.**    The Level of Care Guidelines are supposed to reflect

14   generally accepted standards of care; right?

15   **A.**    That is correct.

16   **Q.**    And you understood that during the time that you were

17   responsible for maintaining the LOCGs?

18   **A.**    That is correct, yes.

19   **Q.**    The Coverage Determination Guidelines are also supposed to

20   reflect generally accepted standards of care?

21   **A.**    That is correct as well.

22   **Q.**    And you understood that during the time that you were

23   responsible for maintaining the CDGs?

24   **A.**    Yes.

25   **Q.**    Do you have a witness binder up there?  If not, let me --

NIEWENHOUS - DIRECT / REYNOLDS

1   **A.**   I've got four witness binders.

2   **Q.**   All right.  Could you grab the binder that has Exhibit 540

3   in it.

4           **THE COURT:**  Well, he should only have one binder for

5   him, which has his name on it.  See if any of those binders are

6   the right one.

7           **MS. REYNOLDS:**  My apologies for that.

8   **BY MS. REYNOLDS:**

9   **Q.**   There are two binders.  There is one that has Exhibits 264

10  and higher.  And then there's another binder up there with

11  guidelines, which we'll talk about in a little bit.

12          Could you please turn to Exhibit 540.

13  **A.**   I'm there.

14  **Q.**   This is a May 3rd, 2016, email from you to Lynn Wetherbee;

15  right?

16  **A.**   That is correct.

17  **Q.**   And as of May 2016, you reported to Ms. Wetherbee?

18  **A.**   That is correct too.

19          **MS. REYNOLDS:**  Your Honor, we move Exhibit 540 into

20  evidence.

21          **THE COURT:**  Any objection?

22          **MS. ROMANO:**  No objection.

23          **THE COURT:**  Okay.  It's admitted.

24      (Trial Exhibit 540 received in evidence.)

25  \\\

 1   **BY MS. REYNOLDS:**

 2   **Q.**   Mr. Niewenhous, I would like to draw your attention to the

 3   second bullet, under the heading "URV versus Improving SOCs."

 4        Do you see that?

 5   **A.**   The second sub-bullet?

 6   **Q.**   Yes.  The bullet that begins "Optum primarily."  Are you

 7   there?

 8   **A.**   I'm there, yes.

 9   **Q.**   Okay.  And here you state:

10        "Optum primarily focuses on UR (i.e., determining medical

11   necessity/benefit coverage)."

12        I read that correctly?

13   **A.**   You did.

14   **Q.**   And UR is utilization review?

15   **A.**   That is correct.

16   **Q.**   And in the next bullet, you state:

17        "One of the elements of medical necessity is that

18   treatment be consistent with the standard of care.  So, on a

19   case-by-case basis, staff shape care."

20        I read that correctly?

21   **A.**   That is correct, yes.

22   **Q.**   And then moving down to the bullet that starts "Over the

23   years."

24        Do you see that?

25   **A.**   I do.

1  **Q.**   You state:

2      "Over the years Optum has made several attempts to promote

3  certain concepts as part of the standard of care (e.g.,

4  recovery/resilience 'why now') through the UR process."

5      Did I read that correct?

6  **A.**   Yes, you did.

7  **Q.**   Let's talk now a little bit about UBH's utilization

8  management model.  Could you turn to Exhibit 512.

9      Are you there?

10  **A.**   I'm there.

11  **Q.**   This is a December 9th, 2015, PowerPoint presentation

12  entitled "Guideline Touchbase Call"; right?

13  **A.**   It is, yes.

14  **Q.**   You wrote this PowerPoint?

15  **A.**   I did.

16      **MS. REYNOLDS:**  Your Honor, we move this Exhibit 512

17  into evidence.

18      **THE COURT:**  Any objection?

19      **MS. ROMANO:**  No objection.

20      **THE COURT:**  It's admitted.

21      (Trial Exhibit 512 received in evidence.)

22  **BY MS. REYNOLDS:**

23  **Q.**   You prepared Exhibit 512 as background for Lynn Wetherbee

24  when she transitioned into her current role as your supervisor;

25  right, Mr. Niewenhous?

1  **A.**  You know, I'm not entirely sure if I prepared this for

2  Ms. Wetherbee.

3        **MS. REYNOLDS:**  Your Honor, plaintiffs would like to

4  read an excerpt from Mr. Niewenhous's deposition in this case.

5        **THE COURT:**  Page and line.

6        **MS. REYNOLDS:**  Page 71, line 15, through 72, line 3.

7        **THE COURT:**  Go ahead.

8        **MS. REYNOLDS:**  And just to make sure that the record

9  is clear, I'll be using the trial exhibit number instead of the

10  exhibit number used at the deposition.

11        **THE COURT:**  Uh-huh.

12        **MS. REYNOLDS:**  So this is from the deposition of

13  Gerard Niewenhous, taken on April 25th, 2017.

14        **"Q.**  I'll show you a document.

15        **"A.**  Okay.

16        **"Q.**  It's been marked as Trial Exhibit 512.  So this is a

17        PowerPoint that was produced to us with the Bates number

18        UBHWit 007-2617.  Do you recognize this PowerPoint?

19        **"A.**  I do.

20        **"Q.**  Did you write it?

21        **"A.**  I did.

22        **"Q.**  Okay.  And why did you prepare this PowerPoint?

23        **"A.**  This was a PowerPoint I presented or prepared for --

24        yes, this was a PowerPoint I prepared for Lynn Wetherbee

25        as a part of her transitioning into what is now her

 1          current role as my supervisor.

 2          "Q.  Why did you prepare this for her?

 3          "A.  As background."

 4   BY MS. REYNOLDS:

 5   Q.   Lets turn to page 7 of the exhibit.  And when I'm

 6   referring to the exhibit, I'm referring to the numbers that are

 7   in the middle, on the bottom of each page.

 8          Trial Exhibit 512-007, are you there?

 9   A.   I'm there.

10   Q.   Okay.  This is a slide entitled, "Evolution of the UM

11   Model"; right?

12   A.   That is correct, yes.

13   Q.   And UM means Utilization Management?

14   A.   That is correct.

15   Q.   And this slide describes the current model as, quote,

16   acute care UM, closed quote; right?

17   A.   It -- yes, it does.

18   Q.   And your definition of acute care utilization management

19   is what's stated in the bullets below "acute care UM"; right?

20   A.   Yes.  In the context.  What I was referring to here is in

21   the context of the commercial benefit plans which provide

22   benefits for what I call traditional services, inpatient.

23          Those -- those levels of care provide services that are

24   intended to bring about some sort of change in why somebody

25   entered into treatment, and that when that change has occurred

 1   to the point where somebody can be safely transitioned to

 2   another level of care, then they're transitioned to another

 3   level of covered service.

 4   Q.   The bullet right below "acute care UM" says, quote,

 5   Focused on managing traditional services (e.g., inpatient);

 6   right?

 7   A.   That is correct, yes.

 8   Q.   And, second, you state that acute care UM, quote, Responds

 9   to requests for services; does not anticipate the needs of the

10   population or the adequacy of the system of care.

11        I read that right?

12   A.   That's correct, yes.

13   Q.   And, third, you state that acute care UM, quote, Uses

14   authorizations and denials to shape care; does not

15   systematically seek to promote evidence-based care, closed

16   quote.

17        I read that correctly?

18   A.   That is correct, yes.

19   Q.   And, last, you state that acute care UM, quote, Is not

20   organized to manage the needs of members with concurrent

21   medical and behavioral health conditions, closed quote.

22        I read that right?

23   A.   That is correct.

24        Again, this goes back to what I testified to a minute ago,

25   that in our commercial business the services focus on the

1   reasons why somebody came into treatment at that point.  So

2   it's a case-by-case process as opposed to one that takes a look

3   at the system of care.

4   **Q.**   And just to make sure that we're clear, traditional

5   services include the inpatient level of care?

6   **A.**   That is one example.  Outpatient is another.  Residential.

7   And there's several others as well.

8   **Q.**   Intensive outpatient is a traditional level of care?

9   **A.**   Intensive outpatient and partial hospital, yes.

10  **Q.**   Mr. Niewenhous, you're generally familiar with the Mental

11  Health Parity and Addiction Equity Act of 2008?

12  **A.**   I am generally familiar with it.

13  **Q.**   And the passage of that act prompted some changes at UBH?

14  **A.**   That is correct.

15  **Q.**   And could you turn, please, to Exhibit 768.

16  **A.**   I'm there.

17  **Q.**   This is a May 20th, 2014, email from Chris Garcia to you

18  and others; is that correct?

19  **A.**   That is correct.

20          **MS. REYNOLDS:**  Your Honor, we move to admit Exhibit

21  768.

22          **THE COURT:**  Any objection?

23          **MS. ROMANO:**  No objection.

24          **THE COURT:**  It's admitted.

25          (Trial Exhibit 768 received in evidence.)

BY MS. REYNOLDS:

Q.   And as of 2014, Chris Garcia was UBH's senior director for specialty networks?

A.   That is correct, yes.

Q.   And attached to this email is a slide presentation; is that right?

A.   That is correct, yes.

Q.   And the slide presentation was for a meeting with Sandy Cohen?

A.   That's what I'm seeing in Ms. Garcia's email, yes.

Q.   And Sandy Cohen was the chief medical officer of United Healthcare at that time?

A.   I'm not sure what the specific title was.

Q.   Sandy Cohen was employed by United Healthcare?

A.   That is my understanding, yes.

Q.   Sticking with the cover page of the email -- sorry, let me just -- in the -- in the paragraph that begins "Attached is the updated draft," would you look at the second sentence.

     The email states:

     "The dec supports the conversation with him," referring to Sandy Cohen, "about the parity legislation history, anticipated versus realized impact, and mitigation strategies."

     Did I read that correctly?

A.   Yes, you did.

Q.   Let's look at page 768-0009.

**NIEWENHOUS - DIRECT / REYNOLDS**

1  **A.**   I'm there.

2  **Q.**   This is part of the slide presentation?

3  **A.**   Yes, it is.

4  **Q.**   It's a slide entitled "Quantitative Impacts and Mitigation

5  Strategies"?

6  **A.**   It is.

7  **Q.**   And there's a chart on that page; right?

8  **A.**   There is, yes.

9  **Q.**   And on the left side of the chart, the heading is

10  "Impacts"; is that right?

11  **A.**   That is correct.

12  **Q.**   And on the other side of the chart, the heading is

13  "Mitigation Strategies"?

14  **A.**   That is correct.

15  **Q.**   And looking at the first row, under "Impacts," the chart

16  states, "Removal of day and visit limits on IP, intermediate,

17  and OP."

18       Did I read that right?

19  **A.**   Yes, you did.

20  **Q.**   And under Mitigation Strategies, it says:

21       "Continued use of concurrent review to ensure appropriate

22  utilization."

23       I read that correctly?

24  **A.**   That is correct.

25  **Q.**   Let's turn to Exhibit 735.

1          Are you there?

2    **A.**    I am there, yes.

3    **Q.**    This is a January 18th, 2012, email from you to Irvin

4    Brock; right?

5    **A.**    That is correct, yes.

6          **MS. REYNOLDS:**  Your Honor, we move Exhibit 735 into

7    evidence.

8          **MS. ROMANO:**  No objection.

9          **THE COURT:**  It's admitted.

10        (Trial Exhibit 735 received in evidence.)

11         **THE COURT:**  Go ahead.

12   **BY MS. REYNOLDS:**

13   **Q.**    Irvin Brock also goes by Pete Brock?

14   **A.**    That is correct, yes.

15   **Q.**    And in 2012, he was the head of UBH's affordability

16   department?

17   **A.**    He held two roles when I knew him, an earlier role as the

18   medical director over government programs and later over

19   affordability.  And I believe in January 2012, he's over

20   affordability, yes.

21   **Q.**    And he was also a member of the Behavioral Policy and

22   Analytics Committee?

23   **A.**    Yes.

24   **Q.**    And that's also known as BPAC?

25   **A.**    That is correct.

NIEWENHOUS - DIRECT / REYNOLDS

1   Q.   Please turn to trial exhibit page number 735-0025.

2        This is one of the documents attached to your email;

3   right?

4   A.   I'm back on 001.  I see an attachment, "Briefing on

5   custodial care."  I'm not sure I see where I've attached the

6   management behavioral benefits policy to the email.

7   Q.   All right.  Well, let me ask if you recognize the document

8   on page 735-25.

9   A.   I do recognize it, yes.

10  Q.   This is UBH's December 2010 Care Advocacy Policies and

11  Procedures on Management of Behavioral Health Benefits?

12  A.   That is correct, yes.

13  Q.   Could you turn to 735-26, under Procedures, paragraph 2.

14  It says:

15        "UBH bases coverage determinations on the Level of

16        Care (LOC) guidelines, the Coverage Determination

17        Guidelines (CDGs), and/or the psychological and

18        neurological testing guidelines.  It is UBH's policy to

19        offer a behavioral health evaluation and treatment when it

20        is determined to be medically necessary and when it is

21        covered by the member's benefit plan."

22        Did I read that correctly?

23  A.   Yes, you did.

24  Q.   Okay.  UBH has adopted a hierarchy of evidence to use in

25  developing its clinical guidelines; right?

1    **A.**   That is -- yes, we've adopted or created a hierarchy of

2    evidence.  And that is one of the things that is used to create

3    the guidelines.

4    **Q.**   And the purpose of the hierarchy is to help UBH gauge the

5    strength of the evidence; right?

6    **A.**   That is correct.

7    **Q.**   Let's look at Exhibit 281.

8         Are you there?

9    **A.**   I am.

10   **Q.**   This is a document entitled "Developing a Hierarchy of

11   Clinical Evidence for Coverage Determination Guidelines."  And

12   it's dated November 2010.

13        Do you see that?

14   **A.**   I do.

15            **MS. REYNOLDS:**  Your Honor, we move Exhibit 281 into

16   evidence.

17            **MS. ROMANO:**  No objection.

18            **THE COURT:**  It's admitted.

19        (Trial Exhibit 281 received in evidence.)

20   **BY MS. REYNOLDS:**

21   **Q.**   This document is adapted from United Healthcare's

22   hierarchy of evidence?

23   **A.**   It is, yes.

24   **Q.**   And you're the one that adopted UBH's hierarchy of

25   evidence from the United Healthcare policy?

1   A.    In conjunction with -- in conjunction and with the

2   approval of the Behavioral Policy and Analytics Committee, yes.

3   Q.    And UBH incorporated the hierarchy of evidence into its

4   current policy?

5   A.    Into a care advocacy policy, yes.

6   Q.    Okay.  If we turn to -- well, actually, before we leave,

7   on 281-0002, do you see the heading "Hierarchy of Clinical

8   Evidence"?

9   A.    I'm sorry, where are we?

10  Q.    It's page 2 of Exhibit 281.

11  A.    Okay.  Yes, I'm there.

12  Q.    Do you see the heading "Hierarchy of Clinical Evidence"?

13  A.    For coverage determination guidelines, yes.

14  Q.    And it says:

15        "The hierarchy of clinical evidence for coverage

16  determination guidelines is graded as follows in descending

17  order."

18        And the first bullet says:

19        "Centers for Medicare and Medicaid Services (CMS) National

20  Coverage Decisions (NCD)."

21        And then the next bullet says:

22        "National guidelines and consensus statements (e.g.,

23  United States Preventive Services Task Force, National

24  Institutes of Health Clinical Statements, Agency for Healthcare

25  Research and Quality Clinical Statements."

NIEUWENHOUS - DIRECT / REYNOLDS

1        And the next bullet says:

2        "Evidence-based nationally-recognized clinical guidelines

3  (e.g., American Psychiatric Association practice guidelines,

4  American Academy of Child and Adolescent Psychiatry practice

5  parameters."

6        And then there are a few more bullets.

7        Did I read that correctly?

8  A.    Yes, you did.

9  Q.    Let's turn to Exhibit 264.

10  A.    I'm there.

11  Q.    This is UBH's 2014 Care Advocacy Policy on Clinical

12  Guidelines Development and Approval, Dissemination and Use;

13  correct?

14  A.    That is correct, yes.

15        MS. REYNOLDS:  Your Honor, we move Exhibit 264 into

16  evidence.

17        MS. ROMANO:  No objection.

18        THE COURT:  It's admitted.

19        (Trial Exhibit 264 received in evidence.)

20  BY MS. REYNOLDS:

21  Q.    On page 3 of Exhibit 264, do you see Section 1.4?

22  A.    I do, yes.

23  Q.    And Section 1.4 is the hierarchy of evidence for Optum's

24  standard clinical guidelines; right?

25  A.    That is correct, yes.

**NIEWENHOUS - DIRECT / REYNOLDS**

1  **Q.**   And that includes both the LOCGs and the CDGs; right?

2  **A.**   That is correct, yes.

3  **Q.**   And the first subparagraph under Section 1.4 refers to

4  "Governmental sources such as the Centers for Medicare and

5  Medicaid Services, (CMS), National Coverage Decisions (NCDs)."

6      And the second paragraph says "National Guidelines and

7  Consensus Statements."

8      Did I read those correctly?

9  **A.**   That's correct.

10  **Q.**   And then there are additional bullets below that?

11  **A.**   That is correct.

12  **Q.**   Or paragraphs, I should say.

13      And the first one on the list is the strongest evidence;

14  right?

15  **A.**   From the hierarchy of evidence, yes.

16  **Q.**   Let's turn to Exhibit 265.

17      Are you there?

18  **A.**   I'm there.

19  **Q.**   This is UBH's 2515 Care Advocacy Policy on clinical

20  guidelines, development and approval, dissemination and use;

21  right?

22  **A.**   From August 2015, yes.

23      **MS. REYNOLDS:**  Your Honor, we move to admit Exhibit

24  265 into evidence.

25      **THE COURT:**  It's admitted.

1          (Trial Exhibit 265 received in evidence.)

2     BY MS. REYNOLDS:

3     Q.    And on page 3 of Exhibit 265, do you see paragraph 1.4?

4     A.    I do.

5     Q.    And I believe it continues on to the next page.  That's

6     the hierarchy of evidence for Optum's standard clinical

7     guidelines?

8     A.    That is correct, yes.

9     Q.    And, again, it starts with "Governmental Sources"; right?

10    A.    That is correct, yes.

11    Q.    And then "National Guidelines" and "Consensus Statements"?

12    A.    That is correct, yes.

13    Q.    Let's look at Exhibit 522.

14          Are you there?

15    A.    I am there, yes.

16    Q.    This is a February 19th, 2016, email from you to Lynn

17    Wetherbee; right?

18    A.    That is correct, yes.

19          MS. REYNOLDS:  We move Exhibit 522 into evidence.

20          MS. ROMANO:  No objection.

21          THE COURT:  It's admitted.

22          (Trial Exhibit 522 received in evidence.)

23    BY MS. REYNOLDS:

24    Q.    Mr. Niewenhous, I would like to draw your attention,

25    first, to the last bullet on page 2 of Exhibit 522.

1          Do you see it?

2    **A.**    I do.

3    **Q.**    And here you wrote "Reliance on acute care UR."

4          And UR there means utilization review?

5    **A.**    That is correct.

6    **Q.**    And then you wrote, "Our guidelines are used to authorize

7    services.  Presumption is that services are acute."

8          I read that correctly?

9    **A.**    That's correct.

10         And it goes back to my earlier testimony about the

11   commercial model and that services that are available under the

12   commercial model are aimed at bringing about a change in what

13   somebody comes into treatment for.  And then when someone can

14   be safely transitioned to another level of care, then they move

15   to another level of care.

16   **Q.**    Let's look further up in the email, the paragraph that

17   begins "Clinical Vision."

18         Do you see it?

19   **A.**    I do.

20   **Q.**    It says:

21         "Aspirational document intended to provide a frame of

22   reference for downstream documents (e.g. guidelines), as well

23   as the operating model.  Intent was to translate the tenets

24   into indicators as a way to ensure that the Vision was

25   operationalized, but this never got traction.  Management level

1    staff are focused on P&L, not sure they see the vision as

2    relevant."

3         Did I read that correctly?

4    A.   Yes, you did.

5    Q.   And in this paragraph, P&L means profit and loss?

6    A.   It does, yes.

7    Q.   And Dr. Lorenzo Triana was part of management level staff;

8    right?

9    A.   Dr. Triana was part of management level staff, but I'm not

10   sure if he had P&L responsibility.

11   Q.   Elements of UBH's Clinical Vision are reflected in the

12   introduction to the UBH Level of Care Guidelines; right?

13   A.   That is correct.

14   Q.   That's the three pillars: care advocacy, services and

15   solutions, and information management?

16   A.   That is correct, yes.

17   Q.   But the philosophy expressed in those pillars was never

18   turned into measurable criteria; right?

19   A.   That's correct.  It was just what you said a minute ago, a

20   statement of principles.

21   Q.   I'd like to turn now to some of UBH's guidelines.  Take a

22   look at them.  Could you pull out the binder that has

23   guidelines in it.

24   A.   I've got a lot of binders here.

25        MS. REYNOLDS:  May I approach, Your Honor?

NIEWENHOUS - DIRECT / REYNOLDS

1   BY MS. REYNOLDS:

2   Q.   All right.  Let's start with Exhibit 1, which is already

3   in evidence.

4        These are UBH's 2011 Level of Care Guidelines?

5   A.   That is correct, yes.

6   Q.   Let's turn to the Common Criteria on page 5 of the

7   exhibit.  And I'd like to focus on criterion 6.

8        Are you there?

9   A.   I am.

10  Q.   The first sentence says:

11          "There must be a reasonable expectation that

12       essential and appropriate services will improve the

13       member's presenting problems within a reasonable period of

14       time." Did I read that correctly?

15  A.   Yes, you did.

16  Q.   And the first part of that sentence, "Reasonable

17  expectation of improvement is based on Medicare sources"?

18  A.   That's correct.

19  Q.   And the second part of that sentence, which says, "within

20  a reasonable period of time" came from input provided by staff?

21  A.   I'm not recall exactly where that came from.

22          MS. REYNOLDS:  Your Honor, I would like to read a

23  short excerpt from Mr. Niewenhous's deposition.

24          THE COURT:  Page and line, please.

25          MS. REYNOLDS:  It's 204, lines 15 to 16.

 1          THE COURT:  Okay.  Go ahead.

 2          MS. REYNOLDS:  This is actually within an answer.

 3  Should I go back --

 4          THE COURT:  Yes.

 5          MS. REYNOLDS:  -- a few lines?

 6      Okay.  So it's going to be 204, lines 9 through 16.

 7      "Q.  Going here, let's quickly take a look at trial

 8      Exhibit Number 6 on page 9, paragraph 1.8.  Where does

 9      that language come from?

10      "A.  It comes from two sources.  The first part of it,

11      'reasonable expectation that services will improve the

12      member's presenting problem' comes from Medicare.  And

13      'within a reasonable period of time' came from input

14      provided by staff."

15          THE COURT:  Talking about Trial Exhibit 6 in there?

16          MS. REYNOLDS:  Yes.

17          THE COURT:  Okay.

18  BY MS. REYNOLDS:

19  Q.  Let's turn to Trial Exhibit 6 for a moment.

20  A.  I'm sorry, did you say 6?

21  Q.  6, yes.

22  A.  Okay.  I'm there.

23  Q.  This is UBH's 2016 Level of Care Guidelines?

24  A.  January 2016, yes.

25  Q.  Let's turn to the Common Criteria, which is on page 9 of

1    Trial Exhibit 6.  And I'd like to direct your attention,

2    actually, to page 10, which is where Section 1.8 is found.

3        Are you there?

4    **A.**   I'm there.

5    **Q.**   And 1.8 says:

6        "There is a reasonable expectation that services will

7    improve the member's presenting problems within a reasonable

8    period of time."

9        Do you see that?

10   **A.**   I do.  And it goes on to say that:

11       "Improvement of the member's condition is indicated by

12   reduction or control of the acute signs and symptoms that

13   necessitated treatment, and that improvement in this context is

14   measured by weighing the effectiveness of treatment against

15   evidence that the member's signs and symptoms will deteriorate

16   if treatment in the current level of care ends.  Improvement

17   must also be understood within the broader framework of a

18   member's recovery, resiliency, and well-being."

19   **Q.**   Thank you.

20       Let's put page 5 of Exhibit 1 and page 10 of Exhibit 6

21   next to each other on the screen.  You have a screen in front

22   of you, Mr. Niewenhous, and it will show you the pages from the

23   exhibit numbers.

24       Okay.  And I just want to focus on the first sentence.

25           **THE COURT:**  It's not Trial Exhibit 6 on the right.

1          **MS. REYNOLDS:**  Oh, sorry.  Exhibit 6, page 10.  Okay.

2    BY MS. REYNOLDS:

3    **Q.**   And I just want to focus on the first sentence of

4    criterion 6 in Trial Exhibit1 and the first sentence of 1.8 in

5    Trial Exhibit 6.

6          The only difference between these two sentences is that,

7    in 2011, the words "professional and appropriate" appeared in

8    that sentence; is that right?

9    **A.**   That is the difference between the two, correct.

10   **Q.**   But both of these sentences come from Medicare sources,

11   the first part?

12   **A.**   That is correct, yes.

13   **Q.**   And "reasonable period of time" comes from input from

14   staff?

15   **A.**   I would have to -- I would have to go back and look at the

16   input documents, but that was what I testified to in the

17   deposition, yes.

18   **Q.**   Okay.  Let's -- let's return to Exhibit 1 on page 5.

19   **A.**   I'm there.

20   **Q.**   You're there?

21   **A.**   Yes.

22   **Q.**   Okay.  And let's look at the second sentence of criterion

23   6.

24         Are you there?

25   **A.**   I am.

1   **Q.**   Okay.  It says:

2        "'Improvement' in this context is measured by weighing the

3   effectiveness of treatment against the evidence that the

4   member's condition will deteriorate if treatment is

5   discontinued in the current level of care."

6        I read that right?

7   **A.**   That is correct, yes.

8   **Q.**   And that language also comes from Medicare sources?

9   **A.**   That language does come from Medicare sources.  It

10  actually comes from outpatient guidance that we thought would

11  apply to all levels of care.

12       And it gets back to what I testified earlier, that one of

13  the considerations in managing the commercial benefits is

14  whether somebody can be safely transitioned from the current

15  level of care to something else.

16  **Q.**   I just want to look at the other years that we haven't

17  looked at.  Let's look at the 2012 Common Criteria, Exhibit 2

18  on page 7.

19       First, why don't you look at the front of Exhibit 2 and

20  make sure you recognize it.

21       This is the 2012 Level of Care Guidelines?

22  **A.**   That's correct.

23  **Q.**   Now, let's turn to page 7.  And we're going to look at

24  criterion 6.

25       The first sentence of criterion 6 is the same as it was in

1    2011; right?

2    **A.**    That is correct, yes.

3    **Q.**    And the third sentence of criterion 6 is the same as the

4    second sentence in 2011; right?

5          We can put them side-by-side, if it will help you.

6    **A.**    The third sentence -- yes.

7    **Q.**    Okay.  And the second sentence of criterion 6 is new in

8    2012, in the Level of Care Guidelines; right?

9    **A.**    Yes.

10   **Q.**    And that sentence says:

11         "Improvement of the member's condition is indicated by the

12   reduction or control of the acute symptoms that necessitated

13   treatment in a level of care."

14         Did I read that correctly?

15   **A.**    You did.

16   **Q.**    Let's turn to 2013.  It's Exhibit 3.

17         Exhibit 3 is the 2013 Level of Care Guidelines?

18   **A.**    I'm there.

19   **Q.**    Do you recognize this as the 2013 Level of Care

20   Guidelines?

21   **A.**    I do, yes.

22   **Q.**    Thanks.

23         And let's turn to page 8 of Exhibit 3.  And I'd like to

24   focus your attention on criterion 7.

25         Criterion 7 in 2013 is the same as criterion 6 in 2012;

1    right?

2        And if you'd like us to put them side-by-side on the

3    screen, we can do that.

4    **A.**   That's not necessary.  It's the same.

5    **Q.**   Okay.  Let's look at 2014.  It's Exhibit 4.

6        So Exhibit 4 is the 2014 Level of Care Guidelines?

7    **A.**   That is correct.

8    **Q.**   Let's turn to page 9 of Exhibit 4.  Okay.  And looking in

9    the Admission column under the common criteria and best

10   practices for all levels of care, do you see that?

11   **A.**   I do.

12   **Q.**   There's a bullet that starts "There is a reasonable

13   expectation."  Is that correct?

14   **A.**   That is correct.

15   **Q.**   And that bullet contains -- that sentence is the same

16   sentence as in the first sentence of criterion 7 in 2013;

17   right?

18   **A.**   That is correct, yes.

19   **Q.**   Okay.  And then there's a sub-bullet that begins

20   "Improvement of the member's condition."

21       Do you see that?

22   **A.**   I do.

23   **Q.**   And that sub-bullet is the same as the second sentence of

24   criterion 7 in 2013; right?

25   **A.**   That is correct.

**NIEWENHOUS - DIRECT / REYNOLDS**

1   **Q.**   And turning to page 10, there's a second sub-bullet which

2   begins "improvement in this context."

3        Do you see that?

4   **A.**   I do.

5   **Q.**   And the information in that sub-bullet is the same as in

6   criterion 7 of 2013; correct?

7   **A.**   Including the last sentence about "Improvement must also

8   be understood within the broader framework of the member's

9   recovery and resiliency goals," yes.

10  **Q.**   Thank you.

11       Okay.  Let's turn to page 5 -- or, excuse me, Trial

12  Exhibit 5.

13       Are you there?

14  **A.**   I'm there.

15  **Q.**   Exhibit 5 is the 2015 Level of Care Guidelines?

16  **A.**   That is correct, yes.

17  **Q.**   And let's look at page 9.  Actually, back up to page 8.

18  Excuse me.

19       Do you see it?

20  **A.**   I do.

21  **Q.**   Section 1.8, the sentence there is the same as the first

22  bullet in 2014 that we just looked at?

23  **A.**   Could you repeat your question?

24  **Q.**   The first sentence in Section 1.8, do you see it?

25  **A.**   I do.

1   Q.   Okay.  That sentence is the same sentence that -- as the

2   first bullet in 2014, that we looked at?

3   A.   That's correct.

4   Q.   And it's the same as the first sentence of criterion 7 in

5   2013?

6   A.   That is correct.

7   Q.   Okay.  And then turning to page 9, Section 1.8.1, do you

8   see it?

9   A.   I do.

10  Q.   And that is the same as the first sub-bullet in the 2014

11  language we looked at a moment ago?

12  A.   That is correct, yes.

13  Q.   And that's the same as the second sentence in criterion 7

14  of 2013?

15  A.   That is correct, yes.

16  Q.   Okay.  And in Exhibit 5, Section 1.8.2 starts "Improvement

17  in this context."

18       Do you see it?

19  A.   I do.

20  Q.   And that is the same as the second sub-bullet in the

21  language in 2014, that we looked at a moment ago?

22  A.   That is correct, yes.

23  Q.   And it's the same as the last two sentences of criterion 7

24  from 2013?

25  A.   That is correct.

1   Q.   Okay.  Let's just do 2016 again to make sure the record is

2   clear.

3        Exhibit 6, this is the 2016 Level of Care Guidelines

4   approved in January of 2016?

5   A.   That is correct.

6   Q.   Let's turn to page 10.

7        Do you see Section 1.8?

8   A.   I do.

9   Q.   And Section 1.8 is the same as in Exhibit 5; correct?

10  A.   That is correct, yes.

11  Q.   And Section 1.8.1 is the same as in the 2015 Level of Care

12  Guidelines?

13  A.   That is correct as well.

14  Q.   And Section 1.8.2 is the same as in the 2015 Level of Care

15  Guidelines?

16  A.   That is correct as well.

17  Q.   Let's turn to Exhibit 7.

18       Exhibit 7 is the version of the 2016 Level of Care

19  Guidelines approved with revisions in June of 2016; is that

20  right?

21  A.   That is correct, yes.

22  Q.   Let's turn to page 10.  Are you there?

23  A.   I'm there.

24  Q.   This is Section 1.8 of the admission criteria; right?

25  A.   That is correct, yes.

1   **Q.**   And Section 1.8 in Exhibit 7 is the same as 1.8 in Exhibit

2   6?

3   **A.**   That is correct, yes.

4   **Q.**   And Section 1.8.1 in Exhibit 7 is the same as 1.8.1 in

5   Exhibit 6?

6   **A.**   That is correct.

7   **Q.**   And Section 1.8.2 in Exhibit 7 is the same as Section

8   1.8.2 in Exhibit 6?

9   **A.**   That is correct, yes.

10   **Q.**   All right.  Lastly, let's turn to Exhibit 8.

11        These are the 2017 Level of Care Guidelines?

12   **A.**   This is the -- yes, January 2017.

13   **Q.**   Let's turn to page 7 of Exhibit 8.  These are -- it starts

14   on page 6, the common admission criteria for all levels of

15   care; right?

16   **A.**   Yes, that is correct.

17   **Q.**   And I'd like to draw your attention to the last black

18   bullet in that section.  Are you there?

19   **A.**   Yes, on page 7.

20   **Q.**   Okay.  And let's just -- okay.  And that black bullet is

21   the same as Section 1.8 from Exhibit 7; right?

22   **A.**   I didn't work on these guidelines, so I need a second to

23   refresh my memory.

24        (Witness examines document.)  No, it's not word for word

25   the same.

1  **Q.**   You're focused on just the first sentence in the black --

2  with the black bullet at the end of the admission criteria in

3  Exhibit 8?

4  **A.**   Oh, no.   I was also looking at the subbullets.   The black

5  bullet is the same.

6  **Q.**   Okay.   So the black bullet is the same as Section 1.8.

7       Let's look at the first subbullet and compare it to

8  Section 1.8.1 from section -- from Exhibit 7.   Are you there?

9  **A.**   I'm there.

10 **Q.**   And the only difference between Section 1.8.1 of Exhibit 7

11 and this subbullet in Exhibit 8 is the removal of the word

12 "acute"?

13 **A.**   That is correct.

14 **Q.**   And then the second subbullet in Exhibit 8 at the end of

15 the admission criteria is the same as Section 1.8.2 of

16 Exhibit 7; right?

17 **A.**   (Witness examines document.)   That is correct, yes.

18 **Q.**   Thank you.

19      All right.   I'd like to talk about where this definition

20 comes from.

21      Could you turn to Exhibit 656?   It would be in the other

22 binder.

23 **A.**   (Witness examines document.)

24 **Q.**   Are you there?

25 **A.**   I'm there.

1   Q.   This is Chapter 6 of the Medicare Benefit Policy Manual;

2   right?

3   A.   That is, yes, Chapter 6, yes.

4          MS. REYNOLDS:  Your Honor, we move Exhibit 656 into

5   evidence.

6          MS. ROMANO:  No objection.

7          THE COURT:  Admitted.

8       (Trial Exhibit 656 received in evidence)

9   BY MS. REYNOLDS:

10  Q.   And Chapter 6 pertains to hospital services covered under

11  Medicare; right?

12  A.   Under Part B, yes.

13  Q.   Under Part B.

14       Let's turn to page 26 of Exhibit 656.

15  A.   (Witness examines document.)

16  Q.   Are you there?

17  A.   I'm there.

18  Q.   Do you see the paragraph numbered 3 on this page?

19  A.   I do.

20  Q.   And it says "Reasonable Expectation of Improvement";

21  right?

22  A.   That is correct, yes.

23  Q.   And just under that heading, CMS, Chapter 6, says

24  (reading):

25          "Services must be for the purpose of diagnostic study

1              or reasonably be expected to improve the patient's

2              condition.  Treatment must, at a minimum, be designed to

3              reduce or control the patient's psychiatric symptoms so as

4              to prevent relapse or hospitalization and improve or

5              maintain the patient's level of functioning."

6              Did I read that correctly?

7     A.    You did, yes.

8     Q.    And in this provision "and" is underlined; right?

9     A.    That is correct.

10    Q.    Now, let's look at the third and fourth sentences of the

11    next paragraph.  It begins "'Improvement' in this context."

12    Are you there?

13    A.    I'm there.

14    Q.    Okay.  So, quote (reading):

15              "'Improvement' in this context is measured by

16          comparing the effect of continuing treatment versus

17          discontinuing it.  Where there is a reasonable expectation

18          that if the treatment services were withdrawn, the

19          patient's condition would deteriorate, relapse further, or

20          require hospitalization, this criterion is met."

21          Did I read that correctly?

22    A.    You did, yes.

23    Q.    And that's where the second -- the last part of UBH's

24    "improvement" definition came from?

25    A.    That is correct.

1   Q.   Now let's look at what comes right before that sentence in

2   CMS, Chapter 6.  So starting at the beginning of the paragraph,

3   the CMS definition says (reading):

4          "It is not necessary that a course of therapy have as

5       its goal restoration of the patient to the level of

6       functioning exhibited prior to the onset of the illness,

7       although this may be appropriate for some patients.  For

8       many other psychiatric patients, particularly those with

9       long-term chronic conditions, control of symptoms and

10      maintenance of a functional level to avoid further

11      deterioration or hospitalization is an acceptable

12      expectation of improvement."

13      Did I read that correctly?

14  A.   You did, yes.

15  Q.   That language does not appear in Section 1.8 of UBH's

16  Level of Care Guidelines, does it?

17  A.   The -- the language itself does not appear in the

18  guidelines.

19  Q.   And that's true for each year from 2011 to 2017; right?

20  A.   (Witness examines document.)  That specific language

21  doesn't appear in the guidelines, that's correct; however, and

22  I'd need to go back to the guidelines, the notion of what I was

23  saying earlier, somebody enters a particular level of care,

24  they receive services of a certain intensity, and that level of

25  care with the idea of bringing about improvement.  If there's

1    improvement, if the person can be safely discharged to another

2    level of care, then they move into another level of care.

3        However, in thinking about that, we also take into account

4    whether a transition might put the person at risk for

5    deterioration.

6    **Q.**   Keep this binder open, but let's just take another look

7    at -- let's go to 2012, which is the first time it appears.

8    Exhibit 2, page 7, criterions.

9    **A.**   (Witness examines document.)

10           **THE COURT:**  6?

11           **MS. REYNOLDS:**  6.

12   **Q.**   Are you there?

13   **A.**   Exhibit 2, page 7, yes.

14   **Q.**   Okay.  Criterion 6, and we just established that the

15   portion of this criterion that starts "'Improvement' in this

16   context" comes from CMS, Chapter 6; right?

17   **A.**   That is correct, yes.

18   **Q.**   In the UBH guideline the language that immediately

19   precedes "'Improvement' in this context" is the sentence that

20   says (reading):

21           "Improvement of the member's condition is indicated

22        by the reduction or control of the acute symptoms that

23        necessitated treatment in a level of care."

24        Right?

25   **A.**   Uh-huh.

1  Q.  And the sentences for CMS, Chapter 6, that refer to

2  long-term chronic conditions and maintenance of a functional

3  level do not appear in Criterion 6; right?

4  A.  Those words do not appear but, again, it's in here

5  indicated by the reduction or control of acute symptoms,

6  "Control" being a synonym for "maintenance."  So the words

7  themselves are not in here but the concept is.

8       THE COURT:  Isn't that sentence limited to acute

9  symptoms?

10      THE WITNESS:  It's --

11      THE COURT:  In your guidelines, it's limited to

12  maintenance and control of acute symptoms; right?

13      THE WITNESS:  The -- yes, acute symptoms, but acute

14  symptoms can be in a condition that's new, it can be a

15  manifestation in symptoms in a condition that's chronic.  So

16  someone can have a --

17      THE COURT:  So it doesn't refer to the presenting

18  problems that were referred to in this first sentence, which is

19  the introductory sentence of this paragraph?

20      THE WITNESS:  I'm sorry, Your Honor.  Could you say

21  that again?

22      THE COURT:  It's not limited to the presenting

23  problems?  It could be anything else?

24      THE WITNESS:  It could be the presenting problems, but

25  the presenting problems also in the context of the person's

1   history, the history of the condition, the history of their

2   treatment, and I think we get into that later in the

3   guidelines.

4           THE COURT:  Yeah, but I'm not talking about later in

5   the guidelines.  I'm talking about right here.  This seems to

6   be clearly limited to the acute symptoms that led to the

7   particular level of care at the time.

8           THE WITNESS:  That's correct.

9           THE COURT:  Right.  And it's those acute symptoms that

10  you're talking about in the second sentence; right?

11          THE WITNESS:  Yes, that's correct.

12          THE COURT:  Okay.  Thank you.

13          MS. REYNOLDS:  Thank you.

14  Q.   Let me turn your attention back to Exhibit 656, which is

15  CMS, Chapter 6.  The third paragraph under "Reasonable

16  Expectation of Improvement" says (reading):

17          "Some patients may undergo a course of treatment that

18      increases their level of functioning but then reach a

19      point where further significant increase is not expected.

20      Such claims are not automatically considered noncovered

21      because conditions have stabilized or because treatment is

22      now primarily for the purpose of maintaining present level

23      of functioning."

24      Do you see that?

25  A.   I do.

1  **Q.**   And that language from the CMS definition does not appear

2  in UBH's Level of Care Guidelines in the admission criteria?

3  **A.**   (Witness examines document.)   The words themselves do not

4  appear in the Level of Care Guidelines, correct.

5  **Q.**   And then continuing with that paragraph, it states

6  (reading):

7          "Rather, coverage depends on whether the criteria

8       discussed above are met.   Services are noncovered only

9       where the evidence clearly establishes that the criteria

10      are not met; for example, that stability can be maintained

11      without further treatment or with less intensive

12      treatment."

13      Do you see that?

14  **A.**   That is correct.   Yes, I see that.

15  **Q.**   And let me turn to Exhibit 1 for a moment.

16  **A.**   (Witness examines document.)

17  **Q.**   And we discussed the fact that in 2011 UBH's improvement

18  criterion already borrowed from CMS, Chapter 6; right?

19  **A.**   (Witness examines document.)   Can you say your question

20  again?

21  **Q.**   I think we established this earlier, but let's just make

22  sure we're clear.   In Exhibit 1, page 5, Criterion 6, under the

23  common criteria, includes the improvement in this context

24  portion which UBH based on CMS, Chapter 6; right?

25  **A.**   That is correct, yes.

1   **Q.**   Okay.  I want to draw your attention to the continued

2   service criteria, which start on page 78 of Exhibit 1.

3   **A.**   (Witness examines document.)

4   **Q.**   Are you there?

5   **A.**   I'm there.

6   **Q.**   Do you see Criterion 8?

7   **A.**   (Witness examines document.)   I do.

8   **Q.**   Now that criterion says (reading):

9          "Measurable and realistic progress has occurred or

10         there is clear and compelling evidence that continued

11         treatment at this level of care is required to prevent

12         acute deterioration or exacerbation that would then

13         require a higher level of care."

14         Did I read that correctly?

15  **A.**   Yes, you did.

16  **Q.**   So this criterion does not say, as it does in CMS,

17  Chapter 6, that services are noncovered only where the evidence

18  clearly establishes that the criteria are not met; for example,

19  that stability can be maintained without further treatment or

20  with less intensive treatment; right?

21  **A.**   It doesn't use those words, but I believe the concept is

22  in there about -- where it says "Treatment at this level of

23  care is required to prevent acute deterioration or

24  exacerbation."

25              **THE COURT:**  Where did you get the clear and

1    compelling?

2              **THE WITNESS:**  You know, I honestly don't know where we

3    got that.

4              **THE COURT:**  You didn't get it from Medicare; right?

5              **THE WITNESS:**  No.  No.

6    **BY MS. REYNOLDS:**

7    **Q.**   And so under the 2011 Level of Care Guidelines, there has

8    to be clear and compelling evidence that either measurable or

9    realistic progress has occurred or that continued treatment at

10   this level of care is required to prevent acute deterioration

11   or exacerbation that would then require a higher level of care;

12   is that right?

13   **A.**   That's what it says here, yes.

14   **Q.**   Mr. Niewenhous, you were the co-chair of the Coverage

15   Determination Committee from 2010 to 2016; right?

16   **A.**   I'm not sure I was the co-chair for that entire period of

17   time but during that time, yes.

18   **Q.**   During that time, you were the co-chair of the Coverage

19   Determination Committee?

20   **A.**   That's correct.

21   **Q.**   And the CDC was responsible for reviewing and providing

22   input on draft CDG's?

23   **A.**   Yes, that's correct.

24   **Q.**   And the CDC met regularly?

25   **A.**   It did, yes.

1  Q.   And there were minutes prepared for each meeting?

2  A.   That is correct, yes.

3  Q.   Would you turn to Exhibit 307 -- and let me ask you one

4  more question before we talk about it.

5       The CDC reported up to the BPAC; right?

6  A.   That's correct, yes.

7  Q.   All right.  So let's look at 307.

8  A.   (Witness examines document.)

9  Q.   Are you there?

10 A.   I'm there.

11 Q.   These are the minutes from the July 1st, 2010, meeting of

12 the CDC; right?

13 A.   That is correct, yes.

14      MS. REYNOLDS:  Your Honor, I move to admit Exhibit 307

15 into evidence.

16      MS. ROMANO:  No objection.

17      THE COURT:  It's admitted.

18      (Trial Exhibit 307 received in evidence)

19 BY MS. REYNOLDS:

20 Q.   You attended this meeting, Mr. Niewenhous?

21 A.   I did.

22 Q.   And you led a discussion about the custodial care CDG;

23 right?

24 A.   That is correct, yes.

25 Q.   And let me direct your attention to the column in the

1   minutes that's headed "Discussion."  Do you see that?

2   **A.**   I do.

3   **Q.**   On page 2 of Exhibit 307, it's the third row down.

4   There's a bullet that -- actually, first starting on the left

5   side there's a column for topic.  Do you see that?

6   **A.**   I do.

7   **Q.**   Okay.  Do you see the topic that says "Custodial care and

8   inpatient services discussion about least intensive LOC, Jerry

9   Niewenhous"?  Do you see that?

10  **A.**   I do.

11  **Q.**   And that refers to the discussion that you led of the

12  custodial care CDG?

13  **A.**   That is correct, yes.

14  **Q.**   Okay.  Now, under "Discussion" let's look at the first

15  bullet.  It says (reading):

16          "Discussed request from BPAC to consider adding a

17      condition to the definition of 'active treatment' that

18      care should be in the least intensive level of care."

19      Did I read that correctly?

20  **A.**   Yes, indeed.

21  **Q.**   And then under the "Conclusions" column in that same row

22  do you see the first bullet?

23  **A.**   I do.

24  **Q.**   And that bullet says (reading):

25          "Add clarification that reasonable expectation of

1        improvement in the patient's condition is improvement in

2        the patient's acute condition."

3        And "acute" is underlined; right?

4   **A.**   That is, yes.

5   **Q.**   Could you turn to -- oh.  Sorry.

6        In the last column, which is headed "Follow-up," in that

7   same row do you see the first bullet?

8   **A.**   I do.

9   **Q.**   And that says "J. Niewenhous to edit the CDG"; right?

10  **A.**   That's correct.

11  **Q.**   That refers to the custodial care CDG?

12  **A.**   That is correct, yes.

13  **Q.**   And you did edit the CDG?

14  **A.**   I would need to take a look at the CDG, but I believe so,

15  yes.

16  **Q.**   We'll do so.  Let's turn to Exhibit 10, which is already

17  in evidence.

18  **A.**   (Witness examines document.)  I'm sorry.  Did you say

19  Exhibit 10?

20  **Q.**   Exhibit 10.

21  **A.**   All right.

22        (Witness examines document.)  I'm there.

23  **Q.**   This is the August 2010 custodial care and inpatient

24  services CDG; right?

25  **A.**   That is correct, yes.

1   Q.   So this CDG was approved a month after the CDC meeting

2   that we were just discussing?

3   A.   That is correct, yes.

4   Q.   Let's look at page 3 of Exhibit 10.   There's a gray box

5   entitled "Key Points."   Do you see it?

6   A.   I do.

7   Q.   Okay.   Let's look at the last two bullets in that box.

8   Are you there?

9   A.   I'm there.

10   Q.   Okay.   The first -- of those two bullets, the first one

11   says (reading):

12          "Improvement of the patient's condition is indicated

13       by the reduction or control of the acute symptoms that

14       necessitated hospitalization or residential treatment in

15       an acute residential" -- "acute or residential treatment

16       center."

17       I'm sorry.   Did I read that correctly eventually?

18   A.   Yes, you did.

19   Q.   Okay.   And then the second bullet says (reading):

20          "'Improvement' in this context is measured by

21       weighing the effectiveness of treatment and the risk that

22       the member's condition would deteriorate or relapse if

23       inpatient or residential treatment were to be

24       discontinued."

25       I read that correctly?

1  **A.**   That is correct, yes.

2  **Q.**   And that's the language borrowed from CMS, Chapter 6?

3  **A.**   That is correct.

4  **Q.**   But the CDG does not have the sentences from Chapter 6 on

5  patients with long-term chronic conditions; right?

6  **A.**   It -- it does not have the exact wording in here nor does

7  it say anything about long-term chronic conditions not being

8  covered.  It's silent on long-term chronic.

9         And, again, you know, the idea of acute symptoms, they can

10 be acute symptoms related to a new condition.  They could be

11 related to acute symptoms of a chronic condition.  Chronic

12 condition symptoms can wax and wane over time and depending on

13 where they're at at any particular point in time, they may

14 indicate the need for one level of care or another.

15         **THE COURT:**  Well, then, why does it say "Improvement

16 of a patient's condition is indicated by a reduction or control

17 of the acute symptoms that necessitated the hospitalization or

18 residential treatment"?  It doesn't say "any acute symptoms."

19 It says "those acute symptoms"; right?

20         **THE WITNESS:**  That's correct.

21         **THE COURT:**  So if there are other acute symptoms,

22 they're not considered here?

23         **THE WITNESS:**  Your Honor, the best way I know to

24 respond is with an example.  Someone could have a persistent

25 form of depression.  The symptoms that somebody is experiencing

1  could worsen.  Those symptoms with psychosocial or

2  environmental factors as well could worsen to the point where

3  somebody needs to be safely treated in an inpatient setting and

4  can't be safely treated in, say, an outpatient setting.

5      Over the course of treatment in an inpatient setting,

6  those symptoms may not go away but they may lessen to the point

7  where somebody could then be safely treated in a less intensive

8  setting.

9          THE COURT:  But what if there are other symptoms,

10  symptoms that occur that are not the symptoms, the acute

11  symptoms, that the depression brought on, or there are

12  co-occurring conditions that may bring -- those symptoms may

13  also be there and may be significant?

14      I don't want to use the word "acute" because what I'm

15  going to ask is:  Those aren't the acute symptoms that this

16  guideline is talking about; right?  These are talking about the

17  acute symptoms that led to the inpatient treatment or

18  residential treatment, whatever it is; right?

19          THE WITNESS:  Yes.  I understand what you're asking.

20      The -- the -- the here and now is understood in the

21  context of -- is also understood in the context of the then and

22  there.

23      You mentioned co-occurring condition.  Certainly if

24  somebody has a chronic form of depression and they've had a

25  stroke, a stroke could potentiate, make worse, those signs of

1    depression.  So, yes, they would be taken into account as a

2    part of the provider's evaluation and then downstream as a part

3    of our making a coverage determination.

4         In fact, in that example it may beg the question about

5    whether the depressive systems are indicative of the stroke or

6    the depression and whether the person should be treated in a

7    behavioral health setting or a medical setting.

8              THE COURT:  Yes, I understand that way of thinking

9    about it.  I don't understand how that fits into this guideline

10   here that you've written, and also I think the example is not

11   nuanced enough.  The kinds of serious things that might arise

12   during the course of someone's treatment for depression where

13   there were certain kinds of symptoms that might be ameliorated

14   in the first week of the inpatient, other symptoms might

15   arise --

16             THE WITNESS:  That's correct.

17             THE COURT:  -- that didn't give rise to the treatment

18   level.

19             THE WITNESS:  That's correct.

20             THE COURT:  Okay.  And they're not encompassed in

21   here.

22             THE WITNESS:  Well, those other symptoms that might

23   arise, that's where we get into what we were talking about a

24   minute ago about "improvement" in this context is understood

25   within the broader context of whether the end of treatment

1   might cause a relapse.

2          **THE COURT:**  Okay.  Thank you.

3   **BY MS. REYNOLDS:**

4   **Q.**   Okay.  So we just talked about the fact that the CDG does

5   not contain the language from CMS, Chapter 6, on patients with

6   long-term chronic conditions; right?

7   **A.**   That's correct.

8   **Q.**   And it also does not contain the language from CMS on

9   maintenance of function; right?

10  **A.**   That is correct.

11  **Q.**   All right.  Let's take a quick look at Exhibit 592.

12  **A.**   (Witness examines document.)

13  **Q.**   Are you there?

14  **A.**   I'm there.

15  **Q.**   Okay.  Exhibit 592 is a March 22nd, 2012, e-mail from you

16  to William Bonfield and others; right?

17  **A.**   That is correct, yes.

18          **MS. REYNOLDS:**  Your Honor, we move Exhibit 592 into

19  evidence.

20          **MS. ROMANO:**  No objection.

21          **THE COURT:**  It's admitted.

22      (Trial Exhibit 592 received in evidence)

23  **BY MS. REYNOLDS:**

24  **Q.**   And attached at page 2 of Exhibit 592 is a summary of the

25  substantial changes from the 2011 edition of the Level of Care

 1  Guidelines to the 2012 edition; right?

 2  **A.**   That is correct, yes.

 3  **Q.**   And I'd like to draw your attention to the sixth black

 4  bullet under the heading "Level of Care Guidelines."  Do you

 5  see it?

 6  **A.**   I do.

 7  **Q.**   And it's noted here (reading):

 8          "Added the indicator of improvement from the

 9      Custodial Care and Inpatient Services Coverage

10      Determination Guideline to the common criteria."

11      Did I read that correctly?

12  **A.**   Yes, you did.

13  **Q.**   Okay.  Let's look really quickly at Exhibit 2, the 2012

14  Level of Care Guidelines at page 7, Criterion 6.

15  **A.**   (Witness examines document.)

16  **Q.**   And I think we established earlier that this is where the

17  sentence that says "Improvement of the member's condition is

18  indicated by the reduction or control of the acute symptoms

19  that necessitated treatment in a level of care is added to the

20  Level of Care Guidelines"; right?

21  **A.**   That is correct, yes.

22  **Q.**   So it was first included in the August 2010 custodial care

23  CDG; right?

24  **A.**   Can you say that again?

25  **Q.**   It was first included in Exhibit 10; right?

1    **A.**    Yes.

2    **Q.**    And then added to the 2012 Level of Care Guidelines;

3    right?

4    **A.**    That is correct, yes.

5    **Q.**    In the common criteria for all levels of care; right?

6    **A.**    That is correct, yes.

7    **Q.**    Okay.  Let's turn back to Exhibit 592 and now look at the

8    ninth black bullet.

9    **A.**    (Witness examines document.)  I'm at Exhibit 592.

10   **Q.**    Sorry.  On page 2.

11   **A.**    Okay.

12   **Q.**    And now look at the ninth black bullet under the heading

13   "Level of Care Guidelines."  It starts "Synchronized."

14   **A.**    Yes, I see that.

15   **Q.**    Are you there?

16        It says (reading):

17            "Synchronize the criteria regarding custodial care

18        and active treatment in the inpatient and residential

19        treatment guidelines with the criteria in the Custodial

20        Care and Inpatient Coverage Determination Guideline."

21        Is that right?

22   **A.**    That is correct, yes.

23   **Q.**    Now let's look at Exhibit 335.

24   **A.**    (Witness examines document.)

25   **Q.**    Are you there?

**NIEWENHOUS - DIRECT / REYNOLDS**

 1   **A.**    I'm there.

 2   **Q.**    Exhibit 335 is an April 5th, 2012, e-mail from Loretta

 3   Urban to Marilyn Holnsteiner and you; right?

 4   **A.**    That is correct.

 5           **MS. REYNOLDS:**  Your Honor, we'd move Exhibit 335 into

 6   evidence.

 7           **MS. ROMANO:**  No objection.

 8           **THE COURT:**  It's admitted.

 9       (Trial Exhibit 335 received in evidence)

10   **BY MS. REYNOLDS:**

11   **Q.**    Turn to page 4 of Exhibit 335.

12   **A.**    (Witness examines document.)

13   **Q.**    This is also a summary of the substantial changes from the

14   2011 Level of Care Guidelines to the 2012 version?

15   **A.**    That's correct.

16   **Q.**    Let's turn to page 7 of the exhibit, and this is a chart

17   summarizing the substantial changes; right?

18   **A.**    That is correct, yes.

19   **Q.**    And the chart also gives a rationale for the change?

20   **A.**    It does, yes.

21   **Q.**    Okay.  And so on page 7 in those two rows, those are the

22   two changes we just looked at?

23   **A.**    (Witness examines document.)  Can you say that question

24   again?

25   **Q.**    It was a bad question.

1        In the first row of the chart that appears on page 7 of

2    Exhibit 335 under "Change" it says (reading):

3              "Synchronize the criteria regarding custodial care

4       and active treatment in the Inpatient and Residential

5       Treatment Center Guidelines with the criteria in the

6       Custodial Care and Inpatient Services Coverage

7       Determination Guideline."

8       Did I read that correctly?

9  **A.**   Yes, you did.

10  **Q.**   And under "Rationale" in that row it says (reading):

11             "To align the Level of Care Guidelines and the

12      Coverage Determination Guidelines."

13      Right?

14  **A.**   That's correct.

15  **Q.**   And then in the next row under "Change" it says (reading):

16             "Added the indicator of improvement from the

17      Custodial Care and Inpatient Services Coverage

18      Determination Guideline to the Common Criteria.

19      Improvement of the member's condition is indicated by the

20      reduction or control of the acute symptoms that

21      necessitated treatment in a level of care."

22      Did I read that correctly?

23  **A.**   You did.

24  **Q.**   And the rationale in that row states (reading):

25            "To align the Level of Care Guidelines and the

1          Coverage Determination Guidelines."

2          Did I read that correctly?

3     **A.**    Yes, you did.

4     **Q.**    Mr. Niewenhous, does the concept of custodial care apply

5     to outpatient treatment?

6     **A.**    Typically, no.

7     **Q.**    UBH's custodial care CDG's also define "active treatment";

8     right?

9     **A.**    Can you say that question again?

10    **Q.**    The custodial care CDGs also define "active treatment";

11    right?

12    **A.**    We have one custodial care CDG, yes.

13    **Q.**    Okay.  And it defines "active treatment"?

14    **A.**    It does.

15    **Q.**    And that definition is based on Chapter 2 of the CMS

16    Medicare Benefit Policy Manual?

17    **A.**    That is correct, yes.

18    **Q.**    All right.  Let's turn to 735, which is in evidence, and

19    look at page 98.

20    **A.**    (Witness examines document.)

21    **Q.**    Are you there?

22    **A.**    I'm there.

23    **Q.**    And this is Chapter 2 of the Medicare Benefit Policy

24    Manual; right?

25    **A.**    This is Chapter 2, yes.

**NIEWENHOUS - DIRECT / REYNOLDS**

1   Q.   And it provides criteria relevant to inpatient psychiatric

2   hospital services; right?

3   A.   That is correct.

4   Q.   All right.  Please turn to page 104 of Exhibit 735.

5   A.   (Witness examines document.)

6   Q.   Are you there?

7   A.   I'm there.

8   Q.   All right.  Look at Section 30.2.2.1.

9   A.   (Witness examines document.)

10  Q.   Are you there?

11  A.   I'm there.

12  Q.   This is the CMS definition of "active treatment" in the

13  context of inpatient psychiatric facilities; right?

14  A.   That is correct, yes.

15  Q.   And this is in the middle of that section and there's a

16  sentence that starts "For services."  Do you see that?

17  A.   Yes.

18  Q.   And the definition states (reading):

19        "For services in an IPF to be designated as active

20        treatment, they must be..."

21        And then there are three bullets.  The first one says

22  (reading):

23        "Provided under an individualized treatment or

24        diagnostic plan."

25        Right?

 1   **A.**   Uh-huh.   That's correct.

 2   **Q.**   The second one says (reading):

 3            "Reasonably expected to improve the patient's

 4        condition or for the purpose of diagnosis."

 5        Right?

 6   **A.**   That is right.

 7   **Q.**   And the third one says (reading):

 8            "Supervised and evaluated by a physician."

 9   **A.**   That's correct.

10   **Q.**   All right.   Let's turn back to Exhibit 10 on page 3 in the

11   key points.

12   **A.**   (Witness examines document.)

13   **Q.**   Are you with me?

14   **A.**   I'm there, yes.

15   **Q.**   Do you see the bullet that begins "Active Treatment"?

16   **A.**   I do, yes.

17   **Q.**   Okay.   It says, "Active treatment in this context is

18   indicated by services that are all of the following," and then

19   it's followed by some bullets.   Do you see that?

20   **A.**   I do, yes.

21   **Q.**   And the first three bullets are the same as what we just

22   read from Chapter 2 of the CMS definition; right?

23   **A.**   That is correct, yes.

24   **Q.**   And then the UBH definition includes two more bullets;

25   right?

1   **A.**   That is correct.

2   **Q.**   The first new bullet says (reading):

3              "Unable to be provided in a less restrictive

4         setting."

5         Right?

6   **A.**   That's correct.

7   **Q.**   And the second new bullet says (reading):

8              "Focused on interventions that are based on generally

9         accepted medical practice and are known to address the

10        critical presenting problems, psychosocial issues, and

11        stabilize the patient's condition to the extent that they

12        can be safely treated in a lower level of care."

13        Did I read that correctly?

14  **A.**   That is correct, yes.

15  **Q.**   Neither of those bullets is in the CMS definition of

16  "active treatment", are they?

17  **A.**   That's correct.  The concept of care being based on

18  generally accepted standards is -- it was taking from -- excuse

19  me -- taken from the Certificate of Coverage.

20        I'm looking at the same exhibit, page 6, "Consistent with

21  nationally recognized scientific evidence," and so forth, and a

22  definition of scientific evidence and what the prevailing

23  standards are.

24        The portion about "unable to be provided in a less

25  restrictive setting" goes back to what I was saying earlier in

1  my testimony about ensuring that the person can be safely

2  treated in the proposed level of care; and that when the

3  objectives have been met to the point where they can be safely

4  discharged to a lower -- a less restrictive setting, a lower

5  level of care, then they are transitioned.

6  Q.   Let me just make sure I understand.  Your testimony, it's

7  that the two bullets that were added to the definition of

8  "active treatment" come from UBH's Certificate of Coverage?

9  A.   No.  That the last bullet about the interventions based on

10  generally accepted standards of medical practice does.  And

11  then the one prior to that, that's ubiquitous in both

12  behavioral health, as well as in clinical guidelines, that when

13  somebody enters a proposed form of treatment -- or a level of

14  care I should say -- once they've either achieved their goals

15  or achieved their goals to the point where they can be safely

16  transitioned to a lower level of care, then they're

17  transitioned.

18  Q.   Chapter 2 does not contain a requirement that refers to

19  active treatment only occurring in the least restrictive

20  setting, does it?

21  A.   I don't recall that it uses those words, no.

22  Q.   And, in fact, the term "least restrictive" doesn't appear

23  in CMS, Chapter 2, at all?

24  A.   I would have to go through the entire chapter.

25  Q.   Let's look back at Exhibit 735 at Chapter 2 for a moment.

NIEWENHOUS - DIRECT / REYNOLDS

1    **A.**   (Witness examines document.)

2    **Q.**   Turn to page 107, please.

3    **A.**   (Witness examines document.)  I'm there.

4    **Q.**   You're there?  Do you see Section 30.3.2?

5    **A.**   I do.

6    **Q.**   It's entitled "Services Expected to Improve the Condition

7    for Purpose of Diagnosis."  Do you see that?

8    **A.**   I do, yes.

9    **Q.**   And that section states (reading):

10            "The services provided must reasonably be expected to

11       improve the patient's condition or must be for the

12       purposes of diagnostic study.  It is not necessary that a

13       course of therapy have as its goal the restoration of the

14       patient to a level which would permit discharge from the

15       institution although the treatment must, at a minimum, be

16       designed both to reduce or control the patient's psychotic

17       or neurotic symptoms that necessitated hospitalization and

18       improve the patient's level of functioning."

19       Did I read that correctly?

20   **A.**   You did.

21   **Q.**   And then let's turn back to page 104 of Exhibit 735.

22   **A.**   Oh, that was Exhibit 735?

23   **Q.**   Yes.  The same place we just were.

24   **A.**   And page 104 did you say?

25   **Q.**   Yes.

**NIEWENHOUS - DIRECT / REYNOLDS**

1   **A.**   (Witness examines document.)  I'm there.

2   **Q.**   Okay.  So under Section 30.2.2.1, the third paragraph

3   which begins "The period of time," do you see that?

4   **A.**   I do, yes.

5   **Q.**   This section says (reading):

6            "The period of time covered by the physician's

7       certification is referred to as a period of active

8       treatment.  This period should include all days on which

9       inpatient psychiatric facility services were provided

10      because of the individual's need for active treatment, not

11      just the days on which specific therapeutic or diagnostic

12      services are rendered."

13      Did I read that correctly?

14  **A.**   Yes, you did.

15  **Q.**   Then the next sentence says (reading):

16           "For example, a patient's program of treatment may

17      necessitate the discontinuance of therapy for a period of

18      time or it may include a period of observation, either in

19      preparation for or as follow-up to therapy while only

20      maintenance or protective services are furnished."

21      Did I read that right?

22  **A.**   Yes, you did.  And then it goes on to say (reading):

23           "If such periods were essential to the overall

24      treatment plan, they would be regarded as part of the

25      period of active treatment."

1    Q.    And so looking back again at Exhibit 10, the last bullet

2    in UBH's definition of "active treatment," which requires that

3    to be considered active treatment, services have to be focused

4    on interventions that are based on generally accepted standard

5    medical practice and are known to address the critical

6    presenting symptoms, psychosocial issues, and stabilize the

7    patient's condition to the extent that they can be safely

8    treated in a lower level of care.

9        And CMS, Chapter 2, does not limit treatment -- does not

10   limit active services -- excuse me -- to services that are

11   directed toward safely transitioning the patient to a lower

12   level of care; right?

13   A.    (Witness examines document.)  Can you state your question

14   again?

15   Q.    Sure.  CMS, Chapter 2, does not limit active treatment to

16   services designed to stabilize the patient's condition to the

17   extent they can be safely treated in a lower level of care,

18   does it?

19   A.    It doesn't use those words, but I'm looking ahead to --

20   and I'm in 735 on page 107 where it talks about discharge

21   planning and discharge summary.  So the presumption is that at

22   some point somebody will have improved to a point where they

23   can safely transition to another level of care.

24   Q.    You're referring to Section 30.5 on page 107?

25   A.    Discharge plan and discharge summary.

NIEWENHOUS - DIRECT / REYNOLDS

1    Q.    And that requirement under CMS, Chapter 2, says (reading):

2              "The record of each patient who has been discharged

3          must have a discharge summary that includes a

4          recapitulation of the patient's hospitalization and

5          recommendations from appropriate services concerning

6          follow-up or aftercare, as well as a brief summary of the

7          patient's condition on discharge."

8          Right?

9    A.    That's correct.

10   Q.    Okay.  That requirement does not limit active treatment to

11   services designed to stabilize the patient's condition to the

12   extent they can be safely treated in a lower level of care,

13   does it?

14   A.    It doesn't specifically call that out, no.

15   Q.    Could you turn to Exhibit 655?

16   A.    (Witness examines document.)

17   Q.    And this is the May 13th, 2016, version of Chapter 2;

18   right?

19   A.    That is correct, yes.

20              MS. REYNOLDS:  Your Honor, we move Exhibit 655 into

21   evidence.

22              MS. ROMANO:  No objection.

23              THE COURT:  It's admitted.

24         (Trial Exhibit 655 received in evidence)

25   \\\

1    BY MS. REYNOLDS:

2    Q.    And you're not aware of any substantive changes that

3    occurred between the version of Chapter 2 that we were looking

4    at in Exhibit 735 and the version in Exhibit 655; right?

5    A.    I haven't done a detailed comparison, no.

6    Q.    One of your tasks as a person responsible for maintaining

7    UBH's Level of Care Guidelines was to ensure that the

8    references supporting the guidelines were updated; is that

9    right?

10   A.    That is correct.

11   Q.    And so each year when the Level of Care Guidelines were

12   being revised, you looked at the references to see if there had

13   been any changes?

14   A.    Yes.

15   Q.    And do you recall there being any changes between the two

16   versions of Chapter 2 that we were just discussing?

17   A.    I don't recall one way or the other.

18   Q.    All right.  Let's talk about UBH's definition of

19   "custodial care."

20            THE COURT:  So let's talk about "custodial care" --

21            MS. REYNOLDS:  After lunch?

22            THE COURT:  Is it 12:15?

23            MS. REYNOLDS:  12:15.

24            THE COURT:  -- in an hour.  Thank you.

25            MS. REYNOLDS:  Thank you.

```
 1              THE COURT:  Thank you.
 2                  (Luncheon recess taken at 12:15 p.m.)
 3   Tuesday, October 17, 2017                    1:23 p.m.
 4                  P-R-O-C-E-E-D-I-N-G-S
 5                       ---oOo---
 6              THE COURT:  Okay.  Go ahead.  All right.  We're back
 7   on the record.
 8              THE CLERK:  We're back on the record in case
 9   C-14-2346, Wit/Alexander versus UBH.
10              THE COURT:  Custodial care.
11              THE CLERK:  And you're still under oath.
12              MS. REYNOLDS:  And I falsely advertised we were going
13   to move on to custodial care.  I have one more thing I want to
14   do before that.
15   BY MS. REYNOLDS:
16   Q.   So we spoke earlier today, Mr. Niewenhous, about UBH's
17   reasonable expectation of improvement provision.
18        Do you remember that?
19   A.   I do.
20   Q.   Okay.  And part of that provision requires that
21   improvement occur within a reasonable period of time.
22        Do you remember that?
23   A.   I do.
24   Q.   Okay.  And the reasonable expectation of improvement comes
25   from CMS Chapter 6; is that correct?
```

1   **A.**   That is correct, yes.

2   **Q.**   Let's just look at one more thing in chapter 6, which is

3   Exhibit 656.  To make sure we're oriented, could you look first

4   at page 25 of 656.

5       Do you see the heading that says "70 Outpatient Hospital

6   Psychiatric Services"?

7   **A.**   I do, yes.

8   **Q.**   And then, turning the page, on Exhibit 656, page 26, you

9   see the section on Reasonable Expectation of Improvement that

10  we were looking at, which is within section 70?

11  **A.**   I do.

12  **Q.**   Okay.  Now let's turn to page 28.  And this is still

13  within section 70; right?

14  **A.**   That is correct, yes.

15  **Q.**   Do you see the paragraph 3 that says "Frequency and

16  Duration of Services"?

17  **A.**   I do, yes.

18  **Q.**   That provision of CMS Chapter 6 says:

19      "There are no specific limits on the length of time that

20  services may be covered.  There are many factors that affect

21  the outcome of treatment.  Among them are the nature of the

22  illness, prior history, the goals of treatment, and the

23  patient's response.

24      "As long as the evidence shows that the patient continues

25  to show improvement in accordance with his/her individualized

**NIEWENHOUS - DIRECT / REYNOLDS**

1   treatment plan and the frequency of services is within accepted

2   norms of medical practice, coverage may be continued.

3       "If a patient reaches a point in his/her treatment where

4   further improvement does not appear to be indicated, evaluate

5   the case in terms of the criteria to determine whether, with

6   continued treatment, there is a reasonable expectation of

7   improvement."

8       Did I read that correctly?

9   **A.**   Yes, you did.

10  **Q.**   Now I'll move on to custodial care.  Let's look first at

11  Exhibit 10, which is the August 2010 Custodial Care CDG.

12      Are you there?

13  **A.**   I'm there.

14  **Q.**   All right.  Turn to page 7, please.

15      In the second full paragraph that begins "In determining,"

16  do you see that?

17  **A.**   I do.

18  **Q.**   It says:  "In determining whether a member is receiving

19  custodial care, United Behavioral Health considers whether,"

20  and there's four bullets.

21      Do you see that?

22  **A.**   I do.

23  **Q.**   The bullets read:

24      "The member is receiving active treatment;

25      "Services are for assistance with activities in daily

1  living.

2      "Services do not seek to cure or which are provided during

3  periods when the member's behavioral health condition is not

4  changing;

5      "Services do not require continued administration by

6  trained medical personnel in order to be delivered safely and

7  effectively."

8      Did I read that right?

9  **A.**  Yes, you did.

10 **Q.**  All right.  Let's take a look at 47, Exhibit 47.

11     Are you there?

12 **A.**  I'm there.

13 **Q.**  This is the December 2011 Custodial Care and Inpatient

14 Services CDG; right?

15 **A.**  That is correct, yes.

16 **Q.**  Okay.  Please turn to page 3.

17 **A.**  I'm sorry, which page?

18 **Q.**  Three.

19 **A.**  Three.  Okay.

20 **Q.**  In the gray box that says "Key Points," do you see the

21 third bullet?

22 **A.**  I do.

23 **Q.**  Okay.  And this CDG says:  "Custodial care in this context

24 is characterized by the following," and then there are some

25 bullets.

1        Do you see that?

2    **A.**   I do.

3    **Q.**   Okay.  The first one says:  "The presenting signs and

4    symptoms of the patient have been stabilized, resolved, or a

5    baseline level of functioning has been achieved."

6        And then the second one is:  "The patient is not

7    responding to treatment or otherwise not improving."

8        The third is:  "The intensity of active treatment provided

9    in an inpatient or residential treatment setting is no longer

10   required or services can be safely provided in a less intensive

11   setting."

12       And then the last one gives some examples of custodial

13   services; is that right?

14   **A.**   Yes.

15   **Q.**   Now let's go to Exhibit 735 again, at page 88.  Actually,

16   before page 88, let's -- let's do page 61.

17       Are you there?

18   **A.**   I'm there.

19   **Q.**   And this is Chapter 16 from the Medicare Benefit Policy

20   Manual; right?

21   **A.**   That is correct, yes.

22   **Q.**   These are the general exclusions from coverage under

23   Medicare?

24   **A.**   That is correct, yes.

25   **Q.**   Okay.  Now, let's turn to page 88 of Exhibit 735.

NIEWENHOUS - DIRECT / REYNOLDS

1          Do you see Section 110?

2     A.    I do.

3     Q.    This is the CMS definition of custodial care; right?

4     A.    It is CMS -- CMS's description of custodial care, yes.

5     Q.    And it says:

6          "Custodial care is excluded from coverage.  Custodial care

7     serves to assist an individual in the activities of daily

8     living, such as assistance in walking, getting in and out of

9     bed, bathing, dressing, feeding, and using the toilet,

10    preparation of special diets, and supervision of medication

11    that usually can be self-administered.

12         "Custodial care is essentially personal care that does not

13    require the continuing attention of trained medical or

14    paramedical personnel."

15         Did I read that correctly?

16    A.    Yes, you did.

17    Q.    The CMS definition does not contrast custodial care with

18    active treatment, does it?

19    A.    It doesn't specifically call it out in this section, but

20    it -- custodial care, as it says here, is services that assist

21    an individual in activities of daily living, et cetera.  So

22    there's nothing in here about the provision of active care.

23    Q.    The CMS definition does not say that care is custodial if

24    it does not seek to cure, does it?

25    A.    I'm not seeing that in here, no.

**NIEWENHOUS - DIRECT / REYNOLDS**

1  Q.    The CMS definition does not say that care is custodial if

2  it is provided during periods when the member's behavioral

3  health condition is not changing, does it?

4  A.    That's not in the definition of custodial care here,

5  right.

6  Q.    The CMS definition does not say that care is custodial if

7  a patient's presenting signs and symptoms have been stabilized,

8  resolved, or a baseline level of functioning has been achieved,

9  does it?

10  A.    Can you say that again?

11  Q.    The CMS definition does not say that care is custodial if

12  a patient's presenting signs and symptoms have stabilized,

13  resolved, or a baseline level of functioning has been achieved,

14  does it?

15  A.    It does not say that in here, no.

16  Q.    The CMS definition does not say care is custodial if the

17  patient is not responding to treatment or otherwise not

18  improving, does it?

19  A.    It doesn't use those exact words, but the description of

20  custodial care -- I'm not seeing anything in the description of

21  custodial care about there being treatment.

22        This is focused, again, on activities of daily living;

23  essentially, personal care that doesn't require the attention

24  of trained medical or paramedical personnel.

25  Q.    And the CMS definition does not say that care is custodial

1    if the intensity of active treatment provided in an inpatient

2    or residential treatment setting is no longer required or

3    services can be safely provided in a less intensive setting,

4    does it?

5    **A.**    No, that's not found within the Section 110.

6    **Q.**    And the CMS definition provides a few examples of

7    custodial care in hospitals and skilled nursing facilities;

8    right?

9    **A.**    It does.

10   **Q.**    Okay.  And those examples do not include respite services,

11   daily living skills instruction, days awaiting placement,

12   activities that are social and recreational in nature, or

13   solely to prevent runaway or truancy or legal problems; right?

14   **A.**    The three examples here are -- the three examples here --

15   yes.  Yes, you're correct.

16   **Q.**    Let's take a look at Exhibit 84.  We may want to compare

17   it to Exhibit 47, because I'm going to ask you if the language

18   is the same.  We are looking at page 3 of Exhibit 84.  And

19   we'll compare it to page 3 of Exhibit 47.

20   **A.**    That was 84 and 47.

21   **Q.**    Yeah.  And we're pulling up on the screen, as well, if

22   that's easier for you.

23   **A.**    Okay.

24   **Q.**    47 is on the right and 84 is on the left.

25        And focusing on the definition of custodial care in the

**NIEWENHOUS - DIRECT / REYNOLDS**

1   gray box, the -- the first three bullets that define custodial

2   care are the same in both of these CDGs; right?

3   **A.**   Can you say your question again?

4   **Q.**   The definition of custodial care in the first three -- the

5   first three bullets in Exhibit 47 and the three bullets in

6   Exhibit 84 are the same; right?

7   **A.**   That is -- that is correct.

8   **Q.**   The only difference is that, in Exhibit 84, the definition

9   is followed by a citation to United Healthcare's template

10  Certificate of Coverage, right?

11  **A.**   For 2011, yes.

12  **Q.**   And in 84, the examples of custodial services that appear

13  in Exhibit 47 are in a separate black bullet; right?

14  **A.**   That is correct.

15  **Q.**   And in Exhibit 84, there's a citation to Centers for

16  Medicare and Medicaid Services Benefit Manual CMS 2010; right?

17  **A.**   I see that, yes.

18  **Q.**   So for the examples of custodial care in the CDG, UBH is

19  relying on CMS?

20  **A.**   For the examples, that's correct.

21  **Q.**   And we just established those examples do not appear

22  anywhere in the CMS definition?

23  **A.**   Not in the section that we've looked at, correct.

24      I'd have to look through the whole manual to see if

25  they're elsewhere.

1  Q.   Okay.  Let's turn to Exhibit 148.  This is the March 2015

2  Custodial Care Guideline.

3       Do you see that?

4  A.   I do, yes.

5  Q.   And on page 3, there's a definition of custodial care.

6       Do you see it?

7  A.   Yes, I do.

8  Q.   And that definition also cites to the 2011 Certificate of

9  Coverage?

10  A.   That is correct.

11  Q.   And here it's slightly different, so I'll just read these

12  bullets in.

13       So in this definition custodial care in a psychiatric

14  inpatient or residential setting is any one of the following --

15  any of the following.  Excuse me.

16       "Non-health-related services, such as assistance in

17  activities of daily living (Examples include feeding, dressing,

18  bathing, transferring and ambulating);

19       "Health-related services that are provided for the primary

20  purpose of meeting the personal needs of the patient or

21  maintaining a level of function (Even if the specific services

22  are considered to be skilled services) as opposed to improving

23  that function to an extent that might allow for a more

24  independent existence."

25       And the last one is "Services that do not require

1    continued administration by trained medical personnel in order

2    to be delivered safely and effectively."

3        Did I read that correctly?

4    **A.**   Yes, you did.

5    **Q.**   And the CMS definition that we looked at earlier does not

6    say that skilled services are custodial; right?

7    **A.**   I'd have to go back to the CMS definition.  I want to

8    recall that there was something in there about that there are

9    services that don't need to be provided by trained medical

10   personnel.

11   **Q.**   Let's take a look.  It is Exhibit 735, at page 88.

12       Are you there?

13   **A.**   I'm there.

14   **Q.**   Are you referring to the sentence that says, "Custodial

15   care essentially is personal care that does not require the

16   continuing attention of trained medical or paramedical

17   personnel"?

18   **A.**   That is what I was referring to, yes.

19   **Q.**   So if services do require the skilled services of medical

20   or paramedical personnel, they are not custodial; right?

21   **A.**   Say that again.

22   **Q.**   If services do require the attention of trained medical or

23   paramedical personnel, they are not custodial under the CMS

24   definition; right?

25   **A.**   For that -- for that provision, yes.

1  Q.   And that includes services that may be needed to maintain

2  a level of function; right?

3  A.   Yes, yes.

4  Q.   Let's look quickly at Exhibit 654.

5       Are you there?

6  A.   I'm there.

7  Q.   This is the November 6th, 2014, version of the Medicare

8  Benefit Policy Manual, chapter 16; right?

9  A.   That is correct.

10       MS. REYNOLDS:   Your Honor, we move Exhibit 654 into

11  evidence.

12       MS. ROMANO:   No objection.

13       THE COURT:   It's admitted.

14       (Trial Exhibit 654 received in evidence.)

15  BY MS. REYNOLDS:

16  Q.   And, Mr. Niewenhous, do you recall there being any

17  substantive changes between the version of Chapter 16 in

18  Exhibit 735 versus the version of Chapter 16 that's in

19  Exhibit 654?

20  A.   I -- I don't recall one way or the other.

21  Q.   Mr. Niewenhous, your responsibilities at UBH include

22  responsibility for the Medicare coverage summaries; right?

23  A.   That is correct.

24  Q.   And the Medicare coverage summaries are clinical

25  guidelines that UBH employees use in making clinical coverage

NIEWENHOUS - DIRECT / REYNOLDS

1  determinations under Medicare Advantage plans?

2  **A.**   That is correct.

3  **Q.**   Would you turn to Exhibit 445.

4  **A.**   I'm there.

5  **Q.**   This is UBH's April 2014 Medicare Coverage Summary for

6  Psychiatric and Psychological Outpatient Services; right?

7  **A.**   That's correct.

8  **Q.**   I'm going to do a couple of these in a row.  So could you

9  look at Exhibit 497.

10  **A.**   I'm there.

11  **Q.**   This is UBH's August 2015 Medicare Coverage Summary for

12  Psychiatric and Psychological Outpatient Services; right?

13  **A.**   August 2015, that's correct.

14  **Q.**   Would you look at Exhibit 555.  555.

15  **A.**   I'm there.

16  **Q.**   This is UBH's October 2016 Medicare Coverage Summary for

17  Psychiatric and Psychological Outpatient Services; right?

18  **A.**   That is correct, yeah.

19  **Q.**   Let's look at 477.  Are you there?

20  **A.**   I'm there.

21  **Q.**   This is UBH's November 2014 Medicare Coverage Summary for

22  Alcohol and Substance Abuse Treatment; right?

23  **A.**   That is correct.

24  **Q.**   And, lastly, Exhibit 494.  Are you there?

25  **A.**   I'm there.

```
 1   Q.   This is UBH's June 2015 Medicare Coverage Summary for
 2   Alcohol and Substance Abuse Treatment; right?
 3   A.   That is correct, yes.
 4        MS. REYNOLDS:  Your Honor, we move Exhibits 445, 497,
 5   555, 477, and 494 into evidence.
 6        MS. ROMANO:  No objection.
 7        THE CLERK:  What was the other one?
 8        THE COURT:  Pardon?
 9        MS. ROMANO:  No objection.
10        THE COURT:  Okay.  It's admitted.
11     (Trial Exhibits 445, 477, 494, 497, 555, 477, and 494
12      received in evidence.)
13        MS. REYNOLDS:  445 --
14        MS. ROMANO:  Your Honor --
15        THE COURT:  Subject to the motion in limine.
16        MS. ROMANO:  Yes.
17        THE COURT:  Got it.
18        THE CLERK:  497.
19        MS. REYNOLDS:  497, 555, 477, and 494.
20        THE CLERK:  Okay.  Thank you.
21        MS. REYNOLDS:  I'm not sure, Your Honor, are they
22   admitted?
23        THE COURT:  Yes, they're admitted.
24        MS. REYNOLDS:  Thank you, Your Honor.
25   \\\
```

NIEWENHOUS - DIRECT / REYNOLDS

1    BY MS. REYNOLDS:

2    Q.    All right.  Let's turn back to Exhibit 445.  Sorry.

3          Custodial care is excluded under Medicare; right?

4    A.    Yes, it is.

5    Q.    Let's turn to page 5 of Exhibit 445.

6          Are you there?

7    A.    I am.

8    Q.    And you drafted the Medicare coverage summaries; right?

9    A.    Either myself or Ms. Urban, yes.

10   Q.    And then they were approved by the BPAC?

11   A.    That is correct.

12   Q.    All right.  Let's look at the definition of custodial care

13   here.  It says:

14         "Personal care that does not require the continuing

15   attention of trained medical or paramedical personnel.  In

16   determining whether a person is receiving custodial care, the

17   intermediatory for care considers the level of care and medical

18   supervision required and furnished.

19         "It does not base the decision on the diagnosis, type of

20   condition, degree of functional limitation, or rehabilitation

21   potential."

22         Did I read that correctly?

23   A.    You did, yes.

24   Q.    And that definition is based on CMS Chapter 16; right?

25   A.    That is correct, yes.

**NIEWENHOUS - DIRECT / REYNOLDS**

1  **Q.**   And it does not define custodial care as treatment

2  occurring when the member is not responding to treatment or is

3  otherwise not improving; right?

4  **A.**   That's not stated here, right.

5  **Q.**   This Medicare coverage summary does not define custodial

6  care as treatment occurring when services can safely be

7  provided in a less intensive setting, does it?

8  **A.**   That is correct.

9       It's worth noting, though, that this is a coverage

10  determination guideline on outpatient services.  And I'm

11  looking at the specific exclusions for outpatient services that

12  start on the bottom of page 5 and go through page 7, and

13  there's nothing in here about custodial being an exclusion for

14  outpatient services.

15  **Q.**   All right.  Let's turn to page 8 of Exhibit 445.

16  **A.**   I'm there.

17  **Q.**   This page has UBH's definition of improvement for purposes

18  of administering Medicare Advantage plans; right?

19  **A.**   Yes.

20  **Q.**   And it says:

21       "Services are for the purpose of diagnostic study or

22  reasonably expected to improve the member's condition."  And

23  then there's a bullet that says, "Improvement in this context

24  is measured by comparing the effect of continuing treatment

25  versus discontinuing it.

1          "Where there is a reasonable expectation that if treatment

2     services were withdrawn the patient's condition would

3     deteriorate or lapse further or require hospitalization, this

4     criterion would be met."

5          This is based on CMS Chapter 2?

6     **A.**    Well, more specifically, it's based on the psychiatry and

7     psychology local coverage determination that you see referenced

8     on page 6.

9     **Q.**    And is that CMS local coverage determination consistent

10    with CMS Chapter 2?

11    **A.**    I would have to compare the two, but I assume that, if CMS

12    is putting out a local coverage determination, they would want

13    it to be consistent with their guidance in the benefit policy

14    manual.

15    **Q.**    And focusing again on page 8 of Exhibit 445, this

16    definition of improvement doesn't limit the context of

17    improvement to the member's acute signs and symptoms, does it?

18    **A.**    It does not, no.

19    **Q.**    And let me just make sure we're oriented.  On page 7, the

20    section that we're looking at right now are the coverage

21    criteria; right?

22    **A.**    That's correct.

23    **Q.**    Okay.  Back on page 8, the next black bullet, do you see

24    that?  It says:

25         "Treatment is designed to reduce or control the member's

1    psychiatric symptoms so as to prevent relapse or

2    hospitalization and improve or maintain the member's level of

3    functioning."  Right?

4    **A.**    That's correct, yes.

5    **Q.**    And then the next bullet says:

6         "Treatment improves or maintains the patient's level of

7    functioning; and although it may be appropriate, it is not

8    necessary for the goal to be to restore the patient's level of

9    functioning prior to the onset of illness."

10        Did I read that correctly?

11   **A.**    That is correct, yes.

12   **Q.**    And then the next bullet says:

13        "For patients with long-term or chronic conditions, the

14   control of symptoms and maintenance of functioning to avoid

15   further deterioration or hospitalization is considered

16   improvement; and patients may increase their level of

17   functioning but reach a point where further significant

18   increase in functioning is not expected.

19        "When stability can be maintained without further

20   treatment/less intensive treatment, services are no longer

21   necessary."

22        Did I read that correctly?

23   **A.**    You did, yes.

24   **Q.**    So, for Medicare Advantage plans, UBH considers

25   maintenance of a level of functioning as an appropriate goal of

1    treatment; right?

2    **A.**    More specifically, CMS and -- well, the particular local

3    coverage determination does.

4    **Q.**    Well, this is a UBH policy; right?

5    **A.**    Which reflects CMS's local coverage determination, yes.

6    **Q.**    So in the context of Medicare, UBH considers maintenance

7    of a level of functioning to be an appropriate goal of

8    treatment; right?

9    **A.**    For -- for these states, under this particular local

10   coverage determination, we would follow CMS's guidance.  And,

11   yes, CMS's guidance is as you stated it.

12   **Q.**    Let's look for a moment at Exhibit 477.  And this is the

13   2014 Medicare Coverage Summary for Alcohol and Substance Abuse

14   Treatment; right?

15   **A.**    That is correct.

16   **Q.**    Okay.  And this Medicare coverage summary is applicable to

17   all levels of care?

18   **A.**    To all levels of covered care.  I'm looking at page 2,

19   gray box, the last bullet.  This is a National Coverage Summary

20   applicable to all states' jurisdictions, et cetera.

21       And then there's a list of levels of care; inpatient

22   hospitalization for treatment of alcoholism -- inpatient

23   hospital stays for treatment of alcoholism, detoxification and

24   rehabilitation, outpatient hospital services for treatment of

25   alcoholism, and others in this list.

1    **Q.**    I'd like to draw your attention to page 4.

2         Do you see the definition of custodial care?

3    **A.**    I do.

4    **Q.**    And that is the same as in the Exhibit 445 that we were

5    just looking at?

6    **A.**    That is correct, yes.

7    **Q.**    And then turn to page 6, please.

8         Do you see the definition of active inpatient treatment?

9    **A.**    I do.

10   **Q.**    And that cites CMS Chapter 2?

11   **A.**    It -- yes, it actually cites, depending on which provision

12   you're looking at, A cites Chapter 2, and B goes on to cite CMS

13   publication 100-01 Medicare General Information Eligibility

14   Entitlement Manual, Chapter 4, Section 10.9.

15   **Q.**    Sticking with A for a moment, the definition of active

16   inpatient treatment in the Medicare Coverage Summary is to be

17   designated as "active" services -- excuse me.  To be designated

18   as "active," services must be:

19        1) Provided under an individualized treatment or

20   diagnostic plan.

21        2) Supervised and evaluated by a physician.

22        3) Reasonably expected to improve the member's condition

23   or for the purpose of diagnostic study.

24        And then there is a subpart A, which says:

25        "It is not necessary that a course of therapy have as its

1    goal the restoration of the member to a level of which would

2    permit discharge from the institution although the treatment

3    must, at a minimum, be designed to reduce or control the

4    member's systems that necessitated hospitalization and improve

5    the member's level of functioning."

6          Did I read that correctly?

7    **A.**    Yes, you did.

8    **Q.**    And then I'd like to draw your attention to -- sorry --

9    the continued stay criteria which are on page 11.

10         Do you see those?

11   **A.**    I do.

12   **Q.**    And there it says that:  "It may be appropriate to

13   continue treatment at the present level of care if one or more

14   of the following is met."

15         And it cites the ASAM criteria; is that right?

16   **A.**    That's correct.

17   **Q.**    And the first one says, in paragraph A:

18         "The member is making progress, but has not yet achieved

19   the goals articulated in the individualized treatment plan.

20   Continued treatment at the present level of care is assessed as

21   necessary to permit the member to continue to work toward his

22   or her treatment goals."

23         Did I read that correctly?

24   **A.**    You did.

25   **Q.**    The next one is, in paragraph B:

1          "The member is not yet making progress but has the

2     capacity to resolve his or her problems.  He or she is actively

3     working toward the goals articulated in the individualized

4     treatment plan.

5          "Continued treatment at the present level of care is

6     assessed as necessary to permit the member to continue to work

7     toward his or her treatment goals."

8          Did I read that correctly?

9     **A.**   That is correct.

10    **Q.**   And then in paragraph C, it says:

11         "New problems have been identified that are appropriately

12    treated at the present level of care.  The new problem or

13    priority requires services the frequency and intensity of which

14    can only be safely delivered by continued stay at the current

15    level of care.

16         "The level of care in which the member is receiving

17    treatment is, therefore, the least intensive at which the

18    member's new problems can be addressed effectively."

19         Did I read that correctly?

20    **A.**   You did.

21    **Q.**   All right.  I'd like to turn to Exhibit 437.

22         Are you there?

23    **A.**   I'm there.

24    **Q.**   All right.  This is a February 2014 email exchange.  And

25    the last email in the chain is from Michael Bresolin to Carolyn

1   Regan and yourself, among others; right?

2   **A.**   That is correct, yes.

3          **MS. REYNOLDS:**   Your Honor, we move Exhibit 437 into

4   evidence.

5          **MS. ROMANO:**   No objection.

6       (Trial Exhibit 437 received in evidence.)

7   **BY MS. REYNOLDS:**

8   **Q.**   This email string is discussing the addition of a

9   definition of medical necessity to the Level of Care

10  Guidelines; right?

11  **A.**   That is -- that is correct, yes.

12  **Q.**   And that definition was, in fact, added in 2014; right?

13  **A.**   That's my recollection, yes.

14  **Q.**   And the definition that UBH added was adopted from the

15  standard United Healthcare Certificate of Coverage?

16  **A.**   That is my recollection, yes.

17  **Q.**   Looking at page 3 of Exhibit 437, there's an email from

18  you to -- is it Mr. Bresolin or Dr. Bresolin?

19  **A.**   Dr. Bresolin.

20  **Q.**   Dr. Bresolin, Ms. Regan, Dr. Triana; and Adam Easterday;

21  right?

22  **A.**   That's correct.

23  **Q.**   And in your email you mentioned that Bill Bonfield

24  proposed adding a reference to the least restrictive level of

25  care; right?

NIEWENHOUS - DIRECT / REYNOLDS

1   **A.**   I see that, yes.

2   **Q.**   Then in the next email above that on the page

3   Mr. Easterday comments that "The 'least restrictive' language

4   cannot be part of the actual definition of medical necessity";

5   right?

6   **A.**   I'm sorry, where are you looking?

7   **Q.**   I am in the next email just above yours on the page where

8   it says "My high level thoughts."

9        Do you see that?

10  **A.**   Yes, I do.

11  **Q.**   Okay.  And then paragraph one is:

12       "We could keep the 'least restrictive' language, but it

13  cannot be part of the actual definition of medical necessity."

14       Do you see that?

15  **A.**   I do.

16  **Q.**   And that's because, as you note in your email below that,

17  the plan's definition of medical necessity does not say

18  anything about least restrictive; right?

19  **A.**   That is my recollection, yes.

20  **Q.**   Okay.  Now let's look at the first page of the exhibit.

21       There's an email from Carolyn Regan, who, as of 2014, was

22  your boss; right?

23  **A.**   That's correct, yes.

24  **Q.**   And she states in her email:

25       "I think that taking out the restrictive setting language

1    is okay because it is likely that the least costly service

2    would also be offered in a less restrictive environment."

3          Did I read that correctly?

4    **A.**    You did.

5    **Q.**    And when Michael Bresolin responds to Ms. Regan, he writes

6    "Agree" under that; right?

7    **A.**    I'm not sure if that is his writing or not.

8    **Q.**    And it's consistent with your understanding that less

9    restrictive settings are generally less costly than more

10   restrictive settings; right?

11   **A.**    No, no.  It's actually not my understanding.  Perhaps on a

12   unit basis, a day of hospitalization may cost more than a day

13   of, say, partial hospital.

14         But over the course of treatment, one day of inpatient is

15   probably going to be cheaper than, say, four weeks of partial.

16   So you just cannot look at it on unit-cost basis.

17   **Q.**    So in the example you just gave, a course of partial

18   hospitalization would be more costly than a course of inpatient

19   hospitalization because the inpatient hospitalization is

20   shorter in duration?

21   **A.**    That would be an example, yes.

22   **Q.**    All right.  Let's turn to Exhibit 450.

23   **A.**    I'm sorry, did you say 415?

24   **Q.**    450.  Four-five-zero.

25         **THE COURT:**  So you're saying she's wrong?  Ms. Regan

NIEWENHOUS - DIRECT / REYNOLDS

1    is wrong in her email when she says it's likely the least

2    costly service would also be offered in a lease restrictive

3    environment?  She's wrong?

4         **THE WITNESS:**  She's wrong if she's talking about

5    anything more than a unit cost at cost per day.

6         **THE COURT:**  All right.

7    **BY MS. REYNOLDS:**

8    **Q.**   But she is correct on a unit-cost basis; right?

9    **A.**   Yes.

10   **Q.**   All right.  Let's turn to 450.

11   **A.**   I'm there.

12   **Q.**   Okay.  This is an email from you to Kiran Kumar, right, on

13   May 20th, 2014?

14   **A.**   Yes, it is.

15        **MS. REYNOLDS:**  Your Honor, we move Exhibit 450 into

16   evidence.

17        **THE COURT:**  Admitted.

18        (Trial Exhibit 450 received in evidence.)

19   **BY MS. REYNOLDS:**

20   **Q.**   In this email you asked Mr. Kumar to post a document to

21   UBH's inSite; right?

22   **A.**   I do, yes.

23   **Q.**   That's UBH's internal internet?

24   **A.**   Intranet.

25   **Q.**   Intranet?

**NIEWENHOUS - DIRECT / REYNOLDS**

1    **A.**    Yes.

2    **Q.**    All right.  And the document was called the "Guideline

3    Applicability Tool"; right?

4    **A.**    That is correct.

5    **Q.**    And in your email you explain, in the paragraph under the

6    heading Optum, "Optum Health Behavioral Solutions of California

7    Guideline Applicability Tool, you say:

8         "Optum and OptumHealth Behavioral Solutions of California

9    utilize the Level of Care Guidelines to make medical necessity

10   determinations and the Coverage Determination Guidelines to

11   make determinations that are based on the terms of the plan.

12        "Optum and OptumHealth Behavioral Solutions of California

13   also utilize unique guidelines when required to do so by

14   contract or regulation."

15        Did I read that correctly?

16   **A.**    You did, yes.

17   **Q.**    And then under is that it says:

18        "The Guideline Applicability Tool provides staff with a

19   means for determining the applicable form of guideline."

20        Did I read that right?

21   **A.**    Yes, you did.

22   **Q.**    And that's the purpose of the Guideline Applicability

23   Tool; right?

24   **A.**    Yes.  As our book of business grew, as there came to be

25   more state and federal regulations mandating guidelines other

1    than our standard guidelines, I was asked to put together an

2    applicability tool.

3         So, as I say here, staff would have a means for

4    determining which form of guideline to use under what

5    circumstance for which line of business.

6    Q.   Okay.  Let's look at page 5 of Exhibit 450.

7         Are you there?

8    A.   I'm there.

9    Q.   So this is the first version of UBH's Guideline

10   Applicability Tool; right?

11   A.   I'm not sure if it's the first version.

12   Q.   Well, this is the one you asked Mr. Kumar to post on the

13   inSite; right?

14   A.   Yes.

15   Q.   And the tool uses UBH's brand name of Optum; right?

16   A.   That is correct.

17   Q.   That's referring to UBH?

18   A.   That is correct.

19   Q.   Okay.  And there's a section at the top that refers to

20   Optum's standard criteria; right?

21   A.   That is correct.

22   Q.   Okay.  And there's a column for commercial?

23   A.   Yes.

24   Q.   And there are columns for Medicaid, Medicare, and

25   Dual-Eligible Medicare-Medicaid; right?

1   **A.**   That's correct.

2   **Q.**   Looking at the commercial column, under the section that

3   says "Optum's Standard Criteria," there's a row for when

4   determinations are based on medical necessity; right?

5   **A.**   That's correct.

6   **Q.**   And that means when the plan has a requirement that

7   services be medically necessary?

8   **A.**   That is correct.

9   **Q.**   And in that row, in the column that says "Commercial,"

10  Optum's standard criteria are the Optum Level of Care

11  Guidelines?

12  **A.**   Say again.

13  **Q.**   I'm just trying to confirm that, when the determinations

14  are based on medical necessity, Optum's standard criteria are

15  the Optum Level of Care Guidelines; right?

16  **A.**   Yes, along with the psychological and neuropsychological

17  testing guidelines.

18  **Q.**   And the psychological and neuropsychological testing

19  guidelines don't have anything to do with selecting a level of

20  care; right?

21  **A.**   No.  There's -- as the name says, it's focused on the

22  request for psychological or neuropsychological testing.

23  **Q.**   And in the next row, it says "When determinations are

24  based on the terms of the benefit plan."  And that refers to

25  plans that don't have a medical necessity definition; right?

1   **A.**   That's correct.

2   **Q.**   So for those plans, Optum's standard criteria are the

3   Optum Coverage Determination Guidelines; right?

4   **A.**   That's correct.

5   **Q.**   Okay.  And then there's another section that follows the

6   top section that says "Criteria that supercedes Optum's

7   standard criteria."  Is that right?

8   **A.**   That is correct.

9   **Q.**   And so -- and then listed under that, on the left side,

10  are all the states; right?

11  **A.**   That is correct.

12  **Q.**   Okay.  And so the way to use this tool, right, is to

13  follow the column for commercial and then look to see if there

14  is a superseding guideline to apply in a particular state;

15  right?

16  **A.**   That's correct.

17  **Q.**   Okay.  And in this version, there are superseding

18  guidelines in Rhode Island for day treatment and in Texas for

19  substance-related disorders; right?

20  **A.**   That's correct.

21  **Q.**   All right?

22          **MS. REYNOLDS:**  All right.  I'm going to mark all of

23  them.  So I'll mark them and then we'll put them all in at

24  once.

25  \\\

1    BY MS. REYNOLDS

2    Q.   So let's look first at Exhibit 268.  And while you're

3    getting there, I just have a general question.

4        UBH updated the Guideline Applicability Tool from time to

5    time; right?

6    A.   That is correct.

7    Q.   All right.  You're at Exhibit 268?

8    A.   I am.

9    Q.   This is the October 2014 version of the Guideline

10   Applicability Tool?

11   A.   That is correct.

12   Q.   Let's look at 269.  That's the November 2014 version of

13   the Guideline Applicability Tool?

14   A.   That's correct.

15   Q.   And let's look at 270.  That's the January 2015 version of

16   the Guideline Applicability Tool?

17   A.   That is correct, yes.

18   Q.   271, that's the March 2015 version of the Guideline

19   Applicability Tool?

20   A.   That is correct.

21   Q.   272, that's the May 2015 version of the Guideline

22   Applicability Tool?

23   A.   That is correct.

24   Q.   273, that's the September 2015 version of the Guideline

25   Applicability Tool?

NIEWENHOUS - DIRECT / REYNOLDS

1     **A.**   That is correct as well.

2     **Q.**   274, Exhibit 274 is the January 2016 version of the

3     Guideline Applicability Tool?

4     **A.**   That's correct.

5     **Q.**   Exhibit 275.  Exhibit 275 is the May 2016 version of the

6     Guideline Applicability Tool?

7     **A.**   That is correct.

8     **Q.**   276.  Exhibit 276 is the July 2016 version of the

9     Guideline Applicability Tool?

10    **A.**   That is correct as well.

11    **Q.**   277.  Exhibit 277 is the August 2016 version of the

12    Guideline Applicability Tool?

13    **A.**   That is correct.

14    **Q.**   And, finally, 278.  And 278 is the January 2017 version of

15    the Guideline Applicability Tool; right?

16    **A.**   That is correct.

17    **Q.**   Okay.  And either you or Loretta Urban prepare each

18    version of this Guideline Applicability Tool?

19    **A.**   That's correct.

20    **Q.**   Let's look very quickly at Exhibit 274.

21        **MS. REYNOLDS:**  Your Honor, I move Exhibits 268 through

22    278 into evidence.

23        **MS. ROMANO:**  No objection.

24        **THE COURT:**  They're admitted.

25       (Trial Exhibit 268 through 278 received in evidence.)

1    BY MS. REYNOLDS:

2    **Q.**   All right.  Now let's turn to 274, which is the

3    January 2016 version of the tool.

4         Are you there?

5    **A.**   I'm there.

6    **Q.**   Okay.  Do you see under "Criteria That Supercedes Optum's

7    Standards Criteria for the State of Illinois" under the

8    Commercial plan column?  Do you see that it says ASAM for

9    substance-related disorders?

10   **A.**   I do.

11   **Q.**   And January 2016 is the first time that UBH reflected that

12   ASAM criteria superseded UBH's standard criteria --

13   **A.**   That is correct.

14   **Q.**   -- for the State of Illinois?

15        And UBH's Guideline Applicability Tool do not reflect in

16   any version that the ASAM criteria supersede UBH's level of

17   care criteria for the State of Rhode Island; right?

18   **A.**   No.  Actually, I'm looking -- I'm still in the

19   January 2016.  I'm in the Medicaid column.  And there's a

20   reference to ASAM for Medicaid.

21   **Q.**   Thank you.

22        Let me make sure I'm very clear for the record.  I'm

23   asking only about the commercial column, so only applicable to

24   commercial plans.

25        UBH's -- UBH's Guideline Applicability Tool does not

**NIEWENHOUS - DIRECT / REYNOLDS**

1    reflect for commercial plans that the ASAM criteria supersede

2    UBH's standard criteria for the State of Rhode Island; right?

3    **A.**    That is correct.

4    **Q.**    And the Guideline Applicability Tool in the commercial

5    column does not reflect that the ASAM criteria supersede UBH's

6    standard criteria in the State of Connecticut; right?

7    **A.**    That is correct.

8    **Q.**    Let's talk about Texas for a moment.

9         Texas law requires insurance companies to make medical

10   necessity determinations for substance use disorder treatment

11   using criteria issued by the Texas Department of Insurance;

12   right?

13   **A.**    That is correct.

14              **MS. ROMANO:**  Objection.  Calls for a legal conclusion.

15              **THE COURT:**  This is background.  Go ahead.

16   **BY MS. REYNOLDS:**

17   **Q.**    And for a period of time those were called the TCADA

18   guidelines; right?

19   **A.**    That is correct.

20   **Q.**    And TCADA stands for Texas Commission on Alcohol and Drug

21   Use?

22   **A.**    Drug Abuse.

23   **Q.**    Drug Abuse, yes.  Thank you.

24        And that Texas requirement was in effect since before

25   2011; right?

 1   A.   That is correct.

 2   Q.   Let's look at Exhibit 493.

 3        And before I ask you about it, every version of UBH's

 4   Guideline Applicability Tool reflects that the Texas criteria

 5   supersede UBH's standard criteria for substance disorder

 6   treatment in Texas; right?

 7   A.   For commercial business, yes.

 8   Q.   For commercial business.  Thank you.

 9        All right.  Now let's turn to 493.  Are you there?

10   A.   I'm there.

11   Q.   This is a May 26, 2015, email from you to Carolyn Regan;

12   right?

13   A.   Yes, it is.

14        MS. REYNOLDS:  I move Exhibit 493 into evidence.

15        MS. ROMANO:  No objection.

16        THE COURT:  It's admitted.

17        (Trial Exhibit 493 received in evidence.)

18   BY MS. REYNOLDS:

19   Q.   Okay.  Let's look at the fourth bullet down in your email.

20   You write:

21        "TCADA guidelines: Question from Houston about whether the

22   TCADA guidelines apply or the CDGs.  Former required by state

23   reg, latter thought to apply because of Parity.  Houston has

24   been using the CDGs.  Meeting with Tom Hamlin, Adam and Kevin

25   later this week."

1        Did I read that correctly?

2   A.   Yes, you did.

3   Q.   Let's talk about Connecticut.

4        Actually, before I move on, Houston there refers to the

5   Houston Care Advocacy Center?

6   A.   It does.

7   Q.   We talked about UBH's guideline applicability tools do not

8   reflect that, in Connecticut, any criteria supersede UBH's

9   standard criteria for commercial plans; right?

10  A.   That is correct, yes.

11  Q.   Connecticut does have a statute that sets forth certain

12  requirements for utilization review under commercial plans

13  though; right?

14  A.   It does.  And my recollection is that the regulation

15  requires either the use of a series of criteria, ASAM being

16  one, or that we post a document visible to our providers to

17  show where our guidelines either conform with or differ from

18  the guidelines that Connecticut recommends.

19  Q.   So let's look at Exhibit 378.  And I'll specifically draw

20  your attention to the portion under Original Appointment.

21       Do you see that?

22  A.   I do, yes.

23  Q.   Okay.  That's a May 28th, 2013, message from you to a

24  group of people for the purpose of scheduling a conference

25  call; right?

NIEWENHOUS - DIRECT / REYNOLDS

1    A.   Yes.

2         MS. REYNOLDS:  Your Honor, we move Exhibit 378 into

3    evidence.

4         MS. ROMANO:  No objection.

5         THE COURT:  It's admitted.

6    (Trial Exhibit 378 received in evidence.)

7    BY MS. REYNOLDS:

8    Q.   You state in your message that you are attaching a

9    legislative bulletin summarizing new Connecticut UR regulation

10   that goes into effect on October 1st of 2013; right?

11   A.   That's correct, yes.

12   Q.   And UR means utilization review; right?

13   A.   That is correct.

14   Q.   Okay.  And your message says:

15        "In a nutshell, the regulation requires use of ASAM for

16   substance use disorders, AACAP, service intensity instrument

17   for child/adolescent mental health, APA Best Practice

18   Guidelines, or ABH Guidelines for Adult Mental Health."

19        Did I read that correctly?

20   A.   You did.

21   Q.   You also note:

22        "The regulation allows the option to create and maintain a

23   crosswalk comparing each aspect of our criteria with the above.

24   Crosswalk has to be visible and must provide citations to

25   peer-reviewed medical literature that justify each deviation

1    from the above criteria."

2         Did I read that correctly?

3    **A.**   You did.

4    **Q.**   And then in your message you pose some key questions;

5    right?

6    **A.**   I do, yes.

7    **Q.**   And the first one is:

8         "What are the pros and cons of using the above criteria

9    versus creating a crosswalk?"

10        I read that correctly?

11   **A.**   Yes, you did.

12   **Q.**   And then underneath that, you state:

13        "Example, the APA Best Practice Guidelines are not UR

14   criteria."

15   **A.**   Right.  They're best practice guidelines.

16   **Q.**   And then underneath that, you state:

17        "Example, our criteria contain business decisions that

18   aren't addressed in clinical criteria such as the various time

19   frames for the initial evaluation."

20        I read that correctly?

21   **A.**   That is correct.

22   **Q.**   And then the next key question that you pose to this group

23   is:

24        "How will this regulation impact our ASO and risk

25   customers, including ben-ex?"

1        Did I read that correctly?

2   A.   You did.

3   Q.   And ASO is Administrative Services Only?

4   A.   That's correct.

5   Q.   That refers to self-funded plans?

6   A.   That is correct, yes.

7   Q.   And risk customers refers to fully insured plans?

8   A.   That is correct.

9   Q.   And ben-ex refers to benefit expense?

10  A.   That is correct.

11  Q.   And the group on this message discussed how to comply with

12  the Connecticut statute?

13  A.   You said that the group "discussed."  I would have to see

14  who showed up for the meeting.  But they were invited to

15  discuss it.

16  Q.   UBH decided to comply with the Connecticut statute by

17  creating a crosswalk?

18  A.   That's correct.

19  Q.   And not by adopting the ASAM criteria as its standard

20  criteria for substance use disorders under commercial plans;

21  right?

22  A.   That is correct.

23  Q.   Let's look at Exhibit 402.  Are you there?

24  A.   I'm there.

25  Q.   Okay.  This is a September 12, 2013, email from Loretta

1   Urban to Sharon Guinan and you; right?

2   **A.**   Sharon Guinan, yes.

3   **Q.**   Guinan.

4   **A.**   Yes.

5   **Q.**   Thank you.

6          **MS. REYNOLDS:**   Your Honor, we move Exhibit 402 into

7   evidence.

8          **MS. ROMANO:**   No objection.

9          **THE COURT:**   Admitted.

10          (Trial Exhibit 402 received in evidence.)

11   BY MS. REYNOLDS:

12   **Q.**   And Loretta Urban reported to you; right?

13   **A.**   Yes.

14   **Q.**   Okay.   And Ms. Urban attached to the email a guideline

15   crosswalk and deviations chart; right?

16   **A.**   That is correct.

17   **Q.**   And this is the chart that UBH created to comply with the

18   Connecticut statute?

19   **A.**   Yes, it is.

20   **Q.**   Okay.   You and Loretta Urban created the chart; right?

21   **A.**   That is correct.   And reviewed both the layout as well as

22   the level of content with -- I can't remember if it was all the

23   members of BPAC but certainly some of the members of BPAC.

24          The regulation didn't lay out specifications for how to do

25   the crosswalk, so Loretta and I wanted to get others' input to

 1   see if they thought that this would comply with the Connecticut

 2   regs.

 3   **Q.**   Did the BPAC approve the deviations chart?

 4   **A.**   You know, I'd have to look at BPAC minutes.  I honestly

 5   can't remember if we brought this to BPAC.

 6   **Q.**   But the purpose of the chart is to compare each aspect of

 7   UBH's guidelines to the criteria mandated by Connecticut and to

 8   note each deviation from the mandated criteria; right?

 9   **A.**   Where -- where it's comparable and where it deviates, yes.

10   **Q.**   UBH did, in fact, post this chart to its website; right?

11   **A.**   Yes, that is correct.

12   **Q.**   And it submitted this chart to the Connecticut Department

13   of Insurance?

14   **A.**   That would have been a filing matter, and I honestly don't

15   know if it was filed with the state.

16        The website that it's posted to is a publicly accessible

17   one, so not only can our providers look at it, but literally

18   anyone can, including a regulator.

19   **Q.**   All right.  Let's look at page 4 of Exhibit 402.  And

20   we're going to put it up on the screen and make it bigger

21   because it's really hard to read.

22        So just to get the lay of the land here, there are --

23   along the left side, there are rows that relate to various

24   guidelines.

25        And these are the different guidelines that are in the

1    Connecticut statute; right?

2    **A.**    Broken out in some detail, yes.

3    **Q.**    Okay.  And then there are columns that correspond to

4    various sections of the CDGs and LOCGs; right?

5    **A.**    Evaluation and treatment planning, discharge planning, and

6    so forth, yes.

7    **Q.**    And so let's look at the middle of the chart.

8         Do you see Admissions Criteria Deviations CDGs?

9    **A.**    I do.

10   **Q.**    And then there's another column that says Admissions

11   Criteria Deviations LOCGs; right?

12   **A.**    Yes, that's correct.

13   **Q.**    And the content underneath those two columns is identical;

14   right?

15   **A.**    Thank you.  Yes.

16   **Q.**    And, likewise, there's a column for Continued Stay

17   Criteria Deviations under the CDGs and a column for Continued

18   Stay Criteria Deviations under the LOCGs.  And the content in

19   those two columns is identical; right?

20   **A.**    We're scrolling over.

21   **Q.**    Sorry, I should be following the screen.

22   **A.**    Yes, that's correct.

23   **Q.**    Okay.  And then, lastly, there's a column for Discharge

24   Criteria Deviations under the CDGs and a column for Discharge

25   Criteria Deviations under the LOCGs; right?

1    **A.**    That is correct.

2    **Q.**    And, again, the actual content in those two columns is

3    identical; right?

4    **A.**    That is correct, yes.

5    **Q.**    All right.  Let's turn to page 5.  It's one big row that

6    pertains to the ASAM criteria; right?

7    **A.**    I'm sorry, are we still in --

8    **Q.**    It should be page 5 of Trial Exhibit 402, and it folds

9    out.

10   **A.**    Okay.  Now I see where we are.  Thank you.

11   **Q.**    Okay.  And so there's a big row on the deviations chart

12   for the American Society for Addiction Medicine; right?

13   **A.**    That is correct, yes.

14   **Q.**    And that refers to the ASAM criteria?

15   **A.**    Yes.

16   **Q.**    Okay.  And so we sort of have to do it by counting,

17   counting columns, because the headings are missing in the next

18   page.  But it would be the fifth -- the sixth column over,

19   actually, is the column that pertains to the admission criteria

20   for the LOCGs; right?

21   **A.**    We're looking again at the fifth and sixth column?

22   **Q.**    Right.  So the fifth column pertains to the admission

23   criteria under the CDGs, and the sixth column pertains to

24   admission criteria under the LOCGs; right?

25   **A.**    That is correct, yes.

1   Q.   Okay.  And so let's just focus on the column that pertains

2   to the LOCGs.

3        The content in the two columns is identical; right?

4   A.   That is correct, yeah.

5   Q.   Okay.  So starting the first row, the deviations chart

6   states -- I'll read it from the bigger one.  States:

7        "Optum Substance Use Disorder Guidelines are consistent

8   with most aspects of the ASAM admission criteria.  Three

9   overarching differences include:

10       "One, Optum does not address the six dimensional

11  categories as in the ASAM criteria;

12       "Two, the Optum criteria also encompass guidance for both

13  adults and adolescents under the same set of criteria;

14       "Three, other sources such as APA are cited alongside the

15  ASAM criteria in the Optum substance using disorder guidelines.

16  See citations."

17       Did I read that correctly?

18  A.   You did.

19  Q.   And this document doesn't contain citations; right?

20  A.   No, it does not.

21  Q.   Let's look at the next row, which refers to outpatient

22  guidelines.  Do you see that?

23       And if it's easier, we have it blown up on the screen.

24  A.   I see that.

25  Q.   Okay.  And so this says:

1          "Optum's Substance Use Disorders Outpatient Guidelines do

2     not cite Dimension 1, acute intoxication or withdrawal absence;

3     4, readiness to change; or, 6, recovery environment in the

4     admission criteria.  However, these elements are addressed in

5     the clinical best practice sections of the guidelines."

6          Did I read that correctly?

7     **A.**   You did.  And what this refers to, as far as the earlier

8     comment about the dimensions, is the ASAM's criteria use a

9     format with six dimensions.

10         We, in our guidelines, don't have six dimensions, although

11    we do address things like whether somebody is ready to change,

12    whether somebody is acutely intoxicated or is in withdrawal,

13    just not in the structure of six dimensions.

14    **Q.**   UBH considers those in the best practices section?

15    **A.**   For -- yes, that's what I wrote here, that for the

16    outpatient guidelines, yes.

17    **Q.**   And this column that we're looking at right now is

18    discussing deviations between UBH's admission criteria from the

19    ASAM criteria; right?

20    **A.**   Yes, that's what it says here in the admission criteria.

21    **Q.**   All right.  Let's look at the next row, which relates to

22    Optum's Intensive Outpatient Guidelines.

23         Do you see it?

24    **A.**   I do.

25    **Q.**   It says:

1          "Optum's intensive outpatient guidelines are consistent

2     with all items of the ASAM admission criteria, although Optum

3     does not identify them as dimensions."  Right?

4     **A.**    That's correct.  And, again, that plays to my earlier

5     point that we don't structure our guidelines into a table like

6     ASAM does with the six dimensions, but we address the same

7     considerations in our guidelines, just not the same structure.

8     **Q.**    And so this chart represents that UBH's intensive

9     outpatient admission criteria are fully consistent with ASAM?

10    **A.**    Yes, consistent with all the items of the ASAM admission

11    criteria.

12    **Q.**    Let's go down to the residential rehabilitation admission

13    criteria.  Do you see it?

14    **A.**    I do.

15    **Q.**    It says:

16         "Optum guidelines do not identify three separate levels of

17    residential treatment as does ASAM.  ASAM Levels 3.1, 3.3, and

18    3.5 are considered residential rehabilitation by Optum.

19    However, the criteria from all 3 ASAM levels are included in

20    the admission criteria for residential rehabilitation."

21         Did I read that correctly?

22    **A.**    You did.

23    **Q.**    Let's look at the next line down.

24         "Optum guidelines do not identify ASAM Level 3.7,

25    medically monitored intensive outpatient" -- excuse me --

1    "medically monitored intensive inpatient treatment in its

2    guidelines as such, but instead identifies inpatient

3    rehabilitation as the level of care that encompasses the

4    criteria for Level 3.7."

5        Did I read that correctly?

6    **A.**   Yes, you did.

7    **Q.**   So this chart represents that UBH's admission criteria

8    include criteria that cover ASAM Levels 3.1, 3.5 -- excuse

9    me -- 3.1, 3.3, 3.5, and 3.7; right?

10   **A.**   That's what it says here.  Although, if I could go back in

11   time, I would correct an error.

12       3.1, as I -- as I recall, is -- they give an example of a

13   halfway house or sober living arrangement.  We actually have

14   separate guidelines for those two levels of care.

15   **Q.**   So UBH's residential rehabilitation criteria do not

16   include criteria that are consistent with ASAM Level 3.1?

17   **A.**   The criteria for sober living and halfway houses are

18   similar Level of Care Guidelines for residential

19   rehabilitation.

20   **Q.**   Okay.  Let me make sure that I get a clear answer.

21       UBH's residential rehabilitation level of care criteria do

22   not include criteria for ASAM Level 3.1?

23   **A.**   That's correct.  That would be captured in the sober

24   living and supervised living a/k/a halfway house Level of Care

25   Guidelines.

1    Q.    Okay.   Let's look at the columns that correspond to the

2    continued stay criteria.   They're the columns to the right.

3    The seventh and eighth columns; right?

4         Are you there?   We're trying to get there.

5    A.    Okay.

6    Q.    Okay.   And so for both the LOCGs and the CDGs, this chart

7    represents that:

8         "Optum's continued stay criteria is more detailed but not

9    inconsistent with ASAM criteria guidance entitled Length of

10   Service.   See citations."

11        Did I read that correctly?

12   A.    You did, yes.

13   Q.    Let's go to the last two columns on the chart which relate

14   to discharge criteria.   And this chart -- do you see where we

15   are?

16   A.    Uh-huh.

17   Q.    "This chart represents that Optum's continued stay

18   criteria is more detailed but not inconsistent with ASAM

19   criteria guidance entitled Length of Service."

20        Did I read that correctly?

21   A.    Yes.

22   Q.    Exhibit 506.   Are you there?

23   A.    I'm there.

24   Q.    This is a November 6th, 2015, email from you to Paige

25   Johnson; right?

1   **A.**   That is correct, yes.

2           **MS. REYNOLDS:**   Your Honor, we move Exhibit 506 into

3   evidence.

4           **MS. ROMANO:**   One moment, Your Honor.

5       No objection.

6           **THE COURT:**   It's admitted.

7       (Trial Exhibit 506 received in evidence.)

8   **BY MS. REYNOLDS:**

9   **Q.**   And attached to the email that you sent, at pages 4 and 5

10  of Exhibit 506, this is again the deviations chart?

11  **A.**   That is correct, yes.

12  **Q.**   And this is the crosswalk that UBH created for the

13  Connecticut statute?

14  **A.**   That is correct, yes.

15  **Q.**   This is just the 2015 version of that chart?

16  **A.**   It's the version that would have been in effect as of

17  November 2015.

18  **Q.**   And let's just look quickly at page 5.   Thankfully, we

19  have the column headings on this page.

20      So there's another row.   Again, we see the row that

21  pertains to the ASAM criteria; right?

22  **A.**   Yes.

23  **Q.**   Okay.   So let's look at the admissions criteria

24  deviations.   And, again, there are two columns, one for CDGs,

25  one for LOCGs; right?

1   **A.**   That's correct.

2   **Q.**   And they contain identical content?

3   **A.**   Yes, they do.

4   **Q.**   And so looking under the Admissions Criteria Deviations

5   for the LOCGs, the first row says:

6        "Optum Substance Use Disorder Guidelines are consistent

7   with most aspects of the ASAM admission criteria.  Three

8   overarching differences include:

9        "One, Optum does not address the six dimensional

10  categories as in the ASAM criteria;

11       "Two, the Optum criteria also encompass guidance for both

12  adults and adolescents under the same set of criteria; and

13       "Three, other sources such as API are cited alongside the

14  ASAM criteria in the Optum Substance Use Disorders Guidelines.

15  See citations."

16       Did I read that correctly?

17  **A.**   Yes, you did.

18  **Q.**   As in the prior exhibit, this document doesn't contain

19  citations; right?

20  **A.**   That's right.  It's a cross-reference to if you look in

21  the guidelines you'll see citations.

22  **Q.**   And then in the next row, which relates to Outpatient

23  Admission Criteria; right?

24  **A.**   That's correct.

25  **Q.**   This states:

1          "Optum's Substance Use Disorders Outpatient Guidelines do

2    not cite Dimension 1, acute intoxication or withdrawal absence;

3    4, readiness to change; or, 6, recovery environment in the

4    admission criteria; however, these elements are addressed in

5    the clinical best practice sections of the guidelines."

6          Did I read that correctly?

7    **A.**   Yes, you did.

8    **Q.**   And that's the same as in the 2013 version of the chart?

9    **A.**   That is correct.

10   **Q.**   And I didn't ask you this for the first row, but that's

11   the same as in the 2013 version of the chart; right?

12   **A.**   Yes, it was.

13   **Q.**   All right.  Let's look at the outpatient intensive

14   guideline part.  It says, under the Admission Criteria

15   Deviations for Intensive Outpatient:

16         "Optum's Intensive Outpatient Guidelines are consistent

17   with all items of the ASAM admission criteria although Optum

18   does not identify them as dimensions."

19         Did I read that correctly?

20   **A.**   That's correct.

21   **Q.**   And that's the same as the 2013 version of the chart?

22   **A.**   That is correct, yes.

23   **Q.**   And then let's go down to the residential rehabilitation

24   row.  It says:

25         "Optum's guidelines do not identify three separate levels

1   of residential treatment as does ASAM.  ASAM Levels 3.1, 3.3,

2   and 3.5 are considered residential rehabilitation by Optum;

3   however, the criteria for all three ASAM levels are included in

4   the admission criteria for residential rehabilitation."

5        Did I read that correctly?

6   **A.**   Yes, you did.  But, as I testified a minute ago, if I

7   could go back in time, I would have taken Level 3.1 out of

8   there.

9   **Q.**   And this is the same as in the version in effect in 2013;

10  right?

11  **A.**   That's correct.

12  **Q.**   And then the next row says:

13       "Optum guidelines do not identify ASAM Level 3.7,

14  medically monitored intensive inpatient treatment, in its

15  guidelines as such, but instead identifies inpatient

16  rehabilitation at the level of care that encompasses the

17  criteria for Level 3.7."

18       Did I read that correctly?

19  **A.**   That is correct.  And here's another difference with ASAM.

20  ASAM uses terms like "medically monitored intensive

21  inpatient" -- they would use a term like "medically monitored

22  intensive inpatient treatment" where we would use a term like

23  "inpatient rehabilitation."

24  **Q.**   And that statement in the 2015 version is the same as in

25  the 2013 version; right?

1    **A.**    That is my recollection, yes.

2    **Q.**    And UBH still posts this chart on its website today;

3    right?

4    **A.**    You know, I haven't been involved in the commercial

5    guidelines since mid 2016, so I'm not sure.

6    **Q.**    All right.  Let's look at Exhibit 322, please.

7    **A.**    I'm there.

8    **Q.**    This is an October 14th, 2011, email from you to Maria

9    Sekac; right?

10   **A.**    That is correct, yes.

11           **MS. REYNOLDS:**  And plaintiffs move Exhibit 322 into

12   evidence.

13           **MS. ROMANO:**  No objection.

14           **THE COURT:**  Admitted.

15       (Trial Exhibit 322 received in evidence.)

16   **BY MS. REYNOLDS:**

17   **Q.**    And in this email you're forwarding to go Ms. Sekac an

18   email from James Slayton to you?

19   **A.**    Yes.

20   **Q.**    And Dr. Slayton's email forwards another chain; right?

21   **A.**    That is correct, yes.

22   **Q.**    Okay.  Let's look at the first email in the chain, which

23   is on page 3 of Exhibit 322.  Are you there?

24   **A.**    I'm there.

25   **Q.**    It's an email from Diana Roscioli to Dr. Slayton and

1    others; right?

2    **A.**    That is correct, yes.

3    **Q.**    And Ms. Roscioli was a UBH employee at that time?

4    **A.**    That is correct.

5    **Q.**    And she was offering input on the 2012 Level of Care

6    Guidelines; right?

7    **A.**    I'm not sure if she's offering input or relaying input

8    from Harvard Pilgram.  For example, "In addition, Harvard

9    Pilgrim clinical leaders have been raising this issue with us."

10   **Q.**    Either way, the input related to the 2012 Level of Care

11   Guidelines?

12   **A.**    Yes.

13   **Q.**    And Ms. Roscioli asks whether there is any workgroup

14   underway to consider how to make current OP criteria more

15   robust to assist Ph.D. and M.D. reviewers in determining

16   optimal duration and frequency of OP sessions.

17       Did I read that correctly?

18   **A.**    You did, yes.

19   **Q.**    And in the next paragraph, Ms. Roscioli notes that Harvard

20   Pilgrim's clinical leaders have raised that issue because they

21   see numerous appeals and, quote, feel they have no criteria or,

22   quote, teeth, closed quote, on which to base denials, closed

23   quote.

24       Did I read that correctly?

25   **A.**    You did, yes.

1   **Q.**   Let's look at Exhibit 342.

2   **A.**   I'm there.

3   **Q.**   This is a June 18th, 2012, email from Maria Sekac to you

4   and others; right?

5   **A.**   That is correct, yes.

6   **Q.**   And it has the subject "Denial Process Documentation";

7   right?

8   **A.**   That is correct, yes.

9   **Q.**   And Ms. Sekac -- Ms. Sekac was a co-chair of the coverage

10  determination committee at this time; right?

11  **A.**   She was at one point, but I honestly don't know if she was

12  at this point.

13  **Q.**   In her email, Ms. Sekac reports that Bill Bonfield asked

14  her to convene a group to address a number of topics; right?

15  **A.**   That's correct.

16  **Q.**   And Bill Bonfield was UBH's chief medical director --

17  chief medical officer at that time?

18  **A.**   That is correct, yes.

19  **Q.**   And the first topic that Dr. Bonfield wanted to discuss

20  with the group on this email was:

21      "One, we need to have CDGs and LOCGs that have footnoted

22  content that is specific enough to drive denials."

23      Did I read that correctly?

24  **A.**   Yes, you did.

25  **Q.**   And Ms. Sekac notes -- below the list of four points that

NIEWENHOUS - DIRECT / REYNOLDS

```
 1   Dr. Bonfield wanted to discuss, she has a number 1.
 2        Do you see that?
 3   A.   I do.
 4   Q.   She notes, "Jerry is starting to work on what this may
 5   look like."  Right?
 6   A.   Yes, that's what it says.
 7   Q.   And "Jerry" refers to you?
 8   A.   Yes.
 9   Q.   All right.  Let's look at Exhibit 786, please.
10        Are you there?
11   A.   I'm there.
12   Q.   Okay.  This is a May 11, 2015, email from Carolyn Regan to
13   you and Dr. Bonfield; right?
14   A.   That is correct, yes.
15   Q.   And at that time you reported to Ms. Regan?
16   A.   Yes.
17   Q.   And Ms. Regan reported to Dr. Bonfield?
18   A.   Yes, that's correct.
19        MS. REYNOLDS:  Your Honor, we move Exhibit 786 into
20   evidence.
21        MS. ROMANO:  No objection.
22        THE COURT:  It's admitted.
23        (Trial Exhibit 786 received in evidence.)
24   BY MS. REYNOLDS:
25   Q.   Let's look at the beginning email in the string, which
```

1  starts on page 2 of the exhibit, Exhibit 786.

2      And that's a May 11, 2015, email from Ms. Regan to you and

3  Dr. Bonfield; right?

4  **A.**   That's correct.

5  **Q.**   And then it continues on page 3.

6      And Ms. Regan states: "I see that the LOCATDR criteria is

7  scheduled to be reviewed at BPAC tomorrow."

8      Did I read that correctly?

9  **A.**   Yes, you did.

10  **Q.**   Okay.  And are those criteria sometimes called the

11  "locator" criteria?

12  **A.**   Yes.  They're -- it's a set of alcohol and drug criteria

13  that was developed by the State of New York called LOCATOR.

14  **Q.**   Ms. Regan's email goes on:

15      "Please be aware that if BPAC recommends using LOCATDR for

16  commercial business, that it is only a recommendation.  There

17  will need to be an analysis of the guideline against our

18  internal criteria.  We cannot increase benefit expense.  And

19  there is also the issue of not having access to the LOCATDR

20  unless you have a New York state license."

21      Did I read that correctly?

22  **A.**   You did.

23      **MS. REYNOLDS:**  Your Honor, I am just about to the

24  sealed exhibit.  I would like to just take a 1-minute break to

25  see if there's anything else I need to cover before then.

```
 1          THE COURT:  One minute?

 2          MS. REYNOLDS:  Let me check with my colleagues.

 3          THE COURT:  Yeah.  Let's do ten minutes, and then

 4    we'll finish up for the day.

 5                 (Recess taken at 2:54 p.m.)

 6              (Proceedings resumed at 3:06 p.m.)

 7          THE CLERK:  We're back on the record in Case Number

 8    C 14-2346, Wit/Alexander versus UBH.

 9          THE COURT:  Okay.  Back on the record.

10       Go ahead.

11          MS. REYNOLDS:  Okay.  Just a couple more things,

12    Mr. Niewenhous.

13       First, for the Court, I neglected to move into evidence

14    Exhibit 342.

15          THE COURT:  That's the June 18, 2012, e-mail from

16    Sekak to various people.

17          MS. REYNOLDS:  Yes.

18          THE COURT:  Okay.  It's admitted.

19       (Trial Exhibit 342 received in evidence)

20    BY MS. REYNOLDS:

21    Q.   Okay.  Mr. Niewenhous, we talked for a little bit about

22    the deviations chart that UBH prepared in response to the

23    Connecticut statute.  Do you remember that?

24    A.   I do.

25    Q.   And you had mentioned that if you could go back in time,
```

1   you would correct the error that you identified; is that right?

2   **A.**   Yes, on that one.

3   **Q.**   Did you ever take any steps to correct that error?

4   **A.**   No, I did not.  In reviewing the evidence for this trial,

5   I noticed that; and, again, this is not part of my current

6   responsibilities, but I will recommend when I return that that

7   change be made.

8   **Q.**   Could you return to Trial Exhibit 445 at page 4?

9   **A.**   (Witness examines document.)

10  **Q.**   This is UBH's 2014 Medicare Coverage Summary for

11  Psychiatric and Psychological Outpatient Services; right?

12  **A.**   That is correct, yes.

13  **Q.**   Okay.  And on page 4 do you see right above the heading,

14  it says "Limitations and Exclusions," there's a paragraph?  Are

15  you with me?

16  **A.**   Yes, I am.

17  **Q.**   Okay.  That paragraph says (reading):

18          "Behavioral Health Services" -- "Behavioral Health

19          care services or supplies are provided when needed to

20          prevent, diagnose, or treat an illness, injury, condition,

21          disease, or its symptoms and that meet accepted standards

22          of medicine."

23          Did I read that correctly?

24  **A.**   Yes, you did.

25  **Q.**   Medicare requires Behavioral Health Services to meet

1    accepted standards of medicine?

2    A.    That's what I'm reading here, yes.

3    Q.    And so UBH's Medicare coverage summaries are supposed to

4    be consistent with generally accepted standards of care?

5    A.    Yes.

6    Q.    And generally accepted standards of care don't vary

7    depending on who's paying for the care; right?

8    A.    No, actually, they do.  For example, in this Medicare

9    coverage summary, I'm looking -- if you just look at the

10   guidance that's put out in the various LCDs starting on page 5

11   going through -- going through page 7, you'll see in the LCD

12   that covers Florida, Puerto Rico, Virgin Islands, et cetera --

13   it begins on the bottom of page 6 -- you'll see on page 7

14   "psychoanalysis is not covered when" and there's some

15   indicators.

16   Q.    So this is under the heading of "Psychotherapy Services

17   Limitations and Exclusions"?

18   A.    Right, as reflected in a local coverage determination for

19   Florida, Puerto Rico, and so forth.

20   Q.    And so those are provisions that reflect an exclusion

21   under Medicare; right?

22   A.    In that LCD for that region.  And where I'm heading to

23   with my point is you don't see a similar provision in the -- on

24   page 5 in the LCD for Alabama, et cetera.

25   Q.    So some Medicare plans have limitations and exclusions

1    that are not found in other Medicare plans?

2    **A.**   It's not so much Medicare plans.   It's CMS uses

3    organizations to develop local coverage determinations.   Those

4    organizations have, I'll call them, catchment areas -- Florida,

5    Puerto Rico for one and the others for another.   Sometimes

6    those organizations agree on what the standard of care is and

7    sometimes they disagree, and this is an example of where

8    there's disagreement.

9    **Q.**   So is it your testimony that what's generally accepted in

10   the behavioral health treatment community differs depending on

11   who is paying?

12   **A.**   No.   It's my testimony that the authors of local coverage

13   determinations don't always agree on what the generally

14   accepted standard of care is.

15   **Q.**   Okay.   Let's turn now to Exhibit 477 at page 12.

16   **A.**   (Witness examines document.)

17   **Q.**   Are you with me?

18   **A.**   I'm there.

19   **Q.**   And this is -- Exhibit 477 is the 2014 Medicare Coverage

20   Summary for Alcohol and Substance Abuse Treatment; right?

21   **A.**   (Witness examines document.)   The November 2014, yes.

22   **Q.**   Okay.   And page 12 is the discharge criteria for all

23   levels of care?

24   **A.**   That is correct, yes.

25   **Q.**   And the section begins (reading):

1              "It may be appropriate to transfer or discharge the

2         member from the present level of care if he or she meets

3         one or more of the following criteria..."

4         And then there's a citation to the ASAM criteria in 2013;

5    right?

6    **A.**    That is correct.

7    **Q.**    And the criteria that are set forth below are taken

8    directly from ASAM; right?

9    **A.**    That is my recollection, yes.

10   **Q.**    Medicare does not require UBH to use the ASAM criteria,

11   does it?

12   **A.**    No, it does not, but the National Coverage Determinations

13   for Alcohol and Substance Abuse Treatment that CMS puts out

14   don't contain any guidance beyond admission criteria.

15   **Q.**    And so UBH decided to include the ASAM criteria?

16   **A.**    Yes.

17        **MS. REYNOLDS:**  Your Honor, the only thing I have left

18   is the sealed exhibit, and I understand there's an issue about

19   that maybe plaintiffs would be able to stay.

20        **MS. ROMANO:**  No, there is no issue with respect to

21   plaintiffs being able to stay --

22        **MS. REYNOLDS:**  Okay.

23        **MS. ROMANO:**  -- since they would be parties to the

24   privilege at issue, as well as our clients and lawyers.  It

25   would only be those folks who fall outside of those categories.

1          THE COURT:  Okay.

2          MS. REYNOLDS:  And, Your Honor, I also understand that

3     there's a nonnamed plaintiff class member, or at least one, in

4     the courtroom, so would that person also be permitted to stay?

5          THE COURT:  I don't think so.

6          MS. REYNOLDS:  Okay.

7          THE COURT:  So here's what I propose to do:  Everyone

8     who isn't a named plaintiff or a plaintiffs' lawyer or the

9     defendants or defense lawyer or witness or court staff I'm

10    afraid will have to leave for a little bit here.  Okay?  Thank

11    you.

12         MR. CADA:  Your Honor, may I ask a question?

13         THE COURT:  Sure.  Come on up and tell me your name,

14    and I'll make a -- you're a class member?

15         MR. CADA:  I am a class member, yes.  I'm not a named

16    plaintiff.

17         THE COURT:  Oh, that's okay.

18         MR. CADA:  Okay.  My --

19         THE COURT:  Why don't you come up so the court

20    reporter can hear what you're saying.  Give me your name.

21         MR. CADA:  My name is Brian Cada, spelled C-A-D-A.

22         THE COURT:  Yes.

23         MR. CADA:  And my question is you mentioned earlier

24    that you were going to seal the courtroom unless there was an

25    objection.

NIEWENHOUS - DIRECT / REYNOLDS

1       THE COURT:  Yes.

2       MR. CADA:  May I ask, if there is an objection by

3   myself there, what would happen with -- maybe there's no

4   option, and then --

5       THE COURT:  Well, it depends what the basis for the

6   objection is, and then I rule on it.

7       MR. CADA:  Okay.  So my objection is that there's many

8   members of the audience, including myself, that have dealt with

9   UnitedHealthcare or United Behavioral Health for many years and

10  their, what I would consider, baseless denials, which included

11  the loss of my daughter to suicide and another daughter that

12  was denied residential care coverage.  And if there is internal

13  information to United Behavioral Health that was the basis for

14  why they would deny coverage in what I consider life-and-death

15  situations, I would certainly be interested in knowing it.

16      THE COURT:  I can appreciate your being interested in

17  knowing it, especially in your situation, and the Court has to

18  balance the confidentiality of the information, and in this

19  case it's strictly limited to a privilege document that all

20  sides agree is protected by the attorney-client privilege and

21  not other documents; but I appreciate your thoughts, but I'll

22  overrule that objection.

23      So as I was saying, if anyone who is not a named

24  plaintiff --

25      MR. CADA:  Thank you.

1          THE COURT:  -- or the defense or their lawyers and the

2    lawyers' staff and court staff, please leave the room.  I don't

3    expect this to be very long.

4         (Pages 425 through 428 were placed under seal by Order of

5    the Court.)

6    \\\

7    \\\

8    \\\

9    \\\

10   \\\

11   \\\

12   \\\

13   \\\

14   \\\

15   \\\

16   \\\

17   \\\

18   \\\

19   \\\

20   \\\

21   \\\

22   \\\

23   \\\

24   \\\

25   \\\

1                    <u>CROSS-EXAMINATION</u>

2    BY MS. ROMANO:

3    Q.   Good afternoon, Mr. Niewenhous.

4    A.   Good afternoon.

5    Q.   I'm going to start by having you take a look at

6    Exhibit 148, please.

7    A.   (Witness examines document.)  I'm there.

8    Q.   And, Mr. Niewenhous, is this Custodial Care and Inpatient

9    and Residential Services Coverage Determination Guideline that

10   you reviewed a little bit with Ms. Reynolds?

11   A.   The March 2015 version, yes.

12   Q.   I'd like to direct your attention to page 2, please.

13   A.   (Witness examines document.)  I'm there.

14   Q.   And specifically the second bullet point from the top that

15   reads (reading):

16           "Custodial care in a psychiatric inpatient or

17        residential setting is any of the following..."

18        And then it says "Certificate of Coverage 2011."  Do you

19   see that?

20   A.   I do.

21   Q.   What is a Certificate of Coverage?

22   A.   It is the -- it's a name for a benefit plan document.

23   Q.   Is it a term for a plan that would apply to Medicare

24   members?

25   A.   No.  It's a term that applies to commercial businesses.

1   Q.   And do the Certificates of Coverage for commercial

2   business contain language relating to custodial care?

3   A.   Well, that's what I'm citing here, is the language out of

4   the 2011 Certificate of Coverage related to custodial care.

5   Q.   And now, Mr. Niewenhous, I'd like to direct your attention

6   to Exhibit 268, please.

7   A.   (Witness examines document.)  I'm there.

8   Q.   And is this a -- this was one of the guideline

9   applicability tools that you testified about earlier with

10  Ms. Reynolds?

11  A.   That's correct, for October 2014.

12  Q.   And you pointed out the provision for the use of TCADA in

13  Texas for commercial plans.  Was that accurate?

14  A.   That is accurate.

15  Q.   And to your knowledge were the TCADA or Texas guidelines

16  used for substance use for UBH reviewers in commercial cases

17  prior to October of 2014?

18  A.   That is correct, yes.

19  Q.   And to your knowledge for how long had they been used for

20  the Texas commercial substance use cases?

21  A.   Oh, my goodness.  Well, I started with Optum in 2003 and

22  it was shortly after that that we became aware of the

23  regulation requiring us to use TCADA.  So 2004, '5.  Somewhere

24  in there.

25  Q.   And is it your understanding that it's been used

1  continuously for those cases from that time period to the

2  present?

3  **A.**    It continues to be a requirement so, yes.

4  **Q.**    Mr. Niewenhous, in your testimony earlier the entity

5  Harvard Pilgrim came up.  Do you recall that?

6  **A.**    I do.

7  **Q.**    Is Harvard Pilgrim part of the UBH or Optum family?

8  **A.**    No, it is not.  It's a -- it's a non-UnitedHealth Group

9  health plan.

10  **Q.**    In your testimony earlier today, the topic of Locator

11  Guidelines in New York came up.  Do you recall that?

12  **A.**    I do.

13  **Q.**    To your knowledge are the Locator Guidelines used for

14  New York business?

15  **A.**    Oh, boy, such an interesting question.  We had received

16  notice of a regulation in New York -- and this goes back

17  several years now -- that Locator or an alternative would be

18  required for use.  The regulation was much more explicit about

19  its required use for Medicaid than it was for commercial.  So

20  that prompted some work with Optum's Compliance Department to

21  understand whether Locator was required for commercial

22  business.

23       Initially the guidance that we got back from the state was

24  that Locator or an equivalent approved by New York's Office of

25  Alcohol and Substance Abuse Services would suffice.  There was

1   no process in the regs nor did Oasis have a process for

2   determining what a suitable alternative was.

3        I had submitted our Level of Care Guidelines for Oasis'

4   consideration, heard nothing back.  Eventually the state issued

5   clarification that ASAM was an alternative to Locator, so we

6   submitted a request to use ASAM; and then the state came back

7   with yet more guidance saying that ASAM was no longer a

8   suitable alternative.

9        So long-winded way of saying that we now use Locator for

10  both commercial and Medicaid.

11  **Q.**   All right.  Mr. Niewenhous, I'd like to direct your

12  attention to Exhibit 1.  That will be in a different binder.

13  **A.**   (Witness examines document.)  Ah, I got it.  I'm there.

14  **Q.**   Okay.  And I'd like to direct your attention to page 78 of

15  Exhibit 1, please.

16  **A.**   (Witness examines document.)

17  **Q.**   I guess let me ask you first, are these the 2011 Level of

18  Care Guidelines?

19  **A.**   That is correct.

20  **Q.**   Now, directing your attention to page 78 and specifically

21  paragraph 8, you were asked earlier about the phrase "clear and

22  compelling evidence."  Do you recall that testimony?

23  **A.**   I do.

24  **Q.**   Is that phrase "clear and compelling evidence" language

25  that's in the level of care common criteria in 2012?

1    **A.**     No.  We removed it.  Frankly, it didn't add anything to

2    the guidelines and it was distracting from the key points in

3    Number 8 that there be measurable and realistic progress and

4    the part about continued treatment is required to prevent acute

5    deterioration or exacerbation.

6         Part of our process for maintaining our guidelines is

7    continually asking ourselves, as well as the providers and

8    staff and consumers who give us input "Are we being clear?"

9    And this is an example of where we were not being clear by

10   adding that phrase "clear and compelling."

11   **Q.**   I'm trying to do this so you don't have to flip the

12   binders around.  So keeping the binder that's in front of you,

13   if you can turn to Exhibit 108, please.

14   **A.**   (Witness examines document.)  I'm there.

15   **Q.**   And is this a Custodial Care and Inpatient and Residential

16   Services Coverage Determination Guideline?

17   **A.**   It is for February 2014.

18   **Q.**   I'd like to direct your attention to page 2 -- excuse

19   me -- page 3 of this document, the trial exhibit number, and

20   specifically the third black bullet point down that starts with

21   "Examples."  Do you see where I am?

22   **A.**   I do.

23   **Q.**   Okay.  And it reads (reading):

24        "Examples of custodial care include respite services,

25        daily living skills instruction, days awaiting placement,

1          activities that are social and recreational in nature, or

2          solely to prevent runaway, truancy or legal problems."

3          Is that language in the subsequent Custodial Care Coverage

4     Determination Guidelines?  Do you know?

5     A.   I would have to check to see if it is.

6     Q.   All right.  Let's go ahead and do that then.  If we can

7     turn to Exhibit 148.

8     A.   (Witness examines document.)

9     Q.   Mr. Niewenhous, is 148 a later version of the Custodial

10    Care and Inpatient and Residential Services Coverage

11    Determination Guideline?

12    A.   It is.  It's the March 2015.

13    Q.   And does it contain the language I just read from the

14    prior Custodial Care Coverage Determination Guideline?

15    A.   No, it does not.

16    Q.   And if I can direct your attention to Exhibit 195.

17    A.   (Witness examines document.)  I'm there.

18    Q.   Is that a subsequent version of the Custodial Care

19    Coverage Determination Guideline?

20    A.   This is the April 2016 version so, yes.

21    Q.   And does this April 2016 version contain the language I

22    read from the March 2015 version?

23    A.   About respite care and so forth?

24    Q.   Yeah.  I'm sorry.  Let me restate the question because I

25    think I just said it wrong.

NIEWENHOUS - CROSS / ROMANO

1        Does this April 2016 version of the Custodial Care

2   Coverage Determination Guideline include the language I had

3   read from the February 2014 Custodial Care Coverage

4   Determination Guideline that included the examples of custodial

5   care including respite services, daily living skills,

6   et cetera?

7   **A.**   No, it does not.

8   **Q.**   And let me direct your attention now to Exhibit 221.

9   **A.**   I'm there.

10  **Q.**   Is this a Custodial Care Coverage Determination Guideline

11  as well?

12  **A.**   Yes, for March 2017.

13  **Q.**   And I'll ask you the same question now.  Does it contain

14  the language relating to the examples of custodial care,

15  including respite services and daily living skills, that we saw

16  in the February 2014 version?

17  **A.**   No, it does not.

18  **Q.**   Mr. Niewenhous, you were shown a variety of Medicare

19  coverage summaries in your testimony with Ms. Reynolds.  Do you

20  recall that?

21  **A.**   I do.

22  **Q.**   Do you play a role in the creation of the Medicare

23  coverage summaries?

24  **A.**   Ms. Urban and myself, yes, we do.

25  **Q.**   Can you explain the process for creating the Medicare

1    coverage summaries?

2    **A.**    Sure.   I'll be happy to.

3        As we were -- as I testified earlier, CMS issues two forms

4    of guidance or guidelines.   One is a National Coverage

5    Determination, which applies to all 50 states.   The alcohol and

6    drug document we looked at earlier is an example of something

7    that's derived from a National Coverage Determination.

8        The other form of guideline is called a Local Coverage

9    Determination and as the name implies, it is guidance that's

10   specific to what I called earlier a catchment area, a series of

11   states.   Those Local Coverage Determinations are developed by

12   organizations that CMS hires to write LCDs for particular

13   reasons -- or regions.   I'm sorry.

14       So our process in either creating or updating a Medicare

15   coverage summary is to go into CMS's site where it has both the

16   National Coverage Determinations and Local Coverage

17   Determinations; and if it's a new document, to pull up the

18   appropriate NCD or LCD and then craft the draft Medicare

19   coverage summary from that.

20       If it's an existing Medicare coverage summary, we check to

21   see if the NCDs have changed, but they rarely do; but we also

22   check to see if the LCDs have changed, which they frequently

23   do.   And then we update the Medicare coverage summary

24   accordingly.

25       Once we have a draft of a Medicare coverage summary, then

1    that draft is presented to BPAC, the Behavioral Policy and

2    Analytics Committee.  If there is a change to an existing

3    Medicare coverage summary, we call out the differences from the

4    previous iteration.  If there isn't a difference, if it's a

5    brand new Medicare coverage summary, then we present it as

6    such.

7         BPAC then discusses the clinical guidance that we put

8    down, and BPAC will then determine whether it's approved or

9    not.

10   **Q.**  And is this a different process than what is used for the

11   guidelines used for commercial members?

12   **A.**  It's -- it's the same in the sense that we are looking at

13   the appropriate source of guidance.  In this case it would be

14   CMSs, NCDs and LCDs.

15        It is different in the sense that for the Medicare

16   coverage summaries we're not required to reach out and get as

17   much input as we do for the Level of Care Guidelines.  However,

18   by dint of the discussion with BPAC, we do get BPAC's input.

19   It's also the same in the sense of BPAC's role.

20             **THE COURT:**  So we're now ten minutes past when I said

21   we had to stop.

22             **MS. ROMANO:**  Apologies, Your Honor.

23             **THE COURT:**  No problem.  So if this is a good stopping

24   point.

25             **MS. ROMANO:**  (Nods head.)

```
 1           THE COURT:  All right.  I'll see you all at 8:30

 2   tomorrow morning.

 3           MR. RUTHERFORD:  Your Honor?

 4           THE COURT:  Yes.

 5           MR. RUTHERFORD:  One quick housekeeping matter just

 6   one minute --

 7           THE COURT:  Yes.

 8           MR. RUTHERFORD:  -- is that we had been following the

 9   practice of not conferring with our party witness when our

10   party witness is being examined by opposing counsel but

11   conferring with them when, for instance, when our party witness

12   is on the stand.  Unless that is a practice that is

13   inconsistent with the Court's practice, we were going to

14   continue with that.

15           THE COURT:  I'm not sure what you mean.

16           MR. RUTHERFORD:  So if that --

17           THE COURT:  If they're presenting a witness, you don't

18   confer with them.

19           MR. RUTHERFORD:  If they're presenting an adverse --

20   when we have one of our party witnesses on the stand being

21   cross-examined or hostily adversely direct examined by the

22   other side --

23           THE COURT:  Right.

24           MR. RUTHERFORD:  -- we are not conferring with that

25   witness during their testimony.
```

1          THE COURT:  Okay.  But?

2          MR. RUTHERFORD:  But when our party-affiliated witness

3     is testifying, so for instance when we leave the office -- we

4     leave court tonight, we would be in a position to confer, for

5     instance, with Mr. Niewenhous; whereas, we wouldn't have when

6     he was being examined by Ms. Reynolds.

7          THE COURT:  No.

8          MR. RUTHERFORD:  Okay.  We just want to understand

9     what the rule is.

10         THE COURT:  Yeah.  I mean, once they're on the stand,

11    I don't want you conferring with the witness about their

12    testimony.

13         MR. RUTHERFORD:  Okay.

14         THE COURT:  Okay.  I think that's the only way to make

15    it fair because the fact that he's now on the stand under

16    cross-examination, he's about to be under redirect in a hostile

17    fashion, and so I don't know -- once he's off the stand on this

18    and you prepare him for direct testimony, or something like

19    that, in advance of his testimony before he's on the stand,

20    that's normal practice.

21         Once he's on the stand, I don't want you to do it; and, of

22    course, it applies to them when they call their own parties as

23    well.

24         MR. KRAVITZ:  Your Honor, can I get one clarification?

25    Under your pretrial order, two days before someone is going to

NIEWENHOUS - CROSS / ROMANO

1  go on the stand and it says "trial days."  So since tomorrow is

2  the last trial day this week, if you had a literal reading, we

3  would have to do it for Monday today.

4         **THE COURT:**  Can you figure it out?

5         **MR. KRAVITZ:**  Well, we can, but --

6         **THE COURT:**  I want to you work it out.  That seems

7  like one you can work out.

8         **MR. KRAVITZ:**  I'd be happy to.

9         **THE COURT:**  A great idea.

10         **MR. KRAVITZ:**  Okay.

11         **MR. RUTHERFORD:**  We'll work it out.

12         **MR. KRAVITZ:**  Okay.  Thank you.

13         **THE COURT:**  No problem.  Thank you.

14         **MR. KRAVITZ:**  Thank you.

15      (Proceedings adjourned at 3:40 p.m.)

16      (Proceedings to resume on Wednesday, October 18, 2017.)

17                 -   -   -   -

18

19

20

21

22

23

24

25

```
 1

 2                    CERTIFICATE OF REPORTERS

 3          We certify that the foregoing is a correct transcript

 4   from the record of proceedings in the above-entitled matter.

 5

 6   DATE:   Tuesday, October 17, 2017

 7

 8

 9

10   _____

11        Katherine Powell Sullivan, CSR #5812, RMR, CRR
                  U.S. Court Reporter
12

13

14

15   _____

16        Jo Ann Bryce, CSR #3321, RMR, CRR
                  U.S. Court Reporter
17

18

19

20

21

22

23

24

25
```