**Volume 3**

**Pages 441 - 636**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JOSEPH C. SPERO, MAGISTRATE JUDGE

DAVID AND NATASHA WIT, et al.,  )
                                )
        Plaintiffs,      )
                                  )
  VS.                    )   **No. C 14-2346 JCS**
                                  )
UNITED BEHAVIORAL HEALTH,        )
                                )
        Defendant.       )
_____)

                        San Francisco, California
                        Wednesday, October 18, 2017

<u>**TRANSCRIPT OF PROCEEDINGS**</u>

<u>**APPEARANCES**</u>:
For Plaintiffs:        ZUCKERMAN SPAEDER LLP
                      1800 M Street, NW, Suite 1000
                      Washington, DC  20036-5807
        **BY:  CARL S. KRAVITZ, ESQUIRE**
             **CAROLINE E. REYNOLDS, ESQUIRE**
             **AITAN D. GOELMAN, ESQUIRE**

                      ZUCKERMAN SPAEDER LLP
                      485 Madison Avenue, 10th Floor
                      New York, New York 10022
        **BY:  JASON S. COWART, ESQUIRE**

            (Appearances continued on next page)

Reported By:   Katherine Powell Sullivan, CSR #5812, RMR, CRR
               Jo Ann Bryce, CSR #3321, RMR, CRR
               Official Reporters - U.S. District Court

```
 1   APPEARANCES (CONTINUED):

 2   For Plaintiffs:          ZUCKERMAN SPAEDER LLP
                              100 East Pratt Street, Suite 2440
 3                            Baltimore, Maryland  21202-1031
                        BY:  ADAM ABELSON, ESQUIRE
 4
                              THE MAUL FIRM, P.C.
 5                            101 Broadway, Suite 3A
                              Oakland, California 94607
 6                      BY:  ANTHONY F. MAUL, ESQUIRE

 7                            PSYCH APPEAL
                              8560 Sunset Bouleavard, Suite 500
 8                            West Hollywood, California  90069
                        BY:  MEIRAM BENDAT, ESQUIRE
 9
     For Defendants:          CROWELL & MORING LLP
10                            515 South Flower Street, 40th Floor
                              Los Angeles, California 90071-2258
11                      BY:  JEFFREY H. RUTHERFORD, ESQUIRE
                              JENNIFER S. ROMANO, ESQUIRE
12                            ANDREW HOLMER, ESQUIRE

13                            CROWELL & MORING LLP
                              3 Embarcadero Center, 26th Floor
14                            San Francisco, California 94111
                        BY:  NATHANIEL P. BUALAT, ESQUIRE
15
                              CROWELL & MORING LLP
16                            1001 Pennsylvania Avenue, NW
                              Washington, DC 20004-2595
17                      BY:  APRIL N. ROSS, ESQUIRE

18

19

20

21

22

23

24

25
```

<u>**I N D E X**</u>

Wednesday, October 18, 2017 - Volume 3

<u>**PLAINTIFFS' WITNESSES**</u>                                    <u>PAGE</u>  <u>VOL.</u>

<u>**NIEWENHOUS, GERARD (RECALLED)**</u>
(PREVIOUSLY SWORN)                                          444    3
Cross-Examination resumed by Ms. Romano                     444    3
Redirect Examination by Ms. Reynolds                        455    3
Recross-Examination by Ms. Romano                           466    3

<u>**PLAKUN, ERIC MARTIN**</u>
(SWORN)                                                     467    3
Direct Examination by Mr. Kravitz                           467    3
Direct Examination resumed by Mr. Kravitz                   570    3
Cross-Examination by Mr. Rutherford                         612    3

<u>**E X H I B I T S**</u>

<u>**TRIAL EXHIBITS**</u>                              <u>IDEN</u>  <u>EVID</u>  <u>VOL.</u>

570                                                        601    3

640                                                        598    3

641                                                        609    3

653                                                        500    3

```
 1   Wednesday - October 18, 2017                    8:33 a.m.

 2                      P R O C E E D I N G S

 3                          ---oOo---

 4        THE CLERK:  We're calling Case Number C 14-2346, which

 5   is Wit/Alexander versus UnitedHealthcare.

 6      Do you need appearances?

 7          THE COURT:  No.

 8          THE CLERK:  No.

 9          THE COURT:  Everybody's here.

10          THE CLERK:  All right.

11          ALL:  Good morning, Your Honor.

12          THE COURT:  Good morning.  All right.  Let's go.

13      You recall you're still under oath.

14          THE WITNESS:  Yes.

15                      GERARD NIEWENHOUS,

16   called as a witness for the Plaintiffs, having been previously

17   duly sworn, testified further as follows:

18                  CROSS-EXAMINATION   (resumed)

19   BY MS. ROMANO:

20   Q.   Good morning, Mr. Niewenhous.

21   A.   Good morning.

22   Q.   You testified yesterday about a document that you and

23   Ms. Urban created in response to a requirement in Connecticut.

24   Do you recall that?

25   A.   I do.
```

1  Q.   I'd like to direct your attention to Exhibit 388, please,

2  and specifically page 4.  Actually -- my apologies.  402 with

3  the spreadsheets, Mr. Niewenhous.

4  A.   (Witness examines document.)

5            THE COURT:  Exhibit 402?

6            MS. ROMANO:  402, yes.

7            THE WITNESS:  I'm there.

8  BY MS. ROMANO:

9  Q.   Page 4 is one of the spreadsheets.  If you can pull that

10 out.

11 A.   That is correct.

12 Q.   Okay.  This is hard to read, so it's going to be on the

13 monitor as well.

14      And I want you to look to the column "Admission Criteria

15 Deviations CDGs" and the one next to it "Admission Criteria

16 LOCGs" in the third row down.

17 A.   (Witness examines document.)

18 Q.   And there are a few different places where it says the

19 words "See citations."  We'll pull it up so you can see what

20 that is.  It would be one -- yes.

21      Do you see where it says "See citations," Mr. Niewenhous?

22 A.   I do.

23 Q.   What is that referring to?

24 A.   If you look at the previous sentence, "Optum guidance

25 relies on VA/DoD, AABH and CMS for this guidance," and then it

1  says "See citations," that's a reference to the citations that

2  are in the guidelines.

3  **Q.**   Did you say "that are in the guidelines"?

4  **A.**   In the guidelines, yes.

5  **Q.**   Have you had any communications with any representatives

6  of the State of Connecticut regarding the documents you

7  prepared in response to that requirement?

8  **A.**   Yes.

9  **Q.**   Can you describe those communications you've had?

10 **A.**   We had a couple meetings with somebody from the

11 Connecticut Department of Insurance to go over the

12 spreadsheets.  The person from the Department of Insurance

13 wanted to understand how to -- how to read them.

14 **Q.**   And what did you -- did you have any response to those

15 conversations with them?

16 **A.**   Oh, yes.  Yeah.  We went over, again, in a couple of

17 meetings how this spreadsheet is set up, organized, and what

18 it's communicating relative to Connecticut's regulation.

19 **Q.**   And did anybody from the State of Connecticut direct UBH

20 to do anything differently with respect to its use of its

21 guidelines in Connecticut in response to these communications?

22 **A.**   No, they did not.

23 **Q.**   I'd like to direct your attention to Exhibit 512, please.

24 And, actually, let me just ask you a couple questions.

25      Yesterday you were asked about a PowerPoint where you had

1    stated that the UM model does not systematically seek to

2    promote evidence-based treatment.  Do you recall that?

3    **A.**    I do.

4    **Q.**    Do the UBH Level of Care Guidelines seek to promote

5    evidence-based treatment?

6    **A.**    On a case-by-case basis, yes.

7    **Q.**    And when you say "case-by-case basis," what do you mean?

8    **A.**    Through the process of utilization management we review a

9    case as a part of discussions with the provider about the

10   proposed treatment plan.  There's some dialogue around whether

11   the proposed treatment plan is evidence based.

12   **Q.**    And do the Coverage Determination Guidelines also seek to

13   promote evidence-based treatment?

14   **A.**    Yes, that's correct.

15   **Q.**    You had also put in that PowerPoint that the UM model is

16   not organized to manage the needs of members with concurrent

17   medical and behavioral health conditions.  Are the guidelines,

18   the Level of Care Guidelines, organized to manage the needs of

19   members with concurrent medical and behavioral health

20   conditions?

21   **A.**    Yes, as a factor in considering why somebody is coming

22   into treatment at this particular point, as well as the

23   elements of an evaluation, which then leads to the treatment

24   plan.

25   **Q.**    And are the Coverage Determination Guidelines organized to

1    manage the needs of members with concurrent medical and

2    behavioral health conditions?

3    **A.**   Yes.

4    **Q.**   Now I'd like to direct your attention to Exhibit 342.

5    **A.**   (Witness examines document.)  I'm there.

6    **Q.**   And on the -- it's just one page.  On that first page this

7    was an e-mail from Ms. Sekak and you were a percipient; is that

8    correct?

9    **A.**   That is correct, yes.

10   **Q.**   And if you look at the subject line, it says "Denial

11   Process Documentation."  Do you see that?

12   **A.**   I do.

13   **Q.**   And what do you understand that to mean?

14   **A.**   The clarity and the adequacy which which -- with which --

15   excuse me -- we communicate the reasons for a denial of

16   coverage.

17   **Q.**   And what do you mean by the -- what do you understand the

18   word "documentation" to mean in that phrase?

19   **A.**   Well, it is a routine part of what we euphemistically call

20   a denial letter to include a rationale for why coverage is

21   being denied, and so this is a reference to whether the

22   rationale is complete enough and clear enough for somebody to

23   understand the basis for the denial.

24   **Q.**   If you can turn to Exhibit 656, please.

25   **A.**   (Witness examines document.)  I'm there.

1    Q.    And is this a Medicare Benefit Policy Manual?

2    A.    It's Chapter 6 of the Medicare Benefit Policy Manual, yes.

3    Q.    And do you recall answering some questions relating to

4    this document yesterday with Ms. Reynolds?

5    A.    Yes, I do.

6    Q.    Is this a document that you reviewed in the course of your

7    work on the UBH guidelines?

8    A.    That is correct.

9    Q.    If you can turn to page 29, please, of this document.

10   A.    (Witness examines document.)   I'm there.

11   Q.    There is a Section 70.3 titled "Partial Hospitalization

12   Services."  Do you see that?

13   A.    I do.

14   Q.    What are partial hospitalization services?

15   A.    This is a form of level of care that's provided on an

16   ambulatory basis where somebody goes to a partial hospital

17   program for a number of hours per day and receives an array of

18   services, therapeutic services.

19   Q.    And if you were to -- are you able to describe where

20   partial hospitalization falls within the range of intensity of

21   different levels of care?

22   A.    Yes, I am.  If we -- if we consider that outpatient is the

23   lowest level of intensity and inpatient is the highest level of

24   intensity, then partial hospital would be an intermediate level

25   of care.

**NIEWENHOUS - CROSS / ROMANO**

1  Q.   And where would partial hospitalization fit as compared to

2  residential?

3  A.   Residential like inpatient is 24 hours a day, 7 days a

4  week.  Partial hospital, as I testified a few minutes ago, is

5  several hours per day.  So it's less intensive than

6  residential.

7  Q.   And where does it fall as compared to intensive outpatient

8  treatment?

9  A.   Typically intensive outpatient treatment is -- offers

10 services for fewer hours per week than partial hospital does.

11 It would be less intensive than partial.

12       THE COURT:  And is the situs different with this level

13 of care?  This is hospital treatment as opposed to going into

14 some other facility for -- I don't know.  Is the site different

15 because it's called hospitalization as opposed to something

16 else?

17       THE WITNESS:  Yes.  Partial hospital programs are

18 usually -- are usually not located within a hospital.  They're

19 located in -- sort of like a clinic would be separate from a

20 hospital, a partial hospital would be separate from the

21 hospital.

22       THE COURT:  And those would be -- but that would be

23 distinct from the kind of places where you'd have intensive

24 outpatient or have residential?

25       THE WITNESS:  That's correct, yes.

1          **THE COURT:**  So that would be a different site?

2          **THE WITNESS:**  That's correct.

3          **THE COURT:**  Okay.

4    BY MS. ROMANO:

5    **Q.**   Mr. Niewenhous, I'd like to direct your attention to the

6    very bottom of page 29 where it says "Patient Eligibility

7    Criteria and Benefit Category."  Do you see where I am?

8    **A.**   I see that.

9    **Q.**   Okay.  And then specifically turn to the next page within

10   that section, and I'm going to go five pages down -- excuse

11   me -- five lines down on page 30 where the sentence starts "The

12   patients."  And it reads (reading):

13          "The patients also require a comprehensive structured

14      multimodal treatment requiring medical supervision and

15      coordination provided under an individualized plan of care

16      because of a mental disorder which severely interferes

17      with multiple areas of daily life, including social,

18      vocational, and/or educational functioning.  Such

19      dysfunction generally is of an acute nature.

20          "In addition, PHP patients must be able to

21      cognitively and emotionally participate in the active

22      treatment process and be capable of tolerating the

23      intensity of a PHP program."

24      Did I read that correctly?

25   **A.**   Yes, you did.

1  **Q.**    And now I'd like to turn your attention to page 31 of this

2  document where there is a heading that says "Reasonable and

3  Necessary Services."  Do you see where I am?

4  **A.**    I do.

5  **Q.**    Do services need to be reasonable and necessary to be

6  covered under Medicare?

7  **A.**    Yes, they do.

8  **Q.**    Okay.  And then I'd like to direct your attention to the

9  first paragraph in this section titled "Reasonable and

10  Necessary Services," four lines down where a sentence starts

11  (reading):

12          "A particular individual coverage service, described

13      above as intervention, expected to maintain or improve the

14      individual's condition and prevent relapse may also be

15      included within the plan of care, but the overall intent

16      of the partial program admission is to treat the serious

17      presenting psychiatric symptoms.  Continued treatment in

18      order to maintain a stable psychiatric condition or

19      functional level requires evidence that less intensive

20      treatment options -- e.g., intensive outpatient,

21      psychosocial, day treatment, and/or other community

22      sports -- cannot provide the level of support necessary to

23      maintain the patient and prevent hospitalization."

24      Did I read that correctly?

25  **A.**    Yes, you did.

1  Q.   And then in the next paragraph starting at the end of the

2  third line I'd like to direct your attention to the sentence

3  that starts with the word "Patients."  (reading)

4          "Patients admitted to a PHP generally have an acute

5      onset of decompensation of a covered Axis I mental

6      disorder as defined by the current edition of the

7      *Diagnostic and Statistical Manual* published by the

8      American Psychiatric Association or listed in Chapter 5 of

9      the version of the *International Classification of*

10     *Diseases* applicable to the service date which severely

11     interferes with multiple areas of daily life."

12     Did I read that correctly?

13 A.   Yes, you did.

14 Q.   And can I direct your attention to page 34, please.

15 A.   I'm there.

16 Q.   And there's a section titled "Treatment Plan."  Do you see

17 that?

18 A.   I do.

19 Q.   And the last sentence of that first paragraph I'd like to

20 direct your attention to starting with the word "Activities."

21 (reading)

22         "Activities that are primarily recreational and

23     diversionary or provide only a level of functional support

24     that does not treat the serious presenting psychiatric

25     problems placing the patient at risk do not qualify as

**NIEWENHOUS - CROSS / ROMANO**

1          partial hospitalization services."

2          Did I read that correctly?

3     **A.**    Yes, you did.

4     **Q.**    Okay.  Now I'd like to turn your attention to page 32

5     where there's a section titled "Reasons for Denial."  Do you

6     see that?

7     **A.**    I do.

8     **Q.**    And beginning at that section it reads (reading):

9          "Benefit category denials made under 1861(ff) or

10         1835(a)(2)(F) are not appealable by the provider and the

11         limitation on liability provision does not apply."

12         Then it has a citation, which I'll omit.  And then it

13    states (reading):

14         "Examples of benefit category based in 1861(ff) or

15         1835(a)(2)(F) of the Act for partial hospitalization

16         services generally include the following..."

17         And one of the bullet points under there says (reading):

18         "Programs attempting to maintain psychiatric wellness

19         where there is no risk of relapse or hospitalization;

20         e.g., daycare programs for the chronically mentally ill."

21         Is it your understanding that programs attempting to

22    maintain psychiatric wellness where there is no risk of relapse

23    or hospitalization are a bases for denial under Medicare for

24    partial hospitalization.

25    **A.**    Yes, it is.

1  Q.  And now I'd like to turn your attention to page 33 of this

2  document.

3  A.  (Witness examines document.)

4  Q.  At the top in the second sentence it reads (reading):

5        "The following examples represent reasonable and

6     necessary denials for partial hospitalization services and

7     coverage is excluded under 1862(a)(1)(A) of the Social

8     Security Act."

9     And the second bullet point reads (reading):

10       "Treatment of chronic conditions with acute

11    exacerbation of symptoms that place the individual at risk

12    of relapse or hospitalization."

13    Is it your understanding that treatment of chronic

14 conditions without acute exacerbation of symptoms that place

15 the individual at risk of relapse or hospitalization are

16 excluded from Medicare benefits for partial hospitalization?

17 A.  That is correct, yes.

18       MS. ROMANO:  I don't have any more questions.

19       THE COURT:  Okay.  Anything further?

20       MS. REYNOLDS:  Yes.

21            (Pause in proceedings.)

22            **REDIRECT EXAMINATION**

23 BY MS. REYNOLDS:

24 Q.  Good morning, Mr. Niewenhous.

25    Let's look first at Exhibit 148, which I left on the

NIEWENHOUS - REDIRECT / REYNOLDS

 1   table.

 2   **A.**   (Witness examines document.)

 3   **Q.**   This is the 2015 Custodial Care CDG; correct?

 4   **A.**   The March 2015, yes.

 5   **Q.**   Could you turn to page 3?

 6   **A.**   I'm there.

 7   **Q.**   Yesterday Ms. Romano asked you some questions about the

 8   citation to the 2011 Certificate of Coverage in this document;

 9   right?

10   **A.**   That's correct.

11   **Q.**   Okay.  Do I understand your testimony correctly that this

12   definition of "custodial care" in this document was drawn from

13   an exclusion that appears in some plans based on the 2011

14   UnitedHealthcare template Certificate of Coverage?

15   **A.**   It's not specifically drawn from the exclusion, although

16   there is an exclusion of custodial care.  It's drawn from the

17   definition of "custodial care" in the Certificate of Coverage.

18   **Q.**   And this CDG is interpreting that plan language?

19   **A.**   That is correct, yes.

20   **Q.**   UBH administers many plans that do not have that same

21   language; right?

22   **A.**   I'm not sure how to gauge "many," "few," but there are

23   some that do.

24   **Q.**   So UBH administers plans that do not contain the language

25   that's reflected in this CDG?

1    **A.**   That, I don't know.

2    **Q.**   You don't know whether they do?

3    **A.**   I haven't looked at all the -- every single one of the

4    plans that UBH administers.

5            **THE COURT:**  No, no, no.  Let's not play games.  Do you

6    know?  Are there any plans that don't contain this language in

7    their Certificate of Coverage?

8            **THE WITNESS:**  I don't know, Your Honor.

9            **THE COURT:**  Okay.

10   **BY MS. REYNOLDS:**

11   **Q.**   If a plan does not contain this language, UBH should not

12   apply the definition in this CDG; right?

13   **A.**   That would be correct, yes.

14   **Q.**   Yesterday you testified that the TCADA or Texas guidelines

15   were used for substance use for UBH reviewers in commercial

16   cases prior to October of 2014; is that right?

17   **A.**   That is correct.

18   **Q.**   And you testified that they were used continuously since

19   roughly 2004 or 2005?

20   **A.**   That is correct, yes.

21   **Q.**   So you're aware that UBH's policies have called for peer

22   reviewers to apply the Texas guidelines since roughly 2004 or

23   2005; is that right?

24   **A.**   Can you say that question again?

25   **Q.**   You're aware that UBH's policies called for peer reviewers

1   to apply the Texas guidelines since 2004 or 2005; right?

2   **A.**   I'm not sure what you mean by "policies."  Are you talking

3   about benefit plans, or are you talking --

4   **Q.**   No.  I'm talking about UBH's policies and procedures.

5   **A.**   Oh.  Yes.

6   **Q.**   Yes, they have called for peer reviewers to apply the

7   Texas guidelines since --

8   **A.**   The winners, yes.

9   **Q.**   -- 2004 or 2005; right?

10  **A.**   Yes.

11  **Q.**   And if a peer reviewer failed to apply the Texas criteria

12  when required, that would violate UBH's policies and

13  procedures; right?

14  **A.**   Yes, it would.

15  **Q.**   But you're not testifying that you have actual knowledge

16  of whether UBH's peer reviewers did apply the Texas criteria;

17  right?

18  **A.**   No.  I'm not responsible for reviewing cases.

19  **Q.**   And you're not saying that you reviewed the denial letters

20  for all UBH members who had requested coverage under a Texas

21  plan for substance use disorder services provided in Texas;

22  right?

23  **A.**   No.  That's outside my scope of responsibility.

24  **Q.**   And you didn't review the denial letters for all the

25  members of the plaintiff class in this case who had requested

1  coverage under a Texas plan for substance use disorder services

2  provided in Texas; right?

3  **A.**  No.  Again, that's outside of my scope of responsibility.

4  **Q.**  This morning you were asked a couple of questions about

5  the deviation chart.  Do you remember that testimony?

6  **A.**  I do.

7  **Q.**  And that's the chart that was prepared in response to the

8  Connecticut statute requiring the use of ASAM or the

9  preparation of such a chart?

10  **A.**  Yes.

11  **Q.**  And you referred to some meetings with the Connecticut

12  Department of Insurance?

13  **A.**  Yes.

14  **Q.**  When were those meetings?

15  **A.**  I'd have to refer back to the e-mail.

16  **Q.**  Okay.  That was Exhibit 402.

17  **A.**  (Witness examines document.)  I am looking at page 1 of

18  Exhibit 402.  The e-mail was dated September 2013.  So in and

19  around that time.

20  **Q.**  So around 2013 -- around September 2013 is when you met

21  with the Connecticut Department of Insurance?

22  **A.**  Yes.  In or around there, yes.

23  **Q.**  And in 2013, did UBH's Level of Care Guidelines contain

24  citations to the sources on which they were based?

25  **A.**  I would have to check that iteration.

1   **Q.**   Let's look at Exhibit 3.

2   **A.**   (Witness examines document.)

3   **Q.**   And let's turn to...

4        All right.  Let's go to page 7, which is the common

5   criteria section.  That's where it begins.  And that section

6   ends on page 11?

7   **A.**   It does.

8   **Q.**   There are no references cited?

9   **A.**   There are no references.

10  **Q.**   And, in fact, there are no references cited in any portion

11  of the 2013 Level of Care Guidelines?

12  **A.**   That is correct, yes.

13  **Q.**   And the same is true for the 2014 Level of Care

14  Guidelines; right?  No references were cited?  That's

15  Exhibit 4.

16  **A.**   That's correct.  That was a later enhancement of ours to

17  give more transparency to the sources that we use for the

18  guidelines.

19  **Q.**   And is the last time that you communicated with the

20  Connecticut Department of Insurance about the Crosswalk in

21  2013?

22  **A.**   You notice I testified earlier there were a couple

23  meetings.  I think they were both in 2013, if not early 2014.

24  **Q.**   And since then, you haven't communicated with the

25  Connecticut Department of Insurance about this chart?

**NIEWENHOUS - REDIRECT / REYNOLDS**

1  **A.**  Not that I recall, no.

2  **Q.**  Yesterday you mentioned that you had determined that some

3  of the information in the chart was in error; is that right?

4  **A.**  That's correct.

5  **Q.**  And specifically the information concerning the admission

6  criteria for substance use disorder treatment?

7  **A.**  For Level 3.1.

8  **Q.**  Correct?

9  **A.**  Yes.

10  **Q.**  Okay.  When did you learn that that was an error?

11  **A.**  I was -- had recent occasion to look over the ASAM

12  criteria and saw a reference to -- or a parenthetical reference

13  to "halfway house," and it dawned on me, ah, that's our halfway

14  house guideline or our sober living arrangement guideline.

15  **Q.**  And when was that?

16  **A.**  It was just recently.

17  **Q.**  Do you have a month when that occurred?

18  **A.**  It was this month in preparation for the trial.

19  **Q.**  And were you -- it was just your own review of the

20  document?

21  **A.**  That's correct.

22  **Q.**  Did you discuss it with anyone?

23        **MS. ROMANO:**  Objection to the extent this calls for

24  attorney-client privilege communications.

25        **THE COURT:**  It's just a yes-or-no answer.  You can

1  answer yes or no.

2           THE WITNESS:  Yes.

3  BY MS. REYNOLDS:

4  Q.   Who did you discuss it with?

5           MS. ROMANO:  Objection to the extent this calls for

6  attorney-client privilege information.

7           MS. REYNOLDS:  Your Honor, this falls within the

8  fiduciary exception squarely.

9           THE COURT:  I'm sure that's correct, but let's --

10  we're not getting too far here, so let's take it a step at a

11  time.

12      Go ahead.  Who did you discuss it with?

13  BY MS. REYNOLDS:

14  Q.   Who did you discuss the error with?

15  A.   With Jennifer Romano.

16  Q.   And what did you discuss?

17           MS. ROMANO:  Objection.  Calls for confidential

18  attorney-client communications that do not fall within the

19  fiduciary exception.

20           THE COURT:  Why is that?

21           MS. ROMANO:  What?

22           THE COURT:  Why is that?

23           MS. ROMANO:  Because it's in the course of the

24  litigation, Your Honor.

25           THE COURT:  Well, yeah, but he's talking about

1    substance, not the law or his testimony; right?  He's not

2    talking about his testimony.  He's talking about an error in a

3    chart that was prepared and presented to the Department of

4    Insurance of the State of Connecticut; right?

5            **MS. ROMANO:**  Your Honor, he's talking about the

6    testimony.

7            **THE COURT:**  Well, okay.

8            **MS. ROMANO:**  In preparation for the testimony.

9            **THE COURT:**  Well, fine.  Then you have to rephrase the

10   question to exclude any discussions about testimony.

11   **BY MS. REYNOLDS:**

12   **Q.**   In your discussions with Ms. Romano about the error in the

13   deviations chart, excluding any discussion about the testimony

14   that you are going -- that you were going to offer at the

15   trial, what was discussed?

16   **A.**   In going over the chart that was prepared as a part of

17   compliance with Connecticut, I noticed they referenced that 3.1

18   was in the context of residential rehabilitation, and it dawned

19   on me at that point that that was an error.

20   **Q.**   And did Ms. Romano provide any legal advice to you that

21   relates to how to follow-up on correcting that error with the

22   Connecticut Department of Insurance?

23   **A.**   No.

24   **Q.**   Did Ms. Romano give you any legal advice that relates to

25   raising the error through appropriate channels at UBH?

```
 1    A.    No.

 2              MS. ROMANO:  Objection.  Vague.

 3              THE COURT:  Overruled.

 4    BY MS. REYNOLDS:

 5    Q.    Did you have any discussions with Ms. Romano, or anyone

 6    else, about contacting the Connecticut Department of Insurance

 7    immediately to apprise them of the error?

 8    A.    No.

 9    Q.    Mr. Niewenhous, you gave a deposition in this case; right?

10    A.    That is correct.

11              MS. REYNOLDS:  Pardon me one moment.

12                       (Pause in proceedings.)

13    BY MS. REYNOLDS:

14    Q.    That deposition was on the 25th of April in 2017; right?

15    A.    That is correct.

16    Q.    And do you recall that at that deposition you were asked

17    questions about the deviations chart?

18    A.    I do recall, yes.

19    Q.    And specifically we discussed the admissions criteria that

20    pertain to ASAM Level 3.1?

21    A.    I'd have to look at the deposition for that level of

22    detail.

23              MS. REYNOLDS:  Your Honor, I'd like to read an excerpt

24    from Mr. Niewenhous's deposition.

25              THE COURT:  Go ahead.
```

1      **MS. REYNOLDS:**  It's from page 155, line 9, through

2   156, line 14 (reading):

3      **"QUESTION:**  So when you were -- when you were preparing

4      the Crosswalk for the Connecticut statute, did you

5      conclude that UBH's residential rehabilitation criteria

6      encompass the criteria for ASAM Levels 3.1 through 3.5?"

7      Objection.

8       **"THE WITNESS:**  When did we" -- "when" -- excuse me.

9      "When we did the grid -- and I'm looking at the deviation

10     grid -- actually, can you say your question again?

11     **"QUESTION:**  Did you conclude that UBH's residential

12     rehabilitation criteria encompassed ASAM's criteria for

13     levels of care for levels 3.1 through 3.5?"

14     Objection.

15      **"THE WITNESS:**  To the extent that those services

16     would be covered in the benefit plan, again, as I stated

17     earlier, 3.1, an example of which is halfway house, and I

18     don't recall there being a benefit in the commercial

19     benefit plan for the UHC for halfway house.

20     **"QUESTION:**  So when you state in the Crosswalk -- when you

21     state in the Crosswalk that the criteria from all three

22     ASAM levels are included in the admission criteria for

23     residential rehabilitation, that's meant to convey that

24     you're excluding 3.1?"

25     Objection.

1           "THE WITNESS:  It's meant to exclude any example of

2       3.1 that wouldn't be covered in a benefit plan.  So one

3       example is halfway house."

4   Q.   After your April 2017 deposition in this case, did you

5   take any steps at all to correct the error in the deviations

6   chart with the Connecticut Department of Insurance?

7   A.   No, I did not.

8           MS. REYNOLDS:  No further questions, Your Honor.

9           THE COURT:  Okay.  Anything further?

10          MS. ROMANO:  One thing, Your Honor.

11          THE COURT:  Sure.

12                      <u>**RECROSS-EXAMINATION**</u>

13  BY MS. ROMANO:

14  Q.   Mr. Niewenhous, in the course of the preparation for this

15  trial and the discussions relating to the 3.1 reference in the

16  deviations chart, did you and I speak in any way about whether

17  you should or should not report anything up to UBH or other

18  channels to make that change?

19  A.   No, we did not.

20          MS. ROMANO:  No more questions.

21          THE COURT:  Okay.  Thank you.

22      Okay.  Thank you.

23          THE WITNESS:  Thank you.

24                      (Witness excused.)

25          MR. KRAVITZ:  Your Honor, the plaintiffs' next witness

1   is Dr. Eric Plakun.

2                    (Pause in proceedings.)

3          THE CLERK:  Good morning.  Could you please raise your

4   right hand.

5                    ERIC MARTIN PLAKUN,

6   called as a witness for the Plaintiffs, having been duly sworn,

7   testified as follows:

8          THE WITNESS:  I do.

9          THE CLERK:  Thank you.  Go ahead and have a seat.

10     Make sure you speak clearly into the microphone for the

11  court reporter.

12         THE WITNESS:  I'm just going to turn my phone off.

13         THE CLERK:  Sure.

14     And there's water there if you need it.  And just make

15  sure you speak clearly.

16     Can you please state your full name for the record and

17  spell your last name.

18         THE WITNESS:  It's Eric Martin Plakun.  Plakun is P,

19  as in Peter, L-A-K-U-N like United Nations.

20         THE CLERK:  Thank you.

21                    DIRECT EXAMINATION

22  BY MR. KRAVITZ:

23  Q.   Good morning, Dr. Plakun.

24     Are you an expert for the plaintiffs in this case?

25  A.   Yes.

1    **Q.**   And are you here to offer your opinions on generally

2    accepted standards of care for determining the appropriate

3    level of care for people with mental health disorders and on

4    whether UBH's guidelines either meet or fall below those

5    generally accepted standards of care?

6    **A.**   Yes.

7    **Q.**   Let's talk about what qualifies you to offer those

8    opinions.

9         First of all, can you tell the Court what your profession

10   is?

11   **A.**   I'm a psychiatrist board certified in psychiatry.  I'm a

12   psychoanalyst.  I've been a psychiatric researcher.  My current

13   title is as the associate medical director.  I'm the director

14   of biopsychosocial advocacy at a hospital-based continuum of

15   care known as the Austen Riggs Center.

16   **Q.**   Okay.  And have you had any experience in the area of

17   forensic psychiatry?

18   **A.**   Yes, I have.

19   **Q.**   Can you tell the Court what that is?

20   **A.**   What the experience is?

21   **Q.**   No.  Or -- no.  Just what is forensic psychiatry?

22   **A.**   It's the application of psychiatric principles to issues

23   in the law.

24   **Q.**   And in terms of your education, could you summarize it

25   briefly for the Court?

1   **A.**   Sure.  Sure.  So I went to Medical School at the Columbia

2   University College of Physicians and Surgeons.

3        I did an internship in medicine at the Dartmouth-Hitchcock

4   affiliated hospitals.

5        I then actually served as a rural primary care physician

6   in Vermont before entering a residency in psychiatry again at

7   Dartmouth.

8        Subsequent to that, I entered a four-year fellowship in

9   psychoanalytic studies at the Austen Riggs Center, and I have

10  remained there ever since.

11  **Q.**   Okay.  So if I -- so from approximately 1978 until the

12  present you've been at Austen Riggs?

13  **A.**   Yes.  Close to 40 years.

14  **Q.**   And we'll get to Austen Riggs in one minute.  I'd like to

15  ask you a question.

16       Are you licensed in any jurisdictions?

17  **A.**   Yes.  I'm licensed in Massachusetts and Vermont by the

18  respective Boards of Registration in medicine.

19  **Q.**   Let's turn to Austen Riggs for a minute.  And if you could

20  tell us, what is Austen Riggs?

21  **A.**   Austen Riggs is a hospital-based continuum of psychiatric

22  care.  It's almost 100 years old.  It was founded in 1919.  It

23  is a place that principally provides residential treatment,

24  although as a continuum of care, it does have programs that go

25  from inpatient through residential through intensive outpatient

1  and other day treatment programs down to an aftercare program.

2      It's a small place in Norman Rockwell's small town of

3  Stockbridge, Massachusetts.  It treats about 65 patients at a

4  time, and people come from around the country.  It's pretty

5  well-recognized usually in the top 10 of the U.S. News & World

6  Report best hospitals list.  This year, again, I think number

7  nine.  A rather small place among some giant places like Johns

8  Hopkins and UCLA and Mass. General.

9  **Q.**    Okay.  And I noticed in your report that you were the

10  chair of the committee that designed and implemented Austin

11  Riggs' continuum of care and that you did that work in the

12  1990s.

13      Can you, first of all, just describe briefly what the

14  continuum of care is, or what does that term mean in your

15  field?

16  **A.**    Yeah.  Well, continuity of care is extraordinarily

17  important in trying to work with patients and so as we

18  implemented a continuum of care, we wanted it to be possible

19  for people to taper, if you will, the degree of their

20  involvement in certain portions of the Austen Riggs program --

21  the therapeutic milieu and some of the groups and things like

22  that -- to be able to taper that while continuing individual

23  treatment services.

24      And so there are eight or nine distinct programs, as I

25  indicated earlier, from inpatient to really outpatient with

1    numerous in between, and -- but people are followed by the same

2    treatment team through all levels of care.

3        So from the outside it may look like there are nine

4    programs, and there are with different services available, but

5    from the inside, from the patient's perspective, although where

6    they sleep at night might change, they're followed by the same

7    therapist, same treatment team, same nursing staff throughout.

8    Q.   And if you could explain, how does the concept of the

9    continuum of care relate to the selection of the appropriate

10   level of care with respect to a behavioral health issue?

11   A.   Yeah.  Well, so there are decisions that need to be made

12   within the continuum of care about what level is appropriate

13   for any given patient.  And in one of my roles as a treatment

14   team leader, which I've done since the early 1990s, one of my

15   jobs in that role is to be the one who makes the level-of-care

16   decisions about which of the different programs within the

17   Riggs continuum of care a patient might be in.

18       People generally are moving downward through the continuum

19   of care as their treatment progresses, but from time to time

20   there are good reasons for them to move -- to step upwards to a

21   higher level of care for a period of time based on the

22   vicissitudes of their course of treatment.

23   Q.   Okay.  So when you say that you would -- that a patient

24   would move down, are you saying that the patient would move to

25   a lower level of service intensity?

PLAKUN - DIRECT / KRAVITZ

1    A.    Yes.

2    Q.    And in some circumstances would that mean that the

3    treatment environment might change in terms of where you sleep?

4    A.    Yes, precisely.

5    Q.    Okay.  I just wanted to make sure I understood that.

6         Now, I think you mentioned a moment ago that the principal

7    level of care at Austen Riggs, although certainly not the

8    exclusive one as you've said, is residential treatment?

9    A.    Yes.

10   Q.    Okay.  And can you describe for the Court typically

11   whether or not a residential treatment program restricts

12   individual freedom?

13   A.    Well, there's a range of kinds of residential treatment

14   programs but, by and large, residential treatment programs are

15   unrestrictive.  In fact, they're designed to be a place

16   generally where people are balancing the freedom that is part

17   of our being alive with the responsibility that comes with part

18   of our being alive, and that balance between freedom and

19   responsibility becomes a central kind of a fulcrum in work in

20   residential treatment settings.

21   Q.    All right.  I also note that you served, I think, for 35

22   years as the director of admissions at Austen Riggs.  What did

23   that involve?

24   A.    Yes, I was the director of admissions until just a few

25   years ago, and that meant that I oversaw the development of the

1  system and ran the system that screened patients and tried to

2  select the group that were appropriate candidates for treatment

3  at the Riggs treatment program.

4      The way in to Riggs is through a residential level of care

5  almost always, very, very rare exceptions.  And so the job of

6  the director of admissions is to decide who is clinically

7  appropriate for that program.  People might have a higher level

8  of acuity than makes sense in a completely open setting.

9      For example, approximately half of our patients have had

10  very significant issues with suicide, and there's an issue of

11  deciding, well, which suicidal patients can you actually treat

12  in a completely open setting where they're free to come and go.

13  When is the risk sensible?  When is the risk unsensible in a

14  sense?

15      And I've often thought about the metaphor of how thick the

16  ice is; that it's the job of the director of admissions to meet

17  with that patient after first reviewing information about

18  someone's background and deciding a rough goodness of fit, to

19  then meet face to face with the patient, also with the family

20  members generally, and to make an assessment of whether the ice

21  on this pond is thick enough to bear the weight of the crossing

22  around the suicidal patient.

23      It's a level of care determination about whether

24  residential treatment is appropriate or whether to make a

25  referral to a different level of care, higher or lower.

**PLAKUN - DIRECT / KRAVITZ**

1  Q.    Okay.  And in your role as director of admissions, did you

2  have to apply the types of factors that are required by

3  generally accepted standards of care for selecting the

4  appropriate level of care?

5  A.    Yes, every day.

6  Q.    And have you evaluated hundreds, or perhaps thousands, of

7  patients for that purpose?

8  A.    Yes, thousands.

9  Q.    Okay.  And then let me ask you also about whether you have

10  any experience actually treating patients or supervising

11  doctors who are treating patients.

12  A.    Yes.  I am on the medical staff of the Austen Riggs Center

13  and I do treat patients.  I have since I began there.  I have

14  more administrative and teaching and other responsibilities now

15  than I did in the past, but I continue to be available to treat

16  patients at Riggs, to do supervision.

17       I indicated previously that I work as a treatment team

18  leader, and that is a clinical role that involves overseeing

19  and integrating the various individual and group components of

20  people's treatment.  So that's -- I also see that as a clinical

21  role.

22  Q.    Okay.  And, Dr. Plakun, have you served on the faculty of

23  any universities or medical schools?  I should say,

24  universities.

25  A.    Yes.  For about, I think it was, 21 years I was a member

1  of the clinical faculty of Harvard Medical School.

2  **Q.**   In what field?

3  **A.**   In psychiatry.

4  **Q.**   Okay.  And have you written any books in the field of

5  psychiatry or psychoanalysis?

6  **A.**   I've edited two books.

7  **Q.**   Okay.  Just very generally on what subjects?

8  **A.**   Well, one was on a relatively newly described kind of

9  personality disorder called narcissistic personality disorder,

10  in the news sometimes in the last year or two.

11       But the more recent one is a book called *Treatment*

12  *Resistance and Patient Authority:  The Austen Riggs Reader*,

13  which is really about the learning of working intensively with

14  the kinds of patients who usually are the ones who find their

15  ways to a place like Austen Riggs -- they are often described

16  under the rubric of treatment resistant, not that they are

17  doing the resisting but they fail treatments -- and applying

18  the learning that we've been able to undertake at Riggs to

19  treatment of patients with similar problems in other levels of

20  care.

21  **Q.**   Okay.  And just have you written scholarly articles?

22  **A.**   Yes, 50 or 60 chapters, peer-reviewed publications of

23  various sorts.

24  **Q.**   And have you written any chapters or peer-review articles

25  that relate to any of the issues in this case?

**PLAKUN - DIRECT / KRAVITZ**

1  **A.**  Yes.

2  **Q.**  Okay.  Could you describe that to the judge?

3  **A.**  Well, I've written about residential treatment.  I have

4  written about treating difficult to treat or so-called

5  treatment-resistant patients.  And I've done some research that

6  I've written about about what are the predictors of outcome in

7  people who have difficult problems.

8  **Q.**  Okay.  And how does that article relate to the issues in

9  this case?

10  **A.**  That last one?

11  **Q.**  Yeah, in terms of outcomes.

12  **A.**  Well, the -- I think one of the things that sometimes gets

13  alleged that really was refuted decades ago is that there's

14  some harm that might come to patients by keeping them for an

15  extended period in a residential or hospital level of care.

16  **Q.**  And what did you find?

17  **A.**  That the length of stay in an active treatment was not a

18  predictor of adverse outcome.

19       You know, a couple of hundred years ago when people were

20  kept in asylums off in the countryside and separated from

21  family and separated from society, I think they did tend to

22  become dependent on the asylums that they were in; but with

23  active treatment as part of someone's engagement in a setting

24  where they also have freedom and with it responsibilities, that

25  has an antiregressive, if you will, kind of pull and there's no

1  evidence that people become, by and large, dependent on the

2  institution and in some way crippled by that.

3  **Q.**  Okay.  One more question about your qualifications, then

4  we'll move on to what you did in this case.

5       Do you participate in any professional associations, like

6  the APA?

7  **A.**  Yes.  I'm actually involved in quite a number.  In the

8  American Psychiatric Association -- well, I'm a Distinguished

9  Life Fellow of the American Psychiatric Association.  I've been

10  involved in various ways in the APA's operations and governance

11  structure.

12       I am a member of the APA Assembly -- which is kind of a

13  legislative body, if you will, a civil space of discourse in

14  the American Psychiatric Association -- where I chair the

15  committee that has to do with subspecialties and sections.  The

16  Assembly Committee of Representatives of Subspecialities and

17  Sections it's called across.  And I sit on the Assembly

18  Executive Committee.

19       I've also served in the past as chair of the APA Committee

20  on Psychotherapy by Psychiatrists.  I'm the founder and leader

21  of the APA Psychotherapy Caucus.

22       It was announced publicly yesterday, as a matter of fact,

23  that I'm a candidate for the APA Board of Trustees in an

24  election that will be held early in 2018.

25       And I've been involved in several other ways in APA

1    functions, but I'm also -- I've also been involved in the

2    American Academy of Psychoanalysis and Dynamic Psychiatry,

3    including as a member of its Board of Trustees.  I represent

4    that organization in the APA Assembly.

5          I'm involved in the Board of Regents of the American

6    College of Psychoanalysts.

7          I am a member of the Psychotherapy Committee of the Group

8    for the Advancement of Psychiatry, which is a kind of a think

9    tank in American psychiatry.

10         There are probably several other organizations as well.

11         And in the past I served as a board examiner for the

12   American Board of Psychiatry and Neurology working for 10 or 11

13   years on the written test committee developing questions that

14   would be part of the written test that psychiatrists would take

15   in order to become board certified.

16         And then also worked for about 10 years as an oral

17   examiner involved in examinations of candidates for board

18   certification where there would be an actual examination orally

19   after they had evaluated a patient either live or on a

20   videotape.

21   **Q.**   Okay.  In that role you had to find out whether the

22   applicants, in fact, understood the basic principles of

23   evaluating a patient and assessing where they should be placed

24   in terms of the continuum of care and level of care?

25   **A.**   Yes, and the treatment plan and were they knowledgeable

1    about psychiatry, could they go from book learning to actual

2    practice with actual patients.

3    **Q.**   Okay.  Let's now turn to what you did in this case to

4    determine whether or not UBH's guidelines either met or fell

5    below generally accepted standards of care with respect to the

6    selection of a level of care.  Can you describe what you did to

7    form those opinions?

8    **A.**   Yes.  I reviewed the guidelines that were provided to me,

9    the Level of Care Guidelines, the Coverage Determination

10   Guidelines, and other relevant documents where they emerged,

11   and I compared them to what I know based on my training and

12   experience and knowledge in the field of psychiatry.

13   **Q.**   Okay.  Are you prepared to go guideline by guideline, year

14   by year, albeit as efficiently as we can, to point out your

15   conclusions concerning the guidelines at least as they relate

16   to mental health disorders?

17   **A.**   Yes.

18   **Q.**   Let's turn now specifically to your opinions, and I'd like

19   to talk first with you about generally accepted standards of

20   care for selecting the appropriate level of care.  Okay?  Do

21   you understand that's the topic here?

22   **A.**   Uh-huh.

23   **Q.**   Okay.  And do you have opinions as to the generally

24   accepted standards of care for determining the appropriate

25   level of care for psychiatric treatment or mental health

**PLAKUN - DIRECT / KRAVITZ**

1  problems?

2  **A.**   Yes, I do.

3  **Q.**   Okay.  And let's talk now about what are some of the base

4  principles that you have to consider.  And I'd like to ask you

5  to start with what are the objectives of treatment on a very

6  high level?

7  **A.**   Yeah.  I mean, I think of the objectives of psychiatric

8  mental health treatment being to restore and improve

9  functioning in an individual who's troubled in the context of

10  their overall clinical picture and to maintain stability and

11  avoid relapse.

12  **Q.**   And I think you mentioned the word "function."  Can you

13  explain what that word means in this context?

14  **A.**   Yeah.  Well, all of us are in one way or another

15  endeavoring to function in the world.  It's certainly true of

16  people with psychiatric disorders as well.  And, you know, I

17  think that good functioning means good performance in the

18  world's of work role, interpersonal role, and being part of a

19  community.  Sometimes this is described as the ability to work,

20  to love, and to be a citizen.

21  **Q.**   Okay.  And then can you explain why at least it would be

22  an objective of treatment after function has been restored or

23  improved -- let me -- withdrawn.

24       Can you explain why treatment might be needed after

25  function has been restored or improved?

A.   Well, sure, I can.  When people are troubled, most often the default place the treatment begins is in an outpatient setting, and there are really two things that must happen effectively if outpatient treatment is going to work; that is, the patient must have two capacities.

One capacity is to use the sessions, the appointments, with their clinician.  Whether that's psychotherapy or general psychiatric management, whatever it is, you have to be able to use the sessions, manage them, bear what emotions get brought up in the course of them, understand instructions, et cetera, and then people have to function adaptively until the next session.

Often there is trouble in one or both of those domains; and when there is, what we try to do is add services in order to improve someone's capacity to do those functions.  That might mean having sessions more frequently if it's hard to manage between sessions.  It might mean adding medications, doing skills training, adding a group, adding a substance abuse treatment.  There are a range of things that might be added to outpatient treatment to try to help someone's capacity to use the sessions better and to manage adaptively between the sessions.

If the latter fails, then people can wind up being in chronic crisis states where they're always fending off the next crisis or recovering from the last crisis, and you cannot

**PLAKUN - DIRECT / KRAVITZ**

1  effectively do the work of treatment if you are always in

2  crisis -- crisis stabilization mode.

3     It's important to be able to have the capacity to manage

4  the emotions, manage the confusion, manage the pain that gets

5  brought up in the individual work if people are going to be

6  able to take charge of their lives in meaningful ways.

7  **Q.**   Okay.  I think as I heard you, you've described that one

8  thing you have to keep in mind in selecting the level of

9  care -- or level -- yeah, level of care, sorry about that --

10  are what the objectives of treatment are; and I think you've --

11  I think you've begun to identify a second one, which is then

12  actually identifying what level of care might fit or match with

13  those treatment objectives for the particular patient.  Did I

14  hear you right?

15  **A.**   Yes.  That's what I was referring to when I talked about

16  adding additional services if somebody's having trouble with

17  that fundamental struggle of how to use the sessions, how to

18  function adaptively between them in an outpatient setting, a

19  basic outpatient setting.

20  **Q.**   Okay.  And I think -- okay.

21     And then you were describing the circumstances where an

22  outpatient setting might not be appropriate.  Can you be

23  specific on that?

24  **A.**   Sure.  So as people --

25  **Q.**   Actually, can I back up for a second?

1      "Outpatient" means what?  Like once a week, twice a week,

2  you go in for an hour?  Can you explain what outpatient is

3  typically?

4  **A.**   "Outpatient" means that an individual is living their life

5  in whatever setting is their ordinary setting and they are

6  seeing a practitioner, a provider of mental healthcare, at some

7  frequency that for the moment is undetermined.  It depends on

8  what they're struggling with.  It could be anything from a

9  single consultation to several times a week psychotherapy that

10  continues over some period of time.

11  **Q.**   And what would the circumstances be where -- an outpatient

12  service where the patient is seeing a therapist once a week,

13  twice a week, or whatever, would not be appropriate?  Can you

14  describe that?

15  **A.**   Well, the -- people struggle with a range of issues.

16  There are often things that lead them to seek treatment in the

17  first place; but in the vast majority of patients, there are

18  underlying issues that are also an important part of the

19  picture.  There are underlying what we call comorbid disorders;

20  that is, the reality is if you diagnose people, rarely do they

21  meet criteria for only one disorder.  In fact, in a very large

22  well-recognized study of depression called the Star*D study --

23  Sequence Treatment Alternative Response for Depression -- which

24  looked at depressed people as they presented for treatment for

25  depression in various places around the country, 78 percent of

1   those people who said they had depression turned out to have

2   other disorders that would have actually been significant

3   enough to exclude them from the kind of randomized trials that

4   are done in research where you try to pick out one disorder at

5   a time to do the study.

6        So, roughly, four out of five individuals have multiple

7   disorders.  I know from my experience at Austen Riggs that when

8   we have done research-level diagnosis in the kinds of patients

9   who come to Riggs, there's an average of six different

10  disorders that people have, that rarely do people have just one

11  disorder; that there may be something that's prominent that is

12  the leading edge, the tip of the iceberg, if you will, about

13  what's wrong, but often there are chronic, comorbid, recurrent

14  underlying issues, experiences related to trauma or early

15  adversity.  And we have learned that these are tremendously

16  important in predicting both the presence of mental disorders

17  and the -- and their severity and how hard they are to treat.

18  **Q.**   And with respect to outpatient, what are the options if

19  the patient cannot manage in between sessions with the

20  therapist?

21  **A.**   Well, as I mentioned quickly when I first addressed this,

22  you can add interventions.  I think of it as the additive

23  model.  Let's add some medications.  Let's add another session.

24  Maybe we were meeting once a week to try to engage these

25  underlying issues; maybe we should try to meet twice a week.

1      You might add a support group.  You might add family work

2  if there are important family issues that seem like they're

3  important.

4      If someone's having trouble managing intense feelings, you

5  might add skills training to help them learn how to manage

6  anger or other kinds of upset in ways that are more adaptive.

7      And we would add services, and eventually we'll have added

8  enough services that we would decide that, oh, we've reached

9  another level of care.  This is now an intensive outpatient

10  program, for example, IOP, because we've added, you know -- I

11  mean, it varies.  Different entities have different

12  definitions, but somewhere between 8 and 12 hours of provision

13  of service per week is often what's involved in intensive

14  outpatient programs.

15      Again, here the individual is living at home but has added

16  additional services to their basic treatment with an eye toward

17  creating stability and functioning between sessions and the

18  capacity to use the sessions so that the underlying issues, the

19  part of the iceberg that doesn't show, can be engaged and

20  addressed.

21      Those are the things that drive people's troubles.  Those

22  are the most important aspects of mental healthcare for the

23  vast majority of patients; and if we focus exclusively on the

24  leading edge of the symptoms, we'll miss out.

25  Q.   Is that --

1  **A.**   And I often think about it as like a pot boiling over on a

2  stove.  If we always are simply removing the lid and giving it

3  a stir a couple of times because the pot's boiling over, we'll

4  neglect that somewhere along the line we have to turn down the

5  flame.

6  **Q.**   Okay.  And I think that you used the term "crisis

7  stabilization."  And is it true that IOP, like outpatient, is

8  not limited to crisis stabilization?

9  **A.**   Yes, it is true it is not at all limited to crisis

10  stabilization.  It's a program in which you have added services

11  to try to make it possible for someone to deal with the

12  underlying comorbidities, recurrent problems, histories of

13  early and later adversity, trauma, all the complexity that is

14  actually in reality part of what mental disorders are about.

15  **Q.**   Okay.  And I take it that what you've said comports with

16  your understanding of generally accepted standards of care?

17  **A.**   Yes.

18  **Q.**   Okay.  Let's turn -- I want to move to residential

19  treatment.  You've already addressed some of that, but are

20  there circumstances under the additive model that you've just

21  described where IOP with 8 to 12 hours of treatment and perhaps

22  a group, and whatever, would still not solve the problem of the

23  patient being able to manage in between sessions or services?

24  **A.**   Sure.  I mean, although we would hope that a large number

25  of people would respond to IOP treatment, people sometimes

1  still need more than an additive model where you simply

2  continue to add services while they live at home.

3      In fact, you know, you do have to shift at some point to

4  the 24-hour, 7-day-a-week kind of services that are available.

5  I think of them as an immersion in treatment because you're

6  really -- you're no longer living at home.  You're now in a

7  different environment 24/7 for some period of time.

8      And, of course, the easiest one to describe is inpatient

9  hospital treatment, acute hospital treatment, where if somebody

10 is a harm -- represents a serious danger of harm to self or

11 others or has such a massive incapacity around functioning that

12 they can't really manage in the world, then we have to find a

13 safe place for them to be, and that's what inpatient hospital

14 treatment is.

15     And that does generally have a crisis stabilization focus.

16 The idea is to help someone focus on the acute crisis and then

17 return them to a lower level of care so that they can get back

18 to doing the work that needs to happen over time that's

19 addressing not so much the crisis as the flame that's making

20 the pot boil over, the drivers of the recurrent risk of crisis.

21 And so that would be an inpatient hospital level of care.

22 Q.  Before we get to the other one, just while you're using

23 the word "hospitalization," I want to ask you about I guess

24 another level of care that the plaintiffs are not challenging

25 in this case, which is partial hospitalization.  Have you heard

1    of that?

2    A.    Sure.

3    Q.    Okay.  And can you just say briefly what partial

4    hospitalization is?

5    A.    Partial hospitalization is a program that is generally on

6    the average expectable continuum of levels of care a higher

7    than intensive outpatient but lower than residential or

8    inpatient, and it generally is of the order of 20 hours per

9    week of services.  It's sometimes called a day hospital, and it

10   really is a hospital-like program focused on crisis

11   intervention generally.

12        I wouldn't say there are never exceptions to that, but

13   it's generally focused on crisis stabilization, crisis

14   intervention, in a way that's similar to the way inpatient

15   hospitals are and usually limited in duration with an eye,

16   again, toward stabilizing the crisis and returning someone to a

17   lower level of care where hopefully they can do the work that's

18   necessary to do and in which they can manage to use the

19   sessions and function adaptively between them.

20   Q.    Okay.  Thank you.

21        And then in terms of the other 24/7 immersion as an

22   alternative to the inpatient hospitalization which you've

23   described, is that the residential treatment center or

24   residential --

25   A.    Yes.

1  Q.   Okay.

2  A.   Yes.

3  Q.   And I believe you've largely answered this, but are the --

4  is the residential treatment center also not simply focused on

5  crisis stabilization but on the other factors that you've

6  described with respect to IOP and OP?

7  A.   Yes, absolutely.  Residential treatment is intentionally

8  designed to be the maximum opportunity to engage underlying

9  chronic, recurrent, comorbid issues and try to get -- to really

10 turn a corner around them so that a person can learn enough,

11 can master enough so that they can return to outpatient

12 treatment to complete their treatment able to use the sessions

13 and function adaptively between them.  That's what residential

14 treatment is.

15      Now, there is one model of residential treatment that

16 is -- I believe was first tried in the Veterans Administration

17 system, which is as a less expensive alternative to inpatient

18 treatment.  So it's for the people who do have crisis problems

19 and it's a less expensive, less intensive model of inpatient

20 treatment.

21      The focus is limited, though.  It tends to be relatively

22 short term with similar lengths of stay to inpatient length of

23 stay; whereas, residential treatment of the sort that is most

24 common around the country and in other countries is generally

25 longer term because you are intentionally working on these

1   underlying problems that take longer to engage and to resolve.

2   **Q.**   Okay.  And while we're on that subject, it sounds like

3   this, but please explain, whether or not assessing and taking

4   into account underlying problems and comorbid problems are

5   factors that should be considered and be put into the calculus

6   for selecting the level of care under generally accepted

7   standards?

8   **A.**   Absolutely.  You cannot really assess an individual's

9   needs in terms of a treatment plan, including level of care,

10  unless you get a pretty comprehensive picture not only of

11  what's the -- what's the presenting symptom right now, but also

12  how does that connect to the part of the iceberg that's not

13  sticking up out of the water.  What's this person's story?

14  What are they struggling with?

15  **Q.**   And I take it from what you said it's not just a treatment

16  plan, but it's putting the patient in the right level of care

17  where that treatment plan can be in effect long enough so it

18  can actually work.  Is that a fair statement?

19  **A.**   Yes.

20  **Q.**   And I'd just like to get this on the record, but in your

21  opinion is it generally accepted standard of care to select a

22  level of care where the acute crisis and the chronic and

23  comorbid behavioral health conditions can be safely and

24  effectively treated?

25  **A.**   Yes, with the possible exception of inpatient treatment

**PLAKUN - DIRECT / KRAVITZ**

1   where you might be forced to go with very limited information

2   about a crisis.  In any other -- and, generally, in many

3   instances involving inpatient treatment, it is really essential

4   to get as much information as you can about presenting

5   problems, about past problems, about how does this person do in

6   treatment, where are they in accepting and recognizing that

7   they have troubles, are there comorbid problems that are

8   contributing to the complexity.

9       Yes, it's -- this is what -- this is what psychiatry

10  residencies teach.  They teach you how to do a comprehensive,

11  multifaceted assessment from multiple domains that include

12  these clinical dimensions, include developmental dimensions as

13  well; that they're -- yes, that's what -- that's what mental

14  healthcare is about.

15  **Q.**   Okay.  And I just want to make sure.  I mean, are you

16  suggesting in any way that the acute crisis or dealing with the

17  acuity is not important as well?

18  **A.**   I am not suggesting that at all.  It's a difference

19  between the part and the whole.

20  **Q.**   So that's one thing but not the whole thing?

21  **A.**   Yes.

22  **Q.**   Okay.  And if you could, for the Court, explain what you

23  believe in your opinion are the consequences of a treatment

24  regime that ends when the acute signs and symptoms or crisis

25  has been reduced or controlled?

1    **A.**   Well, except in those relatively rare instances when

2    that's a one-time thing, you know, in the vast majority of

3    instances this pot will keep boiling over unless you turn the

4    flame down underneath it, and so you wind up in a recipe that

5    is sadly all too familiar in the world these days; that is, of

6    people going in and out of hospital, rotating back and forth

7    between trying to make outpatient treatment work, failing in

8    it, having chronic ongoing crises that need to be managed,

9    winding up in an inpatient unit.

10        In fact, I mean, it's simply a reality that as we

11   shortened length of inpatient stay, readmission rates have gone

12   up; and, you know, it's a serious problem to which there are no

13   easy answers.  It's optimal to try to find a way to turn the

14   flame down and not simply feed the recurrent loop of crisis.

15   **Q.**   That actually reminds me of something.  At Austen Riggs,

16   since you mentioned duration, are there typical lengths of stay

17   at Austen Riggs?

18   **A.**   Yes, there are.  So the program that we have -- and, you

19   know, we've designed a program to be what we feel is the

20   optimal opportunity for an immersion experience that offers a

21   comprehensive evaluation of a complex problem -- as I

22   indicated, the people we treat generally have six different

23   disorders -- and provide treatment at the same time.  And so

24   our smallest complete unit, our smallest building block if you

25   will, is a six-week period of intensive evaluation and

 1    treatment, and that's what, as director of admissions, I was

 2    assessing:  Is this person a candidate for that?  They might

 3    not be; but if they are, then we would continue and go on to

 4    the next step.

 5        And that's a program in which people are evaluated from

 6    eight or nine different perspectives:  The full battery of

 7    psychological tests, a full medical evaluation, complete review

 8    of their medications that have been tried, and understanding

 9    what's worked and what hasn't, family evaluation, various kinds

10    of input from the group and nursing work, and the individual's

11    psychotherapy.

12        This is all presented around week five in a two-hour case

13    conference that is devoted to one patient that the whole staff

14    is invited to.  A patient comes to about 15 or 20 minutes'

15    worth of this two-hour case conference, and this is where we

16    really discuss in depth what we've learned and we make

17    recommendations.

18        So you have a sixth week during which you can provide

19    feedback and make decisions about what makes sense.  Although

20    some patients do leave after six weeks, most stay longer.  They

21    stay because they have decided that it's of value to them.

22        And on average, the length of stay ranges about five or

23    six months in all levels of care.  I mentioned there are nine

24    levels of care.  Four of them are residential, higher level

25    residential, and then there are some lower level residential

1  programs, a little less staffed, a little more small-group

2  focus or other kind of thematic foci.  But the total length of

3  stay would be the length that includes residential treatment,

4  as well as day treatment, which is in many ways equivalent to

5  intensive outpatient program.  So the average in all programs

6  is about five or six months on average.

7  **Q.**  Let me follow-up on one thing that you said.  In terms of

8  the decision to stay at Austen Riggs after the first six

9  months, is that a decision that's made solely by the plaintiff

10 or -- the plaintiff.  Excuse me.  I can't get the lawyer thing

11 out of my head -- solely by the patient -- is what I meant to

12 say, sorry about that -- or is it the patient in collaboration

13 with the doctors?

14 **A.**  Oh, it's a collaborative discussion.  Everyone who's in

15 this treatment is in some way choosing it quite explicitly and

16 voluntarily and often with ambivalence.  Because, you know, I

17 sometimes say the way that you know a person is a human being

18 is because they are ambivalent.  We get torn between different

19 points of view, and so people make the decision to come in the

20 first place, and then they make the decision to continue or not

21 to continue in collaboration with their treaters and often with

22 family members who have been part of the treatment as well.

23 **Q.**  Okay.  Let me ask you, Dr. Plakun, about another potential

24 factor that should be considered in selecting the appropriate

25 level of care under generally accepted standards, and that is

1  developmental progression.

2  **A.**    Sure.

3  **Q.**    Can you comment on that, please.

4  **A.**    Sure.  Well, I mentioned it in passing.  Yes, this is one

5  of the things that we have to pay considerable attention to.

6  You know, throughout the life cycle, human beings are going

7  through developmental challenges.

8  **Q.**    When you say "the life cycle," you mean from being a kid

9  to an old person?

10  **A.**    I mean from being born to being dead.

11  **Q.**    Okay.  Thanks.

12  **A.**    And, in fact, Erik Erikson, who was a staff member at

13  Austen Riggs, you know, wrote quite a bit about the different

14  developmental challenges at different points of life.  Numerous

15  others have written about it as well.

16      But for many people, particularly a group we call emerging

17  adults, it's extraordinarily important to pay attention to

18  developmental considerations.

19  **Q.**    Can you just tell us what emerging adults is, what type of

20  age range, so we know what you're talking about?

21  **A.**    It's usually in the early adult range, late adolescent

22  range; say, ages 17 to 25.  In this age range, a major

23  developmental task that any individual faces is making the

24  transition from being a child in a family to an adult in the

25  world.  That means separating from home, establishing

1   functioning in relationships and in some kind of work role that

2   may be a job, it may be the military, it may be college, and

3   developing a coherent identity.  These developmental tasks are

4   part of that emerging adult transition.

5        Sadly but inevitably for some people this does not go

6   smoothly.  Now, I don't mean somebody goes to college and

7   simply academically they don't do well.  I'm talking about

8   psychiatrically they don't do well.  For example, the young

9   woman who's eating disorder blossoms when she separates from

10  home or substance abuse becomes a big problem or both or

11  there's a traumatic experience under the influence of

12  substances.

13       I mean, there are many ways that things can emerge or that

14  previously -- previously adequately managed problems from

15  earlier in life suddenly erupt at the point of separation and

16  this effort to move into adulthood.  So it becomes quite

17  important for these people.

18       Often what they'll do sensibly, if I use the college

19  example for a bit longer, they'll go to the college counseling

20  center where an effort will be made to help them function

21  adaptively, get back to class, deal with the issues.  But often

22  these are the young people who leave school, who may collapse

23  into the family home, wind up in the basement smoking pot,

24  video games, lost, isolated, possibly recurrent crises,

25  possibly quite the opposite, collapsed into a passive,

1    nonfunctioning morass.

2    **Q.**   What does that tell you, though?  How do you connect that

3    to the selection of the level-of-care decision?

4    **A.**   I was just about to get there.

5    **Q.**   Oh, okay.

6    **A.**   So this individual, you know, has perhaps tried the

7    sensible things that people try first, like outpatient

8    treatment and the additive model, or maybe so collapsed into

9    the hypothetical basement that they can't even get to that, and

10   it may make sense for this person to have an intensive

11   outpatient program; or if they can't get out of the stuck

12   place, perhaps that's a good time to use a residential program

13   because it moves them to the separated side of the

14   developmental effort.

15        Remember the task is to move from child in the family to

16   adult in the world, and they can focus their work on being

17   immersed in a residential treatment program that allows them to

18   engage the issues that have led them to get off track at that

19   point in their lives.

20        So this issue of development throughout the life cycle but

21   especially around emerging adults is quite an important area

22   and, in fact, I know of at least one residential program that

23   exclusively focuses on emerging adults.

24   **Q.**   Okay.  Let me move on to another related topic.  I think

25   that it sounds to me like having identified a number of factors

1   that need to be taken into consideration in selecting the level

2   of care that you believe that there are generally accepted

3   standards of care for this exercise of selecting where to place

4   someone.

5   **A.**   There is a generally accepted standard for assessing level

6   of care and making those determinations, yes.

7   **Q.**   Okay.  And where do these generally accepted standards of

8   care come from?

9   **A.**   Well, I mean, they come from clinical experience.  They

10  come from various kinds of research.  They come from clinical

11  practice guidelines that are promulgated by various

12  professional groups, and they evolve.

13      There's not a single -- a single set of such guidelines

14  but, you know, if -- if you drew a hypothetical circle, there's

15  an infinite number of points in the circle, but it's very easy

16  to tell a point that's in the circle and a point that's outside

17  the circle.  And so generally accepted standards I think of as

18  that kind of boundary perimeter that governs, you know, what we

19  do.  It's the best of our knowledge based on research, based on

20  practice guidelines, based on seasoned clinicians' experience,

21  experts' consensus, various components.

22  **Q.**   Okay.  And then you mentioned certain clinical practice

23  guidelines.  Could you give some examples?

24  **A.**   Well, for example, the American Psychiatric Association

25  has clinical practice guidelines for the psychiatric evaluation

1   of adults that promulgates information about what's a good

2   enough evaluation.

3       There are guidelines usually by single disorders, so there

4   are guidelines for major depressive disorder, panic disorder,

5   posttraumatic stress disorder, borderline personality disorder,

6   and they address treatment recommendations.  The American

7   Psychiatric Association practice guidelines usually link the

8   recommendations to how confident we are based on the evidence

9   base that supports the recommendations.

10  **Q.**  And how about CMS or Medicare and Medicaid?  Do they

11  provide any generally accepted standards in your opinion?

12  **A.**  Oh, absolutely.  They really are quite useful.  The Center

13  for Medicaid and Medicare services is quite useful in helping

14  to set the stage for what are the generally accepted standards

15  if we think about various issues that come up in mental

16  healthcare.

17  **Q.**  Okay.  And then in terms of, I guess, guidelines from

18  professional specialty organizations, I can't remember the

19  exact words, but could you give an example of that?

20  **A.**  Well, I mean, in addition to practice guidelines, there

21  are guidelines that more specifically focus on issues like

22  level-of-care determination.  So, for example, the one I'm most

23  familiar is what's called the LOCUS, the Level of Care

24  Utilization System, where it was developed in the 1990s by I

25  think it was -- yeah, in the 1990s by the American Association

 1   of Community Psychiatrists.  There's an adult -- there's an

 2   adult version, and there's also a child and adolescent version

 3   called the CALOCUS.

 4        So the LOCUS is such an instrument, and the LOCUS --

 5   **Q.**   Okay.  Before -- let me --

 6        **MR. KRAVITZ:**  Jessie, could you turn, please, to Trial

 7   Exhibit 663?  653.  Excuse me.

 8   **Q.**   That should be in the notebook in front of you.

 9   **A.**   Do you know which binder?

10   **Q.**   No, I don't.

11        **THE COURT:**  It's the first one.

12        **MR. KRAVITZ:**  Thank you, Your Honor.

13        **THE WITNESS:**  (Witness examines document.)  653.

14   **BY MR. KRAVITZ:**

15   **Q.**   Yes.  And the first question I have for you before we talk

16   about the substance is:  Can you just tell the Court what that

17   is, Exhibit 653 for identification?

18   **A.**   This is the 2010 adult version of the LOCUS, the Level of

19   Care Utilization System for psychiatric and addiction services.

20        **MR. KRAVITZ:**  Your Honor, I move the admission of

21   Exhibit 653 into evidence.

22        **MR. RUTHERFORD:**  No objection, Your Honor.

23        **THE COURT:**  It's admitted.

24        (Trial Exhibit 653 received in evidence)

25   ///

1   BY MR. KRAVITZ:

2   Q.   Can you tell us, Dr. Plakun, generally how does the LOCUS,

3   which is in Exhibit 653, work?

4   A.   Well, so the LOCUS is a document that does three things.

5   Number one, it describes six different dimensions for assessing

6   an individual in order to make a determination about level of

7   care.  The dimensions are listed on trial exhibit page 4.

8   Q.   So does that just -- so is that exhibit -- is that

9   653-0004?

10  A.   Yes, it is.

11  Q.   Okay.

12  A.   Yes.

13  Q.   So the six different dimensions are risk of harm,

14  functional status, medical addictive and psychiatric

15  comorbidity, the recovery environment -- that actually is a

16  double dimension because it looks both at the stresses in the

17  recovery environment and the supports that are available in the

18  recovery environment -- then the treatment and recovery

19  history, which looks at what do we know about how this patient

20  has responded to treatment in the past.  Have they really

21  responded well, which would tell you something, or have they

22  had a lot of trouble responding?

23      And then there's the sixth one, engagement and recovery

24  status, which is, you know, how aware is this person of their

25  troubles; do they get, for example, that their drinking is a

**PLAKUN - DIRECT / KRAVITZ**

1  problem; or do they think that they have no problem at all even

2  though they've had four DWIs.

3      And so there's six dimensions.

4  **Q.**  You mentioned that there were three things.  So one is the

5  dimensions?

6  **A.**  Yeah, so the six dimensions.

7  **Q.**  Okay.

8  **A.**  That's one.  And then, secondly, it defines six different

9  levels of care from basic outpatient services right through the

10  continuum that we've been discussing up to inpatient, then with

11  stops along the way for intensive -- or the equivalent of

12  intensive outpatient treatment and the equivalent of

13  residential treatment and inpatient treatment.

14      And then the third thing it does is it provides you a

15  scoring algorithm so that you can look at preset descriptive

16  phrases and match your patient's struggles and come up with a

17  numeric score.  And then you can sum the total -- the total of

18  those scores.  And then depending on the score, you can do an

19  assignment to level of care.

20      But there's a little asterisk added to this, and that is

21  there are also override scores so that if you get a high enough

22  score on the first three dimensions -- risk of harm, functional

23  status or co-morbidity -- there's an override and you go

24  directly -- it assigns you directly to, for example,

25  residential treatment regardless of the -- if the total score

**PLAKUN - DIRECT / KRAVITZ**

1   is lower.

2        So it's a very useful, comprehensive, complex document

3   because it includes a multi-facetted look at a complex problem

4   in a complex way, six factors, and a way of trying to render

5   those kinds of decisions relatively objective insofar as

6   they're numeric.

7   **Q.**   Right.  I take it from what you've just said is you

8   believe the LOCUS reflects or captures generally accepted

9   standards of care?

10  **A.**   Yes.

11  **Q.**   Okay.  I would like to ask you, however, do you personally

12  use the LOCUS in making level-of-care decisions?

13  **A.**   I don't use it in making level-of-care decisions.  I do

14  use it in helping people do appeals sometimes.

15  **Q.**   Can you explain for us --

16  **A.**   Sure.

17  **Q.**   -- what you mean by that?

18  **A.**   Sure.  Sure.  When I make level-of-care decisions, I mean,

19  I've been making level-of-care decisions since before there was

20  a LOCUS.  My residency was in psychiatry not in LOCUS.

21       I've learned to do the complex multi-facetted assessment

22  and to engage a person in discussion about all these -- these

23  and additional issues.  And so I don't actually use it myself

24  to make a level of care assessment.  I sometimes use it when

25  I'm training people to do admission work, to help them get a

**PLAKUN - DIRECT / KRAVITZ**

1  picture of it.

2  **Q.**  You mentioned appeals.

3  **A.**  Yes.

4  **Q.**  Okay.  So I understand you don't use it if you're actually

5  deciding as an admissions director or something where in the

6  continuum someone should be.

7      And then you mentioned training and appeals.  Can you tell

8  us what that is?

9  **A.**  Yes.  So from time to time people who are in treatment at

10  Riggs, for example, who have insurance, will have treatment

11  supported for a period of time and then there will be a denial

12  of care that hypothetically, we believe, is a flawed denial,

13  because we believe the services are medically necessary and the

14  insurance company believes it is not.

15      And so in the process of appeal, we will often step out of

16  the he said/she said dichotomy and turn to an objective

17  independent standard, like the LOCUS.  Wasn't developed by us.

18  Developed by the American Association of Community

19  Psychiatrists.  And we'll say, look, you know, you think this.

20  We think that.  Here's what the LOCUS says.

21      And, you know, we have found it to be a useful thing to

22  bring to the attention of insurance companies from time to

23  time, oh, by LOCUS standards this individual meets criteria for

24  medically monitored residential services, which is what

25  residential treatment would be called in LOCUS, as I recollect.

1   **Q.**   Okay.  And based on your review of the UBH guidelines and

2   the dimensions and other aspects of the LOCUS that you've just

3   described, do you have an opinion as to whether the UBH

4   guidelines take into account the dimensions that are set forth

5   in the LOCUS?

6   **A.**   I do.

7   **Q.**   And what is that opinion, sir?

8   **A.**   That opinion is that when it comes to what actually is

9   used to determine level of care, the UBH guidelines do not take

10  into account the comprehensive kind of set of dimensions that

11  the LOCUS does; that, instead it tends to be restricted to the

12  risk of harm, maybe functional status, acute crisis

13  stabilization focal point.

14  **Q.**   So which dimensions, in your opinion, are missing from the

15  UBH guidelines?

16  **A.**   The co-morbidity.  I find no evidence that co-morbidity is

17  used to make a level-of-care determination.

18      I find no evidence that the recovery environment, whether

19  it's the stresses or the supports available are used to make

20  level-of-care determinations.

21      I find no evidence that the treatment and recovery history

22  are used to make level-of-care determinations.

23      And I can't find that the engagement-and-recovery status

24  of the individual is used to make the level-of-care decision.

25      These are things that are maybe talked about in general as

**PLAKUN - DIRECT / KRAVITZ**

 1   issues that a patient has.  But where the rubber meets the road

 2   and the level-of-care decision is made, these are missing

 3   dimensions.

 4   **Q.**   I think that you mentioned, before I move on to my next

 5   topic, that there is something called Cal-LOCUS or CA-LOCUS?

 6   **A.**   Yes.

 7   **Q.**   And is that -- I think you said -- is that an instrument

 8   that works in a similar fashion to the LOCUS but is focused on

 9   children and adolescents?

10   **A.**   Yes.

11         **THE COURT:**  So we're going to take a ten-minute

12   morning break.  See in you a bit.

13         **THE CLERK:**  The Court stands in recess.

14      (Recess taken from 10:08 a.m. to 10:22 a.m.)

15         **THE COURT:**  Okay.  We'll proceed.

16         **MR. KRAVITZ:**  Thank you, Your Honor.

17   BY MR. KRAVITZ:

18   **Q.**   Dr. Plakun, I'd just like to ask one follow-up to

19   something that you said earlier about, I believe I heard you

20   say that at Austen Riggs that there are, sort of, different

21   levels of residential treatment.

22         Did I hear that right?

23   **A.**   You did.

24   **Q.**   Okay.  And what's the purpose of having different

25   intensity levels?

1   **A.**   Well, there are different foci of residential treatment.

2   So when people are admitted, they're admitted to our

3   highest-level residential programs, which are in our main

4   patient building which is called the Inn, I-n-n.

5       And there are two different programs in that building,

6   that different terms of the services that are available to

7   patients.  One is called the in-residential program, nursing

8   IRP.  And it's the most --

9   **Q.**   What's does IRP stand for?  I'm sorry.

10  **A.**   In-residential program is IRP.

11  **Q.**   Sorry about that.

12  **A.**   Yeah, yeah, listen.  We wound up speaking acronym.

13      So IRPN is the most intensive nursing program.  And people

14  have daily check-ins with the nurse while they are in that

15  program.  And they still have access to a range of groups, but

16  a smaller number of groups to which they can gain access than

17  if they are in IRPG, in-residential program group.  That's a

18  more group intensive program.  Two groups a day just for the

19  people in that program.

20      In addition to other various kinds of groups, they still

21  get connection with nursing staff, but instead of daily it's a

22  couple of times a week.

23      After that initial period of six weeks, if people stay

24  longer, they may step down to a lower-level residential

25  program.  One focuses on independent living skills, cooking,

**PLAKUN - DIRECT / KRAVITZ**

1  budgeting, shopping.  One focuses on interpersonal learning in

2  a small group environment.  One focuses more on getting out

3  into the world of work or school.  So there are different foci

4  in some of these step-down residential programs.

5      And then after those residential levels, there is a day

6  treatment program that an individual can be in from seven days

7  a week down to one day a week, in which you continue in the

8  individual treatment services, but the amount of access to some

9  of the other group offerings is tapered, depending on how many

10  days you're in it.  Those are nonresidential.

11  **Q.**   All right.  Let me turn to my next area, which is your

12  opinions as to whether UBH's Common Criteria Level of Care

13  Guidelines, which I might call LOCGs, and Coverage

14  Determination Guidelines, which I might call CDGs, either meet

15  or fall below generally accepted standards of care in selecting

16  the appropriate level of care.  And so do you have an opinion

17  on that?

18  **A.**   Yes, I do.

19  **Q.**   Okay.  And what is your opinion?

20  **A.**   That the level of care guidelines and the Coverage

21  Determination Guidelines are, in large measure, in totality not

22  consistent with generally accepted standards.

23  **Q.**   And I think before the break you testified about a circle,

24  where things are clearly in generally accepted standards, and

25  then there are just things that are not.

1      Where, in your opinion, does -- do the UBH guidelines

2  fall?

3  **A.**   Outside the circle of generally accepted standards.

4  **Q.**   And is this your opinion for every year from 2011 through

5  2017?

6  **A.**   Yes.

7  **Q.**   Now, let's -- we're going to move on to, you know, going

8  through the guidelines and the specifics.  But before we do

9  that, could you identify for the Court the overarching or main

10  reasons or things that, sort of, are -- you see throughout

11  these guidelines that you believe fall below generally accepted

12  standards of care.

13  **A.**   Sure.

14      So the first area would be in an excessive focus on acute

15  presenting factors, "why now" factors, the kinds of crisis

16  elements of treatment.  There's an overfocus on that dimension

17  to the virtual exclusion of anything else in making

18  level-of-care determinations.

19  **Q.**   Okay.

20  **A.**   There's a second area that has to do with a kind of

21  ongoing push to lesser intensity of services, as if that is

22  superior, and it's done usually under the rubric of "least

23  restrictive."  But important in that is not just whether it's

24  least restrictive but also whether it's most effective.

25      And then the third broad area is in a way of broadly

 1  defining custodial care and very narrowly defining active

 2  treatment.  These are the two different kinds of treatment,

 3  active and custodial.  So very broadly defining custodial

 4  treatment and very narrowly defining active treatment so that

 5  it is extraordinarily hard for any treatment that is not

 6  directed at the acute presenting problems to be seen as active

 7  treatment.  And so I see that as a third area of departure from

 8  generally accepted standards.

 9  **Q.**  And if you could, I just have really just a couple of

10  follow-ups on that.

11      With the first area of, I think as you put it, an

12  overfocus on acuity, or something like that, what is the

13  consequence of that?  Why does that matter?  Can you tell the

14  judge why that matters.

15  **A.**  If we focus exclusively on acuity in making level-of-care

16  decisions, we're going to miss the opportunity to work on the

17  underlying problems on the turning down the flame.  We'll be

18  caught in a cycle in which we're always taking the lid off the

19  pot and never turning the flame down.

20      Because whether it's outpatient or intensive outpatient or

21  residential treatment, the goal is to get someone to the

22  position where they can use sessions over time and function

23  adaptively between sessions over time so that they can struggle

24  with achieving recovery, having a life that's the best life

25  they can have.

**PLAKUN - DIRECT / KRAVITZ**

1    Q.   And with respect to the second factor or deficiency that

2    you identified, you said something about "under the rubric of

3    least restrictive."

4         What did you mean by that?

5    A.   Well, I mean the least restrictive level of care is a time

6    honored and important aspect of the provision of treatment.

7    It's extraordinarily important that people simply not be locked

8    up and their civil rights taken away.

9         Although, "least restrictive" actually, as I understand

10   it, has two meanings.  There's that kind of restriction of your

11   civil rights but there's also the possibility of limiting your

12   choice.

13   Q.   Are you talking the patient's or doctor's or whose choice?

14   A.   The patient's choice.

15   Q.   Okay.

16   A.   It's the least restrictive for the patient in terms of

17   restricting them, locking them up and restricting them from

18   having adequate choice about the nature of treatment.

19        By the way, people do better in treatments that are

20   treatments they choose and want.  It's pretty well established.

21   Q.   So -- so I think that the notion of least restrictive is

22   extraordinarily important when it comes to whether it makes

23   sense for someone to be in a locked inpatient setting in terms

24   of the restriction of freedom.

25        However, in the levels of care that are relevant to this

1   case, I think least restrictive is -- it's kind of a misnomer.

2   It's used as if to say "least intensive."  And it's just -- it

3   seems to me to be off the -- off the mark.

4       The more important issue is, what's the most effective way

5   for this person to get better, to be able to engage the

6   underlying chronic co-morbid recurrent trauma-related issues.

7       And sometimes "least restrictive" is used in these

8   guidelines as if there's something inherently good about

9   depriving a patient of a higher level of care that they

10  voluntarily want, that they are seeking, that they are in,

11  perhaps, and want to continue.  But it's as if they are being

12  told, well, for your own good, you don't get that choice, and

13  we're going to put you in something we are calling a least

14  restrictive setting.

15      But it really may be taking away the appropriate level of

16  care that is most likely to give them an opportunity to engage

17  the underlying issues that are the reasons -- ultimately, it's

18  not about just putting out fires.  Well, it's about turning

19  down the gas on --

20  **Q.**   I was going to ask you to explain your connection between

21  the ongoing push down to lesser intensity levels and how that

22  impacted ensuring the most effective treatment, but I think you

23  just answered that.  Does that -- do you have anything else to

24  add to that?

25  **A.**   Well, I think I did.  I think that -- yeah.

1   **Q.**  Okay.  I just wanted to make sure that you had answered

2   that and we don't have to go over that again.

3          **THE COURT:**  So I don't understand that answer.  And

4   let me tell you my confusion.

5          So you gave at great length this morning descriptions of

6   how you proceed with treatments for individuals in residential

7   settings.  And one of the things you said was that residential

8   settings are sometimes appropriate when the individuals who are

9   having trouble with those first two pieces, accepting the -- or

10  using the sessions and getting from session to session.

11         And one of the -- and I don't want to use "goals," but one

12  of the things you want -- you would look at in a residential

13  setting is developing the ability to have adaptive behavior so

14  they can get from session to session.

15         That sounds like you're trying to get somebody to a point

16  where they have a less restrictive level of care, an outpatient

17  as opposed to an inpatient.

18         Why is that different?

19         **THE WITNESS:**  Well, I'm not thinking of outpatient as

20  a restrictive level of care.  It obviously is the least

21  possible restrictive level of care.  But the lens I'm using is,

22  what's the optimal level of care to engage the problems?

23         And ultimately --

24         **THE COURT:**  But that's my point.  Isn't it one of the

25  pieces for engaging the problems is ultimately restrictions

1  like that?  Is it more intensive, is it less intensive?

2      I mean, you mentioned that it is part of the goal in

3  treating someone in a residential care unit to get them out of

4  the residential care unit into another level of care.

5      Why is that different than thinking about it as, I want --

6  one of the things we want to do is help people with their

7  adaptive behavior so they don't have to be in this residential

8  program their whole life.

9          **THE WITNESS:**  Yeah.  Well, the goal of residential

10  treatment is to return someone to their ordinary life better

11  able to engage their problems in the sessions and live

12  adaptively between the sessions.

13      And the way I think about it is that it's warranted to use

14  the residential program for that when -- when you need that

15  level of intensity.  And it's offering a -- an effective form

16  of treatment to a patient.

17          **THE COURT:**  You're not answering my question.

18          **THE WITNESS:**  Maybe I'm not understanding the

19  question.

20          **THE COURT:**  Maybe I'm not --

21  **BY MR. KRAVITZ:**

22  **Q.**   I have a question that might --

23          **THE COURT:**  Let me do this first.

24          **MR. KRAVITZ:**  Oh, okay.  Excuse me.

25          **THE COURT:**  Let me just do this first.

**PLAKUN - DIRECT / KRAVITZ**

1          I understand what you just said.  But that goal of having

2   someone be able to engage in adaptive behavior outside of the

3   residential setting, so that they engage with their problems

4   and accept and utilize treatment in the nonresidential setting,

5   that's a goal of having a less restrictive alternative.

6          Why isn't that a goal of having a less restrictive

7   alternative?

8          **THE WITNESS:**  I follow what you're saying.  And in a

9   sense it is.  I don't have a problem with that.

10         I think of it primarily as a learning goal.  What can I

11  learn in a period at this level of care that will allow me to

12  live better and use outpatient treatment better?

13         We can certainly look at that through the lens of

14  restriction and say, yes, this is theoretically more

15  restrictive in the sense that I can't see my -- my, for

16  example, my spouse or my parent every day.  On the other hand,

17  sometimes we make difficult choices because they're better for

18  us.

19         And an individual may say, you know, it's a tough choice

20  for me, but I need this.  I need a kind of learning that will

21  allow me to then get back to the rest of my life.

22         I hope that answers the question.

23         **THE COURT:**  No, it does.  I just think that part of

24  the problem may be, and part of what we're going to discuss, is

25  just language, that when they say least restrictive level of

1    care, they're not talking about civil liberties, and they're

2    not talking about depriving people of choices.  They're talking

3    about just, we have this continuum and we describe the ones on

4    the lower end of the continuum as less restrictive than the

5    higher end of the continuum, and that's just how we describe

6    them.

7         And then the question is, which is most effective?  And

8    there will be issues about whether it's effectiveness is part

9    of the guidelines, et cetera.

10        But I just don't understand why, if there's an effective

11   lower level of care in this sense that isn't -- that isn't part

12   of what one looks to do when you're at a higher level of care.

13   Get to an effective lower level of care.

14             THE WITNESS:  I'm not sure if there was a question.

15             THE COURT:  It's not.  But that's my point, is that's

16   what -- that's what the discussion centers around for me.  Not

17   so much on this least restrictive nomenclature.

18             THE WITNESS:  I mean, my own view is that -- is that

19   regardless of what -- whoever "we" is may mean by

20   "restriction," it's the wrong word.  It points in the wrong

21   direction.

22        It's hard for me to imagine, for example, that a typical

23   patient at Riggs is completely unrestricted, and that balance

24   of the freedom versus the responsibility is kind of a fulcrum

25   around which the treatment pivots.  And to say, well, this is a

**PLAKUN - DIRECT / KRAVITZ**

 1    restrictive level of care, there's something about that that

 2    doesn't fit.

 3         It's a highly educational immersion opportunity that

 4    allows someone to not live their life in that level of care but

 5    to master some degree of learning that lets them better manage

 6    emotions between sessions and better use sessions.

 7              **THE COURT:**  Okay.

 8    **BY MR. KRAVITZ:**

 9    **Q.**   Doctor, I have some questions about this, too, because I

10    want to make sure I understand, really, what you're saying as

11    well.

12    **A.**   Uh-huh.

13    **Q.**   I think, if I heard you correctly, that one of the goals

14    of residential treatment would be to restore the patient to the

15    skills so that he or she would adapt so the patient could

16    function well in the community without being in a treatment

17    center.  Is that your opinion?

18    **A.**   Yes.  I mean, sometimes it's restore.  Sometimes it's

19    master for the first time a capacity that will allow an

20    individual to regulate their emotions, to function between

21    sessions, to use the sessions, yes.

22    **Q.**   Okay.  So here's my question:

23         Assuming that -- that it would be a good thing if the

24    person were able to adapt and actually have that benefit of the

25    treatment in a residential treatment center, can you comment on

**PLAKUN - DIRECT / KRAVITZ**

1  what happens if you have a rule that pushes you to a lower

2  level of intensity before you have had that treatment and you

3  have actually adapted?  Could you comment on that situation?

4  **A.**  Yes.  Well, in that case you would not have mastered what

5  you need to, and you would be at risk to be waiting for the pot

6  to boil over again, rather than taking the time to turn down

7  the flame by engaging the underlying issues, the co-morbid

8  issues.

9      You know, the focus on someone's suicide attempt, for

10  example, and letting that pass, and then moving them down

11  prematurely might miss that they're finding life unbearable

12  because of some horrific experience of assault and rape.  That

13  needs to be engaged, but they can't do it in an outpatient

14  session.  It becomes too disruptive.  They can't use the

15  sessions.  They can't function adaptively between the sessions.

16  So you can do a period of work with the goal of enough learning

17  to return to outpatient treatment better able to use it.

18      I often talk to people as a treatment team leader at Riggs

19  about, what's the goal of treatment?  And quite often it's to

20  find out what do you need to learn here that will allow you to

21  go back to school, to home, to wherever it is and be able to do

22  better than you were doing when you came here that led to the

23  referral and the need for this kind of treatment.

24  **Q.**  Okay.  I think -- I'm trying to think if I have another

25  question to clarify.  But I think that that's enough for right

**PLAKUN - DIRECT / KRAVITZ**

1    now at least.

2        And then -- let me just follow up to make sure that we

3    understand.  You've talked now about the acuity.  You've talked

4    about the, I think your words were, ongoing push to the lower

5    level of intensity and how that might impact the care that's

6    needed at the appropriate level of care.

7        Let's talk about the custodial care and being

8    overinclusive and the active treatment definition being too

9    restrictive, which is what you said before.

10       Can you just give a little bit more on that so we

11   understand what you're thinking, and then we'll go on to the

12   specific guidelines.

13   **A.**    Sure.  Well, progressively, I think, as one goes through

14   these guidelines one sees, particularly with respect to

15   residential care, a progressive broadening of the definition of

16   custodial care that really moves it away from the generally

17   accepted standard.

18       The generally accepted standard for custodial treatment is

19   that's not really treatment at all.  It's taking care of

20   activities of daily living, toileting, dressing, the kinds of

21   things that a person doesn't need to be in a level of care for

22   help with.

23       It's custodial, as opposed to active treatment, which is

24   directed at dealing with the full range of problems that the

25   person brings to the table, both the relatively acute recent

1    problems that may be, sort of, precipitating events, but also

2    the underlying issues that may be the engine that's driving the

3    presenting problem.

4          And what winds up happening in these guidelines is that

5    custodial treatment becomes applied to active treatment to

6    actual interventions provided by clinicians to patients unless

7    they are directed at the acute presenting problem or the "why

8    now," depending which year and which language is being used.

9          So that if you're trying to treat the underlying problem,

10   to -- just stick for a moment with the example I offered a few

11   moments ago about a suicide attempt in a hypothetical woman who

12   was assaulted and raped, if every time we have resolved the

13   issues that led to the acute suicide attempt, we wind up

14   ignoring getting into the issues around trauma and how that's

15   had a devastating effect on this individual's capacity to trust

16   and capacity to relate, if we call that engagement "custodial

17   care" because it's associated with something that's underlying

18   and is going to change more slowly, then we're doing something

19   that's problematic.

20         So there's a very narrow tightening of the gap between

21   custodial treatment and active treatment.  And there are

22   various components, various ways that the language in the CDGs

23   and the LOCGs wind up doing this that is a departure from the

24   actual language in the Medicare guidelines that are relevant to

25   understanding this issue.

 1   **Q.**   Okay.   Let's take a look at the common criteria.

 2        **MR. KRAVITZ:**  And, Your Honor, we're going to do this,

 3   I guess, from the mental health perspective.

 4   **BY MR. KRAVITZ:**

 5   **Q.**   So could you open up your book to Trial Exhibit 5, which

 6   is in evidence, please.

 7        **THE COURT:**  It's a different book.  There's a book

 8   that has the guidelines in it.

 9        Would you help him?

10        **MR. ABELSON:**  Yeah.

11        **MR. KRAVITZ:**  Your Honor -- Dr. Plakun, do you have

12   your copy as well?

13        **THE WITNESS:**  Yes.

14        **MR. KRAVITZ:**  Your Honor, with your permission,

15   Dr. Plakun has a set that he highlighted so that we can go

16   through this quickly so he doesn't have to paw through.  If

17   that's a problem, you know, we won't use it.

18        With your permission, I think it might make things a

19   little more efficient.

20        **THE COURT:**  As long as the defense counsel gets an

21   opportunity to review them, I don't have a problem with it.

22        **MR. KRAVITZ:**  They can.  There's just highlighting on

23   it.

24        **MR. RUTHERFORD:**  So we're going to take a break to

25   review them?

```
 1              THE COURT:  No, you're not.

 2              MR. KRAVITZ:  You know what --

 3              THE COURT:  You can before cross-examination.

 4              MR. KRAVITZ:  I don't want to waste time.  Why don't

 5    you just give me back the one with the highlighting and we'll

 6    move on.  I don't want to create a new --

 7              MS. REYNOLDS:  He said they could do it before cross.

 8              MR. RUTHERFORD:  I think he said to just provide them

 9    to us before cross-examination.

10              THE COURT:  Right.

11              MR. KRAVITZ:  Oh, okay.  I'm sorry.

12         I was hoping to, you know, do something different to make

13    it more efficient.

14              THE COURT:  They can do it before they cross.

15              MR. KRAVITZ:  Fine.  I just didn't want to slow things

16    down.  My intent was the opposite.

17    BY MR. KRAVITZ:

18    Q.   Okay.  So, Dr. Plakun, you've got in front of you what's

19    in evidence as Trial Exhibit 5; is that true?

20    A.   Yes.

21    Q.   Okay.  And right now I'd like to ask you questions about

22    the common criteria.  Are you aware of what the common criteria

23    are?

24    A.   Yes.

25    Q.   Okay.  And what's your understanding of the common
```

**PLAKUN - DIRECT / KRAVITZ**

1  criteria?

2  **A.**   The common criteria are across all diagnoses, all levels

3  of care.  The criteria that must all be met, because there are

4  "ands" that link all the phrases, in order for someone to be

5  admitted to a given level of care and to remain in that level

6  of care and to determine whether discharge is appropriate from

7  that level of care.

8  **Q.**   Okay.  And if you could turn your attention to

9  page 5-0008, please.  And could you identify the Court which

10  provisions in the admission criteria that you found to be

11  deficient --

12  **A.**   Sure.

13  **Q.**   -- and that you found supported the opinion that you've

14  expressed today.

15  **A.**   Sure.

16     Just for orientation, so we're looking at the 2015 Level

17  of Care Guideline Common Criteria.

18  **Q.**   Yes.

19  **A.**   And when I looked at the admission criteria, I identified

20  a series of them that are outside of generally accepted

21  standards.  They included 1.4.  That focuses excessively on

22  acute changes in the member's signs and symptoms.

23     1.5, that focuses on the "why now" factors.

24     1.6, that states "the co-occurring behavioral health and

25  medical conditions can be safely managed as opposed to

1  adequately treated."

2      1.8, there's a reasonable expectation that services will

3  improve the member's presenting problems within a reasonable

4  period of time.

5      And then there's some associated language that follows in

6  some subheadings.  Those were the admission criteria.

7  **Q.**  Okay.  Why don't we just go through them.

8      First, I think that you mentioned 1.4 and 1.5 as related

9  to the opinion that you've given on acuity.  Could you explain

10 that to the Court.

11 **A.**  Yes.  Well, so what 1.4 says is that (reading):

12          "The member's current condition cannot be safely,

13      efficiently, and effectively assessed, et cetera, due to

14      acute changes in the member's signs and symptoms and/or

15      psychosocial and environmental factors."

16 "That is the "why now" factors leading to admission.  So

17 it makes any admission to any level of care contingent on acute

18 changes.  This is at variance with the discussion we had

19 earlier about, for example, the LOCUS that looks beyond just

20 acute factors and "why now" factors and really looks broadly at

21 the whole context.

22     The same can pretty much be said about 1.5.  The member's

23 current condition can be safely and effectively treated in the

24 proposed level of care.  Assessment and/or treatment of acute

25 changes in the member's signs and symptoms and/or psychosocial

 1    and environmental factors, that is the "why now" factors

 2    leading to admission, require the intensity of the services

 3    provided in the proposed level of care.

 4         So, again, fit to a level of care is based on acuity.

 5    There has to be some kind of acute crisis or there is not a way

 6    in that is more comparable to standards like the LOCUS.

 7    **Q.**   And then let's talk about 1.6 for a minute.  And that's

 8    the one that says "A co-occurring behavioral health and medical

 9    conditions can be safely managed."  You identified that?

10    **A.**   Yes.

11    **Q.**   Okay.  And what, in your opinion, is wrong with 1.6?

12    **A.**   Well, I think that it's fine to safely manage medical

13    conditions.  If somebody has a complicated cardiac or kidney

14    problem, we're not going to treat that in the psychiatric

15    setting.  We need to know that it can be safely managed.

16         But the whole focus of the treatment -- of moving to

17    treatment levels like intensive outpatient or residential is to

18    focus on treating, not simply managing, but engaging and

19    treating the co-occurring behavioral health issues.  This is

20    why the person is there.

21         And so by -- by using language that the co-occurring

22    behaviors can be safely managed, there's a danger we're going

23    to manage them and ignore them.

24         Again, for the moment, let me stick with the example I

25    used of the woman who had --

1    **Q.**    Okay.  I hear what you're saying.

2         Can you explain for the Court whether there is a

3    difference between safely managing a condition and effectively

4    treating it?

5    **A.**    Yes.

6    **Q.**    Is there a difference between the two?  And if so, can you

7    explain it to the Court?

8    **A.**    Yes.  For example, if somebody has a trauma history,

9    safely managing the trauma may be to sort of steer around it,

10   provide some medications to suppress symptoms related to that.

11        But the gold standard for treatment, for real treatment,

12   not simply managing something like trauma, is exposure.  That

13   is opening up the issue and getting into it.  And, you know,

14   there's a very different approach between suppressing symptoms

15   related to something, managing them, and engaging the issue,

16   making the treatment meaningful.

17        This is the time that we're going to try to look at these

18   difficult issues that are hard to deal with and that are the

19   reason that you're having trouble using the sessions in

20   outpatient treatment and functioning between sessions.

21        So it seems to me that the standard is that it's the

22   co-occurring behavioral health conditions that are indeed the

23   focus of moving to higher levels of care, not simply managing

24   them, which is a reason -- it's that -- that "managing them"

25   language is part of the focus on only the acute manifestations,

 1   rather than the whole picture.

 2          THE COURT:  Can I ask you a question?

 3          THE WITNESS:  Sure.

 4          THE COURT:  Do you think that these level of care

 5   guideline common criteria for admission exclude the kinds of

 6   analysis you just said?  That is to say, letting someone into a

 7   standard of care -- a level of care in order to treat

 8   co-occurring conditions effectively?

 9          THE WITNESS:  Well, I can only go by what the words

10   actually say and by what the comparisons are that are made.

11          And I know that when it comes to medical conditions, we're

12   not going to actively treat those on a psychiatric unit.  We

13   want to know that they can be managed, that someone can make it

14   through the unit.

15          And it's the same language that's used for co-occurring

16   behavioral health.  And that coupled with --

17          THE COURT:  Well, but you don't disagree with the

18   language there; right?  You don't disagree that in order to be

19   in a level of care you need to be able to safely manage

20   co-occurring behavioral health conditions?  You need to be able

21   to do that to get into a level of care; right?

22          Otherwise, it's the wrong level of care.  If you can't

23   safely manage co-occurring behavioral health conditions, then

24   it should be some other level of care.

25          THE WITNESS:  Yes, I see what you're saying.

 1          THE COURT:  Right?

 2          THE WITNESS:  I'm focusing not only on whether it can

 3     be managed, which it's hard to see why that would pose a

 4     problem.  The issue is whether it's going to be engaged in

 5     treatment.  And throughout the guidelines what I see is a focus

 6     on the presenting problem and a pushing away of the

 7     co-occurring problems.

 8          THE COURT:  Yeah.  I understand.

 9          But this isn't -- this doesn't say what you just said.

10     This doesn't say that.  You agree with this, what this actually

11     says.

12          What your issue is, is whether the admissions criteria as

13     a whole don't allow for admission based on the need at that

14     level of care to treat the co-occurring conditions; right?

15          THE WITNESS:  Well, I believe that what I'm saying is

16     that "safely managed" and "adequately treated" are not the same

17     thing.

18          THE COURT:  No, I agree with that.  But that's --

19     that's -- and everyone in the room agrees with that.

20          This sentence doesn't say -- wouldn't you agree, this

21     sentence doesn't say you are excluded from a level of care?

22          This sentence is not the sentence that says:  In order to

23     get into a level of care, you have to have the ability to treat

24     co-occurring conditions effectively.  It doesn't say that?

25          THE WITNESS:  That's correct.

PLAKUN - DIRECT / KRAVITZ

1        THE COURT:  And it doesn't say the opposite of that.

2   It doesn't say:  We're not going to consider the effectiveness

3   of a level of care in treating co-occurring conditions in

4   deciding admission.  It doesn't say that either; right?

5        THE WITNESS:  That's correct.  And there's a third

6   thing it doesn't say.  It also doesn't say that co-occurring

7   behavioral health conditions are a priority focus of moving to

8   a higher level of care.

9        THE COURT:  Okay.  I appreciate that.

10       But that goes to all of the admissions criteria, not just

11  this one sentence.  You're saying none of the sentences in

12  Section 1.0 include that; right?

13       THE WITNESS:  Yes.  None of the sentences do, right.

14       THE COURT:  Go ahead.

15  BY MR. KRAVITZ:

16  Q.   And just so that we have this clearly, because I want to

17  make sure that your opinion is here, is it your understanding

18  that the admission criteria that we are looking at set forth

19  the bases on which coverage will be provided for a proposed

20  level of care?

21  A.   Yes.

22  Q.   Okay.  And anywhere in the admission criteria do you see

23  anything that says that a proposed level of care will be

24  covered based on what is needed to effectively treat an ongoing

25  primary condition or a co-occurring behavioral health

1    condition?

2    **A.**    No, I don't see that anywhere.

3    **Q.**    Okay.  Let's move on to 1.8.  And there's been a lot of

4    testimony in the case already about 1.8, so I'm not going to

5    ask you much.

6         But, just in general, why do you believe that 1.8 supports

7    your opinions?

8    **A.**    Well, you just had asked me a question about whether I saw

9    anywhere something that said --

10   **Q.**    Correct.

11   **A.**    -- that both presenting problems and underlying

12   co-occurring problems were -- were both foci of treatment.  And

13   I answered no to that.

14        And this particular item, 1.8, in fact, limits it to the

15   presenting problems and within a reasonable period of time.  It

16   says nothing about co-occurring problems.  And it makes it

17   clear that improvement in the presenting problems,

18   "improvement" means reduction or control of those acute signs

19   and symptoms.

20   **Q.**    Okay.  Let's now, if we could, move on to the continued

21   service criteria, which begins at 5-0009.

22   **A.**    Yes.

23   **Q.**    And can you identify any of those common criteria which

24   you believe supports the opinions that you have expressed here

25   today.

**PLAKUN - DIRECT / KRAVITZ**

1  **A.**    Yes.   2.1 and its subheadings 2.1.2 and 2.1.3.

2  **Q.**    Okay.  And can you explain to the Court why those support

3  your opinions.

4  **A.**    Well, this is the beginning of the custodial treatment

5  versus active treatment problem.

6       So 2.1 says:  "The admission criteria continue to be met

7  and active treatment is being provided."  That's fair enough.

8       But then it says that:  "For treatment to be considered

9  active, services must be."  And under 2.1.2, addressing the

10  "why now" factors, focused on addressing the why now factors.

11       So it seems to me that it says active treatment addresses

12  the "why now" factors, rather than the underlying co-occurring

13  problems that I've emphasized are important to treat.

14       And in 2.1.3, this improvement in the "why now" factors is

15  expected to occur in a reasonable period of time.  And

16  that's -- that's not defined.

17       And "reasonable period of time" is a -- is language that

18  doesn't come from documents that I consider within the

19  generally accepted standards like the Medicare Manual, where it

20  addresses issues like this.

21  **Q.**    Okay.  And is it -- do you believe that measuring

22  improvement with respect to the acute signs and symptoms meets

23  generally accepted standards of care?

24  **A.**    Well, that's one measure of improvement.  But it's not --

25  it's not a good enough way to define active treatment.  It does

1  not meet generally accepted standards to limit active treatment

2  to the acute problems.

3  **Q.**  Okay.  I understand that.

4       And with respect to the definition of "reasonable

5  expectation of improvement," does it meet generally accepted

6  standards to limit it to improvement in acute changes?

7  **A.**  No, it does not.

8  **Q.**  And then with respect to the discharge criteria, which

9  begin also on 5-0009, are there any provisions that you'd like

10  to point out to the Court that you believe support your

11  opinions?

12  **A.**  Yes.  3.1.1.  This is an example of ways that the

13  continued stay criteria are no longer met.  "The 'why now'

14  factors which led to admission have been addressed to the

15  extent that the member can be safely transitioned to a less

16  intensive level of care which no longer requires treatment."

17       So once the relatively acute "why now" factors are -- have

18  subsided in intensity, there's this press to move to a

19  different level of care rather than say, Now this is the

20  opportunity for learning to occur that can have an impact on

21  the underlying co-morbid issues.

22  **Q.**  Okay.  Anything else in the discharge criteria -- I'm not

23  suggesting that there is -- that you'd like to point out to the

24  Court?

25  **A.**  Well, the "why now" language continues in 3.1.2, but in a

1  different context.  This is the principal place.

2  **Q.**   So this refers to 3.1.1?

3  **A.**   Yes.

4  **Q.**   Okay.  And I'd like to -- well, is there anything in

5  Clinical Best Practices, which is Section 4 -- and, first of

6  all, do you understand what Clinical Best Practices is based on

7  your reading of this?

8  **A.**   I believe that I do.

9  **Q.**   What's your understandings?

10  **A.**   Clinical Best Practices appear to be what the provider is

11  instructed to do in order to carry out care that UBH will find

12  conforming to its best practices.

13      But these are not part of how determinations about level

14  of care are made.  And I do find in the Clinical Best Practices

15  some areas that are of concern to me and that are outside the

16  generally accepted standards.

17      For example, on Trial Exhibit 5, page 11, 4.1.4, there is

18  "developing a treatment plan."  And that's, of course,

19  something that makes perfect sense.

20      But under it, 4.1.4.3 says that:  "The expected outcome

21  for each problem to be addressed is expressed in terms that are

22  measurable, functional and time framed and directly related to

23  the "why now" factors."

24      So a provider is instructed that in building a treatment

25  plan the treatment plan itself must be focused on the most

1   acute "why now" factors rather than on the larger clinical

2   picture.

3   **Q.**   Okay.  Anything else?

4   **A.**   Under 4.1.7, at the bottom of that page, it reiterates

5   this point in a way.  Treatment focuses, it focuses on

6   addressing the "why now" factors to the point that the member's

7   condition can be safely, efficiently, and effectively treated

8   in a less intensive level of care or the member no longer

9   requires care.

10      Once again, it's a focus on the "why now" factors.

11  Resolve those acute crises, move them down or stop treatment

12  altogether.

13      So these best practices wind up shaping provider practice

14  in a way that pushes them to ignore the larger clinical

15  picture, the co-occurring problems.

16      It creates a crisis intervention focus, a crisis

17  stabilization model in how you think about treatment and how

18  you make level-of-care decisions.

19  **Q.**   Okay.  And I just want to make sure that -- I think you

20  might have said that clinical best practices is not part of

21  anything having to do with selection of level of care.  And I'd

22  like you to look at 1.7.3 if you might.

23  **A.**   1.7.3.

24  **Q.**   It's on page 0008.

25  **A.**   Yes.

1  Q.   And you see that one of the three -- four subparts of 1.7

2  does refer to Optum's Best Practice Guidelines.  Do you see

3  that?

4  A.   Yes.

5  Q.   Okay.  I take it that you know that's there?

6  A.   Yes.  And, in fact, it makes my point that it requires

7  that to get to any level of care the services that are provided

8  must be consistent with the best practices that limit the

9  treatment to a focus on acute presenting problems, "why now"

10  problems, and then step down.

11  Q.   And in terms of your understanding, if the best practices

12  are complied with, as you read the admission criteria, does

13  that get you covered at the proposed level of care?

14  A.   Could you repeat the question?

15  Q.   Sure.  If the clinical best practices in Section 4 are

16  met, is that sufficient to qualify for coverage under Section

17  1, in your opinion, based on your reading of this?

18  A.   No.

19  Q.   Okay.  Why not?

20  A.   Because the best practices are what the provider is

21  supposed to do.  And they are separate from the level-of-care

22  determinations.  They are instructing the provider how to

23  provide care.

24       If care were provided -- if I were doing, for example, a

25  board exam on a candidate who told me that this was how they

1  were going to practice, I could not imagine that I could pass

2  that candidate psychiatrist to become board-certified.  It's

3  not what treatment is about.

4  **Q.**  All right.

5  **A.**  I should add an asterisk:  Except at an inpatient level of

6  care.  If someone were, in an inpatient level of care, going to

7  focus on the -- just primarily on the acute "why now" problems

8  and then try to step down, I wouldn't have a problem with that.

9  But if we were talking about somebody who was struggling in

10  other levels of care, that's simply not how treatment is done.

11  **Q.**  I guess I was getting at a slightly different question,

12  Doctor, which is that, assuming that the clinical best

13  practices are satisfied, are there other things that have to be

14  met in order to qualify for coverage as you read the admission

15  criteria?

16  **A.**  Yes, a great many.

17  **Q.**  And are they listed in Section 1?

18  **A.**  Yes, they are.

19  **Q.**  That's -- I'm sorry, my question, I'm sure it was

20  confusing.

21     Okay.  Let's turn to the other years, 2011 through 2014,

22  and then '15 through -- '16 and '17.

23     But let me ask you a question.  In your opinion, based on

24  your review of the guidelines, do the overarching defects that

25  you have testified to today, are they present in the common

 1   criteria for the other years?

 2   **A.**   Yes.

 3   **Q.**   Okay.  And you noticed, however, that there are some

 4   variations in language?

 5   **A.**   Yes.

 6   **Q.**   But that does not change your opinion?

 7   **A.**   No.

 8   **Q.**   Okay.  What I'd like to do now is, if you could turn to

 9   Exhibit 1, please.  And in particular, I believe that the

10   common criteria begin on page 1-0005.

11       Do you have that in front of you?

12   **A.**   Yes, I do.

13   **Q.**   Okay.  And I don't want to repeat the testimony that

14   you've just given.  So what I would like you to do, if you

15   could, is identify the provisions for the Court that you

16   believe support your position that the 2011 version of the

17   common criteria have deficiencies?

18   **A.**   Yes.  The ones that are problematic are 5, 6 and 7.

19   **Q.**   Okay.  And that's on pages 5 -- Trial Exhibit Number -005

20   and -006?

21   **A.**   Yes.

22   **Q.**   Okay.  And then is there anything else?  I know that this

23   is -- the format is a little different here.  The continued

24   stay criteria are at the end.

25   **A.**   That's correct.  Page 0078 in that exhibit.

**PLAKUN - DIRECT / KRAVITZ**

1  **Q.**   Okay.  And is there anything on page 0078 in the continued

2  service criteria that you believe supports your opinions?

3  **A.**   Yes.  Items 2 and 8, which must be met, are part of my

4  opinion about this -- this year's continued service criteria.

5  **Q.**   Okay.  And then I'll ask you one more question about this.

6  So forgive me for a second.

7     I'm looking for the language on clear and compelling

8  evidence.  And I'm --

9  **A.**   That is in Number 8.

10 **Q.**   Okay.  Do you have anything to say about that?

11 **A.**   Well, this is one of the ways where the language is a

12 bit --

13 **Q.**   Actually, could you read the language to the Court so we

14 have it on the record what you're commenting on.

15 **A.**   So continued service criterion 8 for 2011, that must be

16 met is that (reading):

17        "Measurable and realistic progress has occurred or

18     there is clear and compelling evidence that continued

19     treatment at this level of care is required to prevent

20     acute deterioration or exacerbation that would then

21     require a higher level of care.  Lack of progress is being

22     addressed by an appropriate change in the treatment plan

23     or other intervention to engage the member."

24 **Q.**   And do you believe that imposing that burden of proof, for

25 lack of a better word, comports with generally accepted

 1  standards of care?

 2  **A.**   "Clear and compelling evidence" is a departure from the

 3  reasonable expectation kind of language that you find in things

 4  like the Medicare Manual.

 5  **Q.**   Okay.

 6  **A.**   And the requirement to prevent acute deterioration or

 7  exacerbation as opposed to something less acute.  This is a

 8  departure from generally accepted standards.

 9  **Q.**   Okay.  Let's turn to 2012, please.  And that's Exhibit 2

10  for the record.  And that's also in evidence.

11       And I believe that the common criteria begin on

12  page 2-0006.  Are you with me?

13  **A.**   Yes.

14  **Q.**   Okay.  Can you identify the provisions in the common

15  criteria for 2012 that you have identified as supporting your

16  opinions?

17  **A.**   Yes.  They are Numbers 6 and 7.

18       6 is very similar language to what we discussed in 2015;

19  although, it is formatted a little bit differently.  And 7 is

20  also something we've seen before that, the goal of treatment is

21  to improve the member's presenting symptoms to the point the

22  treatment in the current level of care is no longer required.

23  It's focused on the acute and then step-down problem.

24  **Q.**   Okay.  And just so the record is clear, both number 6 and

25  number 7, that you have identified, actually are on page

1   2-00007.  Is that correct?

2   **A.**   Yes, it is.

3   **Q.**   Okay.  And just so we also have on the record, number 6,

4   which you said is like language we saw for 2015, relates to the

5   reasonable expectation point that you made?

6   **A.**   Yes.  It's -- I think in other years it's 1.8.

7   **Q.**   Okay.  And then I believe that in 2012 we still have the

8   continued service criteria at the end.  In my book I think it's

9   Exhibit 2-00082.

10  **A.**   Yes.

11  **Q.**   And are there any provisions in the continued service

12  criteria for 2012 that you identified as supporting your

13  opinions?

14  **A.**   Yes.  Numbers 5 and 6.

15      5 addresses the active treatment issue (reading):

16          "There continues to be evidence that the member is

17      receiving active treatment, and there continues to be a

18      reasonable expectation that the member's condition will

19      improve further.  Lack of progress is being addressed by

20      an appropriate change in the member's treatment plan

21      and/or an intervention to engage the member in treatment."

22      This is relevant primarily because of later language

23  describing what active treatment is that narrows it.  Although,

24  it's not narrowed in this particular item.

25  **Q.**   Okay.

**PLAKUN - DIRECT / KRAVITZ**

1   **A.**   And Number 6, once again, is the burden of proof problem.

2   (Reading:)

3           "The member's current symptoms and/or history provide

4       evidence that a relapse or a significant deterioration in

5       functioning would be imminent if the member was

6       transitioned to a level of care, or in the case of

7       outpatient care, was discharged."

8   So it's the use of the "imminent" whereas there had been

9   "clear and compelling" the previous year, as opposed to just a

10  reasonable likelihood there would be a deterioration.

11  **Q.**   Right.  And I think that you mentioned that there's other

12  language related to active treatment.  And, if appropriate,

13  perhaps you can point that out to the Court when we get to the

14  Custodial Care CDG.

15  **A.**   The 2012.

16  **Q.**   Yeah.  But we'll get to it.  I'd like to go through this.

17  But if I forget, help me out here.

18  **A.**   Uh-huh.

19  **Q.**   Okay.  Is there anything else on 2012, in terms of

20  pointing out provisions that you believe support your opinion

21  in the common criteria?

22  **A.**   No.

23  **Q.**   Okay.  Let's turn to 2013, please.  That would be

24  Exhibit 3.

25      And just to help this along, I believe the common

1    criteria -- sorry.  Scratch that.

2        I believe that the common criteria begin on page 3-0007.

3    And is there anything that you'd like to point out to the Court

4    on that page or on the ensuing pages that's in the common

5    criteria?

6    **A.**    In the common criteria on page 0008, numbers 7 and 8 are

7    the ones that I am pointing to.

8        Again, in 7, for example (reading):

9            "There must be a reasonable expectation that

10           essential and appropriate services will improve the

11           member's presenting problems within a reasonable period of

12           time."

13   We've talked about that and we've -- we've talked about

14   this.  It was 1.8 in other years.  It's come up this morning.

15       And Number 8:

16           "The goal of treatment is to improve the member's

17           presenting symptoms to the point the treatment in the

18           current level of care is no longer required."

19   I think this was also number 8 in the previous year;

20   number 7 in the year before.  It's the same "occurring,"

21   "acute" and then step-down language.

22   **Q.**    Okay.  And then anything else on pages 6, 7, or 8 of the

23   2013 common criteria?

24   **A.**    No.

25   **Q.**    All right.  And then I believe that we're still in the

1    time period where the continued service criteria are at the

2    end.  And to help you out, look at page 3-0089.  Are you there?

3    A.   Yes, I'm there.

4    Q.   Okay.  And can you point out to the Court, if there are

5    any, the provisions that you're relying on?

6    A.   Yes.  It's Number 6 at the bottom of the page in the

7    continued service criteria for 2013.  It states:

8         "The member's current symptoms and/or history provide

9         evidence that relapse or a significant deterioration in

10        functioning would be imminent if the member was

11        transitioned to a lower level of care or, in the case of

12        outpatient care, was discharged."

13        So it's the "imminent" language once again that we

14   referenced earlier.

15   Q.   Right.  And you believe that falls below generally

16   accepted standards?

17   A.   Yes.

18   Q.   Okay.  And then anything else in the continued service

19   criteria that you'd like to point out to the Court?

20   A.   No.

21   Q.   Okay.  Let's go to 2014.  Can I help you out there?

22   A.   Put it over here.

23        MR. KRAVITZ:  Your Honor, may I approach just to help

24   with the notebooks?

25        THE WITNESS:  I got it.

PLAKUN - DIRECT / KRAVITZ

 1    BY MR. KRAVITZ:

 2    Q.    You got it.  Okay.

 3          Okay.  Same drill here.  The only problem is that they

 4    turned them sideways.

 5          So in 2014, the -- it's, I guess, a landscape format or

 6    whatever.  But the admission criteria, I believe -- well, I

 7    guess all of the common criteria are on pages 4-0007 through

 8    4-0012.

 9          Are you with me?

10    A.    Yes.

11    Q.    Okay.  And I know that we don't have numbers in 2014, but

12    just bullets.  So if you can -- you can describe the provisions

13    in the admission criteria.  And let's start with them that you

14    believe support your opinions.  Or at least you identified as

15    supporting your opinions.

16          And it would be helpful if you can, in identifying them,

17    give the page number and then some description of the bullet

18    that you're referring to.

19    A.    Sure.

20          So the common criteria that begin on 4-0007, if we go down

21    the admission column on the left side of the page, the second

22    bullet down, that says:

23          "The member's current condition cannot be safely,

24          efficiently, and effectively assessed and/or treated in a

25          less intensive setting due to acute changes in the

**PLAKUN - DIRECT / KRAVITZ**

1     member's signs and symptoms and/or psychosocial and

2     environmental factors" -- that is the "why now" factors --

3     "leading to admission."

4          So that is the first one of the admission criteria that I

5     would highlight.

6          I did not have a problem with any of the admission

7     criteria on 4-0008.

8          But on 4-0009, in the admission column on the left,

9     there's a familiar -- there's familiar language there.  There's

10    a reasonable expectation that services will improve the

11    member's presenting problems within a reasonable period of

12    time.  And it's language that was 1.8 in 2015, when we looked

13    at it.  It's simply in a different format here.

14    **Q.**   And I -- and just so that -- just so that we're clear, so

15    it's the first black bullet on --

16    **A.**   Toward the middle of the page, left under "Admission."

17    **Q.**   Right.  On page 4-0009.  And then if you turn the page to

18    -0010.  Do you see that the sub-bullets under there -- also,

19    there are two sub-bullets that have to do with improvement?

20    **A.**   Yes.

21    **Q.**   Right.  And so it's the main bullet on improvement and the

22    two sub-bullets that you're referring to?

23    **A.**   Yes.

24    **Q.**   Okay.  Just wanted to be clear.

25         Okay.  And then if you look at continued stay, which means

1  you need to go back to 4-0007, could you do that.  Is there

2  anything in the continued service criteria that you identified

3  as supporting your opinions?

4  **A.**  Yes.  On that page, the bullet under "Continued Service,"

5  the black bullet:

6         "The admission criteria are still met and active

7         treatment is being delivered.  For treatment to be

8         considered 'active treatment' services must be," and then

9         there are three sub-bullets that extend on to 4-0008.

10  There's not a problem with the first sub-bullet.  But the

11  second sub-bullet says that:

12         "Active treatment must be provided under an

13         individualized treatment plan focused on addressing the

14         'why now' factors and makes use of clinical best

15         practices."

16  And then on 4-0008, the last sub-bullet:

17         "The active treatment must be reasonably expected to

18         stabilize the member's condition and/or the precipitating

19         'why now' factors within a reasonable period of time."

20  **Q.**  All right.  And then anything else?

21  **A.**  I believe that is the end of the continued stay criteria.

22  But there are some issues with the Discharge criteria.

23  **Q.**  Okay.  All right.  Does that require us to go back to

24  4-0007 again?

25  **A.**  Yes.

**PLAKUN - DIRECT / KRAVITZ**

1   **Q.**   Okay.  If you could identify for the Court the provisions

2   that you have identified.

3   **A.**   Yes.  So under "Discharge" on 4-0007, the first bullet,

4   "Continued stay criteria are no longer met."  And then the

5   example is: "Why now" factors have been addressed, but the

6   member can be safely transitioned to a less intensive level of

7   care or no longer requires treatment."

8       That's familiar language.  It simply is appearing here in

9   this year.  We've discussed it previously.

10  **Q.**   Yes.

11  **A.**   And then I think that's the end of the discharge criteria

12  that I highlighted --

13  **Q.**   Okay.

14  **A.**   -- under the Clinical Best Practices.

15  **Q.**   All right.

16  **A.**   There's a column called Evaluation and Treatment Planning.

17  **Q.**   Yes.  That begins on 4-0007 as well?

18  **A.**   Yes.  And if one follows down a couple of pages later, to

19  4-0010, the top sub-bullet is, again, familiar language we

20  discussed previously.  But here it is appearing in this year.

21          "The expected outcome for each problem to be

22          addressed expressed in terms that are measurable,

23          functional, time framed and directly related to the 'why

24          now' factors."

25          And then, finally, on 4-0011, under "Evaluation and

**PLAKUN - DIRECT / KRAVITZ**

1    Treatment Planning," under the "Best Practices," at the bottom

2    of that page, the last bullet:

3              "Treatment focuses on addressing the 'why now'

4         factors to the point that the member's condition can be

5         safely, efficiently, and effectively treated in a less

6         intensive level of care or treatment is no longer

7         required."

8         And, again, that's familiar language here.  It is

9    appearing in this particular year's clinical best practices.

10   Q.    Okay.  Anything else for 2015 that you'd like to point out

11   to the Court?

12   A.    Not in the LOCGs.

13   Q.    Or in the common criteria?

14   A.    Yeah, not in the common criteria.  Sorry.

15   Q.    Okay.  We've done 2015.  So we're going to go ahead to

16   2016 now.  And same drill here.

17        Why don't you turn to page 6-0009, which is, I believe,

18   the first page of the "Common Criteria and Clinical Best

19   Practices for All Levels of Care."

20        And if you would, starting with the admission criteria,

21   identify to the Court any provisions that you believe support

22   your opinions.

23   A.    Yes.  They would be 1.4, 1.5, 1.6, and 1.8.

24   Q.    Okay.  And --

25   A.    All these are -- represent language we've discussed

1  before.

2  **Q.**   Okay.  I don't -- when you say that, I mean, is this, in

3  your view, substantially similar to 2015, that you called out?

4  **A.**   Yes.

5  **Q.**   Okay.  Is there anything in particular that you want to

6  add about the 2016 language?  I'm talking about this version in

7  Exhibit 6 as to 1.4, 1.5, 1.6 or 1.8.

8  **A.**   No.

9  **Q.**   Okay.  Let's turn now to page 6-0010.  And there's

10  continued service criteria.  Are there any of those provisions

11  that you'd like to identify for the Court?

12  **A.**   Yes.  Again, this is language that we addressed similarly

13  in 2015.  But number 2.1 and 2.1.2 and 2.1.3, that describes

14  what active services -- active treatment services must be, that

15  they must be part of a treatment plan focused on the "why now"

16  factors and the reasonable expectation of improvement in a

17  reasonable period of time.  We've talked about those in 2015.

18  **Q.**   Okay.  Then if you could turn to the Discharge criteria in

19  2016.  Also it begins on 6-0010 and carries over to 6-0011.

20  Are there any provisions there that you'd like to identify in

21  support of your opinions?

22  **A.**   Yes.  3.1 and 3.1.1.  Again, language we've reviewed

23  before.

24      It's not new, that the continued stay criteria are no

25  longer met.  The "why now" factors have been addressed and the

1   person can be transitioned to a less intensive level of care or

2   no longer requires care.

3   **Q.**   Okay.  And in the clinical best practices, are there any

4   provisions that you'd like to identify?  And that would be on

5   6-0011, -12, -13, or -14 or -15.

6   **A.**   Yes.  There are two.  One is on -12.  4.1.4.3.  "Expected

7   outcome" listed in the treatment plan would be "expressed in

8   terms that are measurable, functional time framed and directly

9   related to the 'why now' factors."  Again, it's come up before.

10      And on page 13, 4.1.7.  "Treatment focuses on addressing

11   the 'why now' factors to the point that the member's condition

12   can be safely, efficiently, and effectively treated in a less

13   intensive level of care or the member no longer requires care."

14   Again, language that we've talked about earlier.

15   **Q.**   Okay.  Let's turn to Exhibit 7, please.

16      Oh, anything else in Exhibit 6 with respect to the common

17   criteria that you'd like to identify for the Court?

18   **A.**   No.

19   **Q.**   Let's turn to Exhibit 7, which is 2016 Level of Care

20   Guidelines with revisions in June of 2016.  Do you have that in

21   front of you?

22   **A.**   I do.

23   **Q.**   Okay.  And same drill.  Let's go to page 7-0009.  And can

24   you identify the provisions that you believe support your

25   opinions?  And if the numbers are the same as the earlier 2016

**PLAKUN - DIRECT / KRAVITZ**

1   version, which is Exhibit 6, I would urge you to say that as

2   opposed to listing the numbers.  But check to make sure that

3   it's the same thing.

4   **A.**   I believe that the numbers are the same.  1.4, 1.5, 1.6

5   and 1.8.

6   **Q.**   Okay.  And then going to continued service.

7   **A.**   Yes.  Same numbers under "Continued Service" on page 0010.

8   2.1 and 2.1.2 and 2.1.3.

9        And the discharge criteria at the bottom of that page,

10  same numbers for 3.1 and 3.1.1.

11  **Q.**   And then clinical best practices.

12  **A.**   And clinical best practices, the same number that year,

13  4.1.7.

14  **Q.**   I think you had two.

15  **A.**   I think that's it.

16  **Q.**   I thought you had two in clinical best practices before.

17  I mean, maybe you don't in this one.

18  **A.**   No.  No.  And 4.1.4.3.

19  **Q.**   Okay.

20  **A.**   Same --

21  **Q.**   Okay.

22  **A.**   Same language.

23  **Q.**   Okay.  Anything else with respect to the June revision in

24  2016?

25  **A.**   No.

**PLAKUN - DIRECT / KRAVITZ**

1   Q.   Okay.  Let's go to 2017, which is Exhibit 8.

2   A.   Yes.

3   Q.   Okay.  Now, did you notice that the term "why now" was

4   taken out of most or not all -- I hope I'm not mistaken, but it

5   certainly -- the term "why now" seems to be removed from a

6   number of provisions in 2017.  Did you notice that?

7   A.   Yes, I did.

8   Q.   Okay.  And I'm talking about the common criteria, okay?

9   A.   Yes.

10  Q.   Okay.  And did you notice also, I believe, that the word

11  "acute" was taken out of the "reasonable expectation of

12  improvement" definition and maybe other places?  Did you notice

13  that as well?

14  A.   Yes.

15  Q.   Okay.  I mean, we could find them.  But you noticed that

16  those words were missing at certain places or had been changed?

17  A.   Yes.

18  Q.   Okay.  With -- with those words removed in either some or

19  all places in the common criteria, did you identify continuing

20  deficiencies in the 2017 common criteria that you'd like to

21  identify for the Court?

22  A.   Yes.

23  Q.   Okay.  Could you do that.  And could you help us out here

24  by telling us what page you're on.

25  A.   Sure.  Trial Exhibit 8-0007, the third bullet down from

1    the top of the page, is the familiar language about

2    co-occurring behavioral health and medical conditions being

3    safely managed.

4        And then two bullets below that there's reasonable

5    expectation that services will improve the member's presenting

6    problems.  So we replaced "why now" and "acute" with

7    "presenting problems within a reasonable period of time."  And

8    this is the language that in 2015 was the 1.8 language.

9        And then preceding to the common continued service

10   criteria for all levels of care --

11   **Q.**    Are you still on 8-0007?

12   **A.**    Yes.  It's simply the black line takes you to the common

13   continued service criteria.  And the first bullet there, toward

14   the middle of the page, and the second and third sub-bullets

15   are, again, the familiar language about the admission criteria

16   continue to be met, and that active services mean that it comes

17   from a treatment plan focused on the factors leading to

18   admission instead of the "why now" or acute presenting

19   problems.  And reasonably expected to improve the presenting

20   problems.

21       So presenting problems or comparable language factors

22   precipitating admission have been substituted for the "why

23   now."  But it's a new way of saying the same thing.

24       And then, finally, the next black line going down that

25   same page 7, the common discharge criteria, again, familiar

**PLAKUN - DIRECT / KRAVITZ**

 1   language in the first bullet.  And the first sub-bullet

 2   containing "state criteria are no longer met, factors which led

 3   to admission have been addressed so that the member can be

 4   safely transitioned to a less intensive level of care or no

 5   longer requires care."

 6       Similarly, there was some language in the Common Clinical

 7   Best Practices For All Levels of Care.  Although, the ones I

 8   would highlight are on the next page, Exhibit 8-0008.

 9       And, again, it's familiar language with the words "why

10   now" removed.  But, let's see, the third black bullet down from

11   the bottom -- sorry, down from the top of page 8 describes the

12   treatment plan.  And the third sub-bullet is the familiar

13   language, expected outcome of each problem to be addressed in

14   terms that are measurable, functional, time framed and directly

15   related not to the "why now" but to the factors leading to

16   admission.  So it's the same language with a slight language

17   substitution.

18       Then three black bullets down --

19   **Q.**   On what page are you now?

20   **A.**   It's on the same page, 8, there's language that begins

21   (reading):

22           "Treatment focuses on addressing the factors

23       precipitating admission to the point that the member's

24       condition can be safely, efficiently, and effectively

25       treated in the less intensive level of care or the member

1              no longer requires care."

2         Again, familiar language we followed from year to year in

3    the best practices.

4    **Q.**   Okay.  And then let me just follow up on something you

5    said, because I want to make sure that it's clear.

6         You said -- I think when you were talking about the

7    "reasonable expectation of improvement" language, which I guess

8    is on page 8-0007 -- can you turn back to that?  I guess it's

9    the one, two, three, four -- fifth bullet down from the top of

10   that page.

11   **A.**   Yes.

12   **Q.**   Okay.  And I think you said that that language was

13   familiar and was the same as 2015.  And I just want to make

14   sure that what you're saying is -- and correct this if it's not

15   right.  But what you're saying is that they've substituted

16   other language for what used to be "why now" or "acute."  Is

17   that your opinion?

18   **A.**   Yes.  It's substituted control of the signs and symptoms

19   that necessitated treatment for the previous language.

20   **Q.**   I just wanted to make sure that you wouldn't be

21   misunderstood by saying it was the exact same words.

22   **A.**   Right.

23   **Q.**   Okay.

24   **A.**   Yes, not the same words.  Same message, yeah.

25   **Q.**   Yes.  And is that similar to the pre-"why now" guidelines

PLAKUN - DIRECT / KRAVITZ

1   in 2011 and '12?

2   A.   Yes.

3   Q.   Okay.  Anything else that comes to your mind on the common

4   criteria?

5   A.   No.

6   Q.   Okay.  Let's -- let's go to the custodial care CDGs, okay.

7           MR. KRAVITZ:  And this is another topic on which

8   there's been a lot of testimony.  So I will do my very best not

9   to be too duplicative here, Your Honor.

10  BY MR. KRAVITZ:

11  Q.   So let me ask you a broad question, and then we'll follow

12  up a little bit.

13       But have you reached an opinion as to whether UBH's

14  custodial care and inpatient and residential services, CDGs,

15  which are in evidence as Trial Exhibits 10, 47, 84, 108, 148,

16  195, and 221, are consistent with generally accepted standards

17  of care?

18  A.   Yes.

19  Q.   And what is your opinion?

20  A.   That these are not consistent with generally accepted

21  standards.

22  Q.   And what did you do to reach that conclusion?

23  A.   I read the CDGs for custodial care, and compared them to

24  my knowledge and experience and to other documents that I

25  consider within the generally accepted standards for these

1   matters, like the relevant chapters in the Medicare manual.

2   **Q.**   And what I'd like you to do in a minute is explain why in

3   your opinion these CDGs are inconsistent with the CMS

4   guidelines and do not meet generally accepted standards.

5       But before you do that, I'd like you to explain for the

6   Court how does the concept of active treatment relate to the

7   concept of custodial care?

8   **A.**   Well, I think I addressed this earlier.

9   **Q.**   You did somewhat, but I want to be -- you know, get you

10  directly on that point, if you could.

11  **A.**   Yeah.  So there are two kinds of treatment.  There's

12  active treatment, which is provided by skilled clinicians,

13  which addresses clinical problems; and there is custodial

14  treatment, which is provided by nonclinicians, it's not skilled

15  personnel, and the focus is activities of daily living.

16      And, of course, it makes sense that level-of-care

17  decisions for the levels we're talking about should be based on

18  the presence of active treatment; however, there's a narrowing

19  of the definition of "active treatment" and a broadening of the

20  definition of "custodial treatment" that is problematic here,

21  and it carries from year to year with some evolution but

22  largely the same language.

23  **Q.**   Okay.  And I don't know if you -- and if you did, I just

24  missed it -- but did you explain what "custodial care" is?  Did

25  you just give that answer?

1   **A.**   I think I did.

2   **Q.**   Okay.  Sorry.

3       In determining whether a service is custodial, does that,

4   Dr. Plakun, depend on the degree of functional limitation or

5   rehabilitation potential?

6   **A.**   No, not according to such indicators of generally accepted

7   standards as the Medicare manual.

8   **Q.**   Now, let's get to the reasons that you believe that UBH's

9   definitions of custodial care and active treatment are not

10  consistent with generally accepted standards.  Can you tell us

11  why you have that opinion?

12  **A.**   In general, as opposed to a particular year?

13  **Q.**   Yes.  And then we'll take -- then we'll take a look at

14  2015, and I promise that we'd look at it's either 2011 or 2012,

15  but that will be very quick.

16  **A.**   Yeah.  Okay.

17      So custodial care, according to generally accepted

18  standards as in the Medicare manual, is not provided by skilled

19  individuals and it deals with activities of daily living:

20  Dressing, toileting, that sort of thing.

21      Active treatment, according to the medical -- to the

22  Medicare manual is the kind of treatment that is provided by

23  skilled, clinically trained people.

24      What the UBH CDGs wind up doing here --

25          **MR. RUTHERFORD:**  Objection, Your Honor.  I'm sorry.

**PLAKUN - DIRECT / KRAVITZ**

1    Is the witness reading off of an exhibit, a script?

2              **MR. KRAVITZ:**  Oh, if you are, that's fine, we'll put

3    it up.  That's fair enough.

4         I shouldn't respond to you, but I will deal with it.

5              **THE COURT:**  What are you reading?

6              **THE WITNESS:**  I actually was not reading.  I thought I

7    was answering a general question.

8              **THE COURT:**  Fine.  Okay.

9    **BY MR. KRAVITZ:**

10   **Q.**  Well, that's what I asked, but if you are reading off

11   something, I would ask that we put it up on the screen.

12   **A.**  Oh, well, the thing that is in front of me that I'm --

13   **Q.**  Would it be helpful to look at the 2015 CDG?

14   **A.**  Probably that would be better.

15   **Q.**  Okay.

16             **MR. KRAVITZ:**  Could you put up exhibit, I guess, 148?

17   No, no.  I think -- wrong.  195 I believe is 2015.  No.

18             **THE WITNESS:**  No.  148.

19   **BY MR. KRAVITZ:**

20   **Q.**  148.  My apologies.

21        Would you -- let's put that up, and then if there's

22   something you want to refer to in answering my general

23   question, why don't you do it that way.

24   **A.**  Yes.  So this is Trial Exhibit 148 --

25   **Q.**  Yes.

1    A.    -- and I'm looking at page 0003 --

2    Q.    Okay.

3    A.    -- the key points.

4    Q.    All right.

5    A.    And it's a good place to look because it's a good example

6    of the problem.

7    Q.    Okay.

8    A.    So the second bullet down -- well, let's start at the top,

9    the first bullet (reading):

10          "Services provided in psychiatric inpatient and

11          residential treatment settings that are not active and are

12          solely for the purpose of custodial care as defined below

13          are excluded."

14          That's totally consistent with generally accepted

15    standards.

16          The next bullet addresses custodial care in a psychiatric

17    inpatient or residential setting, and the key points from UBH

18    are that custodial care includes nonhealth-related services --

19    that's fully consistent with what the Medicare manual says --

20    but also health-related services that are provided for the

21    primary purpose of meeting the personal needs of the patient or

22    maintaining a level of function even if the specific services

23    are considered to be skilled services as opposed to improving

24    that function to an extent that might allow for a more

25    independent existence.

1      So what that bullet does is, departing from the standards

2   in the Medicare manual, it says that even health-related

3   services provided by skilled clinicians are custodial if they

4   are intended to maintain a level of functioning as opposed to

5   improve the level of functioning, but that's not what the

6   Medicare manual says.  The Medicare manual says, as we just

7   discussed, that functional level is not relevant in determining

8   improvement and in determining custodial treatment.

9   **Q.**   Just so that I understand, so I understand that you've

10  said that one problem with this second subbullet relates to,

11  you know, clinical -- skilled clinical health workers or health

12  services, but in terms of what this says is it's custodial if

13  it's maintaining a level of function as opposed to improving

14  it.  Is that the way you read that?

15  **A.**   Yes.  There are several parts to what's wrong.

16  **Q.**   Yes.  Okay.  Just -- I just wanted to -- if you have a

17  comment on that, I'd like you to make it.

18  **A.**   Yeah.  So the things that are notable here that are

19  departures from what the Medicare manual, which is a good

20  indicator of generally accepted standards explains, is that

21  services that are skilled that are provided by clinicians are

22  declared to be custodial under certain conditions, and that's a

23  departure in and of itself because that's not what the Medicare

24  manual says.

25  **Q.**   Right.

1    **A.**   In addition, it says that the conditions under which such

2    services provided by a clinician are custodial is if they are

3    directed at maintaining a level of function as opposed to

4    improving it, but that language about maintaining a level of

5    function as opposed to improving is a departure from Medicare.

6    Medicare would consider active treatment for people with

7    chronic disorders to be directed sometimes at maintaining a

8    level of functioning.  You know, for example, if someone is

9    quadriplegic and they might not improve their function, that

10   doesn't mean it's not a skilled service if it's provided by a

11   clinician.  So that's the custodial care piece.

12   **Q.**   Okay.  And if you --

13   **A.**   But this goes hand in glove with the active treatment

14   piece, which is --

15   **Q.**   Okay.  Do you have a comment on the active treatment

16   piece?

17        And just so we can show, you know, on the screen here in

18   this key points box there's the "Custodial Care" black bullet

19   with subpoints and then there's "Inactive Treatment" black

20   bullet with subpoints followed by an "Improvement" bullet.

21   And, you know, if you have comments on that, please share them.

22   **A.**   Yes.  So in the -- there's a black bullet for "Active

23   Treatment" and under that is a subbullet that describes that

24   active treatment is indicated by services that are all of the

25   following, and it cites Medicare manual, Chapter 2, 30.2.2.1,

1  although these are not most -- the important ones are not from

2  that manual.

3      And that is that active treatment, the UBH guidelines say,

4  is unable to be provided in a less restrictive setting.  That's

5  not what the Medicare manual says.  That's in the -- one, two,

6  three -- fourth sub-subbullet.

7      In the fifth sub-subbullet (reading):

8          "If it's focused on interventions that are based on

9      generally accepted standard medical practice and are known

10     to address the critical presenting problems, psychosocial

11     issues, and stabilize the member's condition to the extent

12     they can be treated in a lower level of care."

13     So it limits active treatment to those treatment services

14 that can't be provided in a less restrictive setting and that

15 are only addressing the critical presenting problem.

16 **Q.**  So those are the two points that you think are -- support

17 your opinion that the active treatment aspect of this CDG,

18 which is the 2015 version, is deficient?

19 **A.**  Yes.  We've gone over the ways that the custodial care is

20 broadened so that even clinical services are suddenly

21 custodial, and active treatment is narrowed.  And so even

22 active treatment is custodial if it's not focused on the acute

23 presenting problems.

24 **Q.**  Okay.  And then I notice that under "Active Treatment,"

25 the third sub-subbullet is (reading):

**PLAKUN - DIRECT / KRAVITZ**

1              "Reasonably expected to improve the member's

2         condition or for the purpose of diagnosis."

3         Do you see that?

4    **A.**   Yes.

5    **Q.**   And then I just observe that further down the page also in

6    the key points box there are -- there's a bullet and a

7    subbullet on the subject of improvement.  Do you see that?

8    **A.**   Yes.  (reading)

9              "Improvement of the member's condition is indicated

10        by a reduction or control of the acute symptoms that

11        necessitated hospitalization or residential treatment."

12   So that particular bullet is also part of shaping active

13   treatment so that it is narrowed in ways that lead it to depart

14   from generally accepted standards as codified in the medical --

15   sorry -- Medicare manual.

16   **Q.**   Okay.  Have you identified the parts of the 2015 Custodial

17   Care and Inpatient and Residential Services CDG, which is

18   Exhibit 148 in evidence, that you believe support your opinion

19   that the Custodial Care CDGs fall below generally accepted

20   standards?

21   **A.**   Well, these key points bullets that we've just been

22   discussing are the ones.

23   **Q.**   Yes, okay.  I just want to make sure that you've -- I'm

24   not suggesting to you that there are, but I just want -- before

25   we move on, I just want to make sure that you've pointed out or

1  identified the parts of this CDG that you believe support your

2  opinion.

3  **A.**   We've done that.

4  **Q.**   Okay.  What I'd like to do now is if you could turn back

5  to Exhibit 47 because I believe that when you were looking at

6  the language of the common criteria for 2011 and in particular

7  with respect to the term "active treatment," you said that that

8  was defined elsewhere; and so I'm now showing you the 2011

9  CDG --

10  **A.**   2012.  I thought it was 2012.

11  **Q.**   Am I showing you the wrong one again?  Well, it might have

12  been 2012, but let's just look at 2011; and then if it's the

13  same in 2012, we will have covered it and made up for the fact

14  that maybe I wrote down the wrong year, which is possible.

15       Okay.  Can you -- if you look at the definition of "active

16  treatment" in Exhibit 47, and it's on page 0003 of that exhibit

17  in evidence, in the key points box there's a definition of

18  "active treatment."  Do you see that?

19  **A.**   Yes.

20  **Q.**   And was that what you were referring to earlier?

21  **A.**   Yes.  What's on the screen is what I was referring to

22  earlier.  It's the same -- it's very similar language to what

23  we just discussed in 2015 in terms of subbullets 4, "Unable to

24  be provided in a less restrictive setting," and subbullet 5,

25  "focused on interventions that are based on generally accepted

1   standard medical practice and are known to address the critical

2   presenting problems, psychosocial issues, and stabilize the

3   patient's condition to the extent that they can be safely

4   treated in a lower level of care."

5        And as we just discussed, there is a -- there are two

6   bullets that address improvement.  The third bullet down under

7   "Active Treatment," "Where reasonably expected to improve the

8   patient's condition or for the purpose of diagnosis" and the

9   black bullet below "Active Treatment" again talks about

10  "Improvement as indicated by reduction or control of the acute

11  symptoms that necessitated the hospital or residential

12  treatment."  And so it's the same as we discussed for the

13  previous year.

14  **Q.**   Okay.

15  **A.**   And this is what I was referring to in the Level of Care

16  Guidelines.

17  **Q.**   Yeah.  And just to make sure that the record is complete

18  if I have forgotten whether you've made your comment before

19  about 2011 or 2012, can you just turn to Exhibit 84 in evidence

20  on page 003, which is the 2012 version, and just confirm that

21  the same or virtually identical language is in that CDG as

22  well?

23  **A.**   Yes, it looks like virtually identical.

24  **Q.**   Okay.

25       All right.  Let's change to another subject.

1          THE COURT:  Let's change to another subject in an

2    hour.

3          MR. KRAVITZ:  Okay.  I was hoping you were going to

4    say that.

5                          (Laughter)

6          THE COURT:  Okay.  Thank you.

7                  (Luncheon recess taken at 12:03 p.m.)

8    Wednesday, October 18, 2017                    1:06 p.m.

9                  P-R-O-C-E-E-D-I-N-G-S

10                          ---oOo---

11         THE CLERK:  We are back on the record in Case Number

12   C14-2346 Wit/Alexander versus UBH.

13         THE COURT:  Okay.  Sealing.  I got the administrative

14   motion to seal certain exhibits.

15      They are divided into a couple of different sections.  The

16   first is the per-member-per-month rate information.

17      Well, first of all, who is going to use these exhibits?

18         MR. BUALAT:  Plaintiffs and I were going to use them,

19   I believe, in context of some video that they were considering

20   playing.  I'm not sure if they are playing all of it today, but

21   at some point they've designated use of these exhibits.

22         THE COURT:  So these are going to be used?

23         MR. ABELSON:  If time permits.  We've tried to look

24   forward a day or two to make sure that, to the extent we're

25   going to play videos, that we've dealt with it.

1          THE COURT:  Fine.

2      There are some that have per-member-per-month data in

3   them.  And what do you think about that?

4          MR. ABELSON:  This specific per-member-per-month rates

5   I don't think we have a problem with.  But I also want to

6   just -- maybe this might help.  Based on the schedule, it looks

7   like the only deposition we may get to today is one that

8   involves two particular exhibits.  So I don't know if you want

9   to only go with those or all of them.

10         THE COURT:  Let's do those.  Which ones are those?

11         MR. BUALAT:  I think those are 290 and 291, is the

12  data dictionaries, Your Honor.

13         THE COURT:  Okay.

14         MR. BUALAT:  And those are addressed by the McCulloch

15  declaration.

16         THE COURT:  And what's that about?

17         MR. BUALAT:  The data dictionaries are categorized

18  information in UBH's database.  And it's our understanding, as

19  reflected in Ms. McCulloch's declaration, that those could

20  potentially lead to understanding of the systems that are used

21  and potentially could aid some kind of data intrusion if they

22  were publicly available.

23         THE COURT:  Yeah.  That sounds like every case

24  involving a computer I've ever had in this courtroom.

25         (Laughter)

1          **THE COURT:**  So I'm not particularly swayed by that.

2      But I don't know what you mean.  There's going to be

3  testimony.  You're not asking to seal the courtroom?

4          **MR. BUALAT:**  No, Your Honor.  Our understanding is

5  that there may be a possibility that the testimony can come in

6  without a publishing of documents to the public, because the

7  testimony is more just describing some of the categories in the

8  document but not the entirety of the various fields that are

9  used to track data within the database which contains -- the

10  database contains information as protected by HIPAA.  And the

11  issue is to protect against disclosure in any kind of hacking

12  into that database.

13          **THE COURT:**  Well, none of the HIPAA information is in

14  these exhibits; right?

15          **MR. BUALAT:**  That's correct, Your Honor.

16          **THE COURT:**  Okay.  I'm not going to seal those two

17  exhibits.

18      So when -- just hit me up for the rest of them before we

19  get to them, okay.

20          **MR. ABELSON:**  Perfect.  Thank you.

21          **MR. BUALAT:**  Thank you, Your Honor.

22      One last note, Your Honor.

23          **THE COURT:**  Yes.

24          **MR. BUALAT:**  At the pretrial conference you had noted

25  that retained experts could -- are not excluded.

1          THE COURT:  That's correct.

2          MR. BUALAT:  And so one of UBH's retained experts,

3    Dr. Simpatico, may come in and out during the trial.

4          THE COURT:  Okay.

5          MR. BUALAT:  Thank you.

6          MR. KRAVITZ:  May I resume, Your Honor?

7          THE COURT:  Yes, please.

8                    <u>DIRECT EXAMINATION</u>   (resumed)

9    BY MR. KRAVITZ:

10   Q.   Dr. Plakun, I'd like to turn now to the subject of the

11   Level of Care Guidelines from 2011 to 2017 for the three levels

12   of care at issue in this case: outpatient, intensive outpatient

13   and residential.

14        And so just in terms of -- scratch that.

15        Are you prepared to go guideline by guideline and point

16   out deficiencies, if any, that you've identified?

17   A.   Yes.

18   Q.   Okay.  And just in general, have you identified

19   deficiencies in the Level of Care Guidelines for those levels

20   of care through the years 2011 to 2017?

21   A.   Yes.

22   Q.   Let's turn, please, to Exhibit 1, Trial Exhibit 1.  And in

23   particular, to page 0019, which I believe is the LOCG for

24   Intensive Outpatient.  I might have gotten the page wrong.  I

25   think it might be -18.  Excuse me, not -19.  0018.

1         Okay.  Do you have that in front of you?

2    **A.**   I do.

3    **Q.**   And is there any language that you'd like to identify to

4    the Court that you believe supports your opinions that these

5    Level of Care Guidelines fall below generally accepted

6    standards?

7    **A.**   Yes.  On page 0019, bullet number 7, this is under

8    "Intensive Outpatient Program for Mental Health Conditions."

9    **Q.**   So the paragraph that's numbered 7?

10   **A.**   Uh-huh.  Yes.

11   **Q.**   Okay.  Go ahead.

12   **A.**   So it reads (reading):

13        "The provider and whenever possible the member

14        collaborate to update the treatment plan every three to

15        five treatment days in response to changes in the member's

16        condition," that first part of the sentence is not a

17        problem, "or provide compelling evidence that the current

18        treatment in the current level of care to prevent acute

19        deterioration or exacerbation of the member's current

20        condition."

21   This is very similar to what we addressed previously about

22   the compelling evidence and the acute deterioration or

23   exacerbation that are departure from generally accepted

24   standards.

25   **Q.**   Okay.  And just so that we're clear, you're testifying as

**PLAKUN - DIRECT / KRAVITZ**

1   to all of these Level of Care Guidelines for the three levels

2   of care we just identified that are actually in these

3   documents, but it's in addition to what you've already said

4   about the common criteria?

5   **A.**   Yes, that's correct.

6   **Q.**   Is there anything else for the 2011 LOCG for IOP?

7   **A.**   No.

8   **Q.**   Okay.  Let's now move to page 0026 of Exhibit 1, which I

9   believe is the residential treatment center LOCG for 2011.  Do

10  you have that in front of you?

11  **A.**   I do.

12  **Q.**   And in the first section it says "any one of the criteria

13  must be met."  Do you see that?

14  **A.**   Yes.

15  **Q.**   Okay.  And then there are four numbered paragraphs under

16  that.  Is there any comment that you have on those four

17  paragraphs?

18  **A.**   The 1, 2, 3, and 4.

19       Well, the first two, numbers 1 and 2, about the member's

20  psychosocial functioning deteriorating to a degree that the

21  member is at risk for being unable to safely and adequately

22  care for themselves in the community is a high acuity standard

23  for residential treatment access.  And it's -- of course, it's

24  in "any one."  And as 1 I don't have a problem.

25       But in the second one, the member's experiencing a

 1  disturbance in mood, affect or cognition, resulting in behavior

 2  that cannot be safely managed in a less restrictive setting.

 3  Actually, the third one as well.  Imminent risk of

 4  deterioration in the member's functioning.  So that -- what's

 5  problematic for me about this is that it's relatively narrow in

 6  that each and every one of the criteria that must be met is

 7  related to deterioration or acuity in a way that is not what

 8  most residential treatment is about.

 9      I would much prefer to see something "that meets generally

10  accepted standards" as codified in an instrument like the

11  LOCUS, which doesn't only construct the front door to a level

12  of care around acuity or imminent danger.

13  **Q.**   Okay.  And so just to be clear, are you offering the

14  opinion that this section, "any one of the following," is below

15  the standards of care as reflected in the LOCUS?

16  **A.**   Yes.  On the next page there's an additional --

17  **Q.**   Yeah.  I was just doing this.  So go ahead.

18      Is there something else that you want to point to?

19  **A.**   Yes.

20  **Q.**   Okay.

21  **A.**   Number 5 on --

22  **Q.**   On what page is that?

23  **A.**   0027.

24  **Q.**   Okay.  And please go ahead and, you know, identify the

25  language that you're talking about, and then I'll ask you to

1   explain why you believe that supports your opinion.

2   **A.**   (Reading):

3           "The provider and whenever possible the member

4       collaborate to update the treatment plan at least weekly,"

5       again, nothing wrong with that, "or provide compelling

6       evidence that continued treatment in the current level of

7       care is required to prevent acute deterioration or

8       exacerbation of the member's current condition."

9           In going over the common criteria, we found very similar

10  language that I've already addressed.  In subheading A we get

11  to the active treatment versus custodial care issue.

12          And in 5.a., Roman numeral iv and v, we find language that

13  is the same as the common care -- the common criteria that I've

14  already made comments about.  So it simply turns up again

15  specifically in residential treatment in this particular year.

16  **Q.**   Okay.

17  **A.**   We did not address outpatient mental health conditions.

18  **Q.**   Well, I haven't asked you about that.

19          Did you find anything -- any issue outside the standard of

20  care with respect to the LOCG at 2011 for outpatient?

21  **A.**   No.

22  **Q.**   Okay.  Anything else with respect to the residential

23  treatment LOCG in 2011?

24  **A.**   No.

25  **Q.**   Let's turn to Exhibit 2, please, which is the 2012 version

**PLAKUN - DIRECT / KRAVITZ**

1   of the Level of Care Guidelines.  And why don't we get this out

2   of the way.

3        First, did you notice anything in the outpatient LOCG for

4   that year that you believe was below the standard of care?

5   **A.**   No.

6   **Q.**   Please turn to the LOCG for IOP, which I believe starts at

7   0020 in Exhibit 2.

8        And the question is, is there anything in that LOCG for

9   Intensive Outpatient in 2012 that you would like to identify as

10  supporting your opinions?

11  **A.**   Yes.  Item 7, which is on page 0021, which is really the

12  same language I just addressed in the previous --

13  **Q.**   With respect to what topic?

14  **A.**   The -- number 7:

15           "The provider and whenever possible the member

16           collaborates to update the treatment plan periodically,"

17           no problem there, "or provide compelling evidence that

18           continued treatment in the current level of care is

19           required to prevent acute deterioration or exacerbation."

20        It's the acuity and the compelling evidence that we've

21  addressed earlier.

22  **Q.**   Okay.  Anything else with this LOCG for 2012?

23  **A.**   No.

24  **Q.**   Let's turn to the residential treatment LOCG for 2012,

25  which I believe begins on 2-0028.

**PLAKUN - DIRECT / KRAVITZ**

1      Is there any provision that you identified that you

2  believe supports your opinions in the RTC?

3  **A.**   Yes.  It's number 5, which is on page 29.  Number 5.  And

4  it's subheading A and subheading B in their entirety.

5      Again, it's the exact same language around custodial care

6  versus active treatment that we've gone over a number of times.

7  The same issues.  It appears again in Residential Treatment so

8  I'm including it again.

9  **Q.**   Okay.  And then in the top clause in number 5, you see

10  that it repeats the language "or provide compelling evidence"?

11  **A.**   Yes.

12  **Q.**   That continued treatment?

13  **A.**   Yes.

14  **Q.**   So it's got that language as well?

15  **A.**   Yes.

16  **Q.**   Okay.  Just wanted to be clear.

17  **A.**   Yes.

18  **Q.**   So it's the language in 5 and then 5.a. and 5.b.?

19  **A.**   Correct.

20  **Q.**   For the reasons that you've said previously?

21  **A.**   Yes.

22  **Q.**   Can you turn to Exhibit 3, which is the 2013 document.

23      Okay.  So let's do the same thing.  Do you have any

24  comment or any language in the Outpatient LOCG for 2013 in

25  terms of that document for 2013?

**PLAKUN - DIRECT / KRAVITZ**

1    **A.**   Not for Outpatient.  And similarly not for Intensive

2    Outpatient that particular year.

3    **Q.**   Okay.  How about for Residential Treatment, that begins on

4    3-0033, I think.  Let me confirm that page, but I believe

5    that's correct.

6    **A.**   Correct.  On my copy it's correct.

7    **Q.**   All right.  So would you like to identify -- or strike

8    that.

9        Please identify any provision in the residential treatment

10   center LOCG for 2013 that you believe supports your opinion.

11   **A.**   Yes, number 5 and number 6 on page 0034.

12       This is, again, the custodial care and active treatment

13   language slightly modified but largely -- largely the same.

14   The problems have to do with the way that it broadly defines

15   custodial care and narrowly defines active treatment as we have

16   discussed previously.

17   **Q.**   And in this language in 5 and 6, on page 3-0034, is the

18   language tied in any way to stabilizing the member's presenting

19   signs and symptoms?

20   **A.**   Yes, it is.  I mean, as I indicated, there are slight

21   alterations, you know.

22       So 5 subheading A "The member's presenting signs and

23   symptoms have been stabilized, resolved, or baseline level of

24   functioning has been achieved" as a characterization of what

25   constitutes custodial care, so that virtually any treatment is

1    no longer active.

2        Once the presenting signs and symptoms have been

3    stabilized it becomes declared custodial and, therefore, not

4    what's provided in residential treatment.

5    **Q.**   Okay.  Anything else concerning 2013?

6    **A.**   No.

7    **Q.**   2014, Exhibit 4.  Why don't we start with, I guess, the

8    first one up is IOP, which starts at 4-0027.

9    **A.**   Well, yes.  This is a description of intensive outpatient

10   programs that is different from in the past.  And it's

11   problematic in the box describing intensive outpatient program

12   for mental health conditions, the second paragraph that reads

13   (reading:)

14           "The course of treatment in an intensive outpatient

15       program is focused on addressing the 'why now' factors

16       that precipitated admission.  For example, changes in

17       member's signs and symptoms, psychosocial and

18       environmental factors or the level of functioning to the

19       point that the member's condition can be safely,

20       efficiently, and effectively treated in a less intensive

21       level of care."

22       This is the first time that IOP includes this explicit

23   language defining it not as a way to provide treatment that

24   deals with the underlying problems, chronic problems in a way

25   that might help them resolve, but now makes IOP into a crisis

1  stabilization program.  Once stable, you're out of it.

2  **Q.**  Okay.

3  **A.**  I next find --

4  **Q.**  Okay.  You addressed earlier, I believe, why you are of

5  the opinion that it falls below generally accepted standards to

6  turn intensive outpatient service into a crisis stabilization

7  program.  And I just want to know, have you fully covered that

8  issue?  Do you have anything to add?

9  **A.**  I believe we discussed that much earlier this morning when

10  I was describing the use of an intensive outpatient program as

11  a way to add services to make it possible for someone to deal

12  not only with acute crises or "why now" factors, but with the

13  underlying issues that are driving the repeated crises and to

14  make it possible for someone to use outpatient treatment better

15  and function adequately between sessions better.

16  **Q.**  Okay.  Turn, please, to -- sorry, 4-0034.  And that is the

17  LOCG for Outpatient in 2014.

18      And I would like to ask the usual question, which is, are

19  there any provisions or is there any provision in that LOCG for

20  2014 that you'd like to identify in support of your opinions?

21  **A.**  Yes.  In the Outpatient Mental Health Conditions

22  definition there's new language as well.  It reads:

23  "Assessment diagnosis of active behavioral health treatment

24  that are provided in an ambulatory setting."  And then goes on

25  to say:  "The course of treatment in outpatient is focused on

1    addressing the 'why now' factors that precipitated admission,"

2    et cetera, to the point that the "why now" factors that

3    precipitated admission no longer require treatment.

4        So this frames outpatient treatment for the first time

5    chronologically in the evolution of the LOCGs crisis

6    intervention program.  It's hard to imagine how once the "why

7    now" factors have been addressed an individual would be able to

8    continue in treatment to address underlying issues if

9    outpatient treatment ends once those issues have been -- once

10   the "why now" factors have been addressed.

11       Then in the actual criteria --

12   **Q.**   Yes.

13   **A.**   -- in the admission criteria, on page 0035, there's one

14   bullet.  And that one is one of the ones I'm identifying.  It

15   reads that (reading:)

16           "Acute changes in the member's signs and symptoms

17       and/or psychosocial and environmental factors have

18       occurred and the member's current condition can be safely,

19       efficiently, and effectively assessed and/or treated in

20       this setting."

21       Again, as an admission criteria it requires acute changes

22   in a way that is a departure from generally accepted standards.

23   Someone might be seeking outpatient treatment for chronic

24   reasons rather than acute reasons.

25   **Q.**   How about if you turn back to 4-0034 and the third bullet

1  down.  Do you have any comment on that?

2  **A.**  Yeah.  This "co-occurring behavioral health and physical

3  conditions can be safely managed" language is the same language

4  I addressed in the common criteria.  That's true.

5  **Q.**  Anything else with respect to the outpatient LOCG for

6  2014?

7  **A.**  No.

8  **Q.**  Okay.  Turn, please, to 4-0043, which I believe is the

9  Residential Treatment Center LOCG for 2014.

10  **A.**  Correct.

11  **Q.**  The question is the same.  Are there any parts of this

12  LOCG that you believe support your opinions?

13  **A.**  Yes.  The Residential Treatment Center description at the

14  top of page 43, second paragraph reads (reading:)

15      "The course of treatment in residential treatment center

16  is focused on addressing the 'why now' factors that

17  precipitated admission to the point that the member's condition

18  can be safely, efficiently, and effectively treated in a less

19  intensive level of care."

20      This winds up defining residential treatment as a crisis

21  stabilization focus on the "why now" kind of a program.  So I

22  identify that.

23  **Q.**  Okay.

24  **A.**  And then there are some admission, continued service and

25  discharge criteria that I also name.

1   Q.   Okay.   Could you point those out so they're on the record

2   for the Court?

3   A.   Yes.   Under "Admission" on that same page, 43, the

4   "co-occurring behavioral health or physical conditions can be

5   managed safely" language is present.

6        And on the next page, 44, the only bullet that's there is

7   the "'why now' factors leading to admission cannot be safely,

8   efficiently, or effectively assessed and/or treated in a less

9   intensive setting due to acute changes in the member's signs

10  and symptoms," et cetera.

11       So this is, again, language that appears in the common

12  criteria.   That also is now replicated in the admission

13  criteria for residential treatment, so I identify it.

14       Going back to page 43, under the "Continued Service

15  Criteria for Residential," the -- there's a first bullet that

16  says "See common criteria for all levels of care," and

17  "treatment is not primarily for the purpose of providing

18  custodial care."

19       And so the language that follows below that is -- is --

20  links to the -- it points I've already made about active

21  treatment versus custodial care.

22       And the same is true in the discharge criteria column

23  immediately to the right.

24  Q.   And that's on page 4-0043?

25  A.   Yes.   About the member's signs and symptoms have been

PLAKUN - DIRECT / KRAVITZ

1   stabilize, resolved or a baseline level of function has been
2   achieved.  The member's condition is not improving.  The
3   intensity of active treatment in inpatient, or in this case
4   residential, is no longer required.
5       And so I'm identifying these.  They're the same things
6   that we've addressed in other residential LOCGs and in the
7   common criteria.
8   Q.  Okay.  Anything else with respect to 2014?
9   A.  No.
10  Q.  All right.  Let's turn to 2015, which is Exhibit 5.  And
11  I'd like to direct you to page 5-0030.  And is that the 2015
12  IOP LOCG?
13  A.  Yes, it is.
14      And in this one I identify in the description of the
15  program, on page 0030, that second paragraph, the course of
16  treatment in an IOP is focused on addressing the "why now"
17  factors that precipitated admission to the point that the
18  member's condition can be safely, efficiently, and effectively
19  treated in a less intensive level of care.
20      Again, this has come up before.  It's the same language
21  replicated for IOP.
22  Q.  Okay.  Anything else in the IOP LOCG for 2015?
23  A.  No.
24  Q.  Okay.  Turn to page 5-0033, which I believe is the LOCG
25  for Outpatient for 2015.  And, again, same -- same drill.  Same

1   question.  If there is language or a provision that you can

2   identify, that you believe supports your opinion, please do it.

3   A.   Yes.  I identify in the Outpatient description that -- the

4   same language that I identified previously in Outpatient, that

5   the course of treatment in outpatient is focused on addressing

6   the "why now" factors that precipitated admission to the point

7   that the "why now" factors no longer require treatment.

8   Q.   And that's in the box on the top?

9   A.   Yes.

10  Q.   Okay.

11  A.   And then under "Admission Criteria," 1.3, acute changes in

12  the member's signs and symptoms and/or psychosocial and

13  environmental factors, the "why now" factors have occurred and

14  the member's current condition can be safely, efficiently, and

15  effectively assessed and/or treated in this setting.

16       So that, again, it's constructing outpatient treatment as

17  an acute crisis stabilization intervention.

18  Q.   Okay.  Anything else with OP in 2015?

19  A.   No.

20  Q.   Okay.  Go page 5-0038, please.

21  A.   Yes.

22  Q.   And is that the RTC LOCG for 2015?

23  A.   Yes.

24  Q.   Okay.  And could you identify any provisions in that LOCG

25  that you believe support your opinions.

**A.**    Yes.   These are the factors that are now familiar to us in the -- in the description of Residential Treatment, the second paragraph where it describes the course of treatment in an RTC is focused on addressing the "why now" factors that precipitated admission to the point that their condition can be safely, efficiently, and effectively treated in a less intensive level of care.   That's been turning up in each year at this point.

And then below, under the "Admission Criteria," 1.3, about the "why now" factors leading to admission cannot be safely, efficiently, or effectively assessed and/or treated in a less intensive setting due to acute changes in the member's signs and symptoms, et cetera.

1.3.1, acute impairment -- these are examples in 1.3.1 and 1.3.2.   But in 1.3.1 acuity and safety become the determining issues in whether someone can be admitted to residential treatment.

And then under the "Continued Service Criteria," 2.2 on that same page, we open up the custodial care versus active treatment issue.   In 2.2, 2.2.2.   Those are the ones that address this.   They are the same issues that we've addressed previously.

**Q.**   Let's turn to Exhibit 6, please, which is the first 2016 Level of Care Guidelines exhibit.   And in particular I would direct your attention to 6-0032, where I believe the IOP LOCG

**PLAKUN - DIRECT / KRAVITZ**

1  lives.

2  **A.**   Yes.

3  **Q.**   Do you have that?

4  **A.**   Yes.

5  **Q.**   Okay.  Is there anything supportive of your opinions in

6  that LOCG?

7  **A.**   In the description, second paragraph, the course of

8  treatment in an IOP is focused on "why now" factors.  Same

9  language that's been tracking from year to year now.  It's here

10  as well.  So I identify it again.

11      And then under "IOP," nothing else that year.

12  **Q.**   Okay.

13  **A.**   However, under "Outpatient" --

14  **Q.**   Let's go to Outpatient now, which I believe begins on

15  6-0036.

16      Do you have any provisions or language to identify as

17  supportive of your opinions?

18  **A.**   Yes.  Again, in the box describing outpatient treatment,

19  it's the same issue that the course of treatment and outpatient

20  is focused on addressing the "why now" factors that

21  precipitated admission.  And once those are addressed and no

22  longer require treatment, then the possibility of working on

23  underlying issues and issues that may be chronic, recurrent,

24  related to co-morbidity is excluded.

25      I do not have any other comments on the Outpatient for

**PLAKUN - DIRECT / KRAVITZ**

1    that year.

2    **Q.**    Can I ask you about 1.3, which is on page 6-0036.

3    **A.**    Yes.  This is also carried over year to year.

4    **Q.**    What is it, just so that we have it on the record?

5    **A.**    1.3 reads (reading:)

6              "Acute changes in the member's signs and symptoms

7         and/or psychosocial and environmental factors have

8         occurred, and the member's current condition can be

9         safely, efficiently, and effectively assessed and/or

10        treated in this setting."

11   **Q.**    Okay.  And then anything else in this outpatient LOCG for

12   2016?

13   **A.**    No.

14   **Q.**    Okay.  Turn, please, to 6-0043, which is the LOCG for

15   Residential Treatment in 2016.  And same question.  Are there

16   any provisions that you'd like to identify that you believe are

17   supportive of your opinions in this LOCG?

18   **A.**    Yes.  In the description of Residential Treatment, the

19   second paragraph, "Describing the course of treatment in an RTC

20   as focused on addressing the 'why now' factors continues to be

21   carried into this year."

22        Then in 1.3 below, there's the same language about the

23   "why now" factors "leading to admission cannot be safely,

24   efficiently, or effectively assessed and/or treated in a less

25   intensive setting due to acute changes in the member's signs

**PLAKUN - DIRECT / KRAVITZ**

1  and symptoms and/or psychosocial and environmental factors."So

2  that is identified.

3       As well as in 2.2, the custodial care issue, which is

4  picked up there in 2.2.  And in 2.2.2, where health-related

5  services provided by a clinician are rendered to be custodial

6  in ways that are a departure from generally accepted standards,

7  as I have described a number of times earlier.

8  **Q.**   Okay.  And I just noticed under 1.3, which is on

9  page 6-0043, which you've identified, we haven't talked about

10 sub-bullets or language that's in sub-bullets 1.3.1 and 1.3.2.

11      Have you noticed that before?

12 **A.**   Yes.  I think I did mention the sub-bullets --

13 **Q.**   Oh, okay.

14 **A.**   -- earlier.  These are examples.  And it's the same issue

15 of safety and acuity being the examples of what you need to

16 make decisions about residential treatment.

17 **Q.**   Okay.  And -- okay.

18 **A.**   As --

19 **Q.**   And you've expressed all your opinions as to why that

20 falls below generally accepted standards in your opinion?

21 **A.**   Yes.

22 **Q.**   Okay.  And anything else about 2016 that you'd like to

23 mention?

24 **A.**   No.

25 **Q.**   Turn to Exhibit 7, please, which is the 2016 Level of Care

1  Guidelines with revisions in June of 2016.  Do you have that in

2  front of you?

3  **A.**   Yes, I do.

4  **Q.**   Okay.  And if you would turn, please, to 7-0032, which I

5  believe is the LOCG for IOP.  Do you have that in front of you?

6  **A.**   Yes.

7  **Q.**   Okay.  And are there any provisions that you would like to

8  identify that you believe are supportive of your opinions in

9  that LOCG?

10 **A.**   Yes.  The same paragraph exists about the course of

11 treatment in an IOP being focused on the "why now" factors.

12 And so I identify that.

13      I note that a new sentence is actually added immediately

14 above that paragraph, that reads:  "The purpose of services is

15 to monitor and maintain stability, decreasing moderate signs

16 and symptoms, increase functioning and assist members with

17 integrating into community life."

18      And I think that sentence is actually commendable.

19 However, it's hard for it to fit with the paragraph that

20 follows that has been tracking from year to year, which focuses

21 everything, really, on the "why now" factors.

22      Other than that in the description, I see nothing that I

23 would identify.

24 **Q.**   Okay.  And then let's move on to the Outpatient LOCG,

25 which I believe is at 7-0036.

**PLAKUN - DIRECT / KRAVITZ**

1  **A.**   Yes.

2  **Q.**   And can you identify anything in this LOCG that you

3  believe supports your opinions?

4  **A.**   Same language in the description of Outpatient, making

5  outpatient focused on "why now" factors and ending when those

6  are stabilized.

7       And in 1.3, again, the same admission criteria about acute

8  changes being required to gain access to outpatient treatment.

9  Discussed this a number of times.

10  **Q.**   And then turning to 7-0043, which is the RTC LOCG for the

11  revised 2016 Level of Care Guidelines.  Can you identify to the

12  Court any portions that you believe support your opinions?

13  **A.**   Yes.

14      In this LOCG for Residential Treatment, in the description

15  we have the continuing appearance of the language focusing

16  residential treatment on addressing "why now" factors.

17      And then in the Admission criteria below, on page 0043 in

18  1.3, we have the "why now" factors language requiring acute

19  changes and with the same examples of acute impairment of

20  behavior or problems that threaten the member's safety.

21      And in the Continued Service criteria under 2.2, the same

22  issues that we've discussed earlier about custodial care.  And

23  in 2.2.2 where health-related services provided by clinicians

24  are transformed into custodial treatment.

25  **Q.**   Okay.  Anything else regarding the revised 2016 Level of

1   Care Guidelines?

2   **A.**   No.

3   **Q.**   Let's turn to Exhibit 8, please.  And that is the 2017

4   Level of Care Guidelines.  Do you have that in front of you?

5   **A.**   Yes.

6   **Q.**   Okay.  And if you turn to page 8-0013, I believe you will

7   come to the outpatient LOCG for 2017.

8   **A.**   Yes.

9   **Q.**   Okay.  And is there anything about that LOCG that you care

10  to identify as supportive of your positions?

11  **A.**   Again, the description of outpatient in the first

12  paragraph remains substantially the same as in the preceding

13  years, except that "why now" factors and the word "acute" have

14  been removed, and now it's the "course of treatment."  And

15  Outpatient is focused on addressing the factors that

16  precipitated admission, and to the point that the factors

17  precipitating admission no longer require treatment.

18       So it's slightly different language, but otherwise making

19  the same point about outpatient treatment.  I don't have any

20  others about --

21  **Q.**   Okay.

22  **A.**   -- Outpatient.  But the Intensive Outpatient on

23  page 0014 --

24  **Q.**   Yes, what's your comment on that?

25  **A.**   In the second paragraph --

PLAKUN - DIRECT / KRAVITZ

1   Q.   Yes.

2   A.   -- on page 14 there, it says:  "The course of treatment in

3   an IOP is focused on addressing the factors that precipitated

4   admission."  Again, substituting "factors precipitating

5   admission" for the "why now" language previously, but with the

6   same meaning.

7        And I would note that above that paragraph is the same

8   sentence that I thought was actually commendable (reading):

9            "The purpose of service is to monitor and maintain

10           stability decreasing moderate signs and symptoms,

11           increased functioning, and assist members in integrating

12           into community life."

13       That was similarly added, and I commented on that in the

14   previous --

15   Q.   Okay.  And if you turn to -- anything else on IOP in 2017?

16   A.   No.

17   Q.   Okay.  And let's turn to 8-0018, where I think you'll find

18   the RTC LOCG for 2017.

19   A.   Yes.

20   Q.   Okay.  And can you identify the issues, if any, with that

21   LOCG.

22   A.   Yes.

23       On page 0018, in the description of Residential Treatment

24   Center, we find, once again, the language about the course of

25   treatment being focused on addressing the new language factors

PLAKUN - DIRECT / KRAVITZ

1  that precipitated admission.  But it's the same issue we've

2  been following from year to year, defining residential

3  treatment as focused on the acute factors that precipitated

4  admission.

5      And then below that, under the "Residential Treatment

6  Center Admission Criteria," is also language that's familiar.

7  Third bullet down:  "The factors leading to admission cannot be

8  safely, efficiently, or effectively assessed and/or treated in

9  a less intensive setting due to acute changes."

10     And then there are the examples of acute impairment or

11 threat to member safety that are familiar to us at this point.

12     And then in the common continued service criteria for

13 Residential Treatment, the second bullet down, at the bottom of

14 page 18, we open up the custodial care versus active treatment

15 issue that we've discussed a number of times.  And so I

16 identified that as well.

17     There is, however, nothing else that I identify for

18 Residential Treatment.

19 **Q.**  Or for 2017?

20 **A.**  Right.

21     **MR. KRAVITZ:**  I believe we're done with that.  And

22 I've got just a couple more relatively short things and then

23 I'll be wrapping it up.

24     (Pause)

25     **MR. KRAVITZ:**  Okay.  I need to -- thank you.

1   BY MR. KRAVITZ:

2   Q.    To the extent I didn't ask this question, I'm going to ask

3   it for the record.

4        Is it your opinion that the Level of Care Guidelines for

5   outpatient, intensive outpatient, and residential treatment for

6   the years 2011 through 2017 fall below generally accepted

7   standards of care to the extent that you have just addressed it

8   in your testimony?

9   A.    Yes.  Where I have identified specific criteria that do so

10  for the specific levels of care.

11  Q.    Okay.  And let me ask more broadly the question, because

12  in addition to those LOCGs there are also the common criteria

13  that apply.

14       So my question is, is it your opinion that the level Of

15  care criteria, inclusive, fall below generally accepted

16  standards in all years, 2011 through 2017 for all of the Level

17  of Care Guidelines?

18  A.    Yes, it is my opinion that they all fall below generally

19  accepted standards for those years.

20  Q.    Let me happily change subjects and maybe wrap this up

21  quickly.

22       One thing I did want to ask you about is length of stay.

23  And I think that you discussed your experience at Austen Riggs

24  in terms of duration or length of stay.

25       But what I didn't ask you was about your experience in

1    your either private practice or in your treatment of patients

2    directly at Austen Riggs, let's say on an outpatient basis.

3    What's been your experience in terms of duration?

4    **A.**    At Riggs and in --

5    **Q.**    Let me break it up.  Let's say outside of Riggs.

6    **A.**    Yeah.  Outside of Riggs, I have sometimes done

7    single-session consultations with people.  I have also treated

8    people for extended periods, multiple years.  The frequencies

9    have ranged from as often as four times a week for intensive

10   psychotherapy.  More typically once a week.  Sometimes once

11   every few months or even once a year depending on whether I'm

12   doing psychotherapy or medication management.

13        I have a pretty broad range over the years of different

14   kinds of clinical work that I've done.  It's been variable.

15   **Q.**    And what are the drivers, based on your experience, of

16   whether it takes a long time or a shorter time?

17   **A.**    Whether it takes -- whether treatment becomes --

18   **Q.**    Let me be clearer.  What I'm trying to get is, what are

19   the things that you have observed that might impact the

20   duration?

21   **A.**    Well, it depends on what the patient is struggling with

22   and what we negotiate as my role with them.

23        For example, if it's a single consultation, that's simple.

24   We've -- that's what we've negotiated.

25        But issues like -- like the complexity of their overall

1    situation and what kind of -- what the total clinical picture

2    looks like, including co-morbid conditions, their previous

3    response to treatment, you know, there are quite a range of

4    things that may be determinants.

5    **Q.**   Okay.  I would like to ask you a little bit more about

6    lengths of stay.  And I don't want to go back over your

7    experience at Austen Riggs because I think you've already

8    testified to that.

9         But that to the extent you have, you know, information or

10   knowledge that goes beyond Austen Riggs about typical lengths

11   of stay in residential facilities, could you comment on that?

12   **A.**   Yes.  In residential.

13   **Q.**   Yes, in residential.  Yes.

14   **A.**   There's a range of lengths of stay in residential

15   treatment centers.  There are some, I believe I mentioned

16   earlier, that are acute residential, that focus on basically

17   treating patients who would meet inpatient hospital criteria.

18   And those kinds of programs have lengths of stay that are

19   measured in duration similar to inpatient.  It's days to a

20   couple of weeks.

21        But there are longer term residential treatment programs

22   that substantially show longer periods of length of stay that

23   are measured in months.  That's typically the amount of time it

24   would take to engage the underlying problems.

25        And there has been some data reported, aggregate data, you

1  know, from, for example, from the National Association of

2  Private Health Systems, that summarizes length of stay across a

3  range of institutions.

4       Did you want me to address that?

5  **Q.**   Well, I was about to get into that, but could -- we're

6  going to look at Exhibit 640 for identification.  Can you find

7  Exhibit 640 and let me know when you have found it.

8       Okay.  Do you have Exhibit -- scratch that.

9       Do you have Trial Exhibit 640 marked for identification in

10  front of you?

11  **A.**   Yes.

12  **Q.**   What is that?

13  **A.**   This is the reporting of an annual survey done by the

14  National Association of Psychiatric Health Systems.  It's the

15  2016 survey reporting.  The data reported is from the year

16  2014.

17  **Q.**   And -- okay.  I'm sorry.  Excuse me.  Go ahead.  I didn't

18  mean to interrupt.

19  **A.**   It reports information about length of stay and a number

20  of --

21  **Q.**   Let me move -- okay.  So this contains information about

22  length of stay?

23  **A.**   Yes.

24  **Q.**   Okay.

25       **MR. KRAVITZ:**  I move the admission of Exhibit 640.

1              MR. RUTHERFORD:  Objection, Your Honor, to the extent

2      he's relying on it an as an expert.  We don't have an objection

3      for it being admitted for the truth of the matter asserted.

4              THE COURT:  Okay.  It's admitted.

5          (Trial Exhibit 640 received in evidence.)

6      BY MR. KRAVITZ:

7      Q.   If you could turn, please, to page 0021.  And by that I

8      mean 640-0021, please.

9          And do you have that page in front of you?

10     A.   Yes.

11     Q.   And at the top it says "Residential Treatment," the big

12     heading.

13     A.   Yes.

14     Q.   Okay.  And I think you were referring to this before we

15     put it in evidence.  So is there a chart on this page,

16     640-0021, that relates to average length of stay or ALOS data

17     for 2014 --

18     A.   Yes.

19     Q.   -- for residential treatment?

20     A.   Yes.

21     Q.   Okay.

22              MR. KRAVITZ:  Could we highlight that on the screen,

23     and particularly the bottom line.

24     BY MR. KRAVITZ:

25     Q.   And could you read in what the data collected by NAPHS

PLAKUN - DIRECT / KRAVITZ

1  shows for 2014, about the average length of stay for

2  residential?

3  **A.**   Well, what they did is they gathered information from 33

4  residential treatment facilities and calculated average

5  residential length of stay.

6       And across the small, medium, and large size residential

7  programs, the overall average length of stay in residential

8  treatment was 108 days.

9  **Q.**   Okay.  And just so that we get this on the record, does

10  the document indicate what the payor mix was for this data?

11  **A.**   Yes.  If we go to page 23, it shows a pie chart at the

12  bottom of the page with a residential admission by payor for

13  that year.

14       And it shows that about 85 percent were government funded,

15  presumably using government -- government standards of care for

16  making decisions.  And about -- well, it says 5.6 percent,

17  precisely, were due to commercial insurance as a form of

18  payment.  And then there was some other kinds of payor mix.

19  **Q.**   Okay.  And if you could now turn to Trial Exhibit 570 for

20  identification.

21       And do you have 570 in front of you?

22  **A.**   I do.  I don't have a microscope, but I can read it.

23  **Q.**   Yeah, I know.  It's tough.

24       This is a chart that was produced in discovery by UBH

25  about certain average length of stay data that it accumulated

1   for itself.  And I would like -- do you have that in front of

2   you?

3   **A.**   I do.

4   **Q.**   Okay.

5         **MR. KRAVITZ:**  And I'd like to move the admission of

6   Exhibit 570.

7         **MR. RUTHERFORD:**  Objection to this, Your Honor.  We

8   don't object to the fact that UBH produced it, but he has no

9   personal knowledge of this particular document, and it was not

10  one of the documents cited as support for any of his expert

11  witness reports.

12        **MR. KRAVITZ:**  Your Honor, the -- this precise subject

13  was addressed in his rebuttal report.  There was an earlier

14  version of this document, which is Exhibit 500, which has data

15  through, I believe, 2014.  That was updated for us in May of

16  2017.

17      So he did rely on the earlier version, which is 500.  And

18  what we'd like to do is put it in evidence.  And all I want him

19  to do is compare the 2014 data that UBH produced to us to the

20  2014 data in the NAPHS document that we just looked at.

21        **THE COURT:**  When did he do his report in relationship

22  to the production of this updated chart?

23        **MR. KRAVITZ:**  I can answer that question.  I'm going

24  to give you the exact dates, with the Court's indulgence.

25      Yes.  Okay.  The rebuttal report, Your Honor, by

1   Dr. Plakun was April 10, 2017.  And I believe that Exhibit 570,

2   based on the face of the document, says it was updated on May

3   something, which I can't read because I can't see it.  But

4   it's -- May is after April.  That part I feel really good

5   about.

6           THE COURT:  Okay.  Overruled.  Go ahead.  It's

7   admitted.

8       (Trial Exhibit 570 received in evidence.)

9   BY MR. KRAVITZ:

10  Q.   So, Dr. Plakun, could you compare the UBH ALOS data for

11  residential for the year 2014 to the ALOS residential data in

12  the NAPHS document that we just looked at?

13  A.   So the UBH data that is on the screen for 2014 shows an

14  average length of stay of 24 days compared to the 108 days in

15  the NAPHS data for the same year across 33 reporting hospitals

16  or residential programs.

17  Q.   And as an expert in the field, what meaning does this have

18  for you?

19  A.   Well, we've been talking all day about the quite

20  restrictive access to level of care criteria that limit access

21  to residential treatment in particular.  And it looks like,

22  when you use those UBH criteria, you see a length of stay of

23  approximately 24 days.

24       However, when you use criteria that are less likely to be

25  defined by UBH and more likely to be in accordance with

1  generally accepted standards, you see a length of stay that is

2  over four times longer.

3  **Q.**  So I'd like to --

4      **THE COURT:**  So in making that statement, we are not

5  taking into consideration any of the exclusions that might

6  exist in commercial policies.  You're just -- why do you draw

7  the conclusion that it stems from the restrictive guidelines

8  rather than from something else in the policies?

9      **THE WITNESS:**  I don't think I can draw the conclusion

10  that it does.  What I can say is that we've been -- we've been

11  discussing how restrictive the guidelines for access to care

12  are.  Or I have been.

13      **THE COURT:**  Yes.

14      **THE WITNESS:**  And they have been applied to the 2014

15  candidates for residential treatment.

16      **THE COURT:**  Right.

17      **THE WITNESS:**  And those were not the standards that

18  were applied in the NAPHS data.

19      Now, it's certainly the case that there are lots of things

20  I don't know.  But, a reasonable person, it seems to me, who

21  looked at this data, would say this fits the expectation that

22  one would have.  I can't conclude it.  It's more

23  correlational --

24      **THE COURT:**  Than causative.

25      **THE WITNESS:**  -- than conclusive.

PLAKUN - DIRECT / KRAVITZ

1              THE COURT:  Yeah.

2              THE WITNESS:  But it's the same kind of data that, for

3      example, when cigarettes were first linked to cancer, hey,

4      look, the people who smoke are the people who get the lung

5      cancer, it's the same kind of data.

6              THE COURT:  That turned out to be true.

7              THE WITNESS:  Yes.

8              THE COURT:  But because we examined lots of other

9      inputs.

10             THE WITNESS:  Yes.

11             THE COURT:  Go ahead.

12     BY MR. KRAVITZ:

13     Q.   I'm sorry.  Just to follow up on Judge Spero's question

14     about exclusions, if you could take a look at the -- I guess,

15     the footnote underneath the UBH chart.

16             MR. KRAVITZ:  Can you highlight that, please.  Okay.

17     And then can you highlight that.

18     BY MR. KRAVITZ:

19     Q.   So if I can read this, I'm going to do my best.  It says:

20     "Datasource Auth_Admit or authorized N and authorized ALOS

21     using discharge date to define the year."

22          Do you see that?

23     A.   Yes.

24     Q.   Okay.  So do you understand that -- and then if you keep

25     reading on, it says "Claims N" -- that's what I didn't know

 1  what it was a second -- "only includes authorized admissions

 2  for which claims were paid."

 3      Do you see that?

 4  A.   Yes.

 5  Q.   So do you understand this chart to be ALOS data for people

 6  who were not excluded but admitted?

 7  A.   Oh, yes.  Oh, yes.  No, no.  These -- I thought that was

 8  clear.  I'm sorry.

 9      THE COURT:  There may be other limitations.  It just

10  doesn't begin to answer the question.

11      MR. KRAVITZ:  Okay.  I just --

12      THE COURT:  I think it's correlative.  That's fine.

13  But it doesn't really show very much.

14      MR. KRAVITZ:  Okay.  I just wanted to point out that

15  footnote, which I couldn't see.

16      THE COURT:  Fine.  That's right.

17      MR. KRAVITZ:  Fortunately, I'm working with people who

18  see better.

19      THE COURT:  You and me both.

20  BY MR. KRAVITZ:

21  Q.   All right.  We're done on that point, I think.

22  A.   Okay.

23  Q.   Okay.  If you could turn to Trial Exhibit 6, which is in

24  evidence, and in particular on page 0006.

25  A.   Six?  Number 6?  Exhibit 6?

1   Q.    Yeah.  It's back in the level of care stuff.

2   A.    Yes.

3   Q.    And if you look down under the heading "Use and

4   Limitations," you will see that there is a definition that UBH

5   has provided of medical necessity.  Do you see that?

6   A.    Yes.

7   Q.    Okay.  And could you read that, please.

8   A.    So the -- there's a description of medical necessity that

9   has four components, that (reading):

10          "Such medically necessary treatment is in accordance

11      with generally accepted standards of medical practice,"

12      number 1.

13          "2.  Clinically appropriate in terms of type,

14      frequency, extent, site and duration, and considered

15      effective for the mental illness, substance use disorder

16      or its symptoms.

17          "3.  Not mainly for the member's convenience or that

18      of the member's doctor or other healthcare provider.

19          "4.  Not more costly than an alternative drug,

20      service or supply that is at least as likely to produce

21      equivalent, therapeutic or diagnostic results as to the

22      diagnosis or treatment of the member's mental illness

23      substance use disorder or its symptoms."

24   Q.    Okay.  Dr. Plakun, are you aware of the APA's, the

25   American Psychiatric Association's, definition of medical

1   necessity?

2   **A.**   Yes.

3   **Q.**   And is there a difference between that definition and this

4   definition that jumps out at you?

5   **A.**   Yes.

6   **Q.**   And could you please say what that is.

7   **A.**   In the American Psychiatric Association definition there's

8   an additional sentence that's not included here.  "Not

9   primarily for the financial benefit of the health insurance

10  company."

11  **Q.**   And in your --

12  **A.**   I believe those are the words.

13  **Q.**   And why is it, in your opinion, that -- well, strike that.

14      Is it your opinion that those words are an important

15  aspect of the definition of medical necessity?

16  **A.**   Well, yes.

17      Certainly, number 3 in this definition makes it clear that

18  it's not for the convenience of the member or the convenience

19  of the doctor or other healthcare provider.  And, you know, it

20  seems only fair to indicate that it's also not for the

21  convenience of the health insurance provider.

22  **Q.**   Okay.  And is there any reason that you believe that the

23  definition of medical necessity should not be influenced by the

24  economic or financial interests of the plan?

25  **A.**   Oh, yes.  Well, the plan clearly has an incentive to

1    contain or limit costs.  And those issues should not -- it

2    seems only fair to not allow those incentives to get in the way

3    of the provision of adequate care in a definition of medical

4    necessity.

5    **Q.**   And subject to checking with my colleagues, I wanted to

6    make one more point.

7         If you could turn to Exhibit 885.  And this has been

8    marked for identification.  And this is Thomas A. Simpatico,

9    M.D., his report.

10        Okay.  So do you have Exhibit 885 for identification in

11   front of you?

12   **A.**   I do.

13   **Q.**   Okay.  And I would like you to turn to page 20, if you

14   would.

15   **A.**   Yes.

16   **Q.**   Okay.  And in particular, I'd like to address your

17   attention to the paragraph that begins "Plaintiffs'

18   contention."  It's about 40 percent of the way down the page.

19   Yes.

20        And do you see where Dr. Simpatico says:  "Plaintiffs'

21   contention is inaccurate.  The patient's acute/presenting

22   problems (i.e., 'why now' factors)" --

23   **A.**   Yes.

24   **Q.**   -- "are the appropriate focus in treatment planning.  And

25   this is precisely the focus in the medical literature and

**PLAKUN - DIRECT / KRAVITZ**

1   generally recognized authoritative guidelines addressing the

2   selection of and subsequent changes in a patient's appropriate

3   level of care."

4       Do you see that?

5   **A.**   Yes.

6   **Q.**   And do you see that it's got a footnote 55 there?

7   **A.**   Yes.

8   **Q.**   Okay.  And let's go down and look at footnote 55.  And the

9   first cited source for that statement is the "APA Practice

10  Guidelines for the Psychiatric Evaluation of Adults, 3rd ed.,

11  2016, at page 4, (recommending that psychiatric evaluations

12  begin by taking a 'history of present illness,' i.e. the

13  'reason that the patient is presenting for evaluation.'"

14      Do you see that?

15  **A.**   Yes.

16  **Q.**   Keep that in mind.  And I'd like to go to Exhibit 641,

17  please.

18  **A.**   (Witness examines document.)

19  **Q.**   And do you have that in front of you?

20  **A.**   Yes.

21  **Q.**   And what is Exhibit 641?

22  **A.**   It's the third edition of the American Psychiatric

23  Association Practice Guideline for the psychiatric evaluation

24  of adults.

25  **Q.**   And is that the source that Dr. Simpatico cited in

1    Footnote 55?

2    **A.**    Yes.

3    **Q.**    Okay.  And is this document that's been marked for

4    identification as Exhibit 641 a source of generally accepted

5    standards?

6    **A.**    Oh, yes.

7           **MR. KRAVITZ:**  I'd like to move the admission of Trial

8    Exhibit 641.

9           **MR. RUTHERFORD:**  No objection, Your Honor.

10          **THE COURT:**  It's admitted.

11       (Trial Exhibit 641 received in evidence)

12          **MR. KRAVITZ:**  Okay.

13   **Q.**   And Dr. Simpatico, if I recall, cited internal page 4,

14   which is trial exhibit page 641-0010.  Are you there?

15   **A.**    Yes.

16   **Q.**    Okay.  And he also, I think, made reference to the history

17   of present illness?

18   **A.**    Yes.

19   **Q.**    And that is -- underneath it's got some bullets, including

20   as the lead bullet "The reason that the patient is presenting

21   for evaluation."  Do you see that?

22   **A.**    Yes.

23   **Q.**    And is that how you understand that he is citing this

24   document for the proposition that the "why now" or acute

25   presenting symptoms are the proper focus of treatment?

 1   **A.**   Yes.

 2   **Q.**   Okay.  And if you go down below that on page 4 under the

 3   heading "Psychiatric History," does it tell you that, in fact,

 4   there's more to it?

 5   **A.**   Yes.  There are nine bullets under "Psychiatric History"

 6   and then it continues on other pages with dozens of other

 7   bullets of things that should be gathered and included in a

 8   psychiatric evaluation of adults.

 9   **Q.**   Okay.  And in particular I would like to address your

10   attention to internal page 10, which is Trial Exhibit 641-0016,

11   and there is the paragraph beginning "Selecting an appropriate

12   treatment."

13        **MR. KRAVITZ:**  Jess, could you call that up, please.

14   **Q.**   Okay.  And, Dr. Plakun, could you please read that into

15   the record.

16   **A.**   Yes.  (reading)

17        "Selecting an appropriate treatment will be an

18        outgrowth of the patient's diagnosis as determined during

19        the psychiatric evaluation.  However, it also requires

20        knowledge of the patient's current symptoms, trauma

21        history, and previous diagnoses and psychiatric treatment

22        experiences.  The elements of the treatment plan will vary

23        depending on the individual needs and preferences of the

24        patient but will generally include treatment that

25        addresses the patient's primary and co-occurring

1      diagnoses.  Often co-occurring psychiatric symptoms are

2      present that are subthreshold or subsyndromal or may not

3      respond for the treatment of the primary disorder; for

4      example, psychotic symptoms and mood disorders, cognitive

5      impairment and schizophrenia.  Such symptoms may

6      contribute to functional impairments or risk of relapse

7      and may also require specific intervention.  Prior

8      diagnoses of a co-occurring personality disorder may

9      signal a need for a differing approach to psychotherapy

10     than in an individual without such comorbidity.  For

11     individuals with a past trauma, this experience may

12     influence their ability to establish a trusting

13     relationship and this may need to be considered in terms

14     of the therapeutic alliance."

15  **Q.**  Thank you.

16      And what, Dr. Plakun, does this tell you as an expert in

17  terms of what generally accepted standards of care require in

18  terms of treating just the acute crisis or the acuity plus the

19  underlying ongoing illness and comorbidities?

20  **A.**  Well, I think it states pretty clearly that it's important

21  to look beyond simply the presenting symptoms, and it's largely

22  the case I've been making.

23      It's puzzling that it's cited as support for a limited

24  view focused on the presenting problems, but the actual text

25  states that it's much broader than that and that you must

1    attend to co-occurring, chronic, recurrent, comorbid conditions

2    and trauma.

3         **MR. KRAVITZ:**  Indulge me.  Let me just check with my

4    colleagues.

5                    (Pause in proceedings.)

6         **MR. KRAVITZ:**  No more questions at this time.

7         **THE COURT:**  Okay.  So we're going to go about -- what

8    time is it?

9         **THE CLERK:**  2:30.

10        **THE COURT:**  -- about a half hour more.  So why don't

11   we start the cross-examination.

12        **THE WITNESS:**  Is it possible to take a quick break?

13        **THE COURT:**  We're running short, but a little break,

14   absolutely.  Five minutes.

15        **THE WITNESS:**  Five minutes?

16        **THE COURT:**  Okay.  So stay-in-place break.

17                 (Recess taken at 2:25 p.m.)

18            (Proceedings resumed at 2:28 p.m.)

19        **THE CLERK:**  So we're back on the record.

20        **THE COURT:**  Okay.  Go ahead.

21        **MR. RUTHERFORD:**  Ready?

22        **THE COURT:**  Yes, please.

23                    <u>**CROSS-EXAMINATION**</u>

24   BY MR. RUTHERFORD:

25   **Q.**   Good afternoon, Dr. Plakun.

**PLAKUN - CROSS / RUTHERFORD**

1   **A.**   Good afternoon.

2   **Q.**   I'm going to direct your attention first to one of the

3   last exhibits that you discussed, which is Trial Exhibit 6 on

4   page 0006.

5   **A.**   (Witness examines document.)  Yes.

6   **Q.**   And you had indicated in your direct testimony that there

7   was certain language that was missing from the APA's language

8   with respect to medical necessity.  Do you recall that?

9   **A.**   Yes.

10  **Q.**   And one of the things was that "medical necessity" had a

11  definition that ensured that the services were not for the

12  benefit of the health plans; correct?

13  **A.**   Correct.

14  **Q.**   And it also included the language that it not be for the

15  benefit of providers; right?

16  **A.**   Correct.

17  **Q.**   Because some providers, then, would be incentivized to

18  make money by keeping patients longer than medically necessary;

19  correct?

20  **A.**   Correct.

21  **Q.**   And for the convenience of the patient so the patient just

22  doesn't get sort of a vacation in a nice residential treatment

23  center; correct?

24  **A.**   Well, I'm not sure I would characterize it as a vacation,

25  but --

**PLAKUN - CROSS / RUTHERFORD**

1  Q.   The point being, though, that that language was missing

2  too, that it was for the convenience?

3  A.   Yes.  Yes.

4  Q.   Okay.  And you believe that a health insurance plan should

5  not be required to cover treatment that is not medically

6  necessary; correct?

7  A.   That's correct.

8  Q.   Now, Austen Riggs, which you had discussed in your direct

9  testimony, is not in network with any insurance company?

10  A.   That's correct.

11  Q.   And hasn't been for at least 10 years or maybe more?

12  A.   Correct.

13  Q.   And Medicare doesn't pay for treatment at Austen Riggs?

14  A.   That's correct.

15  Q.   And Medicaid doesn't pay for treatment at Austen Riggs?

16  A.   That's correct.

17  Q.   About 30 percent -- only about 30 percent of the patients

18  at Austen Riggs receive insurance coverage for their time

19  there?

20  A.   Yes.

21  Q.   The other 70 percent are paying, I'm going to call it,

22  out-of-pocket but they're paying as they go?

23  A.   Yes, uh-huh.

24  Q.   And admission to Austen Riggs requires, for instance, a

25  prepayment of $45,000?

**PLAKUN - CROSS / RUTHERFORD**

1   **A.**   Correct.

2   **Q.**   And that would cover the six-week, I think you called it

3   the smallest building block, but that six-week period of

4   evaluation and assessment?

5   **A.**   And treatment.

6   **Q.**   And treatment that would potentially commence a longer

7   stay; correct?

8   **A.**   Correct.

9   **Q.**   But that six-week period is a minimum stay with respect to

10  what Austen Riggs has determined it needs in order to make that

11  initial assessment, evaluation, and set of treatments; correct?

12  **A.**   As you stated it, it's true, a patient could leave three

13  days in, but we're very clear that our program needs the six

14  weeks to do the evaluation and treatment, the case conference,

15  et cetera.

16  **Q.**   Austen Riggs is an open setting, though, meaning that

17  people can come and go?

18  **A.**   Yes.

19  **Q.**   And even though there is this minimum six weeks and there

20  is this 45,000-dollar prepayment, an Austen Riggs' patient is

21  free to leave whenever an Austen Riggs' patient wants to leave?

22  **A.**   Do you mean be discharged, or do you mean leave the

23  grounds?

24  **Q.**   Leave.  Yeah, leave the program, quit the program.

25  **A.**   Quit the program, yes.  They could, yes.

**PLAKUN - CROSS / RUTHERFORD**

1  Q.   But Austen Riggs does not keep people who don't want to be

2  treated?

3  A.   That's correct.

4  Q.   And part of what you assess when admitting somebody is

5  their motivation to be treated; correct?

6  A.   Correct.

7  Q.   If somebody at some point in time during their period of

8  stay at Austen Riggs decides "I don't want to participate any

9  longer, I want to leave," the staff of Austen Riggs does not

10  prevent them from doing that; correct?

11  A.   Well, yes, but I need to put an asterisk there.  Because,

12  obviously, if someone says "This is really hard, I want to

13  leave and kill myself," we're not going to simply let them

14  leave.

15     So -- but, yes, if someone says "I've changed my mind" or

16  "I don't think I can do this work," we would not require them

17  to pursue the treatment unless we thought there was a reason

18  that they were a candidate for involuntary treatment in order

19  to save their lives or someone else's life.

20  Q.   Right.

21  A.   And then we would let them leave, but we would transfer

22  them to the appropriate secure setting.

23  Q.   In other words, to be a patient, you have to be motivated

24  to want to address your issues; correct?

25  A.   Motivated enough.  As I indicated earlier, ambivalence is

**PLAKUN - CROSS / RUTHERFORD**

1   fundamentally human, yes.

2   **Q.**   But a patient can decide to change their mind and then

3   leave and aside from those situations that you mentioned, the

4   Austen Riggs staff wouldn't prevent them from doing that?

5   **A.**   Yes.

6   **Q.**   And you testified on direct examination about LOCUS.  Do

7   you recall that --

8   **A.**   Sure.

9   **Q.**   -- testimony?

10      And I'm going to direct your attention in a moment to the

11  LOCUS instrument, but the LOCUS tool is a tool that you

12  explained you refer to in your practice but you don't actually

13  run an algorithm in order to determine a level of care;

14  correct?

15  **A.**   Correct.

16  **Q.**   That's something that you leave to your clinical judgment;

17  correct?

18  **A.**   Correct.

19  **Q.**   And with respect to the other staff at Austen Riggs, that

20  is the protocol as well, that it's the clinical judgment of the

21  staff at Austen Riggs to make level-of-care placement decisions

22  based upon their clinical judgment?

23  **A.**   Correct.

24  **Q.**   Now, in your direct testimony you made a critique, I'll

25  call it that, of the presence of the "why now" factor in

**PLAKUN - CROSS / RUTHERFORD**

1  certain parts of the Level of Care Guidelines.  Do you recall

2  generally that testimony?

3  **A.**  Yes.

4  **Q.**  It's true, though, that you didn't criticize each and

5  every inclusion of the phrase "why now" in the Level of Care

6  Guidelines; correct?

7  **A.**  I think that's correct.

8  **Q.**  Let me direct -- I'll direct your attention first to

9  Exhibit 3 at page 3-0007.

10  **A.**  (Witness examines document.)

11  **Q.**  And to paragraph 3a on that page.

12  **A.**  0007, 3a, yes.

13  **Q.**  And it indicates there that (reading):

14         "The member's chief complaint presenting problem and

15      the events which precipitated the request for service at

16      this particular point; i.e., the 'why now.'"

17      Do you see that?

18  **A.**  Yeah.

19  **Q.**  And that's not one of the factors that you identified as

20  falling below generally accepted standards of care for the year

21  2013 Level of Care Guidelines; correct?

22  **A.**  Correct.

23  **Q.**  And then, again, directing your attention to Exhibit 4,

24  which is the 2014 Level of Care Guidelines.  And let me know

25  when you have that in front of you.

**PLAKUN - CROSS / RUTHERFORD**

1    **A.**    I've got it.

2    **Q.**    And to page 4-0008.

3    **A.**    (Witness examines document.)  Got it.

4    **Q.**    And this is as an example under "Level of Care Criteria,

5    Continuing Service," in the middle of the page it states

6    (reading):

7                "The 'why now' factors leading to admission have been

8              identified and are integrated into the treatment and

9              discharge plans."

10          Do you see that?

11   **A.**    Yes, I do.

12   **Q.**    And that is not -- that is not one of the places where you

13   think that the 2014 Level of Care Guidelines falls below the

14   generally accepted standards of care; correct?

15   **A.**    Yes.

16   **Q.**    In other words, when you were getting questions from

17   Mr. Kravitz on direct examination, you identified each and

18   every place where the inclusion of the "why now" language

19   caused the UBH Level of Care Guidelines to fall below the

20   generally accepted standards of care; correct?

21   **A.**    Yes.

22   **Q.**    And that was an exhaustive list --

23          **THE COURT:**  Is there a point here?

24          **MR. RUTHERFORD:**  Yes.  I just want to be able to not

25   have to go through each and every place where "why now" appears

1    that he didn't mention it.

2          **THE COURT:**  Are they all like this?  This is obvious.

3    You collect "why now" data to do evaluations.  You include "why

4    now" data in your plans.  That doesn't mean it has anything to

5    do with the criticisms that he made.  These are benign

6    inclusions of "why now" in his theory.  If there's a point to

7    make, I'd be interested in having it made.

8    **BY MR. RUTHERFORD:**

9    **Q.**   You'd agree that it's appropriate in assessing level of

10   care to take into consideration a patient's current symptoms;

11   correct?

12   **A.**   Absolutely.

13   **Q.**   Okay.  And you had mentioned earlier -- you'd spoken

14   earlier about the fact that the LOCUS instrument is at least

15   one of the instruments that you consider to be reflective of

16   generally accepted standards of care?

17   **A.**   Correct.

18   **Q.**   So directing your attention to Exhibit 653.

19   **A.**   (Witness examines document.)

20   **Q.**   Okay.  Before I get to that, just to be clear, the concept

21   of "why now" is not a concept with which you take issue with in

22   terms of the importance of those considerations playing a role

23   in devising -- in evaluating the situation that a patient

24   brings to treatment and devising a treatment plan; correct?

25   **A.**   Correct.

1  Q.   Your issue is the focus that was placed upon the "why now"

2  factor in certain parts of the Level of Care Guidelines and

3  Coverage Determination Guidelines; correct?

4  A.   Yes.

5  Q.   Now, directing your attention to the LOCUS instrument,

6  Trial Exhibit 653, at page 0005.  And I want to direct your

7  attention to the first -- I mean, I'm sorry, to the third full

8  paragraph that begins with "We hope."  Third full paragraph and

9  it's about the sixth line.

10 A.   (Witness examines document.)

11 Q.   It states, does it not -- and this is in the

12 instructions -- in the introduction to Adult Version 2010,

13 second page.  It states, does it not (reading):

14        "It does not claim" -- and this is the LOCUS

15     instrument -- "does not claim to replace clinical judgment

16     and is meant to serve only as an organized guide to

17     resource utilization that must be applied in conjunction

18     with sound clinical thinking"?

19     Do you see that?

20 A.   Yes.

21 Q.   And that is, in terms of the way that you use it,

22 consistent with the way that you would use the LOCUS

23 instrument; correct?

24 A.   Correct.

25 Q.   In conjunction with your clinical judgment?

1    A.    Yes.

2    Q.    I'd like to direct your attention next to page 653-0007.

3    And there is a concept included in the "why now" instrument

4    called "here and now"; is there not?

5    A.    (Witness examines document.)  It doesn't specifically come

6    to mind, but I -- okay.

7    Q.    Well, directing your attention to the third full

8    paragraph, it states in the third full paragraph, does it not

9    (reading):

10          "Since LOCUS is designed as a dynamic instrument,

11          scores should be expected to change over time.  Scores are

12          generally assigned on a here-and-now basis representing

13          the clinical picture at the time of evaluation.  In some

14          parameters, historical information is taken into account

15          but it should not be considered unless it is a clear part

16          of the defined criteria"?

17          That's what it states; correct?

18   A.    Correct.

19   Q.    And then directing your attention to the next page of

20   Trial Exhibit 653-0008, this is the page that begins

21   "Dimension 1, Risk of Harm."

22   A.    Yes.

23   Q.    (reading)

24          "Risk of harm is the dimension of the assessment that

25          considers a person's potential to cause significant harm

PLAKUN - CROSS / RUTHERFORD

1           to self and others."

2           Correct?

3    A.     Yes.

4    Q.     And it states near the bottom of that paragraph, does it

5    not (reading):

6               "When considering historical information, recent

7           patterns of behavior should take precedent over patterns

8           reported from the remote past"; correct?

9    A.     Correct.

10   Q.     And then to the next page, Trial Exhibit 653-0009, and

11   that is the page that begins "Dimension 2," which is

12   "Functional Status"; correct?

13   A.     Yes.

14   Q.     (reading)

15              "Functional status reads as the dimension of the

16          assessment that measures the degree to which a person is

17          able to fulfill social responsibilities, to interact with

18          others, maintain their physical functioning; such as

19          sleep, appetite, energy, et cetera, as well as a person's

20          capacity for self-care."

21          And that is the dimension assessment description for

22   functional status; correct?

23   A.     Yes.

24   Q.     And then at the bottom of that paragraph -- or I should

25   say at the end of that paragraph, it states, does it not

1  (reading):

2          "For the purpose of this document" -- meaning the

3      LOCUS instrument -- "sources of impairment should be

4      limited to those directly related to psychiatric and/or

5      addiction problems that the individual may be

6      experiencing.  While other types of disabilities may play

7      a role in determining what types of support services may

8      be required, they generally" -- "they should" -- I'm

9      sorry -- "generally not be considered in determining the

10     placement a given individual in the behavioral" -- "in

11     determining the placement of a given individual in the

12     behavioral treatment continuum"?

13     That's what it states; correct?

14  A.   Correct.

15  Q.   And then turning to trial exhibit page 653-0011, and this

16  is the page that begins, "The discussion of Dimension 3," which

17  is "Medical, Addictive, and Psychiatric Comorbidity"; correct?

18  A.   Yes.

19  Q.   And this indicates for this particular dimension,

20  second-to-last sentence in that first paragraph (reading):

21          "Unless otherwise indicated, historical existence of

22      potentially interacting disorders should not be considered

23      in this parameter unless current circumstances would make

24      reactivation of those disorders likely."

25     That's what it states; correct?

1    **A.**    Correct.

2    **Q.**    And then moving ahead and directing your attention to

3    page, I guess it would be, Trial Exhibit 653-0016.

4    **A.**    (Witness examines document.)

5    **Q.**    And this is the description of Dimension 5, which is

6    "Treatment and Recovery History."  Do you see that?

7    **A.**    Uh-huh.  Yes.

8    **Q.**    And this is described -- it describes, does it not

9    (reading):

10            "This dimension of the assessment recognizes that a

11        person's past experience provides some indication of how

12        that person is likely to respond to similar circumstances

13        in the future"?

14        That's what it states; correct?

15   **A.**    Correct.

16   **Q.**    But then that paragraph ends with the statement, does it

17   not (reading):

18            "Most recent experiences in treatment and recovery

19        should take precedence over more remote experiences in

20        determining the proper rating"?

21        Correct?

22   **A.**    Correct.

23   **Q.**    And then, finally, in Section 6, this is "Engagement and

24   Recovery Status."  Do you see that?  This is on Trial

25   Exhibit 653-0017.

**PLAKUN - CROSS / RUTHERFORD**

1  A.   Yes.

2  Q.   And under "Engagement and Recovery Status," there is --

3  there are a handful of bullet points under "Optimal Engagement

4  and Recovery."  Do you see that?

5  A.   Yes.

6  Q.   And it states, does it not (reading):

7          "Has complete understanding and acceptance of illness

8       and its effect on function, actively maintains changes

9       made in the past, maintenance stage, is enthusiastic about

10      recovery, is trusting, and shows strong ability to utilize

11      available resources and treatment and understands recovery

12      process and takes on a personal role and responsibility

13      recovery plan"?

14      Do you see that?

15  A.   Yes.

16  Q.   And all of that language is in the present tense; correct?

17  A.   Yes.

18  Q.   And then, finally, directing your attention to a Trial

19  Exhibit 653-025.  This is a question in cross, a different

20  theme, but since we're in the document, I'm going to ask this

21  to you.

22      This is now out of the dimensions and into the various

23  levels of care that you discussed with Mr. Kravitz; correct?

24  A.   Correct.

25  Q.   And this is Level of Care 5, which is "Medically Monitored

**PLAKUN - CROSS / RUTHERFORD**

1   Residential Services"; correct?

2   **A.**   Yes.

3   **Q.**   Paragraph 2 within that definition on trial exhibit

4   page 653-0025 is entitled "Clinical Capabilities."  Do you see

5   that?

6   **A.**   Yes.

7   **Q.**   And that states, does it not (reading):

8            "Access to clinical care must be available at all

9        times.  Psychiatric care should be available either on

10       site or by remote communication 24 hours daily and

11       psychiatric consultation should be available on site at

12       least weekly but client contact may be required as often

13       as daily"?

14       That's what it states; correct?

15  **A.**   Correct.

16  **Q.**   Okay.  Now, directing your attention to the study that you

17  had discussed with Mr. Kravitz.  If you could pull out two

18  documents for this, which would be Exhibit 640 and Exhibit 570.

19  **A.**   640.

20  **Q.**   640 and 570.  And these are the -- these are the documents

21  showing the length of stay.

22  **A.**   640...

23       (Witness examines document.)  Right.

24  **Q.**   And let me know when you have those in front of you.

25  **A.**   I have 640.  What's the other number?

**PLAKUN - CROSS / RUTHERFORD**

1  **Q.**   570.

2  **A.**   (Witness examines document.)  Yep.  I've got them.

3  **Q.**   Okay.  Speaking first with respect to the study that is

4  marked as and has now been admitted as Trial Exhibit 640.  Do

5  you have that in front of you?

6  **A.**   Yes.

7  **Q.**   Okay.  Austen Riggs did not participate in this survey,

8  did it?

9  **A.**   I don't actually no.

10  **Q.**   But you know that the sample size for this survey was 33

11  facilities; correct?

12  **A.**   Correct.

13  **Q.**   And you testified earlier that the payer, the population

14  that was used for this particular study, was largely government

15  payer population; correct?

16  **A.**   Correct.

17  **Q.**   And you drew the conclusion that that meant that it would

18  be subjected to CMS standards; correct?

19  **A.**   Correct.

20  **Q.**   Right.  But wouldn't that only apply to the Medicaid, the

21  39.8 percent of Medicaid?

22  **A.**   I'm sure it wouldn't apply to the whole sample.

23  **Q.**   Right.  Because 45.7 percent of the payer sample is

24  government; correct?

25  **A.**   (Witness examines document.)

**PLAKUN - CROSS / RUTHERFORD**

1  Q.   That's on -- I'm sorry.  I'll direct your attention to

2  Trial Exhibit 640-0023.

3  A.   Government is 45.7.  I'm not sure where "government" is

4  defined.

5  Q.   Right.  So you don't know to what standards or to what

6  guidelines the patient payer population under "Government"

7  would be abiding by; correct?

8  A.   Correct.

9  Q.   Right.  And then with respect to commercial insurance, I

10 know the Court asked you some questions about the commercial

11 insurance, but you understand that the UBH survey to which you

12 compared this survey is a commercial insurance survey; correct?

13 A.   Correct.

14 Q.   And here, as you indicated, the commercial insurance payer

15 population is 5.6 percent; correct?

16 A.   Correct.

17 Q.   Mr. Kravitz had asked you some questions regarding

18 exclusions.  Do you recall that?

19 A.   Exclusions...

20 Q.   Well, let me put it a little differently.  You understand

21 that with a commercial plan, there are potentially exclusions,

22 correct, in the plans?

23 A.   You mean like exclusions of residential treatment?

24 Q.   Correct.

25 A.   Yes.

**PLAKUN - CROSS / RUTHERFORD**

1  Q.  There could also be limitations within the plans; correct?

2  A.  Yes.

3  Q.  You testified earlier about the custodial care.

4  A.  Yeah.

5  Q.  There could be definitional limitations.  There could be a

6  whole host of factors that play into those numbers; correct?

7  A.  Correct.

8  Q.  What's more, the commercial -- the UBH -- you understand

9  that the UBH commercial plans are ERISA plans; correct?

10  A.  Yes.

11  Q.  So they are for employed people or the families of

12  employed people; correct?

13  A.  Yes.

14  Q.  The Medicare -- I mean, the Medicaid population and the

15  government population here, as indicated on Trial

16  Exhibit 640-0023, could be a wide range of individuals;

17  correct?  Some could be employed?  Some could be unemployed and

18  receiving their healthcare through Medicare -- through

19  Medicaid -- I'm sorry -- correct?

20  A.  Correct.

21  Q.  And so the Medicaid population tends to be a sicker

22  population than the employed population; isn't that right?

23  A.  Probably in general.  I don't know that that's true in the

24  sample.

25  Q.  But in general that would be the case; correct?

**PLAKUN - CROSS / RUTHERFORD**

1   **A.**   It could quite possibly be true.

2   **Q.**   But you don't know for the sample either, do you?

3   **A.**   No.  No.

4   **Q.**   Right.

5        And then just one point of clarity.  You had indicated

6   earlier that the average length of participation in

7   Austen Riggs was five to six months; correct?

8   **A.**   Correct.  That was from year to year.

9   **Q.**   Right.  That was across the entire continuum of services?

10  **A.**   Right.

11  **Q.**   So that wasn't a statement as to the length of a

12  residential -- the length of stay in a residential service but

13  participation in your entire continuum of care?

14  **A.**   Correct.

15  **Q.**   Which could include outpatient, intensive outpatient, and

16  the like?

17  **A.**   Not outpatient but intensive outpatient.

18  **Q.**   Intensive outpatient all the way through the stages up to

19  residential.

20            **THE COURT:**  So I think that's a good place to stop --

21            **MR. RUTHERFORD:**  Okay.

22            **THE COURT:**  -- because I want to do a little

23  housekeeping before we adjourn for the week.

24       You're welcome to step down for now if you want.

25       So where are we?

1          **MR. KRAVITZ:**  Your Honor, Doctor -- and this is purely

2    your convenience, but Dr. Plakun is here from Stockbridge,

3    Mass., and -- okay.  I get it.

4          **THE COURT:**  No.  No.  I told you days ago --

5          **MR. KRAVITZ:**  And we're not arguing.

6          **THE COURT:**  -- that today I've got to be out of here

7    at 3:00.  I have a meeting in Monterey at 5:00.  I'm already

8    not going to be there.  I told you days ago.  You could have

9    planned around the witness' convenience.  I apologize to the

10   doctor for that, but I've got to go.

11         **MR. KRAVITZ:**  Thank you.

12         **THE COURT:**  So where are we?  That's a question for

13   you guys, the plaintiffs.

14         **MS. REYNOLDS:**  We're making good progress.  We do

15   have -- we're currently planning at least two additional live

16   witnesses and a couple very short video clips.  We're going to

17   assess --

18         **THE COURT:**  Right.

19         **MS. REYNOLDS:**  -- obviously over the long weekend and

20   determine everything else we need to do.

21         **THE COURT:**  So two live witnesses that will take how

22   long?

23         **MR. KRAVITZ:**  Do you want me to address that?

24         **MS. REYNOLDS:**  Probably.  He's prepared for the longer

25   one.

```
 1              MR. KRAVITZ:  One is going to be very brief.  I would
 2     expect it to be less than 30 minutes.
 3              THE COURT:  Okay.
 4              MR. KRAVITZ:  And that's the summary witness with the
 5     plans and the denial letters.  I hope it takes less than that.
 6         And the other one we're currently planning on calling is
 7     Dr. Triana, and from, I'm estimating -- and lawyers are
 8     terrible at estimating -- but I would say in the two hours,
 9     three hours max from our side.  I know that the defense has him
10     down for a substantial chunk of time as well, but -- so I can't
11     address that, but that's my best estimate of Dr. Triana.
12              THE COURT:  Okay.
13              MR. KRAVITZ:  I hope I'm not wrong by very much.
14              THE COURT:  So you should be done Tuesday?
15              MS. REYNOLDS:  That's reasonable, Your Honor.
16              MR. KRAVITZ:  Yes, or -- yes.  Yes.
17              MS. REYNOLDS:  It's possible.  I suppose it's possible
18     it could be Monday.
19              MR. KRAVITZ:  Yes.
20              THE COURT:  Well, it probably isn't, but I'll tell you
21     why, but go ahead.
22         And then it's your turn.  How are we doing?  What's your
23     case shaping up like?
24              MS. ROMANO:  Your Honor, from our perspective, we
25     haven't done too much of our time yet.
```

1          THE COURT:  No, no, of course not.  I'm just wondering

2    then once they finish.

3          MS. ROMANO:  We will certainly be ready to put on our

4    case.

5          THE COURT:  Yes.

6          MS. ROMANO:  We do have numerous witnesses on our list

7    all scheduled to be in here coming in and out at a pretty fast

8    clip for some of them.

9          THE COURT:  Okay.

10         MS. ROMANO:  And that includes both percipients and

11   experts.

12         THE COURT:  Okay.  Any idea how long it's going to

13   take?

14         MS. ROMANO:  You know, our best -- it's looking like

15   plaintiffs' case is going to be about the full 24 hours, and I

16   suspect ours will be too, but we are mindful to keep it as

17   efficient and quick moving as possible.

18         THE COURT:  Okay.  See, I told you.

19                    (Laughter)

20         MS. ROMANO:  Give us the time and we use it, is that

21   the fear?

22         THE COURT:  I had hopes, but that's fine.

23      Monday is going to be a weird day because you may have

24   seen on the calendar I have Reentry Court, I have six new

25   people fresh out of prison that I have to meet with and, among

1  other things, get them connected with mental health providers

2  and drug treatment providers, and all that sort of thing.

3       And so I'm a dead stop at 1:00 o'clock on Monday.  So we

4  can go from 8:30 to 1:00.  We won't take a lunch break.  We'll

5  just -- we may take a couple short breaks maybe in that period

6  of time, so hopefully we can actually get four hours of

7  testimony in on Monday and then back at it again on Tuesday.

8       You know, I don't know, I'll just say -- let me just tread

9  on this subject lightly, because I have no idea what goes on

10  behind the scenes in this case and what you-all are discussing

11  among yourselves or between each other or with Judge Ryu, but I

12  can say this:

13       Everybody has something to say in this case, and it seems

14  to me that this is exactly the kind of case in which the

15  patient population and the plan health and participants would

16  be served by having some kind of agreed-upon resolution to

17  where this goes.

18       I won't say anything more.  You've got a long weekend.  If

19  anybody wants to pick up that banner and try to carry it over

20  the finish line, that would be great.  If you don't, that's

21  great too.  You know, this is a subject that, as you can tell

22  from my other interests, I find interesting, but still that's

23  my thought.

24       Okay.  Thank you.  See you Monday.

25            **ALL:**  Thank you, Your Honor.

```
 1              (Proceedings adjourned at 2:59 p.m.)

 2         (Proceedings to resume on Monday, October 23, 2017.)

 3                        -   -   -   -

 4

 5                   CERTIFICATE OF REPORTERS

 6         We certify that the foregoing is a correct transcript

 7    from the record of proceedings in the above-entitled matter.

 8

 9    DATE:   Wednesday, October 18, 2017

10

11

12

13    _____

14    Katherine Powell Sullivan, CSR #5812, RMR, CRR
                U.S. Court Reporter
15

16

17

18    _____

19         Jo Ann Bryce, CSR #3321, RMR, CRR
                U.S. Court Reporter
20

21

22

23

24

25
```