**Volume 4**

**Pages 637 - 818**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JOSEPH C. SPERO, MAGISTRATE JUDGE

DAVID AND NATASHA WIT, et al.,  )
                                 )
            Plaintiffs,          )
                                 )
  VS.                            )   **No. C 14-2346 JCS**
                                 )
UNITED BEHAVIORAL HEALTH,        )
                                 )
            Defendant.           )
_____  )   San Francisco, California
                                     Monday, October 23, 2017

<u>**TRANSCRIPT OF PROCEEDINGS**</u>

<u>**APPEARANCES**</u>:

For Plaintiffs:          ZUCKERMAN SPAEDER LLP
                         1800 M Street, NW, Suite 1000
                         Washington, DC  20036-5807
                  **BY:  CARL S. KRAVITZ, ESQUIRE**
                         **CAROLINE E. REYNOLDS, ESQUIRE**
                         **AITAN D. GOELMAN, ESQUIRE**

                         ZUCKERMAN SPAEDER LLP
                         485 Madison Avenue, 10th Floor
                         New York, New York 10022
                  **BY:  JASON S. COWART, ESQUIRE**


            (Appearances continued on next page)


Reported By:  Katherine Powell Sullivan, CSR #5812, RMR, CRR
              Jo Ann Bryce, CSR #3321, RMR, CRR
              Official Reporters - U.S. District Court

**APPEARANCES (CONTINUED):**

For Plaintiffs:        ZUCKERMAN SPAEDER LLP
100 East Pratt Street, Suite 2440
Baltimore, Maryland  21202-1031
**BY:** **ADAM ABELSON, ESQUIRE**

THE MAUL FIRM, P.C.
101 Broadway, Suite 3A
Oakland, California 94607
**BY:** **ANTHONY F. MAUL, ESQUIRE**

PSYCH APPEAL
8560 Sunset Boulevard, Suite 500
West Hollywood, California  90069
**BY:** **MEIRAM BENDAT, ESQUIRE**

For Defendant:        CROWELL & MORING LLP
515 South Flower Street, 40th Floor
Los Angeles, California 90071-2258
**BY:** **JEFFREY H. RUTHERFORD, ESQUIRE**
**JENNIFER S. ROMANO, ESQUIRE**
**ANDREW HOLMER**, **ESQUIRE**

CROWELL & MORING LLP
3 Embarcadero Center, 26th Floor
San Francisco, California 94111
**BY:** **NATHANIEL P. BUALAT, ESQUIRE**

CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595
**BY:** **APRIL N. ROSS, ESQUIRE**

<u>**I N D E X**</u>

Monday, October 23, 2017 - Volume 4

| **PLAINTIFFS' WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| **PLAKUN, ERIC (RECALLED)** | | |
| (PREVIOUSLY SWORN) | 646 | 4 |
| Cross-Examination resumed by Mr. Rutherford | 647 | 4 |
| Redirect Examination by Mr. Kravitz | 662 | 4 |
| | | |
| **DUH, JOSEPHINE** | | |
| (SWORN) | 671 | 4 |
| Direct Examination by Mr. Abelson | 672 | 4 |
| Cross-Examination by Ms. Ross | 684 | 4 |
| | | |
| **TRIANA, LORENZO** | | |
| (SWORN) | 697 | 4 |
| Direct Examination by Mr. Kravitz | 697 | 4 |
| Cross-Examination by Mr. Rutherford | 786 | 4 |
| Redirect Examination by Mr. Kravitz | 808 | 4 |

<u>**E X H I B I T S**</u>

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 225 | | 678 | 4 |
| 226 | | 683 | 4 |
| 227 | | 678 | 4 |
| 229 | | 683 | 4 |
| 231 | | 678 | 4 |
| 232 | | 683 | 4 |
| 233 | | 678 | 4 |
| 234 | | 683 | 4 |
| 235 | | 678 | 4 |
| 236 | | 683 | 4 |
| 237 | | 678 | 4 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 238 | | 683 | 4 |
| 239 | | 678 | 4 |
| 240 | | 683 | 4 |
| 241 | | 678 | 4 |
| 242 | | 683 | 4 |
| 243 | | 678 | 4 |
| 244 | | 683 | 4 |
| 245 | | 678 | 4 |
| 246 | | 683 | 4 |
| 256 | | 734 | 4 |
| 257 | | 734 | 4 |
| 258 | | 733 | 4 |
| 259 | | 714 | 4 |
| 260 | | 735 | 4 |
| 261 | | 735 | 4 |
| 262 | | 735 | 4 |
| 299 | | 737 | 4 |
| 300 | | 738 | 4 |
| 301 | | 738 | 4 |
| 302 | | 738 | 4 |
| 339 | | 706 | 4 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 343 | | 739 | 4 |
| 408 | | 743 | 4 |
| 516 | | 743 | 4 |
| 524 | | 778 | 4 |
| 549 | | 782 | 4 |
| 575 | | 812 | 4 |
| 720 | | 756 | 4 |
| 745 | | 761 | 4 |
| 749 | | 770 | 4 |
| 755 | | 749 | 4 |
| 758 (partially sealed) | | 772 | 4 |
| 766 | | 776 | 4 |
| 770 | | 784 | 4 |
| 798 | | 711 | 4 |
| 850 | | 765 | 4 |
| 892 | | 678 | 4 |
| 893 | | 680 | 4 |
| 894 | | 682 | 4 |
| 895 | | 684 | 4 |
| 1286 through 1289 | | 683 | 4 |
| 1290 through 1292 | | 683 | 4 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1294 through 1300 | | 683 | 4 |
| 1302 | | 683 | 4 |
| 1303 | | 683 | 4 |
| 1304 | | 683 | 4 |
| 1305 | | 683 | 4 |
| 1307 through 1309 | | 683 | 4 |
| 1311 through 1320 | | 683 | 4 |
| 1322 | | 683 | 4 |
| 1325 through 1331 | | 683 | 4 |
| 1333 through 1338 | | 683 | 4 |
| 1340 through 1350 | | 683 | 4 |
| 1352 | | 683 | 4 |
| 1353 | | 683 | 4 |
| 1355 through 1358 | | 683 | 4 |
| 1360 | | 683 | 4 |
| 1361 | | 683 | 4 |
| 1364 through 1373 | | 683 | 4 |
| 1375 through 1381 | | 683 | 4 |
| 1383 through 1392 | | 683 | 4 |
| 1535 | | 678 | 4 |
| 1538 through 1542 | | 678 | 4 |

# I N D E X

## E X H I B I T S

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 1544 | | 678 | 4 |
| 1546 through 1551 | | 678 | 4 |
| 1554 | | 678 | 4 |
| 1556 through 1561 | | 678 | 4 |
| 1563 | | 678 | 4 |
| 1566 | | 678 | 4 |
| 1567 | | 678 | 4 |
| 1570 through 1572 | | 678 | 4 |
| 1578 | | 678 | 4 |
| 1580 through 1589 | | 678 | 4 |
| 1592 through 1594 | | 678 | 4 |
| 1596 through 1606 | | 678 | 4 |
| 1608 | | 678 | 4 |
| 1611 | | 678 | 4 |
| 1614 | | 678 | 4 |
| 1616 | | 678 | 4 |
| 1617 | | 678 | 4 |
| 1619 | | 678 | 4 |
| 1622 through 1625 | | 678 | 4 |
| 1628 through 1631 | | 678 | 4 |
| 1633 through 1637 | | 678 | 4 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1639 | | 678 | 4 |
| 1641 through 1644 | | 678 | 4 |
| 1647 | | 678 | 4 |
| 1649 through 1651 | | 678 | 4 |
| 2000 | | 678 | 4 |
| 2001 | | 683 | 4 |
| 2002 | | 678 | 4 |
| 2003 | | 678 | 4 |
| 2004 | | 683 | 4 |
| 2005 | | 683 | 4 |
| 2006 | | 678 | 4 |
| 2007 | | 678 | 4 |
| 2009 through 2011 | | 678 | 4 |
| 2013 | | 683 | 4 |
| 2014 | | 678 | 4 |
| 2016 | | 678 | 4 |
| 2017 | | 678 | 4 |
| 2018 | | 683 | 4 |
| 2019 | | 683 | 4 |
| 2020 through 2029 | | 678 | 4 |
| 2030 | | 683 | 4 |

# **I N D E X**

## **E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 2031 | | 678 | 4 |
| 2032 | | 678 | 4 |
| 2033 | | 683 | 4 |
| 2034 | | 683 | 4 |
| 2035 through 2039 | | 683 | 4 |

 1   <u>**Monday - October 23, 2017**</u>                              <u>**8:33 a.m.**</u>

 2                        **P R O C E E D I N G S**

 3                            **---oOo---**

 4        **THE CLERK:**  Okay.  We're calling Case Number

 5   C-13-2346, Wit/Alexander versus UnitedHealthcare and Case

 6   Number 14-5337 has been consolidated into the Wit matter.

 7        **THE COURT:**  Okay, everyone, all parties and all

 8   counsel are present.

 9      Are we ready?

10        **MR. RUTHERFORD:**  Yes, Your Honor.  There's a sealing

11   issue.  I didn't know if the Court wanted to take it up.  It's

12   not going to be with this witness.

13        **THE COURT:**  Let's wait until the witness it's for.

14        **MR. RUTHERFORD:**  Yes, Your Honor.

15      I think we're re-calling Dr. Plakun to the stand.  He's on

16   cross-examination, Your Honor.

17        **THE COURT:**  Yes.

18                          <u>**ERIC PLAKUN**</u>,

19   called as a witness for the Plaintiffs, having been previously

20   duly sworn, testified further as follows:

21        **THE CLERK:**  Dr. Plakun, just to remind you you're

22   still under oath.

23        **MR. RUTHERFORD:**  May I proceed, Your Honor?

24        **THE COURT:**  Please.

25   ///

1      <u>CROSS-EXAMINATION</u>   (resumed)

2    BY MR. RUTHERFORD:

3    Q.   Dr. Plakun, you recall on Wednesday of last week you

4    testified regarding an article that you had written that

5    pertained to lengths of stay?  Do you recall that testimony

6    generally?

7    A.   Yes.

8    Q.   And you testified that your study had concluded that

9    active treatment was not a predictor of adverse outcomes?

10   A.   That?

11   Q.   That long-term treatment was not -- did not

12   automatically -- did not result in adverse outcomes -- in an

13   adverse outcome for the patient that was serving in long-term

14   care; correct?

15   A.   Long-term -- the index long-term treatment was not a

16   predictor of adverse outcome, correct.

17   Q.   Right.  But your study did not conclude -- or your article

18   did not conclude that longer lengths of stay in residential

19   treatment are predictors of positive outcomes; correct?

20   A.   That's correct.

21   Q.   Or conclude that one of the goals of residential treatment

22   should be -- should not be returning a patient to the

23   community?  In other words, you still agree that one of the --

24   one of the goals of treatment should be to return a patient to

25   his or her community; correct?

1   **A.**   Certainly.

2   **Q.**   Okay.  I direct your attention to Trial Exhibit 653 to

3   page 0025.

4   **A.**   (Witness examines document.)

5   **Q.**   And let me know when you have that in front of you.

6   **A.**   0025?

7   **Q.**   0025 of Exhibit 653.

8   **A.**   I have it, yes.

9   **Q.**   And I asked you questions about this document, the LOCUS

10  instrument, on Wednesday.  Do you recall those questions

11  generally?

12  **A.**   Generally, yes.

13  **Q.**   Okay.  Well, directing your attention to Section 5, this

14  is the section for medically monitored residential services;

15  correct?

16  **A.**   Correct.

17  **Q.**   And the last sentence of the first paragraph indicates

18  that "Level 5 services must be capable of providing the

19  following"?

20  **A.**   Yes.

21  **Q.**   Yes.  And then down at Number 5 -- I mean, I'm sorry, at

22  Number 4 it has a paragraph entitled "Crisis Resolution and

23  Prevention."  Do you see that?

24  **A.**   Yes.

25  **Q.**   And that paragraph states, does it not, that "Crisis

1    resolution and" -- (reading)

2            "For crisis resolution and prevention that

3        residential treatment programs must provide services

4        facilitating return to community functioning in a less

5        restrictive setting"?

6        Correct?

7    A.    Correct.

8    Q.    Now directing your attention to Exhibit 5.  These are the

9    2005 Level of Care Guidelines, Trial Exhibit 5.

10   A.    (Witness examines document.)

11   Q.    And let me know when you have that in front of you.

12   A.    (Witness examines document.)   Trial Exhibit 5, I have it.

13   Q.    And directing your attention to page 0011 of that

14   document.

15   A.    Yes.

16   Q.    I'm sorry.  Directing your attention to 0010 of that

17   document.

18   A.    Yes.

19   Q.    And to the title "Clinical Best Practices."  Do you see

20   that?

21   A.    Yes.

22   Q.    And you agree that these factors listed under "Clinical

23   Best Practices" are, generally speaking, the type of factors

24   that a clinician should collect when conducting an evaluation

25   of a patient; correct?

**PLAKUN - CROSS / RUTHERFORD**

1   **A.**    I would agree.

2   **Q.**    And then directing your attention now to page 0011.

3   **A.**    (Witness examines document.)

4   **Q.**    But on your direct examination, you brought to the Court's

5   attention and opined that certain of these sections on

6   page 0011 failed to meet generally accepted standards of care.

7   Do you recall that testimony generally?

8   **A.**    Yes.

9   **Q.**    And specifically you pointed to Section 4.1.4.1 -- no.

10  I'm sorry -- 4.1.4; correct?

11  **A.**    Yes.

12  **Q.**    And then within that, specifically 4.1.4.3?

13  **A.**    (Witness examines document.)

14  **Q.**    Correct?

15  **A.**    Correct.

16  **Q.**    And 4.1.7 just below it?

17  **A.**    (Witness examines document.)  Correct.

18  **Q.**    But there are other treatment plan provisions within those

19  "Clinical Best Practices" section that make no mention -- oh,

20  and one of your criticisms was the mention of the "why now"

21  factors and the focus on acuity; correct?

22  **A.**    I did make reference to the "why now" factors and to the

23  focus on acuity, yes.

24  **Q.**    And that -- I guess the focus on both the "why now"

25  factors and acuity was what rendered these provisions in your

**PLAKUN - CROSS / RUTHERFORD**

1  opinion inconsistent with generally accepted standards of care;

2  correct?

3  **A.**   Not -- not quite.  I think what I testified was that the

4  outcomes in 4.1.4.3 were linked directly to "why now" factors

5  instead of to potentially other factors as well; and in 4.1.7,

6  it was the focusing of the treatment plan on the "why now"

7  factors.

8  **Q.**   Those provisions are within the section governing

9  treatment plans; correct?

10  **A.**   Correct.

11  **Q.**   And that section contains other provisions that make no

12  mention of the "why now" factors or acuity; correct?

13  **A.**   Correct.

14  **Q.**   So, for instance, 4.1.4.1 that focuses on short-term and

15  long-term goals of treatment?

16  **A.**   Correct.

17  **Q.**   And 4.1.4.2, which speaks to the type, amount, frequency,

18  and duration of treatment?

19  **A.**   Yes.

20  **Q.**   And 4.1.4.5; correct?

21  **A.**   Yes.

22  **Q.**   How treatment will be coordinated with other providers as

23  well as agencies and programs and with the members involved;

24  correct?

25  **A.**   Yes.

**PLAKUN - CROSS / RUTHERFORD**

1  **Q.**   And 4.1.5; correct?

2  **A.**   Correct.

3  **Q.**   And 4.1.8; correct?

4  **A.**   (Witness examines document.)  Yes.

5  **Q.**   And, in fact, 4.1.8 states, does it not, that the

6  treatment plan and level of care are reassessed when the

7  member's condition improves, worsens, or does not respond to

8  treatment; correct?

9  **A.**   Correct.

10  **Q.**   And this first subprovision indicates that when the

11  member's condition has improved, the provider determines if the

12  treatment plan should be altered or if the treatment plan is no

13  longer required; correct?

14  **A.**   Correct.

15  **Q.**   And then finally in the second subprovision, "When the

16  member's condition has worsened or not responded to treatment,

17  the provider verifies the diagnosis, alters the treatment plan,

18  or determines if the member's condition should be treated in

19  another level of care"; correct?

20  **A.**   Yes.

21  **Q.**   And in none of these provisions is "acuity" mentioned;

22  correct?

23  **A.**   Correct.

24  **Q.**   And none of these provisions contains the phrase "why

25  now"; correct?

1  **A.**   That is correct.

2  **Q.**   All right.  Directing your attention again to Trial

3  Exhibit 5 at page 0008 and 0009.  We're staying in the 2015

4  Level of Care Guidelines.

5  **A.**   Yes.

6  **Q.**   And specifically I want to direct your attention to the

7  bottom of page 5-008 and the top of page 5-009.  Do you see

8  those provisions there under 1.8?

9  **A.**   Yes.

10  **Q.**   And you testified on direct examination that 1.8 --

11  Section 1.8 does not meet generally accepted standards of care

12  because its limits on improvements -- it limits improvement to

13  the concepts of presenting problems and that those presenting

14  problems be addressed within a reasonable period of time.  Do

15  you recall that testimony?

16  **A.**   Yes.

17  **Q.**   And you also testified that this provision says nothing

18  about co-occurring problems and makes clear that improvement in

19  the presenting problems means reduction or control of acute

20  signs and symptoms.  Do you recall that testimony?

21  **A.**   Yes.

22  **Q.**   But 1.8 has two subprovisions; correct?

23  **A.**   Correct.

24  **Q.**   And in one of those two subprovisions is -- and one of

25  those two subprovisions is Section 1.8.2; correct?

PLAKUN - CROSS / RUTHERFORD

1   **A.**   Yes.

2   **Q.**   And 1.8.2 states, does it not, (reading):

3           "Improvement in this context is measured by weighing

4       the effectiveness of treatment against evidence that the

5       member's signs and symptoms will deteriorate if treatment

6       in the current level of care ends.  Improvement must also

7       be understood within the broader framework of the member's

8       recovery, resiliency, and well-being"?

9       That's what it states; correct?

10  **A.**   Correct.

11  **Q.**   And there's no mention of "acuity" in that particular

12  paragraph?

13  **A.**   In 1.8.2?

14  **Q.**   Correct.

15  **A.**   Yes, that's correct.

16  **Q.**   Or the "why now" concept; correct?

17  **A.**   Correct.

18  **Q.**   Now directing your attention to the June 2016 guidelines,

19  specifically at Trial Exhibit 7.  It should be in the same

20  binder.

21  **A.**   (Witness examines document.)  Yes.

22  **Q.**   And I'm going to have you -- I'd like to direct your

23  attention within that exhibit to page 0032.

24  **A.**   (Witness examines document.)  Yes.

25  **Q.**   Now, in direct testimony, specifically directing your

**PLAKUN - CROSS / RUTHERFORD**

1  attention to the paragraph that begins -- second full paragraph

2  within the box on trial exhibit page 7-0032 which begins with

3  "The purpose of services."  Do you see that?

4  **A.**   Yes.

5  **Q.**   Now, in direct testimony, you characterized this as a new

6  sentence; correct?

7  **A.**   Yes.

8  **Q.**   And you testified that you were noting that this new

9  sentence is actually added immediately above the "why now"

10 paragraph; correct?

11 **A.**   Yes.

12 **Q.**   You can't see it on the screen, but the "why now" -- there

13 it is -- the "why now" paragraph is the paragraph that starts

14 with the words "The course of treatment in an intensive

15 outpatient program"; correct?

16 **A.**   Yes.

17 **Q.**   And you described this sentence beginning with -- it

18 indicates (reading):

19       "The purpose of services is to monitor or maintain

20    stability, decreasing moderate signs and symptoms,

21    increase functioning, and assist members with integrating

22    into community life."

23    Do you see that sentence?

24 **A.**   Yes.

25 **Q.**   Okay.  And you described that sentence as actually

**PLAKUN - CROSS / RUTHERFORD**

1  commendable; correct?

2  **A.**   Yes.

3  **Q.**   That sentence is not new to the Level of Care

4  Guidelines -- well, it was not new in June of 2016 with respect

5  to its inclusion in the Level of Care Guidelines for intensive

6  outpatient for mental health conditions; correct?

7  **A.**   I don't recall specifically, but I think it's the first

8  time that it turns up in this description of intensive

9  outpatient treatment.

10  **Q.**   I'd like to direct your attention to Trial Exhibit 6 at

11  page 6-0032, and these are the January 2016 Level of Care

12  Guidelines.

13  **A.**   (Witness examines document.)

14  **Q.**   Let me know when you have that in front of you.

15  **A.**   Yes, where the sentence is actually appended to the end of

16  the first paragraph.

17  **Q.**   Right.  So the sentence does appear as the last sentence

18  of the first full paragraph; correct?

19  **A.**   Yes.

20  **Q.**   And it states, "The purpose of services" -- I mean, it's

21  the exact same sentence as June of 2016; correct.

22  **A.**   Yes.

23  **Q.**   Okay.  Directing your attention to Exhibit 5 at page 0030,

24  and these are the 2015 Level of Care Guidelines.

25  **A.**   (Witness examines document.)  Yes.

**PLAKUN - CROSS / RUTHERFORD**

1   Q.   And, again, the sentence appears on page 5-0030 as the

2   last sentence of that same first full paragraph?

3   A.   Yes.

4   Q.   And then directing your attention to Exhibit 4 at

5   page 0027.  These are the 2014 Level of Care Guidelines.  The

6   last sentence of the first full paragraph.

7   A.   (Witness examines document.)  Yes.

8   Q.   It appears in that section as well; correct?

9   A.   Yes.

10  Q.   And then directing your attention to the 2017 Level of

11  Care Guidelines, Exhibit 8, at page 0014.

12  A.   Which number is that?

13  Q.   Exhibit 8.

14  A.   8?

15  Q.   Uh-huh, at page 0014.

16  A.   (Witness examines document.)  Yep.

17  Q.   And that sentence appears at the end of the first full

18  paragraph in that section as well, does it not?

19  A.   Yes.

20  Q.   And in 2017 in the intensive outpatient program -- well,

21  in 2017 throughout the Level of Care Guidelines the phrase "why

22  now" does not appear; correct?

23  A.   That's correct.

24  Q.   So it's not -- with respect to 2017, "why now" -- that

25  phrase "why now" is not in the following paragraph; correct?

**PLAKUN - CROSS / RUTHERFORD**

1   A.   That's correct.

2   Q.   Now, directing your attention back to your testimony on

3   Wednesday, you testified regarding the concept of emerging

4   adults.  Do you generally speaking recall that testimony?

5   A.   Yes.

6   Q.   And I believe that you defined "emerging adults" as ages

7   17 through 25, or thereabouts?

8   A.   Yes.

9   Q.   Younger adults; correct?

10  A.   Yes.

11  Q.   And you were also asked on direct examination about an

12  instrument called CALOCUS?  CALOCUS?

13  A.   I was asked about it?

14  Q.   Yeah.  You were -- you testified on direct examination

15  that CALOCUS is an instrument that works in similar fashion to

16  the LOCUS but is based upon children and adolescents; correct?

17  A.   Yes.

18  Q.   You don't treat children and adolescents in your work at

19  Austen Riggs, though; correct?

20  A.   Not in my work at Austen Riggs.

21  Q.   And you're not an expert on the treatment of children and

22  adolescents?

23  A.   That's correct.

24  Q.   You only treat people 18 and up; correct?

25  A.   At Austen Riggs.

**PLAKUN - CROSS / RUTHERFORD**

1  **Q.**    Okay.  And you're not -- well, you're not offering an

2  opinion in this case on level of care placements for

3  adolescents; are you?

4  **A.**    No, I'm not.

5  **Q.**    Okay.  And you're not offering an opinion in this case on

6  level of care placement for children either?

7  **A.**    That's correct.

8  **Q.**    You are also not offering -- although you have provided

9  testimony with respect to certain parts of the Level of Care

10  Guidelines that you opine are not consistent with generally

11  accepted standards of care, you are not offering explicit

12  recommendations on how the language in the Level of Care

13  Guidelines should be changed; correct?

14  **A.**    That's correct.

15  **Q.**    Now, in preparation for your work as an expert witness in

16  this case and for your testimony at trial, you testified that

17  you reviewed certain documents.  Do you generally recall that

18  testimony?

19  **A.**    Yes.

20  **Q.**    And the documents that you reviewed included the Level of

21  Care Guidelines?

22  **A.**    (Nods head.)

23  **Q.**    And the Coverage Determination Guidelines?

24  **A.**    Yes.

25  **Q.**    And I think you said other relevant documents; correct?

**PLAKUN - CROSS / RUTHERFORD**

1  **A.**   Yes.

2  **Q.**   Okay.  But you didn't review -- you understand that the

3  plaintiffs here are covered -- these coverage determinations

4  for the plaintiffs in this case were made pursuant to health

5  plans that the plaintiffs have; correct?

6  **A.**   Yes.

7  **Q.**   And you understand that the benefits that the plaintiffs

8  received are benefits that were defined by their health plans;

9  correct?

10  **A.**   Yes.

11  **Q.**   And you didn't review the health plans in this case?

12  **A.**   No.

13  **Q.**   Now, you testified on direct examination about the

14  custodial care Coverage Determination Guidelines.  Do you

15  recall that testimony generally?

16  **A.**   Yes.

17  **Q.**   The exhibits were -- we're not going to look at all of

18  them, but if you could sort of get to the following set of

19  exhibits, which would be Exhibits 10, 47, 84, 108, 148, 195,

20  and 221.  And I think for ease of reference, you can look at

21  Exhibit 148.

22      But those are the custodial care coverage of determination

23  guidelines; correct?

24  **A.**   Correct.

25  **Q.**   And you testified on direct examination that you had

**PLAKUN - CROSS / RUTHERFORD**

1  reviewed these Coverage Determination Guidelines; correct?

2  **A.**   Yes.

3  **Q.**   And you compared them to generally accepted standards of

4  care?

5  **A.**   Yes.

6  **Q.**   And you compared them to certain of the CMS guidelines as

7  well; correct?

8  **A.**   Correct.

9  **Q.**   And you found that their definition of "custodial care"

10  was too broad?

11  **A.**   That the UBH guidelines definition of "custodial care" was

12  too broad, yes.

13  **Q.**   Correct.  And that the UBH definition of "active

14  treatment" was too narrow; correct?

15  **A.**   Correct.

16  **Q.**   Now, directing your attention to Exhibit 148 to

17  page 148-003 --

18  **A.**   Yes.

19  **Q.**   -- to the first bullet point where it reads (reading):

20          "Custodial care is a psychiatric inpatient or

21      residential setting" -- "Custodial care in a psychiatric

22      inpatient or residential setting is any of the

23      following..."

24      And it indicates Certificate of Coverage; correct?

25  **A.**   Correct.

1  Q.   And Certificate of Coverage is in a health plan -- is one

2  of the health plan documents; correct?

3  A.   Yes.

4          MR. RUTHERFORD:  One moment, Your Honor.

5                  (Pause in proceedings.)

6          MR. RUTHERFORD:  No further questions, Your Honor.

7          THE COURT:  Okay.  Redirect.

8                  <u>REDIRECT EXAMINATION</u>

9  BY MR. KRAVITZ:

10 Q.   Good morning, Dr. Plakun.

11        On cross-examination last Wednesday you were asked a

12 question about residential treatment centers that contained the

13 phrase "sort of a vacation."  Do you recall that you were asked

14 the question --

15 A.   Yes.

16 Q.   -- that suggested that a residential treatment center

17 could be sort of a vacation?  You recall that?

18 A.   Yes.

19 Q.   Okay.  And I don't think you fully got a chance to respond

20 to that.  Another question intervened.

21        But could you describe to the Court the intensity of

22 service at a typical residential treatment program?  And by

23 that I'm focusing when are the therapeutic aspects.

24 A.   Well, there are a range of kinds of residential programs.

25 Some of them are fairly limited to immersion in a community

1    experience and perhaps to some work responsibilities.  These

2    are often for people with chronic and severe mental illness.

3         On the other end are the programs that are more similar to

4    the program I work at at Austen Riggs, which are very treatment

5    intensive, where in addition to individual intensive

6    psychotherapy multiple times a week, there are quite a range of

7    group offerings, large and small group offerings, plus

8    immersion in the therapeutic community, plus family therapy,

9    plus substance abuse treatment where it's indicated; and, I

10   mean, quite a rich and robust schedule of activities that many

11   people, as they engage in working on underlying issues, like

12   those related to trauma or recurrent problems, really are

13   opening up rather devastating experiences.

14        And, you know, that's the reason why they also include

15   24-hour access to doctors on call, 24-hour access to nursing

16   care.  It's -- it's not vacation-like at all.  It's quite an

17   intense immersion experience for the most part.

18   **Q.**   Let's turn to Exhibit 653, which is the LOCUS.

19   **A.**   (Witness examines document.)

20   **Q.**   And do you recall you were asked some questions last

21   Wednesday about this exhibit?

22   **A.**   Yes.

23   **Q.**   And if you could turn to page 653-0007, please.

24   **A.**   (Witness examines document.)  Yes.

25   **Q.**   Okay.  And I've highlighted the provision that was pointed

1   out by UBH's counsel on this page.  Do you see that?

2   A.   Yes.

3   Q.   Okay.  And it says (reading):

4          "Since LOCUS is designed as a dynamic instrument,

5       scores should be expected to change over time.  Scores are

6       generally assigned on a here-and-now basis representing

7       the clinical picture at the time of evaluation and some of

8       the parameters historical information is taken into

9       account, but it should not be considered unless it is a

10      clear part of the defined criteria."

11      Do you see that?

12  A.   Yes.

13  Q.   Okay.  If you could turn, please, to page 8.  And do you

14  see that this is the first dimension of LOCUS, risk of harm?

15  A.   Yes.

16  Q.   And is risk of harm the dimension that focuses on the

17  immediate risk?

18  A.   Yes.

19  Q.   And if you could go down to Number 3, and this is under

20  the heading "Moderate Risk of Harm," and please read the

21  provision that is in blue.

22  A.   Yes.  (reading)

23          "So one would get Number 3, Moderate Risk of Harm,

24      score if one had a history of chronic, impulsive,

25      suicidal, or homicidal behavior or threats but current

1      expressions do not represent significant change from the

2      usual behavior."

3  **Q.**   And if we could turn now to page 9, please, and by that I

4  mean Trial Exhibit 653-0009.

5      Thank you.

6      And in particular we're still in the "Risk of Harm"

7  section under the heading "For Serious Risk of Harm."  Could

8  you read the provision in B, which is also highlighted in blue?

9  And you can read the whole line there.

10 **A.**   Yes.  (reading)

11      "So one qualifies for a LOCUS score of 4 on this

12      dimension if one has a history of chronic, impulsive,

13      suicidal, or homicidal behavior or threats with current

14      expressions or behavior representing a significant

15      elevation from usual behavior."

16 **Q.**   And before we turn to the next thing, do you recall that

17 you were asked some questions also about the subject of

18 clinical judgment and the LOCUS?

19 **A.**   Yes.

20 **Q.**   And you recall, I think, that UBH's counsel asked you sort

21 of generally about the role of clinical judgment in placement

22 of a patient at the appropriate level of care and also that

23 same question with respect to the LOCUS.

24      And here's my question:  Does the treating physician's

25 exercising clinical judgment excuse that doctor from

1    considering the factors or dimensions required for patient

2    placement under generally accepted standards of care?

3    **A.**    No.

4    **Q.**    All right.  Let's turn now to page 653-009 and then the

5    second dimension, which is "Functional Status."

6    **A.**    (Witness examines document.)

7    **Q.**    And the provisions that are in yellow are the provisions

8    that were pointed out by UBH's counsel on Wednesday.  So take a

9    look at those and see if you recall being asked about that.

10   **A.**    (Witness examines document.)  Yes.

11   **Q.**    Okay.  And then would you read the portion in blue that

12   was not referred to last Wednesday?

13   **A.**    Sure.  (reading)

14        "This ability" -- and it's referring to the capacity

15        to fulfill social responsibilities, interpersonal

16        functioning, self-care -- "This ability should be compared

17        against an ideal level of functioning given an

18        individual's limitations or may be compared to a baseline

19        functional level as determined for an adequate period of

20        time prior to onset of this episode of illness.  Persons

21        with ongoing, long-standing deficits who do not experience

22        any acute changes in their status are the only exception

23        to this rule and are given a rating of 3.  If such

24        deficits are severe enough that they place the client at

25        risk of harm, they will be considered when rating

1        Dimension 1 in accord with the criteria elaborated there."

2    **Q.**    Okay.  Turn, please, to Dimension 3, which is entitled

3    "Medical, Addictive, and Psychiatric Comorbidity."

4    **A.**    (Witness examines document.)

5    **Q.**    Do you have that in front of you?  I think that's on

6    page 653-0011.

7    **A.**    Yes.

8    **Q.**    Okay.  And, again, the yellow is the part that was pointed

9    out on Wednesday, which says that (reading):

10           "Unless otherwise indicated, historical existence of

11           potentially interacting disorders should not be considered

12           in this parameter unless current circumstances would make

13           reactivation of those disorders likely.  For patients who

14           present with substance use disorders, physiological

15           withdrawal state should be considered to be medical

16           comorbidity for scoring purposes."

17        And could you read the portion in blue that immediately

18    precedes that that we didn't hear on Wednesday?

19    **A.**    Yes.  So this is addressing medical, addictive, and

20    psychiatric comorbidity (reading):

21           "This dimension measures potential complications in

22           the course of illness related to coexisting medical

23           illness, substance use disorder, or psychiatric disorder,

24           in addition to the condition first identified or most

25           readily apparent.  (Here referred to as the presenting

1    disorder.)   Coexisting disorders may prolong the course of

2    illness in some cases or may necessitate availability of

3    more intensive or more closely monitored services in other

4    cases."

5 **Q.**   Okay.  And if you could turn, please, to Dimension 5, and

6 that is on page 653-0016.

7 **A.**   Yes.

8 **Q.**   Do you have that in front of you?

9 **A.**   Yes.

10 **Q.**   And Number 5 is -- what dimension is that?  What is

11 Dimension 5?

12 **A.**   It assesses the response to treatment in the past, how

13 well someone has responded to treatments that have been

14 attempted.

15 **Q.**   Okay.  And, again, we've highlighted the part in yellow

16 that was identified on Wednesday under this dimension, and

17 could you read the part in blue?

18 **A.**   Yes.  (reading)

19        "While it is important to recognize that some clients

20    will respond well to some treatment situations and poorly

21    to others and that this may in some cases be unrelated to

22    level of intensity but, rather, to the characteristics and

23    attractiveness of the treatment provided, the usefulness

24    of past experience as one predictor of future response to

25    treatment must be taken into account in determining

**PLAKUN - REDIRECT / KRAVITZ**

 1          service needs."

 2   **Q.**   Thank you.

 3          In your opinion do the excerpts of the LOCUS identified by

 4   UBH present a full portrait of the instrument?

 5   **A.**   No, not at all.

 6   **Q.**   Okay.  And to get an accurate portrait, do you need to

 7   read, for example, other passages, such as the ones that have

 8   been highlighted in blue today?

 9   **A.**   Yes.

10   **Q.**   And just one more quick thing.  On the subject of

11   improvement, you were asked some questions about 1.8.2.  Do you

12   recall that?

13   **A.**   Yes.

14   **Q.**   Okay.  And you fully took into account 1.8.2 in developing

15   your opinions?

16   **A.**   Oh, yes.

17   **Q.**   Okay.  And did anything that you were shown today change

18   your view that 1.8 and its subparts refer to improvement in the

19   acute changes in symptoms?

20   **A.**   It did not change my conclusions.

21          **MR. KRAVITZ:**  Okay.  Thank you.  That's all.

22          **THE COURT:**  Okay.  Anything further?

23          **MR. RUTHERFORD:**  Nothing further, Your Honor.  Thank

24   you.

25          **THE COURT:**  Thank you, sir.  You can step down.

 1                          (Witness excused.)

 2          THE COURT:  Okay.  What's next?

 3          MR. RUTHERFORD:  Let me just check to see if I left my

 4   pen, Your Honor.

 5          THE COURT:  Yes, please.

 6          MR. KRAVITZ:  I stole it.

 7                          (Laughter)

 8          MR. ABELSON:  The plaintiffs call Josephine Duh.

 9       While she's coming in, a quick sealing matter.

10          THE COURT:  Yes.

11          MR. ABELSON:  So the parties moved to seal a number of

12   denial letter exhibits.

13          THE COURT:  Yeah.

14          MR. ABELSON:  In connection with preparing the summary

15   exhibit, some additional exhibits that are essentially

16   replacement exhibits have been prepared with new exhibit

17   numbers.  The parties agree that those new exhibit numbers

18   should be sealed for the same reasons set forth in the original

19   joint motion.  I can either list those exhibit numbers now

20   or --

21          THE COURT:  List those, please, because the motion is

22   granted, but I want the minutes to reflect what was sealed.  Go

23   ahead.

24          MR. ABELSON:  Okay.  All right.  Thanks.

25       So those exhibits, the new exhibits, that are subject to

**PLAKUN - REDIRECT / KRAVITZ**

1   the joint motion to seal are 2001, 2004, 2005, 2013, 2018,

2   2019, 2030 --

3         **THE CLERK:**  What is it again?

4         **MR. ABELSON:**  -- 2030, 2034, 2035, 2036, 2037, 2038,

5   and 2039.  Those are 13 additional documents.

6         **THE COURT:**  And those we're going to all agree to

7   seal; right?

8         **MR. HOLMER:**  No objection, Your Honor.

9         **THE COURT:**  Go ahead.

10        **MR. ABELSON:**  We call Ms. Duh.

11        **THE CLERK:**  Ms. Duh, before you have a seat, could you

12   please raise your right hand.

13                        <u>**JOSEPHINE DUH**</u>,

14   called as a witness for the Plaintiffs, having been duly sworn,

15   testified as follows:

16        **THE WITNESS:**  I do.

17        **THE CLERK:**  Okay.  Thank you.

18      Make sure you have a seat.  Make sure you pull the

19   microphone close to you for our court reporter.  Water there if

20   you should need it.  Okay?

21      Could you please state your full name for the record and

22   spell your last name.

23        **THE WITNESS:**  Sure.  My name is Josephine Duh.  My

24   name is spelled J-O-S-E-P-H-I-N-E, D-U-H.

25        **THE CLERK:**  Thank you.

1          THE WITNESS:  Thank you.

2                    **DIRECT EXAMINATION**

3  BY MR. ABELSON:

4  **Q.**   Good morning, Ms. Duh.

5        Were you asked to testify as an expert in this case?

6  **A.**   No, I was not.

7  **Q.**   What were you asked to do?

8  **A.**   I was asked to serve as a summary witness.

9  **Q.**   And by "serve as a summary witness," what do you mean?

10 **A.**   Essentially I provide factual information, in this case

11 related to the plan descriptions and denial letters or case

12 notes.

13 **Q.**   So those are the two categories of documents that you were

14 asked to summarize?

15 **A.**   Yes.

16 **Q.**   And you summarized those in some charts that you'll be

17 going through today?

18 **A.**   Yes.

19 **Q.**   Who did those -- whose plans and whose denial letters do

20 you understand that those pertain to?

21 **A.**   I understand that those plans and denial letters come from

22 the named -- the 10 named plaintiffs and a selection of class

23 members, and that selection was provided to me from counsel.

24 **Q.**   Were you given the names of those individuals?

25 **A.**   No.

**DUH - DIRECT / ABELSON**

1    **Q.**   So just identification numbers?

2    **A.**   Yes, that's correct.

3    **Q.**   So we'll get to those charts that you prepared in a moment

4    but, first, what's your educational background?

5    **A.**   I received my undergraduate degree from M.I.T., and I have

6    a Ph.D. in economics from Princeton.

7    **Q.**   Where are you employed?

8    **A.**   I currently work at the Brattle Group.

9    **Q.**   What's the Brattle Group?

10   **A.**   The Brattle Group is an economic consulting firm.

11   **Q.**   How long have you been employed at the Brattle Group?

12   **A.**   A little over -- I've been employed at Brattle a little

13   over three years.

14   **Q.**   And is attention to detail an important part of your work

15   at the Brattle Group?

16   **A.**   Yes.

17   **Q.**   Let's turn, first, to your review of the health benefit

18   plan documents that you were given.  If you could turn to Trial

19   Exhibit 892, which you had labeled at summary Exhibit A.

20   **A.**   (Witness examines document.)

21   **Q.**   Have you got it?

22   **A.**   Yes.  Thanks.

23   **Q.**   So what is Trial Exhibit 892?

24   **A.**   So 892 summarizes excerpts of key phrases from three

25   sections of the plan descriptions.

1   **Q.**   What are the key phrases that you were asked to include?

2   **A.**   A list of the key phrases can be found in the note

3   sections to this exhibit, and in particular it's the second

4   note.

5   **Q.**   So this is trial exhibit, page 892 -- sorry -- Trial

6   Exhibit 892, page 21; right?

7   **A.**   Yes.

8   **Q.**   That's Note Number 2 and the list of key phrases that

9   you're referring to is the list in Note 2 there?

10   **A.**   Yes.

11   **Q.**   Okay.  So you were given a list of key phrases, and what

12   were you asked to do with respect to those key phrases?

13   **A.**   I was asked to identify these excerpts in three sections

14   of the plan descriptions.  The three sections are -- actually,

15   if we flip to 892, page 2, and you see the three sections are

16   the three columns to the right.  So there's definitions of

17   covered health services, definitions of medically necessary,

18   and the exclusion section related to mental health and

19   substance use disorders.

20   **Q.**   I think you said this but just to be clear, how did you

21   decide what excerpts in those three areas to include on the

22   chart?

23   **A.**   I looked for the key phrases from -- as we had seen before

24   and pulled those out.

25   **Q.**   Okay.  And is there -- are there any other provisions,

1   other than the ones that contain those key phrases, that you

2   were asked to include on the chart?

3   **A.**   Yes.  So this chart also includes cross-references between

4   the three sections, and there are a couple instances in which

5   neither the key phrase nor the cross-reference was included.

6   However, there was some description and we included it just to

7   avoid a misleading impression that nothing was written there.

8   **Q.**   So let's look at the first line in summary Exhibit A,

9   first one to Trial Exhibit 225.  Do you see that?

10      So I'll direct your attention to the fourth column under

11  "Definitions for Covered Health Services."  And so is the last

12  bullet point in that box an example of the cross-references

13  that you referred to?

14  **A.**   Yes.

15  **Q.**   So it's a cross-reference from the covered health services

16  to the excluded-in section?

17  **A.**   Yes.

18  **Q.**   And, likewise, if you go to the --

19              **THE COURT:**  Show me.  Where is it?

20          **MR. ABELSON:**  I'm sorry.  The column entitled

21  "Definitions for Covered Health Services" corresponding to

22  Trial Exhibit 25, which corresponds to plaintiff Alexander's

23  plan.

24              **THE COURT:**  Yes.

25          **MR. ABELSON:**  So in that box it says "Defines covered

1   health services as, among other things, services that are," and

2   then there are two bullet points.

3            THE COURT:  The second bullet point?

4            MR. ABELSON:  So the second bullet is the one.

5            THE COURT:  Okay.

6   BY MR. ABELSON:

7   Q.   And then directing your attention similarly to the

8   exclusions column for that plan, do you see the last three

9   lines in that box?  Is that another example of one of these

10  cross-references that you referred to?

11  A.   Yes.  That's an example of a cross-reference from the

12  exclusion section to the covered health service.

13  Q.   Okay.  And were you asked to make any judgment as to

14  whether the list of key phrases you were given were analogous

15  or synonymous with each other?

16  A.   No.

17  Q.   Were you asked to decide how those terms relate to other

18  provisions in the plans?

19  A.   No.

20  Q.   And what -- okay.

21       Let's just, as an example, walk through the plan that

22  corresponds to that first entry.  So if you could -- well,

23  before we turn to Exhibit 225, could you explain to the Court

24  what the numbers in the parentheses in the -- I'll call them

25  the substantive columns on the chart are?

**DUH - DIRECT / ABELSON**

1   **A.**   The numbers correspond to paginations related to the

2   exhibit.   So, for example, page 91 of Exhibit 225.

3   **Q.**   Okay.   So if we go to -- if we look on the chart, if we go

4   to Trial Exhibit 225, page 90, that's where you'd find that

5   language?

6   **A.**   Yes, for the covered health services.

7   **Q.**   So if we could go to page 225 -- Exhibit 225, page 90.

8   **A.**   (Witness examines document.)

9   **Q.**   And so this is the defined terms section of this plan; is

10   that right?

11   **A.**   Yes.

12   **Q.**   And so the definition that you're referring to in the

13   chart refers to this definition of covered health services at

14   the bottom?

15   **A.**   Yes.

16   **Q.**   And it continues on the next page, Trial Exhibit 225,

17   page 91; is that right?

18   **A.**   Yes, it continues onto the next page.

19   **Q.**   Now, on Trial Exhibit 892 for that entry, you also, then,

20   for the exclusions section refer to page 107 and 108 of Trial

21   Exhibit 225?

22   **A.**   Yes.

23   **Q.**   So let's go to Exhibit 225, page 107.

24   **A.**   (Witness examines document.)

25   **Q.**   And if we go back one page to 106.

1   **A.**    (Witness examines document.)

2   **Q.**    So what is this section that you pulled language from?

3   **A.**    So this is a section discussing exclusions for mental

4   health services.

5              **MR. ABELSON:**  Your Honor, I move Exhibit 892 into

6   evidence.

7              **MS. ROSS:**  No objection.

8              **THE COURT:**  It's admitted.

9        (Trial Exhibit 892 received in evidence)

10             **MR. ABELSON:**  We'll also move into evidence the

11  plaintiffs' plans that are identified in the chart, which are

12  Exhibits 225, 227, 231, 233, 235, 237, 239, 241, 243, and 245.

13             **MS. ROSS:**  No objection.

14             **THE COURT:**  It's admitted.

15       (Trial Exhibits 225, 227, 231, 233, 235, 237, 239,

16         241, 243, and 245 received in evidence)

17             **MR. ABELSON:**  And we'll also move into evidence the

18  plans for the claims sample members, which perhaps the easiest

19  way to identify these in the records are the rest of the trial

20  exhibit numbers identified in the leftmost column on Trial

21  Exhibit 892.

22             **MS. ROSS:**  No objection.

23             **THE COURT:**  Admitted.

24       (Trial Exhibits 1535, 1538 through 1542, 1544, 1546

25         through 1551, 1554, 1556 through 1561, 1563, 1566,

```
 1              1567, 1570 through 1572, 1578, 1580 through 1589,

 2              1592 through 1594, 1596 through 1606, 1608, 1611,

 3              1614, 1616, 1617, 1619, 1622 through 1625, 1628

 4              through 1631, 1633 through 1637, 1639, 1641 through

 5              1644, 1647, 1649 through 1651, 2000, 2002, 2003,

 6              2006, 2007, 2009 through 2011, 2014, 2016, 2017, 220

 7              through 2029, 2031 and 2032 received in evidence)
```

 8  **BY MR. ABELSON:**

 9  **Q.**   Ms. Duh, if you could turn to the next exhibit, which is

10  Exhibit 893.

11  **A.**   (Witness examines document.)

12  **Q.**   What is Exhibit 893?

13  **A.**   So Exhibit 893 sorts the plans from Exhibit A into four

14  groups.

15  **Q.**   And would you just summarize what those four groups are?

16  **A.**   So the four groups, the first one is that the key phrase

17  appeared in either the definition of covered health services

18  column from Exhibit A or in the definitions of medically

19  necessary column.  It did not appear in the exclusions column.

20       In Group B the key phrase appeared in the exclusions

21  column but not in the covered health services definitions nor

22  the medically necessary definitions.

23       In the third group, this is where the key phrase appeared

24  in both, exclusions and either the medically necessary or

25  covered health services.

1          And in the fourth group, there were three plans in which

2     the plan referred to medically necessary, but medically

3     necessary was not defined within that plan.

4     **Q.**   And these three -- these four categories were simply the

5     categories that counsel asked you to put the -- to categorize

6     the plans into?

7     **A.**   Yes.

8          **MR. ABELSON:**  Your Honor, we move Trial Exhibit 893

9     into evidence.

10         **MS. ROSS:**  No objection.

11         **THE COURT:**  It's admitted.

12      (Trial Exhibit 893 received in evidence)

13    **BY MR. ABELSON:**

14    **Q.**   Could you turn to the next exhibit, which is Trial

15    Exhibit 894?

16    **A.**   (Witness examines document.)

17    **Q.**   What is Trial Exhibit 894?

18    **A.**   So 894 summarizes excerpts from denial letters or case

19    notes with key phrases that are listed in the note section,

20    which is 894, page 18.  It's Note 1.

21    **Q.**   Again, those were the phrases that counsel identified for

22    you?

23    **A.**   Yes.

24    **Q.**   Okay.  Can you explain why there is a column for case

25    notes and not just a column for denial letters?

1  A.   There are some occasions in which we did not have a denial

2  letter for the denial of that given date.

3  Q.   Were there -- so I direct your attention to Trial

4  Exhibit 894, page 3, the second row corresponding to Trial

5  Exhibit 1290.  Do you see that?

6  A.   Yes.

7  Q.   Is that an example of what you were just saying where

8  there was no letter provided?

9  A.   That's correct, there wasn't a denial letter.  There is

10  case notes.

11          MR. ABELSON:  Your Honor, one moment.

12              (Pause in proceedings.)

13  BY MR. ABELSON:

14  Q.   If you would turn to Exhibit 1290.

15  A.   (Witness examines document.)

16  Q.   So just to explain, this is an excerpt from case notes and

17  this is the portion of the case notes that you used to include

18  on the chart?

19  A.   Yes, that's correct.

20  Q.   Okay.  Were there any instances in which you included

21  portions of the case notes other than an excerpt of a letter,

22  like in the example of 1290?

23  A.   There are instances where I pulled an excerpt from the

24  case notes.  It might be something like decision and rationale.

25  Q.   And did you include any portions of the letters or the

1  case notes related to the named plaintiffs or claim sample

2  members' clinical presentations or just references to the key

3  phrases that you were asked to identify?

4  **A.**  Just I identified references to the key phrases.

5  **Q.**  Both columns -- both Exhibit 892 and 894 there's a column

6  for unique ID; right?

7  **A.**  Yes.

8  **Q.**  And that corresponds to the ID for each claim sample

9  member in addition to the named plaintiffs as you explained

10 before?

11 **A.**  Yes.

12 **Q.**  And so if you were to look for unique ID on Exhibit 892,

13 that would be the plan that corresponds to the denial letter

14 for that unique ID on Trial Exhibit 894; right?

15 **A.**  Yes.

16      **MR. ABELSON:**  Your Honor, we move Trial Exhibit 894

17 into evidence.

18      **MS. ROSS:**  No objection.

19      **THE COURT:**  Okay.  It's admitted.

20   (Trial Exhibit 894 received in evidence)

21      **MR. ABELSON:**  Your Honor, we also move the trial

22 exhibits on which Exhibit 894 is based into evidence.  These

23 are the denial letter exhibits corresponding to the named

24 plaintiffs and the claim sample members, and these are -- the

25 trial exhibit numbers are the ones identified in the leftmost

1    column on Trial Exhibit 894.

2            **MS. ROSS:**  No objection.

3            **THE COURT:**  They're admitted.

4        (Trial Exhibits 226, 229, 232, 234, 236, 238, 240,

5            242, 244, 246, 1286 through 1289, 2033, 1290 through

6            1292, 1294 through 1300, 1302, 1303, 2019, 1304,

7            1305, 1307 through 1309, 1311 through 1320, 1322,

8            1325 through 1331, 1333 through 1338, 1340 through

9            1350, 2034, 1352, 1353, 1355 through 1358, 1360,

10           1361, 1364 through 1373, 2018, 1375 through 1381,

11           1383 through 1392, 2001, 2004, 2005, 2013, 2030, and

12           2035 through 2039 received in evidence)

13   **BY MR. ABELSON:**

14   **Q.**   Finally, Ms. Duh, I ask you to turn to Trial Exhibit 895.

15   **A.**   (Witness examines document.)

16   **Q.**   What is Trial Exhibit 895?

17   **A.**   Exhibit 895 identifies excerpts from the appeal denial

18   letters for the named plaintiffs.

19   **Q.**   Was there an appeal denial letter that you provided for

20   all of the named plaintiffs?

21   **A.**   No.  There -- as noted actually in the notes on page --

22   Exhibit 895, page 4, I did not have a denial letter from

23   Ms. Klein.

24   **Q.**   And in each of the -- as to each of the individuals listed

25   on Exhibits 894 and 895, was there a reference to one or more

 1   of the key phrases that you were asked to identify?

 2   **A.**   Yes, the key phrases did appear.

 3           **MR. ABELSON:**  Nothing further, Your Honor.

 4           **THE COURT:**  Cross-examination.

 5           **MR. ABELSON:**  Oh, I'm sorry.  I move that last

 6   Exhibit 895 into evidence.

 7           **MS. ROSS:**  No objection.

 8           **THE COURT:**  Okay.  It's admitted.

 9       (Trial Exhibit 895 received in evidence)

10           **MS. ROSS:**  Your Honor, may I approach and give the

11   witness a binder?

12           **THE COURT:**  After you give the law clerk a binder.

13                   (Pause in proceedings.)

14

15   ///

16                   <u>**CROSS-EXAMINATION**</u>

17   **BY MS. ROSS:**

18   **Q.**   Good morning, Ms. Duh.

19   **A.**   Good morning.

20   **Q.**   You testified on direct with respect to your chart number

21   Trial Exhibit 892.

22       Can we bring that up?  If we can turn to page 21 of

23   Exhibit 892, and specifically looking at Note 2 on this page.

24       You testified that you were given a list of key phrases;

25   is that right?

**DUH - CROSS / ROSS**

1  **A.**   Yes.

2  **Q.**   Who gave you that list?

3  **A.**   Counsel provided the list to me.

4  **Q.**   And you didn't exercise any judgment about the meaning of

5  those phrases or their relevance to this case; is that right?

6  **A.**   I did not.

7  **Q.**   And your summary Exhibit A, which is Trial Exhibit 892,

8  that omits other provisions of the plans; right?

9  **A.**   I focused on these key phrases listed here.

10 **Q.**   So except where those key phrases appear, you've omitted

11 other portions of the plans?

12 **A.**   And cross-references and other cases where either the

13 cross-reference or the key phrase didn't appear, and we just

14 included what the definition was to avoid making it seem like

15 there was nothing there.

16 **Q.**   So, for example, if there were other exclusions or

17 limitations listed in the plan, you did not include those

18 unless they included one of the key phrases or the

19 cross-reference that you've described?

20 **A.**   I was not asked to do so.

21 **Q.**   Okay.  And you testified that you're not an expert; is

22 that right?

23 **A.**   I am not an expert.

24 **Q.**   So you're not offering an opinion that these plans cover

25 all treatment that's consistent with generally accepted

1   standards of care; is that right?

2   **A.**   I am not opining on that.

3   **Q.**   And you're not offering an opinion that the provisions in

4   your Trial Exhibit 892 are the only provisions that define the

5   scope of coverage with respect to mental health and substance

6   use disorder services in these plans; is that right?

7   **A.**   I am not providing such an opinion.

8   **Q.**   Only that these particular words in your summary exhibit

9   appear on the cited pages; right?

10  **A.**   That's correct.

11  **Q.**   Let's look at your summary Exhibit C, which is Trial

12  Exhibit 894.

13  **A.**   (Witness examines document.)

14  **Q.**   And this is your summary relating to the denial letters

15  for the named plaintiffs and the sample members; is that right?

16  **A.**   Yes, that's correct.

17  **Q.**   And let's turn to page 0003 of Exhibit 894, and there's an

18  entry for Trial Exhibit Number 1291.  Do you see that?

19  **A.**   Yes.

20  **Q.**   And there in the box under "Denial Letter" you've included

21  in quotes (reading):

22          "Coverage is not available under your benefit plan

23      for the following reasons..."  There's a colon and then an

24      ellipsis.

25          "The rationale for this determination is based on,"

1        another ellipsis, "review of the UBH Coverage

2        Determination Guidelines for residential rehabilitation

3        for substance use disorders," and then another ellipsis.

4        Do you see that?

5   A.   Yes.

6   Q.   And those ellipses indicate that you've omitted other

7   language from the letter; is that right?

8   A.   Yes.

9   Q.   If we can take a look at Exhibit 1291, which is in the

10  binder I just handed you, and specifically at page 0001 of

11  Exhibit 1291.

12  A.   (Witness examines document.)

13  Q.   And is this the denial letter that you are capturing in

14  your summary Exhibit 894 for the entry for Trial Exhibit 1291?

15  A.   Yes, this is the denial letter.

16  Q.   Okay.  And if we can look, then, at the fourth paragraph

17  of that letter, and we see the language that starts in the

18  second sentence.  It says (reading):

19            "The rationale for this determination is based on a

20        review of the behavioral health services that the member

21        is receiving and progress made, review of the Certificate

22        of Coverage, review of the UBH Coverage Determination

23        Guideline for residential rehabilitation for substance use

24        disorders, and a life conversation with a treating

25        provider designee."

**DUH - CROSS / ROSS**

1          Do you see that?

2     **A.**    Yes.

3     **Q.**    So you've omitted from your summary exhibit the part that

4     refers to the determination being based on the behavioral

5     health services received and the progress made; is that right?

6     **A.**    Yes.  I was asked to focus on the key phrase.

7     **Q.**    Okay.  And you've also omitted the part that says that the

8     coverage determination is based on a review of the member's

9     Certificate of Coverage; right?

10    **A.**    Yes.

11    **Q.**    You've also omitted the part that says that the coverage

12    determination was based on a live telephone interview with the

13    doctor's designee; right?

14    **A.**    Yes.

15    **Q.**    And you've also omitted the sentence at the end of the

16    paragraph that reads, "Partial hospitalization is the

17    alternative treatment offered"; right?

18    **A.**    Yes.

19    **Q.**    Let's look back at Trial Exhibit 894.  Turning to page 4,

20    there's an entry for Trial Exhibit 1299.

21    **A.**    (Witness examines document.)

22    **Q.**    And, again, here in the denial letter column you have an

23    entry that reads (reading):

24              "Coverage is not available under your benefit plan

25         for the following reasons..."  There's an ellipsis.

1           "The rationale for my decision to issue a noncoverage

2        determination is based on," ellipsis, "review of UBH

3        Coverage Determination Guidelines for residential

4        rehabilitation for substance use disorders."

5        Do you see that?

6   **A.**   Yes.

7   **Q.**   And then there's a citation to Exhibit 1299, at pages 1

8   and 2; right?

9   **A.**   Yes.

10  **Q.**   Let's look at Exhibit 1299, at page 0002.

11       And, again, that ellipses indicates that you've omitted

12  other language from the letter; right?

13  **A.**   Yes.

14  **Q.**   So if we look at Exhibit 1299, beginning at the bottom of

15  page 1, and continuing on to page 2, it reads (reading):

16          "The rationale for my decision to issue a noncoverage

17       determination is based on a review of the behavioral

18       health services that you are receiving; a review of the

19       specific plan description for Delta Airlines Company;

20       review of UBH Coverage Determination Guidelines for

21       residential rehabilitation for substance use disorders,

22       and a live telephone interview with the doctor,

23       Dr. Schmidt."

24       Do you see that?

25  **A.**   Yes.

**DUH - CROSS / ROSS**

1  **Q.**   And, again, in your summary exhibit, Exhibit 894, you've

2  omitted the part of the letter that says the determination is

3  based on a review of the behavioral health services that the

4  member is receiving and the progress made; right?

5  **A.**   Yes.

6  **Q.**   And you're also admitted the part that says that the

7  coverage determination is based on a review of the member's

8  certificate of coverage or plan document?

9  **A.**   Yes.

10  **Q.**   And you've omitted the part that says the coverage

11  determination was based on a live phone interview with the

12  doctor's designee; right?

13  **A.**   Yes.

14  **Q.**   You've also omitted -- sorry.

15       And, in fact, let's go back to your summary Exhibit C,

16  which is Exhibit 894.

17       And it's true, is it not, that most of the exhibits on

18  this chart have ellipses indicating that you've omitted

19  information from the letters about the other bases for the

20  coverage decisions; right?

21  **A.**   Yes.  I was asked to focus on the key phrases.

22  **Q.**   Okay.  Let's look at your Trial Exhibit 895, which I

23  believe you testified is a summary of the appeal denial letters

24  for the named plaintiffs in this case.  Is that right?

25  **A.**   Yes.

1   Q.   And, again, this chart also includes ellipses throughout,

2   indicating that language in the letters has been omitted; is

3   that right?

4   A.   That's correct.   This exhibit also focuses on the key

5   phrases.

6   Q.   So, for example, let's look at the entry for Trial Exhibit

7   234, which appears at the bottom of page 1 of Exhibit 895.   And

8   here your summary reads (reading):

9          "I have completed an appeal review, ellipses.

10      Benefit coverage is not available for the following

11      reasons, ellipses.   Based on, ellipses, UBH Coverage

12      Determination Guidelines covering personality disorders,

13      outpatient treatment of obsessive compulsive disorder, and

14      outpatient treatment of bipolar disorder.   It is my

15      determination to uphold the previous noncoverage

16      determination."

17      And then there's a citation to Exhibit 234, at page 0013.

18   Do you see that?

19   A.   Yes.

20   Q.   So let's look at page 2 -- Exhibit 234, page 13.

21      Looking specifically at the sixth paragraph, the one that

22   begins "Based on."   And, in fact, the exhibit actually reads

23   (reading):

24          "Based on the available clinical information the

25      member's Certificate of Coverage for SSAI and UBH Coverage

 1          Determination Guidelines covering personality disorders,

 2          outpatient treatment, and obsessive compulsive disorder,

 3          and outpatient treatment of bipolar disorder, it is my

 4          decision to uphold the previous noncoverage

 5          determination."

 6          So, again, you have omitted that the decision is based on

 7    clinical information; is that right?

 8    **A.**    Yes.

 9    **Q.**    And you've omitted that the decision was based on the

10    Certificate of Coverage; right?

11    **A.**    Yes.

12    **Q.**    And your Exhibit 895 is limited to the named plaintiffs in

13    this case; is that right?

14    **A.**    That's correct.

15    **Q.**    So it does not include any information about whether any

16    of the sample members in the case, beyond the named plaintiffs,

17    appealed their noncoverage decisions or whether those appeals

18    upheld the original decision; is that correct?

19    **A.**    That's correct.   Exhibit D just focuses on the named

20    plaintiffs.

21          **MS. ROSS:**   No further questions.

22          **MR. ABELSON:**   Nothing further.

23          **THE COURT:**   Thank you.

24       (Witness excused.)

25          **THE COURT:**   Next.

1          **MR. KRAVITZ:**  Your Honor, it's going to take me one

2    second to switch binders.

3          **THE COURT:**  Okay.

4          **MR. KRAVITZ:**  Our next witness is going to be

5    Dr. Lorenzo Triana.  T-r-i-a-n-a.

6          **MR. RUTHERFORD:**  Your Honor, for this witness, there

7    are a few sealing issues that we'd like to address.

8          **THE COURT:**  Okay.  Let's address them.

9          **MR. HOLMER:**  Andrew Holmer.  H-o-l-m-e-r.

10         **THE COURT:**  Okay.  What's up?

11         **MR. HOLMER:**  Your Honor, it's our understanding that

12   on Dr. Triana's examination the plaintiffs intend to use a

13   number of exhibits for which UBH has moved to seal, and one

14   that was part of the -- or subject to the Court's previous

15   order on the parties joint motion to seal.

16       So our understanding is that 539, Exhibit 539 has already

17   been sealed by the Court.  We wanted to bring that to your

18   attention.

19         **THE COURT:**  Okay.

20         **MR. HOLMER:**  And Exhibits 439, 755, 798, and 850 are

21   subject to pending motions to seal.

22         **THE COURT:**  Okay.

23       Talk about them.  Are you going to use them?

24         **MS. REYNOLDS:**  Those are the -- those are the exhibits

25   we anticipate using that are subject to the motion to seal.

**PROCEEDINGS**

 1              **THE COURT:**  Okay.  And why do you want to seal them?

 2              **MR. HOLMER:**  Sure, Your Honor.

 3         So Exhibit 439 is a subject, we believe, to be

 4     attorney-client privilege.  This is an email chain between a

 5     number of folks at UBH, including Dr. Triana and Adam

 6     Easterday, who is in-house counsel for United, discussing -- so

 7     we submitted -- I believe Your Honor has redacted versions.  We

 8     redacted portions we believe are subject to the privilege

 9     because Mr. Easterday is either being asked for or providing

10     legal advice about UBH's obligations under the parity law

11     regarding a potential change to the guidelines.

12         And exhibit --

13              **MS. REYNOLDS:**  The --

14              **MR. HOLMER:**  I apologize, Your Honor.

15              **MS. REYNOLDS:**  There are portions that we don't have a

16     strong objection to on the grounds of privilege.  But the

17     redactions are -- include portions that we don't think are

18     privileged, including --

19              **THE COURT:**  Do you care?

20              **MS. REYNOLDS:**  No.

21              **THE COURT:**  Okay.  That's granted.

22              **MR. HOLMER:**  All right, your Honor.  Switch binders.

23              **THE COURT:**  439 portions are sealed.

24              **THE CLERK:**  439?

25              **THE COURT:**  Portions.

1          THE CLERK:  Portions are sealed?

2          THE COURT:  Yes.

3      MS. REYNOLDS:  Yes.

4          MR. HOLMER:  The next exhibit, Your Honor, is Exhibit

5   755.  And this -- this Exhibit has one very short redaction.

6   It's an email chain.  There's -- there's one particular

7   sentence, at the top of page 2, that we've sought to redact,

8   also based on the attorney-client privilege, where a member of

9   UBH's staff, I believe it's Dr. Triana, is conveying advice

10  that he received from the legal department regarding particular

11  limitations and UBH's Certificates of Coverage.

12         MS. REYNOLDS:  No objection to the redaction, Your

13  Honor.

14         THE COURT:  All right.  Granted portion of 755 to

15  seal.

16         MR. HOLMER:  Exhibit 798, Your Honor, is a

17  presentation.  Again, this is one that's redacted, not being

18  sought to be sealed in whole.

19      But this is a 2016 presentation given to UBH's, sort of,

20  higher-level management regarding business strategy for the

21  coming year.  Particularly there are a number of portions that

22  cite or provide information about the company's

23  per-member-per-month rates which are the prices that the

24  company charges its customers, employers, to manage their

25  health benefit plans.

1      That's information -- we submitted a few declarations on

2  this point -- but information that is widely regarded in the

3  insurance industry to be highly sensitive.

4      It's some of the most closely protected information in the

5  insurance business because that is the information that they

6  use in negotiations both with customers and with providers when

7  they're building out their network.  And it's information that

8  is current and could easily be used to undercut UBH in

9  competitive negotiations.

10      **MS. REYNOLDS:**  No objection, Your Honor.

11      **THE COURT:**  All right.  So there will be portions of

12  798 that are redacted.

13      **MR. HOLMER:**  Thank you, Your Honor.

14      And Exhibit 850, I believe, is the last one.  This,

15  Your Honor, is an Employee Performance Evaluation.  Again, we

16  haven't sought to seal the entire document.  We only sought to

17  seal the name of the employee.

18      **THE COURT:**  Any objection?

19      **MS. REYNOLDS:**  No.

20      **THE COURT:**  Name is sealed.

21      **MS. REYNOLDS:**  Thank you, Your Honor.

22      **MR. HOLMER:**  Thank you, Your Honor.

23      **THE CLERK:**  Dr. Triana, before you are seated, would

24  you please raise your right hand.

25  \\\

TRIANA - DIRECT / KRAVITZ

1                    **<u>LORENZO TRIANA</u>,**

2  called as a witness for the Plaintiffs, having been duly sworn,

3  testified as follows:

4          **THE CLERK:**  Thank you.

5      Have a seat.  Make sure you speak clearly into the

6  microphone for our court reporter.

7      Could you please state your full name for the record and

8  spell your last name.

9          **THE WITNESS:**  Yes.  Lorenzo Triana.  T-r-i-a-n-a.

10          **THE CLERK:**  Thank you.

11                    **<u>DIRECT EXAMINATION</u>**

12  BY MR. KRAVITZ:

13  **Q.**   Good morning, Dr. Triana.

14  **A.**   Good morning.

15  **Q.**   Hi.  My name is Carl Kravitz.  I'm one of the lawyers for

16  the plaintiffs in the class.  And I'm going to ask you some

17  questions.

18      And it's true that UBH designated you in this case to

19  testify as a -- what the lawyers call rule 30(b)(6) witness or

20  a corporate representative on certain topics?

21  **A.**   Yes.

22  **Q.**   And UBH also designated you as a nonretained in-house

23  expert witness; is that also true?

24  **A.**   Yes.

25  **Q.**   You were co-chair of UBH's BPAC, which was disbanded in

1   2016, the committee charged with the responsibility of

2   creating, reviewing, and revising the LOCGs and CDGs; is that

3   correct?

4   **A.**   Yes.

5   **Q.**   And BPAC stands for what?

6   **A.**   Behavioral Policy and Analytics Committee.

7   **Q.**   And in 2016, BPAC was disbanded; correct?

8   **A.**   Yes.

9   **Q.**   And, at that point, you became co-chair of UBH's

10  Utilization Management Committee; is that true?

11  **A.**   Yes.

12  **Q.**   And the Utilization Management Committee took on the

13  responsibility of creating, reviewing, and revising the LOCGs

14  and CDGs that had previously been the responsibility of the

15  BPAC?

16  **A.**   Yes.

17  **Q.**   Okay.  And it's true that you've been working at UBH since

18  2005 or 2006; is that right?

19  **A.**   Yes.

20  **Q.**   And that's when Pacific Care merged into UBH?

21  **A.**   Correct.

22  **Q.**   And you became the senior director of medical behavioral

23  operations in 2016; is that right?

24  **A.**   The senior vice president of Behavioral Medical

25  Operations.

TRIANA - DIRECT / KRAVITZ

1    Q.    Thank you for that correction.

2          And you've held that position since 2010?

3    A.    Yes, sir.

4    Q.    And in that position, UBH regional medical directors who

5    make and supervise clinical coverage decisions report directly

6    to you.  Is that true?

7    A.    The senior medical directors and the clinical operations

8    report directly to me.

9    Q.    Right.

10         And they make and supervise clinical coverage decisions;

11   is that correct?

12   A.    Yes.

13   Q.    And UBH's medical director peer reviewers report to the

14   region medical directors; is that true?

15   A.    Yes.

16   Q.    And I think we already covered, those peer reviewers make

17   clinical coverage decisions; correct?

18   A.    Yes.

19   Q.    Andrew Martorana, who is sitting in the courtroom, is a

20   regional medical director; is that right?

21   A.    Yes.

22   Q.    And he reports to you; is that correct?

23   A.    Yes, sir.

24   Q.    And Danesh Alam reports to Dr. Martorana; is that correct?

25   A.    I think that's changed.

1    **Q.**    He did report to Dr. Martorana?

2    **A.**    He did report to Dr. Martorana.

3    **Q.**    Okay.  And you understand that both Dr. Martorana and

4    Dr. Alam have been designated as experts in this case?

5    **A.**    Yes.

6    **Q.**    And just to get this on the record, you have a medical

7    degree; correct?

8    **A.**    Yes, sir.

9    **Q.**    And so you're properly called "Dr."?

10   **A.**    Yes, sir.

11   **Q.**    And you're a psychiatrist; right?

12   **A.**    Yes, sir.

13   **Q.**    Now, it's true that in addition to being an in-house

14   claims reviewer and supervisor of claims reviewers at UBH, you

15   have a private practice as a psychiatrist?

16   **A.**    I do.

17   **Q.**    And you've maintained that for a number of years; correct?

18   **A.**    Yes, sir.

19   **Q.**    And you provide outpatient services in your private

20   practice; is that true?

21   **A.**    Yes, sir.

22   **Q.**    And it's also true that you don't do much therapy; but,

23   instead, the bulk of your practice is medication management?

24   **A.**    Yes, sir.

25   **Q.**    Your good estimate is that you have more than 50 private

**TRIANA - DIRECT / KRAVITZ**

1  practice patients; is that correct?

2  **A.**   Yes.

3  **Q.**   And some of those patients you've been seeing for quite a

4  long time; right?

5  **A.**   Yes.

6  **Q.**   Now, so looking at your patients, some come in, many of

7  their problems are resolved, and they go away; right?  That

8  would describe some of your patients?

9  **A.**   Yes.

10  **Q.**   And some receive treatment, go away for a while and come

11  back, often after a lengthy period of time; is that also true?

12  **A.**   Yes.

13  **Q.**   And whether patients come back depends, in part, on where

14  they are in their recovery; is that right?

15  **A.**   Yes.

16  **Q.**   And you know from your experience that ongoing mental

17  illnesses can persist for a long time.  True?

18  **A.**   Yes.

19  **Q.**   And ongoing mental illness is not necessarily cured when

20  an acute episode is stabilized; is that true?

21  **A.**   Yes.

22  **Q.**   And it's also true that you do not take insurance in your

23  private practice; right?

24  **A.**   Yes.

25  **Q.**   And one of the reasons is that if you take insurance, you

**TRIANA - DIRECT / KRAVITZ**

1  need a claims operation and it is more complicated; right?

2  **A.**    Yes.

3  **Q.**    So you don't have to deal with the situation where you

4  make a treatment recommendation and then an insurance company

5  refuses to pay?

6  **A.**    That's not accurate.

7  **Q.**    You don't take insurance, do you?

8  **A.**    No.

9  **Q.**    So sometimes your patients submit a claim and then the

10  insurance company says no; is that correct?

11  **A.**    Yes.

12  **Q.**    Right.  But you don't have a claims operation that does it

13  for them?

14  **A.**    No.

15  **Q.**    And turning back to the BPAC for a minute, just to get

16  this clear, you were a member and a co-chair of that committee

17  from the time it started in 2010; true?

18  **A.**    Yes.

19  **Q.**    And you were a member and co-chair until it was disbanded

20  in 2016; right?

21  **A.**    Yes.

22  **Q.**    Okay.  And you were co-chair, first, with Maria Sekac.

23        Did I pronounce that right?

24  **A.**    Sekac.

25  **Q.**    Sekac.  Sorry.

1          That's correct?

2    **A.**    Yes, sir.

3    **Q.**    And then with Mr. Niewenhous; correct?

4    **A.**    Yes.

5    **Q.**    And, also, Mr. Niewenhous and Dr. Bill Bonfield were both

6    on the committee from beginning to end; is that also true?

7    **A.**    Yes.

8    **Q.**    There was a representative of the Affordability Department

9    on the BPAC; is that correct?

10   **A.**    Yes.

11   **Q.**    And that was Pete Brock for a while and then later Nisha

12   Patterson?

13   **A.**    Yes.

14   **Q.**    And Fred Motz, from the Finance Department, was also on

15   the BPAC; is that true?

16   **A.**    Yes.

17   **Q.**    It's also true that the BPAC would discuss the benefit

18   expense, or ben-ex, impact of changes to the guidelines if

19   someone felt that that subject should be discussed?

20   **A.**    It was not something that came up frequently at all.

21   **Q.**    Okay.  My question is:  The BPAC would discuss the benefit

22   expense of changes to the guidelines if someone felt that the

23   subject should be discussed; is that correct?

24   **A.**    Only if there was on rare occasions.

25   **Q.**    So if someone felt like it should be discussed, it was

1   discussed in the BPAC; correct?

2   **A.**   Yes.

3   **Q.**   And when there was a financial issue related to a

4   guideline, Fred Motz, from Finance, would participate; correct?

5   **A.**   Yes.

6   **Q.**   Also, in terms of the impact of a change to a guideline on

7   the average length of stay, or ALOS, that could have been

8   something that if someone in the committee had a concern about

9   that, that would be a good time to bring it up; correct?

10  **A.**   The BPAC didn't evaluate Utilization Management data like

11  that.

12  **Q.**   Okay.  And you consider ALOS Utilization Management data?

13  **A.**   Yes, sir.

14  **Q.**   Okay.

15          **MR. KRAVITZ:**  Your Honor, I'd like to refer to

16  Dr. Triana's deposition.  And, just for the record, he was

17  deposed over three days.  The first day has numbers that run

18  consecutively up to about 280.  And that I will refer to as

19  Volume 1.  The second and third days have numbers that run

20  consecutively, starting again at 1, but up to about 580.  Okay.

21  And that I will refer to as Volume 2, even though they are in

22  separate packets.  Okay?

23  **BY MR. KRAVITZ:**

24  **Q.**   And I am referring to Volume 2, at page 324, 5 to 13.

25  **A.**   Volume binder 2; is that correct?

1          **MR. KRAVITZ:**  I don't know what you have in front --

2     may I approach to make sure he's got the right thing in front

3     of him?

4          **THE COURT:**  He doesn't.

5          **MR. KRAVITZ:**  Oh, he doesn't have it.

6          **THE COURT:**  He should.

7          **MR. KRAVITZ:**  He shouldn't or should?

8          **THE COURT:**  He should.

9          **MR. KRAVITZ:**  Okay.  The Court's indulgence for a

10    moment.

11    **BY MR. KRAVITZ:**

12    **Q.**  Dr. Triana, just to help you out on this, this would be

13    the May 10, 2017, testimony you gave.

14        Would you turn, please, to page 324.  And I'm going to

15    focus on lines 5 to 13.

16          **THE COURT:**  Go ahead and read those.

17          **MR. KRAVITZ:**  I will.

18        **"Q.**  In the BPAC's discussions about proposed changes to

19        the Level of Care Guidelines, did anyone ever raise

20        potential impacts to average length of stay for any level

21        of care?

22        **"A.**  I don't recall a specific example.  That could have

23        been something that if somebody in the committee had a

24        concern about that would be the time to bring it up.

25    \\\

1 | BY MR. KRAVITZ:

2 | Q.   You gave that answer to that question?

3 | A.   Yes, sir.

4 | Q.   Okay.  Let's turn, now, to Trial Exhibit 339, please.

5 |      Do you have that in front of you?

6 | A.   Yes, sir.  339; correct?

7 | Q.   339.

8 | A.   Yes, sir.

9 | Q.   And that is an email with an attachment dated May 29,

10 | 2012, from Mr. Niewenhous to you and Ms. Sekac and -- I guess,

11 | just the two of you; is that correct?

12 | A.   Bruce Bobbitt from ECK.

13 | Q.   Correct.

14 |      And the subject is "Clinical Guideline Process"; correct?

15 | A.   Yes, sir.

16 |      MR. KRAVITZ:   Okay.  I move the admission of Exhibit

17 | 339 into evidence.

18 |      MR. RUTHERFORD:   No objection, Your Honor.

19 |      THE COURT:   It's admitted.

20 |      (Trial Exhibit 339 received in evidence.)

21 | BY MR. KRAVITZ:

22 | Q.   And if you will turn, please, to the page marked

23 | "339-0004."

24 |      Do you have that in front of you?

25 | A.   Yes, sir.

1  **Q.**   Okay.  And that is a page that says "Optum Clinical

2  Guidelines Current State of Guideline Process - Part 1, May 15,

3  2012."  Correct?

4  **A.**   Yes, sir.

5  **Q.**   And if you would go to page Exhibit 339-0005.  It's the

6  next page in the PowerPoint.  Okay.

7      Do you have that in front of you?  It says "Objectives of

8  the Presentation."

9  **A.**   Yes.

10 **Q.**   And if you look down the page, about three-quarters of the

11 way down, it says "BPAC is responsible" -- it's down a little

12 bit.  Next bullet.  There you go.

13         "BPAC is responsible for promoting consistent

14     application of approved guidelines."

15     Do you see that?

16 **A.**   Yes.

17 **Q.**   I read that properly?

18 **A.**   Yes.

19 **Q.**   And then it gives two sub-bullets, giving some detail to

20 that.  Correct?

21 **A.**   Yes, sir.

22 **Q.**   And the first is (reading):

23         "Ensuring the dissemination of the guidelines to the

24     organization."

25     Correct?

1   A.   Yes.

2   Q.   And the second is (reading):

3          "Assessing and ensuring the consistency of benefits

4        management processes with medical plans to satisfy

5        nonquantitative parity requirements."

6        Do you see that?

7   A.   Yes.

8   Q.   Okay.  Now, one purpose of the guidelines is to help

9   ensure that people making clinical coverage determinations will

10  do so in a consistent way; correct?

11  A.   Yes.

12  Q.   And, in fact, you expect consistency in the application of

13  the guidelines; right?

14  A.   Yes.

15  Q.   And if you would turn to page 10 in Exhibit 339.  That is,

16  for the record, the trial exhibit page-0010.

17       And if you look about two-thirds of the way down the page,

18  the third -- yes, "Guideline Interdependencies."  Thank you.

19       Do you see it says "Guideline Interdependencies"?  Do you

20  see that?

21  A.   Yes.

22  Q.   And it says under that (reading):

23          "The Coverage Determination Guidelines and the Level

24        of Care Guidelines are heavily interdependent."

25        Did I read that right?

**TRIANA - DIRECT / KRAVITZ**

1   A.   Yes, sir.

2   Q.   And then it says "Keeping Them in Sync is Important."  Do

3   you see that.

4   A.   Yes.

5   Q.   And I read that properly?

6   A.   Yes, sir.

7   Q.   Okay.  Let's move onto the topic of how UBH uses the LOCGs

8   and CDGs in denying coverage.  Okay?

9   A.   Yes, sir.

10  Q.   It's true UBH cannot make a clinical noncoverage

11  determination without citing a guideline; is that correct?

12  A.   That is correct.

13  Q.   And it's also true that UBH administers thousands of

14  behavioral health plans?

15  A.   I don't know the total number of plans.

16  Q.   But you know it's well into the thousands; right?

17  A.   It's a significant number; but I don't know the exact

18  number.

19  Q.   So you don't know that there are 3,000 plans involved in

20  this case alone?

21  A.   I know that there's thousands, but I don't know how many.

22  Q.   Okay.  And it's true that UBH has one Utilization

23  Management Program Description at any one time for

24  administering commercial plans?

25  A.   The Utilization Management Program Description is for a

TRIANA - DIRECT / KRAVITZ

1   variety -- for all the plans.

2   **Q.**   Yes.  And there's one at a time; right?

3   **A.**   Yes.

4   **Q.**   And the Utilization Management Program Description is

5   sometimes called the UMPD?

6   **A.**   Yes.

7   **Q.**   So if I use that term, you'll know what I'm talking about?

8   **A.**   Yes.

9   **Q.**   And it's also true that UBH has one standard set of

10  guidelines for use on the commercial side of its business?

11  **A.**   Yes.

12  **Q.**   Let's turn, please, to Exhibit 798.

13          **MR. RUTHERFORD:**  Your Honor, to the extent they're

14  going to be displaying this sealed document, we ask that they

15  display the redacted version.

16          **THE COURT:**  Yes.

17          **MS. REYNOLDS:**  Your Honor, I don't believe we're going

18  to be displaying the portions that are redacted.

19          **MR. KRAVITZ:**  I'm going to show something on page 5

20  and page 6.  I don't want to make a mistake here.

21          **THE COURT:**  Are the redactions on 5 or 6?

22          **MR. RUTHERFORD:**  We left our excerpts --

23          **MR. KRAVITZ:**  I don't want to screw it up.

24          **MR. RUTHERFORD:**  It does not contain the sealed

25  portion.

 1              THE COURT:  Okay.

 2    BY MR. KRAVITZ:

 3    Q.   Okay.  So Exhibit 798 is an email from you to Nisha

 4    Patterson dated March 10, 2016; is that correct?

 5    A.   Yes.

 6    Q.   And the subject is "Forward Redesign Behavioral Health UM

 7    Process Workshop 1:  Current State"; right?

 8    A.   Yes.

 9              MR. KRAVITZ:  I move the admission of Exhibit 798.

10              MR. RUTHERFORD:  No objection, Your Honor.

11              THE COURT:  Admitted.

12         (Trial Exhibit 798 received in evidence.)

13    BY MR. KRAVITZ:

14    Q.   And please turn to page 0005 in Exhibit 798.

15    A.   Yes.

16    Q.   Okay.  And that is -- a document begins there that's

17    entitled "UM in Context.  William Bonfield M.D., M.P.H., 3-5-16

18    Executive Summary."

19         Do you see that?

20    A.   Yes.

21    Q.   Okay.  And I'd like to direct your attention to the one,

22    two, three, fourth paragraph down that starts "Utilization

23    Management."  And the document states (reading):

24              "Utilization Management and Case Management are two

25         powerful but very different tools for change.  The essence

**TRIANA - DIRECT / KRAVITZ**

1         of Utilization Management is a decision to pay or not pay

2         for a specific benefit, a service or level of care, for a

3         specific consumer based on the criteria of medical

4         necessity.  It focuses on changing provider behavior and,

5         in a carve-out environment, speciality mental health

6         benefits or medical/surgical benefits, not both."

7         I read that correctly?

8    A.   Yes.

9    Q.   Okay.  Turn, please, to page -- you know something?  I

10   think -- I misspoke before.  I believe the next thing I want to

11   read is on page 0007.  And I want to make sure that -- we're

12   good.  Okay.

13        Can you turn to page 0007.

14   A.   Yes.

15   Q.   Okay.  And then if you go down to the bottom paragraph on

16   that page, do you see where it says (reading):

17        "The essence of Utilization Management is using the

18        power to pay or not pay to change provider behavior for a

19        specific consumer.  Utilization Management focuses

20        primarily on the provider.  It is applied one consumer at

21        a time but it is possible to change provider behavior for

22        populations using Utilization Management."

23        I read that correctly, as well, did I not?

24   A.   Yes.

25   Q.   Okay.  And we've touched on the subject of UMPDs.  And, in

**TRIANA - DIRECT / KRAVITZ**

1   fact, the UMPD is actually a manual; correct?

2        There's a document that's called the Utilization

3   Management Program Description; right?

4   **A.**   Yes.

5   **Q.**   Okay.  And it's UBH's National Utilization Management

6   Committee that creates the UMPD document; is that correct?

7   **A.**   The Utilization Management Committee, yes.

8   **Q.**   And the purpose of the document is that it outlines UBH's

9   processes for managing the behavioral health benefit; is that

10  correct?

11  **A.**   Yes.

12  **Q.**   And Utilization Management is the process by which

13  requests for service or requests for coverage are evaluated;

14  correct?

15  **A.**   Yes.

16  **Q.**   And the UMPD -- and I'm referring to the documents now --

17  are used primarily, but not exclusively, by people inside UBH;

18  is that correct?

19  **A.**   Yes.

20  **Q.**   And the UMPD are also reviewed by UBH's accreditation

21  agencies; is that correct?

22  **A.**   They're used in -- by the accreditation agencies that

23  accredit UBH, yes.

24  **Q.**   They look at them; right?

25  **A.**   Correct.

**TRIANA - DIRECT / KRAVITZ**

1   **Q.**   Could you turn, please, to Trial Exhibit 259.

2        Do you have that in front of you?

3   **A.**   Yes, sir.

4   **Q.**   Okay.  And that's a cover email from John Beaty.

5        Did I say that right?

6   **A.**   Beaty.

7   **Q.**   Sorry.

8        From John Beaty to Mr. Niewenhous, "Subject: UMPD Signed."

9   And then the attachment is the 2014 UBH UMPD; is that correct?

10  **A.**   Yes.

11           **MR. KRAVITZ:**  Okay.  I move the admission of Exhibit

12  259.

13           **MR. RUTHERFORD:**  No objection, Your Honor.

14           **THE COURT:**  It's admitted.

15       (Trial Exhibit 259 received in evidence.)

16  **BY MR. KRAVITZ:**

17  **Q.**   And if you turn to page 4.

18  **A.**   Yes.

19  **Q.**   And I'm referring to the trial number.

20       You see that there's signatures on that page?

21  **A.**   Yes, sir.

22  **Q.**   Okay.  And you've signed this document; is that correct?

23  **A.**   I did.

24  **Q.**   On 2/17/2014?

25  **A.**   Yes.

1   Q.   And the other signatories were Pete Brock and Bill

2   Bonfield?

3   A.   Yes.

4   Q.   And you agreed that Exhibit 259, which is the 2014 UMPD,

5   sets forth the company's policies for that year with respect to

6   the use of the LOCGs and CDGs?

7   A.   It says the policies for our Utilization Management

8   Program, of which the LOCGs and CDGs are a part of.

9   Q.   If you would turn, please, to trial exhibit page 0008 in

10   259.

11        And do you see that halfway down the page there is a

12   heading that says "Scope of the Utilization Management

13   Program"?

14        Do you see that?

15   A.   Yes.

16   Q.   And then it says (reading):

17           "This Utilization Management Program Description

18       applies to all commercial and public sector business

19       managed by Optum."

20        Do you see that?

21   A.   Yes.

22   Q.   And "Optum" would refer to UBH?

23   A.   Yes.

24   Q.   Turn you, please, to page -- trial exhibit page 0011.  And

25   this is the beginning of a section on Utilization Management

 1    processes definitions.

 2         Do you see that?

 3    **A.**    Yes.

 4    **Q.**    And then there's a Footnote 1 on Definitions.  Do you see

 5    that?

 6    **A.**    Yes.

 7    **Q.**    And that provides (reading):

 8              "Definitions reflect the Care Advocacy Policies and

 9         Procedures Definition List, approved 12/13."

10         Do you see that?

11    **A.**    Yes.

12    **Q.**    Turn to the next page, which is Exhibit page 0012.

13         Do you have that in front of you?

14    **A.**    Yes.

15    **Q.**    And there's a definition on that page for "Concurrent

16    Review"; correct?

17    **A.**    Yes.

18    **Q.**    And the "Concurrent Review" definition is a review for an

19    extension of an ongoing course of treatment over a period of

20    time; correct?

21    **A.**    Correct.

22    **Q.**    So that's a review after the treatment has begun; correct?

23    **A.**    Correct.

24    **Q.**    As opposed to a preauthorization consideration; right?

25    **A.**    Correct.

1   Q.   And then if you go down to -- sorry about that.  Let me
2   start again.
3        If you move down the page a little bit, you see that
4   there's a definition of "Denial"?
5   A.   Yes.
6   Q.   Okay.  And, just for the record, I'm still on page 0012.
7   And that definition of "Denial" provides:
8            "Nonauthorization of care or service based on either
9        medical appropriateness or benefit coverage.  There are
10       two categories of denials, clinical and administrative."
11       Then there's a sub-bullet that says:
12           "Clinical Denial:  A nonauthorization that involves a
13       clinical decision."
14           Then there's a second bullet that says:
15           "Administrative Denial:  A nonauthorization that is
16       based upon the member's benefit coverage, and does not
17       require clinical decision-making."
18       Do you see that?
19   A.   Yes.
20   Q.   Have I read that properly?
21   A.   Yes.
22   Q.   Okay.  Turn to page 13 of this document.  That has a trial
23   numbering 0013.
24       And you see that towards the top of that page there's a
25   definition of "External Reviewer."

**TRIANA - DIRECT / KRAVITZ**

1   **A.**   Yes.

2   **Q.**   Okay.  And that provides:

3            "A non-Optum-employed peer reviewer with competency

4        in the same or similar specialty area with an active

5        unrestricted license.  External reviewers do not make

6        determinations - they make recommendations as to whether a

7        request for services meets relevant these criteria.  An

8        Optum peer reviewer reviews the recommendations of an

9        external reviewer and makes a determination."

10       I read that properly, as well, did I not?

11  **A.**   Yes.

12  **Q.**   Okay.  And then if you go down the page to "Guidelines,

13  Coverage Determination," do you see that definition?

14  **A.**   Yes.

15  **Q.**   And that provides:

16           "The coverage determinations are a set of guidelines

17       that standardize the interpretation and application of the

18       terms of the benefit plan."

19       Correct?

20  **A.**   Yes.

21  **Q.**   And then the next one is "Guidelines, Level of Care";

22  right?

23  **A.**   Yes.

24  **Q.**   And that provides (reading):

25           "The Level of Care Guidelines are clinically-based

1          indicators developed to assist care advocacy personnel

2          with making benefit decisions about appropriate levels of

3          care for individual members."

4          Did I read that right?

5     A.   Yes.

6     Q.   Okay.  And turn, please, to page 14.  That's 0014.

7          And do you see there that there is a definition of

8     medical -- strike that.

9          Do you see there's a definition of "Medically Necessary"?

10    A.   Yes.

11    Q.   Yes.  And that provides:

12             "Services provided for the purpose of preventing,

13        evaluating, diagnosing or treating a mental illness or

14        substance use disorder, or its symptoms that are all of

15        the following:" and then there are four bullets?

16    A.   Yes.

17    Q.   And the first is:

18             "In accordance with generally accepted standards of

19        medical practice"; right?

20    A.   Yes.

21    Q.   And that would be saying that they have to be in accord

22    with generally accepted standards of care.  Same idea?

23    A.   Yes.

24    Q.   Okay.  And then the next one is (reading):

25             "Clinically appropriate, in terms of type, frequency,

**TRIANA - DIRECT / KRAVITZ**

```
 1         extent, site, and duration, and considered effective for

 2         the mental illness substance use disorder or its

 3         symptoms"; right?

 4    A.   Yes.

 5    Q.   And that's also referring to generally accepted standards;

 6    correct?

 7    A.   Yes.

 8    Q.   And then the third one is:

 9              "Not mainly for the member's convenience or that of

10         the member's doctor or other healthcare provider"; right?

11    A.   Yes.

12    Q.   And the last one is:

13              Not more costly than an alternative drug, service or

14         supply that is at least as likely to produce equivalent

15         therapeutic or diagnostic results as to the diagnosis or

16         treatment of the member's mental illness, substance use

17         disorder, or its symptoms': right?

18    A.   Yes.

19    Q.   Okay.  If you turn to page 0015.  And there's a definition

20    of "Peer Reviewer" on that page.

21         And we'll put the whole thing up.  I'd just like to focus

22    on the beginning and the end.  But there is some stuff in the

23    middle.

24         But peer reviewers -- well, I'll just read the whole thing

25    (reading):
```

1              "Peer reviewers are psychiatrists, certified

2        addiction medicine specialists and doctoral-level

3        psychologists who have competency in the same or similar

4        specialty area, and hold an active, unrestricted license.

5        A doctoral-level psychologist may serve as a peer reviewer

6        when the level of care is outpatient or intensive out

7        patient and a physician not providing treatment or when

8        the service is psychological or neuropsychological

9        testing.  Only a peer reviewer can make clinical denial.

10       Administrative denial can be made by a clinical operations

11       director/national director or his/her designee."

12       Do you see that?

13  A.   Yes.

14  Q.   Okay.  And a care advocate -- by the way, that's a term

15  you're familiar with, "care advocate"?

16  A.   Yes.

17  Q.   Okay.  And a care advocate can approve a claim or make an

18  administrative denial; is that right?

19  A.   They can approve the claim, yes.

20  Q.   They can approve it?

21  A.   Right.

22  Q.   But they can also make an administrative denial such as:

23  The request or claim for service falls within exclusion?

24  A.   Within an exclusion.

25  Q.   Yes.  So that would be administrative denial; correct?

1    A.   Yes.

2    Q.   And the care advocate can do that; is that correct?  The

3    care advocate as opposed to the peer reviewer --

4    A.   Correct.

5    Q.   Yes.  -- can make an administrative denial; right?

6    A.   Yes.

7    Q.   Okay.  But the care advocate cannot make a clinical

8    denial; is that correct?

9    A.   That is correct.

10   Q.   And a clinical denial can only be made by a peer reviewer

11   who is a psychiatrist or a Ph.D.-level psychologist; is that

12   also correct?

13   A.   That is correct.

14   Q.   Let's turn to page 0016 in Exhibit 259, please.

15        And there's a definition of "Role of the Appeal Reviewer."

16   Do you see that?

17   A.   Yes.

18   Q.   And there's a process for appealing claim denials; is that

19   correct?

20   A.   Yes.

21   Q.   And, in particular, I'd like to focus you on the -- it

22   says (reading):

23             "The appeal reviewer" -- and this is at the bottom of

24        the paragraph -- "is to base his or her decision on the

25        following."

1    Do you see that?

2  **A.**   Yes.

3  **Q.**   And then the first bullet has to do with any documents,

4  records, or written comments submitted by the treating

5  practitioner, member, or authorized representative.

6    Do you see that?

7  **A.**   Yes.

8  **Q.**   And then the second bullet says (reading):

9    "The Level of Care Guidelines, the Coverage

10   Determination Guidelines, the Psychological and

11   Neuropsychological Testing Guidelines, other clinical

12   guidelines required by contract or regulation, and/or

13   other relevant benefit coverage documents."

14   Do you see that?

15 **A.**   Yes.

16 **Q.**   And that is something that the appeal reviewer is to base

17 his or her decision on; correct?

18 **A.**   Correct.

19 **Q.**   Lets turn, now, to page 0018 in Exhibit 259.  And in

20 particular, I'd like to address your attention to the

21 definitions of "Coverage Determinations."

22   Actually, you know what?  I misspoke.

23   There's a new heading here on page 17, that says "Triage

24 and Referral."

25 **A.**   Yes.

**TRIANA - DIRECT / KRAVITZ**

1   **Q.**   Do you see that?

2   **A.**   Yes.

3   **Q.**   Okay.  Just to be accurate, it's under that heading.  And

4   then there's a subheading on 0018 for "Coverage

5   Determinations."

6        Do you see that?

7   **A.**   Yes.

8   **Q.**   I would like to focus on the first sentence of this.  And

9   it says (reading):

10           "All services that are determined to be covered are

11           documented in the member's electronic record."

12       Have I read that right?

13  **A.**   Yes.

14  **Q.**   Okay.  And it's true that UBH maintains electronic records

15  of services for services that it approves; is that true?

16  **A.**   Yes.

17  **Q.**   Okay.  And it's important that those records are accurate;

18  is that right as well?

19  **A.**   Yes.

20  **Q.**   And it's also important that they are complete; correct?

21  **A.**   Yes.

22  **Q.**   If you would turn, please, to page 19.  That would be 0019

23  in Exhibit 259.

24       And you see that there is a heading "Peer-to-peer Review

25  Determinations"?

**TRIANA - DIRECT / KRAVITZ**

1    **A.**    On what page?  I'm sorry.

2    **Q.**    I'm sorry.  0019.

3    **A.**    Oh, yes.

4    **Q.**    And the first sentence in the first paragraph under that

5    heading says (reading):

6              "In the event that the level or type of care

7         requested by the member, treating physician/practitioner,

8         or facility does not appear to meet the criteria outlined

9         in the Level of Care Guidelines, Coverage Determination

10        Guidelines, the Psychological and Neuropsychological

11        Testing Guidelines, or other clinical guidelines required

12        by contract or regulation, the care advocate is to forward

13        the case to a peer reviewer for clinical review, or is to

14        consult with an Optum medical director."

15        Did I read that right?

16   **A.**    Yes.

17   **Q.**    And then if you go down to the next paragraph, and then in

18   the middle it picks up, it talks about the role of the peer

19   reviewer.

20        Do you see that?  It starts "The role of the peer

21   reviewer."  I believe it's the second sentence.

22   **A.**    Yes, I found it, yes.

23   **Q.**    Okay.  Okay.  Sometimes it's -- I get lost in this

24   document too. (Reading:)

25             "The role of the peer viewer is to exercise clinical

**TRIANA - DIRECT / KRAVITZ**

1      judgment in reviewing the relevant information, and to

2      review the case against the pertinent Level of Care

3      Guidelines, Coverage Determination Guidelines,

4      Psychological and Neuropsychological Testing Guidelines,

5      or other clinical guidelines required by contract or

6      regulation, the member's benefit plan, available community

7      resources, and individual member need."

8      Do you see that?

9  **A.**   Yes.

10  **Q.**   Okay.  And I read that accurately?

11  **A.**   Yes.

12  **Q.**   And then below that there's a heading "Denials."

13      Do you see that?

14  **A.**   Yes.

15  **Q.**   It says (reading):

16          "A peer reviewer makes all clinical denials -- with

17      "clinical" underlined in the original -- "based on the

18      criteria outlined in the Level Of Care Guidelines,

19      Coverage Determination Guidelines, Psychological and

20      Neuropsychological Testing Guidelines, or any clinical

21      guidelines required by contract or regulation, the

22      member's benefit plan, available community resources, and

23      individual member need."

24      Did I read that right?

25  **A.**   Yes.

1   **Q.**   And then if you turn to page 0020, in Exhibit 259.  And,

2   in particular, I am making reference to the heading that says

3   "Written Notification of a Denial Includes the Following."

4       Do you see that?  Take your time.  It's on 0020.

5   **A.**   Yes.

6   **Q.**   Okay.  And the "Written Notification of a Denial" includes

7   the following.  Bullet one is:

8       "The specific level of care or service that is being

9       denied"; correct?

10  **A.**   Yes.

11  **Q.**   And then bullet two is -- as what the written notification

12  should concern, is the rationale for the denial.  And then the

13  first sub-bullet is (reading):

14      "In the case of a denial based on clinical

15      considerations, the rationale is to cite the Level of Care

16      Guidelines, the Coverage Determination Guidelines, the

17      Psychological and Neuropsychological Testing Guidelines,

18      or other clinical guidelines required by contract or

19      regulation, as appropriate, on which the denial was

20      based ..."

21      Do you see that?

22  **A.**   Yes.

23  **Q.**   And then goes on and talks about that the language should

24  be understandable and addresses the member's specific clinical

25  needs.

1          Do you see that?

2   A.   Yes.

3   Q.   I shouldn't say "needs."  "Presentation."

4   A.   That's the word.

5   Q.   "Presentation."

6          And then the second sub-bullet there is (reading):

7              "In the case of a denial based on administrative

8          considerations, the rationale is to cite the appropriate

9          section of the member's relevant plan documents on which

10         the denial was based."

11         Did I read that properly?

12  A.   Yes.

13  Q.   And so you'd agree that when a denial is for clinical

14  reasons, what we just read in this provision of the UMPD must

15  be included in the denial letter as a matter of UBH policy and

16  procedure?

17  A.   Yes.

18  Q.   And you agree that when UBH issues an adverse benefit

19  determination for lack of medical necessity, it means that a

20  peer reviewer concluded that the case did not meet the criteria

21  in UBH's LOCGs?

22  A.   Yes.

23  Q.   And when UBH makes a clinical coverage determination to

24  deny benefits, it means that a peer reviewer concluded that the

25  case did not meet the criteria and the applicable CDGs; is that

TRIANA - DIRECT / KRAVITZ

1    also correct?

2    **A.**    Correct.

3    **Q.**    And then once -- as I understand it, that UBH then, if

4    there has been such a determination sends the member the letter

5    notifying the member of the adverse benefit determination and

6    of the member's appeal rights; is that correct?

7    **A.**    Correct.

8    **Q.**    And the letter cites all the reasons for the adverse

9    benefit determination?

10   **A.**    No.

11   **Q.**    And the letter also cites the guideline that the adverse

12   benefit determination is based on?

13   **A.**    Yes.

14   **Q.**    And you said, "No"?

15   **A.**    I said, "No."

16   **Q.**    Oh, I didn't hear that.

17          So you said "no" to the question:  The letter also cites

18   the guideline that the adverse benefit determination is based

19   on?  You said "no" to that?

20   **A.**    I said "yes" to that.

21   **Q.**    Okay.

22          **MS. REYNOLDS:**  Prior question.

23          **MR. KRAVITZ:**  Prior question.  Okay.  Sorry.

24   **BY MR. KRAVITZ:**

25   **Q.**    And the letter cites all the reasons for the adverse

1  benefit determination.  That's what you said "no" to?

2  **A.**  Correct.

3           **MR. KRAVITZ:**  Okay.  Your Honor, I'd like to read from

4  Volume 2, page 579, 13 to 17, from his deposition.

5           **THE COURT:**  Go ahead.

6           **THE WITNESS:**  I'm sorry, what page?

7  **BY MR. KRAVITZ:**

8  **Q.**  579.  And that's obviously the second volume because the

9  first one doesn't go that high.  And I'm making reference to

10  lines 13 to 17.

11       Are you with me?

12  **A.**  Yes, sir.

13  **Q.**  Okay.

14       **"Q.**  And the letter sent to the member sets forth all the

15       reasons for the adverse benefit determination; right?"

16       Then there's an objection to form.

17       **"A.**  That is correct."

18       And you gave that answer to that question; right?

19  **A.**  Yes.

20  **Q.**  Dr. Triana, with respect to denials under ERISA plans --

21  and the first thing is, you're familiar with the term "ERISA"?

22  **A.**  I'm familiar with the term "ERISA."

23  **Q.**  Right.  And you know that some plans are ERISA plans;

24  correct?

25  **A.**  Correct.

1  **Q.**  So if there's a denial under an ERISA plan, you know that

2  ERISA requires UBH to set forth the specific reason or reasons

3  for the adverse benefit determination?

4  **A.**  Yes.

5  **Q.**  Now, I'd just like to identify UMPDs for other years.

6      So if you could turn to 258, please.

7          **THE COURT:**  Let's do that after our morning break.

8          **MR. KRAVITZ:**  Okay.

9          **THE COURT:**  So we'll take a ten-minute break.

10  Thanks, everyone.

11          **MR. KRAVITZ:**  Thank you.

12              (Recess taken at 10:32 a.m.)

13          (Proceedings resumed at 10:50 a.m.)

14          (Proceedings resumed at 10:50 a.m.)

15          **THE COURT:**  All right.  We're back on the record.

16  Proceed.

17          **MR. KRAVITZ:**  Okay.  Thank you.

18  **Q.**  Dr. Triana, it's true that the guidelines are not just in

19  the background but, in fact, the medical directors use the

20  guidelines to make their determinations?  Is that fair?

21  **A.**  Along with their clinical judgment.

22  **Q.**  Right.  It's true that they're not in the background and

23  that the medical directors use the guidelines to make their

24  determinations?  That's a true statement; right?

25  **A.**  They use -- the guidelines augment and are used to be

1   augmenting their sound clinical judgment.

2   **Q.**   Okay.  I'd like to read from Volume 2, page 271, 10

3   through 16.

4   **A.**   I'm sorry.  This binder?  Sorry.

5   **Q.**   I can't see what you're pointing at.

6   **A.**   You said 271?

7   **Q.**   Yes, sir.  No, no.  Not the exhibit.  Your deposition.

8   **A.**   Oh.

9   **Q.**   So, yeah, it would be the second volume.

10  **A.**   Okay.  Thank you.

11  **Q.**   Okay.

12  **A.**   (Witness examines document.)  Page 271?

13  **Q.**   Yes.  And lines 10 to 16 is what I am going to read.

14          **THE COURT:**  Why don't you go ahead and read them.

15          **MR. KRAVITZ:**  Can I read them?

16          **THE COURT:**  Yes.

17          **MR. KRAVITZ:**  Okay.

18          **THE WITNESS:**  I just found them.

19          **MR. KRAVITZ:**   (reading)

20      "**QUESTION:**  So the guidelines are not merely in the

21      background.  They are actually the criteria against which

22      UBH's peer reviewers make clinical coverage

23      determinations; correct?"

24      There's an objection.

25      "**ANSWER:**  The medical directors use the guidelines to make

 1          the determinations."

 2    **Q.**   You gave that answer to that question; correct?

 3    **A.**   Yes.

 4    **Q.**   If you could turn in your exhibit book to page 258 --

 5    page 258, excuse me -- to Exhibit 258, please.

 6    **A.**   (Witness examines document.)

 7    **Q.**   Do you have that in front of you?

 8    **A.**   Yes, sir.

 9    **Q.**   Okay.  And Exhibit 258 is the UBH UMPD for 2013; is that

10    correct?

11    **A.**   Yes, sir.

12          **MR. KRAVITZ:**  Okay.  I move the admission of

13    Exhibit 258.

14          **MR. RUTHERFORD:**  No objection, Your Honor.

15          **THE COURT:**  It's admitted.

16          (Trial Exhibit 258 received in evidence)

17    **BY MR. KRAVITZ:**

18    **Q.**   And that was the first year that UBH had a company-wide

19    UMPD; is that true?

20    **A.**   I don't recall.

21    **Q.**   If you would take a look at Exhibits 256 and 257, please.

22    **A.**   (Witness examines document.)  Yes.

23    **Q.**   Okay.  I just wanted --

24    **A.**   Sorry.  Yes.

25    **Q.**   -- to give you a chance.

1      And those are UBH's UMPD templates for 2011 and 2012; is

2  that true?

3  **A.**   Yes.

4  **Q.**   And in those years the Care Advocacy Centers adopted the

5  template or adopted a UMPD based on the template; is that

6  correct?

7  **A.**   That is correct.

8          **MR. KRAVITZ:**  Okay.  Move the admission of

9  Exhibits 256 and 257.

10         **MR. RUTHERFORD:**  No objection, Your Honor.

11     (Trial Exhibits 256 and 257 received in evidence)

12  **BY MR. KRAVITZ:**

13  **Q.**   And if you could look at Exhibits 261, which is the 2015

14  UMPD, and 262, which is the 2016 UMPD.

15  **A.**   So my 261 says the 2016 UMPD.

16  **Q.**   Okay.  All right.  Well, one is -- okay.

17     So we have -- oh, yeah.  I guess -- I'm sorry.

18     260 is 2015 -- my apologies -- 261 is 2016, and 262 is

19  2017.  If you could just confirm that that's what those

20  documents are.

21  **A.**   So, yes, 260 is the UMPD for 2015, 261 is the UMPD for

22  2016, and 262 is the UMPD for 2017.

23         **MR. KRAVITZ:**  Thank you.

24     I move the admission of 260, 261, and 262.

25         **MR. RUTHERFORD:**  No objection, Your Honor.

```
 1              THE COURT:  They're admitted.

 2         (Trial Exhibits 260, 261, and 262 received in

 3          evidence)

 4   BY MR. KRAVITZ:

 5   Q.   Let's move now to the subject of interrater reliability.

 6   Do you know that term?

 7   A.   Yes, sir.

 8   Q.   And sometimes it's referred to as IRR?

 9   A.   Yes.

10   Q.   And it's true that UBH conducts audits on an annual basis

11   to evaluate whether its reviewers are applying the LOCGs

12   consistently?

13   A.   Yes.

14   Q.   And that's called the interrater reliability process;

15   correct?

16   A.   Yes.

17   Q.   And that IRR process is the one that UBH uses to ensure

18   that the decisions that its clinicians are making are reliable

19   and consistent among themselves?

20   A.   Yes.

21   Q.   And the Quality Improvement Department is the one that

22   does the testing for the IRR process; is that correct?

23   A.   Yes.

24   Q.   And that the IRR gets calculated over a year's time frame;

25   is that also right?
```

1   **A.**   Yes.

2   **Q.**   And in terms of the testing for UBH's peer reviewers, for

3   example, the question would be whether the auditing physician

4   agreed or didn't agree with the medical director; is that true?

5   **A.**   Agreed in reviewing the same exact clinical information,

6   whether they agreed with the decision made by the original

7   medical director.

8   **Q.**   Correct.

9   **A.**   Yes.

10  **Q.**   Okay.  And is it true that UBH's clinicians -- and I'm

11  referring to the period 2011 through 2016 -- have very high

12  marks on interrater reliability?

13  **A.**   Yes.

14  **Q.**   I'd just like for you to look at Trial Exhibit 299.

15  **A.**   (Witness examines document.)  Yes.

16  **Q.**   And, I'm sorry, I'm making a mess here.

17      Okay.  And is 299 a September 2013 report on interrater

18  relibility?

19  **A.**   Yes.

20  **Q.**   Okay.  And you were one of the people in the company that

21  received the results of the IRR process; is that true?

22  **A.**   Yes.

23  **Q.**   And if you could look at page 2 of Exhibit 299.

24  **A.**   Yes.

25  **Q.**   And if you -- yes, if you could highlight that.

1          It says:  (reading)

2                "The overall rate of interrater reliability was

3          96.8 percent."

4          Do you see that?

5     A.   Yes.

6     Q.   And then it goes on to say that it exceeded the target of

7     90 percent.  Do you see that?

8     A.   Yes.

9               MR. KRAVITZ:  Okay.  I move the admission of 299.

10              MR. RUTHERFORD:  One moment, Your Honor.

11              THE COURT:  Uh-huh.

12                        (Pause in proceedings.)

13              MR. RUTHERFORD:  We have no objection.

14              THE COURT:  Okay.  It's admitted.

15         (Trial Exhibit 299 received in evidence)

16    BY MR. KRAVITZ:

17    Q.   And if you could -- we're going to go, just very quickly,

18    through 300, 301, and 302, which are the IRR reports for 2014,

19    2015, and 2016.  If you could take a look at those exhibits and

20    confirm that that's what they are.

21    A.   (Witness examines document.)  So Exhibit 300 is the 2014

22    interrater reliability measure report.

23    Q.   Yes.

24    A.   (Witness examines document.)  Exhibit 301 is the 2015

25    interrater reliability report.

 1          (Witness examines document.)  Exhibit 302 is the 2016

 2    interrater reliability measure report.

 3    **Q.**    Okay.

 4          **MR. KRAVITZ:**  And I move the admission of

 5    Exhibits 300, 301, and 302.

 6          **MR. RUTHERFORD:**  No objection, Your Honor.

 7          **THE COURT:**  They're admitted.

 8          (Trial Exhibits 300, 301, and 302 received in

 9           evidence)

10    **BY MR. KRAVITZ:**

11    **Q.**    And it's true that in those years the IRR was 98 percent

12    or greater and exceeded the 90 percent target?  You can check

13    if you want.  It's on page 2 of each document.

14    **A.**    Yes.  Thank you.

15          (Witness examines document.)  Would you repeat your

16    summary?  It was greater than?

17    **Q.**    Sure.  I think it was 98 percent in --

18    **A.**    Correct.

19    **Q.**    -- 2014.

20    **A.**    Right.  So in 2014 it was 98 percent, not greater than

21    98 percent.

22    **Q.**    And in '15 and '16 I think it was a little higher than

23    98 percent.

24    **A.**    Correct.  Correct.

25    **Q.**    And the target was 90 percent in those years as well?

1    **A.**    Yes, sir.

2    **Q.**    And then one more document -- well, let me ask you this:

3    There were also reports for 2011 and 2012; is that true?

4    **A.**    Yes.

5    **Q.**    Okay.  And your memory is that the company met its goals

6    for those years as well?

7    **A.**    Yes.

8    **Q.**    Okay.  And one more of these.  Exhibit 343.

9    **A.**    (Witness examines document.)

10   **Q.**    And that's the IRR report for 2012; is that correct?

11   **A.**    That is correct.

12         **MR. KRAVITZ:**  And I move the admission of 343.

13         **MR. RUTHERFORD:**  No objection, Your Honor.

14         **THE COURT:**  It's admitted.

15   (Trial Exhibit 343 received in evidence)

16   **BY MR. KRAVITZ:**

17   **Q.**    And if you just confirm on page 4 that the total correct

18   score or the IRR was 95.3.  It's in the first paragraph.

19   **A.**    Yes, it is.

20   **Q.**    Okay.  And would you agree that the results of the IRR

21   processes indicate that UBH's clinicians are and have been

22   applying the LOCGs consistently?

23   **A.**    Yes.

24   **Q.**    Now, I just want to ask you a couple -- a few questions

25   about another subject, which is you're aware of the words

**TRIANA - DIRECT / KRAVITZ**

1    "acute changes in signs and symptoms and/or psychosocial and

2    environmental factors defined as 'why now' leading to

3    admission"?  You're familiar with those terms?

4    **A.**   Yes.

5    **Q.**   And you know that those words appear in the guidelines for

6    a number of years?

7    **A.**   Yes.

8    **Q.**   Okay.  If you could turn to Exhibit 408, please.

9    **A.**   (Witness examines document.)  Yes.

10   **Q.**   And that's an e-mail.  The cover is an e-mail from Loretta

11   Urban to Dr. Bonfield, Mr. Niewenhous, and others; is that

12   correct?

13   **A.**   Yes.

14   **Q.**   And the subject is "Review of Changes to 2014 Level of

15   Care Guidelines"; right?

16   **A.**   Yes.

17   **Q.**   Okay.  And the date is 11/1/2013?

18   **A.**   (Witness examines document.)  Yes.

19   **Q.**   It's right up there.

20   **A.**   Yes.

21   **Q.**   Okay.  And then if you turn the page, you'll see that

22   there is a chart, and can you confirm that you recognize that

23   attachment as the summary of feedback concerning the words of

24   the 2014 guidelines, or proposed 2014 guidelines?

25   **A.**   Yes.  You're talking about beginning on 0004?

1    **Q.**   Yes, sir.  Thank you.

2    **A.**   Yes.

3    **Q.**   And if you could read -- sorry.

4          If you go to page 0008 in Exhibit 408 -- are you with me?

5    **A.**   Yes, sir.

6    **Q.**   -- and under the heading on the left, which we can carry

7    forward, but the first column to the right of "Common Criteria"

8    is the feedback column; is that correct?

9    **A.**   That is correct.

10   **Q.**   And at the top it says (reading):

11          "The idea of 'why now' is very clear for a

12          high-functioning person who has an episode of depression

13          or panic.  It is less clear for more chronic people who

14          seem to be going through one crisis after another."

15          Do you see that?

16   **A.**   Yes.

17   **Q.**   Okay.  And then the discussion point to the right, which

18   is under the heading of "Action," if you could go up to the

19   top, is (reading):

20          Paren, "Term 'why now,'" in quotes, "shows up 82

21          times throughout the guidelines so we should have a clear

22          definition, e.g., precipitating events versus 'why now.'

23          The 'why now' is the immediate cause for the member's

24          distress and the member's motivation for seeking treatment

25          at the current point in time."  Paren, "Clinician needs to

**TRIANA - DIRECT / KRAVITZ**

1          know immediate motive for seeking help.  Elements of the

2          member's current distress, intolerable changes in life

3          circumstances, relapse, or onset of new symptoms, actions

4          made to improve the situation.  This may address comments

5          of ambiguity.  We may also want to link and expand the

6          'why now' into evaluation and treatment planning sections

7          further," paren, "e.g., elicit the 'why now' from the

8          member set of circumstances that brings the member to

9          treatment now, et cetera, page 5."

10         Do you see that?

11    **A.**    Yes.

12    **Q.**    Did I read that properly?

13    **A.**    Yes.

14    **Q.**    Now, you participated in a discussion about these

15    comments; is that correct?

16    **A.**    Yes.

17    **Q.**    And that discussion occurred at the working group level?

18    **A.**    The Level of Care Work Group.

19    **Q.**    Yes.  And that work group reports to the BPAC?

20    **A.**    It doesn't report.  It's the found -- it's the work group

21    that's in charge of developing a draft of the guideline that

22    then gets presented to the BPAC.

23    **Q.**    Thank you.  I thank you for that clarification.

24         It's true that the BPAC or the working group didn't

25    recommend a revision to the "why now" language at that time?

1   **A.**   That is correct.

2   **Q.**   And none was adopted at that time; is that correct?  The

3   BPAC didn't adopt a revision at that time in 2014?

4   **A.**   No.

5   **Q.**   If you could turn to Exhibit 516, please.

6   **A.**   (Witness examines document.)

7   **Q.**   And that is a January 8th, 2016, e-mail to you,

8   Dr. Bonfield, Bruce Bobbitt, and Loretta Urban and it has to do

9   with 2016 standard guideline updates, changes to 2016

10  guidelines, 2016 guideline feedback revised.  Do you see that?

11  **A.**   Yes.

12          **MR. KRAVITZ:**  Okay.  I move the admission of 516 into

13  evidence.

14          **MR. RUTHERFORD:**  No objection.

15          **MR. KRAVITZ:**  And I can't remember whether I moved 408

16  in but if I didn't, I'd like to do that.

17          **MR. RUTHERFORD:**  And no objection to that either.

18          **THE COURT:**  Both admitted.

19      (Trial Exhibits 408 and 516 received in evidence)

20  **BY MR. KRAVITZ:**

21  **Q.**   And then the attachment is feedback for the 2016

22  guidelines; is that correct?

23  **A.**   Yes.

24  **Q.**   And if you would turn, please, to page 007 of Exhibit 516.

25  Do you see that?

**TRIANA - DIRECT / KRAVITZ**

1   **A.**    Yes.

2   **Q.**    And there's some feedback from a person called Axelson

3   from AACAP, which is the American Academy of Child and

4   Adolescent Psychiatry?

5   **A.**    Yes.

6   **Q.**    And also some organization called BSAC; is that correct?

7   **A.**    Yes.

8   **Q.**    What does that stand for?

9   **A.**    The Behavioral -- it's an internal group where we have our

10  specialty, and I think it's the Behavioral Specialty Advisory

11  Council.  That's what I think it stands for.

12  **Q.**    Okay.  And so it's an internal group to UBH?

13  **A.**    To UBH.

14  **Q.**    The BSAC; correct?

15  **A.**    Yes.

16  **Q.**    And Dr. Axelson sits on that as well?

17  **A.**    Yes.

18  **Q.**    And looking at his feedback, it says (reading):

19           "While I understand the focus on 'why now'

20      interventions, I am very concerned that the overemphasis

21      of this type of treatment has contributed to an

22      ineffective and inefficient overall treatment system.  I

23      am speaking from the perspective of 30 years of experience

24      working in and at times managing a full range of services

25      for children and adolescents.  From 1984 to 1989, I

**TRIANA - DIRECT / KRAVITZ**

1    developed and managed an integrated delivery system.  From

2    1990 to 1999 InterCare evolved to provide psychiatric care

3    on a full risk capitated basis for 115,000 lives supported

4    by commercial insurance plans and 25,000 lives that were

5    managed Medicaid supported.  The treatment teams in the

6    two hospitals that we owned and the psychiatrists that

7    were part of our PPO clearly understood that the goal was

8    to provide the intensity and duration of inpatient and

9    partial hospital services so that outpatient services are

10   likely to succeed, managing serious persistent psychiatric

11   illnesses, minimizing the negative impact on the

12   development process of children and adolescents and the

13   recovery goals of adults.  In our experience, a few extra

14   days of inpatient treatment to address issues of denial

15   and misunderstanding of illness and the need to make a

16   substantial commitment to outpatient treatment resulted in

17   overall lower cost of care.  Today I see repeated brief

18   'crisis stabilization' admissions that fail to lead to a

19   long-term commitment to outpatient psychiatric management.

20   If Optum is to be involved in the development of ACOs

21   where longer term effectiveness and efficiency is

22   rewarded, management processes will need to be flexible

23   enough to support extra efforts to increase patient and

24   family engagement."

25   Did I read that correctly?

TRIANA - DIRECT / KRAVITZ

 1   **A.**    Yes.

 2   **Q.**    And it's true, Dr. Triana, that you don't disagree with

 3   Dr. Axelson?

 4   **A.**    I don't disagree with Dr. Axelson.

 5   **Q.**    And it's true that UBH reviewed the guidelines with

 6   Dr. Axelson's comments regarding the overemphasis on "why now"

 7   in mind?

 8   **A.**    Yes.

 9   **Q.**    And the BPAC discussed the subject because what he said

10   was important; is that true?

11   **A.**    The Level of Care Guideline Work Group had that

12   discussion.

13   **Q.**    Oh.   I'm sorry.   Pardon me.

14        The Level of Care Work Group discussed the subject because

15   it was important?

16   **A.**    Yes.

17   **Q.**    And you'd agree that managing serious persistent

18   psychiatric illness is important?

19   **A.**    Yes.

20   **Q.**    And minimizing the negative impact on the developmental

21   process of children and adolescents and the recovery goals of

22   adults are all important as well?

23   **A.**    Yes.

24   **Q.**    And Dr. Axelson's observation that he sees repeated brief

25   crisis stabilization admissions that fail to lead to a

1   long-term commitment to outpatient psychiatric management, if

2   it's happening, is also an important issue?

3   **A.**    Yes.

4   **Q.**    And UBH did not make a change in the "why now" language

5   for 2016; is that correct?

6   **A.**    That is correct.

7   **Q.**    And, now, Dr. Bonfield, who was the company's internal

8   chief medical officer, was one of the people who developed

9   UBH's clinical vision; is that true?

10  **A.**    Yes.

11  **Q.**    And the "why now" concept was part of the company's

12  clinical vision?

13  **A.**    Yes.

14  **Q.**    And so in 2016, it was no surprise to you that

15  Dr. Bonfield was a supporter of "why now"; is that true?

16  **A.**    That is true.

17  **Q.**    And that it's also true that the "why now" was something

18  that Dr. Bonfield really wanted to emphasize; is that correct?

19  **A.**    Yes.

20  **Q.**    And you and Mr. Niewenhous didn't stand in the way of

21  keeping the "why now" for 2016; is that correct?

22  **A.**    I did not disagree with Dr. Bonfield.

23  **Q.**    Okay.  But it was -- the words at least were removed in

24  the 2016 guidelines in many places?

25  **A.**    Yes.

1   Q.   But my understanding is that there was a discussion at the

2   Utilization Management Committee on that subject but you didn't

3   attend; correct?

4   A.   For 2017?

5   Q.   For the 2017 guidelines.

6   A.   I was not present at that committee meeting.

7   Q.   And you have never seen any research or evidence with

8   respect to either removing or keeping the "why now" language;

9   correct?

10  A.   No, I have not.

11  Q.   I'd like to, if you could, turn to Exhibit 755.

12  A.   (Witness examines document.)

13  Q.   And the top e-mail on Exhibit 755 is from you to, I think,

14  Lyndon Good dated March 25th, 2014; is that right?

15  A.   Yes.

16  Q.   And what follows is an e-mail string of conversations

17  between you and him and your boss Keith Keytel and perhaps

18  others?

19  A.   Yes.

20  Q.   Okay.  And the subject has to do with, among other things,

21  developing a CDG?

22  A.   (Witness examines document.)  No, it wasn't about

23  developing a CDG.  It was looking at a benefit -- the potential

24  of a new benefit.

25  Q.   Okay.  And then if you did that, you'd have to develop a

 1    CDG; correct?

 2    **A.**    Yes.

 3              **MR. KRAVITZ:**   Okay.   I move the admission of 755.

 4                        (Pause in proceedings.)

 5              **MR. RUTHERFORD:**   One moment, Your Honor.

 6                        (Pause in proceedings.)

 7              **MR. RUTHERFORD:**   No objection.

 8              **THE COURT:**   Admitted.

 9         (Trial Exhibit 755 received in evidence)

10              **MR. KRAVITZ:**   And, Your Honor, this is one of the

11    documents that's got a little piece redacted.

12              **THE COURT:**   Okay.

13              **MR. KRAVITZ:**   I do want to bring it to your attention,

14    but I also don't want to violate your ruling.   So I understand

15    that the redacted version of the document will be in the public

16    record, but I'll do whatever the Court directs in terms of

17    reading that section that's redacted.

18              **THE COURT:**   What is the nature of the redaction?

19              **MR. KRAVITZ:**   It's a sentence that has to do with a

20    reference to legal advice.

21              **THE COURT:**   I'm not going to seal the courtroom for

22    that.

23              **MR. KRAVITZ:**   Does that mean I can read it?   I don't

24    want to tread on any ruling.

25              **THE COURT:**   No.   All I did was seal the exhibits.   The

 1   redaction is going to be in the exhibits.  No one requested

 2   that the courtroom be sealed.  In fact, I think the motion said

 3   "We're not requesting the courtroom be sealed," so proceed.

 4            **MR. KRAVITZ:**  Okay.  Thank you for that clarification.

 5            **MS. ROMANO:**  Your Honor, I don't think we understood

 6   that they would be read into the record with the open courtroom

 7   here.  It is attorney-client privilege communication.

 8            **THE COURT:**  Fine.  Overruled.

 9       Go ahead.

10   BY MR. KRAVITZ:

11   **Q.**   If you could turn to page 0003 of Exhibit 755, please.

12   **A.**   Yes.

13   **Q.**   And you see that your e-mail is (reading):

14            "I know the group met this morning, but in debriefing

15            with Keith I'd like to meet so we can discuss some of his

16            thoughts and any other ideas you may have."

17            Did I read that right?

18   **A.**   Yes.

19   **Q.**   And that was on March 25th, 2014; is that correct?

20   **A.**   Yes.

21   **Q.**   And then if you could turn to page 0002, and I'd like to

22   make reference to Mr. Keytel's e-mail to you and Mr. Good and

23   Margaret Brennecke the 24th of March.  Do you see that?

24   **A.**   Yes.

25   **Q.**   Okay.  And Mr. Keytel is Keith?

TRIANA - DIRECT / KRAVITZ

1   **A.**   Keith, yes.

2   **Q.**   Okay.  And then he starts out, he says (reading):

3          "Here are a couple of thoughts I took away from the

4   meeting earlier."

5   Do you see that?

6   **A.**   Yes.

7   **Q.**   And then down further he says, and I'm reading (reading):

8          "Here is where we need help.

9          "1.  Perform a thorough analysis of Benefit changes

10   (COCs/SPDs), especially as it relates to 'long-term care.'

11   Broadly speaking, this is Interpretation of Benefits.

12   OHBS Commercial interpretation and application

13   historically has been on (let's get a position quote here

14   that's accurate.  [Lorenzo]) crisis

15   stabilization/short-term treatment and that is not

16   consistent with 'long-term care/placement.'"

17   Do you see that?

18   **A.**   Yes.

19   **Q.**   Okay.  And I read that properly?

20   **A.**   Yes.

21   **Q.**   And the "Lorenzo" is you; right?

22   **A.**   Yes.

23   **Q.**   And then if you turn the page to 0001, that's your e-mail

24   following up on that or responding; is that correct?

25   **A.**   Yes.

1    Q.    And your first comment is (reading):

2              "First of all, the sense is that Keith accurately

3         captured the salient points from the 8:00 o'clock meeting

4         and the potential next steps."

5         Do you see that?

6    A.    Yes.

7    Q.    Okay.  And then if you go down to the bottom of page 1, it

8    reads (reading):

9              "We also talked about the 'Episode of Illness'

10        limitation which CMS allows for Medicare members which, in

11        essence, states that Medicare does not pay for care beyond

12        90 days of consecutive acute treatment and will not pay

13        for care again until the member has been out of the

14        hospital for 60 continuous days.

15             "In talking with Lyndon, he informed me that

16        implementing this policy has been a problem particularly

17        in Arizona where we could have used it on several cases

18        because according to our legal folks, our COCs are not

19        written in a way to support this CMS limitation.

20             "We need to add this topic to the to-do list.  If

21        this policy is able to be implemented correctly, it would

22        also," in all caps, "be used as a blueprint for how to

23        manage/mitigate non-Medicare long-term cases if we decide

24        to cover them in the future."

25        Did I read that properly so far?

1   **A.**   Yes.

2   **Q.**   Okay.  And then you go on to say (reading):

3           "That to that point, it is important to highlight

4       that if the decision is made by SLT" --

5       And that refers to senior leadership team?

6   **A.**   Yes.

7   **Q.**   (reading)

8       -- "to cover long-term care (LTC), we would need to do

9       several things.  One, we would need to develop network

10      criteria that defines what LTC is from a provider

11      perspective and then create a network; two, we would

12      need to develop both Level of Care Guidelines and CDGs

13      for LTC or long term care."

14      Did I read that properly?

15  **A.**   Yes.

16  **Q.**   I'd like to move to another topic, which is ALOS numbers

17  and targets.  And so let's look, please, at Trial Exhibit 305.

18  **A.**   (Witness examines document.)  Yes.

19  **Q.**   And that is an e-mail from you dated April 13th, 2010, to

20  a bunch of people at UBH where the subject is "Authorization

21  Guidelines - Outlier Cases."  Do you see that?

22  **A.**   Yes.

23  **Q.**   And an outlier case is where the member stays for an

24  extended or unusual length of time; is that right?

25  **A.**   Yes.

1  **Q.**   And the Affordability Department, or its equivalent, in

2  2010 became concerned about a trend in outlier cases at that

3  time; is that true?

4  **A.**   Yes.

5  **Q.**   And the idea was that there would be an outlier guideline

6  to authorize certain amounts of days once an individual became

7  an outlier; is that true?

8  **A.**   Yes.

9  **Q.**   Okay.  And if you look at Exhibit 305, at that time seven

10  days or more for acute inpatient was considered an outlier?

11  **A.**   (Witness examines document.)  Yes.

12  **Q.**   And eight days or greater for both residential and partial

13  hospitalization was considered an outlier?

14  **A.**   Yes.

15  **Q.**   And those days, the seven days and eight days, came from

16  the analytics team at UBH?

17  **A.**   Yes.

18  **Q.**   And then if you look at the second paragraph in your

19  e-mail, it says (reading):

20         "As a reminder," and then bolded, "the outlier

21      guideline is to authorize one to two days for inpatient

22      cases and two to three days for partial hospitalization

23      cases and two to four days for residential cases."

24      Did I read that right?

25  **A.**   Yes.

TRIANA - DIRECT / KRAVITZ

1    Q.    And so that once someone became an outlier, they would get

2    those additional days and then there would be a concurrent

3    review?

4    A.    Yes.

5    Q.    Now, just so we get the terms right, "length of stay" is

6    the number of days that a person receives for a particular

7    treatment?  By that I mean, if you're admitted to a

8    residential, for example, and you stay five days, your length

9    of stay would be five days?

10   A.    Yes, sir.

11   Q.    Okay.  And if there were a bunch of people and you

12   calculated what they were on average, that would be average

13   length of stay?

14   A.    Yes.

15   Q.    And it's true that UBH monitors its average length of stay

16   for various levels of care?

17   A.    Yes.

18   Q.    And you were given access to the data through meetings

19   with the Affordability Department?

20   A.    Yes.

21   Q.    And those meetings occurred roughly once a month?

22   A.    Yes.

23   Q.    If you could turn to Trial Exhibit 720, please.

24   A.    (Witness examines document.)  Yes.

25   Q.    Okay.  And that's an e-mail to you and others dated

TRIANA - DIRECT / KRAVITZ

 1    May 25th, 2010; is that true?

 2    **A.**   Yes.

 3    **Q.**   And the subject is "Updated Houston CAC Monthly Business

 4    Review"; is that correct?

 5    **A.**   Correct.

 6    **Q.**   And then there's an attachment that has the business

 7    review, I guess, in like a PowerPoint; is that true?

 8    **A.**   Yes.

 9         **MR. KRAVITZ:**   Okay.  I move the admission of

10    Exhibit 720.

11         **MR. RUTHERFORD:**   One moment, Your Honor.

12                   (Pause in proceedings.)

13         **MR. RUTHERFORD:**   No objection.

14         **THE COURT:**   Admitted.

15      (Trial Exhibit 720 received in evidence)

16    **BY MR. KRAVITZ:**

17    **Q.**   Okay.  And this Exhibit 720 is for the Houston CAC, but

18    were there similar presentations for the other Care Advocacy

19    Centers?

20    **A.**   Yes.

21    **Q.**   And you received them as well?

22    **A.**   (Witness examines document.)  I'm not sure if I did at

23    that time.

24    **Q.**   But you did eventually?

25    **A.**   Yes.

TRIANA - DIRECT / KRAVITZ

1    **Q.**   And they existed; correct?

2    **A.**   Yes.

3    **Q.**   All right.  If you would turn to page 0015 in Exhibit 720,

4    please.

5    **A.**   (Witness examines document.)

6    **Q.**   And this chart contains length-of-stay data for

7    intermediate levels of treatment; is that correct?

8    **A.**   I'm sorry.

9    **Q.**   I think if you look at the top, it says -- it's the second

10   line at the top (reading):

11           "Intermediate authorization length-of-stay frequency

12        table based on admits count," and then paren, "residential

13        partial hospitalization and recovery home."

14   **A.**   Yes, that part; but I think you mentioned that it had to

15   do with length of stay, and I don't think this one has to do

16   with length of stay.

17   **Q.**   Okay.  Well, let's just look at it.

18   **A.**   Uh-huh.

19   **Q.**   But, in any event, it has to do with the commercial

20   business; right?

21   **A.**   Yes.

22   **Q.**   And it has to do with those three intermediate levels of

23   care that we just identified?

24   **A.**   Yes.

25   **Q.**   And the data displayed is for members who are actually

1  admitted to those levels of care; is that correct?

2  **A.**   Correct.

3  **Q.**   So there was no pre-auth denial?

4  **A.**   Correct.

5  **Q.**   And then if you take a look at it, for example, look at

6  the look at the columns on the left-hand side of the chart.

7  **A.**   Yes.

8  **Q.**   Okay.  And it has a heading "Number of Intermediate Days."

9  Do you see that?

10 **A.**   Yes.

11 **Q.**   Okay.  The first one down says "1," so that means that,

12 you know, the person stayed one day; and how many were admitted

13 and stayed one day is the next one over, that's 822.  Is that

14 right?

15 **A.**   Yes.

16 **Q.**   Okay.  And then it goes down, and so by the time you get

17 to eight numbers of days, it shows that 961 were admitted and

18 stayed eight days; correct?

19 **A.**   Correct.

20 **Q.**   Okay.  And then there's a blue line that goes from left to

21 right across the chart.  Do you see that?

22 **A.**   Yes.

23 **Q.**   And what you can tell is that it shows that roughly

24 50 percent -- if you just look on the left-hand side of the

25 chart for, I guess, December year-to-date 2009, it shows that

1   roughly half the members admitted to these intermediate levels

2   of care stayed eight days or less and roughly half stayed eight

3   days or more; is that correct?  And you can see this if you

4   look at the cumulative percentage of admits.

5   **A.**   (Witness examines document.)  Yes.

6   **Q.**   And then let's move over to the little box on the

7   right-hand side of the exhibit.

8        Yeah, keep going.  Yes, that.  Yes, that thing right up

9   there.  Yeah.  No.  Right here.  Yep.  That.

10       Okay.  And in particular it shows that the average length

11  of stay, the ALOS, for 2009 -- oh.  Thank you.

12       So it says if you see that overall December year-to-date

13  2009 ALOS is 10.56 days?

14  **A.**   Yes.

15  **Q.**   Do you see that?

16       And then it shows what the ALOS is for 2010 so far, and

17  it's 10.03?

18  **A.**   Yes.

19  **Q.**   Okay.  And then if you look above that, you'll see that

20  there is a -- that there's actually a target reduction of

21  5 percent in the number of days that were stayed?

22  **A.**   Yes.

23  **Q.**   And so it's true that UBH had length-of-stay targets; is

24  that correct?

25  **A.**   Yes.

TRIANA - DIRECT / KRAVITZ

1    **Q.**   And you were aware of that?

2    **A.**   Yes.

3    **Q.**   Okay.  And it also shows that -- an average INT unit cost

4    of $303.  Do you see that?  It's right above that.  It's total

5    days.

6    **A.**   Yes.

7    **Q.**   Okay.  And the "INT" refers to intermediate levels of

8    care; right?

9    **A.**   Yes.

10   **Q.**   And "unit cost," that says that's an average number as to

11   what it costs to have a member at that level of care per day;

12   is that correct?

13   **A.**   Yes.

14   **Q.**   And it also -- that box also shows the number of days that

15   would be saved if the ALOS were -- or the total number of days

16   were cut by 5 percent?

17   **A.**   Yes.

18   **Q.**   Yes.  And then if you multiply the number of days saved by

19   that unit cost, you get a savings in dollars; is that correct?

20   **A.**   Yes.

21   **Q.**   Okay.  And you see the target total savings is 2,542,181?

22   **A.**   Yes.

23   **Q.**   If you could turn to Exhibit 745, please.

24   **A.**   (Witness examines document.)  Yes.

25   **Q.**   And let me see if I can just ask you generally.  First of

1  all, this is an e-mail from Robin Cooley to you and others

2  dated July 10, 2013, and then with a copy to Fred Motz, subject

3  "My Take on the June Close."  Do you see that?

4  **A.**   Yes.

5         **MR. KRAVITZ:**  Okay.  And I'd like to move the

6  admission of Exhibit 720 -- 720?  No.   745.

7         **THE COURT:**  745.

8         **MR. RUTHERFORD:**  No objection, Your Honor.

9         **THE COURT:**  It's admitted.

10  (Trial Exhibit 745 received in evidence)

11  **BY MR. KRAVITZ:**

12  **Q.**   Okay.  Just so we can do this quickly, I think Ms. Cooley

13  was a part of the affordability team; is that correct?

14  **A.**   Yes.

15  **Q.**   And that one of the things the affordability team did was

16  they track what was going on in terms of admits and length of

17  stay?

18  **A.**   Yes.

19  **Q.**   Okay.  So if the lengths of stays or ALOS increased, that

20  could increase the cost and the utilization; is that correct?

21  **A.**   Yes.

22  **Q.**   And the same thing is true if the number of admits went

23  up; right?

24  **A.**   Yes.

25  **Q.**   Okay.  But if the number of admits went down or the ALOS

**TRIANA - DIRECT / KRAVITZ**

1  went down, that could point it in the other direction; correct?

2  **A.**   Yes.

3  **Q.**   And I want to ask you one more question.  If you would

4  look on page 001 of Exhibit 745.

5  **A.**   (Witness examines document.)

6  **Q.**   And if you go down to "Oregon."

7  **A.**   Yes.

8  **Q.**   Okay.  And it says (reading):

9         "Overall the Portland Medicare BOB" --

10     What does that stand for?

11  **A.**   Book of business.

12  **Q.**   Oh, I'm sorry.  (reading)

13     -- "has been running overtarget and last year

14     performance all year.  Currently we have 37.2

15     overtarget and 48.2 over last year run rate for the

16     same time period.  With regards to the specific Oregon

17     account, both the legacy Secure Horizons East and PBH

18     accounts are overtarget.  Increases are due to an

19     increase in length of stay.  Admits per K," or

20     thousand, "for both plans decreased as compared to

21     last year.

22         "ALOS is Oregon," I think it means "in Oregon," and

23     then it gives some numbers, and then it says, "The lack of

24     an MD on-site has significantly impacted the review of

25     complex cases and contributed to the increase and length

1          of stay.  With the hiring of Dr. Helfing, I anticipate we

2          will see a decrease in length of stay."

3          Do you see that?

4     A.   Yes.

5     Q.   And then the next sentence says (reading):

6              "Most recently, I have been work" -- it says "work"

7          but I think it meant "working" -- "with Paul to develop an

8          HCQAI to address ALOS as we are seeing the increase across

9          the various CACs."

10         Do you see that?

11    A.   Yes.

12    Q.   Did I read that properly?

13    A.   Yes.

14    Q.   And HCQAI is a healthcare quality and affordability

15    initiative; is that right?

16    A.   Yes.

17    Q.   Okay.  Let's move on to another topic that's related,

18    which is benefit expense.  And it's true that benefit expense,

19    also known as ben-ex, is a proxy for medical expense; is that

20    right?

21    A.   Yes.

22    Q.   And just so it's clear, medical expenses are the expenses

23    for services that UBH pays for?  So if there's a claim and it

24    pays a claim, that's the ben-ex?

25    A.   Yes.

**TRIANA - DIRECT / KRAVITZ**

1   **Q.**   And then if you could turn to 850, please.

2   **A.**   (Witness examines document.)

3   **Q.**   And on 850 is your common review or, I guess, performance

4   review for February 24th, 2013?

5   **A.**   Yes.

6   **Q.**   Okay.  And it was done by Mr. Keytel?

7   **A.**   Yes.

8   **Q.**   Is he a medical doctor?

9   **A.**   No.

10  **Q.**   Okay.  So I didn't want to call him by the wrong thing.

11       And in particular if you would turn to page 0003 in

12  Exhibit 850, please.

13  **A.**   Yes.

14  **Q.**   And at the top you'll see that you were reviewed for

15  business goals.  Do you see that?

16  **A.**   Yes.

17  **Q.**   And the title is "Benefit Expense"?  Yes?

18  **A.**   Yes.

19  **Q.**   And description "Achieved overall 2012 ben-ex target."  Do

20  you see that?

21  **A.**   Yes.

22  **Q.**   So you had a ben-ex target for 2012?

23  **A.**   I didn't have a personal ben-ex target for 2012.

24  **Q.**   I'm sorry.  I didn't mean to interrupt you.  Pardon me.

25       You did not personally have one, but there were ben-ex

 1  targets?

 2  **A.**    Yes.

 3  **Q.**    And then comments (reading):

 4           "After very rough start to 2012 and a result of

 5       significant focus on maintaining UM activities as the CACs

 6       transition to CAOM, OHBS is projected to outperform the

 7       budgeted ben-ex targets for 2012."

 8       Do you see that?

 9  **A.**    Yes.

10  **Q.**    And because of that good performance, you got a 5 or an

11  outstanding in that category; correct?

12  **A.**    Yes.

13  **Q.**    Right.  And just to be clear, the thing that you got a

14  5 in was functional -- fundamental execution; correct?  It says

15  "Goal Category Fundamental Execution."

16  **A.**    Yes, under "Maintaining UM Activities," yes.

17  **Q.**    Okay.  Moving on, I'd like to ask you a few questions

18  about TMS.

19           **MR. KRAVITZ:**  Oh, I'm sorry.  I need to move to admit

20  into evidence Exhibit 850.

21           **THE COURT:**  Any objection?

22           **MR. RUTHERFORD:**  I'm sorry.  No objection, Your Honor.

23           **THE COURT:**  It's admitted.

24       (Trial Exhibit 850 received in evidence)

25  \\\

**TRIANA - DIRECT / KRAVITZ**

1   BY MR. KRAVITZ:

2   **Q.**   And you're familiar with the term "TMS"?

3   **A.**   Yes.

4   **Q.**   Okay.  And what does that stand for?

5   **A.**   Trans magnetic stimulation.

6   **Q.**   And that's a treatment for treatment-resistant major

7   depressive disorder?

8   **A.**   Yes.

9   **Q.**   And it's true that UBH's CTAC initially found that TMS was

10  unproven?

11  **A.**   Yes.

12  **Q.**   And unproven treatments are generally excluded from

13  coverage and denied administratively?

14  **A.**   Yes.

15  **Q.**   And it's true, however, that in 2008, the FDA approved TMS

16  for certain uses?

17  **A.**   For the treatment of major depressive disorder.

18  **Q.**   That was treatment-resistant?

19  **A.**   No.  Major depressive disorder, which is different than

20  treatment-resistant depressive disorder.

21  **Q.**   Okay.  But at that time, 2008, UBH did not change its

22  approach to TMS in terms of considering it unproven?

23  **A.**   Correct.

24  **Q.**   But in the 2013-2014 time frame, that began to change;

25  correct?

**TRIANA - DIRECT / KRAVITZ**

1   **A.**    Yes.

2   **Q.**    And more scientific data came out and the companies

3   started to look into whether maybe TMS should be covered in

4   certain circumstances?

5   **A.**    Yes.

6   **Q.**    And also there were external reviewers who were

7   overturning certain UBH denials?

8   **A.**    Yes.

9   **Q.**    Is that correct?

10          And as a result, UBH was paying some of those claims?

11  **A.**    Yes.

12  **Q.**    And as part of that consideration of whether or not UBH

13  would change its position, it did an analysis of the potential

14  cost impact that it would have on the company; is that right?

15  **A.**    Yes.

16  **Q.**    And the result of that analysis would be that TMS would be

17  expensive and increase ben-ex; is that correct?

18  **A.**    Yes.

19  **Q.**    And then once it was determined that the company would

20  cover TMS, it needed a CDG; is that true?

21  **A.**    Yes.

22  **Q.**    And it needed a CDG so that it could manage the benefit?

23  **A.**    Yes.

24  **Q.**    And just to be clear, managing the benefit means to look

25  at the member's benefits and clinical status and the guideline

1   and either deny or authorize coverage?

2   **A.**   Yes.

3   **Q.**   Is that fair?

4   **A.**   Yes.

5   **Q.**   And do you recall that at some period in that process, in

6   2013 or 2014, that there was consideration given to perhaps

7   only covering it on the ASO as opposed to the risk business?

8   **A.**   I don't recall that.

9   **Q.**   Okay.  If you could turn to 749, please, Exhibit 749 in

10  your book.

11      And do you have 749 in front of you?

12  **A.**   Yes.

13  **Q.**   And that's an email from Dr. Bonfield to Rhonda

14  Robinson-Beale and Jerry Niewenhous.  Do you see that?

15  **A.**   Yes.

16  **Q.**   And attached is a power point from the Clinical Policy

17  Committee; is that correct?

18  **A.**   I'm not sure where this PowerPoint came from.

19  **Q.**   I'm sorry?

20  **A.**   I'm not sure where this PowerPoint came from.  You said

21  it's from the Clinical Policy Committee.  I don't know if

22  that's where it came from.

23  **Q.**   It's dated November 7, 2013?

24  **A.**   Yes.  Yes.

25  **Q.**   And you were on the Clinical Policy Committee at that

TRIANA - DIRECT / KRAVITZ

1   time?

2   **A.**   I don't remember if I was.

3   **Q.**   Okay.

4          **MR. KRAVITZ:**  Your Honor, may I approach the witness

5   and show him a document to refresh his recollection?

6          **THE COURT:**  As long as you have a copy --

7          **MR. KRAVITZ:**  Yes, I do.

8          **THE COURT:**  Sure.

9   **BY MR. KRAVITZ:**

10  **Q.**   And, Dr. Triana, I'm showing you the minutes of the

11  clinical coverage committee.

12         **THE COURT:**  Clinical Policy Committee.

13         **MR. KRAVITZ:**  I'm sorry.  Clinical Policy Committee.

14  I've got so many things.

15  **BY MR. KRAVITZ:**

16  **Q.**   From November of 2013.

17  **A.**   Yes.

18  **Q.**   Does that refresh your memory that you were on the

19  committee at that time?

20  **A.**   Yes, I was.

21  **Q.**   Okay.  And that you see that there was a discussion then

22  of TMS?

23         **MR. KRAVITZ:**  I move the admission of 749.

24         **MR. RUTHERFORD:**  Objection.  Lack of foundation.  He's

25  not on this email.

```
 1              THE COURT:  Overruled.  It's admitted.

 2         (Trial Exhibit 749 received in evidence.)

 3   BY MR. KRAVITZ:

 4   Q.   If you would look down on page 749, at page -- strike

 5   that.  I'm getting tongue tied here.

 6         If you look at page 0005 of Exhibit 749.

 7   A.   Yes.

 8   Q.   And its recommendations of the Clinical Policy Committee.

 9   Do you see that?

10   A.   Yes.

11   Q.   And then it says (reading):

12              "Given the lack of evidence about enduring treatment

13         effect and the lack of treatment protocol the Committee

14         recommends that coverage not be extended to our risk

15         business."

16         Do you see that?

17   A.   I do.

18   Q.   (Reading:)

19              "And Committee also recommended that our capability

20         to manage care for those contracts that cover rTMS be

21         built out with clinical policies, CDGs and LOCGs."

22         Do you see that?

23   A.   Yes.

24   Q.   And if you look up higher on the page, on 749-0005, do you

25   see -- under "Customer Demand" do you see it's "Limited to
```

TRIANA - DIRECT / KRAVITZ

1    selected ASO customers"?

2         Do you see that?

3    A.   Yes.

4    Q.   And then if you go to the first page of Exhibit 749, you

5    see Dr. Bonfield's comment which says:

6              "I like this one with modifications.  Thank you.

7         Jerry."

8         Did I read that right?

9    A.   Yes.

10   Q.   Okay.  I'd like to move to 758, please.  Exhibit 758.

11        And that is an email string that ends in April of 2014,

12   also concerning TMS; is that right?

13   A.   Yes.

14        MR. KRAVITZ:  I move the admission of 758.

15        MR. RUTHERFORD:  Two objections, Your Honor:  Lack of

16   foundation; but this is also a sealed document, one of the

17   documents we anticipated was going to be sealed.

18        MS. REYNOLDS:  Yeah, I apologize.  I missed it on the

19   list.

20        THE COURT:  Okay.

21        MR. KRAVITZ:  So what should we do --

22        THE COURT:  So what's sealed in it?

23        MS. REYNOLDS:  There's a reference to legal advice in

24   the document.

25        THE COURT:  Okay.  So the motion to seal partially is

 1    granted.

 2            MR. RUTHERFORD:  Thank you, Your Honor.  Otherwise,

 3    there was just lack of foundation.

 4            THE COURT:  You want me to put on -- we can call the

 5    person who knows about all these emails and have them all put

 6    up there.

 7            MR. RUTHERFORD:  No, we don't have a hearsay objection

 8    to this, or authenticity.  Just that this isn't an email

 9    between Dr. -- lack of foundation.

10            MR. KRAVITZ:  Just to cut to this, if you look down,

11    one email down --

12            THE COURT:  I just want to stop this.  I just want to

13    stop this.

14        What do you mean "lack of foundation"?  He cannot testify

15    enough to allow it to be entered into evidence?  Is that what

16    you're saying?

17            MR. RUTHERFORD:  Potentially.  I don't know the

18    questions that are getting asked, Your Honor.

19            THE COURT:  Then you object to those questions.  The

20    only thing pending before the Court is a motion to admit.

21            MR. RUTHERFORD:  Objection withdrawn, Your Honor.

22            THE COURT:  Okay.  It's admitted.

23        (Trial Exhibit 758 received in evidence.)

24            MR. KRAVITZ:  I'd just note for the record that he

25    actually is in the email string that follows.

 1              THE COURT:  Okay.  Fine.

 2   BY MR. KRAVITZ:

 3   Q.   And then if you would turn to page 0009/10.  I want to ask

 4   you a quick question about that.

 5        You have an email there from -- it's from you to Carolyn

 6   Regan and Jerry Niewenhous, subject TMS benefit request.  Do

 7   you see that?

 8   A.   Yes.

 9   Q.   And it says (reading):

10           "With the new guidance from legal, if the request for

11        TMS meets our CDG, and the member's COC/SPD is silent on

12        whether TMS is covered, is the answer now that we will

13        approve TMS, where before we would deny the request" two

14        question marks.

15        And then if you turn to the next page (reading):

16           "I am assuming the answer is yes.  If so, when and

17        who will be informing SLT and Finance of this decision so

18        they can be aware of the financial implications?"

19        Did I read that right?

20   A.   Yes.

21   Q.   And then if you go over to the page 758-0008, do you see

22   Carolyn Regan responds and she says:

23           "Yes, you are correct in that we would pay for

24        commercial plans if TMS is not specifically excluded.

25        There is a TMS guideline that should be used rather than

1          another guideline, such as the MDD one referenced below.

2          I would suggest tightly managing these requests..."

3          Do you see that?

4    A.    Yes.

5    Q.    And if you recall that I asked you before whether or not

6    the company had considered initially just covering for ASO

7    business as opposed to risk business.  Do you see that?

8          And if you look at page 0003, which is part of Carolyn

9    Regan's email of April 15, 2014, and you see there's something

10   in all bold that says "Bottom Line"?

11   A.    I do see that.

12   Q.    It says (reading):

13              "Bottom line is that from a legal perspective, we

14         cannot deny some commercial requests and approve others

15         based on our financial arrangements.  Since we have found

16         TMS to be proven under some circumstances we need to cover

17         it for all commercial plans when it meets the criteria.

18         We will need to manage it very tightly."

19         Do you see that?

20   A.    I do.

21   Q.    I read that correctly?

22   A.    Yes.

23   Q.    And then if you go to 766, please.  And that is an email

24   from Carolyn Regan to you and others about the TMS coverage

25   guidance.

1          Do you see that?

2   A.    Yes.

3   Q.    And it's -- it attaches a CDG for TMS; is that correct?

4   A.    Yes.

5   Q.    And it's instructing people to use it for TMS requests for

6   the commercial business; is that correct?

7   A.    It says -- it's instructing that that's a CDG to be used

8   in those cases, yes.

9   Q.    Right.  For managing those requests; correct?

10  A.    Correct.

11  Q.    Okay.  And once something like TMS goes into the clinical

12  realm and the guideline is developed, then responsibility --

13  then the responsibility of UBH's clinicians is to follow the

14  guideline; correct?

15  A.    Yes.

16  Q.    Okay.  Here's my last topic, which is ASAM.  You know what

17  ASAM is?

18  A.    Yes.

19  Q.    And it's a tool for selecting the level of care for

20  substance use disorder?

21  A.    Yes.

22  Q.    And it's true that --

23          MR. KRAVITZ:  Oh, I move the admission of Exhibit 758

24  and 766.

25          MR. RUTHERFORD:  No objection, Your Honor.

**TRIANA - DIRECT / KRAVITZ**

 1              **THE COURT:**  They're admitted.

 2          (Trial Exhibits 758 and 766 received in evidence.)

 3  **BY MR. KRAVITZ:**

 4  **Q.**   And if you -- let me back up.

 5          So it's true that UBH has considered adopting ASAM a

 6  variety of times?

 7  **A.**   Yes.

 8  **Q.**   And but UBH still does not use the ASAM criteria as the

 9  standard criteria for commercial business; is that correct?

10  **A.**   Yes.

11  **Q.**   And when UBH looks at the possibility of adopting an

12  external guideline like ASAM, for example, it will look at the

13  clinical side and the ben-ex side; is that correct?

14  **A.**   Yes.

15  **Q.**   And as to the clinical component, the Substance Use

16  Disorder Workgroup was tasked to look at ASAM; is that correct?

17  **A.**   Yes.

18  **Q.**   And that workgroup was made up of clinicians from UBH who

19  specialized in treating substance use disorders?

20  **A.**   Yes.

21  **Q.**   And UBH considers the members of that committee to be

22  subject matter experts; is that correct?

23  **A.**   Yes.

24  **Q.**   And so when we see the term in that context, SMEs, that's

25  subject matter experts?

1    **A.**    Yes.

2    **Q.**    And it's true that the subject matter experts on the

3    workgroup recommended that the company adopt ASAM, at least

4    from a clinical standpoint?

5    **A.**    Yes.

6    **Q.**    They concluded that it was appropriate from that

7    standpoint, the clinical standpoint; right?

8    **A.**    Yes.

9    **Q.**    And you agree that the ASAM criteria is consistent with

10   generally accepted standards of care?

11   **A.**    Yes.

12   **Q.**    And you also agree that they're widely accepted among

13   providers who treat people with substance use disorders?

14   **A.**    Yes.

15   **Q.**    Okay.  Let's look at the benefit side, ben-ex side of

16   this.

17        And just to jump to the end of this, ultimately the reason

18   that UBH didn't adopt ASAM was that it couldn't model the

19   benefit expense?

20   **A.**    I think, amongst reasons, that was one of the reasons.

21   **Q.**    Right.  But there was no clinical reason; correct?

22   **A.**    That is correct.

23   **Q.**    So the reason was on the ben-ex side.  And the company

24   felt like it couldn't model what the ben-ex impact would be.

25   Is that correct?

TRIANA - DIRECT / KRAVITZ

1   **A.**   That's one of the components, yes.

2   **Q.**   Let's -- if you would look at Exhibit 524, please.

3   **A.**   I have it.

4   **Q.**   Okay.  And the email on the first page, the second one

5   down is from you to Keith Keytel and Martin Rosenzweig; right?

6   **A.**   Yes.

7   **Q.**   And who is Martin Rosenzweig?

8   **A.**   He was a senior medical director at that time.

9   **Q.**   And he reported to you or indirectly to you?

10  **A.**   He directly reported to me.

11  **Q.**   And if you would turn, please, to page 0004 in Exhibit

12  524.

13       Are you with me?

14  **A.**   Yes.

15  **Q.**   Okay.  And that's an email from Martha Temple, to

16  Dr. Bonfield, Keith Keytel, Bruce Bobbitt.  Is that correct?

17  **A.**   Yes.

18  **Q.**   But you were ultimately forwarded this email string;

19  right?

20  **A.**   Yes.

21       **MR. KRAVITZ:**  If I haven't moved the admission of

22  Exhibit 524, I would like do that right now.

23       **MR. RUTHERFORD:**  No objection.

24       **THE COURT:**  Admitted.

25       (Trial Exhibit 524 received in evidence.)

1              MR. KRAVITZ:  Sorry.  Excuse me.

2    BY MR. KRAVITZ:

3    Q.   And Martha Temple was, sort of, the highest-ranking

4    executive in the company at that time?

5    A.   In behavioral health, yes.

6    Q.   Yeah, behavioral health?

7    A.   Yes.

8    Q.   Yeah.  Okay.

9         And her email says (reading):

10            "Hi.  I would like us to move towards the adoption of

11       ASAM guidelines for our substance use disorder claim

12       process.  I recognize this will be like taking training

13       and" -- let me start again.  I'm sorry.

14            (reading):

15            "I would like to move towards the adoption of the

16       ASAM guidelines for our substance use disorder claim

17       process.  I recognize this will take training and

18       licensing but I feel that it is something we should be

19       doing to get in line with evidence based guidelines for

20       our policies around substance use.

21            "I understand that in the past we've reviewed and

22       even done a cross walk to see what this means.  I also

23       recognize there will be a cost to this upfront.  I'd like

24       to understand what that is, but I am guessing that using

25       these types of guidelines will help us immensely on the

1          back end when we have issues and denials.

2                "Who has owned this in the past and how do we dust it

3          off and let me know the impact?  Thanks.  Martha."

4          Did I read that right?

5     A.   Yes.

6     Q.   And, then, if you go to page 003, Mr. Keytel responds.  Do

7     you see that at the bottom of the page?

8     A.   Yes.

9     Q.   And he says (reading):

10               "Martha, great question.  Martin and Lorenzo were the

11         ones involved in the past.  And the barrier we couldn't

12         break through was getting 'Finance' to agree on the

13         conversion.  Let me ask Lorenzo and Martin to go back and

14         look for the information they worked on.  I think it was

15         at least two years ago now."

16         Did I read that right?

17    A.   Yes.

18    Q.   So it's true that it wasn't just in 2016 that ASAM came

19    out, but at least in 2014, and probably in 2012, too; correct?

20    A.   Yes.

21    Q.   And then, ultimately, this issue came back to you and

22    Martin Rosenzweig in 2016?

23    A.   Yes.

24    Q.   After Keith said "I think Martin and Lorenzo are the ones

25    who had looked at this in the past," then it came back to you;

**TRIANA - DIRECT / KRAVITZ**

1    right?

2    **A.**    Yes.

3    **Q.**    All right.  And then if you go to page 2, do you see that

4    you respond to this after it got back to you, and you have an

5    email on Friday, February 19th, 2016, at 3:03 p.m.?

6    **A.**    Yes.

7    **Q.**    Okay.  And your email reads (reading):

8          "Wow.  So you are correct, ASAM along with other

9          third party guidelines have been a topic that

10         intermittently surfaces and is discussed.

11         "As part of one of the SUD's work streams" --

12         referring to the SUD workgroup?

13   **A.**    Yes, Substance Use Disorder workgroup.

14   **Q.**    (Reading:)

15         "-- we looked at adopting the ASAM guidelines but

16         NEVER received a green light from Finance because they

17         could not estimate the financial impact on Benex in

18         changing from using the UBH Guidelines to ASAM.

19         "I recently had Martin push Finance again (Martin

20         please let know who you reached out to) and the response

21         was the same.  I have been frankly surprised since I know

22         we have membership that is currently being managed with

23         ASAM guidelines but used to be managed with UBH's

24         guidelines, so it would seem like a simple actuarial

25         exercise."

1          And then it goes on.

2          Did I read that properly?

3    **A.**    Yes.

4    **Q.**    And then if you turn to Exhibit 549.

5          And this is an email string from someone named Courtney

6    Esparza to Martha Temple and others, including you and

7    Mr. Rosenzweig; is that right?

8    **A.**    Dr. Rosenzweig, yes.

9    **Q.**    I didn't mean any insult there.

10   **A.**    Just clarification.

11   **Q.**    Anyway, he's on there and you're on there.  And it

12   involves ASAM; correct?

13   **A.**    Yes.

14          **MR. KRAVITZ:**  Okay.  Move the admission of 549.

15          **MR. RUTHERFORD:**  No objection.

16          **THE COURT:**  It's admitted.

17          (Trial Exhibit 549 received in evidence.)

18   **BY MR. KRAVITZ:**

19   **Q.**    And then if you would turn to page 11 in that document,

20   please.  And that document -- I hate to use that term -- is

21   Exhibit 549?

22   **A.**    Yes.  I'm sorry, you said which page?

23   **Q.**    I'm sorry.  0011.

24   **A.**    Yes.

25   **Q.**    Okay.  And that's -- that's a PowerPoint entitled "ASAM

TRIANA - DIRECT / KRAVITZ

1   Guideline Decision."  Do you see that?

2   **A.**   I do.

3   **Q.**   And there's a gentleman at the fork in the road.  Do you

4   see that?

5   **A.**   Yes.

6   **Q.**   And underneath it says "Adopt or Abandon" question mark?

7   **A.**   Yes.

8   **Q.**   Okay.  And then if you go to page 12, 0012 in Exhibit 549,

9   and look down to the fourth bullet.

10  **A.**   Yes.

11  **Q.**   Okay.  And you see that it says (reading):

12          "ASAM has been formally adopted by Aetna, Cigna,

13      Magellan, and several Blue Cross plans."

14      Do you see that?

15  **A.**   Yes.

16  **Q.**   And then if you go to the next page, which is 549-0013,

17  there's a bullet that says:

18          "Using nationally recognized criteria."

19      Do you see where I am?

20  **A.**   Yes.

21  **Q.**   That says:

22          "Using nationally recognized criteria will better

23      align us with other major national carriers."  And then it

24      brackets "Aetna, Cigna, Magellan and several Blue Cross

25      plans," closed bracket.

TRIANA - DIRECT / KRAVITZ

1        Did I read that right?

2   **A.**   Yes.

3   **Q.**   And that is under -- what we just read on page 13, is

4   under the heading "Advantages to Adopting ASAM"; correct?

5   **A.**   Yes.

6   **Q.**   And then I would like to turn to Exhibit 770.

7        If you would look at Exhibit 770, that is an email string

8   from June 2014.  Do you see that?

9   **A.**   Yes.

10  **Q.**   Okay.  And you know that that was shortly after this

11  lawsuit was filed?  You know that?

12  **A.**   Yes.

13          **MR. KRAVITZ:**  And I would move the admission of 770.

14          **MR. RUTHERFORD:**  No objection, Your Honor.

15          **THE COURT:**  It's admitted.

16       (Trial Exhibit 770 received in evidence.)

17  **BY MR. KRAVITZ:**

18  **Q.**   And then there's a blurb down on the bottom of page

19  770-0002.  Do you see that?  It says:  "Parity Lawsuit Filed

20  Against United Healthcare"?

21  **A.**   Yes.

22  **Q.**   And you recognize that as a description of this case?

23  **A.**   Yes.

24  **Q.**   Okay.  And then -- and that was sent to you from ED

25  Bonnie?

TRIANA - CROSS / RUTHERFORD

1    **A.**    No.

2    **Q.**    No?  Where did you get that?

3    **A.**    From Dr. Michael Bresolin; the next email up.

4    **Q.**    Thank you.

5          And then you responded in an email on June 10th of 2014.

6    You said, quote (reading):

7               "This is an example where using third party

8          guidelines" -- and third party is in quotes -- "such as

9          ASAM would be beneficial ... as long as the Benex piece is

10         cost neutral."

11         Did I read that right?

12   **A.**    Yes.

13             **MR. KRAVITZ:**  Let me consult with my colleagues.

14         Okay.  No further questions at this time.

15             **THE COURT:**  Okay.

16         Cross.

17             **MR. RUTHERFORD:**  Yes, Your Honor.  Just a minute to

18   get the binders up.

19             **THE COURT:**  Yes.

20             **MR. KRAVITZ:**  Sorry.  And I have one more thing.

21   Sorry.

22        (Pause)

23             **MR. RUTHERFORD:**  Your Honor, are you ready?

24             **THE COURT:**  Uh-huh.

25   \\\

TRIANA - CROSS / RUTHERFORD

| 1 | **CROSS-EXAMINATION** |

**BY MR. RUTHERFORD:**

**Q.**   Dr. Triana, you testified or you were asked questions on direct examination regarding whether or not benefit expense was discussed at the BPAC.

Do you recall that testimony?

**A.**   Yes.

**Q.**   And you testified through your deposition testimony that benefit expense could have been raised in the BPAC; correct?

**A.**   Yes.

**Q.**   How many times a year did the BPAC meet during the time that there was a BPAC at UBH?

**A.**   Approximately 30 times each year.

**Q.**   So 30 times each year between 2011 and 2016?

**A.**   Yes.

**Q.**   And on what instances do you recall benefit expense being discussed at the BPAC with respect to what?

**A.**   I recall it being discussed regarding the Milliman, the potential adoption of the Milliman Guidelines.  I remember it being specifically discussed when we developed the CDG for TMS, trans magnetic stimulation.

And then I also recall it coming up when there was a development of a CDG for lab services.

**Q.**   So aside from those three instances, do you have any recollection of benefit expense being raised during the BPAC

**TRIANA - CROSS / RUTHERFORD**

1  meetings over the course of those seven years?

2  **A.**   No.

3  **Q.**   You were also asked questions regarding average length of

4  stay and whether or not average length of stay was discussed at

5  the BPAC meetings.  Do you recall that?

6  **A.**   Yes.

7  **Q.**   And you testified through your deposition that the average

8  length of stay could have been discussed at the BPAC meetings;

9  correct?

10  **A.**   Yes.

11  **Q.**   Do you have any recollection of average length of stay

12  ever being discussed at a BPAC meeting?

13  **A.**   No.

14  **Q.**   You indicated on your direct examination that a

15  representative of the Affordability group had a membership seat

16  on the BPAC; correct?

17  **A.**   Yes.

18  **Q.**   Does Affordability -- does the Affordability group cover

19  any topics other than benefit expense?

20  **A.**   As part of their job?

21  **Q.**   Yes, as part of their job.

22  **A.**   Yes.  Utilization Management trends is what they look for

23  or things that they look at.

24  **Q.**   And you indicated on your direct examination that a member

25  of the Finance group had a seat on the BPAC; correct?

TRIANA - CROSS / RUTHERFORD

1   **A.**   Yes.

2   **Q.**   Specifically Fred Motz?

3   **A.**   Yes.

4   **Q.**   Do you ever recall Fred Motz actually attending a BPAC

5   meeting?

6   **A.**   He didn't attend very frequently at all.

7   **Q.**   Do you ever remember him contributing to discussion at a

8   BPAC meeting?

9   **A.**   No, not at all.

10   **Q.**   Directing your attention to Exhibit 259, specifically to

11   page 0016.

12   **A.**   259?

13   **Q.**   259, at page 0016.

14       And specifically directing your attention to the section

15   of that page starting with the phrase "Role of the Appeal

16   Reviewer."

17       Do you see that?

18   **A.**   Yes.

19   **Q.**   I'm sorry?

20   **A.**   Yes.

21   **Q.**   Do you recall?  You were asked questions about various

22   parts of the process involving an appeal reviewer; correct?

23   **A.**   Yes.

24       **MR. RUTHERFORD:**  If we could go down a little bit more

25   on that document.

1   BY MR. RUTHERFORD:

2   **Q.**   One of the other things that -- aside from reviewing the

3   guidelines and the other items that are listed in the second

4   bullet point, an appeal reviewer will also consult with the

5   treating practitioner; correct?

6   **A.**   I'm sorry, what section are you on right now?

7   **Q.**   Directing your attention to the final paragraph, it

8   indicates, does it not, that "The appeal reviewer may request

9   additional or new information in order to arrive at a

10  determination"?

11       Do you see that?

12  **A.**   Yes.

13  **Q.**   And (reading):

14           "This information may include part or all of the

15       member's electronic record, a written statement from the

16       treating practitioner, a direct discussion with the

17       treating practitioner, and all or part of the available

18       clinical records"; correct?

19  **A.**   Yes.

20  **Q.**   So, in addition to the guidelines, those are matters that

21  could be considered by an appeal reviewer; correct?

22  **A.**   Correct.

23  **Q.**   Now, directing your attention to page 259-0020, and

24  specifically to the section starting with "Written notification

25  of a denial includes..."

**TRIANA - CROSS / RUTHERFORD**

1        Do you see that?

2   **A.**   Yes.

3   **Q.**   When --

4        **MR. RUTHERFORD:**  If we could go down a little bit

5   farther.

6        When a clinical denial is issued -- the third bullet point

7   here -- in addition to the other information that is provided,

8   UBH must offer alternative services that would be available and

9   authorized; correct?

10  **A.**   Yes.

11  **Q.**   And how does that actually work in practice, Dr. Triana?

12  **A.**   As part of the conversation during the peer review, and

13  there's a determination that it's not meeting medical

14  necessity, then it will be conveyed at that time.  And then,

15  also, it will be conveyed through the care advocate when the

16  care advocate communicates with the facility, as well.

17  **Q.**   Now, directing your attention to your testimony earlier

18  today, you were asked a question earlier today regarding what

19  information is included in the letter to the member.

20       Do you generally recall that testimony?

21  **A.**   Yes.

22  **Q.**   And you stated, in response to the question, that the --

23  you were asked the question:  Does the letter to the member

24  cite all of the reasons for the adverse benefit decision;

25  correct?

**TRIANA - CROSS / RUTHERFORD**

1  **A.**    Correct.

2  **Q.**    And you answered, "No"?

3  **A.**    That's correct.

4  **Q.**    And then you were read your deposition testimony where you

5  had stated, "Correct."  Do you recall that?

6  **A.**    Yes.

7  **Q.**    Okay.  Why did you answer "no"?

8  **A.**    Because it doesn't -- the letter does not contain all of

9  the information.  All of the information is contained in the

10  electronic record.  And the letter contains a piece of that in

11  a language that's specific for the letter; meaning that,

12  certain grade levels to the language, et cetera.

13  **Q.**    You were also asked questions --

14           **THE COURT:**  What is --

15           **MR. RUTHERFORD:**  Sorry, Your Honor.

16           **THE COURT:**  What does that mean?

17      Let me tell you what I mean by "What does that mean?"

18      Are there any reasons contained in the electronic record

19  that are not contained in the denial letters?

20           **THE WITNESS:**  There could, yes.

21           **THE COURT:**  Actual reasons?

22      So there could be something in the electronic record that

23  says, well, this particular treatment is not justified because

24  of A, B and C, and that wouldn't be contained?

25           **THE WITNESS:**  No, that would be contained.

1          **THE COURT:**  What kind of a reason would be contained

2    in the electronic record that would not be contained in the

3    denial letter?

4          **THE WITNESS:**  So the rationale on the denial letter is

5    concise.  And it will typically outline what is happening and

6    why the main reason for the denial is.

7       If there's additional reasons like, you know, there are

8    supportive services or something else, that may be contained in

9    the electronic record, then that level of detail may not be

10   also incorporated into the denial letter as well.

11         **THE COURT:**  So you're saying there are, in fact,

12   reasons for the denial that are not included in the denial

13   letter, but not even summarized in the denial letter?

14         **THE WITNESS:**  They are summarized in the denial letter

15   but not outlined.  There may be more things in the electronic

16   record.

17         **THE COURT:**  Okay.  But bear with me.

18         **THE WITNESS:**  Yes.

19         **THE COURT:**  The reasons put into the letter --

20         **THE WITNESS:**  Right.

21         **THE COURT:**  -- are intended to summarize all of the

22   reasons for the denial, including all of the reasons that are

23   in the electronic record; right?

24         **THE WITNESS:**  Yes.

25         **THE COURT:**  Okay.  Thank you.

1   BY MR. RUTHERFORD:

2   **Q.**   You were asked questions this morning, generally, on the

3   relationship between the Coverage Determination Guidelines and

4   the Level of Care Guidelines.

5        Do you generally recall that?

6   **A.**   Yes.

7   **Q.**   Since 2011, has every Coverage Determination Guideline

8   fully incorporated the Level of Care Guidelines?

9   **A.**   Since 2011?

10  **Q.**   Yes.

11  **A.**   Yes.   It's quoted in there, but not the full level of care

12  guideline.

13  **Q.**   So the full level of care guideline has not been?

14  **A.**   No, has not been.   For every year since 2011, no.

15  **Q.**   For every year since 2011, the Common Criteria has not

16  been fully incorporated into the care --

17  **A.**   Correct.

18  **Q.**   -- Coverage Determination Guidelines?

19  **A.**   Correct.

20  **Q.**   Correct.

21       Earlier this morning you were asked a question regarding

22  whether or not the guidelines were merely background.   Do you

23  generally recall that?

24  **A.**   Yes.

25  **Q.**   And you had stated that the guidelines augment clinical

1  judgment; correct?

2  **A.**   Yes.

3  **Q.**   And then do you recall that you were read --

4       **THE COURT:**  That's not what he said.  Try again.

5  **BY MR. RUTHERFORD:**

6  **Q.**   You raised, in connection with the question regarding

7  whether or not the guidelines were backgrounds, you stated --

8  you were read testimony from your deposition this morning that

9  the guidelines are not merely background; correct?

10 **A.**   Yes.

11      **THE COURT:**  Well, why don't you read the full

12 testimony, because you're just getting a tiny piece of what was

13 given.

14      **MR. RUTHERFORD:**  Right.

15 **BY MR. RUTHERFORD:**

16 **Q.**   So I direct your attention to page 271 of your deposition.

17      **MR. KRAVITZ:**  Your Honor, I don't think that I

18 actually had to read that in because I think he answered the

19 question.

20      **THE COURT:**  I think he answered it.

21      **MR. KRAVITZ:**  He gave --

22      **THE COURT:**  I think that's right.

23      **MR. RUTHERFORD:**  Your Honor, this is the point that I

24 would like to make:  My understanding of the question that was

25 asked was that clinical judgment played a role in making

1  coverage determinations.

2          **THE COURT:**  No, that's not the question that was

3  asked.

4          **MR. RUTHERFORD:**  No, no, that was the answer that was

5  given.

6          **THE COURT:**  It's not the answer that was given.

7          **MR. RUTHERFORD:**  If I could just --

8  **BY MR. RUTHERFORD:**

9  **Q.**   Does clinical judgment play a role --

10          **THE COURT:**  There you go.  You can ask that question.

11  **BY MR. RUTHERFORD:**

12  **Q.**   Does clinical judgment play a role in making coverage

13  determination decisions?

14  **A.**   Yes.

15  **Q.**   What role is that?

16  **A.**   A significant role.  It's the biggest role.

17  **Q.**   And how does clinical judgment work with the Level of Care

18  Guidelines and the Coverage Determination Guidelines?  What is

19  the relationship?

20  **A.**   So the relationship is, the physician, the medical

21  director, is taking the clinical information, using their

22  clinical judgment, and then weighing that against the criteria

23  in the guidelines.

24  **Q.**   You were asked questions earlier regarding inter-rater

25  reliability.  Do you recall those questions?

TRIANA - CROSS / RUTHERFORD

```
1    A.   Yes.

2    Q.   And specifically with respect -- well, and then you were

3    shown Exhibits 299, 300, 301, 302, and 343.  Do you recall

4    those?

5    A.   Yes.

6    Q.   And those are the inter-rater reliability reports?

7    A.   Correct.

8    Q.   Is inter-rater reliability required by UBH's accreditors?

9    A.   Yes.

10   Q.   Now, directing your attention to Exhibit 408, and

11   specifically to page 408-08.

12        Do you have that in front of you?

13   A.   I'm sorry, which -- 408; correct?

14   Q.   Yeah.

15   A.   And which page in 408?

16   Q.   0008.

17   A.   8, okay.  The last one.

18   Q.   You were asked questions earlier, were you not, about

19   comments made by, among others, someone named Bernstein.  Do

20   you see that?

21   A.   Yes.

22   Q.   Before I get to that, what is the BSAC?

23   A.   It's the Behavioral Speciality Advisory Council.

24   Q.   And who sits on the BSAC?

25   A.   The BSAC individuals that are clinicians or representative
```

1    of professional societies like the American Psychiatric

2    Association, American Psychological Association, and such.

3    **Q.**   Are they employees of UBH?

4    **A.**   No, they are not.

5    **Q.**   They are external clinicians?

6    **A.**   Yes.

7    **Q.**   Now, you were asked questions, if you recall, about the

8    comments made by Bernstein at the top, beginning with the idea

9    of "Why Now."

10       Do you recall those questions?

11   **A.**   Yes.

12   **Q.**   Who is Bernstein?

13   **A.**   Dr. Bernstein is a psychologist in the outpatient network.

14   **Q.**   And what is the NPAC?

15   **A.**   The National Provider Advisory Council.

16   **Q.**   Does he work for UBH?

17   **A.**   No, he does not.

18   **Q.**   Now, directing your attention to Exhibit 516, at page

19   0005.

20       And this is also provider feedback; right, Dr. Triana?

21   **A.**   Yes.

22   **Q.**   This is provider feedback for 2016; correct?

23   **A.**   That is correct.

24   **Q.**   In 2016, did the Level of Care Guidelines still contain

25   the phrase "why now"?

**TRIANA - CROSS / RUTHERFORD**

1   **A.**    Yes.

2   **Q.**    And directing your attention to page 516-0005.

3   **A.**    Yes.

4   **Q.**    Do you see that there are two comments made by someone

5   named Bernstein?

6   **A.**    Yes.

7   **Q.**    Is that the same Dr. Bernstein who provided the commentary

8   to the 2014 Level of Care Guidelines?

9   **A.**    It is.

10  **Q.**    And he states, does he not (reading):

11          "I have reviewed the Level of Care Guidelines and for

12       the most part find them to be clear, well written and

13       organized, and more complete and better thought out than

14       many such documents I have read.  The guidelines offer

15       adequate support for making decisions about care when

16       facilities or practitioners are available."

17       That's what it states; correct?

18  **A.**    Yes.

19  **Q.**    And then directing your attention to Exhibit 516, at page

20  0007, to the top of that page.

21  **A.**    Yes.

22  **Q.**    And you recall being asked questions earlier today

23  regarding the statements made by Dr. Axelson?

24  **A.**    Yes.

25  **Q.**    And you were asked whether or not you agreed with

**TRIANA - CROSS / RUTHERFORD**

1    Dr. Axelson's statements; correct?

2    **A.**    Yes.

3    **Q.**    Directing your attention to the second sentence of that

4    piece of feedback, it states (reading):

5              "I am very concerned that the overemphasis of this

6         type of treatment has contributed to an ineffective and

7         inefficient overall treatment system."

8         Do you see that?

9    **A.**    Yes.

10   **Q.**    Do you agree with that?

11   **A.**    No.

12   **Q.**    Now, directing your attention to Exhibit 755.

13   **A.**    Sorry.  What was the page number?

14   **Q.**    I'll get you the page in a moment.

15   **A.**    Which exhibit?  Sorry.

16   **Q.**    755.

17   **A.**    Yes.

18   **Q.**    This is an email exchange in 2014; correct?

19   **A.**    Yes.

20   **Q.**    And at the time, did UBH's guidelines provide for

21   long-term placement if the treatment for that service was

22   necessary for the patient?

23        So, at the time, could a patient have gotten a long-term

24   placement under the UBH guidelines?

25   **A.**    Yes, as long as it met the criteria.

**TRIANA - CROSS / RUTHERFORD**

1  **Q.**   And this was an effort to develop a separate and specific

2  level of care for long-term care; correct?

3  **A.**   Correct.

4  **Q.**   That had not existed prior to that; correct?

5  **A.**   Correct.

6  **Q.**   And then directing your attention to page 2 of that

7  exhibit, 755-0002.

8       You set forth three steps that you think are necessary --

9  **A.**   Yes.

10 **Q.**   -- in the event that the company wants to develop a

11 separate specific level of care; correct?

12 **A.**   Correct.

13 **Q.**   Now, directing your attention to Exhibit 305.

14      Let me know when you have that in front of you.

15 **A.**   Yes.

16 **Q.**   This is the exhibit that referenced, in quotations,

17 "outlier cases"; correct?

18 **A.**   Correct.

19 **Q.**   Are these -- these dates that are listed here on Exhibit

20 305, is this still the policy of UBH --

21 **A.**   No.

22 **Q.**   -- stay limits?

23 **A.**   No.

24 **Q.**   And was there a limit, even at the time, on the actual

25 number of days that would be covered?

 1   **A.**   No.

 2   **Q.**   So could more days have been authorized depending upon the

 3   appropriateness of the treatment?

 4          **MR. KRAVITZ:**  Your Honor, I haven't objected to the

 5   leading up to this point, but this is his witness.

 6          **THE COURT:**  Okay.  Let's try to do nonleading

 7   questions.

 8          **MR. RUTHERFORD:**  Yes, Your Honor.

 9   **BY MR. RUTHERFORD:**

10   **Q.**   At the time of this email, were there limits on the number

11   of days that could be authorized by a UBH clinician?

12   **A.**   No.  I specifically stated:  "If you authorize beyond the

13   guideline, you must document clearly the rationale for the

14   exception."

15   **Q.**   Okay.  Now, directing your attention to Exhibit 745.

16   Specifically to page 0001 within that exhibit.

17          Do you have that in front of you?

18   **A.**   Yes.

19   **Q.**   Could you please read the last sentence of the paragraph

20   beginning with "Oregon."

21   **A.**   (Reading:)

22          "Use of this service can be helpful with the

23          discharge of complex cases and reduce the overall length

24          of stay."

25   **Q.**   And was that in connection with bringing in an M.D. on

**TRIANA - CROSS / RUTHERFORD**

1  site?

2  **A.**   Yes.

3  **Q.**   You were asked questions, just a few moments ago,

4  regarding ASAM.  Do you recall those questions?

5  **A.**   Yes.

6  **Q.**   I would like to direct your attention to Exhibit 524.

7  **A.**   Yes.

8  **Q.**   Was the adoption of the ASAM criteria considered by UBH in

9  2012?

10  **A.**   Yes, but not in the BPAC.

11  **Q.**   No, no.  Was the adoption of the UBH criteria considered

12  by UBH in --

13  **A.**   Repeat the question.

14  **Q.**   Yes.  In 2012, did UBH consider adopting the ASAM

15  criteria?

16  **A.**   Yes.

17  **Q.**   And did they?

18  **A.**   No.

19  **Q.**   Do you know whether or not a benefit expense analysis of

20  adopting the ASAM criteria was done in 2012?

21  **A.**   I don't recall that.

22  **Q.**   You don't recall whether there was a ben-ex --

23  **A.**   I don't recall the details of that.

24  **Q.**   Was one done?

25  **A.**   I believe so, yes.

**TRIANA - CROSS / RUTHERFORD**

1   **Q.**   Do you recall what it concluded?

2   **A.**   No.

3   **Q.**   Was another financial analysis done in 2014?

4   **A.**   Yes.

5   **Q.**   You were asked questions a moment ago about the

6   consideration of benefit expense in connection with considering

7   the adoption of the ASAM criteria.

8        Do you generally recall those?

9   **A.**   Yes.

10   **Q.**   Why, in your view, was it important for benefit expense to

11   be considered with respect to adopting the ASAM criteria?

12   **A.**   So when a -- adopting a guideline like ASAM at a national

13   level is a fairly significant process.  And not only does it

14   involve training and those kind of things, but one of the

15   things is that you have to also approach the health plans and

16   the customers that you have plans with, and you have to address

17   and let them know that you may be changing a guideline.  And

18   one of the things that they may be asking is what are,

19   potentially, the cost implications to that.

20        So it's important to be able to answer those kinds of

21   questions, because they are the customers.

22   **Q.**   So what would the potential -- do you have any

23   understanding of what the potential concern would be for a

24   customer that was self-funded?

25   **A.**   They would be paying -- if there's any difference, they

TRIANA - CROSS / RUTHERFORD

 1   would be absorbing the benefit expense.

 2   **Q.**   Do you have any understanding of what the concern would be

 3   for a customer that was fully insured?

 4   **A.**   The same thing.

 5          **THE COURT:**  What do you mean?  How are they absorbing

 6   it when it's fully insured?  What if UBH is insuring it; how is

 7   the customer affected?

 8          **THE WITNESS:**  So if UBH -- the customer could be

 9   United -- the medical plan.  And then if the -- if there would

10   be a benefit expense impact, then the premiums that the

11   behavioral side would charge the medical side would be

12   affected.

13          **THE COURT:**  All right.

14   **BY MR. RUTHERFORD:**

15   **Q.**   You've been on pitches before to sell a plan to an

16   employer; correct?

17   **A.**   Yes.

18   **Q.**   Is cost one of the items that employers, in your

19   experience, ask about when purchasing plans?

20   **A.**   Yes.

21   **Q.**   You were also asked questions about TMS.  Do you recall

22   that?

23   **A.**   Yes.

24   **Q.**   And specifically you were asked questions about which book

25   of business -- well, let me ask it to you differently.

1          You mentioned a difference between MDD and TRD.  What are

2     MDD and TRD?

3     **A.**   So MDD is major depressive disorder.  TRD is treatment

4     resistant depression.

5     **Q.**   And for which of those was there earlier FDA approval?

6     **A.**   For the treatment of MDD, major depressive disorder.

7     **Q.**   And then later, did FDA approve TMS for TRD?

8     **A.**   No.

9     **Q.**   Is that something that the CTAC ultimately approved?

10    **A.**   Recommended that.  Yes, that it was proven.

11    **Q.**   Now, after the CTAC -- the CTAC initially analyzed TMS --

12    no, that's leading.

13         Did the CTAC do an initial evaluation of TMS to determine

14    whether or not it was evidence based?

15    **A.**   Yes.

16    **Q.**   And what was that initial determination?

17    **A.**   That it was unproven and experimental and investigational.

18    **Q.**   Did CTAC conduct a subsequent evaluation of TMS?

19    **A.**   Yes.

20    **Q.**   And what did it subsequently determine?

21    **A.**   That it was proven under certain circumstances.

22    **Q.**   Can you explain which of the customers first began

23    receiving approvals for TMS by UBH?

24    **A.**   The first customers were health plans that requested

25    having that added to their benefit.

```
 1   Q.   What was the second set of customers for which TMS
 2   authorizations were made by UBH?
 3   A.   All of the commercial plans managed out of the national
 4   CACs.
 5   Q.   And were those plans for which UBH carried the risk?
 6   A.   Yes.
 7   Q.   And what was the third set of plans for which TMS was
 8   authorized by UBH?
 9   A.   The self-insured.
10   Q.   Would those be the ones that would --
11   A.   ASOs.
12   Q.   -- bear the costs themselves?
13   A.   Correct.
14        MR. RUTHERFORD:   One moment, Your Honor.   I just need
15   to find an exhibit.
16   BY MR. RUTHERFORD:
17   Q.   So directing your attention to Exhibit 758, at page 0008.
18   A.   Yes.
19   Q.   And specifically to the bottom right-hand corner of that
20   exhibit.
21   A.   What page on 758?   Sorry.
22   Q.   0008.
23   A.   08.  Yes.
24   Q.   And in that exhibit you were asked -- or it was noted to
25   you that there was a suggestion to tightly manage the TMS
```

1   requests; correct?

2   **A.**   Yes.

3   **Q.**   And then the same phrase appeared on page 758-0003?

4   **A.**   Yes.

5   **Q.**   And this was more of a directive from Ms. Regan to tightly

6   manage?

7   **A.**   It was her recommendation, yes.

8   **Q.**   Correct.  What -- what did it mean, at the time, to

9   tightly manage the TMS requests?

10  **A.**   What it looked like operationally was that any TMS request

11  was going to be reviewed by a medical director.

12  **Q.**   And why was that significant, if at all?

13  **A.**   It was significant because we wanted the additional

14  scrutiny of a clinical medical director reviewing the service

15  request for that.

16          **MR. RUTHERFORD:**  Your Honor, just a moment.  I may be

17  done.

18          **THE COURT:**  Sure.

19  **BY MR. RUTHERFORD:**

20  **Q.**   Currently, does UBH cover TMS for all plans where TMS is

21  not excluded?

22  **A.**   Yes.

23          **MR. RUTHERFORD:**  One moment, Your Honor.

24  **BY MR. RUTHERFORD:**

25  **Q.**   Last couple of questions.

1          When the -- during the period of time that the MDDs were

2    tightly managing the requests, were the number of

3    authorizations or denials different from what they are today?

4    **A.**    No.

5               **MR. RUTHERFORD:**  No further questions, Your Honor.

6               **THE COURT:**  Redirect.

7                        <u>**REDIRECT EXAMINATION**</u>

8    **BY MR. KRAVITZ:**

9    **Q.**    Dr. Triana, just a few follow-ups here.

10          You were asked a question on examination by UBH's lawyer

11   about clinical judgment.  Do you remember that?

12   **A.**    Yes.

13   **Q.**    And it is true, as you said in response to my questions,

14   that the guidelines are not just in the background; but, in

15   fact, the medical directors use them to make their

16   determinations?

17   **A.**    Using their sound clinical judgment with the guidelines,

18   yes.

19               **THE COURT:**  I think we beat this to death.

20               **MR. KRAVITZ:**  We have.  I'd just like to -- okay.

21               **THE COURT:**  Don't bother.

22               **MR. KRAVITZ:**  Okay.

23               **THE COURT:**  Don't.

24               **MR. KRAVITZ:**  I got it.  Got it.  Got it.  Got it.

25   \\\

1   BY MR. KRAVITZ:

2   **Q.**   And then in the question about ben-ex discussions at the

3   BPAC level, do you recall being asked questions about that?

4   **A.**   Yes.

5   **Q.**   And you actually gave three examples of discussions of

6   ben-ex at the BPAC level with respect to guidelines; is that

7   correct?

8   **A.**   Correct.

9   **Q.**   And I'd like to refer to your deposition at page 322, page

10   25 -- and this is the Volume 2, Volume 2, page 322, line 25

11   through page 323, line 13.

12      "Q.   When the BPAC discussed changes, proposed changes to

13         the Level of Care Guidelines, did anyone everybody raise

14         concerns about the impact of the changes on benefit

15         expense?

16      "A.   It would be something that would also be part of a

17         discussion if somebody felt that.  So I recall, again, in

18         general that that would occur with a guideline.  Typically

19         I don't recall it as much.  I'm trying to think of

20         specific examples, and I can't come up with something.

21         But, yes, people could -- somebody could bring up an issue

22         related to that."

23      And then you were asked questions about the inter-rater

24   reliability.  Do you recall that?

25   **A.**   Yes.

**TRIANA - REDIRECT / KRAVITZ**

1  **Q.**   And whether or not that was required by the accrediting

2  agencies, it is something that UBH did; right?

3  **A.**   Yes.

4  **Q.**   And took it seriously; correct?

5  **A.**   Yes.

6  **Q.**   And determined that the IRR rates were very high, which

7  indicated consistent use of the guidelines; correct?

8  **A.**   Yes.

9  **Q.**   And then with respect to TMS, I think that you have said a

10  couple of times, in response to UBH's counsel, that -- that

11  those benefits, after they were -- they were going to be

12  covered, and some things were tightly managed.  Do you recall

13  that thing?

14  **A.**   Yes.

15  **Q.**   And you recall that, in fact, the second time that

16  Ms. Regan said that she said "very tightly managed."  Do you

17  recall that?

18  **A.**   Yes.

19  **Q.**   And I think that what you said was that every TMS request

20  for coverage would go to a peer reviewer; is that right?

21  **A.**   To a medical director, yes.

22  **Q.**   Medical director.  So that means that it would be in

23  addition to a care advocate; right?

24  **A.**   Right.

25  **Q.**   And, as you put it, that was additional scrutiny; correct?

1   **A.**    Oversight, yes.

2   **Q.**    And then you were asked questions about, I believe, the

3   feedback by Mr. Bernstein or Dr. Bernstein.

4   **A.**    Uh-huh.

5   **Q.**    Do you recall that?

6   **A.**    Yes.

7   **Q.**    Okay.  And I would like to -- well, let me ask you this

8   question:

9          Isn't it true that the letter that goes to people like

10  Dr. Bernstein, to take a look at the guidelines, doesn't ask

11  them whether or not the guidelines are consistent with

12  generally accepted standards of care?

13  **A.**    I have not seen the letter that actually goes to

14  requesting that.

15  **Q.**    And so I take it that you would say you don't know whether

16  or not it discloses that the plans require that coverage be

17  provided at the level indicated by generally accepted standards

18  of care?

19  **A.**    I don't know what the letter specifically says.

20  **Q.**    Okay.  Have you ever seen it?

21  **A.**    No.

22          **MR. KRAVITZ:**  I'd like to, if I may, approach the

23  witness, Your Honor.

24          Did you give one to them?

25          **MS. REYNOLDS:**  Yes.

1          **MR. KRAVITZ:**  May I approach the witness?

2          **THE COURT:**  Yes.

3     BY MR. KRAVITZ:

4     Q.    And I'm going to show -- I'm going to show you what's been

5     marked as Exhibit 575.  If you could take a look at that.

6          And it is a compilation of feedback solicitation letters,

7     I believe, if my memory serves me, from 2009, 2013, and 2014.

8          Do you have that in front of you?

9     A.    Yes.

10    Q.    Okay.  And it's got United Behavioral Health at the top.

11    Do you see that?

12    A.    Yes.

13    Q.    Okay.  And you have no doubt that this is a UBH document?

14    A.    Correct.

15    Q.    And it's soliciting feedback.

16         Do you see that?

17    A.    Yes.

18         **MR. KRAVITZ:**  And I'd like to move this exhibit into

19    evidence.

20         **MR. RUTHERFORD:**  No objection.

21         **THE COURT:**  Admitted.

22         (Trial Exhibit 575 received in evidence.)

23    BY MR. KRAVITZ:

24    Q.    And if you -- let's just look at the first page.  You'll

25    see what the questions are.

1        "As you review these guidelines, please keep the

2    following questions in mind:

3        "Do the guidelines offer adequate support for making

4    decisions about case?

5        "Are the guidelines organized in a manner that makes

6    them easy to use?

7        "Are there criteria that are ambiguous or unclear?

8        "Are there criteria that should be added or deleted?"

9    Do you see that?

10   **A.**   Yes.

11   **Q.**   Doesn't say anything about are they consistent with

12   generally accepted standards of care; right?

13   **A.**   Doesn't say that.

14   **Q.**   Right.

15       And so this letter isn't specifically soliciting feedback

16   on that subject; correct?

17   **A.**   It's soliciting general feedback.

18   **Q.**   Right.  Doesn't mention generally accepted standards of

19   care; correct?

20   **A.**   No.

21   **Q.**   You were asked some questions about Exhibit 305.  That was

22   the -- you remember that?  Do you recall that?

23   **A.**   Yes.

24   **Q.**   Okay.  And that's -- that's the one that had to do with

25   day and visit limits; right?

1    **A.**    Authorization guidelines.

2    **Q.**    Right.  Outlier guidelines?

3    **A.**    Correct.

4    **Q.**    Right.

5         And that we talked about that, that, in fact, outlier

6    cases would be identified; right?  Yes?

7    **A.**    Yes.

8    **Q.**    And then there would be, you know, two to three days, two

9    to four days, something like that, authorized subject to

10   concurrent review; correct?

11   **A.**    Correct.

12   **Q.**    But you testified, in response to UBH's lawyer, that there

13   are no day or visit limits in effect now; right?

14   **A.**    That is correct.

15   **Q.**    Okay.  Turn to Exhibit 768, please.  And that is a

16   document that is in evidence.  Okay.  And that -- it's an email

17   dated May 20th, 2014, from Chris Garcia to a number of UBH

18   employees; is that correct?

19   **A.**    Correct.

20   **Q.**    Okay.  And if you would turn to page 0009 of that

21   document.  Are you with me?

22   **A.**    Yes.

23   **Q.**    And the title there is "Quantitative Impact and Mitigation

24   Strategies."

25        Do you see that?

1    **A.**    Yes.

2    **Q.**    And "impact" is removal of day and visit limits on

3    inpatient, intermediate, and outpatient; correct?

4    **A.**    Correct.

5    **Q.**    Right.

6          And that was one of the results of the parity act, that

7    you couldn't have day and visit limits; correct?

8    **A.**    Correct.

9    **Q.**    And to the right there's a mitigation strategy; right?

10   **A.**    Correct.

11   **Q.**    And it says:

12          "Continued use of concurrent review to ensure

13          appropriate utilization."

14          Did I read that right?

15   **A.**    Yes.

16          **THE COURT:**  We have to stop shortly.

17          **MR. KRAVITZ:**  I may be done.

18          **THE COURT:**  Okay.

19          **MR. KRAVITZ:**  That's it for now.

20   Thank you, Your Honor.

21          **MR. RUTHERFORD:**  Nothing further from us, Your Honor.

22          **THE COURT:**  Thank you, sir.

23   Okay.  We're done for the day.  8:30 tomorrow morning.

24   Anything we need to talk about?

25          **MR. ABELSON:**  Your Honor, I wanted to raise one quick

```
1    sealing issue.
2        There are two videos we intend to show in the morning.
3    One of the videos of Mr. Rockswold involved two documents they
4    move to sealed seal.  It would be helpful to have a ruling on
5    the sealing so our trial tech, tonight, can prepare the video.
6    We can also address it in the morning, if you prefer.
7             THE COURT:  I don't understand.  Videos are videos.
8         MR. ABELSON:  Oh, I'm sorry.  The documents that are
9    being discussed at the time.  This involves Exhibits 564 and
10   812.
11            THE COURT:  Well, are they going to go over pages that
12   are sealed, you want sealed?
13        MR. HOLMER:  Actually, Your Honor, I believe at least
14   one of the exhibits we've sought to seal in its entirety.  So
15   to the extent they intend to show that, yes.
16        We're happy to address this right now, in the morning,
17   whatever your preference is.
18            THE COURT:  Well, I don't know.  What do you want to
19   seal in its entirety?
20        MR. HOLMER:  The document we seek to seal in its
21   entirety, Your Honor, is an email chain with counsel that is
22   discussing potential changes to a particular guideline in light
23   of some regulatory inquiries by the State of Indiana.
24            THE COURT:  And you're going to show them having
25   testified about it?
```

1          **MR. ABELSON:**  Yes.

2          **THE COURT:**  That's not going to be sealed in the

3    courtroom.  I'm happy to seal it in the record, but I'm not

4    going to seal it in the courtroom.

5          **MR. HOLMER:**  Understood, Your Honor.

6          **THE COURT:**  And the other one is just sealed in part.

7    What's that?

8          **MR. HOLMER:**  Yes.  We -- it's related email.  A

9    similar conversation.  But that document, we think only

10   portions need to be sealed.

11         **THE COURT:**  Okay.  I'm happy with both of them to seal

12   them as you like; but I won't seal the courtroom.

13         **MR. ABELSON:**  Thank you.

14         **MR. HOLMER:**  Understood.  Thank you, Your Honor.

15         **THE COURT:**  They can testify and show those documents.

16         **MR. ABELSON:**  Thank you.

17         **MS. REYNOLDS:**  Your Honor, for planning purposes, we

18   have, we think, less than an hour of video testimony, and then

19   we intend to rest.

20         **THE COURT:**  Great.

21         **MR. HOLMER:**  Excuse me, Your Honor.  If I could just

22   clarify one thing for the record.  Those two exhibits, I

23   believe, were 812 and 564, so that's on the record what's being

24   sealed.

25         **THE COURT:**  Okay.  Moving right along.

**PROCEEDINGS**

1          Okay.  We'll see you then.

2               **THE CLERK:**  The Court stands in recess.

3                    (Recess taken at 1:01 p.m.)

4          (Proceedings to resume on Tuesday, October 23, 2017.)

5                         -   -   -   -

6

7

8                    CERTIFICATE OF REPORTERS

9          We certify that the foregoing is a correct transcript

10   from the record of proceedings in the above-entitled matter.

11   DATE:   Monday, October 23, 2017

12

13

14   _____

15   Katherine Powell Sullivan, CSR #5812, RMR, CRR
              U.S. Court Reporter

16

17

18

19   _____

20        Jo Ann Bryce, CSR #3321, RMR, CRR
              U.S. Court Reporter

21

22

23

24

25