**Volume 5**

**Pages 819 - 1048**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JOSEPH C. SPERO, MAGISTRATE JUDGE

DAVID AND NATASHA WIT, et al.,   )
                                 )
          Plaintiffs,            )
                                 )
  VS.                            )   **No. C 14-2346 JCS**
                                 )
UNITED BEHAVIORAL HEALTH,        )
                                 )
          Defendant.             )
_____)   San Francisco, California
                                     Tuesday, October 24, 2017

<u>**TRANSCRIPT OF PROCEEDINGS**</u>

<u>**APPEARANCES**</u>:

For Plaintiffs:          ZUCKERMAN SPAEDER LLP
                         1800 M Street, NW, Suite 1000
                         Washington, DC  20036-5807
                    BY:  **CARL S. KRAVITZ, ESQUIRE**
                         **CAROLINE E. REYNOLDS, ESQUIRE**
                         **AITAN D. GOELMAN, ESQUIRE**

                         ZUCKERMAN SPAEDER LLP
                         485 Madison Avenue, 10th Floor
                         New York, New York 10022
                    BY:  **JASON S. COWART, ESQUIRE**


          (Appearances continued on next page)


Reported By:   Katherine Powell Sullivan, CSR #5812, RMR, CRR
               Jo Ann Bryce, CSR #3321, RMR, CRR
               Official Reporters - U.S. District Court

**APPEARANCES (CONTINUED):**

For Plaintiffs:        ZUCKERMAN SPAEDER LLP
100 East Pratt Street, Suite 2440
Baltimore, Maryland 21202-1031
**BY: ADAM ABELSON, ESQUIRE**

THE MAUL FIRM, P.C.
101 Broadway, Suite 3A
Oakland, California 94607
**BY: ANTHONY F. MAUL, ESQUIRE**

PSYCH APPEAL
8560 Sunset Boulevard, Suite 500
West Hollywood, California 90069
**BY: MEIRAM BENDAT, ESQUIRE**

For Defendant:        CROWELL & MORING LLP
515 South Flower Street, 40th Floor
Los Angeles, California 90071-2258
**BY: JEFFREY H. RUTHERFORD, ESQUIRE**
**JENNIFER S. ROMANO, ESQUIRE**
**ANDREW HOLMER, ESQUIRE**

CROWELL & MORING LLP
3 Embarcadero Center, 26th Floor
San Francisco, California 94111
**BY: NATHANIEL P. BUALAT, ESQUIRE**

CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595
**BY: APRIL N. ROSS, ESQUIRE**

# I N D E X

Tuesday, October 24, 2017 - Volume 5

|  | PAGE | VOL. |
|---|---|---|
| Motion under Rule 52(c) | 827 | 5 |

**PLAINTIFFS' WITNESSES**

|  | PAGE | VOL. |
|---|---|---|
| **BRIDGE, FRANCIS** | | |
| By Videotape Deposition (not reported) | 823 | 5 |
| **ROCKSWOLD, ERIC** | | |
| By Videotape Deposition (not reported) | 824 | 5 |

**DEFENDANTS' WITNESSES**

|  | PAGE | VOL. |
|---|---|---|
| **DEHLIN, BARRY WILLIAM** | | |
| (SWORN) | 833 | 5 |
| Direct Examination by Ms. Ross | 834 | 5 |
| Cross-Examination by Mr. Abelson | 905 | 5 |
| **MARTORANA, ANDREW** | | |
| (SWORN) | 922 | 5 |
| Direct Examination by Ms. Romano | 922 | 5 |
| Direct Examination resumed by Ms. Romano | 954 | 5 |

# E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 255 | | 825 | 5 |
| 290 | | 824 | 5 |
| 291 | | 824 | 5 |
| 564 | | 825 | 5 |
| 634 | | 969 | 5 |
| 639 | | 971 | 5 |
| 711 | | 827 | 5 |
| 812 | | 825 | 5 |
| 896 | | 825 | 5 |

# I N D E X

## E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1186 | | 941 | 5 |
| 1206 | | 955 | 5 |
| 1502 | | 1017 | 5 |
| 1507 | | 1015 | 5 |
| 1653 | | 892 | 5 |
| 1654 | | 898 | 5 |

                        **P R O C E E D I N G S**

                              **---000---**

            **THE CLERK:**  Okay.  We're calling.

       Case Number is C 14-2346, Wit/Alexander versus

    UnitedHealthcare Insurance Company.  And just a reminder that

    this 14-5337 has been consolidated into the Wit action.

            **THE COURT:**  Okay.  Good morning, everyone.

            **MR. RUTHERFORD:**  Good morning, Your Honor.

            **MS. REYNOLDS:**  Good morning, Your Honor.

       Just very briefly before we begin, I wanted to take a

    moment just to introduce to the Court another of our plaintiffs

    who was here yesterday and is here this morning, Cecilia

    Holdnak.  And Linda Tillitt is in the room as well.

            **THE COURT:**  Okay.  Welcome.

            **MS. REYNOLDS:**  And the plaintiffs call Francis Bridge

    by video.

            **THE COURT:**  Okay.

                (Video was played but not reported.)

            **THE COURT:**  Fabulous.  That's great television.

            **MS. REYNOLDS:**  At this time the plaintiffs call Eric

    Rockswold also by video.

            **THE COURT:**  Do you want to make a motion as to 290 and

    291.

            **MS. REYNOLDS:**  Thank you, Your Honor.  Plaintiffs move

1    Exhibits 290 and 291 into evidence.

2           MR. BUALAT:  No objection, Your Honor.  Those are

3    subject to the sealing order from yesterday --

4           THE COURT:  Okay.

5           MR. BUALAT:  -- correct?

6           THE COURT:  Whatever I ordered counts, yes.

7           MR. BUALAT:  Great.  Thank you.

8           THE COURT:  And, yes, they're admitted.

9        (Trial Exhibits 290 and 291 received in evidence)

10          THE COURT:  So who do we have?

11          MS. REYNOLDS:  Eric Rockswold is the next witness.

12              (Video was played but not reported.)

13          MR. ABELSON:  Your Honor, these two documents are

14    subject to UBH's order to seal.  The Court sealed them so we've

15    provided hard copies to Your Honor in a binder.  UBH asked that

16    they not be displayed, Your Honor.

17          THE COURT:  Okay.  Karen, can I see them?

18        Are these the right exhibit numbers?

19          MR. ABELSON:  In the new exhibits, it's 564 and --

20          THE COURT:  Well, which is 23?

21          MS. REYNOLDS:  812.

22          THE COURT:  It's 812.  Okay.  Got it.  Thank you.

23              (Video was resumed playing but not reported.)

24          MS. REYNOLDS:  Your Honor, plaintiffs move to admit

25    Exhibits 564 and 812 into evidence.

1     **MR. BUALAT:**  No objection, Your Honor.

2     **THE COURT:**  Okay.  Those are admitted.

3     (Trial Exhibits 564 and 812 received in evidence)

4     **MR. ABELSON:**  Your Honor, just a few loose ends.

5  There are some stipulations the parties have entered that we'd

6  like to move into evidence.  First is one that the parties

7  actually signed this morning with respect to the class list.

8  This is Trial Exhibit 896.

9     So we'd like to move into evidence this stipulation, which

10 lays out some of the fields that, among other things, that

11 Ms. Bridge testified about.  So we'd like to move into evidence

12 Trial Exhibit 896, as well as Trial Exhibit 255, which is the

13 underlying class list, and the Court has in electronic form and

14 which the parties have agreed should be filed under seal.

15    **THE COURT:**  Just hang on a second.

16                    (Pause in proceedings.)

17    **THE COURT:**  Okay.  Any objections?

18    **MS. ROMANO:**  No objection, Your Honor.

19    **THE COURT:**  Okay.  They're admitted.

20    (Trial Exhibits 255 and 896 received in evidence)

21    **THE COURT:**  And which one is filed under seal?  The

22 class list?

23    **MR. ABELSON:**  Yeah.  Exhibit 255.

24    **THE COURT:**  Okay.  Those are admitted.  255 is under

25 seal.

1    **MR. ABELSON:**  And then we'd also like to move into

2  evidence Trial Exhibit 711, which is a stipulation concerning

3  per-member-per-month rates.

4    **THE COURT:**  Okay.

5    **MR. ABELSON:**  This document was previously provided to

6  the Court in electronic copy form.

7    **THE COURT:**  Yes?

8    **MR. BUALAT:**  Your Honor, we would -- UBH objected to

9  this document in its *Motion in Limine* Number 3 relating to

10  relevance.  This is related to per member per month.  I assume

11  you're going to overrule the objection.

12    **THE COURT:**  I think I have.

13    **MR. BUALAT:**  Plaintiffs -- I'm sorry, Your Honor.

14    Plaintiffs have stipulated to sealing the member-per-month

15  data that is in Exhibit 1.  We will be providing the redacted

16  versions.  Someone will bring it at lunch so we could -- if

17  that's all right with Your Honor, we'll bring it then.

18    **THE COURT:**  So portions of 711 will be redacted;

19  right?

20    **MR. BUALAT:**  Yes, the exhibit.

21    **THE COURT:**  And sealed.

22    **MR. ABELSON:**  Thank you, Your Honor.

23    **THE CLERK:**  So portions of 711 are sealed?

24    **THE COURT:**  Yes.

25    **THE CLERK:**  And just let me clarify.  896 is not

 1   sealed?

 2           **MR. ABELSON:**  Correct.

 3           **THE COURT:**  896 is not sealed.

 4      (Trial Exhibit 711 received in evidence)

 5           **MS. REYNOLDS:**  And at this time plaintiffs rest.

 6           **THE COURT:**  Okay.  Onward.

 7           **MS. ROMANO:**  Your Honor, since plaintiffs have rested,

 8   UBH brings an oral motion for judgment on partial pleadings --

 9   partial findings -- excuse me -- under Rule 52(c).

10      I want to present a few of the key issues where plaintiffs

11   have failed to carry their burden.  UBH is not raising its

12   right to waive other issues or arguments later in trial,

13   posttrial briefing, on appeal, or in a motion for

14   decertification.

15      Two primary issues we'd like to raise at this time,

16   Your Honor, is that plaintiffs have not offered any testimony

17   about many of the Coverage Determination Guidelines at issue in

18   this case.

19      The Coverage Determination Guidelines were used for

20   approximately half of the class members.  There's 216 Coverage

21   Determination Guidelines that were admitted into evidence,

22   Exhibits 9 through 224.  We have only heard testimony on seven

23   of them, the Custodial Care Guidelines.  Those seven are

24   Exhibits 10, 47, 84, 108, 148, 195, and 221.

25      With the exception of those, there are 216 Coverage

1  Determination Guidelines that have not been mentioned or

2  discussed other than admitting them into evidence.  No

3  testimony about what they say, what they mean, or whether they

4  incorporate any of the language that has been critiqued by

5  plaintiffs' experts with respect to the Level of Care

6  Guidelines at trial.

7          **THE COURT:**  Okay.

8          **MS. ROMANO:**  The issue two -- primary issue two,

9  Your Honor, we wanted to raise is that plaintiffs have not

10 carried their burden to prove that the guidelines are

11 inconsistent with each of the plans as a whole.

12         The only evidence that we saw from plaintiffs with respect

13 to the plans is the testimony and exhibits presented through

14 their summary witness, Ms. Duh, yesterday; but that evidence

15 did not identify instances where -- or they solely identified

16 instances where the plans make reference to particular terms or

17 phrases that counsel asked Ms. Duh to find in the plans.

18         There was no testimony relating to what those plans mean,

19 what the provisions mean that Ms. Duh mentioned or how they fit

20 into the plans as a whole or whether the guidelines are

21 inconsistent with the plans.

22         **THE COURT:**  Okay.

23         **MS. ROMANO:**  Because of these failings, Your Honor,

24 plaintiffs have not presented class-wide common proof that UBH

25 breached a fiduciary duty or violated the terms of all of the

1  class members' ERISA plans that are at issue in this case.

2      And, in addition, Your Honor, I'd like to state for the

3  record that UBH also believes plaintiffs have failed to prove

4  their claims as a matter of law for several other reasons,

5  reasons that have been raised before; namely, that plaintiffs

6  have not offered class-wide proof that any breach of fiduciary

7  duty caused harm to the plaintiffs or class members.

8      They didn't carry their burden to prove that the alleged

9  flaws in the guidelines that were cited by plaintiffs' experts

10  caused a denial of benefits or otherwise caused any harm to

11  plaintiffs or class members.

12      And that plaintiffs have not established with the evidence

13  at trial Article III standing for themselves or the class

14  members because they've not made any showing of actual concrete

15  harm to plaintiffs or the class members resulting from any

16  conduct by UBH.

17          **THE COURT:**  Thank you.

18      Would you like to respond?

19          **MS. ROMANO:**  And I'll go ahead and come over here.

20          **MS. REYNOLDS:**  Your Honor, of course, plaintiffs

21  oppose the motion.  Just addressing first the two primary

22  issues that UBH's counsel has raised.

23      With respect to the Coverage Determination Guidelines,

24  Your Honor, most importantly you'll note that the motion was

25  very carefully limited to a supposed lack of testimony but not

1  a lack of evidence, and that's because the parties have

2  stipulated as to language that incorporates the LOCGs into the

3  CDGs.  That stipulation was entered into evidence on the first

4  day of trial.

5          THE COURT:  What's the exhibit number?

6          MS. REYNOLDS:  Sorry?

7          MR. ABELSON:  880.

8          MS. REYNOLDS:  880.

9          THE COURT:  880.

10          MS. REYNOLDS:  It's Exhibit 880, which is a

11  stipulation between the parties, and in particular in

12  paragraphs 29 and 30, the stipulation addresses the fact that

13  each of the Coverage Determination Guidelines that is listed,

14  which are the Coverage Determination Guidelines in evidence in

15  the case, contains one or more references to one or more Level

16  of Care Guidelines and then there's a specification exactly

17  what that language is.  There are various categories and then

18  there's a chart attached to the stipulation that specifies

19  exactly which of those categories of incorporation language

20  appears in each of the CDGs.

21      And the CDGs further are grouped so that they are

22  corresponding to a particular Level of Care Guidelines year.

23  And so that's also indicated on the stipulated-to chart so that

24  insofar as any particular year's Level of Care Guidelines fall

25  short of generally accepted standards of care and those CDGs

1   are found to incorporate those Level of Care Guidelines,

2   plaintiffs' argument is that the CDGs are also invalid that

3   fall in that same group.

4        And if the Court would like, I can discuss further what

5   the specific incorporation language is.

6        And I'd also just like to note that yesterday there was

7   testimony from Dr. Triana that the CDGs incorporate the LOCGs,

8   and there has been testimony as to the fact that the testimony

9   and documentary evidence as to the fact that the CDGs and the

10  LOCGs are highly interdependent and need to be kept in sync.

11       With respect to the second issue, whether or not

12  plaintiffs have proven that the Level of Care Guidelines are

13  inconsistent with the class members' plans, there has been

14  extensive evidence offered by plaintiffs' expert testimony and

15  documentary evidence to show that the Level of Care Guidelines

16  fall below generally accepted standards of care.

17       And we have submitted into evidence each one of the class

18  members' plans and a summary witness, Ms. Duh, who testified

19  that each and every one of those plans includes language that

20  refers to generally accepted standards of care.  And the

21  plaintiffs' argument is that that language makes it one

22  condition of coverage under each one of the plans that the

23  services be consistent with generally accepted standards of

24  care.

25       And, further, Ms. Duh, the summary witness, testified that

1   each and every one of the denials in this case cited to a Level

2   of Care Guideline or Coverage Determination Guideline, which,

3   as the testimony yesterday and the documentary evidence

4   demonstrates, indicates that the Level of Care Guidelines were

5   used in whole or in part as a basis for the denial for each

6   class member's claim.

7       And we submit that that is sufficient evidence to

8   withstand a motion for partial judgment.

9       **THE COURT:** Anything further?

10      **MS. ROMANO:** Just quickly on the stipulation,

11   Your Honor. It is not a stipulation showing that all of these

12   Coverage Determination Guidelines incorporate in the language

13   or terms of the Level of Care Guidelines.

14      A review of paragraphs 20 through -- let's see -- 28

15   explain what the stipulation is and the multiple types of

16   references or no references to the Level of Care Guidelines

17   that come in through these various Coverage Determination

18   Guidelines.

19      Some of the Coverage Determination Guidelines merely

20   reference that there will be clinical protocols that are

21   followed. And the chart, which I will just show for

22   Your Honor, shows multiple ways that the Coverage Determination

23   Guidelines do or do not reference Level of Care Guidelines or

24   do or do not include language from the Level of Care

25   Guidelines.

1    There is no evidence in the record that the language and

2    terms challenged in the Level of Care Guidelines are

3    incorporated into each of these 216 Coverage Determination

4    Guidelines.

5         THE COURT:  Okay.  Thank you both.

6         MS. ROMANO:  Thank you.

7    Your Honor, United Behavioral Health would like to call

8    Barry Dehlin to the stand, and Ms. Ross will be handling that

9    testimony.

10              (Pause in proceedings.)

11         THE CLERK:  Good morning.  Can you raise your right

12   hand before you're seated?

13              **BARRY WILLIAM DEHLIN**,

14   called as a witness for the Defendant, having been duly sworn,

15   testified as follows:

16         THE WITNESS:  I do.

17         THE CLERK:  Thank you.

18   Please go ahead and have a seat.  Make yourself

19   comfortable and make sure that you speak clearly into the

20   microphone for our court reporter.

21   And could you please just state your full name for the

22   record and spell your last name.

23         THE WITNESS:  Sure.  My name is Barry William Dehlin.

24   Last name is D-E-H-L-I-N.

25         THE CLERK:  Thank you.

1  <u>DIRECT EXAMINATION</u>

2  **BY MS. ROSS:**

3  **Q.**   Good morning, Mr. Dehlin.

4  **A.**   Good morning.

5  **Q.**   Can you briefly describe your educational background?

6  **A.**   Yes.  I had university at Princeton University, and I have

7  a master's degree from the University of Michigan School of

8  Public Health.

9  **Q.**   Who is your current employer?

10  **A.**   UnitedHealthcare.

11  **Q.**   How long have you worked for United?

12  **A.**   Since 2003.  So 14 years.

13  **Q.**   Can you briefly describe for the Court your job title and

14  responsibilities?

15  **A.**   My title is director of product strategy, and I work with

16  a lot of different parts of UnitedHealthcare's product

17  organization supporting them with background information,

18  market research, analytics data, best practices, that type of

19  thing.

20  **Q.**   And have you been in a product management role the full 14

21  years that you've worked for United?

22  **A.**   Yes, I have.

23  **Q.**   And what do you mean when you say "product"?

24  **A.**   Right.  So a product when you're talking about health

25  benefits, the core of it is going to be the benefit coverage

1　that we're responsible for.  Around those benefits, we often

2　wrap many other services:  Tools for consumers, website, things

3　to help them understand how much different types of care might

4　cost, services that help manage the health of a population.  So

5　there are a variety of other services like that.

6　Q.　So is a product the same as a plan?

7　A.　They're pretty close to the same thing, yes.

8　Q.　Who are United's customers?

9　A.　We have a ton of different types of customers, from

10　individuals who buy insurance from us just for themselves or

11　their family, but more frequently employers of all types --

12　very small employers, medium-to-large-size employers -- and

13　then a variety of other non -- you know, other organizations

14　like union organizations and things like that.  So a huge

15　diversity.

16　Q.　Talking about United's employer customers, what do

17　employers hire United to do?

18　A.　Our employers are looking -- our employer customers, I

19　should say, are looking for us to do a variety of things for

20　them.  The most important is to make sure that their employees

21　have a set of benefits that, you know, provide them the

22　coverage they want.

23　　　To do that, we have to do a variety of things.  We

24　contract with providers, hospitals, physicians, and others, to

25　create a network that those folks can seek care from.  We

1   receive claims, review them.  When there are covered services

2   under the plan, we pay them.  So we adjudicate all of those

3   claims.

4        We provide a lot of those services that I mentioned

5   earlier, services for their employees.  We provide, you know,

6   population health services.  So employers are looking for all

7   of those things from us.

8        And then some employers are looking for us to bear the

9   risk of, you know, unexpectedly high healthcare costs.

10  **Q.**   You work for UnitedHealthcare.  Are you familiar with

11  United Behavioral Health or UBH?

12  **A.**   I am.

13  **Q.**   Is there a relationship between UnitedHealthcare and UBH?

14  **A.**   Yes.  We are both sister companies within the larger

15  umbrella company called UnitedHealth Group.

16  **Q.**   And what does UBH do?

17  **A.**   UBH is an organization that is -- has expertise in

18  behavioral health, mental health substance abuse services; and

19  for us but also for other of their customers outside of

20  UnitedHealth Group, they provide many of the types of things

21  that I just mentioned but focus on behavioral health.

22       So they create a network and contract with providers.

23  They receive claims, evaluate those claims, pay them when there

24  are covered services.  They do other similar population health

25  management.  They provide consumer tools.  So they do all of

1 those things for us and for their other customers.

2 **Q.**   And if someone is unhappy with a decision that UBH makes

3 about whether they get coverage for behavioral health

4 treatment, do the plans allow them to appeal?

5 **A.**   They do.

6 **Q.**   Do you understand that this case is about behavioral

7 health benefit plans administered by UBH?

8 **A.**   Yes.

9 **Q.**   And are you familiar with the plans in this case?

10 **A.**   Yes, I am.

11 **Q.**   How are you familiar with the plans?

12 **A.**   I have reviewed many of the plans, not word for word but

13 some -- certainly a lot of the sections that some are critical

14 that have been put together in, you know, the fairly voluminous

15 summaries that we have.

16 **Q.**   And we'll get to those summaries shortly.  Do you

17 understand that the plans that you reviewed in this case for

18 the plaintiffs and the sample members are just a subset of the

19 larger universe of plans involved in this case?

20 **A.**   I do understand that.

21 **Q.**   How many different benefit plans does United offer?

22 **A.**   Almost too many to count.  When it comes to a lot of

23 different customers, we have different states will have

24 different plans, thousands, tens of thousands.  I mean, just a

25 huge number.

**Q.**   And does United Behavioral Health administer the

behavioral benefits for all of those plans?

**A.**   Probably not all but the vast, vast majority.  There will

be some instances where a large group may choose to outsource

their behavioral health services and receive them from a

different behavioral health vendor; but for the vast majority

of what we do, yeah, UBH is involved.

**Q.**   Are all of those plans the same?

**A.**   No.

**Q.**   Can you describe for the Court some of the variations in

the plans that UnitedHealthcare offers to its customers and

that UBH administers with respect to behavioral health

benefits?

**A.**   Sure.  So our products and plans can vary in a lot of

different ways.  I alluded to one earlier, which is some of our

plans are fully insured plans where a customer is looking for

financial certainty and we provide, you know, that certainty by

bearing the risk.

     There are some plans that are self-funded where the

customer will take on more risk themselves.

     There are plans that are for customers who are looking for

a very generous or rich set of benefits.  So there will be, you

know, perhaps some additional covered services, very low cost

sharing, no deductibles, low copays.

     To the contrary, there are plans for customers who are

1　much more price sensitive and are looking for leaner things.

2　So perhaps a fewer -- several fewer covered services and much

3　more significant cost sharing.

4　　　And then the other services that we wrap around it can

5　vary quite a bit, some from plan to plan as well.

6　**Q.**　Could the plans also differ with respect to appeal rights

7　under the plans?

8　**A.**　They could.

9　**Q.**　And could state law also affect the terms of a plan?

10　**A.**　Absolutely, for fully insured plans.

11　**Q.**　Are you familiar with the term "Certificate of Coverage,"

12　which is sometimes shortened to COC?

13　**A.**　I am.

14　**Q.**　And what is a COC?

15　**A.**　A Certificate of Coverage is something that's in

16　conjunction with a fully insured plan, describes our

17　responsibilities to our members, the consumers, and to some

18　extent some describes their responsibilities to us.

19　**Q.**　And does it define the scope of benefits that are

20　available under that plan to its members?

21　**A.**　Among many other things, yes, it does that.

22　**Q.**　What about the term "summary plan description" or SPD?

23　Are you familiar with that term?

24　**A.**　I am.

25　**Q.**　What is an SPD?

1  A.   An SPD will serve pretty much the same role as a COC, or a

2  Certificate of Coverage, but in the context of self-funded

3  plans.

4  Q.   Let's start with fully insured plans.  What is a fully

5  insured plan?

6  A.   A fully insured plan is where an employer is looking for

7  financial certainty in terms of how much they will pay.  So

8  they will have a premium, according to that plan, and that will

9  be the amount they pay typically on a monthly basis; and there

10 is no risk, no chance that they will pay more than that.  So

11 they have financial certainty.  And if there are higher than

12 expected healthcare usage and higher than expected costs, we

13 end up paying, you know, that extra amount.

14 Q.   What is UBH's role with respect to fully insured plans?

15 A.   UBH administers -- or for mental health and substance

16 abuse services will, you know, administer those services for us

17 for a variety of fully insured plans, but their function is

18 really no different for fully insured or self-funded.

19 Q.   And what do you mean by "no different"?

20 A.   They for -- whether it's fully insured or self-funded,

21 there is a set of defined benefits, and they are focused on

22 adjudicating those benefits; and really our risk arrangement

23 with our customer doesn't come into play with how they do

24 their -- how they play their role in any way.

25 Q.   You're referring to how they administer benefits?

**A.**   Correct.

**Q.**   Does it affect whether UBH bears risk with respect to whether a plan is fully insured or self-insured?

**A.**   No.  Our risk arrangements with our customers has nothing to do with, you know, how UBH -- with any risk arrangement they may have.

**Q.**   How does United determine what premium to charge the customer of a fully insured plan?

**A.**   So there's a lot that goes into that, and the answer will be different depending on state laws, depending on the type and size of customer; but, in general, it starts with estimating, you know, the medical costs for that group; or perhaps for some pool of people if we can't focus on that employer, once we have an estimate of medical costs, we will add in a certain amount for administrative expenses, and then we will also add a certain amount for margin or profit.  The sum of those things is the premium.

**Q.**   Does UBH -- or does United review and, if needed, adjust the premiums to account for changes in the anticipated cost of providing or administering fully insured benefit plans?

**A.**   We would, to the extent we can according to law.

**Q.**   Now, what is a self-funded plan?

**A.**   A self-funded plan is a situation where an employer is willing to take some risk.  So we will certainly give them our best guess, our expert guess, at how much their population will

1  spend, but -- and so they will know that.

2     If -- if the actual experience is higher than expected,

3  they will actually pay the extra.  If the actual experience is

4  lower than expected, they will pay less than expected.  They

5  bear the risk and they're only paying us for our administrative

6  services.

7  **Q.**  Do all of the plans offer the same scope of benefit

8  coverage?

9  **A.**  They do not.

10  **Q.**  So who decides what benefits will be included in any given

11  plan?

12  **A.**  It depends on the type of plan.  So for fully insured

13  plans, we typically have filed a variety of different plans

14  with state regulators, and those will, you know, be the

15  amount -- the benefits that are used.  That's, of course,

16  informed over time by what customers have requested and by

17  state law and other rules.

18     For self-funded benefits, we typically have a starting

19  point, but self-funded customers and typically larger customers

20  have the flexibility and often make changes to those things.

21  We try to accommodate those changes to the extent that we have

22  the ability to do so, that it's legal to do so.

23  **Q.**  Does UBH play a role in setting the behavioral health

24  benefit terms for either fully insured or self-insured plans?

25  **A.**  They have some influence.  So they are our behavioral

1   health experts, so we certainly look to them for expertise for

2   our fully insured plans and what should be covered.

3       For self-funded plans, they also have shaped sort of our

4   default starting point; but, again, customers -- self-funded

5   customers do have the right and often do vary or diverge from

6   that.

7   **Q.**  And you mentioned that cost sharing can vary by plans; is

8   that right?

9   **A.**  That's correct.

10  **Q.**  What did you mean by cost sharing?

11  **A.**  Cost sharing is basically a situation where the cost for

12  any given service is split between the insurance company and

13  the consumer.

14      For any given service, there will -- if it's a network,

15  there will typically be a contracted rate depending on the

16  plan, how much the consumer has spent on that plan, to

17  determine whether they've met their deductible and other

18  things.  The consumer may pay more or less.

19      The cost sharing is basically the consumer's

20  responsibility out of any of the cost of any specific service.

21  **Q.**  So that would include things like copays and deductibles

22  and coinsurance?

23  **A.**  Yes, it would.

24  **Q.**  All right.  Is a plan typically effective for a specific

25  period of time or is it open-ended?

1    **A.**    Typically effective for one year.

2    **Q.**    And do state regulators approve the plan terms before you

3    offer the plans to customers?

4    **A.**    For fully insured plans, yes, they do.

5    **Q.**    What about for self-insured plans?

6    **A.**    Self-insured plans state regulators have no role.

7    **Q.**    Okay.  Let's look at some of the plans in this case.

8    Mr. Dehlin, you should have three binders down to your left, I

9    think, sitting on the floor.  We'll start with the one that's

10   labeled Volume 1.

11        And if you could turn to Trial Exhibit 225, which has

12   already been admitted into evidence.

13        Mr. Dehlin, do you recognize Trial Exhibit 225?

14   **A.**    I do.

15   **Q.**    What is it?

16   **A.**    This is a Certificate of Coverage for an employer called

17   Granite Construction, that was in effect January of 2013.

18   **Q.**    Is this a fully insured plan or self-funded plan?

19   **A.**    This Certificate of Coverage represents a fully insured

20   plan.

21   **Q.**    Who is responsible for administering and paying benefits

22   under this plan?

23   **A.**    We are; United Behavioral Health.

24   **Q.**    And how about for behavioral health benefits?  Who's

25   responsible for administering and paying those benefits?

1  **A.**   For behavioral health in general, as we've talked about,

2  we've delegated that responsibility and agreed to that with

3  UBH.

4  **Q.**   And does this plan provide benefits for all healthcare

5  treatment a member might receive?

6  **A.**   It does not.

7  **Q.**   If I can direct your attention to page 0032 of Exhibit

8  225.

9       There's a section here called "Your Responsibilities."  Do

10  you see that?

11  **A.**   I do.

12  **Q.**   About halfway down the page there's a heading that says

13  "Be aware this benefit plan does not pay for all health

14  services."

15      Do you see that?

16  **A.**   I do.

17  **Q.**   So does this plan cover treatment anytime a provider

18  recommends treatment?

19  **A.**   Not necessarily, no.

20  **Q.**   How about anytime a provider believes that it is medically

21  necessary for the member to receive that treatment?

22  **A.**   Not necessarily, no.

23  **Q.**   Does it cover only the covered health services as defined

24  through this document?

25  **A.**   Yes.

1  **Q.**  And are those covered health services also subject to

2  certain exclusions and limitations that would be set out in the

3  plan document?

4  **A.**  They are.

5  **Q.**  So if you can turn, now, your attention to page 0009 of

6  Exhibit 225.

7      At the bottom of that page there's a section with a

8  heading "Mental Health Services and Substance Use Disorder

9  Services."

10     Do you see that?

11 **A.**  I do.

12 **Q.**  And if you turn to page 10, that section continues.

13     And the final paragraph of that section, I'd like to

14 direct your attention there.  It starts:  "The Mental

15 Health/Substance Use Disorder Designee."

16 **A.**  I see it.

17 **Q.**  It says:

18         "The Mental Health/Substance Use Disorder Designee

19         performs utilization review to determine whether the

20         requested service is a covered health service.  The Mental

21         Health/Substance Use Disorder Designee does not make

22         treatment decisions about the kind of behavioral

23         healthcare you should or should not receive.  You and your

24         provider must make those treatment decisions."

25     Do you see that?

1  **A.**   I do.

2  **Q.**   There's a reference here to "The Mental Health/Substance

3  Use Disorder Designee."  Who is that?

4  **A.**   For this plan, that would be UBH.

5  **Q.**   So under this plan, does UBH have discretion in performing

6  utilization review to determine whether the requested service

7  is a covered health service?

8  **A.**   They do.

9  **Q.**   And if I could turn your attention to page 34, please, of

10  Exhibit 225.  This is a section titled "Our Responsibilities."

11      Do you see that?

12  **A.**   I do.

13  **Q.**   What is the purpose of this section?

14  **A.**   This section describes our responsibilities to the

15  consumers or our members in the context of the plan.

16  **Q.**   And if I can direct your attention to the section that

17  says "Determine Benefits," which is the top of the Our

18  Responsibilities section.

19  **A.**   Okay.

20  **Q.**   Do you see that?

21  **A.**   I do.

22  **Q.**   And then about halfway down that section there's a part

23  that starts "We have the discretion to do the following."

24  **A.**   I see it.

25  **Q.**   And two bullet points.

1      And then under that it says:

2          "We may delegate this discretionary authority to

3      other persons or entities that may provide administrative

4      services for this benefit plan, such as claims

5      processing."

6      Do you see that?

7   **A.**   I do.

8   **Q.**   Has United Healthcare delegated to UBH its discretionary

9   authority under this benefit plan with respect to behavioral

10  health coverage?

11  **A.**   That's correct.

12  **Q.**   So looking at the two bullet points above that, is it

13  correct to say now that this means that UBH has the discretion

14  to interpret benefits and the other terms, limitations and

15  exclusions set out in this certificate, the schedule of

16  benefits, and any riders or amendments?

17  **A.**   That's correct.

18  **Q.**   Is it also correct, then, that UBH has discretion to make

19  factual determinations relating to benefits?

20  **A.**   That's correct.

21  **Q.**   Are there other provisions in the plan that also speak to

22  UBH's discretion to interpret terms and administer benefits?

23  **A.**   There are.

24  **Q.**   If I can direct your attention to page 85 of Exhibit 225,

25  please.

1    And if you look at page 83, you see this is in a section

2  called "Section 8: General Legal Provisions."  Do you see that?

3  **A.**   I do.

4  **Q.**   And turning to page 85, about halfway down the page

5  there's a bolded section that has a heading "Interpretation of

6  Benefits."

7    Do you see that?

8  **A.**   I do.

9  **Q.**   What is the purpose of this section?

10  **A.**   This section it's -- points out that we, United

11  Healthcare, or potentially our designee for certain areas, have

12  responsibility and the sole authority to interpret the

13  benefits.

14  **Q.**   And, again, is this discretion that United Healthcare has

15  delegated to UBH with respect to the administration of mental

16  health and substance use disorder benefits?

17  **A.**   Yes, it has.

18  **Q.**   If I can direct your attention back to page 31 of Exhibit

19  225, to the section titled "Introduction to Your Certificate."

20    Do you see that?

21  **A.**   I do.

22  **Q.**   And the first heading under that says "How to use this

23  document."

24    Do you see that?

25  **A.**   Yes.

1  **Q.**   What is the purpose of this section?

2  **A.**   This section is to give our consumers a brief overview of

3  how they should think about using this document which is

4  something that's likely to be unfamiliar to them.

5  **Q.**   And the first sentence here reads:

6       "We encourage you to read your Certificate and any

7       attached riders and/or amendments carefully."

8  Why is it important that you read the certificate and any

9  attached riders and amendments carefully?

10 **A.**   It's important because looking at any one part of this

11 document will not tell you the whole story.

12      To understand whether a service is a covered benefit, you

13 would need to look at, first off, our definition of covered

14 services.  You would need to look at our list of types of

15 services which are covered services.  You'd also need to look

16 at exclusions.

17      And then for some plans you may need to look at things

18 that are added to the end: riders or amendments which, you

19 know, could affect the meaning of the plan.

20 **Q.**   And if you look at the third paragraph of the "How to Use

21 this Document" section, the one that reads:

22      "Many of the sections of this certificate are related

23      to other sections of the document.  You may not have all

24      of the information you need by reading just one section."

25 Is that what you were just referring to, Mr. Dehlin?

1   **A.**   Yes, it is.

2   **Q.**   And then below that there's a heading that says

3   "Information about Defined Terms."

4      Do you see that?

5   **A.**   Yes.

6   **Q.**   Would you also need to look at how specific terms are

7   defined in the document in order to understand the scope of

8   coverage?

9   **A.**   You would.

10   **Q.**   Can you know what is covered by a benefit plan simply by

11   looking at how covered health services are defined?

12   **A.**   That's a good start, but it's not the end of the story.

13   **Q.**   Can you know what's covered by a plan simply by looking at

14   the exclusions for a particular type of coverage?

15   **A.**   Also a very good start, but still not the end of the

16   story.

17   **Q.**   Okay.  So I think you just described a number of steps

18   that you would take to determine coverage.  Am I right that you

19   said that the first step would be to look at how covered health

20   services are defined?  Is that right?

21   **A.**   Yes.

22   **Q.**   So why don't we do that.  Let's look at page 90 of Exhibit

23   225.  And at the bottom of page 90, continuing on to page 91,

24   do you see a definition for "Covered Health Services"?

25   **A.**   I do.

1    Q.    And it starts:

2          "Covered Health Services:  Those health services

3          including services, supplies, or pharmaceutical products

4          which we determine to be all of the following."

5          Do you see that?

6    A.    I do.

7    Q.    And it's followed by five bullet points; is that right?

8    A.    Yes.

9    Q.    Who is the "we" here in terms of "which we determine to be

10   all of the following"?

11   A.    "We" is United Healthcare.

12         But with respect to certain areas like behavioral health,

13   it could be a designee that we use to help us adjudicate the

14   benefits.

15   Q.    So do health services or treatment need to meet all five

16   of these criteria for benefits to be paid under the plan?

17   A.    They do.

18   Q.    And looking at the second bullet here, is one of those

19   requirements for covered health services that the -- that UBH

20   determine that the health services are consistent with

21   nationally recognized scientific evidence, as available, and

22   prevailing medical standards and clinical guidelines as

23   described below?

24   A.    Yes, it is.

25   Q.    Is it sufficient for coverage that the treatment be

1  consistent with nationally recognized scientific evidence as

2  available and prevailing medical standards and clinical

3  guidelines?

4  **A.**   No.  That's one of the requirements, but there's other

5  requirements as well.

6  **Q.**   So would you also need to determine, for example, looking

7  at the first bullet, that the treatment is provided for the

8  purpose of preventing, diagnosing, or treating a sickness,

9  injury, mental illness, substance use disorder, or their

10  symptoms?

11  **A.**   Among other things, yes.

12  **Q.**   And looking at the third bullet, would you also need to

13  determine whether the treatment is not for the convenience of

14  the covered person, physician, facility, or other person?

15  **A.**   Correct.

16  **Q.**   And in the fourth, you'd also need to determine whether

17  the treatment is described in the certificate under the covered

18  health services section in the schedule of benefits?

19  **A.**   Correct.

20  **Q.**   And the last bullet, would you also need to determine that

21  the treatment is not otherwise excluded under Section 2:

22  Exclusions and Limitations?

23  **A.**   Correct.

24  **Q.**   So if you can look at the bottom of -- I'm sorry.  And all

25  of those things would need to be true in order for something to

1    be a covered health service?

2    A.    That's correct.

3    Q.    If you look at the last paragraph of the definition of

4    covered health services, there's a section that begins "We

5    maintain clinical protocols."

6         Do you see that?

7    A.    I do.

8    Q.    And it reads:

9              "We maintain clinical protocols that describe the

10             scientific evidence, prevailing medical standards, and

11             clinical guidelines supporting our determinations

12             regarding specific services."

13        Do you see that?

14   A.    I do.

15   Q.    Does the reference to "clinical protocols" here include

16   UBH's Level of Care Guidelines?

17   A.    It does.

18   Q.    Does it also include UBH's Coverage Determination

19   Guidelines?

20   A.    It does.

21   Q.    And above that you see there are definitions for

22   scientific evidence and prevailing medical standards in

23   clinical practice?

24   A.    I see it.

25   Q.    Sorry, prevailing medical standards and clinical

1    guidelines.  I apologize.

2        You see that?

3    **A.**   I do.

4    **Q.**   Does this section here mean that UBH's Level of Care

5    Guidelines and Coverage Determination Guidelines describe the

6    scientific evidence, prevailing medical standards, and clinical

7    guidelines as those terms are defined here?

8    **A.**   It means that, you know, they describe the protocols but

9    in the context of supporting the services that are covered in

10   the plan.

11   **Q.**   Is there any requirement that the plans cover all

12   treatment that falls within the scope of generally accepted

13   standards of care?

14   **A.**   No.

15   **Q.**   Can plans limit or exclude benefits even where the

16   treatment is consistent with nationally recognized scientific

17   evidence as available and prevailing medical standards and

18   clinical guidelines?

19   **A.**   Yes.

20   **Q.**   So I believe you testified that the definition of covered

21   health services, I think you said, would be a good place to

22   start, but that you would need to look at other sections of the

23   certificate to know what's covered; is that accurate?

24   **A.**   It is.

25   **Q.**   So can you walk us through, at a high level, the steps

1  that you would take after looking at the definition of covered

2  health services to understand what this plan, particularly

3  Trial Exhibit 225, covers with respect to mental health

4  treatment.

5  **A.**   Sure.  And it is alluded here -- alluded to here as well.

6      You would want to look in the covered services section

7  which details a number of specific services that are covered

8  under the plan.  After that, you would want to look at the

9  exclusion section to make sure that whatever service you're

10  investigating is not -- does not fall under one of the

11  exclusions.

12      And then, as we mentioned earlier, there could be -- not

13  in every plan, but in some plans there could be riders or

14  amendments that affect those coverages and exclusions.

15  **Q.**   Would you also need to look at any relevant definitions

16  along the way to understand those provisions?

17  **A.**   You may.

18  **Q.**   Would you have to follow, generally, that same process to

19  determine the scope of coverage for substance use disorder

20  benefits under the plan?

21  **A.**   Yes.  Regardless of the service, it would be the same

22  general approach.

23  **Q.**   And do all of the plans that you reviewed for this case

24  define covered health services the same way that Exhibit 225

25  defines this here?

1   **A.**   No.

2   **Q.**   You testified earlier about self-funded and fully insured

3   plans.  Do you remember that?

4   **A.**   I do.

5   **Q.**   And for self-funded plans, I believe you testified that

6   the employer has input into crafting the plan's coverage terms.

7   Is that right?

8   **A.**   They have that right if they choose to exercise it.  Some

9   do; some don't.

10  **Q.**   Would it be fair to say that there's generally more

11  variation in the coverage terms among self-funded plans

12  compared to fully insured plans?

13          **MR. ABELSON:**  Objection.  Leading.

14          **THE COURT:**  Sustained.

15      Why don't you ask a non-leading question.

16  **BY MS. ROSS:**

17  **Q.**   Mr. Dehlin, how much variation is there in self-funded

18  plans compared to fully insured plans?

19  **A.**   Tremendous, you know, additional variation.

20  **Q.**   Let's turn to Trial Exhibit 2014, which I believe is in

21  Volume 2 of your exhibit binder up there.

22      Mr. Dehlin, do you recognize Trial Exhibit 2014?

23  **A.**   Yes.

24  **Q.**   What is it?

25  **A.**   This is a summary plan description and SPD for benefits

1  provided by Delta to their employees.

2  **Q.** Is this a self-funded plan?

3  **A.** Yes.

4  **Q.** Is it one of the sample member plans that you reviewed for

5  this case?

6  **A.** Yes.

7  **Q.** If I can direct your attention to page 0164 of Exhibit

8  2014. Let me know when you're there.

9  Do you see about halfway down the page there's a section

10  that begins "The services and supplies described on the

11  following pages are covered under this plan -- under the plan?"

12  Do you see that?

13  **A.** I do.

14  **Q.** What is the purpose of this section?

15  **A.** This -- for this SPD is starting to define what the plan

16  will cover.

17  **Q.** And there's three bullets. And under that it says:

18  "These supplies and services must also meet each of

19  the following criteria."

20  Do you see that?

21  **A.** I do.

22  **Q.** And are those criteria that need to apply in order for --

23  for something to be a covered health service under this plan?

24  **A.** That's correct.

25  **Q.** So the first -- the first criteria there in the first

1  bullet says:

2      "They are supported by national medical standards of

3      practice."

4      So is that a condition of coverage on this plan, that

5  treatment be supported by national medical standards of

6  practice?

7  **A.**   Yes.

8  **Q.**   Looking down at the third bullet, reads:

9      "They are the most cost effective method and yield a

10     similar outcome to other available alternatives."

11     Do you see that?

12 **A.**   I do.

13 **Q.**   Would it be appropriate, under this plan, for the

14 administrator to also consider whether the treatment yields a

15 similar outcome to a different method that may be more cost

16 effective in addition to being supported by national medical

17 standards of practice?

18 **A.**   It would be appropriate and pretty much required by the

19 terms of the plan.

20 **Q.**   Let's turn, now, to Trial Exhibit 1555, which is back in

21 Volume 1.

22     Are you there?

23 **A.**   I do.

24 **Q.**   Are you familiar with Trial Exhibit 1555, which was

25 previously admitted?

1  A.    I am.

2  Q.    And what is it?

3  A.    This is a benefit document for PeaceHealth, effective

4  January 2013.

5  Q.    Is this one of the sample plans that you reviewed in this

6  cases?

7  A.    It is.

8  Q.    If I can direct your attention to page 138, please, of

9  Trial Exhibit 1555.  Are you there?

10  A.    I am.

11  Q.    And at the bottom of page 138, continuing on to page 139,

12  do you see a definition for "Medically Necessary"?

13  A.    I do.

14  Q.    What is the purpose of this definition?

15  A.    Most plans, including this one, you know, will only cover

16  plans that are medically necessary.  This is the definition to

17  help guide folks to help make sure they understand that.

18  Q.    Is one of the conditions for service to be medically

19  necessary under this plan that the treatment be appropriate

20  with regard to standards of good medical practice?

21  A.    That's correct.

22  Q.    Is that the only condition to determine whether treatment

23  is medically necessary?

24  A.    No.  There are several others.

25  Q.    And let's look at the fourth bullet, which actually

1   appears at the top of page 139.

2   **A.**   Uh-huh.

3   **Q.**   And that reads:

4          "The least costly of the alternative supplies or

5      levels of service which can be safely provided to the

6      participant when specifically applied to a medical

7      facility inpatient.  It further means that the service or

8      supplies cannot be safely provided in other than a medical

9      facility inpatient setting without adversely affecting the

10     participant's condition or the quality of medical care

11     rendered."

12     Do you see that?

13  **A.**   I do.

14  **Q.**   So in determining whether services -- services for which a

15  member is requesting benefits under this plan are medically

16  necessary, would it be appropriate for the benefit

17  administrator to consider whether this fourth criteria is also

18  met?

19         **MR. ABELSON:**  Objection, Your Honor.  The question is

20  about appropriateness.  This expert testimony has not been

21  disclosed as an expert in this case.

22         **THE COURT:**  Overruled.  Proceed.

23  BY MS. ROSS:

24  **Q.**   Mr. Dehlin, would it be appropriate for the benefit plan

25  administrator to consider whether this fourth criteria, that

1    appears on the top of page 139, that the treatment be the least

2    costly of the alternative supplies or levels of service which

3    can safely be provided to the participant?

4        My question, Mr. Dehlin, is if it would be appropriate for

5    the plan administrator to consider whether that criteria is

6    satisfied in evaluating whether treatment is medically

7    necessary under the terms of the plan at Trial Exhibit 1555.

8    A.    It would be appropriate and also required to faithfully

9    administer the plan.

10   Q.    Let's turn to Trial Exhibit 1622, please, which, I

11   apologize, is now in your second binder again.

12       Are you there?

13   A.    I am.

14   Q.    Do you recognize Trial Exhibit 1622, which was previously

15   admitted into evidence?

16   A.    I do.

17   Q.    What is it?

18   A.    This is another plan document for a company called KeyCorp

19   Medical.  And I apologize.  Effective date January 2014.

20   Q.    Is this another of the sample plans that you reviewed for

21   the sample class members in this case?

22   A.    It is.

23   Q.    And let me direct your attention to page 85 of Exhibit

24   1622, where again the definition of medically necessary

25   appears.

1       Are you there?

2   A.   I am.

3   Q.   Do you see there are -- says:

4           "Healthcare services, supplies, or interventions

5       would satisfy all of the following criteria as determined

6       by the plan administrator."

7       Do you see that?

8   A.   I do.

9   Q.   And then it's followed by eight criteria that are listed

10  below, that are set off by bullet points?

11  A.   That's correct.

12  Q.   Do all eight of those criteria need to be satisfied under

13  this plan for treatment to be medically necessary?

14  A.   That's correct.

15  Q.   And looking at the third bullet, which begins:

16          "The services or supplies are the most appropriate

17      supply or level of service that is essential to the

18      patient's needs."

19      Do you see that?

20  A.   I do.

21  Q.   So under this plan, would it be appropriate for the plan

22  administrator to consider whether the requested level of care

23  is the most appropriate level of care that is essential to the

24  patient's needs?

25  A.   Yes.

1    Q.    In looking at the fourth point, fourth criteria here,

2    which begins "For hospital or other facility stays."

3          Do you see that?

4    A.    I do.

5    Q.    Does that include residential treatment?

6    A.    I'm sorry, it's not immediately obvious to me looking at

7    this bullet.

8    Q.    Okay.  Well, with respect to hospital or other facility

9    stays, in the fourth bullet, would it be appropriate, when

10   evaluating a request for coverage, for the administrator to

11   consider whether safe and adequate care can be provided in a

12   less intensive care setting or in an outpatient setting?

13   A.    It would be.  And, I'm sorry, other facility stays would

14   include residential care.

15   Q.    And looking at the sixth criteria here, "The services or

16   supplies are the most appropriate which can safely and most

17   economically be provided to the patient," would it be

18   appropriate for the plan administrator to also consider whether

19   that criteria has been satisfied?

20   A.    Yes.

21   Q.    Mr. Dehlin, let's turn back to Exhibit 225, which is the

22   Certificate of Coverage we were looking at earlier.

23         And we were looking at the definition of covered health

24   Services under that plan.  What is the next step you would take

25   in order to determine what is covered by this plan with respect

1  to mental health services?

2  **A.**   You would look at the definition of covered health

3  services.  You would look at the list of specific covered

4  health services.  Then you would look at the exclusions.

5  **Q.**   Okay.  Let's start with the definition of specific health

6  services.  If I can direct your attention to page 37, please,

7  of Exhibit 225.

8      And this section is "Section 1: Covered Health Services."

9  Is this the section that defines the specific services that are

10  covered for different types of treatment?

11  **A.**   It is.

12  **Q.**   And can this section be changed through amendments to the

13  plan?

14  **A.**   Sometimes, yes?

15  **Q.**   Let me direct your attention to page 101 of Exhibit 225.

16      And this is titled "Mental Health Parity and Addiction

17  Equity Act of 2008 (MHPAEA) Amendment."

18      Do you see that?

19  **A.**   I do.

20  **Q.**   What is the purpose of the Mental Health Parity and

21  Addiction Equity Act of 2008 to the certificate of coverage?

22  **A.**   So the purpose of this amendment as a whole was, when

23  there was mental health parity legislation passed, we needed to

24  modify our documents to make sure that we were in compliance.

25  So this memo will include various changes to the plan to ensure

1  that compliance.

2  **Q.**   In looking down near the bottom of page 101, do you see

3  the bolded heading that starts:

4       "Mental health services, neurological disorders,

5       autism spectrum disorder services, and substance use

6       disorder services in the certificate Section 1: Covered

7       Health Services are deleted and replaced by the

8       following"?

9       Do you see that?

10 **A.**   I do see it.

11 **Q.**   Or "replaced with the following."

12      So does this amendment override the earlier description of

13 covered health services with respect to mental health and

14 substance use disorders?

15 **A.**   Yes, it does.

16 **Q.**   If you can turn to the next page, on page 102 there's a

17 section called "Mental Health Services" that flows on to page

18 102.

19      What is the purpose of that section?

20 **A.**   I'm sorry, which section are you asking about?

21 **Q.**   We're continuing below that heading.  There's a section

22 that starts "Mental Health Services"?

23 **A.**   Right.

24 **Q.**   And flows on to page 102?

25 **A.**   I'm sorry.  So for the specific -- in the list of specific

1    covered services in the Certificate of Coverage, there was a

2    mention of mental health services.

3       This part of the amendment effectively replaces that, and

4    it specifies the types of mental health services that are

5    covered under the plan.

6    **Q.**   Does this plan cover outpatient mental health treatment?

7    **A.**   It does.

8    **Q.**   Does it cover mental health treatment in an intensive

9    outpatient setting?

10   **A.**   It does.

11   **Q.**   Does it cover treatment at a residential treatment

12   facility for mental health conditions?

13   **A.**   It does.

14   **Q.**   And I see that the word "Residential Treatment Facility"

15   is in initial caps.  What does that indicate?

16   **A.**   So a common convention in these documents is that phrases

17   or words that are capitalized, when you might not expect that,

18   are specifically defined in the definition section.

19   **Q.**   So let me direct your attention, briefly, to page 97 of

20   Exhibit 225; at the bottom of page 97 specifically.

21      Is that where we see the definition of residential

22   treatment facility?

23   **A.**   Yes, it is.

24   **Q.**   And it says:

25          "A facility which provides a program of effective

1       mental health services or substance use disorder services,

2       treatment and which meets all of the following

3       requirements."

4       Do you see that?

5   A.  I do.

6   Q.  Second requirement reads:

7           "It provides a program of treatment under the active

8       participation and direction of a physician and approved by

9       the Mental Health/Substance Use Disorder Designee."

10      Do you see that?

11  A.  I do.

12  Q.  Is the Mental Health/Substance Use Disorder Designee,

13  that's UBH?

14  A.  That's correct.

15  Q.  Is it correct to say that this plan requires the active

16  participation and direction of a physician, as that term is

17  defined by the plan, for something to qualify as a residential

18  treatment facility?

19  A.  That's correct.

20  Q.  And the second bullet reads:

21          "It has or maintains a written specific and detailed

22      treatment program requiring full-time residence and

23      full-time participation by the patient."

24      Do you see that?

25  A.  I do.

1  Q.   So would this plan cover treatment in a residential

2  treatment facility where the patient was not required to stay

3  there full-time?

4  A.   It would not.

5  Q.   How about a program where the patient was not required to

6  participate full-time?

7  A.   It would not cover that either.

8  Q.   Let's go back to page 102, which is where we were before

9  we went to look up the definition.

10      And is this description of the mental health services that

11  are covered under this plan the same as the description of

12  covered mental health services in all of the plans you reviewed

13  for this case?

14  A.   No.

15  Q.   Let's look at Trial Exhibit 233, which should be the next

16  tab in your binder.

17      Are you familiar with Trial Exhibit 233?

18  A.   Yes.

19  Q.   What is it?

20  A.   This is a Certificate of Coverage for an employer group

21  called Science Systems and Applications, effective in 2011.

22  Q.   So, like Exhibit 225, is this also a fully insured

23  Certificate of Coverage insured by United Healthcare?

24  A.   That's correct.

25  Q.   Is this one of the plans you reviewed for the plaintiffs

1    in this case?

2    A.    Yes.

3    Q.    If I can direct your attention to page 47, please, of

4    Exhibit 233.

5          Paragraph 14 says:  "Mental Health and Substance Abuse

6    Services."

7          Do you see that?

8    A.    I do.

9    Q.    Is this the part of this plan that describes the mental

10   health and substance abuse services that are covered under the

11   plan that is marked Trial Exhibit 233?

12   A.    Yes, it is.

13   Q.    And looking under "Inpatient," which is the first section,

14   it reads:

15          "Mental health and substance abuse services received

16       on an inpatient basis in a hospital or an alternative

17       facility, including transitional care and residential

18       crisis services."

19          Do you see that?

20   A.    I do.

21   Q.    Is that a description of the inpatient services that are

22   covered for mental health and substance abuse services in this

23   plan?

24   A.    That's correct.

25   Q.    And would you need to look up all those capitalized words

1    to understand what they mean here?

2    **A.**    You would.

3    **Q.**    The next paragraph in this reads:  "The Mental

4    Health/Substance Abuse Designee" -- is that, again, UBH?

5    **A.**    Correct.

6    **Q.**    -- "who will authorized the services will determine the

7    appropriate setting for the treatment."

8         Do you see that?

9    **A.**    I do.

10   **Q.**    Is that another example of UBH's discretion to determine

11   benefits under this plan?

12        **MR. ABELSON:**  Objection.  Leading.

13        **THE COURT:**  Overruled.

14        **THE WITNESS:**  That's correct.

15   BY MS. ROSS:

16   **Q.**    And looking below that, at the Outpatient Section, is this

17   a description of the outpatient mental health and substance

18   abuse services covered by this plan?

19   **A.**    Yes, it is.

20   **Q.**    And if you look down through those bullets, the sixth one

21   says:

22        "Short term individual family and group therapeutic

23        services including intensive outpatient therapy."

24        Do you see that?

25   **A.**    I do.

1  **Q.**  Does this plan cover long-term therapy in outpatient or

2  intensative outpatient setting?

3  **A.**  No.

4  **Q.**  Let's turn to Trial Exhibit 1539, please.  I think it's,

5  again, the next tab in your binder.

6      Are you familiar with Trial Exhibit 1539?

7  **A.**  I am.

8  **Q.**  What is it?

9  **A.**  This is an SPD.  So a plan document for Wells Fargo, is

10  the employer, effective in 2011.

11  **Q.**  Is this another of the plans that you reviewed for this

12  case?

13  **A.**  Yes.

14  **Q.**  Is this a fully insured or a self-funded plan?

15  **A.**  This is a self-funded plan.

16  **Q.**  I direct your attention to page 53, 0053, of Exhibit 1539.

17  There's a section that starts "Mental Health and Substance

18  Abuse Plan Benefits."

19      Do you see that?

20  **A.**  I do.

21  **Q.**  What is the purpose of this section?

22  **A.**  This is -- one second, please.

23      Right.  This is detailing the benefits for mental health

24  and substance abuse benefits.  So what's covered under this

25  plan in that specific context.

1   Q.   If I can turn your attention to the top of the right-hand

2   column.  There's a heading that says "Residential Treatment for

3   Children and Adolescents."

4        Do you see that?

5   A.   I do.

6   Q.   And can you read for us the bottom paragraph of that

7   section, the one that starts "Admission."

8   A.   Sure.

9            "Admission to a residential treatment center is not

10           intended for use solely as a long-term solution or to

11           maintain the stabilization acquired during treatment in a

12           residential facility or program."

13  Q.   So does that description describe the type of residential

14  treatment that is not covered by this plan?

15  A.   That's correct.

16  Q.   And if we can turn back to Trial Exhibit 2014, which we

17  had previously looked at.  I think it's in your second binder.

18       And is this a plan we looked at a few minutes ago?

19  A.   Yes.

20  Q.   And it's one of the plans you reviewed with respect to the

21  sample in this case?

22  A.   Yes.

23  Q.   Let me direct your attention to page 0168, of Exhibit

24  2014.

25       Are you there?

1  **A.**    I am.

2  **Q.**    And about halfway down the page there's a section that

3  says  "Inpatient facility based mental health or substance

4  abuse treatment."

5         Do you see that?

6  **A.**    I do.

7  **Q.**    And the second paragraph begins "RTC."  Do you see that?

8  **A.**    I do.

9  **Q.**    What does "RTC" refer to there?

10 **A.**    RTC is an idiosyncratic acronym for residential treatment

11 services.  It's defined in the prior paragraph.

12 **Q.**    And can you read for us the first three sentences of that

13 paragraph, please, the one that starts "RTC."

14 **A.**    (Reading)

15         "RTC is a psychiatric or substance abuse treatment

16      program that provides 24 hour supervision, structure, and

17      treatment.  Residential treatment is a short term

18      intervention to stabilize the presenting problem within a

19      reasonable period of time.  RTC is not intended to be for

20      the purpose of providing respite for the family,

21      protection from community influences, increasing the

22      member's social activity, or for addressing antisocial

23      behavior or legal problems, but is for active treatment of

24      a behavioral condition."

25 **Q.**    So does this section describe the scope of coverage that's

1  available for residential treatment for mental health and

2  substance abuse treatment under this plan?

3  **A.**  It does.

4  **Q.**  And in administering this plan, would it be appropriate

5  for the plan administrator to consider whether the treatment

6  falls within the description set forth here on page 168?

7  **A.**  It would.

8  **Q.**  Okay.  Let's go back to Exhibit 225, which is the plan

9  we've been working our way through.

10      So we've looked at the definition of Covered Health

11  Services, and we've looked at the sections of the amendment

12  that describe coverage for mental health treatment.  Is that

13  right?

14  **A.**  That's correct.

15  **Q.**  So what would be the next thing you would want to look at

16  to understand the scope of coverage for mental health treatment

17  under this plan?

18  **A.**  You would want to look at the exclusions section.

19  **Q.**  And if I can direct your attention to page 106, please, of

20  Exhibit 225.  This is also in the mental health parity

21  amendment.

22      Does the mental health parity amendment of this plan also

23  replace the exclusions and limitations section with respect to

24  mental health and substance use disorder treatment?

25  **A.**  It does.

1    **Q.**    And starting on page 106, and continuing on to page 107,

2    do you see the nine points that are listed there?

3    **A.**    I do.

4    **Q.**    What are those nine paragraphs?

5    **A.**    So those are nine different specific exclusions that apply

6    to mental health services under the plan.

7    **Q.**    So if any one of those paragraphs applies, is coverage

8    excluded or limited?

9    **A.**    That's correct.

10    **Q.**    And is that true even if the treatment would otherwise

11    meet the definition of covered health services?

12    **A.**    That's correct.

13    **Q.**    And is that true even if the treatment would otherwise be

14    consistent with generally accepted standards of care?

15    **A.**    That's correct.

16    **Q.**    Let me direct your attention to paragraph 9, which appears

17    on Trial Exhibit 225, page 107.

18          Do you see that?

19    **A.**    I do.

20    **Q.**    And it starts:

21              "Services or supplies for the diagnosis or treatment

22          of mental illness that, in the reasonable judgment of the

23          Mental Health/Substance Use Disorder Designee, or any of

24          the following."

25          Do you see that?

1  **A.**   I do.

2  **Q.**   And, again, you've testified that the Mental

3  Health/Substance Use Disorder Designee means UBH?

4  **A.**   That's correct.

5  **Q.**   So these are, if UBH, in its reasonable judgment, decides

6  that any of the following apply, what does that mean?

7  **A.**   It means that the service would be excluded under the

8  plan.

9  **Q.**   Is this another example of UBH's discretion to make

10  coverage determinations under the plan?

11  **A.**   It is.

12  **Q.**   So the first bullet under paragraph 9 says:

13       "Not consistent with generally accepted standards of

14    medical practice for the treatment of such conditions."

15    So is it correct that the plan does not provide coverage

16  for mental health services that are not consistent with

17  generally accepted standards of medical practice?

18  **A.**   Yes.

19  **Q.**   Is that the only exclusion that applies?

20  **A.**   No.  There are several others.

21  **Q.**   And the second exclusion says:

22       "Not consistent with services backed by credible

23    research, soundly demonstrating that the services or

24    supplies will have a measurable and beneficial health

25    outcome and, therefore, considered experimental."

1    Mr. Dehlin, does UBH have the discretion to determine when
2  this exclusion applies?
3  **A.**   Yes.
4  **Q.**   And would that be an administrative decision or would that
5  be a clinical decision?
6  **A.**   In this instance, it would be a clinical decision.
7  **Q.**   And how about the criteria above that, we were just
8  talking about, "not consistent with generally accepted
9  standards of medical practice," would the determination about
10  whether that exclusion applies be an administrative decision or
11  would it be a clinical decision?
12  **A.**   That requires clinical expertise, so that would also be a
13  clinical decision.
14  **Q.**   And looking at the last bullet, "Not clinically
15  appropriate for the patient's mental illness or condition based
16  on generally accepted standards of medical practice and
17  benchmarks," would the decision about whether that criteria
18  excludes coverage be a clinical determination or would it be an
19  administrative determination?
20  **A.**   That would also be a clinical decision.
21  **Q.**   Let me direct your attention to the third bullet here.
22  This would read -- this would be the exclusion for services or
23  supplies for the diagnosis or treatment of mental illness that,
24  in the reasonable judgment of UBH, are not consistent with
25  UBH's Level of Care Guidelines or best practices as modified

1   from time to time.

2       Is that what that exclusion reads, substituting "UBH" for

3   mental health substance use disorder designee as you've

4   previously defined it?

5   **A.**   That's correct.

6   **Q.**   So what if services are consistent with generally accepted

7   standards of medical practice but not with UBH's Level of Care

8   Guidelines, is that covered by this plan?

9   **A.**   It would not be.  If any of these bullets apply in a

10  specific instance, the service would be excluded.

11  **Q.**   And does this exclusion give UBH permission to create and

12  apply any guidelines it wants even if they're absurd?

13  **A.**   No.  Their guidelines have to be consistent with the

14  details and the intent of the plan.

15  **Q.**   And in -- in interpreting the details and intent of the

16  plan, does UBH have discretion to do that?

17  **A.**   They have discretion, yeah.

18  **Q.**   So if I can direct your attention to page 108 briefly,

19  just the next page.  There's a section that starts "Substance

20  Use Disorders."

21      Do you see that?

22  **A.**   I do.

23  **Q.**   What is this section?

24  **A.**   Again, this is part of the amendments that is replacing

25  the specific exclusions for substance use disorders that apply

1    in this plan.

2    **Q.**    Okay.  And paragraph 4 of the substance use disorder

3    exclusions on page 108, are those the same exclusions we were

4    just talking about in paragraph 9 of the mental health

5    exclusions on page 107?

6    **A.**    They are.

7    **Q.**    Are the exclusions that we reviewed in Exhibit 225, with

8    respect to mental health and substance use disorders, are those

9    the same exclusions that apply to mental health and substance

10   use disorder treatment under all the plans you reviewed in the

11   case?

12   **A.**    No.

13   **Q.**    Let's look at Trial Exhibit 1548.

14        Do you recognize Trial Exhibit 1548?

15   **A.**    I do.

16   **Q.**    What is it?

17   **A.**    This is a Certificate of Coverage for an employer called

18   Sheridan Healthcare Center, that was effective starting April

19   of 2011.

20   **Q.**    So is this another fully insured plan that was insured by

21   United Healthcare?

22   **A.**    That's correct.

23   **Q.**    And let's turn to look at the exclusions for mental

24   health.  If I can direct your attention to page 0030 of Trial

25   Exhibit 1548.

1   Are these the exclusions that apply to mental health under

2   this plan?

3   **A.**   Yes, they are.

4   **Q.**   Let me direct your attention specifically to paragraph 11.

5   Do you see that?

6   **A.**   I do.

7   **Q.**   There are five criteria listed under this exclusion which

8   reads:

9       "Services or supplies for the diagnosis or treatment

10      of mental illness that, in the reasonable judgment of the

11      Mental Health/Substance Use Disorder Designee, are any of

12      the following."

13      Do you see that?

14  **A.**   I do.

15  **Q.**   Are these the same exclusions that we were just looking at

16  with respect to Trial Exhibit 225?

17  **A.**   No, not --

18  **Q.**   Are some of them the same?

19  **A.**   Yes.

20  **Q.**   Which ones?

21  **A.**   So the first one is not consistent with generally accepted

22  standards of medical practice.  The second one, I believe, may

23  not be word for word but is very similar.  After that I'd want

24  to go back and double-check, but there are some that are very

25  consistent.

Q.   Okay.  Let's look at the third one in particular.  This is the exclusion for services or supplies that typically do not result in outcomes demonstrably better than other available treatment alternatives that are less intensive or more cost effective.

Is that one of the exclusions that is the same as Trial Exhibit 225?

A.   I think it's similar.  I'd have to go back and check to be sure.

Q.   Let's go back and look at page -- I think we were on page 107 or 106 -- 107.

If you can just compare paragraph 9 on page 107 with paragraph 11 on page -- I'm sorry, paragraph 9 on page 107 of Trial Exhibit 225 with paragraph 11 on page 30 of Trial Exhibit 1548.

My question was whether that third bullet appears in the exclusions listed in Trial Exhibit 225, the third bullet on page 30 of 1548?

A.   Right.  No, I don't see it.

Q.   So let's turn back to 1548, at page 30.

Under this plan, would it be appropriate for UBH -- in addition to the considerations we talked about with the other criteria, would it be appropriate for UBH to consider in its reasonable judgment whether the requested mental health treatment results in outcomes demonstrably better than other

1  available treatment alternatives that are less intensive?

2  **A.**   It would be appropriate, yes.

3  **Q.**   Let's look at Exhibit 2023, please, which I think is in

4  your second binder.

5       Are you there?

6  **A.**   I am.

7  **Q.**   Are you familiar with Exhibit 2023?

8  **A.**   Yes.

9  **Q.**   And what is it?

10  **A.**   This is an SPD for an employer group, Met Life Healthcare

11  Choices, effective January 2013.

12  **Q.**   Is this one of the plans that you reviewed in this case?

13  **A.**   Yes.

14  **Q.**   If I can direct your attention specifically to page 0043

15  of Exhibit 2023.  And it's -- has a heading that says

16  "Behavioral Health Services Not Covered."  Do you see that?

17  **A.**   I do.

18  **Q.**   What is the purpose of the list of bullets that starts on

19  page 0043 and continues to page 0044?

20  **A.**   In the context of behavioral health services, this is a

21  list of exclusions that apply for this plan.

22  **Q.**   And let's look at the very bottom of page 0043.  Do you

23  see that?

24  **A.**   I do.

25  **Q.**   What does the last exclusion on this page read?

1    A.    It says "residential treatment services."

2    Q.    So does this plan cover residential treatment services for

3    behavioral health conditions?

4    A.    It does not.

5    Q.    And let's look at the second criteria, the second criteria

6    here on page 43.

7    A.    Okay.

8    Q.    Does this plan also limit behavioral health coverage to

9    the period necessary for short-term evaluation diagnosis,

10   treatment, or crisis intervention?

11   A.    It does.

12   Q.    And would it require a clinical decision to determine

13   whether the requested service met that -- fell within that

14   exclusion?

15   A.    It would.

16   Q.    So would that be an administrative denial?

17   A.    That would be a clinical denial.

18   Q.    And let's look, also -- a little more than halfway down

19   the page there's a bullet that starts "Treatment for mental

20   illnesses that will not substantially improve."

21         Do you see that?

22   A.    I do.

23   Q.    It says:

24         "Treatment for mental illnesses that will not

25         substantially improve beyond the current level of

1          functioning or for conditions not subject to favorable

2          modification or management according to generally accepted

3          standards of psychiatric care as determined by United

4          Behavioral Health."

5          Do you see that?

6     A.   I do.

7     Q.   So would UBH need to exercise its clinical discretion to

8     determine whether that exclusion applies?

9     A.   Yes.

10    Q.   Would that be an administrative denial?

11    A.   It would not.  It'd be clinical.

12    Q.   Okay.  Let's go back to Exhibit 225.

13          THE COURT:  Continue with 225 after our next break.

14          MS. ROSS:  Sure.  Thank you, Your Honor.

15          THE COURT:  See you in ten minutes.

16               (Recess taken at 10:34 a.m.)

17               (Proceedings resumed at 10:54 a.m.)

18          THE COURT:  Proceed.

19    BY MS. ROSS:

20    Q.   Mr. Dehlin, right before we took a break we had been

21    talking about exclusions and limitations that apply directly to

22    behavioral health services; is that right?

23    A.   Correct.

24    Q.   Okay.  So let's turn back to Exhibit 225, which is the COC

25    for Granite Construction Group that we've been working through.

1    Are you there?

2    **A.**    I am.

3    **Q.**    Okay.  Are there other exclusions or limitations in this

4    plan that could apply to mental health or substance use

5    disorder services?

6    **A.**    Yes, there are.

7    **Q.**    Can you identify those for us?

8        And it might help if I can direct your attention to page

9    0052, which is the beginning of the exclusions and limitations

10   section.

11   **A.**    Thank you.

12       So, going through the section, not all of the exclusion

13   sections might apply to behavioral health, but many of them

14   might.

15       The alternative treatment section, you know, could apply

16   in some instances.

17       Subsection D is about drugs.  Certainly, drugs are used in

18   behavioral health treatment, and so this would need to be

19   considered.

20       Certain behavioral health services could be experimental

21   or investigational.  So E could apply.

22       Obviously, H is specifically applicable to mental health.

23       And Section K, which is personal care, comfort, or

24   convenience could come into play.

25       Section M talks about a number of different specific types

1    of procedures and treatment, and some of those could apply to

2    behavioral health issues.

3         Subsection N talks about specific providers, and some

4    providers' services are excluded, so that could come into play.

5         Obviously, Q is specifically about substance use

6    disorders.

7         Section S, on travel, could apply to behavioral health

8    services.

9         Section T, on types of care, could apply to mental health

10   services and, specifically, the custodial care exclusion.

11        And then V is sort of a catchall of a variety of other

12   types of exclusions, some of which might apply to behavioral

13   health services.

14   **Q.**   And would you need to look at whether any of those applied

15   before you would know whether services were covered under the

16   plan?

17   **A.**   Yes, you would.

18   **Q.**   So, Mr. Dehlin, we've been reviewing various sections of

19   Exhibit 225.

20        Would you need to look at all of the sections that we've

21   looked at to fully understand what's covered under that plan?

22   **A.**   Yes, you would.

23   **Q.**   Let's turn to what's been marked for identification as

24   Exhibit 1653, which is in the third volume of your exhibits.

25        Mr. Dehlin, are you familiar with what's been marked as

1  Trial Exhibit 1653?

2  **A.**   Yes, I am.

3  **Q.**   What is it?

4  **A.**   This is a document, it's a very long summary that looks at

5  all of the different sample plans in the case, and excerpts,

6  certain portions of those plans that could be critical to

7  mental health substance abuse coverage or any issues relevant

8  to this case.

9  **Q.**   Does it include all of the sections of all of the plans?

10 **A.**   It does not.

11 **Q.**   Does it include the ones that you think would be important

12 to determining the scope of coverage for substance use or

13 mental health treatment?

14 **A.**   Yes, it does.

15       **MR. ABELSON:**  Objection, Your Honor.  Again, he's not

16 being offered for what he thinks is relevant to the issues.

17       **THE COURT:**  Overruled.  He's interpreting.

18 **BY MS. ROSS:**

19 **Q.**   Mr. Dehlin, how did you decide what sections to include in

20 the summary?

21 **A.**   We, you know, looked at -- given some of the issues in

22 terms of covering specific types of mental health and substance

23 use, we looked at the sections that are relevant and very --

24 you know, closely follows the approach that I have talked to

25 you about here today.

1    Talked about specific -- the definition of covered health

2  services, specific coverages, including, you know, mental

3  health and substance abuse, exclusions that apply to mental

4  health and substance abuse services, definitions that are

5  relevant to it.  Those are sections that we've pulled into the

6  summary document.

7  **Q.**  And, to the best of your knowledge, is Exhibit 1653 an

8  accurate reflection of those portions of the plans?

9  **A.**  It is.

10  **Q.**  Let's look at the first page and talk about how this is

11  put together.  There's a little box you see at the top there?

12  **A.**  I do see it.

13  **Q.**  Yeah.  What information is contained within that -- that

14  little box at the top?

15  **A.**  So that box, as I understand it, includes the exhibit

16  number in the context of all of the exhibits being used for

17  this case.  It includes a unique identifier, which, I think,

18  often is the associated plaintiff name, although there are some

19  instances where that's not the case.

20    It includes the plan name, and then it includes the plan

21  date, the date for which the plan is effective, the first date

22  for which the plan is effective.

23  **Q.**  And then below that, if you look at the rest of the first

24  page of Exhibit 1653, can you describe for the Court sort of

25  how this chart is put together and what's reflected here?

1    **A.**   Sure.  So when you're looking at only excerpts from these

2    plans, you often have to make sure you understand what section

3    you're talking about.  So we'll often include a section header,

4    for example, the "Our Responsibilities."

5        But then the specific text that is excerpted there comes

6    directly from the plan and it comes from the page number of the

7    exhibit as shown in the column at right.

8    **Q.**   And are these screenshots taken directly from the

9    electronic versions of the plans?

10    **A.**   That's my understanding, yes.

11    **Q.**   And if we look at the entry here, this is Exhibit 225.  So

12    does this correspond to the plan that we've been looking at?

13    **A.**   Yes, it does.

14    **Q.**   And if we scroll down to the next page, we look, say, for

15    example, on the section that -- there's a Section 9, "Defined

16    Terms."  So we can pull that up to page 90 of Exhibit 225.

17        At the bottom there's the definition of Covered Health

18    Services that we were discussing that continues on to page 91.

19    I think that's where we started with Exhibit 225 a while ago.

20        Does this chart then reflect that same language that

21    appears in Exhibit 228?

22    **A.**   Yes, it does.

23    **Q.**   And if we looked back at Exhibit 1653 and we scroll down

24    to page 6 of that exhibit.

25        So what is page 6 showing us?

**A.**    Page 6 is a different plan.

So you can see at the top that it's the next plan in the summary; so the same things.  It has the plan -- the exhibit number, a unique I.D., again typically the plaintiff's name, a description of the plan, and then the first effective date for that plan.

**Q.**    And then below that, what do we see on page 6?

**A.**    And below that, and for the rest of the pages, will be the specific excerpts taken from this plan and compiled into the summary.

**Q.**    And then what's in the column on the right-hand side?

**A.**    The column on the right-hand side, again, is for this exhibit.  It's the number -- the page number of that exhibit that the excerpt was pulled from.

**Q.**    And if we were to continue to scroll down through this exhibit, would there be an entry for each of the plans that you reviewed in connection with the plaintiffs and sample members in this case?

**A.**    Yes.

**Q.**    And to the best of your knowledge, is Exhibit 1653 an accurate summary of the portions of the plans that you've described as relevant to determining the scope of mental health and substance use disorder coverage?

**A.**    Yes.

**MS. ROSS:**  Your Honor, we move to admit Exhibit 1653

1   into evidence.

2           **MR. ABELSON:**  No objection.

3           **THE COURT:**  Admitted.

4       (Trial Exhibit 1653 received in evidence.)

5   BY MS. ROSS:

6   **Q.**   Mr. Dehlin, if you can turn to what is previously admitted

7   as Exhibit 892, which is the last tab of that binder, that

8   third binder.  If we can turn to page 2 after the cover page.

9       Mr. Dehlin, do you recognize Exhibit 892?

10  **A.**   Yes.

11  **Q.**   And did you review this document in preparing to testify

12  here today?

13  **A.**   No, I did not.  I glanced at it briefly this morning, but

14  I have not reviewed this document.

15  **Q.**   Do you understand what it reflects?

16  **A.**   I can tell you my understanding of what it reflects.  And

17  I briefly looked at one page at the back.

18      My understanding is this is a document from the

19  plaintiffs, and it summarizes a variety of different sections

20  from the plans, the sample plans in the case, including covered

21  health services definition, the medically necessary or medical

22  necessity definition, and then any specific exclusion language

23  that applies to mental health and substance abuse.

24  **Q.**   You mentioned you looked at a page at the back.  If I can

25  direct your attention to page 0021, is that the page that you

1    were referring to?

2    A.    Yes, it is.

3    Q.    And if you look at paragraph 2 of this page, it says:

4              "Chart includes the references to provisions within

5          definitions of Covered Health Services, definitions of

6          Medically Necessary, and exclusion sections specific to

7          mental health and/or substance use disorder that contain

8          one or more of the following phrases."

9          Do you see that?

10   A.    I do.

11   Q.    Then there's a number of phrases listed below that; right?

12   A.    Correct.

13   Q.    If you flip back to page 0002 of Exhibit 892.

14         Do you understand that this exhibit reflects where those

15   particular phrases on page 21 appear in the plans?

16   A.    That's my understanding.

17   Q.    Would this chart give you all the information that you

18   would need to know to determine what treatment is covered by

19   the plans with respect to mental health or substance use

20   disorder, in your opinion?

21   A.    No.

22   Q.    And you mentioned -- when we were talking about general

23   exclusions that might apply, I believe you mentioned the

24   exclusion for custodial care in Section T on page 0062 of Trial

25   Exhibit 225.  Is that right?

1    **A.**    Correct.

2    **Q.**    Is custodial care covered by this plan?

3    **A.**    No.

4    **Q.**    And is custodial care defined by the plan?

5    **A.**    Yes, it is.

6    **Q.**    Direct your attention to the definition section of the

7    plan which starts on page 0090.

8         And on page 0091, do you see a definition for custodial

9    care?

10   **A.**    Yes, I do.

11   **Q.**    And can you read that definition for us?

12   **A.**    "Custodial care:  Services that are any of the following:

13   First bullet:

14        "Nonhealth-related services such as assistance in

15   activities of daily living.  Examples include feeding,

16   dressing, bathing, transferring, and ambulating.

17   Next bullet:

18        "Health-related services that are provided for the

19   primary purpose of meeting the personal needs of the

20   patient or maintaining a level of function even if the

21   specific services are considered to be skilled services,

22   as opposed to improving that function to an extent that

23   might allow for a more independent existence.

24   Next bullet:

25        "Services that do not require continued

1        administration by trained medical personnel in order to be

2        delivered safely and effectively."

3   **Q.**   So if treatment meets any of these criteria, would it be

4   considered custodial under this plan?

5   **A.**   That's correct.

6   **Q.**   Is this the same definition of custodial care that appears

7   in all of the plans for the plaintiffs and the sample members

8   that you reviewed?

9   **A.**   No.

10  **Q.**   Did you review all of the plans for the plaintiffs and the

11  sample members in the case to determine whether those exclude

12  custodial care?

13  **A.**   Yes.

14  **Q.**   Do all of those plans exclude custodial care?

15  **A.**   The vast majority do.  There are a couple where there are

16  pieces that are missing, but -- and it may not be a covered

17  service, but the vast majority of them exclude custodial care.

18  **Q.**   And did you review how those plans define custodial care?

19  **A.**   We did.  I did.

20  **Q.**   If I can direct your attention to what's been marked for

21  identification as Trial Exhibit 1654, please, which is again in

22  Volume 3 of your binders.

23       Do you recognize Trial Exhibit 1654?

24  **A.**   I do.

25  **Q.**   What is it?

**A.**   This is another summary document that -- where we went

through all of the sample plans for this case and pulled out

the definition of custodial care and then included it here.

   And we also made sure that we recognized where in that

plan there was an exclusion to custodial care.

   So if you look at the document, the column on the left

includes the verbatim text, the screenshot text, of any of the

plans that are listed next to it.

   And, again, we'll have the trial exhibit number related to

that plan as well as the unique I.D. and the plan name for that

plan; and then the specific page number from that plan where an

exclusion to custodial care is mentioned; and then, finally,

the page where we've pulled the screenshot of the definition of

custodial care.

**Q.**   And in the third entry down on this first page, I see an

asterisk and a footnote in the definition citation.

   What does that indicate?

**A.**   Right.  So many of the plans from the sample plans have

exactly the same language for a custodial -- the custodial care

definition.  There are some instances where they were

exceedingly minor.  And, I'm sorry, when those plans have the

exact same plan, we've tried to group them together.

   Some of the plans have exceedingly minor and really

nonsubstantive differences in the language.  And in those cases

we have still listed them with the others, but we've noted with

1    the asterisk that every single word and every single letter may

2    not be identical.

3    **Q.**   In your opinion, were those changes that are marked with

4    an asterisk, do they change the meaning of the definition of

5    custodial care in any way?

6    **A.**   They do not.

7    **Q.**   So if the meaning is different, did you group them

8    separately?

9    **A.**   Right.  So if you go down, the first, the second, the

10   third, the fourth, and the fifth pages all include plans that

11   have, you know, that first definition of custodial care that

12   has been listed.

13        Starting on the sixth page, there is a different

14   definition of custodial care.  So this is another definition

15   that has many similar elements, but it's not the same.  And so

16   we've listed it separately along with all of the plans that

17   have this definition.

18   **Q.**   Okay.  If the go to the seventh page, for example, the

19   left-hand column is blank.  What does that indicate?

20   **A.**   Right.  So you just have to go back up to the last listed

21   definition of custodial care.  In this instance there were too

22   many plans to fit on one page, so these all have the same

23   definition that shows up on page 6.  We just didn't include it,

24   to make sure that we knew where there was a break for a new

25   definition.

1   Q.   And does this exhibit continue on in that same formatting

2   for each definition that you saw in the plans that you

3   reviewed?

4   A.   It does.

5   Q.   And, to the best of your knowledge, does the summary

6   accurately reflect the language defining custodial care in

7   those plans?

8   A.   Yes, it does.

9        MS. ROSS:  Your Honor, we move to admit Exhibit 1654

10  into evidence.

11       MR. ABELSON:  No objection.

12       THE COURT:  It's admitted.

13   (Trial Exhibit 1654 received in evidence.)

14  BY MS. ROSS:

15  Q.   Let's go back, Mr. Dehlin, to the first definition that

16  shows up in your Trial Exhibit 1654 on page 0001.

17       Is that the most common definition of custodial care that

18  you saw among the plans you reviewed?

19  A.   It is.

20  Q.   Let's put that definition of custodial care, if we can,

21  side by side with Trial Exhibit 148, which, Mr. Dehlin, is in

22  the binder you have up there that is for the guidelines in the

23  case.  Might have gotten set on the floor.

24  A.   I have both.

25  Q.   So Exhibit 148 is the Custodial Care & Inpatient

1  Residential Services Coverage Determination guideline that is

2  dated March 2015.

3       Do you see that?

4  **A.**   Yes, I do.

5  **Q.**   Is this a document that you're familiar with?

6  **A.**   I've glanced at one portion of it briefly.

7  **Q.**   If you can, turn to page 0003 of Exhibit 148, particularly

8  the second bullet point down under "Key Points."

9  **A.**   Yes, I see that.

10 **Q.**   Says: "Custodial care in a psychiatric inpatient or

11 residential setting is any of the following."  And there's

12 three bullets?

13 **A.**   I see it.

14 **Q.**   Do you recognize that language that appears on Exhibit 148

15 at 003?

16 **A.**   I do.

17 **Q.**   Where does it come from?

18 **A.**   That language is, I think, verbatim, but if not verbatim,

19 incredibly close to the language from the definition of the

20 most common definition of custodial care from Exhibit 1654.

21 **Q.**   And let's keep Exhibit 1654 open on page 1.  And if we can

22 pull up next to that -- if you can turn to Trial Exhibit 195,

23 which is the coverage determination guideline for custodial

24 care and inpatient and residential services with a revision

25 date of April 2016.

1    Do you see that?

2  **A.**   I do.

3  **Q.**   Again, if I can direct your attention to the second bullet

4  point under Key Points on page 0003 of Exhibit 195?

5  **A.**   I see it.

6  **Q.**   "Custodial care in a psychiatric inpatient or residential

7  setting is any of the following."

8    Do you recognize that language?

9  **A.**   I do.  Again, it's, I believe, identical, if not

10  identical, virtually identical, to the most common definition

11  of custodial care from the sample plans.

12  **Q.**   And that's plan language within the plans?

13  **A.**   Correct.

14  **Q.**   Let's look at Trial Exhibit 221, still keeping one hand on

15  1654, on page 1, and turn to page -- to Trial Exhibit 221,

16  please, which is the coverage determination guideline for

17  custodial care inpatient and residential services with the

18  effective date of March 2017.  Do you see that?

19  **A.**   I do.

20  **Q.**   Again, if I can direct your attention to page 0003 of

21  Trial Exhibit 221, the second paragraph begins, "Custodial care

22  in a psychiatric inpatient or residential setting is any of the

23  following."

24    Do you see that?

25  **A.**   I do.

1   Q.   Do you recognize that language?

2   A.   Yes, I do.

3   Q.   Where does it come from?

4   A.   Again, virtually verbatim from the most common definition

5   from the plan language of the sample plans from this case.

6   Q.   Let's go back to Trial Exhibit 1654 now.  And if you can

7   turn to page 10 of Exhibit 1654.  There we go.

8        What is shown here on page 10 in the first column,

9   Mr. Dehlin?

10  A.   This is a -- yet another definition of custodial care from

11  a fairly large subset of sample plans from this case.

12  Q.   And all of those plans are listed here in Exhibit 1654

13  that have that same definition?

14  A.   Correct.  It looks like this page and the two following

15  pages have plans that have this definition.

16  Q.   Okay.  Let's keep that up.  And if you could also turn in

17  your guideline binder that you have there to Exhibit 108, which

18  is the Coverage Determination Guidelines custodial care and

19  inpatient and residential services with a revision date of

20  February 2014.

21       Are you there?

22  A.   I am.

23  Q.   And let's look at the Key Points box again on page 0003.

24  Do you see that?  And particularly the first bullet point on

25  there.

1    **A.**   I see it.

2        **MS. ROSS:**  Mike, let's move up to the first one.

3    **BY MS. ROSS:**

4    **Q.**   And it says:

5        "Custodial care in a psychiatric inpatient or

6    residential setting is the implementation of clinical or

7    nonclinical services that do not seek to cure or which are

8    provided during periods when the member's behavioral

9    health condition is not changing or does not require

10    trained clinical personnel to safely deliver services."

11    Do you see that?

12    **A.**   I do.

13    **Q.**   Mr. Dehlin, do you recognize that language that appears in

14    the Custodial Care CDG for February 2014 on page 003 of

15    Exhibit 108?

16    **A.**   I do recognize it.

17    **Q.**   Where does it come from?

18    **A.**   It's not quite verbatim, but it's very similar to -- the

19    line in Care is effectively the same meaning as, you know, part

20    of this "custodial care" definition that we were looking at on

21    page 10 of 1654.

22    **Q.**   Let's keep 1654 up and let's turn now in your guideline

23    binder to Exhibit 84, which is the Coverage Determination

24    Guideline for Custodial Care and Inpatient and Residential

25    Services dated January 2013.

1    A.    (Witness examines document.)

2    Q.    And, again, if we can direct your attention to page 003 of

3    Exhibit 84 and the key points box to the first bullet.

4    A.    I see it.

5    Q.    Is that the same language that we just looked at in

6    Exhibit 108?

7    A.    It is.

8    Q.    And where does that language come from?

9    A.    Again, from the definition on page 10, which is, you know,

10   one of the more common definitions of "custodial care" and

11   "sample plans," page 10 of 1654.

12   Q.    And if you can still keep 1654 up on page 10 and turn to

13   Exhibit 47 in your guideline binder.  This is the Coverage

14   Determination Guideline for Custodial Care and Inpatient

15   Services with a revision date of December 2011.  Do you see

16   that?

17   A.    I do.

18   Q.    Again, directing your attention to the key points box that

19   appears on page 003 of Exhibit 47 and in particular to, in this

20   case, the second bullet here.  It reads (reading):

21        "Custodial care and psychiatric inpatient or

22        residential setting is the implementation of clinical or

23        nonclinical services that do not seek to cure or which are

24        provided during periods when the member's behavioral

25        health condition is not changing or does not require

1          trained clinical personnel to safely deliver services."

2          Mr. Dehlin, do you know where that language comes from?

3    A.   Again, that language is not verbatim and not structured

4    the same way, but effectively has all of the same points as the

5    "custodial care" definition on page 10 of Exhibit 1654.

6          THE COURT:  So go down to the next line on Exhibit 47,

7    page 3.  There's another bullet point.  Where does that

8    language for the bullet point "'Custodial care' in this context

9    is characterized by the following"?  Do you know where that

10   comes from?

11         Or let me put it differently, that doesn't come from the

12   plan document; right?

13         THE WITNESS:  I don't see it in this -- well, hang on.

14   Let me read it one more time, please.

15         THE COURT:  Sure.

16         THE WITNESS:  (Witness examines document.)  Some of it

17   does appear in this definition.  The daily living skills

18   relates to the first bullet point --

19         THE COURT:  Uh-huh.

20         THE WITNESS:  -- but I agree that there are other

21   portions of it that don't come from this specific definition of

22   "custodial care."

23         THE COURT:  Okay.  Thank you.

24   BY MS. ROSS:

25   Q.   Now, Mr. Dehlin, in administering the behavioral health

1  benefits under the plans that you reviewed for this case, is it

2  appropriate for UBH to make coverage determinations based on

3  the definitions of "custodial care" that appear in the plan

4  documents?

5  A.    Yes.

6        MS. ROSS:  We have no further questions right now,

7  Your Honor.

8        THE COURT:  Cross.

9                    CROSS-EXAMINATION

10 BY MR. ABELSON:

11 Q.    Good morning, Mr. Dehlin.  My name is Adam Abelson,

12 counsel for the plaintiffs.

13 A.    Good morning.

14 Q.    Mr. Dehlin, you testified for a while this morning about

15 various ways -- you were asked about other ways -- I'll start

16 again.

17       You were asked various times about whether language would

18 be appropriate to consider in connection with a benefit

19 determination.  Do you remember those questions?

20 A.    I do.

21 Q.    Did you look at any of the denial letters for any of the

22 plaintiffs for the claim sample members in this case?

23 A.    I know they are part of the documents that you guys have

24 submitted, but I have not looked at them.

25 Q.    So you have -- you don't know whether any of the

1  provisions you pointed to were in fact a basis or the basis of

2  any of the denials for the plaintiffs of the claim sample?

3  **A.**   I don't know the basis of the denials.

4  **Q.**   Do you understand when a claims administrator like UBH

5  issues a denial, it has to tell the member why the claim has

6  been denied; right?

7  **A.**   Correct.

8  **Q.**   And that's for, among other reasons, so that the member

9  knows why the claims administrator concluded that the

10  coverage -- that the treatment for which coverage is sought is

11  not covered by the plan that's being administered?

12  **A.**   Say the question again, please.

13  **Q.**   You understand that when a member has been denied coverage

14  for a particular claim, they receive a letter; right?

15  **A.**   Correct.

16  **Q.**   And the letter has to say the basis on which the denial

17  was based; right?

18  **A.**   That's my understanding.

19  **Q.**   And you don't know whether any of the provisions you

20  pointed to in any of the plans were, in fact, one or any of the

21  bases for the denials in this case?

22  **A.**   I have not reviewed the denial letters, that's correct.

23  **Q.**   And you are aware that all of the denials in this case did

24  have as at least one basis the application of UBH's standard

25  criteria Level of Care Guidelines or Coverage Determination

1   Guidelines; right?

2   **A.**   I actually don't know that.  I don't know the basis of the

3   denials.

4   **Q.**   You're not a psychiatrist; right?

5   **A.**   That's correct.

6   **Q.**   You're not a psychologist?

7   **A.**   Correct.

8   **Q.**   You have no clinical background whatsoever?

9   **A.**   Correct.

10  **Q.**   You're on the business side of UnitedHealth Group; right?

11  **A.**   That's correct.

12  **Q.**   Which is a sister company from UBH.  It's not UBH?  You

13  don't work for UBH?

14  **A.**   Also correct.

15  **Q.**   And since 2010 you've mainly focused on product strategy

16  you said?

17  **A.**   Product issues of all types including product strategy,

18  yes.

19  **Q.**   And your goal in that and your responsibilities in that

20  position is to keep your customers happy; right?

21  **A.**   That's one of many responsibilities, correct.

22  **Q.**   And when you've talked about customers, those are the plan

23  sponsors; right?

24  **A.**   Plan sponsors in a self-funded sense but, you know,

25  employer customers in a fully insured sense.  We also, you

 1   know, view other folks as our customers.  We're trying to keep

 2   our consumers happy.  We're trying to keep providers happy.

 3   We're trying to keep all of those key partners happy.

 4   **Q.**   And your focus at United is on what you've called key

 5   accounts; right?  Those are from 50 to 3,000 employees?

 6   **A.**   I didn't mention key accounts yet, but that's correct,

 7   that's the phrase we use for -- it's not always exactly 50 to

 8   3,000 but that's approximate, yes.  I mean, my focus has been

 9   beyond the key accounts.

10   **Q.**   You testified for a while about Certificates of Coverage,

11   COCs, and Summary Plan Descriptions, SPDs; right?

12   **A.**   Correct.

13   **Q.**   Those are the documents that set out the plan terms;

14   right?

15   **A.**   Correct.

16   **Q.**   Sometimes you call the plan terms "the terms of coverage"?

17   **A.**   That's correct.

18   **Q.**   And the COCs and the SPDs set out what you consider to be

19   your promises to the members?

20   **A.**   Among other things, yes.

21   **Q.**   Or your responsibilities to the members, I believe, as you

22   put it; right?

23   **A.**   Among other things, yes.

24   **Q.**   So when a claims administrator like UBH is administering a

25   plan, its responsibility is to apply the terms of the plan;

1  right?

2  A.   Correct.

3  Q.   So when you testified earlier today about the intent

4  behind a plan, you are referring to the terms of the plan

5  itself; right?

6  A.   Correct.

7  Q.   You pointed to a number of provisions in Exhibit 225,

8  which is the plan for Granite Construction?

9  A.   Correct.

10 Q.   I take it you don't know what kind of treatment the person

11 whose coverage is at issue -- who's covered by this plan was

12 seeking in this case?

13 A.   I don't know the specifics of the instance, no.

14 Q.   So if you were told that this is a plan for a

15 Mr. Alexander, one of the plaintiffs, whose denial related to

16 intensive outpatient, then you would understand that pointing

17 to an exclusion for residential treatment has nothing to do

18 with the denial in this case; right?

19 A.   If that were the case, I think that would be correct, but

20 I don't know any of the details of the -- of that specific

21 instance.

22 Q.   You pointed to -- or strike that.

23      You were asked about a provision in one or two plans that

24 use the term "cost effective," right, within the definition of

25 covered health services, I believe it was?

1  **A.**   That sounds correct, yes.

2  **Q.**   Is there any reference to "cost effective" in all of the

3  definitions of covered health services or medically necessary

4  that you looked at?

5  **A.**   So I looked at all of the definitions, but I was not

6  looking for that phrase in particular.  So I apologize, but I

7  can't answer that comprehensively.

8  **Q.**   And you have no idea whether any of the denials in this

9  case were based on the treatment being not cost effective?

10  **A.**   Right.  Again, I don't know anything about the specific

11  instance or denials in this case.

12  **Q.**   Likewise, you pointed to a condition of residential

13  treatment as short as opposed to long term.  Do you remember

14  those questions?

15  **A.**   For that plan, yeah.

16  **Q.**   Right.  But, again, you don't know whether that denial was

17  even for an RTC claim; right?

18  **A.**   That's correct.

19  **Q.**   Or if it was, whether the basis for the denial was that it

20  was long-term RTC as opposed to short-term RTC?

21  **A.**   That's correct.

22  **Q.**   You're familiar with the Parity Act; right?

23  **A.**   In general terms, yes.

24  **Q.**   You testified you were involved with some of the --

25  scratch that.

1      You were involved in some of the amendments to

2  Certificates of Coverage related to the Parity Act; right?

3  **A.**   At that point -- I mean, I was aware of it.  At that point

4  of time my role, you know, didn't involve specifically making

5  sure we were in compliance, but I'm aware of the Parity Act in

6  general and aware of what changes we had to make in general.

7  **Q.**   The Parity Act has provisions and regulations that govern

8  what levels of care have to be provided.  If the plan covers,

9  for example, inpatient for medical/surgical, then you have to

10 cover inpatient for mental health and substance use disorder;

11 right?

12 **A.**   Correct.

13 **Q.**   And so if there are provisions in any plan that reports a

14 limit coverage for mental health or substance use treatment

15 that apply only to that side and not to medical/surgical, your

16 understanding is that those would not be enforceable; right?

17 **A.**   That's my general understanding, yes.

18 **Q.**   And so if those provisions apply -- appear -- scratch --

19 strike that.

20     If there are provisions in these plans that you've cited

21 that are on your Exhibit 1653 that if applied by UBH would

22 violate the Parity Act, it would have nothing to do with

23 whether the denials in this case are -- I'll withdraw that

24 question.

25     Wait.  So provisions that purport to limit a particular

1    level of care for mental health or substance use settings are

2    not legally enforceable if applied to a denial; right?

3            **MS. ROSS:**  Objection, Your Honor, to the extent it

4    calls for a legal conclusion.

5            **THE COURT:**  Sustained.

6    **BY MR. ABELSON:**

7    **Q.**   But it is your understanding, is it not, that if a given

8    plan covers skilled nursing facilities -- for example, for

9    medical and surgical treatment -- that an exclusion for

10   residential treatment for substance use or mental health

11   treatment would not be enforceable in the context of that given

12   plan?

13           **MS. ROSS:**  Objection again, Your Honor, to the extent

14   it calls for a legal conclusion.

15           **THE COURT:**  Sustained.  Let's move on.

16   **BY MR. ABELSON:**

17   **Q.**   Now, you understand that the denials in this case were all

18   ones where UBH was applying its standard criteria, the Level of

19   Care Coverage Determination Guidelines; right?

20   **A.**   I do not know that.

21   **Q.**   Okay.  Let's -- you were pointed to some of the exclusions

22   for mental health and substance use disorder treatment; right?

23   **A.**   Correct.

24   **Q.**   Let's look at one of those.  Exhibit 225.  I believe it's

25   page 107.

1  A.    (Witness examines document.)

2  Q.    This is the Number 9 on page 107 of Exhibit 225.  Do you

3  see that?

4  A.    I see it.

5  Q.    Do you see that the first bullet under Number 9 is "Not

6  consistent with generally accepted standards of medical

7  practice for the treatment of such conditions"; right?

8  A.    Correct.

9  Q.    You can leave that on the screen and pull up Exhibit 4,

10  page 2.

11        This is in the binder of guidelines that you've got there.

12  A.    (Witness examines document.)

13  Q.    And you see at the top where it reads (reading):

14            "The Level of Care Guidelines is derived from

15        generally accepted standards of practice for the treatment

16        of behavioral health conditions"?

17        Do you see that?

18  A.    I do.

19  Q.    So do you have any reason to doubt that a denial as to

20  which the Level of Care Guidelines were applied were denials

21  that were based on this exclusion or one similar to it?

22  A.    Ask the question again, please.

23  Q.    So you see that this plan, 225 --

24  A.    Yes.

25  Q.    -- Exhibit 225, excludes services that are not consistent

1   with generally accepted standards of medical practice for the

2   treatment of such conditions?  And that is specifically in the

3   context of mental health coverage; right?

4   A.   Correct.

5   Q.   You see the language in the Level of Care Guidelines that

6   say that the Level of Care Guidelines are derived from

7   generally accepted standards of practice; right?

8   A.   Correct.

9   Q.   So you've talked about a lot of other provisions in these

10  plans.  Do you have any reason to believe that when the Level

11  of Care Guidelines are applied, they're applying any other

12  provision of the plans other than that one?

13  A.   I don't think I have any reason to believe or not believe.

14  I don't know anything about the denials.  There are a lot of

15  different covered provisions and a lot of different exclusion

16  provisions that I imagine might be involved.

17  Q.   But you don't know whether they were the basis of any of

18  the denials?

19  A.   That's correct.

20  Q.   Now, you testified about provisions in some of these plans

21  that referred to clinical protocols or guidelines of the mental

22  health substance use disorder designee; right?

23  A.   Correct.

24  Q.   And that's UBH?

25  A.   That's correct.

1    Q.   And you understand --

2    A.   The vast majority of our plans.  I'm sorry.  In all of

3    these plans, yes, that's correct.

4    Q.   You believe that a provision like that appears in every

5    plan that you looked at?

6    A.   No.  I'm sorry.  I was referring to UBH as the designee

7    for all of these plans.

8    Q.   Okay.  But you understand that not every plan in the claim

9    sample has a reference like that; right?

10   A.   Which reference are you talking about again?

11   Q.   A reference -- let's look at the same -- the same

12   document.  Okay?  Exhibit 225, page 107.

13   A.   Okay.

14   Q.   Do you see the third bullet point under Number 9?

15   A.   I do.

16   Q.   It says (reading):

17        "Not consistent with the Mental Health Substance Use

18        Disorder Designee's Level of Care Guidelines or best

19        practices as modified from time to time."

20        Did I read that correctly?

21   A.   You did.

22   Q.   Is that one of the provisions that you were -- the type of

23   provision you were pointing to as referring to UBH's Level of

24   Care Guidelines?

25   A.   That's correct.

1   Q.  But there is not a provision like this in all of the plans

2  of the plaintiffs in the claim sample; right?

3  A.  So, again, I did go through all the documents and I looked

4  at all of this.  I was not looking for this specific language,

5  so I can't answer that with certainty.

6  Q.  Okay.  Now, you also don't know whether Mr. Alexander's

7  denial letter in this case --

8        **THE COURT:**  Yes, he doesn't know anything about the

9  denial letters.  Keep going.

10       **MR. ABELSON:**  Okay.

11  Q.  If you are told that the denial letter did not reference

12  any Level of Care Guideline but referenced a Coverage

13  Determination Guideline, that wouldn't affect whether you think

14  that provision would apply?

15  A.  That's correct.  There could be multiple types of care

16  guidelines that would be -- that this specific phrase could

17  refer to.

18  Q.  You were asked about amendment provisions; right?

19  A.  Correct.

20  Q.  And UBH is a claims administrator; right?

21  A.  Correct.

22  Q.  UBH can't rewrite the plans?

23  A.  That's correct.

24  Q.  Its job is to administer the plans?

25  A.  Correct.

1    **Q.**   As written?

2    **A.**   Correct.

3    **Q.**   Every Certificate of Coverage has a plan year as I believe

4    you testified; right?

5    **A.**   Correct.

6    **Q.**   And so if a UBH guideline were amended, for example, in

7    the middle of a plan year, it couldn't amend the plans of the

8    term; right?

9    **A.**   Right.  The plan is the plan for the year.

10   **Q.**   Now, you testified about custodial care exclusions; right?

11   **A.**   Correct.

12   **Q.**   Now let's look at your Exhibit 1653.

13   **A.**   (Witness examines document.)

14   **Q.**   Let's look at page 37.

15   **A.**   (Witness examines document.)

16   **Q.**   You pointed to some of the definitions of "custodial care"

17   that appear in some of the plans; right?

18   **A.**   Correct.

19   **Q.**   But there are others as well; right?

20   **A.**   Correct.

21   **Q.**   On page 37, for example, there's an exclusion that

22   reads -- or a definition of the term that reads:

23          "Services provided to a person for the primary

24       purpose of meeting nonmedical personal needs, e.g.,

25       bathing, dressing, preparing meals, including special

1          diets, taking medication, assisting with mobility."

2          Did I read that correctly?

3     A.   So I'm perhaps lost.

4     Q.   I'm sorry.

5     A.   Could you refer -- I think you referred me to 1653, a

6     summary document of custodial care, versus document 1654.

7     Q.   I meant 1654, page 37.

8     A.   Okay.

9     Q.   Now, that is another definition of "custodial care" that

10    appears in at least one of the plans that you looked at; right?

11    A.   It's applies in one of the plans that we looked at, yes.

12    Q.   If you could leave that on the screen and pull up

13    Exhibit 108, page 3.

14         It's your understanding that the Custodial Care Coverage

15    Determination Guideline is what UBH uses if it is relying on a

16    custodial care exclusion as the basis for a denial; right?

17    A.   I'm sorry.  Say it again.

18    Q.   You understand that a Custodial Care Coverage

19    Determination Guideline is what UBH relies on if it is denying

20    a claim pursuant to a denial -- an exclusion of custodial care?

21    A.   Okay.  Yes.

22    Q.   Now, does this -- just as an example, does this definition

23    of "custodial care" in this plan say anything about a member

24    not responding to treatment?

25    A.   This definition of "custodial care" does not specify that.

1    **Q.**    It says nothing about active treatment?

2    **A.**    That's correct.

3    **Q.**    It says nothing about improvement; right?

4    **A.**    That's correct.

5    **Q.**    And it says nothing about reduction or control of acute

6    symptoms?

7    **A.**    That's correct.

8    **Q.**    Do any of the definitions of "custodial care" that you

9    looked at include the phrase "reduction or control of acute

10   symptoms"?

11   **A.**    Again, I did go through all the definitions.  I was not

12   looking for that phrase specifically.  I can't answer with

13   certainty.  It certainly did not appear frequently.

14   **Q.**    You testified about exclusions for experimental treatment;

15   right?

16   **A.**    I did.

17   **Q.**    And whether certain denials would have been clinical or

18   administrative; right?

19   **A.**    We also discussed that, yes.

20   **Q.**    Do you have any knowledge of UBH's coding methodology?

21   **A.**    I do not.

22   **Q.**    You testified that for fully insured plans UBH bears risk

23   if the costs are greater than anticipated; right?

24   **A.**    I did not say that, no.

25   **Q.**    I'm sorry.

1  A.    UBH does not bear risk.  UnitedHealthcare bears risk.

2  Q.    You understand -- okay.

3        So let's go back to the relationship between UBH and

4  UnitedHealthcare.

5        You understand that there are plans for which UBH bears

6  risk; right?

7  A.    So my understanding of -- so, first off, I can't testify

8  at all to UBH's relationship with entities outside of

9  UnitedHealth Group.  I know absolutely nothing about that.

10       My understanding of the financial arrangements between

11  UnitedHealthcare and UBH are very high level.  My understanding

12  is -- well, so I can't -- I mean, I can discuss that at a high

13  level, but I do not know the details.

14  Q.    You testified or were asked about Exhibit 892, which is a

15  chart that was prepared by plaintiffs; right?

16  A.    Correct.

17  Q.    And I believe you explained it doesn't include all of the

18  other exclusions; for example, those you included in your

19  chart?

20  A.    Correct.

21  Q.    Does it provide enough information for you to determine

22  whether one condition of coverage is that services have to be

23  consistent with generally accepted standards of care?

24  A.    Whether one set of what?  Please repeat the question.

25  Q.    So is it sufficient for you to determine whether, as at

1  least one condition of coverage, that the treatment for which

2  coverage is sought meet one of the bolded phrases?

3  **A.**    So you're asking if from this document I can conclude that

4  as a condition of coverage, a service needs to meet generally

5  accepted standards?  Is that the question?  I'm sorry.  I'm not

6  understanding.

7  **Q.**    Correct.

8  **A.**    Again, I haven't looked through this document.  If it's a

9  fair representation and if it always includes, you know, the --

10  you know, covered health services, then, yes, that would help

11  understand that one coverage provision.

12  **Q.**    Meaning that a condition of coverage is that the treatment

13  meets that standard?

14  **A.**    Generally accepted standards of care, although there are

15  different phrases, correct.

16          **MR. ABELSON:**  Nothing further.

17          **THE COURT:**  Thank you.

18      Anything further?

19          **MS. ROSS:**  No, Your Honor.

20          **THE COURT:**  Okay.  Thank you, sir.

21          **THE WITNESS:**  Thank you.

22                      (Witness excused.)

23          **MS. ROMANO:**  Your Honor, UBH calls Dr. Andrew

24  Martorana.

25          **THE COURT:**  Okay.

1                      (Pause in proceedings.)

2        **MS. ROMANO:**  May I approach?

3                      **<u>ANDREW MARTORANA</u>,**

4  called as a witness for the Defendant, having been duly sworn,

5  testified as follows:

6        **THE WITNESS:**  I do.

7        **THE CLERK:**  Thank you.

8     Could you please state your full name for the record, and

9  make sure you speak clearly into the microphone.

10       **THE WITNESS:**  Yes.  My name is Andrew Martorana.  Last

11  name is spelled M, as in Mary, A-R-T, as in Tom, O-R-A-N, as in

12  Nancy, A.

13       **THE CLERK:**  Thank you.

14       **MS. ROMANO:**  Just one moment, Your Honor.

15                  (Pause in proceedings.)

16                **<u>DIRECT EXAMINATION</u>**

17  BY MS. ROMANO:

18  **Q.**   Good morning, Dr. Martorana.

19  **A.**   Good morning.

20  **Q.**   Who is your employer?

21  **A.**   I'm employed by United Behavioral Health, UBH.

22  **Q.**   What is your title at UBH?

23  **A.**   My current title is Senior Behavioral Medical Director

24  Northeast Region.

25  **Q.**   Are you a medical doctor?

1    **A.**    I am.

2    **Q.**    Can you please describe your educational background?

3    **A.**    After completing an undergraduate degree at Princeton, I

4    went to the University of Illinois Medical School in Chicago,

5    and then I had a four-year combined internship and psychiatric

6    residency at the University of Illinois hospitals that followed

7    that.

8    **Q.**    When did you complete your residency?

9    **A.**    1985.

10   **Q.**    Can you please describe your medical licensure and

11   specialty?

12   **A.**    I'm board certified in general adult psychiatry.  I'm

13   licensed in Illinois, Maryland, Virginia, New York, New Jersey,

14   Connecticut, and Tennessee.

15   **Q.**    Can you please provide a brief overview of your work in

16   psychiatry since your residency?

17   **A.**    I've been a psychiatrist for about 35 years or so.  I

18   initially came out of residency and affiliated with an

19   established practitioner group.  And once I was able to develop

20   my own practice, then I was predominantly -- excuse me -- a

21   solo practitioner.  I treated patients in hospital as well as

22   in the office.  I did psychotherapy and medication management.

23       In addition, I had administrative positions, including I

24   was medical director for Charter Hospital -- Charter Barclay

25   Hospital in Chicago, and I was chief of service at Michael

1   Reese Hospital also in Chicago.

2       I did -- I was a residency training coordinator and

3   medical student training coordinator at Ravenswood Hospital,

4   which I was admitting at, and I did a fair amount of teaching

5   of medical students and residents.

6   **Q.**  Did you treat patients for both mental health and

7   substance use issues in private practice?

8   **A.**  I did.

9   **Q.**  How long did you engage in a private practice that you

10  just described?

11  **A.**  35 years.  Until 2002.

12  **Q.**  Was the practice for 35 years?  You said your residency --

13  you completed your residency in?

14  **A.**  I practiced from when I completed residency in 1985 until

15  November of 2002.

16  **Q.**  Is that about 17 years of practice?

17  **A.**  I'm sorry.  Yes.  I've been a psychiatrist longer.  I

18  was -- yes, I was in practice for about 17 years.

19  **Q.**  And approximately how many patients did you treat in your

20  practice over those 17 years?

21  **A.**  I never counted them, but it would be in the thousands.

22  **Q.**  Did you treat adults?

23  **A.**  I did.

24  **Q.**  Did you treat adolescents?

25  **A.**  I did.

1  Q.   And how long have you been employed by UBH?

2  A.   I've been employed by UBH since November 2002.

3  Q.   Is that when you stopped practicing treating patients?

4  A.   Yes.

5  Q.   Can you describe generally what are your types of

6  responsibilities you have as a senior behavioral medical

7  director at UBH?

8  A.   I have many responsibilities.  I guess I should divide

9  them into a couple buckets.

10      One is clinical supervision and the other would be quality

11  improvement.  So most everything falls into one of those two

12  buckets.

13  Q.   Can you describe the types of responsibilities you have

14  that fall into clinical supervision?

15  A.   Well, I have 10 direct reports, all board-certified

16  psychiatrists, some are subspecialists.  So I provide

17  supervision, training, and such for them.

18      In addition, I have clinical responsibilities but not a

19  reporting structure with the Care Advocacy staff, which are the

20  other clinicians that operate within United Behavioral Health.

21  Q.   As part of your oversight of the 10 medical directors and

22  the care advocates, do you participate in any training

23  activities?

24  A.   I do.

25  Q.   And can you briefly describe your responsibilities that

1  fall into quality improvement?

2  **A.**   Well, within that bucket you can divide quality

3  improvement into things that we do for individual members and

4  things we do more broadly over a population.

5      So for individual members, one of the activities would be

6  I co-chair the National Peer Review Committee and I sit on the

7  Sentinel Event Committee.  So these committees investigate

8  incidents.  So Sentinel Event investigates incidents that

9  should never happen in treatment, like someone kills themselves

10  in a hospital.

11      NPRC investigates clinical complaints from the members.

12  So we'll review the chart.  We may send out an audit team.  And

13  these are for our network providers.  And if we find a

14  deficiency, we'll ask for a corrective action plan.  If that's

15  not sufficient after multiple attempts, then the ultimate thing

16  we can do is to remove them from the network.

17  **Q.**   And you mentioned "network" a couple times.  What is the

18  network you're referring to?

19  **A.**   Network is the group of providers, which would include

20  facilities as well as individual providers across the country

21  that we have a contractual arrangement with to provide services

22  for our membership.

23  **Q.**   You described your role on the National Peer Review

24  Committee and the Sentinel Events Committee with respect to the

25  quality improvement responsibilities.  Are there other

1  responsibilities you have that fall into that bucket?

2  **A.**   Yes.  Well, in the broader population management-type

3  activity there's a program called ACE, which is Achievements in

4  Clinical Excellence, and this is a program where we meet with

5  network facilities and go over data with them, some data that

6  they may not have, that have to do with quality issues.

7       So, for instance, readmission data is not always

8  accessible to a hospital because they may be readmitted

9  elsewhere, so this information is valuable to them and it tells

10 us something about the quality of care.  And we work with the

11 facility to identify, you know, what happened that the

12 readmission rate went up.  And it can be a variety of things,

13 some that we can effect, some that they can effect, and,

14 therefore, improve the quality of care for our people.

15 **Q.**   Have you served on the committee called the Behavioral

16 Policy and Analytics Committee or the BPAC Committee?

17 **A.**   Yes, I have.

18 **Q.**   And when did you serve on that committee?

19 **A.**   Since about 2013, I believe, until it was disbanded in

20 2016.

21 **Q.**   And do you serve on the Utilization Management Committee?

22 **A.**   I do.

23 **Q.**   Do you have a particular role on that committee?

24 **A.**   I started out as a member, and UM Committee took over for

25 BPAC; and for the last two meetings, I've been acting -- I have

1    been named the co-chair.

2    **Q.**   Can you describe what the Utilization Management Committee

3    does?

4    **A.**   It reviews utilization management issues.  So

5    predominantly it reviews the policies and procedures having to

6    do with utilization management, as well as the guidelines that

7    are used for utilization management.

8    **Q.**   And when did the Utilization Management Committee begin

9    that responsibility?

10   **A.**   It took over for the BPAC.  So after BPAC disbanded, then

11   UM Committee took over from there.

12   **Q.**   Have you held any other positions in psychiatry outside of

13   UBH since you've been employed by UBH in 2002?

14   **A.**   Yes.  I had a position as a physician surveyor for

15   Ascellon Corporation, A-S-C-E-L-L-O-N.  And this is a company

16   that holds a contract with CMS to survey freestanding

17   psychiatric hospitals for participation in the Medicare

18   program.  So we determine if they're qualifying.  That would

19   involve me as the physician surveyor with a team of nurses and

20   social workers going into the hospital to make these

21   determinations.

22   **Q.**   And did that work involve the use of Medicare benefit

23   guidelines?

24   **A.**   Yes, it did.

25   **Q.**   And did you have any role with a task force or committee

1   in Connecticut?

2   **A.**   Yes.  After the Sandy Hook tragedy, the so-called gun law

3   was passed but a large chunk of that law had to do with mental

4   health issues because that was the nature of the tragedy; and

5   from there, there were a number of different commissions

6   formed, and I was named by one of the state senators to the

7   commission that dealt with mental health treatment for young

8   adults.

9   **Q.**   Was there any work product that was created out of that

10  committee?

11  **A.**   Yes.  There was a report that came out of that committee

12  with a variety of -- with analysis and recommendations, some of

13  which are being implemented right now.

14  **Q.**   Do you have any involvement in psychiatry professional

15  societies?

16  **A.**   Yes, I do.

17  **Q.**   What organizations?

18  **A.**   I am a life member of the American Psychiatric

19  Association, and I am a member of the Illinois Psychiatric

20  Society.

21  **Q.**   Are you familiar with the American Board of Quality

22  Assurance and Utilization Review Physicians?

23  **A.**   Yes.

24  **Q.**   What is that?

25  **A.**   This is a not-for-profit group that has as its goal seeks

1    to improve the quality of care for people in treatment across

2    the country.  It's not specific for mental health, but it -- it

3    upholds the science and pursuit of improving quality

4    improvement and appropriate utilization management.

5        It was originally just for physicians.  I was certified

6    with them, and then they've since invited other healthcare

7    professionals that aren't physicians that involve equality,

8    improvement, and utilization management, and I was recently

9    named a fellow.

10   Q.   Now, in addition to your testimony today about your

11   experience at UBH, have you also been identified as a

12   nonretained expert to testify as well?

13   A.   That's correct.

14   Q.   And on what issue will you be providing that nonretained

15   expert opinion today?

16   A.   My opinions will have to do with the guidelines that UBH

17   uses and whether they are in accordance with generally accepted

18   standards of care.

19   Q.   And what are the bases --

20            MS. REYNOLDS:  Your Honor, if I may.

21       A number of the exhibits that were disclosed for this

22   witness he disavowed having relied on for his opinion.  We'd

23   like to request a limiting instruction with respect to any

24   opinion about whether UBH's guidelines are consistent with the

25   sources that he disavowed relying on.

1    **MS. ROMANO:** Your Honor, we disagree with that

2  presentation of the facts. Dr. Martorana was at one time also,

3  in addition to being identified as a nonretained expert, he was

4  identified as a rebuttal expert to speak specifically about the

5  clinical decisions that were made for particular named

6  plaintiffs as a rebuttal to one of the identified experts for

7  plaintiffs.

8    He did prepare a report for that specific work. He won't

9  be offering any opinion testimony in that regard because it

10  dealt with individualized decisions.

11    In the course of his deposition, he was asked about the

12  documents he relied on, and he had his rebuttal report with the

13  documents he relied on for that opinion and he didn't include I

14  think the issue here is some CMS benefit manuals and maybe an

15  American Psychiatric Association document, but he was asked at

16  his deposition about familiarity with some of these things. He

17  did express familiarity with the APA guidelines and CMS in his

18  deposition, so we don't believe there should be any limiting

19  instruction here.

20    **MS. REYNOLDS:** Your Honor --

21    **THE COURT:** Yeah.

22    **MS. REYNOLDS:** -- the rebuttal report omitted all of

23  the exhibits to which we have objected from the list. There

24  are 25 of them. And, in fact, he was asked repeatedly whether

25  he had reviewed any original sources to try to determine

1　whether or not UBH's guidelines were consistent with them, and

2　repeatedly he said that he had not done it.  And I can read

3　from the transcript if that's helpful.

4　　　　**MS. ROMANO:**  Your Honor, he was asked if he had looked

5　at those documents to prepare for his expert opinion in that

6　deposition.  He honestly answered he had not; but through the

7　course of his work at UBH and as a psychiatrist, he is familiar

8　with the APA guidelines and CMS benefit manuals, and some of

9　his testimony disclosed that in his deposition.

10　　　　**THE COURT:**  Okay.  So, I mean, did you not ask him

11　about these things?

12　　　　**MS. REYNOLDS:**  Yes, he was asked, and he -- so, for

13　example, on page 188 of his deposition, lines 5 through 22, in

14　regards to this opinion -- and the opinion appears on page 186,

15　which is the UBH's Level of Care Guidelines from 2011 to

16　2017 -- were created to be and are consistent with generally

17　accepted standards of care in the behavioral health community.

18　So the testimony is on page 188 (reading):

19　　　　"**QUESTION:**  In regards to this opinion, other than your

20　　　　experience and your background with the guidelines, did

21　　　　you consult any other sources in order to arrive at this

22　　　　opinion?"

23　　　　Objection.

24　　　　"**ANSWER:**  Consult any sources other than the understanding

25　　　　of how the UBH creates these, no.

1    "**QUESTION:** Okay. And with respect to the opinion that

2    the guidelines are consistent with generally accepted

3    standards of care in the behavioral health community, did

4    you look at any sources to confirm that they are

5    consistent with the generally accepted standards of care

6    in the behavioral health community?

7    "**ANSWER:** I did not do any additional source

8    verification."

9    And there are numerous examples like that.

10    **THE COURT:** So I'm going to deny the motion subject to

11    a motion to strike. I think it's unlikely you're going to win

12    your motion to strike, but I'll allow it if you want it.

13    **MS. REYNOLDS:** Thank you.

14    **THE COURT:** Okay. Go ahead.

15    **MS. ROMANO:** I think the question I had just asked

16    Dr. Martorana was:

17    **Q.** What are the bases for the opinions -- for your opinions

18    with respect to UBH's guidelines and generally accepted

19    standards of care?

20    **A.** That would have to do with my years of being a

21    psychiatrist, my training and background, my involvement with

22    UBH in the creation of the guidelines, as well as using the

23    guidelines every day in the course of my work.

24    **Q.** Dr. Martorana, what is UBH?

25    **A.** UBH is a managed behavioral healthcare organization.

1  Q.   And what is managed behavioral healthcare?

2  A.   Well, managed healthcare in general is a system by which

3  you attempt to improve the member's experience in terms of

4  accessing and receiving appropriate care.  So a managed

5  behavioral company deals with mental health and substance use

6  issues and the member's experience in accessing and receiving

7  care.

8  Q.   Does managed healthcare include utilization management?

9  Are you familiar with that term?

10  A.   Yes.  That's one of the tools that's used, yes.

11  Q.   What is utilization management?

12  A.   It's a set of procedures that seeks to ensure that the

13  given member is receiving appropriate, safe, effective, and

14  efficient treatment.

15  Q.   What is appropriate treatment?

16  A.   Appropriate treatment is one that is based in evidence and

17  is known to improve the member's condition.

18  Q.   What is effective treatment?

19  A.   That would be about the same thing I would say.

20  Q.   And what is efficient treatment?

21  A.   Efficient treatment is treatment that takes the least

22  amount of time to achieve the result so the member's suffering

23  is limited.

24  Q.   Can you describe the levels of care that are used for

25  behavioral health treatment?

A.    Yes.  From a least restrictive or least intensive to most

restrictive/most intensive, you start with outpatient

treatment, which is typically office-based care.  You go see

your therapist once a week in the office for a therapy session.

Then the next step up in terms of intensity would be

called intensive outpatient treatment, which involves 6 -- 6 or

more hours up to 19 hours per week of programming for an adult

and -- I'm sorry -- 9 to 19 hours for an adult and 6 to 19

hours for an adolescent.  This would include individual as well

as group treatment in the intensive outpatient setting.

Then the next level up is partial hospital, which now is

20 or more hours per week.  You're still living at home so it's

an outpatient program, but it's for people that require a

higher level of intensity of service.  Again, individual

group-type therapies are involved.

Then you move into the 24-hour levels of care, so that

would be residential and inpatient.

So inpatient is the most intensive, residential is also 24

hours but is less intensive in terms of the involvement of

medical personnel.

Q.   For partial hospitalization, is that a service that's

typically provided in a hospital?

A.    No.  They're often affiliated with hospital systems but

can be in a freestanding outpatient clinic as well.

Q.    You've used the terms "least intensive," "most intensive,"

1    "least restrictive," "most restrictive."  Is there a

2    distinction between "intensive" and "restrictive" when you say

3    that?

4    A.    I tend to use them interchangeably, so "restrictive"

5    doesn't necessarily mean restricting your freedom of movement

6    but it does certainly in the case of a 24-hour treatment

7    setting; but in terms of an intensity service in an outpatient

8    setting, the restriction is more on your freedom in terms of

9    your life.  So if you're having to go 20 or more hours per week

10   to a partial hospital, that would be considered more

11   restrictive than seeing someone in an office once a week.

12   Q.    And are you familiar with levels of care that are covered

13   under Medicare?

14   A.    Yes.

15   Q.    Does Medicare cover all of the levels of care that you've

16   just gone over?

17   A.    No.

18   Q.    Which ones does Medicare not cover?

19   A.    Medicare does not cover residential services or intensive

20   outpatient services.

21   Q.    Does Medicare cover outpatient?

22   A.    Yes.

23   Q.    And does Medicare cover partial hospitalization?

24   A.    Yes.

25   Q.    And does Medicare cover inpatient hospitalization?

1    A.    Yes.

2    Q.    What levels of care covered under Medicare are closest to

3    a residential level of care?

4    A.    Well, as I laid out just now, the residential would fall

5    between partial and intensive inpatient treatment.  So it would

6    be similar to inpatient because it's a 24-hour level of care,

7    and it would be similar to partial in that there's 20 or more

8    hours of programming per week.  It would be reasonably typical

9    of a residential program.

10   Q.    Turning to a different topic now, Dr. Martorana, are you

11   familiar with UBH's Level of Care Guidelines?

12   A.    Yes.

13   Q.    Have you used them in the course of your work?

14   A.    I have.

15   Q.    What is the purpose of UBH's Level of Care Guidelines?

16   A.    The guidelines are a tool to assist our clinicians, care

17   advocates, and peer reviewers to make coverage determinations.

18   Q.    Have you had any role in the development of UBH's Level of

19   Care Guidelines?

20   A.    I have.

21   Q.    What role?

22   A.    Well, it starts in about June of the preceding year.  They

23   start asking for opinions from the internal clinical staff --

24   so care advocates as well as the doctors and the senior medical

25   directors -- as to what we would like to see, what issues we've

1    noted using the guidelines for the previous year.  And so we

2    submit that to the work group that is drafting the revisions.

3        And then I have at times participated with the work group

4    when invited to review some of the recommendations that were

5    given or questions, and that would include not only the

6    internal ones but also the opinions that we get from

7    professional societies and as well as practitioners that use

8    these guidelines.

9        And then, finally, in the BPAC and now the UM Committee,

10   I'm involved in the approval of the drafts that are presented

11   there.

12   **Q.**   Are you familiar with Coverage Determination Guidelines

13   used at UBH?

14   **A.**   Yes.

15   **Q.**   Have you used Coverage Determination Guidelines in your

16   work?

17   **A.**   I have.

18   **Q.**   What is a Coverage Determination Guideline?

19   **A.**   It's another document that serves as a tool to assist care

20   advocates and peer reviewers to make coverage determination.

21   **Q.**   Have you had any role in the development of Coverage

22   Determination Guidelines?

23   **A.**   Similarly as to the Level of Care Guidelines, although I

24   don't believe I was on a work group for that in-between step.

25   **Q.**   So when you say "similarly," are you referring to your

1  time on BPAC and Utilization Management Committee?

2  **A.**   Yeah.   So providing input at the front end and then the

3  approval piece of the BPAC and UM.

4  **Q.**   How does the content of a Coverage Determination Guideline

5  compare to the content of a Level of Care Guideline?

6  **A.**   Well, they're organized differently.   They are according

7  to conditions.   So level of care is according to the situs of

8  treatment; whereas, the CDGs are according to the condition.

9  So there would be CDG for posttraumatic stress disorder,

10 another for major depression, another for bipolar, et cetera.

11 **Q.**   Do the Coverage Determination Guidelines include

12 references to specific plan language?

13 **A.**   Yes.

14 **Q.**   Why is that?

15 **A.**   The Coverage Determination Guideline is to assist you to

16 apply the plan determination language.   In addition, it applies

17 only to specific UnitedHealthcare plans that had certain

18 language in their coverage determination -- in their coverage

19 documents.   Sorry.

20 **Q.**   Is there ever a case where Level of Care Guidelines and

21 Coverage Determination Guidelines -- let me strike that and

22 start over.

23     Is it UBH's practice to use both a Level of Care Guideline

24 and a Coverage Determination Guideline for the same coverage

25 decision?

1   **A.**    No.    The Level of Care Guidelines are used for plans that

2   use medical necessity, and the CDGs are used for plans that

3   don't have medical necessity in them.

4   **Q.**    This case relates to 2011 all the way up to 2017.    During

5   that period, did all of the Coverage Determination Guidelines

6   include all of the language from the Level of Care Guidelines?

7   **A.**    No.

8   **Q.**    I'd like to direct your attention to Exhibit 1186, if I

9   can, and it should be in that binder in front of you.

10  **A.**    (Witness examines document.)

11          **MS. ROMANO:**    And for the record, another version of

12  this document was admitted into evidence yesterday.    This is a

13  more final one because it has the signatures on the second

14  page.

15  **Q.**    Dr. Martorana, can you take a look at what's been marked

16  as Exhibit 1186?

17  **A.**    Yes.

18  **Q.**    And tell me, do you recognize it?

19  **A.**    Yes, I do.

20  **Q.**    And what is it?

21  **A.**    This is the utilization management program description for

22  2016 for United Behavioral Health.

23          **MS. ROMANO:**    Move Exhibit 1186 into evidence.

24          **MS. REYNOLDS:**    No objection.

25          **THE COURT:**    It's admitted.

1        (Trial Exhibit 1186 received in evidence)

2    **BY MS. ROMANO:**

3    **Q.**   Why does UBH have utilization management program

4    description?

5    **A.**   Well, this is required by our accreditation bodies, like

6    the NCAA -- NCQA and URAC.  They require a full program

7    description that lays out all the attributes of how we do

8    utilization management.

9    **Q.**   Does this program description address the process for

10   authorizing or not authorizing coverage for treatment?

11   **A.**   Yes, it does.

12   **Q.**   How does UBH become aware of a need for a coverage

13   determination?

14   **A.**   Well, there's typically a request.  Most often we get

15   these requests by telephone from the provider who calls into

16   our queue, and one of the clinician care advocates talks to

17   them and makes a determination.  A member can also call and

18   request authorization as well.

19   **Q.**   And I'd like to direct your attention to page 8 of this

20   exhibit, please.

21   **A.**   (Witness examines document.)  I'm there.

22   **Q.**   And right toward the middle of the page there's a heading

23   "Utilization Management Processes."  Do you see that?

24   **A.**   Yes.

25   **Q.**   And does that address some of this process for making a

1  coverage determination?

2  **A.**   It does.

3  **Q.**   And you just testified about care advocates.  What is a

4  care advocate?

5  **A.**   A care advocate is a clinician who has a master's degree

6  or higher, functions in the front lines of our utilization

7  management program interacting typically with the providers and

8  the members.

9  **Q.**   And what are UBH's practices with respect to a care

10 advocate's job when a request for authorization comes in?

11 **A.**   Well, typically it will come into the triage -- assessment

12 and triage team.  Those are care advocates.  A care advocate

13 will gather information, a lot of clinical information, from

14 the provider and use that to compare against the appropriate

15 guideline that they're requesting coverage for and then make a

16 decision.  They can make a decision to authorize or they would

17 have to refer it to an M.D. for further consultation and

18 discussion.

19 **Q.**   And is there a list somewhere of the information collected

20 by the doctor that then is provided to the care advocate as

21 part of this process?

22 **A.**   Yeah.  That's in the best practices section of the Level

23 of Care Guidelines.

24 **Q.**   Does a care advocate have authority to authorize coverage

25 for care?

1  **A.**   Yes.

2  **Q.**   And if the care advocate determines that he or she is

3  not -- does not believe that the guidelines or coverage permits

4  coverage for that particular treatment, what is UBH's process

5  in that event?

6  **A.**   So this is an unusual occurrence, first, because the care

7  advocates authorize 90 percent or more of the requests.  So in

8  the rest of those cases if the information does not appear to

9  meet guidelines for medical necessity and Level of Care

10  Guidelines, for instance, the care advocate will consult with

11  one of the medical directors, a psychiatrist.

12       And that can occur in a number of different areas.  The

13  care advocacy teams have what they call rounds, regular rounds.

14  So they may meet four, sometimes five times a week in a group.

15  They'll present a case with the information that's been

16  received to the medical director, and then there will be a

17  discussion.  It could be about complexity of the case or it

18  could be about whether it meets guidelines.

19       There are other venues where the care advocate has access

20  to the M.D., including walking in the door and talking to them.

21       So there will be a discussion, and basically one of three

22  things will happen.  The doc will look at that and say, "This

23  meets criteria," and then may give suggestions as to where the

24  treatment should go down the road.

25       They may say, "There's not quite enough.  There's holes in

1   this information.  Go back and talk to them and ask them this,

2   this, and this, and then see what they say.  Then if it meets,

3   fine.  If there's still a question, you know, bring it back to

4   me."

5       Or they look at it and say, "This information isn't lining

6   up with the request that they have.  So please schedule a

7   peer-to-peer review."

8   Q.   And if you turn the page to page 10 of this exhibit.

9   A.   (Witness examines document.)  Yes.

10  Q.   There is a reference to peer-to-peer review

11  determinations.  Can you explain what a peer review is?

12  A.   A peer review is the opportunity to -- for the attending

13  provider to discuss directly on the telephone with a UBH peer

14  reviewer, his peer, and in the process of this they gather as

15  much clinical information as necessary to try and line it up

16  with a level-of-care determination in their favor.

17  Q.   Do you participate in peer reviews?

18  A.   I do.

19  Q.   If I can direct your attention to page 10 under

20  peer-to-peer determinations, the second paragraph reads

21  (reading):

22          "The purpose of a peer-to-peer discussion is to allow

23      the treating physician practitioner the opportunity to

24      share new or additional information about the case to

25      assist the peer reviewer in making a determination."

1    Can you describe how you prepare for a peer review?

2  **A.**    Okay.  Well, I personally prepare by reviewing the

3  available clinical information that's been collected by the

4  care advocate, and that would be in our LINX clinical -- excuse

5  me, LINX, L-I-N-X -- clinical chart.  And so there would be all

6  that information that's just collected.  If the member has been

7  admitted before that we managed, then I'd have that history as

8  well.

9    If I had -- sorry.

10 **Q.**    There's water next to you if you need it.  Sorry to

11 interrupt.

12 **A.**    Thank you.

13    If there was a question in my mind as to what was in the

14 LINX notes, I might reach out to the care advocate directly and

15 ask some further questions.  And so -- so with this, then I

16 have an appointment scheduled to reach out to the provider.

17    Now, if I look at this information and it looks like it

18 meets criteria, then I'll just go ahead and authorize it and

19 tell the care advocate to pick up concurrent review.

20 Otherwise, then I will proceed with the peer-to-peer review and

21 have a live discussion with the attending.

22 **Q.**    And can you describe how you conduct a peer review when

23 you have that live discussion?

24 **A.**    My personal style is to start with what we have.  So I'll

25 tell the doc, I'll say, "This is what I have," and I'll sort of

1    go over the highlights of the case.

2         And then I'll ask them, "You know, is this correct?"

3    Because sometimes that's already just the basis of the decision

4    is to do it, "Oh, well, you didn't hear about this, this, and

5    this," and then we're done.

6         Otherwise, then, if he confirms that information, then

7    I'll say, "Well, so, Doctor, we're wondering if this member can

8    now transition to a less restrictive level of care given the

9    improvements that were made and their current condition., for

10   instance."  And then they will give us information.

11        In the process of this, I'd like to get them to discuss

12   the key reason.  So part of our protocol for documenting is to

13   list the key reason from the provider's point of view.  "So,

14   Doctor, you're saying that the key reason that this person

15   continues to need treatment is that, you know, they're still

16   dangerous, they've said so and that's why they still need to be

17   in a 24-hour level of care?"

18        Then they'll say yes or no.  Then we'll discuss whether it

19   meets criteria, and in this case it would.  And then if I

20   authorize, I'll tell them so and give them an authorization

21   time frame.

22   **Q.**   And you just mentioned the word "criteria."  Are you

23   referring to Level of Care Guidelines or Coverage Determination

24   Guidelines?

25   **A.**   Yes.  The applicable guideline, correct.

1  Q.   When you conduct a peer review in your experience, are the

2  providers familiar with UBH's guidelines?

3  A.   Well, the network providers are generally familiar with it

4  because they've signed a contract saying that they're going to

5  abide by them.  So they're reasonably knowledgeable if they

6  have a large enough UBH practice.

7  Q.   And what about the out-of-network providers?

8  A.   Typically not.  Some do that do see a lot of our members,

9  but most of them don't -- don't have much familiarity with the

10  guidelines.

11  Q.   And after UBH doctors conduct the peer review, do they

12  ever authorize treatment -- authorize coverage?

13  A.   Yes.

14  Q.   And what is the practice for notifying the provider or

15  member of an authorization?

16  A.   Well, I'll tell the provider when we're on the phone that

17  this appears to meet our guidelines, and I'm going to go ahead

18  and authorize it; and I'll tell them how long the authorization

19  goes for, and I'll say that our care advocate will reach out

20  with this information and schedule the next concurrent review

21  prior to the expiration of the authorization.

22  Q.   And if the decision is not to authorize treatment -- or,

23  excuse me -- coverage or deny coverage, how is that conveyed?

24  A.   Similarly I'm on the phone with the attending and I'll

25  tell them that it doesn't meet our guidelines in my opinion,

1  and so the last covered date is thus and such, and you have

2  appeals options and those will be communicated to you directly.

3  Q.   Is the member notified of a noncoverage determination or a

4  denial of coverage?

5  A.   The written determination goes to both the provider and

6  the member.

7  Q.   Is an alternative level of care ever offered when the

8  requested service is not covered?

9  A.   In almost every case an alternative level of care that's

10  available to the member is offered.

11  Q.   And how is that conveyed?

12  A.   Also at the same time during the discussion, if I'm saying

13  that this doesn't meet the guideline and it does meet the

14  guideline for this level of care, and we'd be happy to

15  authorize that, sometimes they hear that and they say, "Okay.

16  We'll take it."  And then we move on and there's no denial

17  issued.  But if a denial is issued, there is the alternative

18  level of care on the table.

19  Q.   I'd like to direct your attention to page 16 of this

20  program description.

21  A.   Yes.

22  Q.   At the bottom there is a reference to independent external

23  appeals.  What are those?

24  A.   This is an appeal done by a clinician that's not part of

25  United Behavioral Health.  Typically for fully insured members,

1   this process is managed by the state whose laws govern the UM

2   practices, and they have a process for setting up an

3   independent external review.  So it's a -- you know, these are

4   often companies that have a panel of psychiatrists of various

5   subspecialties, and they give them the case to make a

6   determination on this would be binding on us.

7   Q.   And does UBH view those external appeal decisions as

8   binding?

9   A.   Yes.

10            THE COURT:  Find a good place for a break for lunch.

11            MS. ROMANO:  Maybe four minutes or so, Your Honor --

12            THE COURT:  Sure.

13            MS. ROMANO:  -- and we'll be at a very logical place.

14  Q.   In making these decisions you've described after a peer

15  review, do UBH doctors use their clinical knowledge and

16  judgment?

17  A.   They must use their clinical knowledge and judgment.

18  That's the primary reason they're there, and then they use that

19  to -- within the framework of the guideline.

20  Q.   And can doctors depart from the guidelines to authorize

21  treatment?

22  A.   If their clinical judgment takes them there, yes.

23  Q.   Do they -- do the UBH doctors need to obtain authority

24  from anyone else to depart from the guidelines?

25  A.   No.

1   **Q.**   Are the UBH doctors permitted to depart from the

2   guidelines to deny coverage?

3   **A.**   No.

4   **Q.**   If I can direct your attention to page 39, please, of this

5   exhibit.

6   **A.**   (Witness examines document.)   Yes.

7   **Q.**   Toward the bottom under "Utilization Management

8   Protocols," there's a heading "Affirmative Statement Regarding

9   Incentives."   Can you read that for me?

10  **A.**   It says (reading):

11           "Optum distributes an affirmative statement to its

12      clinical personnel, its members and practitioners and

13      facilities in the Optum clinical network regarding its

14      incentives to encourage appropriate utilization and to

15      discourage underutilization.   The statement consists of

16      the following components:

17           "First, utilization management decision-making is

18      based only on the appropriateness of care and service and

19      the existence of benefit coverage; next, Optum does not

20      specifically reward practitioners or other individuals for

21      issuing noncoverage decisions; and, last, financial

22      incentives for utilization management decision-makers do

23      not encourage decisions that result in underutilization."

24  **Q.**   Is that policy you described consistent with UBH's

25  practices?

1    A.    Yes.

2    Q.    Do the UBH doctors have any targets for the number or

3    percentage of denials they should issue?

4    A.    No.

5    Q.    The UBH doctors who are making coverage decisions, is

6    their compensation based in any way on the number of percentage

7    of denials?

8    A.    No.

9    Q.    Are the performance evaluations of the doctors making

10   these coverage decisions based in any way on the results of the

11   coverage decisions, denials, or authorizations?

12   A.    No.

13   Q.    Do UBH's doctors consider other criteria or guidelines for

14   patients with substance use problems in certain states?

15   A.    Yes.

16   Q.    What guidelines does UBH use for substance use coverage

17   decisions in Illinois?

18   A.    UBH uses ASAM guidelines.

19   Q.    And for how long has it been doing that?

20   A.    Since January of 2016.

21   Q.    And how about with respect to Texas?  What guidelines does

22   UBH use for substance use decisions for plans governed by Texas

23   law where the services take place in Texas?

24   A.    Texas has its own guidelines that they've created and

25   mandate for use.  They're called TCADA, T-C-A-D-A, and we use

1    those guidelines for treatment in Texas for fully insured

2    members.

3    **Q.**   How long has that been the case?

4    **A.**   When I started in 2002, they were using them then.  So I

5    don't know when it first started.

6               **MS. ROMANO:**  This is a good time to break, Your Honor.

7               **THE COURT:**  Okay.  See you all in an hour.  Thank you.

8                    (Luncheon recess taken at 12:27 p.m.)

9    Tuesday, October 24, 2017                    1:33 p.m.

10                    P-R-O-C-E-E-D-I-N-G-S

11                         ---oOo---

12               **THE CLERK:**  We're back on the record in case number

13   C 14-2346 Wit/Alexander versus United Healthcare.

14          **MR. BUALAT:**  We have some sealing issues, that come up

15   with the cross-examination of Dr. Martorana, that we'd like to

16   raise with the Court.

17               **THE COURT:**  Okay.

18          **MR. BUALAT:**  We filed a motion yesterday evening;

19   handed a courtesy copy to the Court.  Two exhibits.

20        One reflects a request for legal advice to a UBH internal

21   attorney.  That's Exhibit 398.  And the other document, 783,

22   contains per-member-per-month rates and also information that

23   could be used to calculate that from late 2014, that would

24   apply to 2015.

25               **THE COURT:**  Okay.  Two questions:  One, are you going

1    to use them, 783 and --

2         MS. REYNOLDS:  The answer to the first question I

3    don't know.

4         THE COURT:  Okay.  The second question, the redactions

5    are fine.  I have no problem sealing the exhibits.  Are you

6    going to use portions that are redacted?

7         MS. REYNOLDS:  I can't say whether I am or not.

8         THE COURT:  Start with legal advice.  On the legal

9    advice one, are you going to use portions of the redacted --

10        MR. BUALAT:  That's 398.

11        MS. REYNOLDS:  I mean, yeah, that's the substantive

12   part of the email.

13        THE COURT:  So we're going to do with these the way we

14   did it.  I think the per-member-per-month rates are critical to

15   UBH.  And so I'm not going to expose those even in testimony.

16   So figure out a way, if you want to cross-examine that, to do

17   if briefly.  And at some point where you announce it, we'll

18   clear the courtroom and go back on.

19        As to the others, just keep it brief.  But I'm not going

20   to seal the courtroom for the legal advice.

21        MR. BUALAT:  Thank you, Your Honor.

22        MS. REYNOLDS:  Thank you, Your Honor.

23        MS. ROMANO:  We're proceeding with the examination of

24   Dr. Martorana.

25   \\\

1    **DIRECT EXAMINATION**

2    **DIRECT EXAMINATION** (resumed)

3    **BY MS. ROMANO:**

4    **Q.**    Welcome back, Dr. Martorana.

5    **A.**    Welcome.

6    **Q.**    Do UBH's clinicians receive training on the use of Level

7    of Care Guidelines and Coverage Determination Guidelines?

8    **A.**    Yes, they do.

9    **Q.**    Do you participate in trainings?

10   **A.**    Yes, I do.

11   **Q.**    Can you describe the training that is provided.

12   **A.**    Well, during the new-hire orientation, there's a number of

13   trainings that have to do with the guidelines.  The new hires

14   are introduced to the guidelines.  They're shown where they

15   exist how to maneuver through them; when they're applied.

16       And then there's a series of clinical-type trainings that

17   help them walk through how to think about or use a thought

18   process to think about a member and what they need and how to

19   compare it against the guideline itself.

20   **Q.**    And can you turn to Exhibit 1206, please.

21       Are you familiar with this exhibit?

22   **A.**    Yes, I am.

23   **Q.**    What is it?

24   **A.**    This is the PowerPoint that goes along with the

25   instructor-led training for new hires on Coverage Determination

1    Guidelines.

2         **MS. ROMANO:**  Move for admission of Exhibit 1206.

3         **MS. REYNOLDS:**  No objection.

4         **THE COURT:**  It's admitted.

5         (Trial Exhibit 1206 received in evidence.)

6    **BY MS. ROMANO:**

7    **Q.**   Dr. Martorana, can I direct your attention, please, to

8    page 20 of this PowerPoint.

9         Is this an example of the clinical training you were just

10   referring to?

11   **A.**   Yes.

12   **Q.**   And at the top it says "CDG Case Scenario #2."  Do you see

13   that?

14   **A.**   Correct.

15   **Q.**   Can you explain how a case scenario like this is used in a

16   training?

17   **A.**   So the trainees are presented with a typical case.  They

18   actually name the facility and note that the intensive

19   outpatient program is asking for coverage.  Then they describe

20   the patient?

21        So she is 34.  She has a divorce pending.  There's various

22   stressors associated with that and custody of her children.

23   Her husband is harassing and abusing her.  And she is diagnosed

24   with PTSD, Posttraumatic Stress Disorder, migraines.  And she's

25   had a change in her normal functioning.  She's showing signs of

1  isolating.  Helpless, worried, crying all day, doesn't sleep,

2  and not really taking care of herself the way she used to.

3      She has not voicing any suicidal or homicidal ideation.

4  It is noted in the past she self-injured herself, but that

5  hasn't been the current behave.

6      She is able to go to work but not functioning very well.

7  She is able to care for her children.  And she does have the

8  support of a family member she is living with, having moved

9  out.

10      It notes which medication she is taking, the dosage, and

11  the treatment goals that the IOP is presenting at the time of

12  admission.

13  **Q.**    And is this, the type of information you've just read, the

14  type of information that care advocates are trained to gather

15  and evaluate to make a coverage decision?

16  **A.**    Yes.  This is typical.

17  **Q.**    And if you can turn to page to pages 22 and 23, please, of

18  this PowerPoint.

19  **A.**    Yes.

20  **Q.**    At the top there's a question that says:  "What CDG are

21  you reviewing for this scenario?"  And under that it says:

22  "PTSD."

23      How is this discussed in a training session?

24  **A.**    As I mentioned earlier, the CDGs are organized

25  differently.  So they are by condition.

1    So the diagnosis needs to be described by the treating

2    physician.  And then the care advocate would turn to the PTSD

3    CDG for guidance.

4    Q.   And then there's a section that says:

5         "Does the treatment plan follow the required

6         objectives, actions and timeframes outlined in the CDG?"

7         What's discussed in that portion?

8    A.   This points out what's missing from the treatment plan

9    that's being proposed.  So it lists a number of important

10   things that should be taken into account when approaching a

11   member and how to appropriately and efficiently treat her

12   condition.

13   Q.   And are these the types of things that are discussed in

14   trainings for all clinicians at UBH that make coverage

15   decisions?

16   A.   Yes.

17   Q.   Are training materials for the UBH clinicians available to

18   them after the completion of trainings?

19   A.   Yes.  The training department maintains an active web page

20   with all the training materials and access to all the training

21   for the trainees.

22   Q.   Okay.  Changing topics a little bit here, Dr. Martorana,

23   are you familiar with generally accepted standards of care in

24   the behavioral health community?

25   A.   Yes.

1    Q.    What does that mean?

2    A.    Well, that means what is considered to be appropriate care

3    within the treatment community across the country.  These are

4    based on a variety of sources of information, including

5    studies, peer-reviewed studies in peer-reviewed journals;

6    consensus guidelines from professional organizations; other

7    guidelines such as ASAM, for instance.  And the federal

8    government, of course, has their own coverage determinations as

9    well.

10   Q.    You mentioned ASAM.  Did you at one time write an article

11   about ASAM?

12   A.    I did.

13   Q.    And in that article, did you propose that ASAM be used by

14   providers as a patient placement criteria for their patients?

15   A.    Yes.  That article was directed at primary care.  And we

16   thought that was a fine way to help them organize their

17   thinking.

18   Q.    Do you like the ASAM criteria, Dr. Martorana?

19   A.    I do.

20   Q.    And did you, over the years, at different times support a

21   proposal that UBH begin to use the ASAM criteria as its

22   standard criteria for substance use coverage?

23   A.    Yes.

24   Q.    And why is that something that you supported?

25   A.    For a variety of reasons.  One, it's easier, sometimes, to

1　communicate, especially with the out out-of-network providers,

2　assuming they understand what ASAM is about.  So you would be

3　speaking the same language.

4　　　It's certainly a well-documented guideline, which is why

5　we rely on it, as well, for our guidelines.

6　　　It's readily available and publicly available as well.

7　　　They've also recently, now, developed a online tool, as

8　well, which is a particularly helpful for helping people come

9　to decisions.

10　**Q.**　In supporting a change to ASAM for UBH, was it your belief

11　that the UBH guidelines were not consistent with generally

12　accepted standards of care?

13　**A.**　No.  They were consistent as well.

14　**Q.**　And is it your opinion that they are still consistent with

15　generally accepted standards of care?

16　**A.**　Yes.

17　**Q.**　UBH's guidelines?

18　**A.**　Yes.

19　**Q.**　And, as we mentioned before, this case covers years from

20　2011 until the 2017.

21　　　Do you have an opinion as to whether UBH's Level of Care

22　Guidelines and Coverage Determination Guidelines have been

23　consistent with generally accepted standards of care throughout

24　that time period?

25　**A.**　Yes, that's my opinion.

1    **Q.**   I want to make sure it's clear here.  So my question was:

2         Do you have an opinion as to whether they are consistent

3    with generally accepted standards of care over that eight

4    years' range?

5    **A.**   Excuse me.  Yes, my opinion is that through the years in

6    question the guidelines are consistent with the generally

7    accepted standards of care in the country.

8    **Q.**   All right.  We're going to go ahead and start looking at

9    the guidelines then.  And they're going to be in a different

10   binder for you, Dr. Martorana.

11        We're going to start with Exhibit 8, please.

12   **A.**   Okay.

13        **MS. ROMANO:**  Okay.  Starting with Exhibit 8, Your

14   Honor.

15   **BY MS. ROMANO:**

16   **Q.**   Are these the Level of Care Guidelines that are currently

17   in effect, 2017?

18   **A.**   Yes.

19   **Q.**   Okay.  Let's start with the ones currently in effect.  And

20   if I can direct your attention to the section under

21   "Introduction" on page 2 of Exhibit 8, please.

22   **A.**   Yes.

23   **Q.**   And I'm going to read the first part of that.  It says:

24             "The Level of Care Guidelines is a set of objective

25        and evidence-based behavioral health criteria used by

1          medical necessity plans to standardize coverage

2          determinations, promote evidence-based practices, and

3          support members' recovery, resiliency, and well-being for

4          behavioral health benefit plans that are managed by Optum

5          and U.S. Behavioral Health Plan California doing business

6          as OptumHealth Behavioral Health Solutions of California

7          Optum-CA."

8     Dr. Martorana, what does the language "support members'

9  recovery, resiliency and well-being" mean?

10  **A.**    Well, that refers to consumer-centric healthcare, where,

11  we want our members to proceed in their treatment with regard

12  to all aspects of their care.

13          So that would include, you know -- for instance,

14  resiliency is the ability to withstand changes and stressors

15  that perhaps they didn't have beforehand.  Want to make sure

16  that they're getting treatment that's evidence based as opposed

17  to things that aren't evidence based which may or may not help

18  them.

19  **Q.**    Next paragraph reads:

20          "The Level of Care Guidelines is derived from

21          generally accepted standards of behavioral practice.

22          These standards include guidelines and consensus

23          statements produced by professional speciality societies,

24          as well as guidance from governmental sources such as CMS

25          National Coverage Determinations (NCDs)and Local Coverage

1          Determinations (LCD)."

2          Are you familiar with NCD and LCD?

3    A.    I am.

4    Q.    Can you explain what they are?

5    A.    Well, as mentioned, NCD is a national coverage

6    determination, so it applies to every state in the country.

7    The local coverage determinations are limited to specific

8    regions or states; and so the treatment that's delivered in

9    that state is subject to the local coverage determination.

10   Q.    And are the NCDs and LCDs created to define Medicare

11   coverage?

12   A.    Yes.

13   Q.    Are they UBH documents?

14   A.    No, they're not.

15   Q.    And the third paragraph states:

16              "The Level of Care Guidelines is also derived from

17         input provided by clinical personnel providers,

18         professional specialty societies, consumers and

19         regulators."

20         Is that last paragraph I just read, is that consistent

21   with your understanding as to how the -- part of the way the

22   guidelines are created?

23   A.    Yes.

24   Q.    Looking under that, there's a section called "Guiding

25   Principles."  What are the guiding principles?

**A.** Well, this is a statement that they made to help people who are using the guidelines understand that -- how we approach member care in general, to ensure that people get the right care at the right time.

So they identify three pillars. So one is care advocacy, which has to do with us -- our clinicians, the care advocates -- intervening to assist members when they need help to decide what kind of care they need, to point them in the right direction, find them referrals.

And then on the other end, after they've had treatment, to make sure they connect with aftercare -- they got their medications paid for; they can make it to their sessions -- all these things that ensure that a member stays out of the hospital or stays in a less restrictive level of care.

The second one is the service system solutions. It has to do with the network. So we want to make sure that we maintain a network that's robust across the country; that has the full continuum of service whenever possible for our members so that they can access the proper care.

We also maintain the quality of the network through some of the means that I mentioned earlier.

And then, finally, information management technology has to do with how we use information. So there's -- we have a lot of data that we collect. And we use the data to help inform us as to, among other things, the quality of care in a given

1   situation.

2       So, as I mentioned before, with the ACE program, we have

3   data on readmissions that we will use working with a hospital

4   that may be having trouble finding aftercare, or something in

5   their process that, you know, is contributing to a higher

6   relapse rate.

7       So this shows us across populations what -- what the

8   quality of care is in any given area.

9   **Q.**   If I can direct your attention, now, to page 4.  And

10  looking toward the bottom of the page, fifth paragraph from the

11  bottom, it says:

12          "The Level of Care Guidelines are used flexibly, and

13      are intended to augment - but not replace - sound clinical

14      judgment.  Use is informed by the unique aspects of the

15      case, the member's benefit plan, services the provider can

16      offer to meet the member's immediate needs and

17      preferences, alternatives that exist in the service system

18      to meet those needs, and member's broader recovery,

19      resiliency, and well-being goals."

20      What does it mean that their -- "use is informed by the

21  unique aspects of the case"?

22  **A.**   Well, we think it's important as we -- as is present in

23  our Best Practice Guidelines, to have a complete and thorough

24  understanding of the totality of a member who's presenting

25  themselves for treatment.

1    So not just the, you know, the fact that they, you know,

2   tried to hurt themselves; that's why they're here.  No.  The

3   question is:  How did they come to this place at this time?

4   What happened in their life with their environment, with their

5   relationships?  Did they stop taking medication?  Is there

6   co-morbidity impacting on this?

7    So the idea is to understand the member in their totality,

8   as much as we can, as we make our clinical judgments.  Which is

9   how we would practice in our own practices as well.

10  **Q.**  And looking at the next paragraph below that it reads:

11      "Exceptions may be made to the Level of Care

12      Guidelines such as when there is a superceding contractual

13      requirement or regulation or when a medical director

14      authorizes a case-specific exception from using

15      evidence-based treatment when the member's condition has

16      not responded to treatment as anticipated.

17      "It is expected that exceptions be carefully thought

18      out, documented, and approved by the responsible level of

19      management.  It is also expected that an effort will be

20      made to work with the provider to identify an appropriate

21      level of care and forms of treatment that are most likely

22      to be effective."

23   Are medical directors the responsible level of management

24  to have -- to be able to authorize an exception?

25  **A.**  Yes.  So, typically, the care advocate would approach the

M.D. and say, We have this situation.  You know, they're asking
for this and this and this.  And, you know, this seems to not
necessarily line up with the Level of Care Guidelines, but it
appears to be the right thing to do.

    And so then they make the decision at that point.

Q.   And could a medical director make an exception on their
own in a peer review?

A.   Yes.

Q.   Can you turn to page 6, please, of the 2017 Level of Care
Guidelines.

A.   Yes.

Q.   This page is titled "Level of Care Guidelines Common
Criteria and Clinical Best Practices for all Levels of Care."

    And, Dr. Martorana, it's broken up into an Introduction
and then Common Admission Criteria for all Levels of Care,
Common Continued Service Criteria for all Levels of Care,
Common Discharge Criteria for all Levels of Care, and then
Common Clinical Best Practices for all Levels of Care.

    Can you explain the common admission criteria, continued
service, and discharge criteria?  Why are they broken up into
those categories?

A.   Well, first of all, we have common criteria because we
understand, in treating and approaching patients, there are
certain things that cut across, principles that cut across all
different levels of care.

1    So there's three decision points, typically, for us to

2 make in a -- when reviewing a member's care.  That's the front

3 end, when they first come in to treatment and the request for

4 admission to this level of care.  And that needs to meet

5 specific criteria.

6    And then the next question is:  Do they need to continue

7 in this level of care?  And they -- that's what the continued

8 service criteria are.  They have their specific criteria.

9    And then at some point the member gets well enough to

10 transition to a less restrictive level of care.  And that

11 would -- and the discharge criteria pertains to that.

12 **Q.**  I would like to start with the Common Admission Criteria,

13 and specifically with the top two bullets on page 7 --

14 **A.**  Yes.

15 **Q.**  -- where it reads:

16    "The member's current condition cannot be safely,

17    efficiently, and effectively assessed and treated in a

18    less intensive level of care;

19    "Failure of treatment in a less intensive level of

20    care is not a prerequisite for authorizing coverage; and

21    "The member's current condition can be safely,

22    efficiently, and effectively assessed and/or treated in

23    the proposed level of care.

24    "Assessment and/or treatment of the factors leading

25    to admission require the intensity of services provided in

1          the proposed level of care."

2          What do these bullets that I just read mean?

3     A.   Well, these are criteria that talk about how "less

4     intensive" is thought through clinically.

5          So, basically, the -- our clinician and their clinician

6     has to think through the process that understanding everything

7     they know about the patient and what the treatment plan they're

8     proposing the question is can -- can this safely, effectively,

9     and efficiently occur in a less restrictive level of care,

10    which is the preference, to have people least restrictive

11    setting.

12         And then the flip side of that question is:  Okay.  In

13    this level of care can you do all these things and take care of

14    the member in a safe manner?

15         So we wouldn't want someone who is dangerous be in an

16    outpatient setting necessarily.  That would be one example

17    where we would assess a higher level of care, for instance.

18    Q.   Why is it a preference to be in the least restrictive

19    setting?

20    A.   It's a basic principle of psychiatric treatment that goes

21    back quite a while and cuts across all -- all manner of

22    treatment: that people should be free to live their lives as

23    much as possible, as much as reasonable, as safe as you can

24    when you're instituting psychiatric treatment.

25    Q.   And are there external sources that support this

1    principle?

2    **A.**    The basic principle is found in -- the UN puts out a

3    directive.  World Health Organization has their statement.

4    And, of course, ASAM and the American Psychiatric Association

5    have the same principle in their guidelines.

6    **Q.**    Can I direct your attention to Exhibit 634.  That's in the

7    different binder in front of you.

8    **A.**    634, yes.

9    **Q.**    And what is this?

10   **A.**    This is the practice guideline for the Treatment of

11   Patients with Substance Use Disorder, 2nd Edition, that the

12   American Psychiatric Association publishes.

13   **Q.**    Are you familiar with this document through your work?

14   **A.**    I am.

15          **MS. ROMANO:**  I move to admit, Your Honor.

16          **MS. REYNOLDS:**  No objection.

17          **THE COURT:**  It's admitted.

18       (Trial Exhibit 634 received in evidence.)

19   **BY MS. ROMANO:**

20   **Q.**    If you can turn to page 22, please, Dr. Martorana.

21   **A.**    Yes.

22   **Q.**    There is a section called "Treatment Settings."  And then

23   a subsection heading called "Factors Affecting Choice of

24   Treatment Setting"?

25   **A.**    Yes.

1    Q.    And can you read the first sentence there.

2    A.    It says:

3              "Individuals should be treated in the least

4         restrictive setting that is likely to prove safe and

5         effective."

6    Q.    Is that consistent with the principle of "least

7    restrictive level of care" that you were just speaking about?

8    A.    Yes, it is.

9    Q.    Does that concept relate to just inpatient and residential

10   treatment?

11   A.    No.  It's across the board.

12       I think I mentioned earlier that there's a distinction

13   between a 24 hour level of care and an ambulatory level of

14   care.  But there's also the distinction between having to

15   devote 20 hours of your life per week to treatment versus, you

16   know, nine hours per week of treatment.  And that would be

17   considered a restriction, in my mind, as well.

18   Q.    And can I direct your attention to Exhibit 639, please.

19   A.    Yes.

20   Q.    Are you familiar with this document?

21   A.    I am.

22   Q.    What is it?

23   A.    This is the American Psychiatric Association's Practice

24   Guideline for the Treatment of Patients with Major Depressive

25   Disorder, 3rd Edition.

1    **MS. ROMANO:**  Move to admit Exhibit 639.

2    **MS. REYNOLDS:**  No objection.

3    **THE COURT:**  Admitted.

4    (Trial Exhibit 639 received in evidence.)

5  **BY MS. ROMANO:**

6  **Q.**   If I can direct your attention to page 16 of this

7  document, please.

8  **A.**   Yes.

9  **Q.**   The very top there's a subheading that says "Establish the

10  Appropriate Setting for Treatment."

11  **A.**   Yes.

12  **Q.**   Can you read that first sentence, please.

13  **A.**   It says:

14       "The psychiatrist should determine the least

15       restrictive setting for treatment that will be most likely

16       not only to address the patient's safety, but also to

17       promote improvement in the patient's condition."

18  **Q.**   Is that provision consistent with the principles of "least

19  restrictive level of care" that we were discussing?

20  **A.**   Yes, it is.

21  **Q.**   And do other APA guidelines include similar language?

22  **A.**   Yes, many of them do.  For instance, obsessive compulsive

23  disorder guideline, bipolar guideline, others.

24  **Q.**   All right.  You can go ahead and put that binder to the

25  side and return back to the common admission criteria for the

1    2017 guidelines.

2        Staying with the two bullets at the top of page 7, please,

3    there's reference to "the member's current condition."  What

4    does the "member's current condition" mean?

5    A.    The current condition is the set of symptoms that the

6    member brings to the treatment, to the proposed treatment.  So

7    it has to do with, well, pretty much everything that is going

8    on with them that has brought them to this point.

9    Q.    Does that include chronic conditions?

10   A.    Yes.  Chronic conditions can impact the current symptoms

11   as well.

12   Q.    Now, what does it mean to evaluate whether the member's

13   current condition can be safely, efficiently, and effectively

14   assessed and/or treated in the proposed level of care?

15   A.    Well, in terms of treatment planning, this is a basic part

16   of treatment planning to identify the focus of treatment.  So

17   that would be, as we're talking about here, the current

18   condition, the thing the member wants to have help with, and

19   the thought process that goes into it knowing everything you

20   know clinically about them, the disorder that they have, and

21   the treatment options available.

22   Q.    If I can refer you, now, to the next bullet point.  So

23   it's now the third bullet point on page 7?

24   A.    Yes.

25   Q.    Where it reads:

1           "Co-occurring behavioral health and medical

2       conditions can be safely managed"?

3   A.   Yes.

4   Q.   What does that mean?

5   A.   Well, many people present with treatment with additional

6   conditions beside the one that they've identified as the focus

7   of treatment.

8       And these are very important to deal with.  They're called

9   concurrent conditions.  So someone could have an additional

10  behavioral health diagnosis or a substance use disorder and, of

11  course, medical conditions.

12      And the question, the thought process here is that a

13  person with these co-occurring conditions, can they be safely

14  managed in this level of care as well.

15  Q.   What does "manage" mean in this sentence?

16  A.   "Manage" means they're treated to the point where their

17  symptoms don't interfere with the treatment of the primary

18  diagnosis.

19  Q.   And do co-occurring behavioral health and medical

20  conditions include what's sometimes referred to as

21  co-morbidities?

22  A.   Yes.

23  Q.   And does it include medical co-morbidities?

24  A.   Yes.

25  Q.   Can you give an example of what that would be?

A.   Well, so someone who comes in with -- who's in alcoholic

withdrawal.  One of the co-morbidities that makes them tricky

to treat them is if they have high blood pressure, for

instance, that's also monitored to determine what level of

withdrawal they're in.  At the same time, then, you also know

that their withdrawal will increase their blood pressure.  So

you have to make sure the blood pressure is monitored and

controlled at the same time.

Q.   And does the word here, "co-occurring behavioral health

and medical conditions" include behavioral co-morbidities?

A.   Yes.

Q.   Can you give an example of that?

A.   Well, someone could come in with a depressive disorder but

have an underlying personality disorder, for instance, that

will impact their treatment because the characteristics of the

personality disorder may affect how you engage somebody.

     So if a person has, for instance, a borderline personality

disorder, you know that they may be highly reactive and very

sensitive.  So the approach may be different.  You may include

something called dialectical behavior treatment which is

specific for borderline treatment in the context of treating

their depression.

Q.   When you're making coverage decisions, do you consider

whether co-occurring conditions can be effectively addressed at

the level of care?

1    **A.**    Yes.  That's how you manage something; you do that

2    effectively.

3    **Q.**    Do you consider whether co-occurring conditions warrant or

4    could warrant a more intensive level of care to effectively

5    treat the member?

6    **A.**    Yes, that can happen.  Definitely.

7    **Q.**    Is there a provision in the guidelines that calls for

8    consideration of that?

9    **A.**    Yes.  You're supposed to determine whether the person can

10   be treated safely, effectively, efficiently in the level of

11   care that they're requesting.

12        So part of the assessment is to determine whether the

13   co-occurring problem is such that it requires a higher

14   intensity of service.

15        **THE COURT:**  So let's talk about this.

16        Pull up the whole screen.

17        So the first sentence talks about the member's current

18   condition, the condition, the symptoms, et cetera, that bring

19   them to you for treatment.

20        **THE WITNESS:**  Yes.

21        **THE COURT:**  And in that sentence you say "effectively

22   treated."  That's the test you want to have.  "The member's

23   current condition cannot be safely, efficiently, and

24   effectively assessed or treated at a less intensive level of

25   care and can be effectively, efficiently, and safely treated

1    and assessed at the proposed level of care."

2        Do you see that?

3            THE WITNESS:  Yes.

4            THE COURT:  Okay.  And then when you get to

5    "co-occurring" there's not a word about effectiveness.  There's

6    not a word about efficiency.  There's only "safely."

7        How do you get out of that, that that means

8    "effectiveness" when you don't use the words in that sentence

9    but you use it in the two previous?

10           THE WITNESS:  Right.  The same words aren't used.  But

11   my understanding of medical care means that if you -- you're

12   managing someone you're doing it appropriately.  If you're not

13   doing it appropriately, then you're not managing them.

14           THE COURT:  Well, I'm not sure what "managing" means

15   though.  That's the question, what "managing" means.

16       In this context, you're telling the medical director or

17   the care advocate that with respect to the current condition

18   they have to find something that's effective; but with respect

19   to the co-occurring behavioral health and medical conditions

20   all they have to do is find something that can be safely

21   managed.

22       You don't think they draw a distinction between those two?

23           THE WITNESS:  I don't think so.  Certainly --

24           THE COURT:  Well, then why did you draft them with

25   different words?

1    **THE WITNESS:**  I did not actually pick these words.

2    **THE COURT:**  Well, you approved these words.  Why did

3 you approve different words?

4    **THE WITNESS:**  We didn't think it through in the way

5 you're thinking it through now.

6    **THE COURT:**  Ah.  Okay.  Thank you.

7 **BY MS. ROMANO:**

8 **Q.**  Dr. Martorana, looking at the top two bullets, where it

9 speaks of current conditions, I asked before if that would

10 include chronic conditions.

11    Would it include co-occurring behavioral health

12 conditions?

13 **A.**  The current condition includes everything they bring to

14 the table for treatment.

15 **Q.**  Does that include co-occurring conditions?

16 **A.**  Yes, it does.

17    **THE COURT:**  Even though you describe co-occurring

18 conditions in a separate bullet and use separate words?  You

19 meant that "current condition" to mean -- you expect people to

20 understand it to mean including all of the possible things

21 you're going to be treating?

22    **THE WITNESS:**  Sometimes we put things in the Level of

23 Care Guidelines to make sure people think it through in the

24 clinical thought process.  So don't forget, you know, if this

25 person has co-occurring illnesses they need to be safely

1    treated in that setting.

2         **THE COURT:**  Let me propose another way of thinking

3    about this.  This is the plaintiffs' way of thinking about

4    this.

5         The plaintiffs' way of thinking about this is you put it

6    in separate things because you meant different things.  That is

7    to say, you put co-occurring conditions in a particular

8    standard of care different from the current conditions because

9    you meant different things.

10        Why isn't that right?

11        **THE WITNESS:**  I can understand they may think that.

12   That's not how it's trained.  So that wasn't our intention.

13        **THE COURT:**  It's "not how it's trained."

14        **THE WITNESS:**  Right.

15        **THE COURT:**  When you say "trained" --

16        **THE WITNESS:**  When we take new clinicians and current

17   clinicians through the process of how to use these guidelines,

18   we wouldn't be separating it out or parsing it in that way.

19   It's more of a don't forget to consider these things; it's

20   important.

21        **THE COURT:**  Okay.  Thank you.

22   **BY MS. ROMANO:**

23   **Q.**   Dr. Martorana, I'm now going to direct your attention to

24   the fourth bullet point on the top of page 7, where it says

25   "Services are the following," and then there's four bullet

1    points underneath that.

2         Do you see where I am?

3    A.   Yes.

4    Q.   It says:

5              "Services are the following:  Consistent with

6         generally clinical practice; consistent with services

7         backed by credible research soundly demonstrating that the

8         services will have a measurable and beneficial outcome and

9         are, therefore, not considered experimental; consistent

10        with Optum's Best Practice Guidelines; and clinically

11        appropriate for the member's behavioral health conditions

12        based on generally accepted standards of clinical practice

13        and benchmarks."

14        What does this section mean that I just read?

15   A.   Well, these are basically a big definition of what

16   effective treatment is.

17        So effective treatment needs to have an evidence base

18   behind it, have demonstrated that it does make people better.

19   And Best Practice Guidelines, they're there to ensure that a

20   full and complete assessment is made and appropriate diagnosis

21   and treatment planning is made, which would be characteristics

22   of effective treatment.

23        And then "clinically appropriate" means they match.  There

24   are some places that they just do the same thing for everyone

25   no matter who walks in the door.  And we want to make sure

1  they're individualized and known to be appropriate and

2  effective.

3  **Q.**  You just referred to the Best Practice Guidelines.  Was

4  that a reference to the third white bullet point in this

5  provision?

6  **A.**  Yes.

7  **Q.**  And where are those Best Practice Guidelines located?

8  **A.**  They're located within the Level of Care Guidelines.

9  **Q.**  Can you direct the court to where you're referring to?

10  **A.**  At the bottom of the page.  It says "Common clinical best

11  practices for all levels of care."

12  **Q.**  How are those common clinical best practices for all

13  levels of care used in making coverage determinations using

14  these 2017 Level of Care Guidelines?

15  **A.**  Well, first off, it's the standard we would hold a

16  competent and qualified clinician to.  So a thorough and

17  complete assessment.  All this information is collected and

18  taken into consideration in terms of diagnosis and treatment.

19  Appropriate diagnosis is made.  And then there's a treatment

20  plan that addresses the problems that are at hand, in an

21  appropriate way and evidence based.

22      And so we would gather this information, hear what the

23  clinician is saying.  And if it makes sense and it's good

24  clinical treatment, we would authorize it.

25  **Q.**  Is that information in the clinical best practices for all

1  levels of care used in denying authorizations?

2  **A.**   Not really.  Unless we're seeing someone who's, you know,

3  not competently evaluating the member; we may have a discussion

4  with them about doing so.  But it doesn't really end in a

5  denial necessarily.

6  **Q.**   Is that information collected and described in the common

7  clinical best practices information that is collected and

8  considered when evaluating whether a request for authorization

9  should be authorized or denied?

10  **A.**   Oh, I see.  Yes, that would be a yes.

11  **Q.**   And if I can turn your attention to the last bullet point,

12  under the common admission criteria, where it says "There is a

13  reasonable expectation that services will improve."

14      Do you see where I am.

15  **A.**   Yes.

16  **Q.**   (Reading)

17          "There is a reasonable expectation that services will

18      improve the member's presenting problems within a

19      reasonable period of time.  Improvement of the member's

20      condition is indicated by the reduction or control of the

21      signs and symptoms that necessitated treatment in a level

22      of care.  Improvement in this context is measured by

23      weighing the effectiveness of treatment against evidence

24      that the member's signs and symptoms will deteriorate if

25      treatment in the current level of care ends.  Improvement

1          must also be understood within the broader framework of

2          the member's recovery, resiliency, and well-being."

3          This provision I just read refers to the "member's

4     presenting problems."  What does that refer to?

5     **A.**   The presenting problems are the issues, complaints, and

6     the condition that they present to treatment.

7     **Q.**   What does it mean under this provision "for the presenting

8     problems to improve"?

9     **A.**   Well, this defines two ways that you can assess

10    improvement.  One is that by objective means that -- well,

11    first of all, they have to have a treatment plan that you will

12    expect to improve their condition.

13         Then when that's in place, then you would measure the

14    improvement -- this is basic treatment planning -- in an

15    objective manner.  So it can be either reduction or control.

16         And then, also, you can consider improvement in someone by

17    looking at and considering whether if you took this level of

18    care away would they then deteriorate?

19         And then continue to require this level of care or even

20    maybe a higher level of care.

21    **Q.**   Does this provision include maintaining a condition or

22    progress as part of improvement?

23    **A.**   Well, that second part would incorporate maintenance

24    because you're assessing whether the person will deteriorate if

25    you withdraw treatment.

1    Q.    And I asked you what "presenting problems" means.  Does it

2    include chronic problems?

3    A.    Yes.  It's the totality of the -- what the member is

4    presenting when you consider treatment planning.  So they may

5    come in and say, you know, I'm depressed.  But then if it's

6    depression that's on top of, you know, co-morbidity or chronic

7    depression or chronic medical issue, then all that will impact

8    on how you treat this person effectively.

9    Q.    This provision refers to improving the member's presenting

10   problems within a reasonable period of time.

11        What does the "reasonable period of time" mean?

12   A.    Well, that takes into account that the treatment is

13   effective; but it also takes into account the member's -- the

14   individual aspects of a member's condition as well as the --

15   what we understand about the condition itself.

16        So some conditions, we understand, will take a longer time

17   than others.  Like a person with obsessive compulsive disorder,

18   for instance, the nature of the treatment, the repeated

19   exposure-type treatment is lengthy.  So that will take longer

20   than someone else with a different condition.

21   Q.    Is there a set period of time?

22   A.    No.

23   Q.    Is "reasonable period of time" defined anywhere in UBH's

24   practices as a specific set period of time?

25   A.    No.  It's part of the clinical judgment that the reviewer

1  is applying.

2  **Q.**  Looking at the second white bullet point in this

3  improvement section, it says:

4        "Improvement in this context is measured by weighing

5        the effectiveness of treatment against evidence that the

6        member's signs and symptoms will deteriorate if treatment

7        in the current level of care ends."

8  What does "improvement" in this context mean?

9  **A.**  This refers to the major -- the black bullet point about

10 having a reasonable expectation that the condition will

11 improve.

12 **Q.**  How does a UBH doctor weigh the effectiveness of treatment

13 against the evidence that the member's condition will

14 deteriorate if treatment is discontinued in the current level

15 of care?

16 **A.**  Well, that's, you know, one of those judgment -- clinical

17 judgment decisions.  And so we understand that a given

18 treatment is effective.  And we understand that the clinician

19 is instituting the treatment aggressively.

20     And then we also know the member's prior condition in

21 terms of their -- they may have a previous history of

22 deteriorating when they're in a less structured setting, for

23 instance.

24     Or a person could be in a residential setting, for

25 instance, and they try them out on a pass to see how they do

1  without the structure of the residential program.  And if they

2  don't do well, then that would be a good indication that they

3  continue to need residential treatment.

4  **Q.**  What does it mean that "improvement must also be

5  understood within the framework of the member's broader

6  recovery goals"?

7  **A.**  Again, that's another way to draw the attention to

8  treating the member as a whole, not just as a symptom or two.

9      So, number one, it's always important to understand what

10  the member wants from their treatment.  Some clinicians still

11  don't ask, and they just tell them what they want.

12      One of the conditions that you want to make sure you

13  address is resiliency, which means the ability to withstand

14  future stressors to, you know, maintain themselves outside of a

15  restrictive level of care, for instance.

16      And well-being is not just mental but physical as well.

17  And we understand that these are all interrelated and that a

18  member needs to maintain both their health and their mental

19  state all in the context of looking at treatment and what

20  constitutes improvement.

21  **Q.**  Do these 2017 common criteria require continuous

22  improvement in order to remain in a level of care?

23  **A.**  No.

24  **Q.**  Does this section on improvement, that we're just gone

25  over, mean that once presenting problems are improved, no care

1    is covered?

2    **A.**    No.

3    **Q.**    I'm going to direct your attention to the other binder in

4    Exhibit 656, please, which has already been admitted into

5    evidence.

6    **A.**    Yes.

7    **Q.**    Are you familiar with 656?

8    **A.**    Yes.

9    **Q.**    What is it?

10    **A.**    This is the Medicare Benefit Policy Manual Chapter 6 - for

11    Hospital Services Covered Under Part B.

12    **Q.**    If you can turn to page 26, please, there's a section

13    halfway down the page with a heading "Reasonable Expectation of

14    Improvement."

15        Are you familiar with this language?

16    **A.**    Yes.

17    **Q.**    And is it your understanding that the improvement language

18    we just went over in the common criteria at the Level of Care

19    Guidelines is in some part based on the CMS language?

20    **A.**    Yes.

21    **Q.**    Reading from the second paragraph, under "Reasonable

22    Expectation of Improvement," it reads -- and I'm in Exhibit

23    656, now, on page 26.  It reads:

24        "It is not necessary that a course of therapy have as

25        its goal restoration of the patient to the level of

1    functioning exhibited prior to the of the illness,

2    although this may be appropriate for some patients.

3         "For many other psychiatric patients, particularly

4    those with long-term chronic symptoms, control of symptoms

5    and maintenance of a functional level to avoid further

6    deterioration or hospitalization is an acceptable

7    expectation of improvement.

8         "Improvement in this context is measured by comparing

9    the effect of continuing treatment versus discontinuing

10   it.

11        Where there is a reasonable expectation that if

12   treatment services were withdrawn the patient's condition

13   would deterioration, relapse further, or require

14   hospitalization this criterion is met."

15   The language I just read from the Medicare Manual refers

16   to maintenance at a functional level.  How does that relate to

17   prevention of deterioration, if at all?

18   **A.**   Well, by preventing deterioration, that's more or less the

19   definition of maintenance, I would think.

20   **Q.**   Also, what I just read from the CMS guidelines included

21   reference to "long-term chronic conditions."

22        Do you see that?

23   **A.**   Yes.

24   **Q.**   And that sentence and language is not in the UBH guideline

25   that we just looked at for 2017; is that correct?

1  A.    Yes.

2  Q.    Does that make UBH's guidelines more restrictive than the

3  CMS guidelines on improvement?

4  A.    I don't think so.

5  Q.    Why is that?

6  A.    Because we -- we've, I believe, used the parts of the --

7  we've defined "improvement" in a way that covers both acute --

8  treatment of acute symptoms and maintenance of conditions.  So

9  that would -- and, plus, we expect the clinician to take into

10 account all the chronic aspects of a member's condition, if

11 they exist, as part of designing the treatment plan.

12       So it should all be folded in there with -- with a

13 competent clinician treating our member.

14 Q.    I'd like to you keep both binders in front of you because

15 we're going to do a little bit with both in a second.

16       But looking, now, back to the 2017 guidelines, Exhibit 8,

17 and moving to the Common Continued Service Criteria for all

18 Levels of Care.

19 A.    Yes.

20 Q.    At the top black bullet it reads:

21       "The admission criteria continued to be met and

22       active treatment is being provided.  For treatment to be

23       considered active, services must be as follows:

24            "Supervised and evaluated by the admitting provider;

25            "Provided under an individualized treatment plan that

1           is focused on the factors leading to admission and makes

2           use of clinical best practices;

3                "And reasonably expected to improve the member's

4           presenting problems within a reasonable period of time."

5           If you know, where does this language come from, at least

6      in part?

7      **A.**    It's based on Medicare language as well.

8      **Q.**    Can I direct your attention, now, to the other binder,

9      Exhibit 655.

10     **A.**    Okay.

11     **Q.**    Exhibit 655 -- and this exhibit also has already been

12     admitted into evidence.

13          Dr. Martorana, are you familiar with what this document

14     is?

15     **A.**    Yes.

16     **Q.**    What is it?

17     **A.**    This is the Medicare Benefit Policy Manual.  Again, this

18     is chapter 2 - Inpatient Psychiatric Hospital Services.

19     **Q.**    Can I direct your attention to page 7, please.

20     **A.**    Yes.

21     **Q.**    And there's a heading called "Principles for Evaluating a

22     Period of Active Treatment."

23          Do you see that?

24     **A.**    Yes.

25     **Q.**    And there's -- just above the bullet points it reads "For

1    services in an IPF."  What is an IPF?

2    **A.**    Inpatient psychiatric facility.

3    **Q.**    (Reading)

4         "For services in an IPF designated as active

5    treatment they must be provided under an individualized

6    treatment or diagnostic plan; reasonably expected improve

7    the patient's condition or for the purpose of diagnosis;

8    and supervised and evaluated by a physician."

9    Is this the language you were referring to in the CMS

10   guidelines?

11   **A.**    Yes.  This is where it comes from.

12   **Q.**    There's a couple of differences I want to ask you about.

13   The first one is going back to the 2017 guidelines now.  If you

14   can look at them.

15        In the common continued service criteria, under the

16   definition of "active services," second white bullet, it reads:

17        "Provided under an individualized treatment plan that

18   is focused on addressing the factors leading to

19   admission."

20        So the additional language here is "that is focused on

21   addressing the factors leading to admission"; is that right?

22   **A.**    Yes.

23   **Q.**    What does that additional language mean?

24   **A.**    That calls out that one of the important parts of

25   treatment planning should be to specifically address what

1    causes them to be in this level of care.

2    **Q.**   And, in your view, is that consistent with the CMS

3    guideline we just looked at?

4    **A.**   Yes.

5    **Q.**   Can the individualized treatment plan address factors --

6    under UBH's guidelines, can the individualized treatment plan

7    address factors other than factors leading to the admission?

8    **A.**   Yes, because it's individualized.  And it becomes

9    individualized when you've taken all that information that was

10   noted in the common -- in the best practices and synthesize

11   them into a case formulation, diagnosis, and a treatment plan

12   that will improve their condition.

13   **Q.**   Why should the plan be focused on addressing the factors

14   leading to admission?

15   **A.**   Well, that then comes back to the issue of the least

16   restrictive setting.

17       So if the person can be treated safely, effectively, and

18   efficiently in a less restrictive setting, then if you deal

19   with the things that cause them to be in the more restrictive

20   level of care, then you've -- should successfully be able to

21   transition them to more freedom, a less restrictive setting.

22

23

24

25

1  Q.  Now, in that circumstance, what if something else comes up

2  in the course of their treatment that's new or different and

3  wasn't a presenting condition or symptom at the time of

4  admission?  Is that considered when evaluating whether they

5  should be stepped down to a lower level of care?

6  A.  Absolutely.  Had a case the other day where the member had

7  been moved to a higher level of care because he was depressed

8  and the outpatient treatment wasn't working so well.  It was

9  done by a psychologist.  And so they put him on antidepressant,

10  and there was no indication in his history, but it precipitated

11  a manic event.

12      So the depressive symptoms have all obviously resolved,

13  but now he has something brand-new that's brought on by the

14  treatment or unmasked by the treatment.  And, of course, if the

15  person needed to be in that level of care, we would authorize

16  that.

17  Q.  And is there anything in the guidelines that would support

18  consideration of new symptoms that -- conditions that cropped

19  up in the course of treatment?

20  A.  Well, it's part of the individualized treatment plan and

21  looking at the member as a whole.  Also, there's a feedback

22  loop in here that, you know, if we're going to say that someone

23  needs a less restrictive level of care, then they'd have to

24  meet the guidelines all over again for that.

25      So, again, can they safely, effectively, and efficiently

1  be treated in that other level of care, and if the person's

2  floridly manic, then the answer is no, they would need the

3  higher level of care.

4  **Q.**  Looking back at the active treatment definition, still in

5  the Common Continued Service criteria, and comparing it to the

6  CMS Guideline for Active Treatment, I want to call your

7  attention to the third white bullet point where it says:

8         "Reasonably expected to improve the member's

9         presenting problems within a reasonable period of time.

10        The language 'within a reasonable period of time' is in

11        the UBH guidelines and not in the CMS guideline."

12        Can you explain what is meant by "reasonable period of time"

13        of time" here?

14  **A.**  Well, I think that's an additional piece to being

15  effective.  So you reasonably expect the condition to improve

16  because the treatment plan is matched properly and the

17  diagnosis is made appropriately.

18     But you could institute a treatment plan that's slower

19  than others and so it would be less efficient.  So we were

20  asking that the care be efficient for the member's sake so they

21  don't suffer as long.

22  **Q.**  Now I want to turn your attention to the second black

23  bullet point in the Common Continued Service criteria where it

24  reads:

25         "The factors leading to admission have been

1          identified and are integrated into the treatment and

2          discharge plans."

3          What does this mean?

4     **A.**   Well, again, basic treatment planning requires that --

5     that part of the condition that's causing them to require the

6     more intensive or more restrictive level of care is addressed,

7     and there are specific problems identified and treatments that

8     are identified, and expected outcome that's identified in

9     measurable terms.  That's what that refers to.

10    **Q.**   Okay.  Turning to the common discharge criteria under

11    that, it reads:  "The continued stay criteria are no longer

12    met."  And then there's a few examples underneath there.  And

13    the first example is:

14         "The factors which led to admission have been

15         addressed to the extent that the member can be safely

16         transitioned to a less intensive level of care or no

17         longer requires care."

18         What does that first example mean?

19    **A.**   Again, there's a clinical decision to be made when

20    someone -- the symptoms that someone came in with that required

21    this level of care have been resolved.  So then that was your

22    goal or one of your goals?

23         And now that that's happened, can they be transitioned to

24    a less restrictive level of care?  So, as I was mentioning with

25    the feedback loop, then all that comes into play.  Can they

1    safely, efficiently, and effectively be treated in the less

2    intensive level of care that may be available?

3          THE COURT:  Why doesn't it say that?  Why doesn't it

4    use the words "efficiently" and "effectively"?

5       It says "safely transitioned."

6          THE WITNESS:  Well, I think, as I mentioned, that part

7    of the clinical decision is to think about the less restrictive

8    level of care.  And you have to answer those questions that

9    mentioned -- for the admission criteria, is that can they

10   safely, effectively, and efficiently be treated in this level

11   of care that's now being proposed, the lower level of care.

12         THE COURT:  This doesn't say that.  This just says,

13   "safely."

14      Why did you use that word instead of saying "safely,

15   effectively, and efficiently" managed at a lower level -- being

16   treated in a lower level of care?

17         THE WITNESS:  I don't know for a fact why it's not

18   there.

19         THE COURT:  Okay.

20   BY MS. ROMANO:

21   Q.  Staying with the common discharge criteria, the last white

22   bullet point is another example for when a continued stay

23   criteria are no longer met.  And it reads:

24             "The member is unwilling or unable to participate in

25         treatment, and involuntary treatment or guardianship is

1          not being pursued."

2          Why is this included as an example for when continued stay

3     criteria are no longer met?

4     **A.**   Well, as part of treatment planning, as you move along in

5     the care, if the member is displaying an inability or -- to

6     participate in treatment or unwilling to participate in

7     treatment, then we would expect the treatment plan to change.

8          So they would bring into play any number of interventions

9     depending on the individual aspects of the patient's care.  So,

10    you know, the motivational interventions bring in the family,

11    what have you, to attempt to improve the member's condition by

12    having them participate actively in the treatment.

13         Ultimately, if, for instance, you have someone who's very

14    psychotic, out of touch with reality, needs antipsychotic

15    medication but, because of their psychosis, is refusing it and

16    so you're not giving them any medication, that if you haven't

17    at least thought through the idea of taking them to court and

18    having them given meds over objection, then you really haven't

19    addressed the patient's condition or their suffering.  And we

20    would expect them to take those measures if that -- that came

21    up.

22    **Q.**   Turning to the common clinical best practices for all

23    levels of care, which begin on the bottom of page 7.

24         You spoke about them a little bit already, Dr. Martorana.

25    And I just want to ask you, are any of the items here listed on

1    page 8 items or circumstances that relate to information

2    regarding co-morbid and co-occurring conditions?

3    **A.**    The -- certainly, the bullet point that says "Co-Occurring

4    Behavioral Health and Physical Conditions" would be one.

5    **Q.**    Are there any others that you can identify?

6    **A.**    Well, their medical history may involve co-occurring

7    conditions.  Developmental history may show the developmental

8    delay that would be -- need to be taken into consideration as a

9    co-morbidity.

10        Those would be the main ones dealing with co-morbidities.

11   **Q.**    In this section, the Clinical Best Practices section, is

12   this section directed only to what the treating provider should

13   be doing and not what UBH's reviewing clinician should be

14   considering?

15   **A.**    This involves the coordination between us and the

16   provider.  This is the level of excellence and completeness we

17   hold them to because they need to do this to make an

18   appropriate diagnosis and an appropriate treatment plan, which

19   they communicate to us.

20        And if they do all that and it makes clinical sense, then

21   we would authorize that.

22   **Q.**    If you can look at the third black bullet point on page 8

23   in the Clinical Best Practices section, it says:

24            "The provider and, whenever possible, the member use

25        the findings of the initial evaluation and diagnosis to

1          develop a treatment plan.  The treatment plan addresses

2          the following:"

3      And then drawing your attention to the third white bullet

4  point there, it says:

5              "The expected outcome for each problem to be

6          addressed expressed in terms that a measurable,

7          functional, time-framed and directly related to the

8          factors leading to admission."

9      Why is this something to be included in the treatment

10 plan?

11 **A.**   Well, this is a basic aspect of psychiatric treatment

12 planning.  So if you see a treatment plan, especially for a

13 complex patient, it may go on for pages.

14     So you'll have each problem identified, not necessarily

15 diagnosis, but each problem identified.  And then the treatment

16 that's directed at that under it with specific expectations of

17 the outcome and the time frame in which to expect that.

18     So someone comes in with suicidal thinking, then the

19 treatment plan may say -- or the outcome expected would be that

20 the patient is no longer voicing suicidal ideation by such and

21 such date.

22     And if they don't do that, if they're still voicing

23 suicidal ideation, then the expectation would be something else

24 would be brought into play in the treatment plan to address it.

25 So it's a constant, living, evolving document, and that's a

1    good and appropriate treatment.

2    **Q.**   Now, turning your attention, sixth bullet down on page 8,

3    it reads:

4         "Treatment focuses on addressing the factors

5         precipitating admission to the point that the member's

6         condition can be safely, efficiently, and effectively

7         treated in a less intensive level of care or the member no

8         longer requires care."

9    Why is this included?

10   **A.**   Because the principle of a least restrictive setting being

11   of such importance that you want to make sure that the --

12   whatever factors that require them to be in this more intensive

13   level of care are addressed and the goals related to treatment

14   have to do with them improving to the point that they can be in

15   a less restrictive level of care, which is preferable.

16   **Q.**   Directing your attention to page 13 of the 2017

17   Guidelines.  I'm sorry, stop on 10, please, for just a moment.

18        So on page 10 of the 2017 Level of Care Guidelines, there

19   is a section titled "Level of Care Guidelines Mental Health

20   Conditions."

21        Do the 2017 guidelines also have common criteria specific

22   to mental health conditions?

23   **A.**   Yes.

24   **Q.**   And do they apply to all levels of care?

25   **A.**   Yes.

1    **Q.**   Are these the same common criteria we just went over in

2    the general section?

3    **A.**   They are.

4    **Q.**   All right.  Now, turning to page 13, please, there's a

5    section titled "Guidelines:  Outpatient."

6         Do you see that?

7    **A.**   Yes.

8    **Q.**   And if you can look at the paragraph starting

9    "Outpatient," the second sentence, it reads:

10            "The course of treatment in outpatient is focused on

11        addressing the factors that precipitated admission, e.g.

12        changes in the member's signs and symptoms, psychosocial

13        and environmental factors or level of functioning to the

14        point that the factors that precipitated admission no

15        longer require treatment.  Individual outpatient

16        psychotherapy is generally provided in sessions lasting up

17        to 45 minutes."

18        What are factors that precipitated admission?  What does

19    that mean?

20   **A.**   Well, again, these are all the considerations that have

21    led this member to this point in time seeking treatment.

22        So the symptoms that caused them distress, if there were

23    precipitants for that; what their prior history has been; their

24    co-morbidities; what's worked and what hasn't.  All these

25    things come into play as the factors necessitating or

1  precipitating admission.

2  **Q.**   What are psychosocial and environmental factors?

3  **A.**   Well, these are facets of a person that have to do with

4  their relationships, where they live, their financial

5  stability, if they're working, their educational status,

6  marital status, things like that.

7  **Q.**   Are factors that precipitated admission limited to acute

8  symptoms?

9  **A.**   No.

10  **Q.**   Do factors that precipitate admission include chronic

11  conditions, if they exist in a patient?

12  **A.**   Yes.

13  **Q.**   Why are individual outpatient psychotherapy sessions --

14  strike that.  Let me restart that one.

15      Why is it that individual outpatient psychotherapy is

16  generally provided in sessions lasting up to 45 minutes?

17  **A.**   Well, that's the standard billing code that the AMA puts

18  out for psychotherapy, so that would be -- a standard session

19  would be 45 minutes for psychotherapy.  Anything more than that

20  would be an extended session.

21  **Q.**   You said the standard code put out by who?

22  **A.**   I'm sorry, American Medical Association.  Misspoke.

23  **Q.**   If I can turn your attention to page 14, please, of the

24  2017 guidelines.

25      About midway through, there's Intensive Outpatient Program

1  guidelines.  Are these applicable to mental health?

2  **A.**   Yes.

3  **Q.**   Starting with the first paragraph, the last sentence, it

4  reads:

5       "The purpose of services is to monitor and maintain

6       stability, decreasing moderate signs and symptoms,

7       increase functioning, and assist members with integrating

8       into community life."

9       What does it mean to monitor and maintain stability?

10 **A.**   Well, that means to structure your treatment and treatment

11 settings so that you're regularly assessing the member's

12 condition.  And one of the goals would be to maintain

13 stability, so whatever treatment interventions you have to

14 institute to deal with this particular member's reasons for not

15 being stable.

16 **Q.**   And then looking at the next paragraph here in the

17 Intensive Outpatient Program guidelines, it says:

18      "The course of treatment in an intensive outpatient

19      program is focused on addressing the factors that

20      precipitated admission, e.g, changes in the member's signs

21      and symptoms, psychosocial and environmental factors or a

22      level of functioning to the point that the member's

23      condition can be safely, efficiently, and effectively

24      treated in a less intensive level of care."

25      Is this generally the same language we saw for the

1    outpatient guidelines, just the level of care is different?

2    A.    Yes.

3    Q.    And is this language limited -- the factors that

4    precipitated admission limited to just acute factors?

5    A.    No.

6    Q.    Do they include chronic conditions, if they exist, for the

7    patient?

8    A.    Yes.

9    Q.    The next paragraph reads:

10            "An intensive outpatient program can be used to treat

11        mental health conditions or can specialize in the

12        treatment of co-occurring mental health and

13        substance-related disorders."

14        Does this intend to relate to co-occurring conditions?

15   A.    Yes.

16   Q.    How?

17   A.    It's the expectation that someone accessing an intensive

18   outpatient program or other levels of care, that if they have a

19   co-occurring condition, that that be addressed too.

20        And, frequently, you'll see people with mental health

21   disorders coming in with substance use co-morbidities and vice

22   versa.  And so it happens frequently enough that any mental

23   health IOP should be able to assess and treat that as well.

24   Q.    And looking back up to the top of this Intensive

25   Outpatient Program section, it reads:

1        "A structured program that maintains hours of service

2    for at least nine hours per week for adults and six hours

3    per week for children/adolescents."

4    Why is it that there is a different minimum time for

5    adults versus children?

6    **A.**   Well, it's understood that for many children and

7    adolescents the IOP is an after-school program, so by requiring

8    too many hours, then you start interfering with their ability

9    to do homework.

10        Also, it's known that, for especially younger children,

11    that their attention span can be limited to the point that they

12    don't really integrate too many hours of treatment all at once

13    and so they -- the requirement is for a lower number of hours.

14    **Q.**   Can I have you turn now to page 18 of these 2017

15    guidelines.  Are these the residential treatment center

16    guidelines for mental health?

17    **A.**   Yes.

18    **Q.**   Starting with the second paragraph here, it reads, "The

19    course of treatment in a residential treatment center is

20    focused on addressing the factors that precipitated admission,

21    e.g. changes in the member's signs and symptoms, psychosocial

22    and environmental factors or level of functioning to the point

23    that the member's condition can be safely, efficiently, and

24    effectively treated in a less intensive level of care."

25        Again, does -- is this generally the same as the intensive

1    outpatient and outpatient guideline?

2    A.    Yes.

3    Q.    And I want to draw your attention now to the section

4    underneath the residential treatment center admission criteria.

5          Do you see where I am?

6    A.    Yes.

7    Q.    And looking now at the third bullet point, it reads:

8          "The factors leading to admission cannot be safely,

9          efficiently, or effectively assessed and/or treated in a

10         less intensive setting due to acute changes in the

11         member's signs and symptoms and/or psychosocial and

12         environmental factors."

13    And then it gives a couple of examples.

14         "Examples include the following:  Acute impairment or

15         behavior or cognition that interferes with activities of

16         daily living to the extent that the welfare of the member

17         or others is endangered.

18         "Psychosocial and environmental problems that are

19         likely to threaten the member's safety or undermine

20         engagement in a less intensive level of care without the

21         intensity of services offered in this level of care."

22    What are acute changes in the signs and symptoms and/or

23    psychosocial and environmental factors?

24    A.    Well, acute changes are those that are immediate,

25    generally short-lived, and have some impact as to why they need

1    to be in this level of care.

2        I think I mentioned what psychosocial environmental

3    factors were earlier, but that would have to do with the

4    person's living situation, for instance.  And one of the points

5    actually addresses -- the example addresses it directly.

6        So if you have a kid that's in some kind of abusive

7    situation, then that's not going to be a good place for them to

8    be to conduct treatment, so you put them in a residential

9    setting, for instance.

10       But what was the other point?

11       Oh, psychosocial, as I mentioned before, the -- their

12   employment, their education level, their relationships, whether

13   they're married, they have kids; all of those things come into

14   play when assessing a person's psychosocial condition.

15   **Q.**  Now, the word "acute changes" -- or the term "acute

16   changes" does not appear in the common criteria outpatient or

17   IOP criteria for this year in 2017.  Is that correct?

18   **A.**  Yes.

19   **Q.**  Why is it included here in the residential treatment

20   criteria but not the others this year?

21   **A.**  Uhm, well, we took it out of the other ones and we left it

22   in here because we recognize that residential treatment is a

23   24-hour level of care for someone who requires a higher, more

24   intensive level of care.

25       So we want to understand what happened, what changed

1   that -- what was the new change that happened that needs to be

2   addressed that puts them into a 24-hour setting.

3   **Q.**   And why did you take it out of the other levels of care

4   and common criteria for 2017?

5   **A.**   Well, this -- I mentioned before that in the process of

6   doing -- of putting together the revisions to the Level of Care

7   Guidelines, there's a workgroup that looks at the input from

8   outside organizations.

9        And so the -- one of the national social work societies

10  came in with comments about the word "acute" in the lower

11  levels of care, outpatient and IOP.

12       And the feeling that that seemed to -- they used the word

13  "tilt" the consideration to just acute care and wasn't really

14  addressing the kind of patient that they often saw: someone

15  that, you know, needed to come in once a week; otherwise, they

16  would not do well; they would deteriorate and require, you

17  know, probably more intensive level of care.

18       And they felt that that was a reasonable thing to do in

19  terms of treating somebody's condition.

20  **Q.**   Did you agree with the social workers' -- what was the

21  association called?  Do you know what it was called?

22  **A.**   Clinical Social Workers -- CSWA, I think.  Sorry, I don't

23  recall specifically.

24  **Q.**   I'll call them the social workers association if you

25  understand what that means.

1  **A.**    Yes.   Thank you.

2  **Q.**    Did you agree the social workers' association's

3  interpretation that, by using the word "acute changes," it

4  tilted the guideline toward acute care?

5  **A.**    No, not really, because we did have all that language in

6  there about defining improvement as maintaining someone in that

7  level of care, because if you withdraw it, then they have a

8  good chance of deteriorating, which pretty much described what

9  they were saying.

10      So we didn't necessarily agree with their concern, but we

11  registered their concern and felt that we could take it out.

12  And it really didn't make that much difference one way or

13  another in terms of, you know, what we were going to authorize

14  and cover.

15  **Q.**    Was that language, the "acute changes" language, was it

16  used to disallow coverage for outpatient care for chronic

17  conditions prior to 2017?

18  **A.**    Not to my knowledge, no.

19  **Q.**    I'm going to have you turn to -- back to the other

20  exhibit, if you will, for just a couple of moments.

21      Exhibit 656, again, already admitted into evidence.

22  **A.**    Yes.

23  **Q.**    Directing your attention to page 29, please, of this

24  document.

25  **A.**    Yes.

1  **Q.**  The second heading here, 70.3, says "Partial

2  Hospitalization Services."

3      Does this -- this is the Medicare Benefit Policy Manual;

4  is that right?

5  **A.**  Yes.

6  **Q.**  Chapter 6, does this section, beginning on page 29, apply

7  to partial hospitalization services?

8  **A.**  Yes, it does.

9  **Q.**  And, again, partial hospitalization is a less intensive

10  level of care than residential treatment?

11  **A.**  Yes.  It's a outpatient level of care versus a 24-hour

12  level of care.

13  **Q.**  Turning your attention to the section titled "Program

14  Criteria," the second paragraph in that section, midway through

15  the paragraph reads:

16          "The Program reflects a high degree of structure and

17      scheduling.  According to current practice guidelines, the

18      treatment goal should be measurable, functional,

19      time-framed, medically necessary, and directly related to

20      the reason for admission."

21      Are those concepts that also exist in the UBH guidelines

22  as we've discussed?

23  **A.**  Yes.

24  **Q.**  In what way?

25  **A.**  Well, it describes, you know, basic treatment planning in

1  terms of how to set goals, how they -- in terms of their being

2  medically necessary.  So if they're effective for the

3  treatment, then you can measure the goals; they are not vague

4  and unmeasurable.  And that there's a time frame for

5  determining whether you need to change your interventions

6  because things have improved or haven't improved or things have

7  gotten worse.

8  **Q.**  Now, turning your attention to page 30, please.  Are we

9  still in the partial hospitalization section?

10 **A.**  Yes.

11 **Q.**  The top paragraph there, fifth line down, there's a

12 sentence that reads:

13        "The patients also require a comprehensive,

14     structured multi-modal treatment requiring medical

15     supervision and coordination provided under an

16     individualized plan of care because of a mental disorder

17     which severely interferes with multiple areas of daily

18     life, including social, vocational, and/or educational

19     functioning, such dysfunction generally is of an acute

20     nature."

21     What does it mean to say such dysfunction generally is of

22 an acute nature?

23 **A.**  Well, they're talking about conditions that are severe,

24 and they often come up as, you know, exacerbations of a current

25 condition or something relatively sudden.  I mean, not

1    necessarily overnight.  But it's -- acute means that it's of a

2    recent onset, immediate onset.

3    **Q.**   Now, turning to the next paragraph, please, in the middle

4    of the next paragraph, it reads:

5         "Where partial hospitalization is used to shorten an

6         inpatient stay and transitions the patient to a less

7         intense level of care, there must be evidence for the need

8         for the acute, intense, structured combination of services

9         provided by a PHP."

10   What is a PHP?

11   **A.**   Partial hospital program.

12   **Q.**   Is -- under Medicare, is partial hospitalization used to

13   address acute, intense, structured combination of services?

14   **A.**   Yes.

15   **Q.**   Turning to page 31, please, does this section also apply

16   to partial hospitalization coverage under Medicare?

17   **A.**   Yes.

18   **Q.**   At the section under Reasonable and Necessary Services,

19   first paragraph, fourth line, there's a sentence that reads:

20        "A particular individual covered service, described

21        above as intervention, expected to maintain or improve the

22        individual's condition and prevent relapse may also be

23        included within the plan of care, but the overall intent

24        of the partial program admission is to treat the serious

25        presenting psychiatric symptoms."

1    Is the concept of treating the serious presenting

2  psychiatric symptoms also a concept that appears in UBH's

3  guidelines?

4  A.    Yes.

5  Q.    In what way?

6  A.    Well, we talk about the treatment planning having to

7  address the reasons that a person requires this level and

8  intensity of care.

9  Q.    And now looking at the bottom paragraph, also on page 31,

10  does this section still apply to partial hospitalization?

11  A.    Yes.

12  Q.    Third line down of that bottom paragraph reads:

13         "Patients admitted to a PHP generally have an acute

14         onset or decompensation of a covered Axis 1 mental

15         disorder as defined by the current edition of the

16         Diagnostic and Statistical Manual published by the

17         American Psychiatric Association or listed in Chapter 5 of

18         the version of the International Classification of

19         Diseases (ICD) applicable to the service date which

20         severely interferes with multiple areas of daily life."

21         It refers to "an acute onset or decompensation."  What is

22  that?

23  A.    Well, as we talked about before, acute means sudden.  And,

24  you know, by using the word "decompensation," they're talking

25  about something pretty severe.  So in this situation it's both

1    sudden and severe.

2    **Q.**   And turning to page 33, if you will.

3    **A.**   Yes.

4    **Q.**   Are we still in the section on partial hospitalization?

5    **A.**   Yes, we are.

6    **Q.**   The very top paragraph reads:

7            "Reasonable and necessary denials based on

8        1862(a)(1)(A) are appealable and the limitation on

9        liability provision does apply.  The following examples

10       represent reasonable and necessary denials for partial

11       hospitalization services and coverages excluded under

12       Section 1862(a)(1)(A) of the Social Security Act."

13   And then it reads:

14           "Patients who cannot or refuse to participate, due to

15       their behavioral or cognitive status, with active

16       treatment of their mental disorder except for a brief

17       admission necessary for diagnostic purposes or who cannot

18       tolerate the intensity of a PHP."

19   Is it your understanding that members who cannot or refuse

20   to participate will not receive Medicare benefits for partial

21   hospitalization under this manual guideline?

22   **A.**   Yes.

23   **Q.**   And then it reads:

24           "Also, with respect to reasonable and necessary

25       denials, treatment of chronic conditions without acute

1          exacerbation of symptoms that place the individual at risk

2          of relapse or hospitalization."

3          Is it also your understanding that individuals that are

4    seeking treatment of chronic conditions without acute

5    exacerbation of symptoms will not receive benefits for PHP

6    under Medicare?

7    A.   Yes.

8    Q.   I'd like to direct your attention now to Exhibit 1507,

9    please.

10          THE COURT:  So let's take a short break before we do

11   1507.  I'll see you in ten minutes.

12                    (Recess taken at 3:00 p.m.)

13                    (Proceedings resumed at 3:22 p.m.)

14          THE CLERK:  Okay.  We are back on the record in Case

15   Number C 14-2346, which is Wit/Alexander versus UBH.

16          THE COURT:  Go ahead.

17          MS. ROMANO:  All right.  Proceeding with the

18   examination of Dr. Martorana.

19   Q.   Dr. Martorana, before our break, I believe I asked you to

20   turn to Exhibit 1507, please.

21   A.   Yes.

22   Q.   Are you familiar with this document?

23   A.   Yes.

24   Q.   What is it?

25   A.   This is a Local Coverage Determination for a psychiatric

1    partial hospitalization program.

2    **Q.**    Does this apply to Medicare coverage as you described

3    before?

4    **A.**    In certain states, yes.

5            **MS. ROMANO:**  Move to admit Exhibit 1507 into evidence.

6            **MS. REYNOLDS:**  No objection.

7            **THE COURT:**  It's admitted.

8       (Trial Exhibit 1507 received in evidence)

9    **BY MS. ROMANO:**

10   **Q.**    Dr. Martorana, I'd like to draw your attention to page 3

11   of this exhibit.

12   **A.**    Yes.

13   **Q.**    Excuse me.  I have to get my glasses on for this one.

14       And, Dr. Martorana, looking to the second-to-last

15   paragraph on page 3, please.

16   **A.**    (Witness examines document.)

17   **Q.**    Toward the bottom, four lines up there's a sentence that

18   reads (reading):

19           "The degree of impairment will be severe enough to

20       require a multidisciplinary intensive structured program

21       but not so limiting that patients cannot benefit from

22       participating in an active treatment program.  It is the

23       need as certified by the treating physician for the

24       intensive structured combination of services provided by

25       the program that constitute active treatment that are

1    necessary to appropriately treat the member's presenting

2    psychiatric condition."

3         This provision focuses on the patient's presenting

4    psychiatric condition.  Is that something that's also reflected

5    in UBH's guidelines?

6    A.   Yes.

7    Q.   In what way?

8    A.   It goes throughout our guidelines that we want to make

9    sure that the attending provider has determined what so led

10   this person to be in this level of care at this point in time

11   and to make sure that's part of the treatment plan.

12   Q.   And turning to page 17 of this LCD, please.

13   A.   (Witness examines document.)

14   Q.   And this is still a partial hospitalization LCD; is that

15   right?

16   A.   Yes.  Yes.

17   Q.   Okay.  And looking at the section on the bottom, there is

18   a heading that says "Admission Criteria Intensity of Service."

19   Do you see where I am?

20   A.   Yes.

21   Q.   And it reads (reading):

22        "In general, patients should be treated in the least

23        intensive and restrictive setting which meets the needs of

24        their illness."

25        Is that a concept that's included in UBH's guidelines that

1   we've discussed already?

2   **A.**   Yes, it is.

3   **Q.**   And now I'd like you to turn to Exhibit 1502, please.

4   **A.**   (Witness examines document.)   Yes.

5   **Q.**   Are you familiar with this document?

6   **A.**   Yes.

7   **Q.**   What is it?

8   **A.**   This is a Local Coverage Determination for psychiatric

9   inpatient hospitalization.

10  **Q.**   So this one is for psychiatric inpatient hospitalization.

11  Is that a higher level of care than residential treatment?

12  **A.**   Yes, it is.

13       **MS. ROMANO:**  I'd like to move Exhibit 1502 into

14  evidence.

15       **MS. REYNOLDS:**  No objection.

16       **THE COURT:**  It's admitted.

17  (Trial Exhibit 1502 received in evidence)

18  **BY MS. ROMANO:**

19  **Q.**   Dr. Martorana, if you could turn to page 9 of this

20  exhibit, please.

21  **A.**   (Witness examines document.)

22  **Q.**   And there's a section titled "Limitations."

23  **A.**   Yes.

24  **Q.**   And the second paragraph under "Limitations" reads

25  (reading):

1       "The following services do not represent reasonable

2     and medically necessary inpatient psychiatric services and

3     coverage is excluded under Title 18 of the Social Security

4     Act, Section 1862(a)(1)(A)."

5     And then it reads (reading):

6        "First, services which are primarily social,

7     recreational, and diversion activities or custodial or

8     respite care; B, services attempting to maintain

9     psychiatric wellness for the chronically mentally ill; C,

10    treatment of chronic conditions without acute

11    exacerbation."

12    Is that similar language we saw for PHP for Medicare?

13  **A.**   Yes, it is.

14  **Q.**   And now if I can turn your attention to Number 3.  It

15  states (reading):

16       "It is not reasonable and medically necessary to

17    provide inpatient psychiatric hospital services to the

18    following types of patients and coverage is excluded under

19    Title 18 of the Social Security Act,

20    Section 1862(a)(1)(A)."

21    And focusing specifically on item B, it reads (reading):

22       "Patient's whose clinical acuity requires less than

23    24 hours of supervised care per day."

24    Is it the case that patients whose clinical acuity does

25  not require 24 hours a day of supervised care do not qualify

1    for coverage for inpatient treatment under Medicare?

2    **A.**    That's correct.

3    **Q.**    Okay.  Let's go ahead and turn back to the 2017

4    guidelines, if we can.

5    **A.**    (Witness examines document.)

6    **Q.**    And still on the residential treatment center guidelines,

7    at this time turning to the continued service criteria on

8    page 18 and 19.  Beginning on the bottom of page 18, it reads

9    (reading):

10         "Treatment is not primarily for the purpose of

11         providing custodial care.  Services are custodial when

12         they are any of the following:

13         "Nonhealth-related services such as assistance in

14         activities of daily living.  Examples include feeding,

15         dressing, bathing, transferring, and ambulating.

16         "Health-related services provided for the primary

17         purpose of meeting the personal needs of the patient or

18         maintaining a level of function even if the specific

19         services are considered to be skilled services as opposed

20         to improving that function to an extent that might allow

21         for a more independent existence.

22         "And services that do not require continued

23         administration by trained medical personnel in order to be

24         delivered safely and effectively."

25    Do you know where that language, the three white bullet

1  points I just read, comes from?

2  **A.**    Well, it's in the member's coverage documents.

3  **Q.**    Turning to the Level of Care Guidelines for

4  substance-related disorders on page 23 of Exhibit 8.

5  **A.**    (Witness examines document.)  Yes.

6  **Q.**    Do the 2017 guidelines also have common criteria specific

7  to substance use disorders that apply to all levels of care?

8  **A.**    They do.

9  **Q.**    Are these the same common criteria we went over at the

10  beginning of our discussion of 2017 guidelines?

11  **A.**    Yes.

12  **Q.**    If I can direct your attention to page 26, please, of the

13  substance use guidelines.

14  **A.**    (Witness examines document.)

15  **Q.**    This is a section on outpatient; is that right?

16  **A.**    Yes.

17  **Q.**    And if you can look at the first paragraph on outpatient,

18  second sentence, it reads (reading):

19         "The course of treatment in outpatient is focused on

20      addressing the factors that precipitated admission, e.g.,

21      changes in the member's signs and symptoms, psychosocial

22      and environmental factors, or a level of functioning to

23      the point that the factors that precipitated admission no

24      longer require treatment."

25      Is this the same language that we saw in the mental health

1    outpatient section?

2    **A.**    Yes.

3    **Q.**    Is this section limited to acute changes?

4    **A.**    No.

5    **Q.**    Does it include consideration of chronic conditions?

6    **A.**    Yes.

7    **Q.**    And, again, it's limited to 45-minute sessions.  Is that

8    for the same reason you discussed before on mental health

9    guidelines?

10   **A.**    Yes.

11   **Q.**    And then at the bottom of the page 26, it reads (reading):

12            "Coverage for extended outpatient sessions lasting up

13        to 60 minutes may be indicated in the following nonroutine

14        circumstances..."

15       And there's a series of bullets under there, one of which

16   reads (reading):

17            "Periodic involvement of children, adolescent, or

18        geriatric member's family in psychotherapy sessions when

19        such involvement is essential to the member's progress,

20        e.g., when psychoeducation or parent management skills are

21        provided."

22       Why is this example that I just read a nonroutine

23   circumstance?

24   **A.**    Well, this would be an add-on to a regular session.  You

25   wouldn't necessarily normally have other people in the session

1   but when you do and it's important and essential to the

2   treatment, then it makes sense that it takes a longer amount of

3   time.

4   **Q.**   And turning now to page 32 of the substance use guidelines

5   for 2017.

6   **A.**   (Witness examines document.)  I'm sorry.  What page?

7   **Q.**   Page 32, please.

8   **A.**   (Witness examines document.)

9   **Q.**   The third paragraph reads (reading):

10          "The course of treatment in an intensive outpatient

11      program is focused on addressing the factors that

12      precipitated admission -- e.g., changes in the member's

13      signs and symptoms, psychosocial and environmental factors

14      or level of functioning -- to the point that the member's

15      condition can be safely, efficiently, and effectively

16      treated in a less intensive level of care."

17      Again, is this limited to acute changes?

18  **A.**   No, it's not.

19  **Q.**   Does it include consideration of chronic conditions?

20  **A.**   Yes, it does.

21  **Q.**   And looking at the next sentence, it reads (reading):

22          "An intensive outpatient program can be used to treat

23      substance-related disorders or can specialize in the

24      treatment of co-occurring mental health and

25      substance-related disorders."

1        Does this provision take into account comorbid conditions?

2   A.   Yes.

3   Q.   In what way?

4   A.   Well, this is specifically referring to people entering

5   substance use treatment, and that the expectation is the

6   program should be able to handle any comorbid -- co-occurring

7   mental health issues.

8   Q.   And looking to the top of the section on intensive

9   outpatient programs, there is again a distinction between the

10  hours requirements per week for services for adolescents versus

11  adults; is that right?

12  A.   Yes.

13  Q.   And why is that?

14  A.   As I discussed before, there's an acknowledgment that a

15  children's and adolescent's program are typically after school

16  so more hours may tend to interfere with their homework time;

17  and then it's also understood that for -- especially for

18  children that the level of attention that they can bring may --

19  requires a limitation of hours in some circumstances.

20  Q.   If I can direct your attention now to page 35 of the 2017

21  guidelines.

22  A.   (Witness examines document.)

23  Q.   Are these the -- toward the bottom half of the page, are

24  these the substance use guidelines rehabilitation and

25  residential?

1    **A.**    I'm sorry.  We're on page 35?

2    **Q.**    35.

3    **A.**    Oh, yes.  There they are.  Okay.

4    **Q.**    Do the plans UBH administers ever cover sober living

5    homes?

6    **A.**    Some plans require coverage, yes.

7    **Q.**    Do they ever cover halfway houses?

8    **A.**    If the plan says so, yes, we would cover it.

9    **Q.**    Does UBH use these residential treatment guidelines to

10   evaluate coverage for sober living homes or halfway houses?

11   **A.**    No.  There's a special guideline for sober living

12   arrangements.

13   **Q.**    Can I direct your attention to page 52, please, of the

14   Level of Care Guidelines.

15   **A.**    Yes.

16   **Q.**    Still Exhibit 8.  What is the -- what are the guidelines

17   that are on page 52?

18   **A.**    These are for sober living arrangements, which they --

19   they're also called, as they point out, drug-free housing,

20   halfway house.

21   **Q.**    Are these the guidelines that would apply if UBH was

22   evaluating coverage for sober living homes or halfway houses?

23   **A.**    Yes.

24   **Q.**    Okay.  If you can turn back to page 35, please --

25   **A.**    Okay.

1   **Q.**   -- under the guidelines rehabilitation residential bar and

2   the second paragraph, it reads (reading):

3         "The course of treatment in residential

4         rehabilitation is focused on addressing the factors that

5         precipitated admission, e.g., changes in the member's

6         signs and symptoms, psychosocial and environmental

7         factors, or a level of functioning to the point that

8         rehabilitation can be safely, efficiently, and effectively

9         continued in a less intensive level of care."

10   Is this the same language we saw in the mental health

11   guidelines?

12   **A.**   Yes.

13   **Q.**   And now looking at the bottom of the page, there is a

14   section that starts "The factors leading to admission." Do you

15   see where I am?

16   **A.**   Yes.

17   **Q.**   It's three bullet points up. (reading)

18         "The factors leading to admission and/or the member's

19         history of" -- excuse me -- "history of response to

20         treatment suggests that there is imminent or current risk

21         of relapse, which cannot be safely, efficiently, and

22         effectively managed in a less intensive level of care.

23         Examples include a co-occurring mental health condition is

24         stabilizing but the remaining signs and symptoms are

25         likely to undermine treatment in a less intensive level of

1    care" -- excuse me -- "in a less intensive setting; and

2    the member is in immediate or imminent danger of relapse

3    and the history of treatment suggests that the structure

4    and support provided in this level of care is needed to

5    control the recurrence."

6    Does the section that I just read account for co-occurring

7    conditions?

8    A.    Yes, it does.

9    Q.    In what way?

10   A.    It calls out co-occurring mental health conditions and

11   monitoring their progress as well.

12   Q.    And then looking at the last bullet point that I just

13   read, there is a reference to immediate or imminent danger of

14   relapse, and what does that mean?

15   A.    Imminent danger of relapse typically refers to time frame

16   of days to weeks.

17   Q.    And why is it that UBH is looking for an imminent --

18   excuse me -- immediate or imminent danger of relapse in

19   evaluating whether residential is the appropriate level of care

20   under these guidelines?

21   A.    Well, understanding that substance use disorders are --

22   relapses are characteristic of substance use disorders for many

23   individuals, that you would need to define the reason for the

24   immediacy of treatment depending on how acute or immediate the

25   risk of relapse is.  Because, you know, if they might relapse

1    in 6 months or 10 months, then that may not really be a good

2    reason to keep them in a 24-hour level of care.

3    Q.   Why is that?

4    A.   Well, you can't keep people indefinitely in a 24-hour

5    monitored situation just because someday down the road they

6    might relapse.  That wouldn't be good clinical treatment.

7    Q.   Turning your attention now to page 36 at the top of the

8    page.

9    A.   (Witness examines document.)  Yes.

10   Q.   It reads (reading):

11          "The factors leading to admission cannot be safely,

12       efficiently, or effectively assessed and/or treated in a

13       less intensive setting due to acute changes in the

14       member's signs and symptoms and/or psychosocial and

15       environmental factors."

16   This provision has the language "acute changes" in it

17   again; is that right?

18   A.   Yes.

19   Q.   And was it left in in this guideline for the same reasons

20   that you explained it was left in the residential guidelines

21   for mental health in 2017?

22   A.   Yes.

23   Q.   Now looking at the rehabilitation residential continued

24   service criteria also on page 36.

25   A.   (Witness examines document.)  I'm there.

1  Q.   And specifically looking at the second bullet point where

2  it says (reading):

3       "Treatment is not primarily for the purpose of

4       providing custodial care.  Services are custodial when

5       they are any of the following..."

6  And then there's three different provisions there?

7  A.   Yes.

8  Q.   Are those the same provisions we saw in the mental health

9  guideline?

10 A.   Yes, they are.

11 Q.   Now, we just went through a variety of sections of the

12 Level of Care Guidelines for 2017.  Are you familiar with TMS?

13 A.   Yes.

14 Q.   What is TMS?

15 A.   Transcranial magnetic stimulation is a treatment involving

16 applying multiple magnets to a person's head for the treatment

17 of treatment-resistant depression.

18 Q.   When UBH is evaluating whether services for TMS are

19 covered under a plan, does it use any of the guidelines that we

20 just went through?

21 A.   There's a separate guideline for TMS.

22 Q.   And is that one that we didn't go through today?

23 A.   Correct.

24 Q.   Are you familiar with ABA treatment?

25 A.   Yes.

1  Q.   What is that?

2  A.   That's Applied Behavioral Analysis, which is a technique

3  for treating individuals with autism.

4  Q.   When UBH is making a coverage decision on whether ABA

5  services are going to be covered under a plan, does it use any

6  of the guidelines that we've gone through today?

7  A.   No.  It has its own separate guideline.

8  Q.   Let's move along to 2011 if we can.  That would be

9  Exhibit 1.

10  A.   (Witness examines document.)

11  Q.   Dr. Martorana, are you familiar with what has already been

12  admitted into evidence as Exhibit 1?

13  A.   Yes.

14  Q.   What is it?

15  A.   This is the UBH 2011 Level of Care Guidelines.

16  Q.   If I can direct your attention to page 5, please, of

17  Exhibit 1.

18  A.   (Witness examines document.)  Yes.

19  Q.   What begins on this page?

20  A.   Oh, sorry.  Page 5 is the common criteria.

21  Q.   And if I can direct your attention to paragraph 2 here.

22  A.   Yes.

23  Q.   What is the purpose of paragraph 2 in these common

24  criteria in 2011?

25  A.   Well, this sets out the -- what is required for the

1  provider to gather in order to make an initial evaluation,

2  diagnosis, and initial treatment plan, which then they would

3  present to us for purposes of authorizing care.

4  **Q.**   Do these criteria here in paragraph 2 take into account

5  comorbid conditions?

6  **A.**   Yes.

7  **Q.**   Where?

8  **A.**   Item D, "The member's current and past medical and

9  psychiatric histories, including history of substance use,"

10 would encompass comorbid and co-occurring conditions.

11 **Q.**   When we were looking at the 2017 guidelines, you testified

12 about a clinical best practices section in the 2017 guidelines.

13 Do you remember that?

14 **A.**   Yes.

15 **Q.**   Do the 2011 guidelines include a clinical best practices

16 section?

17 **A.**   No.  They put it in the common criteria at this point in

18 time.

19 **Q.**   And when you say that, are you referring to paragraph 2?

20 **A.**   Yes.

21 **Q.**   If you can direct your attention now to paragraph 4 of the

22 common criteria.

23 **A.**   Yes.

24 **Q.**   It reads (reading):

25       "The member's current condition can be most

1    efficiently and effectively treated in the proposed level

2    of care."

3    What does the term "current condition" mean in that

4  sentence?

5  **A.**   That means the symptoms that the member is bringing to

6  treatment, those that cause him distress and wants to be

7  addressed in the context of looking at all the factors that led

8  to this point in time with this particular individual.

9  **Q.**   Does the term "current condition" in paragraph 4 include

10  only crisis?

11  **A.**   No.

12  **Q.**   Looking at paragraph 5 now, it reads (reading):

13    "The member's current condition cannot be effectively

14    and safely treated in a lower level of care even when the

15    treatment plan is modified, attempts to enhance the

16    member's motivation have been made, or referrals to

17    community resources or peer supports have been made."

18    Does "current condition" have the same meaning as you just

19  described for paragraph 4?

20  **A.**   Yes.

21  **Q.**   What is the purpose of the requirement that's set forth in

22  paragraph 5 of this guideline?

23  **A.**   Well, this is taking the clinical thinking through

24  answering the question of whether the member's condition can be

25  treated safely and effectively in a lower level of care, and it

1  adds in the part about even when there's been treatment and

2  plan modifications and addressing the issues that may be

3  interfering with improvement.

4  Q.  Are you familiar with the term "fail first"?

5  A.  I am.

6  Q.  What does "fail first" mean?

7  A.  "Fail first" is a term describing conditions for coverage

8  which require failure at a lower level of care or at a less

9  expensive level of care -- less expensive treatment.

10  Q.  Is paragraph 5 a fail first provision?

11  A.  No, it's not.

12  Q.  And why is that?

13  A.  Because this is setting out a condition that would cause

14  someone to approve the care.  So if you're -- if you have a

15  condition that's severe and they even try to do this and still

16  fail to improve your condition despite all these efforts, then

17  that's a good reason to authorize the level of care.

18  Q.  Turning now to paragraph 6, please, it reads (reading):

19      "There must be a reasonable expectation that

20      essential and appropriate services will improve the

21      member's presenting problems within a reasonable period of

22      time.  Improvement in this context is measured by weighing

23      the effectiveness of treatment against the evidence that

24      the member's condition will deteriorate if treatment is

25      discontinued in the current level of care.  Improvement

 1         must also be understood within the framework of the

 2         member's broader recovery goals."

 3     What does it mean to consider improvement in the framework

 4 of the member's broader recovery goals?

 5 A.     It's similar to the language we saw elsewhere, although

 6 we're still coming into the era of consumer focus treatment, so

 7 this only mentions recovery goals here.  You're talking about

 8 basically what does the member want out of treatment and

 9 focusing in on what the member is thinking.

10 Q.     There's a reference here to "essential and appropriate

11 services."  Is that something different than what we saw in the

12 2017 guidelines?

13 A.     Yeah.  Those are different words, yes.

14 Q.     What do those terms mean?

15 A.     Well, "appropriate" I believe is equivalent to "effective"

16 in that it's known that the treatment matches the diagnosis and

17 other aspects of the member's individualized -- individual

18 condition.  "Essential" means that they're necessary.

19 Q.     Under this provision paragraph 6, what does it mean to

20 improve?

21 A.     Well, it talks about -- it has language about determining

22 whether the member might deteriorate if the current treatment

23 was withdrawn.  So that's one definition of "improvement"

24 that's mentioned here.

25     And then there's the reasonable expectation that the

1   member will -- well, it just says "improve," so it doesn't

2   define it further than that like it does in the other language

3   we've looked at.

4   Q.   Would maintaining a level of functioning -- I'll withdraw

5   that question.

6        Would maintaining a level of functioning be something that

7   is considered part of improvement in paragraph 6?

8   A.   Yes.  That's the part about having evidence that the

9   member might deteriorate if the treatment is withdrawn.  That's

10  another way of describing maintenance treatment.

11  Q.   There's a reference here to improvement within a

12  reasonable period of time.  Does that phrase "reasonable period

13  of time" have the same meaning you've discussed already with

14  respect to 2017 guidelines?

15  A.   Yes.

16  Q.   There's also use of the term "in this context."  Do you

17  see where that is, "improvement in this context"?

18  A.   Yes.

19  Q.   What does "in this context" refer to in this paragraph?

20  A.   It references the first sentence about having expectation

21  of improvement.

22  Q.   Does this paragraph in the 2011 guidelines require

23  continuous improvement in order to remain in a level of care?

24  A.   No.

25  Q.   Does it mean that once the presenting symptoms are

1  improved, no care is covered?

2  **A.**  No.

3  **Q.**  If you can turn to paragraph 7, please.  It's on page 6 of

4  Exhibit 1.

5  **A.**  (Witness examines document.)

6  **Q.**  It reads (reading):

7      "The goal of treatment is to improve the member's

8      presenting symptoms to the point that treatment in the

9      current level of care is no longer required."

10  Why is that the goal of treatment?

11  **A.**  Again, with the principle that being in a least

12  restrictive level of care is desirable, then we would expect

13  that the goal of treatment -- the primary goal of treatment

14  would be to improve the member's condition so they can be in a

15  less restrictive level of care.

16  **Q.**  And have you seen that in external sources?

17  **A.**  Yes.

18  **Q.**  What external sources have you seen that in?

19  **A.**  We saw that in the Medicare guidelines, and I've seen it

20  in ASAM as well.

21  **Q.**  Turning to paragraph 8, please.

22  **A.**  Yes.

23  **Q.**  It reads (reading):

24      "Treatment is not primarily for the purpose of

25      providing respite for the family, increasing the member's

1    social activity, or for addressing antisocial behavior or

2    legal problems, but is for the active treatment of a

3    behavioral health condition."

4    What does this language mean?

5  **A.**   That -- that describes an exclusion for treatment

6  that's -- and the keyword here is "primarily."  So if the focus

7  of treatment has to do with someone being sentenced to a

8  residential treatment program, as an example, instead of going

9  to jail and they otherwise wouldn't need this treatment, then

10 that would be -- that would be an exclusion.

11   Antisocial behavior similarly is often mandated to

12 residential treatment in order to, you know, keep them out of

13 the prisons, for instance, and manage them over a long period

14 of time.

15 **Q.**   Do patients who need treatment for behavioral health

16 issues sometimes have antisocial or legal problems?

17 **A.**   Right, but then that wouldn't be the primary purpose of

18 the treatment.

19 **Q.**   What wouldn't be the primary purpose of the treatment?

20 **A.**   Just addressing the antisocial behavior.  The primary

21 purpose would be to treat the psychiatric condition that may

22 manifest itself as antisocial behavior.

23 **Q.**   Now, the 2011 guidelines didn't have admission criteria

24 and continued service criteria and discharge criteria all

25 together; is that correct?

1  A.   Right.

2  Q.   Okay.  So I'm going to direct you to page 78 of the 2011

3  guidelines.

4  A.   (Witness examines document.)  Okay.

5  Q.   And what is that on page 78?

6  A.   This is the continued service criteria.

7  Q.   Looking at paragraph 2, Dr. Martorana, it reads (reading):

8       "The member continues to present with symptoms and/or

9       history that demonstrate a significant likelihood of

10      deterioration in functioning or relapse if transitioned to

11      a less intensive level of care or, in the case of

12      outpatient care, is discharged."

13      What does this provision mean?

14  A.   Well, it has the same intent as the language we've already

15  seen, so one way to continue authorization at a level of care

16  is that the member still has the symptoms that got them into it

17  in the first place, or that we understand that they -- they

18  could -- that there's a good likelihood that if withdrawn,

19  they'll deteriorate.

20  Q.   What does it mean to have a significant likelihood of

21  deterioration in function or relapse?

22  A.   Well, I think as we alluded to earlier, I mean, there's --

23  mental health and substance use conditions have a high

24  likelihood of relapse, and so the idea being that there's a

25  clinical judgment about is this person really -- he's about to

1  relapse or it's imminent or immediate, or is this something

2  theoretical for down the road that there's a good chance in

3  months to years that they will.  So trying to distinguish that

4  in terms of deciding on a current level of care.

5  **Q.**  Looking at paragraph 4 of the continued service criteria,

6  it reads (reading):

7       "The member is actively participating in treatment or

8       is reasonably likely to adhere after an initial period of

9       stabilization and/or motivational support."

10  What does this mean?

11  **A.**  So as a condition of treatment, the member is

12  participating so they're getting something out of the care and

13  in a situation where they're not right now, that there are

14  efforts to get them to participate and engage in the treatment.

15  **Q.**  And why is that something that's required for continued

16  service criteria in the 2011 guidelines?

17  **A.**  Well, it would be an indication that treatment is

18  occurring or about to occur that will improve the member's

19  condition.  So that there's some level of active treatment

20  happening.

21  **Q.**  Looking at paragraph 8, it reads (reading):

22       "Measurable and realistic progress has occurred or

23       there is clear and convincing evidence that continued

24       treatment at this level is required to prevent acute

25       deterioration or exacerbation that would then require a

1    higher level of care.  Lack of progress is being addressed

2    by an appropriate change in the treatment plan or other

3    intervention to engage the member."

4    What is "measurable and realistic progress"?

5    **A.**    Again, it's related to language we've talked about before

6    where you have a treatment plan that sets out goals and

7    measurable improvement in a -- reasonable and measurable

8    improvement in a certain space of time.  So that would be what

9    that refers to here.

10   **Q.**    And then it says (reading):

11        "Measurable and realistic progress has occurred or

12        there is clear and compelling evidence that continued

13        treatment at this level of care is required to prevent

14        acute deterioration or exacerbation that would then

15        require a higher level of care."

16   What does "clear and compelling evidence" refer to?

17   **A.**    Again, that there's been some indication -- and I think I

18   gave some examples before, you know, someone's in a 24-hour

19   level of care and they have a long history of not functioning

20   well outside of structure like that, or they've tried them on a

21   pass and they've demonstrated clearly that they continue to

22   need the structure.  So -- and, that, again, is that the

23   evidence is not just theoretical; that, yeah, we know that this

24   illness, you know, tends to relapse but that this person, you

25   know, with all we know about him and his history and his

1    current condition is likely to relapse.

2    **Q.**   Now, was "clear and compelling evidence," that language,

3    taken out of the guidelines after 2011?

4    **A.**   Yes, it was.

5    **Q.**   In your experience and your opinion, were the guidelines

6    more restrictive in 2011 because they included that term as

7    opposed to later years?

8    **A.**   No.  The same clinical judgment applied when we were

9    getting the clinical information from the provider and we made

10   the same clinical judgments.

11   **Q.**   Let's turn to the 2012 guidelines, Exhibit 2.

12   **A.**   (Witness examines document.)

13   **Q.**   And if I can direct your attention to pages 6 and 7,

14   Dr. Martorana.

15   **A.**   Yes.

16   **Q.**   Are these the common criteria for the 2012 Level of Care

17   Guidelines?

18   **A.**   They are.

19   **Q.**   And are these similar in format to 2011 in that common

20   criteria or separate and continued service criteria are

21   somewhere else in the guidelines?

22   **A.**   That's correct, yes.

23   **Q.**   And also the clinical best practices section that we

24   looked at for the later years, is that something that is

25   included in the common criteria?

1    A.    Yes.

2    Q.    Where is it in the common criteria for 2012?

3    A.    Mostly in Number 2 where it discusses what's expected for

4    thorough initial evaluation so that we can make a determination

5    of coverage.

6    Q.    And do the items listed in Number 2 take into account

7    comorbid and co-occurring conditions?

8    A.    Yes, it does.

9    Q.    Where is that?

10   A.    Let's see, now it's letter C, so it talks about the

11   psychiatric medical history, substance abuse history, prior

12   history of treatment.  All would fall under that category.

13   Q.    If you can look at paragraph 6, please, of the 2012 common

14   criteria on page 7.

15   A.    (Witness examines document.)

16   Q.    It reads (reading):

17             "There must be a reasonable expectation that

18        essential and appropriate services will improve the

19        member's presenting problems within a reasonable period of

20        time.  Improvement of the member's condition is indicated

21        by the reduction or control of the acute symptoms that

22        necessitated treatment in a level of care.  Improvement in

23        this context is measured by weighing the effectiveness of

24        treatment against the evidence that the member's condition

25        will deteriorate if treatment is discontinued in the

1      current level of care.  Improvement must also be

2      understood within the framework of the member's broader

3      recovery goals."

4      Does your earlier discussion about what it means for there

5  to be a reasonable expectation that services will improve a

6  member's presenting problems in a reasonable period of time in

7  the context of other Level of Care Guidelines apply here as

8  well.

9  A.   Yes.

10 Q.   And the sentence that reads -- it's the second sentence of

11 paragraph 6 -- "Improvement of the member's condition is

12 indicated by the reduction or control of the acute symptoms

13 that necessitated treatment in a level of care," what does that

14 mean?

15 A.   That's one indication of improvement according to this

16 criteria, and so you would be looking at the symptoms that

17 brought them into treatment that required this level of care,

18 and you want to see some reduction in the symptomatology.  That

19 would be one way to define "improvement."

20 Q.   And in this paragraph is improvement only indicated by a

21 reduction or control of the acute symptoms that necessitated

22 treatment in a level of care?

23 A.   No.  As in other language we've seen that's similar,

24 improvement is also considered when the member is likely to

25 deteriorate if not for this level of care or this treatment

1    plan.

2    **Q.**    If you can look at paragraph 7, please.

3    **A.**    (Witness examines document.)  Yes.

4    **Q.**    It reads (reading):

5              "The goal of treatment is to improve the member's

6         presenting symptoms to the point that treatment and the

7         current level of care is no longer required."

8         Have we seen this language before and discussed it?

9    **A.**    Yes.

10   **Q.**    And as we've discussed, does this mean that once the

11   presenting symptoms are improved, no care is covered?

12   **A.**    That's not what this says, no.

13   **Q.**    And does this provision mean that coverage is provided

14   only for crises?

15   **A.**    No.

16   **Q.**    Looking at paragraph 8, please, of these common criteria.

17   **A.**    (Witness examines document.)

18   **Q.**    It reads (reading):

19             "Treatment is not primarily for the purpose of

20        providing respite for the family, increasing the member's

21        social activity, or for addressing antisocial behavior or

22        legal problems, but is for the active treatment of a

23        behavioral health condition."

24        Is this language the same language we discussed in 2011

25   common criteria?

1   A.   Yes.

2   Q.   Looking at paragraph 10, please.

3   A.   (Witness examines document.)

4   Q.   It reads (reading):

5            "The treatment plan stems from the member's

6        presenting condition and clearly documents realistic and

7        measurable treatment goals as well as the treatments that

8        will be used to achieve the goals of treatment.  The

9        treatment plan also considers the following..."

10       The section that I just read, what does that mean?

11   A.   This, again, highlights what basic good clinical treatment

12  is in regard to the treatment plan so that a good treatment

13  plan would be taking into account the member's presenting

14  condition and the factors that require this level of care,

15  setting specific goals for improvement, they're measurable and

16  specific interventions, and then would obviously adjust them as

17  time went on if the member improved, didn't improve, or got

18  worse.

19   Q.   Does this guideline disallow inclusion of nonacute,

20  nonpresenting chronic conditions in the treatment plan?

21   A.   No.  Good clinical judgment and treatment planning

22  includes all the factors that may have bearing on the member's

23  condition and the treatment of the condition.  So you would

24  treat someone differently who's got an acute exacerbation of a

25  chronic illness versus just an acute set of symptoms.

1   **Q.**   Turning to the continued service criteria for 2012 on

2   page 82, please.

3   **A.**   (Witness examines document.)

4          **THE COURT:**  Find a space.  It's 4:00 o'clock.

5          **MS. ROMANO:**  Did you say "Find a space"?

6          **THE COURT:**  Yes.

7          **MS. ROMANO:**  I've got two paragraphs here, and then

8   perhaps we end before we go into 2013?

9          **THE COURT:**  Great.

10          **MS. ROMANO:**  Okay.

11          **THE WITNESS:**  I'm sorry.  What page are we on?

12   **BY MS. ROMANO:**

13   **Q.**   Yes.  Page 82.

14   **A.**   (Witness examines document.)

15   **Q.**   If you can take a look -- well, are these the continued

16   service criteria for 2012?

17   **A.**   Yes, they are.

18   **Q.**   Directing your attention to paragraph 5, please, it reads

19   (reading):

20          "There continues to be evidence that the member is

21       receiving active treatment and there continues to be a

22       reasonable expectation that the member's condition will

23       improve further.  Lack of progress is being addressed by

24       an appropriate change in the member's treatment plan

25       and/or an intervention to engage the member in treatment."

1    What does this paragraph mean?

2   **A.**   So it allows the expectation of good clinical treatment,

3   that active treatment is occurring, that they're getting

4   treatment that's expected to improve their condition; and if

5   they're not, that the treatment plan is being changed and

6   modified to address all that.

7   **Q.**   What does "improvement" or the word "improve" mean in this

8   paragraph?

9   **A.**   That would mean that the member's -- the problems that

10  have been identified have decreased in a measurable fashion.

11  **Q.**   Would prevention of deterioration be a part of the

12  consideration here as well?

13  **A.**   Yes.

14  **Q.**   And if you can turn to paragraph -- or look at

15  paragraph 6, please.

16  **A.**   That's where that is, right, what you just said.

17  **Q.**   If you could look at paragraph 6, please, it says

18  (reading):

19        "The member's current symptoms and/or history provide

20        evidence that relapse or a significant deterioration in

21        functioning would be imminent if the member was

22        transitioned to a lower level of care in the case of

23        outpatient care" -- excuse me -- "or, in the case of

24        outpatient care, was discharged."

25  And I think I just cut you off, Dr. Martorana.  You said

1  something about, "Well, that's in that paragraph."  So let me

2  ask you.  What did you mean by that?

3  **A.**   Well, you were talking about maintaining someone when

4  there's an indication that they may deteriorate without the

5  level of care, and that was in 6 but not in 5 that we were

6  starting to look at.

7  **Q.**   Right.  And paragraph 6 includes the word "imminent," that

8  "Significant deterioration in functioning would be imminent if

9  the member was transitioned to a lower level of care or, in the

10 case of outpatient care, was discharged."  What does the word

11 "imminent" mean there?

12 **A.**   It means in a short amount of time.

13 **Q.**   And why is the word "imminent" included there?

14 **A.**   As we discussed before, there's -- relapse is a common

15 feature of psychiatric and substance abuse treatment, so

16 there's an expectation that there's a high likelihood that

17 someone will relapse at some point in time.  So -- but if

18 you're making a level-of-care determination that continued care

19 must be in this level of care, then really the risk should be

20 near time rather than somewhere down the road and an indefinite

21 time.

22     **MS. ROMANO:**  This is a good spot for a break,

23 Your Honor.

24     **THE COURT:**  Great.  Anything we should talk about

25 before we adjourn for the day?

1   **MS. ROMANO:**  (Shakes head.)

2       **THE COURT:**  Okay, great.

3   All right.  See you tomorrow.

4       **MS. ROMANO:**  Thank you.

5           (Proceedings adjourned at 4:07 p.m.)

6   (Proceedings to resume on Wednesday, October 25, 2017.)

7                   -  -  -  -

8               CERTIFICATE OF REPORTERS

9       We certify that the foregoing is a correct transcript

10  from the record of proceedings in the above-entitled matter.

11

12  DATE:   Tuesday, October 24, 2017

13

14

15

16  _____

17  Katherine Powell Sullivan, CSR #5812, RMR, CRR
              U.S. Court Reporter

18

19

20

21  _____

22      Jo Ann Bryce, CSR #3321, RMR, CRR
              U.S. Court Reporter

23

24

25