UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JOSEPH C. SPERO, MAGISTRATE JUDGE

DAVID AND NATASHA WIT, et al., )
                          )
        Plaintiffs,     )
                          )
  VS.                      )    **No. C 14-2346 JCS**
                          )
UNITED BEHAVIORAL HEALTH,     )
                          )
        Defendant.      )
_____ )    San Francisco, California
                                 Wednesday, October 25, 2017

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:          ZUCKERMAN SPAEDER LLP
                         1800 M Street, NW, Suite 1000
                         Washington, DC  20036-5807
           **BY: CARL S. KRAVITZ, ESQUIRE**
                **CAROLINE E. REYNOLDS, ESQUIRE**
                **AITAN D. GOELMAN, ESQUIRE**

                         ZUCKERMAN SPAEDER LLP
                         485 Madison Avenue, 10th Floor
                         New York, New York 10022
           **BY: JASON S. COWART, ESQUIRE**

(Appearances continued on next page)

Reported By:     Katherine Powell Sullivan, CSR #5812, RMR, CRR
               Jo Ann Bryce, CSR #3321, RMR, CRR
               Official Reporters - U.S. District Court

**APPEARANCES (CONTINUED):**

For Plaintiffs:        ZUCKERMAN SPAEDER LLP
100 East Pratt Street, Suite 2440
Baltimore, Maryland 21202-1031
        BY: **ADAM ABELSON, ESQUIRE**

THE MAUL FIRM, P.C.
101 Broadway, Suite 3A
Oakland, California 94607
        BY: **ANTHONY F. MAUL, ESQUIRE**

PSYCH APPEAL
8560 Sunset Boulevard, Suite 500
West Hollywood, California 90069
        BY: **MEIRAM BENDAT, ESQUIRE**

For Defendant:        CROWELL & MORING LLP
515 South Flower Street, 40th Floor
Los Angeles, California 90071-2258
        BY: **JEFFREY H. RUTHERFORD, ESQUIRE**
**JENNIFER S. ROMANO, ESQUIRE**
**ANDREW HOLMER, ESQUIRE**

CROWELL & MORING LLP
3 Embarcadero Center, 26th Floor
San Francisco, California 94111
        BY: **NATHANIEL P. BUALAT, ESQUIRE**

CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595
        BY: **APRIL N. ROSS, ESQUIRE**

<u>**I N D E X**</u>

Wednesday, October 25, 2017 - Volume 6

| <u>**DEFENDANT'S WITNESSES**</u> | <u>**PAGE**</u> | <u>**VOL.**</u> |
|---|---|---|
| <u>**MARTORANA, ANDREW (RECALLED)**</u> | | |
| (PREVIOUSLY SWORN) | 1052 | 6 |
| Direct Examination resumed by Ms. Romano | 1052 | 6 |
| Cross-Examination by Ms. Reynolds | 1100 | 6 |
| Redirect Examination by Ms. Romano | 1137 | 6 |
| | | |
| <u>**SIMPATICO, THOMAS**</u> | | |
| (SWORN) | 1141 | 6 |
| Direct Examination by Ms. Romano | 1141 | 6 |
| Direct Examination resumed by Ms. Romano | 1204 | 6 |

<u>**E X H I B I T S**</u>

| <u>**TRIAL EXHIBITS**</u> | <u>**IDEN**</u> | <u>**EVID**</u> | <u>**VOL.**</u> |
|---|---|---|---|
| 537 | | 1133 | 6 |
| 662 | | 1157 | 6 |
| 673 | | 1121 | 6 |
| 783 | | 1124 | 6 |
| 1395 | | 1159 | 6 |

<u>**Wednesday - October 25, 2017**</u>                    <u>**8:32 a.m.**</u>

<u>**P R O C E E D I N G S**</u>

**---oOo---**

THE CLERK:  So we are calling Case Number C 14-2346,

Wit/Alexander versus UBH.

And appearances, please.

THE COURT:  Everybody's here.

THE CLERK:  Everybody's here.  Never mind.  Sorry.

It's just automatic mode that I go into.  Never mind.

You're back with direct; correct?

MS. ROMANO:  Yes.  We're proceeding with the direct

examination of Dr. Andy Martorana.

THE COURT:  Right.  Perfect.

<u>**ANDREW MARTORANA**</u>,

called as a witness for the Defendant, having been previously

duly sworn, testified further as follows:

THE CLERK:  And, Dr. Martorana, just to remind you,

you're still under oath.

THE WITNESS:  Thank you.

Just let me shut my phone off.

<u>**DIRECT EXAMINATION**</u>  (resumed)

BY MS. ROMANO:

Q.   Good morning, Mr. -- excuse me -- Dr. Martorana.

A.   Good morning.

Q.   When we broke last evening, we were just turning to the

1    2013 Level of Care Guidelines.  I'm going to ask you to please

2    turn to Exhibit 3 in the guideline binder in front of you.

3    **A.**    (Witness examines document.)

4    **Q.**    Exhibit 3 has already been admitted into evidence.

5        Dr. Martorana, are these the 2013 Level of Care

6    Guidelines?

7    **A.**    Yes, they are.

8    **Q.**    If you can please turn to page 7 of the guidelines.

9    **A.**    (Witness examines document.)

10   **Q.**    Start on 6, if you will.

11       Do the common criteria for the 2013 guidelines begin on

12   page 6?

13   **A.**    (Witness examines document.)

14   **Q.**    I'm sorry, 7.  I'm using the internal pages.  Apologies.

15       So looking down at the trial exhibit numbers, page 7, is

16   that where the common criteria begin?

17   **A.**    Yes.

18   **Q.**    Okay.  And if you can please look to paragraph 3 of the

19   common criteria for 2013 --

20   **A.**    Yes.

21   **Q.**    -- where it reads (reading):

22           "The provider collects information from the member

23       and, when appropriate, other sources to complete an

24       initial evaluation of the following..."

25       Is this the section that reflects the clinical best

1  practices that you've described in prior versions of the

2  guidelines?

3  A.    Yes.

4  Q.    And looking at item A there, it reads (reading):

5             "The member's chief complaint presenting problem and

6        the events which precipitated the request for service at

7        this particular point, i.e., the 'why now.'"

8        Now, is this the first reference in time to the language

9  "why now" in the UBH guidelines?

10 A.    Yes.

11 Q.    And what does "why now" mean here?

12 A.    Well, "why now" is a method of organizing clinical

13 thinking.  So instead of saying "the presenting problem" or

14 "the precipitating event," they really want to focus people

15 more on thinking about the whole person and everything they're

16 bringing to the point of request for this level of care, the

17 "why now."  Why are you here now?

18 Q.    And how did this term "why now" come to be in the UBH

19 common criteria in 2013?

20 A.    I believe it was Dr. Bill Bonfield's -- part of his vision

21 in terms of where he wanted us to move in terms of clinical

22 thinking.

23 Q.    And who is Dr. Bonfield?

24 A.    At the time he was chief medical officer.

25 Q.    Is Dr. Bonfield still at UBH?

1   **A.**   No, he's not.

2   **Q.**   When did he leave?

3   **A.**   He retired earlier this year.

4   **Q.**   Approximately when?

5   **A.**   March-April, I think.  Maybe May.

6   **Q.**   And if you could turn, please, to paragraph 7 of the

7   common criteria located on page 8 of the 2013 guidelines.

8   **A.**   Yes.

9   **Q.**   And there is language relating to expectation of

10  improvement.  Is this the same language -- excuse me.

11       Is this the same language that we've discussed previously

12  in early versions of the guidelines?

13  **A.**   It is.

14  **Q.**   And are your comments with respect to the meaning of this

15  language the same as they were for the prior versions?

16  **A.**   They are.

17  **Q.**   And now looking at paragraph 9, please (reading):

18           "Treatment is not primarily for the purpose of

19           providing respite for the family, increasing the member's

20           social activity, or for addressing antisocial behavior or

21           legal problems, but is for the active treatment of a

22           behavioral health condition."

23       And, again, is this the same language we've discussed in

24  earlier versions of the guidelines?

25  **A.**   Yes.

1    **Q.**   And are your comments with respect to its meaning and its

2    purpose the same as you've already testified?

3    **A.**   Yes.

4    **Q.**   If you can please turn to the continued service criteria

5    on page 89 of the 2013 Level of Care Guidelines.

6    **A.**   (Witness examines document.)   Yes.

7    **Q.**   I can direct your attention to paragraphs 5 and 6 and ask

8    you if this is the same language that you've already addressed

9    and discussed in testimony relating to earlier versions of the

10   guidelines?

11   **A.**   It is.

12   **Q.**   I'll now ask you to please turn to Exhibit 4, which is the

13   2014 Level of Care Guidelines.   It's already been admitted into

14   evidence.

15   **A.**   (Witness examines document.)

16   **Q.**   Are these the 2014 guidelines, Dr. Martorana?

17   **A.**   Yes, they are.

18   **Q.**   Are they in a different format this year?

19   **A.**   Yes.   They're in landscape and then organized into columns

20   as well.

21   **Q.**   And in your opinion did the guidelines become more

22   restrictive in 2014?

23   **A.**   No.

24   **Q.**   If I can direct your attention, please, to page 7 of this

25   exhibit.

1   **A.**   (Witness examines document.)  Yes.

2   **Q.**   And can you explain briefly the formatting here and the

3   way that the guidelines -- or the common criteria are laid out

4   this year?

5   **A.**   Yes.  There's -- on the one side there's the level of care

6   criteria, and so they have the admission, continued service,

7   and discharge criteria in separate columns side by side.

8       And then this year they pulled out some of the things we

9   had seen in common criteria and put them in the clinical best

10  practices in the right-hand columns -- evaluation, treatment

11  planning, and then discharge planning -- side by side.

12  **Q.**   Directing your attention to the left-hand column on page 7

13  under the heading "Admission," and specifically the second

14  black bullet point there where it says (reading):

15          "The member's current condition be safely,

16      efficiently, and effectively assessed and/or treated in a

17      less intensive setting due to acute changes in the

18      member's signs and symptoms and/or psychosocial and

19      environmental factors, i.e., the 'why now' factors leading

20      to admission."

21      What are acute changes in the member's signs and systems

22  and/or psychosocial and environmental factors in this

23  guideline?

24  **A.**   Similarly as in prior guidelines, acute changes have to do

25  with recent and significant differences from the -- in the

1  patient's condition from their normal baseline condition.

2      And then, as also discussed, psychosocial and

3  environmental factors, environmental factors have to do with,

4  you know, where the person lives and whether they can support

5  themselves; and then psychosocial has to do with their

6  relationships and family and education and all that I talked

7  about before.

8  Q.   And you said you talked about it before, and I want to

9  clarify.

10     This language "acute changes in the signs and symptoms

11  and/or psychosocial and environmental factors," did it appear

12  in earlier years of these guidelines before 2014?

13  A.   No.  We talked about it in the 2017 because we started

14  with that one.

15  Q.   And this provision that we've just read, does it exclude

16  consideration of chronic conditions?

17  A.   No.

18  Q.   In your experience, is it typical for members who are

19  being admitted into any level of care to have an acute change

20  that brings them into treatment?

21  A.   Yes, that's very typical.  Something has to happen in

22  order to bring the member to treatment when they haven't been

23  there before.  So it can be an external factor.  It could be an

24  exacerbation of their illness.  It could be an internal factor,

25  they've decided now's the time.  So...

1  Q.   When you say "external factor," what do you mean?

2  A.   Well, like, they suddenly become homeless or they lost

3  their job, for instance.

4  Q.   And what would an internal factor be?

5  A.   An internal factor would be that, you know, the person's

6  been hanging on, coping all this time and finally they decide

7  that they can't take it anymore and initiate treatment.  I

8  think someone else mentioned sick and tired of being sick and

9  tired.

10 Q.   And are all of these examples of acute changes that would

11 be considered as part of the guideline provision we described?

12 A.   Yes.

13 Q.   Looking at the subbullet here, it says just underneath

14 that language (reading):

15      "Failure of treatment in a lower level of care is not

16      a prerequisite for authorizing coverage."

17 I believe we talked a little bit about fail-first

18 requirement yesterday.  What is the purpose of this language

19 here that I just read?

20 A.   Well, this is to make an affirmative statement saying that

21 nothing in this policy really has anything to do with fail

22 first.

23 Q.   Was there a fail-first requirement prior to the addition

24 of this language?

25 A.   No.  This is an affirmative statement stating this but it

1    was not there before.

2    **Q.**    Please turn to page 9 of this exhibit.

3    **A.**    (Witness examines document.)

4    **Q.**    And I'd like to direct your attention to the first black

5    bullet point on page 9 --

6    **A.**    Yes.

7    **Q.**    -- where it reads (reading):

8           "There is a reasonable expectation that services will

9           improve the member's presenting problems within a

10          reasonable period of time.  Improvement of the member's

11          condition is indicated by the reduction and control of the

12          acute signs and symptoms that necessitated treatment in a

13          level of care."

14   And then it goes on to speak about (reading):

15          "Improvement in this context is measured by weighing

16          the effectiveness of treatment against evidence that the

17          member's signs and symptoms will deteriorate if treatment

18          in the current level of care ends.  Improvement must also

19          be understood within the broader framework of the member's

20          recovery and resiliency goals."

21   Is this language that we've already discussed with respect

22   to improvement?

23   **A.**    Yes, it is.

24   **Q.**    And are your comments the same with respect to the meaning

25   of that language?

1   **A.**   Yes, they are.

2   **Q.**   And now turning to page 10 of the 2014 guidelines and the

3   bottom bullet point there where it reads (reading):

4           "Treatment is not primarily for the purpose of

5           providing social, custodial, recreational, or respite

6           care."

7           Again, is this the same language you've already discussed

8   with respect to earlier guidelines?

9   **A.**   Yes.

10  **Q.**   Now, turning up to -- back to page 7 of the 2014

11  guidelines and now looking at the "Continued Service" column.

12  **A.**   (Witness examines document.)

13  **Q.**   Can I direct your attention to the first black bullet

14  point where it reads (reading):

15          "The admission criteria are still met and active

16          treatment is being delivered.  For treatment to be

17          considered active, treatment services must be..."

18          And then there are two bullet points under that (reading):

19              "Supervised and evaluated by the admitting provider.

20              "Provided under an individualized treatment plan that

21          is focused on addressing the 'why now' factors and makes

22          use of clinical best practices."

23          And if you can turn to the next page, there's a third

24  point there (reading):

25              "Reasonably expected to stabilize the member's

1    condition and/or the precipitating 'why now' factors

2    within a reasonable period of time."

3    Why is this provision that I've just read included in the

4 guidelines?

5 **A.**   Well, it's similar to previous language that was placed in

6 there, that we wanted to define what "active treatment" was,

7 inserted "why now" language at the same time.  And the active

8 treatment language is similar to what is -- it's based on

9 what's in the Medicare guidelines.

10 **Q.**   Now, there is some additional language here relating to

11 "why now" beginning in 2014, and let me point out where that

12 is, Dr. Martorana.  If you look at page 7 at the second white

13 bullet point, it says (reading):

14    "It's focused on addressing the 'why now' factors and

15    makes use of clinical best practices."

16    Why is there a reference to the "why now" factors here?

17 **A.**   Well, it includes all the -- the way the previous language

18 referred to the conditions that brought you to this level of

19 care.  The "why now" is now they're promoting this as an

20 organizing principle to approach the same data that you're

21 getting, but to really remind them to consider all the things

22 that brought an individual to this point in time.

23 **Q.**   Does inclusion of the "why now" language here make the

24 guideline more restrictive than prior years?

25 **A.**   No.  It's the same thought process except it's calling out

1   something that's, you know, common in the treatment literature

2   focusing on the consumer-centric care, the whole person, those

3   kinds of concepts.

4   **Q.**   What do you mean by consumer-centric care?

5   **A.**   That means to -- as opposed to the traditional medical

6   style model where someone comes in and says, "This is what's

7   bothering me," and the doctor tells them what's wrong with them

8   and what they're going to do to make them better, the

9   consumer-centric care puts the consumer first.

10       And while they take all this information, what they want

11  to know from the consumer is, "What do you think?  What do you

12  want to be different?  What level of functioning do you want at

13  the end of this treatment?"  So it really does focus on what

14  they want.

15  **Q.**   Staying on page 8 -- or maybe it's turning to page 8 -- at

16  the top white bullet point (reading):

17           "Reasonably expected to stabilize the member's

18           condition and/or precipitating 'why now' factors within a

19           reasonable period of time."

20       You've testified earlier about the meaning of "reasonable

21  period of time."  Is your testimony the same with respect to

22  that language in this provision?

23  **A.**   Yes.

24  **Q.**   And then the "why now" factors, that language is also

25  included in this bullet point.  Did inclusion of "why now" here

1  make that provision more restrictive?

2  A.   No, it did not.

3  Q.   Turning your attention now to the discharge criteria in

4  2014.  If you can go back up to page 7.

5  A.   (Witness examines document.)

6  Q.   Under "Discharge" column, it reads (reading):

7       "The continued stay criteria are no longer met.

8       Examples include the 'why now' factors which led to

9       admission have been addressed to the extent that the

10      member can be safely transitioned to a less intensive

11      level of care or no longer requires treatment."

12      Under this guideline, what happens if the "why now"

13 factors have been addressed and a less intensive level of care

14 would be safe but the less intensive care would not be

15 effective to address new symptoms or conditions?

16 A.   Then the other level of care that's being suggested, the

17 member's condition wouldn't meet the criteria for admission if

18 everything is that -- if the member's treatment is less

19 effective or efficient.

20 Q.   And what, then, would be the case?

21 A.   Then we would need to continue treatment in the current

22 level until it was or there's a different treatment plan being

23 proposed that would be equally effective and efficient in the

24 lower level of care.

25 Q.   Turning to page 8 of these 2014 guidelines staying under

1    the "Discharge" column, the bottom bullet here says (reading):

2         "The member is unwilling or unable to participate in

3    treatment and involuntary treatment or guardianship is not

4    being pursued."

5    Is this language that you've already addressed in prior

6    versions of the guidelines?

7    A.   Yes.

8    Q.   If I can now direct your attention to the "Clinical Best

9    Practices" section.

10   A.   Yes.

11   Q.   Now, these are in a different place or different style for

12   these guidelines.  Can you explain the purpose of the "Clinical

13   Best Practices" section for 2014?

14   A.   Well, similarly to the discussion about 2017, this is

15   the -- this is what we hold our providers to in terms of

16   gathering information, which is what we would consider standard

17   of care, that needs to be considered and used in, number one,

18   making a diagnosis; and, number two, making -- constructing the

19   treatment plan.  And from this they communicate this to us, and

20   we use that to determine whether the treatment should be

21   covered.

22   Q.   If I can direct your attention to page 9, the last black

23   bullet point reads (reading):

24        "The provider and, whenever possible, the member use

25    the findings of the initial evaluation and the diagnosis

1       to develop a treatment plan.  The treatment plan should

2       address" -- and I want to focus your attention on the

3       white bullet point at the top of page 10 -- "should

4       address the expected outcome for each problem to be

5       addressed expressed in terms that are measurable,

6       functional, time framed, and directly related to the 'why

7       now' factors."

8       Now, you've addressed similar language in prior

9  guidelines, but I want to ask you specifically about the new

10  language that says "and directly related to the 'why now'

11  factors."  Why is that included?

12  **A.**    Well, again, as I talked about, the "why now" factors we

13  believe were important -- it was important to organize the

14  information you were getting around the concept of "why now,"

15  which would include all the things we had talked about

16  before -- before they included "why now."  So -- but in a more

17  holistic way, I would say.

18  **Q.**    What do you mean by "more holistic way"?

19  **A.**    To take into consideration the person as a whole; that,

20  you know, they're not just a symptom.  They're not just a

21  diagnosis.  They're a person with all these things that's

22  happened to them in their whole life that brought them to this

23  point in time asking for help.

24  **Q.**    Now moving to page 11 in the bottom bullet point on

25  page 11 under the "Clinical Best Practices Evaluation and

1  Treatment Planning" column.  Do you see where I am?

2  A.  Yes.

3  Q.  It reads (reading):

4      "Treatment focuses on addressing the 'why now'

5      factors to the point that the member's condition can be

6      safely, efficiently, and effectively treated in a less

7      intensive level of care or treatment is no longer

8      required."

9      Here there is a reference to "safely, efficiently, and

10  effectively."  Is there a reason why all three of those are

11  included here?

12  A.  Well, that was the intent all along, that we wanted to

13  make sure that treatment being provided to members had all

14  those attributes and could be provided in the least restrictive

15  setting that made sense.

16  Q.  Can you please turn to Exhibit 5 now?

17  A.  (Witness examines document.)

18  Q.  Exhibit 5 has already been admitted into evidence.  What

19  is it, Dr. Martorana?

20  A.  This is the 2015 Level of Care Guidelines for UBH.

21  Q.  And we're back to a different format from 2014?

22  A.  Yes.  They went back to the more traditional format.

23  Q.  If I can direct your attention, please, to page 8.

24  A.  (Witness examines document.)

25  Q.  Are these the common criteria and clinical best practices

1   for all levels of care for 2015?

2   A.   Yes, they are.

3   Q.   Please take a look at provision 1.4 (reading):

4        "The member's current condition cannot be safely,

5        efficiently, and effectively assessed and/or treated in a

6        less intensive level of care due to acute changes in the

7        member's signs and symptoms and/or psychosocial and

8        environmental factors, i.e., the 'why now' factors,

9        leading to admission."

10   Is this the same language that we just went over in the

11   2014 guidelines?

12   A.   Yes, it is.

13   Q.   There is now an addition, additional language here at 1.5

14   reading (reading):

15        "The member's current condition can be safely,

16        efficiently, and effectively assessed and/or treated in

17        the proposed level of care.  Assessment and/or treatment

18        of acute changes in the member's signs and symptoms and/or

19        psychosocial and environmental factors, i.e., the 'why

20        now' factors leading to admission, require the intensity

21        of services provided in the proposed level of care."

22   How do 1.4 and 1.5 work together, if at all?

23   A.   We've had discussion about similar language, and basically

24   there's two clinical thought processes involved.  When

25   someone's asking for a level -- particular level of care, one,

1   can the person be safely, effect effectively, and efficiently

2   treated in that level of care; and if not, then we have to

3   think about where they should be, for instance, a higher level

4   of care.

5       And then the flip side of that is that, well, can they --

6   can all this happen in a less restrictive, less intensive level

7   of care, which is always the preference when thinking about

8   treating people.

9       And so those two go hand in hand like that.

10  **Q.**   Does there have to be a crisis for coverage to apply based

11  on paragraphs 1.4 and 1.5 of this guideline?

12  **A.**   No.   The member's condition needs to be treated with that

13  intensity of service.   That's what needs to be there.   It

14  doesn't have to be a crisis.

15  **Q.**   Looking at paragraph 1.6 of this guideline, it reads

16  (reading):

17          "Co-occurring behavioral health and medical

18          conditions can be safely managed."

19      Is this the language that we already saw in the 2017

20  guidelines and addressed?

21  **A.**   Yes, it is.

22  **Q.**   And your comments are the same as they were with 2017?

23  **A.**   It is.

24  **Q.**   Turning to 1.8, please.   If you can just look at 1.8 and

25  let me know, is it the same language that we've already

1  discussed in other years' guidelines relating to improvement?

2  A.   Yes, it is.

3  Q.   Are your comments the same with respect to what you've

4  already testified?

5  A.   Yes.

6  Q.   Now, looking at the continued service criteria on page 9.

7  Looking at 2.1 first of all, is this the same language that

8  you've already addressed relating to continued service in

9  Section 2.1, 2.12, and 2.13?

10  A.   Yes, it is.

11  Q.   Now looking at 2.2, it reads (reading):

12       "The 'why now' factors leading to admission have been

13       identified and are integrated into the treatment and

14       discharge plans."

15  What does this language mean?

16  A.   Similar to other language that talked about factors

17  leading to admission, again this calls the clinician to focus

18  on the member in a total, holistic way to address the problems

19  in the treatment plan, as well as the treatment interventions

20  themselves, and then the discharge plans as well.

21  Q.   And what if new symptoms arise?  How would that be

22  considered under this provision?

23  A.   Well, new symptoms would have to be addressed safely,

24  effectively, and efficiently as well.  We wouldn't ignore them

25  because we understand that that can happen in the course of

1    treatment.

2         We wouldn't, you know, require them to be discharged and

3    then readmitted to the same level of care.  We would use our

4    good clinical judgment and say, "Yes, the person's condition

5    has changed.  These are new problems, but they still require

6    this intensity of service."

7    **Q.**   If you can look down to the discharge criteria on page 9,

8    please.

9    **A.**   (Witness examines document.)

10   **Q.**   Looking at 3.1.1, is this language that you've already

11   addressed in the prior years' guidelines?

12   **A.**   Yes.

13   **Q.**   And turning to the next page, page 10, still in the

14   discharge criteria, 3.1.5 (reading):

15            "The member is unwilling or unable to participate in

16        treatment and involuntary treatment or guardianship is not

17        being pursued."

18        Is this language you've already addressed from prior

19   years' guidelines?

20   **A.**   Yes, it is.

21   **Q.**   Now, the clinical best practices.  Turning your attention

22   to 4.1.4.3.

23   **A.**   Yes.

24   **Q.**   Again, is this language that we addressed in the prior

25   years' guidelines?

1    A.    It is.

2    Q.    And now 4.1.7?

3    A.    Yes.

4    Q.    Is this also language that you've already addressed in

5    prior years' guidelines?

6    A.    Yes, it is.

7    Q.    Moving along to 2016 Level of Care Guidelines, Exhibit 6.

8          And, Dr. Martorana, can you also look at Exhibit 7?

9          Are these -- are you able to look at them at the same

10   time, the cover pages?

11   A.    Yes.

12   Q.    Are these both Level of Care Guidelines that were used in

13   2016?

14   A.    Right.  The first one was the one that was approved for

15   use starting the beginning of the year, January 2016, and then

16   the second one is the one that was revised for middle of the

17   year starting in June.

18   Q.    And to your knowledge are any of the provisions that we've

19   been discussing here today, were they revised between January

20   and June of that year?

21   A.    Not to my knowledge, no.

22   Q.    Okay.  Let's start with Exhibit 6, which is the

23   January 2016 guidelines.  Page 9 of Exhibit 6, please.

24   A.    (Witness examines document.)

25   Q.    Can you look at provisions 1.4, 1.5, and 1.6?

1  A.   Yes.

2  Q.   Do all of these provisions contain the same language that

3  you've already addressed and explained the meaning of from

4  prior years' guidelines?

5  A.   Yes, they do.

6  Q.   Turning the page to page 10, looking at 1.8, including

7  1.81 and 1.82, is this, again, language that was in prior

8  years' guidelines that you've already addressed in your

9  testimony?

10  A.   Yes.

11  Q.   Looking at the continued service criteria 2.1, including

12  its subparts, and 2.2, is this language you've already

13  addressed in prior years' guidelines?

14  A.   Yes, they are.

15  Q.   And now the discharge criteria -- specifically 3.1, 3.11,

16  3.12, and 3.1.5 -- is this language you've addressed in prior

17  years' guidelines as well?

18  A.   Yes.

19  Q.   And turning to the clinical best practices sections

20  4.1.4.3 on page 12 --

21  A.   Yes.

22  Q.   -- and 4.1.7 on page 13 --

23  A.   Yes.

24  Q.   -- again, is all of this language that you've addressed

25  from prior years' guidelines?

1   **A.**   It is.

2   **Q.**   Turn to Exhibit 7, please, the June 2016 Level of Care

3   Guidelines.

4   **A.**   (Witness examines document.)

5   **Q.**   Starting on page 9 and looking at provisions 1.4, 1.5, and

6   1.6, is this the same language we just saw in the January

7   guidelines from this year and that you've discussed already?

8   **A.**   Yes.

9   **Q.**   Turning the page to page 10, 1.8 and subparts, is this the

10  same language that you've already addressed?

11  **A.**   Yes.

12  **Q.**   Now, with the continued service criteria, including 2.1

13  and its subparts and 2.2, have you already commented on this

14  language from prior years?

15  **A.**   Yes.

16  **Q.**   And the discharge criteria -- 3.1, 3.1.1, 3.1.2, and

17  3.1.5 -- is this language you've discussed in prior years'

18  guidelines?

19  **A.**   Yes.

20  **Q.**   Dr. Martorana, if you can please turn to Exhibit 221 in

21  the guidelines binder.  It should be the last exhibit in that

22  binder.

23  **A.**   (Witness examines document.)  Yes.

24  **Q.**   This is a different kind of guideline than the ones we've

25  been looking at before?

1  **A.**   It is.

2  **Q.**   What is this?

3  **A.**   This is a custodial care guideline in particular for

4  inpatient residential services.

5  **Q.**   Why does UBH have Custodial Care Coverage Determination

6  Guidelines?

7  **A.**   We use this so it lines up with some of the

8  UnitedHealthcare policies that do not use the terms of medical

9  necessity in their guidelines, and so this -- this lines up

10  with how medical makes their utilization review decisions.

11  They also use Coverage Determination Guidelines as well.

12  **Q.**   Are Coverage Determination Guidelines used for all plans

13  that UBH administers?

14  **A.**   No.

15  **Q.**   Are they used for just the ones you've described?

16  **A.**   Yeah, just the ones that -- that small number, yes.

17  **Q.**   What levels of care do the custodial care guidelines apply

18  to?

19  **A.**   Well, they would apply to any levels of care that have to

20  do with the subject that the Coverage Determination Guidelines

21  is about.  So for this one, this only applies to inpatient

22  residential.  Other ones that are condition specific may

23  consider other levels of care as well.

24  **Q.**   When a Custodial Care Coverage Determination Guideline is

25  used, is that considered a clinical determination?

1    A.    Yes, it is.

2    Q.    And is that opposed to an administrative decision?

3    A.    Correct.

4    Q.    Can you explain the difference?

5    A.    Well, a clinical decision requires clinical judgment to be

6    applied.  So there are some things that are strictly

7    administrative.  Like whether the member is eligible for

8    benefits, and that's not a clinical decision.  It would be an

9    administrative decision.

10        Then there are other considerations where the member's

11    coverage precludes, for instance, custodial care but a

12    clinician has to determine whether the care is custodial or

13    not.  So that would be a clinical decision with all those

14    processes involved.

15    Q.    Is that the case even when custodial care is listed as an

16    exclusion in the benefit plan?

17    A.    Yes, because a nonclinician can't make an assessment as to

18    whether something is custodial or not because the definition of

19    "custodial" is all about the clinical services being done or

20    not done.

21    Q.    Are there other exclusions in the benefit plans that are

22    evaluated as a clinical determination as opposed to an

23    administrative decision?

24    A.    Yes.

25    Q.    Can you give me an example of another type of exclusion

1  that would require a clinical decision?

2  **A.**  I can't offhand.  Sorry.  Yeah, there are others.

3  **Q.**  Do you have any exclusions in the plans that relate to

4  experimental treatment?

5  **A.**  Thank you.

6      Yes.  Those -- those are also specific exclusions but

7  require clinical evaluation and judgment.

8  **Q.**  For a clinical denial or clinical noncoverage

9  determination to be made, who has authority to issue that type

10  of denial?

11  **A.**  The medical director, the peer reviewers.

12  **Q.**  Do care advocates have authority to make a clinical

13  denial?

14  **A.**  No.  Only administrative denials.

15  **Q.**  Sticking with Exhibit 221, please turn to page 4.  There's

16  a second blue bar that says "UnitedHealthcare Benefit Plan

17  Definitions."  Then there's a few different bolded headings

18  (reading):

19          "For plans using 2001 and 2004 generic

20      UnitedHealthcare COC/SPD, unless otherwise specified."

21      The next one is (reading):

22          "For plans using 2007 and 2009 generic

23      UnitedHealthcare COC/SPD, unless otherwise specified."

24      And then (reading):

25          "For plans using 2011 and more recent generic

1    UnitedHealthcare COC/SPD, unless otherwise specified."

2    What do those headings I described refer to?

3 **A.** They're referencing the different UnitedHealthcare

4 language and they start with a generic template and then they

5 may add on to it.  So this would be included in all the generic

6 template for the specified years, and these explain what some

7 of the covered benefits are in relation to the custodial

8 treatment.

9 **Q.** Can you turn to page 2, please, of this exhibit.

10 **A.** (Witness examines document.)

11 **Q.** And directing your attention to the "Instructions for Use"

12 heading, the paragraph right under that starting with the third

13 line (reading):

14    "When deciding coverage, the member's specific

15    benefit plan document must be referenced.  The terms of

16    the member's specific benefit plan document, e.g.,

17    Certificate of Coverage (COC), Schedule of Benefits (SOB),

18    and/or Summary Plan Description (SPD) may differ greatly

19    from the standard benefit plan upon which this coverage

20    determination guideline is based.  In the event of a

21    conflict, the member's specific benefit plan document

22    supersedes this Coverage Determination Guideline."

23    Why does this custodial care guideline include that

24 language?

25 **A.** Because the definitions of "custodial care," which is

1   excluded, that -- come from the plan language, and the customer

2   can change the plan language as they desire.

3   **Q.**   Do the UBH reviewers have access to the plan language?

4   **A.**   Yes.

5   **Q.**   How is that access set up?

6   **A.**   Well, typically it's the care advocate that's looking at

7   the plan language; and then if they need to -- if the reviewer

8   wants to see it, he'll ask the care advocate to pull it for

9   them and it's available.

10      There are summaries that are available that's called IBAG,

11  Internet Benefits At a Glance, and there's a link right out of

12  LINX to get to the member's benefits, and it's a summary.  It

13  has all the highlights in there.

14      And then in addition if there's a question, they can

15  also -- the care advocate can also pull the actual COC or SPD.

16  **Q.**   You said "COC."  Is that Certificate of Coverage?

17  **A.**   Yes.

18  **Q.**   And SPD is what?

19  **A.**   Summary Plan Document.

20  **Q.**   Turning to page 3, please, of this custodial care

21  guideline under "Coverage Rationale."

22  **A.**   Yes.

23  **Q.**   It reads, the first paragraph (reading):

24          "Services provided in psychiatric inpatient and

25      residential treatment settings that are not active and are

1    solely for the purpose of custodial care as defined below

2    are excluded."

3    Is it the case in this guideline that care would be either

4    active treatment or custodial care when it's in a 24-hour

5    setting?

6 **A.**   Yes.  That's generally the thought process.  If you're

7    looking at a member's care and it does not fulfill the

8    definitions of being active care, then what's left that's going

9    on would be custodial if it's in a 24-hour setting.

10 **Q.**   And now looking at the next section, it says (reading):

11        "Custodial care in a psychiatric inpatient or

12        residential setting is any of the following..."

13    Then there's a reference to Certificate of Coverage 2011,

14    and there are three bullet points under that.  Do you know

15    where the language comes from from those three bullet points

16    underneath that sentence?

17 **A.**   It comes from the Certificate of Coverage 2011 that's

18    cited.

19 **Q.**   Now looking at the "Description of Active Treatment," the

20    next paragraph that begins with those words.  It says

21    (reading):

22        "Active treatment in an inpatient or residential

23        treatment setting is a clinical process involving the

24        24-hour care of members that includes assessment,

25        diagnosis, intervention, evaluation of care, treatment and

1            planning for discharge and aftercare under the direction

2            of a psychiatrist that cannot be managed in a less

3            restrictive setting.  Active treatment is indicated by

4            services that are all of the following:

5                  "Supervised and evaluated by a physician.

6                  "Provided under an individualized treatment or

7            diagnostic plan.

8                  "Reasonably expected to improve the member's

9            condition or for the purpose of diagnosis."

10           Do you know where that language comes from?

11    A.     That comes from the CMS Benefit Policy Manual.

12    Q.     If you can pull up the other binder, please, Exhibit 1502.

13    A.     (Witness examines document.)  Yes.

14    Q.     This document has already been admitted into evidence, and

15    I'd like to direct your attention to page 6, please.

16    A.     (Witness examines document.)  Yes.

17    Q.     And before we look at that, I want to ask you about the

18    next paragraph on improvement, please.  Oh, I'm sorry.  No, let

19    me ask you about that first.

20           Looking at page 6, 1502, page 6 --

21    A.     Okay.

22    Q.     -- and there is a section called "Active Treatment."  Do

23    you see that?

24    A.     Yes.

25    Q.     And it says just under that (reading):

1       "For services in an IPF," inpatient psychiatric

2       facility, "to be designated as active treatment, they must

3       be:

4       "Provided under an individualized treatment or

5       diagnostic plan.

6       "Reasonably expected to improve the patient's

7       condition or for the purpose of diagnosis.

8       "Supervised and evaluated by a physician."

9       Is that the language you were referring to?

10  A.   Yes.

11  Q.   And where did this language come from?  What is this

12  document 1502?

13  A.   This is a Local Coverage Determination quoting the

14  Medicare Benefit Policy Manual.

15  Q.   I'm now directing your attention to the "improvement"

16  language on page 3 of the 2000 -- of the custodial care

17  guidelines.

18       And these custodial care guidelines we've been going

19  through, when is their effective date?

20  A.   These were effective March of 2017.

21  Q.   Are these the current Custodial Care Coverage

22  Determination Guidelines?

23  A.   Yes, they are.

24  Q.   Okay.  Now looking at the language of "improvement" on

25  page 3 in the "Coverage Rationale" section, the fourth big

1    paragraph, it reads (reading):

2         "Improvement of the member's condition is indicated

3        by the reduction or control of the acute symptoms that

4        necessitated hospitalization or residential treatment."

5        And then there's a reference to "CMS Psychiatric Inpatient

6    Local Coverage Determinations 2016."  Do you see that?

7    A.    Yes.

8    Q.    Now, the CMS definition does not include the word "acute"

9    in it before "symptoms"; is that right?

10   A.    That's correct.

11   Q.    But UBH did include that language?

12   A.    Yes.

13   Q.    What does "acute symptoms" mean in the language I

14   described from the custodial care guideline?

15   A.    Well, those are the symptoms that have arisen relatively

16   short term as opposed to long-lasting chronic symptoms that

17   should be the focus of treatment when deciding a level of care,

18   whether these symptoms can be addressed properly in the

19   requested level of care.

20   Q.    Is it consistent with generally accepted standards of care

21   to require --

22         THE COURT:  Just a second.  221, page 3.

23        Go ahead.

24   BY MS. ROMANO:

25   Q.    Is it consistent with generally accepted standards of care

1   to require that treatment in residential level of care be

2   designed to reduce or control acute symptoms that necessitated

3   treatment?

4   A.   Yes.

5   Q.   Why?

6   A.   Residential level of care is bringing to bear acute

7   treatment in a restrictive setting.  It's 24-hour supervision.

8   And so the idea would be that you'd like not to be in a 24-hour

9   treatment setting because of the principles we discussed before

10  about least restrictive, so you'd want to address those

11  symptoms that are -- require them to have their treatment in

12  this setting.

13  Q.   Turning to page 5, please, of Exhibit 221, there's a

14  section titled "Evidence-Based Clinical Guidelines."

15  A.   Yes.

16  Q.   And right under that it reads (reading):

17       "Clinical best practice in inpatient and residential

18       settings does not include services that are for the

19       purpose of providing custodial care, respite for the

20       family, increasing social activity, or purely for

21       antisocial or runaway/truancy behavior or legal problems,

22       but is for treatment of a behavioral health condition.  In

23       determining whether a member is receiving custodial care,

24       Optum considers whether..."

25  And there's six bullet points under that.  I want to start

1  by asking you about the third, fourth, and fifth bullet points

2  (reading):

3        "Services are nonhealth related, such as assistance

4     in activities of daily living.  Examples include feeding,

5     dressing, bathing, transferring, and ambulating.

6        "Services are provided for the primary purpose of

7     meeting the personal needs of the patient or maintaining a

8     level of function, even if the specific services are

9     considered to be skilled services as opposed to improving

10    that function to an extent that might allow for more

11    independent existence.

12        "Services require continued administration by trained

13    medical personnel in order to be delivered safely and

14    effectively."

15    Do you know where those three bullet points, the language,

16  comes from?

17  **A.**    That's CMS language.

18  **Q.**    And then the -- is it -- did you say "CMS language"?

19  **A.**    Well, yeah.  I'm sorry.  This actually comes from the plan

20  documents.

21  **Q.**    And then looking at the other three bullet points, the

22  first one is (reading):

23        "The member is receiving active treatment as defined

24     above.

25        "There has been improvement in the member's condition

1    as defined above."

2    And the last one was (reading):

3        "Discharge planning has occurred to prevent custodial

4    care and enable a successful transition to the next-most

5    appropriate level of care."

6    So those last three I just read, are they consistent with

7    generally accepted standards of care?

8  A.    Yes.

9  Q.    Why is that?

10 A.    Well, you would want the treatment to be active and

11 addressing the member's condition.  So if there's no

12 expectation of improvement for whatever reason -- you know, the

13 treatment plan is in effect or what have you -- then there's no

14 expectation of improvement so that's not treatment and that's

15 not the standard of practice.

16    And it also draws attention to discharge planning, which

17 is a key part of treatment planning; and the idea being that if

18 they don't need to be in this restrictive of a setting, then

19 other arrangements should be made.

20 Q.    Okay.  Can I direct your attention, please, to Exhibit 10,

21 which has already been admitted into evidence.

22 A.    (Witness examines document.)  Yes.

23 Q.    What is Exhibit 10?

24 A.    This is the August 2010 Custodial Care and Inpatient

25 Services CDG.

1 **Q.** Is this Custodial Care Coverage Determination Guideline

2 also only applicable to inpatient and residential levels of

3 care?

4 **A.** Yes.

5 **Q.** If you look at page 2, please, at the top there's the word

6 "Product" and then three references to "Generic,

7 UnitedHealthcare, COC/SPD."

8 **A.** Yes.

9 **Q.** What's that a reference to?

10 **A.** As discussed, this only applies to specific

11 UnitedHealthcare coverage documents that don't use the terms

12 "medical necessity." So these only apply to those.

13 **Q.** And then looking at the "Instructions for Use," do the

14 instructions again say that the Coverage Determination

15 Guideline is superseded by the plan if there's a conflict?

16 **A.** Yes.

17 **Q.** And you had described the IBAG system an access to plan

18 documents for reviewers. Has that been the -- that access been

19 available throughout the class period going back to 2011?

20 **A.** Yes.

21 **Q.** Turning to page 3, please, under "Key Points."

22 **A.** (Witness examines document.)

23 **Q.** Under "Active Treatment" it says (reading):

24      "Active treatment in this context is indicated by

25      services that are all of the following..."

1    If you can look at the first three bullets (reading):

2         "Supervised and evaluated by a physician.

3         "Provided under an individualized treatment or

4    diagnostic plan.

5         "Reasonably expected to improve the patient's

6    condition or for the purpose of diagnosis."

7    Do you know where that language comes from?

8  **A.**   That comes from CMS guidelines.

9  **Q.**   And are the two additional bullet points there things that

10   UBH added?

11 **A.**   Yes.

12 **Q.**   (reading)

13         "Unable to be provided in a less restrictive setting

14   and focused on interventions that are based on generally

15   accepted standard medical practice and are known to

16   address the critical presenting problems, psychosocial

17   issues, and stabilize the patient's condition to the

18   extent that they can be safely treated in a lower level of

19   care."

20   What do these last two provisions mean with respect to the

21   definition of "active treatment"?

22 **A.**   Well, part of the decision-making on active treatment is

23   that there may be treatment interventions going on but if they

24   don't require the use of the -- of a restrictive setting, then

25   that would make them not active treatment for these 24-hour

1    levels of care.

2    **Q.**    And is this similar language to what we saw in the Level

3    of Care Guidelines defining "active treatment"?

4    **A.**    Yes.

5    **Q.**    And now looking at the last two bullet points here in the

6    "Key Points" section both relating to improvement, how does UBH

7    assess whether someone is improving under this guideline?

8    **A.**    Well, there's more than one way.  So they're stating that

9    improvement has to do with reducing the symptoms that require

10   them to be in this level of care or that require them to be

11   admitted to this level of care.

12        And then there's also the other side of that where you

13   have to consider clinically whether withdrawing the treatment

14   in this level of care is likely to cause the member to

15   deteriorate and either continue to require this level of care

16   or a higher one.

17   **Q.**    What year was this guideline, Exhibit 10, effective?

18   **A.**    August 2010.

19   **Q.**    Can you turn to Exhibit 47, please.

20   **A.**    (Witness examines document.)

21   **Q.**    Is this another Custodial Care and Inpatient Services

22   Coverage Determination Guideline?

23   **A.**    Yes.

24   **Q.**    And when was it effective?

25   **A.**    This was approved in 2010 and then revised for

1  December 2011.

2  **Q.**  Is it also applicable to the products listed at the top of

3  the guideline?

4  **A.**  Yes.

5  **Q.**  Does it also have instructions for use saying that the

6  Coverage Determination Guideline is superseded by the plan if

7  there's a conflict?

8  **A.**  It does.

9  **Q.**  Can you turn to the "Key Points" section on page 3,

10  please.

11  **A.**  (Witness examines document.)

12  **Q.**  Looking at the second paragraph under "Key Points," it

13  read (reading):

14       "Custodial care in a psychiatric inpatient or

15       residential setting is the implementation of clinical or

16       nonclinical services that do not seek to cure or which are

17       provided during periods when the member's behavioral

18       health condition is not changing or does not require

19       trained clinical personnel to safely deliver services."

20       Do you know where the content of those words comes from?

21  **A.**  That comes from plan documents.

22  **Q.**  Looking at the next bullet point where it says "Custodial

23  care in this context is characterized by the following..."  The

24  first open bullet point says (reading):

25       "The presenting signs and symptoms of the patient

1           have been stabilized, resolved, or a baseline level of

2           functioning has been achieved."

3           How does this criteria fit into the "custodial care"

4    definition above?

5    **A.**   Well, this would indicate that the member's achieved

6    maximum benefit from the level of care that they're in, that

7    there's no expectation of improvement needed to be able to

8    function outside of a restricted setting.

9    **Q.**   The second bullet point says (reading):

10          "The patient is not responding to treatment or

11          otherwise not improving."

12          How does that relate to the definition of "custodial care"

13   in the bullet point above?

14   **A.**   This would also suggest that active treatment is not

15   occurring, so the member is not improving due to treatment.

16   **Q.**   The third bullet says (reading):

17          "The intensity of active treatment provided in an

18          inpatient or residential treatment setting is no longer

19          required or services can be safely provided in a less

20          intensive setting."

21          Why is that something that's considered custodial care and

22   not covered under the definition?

23   **A.**   As I mentioned a little while ago, the consideration of

24   active treatment has to -- also includes the level of care.  So

25   if all the treatment interventions that are being provided can

1  be provided in a less restrictive level of care, then that

2  would mean that the treatment that's being provided in the more

3  restrictive level of care is not active.

4  **Q.**  The next white bullet point includes some examples.  It

5  says (reading):

6         "Examples include respite services, daily living

7         skills instruction, days awaiting placement, activities

8         that are social and recreational in nature solely to

9         prevent runaway, truancy, or legal problems."

10  How do these examples relate to the definition of

11  "custodial care" in that second bullet point?

12  **A.**  Well, these would describe things that are not required in

13  trained personnel to administer:  Respite service, daily

14  living.  Days awaiting placement means you're just waiting

15  there until a bed opens up at a custodial setting.

16      And then it talks about runaway, truancy, or legal

17  problems.  So if the focus of treatment solely is on those

18  items, then that's also a custodial situation.

19  **Q.**  Looking now at the active treatment, so I'm at the sixth

20  bullet point in the "Key Points," it says (reading):

21         "Active treatment in this context is indicated by

22         services that are all of the following..."

23      And there's five bullet points.  Are these the same five

24  bullet points we've already gone over with respect to the

25  active treatment in a prior guideline?

1    A.    Yes.

2    Q.    And then there are a couple of provisions relating to

3    improvement at the bottom of page 3.

4    A.    (Witness examines document.)  Yes.

5    Q.    Is improvement considered in the same way with respect to

6    these paragraphs as they were in your description of

7    improvement in other respects in the guidelines?

8    A.    Yes, they are.

9    Q.    Turning now to Exhibit 84, please.

10   A.    (Witness examines document.)

11   Q.    Are these Custodial Care and Inpatient and Residential

12   Services Coverage Determination Guideline criteria?

13   A.    Yes.

14   Q.    When was it effective?

15   A.    It was revised for January 2013.

16   Q.    And does it also apply to certain products set forth at

17   the top of the guideline?

18   A.    It does.

19   Q.    Do the instructions for use also provide that the Coverage

20   Determination Guideline is superseded by the plan if there's a

21   conflict?

22   A.    They do.

23   Q.    Turning to the "Key Points" section, there's a definition

24   of "custodial care."  Is it the same that we have already

25   discussed?

1    A.    Yes.

2    Q.    And then there are -- it says (reading):

3          "Custodial care in this context is the characterized

4    by the following..."

5    With three bullet points.  Are these the three bullet

6    points we've already discussed?

7    A.    Yes.

8    Q.    In the last version of the guidelines there were actually

9    four bullets.  Dr. Martorana, can you look at the third black

10   bullet point on the "Key Points"?  Is that the one that used to

11   be the fourth white bullet point in the prior year's version?

12   A.    That's correct.

13   Q.    And you've already discussed the content of that?

14   A.    Yes.

15   Q.    And there is a discussion of active treatment with five

16   white bullet points underneath it.  Is that the same language

17   you've discussed?

18   A.    Yes, it is.

19   Q.    And then definition of "improvement" at the bottom of that

20   page and the top of the next one.  And, again, is improvement

21   determined in the same way that you've already described?

22   A.    It is.

23   Q.    Moving to Exhibit 108, please.

24   A.    (Witness examines document.)

25   Q.    Are these Custodial Care and Inpatient and Residential

1   Services Coverage Determination Guideline criteria?

2   **A.**   Yes, they are, for February 2014.

3   **Q.**   Do they also apply to products that are identified on that

4   first page?

5   **A.**   Yes.

6   **Q.**   Do they also provide that they are superseded by the plan

7   if there's a conflict?

8   **A.**   Yes.

9   **Q.**   Turning to the "Key Points" section, is the definition in

10  the first paragraph of "custodial care" the same that we've

11  discussed before?

12  **A.**   (Witness examines document.)  Yes.

13  **Q.**   And where it says "Custodial care in this context is

14  characterized by the following," there's references to plan

15  language; is that right?

16  **A.**   Yes.

17  **Q.**   And then there's three white bullet points.  The same that

18  we've discussed before?

19  **A.**   Yes.

20  **Q.**   And then the examples of custodial care, including respite

21  services and other services, again, you addressed that before?

22  **A.**   Yes.

23  **Q.**   And is the active treatment provision with the five bullet

24  points the same as we discussed before?

25  **A.**   It is.

1   Q.   Same question with the improvement language on the bottom.

2   Is that the language that we discussed for the other versions?

3   A.   Yes, it is.

4   Q.   Okay.  Turning to 148, please.

5   A.   (Witness examines document.)

6   Q.   Are these the custodial care and inpatient and residential

7   services guidelines that were revised in March of 2015?

8   A.   They are.

9   Q.   And are they applicable to the products listed on that

10  first page?

11  A.   Yes.

12  Q.   Are they superseded by the plan language when there's a

13  conflict?

14  A.   Yes.

15  Q.   And turning to the "Key Points" section, please on page 3,

16  there is a definition of "custodial care" in the second bullet

17  point.  It says (reading):

18          "Custodial care in a psychiatric inpatient or

19      residential setting is any of the following..."

20      With three different bullet points under that.  They are

21  the same as the 2017 current version but different from years

22  before; is that correct?

23  A.   Yes.

24  Q.   And do you know where the content of those three white

25  bullet points come from?

1  **A.**   It comes from the Certificate of Coverage language for the

2  2011 generic.

3  **Q.**   In your experience, does Certificate of Coverage language

4  sometimes change?

5  **A.**   Yes.

6  **Q.**   Looking at the "active treatment" paragraph, third bullet

7  point in the key points, and then there's five subparts to

8  active treatment.  Are these the same that we've discussed

9  already?

10  **A.**   Yes.

11  **Q.**   And then some language on improvement toward the bottom of

12  the page.  Is it the same language we've discussed with respect

13  to improvement?

14  **A.**   Yes.

15  **Q.**   Turning now to Exhibit 195, please.

16  **A.**   (Witness examines document.)

17  **Q.**   Are these Custodial Care and Inpatient and Residential

18  Services Coverage Determination Guideline criteria?

19  **A.**   Yes.

20  **Q.**   Effective what year?

21  **A.**   April 2016.

22  **Q.**   And is it applicable to the products listed on that page?

23  **A.**   Yes.

24  **Q.**   Turning to -- I'm sorry.

25       Under "Instructions for Use," is it also the case that the

1  language of this guideline is superseded by plan language when

2  there's a conflict?

3  **A.**   Yes.

4  **Q.**   Now turning to the "Key Points" on page 3, second bullet

5  point starts (reading):

6          "Custodial care in a psychiatric inpatient or

7          residential setting is any of the following..."

8       With three white bullet points.

9  **A.**   Yes.

10 **Q.**   Is that the same content that's in the current 2017

11 guideline?

12 **A.**   It is.

13 **Q.**   Now, looking at "Active Treatment," the next bullet point,

14 it says (reading):

15         "Active treatment in an inpatient or residential

16         treatment setting is a clinical process involving the

17         24-hour care of members that includes assessment,

18         diagnosis, intervention, evaluation of care, treatment and

19         planning for discharge, and aftercare under the direction

20         of a psychiatrist that cannot be managed in a less

21         restrictive setting."

22      Then under that it says (reading):

23         "Active treatment is indicated by services that are

24         all of the following..."

25      With a reference to CMS Benefit Policy Manual,

1  Chapter 230.2.2.1, retrieved March 2016.

2      There's just three bullet points under this definition of

3  "active treatment," Dr. Martorana.  Do you recall that there

4  were five in prior years of the guidelines?

5  A.   Yes.

6  Q.   Do you know why two of them were taken out?

7  A.   I believe I recommended that they be taken out.

8  Q.   And let me ask you.  Are these the two that were taken

9  out, the statement that it's unable to be provided in a less

10 restrictive setting and focused on interventions that are based

11 on generally accepted standard medical practice and are known

12 to address the critical presenting problems, psychosocial

13 issues, and stabilize the member's condition to the extent that

14 they can be safely treated in a lower level of care?  Why did

15 you recommend that those two bullets be taken out?

16 A.   Well, I recommended they be taken out under that

17 particular section because, strictly speaking, they did not

18 appear under that CMS citation.  They appeared elsewhere in

19 Medicare language.

20 Q.   Is it your opinion that taking them out made the

21 guidelines more inclusive?

22 A.   It basically left them unchanged.  They were just subsumed

23 elsewhere.  So the same ideas are in the custodial guideline.

24 Q.   So in your opinion, did taking those two bullet points out

25 change the meaning of the guideline?

1    A.    No.

2            MS. ROMANO:  One moment, Your Honor.

3                    (Pause in proceedings.)

4            MS. ROMANO:  I'm done, Your Honor, subject to

5    redirect.

6            THE COURT:  Okay.  Thank you.

7        Cross.

8                    (Pause in proceedings.)

9            MS. REYNOLDS:  Excuse me, Your Honor.  I need to get

10   some binders.

11                   (Pause in proceedings.)

12           MS. REYNOLDS:  Okay.  Is everybody ready?

13                   **CROSS-EXAMINATION**

14   BY MS. REYNOLDS:

15   Q.   Good morning, Dr. Martorana.

16   A.   Good morning.

17   Q.   You mentioned yesterday your involvement in training of

18   UBH's personnel?

19   A.   Yes.

20   Q.   UBH's care advocates and peer reviewers are trained to use

21   the LOCGs?

22   A.   Yes.

23   Q.   And they're also trained to use the CDGs?

24   A.   Yes.

25   Q.   Have you ever taken part either as a trainer or a trainee

1   in a training on ERISA and what it requires?

2   **A.**   I don't specifically recall.  I certainly didn't give one.

3   **Q.**   Let's talk a little bit about the peer review process,

4   which you discussed yesterday.

5       On average, UBH peer reviewers need to do about eight peer

6   reviews per day; right?

7   **A.**   Yes, if they're full-time.

8   **Q.**   And a medical necessity review takes on average about

9   30 minutes?

10  **A.**   Well, what's scheduled is the time to talk with the doc

11  and then write it up.  So as we had talked earlier about

12  preparation, and so there's time for me to read the LINX notes

13  and such that's generally outside the 30 minutes.

14  **Q.**   And how about care advocates?  How many case reviews do

15  they need to do in one day?

16  **A.**   I don't know what their requirement is.

17  **Q.**   A care advocate does not evaluate the patient directly;

18  right?

19  **A.**   No.

20  **Q.**   The treating provider evaluates the patient?

21  **A.**   That's correct.

22  **Q.**   And the care advocate then collects information from the

23  provider?

24  **A.**   Yes.

25  **Q.**   And the care advocate compares that information against

1  the guidelines; right?

2  **A.**    Yes.

3  **Q.**    And then records in the case note his or her assessment of

4  whether the information collected meets the guideline criteria?

5  **A.**    Yes.

6  **Q.**    And so when a case comes to a peer reviewer, there's

7  already a comparison from the care advocate of the information

8  that they collected and how it compares to the guideline;

9  right?

10  **A.**    Yes.

11  **Q.**    And then the peer reviewer talks to the doctor to see if

12  there's more information?

13  **A.**    Unless the peer reviewer looks at the same information and

14  decides that it should be authorized based on that, but

15  otherwise if they talk -- the next step would be to talk to the

16  provider, yes.

17  **Q.**    And then the peer reviewer decides whether the case meets

18  the guideline criteria; right?

19  **A.**    Yes.

20  **Q.**    And you testified yesterday that peer reviewers can depart

21  from the guidelines.  Do you remember that?

22  **A.**    Yes.

23  **Q.**    They can only depart to approve coverage; right?

24  **A.**    That's correct.

25  **Q.**    So they can't issue a clinical denial where the guideline

1  criteria are met; right?

2  **A.**  Correct.

3  **Q.**  And the guidelines say that exceptions from the guideline

4  criteria need to be carefully thought out, documented, and

5  approved by the responsible level of management; right?

6  **A.**  Yes.

7  **Q.**  I think you testified yesterday that the medical directors

8  are the responsible level of management?

9  **A.**  Yes.

10  **Q.**  Does that mean that a medical director can approve a care

11  advocate's departure from the guidelines?

12  **A.**  Yes.  Often the advocates, as you know, they collect all

13  the information, they make their assessment and say -- and then

14  say, "Well, maybe we should authorize this because thus and

15  such," and then the doctor will look at it and say yes or no.

16  **Q.**  And a medical director can also approve his or her own

17  departure from the guidelines?

18  **A.**  Yes.

19  **Q.**  But, in either case, the departure has to be carefully

20  thought out, documented in the record; right?

21  **A.**  Yes.

22  **Q.**  You also gave some testimony yesterday relating to the

23  fact that UBH usually offers an alternative level of care to

24  the member when it denies coverage.  Do you remember that?

25  **A.**  Yes.

1  Q.   That means that the noncoverage determination letter

2  states that an alternative level of care exists?

3  A.   Yes.

4  Q.   But the claim for the proposed level of care is still

5  denied; right?

6  A.   Correct.

7  Q.   And if the member were to seek services at that

8  alternative level of care, they would still have to meet the

9  guideline criteria for that level of care?

10  A.   Well, if we've offered the alternative level of care, then

11  it's the clinical opinion that the member's current condition

12  would meet that level of care.  So it would expect to be

13  authorized.

14  Q.   But the services, in order to be authorized, still have to

15  meet guideline criteria; right?

16  A.   Yes.

17  Q.   You also testified yesterday about UBH's decision to

18  remove the word "acute" from the Common Criteria, the

19  Outpatient Criteria, and the Intensive Outpatient Criteria in

20  2017.  Do you remember that?

21  A.   Yes.

22  Q.   And you were asked yesterday whether that language, the

23  "acute changes" language, was used to disallow coverage for

24  outpatient care for chronic conditions prior to 2017.  Do you

25  remember that?

1  **A.**   Yes.

2  **Q.**   And you answered, "Not to my knowledge, no."  Do you

3  remember that?

4  **A.**   Yes.

5  **Q.**   You're not testifying that you have reviewed every denial

6  of coverage for outpatient care prior to 2017; right?

7  **A.**   That's correct.

8  **Q.**   And you are not testifying that you have reviewed every

9  denial of coverage for intensive outpatient care prior to 2017;

10  right?

11  **A.**   Correct.

12  **Q.**   And so when you responded "not to my knowledge" you were

13  just referring to what you happened to remember right then;

14  right?

15  **A.**   It had to do with my experience looking at cases where

16  there were denials for outpatient and intensive outpatient and

17  never seeing the example that you mentioned.

18  **Q.**   And, similarly, you testified yesterday that UBH uses

19  certain state-mandated criteria.  Do you remember that?

20  **A.**   Yes.

21  **Q.**   But you're not testifying that you've reviewed all of

22  UBH's denials to confirm that the criteria were used in every

23  case in which they were supposed to be used; right?

24  **A.**   Correct.

25  **Q.**   You also testified yesterday about the partial

1  hospitalization level of care.  Do you remember that?

2  A.   Yes.

3  Q.   You would agree, wouldn't you, that the treatment program

4  of a PHP closely resembles that of a highly structured

5  short-term hospital inpatient program?

6  A.   That's how it's described by CMS, yes.

7  Q.   And it's for patients who would otherwise require

8  inpatient psychiatric care; right?

9  A.   According to Medicare, yes.  But since they don't cover

10  residential, then they are not looking at that.  Medicare is

11  not considering residential as a level of care between partial

12  and inpatient.

13  Q.   It's also true that UBH views partial hospitalization as

14  an acute level of care?

15  A.   Yes.

16  Q.   But residential treatment is a subacute level of care;

17  right?

18  A.   That's one description of residential treatment.

19  Q.   Why don't we look at Trial Exhibit 8, at page 18.

20  A.   I'm sorry, trial exhibit --

21  Q.   It might be in the binder from counsel.

22  A.   Okay.

23  Q.   These are the 2017 Level of Care Guidelines; right?

24  A.   Yes.

25  Q.   The guidelines that are currently in effect?

1   A.   Yes.

2   Q.   And this is the description of residential treatment that

3   appears in those guidelines; right?

4   A.   That's correct.

5   Q.   Okay.  Do you see where it says:

6        "Residential treatment center:  A sub-acute

7        facility-based program which delivers 24-hour/7-day

8        assessment and diagnostic services, and active behavioral

9        health treatment to members who do not require the

10       intensity of nursing care, medical monitoring and

11       physician availability offered in inpatient"?

12       Did I read that correctly?

13  A.   Yes, that's correct.

14  Q.   And you understand that the PHP guidelines are not at

15  issue in this case; right?

16  A.   Yes.

17  Q.   You gave some testimony yesterday about -- and today,

18  about the preference for treatment to occur in the least

19  restrictive level of care.  Do you remember that?

20  A.   Yes.

21  Q.   And "least restrictive" means the level of care that

22  affords the member the most freedom; right?

23  A.   I'm sorry?

24  Q.   "Least restrictive" means the level of care that affords

25  the member the most freedom?

1    **A.**    Yes.

2    **Q.**    And you believe that's a basic right of mental health

3    patients?

4    **A.**    I do.

5    **Q.**    And you base your belief on the United Nations, World

6    Health Organization, and the APA?

7    **A.**    And ASAM, yes.

8    **Q.**    And ASAM.  Okay.

9            Let's take a look, quickly, at Exhibit 1410, which is in

10    the binder.

11            We there?

12    **A.**    Yes.

13    **Q.**    Is this the World Health Organization document you were

14    referring to?

15    **A.**    I believe it is, yes.

16    **Q.**    It's called "Mental Healthcare Law: Ten Basic Principles."

17            Do you see that?

18    **A.**    Yes.

19    **Q.**    Let's turn to page 4 of Exhibit 1410.

20    **A.**    Okay.

21    **Q.**    Do you see the fourth heading there that says:  "Provision

22    of the least restrictive type of mental health care"?

23    **A.**    Yes.

24    **Q.**    And do you see where it says under the description:

25    "Persons with mental health disorders should be provided with

1    healthcare which is the least restrictive"?

2    **A.**    Yes.

3    **Q.**    Did I read that right?

4    **A.**    Yes.

5    **Q.**    And then there are a number of components listed beneath

6    that; right?

7    **A.**    Yes.

8    **Q.**    And component 3 is that:

9            "Institution-based treatments should be provided in

10           the least restrictive environment, and treatments

11           involving the use of physical (e.g., isolation rooms,

12           camisoles) and chemical restraints, if at all necessary,

13           should be contingent upon:" and there are a number of

14           factors underneath there.

15           Do you see that?

16   **A.**    Yes.

17   **Q.**    Okay.  And then underneath the Component section is a

18   section called "Implementation"; right?

19   **A.**    Yes.

20   **Q.**    And the implementation steps include "Maintaining legal

21   instruments and infrastructures to support community-based

22   mental health care"; right?

23   **A.**    Yes.

24   **Q.**    "Taking steps to eliminate isolation rooms and prohibit

25   the creation of new ones"; right?

1    **A.**    Oh, number 2, yes, uh-huh.

2    **Q.**    Number 3 is "Amending relevant legal instruments to remove

3    provisions incompatible with community-based mental health

4    care"; right?

5    **A.**    Yes.

6    **Q.**    And then "Training mental health providers in the use of

7    alternatives to the traditional restraints to deal with crisis

8    situations."

9         I read that right?

10   **A.**    Yes.

11   **Q.**    This document is focused on legal considerations --

12   right? -- not clinical ones?

13   **A.**    Well, some of what they're talking about are clinical

14   intervention, so that's in there.  But the solutions, it

15   appears to be predominantly legal.

16   **Q.**    Let's turn to Exhibit 634.

17   **A.**    I'm sorry, 6 --

18   **Q.**    634 would be in the binder from your counsel.

19   **A.**    Yes.

20   **Q.**    Okay.  This is an APA practice guideline?

21   **A.**    It is.

22   **Q.**    And you looked at this yesterday with Ms. Romano; right?

23   **A.**    Yes.

24   **Q.**    Let's turn to 634, at page 22.

25        Yesterday you read the first sentence in the section under

1  the heading "Factors Affecting Choice of Treatment Setting";

2  right?

3  **A.**    Yes.

4  **Q.**    And it says:

5       "Individuals should be treated in the least

6       restrictive setting that is likely to prove safe and

7       effective."

8       Did I read that right?

9  **A.**    Yes.

10 **Q.**    Okay.  Let's read the next sentence as well.  It says:

11      "Decisions regarding the site of care should be based

12      on the individual's 1)capacity and willingness to

13      cooperate with treatment; 2) ability for self-care; 3)

14      social environment (which may be supportive or high risk);

15      4) need for structure, support and supervision to remain

16      safe and abstinent; 5) need for specific treatments for

17      co-occurring general medical or psychiatric conditions; 6)

18      need for particular treatments or an intensity of

19      treatment that may be available only in certain settings;

20      and 7) preference for a particular treatment setting."

21      Did I read that correctly?

22 **A.**    Yes.

23 **Q.**    And you agree that those are all things that should be

24 taken into account in determining the appropriate setting for

25 treatment?

1    A.    Yes, for the provider, absolutely.

2    Q.    And I'd like to just draw your attention to the next

3    paragraph in this section, and particularly the second sentence

4    which begins -- or which says:

5              "To appropriately match patients and treatment

6         settings, many clinicians, health insurers, hospitals and

7         treatment agencies use the American Society of Addiction

8         Medicine (ASAM) patient placement criteria.  These

9         criteria provide an algorithm for placement that

10        represents expert consensus and that is updated as

11        additional evidence becomes available on treatment

12        outcomes and levels of care."

13        Did I read that correctly?

14   A.    Yes.

15   Q.    And that's consistent with your view of ASAM; right?

16   A.    Yes.

17   Q.    Before we leave this document, let's turn to page 11.

18   A.    Okay.

19   Q.    Are you there?

20        So under the heading "Treatment Settings" it's the fourth

21   paragraph which begins "Residential Treatment."

22        Do you see that?

23   A.    Yes.

24   Q.    That paragraph says:

25             "Residential treatment is indicated for patients who

1          do not meet the clinical criteria for hospitalization but

2          whose lives and social interactions have come to focus

3          predominantly on substance use, who lack sufficient social

4          and vocational skills, and who lack substance-free social

5          supports to maintain abstinence in an outpatient setting.

6          Residential treatment of greater than or equal to three

7          months is associated with better long-term outcomes in

8          such patients.  For patients with an opioid use disorder,

9          therapeutic communities have been found effective."

10         Did I read that correctly?

11    A.   Yes.

12    Q.   And therapeutic communities are a form of long-term

13    residential treatment; right?

14    A.   As ASAM terms them, yes.

15    Q.   Let's look at Exhibit 639 now.

16         Are you there?

17    A.   Yes.

18    Q.   This is the APA practice guideline for the treatment of

19    patients with major depressive disorder?

20    A.   Yes.

21    Q.   Let's turn to page 16.

22         And yesterday, with Ms. Romano, you read the first

23    sentence under Section D, which says -- which is "Establish the

24    appropriate setting for treatment."

25         Is that right?

1    A.    Yes.

2    Q.    And the sentence you read is:

3          "The psychiatrist should determine the least

4    restrictive setting for treatment that will be most likely

5    not only to address the patient's safety but also to

6    promote improvement in the patient's condition."

7    Did I read that correctly?

8    A.    Yes.

9    Q.    Okay.  Let's read what follows.  It says:

10         "The determination of an appropriate setting for

11   treatment should include consideration of the patient's

12   symptom severity, co-occurring psychiatric or general

13   medical conditions, available support system and level of

14   functioning.  The determination of a treatment setting

15   should also include consideration of the patient's ability

16   to adequately care for him or herself, to provide reliable

17   feedback to the psychiatrist, and to cooperate with

18   treatment of the major depressive disorder."

19   Did I read that correctly?

20   A.    Yes.

21   Q.    And you agree that those are all considerations that are

22   relevant to determining the appropriate level of care?

23   A.    Yeah, these are determinations -- all these factors are

24   important for a clinician to make the decision, yes.

25   Q.    And I believe yesterday you mentioned an article that you

1   coauthored?

2   **A.**   Yes.

3   **Q.**   And that article related to selection of level of care;

4   right?

5   **A.**   Yes.

6   **Q.**   Let's turn to Exhibit 673.

7   **A.**   Yes.

8   **Q.**   So this is the article that you cowrote?

9   **A.**   Yes.

10  **Q.**   And your coauthor is Danesh Alam; right?

11  **A.**   Yes.

12  **Q.**   And Dr. Alam is a UBH employee?

13  **A.**   Yes.

14  **Q.**   And you understand that Dr. Alam has been designated by

15  UBH as an expert in this case?

16  **A.**   Yes.

17  **Q.**   Let's look at your article briefly.

18      Turn to page 3 of Exhibit 673.

19  **A.**   Yes.

20  **Q.**   Are you there?

21      There's a section called "Choosing an appropriate level of

22  care."  Do you see it?

23  **A.**   Yes.

24  **Q.**   And in the second paragraph there's a sentence that starts

25  "The continuum."

1        Are you there?

2    **A.**    Yes.

3    **Q.**    It says:  "The continuum of care in addiction treatment

4    facilities" -- excuse me.  Let me start over.

5            "The continuum of care in addiction treatment

6            facilitates, the gradual movement from a more restrictive

7            to a less restrictive level of care."

8        Did I read that correctly?

9    **A.**    Yes.

10   **Q.**    And then in the next paragraph it begins:  "The following

11   are factors that are considered in making this determination."

12   And then the factors are listed in bullets.  And they are:

13           "Severity of illness and goals of treatment;

14           "Co-morbid conditions;

15           "Relapse history;

16           "Motivation;

17           "Workplace risk;

18           "Sober supports;

19           "Resources, including insurance;

20           "Local treatment resources."

21       And then on page 4 there's a paragraph at the end of that

22   section that says:

23           "As in other chronic illnesses, in addition to an

24           initial intensive level of care, a plan for continuum of

25           care may have to be considered to prevent relapses and

1    maintain treatment-related gains."

2    Did I read that correctly?

3 **A.** Yes.

4 **Q.** The next section is called "The goals of treatment";

5 right?

6 **A.** Yes.

7 **Q.** And there are, looks like, five bullets.  So the bullets

8 are:

9    "Safe detoxification;

10    "Address co-morbid medical and psychiatric issues;

11    "Motivational enhancement to facilitate treatment

12 retention;

13    "Skills to remain abstinent and prevent a relapse; and

14    "Offer a continuum of care to maintain treatment gains."

15    Did I read that correctly?

16 **A.** Yes.

17 **Q.** Let's jump down, now, to the bottom of this page, where

18 there's a section "Choosing the appropriate level of

19 treatment."

20    Are you there?

21 **A.** Yes.

22 **Q.** This section says:

23    "The ideal level of care is one that is least

24    intensive, that addresses all the treatment needs, and

25    that provides the individual the best opportunity to

1      develop sobriety.  Generally, a patient may begin

2      treatment at a more intensive level and progress to a less

3      intensive level of care."

4      Did I read that correctly?

5   A.   Yes.

6   Q.   All right.  The section continues:

7           "Choosing the appropriate level of care is important.

8      For example, a relapse may occur if a less intensive level

9      of care than is appropriate is initiated."

10     Did I read that correctly?

11  A.   Yes.

12  Q.   The next paragraph says:

13          "There is a consequence to choosing a more intensive

14     level of care?  There is no research evidence to the

15     existence of a consequence to choosing a more intensive

16     level of care than necessary."

17     Did I read that correctly?

18  A.   Yes.

19  Q.   All right.  Now I'd like to look at page 5, which might be

20  difficult on the screen.  Oh, she's got it.  Good.

21     All right.  So page 5 of Exhibit 673 has a table; right?

22  A.   Yes.

23  Q.   And the table is entitled "Principles of effective

24  treatment"; right?

25  A.    Yes.

**Q.**   There are a number of principles here.  I just want to draw our attention to one in particular -- or to several in particular.

First, number 3.  And the principle is "Effective treatment attends to multiple needs of the individual." And then under Remarks the table says:

"To be effective, treatment must address the individual's drug use and any associated medical, psychological, social, vocational, and legal problems."

Did I read that correctly?

**A.**   Yes.

**Q.**   Let's jump down to principle 5.

"Remaining in treatment for an adequate period is critical for treatment effectiveness."

Did I read that correctly?

**A.**   Yes.

**Q.**   And then under Remarks it says:

"The appropriate duration for individuals depends on their problems and needs.  Research indicates that, for most patients, the threshold of significant improvement is reached at about three months in treatment.  After this threshold is reached, additional treatment can produce further progress toward recovery.  Because people often leave treatment prematurely, programs should include strategies to engage and keep patients in treatment."

1   Did I read that correctly?

2   A.   Yes.

3   Q.   Let's turn to page 6.  This is a continuation of the table

4   called "Principles of effective treatment"; right?

5   A.   Yes.

6   Q.   Okay.  Let's look at number 8.  That says:

7        "Addicted or drug abusing individuals with

8   co-occurring mental disorders should have both disorders

9   treated in an integrated way."

10  Let's look at the remarks, which says:

11       "Because addictive disorders and mental disorders

12  often occur in the same individual, patients presenting

13  for either condition should be assessed and treated for

14  the co-occurrence of the other type of disorder."

15  Did I read all that correctly?

16  A.   Yes.

17  Q.   And then let's look, finally, at principle 13, which is:

18       "Recovery from drug addiction can be a long-term

19  process and frequently requires multiple episodes of

20  treatment.  As with other chronic illnesses, relapses to

21  drug use can occur during or after successful treatment

22  episodes."

23  Did I read that correctly?

24  A.   Yes.

25  Q.   Let's turn to page 8.

1   A.   Yes.

2   Q.   Do you see the section heading "Residential programs

3   including therapeutic community"?

4   A.   Yes.

5   Q.   And that section says:

6        "Residential programs provide care 24 hours a day, in

7        nonhospital settings.  Some are locked facilities, but

8        most are open voluntary treatment programs."

9        Did I read that correctly?

10  A.   Yes.

11       **MS. REYNOLDS:**  Your Honor, I neglected to move Exhibit

12  673 into evidence.

13       **MS. ROMANO:**  No objection.

14       **THE COURT:**  Admitted.

15  (Trial Exhibit 673 received in evidence.)

16  **BY MS. REYNOLDS:**

17  Q.   Let's -- before we leave this exhibit, let's turn back to

18  page 4.

19  A.   Yes.

20  Q.   There's a section on that page called "Placement of

21  patients in the most appropriate treatment setting."

22       Do you see that?

23  A.   Yes.

24  Q.   And the second sentence in that section says:

25       "The American Society of Addiction Medicine (ASAM)

1    Patient Placement Criteria (PPC) is probably the

2    most-studied approach for matching the patient and

3    treatment setting.  The ASAM PPC criteria were first

4    introduced in the 1980s and are now well accepted for

5    patient placement."

6    Did I read that correctly?

7  **A.**  Yes.

8  **Q.**  And I think yesterday you testified that you like the ASAM

9  criteria?

10 **A.**  I do.

11 **Q.**  And you supported, in the past, proposals for UBH to adopt

12 the ASAM criteria as its standard criteria?

13 **A.**  Yes.

14 **Q.**  And you participated in discussions at UBH about whether

15 to adopt it?

16 **A.**  Yes.

17 **Q.**  Did you ever hear a clinical reason for not adopting ASAM

18 as UBH's standard criteria?

19 **A.**  No.

20 **Q.**  One of your duties as a medical director is to monitor

21 utilization; right?

22 **A.**  Yes.

23 **Q.**  And that includes looking at data such as how much of a

24 certain type of service is being used; right?

25 **A.**  Yes.

1  **Q.**   And that also includes looking at data on average length

2  of stay; right?

3  **A.**   Yes.

4  **Q.**   And you also receive information about UBH's benefit

5  expense targets and forecasts; right?

6  **A.**   Yes.

7  **Q.**   And you also receive information about UBH's performance

8  with respect to those targets?

9  **A.**   Yes.

10  **Q.**   Let's look, quickly, at Exhibit 783.  That is one of the

11  documents that is subject to -- or that was redacted.

12        **MS. REYNOLDS:**  And I believe we're going to display

13  the redacted version only; okay?

14        **THE COURT:**  Okay.

15  **BY MS. REYNOLDS:**

16  **Q.**   Are you there?

17  **A.**   Yes.

18  **Q.**   This is an email from Franchelle Dixon to you and a number

19  of her people; right?

20  **A.**   He yes.

21  **Q.**   And the subject of the email is "employer monthly business

22  review"; right?

23  **A.**   Yes.

24        **MS. REYNOLDS:**  Your Honor, we move Exhibit 783 in

25  evidence.

1    **MS. ROMANO:** No objection.

2    **THE COURT:** It's admitted.

3    (Trial Exhibit 783 received in evidence.)

4  **BY MS. REYNOLDS:**

5  **Q.** And attached to this email is a PowerPoint presentation

6  entitled "E&I/Direct Employer Monthly Business Review

7  November 2014"; right?

8  **A.** Yes.

9  **Q.** And "E&I" refers to employer and individual?

10 **A.** Yes.

11 **Q.** That refers to UBH's commercial business?

12 **A.** Yes.

13 **Q.** Let's just turn to page 4 of the exhibit, which is the

14 first page of the PowerPoint.

15    Do you see it?

16 **A.** Yes.

17 **Q.** This is the executive summary of what's in the remainder

18 of the PowerPoint; right?

19 **A.** Yes.

20 **Q.** Okay. And the first heading is "October 2014 E&I direct

21 employer, close."

22    Do you see that?

23 **A.** Yes.

24 **Q.** And then the first bullet under that heading says: "E&I:

25 UHC YTD" -- that means year to date?

1    A.    Yes.

2    Q.    (Reading)

3          "UHC YTD gross margin 1.5 million unfavorable to

4    budget due to voluntary/revenue shortfall; YTD Ben Ex

5    8.4 million favorable to budget."

6    Did I read that correctly?

7    A.    Yes.

8    Q.    Next line:  "October Ben Ex unfavorable 2.5 million to

9    forecast."

10   Did I read that correctly?

11   A.    Yes.

12   Q.    And then this executive summary reflects that the

13   PowerPoint presentation includes information on trend drivers;

14   right?

15   A.    Yes.

16   Q.    It includes information about trend drivers by level of

17   care; right?

18   A.    It does, yes.

19   Q.    Let's talk, now, a little bit about UBH's guidelines.

20   And, first, I guess this is a question about the process of

21   using the guidelines.  And you can use Exhibit 221 as a

22   reference point for that.

23   A.    Yes.

24   Q.    Are you there?

25         You were asked a number of questions about the section

1  "Instructions for Use" in the CDGs; right?

2  **A.**   Yes.

3  **Q.**   And you explained that a care advocate generally checks to

4  see if the plan language is in conflict with the guideline; is

5  that right?

6  **A.**   Yes, that would be their role.

7  **Q.**   And they do that based on a summary of the plan that's in

8  the iBAAG system?

9  **A.**   That's where they would start, yes.

10  **Q.**   And if there was some question, then they could pull up

11  the actual plan language?

12  **A.**   Yes.

13  **Q.**   You don't prepare the summaries that are in the iBAAG;

14  right?

15  **A.**   No.

16  **Q.**   And you don't know whether they accurately summarize the

17  plan terms?

18  **A.**   Uhm, not for a fact, no.

19  **Q.**   If the care advocate determined that there was a conflict

20  between a plan's terms and the guideline, then they would not

21  apply the CDG; right?

22  **A.**   Uhm, right.  Correct, yes.

23  **Q.**   And a peer reviewer would not issue a denial pursuant to

24  that CDG; right?

25  **A.**   Pursuant to the CDG if it doesn't apply, no.

1   Q.   So if UBH uses a CDG to deny coverage to a particular

2   member, it means that UBH has determined that the CDG is

3   consistent with that person's plan; right?

4   A.   That's how it's supposed to work, yes.

5   Q.   And the same is true if UBH issues a Level of Care

6   Guidelines denial to a person, it indicates that UBH has

7   determined that that person's plan is consistent with the Level

8   of Care Guidelines?

9   A.   That the level of care guideline is supposed to be applied

10  to this plan?  Is that what you're asking?

11  Q.   Well, the question is whether there's a conflict between

12  the terms of the plan and the Level of Care Guidelines.  That's

13  what the care advocate is checking?

14  A.   I'm sorry, I'm not following you.  The conflict between

15  the Level of Care Guidelines and the plan language?  Is that

16  what you're referencing?

17  Q.   Well, that's the question.  Let me back up and see if we

18  can get on the same page.

19       So you testified about the instructions for use in the

20  CDGs?

21  A.   Yes.

22  Q.   Which say that if there's a conflict between plan terms

23  and a CDG, then the plan prevails; right?

24  A.   Yes.

25  Q.   And we established that if there's a conflict then the CDG

1    will not be applied; right?

2    A.    Correct.

3    Q.    Okay.  My question is whether the same rule applies with

4    respect to Level of Care Guidelines.

5         If there's a conflict between the Level of Care Guidelines

6    and the terms of a member's plan, the plan terms prevail;

7    right?

8    A.    Right.  If the plan terms say "medical necessity," then

9    that means we use the Level of Care Guidelines because those

10   guidelines determine whether care is medically necessary.

11   Q.    So if a plan contains a definition of "medical necessity,"

12   is any effort made to compare any other provisions of the plan

13   against the Level of Care Guidelines?

14   A.    I don't believe that's our practice, no.

15   Q.    Let's turn to the 2017 Level of Care Guidelines, which is

16   Exhibit 8.

17            THE COURT:  Before we do that, let's take 10.

18               (Recess taken at 10:20 a.m.)

19               (Proceedings resumed at 10:39 a.m.)

20   BY MS. REYNOLDS:

21   Q.    You testified about the 2017 common criteria yesterday;

22   right?

23   A.    Yes.

24   Q.    Okay.  Let's just take a quick look at Exhibit 8, at page

25   7, and put next to it Exhibit 656, at page 26.

1    Do you have it?

2 **A.** One second.

3 **Q.** A lot of paper.

4 **A.** Okay.

5 **Q.** Okay.  Exhibit 656 is Chapter 6 of the Medicare Benefit

6 Policy Manual; right?

7 **A.** Yes.

8 **Q.** And page 26 is the CMC definition of "reasonable

9 expectation of improvement"; right?

10 **A.** Yes.

11 **Q.** Okay.  And you discussed yesterday, with Ms. Romano, the

12 fact that some of the language from the CMS definition does not

13 appear in UBH's definition of "reasonable expectation of

14 improvement."  Do you remember that?

15 **A.** Yes.

16 **Q.** Okay.  And you expressed the view that the requirement of

17 a reasonable expectation of improvement in the UBH guideline

18 was not more restrictive than the CMS guidelines on

19 improvement.  Do you remember that?

20 **A.** Yes.

21 **Q.** And you explained that you based that view on the fact

22 that the UBH guideline defines "improvement" in a way that

23 includes both acute and chronic issues.  Did I get that right?

24 **A.** Yes.

25 **Q.** You would agree you, wouldn't you, that if the UBH

1   definition restricted improvement only to the reduction or

2   control of acute symptoms, that it would be more restrictive

3   than the CMS guideline; right?

4   **A.**   Yes, I have to agree with that.

5   **Q.**   And it would be inconsistent with generally accepted

6   standards of care?

7   **A.**   I would say yes.

8   **Q.**   The Common Admission Criteria do not contain the word

9   "chronic"; right?

10  **A.**   That word, I don't believe, is contained in there,

11  correct.

12  **Q.**   And the Common Continued Stay Criteria do not contain the

13  word "chronic"; right?

14  **A.**   I believe that's correct, yes.

15  **Q.**   And the Discharge Criteria do not contain the word

16  "chronic"; right?

17  **A.**   Correct.

18  **Q.**   Let's go now to Exhibit 47.

19       Are you there?

20  **A.**   Yes.

21  **Q.**   Let's look at the key points on page 3.  Exhibit 47 is the

22  2011 Custodial Care CDG; right?

23  **A.**   Yeah, dated December 2011, correct.

24  **Q.**   And you describe the fact that a portion of UBH's

25  Custodial Care CDG comes from the United Healthcare Standard

1   Certificate of Coverage; is that right?

2   **A.**   That's my understanding, correct.

3   **Q.**   And you testified that the CDG is only supposed to be used

4   with plans that lack a "medical necessity" provision; is that

5   right?

6   **A.**   The United Healthcare plans that lack that, yes.

7   **Q.**   So the plans with which this CDG is supposed to be used,

8   do those plans contain a definition of "active treatment"?

9   **A.**   I don't know for a fact that they all do.

10  **Q.**   Do those plans contain a definition of "improvement"?

11  **A.**   I can't say one way or another.  I haven't ...

12  **Q.**   Before we leave this document, let's just look at the

13  definition of "active treatment" here on page 3.  And you

14  talked about the five bullets underneath the definition.  Do

15  you remember that?

16  **A.**   Yes.

17  **Q.**   And you discussed with Ms. Romano the fact that the last

18  two bullets were removed from the CDG.  And we'll look at where

19  they were removed, but do you remember the testimony?

20  **A.**   I said they were removed from this section under "Active

21  Treatment," correct.

22  **Q.**   Right.  And the two bullets are:

23          "Unable to be provided in a less restrictive

24      setting"; and

25          "Focused on interventions that are based on generally

1      accepted standard medical practice and are known to

2      address the critical presenting problems, psychosocial

3      issues and stabilize the patient's condition to the extent

4      that they can be safely treated in a lower level of care."

5      Did I read those bullets correctly?

6    A.   Yes.

7    Q.   Okay.  And then turn to 195.

8    A.   Yes.

9    Q.   That's the April 2016 Custodial Care CDG?

10   A.   Correct.

11   Q.   And if you look at the definition of "active treatment" on

12   page 195, it doesn't have the two bullets that we just read;

13   right?

14   A.   Yes, correct.

15   Q.   I'd like to keep 195 handy and pull up Exhibit 537,

16   please.

17   A.   537?

18   Q.   537.

19   A.   Right.

20   Q.   Which binder?  It would be the binder from plaintiffs'

21   counsel.

22   A.   The one underneath, yeah.

23        Okay.  I'm there.

24   Q.   Got it?

25        Okay.  Exhibit 537 is an email exchange between you and

1   Loretta Urban; right?

2   **A.**   Yes.

3   **Q.**   Dated March 30, 2016?

4   **A.**   Yes.

5           **MS. REYNOLDS:**  Your Honor, we move Exhibit 537 into

6   evidence.

7           **MS. ROMANO:**  No objection.

8           **THE COURT:**  It's admitted.

9       (Trial Exhibit 537 received in evidence.)

10  **BY MS. REYNOLDS:**

11  **Q.**   Let's turn to page 2, which is the first email in the

12  exchange, dated March 29th.  And it's from you to Ms. Urban and

13  Jerry Niewenhous; right?

14  **A.**   Yes.

15  **Q.**   And the subject is "Follow-up question on active

16  treatment"; right?

17  **A.**   Yes.

18  **Q.**   And in your email you state:

19          "When the Custodial CDG is updated with the new

20          definition of active treatment, I'm thinking that only the

21          strict definition will be used."

22          "The, quote, 'key point,' closed quote, about not

23          being able to manage in a lower LOC and the new section

24          under the Intensity of Service would not be included,

25          correct?"

1    Did I read that correctly?

2  A.  Yes.

3  Q.  And "LOC" means level of care?

4  A.  Yes.

5  Q.  Then turn back to page 1.  And let's look at Ms. Urban's

6  response to you.  She says:

7         "Andy, although (unable to be managed in a lower

8       level of care) is not included in CMS' definition of,

9       quote, 'active treatment,' closed quote, it is included in

10      cross-examination CMS' definition of 24-hour care so it

11      still applies to custodial care.  We can still cite this

12      in the custodial care CDG and I can make sure it remains."

13      Did I read that correctly?

14 A.  Yes.

15 Q.  And then she says:

16         "Planning on bringing the custodial care to the next

17      BPAC."

18      Have I read that right?

19 A.  Yes.

20 Q.  And looking at Exhibit 195 --

21 A.  Yes.

22 Q.  Which is the -- which is the CDG that was approved the

23 month after -- actually, yeah, in the month after your exchange

24 with Ms. Urban; is that right?

25 A.  Yes.

1   **Q.**   And that is where the strict definition of "active

2   treatment" appears?

3   **A.**   Under where the citation is, yes, correct.

4   **Q.**   And so "strict definition" means that it follows the CMS

5   definition closely?

6   **A.**   Yes.

7   **Q.**   But the CDG still includes the same content but elsewhere;

8   right?

9   **A.**   Yes.

10   **Q.**   And that's consistent with your view, is it not, that

11   if -- if the care could continue in a lower level of care, it's

12   not active treatment at the proposed level of care?

13   **A.**   If the treatment interventions provided at the higher

14   level of care could be provided at a lower level of care, then

15   that's not considered active treatment.

16   **Q.**   Even if it otherwise would be active if not for the

17   existence of a lower level of care?

18   **A.**   Sorry, I'm not following.

19   **Q.**   Strike the question.

20      Dr. Martorana, you would agree that it is generally

21   accepted in the behavioral health community to provide

22   effective treatment for mental health and substance use

23   disorders; right?

24   **A.**   Yes.

25   **Q.**   And you would agree that it's generally accepted in the

1  behavioral health community to provide effective treatment for

2  any co-occurring behavioral health conditions as well; right?

3  **A.**   Yes.

4  **Q.**   And you would agree that it's generally accepted in the

5  behavioral health community to provide treatment at the level

6  of service intensity the member needs for effective treatment

7  to occur; right?

8  **A.**   As long as it's the least restrictive care that can

9  fulfill that criteria.

10 **Q.**   And you would agree that effective treatment is not

11 limited to addressing acute symptoms; right?

12 **A.**   Correct.

13 **Q.**   You were asked by Ms. Romano about the meaning of the "why

14 now" phrase in the Level of Care Guidelines.  Do you remember

15 that?

16 **A.**   Yes.

17 **Q.**   And you said, quote:

18      "This calls the clinician to focus on the member in a

19      total holistic way."

20      Do you remember that testimony?

21 **A.**   Yes.

22 **Q.**   Is it your testimony today that the phrase "why now" was

23 included in the Level of Care Guidelines in order to ensure

24 that UBH's clinicians focus on the member in a total holistic

25 way?

1  A.   Well, this was Bill Bonfield's vision.  And he wanted us

2  to do it.  And he wanted the providers to do it.  And he was

3  hoping to move the healthcare community in that direction by

4  having us focus on it and asking our providers to focus on it.

5  Q.   Well, the question, though, is:  It's your testimony that

6  the phrase "why now" is what was used to direct UBH's

7  clinicians to focus on members in a total holistic way?

8  A.   It's not to say that they weren't before that, but this is

9  a call-out to both our providers and our clinicians.

10       MS. REYNOLDS:   I have no further questions, Your

11  Honor.

12             **REDIRECT EXAMINATION**

13  BY MS. ROMANO:

14  Q.   Dr. Martorana, I just have a few questions for you.

15       Ms. Reynolds asked you about whether therapeutic

16  communities are a norm of long-term residential treatment.  Do

17  you recall that testimony?

18  A.   Yes.

19  Q.   And I believe your answer was:  "As ASAM terms them, yes."

20       Can you explain what you mean by "As ASAM terms them,

21  yes"?

22  A.   Well, ASAM has broad definitions of residential treatment,

23  going down to their Level 3.1, which they also say this is

24  sober living community or also known as a halfway house.

25       This -- we have a separate level of care guideline for

1    sober living environment, slash, halfway house in order to

2    distinguish them from residential treatment, which we

3    understand to be a 24-hour intensive level of care.

4    **Q.**    You were also asked about whether there was a clinical

5    reason for not adopting ASAM at UBH.  Do you have an opinion as

6    to whether the UBH guidelines are consistent with the ASAM

7    guidelines in a clinical way?

8    **A.**    Yes, they are.  That's my opinion.

9    **Q.**    You were also asked about some utilization trends and

10   shown a PowerPoint with various trends.

11        Did utilization trends play any role in your experience in

12   the content and revision of the guidelines that we've discussed

13   in your testimony in this trial?

14   **A.**    No.

15   **Q.**    Did utilization trends, in your experience, play any role

16   in the application of the guidelines that we've discussed at

17   trial?

18   **A.**    No.

19   **Q.**    I'd like to direct your attention to Exhibit 673, please.

20   This was a document that was in the cross-examination binder

21   that you received from Ms. Reynolds.

22   **A.**    Yes.

23   **Q.**    And is this the article that you wrote with your colleague

24   Dr. Danesh Alam?

25   **A.**    Yes.

1   Q.   If you can turn to page 5, please.

2   A.   Okay.

3   Q.   And specifically directing your attention to line 5,

4   "Remaining in treatment for an adequate period is critical for

5   treatment effectiveness."

6   A.   Yes.

7   Q.   This was included in your article?

8   A.   Yes, it was.

9   Q.   And Ms. Reynolds read to you the language that was next to

10  that, that read:

11        "The appropriate duration for individuals depends on

12        their problems and needs.  Research indicates that for

13        most patients the threshold of significant improvement is

14        reached at about three months in treatment."

15  Does that "three months" reference relate to just a single

16  level of care?

17  A.   No.  It relates to being engaged in the recovery process.

18  So that goes across the continuum of care as we've talked about

19  the continuum.

20  Q.   And by "continuum of care" are you referring to the

21  different levels of care you testified to yesterday, which

22  could include inpatient, residential, partial hospitalization,

23  intensive outpatient, and outpatient treatment?

24  A.   Yes.

25  Q.   Ms. Reynolds pointed you to various statements throughout

1 the article that you wrote with your colleague, Dr. Alam.  In

2 your work at UBH, do you use the principles set forth in your

3 article in doing your work?

4 **A.**   In general terms, yes.  These are -- these are --

5 represents good clinical treatment, yes.

6 **Q.**   And do the principles that are set forth in the article

7 that you wrote with Dr. Alam -- excuse me, withdrawn.  Let me

8 rephrase it.

9      Do the principles set forth in your article with Dr. Alam

10 are they reflected in the UBH guidelines that we've discussed

11 in your testimony in this trial?

12 **A.**   I would say yes.

13        **MS. ROMANO:**  I don't have any further questions.

14        **THE COURT:**  Okay.

15        **THE COURT:**  Anything further?

16        **MS. REYNOLDS:**  Nothing further, Your Honor.

17        **THE COURT:**  Okay.  Thank you, sir.

18    (Witness steps down.)

19        **MS. ROMANO:**  Your Honor, UBH calls Dr. Thomas

20 Simpatico, designated expert in this case.

21        **MR. RUTHERFORD:**  Your Honor, I am going to step out to

22 get him.

23    (Pause)

24        **THE CLERK:**  Before you have a seat, can you raise your

25 right hand.

1   <u>**THOMAS SIMPATICO**</u>,

2   called as a witness for the Defendant, having been duly sworn,

3   testified as follows:

4           **THE CLERK:**  Thank you.  Please have a seat.  Make sure

5   you speak clearly into the microphone for our court reporter.

6   And you can pull that microphone whatever --

7           **THE WITNESS:**  Great.

8           **THE CLERK:**  There's water there if you should need it.

9       Can you please state your full name for the record, and

10  spell your last name.

11          **THE WITNESS:**  Thomas Simpatico, S-i-m-p-a-t-i-c-o.

12          **THE CLERK:**  Thank you.

13          **MS. ROMANO:**  Just a couple more moments, Your Honor.

14      And, Your Honor, for ease of reference, we have created a

15  highlighted version of the guidelines for Dr. Simpatico's

16  testimony.  I did give a copy to counsel earlier today, and I

17  think there's no objection.

18          **MR. KRAVITZ:**  I'm sorry, Your Honor.  We have no

19  objection to him using the highlighted version.

20          **THE COURT:**  Okay.

21                  <u>**DIRECT EXAMINATION**</u>

22  BY MS. ROMANO:

23  **Q.**   All right.  We'll go ahead and proceed.

24      Good morning, Dr. Simpatico.

25  **A.**   Good morning.

**Q.**   Can you please describe your educational background.

**A.**   Yes.  I'm a board-certified psychiatrist.  I went to medical school at Rush Medical College in Chicago, Illinois. And I trained in psychiatry at the University of Chicago, where I did a year of internal medicine as part of my psychiatrist residency training.

**Q.**   Can you describe your medical licensure and certifications.

**A.**   I'm currently licensed in the state of Vermont.

**Q.**   Do you currently see patients in the practice of psychiatry?

**A.**   I do.

**Q.**   How long have you been practicing psychiatry?

**A.**   Well, counting my psychiatric residency, since 1985.

**Q.**   Please describe your areas of specialty within psychiatry.

**A.**   Well, my areas of specialty include systems of care; standards of care; psychiatry and the law; public policy in serious mental illness; and, sort of as subsets of that, correctional medicine and veterans services.

**Q.**   Are you currently employed?

**A.**   I am.

**Q.**   By who?

**A.**   The University of Vermont College of Medicine.

**Q.**   What are your responsibilities at the University of Vermont?

1  **A.**    I'm a professor of psychiatry, and I'm a director of the

2  Division of Public Psychiatry.

3  **Q.**    How long have you served in that position?

4  **A.**    Since 2004, when we moved from Chicago to Vermont.

5  **Q.**    Are you familiar with something called Pathways Vermont?

6  **A.**    I am.

7  **Q.**    Can you explain what that is?

8  **A.**    So Pathways Vermont is a branch of Pathways to Housing, an

9  organization that started in New York City, which really

10  spawned the Housing First model and Harm Reduction model that

11  applies to persons with serious mental illness that are

12  homeless.

13        So about seven years ago, Vermont got a grant to bring

14  Pathways to Vermont.  And I was originally on their board and

15  then agreed to serve as their medical director.  And I remain

16  serving as their medical director today.

17  **Q.**    Have you held any other medical director positions?

18  **A.**    I have.  In Chicago, I served as the medical director for

19  two community mental health centers: Counseling Center of

20  Lake View and Trilogy.

21        I also served as medical director of the Chicago Reed

22  Mental Health Center, which is a state hospital in the northern

23  part of Chicago.  And I was sort of brought into that because

24  it was, as they say, a troubled state hospital.  So I was

25  brought in to help repair some of the systems.

1     And then, from there, I continued to serve in

2 administrative roles and became the director for mental health

3 services for the Illinois Department of Mental Health for the

4 northern part of Chicago, including funding for 36 community

5 mental health centers that fed Chicago Reed.

6     And then, subsequent to that, I was elevated to oversee

7 the metro Chicago area and oversaw four state hospitals and the

8 funding for 86 community mental health centers.

9     We then moved to Vermont, where I served as the -- for

10 about five years as the medical director for the Vermont State

11 Hospital; and then, as I've already said, began serving and

12 continued to serve as the medical director for Pathways

13 Vermont.

14 **Q.**   Have you had any involvement with the Vermont Medicaid

15 Authority?

16 **A.**   I have.  In my capacity as the director of public

17 psychiatry, the Vermont Medicaid Authority came to the medical

18 school a number of years ago looking to hire a chief medical

19 officer and medical director.  And I was originally on the

20 search committee; and some of my partners on the committee

21 thought it would be good if I served in that position.  So I,

22 for about four and a half years, served as the chief medical

23 officer for the Vermont Medicaid Authority.

24 **Q.**   How recently was that?

25 **A.**   I think up until about five months ago or so.

1  Q.   In your role as the chief medical officer for the Vermont

2  Medicaid Authority, did you serve as the chair of the Vermont

3  Clinical Utilization Review Board?

4  A.   I did.

5  Q.   Can you describe that role.

6  A.   Well, it was looking at Medicaid expenditures.  Part of

7  the role of the Medicaid Authority is to be accountable for the

8  expenditure of federal dollars, Medicaid dollars, to ensure

9  that those dollars are utilized in accordance with federal

10  guidelines.

11       And in Vermont, those dollars are allocated directly from

12  the Medicaid Authority to various providers in the community.

13  And they're also allocated to sister agencies, such as the

14  Department of Mental Health, Department of Aging, et cetera.

15  So part of my role was looking to see how those dollars were

16  being allocated through all of those organizations.

17  Q.   Are you currently performing any professional work in the

18  San Francisco Bay Area?

19  A.   I am.  About six months ago, I was retained to serve as

20  the lead of a clinical evaluation team for the Department of

21  Justice, looking at behavioral health services in Alameda

22  County.

23  Q.   Have you ever worked for a private health insurance

24  company?

25  A.   I have not.

1  Q.  Have you ever worked for a company that you considered to

2  be a managed care company?

3  A.  I have not.

4  Q.  Do you have experience using guidelines for utilization

5  management?

6  A.  I do.

7  Q.  What is your experience in that regard?

8  A.  Well, I have experience from various perspectives: as a

9  provider, as a medical administrator, and as an agent for the

10  payor in my capacity as the chief medical officer for VMA.

11  Q.  You used the term "payor."  What do you mean by "payor"?

12  A.  The source of funding for the provision of healthcare.

13  Q.  And you were referring to your role --

14  A.  As the Medicaid -- sorry.

15  Q.  You were referring to your role as the chief medical

16  officer for the Vermont Medicaid Authority?

17  A.  That's correct.

18  Q.  Have you ever served in the role of a payor on the

19  commercial side?

20  A.  I have not.

21  Q.  Have you ever testified on behalf of an insurance or

22  managed care company?

23  A.  No.

24  Q.  Can you describe the gamut of patients you've treated over

25  the years.

1   **A.**   Well, initially, back in, say, 1988, when I first

2   completed my residency training, I -- I moved in with my -- one

3   of my supervisors at the University of Chicago and had an

4   office on Michigan Avenue, where I saw what would be considered

5   sort of high-functioning individuals, doing largely

6   psychodynamic psychotherapy part of the time.

7       And then for about two-thirds of the time I was one of the

8   directors of the Northwestern University Psychiatric Rehab

9   Clinic, so I saw people with serious mental illness.  And saw

10  both of those populations contemporaneously for a period of

11  time.

12      As time went on, the focus of my practice became more and

13  more people with serious mental illness and also, by extension,

14  systems supportive of people with serious mental illness.

15  **Q.**   Have you treated people with substance use and mental

16  health issues?

17  **A.**   I have.

18  **Q.**   Have you done any research or written any publications

19  related to behavioral health and substance use treatment?

20  **A.**   Yes, I have.  They largely fall into three categories.

21  Papers regarding systems of care and efficiencies of systems of

22  care.  I have a number of papers that I've done in

23  collaboration with a team that I work with, looking at genetics

24  and genetic implications for the dopamine reward cascade which

25  is an underpinning for addictive disorders.

1    And, again, in my capacity as the chief medical officer

2 for Vermont Medicaid, I was very intimately involved in

3 developing and running the so-called Hub and Spoke model, that

4 was originated in Vermont, which was felt to be one of the

5 premiere models of addressing the opioid crisis.  And I've done

6 a number of papers addressing the experience of Vermont in

7 battling the opioid crisis.

8 **Q.**   Have you received any recognition from professional

9 societies in your career with respect to the fields of

10 psychiatry?

11 **A.**   Yes.  I'm a distinguished fellow of the American

12 Psychiatric Association.  I was invited to be a member of the

13 American College of Psychiatrists.  I've received a number of

14 recognitions from NAMI, the National Association for Mental

15 Illness.  I received Psychiatrist of the Year awards in

16 Illinois and Vermont, and also Psychiatrist of the Year award

17 from the national NAMI organization; and other teaching awards

18 and things like that.

19 **Q.**   In your work in behavioral health, have you had the

20 opportunity to become familiar with various criteria that

21 provide guidance on generally accepted standards of care?

22 **A.**   Yes.

23 **Q.**   Are you familiar with the organization ASAM?

24 **A.**   I am.

25 **Q.**   Have you -- are you familiar with what's referred to as

1   ASAM placement -- patient placement criteria?

2   A.   I am.

3   Q.   Are you familiar with an instrument called the LOCUS

4   instrument?

5   A.   I am.

6   Q.   Do you have an understanding as to the organization that

7   creates that?

8   A.   Yeah.  That was created by -- headed up by Wes Saures

9   (phonetic) and the American Association of Community

10  Psychiatrists, which is a subsidiary of the American

11  Psychiatric Association.

12  Q.   What is a community psychiatrist?

13  A.   I am a community psychiatrist.

14       So a community psychiatrist is a term that refers to

15  psychiatric practice that focuses on, generally speaking, care

16  that's given through community mental health centers and, you

17  know, often treats people with serious mental illness that get

18  their care in community mental health centers and, by

19  extension, rely on systems of care such as jails and emergency

20  departments and homeless shelters, because often people who are

21  treated in community mental health centers tend to circulate

22  through those structures.

23  Q.   Are you a member of the organization that created the

24  LOCUS instrument?

25  A.   I am.  I'm a member of the AACP.

1  Q.  Are you familiar with the American Psychiatric

2  Association?

3  A.  I am.

4  Q.  Are you a member?

5  A.  I am a distinguished fellow of the American Psychiatric

6  Association.

7  Q.  Are you familiar with other guidelines or criteria that

8  provide guidance on generally accepted standards of care?

9  A.  Sure.

10     The American Psychiatric Association creates -- for the

11  past 15 or so years have created a series of 20 or so clinical

12  practice guidelines, primarily focused on various disease

13  states.  And there are various committees that maintain and

14  update those criteria on a regular basis.

15     There are other criteria, certainly.  There are the

16  governmental structures that maintain criteria, such as CMS,

17  the Center for Medicare and Medicaid services.  Other

18  organizations, such as the World Health Organization has a

19  number of standards that they promulgate.  There are a number.

20  Q.  And were you retained as an expert to testify in this

21  case?

22  A.  I was.

23  Q.  And UBH retained you?

24  A.  Yes.

25  Q.  And what issues will you be providing opinion testimony on

1  today?

2  **A.**   Well, largely I'll be providing testimony to the following

3  points:

4      That there is no one single standard source of generally

5  accepted practice guidelines for behavioral health;

6      That among the recognized sources of best practices for

7  behavioral health there are a number of attributes or

8  principles that are shared in common;

9      That the UBH guidelines are consistent with the generally

10  accepted standards of care;

11      And that plaintiffs' experts in their opinions criticizing

12  the guidelines, the UBH guidelines, either misinterpret the

13  guidelines or do not take into full consideration other aspects

14  of generally accepted standards of care.

15  **Q.**   And have you reviewed the expert reports that were

16  prepared by Dr. Fishman and Dr. Plakun, plaintiffs' experts?

17  **A.**   I have.

18  **Q.**   Were you in the courtroom to listen to some of the

19  testimony from Dr. Plakun in this trial?

20  **A.**   Yes, I heard several hours of his testimony.

21  **Q.**   And did you also have an opportunity to read the

22  transcript of his testimony that you were not who here present

23  to watch?

24  **A.**   I did.

25  **Q.**   And with respect to Dr. Fishman's testimony, you weren't

1  in the courtroom for that testimony, were you?

2  **A.**  That's correct.

3  **Q.**  But did you have an opportunity to read the testimony from

4  the trial?

5  **A.**  I did.

6  **Q.**  In your opinion, Dr. Simpatico, what clinical practice and

7  utilization guidelines reflect generally accepted standards of

8  care in behavioral health treatment?

9  **A.**  Well, there are a number.  There's the American -- I've

10  listed some of them.  The American Psychiatric Association

11  Clinical Practice Guidelines; the ASAM criteria; the LOCUS; the

12  CMS guidelines; to some extent the World Health Organization.

13  **Q.**  And is there one single source that you would go to for

14  generally accepted standards of care?

15  **A.**  No.  They are complementary, and they tend to refer to one

16  another.

17  **Q.**  Are there some key principles that are consistently

18  represented across a clinical and utilization guidelines in

19  behavioral health care?

20  **A.**  Yes, I think there are.  And I think those include that,

21  in selecting care or how to provide care, care should be

22  provided in the least restrictive, effective, and safe manner

23  possible or location possible; that care should be medically

24  necessary; that care should be organized through individualized

25  treatment plans; that the care that is rendered should have a

1  reasonable expectation of being effective; and that all of the

2  activity going into the provision of care should be informed by

3  best practices, expert best practices and the medical

4  literature.

5  **Q.**  Let's go through each of those.

6  The first one was, you mentioned, least restrictive

7  effective care.

8  **A.**  Yes.

9  **Q.**  What does that concept include?

10  **A.**  So that concept includes when -- when one is selecting how

11  to provide care, one takes into consideration several

12  attributes or items.  One is, what is effective care?  And the

13  second is, what is the most effective, safest, least

14  restrictive safest place to dispense that care?

15  And the reason that is important is because in the

16  provision of care we, as a general matter, are striving to have

17  patients, people that we treat and serve, have as full and

18  productive lives as possible.

19  And, in part, one of the -- one of the considerations, an

20  important consideration is to provide care in the least

21  restrictive setting such that, inadvertently, we do not foster

22  dependency on the treatment setting; which can happen.  And

23  that, wherever possible, we allow people, our patients, to live

24  and work in as free and natural a setting as possible so that

25  their skills and abilities to work in the community do not

1    atrophy.

2    **Q.**    You've used the word "least restrictive."  Are you

3    familiar with the term "least intensive"?

4    **A.**    Yes.

5    **Q.**    How does that relate to "least restrictive," if at all?

6    **A.**    There's a fair amount of overlap.  I would not say they

7    are equivalent, but they -- you would have to use the term in

8    context to have a full precise meaning.

9    **Q.**    Does the principle of least restrictive level of care

10   apply to residential treatment?

11   **A.**    Yes.

12   **Q.**    Does it apply in situations where a member voluntarily or

13   patient voluntarily wants to be at a particular level of care?

14   **A.**    Yes.

15   **Q.**    And why does it apply in that circumstance?

16   **A.**    Well, the same principles apply, which is to say, you

17   know, one of the adages in medicine, of course, is *Do no harm*.

18        So we don't want to inadvertently do harm by causing a

19   person to become unnecessarily dependent on a more restrictive

20   level of care when that's not necessary to provide safe and

21   effective treatment.  And we want to bolster a person's ability

22   to remain able to integrate in the community.

23   **Q.**    How does safety play a role in an evaluation of a least

24   restrictive level of care?

25   **A.**    Well, it's a very important consideration.  And safety

1    generally speaks to a number of -- of considerations.  One is

2    the potential for a patient, the likelihood that they will

3    inflict harm on themselves or others.

4        It also relates to the ability of a person to fend for

5    themselves and care for themselves and make competent decisions

6    in their own service.  And so those are probably obviously

7    important considerations in selecting the safest and most

8    effective place to provide treatment.

9    **Q.**   I asked you about residential treatment.  Let me ask you

10   about other levels of care.

11       Does the principle of least restrictive level of care

12   apply to outpatient levels of care?

13   **A.**   It does.

14   **Q.**   And you said you've worked a lot in systems of care.  Is

15   that right?

16   **A.**   Yes.

17   **Q.**   And does that include various different levels of care in

18   behavioral health treatment?

19   **A.**   Yes.

20   **Q.**   And can you explain?  What are the various levels of care

21   that you're referring to?

22   **A.**   Sure.

23       And from a standpoint organized in terms of

24   restrictiveness, let's say, you know, it's probably easy to

25   conceptualize care the most restrictive level of care would

include inpatient hospitalization, where inpatient units can
either be voluntary units with open door policies or locked
units where a patient's ability to come and go is restricted.
And even within an inpatient unit, there are even more
restrictive levels of intensity, such as seclusion and other
subareas within inpatient.

Moving in a less restrictive direction, coming out of an
inpatient setting, let's say residential would be a next step
where there's still -- a person still resides in the treatment
setting and there's access to 24-hour services, but the person
is not limited to comings and goings, and it's less restrictive
than an inpatient setting but still fairly restrictive in that
it's a 24-hour service.

Less restricted than that would be a -- a partial
hospitalization program, where the patient would live at home
and would come to a fairly intensive array of services anywhere
between three and five days a week.

Slightly less restrictive still would be intensive
outpatient treatment, where it's the frequency of care would be
somewhat less frequent than one would find in a partial
hospitalization program.

And then, finally, outpatient treatment, which generally
speaking can occur several times a week, but generally speaking
occurs on a weekly basis and represents the least imposing of
one's time, of a patient's time and freedom than any of the

1    others.

2         So that sort of represents a continuum from most

3    restrictive to least restrictive.

4    **Q.**   Do criteria or guidelines that reflect generally accepted

5    standards of care in behavioral health uphold the consent of

6    least restrictive effective level of care?

7    **A.**   Yes, they do.

8    **Q.**   Can you provide some examples?

9    **A.**   Well, that concept is -- is explicitly stated in most or

10   all of the generally accepted standards of care.

11   **Q.**   Can I have you go ahead and open the first exhibit here,

12   and direct your attention to Exhibit 662.

13        Dr. Simpatico, are you familiar with this document?

14   **A.**   I am.

15   **Q.**   What is it?

16   **A.**   It is the American Society of Addiction Medicine Criteria.

17        **MS. ROMANO:**  I'd like to move this into evidence.

18        **MR. KRAVITZ:**  There is no objection.

19        **THE COURT:**  It's admitted.

20        (Trial Exhibit 662 received in evidence.)

21        **MR. KRAVITZ:**  Did you get that I said, "No objection"?

22        **THE COURT:**  Got it.

23        **MR. KRAVITZ:**  Sorry.  I can't see you.

24   **BY MS. ROMANO:**

25   **Q.**   Can you explain what the ASAM Criteria are?

1    A.    Sure.

2          So the ASAM criteria, the American Society of Addiction

3    Medicine -- whose cofounder I know; Dr. David Smith -- is a

4    group of subject matter experts that provide treatment for

5    addictive and substance-related disorders.

6          And for, again, probably starting about 12 or 15 years

7    ago, they have worked on collecting and analyzing the medical

8    literature and putting together a set of guidelines that are

9    particularly useful in the treatment of substance use

10   disorders.

11   Q.    And staying on this first page of the ASAM Criteria, have

12   there been multiple editions of the ASAM criteria?

13   A.    They have.  I believe this is the 3rd edition, which was

14   released in 2013.

15   Q.    Directing your attention to page 23, please.

16         On the right-hand column there's a title at the top that

17   says:  "Moving from a limited number of discreet levels of care

18   to a broad and flexible continuum of care."

19         And I'd like to draw your attention to the second

20   paragraph below that.

21   A.    (Witness examines document.)

22   Q.    The seventh line down it reads (reading):

23             "For both clinical and financial reasons, the

24         preferable level of care is that which is the least

25         intensive while still meeting treatment objectives and

1    providing safety and security for the patient."

2        In your opinion, are the ASAM criteria reflective of

3    generally accepted standards of care?

4    **A.**   Yes.

5    **Q.**   And the sentence I just read, is it consistent with your

6    testimony with respect to the least restrictive and effective

7    level of care?

8    **A.**   It certainly is.

9    **Q.**   Now I'd like to direct your attention, please, to

10   Exhibit 1395.

11   **A.**   (Witness examines document.)

12   **Q.**   Are you familiar with this document?

13   **A.**   Yes, I am.

14   **Q.**   What is it?

15   **A.**   It's a circular regarding the ASAM Product Continuum,

16   which is a criteria decision engine or search engine.

17           **MS. ROMANO:**  I'd like to move Exhibit 1395 in

18   evidence.

19           **MR. KRAVITZ:**  No objection.

20           **THE COURT:**  That's admitted.

21       (Trial Exhibit 1395 received in evidence)

22   **BY MS. ROMANO:**

23   **Q.**   Dr. Simpatico, what is the ASAM Continuum?

24   **A.**   It's a set of computerized algorithms intended to

25   operationalize the ASAM criteria.

1   Q.   And can I direct your attention to the second paragraph of

2   this document?   The first sentence reads (reading):

3          "The expert consensus-based algorithm in Continuum

4          recommends the optimal clinical outcome with the least

5          restrictive and most efficient care."

6   Does this also reflect the concept of least restrictive

7   and effective level of care you were testifying about?

8   A.   Yes, it does.

9   Q.   What does "most efficient care" mean in this context?

10  A.   So "most efficient" in this context refers to one of the

11  general principles.   Treatment should have a reasonable

12  expectation of providing improvement and being effective, and

13  so "efficient" implies that part and parcel of working with

14  someone, the expectation would be that there would be an

15  accurate diagnosis rendered, then a commensurate treatment plan

16  that's consistent with the diagnosis and informed by the

17  generally accepted standards of care and the medical

18  literature; and, thus, we would expect that in a,

19  quote/unquote, "reasonable amount of time," which is an

20  indefinite period of time and dependent upon the nature of the

21  underlying pathophysiology and mechanism of action of the

22  treatment, there would be a response.   And the expectation is

23  there would be a response in a timely manner consistent with

24  all of those qualities that I just listed.

25  Q.   And in your opinion, is efficient care something that is

1  required under generally accepted standards of care?

2  A.  Yes.

3  Q.  Turning now to Exhibit 694, please.

4  A.  (Witness examines document.)

5  Q.  Are you familiar with this document?

6  A.  I am.

7  Q.  What is it?

8  A.  It's a -- it's a publication from SAMHSA, which is the

9  Substance Abuse and Mental Health Services Administration,

10  which is a branch of the -- of HHS, federal HHS, and this is a

11  treatment improvement protocol tip document.

12  Q.  And I direct your attention to page 6, please.

13  A.  (Witness examines document.)

14  Q.  This is in Section 2, "Settings, Levels of Care, and

15  Patient Placement," under the heading "Role of Various Settings

16  in the Delivery of Services."  It reads (reading):

17      "Addiction medicine has sought to develop an

18      efficient system of care that matches patient's clinical

19      needs with the appropriate care setting in the least

20      restrictive and most cost effective manner."

21      Is that statement consistent with generally accepted

22  standards of care?

23  A.  Yes, it is.

24  Q.  Why?

25  A.  Well, again, it speaks to some of the general principles

1    of generally accepted standards of care, which is appropriate

2    diagnosis, commensurate treatment that is by definition

3    expected to improve the condition for which it's being

4    prescribed and, therefore, in a reasonable amount of time would

5    ameliorate the symptoms or prevent deterioration of the

6    symptoms.

7    **Q.**   Is the least restrictive and effective level of care a

8    principle that is used when evaluating transition of care to

9    different levels?

10   **A.**   Absolutely.

11   **Q.**   Why is that a principle for generally accepted standards

12   of care?

13   **A.**   Well, that evaluation actually happens constantly.  It

14   happens at the point when one is considering a transition to a

15   level of care, whether that's at the beginning of treatment or

16   subsequently when one is making transition from one level to

17   the next.

18       But it also happens throughout the time one is at a level

19   of care, which is always looking to see how in sort of the

20   dynamic play of treatment and response if the conditions and

21   circumstances of the patient change.  One is always evaluating

22   whether or not they are in the best place to receive the least

23   restrictive, safe, and effective treatment.  That's

24   particularly important when one is making a transition to

25   another level of treatment.

Q.    Is it a goal of treatment to transition to lower levels of

care?

A.    Yes, it is.

Q.    Turning back now to Exhibit 662, please.

A.    (Witness examines document.)

Q.    This was the ASAM criteria we looked at before?

A.    Yes.

Q.    Can I direct your attention to page 131 of the ASAM

placement criteria?

A.    (Witness examines document.)

Q.    Directing your attention to the third paragraph from the

bottom, it reads (reading):

        "The ASAM criteria multidimensional assessment helps

    ensure comprehensive treatment.  In the process of patient

    assessment, certain problems and priorities are identified

    as justifying admission to a particular level of care.

    The resolution of those problems and priorities determines

    when a patient can be treated at a different level of care

    or discharged from treatment."

    What does that mean?

A.    It means that certain aspects of a patient's presentation

will have a disproportionate influence in selecting the

appropriate level of care.  And since the purpose of treatment

is to ameliorate symptoms or prevent deterioration, the goal

and the hope is that symptoms will be ameliorated or

1  deterioration prevented such that there will be an opportunity

2  to consider a less restrictive treatment setting to safely and

3  effectively treat the patient.

4  **Q.**   And now can I direct your attention to Exhibit 653?

5  **A.**   (Witness examines document.)

6  **Q.**   Are you familiar with this document?

7  **A.**   I am.

8  **Q.**   What is this?

9  **A.**   This is the LOCUS, which is an acronym for Level of Care

10 Utilization System, which was developed by the American

11 Association of Community Psychiatrists.

12 **Q.**   Is this the document that Dr. Plakun referred to with

13 respect to patient placement?

14 **A.**   Yes, it is.

15 **Q.**   Are you familiar with the Austen Riggs facility?

16 **A.**   Yes, I am.

17 **Q.**   How are you familiar with the Austen Riggs facility?

18 **A.**   Well, I'm familiar with it through my training --

19 residency training in psychiatry and sort of studying the

20 history of psychiatry.  And Austen Riggs is probably the last

21 representative of a type of hospital that was found primarily

22 in the '50s and '60s.  Others would include Chestnut Lodge, the

23 Menninger Clinic in Topeka, Kansas.  And so it's, to my

24 knowledge, the last such facility in existence.

25 **Q.**   Is the Austen Riggs facility a provider of community

1  psychiatry?

2  **A.**   I would not put it in that category.

3  **Q.**   If I can direct your attention to page 25 of the LOCUS.

4  **A.**   (Witness examines document.)

5  **Q.**   This is under the section "Level 5 Medically Monitored

6  Residential Services."  Do you see that?

7  **A.**   I do.

8  **Q.**   And then down in the paragraph labeled "Crisis Resolution

9  and Prevention" --

10 **A.**   Yes.

11 **Q.**   -- it reads (reading):

12          "Residential treatment programs must provide services

13      facilitating return to community functioning in a less

14      restrictive setting."

15      Why is it important to return to community functioning in

16 a less restrictive setting?

17 **A.**   Well, again, for two reasons.  One, the ability to provide

18 safe and effective treatment in a less effective setting is a

19 proxy for, say, a patient is less symptomatic and doing better.

20      And the reason -- the second point is the reason that we

21 are interested in providing treatment in the least restrictive

22 setting possible is, again, to preserve a patient's ability to

23 function and thrive in the so-called real world and to not

24 foster unnecessarily dependency on the treatment setting.

25 **Q.**   And, finally, if you can turn to Exhibit 1469, please.

1  A.  (Witness examines document.)

2  Q.  Are you familiar with this document?

3  A.  I am.

4  Q.  What is it?

5  A.  This is the -- one of the practice guidelines published by

6  the American Psychiatric Association, and this was for

7  treatment of patients with substance use disorders.

8  Q.  Directing your attention to page 24, please, of

9  Exhibit 1469.

10  A.  (Witness examines document.)

11       MR. KRAVITZ:  Your Honor, could I just raise one

12  thing?  I think that this is the same as 6 -- I think this is

13  in evidence with another number.  Do you want to put it in

14  again?

15       MS. ROMANO:  I do not, and I actually -- no, I do not.

16       MR. KRAVITZ:  I think it's 634.  I'm just trying --

17  really, I'm just trying to be helpful.

18       THE COURT:  Okay.  Work it out later.

19       MS. ROMANO:  We'll work that out later, yes.

20       MR. KRAVITZ:  Fine.

21       MS. ROMANO:  I think you are probably right and I

22  noticed it.  That's why I didn't move it in actually, and thank

23  you.

24       MR. KRAVITZ:  All right.

25  \\\

1  BY MS. ROMANO:

2  Q.   Dr. Simpatico, looking at page 24, please.

3  A.   Yes.

4  Q.   At the bottom here there is a reference to "Residential

5  Treatment," the heading there.

6  A.   Uh-huh.

7  Q.   And if you can turn the page to page 25 of this document.

8  A.   (Witness examines document.)

9  Q.   Still under the "Residential Treatment" section and the

10  first complete paragraph it reads (reading):

11       "The duration of residential treatment should be

12       dictated by the length of time necessary for the patient

13       to meet specific criteria that would predict his or her

14       successful transition to a less structured, less

15       restrictive treatment setting, e.g., outpatient care."

16       Is a less restrictive treatment setting, such as

17  outpatient care, considered an inferior treatment?

18  A.   No, hardly.  In fact, the emphasis should be on the

19  goodness of fit at any point in time in a patient's

20  presentation.  So, again, they are receiving safe and effective

21  care in the least restrictive setting possible.  And so going

22  along with that principle, one hopes that the patient continues

23  to become less encumbered by their illness and, therefore, able

24  to receive services safely and effectively in a less

25  restrictive setting.

**Q.**   The provision I just read refers to "the length of time

necessary for the patient to meet specific criteria."  Do you

read that term "length of time necessary" as a strict time

clock?

**A.**   No.

**Q.**   Is it appropriate, in your opinion, to include language

relating to the length of time necessary for the patient to

meet specific criteria?

**A.**   Yes, from the standpoint that it's consistent with the

notion of reasonable expectation to cause improvement.

**Q.**   In your review of the testimony of Dr. Fishman and

Dr. Plakun, do you believe that -- do you have an opinion as to

whether they sufficiently took into account this essential

element of generally accepted standards of care, least

restrictive effective level of care?

**A.**   No, and this was one of the points I referenced in my

opening remarks today, which is I found that their -- that

plaintiffs' experts' testimony underemphasized the principle of

least restrictive, safe, and effective.

**Q.**   And is it your opinion that that impacted their opinions

relating to whether UBH's guidelines are consistent with

generally accepted standards of care?

**A.**   I think that's true.

**Q.**   And how did it impact that?

**A.**   Well, I would say by omitting or at the very least

1    de-emphasizing that important clinical principle, it was not

2    adequately valenced in their opinions regarding the comments

3    they were making.

4    Q.    You testified to four other principles for generally

5    accepted standards of care, so I'm going to move on to the

6    second one.

7         Medical necessity.  What does medical necessity refer to?

8    A.    So medical necessity essentially refers to care that is

9    reasonable, necessary, and appropriate.  And a way of

10   conceptualizing what that means is the American Psychiatric

11   Association has a fairly concise definition of that, which, if

12   I can paraphrase it, largely says that medically necessary care

13   is care that a prudent physician would provide that is

14   consistent with generally accepted standards of care, is -- has

15   reasonable intensity of services -- meaning the type of

16   service, the location that it is provided, the duration for

17   which it is provided, you know, that it's provided in an

18   effective and capable way -- and that the service provision is

19   not for the purpose of convenience of either the provider or

20   the patient and is not for the economic benefit of the

21   provider.

22   Q.    The third principle you mentioned was an individual

23   treatment plan?

24   A.    Yes.

25   Q.    Can you describe what that principle is of generally

1    accepted standards of care?

2    **A.**    Sure.  So an individual treatment plan is -- you know,

3    it's often referred to as the road map for the provision of

4    care, and it -- it is the organizing principle whereby the

5    information that is collected regarding a patient is compiled

6    and then from which a problem list is generated that then

7    prioritizes -- identifies and prioritizes what the tasks at

8    hand are in working with a patient, and then represents that

9    list in language that is easily able to be operationalized such

10   that it's easily describable in quantifiable terms in order to

11   efficiently talk about whether or not progress is being made

12   and who's responsible for that.  So it's a centerpiece for

13   organizing treatment.

14   **Q.**    What was the fourth principle of generally accepted

15   standards of care?

16   **A.**    That there would be a reasonable expectation of

17   improvement.

18   **Q.**    And can you describe what that principle is?

19   **A.**    Well, as it says on its face, that what we prescribe

20   hopefully works, and by "works" we mean and by "effective" we

21   mean generally one of two things.  One is that it actually

22   ameliorates the signs and symptoms for which it's prescribed;

23   and, secondly, that it prevents deterioration in the realm of

24   the signs and symptoms for which it's prescribed.

25        And if the treatment satisfies either of those criteria,

1  then it is deemed to be -- have a reasonable expectation of

2  causing improvement and is also another way of describing that

3  would be the term of "active treatment."

4  **Q.**  Are you familiar with the concept of maintenance of

5  functioning?

6  **A.**  Yes.

7  **Q.**  And how does that relate to the prevention of

8  deterioration, if at all?

9  **A.**  So "maintenance" itself is a bit of an ambiguous word, but

10  the term relates to the second point in the definition of

11  "active treatment," which is to say the prevention of

12  deterioration in such a way that if the treatment was removed,

13  deterioration would occur; and if the treatment is maintained

14  or provided, deterioration is deferred or prevented.  That is

15  another way of saying maintaining function.

16  **Q.**  Are they the same thing or the flip side?  Can you explain

17  what you mean by that interconnection?

18  **A.**  Well, so that's a way that the term "maintenance" is

19  consistent with the notion of active treatment; that is, it

20  is -- it is another way of saying "prevents deterioration."

21       The term can also be applied not to mean prevention of

22  deterioration in such a way that if the treatment was removed,

23  deterioration would occur.  "Maintenance" can be used in a more

24  vernacular -- in a more general term to simply mean assistance

25  with daily -- activities of daily living and other activities

1    that were they to be withdrawn would not cause a deterioration

2    in functioning.

3        So the term "maintenance" really needs to be used and

4    understood in the context of which it's being applied.

5    **Q.**    The fifth principle of generally accepted standards of

6    care you mentioned was that treatment should be evidence based.

7    What do you mean by that?

8    **A.**    Well, so the way medicine works is that it is, we like to

9    think, a scientific discipline as well as an art, and the

10   scientific part of it relies on all of the work that goes on in

11   doing investigations and recording findings in peer-review

12   journals that is an ongoing dynamic process.

13       And then there are various ways of assimilating that

14   constantly evolving knowledge so that it is most easily usable

15   by practitioners, and there's a sort of a -- sort of a graded

16   level of using that information.  There are, you know,

17   individual source articles.  There are then review articles

18   that collect various relevant articles and make general

19   observations.

20       And then as you go up a hierarchy, you can get to some of

21   the instruments that we've already discussed, which are, you

22   know, expert compilations, like the ASAM or the LOCUS, or the

23   American Psychiatric Association Clinical Practice Guidelines.

24   But the basis of those guidelines and generally accepted

25   standards of care emanate from peer-reviewed literature and

1   expert experience, and that should inform the care that is

2   provided to patients.

3   **Q.**   Dr. Simpatico, if you can put that binder aside but not

4   too far aside and pull out the other binder next to you.

5   **A.**   Uh-huh.

6   **Q.**   Does it contain Level of Care Guidelines that you

7   understand were used by UBH, United Behavioral Health, from

8   2011 to the present?

9   **A.**   It does.

10  **Q.**   And did you review all of those Level of Care Guidelines

11  in the course of your work in this case?

12  **A.**   Yes, I did.

13  **Q.**   And specifically did you review the common criteria?

14  **A.**   Yes, I did.

15  **Q.**   And did you review the language relating to residential

16  treatment for both mental health and substance use?

17  **A.**   Yes, I did.

18  **Q.**   And did you review the language relating to intensive

19  outpatient treatment for both mental health and substance use?

20  **A.**   I did.

21  **Q.**   And did you review the language relating to outpatient

22  treatment for both mental health and substance use?

23  **A.**   I did.

24  **Q.**   And did you form an opinion as to whether those guidelines

25  you reviewed are consistent with generally accepted standards

1  of care?

2  A.    I did.

3  Q.    What is that opinion?

4  A.    I find them to be consistent with generally accepted

5  standards of care.

6  Q.    Let's start with the 2017 guidelines, which is Exhibit 8.

7  A.    Just one second.

8        (Witness examines document.)  Okay.

9  Q.    If you could pull out the 2017 guidelines --

10  A.    Yes.

11  Q.    -- and please turn to page 6.

12  A.    (Witness examines document.)

13  Q.    This page is labeled "Level of Care Guidelines Common

14  Criteria and Clinical Best Practices For All Levels of Care."

15  What is your understanding as to the purpose of the common

16  criteria and clinical best practices?

17  A.    So the common criteria part of the guidelines are intended

18  to be applicable to all of the Level of Care Guidelines that

19  are part of that year's publication.

20  Q.    And turning to the bottom of page 6, please, there is a

21  reference to "Common Admission Criteria For All Levels Of

22  Care."  What is your understanding as to the purpose of the

23  common admission criteria?

24  A.    That the attributes that are described under this heading

25  are applicable to all levels of care.

1    Q.   If you can turn to page 7, please, and take a look at the

2    content next to the first two black bullet points.  It reads

3    (reading):

4            "The member's current condition cannot be safely,

5        efficiently, and effectively assessed and/or treated in a

6        less intensive level of care.  Failure of treatment in a

7        less intensive level of care is not a prerequisite for

8        authorizing coverage; and the member's current condition

9        can be safely, efficiently, and effectively assessed

10       and/or treated in the proposed level of care.  Assessment

11       and/or treatment of the factors leading to admission

12       require the intensity of services provided in the proposed

13       level of care."

14   Are these provisions as common admission criteria

15   consistent with generally accepted standards of care?

16   A.   Yes, they are.

17   Q.   Why is that?

18   A.   Well, they speak to considerations of least restrictive,

19   safe, and effective level of care and they specifically address

20   the fact that in considering the patient's presenting picture,

21   that an active determination is made that the proposed level of

22   care represents the least restrictive, safe, and effective

23   level and that a less restrictive level would not be able to

24   provide safe and effective care.

25   Q.   There's a reference to "the member's current condition"

1    twice in the language I just read.  In your opinion what does

2    that mean, "the member's current condition"?

3    **A.**    Well, as the name implies, it's their current condition.

4    And what that correlates to in the way of sort of the data

5    acquisition that is usual and customary in medicine is several

6    things.  One is:  Why does the patient -- why is the patient

7    seeking care at this time, or why are they -- why are they

8    before you at this time?

9        And there's a general, you know, common term that is used,

10   you know, everywhere that is called "the chief complaint,"

11   which basically is:  Why does the patient present?  What is

12   their opinion?

13       In addition, it includes another category that is commonly

14   used, which is the history of the present illness.  And the

15   history of the present illness is a both sort of subjective and

16   objective assessment of the current circumstance that brings

17   the patient before you that day, and that includes more of the

18   subjective experience or opinion of the patient and other

19   members of the support system that may be accompanying the

20   patient.

21       It also includes other collateral information that comes

22   from -- may come from other sources or the patient's record all

23   describing different aspects of the relatively recent, and

24   that's again an indefinite period of time, but the underpinning

25   for the presentation that you are confronted with that day.

1    It also includes the assessment of the data that is

2  compiled in the service of collecting and creating the

3  individualized treatment plan, which is a considerable amount

4  of information that largely addresses a patient's past history

5  in a variety of ways such that the presenting circumstance can

6  be understood not only unto itself but also in the context of

7  the patient's history.

8  **Q.**  Is there a place in the guidelines that you reviewed where

9  the database factors are considered or set forth?

10  **A.**  Yes.  The database factors fall under the heading on the

11  lower right on page 7 under "Common Clinical Best Practices For

12  All Levels Of Care."

13  **Q.**  And what specifically are you referring to when you talk

14  about the database factors?

15  **A.**  Well, if one -- you know, they are primarily listed on

16  page 8, and it's a quite comprehensive listing of the different

17  types of information that one would be expected to collect and

18  then to assimilate into constructing and synthesizing a

19  treatment plan.

20      And, as you can see, some of the things that I mentioned

21  are listed here:  The chief complaint, the history of the

22  present illness, factors leading to the request for service, on

23  and on.

24  **Q.**  Do you have an opinion as to whether this list of database

25  factors is a comprehensive list?

1  **A.**   Well, it certainly is a very reasonable representation of

2  the array of services that should be collected in order to make

3  a competent individual treatment plan.

4  **Q.**   Can you turn back to page 7, please, back up to those top

5  two common admission criteria we're talking about and the term

6  "current condition."

7       In your opinion does the term "current condition" in these

8  bullet points include chronic conditions?

9  **A.**   Yes.

10  **Q.**   Does it include comorbid conditions?

11  **A.**   Yes.

12  **Q.**   And is it consistent with generally accepted standards of

13  care to evaluate whether the member's current condition can be

14  safely, efficiently, and effectively assessed and/or treated in

15  the proposed level of care?

16  **A.**   Absolutely.

17  **Q.**   Is this consistent with the principle of least restrictive

18  and effective level of care that you spoke about earlier?

19  **A.**   Yes, it is.

20  **Q.**   Turning your attention to the third bullet point on this

21  page that reads (reading):

22       "Co-occurring behavioral health and medical

23       conditions can be safely managed."

24       Do you have an opinion as to whether this provision is

25  consistent with generally accepted standards of care?

1  **A.**   It is.

2  **Q.**   Did you say it is?

3  **A.**   It is.

4  **Q.**   Why is that?

5  **A.**   Well, it speaks to, again, compiling a comprehensive

6  understanding of a patient's current and past medical history

7  and circumstances in order to understand how to understand the

8  presenting picture, and it necessarily includes an

9  understanding of their behavioral health history and any

10  general medical conditions that they may have.

11  **Q.**   In your opinion, what does --

12      **THE COURT:**  So let me ask you a question about that

13  because this troubles me.  The top of the page when referring

14  to current conditions says that the current condition needs to

15  be effectively managed.  Effectively treated essentially.

16      **THE WITNESS:**  Yes.

17      **THE COURT:**  When they get to co-occurring conditions,

18  they say they only have to be safely managed.  I have a couple

19  of questions.  Isn't that different?

20      **THE WITNESS:**  I don't think so.

21      **THE COURT:**  It's not different?

22      **THE WITNESS:**  No.

23      **THE COURT:**  So why didn't they say "safely,

24  effectively, and efficiently treated"?

25      **THE WITNESS:**  I don't know.  I would approve that edit

1    in future.

2         THE COURT:  Oh.  Excellent.  Okay.  Write that down,

3    please.

4       Okay.  The other alternative is also that it means that

5    co-occurring behavioral health and medical conditions are not

6    included in the co-occurring -- in the current conditions

7    because they're treated separately in terms of these particular

8    guidelines.  The current condition is in one place and the

9    comorbidity conditions are in another place.

10        THE WITNESS:  I don't read it that way.

11        THE COURT:  You don't read it that way?

12        THE WITNESS:  I do not.

13        THE COURT:  Okay.  And why not?  Why would you have

14   this at all given the first one if your interpretation is

15   correct?

16        THE WITNESS:  Overkill perhaps.  But the reason I

17   don't read it that way --

18        THE COURT:  I don't read these guidelines as

19   overkill --

20        THE WITNESS:  Well --

21        THE COURT:  -- but --

22        THE WITNESS:  -- there are certainly some editorial

23   improvements that could happen throughout the guidelines.

24      And the reason I don't view it that way is because of my

25   familiarity with the standard of care in providing care, which

1  necessarily means understand the chief complaint, understand

2  the history of the present illness, understand the patient's

3  past medical history, understand that elements in the past

4  medical history.

5      And intercurrent general medical conditions, for example,

6  certainly may affect the presentation of the current clinical

7  picture.  So one cannot think about the current clinical

8  picture without adequately reviewing the data elements that are

9  collected in this array in the database.

10     **THE COURT:**  Oh, but you're talking about what

11 generally accepted standards of care are.  You're not talking

12 about what's in the guidelines.  So what you're doing is you're

13 reading into the guidelines your generally accepted standard of

14 care.  Because you know it's got to be done a particular way,

15 therefore, they must mean it that way.

16     **THE WITNESS:**  Well, I don't think so.  So further down

17 here I think it says (reading):

18         "Services are the following" -- and this is a list of

19     "and" statements; right? -- "Services are the following:

20     That they are consistent with generally accepted standards

21     of clinical practice" -- well, that's what we're talking

22     about -- "that they are consistent with services backed by

23     credible research soundly demonstrating that the services

24     will have a measurable and beneficial health outcome" --

25     that's the reasonable expectation of improvement -- "that

1    they are consistent with Optum's Best Practice

2    Guidelines" -- that refers to the database.

3        So I see those as -- in my mind, that pulls all of that

4    together and which also happens to be consistent with my

5    understanding of how to safely and appropriately provide care.

6    I think that is what that says.

7        THE COURT:  That's what that says, but why do you say

8    that's what the first bullet point says since it's not in the

9    first bullet point?  And the first bullet point is

10   distinguished from co-occurring behavioral health conditions,

11   and aren't you just reading into those what you think should be

12   the standard of care?

13       THE WITNESS:  I don't think so.  Like I said, I agree

14   that there could be improvements in the syntax of these

15   guidelines.

16       THE COURT:  Yeah.

17       THE WITNESS:  But I -- the fact that this --

18       THE COURT:  Well, just bear with me.  Bear with me a

19   second.

20       THE WITNESS:  Sure.  Sure.

21       THE COURT:  If you were writing these things --

22       THE WITNESS:  Yes.

23       THE COURT:  -- you wouldn't write "Current condition"

24   including all of those things you're saying and then say "And

25   on top of that I want you to take care of their co-occurring

1  conditions."  You wouldn't say that; right?  You wouldn't say

2  that because someone might look at you and say, "Does that mean

3  in dealing with the current condition you meant don't treat the

4  co-occurring conditions?"

5          **THE WITNESS:**  If I were writing these, I would

6  probably write them in a slightly different style.  However, in

7  the style that they are written, I understand the fact that

8  somewhat inartfully there is listed in these "and" statements a

9  support for my view of what is -- what should happen.

10     I think the fact that they talk about generally accepted

11  standards of care and talk about "Services are the following"

12  created through the database that's collected in the section

13  considered clinical best practices, I think that supports it.

14          **THE COURT:**  Thank you.  I appreciate that.

15          **THE WITNESS:**  Absolutely.

16  **BY MS. ROMANO:**

17  **Q.**  Let's move ahead to a different provision now.

18  **A.**  Okay.

19  **Q.**  Staying on page 7, I'd like to go to the last black bullet

20  point in the "Common Admission Criteria," which reads

21  (reading):

22          "There is a reasonable expectation that services will

23      improve the member's presenting problems within a

24      reasonable period of time.  Improvement of the member's

25      condition is indicated by the reduction or control of the

1    signs and symptoms that necessitated treatment in a level

2    of care.  Improvement in this context is measured by

3    weighing the effectiveness of treatment against evidence

4    that the member's signs and symptoms will deteriorate if

5    treatment in the current level of care ends.  Improvement

6    must also be understood within the broader framework of

7    the member's recovery, resiliency, and well-being."

8    Is it your opinion that this provision that I've just read

9    is consistent with generally accepted standards of care?

10   A.   Yes.

11   Q.   There is reference here to presenting problems.  In your

12   opinion, what does that mean?

13   A.   Presenting problems are part of the -- are the

14   constellation of reasons for which a person is seeking care and

15   the -- not only their opinion about why they are seeking care

16   but the presenting problems that are both objectively and

17   subjectively determined in the process that we just talked

18   about.

19   Q.   Do presenting problems include symptoms associated with

20   chronic conditions?

21   A.   Of course.

22   Q.   Do presenting problems include symptoms associated with

23   comorbid conditions?

24   A.   Yes.

25   Q.   There is a reference here to "improvement within a

1  reasonable period of time."  In your opinion, is that

2  consistent with generally accepted standards of care?

3  **A.**    Yes.

4  **Q.**    Why?

5  **A.**    Well, I think it's a proxy for the concept of reasonable

6  expectation of improvement, which is not much of a proxy.  It's

7  kind of saying that.  And so, again, it gets to the -- it goes

8  to the heart of the expectation that one -- that a provider is

9  responsible for generating an accurate diagnosis such that --

10  and being knowledgeable enough to match the treatment for that

11  diagnosis with information that is supported by the generally

12  accepted standards of care; and that once that happens, one is

13  necessarily selecting treatment that is expected to improve the

14  signs and symptoms for which it's being applied.

15      And depending on the underlying pathophysiology and the

16  nature of how the treatment works, there would be a period of

17  expectation after which you would be forced to reevaluate

18  whether you had made an accurate diagnosis or whether it was

19  not responding to that period of -- that type of treatment.

20      But there is a -- and I can give you examples of what that

21  could look like, but "reasonable period of time" is

22  purposefully indefinite because what is reasonable varies from

23  diagnosis to diagnosis, treatment to treatment, context to

24  context.

25  **Q.**    The last white bullet point that I had read refers to

1  weighing the effectiveness of treatment against the evidence

2  that the member's condition will deteriorate if treatment is

3  discontinued in the current level of care.  What does that mean

4  in your opinion?

5  **A.**   So, again, that goes to sort of the second part of the

6  definition of "active treatment," which is treatment is

7  effective if it either ameliorates the symptoms, the signs and

8  symptoms, for which it's being prescribed, or it prevents

9  deterioration in the realm of the signs and symptoms for which

10  it's prescribed, such that if it were to be removed, there

11  would be predictable and expectable deterioration.  And so the

12  effectiveness of that treatment for that application is

13  supported by either of those examples.

14  **Q.**   I'm going to ask you to pull up the other binder for a

15  moment and open it to Exhibit 656, please.

16  **A.**   (Witness examines document.)

17  **Q.**   Are you familiar with this document, Dr. Simpatico?

18  **A.**   Yes, I am.

19  **Q.**   And is it a Medicare Benefit Policy Manual, Chapter 6?

20  **A.**   Yes, it is.

21  **Q.**   If you can turn, please, to page 26 of this document.

22  **A.**   (Witness examines document.)

23  **Q.**   And there's a section titled "Reasonable Expectation of

24  Improvement."  Do you see that?

25  **A.**   I do.

Q.  I'm going to read a portion of it and then I'll ask you a

few questions.  It reads (reading):

      "Services must be for the purpose of diagnostic study

     or reasonably be expected to improve the patient's

     condition.  The treatment must at a minimum be designed to

     reduce or control the patient's psychiatric symptoms so as

     to prevent relapse or hospitalization and improve or

     maintain the patient's level of functioning.  It is not

     necessary that a course of therapy have as its goal

     restoration of the patient to the level of functioning

     exhibited prior to the onset of the illness, although this

     may be appropriate for some patients.  For many other

     psychiatric patients, particularly those with long-term

     chronic conditions, control of symptoms and maintenance of

     a functional level to avoid further deterioration or

     hospitalization is an acceptable expectation of

     improvement.  Improvement in this context is measured by

     comparing the effect of continuing treatment versus

     discontinuing it.  Where there is a reasonable expectation

     that if treatment services were withdrawn, the patient's

     condition would deteriorate, relapse further, or require

     hospitalization, this criterion is met."

    Is it your understanding, Dr. Simpatico, that what I've

just read is part of the CMS' definition of a "reasonable

expectation of improvement"?

1    **A.**    Yes.

2    **Q.**    And what I just read did not include the provision

3    "reasonable amount of time"?

4    **A.**    It did not.

5    **Q.**    Does this mean in your opinion that the CMS guideline is

6    not consistent with the UBH guidelines with respect to that

7    issue, a reasonable period of time?

8    **A.**    No.  I think it's completely consistent.

9    **Q.**    And why do you say that?

10   **A.**    Well, because the heading here is "Reasonable Expectation

11   of Improvement" and in order for there to be a reasonable

12   expectation of improvement, there is -- it is -- there is

13   necessary -- it is necessary for there to be a temporal

14   correlation to the application of the treatment, knowledge of

15   the underlying pathophysiology and mechanism of action of the

16   treatment and, therefore, a -- you know, a window of

17   expectation of when we should see improvement.

18        So implicit in that construct is a period of time that is

19   determined by those three variables.  So I view "reasonable

20   expectation of improvement" to necessarily mean a commensurate

21   period of time that's commensurate with those three elements

22   that I just described.

23        And if it didn't happen in that period of time, it would

24   then begin to raise the question:  Is this person not

25   responsive to a treatment that for many people in this

1  particular circumstance works, or do we have the incorrect

2  diagnosis?  But you start to then challenge your fundamental

3  assumptions in the treatment construct.

4  Q.  And then there's other language in the CMS guideline

5  that's not reflected in the UBH guideline, and I want to direct

6  your attention specifically to a sentence that starts in the

7  second paragraph -- so I'm on Exhibit 656, page 26 -- and that

8  sentence is (reading):

9        "For many other psychiatric patients, particularly

10       those with long-term chronic conditions, control of

11       symptoms and maintenance of a functional level to avoid

12       further deterioration or hospitalization is an acceptable

13       expectation of improvement."

14  Now, the UBH guidelines don't reference long-term or

15  chronic conditions, or at least use those words; is that right?

16  A.  That's correct.

17  Q.  And in your opinion, does that make the UBH guidelines

18  more restrictive with respect to the definition of

19  "improvement"?

20  A.  Not at all.  The UBH guidelines' language is fully

21  consistent with the example that you just read.

22  Q.  Can you explain why that's your opinion?

23  A.  Well, because the UBH guidelines simply defining "active

24  treatment" in the context of amelioration of symptoms or

25  prevention of deterioration, it is silent on duration of

illness; and this is simply making an explicit example of

chronic mental illness and how for many people the second part

of the definition of "active treatment" is often the focus of

their treatment, which is the prevention of deterioration.

But this description is completely consistent with the

language in the UBH guideline.

**Q.** Does the UBH guideline provision relating to improvement

include maintaining a level of function as a concept that's

considered as part of improvement?

**A.** Say that one more time. I'm sorry.

**Q.** Sure.

Does UBH's provision relating to improvement --

**A.** Yes.

**Q.** -- include consideration of maintaining functioning?

**A.** Yes.

**Q.** How?

**A.** Well, again, maintaining function, it defines

"improvement" in terms of either amelioration of symptoms or

predictable preservation of -- or prevention of deterioration,

and prevention of deterioration is maintenance of functioning.

**Q.** What does it mean that "Improvement must also be

understood within the framework of the member's broader

recovery, resiliency, and well-being goals"? And I'm

specifically -- I'm going to withdraw that question.

Let me refer you back to the 2017 guideline, which is

1  Exhibit 8, page 7.

2  **A.**  (Witness examines document.)

3  **Q.**  And looking at the provisions relating to improvement, and

4  the very last sentence there on improvement it says (reading):

5      "Improvement must also be understood within the

6      broader framework of the member's recovery, resiliency,

7      and well-being."

8  What does that mean?

9  **A.**  So it means that care should be patient centric.  So

10  because in all of our infinite cleverness and wisdom, we will

11  come up with an elegant determination of what the problem is,

12  what the presenting problems mean, what treatment should be.

13  We don't simply impose this on patients.  We collaboratively

14  discuss our findings with the patients and understand their

15  understanding of what their symptoms mean to them in the

16  context of their lives.

17      By the way, many mental illnesses are by definition

18  chronic mental illnesses, and so -- and some of this language,

19  recovery is -- actually one of the ways that recovery can be

20  understood here is in the context of the so-called recovery

21  movement, which has grown up over the last several decades in

22  the mental health world, which precisely addresses how people

23  conceptually -- with mental illness conceptualize their illness

24  vis-a-vis their own selfhood and the role it plays on defining

25  them and how their symptoms are dealt with by them.

1       And there's a fair amount of variability in terms of how

2   people view that, and it's incumbent on the provider to be

3   sensitive to that and to provide treatment or to propose

4   treatment in the context of the patient's understanding of the

5   meaning of their illness for them.

6   **Q.**  Consideration of the broader framework of the member's

7   recovery, resiliency and well-being, is that consistent with

8   generally accepted standards of care?

9   **A.**  Absolutely.

10  **Q.**  In your opinion, do the common admission criteria we've

11  just read require continuous improvement in order to remain in

12  a level of care?

13  **A.**  No.

14  **Q.**  In your opinion, do the guidelines mean that once the

15  presenting problems are improved, no care is covered?

16  **A.**  No.

17  **Q.**  And in your opinion, do the guidelines mean that once the

18  presenting problems are improved, there must be a step down to

19  a different level of care?

20  **A.**  No.

21  **Q.**  Let's move to the common continued service criteria for

22  all levels of care.  Still on page 7.  The first bullet point

23  reads (reading):

24          "The admission criteria continued to be met and

25      active treatment is being provided.  For treatment to be

1    considered active, services must be as follows:

2         "Supervised and evaluated by the admitting provider.

3         "Provided under an individualized treatment plan that

4    is focused on addressing the factors leading to admission

5    and makes use of clinical best practices.

6         "Reasonably expected to improve the member's

7    presenting problems within a reasonable period of time."

8    Is the provision that I just read with respect to "active

9    treatment" consistent with generally accepted standards of

10   care?

11   A.   Yes, it is.

12   Q.   Is it appropriate in your opinion to limit services to

13   active treatment?

14   A.   Well, it's not limiting services, but unless active

15   services are being provided and they're often determinative of

16   the appropriate level of care, that doesn't exclude other

17   considerations or other elements that may be on the problem

18   list that are also being addressed at a given level of care.

19   It's just that those are generally not determinative of that

20   level of care.

21   Q.   And are the three bullet points that are set forth as the

22   requirement for active treatment, in your view, are those three

23   bullet points consistent with generally accepted standards of

24   care?

25   A.   Yes, they are.

1  **Q.**  And looking specifically at that second white bullet

2  point, it says (reading):

3       "Provided under an individualized treatment plan that

4       is focused on addressing the factors leading to

5       admission."

6  What does it mean for a treatment plan to be focused on

7  addressing the factors leading to admission?

8  **A.**  It means that after one has reviewed the information that

9  we've already discussed in the context of the chief complaint

10  and history of present illness and the analysis of the

11  database, that one creates a list -- a problem list and one

12  valences the elements on that problem list in different ways,

13  and certain elements on the problem list are going to have a

14  disproportionate influence on selecting the appropriate level

15  of care in order to provide least restrictive, safe, and

16  effective level of care.

17      And so -- did I answer the question for that one?  I'm

18  sorry.

19  **Q.**  Let me ask you an additional one.

20  **A.**  I'm sorry.  Yes.

21  **Q.**  Why is it consistent with generally accepted standards of

22  care for an individualized treatment plan to be focused on

23  addressing the factors leading to admission?

24  **A.**  Oh, yes.  I'm sorry.

25      Because as -- because there are going to be certain

1  problems on the problem list that are going to be more

2  determinative of which level of care is the appropriate level

3  of care; and as those problems are addressed and hopefully

4  ameliorated in the way that we have defined "ameliorated,"

5  either amelioration of the symptoms or preservation or

6  prevention of deterioration, there's an ongoing assessment of

7  what is the most appropriate best fit for the provision of

8  least restrictive, safe, and effective care.

9       And so the hope is that the problems -- or the intent is

10  that the problems that have -- are included on the problem list

11  and largely are determinative of which level of care a person

12  is placed at are a focus of care.

13  **Q.**   And looking at the third white bullet point, why should

14  services be reasonably expected to improve the member's

15  presenting problems within a reasonable period of time?

16  **A.**   Because we hope treatment works and, you know, there is --

17  if the -- you know, the presenting problems -- the point of

18  treatment would be to address the presenting problems, and one

19  would imagine that the presenting problems are determinative of

20  why they are receiving care.  So if we are addressing care, we

21  hope that we are addressing the presenting problems.  And in

22  order to address them, we hope that we are, as we've discussed,

23  using treatment that is medically necessary and expected to

24  produce improvement.

25  **Q.**   And looking at the next black bullet point there, it says

1    (reading):

2              "The factors leading to admission have been

3         identified and are integrated into the treatment and

4         discharge plans."

5         Is that provision consistent with generally accepted

6    standards of care?

7    A.   Yes, it is.

8    Q.   Why?

9    A.   Again, because the factors leading to admission is -- has

10   in the array of actionable problems on the problem list several

11   of those are valenced more highly and more relevant to the

12   selection of the level of care.  And so it would be derelict to

13   not address the reasons why someone had sought treatment and

14   was placed at a particular level of care.  And this simply

15   states that a treatment plan should be careful to include those

16   things that required someone to seek treatment in the first

17   place.

18   Q.   Do you read this provision to mean that the treatment plan

19   is only focused on addressing the factors leading to admission

20   to the exclusion of everything else?

21   A.   No, it does not say that.

22   Q.   Moving now to the common discharge criteria still on

23   page 7 of Exhibit 8, it reads (reading):

24              "The continued stay criteria are no longer met."

25         And then there's a series of five examples.  Looking at

the first example (reading):

      "The factors which led to admission have been

   addressed to the extent that the member can be safely

   transitioned to a less intensive level of care or no

   longer requires care."

   Is it consistent with generally accepted standards of care

for this first prong to be an example of when there should be a

transition to a less intensive level of care or to be part of

discharge criteria?

A.   Yes.

Q.   Why?

A.   Again, the exercise is that we identify problems to be

addressed.  We have metrics to address what progress in

addressing those problems looks like.  We are bringing to bear

treatments that are -- have a reasonable expectation of

providing improvement.  "Improvement" is defined as the

amelioration of symptoms or the prevention of deterioration.

   As those things happen, we are constantly reassessing for

the opportunity to be able to continue to provide safe and

effective treatment in a less restrictive manner.  So that's

precisely what we would want to do in order to move someone to

have the opportunity to move someone to a less restrictive

level of care and still be able to provide safe and effective

treatment.

Q.   Looking at that first example I just read, it refers to

1    "safely transition to a less extensive level of care."  It

2    doesn't include the word "effective" in there.  Do you read

3    that to mean that a patient will be transferred to a less

4    intensive level of care when it's safe even if it's not

5    effective?

6    **A.**    No.  As a clinician, I read the word "safe" as being

7    applied to a clinical condition or clinical circumstance.  So

8    my reading of the word "safe" in that context necessarily

9    implies "effective."

10       Even if that were not correct -- but I think it is

11   correct -- in moving to another level of care, there is the

12   safeguard that in moving to another level of care, if we go

13   back to the top of the page, in assessing someone for treatment

14   at a new level of care, there is explicitly the language that

15   says "safe and effective."

16   **Q.**    And now looking at the last bullet point in this comment

17   discharge criteria, still on page 7 of Exhibit 8, it reads

18   (reading):

19            "The member is unwilling or unable to participate in

20        treatment and involuntary treatment or guardianship is not

21        being pursued."

22       In your opinion, is it consistent with generally accepted

23   standards of care for this to be among the examples of

24   discharge criteria?

25   **A.**    Yes.

1  **Q.**   Why?

2  **A.**   Well, again, excluding the population of persons that

3  would qualify for involuntary hospitalization or treatment, as

4  is said here, in order to provide treatment, one needs to be,

5  as we've established, able provide active treatment.  And it's

6  hard to imagine how one would be able to provide active

7  treatment if you're unable to establish a therapeutic

8  relationship or a collaborative meeting of the minds with the

9  patient.

10      And so if they are unwilling to participate in treatment

11  or unable to participate in treatment, there would be --

12  depending on the circumstance, after an attempt to get them to

13  the place where they could participate in treatment, a decision

14  would have to be rendered that active care is not being

15  rendered and there would, therefore, no longer be the basis of

16  providing medically necessary care.

17  **Q.**   Now, looking at the common clinical best practices for all

18  levels of care, Dr. Simpatico, you've spoken a little bit about

19  this section and how you read it already.  I want to call your

20  attention to just a couple of the bullet points here.

21      So turning to page 8, the third black bullet point down

22  reads (reading):

23          "The provider and, whenever possible, the member use

24      the findings of the initial evaluation and diagnosis to

25      develop a treatment plan.  The treatment plan addresses

1    the following..."

2    And then calling your attention to the third white bullet

3    point down there, it says (reading):

4        "The expected outcome for each problem to be

5        addressed expressed in terms that are measurable,

6        functional, time framed, and directly related to the

7        factors leading to admission."

8    A.    Yes.

9    Q.    Do you read that provision to be consistent with generally

10   accepted standards of care?

11   A.    I do.

12   Q.    Why?

13   A.    Well, that description of treatment planning could be

14   lifted from any textbook on how to do treatment planning.  And

15   by that I mean -- and I alluded to this earlier -- in devising

16   a treatment plan, one needs to conceptualize the actionable

17   problems in actionable remedies.

18   And so the active problem list is organized after the

19   diagnostic interview and diagnosis and treatment is proposed.

20   That's represented in the treatment plan, and the treatment

21   plan then is written in language that lends itself to

22   describing progress so that there are -- there need to

23   necessarily be metrics that are easy to discuss with treatment

24   team members so that in the ongoing treatment team meetings

25   that happen, there's an efficient and an effective language to

1  assure all concerned that care is being delivered in accordance

2  with the expectations of improving signs and symptoms.

3     And this is precisely the way that treatment plans should

4  be structured in order to facilitate that part of the exercise.

5  That's an inherently important part of treatment planning.

6  **Q.**  Does the provision I just read raise a concern that the

7  treatment plan is focused on only acute factors rather than on

8  a larger clinical picture?

9  **A.**  No.

10  **Q.**  Looking at the top white bullet point here, it says

11  (reading):

12        "The short and long-term goals of treatment."

13  **A.**  Yes.

14  **Q.**  Is it consistent with generally accepted standards of care

15  for a treatment plan to include both short- and long-term goals

16  of treatment?

17  **A.**  Absolutely.

18  **Q.**  Why?

19  **A.**  Well, because, you know, in constructing a treatment plan

20  and a treatment, you know, you don't want to artificially

21  delimit your conception of what constitutes care.  So, say,

22  using mania as an example, there would be short-term goals for

23  someone who was receiving treatment for a manic episode, which

24  would include, you know, in simple language, you know,

25  decreasing the mania so they were no longer manic.  There would

1  be an array of objectives to achieve that short-term goal.

2  Most of that could be -- and that short-term goal could occur

3  over a sequence of treatment locations.

4      After the mania was contained, we don't want to stop

5  there.  We want to recognize -- and one of the reasons we have

6  diagnostic categories is for prognostic benefit, so recognizing

7  that a mania has occurred helps us understand that when that --

8  when people look like that, when there's a presentation of

9  mania, there's a very good likelihood that they are very likely

10 or more likely than the average person to have a similar

11 episode going forward or another affective instance.

12     And so the long-term goals of treatment would include

13 prophylactic measures to minimize the likelihood that another

14 event happened, and that would happen in yet other treatment

15 settings.

16     But the conceptualization of the arc of treatment happens

17 in the treatment planning session and is communicated and

18 passed on as the person progresses through progressively less

19 restrictive levels of care.

20     **MS. ROMANO:**  Your Honor, I'm mindful of the clock.  I

21 just have a couple more questions, and then it may be a good

22 time to break.

23 **Q.**  Dr. Simpatico, staying on page 8 and looking down just a

24 few more bullet points down.  Six black bullet points down that

25 page, still in the clinical best practices section, there's a

1  provision that reads (reading):

2        "Treatment focuses on addressing the factors

3     precipitating admission to the point that the member's

4     condition can be safely, efficiently, and effectively

5     treated in a less intensive level of care or the member no

6     longer requires care."

7     Is that provision consistent with generally accepted

8  standards of care?

9  **A.**   Yes, it is.

10 **Q.**   Why is that?

11 **A.**   Well, we aspire to make people better, and by "better" I

12 mean free of the encumbrance of mental health or substance use

13 signs and symptoms.  And to the extent that we can do that, it

14 generally follows that safe and effective care can be provided

15 in progressively less restrictive treatment settings.  So

16 that's why we -- why that's consistent.

17 **Q.**   Does this language raise any concern that once a crisis is

18 resolved, the provider is instructed to move the patient down

19 or stop treatment altogether?

20 **A.**   No, it does not.

21        **MS. ROMANO:**  I'm at a place where I move on to the

22 mental health portion.

23        **THE COURT:**  Okay.  So I'll see you all in an hour.

24 Thank you.

25        (Luncheon recess taken at 12:31 p.m.)

1    <u>Tuesday, October 25, 2017</u>                    <u>1:34 p.m.</u>

2                        **P-R-O-C-E-E-D-I-N-G-S**

3                            **---oOo---**

4         **THE CLERK:**  You're still under oath.

5         **MS. ROMANO:**  Shall we proceed, Your Honor?

6         **THE COURT:**  Yes, please.

7                        <u>**DIRECT EXAMINATION**</u>

8    BY MS. ROMANO:

9    **Q.**  Dr. Simpatico, welcome back.

10   **A.**  Thank you.

11   **Q.**  Good afternoon.

12        Just before lunch we had finished the common criteria of

13   the 2017 guidelines.  So let's move over to the mental health

14   condition guideline still in Exhibit 8, 2017 guidelines, now on

15   page 10.

16        Dr. Simpatico, I'd like to direct your attention to the

17   guidelines, the mental health guidelines.  And if you can turn

18   now to page 13, where there are specific outpatient guidelines.

19        Do you understand that these relate to mental health

20   coverage decisions in 2017?

21   **A.**  Yes.

22   **Q.**  Looking at -- looking at page 13, please, the first

23   paragraph there says "Outpatient."  And the second sentence

24   reads:

25             "The course of treatment in outpatient is focused on

1    addressing the factors that precipitated admission (e.g.

2    changes in the member's signs and symptoms, psychosocial

3    and environmental factors or level of functioning) to the

4    point that the factors that precipitated admission no

5    longer require treatment."

6    Is this sentence that I've just read, with respect to

7  outpatient treatment, consistent with generally accepted

8  standards of care?

9  A.   Yes.

10  Q.   Why is that?

11  A.   Well, it speaks to, as we talked about a little bit

12  earlier, that there are -- in the array of symptoms that a

13  patient presents with, there are certain ones that are likely

14  to be more determinative in the level of care.

15    And the focus of treatment in selecting the least

16  restrictive, safe, and effective level of treatment should

17  include and focus upon the reason why a person was placed in

18  that level of care.

19  Q.   And looking specifically at the language "the factors that

20  precipitated admission" --

21  A.   Yes.

22  Q.   -- in your opinion, does that include consideration of

23  chronic conditions?

24  A.   Yes.

25  Q.   Does it include consideration of acute symptoms?

1   A.   Yes.

2   Q.   And the next sentence reads:

3            "Individual outpatient psychotherapy is generally

4        provided in sessions lasting up to 15 minutes."

5   A.   45, yeah.

6   Q.   Did I say "15"?

7   A.   Yes.

8   Q.   Yes.  I meant 45.

9   A.   Yes.

10  Q.   So let me reread it then.  It says:

11           "Individual outpatient psychotherapy is generally

12       provided in sessions lasting up to 45 minutes."

13  A.   Yes.

14  Q.   Is that consistent with generally accepted standards of

15  care, in your opinion?

16  A.   Yes.

17  Q.   Why?

18  A.   Well, that's a conventional period of time for

19  conventional outpatient psychotherapy sessions.

20  Q.   And when you use the word "conventional," is there

21  anything in particular you're referring to?

22  A.   Standard practice.  There are certain billing codes.  And

23  that's the predominant length of time that is used in billing

24  for outpatient psychotherapy.

25  Q.   Okay.  Directing your attention, now, to the intensive

1    outpatient program guidelines for mental health in 2017.  If

2    you can turn to page 14.  Starting with the second paragraph,

3    it reads:

4            "The course of treatment in an intensive outpatient

5        program is focused on addressing the factors that

6        precipitated admission, (e.g., changes in the member's

7        signs and symptoms, psychosocial and environmental factors

8        or level of functioning) to the point that the member's

9        condition can be safely, efficiently, and effectively

10        treated in a less intensive level of care."

11        This is same or similar to the one we just read for

12    outpatient treatment?

13    **A.**    It is.

14    **Q.**    In your opinion, is it consistent with generally accepted

15    standards of care?

16    **A.**    It is.

17    **Q.**    And the next paragraph reads:

18            "An intensive outpatient program can be used to treat

19        mental health conditions or can specialize in the

20        treatment of co-occurring mental health and

21        substance-related disorders."

22        What does this mean?

23    **A.**    Means, depending on the structure of the program and the

24    expertise of the practitioners, the scope of focus of the

25    program can be limited to mental health only; or it can include

1  both mental health and substance abuse disorders, which are --

2  generally go under the name "dual diagnosis" programs.

3  Q.  And in this circumstance, would the substance-related

4  disorders be a co-occurring condition?

5  A.  Yes.

6  Q.  Now, turning to the residential treatment center

7  guidelines for mental health, on page 18, please.  Directing

8  your attention to the second paragraph here.  It reads:

9        "The course of treatment in a residential treatment

10       center is focused on addressing the factors that

11       precipitated admission (e.g., changes in the member's

12       signs and symptoms, psychosocial and environmental factors

13       or level of functioning) to the point that the member's

14       condition can be safely, efficiently, and effectively

15       treated in a less intensive level of care."

16  Is this the same language we saw before, with respect to

17  the other levels of care?

18  A.  It is.

19  Q.  Is it also your opinion that this is consistent with

20  generally accepted standards of care?

21  A.  Yes.

22  Q.  Now, if you can look, still, in the residential treatment

23  center guidelines on page 18, there's a heading that says,

24  "Residential treatment center admission criteria."  And

25  directing your attention to the third bullet point here.  It

1  reads:

2          "The factors leading to admission cannot be safely,

3      efficiently, or effectively assessed and/or treated in a

4      less intensive setting due to acute changes in the

5      member's signs and symptoms and/or psychosocial and

6      environmental factors.  Examples include the following:"

7      We'll get to the examples in a moment but, first of all,

8  is the language I just read consistent with generally accepted

9  standards of care?

10 **A.**   Yes, it is.

11 **Q.**   Why is that?

12 **A.**   Well, so the -- in considering, again, why someone

13 presents for treatment, this language again is focused on

14 selecting a location that can -- can provide for safe,

15 efficient, and effective treatment, and at the -- in the least

16 restrictive manner possible.

17     And it refers to acute changes in the member's signs and

18 symptoms and/or psychosocial and environmental factors.  The

19 notion "acute changes" refers to -- again, regarding why does

20 the person present now, is referring to a departure from a

21 baseline that would have brought the person to the attention of

22 healthcare providers or, in this case, behavioral health care

23 providers.

24 **Q.**   And do you read this sentence to exclude consideration of

25 chronic symptoms?

1  **A.**   No.

2  **Q.**   Why is that?

3  **A.**   Well, you know, generally speaking, someone will come to

4  the attention of a behavioral healthcare provider either

5  because there's been a departure from a baseline -- that is a

6  change in their actual presentation -- or their circumstances

7  may have changed.

8       So, for example, someone who has had relatively consistent

9  signs and symptoms may, for a variety of reasons, suddenly

10 decide that they're willing to avail themselves of treatment;

11 whereas, they had never presented for treatment before.

12      Or their circumstances may have changed.  They may have

13 been incarcerated and released, and this may be the first time

14 that they had the capacity to be evaluated by the treatment

15 program.

16      So, in either case, either there's a departure from the

17 baseline within an individual or the person's circumstances and

18 willingness to be treated may change.

19 **Q.**   And when you refer to the situation where the patient's

20 circumstances or willingness to be treated changed, in your

21 reading of this language would those be acute changes in the

22 member's signs and symptoms and/or psychosocial and

23 environmental factors?

24 **A.**   Yes.

25 **Q.**   Why is that?

1   **A.**   Well, in the examples that I gave, if someone had been

2   incarcerated and was released, and had been suffering from

3   depression, and didn't have the occasion to have that treated

4   while they were incarcerated, and was now for the first time

5   presenting, they may have had a relatively static depressive

6   presentation, but their environmental factors and psychosocial

7   factors have changed in that they now are free to avail

8   themselves of service.

9   **Q.**   Now, looking at these two examples that are under there,

10  the first one is:

11          "Acute impairment of behavior or cognition that

12          interferes with activities of daily living to the extent

13          that the welfare of the member or others is endangered."

14      In your opinion, is it consistent with generally accepted

15  standards of care to include this as an example of an acute

16  change.

17  **A.**   Yes.

18  **Q.**   Why?

19  **A.**   An acute change?  So it refers to, again, acute impairment

20  of behavior or cognition, again referring to a departure from a

21  baseline.

22      So a change in or at least the opportunity to consider

23  whether a change in where care could most effectively be

24  rendered in the least restrictive manner with a change in the

25  baseline -- this is what this speaks to -- is an acute

1    impairment or change in the baseline.

2    **Q.**   And let's look at the other example.  It says:

3            "Psychosocial and environmental problems that are

4        likely to threaten the member's safety or undermine

5        engagement in the less intensive level of care without the

6        intensity of services offered in this level of care."

7    How does that example fit into the language "acute changes

8    in the member's signs and symptoms and/or psychosocial and

9    environmental factors"?

10   **A.**   Well, that's precisely the definition of an acute change

11   in the psychosocial and environmental problems such that would

12   warrant admission to this level of care.

13   **Q.**   Does that second example involve a change in the baseline?

14   **A.**   No, it does not.

15   **Q.**   Looking at the next section here, it says, "Residential

16   treatment center continued service criteria."  And the second

17   black bullet point says:

18           "Treatment is not primarily for the purpose of

19       providing custodial care.  Services are custodial when

20       they are any of the following:"

21   And then there's three bullet points under there.

22   Are those three bullet points a definition of custodial

23   care that you are generally familiar with?

24   **A.**   These are examples of custodial care.  It's not

25   necessarily the language that I'm familiar with, but it's

1  consistent with language that I'm familiar with.

2  **Q.**  Did you read any of the benefit plans that UBH administers

3  as part of this case?

4  **A.**  I did not.

5  **Q.**  Do you know how UBH plans define custodial care?

6  **A.**  I do not.

7  **Q.**  Can I direct your attention, now, to page 23 of the 2017

8  Level of Care Guidelines.

9      Are these the -- what you understand to be the guidelines

10  that apply to substance-related disorders?

11  **A.**  Yes.

12  **Q.**  Can you please turn to page 26.

13      Do you understand these to be the guidelines specific to

14  outpatient treatment for mental use disorders?

15  **A.**  For substance use disorders, yes.

16  **Q.**  I'm sorry, for substance use disorders?

17  **A.**  Yes.

18  **Q.**  Okay.  Looking at the paragraph that starts "Outpatient"

19  please.

20  **A.**  Uh-huh.

21  **Q.**  It reads:

22      "Assessment and diagnosis and active behavioral

23      health treatment that are provided in an ambulatory

24      setting.  The course of treatment in outpatient is focused

25      on addressing the factors that precipitated admission

1    (e.g., changes in the member's signs and symptoms,

2    psychosocial and environmental factors or level of

3    functioning) to the point that the factors that

4    precipitated admission no longer require treatment."

5    Is this consistent with the language we saw with respect

6    to the mental health outpatient guidelines?

7  **A.**  Yes.

8  **Q.**  And is it your opinion it's consistent with generally

9    accepted standards of care?

10  **A.**  Yes.

11  **Q.**  This section then proceeds with:

12    "Individual outpatient psychotherapy is generally

13    provided in sessions lasting up to 45 minutes."

14    And, again, is this consistent with generally accepted

15    standards of care, in your experience, with respect to the

16    length of a standard session?

17  **A.**  Yes.

18  **Q.**  Let's look below there.  It says:

19    "Extended outpatient sessions are individual

20    psychotherapy sessions with or without evaluation and

21    management services lasting longer than 45 minutes.

22    Extended outpatient sessions require preservice

23    notification before services are received except in

24    extenuating circumstances, such as a crisis, when

25    notification should occur as soon as possible.

1    "In the event that the Mental Health/Substance Use

2    Disorder Designee is not notified of extended outpatient

3    sessions, benefits may be reduced."

4    And then looking a little bit below the -- says,

5    "Outpatient admission criteria."  And there's a few bullet

6    points.  And then there's language at the bottom there.  That

7    reads:

8    "Coverage for extended outpatient sessions lasting up

9    to 60 minutes may be indicated in the following nonroutine

10   circumstances."

11   And then there's a list of four different circumstances.

12   Does this list of four services include an exhaustive list

13   of when extended outpatient sessions might be appropriate, in

14   your opinion?

15   **A.**   No, I don't read this to be an exhaustive list.

16   **Q.**   And if you can please take a look at the four bullet

17   points in these examples, and then let me know if you have an

18   opinion as to whether these would be examples of situations

19   where there are nonroutine circumstances warranting up to

20   60-minute sessions?

21   **A.**   Yes, these would be examples.

22   **Q.**   And what's the basis of that opinion?

23   **A.**   Well, there are reasonable conditions that are outside of

24   what would easily be able to be dealt with in the context of a

25   conventional 45-minute session; so the additional time is

1   warranted for the added level of complexity or additional tasks

2   that are to be completed.

3   **Q.**   And drawing your attention specifically to the third of

4   those bullets, it says:

5           "Periodic involvement of children, adolescent or

6       geriatric member's family in a psychotherapy session when

7       such involvement is essential to the member's progress

8       (e.g., when psychoeducation or parent management skills

9       are provided)."

10      In your opinion, is that a situation where sessions

11  lasting up to 60 minutes may be warranted?

12  **A.**   Yes.

13  **Q.**   And does that provision, or any of the provisions here, in

14  your opinion, disallow coverage for an extended outpatient

15  session when an adult needs or wants somebody else present for

16  a session?

17  **A.**   No.

18  **Q.**   Turning, please, to page 32 of Exhibit 8.

19      Do you understand this page to include the intensive

20  outpatient program guidelines for substance use in 2017?

21  **A.**   Yes.

22  **Q.**   Directing your attention to the third paragraph in this

23  section, it reads:

24          "The course of treatment in an intensive outpatient

25      program is based on addressing the factors that

1  precipitated admission (e.g., changes in the member's

2  signs and symptoms, psychosocial and environmental factors

3  or level of functioning) to the point that the member's

4  condition can be safely, efficiently, and effectively

5  treated in a less intensive level of care."

6  Is this the same language you saw with respect to

7  intensive outpatient for mental health?

8  A.  Yes, it is.

9  Q.  And do you read this provision to disallow consideration

10  of acute conditions or symptoms?

11  A.  No, I don't.

12  Q.  Do you read it to include consideration of chronic

13  conditions and symptoms?

14  A.  Yes.

15  Q.  Now, turning your attention to page 35 of the 2017

16  guidelines.

17  Do you understand this and the following page to include

18  the guidelines specific to residential rehabilitation for

19  substance use in the 2017 guidelines?

20  A.  Yes.

21  Q.  And looking at the second paragraph in this section, it

22  reads:

23  "The course of treatment in residential

24  rehabilitation is focused on addressing the factors that

25  precipitated admission (e.g., changes in the member's

1    signs and symptoms, psychosocial and environmental factors

2    or level of functioning) to the point that rehabilitation

3    can be safely, efficiently, and effectively continued in a

4    less intensive level of care."

5    Is this provision consistent with generally accepted

6    standards of care, in your opinion?

7    A.   Yes, it is.

8    Q.   Is it the same language we've seen in the mental health

9    section as well?

10   A.   It is.

11   Q.   Now I'd like to turn your attention, same page, after

12   rehabilitation/residential admission criteria.  The third

13   bullet point reads:

14       "The factors leading to admission and/or the member's

15       history of response to treatment suggests that there is

16       imminent or current risk of relapse, which cannot be

17       safely efficiently, and effectively managed in a less

18       intensive level of care."

19   In your opinion, what is an "imminent or current risk of

20   relapse"?

21   A.   Means that it's in the judgment of the clinicians working

22   with the person that it's felt that if the person were to be

23   moved to a less restrictive level of care, the fact that they

24   no longer were in the current level of care, in this case

25   residential rehab, would have a causal effect on their

1  recisdivating.

2     And the time element refers to there being a short enough

3  time frame to be able to conclude that the active ingredient or

4  the reason why a person recidivates is a fact more than likely

5  attributable to the level of service.

6  **Q.**  And there's two examples that follow that provision.  The

7  first one is:

8          "A co-occurring mental health condition is

9          stabilizing, but the remaining signs and symptoms are

10         likely to undermine treatment in a less intensive

11         setting."

12    Does that example include an evaluation of whether the

13 co-occurring mental health condition can be effectively treated

14 at that level of care?

15 **A.**  Yes, it does.

16 **Q.**  Can you explain why, in your opinion.

17 **A.**  Well, so it's -- it's anticipating that if -- if a

18 co-occurring mental health condition were not present, the

19 judgment might be otherwise; that a person might be able to use

20 a less intensive level of care.

21    But in assessing co-occurring disorders and other chronic

22 conditions, it's judged that even though there is a

23 co-occurring mental health condition, that doesn't rise to the

24 level of, perhaps, a primary diagnosis or leading to treatment

25 primarily for that symptom.

1    There are -- there is an effect on the patient's reality

2  enough to the extent that it makes it less likely that they can

3  thrive or do well in a less intensive level of care.

4  **Q.**   Does this provision take into account more than just

5  whether a co-occurring mental health condition can be safely

6  managed?

7  **A.**   Yes.

8  **Q.**   And now, looking at the second example here, it reads:

9         "The member is in immediate or imminent danger of

10         relapse, and the history of treatment suggests that the

11         structure and support provided in this level of care is

12         needed to control the occurrence."

13    Again, what does "immediate or imminent danger of relapse"

14  mean here?

15  **A.**   Again, it refers to the active ingredient or the primary

16  determinant in preventing relapse is the intensity of the level

17  of care.

18  **Q.**   Do these provisions I have just read, starting with the

19  factors leading to admission and the two examples, do they mean

20  that residential treatment coverage is not available for

21  chronic substance use if the member is not imminently at risk

22  for relapse?

23  **A.**   No.  It means that their history is taken into

24  consideration and their unique circumstances are taken into

25  consideration, and a judgment is made about what in the

1  individual case constitutes the least restrictive safe and

2  effective place for treatment.

3  **Q.**  I'd --

4  **A.**  This particular example is an example of using a patient's

5  past history as a determinant in retaining them at this level

6  of care.

7  **Q.**  I'd like to direct your attention, now, to Exhibit 662, in

8  the other binder.

9      Again, are these the ASAM criteria?

10 **A.**  They are.

11 **Q.**  3rd Edition?

12 **A.**  Yeah.

13 **Q.**  Looking at page 136, please.

14      And just to orient you, Dr. Simpatico, if you turn to page

15 135.  Do you see that this is the section relating to Level 3

16 residential and inpatient services?

17 **A.**  I do.

18 **Q.**  And then turning to 136, in the right-hand column, middle

19 of the paragraph.  Middle of the first main paragraph.  It

20 reads:

21      "Individuals are transferred to less intensive levels

22      of care at the point that they have established sufficient

23      skills to safely continue treatment without the immediate

24      risk of relapse, continued use or other continued

25      problems, and are no longer in imminent danger of harm to

1    themselves or others."

2    What do you understand this provision to communicate?

3  **A.**    It communicates what we were just discussing, which is

4  having a time frame that's commensurate with being able to

5  reasonably conclude that the primary determinant for preventing

6  a relapse is the inclusion in the residential rehab level of

7  care.

8  **Q.**    In your opinion, is the UBH guideline relating to relapse

9  consistent with the ASAM criteria?

10  **A.**    Yes.

11  **Q.**    If you can turn your attention, please, to page 36 of the

12  2017 guidelines.  And looking at the top --

13  **A.**    Excuse me.

14  **Q.**    Okay.

15  **A.**    Yes.

16  **Q.**    36, please.

17  **A.**    Uh-huh.

18  **Q.**    Looking at the top bullet point.  It reads:

19        "The factors leading to admission cannot be safely,

20    efficiently, or effectively assessed and/or treated in a

21    less intensive setting due to acute changes in the

22    member's signs and symptoms and/or psychosocial and

23    environmental factors."

24    Is this the same language that we saw for the residential

25  treatment guidelines for mental health in 2017?

1  A.   Yes, it is.

2  Q.   And are your opinions the same with respect to consistency

3  with generally accepted standards of care for this provision in

4  the substance use guidelines as it was for the mental health

5  guidelines?

6  A.   Yes, it is.

7  Q.   Now, moving down on that same page, there is a section

8  "Rehabilitation residential continued service criteria."

9       Looking at the second bullet point, it reads:

10          "Treatment is not primarily for the purpose of

11          providing custodial care.  Services are custodial when

12          they are any of the following."

13      Is this description of custodial care the same as we

14  already discussed with respect to the residential guidelines

15  for mental health in 2017?

16  A.   Yes.

17  Q.   Let's move to the 2011 Level of Care Guidelines.  This

18  will be Exhibit 1.

19      Dr. Simpatico, did you review the 2011 Level of Care

20  Guidelines?

21  A.   Yes, I did.

22  Q.   And is it your opinion that they are consistent with

23  generally accepted standards of care?

24  A.   That is my opinion.

25  Q.   And is it your opinion that they are also consistent with

1    the five principles that you discussed of generally accepted

2    standards of care?

3    **A.**    Yes.

4    **Q.**    I'd like to direct your attention to page 5, please, of

5    the 2011 guidelines.

6        Do you understand these to be the common criteria --

7    **A.**    Yes.

8    **Q.**    -- applicable to all of the levels of care?

9    **A.**    Uh-huh, yes.

10   **Q.**    Are they different from the ones we reviewed for 2017?

11   **A.**    They are stylistically different but substantively not

12   different.

13   **Q.**    Looking at paragraph 4, please, of the common criteria on

14   page 5.  It reads:

15       "The member's current condition can be most

16       efficiently and effectively treated in the proposed level

17       of care."

18       Is inclusion of this in the common criteria consistent

19   with generally accepted standards of care?

20   **A.**    Yes.

21   **Q.**    And, in your opinion, what does the term "current

22   condition" refer to here?

23   **A.**    Well, as we discussed earlier, "current condition" refers

24   to the presenting picture that the patient brings as they come

25   to that level of care, which includes information that is

1  captured within the chief complaint, the history of the present

2  illness, and information elucidated by the database that is the

3  underpinning for the individualized treatment plan.

4  **Q.**   When we were speaking about the 2017 guidelines, you

5  referred to the clinical best practices section as containing

6  the database factors.

7      Do you recall that?

8  **A.**   That's correct.

9  **Q.**   Now, these 2011 guidelines don't include a separate best

10 practices section.

11      Do you see here, on page 5, clinical database factors that

12 you would be referring to?

13 **A.**   I do.

14 **Q.**   And where are they?

15 **A.**   Well, they're included in number 2:  Chief complaint,

16 member's chief complaint; description of the member's current

17 condition; the precipitant for treatment; the member's current

18 and past medical and psychiatric histories, including history

19 of substance use; member's family vocational/educational and

20 social history; mental status examination; findings of the

21 physical examination.

22      So these are -- these are elements that are listed under

23 the heading of Best Practice Guidelines in the subsequent

24 versions of the clinical practice guidelines.

25 **Q.**   Looking at paragraph 5 here, please.  It reads:

1        "The member's current condition cannot be effectively

2     and safely treated in a lower level of care, even when the

3     treatment plan is modified, attempts to enhance the

4     member's motivation have been made, or referrals to

5     community resources or peer supports have been made."

6     Does this provision, and inclusion of it in the common

7  criteria, is it consistent with generally accepted standards of

8  care?

9  A.   Yes.

10  Q.   Can you explain why?

11  A.   Well, again, it specifically identifies an attempt to do a

12  goodness of fit with the needs of the presenting problem with

13  the level of care that provides for the least restrictive safe

14  and effective place to mete out treatment.

15  Q.   Looking at paragraph 6, it reads:

16        "There must be a reasonable expectation that

17     essential and appropriate services will improve the

18     member's presenting problems within a reasonable period of

19     time.  Improvement in this context is measured by weighing

20     the effectiveness of treatment against the evidence that

21     the member's condition will deteriorate if treatment is

22     discontinued in the current level of care.  Improvement

23     must also be understood within the framework of the

24     member's broader recovery goals."

25     Here there is a reference to "the member's presenting

1 problems."  What does that mean, in your opinion?

2 **A.**   Again, it refers to what we've discussed, which is the

3 compilation of information that allows for the synthesis of

4 understanding why a patient is presenting at this moment to

5 this level of care.

6 **Q.**   And under this paragraph 6, in these guidelines, in your

7 opinion, what does it mean to "improve"?

8 **A.**   It means to improve -- and, again, this goes to the

9 general principle of reasonable expectation of improvement.

10 Meaning that either the signs and symptoms that are part of the

11 clinical picture are ameliorated by treatment, or treatment

12 actually prevents the deterioration of -- of the person's

13 ability to function, or signs and symptoms such that the

14 removal of treatment would precipitate a deterioration.  And if

15 either of those criteria are met, then that would be a

16 definition of "improvement."

17 **Q.**   And we've talked a little bit today about the term

18 "reasonable period of time," which is also contained in this

19 paragraph.

20     Is it your opinion that it has the same meaning that you

21 have already discussed earlier today?

22 **A.**   Yes.

23 **Q.**   And what does it mean that improvement must also be

24 understood within the framework of the member's broader

25 recovery goals?

**A.**   Again, as we discussed earlier with slightly different language, it speaks to having patient-centric care; precisely understanding how the patient conceptualizes their illness both in the here and now and over the course of the illness, and to do the best job at matching the provision of treatment with their conceptualization and wishes regarding the treatment.

**Q.**   In your opinion, is paragraph 6, in this common criteria in 2011, consistent with generally accepted standards of care?

**A.**   Yes.

**Q.**   In your opinion, does it require continuous improvement in order to remain in the level of care?

**A.**   No.

**Q.**   Does it mean that once presenting problems are improved, no care will be covered?

**A.**   No.

**Q.**   Does it mean that once presenting problems are improved, the member must step down to a different level of care?

**A.**   No.

**Q.**   In your opinion, do paragraphs 4, 5, and 6 of this common criteria interact or relate to each other?

**A.**   Yes.

**Q.**   Why do you say that?

**A.**   Well, taken together, they -- they speak to goodness of fit at the correct level, to provide the least restrictive, safe, and effective treatment.  And it, within that same

1  bundle, taking the three together, defines what improvement

2  means for the provision of effective treatment.

3  Q.   Turning to paragraph 7, please, on page 6.  It reads:

4        "The goal of treatment is to improve the member's

5     presenting symptoms to the point that treatment in the

6     current level of care is no longer required."

7     Is this consistent with generally accepted standards of

8  care?

9  A.   It is.

10 Q.   Why?

11 A.   The goal of treatment is to make people better.  And so,

12 again, if there are certain signs or symptoms or criteria that

13 are disproportionately influential in the selection of a

14 particular level of care, such that they determine, as a

15 practical matter, the most restrictive level of care because of

16 the intensity of those symptoms, the goal would be to

17 ameliorate those symptoms to the point where it was no longer

18 necessary to stay at that level of care and ideally to move to

19 a less restrictive level of care.

20 Q.   Looking at paragraph 7 in particular, in your opinion, is

21 there an overfocus on acuity in that sentence?

22 A.   No.

23 Q.   Is there any mention of acuity?

24 A.   I don't believe there is.

25 Q.   And, in your opinion, does paragraph 7 omit consideration

1   of a patient's enduring problems or co-morbidities?

2   A.   No.

3   Q.   Would it include consideration of a patient's enduring

4   problems and co-morbidities, in your opinion?

5   A.   Yes.

6   Q.   Why?

7   A.   Because in the consideration of the presenting problems,

8   it necessarily includes the data that's derived from that list

9   of sources that we've gone through a number of times.  Not to

10  mention the fact that many, if not most, behavioral health

11  conditions are in and of themselves chronic conditions.

12  Q.   Looking to paragraph 8 now, on page 6, it reads:

13       "Treatment is not primarily for the purpose of

14       providing respite for the family, increasing the member's

15       social activity, or for addressing antisocial behavior or

16       legal problems, but is for the active treatment of the

17       behavioral health condition."

18  Is this provision consistent with generally accepted

19  standards of care?

20  A.   Yes, it is.

21  Q.   Is it consistent with generally accepted standards of care

22  to exclude from active treatment, treatment for primarily legal

23  problems?

24  A.   Yes.

25  Q.   Why is that?

1  **A.**  Because that doesn't satisfy the criteria for medical

2  necessity.

3  **Q.**  And can you explain why that's the case?

4  **A.**  Yeah.

5     So the provisions of dealing with primarily legal problems

6  would be addressed if they occurred in the context of a

7  condition that lent itself to treatment with a medically

8  necessary form of treatment.  But if that was the sole

9  presenting symptom, that would not warrant treatment under

10  the -- the guidance that we have talked about, including a

11  treatment that is medically necessary.

12  **Q.**  In your opinion, does excluding coverage for treatment of

13  primarily legal problems mean that someone who has a mental

14  health or substance use disorder will not receive treatment for

15  that condition?

16  **A.**  No.  They would receive treatment for the condition

17  attendant to the primary treatment of the mental health

18  condition.

19  **Q.**  Is it consistent with generally accepted standards of care

20  to consider treatment that's primarily for addressing

21  antisocial behavior as not active treatment?

22  **A.**  Yes.

23  **Q.**  Why is that?

24  **A.**  Well, treatment of -- again, the term "antisocial" in this

25  language is used more colloquially, which is really in

 1  contradistinction to the technical use of the word

 2  "antisocial."

 3      Antisocial personality disorder, for example, has a

 4  particular meaning.  And many sources -- most sources of best

 5  practices would say that that can be a reason for exclusion of

 6  treatment, because of their incapacity to form a therapeutic

 7  relationship.

 8      I don't believe that's how this term is being used here.

 9  I think it's being used colloquially.  And not unlike the

10  example of problems with legal problems, antisocial behaviors,

11  in and of themselves, are not a reason for treatment because

12  they, again, wouldn't meet the -- the medical necessity

13  standard.  But if they were presented in the context of another

14  condition that did meet the medical necessity standard, then

15  they could and would be addressed.

16  **Q.**  And, in your opinion, does paragraph 8 permit addressing

17  mental health or substance use disorders -- withdraw that.

18      In your opinion, does paragraph 8 permit treatment and

19  coverage for services provided for mental health or substance

20  use disorders if -- even if they are associated with antisocial

21  behavior?

22  **A.**  Yes.

23  **Q.**  Dr. Simpatico, I want to turn your attention to paragraph

24  10, in these common criteria.  This paragraph relates to the

25  treatment plan.  Would you agree?

1  A.   Yes.

2  Q.   And does this paragraph and the subparts below it

3  appropriately reflect the considerations that should be part of

4  a treatment plan consistent with generally accepted standards

5  of care?

6  A.   Yes.

7  Q.   And why is that?

8  A.   Well, again, it's an expanded version of the language that

9  we looked at earlier, which is providing for the way that the

10  treatment plan articulates the problems is in such a way that

11  it lends itself to having a way of measuring progress and

12  allocating tasks to team members.

13  Q.   Can I direct your attention, now, to page 78 of the 2011

14  Level of Care Guidelines.

15       Do you understand these to be the continued service

16  criteria for 2011?

17  A.   Yes.

18  Q.   They're broken out differently than they were in 2017.  Is

19  that your understanding?

20  A.   Yes.

21  Q.   Directing your attention to paragraph 2 of continued

22  service criteria.

23  A.   Uh-huh.

24  Q.   It reads:

25            "The member continues to present with symptoms and/or

1      history that demonstrate a significant likelihood of

2      deterioration and functioning relapse if transitioned to a

3      less intensive level of care or, in the case of outpatient

4      care, is discharged."

5      What do you understand this to mean?

6  A.   So it's under the heading of "All of the following

7  criteria must be met for continued service."

8      And this particular item says that the member continues to

9  present with symptoms or history that demonstrate, in the

10 judgment of the treatment team, the likelihood that if they

11 were moved from this level of service that there would be

12 deterioration in function or relapse.

13     And, again, that -- it would be the moving from this level

14 to a less intensive level that would be felt to be

15 determinative to prompt the relapse or deterioration.  And that

16 would be a basis for retaining them at that level of care.

17 Q.   Is it consistent with generally accepted standards of care

18 to require that risk of relapse or deterioration be a

19 significant likelihood?

20 A.   Well, significant in the sense that it is -- it is always

21 a possibility.  It is -- and when one moves from one level of

22 care to another level of care.

23     The language, as I read it here, implies that it would

24 be -- that it would be the movement from one level of care to

25 another that would be causal in -- with regard to the

1  deterioration or decrease in function.  So from that -- that's

2  what I take this to mean.

3  Q.  Let me make sure I got an answer.

4     Is it consistent with generally accepted standards of care

5  to require that the risk of relapse or deterioration be a

6  significant likelihood?

7  A.  Yes.

8  Q.  As opposed to any likelihood?

9  A.  Yes.

10  Q.  Why is that?

11  A.  Because there's -- you can argue that there's always some

12  likelihood.  And "significant" means that there's a reasonable

13  likelihood that we can anticipate that movement would result in

14  deterioration.

15  Q.  In your opinion, does this provision allow a patient to

16  remain in a level of care in order to maintain functioning and

17  avoid deterioration?

18  A.  Yes.

19  Q.  Turning to paragraph 4 of the continued service criteria,

20  it reads:

21       "The member is actively participating in treatment or

22     is reasonably likely to adhere after an initial period of

23     stabilization and/or motivational support."

24     Is this consistent with generally accepted standards of

25  care?

1   A.   Yes, it is.

2   Q.   How so?

3   A.   Well, again, it requires that the member is able and

4   willing to participate; that is, that it is possible to

5   actually have medically necessary care because the member is

6   participating in the care.  Were they not willing and able to

7   do that, then it would be hard to make the argument that they

8   were benefiting from the intended care.

9   Q.   Does this provision raise any concerns for you that as

10  soon as the initial period of stabilization is over, if there

11  aren't signs of motivation the patient will be denied continued

12  coverage?

13  A.   No.

14  Q.   Why not?

15  A.   Well, that there is -- depending on the circumstances,

16  would be a reasonable period of time when there would be an

17  attempt at engagement.  But at a certain point there would have

18  to be a judgment made that the likelihood of engagement was

19  significantly low; that it no longer warranted keeping the

20  person in a motivational phase.

21  Q.   Turning your attention, now, to paragraph 8.  It reads:

22          "Measurable and realistic progress has occurred where

23       there is clear and compelling evidence that continued

24       treatment at this level is required to prevent acute

25       deterioration or exacerbation that would then require a

1    higher level of care.  Lack of progress is being addressed

2    by an appropriate change in the treatment plan or other

3    intervention to engage the member."

4        So starting with "measurable and realistic progress has

5    occurred," is it consistent with generally accepted standards

6    of care to require that for continued service?

7    A.   Yes.

8    Q.   Why?

9    A.   Well, it's consistent with the language of writing a

10   treatment plan; which is, measurable and realistic progress can

11   be documented.  That's one of the essential purposes of writing

12   a treatment plan.

13   Q.   And the provision provides that either that is required or

14   "there is clear and compelling evidence that continued

15   treatment at this level of care is required to prevent acute

16   deterioration or exacerbation that would then require a higher

17   level of care."

18       Is the language "clear and compelling evidence" something

19   you typically see in medical or behavioral health guidelines?

20   A.   More in police dramas; but not generally in medical

21   language, no.

22   Q.   What do you interpret that term to require here?

23   A.   I take that to mean reasonably -- reasonably likely.

24   Q.   And why is that your interpretation?

25   A.   That's how I would read that.  And that's how I would

1  apply this kind of decision-making; which is whether or not to

2  keep someone at a current level or move them.  I would be

3  thinking what's the -- what's the relative impact of the

4  movement going to be and do I think that it's -- has a

5  reasonable likelihood of causing deterioration.  If I did, then

6  I would not move the person.

7           THE COURT:  Excuse me.

8           THE WITNESS:  Yeah.

9           THE COURT:  You don't really read it that way, do you?

10          THE WITNESS:  I do.

11          THE COURT:  You read the word "compelling" as

12  reasonable likelihood?

13          THE WITNESS:  Yes.

14          THE COURT:  You read "compelling evidence" to mean

15  evidence that there's a reasonable likelihood; not that there's

16  compelling evidence?

17          THE WITNESS:  I do.

18          THE COURT:  Why is that?

19          THE WITNESS:  Well, I don't know what "compelling

20  evidence" in medical parlance would mean.

21          THE COURT:  Well, it means something more, doesn't

22  it?

23          THE WITNESS:  It means what I just said it means,

24  which is --

25          THE COURT:  Well, it's not used in medical parlance;

1   right?

2         **THE WITNESS:**  Well, "clear and compelling" is not

3   traditional medical language.

4         **THE COURT:**  Okay.  So we don't interpret it from a

5   medical point of view, do we?

6         **THE WITNESS:**  Correct.

7         **THE COURT:**  So we interpret from what the words mean

8   in English, not from a medical point of view; right?  And

9   "compelling" does not mean a reasonable likelihood.  It means

10   clear and compelling.

11       I don't understand how you can possibly say that those two

12   mean the same thing; unless, as I suggested before, you're just

13   reading your own medical practice into it because you think the

14   right thing to do is, when there's a reasonable likelihood,

15   take steps based on that.

16         **THE WITNESS:**  Well, as a practical matter, I don't

17   know how one would make the argument that -- make a distinction

18   between "clear" and "compelling" and "likely."  I don't know

19   what that looks like in medical prognostics.  And I would say

20   they're equivalent.

21         **THE COURT:**  So there are -- there's no difference in

22   likelihoods in medical prognostics?

23         **THE WITNESS:**  Of course there are.

24         **THE COURT:**  Okay.  So some of them are very strong.

25         **THE WITNESS:**  Yeah.

1    THE COURT:  Some of them are likely.  Some of them are

2  reasonably likely.

3      Aren't the ones that are compelling, more likely than the

4  ones that are reasonably likely?

5      THE WITNESS:  As I said, I wouldn't read it that way;

6  that distinction.

7      THE COURT:  I'm not asking about reading it that way.

8  I said:  In medical parlance, there are varying degrees of

9  likelihoods of things happening; right?

10     THE WITNESS:  Yes.

11     THE COURT:  From certain signs, you can say this is

12  absolutely going to happen; from certain signs you can say,

13  well, that is likely to happen; and in this one it's more

14  likely to happen; that sort of thing.

15     THE WITNESS:  That's right.

16     THE COURT:  So there is a distinction between

17  something being reasonably likely and something being certain,

18  for example?

19     THE WITNESS:  Yeah.

20     THE COURT:  Okay.  So isn't "compelling" more close to

21  certain than it is to reasonably likely?

22     THE WITNESS:  Yes.  But in the kind of decision this

23  is, which is, I don't know how you know that something is

24  certainly going to happen in making a decision --

25     THE COURT:  That's my point.

1      THE WITNESS:  Right.

2      THE COURT:  That's my point.

3      THE WITNESS:  Well, that's why this is not med- --

4  this is not traditional language that --

5      THE COURT:  That's my point exactly.

6      THE WITNESS:  I would agree with that.

7      THE COURT:  My point exactly.

8      THE WITNESS:  Okay.

9      THE COURT:  Is that, when you read this, it requires

10  something you can't have in medicine: something certain about

11  what's going to happen in this particular context.

12      Why doesn't it read that way?

13      THE WITNESS:  Well, I guess I would take a step back

14  and say the following:

15      Any practitioner worth their salt, if they are referring

16  to practice guidelines to conduct the art of the practice of

17  medicine, then that's a bigger problem.

18      So I would not be looking at these documents to make

19  clinical judgments about how -- whether or not to discharge

20  someone to another level of care.  And so when I --

21      THE COURT:  Wait a second.  Wait a second.

22      Did you just say that you would not look at these

23  documents to make clinical judgments about whether to discharge

24  somebody to another level of care?

25      THE WITNESS:  I would be not following these as a

1   script.  I would be doing what these documents tell me to do,

2   which is to adhere to generally accepted standards of care.

3   And in meeting generally accepted standards of care --

4            THE COURT:  Yes.

5            THE WITNESS:  -- I would know because I would be

6   reading the APA Clinical Practice Guidelines or I would be

7   reading the ASAM Criteria or I would be reading the LOCUS, and

8   I wouldn't be looking at clear and compelling impossible

9   metrics to -- to anticipate what would happen before something

10  happens --

11           THE COURT:  Pretend you're not really a psychiatrist

12  who's the chair of the medical department at the University of

13  Vermont.  And let's pretend that you are an M.D., medical

14  director at UBH, and you've been taught, in terms of medical

15  necessity determinations, to follow the guidelines.  The

16  guidelines define for you what is the generally accepted

17  medical practices.

18       If you're doing that, then you're not reading into them

19  more than is into them, than -- than something that is not in

20  them; isn't that right?

21           THE WITNESS:  Well, then, how do reconcile the

22  discrepancy that I would be reading in the source documents for

23  these documents?  Namely, the APA guidelines or the LOCUS or

24  the ASAM.

25           THE COURT:  As we always say in court, assumes facts

1    not in evidence, that they're reading source documents.

2         **THE WITNESS:**  But you're asked to read source doc- --

3    you're asked to follow generally accepted standards of care.

4    You're specifically instructed to avail yourself of those

5    resources.

6         **THE COURT:**  Okay.  It would be very interesting to see

7    if people are referring to them.

8         **THE WITNESS:**  Well, I actually would think that they

9    are as a clinician --

10        **THE COURT:**  Well, we'll find out.

11        **THE WITNESS:**  Yes.

12        **THE COURT:**  We'll find out.

13        But the idea that there is something in here that are

14   words on a page that are English, that someone at an insurance

15   company is trying to figure out whether or not it's generally

16   accepted, and it says a specific thing, and you're saying

17   ignore it, I don't think they're doing that.

18        **THE WITNESS:**  I amend what I said, if I said that.

19        I don't mean ignore it.  I mean read it in the context of

20   other information that one is instructed to refer to.

21        And as a clinician, I can tell you that I, and I think

22   virtually all clinicians, would prefer and would naturally

23   gravitate to the -- the generally accepted standards of care

24   recommended in those other documents than looking at my

25   organization's clinical practice guidelines.  That's how we

1   train.  That's how we practice.

2           **THE COURT:**  Well, but then you won't get an IRR that's

3   98 percent.  This is not -- this is not a practice.

4           **THE WITNESS:**  I understand.

5           **THE COURT:**  Okay.  Go ahead.

6   BY MS. ROMANO:

7   **Q.**   Turning your attention, Dr. Simpatico, to page 56 of the

8   2011 residential rehabilitation substance use disorders

9   guidelines.

10  **A.**   Yes.

11  **Q.**   Is it your understanding that these are the guidelines

12  that are applicable -- or were applicable, excuse me, for

13  substance use disorders for residential rehabilitation in 2011?

14  **A.**   Yes.

15  **Q.**   And reading the preamble or the section there, up in the

16  box, there's a sentence that says:

17          "Residential rehabilitation program is appropriate

18          when a member lacks the motivation or support system to

19          remain abstinent but does not require the structure and

20          intensity of services provided in a hospital."

21          Is this language consistent with generally accepted

22  standards of care?

23  **A.**   Yes.

24  **Q.**   Why is that?

25  **A.**   Well, it's a description of the place in the continuum of

1    services that residential rehab programs play.

2    **Q.**   Can you explain what you mean by that?

3    **A.**   Well, it says:

4           "Residential rehab program is appropriate when a

5    member lacks the motivation or social support system to

6    remain abstinent but does not require the structure and

7    intensity of services provided in a hospital."

8    So it has ruled out a more -- the need for a more

9    restrictive intensive level of service in a hospital; but says

10   that in order to meet these clinical needs, this would be

11   the -- would be deemed the appropriate level of intensity of

12   services.

13   **Q.**   And under that it reads, "Any one of the following must be

14   met."  And there's a list of six items.

15   **A.**   Yes.

16   **Q.**   Let's take them all together.

17   Is this an appropriate list of potential bases for

18   admission to residential rehab for substance use treatment?

19   **A.**   Yes.

20   **Q.**   Why is that?

21   **A.**   Well, it's listing -- it says any one is appropriate.  And

22   there's a number that are clearly appropriate.

23   **Q.**   And can you --

24   **A.**   Sure.

25   **Q.**   Let's go through them one by one then.

1   A.   Okay.

2   Q.   First one says:

3         "The member continues to use substances despite

4         appropriate motivation and recent treatment in an

5         intensive outpatient program or partial hospital/day

6         treatment program."

7         Is that consistent with generally accepted standards of

8   care --

9   A.   It is.

10  Q.   -- for substance use residential treatment?

11  A.   Yes.  And it does because it implies or says that the --

12  the services made available in the intensive outpatient program

13  were provided in a manner that one could determine they were

14  provided correctly to the extent that one could determine that

15  that level of care was insufficient to -- to meet the needs of

16  the patient; and, therefore, it would be reasonable to move

17  them to a higher level of care.

18  Q.   Are you familiar with the term "fail first"?

19  A.   I am.

20  Q.   Is this an example of a fail first?

21  A.   No.

22  Q.   Why is that?

23  A.   Well, it would only be fail first if there was an

24  expectation that they necessarily had to go to a lower level,

25  demonstrate that that wasn't sufficient before entering the

1  higher level.  This does not in any way instruct that someone

2  necessarily has to go to a lower level before going to a higher

3  level.

4  **Q.**    There's five other different possibilities here.  So the

5  next one is:

6          "The member continues to use substances, and the

7      member's functioning has deteriorated to the point that

8      the member cannot be safely treated in a less restrictive

9      level of care."

10     Why is it consistent with generally accepted standards of

11 care for that to be one of the criteria that needs to be met?

12 **A.**    Well, on its face, it's correct.  It's defining that the

13 person continues to use substances.  And it defines the fact

14 that -- that the member cannot be safely treated in a less

15 restrictive level of care.  So it's pretty straightforward.

16 **Q.**    The third one says:

17         "The member continues to use substances, is at risk

18     of exacerbating a serious co-occurring medical condition,

19     and cannot be safely treated in a lower level of care."

20     Why is that one consistent with generally accepted

21 standards of care?

22 **A.**    Well, again, it speaks to a need for the intensity of

23 service at a residential rehab program if in the event that

24 someone has an intercurrent general medical condition that is

25 either going to exacerbate their substance use disorder or

1  because of their substance use disorder they won't be able to

2  attend to their medical condition.

3  Q.   The fourth is:

4       "The member is at risk of developing withdrawal

5       symptoms which cannot be safely treated in a lower level

6       of care."

7  Is that consistent with generally accepted standards of

8  care?

9  A.   Yes.  And, again, it defines itself in terms of this is

10  the appropriate level of care.

11  Q.   And, fifth:

12       "Severe impairment in the social support system has

13       heightened the risk that the member will use substances if

14       not in residential rehabilitation."

15  Is this one consistent with generally accepted standards

16  of care?

17  A.   Yes, it is.

18  Q.   And sixth is:

19       "The member is experiencing withdrawal symptoms that

20       do not compromise the member's medical status but are of

21       extreme subjective severity accompanied by the lack of

22       resources or functional social supports to manage the

23       symptoms."

24  Is this one consistent with generally accepted standards

25  of care?

1    A.    Yes.

2    Q.    And taken together, is it your opinion that requiring that

3    one of these be satisfied, for residential treatment for

4    substance use disorders, is an appropriate bar or requirement

5    for residential treatment?

6    A.    Yes.

7    Q.    Why is that?

8    A.    Well, they are, you know, fairly vaguely worded so that,

9    you know, I would have to think a bit about a circumstance that

10   I wouldn't be able to conceptualize that warranted admission to

11   a residential rehab level of care that couldn't be understood

12   in one of these conditions.

13   Q.    Now, looking down underneath the section that says, "And

14   all of the following."

15   A.    Uh-hum.

16   Q.    It says:

17         "Within 48 hours of admission, the following occurs:

18   A psychiatrist/addictionologist completes a comprehensive

19   evaluation of the member."

20   Is this consistent with appropriate generally accepted

21   standards of care?

22   A.    It is for more intensive levels of residential rehab

23   programs.

24   Q.    And what do you mean by that?

25   A.    For example, in ASAM parlance, a level at the 3.7 level

1  program.

2  **Q.**  Would it be something that would happen at a sober living

3  house?

4  **A.**  I wouldn't expect this level of -- I wouldn't expect this

5  to be provided at a sober living house.

6  **Q.**  And how about a 3.5 ASAM level?

7  **A.**  I wouldn't necessarily expect that, but I would be happy

8  to see it.

9  **Q.**  Turning to provision 5 on page 57.  It reads:

10        "The treating psychiatrist/addictionologist and,

11     whenever possible, the member collaborate to update the

12     treatment plan at least every 5 days in response to

13     changes in the member's condition, or provide compelling

14     evidence that continued treatment in the current level of

15     care is required to prevent acute deterioration or

16     exacerbation of the member's current condition."

17     In your opinion, is it consistent with generally accepted

18  standards of care for there to be collaboration and an update

19  to the treatment plan at least every five days in response to

20  changes in the member's condition?

21  **A.**  Yes.

22  **Q.**  Why is that?

23  **A.**  I think that's a reasonable amount of time for the level

24  of intensity of the services being provided.

25     And, again, I would be most clear about that for higher

orders of residential rehab programs.  Again, like a 3.7-type

program for sure.

**Q.**   Turning to page 42, please.

Is this the provision for intensive outpatient for

substance use disorders?

**A.**   Yes.

**Q.**   Is that your understanding?

**A.**   Yes.

**Q.**   And looking at the section underneath the big box, it

says, "Any of the following criteria must be met."  And there's

three there.

**A.**   Yes.

**Q.**   So I want to draw your attention to the first one, says:

"The member continues to use substances despite

appropriate motivation, peer support such as can be

provided in an organized sobriety group and the adequate

trial of routine outpatient treatment."

Let me read the first three.

Second:

"The member's psychosocial functioning has become

impaired by moderate-severe symptoms of a substance use

disorder, and treatment cannot be safely managed in the

less intensive level of care."

And, third:

"The member's mood, affect or cognition has

1     deteriorated to the extent that a higher level of care

2     will likely be needed if treatment in an intensive

3     outpatient program is not provided."

4     In your opinion, are these criteria for intensive

5  outpatient treatment too restrictive for substance use

6  disorders?

7  A.   No.

8  Q.   Why is that?

9  A.   Well, again, they are defining the appropriateness of --

10  of intensity of services in the context of not being able to --

11  care not being able to successfully be provided at the next

12  lower level of intensity --

13  Q.   And --

14  A.   -- without -- without requiring a fail first model.

15  Q.   And taking those three with the other three listed there,

16  4, 5, and 6, is it your opinion that this is an appropriate bar

17  or requirement, to require that at least one of these be met

18  for intensive outpatient treatment for substance use disorders?

19  A.   Yes.

20  Q.   Why is that?

21  A.   Again, I think that there's -- these are worded in such a

22  way that I think it would be -- would take a fair amount of

23  thinking to come up with a scenario that would not be able to

24  be understood in terms of one of these scenarios.

25  Q.   Looking at paragraph 5, please, on page 43.  And this is

1  now in a section where all of the following are required; is

2  that right?

3  **A.**   Yes.

4  **Q.**   Okay.  Looking at paragraph 5, it says:

5          "The member or his/her family or social support

6       system understands and can comply with the requirements of

7       an IOP, or the member is likely to participate in

8       treatment with the structure and supervision afforded by

9       an IOP."

10      Is this consistent with generally accepted standards of

11 care?

12 **A.**   Yes.

13 **Q.**   Does this require that a family or other aspects of the

14 social support system comply or understand the IOP

15 requirements?

16 **A.**   No.

17 **Q.**   Why do you say that?

18 **A.**   Well, it makes the -- it takes into account the

19 possibility that a person -- the patient, or the identified

20 patient, may not be ready, willing and able to avail themselves

21 of services, and there may be a bit of an intervention and

22 support of their support system to get them in, in the hopes

23 that there would be ample motivational opportunity to get them

24 to engage in treatment.  Or the patient may be willing and able

25 to engage in treatment from the get-go.  And this anticipates

both possibilities.

**Q.**   And turning to 6, it says:  "Within the first 3 days of treatment, the following should occur."  And that includes (as read):

"A psychiatrist completes a comprehensive evaluation of the member when the member has been directly admitted from an inpatient setting.

"The provider and, whenever possible, the member do the following:

"Develop a treatment plan which includes the plan to introduce a model of recovery within the first eight sessions, and the plan to monitor for signs of relapse, such as by conducting random drug screens, projected discharge date, and develop an initial discharge plan.

"And the provider does the following within 48 hours of admission with the member's documented consent:

"Contacts the member's family social supports to discuss participating in treatment and discharge planning, when such participation is essential and clinically appropriate.

"Contacts the member's most recent provider to obtain information about the member's presenting condition and response to treatment."

Is this provision I have just read consistent with generally accepted standards of care?

1  **A.**  I would say it is.

2  **Q.**  Why is that?

3  **A.**  Well, again, we're talking about intensive outpatient

4  program.  And, you know, the "i" does stand for intensive.  And

5  doing an assessment within three days of someone being admitted

6  directly from an inpatient setting is quite reasonable.

7  **Q.**  And what about the provision in C?

8  "The provider does the following within 48 hours of

9  admission:

10  "Contacts the member's family supports and contacts

11  the member's most recent provider."

12  **A.**  Yeah, I think that's consistent.

13  And, you know, again, we're talking about someone who

14  meets criteria for an intensive outpatient level.  There is --

15  time is, to some extent, of the essence, to make sure that any

16  of the -- sort of the tendrils that will make it more likely

17  that the person will be successful in engagement be linked as

18  soon as possible.  And within 48 hours of linking up some of

19  the tendrils is good practice.

20  **Q.**  Turning to paragraph 7, it reads:

21  "After admission, the program shall ensure that, A, a

22  psychiatrist continues to see the member at least weekly

23  when the member has been directly admitted from an

24  inpatient setting; and, B, services are coordinated with

25  other behavioral health or medical providers who are

1    providing concurrent care, as well as with agencies and

2    programs, such as the school or court system, which the

3    member is involved" -- excuse me, "with which the member

4    is involved, with the member's documented consent."

5    Is this consistent with generally accepted standards of

6    care?

7    **A.**   Yes.

8    **Q.**   Why is that?

9    **A.**   Well, it describes what we would expect to have happen if

10   there was good continuity of care and reaching out to crucial

11   pieces of the person's -- the patient's world so as to, again,

12   have as many links to relevant consequences of their substance

13   use disorder folded into the treatment plan.

14   **Q.**   And looking at paragraph 8, please, on page 44, it reads:

15   "The provider and, whenever possible, the member

16   collaborate to update the treatment plan every 3 to 5

17   treatment days in response to changes in the member's

18   condition, or provide compelling evidence that continued

19   treatment in the current level of care is required to

20   prevent acute deterioration or exacerbation the member's

21   current condition."

22   Is it consistent with generally accepted standards of care

23   to require the member to collaborate to update the treatment

24   plan every three to five treatment days?

25   **A.**   Yes.

1   **Q.**   Turning to page 46, please.

2        Is it your understanding that this is the guideline for

3   outpatient treatment for substance use?

4   **A.**   Yes.

5   **Q.**   Looking at the top section, where it says, "Any one of the

6   following criteria must be met." First, it says:

7            "The member's use of alcohol or drugs meets criteria

8            for a substance use disorder."  And, second, "A lapse has

9            occurred or is imminent, and treatment is needed to

10           maintain or regain abstinence."

11       Is it consistent with generally accepted standards of care

12   to require that one of these be satisfied for treatment for a

13   substance use disorder?

14   **A.**   Yes.

15   **Q.**   Why is that?

16   **A.**   Well, I think, number one is essentially the definition of

17   who would be eligible to be appropriate for an outpatient

18   substance use disorder program.

19       And two is actually superfluous.  So, I think, "The

20   member's use of alcohol or drugs meets criteria for a substance

21   use disorder," that is a pretty inclusive criterion.

22   **Q.**   Turning to page 26, please, of the 2011 guidelines.  Still

23   in Exhibit 1.  Is it your understanding that these are the

24   residential treatment guidelines for mental health conditions

25   in 2011?

1    **A.**    Yes.

2    **Q.**    Starting with the top section, it says, "Any one of the

3    following criteria must be met."

4         And I want to refer you to -- or direct your attention to

5    paragraph 2, where it says:

6              "The member is experiencing a disturbance in mood,

7         affect or cognition resulting in behavior that cannot be

8         safely managed in a less restrictive setting.  This

9         criterion is not intended for use solely as a long-term

10        solution to maintain the stabilization acquired during

11        treatment in a residential facility program."

12        Is that provision consistent with generally accepted

13    standards of care?

14   **A.**    Yes.

15   **Q.**    Why is that?

16   **A.**    Well, it says:

17        "The member is experiencing a disturbance in mood, affect

18   or cognition resulting in behavior that cannot be safely

19   managed in a less restrictive setting."

20        That's the essence of the determination.

21        And then it goes on to say:

22        "This criterion is not intended for use solely as a

23   long-term solution to maintain the stabilization."

24        It's a caveat against using residential treatment centers

25   inappropriately after the -- the assessment and the

1    stabilization phase has occurred.

2    **Q.**   And turning to paragraph 3, it says:

3            "There is an imminent risk of deterioration in the

4        member's functioning due to the presence of severe,

5        multiple and complex psychosocial stressors that are

6        significant enough to undermine treatment at a lower level

7        of care."

8        And then it says the same -- I think it's caveat, is what

9    you called it.

10           "This criterion is not intended for use solely as a

11       long-term solution to maintain the stabilization acquired

12       during treatment in a residential facility program."

13       What is an "imminent risk of deterioration"?

14   **A.**   Well, again, you know, I read "imminent risk of

15   deterioration" to mean causally related to whether or not one

16   is selecting the appropriate level of care as the active

17   ingredient of whether or not deterioration will occur.

18   **Q.**   What does "imminent" mean?

19   **A.**   Within a short period of time.

20   **Q.**   Is that consistent with generally accepted standards of

21   care?

22   **A.**   I think it is.

23   **Q.**   Why is that?

24   **A.**   Because it is a short enough period of time that one can

25   reasonably conclude that it is the presence or absence of a

1  particular level of care that is causal about whether or not

2  deterioration will happen.

3  **Q.**  Turning to the next section -- well, let me go back to

4  that one for just a moment.

5  In your opinion, is it consistent with generally accepted

6  standards of care to require that at least one of the criteria

7  listed on page 26, 1 through 4, is satisfied to -- to meet the

8  requirements for residential treatment for a mental health

9  condition?

10  **A.**  Yes.

11  **Q.**  Why is that?

12  **A.**  Again, especially number 1 is quite broad.  So I think

13  it's -- I'd be hard-pressed to think of an example that's

14  appropriate that doesn't fit into one of these criteria.

15  **Q.**  And, now, turning to the next section, you can see on the

16  bottom of page 26 it says, "And all of the following."

17  **A.**  Uh-huh.

18  **Q.**  So looking, now, at paragraph 5 on page 27, it reads:

19       "The provider and, whenever possible, the member

20       collaborate to update the treatment plan at least weekly

21       in response to changes in the member's conditions, or

22       provide compelling evidence that continued treatment in

23       the current level of care is required to prevent acute

24       deterioration or exacerbation of the member's current

25       condition."

1    Is it consistent with generally accepted standards of care

2  to require that the member collaborate to update the treatment

3  plan at least weekly?

4  **A.**    Yes.

5  **Q.**    And this is for residential treatment; right?

6  **A.**    Yes.

7  **Q.**    And 5a says:

8         "Treatment in a residential setting is not for the

9         purpose of providing custodial care but is for the active

10        treatment of a mental health condition.  Active treatment

11        is a clinical process involving 24-hour care that includes

12        assessment, diagnosis, intervention, evaluation of care,

13        treatment, and planning for discharge and aftercare.

14        Active treatment is indicated by services that are all of

15        the following."

16   And there's five subparts under that section.  In your

17  opinion, are those five subparts for active treatment

18  consistent with generally accepted standards of care?

19  **A.**    Yes.

20  **Q.**    Why?

21  **A.**    This language is consistent with the definition of active

22  treatment.

23  **Q.**    When you're referring to "the definition of active

24  treatment," what are you referring to?

25  **A.**    That active treatment is defined as a treatment

1  intervention that either ameliorates signs and symptoms or

2  prevents deterioration such that if it were removed

3  deterioration would happen.

4  **Q.**  It's your opinion that all five subparts here are

5  consistent with active treatment?

6  **A.**  It is consistent with the idea that treatment in a

7  residential facility is not intended to provide custodial care.

8  **Q.**  Do you read the subparts for active care here to address

9  only coverage for crisis situations?

10 **A.**  No.

11 **Q.**  Why?

12 **A.**  Well, as we established before, we're not dealing

13 exclusively in crises.  We're dealing with presenting the

14 presenting picture or presenting clinical condition, which

15 includes chronic conditions.

16 **Q.**  Directing your attention, now, to page 19 of this exhibit.

17 Actually, let me start with 18.

18      Is this, to your understanding, the intensive outpatient

19 guidelines for mental health in 2011?

20 **A.**  Yes.

21 **Q.**  I'm going to ask you about paragraph 7, on page 19.  And

22 does this fall into a section that requires all of the

23 following to be met?

24 **A.**  Yes.

25 **Q.**  So looking at number 7, it says:

1          "The provider and, whenever possible, the member

2     collaborate to update the treatment plan every 3 to 5

3     treatment days in response to changes in the member's

4     conditions, or provide compelling evidence that continued

5     treatment in the current level of care is required to

6     prevent acute deterioration or exacerbation of the

7     member's current condition."

8     Is this the same language we saw for IOP and substance

9  use?

10 **A.**   It is.

11 **Q.**   And is it your opinion that it is consistent with

12 generally accepted standards of care?

13 **A.**   It is.

14        **THE COURT:**  Can I ask a question?

15     And I take it when you see the word "compelling" you read

16 the word "reasonable"?

17        **THE WITNESS:**  Yes.

18        **THE COURT:**  Okay.  Thanks.

19        **THE WITNESS:**  And, again, that's informed by --

20        **THE COURT:**  -- generally accepted standards of care.

21        **THE WITNESS:**  Yes.  It's informed by generally

22 accepted standards of care.

23 **BY MS. ROMANO:**

24 **Q.**   Let's turn to the 2012 guidelines.  This would be Exhibit

25 2.

1      Are you there, Dr. Simpatico?

2  **A.**   I am there.

3  **Q.**   And did you review the 2012 Level of Care Guidelines?

4  **A.**   I did.

5  **Q.**   Is it your opinion that they are consistent with generally

6  accepted standards of care?

7  **A.**   That is my opinion.

8  **Q.**   All right.  Let's turn to the common criteria, beginning

9  on page 6, extending a few pages after that.

10      I'd like to direct your attention to paragraph 6, please.

11  It's found on page 7 of the 2012 guidelines.  And it reads:

12          "There must be a reasonable expectation that

13          essential and appropriate services will improve the

14          member's presenting problems within a reasonable period of

15          time.  Improvement of the member's condition is indicated

16          by the reduction or control of the acute symptoms that

17          necessitated treatment in a level of care.  Improvement in

18          this context is measured by weighing the effectiveness of

19          treatment against the evidence that the member's condition

20          will deteriorate if treatment is discontinued in the

21          current level of care.  Improvement must also be

22          understood within the framework of the member's broader

23          recovery goals."

24      Now, we've discussed some similar language relating to

25  improvement already, but I want to call your attention to one

1    sentence that, I believe, we haven't talked about.  And that is

2    paragraph 6, third line:

3            "Improvement of the member's condition is indicated

4        by the reduction or control of the acute symptoms that

5        necessitated treatment in a level of care."

6        Is that consistent with generally accepted standards of

7    care?

8    A.    Yes.

9    Q.    Why is that?

10   A.    Improvement of the member's condition is indicated by the

11   reduction or control of the acute symptoms that necessitated

12   treatment in the level of care.

13       So it's a paraphrase of what we already said; which is to

14   say that, the symptoms that are determinative in the level of

15   care are to be included in the active problem list because they

16   are balanced in a more central way, because they are such that

17   they are determining the most restrictive level of care that's

18   necessary to provide the least restrictive, most effective

19   level of care.

20       So, necessarily, you need to be focusing on those signs

21   and symptoms that are determinative in -- in having that level

22   of restrictiveness.

23       So it's a paraphrase of, basically, of course you will be

24   treating the signs and symptoms that caused the person to seek

25   treatment and are determining the level of treatment.

1    **Q.**    Looking, now, at paragraph 7, it says:

2            "The goal of treatment is to improve the member's

3        presenting symptoms to the point that current treatment in

4        the current level of care is no longer required."

5        As we discussed, does this mean that once the presenting

6    symptoms are improved no care is covered?

7    **A.**    Does not mean that.

8    **Q.**    And does that provision, in your opinion, mean that

9    coverage is for crisis only?

10    **A.**    No.

11    **Q.**    Looking at paragraph 8:

12            "Treatment is not primarily for the purpose of

13        providing respite for the family, increasing the member's

14        social activities, or for addressing antisocial behavior

15        or legal problems, but is for the active treatment of a

16        behavioral health condition."

17        Is this the same language we saw in the 2011 common

18    criteria?

19    **A.**    It is.

20    **Q.**    Is it consistent with generally accepted standards of care

21    for the same reasons?

22    **A.**    Yes.

23    **Q.**    Looking at paragraph 10, please.  It's a lengthy paragraph

24    so I'm not going to read the whole thing, but just focusing --

25    if you can take a look at it relating to the treatment plan.

1  Is it the same or similar to what we saw in 2011?

2  A.   Yes.

3  Q.   And is it consistent with generally accepted standards of

4  care for the same reasons?

5  A.   Yes, it is.

6  Q.   And now let's look at the continued service criteria for

7  2012.  These are located in the back of these guidelines on

8  page 82.

9  A.   (Witness examines document.)

10  Q.   Looking at paragraph 5, please, it reads (reading):

11       "There continues to be evidence that the member is

12       receiving active treatment and there continues to be a

13       reasonable expectation that the member's condition will

14       improve further.  Lack of progress is being addressed by

15       an appropriate change in the member's treatment plan

16       and/or intervention to engage the member in treatment."

17       Do you understand that this is one of the required

18  elements for continued service in 2012?

19  A.   Yes.

20  Q.   Is that, including this as a requirement, consistent with

21  generally accepted standards of care?

22  A.   Yes.

23  Q.   Why is that?

24  A.   Because it, again, is stating that the member continues

25  to -- there's evidence that the member is receiving active

1  treatment, which we've talked about; and there continues to be

2  a reasonable expectation that the condition will improve

3  further, so that's a basis for continuing the active treatment.

4  And, again, by "improvement" we mean either amelioration

5  of symptoms or decreasing the likelihood of deterioration.

6  And then it says, and then just to make sure, "Lack of

7  progress is being addressed."  So that the treatment plan is

8  refined to ensure that the patient is given every

9  opportunity -- or that there's every opportunity to make sure

10 that the treatment that's being provided is being provided in

11 the -- at the proper level of intensity so that it has every

12 chance of being effective.

13 Q.   And looking at paragraph 6 here on page 82, it reads

14 (reading):

15      "The member's current symptoms and/or history provide

16      evidence that relapse or a significant deterioration in

17      functioning would be imminent if the member was

18      transitioned to a lower level of care or, in the case of

19      outpatient care, was discharged."

20      Is this consistent with generally accepted standards of

21 care?

22 A.   Yes.

23 Q.   Why is that?

24 A.   Well, again, it speaks to maintaining access to this level

25 of care is determinative in preventing a decrease in

1  functioning; and that is to say that, whatever the active

2  ingredient that has been identified and used in this level of

3  care cannot be successfully instituted in a less restrictive

4  level of care.

5      And in this case since we're talking about outpatient,

6  there isn't a level below that.  So as a practical matter, it

7  would mean the possibility of returning to outpatient or

8  whatever level was appropriate depending on the circumstances.

9  Q.   And you say in this case we're talking about outpatient.

10 You're referring specifically to that last clause referring to

11 outpatient?

12 A.   That's correct.

13 Q.   And is it appropriate to include the word "imminent" there

14 in paragraph 6?

15 A.   Again, "imminent" -- my reading of "imminent" means a

16 period of time, a duration of time that is consistent with

17 being able to conclude that it is the removal from that level

18 of care that causes the deterioration.

19 Q.   Turning to page 62, please, of these 2012 guidelines.

20 A.   (Witness examines document.)

21 Q.   Do you understand these to be the residential

22 rehabilitation for substance use disorders guidelines?

23 A.   Yes.

24 Q.   For 2012?

25 A.   Uh-huh.  Yes.

1   Q.   The first section is another one of those that says "Any

2   one of the following criteria must be met."  I want to walk

3   through -- we'll walk through the first five.

4        The first one is (reading):

5            "The member continues to use alcohol or drugs and the

6            member's functioning has deteriorated to the point that

7            the member cannot be safely treated in a less restrictive

8            level of care."

9        Is that consistent with generally accepted standards of

10  care?

11  A.   It is, and it's largely a catchall for anyone that's

12  appropriate for this level of care.

13  Q.   Why do you say that?

14  A.   Well, it's a pretty broad definition.  It's anyone who

15  continues to use and the functioning has deteriorated to the

16  point that the member cannot be safely treated in a less

17  restrictive level of care.  Checkmate.

18  Q.   Looking at the second one it says (reading):

19           "The member continues to use alcohol or drugs, is at

20           risk of exacerbating a serious co-occurring medical

21           condition, and cannot be safely treated in a lower level

22           of care."

23       Is that an appropriate criteria to include in this list

24  where one of them needs to be met?

25  A.   Yes.

1    Q.   Why is that?

2    A.   Similar reason.  It's describing a member continues to use

3    and is at risk for exacerbating serious co-occurring medical

4    condition as a function of their substance use disorder and

5    can't safely be treated in a lower level of care.  So that's a

6    reason for treating someone.

7    Q.   And the third one is (reading):

8            "There is a high risk of harm to self or others due

9         to continued and severe alcohol or drug use which

10        prohibits treatment from safely occurring in a less

11        restrictive level of care."

12   Is that consistent with generally accepted standards?

13   A.   You know, it is, but if someone were truly at high risk

14   for harm to self or others, I wouldn't be -- I would not likely

15   place them in a residential rehab setting.  I would likely

16   place them in an inpatient setting.  I'd need to know details

17   about a particular case; but as a general rule, I'd be inclined

18   to not place them at a residential rehab level.

19   Q.   Does this provision disallow placing them at the higher

20   level of care?

21   A.   It does not.

22   Q.   And looking at Number 4, it says (reading):

23          "There's a high risk that continued use of alcohol

24       and drugs will exacerbate a co-occurring medical condition

25       to the extent that treatment in a less restrictive level

1    of care cannot be safely provided."

2    Is that consistent with generally accepted standards?

3  **A.**   Yes, it is.

4  **Q.**   Why is that?

5  **A.**   It's a variation on the theme of Number 2, so that it's

6  taking in mind the overall clinical presentation of the patient

7  and the various ways that ongoing substance use, either

8  directly or indirectly, through a co-occurring disorder can

9  warrant placement at this level of care.

10  **Q.**   And fifth it says (reading):

11        "There's a high risk of developing severe withdrawal

12        symptoms which cannot be safely treated in a lower level

13        of care."

14    Is that appropriate to be among the list of criteria to

15  have coverage for residential treatment?

16  **A.**   Yes.  And on its face, it's correct.

17  **Q.**   Reviewing the list as a whole, and there's a sixth one,

18  "The member's experience withdrawal symptoms," but reviewing

19  this list as a whole, is this -- is it appropriate and

20  consistent with generally accepted standards of care to require

21  that at least one of them be satisfied for residential

22  treatment?

23  **A.**   Yes.

24  **Q.**   Turning to the next section, "All of the following must be

25  met," Number 2 (reading):

1          "Within 48 hours of admission, the following occurs:

2          "A psychiatrist addictionologist completes a

3     comprehensive evaluation of the member."

4     Is this the same language you spoke about with respect to

5     the 2011 guidelines?

6  **A.**    Yes, it is.

7  **Q.**    And moving to item 3 on page 63, it says (reading):

8          "Subsequent psychiatric evaluations and consultations

9     are available 24 hours a day.  Visits with the treating

10    psychiatrist addictionologist occur at least two times per

11    week."

12    Excluding the sober living home or what might be

13    considered a 3.1 level under ASAM, is this consistent with

14    generally accepted standards of care?

15 **A.**    Yeah.  As before, I would expect to see this at a level

16    3.7.  I'd be happy to see it at a 3.5.

17 **Q.**    With respect to paragraph 4, please, it reads (reading):

18         "All relevant general medical services, including

19    assessment and diagnostic treatment and consultative

20    services, are available as needed and provided with an

21    urgency that is commensurate with the member's medical

22    need.  Co-occurring medical conditions can be safely

23    treated in this level of care."

24    Is it consistent with generally accepted standards of care

25    to include this in this criteria for residential treatment?

1   **A.**    Yes.

2   **Q.**    Why is that?

3   **A.**    Well, it's commensurate with having 24-hour access to

4   physicians and for the nature of an instability of the

5   presentations that are treated at this level.

6   **Q.**    And looking at paragraph 5, please, it reads (reading):

7        "The treating psychiatrist addictionologist and,

8        whenever possible, the member collaborate to update the

9        treatment plan at least every five days in response to

10       changes in the member's condition or provide compelling

11       evidence that continued treatment in the current level of

12       care is required to prevent acute deterioration or

13       exacerbation of the member's current condition."

14       Is this language that we already discussed in the prior

15   guidelines?

16   **A.**    It is.

17   **Q.**    And your opinion is the same?

18   **A.**    It is.

19   **Q.**    And now let's look at 5A, please.  And A specifically says

20   (reading):

21       "Treatment in a residential setting is not for the

22       purpose of providing custodial care.  Custodial care in a

23       residential setting involves the implementation of

24       clinical or nonclinical services that do not seek to cure

25       or which are provided during periods when the member's

1        substance use disorder is not changing or does not require

2        trained clinical personnel to safely deliver services.

3        Examples of custodial care include respite services, daily

4        living skills instruction, days awaiting placement, and

5        activities that are social and recreational in nature, and

6        interventions that are solely to prevent runaway, truancy,

7        or legal problems."

8        Are you familiar here with the language that describes

9    what custodial care is?

10   **A.**   Yes.

11   **Q.**   Is it more restrictive than generally accepted standards

12   of care?

13   **A.**   No.

14   **Q.**   A definition of "custodial care" as including something

15   that is solely to prevent runaway, truancy, or legal problems,

16   does that comport with generally accepted standards of care?

17   **A.**   Yes.

18   **Q.**   Turning the page to page 64, please, B.  It says

19   (reading):

20        "Treatment in a residential setting is for the active

21        treatment of a substance use disorder.  Active treatment

22        is a clinical process involving 24-hour care that includes

23        assessment, diagnosis, intervention, evaluation of care,

24        treatment and planning for discharge and aftercare.

25        Active treatment is indicated by services that are all of

1        the following..."

2        And then there's a list of five things.  Is this an

3   appropriate definition of "active treatment" under generally

4   accepted standards of care?

5   A.   (Witness examines document.)  Yes.

6   Q.   Is this consistent with the list we saw before?

7   A.   Yes.

8   Q.   Let's turn to page 47, please.  Still in the 2012

9   guidelines, Exhibit 2.

10  A.   (Witness examines document.)

11  Q.   Are these the Intensive Outpatient Substance Use Disorder

12  Guidelines for 2012?

13  A.   Yes.

14  Q.   At the beginning we have a list of items where it says

15  "Any one of the following must be met."  Can you take a look at

16  these together, Dr. Simpatico, and respond whether it is

17  consistent with generally accepted standards of care to require

18  that one of these be required for intensive outpatient

19  treatment for substance use disorders?

20  A.   Yes, they are -- I think it's appropriate that any one of

21  them could easily be the reason why a person would

22  appropriately be admitted.

23  Q.   And in your opinion, is it overly restrictive to require

24  that at least one of them be met?

25  A.   No.

1  **Q.**   And can you look at these five and respond as to why that

2  is your opinion?

3  **A.**   Sure.  Sure.

4      So what they have in common -- one, two, and three have in

5  common -- the fact that a less intensive or less restrictive

6  level of care cannot safely manage the problem, and it

7  basically makes the distinction between psychosocial

8  functioning has become impaired or mood affect or cognition has

9  become impaired or symptoms have deteriorated to the extent

10  that there's a likelihood of imminent relapse.

11      So it's basically -- each one of these is addressing one

12  of the aspects of the presentation that if it were sufficiently

13  at a sufficient level, which is being defined, it has declined

14  to a sufficient level that it cannot be safely managed at a

15  lower level, then these are, again, a fairly broad entryway for

16  the appropriate use of this level of care.

17  **Q.**   And looking at the next section where it says "All of the

18  following need to be satisfied."  I direct your attention to

19  paragraph 3 (reading):

20          "Co-occurring medical conditions, if any, can be

21      safely managed in an outpatient setting."

22      And let's look at the next one as well.  It says

23  (reading):

24          "Co-occurring mental health conditions, if any, can

25      be managed in a dual diagnosis program or can be safely

1    managed at this level of care."

2        Is it your opinion that these two requirements are

3    consistent with generally accepted standards of care?

4    **A.**    Sure.  Yes.

5    **Q.**    Why?

6    **A.**    Well, it's just in a way stating the obvious, that these

7    important aspects of a person's presentation can be adequately

8    managed at this level of care should they exist.

9    **Q.**    And turning to page 48, paragraph 5, please.

10   **A.**    (Witness examines document.)

11   **Q.**    It reads (reading):

12            "The member or his/her family's social support system

13            understands and can comply with requirements of an IOP or

14            the member is likely to participate in treatment with the

15            structure and supervision afforded by an IOP."

16        Does this in your opinion require motivation or adherence

17   on the part of the family member?

18   **A.**    No.  Again, this is similar language to what we looked at

19   before, which is it creates a broader entree to engage someone.

20   If the person is engagable themselves, that's great.  That's

21   provided for by the second part of that statement.

22        If they are ambivalent or not engaged at the beginning, it

23   provides that there can be -- they can benefit from the help of

24   their social support system.  That may get them in for the

25   opportunity to be exposed to motivational techniques to

1   hopefully engage them.

2   **Q.**   Looking to page 49, please, at the top, paragraph 8.  It

3   provides (reading):

4           "The provider and, whenever possible, the member

5       collaborate to update the treatment plan every three to

6       five treatment days in response to changes in the member's

7       condition or provide compelling evidence that continued

8       treatment in the current level of care is required to

9       prevent acute deterioration or exacerbation of the

10      member's current condition."

11  Is this the same language we've discussed before with

12  respect to the treatment plan.

13  **A.**   Yes.

14  **Q.**   And is it consistent with generally accepted standards of

15  care?

16  **A.**   Yes.

17  **Q.**   And turning now to page 51, please.  These are outpatient

18  substance use disorders?

19  **A.**   Yes.

20  **Q.**   And at the top it says "Any one of the following criteria

21  must be met."  It's got two criteria here.  Is it the same

22  language that was included in the outpatient substance use

23  criteria for 2011?

24  **A.**   Yes, it is.

25  **Q.**   And in your opinion, is it consistent with generally

1   accepted standards of care for the same reasons previously

2   stated?

3   **A.**   It is.

4   **Q.**   Turning now to page 29 of the 2012 guidelines.

5   **A.**   (Witness examines document.)

6   **Q.**   Are these the Residential Treatment Guidelines for Mental

7   Health in 2012?

8   **A.**   Yes, they are.

9   **Q.**   And directing your attention now to page 29 and 30, it's

10  paragraph 5 and its subparts relating to custodial care and

11  active treatment.  Is this the same language we saw with

12  respect to residential treatment already today?

13  **A.**   (Witness examines document.)  Yes, it is.

14  **Q.**   And is it consistent with generally accepted standards of

15  care for the same reasons you've already testified?

16  **A.**   Yes, it is.

17  **Q.**   And now turning to page 21, please, of the 2012

18  guidelines.

19  **A.**   (Witness examines document.)

20  **Q.**   Are these the Intensive Outpatient Mental Health

21  Guidelines for 2012?

22  **A.**   Yes.

23  **Q.**   Directing your attention to paragraph 7 relating to the

24  treatment plan and continued treatment.  Is this the same

25  language that we have previously seen in the substance use IOP?

1    A.    Yes.

2    Q.    Does your previous analysis and testimony apply here as

3    well?

4    A.    It does.

5    Q.    Let's go ahead and move into the 2013 guidelines.

6          THE COURT:  Let's take a ten-minute break and then

7    we'll finish up for the day.

8                   (Recess taken at 3:17 p.m.)

9                 (Proceedings resumed at 3:33 p.m.)

10         THE COURT:  Okay.  Let's finish up.

11    Okay.  Let's go.

12         MS. ROMANO:  All right, proceed.

13    Q.    Dr. Simpatico, welcome back.

14    Just before the break, we were going to turn to the 2013

15    guidelines.  So if you can please turn to Exhibit 3.

16    A.    (Witness examines document.)  I'm there.

17    Q.    Thank you.

18    Are these 2013 Level of Care Guidelines that you reviewed?

19    A.    Yes.

20    Q.    And is it your opinion that they are consistent with

21    generally accepted standards of care?

22    A.    Yes.

23    Q.    First I'd like to direct your attention to paragraph 3 on

24    page 7.

25    A.    (Witness examines document.)

1  **Q.**  Are these the common criteria for 2013?

2  **A.**  Yes.

3  **Q.**  Looking at paragraph 3, it says (reading):

4      "The provider collects information from the member

5      and, when appropriate, other sources to complete an

6      initial evaluation of the following."

7      And under A it says (reading):

8      "The member's chief complaint presenting problem and

9      the events which precipitated the request for service at

10      this particular point, i.e., the 'why now.'"

11      Do you see that?

12  **A.**  I do.

13  **Q.**  Is this the first appearance of the term "why now" in the

14  guidelines?

15  **A.**  It is.

16  **Q.**  And, in fact, Dr. Plakun and Dr. Fishman, plaintiffs'

17  experts, didn't criticize this appearance of "why now"; is that

18  your understanding?

19  **A.**  I believe that's correct.

20  **Q.**  What does "why now" mean in 3A on page 7?

21  **A.**  Well, it says that the member's chief complaint presenting

22  problem and the events which precipitated the request for a

23  service at this particular point, which is essentially what

24  we've been talking about in terms of why the person is

25  presenting here and now.

1  **Q.** I'm going to turn to some of the language that was

2  mentioned by Dr. Fishman and Dr. Plakun in their testimony. So

3  if we can turn to page 8 of these 2013 guidelines and focus

4  on -- first let's focus on paragraph 7 where it says (reading):

5          "There must be a reasonable expectation that

6          essential and appropriate services will improve the

7          member's presenting problems within a reasonable period of

8          time. Improvement of the member's condition is indicated

9          by the reduction or control of the acute symptoms that

10         necessitated treatment in a level of care. Improvement in

11         this context is measured by weighing the effectiveness of

12         treatment against the evidence that the member's condition

13         will deteriorate if treatment is discontinued in the

14         current level of care. Improvement must also be

15         understood within the framework of the member's broader

16         recovery resiliency goals."

17 Other than the last line, is this language consistent with

18 what we saw in the 2012 Level of Care Guidelines?

19 **A.** Yes.

20 **Q.** And what I'm referring to "other than the last line," I'm

21 referring to the word "resiliency" that now appears here.

22 **A.** Yes.

23 **Q.** Is it consistent with generally accepted standards of care

24 for improvement to be understood within the framework of the

25 member's broader resiliency goals?

1    **A.**    Yes.

2    **Q.**    Why is that?

3    **A.**    Well, resiliency is sort of -- again, reflects sort of an

4    evolving use of the term and, again, the broader -- sort of in

5    the context of the evolving recovering -- recovery movement.

6    And resiliency speaks to, again, well-being, the ability to

7    bounce back from intermittent exacerbations of a chronic mental

8    illness, and how, you know, the chronic mental illness affects

9    one's perception of oneself and how a person views the mental

10    illness.  So that's all -- that's covered under the notion of

11    recovery resiliency goals.

12        You know, there's a whole lot that can be said about the

13    recovery movement, and recovery by now would imply many people

14    would have what are called recovery plans anticipating possible

15    future exacerbations or of remitting relapsing signs and

16    symptoms of their mental illness and they would plan ahead and

17    anticipate what they would do, sort of contingency plans for

18    the presentation of future events.

19        But it's all in the service of a person having a clear

20    understanding of the mental illness, a personalized

21    understanding of the mental illness, and of how that conception

22    needs to be woven into any treatment plan collaboration.

23    **Q.**    And looking at paragraph 8, please (reading):

24            "The goal of treatment is to improve the member's

25        presenting symptoms to the point that treatment in the

1          current level of care is no longer required."

2          Is this the same language we saw in the 2012 guidelines?

3     A.   Yes.

4     Q.   And your opinions with respect to it are the same?

5     A.   Yes.

6     Q.   And, finally, paragraph 9 (reading):

7              "Treatment is not primarily for the purpose of

8          providing respite for the family, increasing the member's

9          social activity, or for addressing antisocial behavior or

10         legal problems, but is for the active treatment of a

11         behavioral health condition."

12         Also language we've seen before?

13    A.   Yes.

14    Q.   And are your opinions the same with respect to that

15    language?

16    A.   Yes.

17    Q.   Okay.  Let's turn to the continued service criteria on

18    page 89 of Exhibit 3.

19    A.   (Witness examines document.)

20    Q.   Directing your attention to paragraphs 5 and 6 of the

21    continued service criteria.  Is this the same language we saw,

22    both paragraphs 5 and 6, in the 2012 guidelines?

23    A.   It is.

24    Q.   And have you already addressed that language and whether

25    it's consistent with generally accepted standards of care?

1    A.    Yes, I have.

2    Q.    Okay.  Let's turn now to the Substance Disorder

3    Residential Rehabilitation Guidelines found on page 67 of the

4    2013 guidelines.

5    A.    (Witness examines document.)

6    Q.    As we have seen before, this section has a requirement of

7    "Any one of the following criteria must be met," and then

8    there's six choices there.

9    A.    Yes.

10   Q.    Can you review these six choices and opine as to whether

11   or not it is consistent with generally accepted standards of

12   care to require that at least one of them be met?

13   A.    My opinion is that it's reasonable to have at least one of

14   these being met, in particular because number one is so broad.

15   Q.    And let's look at number one then (reading):

16         "The member continues to use alcohol or drugs and the

17         member's functioning has deteriorated to the point that

18         the member cannot be safely treated in a less restrictive

19         level of care."

20         And why is it your opinion that it's so broad that that

21   one is sufficient?

22   A.    That's pretty simple inclusion criteria for this level of

23   care.

24   Q.    Is it your opinion, then, that residential treatment is

25   not indicated if number one is not met?

1  **A.**   No, because it's any one needs to be met.  So it would

2  be -- again, that's a pretty broad landing pad to match someone

3  who is in need of this level of care, but it's not necessary

4  that that one is satisfied.  There are other options as well.

5  **Q.**   Okay.  Let's look at some of those other options.  Option

6  2 (reading):

7           "The member continues to use alcohol or drugs, is at

8       risk of exacerbating a serious co-occurring medical

9       condition, and cannot be safely treated in a lower level

10      of care."

11     Is it consistent with generally accepted standards to

12  include that as one of the potential -- one of the six criteria

13  for residential treatment?

14  **A.**   Yes.

15  **Q.**   Why?

16  **A.**   Well, so, for example, it could be that this could

17  describe a scenario where a person, although they continue to

18  use, if we were simply looking at the level of intensity of

19  their use, that in and of itself might not warrant admission to

20  a residential rehab program.

21     But let's say they have acute pancreatitis and the level

22  of intensity of use inflames their pancreatitis and so there

23  needs to be an intervention to avoid an acute episode of

24  pancreatitis.  So that's just a for instance of how an

25  intercurrent general medical condition could be exacerbated by

1  the level of substance use even though the level of substance

2  use in and of itself might not warrant admission to a

3  residential rehab program *per se.*

4  **Q.**  And Item Number 3 says -- well, let me back up to

5  Number 2.  Is that an example of where a co-occurring medical

6  condition could indicate a higher level of care?

7  **A.**  Sure.

8  **Q.**  Okay.  Looking at 3 (reading):

9          "There is a high risk of harm to self or others due

10      to continued and severe alcohol or drug use which

11      prohibits treatment from safely occurring in a less

12      restrictive level of care."

13      Is that consistent with generally accepted standards of

14  care to include as one of the criteria here?

15  **A.**  Again, that's a pretty thin needle to thread.  I would err

16  on the side of a more restrictive setting for this kind of a

17  scenario, but it's not inconsistent under the right clinical

18  circumstances for this level.

19  **Q.**  And does this provision disallow placement at a higher

20  level of care?

21  **A.**  No.

22  **Q.**  Fourth, it says (reading):

23          "There is a risk that continued use of alcohol or

24      drugs will exacerbate a co-occurring medical condition to

25      the extent that treatment in a less restrictive level of

1    care cannot be safely provided."

2    Is this another provision that addresses co-occurring

3    medical conditions?

4    A.   Yes.

5    Q.   And is it consistent with generally accepted standards of

6    care to include it here?

7    A.   Yes.

8    Q.   Why is that?

9    A.   Because, again, it's treating the patient holistically and

10   taking into consideration clinical factors that are relevant to

11   the current presentation, and certain intercurrent general

12   medical conditions are highly relevant to the current

13   presenting situation.

14   Q.   And the fifth one (reading):

15        "There is a high risk of developing severe withdrawal

16        symptoms which cannot be safely treated in a lower level

17        of care."

18   Is that consistent with generally accepted standards?

19   A.   It is.

20   Q.   And on what do you base that opinion, or why do you say

21   that?

22   A.   Well, it's -- you know, it's a situation where in the

23   clinical judgment of those who are assessing the person, that

24   unless the person is admitted to this level of care, there is

25   an unduly high risk of developing severe withdrawal symptoms

1    that cannot be safely treated in a lower level.  So you'd be at

2    24-hour access to services.

3    **Q.**    Now looking to the bottom of page 67 starting now on the

4    section that says "All of the following criteria must be met."

5    Number 2 refers to what should be done within the first 48

6    hours of admission.  Is this the same language you have already

7    addressed from the 2012 guidelines?

8    **A.**    Yes.

9    **Q.**    And Number 3 --

10              **THE COURT:**  So let me ask you about that.  This is

11   residential?

12              **THE WITNESS:**  Correct.

13              **THE COURT:**  You said that an M.D. is not required at

14   certain levels of residential?

15              **THE WITNESS:**  Correct.

16              **THE COURT:**  And certainly at 3.1, 3.3?

17              **THE WITNESS:**  Right.

18              **THE COURT:**  3.7 you thought an M.D. was required?

19              **THE WITNESS:**  Yes.

20              **THE COURT:**  3.5 you thought an M.D. was not required

21   but a good idea?

22              **THE WITNESS:**  Yes.

23              **THE COURT:**  So the generally accepted medical

24   standards would not require an M.D. at 3.5?

25              **THE WITNESS:**  They would be required but not at the

1    frequency that is stipulated in this.

2            **THE COURT:** I see. Okay. Thank you.

3    **BY MS. ROMANO:**

4    **Q.** Is an addictionologist an M.D.?

5    **A.** Yes. Not necessarily a psychiatrist.

6    **Q.** And turning to paragraph 3 on 68, it says (reading):

7            "Subsequent psychiatric evaluations and consultations

8        are available 24 hours a day. Visits with the treating

9        psychiatrist addictionologist occur at least two times per

10       week."

11       Is this the language you also already addressed from the

12   2012 guidelines?

13   **A.** Yes.

14   **Q.** Turning to page -- excuse me -- paragraph 5 on page 68

15   relating to custodial care. Is this, again, the same language

16   that -- let me ask this clearly.

17       The section that is just the paragraph 5, not the

18   subparts, is that the same language that you have discussed and

19   addressed from the 2012 Level of Care Guidelines?

20   **A.** Yes.

21   **Q.** Now I want to ask you about the subpart C on page 69, and

22   this is connected to the phrase at the bottom of Section 5. So

23   it would read (reading):

24           "Custodial care is characterized by the following..."

25   **A.** Yes.

1  **Q.**  C (reading):

2      "The intensity of active treatment provided in a

3      residential setting is no longer required or services can

4      be safely provided in a less intensive setting."

5  Is this language that you would usually connect with the

6  definition of "custodial care"?

7  **A.**  (Witness examines document.)  No.

8  **Q.**  Is inclusion of this language more restrictive than

9  generally accepted standards of care?

10  **A.**  Well, it's not really defining "custodial care."  It's

11  talking about a mismatch, or it's really talking about

12  continued active treatment, which is not custodial care but

13  care that doesn't necessarily have to be provided at this

14  current level of treatment -- level of intensity.

15  **Q.**  In your opinion, is it appropriate to step down in a level

16  of care if active service is -- services are no longer required

17  or can be safely provided in a less restrictive setting?

18  **A.**  Yes.

19  **Q.**  Okay.  Now looking at paragraph 6, it says (reading):

20      "Treatment in residential rehabilitation is for the

21      active treatment of a substance use disorder.  Active

22      treatment is a clinical process involving 24-hour care

23      that includes assessment, diagnosis, intervention,

24      evaluation of care, treatment and planning for discharge

25      and aftercare.  Active treatment is indicated by services

1       that are all of the following..."

2       And there are five subparts there.  Is this an appropriate

3  definition of "active treatment"?

4  **A.**   Yes.

5  **Q.**   Turning now to page 53, please.

6  **A.**   (Witness examines document.)

7  **Q.**   And I suppose if you start on page 52, are these the

8  intensive outpatient program guidelines for substance use

9  disorders in 2013?

10  **A.**   Yes.

11  **Q.**   Okay.  Directing your attention to paragraph 4 on page 53

12  relating to family social support system and participation in

13  treatment, is this the same language that we have already

14  discussed and you'd already offered your opinion on from the

15  2012 Level of Care Guidelines?

16  **A.**   Yes.

17  **Q.**   Is this language consistent with generally accepted

18  standards of care for reasons previously discussed?

19  **A.**   Yes.

20  **Q.**   Okay.  And then looking at paragraph 5, which relates to

21  things that should occur upon admission, is this language

22  similar to the language in the 2012 Level of Care Guidelines?

23  **A.**   Yes.

24  **Q.**   And is this language consistent with generally accepted

25  standards of care for the reasons that we've already discussed?

1  **A.**  Yes.

2  **Q.**  Directing your attention to paragraph 7, please.

3  **A.**  (Witness examines document.)

4  **Q.**  This section also refers to things that should occur after

5  admission.  Is this the same language that we have seen from

6  the 2012 guidelines?

7  **A.**  Yes.

8  **Q.**  Is this language consistent with generally accepted

9  standards of care for the reasons previously discussed?

10  **A.**  Yes.

11  **Q.**  And turning to page -- let's turn to 56 quickly.

12  **A.**  (Witness examines document.)

13  **Q.**  Are these the Substance Use Disorders Guidelines for

14  Outpatient in 2013?

15  **A.**  Yes.

16  **Q.**  Okay.  Looking at page 57 toward the bottom, there is

17  language that says (reading):

18          "Consider whether outpatient needs to continue when

19      any one of the following criteria is met..."

20      And I'd like to direct your attention to paragraph 2 after

21  that heading, which is located on page 58, and it reads

22  (reading):

23          "The member refuses further treatment or repeatedly

24      does not adhere with recommended treatment despite

25      attempts to enhance the member's engagement in treatment

1    and/or peer support and other community support services.

2    In such cases, the provider explains the risks of

3    discontinuing treatment to the member and, as appropriate,

4    the member's family social supports.  Alternative

5    referrals are provided in writing and the member is

6    provided with instructions for resuming services should

7    the need arise in the future."

8    In your opinion, under the circumstances described in

9    paragraph 2, is it appropriate to consider whether outpatient

10   needs to continue?

11   A.   Yes.

12   Q.   Why?

13   A.   Because this describes a situation where a person is by

14   definition not engaging and actively participating in their own

15   treatment despite appropriate levels of motivation; and, you

16   know, at a certain point a judgment needs to be made that the

17   person is not engaging in their own treatment, and so

18   treatment -- that's a legitimate basis to terminate treatment

19   and to do so under -- under the -- by leaving the door open if

20   the patient -- person changes their mind in the future, and to

21   give them alternatives is the correct way to do that.

22   Q.   All right.  And does this provision disallow coverage

23   under those circumstances?

24   A.   No.  It just recognizes whether or not someone's actually

25   participating in treatment.

1  **Q.**   And if you can turn, please, to page 33 of the 2013

2  guidelines.

3  **A.**   (Witness examines document.)

4  **Q.**   Are these the Mental Health Residential Treatment Center

5  Guidelines for 2013?

6  **A.**   Yes.

7  **Q.**   Turning to page 34 and 35, if you can look to paragraphs

8  5 and 6.

9  **A.**   Yes.

10  **Q.**   Is this the same language that we have discussed from the

11  2012 Level of Care Guidelines for substance use with the

12  exception that these refer to mental health instead of

13  substance use?

14  **A.**   Yes.

15  **Q.**   And are your comments with respect to those provisions

16  from 2012 and opinions the same as they are for these

17  provisions?

18  **A.**   Yes.

19  **Q.**   Okay.  Let me direct your attention now to -- or let me

20  have you turn to the 2014 guidelines, Trial Exhibit 4.

21  **A.**   I need a minor adjustment of the microphone.

22       **THE COURT:**  So figure out what the appropriate

23  breaking spot is for you.

24       **MS. ROMANO:**  Do you want -- is this a good time for --

25       **THE COURT:**  Well, we're going to break around 4:00, so

1    it's not far.  You decide.

2         **MS. ROMANO:**  I think it's probably better to start in

3    the morning, but I'm happy to go for five minutes.

4         **THE COURT:**  Oh, okay.  Let's go in the morning.

5         **MS. ROMANO:**  Okay.

6         **THE COURT:**  See you in the morning.

7    Anything we should deal with right now?

8         **MR. RUTHERFORD:**  I don't think so, Your Honor.

9         **THE COURT:**  Okay.  Great.

10        **MR. RUTHERFORD:**  Thank you.

11             (Proceedings adjourned at 3:56 p.m.)

12        (Proceedings to resume on Thursday, October 26, 2017.)

13                      - - - -

14                CERTIFICATE OF REPORTERS

15        We certify that the foregoing is a correct transcript

16    from the record of proceedings in the above-entitled matter.

17    DATE:  Wednesday, October 25, 2017

18

19                    *Katherine Sullivan*

20    _____

21    Katherine Powell Sullivan, CSR #5812, RMR, CRR
                U.S. Court Reporter

22

23

24    _____

25       Jo Ann Bryce, CSR #3321, RMR, CRR
              U.S. Court Reporter