**Volume 7**

**Pages 1298 - 1548**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JOSEPH C. SPERO, MAGISTRATE JUDGE

DAVID AND NATASHA WIT, et al., )
                             )
         Plaintiffs,     )
                             )
  VS.                     )   **No. C 14-2346 JCS**
                             )
UNITED BEHAVIORAL HEALTH,   )
                             )
         Defendant.     )
_____ )   San Francisco, California
                              Thursday, October 26, 2017

<u>**TRANSCRIPT OF PROCEEDINGS**</u>

<u>**APPEARANCES**</u>:

For Plaintiffs:         ZUCKERMAN SPAEDER LLP
                       1800 M Street, NW, Suite 1000
                       Washington, DC  20036-5807
         **BY: CARL S. KRAVITZ, ESQUIRE**
              **CAROLINE E. REYNOLDS, ESQUIRE**
              **AITAN D. GOELMAN, ESQUIRE**

                       ZUCKERMAN SPAEDER LLP
                       485 Madison Avenue, 10th Floor
                       New York, New York 10022
         **BY: JASON S. COWART, ESQUIRE**

         (Appearances continued on next page)

Reported By:   Katherine Powell Sullivan, CSR #5812, RMR, CRR
              Jo Ann Bryce, CSR #3321, RMR, CRR
              Official Reporters - U.S. District Court

<u>**APPEARANCES (CONTINUED):**</u>

For Plaintiffs:            ZUCKERMAN SPAEDER LLP
                           100 East Pratt Street, Suite 2440
                           Baltimore, Maryland  21202-1031
                      BY:  **ADAM ABELSON, ESQUIRE**

                           THE MAUL FIRM, P.C.
                           101 Broadway, Suite 3A
                           Oakland, California 94607
                      BY:  **ANTHONY F. MAUL, ESQUIRE**

                           PSYCH APPEAL
                           8560 Sunset Boulevard, Suite 500
                           West Hollywood, California  90069
                      BY:  **MEIRAM BENDAT, ESQUIRE**

For Defendant:             CROWELL & MORING LLP
                           515 South Flower Street, 40th Floor
                           Los Angeles, California 90071-2258
                      BY:  **JEFFREY H. RUTHERFORD, ESQUIRE**
                           **JENNIFER S. ROMANO, ESQUIRE**
                           **ANDREW HOLMER, ESQUIRE**

                           CROWELL & MORING LLP
                           3 Embarcadero Center, 26th Floor
                           San Francisco, California 94111
                      BY:  **NATHANIEL P. BUALAT, ESQUIRE**

                           CROWELL & MORING LLP
                           1001 Pennsylvania Avenue, NW
                           Washington, DC 20004-2595
                      BY:  **APRIL N. ROSS, ESQUIRE**

# I N D E X

Thursday, October 26, 2017 - Volume 7

| **DEFENDANTS' WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| | | |
| **SIMPATICO, THOMAS (RECALLED)** | | |
| (PREVIOUSLY SWORN) | 1301 | 7 |
| Direct Examination resumed by Ms. Romano | 1301 | 7 |
| | | |
| **ALLCHIN, THEODORE** | | |
| (SWORN) | 1352 | 7 |
| Direct Examination by Mr. Bualat | 1353 | 7 |
| Cross-Examination by Mr. Goelman | 1441 | 7 |
| Redirect Examination by Mr. Bualat | 1465 | 7 |
| | | |
| **BRIDGE, FRANCES** | | |
| (SWORN) | 1468 | 7 |
| Direct Examination by Mr. Holmer | 1468 | 7 |
| Cross-Examination by Ms. Reynolds | 1505 | 7 |
| Redirect Examination by Mr. Holmer | 1539 | 7 |

# E X H I B I T S

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 644 | | 1465 | 7 |
| 645 | | 1465 | 7 |
| 693 | | 1441 | 7 |
| 897 | | 1507 | 7 |
| 899 | | 1539 | 7 |
| 1655 | | 1505 | 7 |

 1    **<u>Thursday - October 26, 2017</u>**                        **<u>8:33 a.m.</u>**

 2                          **<u>P R O C E E D I N G S</u>**

 3                                **---oOo---**

 4          **THE CLERK:**  We're calling Case Number C 14-2346,

 5    Wit/Alexander versus UBH.

 6          And we're ready to do --

 7          **THE COURT:**  Okay.  Everybody's here.  Let's proceed.

 8          **MS. ROMANO:**  We are, Your Honor.  I don't believe we

 9    have any housekeeping to take care of, so we are proceeding

10    with the examination of Dr. Simpatico.

11          **THE COURT:**  Excellent.

12          **MS. ROMANO:**  He's just going up to the witness stand.

13                          **<u>THOMAS SIMPATICO</u>,**

14    called as a witness for the Defendant, having been previously

15    duly sworn, testified further as follows:

16          **THE COURT:**  Good morning.

17          **THE CLERK:**  And just a reminder, Dr. Simpatico, you're

18    still under oath.

19          **THE WITNESS:**  Thank you.

20                  **<u>DIRECT EXAMINATION</u>  (resumed)**

21    BY MS. ROMANO:

22    **Q.**   Good morning, Dr. Simpatico.

23    **A.**   Good morning.

24    **Q.**   Before we broke yesterday afternoon, we were just going to

25    turn to the 2014 Level of Care Guidelines, Exhibit 4.

SIMPATICO - DIRECT / ROMANO

1      I will let you pour yourself some water, though, because I

2 know you were about to do that.

3 **A.**   I see I have two containers of water today.  That's great.

4      **THE COURT:**  Yeah.

5 **BY MS. ROMANO:**

6 **Q.**   Dr. Simpatico, if you can take a look at what's been

7 admitted as Exhibit 4.

8 **A.**   (Witness examines document.)

9 **Q.**   Are these the 2014 Level of Care Guidelines that you

10 reviewed as part of your work in the case?

11 **A.**   They are.

12 **Q.**   And the formatting is a bit -- not a bit -- quite

13 different from prior years?

14 **A.**   Landscape instead of portrait, yes, and other changes as

15 well.

16 **Q.**   So let's go to the page 7 of Exhibit 4, please.

17 **A.**   (Witness examines document.)  Uh-huh.

18 **Q.**   And I'd like to direct your attention to the first column

19 on the left.  This is under the heading "Common Criteria and

20 Best Practices For All Levels of Care."  Is that your

21 understanding?

22 **A.**   Yes.

23 **Q.**   And looking specifically at the "Admission" column on the

24 left, please, and focusing on the second black bullet point,

25 which reads (reading):

1          "The member's current condition cannot be safely,

2      efficiently, and effectively assessed and/or treated in a

3      less intensive setting due to acute changes in the

4      member's signs and symptoms and/or psychosocial and

5      environmental factors, i.e., the 'why now' factors leading

6      to admission."

7      And we saw language relating to "acute changes in signs

8  and symptoms" in the 2017 guidelines.  In your opinion, what

9  are acute changes in signs or symptoms --

10 **A.**   Well, acute --

11 **Q.**   -- and/or psychosocial and environmental factors?

12 **A.**   Exactly.  So I think what that refers to is a departure

13 from a baseline in any of those realms such that it likely is

14 the basis for which someone comes to the attention for seeking

15 care or changing ongoing care.

16 **Q.**   And when you're speaking about "any of those realms," what

17 would it -- can you give me an example of what it would mean in

18 the realm of psychosocial and/or -- excuse me -- psychosocial

19 and environmental factors?

20 **A.**   Sure.  So environmental factors, you know, someone's

21 living situation may have changed.  They may have become

22 homeless, which could provide stressors on an existing clinical

23 condition.  Someone -- you know, there may have been some other

24 fundamental life change in the psychosocial realm that,

25 likewise, could change the backdrop against which someone is

1  maintained in a chronic condition possibly causing acute

2  changes.

3  **Q.**  And would this require an acute crisis?

4  **A.**  No.

5  **Q.**  There is also reference to it says "i.e., the 'why now'

6  factors leading to admission."  What does "the 'why now'

7  factors leading to admission" mean in this context in your

8  opinion?

9  **A.**  Well, again, the "why now" factors, as the name implies --

10  and, again, just as a brief comment if it hasn't -- if I

11  haven't stated this already, "why now" is not a usual and

12  customary term of art in medical practice.  Just having said

13  that, but I'm clear about what it means in the vernacular of

14  these guidelines.

15      And what it means is answering the question "Why now?  Why

16  are we thinking about either treating or changing the treatment

17  of a person at this point in time?"

18  **Q.**  And this provision refers to the current condition; is

19  that correct?

20  **A.**  It does.

21  **Q.**  Does ASAM and LOCUS also similarly focus on the member's

22  current condition?

23  **A.**  They do.

24  **Q.**  And are you familiar with ASAM language discussing using

25  the phrase "here and now"?

SIMPATICO - DIRECT / ROMANO

1    **A.**    I am.

2    **Q.**    Okay.  Let's go ahead and turn to the other binder that

3    you have in front of you, specifically Exhibit 662, please.

4    **A.**    (Witness examines document.)

5    **Q.**    Are these the ASAM criteria that we were looking at

6    yesterday as well?

7    **A.**    They are.

8    **Q.**    Turning to page 77, please.

9    **A.**    (Witness examines document.)

10   **Q.**    If I can direct your attention to the top of the page,

11   there is a heading "History and Here and Now."  And then it

12   reads (reading):

13            "Risk assessment must integrate the patient's

14       history, current status, and changing situation.  The

15       patient's historical function and severity does not

16       override the current status when assessing here and now,

17       severity, and level of function.  However, the here and

18       now current status of an individual's severity and level

19       of function does override the patient's history."

20       How do the ASAM criteria provide for the here and now to

21   be taken into account?

22   **A.**    I would say in precisely the same way as the UBH concept

23   of "why now" does, which is to take factors into consideration

24   to answer that question "Why is the person presenting now?" in

25   the context of a departure from a baseline in their clinical

**SIMPATICO - DIRECT / ROMANO**

1    symptoms or their circumstances that may affect their clinical

2    symptoms, and also in the context of intercurrent general

3    medical or other behavioral health issues that are the backdrop

4    and the context in which to understand the current

5    presentation.  So I would say these are extremely consistent

6    with the UBH guidelines.

7          THE COURT:  Doesn't the ASAM distinguish in this set

8    here between history and the here and now?

9          THE WITNESS:  Well, it does appropriately.

10         THE COURT:  And doesn't the -- and your interpretation

11   of the guidelines is the here and now includes the history?

12         THE WITNESS:  That's correct.

13         THE COURT:  Okay.  So they're not using the "why now"

14   factors in the same way that ASAM is using "here and now"

15   because they distinguish ASAM?

16         THE WITNESS:  Yes.  Yes.  But, as a practical matter,

17   I would say that the concepts captured in "here and now," which

18   is suspiciously similar to the "why now" factors in the UBH

19   guidelines, capture the same practical considerations.

20         THE COURT:  Except not the history.

21         THE WITNESS:  Well, I think they do.

22         THE COURT:  But not in ASAM.  ASAM distinguishes

23   between the history and, in fact, says in some circumstances

24   the history can't override the here and now and the here and

25   now can override the history suggesting that they are separate

**SIMPATICO - DIRECT / ROMANO**

1   pieces of the analysis.

2          **THE WITNESS:**  Yes, but I would say from a clinical

3   perspective --

4          **THE COURT:**  So the reason I'm asking you this --

5          **THE WITNESS:**  Yes.

6          **THE COURT:**  -- is because the intuitive way of reading

7   the "why now" factors is not the way you're doing it.

8          **THE WITNESS:**  I disagree.

9          **THE COURT:**  No, no.  Fine.  You can disagree all you

10  like.  I'm not reading it that way.

11         **THE WITNESS:**  Okay.

12         **THE COURT:**  It's not a medical term.  "Why now" is not

13  a term of art in the medical profession.  You just said that.

14         **THE WITNESS:**  That's correct.

15         **THE COURT:**  Okay.  So the question is:  Why would

16  someone think, when you're saying "why now," does it include

17  the history?  Well, you think it does.  I appreciate that.  But

18  if you point to ASAM, ASAM distinguishes between here and now

19  and history suggesting that "here and now" is different from

20  the "why now" factors.

21         **THE WITNESS:**  Well, if I may.

22         **THE COURT:**  Yes.

23         **THE WITNESS:**  I think reading the ASAM language it

24  says, "Risk assessment must integrate the patient's history,"

25  which --

1    **THE COURT:**  I'm not arguing that.  I'm not even

2    suggesting that.  I'm not arguing anything.  I'm not suggesting

3    that.  I'm suggesting that it's a different piece of the

4    analysis, history from here and now under ASAM.  Don't you

5    agree with that?

6    **THE WITNESS:**  I don't.

7    **THE COURT:**  Okay.  Great.

8    Go ahead.  Proceed.

9    **BY MS. ROMANO:**

10   **Q.**  All right.  Turning, please, to page 9 of the 2014

11   guidelines.

12   **A.**  (Witness examines document.)

13   **Q.**  This is the only black bullet point on this page in the

14   admission criteria.  It reads (reading):

15       "There is a reasonable expectation that services will

16       improve the member's presenting problems within a period

17       of time.  Improvement of the member's condition is

18       indicated by the reduction or control of the acute signs

19       and symptoms that necessitated treatment in a level of

20       care.  Improvement in this context is measured by weighing

21       the effectiveness of treatment against evidence that the

22       member's signs and symptoms will deteriorate if treatment

23       in the current level of care ends.  Improvement must also

24       be understood within the broader framework of the member's

25       recovery and resiliency roles" -- excuse me -- "goals."

1    Now, this language is very similar to 2017 admission

2    criteria defining "reasonable expectation of improvement"

3    except that the bullet point includes the word "acute."  Do you

4    see where that is?

5    **A.**   Yes.

6    **Q.**   In your opinion, is that consistent with generally

7    accepted standards of care?

8    **A.**   Yes.

9    **Q.**   And is that consistent with generally accepted standards

10   of care for all of the different levels of care we've been

11   talking about?

12   **A.**   Yes.

13   **Q.**   Why is that?

14   **A.**   Again, the term "acute" in this context refers to a

15   departure from a baseline in a timely manner that represents an

16   actionable departure from a clinical baseline.

17   **Q.**   And what does it mean that "Improvement must also be

18   understood within the broader framework of the member's

19   recovery and resiliency goals"?

20   **A.**   Again, and we discussed aspects of this in earlier -- in

21   my earlier testimony, it's consistent with the developing

22   concept of the recovery movement in the mental health advocacy

23   world and the general notion that care should be patient

24   centric and should take into consideration in a prominent way

25   how a patient conceptualizes their clinical -- their mental

**SIMPATICO - DIRECT / ROMANO**

1  illness or their substance use disorder; and that whatever is

2  proposed and implemented in the way of treatment should be

3  sensitive to that and be -- be conducted in accordance with

4  that.

5  **Q.**   Does that include consideration of chronic conditions and

6  symptoms?

7  **A.**   It does.  And, again, by definition, many mental illnesses

8  and substance use disorders are by definition chronic

9  illnesses.

10 **Q.**   Staying on page 10 in the admission criteria, it says

11 (reading):

12         "Treatment is not primarily for the purpose of

13     providing social, custodial, recreational, or respite

14     care."

15     Is it consistent with generally accepted standards of care

16 to exclude coverage for treatment that is primarily for

17 custodial care?

18 **A.**   Yes.

19 **Q.**   Directing your attention now to page 7 under the continued

20 service criteria.

21 **A.**   (Witness examines document.)

22 **Q.**   The top black bullet says (reading):

23         "The admission criteria are still met and active

24     treatment is being delivered.  For treatment to be

25     considered active treatment, services must be..."

**SIMPATICO - DIRECT / ROMANO**

1    I want to call your attention to the second white bullet

2  point here where it says (reading):

3         "Provided under an individualized treatment plan that

4      is focused on addressing the 'why now' factors and makes

5      use of clinical best practices."

6    Is this provision consistent with generally accepted

7  standards of care in your opinion?

8  **A.**   Yes.

9  **Q.**   Why is that?

10 **A.**   Well, and, again, I think we addressed if not this

11 language similar language yesterday, which is to say that in

12 putting together an individualized treatment plan, it would

13 stand to reason that included in the problem list, that you

14 would include and address the identified reasons for why a

15 person is presenting now, and it would be an omission to not do

16 so.

17 **Q.**   And turning to page 8, please, the top white bullet point.

18 And this is still referring to the prefatory language

19 (reading):

20         "The admission criteria are still met and active

21      treatment is being delivered.  For treatment to be

22      considered active treatment, services must be," now

23      turning to page 8, "reasonably expected to stabilize the

24      member's condition and/or the precipitating why factors

25      within a reasonable period of time."

**SIMPATICO - DIRECT / ROMANO**

1    Does this raise any concern for you that the clock is

2    ticking on removing a patient from care?

3    **A.**   No.

4    **Q.**   Why is that?

5    **A.**   Well, because this is consistent with the principle of

6    care should have a reasonable expectation of being effective,

7    and so -- and, again, we alluded to this or talked about this

8    in a slightly different context yesterday.

9        When a diagnosis is rendered and a treatment is proposed

10   commensurate with that diagnosis, there is a reasonable

11   expectation that it will work.  And by "work," we mean either

12   ameliorate the signs and symptoms or prevent deterioration; and

13   the effect of doing either/or both of those things should be

14   seen in an expectable time window, which is not a definite

15   period of time.  The time window is determined both by the

16   underlying pathophysiology of the condition as well as the

17   mechanism of action of the treatment.

18   **Q.**   And now turning back up to page 7 in the discharge

19   criteria, please.

20   **A.**   (Witness examines document.)

21   **Q.**   The first bullet point says (reading):

22       "The continued stay criteria are no longer met.

23   Examples include..."

24   Looking at the first example, it says (reading):

25       "The 'why now' factors, which led to admission, have

1    been addressed to the extent that the member can be safely

2    transitioned to a less intensive level of care or no

3    longer requires treatment."

4        In your opinion, is this an appropriate example of when

5    discharge criteria would be met.

6    **A.**   Yes.

7    **Q.**   Why is that?

8    **A.**   Well, again, it's in accordance with the principle of care

9    should be provided in a least restrictive, safe, and effective

10   manner possible; and presuming that the "why now" factors

11   include a departure from a baseline that required services in a

12   particular level of care, once those have been ameliorated or

13   stabilized, it at least raises the question to see whether or

14   not a less restrictive level of care would now be appropriate.

15   **Q.**   Turning to page 8, please, still in the discharge

16   criteria.

17   **A.**   (Witness examines document.)

18   **Q.**   The second and last white bullet point in that column

19   reads (reading):

20        "The member is unwilling or unable to participate in

21    treatment and involuntary treatment or guardianship is not

22    being pursued."

23        Is this the same language that you offered an opinion on

24   yesterday with respect to a different year?

25   **A.**   It is.

1   **Q.**   Are your opinions the same with this provision?

2   **A.**   They are.

3   **Q.**   Now turning to page 10, please, still in Exhibit 4 of the

4   2014 guidelines.

5   **A.**   (Witness examines document.)

6   **Q.**   And drawing your attention to the column under "Clinical

7   Best Practices" and subcolumn "Evaluation and Treatment

8   Planning."  The first bullet says (reading):

9          "The expected outcome for each problem to be

10         addressed expressed in terms that are measurable,

11         functional, time framed and directly related to the 'why

12         now' factors."

13   This language is similar to what we've seen before and now

14   includes "why now" factors.  Is the inclusion of "why now"

15   factors there consistent with generally accepted standards of

16   care?

17   **A.**   Yes.

18   **Q.**   Why is that?

19   **A.**   Because, again, it would be an omission not to include a

20   treatment -- in a treatment plan that would not address the

21   reason that brought someone to the attention of that particular

22   level of treatment.

23          **THE COURT:**  Should it address other things?

24          **THE WITNESS:**  Of course.

25          **THE COURT:**  Okay.  And so the expected outcome for

1    each problem to be addressed does not necessarily have to

2    directly relate to the "why now" factors; right?

3            **THE WITNESS:**  That is correct.

4            **THE COURT:**  Okay.

5    **BY MS. ROMANO:**

6    **Q.**   Turning to page 11, please.

7    **A.**   (Witness examines document.)

8    **Q.**   The second black bullet point says (reading):

9            "Treatment focuses on addressing the 'why now'

10           factors to the point that the member's condition can be

11           safely, efficiently, and effectively treated in a less

12           intensive level of care or treatment is no longer

13           required."

14           There's a reference there to "the member's condition."

15   What does that mean in your opinion in this context?

16   **A.**   Well, the member's condition is really a general term.

17   That means the overall condition, which certainly would include

18   the so-called "why now" factors but would also include anything

19   else that was uncovered during the clinical analysis that

20   generated the treatment plan.

21           So the scope of what would be considered in moving someone

22   to another level of care would necessarily include anything

23   that the treatment team was aware of by virtue of having gone

24   through that database, which in the parlance of UBH is referred

25   to as the best practices compilation of data elements.

SIMPATICO - DIRECT / ROMANO

1          And in moving someone to another level of care, one would

2    include those, as well as the so-called "why now" factors, in

3    having a goodness of fit at the next level of care.

4    Q.   And in your opinion is that consistent with generally

5    accepted standards of care?

6    A.   It is.

7    Q.   Turning now to page 77, please, of the 2014 guidelines.

8    A.   (Witness examines document.)

9    Q.   Do you understand these to be the residential

10   rehabilitation portion of the 2014 guidelines?

11   A.   Yes.

12   Q.   And directing your attention to the bar at the top and the

13   second full paragraph where it reads (reading):

14          "The course of treatment in residential

15       rehabilitation is focused on addressing the 'why now'

16       factors that precipitated admission, e.g., changes in the

17       member's signs and symptoms, psychosocial and

18       environmental factors, or level of functioning to the

19       point that rehabilitation can be safely, efficiently, and

20       effectively continued in the less intensive level of

21       care."

22          Is this similar to the language that we've discussed

23   already from the common criteria?

24   A.   It is.

25   Q.   Except now it's specific to residential treatment?

1   **A.**   That's correct.

2   **Q.**   Is it your opinion this provision is consistent with

3   generally accepted standards of care?

4   **A.**   It is.

5   **Q.**   Do you have anything additional to add to what we had

6   already discussed with respect to this language in the common

7   criteria?

8   **A.**   I don't think so.

9   **Q.**   And looking at the admission criteria on the same page,

10   77, on the third black bullet point, it reads (reading):

11           "The 'why now' factors leading to admission suggest

12       that physical complications, if present, can be safely

13       managed."

14       Is that provision consistent with generally accepted

15   standards of care?

16   **A.**   Yes.

17   **Q.**   Why is that?

18   **A.**   That's one of the fundamental inclusion criteria of making

19   a judgment about the least restrictive, safe, and effective

20   place where care can be provided, and here it is explicitly

21   taking into consideration other general medical complications;

22   and that in making a determination about level of care, you

23   would necessarily determine that those conditions could be

24   safely managed in that level of care.

25   **Q.**   Now, this section is for residential rehabilitation for

1    substance-related disorders.  Is that your understanding?

2    **A.**   Yes.

3    **Q.**   And in your experience, do residential facilities that

4    treat substance-related disorders typically have professionals

5    and expertise present to address physical complications,

6    physical health issues?

7    **A.**   Well, as they say, it depends.  And, again, you know, you

8    would expect there would be a greater capacity to do so at a

9    more intensive level, like a 3.7 level facility, and likely not

10   in any kind of a comprehensive way at a less intensive facility

11   like a 3.1 level facility.  And the particular capacity to

12   treat particular conditions would necessarily be part of a

13   calculus before deciding that a particular disposition was safe

14   and effective.

15   **Q.**   Turning to page 79, please, also in the admission criteria

16   for residential rehabilitation.  It reads (reading):

17        "The member is in immediate or imminent danger of

18        relapse and the history or treatment suggests that

19        structure and support provided in this level will be

20        needed to control the recurrence."

21   And my apologies.  I want to read up to the prefatory

22   paragraph.  It says (reading):

23        "The 'why now' factors leading to admission and/or

24        the member's history of response to treatment suggests

25        that there is imminent or current risk of relapse, which

SIMPATICO - DIRECT / ROMANO

1    cannot be safely, efficiently, and effectively managed in

2    a less intensive level of care.  Examples include..."

3        And then going back to the one I originally read

4    (reading):

5            "The member is in immediate or imminent danger of

6        relapse and the history of treatment suggests that the

7        structure and support provided in this level will be

8        needed to control the recurrence."

9        Is this example consistent with generally accepted

10   standards of care?

11   A.    Yes.

12   Q.    Why is that?

13   A.    Well, it's a really nice example of illustrating why

14   there's not a finite time period in many of these definitions,

15   because care needs to be individualized and this explicitly

16   says your consideration of the likelihood of relapse is to be

17   informed by the -- that individual patient's history.

18       And, you know, as probably as is self-evident, history is

19   a reasonably good predictor of future events, and so this

20   requires the consideration of past events in the case of that

21   particular patient to make a determination of how -- how it

22   meets the inclusion criteria for admitting someone to

23   residential rehab.

24   Q.    And do you read this as a requirement or an example?

25   A.    I believe it says an example.

1   Q.   On page 79, it's the only black bullet point there in the

2   admission criteria, it still reads (reading):

3          "The 'why now' factors leading to admission cannot be

4      safely, efficiently, or effectively assessed and/or

5      treated in a less intensive setting due to acute changes

6      in the member's signs and symptoms and/or psychosocial and

7      environmental factors."

8   And then there are a couple of examples there.  In your

9   opinion, is that consistent with generally accepted standards

10  of care?

11  A.   Yes.

12  Q.   And why is that?

13  A.   Well, again, it speaks to a departure from a baseline as

14  the basis for considering a change in the intensity or

15  appropriate level of care to deliver safe, efficient, and

16  effective care, and it specifically lists categories in which

17  the departure from the baseline might occur; and, again, it

18  does so not in the way of necessary inclusion criteria but in

19  the way of examples.

20  Q.   If I can direct your attention to the other binder,

21  please, Exhibit 662, which again is the ASAM criteria.

22  A.   (Witness examines document.)

23  Q.   And directing your attention to page 133, please.

24  A.   (Witness examines document.)

25  Q.   And I'm going to ask you about a section on the top

**SIMPATICO - DIRECT / ROMANO**

1  portion of page 112, but is this in the section relating to

2  service, planning, and placement?  And I'm looking at the --

3  **A.**  Page 133?

4  **Q.**  -- chapter heading, Chapter 3.

5      Page 133, yes.

6  **A.**  Uh-huh.

7  **Q.**  Chapter 3 relates to planning and placement?

8  **A.**  Yes.

9  **Q.**  And if I can direct your attention to the paragraph on the

10  top of 112, the first full paragraph, where it reads (reading):

11          "Once acute medical psychiatric stabilization has

12      been achieved, the initial placement for substance use

13      addiction treatment services should reflect an assessment

14      of the patient's status in all six ASAM criteria

15      dimensions.  The principle here is that the highest

16      severity problem, particularly those in Dimensions 1, 2,

17      or 3, should determine the patient's entry point into the

18      treatment continuum.  Subsequent resolution of the acute

19      problem creates an opportunity to transfer the patient to

20      a less intensive level of care."

21      In your opinion, what does it mean by "subsequent

22  resolution of the acute problem"?

23  **A.**  Well, it's as we've been discussing.  It means recognizing

24  what -- why a person is presenting now for consideration for

25  treatment or change in level of treatment and necessarily

1  focusing on those particular issues.

2      And once those issues have been resolved, it likely

3  presents an opportunity to reevaluate to see if a person can be

4  shifted to a -- safely to a less intensive or less restrictive

5  safe and effective manner of treatment.  It particularly uses

6  the word "opportunity" as a desirable thing to do.

7  **Q.**   On page 77 -- oh, I'm sorry.  Different binder.  Going

8  back to the guidelines, please.

9  **A.**   Ah.

10     (Witness examines document.)  I'm refining my technique

11  here for shifting binders.

12  **Q.**   Page 77, please, of the 2014 guidelines.

13  **A.**   Uh-huh.

14  **Q.**   Looking at "Evaluation and Treatment Planning."

15  **A.**   Yes.

16  **Q.**   The second bullet point reads (reading):

17         "The psychiatrist or addictionologist in conjunction

18      with the treatment team completes the initial evaluation

19      within 24 hours of admission."

20     Is this consistent with the language we've seen in prior

21  guidelines?

22  **A.**   Yes, it is.

23  **Q.**   And is your opinion the same with respect to that?

24  **A.**   It is.

25  **Q.**   Okay.  Now, if you can turn to page 59 still in Exhibit 4.

**SIMPATICO - DIRECT / ROMANO**

1   **A.**   (Witness examines document.)

2   **Q.**   Directing your attention to the second paragraph

3   (reading):

4           "The course of treatment in an intensive outpatient

5        program is focused on addressing the 'why now' factors

6        that precipitated admission, i.e., changes in the member's

7        signs and symptoms, psychosocial and environmental

8        factors, or level of functioning to the point that the

9        member's condition can be safely, efficiently, and

10       effectively treated in a less intensive level of care."

11       Is this the same language we saw with respect to the

12   residential -- and, I'm sorry, this is substance use as well --

13   except it has a different level of care here?

14   **A.**   Yes, it is.

15   **Q.**   And is your opinion the same with respect to this

16   provision as it was with residential?

17   **A.**   Yes.

18   **Q.**   I want to draw your attention to the paragraph right above

19   the one I just read starting in the third line where it reads

20   (reading):

21           "The purpose of services is to monitor and maintain

22       stability, decrease moderate signs and symptoms, increase

23       functioning, help members integrate into community life,

24       and assist members with gaining the knowledge and skills

25       needed to prevent recurrence of a substance-related

SIMPATICO - DIRECT / ROMANO

1     disorder."

2         In your opinion, what does that mean?

3   **A.**    Well, that's a fairly succinct description of what this

4   particular level of care is intended to focus upon in terms of

5   severity of signs and symptoms and skills that might be

6   imparted at this level to minimize the likelihood of recidivism

7   to this more restrictive levels of care.

8   **Q.**    And is that consistent with generally accepted standards

9   of care?

10  **A.**    Yes, it is.

11  **Q.**    Turning to page 60, please.

12  **A.**    (Witness examines document.)

13  **Q.**    Still in "Intensive Outpatient Substance-Related

14  Disorders," the top bullet point reads (reading):

15         "Co-occurring behavioral health or physical

16         conditions can be safely managed."

17        Is this the same language you've addressed from the 2017

18  common criteria?

19  **A.**    Yes.

20  **Q.**    Now turning to page 66, please.

21  **A.**    (Witness examines document.)

22  **Q.**    Do you understand these to be the outpatient

23  substance-related disorders guidelines --

24  **A.**    I do.

25  **Q.**    -- for 2014?

1          And if you can turn to the paragraph right at the top bar

2    there, it reads (reading):

3               "Assessment and diagnosis in active behavioral health

4          treatment that are provided in an ambulatory setting for

5          the purpose of assisting a member with gaining the

6          knowledge and skills needed to prevent recurrence of a

7          substance-related disorder.  The course of treatment in

8          outpatient is focused on addressing the 'why now' factors

9          that precipitated admission, e.g., changes in the member's

10         signs and symptoms, psychosocial and environmental

11         factors, or level of functioning to the point that the

12         'why now' factors that precipitated admission no longer

13         require treatment."

14         The second sentence I read, is that the same in substance

15   as we have looked at for IOP and residential with the exception

16   that, of course, the level of care is differently named there?

17   A.    That's correct.

18   Q.    And is your opinion with respect to generally accepted

19   standards of care the same with respect to this portion as it

20   was for the other levels of care?

21   A.    Yes.

22   Q.    Looking at page 67, please, for the admission criteria

23   here.

24   A.    (Witness examines document.)

25   Q.    It reads (reading):

1                "Acute changes in the member's signs and symptoms

2         and/or psychosocial and environmental factors, i.e., the

3         'why now' factors leading to admission, have occurred and

4         the member's current condition can be safely, efficiently,

5         and effectively assessed and/or treated in this setting."

6         In your opinion, does this allow for treatment of the

7    prevention of relapse?

8    A.    Yes.

9    Q.    Turning to page 43, please.

10   A.    (Witness examines document.)

11   Q.    Do you understand these to be the residential treatment

12   mental health guidelines?

13   A.    Yes.

14   Q.    And looking at the second paragraph here, it, of course,

15   focuses on residential treatment.  And with the exception of

16   the change in the level of care there, is it the same language

17   we've seen with respect to the description of the course of

18   treatment at this level of care for 2014?

19   A.    Yes.

20   Q.    Are your opinions with respect to this paragraph the same

21   as they have been for the other levels of care we've

22   discussed --

23   A.    Yes, they are.  I'm sorry.

24   Q.    Let me finish the question, please.

25         Are your opinions with respect to this paragraph and

1  whether it is consistent with generally accepted standards of

2  care the same as it was for the other similar paragraphs for

3  other levels of care within the 2014 guidelines?

4  **A.**   Yes.

5  **Q.**   Looking at page 43, please, still in residential mental

6  health conditions, third black bullet point refers to

7  (reading):

8         "Co-occurring behavioral health or physical

9      conditions."

10      Is this the same language you've already offered opinions

11  with with respect to other levels of care for this year?

12  **A.**   Yes.

13  **Q.**   And are your opinions the same?

14  **A.**   Yes.

15  **Q.**   Page 44, admission criteria here, the top bullet point.

16  **A.**   (Witness examines document.)

17  **Q.**   Is this the same language you've already offered opinions

18  on with respect to other levels of care for 2014?

19  **A.**   Yes.

20  **Q.**   Are your opinions the same?

21  **A.**   Yes.

22  **Q.**   Can you go back to page 43 focused on the continued

23  service criteria column, language here relating to custodial

24  care.

25  **A.**   (Witness examines document.)

1   Q.   Same language that we addressed with respect to substance

2   use?

3   A.   Yes.

4   Q.   And are your opinions the same?

5   A.   Yes.

6   Q.   And with respect to the discharge criteria also on this

7   page, are your opinions the same with respect to this criteria

8   as you've offered previously with respect to the same and

9   similar language?

10  A.   Yes.

11  Q.   Turning to page 27, please.

12  A.   (Witness examines document.)

13  Q.   Are these the intensive outpatient program guidelines for

14  mental health?

15  A.   Yes.

16  Q.   And looking directly at the second paragraph here

17  describing a course of treatment in the intensive outpatient

18  program, is this the same language you've addressed already

19  with respect to intensive outpatient only this time with mental

20  health conditions?

21  A.   Yes.

22  Q.   And are your opinions the same with respect to this

23  language as you've previously offered?

24  A.   Yes is.

25  Q.   I'll ask you one more question about this one before we

SIMPATICO - DIRECT / ROMANO

1    move on.  Still on page 27, this one also includes the sentence
2    above reading (reading):
3              "The purpose of services is to monitor and maintain
4         stability, decreasing moderate signs and symptoms,
5         increase functioning, and assist members with integrating
6         into community life."
7         We saw the same language with respect to substance use.
8    Is your opinion with respect to consistency with generally
9    accepted standards of care for the sentence the same as you
10   offered before?
11   A.   Yes.
12   Q.   All right.  Now turning to page 34, please.
13   A.   (Witness examines document.)
14   Q.   Are these the outpatient mental health condition
15   guidelines you reviewed?
16   A.   Yes.
17   Q.   The paragraph below it, second sentence, describes this
18   course of treatment for outpatient.  Is this same or similar
19   language to what we've seen before only changing the level of
20   care?
21   A.   Yes.
22   Q.   And are your opinions the same with respect to this
23   sentence as they have been offered previously?
24   A.   Yes.
25   Q.   Okay.  And page 35, please.

1    **A.**    (Witness examines document.)

2    **Q.**    Looking at the admission criteria, is this language the

3    same as you have already offered an opinion on with respect to

4    substance use?

5    **A.**    Yes.

6    **Q.**    And other levels of care as well?

7    **A.**    Yes.

8    **Q.**    All right.  Let's turn to the 2015 guidelines, if you can.

9    That's Exhibit 5, please.

10   **A.**    (Witness examines document.)

11   **Q.**    Are these the 2015 Level of Care Guidelines that you

12   reviewed as part of your work in this case, Dr. Simpatico?

13   **A.**    Yes.

14   **Q.**    If you can turn to page 8, please, the common criteria and

15   clinical best practices for all levels of care.

16   **A.**    (Witness examines document.)

17   **Q.**    Directing your attention first to paragraph 1.4, is this

18   language the same as what we have seen and discussed with

19   respect to the 2014 guidelines?

20   **A.**    Yes.

21   **Q.**    I do want you to look at 1.5, Dr. Simpatico, since we

22   haven't discussed it yet.  It reads (reading):

23             "The member's current condition can be safely,

24        efficiently, and effectively assessed and/or treated in

25        the proposed level of care.  Assessment and/or treatment

**SIMPATICO - DIRECT / ROMANO**

 1          of acute changes in the member's signs and symptoms and/or

 2          psychosocial or environmental factors, i.e., the 'why now'

 3          factors leading to admission, require the intensity of

 4          services provided in the proposed level of care."

 5          In your opinion, do paragraphs 1.4 and 1.5 interrelate or

 6     connect in any way?

 7     **A.**     Yeah.  I would say one is a corollary of the other, and

 8     they address considering the appropriate level of care that

 9     represents the least restrictive, safe, and effective manner of

10     providing treatment.

11     **Q.**     And in your opinion, do they do so in a way that is

12     consistent with generally accepted standards of care?

13     **A.**     Yes.

14     **Q.**     Looking at 1.6, please, relating to co-occurring

15     behavioral health and medical conditions.

16     **A.**     (Witness examines document.)

17     **Q.**     Is this language that we've already addressed in prior

18     editions of the guidelines?

19     **A.**     Yes.

20     **Q.**     Are your opinions -- do you have anything additional to

21     offer with respect to your opinions on this?

22     **A.**     No.

23     **Q.**     And paragraph 1.8, please, relating to improvement.

24     **A.**     (Witness examines document.)

25     **Q.**     Have you already offered your opinion with respect to the

SIMPATICO - DIRECT / ROMANO

1  language in this section?

2  **A.**   Yes.

3  **Q.**   Do you have anything additional to add there?

4  **A.**   No.

5  **Q.**   Directing your attention to paragraphs 2.1 and 2.12 and

6  2.13.

7  **A.**   (Witness examines document.)

8  **Q.**   Is this also language that is the same or similar to

9  language you've already addressed with respect to the admission

10  criteria and active treatment being met for continued service?

11  **A.**   Yes.

12  **Q.**   And, finally, 2.2.

13  **A.**   (Witness examines document.)

14  **Q.**   Is this language you've already offered your opinion on as

15  well in other years?

16  **A.**   Yes.

17  **Q.**   And turning to the discharge criteria, please.

18  **A.**   (Witness examines document.)

19  **Q.**   Focusing your attention on 3.1, 3.1.1, and 3.1.5.

20  **A.**   (Witness examines document.)

21  **Q.**   Is it your opinion that these are consistent with

22  generally accepted standards of care?

23  **A.**   Yes.

24  **Q.**   Can you explain why that's the case?

25  **A.**   Well, again, it's stating in a similar manner as previous

**SIMPATICO - DIRECT / ROMANO**

1  versions that the continued stay criteria are no longer met and

2  that the reasons for presentation, the so-called "why now"

3  factors, which led to admission, have been addressed to the

4  extent that the member can be safely transitioned to a less

5  intensive level of care, which is the whole point of treatment.

6       And then, finally, it again addresses a situation where

7  excluding an involuntary population, which is sort of a

8  separate consideration, if a member is -- that has capacity is

9  unwilling or unable to participate in their own treatment after

10 inadequate attempt to motivate them and engage them, then by

11 definition they're not capable of participating in active

12 treatment and there wouldn't be a medical necessity to continue

13 treatment.

14 **Q.**   Turning your attention now to pages 10 and 11 of

15 Exhibit 5, please, and specifically looking at 4.1.4 relating

16 to the treatment plan.  I'm sorry.  4.1.4.3 --

17 **A.**   Got it.

18 **Q.**   -- relating to the treatment plan and the expected outcome

19 for each problem to be addressed expressed in the terms that

20 are measurable, functional, time framed, and directly related

21 to the "why now" factors.  Is this language you've already

22 expressed opinions on?

23 **A.**   Yes.

24 **Q.**   Do you have anything additional to add there?

25 **A.**   I don't.

**SIMPATICO - DIRECT / ROMANO**

1   **Q.**   And now 4.1.7.

2   **A.**   (Witness examines document.)

3   **Q.**   Do you have anything additional to address with respect to

4   opinions on this language in addition to what you've addressed

5   before?

6   **A.**   No.

7   **Q.**   Okay.  Let's turn to page 39, please.  Actually, pages 38

8   and 39.

9   **A.**   (Witness examines document.)

10  **Q.**   Is this the residential treatment level of care mental

11  health guidelines for 2015?

12  **A.**   Yes.

13  **Q.**   Calling your attention to 1.3 and its subparts, do you

14  have anything additional to add with respect to your opinions

15  on this language?

16  **A.**   No.

17  **Q.**   Section 2, continued service criteria, and focusing on

18  custodial care, is this consistent with generally accepted

19  standards for care, that is custodial care, not to be covered?

20  **A.**   Yes.

21  **Q.**   Turning to page 30, please.

22  **A.**   (Witness examines document.)

23  **Q.**   The second paragraph -- well, these are intensive

24  outpatient mental health condition guidelines; is that right?

25  **A.**   Yes.

SIMPATICO - DIRECT / ROMANO

1   Q.   And the second paragraph describes the course of

2   treatment?

3   A.   Yes.

4   Q.   Is this the same language you've already offered an

5   opinion on?

6   A.   Yes.

7   Q.   Do you have anything additional to add?

8   A.   No.

9   Q.   And this section also includes that language before that

10  we've addressed (reading):

11          "The purpose of the services is to monitor and

12      maintain stability, decreasing moderate signs and

13      symptoms, increase functioning, and assist members with

14      integrating into community life."

15      Again, do you have anything additional to add with respect

16  to that language?

17  A.   No.

18  Q.   Turning to page 33, please, are these the outpatient

19  mental health guidelines you reviewed for 2015?

20  A.   Yes.

21  Q.   And looking at paragraph 1.3, is this the same language

22  you've already addressed in the prior year?

23  A.   Yes.

24  Q.   And also the, I call it the preamble, that first section

25  at the top of page 33, again, same or similar language to what

1   you've already offered your opinions on?

2   **A.**   Yes.

3   **Q.**   Turning to page 81 and 82.

4   **A.**   (Witness examines document.)

5   **Q.**   First in the preamble section at the top, the second

6   paragraph describing the course of treatment in residential

7   rehabilitation.  Again, is this the language you've already

8   addressed that was in the 2014 guidelines as well?

9   **A.**   Yes.

10  **Q.**   And your opinions are the same; is that right?

11  **A.**   Yes.

12  **Q.**   And looking at paragraphs 1.3 and 1.4, again, same

13  language you've already addressed?

14  **A.**   Yes.

15  **Q.**   Are your opinions the same?

16  **A.**   Yes.

17  **Q.**   Turning to page 82, please, 2.2.3.

18  **A.**   (Witness examines document.)

19  **Q.**   The same language you've addressed previously?

20  **A.**   Yes.

21  **Q.**   Are your opinions the same?

22  **A.**   Yes.

23  **Q.**   Turning to page 55, please.

24  **A.**   (Witness examines document.)

25  **Q.**   Are these the substance-related disorders intensive

SIMPATICO - DIRECT / ROMANO

1    outpatient program guidelines for 2015?

2    **A.**    Yes.

3    **Q.**    Looking at the preamble section, the second paragraph, is

4    this the same paragraph you already discussed with respect to

5    the 2014 guidelines?

6    **A.**    Yes.

7    **Q.**    Are your opinions the same?

8    **A.**    Yes.

9    **Q.**    As well as for the sentence before that paragraph

10   beginning with "The purpose of services"?

11   **A.**    Yes.

12   **Q.**    Turning now to page 70, please.

13   **A.**    (Witness examines document.)

14   **Q.**    Looking at paragraph 1.4, is this the same language that

15   you've already addressed as well?

16   **A.**    Yes.

17   **Q.**    Are your opinions the same?

18   **A.**    Yes.

19   **Q.**    Okay.  Let's look at -- if you can look at Tab 6, the 2016

20   Level of Care Guidelines dated January 2016, as well as I'd

21   like to direct you to the other 2016 Level of Care Guidelines

22   revised as of June 2016.

23   **A.**    Okay.

24   **Q.**    Have you reviewed the critiques by Dr. Fishman and

25   Dr. Plakun relating to the 2016 guidelines both in Exhibit 6

1    and Exhibit 7?

2    **A.**    Yes.

3    **Q.**    Did those experts critique any new provisions in January

4    or June of 2016 that we have not already addressed through the

5    2015 or prior guidelines?

6    **A.**    No.

7    **Q.**    Do you have anything additional to add in response to

8    critiques for the 2016 guidelines?

9    **A.**    No.

10   **Q.**    In your review of the 2011 through 2017 Level of Care

11   Guidelines, is it your opinion that the guidelines became

12   increasingly more restrictive over the years?

13   **A.**    No.

14   **Q.**    Throughout the course of your testimony, we've looked at

15   ASAM placement criteria and LOCUS tool, as well as various

16   other external sources; is that correct?

17   **A.**    That's right.

18   **Q.**    Is it your opinion that ASAM and LOCUS are consistent with

19   generally accepted standards of care?

20   **A.**    Yes.

21   **Q.**    Now, we'll look a little bit more closely at the specific

22   dimensions of ASAM in a moment, but can you first explain just

23   generally the structure of the ASAM placement criteria?

24   **A.**    Sure.  So the ASAM criteria are intended to be -- to look

25   at the knowledge base and to standardize or, you know, provide

1  a framework to think about important aspects of working and

2  treating with someone with a substance use disorder; and it

3  essentially, you know, lists into a matrix format the six

4  levels, or what it refers to as domains, for consideration.

5      And within that framework, in addition to providing a

6  conceptualization of the kinds of attributes or considerations

7  that should be part of thinking through how to work with

8  someone, it attempts to provide -- or it provides, I should

9  say, a numeric methodology to attribute a numeric value to

10  determinations that are made at each level toward the end of

11  being able to summate the numeric values and for that to help

12  inform placement decisions.

13  Q.  And can you generally describe the structure of the LOCUS

14  instrument?

15  A.  Well, it's -- much of what I just described applies to the

16  LOCUS as well.  I would say coincidentally there are also six

17  domains in the LOCUS instrument and it, likewise, attempts to

18  review the expert literature and organize the literature into a

19  framework that can be more consistently applied in working with

20  people with mental illness.

21      And, likewise, it, in addition to providing sort of

22  language, narrative language, and criteria in each of those

23  domains, it also provides numeric algorithm that is intended to

24  generate a number that is intended to help to correlate with

25  and inform placement decisions.

**SIMPATICO - DIRECT / ROMANO**

1   **Q.**   In your opinion, are there benefits to a framework that

2   uses numeric values and numeric algorithms?

3   **A.**   I think those are largely aspirational at this point.  I

4   mean, I fully agree with the aspiration to do that.  I don't

5   know of any clinicians that rely on numbers or numeric systems

6   like that to actually make treatment decisions.

7        I do think that, you know, the content that's provided in

8   the ASAM criteria and in the LOCUS criteria is very helpful,

9   and I think the approaches, the clinical approaches, that are

10  discussed in the framework is very helpful and is broadly used;

11  but I don't think that extra step of it reliably translating to

12  a numeric value as the basis for making a decision is ready for

13  prime time.

14  **Q.**   Are there drawbacks to a numeric methodology in your

15  opinion?

16  **A.**   Yeah.  I think it's overly simplistic and misleading and,

17  therefore, is not used.

18  **Q.**   What is your personal experience with the LOCUS tool?

19  **A.**   Well, consistent with what I just described, a number of

20  years back -- I mean, I've -- I'm familiar with the LOCUS over

21  the years of its development and in the interest of full

22  disclosure; but, you know, one example of what I'm describing,

23  several years back, and it was probably maybe three years ago

24  or so, the Department of Mental Health in Vermont looked to see

25  if it could operationalize the LOCUS, in particular the

**SIMPATICO - DIRECT / ROMANO**

1    algorithmic application of the LOCUS and the numeric values,

2    et cetera, and they did a sort of a fairly intensive training

3    program, engaging practitioners in the community mental health

4    centers and the hospital settings.

5         And after maybe eight months or so, they decided that it

6    was a no-go and for reasons that I have alluded to, which is to

7    say, although the framework was very helpful, the notion of

8    actually having numeric values be the basis of negotiations and

9    treatment -- and placement decisions didn't work, and so they

10   abandoned that strategy.

11   **Q.**   Is there a decision tree associated with LOCUS?

12   **A.**   There is.

13   **Q.**   Let's go ahead and take a look at Exhibit 653, please.

14   **A.**   (Witness examines document.)

15   **Q.**   And if we could pull up 653, pages 28 and 29 together.

16        Dr. Simpatico, is this the LOCUS tool you're looking at,

17   Exhibit 653?

18   **A.**   Yes.

19   **Q.**   And what is located on pages 28 and 29?

20   **A.**   The circuit board for -- no.

21        It's a fairly complicated decision tree that is the basis

22   for ascribing numeric values to decisions that are -- for which

23   there is a narrative of the consideration in the matrix

24   organization of the LOCUS, and it is through this algorithm

25   that one is intended to be able to ascribe numeric values for

1    different consideration points and come up with a number and

2    then on the basis of that number, have an informed decision

3    about the placement decision.

4    **Q.**   And as you were explaining your experience with the LOCUS

5    tool and the numeric methodology, is this the decision tree

6    that was a component of that numeric methodology?

7    **A.**   Yes.

8    **Q.**   Do other nationally recognized guidelines for making

9    level-of-care decisions and treatment decisions have the same

10   or similar frameworks as ASAM and LOCUS?

11   **A.**   No.  I mean, again, I think ASAM and LOCUS have -- are

12   similar in the basic sort of the practical approach and intent

13   for the work product that they come up with; again, namely,

14   that they want to create sort of a metricized way of

15   standardizing thinking through important areas of

16   consideration, ultimately with the goal of having a numeric

17   equivalent.

18       But other -- other generally recognized standards, like

19   the American Psychiatric Association Clinical Practice

20   Guidelines, for example, are -- although they actually have

21   some algorithms at the appendix of their Clinical Practice

22   Guidelines, those are more conceptual and not intended to

23   actually be reducible to a numeric value.  And the way that

24   they are structured is much more in keeping with, let's say, a

25   book chapter or sort of it's a treatise.  They're treatises of

 1   individual disease states or general activities, like

 2   assessment, that are updated on a regular basis and, again,

 3   draw upon the existing literature and other expert products,

 4   like the ASAM and the LOCUS, but also the source literature,

 5   et cetera.

 6        But to answer the question, it's a different format and

 7   it's much more of a narrative format, as is the, you know, the

 8   governmental structures, like the CMS criteria.  That's much

 9   more of a sort of a bullet point and statement-oriented kind of

10   a thing.  It's less for instruction and more to define

11   activities that correlate with payment of the services.

12        So the formats are different.  I would say that the

13   formats are complementary.  In going to, as is repeatedly

14   instructed in the UBH clinical guidelines, to refer to the

15   standards of care, I read that to mean go to the standards of

16   care, which include, but are not limited to, those instruments

17   that I just described; and, needless to say, kind of go to the

18   ones which are most relevant to the question that one is asking

19   with the understanding that there is no one single source and

20   together they represent a very useful array of expert opinions

21   and guidance.

22   Q.   Staying with 653 for a moment, the LOCUS instrument, if

23   you can take a look at page -- starting with page 8.

24   A.    (Witness examines document.)

25   Q.   And just going through the six different dimensions or

1  parameters, can you recite what those six are, please.

2  **A.**   And we're talking about trial exhibit page 8; right?

3  **Q.**   No.  653, the LOCUS tool.

4  **A.**   Yeah.

5  **Q.**   Yes.  And then page 8, yes.

6  **A.**   Got it.  Okay.

7       Sure.  So the first domain is called "Risk of Harm," and

8  this, as the name implies, is focused on the likelihood at the

9  most extreme that someone is suicidal or homicidal, which

10  probably obviously would be a strong determinant in the

11  appropriate level of care in thinking about a safe and

12  effective place to work with someone.

13       And then it describes sort of a gradient of progressively

14  less intensive concern for harm; and in addition to suicidality

15  and homicidality, it addresses the ability for someone to care

16  for themselves, to take care of their activities of daily

17  living, the extent to which they may be making decisions that

18  pose a danger to themselves or others even though they're not

19  overtly intending to kill themselves or harm -- or kill someone

20  else.

21       An example of that might be someone who is suffering from

22  delusions and thinking that they are the traffic controller and

23  are standing out in traffic controlling traffic with the

24  intention of providing a useful service.  They're endangering

25  themselves and other people.  That's just a quick example.

**SIMPATICO - DIRECT / ROMANO**

1    And so this domain basically just goes down a progression

2    of progressively less pressing concerns for harm.  And, again,

3    that's a very important consideration in determining safe and

4    effective placement.

5    **Q.**   If you can turn your attention to page 27, please.

6    **A.**   27.

7    **Q.**   27 of the LOCUS instrument.

8    **A.**   The LOCUS instrument?

9    **Q.**   Yes.

10   **A.**   (Witness examines document.)

11   **Q.**   So Exhibit 53, page 27.

12   **A.**   Yes.

13   **Q.**   Okay.  I know you have "Risk of Harm" as the first

14   placement criteria.

15   **A.**   Yes.

16   **Q.**   And "Functional Status" is the second?

17   **A.**   Yes.

18   **Q.**   Can you briefly describe what "Functional Status" is?

19   **A.**   Sure.  "Functional status," again as the name implies, is

20   how well someone can fend for themselves as a function of the

21   impairment that may be caused by their mental illness.

22         And, you know, to the extent that someone is really

23   functioning in their own private world as a function of

24   delusions or -- and/or hallucinations as opposed to, again, a

25   progression of less compromising symptoms, signs and symptoms,

SIMPATICO - DIRECT / ROMANO

1  that would allow someone to actually exist in a reasonable and

2  meaningful way in the world.

3  **Q.**   The third one is "Medical and Psychiatric Comorbidity."

4  Can you just briefly describe what that is?

5  **A.**   Well, that's pretty straightforward as the name implies.

6  It's, which is a very common thing, that people with mental

7  illness, like everyone else, have medical conditions as well,

8  in a higher likelihood actually if one has a mental health

9  issue.  There's a much higher likelihood that someone has a

10  comorbid general medical condition, and often the general

11  medical conditions may be suffering or be neglected as a

12  function of the mental illness; or vice versa, sort of the

13  metabolic effects of the general medical condition may have a

14  deleterious effect on the signs and symptoms of the mental

15  illness.  So these are extremely important to consider in

16  tandem.

17  **Q.**   The fourth is "Recovery Environment."  Can you briefly

18  describe what that is?

19  **A.**   Yeah.  It's, you know, generally speaking, where a person

20  will reside or spend their time and how that either supports or

21  detracts from the likelihood that they can maintain themselves

22  in the world.

23  **Q.**   And the fifth is "Treatment and Recovery History."  Can

24  you briefly describe what that is?

25  **A.**   Yeah.  That largely speaks to, you know, the sort of the

**SIMPATICO - DIRECT / ROMANO**

1  so-called insight that a person has about their mental illness,

2  how they are -- in what way they are capable of participating

3  collaboratively in their treatment to the extent that they

4  believe they have a mental illness, and how they have responded

5  to treatment in the past as a predictor for what strategies

6  might best work in the future.

7  **Q.**   And the sixth one is "Engagement in Recovery Status."  Can

8  you briefly describe what that includes?

9  **A.**   Yeah.  That's a corollary of the same thing, which is the

10  history and capacity for engagement in a partnership in their

11  treatment; and as we kind of alluded to with the word

12  "recovery" earlier, the notion of having -- to the extent that

13  the patient has a conception of their illness and how that

14  affects the trajectory of their life and how treatment can

15  affect the trajectory of their life.

16  **Q.**   And in your opinion, do the UBH guidelines encompass and

17  take into account all of the principles of these six different

18  levels from LOCUS?

19  **A.**   Yes.

20  **Q.**   Why is that?

21  **A.**   Well, there are -- these are either explicitly or -- these

22  are certainly, in my opinion, amply covered and referred to in

23  the UBH guidelines.

24  **Q.**   And now directing your attention to the ASAM criteria,

25  which was admitted as Exhibit 662.

**SIMPATICO - DIRECT / ROMANO**

1    **A.**    (Witness examines document.)

2    **Q.**    Directing your attention to page 64, please.

3    **A.**    (Witness examines document.)

4    **Q.**    Are these the six dimensions that you were describing for

5    ASAM?

6    **A.**    Yes.

7    **Q.**    Can you briefly describe what each dimension relates to?

8    **A.**    Yes.  And, again, I would point out I would say the

9    largely coincidental fact that there happen to be six.

10           And there is, if one were to -- before -- I will answer

11   the question, but just in the way of context, if one were to

12   overlay the LOCUS and the ASAM criteria, one could see several

13   things.  One is that they're not the same.  They're not

14   identical; that there are -- there's considerable overlap in

15   the considerations even though the language may be slightly

16   different or -- you know, and that, again, taken together they

17   each represent very useful models to think through and

18   conceptualize care for someone.

19           So having said that, Dimension 1 here refers to acute

20   intoxication or withdrawal potential.  And I'll -- unless --

21   unless the Court is interested, I'll refrain from making direct

22   comparisons with.

23           So, you know, this, again, is often a very pressing matter

24   and in thinking through what the least restrictive, safe, and

25   effective location for treatment is, you would certainly want

1   to have an opinion, an accurate opinion, about what the acute

2   withdrawal -- intoxication and withdrawal potential was because

3   if there's a miscalculation here, that could result in serious

4   injury or death.  So that's an important consideration.

5        Shall I progress through?

6   **Q.**   Sure.  Dimension 2?

7   **A.**   So Dimension 2, again, is "Biomedical Conditions and

8   Complications," which is another way of saying "general medical

9   conditions."  And for similar reasons, they are relevant to

10  mental illnesses.  You know, these mental illnesses and

11  substance use disorders happen in the framework of one's body,

12  and organ systems tend to be interrelated, and so it stands to

13  reason that in conceptualizing care for someone, you need to

14  necessarily understand their intercurrent general medical

15  conditions and the extent to which, in this case, their

16  substance use disorder has an effect on their general medical

17  conditions or, conversely, how the general medical conditions

18  may impact their sensitivity to substances or their pattern of

19  use.

20       Thirdly, Dimension 3 is the emotional, behavioral, or

21  cognitive conditions.  This is, again, using slightly different

22  language to say mental health issues or neurologic issues.

23       And, again, I would say, for the sense of completeness, in

24  conceptualizing one's clinical picture it complements

25  understanding one's general medical conditions as far as

1  understanding any behavioral or mental health or neurologic

2  conditions.

3      And the first three dimensions taken together arguably

4  have -- can have a particular focus when considering the

5  appropriate level of placement for someone, because these tend

6  to have more immediate consequences if there's a miscalculation

7  also.

8      Dimension 4, readiness to change, this is, as the name

9  implies, how a person conceptualizes their addiction; where

10 they are in terms of wanting to do anything about it or not do

11 anything about it.  That's probably obviously an important

12 consideration.  And to what extent their position, if it is not

13 engaged in addressing their addiction, is amenable through

14 motivational techniques to become engaged.

15     Relapse, continued use, or continued problem potential,

16 again, this is looking historically what a person's pattern of

17 use has been and what strategies may have impacted things

18 positively or negatively so as to inform future strategies to

19 help minimize the likelihood of relapse and continued use.

20     And finally the -- in a similar fashion to what we saw in

21 the LOCUS, the notion of recovery, sort of a lifelong

22 conception of living with a chronic illness of substance use

23 disorder and how the living environment can either support or

24 undermine that.

25 **Q.**  And, in your opinion, do UBH's guidelines address all of

1    the principles set forth in the six dimensions in the ASAM

2    placement criteria?

3    **A.**    Yes.

4    **Q.**    Why is that?

5    **A.**    Again, I -- I specifically looked through that with this

6    in mind.  And I see ample reference and support for each of

7    these six principles.

8    **Q.**    In your opinion, are the UBH guidelines more restrictive

9    than the ASAM placement criteria?

10   **A.**    No.

11   **Q.**    And are the UBH guidelines more restrictive than the LOCUS

12   tool?

13   **A.**    No.

14           **MS. ROMANO:**  Your Honor, one housekeeping matter.  An

15   exhibit came up yesterday where we had shown and marked for

16   identification Exhibit 1469, which was the practice guideline

17   for the treatment of patients with substance use disorders.

18   That same document had already been admitted into evidence as

19   Exhibit 634.

20           **THE COURT:**  Okay.  Thank you.

21           **MS. ROMANO:**  We're done, subject to redirect.

22           **THE COURT:**  All right.

23   Start cross?

24           **MR. KRAVITZ:**  Your Honor, if it's not too

25   inconvenient, could we take a really brief break right now?  We

**SIMPATICO - DIRECT / ROMANO**

 1   just want to decide what we're going to do.

 2        **THE COURT:**  Oh.  I'm in favor of deciding what you

 3   want to do.

 4      (Laughter)

 5        **THE COURT:**  But we'll take our morning break now.  Ten

 6   minutes.

 7        **MR. KRAVITZ:**  Thank you, Your Honor.

 8              (Recess taken at 9:50 a.m.)

 9           (Proceedings resumed at 10:14 a.m.)

10        **THE CLERK:**  All parties are present.

11        **MR. KRAVITZ:**  Yes.  Your Honor, that break was very

12   judicious for you to take at that moment.

13      We have no questions for this witness.

14        **THE COURT:**  Thank you.

15      You can step down.

16      (Witness steps down.)

17        **MS. ROMANO:**  Your Honor, UBH calls Dr. Theodore

18   Allchin.  We're just getting him.  And Mr. Bualat will be

19   handling that.

20              **THEODORE ALLCHIN,**

21   called as a witness for the Defendant, having been duly sworn,

22   testified as follows:

23        **THE CLERK:**  Thank you.  Go ahead and have a seat.

24      Mr. Allchin, could you spell your last name.

25        **THE WITNESS:**  Sure.  Theodore Adam Allchin,

ALLCHIN - DIRECT / BUALAT

1    A-l-l-c-h-i-n.

2              **THE CLERK:**  Thank you.

3         There's water there if you need it.  And you have the

4    microphone pulled up.

5              **MR. BUALAT:**  We're just using the basic care guideline

6    binder.

7              **THE COURT:**  Okay.

8              **MR. BUALAT:**  May I begin, Your Honor?

9              **THE COURT:**  Yes.

10                       <u>**DIRECT EXAMINATION**</u>

11   BY MR. BUALAT:

12   **Q.**   Good morning, Dr. Allchin.

13   **A.**   Good morning.

14   **Q.**   How are you today?

15   **A.**   Doing fine.  Thank you.

16   **Q.**   Can you describe your educational background, please.

17   **A.**   Sure.

18        I have a bachelor in arts degree from Northwestern

19   University and then an M.D. degree from Ohio State University.

20   And then did an internship, general psychiatry residency, and a

21   child psychiatry fellowship at the University of Chicago.

22   **Q.**   And when did you graduate from medical school?

23   **A.**   1982.

24   **Q.**   And you mentioned a child fellowship at the University of

25   Chicago?

ALLCHIN - DIRECT / BUALAT

1   **A.**   Yes.

2   **Q.**   What years did you have that fellowship?

3   **A.**   It was from 1985 to '87.

4   **Q.**   And what did the fellowship involve?

5   **A.**   The fellowship involved following children and adolescent

6   in both outpatient levels of care as well as partial

7   hospitalization, inpatient levels of care at that point.

8       In addition, I also did consultation services at their

9   pediatric hospital at the University of Chicago.

10      I also did work, consultant work, with a therapeutic

11  school that serviced developmentally delayed children.  And,

12  also, for two years was the psychiatric consultant for the Cook

13  County juvenile detention facility.

14  **Q.**   And do you have a medical license?

15  **A.**   Yes.

16  **Q.**   For which states?

17  **A.**   For Illinois, Arizona, Maryland, and Virginia.

18  **Q.**   Do you have any board certifications?

19  **A.**   Yes.

20  **Q.**   What are your board certifications?

21  **A.**   I have a board certification in general psychiatry and

22  also child psychiatry.

23  **Q.**   And when did you receive your board certification in child

24  psychiatry?

25  **A.**   1988.

ALLCHIN - DIRECT / BUALAT

1  Q.   When did you start any private practice?

2  A.   When I finished my child fellowship in 1987.

3  Q.   And for how long did you maintain a private practice?

4  A.   I was -- practiced from 1987 until approximately 2009.

5  Q.   Could you give me a brief overview of your private

6  psychiatric practice.

7  A.   Sure.

8       At various times, although I was the only psychiatrist I

9  also employed social worker and psychologists, as well, and

10 provided outpatient services as well as following patients in

11 intensive outpatient treatment, partial hospitalization, and

12 inpatient levels of care.

13      I also did consulting work with various school districts;

14 did child custody evaluations; and also did consultation

15 services at an organization that dealt with developmentally

16 delayed and autistic individuals that had services that ranged

17 from outpatient all the way through residential services.

18 Q.   I'm sorry, did you say how long you were in private

19 practice for?

20 A.   Yes.  From about 1987 through 2009.

21 Q.   And did your practice focus on children, or was it a mixed

22 practice?

23 A.   It was mixed.  But I would say the majority of cases was

24 child and adolescent services, and didn't generally involve any

25 geriatrics at all.

**ALLCHIN - DIRECT / BUALAT**

1   **Q.**  Can you approximate how many children or adolescents you

2   treated while you were in private practice?

3   **A.**  I would have to say in the thousands.  Partly because

4   child psychiatry, based on shortages involved, that we

5   frequently do a lot more on the evaluation/consultation range

6   rather than necessarily treatment always.  So it leads to

7   increase in the number of people that we see.

8   **Q.**  And at what levels of care did you provide treatment to

9   children and adolescents?

10   **A.**  I did outpatient, intensive outpatient, partial

11   hospitalization, and inpatient services.

12   **Q.**  Did you have any experience with residential treatment for

13   children?

14   **A.**  I referred patients to residential facilities.  But the

15   area I'm from, which is the Chicago area, there aren't terribly

16   many residential facilities for children and adolescents to be

17   directly involved with.

18   **Q.**  Are you currently employed?

19   **A.**  Yes.

20   **Q.**  Who is your employer?

21   **A.**  OptumHealth.

22   **Q.**  How long have you worked at OptumHealth?

23   **A.**  Nineteen years.

24   **Q.**  And is OptumHealth sometimes referred to as United

25   Behavioral Health --

1   **A.**   Correct.

2   **Q.**   -- or UBH?

3   **A.**   Correct.

4   **Q.**   And 19 years.  So when did you start at UBH?  1988?

5   **A.**   Correct.

6   **Q.**   Was there any overlap between your work as a private

7   practitioner versus your work at Optum?

8   **A.**   Yes.  I started part-time in 1998 at Optum.  And

9   maintained a private practice part-time, as well, during those

10  times, until approximately 2009.

11  **Q.**   And so during that overlap, how much was your time spent

12  in private practice versus your time spent at UBH?

13  **A.**   Approximately 50/50.

14  **Q.**   And were you still seeing patients at the intensive

15  outpatient level, partial hospitalization during this overlap

16  period?

17  **A.**   No.  I curtailed my practice to mainly outpatient services

18  and consultations, at that time, just because of time

19  constraints.

20  **Q.**   What types of patients would you see during this overlap

21  period in the outpatient context?

22  **A.**   Certainly saw children with attention deficit

23  hyperactivity disorder, anxiety and depressive disorders,

24  occasionally psychotic disorders.  Saw, frequently,

25  developmentally delayed and autistic spectrum disorders as

ALLCHIN - DIRECT / BUALAT

1  well.  And treated some adults for anxiety and depressive and

2  bipolar concerns as well.

3  Q.   Would you make recommendations for higher levels of care

4  during this overlap period for patients you saw in the

5  outpatient context?

6  A.   Yes.

7  Q.   And what levels of care would you make these

8  recommendations for?

9  A.   I would say all levels I recommended intensive outpatient,

10  partial hospitalization, residential inpatient.

11  Q.   What is your title at UBH?

12  A.   I'm an associate medical director.

13  Q.   And what are your responsibilities as an associate medical

14  director at UBH?

15  A.   Well, it involves me doing peer reviews.  Up until

16  recently, I also did both nonurgent and urgent appeals.

17  Certainly do case consultation with providers as well.

18      I'm involved with a few committees with UBH.  And I also

19  am involved in doing rounds with our care advocates, which are

20  masters-level clinicians.  And also involved with both

21  individually and, sort of, group teaching with them as well.

22  Q.   You mentioned that you're on some committees at UBH?

23  A.   Yes.

24  Q.   Which committees?

25  A.   I'm on our national credentialing committee, which is the

1    committee that credentials and then re-credentials both

2    clinicians of various licensure levels as well as facilities as

3    well.  That involves, again, both initial credentialing and

4    also re-credentialing.

5    **Q.**   What does that process entail for the credentialing of

6    facilities?

7    **A.**   It involves following through with what their licensure

8    is, whether they've interacted with various accreditation

9    processes.  Occasionally, via either internal concerns or other

10   issues, that we sometimes do internal audits on the facilities,

11   as well, to make sure that they're following through with

12   their -- their quality improvement programs.

13   **Q.**   Would you be conducting the internal audit, or is that the

14   internal audit the facility would be?

15   **A.**   Sometimes it's the internal one that the facility does.

16   Sometimes they are ones that UBH directs.  And then the

17   committee reviews the results of what that is and makes

18   recommendations from there.

19   **Q.**   Are these facilities that are out of network or in network

20   for UBH?

21   **A.**   They're usually in-network facilities.

22   **Q.**   Is the initial credentialing necessary for the facility to

23   become part of the network?

24   **A.**   Correct.

25   **Q.**   What types of criteria does UBH employ to assess whether

1   or not to credential a new facility?

2   **A.**   I think they look at various factors.  Some of them are

3   requests from the facility to be part of the network.  Part of

4   it is need and access, whether -- whether we don't have

5   sufficient coverage for our members in various parts of the

6   country, or various levels of care.

7   **Q.**   I'm sorry, were you saying, is that a gap-filling type of

8   process?  Is that what you're referring to?

9   **A.**   Correct.  Sometimes we will solicit providers based on it

10   looks like we don't have enough of certain programs within a

11   certain area of the country, and we try to bolster the network.

12   **Q.**   Are there any other committees that you're on at UBH?

13   **A.**   I'm also on various committees for different facilities

14   where we evaluate various criteria that they're working on,

15   such as a 30-day readmission rate or having an appointment,

16   let's say, seven days after discharge.

17   **Q.**   Why would you look at that type of information?

18   **A.**   It's not only our goal, it's usually like HEDIS scores and

19   other national scoring that we look at clear parameters that

20   are quality.  We know that if you have a outpatient followup

21   within seven days of a discharge, the likelihood of readmission

22   is significantly less.

23       We also look, again, at the 30-day readmission rates, to

24   make determinations were the treatment plans accurate or not,

25   and how was that addressed if the readmission rate seems

ALLCHIN - DIRECT / BUALAT

1    excessive.

2    **Q.**   Does that relate to the credentialing committee?  Or it's

3    a separate process?

4    **A.**   It's a separate process to give feedback.

5         Some facilities do some of this internally, and some

6    don't.  So it's to give internal feedback back to the facility

7    as far as how they're meeting these various guidelines.

8    **Q.**   Let's focus on your work as an associate medical director

9    at UBH.  Do you focus on child and adolescent members?

10   **A.**   I certainly do a little bit of everything.  But I would

11   say about two-thirds of my work is with children and

12   adolescents.

13   **Q.**   Have you held any medical director positions at treatment

14   facilities?

15   **A.**   Yes.

16   **Q.**   Which ones?

17   **A.**   I was medical director of a child and adolescent inpatient

18   unit in suburban Chicago for about six years.

19   **Q.**   I'm sorry, did you give the name of that facility?

20   **A.**   Woodland.

21   **Q.**   And what were your duties as medical director at Woodland

22   for those six years?

23   **A.**   Well, I certainly admitted my own patients there to

24   intensive outpatient, partial hospitalization, inpatient levels

25   of care.

1      But I also monitored other attending physicians' care of

2  patients on the unit, and was involved in quality of care

3  assessments.  And also certainly handled and investigated

4  patient or family complaints of services as well.

5  **Q.**   Were you involved in assessing the placement of patients

6  at that level of care and at other levels of care?

7  **A.**   I often was because we had an assessment center at the

8  hospital.  So at times the assessment center would contact me,

9  if it was a child and adolescent case, when they were having

10  difficulty ascertaining what they thought an appropriate level

11  of care would be.

12  **Q.**   You mentioned Woodland.  Were there any other hospitals

13  you were affiliated with in your private practice?

14  **A.**   Yes.  At various times, I was affiliated with the Chicago

15  Lakeshore Hospital and also Luthern General Hospital.

16  **Q.**   Did you hold any other type of medical director-type

17  positions for a hospital or treatment facility?

18  **A.**   No.

19  **Q.**   Did you ever --

20  **A.**   I'm sorry, except for I was a consult liaison coordinator

21  for Alexion Brothers Hospital for approximately two years.

22  **Q.**   What did you do as a consult liaison?

23  **A.**   What it involved was seeing consults for mental health

24  issues on both adult and pediatric units as well as consulting

25  with an emergency room.

**ALLCHIN - DIRECT / BUALAT**

1  Q.   And would you be involved in patient placement decisions

2  as a consult liaison?

3  A.   Yes.  Frequently the question was that someone initially

4  came in with a primarily medical issue, and then subsequently

5  it was discovered that they also had a compounding or

6  complicating mental health or substance abuse issue.  And so I

7  would be brought in to say the medical issue is wrapping up;

8  what should we do further for those mental health or substance

9  use issues.

10  Q.   And would that be assessing whether or not they should go

11  to an inpatient level or other various levels as well?

12  A.   Correct, all levels.

13  Q.   And did you work for any -- you mentioned that you were a

14  consultant for various school districts?

15  A.   Yes.

16  Q.   And what was -- what was your role in that capacity?

17  A.   I was brought in by school districts to evaluate mental

18  health issues for various children as young as 3 and as old as

19  high school aged, depending on the school districts involved.

20  Q.   And do you have any experience as a legal expert in child

21  psychiatry?

22  A.   Yes.

23  Q.   Can you explain your experience.

24  A.   Yes.  I was designated by Cook County, in Illinois, which

25  is where Chicago is, to do child custody evaluations for the

ALLCHIN - DIRECT / BUALAT

1    Court.

2    **Q.**    And how did you become qualified to do those types of

3    evaluations for court?

4    **A.**    The court solicited various child psychiatrists so that

5    they could give lists to attorneys to pick an independent

6    person to do a child custody evaluations that would be

7    recognized by the Court.

8    **Q.**    And how long did you do that for?

9    **A.**    Did it for -- off and on for the better part of five, six

10   years.

11   **Q.**    Have you done any teaching with respect to child and

12   adolescent psychiatry?

13   **A.**    Yes.  I do teaching, I think, right now with our care

14   advocates, which are the master's degree people.  But in the

15   past I've also taught medical students at the University of

16   Chicago medical interviewing skills.

17   **Q.**    And have you taught at any medical schools?

18   **A.**    Not formally, other than what I just said about the

19   medical students.

20   **Q.**    Oh, I'm sorry.  Can you explain what you did with the

21   medical students?

22   **A.**    Yes.  Our -- our -- my role was to teach medical students

23   how to interview patients besides just the exact medical

24   reasons why they were there.

25        So to ask patients, learn how to ask open-ended

1  questions -- such as, Why are you here?  What do you expect

2  from treatment?  What are your fears of the treatment?  --- so

3  that they could get to know patients as more of a holistic

4  person rather than just sort of the liver ailment in room 5.

5  **Q.**  What was the audience?  Were these medical students in

6  their last year of medical school?

7  **A.**  No, it was early in their career.  I believe it was

8  between second and third year.

9  **Q.**  And is that similar to the chief complaint that were

10  teaching them about, how to interview about that?

11         **MR. GOELMAN:**  Objection as leading, Your Honor.

12         **THE COURT:**  Sustained.

13  **BY MR. BUALAT:**

14  **Q.**  Are you familiar with the concept of chief complaint?

15  **A.**  Yes.

16  **Q.**  How does that relate to the interviewing skills that you

17  were teaching the medical students?

18  **A.**  Well, one of the things traditionally in medicine we've

19  always tried to teach is that a person comes in for treatment

20  with what we call the chief complaint, which is always worded

21  in what the patient says.

22      And one of the things medical students frequently start to

23  do is they look at how they understand that complaint as part

24  of a disease entity.

25      And the idea was to try to get them to be more involved

ALLCHIN - DIRECT / BUALAT

1    with understanding what the patient was saying was why they
2    were there.  Because if you don't really address what that
3    particular complaint is, you -- you really won't satisfy the
4    patient even though you may have felt that you did the correct
5    job and a correct diagnosis and a correct treatment.
6    Q.   Are you involved in any professional societies as a
7    psychiatrist?
8    A.   Yes.
9    Q.   Which ones?
10   A.   The American Psychiatric Association, American Academy of
11   Child and Adolescent Psychiatry.
12   Q.   If I refer to the American Academy of Child and Adolescent
13   Psychiatry as the AACAP, will you understand me?
14   A.   Yes.
15            THE COURT:  That's much simpler.
16                      (Laughter)
17            MR. BUALAT:  It's more for me.
18            THE WITNESS:  Rolls off the tongue.
19   BY MR. BUALAT:
20   Q.   Do you keep up with literature with respect to child and
21   adolescent psychiatry?
22   A.   Yes.
23   Q.   And how do you do that?
24   A.   Well, I certainly do continuing medical education in the
25   child and adolescent field, but also follow the literature and

ALLCHIN - DIRECT / BUALAT

1   specifically for the AACAP.

2   **Q.**   And what type of literature do you review for the AACAP?

3   **A.**   Whenever they update or have new practice parameters, I

4   certainly review those.  Those are guidelines from that

5   organization usually about specific disease entities.

6   **Q.**   What do they cover about the particular disease?

7   **A.**   It's just -- it's a general guideline as far as how the

8   disease presents, how the illness should be evaluated, and

9   various treatment options, and the current scientific evidence

10  that backs various treatment options.

11  **Q.**   You mentioned that you also follow the APA publications?

12  **A.**   Correct.

13  **Q.**   What types of publications from the APA do you review?

14  **A.**   Again, they have guidelines that are generally more

15  disease or illness based, that are very similar to what the

16  AACAP does, except for a more general and adult population.

17  **Q.**   Let's talk about some of your work at UBH.  You mentioned

18  something called a "case consultation."  Do you remember that?

19  **A.**   Yes.

20  **Q.**   What is a case consultation?

21  **A.**   A case consultation is where we discuss with a peer at the

22  facility where a patient is getting treatment.

23         And the discussion really does not revolve around any

24  disagreement about a level of care.  But what it involves is

25  that there appears to be, sometimes, a mismatch between what

ALLCHIN - DIRECT / BUALAT

1   the diagnosis is and what the treatment strategy is.

2        There may be gaps from a historical nature, or information

3   that seems to be either missing or unavailable.  Or sometimes

4   just that the treatment appears stalled, that -- that despite

5   doing what we would consider the right treatment for the right

6   illness, things aren't getting any better.  And the idea, then,

7   is to have a collegial dialogue to figure out where do we move

8   from here.

9   Q.   Would that be a conversation between you and the provider?

10  A.   Correct.

11  Q.   And how would those be arranged?

12  A.   They're arranged by -- our care advocates let the facility

13  know that this is what we're requesting at that time.  And they

14  make it clear that it's, again, not a level of care discussion.

15  Q.   So the nature of the conversation isn't one about

16  authorizing coverage?  Or is it?

17  A.   In general, no.  It's more about what the treatment

18  strategies are and how that -- how the provider is viewing the

19  case and how they're making treatment plan accommodations.

20  Q.   Do you use the Level of Care Guidelines that UBH has in

21  the case consultation?

22  A.   We can at times.  If we use them just to -- to offer what

23  other levels of care that we may have available or can be

24  accessed.

25  Q.   How frequently do you do a case consultation versus peer

1    reviews?

2    **A.**   I would say about 25 to 35 percent are case consultations,

3    and the rest are peer reviews.

4    **Q.**   Let's talk about peer reviews.  What is a peer review?

5    **A.**   A peer review is when there's a disagreement between a

6    provider or a facility and UBH.  So generally how that's

7    handled is a care advocate presents a case to us, either

8    individually or in a staffing situation, because the care

9    advocate has an opinion that it might not be meeting that level

10   of care that the provider is requesting.

11        So at that point they present it to me.  If I think it's

12   meeting, then we continue from there.  If I have some concerns

13   I think need clarification, then sometimes that results in the

14   care advocate asking those questions back to the provider.

15   Sometimes that results in a case consultation.

16        But if it's clear that it does not appear that it's

17   meeting whatever level of care they are requesting, at that

18   point we look at offering an alternative level of care, which

19   we make sure is available from both a geo access setting -- so

20   within a certain distance from the patient's home -- and also

21   that it's available, that they have a bed available for that.

22        And then we make that offer to the provider.  If the

23   provider accepts that, then we move on.  If they don't, that's

24   when we arrange for a peer review for the provider to provide

25   any additional information that we may not know or about their

ALLCHIN - DIRECT / BUALAT

1  view of the treatment process.

2  **Q.**    You mentioned something about -- called a "staffing."  Do

3  you remember that.

4  **A.**    Yes.

5  **Q.**    What is a staffing?

6  **A.**    Staffing, in our process, can come across from two ways.

7  It can be just an individual care advocate reaching out and

8  saying, There's aspects about a particular case that I'm having

9  trouble understanding or think might not be meeting.

10      And then we also have by treatment teams that cover

11  certain specific products, that we routinely meet with on a

12  regular basis, where they present virtually all their cases

13  that they're currently working on.

14  **Q.**    Now, you mentioned that you actually have a phone call

15  with the provider; is that right?

16  **A.**    Correct.

17  **Q.**    Is it always the provider, the treating provider?

18  **A.**    We offer it to the attending.  The attending has the

19  ability to delegate that to others, which they at times do,

20  which can be other clinicians involved with the case; sometimes

21  therapists; sometimes nurses; nurse practitioners.  They can

22  also defer it to the utilization review process, whoever is

23  doing utilization review for that particular facility.

24  **Q.**    What do you mean by "the utilization review process," "for

25  that facility"?

**ALLCHIN - DIRECT / BUALAT**

1   **A.**   Well, usually -- though not always -- a utilization review

2   in place from the provider tend to have some clinical

3   experience; but sometimes they don't.

4        But their job is in interacting with various insurance

5   companies to provide the information to our care advocates, for

6   instance, on how to make treatment determinations.  And so

7   those people usually review the charts.

8        Sometimes have their charts with them when they're doing

9   it so that they try to make a presentation of this is what the

10  psychiatrist, this is what the social worker or various other

11  therapists are thinking about this case, and this is why

12  they're requesting that level of care.

13  **Q.**   Do you have an understanding if the people in the

14  utilization review process that you mentioned have direct

15  contact with the member?

16  **A.**   Usually they do not.

17  **Q.**   And do you find -- are there particular levels of -- are

18  there particular levels of care that you see -- you interact

19  more with utilization review people versus treating providers?

20  **A.**   I would say for substance use disorder facilities, it's

21  more likely a utilization review process than it is with mental

22  health settings.

23  **Q.**   And how often, in that circumstance, do you interact with

24  the utilization review person versus a treating provider?

25  **A.**   In a substance use setting?

**ALLCHIN - DIRECT / BUALAT**

1    **Q.**   Yeah, in that sub- --

2    **A.**   I would say that it can be 50 percent or higher would be

3    with a utilization review manager.

4    **Q.**   Let's talk about how you prepare for a peer review.  What

5    do you do?

6    **A.**   What I do is I review the current episode of treatment

7    from admission to the point of where we're at, at this point.

8          One of the, I think, unique things we have the ability to

9    do is to access past treatment histories of levels of care

10   higher than outpatient.  And we have a record of that, of when

11   those occurred and for the length of duration.

12         And I can access any of those cares -- those periods of

13   service as well.  So I routinely look at those, as well, so I

14   can see if there's patterns involved with accessing care or

15   looking at, perhaps, treatment plans that either didn't work,

16   or at other times treatment plans that were successful, so that

17   we can have -- when I'm having the discussion with the

18   provider, I can sometimes help add that.  Because, at times,

19   the current provider may not be any of the past providers, and

20   so their understanding and knowledge of that base may be

21   limited.

22   **Q.**   How often do you use, in your assessment, the prior

23   treatment episodes?

24   **A.**   I look at them for every case.

25   **Q.**   You mentioned that you also look at information relating

ALLCHIN - DIRECT / BUALAT

 1   to the current episode of treatment?

 2   **A.**   Correct.

 3   **Q.**   And where do you look for that information?

 4   **A.**   I look for it in -- our various computer systems have

 5   areas where the care advocate can put in detailed information

 6   regarding every contact they've had with the provider.

 7   **Q.**   And are you familiar with whether or not care advocates

 8   are trained to obtain information about children and

 9   adolescents in a particular way?

10   **A.**   I think we -- we train them to understand that there are

11   nuances of children and adolescents that need to be focused on.

12   **Q.**   Are you involved in that training?

13   **A.**   Occasionally, yes.  We have various times with new

14   employee care advocates where we walk them through various

15   level-of-care decision-making utilizations that we specifically

16   use child and adolescent cases.

17   **Q.**   And in those trainings, are there particular types of

18   information that you instruct a care advocate to gather when

19   there is a child or adolescent involved in the treatment

20   request?

21   **A.**   Yeah.  I make sure that they understand that family

22   information is extremely important, because the child's impact

23   on the family and vice versa could be potentially very large.

24        I also make sure that they understand that educational

25   issues are extremely important so that any -- attempts should

**ALLCHIN - DIRECT / BUALAT**

1    be made to obtain any kind of school-based information as much

2    as possible.

3    **Q.**    And why is it important, in your mind, to review the

4    information about the current episode of care?

5    **A.**    In my opinion, I feel that -- in the interests of saving

6    the provider time, and also having them understand what I know

7    about the case, I usually try to give a preamble of what I know

8    about the case based on, kind of, the past and the current

9    episodes and looking at what has happened since the admission.

10    And then I ask the provider if that's accurate

11    information, and then ask them to provide any further

12    information or how they're viewing the patient from that point

13    forward.

14    **Q.**    Is that a requirement, to ask for further information, or

15    is that something you just do on your own?

16    **A.**    Well, I think we do it as part of the give and take of a

17    peer review.  But we certainly are -- one of the instructions

18    we have before we end a phone conversation with a provider is

19    to ask them, once again, if there's any further information

20    that they would have that might have clinical bearing on the

21    case.

22    **Q.**    And do you use guidelines when you conduct a peer review?

23    **A.**    Yes.

24    **Q.**    Which guidelines do you use?

25    **A.**    I use the Optum Level of Care Guidelines.

**ALLCHIN - DIRECT / BUALAT**

1  **Q.**   And do you use any other guidelines in conducting peer

2  reviews?

3  **A.**   Yes, depending on other products.

4  **Q.**   Do you use any that are mandated by particular state laws?

5  **A.**   Yes.

6  **Q.**   Are you familiar with the ASAM criteria?

7  **A.**   Yes.

8  **Q.**   Under what circumstances would you use the ASAM criteria

9  in conducting a peer review?

10  **A.**   We use them when they're required by various states.   For

11  instance, I frequently am involved with Rhode Island Medicaid,

12  and they require ASAM criteria.

13  **Q.**   Do you review cases for substance abuse that arises out of

14  Illinois?

15  **A.**   Yes, occasionally.

16  **Q.**   And have you used ASAM criteria when you conduct those

17  reviews?

18  **A.**   Yes, for the past two years.

19  **Q.**   I'm sorry, what was that?

20  **A.**   Since -- since 2016.

21  **Q.**   Is it your view that -- do you have a view as to whether

22  or not ASAM reflects generally accepted standards of care?

23  **A.**   Yes.

24  **Q.**   And what is that view?

25  **A.**   I view it does reflect generally accepted standards of

ALLCHIN - DIRECT / BUALAT

1    care.

2    **Q.**    And does ASAM have separate criteria for assessing

3    placement for children and adolescents?

4    **A.**    It's not separate criteria.   They have more of a

5    commenting section, where they point out when adolescents --

6    because it's mostly adolescents instead of children because of

7    substance issues -- how their presentation and treatment

8    progress may perhaps be different than adults.

9    **Q.**    Does UBH's Level of Care Guidelines have similar type of

10   guidance that ASAM has regarding the assessment of adolescents?

11            **MR. GOELMAN:**   Objection to form, Your Honor.   Vague.

12   "Similar."

13            **THE COURT:**   Overruled.

14            **THE WITNESS:**   I'm sorry, could you repeat that.

15   **BY MR. BUALAT:**

16   **Q.**    Does UBH's Level of Care Guidelines have similar guidance

17   with respect to assessing placement for children and

18   adolescents?

19   **A.**    I believe in the clinical best practices part of the level

20   of care guideline there's specific things that are very

21   pertinent to children and adolescents and are addressed in

22   there.

23   **Q.**    Are there -- explain to me what the guidance is in ASAM

24   relating to assessing children and adolescents.   How does that

25   appear in the book?

ALLCHIN - DIRECT / BUALAT

1    A.    Well, it's sort of highlighted as part of being different.

2         For instance, one comment that's made, as an example, in

3    the adolescent section, as far as physiological effects of drug

4    and alcohol use, they point out that typically, obviously, if

5    an adult has had 20-, 30-plus years of abuse, their

6    physiological consequences are going to be significantly

7    greater than an adolescent with one or two years of experience

8    and just needs to be taken into account.

9    Q.    Does UBH Level of Care Guidelines have sections like you

10   just mentioned, where it deals with different physiologies

11   between adults and adolescents?

12   A.    Not particularly.

13   Q.    Does the fact that UBH's guideline doesn't have such a

14   section, does that, in your mind, make UBH's guidelines

15   deficient in any way?

16   A.    No.

17   Q.    Why not?

18   A.    Again, I think in the clinical best practices part there's

19   sufficient detail to tease out aspects that are developmentally

20   related.

21   Q.    Have you ever used -- have you ever assessed cases arising

22   out of Texas?

23   A.    Yes.

24   Q.    And what guidelines would you use for a case arising out

25   of Texas that relates to substance use?

1   **A.**   We use one that's called TDI CDS.

2   **Q.**   And, in your view, do the TDI CDS guidelines reflect

3   generally accepted standards of care?

4   **A.**   Yes.

5   **Q.**   Do the TDI CDS guidelines have separate criteria for

6   children and adolescents?

7   **A.**   No.

8   **Q.**   Have you ever had occasion to use criteria relating to

9   substance use treatment in -- arising out of the state of

10  New York?

11  **A.**   Yes.

12  **Q.**   And what guidelines would you use in that case?

13  **A.**   They use what's called a locator system that's been

14  developed by New York state.

15  **Q.**   And how do you spell LOCADTR?

16  **A.**   I believe it's L-O-C-A-D-T-R.

17  **Q.**   And do you believe that the LOCADTR criteria reflect

18  generally accepted standards of care?

19  **A.**   Yes.

20  **Q.**   And do the LOCADTR criteria have separate sections or

21  criteria for children and adolescents?

22  **A.**   Not to my knowledge.

23  **Q.**   Do you recall ever having a conversation with a treating

24  provider in which the provider told you that UBH's Level of

25  Care Guidelines did not reflect generally accepted standards of

ALLCHIN - DIRECT / BUALAT

1   care?

2   **A.**   I would say no.  I've had times, certainly, where

3   providers disagree with interpretations of them.  But I have

4   never really been told that they don't feel that they're not

5   generally accepted standards.

6   **Q.**   Other than guidelines, what sources do -- would you look

7   at and consider in making a coverage decision relating to a

8   child or adolescents with a behavioral health diagnosis?

9   **A.**   I certainly, again, would look at the AACAP practice

10  parameters and guidelines regarding that, but would also

11  utilize my training and experience with children and

12  adolescents.

13  **Q.**   You mentioned earlier that if coverage at a requested

14  level of care is denied during a peer review, you would offer

15  an alternative.  Do you remember that?

16  **A.**   Yes.

17  **Q.**   What types of alternatives would be offered in that

18  circumstance?

19  **A.**   You know, it depends on what would felt to be the

20  appropriate least restrictive environment at that point that

21  would prove safe and effective.

22  **Q.**   Do particular issues arise with respect to proposing

23  alternative levels of care for children or adolescents?

24  **A.**   There can be.  More so than with adults, in that,

25  particularly in some regions of the country, the programming

1  availability, particularly for partial hospitalization and IOP

2  programs, is much less robust than it is with an adult

3  population.

4  Q.   If there is not an opening at a facility that UBH is

5  offering as an alternative for a child or adolescent, or the

6  facility is too far, what would you do in that circumstance?

7  A.   We generally would authorize the higher level of care.

8  Q.   Would there be any circumstances under which you would

9  offer a lower level of care?

10 A.   The only way we would offer a lower level of care if that

11 would be the patient preference or the -- or the family or

12 provider preference.

13 Q.   And, in addition to you, how many child and adolescent

14 specialists does UBH have on staff?

15 A.   I believe there's approximately ten of us.

16 Q.   And are you aware of how many medical directors UBH has as

17 a whole?

18 A.   I believe, again, approximately 50.

19 Q.   So is it your understanding that UBH has -- 10 out of the

20 50 are child and adolescent specialists?

21 A.   Yes.

22 Q.   Does UBH make its child and adolescent specialists

23 available to other medical directors or care advocates who

24 don't have child and adolescent specialties?

25 A.   Yes.

**ALLCHIN - DIRECT / BUALAT**

1    **Q.**   And how is that done?

2    **A.**   From the general psychiatrists, a couple of different

3    ways.  Some of the general psychiatrists will either reach out

4    individually to one of us, if they have particular child

5    questions about a case they're covering, or they'll direct the

6    care advocate to bring them to our attention.

7         We also have what's child rounds a couple of times a week,

8    where the care of a -- care advocates can independently bring

9    child and adolescent cases to child psychiatrists for

10   questions, reviews, clarification.

11   **Q.**   And how often do these child rounds occur?

12   **A.**   On our site, they're twice a week.

13   **Q.**   And do -- do care advocates take advantage of those child

14   rounds?

15   **A.**   Yes.  They take full advantage of them.  They're usually

16   quite full.

17   **Q.**   What type of discussions would you have with a care

18   advocate in a child round?

19   **A.**   It sometimes focuses on, you know, issues that they don't

20   understand regarding, sort of, normal developmental issues

21   regarding age appropriate milestones.

22        Sometimes it can be medical conditions that -- that they

23   either don't understand, because frequently a lot of them don't

24   have extensive medical training, or medical illnesses that are

25   more likely to occur or be problematic in childhood range.

**ALLCHIN - DIRECT / BUALAT**

1  **Q.**   Would you ever have the occasion to advise the care

2  advocate to seek further information from the treating

3  provider?

4  **A.**   Sure.  We might ask specific questions that -- with the

5  hopes that the provider team could either -- already knows

6  those and can pass them on or, if they don't, to do some

7  further exploration.

8  **Q.**   Would those be tailored to the particular needs of

9  children and adolescents in the context of behavioral health?

10  **A.**   Yes.

11  **Q.**   How do you and other UBH child psychiatrists draw on their

12  specialization in making coverage decisions?

13  **A.**   I think, through experience and again additional two years

14  of training, I think, bear in mind how we make various

15  determinations.

16      I think the other thing that's sort of unique to child

17  psychiatrists is that we tend to have, sort of, a broader

18  experience in dealing with various aspects of things in the

19  community as far as, for instance, schoolwork or juvenile

20  detention work, that also adds to the experience.

21  **Q.**   Do you find that you employ that additional experience

22  with any frequency?

23  **A.**   Yes, I think we do it all the time.

24  **Q.**   Do the other clinicians at UBH seek out the child and

25  adolescent specialists for that type of broader experience?

ALLCHIN - DIRECT / BUALAT

1   **A.**   Correct.

2   **Q.**   And why is that important to consider -- or if it is, is

3   it important to consider that broader experience when treating

4   a child and adolescent?

5   **A.**   I think so.  Just that it's a better way of trying to

6   understand how the particular individual needs of a child and

7   adolescent are impacted by whatever the behavioral health issue

8   is, and also understanding that it's much more likely to not

9   be, sort of, an independent issue, that it has probably a great

10  deal of effect on a variety of other people, such as siblings

11  and other family members.

12  **Q.**   What do you mean by that?  Why would reaching out to a

13  different part of the community provide that insight?

14  **A.**   Well, it allows you to see that -- for instance, how

15  school issues impact, or potentially could impact, behavioral

16  health issues, and family dynamics as well.

17       The part about an adult is, hopefully, at some point

18  you're working at a job you like or at least tolerate.  But,

19  you know, when you're in sixth grade, you have to be in sixth

20  grade.  So as part of that, that can lead to a lot of

21  behavioral difficulties that perhaps wouldn't be there if they

22  didn't have to go to school at all.  But, obviously, that's not

23  an option.

24  **Q.**   Do you compare reactions or conduct of a child in school

25  versus family to draw any conclusions from that?

1   **A.**   Yeah.  I think that's one of the things that I spend a lot

2   of time with care advocates understanding, is that frequently

3   children will access the behavioral health treatment setting

4   because of issues with family, where perhaps the person's been

5   aggressive with family members or is some other way acting out.

6        And one of the important aspects that school can tell us

7   is are they seeing the same issues at school?  Because if

8   that's occurring, then probably it's much more likely to be a

9   global issue that's impacting virtually all globes of this

10  person's life.

11       On the other hand, if school tells you things are fine,

12  grades are goods, behavior is appropriate, et cetera, then it's

13  much more likely that the real elements of the case are in the

14  family situation, and you want to make sure that the treatment

15  plan is really going to be robust in addressing that.

16  **Q.**   Does board certification in general psychiatry allow or

17  qualify a psychiatrist to treat adolescents?

18  **A.**   I think so.  Most general psychiatry residency programs

19  have a fairly significant training aspect with adolescents.

20  And certainly the -- I think they can handle that.

21  **Q.**   Is there an age that you believe under which a child and

22  adolescent should be treated by a specialist?

23  **A.**   I think we generally, sort of, draw the line at 13 and

24  under.  Although, I don't know that that age is necessarily

25  etched in stone.  But I think that we generally do that, partly

**ALLCHIN - DIRECT / BUALAT**

1  because it's a break of somewhat pre pubertal and post

2  pubertal.

3  **Q.**   How much of your time at UBH do you devote to clinical

4  issues relating to children and adolescents?

5  **A.**   Again, I would say about two-thirds of my time.

6  **Q.**   Do you know if the other child and adolescent specialists

7  have equivalent ratios with respect to the time they spend with

8  the children and adolescents issues?

9  **A.**   I don't know for a fact, but I would -- from talking with

10  them, I would think the percentages are fairly accurate.

11  **Q.**   When making a coverage decision for a child and adolescent

12  member, what do you do differently than what you would do when

13  making a coverage decision for an adult?

14  **A.**   Well, I think, again, one of the things you need to

15  understand is that it's not in a vacuum; that it has to look at

16  how it's going to impact various other aspects, as well, as far

17  as school and family life.  And they need to be integrated

18  extensively in any kind of treatment planning.

19  **Q.**   Are there any other factors that you would consider for a

20  child and adolescent that's different than for an adult?

21  **A.**   I think those are probably the major ones.

22  **Q.**   Do UBH's Level of Care Guidelines instruct the user -- be

23  it a care advocate or a peer reviewer -- to collect the type of

24  information you just described about children and adolescents?

25  **A.**   Yes.  I think in the clinical best practices area it leads

**ALLCHIN - DIRECT / BUALAT**

1    people to obtain a whole host of information that that

2    encompasses, how to get not only the pertinent current clinical

3    state, but the past clinical state, for children and

4    adolescents.

5    **Q.**    You should have a binder in front of you that has the

6    Level of Care Guidelines.

7    **A.**    Yes.

8    **Q.**    All right.  Would you please turn to Exhibit 6 of the

9    Level of Care Guidelines.

10        Sorry, Exhibit 6.  Are you there?

11   **A.**    Yes.

12   **Q.**    What is Exhibit 6?

13   **A.**    It's the 2016 Level of Care Guidelines.

14   **Q.**    And are you familiar with them?

15   **A.**    Yes.

16   **Q.**    How so?

17   **A.**    From utilizing them for this year in question.

18   **Q.**    Can you turn to page 9 of Exhibit 6.

19        Are you there?

20   **A.**    Yes.

21   **Q.**    What is -- what starts on page 9 of Exhibit 6?

22   **A.**    The common criteria and clinical best practices for all

23   levels of care.

24   **Q.**    So that starts on page 6 and continues to page 15.  Is

25   that right?

**ALLCHIN - DIRECT / BUALAT**

1    **A.**   Correct.

2    **Q.**   Focus your attention on section 1.4.  Do you see that?

3    **A.**   Yes.

4    **Q.**   1.4 starts with "The member's current condition cannot be

5    safely, efficiently, and effectively assessed or treated."

6    Do you see that?

7    **A.**   Yes.

8    **Q.**   What is your understanding of what the "member's current

9    condition" encompasses in this section?

10    **A.**   My feel is that that's an all-encompassing look at how is

11    that this child presenting currently; which means not only an

12    understanding of chronic issues and how they're presenting now,

13    as well as acute issues and any kind of co-morbid medical

14    conditions that might also be occurring.

15    **Q.**   Before we move further on this section, can you focus on

16    section 1.6?

17    **A.**   Yes.

18    **Q.**   That provides, co-occurring behavioral health and medical

19    conditions cannot be safely managed.

20    Do you see that?

21    **A.**   I believe it says "can be safely managed."

22    **Q.**   Sorry.  With that correction, did I read that correctly?

23    **A.**   Yes.

24    **Q.**   All right.  If the member's current condition, as

25    expressed in section 1.4, includes co-occurring conditions,

1    what is the purpose, in your mind, of 1.6?

2    **A.**    I believe that this is an attempt to look at and to make

3    sure that the provider is able to provide these kind of

4    services.

5         So, for instance, some residential facilities do not have

6    robust medical backup or medical treatment facilities, so that

7    if it looked like the medical conditions were of a severity

8    that might -- might be very high, we would question whether

9    they could provide those services and would ask them how they

10   would do that.

11        From a co-occurring behavioral health issue, an example of

12   that would be somebody was referred to, say, a eating disorder

13   residential facility, and it's a specific eating disorder

14   focus, but the patient also had recently been significantly

15   abusing, let's say, alcohol and benzodiazepine, and might be in

16   a position to have a withdrawal.  The question would be can

17   that facility provide the services that would be safe and

18   appropriate for that patient.

19        I believe that part of this is put in because, I think, a

20   lot of the care advocates we have, that are learning level of

21   care guidelines, don't necessarily automatically think of some

22   of the medical issues involved.  And I look at this as a

23   failsafe way to make sure they look at the medical conditions

24   could be provided if necessary so that the patient's safety is

25   the paramount thing.

**ALLCHIN - DIRECT / BUALAT**

1         **THE COURT:**  So let me ask you about that.

2      Do you think that the care advocates may not naturally

3   think that these co-occurring conditions that you were talking

4   about fit under 1.4, and they need the reminder of 1.6?

5         **THE WITNESS:**  I think that that can be the case, yes.

6         **THE COURT:**  Okay.  Because, in your view, 1.6 is

7   otherwise unnecessary because it's all included in 1.4; right?

8         **THE WITNESS:**  Yes.  I believe that it is.  I think it

9   reiterates, though, from the medical condition parts of it,

10  yes.

11        **THE COURT:**  Okay.  But that means that staff are

12  interpreting these guidelines, 1.4, as not including 1.6;

13  right?

14        **THE WITNESS:**  I would think that they are considering

15  that as including that.

16        **THE COURT:**  Well, then why do you have 1.6?

17        **THE WITNESS:**  Again, I see this as being a way to make

18  sure that patient's safety is considered paramount.

19        **THE COURT:**  Well, then why don't you have another one

20  that says the acute symptoms can be safely managed as well?

21        **THE WITNESS:**  I didn't write the guidelines.

22        **THE COURT:**  No.  But I'm saying, why does that

23  interpretation make sense?  Why does that interpretation make

24  sense?

25      You call out the co-occurring conditions as being safely

1  managed, but you don't call out any other conditions that are

2  in the current condition as being safely managed.  That

3  suggests to me that the co-occurring conditions are not in the

4  first -- 1.4.

5      Why isn't that a reasonable interpretation?

6          THE WITNESS:  I say it could be a reasonable

7  interpretation.  The way I interpret this is that it's a way of

8  maintaining patient safety.

9          THE COURT:  Okay.  But some staff -- you think it's

10 necessary to maintain patient safety because some staff don't

11 naturally think of those co-occurring conditions as being in

12 1.4?

13         THE WITNESS:  Sometimes, without prompts, yes.

14         THE COURT:  Okay.  Thank you.

15 BY MR. BUALAT:

16 Q.  What staff are you referring to in your last response?

17 What staff are you referring to?

18 A.  The care advocates.

19 Q.  And what type of training do the care advocates have?

20 A.  Typically, care advocates have only mental health

21 training, so that they might have a master's degree in social

22 work; sometimes psychiatric nurse degrees; sometimes a few

23 Ph.D.s in psychology.

24 Q.  Do you -- is your experience, how many of them have

25 medical training?

ALLCHIN - DIRECT / BUALAT

1    **A.**    I would say very few.

2         Some of the nurses have, perhaps, a little bit, but that's

3    a minority of who we have in that role.

4    **Q.**    Can you provide me with any examples of why this would

5    come into play or how this would come into play, this concept

6    of this failsafe that you mentioned?

7    **A.**    Well, I think -- some -- particularly where we see this is

8    in residential facilities, where it's not infrequent that the

9    psychiatrist is only involved once a week or less.  And

10   frequently there's even less medical involvement.  There may be

11   medical involvement only on an as-needed basis.

12        And so I view it as if there's concern about that, it

13   doesn't mean that necessarily the facility can't provide that.

14   But we would want to make sure that they have the capacity to

15   do it or at least a treatment plan that would suggest how they

16   would address that if it were to proceed in a -- in a more

17   acute manner.

18   **Q.**    Is 1.6 focused on the capabilities of the facility or on

19   the treatment proposed to treat the member's condition?

20   **A.**    I'm sorry, one more time.

21   **Q.**    Sure.  Is 1.6 focused on the capabilities of the facility

22   or is it focused on the actual treatment plan for the member's

23   condition?

24   **A.**    Well, it depends on both.  But it's mostly on can that

25   facility provide what might be a reasonably expected medical

ALLCHIN - DIRECT / BUALAT

1   occurrence.

2   **Q.**   Now, let's focus back on 1.4.  So 1.4 provides that:

3        "The member's current condition cannot be safely,

4   efficiently, and effectively assessed and/or treated in a

5   less intensive level of care due to acute changes in the

6   member's signs and symptoms and/or psychosocial

7   environmental factors (i.e. the "why now" factors leading

8   to admission)."

9   Do you see that?

10  **A.**   Yes.

11  **Q.**   This criteria asks whether the member's current condition

12  can be treated safely and effectively; correct?

13  **A.**   Correct.

14  **Q.**   And whether or not a less intensive level of care is

15  appropriate?

16  **A.**   Correct.

17  **Q.**   Is that an important consideration, in your mind?

18  **A.**   Yes.

19  **Q.**   Why is that?

20  **A.**   Well, I think generally accepted guidelines always

21  reinforce that if we can treat a patient safely and

22  effectively, in a less restrictive level of care, it should

23  always be considered.  And I think that consideration is even

24  particularly more important in a child and adolescent setting.

25  **Q.**   And why is it, in your view, more important to consider

**ALLCHIN - DIRECT / BUALAT**

1    the restrictiveness of a level of care when assessing the

2    placement of a child or adolescent?

3    **A.**    Well, the concept of least restrictive has always been to

4    look at trying to maintain the patient in their home and

5    community as much as possible, while the treatment is being

6    delivered, to establish more of a normalcy as much as possible.

7         I think that's even more important in a child and

8    adolescent setting where you hope to keep them, inasmuch as

9    possible, with their school system, their family dynamics.

10        And, in fact, it can be, I think, more harmful at times

11   for child and adolescents to be removed from a family session

12   to a very restrictive level of care.  Some younger children,

13   for instance, view it as a rejection from the parents, that

14   they no longer want them or no longer want to deal with their

15   problems; and that, in itself, is a difficulty.

16   **Q.**    Are you referring to some downsides to placing a child or

17   adolescent at a higher level of care?

18   **A.**    Correct.

19   **Q.**    Are there other ones you can think of besides what you

20   just mentioned?

21   **A.**    I think in part of removing a child you take them into, I

22   think, more of an artificial environment than they would

23   normally have.  And I think that sometimes makes treatment more

24   difficult.

25   **Q.**    Would there be instances where a child and adolescent

1    would require a higher level of care or longer duration than an

2    adult would?

3    A.    Yes.

4    Q.    What would be the instances when that would occur?

5    A.    Certainly, one of the issues is if family situations are

6    quite difficult or, if not, even perhaps toxic for the child,

7    then we might consider longer durations or higher levels of

8    care due to the fact the child really doesn't have a choice,

9    necessarily, returning back to that environment; whereas, an

10   adult might.

11   Q.    And when making the assessment about the -- whether or not

12   a less intense level of care is appropriate, what type of

13   factual information would you -- would you want to see?

14   A.    Well, we certainly would go through the clinical best

15   practices to get enough information to make a determination

16   whether -- you know, what would be the appropriate level of

17   care that we could recommend, that would be the least

18   restrictive involved, that would be both safe and effective for

19   that.

20        So we would take all that information, which would

21   include, certainly, family information and how they view what

22   the problem is and how they assess what the child's role of it

23   is.

24   Q.    Do the Level of Care Guidelines that UBH has, do they tell

25   you how to make the assessment of whether a member's current

**ALLCHIN - DIRECT / BUALAT**

1  condition can be safely, efficiently, and effectively assessed

2  or treated at a less intensive level of care?

3  **A.**   I think they can offer guidelines to that.  But I think,

4  ultimately, it's the clinical judgment and experience, training

5  that also is important, that utilizes the guidelines to make an

6  appropriate recommendation.

7  **Q.**   When using your clinical judgment, would you ever attempt

8  to supplement them if they were, for instance, dealing with a

9  diagnosis that you are not familiar with or haven't dealt with

10  in years?

11  **A.**   Would I access other things?  Yes, I would access children

12  and adolescent -- probably the AACAP practice parameter.

13  **Q.**   And if you were dealing with an adult, would you access

14  other sources to supplement your knowledge base?

15  **A.**   Yes, probably the American Psychiatric Association

16  guidelines.

17  **Q.**   You referenced the American Psychiatric Association

18  guidelines.  What type of documents are those?

19  **A.**   They periodically are put out by the American Psychiatric

20  Association after, usually, a committee and feedback as far as

21  where they think, sort of, the state of the art is regarding

22  certain disease entities.

23  **Q.**   When you were talking about the AACAP practice parameters,

24  you described them as being diagnosis specific.  Do you recall

25  that?

1   **A.**   Correct.

2   **Q.**   Are the APA guidelines you're referring to, are they

3   similar in that they're diagnosis specific?

4   **A.**   Yes, generally they are.

5   **Q.**   And do those type of -- for instance, the AACAP practice

6   parameters, what types of information do they provide about

7   treating individuals who have the diagnosis to which they

8   relate?

9   **A.**   They're just -- they're general assessments of how to go

10  from assessing, appropriately diagnosing, appropriately looking

11  at co-morbidities, and then looking at evidence-based treatment

12  strategies.

13  **Q.**   And how about the AACAP practice parameters?  What are

14  they like?

15  **A.**   Very similar.

16  **Q.**   Looking at section 1.4 again, there is a reference to the

17  "acute changes in the member's signs and symptoms and/or

18  psychosocial, environmental factors (i.e. the "why now" factors

19  leading to admission)."

20       Do you see that?

21  **A.**   Yes.

22  **Q.**   What is your understanding of what the "why now" factors

23  that are articulated there encompass?

24  **A.**   In my view, the "why now" is, why is this person

25  presenting for some behavioral health or substance abuse

ALLCHIN - DIRECT / BUALAT

1    intervention at this time?

2        And it includes not only acute issues but chronic issues,

3    as well, because we frequently see people who have had,

4    perhaps, a chronic issue for, you know, a year, but why are

5    they presenting now, on a Tuesday afternoon, at this particular

6    time?

7        So I think unless you know that and are able to further

8    investigate it, your ability to develop a treatment plan is

9    limited.

10       So it incorporates not only some acute issues but how some

11   chronic issues -- how they have been addressed.  Why are they

12   exacerbated right now?  Are there additional factors?  Are

13   there recent stress issues or other environmental issues that

14   would suggest this is why the person is presenting treatment?

15   Sometimes it's external motivation.  Sometimes it's things like

16   a DUI makes people want to present for alcohol treatment.

17       But I feel that's part of the "why now," is to understand

18   that in the context of why the person is presenting for

19   treatment at this particular time.

20   **Q.**   And what types of questions would you ask or care

21   advocates ask in order to elicit that type of information that

22   you were just describing?

23   **A.**   Again, frequently -- I'm sort of surprised, at times, that

24   facilities don't ask these kind of questions, where -- why is

25   this person suddenly coming into an assessment setting?

 1          Because we ask these questions from a medical standpoint

 2     all the time.  When someone presents to a medical doctor, even

 3     for an outpatient visit, you're there for a reason.  There's

 4     some specific thing you hope to be improved by that interaction

 5     with the treating provider.

 6          So what we do is sometimes we ask, why is this person

 7     here?  Is there a particular reason for why this particular

 8     time and place there's -- they're requesting treatment?

 9          Sometimes in children and adolescents it's not the

10     patient, necessarily, because you may ask the patient why are

11     they getting treatment now and they'll say, I don't think I

12     need treatment.  Family might have a specifically different

13     viewpoint of that.  And they can provide more of the "why now"

14     for that.  But I think it's essential as far as treatment

15     planning goes.

16     Q.   Can you slow down a little.  I think the court reporter is

17     having a little ...

18     A.   Sorry.

19     Q.   It's all right.

20          What is the purpose, in your mind, of considering the "why

21     now" factors in this section 1.4?

22     A.   I'm sorry, could you repeat that.

23     Q.   Sure.  What is the purpose of considering the "why now"

24     factors in this section 1.4?

25     A.   I think that it's -- it's in terms of trying to develop

1  not -- not only assess, A, what is the appropriate level of

2  care, but also to begin the start of how you're going to do a

3  treatment plan to address what you're going to accomplish in

4  that level of care.

5  **Q.**   Is the consideration of these type of "why now" factors

6  unique to UBH's Level of Care Guidelines, in your experience in

7  psychiatry?

8  **A.**   No.

9  **Q.**   Is focusing on "why now" factors consistent with your

10  understanding of generally accepted standards of care?

11  **A.**   Yes.

12  **Q.**   Let me ask you about your work at Woodland.  Do you

13  remember talking about that?

14  **A.**   Yes.

15  **Q.**   You were a medical director there in the 1990s; is that

16  right?

17  **A.**   Correct.

18  **Q.**   In your consideration of patient placement, did you make

19  decisions as to where a patient should be placed as far as

20  levels of care?

21  **A.**   Yes.

22  **Q.**   How did -- how do the considerations that you employed at

23  Woodland compare to the considerations you employ in making

24  level of care determinations at UBH?

25  **A.**   I would say they're very similar.

**ALLCHIN - DIRECT / BUALAT**

1   **Q.**   Did you employ a concept similar to the "why now" factors

2   when you were doing patient placement considerations at

3   Woodland?

4   **A.**   Yes.

5   **Q.**   You also mentioned that you taught first or second year

6   medical students in the 1980s.  Do you remember that?

7   **A.**   Correct.

8   **Q.**   And you -- it was about interview skills; is that right?

9   **A.**   Correct.

10  **Q.**   Were -- how does those interview skills relate to this

11  concept of "why now" factors, if at all?

12  **A.**   Again, I think it factors into chief complaint issues of

13  trying to understand why the patient's there, what you're

14  expected to do in a treatment episode.  Because you're not --

15  aren't necessarily going to treat or cure everybody's

16  conditions in what -- that episode of care at that level of

17  care.  But it's very important to know the whys of why they're

18  presenting at that time.

19  **Q.**   You mentioned "chief complaint."  Are the "why now"

20  factors limited to the chief complaint?

21  **A.**   No.  It's incorporated in that.  But I think the "why now"

22  is also, again, looking at if they had a chronic condition or

23  if they had some co-morbid issues, what's gone on that they

24  have seemingly reached the point where a further intervention

25  is indicated.

**ALLCHIN - DIRECT / BUALAT**

1   **Q.**   In your experience, is it necessary to understand a

2   member's baseline function in order to understand the acute

3   changes that may be presenting at the time?

4   **A.**   Yeah, absolutely.

5   **Q.**   Would that be important in your assessment of the patient

6   who is coming in for treatment?

7   **A.**   Yes.

8   **Q.**   Why is that?

9   **A.**   Well, it's understanding that -- what their sort of what

10  we call premorbid condition is.  So if somebody has a very high

11  level of functioning, with very -- with no previous mental

12  health intervention, and they're now presenting, you would

13  certainly expect that the treatment plan would return them to

14  that level of functioning.

15      On the other hand, if a person has been functioning for

16  some time at a lower level of functioning, meaning that, for

17  instance, they have chronic self-harm urges, you aren't

18  necessarily going to eradicate that in one treatment episode at

19  a higher level of care.

20  **Q.**   Can a clinician accurately assess the "why now" factors if

21  the clinician excludes possible chronic conditions?

22  **A.**   I -- I think it's certainly much better understood if

23  there's an understanding of the chronic conditions.

24  **Q.**   Is treatment under UBH's Level of Care Guidelines limited

25  to treating only the "why now" factors?

ALLCHIN - DIRECT / BUALAT

1    A.    No.

2    Q.    And why do you say that?

3    A.    Again, I think that we look at that as that's sort of the

4    opening of the door.  But the understanding is to understand

5    how this impacts their entire past behavioral health issues,

6    medical issues, and substance use issues as well.

7    Q.    Can you focus your attention, please, on section 1.5 of

8    the 2016 Level of Care Guidelines.

9    A.    Yes.

10   Q.    So that provides:

11         "The member's current condition can be safely,

12         efficiently, and effectively assessed and/or treated in

13         the proposed level of care.  Assessment and/or treatment

14         of the acute changes in the member's signs and symptoms

15         and/or psychosocial environmental factors (i.e., the 'why

16         now' factors leading to admission) require the intensity

17         of services provided in the proposed level of care."

18         Did I read that right?

19   A.    Yes.

20   Q.    What is the point of section 1.5?

21   A.    I sort of view it as the flip side of the coin of 1.4.

22   It's saying that the current condition can't be safely managed

23   in a less restrictive level of care.  And, conversely, with 1.5

24   it can be safely, efficiently, and effectively assessed or

25   treated at the proposed level of care.

1          So, in other words, it's sort of the just right.  It can't

2    be handled at the less restrictive level of care and it can be

3    handled at this level of care.  So this would be the

4    appropriate recommendation.

5    **Q.**   Do UBH's Level of Care Guidelines, like the 2016 one we're

6    looking at, do they tell a user how to make the assessment of

7    whether treatment of the member's acute changes in signs and

8    symptoms require the intensity of the proposed level of care?

9    **A.**   No.  I think you need to utilize the guidelines in

10   addition to experience, knowledge, training, et cetera, to make

11   a combined determination.

12   **Q.**   In your view, is it important to use your clinical

13   judgment in assessing the criteria that are set forth in the

14   Level of Care Guidelines?

15   **A.**   Yes.

16          **MR. GOELMAN:**  Objection.  Leading, Your Honor.

17          **THE COURT:**  Sustained.

18   **BY MR. BUALAT:**

19   **Q.**   Do you have a view as to the relative importance of your

20   clinical judgment in assessing the criteria set forth in the

21   Level of Care Guidelines?

22   **A.**   Yes.

23   **Q.**   And what is your view?

24   **A.**   I view it's essential.  Because a guideline is, by virtue

25   of what we use guidelines for, is more of a suggestion; much

1  like when we make medical determinations based on decision

2  trees.  There certainly is room to deviate from those.  But the

3  expectation is if you do deviate from them, are you utilizing

4  clinical judgment and are you able to describe what it is that

5  is specific about this individual that would make you consider

6  working around what would be generally considered the

7  guidelines in question.

8  Q.   Are you suggesting that you could diverge from the

9  guidelines?

10  A.   Yes.

11  Q.   Do you have a view as to whether or not you could -- a

12  person could use the guidelines without employing their

13  clinical judgment?

14  A.   Yes.

15  Q.   And what is your view?

16  A.   I would find that very difficult, because it's designed to

17  use both.

18       THE COURT:  So I may have misheard you.  You didn't

19  mean to suggest, did you, that the guidelines were merely a

20  suggestion?

21       THE WITNESS:  No.  What I mean is that they're a way

22  of looking at: This is what we propose.  But it doesn't mean

23  that they necessarily have to always be followed.

24  BY MR. BUALAT:

25  Q.   Have you issued determinations that are inconsistent with

ALLCHIN - DIRECT / BUALAT

1  the guidelines?

2  **A.**    Yes.

3  **Q.**    And do you require advanced authorization from anybody in

4  order to do that?

5  **A.**    No.

6  **Q.**    Let's direct your attention to section -- let's.  It's

7  just me.

8        Please direct your attention to section 1.7.

9        1.7 lists certain requirements of the services that are

10  being presented.  Do you see that?

11  **A.**    Yes.

12  **Q.**    What is your understanding as to why section 1.7 is in the

13  Level of Care Guidelines?

14  **A.**    Well, my understanding of it is that to point out that we

15  expect services to be within generally accepted standards of

16  practice that are backed by credible research and not

17  considered experimental, and are consistent with Optum's best

18  practice guidelines.

19  **Q.**    You mentioned Optum's best practice guidelines.  Where do

20  you see that?

21  **A.**    It's 1.7.3.

22  **Q.**    What do you understand that that section to instruct users

23  of the Level of Care Guidelines to do?

24  **A.**    To refer back to the clinical best practices.

25  **Q.**    And you said "refer back."  What are you referring to?

ALLCHIN - DIRECT / BUALAT

1    **A.**    To -- actually, it's turn forward to section 4.

2    **Q.**    And that's section 4 that starts on page 11 of Exhibit 6?

3    **A.**    Yes.

4    **Q.**    Okay.  Can you turn there, please.

5    **A.**    Yes.

6    **Q.**    What is this section supposed to reflect?

7    **A.**    What it's supposed to reflect is in the base -- best case

8    scenario of trying to provide as much as we certainly can of

9    information so that we can hopefully make appropriate

10   determinations.

11        So this focuses not only on the member's specific needs,

12   so as individualistic as we can make it, so it's not just

13   someone who they're depressed.  Specifically, how is that

14   manifesting with them.  But also to differentiate various

15   things for every individual and also be able to ascertain

16   things that involve age differences, sexual orientation

17   differences, co-occurring illnesses.

18   **Q.**    Can you please -- well, let me ask you this.  Let me start

19   over.

20        In prior years, did UBH's Level of Care Guidelines have

21   similar types of practice guidelines in them?

22   **A.**    Yes.

23   **Q.**    Can you turn to Exhibit 2, please.  Should be in the same

24   binder.  And directing your attention to page 2 of Exhibit 2.

25   **A.**    Yes.

ALLCHIN - DIRECT / BUALAT

1  Q.   Are these the 2012 Level of Care Guidelines that you used

2  when you were working at UBH at that time?

3  A.   Yes.

4  Q.   Can you turn to page, now, to page 6 of Exhibit 2.  Are

5  you there?

6  A.   Yes.

7  Q.   Are there -- what is this -- what starts here on page 6?

8  A.   What's called "Common Criteria."

9  Q.   Are there provisions in this set of common criteria for

10 the year 2012, that reflect the best practice type of

11 guidelines we were looking at in the 2016 guidelines?

12 A.   Yes.  I think the 2016 ones are a little bit more specific

13 and perhaps a little bit robust.  But I believe it's the

14 general concept is there.

15 Q.   What are you looking at when you're saying that?

16 A.   As a comparison between, for instance, section 2,

17 primarily, where it goes through chief complaint, presenting

18 problem, various past histories, history of trauma abuse,

19 family issues, et cetera.

20 Q.   This common criteria, including that paragraph you were

21 mentioning, those are all contained in the one set of common

22 criteria at that time?

23 A.   Correct.

24 Q.   Will you turn back to Exhibit 6, please, the 2016 Level of

25 Care Guidelines we've been looking at, and in particular

1    page 11, please.

2    **A.**   (Witness examines document.)   Okay.

3    **Q.**   When the best practice guidelines were put into a separate

4    section in the Level of Care Guidelines like they are in 2016,

5    did you have an understanding as to whether or not that meant

6    that the clinical best practices were now viewed as a separate

7    part of the Level of Care Guidelines?

8    **A.**   No.

9    **Q.**   What was your view about that when they were moved into a

10   separate section?

11   **A.**   My view of it was that they were looking at it as what you

12   were trying to obtain to make a determination and containing it

13   into both the admission and continuing service criteria.

14   **Q.**   I'm sorry.   You were saying the admission criteria?

15   **A.**   As well as the continuing service criteria.

16   **Q.**   Why did you have that view?

17   **A.**   Both the admission and service criteria refer you back to

18   the clinical best practices part of the Level of Care

19   Guidelines so that you utilize -- the understanding is that you

20   don't make the determinations without understanding as much of

21   the information in the clinical best practices that you can

22   obtain.

23   **Q.**   So looking at some of the information that's contained in

24   the clinical best practices that start on page 11 of Exhibit 6,

25   are any of the factors you were mentioning that are particular

**ALLCHIN - DIRECT / BUALAT**

1  to children and adolescents present in that section?

2  **A.**  Yes.

3  **Q.**  Which ones are you looking at?

4  **A.**  Well, I think certainly when you look at issues such as

5  the history of trauma, by definition if trauma has occurred in

6  a child or adolescent, it's much more likely to be a recent

7  event than it would be likely in an adult.  Although it can be

8  in an adult, but it's certainly almost always going to be

9  recent if it's a child or adolescent.

10     Understanding their medical history and current physical

11  health status.  Are they prepubertal?  Are they postpubertal?

12     Developmental history.  When we look at developmental

13  history, we try to view things with children in sort of three

14  different spheres.  We look at intellectual functioning, social

15  functioning, emotional functioning; and then try to make,

16  independently of those, with their chronological age, are they

17  at chronicle age? Higher?  Lower?  Is it universal?  In other

18  words, are they one year behind in all of them, or are they

19  perhaps only one year behind in one and the other two are

20  appropriate?

21     And then we also try to take into effect from a

22  developmental issue if they're delayed, is it delayed and

23  appropriate or delayed and unusual?  And what I mean by that is

24  if you had an 11-year-old who has social skills that are, let's

25  say, closer to an 8-year-old, if you could close your eyes and

1    envision that person as an 8-year-old, would they be

2    appropriate for that person?  Or are there things like, for

3    instance, people who do hand flapping in front of their eyes,

4    which we would consider to be not only delayed but not

5    appropriate for any age?

6         We also look at things like -- obviously it mentions age,

7    but also things like sexual orientation where we look at issues

8    that if a child -- an adolescent is coming out, for instance,

9    for the first time, it has an essentially different aspect than

10   somebody who has been perhaps comfortable with their sexual

11   orientation for sometime.  Part of that is dependent on they're

12   living in a family structure and the family may or may not be

13   happy, let's say, or understand from either a cultural and/or

14   religious belief.  And we know that in that age group, suicide

15   risk factors are much higher.

16        Certainly spiritual beliefs we look at from an adolescent

17   point of view because most children and adolescents have the

18   spiritual beliefs of their parents whether they want them or

19   not, and that sometimes needs to be affected.  An adult, you

20   know, at a certain point you can make your own determinations.

21        Obviously educational history is very important.

22        And relationships with family and other natural resources

23   are going to be significantly, I view, more important in a

24   child and adolescent population than an adult.

25   Q.   Does employment history ever come into play for children

**ALLCHIN - DIRECT / BUALAT**

1   and adolescents?

2   **A.**   It can.   We occasionally look at that in the same way as

3   we do educational in that it's more data to look at.   If the

4   person is functioning fine in school and fine in a part-time

5   job and the dysfunction seems to be limited to when they're

6   with their family, again that is additional data we would use.

7   **Q.**   You mentioned -- you focused some of your testimony about

8   sexual orientation and how that can be particularly of note for

9   a child or adolescent?

10  **A.**   Yes.

11  **Q.**   How would that information play into your assessment about

12  whether or not a particular level of intensity is appropriate

13  for a child or adolescent?

14  **A.**   We would certainly take into account maybe a different

15  issue is a family that's surprised but is open, wants to

16  understand the issue or understand the child's positioning

17  versus one that is perhaps the opposite of that is demeaning or

18  not accepting, whatever.   We certainly would factor that into

19  some Level of Care Guidelines based on, you know, their -- what

20  the situation is they're coming from.

21  **Q.**   So if the family was less accepting, how could that

22  affect --

23  **A.**   It certainly could lead to a higher level of care, if

24  possible, that might prevent -- it might help sort of a

25  cooling-off period with the family.

**ALLCHIN - DIRECT / BUALAT**

1   **Q.**   Can you turn now your attention to section -- turning to

2   the forward -- or, I guess, page 10 -- sorry.  I don't know

3   back and front.  You've got me confused -- 1.8, please.

4   **A.**   Yes.

5   **Q.**   1.8 deals with improvement; is that right?

6   **A.**   Correct.

7   **Q.**   Let's focus on the first section of that, which is

8   (reading):

9           "There is a reasonable expectation that services will

10          improve the member's presenting problems within a

11          reasonable period of time."

12          Do you see that?

13  **A.**   Yes.

14  **Q.**   What is reasonable period of time in your mind?

15  **A.**   I view this as really affecting adults much more than

16  children and adolescents, and usually what we're asking at that

17  point is people, for instance, with dementia or, rather,

18  persistent psychotic symptoms, you know, is there any kind of

19  treatment strategy that we would reasonably expect is going to

20  change that.  I don't see us usually looking at that as a --

21  from a child-and-adolescent standpoint.

22  **Q.**   You said that it could come into play for adults.  Do you

23  remember that?

24  **A.**   Yes.

25  **Q.**   What were you referring to when you said that?

ALLCHIN - DIRECT / BUALAT

1   **A.**    Yeah, with areas with, you know, dementia, which currently

2   we have no treatment process for.  So if -- the idea is that

3   where somebody is coming in for inpatient care, to treat that,

4   we wouldn't really expect that there's reasonable expectation

5   that they would improve within a reasonable time frame.

6   **Q.**   And how would that affect a consideration of the

7   appropriate level of care?

8   **A.**    Well, we would look at if it's -- if it's not going to

9   result in a reasonable expectation or improvement within a

10   reasonable amount of time, the question is:  What is the

11   purpose of the treatment?

12          **THE COURT:**  So did you say that 1.8 doesn't apply to

13   children and adolescents?

14          **THE WITNESS:**  No.

15          **THE COURT:**  You did not say that?

16          **THE WITNESS:**  No.  I said that it generally doesn't.

17          **THE COURT:**  It generally doesn't apply to children or

18   adolescents?

19          **THE WITNESS:**  Right.

20          **THE COURT:**  In the guidelines it's a mandatory

21   condition; right?

22          **THE WITNESS:**  Correct.

23          **THE COURT:**  So what do you mean it doesn't apply to

24   children and adolescents?

25          **THE WITNESS:**  What I mean is that our way of looking

1    at what is a reasonable period of time tends to be a much more

2    expanded look than it would be with an adult.

3          **THE COURT:**  Okay.  Got it.

4    **BY MR. BUALAT:**

5    **Q.**   Let's focus now on Section 1.8.1, and that provides that

6    (reading):

7              "Improvement of the member's condition is indicated

8         by the reduction or control of the acute signs and

9         symptoms that necessitate treatment and a level of care."

10   Do you see that?

11   **A.**   Yes.

12   **Q.**   Does that provision provide for maintaining a level of

13   function?

14   **A.**   It talks about the acute signs, but acute signs can always

15   mean the exacerbation of a chronic issue.  So I view that as

16   it's how the patient is presenting now.  That doesn't

17   necessarily mean that we aren't looking at chronic conditions

18   as part of that as well.

19   **Q.**   How do you understand the term "the control of acute signs

20   and symptoms"?  What's your interpretation of the use of that

21   phrase?

22   **A.**   "Control" might mean that it's better but it's not

23   completely improved.  For instance, if somebody came in with

24   suicidal thoughts with an intent and plan to act on those and

25   now at this point is having intermittent thoughts of death,

**ALLCHIN - DIRECT / BUALAT**

1  let's say, but has no intent or plan in acting on that and is

2  future oriented, we would look at that as a control of the

3  acute signs but it's not necessarily, you know, a complete

4  recovery from that.

5  **Q.**   Let's focus now on that Section 1.8.2, please.

6  **A.**   Yes.

7  **Q.**   That provides (reading):

8          "Improvement in this context is measured by weighing

9          the effectiveness of treatment against evidence that the

10         member's signs and symptoms will deteriorate if treatment

11         in the current level of care ends.  Improvement must also

12         be understood within the broader framework of the member's

13         recovery, resiliency and well-being."

14         Do you see that?

15 **A.**   Yes.

16 **Q.**   There's a reference there to weighing the effectiveness of

17 the treatment versus the evidence of deterioration.  Do you see

18 that?

19 **A.**   Yes.

20 **Q.**   How would one in your position weigh those considerations?

21 **A.**   I think we would look at it through a combination of:  Is

22 there any past indication that would help us with the weighing

23 process of when they've moved out of that level of care in the

24 past?  How has that gone?  What was provided at that point to

25 try to help with the situation to get a history from that?

ALLCHIN - DIRECT / BUALAT

1   That may or may not be present.

2       But the other issue is, again, when it says "weighs," we

3   look at the pros and cons.  The pros with someone being

4   transferred to a lower level of care is that it's less

5   restrictive, would involve hopefully more issues in the

6   community, more time with the family, et cetera.

7       And the cons that we would look at tend to be more, I

8   think individualistic.  In other words, what is it particularly

9   about this person in this situation that's saying that we don't

10  think there's a likelihood that this would work?

11      And what we would expect in those situations, that that

12  sort of overweighs the idea of less restrictive, we would want

13  to say:  How is that being addressed in the treatment plan?  In

14  other words, if there are roadblocks to trying to do this or

15  we're thinking that it's, you know, it's unlikely -- it's

16  likely to cause a deterioration, how are we addressing that in

17  the treatment plan to say this is what we're doing to try to

18  bolster the situation so that we can get to a point of getting

19  them into a less restrictive level of care.

20  **Q.**  What sorts of information would you need to have collected

21  in order to make that type of weighing that you just discussed?

22  **A.**  You know, it certainly would be individualistic, but it's

23  certainly family issues would provide -- would be important

24  with that, community issues would be important.  Do they have

25  access to other less restrictive levels of care; for instance,

**ALLCHIN - DIRECT / BUALAT**

1  partial hospitalization or intensive outpatient service?  How

2  often could that occur?  Could outpatient services be done more

3  than once a week?  So it would be on a variety of different

4  things.

5  **Q.**   Do you believe you could make that weighing assessment

6  without the type of information you were discussing a moment

7  ago?

8  **A.**   No.

9  **Q.**   Do the Level of Care Guidelines instruct you how to do

10  that weighing that you've been discussing?

11  **A.**   No.  I think that that weighing aspect is really clinical

12  judgment and experience.

13  **Q.**   Focusing now on the last sentence of Exhibit -- excuse

14  me -- of Section 1.8.2 of page 10 of Exhibit 6, it says

15  (reading):

16          "Improvement must also be understood within the

17      broader framework of the member's recovery, resiliency,

18      and well-being."

19      What does "recovery, resiliency, and well-being" mean to

20  you when you use this provision?

21  **A.**   Well, I think it's in the concept of how does an

22  individual patient go from having acute symptoms to moving

23  towards more what we call normalcy or -- which is the recovery

24  process, which is generally, you know, not an all-or-none

25  phenomena.  It's a gradual process where we try to see that the

ALLCHIN - DIRECT / BUALAT

 1   person is moving forward but they, as part of that process, may

 2   be moving two steps forward and one step back.  But to make

 3   sure that the progression seems to be going in the appropriate

 4   way.

 5        Resiliency is a way of looking at how does someone respond

 6   to an adverse life event stressor.  So that do they have acute

 7   difficulties with that?  Do they have more long-standing issues

 8   to that?  Are they able to recover in a fairly quick manner

 9   from those?  Are they not?  Does it impact various other

10   medical conditions or, again, behavioral health issues they

11   have?

12        And one of the hard parts with adolescents with resiliency

13   is that for some of these -- for most people there's always a

14   first time when you experience certain life stressors.  When

15   you have a death of a family member, for instance, there's a

16   first time for that.  And so you have to see how do you relate

17   to that as opposed to when you get middle age and older,

18   unfortunately, these become more frequent events and you can

19   reflect back on how you -- how you dealt with them before, good

20   or bad, and hopefully learn from that experience.

21        When it's your first experience for this, it's hard to

22   tell necessarily how someone's going to relate to that and how

23   they're going to respond, but we try to ascertain what -- if we

24   have any information of that, what can we do to learn from it,

25   and then also what we can do to bolster that resiliency or

**ALLCHIN - DIRECT / BUALAT**

1   encourage more development of it.

2   **Q.**   If you felt that a child or adolescent's resiliency may

3   present issues for potential stepdown in level of care, what

4   would you do in that circumstance?

5   **A.**   Again, what we would like to see is the provider

6   addressing that.  So, in other words, if we look to develop a

7   treatment plan that would put some understanding of this.  So

8   if the resiliency issue resulted in a deterioration in function

9   or an increase in severity of symptoms, what can we put in

10  place that that would not occur, or what could we do bolster

11  that the person is more likely to seek services, less likely to

12  be involved in symptoms?

13  **Q.**   Would that at times lead to a continued stay at the level

14  of care that the patient is currently being treated at?

15  **A.**   Certainly.

16  **Q.**   And have you done that in the past?

17  **A.**   Yes.

18  **Q.**   Do these concepts of improvement here that we've been

19  looking at in Sections 1.8, 1.8.1, and 1.8.2 deal with chronic

20  conditions?

21  **A.**   I think so.  Because what they do is they talk about not

22  only the acute signs that necessitated treatment, but when it

23  talks about recovery and well-being and resiliency, all those

24  issues are having to do with past symptoms as well.  So that

25  the past symptomatology might include a chronic long-term issue

ALLCHIN - DIRECT / BUALAT

1  or it might include various distinct episodes of acute

2  treatment.

3  **Q.**  Do these provisions, 1.8 through 1.82, require constant

4  improvement on the part of the member?

5  **A.**  No.  What we would like to see, obviously, is a

6  progression towards that but that, again, is not generally a

7  consistent always in the right direction.  People stumble,

8  people occasionally have a mild regression from what their

9  improvement is.  But the important point of that is:  How does

10  the treatment plan deal with that regression to get the person

11  back up and moving in the right direction again?

12       **MR. BUALAT:**  Your Honor, if I may, may I get another

13  bottle of water?

14       **THE COURT:**  Sure.

15       **MR. BUALAT:**  Okay.

16                    (Pause in proceedings.)

17       **THE COURT:**  I was tempted to say no because it will

18  just make it easier for you to ask questions.  That would be

19  mean.

20                         (Laughter)

21       **MR. BUALAT:**  It's time for the afternoon nap, so I'll

22  keep on asking questions.

23  **Q.**  Let's focus on the continued service criteria if we may.

24  It's on Page 10 of Exhibit 6.  Do you see that?

25  **A.**  Yes.

**ALLCHIN - DIRECT / BUALAT**

1   **Q.**   All right.   Focusing on Section 2.1.1, it says (reading):

2           "Supervise and evaluate by the admitting provider."

3       Do you see that?

4   **A.**   Yes.

5   **Q.**   Do you know why that is a criteria set forth in the

6   continued service criteria?

7   **A.**   I believe it's to make sure that the appropriate providers

8   are seeing people on a frequency that we maintain.   When we

9   have contractual relationships, for instance, with residential

10  mental health facilities, the requirement is a psychiatrist see

11  the patient at least once a week.   So we would want to make

12  sure that that is occurring, that that person is being seen and

13  doing an appropriate evaluation at least weekly.

14  **Q.**   Do you believe that's an important fact in order for the

15  generally accepted standards of care?

16  **A.**   Yes.

17  **Q.**   Why is that?

18  **A.**   I think the role of the psychiatrist, and this is not

19  necessarily in any of these treatment levels of care to do the

20  sole treatment, but I view it is their important role to direct

21  care, to supervise the care that's being done by others, to

22  bring in medical evaluation as necessary, and certainly to be

23  monitoring if there's medications used, both from a physical

24  standpoint, side effects standpoint, lab values, that kind of

25  thing.

**ALLCHIN - DIRECT / BUALAT**

1              **THE COURT:** So you're just talking from a mental

2   health perspective, not from a substance abuse perspective?

3              **THE WITNESS:** Correct.

4              **THE COURT:** Okay.  Thank you.

5   **BY MR. BUALAT:**

6   **Q.**   Would those same considerations be applied to substance

7   use as well?

8   **A.**   Yes, in that we look at what is being provided at what

9   level of care and how much is the supervision.  In substance

10  abuse, once you get out of very high levels of care, there

11  sometimes is not particularly a lot of physician involvement

12  because it really is an unnecessary component of it.

13  **Q.**   All right.  Looking at Section 2.1.2, it says (reading):

14           "Provided under an individualized treatment plan that

15       is focused on addressing the 'why now' factors and makes

16       use of clinical best practices."

17       Do you see that?

18  **A.**   Yes.

19  **Q.**   Does the focus on addressing the "why now" factors mean to

20  you that it only addresses those factors?

21  **A.**   No.

22  **Q.**   What other issues should an individualized treatment plan

23  consider?

24  **A.**   Well, it certainly should consider any past issues via

25  whether they're acute or chronic in nature.  That would

ALLCHIN - DIRECT / BUALAT

1   certainly be important, whether there's any medical issues that

2   compound on this.

3   **Q.**   Looking at the Section 2.1.3, it says (reading):

4          "Reasonably expected to improve the member's

5          presenting problems within a reasonable period of time."

6          What does that mean to you in your understanding?

7   **A.**   Again, I view this similarly as the 1.8 aspect.  It's to

8   make sure that treatment can be -- can occur within a timely

9   fashion.

10  **Q.**   Let's look down at the Section 2.4.  It says (reading):

11         "The member's family and other natural resources are

12         engaged and participate in the member's treatment as

13         clinically indicated."

14         Do you see that?

15  **A.**   Yes.

16  **Q.**   How does this relate, if at all, to children and

17  adolescents?

18  **A.**   Well, I would view it as crucial because if you don't

19  involve the family in this and then expect the family to -- the

20  patient to return to the family, it's a very difficult process

21  because not only does the child or adolescent need to make some

22  changes but usually the family does as well, and I think they

23  have to be a co-occurring treatment modality.

24  **Q.**   Let's look at the discharge criteria that starts at

25  Section 3.  Looking at the 3.1.1, it provides (reading):

1              "The 'why now' factors which led to admission have

2        been addressed to the extent that the member can be safely

3        transitioned to a less intensive level of care or no

4        longer requires care."

5        Do you see that?

6   A.    Yes.

7   Q.    That doesn't -- do you know why that doesn't include the

8   term "effective" in there?

9   A.    (Witness examines document.)  "Effective" in where

10  exactly?

11  Q.    In that section I just read.  It talks about safely

12  transitioned to a less intensive level of care.  Do you see

13  that?

14  A.    Right.  I would argue that what we're doing here is, at

15  that point we're making a determination on an admission to a

16  different level of care, and at that point the whole process

17  would start over again going back to an admission process that

18  would take into account all the things we talked about from 1.1

19  forward.

20  Q.    So what do you mean by that?

21  A.    We would be looking at -- let's say if somebody went from

22  an inpatient unit to a partial hospitalization unit, what we

23  would say is that the "why now" factors have been addressed,

24  the person can proceed with a less intensive level of care; in

25  this case, the recommended level of care of partial

1  hospitalization.  Then we would move back to what are the

2  admission criteria for a partial hospitalization level of care.

3        **THE COURT:**  So why does it work that way?  This is the

4  discharge criteria.  Don't you consider in the discharge

5  criteria whether or not when you discharge them, and presumably

6  they're going to some other level of care, that level of care

7  will be effective?  Why isn't that part of the discharge

8  criteria?  And then you don't discharge them if it's not going

9  to be effective, or at least that's something you consider in

10  terms of the discharge criteria, whether it will be effective.

11        **THE WITNESS:**  I would say that it's addressed when you

12  look what is the next thing that's being offered.

13        **THE COURT:**  Okay.  So you go look at what is the next

14  thing that's being offered and it doesn't work, but you can

15  still fulfill these discharge criteria even if you don't

16  fulfill the admission criteria for something else that's being

17  offered because it's not effective.

18        Isn't that consistent with both sets of guidelines -- both

19  parts of this guideline, that you can get between them?  You

20  can say:  Well, you can be discharged because it's safe, but we

21  haven't evaluated effectiveness.  We'll go to the next level of

22  care and say, "Well, will it be effective?"  No, it won't be

23  actually.  Then you've got discharged because it's safe and --

24        **THE WITNESS:**  Right.  At least in the clinical way we

25  use this, whenever we're making a discharge evaluation, it's

1    what is the next level of care and how is that being utilized

2    and why would that be safe and effective.

3            THE COURT:  So you treat the admission criteria for

4    the next level of care as part of the discharge criteria?

5            THE WITNESS:  Yes.

6            THE COURT:  Okay.  Thank you.

7    BY MR. BUALAT:

8    Q.    You have with you a binder that I handed up, those two

9    small binders there.

10   A.    Yes.

11   Q.    Can you please pull out the binder that is titled "Witness

12   Binder for Dr. Theodore Allchin Plaintiffs' Cross-Examination

13   Exhibits"?

14   A.    Yes.  Are we done with this one?

15   Q.    Actually, you might want to leave it open because we may

16   make some cross-references.

17   A.    Okay.

18   Q.    So if you will please turn to Exhibit 693.

19   A.    (Witness examines document.)

20   Q.    And if you could turn to page 2, there's a title there.

21   A.    Yes.

22   Q.    Do you know what Exhibit 693 is?

23   A.    Yes.

24   Q.    What is it?

25   A.    It's a document from the American Academy of Child and

**ALLCHIN - DIRECT / BUALAT**

1    Adolescent Psychiatry on the principles of care for treatment

2    of children and adolescents with mental illnesses in

3    residential treatment centers.

4    **Q.**   You mentioned that the AACAP has practice parameters that

5    you review to keep abreast of child and adolescent psychiatry?

6    **A.**   Correct.

7    **Q.**   Is this one of those?

8    **A.**   This would be in that line, yes.

9    **Q.**   Okay.  I want to direct your attention to the first

10   paragraph under "Introduction."

11   **A.**   Okay.

12   **Q.**   All right.  That begins (reading):

13          "The best place for children and adolescents is at

14       home with their children" -- excuse me.

15       Let me start over.  (reading)

16          "The best place for children and adolescents is at

17       home with their families.  A child or adolescent with

18       mental illness should be treated in the safest and least

19       restrictive environment and needed service should be

20       wrapped around to provide more intensive home or

21       community-based services."

22       Do you see that?

23   **A.**   Yes.

24   **Q.**   Is that consistent with your understanding of what's the

25   appropriate restrictiveness for treating children with

**ALLCHIN - DIRECT / BUALAT**

1   behavioral health problems?

2   **A.**   Yes.

3   **Q.**   Do you view that statement that I just read to you to be

4   consistent with UBH's Level of Care Guidelines?

5   **A.**   Yes.

6   **Q.**   Referring to Exhibit 6, that's the binder that you should

7   be keeping open, what provisions in the 2016 Level of Care

8   Guidelines, the common criteria which start on page 9, reflect

9   that generally accepted standard of care that we read from the

10  AACAP document?

11  **A.**   Well, I would say that 1.4 where it says (reading):

12          "The current condition cannot be safely, efficiently,

13          and effectively assessed and/or treated in a less

14          intensive level of care."

15      So we would always look at can they be placed in a level

16  of care before we make any decisions about if they cannot, then

17  move to make an appropriate recommendation.

18  **Q.**   Are there other provisions in the 2016 guidelines that

19  reflect the statement that we just read from the AACAP

20  guidance?

21  **A.**   Yeah.  I think that the 1.5, again, since it's

22  realistically the flip side of the 1.4, is the same.

23  **Q.**   Now, looking now back at the Exhibit 693, the AACAP

24  guidance, if you turn to page 3.  Are you there?

25  **A.**   Yes.

ALLCHIN - DIRECT / BUALAT

1  Q.   The first full paragraph starts off (reading):

2           "The best intervention for serious mental health

3       issues that cannot be treated in the child's home

4       environment is a facility that has a multidisciplinary

5       treatment team providing safe, evidence-based care that is

6       medically monitored."

7       Do you see that?

8  A.   Yes.

9  Q.   Do you have a similar view as to whether -- or, excuse me.

10 Let me start over.

11      Do you have a view of whether or not that statement I just

12 read is consistent with generally accepted standards of care?

13 A.   Yes.

14 Q.   Do you have a view of whether or not UBH's Level of Care

15 Guidelines provide for such care?

16 A.   Yes.

17 Q.   Why is evidence-based care an important consideration with

18 respect to residential treatment for children and adolescents?

19 A.   I believe evidence-based care is necessary for every kind

20 of treatment modality we do.  And, unfortunately, psychiatry I

21 think at times has been the worst part of medicine as far as

22 doing nonevidence-based ideas on the fact that we just think

23 they work or hope they work or expect them to work when we

24 don't really have the evidence to suggest that they do.

25      So I think it's important that if people are going to put

ALLCHIN - DIRECT / BUALAT

1    their hands in professionals and say "This is the treatment

2    that should be occurring with my child and adolescent," that

3    it's extremely important that it be based on evidence-based

4    treatments that we know are effective for the diagnosis in

5    question.

6    Q.    Referring to the bottom of that page under "Program

7    Description."  Do you see that?

8    A.    Yes.

9    Q.    Do you have an understanding of what the program is

10   being -- what type of program is being described there?

11   A.    It looks like a residential mental health program.

12   Q.    Okay.  And looking at the second-to-the-last sentence that

13   begins "Psychiatrists and mental health professionals."  Do you

14   see that?

15   A.    Yes.

16   Q.    Okay.  So that provides that (reading):

17            "Psychiatrists and mental health professionals should

18        meet face to face on a weekly basis as a treatment team to

19        assess progress and modify the treatment plan when

20        necessary.  Psychiatrists should also meet with the

21        patient once a week or more as clinically indicated."

22        Did I read that right?

23   A.    Yes.

24   Q.    And do you have an understanding as to whether or not what

25   I just read to you is consistent with generally accepted

**ALLCHIN - DIRECT / BUALAT**

1   standards of care?

2   **A.**   Yes.

3   **Q.**   Does UBH's Level of Care Guidelines, such as the 2016 ones

4   we've been looking at, provide for such requirements as we just

5   read from the AACAP guidance?

6   **A.**   Yes, in that it maintains that the professionals involved

7   need to be involved on a substantial basis, and our feeling is

8   that this level of involvement would be sort of the minimum.

9   **Q.**   You were just gesturing.  Are you looking at a particular

10  provision?

11  **A.**   What you just read.

12  **Q.**   Oh, okay.  I was referring actually to the 2016 Level of

13  Care Guidelines.  Are there provisions there that match the

14  sentiment that we just read in the AACAP?

15  **A.**   In the continued service criteria under 2.1.1 where it

16  says "Supervised and evaluated by the admitting provider," we

17  really view it as the attending's job to not only do the

18  evaluation and directly be involved in the treatment plan but

19  also to be involved in the psychiatric care as well.

20  **Q.**   Let's turn now to page 5 -- going back to the 693 -- of

21  that exhibit.

22  **A.**   (Witness examines document.)

23  **Q.**   That section, the title for that is "Admission Process,

24  Treatment Planning, and Discharge Planning."  Do you see that?

25  **A.**   Yes.

**ALLCHIN - DIRECT / BUALAT**

1  **Q.**   All right.   The second sentence that begins "The primary

2  treatment goal," do you see that, underneath that heading on

3  page 5?   It's also on the screen.

4  **A.**   Yes.

5  **Q.**   All right.   The second sentence begins, "The primary

6  treatment goal."   Do you see that?

7  **A.**   Yes.

8  **Q.**   Okay.   It reads (reading):

9         "The primary treatment goal is to return the child or

10        adolescent to the community in order to resume the family

11        social and educational functions that contribute to normal

12        development.   Discharge planning should begin at the time

13        of admission and shape the treatment process."

14        Do you see that?

15  **A.**   Yes.

16  **Q.**   Do you have a view as to whether or not discharge planning

17  should begin at the time of admission and shape the treatment

18  process?

19  **A.**   Yes.

20  **Q.**   What is your view about that suggestion?

21  **A.**   My view is, and I think this is a generally accepted

22  standard, is that it's necessary so that one can see what would

23  be required to involve a discharge to a less restrictive level

24  of care and start establishing not only a treatment plan to get

25  the person to that point but also to look at what other

**ALLCHIN - DIRECT / BUALAT**

1  available resources at various level of cares are available in

2  the community.

3  **Q.**   If you turn to the next page of Exhibit 693.

4  **A.**   (Witness examines document.)

5  **Q.**   Are you there?

6  **A.**   Yes.

7  **Q.**   It seems to reinforce that, if you look under "Discharge

8  Planning should."  Do you see that?

9          **MR. GOELMAN:**  Would you repeat it?

10         **MR. BUALAT:**  All right.

11 **Q.**   Do you see "Discharge planning should" in the middle of

12 page 6 of Exhibit 693?

13 **A.**   Yes.

14 **Q.**   What does it say as the first bullet point?

15 **A.**   "Begin at admission."

16 **Q.**   Go to Exhibit 6, which is the 2016 Level of Care

17 Guidelines.

18 **A.**   (Witness examines document.)

19 **Q.**   Are you there?

20 **A.**   Yes.

21 **Q.**   Can you go to page 13 of Exhibit 6?

22 **A.**   (Witness examines document.)

23 **Q.**   Are you there?

24 **A.**   Yes.

25 **Q.**   Do you see an entry for 4.2 for discharge planning?

1    A.    Yes.

2    Q.    Can you read into the record what 4.2.1 says?

3    A.    (reading)

4           "The provider and, whenever possible, the member

5          develops an initial discharge plan at the time of

6          admission and estimates the length of treatment."

7    Q.    Is it your understanding that generally accepted standards

8    of care for the treatment of children and adolescents call for

9    discharge planning at the time of admission for a residential

10   treatment facility?

11   A.    Yes.

12   Q.    And what do you base that on?

13   A.    Again, to me the whole idea is that a treatment is a

14   process but it's not necessarily an endpoint.  So you have to

15   look at what will happen when this treatment modality ends and

16   make appropriate discharge planning and treatment planning to

17   have that occur.

18   Q.    Can you turn to -- going back to Exhibit 693, on page 10

19   there is an appendix that starts there.  Do you see that?

20   A.    Yes.

21   Q.    And it says it's for special populations and programs;

22   right?

23   A.    Yes.

24   Q.    There is a -- it starts right around the -- in that first

25   full bullet paragraph, the fifth line from the bottom it begins

ALLCHIN - DIRECT / BUALAT

1    "Still the lack of available treatment centers."  Do you see

2    that?

3    A.    Yes.

4    Q.    It says (reading):

5         "Still the lack of available treatment centers, the

6         presence of comorbid psychiatric illness or geographic

7         necessity might require that a child or adolescent with

8         these or other psychiatric disorders receive treatment in

9         an RTC that is not specialty focused.  In such cases, the

10        clinical and medical directors have the responsibility to

11        determine which disorders their facility can effectively

12        treat using current EVP standards."

13   Do you see that?

14   A.    Yes.

15   Q.    Do you know what that's referencing?

16   A.    The EVP you mean?

17   Q.    Oh, no.  The requirement about responsibility to determine

18   which disorders can be effectively treated.

19   A.    Well, what they're saying is that there isn't always an

20   available program that people can address, and so at times we

21   have to do with what we have and try to make the best of

22   treatment planning and appropriate interventions.

23   Q.    Does that relate at all to the requirement that comorbid

24   conditions be safely managed?

25   A.    It involves both the co -- comorbid, it says, psychiatric

ALLCHIN - DIRECT / BUALAT

 1   illnesses in this case.

 2   **Q.**   Can we turn now to -- we're going to go to the 2017 Level

 3   of Care Guidelines.

 4   **A.**   (Witness examines document.)

 5   **Q.**   Dr. Allchin, are you -- Exhibit 8.  Sorry about that.  Are

 6   you there?

 7   **A.**   Yes.

 8   **Q.**   Okay.  Exhibit 8 on page 2 do you see it says "Level of

 9   Care Guidelines Introduction"?

10   **A.**   Yes.

11   **Q.**   And are you familiar with this document?

12   **A.**   Yes.

13   **Q.**   What is it?

14   **A.**   It's the Level of Care Guidelines for 2017 for

15   OptumHealth.

16   **Q.**   All right.  The considerations that we've been discussing

17   that are particular to children and adolescents, are they

18   addressed in the 2017 Level of Care Guidelines?

19   **A.**   Yes.

20   **Q.**   And where would I find that portion of the Level of Care

21   Guidelines that you're thinking of when you answer that way?

22   **A.**   (Witness examines document.)  When we look at Pillar 2

23   where it says "Service System Solutions," it talks about we

24   look at recovery, resiliency, well-being; and it says

25   (reading):

**ALLCHIN - DIRECT / BUALAT**

1              "When the most appropriate level of care is not

2          available in the service system, we either facilitate

3          access to services that augment a lower level of care,

4          thus allowing for safe and effective treatment, or we

5          facilitate access to a higher level of care."

6     **Q.**   Are you familiar with whether or not the 2017 Level of

7     Care Guidelines have best practice guidelines?

8     **A.**   I do not believe they do.

9     **Q.**   Could you turn to page 7?

10    **A.**   (Witness examines document.)

11    **Q.**   At the bottom of page 7, there is reference to the common

12    clinical best practices for all levels of care?

13    **A.**   Yes.

14    **Q.**   Does that refresh your recollection?

15    **A.**   Yeah.  I'm sorry.  I thought you were referring to just

16    that one, the introduction aspect of it.  Yes.

17    **Q.**   Oh, I'm sorry.  No.  Let me restate it.

18         So -- well, focusing on the clinical best practices for

19    the Level of Care Guidelines for 2017, do these best practices

20    include collection of the information that you believe is

21    pertinent to assessing whether or not -- or, excuse me --

22    assessing the level of care that is appropriate for a child or

23    adolescent?

24    **A.**   Yes.

25    **Q.**   And which criteria are you thinking of when you say that?

ALLCHIN - DIRECT / BUALAT

1   **A.**   Under I guess it would be page 8 where it includes an

2   initial evaluation of the following, which includes history of

3   behavioral health problems, history of trauma, developmental

4   history, current and historical life information.  I think all

5   those would be considered in child and adolescent.

6   **Q.**   Are the clinical best practices that you were just looking

7   at in 2017 in your mind different materially from the ones in

8   2016?

9   **A.**   No.

10  **Q.**   Would you, as a clinician at UBH, use them differently?

11  **A.**   No.

12  **Q.**   Turn to -- well, actually, still -- let's look at page 7

13  of that document, Exhibit 8.

14  **A.**   (Witness examines document.)

15  **Q.**   And there is some bullet points at the top of that.  Do

16  you see that?

17  **A.**   Yes.

18  **Q.**   Okay.  The second full bullet point it says "The member's

19  current condition."  Do you see that?

20  **A.**   Yes.

21  **Q.**   It says (reading):

22          "The member's current condition can be safely,

23      efficiently, and effectively assessed and/or treated in

24      the proposed level of care.  Assessment and/or treatment

25      of the factors leading to admission require the intensity

ALLCHIN - DIRECT / BUALAT

1        of services provided in the proposed level of care."

2        Do you see that?

3    A.   Yes.

4    Q.   The term "why now" doesn't appear there?

5    A.   Correct.

6    Q.   Does that change your approach as to how you gather

7    information and assess it with respect to assessing the

8    placement of a patient?

9    A.   No.

10   Q.   Why doesn't it?

11   A.   Again, I view it as when somebody is being assessed for

12   any level of treatment, the focus is on "why now," why are they

13   presenting.

14        MR. BUALAT:  One moment, Your Honor.

15              (Pause in proceedings.)

16   BY MR. BUALAT:

17   Q.   Let's turn quickly back to 2012 criteria.

18   A.   Which exhibit is that?

19   Q.   I'm sorry.  Yeah, it's going to be Exhibit 2.

20   A.   Okay.

21   Q.   And in particular on page 6.  Do you remember looking at

22   this earlier today?

23   A.   Yes.

24   Q.   And there is the common criteria that we looked at?

25   A.   Yes.

1   **Q.**   And you were saying that earlier that the Section 2 is

2   similar to the best practice guidelines we were looking at in

3   2016.  Do you recall that?

4   **A.**   Yes.

5   **Q.**   Do the criteria that are set forth in paragraph 2 of the

6   common criteria of the 2012 Level of Care Guidelines call for

7   the collection of the information that you believe is

8   particularly pertinent to the treatment of children and

9   adolescents?

10   **A.**   Yes.

11   **Q.**   Which criteria?

12   **A.**   Well, again, it goes to a presenting problem.  It goes to

13   the history of abuse and trauma, the member's family histories,

14   resiliency factors, what their social and support is.  And

15   there's a few adult things here that don't really pertain to a

16   child, like such as having an advanced directive.

17   **Q.**   Is it your view that UBH's -- strike that.

18       Do you have a view as to whether or not UBH's Level of

19   Care Guidelines reflect generally accepted standards of care

20   for the patient placement of children and adolescents?

21   **A.**   Yes.

22   **Q.**   And what is your view?

23   **A.**   I view that they are generally consistent.

24           **MR. BUALAT:**  No further questions.

25           **THE COURT:**  All right.  Let's take a lunch break, and

 1   we'll come back for cross.  Thanks a lot.

 2            THE WITNESS:  Thank you.

 3            MR. RUTHERFORD:  I'm sorry, Your Honor.  Come back

 4   when?

 5            THE COURT:  One hour.

 6               (Luncheon recess taken at 12:14 p.m.)

 7   <u>Thursday, October 26, 2017</u>              <u>1:23 p.m.</u>

 8                    P-R-O-C-E-E-D-I-N-G-S

 9                        ---000---

10            THE CLERK:  Court will come to order.

11        I believe, Mr. Bualat, you have a housekeeping issue.

12            THE COURT:  A housekeeping issue?

13            MR. BUALAT:  Yes, Your Honor.  I neglected to move

14   Exhibit 693 into the record, which I had examined Dr. Allchin

15   about.

16            THE COURT:  Any objection?

17            MR. GOELMAN:  No objection.

18            THE COURT:  It's admitted.

19        (Trial Exhibit 693 received in evidence.)

20            THE COURT:  Okay.  Cross-examination.

21                    <u>CROSS-EXAMINATION</u>

22   BY MR. GOELMAN:

23   Q.   Good afternoon, Dr. Allchin.

24   A.   Good afternoon.

25   Q.   My name is Aitan Goelman.  I'm one of the lawyers

1    representing the plaintiffs in this matter.

2         You talked on direct examination about how UBH clinicians

3    used their clinical judgment in making decisions about what

4    level of care to authorize.  Do you recall that?

5    **A.**   Yes.

6    **Q.**   Those decisions are made within the framework of the

7    applicable level of care guidelines; correct?

8    **A.**   Correct.

9         (Equipment malfunction interruption.)

10        **MR. GOELMAN:**  So what was the last question that you

11   got?  I'll just ask that one again.

12   **BY MR. GOELMAN:**

13   **Q.**   The decisions, the clinical judgment decisions that

14   clinicians at UBH make are within the framework of the

15   applicable level of care guideline; right?

16   **A.**   Correct.

17   **Q.**   And those guidelines are not mere suggestions; true?

18   **A.**   True.

19   **Q.**   In fact, UBH has rules that require its clinicians to use

20   the guidelines when deciding whether to approve a level of care

21   coverage request; right?

22   **A.**   Correct.

23   **Q.**   You're required to actually cite to the guidelines in your

24   decision; right?

25   **A.**   Correct.

**ALLCHIN - CROSS / GOELMAN**

1   Q.   You're required to record which specific guideline you

2   used in making your determination; true?

3   A.   True.

4   Q.   And if UBH denies a coverage request, the guideline used

5   goes in the denial letter to the member; right?

6   A.   Correct.

7   Q.   And when you reference a guideline in the denial letter to

8   a member, that means that you have actually considered that

9   particular guideline in making the determination that the care

10  they want isn't covered; right?

11  A.   Correct.

12  Q.   It's fair to say that in your 19 years with UBH, or

13  Optum -- I'm using the term interchangeably -- you've never

14  written in a letter that your decision was based on a

15  particular guideline when you hadn't, in fact, considered that

16  guideline in arriving at your decision?

17  A.   That's correct.

18  Q.   And from the time you started at UBH, you were trained to

19  always use the guidelines when making medical necessity

20  determinations; right?

21  A.   Right.

22  Q.   It's a requirement at UBH that your coverage decisions be

23  consistent with the guidelines; right?

24  A.   Correct.

25  Q.   By the way, in the time that you've been at UBH, have you

**ALLCHIN - CROSS / GOELMAN**

1  ever received any training on any obligations that UBH might

2  have under the ERISA law?

3  **A.**   No particular training.

4  **Q.**   Dr. Allchin, UBH's CDGs, coverage determination

5  guidelines, incorporate UBH's Level of Care Guidelines;

6  correct?

7  **A.**   Not all of them.  There is an early CDG, I believe, from

8  2011-2012, that did not incorporate the Level of Care

9  Guidelines.

10 **Q.**   Which one?

11 **A.**   I believe -- I'd have to look to be sure, but I believe

12 it's -- can I look?

13 **Q.**   Sure.

14 **A.**   I may not even have it with me because these are all Level

15 of Care Guidelines -- oh, wait.  So I can't cite you specific

16 one, but I believe it's 2011.

17 **Q.**   And do you recall which CDG?

18 **A.**   No, I'm sorry, I don't.  I think there's one for attention

19 deficit disorder.

20 **Q.**   Do you recall, you were deposed twice in this case;

21 correct?

22 **A.**   Yes, I believe so.

23 **Q.**   I want to read from your second deposition, page 101, line

24 25.

25       **THE COURT:**  To?

ALLCHIN - CROSS / GOELMAN

1              MR. GOELMAN:  To 102, line 3.

2         "Q.   Okay.   In the Coverage Determination Guidelines

3         incorporate the Level of Care Guidelines; is that correct?

4         "A.   Correct."

5    BY MR. GOELMAN:

6    Q.   Did you give that testimony?

7    A.   Yes.

8    Q.   Dr. Martorana is your boss; correct?

9    A.   Yes.

10   Q.   Does your performance reviews?

11   A.   Yes.

12   Q.   Is one of the criteria that you're evaluated on whether

13   you meet the goal for completing a certain number of peer

14   reviews in a given day?

15   A.   A certain amount of what I call work-related issues, which

16   include peer reviews.

17   Q.   And is there a particular number that you're supposed to

18   achieve under that goal?

19   A.   That's sort of in flux right now because how they're

20   changing the system of how they are accommodating that.  But it

21   has been ten.

22   Q.   Ten.

23        And is it fair to say that you're allocated about a half

24   hour for a review of a care advocate's recommendation?

25   A.   For a peer review?

**ALLCHIN - CROSS / GOELMAN**

1    **Q.**    Yeah.

2    **A.**    Yes.

3    **Q.**    You testified this morning about the different

4    considerations for children and adolescents versus adults.  Do

5    you recall that?

6    **A.**    Yes.

7    **Q.**    Is it fair to say that for the purpose of determining the

8    appropriate level of care, kids are pretty different from

9    adults?

10   **A.**    They can be, yes.

11   **Q.**    Well, you have to consider their developmental stage;

12   right?

13   **A.**    Correct.

14   **Q.**    And there are a lot of mental illnesses and substance

15   abuse problems that first manifest during adolescents; right?

16   **A.**    Correct.

17   **Q.**    Now, it's important to get level of care correct for any

18   patient; right?

19   **A.**    Yes.

20   **Q.**    Would you agree that it is particularly so for kids?

21   **A.**    I don't know "particularly so," but it certainly is very

22   important.

23   **Q.**    And you talked on direct examination about some of the

24   down sides of a kid with mental health issues being in a overly

25   restrictive level of care.  Do you recall that?

**ALLCHIN - CROSS / GOELMAN**

1    **A.**    Yes.

2    **Q.**    Be away from their family and peers; right?

3    **A.**    Correct.

4    **Q.**    There can also be dire consequences when a kid is put in a

5    level of care that is not as restrictive as it should be;

6    right?

7    **A.**    That can occur, yes.

8    **Q.**    Fair to say that if a youngster with a substance abuse or

9    behavioral health issue doesn't get the help they need that it

10   can have very severe consequences?

11   **A.**    Yes.

12   **Q.**    They can sustain damage that they have to live with the

13   rest of their lives?

14   **A.**    Certainly possible.

15   **Q.**    It could even dramatically shorten their lives; right?

16   **A.**    Possible.

17   **Q.**    And there are generally accepted standards of care for

18   treating children with mental health issues and substance use

19   disorder that are distinct from adults; right?

20   **A.**    I'm sorry, could you repeat that.

21   **Q.**    Yeah.

22        Would you agree that there are generally accepted

23   standards of care for treating kids with mental health and

24   substance use conditions that are distinct from adults?

25   **A.**    That's a difficult question to answer because I don't know

ALLCHIN - CROSS / GOELMAN

1    that there are standards of care that are necessarily

2    different.  I think there are different elements that are

3    considered for the same standards of care.

4    Q.   Okay.  You testified this morning about ASAM --

5    A.   Yes.

6    Q.   -- right?  ASAM criteria.  And you're familiar with those?

7    A.   Yes.

8    Q.   And you believe that they reflect a generally accepted

9    standard of care for substance use disorders; correct?

10   A.   Yes.

11   Q.   I want to read from this transcript, because I don't want

12   to get it wrong.

13        It's at 1048:11.

14        THE COURT:  What are you reading?

15        MR. GOELMAN:  From this morning's transcript, Your

16   Honor.

17        THE COURT:  Okay.

18   BY MR. GOELMAN:

19   Q.   10:48:01 you were asked (as read):

20        "Does ASAM have separate criteria for accessing

21        placement for children and adolescents?

22   "A.  It's not separate criteria.  They have more of a

23        commenting section, where they point out when

24        adolescents -- because it's mostly adolescents, because

25        instead of children, because of substance issues, how

ALLCHIN - CROSS / GOELMAN

```
 1        their presentation and treatment progress may perhaps be
 2        different than adults."
 3        Do you remember giving that testimony?
 4   A.   Yes.
 5             MR. GOELMAN:  Can we show Dr. Allchin Exhibit 662,
 6   please, the ASAM guidelines.
 7   BY MR. GOELMAN:
 8   Q.   And can you turn -- you can look on your screen or you can
 9   look in the book; whatever is more --
10   A.   Okay.
11   Q.   -- convenient for you.
12             MR. GOELMAN:  Can you turn to page 350, please, of
13   that exhibit.
14   BY MR. GOELMAN:
15   Q.   Do you see the second bullet point on the right-hand
16   column?
17   A.   Yes.
18   Q.   That says:
19             "Combining adult and adolescent treatment information
20        in order to show overarching alignment with the guiding
21        principles and applications of the ASAM criteria.  At the
22        same time, the ASAM criteria continues to distinguish
23        between adult and adolescent populations, and presents
24        separate diagnostic and dimensional admission criteria
25        within each level of care."
```

1       Do you see that?

2   A.   Yes.

3   Q.   Isn't it true that ASAM has separate diagnostic and

4   dimensional admission criteria for kids than for adults?

5   A.   For adolescents, yes.

6   Q.   And the Level of Care Guidelines that you use at Optum

7   don't have anything like that; right?

8   A.   Well, I think that by our use of the clinical best

9   practice it does separate adolescents and developmental issues

10  from adults.

11  Q.   You think that's similar to the different criteria that

12  ASAM has?

13  A.   Yes.

14  Q.   Okay.  Let's look at that then.  Can you turn to page 249

15  of ASAM, please.  It says "Adult Dimensional Admission

16  Criteria"; right?

17  A.   Correct.

18  Q.   And that has the criteria that are applicable for adults

19  in terms of the six ASAM dimensions; right?

20  A.   Correct.

21  Q.   Can you now turn to page 253, please.  Actually, let's go

22  page by page.  Let's go to 250.  Go to 251.  Now let's go to

23  252.

24       Now let's go to -- at the bottom it says "Adolescent

25  Diagnostic Admission Criteria"; right?

ALLCHIN - CROSS / GOELMAN

1    **A.**    Correct.

2    **Q.**    And it says:

3              "The adolescent who is appropriately placed in a

4         Level 3.1 program meets the diagnostic criteria for

5         moderate or severe substance use and/or addictive disorder

6         as defined in the current DSM"; correct?

7    **A.**    Correct.

8    **Q.**    Can you turn, now, to 253.  And that is titled "Adolescent

9    Dimensional Admission Criteria"; right?

10   **A.**    Correct.

11   **Q.**    And it says:

12             "The adolescent who is appropriately placed in Level

13        3.1 program meets specifications in at least two of the

14        six dimensions"; correct?

15   **A.**    Correct.

16   **Q.**    And the adult has to meet more than that; right?

17   **A.**    Correct.

18   **Q.**    Can you now turn to page 279, please.  It says, at the

19   bottom, "Adult Dimensional Admission Criteria."  That's for a

20   Level 3.45; correct?

21   **A.**    Correct.

22   **Q.**    And now turn to page 285, please.  It says "Adolescent

23   Dimensional Admission Criteria?

24   **A.**    Correct.

25   **Q.**    And, again, it requires that an adolescent placed in the

**ALLCHIN - CROSS / GOELMAN**

1    Level 3.5 program meets specifications in at least two of

2    Dimensions 1 through 6?

3    **A.**    Correct.

4    **Q.**    Have you ever used the ASAM criteria for making a

5    level-of-care decision?

6    **A.**    Yes.

7    **Q.**    And you were able to understand the numbering system?   It

8    wasn't burdensome or too hard to work with?

9    **A.**    Which numbering system are you --

10   **Q.**    The ASAM criteria and the ASAM levels of care.

11   **A.**    Correct.

12   **Q.**    Pretty easy to use?

13   **A.**    I don't think it's easy to use, but I think it's

14   understandable.

15   **Q.**    Okay.  Are you familiar with LOCUS?

16   **A.**    Yes.

17   **Q.**    And what is LOCUS?

18   **A.**    It was -- well, the -- I'm more familiar with CALOCUS.

19   **Q.**    Okay.  Why don't do you explain the distinction between

20   the two.

21   **A.**    LOCUS was generally for a general population, and CALOCUS

22   was a guideline with children and adolescents in mind.  And it

23   was developed, I believe, in combination with the AACAP.

24   **Q.**    So there's separate volumes for children and adolescents

25   compared to adults; correct?

ALLCHIN - CROSS / GOELMAN

1  **A.**   Right.

2  **Q.**   Okay.  Can we -- is it fair to say that CALOCUS is a

3  reflection of the generally accepted standards of care for

4  kids?

5  **A.**   Yes.

6  **Q.**   Let me turn to Exhibit 644.  I believe this is in

7  evidence.

8      Do you recognize this as the CALOCUS volume you were just

9  describing?

10 **A.**   Yes.

11 **Q.**   Can you turn to page 0004, please.

12     And the fourth paragraph down.  It says:

13         "The CALOCUS instrument is a method of quantifying

14     the clinical severity and service needs of three quite

15     different populations of children and adolescents.  It may

16     be used in children with psychiatric disorders, substance

17     use disorders, or developmental disorders, and has the

18     ability to integrate these as overlapping clinical issues.

19     This differs from the adult instrument LOCUS which did not

20     incorporate patients with developmental disorders."

21     Did I read that correctly?

22 **A.**   Yes.

23 **Q.**   Are you also familiar with an instrument calls CASII?

24 **A.**   Yes.  It was sort of an offshoot after CALOCUS.

25 **Q.**   Okay.  And how is CASII used?

**ALLCHIN - CROSS / GOELMAN**

1  **A.**   It's also used as a guideline for children and

2  adolescents.

3  **Q.**   It's also applicable, in particular, to kids and

4  adolescents and not adults?

5  **A.**   Correct.

6        **MR. GOELMAN:**  Can you put Exhibit 645 up, please.

7  **BY MR. GOELMAN:**

8  **Q.**   And is that the CASII user's manual from October 2014?

9  **A.**   Yes.

10 **Q.**   Can you turn to page 5, please.

11       Do you see the -- in that fourth paragraph, please, starts

12 "In most cases."  That says:

13        "In most cases, the CASII may be applied to children

14     ages 6 through 18 years.  Because the service needs of

15     infants and toddlers are fundamentally different than

16     those of older children, they are excluded from CASII

17     evaluations.  Service intensity needs of children under

18     the age of 6 years should be determined by use of Early

19     Childhood Service Instrument, ECSII, developed by the

20     AACAP in 2009."

21       Do you see that?

22 **A.**   Yes.

23 **Q.**   So CASII, is it fair to say, recommends separate tools for

24 kids between 6 and 18 and kids who are under 6?

25 **A.**   Correct.

**ALLCHIN - CROSS / GOELMAN**

1  Q.   And UBH doesn't have separate guidelines even for

2  adolescents and kids with -- as opposed to adults; right?

3  A.   Correct.

4  Q.   Would you agree that both CA-LOCUS and CASII provide

5  objective, data driven, evidence-based methodology?

6  A.   Yes.

7  Q.   For determining the level of care or level of service

8  specifically for children?

9  A.   Yes.

10 Q.   And you are a child psychiatrist, board-certified;

11 correct?

12 A.   Correct.

13 Q.   You're one of the M.D.s at UBH who is a subject matter

14 expert in child psychiatry; right?

15 A.   Correct.

16 Q.   Have you ever actually used CA-LOCUS?

17 A.   No, I haven't.

18 Q.   Have you ever actually used CASII?

19 A.   No.

20 Q.   You talked on direct examination about the best practices

21 section of the Level of Care Guidelines.

22       Do you recall that?

23 A.   Yes.

24 Q.   And, specifically, I think section 4.1.2.13, I think --

25 can we turn to Trial Exhibit 5?  I believe that's the 2015

ALLCHIN - CROSS / GOELMAN

1   version that you were testifying about.

2              THE COURT:  What page did you want?

3              MR. GOELMAN:  I think it's 9 -- no, it is 10.  Sorry.

4   Actually.

5   BY MR. GOELMAN:

6   Q.   Actually, you were testifying clinical best practices,

7   it's on page 10.  Do you see that?  Exhibit 500.0.

8   A.   Yes.

9   Q.   And 4.1.2 says:

10          "The provider collects information from the member

11          and other sources and completes an initial evaluation of

12          the following."

13          Do you see that?

14   A.   I'm sorry, which one was it again?

15   Q.   4.1.2.

16   A.   Yes.

17   Q.   Okay.  And that section applies to patients of any age;

18   correct?

19   A.   Correct.

20   Q.   So if the provider follows best practices, he or she will

21   know how old the patient is; right?

22   A.   Correct.

23   Q.   And a whole bunch of other pedigree information?

24   A.   Yes.

25   Q.   And then if that information is conveyed to the care

**ALLCHIN - CROSS / GOELMAN**

 1  advocate or the M.D. at UBH, UBH will also have that

 2  information; right?

 3  **A.**   Correct.

 4  **Q.**   But there's nothing in the guidelines, is there, that

 5  provides the care advocate or the M.D. with any guidance about

 6  how this information is supposed to be used to arrive at a

 7  decision about placement that is appropriate for children or

 8  adolescents in particular; true?

 9  **A.**   True.  But I would also say that's inherent in having that

10  information is important to then make the clinical

11  determination.

12  **Q.**   But nothing in the guidelines actually helps the clinician

13  figure out how to use this information; right?

14  **A.**   Correct.

15  **Q.**   This section, section 4, clinical best practices, it

16  imposes obligations on the provider; right?

17  **A.**   Could you expand on what you mean by that?

18  **Q.**   Well, sure.

19      Like, 4.1.2 says, "The provider collects information from

20  the member and other sources"; right?

21  **A.**   Right.

22  **Q.**   Okay.  And if the provider doesn't fulfill the obligations

23  here, that's the reason that UBH can cite to deny the request

24  for care; right?

25  **A.**   No, not really.

1     What we -- what we try to do is to try to elicit support

2  to obtain this as much as possible.  But if for some reason the

3  provider isn't cooperative with that, then we proceed with

4  making determinations with the available clinical information

5  we have.

6  **Q.**   All right.  Let's take the flip side.  Say the provider

7  does do a great job and collect all this information, okay.

8     There's still no coverage under UBH's guidelines unless

9  all of the admission criteria in the common criteria, 1.1

10 through 1.9, are met; right?

11 **A.**   Correct.

12 **Q.**   I want to turn to your testimony this morning about the

13 meaning of "why now."  Do you recall talking about that?

14 **A.**   Yes.

15 **Q.**   This is what you said at 11:16:49.  You were asked (as

16 read):

17     **"Q.**  What is your understanding of what the quote 'why

18     now' factors that are articulated there encompass?"

19     You said (as read):

20        "In my view, the 'why now' is -- is this person

21     presenting for some behavioral health or substance abuse

22     intervention at this time?  And it includes not only acute

23     issues but chronic issues, as well, because we frequently

24     see people who have had perhaps a chronic issue for, you

25     know, a year, but why are they presenting now, on a

ALLCHIN - CROSS / GOELMAN

1    Tuesday afternoon, at this particular time.  So I think
2    unless you know that and are able to further investigate
3    it, your ability to develop a treatment plan is limited.
4    So it incorporates not only some acute issues but how some
5    chronic issues, how they have been addressed.  Why are
6    they exacerbated right now?  Are there additional factors?
7    Are there recent stress or other environmental issues that
8    would suggest this is why the person is presenting
9    treatment?  Sometimes it's an external motivation.
10   Sometimes it's a thing like DUI, makes people want to
11   present for alcohol treatment.  I feel that's part of the
12   'why now' is to understand in the context of why the
13   person is presenting for treatment at this particular
14   time."
15        Do you recall giving that testimony?
16   A.  Yes.
17   Q.  Okay.  Let's turn back to the Level of Care Guidelines
18   from 2015, and go to 1.4.
19        And is that the section that refers to "why now" factors
20   that you were describing in the answer I just read?
21   A.  Correct.
22   Q.  It says:
23        "The member's current condition cannot be safely
24   efficiently, and effectively assessed and/or treated in a
25   less intensive level of care due to acute changes in the

**ALLCHIN - CROSS / GOELMAN**

1     member's signs and symptoms and/or psychosocial and

2     environmental factors (i.e., the 'why now' factors leading

3     to admission)."

4     That's what it says; right?

5  **A.**   Yes.

6  **Q.**   And the word "acute" appears there?

7  **A.**   Yes.

8  **Q.**   The word "chronic" does not; right?

9  **A.**   Correct.

10 **Q.**   And you understand that "i.e." is abbreviation for "in

11 other words," or a definition; correct?

12 **A.**   Yes.

13 **Q.**   So this defines the "why now" factors; correct?

14 **A.**   Again, I think it says "current condition" when it refers

15 to "why now."  And the current condition involves how they are

16 presenting at this time, which may or may not include past

17 issues and chronic issues that are occurring as well.

18 **Q.**   Okay.  Let's turn back to 4.1.2 on page 10, of the

19 clinical best practices section.  This is a section that we saw

20 before.

21    Requires the provider to collect a bunch of different

22 kinds of information; correct?

23 **A.**   Yes.

24 **Q.**   Okay.  4.1.2.1 is the member's chief complaint; right?

25 **A.**   Yes.

**ALLCHIN - CROSS / GOELMAN**

1   Q.   4.1.2.2 is the history of the presenting illness; right?

2   A.   Yes.

3   Q.   4.1.2.3 is the "why now" factors leading to the request

4   for service; right?

5   A.   Yes.

6   Q.   And then there are a whole list of other criteria; right?

7   A.   Correct.

8   Q.   Mental status; right?

9   A.   Yes.

10   Q.   Current level of functioning; right?

11   A.   Yes.

12   Q.   Co-occurring behavioral health and physical conditions;

13   right?

14   A.   Yes.

15   Q.   So the "why now" factors are one piece of information,

16   among a whole long list of information, that the provider is

17   directed to collect; right?

18   A.   Correct.

19   Q.   And the fact that "why now" is one of those factors, does

20   that not suggest to a reader that "why now" doesn't include all

21   the other information in that list?

22   A.   No.   I think that it -- it's a factor on "why now" all

23   these other factors have come to the forefront.

24   Q.   Okay.   Can you please answer my question now.

25        Doesn't the fact that it's broken out separately suggest

**ALLCHIN - CROSS / GOELMAN**

1   that it doesn't include all the other information on this list?

2   **A.**   No.

3   **Q.**   It doesn't to a reader?

4   **A.**   Not -- not to this reader.

5   **Q.**   Not to that reader.  Okay.

6        I want to -- you also testified this morning about 1.8 --

7   right? -- the improvement section.  Do you recall that?

8   **A.**   Yes.

9   **Q.**   All right.  This is a transcript of this morning's

10  testimony at 11:38.  And you were talking about -- yeah, 1.8.

11  (As read:)

12          "The stem part of the 1.8 says there's a reasonable

13       expectation that services will improve the member's

14       presenting problems within a reasonable period of time."

15       Do you recall that?

16  **A.**   Yes.

17  **Q.**   And you were talking about the -- your understanding of

18  what a reasonable period of time was.  Do you recall?

19  **A.**   Yes.

20  **Q.**   And you said -- and at 11:38:24 you said (as read):

21          "I don't see us usually looking at that as from a

22       child and adolescent standpoint."

23       Remember that?

24  **A.**   Yes.

25  **Q.**   And then you had a colloquy with the Court that ended with

ALLCHIN - CROSS / GOELMAN

1    the Court saying (as read):

2         "So what do you mean it doesn't apply to children and

3         adolescents?"

4    And you said (as read):

5         "What I mean is that our way of looking at what is a

6         reasonable period of time tends to be a much more expanded

7         look than it would be with an adult"; correct?

8    A.   Correct.

9    Q.   And you know that there's certain criteria that may be

10   okay to be imposed in situations where there's an adult who

11   needs care, but that just isn't when the patient presenting is

12   a child; right?

13   A.   I don't understand that question.

14   Q.   Well, you view than -- the fact is that reasonable period

15   of time, it might be appropriate to require some level of

16   improvement for an adult within some period of time that might

17   not be appropriate for a child; right?

18   A.   Correct.

19   Q.   And that's why you said that you generally don't see this

20   with adolescents and kids; right?

21   A.   Correct.

22   Q.   And you know that because you are a specialist; correct?

23   A.   I think that general psychiatrists know that as well.

24   Q.   You are a board-certified child psychiatrist; right?

25   A.   Correct.

**ALLCHIN - CROSS / GOELMAN**

1   **Q.**   Is there anything about the text of this section, 1.8,

2   that would let a care advocate say no, that -- you know, don't

3   hold a kid to the same requirements that you're holding a

4   grownup?

5   **A.**   No.

6   **Q.**   In your professional opinion, shouldn't a guideline that

7   is used to determine whether care is appropriate for a child

8   offer that?

9   **A.**   Again, the care advocates aren't the ones making

10  determinations.  So this would be put into a position of

11  someone who's a psychiatrist who would understand that.

12  **Q.**   Wouldn't a system of guidelines that's being used to

13  determine care for children, adolescents and adults, shouldn't

14  that include, when there are separate criteria, different

15  criteria for kids than adults?

16  **A.**   Again, I think that's included in the best practices

17  section.

18  **Q.**   Okay.  Not 1.8?

19  **A.**   No.

20      **MR. GOELMAN:**  One moment, please.

21  Nothing further.  Thank you.

22      **THE COURT:**  Redirect.

23      **MR. GOELMAN:**  Can I borrow a page?

24  I forgot to offer into evidence 644 and 645, which are

25  CASII and CA-LOCUS --

ALLCHIN - REDIRECT / BUALAT

```
 1              THE COURT:  Any objection?

 2              MR. BUALAT:  No, your Honor.

 3              THE COURT:  They are admitted.

 4         (Trial Exhibits 644 and 645 received in evidence.)

 5                    REDIRECT EXAMINATION

 6   BY MR. BUALAT:

 7   Q.    Hello, Dr. Allchin.

 8   A.    Hello.

 9   Q.    You were asked if you reference CALOCUS in your work.  Do

10   you remember that in your cross-examination?

11   A.    Yes.

12   Q.    Why don't you?

13   A.    I rarely, if ever, have seen this used in any kind of

14   community setting that we're dealing with, when we're making

15   determinations.

16   Q.    How about for CASII, why don't you use that?

17   A.    Again, the same reason.  I have never had -- I can't think

18   of an instance when I've had a provider want to or elicit using

19   that as a guideline.

20   Q.    Do you recall in your discussions with treating providers,

21   about the placement and treatment of children and adolescents,

22   that -- them mentioning the use of CALOCUS?

23   A.    No.

24   Q.    How about for CASII?

25   A.    No.
```

ALLCHIN - REDIRECT / BUALAT

1    **Q.**   You were shown some provisions from the ASAM criteria.

2    Remember that?

3    **A.**   Yes.

4    **Q.**   And there was a discussion about how that criteria

5    differentiates between children and adults?

6    **A.**   Yes.

7    **Q.**   Remember that?

8    **A.**   Uh-huh.

9    **Q.**   Do you believe that UBH's criteria also addresses

10   difference between children and adults?

11   **A.**   Yes.

12   **Q.**   You were shown some criteria from CALOCUS that talked

13   about differences between children and adults remember that?

14   **A.**   Yes.

15   **Q.**   Do UBH's criteria also account for differences between

16   children and adults?

17   **A.**   Yes.

18   **Q.**   You were also shown some criteria from CASII, which noted

19   differences between children and adults?

20   **A.**   Yes.

21   **Q.**   Do UBH's criteria address differences between children and

22   adults?

23   **A.**   Yes.

24   **Q.**   Does the provisions that -- that you were shown on

25   cross-examination change your opinion that UBH's Level of Care

ALLCHIN - REDIRECT / BUALAT

1  Guidelines are consistent with generally accepted standards of

2  care?

3  **A.**   No.

4  **Q.**   Did you conduct case consultations when you were in

5  private practice?

6  **A.**   Meaning with an insurance company or --

7  **Q.**   No.  So, for instance, you were a medical director at

8  Woodland?

9  **A.**   Correct.

10 **Q.**   And would you consult with other psychiatrists about the

11 treatment of a patient?

12 **A.**   Yes, both my own and theirs.

13 **Q.**   Approximately how long would those consultations take?

14 **A.**   Five, ten minutes.

15       **MR. BUALAT:**  Nothing further, Your Honor.

16       **THE COURT:**  Okay.

17       **MR. GOELMAN:**  Nothing for us.

18       **THE COURT:**  Thank you, sir.

19       **THE WITNESS:**  Thank you.

20    (Witness steps down.)

21       **MR. RUTHERFORD:**  The defense calls Fran Bridge.  I

22 will bring her in.

23       **THE COURT:**  Sure.

24    (Pause)

25       **MR. RUTHERFORD:**  Your Honor, Mr. Holmer is going to

BRIDGE - DIRECT / HOLMER

1  examine Ms. Bridge.

2          **THE COURT:**  Okay.

3          **THE CLERK:**  Hi, Ms. Bridge.

4                    **<u>FRANCES BRIDGE</u>**,

5  called as a witness for the Defendant, having been duly sworn,

6  testified as follows:

7          **THE CLERK:**  Go ahead and have a seat.  Make yourself

8  comfortable.  Pull the microphone.  Water there if you should

9  need it.

10          **THE WITNESS:**  Thank you.

11          **THE CLERK:**  Could you please state your full name for

12  the record and spell your last name.

13          **THE WITNESS:**  Frances Randall Bridge.  Last name

14  B-r-i-d-g-e.

15          **THE CLERK:**  Okay.  Thank you.

16          **THE WITNESS:**  Sure.

17                  **<u>DIRECT EXAMINATION</u>**

18  **BY MR. HOLMER:**

19  **Q.**   Good afternoon, Ms. Bridge.

20  **A.**   Good afternoon.

21  **Q.**   Can you please describe your education history.

22  **A.**   Yes.  I have an undergraduate degree in English

23  literature, from San Francisco State University, and a master's

24  degree in clinical psychology from the California Institute of

25  Integral Studies.

**BRIDGE - DIRECT / HOLMER**

1   **Q.**   Are you currently employed?

2   **A.**   Yes.

3   **Q.**   By whom?

4   **A.**   United Behavioral Health.

5   **Q.**   And what is your job title at UBH?

6   **A.**   I am the director of behavioral health audits.

7   **Q.**   What are your responsibilities as director of behavioral

8   health audits?

9   **A.**   I oversee a team of people who respond to all audits for

10  regulatory compliance, customer and accreditation audits,

11  supporting primarily utilization management functions.  So

12  authorization appeal, denial, complaint data in cases.

13  **Q.**   And how long have you been in that role?

14  **A.**   A couple of years.

15  **Q.**   Before you were in that role, did you have any

16  responsibility that directly related to appeals?

17  **A.**   Yes, I did.

18  **Q.**   In what capacity?

19  **A.**   I was the director of compliance for the San Francisco

20  care advocacy center, and oversaw a team of people responsible

21  for the appeals and denials.

22  **Q.**   How long were you in that role?

23  **A.**   About five years.

24  **Q.**   In total, how long have you worked for UBH?

25  **A.**   Twenty-three years.

**BRIDGE - DIRECT / HOLMER**

1   Q.   In your work, first, in the appeals department, and now in

2   your role supervising audits relating to utilization

3   management, have you become familiar with the internal

4   databases UBH utilizes to track utilization management?

5   A.   Yes.

6   Q.   And what are those databases?

7   A.   ARTT and LINX are the primary databases.

8   Q.   Let's start with the LINX database.  Can you explain what

9   the LINX database is.

10  A.   It's a database that's used to track the member's records

11  related to all calls and contact from members directly or from

12  providers related to utilization management authorizations,

13  denials, benefit inquiries.

14  Q.   Can you give an example of a specific piece of

15  information, for instance, that would be tracked in the LINX

16  database?

17  A.   So you might have an example of a member calling in to ask

18  about their benefits and get a referral to an outpatient

19  clinician for treatment for marital counseling.

20  Q.   So if a member made that call, how would that be reflected

21  in the LINX database?

22  A.   The person who received the call would open up a case

23  contact note and document the nature of that call and the

24  details of what was discussed.

25  Q.   How does that information get input into the LINX

BRIDGE - DIRECT / HOLMER

1  database?

2  **A.**   Somebody manually would type it in.

3  **Q.**   And can you explain, sort of, the mechanics of that?  Is

4  that like a pull-down menu?  Is it a free-form-type box someone

5  types directly into?

6  **A.**   It depends on the nature of what's being recorded.  A call

7  such as what I was describing would just be a manually entered

8  text field.  If it were a facility calling with clinical

9  information, some of those items would be drop-down lists that

10  could be populated.  And then there would also be free-form

11  text.

12  **Q.**   You also mentioned the ARTT database, A-R-T-T?

13  **A.**   Yes.

14  **Q.**   What is the ARTT database?

15  **A.**   The ARTT database is a database that was in use up until

16  2014, for tracking appeals and denials.

17  **Q.**   How is the information entered into the ARTT database?

18  **A.**   It would have been manually input put by users.

19  **Q.**   What was the purpose of maintaining the ARTT database?

20  **A.**   The ARTT database was used to track denials and appeals.

21  **Q.**   Did the ARTT database also track clinical information?

22  **A.**   No.

23  **Q.**   So how did -- who within the organizational structure of

24  UBH, who were the people who were inputting the data into the

25  ARTT database prior to 2014?

**BRIDGE - DIRECT / HOLMER**

1   **A.**   Those would have been appeal specialists.

2   **Q.**   And how did they get that information that they were

3   manually inputting into the ARTT database?

4   **A.**   They would have gotten it from LINX primarily.

5   **Q.**   So they would have looked at the LINX notes; is that

6   right?

7   **A.**   Yes.

8   **Q.**   And then what would happen after that?

9   **A.**   They would take those pieces of that information that they

10  needed and input that into the ARTT database.

11  **Q.**   So prior to 2014, was the ARTT database the primary

12  database or the primary repository for deny and appeal

13  information at UBH?

14  **A.**   Yes, that's correct.

15  **Q.**   Prior to 2014, did the ARTT database include appeal and

16  denial information for cases or members that were being tracked

17  from a clinical perspective in the LINX database?

18  **A.**   Yes.

19  **Q.**   And then what happened after 2014, or starting in 2014?

20  **A.**   Right.  Starting in 2014, the LINX database was enhanced

21  to track appeals and denials directly within that database.

22  And the ARTT database was sunseted.

23  **Q.**   So the information that had been previously tracked in the

24  ARTT database was migrated -- or was now being tracked in the

25  LINX database?

**BRIDGE - DIRECT / HOLMER**

1   **A.**   Yes, that's correct.

2   **Q.**   Was the data migrated into the LINX database?

3   **A.**   No.  No.  It was what was in our -- remains in our -- from

4   2014 forward, it was put into LINX, any new information.

5   **Q.**   So LINX and ARTT databases, they remain separate

6   databases?

7   **A.**   Yes.

8   **Q.**   Prior to 2014, although ARTT was the primary repository,

9   did the LINX database contain any information about benefit

10   denials or appeals from benefit denials?

11   **A.**   Yes, it contained information.

12   **Q.**   And what -- how would that information be reflected in

13   LINX?

14   **A.**   Primarily, that would have been the peer-reviewed

15   documentation done by either the M.D.s or Ph.D.s who were

16   conducting those reviews and making the determinations.

17   **Q.**   Is that information that would be reflected in the LINX

18   notes themselves?

19   **A.**   Yes.

20   **Q.**   But would that -- would that information, prior to 2014,

21   be -- be tracked also sort of in searchable fields?

22   Did my question make sense?

23   **A.**   Yes.

24   No, it wouldn't have been searchable in LINX prior to

25   2014.

BRIDGE - DIRECT / HOLMER

1   Q.   Okay.  I'd like to if we could pull up what has already

2   been admitted, I believe, as Exhibit 255.  This is a native

3   spreadsheet which has been sealed by the Court.  So it's only

4   been submitted in electronic format due to its size.

5          MR. HOLMER:  Can we bring up the --

6   BY MR. HOLMER:

7   Q.   Do you see that in front of you, Ms. Bridge?

8   A.   Yes, I do.

9   Q.   Do you see, at the bottom of that spreadsheet there are

10  four tabs?

11  A.   Yes.

12  Q.   Can we start with the Alex ARTT tab.  Is that the one

13  that's up?

14       Have you seen this document before?

15  A.   Yes, I have.

16  Q.   Does this document include data that is drawn from the

17  ARTT database?

18  A.   Yes.

19  Q.   And are you familiar with the data fields displayed on

20  this chart that are drawn from the ARTT database?

21  A.   I am, yes.

22  Q.   Let's begin with column C.  Do you see that in front of

23  you?

24  A.   I do.

25  Q.   And that column is titled "State"?

**BRIDGE - DIRECT / HOLMER**

1    **A.**    Yes, correct.

2    **Q.**    What is that column indicating?

3    **A.**    That is indicating the state of residence of the member on

4    that particular line.

5    **Q.**    And moving to column J.  That column reads "Denial

6    Category."  Do you see that?

7    **A.**    Yes.

8    **Q.**    What does the denial category indicate?

9    **A.**    That's indicating whether it's a clinical or

10   administrative denial.

11   **Q.**    What do you mean when you say a clinical denial?

12   **A.**    A clinical denial is one which requires review by a

13   licensed professional, an M.D. or a Ph.D., to make a clinical

14   determination about the coverage.

15   **Q.**    Can a clinical determination involve the use of a level of

16   care guideline or a coverage determination guideline?

17   **A.**    Yes.

18   **Q.**    Is the category of clinical denials limited to denials

19   that involve the use of a level of care coverage determination

20   guideline?

21   **A.**    No, it's not exclusively limited to that.

22   **Q.**    Can you give an example of a denial category that would

23   not relate to level of care guideline or a coverage

24   determination guideline, necessarily anyway?

25   **A.**    Probably experimental treatment or excluded services.

**BRIDGE - DIRECT / HOLMER**

1    **Q.**   Those would also be considered clinical denials?

2    **A.**   They can be.

3    **Q.**   But they don't involve the use of a guideline?

4    **A.**   Correct.

5    **Q.**   For at least a level of care coverage determination

6    guideline?

7    **A.**   Right.  Those specific ones.

8    **Q.**   Drawing your attention, next, to column L.  This column is

9    titled "Denial Type."  And I believe that's an abbreviation for

10   description?

11   **A.**   That's correct.

12   **Q.**   Can you explain what information is reflected in this

13   column?

14   **A.**   That is indicating whether or not the clinical decision

15   was based on, in this case, primarily either the clinical

16   coverage determination guidelines, or the medical necessity

17   which would refer to the Level of Care Guidelines.

18   **Q.**   Could this field reflect any guidelines or any basis --

19   sorry, any denial type other than a medical necessity or

20   clinical coverage determination?

21   **A.**   Yes.

22   **Q.**   Can you give an example of what one of those might be?

23   **A.**   Psych testing; experimental treatment.

24   **Q.**   Ms. Bridge, do you know whether -- you mentioned the

25   coverage determination guidelines.  Do you know whether UBH

**BRIDGE - DIRECT / HOLMER**

1  maintains multiple coverage determination guidelines?

2  **A.**   Yes, they do.

3  **Q.**   And has that been the case since 2011?

4  **A.**   Yes.

5  **Q.**   Does the information in column L, where it indicates a

6  clinical coverage determination, does that indicate which

7  specific CDG was used in the benefit determination?

8  **A.**   No, it does not.

9  **Q.**   Can we move to column N, please.

10      Ms. Bridge, do you see this column called "Funding"?

11  **A.**   Yes.

12  **Q.**   What does this indicate?

13  **A.**   That's indicating, for that particular member on each

14  line, what the nature of their contract is; whether it's fully

15  insured or self-funded.

16  **Q.**   And then column O, which is titled "LOC."  And, again, I

17  think that's an abbreviation for description?

18  **A.**   Yes.  That's referring to the level of care which is being

19  denied.

20  **Q.**   How about column Q?  Can you explain column Q, "Written

21  Notification"?

22  **A.**   Column Q is the written notification date that the letter

23  was sent to both the member and the provider regarding the

24  denial in question.

25  **Q.**   Drawing your attention next to column R, that's a column

**BRIDGE - DIRECT / HOLMER**

1  or a field entitled "Service Type."  Do you see that?

2  **A.**   Yes.

3  **Q.**   What is service type?

4  **A.**   That's referring to whether the service is psychological

5  or chemical dependency in nature; so mental health or substance

6  abuse treatment.

7  **Q.**   So can you explain -- so, for example, up here we see a

8  number of entries.  I think all the entries that are being

9  displaced here read "PSY."  What does that indicate?

10 **A.**   That's indicating that the treatment is for mental health

11 services, psychiatric or psychological services.

12 **Q.**   You also mentioned clinical de -- chemical dependency?

13 **A.**   Yes.

14 **Q.**   Is that referenced in the -- I think we have an example

15 being displayed as CD.

16 **A.**   Yes, that's correct.

17 **Q.**   That's what "CD" refers to?

18 **A.**   Substance abuse, yes.

19 **Q.**   Move to column Z, please.

20      This is a field that reads "Dates Denied."  Do you see

21 that?

22 **A.**   Yes.

23 **Q.**   What does the dates denied field indicate?

24 **A.**   That's referencing, in terms of each specific denial, what

25 dates are being denied; either a specific set of dates, a

**BRIDGE - DIRECT / HOLMER**

1  single date, or a date and a period forward.

2  **Q.**   So when a member or a provider makes a request for

3  benefits, does that request seek authorization for specific

4  dates of treatment?

5  **A.**   Usually, yes.

6  **Q.**   And so this is indicating -- is that indicating which of

7  those dates were denied?

8  **A.**   Yes, that's correct.

9  **Q.**   The next column over, column AA?

10  **A.**   Yes.

11  **Q.**   Reads "Denial Type Cd."  Is that short for "code"?

12  **A.**   I believe so, yes.

13  **Q.**   What is the denial type code?

14      Is there any difference between, for example, denial type

15  code and the denial type description that we saw?

16  **A.**   No.  They are linked to each other.  So one is an

17  abbreviation of the other.

18  **Q.**   And the next column is AB, "Determination Date"?

19  **A.**   Yes.

20  **Q.**   What is the determination date?

21  **A.**   That is the date on which the clinician who is making the

22  decision, either the M.D. or the Ph.D., is rendering that

23  decision.

24  **Q.**   Is there a difference between a determination date and the

25  written notification date that we saw in column Q?

**BRIDGE - DIRECT / HOLMER**

1   **A.**   The written notification may be slightly later, just

2   depending on when that action takes place.

3   **Q.**   And why -- why could that possibly be later?

4   **A.**   Because the peer reviewer who's doing the actual review

5   isn't the one producing the letter.  So it's another

6   administrative staff member may do that the following day or

7   some -- or the same day potentially.

8   **Q.**   And when you say "producing the letter," how does the

9   letter get produced, mechanically speaking?

10  **A.**   Individual administrative function within the appeals unit

11  would take the information from LINX and the peer review, and

12  produce a letter based on the use of a template, which is

13  populated with the information specific to that member; level

14  of care, dates of service, et cetera.

15  **Q.**   The -- do denial and appeal letters also indicate a

16  clinical rationale?

17  **A.**   Yes.

18  **Q.**   Is the clinical rationale reflected in the denial or the

19  appeal letter?

20  **A.**   Yes.

21  **Q.**   How does that information wind up in the denial or the

22  appeal letter?

23  **A.**   The staff member producing the letter takes that

24  information from the LINX note, put in by the reviewer, and

25  puts it in the letter.

**BRIDGE - DIRECT / HOLMER**

1   **Q.**   When you say "reviewer," do you mean the clinician?

2   **A.**   Yes.

3   **Q.**   Can we move to column AC.  This is the column that is

4   entitled "Facility Name."  Do you see that?

5   **A.**   Yes, I see that.

6   **Q.**   What is the facility name?

7   **A.**   That's the name of the facility where the treatment is

8   being provided, if it's being provided by a facility.

9   **Q.**   Does the -- does the facility name field also indicate

10  where the facility is located?

11  **A.**   No, it does not.

12  **Q.**   Can we move to column AF.

13      Ms. Bridge, column AF is titled "State of Governance."

14  Can you explain what state of governance is?

15  **A.**   That is the state where the member's contract is sitused.

16  And it indicates where their benefits are governed.

17  **Q.**   What do you mean when you say "governed"?

18  **A.**   Different states have different appeal rights.  So this is

19  primarily used for determining what appeal rights would go with

20  the letter that's being sent to the member, to give them their

21  next level of redress.

22  **Q.**   Can you give an example of what an appeal right that's

23  governed by -- governed by a state rule would be?

24  **A.**   Sure.

25      In California, the Department of Managed Healthcare

BRIDGE - DIRECT / HOLMER

```
 1    oversees some people's benefits.  And if they had a contract
 2    that was sitused in California and regulated by the Department
 3    of Managed Healthcare, they would get rights that were
 4    associated with that governing body.
 5    Q.    Is that the same thing -- first of all, are you aware that
 6    certain states require the use of certain guidelines --
 7    A.    Yes.
 8    Q.    -- for benefit determinations?
 9    A.    Yes.
10    Q.    Does column AF indicate whether a state requirement for
11    the use of a guideline applies?
12    A.    No.
13    Q.    You mentioned the term "situs" in reference to the plan, a
14    moment ago.  Do you recall that?
15    A.    Yes.
16    Q.    What did you mean when you said "situs"?  What is the
17    situs of a plan?
18    A.    We use that to refer to where the contract is written.
19          Insurance is written in particular states, generally
20    speaking.  So if an employer has a policy that's sitused in
21    Illinois, then that's where -- that's the state in which that
22    policy is written and overseen.
23    Q.    So what's the relevance of the situs of a plan?
24    A.    It is one of the reasons -- one of the ways that you can
25    determine what rights a member is going to get on appeal.
```

**BRIDGE - DIRECT / HOLMER**

1   **Q.**  Before you came to testify today, Ms. Bridge, did you have

2   an opportunity to review all the fields on this "Alex ARTT"

3   tab?

4   **A.**  Yes.

5   **Q.**  Were there any fields on this tab identifying the specific

6   CDG that was used in any benefit decision?

7   **A.**  No.

8   **Q.**  Were there any data fields on this tab identifying whether

9   states' mandate related to the use of guidelines applied to a

10   benefit decision?

11   **A.**  No.

12   **Q.**  Were there any data fields on this tab identifying where

13   the treatment that was being requested would have occurred?

14   **A.**  No.

15   **Q.**  Were there any data fields that indicated whether a member

16   took an appeal from the benefit denial identified on this

17   spreadsheet?

18   **A.**  No.

19   **Q.**  Or how about data fields indicating whether a benefit

20   determination was overturned on appeal?

21   **A.**  No.

22   **Q.**  If a member took an appeal, and that appeal resulted in an

23   overturn, would that affect the information that is reflected

24   on this spreadsheet?

25   **A.**  No, it wouldn't.

**BRIDGE - DIRECT / HOLMER**

1  **Q.**   Why not?

2  **A.**   Because this is a discreet event.  This is the denial.

3  And it's capturing what occurred, what happened at that

4  particular point in time.  Doesn't reference what happened

5  before or what happens after.

6  **Q.**   So if an appeal had resulted in an overturn, the data on

7  this spreadsheet would remain static.  Is that what you're

8  saying?

9  **A.**   Yes.

10  **Q.**   If a member took an appeal, and that appeal resulted in

11  an -- sorry -- that appeal resulted in an overturn, would that

12  decision have any impact not on the database but on the member?

13  **A.**   Yes.

14  **Q.**   And what would be that impact?

15  **A.**   The impact would be that they would now have benefit

16  coverage available, and services would be paid for or could be

17  paid for and authorized.

18  **Q.**   Can we move to the Alex LINX tab that's the next tab on

19  the spreadsheet.

20        Ms. Bridge, have you seen this portion of the document

21  before?

22  **A.**   Yes.

23  **Q.**   And does this document draw on data fields that are

24  contained in the LINX database?

25  **A.**   Yes, it does.

**BRIDGE - DIRECT / HOLMER**

1   Q.   Are you familiar with the data fields displayed on this

2   tab that are drawn from the LINX database?

3   A.   Yes.

4   Q.   Let's begin, again, with column C.

5        First of all, let me just ask, are the data fields

6   contained in the ARTT database and the LINX database identical?

7   A.   No.

8   Q.   Are they similar?

9   A.   Yes.

10  Q.   Similar information, but not identical?

11  A.   Correct.

12  Q.   So looking at column C, this is another field that's

13  labeled "State"?

14  A.   Correct.

15  Q.   And what does this column say?

16  A.   It's indicating the state of residence of the member in

17  question.

18  Q.   And next, can we turn to look at column J, please.

19       **MR. HOLMER:**  I apologize.  Mike, can you tab over a

20  little more.  Sorry.  Can we look at column P.

21  BY MR. HOLMER:

22  Q.   What does this column indicate?

23  A.   That is indicating what was used -- what was the nature of

24  the denial.  Was it using Level of Care Guidelines or CDGs?

25  Q.   And just to the left, column O?

**BRIDGE - DIRECT / HOLMER**

1  **A.**   Yes.

2  **Q.**   What is column O?

3  **A.**   That's, similarly, indicating, as it did in ARTT, whether

4  it's a clinical or administrative denial.

5  **Q.**   And when you make that distinction between clinical and

6  administrative, is that the same distinction that you made in

7  the context of the ARTT database?

8  **A.**   Yes.

9  **Q.**   Looking back at column P, for just a second, are there

10  other clinical denials besides medical -- clinical denial types

11  besides medical necessity criteria and clinical coverage

12  determination?

13  **A.**   Yes.

14  **Q.**   Can you give an example of one?

15  **A.**   You might see psych testing or, again, experimental.  The

16  most common ones are the ones we see here.

17  **Q.**   Looking next at column Q.  This is one -- I think that's

18  an abbreviation for "Service Type Description"?

19  **A.**   Correct.

20  **Q.**   Can you explain what we see in column Q?

21  **A.**   We're, in here, seeing an indication of whether the

22  treatment is for mental health or substance abuse issues.

23  **Q.**   And what are the -- where it says -- do you see how there

24  are different indicators?  MA.  Some say SA.  Do you see that?

25  **A.**   Yes.

**BRIDGE - DIRECT / HOLMER**

1   Q.   What's the difference -- sorry, MH and SA.

2   A.   Mental health is treatment for mental health or

3   psychological issues.  And substance abuse is treatment for

4   substance abuse disorders or chemical dependency.

5   Q.   Okay. So "MH" means mental health?

6   A.   Yes.

7   Q.   And "SA" means substance abuse?

8   A.   Correct.

9   Q.   Is that the same distinction that you mentioned before in

10  the ARTT database with respect to, I think you said,

11  psychological and chemical dependence?

12  A.   Correct.

13  Q.   How do those match up?

14  A.   So psychological equates to mental health.  Substance

15  abuse equates to chemical dependency.

16  Q.   Can you look at column R?

17  A.   Yes.

18  Q.   "LOC."  I think that's another abbreviation for

19  description?

20  A.   Correct.

21  Q.   And what is that indicating?

22  A.   That is indicating what level of care is being denied.

23  Q.   Moving next to column S.  "Fund Description."

24  A.   This is indicating how the benefits are structured,

25  whether they're fully insured or self-funded.  Or

BRIDGE - DIRECT / HOLMER

 1    administrative services only is another term for self-funded.

 2    **Q.**   Can we look at column Y.

 3         Do you see column Y?  It's an abbreviation DNLDT.  Do you

 4    know what that stands force?

 5    **A.**   Stands for "denial date."

 6    **Q.**   What is this indicating?

 7    **A.**   This is indicating the date that the decision was made by

 8    the peer reviewer.

 9    **Q.**   Next over in column Z.  Do you see that?  That's another

10    one that indicates denial type code?

11    **A.**   Yes.

12    **Q.**   Is that similar to what we saw in the ARTT database?

13    **A.**   Yes.

14    **Q.**   Where the -- this is essentially a code that triggers the,

15    sort of, long form written version that we saw before?

16    **A.**   Yes.

17    **Q.**   And next in column AA.  What does this column indicate?

18    **A.**   That's the determination date.

19    **Q.**   What's the determination date?

20    **A.**   It's the date that the decision is made to issue the

21    denial.

22    **Q.**   Is there a difference between a determination date and a

23    denial date?

24    **A.**   No.  Essentially the same.  They may be different

25    occasionally, but they're usually the same.

**BRIDGE - DIRECT / HOLMER**

1    **Q.**    Would that be a rare occurrence?

2    **A.**    Yes.

3    **Q.**    Look at column AD.  What does column AD show us?

4    **A.**    Shows us the governing state one code.

5    **Q.**    And what is the governing state one code?

6    **A.**    That is indicating what state has primary control over the

7    member's appeal rights.

8    **Q.**    Is that similar to the state of governance field we saw in

9    the ARTT database?

10   **A.**    Yes.

11   **Q.**    And you testified before, with respect to the ARTT

12   database, that that deals mainly with appeal rights, the

13   member's appeal rights?

14   **A.**    Correct.

15   **Q.**    Is that indicating the same information here?

16   **A.**    Yes.

17   **Q.**    Does column AD indicate which state guideline mandates

18   applied to a particular benefit decision, if any?

19   **A.**    No.

20   **Q.**    Look at column AF, please.  Do you recognize this field?

21   **A.**    I do.

22   **Q.**    What is this field?

23   **A.**    It's the description of what guideline was used to make

24   the determination at a high level.

25   **Q.**    So other options that we see here on the screen are level

BRIDGE - DIRECT / HOLMER

1    of care.  Is that a reference to the level of care guidelines?

2    A.    Yes.

3    Q.    And coverage determination, is that a reference to

4    coverage determination guidelines?

5    A.    Correct.

6    Q.    Are there any other guidelines that might be cited in this

7    field?

8    A.    Yes.

9    Q.    Can you give an example?

10   A.    Neuropsych testing, psych testing.

11   Q.    Can we turn to column AH.  What is column AH, Ms. Bridge?

12   A.    It's the clinical guideline subcategory description.

13   Q.    And what information is that reflecting?

14   A.    It's providing additional detail as to which level of care

15   or coverage determination guideline was used.

16   Q.    You testified that the ARTT database fields we just looked

17   at did not include information about a specific coverage

18   determination guideline; is that right?

19   A.    That's correct.

20   Q.    So does the LINX database provide more information about

21   the specific guideline that was used in a benefit decision?

22   A.    Yes, it does.

23   Q.    Can we move to column AO.  What is column AO?

24   A.    This is specifically the situs state.  So this is talking

25   about where the contract is sitused.

**BRIDGE - DIRECT / HOLMER**

1  **Q.**  And can you explain why that's relevant in the context of

2  the LINX database?

3  **A.**  It's one of the factors that determines what appeal rights

4  go with the remember.

5  **Q.**  What is the difference between the situs state and the

6  governing state?

7  **A.**  It may be the same.  It's also possible that another state

8  has some set of appeal rights that apply to that member even

9  though the contract isn't sitused there.

10  **Q.**  Can you give me an example of when that would happen?

11  **A.**  Sure.

12      You may have a contract that's sitused in Illinois.  The

13  member may reside in Nebraska.  Nebraska's laws may be

14  extraterritorial and apply even though the contract is sitused

15  in Illinois; and, therefore, the member may have both rights.

16  **Q.**  Look at column AP now.  That's -- I believe that's an

17  abbreviation for "Service Request Date."  Is that correct?

18  **A.**  Correct.

19  **Q.**  What's the service request date?

20  **A.**  That's the date at which the member or the provider

21  requested authorization.

22  **Q.**  Before you came to testify today, did you have a chance to

23  review all of the data fields indicated on this tab of Exhibit

24  255?

25  **A.**  Yes.

BRIDGE - DIRECT / HOLMER

1  **Q.**   Were there any data fields on this tab identifying whether

2  a state's mandate related to the use of guidelines applied to a

3  benefit decision?

4  **A.**   No.

5  **Q.**   Were there any data fields on this tab identifying where

6  the treatment that was being requested would have occurred?

7  **A.**   No.

8  **Q.**   Were there any data fields indicating whether a member

9  took an appeal?

10 **A.**   No.

11 **Q.**   Or data fields indicating whether a benefit determination

12 was overturned on appeal?

13 **A.**   No.

14 **Q.**   Is the LINX database similar to the ARTT database with

15 respect to the way that it maintains denial and appeal

16 information?

17 **A.**   Yes.

18 **Q.**   In other words, you testified before that those are

19 discreet entries in the database?

20 **A.**   Yes, that's correct.

21 **Q.**   So would an appeal from any benefit decision listed here,

22 on the LINX tab of Exhibit 255, would an appeal affect any of

23 the data on this?

24 **A.**   No.

25 **Q.**   Even if it resulted in an overturn?

**BRIDGE - DIRECT / HOLMER**

1   **A.**   No, it wouldn't change the data here.

2   **Q.**   Ms. Bridge, does this database reflect whether a nonUBH

3   guideline was applied?

4   **A.**   No.

5   **Q.**   Specifically for substance use disorder treatment in

6   Texas, would this data typically indicate whether UBH cited in

7   the denial letter the TDI guidelines?

8        First of all, are you familiar with the TDI, the Texas

9   Department of Insurance guidelines?

10  **A.**   Yes.

11  **Q.**   Would this database -- or would the information here,

12  either in the LINX or in the ARTT tab that we just reviewed,

13  indicate whether UBH utilized guidelines written by the Texas

14  Department of Insurance?

15  **A.**   I don't believe the data is captured in the report.

16  **Q.**   Would it typically indicate whether an external guideline,

17  such as ASAM, was used in the benefit determination?

18  **A.**   It may indicate that.

19  **Q.**   Do you know if it would?

20  **A.**   I don't know if any of the data on this particular

21  spreadsheet indicated that.  I know that the system can

22  indicate that.

23  **Q.**   Can we go next to the ARTT tab.

24       Ms. Bridge, did you have an opportunity, before you

25  testified today, to review all the data fields on the "Wit

**BRIDGE - DIRECT / HOLMER**

1    ARTT" tab?

2    **A.**    Yes.

3    **Q.**    And were those -- at least to the extent they were drawn

4    from the ARTT database, were those fields identical to the

5    fields we viewed with respect to the Alexander tab?

6    **A.**    Yes.

7    **Q.**    And are the meaning and content -- I suppose the meaning

8    of those data fields identical to what we saw with respect to

9    the Alexander ARTT tab?

10   **A.**    Yes.

11   **Q.**    Can you move now to the "Wit LINX" tab.

12        Similarly, with respect to the Wit LINX tab, did you have

13   a chance to review the data fields on this tab of the

14   spreadsheet before you came to testify today?

15   **A.**    Yes, I did.

16   **Q.**    And are they identical to the LINX data fields we saw with

17   respect to the Alexander class?

18   **A.**    Yes.

19   **Q.**    With the same meaning?

20   **A.**    Yes.

21   **Q.**    I'd like to now turn to what's been marked for

22   identification as Exhibit 1655.

23        Do you have that in front of you?

24   **A.**    Yes.

25   **Q.**    Ms. Bridge, do you recognize this document?

**BRIDGE - DIRECT / HOLMER**

1   **A.**   Yes, I do.

2   **Q.**   What is this document?

3   **A.**   This is a document that was produced by counsel in

4   reference to specific members and their denials.

5   **Q.**   So did you create this document yourself?

6   **A.**   No, I did not.

7   **Q.**   Before you came to testify today, did you become familiar

8   with this document and its contents?

9   **A.**   Yes.

10  **Q.**   How?

11  **A.**   It was shown to me by counsel.

12  **Q.**   In connection with giving you this document, did counsel

13  provide you with any other documents?

14  **A.**   Yes.

15  **Q.**   What were those documents?

16  **A.**   They provided me with pdf files of the -- copies of the

17  LINX notes and letters associated with these members.

18  **Q.**   When you say "letters," what do you mean?

19  **A.**   Denial letters or appeal letters, if any, were included.

20  **Q.**   What did you do when you received those documents?

21  **A.**   I reviewed the files.

22  **Q.**   And what was the purpose of your review?

23  **A.**   To validate the information in the remaining columns and

24  confirm that that matched with what was in the file.

25  **Q.**   And can you explain the process that you used to do that?

**BRIDGE - DIRECT / HOLMER**

1  **A.**   I located the denial based on the date and the number

2  below that, which indicates a location in a file.  And then I

3  scanned forward from that date for approximately one year to

4  see if there were any appeals.

5  **Q.**   Why did you stop at one year?

6  **A.**   Generally, there's a timely filing limit of 180 days.  So

7  a year should accommodate for any appeals that would have been

8  found, if any.

9  **Q.**   And did you review the underlying records for -- at least

10  to the extent they were provided to you -- for each of the

11  unique numbers listed on this chart?

12  **A.**   Yes, I did.

13  **Q.**   You said you reviewed LINX notes in addition to denial and

14  appeal letters?

15  **A.**   Yes, that's correct.

16  **Q.**   What are LINX notes?

17  **A.**   The LINX notes are the transactions of calls and contact

18  between members and providers contacting United Behavioral

19  Health for either authorizations, or questions to be answered,

20  or whatever the case may be, providing clinical information or

21  getting information from us.

22  **Q.**   Does that include information about noncoverage decisions?

23  **A.**   It could.

24  **Q.**   To the extent there was a noncoverage decision or

25  determination made for a particular member, would that reflect

BRIDGE - DIRECT / HOLMER

1   it in the LINX notes?

2   **A.**   Yes.

3   **Q.**   Does it also reflect information about appeals?

4   **A.**   Yes.

5   **Q.**   The LINX notes, that is?

6   **A.**   Yes.

7   **Q.**   If a member files an appeal, is it UBH's regular practice

8   to reflect information about that appeal in the LINX notes?

9   **A.**   Yes.

10  **Q.**   How would it be reflected in the LINX notes?

11  **A.**   There would be an entry indicating that an appeal had been

12  requested, and then subsequent entries associated with

13  conducting that appeal and the outcome of it.

14  **Q.**   All of that would be reflected in the LINX notes?

15  **A.**   Yes.

16  **Q.**   Was that true from 2011 through the present?

17  **A.**   It was certainly true from 2014 to present.  In 2011, some

18  of that would have been in the ARTT database.  Although, it

19  would have also been in the LINX database at least in part.

20  **Q.**   When you say "in part," what part of that would have been

21  reflected in the LINX database prior to 2014?

22  **A.**   During 2011 to 2014, the clinical notes would have been in

23  LINX.  They would be in LINX after 2014, as well, but the

24  administrative function of the appeal or the administrative

25  documentation of the appeal would have been in ARTT between

BRIDGE - DIRECT / HOLMER

1    2011 and 2014.

2    **Q.**    So to the extent a member had actually filed an appeal

3    prior to 2014, would there be a case note about that in the

4    LINX notes?

5    **A.**    Yes.

6    **Q.**    And to the extent that UBH -- a UBH clinician or someone

7    else made a decision about an appeal, for instance, to uphold

8    or to overturn the decision, would that also be reflected in

9    the LINX notes prior to 2014?

10   **A.**    Yes.

11   **Q.**    Before you received those documents from counsel, were you

12   familiar with the format and structure of LINX notes?

13   **A.**    Yes.

14   **Q.**    Have you reviewed them many times?

15   **A.**    Yes.

16   **Q.**    Maybe more than you'd like to count?

17   **A.**    Perhaps.

18   **Q.**    Did you see anything in the LINX notes that would suggest

19   to you that they were incomplete or inaccurate?  Let me back

20   up.

21       Did you see anything in the LINX notes provided to you by

22   counsel that would indicate that they were incomplete or

23   inaccurate?

24   **A.**    No.

25   **Q.**    Are LINX notes typically in a chronological order.

**BRIDGE - DIRECT / HOLMER**

1   **A.**   Yes.

2   **Q.**   So if you started at a denial date for a particular

3   benefit decision, how would you -- how would you know that you

4   would look forward in the notes for a year?

5   **A.**   Each note is date stamped, so you can see the time as it

6   elapses and determine when you've reached that one-year mark.

7   **Q.**   Okay.  Let's focus specifically on the information on this

8   chart.  And can you please just walk us through the chart, how

9   it's organized and what the information reflects, starting with

10  the left-hand column.

11  **A.**   Sure.

12      So the first column is a unique member ID that was

13  assigned to a given individual.  The next column is the date of

14  the initial noncoverage determination, which is just another

15  way of saying the denial.  And then below that is -- below the

16  date is information about where in the file that is located.

17      The next column is the date of the first appeal.  So if

18  there was an appeal, it would be noted there, with a date and a

19  location in the file.

20      If there were a second level appeal, that would be noted

21  in the fourth column, with the date and the location in the

22  file.

23      And then if any of those appeals resulted in an overturn,

24  that would be noted in the final column, with a date and a

25  location in the file.

**BRIDGE - DIRECT / HOLMER**

1   Q.   What does it mean if a cell is blank?  Do you see that

2   there are a number of blank cells on that sheet?

3   A.   Yes.

4   Q.   What does a blank cell indicate?

5   A.   It would seem to indicate that those things did not occur

6   in that file.  That's what it's intended to indicate.

7   Q.   So let's look at the first row, which is for unique member

8   ID 659.  Do you see that?

9   A.   Yes.

10  Q.   Maybe we can use that as an example to explain for the

11  Court what this information reflects.

12       So what does -- can you explain to us the information we

13  see in that first row for member 659?

14  A.   Sure.

15       So for member 659, there was an initial denial on 7/27/11.

16  And then there was no indication in the record of an appeal,

17  first or second level appeal.  And since there was no appeal

18  then there's no overturn, because you'd have to have the appeal

19  in order to have the overturn.

20  Q.   And did you, in fact, look at the LINX notes for member

21  659?

22  A.   I did.

23  Q.   And did you identify that initial noncoverage

24  determination in the documents provided to you?

25  A.   Yes.

BRIDGE - DIRECT / HOLMER

1  **Q.**   And did you search the LINX notes for up to a year past

2  that denial date to identify whether there was any evidence of

3  an appeal?

4  **A.**   Yes, I did.

5  **Q.**   And was there?

6  **A.**   No, there was not.

7  **Q.**   The next one down, 828 is the unique member ID.

8       Can you explain to us what we see in this row?

9  **A.**   In this row, we're seeing all of the events that are

10  located or named in the header column.  So there was a denial

11  on 7/12/11.  There was a first level appeal on 7/19/11.  There

12  was a second level appeal on 10/24/11.  And that resulted in an

13  overturn which was determined on 12/23/11.

14  **Q.**   Ms. Bridge, I think you mentioned -- for the first level

15  of appeal column you mentioned that 7/19/2011, I think.

16  **A.**   I'm sorry.  8/19.

17  **Q.**   And then the numbers below that, you mentioned those

18  indicate where in the record that information is located?

19  **A.**   Correct.

20  **Q.**   And did you confirm that that information is located at

21  those points in the record?

22  **A.**   Yes.

23  **Q.**   And did you do that for all of the unique I.D.s listed on

24  this chart?

25  **A.**   Yes.

**BRIDGE - DIRECT / HOLMER**

1  **Q.**   And for all of the different data points listed on this

2  chart?

3  **A.**   Yes.

4  **Q.**   Including the cells that are blank?

5  **A.**   Yes.

6  **Q.**   So it looks like member 828, you identified that that

7  person's noncoverage determination was overturned on

8  December 23rd, 2011?

9  **A.**   Correct.

10 **Q.**   You mentioned before that an appeal overturn would mean

11 that the benefit requested were ultimately authorized?

12 **A.**   Yes.

13 **Q.**   Could we go to page 2 of the exhibit.  And down the very

14 last row in the bottom, for unique member ID 10922.

15      Do you see that, Ms. Bridge?

16 **A.**   Yes, I do.

17 **Q.**   Can you explain what we see on -- in this row?

18 **A.**   We're seeing an initial denying taking place on 3/28/14;

19 an appeal that took place on 4/1/14.  And on 4/1/14, as a part

20 of that appeal, there was a partial overturn of that decision.

21 **Q.**   So, I think, in the one we just -- in the instance we just

22 saw, the overturn seemed to apply to the second level appeal?

23 **A.**   Yes.

24 **Q.**   Is that right?

25      But here there was no second level appeal.  Is that what

**BRIDGE - DIRECT / HOLMER**

1  this is indicating?

2  **A.**   That's correct.

3  **Q.**   Because it was overturned on the first level?

4  **A.**   It was partially overturned on the first level, yes.

5  **Q.**   And what do you mean when you say "partially overturned"?

6  **A.**   Partially overturned refers to some portion of the service

7  being requested being available for authorization and some

8  portion remaining denied.

9  **Q.**   So you testified before that a benefit request usually

10  seeks benefits for a certain number of days?

11  **A.**   Correct.

12  **Q.**   Can you explain what partial overturn means in that

13  context?

14      Are you saying that it's essentially the amount of days --

15  there are certain days that are authorized and certain days

16  that are not authorized?

17  **A.**   Yes, that's correct.

18  **Q.**   In total, Ms. Bridge, do you remember how many records

19  there were on this chart?

20  **A.**   100.

21  **Q.**   And of those 100 records, do you recall for how many of

22  them you were able to find evidence of at least a first level

23  appeal?

24  **A.**   I believe it was 36.

25  **Q.**   And of those, do you know how many resulted in a completes

**BRIDGE - DIRECT / HOLMER**

 1   or partial other turn?

 2   **A.**   I believe it was six.

 3   **Q.**   How many resulted in a complete overturn?

 4   **A.**   A complete overturn, I think, was four.

 5   **Q.**   So partial, by doing 1078 math here, that would make two

 6   partials?

 7   **A.**   Correct.

 8   **Q.**   Of this group, then, that would be roughly 17.5 percent

 9   overturn rate if you combined complete and partial overturns;

10   is that right?

11   **A.**   That sounds about right.

12   **Q.**   And if you're just looking at the -- the full overturns,

13   it's closer to 12 percent?

14   **A.**   Yes.

15   **Q.**   When you were working in the appeals unit at UBH, did UBH

16   keep track of the overturn rate for clinical noncoverage

17   determinations?

18   **A.**   Yes.

19   **Q.**   Do you remember the exact overturn rate for the years in

20   which you worked in the appeals unit?

21   **A.**   No, I don't.

22   **Q.**   Do you remember, sort of, roughly a range in which the

23   appeal -- or the overturn rate would tend to fall?

24   **A.**   Yes.

25   **Q.**   And what was that range?

**BRIDGE - CROSS / REYNOLDS**

1   **A.**   About 15 to 20, 25 percent.

2   **Q.**   So is the 17.5 percent complete and partial overturn rate

3   in the ballpark of what you recall as normal at UBH?

4   **A.**   I would say so, yes.

5          **MR. HOLMER:**  Your Honor, at this point, UBH would move

6   to admit Exhibit 1655.

7          **MS. REYNOLDS:**  No objection.

8          **THE COURT:**  Admitted.

9      (Trial Exhibit 1655 received in evidence.)

10         **MR. HOLMER:**  Nothing further.

11         **THE COURT:**  Cross.

12                    <u>**CROSS-EXAMINATION**</u>

13  BY MS. REYNOLDS:

14  **Q.**   Good afternoon, Ms. Bridge.  My name is Carolyn Reynolds.

15  I'm one of the attorneys for the plaintiffs in this case.

16      You answered a number of questions today about the fields

17  and the LINX and ARTT databases and what they mean; right?

18  **A.**   Correct.

19  **Q.**   You also gave a deposition in this case; right?

20  **A.**   Yes.

21  **Q.**   And you were designated to testify on behalf of UBH in

22  that deposition; right?

23  **A.**   Correct.

24  **Q.**   And you were testifying about the fields in the ARTT and

25  LINX database and what they mean; right?

**BRIDGE - CROSS / REYNOLDS**

1  **A.**   Yes.

2  **Q.**   And about the codes that can be used in those fields?

3  **A.**   Yes.

4  **Q.**   And you answered the questions truthfully to the best of

5  your ability; right?

6  **A.**   To the best of my ability, yes.

7  **Q.**   When UBH issues an adverse benefit determination to a

8  member, the letter to the member identifies what guideline is

9  being used if it's a clinical denial; right?

10  **A.**   Yes, should be in the letter.

11  **Q.**   And a copy of the letter also goes to the provider; right?

12  **A.**   Yes.

13  **Q.**   So UBH does have the provider's address; right?

14  **A.**   Yes.

15  **Q.**   And that would indicate the state in which the services

16  were provided?

17  **A.**   Yes.

18  **Q.**   You answered some questions earlier about particular

19  states that mandate that certain guidelines are used.  Do you

20  remember that?

21  **A.**   Yes.

22  **Q.**   Do peer reviewers determine whether a particular state

23  guideline applies to a particular member's request for coverage

24  by using fields in the LINX or ARTT database?

25  **A.**   I'm not sure which fields they use to make that

BRIDGE - CROSS / REYNOLDS

1  determination.

2  **Q.**   You don't know how they determine whether or not the

3  state-mandated guidelines apply?

4  **A.**   They may use information in LINX or other locations to do

5  that.

6  **Q.**   Do you know?

7  **A.**   I don't know specifically which ones.

8  **Q.**   And you're aware that the parties entered into a joint

9  stipulation concerning a claim sample in this case?

10  **A.**   That sounds familiar.  I don't know the details.

11  **Q.**   Let's take a look at it.  Could you please pull up

12  Exhibit 897?  And it's in your binder.

13  **A.**   (Witness examines document.)

14  **Q.**   Okay.  Exhibit 897 is entitled "Joint Stipulation

15  Concerning Sampling Methodology," and it's executed on

16  March 14th, 2016, by counsel for United Behavioral Health and

17  by counsel for the plaintiffs.  The signatures are on the last

18  page.  Do you see them?

19  **A.**   (Witness examines document.)  Yes.

20       **MS. REYNOLDS:**  Your Honor, we enter Exhibit 897 into

21  evidence.

22       **MR. HOLMER:**  No objection.

23  (Trial Exhibit 897 received in evidence)

24  **BY MS. REYNOLDS:**

25  **Q.**   Let's look at the first page of the joint stipulation, and

BRIDGE - CROSS / REYNOLDS

 1   particularly paragraph 1.

 2   **A.**    Okay.

 3   **Q.**    That paragraph states (reading):

 4           "Plaintiffs served their first set of interrogatories

 5       and first set of requests for production of documents in

 6       the Wit case on December 8th, 2014.  At that time

 7       plaintiffs requested that UBH identify all individuals

 8       whose requests for coverage of residential treatment

 9       services were denied on or after May 21st, 2011, and that

10       UBH produce all documents related to any such

11       determinations.  Plaintiffs also requested that UBH

12       identify all employer-sponsored health benefit plans

13       governed by ERISA for which UBH serves as a claims

14       administrator and produce all plan documents relating to

15       those plans.  After the Court consolidated the Wit and

16       Alexander cases for discovery purposes, plaintiffs served

17       a revised first set of requests for production of

18       documents in both cases that expanded the first set of

19       requests for production to include denials of outpatient

20       and intensive outpatient claims."

21       Did I read that correctly?

22   **A.**    Yes.

23   **Q.**    Let's look at paragraph 2 (reading):

24           "UBH objected to plaintiffs' request that UBH

25       identify all individual members whose benefit requests

**BRIDGE - CROSS / REYNOLDS**

1    were denied as described in paragraph 1 and that UBH

2    produce all documents related to any benefit requests on

3    the ground that such discovery was unduly burdensome,

4    among other objections.  UBH also objected to plaintiffs'

5    request that UBH identify all health benefit plans for

6    which UBH serves as claims administrator and that UBH

7    produce all documents relating to those plans on the

8    ground that such discovery was unduly burdensome, among

9    other objections."

10   Did I read that correctly?

11   **A.**   Yes.

12   **Q.**   And now paragraph 3 (reading):

13        "The parties met and conferred on UBH's objections

14   and subsequently agreed to select a sample of Adverse

15   Benefit Determinations, 'ABDs' (the 'ABD sample'), and a

16   sample of Health Benefit Plans (the 'Plan Sample') that

17   would be adequate for purposes of briefing and argument

18   relating to class certification."

19   Did I read that correctly?

20   **A.**   Yes.

21   **Q.**   And then the stipulation goes on, and as reflected in

22   paragraph 7 --

23   **A.**   Okay.

24   **Q.**   Do you see paragraph 7?

25   **A.**   Yes, I do.

1  Q.   Okay.  There's a description of certain fields in the ARTT

2  and LINX database in that paragraph.  Do you see that?

3  A.   Yes, I do.

4  Q.   Okay.  And it indicates that the parties agreed to select

5  certain codes from those fields to select the members of the

6  class.  Do you see that?

7  A.   (Witness examines document.)  Yes, I do.

8  Q.   Let me correct myself.  The parties agreed to use those

9  fields to select a claim sample.  Do you see that?

10 A.   (Witness examines document.)  I'm not catching the word

11 "claim" --

12 Q.   I'm sorry.

13 A.   -- but I see what you're -- paragraph you're talking

14 about.

15 Q.   You see the fields?  The parties agreed to use particular

16 fields; right?

17 A.   Yes.

18 Q.   Okay.  And the parties agreed to use particular codes that

19 are used in those fields; right?

20 A.   (Nods head.)

21 Q.   Okay.  And the codes in the ARTT database that the parties

22 agreed would reflect the clinical denials at issue in this

23 litigation are medical necessity and clinical coverage

24 determination; right?

25 A.   Yes.

BRIDGE - CROSS / REYNOLDS

1   Q.   And the fields in the LINX database that the parties

2   agreed would reflect the clinical denials at issue in this

3   litigation are "Medical Necessity Criteria Not Met" and

4   "Clinical Coverage Determination"; right?

5   A.   Yes.

6   Q.   The fields that are indicated in paragraph 7, it's

7   possible to enter other types of codes in those fields; right?

8   A.   Yes.

9   Q.   And those other codes are for other purposes; right?

10  A.   They identify other guidelines, yes.

11  Q.   They identify other types of denials?

12  A.   They're all clinical denials using different types of

13  guidelines.

14  Q.   Okay.  And when UBH makes a decision on an appeal from an

15  adverse benefit determination, it sends out a letter to the

16  member; right?

17  A.   Yes.

18  Q.   And the letter sent out to the member indicates the

19  outcome of the appeal; right?

20  A.   Correct.

21  Q.   And if UBH decides to uphold a noncoverage determination,

22  the letter to the member includes the reason the denial was

23  upheld?

24  A.   Correct.

25  Q.   And if the decision to uphold the noncoverage

BRIDGE - CROSS / REYNOLDS

1    determination was a clinical decision, the letter also

2    indicates the guideline that was used; right?

3    A.   Yes.   It should indicate the guideline.

4    Q.   And that administrative decision is also reflected in the

5    case notes for each member; right?

6    A.   I don't think you're describing an administrative

7    decision.   I'm thinking about it's a clinical decision.

8    Q.   The outcome of the appeal is also indicated in the case

9    notes for the member?

10   A.   Yes.

11   Q.   Okay.

12        All right.   Let's take a look at Exhibit 899.   And what

13   you have up there is both a clean version and a highlighted

14   version.   The highlighted version is just to try to make it a

15   little easier and faster for us to work through this exhibit.

16   A.   Okay.

17   Q.   So Exhibit 899 is a compilation of letters and, in some

18   instances, excerpts from case notes relating to the appeals

19   that are listed in your summary exhibit, which is 1655, but

20   we're going to discuss each one quickly and then we'll enter

21   the exhibit.

22        So let's first start on page 1 of Exhibit 899.

23   A.   (Witness examines document.)

24   Q.   Are you there?

25   A.   Yes, I am.

**BRIDGE - CROSS / REYNOLDS**

1  **Q.**   Okay.  And this is a letter notifying a member of a

2  determination upholding a noncoverage determination; right?

3  **A.**   Yes.

4  **Q.**   And if I refer to this as an appeal denial letter, will

5  you understand what I mean?

6  **A.**   Yes, I will.

7  **Q.**   Okay.  So the letter indicates the date on which it was

8  sent; right?

9  **A.**   Yes, it does.

10  **Q.**   And then you see in the paragraph under -- the paragraph

11  that begins "Your member's doctor"?  Do you see that one?

12  **A.**   Yes, I do.

13  **Q.**   That's the rationale for the decision; right?

14  **A.**   Yes, it is.

15  **Q.**   The decision that upheld the original noncoverage

16  determination?

17  **A.**   I believe it's an uphold.  Yes, correct.

18  **Q.**   Okay.  And you see it's highlighted in yellow here?  You

19  see that the rationale cites "UBH's Coverage Determination

20  Guideline for Substance Use Disorder Residential

21  Rehabilitation"; right?

22  **A.**   Yes, I see that.

23  **Q.**   Okay.  Look up at the very top left corner of page 1 of

24  Exhibit 899.  Do you see a number there?

25  **A.**   I do.

**BRIDGE - CROSS / REYNOLDS**

1    **Q.**   Do you have an understanding of what that number is?

2    **A.**   I believe it refers to the list identifying those members

3    that we were looking at with the five columns.

4    **Q.**   So that corresponds to the unique ID for that claim sample

5    number?

6    **A.**   That's my understanding, yes.

7    **Q.**   And do you have an understanding that the members on the

8    summary chart that you prepared correspond to the claim sample

9    that was agreed upon by the parties?

10   **A.**   That's my understanding, yes.

11   **Q.**   Okay.  So let's put Exhibit 1655 up on the screen along

12   with 899, and if we could focus in on the first three columns

13   on the left.

14        So on your summary chart 1655, we can see the column on

15   the far left that has the unique member ID.  Do you see that?

16   **A.**   Yes.

17   **Q.**   And then the third column is the date of the first level

18   appeal; right?

19   **A.**   Yes.

20   **Q.**   And that indicates whether or not the member appealed?

21   **A.**   Correct.

22   **Q.**   All right.  And so this first member with unique member

23   ID 828 is reflected on both 1655 and then here in 899; right?

24   **A.**   Yes, that's correct.

25   **Q.**   Okay.  So let's now turn to page 4 of Exhibit 899.

BRIDGE - CROSS / REYNOLDS

1   **A.**   (Witness examines document.)

2   **Q.**   Are you there?

3   **A.**   Yes, I am.

4   **Q.**   That corresponds to unique member ID 1010; right?

5   **A.**   Yes.

6   **Q.**   And 1010 is the next one on your chart that indicates

7   there was an appeal; right?

8   **A.**   Yes, that's correct.

9   **Q.**   So this is the appeal denial letter for member 1010?

10  **A.**   (Witness examines document.)  Yes, it appears to be.

11  **Q.**   Okay.  Let's turn to page 5 of Exhibit 899.

12  **A.**   (Witness examines document.)

13  **Q.**   Are you there?

14  **A.**   I am, yes.

15  **Q.**   Okay.  It's highlighted in yellow.  You see in the middle

16  of the page the rationale for the appeal denial letter cites

17  "UBH's Coverage Determination Guidelines for Residential

18  Rehabilitation for Substance Use Disorders"; right?

19  **A.**   Yes, I see that.

20  **Q.**   Okay.  Let's turn to page 7 of Exhibit 899.

21  **A.**   (Witness examines document.)

22  **Q.**   Are you there?

23  **A.**   Yes.

24  **Q.**   This is the appeal denial letter for unique member

25  ID 1060; right?

BRIDGE - CROSS / REYNOLDS

1   **A.**   Yes.

2   **Q.**   And that's the next one on your chart that's indicated as

3   having filed an appeal?

4   **A.**   Yes.

5   **Q.**   Okay.  Let's turn to page 8 of 899.

6   **A.**   (Witness examines document.)  Okay.

7   **Q.**   Do you see in roughly the middle of the page highlighted

8   in yellow in the rationale it cites "UBH Coverage Determination

9   Guidelines for Residential Rehabilitation of Substance Use

10  Disorders"?

11  **A.**   Yes, I see that.

12  **Q.**   Could you turn to page 10 of Exhibit 899?

13  **A.**   (Witness examines document.)  Yes.

14  **Q.**   This is an appeal denial letter for unique member ID 3262?

15  **A.**   Yes, I see that.

16  **Q.**   Okay.  And that's the next one on your chart that has

17  indicated that there's an appeal been filed?

18  **A.**   That's correct.

19  **Q.**   Let's turn to page 11.

20  **A.**   (Witness examines document.)

21  **Q.**   Are you there?

22  **A.**   Okay.  Yes, I am.

23  **Q.**   And you see in the third paragraph down that this appeal

24  denial letter cites to "UBH Coverage Determination Guidelines

25  for Custodial Care"?

BRIDGE - CROSS / REYNOLDS

1  **A.**   Yes, it does.

2  **Q.**   Turn to page 12 of 899, please.

3  **A.**   (Witness examines document.)  I'm there.

4  **Q.**   This is the appeal denial letter for unique member

5  ID 3435?

6  **A.**   Yes.

7  **Q.**   And that's the next one on your list that shows an appeal?

8  **A.**   Yes, I see that.

9  **Q.**   Okay.  Turn to page 13 --

10  **A.**   Okay.

11  **Q.**   -- of 899.  And you see highlighted in yellow in the first

12  paragraph that the rationale for this appeal denial letter

13  cites "UBH Coverage Determination" -- I think that's probably

14  supposed to say "guideline -- "UBH Coverage Determination for

15  Residential Treatment of Substance Disorder"?  Do you see that?

16  **A.**   Yes, I do.

17  **Q.**   And do you agree that that's a reference to the Coverage

18  Determination Guideline for substance use disorder?

19  **A.**   Yes, it is.

20  **Q.**   All right.  Turn to page 15 of 899.

21  **A.**   I'm there.

22  **Q.**   That's an appeal denial letter for unique member ID 3867?

23  **A.**   Yes, I see that.

24  **Q.**   And that's the next one on your list?

25  **A.**   Yes.  It appears to be, yes.

**BRIDGE - CROSS / REYNOLDS**

1  **Q.**   All right.  Let's turn to page 16.

2  **A.**   Okay.

3  **Q.**   Do you see in the middle of the page that the appeal

4  denial letter cites to "UBH Coverage Determination Guideline

5  for Residential Rehabilitation for Substance Use Disorders"?

6  **A.**   Yes.

7  **Q.**   Let's turn to page 20 of 899.

8  **A.**   (Witness examines document.)  Okay.

9  **Q.**   That's an appeal denial letter for unique member ID 4176;

10  right?

11  **A.**   Yes, that's correct.

12  **Q.**   And that's the next one on your list?

13  **A.**   Yes, it is.

14  **Q.**   Turn to page 21.

15  **A.**   Okay.

16  **Q.**   You see that the appeal denial letter cites to "UBH

17  Coverage Determination Guidelines for Substance Disorder

18  Residential Rehabilitation and TACADA"; right?

19  **A.**   Yes, I see that.

20  **Q.**   And "TACADA" refers to the Texas guidelines; right?

21  **A.**   Yes.

22  **Q.**   Okay.  Turn to page 23 of 899.

23  **A.**   (Witness examines document.)  Okay.

24  **Q.**   You see this is an appeal denial letter for unique member

25  ID 5618?

**BRIDGE - CROSS / REYNOLDS**

1   **A.**   Yes, I see that.

2   **Q.**   And that's the next one on your list?

3   **A.**   Yes, it is.

4   **Q.**   Okay.  Turn to page 24 of 899.

5   **A.**   Okay.

6   **Q.**   And you see in the middle of the page the rationale for

7   the appeal denial letter cites to "UBH Coverage Determination

8   Guidelines for Inpatient Detoxification, Inpatient

9   Rehabilitation, and Residential Rehabilitation of Substance Use

10  Disorders"; right?

11  **A.**   Yes, I see that.

12  **Q.**   Inpatient detoxification, inpatient rehabilitation, and

13  residential rehabilitation are all different levels of care;

14  right?

15  **A.**   Correct.

16  **Q.**   Okay.  Let's turn to page 30 of 899.

17  **A.**   (Witness examines document.)  Okay.

18  **Q.**   Okay.  That's an appeal denial letter for unique member

19  ID 6355; right?

20  **A.**   Yes, I see that.

21  **Q.**   And that's the next one on your list?

22  **A.**   Yes, it is.

23  **Q.**   Turn to page 31 of 899.

24  **A.**   Yes.

25  **Q.**   And you see, it's in the bottom of the second paragraph,

**BRIDGE - CROSS / REYNOLDS**

1    the rationale for the appeal denial letter cites to "UBH

2    Coverage Determination Guidelines for Residential Treatment of

3    Substance Disorder"; right?

4    **A.**    Yes, I see that.

5    **Q.**    Okay.  Let's turn to page 33 of Exhibit 899.

6    **A.**    Okay.

7    **Q.**    Are you there?

8    **A.**    I am.

9    **Q.**    That's an appeal denial letter for unique member ID 8179;

10   right?

11   **A.**    Yes.

12   **Q.**    And that's the next one on your list?

13   **A.**    Yes, it is.

14   **Q.**    And turn to page 34 of 899.

15   **A.**    Okay.

16   **Q.**    Do you see that the rationale for this appeal denial cites

17   to "Coverage Determination Guideline for Treatment of Substance

18   Use Disorders"; right?

19   **A.**    Yes, it does.

20   **Q.**    Let's turn to page 38 of Exhibit 899.

21   **A.**    Okay.

22   **Q.**    That is the appeal denial letter for unique member

23   ID 8301?

24   **A.**    Correct.

25   **Q.**    And that's the next one on your list?

BRIDGE - CROSS / REYNOLDS

1   **A.**   Yes, it is.

2   **Q.**   And turn to page 39.

3   **A.**   Okay.

4   **Q.**   Do you see that the rationale for this letter cites to

5   "Coverage Determination Guidelines for Obsessive/Compulsive

6   Disorder," OCD; right?

7   **A.**   Yes, I see that.

8   **Q.**   Let's turn to page 41 of Exhibit 899.

9   **A.**   Okay.

10  **Q.**   You see this is an appeal denial letter for unique member

11  ID 8355?

12  **A.**   Yes.

13  **Q.**   And that's the next one on your list?

14  **A.**   Yes, it is.

15  **Q.**   Okay.  Let's turn to page 42.

16  **A.**   Okay.

17  **Q.**   You see that the rationale for this denial cites to the

18  "Residential Rehabilitation Substance Use Disorders Level of

19  Care Guideline"; right?

20  **A.**   Yes, I see that.

21  **Q.**   Okay.  All right.  Let's turn to page 44 of Exhibit 899.

22  **A.**   Okay.

23  **Q.**   Now, this is not an appeal denial letter; right?  Right?

24  **A.**   You mean what's appearing on this page is not a letter?

25  **Q.**   Correct.

BRIDGE - CROSS / REYNOLDS

1   **A.**   Correct, it is not a letter.

2   **Q.**   It is not a letter.  This is an excerpt from a case note;

3   right?

4   **A.**   That is correct.

5   **Q.**   Okay.  And it corresponds to unique member ID 8895; right?

6   **A.**   Yes, it does.

7   **Q.**   And that's the next one on your list?

8   **A.**   Yes.

9   **Q.**   All right.  Now let's jump to page 52 of 899.

10  **A.**   Okay.

11  **Q.**   This is still within the case note for 8895; right?

12  **A.**   Yes, I see that.

13  **Q.**   Okay.  And then you see toward the bottom of the page

14  where it says "Reference 2013 Level of Care Guidelines for

15  Mental Health Residential Treatment"; right?

16  **A.**   Yes.

17  **Q.**   Let's turn to page 55 of Exhibit 899.

18  **A.**   Okay.

19  **Q.**   This is an appeal denial letter for unique member ID 8988?

20  **A.**   Yes, it is.

21  **Q.**   And that's the next one on your list?

22  **A.**   Yes, it is.

23  **Q.**   If you turn to page 56.

24  **A.**   Yes.

25  **Q.**   You see that the rationale for this letter cites to

**BRIDGE - CROSS / REYNOLDS**

1   "Residential Rehabilitation Substance Use Disorders Level of

2   Care Guidelines"; right?

3   **A.**   Yes, it does.

4   **Q.**   Let me ask you a question.  UBH doesn't have any Level of

5   Care Guidelines that correspond to a particular plan; right?

6   **A.**   The guidelines aren't associated with individual plans,

7   no.

8   **Q.**   Okay.  So where it says "Your health plan's residential

9   rehabilitation Level of Care Guidelines," that's referring to

10  UBH's standard guidelines?

11  **A.**   Yes, I believe so.  Yes.

12  **Q.**   Okay.  Let's turn to page 61 of Exhibit 899.

13  **A.**   (Witness examines document.)  Okay.

14  **Q.**   This is an excerpt from the case note corresponding to

15  unique member ID 9011; right?

16  **A.**   Correct.

17  **Q.**   Nine zero one one.  And that's the next one on your list;

18  right?

19  **A.**   Yes, it is.

20  **Q.**   If you turn to page 66 of 899.

21  **A.**   Okay.

22  **Q.**   This is still within the case note for 9011; right?

23  **A.**   It appears to be, yes.

24  **Q.**   And this one got really small on us, didn't it?

25  **A.**   Yeah.

BRIDGE - CROSS / REYNOLDS

1   Q.   If you can make it out in the middle of the page, it cites

2   to --

3   A.   Yeah, I can.

4   Q.   Okay.  Under "Decision and Clinical Rationale," it states

5   "UBH Level of Care Guidelines for Intensive Outpatient

6   Treatment of Substance-Related Disorder"; right?

7   A.   Yes, it does.

8   Q.   And just to make sure I've made this clear, up at the top

9   of the page where it says "Note Type:  Nonurgent Appeal," that

10  indicates that this case note relates to the determination of

11  an appeal; right?

12  A.   Yes, that's correct.

13  Q.   Okay.  Let's turn to page 67 of 899.

14  A.   (Witness examines document.)  Okay.

15  Q.   This is an appeal denial letter that relates to unique

16  member ID 10769; right?

17  A.   Correct.

18  Q.   And that's the next one on your list?

19  A.   Yes, it is.

20  Q.   Okay.  And here there --

21                      (Pause in proceedings.)

22  BY MS. REYNOLDS:

23  Q.   Okay.  You see that this appeal denial letter on the first

24  page refers to "UBH criteria are not met for continued stay at

25  this level of care"; right?

**BRIDGE - CROSS / REYNOLDS**

1   **A.**   Yes, I see that.

2   **Q.**   And then if you turn to page 68, it says (reading):

3          "UBH continued stay criteria 1 and 6 are no longer

4   met as of March 19th, 2014."

5   Do you see that?

6   **A.**   I do.

7   **Q.**   And do you understand that to be a reference to the

8   continued stay criteria in UBH's standard Level of Care

9   Guidelines?

10  **A.**   Yes.

11  **Q.**   All right.  Let's turn to page 69 of Exhibit 899.

12  **A.**   Okay.

13  **Q.**   Are you there?

14  **A.**   Yes, I am.

15  **Q.**   And that's an appeal denial letter for unique member

16  ID 10922; right?

17  **A.**   That's correct.

18  **Q.**   And you see -- and that's the next one on your list;

19  right?

20  **A.**   Yes, it is.

21  **Q.**   And you see on the first page of that letter the rationale

22  for the appeal denial is based on the "United Behavioral Health

23  (UBH) Coverage Determination Guidelines"; right?

24  **A.**   Yes, I see that.

25  **Q.**   All right.  Let's turn to page 71 of Exhibit 899.

BRIDGE - CROSS / REYNOLDS

1    **A.**    Okay.

2    **Q.**    Okay.  This is an appeal denial letter that corresponds to

3    unique member ID 11251; right?

4    **A.**    Correct.

5    **Q.**    Now, in your chart there's no indication that there was an

6    appeal filed for this member; right?

7    **A.**    That's true.

8    **Q.**    Okay.  Did you compare the summary chart in Exhibit 1655

9    against the original data that was pulled for the claim sample

10   members?

11   **A.**    I did.

12   **Q.**    You did?  And did you note whether or not the date of the

13   initial noncoverage determination was correct?

14   **A.**    That was one of the things I looked at when I was

15   reviewing it.

16   **Q.**    Okay.  For claim sample member 11251, in fact, the date of

17   the initial noncoverage determination that is in this class is

18   April 18th, 2014.  Are you aware of that?

19   **A.**    I wasn't aware of that, no.

20   **Q.**    Okay.  And so for that member there is an appeal letter

21   that's not reflected on your chart; right?

22   **A.**    Yes, it appears so.

23   **Q.**    And that's at page 71 of 899; right?

24   **A.**    Yes.

25   **Q.**    Okay.  And that page reflects that the rationale for the

BRIDGE - CROSS / REYNOLDS

1    appeal denial is citing "Coverage Determination Guidelines for

2    Substance Use Disorders"; right?

3    **A.**    Yes.

4    **Q.**    Turning now to page 74 of Exhibit 899.

5    **A.**    Okay.

6    **Q.**    Are you there?

7    **A.**    I am.

8    **Q.**    This is an excerpt from a case note for unique member

9    ID 11276; right?

10   **A.**    Yes, I see that.

11   **Q.**    And that is the next appeal listed on your list; right?

12   **A.**    Yes, it is.

13   **Q.**    Okay.  And if we turn to page 77 of 899.

14   **A.**    Okay.

15   **Q.**    This is still in the case note for 11276?

16   **A.**    Yes, it is.

17   **Q.**    And you can see under the decision and clinical rationale

18   for the appeal denial, it states that the rationale is based on

19   a review of UBH Level of Care Guidelines for residential

20   treatment of substance-related disorder; right?

21   **A.**    Yes, it does.

22   **Q.**    Among other things?

23   **A.**    Yes.

24   **Q.**    There's other words there.

25         Okay.  Let's turn to page 79 of 899.

BRIDGE - CROSS / REYNOLDS

1   **A.**   Okay.

2   **Q.**   This is an appeal denial letter for unique member

3   ID 12446; right?

4   **A.**   Yes, it is.

5   **Q.**   And that is the next appeal listed on your chart?

6   **A.**   Yes, it is.

7   **Q.**   Okay.  And you see in the appeal denial letter that the

8   rationale cites to "UBH Level of Care Guidelines for Mental

9   Health Residential Treatment"; right?

10  **A.**   Yes.

11  **Q.**   Let's turn to page 81.

12  **A.**   Okay.

13  **Q.**   This is for unique member ID 12605; right?

14  **A.**   Yes, it is.

15  **Q.**   And this is an appeal denial letter; right?

16  **A.**   Yes.

17  **Q.**   Okay.  This is another one that doesn't appear on your

18  chart; right?

19  **A.**   That's true.

20  **Q.**   Okay.  And the rationale for the appeal denial on page 81

21  of Exhibit 899 also cites to "UBH Coverage Determination

22  Guideline for Bipolar Disorder Treatment"; right?

23  **A.**   Yes.

24  **Q.**   Let's turn to page 83 of Exhibit 899.

25  **A.**   Okay.

**BRIDGE - CROSS / REYNOLDS**

1  **Q.**   This is a case note excerpt for unique member ID 12649;

2  right?

3  **A.**   Yes, I see that.

4  **Q.**   And that's the next appeal listed on your chart?

5  **A.**   Yes, it is.

6  **Q.**   Turn to the next page, 84.

7  **A.**   Okay.

8  **Q.**   It's another small one.  Under "Decision and Clinical

9  Rationale" for this appeal denial it cites the "Optum Coverage

10  Determination Guideline for Substance Use Disorders"; right?

11  **A.**   Yes, it does.

12  **Q.**   Okay.  Let's turn to page 85 of Exhibit 899.  Are you

13  there?

14  **A.**   One moment.

15      (Witness examines document.)  Yes.  Okay.

16  **Q.**   This is an appeal denial letter for unique member

17  ID 13292; right?

18  **A.**   Yes, it is.

19  **Q.**   Okay.  And that's the next one listed on your chart?

20  **A.**   Yes.

21  **Q.**   And if you turn to page 86.

22  **A.**   Okay.

23  **Q.**   The appeal denial letter cites to "UBH 2013 Level of Care

24  Guidelines:  Substance Use Disorders"; right?

25  **A.**   Yes, it does.

BRIDGE - CROSS / REYNOLDS

1    **Q.**    Let's turn to page 88 of Exhibit 899.

2    **A.**    Okay.

3    **Q.**    Okay.  This corresponds to unique member ID 15332; right?

4    **A.**    Yes, it does.

5    **Q.**    It looks like this is on page 4 of Exhibit 1655; right?

6    **A.**    Yes, it -- is that page 4?  I can't tell.  Yes.  I guess

7    it is page 4.

8    **Q.**    All right.  And you see on page 88 that the appeal denial

9    letter cites to "Optum Coverage Determination Guidelines for

10   the Treatment of Bipolar Disorder"; right?

11   **A.**    Yes, it does.

12   **Q.**    If you could turn to page 90 of Exhibit 12 -- excuse me --

13   of Exhibit 899.

14   **A.**    Yes.

15   **Q.**    This corresponds to unique member ID 1252; right?

16   **A.**    Yes, it does.

17   **Q.**    It's an excerpt from a case note?

18   **A.**    Yes.

19   **Q.**    If you turn to page 97.

20   **A.**    (Witness examines document.)  Okay.

21   **Q.**    This is still in the case notes for member 1252?

22   **A.**    Yes, it is.

23   **Q.**    Okay.  And you can see that the rationale for the appeal

24   denial cited at the bottom of the page cites "Partial Hospital

25   Day Treatment Mental Health Conditions Level of Care

**BRIDGE - CROSS / REYNOLDS**

1    Guidelines"; right?

2    **A.**    Correct.

3    **Q.**    Okay.  Let's turn to page 100 --

4    **A.**    Okay.

5    **Q.**    -- of Exhibit 899.  Are you there?

6    **A.**    Yes, I am.

7    **Q.**    This corresponds to unique member ID 1870; right?

8    **A.**    Yes, it does.

9    **Q.**    And that's the next appeal on your chart?

10   **A.**    Yes, it is.

11   **Q.**    And the rationale for this appeal denial states -- it

12   cites to -- excuse me -- "Optum Coverage Determination

13   Guidelines for Intensive Outpatient Program for Schizophrenia,

14   Schizoaffective Disorder, Indications for Coverage"; right?

15   **A.**    Yes.

16   **Q.**    Let's turn to page 103 of Exhibit 899.

17   **A.**    Okay.

18   **Q.**    This corresponds to unique member ID 2607; right?

19   **A.**    Yes, it does.

20   **Q.**    It's an appeal denial letter?

21   **A.**    Yes.

22   **Q.**    And that's the next one on your chart?

23   **A.**    Yes, it is.

24   **Q.**    If you turn to page 104.

25   **A.**    Okay.

1    **Q.**   You see that toward the bottom half of the page there's a

2    paragraph that says "Policy References"?  Do you see that?

3    **A.**   I do.

4    **Q.**   And it cites to "Optum Clinical Coverage Guidelines,

5    Treatment of Panic Disorder, and Optum Level of Care Guidelines

6    Mental Health Continued Service, Items 1 and 6"; right?

7    **A.**   Yes.

8    **Q.**   Let's turn to page 106 of Exhibit 899.

9    **A.**   Okay.

10   **Q.**   This corresponds to unique member ID 2928; right?

11   **A.**   Yes, it does.

12   **Q.**   That's the next appeal listed on your chart?

13   **A.**   Yes, it is.

14   **Q.**   And this is an excerpt from a case note; right?

15   **A.**   Yes, it is.

16   **Q.**   Let's turn to page 112 of Exhibit 899.

17   **A.**   Okay.

18        (Witness examines document.)  Okay.

19   **Q.**   And this is still within the case note for 2928; right?

20   **A.**   Yes, it is.

21   **Q.**   And you see where the decision and clinical rationale for

22   the appeal denial cites to -- looks like it's a little cut

23   off -- "UBH Level of Care Guidelines for Intensive Outpatient

24   Treatment of Substance-Related Disorder"; right?

25   **A.**   Yes.

BRIDGE - CROSS / REYNOLDS

1   **Q.**   Now let's turn to page 113 of Exhibit 899.

2   **A.**   Okay.

3   **Q.**   This corresponds to -- let's see, that's cut off as well;

4   you can mostly make it out at the top of the page -- unique

5   member ID 3739; right?

6   **A.**   Yes, I see that.

7   **Q.**   Okay.  And turning to page 5 of Exhibit 1655, that's the

8   next appeal listed on your chart?

9   **A.**   Yes, it is.

10   **Q.**   Okay.  And so if we turn to page 114 of Exhibit 899 --

11   **A.**   Yes.

12   **Q.**   -- do you see where it says "Rationale"?

13   **A.**   I do.

14   **Q.**   And that cites to "UBH Level of Care Guideline Criteria

15   for Intensive Outpatient Treatment of Substance Use Disorders";

16   right?

17   **A.**   Correct.

18   **Q.**   Okay.  Let's turn to page 116 --

19   **A.**   Okay.

20   **Q.**   -- of Exhibit 899.  That corresponds to unique member

21   ID 3958; right?

22   **A.**   Yes, it does.

23   **Q.**   And this looks a little bit different than the ones we've

24   seen, but this is also an excerpt from a case note; right?

25   **A.**   Yes, it is.

**BRIDGE - CROSS / REYNOLDS**

1   **Q.**   Okay.  Let's turn to -- oh, 3958.  Okay.

2        So let's turn to page 121.

3   **A.**   Okay.

4   **Q.**   Okay.  Do you see the note that's dated September 29th,

5   2014?

6   **A.**   Yes, I do.

7   **Q.**   And do you see where it states in the middle of the second

8   paragraph in that note (reading):

9            "We regret to inform you that UBH is unable to

10       process the request for an appeal review as the request

11       was not received within the 180-day period"?

12       Is that right?

13  **A.**   Yes, I see that.

14  **Q.**   Okay.  So this appeal was untimely; is that right?

15  **A.**   Yes, that's correct.

16  **Q.**   So it was not substantively addressed by UBH?

17  **A.**   I don't know what happened after this note, but that is

18  indicating that it was too late to appeal.

19  **Q.**   So a clinical decision was not made on that particular

20  appeal in that note; right?

21  **A.**   Not in this note, correct.

22  **Q.**   Okay.  Let's turn to page 122 of Exhibit 8480 --

23  Exhibit 899.

24  **A.**   Yes.  I'm there.

25  **Q.**   Excuse me.  I keep doing that.

**BRIDGE - CROSS / REYNOLDS**

1        Let's turn to page 7 of Exhibit 1655.  We got one of them

2    out of order on your chart so we'll come back to it.

3    **A.**    Okay.

4    **Q.**    And you see unique member ID 8489 at the top of

5    Exhibit 1655?

6    **A.**    Yes, I do.

7    **Q.**    And that corresponds to the unique member ID on page 122

8    of 899; right?

9    **A.**    Yes.

10   **Q.**    Okay.

11   **A.**    Okay.  Yes.

12   **Q.**    We're back together.

13   **A.**    Right.

14   **Q.**    And this is an excerpt from a case note; right?

15   **A.**    Yes, it is.

16   **Q.**    And this indicates that the rationale for the appeal

17   denial is citing to the "UBH Coverage Determination Guideline

18   for Outpatient Treatment of Major Depressive Disorder and

19   Dysthymic Disorder and Coverage Determination Guidelines for

20   the Treatment of Substance Use Disorders"; right?

21   **A.**    Yes.

22   **Q.**    And let's turn to page 127.

23   **A.**    Okay.

24   **Q.**    And you see unique member ID 9836 at the top?

25   **A.**    Yes, I do.

BRIDGE - CROSS / REYNOLDS

1    **Q.**   And that's the next appeal listed on your chart; right?

2    **A.**   Yes, I see that.

3    **Q.**   Okay.  Did you look at the letter that corresponded to

4    this appeal?

5    **A.**   I looked at all of them, so I assume I looked at that

6    letter.  I don't specifically recall each letter.

7    **Q.**   Okay.  And on page 127 you see that this is a letter

8    requesting more information?

9    **A.**   Yes, I see that.

10   **Q.**   So this isn't a clinical decision on the appeal; right?

11   **A.**   No, it's not.

12   **Q.**   And do you know whether or not any clinical decision was

13   ever issued on that appeal?

14   **A.**   I don't know.

15   **Q.**   Oh, let's turn to page 129 of Exhibit 899.

16   **A.**   Okay.

17   **Q.**   This is still corresponding to member 9836; right?

18   **A.**   Yes, it is.

19   **Q.**   And this is an excerpt from the case notes?

20   **A.**   Yes.

21   **Q.**   Okay.  And do you see where it says "Contact Summary"?

22   **A.**   Yes, I do.

23   **Q.**   And that contact summary notes that the provider did not

24   send in records in connection with that appeal; right?

25   **A.**   (Witness examines document.)  Yes, that's what it says.

**BRIDGE - CROSS / REYNOLDS**

1  Q.   And the appeal was closed?

2  A.   (Witness examines document.)  I don't see a notation

3  specifically stating that it was closed, but let me read it.

4  Q.   Look under where it says "Contact Summary" and look at the

5  second sentence that begins "AC informed the caller."

6  A.   Ah, yes.

7  Q.   Do you see that?

8  A.   Correct.

9  Q.   It says (reading):

10        "AC informed the caller that the appeal was closed

11       and medical records were requested."

12       Right?

13 A.   Yes, I do see that.  Sorry.

14 Q.   So a clinical decision was not made in connection with

15 that appeal either; right?

16 A.   Not in association with this note.

17 Q.   Okay.  Do you know whether any clinical decision was ever

18 issued with respect to this denial?

19 A.   I don't know.

20 Q.   Or, excuse me.  With respect to the appeal?

21 A.   I don't know.

22 Q.   Okay.  Let's turn to page 130 of Exhibit 899.

23 A.   Okay.

24 Q.   That corresponds to unique member ID 11000; right?

25 A.   Yes.  Yes, I see that.

BRIDGE - CROSS / REYNOLDS

1   Q.   Okay.  And this is also a letter indicating that an appeal

2   was untimely?

3   A.   Yes, that's what it states.

4   Q.   Okay.  And this is one that -- the next one that's listed

5   on your chart?

6   A.   Yes, it is.

7   Q.   And then let's turn to page 131 of Exhibit 899.

8   A.   Okay.

9   Q.   And then if you go to page 6 of Exhibit 1655.

10  A.   Okay.

11  Q.   Okay.  So you see the unique member ID 5927?

12  A.   Yes, I do.

13  Q.   And that's the letter that's reflected on page 131 of

14  Exhibit 899; right?

15  A.   Yes, it is.

16  Q.   An appeal denial for that member?

17  A.   Yes.

18  Q.   And it cites to -- in the rationale it cites to "United

19  Behavioral Health (UBH) Outpatient Level of Care Guidelines for

20  Substance Use Disorders"; right?

21  A.   Yes.

22          THE COURT:  Well, that was fun.  Thank you for that.

23          MS. REYNOLDS:  I apologize, I really do.

24                    (Laughter)

25          MS. REYNOLDS:  It's possible that I misspoke and

BRIDGE - REDIRECT / HOLMER

1   called a couple of the appeals that were overturned were

2   upheld, but --

3           THE COURT:  I think you did.

4           MS. REYNOLDS:  -- they're in the record.

5       Okay.  I have no further questions, although before I

6   forget, I'd like to move into evidence Exhibit 899.

7           MR. HOLMER:  No objection.

8           THE COURT:  899 is admitted.

9       (Trial Exhibit 899 received in evidence)

10          MS. REYNOLDS:  Thank you.  No further questions.

11          THE COURT:  Okay.

12          MR. HOLMER:  Very briefly, Your Honor.

13          THE COURT:  Sure.

14                 <u>REDIRECT EXAMINATION</u>

15  BY MR. HOLMER:

16  Q.  Ms.  Bridge, taking a brief look back at Exhibit, I

17  believe, 897.

18  A.  Which one's 897?  I've got 899.

19  Q.  It should be in the binder that's labeled "Plaintiffs'

20  Cross-Examination Binder."

21  A.  Okay.  Yes.

22  Q.  Do you have that?

23  A.  I do.

24  Q.  And there's Exhibit 897 under the tab there.

25  A.  Oh, yes.  Okay.

BRIDGE - REDIRECT / HOLMER

1  **Q.**   You reviewed this briefly with plaintiffs' counsel in your

2  cross-examination.  Do you remember that?

3  **A.**   Yes.

4  **Q.**   Have you seen this document before today?

5  **A.**   No.

6  **Q.**   Do you know anything about the negotiations that the

7  parties engaged in relating to this stipulation?

8  **A.**   No.

9  **Q.**   Or the sample claims that are discussed in here --

10 **A.**   No.

11 **Q.**   -- other than what you reviewed?

12 **A.**   No, I don't know anything about that.

13 **Q.**   Can you in that same binder go to Exhibit 899?

14 **A.**   Okay.

15 **Q.**   And specifically page 10.

16 **A.**   (Witness examines document.)  Okay.

17 **Q.**   This is one of the appeal letters that you reviewed with

18 plaintiffs' counsel?

19 **A.**   Yes, it is.

20 **Q.**   And if you compare that to your chart -- this is sample

21 member 3262.  Do you see that?

22 **A.**   Yes, I do.

23 **Q.**   If you compare that to your chart, is sample member 3262

24 also on your chart?

25 **A.**   I don't have the chart in front of me anymore.  Can we put

BRIDGE - REDIRECT / HOLMER

1    it back up?

2    **Q.**    I apologize.

3          Can we pull that up?  It's 1655.

4          And it's on, I believe, page 1 of the exhibit about

5    halfway down, 3262.

6    **A.**    I see it.

7    **Q.**    Is this one of the appeals that resulted in an overturn?

8    **A.**    (Witness examines document.)  No, it does not appear that

9    it was overturned.  Am I misreading it?

10   **Q.**    Yeah.  Can I direct your attention to page 11?

11   **A.**    Okay.

12   **Q.**    Do you see the first sentence there, "As requested, I have

13   completed an urgent appeal of review on April 17th"?

14   **A.**    Yes, I do.

15   **Q.**    And then the fourth paragraph down?

16   **A.**    Oh, yes, I see.  Yes.

17   **Q.**    It reads --

18   **A.**    "Coverage is available."  So it is an overturn.

19   **Q.**    Okay.  And if you look at the third paragraph.

20   **A.**    Yes.

21   **Q.**    And this is on Exhibit 899, page 11.

22   **A.**    Okay.

23   **Q.**    Can you read the first sentence of that third paragraph?

24   **A.**    (reading)

25          "Based on the clinical information provided and UBH

BRIDGE - REDIRECT / HOLMER

1           Coverage Determination Guidelines for custodial care, it

2           is my determination that active treatment is occurring and

3           I will overturn the noncoverage determination for mental

4           health residential treatment care for April 13th, 2012,

5           forward."

6    Q.    So this is an overturn based on the Custodial Care CDG; is

7    that right?

8    A.    Yes, that's correct.

9    Q.    And if you go back to the first page of this letter on

10   page 10 of the exhibit.

11   A.    Yes.

12   Q.    Do you see the third paragraph down?

13   A.    I do.

14   Q.    Is that -- what is the third paragraph there saying?

15   A.    Do you want me to read it?

16   Q.    Well, can you explain what it is?  Is that a summary of

17   something?  Do you understand that to be a summary of anything,

18   that third paragraph?

19   A.    It appears to be a summary of the peer-to-peer review

20   occurring between the M.D.s.

21   Q.    So a summary of the initial denial?

22   A.    (Witness examines document.)

23   Q.    If you read the paragraph above it.

24   A.    I see.  Yes.  So the paragraph is saying that this is from

25   a denial, that's correct.

**BRIDGE - REDIRECT / HOLMER**

1   **Q.**   So can you read the first paragraph that is quoted from

2   the original denial letter?

3   **A.**   Okay.  (reading)

4          "Based on the clinical information provided, the

5          treatment interventions noted, the member's Certificate of

6          Coverage for Helen Keller National Center, and UBH

7          Coverage Determination Guidelines for custodial care, it

8          is my determination that further treatment at this

9          facility is no longer covered.  It does not appear that

10         the proposed treatment is likely to improve the member's

11         condition and is not active treatment."

12  **Q.**   You can stop.  That's fine.

13  **A.**   Okay.

14  **Q.**   So the initial denial, was that based on the Coverage

15  Determination Guideline for custodial care?

16  **A.**   Yes.

17  **Q.**   And then on the first level appeal, was the first level

18  appeal also reviewing that same Coverage Determination

19  Guideline?

20  **A.**   Yes.

21  **Q.**   And the result of that appeal was to overturn the initial

22  decision?

23  **A.**   Correct.

24  **Q.**   Meaning that the member was ultimately authorized

25  benefits?

**PROCEEDINGS**

```
 1    A.     Correct.

 2            MR. HOLMER:  Nothing further.

 3            THE COURT:  That's it?

 4          MS. REYNOLDS:  No redirect, Your Honor.

 5            THE COURT:  Thank you.

 6          MS. REYNOLDS:  Unless you want me to --

 7            THE COURT:  Thank you for your patience.

 8            THE WITNESS:  You're welcome.

 9                        (Witness excused.)

10            THE COURT:  So I'm going to exercise judge's

11    discretion and stop 20 minutes early today since you exhausted

12    me in the last two hours.

13                        (Laughter)

14            THE COURT:  Where are we?

15          MS. ROMANO:  Your Honor, we are well through our case

16    at this point.  I don't have the current hours left, but --

17            THE COURT:  6 hours and 48 minutes.

18          MS. ROMANO:  Well, that is consistent with our

19    thinking, which is that we would likely finish our case on

20    Tuesday.  Depending on the length of cross-examination, it

21    could be early on Tuesday, toward midday perhaps.

22            THE COURT:  Okay.  And then?  Any rebuttal?

23          MR. GOELMAN:  That's an interesting question,

24    Your Honor.

25            THE COURT:  Thank you.
```

1          **MR. GOELMAN:**  We may call Jerry Shulman in rebuttal to

2     rebut the good faith defense that the defendants are using

3     Mr. Shulman's report work for them.  The complicating factor to

4     that -- he's the ASAM guy.  We haven't gotten to that yet.

5          **THE COURT:**  We haven't gotten to that, right.

6          **MR. GOELMAN:**  The complicating fact there is that

7     while Mr. Shulman is willing to testify, he is worried that he

8     will be blamed or accused of violating his confidentiality

9     agreement.  We have asked the defendant to provide assurance

10    that they will not regard his testimony as a violation of that

11    agreement, but he will decline to testify if he does not get

12    that assurance.

13         **THE COURT:**  Hmm.  How interesting.

14         **MR. GOELMAN:**  Isn't it?  So we are not asking for the

15    Court's intervention at this point, but we may.

16         **THE COURT:**  I think you can work this out.

17         **MS. ROMANO:**  Your Honor, this issue just came up last

18    night.  We are working with counsel on the other side because

19    we don't believe it would be even appropriate rebuttal evidence

20    at this point, but I think it's premature to really address

21    that.

22         **THE COURT:**  Okay.  Well, but the confidentiality

23    thing, I understand you may object to the testimony at all, but

24    the confidentiality thing you should work out, especially if

25    you intend on putting in his feedback on the criteria.

 1          Okay.  So that's done.  So we'll finish Tuesday.  Great.

 2          So I've got -- then here's what I want to do.  I want

 3     closing arguments.  Let's do those Wednesday after my criminal

 4     calendar, assuming that things go the way we're talking about.

 5          And then I want you to start to think about briefing and

 6     when you want to do it, and I'm going to want a claim chart.

 7     So I assume that we'll do -- I don't really want to do

 8     simultaneous briefing because that always is ships passing in

 9     the night; and especially with this, I want to make sure we're

10     talking about the same exact language.

11          So my thought is that there will be briefing and when the

12     plaintiffs go, they will attach a chart which will have every

13     challenged guideline, the specific language of every challenged

14     guideline that is challenged, a summary reason -- there will be

15     briefing so a summary reason -- and then citations to the

16     specific testimony that they say stands for the proposition

17     that this particular sentence, word, whatever it is, doesn't

18     meet the standard of care.

19          And then when you do your response, you'll know exactly

20     what they're challenging and you can do the same thing.  Okay?

21          The reason I say that today is because in thinking about

22     the when, you may want to think about that has to be done too.

23          Okay.  Thanks very much for the last couple of hours.

24          **MS. ROMANO:**  One question, Your Honor.  On the

25     closing, any parameters or guides on that for Wednesday?

1            **THE COURT:**  No.  You know, don't -- you know, I'll

2    fall asleep at some point but, you know, I want you to walk me

3    through your cases.  I want you to walk me through how you meet

4    the elements for your claims.

5            We outlined in the minutes of the pretrial conference what

6    you've got to prove, and I want you to walk me through why

7    you're meeting it, and you walk me through why they're not, so

8    that it's in an organized fashion so that -- I mean, it's kind

9    of a preview of what you're going to do in your briefing.  And

10   so it can be -- it doesn't -- I don't know that it has to be --

11   it won't be in the kind of detail you're going to do in the

12   briefing, but just sort of an organization chart -- this.

13   This.  This.  This -- so that we have some idea.

14           And, you know, I'll say one more thing.  You know, one

15   thing is apparent from the testimony of the many doctors who've

16   testified, that the decision is not going to be easy.  If it

17   was easy, I wouldn't be making it.  And my thought at this

18   unformed time -- and that is to say, I just don't know where

19   I'm going to be going on all this -- is that it's going to be

20   mixed.  There are some arguments that the plaintiffs make that

21   seem stronger than others.  So I don't know that anybody wants

22   that decision out there from either side.  Therefore, think

23   about that over the weekend.

24           **MS. ROMANO:**  One more question, Your Honor.

25           **THE COURT:**  Yes.

**PROCEEDINGS**

1          **MS. ROMANO:**  I know you had mentioned at the pretrial

2   conference that remedies, if they were applied, would be a

3   second phase of briefing.  So I'm assuming that next week does

4   not focus on that issue.

5          **THE COURT:**  So the argument you mean?

6          **MS. ROMANO:**  Yes.

7          **THE COURT:**  Yes, that's right.  I mean, what I'll do

8   is I'll go through and figure out whether I think a claim has

9   been sustained; and if it has been sustained, it will be as to

10  a particular sentence or a particular guideline or a particular

11  set of guidelines, whatever it is, and then we'll figure out

12  what the remedy is if there's a failure of the guideline in

13  this respect or that respect.  That will be part two.

14       Okay.  Thank you, all.

15         **MS. ROMANO:**  Thank you, Your Honor.

16              (Proceedings adjourned at 3:43 p.m.)

17         (Proceedings to resume on Monday, October 30, 2017.)

18                        -   -   -   -

19

20

21

22

23

24

25

1

2                          CERTIFICATE OF REPORTERS

3              We certify that the foregoing is a correct transcript

4       from the record of proceedings in the above-entitled matter.

5

6       DATE:    Thursday, October 26, 2017

7

8

9                           _Katherine Sullivan_

10      _____

11             Katherine Powell Sullivan, CSR #5812, RMR, CRR
                         U.S. Court Reporter

12

13

14                          _Jo Ann Bryce_

15      _____

16                Jo Ann Bryce, CSR #3321, RMR, CRR
                         U.S. Court Reporter

17

18

19

20

21

22

23

24

25