**Volume 8**

**Pages 1549 - 1777**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JOSEPH C. SPERO, MAGISTRATE JUDGE

DAVID AND NATASHA WIT, et al., )
                           )
         Plaintiffs,      )
                           )
   VS.                  )    **No. C 14-2346 JCS**
                           )
UNITED BEHAVIORAL HEALTH,     )
                           )
         Defendant.       )
_____)   San Francisco, California
                                     Monday, October 30, 2017

<u>**TRANSCRIPT OF PROCEEDINGS**</u>

<u>**APPEARANCES**</u>:

For Plaintiffs:         ZUCKERMAN SPAEDER LLP
                     1800 M Street, NW, Suite 1000
                     Washington, DC  20036-5807
         **BY: CARL S. KRAVITZ, ESQUIRE**
             **CAROLINE E. REYNOLDS, ESQUIRE**
             **AITAN D. GOELMAN, ESQUIRE**

                     ZUCKERMAN SPAEDER LLP
                     485 Madison Avenue, 10th Floor
                     New York, New York 10022
         **BY: JASON S. COWART, ESQUIRE**

(Appearances continued on next page)

Reported By:       Katherine Powell Sullivan, CSR #5812, RMR, CRR
                   Jo Ann Bryce, CSR #3321, RMR, CRR
                   Official Reporters - U.S. District Court

**<u>APPEARANCES (CONTINUED):</u>**

For Plaintiffs:         ZUCKERMAN SPAEDER LLP
                       100 East Pratt Street, Suite 2440
                       Baltimore, Maryland  21202-1031
             **BY:  ADAM ABELSON, ESQUIRE**

                       THE MAUL FIRM, P.C.
                       101 Broadway, Suite 3A
                       Oakland, California 94607
             **BY:  ANTHONY F. MAUL, ESQUIRE**

                       PSYCH APPEAL
                       8560 Sunset Boulevard, Suite 500
                       West Hollywood, California  90069
             **BY:  MEIRAM BENDAT, ESQUIRE**

For Defendant:        CROWELL & MORING LLP
                       515 South Flower Street, 40th Floor
                       Los Angeles, California 90071-2258
             **BY:  JEFFREY H. RUTHERFORD, ESQUIRE**
                 **JENNIFER S. ROMANO, ESQUIRE**
                 **ANDREW HOLMER, ESQUIRE**

                       CROWELL & MORING LLP
                       3 Embarcadero Center, 26th Floor
                       San Francisco, California 94111
              **BY:  NATHANIEL P. BUALAT, ESQUIRE**

                       CROWELL & MORING LLP
                       1001 Pennsylvania Avenue, NW
                       Washington, DC 20004-2595
             **BY:  APRIL N. ROSS, ESQUIRE**

# I N D E X

Monday, October 30, 2017 - Volume 8

| DEFENDANT'S WITNESSES | PAGE | VOL. |
|---|---|---|
| **ROBINSON-BEALE, RHONDA** | | |
| By Videotaped Deposition | 1556 | 8 |
| | | |
| **ALAM, DANESH** | | |
| (SWORN) | 1568 | 8 |
| Direct Examination by Mr. Rutherford | 1568 | 8 |
| Cross-Examination by Mr. Goelman | 1630 | 8 |
| Redirect Examination by Mr. Rutherford | 1677 | 8 |
| | | |
| **TRIANA, LORENZO** | | |
| (SWORN) | 1685 | 8 |
| Direct Examination by Mr. Rutherford | 1685 | 8 |
| Cross-Examination by Mr. Kravitz | 1727 | 8 |
| Redirect Examination by Mr. Rutherford | 1756 | 8 |
| Recross-Examination by Mr. Kravitz | 1759 | 8 |
| | | |
| **BEATY, JOHN** | | |
| By Videotaped Deposition | 1761 | 8 |
| | | |
| **GODDARD, THOMAS GLENN** | | |
| (SWORN) | 1761 | 8 |
| Direct Examination by Mr. Bualat | 1762 | 8 |

# E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 332 | | 1711 | 8 |
| 348 | | 1677 | 8 |
| 368 | | 1714 | 8 |
| 382 | | 1632 | 8 |
| 407 | | 1567 | 8 |
| 409 | | 1567 | 8 |
| 412 | | 1628 | 8 |

# I N D E X

## E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 420 | | 1653 | 8 |
| 421 | | 1655 | 8 |
| 423 | | 1715 | 8 |
| 430 | | 1677 | 8 |
| 434 | | 1716 | 8 |
| 452 | | 1669 | 8 |
| 482 | | 1720 | 8 |
| 482 | | 1746 | 8 |
| 486 | | 1750 | 8 |
| 517 | | 1741 | 8 |
| 548 | | 1670 | 8 |
| 879 | | 1567 | 8 |
| 1011 | | 1761 | 8 |
| 1012 | | 1761 | 8 |
| 1033 | | 1567 | 8 |
| 1114 | | 1736 | 8 |
| 1116 | | 1736 | 8 |
| 1143 | | 1721 | 8 |
| 1189 | | 1693 | 8 |
| 1235 | | 1690 | 8 |
| 1252 | | 1700 | 8 |

# **I N D E X**

## **E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 1253 | | 1701 | 8 |
| 1254 | | 1703 | 8 |

1  <u>Monday - October 30, 2017</u>                    <u>8:30 a.m.</u>

2                    P R O C E E D I N G S

3                        ---000---

4        THE CLERK:  Okay.  We are calling Case Number

5  C 14-2346, Wit/Alexander versus UBH.

6      And all counsel and parties are here.

7        THE COURT:  Okay.  What's up?

8        MR. GOELMAN:  Your Honor, I just have one matter to

9  address before we start the evidence today.  The Court's

10  confidence in the parties' ability to work out the Shulman

11  confidentiality issue was warranted.  I want to thank the

12  defense for taking care of that.

13      The bad news is that we do have an additional Shulman

14  issue before we start today.

15        THE COURT:  Shulman issue?

16        MR. GOELMAN:  There's a whole genre of issues now.

17        THE COURT:  Yes.

18        MR. GOELMAN:  The first piece of evidence that the

19  defendant is putting on today is going to be the deposition of

20  Rhonda Robinson-Beale, who was at the company in 2014 and then

21  left and was deposed in this case in 2017.

22        THE COURT:  Okay.

23        MR. GOELMAN:  And the Shulman report, which we have

24  objected to and the Court has overruled, actually turns out

25  there's more than one iteration of it.

1      **THE COURT:**  Oh.

2      **MR. GOELMAN:**  And the one that counsel showed to

3   Ms. Robinson-Beale is Trial Exhibit 1033.  The one that

4   Mr. Shulman sent to UBH is Trial Exhibit 412.  And they're very

5   different.  412 has track changes that Mr. Shulman used to

6   point out some of his objections to the guidelines; and 1033,

7   the changes have been accepted.

8      So that Ms. Robinson-Beale was shown a document where she

9   couldn't see some of the changes that Mr. Shulman made, and we

10  have not objected on that basis up to this point and now we do.

11     **THE COURT:**  Huh.  On the basis of what?

12     **MR. GOELMAN:**  It's misleading, Your Honor.  She is

13  shown this document three years after she left the company and

14  told that this is Mr. Shulman's --

15     **THE COURT:**  Do you think I won't be able to understand

16  that?

17     **MR. GOELMAN:**  I think she didn't understand it,

18  Your Honor.

19     **THE COURT:**  Well, as to any of it?  All of it?

20  There's no questions she was asked about the Shulman report

21  that are about things that are relevant to the case?

22     **MR. GOELMAN:**  No, no.  She is asked about things that

23  are relevant.  My point just is she's shown this document three

24  years after she left.

25     **THE COURT:**  No, no, no.  I appreciate that, but it's

1    one by one.  We do questions one by one.  So if you ask a

2    question that says -- that implies that there's no changes in

3    the language and she thinks there is a change, well, then,

4    that's a problem.  If she is asked a question where there's no

5    changes in the language, then that's not a problem.

6         MR. GOELMAN:  It's less the questions than the use of

7    the document itself that we object to.

8         THE COURT:  Okay.  That's overruled.  Good work.

9         MS. ROSS:  Thank you, Your Honor.  Good morning.

10        THE COURT:  Sometimes it's the best thing to remain

11   silent.

12      Okay.  So what else?

13        MS. ROSS:  We're ready to begin.

14        THE COURT:  Okay.

15                   (Pause in proceedings.)

16        THE COURT:  Oh, okay.  I see.

17        MS. ROSS:  Your Honor, United Behavioral Health calls

18   Dr. Rhonda Robinson-Beale, who's a former employee who lives

19   out of state and will appear by video.

20        THE COURT:  Hang on one second.

21                   (Pause in proceedings.)

22        THE COURT:  Okay.  Ready.

23             (Video was played but not reported.)

24        MS. ROSS:  One moment, Your Honor.

25                   (Pause in proceedings.)

1        MS. ROSS:  Your Honor, we seem to be having technical

2    difficulties with the video.  Can we read -- would we have

3    permission to read the remainder of the transcript in?  There's

4    not much left in the designation.

5        THE COURT:  Okay.  Page and line?

6        MS. ROSS:  We are on, in the binder that you have, the

7    clip report, we're on page 24.

8        THE COURT:  Okay.

9        MS. ROSS:  Starting at the clip that is numbered 119

10    (reading):

11        ▪QUESTION:  Okay.  And you don't recall -- sorry.  Let me

12        phrase that differently.

13           "You testified that you left UBH in March of 2014?

14        ▪ANSWER:  That's correct.

15        ▪QUESTION:  And this discussion was occurring in early

16        2014?

17        ▪ANSWER:  That's correct.

18        ▪QUESTION:  And did that -- was there any resolution to

19        that discussion before you left UBH?

20        ▪ANSWER:  Not that I can recall at this point.

21        ▪QUESTION:  So you don't know one way or the other what

22        was happening with this -- what happened with this

23        recommendation?

24        ▪ANSWER:  That's correct.

25        ▪QUESTION:  Yeah.  And you don't know one way or the other

1  whether there was other relevant factors that might have

2  affected a decision to adopt or not adopt ASAM?

3  ▪**ANSWER:**  That's correct.

4  ▪**QUESTION:**  You testified earlier that there is lack of

5  good evidence or consensus about treatment of chronic

6  conditions?

7  ▪**ANSWER:**  For behavioral health, yes.

8  ▪**QUESTION:**  For behavioral health.  And you also testified

9  that medical necessity is a concept that is -- or at least

10  as defined from the Kaiser settlement, that definition of

11  medical necessity is predicated on evidence?

12  ▪**ANSWER:**  That's correct.

13  ▪**QUESTION:**  My question is:  The point you were making

14  here -- again, not on behalf of or a representative of

15  UBH -- was that chronic conditions can -- it can be

16  difficult to assess medical necessity for chronic

17  conditions because the evidence base is not good?

18  ▪**ANSWER:**  That's correct.

19  ▪**QUESTION:**  But that doesn't mean that -- that insurance

20  companies don't cover chronic conditions?

21  ▪**ANSWER:**  That's correct.

22  ▪**QUESTION:**  And that didn't mean that UBH did not provide

23  coverage for chronic conditions?

24  ▪**ANSWER:**  That's correct.

25  ▪**QUESTION:**  This is just a statement about the state of

1      the evidence?

2      ■**ANSWER:** That's correct.

3      ■**QUESTION:** And you also testified, I believe, that you

4      understood UBH's Level of Care and Coverage Determination

5      Guidelines to, in fact, cover chronic care or cover

6      conditions for chronic conditions?

7      ■**ANSWER:** That's correct. There was no exclusion.

8      ■**QUESTION:** You testified a little bit about your role in

9      the BPAC?

10      ■**ANSWER:** Yes.

11      ■**QUESTION:** That's the Behavioral Analytics and Policy

12      Committee?

13      ■**ANSWER:** Yes.

14      ■**QUESTION:** And your role on that committee was to bring

15      outside information from professional organizations, from

16      consumer groups, from practitioners, to help inform the

17      BPAC when it was making decisions about the content of the

18      guidelines?

19      ■**ANSWER:** That's correct.

20      ■**QUESTION:** Did you do that regularly?

21      ■**ANSWER:** Yes.

22      ■**QUESTION:** Brought in sort of that third-party input?

23      ■**ANSWER:** Right.

24      ■**QUESTION:** And the BPAC, the members of the BPAC,

25      considered that input; right?

1    ▪**ANSWER:**  Yes.

2    ▪**QUESTION:**  Including you?

3    ▪**ANSWER:**  Yes.

4    ▪**QUESTION:**  Because you were a member of the BPAC?

5    ▪**ANSWER:**  Right.

6    ▪**QUESTION:**  And that helped inform the BPAC's decision

7    about what should or should not be in a particular Level

8    of Care or Coverage Determination Guideline?

9    ▪**ANSWER:**  That's correct.

10   ▪**QUESTION:**  Does the BPAC take those recommendations

11   seriously?

12   ▪**ANSWER:**  Yes, I think they did take them seriously.

13   There were many incidents where the information helped to

14   inform where people did not have information from before.

15   ▪**QUESTION:**  Do you recall any instance where someone on

16   the BPAC thought a recommendation from a third party that

17   you brought to the BPAC would have been the best clinical

18   decision but decided not to implement it because it would

19   have -- it would negatively affect benefit expense?

20   ▪**ANSWER:**  I can't recall that coming up, no.

21   ▪**QUESTION:**  The BPAC was -- the voting members of the BPAC

22   was clinicians; right?

23   ▪**ANSWER:**  Right.  They were not doing what I call

24   financial analysis.

25   ▪**QUESTION:**  They weren't businesspeople?

1    ▪**ANSWER:**  No.

2    ▪**QUESTION:**  They were doctors and social workers and

3    doctors and psychologists?

4    ▪**ANSWER:**  Right.

5    ▪**QUESTION:**  You testified a little bit today about the

6    'why now' factors?

7    ▪**ANSWER:**  Yes.

8    ▪**QUESTION:**  And the Level of Care Guidelines?

9    ▪**ANSWER:**  Yes.

10   ▪**QUESTION:**  Did you understand the 'why now' factors to be

11   an attempt to take a more holistic approach to patient

12   care?

13   ▪**ANSWER:**  A holistic approach but also a holistic

14   assessment, yes.

15   ▪**QUESTION:**  Because it's about evaluating the entire

16   patient?

17   ▪**ANSWER:**  That's correct.

18   ▪**QUESTION:**  And not just the symptoms?

19   ▪**ANSWER:**  Right.

20   ▪**QUESTION:**  You also discussed earlier today that there

21   was a perception in some areas or by some third parties

22   that UBH's guidelines were overly focused on acute care?

23   ▪**ANSWER:**  Yes.

24   ▪**QUESTION:**  Do you remember that testimony?

25   ▪**ANSWER:**  Yes.

1  ▪**QUESTION:** Most of that concern was from the PIC, P-I-C?

2  ▪**ANSWER:** Yes.

3  ▪**QUESTION:** Did you believe that UBH's guidelines were

4  overly focused on acute care?

5  ▪**ANSWER:** No, I didn't believe that. I felt it was a

6  matter of lack of interpretation on the part of PIC, and

7  that's why I spent time working with them and the

8  clinicians that they brought in to work through the

9  differences of understanding of the Level of Care

10 Guidelines.

11 ▪**QUESTION:** And you understood that part of the reason for

12 that -- to be that, again, much of that determination

13 would need to be made on a patient-by-patient basis?

14 ▪**ANSWER:** That's correct.

15 ▪**QUESTION:** Or on a case-by-case basis?

16 ▪**ANSWER:** Right.

17 ▪**QUESTION:** Depending on the patient situation?

18 ▪**ANSWER:** That's correct.

19 ▪**QUESTION:** The 'why now' factors?

20 ▪**ANSWER:** Right.

21 ▪**QUESTION:** And the particular treatment being sought?

22 ▪**ANSWER:** Right.

23 ▪**QUESTION:** In your experience dealing with third-party

24 groups, that was not -- you didn't understand that to be

25 the majority position, did you?

1    ▪**ANSWER:**  I'm not sure I understand your question.

2    ▪**QUESTION:**  So if -- if PIC approached you to say 'We

3    think your guidelines may be overly focused on providing

4    acute treatment' --

5    ▪**ANSWER:**  Uh-huh.

6    ▪**QUESTION:**  -- 'or treatment for acute conditions,' you

7    said PIC offered that and maybe one other organization you

8    couldn't remember, but that's not a critique you heard

9    from a large swath of third-party organizations, is it?

10   ▪**ANSWER:**  Right.  It's not what I heard consistently from

11   all the subspecialty organizations that I worked with.

12   The intent of interacting with them was to get their

13   feedback not only on the parity issues, these kind of

14   issues, but other kinds of issues.  So this came from the

15   PIC, which was a very political group but it was a group

16   that was a coalition so it was one of the areas brought

17   up.

18   ▪**QUESTION:**  During your time at UBH, were you involved in

19   any discussions about how changes to Level of Care

20   Guidelines would impact benefit expense?

21   ▪**ANSWER:**  No.

22   ▪**QUESTION:**  More specifically, were you involved in any

23   conversations about how changes to the common criteria

24   wouldn't affect benefit expense?

25   ▪**ANSWER:**  No.

1     **"QUESTION:** Did you ever discuss with anyone how a

2     proposed change to the common criteria would affect denial

3     rates?

4     **"ANSWER:** No.

5     **"QUESTION:** Or length of stay?

6     **"ANSWER:** No.

7     **"QUESTION:** If you turn back to Exhibit 17.

8     **"ANSWER:** Okay.

9     **"QUESTION:** Again, this is what you understood to be

10     Mr. Shulman's -- the scope of Mr. Shulman's assignment?

11     **"ANSWER:** Yes.

12     **"QUESTION:** And the services will include but not be

13     limited to creating a Crosswalk or creating a document

14     that Crosswalks Optum's Coverage Determination Guidelines,

15     CDGs, and the LOCG with the new criteria; is that right?

16     **"ANSWER:** That's right.

17     **"QUESTION:** And then below that there is a subpoint is

18     'Provide written comments on where the two documents are

19     consistent with each other and where and how they differ';

20     is that right?

21     **"ANSWER:** That's correct.

22     **"QUESTION:** Did you understand that to mean comparison of

23     both the CDGs and the LOCGs --

24     **"ANSWER:** Yes.

25     **"QUESTION:** -- to ASAM?

1    ▪**ANSWER:**  Yes.

2    ▪**QUESTION:**  The page ending in Bates Number 731.

3    ▪**ANSWER:**  Yes.

4    ▪**QUESTION:**  Again, you understood this to mean -- you

5    understood this to be Dr. Shulman's assessment of the

6    scope of his work?

7    ▪**ANSWER:**  That's correct.

8    ▪**QUESTION:**  And he discusses the Optum criteria; is that

9    right?

10   ▪**ANSWER:**  Yes.

11   ▪**QUESTION:**  Did you understand that to be both the CDGs

12   and the Level of Care Guidelines?

13   ▪**ANSWER:**  Right.  I believe that to be the case because he

14   reviewed the comment on each of the criteria sets.

15   ▪**QUESTION:**  And so when he said 'make them consistent with

16   the ASAM criteria,' you understood that to be a reference

17   to both the CDGs and the LOCGs?

18   ▪**ANSWER:**  Right, because that was part of the huge packet

19   that was sent to him.

20   ▪**QUESTION:**  Right.  And so those in Exhibit, I believe it

21   was, 19?

22   ▪**ANSWER:**  Yes.

23   ▪**QUESTION:**  The various attachments that we walked through

24   that were versions of the guidelines?

25   ▪**ANSWER:**  Yes.

1  **QUESTION:** I understand that those didn't reflect track

2  changes. Plaintiffs' counsel mentioned that; is that

3  right?

4  **ANSWER:** Yes.

5  **QUESTION:** But when you received this document, you

6  understood this to reflect Dr. Shulman's substantive

7  edits; is that correct?

8  **ANSWER:** What my assumption was is that he had read all

9  the documents, and anything in misalignment he would have

10  highlighted in his summary, yes.

11  **QUESTION:** So when -- sorry. I didn't mean to interrupt.

12  **ANSWER:** No. That's all I was going to say.

13  **QUESTION:** So when you read the documents, that's the way

14  you interpreted them?

15  **ANSWER:** Yes.

16  **QUESTION:** You interpreted these documents as indicating

17  Dr. Shulman's opinion about what was consistent with ASAM?

18  **ANSWER:** That's correct.

19  **QUESTION:** So as you read the documents, if Mr. Shulman

20  had left some component of the existing Level of Care

21  Guidelines in the document, you would have understood --

22  you understood that to mean what?

23  **ANSWER:** As being consistent.

24  **QUESTION:** In Mr. Shulman's opinion?

25  **ANSWER:** Right.

PROCEEDINGS

1   ▪**QUESTION:** And on page -- of that exhibit the page ending

2   in 904, it's the second page of the exhibit, Mr. Shulman

3   specifically references '15 files of Optum criteria that I

4   have reviewed and edited'?

5   ▪**ANSWER:** Yes.

6   ▪**QUESTION:** And you understood that to mean that the

7   documents reflected his edits?

8   ▪**ANSWER:** Yes."

9       **THE COURT:** Okay.

10      **MS. ROSS:** Your Honor, at this time we move to admit

11  Exhibits 407, 409, 879, and 1033.

12      **THE COURT:** Other than the objections already been

13  raised, any objections?

14      **MR. ABELSON:** No objections.

15      **THE COURT:** All right. They're all admitted.

16      (Trial Exhibits 407, 409, 879, and 1033 received in

17       evidence)

18      **MS. ROSS:** Thank you, Your Honor.

19      **MR. RUTHERFORD:** Your Honor, the Defense calls

20  Dr. Danesh Alam. We need to distribute some binders.

21      **THE COURT:** Okay. I'm going to take a five-minute

22  break.

23      **MR. RUTHERFORD:** Okay.

24              (Recess taken at 9:53 a.m.)

25          (Proceedings resumed at 10:03 a.m.)

1    THE CLERK:  Please raise your right hand.

2                    **DANESH ALAM**,

3  called as a witness for the Defendant, having been duly sworn,

4  testified as follows:

5        THE CLERK:  Thank you.

6     Go ahead and have a seat.  Would you please state your

7  full name for the record, and spell your last name.

8        THE WITNESS:  Danesh Alam.  My last name is spelled

9  A-l-a-m, as in Michael.

10        THE CLERK:  Thank you.

11     And just make sure you speak clearly into the microphone

12  for our court reporter.  And there is water there if you need

13  it.

14        THE WITNESS:  Thank you.

15        THE CLERK:  Thank you.

16                **DIRECT EXAMINATION**

17  BY MR. RUTHERFORD:

18  **Q.**  Dr. Alam, briefly describe your educational background.

19  **A.**  I'm a psychiatrist.  I completed my medical training in

20  India and my psychiatry training at the University of Illinois

21  at Chicago, where I remain on faculty.  I completed a

22  fellowship in psychopharmacology and research at the University

23  of Illinois in Chicago.

24     That's basically my training.

25  **Q.**  Are you board-certified?

1   **A.**   I am.

2   **Q.**   In what areas?

3   **A.**   I'm board-certified by the American Board of Psychology

4   and Neurology and the American Board of Addiction Medicine.

5   **Q.**   Are you licensed to practice medicine in any states?

6   **A.**   I am.

7   **Q.**   What are those states?

8   **A.**   I'm licensed to practice in the states of Illinois,

9   New York, Florida, Nevada, and Tennessee.

10  **Q.**   Broadly speaking, what type of work have you done as a

11  psychiatrist?

12  **A.**   I've always provided direct patient care.  I've done

13  research, and have done some administrative work, as well as

14  advocacy for our patients in the field.

15  **Q.**   Do you teach psychiatry?

16  **A.**   I do.

17  **Q.**   Where?

18  **A.**   At the University of Illinois at Chicago.

19  **Q.**   And do you research or write in the area of either mental

20  health or substance use disorders?

21  **A.**   I do.

22  **Q.**   Have you received any professional recognition?

23  **A.**   I have.

24  **Q.**   What is that?

25  **A.**   I've been recognized by the American Psychiatric

1  Association as a distinguished fellow.

2  **Q.**   Are you familiar with an organization called the American

3  Society of Addiction Medicine or ASAM?

4  **A.**   I am.

5  **Q.**   Are you affiliated with ASAM?

6  **A.**   I'm the president or past president of the local chapter

7  in Illinois for ASAM.

8  **Q.**   Do you have any involvement with the ASAM national

9  organization?

10  **A.**   I do.

11  **Q.**   What is that involvement?

12  **A.**   I've presented at the national conference.  I'm on a

13  couple of national committees.

14  **Q.**   And do you have any involvement with the Illinois

15  Psychiatric Society?

16  **A.**   I'm the current president of the Illinois Psychiatric

17  Society.

18  **Q.**   Now, have you been involved with substance use disorder

19  treatment programs as a healthcare provider?

20  **A.**   Yes, I have.

21  **Q.**   In what capacities?

22  **A.**   I provide direct treatment to two facilities that provide

23  residential care.

24  **Q.**   Currently?

25  **A.**   Yes.

1    **Q.**   What are those facilities?

2    **A.**   One is a university-based program called Northwestern

3    Medicine Central DuPage.  And the other is Sunspire Heartland.

4    **Q.**   Just very generally speaking, what levels of care do you

5    treat at Sunspire?

6    **A.**   They provide the Level 4.0, which is detox; 3.7, which is

7    residential; 3.5, another residential level of care; 2.5,

8    partial hospitalization; and 2.1, IOP.

9    **Q.**   Are those numbers that you're stating right now on the

10   record, are those -- do those come from the ASAM criteria?

11   **A.**   They do.

12   **Q.**   And at Sunspire, do you have experience dealing with

13   insurance coverage for the patients treated at Sunspire?

14   **A.**   Yes.

15   **Q.**   At DuPage, do you have experience dealing with insurance

16   coverage for the patients at DuPage?

17   **A.**   I do.

18   **Q.**   With respect to both of those, do you have experience

19   dealing with various levels of placement guidelines that the

20   insurance companies use for coverage determinations?

21   **A.**   I do.

22   **Q.**   Currently, what is your main area of employment?

23   **A.**   I'm employed by Optum or United Behavioral Health.

24   **Q.**   What's your position there?

25   **A.**   My position is behavioral medical director.

1  **Q.**   What are your responsibilities as behavioral medical

2  director at UBH?

3  **A.**   I manage the care of our members in a particular area.

4  And I supervise, you know, our care advocacy staff from a

5  clinical perspective.  And I also make medical necessity

6  determinations.

7  **Q.**   And did you say, did you conduct any training in -- with

8  respect to your current position at UBH?

9  **A.**   I do.  I do conduct training.

10  **Q.**   Does any of that training pertain to the use of the ASAM

11  criteria?

12  **A.**   It does.

13  **Q.**   And to which group do you -- with which group of people do

14  you conduct that training?

15  **A.**   Uhm, I train new hires, the care advocacy staff, you know,

16  my colleagues.  So mostly internally.

17  **Q.**   Within UBH, are you considered a subject matter expert on

18  any particular subject matters?

19  **A.**   I am.

20  **Q.**   What are those subject matters?

21  **A.**   Substance use disorders and transcranial magnetic

22  stimulation.

23  **Q.**   You understand that you've been identified as an expert

24  witness in this case; is that right?

25  **A.**   I do.

1  **Q.**   And on what topics will you be providing an expert

2  opinion?

3  **A.**   That the UBH Level of Care Guidelines are consistent with

4  the generally accepted standard of care, and the application of

5  the UBH Level of Care Guidelines is consistent with the

6  generally accepted standards of care.

7  **Q.**   Now, I'm going to direct your attention to an exhibit in

8  the book in front of you, which is 662, which has already been

9  admitted into evidence.

10      Do you have that in front of you, Dr. Alam?

11 **A.**   I do.

12 **Q.**   You indicated a few moments ago that you are familiar with

13 and affiliated with the ASAM organization?

14 **A.**   Yes.

15 **Q.**   Are you familiar with the ASAM Criteria?

16 **A.**   I am.

17 **Q.**   Do you regularly use the ASAM Criteria in your practice?

18 **A.**   I do.

19 **Q.**   Are you familiar with the ASAM Criteria's levels of care?

20 **A.**   I am.

21 **Q.**   On a very high level, can you describe how ASAM -- or what

22 are the ASAM levels of care?  You used some numbers earlier.

23 Can you give some description to that?

24 **A.**   Sure.  The criteria is the levels of care are organized,

25 you know, with numerical attributes.

1    So 4.0 is the highest level of care that reflects either

2  inpatient detox or inpatient rehabilitation.

3    3.0 refers to residential levels of care, which there are

4  four subtypes of residential treatment.

5    2.0 refers to partial hospital and intensive outpatient

6  levels of care.

7    And 1.0 refers to outpatient treatment.

8    And 0.5 refers to early intervention.

9  **Q.**  Within the Level 3 levels of care, what are the various

10  residential levels that the ASAM Criteria describe?

11  **A.**  So 3.7 refers to the highest level of care within the

12  residential, you know, subtypes, which is really medically

13  monitored high intensity residential treatment.

14    3.5 is medically, you know -- actually, it also is high

15  intensity residential treatment.

16    And 3.3 is for special populations.

17    And 3.1 is for -- is low intensity residential treatment.

18  **Q.**  Do the UBH guidelines allow for coverage at each of those

19  residential levels of care?

20  **A.**  They do.

21  **Q.**  Does UBH, though, have a separate and distinct guideline

22  for the ASAM 3.5 level of care?

23  **A.**  They do not.

24  **Q.**  I'm sorry?

25  **A.**  They do not.  Sorry.

1  **Q.**  In your experience, though, if a member is requesting a

2  3.5 level of care, would UBH deny placement merely because

3  there's not a separate and distinct level in the UBH

4  guidelines?

5  **A.**  No.

6  **Q.**  Have you had a situation, in your experience, where you

7  personally denied a 3.5 level placement because there was not a

8  specific and distinct 3.5 level of care guideline?

9  **A.**  Not to my knowledge; I have not issued a denial.

10  **Q.**  Does UBH contract with facilities in its in-network

11  provider -- with -- with facilities through its in-network

12  provider program?

13  **A.**  They do.

14  **Q.**  Do any of those contracts -- do any of those contracts

15  speak to level of care placement at the 3.5 level of care?

16  **A.**  So in the states where, you know, we are required to use

17  the ASAM Criteria, we do contract with the specific levels.

18      In the states that we are not required, providers have

19  contracted with us, providers that generally provide 3.5

20  services have contracted with us and will receive coverage

21  based on that.

22          **MR. RUTHERFORD:**  I'm sorry, Your Honor?

23      Oh, I thought you said something.

24  **BY MR. RUTHERFORD:**

25  **Q.**  Is it your opinion the ASAM Criteria are consistent with

1    generally accepted standards of care?

2    **A.**    Yes.

3    **Q.**    Do you believe that the UBH guidelines are consistent with

4    generally accepted standards of care?

5    **A.**    Yes.

6    **Q.**    Is it your opinion that the UBH level of guidelines for

7    substance use disorders, specifically, are consistent with

8    generally accepted standards of care?

9    **A.**    Yes.

10   **Q.**    Are you familiar with the concept of "why now" that's been

11   used between 2011 and 2016 in the UBH guidelines?

12   **A.**    I am.

13   **Q.**    Do you recall, sort of generally, which years the "why

14   now" concept appeared in the UBH guidelines?

15   **A.**    I believe it was between 2014 and 2016.

16   **Q.**    Do you have an understanding as to the meaning of the "why

17   now" concept as used in the UBH guidelines?

18   **A.**    I do.

19   **Q.**    What's that?

20   **A.**    So "why now" is really a broad term that is -- that has a

21   couple of components.  One is really what the patient's

22   perspective needs are.  And the second part of that is what the

23   clinician's assessment of the patient's needs are.

24       Now, these two components are, you know, really looked

25   under what we call a biopsychosocial perspective.  In fact, I

1  think the criteria also talks about the individual level of

2  function, the environmental factors.  So it really is a broad

3  term that describes a number of issues that are bringing the

4  member into treatment.

5  **Q.**   And, in your view, is this "why now" concept utilized in

6  the same way at each of the different levels of care within the

7  UBH Level of Care Guidelines?

8  **A.**   That's correct.  The way the criteria is applied is at

9  each level you really take a new look and add the new

10  information that -- that -- the information that may have

11  changed since the last level of care.  Absolutely.

12  **Q.**   What do you mean by that, that you take a new look at --

13  **A.**   So if a patient is going from, let's say, an inpatient

14  level of care to an intensive outpatient level of care, you're

15  not still looking at the data that was obtained at the

16  inpatient level.  You're looking at the new data that's

17  available for the new level of care.  And you're looking at it,

18  really, from trying to match, you know, the patient's symptoms

19  to the level of care.

20  **Q.**   In your opinion, is -- is the "why now" concept limited to

21  acute factors?

22  **A.**   No, it is not.

23  **Q.**   Does it include -- potentially include acute factors?

24  **A.**   It does.

25  **Q.**   So, now, directing your attention to Exhibit 1, which is

1   in the front of the book you have in front of you.

2          **MR. RUTHERFORD:**  It's been previously admitted, Your

3   Honor.

4   **BY MR. RUTHERFORD:**

5   **Q.**   And specifically to Exhibit 1, page 0002.  Do you

6   recognize this document?

7   **A.**   I do.

8   **Q.**   What is it?

9   **A.**   It's the 2011 Level of Care Guidelines at UBH.

10  **Q.**   Are you generally familiar with the structure of the 2011

11  Level of Care Guidelines?

12  **A.**   I am.

13  **Q.**   Within the 2011 Level of Care Guidelines, are there

14  specific -- are there criteria, I'm sorry, specific to

15  substance use disorders and the levels of care for substance

16  use disorders?

17  **A.**   Yes.

18  **Q.**   And is there a specific section for residential treatment

19  for substance use disorders?

20  **A.**   There is.

21  **Q.**   Directing your attention to Exhibit 1, page 0056.

22         Please tell the Court, what are the criteria set forth

23  beginning on Trial Exhibit 1-0056.

24  **A.**   It's the 2011 Level of Care Guidelines, residential

25  rehabilitation for substance use disorders.

1  **Q.**   Okay.  And then beginning on page 1-0056 and then

2  continuing on to page 1-0059, do you see there are two

3  sections?

4  **A.**   Yes.

5  **Q.**   What is Section 1?

6  **A.**   Section 1 is a list of criteria that is required to be

7  met.

8  **Q.**   And then Section 2?

9  **A.**   And has additional criteria which require that all of the

10  elements should be met.

11  **Q.**   Okay.  So what's the difference between Section 1 and

12  Section 2, in other words?

13  **A.**   So you have to pick one from Section 1 and all from

14  Section 2.

15  **Q.**   How -- so you need to establish at least one of the six

16  criteria in Section 1, but all of the seven criteria in Section

17  2; is that right?

18  **A.**   That's right.

19  **Q.**   Now, are -- in your opinion, are each of the six criteria

20  here, which -- are these the potential bases for admission,

21  just to be clear?

22  **A.**   Yes.

23  **Q.**   Are any of these six criteria inconsistent, in your

24  opinion, with generally accepted standards of care for

25  admitting a patient to residential rehabilitation for substance

1  use disorders?

2  **A.**    No.

3  **Q.**    And is your opinion that -- are there any -- is it your

4  opinion that there are any one of these six criteria that

5  provide too high a bar for admission to residential treatment

6  for substance use disorders?

7  **A.**    They do not.

8  **Q.**    Why is that?

9  **A.**    Well, you know, as a clinician and someone who does

10  reviews, I look at this criteria and I say that they really are

11  very broad.  They actually capture all possible instances.

12      When you're looking at 24-hour confinement in a 24-hour

13  setting, the evaluation that is needed to actually enter that

14  is a risk -- is what's called the risk assessment.  So what are

15  the risks that need to be addressed by confining a member or a

16  patient in a 24-hour setting.

17      And if you look at the criteria itself, they are broad.

18  If you look at, for example, criteria number six, you know, a

19  patient just saying -- see, it talks about subjective severity.

20  So all a patient has to say is that I have a severe problem

21  with substances and some social issues related to that, and

22  that's enough.

23      So the criteria really allows a lot of scenarios to -- to

24  lead to an admission.  It really allows clinical judgment to

25  drive the decision making.

1    **Q.**   Let's take another example.

2         So how, in your opinion, is criteria number three

3    consistent with generally accepted standards of care for

4    admission to a residential treatment facility for substance use

5    disorders?

6    **A.**   So that particular point is criteria for a number of

7    other, you know, guidelines.  And that's really referring to

8    having a medical problem that will worsen with continued use.

9    So it is consistent with the generally accepted standards that

10   you need a higher level of care to address that risk.

11   **Q.**   A medical problem being separate from the behavioral

12   health problem?

13   **A.**   That's correct.

14   **Q.**   So the second section you indicated, and all of the

15   following, each of these seven criteria would need to be met

16   for admission to a residential treatment center for substance

17   use disorders; is that right?

18   **A.**   That's correct.

19   **Q.**   Okay.  Now, directing your attention to -- first, to 2a.,

20   which states:

21             "Within 48 hours of admission, the following occurs:

22             A., a psychiatrist/addictionologist completes a

23        comprehensive evaluation of the member."

24        Do you see that?

25   **A.**   I do.

1  Q.   Is that requirement for admission to a residential

2  treatment facility consistent with generally accepted standards

3  of care?

4  A.   It is.

5  Q.   Why is that?

6  A.   It is prudent to have a physician see a patient in a

7  setting which requires 24-hour confinement.

8      It really is the community standard.  It is the

9  expectation that a patient will be seen by a physician as

10  promptly as possible.

11  Q.   You mentioned earlier the ASAM Level 3.5.  Do you recall

12  that?

13  A.   I do.

14  Q.   In your opinion, would this requirement of a 48-hour

15  comprehensive evaluation preclude UBH coverage for a level of

16  care to 3.5 facility?

17  A.   It does not.

18  Q.   Why is that?

19  A.   Uhm, because even the 3.5 criteria does mention the need

20  for the availability for medical services.

21      And, you know, it's about being practical.  You know, we

22  know a patient needs to be seen.  And so I think it actually

23  matches the 3.5 criteria.

24  Q.   Directing your attention, now, to a Criteria 5, which is

25  on page 1-0057.  Do you have that in front of you?

1    **A.**   I do.

2    **Q.**   It reads:

3         "The treating psychiatrist/addictionologist and,

4    whenever possible, the member collaborate to update the

5    treatment plan at least every five days in response to

6    changes in the member's condition, or provide compelling

7    evidence that continued treatment in the current level of

8    care is required to prevent acute deterioration or

9    exacerbation of the member's current condition."

10   Do you see that?

11   **A.**   I do.

12   **Q.**   And is that requirement, in your opinion -- well, first of

13   all, let's look at the every five days.

14   Are the requirement for a treatment plan at least every

15   five days consistent with generally accepted standards of care?

16   **A.**   It is.

17   **Q.**   Why is that?  For residential treatment for substance use

18   disorder.

19   **A.**   I think it's reasonable to take a look at your treatment

20   plan every week, to address, you know, progress, et cetera.

21   And that's how it's generally done in clinical practice.

22   **Q.**   And, in your opinion, would the requirement of a treatment

23   plan update every five days preclude placement at an ASAM 3.5

24   level of care?

25   **A.**   It does not.

1    Q.   Now, looking at the paragraph as a whole, do you think the

2    paragraph as a whole is consistent with generally accepted

3    standards of care?

4    A.   Except for the word "compelling."

5    Q.   Okay.  Why is that not consistent?

6    A.   I just don't think it's a medical term.

7    Q.   So aside from "compelling," which comes after "or

8    provide," is the rest of the paragraph there consistent with

9    generally accepted standards of care?

10   A.   Yes.

11   Q.   And do you know whether this word "compelling" appears

12   again in later years?

13   A.   It does.

14   Q.   Okay.  Now, directing your attention to Exhibit 2, at page

15   00002.  Do you recognize that document?

16   A.   I do.

17   Q.   What is it?

18   A.   It's the 2012 Level of Care Guidelines at UBH.

19   Q.   Does the 2012 Level of Care Guidelines also have criteria

20   specific to substance use disorders for the various levels of

21   care?

22   A.   Yes.

23   Q.   And does it specifically have a placement guideline for

24   residential rehabilitation placement for substance use

25   disorders?

1    A.    It does.

2    Q.    Okay.  Directing your attention to Exhibit 2 -- at page --

3          MR. RUTHERFORD:  I'm sorry, Your Honor.

4    BY MR. RUTHERFORD:

5    Q.    Directing your attention to Exhibit 2-0062.

6          What criteria, Dr. Alam, are set forth beginning on page

7    2-0062 and continuing to 2-0065?

8    A.    It's the 2012 Level of Care Guidelines, residential

9    rehabilitation substance use disorders.

10   Q.    And is the structure of this guideline the same basic

11   structure as the 2011 guideline?

12   A.    It is.

13   Q.    With the section where six -- one of the six criteria need

14   to be met?

15   A.    Yes.

16   Q.    And then a section where all of the seven criteria need to

17   be met?

18   A.    Yes.

19   Q.    For placement in a residential treatment facility for

20   substance use disorders?

21   A.    Yes.

22   Q.    Okay.  Again, looking at the six criteria in the first

23   section, any one of which need to be met, in your opinion, do

24   any of these criteria -- are any of these criteria inconsistent

25   with generally accepted standards of care for placement in a

1  residential treatment facility for substance use disorders?

2  **A.**   They are not.

3  **Q.**   And looking down to Section 2 here, "And all of the

4  following," and directing your attention, first, to paragraph

5  2a., do you see that?

6  **A.**   I do.

7  **Q.**   Is that the same requirement for a 48-hour comprehensive

8  evaluation that we just discussed in the 2011 Level of Care

9  Guidelines?

10  **A.**   It is.

11  **Q.**   And do you believe that this requirement is consistent

12  with generally accepted standards of care?

13  **A.**   It is.

14  **Q.**   For the same reasons that you -- that you stated with

15  respect to the same language in the 2011 Level of Care

16  Guidelines?

17  **A.**   Yes.

18  **Q.**   And then to --

19          **THE COURT:**   So stop there.

20      Turn to Exhibit 662 and show me where in the 3.5 level of

21  care criteria it requires a doctor's -- an M.D., within 48

22  hours, to do the things that are required by that level of care

23  guideline.

24          **THE WITNESS:**   I think we -- from the broad difference

25  between the UBH --

1      THE COURT:  So, in other words, it does not.

2      THE WITNESS:  It does not specifically say "48 hours,"

3 but it does talk about the need for medical monitoring and

4 availability.

5      THE COURT:  Well, it doesn't say "complete a

6 comprehensive evaluation"; right?

7      THE WITNESS:  Right.  It doesn't specifically say

8 that.

9      THE COURT:  It talks about the availability of a

10 doctor, or a consultation with a doctor; right?

11      THE WITNESS:  It talks about really matching the

12 patient's symptoms with --

13      THE COURT:  Look at page 662-274, if you would.

14      And under support systems it says, all programs, 3.5

15 programs, necessary support systems include, and then it has a

16 list -- which was the only place where I could find; maybe you

17 can find other places -- where it referred to a physician.

18 Nothing in that requires a physician to do anything like

19 what -- to do what is required by the Level of Care Guidelines;

20 right?

21      THE WITNESS:  That is correct.

22      THE COURT:  Thank you.

23      So this is an instruction to you.  I'm not going to take

24 this high level, oh, it's all sort of very generally accepted

25 standards of care.

1    You're going to have to dig down and point it out to me

2  because by now you've had chapter and verse on why the details

3  are inconsistent.  So you're going to have to go and dig down.

4    Okay.  Go ahead.

5  **BY MR. RUTHERFORD:**

6  **Q.**   Dr. Alam, directing your attention to the criteria in

7  number 3.  Do you see that, at Exhibit 2-0063?

8    Criteria 3 states:

9      "Subsequent psychiatric evaluations and consultations

10     are available 24 hours a day.  Visits with the treating

11     psychiatrist and addictionologist occur at least two times

12     per week."

13    Do you see that?

14  **A.**   I do.

15  **Q.**   And, in your opinion, is that requirement for residential

16  placement for substance use disorders consistent with generally

17  accepted standards of care?

18  **A.**   In my opinion, yes.

19  **Q.**   Okay.  Can you explain why.

20  **A.**   The expectation that a patient in a 24-hour confinement is

21  seen by a physician a couple of times a week is reasonable and

22  generally followed in the community.

23  **Q.**   And why is that -- is there any reason to require that

24  with respect to residential treatment placement as opposed to

25  another level?

1    A.    As opposed to an outpatient or --

2    Q.    Correct.

3    A.    It's -- usually there is a degree of risk that has led

4    patients into this level of care.  Part of our role is to

5    monitor that safe and appropriate care as provided to our

6    members.  And part of that monitoring role, you know, requires

7    that we make sure that a physician is seeing our members.  And

8    a number of times this is the first level that members enter;

9    and we don't know much about them.  And so it is prudent to

10   expect phys- -- close physician follow up.

11   Q.    Now I want to direct your attention, then, to number 4,

12   just right below it.  That criteria states:

13            "All relevant general medical services, including

14        assessment and diagnostic treatment and consultative

15        services, are available as needed and provided with an

16        urgency that is commensurate with the member's medical

17        need.  Co-occurring medical conditions can be safely

18        treated in this level of care."

19        Do you see that?

20   A.    I do.

21   Q.    What is a medical service or a medical need?  What is this

22   speaking to?

23   A.    This is really speaking to co-morbid conditions that a

24   patient may have, and the need for treating these co-morbid

25   conditions.

1  Q.  What's an example of a medical co-morbid condition?

2  A.  An example would be for an IV drug user, you know, an

3  infection, injection site infection.

4  Q.  Is this provision, in your opinion, consistent with

5  generally accepted standards of care?

6  A.  It is.

7  Q.  Why?

8  A.  The expectation that someone in a 24-hour confinement is

9  seen by a physician, their medical conditions are actively

10  treated; that's consistent.

11  Q.  And would this requirement of safely treating co-occurring

12  medical conditions preclude, in your opinion, placement at a

13  level of care lower than an ASAM 3.7 for residential treatment?

14  A.  It does not.

15  Q.  And why not?

16  A.  We have contracted with a number of facilities that just

17  provide 3.5 services.  And we -- a number in network facilities

18  do provide the service and are compliant with this expectation.

19  So when we get a request, I mean, we do apply the general

20  residential criteria even for the 3.5 level of care.

21  Q.  What are you looking for, though, when you want to ensure

22  that a level of care can safely treat a medical condition?

23  What are the qualities of a facility that you're looking for?

24  A.  That -- that -- first of all, that they have, you know,

25  involvement of a physician in a timely manner; that they have,

1  you know, the facilities to manage a medical condition; and

2  that they -- they -- the expectation of 24-hour monitoring that

3  takes place.

4  **Q.**   Not necessarily that a physician is on site the whole

5  time?

6  **A.**   That's correct.

7  **Q.**   Okay.  Now, directing your attention to paragraph 5 below

8  that, do you have that in front of you?

9  **A.**   I do.

10 **Q.**   Is paragraph 5 the same language as I had you discuss in

11 the 2011 Level of Care Guidelines?

12 **A.**   Yes.

13 **Q.**   And is your opinion, regarding the entirety of that

14 paragraph, the same with respect to the 2012 Level of Care

15 Guidelines?

16 **A.**   It is.

17 **Q.**   Which is that the -- am I right that the paragraph is

18 consistent with generally accepted standards of care except

19 with respect to the use of the word "compelling"?

20 **A.**   Yes.

21 **Q.**   Now, directing your attention to paragraph 5a., underneath

22 paragraph 5.  This is the paragraph beginning "Treatment in a

23 residential setting is not for the purpose of providing

24 custodial care."

25      Do you see that?

1  **A.**  I do.

2  **Q.**  Was that paragraph in the 2011 Level of Care Guidelines?

3  **A.**  I don't recall, actually.

4  **Q.**  This is the first time --

5  **A.**  Yes, it is.

6  **Q.**  -- that this provision has appeared; correct?

7  **A.**  Yes.

8  **Q.**  And this -- this paragraph, what does this paragraph

9  pertain to?  The concept of what?

10  **A.**  The concept of custodial care.

11  **Q.**  And is custodial care -- let me ask it this way:  Do you

12  know whether custodial care is generally defined in the UBH

13  health plans?

14  **A.**  It is.

15  **Q.**  And do you have an opinion as to whether or not this

16  custodial care definition in 5a. is consistent with generally

17  accepted standards of care?

18  **A.**  It is.

19  **Q.**  And is it?

20  **A.**  It is.

21  **Q.**  In your opinion, is it consistent with generally accepted

22  standards of care to exclude coverage that is solely to prevent

23  runaway, truancy, and legal problems?

24  **A.**  It is.

25  **Q.**  Why is that?

1    **A.** Custodial care is sort of a universal concept. CMS has

2    defined it. It's -- and it's part of, you know, the need for

3    medical necessity, really.

4    **Q.** Now directing your attention at the top of the next page,

5    at 2-0064, at 5b. Do you see that?

6    **A.** I do.

7    **Q.** States:

8          "Treatment in a residential setting is for the active

9          treatment of a substance use disorder."

10   Do you see that?

11   **A.** I do.

12   **Q.** And the rest of the paragraph, including the subparts,

13   discuss active treatment?

14   **A.** Yes.

15   **Q.** Have you reviewed this entire 5b.? 5b. -- paragraph 5b.

16   and then the five subparts?

17   **A.** Yes.

18   **Q.** And do you consider 5b. to be consistent with generally

19   accepted standards of care?

20   **A.** I do.

21   **Q.** Why is that?

22   **A.** Again, active treatment is really the expectation of

23   medical necessity; that if you're confined in a 24-hour

24   setting, hopefully, you're there to receive treatment. And

25   when the treatment ends, you're able to transition to a less

1  restrictive setting.

2  **Q.**   Okay.  Directing your attention to Exhibit 3, page 0002.

3  Do you recognize that document?

4  **A.**   I do.

5  **Q.**   What is it?

6  **A.**   It's the 2013 Level of Care Guidelines, UBH.

7  **Q.**   Okay.  And then do the 2013 Level of Care Guidelines also

8  have specific level of care criteria for residential placement

9  for substance use disorders?

10 **A.**   They do.

11 **Q.**   Okay.  Directing your attention to Exhibit 3-0067.  And

12 what are the criteria set forth beginning on page 3-0067?

13 **A.**   It's the 2013 Level of Care Guidelines for substance use

14 disorders residential rehabilitation.

15 **Q.**   And is the general structure of the 2013 level of care

16 guideline for residential placement for substance use disorders

17 consistent with the structure in the prior two years?

18 **A.**   Yes.

19 **Q.**   All right.  Directing your attention, first, to the six

20 factors under "Any one of the following criteria must be met."

21    Do you see those?

22 **A.**   I do.

23 **Q.**   And are these six criteria, in your opinion, consistent

24 with generally accepted standards of care?

25 **A.**   Yes.

1  **Q.**  Are any of them inconsistent with generally accepted

2  standards of care for the purposes of placement in a

3  residential treatment facility for substance use disorders?

4  **A.**  Not in my opinion.

5  **Q.**  And are your reasons the same reasons stated with respect

6  to these same set of factors for 2011 and 2012?

7  **A.**  Yes.

8  **Q.**  And down below it has the same section criteria that all

9  must be met in order to get placement to a residential

10  treatment center --

11  **A.**  Yes.

12  **Q.**  -- for substance use disorders?

13  **A.**  Yes.

14  **Q.**  Although, is there an additional factor?  Seven for the

15  years before.  And this year, how many criteria must be met?

16  **A.**  Eight.

17  **Q.**  Directing your attention to paragraph 2a., 3, 5, and 6

18  with its subparts.  Do you see those?

19  **A.**  I do.

20  **Q.**  Are these four paragraphs substantively the same language

21  we saw in the 2012 residential rehabilitation guidelines for

22  substance use disorder?

23  **A.**  Yes.

24  **Q.**  And is your opinion, as to whether or not they are

25  consistent with generally accepted standards of care, the same

1  with respect to these in 2013?

2  A.    Yes.

3  Q.    And what is that opinion?

4  A.    That they are consistent with the generally accepted

5  standards of care.

6  Q.    Now, directing your attention to the top of page 3-0069,

7  where it says "c."  Do you see that?

8  A.    I do.

9  Q.    Part 5c.  So, again, paragraph 5 is describing what

10  concept, Dr. Alam?

11  A.    It's the concept of custodial care.

12  Q.    And can you read the last sentence in that -- in paragraph

13  5?

14  A.    C?

15  Q.    Yeah.  Paragraph 5, it indicates: "Custodial care is

16  characterized by the following."

17        Do you see that?

18  A.    I do.

19  Q.    And to C, can you please read C.

20  A.    (Reading)

21        "The intensity of active treatment provided in a

22        residential setting is no longer required or services can

23        be safely provided in a less intensive setting."

24  Q.    Is that definition of custodial care -- well, is that a

25  definition of custodial care?

1    **A.**   One of the components of custodial care.

2    **Q.**   And is that definition consistent with generally accepted

3    standards of care?

4    **A.**   It is.

5    **Q.**   And, as you mentioned earlier, is the custodial -- for

6    2013, was custodial care defined within UBH's health plans?

7    **A.**   Yes.

8    **Q.**   Directing your attention, now, to Trial Exhibit 5.  We're

9    going to skip Exhibit 4 for the moment.  Page 0001.

10        Do you recognize this document?

11   **A.**   I do.

12   **Q.**   What is it?

13   **A.**   It's the UBH 2015 Level of Care Guidelines.

14   **Q.**   And in 2015, did the UBH Level of Care Guidelines have

15   specific criteria for residential placement for substance use

16   disorders?

17   **A.**   Yes.

18   **Q.**   Directing your attention to Trial Exhibit 5-0081.

19        What criteria are set forth on Trial Exhibit 5-0081, if

20   you know?

21   **A.**   It's the 2015 Level of Care Guidelines' residential

22   rehabilitation criteria.

23   **Q.**   Directing your attention, first, to the shaded box at the

24   top.  The second paragraph which reads:

25             "The course of treatment in residential

1          rehabilitation is focused on addressing the 'why now'

2          factors that precipitated admission (e.g, changes in the

3          member's signs and symptoms, psychosocial and

4          environmental factors, or level of functioning) to the

5          point that rehabilitation can be safely, efficiently, and

6          effectively continued in a less intensive level of care."

7          Do you see that?

8     A.   I do.

9     Q.   And with respect to placement in the residential

10    rehabilitation facility for substance-related disorders, is

11    this provision consistent with generally accepted standards of

12    care?

13    A.   It is.

14    Q.   Can you explain why?

15    A.   The "why now" here describes two components:  One, the

16    patient's goals or the reason the patient is coming, you know,

17    to receive this 24-hour confinement-related treatment.  And the

18    other part is obviously the clinician's assessment of the

19    member or patient.

20         And this information is looked at from a biopsychosocial

21    perspective with, really, an emphasize on psychosocial and

22    environmental factors, the level of functioning, et cetera.

23    And this is applied.  And this becomes, really, your treatment

24    plan.

25    Q.   Does this have any special significance, given that it's

1  placement for residential rehabilitation for substance use

2  disorders?

3  **A.**    Yes.   Obviously, it's for individuals who are at a certain

4  degree of risk.   And the risk assessment is required in a more

5  intensive treatment.

6  **Q.**   Do you have any concerns that this provision

7  overemphasizes the "why now" factors?

8  **A.**    I do not.

9  **Q.**   Do you have any concerns that this provision

10  overemphasizes acute changes in signs and symptoms?

11  **A.**    I do not.

12  **Q.**   Do you have any concerns that this provision

13  underemphasizes chronic factors?

14  **A.**    It does not.

15     When you talk about acute symptoms, you're really

16  referring to the acute changes of a chronic condition.

17     Most of what we treat are chronic conditions.   So when

18  you're talking about acute changes, you're referring to the

19  acute changes that are contributed because of the underlying

20  chronic condition.

21  **Q.**   When you say "most of what we treat are chronic

22  conditions," are you talking about substance use disorders?

23  Mental health?   What are you talking about?

24  **A.**    You could pick.   Most of what we treat now, whether it's

25  substance use disorders or mental health conditions, they are

1  chronic conditions.

2  **Q.**  Now, directing your attention a little farther down the

3  page, to 1.3.

4      Do you see that?

5  **A.**  I do.

6  **Q.**  Where it reads the "why now" -- well, the admission

7  criteria are structured differently in this guideline; is that

8  right?

9  **A.**  Yes.

10  **Q.**  Are each of these criteria required for there to be

11  admission to a residential rehabilitation facility for

12  substance use disorders?

13  **A.**  Yes.

14  **Q.**  So then directing your attention to 1.3, one of those

15  required criteria reads:

16      "The 'why now' factors leading to admission and/or

17      the member's history of response to treatment suggests

18      that there is imminent or current risk of relapse which

19      cannot be safely, efficiently, or effectively managed in a

20      less intensive level of care."

21      Do you see that?

22  **A.**  I do.

23  **Q.**  And is that requirement consistent with generally accepted

24  standards of care?

25  **A.**  It is.

1   **Q.**   Why?  I'm sorry, for residential placement for substance

2   use disorders?

3   **A.**   Yes.

4   **Q.**   Why?

5   **A.**   If you see, that point really has two components.  You can

6   get into residential if the "why now" factors alone, you know,

7   require 24-hour care.  And the second point is referring to a

8   risk of relapse and needs for a structure to prevent that.

9   That's consistent with the generally accepted standards of

10  care.

11          **THE COURT:**  Can I ask you a question?  Isn't that

12  second part, by your definition, included in the "why now"

13  factors?

14          **THE WITNESS:**  It is.

15          **THE COURT:**  Thank you.

16          **THE WITNESS:**  And, Your Honor, if I may.

17          **THE COURT:**  Sure.

18          **THE WITNESS:**  Some of these points are redundant

19  because our frontline, we have a multidisciplinary team; so we

20  have a number of clinicians.  Some of these points we have to

21  reiterate because, you know, a number of our patients may only

22  receive residential treatment.  So this may be the entry into,

23  sort of, the mental health/substance abuse system.  So there is

24  some redundancy that is expected.

25      In medical care, repetition -- we're still learning from

1  the FAA and the error rates, so repetition is sort of the norm.

2       THE COURT:  Well, I appreciate that way of looking at

3  this.

4       The other way of looking at this is that people reading

5  this, who didn't draft them, are trying to figure out what they

6  mean and trying to figure out what the "why now" factors mean,

7  see what it means and see what it doesn't mean, and distinguish

8  it from other factors.

9       So aren't you at risk that when somebody reads this

10  sentence they will think that "why now" is not as broad as

11  you -- as you understand it to be?

12       THE WITNESS:  Point taken, yes.

13       THE COURT:  Thank you.

14  BY MR. RUTHERFORD:

15  Q.  Directing your attention to this phrase "imminent or

16  current risk of relapse."

17       Do you see that?

18  A.  I did.

19  Q.  1.3.  And down in 1.3.2, it talks about "immediate or

20  imminent danger of relapse."

21       Do you see that?

22  A.  I do.

23  Q.  Do those basically mean the same thing?

24  A.  They do.

25  Q.  What do they mean?  What does it mean to be in imminent

1  danger of relapse?

2  **A.**   It means that without the structure of a 24-hour setting,

3  the member or patient is going to resume use of substances,

4  putting himself or herself in danger, basically.

5  **Q.**   In your opinion, would this language preclude coverage at

6  a -- for instance, at an ASAM Level 3.5?

7  **A.**   It would not.

8  **Q.**   Why not?

9  **A.**   Because, again, the risk assessment that is used in ASAM,

10  to arrive at a level of care determination, requires certain

11  elements to be met to meet residential criteria.

12  **Q.**   Down -- directing your attention down to 1.4, a little bit

13  lower.  This is also a requirement for admission to residential

14  rehabilitation for substance-related disorders.  Is that right?

15  **A.**   Yes.

16  **Q.**   Okay.  It reads:

17        "The 'why now' factors leading to admission cannot be

18        safely, efficiently, or effectively assessed and/or

19        treated in a less intensive setting due to acute changes

20        in the member's signs and symptoms and/or psychosocial and

21        environmental factors"; and then says "examples include."

22        Do you see that?

23  **A.**   I do.

24  **Q.**   Is this provision consistent with generally accepted

25  standards of care for residential treatment for substance use

1    disorders?

2    **A.**    It is.

3    **Q.**    Why?

4    **A.**    You know, the first point we talked about, really, the

5    risk, which is imminent danger of relapse or imminent risk of

6    relapse.

7    And the second point is really reemphasizing, is this the

8    appropriate level of care given the "why now" factors.

9    So it's another sort of check, again, for our team to say,

10   well, okay, we've now assessed the risk; is this the right

11   level of care?  And all of the, you know, perspective of

12   safely, efficiently, and effectively assessing and treating the

13   member at this level of care.

14   **Q.**    So you see where it says "acute changes in the member's

15   signs and symptoms"?

16   **A.**    I do.

17   **Q.**    In 1.4?

18   **A.**    Yes.

19   **Q.**    Okay.  Does this language -- does this language concern

20   you with respect to an overemphasis on acute and an

21   underemphasis on chronicity?

22   **A.**    It does not.

23   **Q.**    Why not?

24   **A.**    It's talking about the acute changes, probably, of a

25   chronic condition.  Even chronic conditions have, you know,

1  episodic, acute exacerbations.  So this is referring to that.

2  **Q.**   Now, directing your attention to Exhibit 5-0082, to 2.2,

3  the top of Exhibit 5-0082.

4       Do you see that?

5  **A.**   I do.

6  **Q.**   Where it states:

7            "Treatment is not primarily for the purpose of

8       providing custodial care."

9       Do you see that?

10 **A.**   I do.

11 **Q.**   And then directing your attention down to 2.2.3, it reads:

12            "Services that do not require continued

13       administration by trained medical personnel in order to be

14       delivered safely and effectively."

15      Do you see that?

16 **A.**   I do.

17 **Q.**   And is that part of the definition of custodial care?

18 **A.**   It is.

19 **Q.**   And is this definition of custodial care consistent with

20 generally accepted standards of care, in your opinion?

21 **A.**   It is.

22 **Q.**   Why?

23 **A.**   When you don't need the care of -- of a medically trained

24 individual, do you need -- do you continue to need the current

25 intensity of treatment?

1  Q.  At the residential --

2  A.  Correct, at the 24-hour confinement.

3         THE COURT:  What is "medically trained"?

4         THE WITNESS:  Anyone that requires licensure to

5  take --

6         THE COURT:  It's not limited to physicians?

7         THE WITNESS:  It's not.

8  BY MR. RUTHERFORD:

9  Q.  Directing your attention to Exhibit 6 and Exhibit 7, at

10  pages 0001 in each of those exhibits.  Do you have those in

11  front of you?

12  A.  I do.

13  Q.  What are Exhibits -- do you recognize Exhibit 6 and 7?

14  A.  I do.

15  Q.  What are they?

16  A.  They are the two versions of the 2016 Level of Care

17  Guidelines, UBH Level of Care Guidelines.

18  Q.  And do both of these 2016 Level of Care Guidelines have

19  criteria specific to residential treatment placement for

20  substance use disorders?

21  A.  They do.

22  Q.  And is the language the same for each of these versions in

23  2016?

24  A.  In general, yes.

25  Q.  Now, just with respect to that criteria for residential

1    treatment placement for substance use disorders?

2    **A.**    Yes.

3    **Q.**    It's the same language?

4    **A.**    Yes.

5    **Q.**    So directing your attention to Exhibit 6-0090.  What

6    criteria set forth on Exhibit 6-0090.

7    **A.**    I see it's the 2016 Level of Care Guidelines, residential

8    rehabilitation.

9    **Q.**    And then directing your attention to Exhibit 7-0091.

10   7-0091.

11   **A.**    Yes.

12   **Q.**    Do you have 7-0091 in front of you?

13   **A.**    I do.

14   **Q.**    What is that?

15   **A.**    It's the 2016 Level of Care Guidelines, residential

16   rehabilitation.

17   **Q.**    And so the language is the same in both?

18   **A.**    It is.

19   **Q.**    And is your -- will your opinion be the same with respect

20   to both?

21   **A.**    Yes.

22   **Q.**    Directing your attention to Trial Exhibit 6-0090, to the

23   shaded box at the top.  Second paragraph.  Do you see that?

24   **A.**    I do.

25   **Q.**    The paragraph beginning with "The course of treatment in

1  residential rehabilitation."

2  A.   Yes.

3  Q.   Okay.  Is that the same provision that you just discussed

4  from the 2015 Level of Care Guidelines for substance use -- for

5  residential treatment and substance use disorders?

6  A.   It is.

7  Q.   And is your opinion, with respect to whether this

8  provision is consistent with generally accepted standards of

9  care, the same with respect to 2016, both versions, as it was

10 with respect to 2015?

11 A.   It is.

12 Q.   And what is that opinion?

13 A.   That the description here is consistent with the generally

14 accepted standards of care.

15 Q.   And then directing your attention down to the provisions

16 that say "1.3" and "1.4."  Do you see that?

17 A.   I do.

18 Q.   And the language at 1.3, 2 regarding imminent -- I'm

19 sorry, immediate or imminent danger of relapse.  Do you see

20 that?

21 A.   I do.

22 Q.   Is that the same language as you discussed for the 2015

23 Level of Care Guidelines?

24 A.   It is.

25 Q.   And is it your opinion that these provisions are

1  consistent with generally accepted standards of care for

2  residential rehabilitation for substance use disorders?

3  **A.**   Yes.

4  **Q.**   For the same reasons as you testified earlier?

5  **A.**   Yes.

6  **Q.**   Okay.  Now, directing your attention to exhibit --

7        **MR. RUTHERFORD:**  One moment, Your Honor.  I'm sorry.

8  **BY MR. RUTHERFORD:**

9  **Q.**   Directing your attention to Exhibit 6.  I'm sorry, to

10 Exhibit 4, to the 2014 Level of Care Guidelines.

11      Do you have that in front of you?

12 **A.**   I do.

13 **Q.**   Are you familiar with the 2014 Level of Care Guidelines?

14 **A.**   I am.

15 **Q.**   And aside from the formatting, is the -- do the 2012 --

16 I'm sorry, the 2014 Level of Care Guidelines, at Trial Exhibit

17 4, also contain criteria specific to residential treatment for

18 substance use disorders?

19 **A.**   Yes.

20 **Q.**   Directing your attention to page 4-0077, starting with the

21 shaded box at the top, second paragraph that begins with "The

22 course of treatment," do you see that?

23 **A.**   I do.

24 **Q.**   Is that the same language that appeared in the 2015 and

25 2016 --

1    **A.**    It is.

2    **Q.**    -- Level of Care Guidelines?

3    And is your opinion, with respect to whether or not this

4    provision is consistent with generally accepted standards of

5    care, the same as it was for those other years?

6    **A.**    It is.

7    **Q.**    Now, directing your attention -- staying on 4-0077, do you

8    see the column that says "Admission"?

9    **A.**    I do.

10    **Q.**    What is contained in the column that says "Admission"?

11    What information is that?

12    **A.**    It's the criteria required for admission.

13    **Q.**    And where it says "and," it means that each one of these

14    criterion must be met; correct?

15    **A.**    Yes.

16    **Q.**    Directing your attention to the third bullet point, the

17    third bullet point states:

18    "The 'why now' factors leading to admission suggest

19    that physical complications, if present, can be safely

20    managed."

21    Do you see that?

22    **A.**    I do.

23    **Q.**    What do you understand "physical complications" to mean?

24    **A.**    To mean medical conditions.

25    **Q.**    And is this requirement that physical complications, which

1  you understand to be medical conditions, can be safely managed

2  a requirement that is consistent with generally accepted

3  standards of care?

4  **A.**   It is.

5  **Q.**   Why is that?

6  **A.**   The expectation that you're in a 24-hour care setting and

7  that if you have medical conditions that they would be

8  addressed, you know, safely.

9  **Q.**   And does it concern you that this requirement regarding

10  physical complications does not also require that these

11  physical complications can be effectively treated?

12  **A.**   It does not.

13      I would be concerned if it did, because we're talking

14  about behavioral health or substance abuse settings; in this

15  particular case, a 24-hour residential setting.

16      You know, as a practitioner, all of our psychotropic

17  medications now have a warning around cardiac side effects.  So

18  if one of my patients actually needs medical care, they

19  probably need to go to a medical setting.  So to -- to promise

20  or expect that one of our members will receive effective

21  medical care in a substance use setting, that may be a stretch.

22  So as long as they can provide safe care for what's needed, I'm

23  satisfied.

24      **THE COURT:**  So this purposefully excludes the notion

25  of effective care for physical complications if present?

1          THE WITNESS:   That's correct.

2   BY MR. RUTHERFORD:

3   Q.   Directing your attention to page 4-0078, which is just the

4   next page.  The first bullet point under "Admission," do you

5   see that?

6   A.   I do.

7   Q.   Okay.  It reads:

8          "The 'why now' factors leading to admission and/or

9          the member's history of response to treatment suggests

10         that there is imminent or current risk of relapse which

11         cannot be safely, efficiently, or effectively managed in a

12         less intensive level of care."

13         And then it gives some examples.  Do you see that?

14  A.   I do.

15  Q.   And is this -- while there aren't numbers next to it, is

16  this essentially the same language that you discuss with

17  respect to the 2015 and 2016 Level of Care Guidelines?

18  A.   It is.

19  Q.   And is your opinion, with respect to whether or not this

20  language is consistent with generally accepted standards of

21  care, the same with respect to 2014 as it was with respect to

22  2015 and '16?

23  A.   It is.

24  Q.   Okay.  Now, directing your attention down to Trial Exhibit

25  4-0079.  Under "or" do you see that?

1    **A.**    I do.

2    **Q.**    It says:

3          "The 'why now' factors leading to admission cannot be

4    safely, efficiently, or effectively addressed and/or

5    treated in a less intensive setting due to acute changes

6    in the member's signs and symptoms and/or psychosocial and

7    environmental factors."

8    And then it gives some examples that go to the next page.

9    Do you see that?

10    **A.**    I do.

11    **Q.**    And is that the same language as you testified about from

12    Section 1.4 in the 2015 and 2016 Level of Care Guidelines?

13    **A.**    It is.

14    **Q.**    And is your opinion, with respect to whether or not this

15    language is consistent with generally accepted standards of

16    care, the same as it was for 2015 and '16?

17    **A.**    It is.

18    **Q.**    And what is that opinion?

19    **A.**    That the language is consistent with the generally

20    accepted standards of care.

21    **Q.**    Now, directing your attention back to Trial Exhibit

22    4-0077, to the middle column, under "Level of Care Criteria."

23    Do you see that?

24    **A.**    I do.

25    **Q.**    What information is this in this middle column, of "Level

1    of Care Criteria"?

2    **A.**    It's the evaluation and treatment planning column.

3    **Q.**    In the -- don't have numbering here, but do you see the

4    last full paragraph, starting with "Custodial care"?  On

5    4-0077, under continued service --

6    **A.**    Yes, I do.

7    **Q.**    Reads:

8         "Custodial care involved services that don't seek to

9         cure are provided when the member's condition is

10        unchanging, are not required to maintain stabilization, or

11        don't have to be delivered by trained clinical personnel."

12        Do you see that?

13   **A.**    I do.

14   **Q.**    And do you know whether or not in 2014 UBH's health plans

15   defined "custodial care"?

16   **A.**    They do.

17   **Q.**    Also, on 4-0077, under "Evaluation and treatment

18   planning," do you see that language?

19   **A.**    I do.

20   **Q.**    What does "Evaluation and treatment planning" cover?

21   **A.**    It covers, you know, the issues related to the patient's

22   specific treatment plan.

23   **Q.**    Second of those two bullet points requires that the

24   evaluation and treatment planning -- as part of evaluation and

25   treatment planning, that the psychiatrist or addictionologist,

1    in conjunction with the treatment team, completes the initial

2    evaluation within 24 hours of admission.

3         Do you see that?

4    A.    I do.

5    Q.    And is that requirement of an initial evaluation within 24

6    hours of admission to residential rehabilitation for

7    substance-related disorders consistent with generally accepted

8    standards of care?

9    A.    It is.

10   Q.    Why?

11   A.    It's -- to have a patient seen as soon as possible in a

12   24-hour confinement setting is -- is generally, you know,

13   expected.  You want that to happen.

14   Q.    In your opinion, is this -- does this provision preclude

15   members who are seeking placement at an ASAM Level 3.5

16   facility?

17   A.    It does not.

18   Q.    Why not?

19   A.    Because this is something we emphasize.  But we'll work

20   with the facilities.  So it's not something that alone I would

21   use to issue a denial; that your doctor can't see you within 24

22   hours.

23        And, for example, in our state, where ASAM Criteria is

24   required by law, patients are required to be seen within 24

25   hours.

1  Q.   Now, directing your attention back to Exhibit 2, at 0029.

2       Let me know when you have that in front of you.

3  A.   I do.

4  Q.   Okay.  Paragraph 5.  You see this is a -- well, tell me,

5  what criteria begin on Trial Exhibit 2-0028?

6  A.   It's the residential treatment mental health conditions

7  2012 Level of Care Guidelines.

8  Q.   Okay.  This is different criteria from the substance use

9  disorder criteria?

10 A.   It is.

11 Q.   Directing your attention to paragraph 5.  Paragraph 5

12 states:

13        "The provider and, whenever possible, the member

14     collaborate to update the treatment plan at least weekly

15     in response to changes in the member's condition, or

16     provide compelling evidence that continued treatment in

17     the current level of care is required to prevent acute

18     deterioration or exacerbation of the member's current

19     condition."

20      Do you see that?

21 A.   I do.

22 Q.   And is this paragraph, in your opinion, consistent with

23 generally accepted standards of care for residential placement

24 for mental health conditions?

25 A.   Again, except for the word "compelling," yes.

1    **Q.**    But, otherwise, in your opinion, it is?

2    **A.**    It is.

3    **Q.**    Why is that for mental health conditions?

4    **A.**    That, you know, the expectation that you take a look at

5    how the patient is doing and update the treatment plan at least

6    on a weekly basis, I believe that's the standard of care.  And

7    providing evidence for the continued need for 24-hour

8    confinement, that's within the expected standards of care.

9    **Q.**    And at 5a., if I could direct your attention to 5a. and

10   its subparts.

11          What do 5a. and its subparts, in short, describe?

12   **A.**    They describe the custodial care description.

13   **Q.**    And do you have an understanding as to whether in 2012

14   UBH's health plans defined custodial care?

15   **A.**    Yes.

16   **Q.**    And down to paragraph 5b., which also has five subparts.

17   Do you see that?

18   **A.**    I do.

19   **Q.**    What does paragraph 5b. describe?

20   **A.**    It describes -- it's a definition of active treatment, and

21   then has more specifics around what is defined as active

22   treatment.

23   **Q.**    Is this definition of active treatment similar in all

24   material respects as to the definitions of active treatment

25   that you previously discussed today?

1    **A.**    Yes.

2    **Q.**    Is it your opinion that 5b. and its definition of active

3    treatment is consistent with generally accepted standards of

4    care?

5    **A.**    It is.

6    **Q.**    For the reasons that you stated earlier?

7    **A.**    Yes.

8    **Q.**    Now, directing your attention to page 2-0047.

9           What level of care criteria are set forth on page 2-0047,

10   Dr. Alam?

11   **A.**    It's the 2012 intensive outpatient program substance use

12   disorders.

13   **Q.**    And is the structure -- how does the structure of the 2012

14   intensive outpatient program substance use disorder criteria

15   compare to the residential treatment substance use disorder

16   criteria that you were discussing earlier?

17   **A.**    It's similar.

18   **Q.**    In what -- in what general respects?

19   **A.**    In general layout, you know, there's a shaded box with

20   some descriptives.  And then you have a checklist that one of

21   the criteria has to be met, and then all of the following.

22   **Q.**    So I want to direct your attention to one of the required

23   criteria under any -- I mean under "and all of the following."

24   So go to, if you could, Trial Exhibit 2-0048, at Criteria 6.

25   And this reads, Criteria 6:

1    "Within the first three days of treatment" -- this

2    being intensive outpatient treatment -- "the following

3    should occur:

4    "A psychologist our addictionologist completes a

5    comprehensive evaluation of the member when the member has

6    been directly admitted from an inpatient setting."

7    Do you see that?

8  A.   I do.

9  Q.   Is that requirement, in your opinion, from inpatient to

10  intensive outpatient, a requirement that is consistent with

11  generally accepted standards of care?

12  A.   It is.

13  Q.   Why is that?

14  A.   Most of our patients get into IOP.  They've not had care

15  before.  But, more importantly, IOP is a common step down from

16  an acute treatment setting such as inpatient.

17    So they transition from a higher level of care to IOP.

18  That can -- there's a significant transition, especially for an

19  individual who has recently been at higher risk, as determined

20  by a risk assessment.  So it is prudent to make sure that a

21  patient is seen quickly after an acute transition between

22  levels of care.

23  Q.   And, in your opinion, does this requirements create a

24  barrier of access to placement in an intensive outpatient

25  setting?

1   **A.**   It does not.

2   **Q.**   Directing your attention to Exhibit 5, at page 0039.

3   **A.**   I'm sorry, 0029?

4   **Q.**   39.  I'm sorry.

5        At the top, at 2.2.2.

6   **A.**   Yes.

7   **Q.**   What does this paragraph, 2.2.2 speak to?  What concept is

8   it referring to?

9   **A.**   It's referring to a concept of custodial care, one of the

10  elements of custodial care.

11  **Q.**   And this requirement states -- am I right? -- (reading):

12       "Health-related services that are provided for the

13       primary purpose of meeting the personal needs of the

14       patient or maintaining a level of function, even if the

15       specific services are considered to be skilled services,

16       as opposed to improving that function to an extent that

17       might allow for a more independent existence."

18       Do you see that?

19  **A.**   I do.

20  **Q.**   And is that -- do you interpret that to be part of the

21  definition of custodial care?

22  **A.**   I do.

23  **Q.**   And in 2015, do you know whether or not the UBH health

24  plans contained a definition of custodial care?

25  **A.**   They did.

1    **Q.**    And did they?

2    **A.**    They did.

3    **Q.**    Now, directing your attention to Exhibit 10, at page 0002.

4    Starting at page 0002.  Exhibit 10.  It will be at the front of

5    your book.  Probably the very front.

6    **A.**    I can look at the screen.

7    **Q.**    Okay.  Do you recognize this document?

8    **A.**    I do.

9    **Q.**    What is it?

10   **A.**    It's the Coverage Determination Guidelines' custodial care

11   and inpatient services criteria.

12   **Q.**    Now, directing your attention to the section on 0003, that

13   starts with "Key Points."

14        Do you see that?

15   **A.**    I do.

16   **Q.**    Down to the third bullet point, it reads:

17        "United Behavioral Health maintains that treatment of

18        a behavioral health condition in an acute inpatient unit,

19        or RTC, is not for the purpose of providing custodial

20        care, but is for active treatment of a behavioral health

21        condition."

22        Do you see that?

23   **A.**    I do.

24   **Q.**    In essence, what does that mean?

25   **A.**    It means that custodial care is an excluded benefit.

1    Q.    And then down to the -- okay.  Now, I want to direct your

2    attention to Exhibit 108.

3        Let me ask one more question about that.  Do you have an

4    understanding as to whether, in 2010, UBH health plans defined

5    custodial care?

6    A.    In 2010?

7    Q.    Yes.

8    A.    Yes, they did.

9    Q.    And did they?

10   A.    They did.

11   Q.    Now, directing your attention to Exhibit 108, and

12   specifically to page -- well, we'll start with page 0002.  Do

13   you have that in front of you?

14   A.    I do.

15   Q.    Do you recognize that document?

16   A.    I do.

17   Q.    What is it?

18   A.    It's the Coverage Determination Guideline custodial care

19   and inpatient and residential services criteria.

20   Q.    Okay.  And then turning, then, to page 0003 in the shaded

21   area of key points.  Do you see that?

22   A.    I do.

23   Q.    I want to direct your attention to the fourth bullet

24   point.  Do you have that in front of you?

25   A.    I do.

1   **Q.**   And the fourth bullet point reads (reading):

2          "The provision of custodial care by trained

3       behavioral health personnel, such as a psychiatrist or

4       licensed clinician, does not cause the services to be

5       classified as skilled services.  If the nature of the

6       services can be safely and effectively performed by a

7       nontrained person, the services will be considered

8       custodial care."

9       Do you see that?

10  **A.**   I do.

11  **Q.**   And is that point consistent with generally accepted

12  standards of care?

13  **A.**   It is.

14  **Q.**   Why is that?

15  **A.**   Custodial care is a universal concept really primarily

16  defined by CMS or Center for Medicare Services and it's

17  directed by the plan documents.

18  **Q.**   Now directing your attention to the fifth bullet point

19  right under it, it starts (reading):

20          "Active treatment in an inpatient or residential

21       treatment setting is a clinical process involving the

22       24-hour care of members that includes assessment,

23       diagnosis, intervention, evaluation of care, a treatment

24       and planning for discharge and aftercare under the

25       direction of a psychiatrist."

1    Do you see that?

2  **A.**    I do.

3  **Q.**    And is this provision in your opinion consistent with

4  generally accepted standards of care for a placement in a

5  residential or inpatient setting?

6  **A.**    It is.

7  **Q.**    Why is that?

8  **A.**    Again, it's looking at medical necessity of treatment,

9  describing definition of "active treatment."

10  **Q.**    When you say "medical necessity," what do you mean?

11  **A.**    That the treatment is driven by a need for prevention,

12  assessment, diagnosis, intervention, evaluation, treatment

13  planning, et cetera; that the focus of treatment is that.

14  **Q.**    Okay.  And then, finally, directing your attention to

15  Exhibit 195-0003.

16  **A.**    (Witness examines document.)

17  **Q.**    Do you have that in front of you?

18  **A.**    I do.

19  **Q.**    Do you recognize what is on -- well, first of all, do you

20  recognize Trial Exhibit 195?

21  **A.**    Yes.  It's the Coverage Determination Guideline for

22  custodial care and inpatient and residential services.

23  **Q.**    Now, directing your attention to 0003, the fourth black

24  bullet point.  Do you see that?

25  **A.**    I do.

1    Q.    Where it starts with "Improvement"?

2    A.    Yes.

3    Q.    It states (reading):

4          "Improvement of the member's condition is indicated

5    by the reduction or control of the acute symptoms that

6    necessitated hospitalization or residential treatment."

7    And then it has a subpoint, which states -- I left out the

8    citation, but it has a subpoint that states (reading):

9          "Improvement is measured by weighing the

10   effectiveness of treatment and the risk that the member's

11   condition would deteriorate or relapse if inpatient or

12   residential treatment were to be discontinued."

13   Do you see that?

14   A.    I do.

15   Q.    In your opinion, are these provisions regarding

16   improvement consistent with generally accepted standards of

17   care for residential and inpatient services?

18   A.    It is.

19   Q.    Why is that?

20   A.    You know, from a perspective of a clinician, this is what

21   I'm accountable to to my patients.  From a perspective of my

22   medical director role, this is the very definition of

23   "improvement," and it's a complex definition that not only

24   includes symptom improvement but is looking at the impact of

25   the level of care to your symptoms.

1  **Q.**  In your view, does it overly focus on acuity?

2  **A.**  It does not.

3  **Q.**  Changing topics now, are you familiar with someone named

4  Gerald Shulman?

5  **A.**  I am.

6  **Q.**  Who is Mr. Shulman?

7  **A.**  Mr. Shulman is one of the editors of the ASAM criteria.

8  He also headed the group that finalized the residential

9  treatment for the ASAM criteria.

10  **Q.**  In 2013-2014, did UBH hire Mr. Shulman?

11  **A.**  They did.

12  **Q.**  As a consultant?

13  **A.**  They did.

14  **Q.**  For the purpose of doing what?

15  **A.**  He was to review the Level of Care Guidelines and the

16  Coverage Determination Guidelines and determine -- and actually

17  give us feedback on the consistency of the Level of Care

18  Guidelines and Coverage Determination Guidelines with ASAM

19  criteria.  He was to align the criteria with the *DSM-5* and give

20  us feedback around our criteria.

21  **Q.**  Was it a comparison between the 2000 -- was it looking at

22  the 2013 Level of Care Guidelines and Coverage Determination

23  Guidelines?

24  **A.**  Yes.

25  **Q.**  And was it comparing it to the new and current -- then new

1  and now current edition of the ASAM criteria?

2  **A.**   Yes.

3  **Q.**   The same ASAM criteria as we have at Exhibit 662?

4  **A.**   Yes.

5  **Q.**   And did Mr. Shulman complete that project?

6  **A.**   He did.

7  **Q.**   And do you know whether he provided suggestions to UBH

8  with respect to changes in its guidelines?

9  **A.**   He did.

10  **Q.**   Do you know what a Crosswalk is?

11  **A.**   I do.

12  **Q.**   What is a Crosswalk?

13  **A.**   It's essentially a lineup of our criteria next to the ASAM

14  criteria to allow sort of a back and forth, some matching, you

15  know.

16  **Q.**   Did he create a Crosswalk as well?

17  **A.**   He did.

18  **Q.**   As part of his work product, do you recall whether or not

19  Mr. Shulman provided a redline of UBH's Level of Care

20  Guidelines and Coverage Determination Guidelines?

21  **A.**   He did.

22  **Q.**   And did you have an understanding as to whether or not

23  that redline included Mr. Shulman's suggested changes?

24  **A.**   It did.

25  **Q.**   Directing your attention to what has been marked as

1    Exhibit 412 for identification.

2    **A.**    (Witness examines document.)

3    **Q.**    Would you page through this document, please.

4    **A.**    I have.

5    **Q.**    Okay.  Do you recognize the documents contained in

6    Exhibit 412?

7    **A.**    I do.

8    **Q.**    What generally are contained in Exhibit 412?

9    **A.**    It's the contractual agreement that Mr. Shulman signed,

10   and then there's a Crosswalk and the -- sort of the redlined

11   Level of Care Guidelines, as well as the Coverage Determination

12   Guidelines.

13   **Q.**    And does the redline -- on what page does the redline

14   begin, Doctor?

15   **A.**    It begins on page 0016 -- or 15, let's say.

16         **MR. RUTHERFORD:**  Your Honor, we'd move to admit

17   Exhibit 412 into evidence.

18         **MR. GOELMAN:**  No objection beyond those previously

19   articulated.

20         **THE COURT:**  There wasn't an objection to this.  This

21   is the redline.  You didn't object to the redline.

22         **MR. GOELMAN:**  I think we objected to any iteration of

23   the Shulman report originally.

24         **THE COURT:**  All right.  It's admitted.

25      (Trial Exhibit 412 received in evidence)

BY MR. RUTHERFORD:

**Q.**   Dr. Alam, did you understand that all of Mr. Shulman's suggested changes were included in the redline that he provided to UBH with respect to the differences between the UBH guidelines and the ASAM criteria?

**A.**   I'm sorry.  Your question is whether they were --

**Q.**   Yeah.  Did you understand that all of Mr. Shulman's suggested changes and, you know, points of difference were contained in the redline --

**A.**   Yes.

**Q.**   -- that he provided?

**A.**   Yes.

**Q.**   And except for the redlines, the redlined suggested changes that he made, did you understand that the 2013 Level of Care Guidelines and Coverage Determination Guidelines were otherwise consistent with the ASAM criteria?

        **MR. GOELMAN:**  Objection.  Foundation.

        **THE WITNESS:**  Yes.

        **THE COURT:**  Overruled.

        **MR. RUTHERFORD:**  One moment, Your Honor.

        **THE COURT:**  Yes.

              (Pause in proceedings.)

        **MR. RUTHERFORD:**  No further questions, Your Honor.

        **THE COURT:**  Cross-examination.

\\\

<u>**CROSS-EXAMINATION**</u>

**BY MR. GOELMAN:**

**Q.**   Good morning.

**A.**   Good morning.

**Q.**   My first question is a real easy one.

  **THE COURT:**  Wait a minute.  Don't start yet.

    (Pause in proceedings.)

  **THE COURT:**  Okay.  Now proceed.

  **MR. GOELMAN:**  Thank you.

**Q.**   My first question is an easy one.  Is it Dr. Alam or Alam?

**A.**   Alam.

**Q.**   Alam, okay.

  Dr. Alam, is it fair to say that the ASAM criteria is the most widely recognized iteration of generally accepted standards of care for the treatment of SUD?

**A.**   It is.

**Q.**   And also fair to say that a majority of providers have adopted ASAM?

**A.**   That's true in the states where by legislation it's required; but in general, it is really provider-specific criteria so, yes.

**Q.**   And Illinois is one of the states in which ASAM is required by law?

**A.**   It is.

**Q.**   You can't get a license in Illinois unless you know the

1  ASAM criteria?

2  **A.**    That's correct.

3  **Q.**    And you personally supported the law making ASAM use

4  mandatory in Illinois, did you not?

5  **A.**    I did.

6  **Q.**    And before Dr. -- I'm sorry -- Mr. Shulman was hired in

7  2013, were you aware that some within UBH wanted to adopt ASAM

8  as UBH's standard criteria for substance abuse?

9  **A.**    Yes.

10  **Q.**    And before 2013 it had not been done; true?

11  **A.**    That's true.

12  **Q.**    Okay.  I want to show you what's been marked for

13  identification Exhibit 382, and I'm going to ask you a couple

14  questions.

15      First of all, do you recognize this?

16  **A.**    (Witness examines document.)

17  **Q.**    And you're the first listed recipient on that e-mail?  I'm

18  sorry.  You can look on your screen if it's easier, Doctor.

19  **A.**    Okay.  All right.

20      (Witness examines document.)  I am.

21  **Q.**    And you recognize this as a cover e-mail to the meeting

22  agenda and minutes of something called the SUDS Clinical

23  Protocols and Policy Meeting?

24  **A.**    I do.

25  **Q.**    Okay.  And what is the SUDS Clinical Protocols and Policy

1    Meeting?

2    **A.**   It was a group put together to -- to review clinical

3    policies and protocols.

4    **Q.**   And were you part of that group?

5    **A.**   I was.

6    **Q.**   Were you actually the head of that group?

7    **A.**   I was.

8         **MR. GOELMAN:**  We offer Exhibit 382, Your Honor.

9         **MR. RUTHERFORD:**  No objection, Your Honor.

10        **THE COURT:**  It's admitted.

11    (Trial Exhibit 382 received in evidence)

12   **BY MR. GOELMAN:**

13   **Q.**   Can you turn to page with Bates stamp 0003, please.

14   **A.**   (Witness examines document.)

15   **Q.**   And if you would focus on the -- let's see, under

16   "Discussion."

17   **A.**   (Witness examines document.)

18   **Q.**   It says (reading):

19        "CT may have already passed legislation and

20        requires."

21        Do you see that?

22   **A.**   Yes.

23   **Q.**   And it says (reading):

24        "Will allow us to look at impacts to commercial."

25   **A.**   Yes.

1    Q.    And is that a reference to the State of Connecticut

2    passing legislation that required the use of ASAM?

3    A.    Yes.

4    Q.    And then it says down below (reading):

5          "Cost analysis impact on UM in process."

6    Do you see that?

7    A.    I do.

8    Q.    It says (reading):

9          "Concern from leaders that we give due diligence in

10         an attempt to determine if any ben-ex impact."

11    Do you see that?

12    A.    I do.

13    Q.    And is that a reference to a concern by executives at UBH

14    that adopting ASAM would lead to an effect on the benefit

15    expense?

16    A.    I think the impact, if any, was important there better or

17    worse.  So knowledge of the impact was, I think, more

18    important.

19    Q.    Okay.  Do you remember which leaders in particular were

20    concerned about the ben-ex impact?

21    A.    I don't.

22    Q.    And what kind of due diligence was supposed to be

23    performed on the potential ben-ex impact of adopting ASAM?

24    A.    I suppose looking at current or, at that time, the ben-ex

25    at that time.

1  Q.   Okay.  And up above where it says "Will allow us to look

2  at impact commercial," do you see that?

3  A.   I do.

4  Q.   Do you remember what the discussion was around that

5  particular point about Connecticut's legislation allowing a

6  look at the impact on commercial?

7  A.   I do not remember the discussion.

8  Q.   Okay.  Reference to "commercial," you understand that to

9  be the commercial side of the business as opposed to the

10  government side of the business?

11  A.   I do.

12  Q.   And the second bullet point says -- it talks about Jerry

13  Shulman.  Do you see that?

14  A.   I do.

15  Q.   Is that the same Jerry Shulman that you testified about on

16  direct examination?

17  A.   Yes.

18  Q.   And as you testified on direct examination, in -- what was

19  it, in the fall of 2013 UBH actually hired Mr. Shulman?

20  A.   Yeah, about that time.

21  Q.   Can you take a look at what's already in evidence as

22  Exhibit 1033, please.

23  A.   (Witness examines document.)

24  Q.   And is that an e-mail chain from Dr. Robinson-Beale dated

25  January 1st, 2014?

1  **A.**  It is.

2  **Q.**  And you're one of the recipients of that?

3  **A.**  I am.

4  **Q.**  Okay.  And can you turn now to -- and that e-mail attaches

5  a number of documents; correct?

6  **A.**  It does.

7  **Q.**  Okay.  Can you turn to 0002 of that exhibit, please.

8  **A.**  (Witness examines document.)

9  **Q.**  And that's an e-mail from Mr. Shulman to you and

10  Dr. Robinson-Beale; correct?

11  **A.**  It is.

12  **Q.**  Sent on December 20th of 2013?

13  **A.**  It is.

14  **Q.**  And can you turn to (reading):

15  "Please find attached in no particular order 15 files

16  of Optum criteria sent to me.  16 were sent but one was a

17  duplicate."

18  Do you see that?

19  **A.**  I do.

20  **Q.**  You're the one who sent Mr. Shulman those files; correct?

21  **A.**  I do not recall at this time.

22  **Q.**  Okay.  Do you recall that the files that he was sent

23  included various CDGs of Optum that applied to SUD?

24  **A.**  Yes.

25  **Q.**  And he was not sent any mental health CDGs; true?

1   **A.**   I don't believe so.

2   **Q.**   And he was not sent any of the benefit plans that Optum

3   administered; right?

4   **A.**   Not to my knowledge.

5   **Q.**   So to your knowledge he never saw a Certificate of

6   Coverage; right?

7   **A.**   Yes.

8   **Q.**   Okay.  And then, Dr. -- I'm sorry -- Mr. Shulman -- I keep

9   doing that -- writes that he's "including four files I have

10  assisted to assist in the process, e.g., ASAM Optum Crosswalk"?

11  **A.**   Yes.

12  **Q.**   And that's -- you identified earlier what a Crosswalk was.

13  And he writes (reading):

14          "I suggest that you review the four original

15      documents first as will make my edited criteria clearer.

16      I converted the PDF files to word, which I then edited

17      using track changes so that you could see the original

18      copy and any changes that I made.  I also added comments

19      when appropriate."

20      And you understand the reference to "track changes" being

21  part of the Microsoft Word program?

22  **A.**   I do.

23  **Q.**   And that allows you to see what changes someone makes to a

24  document?

25  **A.**   Yes.

1  Q.   And comments are also things that the person who's making

2  changes can insert; is that right?

3  A.   Yes.

4  Q.   And you can see that if track changes is turned on;

5  correct?

6  A.   You could.

7  Q.   But if track changes is turned off, you can't see it;

8  correct?

9  A.   Yes.

10  Q.   Let us turn to Exhibit 412.  Wait.

11       Actually, before that, if you could just look at 1033.

12  There are no -- there are no track changes in those versions of

13  Mr. Shulman's report; correct?

14  A.   (Witness examines document.)  I'm sorry.  That's exhibit?

15  Q.   1033.  I believe you -- is it not up there?

16  A.   It's not up there.

17  Q.   Okay.  You know what?  I'll withdraw the question.

18  A.   Okay.

19  Q.   You and Dr. Robinson-Beale were both on this e-mail;

20  correct?

21  A.   Yes.

22  Q.   And when you got the e-mail, did you open up and look at

23  the files that were attached?

24  A.   I don't recall.

25  Q.   I'm not talking about immediately, but at some point did

1    you?

2    **A.**    At some point, yes.

3    **Q.**    And you were able to see Mr. Shulman's comments and markup

4    using track changes; correct?

5    **A.**    Yes.

6    **Q.**    And Dr. Robinson-Beale got the same attachments as you

7    did; right?

8    **A.**    Yes.

9    **Q.**    So she would have been able to do that too; correct?

10   **A.**    Yes.

11   **Q.**    Let's turn back to Trial Exhibit 412.

12   **A.**    (Witness examines document.)

13   **Q.**    So when you -- when you first looked at the report that

14   Mr. Shulman submitted to you using track changes, it contained

15   a large number of changes that he suggested; true?

16   **A.**    Yes.

17   **Q.**    And some of them were minor; right?

18   **A.**    Yes.

19   **Q.**    Some of them were quite substantive?

20   **A.**    Yes.

21   **Q.**    Okay.  Let's turn to the Crosswalk, which I think is

22   Exhibit 412, page 0013.

23   **A.**    (Witness examines document.)

24   **Q.**    And was the purpose of this Crosswalk to make it easier to

25   see the differences and similarities between ASAM and Optum's

1   guidelines?

2   **A.**   That was one reason, yes.

3   **Q.**   Okay.  And there's, I don't know, 16 different categories

4   here?

5   **A.**   Yes.

6   **Q.**   Okay.  And I believe four of them, the third and then the

7   ninth, tenth, and eleventh all say "Optum" -- under "Optum

8   Guidelines," "Not an Optum plan benefit"; correct?

9   **A.**   Yes.

10   **Q.**   And the last three of those on the ASAM criteria side list

11   Level 3.1, Level 3.3, and Level 3.5; right?

12   **A.**   Yes.

13   **Q.**   And those are the lower residential treatment criteria

14   under ASAM; correct?

15   **A.**   Correct.

16   **Q.**   Do you recall getting a phone call from Mr. Shulman

17   shortly after he was retained where he wanted to know where the

18   Optum guidelines for Levels 3.1 to 3.5 were?

19   **A.**   Yes.

20   **Q.**   Okay.  And you told him that the plans that UBH

21   administered didn't cover those levels; true?

22   **A.**   I don't recall the conversation but possibly at that time,

23   yes.

24   **Q.**   Okay.  Well, in any case, this Crosswalk is accurate in

25   that ASAM levels of treatment 3.1, 3.3, and 3.5 were not

1    covered by Optum; correct?

2    **A.**    Correct.

3    **Q.**    And Mr. Shulman, among the changes that he recommended,

4    recommended that this change; true?

5    **A.**    True.

6    **Q.**    He recommended that Optum begin to cover Level 3.5; right?

7    **A.**    Yes.

8    **Q.**    And he recommended that Optum begin to cover Level 3.3;

9    correct?

10   **A.**    Correct.

11   **Q.**    I want to ask you a couple questions about the different

12   levels of residential treatment under ASAM.

13       First, on direct examination you've repeatedly referred to

14   residential treatment as 24-hour confinement.  Do you recall

15   that?

16   **A.**    I do.

17   **Q.**    Is it your understanding that under the ASAM criteria, all

18   the levels of residential treatment require 24-hour

19   confinement?

20   **A.**    It's 24-hour care.  All the levels require a 24-hour

21   setting.

22   **Q.**    Okay.  Would you agree with me that "confinement" means

23   you can't leave?

24   **A.**    "Confinement" could have those limitations in some cases,

25   but -- but you have to stay in a facility.  So "confinement"

1  from that perspective.  So I use the term more broadly, yes.

2  **Q.**  Okay.  I understood the meaning of the word "confinement"

3  in English.  It means that you're unable to leave; true?

4  **A.**  In general, true.

5  **Q.**  And the ASAM criteria, even a 3.7 level is not a

6  locked-down prison; true?

7  **A.**  That's true.

8  **Q.**  If you're a patient in a 3.7 facility, you can get up and

9  walk out if you want; right?

10 **A.**  Not in all facilities.  So that concept is --

11      **THE COURT:**  This is not useful.  This is a waste of

12 time.  Move on to a different subject.  He meant it -- he

13 didn't mean that the people were locked down in a residential

14 facility.

15      **MR. GOELMAN:**  Yes, Your Honor.

16 **Q.**  Is it your understanding that the criteria for ASAM levels

17 3.3 and 3.5 are the same as Level 3.7?

18 **A.**  They are not.

19 **Q.**  And under the UBH guidelines, if -- actually, you know

20 what?  Let me turn first to -- back to 412, and I want to look

21 at residential care guideline there in the redlined version.  I

22 think it's 412-0093.

23 **A.**  (Witness examines document.)

24 **Q.**  Is that the 2013 Level of Care Guidelines SUD Residential

25 Rehabilitation?

1    **A.**    It is.

2    **Q.**    And do you see the blue parenthetical there, "ASAM

3    Level 3.7"?

4    **A.**    Yes.

5    **Q.**    And that was added by Mr. Shulman; correct?

6    **A.**    It was.

7    **Q.**    And that reflected his belief that this criteria

8    corresponded to 3.7 in particular; correct?

9    **A.**    Correct.

10   **Q.**    And not to 3.5 or 3.3; right?

11   **A.**    Yes.

12   **Q.**    And the use of guidelines at UBH is mandatory; right?

13   It's not optional?

14   **A.**    From the perspective that they support clinical judgment,

15   yes.

16   **Q.**    Okay.  Is there anything in the guidelines for residential

17   treatment that suggests that a care advocate can ignore the

18   requirements and allow treatment for a less -- allow treatment

19   where they are not met?

20   **A.**    There is not.

21   **Q.**    And I want to -- I want to ask you about something you

22   said on direct about UBH contracting with 3.5 providers.

23              **MR. GOELMAN:**  Will you hold on one second, please.

24                        (Pause in proceedings.)

25   \\\

1  BY MR. GOELMAN:

2  Q.   You wrote an expert report in this case, did you not, sir?

3  A.   I did.

4  Q.   Okay.  Do you have a copy of it up there?

5       **MR. GOELMAN:**  Can we get him a copy?

6  Can you put 891 up on the screen, please, page 12,

7  Footnote 36.

8  Q.   This footnote says (reading):

9       "Mr. Shulman suggested that UBH provide coverage for

10       certain levels of care as outlined in the ASAM criteria,

11       such as Level 3.3 and Level 3.5, as these levels of care

12       may theoretically" -- "may be theoretically appropriate

13       for some patients.  However, from a practical standpoint,

14       whether UBH provides coverage or not depends on the

15       availability of level of care" -- "the level of care of

16       residential facilities.  In my experience, very few

17       facilities, if any, provide these levels of care.  As a

18       result, they do not contract for these levels of care with

19       UBH and providers do not request these levels of care for

20       patients at those facilities."

21       Do you see that?

22  A.   I do.

23  Q.   Is that true that Level 3.3 and 3.5 providers do not

24  contract for these levels of care with UBH?

25  A.   Not as many as we would like.

1    **THE COURT:**  So what you're saying is that footnote's

2  false?  Few, if any?

3    **THE WITNESS:**  So --

4    **THE COURT:**  I mean, you just told us that you

5  contracted with people specifically for Level 3.5 facilities.

6  It's not correct to leave the implication in that footnote that

7  there may be no 3.5 level of care facilities that you contract

8  with; right?  You overstated in the footnote, let me put it

9  gently.

10    **THE WITNESS:**  Probably did.

11    **THE COURT:**  Okay.

12  **BY MR. GOELMAN:**

13  **Q.**  All right.  Dr. Alam, we saw before that Mr. Shulman wrote

14  "ASAM Level 3.7" on the top of the residential treatment.

15  **A.**  I did.

16  **Q.**  You saw that; right?

17    I know that you have experience in ASAM.  Is it fair to

18  say that Mr. Shulman is more of an expert in ASAM than you are?

19  **A.**  Yes.

20  **Q.**  And is it fair to say that Dr. Mark Fishman is also more

21  of an expert in ASAM than you are?

22  **A.**  I would concede, yes.

23  **Q.**  Can we look at Exhibit 402 in evidence, please, at 0005.

24  **A.**  (Witness examines document.)

25  **Q.**  Do you recognize this as a Crosswalk that was provided to

1   the State of Connecticut in 2013 to respond to the inquiries

2   about residential care from the Connecticut authorities?

3   **A.**   I do.

4   **Q.**   And you were involved in the -- in putting together that

5   response, were you not?

6   **A.**   I don't recall.

7   **Q.**   Okay.  Well, let me focus you on a particular box that

8   deals with the ASAM criteria under "Residential Care."  It's at

9   the bottom there it says (reading):

10          "Optum guidelines do not identify three separate

11          levels of residential treatment as does ASAM."

12          That's true; right?

13  **A.**   Yes.

14  **Q.**   (reading)

15          "ASAM levels 3.1, 3.3, and 3.5 are considered

16          residential rehabilitation by Optum."

17          Do you see that?

18  **A.**   Yes.

19  **Q.**   And then it says (reading):

20          "However, the criteria for all three ASAM levels are

21          included in the admission criteria for residential

22          rehabilitation."

23          Do you see that?

24  **A.**   I do.

25  **Q.**   That's not true; right?

1   **A.**   So the last point you're checking whether it's true or

2   not?

3   **Q.**   Right.  Is it true that ASAM's residential rehabilitation

4   guidelines provided or included criteria for all three ASAM

5   levels?

6   **A.**   It is true.

7   **Q.**   But we just saw that Mr. Shulman labeled it 3.7; correct?

8   **A.**   That was his recommendation to label our current criteria

9   3.7 and then include 3.5 and other levels of the residential

10  care.

11  **Q.**   And didn't we just see a Crosswalk that had 3.1, 3.3, 3.5

12  not an Optum benefit?

13  **A.**   I think that in his opinion, there is no benefit, but he

14  had not seen a benefit plan so he was commenting on a benefit

15  plan.  So --

16          **THE COURT:**  You told him there was no benefit.

17          **THE WITNESS:**  I told him there was no criteria,

18  specific criteria, for it, so...

19  **BY MR. GOELMAN:**

20  **Q.**   Right.  And this says the criteria from all three ASAM

21  levels are included in the admission criteria for residential

22  rehabilitation; right?

23  **A.**   Yes.

24  **Q.**   That's not true; right?

25  **A.**   Well, the way we practice it, as I said, there are

1  facilities that provide 3.5 residential exclusively that are in

2  that work; and, you know, we would use our current criteria to

3  manage patients at those facilities.

4  **Q.**   Okay.  But the words, the words that were in the

5  residential treatment criteria for admissibility, they did not

6  cover ASAM 3.1, 3.3, and 3.5; right?

7  **A.**   It can be argued that way, yes.

8  **Q.**   Okay.  Did you know that this is what UBH was telling its

9  regulators in Connecticut in 2013?

10 **A.**   I did not.  I was not involved in this, so...

11 **Q.**   Can you bring up Exhibit 506 in evidence, please.

12 **A.**   (Witness examines document.)

13 **Q.**   And this is an e-mail from November 6, 2015; correct?

14 **A.**   (Witness examines document.)  It is.

15 **Q.**   And the subject is "Follow-up for the CT DOI."  Do you see

16 that?

17 **A.**   I do.

18 **Q.**   Okay.  Can you turn to page 0005, please.

19 **A.**   (Witness examines document.)

20 **Q.**   Do you see the same language is contained in these boxes

21 (reading):

22         "Criteria from all three ASAM levels are included in

23      the admission criteria for residential rehabilitation"?

24 **A.**   Yes.

25 **Q.**   To your knowledge has UBH ever told the State of

1   Connecticut the truth about its residential treatment criteria?

2   **A.**   I don't know.

3   **Q.**   Let's go back to 412 and look at some of the other changes

4   that Mr. Shulman recommended.  Okay?

5        I want to refer you to 412-00 -- sorry -- 0036.

6   **A.**   (Witness examines document.)

7   **Q.**   Can you go back to the beginning of the section so we can

8   at least be oriented?  I think it's the "Residential Rehab

9   Admission Criteria."

10       Next.  Sorry.  Next page.  Next page.

11       Okay.  Do you see that at the bottom, it says "Residential

12  Rehabilitation Admission Criteria"?

13  **A.**   I do.

14  **Q.**   Okay.  And this -- yeah, now can you go to 36, please.

15       You know, I'm sorry, let's stick with 31 for now.  Okay?

16  31.

17       The blue, that indicates that it's track changes; correct?

18  **A.**   It is.

19  **Q.**   And you see on the side it says "Deleted"?  It's got a

20  bunch of things that Mr. Shulman deleted; right?

21  **A.**   Yes.

22  **Q.**   And then a bunch of things that he added; right?

23  **A.**   Yes.

24  **Q.**   And one of the things that he added, the second bullet

25  point, is:

1       "The member must meet specifications in at least two

2      of the ASAM six dimensions."

3      Right?

4  A.   Yes.

5  Q.   This was a change that Mr. Shulman recommended that UBH

6  make; correct?

7  A.   He did.

8  Q.   And it would have made the UBH residential treatment

9  criteria less restrictive; right?

10  A.   Actually, in my opinion, using the ASAM criteria would

11  make the UBH criteria more restrictive.

12  Q.   I'm not talking about in general.  I'm talking about

13  taking out the language that was there and requiring that the

14  member must meet specifications in at least two of the six

15  dimensions.  That would have made the criteria less

16  restrictive; correct?

17  A.   No.

18  Q.   No.

19      Okay.  Can you turn to 412-0036, please.

20  A.   (Witness examines document.)

21  Q.   Would that change have made the UBH criteria more

22  consistent with ASAM?

23  A.   Possibly.

24  Q.   Well, doesn't ASAM also require meeting only two of six

25  dimensions for admission to residential treatment?

1   **A.**   That's true.

2   **Q.**   This is the continued stay criteria for all levels of

3   care; right?

4   **A.**   Yes.

5   **Q.**   So you understand that applies not just to residential but

6   also IOP and OP and the others; right?

7   **A.**   Yes.

8   **Q.**   Okay.  And Mr. Shulman adds the word "or" to this list,

9   and then writes (reading):

10          "The member is not yet making progress but has the

11          capacity to resolve his or her problems and is actively

12          working toward the goals articulated in the individualized

13          treatment plan."

14   Do you see that?

15   **A.**   I do.

16   **Q.**   And he adds another one (reading):

17          "New problems have arisen which can only be treated

18          safely at this level of care."

19   Do you see that?

20   **A.**   I do.

21   **Q.**   And because he uses the word "or," Mr. Shulman is

22   broadening the pathways to treatment here; right?

23   **A.**   I don't agree with that.

24   **Q.**   You don't?

25   **A.**   I don't.

1    **Q.**   Isn't he providing a separate way into residential

2    treatment for people?

3    **A.**   I think that that was one way of looking at it, but it's

4    just changing words so I don't really agree with that concept

5    because I...

6    **Q.**   When you say "just changing words," you'd agree with me

7    that the words in the criteria matter; right?

8    **A.**   Yes, they do.

9    **Q.**   And they affect how the people who work for UBH make

10   determinations whether or not to cover people's health

11   benefits; right?

12   **A.**   Right.

13   **Q.**   Okay.  So the preexisting bullet point here was (reading):

14         "The admission criteria is still met and the member

15         is making progress in addressing the admission criteria."

16         Right?  That was already there; correct?

17   **A.**   Yes.

18   **Q.**   And he adds a couple other alternatives; right?

19   **A.**   Yes.

20   **Q.**   And one of them is "The member is not yet making

21   progress..."; right?

22   **A.**   Yes.

23   **Q.**   "... but has the capacity to resolve his or her problems

24   and is actively working toward the goals"; right?

25   **A.**   Right.

1   Q.   And another one is "New problems have arisen which can

2   only be treated safely at this level of care"; right?

3   A.   Right.

4   Q.   And those are other alternatives that would allow somebody

5   to be approved for continued stay criteria; right?

6   A.   There are other alternatives, yes.

7   Q.   Okay.  But you don't agree that Mr. Shulman's suggestions

8   would have, if they were adopted, made the guidelines less

9   restrictive?

10  A.   I don't agree with that.

11  Q.   Okay.  So Mr. Shulman submits to you his changes, and UBH

12  reviewed it; correct?

13  A.   Yes.

14  Q.   And they considered them; right?

15  A.   Yes.

16  Q.   Was the group that was assigned the job of evaluating

17  Mr. Shulman's provisions SUD Team 2?

18  A.   It was.

19  Q.   And were you the leader of SUD Team 2?

20  A.   I was.

21  Q.   Okay.  Can you take a look at Exhibit 420, please.

22  A.   (Witness examines document.)

23  Q.   And that is an e-mail from Dr. Robinson-Beale; correct?

24  A.   Yes.

25  Q.   To a list of recipients and it talks about "Jerry and SUD

1  Team 2 will review and flush out the comments from Jerry";

2  correct?

3  **A.**  Yes.

4  **Q.**  Okay.  Is this 002?  Would you turn to page 2 of this

5  exhibit, please.

6  **A.**  (Witness examines document.)

7  **Q.**  That is page 2?  Okay.  Great.

8       Why -- do you know why SUD Team 2 was chosen for this

9  role?

10  **A.**  I don't.

11  **Q.**  Okay.  Is SUD Team 2 considered subject matter experts on

12  the use of ASAM?

13  **A.**  Yes.

14  **Q.**  Could that have been the reason that it was chosen?

15  **A.**  Yes.

16  **Q.**  And did you --

17       **MR. GOELMAN:**  First, we offer Exhibit 420, Your Honor.

18       **MR. RUTHERFORD:**  No objection, Your Honor.

19       **THE COURT:**  It's admitted.

20       (Trial Exhibit 420 received in evidence)

21  **BY MR. GOELMAN:**

22  **Q.**  How did SUD Team 2 go about considering whether or not to

23  implement Mr. Shulman's recommendations?

24  **A.**  By making the recommendations, I believe, that ASAM be

25  adopted.

1   **Q.**   That was the conclusion; correct?

2   **A.**   That was the conclusion.

3   **Q.**   But in the process, did you have a meeting and discuss the

4   recommendations?

5   **A.**   Right.  We probably had several meetings.

6   **Q.**   Okay.  And the conclusion of that was that the team

7   decided to recommend that UBH adopt ASAM as the criteria;

8   correct?

9   **A.**   Yes.

10  **Q.**   Did anyone on the SUD team disagree with that conclusion?

11  **A.**   Not that I recall.

12  **Q.**   Okay.  So as far as you remember, it was unanimous among

13  the subject matter experts?

14  **A.**   Yes.

15  **Q.**   Okay.  And you personally agreed with that; correct?

16  **A.**   I did.

17  **Q.**   And then that recommendation was brought before the

18  committee called BPAC for its consideration and decision;

19  right?

20  **A.**   I don't recall that part actually.

21  **Q.**   Okay.  Can you turn to Exhibit 421, please, page 12.

22  **A.**   (Witness examines document.)

23  **Q.**   This is a PowerPoint entitled "Is it time to adopt ASAM

24  criteria as SUD guidelines?  BPAC February 2014."  Do you see

25  that?

1    **A.**    I do.

2    **Q.**    And does that indicate that your committee's

3    recommendation was to consider it at the BPAC meeting in

4    February 2014?

5    **A.**    I think we were preparing to go to BPAC, but I -- this is

6    still in preparation.  I don't believe we went to BPAC at that

7    time.  I don't recall.  I mean, I -- yeah, at least I don't

8    recall.

9    **Q.**    Okay.  Can you turn to page 13, please.

10   **A.**    (Witness examines document.)

11   **Q.**    It says (reading):

12          "SUDS Team 2 is proposing that OptumHealth use ASAM

13        guidelines for utilization management."

14        Do you see that?

15   **A.**    I do.

16   **Q.**    And that's an accurate portrayal of what your committee's

17   recommendation was; right?

18   **A.**    It is.

19          **MR. GOELMAN:**  Okay.  We offer Exhibit 421, Your Honor.

20          **MR. RUTHERFORD:**  No objection.

21          **THE COURT:**  It's admitted.

22        (Trial Exhibit 421 received in evidence)

23   BY MR. GOELMAN:

24   **Q.**    Can you turn to page 14, please.

25   **A.**    (Witness examines document.)

1  Q.  This says (reading):

2         "ASAM criteria is used in most plans in over 30

3      states."

4      Right?

5  A.  Yes.

6  Q.  That's true; right?

7  A.  It is.

8  Q.  (reading)

9         "Most other providers use ASAM criteria."

10     Right?

11 A.  Yes.

12 Q.  That's also accurate; correct?

13 A.  Yes.

14 Q.  And then (reading):

15        "A strong consideration to adopt ASAM guidelines

16     should be made considering the current healthcare

17     climate."

18     Do you see that?

19 A.  I do.

20 Q.  And do you know what is referred to when reference is made

21 to "the current healthcare climate"?

22 A.  Really sort of a number of states were looking at adopting

23 ASAM.

24 Q.  Okay.  It says (reading):

25        "Community is demanding more neutrality.  Add points

1       from e-mail, Conn. law, Danesh reviewing."

2       Do you see that?

3  **A.**   I do.

4  **Q.**   What does it mean when it says "community is demanding

5  more neutrality"?

6  **A.**   In terms of criteria, that they want more sort of neutral

7  criteria.

8  **Q.**   Do you understand "community" being the SUDS treating

9  community?

10  **A.**   Yes.

11  **Q.**   And they thought that the UBH criteria were not

12  sufficiently neutral?

13  **A.**   Not -- I don't agree with that.

14  **Q.**   I'm not asking if that's your opinion.  That was the

15  community's opinion; right?

16  **A.**    In this instance, yes.

17  **Q.**   Okay.  And when it says "Conn. law, Danesh reviewing" --

18  do you see that?

19  **A.**   I do.

20  **Q.**   -- do you understand that reference?

21  **A.**   I do.

22  **Q.**   And you're Danesh; right?  You're the only Danesh on the

23  SUDS committee?

24  **A.**   I am, yes.

25  **Q.**   So were you reviewing Connecticut law for some reason?

1    **A.**    I was not reviewing -- well, I was reviewing what was

2    going on in Connecticut.  It was still sort of developing.

3    **Q.**    Okay.  And what was your assignment with regard to

4    Connecticut law?

5    **A.**    Well, it was to find out if Connecticut is moving towards,

6    you know, adapting ASAM.

7    **Q.**    Okay.  And what did you find out?

8    **A.**    That they were.

9    **Q.**    Can you turn to 0015, please.

10   **A.**    (Witness examines document.)

11   **Q.**    This is under the title "Challenges"; correct?

12   **A.**    Yes.

13   **Q.**    The second bullet point it says (reading):

14           "What would the impact be on our utilization?"

15        Do you see that?

16   **A.**    I do.

17   **Q.**    And do you understand the reference to "utilization" being

18   a reference to utilization of care?

19   **A.**    Yes.

20   **Q.**    Of benefits?

21   **A.**    Yes.

22   **Q.**    Okay.  Does this reflect a concern about whether UBH's

23   ben-ex would increase if UBH adopted ASAM?

24   **A.**    Not just increase.  Whether there would be a change is

25   more important.

1  **Q.** Well, UBH wouldn't be concerned if the change was that

2  ben-ex would decrease, would it?

3  **A.** It would be of interest, absolutely.

4  **Q.** But it wouldn't be a challenge; right? It would be a

5  benefit.

6  **A.** Yeah.

7  **Q.** Can you turn to the next page, please.

8  **A.** (Witness examines document.)

9  **Q.** It says "Benefits to Adopting ASAM"; right?

10  **A.** Yes.

11  **Q.** I just want to ask you a question about the last bullet

12  point there. It says (reading):

13       "Using nationally recognized criteria would provide a

14       degree of legitimacy."

15       Do you see that?

16  **A.** Uh-huh.

17  **Q.** And was there a sense, in the provider community at least,

18  that the UBH's guidelines as they were written were not

19  particularly legitimate?

20  **A.** I wouldn't agree with that.

21  **Q.** You wouldn't. Okay.

22       Could you turn to the next page, please, 17.

23  **A.** (Witness examines document.)

24  **Q.** It says "ASAM Guideline Limitations." Do you see that?

25  **A.** I do.

1  **Q.** It says, "Will this increase utilization?"  Right?

2  **A.** Yes.

3  **Q.** And we talked about utilization before.  Then it says,

4  "Best case cost savings.  Minimum no impact"; right?

5  **A.** Yes.

6  **Q.** And is that another reflection of the concern that a

7  switch to ASAM might increase ben-ex?

8  **A.** It had to be evaluated one way or the other.

9  **Q.** Okay.  So is that yes?

10  **A.** Yes.

11  **Q.** Okay.  When it says "Minimum no impact," that means that

12  at worst for UBH to switch to ASAM, it had to not increase

13  ben-ex; right?

14  **A.** One of the -- yes, one of the possibilities.

15  **Q.** Well, "minimum" means if it doesn't meet that criteria,

16  we're not going to adopt it; right?

17  **A.** (Witness examines document.)  If it -- if it has minimal

18  impact you mean?

19  **Q.** No.  It says, "Best case cost savings"; right?

20  **A.** Right.

21  **Q.** "Minimum no impact"; right?

22  **A.** Right.

23  **Q.** So doesn't this reflect the sentiment that UBH is not

24  going to adopt ASAM unless the worst case scenario is that

25  there's not going to be any impact on ben-ex?  Isn't that what

1  this means?

2  **A.**   I think it's predicting what the utilization would be and

3  it's actually saying -- win-win both ways is what it's saying.

4  **Q.**   I see.

5      Okay.  It says, the third bullet point (reading):

6          "ASAM criteria has multiple levels of care for which

7      we do not currently have guidelines."

8      Do you see that?

9  **A.**   I do.

10  **Q.**   And does that include 3.1, 3.3, and 3.5?

11  **A.**   Yes.

12  **Q.**   And why was that considered a limitation of switching to

13  ASAM?

14  **A.**   You know, as I mentioned before, all the communities

15  don't -- all of the providers don't have all the levels of

16  care.

17  **Q.**   Right.

18  **A.**   We have more levels in some instances and ASAM has more

19  levels in others, and so that's a challenge.

20  **Q.**   Okay.  Can you turn to page 19, please, 421-0019.  It says

21  "Limitation to the Levels of Care Guidelines."  Do you see

22  that?

23  **A.**   Yes.

24  **Q.**   You understand that to be a reference of the UBH Level of

25  Care Guidelines as they existed in 2014?

1  A.  Yes.

2  Q.  And it says -- the last bullet point says (reading):

3       "Perceived as making our own rules for benefits

4       determination."

5       Do you see that?

6  A.  I do.

7  Q.  What do you understand that to be referring to?

8  A.  Perception that we make our rules around, you know,

9  decisions, medical necessity decisions.

10  Q.  Okay.  And does that reflect a perception that UBH made

11  its rules in order to benefit itself and not its members?

12  A.  It could be perceived that way, but it's a perception.

13  Again, we're talking about perception versus reality here, sir.

14  Q.  Right.

15      Okay.  Can you turn to page 20, please.

16  A.  (Witness examines document.)

17  Q.  "Other Stakeholders Implications."  It says (reading):

18       Legal.  Feedback from legal.  Martin does not want to

19       do this until we know cost information."

20       Do you see that?

21  A.  I do.

22  Q.  And who's Martin?

23  A.  Martin Rosenzweig is chief medical officer.

24  Q.  Okay.  What was your understanding of why Dr. Rosenzweig

25  wanted to refrain from consulting with legal until you knew the

1  cost information?

2  **A.**   I don't know why.

3  **Q.**   He never explained that?

4  **A.**   No.

5  **Q.**   Can you put this exhibit to the side for a moment and look

6  at Exhibit 430, please, and 0007.

7  **A.**   (Witness examines document.)

8  **Q.**   Is that an e-mail from you to Michael Haberman with the

9  subject "Jerry Shulman" that you sent on February 10th of that

10  year 2014?

11  **A.**   It is.

12  **Q.**   And who is Mr. Haberman?

13  **A.**   He's a regional medical director.

14  **Q.**   Okay.  And you know of him that Jerry charges 350 for

15  one-hour training; correct?

16  **A.**   Yes.

17  **Q.**   And is that a reference to Mr. Shulman's rate for a

18  one-hour training?

19  **A.**   That's correct.

20  **Q.**   And why did you send Mr. Haberman that e-mail?

21  **A.**   Because we were looking at Jerry doing some training for

22  our staff.

23  **Q.**   Okay.  Can you turn to 0004, please.

24  **A.**   (Witness examines document.)

25  **Q.**   This is an e-mail from Dr. Triana to Dr. Rosenzweig;

1    right?

2    **A.**    Yes.

3    **Q.**    And he says (reading):

4            "We are placing the cart way in front of the horse."

5    Right?

6    **A.**    Right.

7    **Q.**    (reading)

8            "Let's see if the ASAM adoption occurs first.  I have

9    received e-mails from folks wondering why we are talking

10   about training when the ASAM decision has not been made

11   yet."

12   Correct?

13   **A.**    Correct.

14   **Q.**    And then the third paragraph says (reading):

15           "Have all the SUDS teams had a chance to review the

16   ASAM recommendation by Team 2?  And if so, is there

17   consensus that this is the formal SUDS," quote/unquote,

18   "recommendation."

19   Do you see that?

20   **A.**    I do.

21   **Q.**    (reading)

22           "If not, I would recommend doing so, otherwise we

23   need to change the dec. to reflect that this is Team 2's

24   recommendation, not all of SUDS."

25   Do you see that?

1    **A.**    I do.

2    **Q.**    And was the recommendation to adopt ASAM the

3    recommendation of all of SUDS and not just SUDS Team 2?

4    **A.**    I don't recall actually.

5    **Q.**    Do you recall any of the other SUDS teams voicing a

6    disagreement?

7    **A.**    I know there was a discussion, but I don't believe that

8    there was a major disagreement.

9    **Q.**    Okay.  Well, let's turn to page 2.  There's an e-mail from

10   Dr. Rosenzweig to Dr. Triana and it says (reading):

11            "Team 2 is tasked with looking specifically at ASAM

12       versus OHBS and has looked extensively at this.  I'm not

13       sure if there is much value to the other teams weighing in

14       here as they do not have the background and at this point

15       would be reviewing a dec.  I have added some of the

16       participants and other teams for their input, and I think

17       there is consensus amongst all the addiction psychiatrists

18       that this would be a good idea."

19       Do you see that?

20   **A.**    Uh-huh.

21   **Q.**    Okay.

22   **A.**    I do.

23   **Q.**    Dr. Rosenzweig was correct, was he not, that there was

24   consensus among all the addiction psychiatrists at Optum that

25   UBH should move to the ASAM criteria?

1   **A.**   Yes.

2   **Q.**   Let's turn to Exhibit 452, please.

3   **A.**   (Witness examines document.)

4   **Q.**   And this is an e-mail from the following year -- right? --

5   June 10th, 2015?

6   **A.**   (Witness examines document.)   It is.

7   **Q.**   And you're one of the recipients?

8   **A.**   I am.

9   **Q.**   And it's attaching a SUDS quarterly update?

10  **A.**   Yes.

11  **Q.**   Okay.   Can you turn to page 8, 452-0008?

12  **A.**   (Witness examines document.)

13  **Q.**   At this point was the team -- oh, I'm sorry.   I may have

14  misspoken.

15       Is this -- turn back to page 1, please.

16  **A.**   (Witness examines document.)

17  **Q.**   Okay.   This e-mail is from June 2014 -- right? -- not

18  2015?

19  **A.**   Yes.

20  **Q.**   Okay.   My mistake.

21       Can you turn again to page 8, please.

22  **A.**   (Witness examines document.)

23  **Q.**   All right.   And it says (reading):

24          "Team 2 clinical protocol.   ASAM contingent rollout."

25       Do you see that?

1  **A.**   I do.

2  **Q.**   And you're listed as the team lead?

3  **A.**   I am.

4  **Q.**   And was the contingent rollout a proposal to basically

5  stick a toe in the ASAM waters?

6  **A.**   That's one way of looking at it.

7  **Q.**   Okay.  You were going to start small and see whether or

8  not it had any impact on ben-ex?

9  **A.**   Well, I wasn't looking at ben-ex.  I was looking at the

10  clinical impact of it.

11  **Q.**   Okay.  Under issue it says (reading):

12        "Currently no utilization/ben-ex data allowing

13        meaningful comparison for ASAM versus OHBS SUDS criteria

14        sets."

15        Right?

16  **A.**   Yes.

17  **Q.**   And so was the point of this contingent rollout so that

18  UBH -- I'm not saying you personally -- could get a sense of

19  whether there was an impact on ben-ex from using ASAM instead

20  of UBH's own guidelines?

21  **A.**   It's one of the things we would look at.

22  **Q.**   Okay.  The second-to-the-last bullet point says (reading):

23        "If utilization is same or less for ASAM, continue

24        rollout/expand pilot."

25        Do you see that?

1    A.    I do.

2    Q.    Does that reflect that if this pilot project reflected

3    that it wasn't causing UBH's ben-ex to go up, then it would be

4    continued; correct?

5    A.    Actually, you know, ASAM criteria came into existence to

6    control ben-ex so that the very first iteration going back in

7    the '80s, the group got together to control ben-ex.  So I think

8    just to assume that, ASAM is important to understand the

9    ben-ex; but I think going into it expecting it would be less or

10   more, it may not be fully accurate.

11   Q.    Yeah.  I'm actually asking you about this line in this

12   PowerPoint that UBH put together.  Okay?  It says (reading):

13        "If utilization is same or less for ASAM, continue

14        rollout/expand pilot."

15        Do you see that?

16   A.    I do.

17   Q.    And you're listed as the team lead; correct, Doctor?

18   A.    Yes.

19   Q.    And was it your understanding, did this mean that if this

20   pilot program showed that the utilization was the same or less

21   under ASAM, then it would be continued and expanded?  Right?

22   That's what this means?

23   A.    That would be a stop and reconsider.

24   Q.    Okay.  Can you answer my question now?

25   A.    Yes, that would be one, you know, consequence probably.

1  Q.   Okay.  Thank you.

2       And, conversely, if utilization was more for ASAM, then

3  the rollout would not be continued, would not be expanded, it

4  would be terminated; correct?

5  A.   Yes.

6  Q.   548, please.

7       MR. GOELMAN:  I'm sorry.  Can we offer 452 if we

8  haven't yet?

9       MR. RUTHERFORD:  No objection.

10      THE COURT:  It's admitted.

11      (Trial Exhibit 452 received in evidence)

12 BY MR. GOELMAN:

13 Q.   Turn to 548, please.

14 A.   (Witness examines document.)

15 Q.   Now, this is an e-mail to Martha Temple, and this is from

16 July 2016; right?

17 A.   (Witness examines document.)  It is.

18 Q.   And Ms. Temple is the head of UBH; correct?

19 A.   Yes.

20 Q.   And was in 2016?

21 A.   Yes.

22 Q.   Can you turn to 0002, please, their ASAM criteria, the

23 fifth -- Number 5 there.  It says (reading):

24           "ASAM Criteria.  Martin will be walking us through

25      the journey thus far on transitioning ASAM to be our

1    standard SUD criteria."

2    Do you see that?

3 **A.**    Yes.

4 **Q.**    (reading)

5        "He will share the pros, cons, cost impacts,

6    et cetera, and we will make a decision on where we want to

7    go from here."

8    That's what it says; right?

9 **A.**    Yes.

10 **Q.**    Do you understand the reference to "cost impacts" to be a

11 reference to the impact on ben-ex?

12 **A.**    Yes.

13        **MR. GOELMAN:**  We offer 548, Your Honor.

14        **MR. RUTHERFORD:**  No objection, Your Honor.

15        **THE COURT:**  It's admitted.

16    (Trial Exhibit 548 received in evidence)

17 BY MR. GOELMAN:

18 **Q.**    Let's turn to Exhibit 348.

19 **A.**    (Witness examines document.)

20 **Q.**    And this is an e-mail from four years earlier in 2012.  Do

21 you see that?

22 **A.**    I do.

23 **Q.**    And the subject is "Use of ASAM Criteria Poll"; right?

24 **A.**    Yes.

25 **Q.**    All right.  Will you turn to 0002, please.

1    **A.**    (Witness examines document.)

2    **Q.**    It says (reading):

3            "While the six dimensions ASAM criteria are helpful

4        in conceptualizing cases and focusing on what they need,

5        use of these criteria usually will result in more

6        authorization as they are more subjective and broader than

7        our Level of Care Guidelines/CDGs."

8        Do you see that?

9    **A.**    Yes.

10   **Q.**    Do you agree that use of ASAM generally usually will

11   result in more authorization?

12   **A.**    I do not.

13           **MR. RUTHERFORD:**  I'm sorry, Your Honor.  If we could

14   just pause for a moment.  I can't seem to find the 348 exhibit.

15           **MR. GOELMAN:**  Oh.

16           **MS. ROMANO:**  It's not in our binder.

17           **MR. RUTHERFORD:**  It's not in our binder.

18           **THE COURT:**  Let's pause.  Is it on the list?

19           **MR. GOELMAN:**  I thought it was, Your Honor.

20           **MR. RUTHERFORD:**  I don't know if it's in the binder

21   for this witness.

22           **THE COURT:**  It is in the binder for this witness.

23           **MR. RUTHERFORD:**  Okay.  If we can --

24           **THE COURT:**  Sure.  Let's make sure you have it.

25                   (Pause in proceedings.)

1     MR. RUTHERFORD:  I don't believe he's a recipient of

2  this.

3     THE COURT:  Okay.  Let's just continue with the

4  examination.

5     MR. RUTHERFORD:  Yeah.

6  BY MR. GOELMAN:

7  Q.  Actually, you'd said that you disagree with the opinion

8  that use of ASAM usually will result in more authorization;

9  correct?

10 A.  I disagree.

11 Q.  You disagree with that.

12     But are you aware that in 2012, UBH considered adopting

13 ASAM?

14 A.  I am not.

15 Q.  Are you aware that they -- well, we just talked about the

16 consideration in 2014; correct?

17 A.  We did.

18 Q.  And again in 2016, UBH considered adopting ASAM; correct?

19 A.  I'm not aware of the efforts.

20 Q.  Okay.  We just saw an e-mail from -- e-mail to Martha

21 Temple dated July 2016; right?

22 A.  I was not a recipient of that e-mail.

23 Q.  Okay.  And you had no idea that there was a consideration

24 by UBH of whether or not to adopt ASAM in 2016?

25 A.  No.

1    Q.    Is it true that to this day, UBH has not adopted ASAM?

2    A.    It has adopted ASAM in the states where it's required by

3    legislation.

4    Q.    Okay.  In states where it's not legally compelled to adopt

5    ASAM, UBH has not adopted it; right?

6    A.    Yes.

7    Q.    You testified that it's your opinion that UBH's

8    guidelines, substance use guidelines, are consistent with

9    generally accepted standards of care?

10    A.    I have.

11    Q.    I want to ask you a couple questions about that opinion.

12    UBH's guidelines do not contain separate criteria for children

13    and adolescents, do they?

14    A.    They do not.

15    Q.    And there are peer reviews at UBH that are conducted by

16    nonchild psychiatrists; right?

17    A.    Correct.

18    Q.    And you regard -- strike that.

19        Substance use disorder is a long-term chronic illness,

20    isn't it?

21    A.    The concept that developed in the 21st century, yes.

22    Q.    And is it true that like other chronic illnesses,

23    underreporting is common in addictive disorders?

24    A.    Yes.

25    Q.    Would you agree that choosing appropriate level of care

1  for substance use disorders is important?

2  A.   Yes.

3  Q.   And that relapse may occur if a less intensive level of

4  care than is appropriate is initiated?

5  A.   One of the possibilities, yes.

6  Q.   On the other hand, is it true that there is no research

7  evidence to the existence of a consequence to choosing a more

8  intensive level of care than necessary?

9  A.   Actually, that is true.  That's true, yes, that there's no

10  research saying if you choose a higher level of care, whether

11  it's bad for you.  Yes, there's no research.

12  Q.   Okay.  And that remaining in treatment for an adequate

13  period is critical for treatment effectiveness?  That's true

14  too; right?

15  A.   I would modify that a little bit.

16  Q.   You would modify the statement of remaining in treatment

17  for an adequate period is critical for treatment effectiveness?

18  A.   Treatment engagement irrespective of the level of care --

19  Q.   Uh-huh.

20  A.   -- yes.

21  Q.   What about remaining in treatment for an adequate period,

22  is that critical?

23  A.   It is critical.

24  Q.   Are patients who are unlikely or unable to maintain

25  abstinence, are those a group of patients that could benefit

1    from residential programs?

2    **A.**    That's broad.  Yes, they could.

3    **Q.**    And would you agree that the duration of residential

4    treatment should be determined by the clinical response to

5    therapy based on the ASAM criteria?

6    **A.**    Yes.

7    **Q.**    And that there is even some evidence that some patients

8    may benefit from -- well, withdrawn.

9         Is it true that data suggests that individuals who stay in

10   residential treatment at therapeutic communities for 12 to 24

11   months are more likely to maintain long-term abstinence?

12   **A.**    I don't agree with that.

13   **Q.**    You don't agree that data suggests that?

14   **A.**    I'm not.  I've written about it.  I would like to review

15   the data, but the data that I have looked at is not -- is not

16   convincing.  So there are two areas where research has not been

17   helpful.  Lengths of stay, and ASAM criteria does talk about it

18   just in those words.

19        The second issue is in terms of assessing risk, research

20   has not been helpful.  Risk is used to determine the level of

21   care.  Research has not been helpful in helping us define the

22   risk needed for each of the levels of care.

23   **Q.**    Okay.  You mentioned that you've written about this.  Can

24   you turn to Exhibit 673, please.

25   **A.**    (Witness examines document.)

1    **THE COURT:** So find an appropriate place for us to

2  break.

3    **MR. GOELMAN:** Okay.

4  **Q.** Can you turn to page 10 of this exhibit, please.

5  **A.** (Witness examines document.)

6  **Q.** Let's see, where... "In the therapeutic community,

7  transitional living program," do you see that?

8  **A.** I do.

9  **Q.** The last line in that section says (reading):

10      "Data suggests that individuals who complete 12 to 24

11      months at this level of care are more likely to maintain

12      long-term abstinence."

13      Do you see that?

14  **A.** Yes.

15  **Q.** And did you and Dr. Martorana include that in your

16  article?

17  **A.** We did.

18    **MR. GOELMAN:** This is a good place, Your Honor.

19    **THE COURT:** All right. So I'll see you all here in an

20  hour.

21      (Luncheon recess taken at 12:24 p.m.)

22    //

23    //

24    //

25    //

1    <u>Monday, October 30, 2017</u>                    <u>1:31 p.m.</u>

2                        **P-R-O-C-E-E-D-I-N-G-S**

3                            **---000---**

4         **THE COURT:**  Let's proceed.

5         **THE CLERK:**  So we're back on the record in case number

6    C 14-2346 Wit/Alexander versus UBH.

7         Mr. Goelman, go ahead.

8         **MR. GOELMAN:**  Thank you.

9         Your Honor, after review of the transcript it was revealed

10   I neglected to offer two the exhibits that I asked the witness

11   about:  430 and 348.  So we offer them into evidence any.

12        **THE COURT:**  Any objection?

13        **MR. RUTHERFORD:**  No objection.

14        **MR. GOELMAN:**  348 and 430.

15        **THE CLERK:**  Thank you.

16        **THE COURT:**  They are admitted.

17   (Trial Exhibit 348 and 430 received in evidence.)

18        **MR. GOELMAN:**  And I don't have any further questions.

19        **THE COURT:**  Okay.  Redirect.

20        **MR. RUTHERFORD:**  Very briefly, Your Honor.

21                      <u>**REDIRECT EXAMINATION**</u>

22   BY MR. RUTHERFORD:

23   **Q.**   Dr. Alam, directing your attention to Exhibit 506.

24        Do you have that in front of you?

25   **A.**   I have.

1    **Q.**    You're not listed on this email; is that right?

2    **A.**    Yes, I'm not.

3    **Q.**    And you didn't see this email prior to this litigation?

4    **A.**    I did not.

5    **Q.**    Directing your attention to Exhibit 548.

6        Dr. Alam, are you a recipient of this email?

7    **A.**    I am not.

8    **Q.**    And have you seen this email prior to this litigation?

9    **A.**    I have not.

10    **Q.**    And then Exhibit 348.

11        Are you a recipient of this email, Dr. Alam?

12    **A.**    I am not.

13    **Q.**    Okay.  And had you seen this email before this litigation?

14    **A.**    I have not.

15        **MR. RUTHERFORD:**  No further questions, Your Honor.

16        **THE COURT:**  Okay.  Thank you very much.

17        **THE WITNESS:**  Thank you.

18        **THE COURT:**  You may step down.

19    They'll take care of that.

20        **THE WITNESS:**  Thank you.

21    (Witness steps down.)

22        **MR. RUTHERFORD:**  So, Your Honor, defense is going to

23    call Dr. Lorenzo Triana.  Switch out some binders.

24        And, Your Honor, for this witness, just as everyone is

25    getting settled, there are some sealing issues Mr. Bualat is

1    going to raise.

2              **THE COURT:**  Yes, Mr. Bualat.  Go ahead.

3              **MR. BUALAT:**  Thank you, Your Honor.

4        There are no exhibits on the direct examination, but there

5    are several exhibits on plaintiffs' cross-examination exhibits

6    that raise sealing issues and for which we filed motions either

7    last night or the last couple of weeks.

8              **THE COURT:**  Yes, I have them.

9              **MR. BUALAT:**  So the exhibits, the first one is Exhibit

10   8 -- excuse me, 810.

11             **THE COURT:**  What's the issue with -- 810, is that

12   going to be used?

13             **MR. ABELSON:**  Your Honor, I think this is one of the

14   situations where we don't know at this moment.

15             **THE COURT:**  Okay.  You can't rule it out.  Got it.

16   810, yes.

17             **MR. BUALAT:**  You want me to state the basis, Your

18   Honor?

19             **THE COURT:**  Yes, please.

20             **MR. BUALAT:**  810 reflects legal advice from in-house

21   attorney Adam Easterday.  It relates to ABA and the regulatory

22   inquiry.  And that one, in fact, there's clear advice from

23   Mr. Easterday relating to those issues.

24             **THE COURT:**  Okay.

25             **MR. BUALAT:**  803 is another email that relates to that

1 issue.

2       **THE COURT:** Okay.

3       **MR. BUALAT:** And that is in the motion that we filed

4 yesterday.

5       **THE COURT:** Yep, I got that.

6       **MR. BUALAT:** There's also Exhibit 552. That is a

7 redaction on one page. It's meeting minutes in which one of

8 the attendees to the meeting relays to the meeting members

9 legal advice.

10       **THE COURT:** Uh-huh.

11    810 and 803 are also just partially redacted?

12       **MR. BUALAT:** Yes, Your Honor. Those ones are

13 partially redacted.

14       **THE COURT:** Uh-huh.

15       **MR. BUALAT:** And if you would like, the pages for 803

16 is page 2. The pages for 810 is page 1 and 2 have redactions.

17       **THE COURT:** Okay.

18       **MR. BUALAT:** Exhibit 552, which I mentioned, is that

19 one entry on page 10. Exhibit 458 also has an email that has

20 legal advice. And it's a redaction of page 2, or part of page

21 2.

22       **THE COURT:** Uh-huh.

23       **MR. BUALAT:** This one was filed in a motion that we

24 filed last week, on the 22nd. And this exhibit, it's motion

25 367, and it's Exhibit 349. And that also reflects legal

1  advice.  And I believe that's a partial redaction of that

2  document, Your Honor.

3       I don't have the page numbers here.

4            **THE COURT:**  That's okay.

5            **MR. BUALAT:**  And then the last exhibit on the list,

6  that has not been ruled upon yet, is in motion 361, which was

7  filed on the 17th of October.  And the exhibit there is Exhibit

8  812.

9       And that one, actually, we sought to seal the entirety of

10  that exhibit.  That relates to the ABA Indiana regulatory

11  issue.  And that reflects advice from Mr. Easterday on, for

12  instance, page 2.  And there's a request of advice from him on

13  page 4.  And then the message on page 1 reflects a question

14  about legal advice.

15            **THE COURT:**  Okay.  Can I see 812, please?

16            **MR. BUALAT:**  It's at the very back.

17       (Pause)

18            **THE COURT:**  Who is the lawyer in Exhibit 812?

19            **MR. BUALAT:**  Adam Easterday, Your Honor.  And there's

20  an email, for instance, from him on page 2.  I think it's

21  December 15, 2016.  And then the initial email is a message

22  directed to him amongst others.

23            **THE COURT:**  I'm not going to allow that.

24       You can redact the legal advice that's in there; but a lot

25  of it is not legal advice or in response to legal advice.

1    There's a lot of discussion about benefit expense in there.

2    And you're not going to be allowed to redact things that's

3    basically business.

4        So I don't know -- I guess, I don't have a problem with

5    the exhibits being sealed, at least redacted in the fashion you

6    have chosen.

7            MR. ABELSON:  We don't object to the other redactions.

8    We do object to 812 in full.

9            THE COURT:  So I want that redacted.  And you can meet

10   and confer on what's appropriate to redact; but only legal

11   advice or references to legal advice or direct seeking of legal

12   advice or indirect seeking of legal advice.  Those are the

13   things that get redacted; not "I don't want to make a change

14   because it will impact our ben-ex."  Right.

15           MR. BUALAT:  Understood, Your Honor.

16       One last point is, there are several other exhibits on

17   their list for cross-examination that were subject to the joint

18   motion that the parties filed.  I imagine we would just bring

19   that up as they come, to the extent they're used.

20           THE COURT:  Well, it depends what it is.  If it's --

21   if it is the per-member-per-day, then I'm prepared to seal the

22   courtroom for that.  I doubt very much they'll be using those.

23       If it is the -- so what's the others?  I guess you had

24   joint motions because of some of the privilege is still

25   preserved because it was the fiduciary exception?

1       **MR. BUALAT:**  That's correct, Your Honor.  And I

2   believe these all fall -- because they are the part of the

3   joint motion would not be the per-member-per-month because

4   there is no agreed-upon sealing of those documents.

5       **THE COURT:**  Okay.  Well, I don't know.  What are you

6   going to do with those?

7       **MR. BUALAT:**  This would be 472, 539, 758, 782, and

8   814.

9       **MR. ABELSON:**  These are all subject to the joint

10   motion?

11       **MR. BUALAT:**  Yes.

12       **MR. ABELSON:**  If it was subject to the joint motion,

13   we don't --

14       **THE COURT:**  Well, all I'm saying is, if you are going

15   to use things subject to the joint motion, I am prepared for

16   those, to accommodate that in terms of arranging to seal the

17   courtroom for a very brief period of time, if you're agreeable

18   to doing it.  I'm not with respect to something that I think

19   has been waived, which is the other privileges.

20       **MS. REYNOLDS:**  Your Honor, I think, probably before

21   cross-examination it would be appropriate for us to take a

22   moment and determine if any of those documents are actually

23   going to be used.

24       **THE COURT:**  Fine.  And then you can figure out which

25   end of the examination you want to use them on.

1    **MS. REYNOLDS:**  Sure.

2    **MR. ABELSON:**  Your Honor, looking at the docket over

3    the weekend, there are four documents that are

4    denial-letter-related exhibits that we just need to have sealed

5    on the record.  The parties have agreed and the Court has

6    already ruled that those can be sealed.  Those are exhibits

7    899, 2033, 2038, and 2039.

8    **THE COURT:**  Okay.  So just to be clear, those are

9    sealed.  At least the redactions; right?  We're sealing the

10   whole exhibit, or sealing redactions?

11   **MR. ABELSON:**  We had been sealing the whole denial

12   letter.  Chock-full of --

13   **THE COURT:**  Whatever we have done in the past is fine.

14   The ones you brought up today, the non-joint ones, the

15   redactions are granted.  You will meet and confer on the 812

16   redaction.

17   **MR. ABELSON:**  Thank you.

18   **MR. BUALAT:**  Thank you, Your Honor.

19   **THE COURT:**  Great.  Okay.  Where were we?

20   **MR. RUTHERFORD:**  We were where the defense is calling

21   Dr. Lorenzo Triana.

22   **THE COURT:**  Okay.

23   **THE CLERK:**  Dr. Triana.

24   **THE WITNESS:**  Yes, ma'am.

25   **THE CLERK:**  Please raise your right hand.

**LORENZO TRIANA**,

called as a witness for the Defendant, having been duly sworn,

testified as follows:

**THE CLERK:** Thank you.

So have a seat. Speak clearly into the microphone. And

if you could just spell your last name for the record, please.

**THE WITNESS:** Yes, Triana, T-r-i-a-n-a.

**THE CLERK:** Thank you.

**DIRECT EXAMINATION**

BY MR. RUTHERFORD:

**Q.** Good afternoon, Dr. Triana.

**A.** Good afternoon.

**Q.** Are you a psychiatrist?

**A.** I am.

**Q.** In which states are you licensed?

**A.** I'm licensed in the state of Texas.

**Q.** Are you board-certified?

**A.** I am.

**Q.** In what?

**A.** In both general and addiction psychiatry.

**Q.** And do you see patients in private practice?

**A.** I do.

**Q.** And have you treated patients for both mental health and

substance use disorders in private practice?

**A.** I have.

1    **Q.**    And have you treated patients along the entire continuum

2    of care?

3    **A.**    Yes.

4    **Q.**    From outpatient to res- -- I mean outpatient to inpatient?

5    **A.**    Yes.

6    **Q.**    Now, you testified last week that you're currently the

7    Senior Vice President of Behavioral Medical Operations at UBH?

8    **A.**    Yes.

9    **Q.**    How long have you held that position?

10   **A.**    Since 2010.

11   **Q.**    And how long have you worked for UBH?

12   **A.**    Since 2000.

13   **Q.**    Briefly describe your responsibilities as the senior vice

14   president for behavioral operations.

15   **A.**    I oversee the activities of the medical directors on the

16   behavioral or operations side of the organization.  I

17   participate in committees.  And I'm also a member of the senior

18   leadership team for behavioral operations.

19   **Q.**    Is one of the committees that you've participated in a

20   committee known as the BPAC?

21   **A.**    Yes.

22   **Q.**    Is another committee you've participated in a committee

23   known as the Utilization Management Committee?

24   **A.**    Yes.

25   **Q.**    Prior to being the senior vice president position, did you

1    serve as a medical director at UBH?

2    **A.**    I did.

3    **Q.**    Out of which part of the country?

4    **A.**    Dallas.

5    **Q.**    What was your position?

6    **A.**    I was a medical director.

7    **Q.**    And what were your duties as a medical director at UBH?

8    **A.**    I would be involved in quality and utilization activities,

9    involved in peer reviews, case consultations, committee work,

10   and such.

11   **Q.**    And are you a member of any professional societies?

12   **A.**    I am?

13   **Q.**    Which are those?

14   **A.**    The American Medical Association, the American Psychiatric

15   Association, the Texas State Psychiatric Physicians

16   Association, and then also the American Academy of Addiction

17   Psychiatry.

18   **Q.**    Now, you testified last week that UBH creates its own

19   level of care and coverage determination guidelines.  Do you

20   recall that generally?

21   **A.**    Yes.

22   **Q.**    And that these guidelines are used to make medical

23   necessity and coverage determinations except when required to

24   use other guidelines, like state-specific guidelines; right?

25   **A.**    Yes.

1  **Q.**  Has UBH used its own Level of Care Guidelines or Coverage

2  Determination Guidelines since you joined --

3  **A.**  Yes.

4  **Q.**  -- UBH?

5     Do you know why UBH creates its own guidelines?

6  **A.**  I think there's several reasons why UBH uses its own

7  guidelines.

8     I think that it allows the company to review those and

9  update those on an annual basis, and allows us to obtain

10  feedback from internal clinicians, external clinicians, and

11  also professional organizations.

12     It allows us to adjust the guidelines according to what's

13  going on in the network.

14     And it also helps us reflect the clinical vision regarding

15  recovery and resiliency.

16  **Q.**  Are you familiar with the process by which the Level of

17  Care Guidelines and Coverage Determination Guidelines were

18  developed, updated, and approved between 2011 and 2017?

19  **A.**  Yes.

20  **Q.**  Okay.  Starting with the Level of Care Guidelines, were

21  there Level of Care Guidelines in existence when you joined --

22  let me ask this differently.

23     When did you join the BPAC?

24  **A.**  2010.

25  **Q.**  Is that when the BPAC was formed?

1  A.   Yes, sir.

2  Q.   In 2010, when the BPAC was formed, was UBH already using

3  Level of Care Guidelines?

4  A.   Yes.

5  Q.   How often are Level of Care Guidelines updated?

6  A.   On a yearly basis.

7  Q.   And at what point in the year would the process of

8  updating a level of care guideline get started?

9  A.   Usually around the third quarter, into the fourth quarter

10  of the year.

11  Q.   How would the process start?

12  A.   It would start with, typically, Jerry Niewenhous and his

13  team conducting research on any updates -- scientific evidence;

14  practice guidelines; regulatory updates -- that may have

15  occurred since the last guideline was updated.

16  Q.   And then once Jerry and his team conduct -- conduct this

17  review, what would happen next?

18  A.   A draft of the Level of Care Guidelines for the following

19  year would be created.  And then we would solicit input from

20  clinicians, both internal and external to the company, and also

21  representatives of various professional organizations as well.

22  Q.   When you say internal clinicians of the company were

23  solicited, what level of degree did those clinicians generally

24  hold?

25  A.   It was typically our medical doctors, Ph.Ds, and

1    masters-level education as well.

2    **Q.**    Directing your attention to Exhibit 1235.

3         Do you recognize this document?

4    **A.**    I do.

5    **Q.**    What is it?

6    **A.**    This is -- this is a copy of individuals whose feedback we

7    solicited for the guidelines, for the 2016 guidelines.

8    **Q.**    On page 1235-0001, does that indicate -- where it says

9    "staff," is that the same thing as your internal clinicians?

10   **A.**    Yes.

11   **Q.**    And then what does it show on page 1235-0002?

12   **A.**    Indicates the individuals outside of the organization that

13   were also asked to provide some input.

14        **MR. RUTHERFORD:**  Would move to admit Exhibit 1235 into

15   evidence, Your Honor.

16        **MR. KRAVITZ:**  No objection.

17        **THE COURT:**  It's admitted.

18     (Trial Exhibit 1245 received in evidence.)

19   BY MR. RUTHERFORD:

20   **Q.**    Dr. Triana, is this list of Optum staff consistent with

21   the Optum staff that would receive the solicitation each year

22   for input on the Level of Care Guidelines?

23   **A.**    Yes.

24   **Q.**    Now, turning to page -- and that was from 2011 to, what,

25   2017?

1  **A.**   Yes.

2  **Q.**   Turning the page to Trial Exhibit 1235-0002, what is this

3  list on this second -- on the second page?

4  **A.**   Again, this is a list of a combination of individual

5  providers and/or representatives of some of the professional

6  organizations.

7  **Q.**   Do you recall your testimony last week regarding an entity

8  called the BSAC?

9  **A.**   Yes.

10 **Q.**   Would -- well, let me ask this:  Where -- what connection,

11 if any, do these providers, these external clinicians, have to

12 UBH?

13 **A.**   So if they're providers, they would be treating our

14 members.  So they're part of the provider network.  Some of

15 these individuals would be a member, maybe, of the BSAC.  But

16 that would be the relationship.

17 **Q.**   And do these represent providers who are affiliated

18 with -- at least in part, affiliated with the BSAC?

19 **A.**   Yes.  Several of these are.

20 **Q.**   Are you familiar with an entity called the NPAC?

21 **A.**   Yes.

22 **Q.**   What is the NPAC?

23 **A.**   The NPAC is a National Provider Advisory Council.  And

24 it's a UBH group that is comprised of external providers.

25 **Q.**   Back to the BSAC for a moment, what organizations are

1    represented on the BPAC?

2    **A.**    Several organizations, including the American Psychiatric

3    Association, the American Psychological Association, the

4    National Association of Social Workers, National Association of

5    Psychiatric Health Systems, ASAM, and several others.

6    **Q.**    Now, directing your attention to Exhibit 11 -- actually,

7    one more question.

8        As network providers, is it your understanding that these

9    external clinicians are clinicians who would have experience

10   with coverage decisions being made pursuant to UBH's Level of

11   Care Guidelines?

12   **A.**    Yes.

13   **Q.**    Okay.  Now directing your attention to Exhibit 1189.

14   **A.**    Yes.

15   **Q.**    You recognize this document?

16   **A.**    Yes.

17   **Q.**    What is it?

18   **A.**    It is a email from Johnna Sears.  And it represents -- or

19   it's an invitation regarding the BSAC, and includes the BSAC

20   agenda for a meeting that occurred in March of 2016.

21   **Q.**    And you're a recipient to this email; is that right?

22   **A.**    Yes.

23        **MR. RUTHERFORD:**  We'd move to admit Exhibit 1189, Your

24   Honor.

25        **MR. KRAVITZ:**  No objection.

1    **THE COURT:**  Admitted.

2        (Trial Exhibit 1189 received in evidence.)

3    **BY MR. RUTHERFORD:**

4    **Q.**   Dr. Triana, this is a BSAC agenda from March 2016; is that

5    right?

6    **A.**   Yes.

7    **Q.**   Do you recall whether this is a meeting that you attended?

8    **A.**   I believe I attended this, yes.

9    **Q.**   Okay.  Directing your attention to Trial Exhibit

10   1189-0007.

11       Do you have that in front of you?

12   **A.**   Yes, I do.

13   **Q.**   What do we see on Trial Exhibit 1189-0007?

14   **A.**   So this is a copy of the -- of a roster of the committee

15   members, of the BSAC committee members.  And it divides it into

16   the external members and the internal members, and includes

17   their title, and then whether they were present or absent at

18   that meeting.

19   **Q.**   And then under the column that says "Title."

20   **A.**   Yes.

21   **Q.**   Do you see those organizations?

22   **A.**   Yes.

23   **Q.**   And are those some of the organizations that you just

24   mentioned a few moments ago?

25   **A.**   Yes.

**Q.**   Now, turning to 1189-0008, if you could.

Could you explain, just briefly, how these minutes displayed on 008 are laid out, what are each of the columns?

**A.**   Yes.

So on the left side, left column, it has the topic that was going to be discussed during that meeting.  The middle column, that's titled "Summary of Discussion," gives a brief summary of that discussion.  And then the next column over has "Next Steps," if there were any next steps associated with that particular topic.  And if there were, the last column shows who was going to be the responsible party for following up on those next steps.

**Q.**   If I could direct your attention down to the first entry, under "Annual Review of our Guidelines."  Do you see that?

**A.**   Yes.

**Q.**   And the first entry states:

"G. Niewenhous, currently we are beginning our annual solicitation of input regarding our clinical psych and neuropsych testing guidelines.  Per the usual process, we want to reach out to our members of BSAC to see if anyone would like to suggest representatives to provide input on these guidelines.  This year, we are particularly interested in those related to nontraditional wrap around services, such as Psych Rehab, since we've been implementing Medicaid contracts for those types of

1    services."

2    Do you see that?

3 A.   Yes.

4 Q.   What does that explain?  First of all, who is

5 G. Niewenhous?

6 A.   That's Jerry Niewenhous.

7 Q.   What does this indicate is taking place?

8 A.   So it indicates that he's in the process of beginning the

9 whole process of reviewing the guidelines on an annual basis.

10    And this is his reminder to the BSAC members that, A, we

11 would like their input; but, also, B, if they had anybody in

12 particular they wanted to also recommend, for us to obtain

13 input from, to let us know so that we would reach out to them

14 as well.

15 Q.   Was it important to you that the BSAC members were

16 reviewing and commenting on the UBH guidelines?

17 A.   Yes.

18 Q.   Why is that?

19 A.   Because many of them, obviously they represent providers.

20 They -- which, you know, are out in the community treating our

21 members and using our guidelines.  They also -- the

22 organizations -- many other organizations have practice

23 guidelines as well.  So it was important to receive that

24 feedback, as well, for us.

25 Q.   So the next stage in the process, once the solicitation

1  has gone out and feedback has received, what happens -- what

2  happens next in the process?

3  **A.**   So we would get together, the Level of Care Guideline

4  Workgroup, and we would have a meeting and discuss all the

5  different items, which would include the guideline revision or

6  draft guideline, the input from the various individuals.  And

7  we would have that -- that meeting.

8  **Q.**   Prior to having the meeting of this group -- which I'll

9  ask you about in a second -- did Jerry and his team do anything

10 to pull together the feedback that was received?

11 **A.**   Yes.  They would develop a grid.  So they would reach out

12 to the individuals.  They would get that feedback.  And then

13 they would develop a grid that would outline that feedback for

14 that year.

15 **Q.**   This group that you just mentioned, did it have -- it gets

16 together to talk about the Level of Care Guidelines, does that

17 group have a name?  Or did it have a name?

18 **A.**   Yes, it was the Level of Care Guideline Workgroup.

19 **Q.**   Is there still a Level of Care Guideline Workgroup, to

20 your knowledge?

21 **A.**   Yes.

22 **Q.**   Were you a member of the Level of Care Guideline

23 Workgroup?

24 **A.**   Yes.

25 **Q.**   Between 2011 and 2017, who were some of the other members

1    of the Level of Care Guideline Workgroup?

2    **A.**    So our chief medical officers.  So, for example,

3    Dr. Robinson-Beale, Dr. Bonfield, Dr. Bruce Bobbitt, myself,

4    Jerry Niewenhous, Dr. Pete Brock, Dr. Martorana.  Those are

5    some of the folks that would be part of that.

6    **Q.**    Turning your attention to what has previously been

7    admitted as Exhibit 516.

8    **A.**    Yes.

9    **Q.**    Do you recall seeing this exhibit when you testified last

10   week?

11   **A.**    Yes.

12   **Q.**    You testified a moment ago, I think, that to get the Level

13   of Care Guideline Workgroup meeting started, a calendar

14   invitation would go out?

15   **A.**    Correct.

16   **Q.**    Typically, who would send that calendar invitation?

17   **A.**    Usually it would be Loretta Urban.

18   **Q.**    Is this -- at Exhibit 516, is this an example of the type

19   of calendar invitation that you would receive?

20   **A.**    Yes.

21   **Q.**    And was this the process each year for the -- for the

22   Level of Care Guideline Workgroup?

23   **A.**    Yes.

24   **Q.**    Now, it looks like Exhibit 516 indicates some attachments

25   to it.  Do you see that?

1  A.    Yes.

2  Q.    Typically, what was attached to the calendar invitations

3  for the Level of Care Guideline Workgroup meeting?

4  A.    So you would have a copy of what we would call a draft or

5  red-line version of the upcoming guidelines.  You would also

6  have a summary sheet indicating some of the changes from the

7  last -- the previous guideline to this guideline.  And then

8  there would also be an attachment having the feedback from all

9  the individuals that -- that sent that feedback in regarding

10  the guidelines.

11  Q.    What was your practice with respect to what you did with

12  this information in preparation for the Level of Care Guideline

13  Workgroup meeting?

14  A.    So I would open these documents and become familiar with

15  them and take a look at them.  And that's what I would do.

16  Q.    Okay.  After receiving this calendar invitation -- I

17  guess, is a calendar invitation typically setting up a

18  conference call? a WebEx? an in-person meeting?  What would the

19  Level of Care Guideline Workgroup meeting be?

20  A.    It would be, typically, a telephonic conversation via a

21  WebEx as well.

22  Q.    Again, turning to the top it, says "2016 Guideline

23  Feedback Revised."  Do you see that?

24  A.    Yes.

25  Q.    Would the feedback chart delivered to the Level of Care

1  Guideline Workgroup typically be reviewed during the level of

2  care guideline meeting?

3  **A.**   Yes.

4  **Q.**   And what did the Level of Care Guideline Workgroup

5  generally talk about with respect to the feedback that was

6  received?

7  **A.**   Depended on the feedback.  You know, some feedback there

8  really wasn't anything much to discuss.  Some feedback there

9  would be a larger discussion.  But, typically, we would just go

10 through the grid.  And then as we would get through it, we

11 would make comments.  We'd, you know, have discussion depending

12 on what the topic was.

13 **Q.**   Now, was the feedback, was the feedback ever received --

14 was the feedback received ever critical of the Level of Care

15 Guidelines?

16 **A.**   Yes, sometimes.

17 **Q.**   And, typically, what -- how would the Level of Care

18 Guideline Workgroup approach critical feedback?

19 **A.**   We would review it and see what the recommendation was or

20 what the feedback was.

21 **Q.**   Now, you testified last week about a few of the feedback

22 charts.  Do you recall that?

23 **A.**   Yes.

24 **Q.**   Okay.  Directing your attention to Exhibit 1252.

25 **A.**   Yes.

1  **Q.**  Do you recognize this document?

2  **A.**  I do.

3  **Q.**  What is it?

4  **A.**  This is a copy of the feedback that we had received for

5  the 2011 guidelines.

6      **MR. RUTHERFORD:**  Your Honor, we would move to admit

7  Exhibit 1252 into evidence.

8      **MR. KRAVITZ:**  No objection.

9      **THE COURT:**  Admitted.

10     (Trial Exhibit 1252 received in evidence.)

11  **BY MR. RUTHERFORD:**

12  **Q.**  Now, before your testimony today, did you have an

13  opportunity to review the feedback on this chart at 1252?

14  **A.**  Yes.

15  **Q.**  And did that feedback -- and this feedback is commenting

16  on what year of the Level of Care Guidelines?

17  **A.**  2011.

18  **Q.**  And did this feedback include any commentary stating that

19  the words "clear and compelling," in the continued service

20  criteria, were inconsistent with generally accepted standards

21  of care?

22  **A.**  No.

23  **Q.**  Or that the words "clear and compelling" should be deleted

24  from the 2011 Level of Care Guidelines?

25  **A.**  No.

1    Q.    Now, directing your attention to Exhibit 1253.

2          MR. KRAVITZ:  I'm sorry, I didn't hear the number.

3          MR. RUTHERFORD:  I'm sorry, 1253.

4          MR. KRAVITZ:  That is my fault.

5    BY MR. RUTHERFORD:

6    Q.    Do you recognize this exhibit?

7    A.    Yes.

8    Q.    What is it?

9    A.    This is a copy of the feedback that we had received for

10   the 2012 guidelines.

11         MR. RUTHERFORD:  We'd move to admit Exhibit 1253 into

12   evidence.

13         MR. KRAVITZ:  There's no objection.

14         THE COURT:  Admitted.

15      (Trial Exhibit 1253 received in evidence.)

16   BY MR. RUTHERFORD:

17   Q.    Dr. Triana, directing your attention to page 1253-0009.

18   Are you there?

19   A.    No, not yet.

20         Yes.

21   Q.    What do we see on page 0009?

22   A.    This is just a sample of the type of information that we

23   would get on the feedback.  And it basically has the section

24   where the feedback is -- the comments are related to the actual

25   feedback, if there was any action, and then the source of the

1    feedback.

2    **Q.**    And under "Source" it has "PIC" and "USB-HPC."  What --

3    what do those stand for?

4    **A.**    PIC is the Parity Implementation Coalition, which was

5    comprised of external providers.  And then the USB-HPC was

6    representatives of the network in California.

7    **Q.**    And are those UBH employees?

8    **A.**    No.

9    **Q.**    And do you see the sixth --

10        **MR. RUTHERFORD:**  One moment, Your Honor.

11   **BY MR. RUTHERFORD:**

12   **Q.**    In other words, do you understand that UBH, in 2012, was

13   receiving feedback on its Level of Care Guidelines from

14   external sources?

15   **A.**    Correct.

16   **Q.**    Now, directing your attention to Exhibit 1254.

17   **A.**    Yes.

18   **Q.**    I'm sorry, if you could go back to Exhibit -- I'm sorry,

19   back to Exhibit 1253, at page 0009, one more time.

20   **A.**    Yes.

21   **Q.**    Did the feedback that was received -- well, let me ask it

22   this way:

23        Did UBH receive positive feedback, critical feedback, and

24   feedback in the middle, for each of the years that it was

25   soliciting feedback?

1    **A.**    It did.

2    **Q.**    Okay.  And so would -- if you look at the sixth -- okay.

3         Now I'm going to direct your attention to Exhibit 1254.

4    I'm sorry.  Let me know when you have that in front of you.

5    **A.**    Yes.

6    **Q.**    Do you recognize this document?

7    **A.**    Yes.  This is the feedback for the 2013 guidelines.

8         **MR. RUTHERFORD:**  Your Honor, we move to admit Exhibit

9    1254 into evidence.

10        **MR. KRAVITZ:**  No objection.

11        **THE COURT:**  Admitted.

12        (Trial Exhibit 1254 received in evidence.)

13   **BY MR. RUTHERFORD:**

14   **Q.**    And in the right-hand column, Dr. Triana, do you see,

15   under "Source" it says "Provider" --

16   **A.**    Yes.

17   **Q.**    -- on page 0002?

18        And then further down, on page 0003, it indicates "Staff."

19   **A.**    Yes.

20   **Q.**    Where it says "Provider," is that feedback that is coming

21   from an external source?

22   **A.**    Correct.

23   **Q.**    And where it says "Staff," is that feedback that's coming

24   from an internal source?

25   **A.**    Yes.

1  **Q.**  Now, directing your attention to Exhibit 1260.

2  **A.**  Yes.

3  **Q.**  Do you recognize this document?

4  **A.**  Yes.  It's the feedback for the 2015 guidelines.

5  **Q.**  Okay.  Now, directing your attention to page 0002.

6  **A.**  Okay.

7  **Q.**  Does this page contain feedback that you would

8  characterize as positive?

9  **A.**  No.

10  **Q.**  Does it contain feedback that you would characterize as

11  critical?

12  **A.**  Yes.

13  **Q.**  Specifically from whom?

14  **A.**  Dr. Axelson.

15  **Q.**  Who is Dr. Axelson?

16  **A.**  Dr. Axelson is a physician.  And he's associated with the

17  American Academy of Child and Adolescent Psychiatry, and one of

18  the members of our BSAC.

19  **Q.**  And specifically directing your attention to the second

20  piece of feedback, where it states:

21          "Thank you for the opportunity to review and comment

22      on the UM UMLOC guidelines.  I took the opportunity to

23      share them with the AACAP committee that has developed and

24      tested the AACAP CASII, Child and Adolescent Services

25      Intensity Instrument."

1        Then it goes on to talk about the CASII.  Do you see that?

2   **A.**   Yes.

3   **Q.**   What is the CASII?  Are you familiar with that?

4   **A.**   Yes.  It's a scoring instrument that the AACAP developed.

5   And it can be used in the placement of children and

6   adolescents.

7   **Q.**   Was Dr. Axelson a regular commenter on the UBH clinical

8   guidelines?

9   **A.**   Yes.

10  **Q.**   And was he somebody who regularly advocated the use of the

11  CASII?

12  **A.**   Yes.

13  **Q.**   And is his organization an organization associated with

14  the CASII?

15  **A.**   Yes.  They're the ones that actually develop it.

16  **Q.**   Now, do you recall the testimony last week, involving a

17  Dr. Bernstein, generally some feedback that UBH received from a

18  Dr. Bernstein --

19  **A.**   Yes.

20  **Q.**   -- where he was critical of the "why now" inclusion in the

21  guidelines?

22  **A.**   Yes.

23  **Q.**   Directing your attention to the second to last comment on

24  Trial Exhibit 1260, at 0002, do you see that?

25  **A.**   Yes.

1  **Q.**  And is that comment from Dr. Bernstein?

2  **A.**  Yes.

3  **Q.**  And what does that comment read it?

4  **A.**  Says:

5      "I reviewed the guidelines that are most relevant to

6      my outpatient psychological practice.  For the most part,

7      they are clear, exhaustive, and seem to offer adequate

8      support for making decisions."

9  **Q.**  Now directing your attention to 003, just below.

10 **A.**  Yes.

11 **Q.**  The second row from the bottom, do you see there's a

12 discussion of custodial care?

13 **A.**  Yes.

14 **Q.**  And it indicates that it's a feedback coming from Carla

15 Phillips.

16     Do you know who Carla Phillips is?

17 **A.**  Yes.

18 **Q.**  Who is Carla Phillips?

19 **A.**  She is one of our internal clinicians.

20 **Q.**  And she -- her feedback is that:

21     "The language defining custodial care would be

22     greatly enhanced if it included the language that ongoing

23     care is not solely for the purpose of protective

24     detention."

25     Do you see that?

1   **A.**   Yes.

2   **Q.**   And then she goes on to describe why that caveat best

3   describes a situation, that she says:

4           "We often find when adolescents are being maintained

5           at a residential level of care for custodial care.  And it

6           is easier for members and providers to understand the more

7           traditional medical definitions of custodial care as they

8           apply to adolescents."

9           Do you see that?

10  **A.**   Yes.

11  **Q.**   Now, under the third column from the right, it indicates

12  "No action."  Do you see that?

13  **A.**   Yes.

14  **Q.**   And then states "Cannot change a definition of custodial

15  care."

16  **A.**   Correct.

17  **Q.**   Do you know why the definition of custodial care could not

18  be changed in the Level of Care Guidelines?

19  **A.**   Because the source for that was the plan language in the

20  COCs, the certificates of coverage.

21  **Q.**   Back to the Level of Care Guideline Workgroup meetings.

22  What would actually take place?  Was there, like, a group

23  discussion leader in the Level of Care Guideline Workgroup

24  meetings?

25  **A.**   No.  Typically, Jerry would get us through the agenda.

1   And, basically, we would just get through the document, and all

2   of us would offer our opinions.  And at the end of that

3   meeting, the idea was that we would have agreed upon developing

4   what the next draft of the guidelines would be.

5   **Q.**   After the Level of Care Guideline Workgroup reviewed the

6   documents and the feedback and discussed the changes, what

7   happened next?

8   **A.**   Then all those changes, everything would be incorporated

9   into a final draft version, which would then be presented to

10   the appropriate committee, the BPAC.

11   **Q.**   Okay.  And -- well, for which years would it be submitted

12   to the BPAC?

13   **A.**   For every year but this 2017 year.

14   **Q.**   And in 2017, which committee received the work product

15   from the Level of Care Guideline Workgroup?

16   **A.**   The Utilization Management Committee.

17   **Q.**   Okay.  Now, in your testimony last week, you testified

18   that you were, from 2011 to 2016, the co-chair of the BPAC?

19   **A.**   Yes.

20   **Q.**   Just explain, briefly, why was the BPAC created initially,

21   and what was its general purpose?

22   **A.**   So the BPAC was created in 2010, as a result of the

23   Amendment Parity Act.  And its charge was to develop a

24   standardized approach to the guideline development process,

25   especially the Coverage Determination Guidelines, the CDGs.

1    And then it was in charge of making sure those were

2 distributed and applied appropriately across the organization.

3 **Q.**   Now, while the -- okay.  So initially it was for the

4 Coverage Determination Guidelines, but then also took over

5 responsibility of updating the Level of Care Guidelines?

6 **A.**   Right.  I think around 2012, it also took the

7 responsibility of reviewing and updating and approving the

8 Level of Care Guidelines on an annual basis.

9 **Q.**   Once -- from 2011 to 2017, once the BPAC approved a change

10 to the Level of Care Guidelines, did any other committees or

11 individuals within UBH need to further approve that change?

12 **A.**   No.

13 **Q.**   So what happened once there was a change approved for the

14 guidelines during this annual process by the BPAC?

15 **A.**   Once the -- once the guideline would be approved, then

16 from there it would be posted in the various places; you know,

17 for external providers.  I think Provider Express.

18    And then once that would get done, we would also notify

19 the internal staff of the fact that the updated guidelines had

20 been posted.

21 **Q.**   So what is Provider Express?

22 **A.**   Provider Express is a web portal that all providers can

23 access, and includes or houses our guidelines.

24 **Q.**   These BPAC meetings, were these meetings held in person or

25 over the phone or by WebEx, or some combination?

1  **A.**   They were telephonically, with typically a WebEx component

2  as well.

3  **Q.**   And maybe I asked this, but were the Level of Care

4  Guideline Workgroup meetings also done by WebEx?

5  **A.**   Yes.

6  **Q.**   And does that mean that certain documents can be displayed

7  while everyone is talking on the phone?

8  **A.**   Yes.

9  **Q.**   Okay.  Now, with respect to the typical BPAC meeting,

10  typically, you know, during that 7-year period of time, how

11  long do these meetings last or would these meetings last?

12  **A.**   They would go anywhere from 30, 45 minutes, to an hour and

13  a half, is what we would block out.

14  **Q.**   You may have testified about this last week, but how often

15  during the year are they held, the BPAC meetings?

16  **A.**   They were held usually twice a month or every other week.

17  **Q.**   So the Level of Care Guideline Workgroup met how many

18  times a year?

19  **A.**   They would meet anywhere from, oh, 26 to 30 times a year.

20  **Q.**   No.  The level of care guideline group.

21  **A.**   Sorry.  The Level of Care Guideline Workgroup would meet

22  once a year.  At least once a year.

23  **Q.**   But the BPAC would meet more often?

24  **A.**   More often, yes.  Sorry.

25  **Q.**   Did the BPAC have a practice of keeping minutes of its

1  meetings?

2  **A.**  Yes.

3  **Q.**  Directing your attention to Exhibit 332.

4  **A.**  Yes.

5  **Q.**  Do you recognize this document?

6  **A.**  I do.

7  **Q.**  What is it?

8  **A.**  It is a copy of the BPAC minutes from March 20 of 2012.

9       **MR. RUTHERFORD:**  Okay.  We'd move to admit Exhibit 332

10  into evidence.

11       **MR. KRAVITZ:**  No objection.

12       **THE COURT:**  Admitted.

13     (Trial Exhibit 332 received in evidence.)

14  **BY MR. RUTHERFORD:**

15  **Q.**  Okay.  And just very briefly, how are the minutes laid out

16  to convey what information?

17  **A.**  So similar to the private set of minutes, it has a topic

18  on the left column, where we would discuss whatever that topic

19  was.  The summary of that discussion would be in the middle

20  column, labeled "Discussion."  Conclusions would be the next

21  column.  And that would be whether there's any action item or

22  if something was approved.  And then follow-up column is

23  whether there was any action items that needed to be followed

24  up on.

25  **Q.**  Okay.  So then directing your attention to where it says

1  "New committee structure."  Do you see that on the left-hand

2  side?

3  **A.**   Yes.

4  **Q.**   Exhibit 332, at 0002?

5  **A.**   Yes.

6  **Q.**   That first bullet point, it says:

7       "As an introduction to the new committee structure,

8  BPAC reviewed the updated charter to reflect new

9  responsibilities and relationships between new and

10  existing committees."

11  **A.**   Correct.

12  **Q.**   (Reading)

13       "BPAC will not only oversee the development and

14  update of the CDGs, but also the Level of Care and Best

15  Practice Guidelines."

16  Do you see that?

17  **A.**   Yes.

18  **Q.**   And then it says:

19       "Committees/workgroups that will report to BPAC now

20  include the CTAC, CDC, LOCG and CPG."

21       Do you see that?

22  **A.**   Yes.

23  **Q.**   Where it says "LOCG," is that the Level of Care Guideline

24  Workgroup?

25  **A.**   Correct.

1  **Q.**  And to the best of your recollection, is this the BPAC

2  meeting at which it was approved that the BPAC would begin

3  approving the Level of Care Guidelines?

4  **A.**  Yes.

5  **Q.**  Which is in 2012?

6  **A.**  Yes.

7  **Q.**  Directing your attention to, again, a little lower down on

8  the page, at 00002, it's got a notation in the left-hand column

9  that says "Fail-First and Level of Care Guidelines.  Jerry

10  Niewenhous."

11     Do you see that?

12  **A.**  Yes.

13  **Q.**  And with Jerry Niewenhous's name there, what significance

14  does it have that Jerry Niewenhous's name is with that topic?

15  What did that mean?

16  **A.**  So Jerry -- again, he and his team were the ones that were

17  at the front line in helping us develop and draft our

18  guidelines, and would be also in the front line of receiving

19  the feedback from external providers regarding our guidelines.

20  And, also, that team would be the one conducting the research

21  related to any updates from the guidelines as well.

22  **Q.**  Okay.  Now, directing your attention to Exhibit 368.

23  **A.**  Yes.

24  **Q.**  Do you recognize this document?

25  **A.**  Yes.

1    **Q.**    What is it?

2    **A.**    It is a copy of the BPAC minutes from March 19 of 2013.

3              **MR. RUTHERFORD:**  We'd move Exhibit 368 into evidence.

4              **MR. KRAVITZ:**  No objection.

5              **THE COURT:**  Admitted.

6         (Trial Exhibit 368 received in evidence.)

7    **BY MR. RUTHERFORD:**

8    **Q.**    Directing your attention within this exhibit, to page

9    0005 -- actually, it's going to be 0004.  Do you see that?

10   **A.**    Yes.

11   **Q.**    Lists the same types of -- of topics but with different

12   language in terms of the columns; is that right?

13   **A.**    Correct.

14   **Q.**    And then do you see down, in the middle of page 0005,

15   indicates 2013 Level of Care Guidelines?

16   **A.**    Yes.

17   **Q.**    And it says "Presented the 2013 Level of Care Guidelines."

18   Do you see that?

19   **A.**    Yes.

20   **Q.**    And then what action was taken by the BPAC with respect to

21   the 2013 Level of Care Guidelines?

22   **A.**    The BPAC had made some suggestions related to the

23   introduction.  And then we reviewed it and approved the 2013

24   Level of Care Guidelines.

25   **Q.**    So these are the minutes that indicate that that action

1  was taking place by the BPAC with respect to the 2013 Level of

2  Care Guidelines?

3  **A.**  Correct.

4  **Q.**  Directing your attention to Exhibit 423.

5  **A.**  Yes.

6  **Q.**  Do you recognize this document?

7  **A.**  Yes.

8  **Q.**  What is it?

9  **A.**  It's a copy of the BPAC minutes from January 21st of 2014.

10     **MR. RUTHERFORD:**  We'd move Exhibit 423 into evidence.

11     **MR. KRAVITZ:**  No objection.

12     **THE COURT:**  Admitted.

13     (Trial Exhibit 423 received in evidence.)

14  **BY MR. RUTHERFORD:**

15  **Q.**  On this document, directing your attention to page 0004.

16  **A.**  Yes.

17  **Q.**  And to the last column, what happened during this meeting

18  with respect to the 2014 Level of Care Guidelines?

19  **A.**  So, again, they were presented.  And the committee made a

20  recommendation regarding the definition of "medical necessity,"

21  and then the guidelines were reviewed and approved.

22  **Q.**  Directing your attention to Exhibit 434.

23  **A.**  Yes.

24  **Q.**  Do you recognize this document?

25  **A.**  Yes.

1   **Q.**   What is it?

2   **A.**   It is a copy of the BPAC minutes from February 18 of 2014.

3          **MR. RUTHERFORD:**  We'd move to admit Exhibit 434 into

4   evidence.

5          **MR. KRAVITZ:**  No objection.

6          **THE COURT:**  Admitted.

7      (Trial Exhibit 434 received in evidence.)

8          **MR. RUTHERFORD:**  Did you say "admitted," Your Honor?

9          **THE COURT:**  Yes, I did.

10  BY MR. RUTHERFORD:

11  **Q.**   Okay.  Now, first, directing your attention to page

12  434-00003.  Do you see where it says "medical necessity"

13  language there?

14  **A.**   Yes.

15  **Q.**   Sort of third row.

16      What happened at this meeting with respect to "medical

17  necessity" language?

18  **A.**   So there was a recommended -- from the previous meeting,

19  there had been recommendation that the BPAC take a look at a

20  definition for "medical necessity."  That definition was then

21  presented at this particular meeting, and then reviewed and

22  voted on and approved.

23  **Q.**   And where it says, in that middle column, "COC," do you

24  see that?

25  **A.**   Yes.

1  Q.  Including a definition from the COC.  What is the COC?

2  A.  The Certificate of Coverage.

3  Q.  Now, directing your attention to page 0002, at the top of

4  that page.

5  A.  Yes.

6  Q.  Under "Optional attendee guest name," do you see those two

7  names?

8  A.  Yes.

9  Q.  Okay.  Says "Sue Burgeson"?

10  A.  Yes.

11  Q.  Who is Sue Burgeson?

12  A.  Sue was our vice president of consumer affairs.

13  Q.  And what was Sue Burgeson's background?

14  A.  Sue had a very diverse background.  She owned a company,

15  and participated and was very active in patient advocacy type

16  of activities.  She, herself, was a consumer.  So she provided

17  a very unique viewpoint to our members.

18  Q.  By "consumer," what do you mean?

19  A.  By "consumer" means she was a patient herself.

20  Q.  With some sort of behavioral health disorder?

21  A.  Correct.

22  Q.  And what was she meant to represent -- like, who did she

23  represent at the company?  What was her role --

24  A.  She would represent the consumers, the members themselves.

25  Q.  And do you know who decided to hire Sue Burgeson?

1  **A.**   I believe it was Dr. Bonfield, Bill Bonfield.

2  **Q.**   Is she somebody who was given an opportunity each year to

3  provide commentary and feedback on the Level of Care

4  Guidelines?

5  **A.**   Yes.

6  **Q.**   And the Coverage Determination Guidelines?

7  **A.**   Yes.

8  **Q.**   Now, directing your attention to Exhibit 482.

9       Do you recognize this document?

10  **A.**   Yes.

11  **Q.**   What is it?

12  **A.**   It's BPAC minutes from January 20 of 2015.

13  **Q.**   Okay.  And then to page 0004.

14       Let me know when you're there.

15  **A.**   Yes.

16  **Q.**   Do you see where it says "2015 Level of Care Guideline

17  Updates"?

18  **A.**   I do.

19  **Q.**   What happened at this meeting with respect to the 2015

20  Level of Care Guidelines?

21  **A.**   So, again, we reviewed the guidelines, and then the

22  committee voted on them and approved them.

23  **Q.**   Okay.  Now, go up to "Opening remarks," where it says,

24  "BPAC welcomed two new members to the committee."  Do you see

25  that?

1    A.    Yes.

2    Q.    Do you see the two names underneath that statement that I

3    just read?

4    A.    I do.

5    Q.    Okay.  Is this the meeting -- see where it says "Fred

6    Motz"?

7    A.    Yes.

8    Q.    "Vice president of Actuarial Services"?

9    A.    Correct.

10   Q.    Was this the first meeting that Fred Motz was attending as

11   a member of the BPAC?

12   A.    Yes.

13   Q.    And was Mr. Motz on the BPAC before this meeting?

14   A.    No.

15   Q.    Was any representative from finance on the BPAC before

16   this meeting?

17   A.    No.

18   Q.    And prior to this meeting, had Mr. Motz, to your

19   knowledge, ever attended a meeting where the BPAC discussed and

20   approved Level of Care Guidelines?

21   A.    Not that I remember.

22   Q.    Directing your attention to Exhibit 519.

23   A.    I'm sorry, to which one?

24   Q.    519.

25   A.    Yes.

1   **Q.**   Do you recognize this document?

2   **A.**   I do.

3   **Q.**   What is it?

4   **A.**   It is a copy of the BPAC minutes from January 19 of 2016.

5           **MR. RUTHERFORD:**  Before I ask that question, Your

6   Honor, may I move Exhibit 482 into evidence?

7           **MR. KRAVITZ:**  No objection.

8           **THE COURT:**  Admitted.

9       (Trial Exhibit 482 received in evidence.)

10  **BY MR. RUTHERFORD:**

11  **Q.**   Okay.  Back to Exhibit 519, Dr. Triana.  You said you

12  recognize this.  What is it?

13  **A.**   This is a copy of the BPAC minutes from January 19 of

14  2016.

15  **Q.**   Okay.  And then directing your attention to page 0004.

16  What, if anything, occurred at this meeting relative to the

17  Level of Care Guidelines?

18  **A.**   So, again, the guidelines were reviewed and then voted on

19  and approved by the BPAC for the 2016 guidelines.

20  **Q.**   Now, back to page 519, at 0002.  Do you see that?

21  **A.**   Yes.

22  **Q.**   Do you see where it says -- it's got the committee member

23  names?

24  **A.**   Yes.

25  **Q.**   And titles?

1   **A.**   Yes.

2   **Q.**   And whether they attended or not?

3   **A.**   Correct.

4   **Q.**   And this was a meeting that Mr. Motz did not attend; is

5   that right?

6   **A.**   That's correct.  He was not at that meeting.

7   **Q.**   Directing your attention to Exhibit 1143.

8   **A.**   Yes.

9   **Q.**   Do you recognize this document?

10  **A.**   I do.

11  **Q.**   What is it?

12  **A.**   It's a copy of the BPAC minutes from April 2nd of 2013.

13  **Q.**   And then within --

14          **MR. RUTHERFORD:**  We'd move to admit this document into

15  evidence, Your Honor, Exhibit 1143.

16          **THE COURT:**  Admitted.

17          **MR. KRAVITZ:**  No objection.

18      (Trial Exhibit 1143 received in evidence.)

19  **BY MR. RUTHERFORD:**

20  **Q.**   Directing your attention, Dr. Triana, to page 0003.

21  **A.**   Yes.

22  **Q.**   To the last entry on -- on that page, where it says "BSAC

23  request to post guideline changes."

24  **A.**   Yes.

25  **Q.**   It indicates that:

1       "Continued discussion about BSAC's request to post

2       guideline changes and a red-line version of the guidelines

3       recommended that BSAC be notified of changes made based on

4       their input that the National Provider Advisory Council be

5       similarly notified.  And that A committee accepted the

6       recommendation to notify BSAC of changes made based on

7       their input to similarly notify the National Provider

8       Advisory Council and to post a summary of significant

9       changes on Provider Express."

10      Do you see those two statements?

11   A. Yes.

12   Q. What is that conveying?

13   A. The BSAC representatives had requested that if, as a

14   result of some of the recommendations they had made, any

15   changes were made, that those changes would get informed back

16   to the BSAC membership.  And then, also, the suggestion was

17   that it would also occur to the NPAC membership as well.

18   Q. Generally, what was the level of engagement at the BPAC

19   meetings?

20   A. It was good.

21   Q. What was your role during those meetings as the co-chair?

22   What did the co-chair do during a typical BPAC meeting?

23   A. So, typically, I was in charge of making sure, first of

24   all, that we would get through the agenda.  I would make sure

25   that there was adequate discussion of the various topics.  I

1  would make sure that if there was any topics that required a

2  vote, that we would follow the appropriate procedures regarding

3  that.  And I would make sure that the committee members were

4  engaged.

5  **Q.**  Do you know what an SME is?

6  **A.**  Yes.

7  **Q.**  What is it?

8  **A.**  It's a subject matter expert.

9  **Q.**  And were subject matter experts ever invited to attend

10  BPAC meetings?

11  **A.**  Yes.

12  **Q.**  Whose responsibility was it to invite those subject matter

13  experts?

14  **A.**  Either me or Jerry Niewenhous.

15  **Q.**  Now, you testified last week that after the BPAC, I think,

16  was sunsetted or disbanded in 2016, the Utilization Management

17  Committee took over responsibility for approving the

18  guidelines; is that right?

19  **A.**  Yes.

20  **Q.**  And were you -- what was your role in the UMC?

21  **A.**  I was also a co-chair for the UMC.

22  **Q.**  Are you currently on the UMC?

23  **A.**  No.

24  **Q.**  And was the process that you described for updating the

25  Level of Care Guidelines, even after the UMC, the same from

1   2011 to 2017?

2   **A.**   Yes.

3   **Q.**   Now, were you also involved in the annual updates to the

4   Coverage Determination Guidelines?

5   **A.**   Yes.

6   **Q.**   What was your involvement there?

7   **A.**   The CDG revisions and updates would be presented to the

8   BPAC.  So I would review them in that capacity.

9   **Q.**   Are you familiar with a committee called the Coverage

10   Determination Committee?

11   **A.**   Yes.

12   **Q.**   Were you a member of the Coverage Determination Committee?

13   **A.**   No.

14   **Q.**   Do you know what the role of the Coverage Determination

15   Committee is or was?

16   **A.**   Yes.

17   **Q.**   What is that?

18   **A.**   It was to create the CDGs, the Coverage Determination

19   Guidelines, and update those, and then develop a draft of the

20   CDGs.

21   **Q.**   Was the Coverage Determination Committee similar in its

22   function to the Level of Care Guideline Workgroup?

23   **A.**   Yes.

24   **Q.**   Now, between 2011 to 2017, were the Level of Care

25   Guidelines fully incorporated into the Coverage Determination

1    Guidelines -- wait.  I'm sorry.  Were the -- let me ask this a

2    little bit differently.

3        You were asked last week a question as to whether or not

4    the Level of Care Guidelines were fully incorporated into the

5    Coverage Determination Guidelines.

6        Do you recall that?

7    A.   Yes.

8    Q.   I think I asked you that question.

9        Now, for some Coverage Determination Guidelines, are the

10   words of the Level of Care Guidelines literally, like, copied

11   and pasted into the Coverage Determination Guidelines?

12   A.   Yes.

13   Q.   Is that true for every CDG, though, between 2011 and 2017?

14   A.   No.

15   Q.   If the words of the Level of Care Guidelines were not

16   copied and pasted into the CDG, would a peer reviewer have been

17   allowed to open up the Level of Care Guidelines and apply them

18   in a CDG benefit determination?

19   A.   No.

20   Q.   Is that true even if the CDG made a reference to the level

21   of care guideline as opposed to fully incorporated it?

22   A.   Yes, that's true.

23   Q.   Now, Dr. Triana, do you have an understanding about

24   whether the Level of Care Guidelines from 2011 to 2017 were

25   consistent with generally accepted standards of care?

1  **A.**    Yes.

2  **Q.**    What is that understanding?

3  **A.**    That they were.

4  **Q.**    And what is that -- what is that understanding based on?

5  **A.**    It's based on the fact that our guidelines are

6  evidence-based.  We use scientific evidence.  Our guidelines

7  use and reference other guidelines, like practice guidelines,

8  external guidelines and such.  The fact that they were viewed

9  by individuals actively practicing psychiatry and treating our

10  members.  It's also based on my own clinical experience in

11  treating patients as well.

12  **Q.**    And what role, if any, did this external feedback that you

13  received play in your determination that the Level of Care

14  Guidelines and Coverage Determination Guidelines were

15  consistent with generally accepted standards of care?

16  **A.**    The feedback was very important to me.  And the feedback,

17  in general, was positive regarding that.

18      So I used that as a point of validation of the generally

19  accepted -- that our guidelines are consistent with generally

20  accepted standards of medical practice.

21          **MR. RUTHERFORD:**  No further questions, Your Honor.

22          **THE COURT:**  Okay.  Cross.

23      (Pause)

24          **MR. KRAVITZ:**  Too many notebooks.

25          **THE COURT:**  Mr. Kravitz, will you be using any of the

1    exhibits that were jointly agreed upon to be sealed?

2         MR. KRAVITZ:  Well, you know, I was planning to use

3    some of them.  But I'm not sure, given what he just testified

4    to, that I'm going to get to them.  I've got the list here so

5    that -- I don't -- actually, looking at this, I don't think so.

6    But --

7         THE COURT:  Okay.

8         MR. KRAVITZ:  Do you want me to take two minutes and

9    figure it out?

10        THE COURT:  No, I don't.  I want you to not use them.

11   Or if you're going to use them, use them at the close of your

12   examination and announce it before you do it.

13        MR. KRAVITZ:  Absolutely.

14        THE COURT:  Okay.

15        MR. KRAVITZ:  I wasn't -- I wouldn't have considered

16   using them without making --

17        THE COURT:  No, I just want to make sure you don't use

18   them in the middle and we send people in and out.

19        MR. KRAVITZ:  Got it.  Okay.  Makes perfect sense.

20                        **CROSS-EXAMINATION**

21   BY MR. KRAVITZ:

22   Q.   Dr. Triana, good afternoon.

23   A.   Good afternoon.

24   Q.   You just testified that one of the reasons that UBH

25   creates its own guidelines is with respect to its clinical

1   vision.  Do you remember that?

2   **A.**   Correct.

3   **Q.**   And I think you mentioned "recovery and resiliency."  You

4   recall that?

5   **A.**   Correct.

6   **Q.**   And you recall the last time that you testified that you

7   also talked about "why now" as being part of the clinical

8   vision?

9   **A.**   Correct.

10   **Q.**   Let's talk about the BPAC, if we may.

11      And the first thing is, you know and knew, while you were

12   the chair, that the guidelines were supposed to be consistent

13   with generally accepted standards of care?

14   **A.**   Yes.

15   **Q.**   And I assume that you, as the chair of the BPAC, must have

16   made sure that the members of the committee knew that the

17   guidelines were supposed to be consistent with generally

18   accepted standards of care?

19   **A.**   Yes.

20   **Q.**   And that they were supposed to be evidence-based?

21   **A.**   Yes.

22   **Q.**   And not be adopted, rejected, or revised for a business

23   reason.  Is that true as well?

24   **A.**   Yes.

25   **Q.**   And in terms of the materials that went to the BPAC, I

1  believe that you mentioned today that what it was that the

2  level of care -- level of care guideline workgroup would get.

3  Do you recall discussing that?

4  **A.**  Yes.

5  **Q.**  And I think that you said that that group would get --

6  what I heard to you say was, like, a red-line of the guidelines

7  so that the workgroup could see what the proposed changes were?

8  **A.**  Correct.

9  **Q.**  And, also, I think that you said that the workgroup would

10 get those grids of the feedback; is that correct?

11 **A.**  Yes.

12 **Q.**  So those were the two principal documents that the

13 workgroup got?

14 **A.**  Correct.

15 **Q.**  Now, in terms of what the BPAC got, as I understand it,

16 the BPAC would get the red line or its equivalent; right?

17 **A.**  Yes.

18 **Q.**  But the grids of the feedback did not actually go to the

19 BPAC; correct?

20 **A.**  Correct.

21 **Q.**  And then, in terms of the evidence base, let's -- let's

22 talk a little bit about that.  My understanding, from your

23 prior testimony -- or let me -- scratch that.  Let me start

24 again.

25      My understanding is that if there was a proposed change,

1  you more than likely would look at the supporting evidence.  Is

2  that true?

3  **A.**  A proposed change to the guideline?

4  **Q.**  Yes.

5  **A.**  It depended on it, yes.

6  **Q.**  Okay.  So sometimes you might look at the supporting

7  evidence, and other times you might not.  Is that fair?

8  **A.**  That's fair.

9  **Q.**  And whatever material you did look at would be supplied by

10  Mr. Niewenhous and his team; is that correct?

11  **A.**  Correct.

12  **Q.**  And then, I think, beginning in 2016, Mr. Niewenhous was

13  replaced by Mr. Rockswold?

14  **A.**  Correct.

15  **Q.**  Is that right?

16  **A.**  Correct.

17  **Q.**  But absent a proposed change, you as the chairman of the

18  BPAC and a member of the workgroup would not go back and

19  revalidate the evidence base for the guidelines.  Is that true?

20  **A.**  We would always review the guideline, whatever the new

21  version of it.  And we would review it in its entirety.

22  **Q.**  Right.  And, I'm sorry, I think my question was not

23  entirely clear.  I wasn't talking about guideline.

24  **A.**  Okay.

25  **Q.**  I understand that you looked at the guideline and the

1  changes and red-line; right?

2  **A.**   Yes.

3  **Q.**   I'm talking about the evidence base that supports the

4  guidelines, okay.

5  **A.**   Yes.

6  **Q.**   And in terms of that, if there wasn't a change to a

7  particular part of the guidelines, you didn't go back and take

8  a look at what the evidence base was; is that correct?

9  **A.**   Typically not.

10  **Q.**   Right.  And that was the job of Mr. Niewenhous; is that

11  correct?

12  **A.**   To monitor the annual changes or any updates to the

13  practice guidelines, yes.

14  **Q.**   And it was also his job to monitor the validity of the

15  evidence base?

16  **A.**   Yes.

17  **Q.**   Okay.  But if anybody had that responsibility, it would

18  have been Mr. Niewenhous; correct?

19  **A.**   Yes.  At the same time, all of us are licensed and were

20  clinicians; right.  And I'm a member of the American

21  Psychiatric Association.  So we would individually get updates

22  to practice guidelines, and those sort of things, just as a

23  course of our, you know, licensure, CME activities as well.

24  **Q.**   Okay.

25

1

2  **Q.**  But just to be clear, in terms of the job of monitoring

3  the evidence base, that was Mr. Niewenhous's job; correct?

4  **A.**  Yes.

5  **Q.**  And then Mr. Rockswold's; right?

6  **A.**  Correct.

7  **Q.**  And Mr. Niewenhous was not a medical doctor; is that

8  correct?

9  **A.**  That's correct.

10  **Q.**  And as I understand it, he's an unlicensed social worker?

11  **A.**  Correct.

12  **Q.**  And Mr. Rockswold also isn't a medical doctor?

13  **A.**  Correct.

14  **Q.**  And my understanding is he is not a licensed or

15  professional clinician; is that correct?

16  **A.**  I'm not sure what his credentials exactly are.

17  **Q.**  In terms of the BPAC and its job of approving or

18  disapproving changes to the guidelines, as I understand it,

19  Mr. Niewenhous would -- or perhaps someone from his group --

20  would present proposed changes to the BPAC.  Is that how it

21  would work?

22  **A.**  Yes.

23  **Q.**  And --

24          **THE COURT:**  Who drafted the proposed changes?

25          **THE WITNESS:**  So the Level of Care Guideline Work

1    Group would be the one that would develop the final draft.

2        The actual typing it?

3        **THE COURT:** No. Who came up with the language in the

4    first instance to propose to the Level of Care Guidelines Work

5    Group? Was that Mr. Niewenhous?

6        **THE WITNESS:** Yes. Mr. Niewenhous and his team would

7    make their suggestions.

8        **THE COURT:** Okay. Thank you.

9        Who's on his team?

10       **THE WITNESS:** Loretta Urban was on his team, and I'm

11   not sure who else was on his team.

12   **BY MR. KRAVITZ:**

13   **Q.** And, Dr. Triana, the requirement that the guidelines be

14   evidence based was important to UBH; is that correct?

15   **A.** Yes.

16   **Q.** Now, in terms of the BPAC's role, it's true that you do

17   not recall an example of anyone on the BPAC ever opposing a

18   proposed change to the guidelines; is that right?

19   **A.** I'm not sure that I ever said that. There could have been

20   a chance, but I can't recall an example of that.

21   **Q.** All right. So you might recall that there were

22   discussions of changes, but you don't recall an example of

23   someone actually opposing a change?

24   **A.** Correct.

25   **Q.** Let me ask you about -- if I can find it in my morass of

1   paper here -- Exhibit 1235, which is somewhere in the vicinity.

2       And as I understand it, Exhibit 1235 was a list of

3   internal and external people from whom feedback was solicited;

4   is that correct?

5   **A.**   Yes.  Yes.

6   **Q.**   I'll give you a chance to find it too since --

7   **A.**   Yes.

8   **Q.**   Okay.  But this is not -- "this" being Exhibit 1235 -- is

9   not necessarily a list of people who provided feedback;

10  correct?

11  **A.**   Correct.

12                  (Pause in proceedings.)

13          **MR. KRAVITZ:**  Sorry.

14  **Q.**   If you could turn to Exhibit 114 [sic], please.

15  **A.**   (Witness examines document.)  Which binder is that in?

16  Sorry.

17  **Q.**   Yeah, good question.  I think it's in -- well, it was in

18  the -- it was on the list of documents that UBH identified for

19  you.

20                  (Plaintiffs counsel conferring.)

21          **MR. KRAVITZ:**  1114.  What did I say?

22          **MS. REYNOLDS:**  114.

23          **THE WITNESS:**  Oh.  Yes.

24  BY MR. KRAVITZ:

25  **Q.**   I'm sorry.  Okay.  I'm sorry.  I misspoke.

1    **A.**    (Witness examines document.)  Yes.

2    **Q.**    Okay.  And this is a letter from Dr. Bernard Bogard to UBH

3    dated January 20th, 2012, and it's a response to the feedback

4    solicitation letter; is that correct?

5    **A.**    Yes.

6    **Q.**    And if you go down to the end of the first paragraph, it

7    says (reading):

8              "In return for your written comments, we will

9              reimburse you $150."

10   Do you see that at the end of the first paragraph?

11   **A.**    Yes.

12   **Q.**    Okay.  And that's what the financial reward was or payment

13   was for providing solicitation -- I mean, for feedback?

14   **A.**    That was not part of my job, so I cannot confirm that.

15   **Q.**    And then if you look down, you can look at Dr. Bogard's

16   feedback, and it says (reading):

17             "Do the guidelines offer adequate support for making

18             decisions about care?  Yes.

19             "Are the guidelines organized in a manner that makes

20             them easy to use?  Yes.

21             "Are the criteria that are" -- "Are there criteria

22             that are ambiguous or unclear?  No.

23             "Are there criteria that should be added or deleted?

24             No."

25   Did I read that right?

1  A.   Yes.

2  Q.   Let's take a look at another feedback letter.  If you look

3  at Exhibit 11 --

4            MR. KRAVITZ:  Oh, I move 1114 into evidence.

5            MR. RUTHERFORD:  No objection, Your Honor.

6       (Trial Exhibit 1114 received in evidence)

7  BY MR. KRAVITZ:

8  Q.   And if you would turn to Exhibit 1116 in your book.

9  A.   Yes.

10  Q.   And this is another feedback letter from 2012.  Do you see

11  that?

12  A.   Yes.

13            MR. KRAVITZ:  And I move 1116 into evidence.

14            THE COURT:  It's admitted.

15            MR. KRAVITZ:  Oh, go ahead.

16            MR. RUTHERFORD:  No objection.

17            THE COURT:  Okay.

18            MR. RUTHERFORD:  Sorry.

19       (Trial Exhibit 1116 received in evidence)

20  BY MR. KRAVITZ:

21  Q.   And just one more (reading):

22            "Dear Gerard:

23            "I reviewed the guidelines.  I found them to be very

24       clear, easy to follow.  I think that they will be very

25       helpful in making decisions about patient care.  They have

1    become much more readable, user friendly over the years."

2    Did I read that right?

3  **A.**    Yes.

4                    (Pause in proceedings.)

5  **BY MR. KRAVITZ:**

6  **Q.**    If you would turn to Exhibit 1260, please.

7  **A.**    (Witness examines document.)

8  **Q.**    I know.  The books are very hard here.  1260, when you get

9  it, I believe is one of the grids --

10  **A.**    Yes, sir.

11  **Q.**    -- for the feedback 2015 Level of Care Guidelines?

12  **A.**    Yes.

13  **Q.**    And if you look at page 0002, do you see that?

14  **A.**    Yes.

15  **Q.**    And at the top of that page I believe you were asked some

16  questions about that excerpt from a comment by Dr. Axelson.  Do

17  you see that?

18  **A.**    Yes.

19  **Q.**    And you see that he's recommending that UBH adopt the

20  CASII instrument?  Do you see that?

21  **A.**    Yes.

22  **Q.**    And that is not something that UBH has ever done; is that

23  correct?

24  **A.**    That's correct.

25  **Q.**    And UBH has never adopted any special set of rules for

1  children or adolescents; correct?

2  **A.**  That is correct.

3  **Q.**  And do you recall whether or not Dr. Axelson's comment on

4  CASII was ever discussed at the BPAC level?

5  **A.**  I don't recall it being discussed at the BPAC level.

6  **Q.**  Do you recall whether it was discussed at the Level of

7  Care Work Group level?

8  **A.**  Yes.

9  **Q.**  But the decision was made not to adopt it; correct?

10  **A.**  Correct.

11  **Q.**  I did want to ask you about another one of these things

12  here.  It's Exhibit 1253.  I believe you were asked some

13  questions about that.  I believe that was the feedback grid for

14  the year 2012.

15  **A.**  Yes.

16  **Q.**  And if you look to page 0009, do you see that, that page?

17  Can you find it?

18  **A.**  (Witness examines document.)  Yes.

19  **Q.**  And you note that there is a comment about the residential

20  rehab guideline change?  Do you see that?  It's the top one by

21  PIC.  It says --

22  **A.**  Yes.

23  **Q.**  -- in the residential rehab guideline change any, I think

24  it should say "any of the following criteria must be met."

25  Change it to "any one of the following criteria must be met."

1    And then each of these -- and each of these criteria with an

2    "or."  Do you see that?

3    **A.**    Yes, sir.

4    **Q.**    Okay.  And I'd like to take a quick look at that

5    Residential Rehab Level of Care Guideline, which I think is

6    Exhibit 2 at page 28.

7    **A.**    (Witness examines document.)

8    **Q.**    Okay.  Have you found that in the book?

9    **A.**    Yes.  Page 28.

10   **Q.**    Yes.

11          And if you -- so, first of all, that's the residential

12   treatment center mental health conditions; is that correct?

13   **A.**    Yes.

14   **Q.**    For 2012; right?

15   **A.**    That's correct.

16   **Q.**    And if you flip the page to 0029, you'll see that there is

17   a paragraph 5.  Do you see that?

18   **A.**    Yes.

19   **Q.**    And then there is a 5b, which starts out, "Treatment in a

20   residential setting," and then it goes on.  And then the end of

21   that paragraph says (reading):

22               "Active treatment is indicated by services that are

23          all of the following..."

24          Do you see that?

25   **A.**    Yes.

1  **Q.**  And there are five bullets or listed factors there; is

2  that correct?

3  **A.**  Correct.

4  **Q.**  And you recognize that the first three -- little one,

5  little two, little three -- are consistent with the CMS

6  definition of "active treatment"?

7  **A.**  Yes.

8  **Q.**  Okay.  But the fourth and fifth bullets are not; correct?

9  **A.**  They are not consistent with the definition of "active

10  treatment."  They're incorporated into the CMS guidelines but

11  not under the active treatment section.

12  **Q.**  They're not in the "active treatment" definition; is that

13  correct?

14  **A.**  Correct.

15  **Q.**  Right.  And so if you go back to Exhibit 1253 now, which

16  we were looking at, and there's a comment on this same Level of

17  Care Guideline, do you see that?

18  **A.**  Yes.

19  **Q.**  And no one that year commented on the fact that that

20  Residential Rehab Level of Care Guideline actually had a

21  definition that included two additional bullets beyond what was

22  in the CMS definition; correct?

23  **A.**  Correct.

24  **Q.**  Right.  And as we just saw in Exhibit, I believe, 1114,

25  the solicitation letter at least does not ask the people

1    reviewing the guidelines to give their opinion on whether or

2    not the guidelines reflect or capture generally accepted

3    standards of care; correct?

4    **A.**    Correct.

5    **Q.**    If we could turn, please, to Exhibit 517.

6    **A.**    (Witness examines document.)

7    **Q.**    Do you have Exhibit 517 in front of you?

8    **A.**    Not yet.

9    **Q.**    Okay.

10   **A.**    It's in --

11   **Q.**    Take your time.  This is --

12   **A.**    517, yes.

13   **Q.**    Okay.  And Exhibit 517 is -- well, let me scratch that.

14          The top e-mail in Exhibit 517 is from you to Jerry

15   Niewenhous with a copy to Loretta Urban, and it is dated

16   January 12th, 2016, and the subject is "Guideline Input Call

17   Highlights"; is that correct?

18   **A.**    Correct.

19          **MR. KRAVITZ:**  I move the admission of Exhibit 517.

20          **MR. RUTHERFORD:**  No objection, Your Honor.

21          **THE COURT:**  It's admitted.

22       (Trial Exhibit 517 received in evidence)

23   **BY MR. KRAVITZ:**

24   **Q.**    And if you would turn to page 0002, please.

25   **A.**    (Witness examines document.)  Yes.

1  Q.   And the e-mail on that page is from Mr. Niewenhous to you

2  with a copy to Ms. Urban; correct?

3  A.   Correct.

4  Q.   And it's the day before on January 11th; right?

5  A.   Correct.

6  Q.   And it says (reading):

7        "From Friday's call with Bill and Bruce," first

8        bullet, "'Why now' concept.  One provider questioned the

9        use of.  Bill still favors.  Will keep in the guidelines.

10       Prompted a discussion about how well the concept has been

11       operationalized.  As follow-up, provided Bill and Bruce

12       with the attached."

13       Did I read that right?

14 A.   Yes.

15 Q.   Okay.  And if you now would turn to page 0001, which is

16 your e-mail of January 12th.  Are you with me?

17 A.   Yes.

18 Q.   Okay.  And then you say, "Bill likes Magellan's

19 definition."  Do you see that at the top?

20 A.   Yeah.  That's not me staying that.

21 Q.   Oh, that's not you.  Who is that?

22 A.   That's Jerry sending me that e-mail.

23 Q.   Oh, okay.  All right.  Fine.

24       So Jerry says, "Bill likes Magellan's definition";

25 correct?

1  **A.**   Correct.

2  **Q.**   And that's referring to the definition of "why now"?

3  **A.**   (Witness examines document.)  Yes.

4  **Q.**   And Jerry is -- (reading)

5       "Bill likes Magellan's definition and is concerned

6   that we haven't fully embraced the approach in the

7   day-to-day.  He recalled there being a training but

8   couldn't recall whether it was impactful.  Bill's interest

9   seemed to be in ensuring that care is being managed in

10  accordance with the guidelines, as well as to see if a

11  more directed solicitation of input might yield more

12  fruit."

13  Do you see that?

14 **A.**   Yes.

15 **Q.**   Did I read that right?

16 **A.**   Yes.

17 **Q.**   And then the next paragraph provides (reading):

18      "As for the level of input from staff and providers,

19  it has trailed off over the years.  Nothing in the input

20  explicitly indicates why.  That said, prior to the

21  trail-off, we did hear concerns from providers about how

22  the guidelines are applied.  Here's two examples from

23  2010."

24  Did I read that right?

25 **A.**   Yes.

1  Q.  And then example one (reading):

2          "I previously responded to UBH's request for feedback

3      on Level of Care Guidelines on March 6, 2006, and

4      February 12th, 2008.  I believe my comments now, which are

5      attached to the proposed guidelines, are similar to my

6      comments then.  However, the most disturbing aspect of the

7      guidelines is not so much what is in them," paren,

8      "although in places they are certainly unrealistic and

9      consultive rather than UR but how they are utilized.  The

10     reviewers too often do not seem to know or care that

11     clinical experience and judgment can be used in making

12     level of care determinations and that imminent safety is

13     not and should not be the only criteria for a specific

14     level of care.  This is especially important for children.

15     Access and availability of treatment is mentioned in your

16     guidelines, but in my experience is only infrequently or

17     rarely used.  The inability to utilize less structured

18     treatment and, therefore, requiring a higher level of care

19     should also be considered in the guidelines.  Peer

20     reviewers often use these guidelines as a cookbook and do

21     not use clinical judgment."

22     Did I read that right?

23  A.  Yes.

24  Q.  And then here's the next example (reading):

25          "Often it appears as if the reviewer's goal is to

1    deny treatment and use the guidelines to justify the

2    denial.  Maybe someday there will be a more collaborative

3    rather than adversarial process between those trying to

4    treat patients and those often preventing treatment.  In

5    that way a patient's needs will more likely be met, and I

6    believe in the long run can still be cost effective (for

7    society if not for UBH).  Obviously this is my opinion,

8    but determining if this opinion is shared by others and

9    addressing it not only" -- "can not only be helpful for

10   patient care but also may help UBH's reputation and

11   credibility."

12   Did I read that right?

13   A.   Yes.

14   Q.   I would like now to ask you a bit more -- scratch that.

15   Let me follow-up.  You gave some testimony here today

16   about Mr. Motz and his attendance at the BPAC.  Do you recall

17   that?

18   A.   Yes.

19   Q.   And I think that you said before that he would attend once

20   he was on the committee when there was a financial issue; is

21   that correct?

22   A.   He would attend rarely.

23   Q.   Rarely.  But if there was a financial issue that was

24   actually being discussed, that is when he would attend; right?

25   A.   I'm not sure when he would attend or not attend.  He just

1    didn't attend very frequently.

2    **Q.**   Okay.  Well, let me move on from that then.

3        I'd like to talk to you about the testimony you gave that

4    guidelines were supposed to be evidence based and not adopted

5    for business reasons.  Do you recall that?

6    **A.**   Yes.

7    **Q.**   Okay.  If you could turn to 482.

8    **A.**   (Witness examines document.)

9    **Q.**   Do you have Exhibit 482 in front of you?

10   **A.**   I do.

11   **Q.**   And that is -- strike that.

12       That document is a set of BPAC minutes from January 20th,

13   2015; is that correct?

14   **A.**   Yes.

15   **Q.**   And you attended that meeting?

16   **A.**   Yes, sir.

17          **MR. KRAVITZ:**  Okay.  I move the admission of

18   Exhibit 482.

19          **MR. RUTHERFORD:**  No objection, Your Honor.

20          **THE COURT:**  It's admitted.

21       (Trial Exhibit 482 received in evidence)

22   **BY MR. KRAVITZ:**

23   **Q.**   And this was a meeting where Fred Motz did attend; is that

24   correct?

25   **A.**   Yes.

1  **Q.**  And Carolyn Regan was there; is that right?

2  **A.**  Yes.

3  **Q.**  And Pete Brock from the Affordability Department; right?

4  **A.**  Yes.

5  **Q.**  And Mr. Niewenhous was also there; is that correct?

6  **A.**  Yes.

7  **Q.**  And then there's someone named Francisca Azocar?

8  **A.**  Yes.

9  **Q.**  I assume that's a she?

10  **A.**  Yes.

11  **Q.**  And what was her role?

12  **A.**  I'm not sure exactly what role, but she was in Research --

13  I believe the Research Department.

14  **Q.**  Okay.  And if you could turn, please, to page 0004 of

15  Exhibit 482.

16  **A.**  Yes.

17  **Q.**  And if you look down under the heading of "New Business,"

18  do you see that?

19  **A.**  Yes.

20  **Q.**  Do you see that "New Business"?  And then the third column

21  to the right is (reading):

22       "BPAC Committee recommended action plan to resolve

23     issue."

24     Do you see that?  That's the third -- that's the heading

25  under the third column reading from left to right.

1  **A.**   Oh, yes.

2  **Q.**   Okay.  And then look down to the entry under "New

3  Business" in that column.

4  **A.**   Yes.

5  **Q.**   Okay.  And that entry says (reading):

6         "BPAC approved the proposed changes to the Level of

7      Care Guidelines.  There were two additional areas where

8      BPAC made business decisions impacting the Level of Care

9      Guidelines due to no existing evidence-based practice that

10      could provide guidance.  These include:"

11         Bullet one:  "IOP.  There is no current best practice

12      documenting that the initial evaluation needs to be

13      completed within three treatment days.  BPAC approved

14      keeping this in the guidelines according to the following

15      rationale."

16      And there are two subbullets.

17      Well, first of all, have I read that correctly up to that

18  point?

19  **A.**   Yes.

20  **Q.**   And then the two subbullets say (reading):

21         "The initial evaluation is a critical component of

22      treatment planning.  Completion of the initial evaluation

23      within three treatment days is reasonable and support

24      safe, efficient, and effective treatment."

25      Do you see that?

1   **A.**   Yes.

2   **Q.**   And then the next bullet, black bullet, down says -- by

3   the way, did I read that right up to that point?

4   **A.**   Yes.  Yes.

5   **Q.**   And then it says (reading):

6          "Residential Treatment.  There is no current best

7          practice standard that states the initial evaluation needs

8          to be completed within 24 hours of admission.  BPAC

9          approved keeping this time frame in the guidelines

10         according to the following rationale:

11         "The initial evaluation is a critical component of

12         treatment planning.  Completion of an initial evaluation

13         within 24 hours is reasonable and supports safe,

14         efficient, and effective treatment."

15         I read that right?

16  **A.**   Yes.

17  **Q.**   Okay.  Let's now go to Exhibit 486, please.

18  **A.**   (Witness examines document.)

19  **Q.**   And 486 is an e-mail from you to Dr. Martorana and others

20  dated March 9, 2015; is that correct?

21  **A.**   Yes.

22  **Q.**   And the subject is "2015 LOCGs Update Training."  Do you

23  see that?

24  **A.**   Yes.

25         **MR. KRAVITZ:**  I'd like to move into evidence 482,

1   which is the last document we just discussed, and 486, which is

2   the current one.

3           **MR. RUTHERFORD:**  No objection.  I think 482 may

4   already be in evidence.

5           **THE COURT:**  Well, they're both admitted.

6       (Trial Exhibit 486 received in evidence)

7           **MR. KRAVITZ:**  Okay.  All right.  Then it doesn't have

8   to come in again.  Sorry.

9   **Q.**  And this is approximately -- "this" being Exhibit 486 --

10  is approximately, in terms of time, two months after

11  Exhibit 482; is that correct?

12  **A.**  (Witness examines document.)  Yes.

13  **Q.**  Okay.  And your e-mail says (reading):

14          "Good afternoon.  Attached is a highlighted version

15      of the document outlining the changes in the Level of Care

16      Guidelines between 2014 and 2015.  (Thanks to Andy

17      Martorana for the highlights!)"

18      And then if you would turn to page 0004 in Exhibit 486.

19  Actually, I think we have to back up to 0003.  And you see that

20  at the bottom of that page there is a black bullet for

21  "Intensive Outpatient Program"?

22  **A.**  (Witness examines document.)  Yes.

23  **Q.**  Okay.  And then under that heading, if you go down, and

24  this is really hard to read, but I think there is a bullet that

25  says "Frequency of visits with a psychiatrist"; is that

1  correct?

2  **A.**    Yes.

3  **Q.**    Okay.  And then the next bullet down says "Initial

4  Evaluation."  Do you see that?

5  **A.**    Yes.

6  **Q.**    And then there are -- under that there are subbullets that

7  say (reading):

8          "Discussion point for BPAC.  No evidence base for the

9          current standard that the initial evaluation be completed

10         within three treatment days of admission.  Evidence base

11         doesn't provide an alternative standard.  After discussion

12         with Lorenzo Triana and Bill Bonfield recommending that

13         the standard be maintained as a business decision,

14         rationale is:

15         "The initial evaluation is a critical component of

16         treatment planning, completion of the initial evaluation

17         within three treatment days is reasonable and support

18         safe, efficient, and effective treatment."

19         Do you see that?

20  **A.**    Yes.

21  **Q.**    Okay.  And that's what's reported in this substantial

22  change document with respect to the 2015 guidelines?

23  **A.**    Yes.

24  **Q.**    And then if you go down, there's a heading that says

25  "Residential Treatment Program."  Do you see that?

1   A.   Yes.

2   Q.   That's also on 0004; is that correct?

3   A.   Correct.

4   Q.   And then the first subbullet is "Frequency of visits with

5   a psychiatrist"; is that right?

6   A.   Yes.

7   Q.   And with respect to this one, it says (reading):

8          "No evidence base for the current standard of twice

9       weekly visits.  Replace with guidance from the LOCUS that

10      a psychiatric consultation occurs no less than weekly."

11      And then under "Initial Evaluation":

12          "Discussion Points for BPAC.  No evidence base for

13      the current standard that the initial evaluation be

14      completed within 24 hours of admission.  Evidence base

15      doesn't provide an alternative standard.  After discussion

16      with Lorenzo Triana and Bill Bonfield recommending that

17      the standard be maintained as a business decision,

18      rationale is:

19          "Initial evaluation is a critical component of

20      treatment planning, completion of the initial evaluation

21      within 24 hours is reasonable and supports safe,

22      efficient, and effective treatment."

23      Did I read that right?

24  A.   Yes.

25  Q.   And in terms of your testimony about Mr. Motz, it is true

1  that if it was not actually in the BPAC, you did receive

2  information or financial information concerning utilization

3  management and how the company was doing; is that correct?

4  **A.**  When you say "you," you mean me?

5  **Q.**  Yes, you.

6  **A.**  Outside of the BPAC?

7  **Q.**  Yes.

8  **A.**  Yes.

9  **Q.**  Okay.  And you would also get UM information from

10  Affordability, correct, outside of the BPAC?

11  **A.**  Yes, sir.

12  **Q.**  Now, I do want to ask you a few questions about the BPAC

13  and information that might have been discussed in the BPAC

14  concerning ALOS data.

15      And just to review the bidding here, I think you testified

16  last week, and it's at transcript pages 704, lines 2 to 9, that

17  the BPAC didn't evaluate UM data, including ALOS data.  Do you

18  recall that?

19  **A.**  Yes.

20  **Q.**  And then do you also recall that at transcript page -- I'm

21  sure you don't remember the page -- 705, lines 6 to 20, I read

22  you your deposition testimony where you said that if a

23  committee member had a concern about ALOS, that would be the

24  time for the committee member to bring it up?  Do you recall

25  that?

1   **A.**   Yes.

2   **Q.**   And then I believe that in response to a question by UBH's

3   counsel you said -- and this is at trial transcript 786, line

4   23, through 787, line 4 -- that you recall no instance of

5   average length of stay data being discussed at the BPAC.  Do

6   you recall that?

7   **A.**   Correct.

8   **Q.**   Okay.  Let's take a look at this, and I would like to ask

9   you about -- if I can find it -- pardon me for one second while

10  I see if I can find my document.

11                   (Pause in proceedings.)

12       **MR. KRAVITZ:**  Sorry, Judge.  I'm just trying to --

13       **THE COURT:**  It's okay.

14       **MR. KRAVITZ:**  -- find which of these notebooks it's

15  in.  It's not going to be in here.

16                   (Pause in proceedings.)

17       **MR. KRAVITZ:**  Okay.

18  **Q.**   I just want to see if you remember this, and it's with

19  respect to a BPAC meeting from July 27 of 2010.  You were the

20  chair of the BPAC back then; is that correct?

21  **A.**   Yes.

22  **Q.**   And do you recall that Francisca Azocar presented an

23  update on ALOS benchmarks and the pros and cons of using the

24  NIS national benchmarks versus the internally created

25  benchmarks that are being used today?  Do you recall that?

1  **A.**   I have to see the --

2  **Q.**   Okay.  Let me -- and then I'll ask you one more.

3       Do you recall that there was a discussion about using a

4  hybrid approach to benchmarking?  (reading)

5            "This would include using NIS national and OHBS

6       homegrown data.  However, if this method is used, an

7       analysis will have to occur comparing all of the

8       differences and explaining how they will be mitigated."

9            **MR. RUTHERFORD:**  Objection, Your Honor.  If this is

10 for refreshing recollection, there's a process for that.  We

11 don't also have a copy of this document.

12           **MR. KRAVITZ:**  Well, I'm going to give it to you.

13           **THE COURT:**  Give it to him before you start reading

14 out of it.

15           **MR. KRAVITZ:**  Well, that's fair enough.  I'm sorry.

16           **THE COURT:**  Thank you.

17           **MR. KRAVITZ:**  I should have.

18      Here.  I'm sorry.  I apologize for that.  This is what

19 I -- that's what I just read.

20           **MR. RUTHERFORD:**  The exhibit number?

21           **MR. KRAVITZ:**  There isn't one.  I'm just going to

22 refresh his recollection.

23      And may I approach the witness?

24           **THE COURT:**  Okay.

25           **MR. KRAVITZ:**  Would you like a copy too?

1    THE COURT:  No.  I think I've got the gist.

2    MR. KRAVITZ:  Okay.

3 Q.  I'm handing you these minutes, and I'm just going to show

4 you that I was reading from there (indicating).  Okay?

5    And now that you've said you don't recall, I want to know

6 whether or not this document refreshes your recollection.

7 A.  (Witness examines document.)

8 Q.  Okay.

9    THE COURT:  Let him respond to the question.

10    MR. KRAVITZ:  Okay.  Yeah.

11    THE WITNESS:  Yes.  Can I read this real quick?

12 BY MR. KRAVITZ:

13 Q.  Sure.  Of course.

14 A.  (Witness examines document.)  Yes.

15 Q.  That refreshes your recollection?

16 A.  Uh-huh.  Yes.

17 Q.  And do you recall that those discussions occurred?

18 A.  Yes.

19    MR. KRAVITZ:  Okay.  I have no further questions.

20    THE COURT:  Okay.  Any redirect?

21    MR. RUTHERFORD:  Briefly, Your Honor.

22    (Pause in proceedings.)

23    REDIRECT EXAMINATION

24 BY MR. RUTHERFORD:

25 Q.  Dr. Triana, with respect to that last meeting in 2010,

1  aside from that meeting seven years ago, do you recall any

2  other meetings since 2010 where ALOS was discussed?

3  **A.**   I do not.

4  **Q.**   You indicated there are approximately 25 to 30 meetings

5  per year?

6  **A.**   Correct.

7  **Q.**   Directing your attention to Exhibit 1114, this is a

8  solicitation letter that you were asked questions about by

9  Mr. Kravitz; is that right?

10  **A.**   Yes.

11  **Q.**   And you were asked specifically about the questions as set

12  forth in that document.  Do you see those?

13  **A.**   Yes.

14  **Q.**   Was it your expectation that if there was something in the

15  Level of Care Guidelines that was inconsistent with generally

16  accepted standards of care, that these questions would elicit a

17  response from the person from whom feedback was solicited --

18  **A.**   Yes.

19  **Q.**   -- to either delete the language or change it?

20  **A.**   Correct.

21  **Q.**   And then directing your attention to Exhibits 482 and 486.

22  **A.**   (Witness examines document.)

23  **Q.**   Do you recall just generally that you were asked about the

24  phrase "business decision"?

25  **A.**   Yes.

1  **Q.**  In your experience, is the evidence base that supports a

2  guideline always clear?

3  **A.**  Yes.  I'm sorry.  What was the question again?

4  **Q.**  Okay.  In your experience --

5  **A.**  Yes.

6  **Q.**  -- is the evidence base that supports a guideline always

7  clear?

8  **A.**  No.

9  **Q.**  Are there instances that you can recall when UBH had to

10  make a decision regarding guideline changes without evidence

11  base?

12  **A.**  Yes.

13  **Q.**  And in those situations, what would UBH look to to support

14  the guideline change?

15  **A.**  So in that particular example, it cited myself and

16  Dr. Bonfield, and that was a clinical decision based on our

17  clinical judgment and our clinical expertise.

18  **Q.**  But it said "business decision."  So what did you mean by

19  "business decision" when you said that?

20  **A.**  I'm not sure why that word was in there, that document,

21  but I remember the discussion and the discussion was very much

22  a clinical one.

23       **MR. RUTHERFORD:**  One moment, Your Honor.  I think I

24  may be done.

25       **THE COURT:**  Okay.

1    (Pause in proceedings.)

2    BY MR. RUTHERFORD:

3    Q.   And then you were asked questions, do you recall -- I

4    guess directing your attention to Exhibit 517, and specifically

5    to the two pieces of critical feedback that were read into the

6    record.  Do you recall that, Dr. Triana?

7    A.   Hold on one second.

8         (Witness examines document.)  Yes, 517.

9    Q.   And the last sentence of that first piece of critical

10   feedback read (reading):

11        "Peer reviewers often use these guidelines as a

12        cookbook and do not use clinical judgment."

13        Do you see that?

14   A.   Yes.

15   Q.   Do you agree that UBH's medical directors should use

16   clinical judgment in making coverage determinations?

17   A.   Yes.

18        MR. RUTHERFORD:  No further questions, Your Honor.

19        MR. KRAVITZ:  Your Honor, one more document.  It will

20   take a minute.

21                    RECROSS-EXAMINATION

22   BY MR. KRAVITZ:

23   Q.   If you could open your book to 552, please.

24   A.    (Witness examines document.)

25   Q.   And those are minutes of the Utilization Management

1    Committee dated August 9, 2016; is that correct?

2    **A.**    Yes, sir.

3    **Q.**    And if you turn to page 0006, do you see that?

4    **A.**    Yes.

5    **Q.**    There's something on the quick cert treatment milestones

6    update.

7            **MR. RUTHERFORD:**  Objection, Your Honor.  Beyond the

8    scope.

9            **THE COURT:**  Sustained.

10        Thank you very much.

11           **MR. KRAVITZ:**  I just was -- okay.

12           **THE COURT:**  Okay.  You may step down.

13           **THE WITNESS:**  Oh.  Thank you.

14           **THE COURT:**  Thank you.

15                         (Witness excused.)

16           **MR. RUTHERFORD:**  Your Honor, by video the defense now

17    calls John Beaty.

18           **THE COURT:**  How long?

19           **MR. RUTHERFORD:**  It's a ten-minute video.

20           **THE COURT:**  Okay.  What time is it?

21           **THE CLERK:**  3:28.

22           **THE COURT:**  Okay.  Let's get going.  Sure.

23           **MR. RUTHERFORD:**  Right now, Your Honor?

24           **THE COURT:**  Yeah, if everybody's okay.

25           **MR. RUTHERFORD:**  May I just walk the witness out while

1  they --

2          THE COURT:  Yes.  That's fine.

3                    (Pause in proceedings.)

4               (Video was played but not reported.)

5          MS. ROSS:  Your Honor, we move to admit Exhibits 1011

6  and 1012.

7          MR. ABELSON:  No objection.

8          THE COURT:  They're admitted.

9      (Trial Exhibits 1011 and 1012 received in evidence)

10         MS. ROSS:  Your Honor, we do have one more witness

11 we'd like to call this afternoon.  UBH calls Dr. Thomas

12 Goddard.

13         THE COURT:  Okay.  Well, we can do 15, 20 minutes of

14 Dr. Goddard.

15         MS. ROSS:  We think we might be able to complete his

16 direct examination in that time.

17                    (Pause in proceedings.)

18                 **THOMAS GLENN GODDARD**,

19 called as a witness for the Defendant, having been duly sworn,

20 testified as follows:

21         THE WITNESS:  I do.

22         THE CLERK:  Thank you.  Go ahead and have a seat.

23     Please state your full name for the record and spell your

24 last name.

25         THE WITNESS:  Thomas Glenn Goddard, G-O-D-D-A-R-D.

1    **THE CLERK:**  Thank you.

2    **THE COURT:**  Okay.  Proceed.

3    <u>**DIRECT EXAMINATION**</u>

4    BY MR. BUALAT:

5    **Q.**   Good afternoon, Dr. Goddard.

6    **A.**   Good afternoon.

7    **Q.**   Can you please briefly explain -- excuse me -- describe

8    your educational background after high school?

9    **A.**   I attended the University of Arizona in 1972 to 1976,

10   received a bachelor's in political science.  I went to law

11   school, received my Juris Doctor from the University of Arizona

12   in 1979.  Went back to graduate school in '92 and -- in George

13   Mason University, got a master's in industrial organizational

14   psychology and a Ph.D. in industrial organizational psychology.

15   **Q.**   And what has been the focus of your career over the last

16   20-plus years?

17   **A.**   I've been in healthcare for about that length of time and

18   for the last 18 or so years, focusing on accreditation of

19   healthcare organizations.

20   **Q.**   And what is the accreditation of healthcare organizations?

21   **A.**   It's a process by which an independent body assesses

22   whether a healthcare organization meets certain national

23   standards for process.  It depends on the accreditation as to

24   what process.

25   **Q.**   And you're currently employed in that field?

1  **A.**   I am.

2  **Q.**   And who's your current employer?

3  **A.**   Integral Healthcare Solutions.

4  **Q.**   And what is your role there?

5  **A.**   I'm the founder and chief executive officer of that firm.

6  **Q.**   And when did you found Integral Healthcare Solutions?

7  **A.**   January of 2002.  So about 15 and a half years ago.

8  **Q.**   And what does Integral Healthcare Solutions do?

9  **A.**   We specialize in helping healthcare organizations achieve

10  accreditation from certain accreditation -- no -- yeah,

11  healthcare organizations achieve from about a half a dozen

12  different accreditation bodies.

13  **Q.**   And what type of accreditation support services does your

14  company provide?

15  **A.**   The bulk of our work is documentary assessment.  We review

16  through a GAAP analysis and desktop review process documents to

17  be submitted for accreditation to accreditation organizations.

18       We also conduct mock on-site reviews as well as a part of

19  that preparation, and other things as well:  Preparing

20  policies, procedures, and helping our clients in all sorts of

21  ways, but mainly this document assessment takes most of our

22  time.

23  **Q.**   And prior to founding your company, did you work with any

24  of the accrediting agencies?

25  **A.**   Yes.  I worked with URAC.

1  **Q.**   And what was your role at URAC?

2  **A.**   I was chief operating officer and general counsel at URAC

3  and also both as an employee, and after that I was a reviewer

4  for URAC.

5  **Q.**   Approximately how many healthcare utilization management

6  accreditation processes have you worked on in your career?

7  **A.**   I've been involved with organizations dealing with health

8  UM, health utilization management, probably 200 times.  Maybe

9  175 to 200.

10 **Q.**   And have you done any training or teaching with respect to

11 healthcare utilization management before?

12 **A.**   I have.

13 **Q.**   How about the accreditation process?

14 **A.**   Very much so, yes.

15 **Q.**   What is your opinion that you plan to offer today at

16 trial?

17 **A.**   I reviewed nearly 200 documents from UBH; and based on a

18 review of those documents, I've concluded that UBH met the

19 requirements of UM 2 of the NCQA standards and HUM 1 of the

20 URAC standards dealing with the selection and approval of

21 clinical review criteria.

22 **Q.**   And you said you reviewed UBH internal documents; is that

23 right?

24 **A.**   I did.

25 **Q.**   What types of documents did you review in reaching your

1  opinion today?

2  **A.**   The typical set of documents that accreditation

3  organizations review in connection particularly with those

4  particular standards I mentioned.   So examples would be

5  utilization management program descriptions and other policies

6  and procedures; committee and task force meeting minutes; lists

7  of providers whose opinion were solicited in the selection,

8  review, and approval of those clinical review criteria; the

9  clinical review criteria themselves.

10  **Q.**   You mentioned clinical review criteria.   Would that

11  include any Level of Care Guidelines, Coverage Determination

12  Guidelines?   What were you referring to?

13  **A.**   Level of Care Guidelines for the most part that were the

14  focus of my review.

15  **Q.**   And why is that document -- why are those documents

16  relevant to your understanding of utilization management?

17  **A.**   Well, those are the documents that help an organization to

18  demonstrate to the accreditation organization that they've met

19  the specific criteria of those standards I referenced.

20  **Q.**   Now, you mentioned a few organizations.   What are the

21  organizations that accredit healthcare utilization management

22  organizations?

23  **A.**   The ones that I've -- my organization focuses on are URAC

24  and NCQA.

25  **Q.**   Are there other ones that also involve an accreditation?

1    A.    Not at the same level as those two organizations.

2    Q.    And what is your view about the accreditations from either

3    of those organizations?

4    A.    What is my view of them?

5    Q.    Yes.

6    A.    Well, they dominate the field.  For major health plans and

7    for freestanding health utilization management organizations,

8    those two are the gold standard.

9    Q.    And what is the purpose in your mind of healthcare

10   utilization management accreditation?

11   A.    They are a demonstration to payers, regulators, and

12   consumers that the organization that has been accredited under

13   those standards has complied with these national standards for

14   process around those particular topics.

15   Q.    Let's focus on URAC.  What is the focus of URAC?

16   A.    URAC from its inception focused on utilization review.  In

17   fact, the "UR" in the original name was the Utilization Review

18   Accreditation Commission.  So that's been its central focus,

19   and it continues to be a very important focus for health plans,

20   utilization management organizations.  And you can see that

21   influence in some other kinds of accreditation programs to

22   pharmacy benefit management accreditation all have these

23   utilization review standards or something like them in them.

24   Q.    Who governs URAC?

25   A.    URAC is governed by a large and diverse Board of

1   Directors.  The members of that Board of Directors are drawn

2   from stakeholders across the healthcare industry from providers

3   like the American Medical Association, American Hospital

4   Association; payers like America's health insurance plans, the

5   Blue Cross/Blue Shield association; regulators like the NAIC,

6   the insurance regulators; consumer organizations are

7   represented and other stakeholders throughout the healthcare

8   industry.

9   **Q.**   Do any of those stakeholders include any behavioral

10  health-related organizations?

11  **A.**   Yes.

12  **Q.**   Which ones?

13  **A.**   I believe the American Psychiatric Association.

14  **Q.**   Do you have an understanding as to why URAC has those

15  variety of stakeholders on its board?

16  **A.**   It helps with the credibility of standards.  If you can

17  develop accreditation standards that all of the major

18  stakeholders in your industry -- in this case healthcare

19  industry -- or most of them agree on, then the credibility of

20  the standards is raised.

21  **Q.**   And you also mentioned an organization called NCQA.  Do

22  you remember that?

23  **A.**   Yes.

24  **Q.**   What is the NCQA?

25  **A.**   National Council of Quality Assurance.

1 **Q.** And how does NCQA compare relatively as far as its role to

2 URAC?

3 **A.** It was created around the same time, 1989 or 1990. Its

4 focus was different than URAC. Where URAC was focused on the

5 utilization review process, NCQA was focused in its inception

6 on health plans, which include the utilization review process,

7 but -- and more HMO-style health plans at first.

8    In both cases URAC and NCQA have broadened the scope of

9 accreditation programs that they operate in, but the initial

10 focus and to this day is still on health plans.

11 **Q.** As part of the accreditation process, is the development

12 of clinical guidelines for healthcare utilization management

13 reviewed?

14 **A.** Yes.

15 **Q.** And the accreditation process that URAC and NCQA, is that

16 similar with respect to the development of clinical guidelines?

17 **A.** Yes.

18 **Q.** And can you briefly describe what that process entails?

19 **A.** The two standards from NCQA and URAC have essentially the

20 same requirements, and they require that you have actively

21 practicing providers with relevant knowledge in the field who

22 are consulted, that evidence-based or literature-based

23 considerations are taken into account, and that the guidelines

24 be reviewed annually to make sure that they're up to date.

25 **Q.** And how would you characterize the time and effort that

1   goes into the process for accreditation?

2   **A.**   It's substantial, particularly for the kinds of

3   organizations we're talking about, large, complex

4   organizations.

5   **Q.**   Are there standards for accreditation with respect to

6   developing guidelines that are viewed as the national

7   standards?

8   **A.**   Yes.   These two organizations' accreditation standards on

9   this topic are national -- the national standards for the

10   development and review and approval of clinical review

11   criteria.

12   **Q.**   All right.   Let's look at one of those standards.   Can you

13   please pull up Exhibit 1012, and if you could turn to

14   page 0154, and let's focus on the top half of that page,

15   please.

16   **A.**   (Witness examines document.)

17   **Q.**   So, Dr. Goddard, are you familiar with this provision that

18   is displaying on your screen there?

19   **A.**   Yes.

20   **Q.**   Actually, if you could blow it up, please.

21       What is it?

22   **A.**   This is taken from Version 7.0 of the Health -- of the

23   URAC Health Utilization Management Accreditation Program, and

24   it's HUM 1, which is the standard that describes URAC's

25   requirements for the clinical review criteria selection

1  development, et cetera.

2  **Q.**   Now, did you make any conclusions about UBH and its

3  compliance with or satisfaction of UH 1 [sic] in your work?

4  **A.**   Yes.  Based on the documents I reviewed, UBH met and/or

5  exceeded these requirements of each of these elements.

6  **Q.**   Okay.  Let's look first at requirement under subsection

7  (a).  It says that the clinical review criteria or scripts are

8  developed with involvement from appropriate providers with

9  current knowledge relevant to the criteria or script under

10  review.  Do you see that?

11  **A.**   I do.

12  **Q.**   And did UBH meet or exceed that requirement?

13  **A.**   In my opinion, yes.

14  **Q.**   The next requirement under subsection (b) says that the

15  criteria is based on current clinical principles and processes.

16  Do you see that?

17  **A.**   Yes.

18  **Q.**   And did UBH meet or exceed that requirement?

19  **A.**   Yes.

20  **Q.**   And what is your -- and why do you say that?

21  **A.**   The documentation I reviewed, particularly the task force

22  meeting minutes, e-mails in connection with task force

23  meetings, and the guidelines themselves, the Level of Care

24  Guidelines, all showed abundant evidence of this.

25  **Q.**   The criteria Number C under HUM 1, it says (reading):

1          "Evaluated at least annually and updated if necessary

2      by, one, the organization itself; and, two, appropriate

3      actively practicing physicians and other providers with

4      current knowledge relevant to the criteria or scripts

5      under review."

6      Do you see that?

7   A.  I do.

8   Q.  And did UBH meet or exceed that requirement?

9   A.  Yes.

10  Q.  And what do you base your determination on?

11  A.  Well, let's take the annually first.  I looked at

12  documentation from each of the years in question, 2008 through

13  2016, and I saw ongoing annual processes.  So that criterion

14  was met.

15      And then the organization itself involving

16  appropriately -- appropriate actively practicing physicians,

17  the documentation throughout that period of time involved --

18  involved both providers from within the organization and from

19  outside of the organization engaged in a rather dynamic process

20  of review and development of clinical review criteria.

21  Q.  Do you know why URAC requires that actively practicing

22  providers provide input as to the criteria under review?

23  A.  I believe it's URAC's way of making sure that the review

24  criteria are based on current principles.

25  Q.  Under URAC HUM 1, is it necessary for an organization to

1    seek input from experts from outside the organization?

2    **A.**   It is not.

3    **Q.**   Is it -- when would be an instance in which the

4    organization would need to seek outside input?

5    **A.**   If the pool of providers that they have within the

6    organization don't meet the criteria of this standard.

7    **Q.**   And did UBH's internal pool meet the criteria for the

8    standard?

9    **A.**   Yes.

10   **Q.**   Then was it necessary for UBH to seek external input --

11   excuse me -- external input?

12   **A.**   It was not.

13   **Q.**   And how were you able to determine that UBH sought

14   external output -- input?

15   **A.**   They -- through a couple of ways.  On a number -- a number

16   of documents had actual lists of outside providers with their

17   qualifications of providers who were solicited for their input,

18   and the task force meeting minutes also reflected input from

19   outside providers.

20   **Q.**   All right.  Let's look at the last criteria under HUM 1.

21   Subsection (d) says (reading):

22          "Approved by the medical director or equivalent

23       designate or clinical director or equivalent designee."

24       Do you see that?

25   **A.**   I do.

1    Q.   Did UBH satisfy that requirement?

2    A.   Yes.

3           THE COURT:  So before you do that, can I ask a

4    question about subsection (b)?

5           THE WITNESS:  Yes.

6           THE COURT:  Is that a process or a substantive

7    criteria?

8           THE WITNESS:  It's process.

9           THE COURT:  And what process is it that it represents?

10          THE WITNESS:  It represents typically a task force or

11   committee looking at and debating or discussing whether, you

12   know, this clinical procedure is appropriate or whether there's

13   been research elsewhere or clinical practice that has come to

14   light that would suggest it should be changed.

15          THE COURT:  Thank you.

16          THE WITNESS:  You're welcome.

17   BY MR. BUALAT:

18   Q.   If we could move on, let's go to Exhibit 1011 and page 007

19   of that, please.  And focusing on the top half of that page

20   through element (a), item (5), please.

21         Dr. Goddard, are you familiar with what's displayed on

22   your screen there?

23   A.   I am.

24   Q.   And what is that?

25   A.   This is URAC's equivalent to the standard we just looked

1   at from -- this is NCQA's equivalent to the URAC standard we

2   just looked at.

3   **Q.**   And are these criteria similar in nature to the URAC

4   criteria we just looked at?

5   **A.**   Very similar, particularly under element (a), numbers (1),

6   (4), and (5).

7   **Q.**   And are those the elements that relate to the development

8   of clinical guidelines?

9   **A.**   Yes.

10  **Q.**   Do you have an opinion as to whether or not UBH satisfied

11  those elements that you identified?

12  **A.**   I do, and that opinion is that they did.

13  **Q.**   So do you have an opinion as to whether or not UBH has

14  written decision-making criteria that are objective and based

15  on clinical evidence?

16  **A.**   Yes, and I believe they -- my opinion is that they did.

17  **Q.**   And do you have an opinion as to whether or not UBH

18  involves appropriate practitioners in developing, adopting, and

19  reviewing criteria?

20  **A.**   Yes.  UBH in my opinion does.

21  **Q.**   And, finally, do you have an opinion as to whether or not

22  UBH annually reviews the UM criteria and the procedure for --

23  excuse me -- procedures for applying them and updates the

24  criteria when appropriate?

25  **A.**   I do, and UBH does meet that element.

1    **Q.**    Does URAC review and accredit the substantive content of

2    clinical guidelines?

3    **A.**    No.

4    **Q.**    Does NCQA review and accredit the substantive content of

5    clinical guidelines?

6    **A.**    No.

7    **Q.**    Do these national standards that we've been looking at

8    require a utilization management organization to adopt

9    particular guidelines?

10    **A.**    No.

11    **Q.**    How about require that guidelines that are adopted follow

12    some format or structure?

13    **A.**    No.

14    **Q.**    Does it require that the guidelines use some kind of

15    algorithm?

16    **A.**    No.

17    **Q.**    How about if it has some decision tree relating to

18    level-of-care decisions, is that a requirement?

19    **A.**    No.

20    **Q.**    Based on your review of UBH's accreditation documents,

21    were you able to assess how UBH develops its clinical

22    guidelines?

23    **A.**    Yes.

24    **Q.**    And how is that?

25    **A.**    It has a task force composed of diverse clinicians from

1　within the organization.　That task force leads the process and

2　is supported by staff, nonvoting members of the task force, who

3　provide technical support and organizational support.　The task

4　force oversees a process by which providers within the

5　organization and outside of the organization are solicited for

6　their opinion on the clinical review criteria.　There's debate

7　and discussion and drafting of new criteria each year.

8　**Q.**　And how would you describe the level of detail in UBH's

9　guideline creation?

10　**A.**　Robust.

11　**Q.**　And based on your experience, do you have an opinion as to

12　what the best practices are for a utilization management

13　organization in the development of clinical guidelines?

14　**A.**　I do.

15　**Q.**　And did UBH employ best practices in developing its

16　clinical guidelines?

17　**A.**　In my opinion, it did.

18　　　　**MR. BUALAT:**　I pass the witness, Your Honor.

19　　　　**THE COURT:**　Okay.　So do you have any

20　cross-examination of this witness?

21　　　　**MR. ABELSON:**　I do.　More than 10 or 15 minutes.

22　　　　**THE COURT:**　No, I can't do 10 or 15 minutes.　Two

23　minutes I can do.

24　　　　**MR. ABELSON:**　I'd be happy to start.

25　　　　**THE COURT:**　No.　You're going to have to go over to

1    tomorrow.  We're going to stop now.

2        So I apologize for this --

3            THE WITNESS:  No problem at all, sir.

4            THE COURT:  -- but I have to stop at 4:00.

5        So where are we?

6            MS. ROMANO:  We expect to conclude our case before

7    lunch tomorrow, Your Honor.

8            THE COURT:  Okay.  And then?

9            MS. REYNOLDS:  We may have a very brief rebuttal case.

10            THE COURT:  Okay.  Great.  And then we'll do closings

11    on Wednesday?  Is that okay?

12            MS. REYNOLDS:  That's the plan.

13            MS. ROMANO:  That's the plan.

14            THE COURT:  I have 9:30 calendar, so 10:30 for

15    closings on Wednesday.

16            MS. REYNOLDS:  Okay.

17            THE COURT:  Perfect.  Thank you.

18            MS. REYNOLDS:  Thank you.

19            MS. ROMANO:  Thank you.

20                (Proceedings adjourned at 4:00 p.m.)

21        (Proceedings to resume on Tuesday, October 31, 2017.)

22                        -  -  -  -

23

24

25

```
 1

 2                    CERTIFICATE OF REPORTERS

 3          We certify that the foregoing is a correct transcript

 4    from the record of proceedings in the above-entitled matter.

 5

 6    DATE:   Monday, October 30, 2017

 7

 8

 9                        Katherine Sullivan

10    _____

11         Katherine Powell Sullivan, CSR #5812, RMR, CRR
                      U.S. Court Reporter
12

13

14                        Jo Ann Bryce

15    _____

16           Jo Ann Bryce, CSR #3321, RMR, CRR
                      U.S. Court Reporter
17

18

19

20

21

22

23

24

25
```