**Volume 9**

**Pages 1778 - 1823**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JOSEPH C. SPERO, MAGISTRATE JUDGE

DAVID AND NATASHA WIT, et al.,  )
                                )
        Plaintiffs,     )
                                )
  VS.                 )   **No. C 14-2346 JCS**
                                )
UNITED BEHAVIORAL HEALTH,   )
                                )
        Defendant.     )
_____)   San Francisco, California
                                Tuesday, October 31, 2017

<u>**TRANSCRIPT OF PROCEEDINGS**</u>

<u>**APPEARANCES**</u>:

For Plaintiffs:       ZUCKERMAN SPAEDER LLP
                   1800 M Street, NW, Suite 1000
                   Washington, DC  20036-5807
        BY:  **CARL S. KRAVITZ, ESQUIRE**
             **CAROLINE E. REYNOLDS, ESQUIRE**
             **AITAN D. GOELMAN, ESQUIRE**

                   ZUCKERMAN SPAEDER LLP
                   485 Madison Avenue, 10th Floor
                   New York, New York 10022
        BY:  **JASON S. COWART, ESQUIRE**

(Appearances continued on next page)

Reported By:   Katherine Powell Sullivan, CSR #5812, RMR, CRR
              Jo Ann Bryce, CSR #3321, RMR, CRR
              Official Reporters - U.S. District Court

**APPEARANCES (CONTINUED):**

For Plaintiffs:   ZUCKERMAN SPAEDER LLP
        100 East Pratt Street, Suite 2440
        Baltimore, Maryland 21202-1031
    **BY: ADAM ABELSON, ESQUIRE**

        THE MAUL FIRM, P.C.
        101 Broadway, Suite 3A
        Oakland, California 94607
    **BY: ANTHONY F. MAUL, ESQUIRE**

        PSYCH APPEAL
        8560 Sunset Boulevard, Suite 500
        West Hollywood, California 90069
    **BY: MEIRAM BENDAT, ESQUIRE**

For Defendant:    CROWELL & MORING LLP
        515 South Flower Street, 40th Floor
        Los Angeles, California 90071-2258
    **BY: JEFFREY H. RUTHERFORD, ESQUIRE**
        **JENNIFER S. ROMANO, ESQUIRE**
        **ANDREW HOLMER, ESQUIRE**

        CROWELL & MORING LLP
        3 Embarcadero Center, 26th Floor
        San Francisco, California 94111
    **BY: NATHANIEL P. BUALAT, ESQUIRE**

        CROWELL & MORING LLP
        1001 Pennsylvania Avenue, NW
        Washington, DC 20004-2595
    **BY: APRIL N. ROSS, ESQUIRE**

**I N D E X**

Tuesday, October 31, 2017 - Volume 9

| **PLAINTIFFS' WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| **NIEWENHOUS, GERARD  (CALLED IN REBUTTAL)** | | |
| (PREVIOUSLY SWORN) | 1801 | 9 |
| Direct Examination by Ms. Reynolds | 1801 | 9 |
| Cross-Examination by Ms. Romano | 1820 | 9 |

| **DEFENDANT'S WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| **GODDARD, THOMAS GLENN (RECALLED)** | | |
| (PREVIOUSLY SWORN) | 1782 | 9 |
| Cross-Examination by Mr. Abelson | 1783 | 9 |
| **URBAN, LORETTA** | | |
| By Videotaped Deposition (not reported) | 1791 | 9 |
| **BROCK III, IRVIN PETE** | | |
| By Videotaped Deposition (not reported) | 1791 | 9 |
| **BONFIELD, WILLIAM CLIFFORD** | | |
| By Videotaped Deposition (not reported) | 1792 | 9 |

**E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 305 | | 1801 | 9 |
| 353 | | 1802 | 9 |
| 360 | | 1810 | 9 |
| 519 | | 1782 | 9 |
| 539 | | 1818 | 9 |
| 552 | | 1817 | 9 |
| 556 | | 1817 | 9 |
| 651 | | 1809 | 9 |

# <u>I N D E X</u>

## <u>E X H I B I T S</u>

| <u>TRIAL EXHIBITS</u> | <u>IDEN</u> | <u>EVID</u> | <u>VOL.</u> |
|---|---|---|---|
| 694 | | 1782 | 9 |
| 1657 through 1661 | | 1793 | 9 |

1    <u>**Tuesday - October 31, 2017**</u>                    <u>**8:36 a.m.**</u>

2                    **P R O C E E D I N G S**

3                        **---000---**

4        **THE CLERK:**  We're calling Case Number C 14-2346,

5    Wit/Alexander versus UBH.  And everybody is here.

6        **THE COURT:**  So what's up?  Sealing matters and

7    motions.

8        **MR. BUALAT:**  Actually, Your Honor, these were two

9    exhibits that were introduced during examination by UBH that we

10   seek to move into evidence that we didn't do at the time.

11       **THE COURT:**  Okay.

12       **MR. BUALAT:**  I believe --

13       **MR. ABELSON:**  No objection.

14       **MR. BUALAT:**  -- there's no objection.

15       **THE COURT:**  What are they?

16       **MR. BUALAT:**  Exhibit 519 and Exhibit 694.

17       **THE COURT:**  Okay.  Those are admitted.

18      (Trial Exhibits 519 and 694 received in evidence)

19       **MR. BUALAT:**  And I think at this point we'll be

20   re-calling Dr. Goddard.

21       **THE COURT:**  Yes.

22                    <u>**THOMAS GLENN GODDARD**</u>,

23   called as a witness for the Defendant, having been previously

24   duly sworn, testified further as follows:

25       **THE CLERK:**  Dr. Goddard, I'm just going to remind you

1    you're still under oath.

2         **THE WITNESS:**  Got it.

3         **THE CLERK:**  And just be sure you speak clearly into

4    the microphone for our court reporter, and there's water if you

5    need it.

6         **THE WITNESS:**  Thank you.

7         **THE CLERK:**  Okay.  Thank you.

8                        **CROSS-EXAMINATION**

9    **BY MR. ABELSON:**

10   **Q.**   Good morning, Dr. Goddard.

11   **A.**   Good morning.

12   **Q.**   You were asked yesterday about two accreditation

13   standards, URAC's HUM 1 and NCQA's UM 2; right?

14   **A.**   That's correct.

15   **Q.**   URAC and NCQA have various other requirements for

16   accreditation, but those two were the only ones that relate to

17   the clinical review criteria; right?

18   **A.**   Yes.  Relate at least to their review, approval, and

19   adoption, yes.

20   **Q.**   You testified that neither URAC nor NCQA review or

21   accredit the substantive content of clinical guidelines; right?

22   **A.**   That's correct.

23   **Q.**   Let's look at the URAC standard just to make sure your

24   testimony is clear on that point.  We'll turn to Exhibit 1012

25   at page 154.

1   **A.**   (Witness examines document.)

2   **Q.**   Now, there are four subparts of this requirement, right,

3   (a), (b), (c), and (d)?

4   **A.**   Yes.

5   **Q.**   Now, the Court asked you about the second one, subsection

6   (b), which says "Based on current clinical principles and

7   processes," and specifically whether that subsection refers to

8   a process or a substantive criteria.  Do you remember that?

9   **A.**   That's right.

10  **Q.**   And you explained that the requirement based on current

11  clinical principles and processes relates to a process; right?

12  **A.**   That's right.

13  **Q.**   So when URAC assesses a company's compliance with HUM 1,

14  including subsection (b), they do not assess the clinical

15  appropriateness of clinical standards or the guidelines

16  themselves?

17  **A.**   That's correct.

18  **Q.**   And the same goes for NCQA, it does not substantively

19  evaluate medical necessity criteria in deciding whether to

20  grant accreditation?

21  **A.**   That's correct.

22  **Q.**   And neither accreditation -- the accreditation agencies do

23  not determine whether clinical criteria are clinically sound or

24  consistent with generally accepted standards of care?

25  **A.**   That's correct.

1  Q.   They focus exclusively on the process by which these

2  accreditation agencies select, review, and approve criteria,

3  not on the criteria themselves?

4  A.   Yes.

5  Q.   And URAC and NCQA do not review the terms of benefit plans

6  in deciding whether to grant accreditation; right?

7  A.   That's correct.

8  Q.   And so they make no determination on whether the clinical

9  review criteria are consistent or inconsistent with the terms

10  of any health benefit plans?

11  A.   That's correct.

12  Q.   Now, in the course of your testimony yesterday in

13  describing the process that URAC and NCQA review, you offered

14  the opinion that UBH's criteria are, quote, "objective and

15  based on clinical evidence."  And you're not offering an

16  opinion, though, on generally accepted standards of care in the

17  behavioral health field; right?

18  A.   That's correct.

19  Q.   You didn't conduct any analysis of the content of UBH's

20  guidelines?

21  A.   That is also correct.

22  Q.   That was outside of the scope of your assignment and

23  outside the scope of your expertise?

24  A.   Both are true.

25  Q.   So when you say that UBH's guidelines are based on

1    clinical evidence, you're using that same term in the same

2    sense as HUM standard 1, subpart (b)?

3    **A.**    Yes.

4    **Q.**    You reviewed UBH's Level of Care Guidelines using the same

5    process that URAC or NCQA -- a reviewer from those agencies

6    would use to determine whether the clinical criteria are based

7    on current clinical principles and processes; right?

8    **A.**    Yes.

9    **Q.**    So you looked to see whether there were citations in the

10   guidelines; right?

11   **A.**    Right.

12   **Q.**    You didn't read the sources cited by UBH in those

13   guidelines?

14   **A.**    No.

15   **Q.**    You didn't assess whether UBH had properly incorporated

16   the cited materials into the guidelines?

17   **A.**    That's correct.

18   **Q.**    You didn't examine whether the guidelines actually reflect

19   the content of the sources that you cited?

20   **A.**    That's correct.

21   **Q.**    You didn't do any analysis of whether the criteria in the

22   footnotes were adopted by UBH without modification?

23   **A.**    That's correct.

24   **Q.**    And you didn't know whether there's any relationship

25   between the citations in UBH's guidelines and the guidelines

1  themselves?

2  **A.**    That is generally correct.  In a couple of cases I said,

3  "All right.  Let me just see what's there behind that

4  footnote," and I would go to that resource; but I didn't do any

5  substantive analysis of what I found there other than to say,

6  "Oh, this is a real resource."

7  **Q.**    You offered the opinion that UBH met the requirements of

8  HUM 1 for URAC and NCQA UM 2; right?

9  **A.**    UM 2 to the -- the element (a), Numbers 1, 4, and 5.

10  Numbers 2 and 3 in the NCQA standard relate to application of

11  the guidelines, and I didn't look at that at all.

12  **Q.**    Okay.  But in, for example, looking at UM -- HUM 1 for

13  URAC, you were looking at whether UBH's guidelines, as you

14  said, were based on current clinical principles and processes;

15  right?

16  **A.**    Right.

17  **Q.**    You reached that opinion by reviewing UBH's guidelines,

18  minutes from what you called the task force, and some e-mails;

19  right?

20  **A.**    And a few other documents as well, yes.

21  **Q.**    That was how you concluded that UBH's guidelines were

22  based on clinical principles?

23  **A.**    That's right.

24  **Q.**    Would it change your opinion if you knew that UBH's

25  subject matter experts for substance use disorders unanimously

1  recommended shifting to third-party guidelines by the American

2  Society of Addiction Medicine, and the only reason the company

3  did not was because executives could not be guaranteed that the

4  benefit expense would not go up?  Would that change your

5  opinion?

6        **MR. BUALAT:**  Objection.  Assumes facts.

7        **THE COURT:**  Overruled.

8        **THE WITNESS:**  Could you restate the question, please?

9  I want to make sure I understand it.

10  **BY MR. ABELSON:**

11  **Q.**  Sure.  So you offered the opinion based on what you

12  reviewed that UBH's guidelines were based on clinical

13  principles?

14  **A.**  Yes.

15  **Q.**  Would it change that opinion if you knew that UBH's

16  clinical subject matter experts unanimously recommended for

17  substance use disorders that the company move to third-party

18  guidelines developed by the American Society of Addiction

19  Medicine, and that the only reason the company did not was

20  because executives could not be guaranteed that benefit expense

21  would not go up?

22  **A.**  Hmm.  I'm not sure about that.  I'd have to see what --

23  how that showed up in the documentation and how that landed in

24  the task force discussion.  It's a little more ornate an

25  assessment than the way you've presented, I think.

1    **Q.**   So you can't say now one way or the other whether that

2    would change your opinion?

3    **A.**   Right.  Right.  I'd have to sit down with the set of

4    documents that the accreditation reviewer would have in front

5    of him or her and make an assessment based on that.

6    **Q.**   Now, the URAC accreditation requirements have two

7    sections; right?  Core requirements and the health utilization

8    management requirements?

9    **A.**   That's correct.

10   **Q.**   And the core requirements are requirements that all --

11   that health utilization management organizations must meet as

12   well; right?

13   **A.**   That's right.  It's just as much a part of the

14   accreditation program as the UM standards themselves.

15   **Q.**   If you could turn to Exhibit 1012 at page 60.  If you can

16   bring that up.

17   **A.**   (Witness examines document.)

18   **Q.**   This is the URAC accreditation requirement with respect to

19   regulatory compliance?

20   **A.**   Yes.

21   **Q.**   The standard requires that an organization tracks

22   applicable laws and regulations, ensures the organization's

23   compliance with those laws, and that it responds promptly to

24   assess -- to correct detected problems; is that right?

25   **A.**   Yes.

1  Q.   If a URAC accredited entity misinforms a regulator, for

2  example, under this requirement, it must promptly take

3  corrective action; right?

4  A.   Yes.  That would be assumed from this.

5  Q.   And by "assumed," you mean it is a requirement that that

6  be done?

7  A.   That would be consistent with the intent of this standard,

8  yes.

9  Q.   And so failure to do so would violate this --

10  A.   It would violate the intent of this standard, yes.

11  Q.   Well, it would violate the terms of this; right?

12  A.   Right.  The reason I'm cautious around this is because

13  it's not clear how that information would come to the

14  accreditation entity within the normal accreditation process.

15  It might come to the attention of the accrediting body through

16  a complaint filed to the accrediting body, but it wouldn't

17  necessarily show up in the accreditation process.

18  Q.   It would be a violation of Core 4, would it not, if you

19  knew that UBH provided inaccurate information to the

20  Connecticut Department of Insurance in 2013 and again in 2015

21  and has failed to correct it to this day despite multiple

22  annual accreditation processes?

23  A.   It would be -- it would be relevant to an assessment.

24  This standard goes -- is, like many of the URAC standards, is

25  an assessment of the system in place, and a single -- and

1  whether the system in place is consistent with this.  A single

2  variance from this system wouldn't necessarily pull them out of

3  compliance with this standard if the system were, as a whole,

4  still consistent with this standard.

5  **Q.**  That information would be relevant to whether UBH has

6  complied with Core 4?

7  **A.**  Yes.

8         **MR. ABELSON:**  No further questions.

9         **THE COURT:**  Redirect?

10        **MR. BUALAT:**  No, Your Honor.

11        **THE COURT:**  Okay.  Thank you very much.

12        **THE WITNESS:**  Thank you.

13                    (Witness excused.)

14        **MS. ROSS:**  Your Honor, at this time UBH calls Loretta

15  Urban, who will appear by video.

16        **THE COURT:**  Okay.

17             (Video was played but not reported.)

18        **MS. ROSS:**  Your Honor, UBH next calls Dr. Irvin Brock.

19  Dr. Brock is a former employee who lives out of state, who will

20  also appear by video this morning.

21        **THE COURT:**  Okay.

22             (Video was played but not reported.)

23        **THE COURT:**  Next?

24        **MS. ROSS:**  Your Honor, one more video.  UBH calls

25  Dr. William Bonfield, who will also appear by video.

1    (Video was played but not reported.)

2    **MS. ROSS:**  Your Honor, at this time for the record we

3 would like to move to admit the transcripts of the testimony

4 that has come in by video yesterday and today.  Specifically we

5 have what has been marked as Exhibit 1657, which is the video

6 testimony of Dr. Robinson-Beale; Exhibit 1658, which is the

7 video testimony of John Beaty; Exhibit 1659, which is the video

8 testimony of Dr. William Bonfield; Exhibit 1660, which is the

9 video testimony of Dr. Irvin Brock; and Exhibit 1661, which is

10 the deposition -- I'm sorry -- the video testimony of Loretta

11 Urban.

12    **THE COURT:**  I don't think that's how we do it.  I

13 don't think these are marked as exhibits.

14    **MS. ROSS:**  We spoke with Ms. Hom earlier, and that's

15 how she suggested we do it.

16    **THE COURT:**  We mark them as exhibits?  We mark the

17 transcripts as exhibits?  We've got transcripts -- lots of

18 transcripts.

19    **MS. ROSS:**  These -- I'm sorry, Your Honor.  These are

20 not the full transcripts.  These are specifically the clips.

21    **THE COURT:**  I appreciate that, but that's just the

22 four videos you played.  They played a bunch of videos too.

23    You guys work it out, and whatever it is is fine with me.

24 Meet and confer and figure out what you want.

25    **MS. ROSS:**  Thank you, Your Honor.

1    **THE COURT:**  I don't want to have it done unilaterally

2  by one side.

3    **MS. ROSS:**  My understanding, Your Honor, is that the

4  plaintiffs intend to do the same thing with their videos that

5  they showed.

6    **THE COURT:**  Well, okay.  Just give Ms. Hom a list of

7  all the videos.  They're all admitted.

8    **MS. ROSS:**  Okay.  Thank you, Your Honor.

9    (Trial Exhibits 1657 through 1661 received in

10    evidence)

11    **MS. ROMANO:**  At this time, Your Honor, defendant UBH

12  rests its case.  We do understand that plaintiffs have some

13  redirect.  I'm sorry, rebuttal.

14    We have raised some objections with them already, in light

15  of some of the exhibits that have been identified to us for

16  rebuttal, as being outside the scope of UBH's case-in-chief.

17  Including an indication that they had intended to offer

18  deposition testimony of a witness that we haven't seen the

19  designations for.  And it would also fall outside the scope of

20  UBH's case-in-chief.

21    **THE COURT:**  Okay.

22    **MS. REYNOLDS:**  Your Honor, with respect, first, to the

23  deposition testimony, we'll read it in as a foundation for a

24  question which is provided for in the Court's pretrial order.

25  It's just a short excerpt.

 1          THE COURT:  Okay.

 2          MS. REYNOLDS:  Introducing a document that was offered

 3     in response to a 30(b)(6) deposition subpoena.

 4          THE COURT:  Okay.  And with respect to documents and

 5     topics, how do you want to proceed?

 6       I don't understand what the objection is.

 7          MS. ROMANO:  Certainly, Your Honor.  I guess I'll take

 8     one at a time.

 9       Back to the deposition testimony, I guess we're not sure

10     about what the process is that plaintiffs are intending to use

11     here.  They haven't identified any particular deposition

12     testimony from -- I believe it's Ms. Catlin, Heather Catlin.

13       Plaintiffs have informed us that they are seeking to use

14     that, with a 30(b)(6) notice, to admit a document relating to

15     financial information which falls outside the scope of UBH's

16     case-in-chief.  So it's not proper rebuttal.  And, in addition,

17     we are not aware of what that deposition testimony is.

18          THE COURT:  Okay.

19          MS. REYNOLDS:  Okay.  So with respect to the subject

20     matter, there was testimony during UBH's case concerning UBH's

21     inclusion in its standard criteria of certain definitions that

22     come from the United Healthcare template Certificate of

23     Coverage.  There was also testimony denying that financial

24     considerations played any role in guideline creation.

25       And the document shows, first, the proportion of UBH's

1   commercial membership that's insured under United Healthcare

2   plans and the proportion of revenue derived from those plans.

3   And it also shows the proportion of UBH's revenue that's

4   derived from fully insured versus ASO plans, which is relevant

5   to the conflict issue.

6       **THE COURT:**  Yeah, but it was relevant to your

7   case-in-chief.  It's not rebuttal to the specific things that

8   they talked about, which was:  We didn't talk about it in

9   connection with the guidelines; we didn't talk about it in

10  connection with this; we didn't talk about it in connection

11  with this.

12      That's not proper rebuttal.  You cannot do that on

13  rebuttal.

14      Next.

15      **MS. ROMANO:**  So then going to the other issue, Your

16  Honor, with respect to -- there were numerous exhibits that

17  were disclosed to us as being used for Mr. Niewenhous, who is

18  plaintiffs' rebuttal witness.

19      Things relating to ABA treatment and the Connecticut

20  guidelines or regulatory requirements.  Again, revenue

21  information; again, items that were not new theories raised as

22  part of UBH's case-in-chief, and improper rebuttal.

23      **MS. REYNOLDS:**  So a lot of those documents are not on

24  the list.  It's only a short number of documents that -- we

25  used the same list as the cross-examination list, which was

1   keyed off of there.

2           THE COURT:  But there's a subject matter.  Tell me,

3   what are you doing in rebuttal?

4           MS. REYNOLDS:  Sure.  Okay.  That's probably the

5   easiest way to go.

6       There are a couple of documents that relate to whether or

7   not UBH --

8           THE COURT:  So are you calling a witness in rebuttal?

9           MS. REYNOLDS:  Yes.

10          THE COURT:  Who is the witness?

11          MS. REYNOLDS:  The witness is Mr. Niewenhous.

12          THE COURT:  Mr. Niewenhous.  He's called live?

13          MS. REYNOLDS:  Yes.

14          THE COURT:  Okay.

15          MS. REYNOLDS:  And we intend to ask him a short, small

16  number of questions.  There's one small number of questions

17  related to testimony we heard today.

18      And then the first subject is in relation to the state

19  mandate.  There were assertions in UBH's case about the fact

20  that UBH always uses the state-mandated guidelines.  And so

21  there are a couple of documents that rebut that testimony.

22          THE COURT:  Is that an issue, subject with which you

23  have an issue?

24          MS. ROMANO:  As characterized like that, I don't think

25  we'd object right now, Your Honor.  We'd have to see what the

1    question is and what it got into.

2         THE COURT:  Okay.

3         MS. REYNOLDS:  There are three documents that go to

4    the meaning of specific concepts that appear in the guidelines

5    on which there was testimony in UBH's direct case.  One about

6    the meaning of the reasonable period of time.  One about

7    readiness for change.  And one about co-occurring conditions

8    provision.  And then, lastly, there are documents that rebut

9    the testimony yesterday that average length of stay was

10   discussed at the BPAC only rarely or only once.

11        THE COURT:  Do you have an issue with those?

12        MS. ROMANO:  On the first issue, Your, Honor with

13   respect to the guideline language and different terms,

14   plaintiffs did walk through, in fact, all of the introduced and

15   showed all of the Level of Care Guidelines to Mr. Niewenhous,

16   as well as others, in their case-in-chief.  Certainly, it was

17   part of their case-in-chief.  And, again, we would say it's not

18   proper rebuttal testimony, subject to a specific question

19   relating to a specific item that -- that was raised or

20   presented in UBH's case-in-chief.

21        THE COURT:  Yeah.  I mean, that's my question.  How do

22   these go to the specific --

23        MS. REYNOLDS:  I mean --

24        THE COURT:  General category, yes.  But that was

25   addressed during the case-in-chief.

1      **MS. REYNOLDS:** Right. I mean, there was testimony --

2 so taking, first, reasonable period of time.

3      **THE COURT:** Right.

4      **MS. REYNOLDS:** If you need a specific citation, I'll

5 have to take a pause and grab that. But there was testimony

6 from UBH's witnesses about the fact that the reasonable period

7 of time is -- is determined in relation to a specific person

8 and so forth.

9     There's a document that -- in which a UBH medical director

10 states that improvement within a reasonable period of time

11 trumps the issue of deterioration.

12      **THE COURT:** "Trumps the issue of deterioration."

13      **MS. REYNOLDS:** Trumps whether or not a person will

14 deteriorate if services are withdrawn.

15      **THE COURT:** Interesting. Okay.

16     What about the co-occurring conditions?

17      **MS. REYNOLDS:** There was testimony in UBH's

18 case-in-chief that the provision on safely managing

19 co-occurring conditions includes safely treating them. And

20 there's an email exchange specifying that, no, what is intended

21 is that they are safely managed.

22      **THE COURT:** Okay. And what about the readiness for

23 treatment?

24      **MS. REYNOLDS:** So readiness for change, I believe

25 there was testimony about whether or not that could concern --

 1   whether or not that could be the basis for a denial.  And

 2   there's an email on that issue.  And that one I would have to

 3   go back and look at the transcript to get the exact testimony

 4   for you.

 5          **THE COURT:**  Yeah, I need to know what you're talking

 6   about in terms of what you're trying to rebut to answer that

 7   question.

 8          **MS. REYNOLDS:**  Right.

 9          **THE COURT:**  Do you want to get that?

10          **MS. REYNOLDS:**  I don't have it right this minute so

11   I'll -- I can withdraw that one.

12          **THE COURT:**  Okay.

13          **MS. REYNOLDS:**  That's fine.

14          **THE COURT:**  Okay.  I'll allow the testimony about

15   rebuttal in a reasonable period of time, and the co-occurring

16   conditions, and ALOS, and the state guidelines.

17          **MS. REYNOLDS:**  And then the last piece was there was

18   some testimony this morning.  It was -- that was a little

19   unclear.  We just wanted to clarify, there was a reference to

20   Best Practice Guidelines.  And we just wanted to clarify what

21   those are.  It's just a couple of questions.

22          **THE COURT:**  I'm not quite sure what that means.

23          **MS. REYNOLDS:**  That was our concern.  There's a -- UBH

24   has a practice of adopting a list of Best Practice Guidelines

25   that are something that UBH does not itself develop.  They're

1  different than the Level of Care Guidelines and different than

2  the CDGs.  And we just wanted to make sure that that was clear.

3  There was some discussion about --

4       THE COURT:  Discussion this morning about adopting

5  external national standards that would be complementary to the

6  CDGs.

7       MS. REYNOLDS:  Right.

8       THE COURT:  And so what are you going to ask about?

9       MS. REYNOLDS:  Just to clarify that, that these are --

10  these are sets of guidelines that are -- that are developed by

11  professional associations, not by UBH, and that they are not

12  used as the basis for denials at UBH.

13       THE COURT:  Okay.  That sounds good.

14     All right.  What time is it?  How long is this testimony?

15       MS. REYNOLDS:  I don't think this is going to take

16  very long.

17       THE COURT:  That's not an answer.

18     All right.  We're going to take ten minutes right now.

19       MS. REYNOLDS:  Okay.

20            (Recess taken at 10:11 a.m.)

21          (Proceedings resumed at 10:23 a.m.)

22       THE COURT:  Okay.

23       MS. REYNOLDS:  One quick housekeeping matter before we

24  move on.  In reviewing the transcript, we determined that

25  plaintiff neglected to move into evidence Exhibit 305.

1        **MR. RUTHERFORD:**  No objection, Your Honor.

2        **THE COURT:**  Okay.  305 is admitted.

3      (Trial Exhibit 305 received in evidence.)

4        **MS. REYNOLDS:**  Plaintiffs call Mr. Gerard Niewenhous

5   in rebuttal.

6        **THE COURT:**  Okay.

7        **MS. REYNOLDS:**  Please don't be alarmed at the size of

8   the binders.  We're not going through all of those.

9        **THE COURT:**  You're still under oath.  You know that?

10       **THE WITNESS:**  I do.

11       **THE COURT:**  Okay.  Thank you.

12                          **GERARD NIEWENHOUS**,

13   called as a rebuttal witness for the Plaintiffs, having been

14   previously duly sworn, testified as follows:

15                        **DIRECT EXAMINATION**

16   BY MS. REYNOLDS:

17   **Q.**   Good morning, Mr. Niewenhous.

18   **A.**   Good morning.

19   **Q.**   We've talked a lot during this trial about Level of Care

20   Guidelines and Coverage Determination Guidelines.  I'd just

21   like to clarify one thing for the record.

22       UBH also adopts a set of what it calls "Best Practice

23   Guidelines"; right?

24   **A.**   That is correct.

25   **Q.**   And the Best Practice Guidelines is essentially a list of

1  guidelines that are issued by the American Psychiatric

2  Association, the American Academy of Child and Adolescent

3  Psychiatry, and other associations; right?

4  **A.**   That is correct.

5  **Q.**   Those are not guidelines that are developed by UBH; right?

6  **A.**   That is correct.

7  **Q.**   And they're not used by UBH as the basis for clinical

8  denials; right?

9  **A.**   My understanding is that they're used as a basis for

10  discussion with providers about best practices.

11  **Q.**   So not as a basis for clinical denials?

12  **A.**   That's a bit out of my swim lane, how they are actually

13  used in the course of reviewing a case.

14  **Q.**   Could you turn in your binder to Exhibit 353.

15  **A.**   I'm there.

16  **Q.**   Are you there?

17      This is an email string in which the last email is a

18  message from you to Jeremy Hodess and others on September 19th,

19  2012; right?

20  **A.**   That is correct, yes.

21      **MS. REYNOLDS:**  Your Honor, we offer Exhibit 353 into

22  evidence.

23      **MS. ROMANO:**  No objection.

24      **THE COURT:**  Okay.  It's admitted.

25      (Trial Exhibit 353 received in evidence.)

1    BY MS. REYNOLDS:

2    Q.   Let's turn, first, to the very beginning of this string,

3    which is on page 17.

4         Are you there?

5    A.   I'm there.

6    Q.   Okay.  So the subject matter of the string is "ASAM for

7    Illinois commercial members."

8         Do you see that?

9    A.   I do, yes.

10   Q.   Okay.  And this email -- Christa Castaneda, who is the

11   director of clinical operations in Houston; right?

12   A.   For After Hours, yes.

13   Q.   And Ms. Castaneda states:

14        "According to the attached document, it appears we

15        should be using ASAM Criteria for Illinois commercial

16        accounts.  We have not been using ASAM in these accounts

17        in AH."

18        Do you see that?

19   A.   I do.

20   Q.   What is "AH"?

21   A.   After Hours.

22   Q.   And then let's jump ahead to the next -- it's two emails

23   after that, which is on page 16.

24        Do you see an email from Ms. Castaneda to Julie Burton?

25   A.   I do.

1  Q.  And Ms. Castaneda asks Ms. Burton in her email:

2      "Does your team use ASAM Criteria for Illinois

3      commercial members?"

4      Do you see that?

5  A.  I do.

6  Q.  All right.  Let's turn to page 15.  This is the email on

7  the bottom of the page.  And Ms. Burton, Julie Burton, is

8  regional director of clinical operations in Saint Louis; right?

9  A.  She's the region director of clinical operations.  I'm not

10 sure if she's based in Saint Louis.

11 Q.  Do you see on the top of page 16 where it says "Saint

12 Louis CAC"?

13 A.  Oh, yes, I do.  Thank you.

14 Q.  That's Saint Louis Care Advocacy Center?

15 A.  That's correct.

16 Q.  So Ms. Burton responds to Ms. Castaneda:

17      "Actually, we don't.  But apparently we," quote,

18      "'should'"; unquote.

19      Do you see that?

20 A.  I do.

21 Q.  Okay.  Let's turn to page 13.  There's an email from Judy

22 Bronson.  And Judy Bronson is a clinical appeals consultant and

23 appeals team supervisor for UBH; right?

24 A.  That is correct, yes.

25 Q.  Okay.  And in her email, Ms. Bronson is referencing the

1  question in the previous emails that we discussed; right?

2  **A.**  I'm sorry, could you say your question please.

3  **Q.**  Why don't I read the email.  She says that:

4      "Julie Burton requested that I send this up through

5      compliance for a determination on the attached document,

6      which indicates that for certain books of business

7      (Illinois commercial is most relevant for Saint Louis, but

8      it appears this applies to other accounts as well) peer

9      reviewers should cite ASAM Criteria in denial letters for

10     substance abuse treatment.  This is the first our office

11     has heard of this requirement, and I doubt our reviewers

12     have been using this as a basis for their denials.  (Using

13     the CDG or LOC guidelines instead)."

14     Did I read that correctly?

15 **A.**  Yes, you did.

16 **Q.**  And then turn to page 12.  There's an email from Kim

17 Tulsky.  Do you know who that is?

18 **A.**  Yes, I do remember Kim.

19 **Q.**  Who is Kim Tulsky?

20 **A.**  I don't remember her exact role at the time, but she was

21 an employee of United Behavioral Health.

22 **Q.**  And in her email do you see the second paragraph it says:

23     "Per Wendy Morse, there are two states (IL and WA)

24     that specifically require that we are using the ASAM

25     patient placement criteria for our commercial business

1      when making our medical necessity determinations."

2      Did I read that correctly?

3  A.  Yes, you did.

4  Q.  Okay.  Now, let's turn to page 11.  And there's an email

5  from you; right?

6  A.  Yes, that's correct.

7  Q.  On July 9th, 2012; right?

8  A.  July 9th, 2012, correct.

9  Q.  And you say:

10      "Wendy, I would like additional clarification."

11     Right?

12 A.  That's correct.

13 Q.  And then at the top of page 12 is your specific question.

14     Are you there?

15 A.  Yes.

16 Q.  You asked:

17      "Are there regulatory requirements in each of these

18     states and do they specify that we use the ASAM Criteria

19     or criteria that is consistent with ASAM?"

20     And underline "that is consistent."

21     Did I read that correctly?

22 A.  That is correct.

23 Q.  And then back on page 11, Ms. Morse responds to you:

24      "Hi, Jerry.  These states require using ASAM

25     criteria."

1    Did I read that correctly?

2  **A.**   Yes, you did.

3  **Q.**   And Wendy Morse was in the compliance department?

4  **A.**   That is correct, yes.

5  **Q.**   All right.  Let's jump to page 6.  There's another email

6  from Wendy Morse.  Do you see it?

7  **A.**   I do, yes.

8  **Q.**   And in her email she provides supporting insurance law

9  citations for the commercial requirements.

10    Do you see that?

11  **A.**   I do, yes.

12  **Q.**   Including for Illinois?

13  **A.**   That is correct, yes.

14  **Q.**   Now let's go to page 2.

15  **A.**   I'm there.

16  **Q.**   Okay.  And do you see the email from Jerry Hodess?

17  **A.**   I do.

18  **Q.**   Okay.  What was his position?

19  **A.**   You know, what?  I'm not entirely sure.

20  **Q.**   So Mr. Hoe des writes:

21    "Marie, LaRhonda Jones, regional medical director in

22    Saint Louis, just approached me with a question about this

23    particular issue.

24    "We have continued to operate here in Saint Louis as

25    though we do not need to cite ASAM in our coverage

1    determinations for treatments of SUDs on commercial

2    members in Illinois.  Based on previous advice, we were

3    operating as though our LOCs/CDGs are generally," quote,

4    "'in accordance,'" closed quote, "with ASAM criteria."

5    Did I read that correctly?

6  A.   Yes, you did.

7  Q.   And then that last email in the string is your response to

8  Mr. Hodess; right?

9  A.   Yes.

10  Q.   And you state:

11       "Jeremy, you're correct, operating as though our

12    guidelines are in accordance with ASAM's criteria."

13    Did I read that correctly?

14  A.   That is correct.

15  Q.   Could you turn to Exhibit 651, please.  Are you there?

16  A.   I'm there.

17  Q.   Exhibit 651 is an email from -- is it Von Grubbs?

18  A.   Von Grubbs, correct.

19  Q.   To you, among others?

20  A.   Among others, yes.

21  Q.   And it's dated June 20, 2014?

22  A.   Yes, that's correct.

23       **MS. REYNOLDS:**  We offer Exhibit 651 into evidence.

24       **THE COURT:**  651.  Any objection?

25       **MS. ROMANO:**  No objection.

1          **THE COURT:**  It's admitted.

2          (Trial Exhibit 651 received in evidence.)

3   **BY MS. REYNOLDS:**

4   **Q.**   And this email, the subject matter is "ASAM Level of Care

5   Guidelines"; is that right?

6   **A.**   That is correct, yes.

7   **Q.**   And what's being discussed in this email string is moving

8   to the ASAM Criteria for Rhode Island with respect to Medicaid

9   only; right?

10  **A.**   That is correct, yes.

11  **Q.**   UBH has never adopted ASAM Criteria in Rhode Island for

12  commercial plans; right?

13  **A.**   That is correct, yes.

14  **Q.**   Okay.  Let's just look at the -- the final email in this

15  string here, from Von Grubbs to you and others.

16         Is that Mr. Grubbs or Ms. Grubbs?

17  **A.**   Mr. Grubbs.

18  **Q.**   Okay, Mr. Grubbs.  Mr. Grubbs states:

19             "What I want to understand is if/how this change

20         would impact residential costs for other Rhode Island

21         members who have a residential benefit.  Historically, we

22         haven't covered the lower levels of residential.  However,

23         if we move to using ASAM, I don't see how we are able to

24         deny the lower levels if the member has a residential

25         benefit."

1      Did I read that correctly?

2   **A.**   Yes, you did.

3   **Q.**   Can you turn to Exhibit 360.

4   **A.**   I'm there.

5   **Q.**   Okay.  Exhibit 360 is an email string, where the last

6   email is to you from Michael Haberman; right?

7   **A.**   That is correct, yes.

8   **Q.**   Dated January 4th, 2013?

9   **A.**   That is correct.

10      **THE COURT:**  Your Honor, we move Exhibit 360 into

11   evidence.

12      **MS. ROMANO:**  No objection.

13      **THE COURT:**  Admitted.

14      (Trial Exhibit 360 received in evidence.)

15   **BY MS. REYNOLDS:**

16   **Q.**   Let's turn to the first email in that string, which starts

17   on page 3 of Exhibit 360.  Are you there?

18   **A.**   I'm there.

19   **Q.**   And this is an email from Lawrence Baker to Michael

20   Haberman?

21      Dr. Baker is a medical director at UBH?

22   **A.**   Yes, yes, he is.

23   **Q.**   And Michael Haberman is also a medical director at UBH?

24   **A.**   That is correct.

25   **Q.**   So Dr. Baker is posing a question to Dr. Haberman in this

1    email; right?

2    **A.**    That is correct, yes.

3    **Q.**    Okay.  So in the second paragraph of the email it says:

4           "The following statement from the LOC guidelines has

5           always" -- I think he means "been" -- "has always been

6           troubling to me, especially the sentence I have bolded

7           below.  It has reached more relevancy as a father of one

8           of our members quoted the bolded sentence while talking

9           about his son's case to one of our care advocates.  His

10          son's case is similar to many others, where you have a

11          child who is clearly dangerous and unresponsive to

12          treatment.  We can further easily assume that the member

13          would deteriorate or relapse if treatment at the current

14          level were discontinued.  So the question is, how can you

15          legitimately ABD such a case by calling it custodial,

16          which is what the father was saying?  My answer, which is

17          implied in the paragraph, is that we always assume that

18          services will improve the person's ability to function in

19          the community and that there must be a reasonable

20          expectation that this can occur within a reasonable period

21          of time.  The person's inability to improve within a

22          reasonable period of time trumps the issue of whether they

23          would deteriorate if discharged."

24          Did I read that correctly?

25   **A.**    Yes, you did.

1  **Q.**   And ABD means adverse benefit determination?

2  **A.**   That is correct.

3  **Q.**   That's referring to whether or not -- that's referring to

4  the issuance of a denial; right?

5  **A.**   Denial of coverage, yes.

6  **Q.**   Okay.  And then on the next page is the paragraph that he

7  was referring to, which states:

8       "Care should be effective:  There must be a

9       reasonable expectation that evidence-based treatment

10      delivered in the appropriate level of care will improve

11      the member's presenting problems within a reasonable

12      period of time."

13  And then bolded:

14      "Improvement in this context is measured by weighing

15      the effectiveness of treatment and the risk that the

16      member's condition is likely to deteriorate or relapse if

17      treatment in the current level of care were to be

18      discontinued."

19  And then the last sentence is not bolded.

20      "Improvement must also be understood within a

21      recovery framework where services support movement toward

22      a full life in the community."

23  Did I read that correctly?

24  **A.**   Yes, you did.

25  **Q.**   And then let's turn to page 2.  Are you there?

1    **A.**    I'm there.

2    **Q.**    Okay.  So Dr. Haberman forwards the question from

3    Dr. Baker to Dr. Triana; right?

4    **A.**    That is correct, yes.

5    **Q.**    Okay.  And Dr. Triana says in his own email on page 2:

6           "I would forward this to Jerry Niewenhous.  He is

7           leading to efforts in editing the LOCs.  If I am reading

8           Larry's email correctly, he is advocating being clearer in

9           the guideline by adding a statement that addresses 'within

10          a reasonable period of time.'"

11          Did I read that correctly?

12   **A.**    Yes, you did.

13   **Q.**    UBH did not make any changes to the Level of Care

14   Guidelines in response to this question; right?

15   **A.**    I would have to see the -- that version of the guideline

16   to verify that.

17   **Q.**    Has UBH ever added a clarification about what is meant by

18   "reasonable period of time"?

19   **A.**    Not that I recall, no.

20   **Q.**    Could you turn to Exhibit 539.

21          Are you there?

22   **A.**    I'm there.

23   **Q.**    This is an email exchange between you and Lynn Wetherbee;

24   right?

25              **MS. ROMANO:**  Your Honor, this one is subject to the

1    joint sealing motion, 539.

2             **MS. REYNOLDS:**  Oh, I'm sorry.

3             **THE COURT:**  So can we do this at the end.

4             **MS. REYNOLDS:**  I'll do it last.

5             **THE COURT:**  So we can seal the courtroom.

6             **MS. REYNOLDS:**  Okay.  Could you please turn to Exhibit

7    552.

8             **THE WITNESS:**  I'm there.

9    **BY MS. REYNOLDS:**

10   **Q.**   Okay.  These are the minutes of the August 9, 2016

11   Utilization Management Committee meeting; right?

12   **A.**   That is correct.

13   **Q.**   And you were present at that meeting?

14   **A.**   That is correct; as a nonvoting member.

15   **Q.**   And Dr. Triana was present at that meeting; right?

16   **A.**   That is correct.

17   **Q.**   Okay.  Okay.  Could you turn to page 8 of Exhibit 552.

18   **A.**   I'm there.

19   **Q.**   Okay.  So the first row relates to the discussion about

20   the Quick Cert program.  Is that right?

21   **A.**   I'm sorry, we're on page?  8, yes.  Yes, that's what I'm

22   reading here.

23   **Q.**   The discussion starts, actually, I think, on page 6; but

24   I'm going to focus you on the part on page 8.

25   **A.**   Yes.

1    **Q.**    Okay.  So this is a discussion about Quick Cert and

2    treatment milestones; right?

3    **A.**    That's what I'm reading here, yes.

4    **Q.**    Okay.  So on page 8 the minutes state:

5            "Finally, baseline data is being compiled as

6        claims-based data becomes available.  These reports

7        include a monthly breakout of the average length of stay

8        (ALOS) by diagnostic category and level of care, and

9        enable a month-by-month comparison of baseline run rates

10       to pilot actuals.  The report includes the ALOS mean,

11       median, standard deviation and the percent of readmits

12       within 30 days by the three age categories."

13       Did I read that correctly?

14   **A.**    Yes, you did.

15   **Q.**    And then if you skip down to the last -- second to last

16   paragraph in that portion of the guidelines, it states:  "For

17   the purposes of this committee."

18       Do you see that?

19   **A.**    I do.

20   **Q.**    So the minutes say:

21           "For the purposes of this committee, Dr. Triana

22       requested that the UM Committee be updated going forward

23       on significant data trends or if the ACE Committee would

24       like to obtain the commit members input on a particular

25       topic."

1        Did I read that correctly?

2   A.   Yes, you did.

3   Q.   Could you turn to Exhibit 556.

4   A.   I'm there.

5   Q.   Okay.  These are minutes of the October 11, 2016

6   Utilization Management Committee meeting; right?

7   A.   That is correct.

8   Q.   And you were present at that meeting?

9   A.   Yes.  Again, as a nonvoting member.

10  Q.   And Dr. Triana was present at that meeting; right?

11  A.   That is correct.

12  Q.   Let's turn to page 6.  There's another discussion of the

13  Quick Cert and treatment milestones update.  Do you see that?

14  A.   I do.

15  Q.   Okay.  And in that section of the minutes it states:

16            "There are three potential concerns with QC and the

17       impact to BenEx:  Increase in volume, increase in average

18       length of stay (ALOS), increase in step down rates."

19       And then there's some additional discussion under that;

20  right?

21  A.   That is correct, yes.

22  Q.   And then beneath the bullet points it says:

23            "Together, these have an estimated monetized impact

24       of risk business of 1.6 million for the month (versus

25       baseline ALOS levels)."

1      Did I read that correctly?

2  **A.**   Yes, you did.

3  **Q.**   Okay.

4      **MS. REYNOLDS:**  Your Honor, I move exhibits 552 and 556

5  into evidence.

6      **THE COURT:**  552 and 556.

7      **MS. ROMANO:**  No objection.

8      **THE COURT:**  Admitted.

9      (Trial Exhibits 552 and 556 received in evidence.)

10     **MS. REYNOLDS:**  Okay.  Your Honor, the only thing I

11 have left is the sealed exhibit.

12     **THE COURT:**  Okay.  We're going to go into a brief

13 sealed session.  So I'll ask anyone who is not counsel for a

14 party or a party to please go outside.  And that does mean

15 class members who are not named plaintiffs.  It will only take

16 a couple of minutes.

17     **MS. ROMANO:**  Can I ask one question?  It looks like

18 this document is a PHI one.  It might have been redacted.  So

19 before we clear the courtroom, we wanted to clarify that.

20     **MS. REYNOLDS:**  Do we have the right exhibit?

21     **MS. ROMANO:**  Maybe we're confused by.  It just seemed

22 like maybe we should sort it out before --

23     **THE COURT:**  Go ahead.  Sort away.  What exhibit number

24 are we talking about?

25     **MS. REYNOLDS:**  Oh, maybe there's additional.

1    (Counsel confer off the record.)

2    **THE COURT:**  We don't have to clear the courtroom?

3    **MS. REYNOLDS:**  We don't.  There's a redaction for PHI,

4    but we're not going to be talking about it at all.

5    **THE COURT:**  Invite everybody back in.

6    **MS. REYNOLDS:**  I'm sorry, Your Honor, I didn't realize

7    that was the issue.

8    **BY MS. REYNOLDS:**

9    **Q.**   Could you turn to Exhibit 539, please.

10   **A.**   Okay.  I'm there.

11   **Q.**   Okay.  So Exhibit 539 is an email exchange between you and

12   Lynn Wetherbee; right?

13   **A.**   That is correct.

14   **Q.**   Dated April 5th, 2016?

15   **A.**   That's correct.

16   **MS. REYNOLDS:**  Your Honor, we move Exhibit 539 into

17   evidence.

18   **MS. ROMANO:**  No objection.

19   **THE COURT:**  It's admitted.

20   (Trial Exhibit 539 received in evidence.)

21   **BY MS. REYNOLDS:**

22   **Q.**   And let's -- let's start on page 2.  There's an email from

23   you to Ms. Wetherbee.  Ms. Wetherbee was your boss at this

24   time; right?

25   **A.**   That is correct, yes.

1   **Q.**   And so you state:

2           "Here you go, Lynn.  Let me know if this works."

3       And then you're summarizing some information about the

4   Level of Care Guidelines; right?

5   **A.**   Yes.

6   **Q.**   Okay.  Do you see the heading "Changes in 2015"?

7   **A.**   I do.

8   **Q.**   Okay.  And then it goes over to page 3, the first bullet

9   on the top of page 3.  Do you see that?

10  **A.**   I do.

11  **Q.**   It says:

12          "Removed the admission criteria 'co-occurring

13          behavioral health or medical surgical conditions can be

14          safely managed.'  This criteria became a criteria for all

15          levels of care."

16      Did I read that correctly?

17  **A.**   Yes, you did.

18  **Q.**   And so this was referring to the fact that in 2015, the

19  admission criterion moved from the residential treatment

20  section to the common criteria; right?

21  **A.**   That is correct.

22  **Q.**   Okay.  And then Ms. Wetherbee's response appears at the

23  top of page 2; right?

24  **A.**   Yes.

25  **Q.**   Okay.  She says:

1      "Thank you.  Please see the highlighted section

2      below.  Looks like a word or two are missing.  Please

3      include me in your response."

4      Did I read that correctly?

5  A.  Yes, you did.

6  Q.  And the highlighted section in your email says:

7      "Surgical conditions can be safely managed."

8      Right?

9  A.  Yes.

10 Q.  And then your response to her on page 1.  Are you there?

11 A.  I'm there.

12 Q.  You say:

13      "No words missing.  That's how the criteria was

14     written.  Intended to convey that someone could be treated

15     in residential if co-occurring conditions could be safely

16     managed."

17     Did I read that correctly?

18 A.  Yes, you did.

19     MS. REYNOLDS:  Your Honor, we have no further

20 questions.  And plaintiffs rest.

21     MS. ROMANO:  Redirect, Your Honor.

22     THE COURT:  Cross-examination.

23                   CROSS-EXAMINATION

24 BY MS. ROMANO:

25 Q.  Good morning, Mr. Niewenhous.

1    A.    Good morning.

2    Q.    Just a few questions.

3          In your testimony just a few moments ago, Ms. Reynolds

4    showed you a couple of minutes from Utilization Management

5    Committee meetings.

6          Do you recall that?

7    A.    I do.

8    Q.    And is the Utilization Management Committee something

9    different from BPAC?

10   A.    It is a different committee from BPAC, but it shares the

11   responsibility for -- that BPAC had for approving guidelines.

12   Q.    Does the Utilization Management Committee cover more

13   things than just discussing and approving Level of Care

14   Guidelines and Coverage Determination Guidelines?

15   A.    That is my recollection, yes.

16   Q.    And there were some references to something called Quick

17   Cert.

18   A.    I recall that.

19   Q.    And are you familiar with what Quick Cert is?

20   A.    Oh, at the 50,000-foot level.

21   Q.    And does Quick Cert relate, in any way, to the content of

22   the Level of Care Guidelines?

23   A.    No, it does not.

24   Q.    Does the Quick Cert relate, in any way, to the content of

25   the Coverage Determination Guidelines?

**PROCEEDINGS**

1  A.   No, it does not.

2          MS. ROMANO:  Okay.  I have no further questions.

3          MS. REYNOLDS:  No further questions.  And now

4  plaintiffs rest.

5          THE COURT:  Thank you, sir.

6          THE WITNESS:  Thank you.

7      (Witness steps down.)

8          THE COURT:  Okay.  Tomorrow -- closings are next.  Is

9  that all that's left here?

10          MS. REYNOLDS:  Yes.

11          THE COURT:  We'll start at 10:30.

12      How long do you want for your closings?

13          MR. GOELMAN:  Best estimate, Your Honor, somewhere

14  between 60 and 75 minutes for plaintiffs'.

15          MS. ROMANO:  Our estimate was around an hour, Your

16  Honor.

17          THE COURT:  Okay.  Great.  So we'll see how it goes.

18      We'll try to get it all done before a lunch break, if we

19  can.  And we'll break between the arguments, not in the middle

20  of somebody's argument.  Even if it means a little awkward

21  timing.

22      Okay.  See you tomorrow morning.

23          MS. ROMANO:  One more thing, Your Honor.  UBH does

24  renew its motion for judgment on partial findings under Rule

25  52(c).

1          THE COURT:  Okay.

2          MS. ROMANO:  And, in addition, UBH does intend to

3   bring a motion for a decertification.

4       We have been working with plaintiffs' counsel about

5   briefing schedule on post-trial briefs, and we will be working

6   with them on that as well.

7          THE COURT:  Okay.  I would like to finalize that

8   briefing schedule tomorrow, okay.  Great.

9          MS. ROMANO:  Okay.  Thank you.

10          THE COURT:  Thank you.

11          THE CLERK:  The Court stands in recess.

12      (Proceedings to resume on Wednesday, November 1, 2017.)

13                        -  -  -  -

14                  CERTIFICATE OF REPORTERS

15          We certify that the foregoing is a correct transcript

16   from the record of proceedings in the above-entitled matter.

17   DATE:   Tuesday, October 31, 2017

18

19                       *Katherine Sullivan*

20   _____

21       Katherine Powell Sullivan, CSR #5812, RMR, CRR
                   U.S. Court Reporter

22

23                       *Jo Ann Bryce*

24   _____

25          Jo Ann Bryce, CSR #3321, RMR, CRR
                 U.S. Court Reporter