Volume 10

Pages 1824 - 1936

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JOSEPH C. SPERO, MAGISTRATE JUDGE

DAVID AND NATASHA WIT, et al.,　)
　　　　　　　　　　　　　　　　　)
　　　　　　　Plaintiffs,　　　　)
　　　　　　　　　　　　　　　　　)
　VS.　　　　　　　　　　　　　　)　　**No. C 14-2346 JCS**
　　　　　　　　　　　　　　　　　)
UNITED BEHAVIORAL HEALTH,　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　Defendant.　　　　　)
_____)　　San Francisco, California
　　　　　　　　　　　　　　　　　　　Wednesday, November 1, 2017

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:　　　　　ZUCKERMAN SPAEDER LLP
　　　　　　　　　　　　　1800 M Street, NW, Suite 1000
　　　　　　　　　　　　　Washington, DC　20036-5807
　　　　　　　　BY:　**CARL S. KRAVITZ, ESQUIRE**
　　　　　　　　　　**CAROLINE E. REYNOLDS, ESQUIRE**
　　　　　　　　　　**AITAN D. GOELMAN, ESQUIRE**

　　　　　　　　　　　　　ZUCKERMAN SPAEDER LLP
　　　　　　　　　　　　　485 Madison Avenue, 10th Floor
　　　　　　　　　　　　　New York, New York 10022
　　　　　　　　BY:　**JASON S. COWART, ESQUIRE**


　　　　　　　(Appearances continued on next page)



Reported By:　　Katherine Powell Sullivan, CSR #5812, RMR, CRR
　　　　　　　　　Jo Ann Bryce, CSR #3321, RMR, CRR
　　　　　　　　　Official Reporters - U.S. District Court

**APPEARANCES (CONTINUED):**

For Plaintiffs:          ZUCKERMAN SPAEDER LLP
                         100 East Pratt Street, Suite 2440
                         Baltimore, Maryland  21202-1031
                 **BY:  ADAM ABELSON, ESQUIRE**

                         THE MAUL FIRM, P.C.
                         101 Broadway, Suite 3A
                         Oakland, California 94607
                 **BY:  ANTHONY F. MAUL, ESQUIRE**

                         PSYCH APPEAL
                         8560 Sunset Boulevard, Suite 500
                         West Hollywood, California  90069
                 **BY:  MEIRAM BENDAT, ESQUIRE**

For Defendant:           CROWELL & MORING LLP
                         515 South Flower Street, 40th Floor
                         Los Angeles, California 90071-2258
                 **BY:  JEFFREY H. RUTHERFORD, ESQUIRE**
                       **JENNIFER S. ROMANO, ESQUIRE**
                       **ANDREW HOLMER, ESQUIRE**

                         CROWELL & MORING LLP
                         3 Embarcadero Center, 26th Floor
                         San Francisco, California 94111
                 **BY:  NATHANIEL P. BUALAT, ESQUIRE**

                         CROWELL & MORING LLP
                         1001 Pennsylvania Avenue, NW
                         Washington, DC 20004-2595
                 **BY:  APRIL N. ROSS, ESQUIRE**

## **I N D E X**

Wednesday, November 1, 2017 - Volume 10

|                                        | **PAGE** | **VOL.** |
| -------------------------------------- | -------- | -------- |
| Closing Argument by Mr. Goelman        | 1828     | 10       |
| Closing Argument by Mr. Rutherford     | 1872     | 10       |
| Rebuttal Argument by Mr. Cowart        | 1925     | 10       |

## **E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
| ------------------ | -------- | -------- | -------- |
| 903                |          | 1936     | 10       |
| 904                |          | 1936     | 10       |

**Wednesday - November 1, 2017**                    **10:38 a.m.**

P R O C E E D I N G S

---000---

          THE CLERK:  Okay.  We're calling Case Number

C 14-2346, witness/Alexander versus UBH.  Everybody here's,

so...

          THE COURT:  All right.  Time for closing arguments.

Let's proceed.

          MR. GOELMAN:  Good morning, Your Honor.

          THE COURT:  Good morning.

          MR. GOELMAN:  I believe I speak for both parties when

I say thank you for the candy.

                    (Laughter)

          THE COURT:  Oh, I should have mentioned it's required

that you eat the candy because I'm not bringing that back into

chambers.

                    (Laughter)

          THE COURT:  It's probably not appropriate in an

healthcare case, but....

     Okay.  Go ahead.

          MR. GOELMAN:  Your Honor, I'd like to reserve 20

minutes for rebuttal with the Court's permission.

          THE COURT:  Okay.  So what are we clocking him at?

          THE CLERK:  So --

          THE COURT:  Let's put down an hour and hopefully that

1    will be enough --

2         **MR. GOELMAN:**  It should be.

3         **THE COURT:**  -- but reserve 20 minutes of that hour for

4    rebuttal.  We'll let you know when you're getting close to the

5    20 minutes.

6         **MR. GOELMAN:**  Oh.  The 20 minutes comes out of the

7    hour?

8         **THE COURT:**  Oh, yes.

9         **MR. GOELMAN:**  Okay.

10        **THE COURT:**  Well, I don't know.  What do you think?

11        **MR. GOELMAN:**  I think I'll be done within an hour, the

12   principal closing.

13        **THE COURT:**  Fine.

14        **MR. GOELMAN:**  And then I'd like at least to have the

15   option of coming back for 20 minutes after the defense closing.

16        **THE COURT:**  Okay.  Well, try to make it as concise as

17   you can, please.

18        **MR. GOELMAN:**  I will.  I will.

19                      **CLOSING ARGUMENT**

20        **MR. GOELMAN:**  UBH chose to administer thousands of

21   discrete ERISA plans.  Each of those plans has its own plan

22   document, its own collection of beneficiaries.  In order to

23   ease the burden of administering so many plans and because all

24   of the plans required as one condition of coverage that the

25   prescribed treatment be consistent with generally accepted

1   standards of care, UBH developed Level of Care Guidelines that

2   purported to embody those standards so that it could use those

3   guidelines to make coverage determinations.

4        UBH chose to administer its plans in this manner, but that

5   didn't change the fact that it was legally required to

6   interpret each of those plans according to its terms and

7   exercise its discretion solely for the benefit of its

8   beneficiaries.  The evidence shows it did not do that.

9        The evidence shows that each time there was a decision to

10  be made about how to draft a guideline, UBH's own financial

11  interests trumped the interests of plan beneficiaries.  It's no

12  accident that UBH ended up with guidelines that were and are

13  pervasively, systemically, and improperly more restrictive than

14  the generally accepted standards and that they used those

15  guidelines to deny members' claims.

16       The Court has provided the parties with a list of issues

17  to be addressed in this case and has asked the parties to

18  address whether and why particular provisions of the guidelines

19  are consistent with the generally accepted standards and to

20  point to particular evidence in the record that supports our

21  position.  We will do so both today and in more detail in

22  posttrial briefing but before I turn to that, I want to address

23  one issue, witness credibility, because not all testimony is

24  created equal.  Plaintiffs' experts gave testimony that should

25  be credited in full.  Defendant's witnesses did not.

1    First, demeanor.  Witnesses' demeanor and behavior on the

2  stand matter.  The Court had the opportunity to sit closer than

3  anyone else in this courtroom as the witnesses testified.  The

4  Court had the opportunity to ask its own questions of these

5  witnesses.  So the Court no doubt already has its own opinions

6  about their credibility.

7    Here's why the Court should credit the testimony and

8  opinions of the plaintiffs' experts and accept their opinion

9  that UBH's Level of Care Guidelines fell far below the

10  generally accepted standards.

11    First, the Court heard from Dr. Mark Fishman, one of the

12  leading architects of the ASAM criteria, which every witness

13  asked has admitted is generally accepted standards for

14  substance use disorder and is by far the most widely used,

15  broadly accepted iteration of those standards.

16    The Court also heard from Dr. Plakun, a long-time

17  practitioner, former faculty member at the Harvard Medical

18  School, someone who has written a number of peer-reviewed

19  articles on issues directly relevant to this case, and someone

20  who runs one of the most highly regarded residential treatment

21  facilities for mental health disorders in the country.

22    Both of these men took the witness stand and walked the

23  Court through chapter and verse their problems with UBH's

24  guidelines and why they both concluded that they fell far short

25  of generally accepted standards.

1    The Court should credit their testimony not just because

2 they are leading experts in their respective fields, but

3 because the Court had the opportunity to hear and watch them

4 testify, to judge their seriousness and credibility by their

5 demeanor, and their testimony had all the hallmarks of

6 authenticity and credibility.  They testified the same on

7 direct examination and cross-examination.  Their testimony,

8 while internally consistent, was not identical with each other.

9    The opinions offered by all the experts in this case are

10 not based on immutable laws of physics or mathematics, so you'd

11 expect there to be some daylight even between one party's

12 experts, and there was some daylight between Drs. Fishman and

13 Plakun.  Defendant's experts, however, were in lockstep, often

14 verbatim.  That's a sign of careful coaching, not authenticity.

15    Dr. Fishman and Dr. Plakun were unrehearsed and they both

16 called the balls and strikes the way they saw them, including

17 endorsing certain parts of the guidelines when they felt that

18 that was warranted.

19    You may not agree with their opinions, although you

20 should, but there can be no doubt that these two men believed

21 what they told you and that their opinions were based on vast

22 experience and careful thought and consideration.

23    Dr. Simpatico.  The difference between Dr. Simpatico and

24 the plaintiffs' expert witnesses could not be starker.

25 Dr. Simpatico testified over two days after sitting in court

1   and watching for part of the trial, so he was definitely

2   prepared.  He gave testimony that in style, diction, and

3   delivery was rehearsed and almost preprogrammed, but what

4   really destroyed Dr. Simpatico's credibility wasn't his

5   delivery.  It was the substance of his testimony.  It was his

6   shifting answers, particularly when he was answering difficult

7   questions from the Court instead of scripted ones from his own

8   lawyer.  It was his insistence that words on a page do not mean

9   what they say.

10      A standard jury instruction, Your Honor, is that jurors if

11  they don't find a particular witness credible, they can reject

12  his or her testimony in whole or in part.  Plaintiffs submit

13  that Dr. Simpatico was so profoundly noncredible that the Court

14  should disregard his testimony in its entirety.

15      Plaintiffs after listening to and watching Dr. Simpatico's

16  testimony over two days made the unusual and, for trial

17  lawyers, exceedingly difficult decision to waive

18  cross-examination.  We did so because we couldn't imagine

19  Dr. Simpatico being more thoroughly discredited than he already

20  was.  His testimony should simply not count as evidence.  His

21  opinion, to the extent that he genuinely has one, should carry

22  no weight with the Court and should carry no weight when the

23  Court goes through the guideline provisions and decides which

24  party's experts are more persuasive.

25      UBH's nonretained experts, on the other hand, were not

1    utterly without credibility but they were certainly not

2    independent, and none of them were able to offer any

3    explanation as to why their reading of the guidelines comported

4    with the actual text of the guidelines.  Instead, over and over

5    they told the Court that the words don't mean what they say.

6        Now, I want to turn to the issues that the Court has asked

7    the parties to focus on.  Some of them are easy, and I want to

8    tick through those first.

9        The Court asked:  Does ERISA apply?  The answer is yes.

10   The parties stipulated that every class member's plan was

11   governed by ERISA, and that stipulation is in evidence as

12   Exhibit 896.

13       Was UBH acting as a fiduciary?  The answer again is yes.

14   There's no question that in its role of administering these

15   benefits, UBH was interpreting these plans.  You see that again

16   and again in the plan language itself.  And the act of writing

17   and amending the guidelines was the method by which UBH decided

18   to interpret the plans.  Indeed, the guidelines explicitly

19   state that they are designed to standardize UBH's plan

20   interpretation.

21       The next question:  Did UBH use the guidelines in whole or

22   in part to make coverage determinations?

23       **THE COURT:**  So I missed that last part.  So the

24   guidelines themselves say what?

25       **MR. GOELMAN:**  That they are designed to standardize

1    UBH's plan interpretation.

2         **THE COURT:** And that's in the texts of the Level of

3    Care Guidelines?

4         **MR. GOELMAN:** I believe that is in the introduction,

5    "standardize the coverage determinations."

6         Next question: Did UBH use the guidelines in whole or in

7    part to make coverage determinations? Indisputably it did.

8    Every denial cited a guideline, and this is set forth in

9    plaintiffs' summary Exhibit 894, which Ms. Duh testified about.

10        Not only that, UBH's employees testified consistently that

11   application of the guidelines was mandatory, and I refer the

12   Court just to one example of this testimony. It was from

13   Dr. Triana at page 709 of the transcript, lines 10 to 12

14   (reading):

15        **"QUESTION:** It's true UBH cannot make a clinical

16        noncoverage determination without citing a guideline; is

17        that correct?

18        **"ANSWER:** That is correct."

19        728:18 to 729:2 (reading):

20        **"QUESTION:** And you agree that when UBH issues an adverse

21        benefit determination for lack of medical necessity, it

22        means that a peer reviewer concluded that the case did not

23        meet the criteria in UBH's Level of Care Guidelines?

24        **"ANSWER:** Yes.

25        **"QUESTION:** And when UBH makes a clinical coverage

1          determination to deny benefits, it means that a peer

2          reviewer concluded that the case did not meet the criteria

3          and the applicable CDGs; is that also correct?

4          **"ANSWER:** Correct."

5          Next question.  Did the CDGs incorporate the Level of Care

6    Guidelines?  The answer again is yes.  The parties have entered

7    a stipulation.  It's marked as Exhibit 880 and it's in

8    evidence.  It sets forth the evidence that over the years of

9    the class, the Level of Care Guidelines were incorporated into

10   the CDGs.

11         In 2017, the CDGs contained a hyperlink to the Level of

12   Care Guidelines.  From 2014 to 2016 --

13         **THE COURT:**  So in 2017 all of the CDGs contained a

14   hyperlink to the complete Level of Care Guidelines?

15         **MR. GOELMAN:**  All of the CDGs contain a hyperlink to

16   at least the common criteria of the Level of Care Guidelines,

17   all of the CDGs at issue in this case.

18         **THE COURT:**  Contain a hyperlink to the common

19   criteria?

20         **MR. GOELMAN:**  I believe that's correct.  And then once

21   you're in the common criteria, you're in the Level of Care

22   Guidelines.

23         **THE COURT:**  Well, you're in the common criteria for

24   the Level of Care Guidelines.

25         **MR. GOELMAN:**  Correct.  I think if you go down, you

1  can see the rest of the guidelines.  You don't have to go to

2  another link.

3      **THE COURT:**  Yes.  I see.  It's a link to the entirety

4  of the guidelines, but it starts at the common criteria; is

5  that what you're saying?

6      **MR. GOELMAN:**  I believe that's accurate.

7      **THE COURT:**  Okay.  Thank you.

8      And your position is that a reviewer reviewing the CDGs

9  for 2017, for example --

10     **MR. GOELMAN:**  Uh-huh.

11     **THE COURT:**  -- because there is a link must also

12 review whether or not coverage of the particular treatment is

13 appropriate under the Level of Care Guidelines?  Must do that?

14     **MR. GOELMAN:**  I think that --

15     **THE COURT:**  I'm wondering what you mean by

16 "incorporated."

17     **MR. GOELMAN:**  Well, I think that the individual

18 reviewers use the guidelines in every case, and there's

19 evidence of that.

20     I think that --

21     **THE COURT:**  Individual reviewers use what in every

22 case?

23     **MR. GOELMAN:**  Guidelines, whether it's CDGs --

24     **THE COURT:**  Some guidelines, yes.

25     **MR. GOELMAN:**  Right.

1    THE COURT:  I understand.

2    MR. GOELMAN:  And I think that --

3    THE COURT:  We're distinguishing between CDGs and

4 Level of Care Guidelines.

5    MR. GOELMAN:  I think that the fact -- well, when the

6 Court asks must every reviewer click on that hyperlink every

7 time, I don't think there's any evidence in the case one way or

8 another about that; but the presence of that hyperlink in the

9 CDG incorporates the terms of the Level of Care Guidelines.

10    THE COURT:  "Incorporates the terms."  What does it

11 say when it says the hyperlink?

12    MR. GOELMAN:  Your Honor, the CDGs contain no level of

13 care criteria except for the link to the level of care

14 criteria.  So if a --

15    THE COURT:  The CDGs don't say anything about whether

16 or not you're allowed to have this in a residential setting?

17    MR. GOELMAN:  I don't believe that they set forth the

18 criteria to choose a level of care.  I think they deal with the

19 disorder specific.

20    THE COURT:  Right.  Disorder specific.

21    MR. GOELMAN:  There's a section in the CDGs that says

22 "Level of Care Guidelines" --

23    THE COURT:  Yeah.

24    MR. GOELMAN:  -- but then there's no substance in

25 there.  All there is is the hyperlink.

1    **THE COURT:**  What does it say?

2    **MR. GOELMAN:**  It says -- Optum has the computer

3    designation for the hyperlink, "Optum/OptumHealth Behavioral

4    Solutions of California Level of Care Guidelines are available

5    at," and then it has a hyperlink.  And then it says (reading):

6        "The Level of Care Guidelines are a set of objective

7        and evidence-based behavioral health guidelines used to

8        standardize coverage determinations, promote

9        evidence-based practices, and support member's recovery,

10       resiliency, and well-being."

11   **THE COURT:**  Okay.

12   **MR. GOELMAN:**  So if you're a reviewer and you're in

13   the CDG and you want to figure out what Level of Care

14   Guidelines should be applied, you go to the link.  That's for

15   2017.

16   From 2014 to 2016, the Level of Care Guidelines were

17   literally copied and pasted into the CDGs.

18   **THE COURT:**  In their entirety?

19   **MR. GOELMAN:**  I was afraid you were going to ask that.

20   **THE COURT:**  Yeah, of course.

21   **MR. GOELMAN:**  The answer is yes.

22   **THE COURT:**  So each CDG copied and pasted the entirety

23   of the Level of Care Guidelines for that year?  These Level of

24   Care Guidelines are very long.

25   **MR. GOELMAN:**  Can I have my co-counsel answer this

1    question?

2           THE COURT:  Sure.

3           MS. REYNOLDS:  Okay.  Yes, Your Honor, as reflected in

4    the stipulation, the common criteria are copied verbatim in

5    their entirety in each of the guidelines where the column G has

6    a checkmark, and the --

7           THE COURT:  Each of the guidelines where column G has

8    a checkmark.  Is that all of them?

9           MS. REYNOLDS:  It is -- let me look.  I mean, it's

10   not -- it's not every single one, but the ones that have a

11   checkmark in that column have copied the language verbatim.

12          THE COURT:  Yeah, I understand that, but the problem

13   here is we're judging all 216 CDGs, or whatever it is.  So most

14   of them?  Some of them?

15          MS. REYNOLDS:  Most of them, Your Honor.

16          THE COURT:  Okay.  And the others didn't?

17          MS. REYNOLDS:  In years before 2014 --

18          THE COURT:  2014 to 2016 is all we're talking about.

19          MS. REYNOLDS:  Right.

20          THE COURT:  2014 to 2016 most of them but not all of

21   them?

22          MS. REYNOLDS:  Right, the vast majority.

23          THE COURT:  And what about the rest?

24          MS. REYNOLDS:  The other ones use the same format as

25   the earlier years where there's incorporation by reference --

1          **THE COURT:**  Okay.

2          **MS. REYNOLDS:**  -- according to other language.

3          **THE COURT:**  And so the 2011 to 2014 -- '13, what's the

4     guidelines?

5          **MS. REYNOLDS:**  Right.  So 2011 to 2013 there are

6     references to the Level of Care Guidelines and there are

7     statements to the effect, for example, that UBH maintains that

8     coverage must be consistent with its Level of Care Guidelines,

9     that coverage is excluded if it's not consistent with the Level

10    of Care Guidelines.  And then, as we saw in 2017, there aren't

11    other level of care criteria in those guidelines necessarily.

12         **THE COURT:**  So every one from 2011 to 2013 says,

13    either affirmatively or negatively, you have to comply with the

14    Level of Care Guidelines?

15         **MS. REYNOLDS:**  There are -- there are some on the list

16    where the only incorporation is a parenthetical citation to the

17    Level of Care Guidelines, and those are indicated in column D.

18    And so the Court can see on the chart which ones have only a

19    checkmark in that column.

20         More often and, you know, the vast majority of the time

21    there is language from column A, B, and/or C, often two of the

22    three.

23         **THE COURT:**  What are those saying?

24         **MS. REYNOLDS:**  So A is a citation to an exclusion of

25    coverage --

1    **THE COURT:**  Right.

2    **MS. REYNOLDS:**  -- when the services are not consistent

3  with the Level of Care Guidelines.

4    **THE COURT:**  Right.

5    **MS. REYNOLDS:**  B is the statement, the affirmative

6  statement, that UBH maintains that treatment should be

7  consistent with its Level of Care Guidelines.

8    **THE COURT:**  Uh-huh.

9    **MS. REYNOLDS:**  And C is a reference to UBH maintaining

10  clinical protocols that include the Level of Care Guidelines

11  which describe scientific evidence, prevailing medical

12  standards, and clinical guidelines supporting our

13  determinations regarding treatment that are available upon

14  request.  And that's generally coupled with one or more of the

15  other types of language.

16    **THE COURT:**  Okay.

17    Okay.  Got it.  Thank you.

18    **MS. REYNOLDS:**  Okay.

19    **MR. GOELMAN:**  The next question concerns exhaustion.

20  The question is:  Did the members of the class exhaust their

21  administrative remedies?  And, again, the answer is yes.  The

22  evidence is that UBH on appeal applied the same flawed

23  guidelines, so appeal was and would have been futile.

24    I'm going to turn to the state mandates and the question

25  that the Court had about whether or not the guidelines violated

1  the state mandates.  The answer again is yes.  That's why UBH

2  lied to the State of Connecticut.  That's why it told the

3  Connecticut Department of Insurance that its guidelines

4  contained criteria for all the ASAM levels for residential

5  treatment even while acknowledging the precise opposite to its

6  own consultant to whom it told a different untruth, that it

7  didn't need criteria for low-intensity residential treatment

8  because the plans it administered didn't cover it.

9       It wasn't just Connecticut.  Illinois mandated the use of

10  ASAM beginning in 2011.  A year later, Jerry Niewenhous sent

11  this e-mail, which is in evidence at Exhibit 353, page 002.

12  First there's an e-mail from Jeremy Hodess to him.  It says in

13  part (reading):

14       "We have continued to operate here in St. Louis as

15       though we do not need to cite ASAM in our coverage

16       determinations for treatment of SUDS on commercial members

17       in Illinois.  Based on previous advice, we were operating

18       as though our LOCGs/CDGs are generally 'in accordance'

19       with ASAM criteria."

20  Mr. Niewenhous's response is above (reading):

21       "Jeremy, you're correct, operating as though our

22       guidelines are in accordance with ASAM's criteria."

23  The problem is they're not in accordance with ASAM's

24  criteria.  UBH's guidelines are very much not in accordance

25  with ASAM, and UBH knew that at the time.

1    It wasn't just Connecticut and Illinois.

2        THE COURT:  How long did the situation obtain in

3    either of those states?  So in Connecticut, when were they

4    required to apply ASAM in Connecticut?

5        MR. GOELMAN:  I think that the Connecticut statute was

6    enforce in 2014 -- 2013.  Illinois was even before the class

7    started.

8        THE COURT:  And how long before they applied ASAM in

9    Connecticut?  They're still not applying ASAM in Connecticut?

10       MR. GOELMAN:  Correct.

11       THE COURT:  And in Illinois, how long before they

12   complied with the 2011 law to apply ASAM?

13       MR. GOELMAN:  2016, Your Honor.

14       THE COURT:  Okay.  Go ahead.

15       MR. GOELMAN:  Texas has required application of its

16   own criteria for SUD placement since before the class period

17   started, and Mr. Niewenhous testified at trial that UBH used

18   the Texas criteria since before the class period.  The problem

19   is that that's not true either, and Exhibit 493 is an e-mail

20   again with Mr. Niewenhous part of the chain at 0002.  It talks

21   about the TCADA guidelines which are the Texas State

22   regulations (reading):

23           "Question from Houston about whether the TCADA

24       guidelines apply or the CDGs.  Former required by State

25       reg, latter thought to apply because of Parity.  Houston

1    has been using the CDGs.  Meeting with Tom Hamlin, Adam,

2    and Kevin later this week."

3        That's from May 2015.  And the Court heard testimony from

4    Dr. Fishman who voiced the opinion that the UBH guidelines do

5    not comply with the Texas regulations for placement of

6    substance use disorder patients.

7            THE COURT:  And Texas permits the use of alternative?

8            MR. GOELMAN:  Texas has its own regulations.

9            THE COURT:  You're allowed to apply your own

10   guidelines if they're consistent with the Texas regulation, or

11   do you have to apply the Texas regulation?

12           MR. GOELMAN:  If they're consistent with the Texas

13   regulation, you may apply your own.  The question is whether or

14   not UBH's were consistent.

15           THE COURT:  Got it.

16           MR. GOELMAN:  It wasn't just Connecticut, Illinois,

17   and Texas; it's also Rhode Island, which has required ASAM

18   since 2015.  But just yesterday, October 31st, 2017,

19   Mr. Niewenhous conceded that UBH -- and this is at 1809,

20   lines 11 to 13 of the transcript -- has never adopted ASAM

21   criteria in Rhode Island for commercial plans.

22       Oh, I'm told that Texas is mandatory.  You actually have

23   to use TCADA.  You cannot use your own guidelines even if they

24   are consistent or you think they're consistent with the Texas

25   regs.

1    So those questions are relatively easy, but I don't want

2  to pretend that all the questions --

3         **THE COURT:**  So what is -- I guess I don't understand

4  about Texas.  There's an e-mail chain where somebody says

5  Houston is not using this.  What does "Houston" mean?

6         **MR. GOELMAN:**  I think "Houston" is the CAC that is

7  responsible for plans for members who live in Texas.

8         **THE COURT:**  Okay.

9         **MR. GOELMAN:**  If all the questions in this trial were

10  easy, the parties would not have spent the last three weeks

11  boring everyone in the courtroom parsing language from the

12  various iterations of the guidelines.

13    So the big question in this case is:  Are the guidelines

14  at issue inconsistent with the class members' plans?  And this

15  question and answer has several subparts; some easy, one is

16  not.

17    One easy one is:  Did the plans require compliance with

18  the generally accepted standards as one condition of coverage?

19  That's an easy yes.  The plans contain language using that or

20  virtually identical language and make clear that UBH cannot

21  approve coverage without finding that the services meet that

22  standard.  That is set forth in plaintiffs' summary

23  Exhibit 892, which Ms. Duh testified about earlier in the case.

24    Another question:  Did UBH reasonably interpret that

25  requirement when it wrote, amended, and applied the guidelines?

1  Now, this subquestion itself has several parts, some easier

2  than others.

3  First, what standard do we use in evaluating that

4  question?  I note for Claim 2 it's abuse of discretion.  During

5  the pretrial conference, the Court made it clear that it

6  believes that it is also the appropriate standard for Claim 1.

7  We have reasons that we think the Court should use a lower

8  standard for the first claim, which we're happy to put in our

9  posttrial briefs but don't want to take the time to argue it

10  here today, so we will assume that we're operating under the

11  abuse of discretion standard for both claims but plaintiffs

12  prevail regardless.

13  First, the abuse of discretion asks whether UBH's

14  interpretation of the plan was reasonable.  It was not.  No

15  reasonable and faithful fiduciary would interpret the generally

16  accepted standards the way that UBH did with the overemphasis

17  on acuity and underemphasis on chronicity and comorbidity and

18  with the distortions of CMS definitions of "improvement,"

19  "custodial care," and "active treatment."

20  Then we get to the hard part or the big question:  Did the

21  guidelines at issue violate generally accepted standards?  And

22  I said it was hard but not because it's a close call.  It's

23  not.  It's hard because it's complicated and the Court will

24  need to make findings on why the guidelines are flawed or not

25  flawed in each year, and there are various guidelines that some

1  of the language changes from year to year.

2  But the parties agree on one thing in this case,

3  Your Honor; that the changes to the guidelines between 2011 and

4  2017 did not change the fundamental nature and did not bring

5  them into or take them out of compliance with the generally

6  accepted standards.

7  So where does the Court look to see what the real

8  genuinely accepted standards are and were?

9  **THE COURT:**  So let me just ask you a question about

10  the latter.  That seems to me to be an irrelevancy because they

11  agree that it doesn't take them out of compliance because they

12  think every year is in compliance with generally accepted

13  standards of care.

14  But if you told them, "Well, I've decided that 2014, which

15  has the 'why now' factors, is not inconsistent with generally

16  accepted standards of care," they'd look to 2017 and they'd

17  say, "Well, we don't have that anymore."

18  So you have to go through every one.  You can't just say

19  that the fact that for varying -- for different reasons, based

20  on our own assumptions about where we end up, we're going to

21  say that there's no change in whether or not they comply with

22  the generally accepted standard of care.  It's too simplistic.

23  **MR. GOELMAN:**  Okay.

24  **THE COURT:**  The reason I say that is because it

25  affects remedy because if I say, for example, that the 2014

1  violated the generally accepted standards of care but the 2017

2  doesn't, I'm not sure what the remedy is, and it would be

3  different if I thought both of them were.

4  　　　　MR. GOELMAN:  Fair enough.  I'm sure both parties'

5  fallback position will be that certain guidelines do and

6  certain don't.

7  　　　　THE COURT:  Right.

8  　　　　MR. GOELMAN:  I want to talk about what the sources of

9  generally accepted standards are because I don't think there's

10  much of a dispute about a lot of that.

11  　　　　Plaintiffs have always maintained while there's no book

12  that's entitled "The Generally Accepted Standards of Care for

13  X," that there are and were generally accepted standards of

14  care reflected in various authoritative government and

15  professional sources.  The evidence has proved that out.

16  Witnesses for both sides have identified some of these sources:

17  CMS guidelines, ASAM, LOCUS, CALOCUS, and others.

18  　　　　In 2015, UBH started to include in their guidelines cites

19  to some of these and other sources; and you see some of the

20  sources cited repeatedly, including ASAM, including CMS.  If

21  this was a law school source cite quiz, the Table of

22  Authorities would say ibid for CMS.

23  　　　　But as the Court has seen, the citations in UBH's

24  guidelines can't be trusted to support the propositions that

25  they are cited for.  UBH repeatedly added or deleted critical

1    language that changed the meaning of the original source and

2    this, Your Honor, was not the product of carelessness or

3    mistake.  If it had been, you'd expect to see mistakes in both

4    directions.  Here, all the differences militate in one

5    direction, restricting the care that members' plans promise

6    them.

7        I want to just point the Court to a couple examples of

8    this.  The first one involves the definition of "reasonable

9    expectation of improvement."  This is the 2016 Level of Care

10   Guideline 1.8, and there has been a lot of testimony about this

11   in this trial.  It is side by side with the CMS definition of

12   "reasonable expectation of improvement."

13       Can you turn to the next slide, please.  And then the next

14   one again.

15       Okay.  So both of these documents talk about "improvement

16   in this context," and they have similar wording about "in this

17   context is measured by comparing the effect of continuing

18   treatment versus discontinuing" it in CMS; and in the UBH

19   version "in this context is measured by weighing the

20   effectiveness of treatment against evidence that the member's

21   signs and symptoms will deteriorate if the current level of

22   care ends."

23       But -- and you go to the next -- UBH's version has

24   dramatically changed the context that is relevant to the

25   interpretation of "improvement."  On the CMS side it says

1 (reading):

2        "For many other psychiatric patients, particularly

3    those with long-term chronic conditions, control of

4    symptoms and maintenance at a functional level to avoid

5    further deterioration or hospitalization is an acceptable

6    expectation of improvement."

7    UBH, on the other hand, writes that there's a reasonable

8 expectation that services will improve the member's presenting

9 problems within a reasonable period of time.  And then in 1.8.1

10 (reading):

11        "Improvement of the member's condition is indicated

12    by the reduction or control of the acute signs and

13    symptoms that necessitated treatment in the level of

14    care."

15    So "in this context," it is modifying the stem clause of

16 1.8, "the reasonable expectation of services will improve the

17 member's presenting problems within a reasonable period of

18 time."

19    Go to the next one, please.

20    So on CMS you have reference to "long-term chronic

21 conditions" and on the UBH side you have "presenting problems

22 and acute signs and symptoms."

23    Move on to the next one, please.

24    And here in green is important language in the CMS

25 definition that has been entirely omitted from UBH's definition

1    of "improvement" (reading):

2         "The treatment must at a minimum be designed to

3    reduce or control the patient's psychiatric symptoms so as

4    to prevent relapse or hospitalization and improve or

5    maintain the patient's level of functioning."

6    If you go down again, and then one more.

7    So this is another big difference.  The CMS side

8    repeatedly refers to "maintaining the present level of

9    functioning," and there is nothing at all on the United side

10   that takes into account maintenance of function.

11   Is that the last one for here?

12   Okay.  And the evidence is that UBH knows how to

13   faithfully borrow from the CMS guidelines when it wants to.  So

14   now I want to direct the Court to a side-by-side comparison of

15   the same CMS excerpt but instead of the commercial plans, this

16   is what UBH says about reasonable expectation of improvement on

17   the Medicare side.  It's far more similar to the CMS definition

18   than the commercial side.

19   Can you go down, please.  Again.

20   Okay.  So, again, "in this context" appears both in the

21   CMS version and in the UBH version; but here, in the UBH

22   version, "in this context" modifies "services that are for the

23   purposes of diagnostic study or reasonably expected to improve

24   the member's condition."  Same language as on the CMS side.

25   And in this version that UBH uses, it talks about

1    "long-term or chronic conditions, control of symptoms, and

2    maintenance of functioning," all part of the definition of

3    "improvement."

4         THE COURT:  Well, the "context" language argument

5    doesn't work because the context in the CMS is the first

6    paragraph and most of the second paragraph, which includes the

7    reference to "prevention of deterioration, maintenance of

8    function"; whereas, in the Medicare plan for UBH, "in this

9    context" doesn't refer to that.

10        MR. GOELMAN:  That's true, although "in this

11   context" --

12        THE COURT:  I mean, they did add later on more

13   references to maintaining the patient's level of function.

14        MR. GOELMAN:  Right.  And "improvement in this

15   context" on the Medicare side for UBH modifies at least the

16   verbatim same sentence from the CMS side as opposed to what

17   they created in 1.8.  Right here it says "Services are for the

18   purpose..."

19        THE COURT:  One of the same sentences?

20        MR. GOELMAN:  Right.

21        THE COURT:  Yours is not quite that different.  If you

22   want to just talk about the first sentence, talking about 1.8,

23   if it had "reasonable expectations of improving or

24   improvement," it would have added something but it's not that

25   different.

1    **MR. GOELMAN:**  That's true, they're not as different,

2  although in 1.8 it still says "presenting problems"; whereas,

3  in the Medicare, it says "expected to improve the member's

4  condition."

5    **THE COURT:**  Okay.

6    **MR. GOELMAN:**  But, you know, maybe it was inadvertent.

7  Maybe they just messed up when they were borrowing from CMS for

8  their commercial plans, but that's not what the evidence shows.

9    So let's turn to 307, which is the minutes of the

10  July 1st, 2000, Coverage Determination Committee, second page

11  of this exhibit.

12    This is something -- I'm sorry.  It's from July 2010.  I

13  thought I said that.  Oh.  I said "2000."  Thanks.  Okay.

14    (reading)

15    "Add clarification" -- this is something that Jerry

16    Niewenhous is supposed to do -- "Add clarification that

17    reasonable expectation of improvement in a patient's

18    condition is improvement in the patient's acute" --

19    underlined -- "condition."

20    Now let's turn to 10, Exhibit 10-0003.  That's the

21  Custodial Care and Inpatient Services CDG as it was modified in

22  August of 2010, so one month after Mr. Niewenhous received this

23  direction from the committee, and it indeed contains the

24  language that he was instructed to put in there (reading):

25    "Improvement of the patient's condition is indicated

1    by the reduction or control of the acute symptoms that

2    necessitated hospitalization or residential treatment in

3    an acute or RTC."

4    But it doesn't stop with the CDG.  The acute centric

5    definition of "improvement" metastasizes through the Level of

6    Care Guidelines as well, and the Court can see this in the 2012

7    version of the common criteria (reading):

8        "Improvement of the member's condition is indicated

9        by the reduction or control of the acute symptoms that

10       necessitated treatment in a level of care."

11   And you can even trace through contemporaneous documentary

12   evidence of how this got from the CDG into the LOCG.  That is

13   at Exhibit 335-0007 (reading):

14       "Considerations of the substantial changes to the

15       clinical guidelines from the 2011 edition to the 2012

16       edition" -- and it says there in black and white -- "added

17       the indicator of 'improvement' from the Custodial Care CDG

18       to the common criteria.  'Improvement of the member's

19       condition as indicated by the reduction or control of the

20       acute symptoms that necessitated treatment in a level of

21       care.'"

22   So the way that CMS treats "reasonable expectation of

23   improvement" is consistent with the generally accepted

24   standards.  UBH's requirement of "improvement within a

25   reasonable period of time" is not.  Both Dr. Fishman and

1    Dr. Plakun testified that this was inconsistent with generally

2    accepted standards, that it reflected a ticking-clock approach

3    that was monitoring a patient's progress.

4        Now, monitoring a patient's progress is not a bad thing in

5    and of itself but that here, where coverage can be terminated

6    if and when the patient wasn't getting better within the time

7    period that UBH wanted, that violated the generally accepted

8    standards of care.

9        What is UBH's response?  Well, it's to pretend, for one

10   thing, that its definition of "improvement" was much broader

11   and more generous than it actually is and that it includes

12   prevention of deterioration and maintenance of function and

13   that the, quote, "within a reasonable period of time" was

14   essentially surplusage.  Again, this is belied by the

15   contemporaneous documentary evidence.

16       I refer the Court now to Exhibit 360 -- can you go to the

17   first page first, please -- an e-mail chain from

18   January 2013 -- and now to pages 3 and 4 -- e-mail chain

19   between Mr. Haberman and, again, Jerry Niewenhous.  And the

20   bottom portion that is highlighted here (reading):

21           "Improvement in this context is measured by weighing

22       the effectiveness of treatment and the current risk that

23       the member's condition is likely to deteriorate or relapse

24       if treatment in the current level of care were to be

25       discontinued."

1   And then the question --

2   **THE COURT:** Why isn't that CMS, "... member's
3   condition will deteriorate if the current level of care is
4   discontinued"?

5   **MR. GOELMAN:** I think that actually is CMS. I think
6   that it was... That is CMS. The dialogue here is the way that
7   it is reflected in the Level of Care Guidelines, which I think
8   it was Mr. Haberman said was troubling to him. Here's what he
9   said, he said (reading):

10      "The sentence that I bolded below, it has reached
11      more relevancy as a father of one of our member," quote
12      the bolden sentence, "while talking about his son's case
13      to one of our care advocates. His son's case is similar
14      to many others where you have a child who is clearly
15      dangerous or unresponsive to treatment. We can further
16      easily assume that the member would deteriorate or relapse
17      if treatment at the current level were discontinued. So
18      the question is how you legitimately ABD," which is a
19      denial, "such a case by calling it custodial, which is
20      what the father was saying. My answer, which is implied
21      in the paragraph, is that we always assume that services
22      will improve the person's ability to function in the
23      community and that there must be a reasonable expectation
24      that this can occur within a reasonable period of time.
25      The person's inability to improvement within a reasonable

1    period of time trumps the issue of whether they would

2    deteriorate if discharged."

3        **THE COURT:**  So what are you saying?

4        **MR. GOELMAN:**  I'm saying this reflects UBH's approach

5    that if you cannot improve or if you don't have a demonstrated

6    track record of improvement within whatever they determine a

7    reasonable period of time to be, that becomes more important --

8    the word "trumps" -- than the deterioration that would happen

9    if they were discharged from that level of care.

10       **THE COURT:**  That's what?  That's how they're applying

11   the language?  I mean, the question is with the language.

12       **MR. GOELMAN:**  That --

13       **THE COURT:**  Are you saying that's what the language

14   means?

15       **MR. GOELMAN:**  Yeah.  I'm saying that that is what they

16   intended when they adopted the language.

17       **THE COURT:**  Okay.

18       **MR. GOELMAN:**  The defendant argues the different

19   points in this case -- has argued -- that you can string

20   adjectives together and that eliminates conflicts between the

21   adjectives.  So you have some of their experts talking about

22   standards like the least restrictive effective level of care.

23   And I think everybody agrees if you have the same treatment,

24   the same level of care, and it's both the most effective and

25   the least restrictive or the most effective and the least

1    intensive, that's the one you should choose.

2        The question is:  What do you do when there is a conflict

3    between two of the adjectives?  What happens when the most

4    effective level of care is not the least intensive, when it's

5    more expensive than the second most effective treatment?  And

6    that, Your Honor, is where UBH failed as a fiduciary because it

7    was supposed to put the member's interests first and that would

8    require prioritizing "effective" over "least intensive," and

9    time after time it didn't do that.

10        And you can see that -- actually, I want to turn now to

11    the two words I think everyone in this courtroom is hoping

12    never to hear again, and that is "why now."  You can see from

13    the face of the guidelines that UBH placed a disproportionate

14    emphasis on "acuity" and that this was used to build a gauntlet

15    that members had to make it through to be entitled to coverage.

16        Drs. Fishman and Plakun testified to the effect that the

17    Court can look at the language of the guidelines and see for

18    itself the pervasive underemphasis on chronicity and

19    comorbidity and overemphasis on acuity.  Now, this is not to

20    say that someone using the guidelines might not have

21    information about a patient's chronic symptoms and

22    comorbidities.  It's saying that overall, the emphasis of the

23    coverage criteria is heavily skewed towards acute, towards the

24    "why now."

25        I want to turn to common criteria, Level of Care

1   Guidelines 2015, 1.4 to 1.6, "Member's Current Condition," and

2   we've been over and over these provisions, so I'm not going to

3   dwell on them too long.

4        Here you have "why now," the "why now" factors leading to

5   admission, defined to the acute -- as "the acute changes in the

6   member's signs and symptoms and/or psychosocial and

7   environmental factors."  And the term "why now" appears over 80

8   times in the 2014 Level of Care Guidelines and then over a

9   hundred times in 2015 and 2016.

10       And then you have the focus on acuity, and in 1.6 the

11  reference to comorbidities, both behavioral health and medical

12  conditions.  And as we have noted repeatedly now, the

13  co-occurring behavioral health and medical conditions are

14  supposed to be able to be safely managed; whereas, the acute

15  changes or the current condition is supposed to be able to be

16  safely, efficiently, and effectively assessed and/or treated.

17       Words matter.  Safe management is not the same thing as

18  effective treatment.  We know that UBH knows how to say

19  "effective treatment" because it's included in 1.4 and 1.5.  So

20  the fact that they do not use that phrase in 1.6 is

21  significant.  It's like the doctrine of statutory

22  interpretation.  When Congress knows how to use certain

23  language and chooses not to, we presume that it does so for a

24  reason and that the different language has a different meaning.

25       Can we go down in this document to the best practices?  I

1    think that's on page 10.

2         Now, UBH runs away from much of the language in its

3    guidelines in this case, but it runs toward best practices,

4    embraces the best practices.  And there is a lot of important

5    information in here that the provider is supposed to collect

6    and the care advocate is supposed to ask for.  We note that

7    4.1.2.3 directs the provider to collect information about the

8    "why now" factors leading to the request for service.

9         And can you go through the whole list, please?

10        You'll note that the "why now" information is one factor

11   among many side by side with information about comorbidities,

12   personal family history, barriers to treatment.

13        So the question is:  If all those factors, if all that

14   information is already baked into "why now," why are they

15   listed separately in this list?  More evidence that the phrase

16   "why now" does not mean what the defendant now says it does.

17        But additional evidence that the phrase "why now" promotes

18   a focus on the acute over the chronic comes from its historic

19   origins, and the evidence is that this phrase and the impetus

20   for UBH's clinical vision came from Dr. Bonfield, who was UBH's

21   chief medical officer until earlier this year and whose video

22   testimony was played in the courtroom yesterday.

23        He testified that he got the concept of "why now" from

24   crisis intervention literature.  So right there the concept

25   originated from an inherently acute level of care.  He further

1  testified that "why now" was, quote, "a pretty immediate issue"

2  and, quote, "not something that happened 10 years ago," and he

3  gave an example of what "why now" meant.  His example was

4  somebody who had long-term depression, and that depression is

5  aggravated when he discovers that his wife has been having an

6  affair.  The depression in that example is the chronic

7  condition.  The learning of his wife's infidelity is the "why

8  now" factor.

9      So long-term depression, whatever biological or historical

10  factors that led to it, whatever comorbid issues are wrapped up

11  in it, are not included in the concept of "why now," which is

12  limited to the immediate trigger that precipitated the

13  aggravation of the preexisting condition.  And that,

14  Your Honor, is the very definition of "acuity."

15      Another way to know that why --

16      **THE COURT:**  So what's wrong with that?

17      **MR. GOELMAN:**  It's directly in conflict with the

18  testimony from UBH's employees that "why now" incorporates

19  everything under the sun.

20      **THE COURT:**  I see.

21      **MR. GOELMAN:**  I want to turn to another guideline.

22  This is Exhibit 148, 2015 Custodial Care and Inpatient

23  Residential Service CDG under the "Key Points."

24      Here we see under "Custodial Treatment" and then "Active

25  Treatment" -- can you go down a little bit more in "Active

1  Treatment," please -- a citation -- under "Improvement," a

2  citation to CMS Local Coverage Determination, and also for

3  "active treatment" a citation to CMS LCD, and then in the text

4  of "active treatment" in the bullet it says (reading):

5       "Active treatment is indicated by services that are

6    all of the following..."

7  And here the CMS Benefit Policy Manual, Chapter 2, is

8  cited.  Again, another example of a source that is distorted,

9  and this CDG is for Custodial Care and Inpatient Residential

10  Service, so it is not simply for inpatient.

11  Can you go to the top, please.  Right.

12  It's citing the CMS Psychiatric Inpatient Local Coverage

13  Determination, but this is a CDG that is supposed to apply also

14  to residential, and that gets into the difference in the ASAM

15  residential levels of care.

16  And Dr. Fishman explained when he was shown this CDG that

17  features of this level of care are akin to an ASAM Level 3.7,

18  which is the most intensive residential level of care for

19  substance use disorders; but Dr. Fishman also testified that

20  they're way too restrictive for lower levels, like 3.5 and 3.1.

21  And, again, contemporaneous evidence shows that not only

22  was Dr. Fishman right, but that UBH knew that he was right,

23  knew that they didn't comply with ASAM back at least until --

24  at least since 2013.

25  And Exhibit 412 at 13 is the Crosswalk that Dr. Alam got

1    from Mr. Shulman, and it shows -- and I think the Court

2    probably remembers this testimony -- Mr. Shulman gets the

3    guidelines, and he calls Dr. Alam up and he says, "Wait a

4    minute.  Where's the criteria for all the other residential

5    levels under ASAM?"

6         And Dr. Alam tells Mr. Shulman falsely that the plans

7    don't cover that.  And then UBH tells Connecticut, again

8    falsely, that its Level of Care Guidelines do provide for

9    coverage of the lower residential levels of care under ASAM.

10        So UBH tells its regulators one thing, its ASAM

11   consultants something else, and then comes here and tells the

12   Court something altogether different; meanwhile, its internal

13   e-mails show that it recognizes the truth.  And, yet, the

14   defendant still asks this Court for the benefit of the doubt,

15   still claims a defense of good faith.

16        It's not just the overemphasis on acuity, the failure to

17   adequately account for chronic conditions and comorbidities.

18   The guidelines violated generally accepted standards because

19   they had one set of criteria for everyone, including children

20   and adolescents.  But the evidence is that for the purpose of

21   mental health, mental illness, substance abuse, kids are not

22   just little adults.  This evidence is uncontroverted.  Children

23   present differently, and the treatment appropriate for an adult

24   may not be appropriate for a child with the same symptoms.

25        For this reason, those resources that everybody recognizes

1  as reflections of the generally accepted standards -- ASAM,

2  CALOCUS, CASII -- all of them have differing criteria for

3  children and adults.  UBH does not and this is not in dispute.

4      What is UBH's response?  They say they know how old the

5  beneficiary is and their care advocates or medical directors

6  take that into account somehow.  But how?

7      As Dr. Allchin conceded, there's nothing in UBH's

8  guidelines that tells the clinician to use the information

9  collected in a way that varies the coverage criteria from the

10  way they're used for adults.  That's a clear-cut departure from

11  the standard of care.  UBH should have separate guidelines for

12  kids or at least separate criteria for children.  They do not.

13  That's inconsistent with the generally accepted standards.

14      I mentioned earlier that if UBH thinks that the

15  evidentiary record in this case is consistent with its good

16  faith, it has a very different idea of the meaning of the term

17  "good faith" in most English speakers, but it's just one

18  example of the bizarre linguistic positions that we've heard

19  UBH and its witnesses adopt in this trial.

20      Their effort to defend the guidelines to persuade this

21  Court that the guidelines don't really mean what they say has

22  led UBH to the following bizarre interpretation of common

23  English phrases and words:

24      "Safely manage" has the same meaning as "effectively

25  treat," "clear and compelling evidence" actually means

1   "reasonably likely."  Time after time, witness after witness,

2   the Court asked about these strange new takes on the English

3   language, asked the witness why the guidelines said one thing

4   when they really supposedly meant something else; and time

5   after time, witness after witness, the Court didn't get a real

6   answer.  It got explanations like "Inartful drafting," or

7   "That's the colloquial reading," or halfhearted concession "I

8   wouldn't have written it like that," "I would approve that

9   edit"; and it got simple denials, "That's not how I read it,"

10  or, "I just disagree."

11      But one thing the Court has not gotten is a real answer.

12  Maybe counsel for UBH will have a coherent explanation in

13  closing argument, but we certainly haven't heard it from any of

14  the witnesses.

15      And another thing that we haven't heard from UBH is

16  details.  They can point to a lot of their doctors who they

17  called to the stand and testified that it was their opinion

18  that the guidelines conformed to generally accepted standards,

19  but that's not good enough.  You can't just incant the mantra

20  "In my opinion, this is consistent with GASC, in my opinion,

21  that is consistent with GASC" and expect that to have any

22  weight.

23      So what explains all this?  What explains UBH's extreme

24  departures from the generally accepted standards of care?  It's

25  actually not a big mystery.  The evidence has shown, as

1    Ms. Reynolds predicted in her opening statement, that UBH

2    consistently sacrificed the interests of its beneficiaries to

3    its own financial interests; that UBH, the desire to limit

4    ben-ex trumps all.

5         First, it's undisputed that UBH operated with a structural

6    conflict of interest.  It is directly at risk for benefit

7    expenses paid on its fully insured plans, and these plans are

8    administered under the guidelines that UBH itself writes and

9    maintains.

10         ERISA is clear that this isn't necessarily a problem but

11   that a faithful fiduciary should wall off the people making the

12   decisions from those concerned about financial considerations.

13   That's why insurance company clinicians no longer get bonuses

14   for the number of claims that they deny.  And there's no

15   evidence here that the individual care advocates and medical

16   directors working for UBH were incentivized by these kind of

17   goals, but that doesn't eliminate the conflict.  It just kicks

18   it upstairs.

19         The BPAC and the UMC had to approve the guidelines before

20   their use.  Minutes from these --

21         **THE COURT:**  Before you get to that --

22         **MR. GOELMAN:**  Yes.

23         **THE COURT:**  -- this argument doesn't apply to the

24   majority of plans; right?

25         **MR. GOELMAN:**  "Majority of plans" meaning the ASO

1    plans?

2         THE COURT:  Yeah, the ASO plans, which are the

3    majority of the plans at issue in these benefit determinations,

4    the majority of the benefit determinations, slight majority;

5    60 percent or 56 -- I can't remember what it is -- were

6    determinations under nonrisk plans, the ASO plans.

7         MR. GOELMAN:  UBH showed a slide in its opening, the

8    62-38 percent pie chart.  We had planned to show a slide that

9    showed 75 to 80 percent of the income came from the fully

10   insured plans.

11        I think that neither of those evidence --

12        THE COURT:  "Plan to" doesn't get you into the --

13        MR. GOELMAN:  I don't think they entered their

14   evidence either.  I don't think there's any evidence and the

15   record from the trial is devoid of those proportions.

16        THE COURT:  Well, is there -- okay.

17        There's no evidence of proportions.  There is evidence

18   that --

19        Okay.  Got it.

20        MR. GOELMAN:  At UBH the need to consider the impact

21   of guideline changes on ben-ex was not even controversial, it

22   was assumed; and the influence of the bottom line on the terms

23   of the guidelines was consistent, it was pervasive, not as UBH

24   has tried to portray it episodic and rare.  And, worse yet,

25   there's no reason to believe that it's not still going on.

1    Exhibit 556 is the minutes from October 26 UMC meeting

2    where a disturbing increase in monthly ben-ex was discussed.

3    That was a year ago, more than two years after this lawsuit was

4    filed.  And what's UBH's response?  Well, this committee does

5    more than just vote on changes to the guidelines; but that,

6    respectfully, is exactly the point.  The committee who has

7    oversight over the guidelines shouldn't be the same committee

8    that is closely monitoring ben-ex.

9    In any event, the committee is not the real issue.  The

10   issue is how UBH makes decisions when there's a conflict,

11   perceived or real, between the right answer clinically and the

12   right answer for the bottom line.  Here, the evidence is

13   completely one-sided.  When there's tension between clinical

14   judgment and the bottom line, the evidence shows that the

15   bottom line trumps every time.

16   You heard testimony about the way UBH manipulated the

17   extent to which it would cause its plan to cover TMS,

18   transcranial magnetic stimulation, and ABA for the reasons that

19   have nothing to do with clinical reasons.  It has nothing to do

20   with generally accepted standards of care and everything to do

21   with UBH's bottom line.

22   But perhaps no episode illustrates how completely

23   subordinated clinical considerations are to financial

24   considerations at UBH than the ASAM saga.  And I call it a

25   "saga" for a reason.  Three times during the class period UBH

1 considered adopting the ASAM criteria for making level of care

2 placement decisions for SUD patients.  Each time the senior

3 leadership, the nonclinical business leadership, made the

4 decision not to do so.  Each time that decision was based on

5 pure naked consideration of UBH's financial self-interests.

6     The episode that we have the most evidence about was the

7 2013-2014 consideration of adopting ASAM.  Then at that point

8 in time the course in support of adopting ASAM included Jerry

9 Shulman, UBH's consultant; SUDS Team 2, the ASAM subject matter

10 experts.  In fact, there was a consensus among all the

11 addiction psychiatrists at UBH that adopting ASAM would be a

12 good idea.

13     Here's Exhibit 430-002 from Dr. Rosenzweig to Dr. Triana.

14 It says, among other things, "I think there is consensus among

15 all the addiction psychiatrists that this would be a good

16 idea," referring to adoption of ASAM.

17     So everyone on the clinical side was on the same page.

18 This was a good idea clinically.  What was the opposition?

19 Again, concern about ben-ex.

20     Exhibit 382, please.

21     This is the minutes and agenda for the SUDS clinical

22 protocol meeting on June 10th, 2013, talking about the adoption

23 of ASAM.  There's a cost analysis impact on utilization

24 management and process, concern from leaders that we do due

25 diligence in an attempt to determine if any ben-ex impact.

1    So they weren't sure that it was going to have a huge

2 benefit -- a huge impact on ben-ex, but just the concern was

3 enough to block the adoption of criteria that was supported by

4 all the addiction psychiatrists.

5    What did the addiction psychiatrists do?  They knew that

6 the only way that ASAM would be adopted is if they could prove

7 to the higher-ups that there would be no impact on ben-ex or

8 that UBH would actually make money by adopting ASAM.

9    So someone had the idea "Let's do a pilot program."  This

10 is Exhibit 452, and it is a part of a deck for the SUDS team.

11 This is a clinical protocol project that Dr. Alam was in charge

12 of (reading):

13        "The issue is that there's no utilization ben-ex data

14        allowing meaningful comparison for ASAM versus Optum SUDS

15        criteria sets.  So what is the solution?  Let's do a test.

16        Collect relevant UM data with utilization and ben-ex

17        summaries at three- and six-month periods.  If utilization

18        is same or less for ASAM, continue rollout/expand pilot."

19    What was the plan if this pilot program utilization was

20 more for ASAM instead of being the same or less than for UBH's

21 guidelines?  The plan, as Dr. Alam conceded on the stand,

22 transcript at 1669, 1 through 5, was to abandon ship (reading):

23        "QUESTION:  Conversely, if utilization was more for ASAM,

24        then the rollout would not be continued, would not be

25        expanded, it would be terminated; correct?

1    **"ANSWER:** Yes."

2    Right there, that shows you all you need to know about

3   what trumps what at UBH.  This is a SUDS team document.  These

4   are the subject matter experts.  They support adoption of ASAM

5   and they know that if there's any negative impact on ben-ex,

6   the company won't do it.  It doesn't matter how many states,

7   professional groups, how many of their own clinical folks tell

8   them that it's the right thing to do, that ASAM is clinically

9   superior.  All that goes out the window.  All that has zero

10   impact if there is even the possibility that ben-ex could be

11   impacted.

12    Now, I said earlier that the Court shouldn't credit

13   Dr. Simpatico's testimony at all.  I actually want to amend

14   that because Dr. Simpatico did have a brief lapse into candor

15   when the Court was asking him about his opinion that "clear and

16   compelling" means "reasonably likely."

17    Dr. Simpatico said (reading):

18        "Well, I guess I would take a step back and say the

19        following:  Any practitioner worth their salt, if they are

20        referring to practice guidelines to conduct the art of the

21        practice of medicine, then that's a bigger problem.  So I

22        would not be looking at these documents to make clinical

23        judgments about how -- whether or not to discharge someone

24        to another level of care."

25    That was an extraordinary moment.  Defendant's principal

1  expert, their only independent expert, started working with UBH

2  on this case long before trial, that guy testified that he

3  wouldn't use the guidelines to make clinical judgments about

4  level-of-care decisions.

5      You know what?  That just means that Dr. Simpatico, while

6  he was an awful expert witness, is probably a pretty good

7  doctor because these documents that Dr. Simpatico dismissed

8  after spending two days extolling their virtue, these

9  guidelines, to use a legal term of art, they stink.  They

10  represent an extreme departure from the generally accepted

11  standards, they hamper the providers who care for UBH's

12  beneficiaries, and they do a grave disservice to the

13  beneficiaries themselves, the very people that UBH is supposed

14  to administer their plans solely for the benefit of.

15          THE COURT:  So you're done?

16      MR. GOELMAN:  I'm done, Your Honor.

17          THE COURT:  And how long do you think you're going to

18  go?

19      MR. RUTHERFORD:  Just one hour, Your Honor.  Give or

20  take a minute, but that's what I think.

21          THE COURT:  All right.  Okay.  Go ahead.

22                  **CLOSING ARGUMENT**

23      MR. RUTHERFORD:  Good morning, Your Honor.

24      UBH didn't breach its fiduciary duty to its members.  It

25  didn't wrongfully deny benefits to the class, not in any of the

1 years from 2011 to 2017, not under any of the plans, and not by
2 creating or using any of the guidelines.

3 UBH was granted discretion in each of the plans at issue.
4 In this case, to promulgate and apply guidelines for the
5 purpose of determining coverage for its members. UBH acted
6 within that discretion during each year at issue and under each
7 guideline.

8 The terms of the plans in this case define and limit
9 benefits sometimes in a manner that may differ from generally
10 accepted standards of care, and that's not a violation of
11 ERISA.

12 We're not limited by the terms of the plan. UBH had
13 discretion to create and use guidelines to make coverage
14 decisions. It was not required to adopt third-party guidelines
15 for every commercial member across the country, and it was not
16 required to use certain words. It was required to act in
17 accordance with the plans and its duties as a fiduciary, which
18 require faithfulness to the members but not perfection.

19 Much time was spent in this trial examining the specific
20 words and provisions within eight Level of Care Guidelines and
21 seven Coverage Determination Guidelines. Retained expert
22 witnesses and UBH's in-house clinicians focused on the words
23 and their provisions, their meanings, and their use. And the
24 evidence showed differences of opinions about the meanings of
25 many words and provisions and how they might be used by UBH's

1  clinicians and about whether the words and provisions were

2  consistent with the plans and generally accepted standards of

3  care.

4      But what the evidence also showed was that even with these

5  differences of opinion, UBH's promulgation and use of the

6  guidelines fell within its discretion; and that regarding the

7  specific words and provisions at issue in this case, which I'll

8  get to, UBH did not elevate its own financial interests above

9  the interests of its members and that it engaged in a process

10 that was intended to produce guidelines that were consistent

11 with generally accepted standards of care in the plans, and

12 that it did, in fact, produce guidelines that were consistent

13 with generally accepted standards of care in the plans.

14      Now, before trial began, the Court framed the issues to be

15 tried in this case with a number of key questions, and today

16 we're going to focus on six of those questions and we'll be

17 saving some of the others, Your Honor, for posttrial briefing.

18      Now, it was plaintiffs' burden to prove each of the

19 elements of each of their causes of action and then to prove a

20 right to the relief sought.  Plaintiffs haven't satisfied their

21 burden, including with respect to class-wide proof.

22      So what I'm going to do for the next hour is review the

23 evidence about the plans, I'll review what the law and the

24 evidence says about the standard of review that UBH believes

25 should apply, and then I'm going to address the guidelines

 1    challenged in this case, and then finally the process that UBH

 2    used to create and update those guidelines and how that

 3    demonstrates that UBH didn't abuse its discretion under the

 4    plans.

 5        Now, this case, as we said in our opening statement, is

 6    about UBH's obligations under the terms of a thousand health

 7    benefit plans.  It's the plans that govern a class member's

 8    right to coverage and it's the plans that govern plaintiffs'

 9    claims.

10        111 of those plans came into evidence in this case, and

11    three of the Court's questions, pretrial questions, speak

12    directly to what the written terms of those plans say.

13        First, did the plans of the class provide coverage for

14    treatment that's within generally accepted standards of care?

15        Second, were the guidelines at issue inconsistent with the

16    plans?

17        Third, was UBH acting as a fiduciary when it promulgated

18    the guidelines at issue or was it just acting as a settlor?

19        Now, like ERISA itself, we'll begin today by focusing on

20    what the evidence showed about the plans in each one of these

21    threshold questions.  So let's go to the first question.

22        Did the plans of the class provide coverage for treatment

23    that's within generally accepted standards of care?  The

24    evidence in UBH's opinion is uncontroverted.  The plans do not

25    provide coverage for all treatment that's within generally

1   accepted standards of care.

2       In a case about whether UBH abused its discretion in

3   interpreting the class members' plans, plaintiffs gave the

4   Court no evidence about what the plans mean.  Instead, the only

5   evidence the Court heard from plaintiffs about the plans is

6   that specific phrases relating to generally accepted standards

7   of care appear on specific pages and in specific sections of

8   each of the plans at issue -- I mean, I'm sorry -- each of the

9   plans that are actually in evidence.

10      **THE COURT:**  Do you agree that it is a necessary but

11  not sufficient condition to coverage under all of the plans

12  that the treatment at issue be consistent with generally

13  accepted standards of care?

14      **MR. RUTHERFORD:**  Yes, Your Honor.  It's one condition

15  but not the only condition.

16      **THE COURT:**  So every plan, every plan requires as a

17  condition -- not the only condition, there are other

18  conditions, there are other exclusions -- requires that the

19  treatment at issue be consistent with the generally accepted

20  standards of care?

21      **MR. RUTHERFORD:**  Yes.  And I'm going --

22      **THE COURT:**  And the generally accepted standards of

23  care in terms of level of treatment are defined by UBH in its

24  Level of Care Guidelines?

25      **MR. RUTHERFORD:**  Yes.

 1        **THE COURT:**  Okay.  Thank you.

 2        **MR. RUTHERFORD:**  Now, through the testimony of their

 3   summary witness, Ms. Duh, plaintiffs offered evidence that each

 4   of the plans included specific phrases relating to generally

 5   accepted standards of care; but Ms. Duh did not offer any

 6   expert testimony about what the plans mean, the specific

 7   phrases -- what the specific phrases she identified mean, and

 8   how those phrases regarding generally accepted standards of

 9   care fit within the plans, or whether the plans cover all

10   treatment that's consistent with generally accepted standards

11   of care.

12        By contrast, UBH offered the testimony of Barry Dehlin,

13   director of product strategy for UnitedHealthcare.  Mr. Dehlin

14   is the only witness in this case who testified about what the

15   plans mean, including the specific aspects of the plans that

16   are relevant to the issues in this case.

17        Mr. Dehlin confirmed that there is no requirement that the

18   plans cover all treatment that falls within the scope of

19   generally accepted standards of care.

20        Mr. Dehlin further explained that in order to understand

21   what is covered under the plans, one would need to look -- I'm

22   sorry, Your Honor -- one would lead -- I'm sorry -- one

23   would --

24        **THE COURT:**  So I don't think anyone disputes what

25   you're saying.

1    **MR. RUTHERFORD:**  I need to get some water.

2    **THE COURT:**  Yes.  Go ahead.  Please.

3    So while you're taking care of that, I don't think anyone

4    disputes what you're saying.  I don't think anyone disputes the

5    notion that the plans do not have coverage, all of them, for

6    all treatment that is within generally accepted standards of

7    care.  No one disputes that.

8    **MR. RUTHERFORD:**  Okay.

9    **THE COURT:**  The question is not that.  The question is

10   the one that you answered, which is it's a condition that it be

11   generally accepted standards of care.  There are others.

12   Now, there are other exclusions.  Why does that matter to

13   me that there are other conditions to coverage or there are

14   other exclusions?  Why do I care?

15   **MR. RUTHERFORD:**  Well, it's going to matter in part

16   because of the issue of class-wide proof, Your Honor.  So --

17   **THE COURT:**  Go ahead.

18   **MR. RUTHERFORD:**  So -- and I'm -- so back to

19   Mr. Dehlin.  So Mr. Dehlin further explained that in order to

20   understand what's actually covered to this point, one would

21   need to look at five factors:  The covered services section of

22   each of the plans; the excluded services section of each of the

23   plans; the definition section of each of the plans; and for any

24   additional riders to those covered services, exclusions, and

25   definitions; and any additional amendments to those covered

1    services, exclusions, and definitions.

2        Plaintiffs argue that the plans require guidelines that

3    are consistent with generally accepted standards of care; to

4    the Court's point.  But plaintiffs didn't offer the class-wide

5    proof to support this argument that each applies in the same

6    way to each class member because of the differences in the

7    plans that the plaintiffs didn't put into evidence.

8        **THE COURT:**  I don't understand that argument at all.

9        Plaintiffs' argument here is that one of the conditions --

10       **MR. RUTHERFORD:**  Yes.

11       **THE COURT:**  -- not a sufficient condition for

12   coverage, but a necessary condition, as you just said, is that

13   it be a generally accepted standard of care treatment.  You

14   define it through your Level of Care Guidelines.  That's what

15   UBH does.

16       Their point is that if you're going to give guidance to

17   the people making coverage determinations on what is generally

18   accepted standards of care, it better be generally accepted

19   standards of care; not that there is actually coverage.

20       And I decided early on that they don't have to show that

21   there's actually coverage for any particular person or any

22   particular this or any particular that.  Right?

23       So I don't know why it matters that to decide, ultimately,

24   what the coverage is I have to go through the plans.  Of

25   course.  That's how do you insurance.  You'd have to go through

1  every plan and figure out for a particular treatment whether or

2  not it's a covered service as defined by the plan; it's not an

3  excluded one, and there aren't any riders that change it.  Of

4  course.

5      But why do I have to go through any of that in this case?

6      **MR. RUTHERFORD:**  I'm going to get to this later with

7  custodial care, but custodial care is a definition defined by

8  the plan.

9      And with respect to custodial care, we're going to point

10  out that the definition of custodial care is essentially a

11  plan-defined benefit.

12      **THE COURT:**  So let me ask you about that.

13      What are CDGs?

14      **MR. RUTHERFORD:**  They are the coverage determination

15  guidelines that are used when there is not a medical necessity

16  provision in the health plan.

17      **THE COURT:**  Okay.  And I'm not sure what you mean by

18  there's no medical necessity condition in the health plan,

19  since all of the plans require that the treatment be, as a

20  condition, consistent with medical necessity.  I mean, I have

21  no idea what that means.

22      But the CDGs don't apply to every healthcare plan; that's

23  right.

24      **MR. RUTHERFORD:**  Right.

25      **THE COURT:**  Doesn't apply, for example, to the ASO

1  business.  Is that right?

2  **MR. RUTHERFORD:**  That I don't know the answer to, Your

3  Honor.  Somebody else might, but I don't.

4  **THE COURT:**  The certificates of coverage that are

5  quoted in the CDGs, that's all for the risk business.

6  **MR. RUTHERFORD:**  That's true, Your Honor, yes.

7  **THE COURT:**  So to the extent the CDGs are drawn from

8  the actual plan language, as quoted in the CDGs --

9  **MR. RUTHERFORD:**  Yes.

10  **THE COURT:**  -- it's not from the ASO business; right?

11  **MR. RUTHERFORD:**  Yes, Your Honor.

12  **THE COURT:**  Just from the CDGs, just from the risk

13  business.  That's right.

14  **MR. RUTHERFORD:**  Yes.

15  **THE COURT:**  So, I guess, my concern is that I don't

16  understand the role that you see, this differing role for the

17  CDGs and the -- and the Level of Care Guidelines, because the

18  plans all have some reference to the generally accepted

19  standards of care in the plans.

20  **MS. ROMANO:**  Your Honor, might I provide a little bit

21  of detail on this one?

22  **THE COURT:**  Sure.

23  **MS. ROMANO:**  First of all, I want to just clarify that

24  ASOs, the self-insured plans, are also under ERISA.  So the

25  ASOs and fully insured plans are both under ERISA.

1        **THE COURT:**  Of course.  I understand that.

2        **MS. ROMANO:**  And, for the most part, United Healthcare

3    plans during certain periods of time included certain language

4    in them for which it --

5        **THE COURT:**  You mean the risk business.

6        **MS. ROMANO:**  I'm sorry -- well, all risk business is

7    not necessarily United Healthcare business.

8        **THE COURT:**  Okay.  You mean both kinds of plans.

9        **MS. ROMANO:**  Yes.

10        But for some fully insured plans, where United Healthcare

11    was providing the medical and surgical benefits, UBH was

12    managing those for them, fully insured.

13        For many of those plans, during certain periods of time

14    their was certain language in those plans that would then

15    dictate the coverage determination guidelines would be used for

16    making decisions under those plans.

17        For ASOs or self-insured plans, some of them also came

18    through United Healthcare, also used some of the same language,

19    and also would have resulted in coverage determination

20    guidelines being used as well.

21        And there was certain language that would trigger whether

22    a level of care guideline or a coverage determination guideline

23    would be used for the plans.

24        I don't have the number with me right now, but my

25    understanding is it's approximately half of the plans for the

1  class members at issue in this case used coverage determination

2  guidelines, and half used -- or half of the class members had a

3  coverage determination guideline used, and approximately half

4  had a level of care guideline used.

5        **THE COURT:**  So, I guess, I'm still a little confused.

6      The CDGs that were -- we've gone through and are in

7  evidence all quote from certificates of coverage.  Those

8  certificates of coverage are for the risk business -- right? --

9  not for the ASO business.

10        **MS. ROMANO:**  The actual language they are quoting

11  there, where it says "COC," that refers to a certificate of

12  coverage, which would be a fully insured plan.

13        **THE COURT:**  Okay.

14        **MS. ROMANO:**  Although, there are some ASOs or

15  self-insured plans that would have had similar language and

16  that might have, because of language in the plan, driven the

17  use of a CDG versus a level of care guideline.

18        **THE COURT:**  All right.  Thank you.

19      Okay.

20        **MR. RUTHERFORD:**  And this leads to the Court's next

21  question:  Were the guidelines at issue inconsistent with the

22  plans?

23      And we just discussed that the plaintiffs didn't offer any

24  evidence about what the plans mean or what the plans require.

25      But even if the Court considers the testimony and summary

1  evidence of Ms. Duh -- who was the witness, Your Honor, who put

2  together the summary for the plaintiffs -- plaintiffs didn't

3  offer any evidence about whether or not the guidelines are

4  consistent with the plans.

5      The plaintiffs called two experts mentioned just a moment

6  ago by Mr. Goelman.  And that is Dr. Fishman and Dr. Plakun.

7  But neither of those experts offered any opinions about whether

8  or not the guidelines are consistent with the plans.  And both

9  of them conceded that neither one of them had reviewed the

10  plans in preparation for their expert testimony in this case.

11      THE COURT:  I wish I had those pictures.

12  (Laughter)

13      THE COURT:  No, it helps, you know, to get a visual.

14      But you just admitted that all of the plans require, as a

15  condition of coverage, that the treatment be consistent with

16  generally accepted standards of care.  It's not a big

17  admission.  It's what you had to say.

18      And they testified that the guidelines were inconsistent

19  with the generally accepted standards of care.  Why isn't that

20  enough?  Why do they have to go down to the plan level?

21      MR. RUTHERFORD:  Well, back -- it's essentially back

22  to the point I made a few moments ago, Your Honor, which is

23  that with respect to what is covered -- that essentially

24  there's going to be a difference, depending upon the plan, as

25  to what ends up getting covered --

1    **THE COURT:**  Again, why do I care what's being covered?

2    **MR. RUTHERFORD:**  I think again, Your Honor, this goes

3    to the issue of whether or not the claims are being proven on a

4    class-wide basis.

5    So, for instance, if the definitions of custodial care or

6    coverage for maintenance of long-term care, or the like, change

7    within the plans, I believe that that is important for the

8    analysis of whether or not the plaintiffs have proven the class

9    wide -- made --

10    **THE COURT:**  Why?

11    **MR. RUTHERFORD:**  I'm sorry, Your Honor.

12    **THE COURT:**  Why?  I don't understand.  Their

13    class-wide proof is this:

14    All the plans require that, as a condition of coverage,

15    that the treatment be in accordance with generally accepted

16    standards of care.  That's every plan.  Everybody stipulated to

17    that.

18    Second, these are the Level of Care Guidelines.  They're

19    not consistent with generally accepted standards of care.

20    Third, the Level of Care Guidelines are incorporated into

21    the CDGs.

22    Fourth, the Level of Care Guidelines and the CDGs were

23    applied in denying these 212, and these seven or eight, were

24    applied in denying all of these.

25    That's their class-wide proof.  Why do I have to go down

1    to the level you're talking about and talk about whether or not

2    in a particular plan there's coverage?  Or a particular

3    service?

4        This is -- as you always said, this is a facial challenge.

5    And no one has put in any evidence about a particular person's

6    denial being wrongful because there was, in fact, coverage.

7        This is about the process used.  That's what this case is

8    about.  It's about the process used.

9        Why do I care that, yes, insurance plans are complicated?

10       **MR. RUTHERFORD:**  Well, I may just save this point for

11   post-trial briefing, Your Honor.

12       But I think the basic point we are making -- and maybe we

13   will just need to persuade the Court in writing -- is that the

14   limits, the varying limits, limitations and language within the

15   plan -- within the plans, do make a difference with respect to

16   the plaintiffs' ability to meet their burden on class-wide

17   proof.

18       **THE COURT:**  You keep saying that.  You don't have the

19   slightest answer to me what that means.

20       **MR. RUTHERFORD:**  Number one --

21       **THE COURT:**  What class-wide proof do they need that

22   they don't have?  What do they need to show for the class that

23   you think they don't show?

24       **MR. RUTHERFORD:**  To take a definition like custodial

25   care and have that definition be consistent you, if that's what

1    they are going to claim is inconsistent with generally accepted

2    standards of care, to have that definition be consistent

3    through all 111 plans at issue.

4        To take the definition of coverage for maintenance or

5    long-term care, or the definition of less intensive or more

6    cost effective alternatives, or whether there is residential

7    treatment available under a plan to be consistent.

8        **THE COURT:** Why? I guess I don't understand any of

9    that. That makes no sense to me.

10       Here's where I think the flaw is: The only way I think

11   you can make this argument is by saying that, actually, the

12   language of the guidelines -- and I think you have made this

13   argument -- the CDGs are driven by individual plan language

14   from year to year.

15       **MR. RUTHERFORD:** That would be true.

16       **THE COURT:** True, false, I don't know.

17       **MR. RUTHERFORD:** That's the position.

18       **THE COURT:** That's the position.

19       That's the only thing that makes any sense to me about

20   whether or not -- and I think the plaintiffs are going to have

21   to answer that question. Why should I examine the coverage

22   determination guideline for custodial care when the custodial

23   care guideline says that it draws its language from a coverage

24   determination -- from a certificate of coverage?

25       That's the problem for the plaintiff with that one. And

1  I'm not sure what the answer is other than that they will say

2  this, they will say this:

3      It's also a condition of every one of those plans that you

4  go through a process to satisfy one condition -- that is to

5  say, the treatment is consistent with generally accepted

6  standards of care -- and that the way in which you do that is

7  through the Level of Care Guidelines, either directly, because

8  you refer to them and you look at them, or through the

9  incorporation in the CDGs.

10     And that the Level of Care Guidelines language is not --

11  there is no testimony that that's driven by the plan language,

12  by the plan exclusions, et cetera.  The Level of Care

13  Guidelines are to help the practitioner decide what is, in

14  their clinical judgment, within the generally accepted

15  standards of care.  Then they go to the other steps, through

16  the rest of the CDG, which may be driven by plan language.

17     But that's -- that's their proof.  That's their proof.

18  Why do they need to do more than that?  Why do they need to say

19  anything about the individual plan language for custodial care?

20     It's not your usual closing argument, I guess.

21     (Laughter)

22     **MR. RUTHERFORD:**  I know.  Much like this trial, it

23  might not be the one I planned for.

24     **THE COURT:**  Right.

25     **MR. RUTHERFORD:**  Maybe I'll just say this and then

1   move on to the next point.

2       Our position is that to prove the breach of fiduciary duty

3   in denial of benefits, the benefits must actually deny

4   benefits -- never mind, Your Honor.  I'm just going to move on

5   to the next point.

6       **THE COURT:**  Let me ask one other question.  I want to

7   make sure one thing is true.

8       You're not arguing that they had to put in evidence on all

9   1,000 plans.

10      **MR. RUTHERFORD:**  No.

11      **THE COURT:**  If they had to prove up anything about

12  individual plans, we all agree that it can be proved up through

13  the sample plans that are in evidence; and that will be taken

14  as a representative sample for the entire class.

15      Do we agree to that?

16      **MS. ROMANO:**  With one clarification.

17      When we did the discovery stipulation, and whatnot, we did

18  not agree it was a representative sample.  But given the

19  Court's remarks at the pretrial conference, with respect to the

20  fact that we only produced what we produced, that this trial

21  and the decisions in it would be limited to those plans at

22  issue and those that were admitted in this trial.

23      **THE COURT:**  So I'm not sure.  If that's an actual

24  caveat, I'm not accepting it.  That's an explanation for how we

25  got there.

 1          But I want to make sure that right now UBH is stipulating

 2     that to the extent that there are any individual plan issues,

 3     they have to be decided.  And the plans are in.  And the plans

 4     are in even -- you have to look at them for plaintiffs' case

 5     even in their high-level case; right?  You have to show the

 6     provision that talks about generally accepted levels of care,

 7     or whatever it is.

 8          We can look at, for any issue that regards individual

 9     plans, the sample that was put into evidence is binding on UBH

10     for the entire class.

11          That is to say, I don't have to look at -- that the only

12     argument will be that sample; it will not be about outside the

13     sample.  And that the sample is, for all purposes, a

14     representative sample of the entire class.

15               **MS. ROMANO:**  For purposes of this case, yes.

16               **THE COURT:**  For purposes of this case.  The other

17     cases I don't care.

18          (Laughter)

19               **THE COURT:**  Okay.  Thank you.

20          **MR. RUTHERFORD:**  Okay.  Then let me just put this

21     final statement on the record, Your Honor, and then I'm going

22     to move on.

23          So our position on this, for the record, would be that to

24     prove a breach of the fiduciary duty and denial of benefits

25     there must be proof that there was an actual denial of benefits

1    in breach of the actual plans.

2        I think that is the concept --

3        **THE COURT:**  No, you've said that from the beginning.

4    I understand that.

5        **MR. RUTHERFORD:**  All right.

6        Now, to the standard of review for evaluating the claims.

7        **THE COURT:**  Yeah.

8        **MR. RUTHERFORD:**  There's going to be some law in here,

9    Your Honor, that I'm going to cite just because I'm used to

10   jury instructions.  And this was the -- sort of the best way

11   that we could come to formulate it.  But we will be briefing

12   these issues as well.

13       Now, as Mr. Dehlin explained, the plans in evidence give

14   UBH discretion to interpret their plans.  And, accordingly, the

15   standards of review, in our view, is, for all plaintiffs'

16   claims, abuse of discretion.

17       This deferential standard of review is critical because it

18   provides the lens through which all of the evidence must be

19   viewed.

20       We submit that the question for this Court is not whose

21   interpretation of the plans is most persuasive or whether or

22   not the Court would have interpreted the plans differently or

23   even written different guidelines, and not whether the

24   guidelines are a perfect reflection of generally accepted

25   standards of care.

1    The question, in our view, is whether or not UBH's

2  interpretation of each of those plans is reflected in the

3  guidelines as an abuse of discretion.  In other words, whether

4  it was unreasonable, or however the law states that -- that

5  particular definition.

6         **THE COURT:**  "However the law states that."

7         **MR. RUTHERFORD:**  Well, there's different cases.

8    But the case that I have, for instance, on the -- on the

9  screen, which is not the only case on point, is that the

10  question is whether the administrator's interpretation was

11  illogical, implausible, or without support, and inferences that

12  may be drawn from facts in the record.

13    And I think there's similar language in other cases.  But

14  the idea behind it is that it's an abuse of discretion.

15         **THE COURT:**  Right.

16         **MR. RUTHERFORD:**  Plaintiffs argue that the Court

17  should apply a significant amount of scepticism -- I don't know

18  exactly what the phrase Mr. Goelman used was -- but some

19  scepticism to UBH's exercise of discretion, because UBH had a

20  conflict of interest that systematically incentivized UBH to

21  create restrictive guidelines.

22    So that leads us to the Court's next question which was:

23  Did UBH operate under a conflict of interest when it

24  promulgated the guidelines and/or denied the benefits to the

25  class?  And did that conflict, if any, affect the decision

1    promulgating or using the guidelines?

2        Now, to the question that the Court asked before, with

3    respect to the conflict -- and I'm going to talk about in a

4    second -- that is a conflict that does exist only with respect

5    to the fully insured plans.

6        But, as the Court pointed out -- I think it might have

7    been during opening statements -- the guidelines are written

8    for all of the plans, both the fully insured and the

9    self-insured.

10       **THE COURT:**  So that means the conflict applies to all

11   of the guidelines; right?

12       **MR. RUTHERFORD:**  We're essentially going to -- the

13   Court can draw that, but we're -- we're going to assume, in the

14   comments that I make right now, that they do.

15       **THE COURT:**  Okay.

16       **MR. RUTHERFORD:**  And the question here has two

17   components:  The first, whether or not UBH has the conflict of

18   interest in the sense that it acted in the dual role of

19   administering the benefits and funding the ERISA plan.  And as

20   I've just said, with respect to the fully insured it did, which

21   is not unusual, as the Court probably knows, from managed care

22   companies.

23       But the fact that UBH operated under this structure of

24   conflict of interest with respect to its fully insured plans

25   doesn't by itself change the standards of review.

1    In fact, for managed care companies like UBH, structural

2  conflict of interests like this can be mitigated by the fact

3  that most or all of the cost is passed on to others.  And

4  plaintiffs bear the burden of proving that this structural

5  conflict of interest actually affected the content of the

6  guidelines at issue in this case.

7    And this is why the second component of the Court's

8  question is so important.  Did the conflict, if any, the

9  structural conflict, affect UBH's decision in promulgating or

10 using the guidelines?

11   Now, of course, UBH considers and the evidence shows that

12 benefit -- considers benefit expense and utilization trends

13 such as average length of stay.  Plaintiffs say it's a bad

14 thing.  UBH contends that it's not.

15   The Court heard evidence from UBH's witnesses confirming

16 that it's not only appropriate but necessary for UBH, as a

17 company, to be aware of the costs of providing services.  In

18 fact, UBH has a fiduciary duty under ERISA to defray reasonable

19 expenses of administering the plans.

20   UBH also has a fiduciary duty to enforce plan terms,

21 including plan terms that relate to -- that require UBH, I'm

22 sorry, to consider the cost of services.

23   Now, as Dr. Brock, UBH's former senior vice president of

24 affordability explained, UBH is a managed care company.  And

25 part of its job is to manage costs.  That's what employers hire

1   UBH to do.

2       As Dr. Triana testified, employers consider cost among

3   other things when choosing a plan, and they expect to know how

4   much the product they are purchasing will cost.  That's the

5   healthcare system that we have in this country.

6       And this isn't just something that UBH focuses on.  The

7   idea of managing costs in healthcare is a national focus, seen

8   directly through CMS and the triple aims of managed care:

9   improving quality, improving outcomes, and reducing costs.

10      According to Dr. Brock, UBH focuses on developing and

11  implementing solutions to service system problems that address

12  the triple aims.

13      Dr. Brock testified, UBH employees' data about

14  utilization, including average length of stay, benefit expense,

15  and readmission rates, among other things, formulate healthcare

16  quality and affordability initiatives or service system

17  solutions to better serve members and reduce cost, waste, and

18  fraud.

19      UBH's solutions and initiatives are not just about

20  watching costs; which, again, is one of the triple aims.  But

21  they focus on promoting evidence-based care to improve quality.

22  That has an added benefit of reducing costs because, as

23  Dr. Brock explained in his testimony, improving quality reduces

24  the cost of care.

25      Now, in contrast, plaintiffs offered no evidence that it's

1  improper or inappropriate for UBH, as a company, to consider

2  benefit expense or average length of stay.

3      **THE COURT:**  Let's talk about that.

4      **MR. RUTHERFORD:**  Yes, Your Honor.

5      **THE COURT:**  You know that's always an introduction to

6  a question.

7      (Laughter)

8      **MR. RUTHERFORD:**  Okay.

9      **THE COURT:**  So, you know, I don't know that I disagree

10  with anything you said in the last couple of minutes as a

11  general proposition.

12      **MR. RUTHERFORD:**  Yes, Your Honor.

13      **THE COURT:**  But the proposition here is very specific.

14  It is:  In determining whether or not the generally accepted

15  level of care, the treatment level that is proposed, is

16  consistent with generally accepted level of care, as required

17  by the plans, in deciding -- making that interpretation, you're

18  not allowed to consider costs in deciding that.  That's not a

19  benefit.  That's not a decision of coverage.

20      The plan says one condition of coverage is it shall be

21  consistent with generally accepted; or it's exclude, it's not

22  consistent with generally accepted standards of care.

23      In deciding that issue -- what is the generally accepted

24  standard of care, and does this fall outside the generally

25  accepted standard of care, putting in a residential program,

1  3.7, 3.5, whatever it is -- you don't get to consider money

2  when you're doing that, do you?

3      **MR. RUTHERFORD:**  Well, first of all, I don't think

4  that -- I'm going to explain in a second, the evidence in this

5  case was very specific with respect to when benefit expense was

6  considered.

7      And with respect to the -- and I'll get to this in a

8  moment, but with respect to the guideline provisions at issue

9  in this case, as opposed to other guideline provisions that

10  aren't, we would submit that the evidence does not show that

11  benefit expense or average length of stay was considered.

12      **THE COURT:**  What about ASAM?

13      **MR. RUTHERFORD:**  Well, I'm going to talk about --

14      **THE COURT:**  That's the one I think you have the

15  biggest problem with, is that the ASAM is about adopting those

16  guidelines for -- to determine level of care you made a

17  decision not to adopt them on several occasions.  And it looks

18  like, from the evidence, that you clearly decided not to adopt

19  them -- or at least your concern in whether to adopt them was

20  driven in part by money.

21      **MR. RUTHERFORD:**  I believe what the evidence will

22  show -- and I'll get to that in just a second, Your Honor -- is

23  that the decision not to adopt ASAM was a decision that was

24  based at least in part -- and this is what the evidence showed,

25  I'd submit -- because the benefit expense could not be

1    determined.

2         And the evidence further showed that it was important,

3    given the fact -- well, it was -- it was important for UBH to

4    be able to convey to its customers the health plans, whether or

5    not there would be a benefit expense change.

6         Now, there was -- I'm sorry, Your Honor.

7              **THE COURT:**  I don't know how that works.  What were

8    you considering adopting ASAM as?

9              **MR. RUTHERFORD:**  Wholesale change to essentially an

10   entire business model.

11        So if you look at the Level of Care Guidelines, you would

12   take out that whole second section.

13             **THE COURT:**  Right.  And put in ASAM.

14             **MR. RUTHERFORD:**  Right.

15             **THE COURT:**  So you were going to replace part of the

16   level of care guidelines?

17             **MR. RUTHERFORD:**  Yes.

18             **THE COURT:**  Wholesale with ASAM?

19             **MR. RUTHERFORD:**  Yes, Your Honor.

20             **THE COURT:**  Okay.  Why, in deciding whether or not

21   ASAM should be put in, because it is consistent with the level

22   of care, generally accepted standards of care, do you get to

23   include in that question money in the formula?  Right?

24        The Level of Care Guidelines are just used -- they're not

25   used to determine the ultimate decision on whether somebody

1   gets a benefit.  They are the first step.  They are a necessary

2   but not sufficient condition.  Is this consistent with

3   generally accepted standards of care?

4        You look at the various choices and you decide, we'll put

5   this in; we won't put that in.  One suggestion is, let's put

6   ASAM in because it's the gold standard for generally accepted

7   standards of care.

8        Why, in deciding whether or not something is within the

9   generally accepted standard of care, do you ever get to

10  consider money?

11           MR. RUTHERFORD:  Because if you have a thousand health

12  benefit plans that you're working with, some percentage of

13  which are going to incur the cost of any change to the extent

14  that there is a change upward, and the others -- will incur the

15  cost directly by having to pay the benefits.  And then the

16  other whatever the percentage is of the plans, will potentially

17  see that cost in a premium.  I think it is reasonable, given --

18  it is reasonable for United Healthcare to be able to calculate

19  the impact from a financial standpoint, to be able to

20  communicate to the plans whether there's going to be an effect;

21  and, if so, what is it likely to be.

22           THE COURT:  And to turn it down if it's going to be an

23  increase.  Because that's the import -- that's what Dr. Alam's

24  committee thought.  He thought if -- if it was going to be an

25  increase in ben-ex, it was going to be an increased financial

1   burden, we're stopping.  Right?

2       MR. RUTHERFORD:  The testimony that he gave, which we

3   saw in the transcript this morning, is the testimony that he

4   gave.

5       The analysis, as I saw it, was that -- or what I believe

6   the evidence showed, was that in each instance the calculation

7   as to whether or not to adopt ASAM was a clinical one; that the

8   understanding of the clinicians within UBH, at least the

9   clinicians who are speaking to the cross walk that Mr. Shulman

10  created, was that but for the identified levels of care at -- I

11  don't remember, 3.5 and 3.1, that their criteria were otherwise

12  consistent with ASAM.  So that's what begins the discussion.

13      The next stage is to be able to calculate, because you

14  have to be a responsible business to your customers, meaning

15  the plans, is there going to be a difference?

16      And I think it is reasonable for UBH to have taken the

17  position that we need to be able to understand if there's a

18  difference so that when somebody asks, we can say more than,

19  well, our doctors looked at the ASAM Criteria and our own

20  criteria, and they think it's going to be the same.

21      THE COURT:  Let's assume you're right, that they are

22  allowed to do that.  What are the implications of that

23  position?

24      That means, in your view, in deciding whether something is

25  within the generally accepted standard of care, as required by

1  a condition of coverage of the plan, you are always allowed to

2  evaluate benefit expense.

3          **MR. RUTHERFORD:**  I'm saying, Your Honor, that --

4          **THE COURT:**  Isn't that -- I know what you're saying.

5  But if you can examine benefit expense with respect to this

6  change in whether something is within generally accepted

7  standards of care, the next change for generally accepted

8  standards of care will judge not just by whether or not it's

9  generally accepted standards of care, it's by whether it costs

10  more money.

11      You're saying you're always allowed to do that.  Is that

12  right?

13          **MR. RUTHERFORD:**  What I'm saying --

14          **THE COURT:**  Is that right or wrong?

15          **MR. RUTHERFORD:**  No, Your Honor, that's not right.

16      What I'm saying right now --

17          **THE COURT:**  Why isn't that the necessary implication

18  of what you just said about ASAM?

19          **MR. RUTHERFORD:**  Because here we have -- this needs to

20  be put into context.

21      There were only three instances where the evidence in this

22  case pointed to benefit expense consideration:  TMS, which is

23  not at issue; ABA, which is not at issue; and ASAM.

24      ASAM, the evidence, at least from the standpoint of UBH,

25  is that both the UBH guidelines and ASAM were consistent with

1    generally accepted standards of care.

2         So this was not to move to a new set of criteria that was

3    consistent --

4         **THE COURT:**  Well, that's not what he said.  That's not

5    what Shulman said.  It's not even close to what Shulman said.

6         **MR. RUTHERFORD:**  It may not have --

7         **THE COURT:**  Shulman had 50,000 changes to them.  Maybe

8    not as many as the plaintiff would have liked, but a lot of

9    changes.  There was a big red line -- a blue-line document

10   which had lots of changes; and he said that it was inconsistent

11   with ASAM because you don't do this and you don't do this and

12   you don't do this.

13        Fine.  It's not -- it's not just we're adopting something

14   that is, oh, we're obviously compliant, and they're obviously

15   compliant, so it doesn't matter because we're consistent with

16   ASAM.  That's not what he said.

17        **MR. RUTHERFORD:**  That's not what he said, but that's

18   what our people said, Your Honor.

19        And there may be a disagreement in the evidence, but the

20   UBH clinicians each testified that it was their understanding

21   that the ASAM Criteria was consistent with generally accepted

22   standards of care, and that the UBH criteria was consistent

23   with generally accepted standards of care.

24        They may have differed, but they didn't differ, at least

25   in terms of the testimony of any of the witnesses that UBH

1    presented, such that one was consistent with generally accepted

2    standards and one wasn't.

3         **THE COURT:**  Okay.

4      What else have you got?

5         **MR. RUTHERFORD:**  I think that the -- we're going to

6    focus in a moment -- and certainly plaintiffs did in their

7    closing argument -- on a number of flaws in the guidelines,

8    purported flaws in the guidelines; none of which was connected

9    to any testimony of benefit expense; none of which -- no

10   changes of which were subjected to any of -- any such financial

11   analysis.

12      With respect to the emails, with respect to the testimony,

13   with respect, you know, to the documents that we read, nothing

14   about "acute" being tied to benefit expense.  Nothing about

15   "why now" being tied to benefit expense, or custodial or active

16   treatment or child and adolescent care.

17      And we would submit, given this, given that those

18   financial considerations were not tied to any of the actual

19   guideline issues -- I mean, guidelines at issue in this case,

20   that standard of review should be abuse of discretion without

21   much, if any, scepticism being applied.

22         **THE COURT:**  Got it.

23         **MR. RUTHERFORD:**  Which brings us to the guidelines.

24      The Court's next question was:  Did the guidelines at

25   issue contain restrictions that would not allow treatment

1    that's within generally accepted standards of care?

2        And we'll start with the coverage determination

3    guidelines.

4        May I get another water, Your Honor?

5        **THE COURT:**  Yeah.

6        **MR. RUTHERFORD:**  Now, other than the custodial care

7    guidelines, which I'll talk about in a second, which were

8    discussed at length in this trial, plaintiffs challenge 209

9    different coverage determination guidelines that were admitted

10   into evidence on the first day of trial.

11       And on that same day, plaintiffs introduced Exhibit 880,

12   which was discussed a little bit earlier, which is a

13   stipulation that included a chart of each of the 209 coverage

14   determination guidelines that categorize how, if at all, each

15   of these coverage determination guidelines reference one or

16   more Level of Care Guidelines.

17       And I think for purposes of the Court's questions earlier,

18   I will refer to a couple of the columns in Exhibit 880.

19       **THE COURT:**  Just remind me what they mean when you go

20   through.

21       **MR. RUTHERFORD:**  Yes, Your Honor.  So I should have it

22   in -- let me just get my binder.

23       **THE COURT:**  Yeah.

24       **MR. RUTHERFORD:**  Set forth in the declaration that is,

25   just for the record, a declaration that is included in -- or

1   it's a stipulation that's included in 880.  The lettered

2   paragraphs on page 8, at Trial Exhibit 880-0009, contain the

3   various definitions of the cross-references between the

4   Coverage Determination Guidelines and the Level of Care

5   Guidelines.

6       Now, Exhibit 880 reflects that only 81 of the 209 coverage

7   determination guidelines contain language from the Level of

8   Care Guidelines.  And that would be in columns F and G.

9           **THE COURT:**  That's where they reproduce the language.

10          **MR. RUTHERFORD:**  Yes, Your Honor.

11          **THE COURT:**  F and G.

12          **MR. RUTHERFORD:**  In some fashion.

13      I think the descriptions are, F contains language that is

14  similar to the common criteria and/or language relating to

15  various levels of care from a specific level of care guideline.

16      And then column G contains all of the provisions of the

17  common criteria and the clinical best practices for all levels

18  of care from the 2015 and 2016 Level of Care Guidelines.

19      And, by our count, that's 81 of the 209.

20          **THE COURT:**  Okay.

21          **MR. RUTHERFORD:**  Sorry.

22      And Exhibit 880 then reflects that the level of care

23  language is not included -- so the inverse -- in the other 128

24  noncustodial care coverage determination guidelines.

25      So there's the custodial care coverage determination

 1  guidelines, the 81 that include either language -- full

 2  language or language similar, and then 128 noncustodial care

 3  coverage determination guidelines.

 4      And on this the Court heard no evidence, no testimony

 5  about what they include, about what they mean, whether they

 6  incorporate the terms of the Level of Care Guidelines.

 7  Nothing.

 8          **THE COURT:**  Well, other than the stipulation.

 9          **MR. RUTHERFORD:**  Other than the stipulation, correct,

10  Your Honor.

11      And in response -- we raised this issue, in essence, with

12  Dr. Triana.  And Dr. Triana offered the testimony that the only

13  instance in which a peer reviewer is permitted to apply the

14  criteria from a level of care guideline in the decision using

15  its CDG is when that language appears verbatim in the CDG.

16  That's the testimony.

17      So this idea that the reviewer can click a hyperlink is

18  not supported by the testimony in this trial, which was

19  uncontroverted.

20      Now, the coverage determination guidelines, the witnesses

21  did discuss, are the seven custodial care guidelines, and some

22  of which we have spoken about earlier.

23      I think that we covered most of the discussion of

24  custodial and active treatment in the Court's questions

25  earlier.  So if the Court is okay with it, I'm just going to

1  move ahead.

2          **THE COURT:**  Okay.

3          **MR. RUTHERFORD:**  So I'm going to move ahead to the

4  Level of Care Guidelines.

5          These are the guidelines we did hear most about during

6  this trial.  There were eight different versions of these

7  guidelines, used from 2011 to 2017.  And all eight of them are

8  admitted into evidence.

9          Plaintiffs' experts provided critiques of multiple

10  portions of these guidelines for each year, critiquing largely

11  the common criteria, the special guidelines for substance use

12  disorders, the three levels being residential, intensive

13  outpatient, and outpatient.  And then the specific guidelines

14  for mental health placement.  And, again, three specific levels

15  being residential, intensive outpatient, and outpatient.

16          And Dr. Fishman and Dr. Plakun critiqued language --

17  critiqued that the language changed substantially over the

18  years.  They pointed out some language they liked.  They opined

19  that some sections were made more or less consistent with

20  generally accepted standards of care over the years.  And, as

21  pointed out earlier, they didn't always agree with each other's

22  critique.

23          The question for the Court, we would submit, is whether

24  UBH abused its discretion in drafting and using these

25  provisions in each of the levels of care in each of the years.

1    Now, I'm not going to focus on all of these issues because

2    we're going to be briefing them at post trial.  But I do want

3    to point out a few -- a few basic principles that -- that each

4    of the issues that are raised by plaintiffs, at least in some

5    way, touch on this bedrock principle of behavioral health

6    treatment that plaintiffs -- I mean, that -- I'm sorry,

7    patients should be treated in the least restrictive level of

8    care that's effective for their condition, and transitioned

9    into a less restrictive setting if they can be effectively

10    treated and it's safe to do so.

11    And the external sources, like the APA and ASAM and CMS

12    and LOCUS, and the others that have been mentioned over the

13    last three weeks, all seem to agree that that is an essential

14    and acceptable principle of behavioral healthcare.

15    And is -- oh, and then consistent with this fundamental

16    principle, UBH's Level of Care Guidelines provide for patients

17    to be treated in the least restrictive appropriate level of

18    care in which they can be treated effectively, efficiently, and

19    safely.

20    What the plaintiffs challenged and what was mentioned in

21    Mr. Goelman's closing argument is how UBH's guidelines reflect

22    this concept.

23    Dr. Fishman and Dr. Plakun testified that the guidelines

24    overemphasize acute changes, or the "why now" factors, at the

25    expense of chronic conditions when evaluating whether treatment

1    could be effectively, efficiently, or safely provided in the

2    less intensive level of care.

3         First, in the 2011-2013 guidelines -- let me say, this

4    gets raised in a different way over what I think of as sort of

5    three blocks of the guidelines.

6         First, in the 2011-2013 guidelines, the Level of Care

7    Guidelines reference the patient's current condition or

8    presenting problems.  And plaintiffs' expert testified that

9    they are concerned that this might lead reviewers to place too

10   much emphasis on a member's immediate condition and ignore any

11   potential chronic conditions or complications.

12        Then in 2014 to 2016, plaintiffs' experts shift their

13   focus to the "why now" language, again saying they are

14   concerned reviewers would read this to mean that only acute

15   crises are covered.

16        And then, finally, in 2017, when the "why now" phrase is

17   removed, plaintiffs' experts testified that they continue to be

18   concerned that references to, quote, factors leading to

19   admission, or, quote, factors that precipitated admission, are

20   overly narrow and might foreclose paths to treatment -- or

21   pathways to treatment for certain types of members, such as

22   members suffering from chronic conditions.

23        So let's look at the rest of the evidence.

24        The 2011-2012 language focused on the member's current

25   condition or presenting problem.  UBH's doctors, including

1  Dr. Martorana and Dr. Allchin, as well as UBH's expert,

2  Dr. Simpatico, testified that, quote, presenting problems,

3  closed quote, include assessing all of the patient's current

4  conditions, including chronic conditions, in the context of the

5  particular symptoms that led the patient to treatment at a

6  particular level of care.

7       These doctors explained that information that is gathered

8  and used to access presenting problems is the information

9  detailed in the best practices section of the guideline -- the

10 guidelines, I'm sorry -- which include chronic conditions,

11 co-occurring behavioral and medical conditions, treatment

12 history, and many other factors.

13      And they testified, patient placement is about fit;

14 finding the right level of care for safe, effective, and

15 minimally restrictive treatment that match the member's current

16 needs.

17      Now, for 2013, we first see the "why now" language.

18           **THE COURT:**  2014, you mean?

19           **MR. RUTHERFORD:**  No, 2013.  That's the year it appears

20 once, Your Honor, in paragraph 3a.

21      And that's when we first see the "why now" language.  It's

22 included in the section requiring that a provider collect

23 information from the member and, when appropriate, other

24 sources to complete an initial evaluation of the member's chief

25 complaint/presenting problem, and the events which precipitated

the request for service at this particular point in time; i.e., the "why now."

Neither of plaintiffs' experts criticize the "why now" language in 2013, and both agree that it's important, without more, to evaluate and consider "why now."

In fact, Dr. Fishman testified that he didn't think that even the way that it is phrased as "why now," that those things -- he said, "And I do think that even the way that it is phrased as 'why now' those things ought to be considered. It's a useful clinical tool."

And this is consistent with what Dr. Bonfield, UBH's chief medical officer in 2013, testified about "why now."

Now, Dr. Bonfield is a psychiatrist with more than 45 years of training and experience. He testified that adding "why now" was his idea. He explained that "why now" is the way to understand why a person is presenting now for treatment and what is the root cause.

Dr. Martorana also testified that considering the "why now" does not exclude consideration of chronic conditions, and has a consumer-centric whole-person focus.

Now, in 2014 to 2016, which the Court just mentioned, the "why now" factors were integrated throughout the common criteria and throughout the separate level of care criteria.

And plaintiffs' experts focus on the references to acute changes in the member's signs and symptoms, asserting that the

1  "why now" factors in 2014 to 2016 exclude chronic conditions.

2      But UBH's doctors who use the guidelines testified that

3  that's not the case.  Dr. Martorana testified that acute

4  changes have to do with recent and significant differences in

5  the patient's condition, and the psychosocial and environmental

6  factors that relate to where the person lives, and whether they

7  can support themselves in their relationships and family and

8  education, and that this provision does not exclude

9  consideration of chronic conditions.

10      Dr. Alam testified that when you talk about acute

11  symptoms, you're really referring to the acute changes of a

12  chronic condition.  Most of what we treat now, whether it's

13  substance use disorders or mental health conditions, they are

14  chronic conditions.

15      Now, finally, in 2017, UBH removed the "why now" and

16  "acute" language from the common criteria and from the

17  outpatient and intensive outpatient criteria.  So it only

18  remained in the residential treatment criteria, Your Honor, for

19  2017, resulting in criteria, with respect to admission, that

20  provided that the member's current condition can be safely,

21  efficiently, and effectively assessed and/or treated in the

22  proposed level of care, assessment and/or treatment of the

23  factors leading to admission require the intensity of services

24  provided in the proposed level of care.  Yet plaintiffs still

25  challenge this language.

1    For example, Dr. Fishman claims that even though the word

2  "acute" isn't used in this context, the phrase "factors leading

3  to admission" may still focus the user to think about acuity.

4    There was no evidence that UBH reviewers read this

5  provision as focusing on acuity.  Dr. Martorana testified that

6  "current condition" includes chronic conditions.  Chronic

7  conditions can impact current symptoms.

8    THE COURT:  Everybody has testified, from the UBH

9  side, that the taking out of the "why now" concept from these

10  various provisions did not change the guidelines.  Didn't

11  change the guidelines; right?  Didn't change the Level of Care

12  Guidelines.

13    MR. RUTHERFORD:  Right.

14    THE COURT:  That you still were focusing on the same

15  things you were focusing on when it said "why now."

16    MR. RUTHERFORD:  True.  But part of what the Court is

17  doing is also analyzing the words and taking into consideration

18  the critique of the plaintiffs' experts.  And so I felt

19  obligated to raise that issue.

20    THE COURT:  No, that's okay.

21    MR. RUTHERFORD:  Now, the "acute" does appear in 2017,

22  in connection, as I said, with the 24-hour levels of care.

23  That's residential treatment and inpatient treatment.

24    But we would submit that that focus is supported by the

25  CMS Benefit Policy Manual and Guidelines, which we would draw

1 the Court's attention to at Trial Exhibit 656 and Trial Exhibit

2 1507.

3      Taking all of this together it, what is the evidence about

4 "acute" and "why now" in the Level of Care Guidelines?  That

5 the "why now" language and the use of the term "acute changes"

6 was not in the 2011 or 2012 Level of Care Guidelines; that in

7 2013 "why now" was added, and plaintiffs have no critique of

8 that addition.

9      But in 2014, the guidelines include the terms "acute

10 changes" in "why now," and that there aren't any significant

11 changes through 2016.  And that both terms were taken out --

12 except for what I mentioned -- in 2017.

13      Furthermore, as Dr. Martorana explained, "why now" is

14 consistent, in his view, with generally accepted standards of

15 care.  The language is included to address, as Dr. Bonfield

16 said, the root cause for why patients would come to treatment

17 with a consumer-centered focus.

18      And it includes consideration of all of the factors that

19 give rise to treatment, including acute, chronic symptoms, and

20 all of the family and psychosocial factors that we see in a

21 typical evaluation.

22      Now, the second of the LOCs that I want to focus on, which

23 was discussed at length during plaintiffs' closing argument, is

24 improvement.

25      There were three iterations of the improvement language

1   during the class period.  Plaintiffs' primarily critique UBH's

2   improvement criteria for including the term "acute" and for

3   stating that "improvement should occur in a reasonable period

4   of time."

5       Now, UBH agrees that the definitions of "improvement"

6   don't track CMS exactly; and, yes, the language was modified

7   and other language was not included.

8       But, as Dr. Martorana testified, who used these

9   guidelines, "improvement" in the Level of Care Guidelines

10  doesn't mean that there is no more coverage once the presenting

11  symptoms improve.  It means that reduction and control of acute

12  symptoms, as the guideline states, get weighed against evidence

13  that the member might deteriorate if treatment in the current

14  level of care ends.

15      He testified that weighing of the risk of deterioration

16  and concern for recovery and resiliency equates to maintenance

17  of the member's condition.

18      And with respect to "a reasonable period of time,"

19  Dr. Fishman's concern is that it directs the user to the notion

20  that a clock is ticking and that this was not -- but this

21  wasn't borne out by the doctors who used the guidelines.  None

22  of the doctors testified that "a reasonable period of time" was

23  equated to the notion of a clock ticking.

24      In fact, Dr. Martorana testified that the "reasonable

25  period of time" in this provision is individualized, based upon

1    clinical judgment, and is not a specific set period of time.

2        I'm just going to skip ahead, Your Honor.

3        That while not necessarily addressed in the Court's

4    questions from the pretrial order, I do want to just address

5    these state mandate claims for a moment, Your Honor.

6        **THE COURT:**  Uh-huh.

7        **MR. RUTHERFORD:**  Now, plaintiffs bear the burden of

8    proving their claims with respect to each stated issue in this

9    case.  That means that for each of the four states -- Texas,

10   Illinois, Connecticut, and Rhode Island -- plaintiffs must

11   prove that UBH was obligated to use a particular set -- a

12   particular and mandated set of guidelines in lieu of UBH's

13   internal guidelines; and that UBH did not, in fact, use the

14   mandated guidelines.

15       And each of these states presents a somewhat different

16   legal or evidentiary issue, so I'm going to go through them

17   briefly in turn.

18       Let's take Texas first.  The only evidence that plaintiffs

19   offered to prove that UBH failed to use the Texas Department of

20   Insurance guidelines for Texas-based treatment during the class

21   period was the email that we saw about potential confusion in

22   the Houston Care Advocacy Center about the use of coverage

23   determination guidelines and nonmedical necessity

24   determinations.

25       Now, I don't have the quote from Mr. Goelman in front of

1    me, so I'm not saying that I quote this accurately, but what

2    the coverage area is, and what the role is of the Houston Care

3    Advocacy Center, is not in evidence in this case.  That was not

4    in evidence.

5        What is in evidence in this case is the testimony --

6        **THE COURT:**  So you're saying I can infer that the

7    Houston Care Advocacy Center included, among other things,

8    since they're talking about the Texas guidelines, things that

9    are covered by the Texas guidelines?

10       **MR. RUTHERFORD:**  I think the way it works -- and,

11   again, I'm not sure this is in the evidence -- what determines

12   the state -- what determines the state that covers the plan

13   depends upon where the plan is based and the situs --

14   sometimes.  And other times the situs of the actual treatment.

15   So it differs.

16       **THE COURT:**  Can't you absolutely infer from that email

17   that the Houston Care Advocacy Center was sometimes doing

18   business/making determinations that it thought were the kinds

19   of business that if you had to apply the Texas guidelines, you

20   would apply them, because that's why they asked the question.

21   They said, We're not using it.

22       So isn't it a complete and fair inference that, yes, that

23   shows that for some -- I don't know how many -- for some, they

24   weren't applying the Texas guidelines?  How could you dispute

25   that inference?

1    **MR. RUTHERFORD:**  I think that's two different

2  questions.

3      So the first inference is, can we draw the inference that

4  the people in the email were involved in applying the Texas

5  guidelines?  Yes.

6    **THE COURT:**  Yes.

7    **MR. RUTHERFORD:**  I dispute the inference that the --

8  that they were failing to do so.  Nobody within that email was

9  testifying about it.

10    **THE COURT:**  That's what they said in the email.  It's

11  in evidence.

12    **MR. RUTHERFORD:**  Agreed, Your Honor.

13    **THE COURT:**  The Houston Care Advocacy Center was not

14  applying --

15    **MR. RUTHERFORD:**  Let me point out what else was in the

16  evidence, Your Honor.

17    **THE COURT:**  But --

18    **MR. RUTHERFORD:**  I understand that, Your Honor.

19    **THE COURT:**  I understand there's testimony.  There's

20  testimony from -- and I can't remember who was on the stand and

21  said, we've been applying it since 2003, or something like

22  that.  I appreciate that.

23      Doesn't this evidence also say that they weren't applying

24  it?

25    **MR. RUTHERFORD:**  Yes, this evidence says that they

1    weren't applying it.

2         And the evidence that says that they were is the testimony

3    of Dr. Martorana, the testimony of Dr. Allchin, the testimony

4    of Mr. Niewenhous, and the guideline applicability tools, one

5    of which is at Exhibit 268, that states, in the Guideline

6    Applicability Tool, that UBH uses the mandated Texas

7    guidelines.

8         And they are specific guidelines, Your Honor, that are

9    mandated.  This is not one of the states where you can use,

10   essentially, a corollary guideline.

11        That is the case with Rhode Island.  So with respect to

12   Rhode Island, the question is whether or not the relevant

13   statute requires the use of ASAM.

14        And the statute in Rhode Island provides, the payor shall

15   rely upon criteria of the American Society of Addiction

16   Medicine when developing coverage for levels of care for

17   substance use disorder treatment.

18        And the evidence shows that UBH did rely on the ASAM

19   Criteria when creating and revising its internal guidelines,

20   which it used for Rhode Island.

21        With respect to Connecticut, Connecticut gives --

22   essentially provides two ways to comply.  You can either use

23   ASAM or you can use internal guidelines and then post a cross

24   walk showing the differences between ASAM and the guidelines.

25        And Mr. Niewenhous testified about UBH's compliance with

1    this requirement.  The Court is obviously aware of the

2    testimony, including UBH's communications with Connecticut

3    insurance regulators about it.

4        And while he did note one mistake in the document, that he

5    said he recently noticed, his testimony otherwise did not

6    reflect any intent to represent any fact with respect to UBH's

7    compliance with Connecticut law.

8        Finally, there is the state of Illinois.  So with respect

9    to the state of Illinois, before September 2015, the evidence

10   shows that state law provided that medical necessity

11   determinations for substance use disorders shall be made in

12   accordance with the ASAM criteria.

13       And then in September of 2015, Illinois law was amended to

14   state that no additional criteria may be used to make medical

15   necessity determinations for substance use disorders.

16       The evidence shows that UBH considered the pre September

17   2015 law and whether its guidelines were in accordance with

18   ASAM, and concluded that they were.  And that's at Exhibit 353.

19       And Dr. Martorana testified that after the second law was

20   passed, by no later than January 2016, UBH had adopted use of

21   ASAM in Illinois and currently uses it today.

22       Now, the last of the Court's remaining questions was:  Did

23   UBH abuse its discretion as a plan administrator in

24   promulgating the guidelines or using the guidelines in

25   connection with the claims it denied?

1       And after considering all the evidence, we submit to the

2  Court that the answer is no, it did not abuse its discretion.

3       As Dr. Triana and Ms. Urban testified -- and she was the

4  one who testified, Your Honor, by video -- UBH employed a

5  year-round review of recognized sources in connection with

6  updating and amending the guidelines.

7       This review included some of the same sources upon which

8  plaintiffs rely, and ones I have mentioned earlier today,

9  including CMS, APA Practice Guidelines, and ASAM.

10      That each year UBH sought and received input about its

11  Level of Care Guidelines from internal and external behavioral

12  health experts, and through its internal process alone, UBH

13  sought and received input from dozens of in-house

14  psychiatrists, doctorate level and masters level behavioral

15  specialists.

16      And we have at Exhibit 1235 a sample list from 2016.

17      Each year UBH sent out letters by mail and email, asking

18  for feedback.  The four questions that were asked, which were

19  pointed out by plaintiffs in their examination of Dr. Triana,

20  were whether the guidelines -- whether the guidelines offer

21  adequate support for making decisions about care; whether the

22  guidelines were organized in a manner that makes them easy to

23  use; whether the criteria are ambiguous or unclear; and whether

24  there are criteria that should be added or deleted.

25      The criticism was, these solicitation letters didn't

1    include a fifth sentence that said, Are the guidelines

2    consistent with generally accepted standards of care?

3        But, as Dr. Triana testified, he expected that the person

4    or persons providing feedback would make any recommendations to

5    UBH about whether any language was inconsistent with generally

6    accepted standards of care based upon the questions that were

7    asked.

8        And these requests for feedback went out to dozens of

9    external behavioral health providers annually.  They included

10   representatives of several subspeciality organizations that

11   were part of this BSAC, that the Court heard testimony about.

12       And Dr. Triana testified that each year this internal and

13   external feedback was gathered and organized into charts and

14   summarized.

15       And the Court has feedback from each -- maybe not each of

16   the years, but I think for most of the years in question in

17   evidence.

18       This feedback was then discussed by a Level of Care

19   Guideline Workgroup which included clinicians such as

20   Dr. Robinson-Beale and Dr. Bonfield.

21       Through this process, over the entire class period UBH

22   received scores of comments about its guidelines.

23       Now, regardless of whether this feedback was critical or

24   neutral or complementary -- and when the Court reviews these

25   feedback, I think the Court is going to see all three types of

1  feedback -- UBH's level of care guideline reviewed and

2  considered it.

3      Now, after the guideline -- Level of Care Guideline

4  Workgroup reviewed, the BPAC would meet.  It would meet at

5  least once a year, and it would vote on the updated guidelines.

6  And the Court has each of those BPAC minutes in evidence,

7  except for, I think, 2015.

8      Now, was this process a process that was a standard

9  accredited by an external agency?

10     Well, as Dr. Goddard, an expert in healthcare

11 accreditation, and as Mr. Beaty, a UBH employee, testified,

12 this satisfied and even exceeded the nationally recognized

13 standards of two primary organizations that are used to

14 accredit healthcare utilization management companies.  And

15 that's URAC and the NCQA.

16     In particular, Dr. Goddard opined that UBH could have

17 satisfied URAC's and NCQA's requirements by simply seeking

18 internal staff input.

19     UBH's solicitation of external providers and nationally

20 known psychiatric associations surpassed accreditation

21 standards.  And beyond this -- passed accreditation standards.

22     So, in sum, UBH's annual work to obtain external feedback

23 from experts from across the spectrum in behavioral health

24 demonstrated that not only did UBH act in good faith in its

25 development and updating of its clinical criteria, but also the

1    healthy debate among experts about whether the guidelines are

2    consistent with generally accepted standards of care.

3         Now, the task before the Court is to determine whether UBH

4    abused its discretion by promulgating and applying the

5    guidelines at issue in this case.

6         We would submit that the question isn't whether the

7    guidelines were perfect.  And we don't contend that they were.

8    That's why every year UBH seeks advice from doctors, inside and

9    outside of UBH, to adapt and improve the guidelines, to try to

10   make them better.

11        But a fiduciary, Your Honor, doesn't need to get it

12   100 percent right 100 percent of the time.

13        The evidence shows -- I'm sorry, the question of whether

14   the good-faith efforts of dozens of UBH doctors, psychologists,

15   and social workers, reflected in each of the guidelines at

16   issue in this case, were so far afield from what the plans

17   required that they were illogical, implausible, or completely

18   unsupported by the evidence, and the evidence shows that they

19   were not.

20        The Court heard conflicting testimony about the

21   guidelines.  Plaintiffs experts, Drs. Fishman and Plakun,

22   opined that the guidelines overemphasized certain things and

23   underemphasized others.

24        UBH's expert, Dr. Simpatico, and several of UBH's

25   psychiatrists, opined that the guidelines were fully consistent

1  with generally accepted standards of care.

2       And these disagreements about the guidelines are

3  consistent with the other evidence we saw in this case; namely,

4  in form of the feedback that really ran the gamut.  It's a mix.

5  Some of it positive; some of it critical; some of it fairly

6  neutral.

7       We submit that's precisely the point.  If reasonable

8  minds, clinicians from across the spectrum, all trying to do

9  their best for patients and members, can honestly disagree

10  about UBH's guidelines, then UBH's guidelines cannot constitute

11  an abuse of discretion.

12       Thank you, Your Honor.

13           **THE COURT:**  Thank you, sir.

14       Anything further?

15           **MR. RUTHERFORD:**  Not from me, Your Honor.

16           **MR. GOELMAN:**  Your Honor, can we have a short break?

17           **THE COURT:**  No.

18           **MR. GOELMAN:**  Is it okay if Mr. Cowart handles our

19  rebuttal?

20           **THE COURT:**  Yeah.  I don't know what else there is to

21  say.  So be brief.

22           **MR. COWART:**  Less than five minutes.

23           **THE COURT:**  Go ahead.

24                       **CLOSING ARGUMENT**

25           **MR. COWART:**  Your Honor, my name is Jason Cowart.

1          **THE COURT:**  Oh, good to meet you.

2          **MR. COWART:**  You may recall, four years ago I argued

3     the motion to dismiss in this case.

4          **THE COURT:**  Yes.

5          **MR. COWART:**  I think I want to make three points.  Two

6     of them legal; one of them factual.

7          The first is a legal point having to do with the Court's

8     questions concerning how ERISA analyzes conflicts of interest.

9          As the Court is no doubt aware, most of the conflict of

10    interest case law develops in the context of a single

11    individual bringing a claim under their plan.  And the question

12    is whether the administrator has properly interpreted that

13    plan.  There are not very many cases that analyze guidelines in

14    the context of that.  So this is relatively new in that

15    respect.

16         So usually the question is:  Did the administrator

17    interpret the plan terms in a self-interested way?  So the

18    guidelines make this somewhat novel.  But our theory is as

19    follows:

20         Generally accepted standards -- there are only one set of

21    generally accepted standards, whatever they are.

22         United Behavioral Health had an interest in narrowly

23    interpreting that phrase, those standards, because a

24    significant portion of its business relates to fully insured

25    products.  So it had a financial self-interest in narrowing

1   what it considered to be generally accepted standards.

2       But because all of the plans that it administers require,

3   as one condition of coverage, that the care be consistent with

4   generally accepted standards, it had to also use those same

5   guidelines vis-a-vis self-funded plans.

6       That's exactly what it did.  And if it had done something

7   differently, everyone would have asked, Why?  How is it

8   possible that generally accepted standards are different on the

9   self-funded side than they are on the fully insured side?

10      And so our position is that that self-interest, that was

11  alive and well and actually meant dollars in the pockets for

12  UBH on the fully insured side, infected its decision-making on

13  the self-funded side, despite the fact that on the self-funded

14  side it was not personally paying the benefits.

15      That's the theory.

16          **THE COURT:**  Okay.

17      **MR. COWART:**  And I believe that the evidence supports

18  that theory.  Okay.  That was the first legal point.

19      The second has to do with the question of whether United

20  Behavioral Health, whether it's appropriate for UBH to worry

21  about ben-ex.  Is that appropriate?  Can they talk about it?

22  Can they talk about it with plan sponsors?  And the answer is

23  yes, they can.

24      When they go out to a self-funded plan, an employer, and

25  they're talking about designing the plan, it's entirely

1    appropriate for them to project for the plan how much they

2    think they'll have to pay.  And it's entirely appropriate when

3    UHIC sets premiums for its fully insured plans, it's entirely

4    for UHIC to make certain estimates about how much it thinks

5    it's going to pay.

6         But something fundamentally important happens the minute

7    that UBH begins to administer benefits, because suddenly all of

8    the ERISA fiduciary duties come down and a wall is supposed to

9    exist around that administrator.  And that administrator, once

10   they started administering benefits, is supposed to ignore all

11   of those conversations of ben-ex.

12        Which is precisely why the case law has developed to say

13   that people who make benefit decisions owe two kinds of duties:

14   A duty of fidelity to the plan terms as written and reasonably

15   interpreted, and the interests of the beneficiaries.

16        And so while it's appropriate -- we don't dispute that

17   UBH, as a, quote-unquote, managed care company, can worry about

18   all these things and talk about all these things and worry

19   about fraud and worry about ben-ex and worry about all kinds of

20   other things.

21        When Congress enacted ERISA, it did something knowing it,

22   which is it said you can do all of that, but the minute you

23   started administering benefits, which are viewed in ERISA as a

24   trust, you take on those common law trust obligations: fidelity

25   to plan terms, interests of beneficiaries.  And ben-ex expense

1    is explicitly not one of the things that an ERISA fiduciary is

2    allowed to consider.

3         The statute couldn't be more clear about that.  That's the

4    second legal point.

5         The third point is the factual one.  There's been a lot of

6    discussion in this cases about all these guidelines.  And we're

7    going to give you briefing which is going to lay out chapter

8    and verse year to year, provision to provision.

9         I want to just make sure that we are very clear about what

10   our, sort of, meta position is, if you will.  And here it is:

11        In 2011 and 2012, the guidelines were focused on

12   "presenting signs and symptoms."  In 2013 through '16, the

13   words that were used were the "why now" factors.  And in 2017,

14   UBH reverted back to "presenting signs and symptoms."

15        Our position is that "presenting signs and symptoms" or

16   "why now," what that means is has there been an acute change in

17   the member's symptoms that necessitate some kind of new

18   treatment.

19        So, for example, a chronic alcoholic, where nothing has

20   happened, they have simply been a chronic functional alcoholic

21   for 30 years, and they go in for treatment one day because they

22   decide that, today is the day I'm finally going to address this

23   problem, there has been no change in their symptoms.  There's

24   been no acute change when the question gets asked, What is the

25   acute change?  Why now?  And the answer is, I don't know why

1  now; nothing happened.

2      Under UBH's guidelines as written, that person doesn't get

3  coverage.  And that was true --

4      **MR. RUTHERFORD:**  Your Honor, I don't think this is

5  based upon the testimony in the case.

6      **THE COURT:**  Overruled.  There actually was direct

7  testimony on this almost exact point.

8      So go ahead.

9      **MR. COWART:**  That was true in 2011, and it was always

10  true through the end of 2017.

11      Now, it is also true that every one of UBH's witnesses

12  took the stand and said that's not what "presenting signs and

13  symptoms" means; that's not what "why now" means.

14      But when you go back into chambers and you think about the

15  evidence, I'd ask you to think about two things:

16      One, why is UBH not -- of the hundreds of pages, thousands

17  of pages of documents in this case, numerous exhibits, hundreds

18  of exhibits, there's not a single, not one contemporaneous

19  document that supports what the witnesses told you from the

20  stand.  No PowerPoints.  No emails.  Nothing.  Not a single

21  document.  All you have is self-serving testimony from the

22  stand.

23      And, second, when you think about that testimony, I'd ask

24  you to compare the best practices provision and the detail with

25  which that provision discusses the myriad of considerations,

1   chronic and co-morbid and acute, and contrast that with the

2   front side of the coverage guideline -- level of care guideline

3   and the myopic focus on presenting symptom changes or "why now"

4   factors.

5       And I would submit to you that that evidence, in total,

6   suggests that not only do the guidelines represent a departure

7   from GASC, as written, but that the evidence is overwhelming

8   that in practice that's exactly what they did.

9       Thank you, Your Honor.

10          **THE COURT:**  Fine.

11      Okay.  Ladies and gentlemen, thank you so much.

12      What shall we do now?

13      (Laughter)

14          **THE COURT:**  What did you have in mind?

15          **MS. REYNOLDS:**  Your Honor, the parties, unfortunately,

16  have not reached an agreement on this issue.

17      Yesterday, counsel for UBH announced an intention to file

18  a motion to decertify, which was the first time that plaintiffs

19  were made aware of this.

20      We did ask the grounds for this last night, and we were

21  told it turns on a failure to present class-wide proof as to

22  all guidelines, all plans, and all years.

23      We find that, frankly, somewhat outrageous.  We just

24  completed a trial in this case in which no individualized proof

25  at all was offered --

1    **THE COURT:**  Leaving that one aside.  And I'll decide

2  when I'll allow it.  The whether is not true.  I will allow it

3  at some point.

4    Have you agreed on the briefing for everything else?

5    **MS. REYNOLDS:**  Well, no.  The issue is that UBH wants

6  to do two tracks of briefing at the same time.

7    **THE COURT:**  No, we're not doing them at the same time.

8  That's not happening.

9    **MS. REYNOLDS:**  All right.  So plaintiffs --

10    **THE COURT:**  I know what the arguments are.  I actually

11  ruled on the arguments before.

12    I'm going to allow you, for purposes of whatever you want,

13  to make a motion at some point.  But we're going to brief this

14  thing first.

15    So what do you want to do about -- they wanted two tracks;

16  you wanted one track.  Do you have a track line for any of

17  these tracks?

18    **MS. REYNOLDS:**  The proposal that the plaintiffs made

19  was that plaintiffs' brief and the associated chart that the

20  Court required would be due on December 6th, which is five

21  weeks from today; that UBH's brief would be due on

22  January 10th, five weeks after plaintiffs' brief; and that

23  plaintiffs' reply will be due January 31st.

24    **THE COURT:**  And what was UBH's proposal?

25    **MS. ROSS:**  Well, Your Honor, our proposal, which, as

1    Ms. Reynolds has said, would have also included a simultaneous

2    briefing on the motion for class decertification, which we are

3    fine to defer; although, we note that under Rule 23(c)(1)(C)

4    that would need to be addressed before final judgment is

5    entered in the case.

6         THE COURT:  Oh, we're quite a ways from final --

7    (Laughter)

8         MS. ROSS:  With respect to the briefing schedule --

9         THE COURT:  I think I can make that.

10         MS. ROSS:  Think we can squeeze it in.

11         THE COURT:  I'm still a judge.  I can make that.

12         MS. ROSS:  Understand.

13    With respect to the briefing schedule, only two points we

14    would raise that differ from the plaintiffs' proposal.  The

15    first is a relatively modest change in the timing, simply to

16    add five days to each of the initial briefs.  Which would put

17    us at December 11th for plaintiffs' proposed trial brief and

18    the chart that the Court has requested.  And then at

19    January 22nd for UBH's brief.  And that's in part to account

20    for the intervening holidays.

21    And then with respect to the reply brief, it is not our

22    understanding, at least at this point, of the Court's prior

23    comments that the plaintiffs would have a reply brief.

24    We assumed this would be proposed findings of fact and

25    conclusions of law, along with the chart that Your Honor has

1  requested.  Although, obviously, we'll defer to the Court on

2  that.

3          **THE COURT:**  We'll have a reply brief.

4      So if I have a December 11th opening brief from the

5  plaintiff, responding brief from the defendants on

6  January 22nd, when do you want to have your reply brief?

7          **MS. REYNOLDS:**  If we can have three weeks, Your Honor,

8  that would be --

9          **THE COURT:**  What did you have?  You had three weeks --

10         **MS. REYNOLDS:**  We had --

11         **THE COURT:**  Just tell me what the date is.

12         **MS. ROSS:**  February 12th.  And that's fine with us.

13         **THE COURT:**  Okay.  So that's reply, opposition.

14     So I don't envision this just being the -- you'll do

15 proposed findings of fact and conclusions of law with pin cites

16 to testimony and cites to exhibits, and all that stuff.  But I

17 envision an actual brief that makes your case on either side,

18 and attaches to that brief the chart that really walks through

19 each of the provisions and why it's bad, and where the evidence

20 is that shows it's bad, or good, or not bad or not abuse of

21 discretion.  I don't mean to prejudge that.

22     But I do think -- I don't -- but I do think it's useful to

23 do this in a narrative form.  Findings of fact and conclusions

24 of law are great because it puts forward the detail of the

25 exact thing that you think I need to find and cites to where

**PROCEEDINGS**

1 the evidence is. And I can take that and I can use it or not

2 use it. But the brief is narrative and presents them in an

3 argument form.

4     And I want them in an argument form. So I'm talking about

5 both for briefs and proposed findings of fact and conclusions

6 of law. And then I'll look at it and I'll decide whether I

7 need to see you again.

8     I should tell you, this is going to take a while. It's

9 going to take a while for you to do what you're doing. It's

10 going to take -- you know, there's six or eight per side

11 writing these things. There's two of us working on this. So

12 it's going to take a while.

13     So I don't know how long "a while" is. You can always

14 call Judge Ryu if you get tired of waiting.

15     But, okay. That's fine. So that will be the schedule.

16 Those will be the briefs.

17     Is there anything?

18         **MS. REYNOLDS:** Not for --

19         **THE COURT:** He's always got something.

20         **MS. REYNOLDS:** Our detail man.

21     **MR. ABELSON:** On the subject of the transcript

22 depositions, I think our understanding is that they should be

23 attached as exhibits.

24     So I would just like to formally move into evidence

25 Exhibits 903 and 904, which are the transcripts of the

1    depositions of Ms. Bridge and Mr. Rockswold.

2              THE COURT:  Okay.

3         (Trial Exhibits 903 and 904 received in evidence.)

4              THE COURT:  And your motion is granted as well.

5              MS. ROSS:  Thank you, Your Honor.  We have no

6    objection.

7              THE COURT:  UBH's motion is granted to put in their

8    transcripts.

9              MR. ABELSON:  Thank you.

10        And with respect Exhibit 880, which is the stipulation

11   with respect to the guidelines, the parties have a version to

12   replace, that replaces the Bates number with the trial exhibit

13   numbers, for your convenience.  We'll replace that in the

14   record.

15             THE COURT:  I always appreciate it when people take

16   care of my convenience.

17        (Laughter)

18             THE COURT:  So let me just say, a remarkable

19   experience.  It was great.  And you were all terrific and

20   patient with my trying to get through this, and patient with my

21   way of getting through it, and patient with my impatience most

22   importantly.  But I really appreciated all the work you did.

23        And if you will stay for a second, I would like to shake

24   your hands.  So we will be adjourned.

25                  (Proceedings concluded 1:13 p.m.)

CERTIFICATE OF REPORTERS

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Wednesday, November 1, 2017

_____

Katherine Powell Sullivan, CSR #5812, RMR, CRR
U.S. Court Reporter

_____

Jo Ann Bryce, CSR #3321, RMR, CRR
U.S. Court Reporter