PSYCH-APPEAL, INC.
Meiram Bendat (Cal. Bar No. 198884)
8560 West Sunset Boulevard, Suite 500
West Hollywood, CA 90069
Tel: (310) 598-3690, x.101
Fax: (888) 975-1957
mbendat@psych-appeal.com

ZUCKERMAN SPAEDER LLP
D. Brian Hufford (admitted *pro hac vice*)
Jason S. Cowart (admitted *pro hac vice*)
485 Madison Avenue, 10th Floor
New York, NY 10022
Tel: (212) 704-9600
Fax: (212) 704-4256
dbhufford@zuckerman.com
jcowart@zuckerman.com

*Attorneys for Plaintiffs and the Classes*
*(Additional Counsel on Signature Page)*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| DAVID AND NATASHA WIT, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED BEHAVIORAL HEALTH (operating as OPTUMHEALTH BEHAVIORAL SOLUTIONS),<br><br>Defendant. | Case No. 3:14-CV-02346-JCS<br>Action Filed: May 21, 2014<br><br>**PLAINTIFFS' POST-TRIAL BRIEF** |
| GARY ALEXANDER, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED BEHAVIORAL HEALTH (operating as OPTUMHEALTH BEHAVIORAL SOLUTIONS),<br><br>Defendant. | Case No. 3:14-CV-05337-JCS<br>Action Filed: December 4, 2014<br><br>Trial Date: October 16, 2017<br>Time: 8:30 A.M.<br>Judge: Hon. Joseph C. Spero<br>Courtroom: G<br><br>**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED** |

# TABLE OF CONTENTS

PAGE


**I. INTRODUCTION** .....1

**II. SUMMARY OF FACTS ESTABLISHED AT TRIAL** .....2

A. INTRODUCTION .....2

B. OVERVIEW OF UBH'S GUIDELINES .....3

*1. Level of Care Guidelines* .....*3*

*2. CDGs* .....*4*

(a) Diagnosis-Specific CDGs .....5

(b) Custodial Care CDGs .....6

C. THE PLAINTIFF CLASS CONSISTS OF INDIVIDUALS WHOSE REQUESTS FOR COVERAGE UBH DENIED BASED ON THE CHALLENGED GUIDELINES. .....7

D. THE CLASS MEMBERS' PLANS REQUIRED, AS ONE CONDITION OF COVERAGE, THAT THE PRESCRIBED TREATMENT BE CONSISTENT WITH GENERALLY ACCEPTED STANDARDS OF CARE. .....8

E. UBH DEVELOPS AND USES ITS GUIDELINES TO DETERMINE WHETHER TREATMENT AT A PRESCRIBED LEVEL OF CARE IS CONSISTENT WITH GENERALLY ACCEPTED STANDARDS. .....9

F. THE GENERALLY ACCEPTED STANDARDS OF CARE FOR MAKING PATIENT PLACEMENT DECISIONS ARE WELL ESTABLISHED IN THE BEHAVIORAL HEALTH COMMUNITY .....12

*1. Behavioral Health Services Should Provide Effective Treatment* .....*15*

(a) Effective Treatment of Underlying Conditions, Not Merely Alleviation of Acute Symptoms .....16

(b) Effective Treatment of Co-Occurring Behavioral Health Conditions .....17

*2. Treatment is Most Effective when it is Provided at the Appropriate Level of Care for the Particular Patient* .....*20*

*3. Practitioners Should Err on the Side of Caution When Making Patient Placement Decisions* .....*24*

*4. Level of Care Decisions Should Turn on a Multi-Dimensional Assessment of the Patient* .....*25*

*5. Effective Treatment Includes Services Needed to Maintain Functioning or Prevent Deterioration* .....*27*

*6. Services Should Continue as Long as they are Needed and the Patient Has the Capacity to Benefit.* .....*29*

*7. The Unique Needs of Children and Adolescents Should be Considered in Making Level of Care Decisions* .....*30*

(a) Developmental Trajectory .....30

(b) Different and/or Relaxed Criteria Across Dimensions .....31

(c) Improvement .....31

G. THROUGHOUT THE CLASS PERIOD, THE LEVEL OF CARE CRITERIA IN UBH'S GUIDELINES HAVE FALLEN BELOW THE GENERALLY ACCEPTED STANDARDS OF CARE. .....32

*1. Overemphasis on Acuity* .....*32*

(a) Expectation of Improvement of Acute Symptoms .....32

(b) Why Now .....34

(c) Coverage Ends When Acute Crisis Has Passed .....37

(d) Acuity Required for All Levels of Care .....38

*2. Failure to Consider Effective Treatment of Co-Occurring Conditions* ..... *40*

*3. Drive Toward Lower Levels of Care Rather than Erring on the Side of Caution* ..... *43*

*4. Mandatory Prerequisites for Coverage, Rather than Multi-Dimensional Assessment* ..... *45*

*5. Preclusion of Coverage for Treatment to Maintain a Level of Function* ..... *47*

*6. Lack of Motivation is Grounds for Denying Coverage, Even Where the Member has the Capacity to Recover* ..... *50*

*7. Failure to Address the Unique Needs of Children and Adolescents* ..... *51*

*8. Overbroad Definition of Custodial Care and Overly Narrow View of Improvement and Active Treatment* ..... *52*

(a) Custodial Care ..... 52

(b) Active Treatment ..... 54

(c) Improvement ..... 56

(d) UBH Was Not Entitled to Interpret All Plans According to the Most Restrictive Plan's Language ..... 57

H. UBH'S GUIDELINES, IN THEIR ENTIRETY, FALL SHORT OF GENERALLY ACCEPTED STANDARDS OF CARE. ..... 59

I. UBH'S GUIDELINES ARE INCONSISTENT WITH THE ASAM CRITERIA. ..... 61

J. UBH IGNORED STATE LAWS MANDATING SPECIFIC CRITERIA FOR ADMINISTERING SUDS BENEFITS ..... 63

K. UBH'S GUIDELINE DEVELOPMENT PROCESS WAS INFECTED BY ITS CONSIDERATION OF ITS OWN SELF-INTEREST ..... 66

*1. ABA* ..... *69*

*2. TMS* ..... *69*

*3. The ASAM Decision* ..... *70*

**III. CLAIMS AND STANDARD OF REVIEW** ..... 72

A. CLAIM ONE: BREACH OF FIDUCIARY DUTY ..... 73

B. CLAIM TWO: WRONGFUL DENIAL OF BENEFITS ..... 75

C. THE COURT SHOULD VIEW UBH'S CONDUCT WITH SKEPTICISM. ..... 75

**IV. LEGAL ARGUMENT** ..... 78

A. UBH EXERCISED FIDUCIARY DUTIES WHEN IT DEVELOPED AND APPLIED ITS GUIDELINES. ..... 78

B. UBH BREACHED ITS DUTY TO HONOR PLAN TERMS. ..... 79

C. AS TO THE *WIT* STATE MANDATE CLASS, UBH BREACHED ITS DUTY TO COMPLY WITH STATE LAW. ..... 79

D. UBH BREACHED ITS DUTY OF LOYALTY. ..... 82

E. UBH BREACHED ITS DUTY OF CARE. ..... 83

F. UBH ABUSED ITS DISCRETION BY USING ITS OVERLY-RESTRICTIVE GUIDELINES TO DENY COVERAGE TO THE CLASS MEMBERS. ..... 85

G. UBH FAILED TO PROVE ANY OF ITS AFFIRMATIVE DEFENSES. ..... 86

*1. "As Applied" Defense* ..... *86*

*2. "Good faith"* ..... *87*

*3. Exhaustion* ..... *88*

*4. Standing and Causation* ..... *91*

*5. Conditions Precedent/Subsequent and Waiver* ..... *91*
*6. Settlor Defense* ..... *92*
**V. CONCLUSION** ..... 94

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albino v. Baca*,
747 F.3d 1162 (9th Cir. 2014) ........ 88

*Amato v. Bernard*,
618 F.2d 559 (9th Cir. 1980) ........ 89

*Anderson v. Suburban Teamsters of N. Ill. Pension Fund Bd. of Trs.*,
588 F.3d 641 (9th Cir. 2009) ........ 85

*Arizona State Carpenters Pension Tr. Fund v. Citibank (Arizona)*,
125 F.3d 715 (9th Cir. 1997) ........ 78, 93

*Barboza v. California Ass'n of Prof. Firefighters*,
651 F.3d 1073 (9th Cir. 2011) ........ 88

*Barnes v. AT&T Pension Benefit Plan—Nonbargained Program*,
270 F.R.D. 488 (N.D. Cal. 2010) ........ 90

*Bins v. Exxon Co. U.S.A.*,
220 F.3d 1042 (9th Cir. 2000) ........ 82

*Block v. Office of Ill. Sec'y of State*,
988 N.E.2d 718 (App. Ct. Ill. 2013) ........ 81

*Braun v. Retirement Bd. of Firemen's Annuity & Ben. Fund of Chicago*,
483 N.E.2d 8 (Ill. 1985) ........ 81

*Bussian v. RJR Nabisco, Inc.*,
223 F.3d 286 (5th Cir. 2000) ........ 76, 83

*Conkright v. Frommert*,
559 U.S. 506 (2010) ........ 73, 74, 88

*De Leon v. Standard Ins. Co.*,
2016 WL 768908 (C.D. Cal. Jan 28, 2016) ........ 89

*Demer v. IBM Corp. LTD Plan*,
835 F.3d 893 (9th Cir. 2016) ........ 75

*Des Roches v. California Physicians' Serv.*,
320 F.R.D. 486 (N.D. Cal. 2017) ........ 86, 89

*DiFelice v. U.S. Airways, Inc.*,
497 F.3d 410 (4th Cir. 2007) ........ 87

*Donovan v. Cunningham*,
716 F.2d 1455 (5th Cir. 1983) .......... 88

*FDIC v. Meyer*,
510 U.S. 471 (1994) .......... 80

*Fifth Third Bancorp v. Dudenhoeffer*,
134 S. Ct. 2459 (2014) .......... 94

*Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*,
491 F.3d 1180 (10th Cir. 2007) .......... 89

*Guenther v. Lockheed Martin Corp.*,
Case No. 5:11-cv-00380-EJD, 2017 WL 976939 (N.D. Cal. Mar. 14, 2017) .......... 89

*Harlick v. Blue Shield of Cal.*,
686 F.3d 699 (9th Cir. 2012) .......... 11, 79

*Holcomb v. Unum Life Ins. Co. of Am.*,
578 F.3d 1187 (10th Cir.2009) .......... 89

*Huerta v. AT & T Umbrella Benefit Plan No. 1*,
No. 3:11-CV-01673-JCS, 2012 WL 4935548 (N.D. Cal. Oct. 17, 2012) .......... 88

*In re FedEx Ground Package Sys., Inc.*,
722 F. Supp. 2d 1033 (N.D. Ind. 2010) .......... 89

*John Blair Commc'ns Inc. Profit Sharing Plan v. Telemundo Grp., Inc.*,
26 F.3d 360 (2d Cir. 1994) .......... 74

*Johnson v. Couturier*,
572 F.3d 1067 (9th Cir. 2009) .......... 92

*Kanawi v. Bechtel Corp.*,
590 F. Supp. 2d 1213 (N.D. Cal. 2008) .......... 82

*King v. Blue Cross & Blue Shield of Ill.*,
871 F.3d 730 (9th Cir. 2017) .......... 78

*Kungys v. United States*,
485 U.S. 759 (1988) .......... 80

*Leber v. Citigroup 401(k) Plan Inv. Comm.*,
__ F.R.D. __, 07-CV-9329 (SHS), 2017 WL 5664850 (S.D.N.Y. Nov. 27, 2017) ...... 76, 82, 83

*Lockheed Corp. v. Spink*,
517 U.S. 882 (1996) .......... 93

*Meidl v. Aetna, Inc.*,
No. 15-CV-1319 (JCH), 2017 WL 1831916 (D. Conn. May 4, 2017)........................................ 86

*Metro. Life Ins. Co. v. Glenn*,
554 U.S. 105 (2008)........................................................................................ 75, 76, 77

*Morais v. Cent. Beverage Corp. Union Emps.' Supplemental Retirement Plan*,
167 F.3d 709 (1st Cir. 1999)........................................................................................ 92

*Moyle v. Liberty Mut. Retirement Benefit Plan*,
823 F.3d 948 (9th Cir. 2016) ...................................................................................... 86

*Nieves v. Prudential Ins. Co. of Am.*,
233 F. Supp. 3d 755 (D. Ariz. 2017) ............................................................................ 11

*Norris v. Mazzola*,
No. 15-CV-04962-JSC, 2016 WL 1588345 (N.D. Cal. Apr. 20, 2016) .................................. 88

*Pac. Shores Hosp. v. United Behav. Health*,
764 F.3d 1030 (9th Cir. 2014) ............................................................................. 77, 85

*Plumber, Steamfitter & Shipfitter Industry Pension Plan & Trust v. Siemens Building Technologies Inc.*,
228 F.3d 964 (9th Cir. 2000) ...................................................................................... 82

*Saffle v. Sierra Pac. Power Co. Bargaining Unit Long Term Income Plan*,
85 F.3d 455 (9th Cir. 1996) ...................................................................... 73, 75, 85, 86

*Spinedex Phys. Therapy USA Inc. v. United Healthcare of Ariz., Inc.*,
770 F.3d 1282 (9th Cir. 2014) .................................................................................... 89

*Terraza v. Safeway Inc.*,
241 F. Supp. 3d 1057 (N.D. Cal. 2017) ........................................................................ 82

*Tibble v. Edison Int'l*,
135 S. Ct. 1823 (2015)................................................................................................ 83

*Upadhyay v. Aetna Life Ins. Co.*,
No. C 13-1368 SI, 2014 WL 186709 (N.D. Cal. Jan. 16, 2014), *aff'd*, 645 F. App'x 569 (9th Cir. 2016)........................................................................................................ 92

*Varity Corp. v. Howe*,
516 U.S. 489 (1996).......................................................................................... 82, 83

*Williams v. Rohm & Haas Pension Plan*,
No. 4:04-CV-0078-SEB-WGH, 2009 WL 382628 (S.D. Ind. Feb. 11, 2009) ......................... 89

*Wit v. United Behav. Health*,
Case No. 14cv-02346-JCS, 2017 WL 3478775 (N.D. Cal. Aug. 14, 2017)............................ 85

*Zhu v. Fujitsu Grp. 401(k) Plan*,
2003 WL 24030329 (N.D. Cal. Sept. 9, 2003) ........................................................... 75

**Statutes**

2013 CONN. LEGIS. SERV. 13-3 ........................................................................ 64, 81

2015 R.I. PUB. LAWS 15-236 (15-H 5837A)............................................................ 65, 81

215 Ill. Comp. Stat. § 5/370c(b)(3) (effective Aug. 18, 2011) ....................................... 63, 80

27 R.I. GEN. LAWS § 27-38.2-1(g) (2015) ................................................................ 65, 81

28 TEX. ADMIN. CODE § 3.8011 (1991) ..................................................................... 65, 82

29 U.S.C. § 1002(21)(A)........................................................................................... 3, 78

29 U.S.C. § 1104(a)(1)....................................................................................... 82, 83, 85

29 U.S.C. § 1104(a)(1)(A) ............................................................................................ 73

29 U.S.C. § 1104(a)(1)(B) ...................................................................................... 73, 83

29 U.S.C. § 1104(a)(1)(D) ................................................................................ 73, 74, 79

29 U.S.C. § 1110(a) ................................................................................................. 92, 94

29 U.S.C. § 1132(a)(1)(B) ................................................................................ 73, 86, 92

29 U.S.C. § 1132(a)(3)................................................................................................... 86

29 U.S.C. § 1132(a)(3)(A) ............................................................................................ 73

29 U.S.C. § 1132(a)(3)(B) ............................................................................................ 73

29 U.S.C. § 1133............................................................................................................ 11

CONN. GEN. STAT. § 38a-591c(a)(3) (2017) ............................................................ 64, 81

**Rules**

Fed. R. Civ. P. 23............................................................................................................ 7

**Treatises**

Restatement (Third) of Trusts § 78(2) (Am. Law Inst. 2007) ......................................... 83

**Regulations**

29 C.F.R. § 2560.503- 1 .......... 11, 88

## I. INTRODUCTION

This case revolves around one central question: are UBH's Level of Care Guidelines and Coverage Determination Guidelines, on their face, more restrictive than generally accepted standards of care? The trial evidence on that critical issue pointed overwhelmingly to one answer: yes. UBH's own expert, Dr. Thomas Simpatico, all but admitted the point, testifying not only that he would not use UBH's Guidelines to "make clinical judgments," but that the *reason* he would not do so is because of irreconcilable "discrepancies" between the terms of those Guidelines and the sources reflecting generally accepted standards of care. Trial Transcript ("Tr.") 1241:15-1243:1. For Dr. Simpatico, the only way to make UBH's Guidelines consistent with generally accepted standards – which are reflected in sources like the ASAM Criteria, the LOCUS, American Psychiatric Association guidelines, and the CMS Medicare Benefit Policy Manual – is to ignore their plain language and to read into them what is not otherwise there. But that can only mean one thing: that even Dr. Simpatico agrees that the Guidelines, *as written*, fall short of the generally accepted standards of care. The testimony from Plaintiffs' experts, the documentary evidence, and other concessions by each of UBH's witnesses, discussed in detail below, all confirm that conclusion.

The evidence, moreover, also shows that this was no innocent mistake. UBH not only failed entirely to insulate its Guideline development process from the influence of concerns about the company's bottom line; it designed a process that all but ensured its financial interests would trump clinical considerations. The committee responsible for the Guidelines was dominated by individuals with direct responsibility for helping UBH minimize its "benefit expense," including the committee Chairman and representatives from UBH's Finance and Affordability departments. Senior management admonished Guideline drafters to be mindful of "business impacts" and overrode the committee's clinical judgments in order to further UBH's financial interests. In the most stark example, UBH refused, repeatedly throughout the Class Period, to adopt the ASAM Criteria as its standard criteria for administering substance use disorder benefits, even though its own addiction-medicine specialists unanimously recommended them for clinical reasons – and UBH's refusal was because of the mere possibility that adopting

criteria that were consistent with generally accepted standards might cause an increase in benefit expense that would cut into UBH's profits. It is no surprise, then, that the UBH employees responsible for the Guidelines manipulated the source material on which the Guidelines were based, selectively quoting and extensively revising them to change their meaning. Nor is it surprising that UBH left the job of reviewing generally-accepted sources and integrating them into the Guidelines primarily in the hands of an unlicensed social worker with little clinical experience – but extensive experience in "managed care."

For these reasons and others, as explained more fully below, UBH not only breached its duty to administer the class members' benefit plans as written, but also breached its duties of loyalty and care. It also wrongfully denied Class Members' claims by using its overly-restrictive Guidelines to adjudicate their requests for benefits.

This brief summarizes the facts established at trial (§ II), Plaintiffs' claims and the standard of review (§ III), and explains why the evidence entitles Plaintiffs to judgment on each of their claims (§ IV). It is accompanied by Proposed Findings of Fact ("PFF"), Proposed Conclusions of Law ("PCL"), and a Claims Chart, which identifies the specific Guideline provisions that, independently and collectively, render UBH's Guidelines fundamentally more restrictive than generally accepted standards of care.

## II. SUMMARY OF FACTS ESTABLISHED AT TRIAL

### A. Introduction

Throughout the Class Period, UBH administered insurance benefits for mental health and substance use disorder services ("behavioral health" services) for commercial welfare benefit plans. Ex. 880-0004 (Guideline Stipulation) ¶ 1.[1] As a claims administrator, UBH interpreted the terms of the plans and decided whether to approve Requests for Coverage. *See id.* ¶¶ 3, 5. *See also* Tr. 36:4-10 (UBH admission that the plans introduced into evidence all "grant UBH the discretion to interpret the plans and manage the behavioral health benefits under those plans"); Tr. 37:24-25 (UBH admission that it is "UBH's job," among other things, "to determine whether

[1] This brief cites to the exhibits admitted at trial as "Ex. XX-YYYY," using the exhibit page numbers branded in the bottom-center of each page.

treatment the member receives is covered by the member's health benefit plan"); Tr. 38:5-7 (UBH admission that ". . . the health benefit plans give UBH the discretion to interpret the plans, administer the benefits, and decide if the treatment is medically necessary."); Tr. 908:24-909:2 ("Q. So when a claims administrator like UBH is administering a plan, its responsibility is to apply the terms of the plan, right? A. Correct."); Tr. 916:20-917:2 (Dehlin) (UBH's job as claims administrator is to administer the plans as written).[2] The plan terms UBH interpreted included provisions that conditioned coverage on the treatment in question being consistent with generally accepted standards of care. Tr. 1876:10-21 (UBH admission); *see also* § II.D, *infra*. To standardize its employees' interpretations of those terms, UBH developed a set of clinical coverage criteria, including its Level of Care Guidelines ("LOCGs") and Coverage Determination Guidelines ("CDGs"), which purported to summarize generally accepted standards of care. *See* § II.B, *infra*. In reality, however, UBH's Guidelines were much more restrictive than the generally accepted standards and, throughout the Class Period, imposed requirements and limitations that severely restricted coverage in violation of the terms of the Class Members' plans. §§ II.G, H, I, *infra*.

### B. Overview of UBH's Guidelines

#### 1. Level of Care Guidelines

UBH first created its LOCGs well before the Class Period began; it re-evaluated and re-issued them at least annually from 2011 to 2017. *See* Ex. 880-0006, ¶ 19; Ex. 880-0012-20; Exs. 1-8 (all versions of the LOCGs in effect throughout the Class Period). Each year's version of the LOCGs contains an Introduction; a set of Common Criteria for coverage at all levels of care; a section describing UBH's understanding of the "best practices" practitioners should follow[3]; and additional criteria applicable to particular levels of care, including those at issue in this case

---

[2] As such, UBH was a fiduciary under the Employee Retirement and Income Security Act ("ERISA"). See 29 U.S.C. § 1002(21)(A). *See also* § IV.A, *infra*.

[3] The provisions summarizing "best practices" were set forth in a separate section of the Common Criteria from 2014 on; before then, the best-practices provisions appeared within the Common Criteria. *Compare, e.g.*, Ex. 1-0005 to -0008 *with* Ex. 4-0007 to -0012. At trial, UBH admitted that the "best practices" section is not used in denying requests for coverage. 980:25-981:5.

(residential, intensive outpatient, and outpatient ), in the context of both mental health conditions and substance use disorders. *See generally* Exs. 1-8.

At trial, UBH admitted that each and every provision in the Common Criteria must be satisfied for UBH to approve coverage at any level of care. *See*, *e.g.* Tr. 285:12-286:17 (UBH admission). *See also* Tr. 104:6-16 (Fishman) (member must meet each one of the admission criteria to obtain coverage for admission to treatment); 966:19-967:11 (Martorana) (describing Common Criteria as "principles that cut across all different levels of care"); Tr. 103:10-18 (Fishman) (Common Criteria are "subsumed and contained in all levels of care. So it's material that you would apply no matter which level of care you were looking at, and you would include that and then add the level-of-care-specific material.").[4] In addition, the member must also meet the criteria in the applicable level-of-care-specific section. *See*, *e.g.*, Ex. 1-0018 (mental health IOP treatment); Ex. 1-0021 (mental health outpatient treatment); Ex. 1-0026 (mental health residential treatment; Ex. 1-0042 (substance use IOP treatment); Ex. 1-0046 (substance use outpatient treatment); Ex. 1-0056 (substance use residential treatment). Under UBH's Guidelines, the fact that the prescribing professional is using what UBH considers "best practices" is not sufficient for coverage – though it is certainly a necessary condition. *See*, *e.g.*, Tr. 216:6-217:7; Tr. 285:12-286:17.

### 2. CDGs

In addition to its LOCGs, UBH also develops and adopts Coverage Determination Guidelines ("CDGs"), which it claims it generally uses to make clinical coverage determinations with respect to plans that do not contain a "medical necessity" requirement. *See*, *e.g.*, Tr. 1075:5-16, 1087:1-12 & 1128:8-10 (Martorana).[5] Like the LOCGs, UBH updates its CDGs on an annual

---

[4] From 2014 through 2017, the provisions within the Common Criteria are separated by the word "AND," in all capital letters and typically underlined. *See* Ex. 4-0007 to -10; Ex. 5-0008 to -0010; Ex. 6-0009 to -0011; Ex. 7-0009 to -011; Ex. 8-0006 to -0007. From 2011 to 2013, the provisions appear in a numbered list, not separated by "and," but with no indication that any are optional or could be ignored. UBH admitted at trial that the 2011-2013 formulation "work[s] the same way" as the later iterations that say "AND." Tr. 285:12-287:4.

[5] Because use of the CDGs turns on the presence or absence of a "medical necessity" requirement, it does not depend on whether a plan is fully-insured or self-funded. *See* PFF § V.A.2.

basis. *See generally* Ex. 880-0006 (¶ 19); Ex. 880-0009 to -0020.

(a) Diagnosis-Specific CDGs

Most of UBH's CDGs are diagnosis-specific, meaning that each one contains detailed criteria relating to the treatment of a particular mental health condition or substance use disorder. *See, e.g.*, Ex. 214 (2017 CDG for Substance-Related and Addictive Disorders); Ex. 222 (2017 CDG for Bipolar and Related Disorders). Plaintiffs challenge these CDGs only to the extent they incorporate the Level of Care Guidelines. *See generally* Ex. 880-0009 to -0020 (stipulated chart listing all challenged Guidelines, by effective date).[6]

UBH incorporated its LOCGs into its CDGs throughout the Class Period, using different combinations of language depending on the time frame. *See generally*, PFF at § V.B.[7] For example, the CDGs currently in effect (which are all published on UBH's website[8]) contain a hyperlink to the Level of Care Guidelines – and no separate level of care criteria. Ex. 880-0019 to -0020 (Category H). *See also, e.g.*, Ex. 218-0005. From about 2015 until late 2016, most of the challenged CDGs contained a "Common Criteria" section that was identical to the Common Criteria in the applicable LOCG, Ex. 880-0017 to -0020 (Category G), coupled with level-of-care-specific sections that were also similar to the LOCG language, *id*. (Category F). In earlier years, UBH used other combinations of incorporation language. For example, nearly every CDG, throughout the Class Period, states that services are excluded under the CDG if they are "not consistent with . . . [UBH's] level of care guidelines as modified from time to time." Ex. 880-0008 to -0020 (Category A). In 2011 and 2012, most CDGs ***also*** provided that UBH "maintains that treatment . . . should be consistent with its level of care guidelines . . . ." Ex. 880-0008 to -

[6] In a handful of instances, a particular CDG did not refer to the LOCGs in any way. Plaintiffs are not challenging those CDGs, and the parties have omitted them from the stipulation.

[7] The Court need not decide now (*i.e.*, at the liability stage) whether each of the CDGs on Exhibit 880 incorporates the level of care criteria in the LOCGs. Plaintiffs have submitted ample proof of incorporation, and the Court will easily find that the CDGs *do* incorporate those criteria. But the specific findings as to which CDGs incorporate which LOCGs are most relevant to the remedy, insofar as they may impact whether the Class definition needs to be refined.

[8] https://www.providerexpress.com/content/ope-provexpr/us/en/clinical-resources/guidelines-policies.html (last visited December 11, 2017).

0013 (Category B). Many other CDGs, in effect at various times, combined the Category A language with a statement that UBH "maintains clinical protocols that include the Level of Care Guidelines which describe the scientific evidence, prevailing medical standards and clinical guidelines supporting our determinations regarding treatment…[that are] available…upon request." Ex. 880-0008 to -0020 (Categories A and C).

The fact that each of the CDGs incorporates the level of care criteria in the LOCGs is reinforced by the UBH witnesses' testimony. For UBH's Peer Reviewers, there is no material distinction between the LOCGs and the CDGs. Dr. Theodore Allchin's testimony was particularly telling in this regard. When asked whether UBH's CDGs "incorporate UBH's Level of Care Guidelines," he identified only one that did not do so ("an early CDG, I believe, from 2011-2012. . . I think there's one for attention deficit disorder"), but did not even attempt to explain why that one CDG allegedly did not incorporate an LOCG. Tr. 1444:4-19. Likewise, Dr. Andrew Martorana testified that the only distinction between CDGs and LOCGs is whether the term "medically necessary" appears in the applicable benefit plan. Tr. 939:23-940:3.

In short, each of the CDGs on Exhibit 880 incorporates, in one way or another, the level of care criteria in at least one of the LOCGs. If the Court finds that a given year's LOCGs are more restrictive than generally accepted standards of care (and thus inconsistent with the Class Members' plans), a denial pursuant to the CDGs incorporating those criteria is wrongful for the same reasons.

(b) Custodial Care CDGs

In addition to the diagnosis-specific CDGs, Plaintiffs also challenge UBH's Custodial Care CDGs, which apply to inpatient or residential treatment for *any* diagnosis. *See* Exs. 10, 47, 84, 108, 148, 195, 221 (UBH's Custodial Care CDGs in effect in successive years). While the Custodial Care CDGs do contain incorporation language, Plaintiffs also challenge the Custodial Care CDGs independently of their incorporation of the LOCGs. As discussed further below, the evidence proves that each version of UBH's Custodial Care CDG was much more restrictive than generally accepted standards of care. *See* § II.G.8, *infra*.

### C. The Plaintiff Class Consists of Individuals Whose Requests for Coverage UBH Denied Based on the Challenged Guidelines.

The Court previously certified three classes under Rules 23(b)(1), (b)(2) and (b)(3). Order Granting Mot. For Class Certification, *Wit* ECF No. 174 ("Class Cert. Order").[9] By definition, the three classes include only members of health benefit plans governed by ERISA, whose requests for coverage of behavioral health services at specified levels of care were denied by UBH, in whole or in part, based upon UBH's LOCGs or CDGs. *Id.* at 12-13 (defining classes). *See also Wit* ECF Nos. 224 & 281 (orders amending class definitions), PFF § II.B.

During pretrial discovery, Plaintiffs asked UBH to produce the plan term documents and administrative records for all Class Members. Ex. 897-0001 ¶ 1. UBH objected on the ground that producing all such documents would be overly burdensome, and refused to comply with Plaintiffs' request. *Id.* ¶ 2. The parties therefore negotiated and stipulated to a small, random sample of Class Members (together with the Named Plaintiffs, the "Claim Sample"), for which UBH would produce the requested documents. *Id.* ¶ 3. UBH stipulated at trial that, for purposes of this case, the Claim Sample is "a representative sample of the entire class" and the evidence submitted concerning the Claim Sample is "binding on UBH for the entire class." Tr. 1890:1-15.

At trial, the Court admitted the following evidence about the Claim Sample members:

- The applicable document reflecting the terms of each Claim Sample member's plan (*i.e.*, the Certificate of Coverage or Summary Plan Description for each plan), *see* Tr. 678:10-679:7 (listing plan term exhibits admitted into evidence).

- Charts summarizing what each party considered the relevant provisions of each Claim Sample member's plan, *see* Ex. 892 (Plaintiffs' Summary Exhibit A: Plan Terms), Ex. 893 (Plaintiffs' Summary Exhibit B: Plan Groupings); Ex. 1653 (UBH's Summary Exhibit: Plans); Ex. 1654 (UBH's Summary Exhibit: Custodial Care Definition).

- The "denial letter" from UBH notifying the each Claim Sample member of UBH's adverse benefit determination denying coverage for the services at issue,

---

[9] Subject to date restrictions and other applicable limitations, the *Wit* Guidelines Class includes individuals who were denied coverage for residential treatment services; the *Wit* State Mandate Class includes members of fully-insured plans governed by both ERISA and the state law of Connecticut, Illinois, Rhode Island or Texas who were denied coverage for residential treatment services for substance use disorders; and the *Alexander* Guidelines Class includes individuals who were denied coverage for intensive outpatient or outpatient services. *See* PFF § II.B. This Memorandum will refer collectively to the members of all three classes as the "Class Members."

*see* Tr. 682:20-683:12 (listing denial letter exhibits admitted into evidence).[10]

- A chart summarizing the relevant portions of the denial letters, Ex. 894 (Plaintiffs' Summary Exhibit C: Denial Letters/Case Notes).
- Charts offered by each party summarizing certain UBH records concerning Claim Sample member appeals, Ex. 895 (Plaintiffs' Summary Exhibit D: Plaintiff Appeal Denial Letters); Ex. 1655 (UBH's Appeal Chart).
- Where applicable,[11] the letter from UBH notifying the member of UBH's appeal, determination, *see* Ex. 899 (appeal determination letters).

As discussed further below, this evidence clearly demonstrated that, by adopting and then using its overly-restrictive Guidelines in denying the Class Members' requests for benefits, UBH harmed each of the Class Members in the same way.

**D. The Class Members' Plans Required, as One Condition of Coverage, that the Prescribed Treatment be Consistent with Generally Accepted Standards of Care.**

As UBH admitted at trial, under every Plan at issue in this case, "it is a necessary but not sufficient condition to coverage . . . that the treatment at issue be consistent with generally accepted standards of care." Tr. 1876:10-21. *See also* Tr. 38:19-22 (UBH admission that the plans admitted into evidence all "include a requirement that treatment be consistent with generally accepted standards of care or with professional standards. . ."); Ex. 892 (chart summarizing key plan language). Sometimes that condition is incorporated in the plans through a definition of the phrases "Covered Health Services" and/or "Medically Necessary," such that the plan only *covers* treatment that is consistent with generally accepted standards of care, or a functionally equivalent phrase. Exs. 892, 893 (summary exhibits regarding plan terms); Tr. 679:12-680:3 (Duh testimony describing plan language groupings); Tr. 920:14-921:15 (UBH

---

[10] In some instances, UBH did not produce a copy of the denial letter issued to the member. In those cases, Plaintiffs offered an excerpt from UBH's electronic case record for the member (the "case notes"), which contain the rationale for the denial. *Compare, e.g.*, Ex. 1290 *and* Ex. 894-0003; *see also* Ex. 894-0018 (n.2).

[11] Each of the Named Plaintiffs and at least 34 of the Claim Sample Members submitted one or more administrative appeals. *See* Exs. 895, 1655, 238-0018. With respect to one Named Plaintiff, UBH never responded to the appeal. *Compare* Exs. 238-0018 to -0024 *with* Ex. 895-0002. UBH did not dispute that each of the Named Plaintiffs exhausted all administrative remedies. *See* [Joint Proposed] Final Pretrial Order (Sept. 6, 2017), *Wit* ECF No. 296 at 3. In any event, any administrative appeal would have been futile, as discussed below. *See* § IV.G.3, *infra*.

witness Barry Dehlin conceding that “although there are different phrases,” the provisions cited in Exhibit 892 are sufficient to determine whether one condition of coverage under the listed plans is that a service needs to meet generally accepted standards). *See also* Tr. of Class Certification Hrg., *Wit* ECF No. 173, at 31:22-32:2 (UBH admission that even though some plans use phrases other than “generally accepted standards of care,” UBH does not “treat them as different”). Other plans describe covered services more broadly, but *exclude* services that are *not* consistent with generally accepted standards of care. Exs. 892, 893; Tr. 679:12-680:3. Many Plans do both. *See, e.g.*, Ex. 892-0002 (citing the Flanzraich plan (Ex. 231)). Either way, every Class Member’s Plan required, as one condition of coverage, that the prescribed services be consistent with generally accepted standards of care. *See generally* PFF § IV.

**E. UBH Develops And Uses Its Guidelines to Determine Whether Treatment at a Prescribed Level of Care is Consistent with Generally Accepted Standards.**

UBH develops and maintains its Guidelines to interpret the plan language requiring services to be consistent with generally accepted standards and to standardize its clinicians’ application of those plan terms. Tr. 36:8-10 (UBH admission that “. . . UBH creates clinical guidelines to help its reviewers administer the benefits and determine whether coverage is available”); Tr. 1876:22-25 (UBH admission that “the generally accepted standards of care in terms of level of treatment are defined by UBH in its Level of Care Guidelines.”); Ex. 1-0002 (“The Level of Care Guidelines . . . are intended to standardize care advocacy decisions regarding the most appropriate and available level of care needed to support a member’s path to recovery”); Ex. 2-0002 (same); Ex. 3-0002 (same); Ex. 4-0002 (“The *Level of Care Guidelines* is a set of objective and evidence-based behavioral health criteria used to standardize coverage determinations . . . . [It] is derived from generally accepted standards of practice for the treatment of behavioral health conditions.”); Ex. 5-0004 (same); Ex. 6-0004 (same); Ex. 7-0004 (same); Ex. 8-0002 (same, except last phrase is replaced by “generally accepted standards of behavioral health practice”). Mr. Gerard (“Gerry”) Niewenhous, who was primarily responsible for UBH’s Guidelines from 2003 to mid-2016, Tr. 297:4-9, conceded that the LOCGs and CDGs are “supposed to reflect generally accepted standards of care.” Tr. 297:6-298:24. In short, the

Guidelines purport to set forth UBH's understanding of the generally accepted standards for making level of care placement decisions.

When a member or provider submits a request for coverage to UBH, a first-line reviewer (a so-called "Care Advocate") is assigned to (1) determine whether there is an administrative (*i.e.*, non-clinical) basis to deny the request, such as a contractual exclusion for a particular form of treatment or a certain condition, and (2) make an initial determination whether the prescribed treatment, at the proposed level of care, meets the criteria in the applicable Guideline. *See* Ex. 259-0017 (2014 Utilization Management Program Description ("UMPD")); Tr. 721:9-722:6 (Triana); Tr. 1101:17-1102:5 (Martorana). A Care Advocate generally has authority to *approve* treatment that "meets criteria." Tr. 942:12-18 (Martorana). Where the Care Advocate determines that one or more Guideline criteria are *not* met, he or she elevates the case to a Peer Reviewer: a psychiatrist or psychologist who works for UBH and is authorized to issue an adverse benefit determination where the prescribed treatment does not meet UBH's Guidelines criteria. *E.g.*, Ex. 259-0019 ("A Peer Reviewer makes all clinical denials . . .") (original emphasis); Tr. 720:14-721:13, 724:17-725:16 (Triana); Tr. 1374:22-25 (Allchin) ("Q. And do you use guidelines when you conduct a peer review? A. Yes. Q. Which guidelines do you use? A. I use the Optum Level of Care Guidelines.").

A Peer Reviewer's job is to decide, for each request for coverage (whether pre- or post-service), whether the prescribed treatment "meets criteria." 725:18-726:11 (Triana); Tr. 1102:17-19 (Martorana); *see also* Tr. 309:15-18 ("UBH bases coverage determinations on the Level of Care (LOC) guidelines, the Coverage Determination Guidelines (CDGs), and/or the psychological and neurological testing guidelines.") (quoting Ex. 735-0026). If the Peer Reviewer determines that the requested services satisfy the Guideline criteria, the Peer Reviewer must approve coverage. Tr. 1102-20-1103:2 (Martorana) ("Q: So they can't issue a clinical denial where the guideline criteria are met; right? A: Correct."). If, on the other hand, the Peer Reviewer determines that the requested services do not satisfy all of the Guideline criteria, the Peer Reviewer denies coverage. *See, e.g.*, Ex. 259-0019; Tr. 726:10-25, 728:13-22 (Triana). Each Peer Reviewer spends about half an hour reviewing a Care Advocate's recommendation

and whatever information is available in the case file, speaking to the treating physician, determining whether to uphold the Care Advocate's recommendation to deny coverage, and recording the rationale for the denial in the case file, for the denial-letter department to paste into a written notice to the member. Tr. 1445:23-1446:2 (Allchin); Tr. 1101:3-13 (Martorana).

Whenever a Peer Reviewer denies coverage "based on clinical considerations," the "[w]ritten notification of a denial" must include, among other things, "[t]he rationale for the denial," which must "cite the *Level of Care Guidelines*, the *Coverage Determination Guidelines*, the *Psychological and Neuropsychological Testing Guidelines*, or other clinical guidelines required by contract or regulation, as appropriate, **on which the denial was based**." Ex. 259-0020 (bold emphasis added). The denial letter must include *all* the reasons UBH has relied upon in denying coverage. Tr. 729:23-730:19 (Triana).[12] UBH peer reviewers, therefore, rely on [redacted]. Ex. 372-0002.

Moreover, UBH fastidiously measures the "inter-rater reliability" ("IRR") of its Guidelines, *i.e.*, the consistency with which its Peer Reviewers apply the criteria. Tr. 735:10 – 736:13 (Triana); 739:20-23 (Triana) ("Q. . . . And would you agree that the results of the IRR processes indicate that UBH's clinicians are and have been applying the LOCGs consistently? A. Yes."). UBH unfailingly reports an IRR of over 95 percent, and even as high as 98 percent in some years. Tr. 738:4-24 (Triana); Exs. 343 (2012 IRR Report); 299 (2013 report); 300 (2014 report); 301 (2015 report); 302 (2016 report). And UBH takes its IRR very seriously. Once

[12] This procedure is mandated by ERISA, which requires a claims administrator, upon denying a request for coverage, to explain its "specific reasons" for denying the claim and to provide information about the denial, including the "specific plan provisions" on which it was based and "any additional material or information necessary for the claimant to perfect the claim." 29 U.S.C. § 1133; 29 C.F.R. § 2560.503- 1(g)(1)(iii). The obvious corollary to this disclosure requirement is that, if the denial is challenged in court, the administrator may not "assert a reason for denial of benefits that it had not given during the administrative process." *Harlick v. Blue Shield of Cal.*, 686 F.3d 699, 719- 20 (9th Cir. 2012) (preventing insurer from arguing that it denied plaintiff's claim due to lack of medical necessity when lack of medical necessity was not communicated to plaintiff as a basis for denial of her claim). *See also Nieves v. Prudential Ins. Co. of Am.*, 233 F. Supp. 3d 755, 762-64 (D. Ariz. 2017) (holding that, by failing to assert during the administrative process that plaintiff was not disabled, the plan administrator forfeited its right to assert this as a basis for denial of coverage).

results are reported, "[s]upervisors" at UBH are directed to address "areas of discrepancy," and "clinical leaders" must "oversee any necessary corrective action." Ex. 259-0048.

Consistent with UBH's established policies and procedures, the evidence in this case reflects that each Class Member's denial was based, in whole or in part, on UBH's determination that the member failed to meet the criteria in UBH's Guidelines. *See* Ex. 896 (Class List stipulation); Ex. 894 (summarizing excerpts from the denial rationales for the Claim Sample members, all of which reference UBH's Guidelines).

### F. The Generally Accepted Standards of Care For Making Patient Placement Decisions Are Well Established in the Behavioral Health Community.

Generally accepted standards of care are, by definition, the standards that have developed and achieved wide acceptance among behavioral health professionals. As Plaintiffs' expert, Dr. Eric Plakun, explained, "[i]t's the best of our knowledge based on research, based on practice guidelines, based on seasoned clinicians' experience, [and] experts' consensus." Tr. 498:19-21 (Plakun). There is certainly no single codification of "generally accepted standards of care," and there are many ways one could write criteria that are consistent with those standards. But it is nevertheless possible – and often easy – for experienced professionals to determine whether a given practice is in line with those standards. As Dr. Plakun put it: "[I]f you drew a hypothetical circle, there's an infinite number of points in the circle, but it's very easy to tell a point that's in the circle and a point that's outside the circle." Tr. 498:14-17.

At trial, the Court heard testimony from a number of witnesses about the generally accepted standards of care in the behavioral health community that relate to patient placement decisions. Among other things, Plaintiffs offered the testimony of Dr. Marc Fishman, an expert in addiction psychiatry and co-editor of the ASAM Criteria (discussed below),[13] and Dr. Eric

[13] Dr. Fishman is a psychiatrist who specializes in addiction psychiatry and addiction medicine, with subspecialties in the treatment of adolescents and young adults, and the treatment of opioid use disorders and use of medication. Tr. 62:1-23 (Fishman). He is a recognized researcher on addiction issues, and was a full-time member of the faculty of Johns Hopkins Hospital for several years. Tr. 62:10-14 (Fishman); Ex. 670-0002 (CV). Since 1993, he has served as the medical director of Mountain Manor Treatment Center and the Maryland Treatment Center, a network of community treatment providers for addictions and co-occurring conditions. Tr. 62:10-13; Ex. 670-0002. A particular focus of Dr. Fishman's practice and research has been on

Plakun, a psychiatrist with more than forty years of experience who served for thirty-five years as the Director of Admissions for the Austen Riggs Center.[14] UBH offered the testimony of a single retained witness, Dr. Thomas Simpatico, and several of its own employees, including Drs. Allchin, Martorana, and Danesh Alam.

Remarkably, all of these witnesses were in overwhelming agreement about nearly all the generally accepted standards of care that apply to patient placement in the context of behavioral health treatment.[15] They were also in complete agreement that the following resources, admitted into evidence, reflect the applicable generally accepted standards of care:

**The ASAM Criteria** (Exs. 642 & 662). Developed by the American Society of Addiction Medicine ("ASAM"), a professional society of physicians and other professionals who specialize in the treatment of substance use disorders, Tr. 65:4-6 (Fishman), the ASAM Criteria are the most widely accepted articulation of "the generally accepted standards of care for how to

---

levels of care, level of care guidelines, and treatment matching strategies to ensure patients receive treatment in the appropriate and most effective level of care. Tr. 62:24-63:2 (Fishman). He was appointed in the late 1990s to the steering committee for the ASAM Criteria and later served as a co-editor of the second and third editions. Tr. 67:1-9. He is recognized as a prominent expert particularly with respect to level of care criteria for adolescents, and is the Lead Author for Adolescent Criteria in the ASAM Criteria. Ex. 662-0009; Tr. 67:15-18 (Fishman).

[14] The Austen Riggs Center is a residential treatment facility that also provides a "hospital-based continuum of care," and is consistently recognized as one of the top ten psychiatric hospitals in the country. Tr. 468:15; 470:4-8 (Plakun). Dr. Plakun, who is currently the Associate Medical Director at Austen Riggs, graduated from medical school at Columbia University, served for twenty-one years as a member of the clinical faculty at Harvard Medical School, is a Distinguished Life Fellow of the American Psychiatric Association, and has edited two books, including one on selecting treatment strategies for treatment-resistant patients. 474:22-475:20, 477:8-9 (Plakun). He has practiced psychiatry at Austen Riggs for nearly forty years. Tr. 469:1-13; 472:21-23 (Plakun). As the facility's Director of Admissions for more than three decades, it was Dr. Plakun's responsibility, as to thousands of patients, to make a "level of care determination about whether residential treatment [was] appropriate," or whether a different level of care was more appropriate. Tr. 473:15-25 (Plakun).

[15] The chief area of disagreement at trial was about whether providing treatment in the "least restrictive" setting is an overriding principle that trumps considerations of effectiveness, if there is a direct conflict between the two. *See, e.g.*, Tr. 1136:4-9 (Martorana) (asserting that it is generally accepted to provide services at the level the patient needs for effective treatment *only* "[a]s long as it's the least restrictive care that can fulfill that criteria"). As discussed further below, the evidence clearly shows that effectiveness, not restrictiveness, is the touchstone under the generally accepted standards for selecting an appropriate level of care. *See* § II.F.1, *infra*.

do a comprehensive multidimensional assessment of patient severity, translate that into patient treatment needs, and, most importantly, how to do patient treatment matching to level of care." Tr. 69:20-24 (Fishman). *See also* Tr. 1575:25-1576:2 (Alam) ("the ASAM Criteria are consistent with generally accepted standards of care."); Tr. 957:22-958:9, 1112:5-16 (Martorana). As early as 2006, ASAM was recognized as "the most extensively used set of national guidelines for placement, continued stay, and discharge of clients with alcohol and other drug addictions." Ex. 548-0063. As of 2011, "[a]bout 30 US states require[d] the use of at least some aspects of the ASAM criteria." Ex. 673-0004 (Alam/Martorana article). *See also* PFF at VIII.E.1. In fact, repeatedly during the Class Period, the Peer Reviewers who were internally recognized as UBH's substance use disorder experts recommended that UBH adopt the ASAM Criteria as its standard criteria for substance use disorders. *See* § II.K.3, *infra*; PFF § XII.C.

**LOCUS** (Ex. 653). The Level of Care Utilization System ("LOCUS") was developed in the 1990s by the American Association of Community Psychiatrists ("AACP"), a national professional association of psychiatrists, to capture and articulate the generally accepted standards of care for level of care placement for mental health treatment of adults. Tr. 499:24-503:10 (Plakun). It was updated several times, including in 2009. Ex. 653-0001; Tr. 500:15-19 (Plakun). The evidence at trial was undisputed that LOCUS reflects generally accepted standards of care. Tr. 503:7-10 (Plakun); Tr. 1241:25-1242:10, 1338:18-20 (Simpatico). *See also* PFF § VII.E.2.

**CALOCUS/ CASII** (Exs. 644 & 645). The Child and Adolescent Level of Care Utilization System ("CALOCUS") was developed by the AACP and the American Academy of Child and Adolescent Psychiatry ("AACAP"), the preeminent association of child and adolescent psychiatrists, based upon LOCUS, but "adapted to reflect a developmental perspective, family focus, and inclusion of the comprehensive array of services in systems that serve children and adolescents." Ex. 645-0005. In 2001, the AACAP developed the Child and Adolescent Service Intensity Instrument ("CASII") (pronounced "kă-see") as a refinement of CALOCUS. Ex. 645-0005 & -0007. Among other things, the CASII explicitly and holistically "takes account of the impact of comorbid developmental, substance abuse and medical conditions in determining the

overall service intensity need." Ex. 645-0010. CASII was most recently updated in 2014. Ex. 645-0001. There is no dispute that CALOCUS and CASII reflect generally accepted standards of care for determining the most appropriate level of care for children and adolescents. Tr. 180:9-13 (Fishman); Tr. 1453:2-5, 1455:4-6 (Allchin). *See also* PFF § VII.E.3.

**CMS Manual (Exs. 653, 655, 656, 735)**. The Centers for Medicare and Medicaid Services ("CMS") administers the Medicare program. Coverage decisions under Medicare must comply with the Medicare Benefit Policy Manual (the "CMS Manual"), the functional equivalent of the "health plan" for purposes of Medicare. *See, e.g.*, 42 C.F.R. § 422.1019(b)(1)-(2). The CMS Manual includes provisions on, among other things, what constitutes a "reasonable expectation of improvement" (*e.g.*, Ex. 656-0026 to -0027); metrics for determining frequency and duration of services (*e.g.*, Ex. 656-0028); and definitions of active treatment (*e.g.*, Ex. 735-0104 to -0105, Ex. 655-0006 to -0008) and custodial care (*e.g.*, Ex. 735-0088 to -0089, Ex. 654-0029). There is no dispute that the CMS standards on improvement, custodial care, and active treatment are consistent with generally accepted standards of care. *See*, *e.g.*, Ex. 281-0002 (UBH's "Hierarchy of Clinical Evidence"); Tr. 310:4-6, 311:12-20 (Niewenhous); Tr. 111:14-17 (Fishman); Tr. 499:10-16 (Plakun). *See also* PFF at § VII.E.4.

The witnesses' testimony, and the sources they uniformly credited, make clear that there is little dispute in this case about the standards of care that are generally accepted in the behavioral health field for making patient placement decisions. The following such standards are particularly relevant to this case:

**1. <u>Behavioral Health Services Should Provide Effective Treatment</u>**

It is generally accepted in the behavioral health community that the appropriate level of care is the one that will provide effective treatment for all of the patient's mental health and substance use disorders. Tr. 80:17-19 (Fishman); Tr. 511:25-512:6 (Plakun); Tr. 1135:20-24 (Martorana admission). That means services must effectively treat not only patients' symptoms, but also their underlying conditions, and not only their primary diagnosis, but co-occurring conditions as well.

(a) <u>Effective Treatment of Underlying Conditions, Not Merely Alleviation of Acute Symptoms</u>

There is a basic distinction in behavioral health treatment between conditions, on one hand, and symptoms, on the other. *See, e.g.*, Tr. 333:13-16, 342:9-14 (Niewenhous); Tr. 972:10-11 (Martorana). A person may suffer long-term from the *condition* of major depressive disorder, while the *symptoms* of that disorder, which may be acute or chronic, can range (for example) from suicidal ideation or planning to a diminished ability to maintain relationships. *See, e.g.*, Tr. 133:13-16, 139:9-13 (Fishman). The purpose of treatment is not just to alleviate a patient's symptoms at a given time, but to treat – effectively – his or her underlying condition. Dr. Plakun explained this core principle as follows:

> I often think about it as like a pot boiling over on a stove. If we always are simply removing the lid and giving it a stir a couple of times because the pot's boiling over, we'll neglect that somewhere along the line we have to turn down the flame. . . .
>
> [E]xcept in those relatively rare instances when that's a one-time thing, you know, in the vast majority of instances this pot will keep boiling over unless you turn the flame down underneath it, and so you wind up in a recipe that is sadly all too familiar in the world these days; that is, of people going in and out of hospital, rotating back and forth between trying to make outpatient treatment work, failing in it, having chronic ongoing crises that need to be managed, winding up in an inpatient unit. . . . It's optimal to try to find a way to turn the flame down and not simply feed the recurrent loop of crisis.

Tr. 486:1-5, 492:1-14. The same goes for substance use disorder treatment. "Addiction treatment services have as their goal not simply stabilizing the patient's condition but altering the course of the patient's disease toward wellness and recovery." Ex. 662-0025.

Because effective treatment requires more than simply alleviating symptoms, it also requires more than simply managing acute crises. Tr. 701:19-21 (Triana) ("[O]ngoing mental illness is not necessarily cured when an acute episode is stabilized."). Most behavioral health disorders are long-term and/or chronic. For example, as UBH's own personnel admitted, "Substance Use Disorder (SUD) is a chronic, complex condition that is subject to reoccurrence of symptoms (relapse). It is [a] public health issue that ruins lives, impacts families and weakens communities." Ex. 548-0010. *See also* Ex. 634-0127 ("Although there is considerable

heterogeneity among patients with substance use disorders the disease course is often chronic, lasting for years."); Tr. 1599:21-1600:1 (Alam); Tr. 491:22-492:14 (Plakun); Tr. 484:11-17 (Plakun) (identifying chronic issues is "tremendously important in predicting both the presence of mental disorders and. . . their severity and how hard they are to treat."). Because behavioral health conditions are so often chronic, "[t]reatment of these individuals is most effective and efficient when it addresses the individuals' specific biopsychosocial issues in a manner that [not only] will stabilize the acute episode, [but also] arrest further deterioration of function, and help promote ongoing recovery." Ex. 662-0075 (the ASAM Criteria).

(b) <u>Effective Treatment of Co-Occurring Behavioral Health Conditions</u>

It is also generally accepted in the behavioral health community to provide effective treatment for a patient's co-occurring behavioral health conditions. *See, e.g.*, Tr. 1135:25-1136:3 (Martorana admission). As Dr. Plakun explained, roughly four out of five individuals who have a behavioral health diagnosis actually have *multiple* disorders, as found in a "very large well-recognized study of depression called the Star*D study -- Sequence Treatment Alternative Response for Depression." Tr. 483:21-484:7. Dr. Plakun's decades of experience treating individuals at Austen Riggs have also borne this out:

> [W]hen we have done research-level diagnosis in the kinds of patients who come to Riggs, there's an average of six different disorders that people have, that rarely do people have just one disorder; that there may be something that's prominent that is the leading edge, the tip of the iceberg, if you will, about what's wrong, but often there are chronic, comorbid, recurrent underlying issues, experiences related to trauma or early adversity.

Tr. 484:6-15. When a patient presents with a particular diagnosis, that is often only "the tip of the iceberg"; upon further evaluation, most patients are found to have multiple, co-occurring conditions. *Id.*

The presence and severity of co-occurring conditions are thus critical considerations in level of care placement in the behavioral health context. Multiple disorders can interact in a "reciprocal way" that makes each of them "worse." Tr. 81:9-17 (Fishman). *See also* Tr. 1349:10-19 (Simpatico); Tr. 610:24-611:14 (Plakun). Because co-occurring conditions can aggravate each

other, treating any of them effectively requires a comprehensive, coordinated approach to all conditions. Tr. 81:18-22 (Fishman); Tr. 525:16-20 (Plakun) ("[T]he whole focus of the treatment . . . is to focus on treating, not simply managing, but engaging and treating the co-occurring behavioral health issues."); Ex. 662-0046 (noting that when "two or more disorders co-occur and are concurrent, they all need to be addressed simultaneously as "primary" conditions in order to provide the most effective integrated and holistic care"); Ex. 673-0005 (Alam/Martorana article: "To be effective, treatment must address the individual's drug use and any associated medical, psychological, social, vocational, and legal problems."); Ex. 673-0006 ("Addicted or drug-abusing individuals with co-occurring mental disorders should have both disorders treated in an integrated way."). For similar reasons, the presence of a co-occurring condition, whether behavioral or medical, also is an aggravating factor that may necessitate a more intensive level of care for the patient to be effectively treated. *See, e.g.*, Tr. 108:3-5, 108:22-24, 139:15-17, 227:13-20 (Fishman); Ex. 653 -0011 (LOCUS). In addition, not all facilities have the capabilities to effectively treat certain co-occurring conditions, Tr. 1388:5-18 (Allchin), which could necessitate selection of a different treatment setting.

ASAM and LOCUS both reflect the importance of a comprehensive approach to treating co-occurring conditions. For example, ASAM Dimension 2 "assesses the need for physical health services, including whether there are needs for acute stabilization and/or ongoing disease management for a chronic physical health condition." Ex. 662-0066; Tr. 77:25-78:3 (Fishman). ASAM Dimension 3 "assesses the need for mental health services," and "specifically references mental health conditions, including trauma-related issues and conditions such as posttraumatic stress, cognitive conditions and developmental orders, and substance-related mental health conditions." Ex. 662-0066. After all, "[a] person might have a psychiatric or a mental health problem that either preceded substance use or is caused by substance use or, more often, is intertwined with substance use, and that has implications for their treatment needs and their placement." Tr. 78:8-12 (Fishman). When "two or more disorders co-occur and are concurrent, they all need to be addressed simultaneously as 'primary' conditions in order to provide the most effective integrated and holistic care." Ex. 662-0067. LOCUS Dimension III captures the same

mandate to take a comprehensive approach to effectively treating co-occurring conditions:

> III. Medical, Addictive, and Psychiatric Co-Morbidity
> This dimension measures potential complications in the course of illness related to co-existing medical illness, substance use disorder, or psychiatric disorders, in addition to the condition first identified or most readily apparent (here referred to as the presenting disorder). Co-existing disorders may prolong the course of illness in some cases, or may necessitate availability of more intensive or more closely monitored services in other cases.

Ex. 653-0011.

* * *

As reflected above, the evidence shows that, under generally accepted standards of care, practitioners strive to provide the *most* effective treatment they can to each patient. *See, e.g.*, Ex. 662-0132 (ASAM Criteria) ("The paramount objective [of treatment] should be safety *and effectiveness*") (emphasis added); Tr. 512:4-6 (Plakun) (practitioners seek to determine "the *most effective* way for this person to get better, to be able to engage the underlying[,] chronic[,] co-morbid[,] recurrent[,] trauma-related issues.") (emphasis added); *See also* Tr. 97:10-14 (Fishman) ("[W]hat we want from a level of care placement matching guideline are decision rules that direct a user to place a patient where the treatment will be ***most effective***, where the outcomes will be best, where their journey of recovery will likely be aided in the most successful way.") (emphasis added); Tr. 213:6-18 (Fishman) ("[W]what typically drives decisions are [what level of care will be] most effective. . . . "[U]sually it is that one is likely to be more effective, or the hypothesis is that one is more likely to be effective, and that's the one that you choose and try.").This means that, where there are two treatment settings in which a patient would be equally safe, practitioners should choose the *more effective* one for that patient. [16] Sometimes that will be a lower level of care; sometimes it will be higher. But the touchstone in all cases should be effectiveness.

---

[16] Because restrictiveness is a proxy for the cost of treatment, *see* n. 32, *infra*, this principle necessarily means that effectiveness should also trump concerns about "efficiency." It is only if two levels of care are *equally* safe and effective – a rare occurrence at best – that practitioners err on the side of selecting the lower level. *See* Tr. 213:6-18 (Fishman).

### 2. <u>Treatment is Most Effective when it is Provided at the Appropriate Level of Care for the Particular Patient</u>

It is also generally accepted in the behavioral health community to provide treatment at the level of service intensity the patient needs for effective treatment to occur. *See*, *e.g.*, Ex. 673-0005 (Alam/Martorana article: "Matching treatment settings, interventions, and services to individuals' particular problems and needs is critical to their ultimate success. . ."). A threshold question in ensuring patients' access to effective treatment is, thus, which level of care would be most effective in each case.[17]

There is a well-recognized continuum of intensity at which services can be delivered. In the most extreme situations, where a patient poses an imminent risk of serious harm to self or others, a provider will recommend inpatient hospitalization. *See, e.g.*, Tr. 487:10-11 (Plakun). At the opposite end of the spectrum is outpatient treatment, such as once- or twice-a-week psychotherapy. Some patients may be prescribed outpatient treatment only once, or for a short duration, but its purpose is just as commonly to treat chronic conditions. *See*, *e.g.*, Tr. 580:23-24 (Plakun) ("Someone might be seeking outpatient treatment for chronic reasons rather than acute reasons."); Ex. 662-207 (Level 1 outpatient services often provided indefinitely to patients with chronic conditions).

Sometimes, however, outpatient treatment is not adequate to effectively treat a patient's underlying and co-occurring conditions. That is where the "intermediate" levels of care, such as intensive outpatient and residential treatment, come into play. As Dr. Plakun explained, "there are really two things that must happen effectively if outpatient treatment is going to work[;] that is, the patient must have two capacities." Tr. 481:3-4. The patient must be able to (1) effectively "use the sessions," that is, to "manage them, bear what emotions get brought up in the course of them," and "understand instructions," and (2) "function adaptively until the next session." Tr. 481:6-12 (Plakun). When there is "trouble in one or both of those domains," providers may "add services" in order to "help someone's capacity to use the sessions better and to manage

---

[17] As noted above, n.15, *infra*, it is UBH's position in this case that generally accepted standards seek to match patients to the *least restrictive*, safe and effective level of care, but not necessarily the *most effective* level for the particular patient.

adaptively between the[m]," such as "having sessions more frequently" or adding medications, skills training, group sessions, and/or substance abuse treatment. Tr. 481:13-22 (Plakun).

For some patients, this additive model indicates that treatment may be most effective through an intensive outpatient program, or "IOP." IOP is typically a structured program involving 9 hours per week of outpatient treatment (or 6 hours for children). *See, e.g.*, Ex. 5-0030. It is "a program in which you have added services to try to make it possible for someone to deal with the underlying comorbidities, recurrent problems, histories of early and later adversity, trauma, all the complexity that is actually in reality part of what mental disorders are about." Tr. 486:10-14 (Plakun). This level of care, while more intensive than routine outpatient, is "not at all limited to crisis stabilization." Tr. 486:9-10 (Plakun).

In some cases, a patient needs a more structured, 24-hour setting in which to effectively "engage underlying chronic, recurrent, comorbid issues and try to. . . really turn a corner." Tr. 489:8-10 (Plakun). Residential treatment is for individuals who do not pose an imminent risk of serious harm to self or others (*i.e.*, who do not need inpatient hospitalization), but rather, "because of specific functional limitations, need safe and stable living environments and 24-hour care." Ex. 662-0240 (the ASAM Criteria). *See also, e.g.*, Ex. 634-0011 ("Residential treatment is indicated for patients who do not meet the clinical criteria for hospitalization but whose lives and social interactions have come to focus predominantly on substance use, who lack sufficient social and vocational skills, and who lack substance-free social supports to maintain abstinence in an outpatient setting."); Ex. 693-0011 ("Residential care should be considered for those children and adolescents who present with prolonged and chronic symptoms that have not responded to acute, short-term hospitalization.").

Residential treatment takes different forms. As reflected most explicitly in the ASAM Criteria, there are sub-levels of residential treatment, "on a continuum ranging from the least intensive residential services [level 3.1] to the most intensive medically monitored intensive inpatient services [level 3.7]." Ex. 662-0240. Level 3.7 programs "provide a planned and structured regimen of 24-hour professionally directed evaluation, observation, medical monitoring, and addiction treatment in an inpatient setting." Ex. 662-0290. Levels 3.1 through

3.5 are "clinically managed," which means that "on-site physician services are not required" but patients still "are in need of interventions directed by appropriately trained and credentialed addiction treatment staff." Ex. 662-0241.[18] For example, Level 3.5 is generally for individuals who "have multiple limitations, which may include substance use and addictive disorders, criminal activity, psychological problems, impaired functioning, and disaffiliation from mainstream values. Their mental disorders may involve serious and chronic mental disorders (such as schizophrenia, bipolar disorders, and major depression) and personality disorders (such as borderline, narcissistic, and antisocial personality disorders)." Ex. 662-0265. Lengths of stay in Levels 3.1 through 3.5 are often longer, even significantly longer, than lengths of stay in Level 3.7. *See, e.g.*, Ex. 662-0244 to -0045 ("The length of stay in a clinically managed Level 3.1 program tends to be longer than in the more intensive residential levels of care. Longer exposure to monitoring, supervision, and low-intensity treatment interventions is necessary for patients to practice basic living skills and to master the application of coping and recovery skills.").[19]

In contrast to these levels of care, hospitalization and partial hospitalization are designed to treat acute crises. Inpatient hospitalization (level 4 in the ASAM nomenclature), for example, is for patients who present "a serious danger of harm to self or others or [have] such a massive incapacity around functioning that they can't really manage in the world." Tr. 487:10-11 (Plakun); *see also* Ex. 5-0027 (per UBH's Level of Care Guidelines, hospitalization is called for where "there is imminent or current risk of harm to self, others, and/or property which cannot be safely, efficiently, and effectively managed in a less intensive level of care"). Partial hospitalization, another facility-based treatment setting, is also an acute, crisis-focused level of

---

[18] A 3.1 program is not a "sober living" facility. Residential treatment, including 3.1, is a treatment program – specifically, at least five hours of individual, group and/or family therapy per week. Ex. 662-0244. "Level 3.1 is not intended to describe or include sober houses, boarding houses, or group homes where treatment services are not provided." Ex. 662-0245.

[19] Level 3.3 describes residential treatment programs designed specifically for persons with cognitive limitations, such as individuals with traumatic brain injury, developmental disabilities, and/or dementia. Ex. 662-0255 to -0256. "Typically, [such patients] need a slower pace of treatment because of mental health problems or reduced cognitive functioning (Dimension 3), or because of the chronicity of their illness (Dimensions 4 and 5)." Ex. 662-0256.

care. Tr. 488:13-17 (Plakun) ("[PHP is] generally focused on crisis stabilization, crisis intervention, in a way that's similar to the way inpatient hospitals are and usually limited in duration with an eye, again, toward stabilizing the crisis and returning someone to a lower level of care."). *See also* Ex. 656-0031 (per CMS, "Patients admitted to a PHP generally have an *acute* onset or decompensation of a covered Axis I mental disorder.") (emphasis added); *id.* at -0030 (the "dysfunction" necessary to require PHP "generally is of an acute nature").

Matching patients to the most appropriate level of care is critical to ensuring the best outcomes. *See, e.g.*, Ex. 673-0005. If patients do not receive adequate treatment to enable them to use outpatient sessions and manage adaptively between them – and do not receive immersive treatment when needed – then they "can wind up being in chronic crisis states where they're always fending off the next crisis or recovering from the last crisis." Tr. 481:23-25 (Plakun). "[Y]ou cannot effectively do the work of treatment if you are always in . . . crisis stabilization mode." Tr. 481:25-482:2 (Plakun); *see also* Ex. 673-0004 ("Choosing the appropriate level of care is important. For example, a relapse may occur if a less intensive level of care than is appropriate is initiated.").

Research consistently shows that (a) patients who are "under-matched," *i.e.*, placed in a lower level of care than clinically indicated, generally face worse outcomes than those who are appropriately matched, and (b) there are generally no adverse effects on patients who are "over-matched," or placed in a higher level of care than indicated. *See*, *e.g.*, Ex. 673-0004 (Alam/Martorana article: "There is no research evidence to the existence of a consequence to choosing a more intensive level of care than necessary."); Tr. 73:8-76:22 (Fishman) (Dr. Fishman describing randomized controlled trials of matching under the ASAM Criteria:"[T]he most consistent finding is that undermatching, mismatching down, always does worse than appropriately matching to the appropriate level of care."); Tr. 475:24-25, 476:3-477:2 (Plakun) (explaining that a myth that "was refuted decades ago is that there's some harm that might come to patients by keeping them for an extended period in a residential or hospital level of care"; in fact, "length of stay in an active treatment was not a predictor of adverse outcome"); Tr. 481:23-482:6 (Plakun); Tr. 1674:6-11 (Alam); Ex. 634-0147 (APA Practice Guideline explaining that

"[a]t 3 months after intake, individuals who received regular outpatient care when intensive outpatient care would have been recommended as more appropriate had poorer drinking outcomes," and "[i]n individuals who received residential as compared with intensive outpatient treatment, there also was a trend for a better outcome").

#### 3. **Practitioners Should Err on the Side of Caution When Making Patient Placement Decisions**

Even where a given set of criteria is perfectly in line with generally accepted standards for making patient placement decisions, there sometimes remains "some ambiguity about whether a subject has met criteria." Ex. 653-0007 (LOCUS). Appropriate level-of-care criteria, therefore, consistently instruct practitioners to err on the side of caution – that is, on the side of higher levels of care. The LOCUS, for example, acknowledges that "there will be instances when it will remain difficult" to score patients on particular parameters. *Id.* "In these cases the highest score in which it is more likely than not that [at] least one criterion has been met should generally be assigned. The result will be that any errors will be made on the side of caution." *Id.* ASAM and CMS do the same, including in instances when a clinically-indicated lower level of care is unavailable. Ex. 662-0132 ("In general, when the criteria designate a treatment placement that is not available, a strategy must be crafted that gives the patient the needed services in another placement or combination of placements. The paramount objective should be safety and effectiveness, which usually requires opting for a program of greater intensity than the placement criteria indicate."); Ex. 656-0026 (CMS: "Services are noncovered only where the evidence clearly establishes that the criteria are not met.").[20] The mandate to err, if at all, on the side of a higher level of care, is backed up by the research described above: under-matching creates risks of poor long-term outcomes and patients in perpetual "crisis stabilization mode," while there is no evidence of any risk of adverse outcomes from over-matching. *See* § II.F.2, *supra*.

---

[20] Erring on the side of caution is especially important when it comes to children and adolescents. The CASII, for example, provides that "[t]he clinician should select the highest rating level in each dimension that most accurately identifies the child or adolescent's condition." Ex. 645-0021 (original emphasis). As discussed below, § II.G.7, UBH has no level of care criteria specific to youngsters.

### 4. <u>Level of Care Decisions Should Turn on a Multi-Dimensional Assessment of the Patient</u>

"Individuals with mental and substance use disorders can be viewed as suffering from biopsychosocial illnesses that, to varying degrees, have biological and medical, psychological and psychiatric, and sociocultural origins and clinical features." Ex. 662-0075 (the ASAM Criteria). For that reason, decisions about the level of care at which a patient should receive treatment must be made based upon a multi-dimensional assessment that takes into account a wide variety of information about the patient. *See, e.g.*, Tr. 1111:10-1112:1, 1116:10-1117:3 (Martorana); Ex. 673-0003 (Alam/Martorana article listing eight "factors" for "Choosing an Appropriate Level of Care"). It is a fundamental deviation from generally accepted standards of care to view a single factor, like the presence of acute changes, as a threshold requirement for services to be provided or covered.[21]

As the ASAM Criteria explain, "assessments are most accurate when they take into account all of the factors that affect each individual's receptivity and ability to engage in treatment at a particular point in time." Ex. 662-0080. Dr. Fishman described this as a "full multidimensional, multicomponent holistic assessment." Tr. 66:3-9 (Fishman). "Being aware of cross-dimensional interactions, and the potential increase or decrease in overall risk they pose, can have a great effect on service planning and placement decisions." Ex. 662-0080. Under ASAM, for example, there are six such dimensions:

---

[21] The exception to this general rule is that the *presence* of a truly acute crisis may be sufficient, by itself, to necessitate treatment at a higher level of care. *See, e.g.*, Tr. 490:25-491:2 (Plakun). But, under generally accepted standards of care, the *absence* of acute symptoms should not be determinative in deciding on an appropriate level of care. *See, e.g.*, Ex. 662-0077) (ASAM) (explaining that a patient's "current status . . . does override the patient's history" where, for example, the patient "is currently in severe withdrawal . . . even without a history of previous severe withdrawal signs and symptoms," but otherwise "[r]isk assessment must integrate the patient's history, current status, and changing situation").

| | |
|---|---|
| DIMENSION 1 | **Acute Intoxication and/or Withdrawal Potential**<br>Exploring an individual's past and current experiences of substance use and withdrawal |
| DIMENSION 2 | **Biomedical Conditions and Complications**<br>Exploring an individual's health history and current physical condition |
| DIMENSION 3 | **Emotional, Behavioral, or Cognitive Conditions and Complications**<br>Exploring an individual's thoughts, emotions, and mental health issues |
| DIMENSION 4 | **Readiness to Change**<br>Exploring an individual's readiness and interest in changing |
| DIMENSION 5 | **Relapse, Continued Use, or Continued Problem Potential**<br>Exploring an individual's unique relationship with relapse or continued use or problems |
| DIMENSION 6 | **Recovery/Living Environment**<br>Exploring an individual's recovery or living situation, and the surrounding people, places, and things |

Ex. 662-0064. LOCUS has a similar set of dimensions: (1) Risk of Harm, (2) Functional Status, (3) Medical, Addictive, and Psychiatric Co-Morbidity, (4) Recovery Environment, (5) Treatment and Recovery History, and (6) Engagement and Recovery Status. Ex. 653-0008 to -0018.

Each of these dimensions must always be taken into account in matching a patient to the most appropriate level of care, so that lower scores in one dimension can be offset by higher scores in another. *See, e.g.*, Ex. 662 at -0076 ("Because risk is multidimensional, each of the [ASAM] criteria's six dimensions is assessed independently and receives its own risk rating."). *See also id.* at -0081 to -0086 (describing various examples of "dimensional interactions"); *id.* at -0055 ("Numerous studies have shown that patient assessment using ASAM-like dimensions can generate both better clinical outcomes and lower costs.") (citing sources). As Dr. Fishman explained, "the numbering of [the dimensions] and the ordering of them and the names used isn't the critical thing." Tr. 80:6-9. "[H]owever you order them, however you name them, however you enumerate or catalog them, the content of each of these is essential to being able to do a comprehensive assessment, a comprehensive enumeration of treatment needs, and then using that as the basis for a level of care placement matching." Tr. 84:2-7. *See also* Tr. 490:2-14, Tr. 491:3-14 (Plakun) (a "comprehensive, multifaceted assessment from multiple domains. . . is what mental healthcare is about"); Ex. 653-0028-30 (LOCUS's "decision tree" and "determination

grid," reflecting that every dimension goes into determining the most appropriate level of care).

In short, generally accepted standards of care require that many considerations beyond acuity be taken into account in determining the proper level of care for treatment, including chronicity, comorbidity, recovery environment, patient age and motivation, and history of and response to interventions.

### 5. Effective Treatment Includes Services Needed to Maintain Functioning or Prevent Deterioration

Just as treatment must not be limited to "reduc[ing] or control[ling] the patient's psychiatric symptoms," treatment must also "be designed . . . so as to prevent relapse or hospitalization, and improve or maintain the patient's level of functioning." Ex. 656-0026 (emphasis in original). Functioning refers to "performance in the world[s] of work role, interpersonal role, and being part of a community." Tr. 480:17-19 (Plakun). Preventing deterioration and maintaining a patient's level of functioning are critically important components of effective treatment – particularly in the context of long-term, chronic conditions, as reflected, for example, in the CMS Manual's exposition of what constitutes a "reasonable expectation of improvement":

> It is not necessary that a course of therapy have as its goal restoration of the patient to the level of functioning exhibited prior to the onset of the illness, although this may be appropriate for some patients. **For many other psychiatric patients, particularly those with long-term, chronic conditions, control of symptoms and maintenance of a functional level to avoid further deterioration or hospitalization is an acceptable expectation of improvement.** "Improvement" in this context is measured by comparing the effect of continuing treatment versus discontinuing it. Where there is a reasonable expectation that if treatment services were withdrawn the patient's condition would deteriorate, relapse further, or require hospitalization, this criterion is met.
>
> Some patients may undergo a course of treatment that increases their level of functioning, but then reach a point where further significant increase is not expected. **Such claims are not automatically considered noncovered because conditions have stabilized, or because treatment is now primarily for the purpose of maintaining present level of functioning**. Rather, coverage depends on whether the criteria discussed above are met. Services are noncovered only where the evidence clearly

> establishes that the criteria are not met; for example, that stability can be maintained without further treatment or with less intensive treatment.

Ex. 656-0026 to -0027 (emphases added). *See also* Tr. 110:24-111:23 (Dr. Fishman explaining that these concepts reflect generally accepted standards of care); Tr. 561:1-562:11 (similar testimony by Dr. Plakun).

Many patients with chronic conditions, such as substance use disorders, "need very long-term treatment even past the point of having problems, even when they're stable, with a focus on preventing relapse while they're in remission." Tr. 130:11-14 (Fishman). *See also* Ex. 653-0009 ("[p]ersons with ongoing, longstanding deficits who do not experience any acute changes in their status" automatically given a rating of three, reflective of "moderate impairment," for LOCUS "functional status" dimension). That is why the ASAM Criteria, for example, note that "[t]reatment successes such as a period of abstinence or improvement in function sometimes are misinterpreted as indicating that treatment is completed." Ex. 662-0206. But "maintenance strategies such as relapse prevention and strengthening protective factors are critical components of treatment." *Id.* Even where patients "have achieved stability in recovery," ongoing outpatient treatment, sometimes indefinite, is necessary "for ongoing monitoring and disease management," – just as "is done with other chronic diseases such as hypertension, diabetes, and asthma." Ex. 662-0207. *See also* Tr. 131:5-18 (Fishman) ("Q. If the acute symptoms have made somebody with substance use disorder seek treatment, does that mean that that person is cured and no longer requires treatment of any kind, Doctor? A. . . . [N]othing could be further from the truth for many patients who are succeeding in ongoing, enduring, low-intensity treatment like outpatient treatment. It is the treatment itself and its enduring nature that is keeping them in good stead, and we would be remiss to discontinue it to wait for them to relapse to need further treatment."). *See also* Tr. 130:19-24 (Fishman) ("[P]erhaps the analogy is to medical treatments for chronic medical conditions where there's enduring vulnerability but you still need to go get treatment for your chronic diabetes, your chronic hypertension even if it's under control for now exactly because the treatment is what's keeping it under control without acute changes.").

### 6. **Services Should Continue as Long as they are Needed and the Patient Has the Capacity to Benefit.**

It is generally accepted in the behavioral health community that treatment should continue in a given level of care so long as the patient is making progress *or has the capacity to do so*, and so long as services at that level of care are necessary to improve the patient's condition and/or maintain his or her level of functioning. There should be "no specific limits on the length of time that services may be covered." Ex. 656-0028 (CMS Manual). To the contrary, "[t]here are many factors that affect the outcome of treatment; among them are the nature of the illness, prior history, the goals of treatment, and the patient's response." *Id.* "As long as the evidence shows that the patient continues to show improvement in accordance with his/her individualized treatment plan, and the frequency of services is within accepted norms of medical practice, coverage may be continued." *Id.*

ASAM's continued service criteria also reflect these principles. According to ASAM, "It is appropriate to retain the patient at the present level of care if:"

> A. The patient is making progress, but has not yet achieved the goals articulated in the individualized treatment plan. Continued treatment at the present level of care is assessed as *necessary to permit the patient to continue to work toward his or her treatment goals*; **or**
>
> B. The patient is not yet making progress, but has the capacity to resolve his or her problems. He or she *is actively working toward the goals articulated in the individualized treatment plan*. Continued treatment at the present level of care is assessed as necessary to permit the patient to continue to work toward his or her treatment goals; **and/ or**
>
> C. *New problems have been identified that are appropriately treated at the present level of care*. The new problem or priority requires services, the frequency and intensity of which can only safely be delivered by continued stay in the current level of care. The level of care in which the patient is receiving treatment is therefore the least intensive level at which the patient's new problems can be addressed effectively.

Ex. 662-0325 (emphases added). UBH's Dr. Alam agreed that these are the proper criteria for determining "the duration of residential treatment." Tr. 1675:3-6.

After all, "[l]onger exposure to treatment interventions is necessary for certain patients to

acquire basic living skills and to master the application of coping and recovery skills.” Ex. 662-0242. *See also, e.g.*, Tr. 130:17-131: 18 (Fishman). As UBH’s own Drs. Alam and Martorana wrote in their 2011 article, “[t]he appropriate duration for individuals depends on their problems and needs. Research indicates that, for most patients, the threshold of significant improvement is reached at about 3 mo[nths] in treatment,” and after that, “additional treatment can produce further progress toward recovery.” Ex. 673-0005. And as the ASAM Criteria reflect, even after a person has “achieved stability in recovery,” outpatient treatment services may continue “***indefinitely***.” Ex. 662-0207 (emphasis added).

**7. <u>The Unique Needs of Children and Adolescents Should be Considered in Making Level of Care Decisions</u>**

There was also consensus among the trial witnesses that when it comes to behavioral health treatment – including level of care placement decisions – children and adolescents differ from adults in important ways. *See, e.g.*, Tr. 101:4-13 (Fishman) (“adolescents have a different set of needs [than adults], they have different assets and vulnerabilities.”); Tr. 152:7-9 (“[I]n a variety of ways, we tend to think that youth would need higher levels of care for lower durations with lower barriers to access than adults”). As discussed below, appropriate level of care criteria must therefore take into account the unique needs of these young patients, particularly in three areas:

(a) <u>Developmental Trajectory</u>

Children and adolescents are, by definition, not fully developed. Psychiatrically speaking, a person does not become an “adult” until approximately age 25. Tr. 495:19-497:1 (Plakun). Before that point, a critical consideration not only in developing a treatment plan but also in selecting the most appropriate level of care is the person’s level of development: where the youngster falls on the trajectory of development. Tr. 88:13-21 (Fishman); Tr. 494:23-497:23 (Plakun). As UBH’s Dr. Allchin, a board-certified child psychiatrist, admitted, to determine “the appropriate level of care” for a child or adolescent, “you have to consider their developmental stage.” Tr. 1446:7-16.The CALOCUS, for example, reflects the keystone nature of developmental considerations, but incorporating them into its multi-dimensional assessment tool

for "psychiatric disorders, substance use disorders, [and] developmental disorders," which are "integrate[d]. . . as overlapping clinical issues." Ex. 644-0004. The ASAM Criteria also recognize that "[t]o be most effective" in treating adolescents, practitioners "must adapt their methods and strategies to respond to adolescents' emotional, behavioral, and cognitive vulnerabilities and strengths, as well as a developmental perspective that evolves dynamically." Ex. 662-0070.

Some of these considerations are reflected in UBH's "best practices" provisions, although, as discussed below, they are completely absent from its coverage criteria. *See, e.g.*, Ex. 5-0010 (¶ 4.1.2.12: provider should evaluate, *inter alia*, "[t]The member's developmental history."); Tr. 1377:13-20 (Allchin) (testifying that the clinical best practices section contains "sufficient detail to tease out aspects that are developmentally related" to make up for the lack of coverage criteria tailored to young people) (emphasis added).

(b) Different and/or Relaxed Criteria Across Dimensions

Another way in which appropriate standards tailor their criteria for children and adolescents is to relax the threshold requirements for admission and continued service at a given level of care. One way is by relaxing the entry threshold in a given dimension, such as "in [ASAM] Dimension 1, not requiring as high a level of severity." Tr. 151:19-25 (Fishman). Another way is by not requiring a showing in as many dimensions. Under ASAM, for example, for an adult to meet criteria for level 3.1 residential treatment, the patient must "meet[] specifications in ***each*** of the six dimensions" (Ex. 662-0249 to -0252), while an adolescent need only "meet[] specifications in at least ***two*** of the six dimensions" (Ex. 662-0253 to -0255). *See also* Tr. 152:7-9 (Fishman) (noting that youth are generally subjected to lower barriers to access than adults."). "For any given level of care, the entry criteria, that is, the decision rules for matching treatment severity and needs to level of care, are more inclusive, more permissive for adolescents." Tr. 151:15-152:9 (Fishman).

(c) Improvement

Children and adolescents also do not necessarily respond to treatment, or otherwise demonstrate improvement, in the same ways or on the same timeframe as adults. "Recovery for

children and adolescents is defined not only as a period of stability and control of problems, but also as a continuation or resumption of progress toward an expected developmental level." Ex. 645-0035 (CASII). Accordingly, "[i]t may be desirable . . . for a child or adolescent to remain at a higher level of service intensity to preclude relapse and unnecessary disruption of care, and to promote lasting stability." Ex. 645-0042. *See also* Tr. 1463:15-21 (Allchin) ("[I]t might be appropriate to require some level of improvement for an adult within some period of time that might not be appropriate for a child."); Tr. 101:4-13 (Fishman) ("[A]dolescents have a different set of needs. . . Most often they will need longer duration of treatment than adults.").

### G. Throughout the Class Period, the Level of Care Criteria in UBH's Guidelines Have Fallen Below the Generally Accepted Standards of Care.

UBH was well aware of the generally accepted standards described in Section II.F, above. Nevertheless, Plaintiffs proved at trial that throughout the Class Period, UBH developed, adopted, and used Guidelines that fell far short of those standards. The following discussion describes the numerous and often interconnected ways in which UBH's Guidelines were inconsistent with the generally accepted standards of care. Plaintiffs also set forth the evidence supporting each defect, in each provision, in each year, in the Claim Chart and Proposed Findings of Fact accompanying this brief.

#### 1. <u>Overemphasis on Acuity</u>

Throughout the Class Period, the Guidelines give primacy to the presence or absence of acute changes in symptoms and downplay or ignore other relevant considerations. To meet the Guidelines' threshold requirements for coverage, a member must show the presence of an acute crisis necessitating the level of care requested, and once the crisis has passed, the Guidelines provide that the member is no longer eligible for continued coverage. The Guideline provisions mandating acuity thus negate consideration of what is required to effectively treat the member's underlying condition and any chronic symptoms, and inherently drive members towards lower levels of care, or no care at all.

##### (a) <u>Expectation of Improvement of Acute Symptoms</u>

Throughout the Class Period, to obtain coverage upon admission, the Guidelines require a "reasonable expectation that services will improve the member's presenting problems within a

reasonable period of time." *See* Ex. 1-0005 (¶ 6); Ex. 2-0007 (¶ 6); Ex. 3-0008 (¶ 7); Ex. 4-0009; Ex. 5-0008 (¶ 1.8); Ex. 6-0010 (¶ 1.8); Ex. 7-0010 (¶ 1.8); Ex. 8-0007; *see also* PFF § IX.A.1. On its face, the term "presenting problems" refers to the immediate, acute symptoms that brought the member to treatment – not to his or her underlying condition.[22] *See, e.g.*, Tr. 99:1-4, 269:20-24 (Fishman) ("[E]ven though the word 'acute' isn't used, it focuses a user on thinking about the kinds of changes that are likely to be acute as different from baseline where even problems that are significant but not a change, that are chronic and enduring, in my view, ought to also be a focus of treatment.").

From 2012 through 2016, UBH made the focus of this provision even more explicit by specifying that "[i]mprovement of the member's condition is indicated by the reduction or control of **the acute symptoms that necessitated treatment in a level of care**." Ex. 2-0007 (¶ 6) (emphasis added). *See also* Ex. 3-0008 (¶ 7) (including identical language); Ex. 4-0009 (same); Ex. 5-0008 (¶ 1.8) (same); Ex. 6-0010 (¶ 1.8) (same); Ex. 7-0010 (¶ 1.8.1) (same). In 2017, UBH removed the word "acute" from this provision, but the Guidelines continue to require a "reasonable expectation" that services will, within a "reasonable period of time," "reduc[e] or control. . . the **signs and symptoms that necessitated treatment in a level of care**." Ex. 8-0007 (emphasis added).[23] In other words, to even get in the door to begin treatment at a level of care, not only must the UBH member have a "presenting problem" characterized by "acute symptoms," but those symptoms must have "necessitated treatment" at that level of care and be

---

[22] As early as 2011, the Guidelines make clear that the member's "presenting problems" are distinct from his "current condition." *Compare, e.g.*, Ex.1-0005 ¶¶ 4-5 (referring to member's "current condition") *with id.* ¶ 6 (referring to member's "presenting problem"). In this way, UBH's Guidelines pay lip service to treating a patient's "condition," but restrict coverage only to treatment necessary to alleviate the patient's most immediate *symptoms*.

[23] Plaintiffs' experts explained that in the context of the 2011 and 2017 Guidelines, "presenting problems" meant "acute symptoms" nearly as clearly as the 2012-16 Guidelines did. Tr. 99:1-4, 269:20-24 (Fishman); Tr. 552:19-553:8, 555:15-556:2 (Plakun). UBH, on the other hand, has never suggested, and produced no evidence at trial, that the terms "presenting problems" and "improvement" had different meanings in 2011 and 2017 than they do in the rest of the Class Period.

expected to improve within some arbitrary period of time.[24]

The contemporaneous evidence also makes clear that UBH knowingly and purposefully drafted its Guidelines to limit coverage to acute signs and symptoms. In June 2010, the BPAC issued a request to the Coverage Determination Committee ("CDC") to "consider adding a condition to the definition of 'active treatment'" to the CDG for Custodial Care to make clear that "care should be in the least intensive level of care." Ex. 307-0002. On July 1, 2010, the CDC decided on the following action-item: "**Add clarification** that reasonable expectation of improvement in the patient's condition is **improvement in the patient's <u>acute</u> condition**." *Id.* (bold emphasis added). Mr. Niewenhous was instructed to "edit the CDG" accordingly, *id.*, which he did. *See* Ex. 10-0003 (August 2010 CDG for Custodial Care: "Improvement of the patient's condition is indicated by the reduction or control of the acute symptoms that necessitated hospitalization or residential treatment."); Tr. 340:9-341:18 (Niewenhous). That exact language appeared in the very next iteration of the Level of Care Guidelines, Ex. 2-0007 (¶ 6), and in every version afterward until 2017. Ex. 3-0008 (¶ 7) (including identical language); Ex. 4-0009 (same); Ex. 5-0008 (¶ 1.8) (same); Ex. 6-0010 (¶ 1.8) (same); Ex. 7-0010 (¶ 1.8.1) (same).

(b) <u>Why Now</u>

Starting in 2014, UBH doubled down on this requirement of "acute symptoms" that "necessitated treatment" in a level of care by embracing a concept derived from "crisis intervention literature" – "Why Now." Ex. 1659-0006 (Bonfield Dep.) at 206:10-15. UBH defined "Why Now" as the "**acute changes** in the member's signs and symptoms and/or psychosocial and environmental factors leading to admission," Ex. 4-0007 (emphasis added), and

[24] The Guidelines do not specify how long a "reasonable period of time" is. UBH's witnesses claimed that the period is open-ended. *See, e.g.*, Tr. at 983:9-984:1 (Martorana). But if that were the case, there would be no point in including a time requirement at all. Other provisions, like the paragraph stating that "**[t]he** goal of treatment is to improve the member's **presenting symptoms** to the point that treatment in the current level of care is no longer required," Ex. 1-0006 (¶ 7) (emphasis added), suggest that improvement should occur quickly. In any event, setting *any* deadline within which a patient must demonstrate improvement (particularly as UBH defines improvement) is itself inconsistent with generally accepted standards. *See* § II.F.6, *supra*.

proceeded to incorporate the term *82 times* throughout the Guidelines. *See* Ex. 408-0008 ("Term 'why now' shows up 82 times throughout guidelines so we should have a clear definition. . ."); Tr. 741:17-25 (Triana). Thus, coverage upon admission required not only a finding the patient "cannot" be "treated in a less intensive setting," but that the *reason* the patient requires a higher level of care is the "Why Now" – *i.e.*, the member's "acute changes." Ex. 4-0007 (second black bullet) (admission requires that "[t]he member's current condition cannot be safely, efficiently and effectively assessed and/or treated in a less intensive setting **due to acute changes in the member's signs and symptoms and/or psychosocial and environmental factors (i.e., the "why now" factors leading to admission)**.") (emphasis added). *See also* Ex. 5-0008 (¶ 1.4) (same); Ex. 6-0009 (¶ 1.4) (same); Ex. 7-0009 (¶ 1.4) (same).

In 2015, UBH added yet another admission requirement (the flip side of ¶ 1.4): that "Assessment and/or treatment of **acute changes** in the member's signs and symptoms and/or psychosocial and environmental factors (i.e., the 'why now' factors leading to admission) require the intensity of services provided in the proposed level of care." Ex. 5-0008 (¶ 1.5); *see also* Ex. 6-0009 (¶ 1.5); Ex. 7-0009 (¶ 1.5).[25] On the face of these provisions, a member is denied coverage – even if the other criteria are met – if the *reason* the patient requires the prescribed level of care and "cannot" be treated in a lower level of care is anything other than "acute changes in the member's signs and symptoms and/or psychosocial and environmental factors." But as discussed above, neither "acute symptoms" nor "acute changes" should be a mandatory prerequisite for coverage of outpatient, intensive outpatient or residential treatment. *See* § II.F.4.

At trial, UBH conceded that "acute changes" means just that: significant, recent, short-term changes. *See* Tr. 1005:22-1006:1 (Martorana) ("acute changes are those that are immediate, generally short-lived, and have some impact as to why they need to be in this level of care"); Tr. 1057:21-1058:1 (Martorana) ("acute changes have to do with recent and significant differences from the -- in the patient's condition from their normal baseline condition"); Tr. 1083:15-16 (Martorana) ("acute symptoms" are "symptoms that have arisen relatively short term as opposed

[25] UBH removed these references to the "Why Now" factors from the 2017 Guidelines, which were revised after the Court certified the Class in this case. *See* Ex. 8-0006 (effective Jan. 2017).

to long-lasting chronic symptoms"); Tr. 1309:14-16 (Simpatico) ("the term 'acute' in this context refers to a departure from a baseline in a timely manner that represents an actionable departure from a clinical baseline").

Sometimes UBH's witnesses tried to suggest – contrary to the Guidelines' plain language – that the "Why Now" factors referenced in paragraphs 1.4 and 1.5 call for an assessment of the "whole person" or the patient's entire multi-dimensional history. *See, e.g.*, Tr. 1054:12-17 (Martorana); Tr. 1561:5-19 (Robinson-Beale); 1601:5-14 (Alam); Ex. 1659 (Bonfield Dep.) at 176:21-25.

But the plain language of the Guidelines contradicts these post-hoc rationalizations: not only did UBH clearly define what it meant by "Why Now" – acute changes – it equally clearly included *other* provisions that referred explicitly to the types of factors UBH's witnesses now claim were subsumed in the "Why Now" factors. In the "best practices" section, for example, UBH specified that a treating provider should evaluate *not only* the "Why Now" factors, but *also* a host of other factors including the member's chief complaint, psychiatric and medical history, psychosocial and environmental problems (as distinct from *acute changes* in those issues), risk factors, readiness for change, etc. *See* Ex. 4-0007 to -0009 (column headed "Evaluation & Treatment Planning" under "Clinical Best Practices"); *see also* Ex. 5-0010 to -0011 (¶ 4.1.2); Ex. 6-0011 to -0012 (¶ 4.1.2); Ex. 7-0011 to -0012 (¶ 4.1.2). If the term "Why Now" already subsumed a full multi-dimensional assessment, there would be no reason to separately list all of those other elements.[26]

When confronted with the fact that the plain language of the Guidelines does not support their testimony, UBH's witnesses fell back on the suggestion that the Court should disregard the actual language of the Guidelines because, for example, "That's not how it's trained" or "[T]hat

[26] *See also* Tr. 1602:2-10 (Alam) ("THE COURT: Well, I appreciate that way of looking at this. The other way of looking at this is that people reading this, who didn't draft them, are trying to figure out what they mean and trying to figure out what the 'why now' factors mean, see what it means and see what it doesn't mean, and distinguish it from other factors. So aren't you at risk that when somebody reads this sentence they will think that 'why now' is not as broad as you -- as you understand it to be? THE WITNESS: Point taken, yes.").

wasn't our intention." Tr. 978:12 (Martorana). But the plain meaning of the Guidelines is clear. And even if the Court were inclined to consider extraneous evidence about how they are applied – which it should not, *see* § IV.G.1, *infra* – UBH offered no contemporaneous evidence indicating that they were applied in the way those witnesses suggested. UBH failed to offer a single email, or power-point presentation, or other contemporaneous document instructing employees to disregard the Guidelines' plain meaning.[27]

(c) Coverage Ends When Acute Crisis Has Passed

UBH further reinforced the Guidelines' focus on acuity through the continued service and discharge criteria, which determine *how long* UBH will cover treatment at a level of care. If a member does not meet the continued service criteria, or *does* meet the discharge criteria, then coverage at the requested level of care ends.[28]

As an initial matter, in every year of the Class Period, to be eligible for coverage of continued services, a UBH member must show that s/he continues to meet the *admission* criteria for that level of care. *See* Ex. 1-0078 (¶ 1); Ex. 2-0082 (¶ 1); Ex. 3-0089 (¶ 1); Ex. 4-0007 (first black bullet in "Continued Service" column under "Level of Care Criteria"); Ex. 5-0009 (¶ 2.1); Ex. 6-0010 (¶ 2.1); Ex. 7-0010 (¶ 2.1); Ex. 8-0007. This means that just as a showing of acute symptoms is necessary for admission to a level of care, the patient must continue to suffer from those acute symptoms for coverage to continue – so, as soon as the acute crisis is alleviated, the Guidelines end coverage. In effect, the Guidelines allow treatment to take the lid off of the pot,

[27] The Claim Sample members' denial letters, on the other hand, make clear that the Guidelines mean exactly what they say. The word "acute" shows up in those letters many, many times; the word "chronic" does not appear even once. *See* PFF § IX.A.2.

[28] A denial of coverage at one level of care does not automatically lead to authorization of coverage at a lower level of care. Rather, the member must return to square one and request authorization for admission all over again. Tr. 1103:22-1104:16 (Martorana). Because both the admission criteria and the discharge criteria that apply to *all* levels of care require the ongoing presence of acute symptoms in order to obtain coverage, when a patient triggers the discharge criteria, chances are high that s/he will also be unable to meet the admission criteria and will be caught between them, a possibility the Court recognized. Tr. 1425:3-23. UBH's witness could only argue to the contrary by asserting that, in practice, UBH construes the admission criteria as part of the discharge criteria. Tr. 1425:24-1426:5 (Allchin). But that testimony has no support whatsoever on the face of the Guidelines themselves, and UBH did not offer a shred of contemporaneous evidence even hinting that this testimony was accurate.

but not to turn down the flame.

The other continued service and discharge criteria make this even clearer. For continued service, for example, the patient must be receiving "active treatment," which requires that the treatment plan be "focused on addressing the 'why now' factors." Ex. 5-0009 (¶ 2.1.2).[29] *See, e.g.*, Tr. 97:20-98:25 (Fishman); Tr. 491:22-492:14 (Plakun) (describing the "recurrent loop of crisis" that results from a "treatment regime that ends when the acute signs and symptoms or crisis has been reduced or controlled"). The Guidelines then expressly require coverage to end as soon as "*[t]he 'why now' factors which led to admission have been addressed* to the extent that the member can be safely transitioned to a less intensive level of care, or no longer requires care." Ex. 5-0009 (¶ 3.1.1) (emphasis added). *See also* Ex. 6-0010 (¶ 3.1.1); Ex. 7-0010 (¶ 3.1.1). In other words, once the "**acute changes** . . . (*i.e.*, **the "why now" factors** leading to admission)" "have been addressed," coverage at that level of care ends.

(d) Acuity Required for All Levels of Care

The Guidelines impose these acute-focused criteria for admission, continued service and discharge for all levels of care, including not only residential treatment, but outpatient levels of care as well. The LOCG sections for each of those levels of care not only require that every criterion in the Common Criteria be satisfied, but also frequently reiterate the Common Criteria's focus on acuity. *See, e.g.*, Ex. 4-0034 to -0035 (Outpatient: Mental Health Conditions) (incorporating the "Common Criteria for all Levels of Care" and also reiterating the requirement to have shown "[a]cute changes in the member's signs and symptoms and/or psychosocial and environmental factors (i.e. the 'why now' factors leading to admission) have occurred…").

As discussed above, none of these levels of care (including residential treatment) is inherently acute-focused. *See* § II.F.2, *supra*. Outpatient treatment, in particular, is incompatible with the notion that treatment is available only to patients with "acute changes," and only until the point those "why now" factors have "been addressed." *See, e.g.*, Tr. 510:11-25 (Plakun) ("If we focus exclusively on acuity in making level-of-care decisions, we're going to miss the

---

[29] Similar requirements appear in other years' criteria. Ex. 6-0010 (¶ 2.1); Ex. 7-0010 (¶ 2.1).

opportunity to work on the underlying problems on the turning down the flame. We'll be caught in a cycle in which we're always taking the lid off the pot and never turning the flame down. Because whether it's outpatient or intensive outpatient or residential treatment, the goal is to get someone to the position where they can use sessions over time and function adaptively between sessions over time so that they can struggle with achieving recovery, having a life that's the best life they can have."); Tr. 149:9-12 (Fishman) ("[O]ne of the purposes for low intensity treatment at this level of care, outpatient treatment, is to continue maintenance of stability and to continue maintenance of remission if a person is in remission.").

* * *

In all these ways, in every year of the Class Period, the Guidelines pervasively overemphasize acuity, turning the presence of acute symptoms or changes into a threshold prerequisite for coverage. In so doing, the Guidelines run afoul of the generally accepted standards of care described in Section II.F, above:

- By limiting coverage to services aimed at alleviating acute symptoms, the Guidelines fail to provide for the effective treatment of a patient's underlying condition, chronic symptoms, and co-occurring conditions, *see*, *e.g.*, Tr. 97:20-98:4 (Fishman) ("[T]here is an inordinate, in my view, overemphasis on looking for acuity in determining why patients should get admitted and should stay in particular levels of care. . . [A]nd I think that matters of enduring severity, matters of chronic severity, matters of cumulative severity are underemphasized and not taken into account adequately.");

- By myopically focusing on a single issue (whether the patient has acute symptoms), the Guidelines fail to take into account the multitude of factors that should be considered in making patient placement decisions, *see*, *e.g.*, Tr. 505:1-5, 505:8-506:3 (Plakun), Tr. 80:6-9, 84:2-7 (Fishman);

- By limiting coverage for higher levels of care only to the most acute, time-limited circumstances, the Guidelines fail to err on the side of caution, *see* also § II.G.3, *infra*; and

- By ending coverage as soon as the acute symptoms are reduced, the Guidelines prematurely truncate coverage when continued services are still warranted and preclude coverage for maintenance treatment, *see also* §§ II.G. 5 & 6, *infra*.

For this reason, alone, UBH's Guidelines are inconsistent with the terms of the Class Members' plans.

### 2. Failure to Consider Effective Treatment of Co-Occurring Conditions

UBH's Guidelines omit any evaluation of whether a member's co-occurring conditions can be ***effectively treated*** in the requested level of care, or whether those conditions ***complicate or aggravate*** the member's situation such that an effective treatment plan requires a more intensive level of care than might otherwise be appropriate. Instead, the Guidelines call for UBH to verify only that "[c]o-occurring behavioral health and medical conditions can be ***safely managed***" at the prescribed level of care." Ex. 8-0007 (third bullet point) (emphasis added); *see also* Ex. 5-0008 (¶ 1.6); Ex. 6-0009 (¶ 1.6); Ex. 7-0009 (¶ 1.6).[30]

As Dr. Plakun explained, "safe management" of co-occurring behavioral health disorders is often the opposite of effective treatment. For example, if a patient has been diagnosed with depression and attempted suicide, it is critical for effective treatment to find out that the reason the patient is "finding life unbearable" is "because of some horrific experience of assault and rape." Tr. 518:9-17 (Plakun). A directive to "safely manage" such trauma, in contrast, would suggest steering clear of "the underlying issues, the co-morbid issues," because dredging up traumatic experiences like that can itself be traumatic. Tr. 518:4-8 (Plakun). But avoiding such issues simply puts the patient "at risk to be waiting for the pot to boil over again." Tr. 518:4-8 (Plakun). "[R]eal treatment" means "not simply managing something like trauma" but rather "opening up the issue and getting into it." Tr. 526:8-13 (Plakun). "[T]here's a very different approach between suppressing symptoms related to something, managing them, and engaging the issue, making the treatment meaningful." Tr. 526:14-16 (Plakun). In other words, there is a fundamental "difference between safely managing a condition and effectively treating it." 526:2-527:1 (Plakun). *See also* Tr. 528:15-19 ("[Dr. Plakun]: Well, I believe that what I'm saying is that 'safely managed' and 'adequately treated' are not the same thing. THE COURT: No, I agree with that. . . . [E]veryone in the room agrees with that."). *See also, e.g.*, Tr. 107:20-108:24 (Fishman).

---

[30] Before 2015, the Common Criteria mention co-occurring conditions only when describing best practices concerning the contents of a treatment plan. *See generally* Claims Chart. *See, e.g.*, Ex. 3-0052 (IOP: Substance Use Disorders) ("The member's co-occurring medical, mental health or substance use conditions can be safely managed in an intensive outpatient program.").

At trial, some of UBH's witnesses attempted to erase this deviation from the generally accepted standards by asserting that the words "safely managed" mean the same thing as "effectively treated." *See* Tr. 974:23-976:13 (Martorana); Tr. 1179:12-1180:1 (Dr. Simpatico asserting the phrases mean the same thing but noting he would "approve" of editing "safely managed" to say, "safely, effectively and efficiently treated").[31] As the Court pointed out, UBH used the phrase "safely, efficiently and effectively assessed and/or treated" in one provision (with respect to the member's "current condition"), but in the very next provision, used different words – "safely managed" – with respect to co-occurring conditions. Tr. 975:15-976:9. UBH's use of two very different standards for the patient's "current condition" ("safely, effectively and efficiently treated") and the patient's co-occurring conditions ("safely managed") can only mean that UBH "meant different things" – and thus that UBH's Guidelines do not direct that co-occurring conditions should be effectively treated. Tr. 978:5-11. When the Court pointed that out to Dr. Martorana, he had three responses: (1) "I can understand [Plaintiffs] may think that" (Tr. 978:11); (2) "I did not actually pick these words" (Tr. 977:1), and (3) "We didn't think it through in the way you're thinking it through now." 976:14-977:5. Dr. Allchin's response to the same question was essentially the same: "[I]t could be a reasonable interpretation" (Tr. 1390:5-7) and "I didn't write the guidelines" (Tr. 1389:21).

The Court also pointed this out to Dr. Simpatico. These were his responses: "Overkill perhaps" (Tr. 1180:16); "I would approve that edit in the future" (Tr. 1179:12-1180:3); "[T]here are certainly some editorial improvements that could happen throughout the guidelines" (Tr. 1180:22-23); and "If I were writing these, I would probably write them in a slightly different style" (Tr. 1183:5-6). In fact, Dr. Simpatico's testimony revealed that the reason he reads "safely managed" to mean the same thing as "effectively treated," and "current condition" to include "co-occurring conditions" (among many other things) is because he imports his understanding of

---

[31] Dr. Martorana also claimed that UBH trains its clinicians that – despite the Guidelines' plain wording – "current condition" means "everything they bring to the table for treatment." Tr. 977:13-14 & 978:5-20. But UBH did not offer a single document – contemporaneous or otherwise – demonstrating that UBH, in fact, trains its clinicians that the words of the Guidelines mean something other than what they say.

generally accepted standards of care into the Guidelines, notwithstanding what they say on their face. *See* Tr. 1180:16-1181:9; 1183:5-13. As the Court observed,

> [Y]ou're talking about what generally accepted standards of care are. You're not talking about what's in the guidelines. So what you're doing is you're reading into the guidelines your generally accepted standard of care. Because you know it's got to be done a particular way, therefore, they must mean it that way.

Tr. 1181:10-15. But what all this testimony shows is that even UBH's own witnesses admit that, **as written, on their face,** UBH's Guidelines fall short of the generally accepted standards of care, and they can only be brought in line with those standards by interpreting them to have a different, hidden meaning.

Mr. Niewenhous – the UBH employee primarily responsible for the Guidelines throughout most of the Class Period – was more candid on this issue (at least when writing to his new boss, Lynn Wetherbee, in 2015). He admitted that UBH's "acute care" model of utilization management is "***not*** organized to manage the needs of members with concurrent medical and behavioral health conditions." Tr. 304:19-21 (Niewenhous testimony on Ex. 512) (emphasis added); *see also* Ex. 512-0007. Mr. Niewenhous's contemporaneous powerpoint, unlike the testimony of Drs. Martorana, Allchin, and Simpatico, comports with the way the Guidelines are actually written. And his assessment is consistent with the other contemporaneous evidence, unlike the post-hoc rationalizations the other witnesses offered at trial. As noted above, in the 2015 Guidelines, UBH moved the "safely managed" language from the best practices section to the Common Criteria. When Mr. Niewenhous forwarded Ms. Wetherbee, a list of changes that included that provision, Ms. Wetherbee [redacted] Ex. 539-0001; Tr. 1820:12-18.

### 3. Drive Toward Lower Levels of Care Rather than Erring on the Side of Caution

At trial, the evidence showed that UBH's Guidelines actively seek to move patients to the least "intensive" level of care at which they could be safely treated – even if a lower level of care may be less effective for that patient. For UBH, the paramount consideration is to move patients to the lowest possible level of care at the earliest possible point. *See*, *e.g.*, Tr. 968:18-24 (Martorana) (calling the "preference to be in the least restrictive setting" a "basic principle of psychiatric treatment"); Tr. 991:13-16 (Martorana) ("Q. Why should the [treatment] plan be focused on addressing the factors leading to admission? A. Well, that then comes back to the issue of the least restrictive setting.").[32]

For example, in all years, the Guidelines only permit UBH to approve coverage for admission to a given level of care if the treatment ***cannot*** be safely, efficiently, and effectively provided in any ***less intensive level of care***. Ex. 8-0007 (first and second black bullet points); Ex. 7-0009 (¶ 1.4); Ex. 6-0009 (¶ 1.4); Ex. 5-0008 (¶ 1.4); Ex. 4-0007 (second black bullet point under "Level of Care Criteria: Admission"); Ex. 3-0008 (¶ 6); Ex. 2-0006 (¶ 5); Ex. 1-0005 (¶ 5).[33] Starting in 2015, the Guidelines also mandate a separate finding that treating the member's "acute changes" in "signs and symptoms and/or psychosocial or environmental factors. . . ***require the intensity of services*** provided in the proposed level of care." Ex. 5-0008 (¶ 1.5); Ex. 6-0009 (¶ 1.5); Ex. 7-0009 (¶ 1.5); Ex. 8-0007 (second black bullet point).

Moreover, the Guidelines repeatedly emphasize that the purpose of treatment is to address the member's acute changes only "***to the point***" that it is possible for the patient to step down to a lower level of care. *See*, *e.g.*, Ex. 1-0006 (¶ 7) ("The goal of treatment is to improve the member's presenting symptoms to the point that treatment in the current level of care is no

---

[32] For UBH, the "least restrictive" mantra is a thinly veiled way to ensure that in every choice between levels of care, UBH's Peer Reviewers will err toward the less expensive one. *See* Ex. 437-0001 ("[redacted]."). *See also* Tr. 383:24-384:4 (Niewenhous).

[33] UBH added the "efficiency" requirement in 2014. *See* Ex. 1 (¶ 5) (no requirement that treatment be "efficient"); Ex. 2-0006 (¶ 5) (same); Ex. 3-0008 (¶ 6) (same).

longer required."); Ex. 2-0006 (¶ 7) (same); Ex. 3-0008 (¶ 8) (same); Ex. 4-0011 (second bullet under "Clinical Best Practices: Evaluation & Treatment Planning") ("Treatment focuses on addressing the 'why now' factors to the point that the member's condition can be safely, efficiently, and effectively treated in a less intensive level of care. . ."); Ex. 5-0011 (¶ 4.1.7) (same); Ex. 6-0013 (¶ 4.1.7) (same); Ex. 7-0013 (¶ 4.1.7) (same); Ex. 8-0008 (sixth black bullet) (same, except "'why now' factors" is revised to "factors precipitating admission"); *see also* PFF § IX.A.C (citing preamble to level of care-specific LOCGs sections).

At the same time, in all years, only evidence that step-down would be ***unsafe*** is enough to stave off a discontinuation of coverage at a given level of care. *See*, *e.g.*, Ex. 1-0078 to -0079 (¶¶ 2, 8, 10) (for continued coverage, member must demonstrate, *inter alia*, "a significant likelihood of deterioration in functioning/relapse if transitioned to a less intensive level of care;" either measurable progress or "clear and compelling evidence[34] that continued treatment at this level of care is required to prevent acute deterioration or exacerbation that would then require a higher level of care;" AND that s/he "cannot effectively move toward recovery and be safely treated in a lower level of care. . ."); Ex. 2-0082 (¶ 6) (requiring "evidence that relapse or a significant deterioration in functioning would be imminent if the member was transitioned to a lower level of care. . ." ); Ex. 3-0089 (¶ 6) (same); Ex. 4-0007 (first sub-bullet under "Discharge") (providing that coverage ends when the member's acute changes have been "addressed to the extent that the member can be safely transitioned to a less intensive level of care. . ."); Ex. 5-0009 (¶ 3.1.1) (same); Ex. 6-0010 (¶ 3.1.1) (same); Ex. 7-0010 (¶ 3.1.1) (same); Ex. 8-0007 (first sub-bullet under ("Common Discharge Criteria for All Levels of Care") (same).

While some of these Guideline criteria acknowledge that treatment in the lower level of care ought to be effective, none calls for UBH to identify or cover the ***most effective*** level of care for the member. And the continued service and discharge criteria do not turn on effectiveness at all, only safety. This means that, under the Guidelines, coverage ends as soon as it would be *safe*

[34] At trial, Dr. Simpatico conceded that "clear and compelling evidence" is not "traditional medical language," Tr. 1239:2-3, and Dr. Alam conceded the "clear and compelling" requirement is inconsistent with generally accepted standards of care. Tr. 1584:1-13.

to transition the member to a lower level of care – regardless of whether treatment at that lower level would be effective *at all*, let alone the most effective. This approach flies in the face of generally accepted standards, which not only place the primary emphasis on effectiveness, but also call for practitioners to err on the side of caution (*i.e.*, by selecting a more intensive level of care) when making patient placement decisions. *See* §§ II.F.1, 2 & 3, *supra*.

At trial, UBH's witnesses insisted that the Guidelines' overriding push to the least *intensive* level of care is supported by the concept that patients should be placed in the "least restrictive" level of care that is "safe and effective." *See, e.g.*, Tr. 970:1-11 (Martorana); Tr. 1175:14-24 (Simpatico). As Dr. Plakun explained, however, "in the levels of care that are relevant to this case," the "least restrictive" concept is "off the mark." Tr. 511:25-512:3. "The more important issue is, what's the *most effective* way for this person to get better, to be able to engage the underlying[,] chronic[,] co-morbid[,] recurrent[,] trauma-related issues." Tr. 512:4-6 (Plakun) (emphasis added).

UBH's Guidelines all but ignore that question, instead limiting coverage to services at the lowest level of intensity that can keep the patient safe – whether that level is effective or not.

#### 4. <u>Mandatory Prerequisites for Coverage, Rather than Multi-Dimensional Assessment</u>

As discussed above, decisions about the level of care at which a patient should receive treatment must be multi-dimensional, taking into account a wide variety of information about the patient. *See* § II.F.4, *supra*. In every year from 2011 to 2017, UBH's Guidelines violated this core principle. Unlike the multi-dimensional structure of ASAM and LOCUS, for example, UBH's Guidelines are sets of mandatory criteria, each of which must be met. *See* § II.B.1, *supra*; Exs. 1-8; Tr. 286:13-17. Under the generally accepted standards of care, a higher showing in one dimension can suffice to entitle a patient to a higher level of care, even in the absence of any showing in another dimension. Under ASAM, for example, a patient is placed in intensive outpatient treatment upon satisfying "at least ***one*** of Dimensions 4, 5, or 6," Ex. 662-0223 (emphasis in original), using criteria in those dimensions that is tailored to IOP, and which themselves are alternatives, *either* of which may be met, *see, e.g.*, Ex. 662-0224 ("The patient's

status in Dimension 4 is characterized by (a) ***or*** (b).") (emphasis in original). *See also, e.g.*, Ex. 662-0267 ("Patients may be appropriately placed in a Level 3.5 program as direct admissions or as transfers from a Level 3.7 or Level 4 program when their problems in Dimensions 1, 2, and 3 no longer warrant the availability of 24-hour medical or nursing interventions, but problems in Dimensions 4, 5, and 6 are sufficiently severe to exclude outpatient treatment as a viable option.").

Similarly, under the LOCUS, a patient rated as having a "serious impairment" in functional status (Dimension II), a "major co-morbidity" (Dimension III) or a "highly stressful environment" and "minimal support" in the Recovery Environment dimension (IV) is generally placed in residential treatment – "independently of other dimensional ratings." Ex. 653-0001 to -0016, -0025. But under UBH's Common Criteria, if even a single criterion is not met, coverage is unavailable for that level of care. This is a fundamental, structural way in which the Guidelines each year violate generally accepted standards of care.

The truth is, UBH knows that a wide variety of considerations must be taken into account in deciding how to effectively treat someone: UBH's "clinical best practices" section, appearing after the coverage criteria in the LOCGs, is a fairly exhaustive laundry list of information UBH requires the "provider" to "collect[]." *See, e.g.*, Ex. 5-0010-13. But the Guidelines make clear (and UBH admitted at trial) that whether a provider's treatment plan satisfies UBH's "best practices" is a different question from whether UBH will approve coverage at a prescribed level of care. For *coverage*, the patient must satisfy the level of care criteria as well. *See* § II.B.1, *supra*; Tr. 285:12-286:17 (UBH admission). *See also* Tr. 104:6-16 (Fishman) (member must meet each one of the admission criteria to obtain coverage for admission to treatment); Tr. 103:10-18 (Fishman) (Common Criteria are "subsumed and contained in all levels of care. So it's material that you would apply no matter which level of care you were looking at, and you would include that and then add the level-of-care specific material."). UBH's failure, year after year, to make its own coverage decisions subject to the same exhaustive list of factors it mandates for provider evaluations cannot be construed as anything other than a purposeful departure from the generally accepted standards of care.

### 5. <u>Preclusion of Coverage for Treatment to Maintain a Level of Function</u>

In direct contrast to generally accepted standards of care, UBH's Guidelines effectively ***preclude*** coverage for treatment needed to prevent deterioration or maintain a level of functioning. Instead, as explained above, for coverage to be approved, the Guidelines require a finding that services are expected to cause a patient to "improve" within a "reasonable time," and further restrict the concept of "improvement" to "reduction or control of the acute symptoms that necessitated treatment in a level of care." *See* § II.G.1(a), *supra* (citing Guideline provisions). In drafting those criteria, UBH deliberately manipulated the source from which the standard was drawn to ensure that UBH's Guidelines would not only keep the focus on acuity, but also preclude any coverage treatment aimed at maintenance.

UBH's improvement standard is ostensibly based on Chapter 6 of the CMS Manual. Tr. 335:21-25. *See also* § II.F.5 (quoting "reasonable expectation of improvement" language). But when Mr. Niewenhous incorporated the standard, he excised the key context, and replaced it with an acute-focused provision that completely changed the meaning of the provision. The CMS Manual stated, in part:

> Services must . . . reasonably be expected to improve the patient's condition . . . **For many other psychiatric patients, particularly those with long-term, chronic conditions, control of symptoms and maintenance of a functional level to avoid further deterioration or hospitalization is an acceptable expectation of improvement**. "Improvement" in this context is measured by comparing the effect of continuing treatment versus discontinuing it. . . .

Ex. 656-0026 (emphasis added). Mr. Niewenhous, however, struck the bolded language and replaced it with UBH's admonition that **"[i]mprovement of the member's condition is indicated by the reduction or control of the acute symptoms that necessitated treatment in a level of care**." *See, e.g.*, Ex. 2-0007 (¶ 6). In so doing, he dramatically altered the "improvement" requirement to eliminate the generally-accepted principle that maintaining a level of function or preventing deterioration count as "improvement" and services aimed at

meeting those goals should be covered.[35] And as explained above, this was intentional: Mr. Niewenhous was carrying out explicit instructions from the BPAC. *See* § II.G.1(a), *supra*.

These edits – which were approved every year by the BPAC – transmogrified CMS's improvement standard for long-term, chronic conditions into a way to limit coverage to treatment of short-term, acute symptoms. CMS explicitly instructs that "many" patients have "long-term, chronic conditions," and those patients in particular may need treatment for "control of symptoms and maintenance of a functional level to avoid further deterioration or hospitalization." Ex. 656-0026. That is the "context" in which CMS "compar[es] the effect of continuing treatment versus discontinuing it." *Id.* UBH replaced that "context" – the emphasis on long-term, chronic conditions – with a "context" that limits coverage to treatment of "the member's presenting problems," and specifically "the acute symptoms that necessitated treatment in a level of care." Ex. 2-0007 (¶ 6).

Through its continued service and discharge criteria, UBH went even further to strip out consideration of chronic conditions. Under CMS, a patient whose "conditions have stabilized" and/or whose "level of functioning" is not expected to show "further significant increase" is explicitly "*not* automatically considered noncovered." Ex. 656-0026 (emphasis added). UBH's discharge criteria impose the opposite requirement, cutting off coverage as soon as "[t]he 'why now' factors which led to admission have been addressed . . . ." *E.g.*, Ex. 6-0010 (¶ 3.1.1).

UBH also converted a standard that emphasizes the need for treatment to prevent deterioration into one that explicitly ends coverage once a patient's presenting symptoms have stabilized. CMS expressly defines improvement to include prevention of "relapse or hospitalization." Ex. 656-0026. "Services are noncovered only where the evidence *clearly establishes* that the criteria are not met; for example, that *stability can be maintained* without

[35] Mr. Niewenhous ignored or cut other portions of the CMS provision as well, including, for example, the admonition that "[i]t is not necessary that a course of therapy have as its goal restoration of the patient to the level of functioning exhibited prior to the onset of the illness;" that the criterion is met if there is a "reasonable expectation that if treatment services were withdrawn the patient's condition would deteriorate. . .;" and that "claims are not automatically considered noncovered because conditions have stabilized, or because treatment is now primarily for the purpose of maintaining present level of functioning." Ex. 656-0026.

further treatment or with less intensive treatment." Ex. 656-0026 to -0027 (emphases added). UBH's criteria again provide the opposite: coverage ends when "[t]he continued stay criteria are no longer met," such as where "[t]he 'why now' factors which led to admission have been addressed to the extent that the member can be safely transitioned to a less intensive level of care, or no longer requires care." Ex. 6-0010(¶ 3.1). *See also*, *e.g.*, Tr. 98:21-25 (Fishman) ("[O]nce those are resolved or addressed, there's not as much emphasis on other things that may be problems that are enduring, problems that have emerged, or other ways in which patients continue to need . . . treatment for ongoing recovery.").

At trial, UBH argued that these restrictive deviations are simply different ways of describing the same criteria – that Plaintiffs are nitpicking. For example, UBH's witnesses suggested the last sentence of the improvement criteria reversed all of these flaws – that by appending that "[i]mprovement must also be understood within the broader framework of the member's recovery and resiliency goals," the Guidelines do not, in fact, limit the concept of "improvement" as the plain language suggests and as Mr. Niewenhous was instructed to do. *See*, *e.g.*, Tr. 1415:5-1416:19 (Allchin) (describing a host of "individualistic" factors purportedly incorporated into ¶ 1.8.2). This post-hoc effort to rationalize the purposeful mangling of the CMS standard collapses under scrutiny. These deviations simply cannot seriously be seen as immaterial, or honest mistakes, as UBH seems to be suggesting.

The truth is that UBH knows how to write criteria that are more faithful to CMS's improvement standard, and it has done so when administering Medicare Advantage Plans. UBH's Medicare Coverage Summaries are the public sector equivalent of its LOCGs and CDGs. Tr. 371:24-372:2 (Niewenhous). But those criteria, unlike the LOCGs, provide that treatment *is* covered if necessary to "improve or maintain the member's level of functioning." *E.g.*, Ex. 445-0008. They acknowledge that continued treatment for patients with "long-term or chronic conditions" may be necessary even if "further significant increase in functioning is not expected." *Id.* They make clear – no fewer than three times – that prevention of deterioration is sufficient to entitle a patient to coverage. *See* PFF § IX.E (discussing Exs. 445, 494, 497, 555). And nowhere do they suggest that reduction of "acute symptoms" is the be-all, end-all of

coverage at all levels of care.

In short, throughout the Class Period, UBH's Level of Care Guideline criteria precluded coverage for services to prevent deterioration or maintain a level of functioning, and required instead an expectation that services would cause a patient to continually progress toward recovery, and only in the context of reducing his or her acute signs and symptoms.

**6. <u>Lack of Motivation is Grounds for Denying Coverage, Even Where the Member has the Capacity to Recover</u>**

The Guidelines further deviate from the generally accepted standards of care by discontinuing coverage when a patient is "unwilling or unable to participate in treatment" – regardless of whether the patient has the *capacity* to recover. Ex. 4-0008 (discharge criteria). *See also, e.g.*, Ex. 1-0078 (¶ 4) (requiring, for continued service, that the member "is actively participating in treatment or is reasonably likely to adhere after an initial period of stabilization and/or motivational support."). But "it is not appropriate or consistent with generally accepted standards of care to discharge a person [from treatment] for lack of motivation or for unwillingness to participate." Tr. 115:15-17 (Fishman). "In fact, sometimes it's lack of motivation or reluctance or even frank opposition to treatment that requires a certain intensity of treatment to get to persuade them to get with the program and to do better and to become cooperative and to become motivated." Tr. 115:17-22 (Fishman).

This flaw is critical for all behavioral health conditions, but particularly so for substance use disorders, which are "chronic disorder[s] in which people's ability to recognize that focusing on quitting is good for their health is problematic." Tr. 117:15-17 (Fishman). "Most people come to treatment not necessarily seeing the impairment, having low self-recognition of problem, and not making the connection between even their most acute and dangerous problems to substance use, never mind their more chronic and indolent problems." Tr. 117:6-10 (Fishman). Effective treatment thus means continuing treatment for patients who have become discouraged about their likelihood of recovery – or, if necessary, transitioning them to a *higher* level of care to help them develop the motivation needed to succeed in a less intensive setting. UBH's Guidelines do the opposite.

**7. <u>Failure to Address the Unique Needs of Children and Adolescents</u>**

Throughout the Class Period, UBH failed to adopt separate level-of-care criteria tailored to the unique needs of children and adolescents. The absence of such criteria is evident on the face of the Guidelines. *See generally* Exs. 1-8. Moreover, UBH's own witness, Dr. Allchin admitted that the only place the Guidelines make reference to child-specific considerations is in its list of "clinical best practices." Tr. 1376:16-22, 1377:13-20, 1385:22-1386:4. But as noted above, "clinical best practices" is about what UBH requires members' providers to do; they are distinct from the other criteria that must be satisfied to obtain coverage, which make no allowance for considerations tailored to children or adolescents. *See* § II.G.4, *supra*. Dr. Alam also conceded that the UBH Guidelines "do not contain separate criteria for children and adolescents," Tr. 1673:11-14, as did Dr. Triana. Tr. 1737:25-1738:2 (conceding that "UBH has never adopted any special set of rules for children or adolescents."). UBH also admitted as much in its regulatory submission to the Connecticut Department of Insurance. Ex. 402-0005 ("[T]he Optum criteria also encompass guidance for both adults and adolescents under the same set of criteria."); Ex. 506-0002 (same); Tr. 409:11-12 (Niewenhous). Thus, unlike ASAM, CALOCUS and CASII, UBH applies its one-size-fits-all criteria across the board, regardless of members' ages or developmental stage.

Because UBH does not have separate criteria for children and adolescents, the Guidelines fail all three aspects of generally accepted standards of care discussed above. *See* §§ II.F.7(a)-(c). **First**, they do not incorporate any consideration of developmental trajectory, or permit admission or continued service if necessary given a youngster's stage of development. **Second**, they fail to account for the unique needs of children and adolescents by relaxing criteria or permitting those patients to meet fewer criteria – instead, children must meet every criterion that an adult must meet (that is, *all* of the Common Criteria and any additional level of care-specific criteria). **Third**, the Guidelines fail to account for the different, often slower, pace at which children and adolescents generally respond to treatment. Dr. Allchin conceded that the improvement standard (¶ 1.8 in 2015-16), for example, is a "mandatory condition" for all members, including children and adolescents. Tr. 1413:12-1414:3. Just like an adult, then,

children and adolescents are subject to UBH's restrictive improvement standard.

### 8. Overbroad Definition of Custodial Care and Overly Narrow View of Improvement and Active Treatment

UBH adopted an excessively broad definition of "custodial care," coupled it with overly narrow definitions of "improvement" and "active treatment," and enshrined it in both the LOCGs and in its Custodial Care CDG.[36] *See* PFF § IX.H. The combined effect of these Guideline provisions is to restrict coverage to just a narrow slice of the circumstances in which generally accepted standards of care call for treatment to be provided.

(a) Custodial Care

Under generally accepted standards, "custodial care" has a specific, narrow definition, which appears in the CMS Manual:

> Custodial care serves to assist an individual in the activities of daily living, such as assistance in walking, getting in and out of bed, bathing, dressing, feeding, and using the toilet, preparation of special diets, and supervision of medication that usually can be self-administered. ***Custodial care essentially is personal care that does not require the continuing attention of trained medical or paramedical personnel.*** In determining whether a person is receiving custodial care, the intermediary or carrier considers the level of care and medical supervision required and furnished. It does not base the decision on diagnosis, type of condition, degree of functional limitation, or rehabilitation potential.

Ex. 654-0029 (emphasis added). As explained above, there is no dispute that this provision is consistent with generally accepted standards of care. *See* § II.F, *supra* (citing, *e.g.*, Ex. 281-0002). *See also* Tr. 519:18-22 (Plakun) ("The generally accepted standard for custodial treatment is that's not really treatment at all. It's taking care of activities of daily living, toileting, dressing, the kinds of things that a person doesn't need to be in a level of care for help with.").

UBH's definition, which appears in the Custodial Care CDG, is decidedly broader:

> Custodial Care in a psychiatric inpatient or residential setting is the

[36] The LOCGs also preclude coverage for services UBH deems "custodial" or not "active." *See, e.g.*, Ex. 1-0027 (¶ 5(a)); Ex. 2-0007 (¶ 8); Ex. 3-0008 (¶ 9); Ex. 4-0007 (first bullet under "Continued Service"); Ex. 4-0010 (last black bullet under "Admission"); Ex. 5-0009 (¶¶ 1.9, 2.1, 3.1.3); Ex. 6-0010 (¶¶ 1.9, 2.1, 3.1.3); Ex. 7-0010 to -0011 (¶¶ 1.9, 2.1, 3.1.3); Ex. 8-0007 (first bullet under "Common Continued Service Criteria for All Levels of Care", third sub-bullet under "Common Discharge Criteria for All Levels of Care").

> implementation of **<u>clinical or non-clinical services that do not seek to cure, or which are provided during periods when the member's behavioral health condition is not changing</u>**, or does not require trained clinical personnel to safely deliver services (Certificate of Coverage (COC), 2011).
>
> "Custodial Care" in this context is characterized by the following (COC, 2011):
>
> - The presenting signs and symptoms of the member have been stabilized, resolved, or a baseline level of functioning has been achieved; or
> - The member is not responding to treatment or otherwise not improving; or
> - The intensity of active treatment provided in an inpatient or residential treatment setting is no longer required or services can be safely provided in a less intensive setting.

Ex. 84-0003 (2013 Custodial Care CDG) (emphasis added); *see also* Ex. 47-0003 (nearly identical definition in 2011 version of Custodial Care CDG); Ex. 108-0003 (same in 2014 version).[37] UBH revised the definition in 2015, but continued to deem "custodial" any services "for the primary purpose of . . . **<u>maintaining a level of function (even if the specific services are considered to be skilled services)</u>**." Ex. 148-0003 (2015 Custodial Care CDG) (emphasis added). *See also* Ex. 195-0003 (same in 2016 version); Ex. 221-0003 (same in 2017 version).[38]

UBH's definition expands the concept of custodial care far beyond what generally accepted standards recognize. First, UBH defines "custodial care" to include <u>clinical</u> and <u>skilled</u> services. This is exactly the opposite of the generally accepted definition, which specifies that custodial care "***does not*** require the continuing attention of trained medical or paramedical personnel." Ex. 654-0029 (emphasis added).

Second, UBH's definition deems services – even skilled clinical services – to be

[37] The LOCGs in effect from 2012 to 2014 also incorporate this definition. *See* Ex. 2-0029 (¶ 5(a)); Ex. 2-0059 (¶ 6(a)); Ex. 2-0063 (¶ 5(a)); Ex. 3-0034 (¶ 5); Ex. 3-0068 to 00069 (¶ 5); Ex. 4-0043 ("Continued Service" and "Discharge" columns); Ex. 4-0077 (same).

[38] The LOCGs in effect from 2015 through 2017 also incorporate this definition. *See, e.g.*, Ex. 5-0039 (¶ 2.2.2); Ex. 5-0082 (¶ 2.2.2); Ex. 6-0044 (¶ 2.2.2); Ex. 6-0091 (¶ 2.2.2); Ex. 7-0044 (¶ 2.2.2); Ex. 7-0092 (¶ 2.2.2); Ex.8-0018 (second sub-bullet under second black bullet under "Residential Treatment Center Continued Service Criteria"); Ex. 8-0036 (second sub-bullet under second black bullet under "Rehabilitation, Residential Continued Service Criteria").

"custodial" whenever the patient's condition is stable: "during periods when the member's behavioral health condition is not changing," such as when the patient's "presenting signs and symptoms. . . have been stabilized, resolved, or a baseline level of functioning has been achieved" or when the patient "is not responding to treatment or otherwise not improving." Ex. 84-0003; *see also* Ex. 148-0003 (skilled services deemed custodial if they are for the purpose of "maintaining a level of function"). This is completely inconsistent with the generally accepted standard, discussed in § II.F.5 above, that calls for treatment to be provided when needed to maintain a patient's level of function or to prevent deterioration. *See, e.g.*, Tr. 558:3-7 (Plakun) ("determining whether a service is custodial" should not "depend on the degree of functional limitation or rehabilitation potential"); Tr. 520:4-8 (Plakun) ("[W]hat winds up happening in these guidelines is that custodial treatment becomes applied to active treatment [--] to actual interventions provided by clinicians to patients unless they are directed at the acute presenting problem or the 'why now,' depending which year and which language is being used."); Tr. 120:12-121:13 (Fishman) (explaining that defining custodial as *any* "services that do not require continued administration by trained medical personnel" is not consistent with generally accepted standards, because lower levels of residential treatment do not require medical personnel). Likewise, the fact that a patient is not "responding" to treatment is not a generally-accepted ground for withholding services, at least where a patient still has the potential to respond to treatment. Tr. 114:15-22, 117:6-17 (Fishman); *see also* § II.F.6, *supra*. UBH's interpretation of the term "custodial" is thus wholly unreasonable in light of what is generally accepted.

(b) Active Treatment

UBH's Guidelines further define "custodial care" as services that do not constitute "active treatment." *See, e.g.*, Ex. 10-0003 (UBH "maintains that treatment of a behavioral health condition in an acute inpatient unit or RTC is not for the purpose of providing custodial care, but is for the active treatment of a behavioral health condition."); Ex. 1-0027 (¶ 5(a)) (similar). UBH's definition of active treatment, however, directly contradicts the generally accepted standards.

CMS incorporates a definition of "active treatment" that is consistent with generally

accepted standards. As UBH itself acknowledges,

> According to CMS, active treatment is services that are:
>
> - Provided under an individualized treatment or diagnostic plan;
> - Reasonably expected to improve the patient's condition or for the purpose of diagnosis; and
> - Supervised and evaluated by a physician.

Ex. 10-0008 (2010 Custodial Care CDG) (citing CMS Chapters 2 and 16). *See also* Ex. 735-0104 (CMS Manual, Chapter 2).

In the "context" of determining whether treatment is "active" and thus not "custodial," however, UBH added two additional requirements that completely alter the generally-accepted definition:

> - Unable to be provided in a less restrictive setting
> - Focused on interventions that are based on generally accepted standard medical practice and are known to address the critical presenting problem(s), psychosocial issues and stabilize the patient's condition to the extent that they can be safely treated in a lower level of care.

Ex. 10-0003 ("Key Points" section of 2010 Custodial Care CDG); *see also* Ex. 47-0003 (same definition in 2011 version); Ex. 84-0003 (same in 2013); Ex. 108-0003 (same in 2014); Ex. 148-0003 (same in 2015); Ex. 10-0027 (¶ 5(a)(iv)-(v)); Ex. 1-0057 (¶ 5(a)(iv)-(v)); Ex. 2-0059 to -0060 (¶ 6(b)); Ex. 2-0064 (¶ 5(b)); Ex. 3-0034 to -0035 (¶ 6); Ex. 3-0069 (¶ 6).[39]

UBH's Guidelines, therefore, provide that treatment is not "active" (and is thus custodial) whenever it is "[]able to be provided in a less restrictive setting." But, as explained in

---

[39] In 2016, UBH revised the CDG to include the "strict definition" of active treatment, but kept its additional requirement that treatment "cannot be provided in a less restrictive setting," moving it to two different bullet points. *See* Ex. 195-0003 (third bullet)("Active Treatment in an inpatient or residential treatment setting is a clinical process involving the 24-hour care of members that. . . cannot be managed in a less restrictive setting."); *id.* (fifth bullet) ("Optum maintains that inpatient or residential treatment . . . cannot be provided in a less restrictive setting."); *see also* Ex. 221-0003 (same provisions in 2017 version); Ex. 537 ("Although (unable to be managed in a lower level of care) is not included in CMS' definition of "active treatment," it is included in CMS' definition of 24-hour care so it still applies to custodial care. We can still cite this in the custodial care CDG and I can make sure it remains").

Sections II.F.1, 2 and 3, above, the mere fact that it is *possible* to provide services in a less restrictive setting does not mean that setting is the appropriate one for a particular patient: rather, generally accepted standards call for a multi-dimensional assessment of the patient to determine where treatment will be both safe and most effective, erring on the side of caution. It is wholly unreasonable to conclude that services are not "active" just because they could, in theory, be provided somewhere else.

Similarly, it is also not consistent with generally accepted standards to limit "active treatment" to interventions that "address the critical presenting problem(s), psychosocial issues" and "stabilize the patient's condition to the extent that they can be safely treated in a lower level of care." Dr. Plakun explained why, using a hypothetical:

> [J]ust stick for a moment with the example I offered a few moments ago about a suicide attempt in a hypothetical woman who was assaulted and raped[.] [I]f every time we have resolved the issues that led to the acute suicide attempt, we wind up ignoring getting into the issues around trauma and how that's had a devastating effect on this individual's capacity to trust and capacity to relate[.] [I]f we call that engagement 'custodial care' because it's associated with something that's underlying and is going to change more slowly, then we're doing something that's problematic.

Tr. 520:10-19 (Plakun). In short, once again, UBH was fully cognizant of the generally accepted definition, but deliberately altered it to suit its own purposes.

(c) Improvement

UBH further narrowed its definition of what constitutes "Active Treatment" by incorporating its overly-restrictive definition of "improvement." As described above, UBH limits the concept of "improvement" to "reduction or control of the ***acute symptoms*** that necessitated hospitalization or residential treatment." Ex. 10-0003; Ex. 307-0002 (minutes reflecting decision to implement BPAC instruction by clarifying that "reasonable expectation of improvement in the patient's condition is improvement in the patient's acute condition.") (original emphasis); *see also* § II.G.1(a), *supra*. Thus, for UBH, *only* those services that are expected to reduce or control acute symptoms count as "active treatment" sufficient to avoid a finding that the services are

custodial (and consequently excluded from coverage).[40] As a result, UBH's concepts of custodial care, active treatment, and improvement work independently and together to narrow available coverage to just a small sliver of appropriate services under generally accepted standards of care.

(d) <u>UBH Was Not Entitled to Interpret All Plans According to the Most Restrictive Plan's Language</u>

At trial, UBH made no serious effort to prove that its definition of "custodial care" is consistent with generally accepted standards. Instead, UBH suggested that its definition is consistent with the way the custodial care exclusion is worded in the Class Members' plans. *See, e.g.*, Tr. 898:15-899:20 (Dehlin). To the contrary, however, the extremely narrow definition of custodial care, in which "custodial" is effectively defined as anything other than the treatment of acute symptoms, does not appear in any of the Class Members' plans. *See* Ex. 1654 (UBH summary exhibit regarding Custodial Care definitions). Many of the plans, like the CMS Manual, define the "custodial care" exclusion narrowly to apply only to assistance in activities of daily living provided by non-medical personnel. *See, e.g.*, Ex. 1654-0027 ("Charges for custodial or Home Health Care that involves assistance with daily activities of life, including, but not limited to eating, bathing, dressing or other custodial or self-care activities; homemaker services; services primarily for domiciliary or convalescent care; and services for bed rest and patient convenience.") (quoting Ex. 2023-0038); Ex. 1654-0035 ("Custodial care means care which is designed to help a person in the activities of daily living. Continuous attention by trained medical or paramedical personnel is not necessary. Such care may involve: 1. Preparation of special diets. 2. Supervision over medication that can be self-administered. 3. Assisting the person in getting in or out of bed, to walk, to bathe, to dress, to eat, or to use the toilet.") (quoting Ex. 1650-0123).

Some plans define the term more broadly. *See, e.g.*, Ex. 1654-0001 (identifying a definition that includes "[h]ealth-related services that are provided for the primary purpose of meeting the personal needs of the patient or maintaining a level of function"). But none go as far as UBH's Guidelines. Not a single Class Member's plan defines custodial care as treatment that

[40] As such, these provisions not only over-emphasize acuity, but also preclude coverage of services needed to maintain function or prevent deterioration. *See* §§ II.G.1(a), II.G.5, *supra*.

is not “active,” nor do any plans define “active treatment” or “improvement.” Not a single plan defines custodial care to include any treatment that cannot “be provided in a less restrictive setting.” And no plan defines as “custodial” all treatment that is for anything other than reducing a patient’s “acute symptoms.” *See generally* Ex. 1654-0001. Yet UBH interprets all plans the same way: it takes the most restrictive possible definition provided in any plan language, and then makes it even more restrictive by adding definitions and requirements that conflict with generally accepted standards.

UBH argued at trial that, even if its Guideline criteria conflict with a Class Member’s plan terms, that should not matter because its Peer Reviewers apply the plan definition, not the CDG. But that assertion is not borne out by the evidence, either. In the only two instances within the Claim Sample in which UBH denied coverage based on its Custodial Care CDG, the plan language does *not* match UBH’s overly-restrictive definition. *See* Ex. 236-0002 (Holdnak); Ex. 1294-0001 (Unique ID 3262); *compare* Ex. 235-0161 and Ex. 1547-0053 with Ex. 47 (CDG for Custodial Care and Inpatient Services, revised December 1, 2011, applicable to Holdnak and Unique ID 3262). In any event, if UBH ever applied a plan definition and *not* its Guidelines, the resulting denial would not fit the class definitions and is not at issue here. *See* PFF § II.B (quoting class definitions).

In short, where UBH applies its excessively restrictive Custodial Care CDG, it cannot find refuge in generally accepted standards or the terms of any plan. Its LOCGs’ reference to custodial care (defined in the LOCGs’ residential treatment sections), and its Custodial Care CDGs’ definition of custodial care, are more restrictive, and unreasonably so, than *all* of the Plaintiffs’ and class members’ plans.

*        *        *

For all these reasons, and as catalogued on the Claims Chart, UBH’s Guidelines are more restrictive than generally accepted standards of care, and thus inconsistent with the terms of the Class Members’ plans. Every criterion in the Common Criteria is mandatory, and has been so every year of the Class Period. If the Court finds that *any* of those criteria are flawed, for *any* of these reasons, the Guidelines are necessarily more restrictive than generally accepted standards

of care, and denials pursuant to the tainted Guidelines are wrongful.

As for the LOCG sections for the specific levels of care, each incorporates the Common Criteria, so a flaw in the Common Criteria renders the RTC, OP and IOP sections unreasonably restrictive as well. The *additional* criteria in those sections are largely duplicative of the Common Criteria, and the Court should find them flawed for those same reasons (as also set forth on the Claims Chart). In any event, those additional criteria are almost all mandatory as well, so even if the Court were to find that *only* one or more of those RTC/OP/IOP-specific criteria were flawed, any denial pursuant to those LOCGs for coverage of treatment at the pertinent level of care would be wrongful.[41]

**H. UBH's Guidelines, in their Entirety, Fall Short of Generally Accepted Standards of Care.**

Sometimes the whole is greater than the sum of its parts. When it comes to UBH's Guidelines, the opposite is true. Many of the specific provisions in the Common Criteria and the other sections are flawed, and each renders the Guidelines more restrictive than generally accepted standards of care. But the Guidelines' restrictiveness is even worse than the cumulative effect of each of the specific flaws in the individual provisions. The Guidelines are pervasively flawed, in ways that interconnect and reinforce each other. The Guidelines as a whole, therefore,

[41] For some of the RTC/OP/IOP-specific LOCG sections in 2011 through 2013, some of the additional criteria (*i.e.*, those that apply in addition to the Common Criteria) are not mandatory, and only one of them must be met. *See, e.g.*, Ex. 3-0067 ("Any <u>ONE</u> of the following criteria must be met…"). As Plaintiffs' experts testified, sometimes *all* or *nearly all* of the "Any <u>ONE</u>" criteria are flawed, *see, e.g.*, Claims Chart § II.G; other times just one or two is flawed, *see, e.g.*, *id.* § II.B. As Dr. Fishman explained, if *any* of those provisions is overly restrictive, that "narrows the portal" such that "in aggregate you have only a very narrow portal or create only a very few number of non-flawed pathways to get in. So if a person can't reasonably meet this one or this one or this one, then we're left with not enough." Tr. 140:1-7. In the 2012 LOCG section for Intensive Outpatient Program: Substance Use Disorders, for example, Dr. Fishman explained why criteria 1, 2, 3, and 5 in the "Any <u>ONE</u>" list are flawed. Tr. 225:16-226:17. He did not criticize criteria 4, but that "pathway" only applies if the member "has completed inpatient, residential treatment or a partial hospital/day treatment program." Ex. 2-0047. Any person who is not stepping down from one of those levels of care could only obtain coverage by satisfying (a) the Common Criteria, (b) the mandatory provisions of the IOP section, and (b) at least one of the *flawed* "Any <u>ONE</u>" provisions. Each of the "Any <u>ONE</u>" provisions that Plaintiffs have challenged is the "portal" for particular categories of patients; thus, if any of them is flawed, those flaws render the criteria more restrictive just as the mandatory criteria do.

fall far below generally accepted standards of care, because each of the flaws "act[s] in a synergistic and mutually reinforcing way to act as barriers to access to care." Tr. 282:6-8 (Fishman). Thus "in each of those years in their totality the UBH guidelines were not consistent with generally accepted standards of care." Tr. 96:19-97:01 (Fishman). *See also* Tr. 508:11-22, 508:23-509:6 (Plakun) (the Guidelines, in each year, are "in totality not consistent with generally accepted standards"); Tr. 570:10-13, 570:18-21, 594:4-19 (Dr. Plakun reiterating that the Guidelines "fall below generally accepted standards in all years").

Dr. Simpatico's testimony, perhaps more than any other witness, underscores how thoroughly deficient UBH's Guidelines are. He told the Court that he would not even use them in his practice, because he could not reconcile the discrepancies between the Guidelines and the sources that do reflect generally accepted standards of care:

> THE WITNESS: . . . Any practitioner[s] worth their salt, if they are referring to practice guidelines to conduct the art of the practice of medicine, then that's a bigger problem. So **I would not be looking at these documents to make clinical judgments about . . . whether or not to discharge someone to another level of care**.
>
> THE COURT: Wait a second. Wait a second. Did you just say that you would not look at these documents to make clinical judgments about whether to discharge somebody to another level of care?
>
> THE WITNESS: **I would be not following these as a script**. I would be doing what these documents tell me to do, which is to adhere to generally accepted standards of care. And in meeting generally accepted standards of care . . . I would know **because I would be reading the APA Clinical Practice Guidelines or I would be reading the ASAM Criteria or I would be reading the LOCUS**, and I wouldn't be looking at clear and compelling impossible metrics to -- to anticipate what would happen before something happens --
>
> THE COURT: Pretend you're not really a psychiatrist who's the chair of the medical department at the University of Vermont. And let's pretend that you are an M.D., medical director at UBH, and you've been taught, in terms of medical necessity determinations, to follow the guidelines. The guidelines define for you what is the generally accepted medical practices. If you're doing that, then you're not reading into them more than is into them, than -- than something that is not in them; isn't that right?

> THE WITNESS: Well, then, **how do reconcile the discrepancy that I would be reading in the source documents for these documents? Namely, the APA guidelines or the LOCUS or the ASAM.**
>
> THE COURT: As we always say in court, assumes facts not in evidence, that they're reading source documents.

Tr. 1241:15-1243:1.

In short, the evidence established not only that each of the challenged provisions in the Guidelines was more restrictive than generally accepted standards of care, but also that the Guidelines were holistically and intrinsically more restrictive.

**I. UBH's Guidelines Are Inconsistent With The ASAM Criteria.**

For the same reasons UBH's Guidelines are more restrictive than generally accepted standards of care, they are also inconsistent with, and more restrictive than, the ASAM Criteria. This has been the case throughout the Class Period, including before and after the 2013 publication of the ASAM third edition. It is not surprising that UBH's own personnel have frankly acknowledged that the ASAM Criteria "usually will result in more authorization as they are more subjective and broader than our LOCG/CDGs." *See* Ex. 348-0001 to -0002. *See also* Ex. 651-0002 ("Historically, we haven't covered the lower levels of residential. However, if we move to using ASAM, I don't see how we are able to deny the lower levels if the member has a residential benefit"); Tr. 1809:14-25 (Niewenhous).

At trial, UBH's principal effort to prove that its Guidelines are consistent with ASAM was through the testimony of Drs. Alam and Robinson-Beale about UBH's brief engagement in 2013-14 of Mr. Jerry Shulman, a co-editor with Dr. Fishman of the ASAM Criteria. There is no evidence supporting UBH's contention that Mr. Shulman's 2013 report indicates anything remotely close to a judgment that UBH's Guidelines were then, or were at any time since, consistent with the ASAM Criteria.

Mr. Shulman's report to UBH made clear that its Guidelines were *not* consistent with ASAM, in fundamental ways. Mr. Shulman principally critiqued the March 2013 CDG for Treatment of Substance Use Disorders (Ex. 412-0015 to -0045) and the substance use disorder sections of the 2012 Level of Care Guidelines (Ex. 412-0046 to -0098). Among many other

things, he determined – and explained to UBH – that its continued service criteria were fundamentally more restrictive than ASAM. *See* Ex. 412-0058 (proposing two additional *alternate* bases for continued service, separated by "or," which would have fundamentally changed how UBH's Guidelines work: "5. The member has not yet resolved the problems that justified admission but is working on them and making progress. OR 6. The member has resolved the problems that justified admission but new problems have surfaced which can only be dealt with safely at the current level of service.") (Ex. 412-0058) (also proposed as addition to the CDG, Ex. 412-0036). Mr. Shulman also determined that UBH's residential treatment criteria were completely irreconcilable with ASAM. *See* Ex. 412-0031 to -0032 (proposing to discard UBH's criteria in their entirety and replace them with the ASAM Criteria). He also identified ways UBH's Guidelines failed to appropriately consider co-occurring conditions (Ex. 412-0093), and explained that coverage criteria that are limited to "stabilization" create a "likelihood of the member experiencing further problems," facing additional "risk," and needing "additional treatment" (Ex. 412-0053).

UBH, however, ignored nearly *every single one* of those critiques (other than making a change to the partial hospitalization criteria, which is not at issue here, and a one-word tweak to the *introduction* to the residential rehabilitation section, *compare* Ex. 412-0093 (Shulman report) (replacing "acute" with "sub-acute") *with* Ex. 5-0081 (correcting the introduction to recognize that RTC is a "sub-acute" level of care)). Instead, UBH drastically moved in the opposite direction. After having received all of Mr. Shulman's critiques, UBH put the full weight of its Guidelines behind "Why Now," "acute symptoms," and "acute changes" – which, as noted above, appear no fewer than 82 times in the 2014 Guidelines. *See* § II.G.1(b), *supra*.

Even more troubling, the trial testimony confirmed that UBH's entire assignment to Mr. Shulman was premised on a lie. UBH asked Mr. Shulman to identify deviations between its Guidelines and ASAM. When he began reviewing the Guidelines UBH sent him, he could not find any criteria for most levels of residential treatment (levels 3.1, 3.3, and 3.5, in the ASAM parlance), and so he called Dr. Alam, his main contact at UBH, to find out "where the[y] were." Tr. 1639:16-19 (Alam). Dr. Alam told him that UBH did not have criteria for residential

treatment at any level of intensity lower than 3.7 because "the plans that UBH administered didn't cover those levels, " Tr. 1639:16-23, 1646:11-18 (Alam), which Mr. Shulman then recorded on his "Optum/ASAM Crosswalk" (Ex. 412-0013) (levels 3.1, 3.3, and 3.5 are "[n]ot an Optum member benefit").[42] But of course, the plans UBH administers do *not* exclude sub-acute residential treatment for substance use disorders, and UBH did not even attempt at trial to identify a plan that contained such an exclusion. The truth is that for its criteria to be consistent with ASAM and with generally accepted standards of care, UBH *was* (and still is) required to include criteria for sub-3.7 residential treatment; its lie about a non-existent plan exclusion does not erase its admission to Mr. Shulman back in 2013 that it had no such criteria.

**J. UBH Ignored State Laws Mandating Specific Criteria for Administering SUDs Benefits.**

Several states require insurers to apply particular criteria to determine medical necessity for substance use disorder ("SUD") treatment, including for fully-insured commercial Plans. UBH ignored these requirements by using its own Guidelines – and not the ASAM Criteria – when administering benefits under commercial plans governed by Illinois, Connecticut, Rhode Island, and Texas law.

**Illinois**. On August 18, 2011, Illinois mandated that all "[m]edical necessity determinations for substance use disorders shall be made in accordance with appropriate patient placement criteria *established by* the American Society of Addiction Medicine." 215 Ill. Comp. Stat. § 5/370c(b)(3) (effective Aug. 18, 2011) (emphasis added). For years, UBH misconstrued the statute by deciding that it did not require UBH to actually *use* the ASAM Criteria. UBH did not start using the ASAM Criteria for Illinois substance use disorder claims until January 2016.

---

[42] UBH's admission to Mr. Shulman – that its Guidelines lacked any criteria for ASAM levels 3.1, 3.3, and 3.5 (though UBH lied to Mr. Shulman about the reason for that omission) – underscores the fact that UBH was simultaneously lying to the Connecticut regulators about whether its criteria were consistent with ASAM. While UBH acknowledged to Mr. Shulman that the three lower-intensity levels of residential treatment were omitted from UBH's Guidelines, UBH represented to Connecticut in 2013, and then again in 2015, that although its guidelines "do not identify 3 separate levels of Residential Treatment as does ASAM," "the criteria from all 3 ASAM levels *are included* in the admission criteria for Reside[n]tial Rehabilitation." Ex. 402-0005 & 506-0005 (emphasis added).

Tr. 951:16-20 (Martorana). Compare Ex. 273-0002 (September 2015 Guideline Applicability Tool) with Ex. 274-0002 (January 2016 Guideline Applicability Tool). Even then, it only did so because Illinois had passed a clarification that UBH could not interpret its way around. {Citation}

From 2011 through 2015, however, UBH determined it was permitted to use its own Guidelines if they were "in accordance with" the ASAM Criteria. *See, e.g.*, Tr. 951:16-20 (Martorana); Ex. 353-0010 ("We have continued to operate here in St. Louis as though we do **not** need to cite ASAM in our coverage determinations for treatment of SUDs on commercial members in Illinois. Based on previous advice, we were operating as though our LOCGs/CDGs are generally 'in accordance' with ASAM criteria."); *Id.* (Mr. Niewenhous's response: "[Y]ou're correct operating as though our guidelines are in accordance with ASAM's criteria."); Tr. 392:11-14 (Niewenhous).

**Connecticut**. Connecticut has required insurers to use the ASAM Criteria, or a set of criteria that UBH "demonstrates to the Insurance Department is consistent with" the ASAM Criteria, since October 1, 2013. CONN. GEN. STAT. § 38a-591c(a)(3) (2017); 2013 CONN. LEGIS. SERV. 13-3. UBH concedes that it has never used the ASAM Criteria in Connecticut, and rests on the "consistent with" option as its defense to the Connecticut state mandate claims. *See* Tr. 390:15-391:19 (Niewenhous) (discussing Guideline Applicability Tools); Exs. 450, 268, 270-78 (Guideline Applicability Tools). But UBH's Guidelines are not "consistent with" the ASAM Criteria, as discussed at length above. *See* §§ II.F & I, *supra*.

And UBH did not "demonstrate[] to the Insurance Department" that its Guidelines were consistent with ASAM – rather, it *lied* about that fact. The "crosswalk" that UBH submitted to Connecticut, in both 2013 and 2015 (the two submissions during the Class Period) (Exs. 402 & 506), misrepresented to the Connecticut Insurance Department that, although UBH's Guidelines "do not identify 3 separate levels of Residential Treatment as does ASAM," "***the criteria from all 3 ASAM levels are included*** in the admission criteria for Reside[n]tial Rehabilitation." Ex. 402-0005 & 506-0005 (emphasis added). But UBH has long recognized that its Guidelines do *not* include any criteria for lower-intensity levels of residential treatment (*i.e.*, below Level 3.7,

in the ASAM parlance). Indeed, as discussed above, UBH admitted as much to ASAM co-editor Jerry Shulman in 2013, at the same time as it was telling Connecticut that the opposite was true.[43] Tr. 1639:16-23, 1646:11-18 (Alam), § II.I.

UBH never corrected the misrepresentation it made to Connecticut. Tr. 417:25-418:7 (Niewenhous). *See also* Tr. 464:9-466:7 (Niewenhous) (conceding that the misrepresentation was brought to his attention, at the latest, in April 2017, six months before trial, but that UBH had made no effort to correct the misrepresentation during that time). To the contrary, from 2013 to the present, UBH has continued to rely on its false "crosswalk" as justification for its failure to use the ASAM Criteria as mandated under the Connecticut statute.

**Rhode Island**. Since July 10, 2015, Rhode Island has required payors such as UBH to "rely upon the criteria of the American Society of Addiction Medicine when developing coverage for levels of care for substance-use disorder treatment." 27 R.I. GEN. LAWS § 27-38.2-1(g) (2015); 2015 R.I. PUB. LAWS 15-236 (15-H 5837A). It is undisputed that UBH did not use the ASAM Criteria for administering Rhode Island claims. *See* Tr. 392:25-393:3 (Niewenhous) ("Q: UBH's Guideline Applicability Tool [from January 2016] does not reflect for commercial plans that the ASAM criteria supersede UBH's standard criteria for the State of Rhode Island; right? A: That is correct."); Tr. 1809;11-13 (Niewenhous) (admitting that UBH "has never adopted ASAM Criteria in Rhode Island for commercial plans"); Ex. 274-0003.

**Texas.** Texas requires insurance companies to make medical necessity determinations for substance use disorder treatment using criteria issued by the Texas Department of Insurance, where the plan is governed by Texas law and the treatment was sought from a provider or facility in Texas. 28 TEX. ADMIN. CODE § 3.8011 (1991). UBH knows it was required to apply the TDI Criteria (referred to as the TCADA guidelines) throughout the Class Period. Tr. 393:8-394:1 (Niewenhous); Exs. 268-278. Yet in practice, UBH has regularly ignored this requirement. Tr. 394:9-395:2 (Niewenhous); Ex. 493-0002 ("TCADA Guidelines: Question from Houston about

---

[43] With Mr. Shulman, UBH tried to excuse the omission of these criteria by telling a different lie, that Levels 3.1, 3.3 and 3.5 treatment were excluded by the members' plans. Tr. 1639:20-23, 1646:11-18 (Alam).

whether the TCADA guidelines apply or the CDGs. Former required by State reg. [L]atter thought to apply because of Parity. Houston has been using the CDGs."). As Dr. Fishman explained, UBH's Guidelines are inherently more restrictive than the TDI criteria. Tr.152:10-154:15. Where a class member's denial letter reflects that the denial was based in whole or in part on UBH's Guidelines, UBH has violated Texas law, and, consequently, ERISA.

**K. UBH's Guideline Development Process was Infected by its Consideration of its Own Self-Interest**

UBH earns money by charging fees for its services as the behavioral health administrator for various health plans. The plans UBH administers fall into two general categories: fully-insured, or "risk" plans (where UBH pays the benefits for the services it approves out of the fees it receives from the plans, and keeps the remainder as profit) and self-funded or "administrative services only" ("ASO") plans (where UBH charges an administrative fee only, and the plan pays the benefits UBH approves). Ex. 711-0003 to -0004 (Stipulation Concerning Per-Member Per-Month Rates) (¶¶ M, N).

Thus, for fully-insured plans, UBH bears the risk that the "benefit expense" for the services it approves will be more than it projected when it fixed its premium, which would reduce UBH's potential profit. Tr. 840:6-14 (Dehlin).[44] Although UBH does not bear risk with respect to self-funded plans, UBH nevertheless had a self-serving incentive to minimize benefit expenses for self-funded plans, as UBH itself emphasized at trial. *See, e.g.*, Tr. 803:10-804:20 (Triana); Tr. 1899:11-21 (Rutherford). As a consequence, UBH is focused, across the board, on "managing" – *i.e.*, minimizing – benefit expense. *See* Ex. 1660 (Brock Dep.) at 216:1-219:9.

UBH, therefore, regularly prepares detailed financial forecasts that include <u>projections</u> of expected benefit expense and benefit expense <u>targets</u> the company wants to achieve. UBH also assiduously tracks its <u>performance</u> in relation to those benefit expense forecasts and targets, noting monthly trends and taking immediate action to drive down benefit expenses that exceed

---

[44] UBH takes in much more revenue on its fully-insured ("risk") business than on its self-funded ("ASO") business. On a per-member/per-month basis, UBH makes an average of [redacted] as much revenue on its risk business than its ASO business. Ex. 711-0014. On an aggregate basis, approximately [redacted] of UBH's revenue is generated from its risk business. *See* PFF § XIII; Exs. 255 & 711.

its projections. *See*, *e.g.*, Ex. 745; Ex. 783-0009.

In general, when average length of stay ("ALOS") increases, UBH's (or its customer's) cost increases, and vice versa. Tr. 761:12-21 (Triana). Because benefit expense is thus directly related to the amount of services UBH approves, UBH also carefully monitors "utilization" data, including with regard to ALOS for particular levels of care.[45] *See*, *e.g.*, Ex. 783-0031 to -0038; Ex. 745. UBH sets ALOS targets for each level of care, and tracks them on a granular level, every month. *See e.g.*, Tr. 759:15-760:15; Ex. 720-0017 (Triana).

Despite its status as an ERISA fiduciary, UBH made no effort to insulate its Guideline developers from the company's desire to minimize benefit expense and utilization. Quite the contrary: UBH made sure that the individuals responsible for approving UBH's clinical Guidelines were well aware of the company's financial and utilization budgets, targets and goals. *See*, *e.g.*, Tr. 703:17-704:2 (Triana); Tr. 759:16-22 (Triana); Tr. 1122:20-1123:9 (Martorana). This was deliberate: UBH has long seen the Guidelines as a way to "mitigate" the fact that the 2008 Parity Act eliminated UBH's ability to impose quantitative limitations on services to minimize its benefit expense. *See* Ex.768-0009 (2014 presentation describing "[c]ontinued use of concurrent review[46] to ensure appropriate utilization" as the "Mitigation Strateg[y]" for Parity's "[r]emoval of day and visit limits on IP, Intermediate and OP"); Tr. 307:4-24 (Niewenhous).

For example, Peter Brock, the head of UBH's Affordability Department, and Fred Motz, from UBH's Finance Department, were both members of the Behavioral Policy and Analytics Committee ("BPAC"), the committee responsible for approving the LOCGs and CDGs. Tr. 703:3-16 (Triana); Ex. 482-0002 (BPAC minutes showing members). Another Affordability representative, Michael Powell, was also on the BPAC through at least 2015. *See*, *e.g.*, Ex. 482-0002. Brock's successor at the helm of Affordability, Nisha Patterson, became a member of the Utilization Management Committee ("UMC"), which replaced the BPAC in 2016. Ex. 552-0002.

---

[45] ALOS, which refers to the average number of days or visits for which UBH approves coverage, Tr. 755:8-10 (Triana); Ex. 305, is directly impacted by UBH's continued service and discharge criteria.

[46] "Concurrent review" is a Peer Review that takes place when services are ongoing. Ex. 258-0011.

Dr. Lorenzo Triana, Chair of the BPAC and then the UMC, and committee member Dr. Martorana – neither of whom was a member of UBH's finance or affordability departments – were both briefed in detail on a monthly basis on UBH's financial metrics and its performance related to targets. *See, e.g.*, Ex. 783 (example of monthly business review sent to Drs. Triana and Martorana); Ex. 720 (ALOS report sent to Dr. Triana); Ex. 745 (email discussion of "June close" sent to Dr. Triana); Tr. 755:5-17 (Triana); Tr. 1122:20-1123:9 (Martorana).[47] Dr. Triana was even assessed, in his performance evaluation, based on whether UBH met its benefit expense targets. Ex. 850 (Triana 2012 Performance Review, dated Feb. 24, 2013). Both Dr. Triana and Dr. Martorana kept a close eye on UBH's utilization data, including average length of stay. Tr. 755:5-17 (Triana); Tr. 1122:20-1123:9 (Martorana). And numerous members of the BPAC and UMC participated in meetings and discussions about business considerations that took precedence over clinical concerns, as discussed further below.[48]

Thus, far from being insulated behind a firewall, the UBH personnel developing and approving the Guidelines were well aware of UBH's financial interests and performance and even bore personal responsibility for ensuring that UBH met its financial goals. As a result, it

[47] Other BPAC members likewise received these monthly reports. *See*, *e.g.*, Ex. 783 (December 2014 email also sent to, *inter alia*, BPAC members Margaret Brennecke, Peter Brock, James Davis, and Nisha Patterson); Ex. 482 (January 2015 minutes showing BPAC members); Ex. 745 (July 2013 email also sent to, *inter* alia, BPAC members Michael Powell, Peter Brock, Brett Hart, James Davis, and future BPAC members Patterson and Motz); Ex. 368 (March 2013 minutes showing BPAC members).

[48] At trial, Dr. Triana testified that the BPAC only rarely considered benefit expense or utilization data, although when confronted, he admitted that benefit expense was explicitly discussed when the committee was developing the TMS guidelines. *See* Tr.786:2-18, 770:10-771:9) (Triana); Ex. 749-0004 to -0005. Dr. Triana also conceded that UBH considered benex each time it thought about adopting the ASAM Criteria. *See*, *e.g.*, Tr. 802:19-803:21 (Triana). He admitted, when shown committee minutes, that the BPAC also commissioned an analysis of UBH's use of ALOS benchmarks. Tr. 1753:12-Tr. 1756:18. The BPAC also developed recommendations for how to use "internal and external data" to "drive decision-making regarding [OptumHealth Behavioral Services'] approach to medical management," Ex. 332. And the UMC, which Dr. Triana also chaired, had extensive discussions of UBH initiatives to manage benefit expense and lengths of stay. *See* Ex. 552-0004 to -0008; Ex. 556-0006 to -0007. But regardless of the frequency with which official committee discussions centered around financial concerns, BPAC and UMC members were aware of, and regularly discussed these issues *outside* of meetings. *See*, *e.g.*, 1752:25-1753:11; Ex. 786.

was no accident or oversight that caused financial considerations to infect the Guideline development process, as the following three vignettes demonstrate:

### 1. ABA

UBH – at the direction of its effective CEO, Martha Temple – decided not to amend its Guidelines for applied behavioral analysis ("ABA," a generally-accepted treatment for autism spectrum disorders) to conform to national standards and clinical evidence, until the changes could be "priced in" and paid for by UBH's customers. Ex. 904-0004 to -0005, -0008 (Rockswold) (183:15-22, 192:13-17) (ABA guideline changes "were not made because Martha Temple said not to make them."). Significantly, Ms. Temple's decision, which was driven solely by the desire to mitigate the impact to UBH from the expected increase in benefit expense, overrode the decision of the Utilization Management Committee, which had already approved the changes. Ex. 904-0005 (Rockswold Tr., 185:22-186:4). Ms. Temple made clear that at UBH, business considerations trump clinical analysis. Rather than warning employees to faithfully honor the terms of the plans they were administering, and to keep only the interests of the plan members in mind when drafting Guidelines, Ms. Temple issued the following admonition to UBH staff: "We need to be more mindful of ***the business implications of guideline change recommendations***." Ex. 812-0001 (emphasis added).[49]

### 2. TMS

Similarly, when, as a result of pressure from customers, UBH was forced to acknowledge that transcranial magnetic stimulation ("TMS") treatment had become a generally accepted form of treatment for some patients suffering from specific forms of depression, it commissioned an internal study of the "financial impact" of covering TMS claims where medically necessary. Tr. 767:4-7 (Triana). *See also* Ex. 758. Fred Motz of UBH's finance department conducted the analysis and UBH "estimated [a] cost per patient" in the range of $9,000 to $14,000. Ex. 749-0004. The Clinical Policy Committee, with the benefit of this analysis, then considered a number

[49] Two of the people to whom Ms. Temple addressed her email were members of the UMC: Nisha Patterson and Adam Easterday. *See, e.g.*, Ex. 556 (UMC minutes). A third, Eric Rockswold, replaced Mr. Niewenhous in mid-2016 as the person primarily responsible for revising the Guidelines. Tr. 297:18-20 (Niewenhous).

of factors, including the impact to benefit expense and the "return on investment" ("ROI") if it revised the Guidelines to cover TMS treatment in accordance with national standards (*see* Ex. 749-0004). The Committee recognized that there was no defensible *clinical* rationale for continuing to deny TMS claims. So it did precisely what it is *not* permitted to do under ERISA: it recommended a policy solely to protect its own bottom line. It recommended that UBH approve TMS claims only when someone else (*i.e.*, a self-funded plan sponsor) would be on the hook for the expense, *i.e.*, that coverage *not* be extended to UBH's "risk business." *See* Ex. 749-0005.

Unsurprisingly, UBH's decision to cover TMS only if UBH was not paying the bill created confusion for UBH's Care Advocates and Peer Reviewers. Thus, in the spring of 2014, [redacted].[50] [redacted].

### 3. The ASAM Decision

Most tellingly, the evidence at trial confirmed that financial considerations directly influenced UBH's decision about the Guidelines at issue – specifically, whether to replace the Guidelines (for purposes of managing coverage for substance use disorder treatment) with the ASAM Criteria.

UBH concedes the ASAM Criteria reflect generally accepted standards of care for level of care placement decisions for substance use disorders. Tr. 776:24-777:11 (Triana); Tr.

---

[50] The discussions about how to avoid or mitigate the financial impact of covering TMS included numerous BPAC members: Lorenzo Triana, Bill Bonfield, Fred Motz, Peter Brock, Michael Powell, Gerry Niewenhous, and Rhonda Robinson-Beale. *See*, *e.g.*, Ex. 423 (Jan. 2014 BPAC minutes); Ex. 434 (Feb. 2014 BPAC minutes) Tr. 703:3-16 (Motz was BPAC member).

1630:13-16 (Alam); Tr. 957:22-958:9, 1112:5-16 (Martorana). Throughout the Class Period – in 2012, 2013, 2014, and 2016 – UBH explored adopting the ASAM Criteria as its standard clinical coverage criteria for substance use disorders in lieu of the LOCGs and CDGs. Tr. 802:4-16 (Triana) (2012); Ex. 382-0003 (2013); Tr. 1631:6-9 (Alam) (2013); Ex. 430-0002-06 (2014); Ex. 524-0002-04 (2016); Tr. 1897:21-1898:19 (UBH counsel explaining that in these instances, the question was whether to "take out" the existing level of care criteria and replace them with ASAM, on a "wholesale" basis). Each time, the UBH clinicians who specialized in addiction medicine (the "SUDs Team") recommended adopting ASAM. Tr. 1653:22-25 (Alam); Tr. 776:5-777:8 (Triana); Ex 420; Ex. 430; Ex. 548-0033, -0041. Dr. Danesh Alam, a Senior Medical Director at UBH and a substance use disorder specialist, testified that there was consensus among all of UBH's addiction psychiatrists that the company should adopt the ASAM criteria. Tr. 1654:6-16 (Alam). Dr. Martorana, who supported the ASAM criteria and participated in the discussions at UBH about whether to adopt them, testified that he never heard *anyone* raise a clinical objection to the ASAM Criteria. Tr. 1122:8-19. Dr. Triana, the Chair of the BPAC and the UMC at every time ASAM was considered, also confirmed that there was no clinical reason not to adopt ASAM. Tr. 777:17-22 (Triana). Even Martha Temple – UBH's effective CEO and not a clinician – recognized that UBH should adopt ASAM "to get in line with evidence based guidelines for our policies around Substance Use." Ex. 524-0004.[51]

Despite the clear consensus among UBH's addiction specialists that adopting ASAM was preferable from a clinical standpoint, UBH could not replace its standard Guidelines with those criteria without first obtaining approval from the finance department. *See, e.g.*, Ex. 524-0002 (moving forward would require "'green light' from finance"); Ex. 548-0034 ("BPAC requested that there be a financial review of possible impact of adoption of ASAM criteria prior to moving forward"). But finance would not approve the change. As UBH admitted in an internal presentation drafted the last time the company considered the issue, UBH concluded that – despite six months of joint effort by the HCA, Finance and Affordability departments – "a

[51] Ms. Temple's first request, though, was for someone to let her know the "impact" of the potential change. Ex. 524-0004.

meaningful and valid BenEx modeling of the impact of a move to ASAM criteria (vs. OHBS criteria) is not possible due to the paucity of robust and relevant data." Ex. 548-0034 (original emphasis). *See also* Ex. 524-0002 ("As part of one of the SUD's work streams, we looked at adopting the ASAM guidelines but NEVER received a 'green light' from finance because they could not estimate the financial impact on BenEx in changing from using the UBH guidelines to ASAM. I recently had Martin [a Senior Medical Director at UBH] push finance again … and the response was the same.").

To this day, UBH has never made the switch to ASAM. Tr. 775:22-776:14 (Triana); 1673:4-6 (Alam). And the *sole reason* UBH has never done so is its concern that adopting ASAM *might* increase benefit expense. *See, e.g.*, Ex. 452-0008; Tr. 781:7-782:3 (Triana); Tr. 1122:8-19 (Martorana) (no clinical objections to ASAM criteria); Ex. 524-0002 (reason finance would not sign off was that "they could not estimate the financial impact on BenEx in changing from using the UBH guidelines to ASAM."); Tr. 1669:2-5 (Alam) (testimony that proposed "rollout" of ASAM pilot would be terminated if it led to an increase in utilization); Ex. 548-0042 (noting "[p]ossible impact on benex cost" as a "limitation" of ASAM); Ex. 348-0001 to -0002 (UBH medical director warning that the ASAM Criteria "usually will result in more authorization as they are more subjective and broader than our LOCG/CDGs").

In short, even though UBH well knew that the ASAM Criteria were consistent with generally accepted standards *and* that UBH's own criteria were more restrictive than ASAM, § II.I, *supra*, even though UBH's own SUDs Team repeatedly advised, for clinical reasons, that UBH use the ASAM Criteria in place of its standard substance use disorder Guidelines, and even though no one ever identified a single *clinical* reason not to do so, UBH never adopted the ASAM Criteria. The reason was simple: UBH's management was concerned doing so *might* require it to pay out more in benefits. Even the possibility that UBH's bottom line might be impacted was enough to prevent UBH from adopting criteria that, unlike the Guidelines, were consistent with generally accepted standards and the Class Members' plans.

## III. CLAIMS AND STANDARD OF REVIEW

Under ERISA, "[a] civil action may be brought" by a plan participant or beneficiary not

only to "recover benefits due . . . under the terms of [a] plan," 29 U.S.C. § 1132(a)(1)(B), but also to "enforce . . . rights under the terms of [a] plan," *id.*, to "clarify . . . rights to future benefits under the terms of [a] plan," *id.*, to "enjoin any act or practice which violates any provision of this subchapter," *id.* § 1132(a)(3)(A), and to "obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan," *id.* § 1132(a)(3)(B).

### A. Claim One: Breach of Fiduciary Duty

In Claim One (Counts I and III), Plaintiffs allege that UBH breached several fiduciary duties in developing and applying its deficient Guidelines to their benefit requests: a duty of loyalty, *id.* § 1104(a)(1)(A), a duty of due care, 29 U.S.C. § 1104(a)(1)(B), and a duty to comply with plan terms, *id.* § 1104(a)(1)(D). The questions under Claim One are whether UBH did, or did not, discharge its duties "solely in the interest of the participants and beneficiaries," "with . . . care, skill, prudence, and diligence," and "in accordance with the documents and instruments governing the plan."

When the Court evaluates the last of these questions – *i.e.*, whether UBH faithfully complied with plan terms – it applies abuse of discretion review.[52] Under the abuse of discretion standard, "a plan administrator's decision 'will not be disturbed if reasonable.'" *Stephan*, 697 F.3d at 929 (quoting *Conkright v. Frommert*, 559 U.S. 506, 512 (2010)). The terms of the plan control whether an ERISA fiduciary's conduct is "reasonable." A fiduciary "abuses its discretion if it construes provisions of the plan in a way that 'conflicts with the plain language of the plan.'" *Saffle v. Sierra Pac. Power Co. Bargaining Unit Long Term Income Plan*, 85 F.3d 455, 458 (9th Cir. 1996) (citation omitted). In other words, a claims administrator like UBH abuses its discretion if it adopts an "unreasonable" interpretation of the plan. *Id.* (citation omitted). After

---

[52] UBH did not offer proof at trial that the plans, in fact, formally delegated discretion to UBH. If the Court were to reject UBH's claim to deference because of that failure of proof, the Court would apply de novo review to all of Plaintiffs' claims. *Pac. Shores Hosp.*, 764 F.3d at 1039–40 ("The essential first step of the analysis is to examine whether the terms of the ERISA plan unambiguously grant discretion to the administrator. When the terms of the plan do not grant discretion to determine eligibility for benefits or to construe the terms of the plan, we review de novo the administrator's denial of coverage.") (citations and alteration omitted).

all, a claims administrator must administer a plan "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D).[53]

The abuse-of discretion standard does not apply to UBH's breaches of its duties of loyalty and care, however. Those duties are enshrined in ERISA's statutory language itself, and they exist independent of plan terms and outside any delegation of discretion to interpret plan terms. *See Conkright v. Frommert*, 559 U.S. 506, 512 (2010) (*Firestone* deference applies where the "benefit plan" grants discretion to "construe the terms of the plan"). *Firestone* deference does not alter the "standard articulated in [§ 1104]" because a contrary rule would "eviscerat[e] ERISA's statutory command that fiduciary decisions be held to a strict standard." *John Blair Commc'ns Inc. Profit Sharing Plan v. Telemundo Grp., Inc.*, 26 F.3d 360, 369 (2d Cir. 1994).[54]

As to the duty of loyalty, for example, Plaintiffs' claim is that UBH did *not* act "solely in the interest of the participants and beneficiaries," and instead let its self-interest in minimizing benefit expense infect the development of its clinical Guidelines. *See* § IV.D, *infra*. This is a true statutory claim. UBH breached its duty of loyalty independent of its interpretation of plan terms. In other words, in deciding whether UBH failed to act solely in the interest of the participants and beneficiaries, the Court need not decide whether UBH's interpretation of plan terms was reasonable; those are two separate questions. For that reason, this is not a situation where "[a] claim for breach of fiduciary duty is actually a claim for benefits" because "resolution of the claim rests upon interpretation and application of an ERISA regulated plan." Def.'s Tr. Br., ECF No. 300 at 5 (quoting *Zhu v. Fujitsu Grp. 401(k) Plan*, 2003 WL 24030329, at *2 (N.D. Cal.

[53] Analyzing whether an ERISA fiduciary has abused its discretion also entails a determination of whether "the decision appears to have been affected by a conflict of interest." *Stephan*, 697 F.3d at 929. That aspect of the analysis is discussed below. *See* § III.C, *infra*.

[54] While the Ninth Circuit in *Tibble v. Edison Int'l* distinguished *John Blair* on the facts of the case, it did not repudiate *John Blair*'s reasoning. *See* 729 F.3d 1110, 1128-30 & n.17 (9th Cir. 2013), *rev'd on other grounds*, 135 S. Ct. 1823 (2015). Indeed, the Ninth Circuit explained that the *Tibble* plaintiffs did not "pursue[] this challenge as a violation of [§ 1104(a)'s] prudent person standard" and that "[a]s to issues of plan interpretation ***that do not implicate ERISA's statutory duties***, they are subject to *Firestone*." *Id.* at 1116 (emphasis added). Thus *Tibble* implies that where the plaintiffs do pursue a statutory duty-of-loyalty claim, as they do here, then no deference is owed the defendant fiduciary.

Sept. 9, 2003)). *See also Zhu*, 2003 WL 24039329, at *3 (holding that even if "plaintiff ultimately ends up with additional benefits because of the injunction, this does not change the nature of his claim"). Similarly, Plaintiffs claim that UBH breached its duty of care by, for example, using a fundamentally flawed process to develop Guidelines that purported to be consistent with generally accepted standards of care – regardless of whether its Guidelines *in fact* unreasonably interpret plan terms. *See* § IV.E, *infra*.

In short, the abuse of discretion standard applies to Plaintiffs' fiduciary duty claim based on UBH's failure to comply with plan terms; Plaintiffs' other fiduciary duty claims should be reviewed de novo.

**B. Claim Two: Wrongful Denial of Benefits**

Claim Two (Counts II and IV) alleges that UBH not only breached its fiduciary duties in developing and adopting overly restrictive Guidelines, it then wrongfully denied Plaintiffs' claims by analyzing them pursuant to those Guidelines. The usual standard of review on an ERISA denial of benefits claim is "abuse of discretion." *Saffle*, 85 F.3d at 458. As discussed above, "[a]n ERISA plan administrator abuses its discretion if it construes provisions of the plan in a way that 'conflicts with the plain language of the plan.'" *Id.*

**C. The Court Should View UBH's Conduct with Skepticism.**

In applying the abuse of discretion standard, the Court should view UBH's conduct with skepticism. Where, as here, the claims administrator labors under a conflict of interest, evidence of the conflict will "weigh[] as a factor in determining whether there is an abuse of discretion." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115 (2008). Proof of a conflict of interest can tip the scales in favor of a finding of abuse of discretion if the Court finds that two alternatives are equally reasonable. *Id.*, 554 U.S. at 116-17. "[T]he degree of skepticism with which [courts] regard a plan administrator's decision when determining whether the administrator abused its discretion varies based upon the extent to which the decision appears to have been affected by a conflict of interest." *Stephan*, 697 F.3d at 929. *See Demer v. IBM Corp. LTD Plan*, 835 F.3d 893, 900 n.3 (9th Cir. 2016) (describing the resulting standard of review as "abuse of discretion with skepticism").

The extent to which a conflict of interest militates toward an abuse of discretion thus turns on "the likelihood that the conflict impacted the administrator's decisionmaking," *Stephan*, 697 F.3d at 929. On one hand, a claims administrator's conflict of interest "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration." *Metro. Life*, 554 U.S. at 117. On the other hand, a conflict of interest "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances." *Id.* The question ultimately is "whether the fiduciary took 'all steps necessary to prevent conflicting interests from entering into the decision-making process.'" *Leber v. Citigroup 401(k) Plan Inv. Comm.*, __ F.R.D. __, 07-CV-9329 (SHS), 2017 WL 5664850, at *9 (S.D.N.Y. Nov. 27, 2017) (citing *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 298 (5th Cir. 2000)).

Here, even if the evidence of UBH's abuse of discretion were in equipoise based on the plain terms of the plans and the Guidelines (when in fact, it is not even close), UBH's conflict of interest would definitively render UBH's conduct an abuse of discretion. **First**, UBH had an inherent, structural conflict, at least as to the thousands of fully insured plans it administered, as UBH conceded at trial. Tr. 1893:17-22 (closing). At trial, UBH witnesses sought to characterize its cost-saving efforts as focused solely on its self-funded customers. But the vast bulk of its revenue (approximately [redacted]) is from fully-insured plans. PFF § XII. UBH also has every motive to minimize benefit authorizations under ASO plans, to please current customers and attract new ones, as its own witnesses testified. § II.K, *supra*. And, in any event, UBH uses the same Guidelines regardless of whether the member's plan is self-funded or fully insured.

**Second**, UBH has not shown that it took any steps, let alone "all steps necessary," "to prevent conflicting interests from entering into the decision-making process." *Leber,* __ F.R.D. at __, 2017 WL 5664850, at *9. In fact, UBH's process ensured the opposite. UBH's process itself all but ensured that its Guidelines – which are supposed to embody generally accepted standards of care – were instead a cost-cutting tool disguised as clinical coverage criteria. The

BPAC was staffed not only with clinicians, but with Affordability and Finance representatives as well. *See* § II.K, *supra*. To be sure, UBH distributed to its "clinical personnel" an "affirmative statement . . . regarding its incentives to encourage appropriate utilization, and to discourage under-utilization," including that it "does not specifically reward practitioners or other individuals for issuing non-coverage decisions," and Peer Reviewers' *personal* compensation was not contingent on their own rates of denials of requests for coverage. *E.g.*, Tr. 950:7-951:12 (Martorana) (discussing Ex. 1186-0039). But the task of drafting and approving the Guidelines that will be *used* to issue denials is a separate, prior task that is not covered by those attestations. UBH took no steps to ensure that the Guideline drafters or the responsible committee members would limit themselves to clinical considerations when making decisions about the content of the Guidelines that the rest of UBH's clinical staff was then charged with applying.[55] Quite the contrary, UBH's chief executive Martha Temple herself made the mandate crystal-clear: "We need to be more mindful of the business implications of guideline change recommendations." Ex. 812-0001. And committee members – particularly BPAC/UMC Chair Lorenzo Triana – *were* evaluated based on UBH's performance against its benefit expense targets.

One example where a claims administrator's conflict "affected the benefits decision" is where it has a "history of biased claims administration." *Metro. Life*, 554 U.S. at 1117. In individual denial-of-benefits cases, a plaintiff generally can only show such a "history" by proving that the administrator had been biased in *prior* cases. *See, e.g. Stephan*, 697 F.3d at 929. This case is different, because Plaintiffs are challenging the criteria by which UBH has made *all* its clinical coverage determinations from 2011 to 2017. Because UBH permitted its financial interests to influence the content of those criteria, there is no evidence to *avoid* a finding that UBH has a "history of biased claims administration." *See also Pac. Shores Hosp. v. United Behav. Health*, 764 F.3d 1030, 1040 (9th Cir. 2014) ("Even when a plan confers discretion on an administrator, if that administrator engages in 'wholesale and flagrant violations of the

[55] For example, one small step UBH *could* have taken is to train the Guideline drafters on its ERISA fiduciary duties and what the duty of loyalty requires. The evidence showed UBH wholly failed to do so. *See* Tr. 1100:25-1101:2 (Martorana); Tr. 1443:25-1444:3 (Allchin).

procedural requirements of ERISA,' its decision is subject to de novo review.").

## IV. LEGAL ARGUMENT

For more than seven years, UBH has been denying its members' requests for coverage using Guidelines that are fundamentally more restrictive than the plan terms those Guidelines purport to interpret. By adopting Guidelines that are fundamentally more restrictive than generally accepted standards of care or the standards required by state law, UBH abused its discretion and breached its duty to honor plan terms.[56] UBH also breached its duty of loyalty by failing to act solely in the interests of plan participants and beneficiaries, instead permitting its financial interests to infect its development of its clinical Guidelines. And it breached its duty of care by failing to ensure that its Guidelines were in fact consistent with generally accepted standards. Accordingly, UBH is liable on Claims I-IV.

### A. UBH Exercised Fiduciary Duties When It Developed And Applied Its Guidelines.

ERISA defines a "fiduciary with respect to a plan" to include a person who "exercises any discretionary authority or discretionary control respecting management of such plan" or "has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A). One example of an ERISA fiduciary is "an agent who has the final authority to authorize or disallow benefit payments in cases where a dispute exists." *King v. Blue Cross & Blue Shield of Ill.*, 871 F.3d 730, 745 (9th Cir. 2017). "Fiduciary status under ERISA is to be construed liberally, consistent with ERISA's policies and objectives." *Arizona State Carpenters Pension Tr. Fund v. Citibank (Arizona)*, 125 F.3d 715, 720 (9th Cir. 1997).

As explained above, the Guidelines constitute UBH's interpretation of plan requirements that the prescribed treatment, at the prescribed level of care, be consistent with generally accepted standards of care. *See* § II.E, *supra*. Accordingly, UBH's development, promulgation and use of the Guidelines are fiduciary acts. Indeed, UBH concedes that it "was required to act in accordance with the plans and its duties as a fiduciary." Tr. 1873:16-17. Thus UBH had, and

---

[56] Each of the Plaintiffs' and class members' plans was governed by ERISA, at least at the time of the denial at issue in this case. Ex. 896-0003 (¶ 1(f)).

exercised, "discretionary authority or discretionary responsibility" in creating, amending, and applying its Guidelines.

**B. UBH Breached its Duty to Honor Plan Terms.**

UBH was bound by ERISA to design Guidelines and adjudicate requests for coverage "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D). As discussed above, one condition of coverage under the Plaintiffs' and class members' plans was that the prescribed treatment be consistent with generally accepted standards of care. *See* § II.D, *supra*. UBH purported to interpret that condition by drafting its Guidelines. *See* § I.E, *supra*.

The Guidelines are more restrictive than generally accepted standards of care in numerous ways. *See* § II.F-I, *supra*. These flaws were pervasive and inter-related, and rendered individual Guideline provisions and the Guidelines as a whole, fundamentally more restrictive than generally accepted standards of care and thus "in contravention of the plan's plain terms." *Kearney*, 175 F.3d at 1102. Accordingly, UBH has breached its duty to administer the plans as written, and the Court should enter judgment for Plaintiffs.

None of this analysis changes if the Court analyzes the claim under the abuse of discretion standard. In interpreting the plans' generally-accepted-standards requirement, UBH's plan-based right to exercise discretion means UBH was free to choose among different criteria – but only if those criteria are consistent with generally accepted standards of care. After all, there are multiple ways to articulate generally accepted standards for matching patients with levels of care. ASAM and LOCUS, for example, take somewhat different approaches. But UBH's fiduciary duty to honor plan terms prohibited it from adopting coverage criteria that were more restrictive than generally accepted standards. Yet that is precisely what UBH did.

**C. As to the *Wit* State Mandate Class, UBH Breached its Duty to Comply With State Law.**

In addition to complying with the express terms of the plans, UBH was required by ERISA to comply with the applicable laws of the states that governed those plans. *See, e.g.*, *Harlick v. Blue Shield of California*, 686 F.3d 699, 721 (9th Cir. 2012). UBH breached its duty

to comply with the law of Illinois, Connecticut, Rhode Island and Texas as to plans governed by those states' laws, and therefore committed an independent breach of its fiduciary duties and its duties to comply with plan terms.

**Illinois**. As explained above, beginning August 18, 2011, Illinois mandated that all "[m]edical necessity determinations for substance use disorders shall be made in accordance with appropriate patient placement criteria *established by* the American Society of Addiction Medicine." 215 Ill. Comp. Stat. § 5/370c(b)(3) (eff. Aug. 18, 2011) (emphasis added). UBH undisputedly did *not* begin using the ASAM Criteria for making medical necessity determinations for substance use disorders for another five years, until January 2016. *See* § II.J, *supra*. It purportedly justified doing so by (a) construing the statute as *not* requiring that it actually use the ASAM Criteria, but rather permitting UBH to use its own Guidelines if they were "in accordance with" the ASAM Criteria, and (b) concluding that its Guidelines *were* "in accordance with" the ASAM Criteria.

UBH's interpretation of this clear and unambiguous statutory language was unreasonable. There is no reasonable way to read the statute to mean anything other than requiring UBH to use the ASAM Criteria themselves. The statute clearly required that "medical necessity determinations" be made "in accordance with" "criteria *established by* [ASAM]" (emphasis added). When the language is clear and unambiguous, a statute must be held to bear its "ordinary or natural meaning," *FDIC v. Meyer*, 510 U.S. 471, 476 (1994), and every word must be given effect, *Kungys v. United States*, 485 U.S. 759, 778 (1988). UBH's construction not only rendered the phrase "established by" superfluous; it rendered the phrase "in accordance with" essentially meaningless.

The fact that the 2011 statute required that UBH actually use the ASAM Criteria was confirmed in September 2015, when the Illinois legislature amended the statute to add: "No additional criteria may be used to make medical necessity determinations for substance use disorders." 215 Ill. Comp. Stat. 5/370c(b)(3). The Illinois courts have made clear that where a statutory amendment was made "by way of clarification," the amendment should be read to indicate the meaning of the earlier, amended statute. *See, e.g.*, *Braun v. Retirement Bd. of*

*Firemen's Annuity & Ben. Fund of Chicago*, 483 N.E.2d 8, 11-12 (Ill. 1985). *See also Block v. Office of Ill. Sec'y of State*, 988 N.E.2d 718, 721-722 (App. Ct. Ill. 2013) ("While a material change in a statute made by an amendatory act is presumed to change the original statute, that presumption is rebutted where the circumstances surrounding the enactment of the amendment indicate that the legislature intended to interpret, rather than change, the original act.").

Thus, by using its own Guidelines from 2011 through 2015, rather than the ASAM Criteria for requests for coverage governed by Illinois law, UBH violated the Illinois statute. Alternatively, even if Illinois had permitted the use of comparable Guidelines, as opposed to the actual use of the ASAM Criteria, UBH still violated the statute because its Guidelines bear little resemblance to the ASAM Criteria, due to all the restrictive flaws discussed above. *See* § II.F-I.

**Connecticut**. Since 2013, Connecticut has required UBH to either (a) use the ASAM Criteria, or (b) "demonstrate[] to the Insurance Department" that is own Guidelines are "consistent with" the ASAM Criteria. CONN. GEN. STAT. § 38a-591c (2017); 2013 CONN. LEGIS. SERV. 13-3. UBH concedes that it has never used the ASAM Criteria in Connecticut, and rests on the "consistent with" option as its defense to the Connecticut state mandate claims. Tr. 391:6-14 (Niewenhous); Exs. 450, 268, 270-78 (Guideline Applicability Tools). But UBH did not "demonstrate[] to the Insurance Department" that its Guidelines were consistent with ASAM because the "crosswalk" that UBH submitted to Connecticut, in both 2013 and 2015 (the two submissions during the Class Period) (Exs. 402 & 506), misrepresented UBH's Guidelines, and the company has never corrected the misrepresentation. *See* § II.J, *supra*; PFF § XII.B. In any event, the Guidelines are not (and were never) "consistent with" the ASAM Criteria, by any stretch. § II.F-I, *supra*.

**Rhode Island**. Since July 10, 2015, Rhode Island has required payors such as UBH to "rely upon the criteria of the American Society of Addiction Medicine when developing coverage for levels of care for substance-use disorder treatment." 27 R.I. GEN. LAWS § 27-38.2-1; 2015 R.I. PUB. LAWS 15-236 (15-H 5837A). It is undisputed that UBH did not use the ASAM Criteria for administering Rhode Island claims. *See* Tr. 392:25-393:3 (Niewenhous). The evidence also establishes that UBH did not "rely upon" the ASAM Criteria when "developing"

its LOCGs and CDGs. It paid lip service to ASAM, and cited ASAM as part of the purported evidence base for its Guidelines. But any such "reliance" was illusory. UBH's Guidelines were, and remain, fundamentally different and more restrictive that the ASAM Criteria. § II.F-I, *supra*.

**Texas.** Texas requires insurance companies to make medical necessity determinations for substance use disorder treatment using criteria issued by the Texas Department of Insurance, where the plan is governed by Texas law and the treatment was sought from a provider or facility in Texas. 28 TEX. ADMIN. CODE § 3.8011. Yet in practice, UBH has regularly ignored this requirement. *See* § II.J, *supra*.

For these reasons, UBH committed additional, independent violations of its duties under ERISA by failing to comply with Illinois, Connecticut, Rhode Island and Texas law.

**D. UBH Breached its Duty of Loyalty.**

ERISA requires that fiduciaries like UBH act "solely in the interest of the participants and beneficiaries." *See* 29 U.S.C. § 1104(a)(1). "A fiduciary's duty requires complete and undivided loyalty to plan participants without any dealing for the fiduciary's own benefit." *Kanawi v. Bechtel Corp.*, 590 F. Supp. 2d 1213, 1222 (N.D. Cal. 2008). This is the "strict duty of loyalty" imposed by ERISA, *Plumber, Steamfitter & Shipfitter Industry Pension Plan & Trust v. Siemens Building Technologies Inc.*, 228 F.3d 964, 968 (9th Cir. 2000), which is the "core obligation of an ERISA fiduciary." *Bins v. Exxon Co. U.S.A.*, 220 F.3d 1042, 1048 (9th Cir. 2000). The Supreme Court has made clear that ERISA's duty of loyalty is an independent statutory duty: an ERISA fiduciary that breaches its duty of loyalty has violated ERISA, regardless of whether it has abused its discretion or breached its fiduciary duties in other ways. *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996) ("breach of this duty [of loyalty] is sufficient to uphold the decision below"). *See also, e.g.*, *Terraza v. Safeway Inc.*, 241 F. Supp. 3d 1057, 1070 (N.D. Cal. 2017) (upholding plaintiff's independent claim for breach of fiduciary duty based on her "separate loyalty-based allegations").

"[T]he standard for evaluating breach of loyalty claims 'focuses . . . on the fiduciary's conduct,' and asks whether the fiduciary took 'all steps necessary to prevent conflicting interests from entering into the decision-making process.'" *Leber*, __ F.R.D. __, 2017 WL 5664850, at *9

(quoting *Bussian*, 223 F.3d at 298). That is because ERISA's fiduciary duties, including the duty of loyalty, are derived from trust law. *Varity*, 516 U.S. at 506. *See also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015) ("In determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts."). Trust law "strictly prohibit[s]" a fiduciary from "engaging in transactions that involve self-dealing or that otherwise involve or create a conflict between the trustee's fiduciary duties and personal interests." Restatement (Third) of Trusts § 78(2) (Am. Law Inst. 2007). The purpose of that prohibition is to "assur[e]" beneficiaries that the fiduciary is exercising "independent and objective fiduciary judgment." *Id.* at cmt. d(1). A fiduciary thus breaches its duty of loyalty when it "personally has a financial interest in the transaction of such a nature that it might affect the trustee's judgment." *Id.* at cmt. (d). "In transactions that violate the trustee's duty of undivided loyalty, under the so-called 'no further inquiry' principle it is immaterial that the trustee may be able to show that the action in question was taken in good faith, that the terms of the transaction were fair, and that no profit resulted to the trustee." *Id.* at cmt. b.

Here, UBH breached its statutory duty of loyalty because it took no steps, let alone "all steps," that were "necessary to prevent conflicting interests from entering into [its] decision-making process." *Leber*, 2017 WL 5654850, at *9. In fact, the evidence shows that UBH's conflict played a meaningful role in its decision to draft restrictive guidelines. *See* § II.K, *supra*. UBH placed its own financial interests front and center, far from acting "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1). In so doing, UBH breached its fiduciary duty of loyalty.

**E. UBH Breached its Duty of Care.**

UBH also had a fiduciary duty to develop the Guidelines "with . . . care, skill, prudence, and diligence," 29 U.S.C. § 1104(a)(1)(B) – to use the care and skill that a reasonable and faithful fiduciary would use. UBH breached that statutory duty as well.

Although UBH had a Guideline-development process that was sufficient for utilization management accreditation, Tr. 1783:12-1791 (Goddard), the process was not designed to ensure that UBH's Guidelines were consistent with generally accepted standards of care as required by

the plans or with state law. UBH placed the lion's share of responsibility for researching and drafting the Guidelines on the shoulders of Gerry Niewenhous, an unlicensed social worker with little clinical experience. Tr. 1729:25-1733:11. Ultimate authority for approving the Guidelines rested with the BPAC, but the BPAC members rarely reviewed the sources Mr. Niewenhous and his assistant, Loretta Urban, cited; they relied on Niewenhous and Urban to do that critical work. Tr. 1730:6-11, 1731:6-9 (Triana).

While UBH personnel annually solicited feedback from some in-network physicians, UBH did not ask whether the Guidelines are consistent with generally accepted standards of care, but rather whether, for example, the guidelines are "easy to use" or "are ambiguous or unclear." *See, e.g.*, Ex. 1114-0002. One of the questions was "Are there criteria that should be added or deleted?" Ex. 1114-0002. But UBH offered only $150 for responses and required responses within a few weeks, *id.*, hardly a message that UBH wanted the physicians to take the substantial time that would be necessary to bring UBH's Guidelines into conformity with generally accepted standards. *See* Tr. 1735:6-1736:1, 1740:24-1741:4 (Triana). And it likely would not occur to most physicians that UBH had any interest in making its criteria consistent with how mental health professionals actually treat their patients, let alone based on the questions UBH posed.

Even though they were not asked, some providers nevertheless did provide substantive feedback, criticizing UBH's Guidelines in fundamental ways. *See, e.g.*, Tr. 1007:3- (Martorana) (Clinical Social Work Association criticized use of "the word 'acute' in the lower levels of care," because that "'tilt[ed]' the consideration to just acute care and wasn't really addressing the kind of patient that they often saw: someone that, you know, needed to come in once a week; otherwise, they would not do well; they would deteriorate and require, you know, probably more intensive level of care," and "they felt that that was a reasonable thing to do in terms of treating somebody's condition"); Ex. 516-0007 (Dr. Alan Axelson, "While I understand the focus on 'why now' interventions, I am very concerned that the overemphasis of this type of treatment has contributed to an ineffective and inefficient overall treatment system."); Tr. 743:24-747:6 (Dr. Triana conceding that although "managing serious persistent psychiatric illness is important,"

and he does not "disagree with Dr. Axelson," the Level of Care Workgroup discussed Dr. Axelson's comments, UBH "did not make a change in the 'why now' language for 2016"). This feedback was never shared with the BPAC, however. Only the Level of Care Guidelines Workgroup – made up of Mr. Niewenhous and Drs. Triana, Bonfield and Brock – reviewed the feedback. Tr. 1699:17-20.

At trial, UBH's witnesses could identify only a single person whom the company had ever asked to analyze whether its Guidelines were consistent with generally accepted standards of care (specifically, the ASAM Criteria): Jerry Shulman, the ASAM co-editor who commented on UBH's Guidelines in 2013. At trial, UBH pointed to Mr. Shulman's engagement as evidence that its Guidelines are consistent with the ASAM Criteria – but that was a completely unsupportable suggestion, for the reasons discussed above. *See* § II.I, *supra*.

For these reasons, UBH breached its duty of care under ERISA, namely to discharge its duties with "care, skill, prudence, and diligence," 29 U.S.C. § 1104(a)(1). Perhaps given the flaws in its Guideline development process it is not surprising what the process resulted in: Guidelines that are pervasively more restrictive than generally accepted standards of care and the standards required by state law.

**F. UBH Abused its Discretion by Using its Overly-Restrictive Guidelines to Deny Coverage to the Class Members.**

As this Court has previously found, in addition to fiduciary duty claims, "an ERISA Plan participant or beneficiary may bring a claim for arbitrary and capricious denial of benefits based on an injury other than the actual denial if the process by which a coverage determination was made was defective." *Wit v. United Behav. Health*, Case No. 14cv-02346-JCS, 2017 WL 3478775, at *13 (N.D. Cal. Aug. 14, 2017) (citing *Saffle*, 85 F.3d 455). "A plan administrator abuses its discretion if it . . . construes provisions of the plan in a way that conflicts with the plain language of the plan. . . ." *Pac. Shores Hosp.*, 764 F.3d at 1042 (quoting *Anderson v. Suburban Teamsters of N. Ill. Pension Fund Bd. of Trs.*, 588 F.3d 641 (9th Cir. 2009)). A plaintiff is entitled to relief upon showing that "a plan administrator applied an incorrect standard in making a coverage determination." *Wit*, 2017 WL 3478775, at *13. *See also Des Roches v.*

*California Physicians' Serv.*, 320 F.R.D. 486, 499 (N.D. Cal. 2017) ("[U]nder *Saffle*, Plaintiffs can show that Defendants caused harm on a general basis if Plaintiffs can show that Defendants applied an incorrect standard in evaluating their claims."); *Meidl v. Aetna, Inc.*, No. 15-CV-1319 (JCH), 2017 WL 1831916, at *11 (D. Conn. May 4, 2017).

UBH has a single set of standards for determining whether treatment prescribed by its members' providers is consistent with generally accepted standards of care: its Guidelines. The evidence is overwhelming that those Guidelines are not consistent with generally accepted standards of care, as explained at length above. *See* §§ II.F-I, *supra*. Thus, UBH's abuse of discretion did not end when it adopted its defective Guidelines. By the time the Plaintiffs and class members submitted requests for coverage, the fix was in. Every time UBH denied a class member's claim pursuant to its Guidelines, it abused its discretion anew. Accordingly, Plaintiffs are also entitled to judgment on Claim Two.

### G. UBH Failed To Prove Any of Its Affirmative Defenses.

UBH did not satisfy its burden of proof on any of its raft of affirmative defenses.[57]

#### 1. <u>"As Applied" Defense</u>

As the Court has made clear, including at the pretrial conference, the fundamental factual question for trial was whether UBH's Guidelines, on their face, are more restrictive than generally accepted standards of care. *See, e.g.*, Transcript of Pretrial Conference (Oct. 5, 2017) ("PTC Tr.") 16:2-5 (describing the issues as whether "the plans at issue have the provisions that you think incorporate the relevant standard and [whether] the guidelines at issue are inconsistent with that standard"). During trial, it quickly became apparent that UBH had little interest in defending the actual terms of the Guidelines. Instead, as described above, its witnesses and counsel repeatedly suggested that the Guidelines mean something other than what they say.

The Court should reject this "as-applied" defense. It fails as a factual matter because

---

[57] UBH also argued before trial that counts II and IV, which arise under 29 U.S.C. § 1132(a)(3), should be dismissed. A plaintiff can bring both an (a)(1)(B) and (a)(3) claim "so long as there is no double recovery." *Moyle v. Liberty Mut. Retirement Benefit Plan*, 823 F.3d 948, 961 (9th Cir. 2016). The only conceivably appropriate time to consider whether granting Plaintiffs relief under (a)(3) would result in "double recovery" is after the Court enters judgment on liability and the parties have briefed the appropriate remedy.

there is no contemporaneous evidence that the Guidelines are not applied as written. To the contrary, the evidence was overwhelming that the Guidelines are mandatory, and mean what they say. The defense also fails on its own terms. The Guidelines *are* the standard that UBH applied to interpret plan terms conditioning coverage on treatment being consistent with generally accepted standards of care, and the Guidelines constituted an unreasonable interpretation of that standard. If UBH were to draft one set of Guidelines that it published and represented to its members (on its website and its ERISA-governed denial letters), as the clinical standard it applied, and then instruct its Peer Reviewers to apply some *other*, undisclosed standard, that would be nothing if not "arbitrary and capricious." Finally, UBH's "as-applied" defense fails because, as the Court correctly reiterated at the pretrial conference, the central question in this case is a "facial" one: whether UBH's Guidelines are more restrictive than generally accepted standards of care. Plaintiffs were prepared to present overwhelming evidence, based on UBH's denials of the named Plaintiffs' requests for coverage, that UBH does, in fact, apply the Guidelines as written, and just as restrictively as their criteria provide, but Plaintiffs accepted the Court's instruction to make the trial solely about the plain language of the challenged Guidelines. UBH ignored that instruction, and constructed almost its entire defense using evidence that was essentially irrelevant.

**2. <u>"Good faith"</u>**

In the joint pretrial order, UBH contended that Plaintiffs' claims are "barred in whole or in part, because in developing and using the Guidelines, UBH at all times acted in good faith and consistent with reasonable care," and that, in any event, "it is Plaintiffs' burden to prove that UBH's actions were not in good faith." *Wit* ECF No. 296 at 6 & 5 n.5. As the Court made clear at the pretrial conference, however, "good faith" is not a defense in an ERISA case but rather is "part of the abuse of discretion standard." PTC Tr. 22:6-7. Indeed, in arguing that good faith *was* a defense, UBH betrayed a misunderstanding of the standard of review. Having acted in "good faith," by itself, is not sufficient to defeat an abuse of discretion claim. *See, e.g., DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 (4th Cir. 2007) ("Good faith does not provide a defense to a claim of a breach of these fiduciary duties; 'a pure heart and an empty head are not enough.'")

(quoting *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983)). In fact, in the case on which UBH relied for its purported "good faith" standard, *Conkright*, 559 U.S. 506, the Supreme Court made clear that "[m]ultiple erroneous interpretations of the same plan provision, *even if issued in good faith*, might well support a finding that a plan administrator is too incompetent to exercise his discretion fairly." *Id.* at 521 (emphasis added).

In any event, for the reasons discussed above, UBH did breach its fiduciary duties and abuse its discretion. UBH, among other things, adopted and applied Guidelines that were more restrictive than the plans, put its bottom line ahead of clinical considerations, distorted sources of generally accepted standards like the CMS Manual beyond recognition, and misled regulators. It also misled the very consultant whose opinion UBH ultimately ignored, but then half-heartedly held up at trial as evidence of its own "good faith." Good faith is not a defense, but even it if were, UBH's conduct was anything but.

**3. <u>Exhaustion</u>**

"As a general rule, an ERISA claimant must exhaust available administrative remedies before bringing a claim in federal court." *Barboza v. California Ass'n of Prof. Firefighters*, 651 F.3d 1073, 1076 (9th Cir. 2011). "[E]xhaustion of administrative remedies [i]s an affirmative defense that defendants 'must plead and prove.'" *Norris v. Mazzola*, No. 15-CV-04962-JSC, 2016 WL 1588345, at *5 (N.D. Cal. Apr. 20, 2016) (quoting *Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014) (en banc), and collecting other cases).

The Named Plaintiffs undisputedly exhausted administrative remedies. *See* Ex. 895 (summary exhibit); Ex. 238-0018 to -0024 (urgent appeal denial on behalf of Ms. Klein, to which UBH did not respond, in violation of 29 C.F.R. 2560.503-1(i)(2)); *Huerta v. AT & T Umbrella Benefit Plan No. 1*, No. 3:11-CV-01673-JCS, 2012 WL 4935548, at *7 (N.D. Cal. Oct. 17, 2012) (explaining that where a claims administrator fails to respond to an appeal, the member is "'deemed to have exhausted' his [or her] administrative remedies"). UBH has argued, however, that it is entitled to judgment as to absent class members who did not *also* exhaust administrative

remedies. *Wit* ECF No. 301 at 27 (¶ 99).[58]

As an initial matter, exhaustion is not required for claims asserting a breach of fiduciary duty. *See, e.g.*, *Guenther v. Lockheed Martin Corp.*, Case No. 5:11-cv-00380-EJD, 2017 WL 976939, at *4 n.1 (N.D. Cal. Mar. 14, 2017); *Spinedex Phys. Therapy USA Inc. v. United Healthcare of Ariz., Inc.*, 770 F.3d 1282, 1294 (9th Cir. 2014). Therefore, Claim One withstands any exhaustion arguments by UBH.

As to Claim Two, exhaustion is not required beyond the class representatives. As Judge Koh recently explained in a similar action against a different claims administrator, "unnamed class members in an ERISA class action *need not exhaust* their administrative remedies." *Des Roches v. Cal. Physicians' Serv.*, 320 F.R.D. 486, 500 (N.D. Cal. 2017) (emphasis added). That is because "the named plaintiff's claim puts the defendant on notice of the absent class members' claims and thus fulfills the function of the internal grievance procedure." *Id.* (citing *De Leon v. Standard Ins. Co.*, 2016 WL 768908, at *4 (C.D. Cal. Jan 28, 2016)). *See also Amato v. Bernard*, 618 F.2d 559, 567-68 (9th Cir. 1980) (purposes of exhaustion are to allow administrators to self-correct or develop their reasoning, while encouraging consistency).[59] Because absent class

---

[58] In its Proposed Findings of Fact and Conclusions of Law, UBH also framed its exhaustion defense as a "waiver" defense. *Wit* ECF No. 301 at 27-28 (¶¶ 96-99). For the same reasons its exhaustion defense fails, so does its "waiver" defense.

[59] Although *Des Roches* was decided at the class certification stage, Judge Koh's reasoning, and that of the cases on which she relied, applies fully to the merits. Courts have resolved summary-judgment motions, for example, in reliance on the proposition that exhaustion is only required by the named plaintiffs in a class action. *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1193 n.5 (10th Cir. 2007) (reversing grant of summary judgment to plan and ordering award of benefits: "the Spokane plaintiffs' administrative appeal is not actually relevant because . . . only the class representatives must exhaust their administrative claims, and the class representatives are Woods Cross plaintiffs."), *overruled on other grounds*, *Holcomb v. Unum Life Ins. Co. of Am.*, 578 F.3d 1187, 1192–93 (10th Cir.2009); *Williams v. Rohm & Haas Pension Plan*, No. 4:04-CV-0078-SEB-WGH, 2009 WL 382628, at *6 (S.D. Ind. Feb. 11, 2009) (after granting summary judgment to plaintiff class, rejecting every-member exhaustion argument: "The Plan cannot credibly claim surprise concerning the fact that its determination with respect to Williams's internal claim is being extended to the claims of the other similarly situated Plaintiffs."). *See also In re FedEx Ground Package Sys., Inc.*, 722 F. Supp. 2d 1033, 1052 (N.D. Ind. 2010) (dismissing ERISA claims of certified class on summary judgment, but with leave to refile after administrative remedies exhausted, and stressing that only named plaintiffs needed to exhaust).

members need not exhaust administrative remedies, the Court should reject UBH's exhaustion defense.

Even if UBH could validly assert failure-to-exhaust as an affirmative defense against absent class members, it fails because additional appeals would be futile. No matter how many appeals were lodged, UBH always applied its Guidelines on appeal, and in so doing always applied the same coverage criteria that it applied to deny the claims. *See* Ex. 1655; Tr. 1518:3-1538:21 (Bridge). Where a plan administrator demonstrates it will not change its interpretation of the plan even if a claimant (or many claimants) were to appeal, exhaustion is futile, and plaintiffs need not exhaust. *See Barnes v. AT&T Pension Benefit Plan—Nonbargained Program*, 270 F.R.D. 488, 494 (N.D. Cal. 2010) ("In the instant case, AT & T maintains that it has and will continue to interpret the plan as it did for Barnes . . . . For class members to exhaust their claims would therefore be futile.").

At trial, UBH identified six class members whose denials were "[o]verturned on [a]ppeal," Ex. 1655, from which UBH presumably intends to argue that appeal would not be futile. But the question has never been whether the class members are entitled to benefits, but whether UBH applied unduly restrictive Guidelines to class members' claims. The fact that some class members received some benefits even under UBH's restrictive Guidelines says nothing about whether appeals by additional class members would have persuaded UBH to align its Guidelines with generally accepted standards of care. In any event, two of those overturns were in fact affirmances of partial denials (Unique IDs 2607 & 10922), and one was an overturn upon *external* appeal, which says nothing about the likelihood that UBH would reach a different decision on *internal* appeal (Unique ID 828). In short, further appeals would be futile.

Finally, even if exhaustion were required for absent class members, and even if exhaustion were not futile, UBH simply has not satisfied its evidentiary burden. At the pretrial conference, the Court admonished the parties to highlight important parts of the evidentiary record, not "save it for post-trial briefings and it's just buried in there." PTC Tr. 54:8-10, Oct. 5, 2017. But UBH did not even attempt to identify the plan terms delineating exhaustion requirements for each claim-sample member, much less match those requirements to each

administrative file at issue. *See* Ex. 1653 (excerpting plan terms for members, but only addressing coverage, not appeals and exhaustion requirements); Ex. 1655 (listing appeals history for certain members, but not referencing related plan terms). In short, UBH has not provided the Court an evidentiary basis to identify which, if any, absent class members failed to exhaust.

**4. Standing and Causation**

At trial, UBH reiterated a defense the Court had previously, repeatedly rejected: that Plaintiffs and class members did not have "standing" to assert their claims, and/or had not established that UBH's adoption and application of overly restrictive Guidelines caused "harm" to Plaintiffs and class members. *See, e.g.*, *Wit* ECF No. 286 (order denying UBH's motion for summary judgment) at 11-25. Plaintiffs need not reiterate the reasons UBH's argument fails, but rather incorporate by reference their arguments in opposition to UBH's motion for summary judgment. *See Wit* ECF No. 260-04 at 12-19.

**5. Conditions Precedent/Subsequent and Waiver**

UBH asserts two affirmative defenses concerning an alleged failure to satisfy a "condition[] precedent or subsequent."

**First**, UBH suggested that Plaintiffs were not entitled to "pursue their claims because they have not offered class-wide evidence that they were entitled to the benefits at issue in this litigation." *Wit* ECF No. 301at 28 (¶ 101). That argument fails for the same reason UBH's "standing "and "causation" arguments fail.

**Second**, UBH argued that, as to Plaintiffs' claim for class-wide reprocessing, class members who did not, after being denied coverage, "obtain[] the treatment for which coverage was denied," could not satisfy a "condition[] precedent or subsequent to pursue reprocessing." *Wit* ECF No. 301 at 28 (¶ 102). In other words, UBH argues that even if it violated its fiduciary duties and applied an illegally restrictive standard in denying the Class Members' requests for coverage, the remedy to which some Class Members are entitled may be affected by whether, after UBH's illegal denial, they nevertheless went forward and received – at their own expense – the treatment that UBH refused to cover in violation of ERISA. *Id.*

The argument is premature, because it goes only to remedy; in any event, it is entirely

inconsistent with the law. ERISA entitles a plaintiff, among other things, "to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[]." 29 U.S.C. § 1132(a)(1)(B). None of these statutory causes of action is dependent on what happened after the administrator breached its duties. Nor are the substantive rights and procedural protections ERISA confers limited only to relatively more wealthy members and families who have the means to pay out-of-pocket for treatment when coverage is denied.

Moreover, insofar as UBH has raised the same argument in terms of "waiver," *see Wit* ECF No. 296, courts apply "heightened scrutiny" when ERISA fiduciaries like UBH assert that a member or beneficiary waived his or her rights under ERISA. *Upadhyay v. Aetna Life Ins. Co.*, No. C 13-1368 SI, 2014 WL 186709, at *4 (N.D. Cal. Jan. 16, 2014), *aff'd*, 645 F. App'x 569 (9th Cir. 2016) (quoting *Morais v. Cent. Beverage Corp. Union Emps.' Supplemental Retirement Plan*, 167 F.3d 709, 712-13 (1st Cir. 1999)). For such a waiver to be valid, the defendant must prove that the waiver was:

> "knowing and voluntary," by examining the totality of the circumstances, including but not limited to "(1) plaintiff's education and business sophistication; (2) the respective roles of employer and employee in determining the provisions of the waiver; (3) the clarity of the agreement; (4) the time plaintiff had to study the agreement; (5) whether plaintiff had independent advice, such as that of counsel; and (6) the consideration for the waiver."

*Id*. UBH presented no evidence at trial of any such knowing and voluntary waiver by any Plaintiff or Class Member.

Finally, this "waiver" theory also fails because any "agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty" is "void as against public policy." 29 U.S.C. § 1110(a). "Congress chose to hold plan fiduciaries to a high standard – in fact, 'the highest known to the law.'. . . Congress also chose to render void any agreement that would exculpate a fiduciary from responsibility for a breach of that standard. 29 U.S.C. § 1110(a)." *Johnson v. Couturier*, 572 F.3d 1067, 1082 (9th Cir. 2009).

**6. Settlor Defense**

Finally, UBH asserts that it was acting as a "settlor," not a claims administrator, when it

adopted and revised its Guidelines. UBH cannot possibly prove that it was a "settlor" of the plans that it administers, because it does not "adopt, modify, or terminate" them. *See Lockheed Corp. v. Spink*, 517 U.S. 882, 890 (1996). Not a single Plan identifies UBH as a Plan Sponsor. Barry Dehlin, United Healthcare's Director of Product Strategy, testified that UBH *cannot* "rewrite plan terms." Tr. 916:22-23. And UBH did not even attempt to show that, when UBH amends its Guidelines during a plan year (*i.e.*, after the plan has become effective), it even attempts to comply with each plan's requirements for plan amendments. *See, e.g.*, Ex. 241-0003 & -0059 (providing that an amendment is only effective if it is in writing and has been sent to the members and attached to the plan document). *Cf.* Tr. 917:6-9 (Dehlin: "Q. And so if a UBH guideline were amended, for example, in the middle of a plan year, it couldn't amend the [terms of the plan]; right? A. Right. The plan is the plan for the year.").

UBH resorts instead to the fact that some of the plans exclude coverage for treatment that is "[n]ot consistent with [UBH's] level of care guidelines or best practices as modified from time to time" (the "Guideline exclusion"). This argument fails for the same reasons the Court has rejected it twice before:

> The Court . . . rejects UBH's reliance on the fact that some class members' health insurance plans excluded coverage for treatment that is "not consistent with the Mental Health/ Substance Use Disorder Designee's level of care guidelines or best practices as modified from time to time" (the "guidelines exception"). . . . To the extent it is undisputed that all Named Plaintiffs' and Sample Plaintiffs' insurance plans incorporated generally accepted standards, UBH has pointed to nothing in any plan that would suggest that the "guidelines exception" would permit insurance plans to adopt rules that are inconsistent with those standards.

ECF No. 286 at 29 (summary judgment order) (quoting class certification order, ECF No. 174 at 33). If accepted, UBH's argument would necessarily mean that it was free to put anything in its Guidelines, regardless of the plans' other terms. But even Mr. Dehlin conceded that the Guideline "exclusion" does *not* "give UBH permission to create and apply any guidelines it wants." Tr. 879:11-12. Rather, UBH's Guidelines "have to be consistent with the details and the intent of the plan[s]." Tr. 879:13-14. *See, e.g.*, *Ariz. State Carpenters Pension Tr. Fund*, 125 F.3d

at 720 ("Fiduciary status under ERISA is to be construed liberally.").[60]

In short, UBH cannot end-run its fiduciary duties by arguing it was a "settlor" when it adopted and revised its Guidelines.

## V. CONCLUSION

For the reasons set forth above, the Court should enter judgment for Plaintiffs on each of their claims.

Dated: December 11, 2017

ZUCKERMAN SPAEDER LLP

*/s/ Caroline E. Reynolds*
Caroline E. Reynolds
Carl S. Kravitz
Aitan D. Goelman
Jason S. Cowart
Adam B. Abelson

PSYCH-APPEAL, INC.
Meiram Bendat

*Attorneys for Class Plaintiffs*

[60] Even if the Guideline exclusion did mean what UBH has previously argued it means, it would be void. 29 U.S.C. § 1110(a) ("[A]ny provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part shall be void as against public policy."). *See also Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2469 (2014) ("[T]rust documents cannot excuse trustees from their duties under ERISA."); *IT Corp. v. Gen. Am. Life Ins. Co.*, 107 F.3d 1415, 1418-19 (9th Cir. 1997) ("If an ERISA fiduciary writes words in an instrument exonerating itself of fiduciary responsibility, the words, even if agreed upon, are generally without effect . . . . If General American is a fiduciary, as defined in section 1002(2)(21)(A), 'any interpretation of the Plan which prevents [it] acting in a fiduciary capacity from being found liable as [a] fiduciar[y] is void.'").