JENNIFER S. ROMANO (SBN 195953)
jromano@crowell.com
JEFFREY H. RUTHERFORD (SBN 181695)
jrutherford@crowell.com
ANDREW HOLMER (SBN 268864)
aholmer@crowell.com
CROWELL & MORING LLP
515 South Flower Street, 40th Floor
Los Angeles, California 90071
Phone: (213) 622-4750
Fax: (213) 622-2690

NATHANIEL P. BUALAT (SBN 226917)
nbualat@crowell.com
CROWELL & MORING LLP
3 Embarcadero Center, 26th Floor
San Francisco, California 94111
Phone: (415) 986-2800
Fax: (415) 986-2827

APRIL N. ROSS (admitted *pro hac vice*)
aross@crowell.com
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Phone: (202) 624-2500
Fax: (202) 628-5116

Attorneys for Defendant
UNITED BEHAVIORAL HEALTH

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

**DAVID WIT et al.**,

Plaintiffs,

v.

**UNITED BEHAVIORAL HEALTH**,

Defendant.

Case No. 14-cv-02346 JCS
Related Case No. 14-cv-05337 JCS

**UNITED BEHAVIORAL HEALTH'S POST-TRIAL [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Hon. Joseph C. Spero

Trial: October 16, 2017 at 8:30 a.m.
Courtroom: G, 15th Floor

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

**GARY ALEXANDER et al.**,

Plaintiffs,

v.

**UNITED BEHAVIORAL HEALTH**,

Defendant.

# TABLE OF CONTENTS

Page


[PROPOSED] FINDINGS OF FACT ..... 1

I. THE PARTIES ..... 1

A. United Behavioral Health ..... 1

B. The Named Plaintiffs ..... 2

C. The Classes ..... 2

II. PLAINTIFFS' CLAIMS ..... 4

III. THE PLANS ..... 5

A. The Plans Do Not Condition Coverage Solely On Generally Accepted Standards Of Care ..... 11

B. The Plans Grant UBH Discretion To Interpret Plan Terms And Determine Whether Benefits Are Available For Specific Health Services ..... 12

C. Many Plans Incorporate The Level Of Care Guidelines By Reference ..... 13

IV. THE GUIDELINES ..... 14

A. UBH Creates Level of Care Guidelines and Coverage Determination Guidelines To Ensure Consistency in Coverage Determinations ..... 14

1. Level of Care Guidelines ..... 16

2. Coverage Determination Guidelines ..... 18

B. UBH Developed The Guidelines Using A Process That Exceeded National Accreditation Standards ..... 26

1. The Guidelines Were Reviewed And Approved Annually By UBH Psychiatrists And Psychologists Based On The Evidence Base and External Feedback ..... 26

2. The Guidelines Were Accredited By Two Different National Accrediting Bodies ..... 33

C. The Guideline Creation and Review Process Was Not Influenced By Improper Financial Considerations ..... 34

1. Benefit Expenses Did Not Influence the Content of the Challenged Guidelines ..... 34

2. The "Three Vignettes" Plaintiffs Identify As Evidence Of A Conflict Of Interest Are Irrelevant ..... 37

D. UBH's Clinicians Use Clinical Judgment In Applying the Guidelines, Without Any Consideration Of The Financial Impact Of Their Coverage Decisions ..... 40

V. THE GUIDELINES ARE CONSISTENT WITH GENERALLY ACCEPTED STANDARDS OF CARE ..... 45

A. There Is No Single Set of Generally Accepted Standards Of Care ..... 45

B. The Guidelines Require A Comprehensive Assessment Of The Member's Entire Presentation ..... 46

C. The Guidelines Seek To Match Patients At The Least Restrictive Level Of Care That Is Both Safe And Effective To Treat The Member ..... 51

# TABLE OF CONTENTS
(continued)


**Page**

D. The Guidelines Account For Both Acute And Chronic Conditions Consistent With Generally Accepted Standards of Care ..... 56

1. Both Acute And Chronic Conditions and Symptoms Should Be Assessed and Considered in Determining the Appropriate Level of Care ..... 57

2. The LOCGs Call For Assessment and Coverage of Treatment for Chronic Conditions And Symptoms ..... 60

3. Guideline Language Referring To The "Why Now" Factors and "Acute Changes" Are Not Unreasonable Interpretations Of Generally Accepted Standards of Care ..... 65

4. It Is Consistent With Generally Accepted Standards of Care To Expect that Treatment Will Improve Presenting Problems Within a Reasonable Period of Time ..... 69

5. Coverage Does Not End When An "Acute Crisis" Has Passed ..... 73

E. The Guidelines Account For Co-Occurring Behavioral And Mental Health Conditions ..... 76

F. The Guidelines Account For Treatment That Is Necessary To Prevent Deterioration Or Maintain A Level Of Functioning ..... 81

G. The Guidelines Account For the Member's Motivation to Recover ..... 84

H. The Guidelines Account For The Unique Needs Of Children And Adolescents ..... 85

I. The Definitions Of Custodial Care And Active Treatment In UBH's Custodial Care CDG Are Consistent With the Plans And Generally Accepted Standards Of Care ..... 89

J. The Feedback UBH Received On Its Guidelines Demonstrates That UBH's Interpretation Of Generally Accepted Standards Of Care Is Reasonable ..... 94

K. Plaintiffs Did Not Offer Classwide Proof As To Each of The Plaintiffs' Critiques In Each of The Years of the Class Period ..... 95

L. The LOCGs in 2011-2017 Are A Reasonable Interpretation of Generally Accepted Standards of Care ..... 96

M. UBH's Guidelines Are Consistent With Plan Terms And Generally Accepted Standards Of Care For Residential Treatment for Substance Use ..... 107

VI. PLAINTIFFS FAILED TO OFFER CLASSWIDE PROOF THAT ANY OF THE "FLAWS" THEIR EXPERTS IDENTIFIED IN THE GUIDELINES WAS RELEVANT TO OR AFFECTED CLASS MEMBERS' BENEFIT DECISIONS ..... 111

VII. PLAINTIFFS FAIL TO PROVE THEY HAVE ARTICLE III STANDING TO BRING THEIR CLAIMS ..... 112

VIII. PLAINTIFFS DID NOT PROVE FACTS SUPPORTING A VIOLATION OF STATE LAW FOR THE STATE MANDATE CLASS ..... 112

A. Texas ..... 112

B. Illinois ..... 114

C. Rhode Island ..... 115

# TABLE OF CONTENTS
(continued)


Page

D. Connecticut ... 116

IX. CLASS MEMBERS FAILED TO EXHAUST THEIR ADMINISTRATIVE REMEDIES ... 117

[PROPOSED] CONCLUSIONS OF LAW ... 118

I. STANDARD OF REVIEW ... 118

A. The Abuse Of Discretion Standard Applies To Acts Of Plan Interpretation ... 118

B. The Abuse Of Discretion Standard Applies Even In The Face Of A Conflict Of Interest ... 122

C. The Abuse Of Discretion Standard Apples To All Of Plaintiffs' Claims ... 124

1. Plaintiffs Concede That The Abuse Of Discretion Standard Applies To Counts II and IV For Wrongful Denial Of Benefits ... 125

2. The Abuse Of Discretion Standard Applies To Count I Under § 1132(a)(1)(B) Because Claims For "Breach Of Fiduciary Duty" Under § 1132(a)(1)(B) Must Relate To Plan Interpretation ... 125

3. The Abuse of Discretion Standard Applies to Count III Under § 1132(a)(3) ... 127

II. PLAINTIFFS' BURDEN OF PROOF AT TRIAL ... 129

III. THE GUIDELINES ARE INCORPORATED INTO AND REFLECT PLAN TERMS, AND ARE NOT SUBJECT TO CHALLENGE AS A FIDUCIARY ACT ... 131

IV. TO THE EXTENT UBH'S PROMULGATION AND APPLICATION OF THE GUIDELINES IS A FIDUCIARY ACT IN WHOLE OR IN PART, PLAINTIFFS DID NOT PROVE THAT UBH ABUSED ITS DISCRETION IN CONSTRUING THE PLAN TERMS ... 135

A. Plaintiffs Did Not Satisfy Their Burden to Prove On An Individual Or Classwide Basis That The Guidelines Are An Unreasonable Interpretation Of The Terms Of The Class Members' Plans ... 135

B. Plaintiffs Did Not Prove That UBH's Guidelines Are An Unreasonable Interpretation of Generally Accepted Standards Of Care ... 136

1. Plaintiffs Did Not Satisfy Their Burden To Prove That UBH's LOCGs Are An Unreasonable Interpretation of Generally Accepted Standards Of Care ... 137

2. Plaintiffs Did Not Satisfy Their Burden To Prove That UBH's Custodial Care CDGs Are An Unreasonable Interpretation of Generally Accepted Standards Of Care And The Terms Of Class Member's Plans ... 137

C. Plaintiffs Failed To Offer Classwide Proof That UBH's Guidelines Are Inconsistent With Plan Terms And Generally Accepted Standards Of Care For Residential Treatment Of Substance Use Disorders ... 138

D. Plaintiffs Failed To Offer Classwide Proof That Their Critiques Apply Equally To Each Of The Level Of Care Guidelines At Issue In Each Year In The Class Period ... 138

## TABLE OF CONTENTS
(continued)


| | | Page |
|---|---|---|
| V. | PLAINTIFFS FAILED TO SATISFY THEIR BURDEN OF CLASSWIDE PROOF WITH RESPECT TO THE CDGS | 139 |
| VI. | PLAINTIFFS FAILED TO OFFER CLASSWIDE PROOF THAT ANY OF THE CRITICISMS THEIR EXPERTS IDENTIFIED IN THE GUIDELINES WAS RELEVANT TO OR AFFECTED CLASS MEMBERS' BENEFIT DECISIONS | 140 |
| VII. | PLAINTIFFS FAILED TO PROVE THAT THEY HAVE ARTICLE III STANDING TO BRING THEIR CLAIMS | 142 |
| VIII. | PLAINTIFFS ARE NOT ENTITLED TO FINDINGS OF LIABILITY ON COUNTS III AND IV UNDER § 1132(A)(3) BECAUSE THOSE CLAIMS ARE DUPLICATIVE OF COUNTS I AND II | 144 |
| IX. | PLAINTIFFS DID NOT CARRY THEIR BURDEN WITH RESPECT TO THE STATE MANDATE CLASS | 145 |
| | A. Plaintiffs Did Not Prove UBH Violated Texas Law | 145 |
| | B. Plaintiffs Did Not Prove UBH Violated Illinois Law | 145 |
| | C. Plaintiffs Did Not Prove UBH Violated Rhode Island Law | 147 |
| | D. Plaintiffs Did Not Prove UBH Violated Connecticut Law | 147 |
| X. | PLAINTIFFS' COUNTS | 148 |
| | A. Count I for Breach of Fiduciary Duty Under 29 U.S.C. § 1132(a)(1)(B) | 148 |
| | B. Count II for Improper Denial of Benefits Under 29 U.S.C. § 1132(a)(1)(B) | 148 |
| | C. Count III for Breach of Fiduciary Duty Under 29 U.S.C. § 1132(a)(3) | 148 |
| | D. Count IV for Improper Denial of Benefits Under 29 U.S.C. § 1132(a)(3) | 149 |
| XI. | UBH'S AFFIRMATIVE DEFENSE OF FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES | 149 |

Defendant United Behavioral Health submits the following [Proposed] Findings of Fact and Conclusions of Law under Federal Rule of Civil Procedure 52 and as directed by the Court. Trial Tr. 1934:14-1935:7. Headings are provided within the proposed findings of fact and conclusions of law for the Court's convenience.

## [PROPOSED] FINDINGS OF FACT

### I. The Parties.

#### A. United Behavioral Health.

1. UBH is a managed healthcare organization. (Trial Tr. 933:24–25 (Martorana); Trial Ex. 1660-0003, at 32:4–6 (Brock).)

2. Managed healthcare is a system that tries to improve its members' experiences by ensuring they can access and receive appropriate, safe, effective, and efficient medical care. (Trial Tr. 934:1–14 (Martorana).)

3. UBH employs a utilization management program to facilitate its members' access to safe, effective, and efficient treatment covered by the terms of the member's specific benefit plan. (Trial Tr. 934:8-14 (Martorana); *see* Trial Ex. 1660 at 32:19–33:09 (Brock).)

4. UBH's utilization management program focuses on CMS' concept of "the Triple Aims" of the broader healthcare system: (1) improving the member experience, (2) improving healthcare outcomes, and (3) keeping healthcare affordable. (Trial Ex. 1660 at 33:15–21 (Brock).)

5. UBH improves the experiences and supports the recovery, resiliency, and wellbeing of individuals in the communities it serves by:

- "Using [its] managed care tools and techniques to ensure that treatment, community resource and natural supports are of the highest quality, delivered in a cost-effective manner, and support recovery, resiliency and wellbeing[;]
- Providing services through [its] contracted facilities and programs, and multidisciplinary network of practitioners[; and]
- Collecting, organizing and sharing data and information derived from the experience of individuals [it] serve[s] to continuously improve the system of care."

(Trial Ex. 1186-0005 (2016 Optum Utilization Management Program Description).)


CROWELL & MORING LLP
ATTORNEYS AT LAW

6. UBH has specific expertise in administering benefits for behavioral health services, which include services for the diagnosis and treatment of mental health conditions and substance use disorders. (Trial Tr. 836:17–21 (Dehlin); Ex. 880-0004 at ¶ 2.)

7. Among other things, UBH administers insurance benefits for behavioral health services for various healthcare benefit plans. (Trial Ex. 880-0004 at ¶ 1.)

8. This includes administering requests for coverage made by members of ERISA-governed health benefit plans and by providers on behalf of those members. (Trial Ex. 880-0004 at ¶ 3.)

**B. The Named Plaintiffs.**

9. David Wit, Natasha Wit, Brian Muir, Brandt Pfeifer, Lori Flanzraich, Cecilia Holdnak; Linda Tillitt, Gary Alexander, Corinna Klein, David Haffner and Michael Driscoll (collectively, "**named Plaintiffs**") are members of health benefit plans who received clinical non-coverage determinations from UBH. (*See* Trial Exs. 245 (David Wit), 246-0002 (Natasha Wit), 231 (Lori Flanzraich & Casey Flanzraich), 235 (Cecilia Holdnak), 236-0002 (Emily Holdnak), 239 (Brian Muir); 243 (Linda "DeeDee" Tillit), 244-0002 (Maxwell "Max" Tillitt), 241 (Brandt Pfeifer), 242-0002 (Lauralee Pfeifer), 225 (Gary Alexander), 226-0002 (Jordan Alexander), 227 (Michael Driscoll), 229-0002 (Sara Driscoll), 233 (David Haffner), 237 (Corinna Klein).)

10. UBH and Plaintiffs have agreed to refer to two named Plaintiffs using pseudonyms, Emily Holdnak and Sara Driscoll.

11. The Plaintiffs' plans at issue in this case are governed by ERISA. (Trial Ex. 880-0004 at ¶ 4.)

**C. The Classes.**

12. The Court certified the following classes, including the respective class periods, for trial:

**The "*Wit* Guideline Class":**

Any member of a health benefit plan governed by ERISA whose request for coverage of residential treatment services for a mental illness or substance use disorder was denied by UBH, in whole or in part, between May 22, 2011 and June

1, 2017, based upon UBH's Level of Care Guidelines or UBH's Coverage Determination Guidelines.

The *Wit* Guideline Class excludes members of the *Wit* State Mandate Class, as defined below.

**The "*Wit* State Mandate Class":**

Any member of a fully-insured health benefit plan governed by both ERISA and the state law of Connecticut, Illinois, Rhode Island, or Texas, whose request for coverage of residential treatment services for a substance use disorder was denied by UBH, in whole or in part, within the Class period, based upon UBH's Level of Care Guidelines or UBH's Coverage Determination Guidelines, and not upon the level-of-care criteria mandated by the applicable state law.

With respect to plans governed by Texas law, the *Wit* State Mandate Class includes only denials of requests for coverage of substance use disorder services that were sought or received in Texas.

The Class period for the *Wit* State Mandate Class includes denials governed by Texas law that occurred between May 22, 2011 and June 1, 2017, denials governed by Illinois law that occurred between August 18, 2011 and June 1, 2017, denials governed by Connecticut law that occurred between October 1, 2013 and June 1, 2017, and denials governed by Rhode Island law that occurred between July 10, 2015 and June 1, 2017.

**The "*Alexander* Guideline Class":**

Any member of a health benefit plan governed by ERISA whose request for coverage of outpatient or intensive outpatient services for a mental illness or substance use disorder was denied by UBH, in whole or in part, between December 4, 2011 and June 1, 2017, based upon UBH's Level of Care Guidelines or UBH's Coverage Determination Guidelines.

The *Alexander* Guideline Class excludes any member of a fully insured plan governed by both ERISA and the state law of Connecticut, Illinois, Rhode

Island or Texas, whose request for coverage of intensive outpatient treatment or outpatient treatment was related to a substance use disorder, except that the *Alexander* Guideline Class includes members of plans governed by the state law of Texas who were denied coverage of substance use disorder services sought or provided outside of Texas.

(Order Granting Mot. For Class Cert., *Wit* ECF No. 174 ("Class Cert. Order") at 12-13 (defining classes); *Wit* ECF Nos. 224, 281 (amending class definitions).)

**II. Plaintiffs' Claims.**

13. In the operative complaints, Plaintiffs allege four separate Counts. (*See Wit* First Am. Compl. ("FAC"), *Wit* ECF No. 39, at 61–65; *Alexander* Compl., *Alexander* ECF No. 1, at 47–50.)

14. Count I alleges a "breach of fiduciary duty" under 29 U.S.C. § 1132(a)(1)(B), which provides an ERISA plan participant a cause of action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." (*See Wit* FAC, ECF No. 39, at 61–63; *Alexander* Compl., *Alexander* ECF No. 1, at 47–49.)

15. Count II is also pleaded under 29 U.S.C. § 1132(a)(1)(B), but styled as a claim for "improper denial of benefits." (*Wit* FAC, ECF No. 39, at 63–64; *Alexander* Compl., *Alexander* ECF No. 1, at 49.)

16. Counts III and IV are brought under 29 U.S.C. § 1132(a)(3), which authorizes a claim "to enjoin any act or practice which violates any provision of [ERISA] or the terms of the plan, or . . . obtain other appropriate equitable relief." (*Wit* FAC, ECF No. 39, at 64-65; *Alexander* Compl., *Alexander* ECF No. 1, at 49–50.)

17. The underlying basis for each of Plaintiffs' Counts is identical: Plaintiffs allege that UBH, as claims administrator of each class member's plan, misconstrued each plan by developing guidelines allegedly inconsistent with generally accepted standards of care, which Plaintiffs say each plan prohibits, and using those guidelines to evaluate class members' requests for benefits. (Trial Tr. 11:3–15, 33:8–11 (Pls.' Opening Statement).)

18. In the complaints, Plaintiffs seek the following relief:

- pursuant to Count I, or alternatively pursuant to Count III, a declaration that the Guidelines are inconsistent with generally accepted standards of care;
- pursuant to Count I, or alternatively pursuant to Count III, an injunction requiring UBH to develop new, compliant guidelines;
- pursuant to Count II, or alternatively pursuant to Count III, a declaration that UBH's denial of claims for benefits based on the Guidelines was improper; and
- pursuant to Count II, or alternatively pursuant to Count III, a remand requiring UBH retroactively to reprocess all class members' benefits claims under new, compliant guidelines.

(*See Wit* FAC, at 65–66; *Alexander* Compl., *Alexander* ECF No. 1, at 50–51.)

19. The only form of relief Plaintiffs sought in connection with Count IV was the surcharge relief that the Court dismissed in its August 14, 2017 order granting in part UBH's motion for summary judgment. (*See* Order, *Wit* ECF No. 286, at 25:19–26:18.)

20. Although Plaintiffs previously ascribed the remedies listed in Paragraph 18 to specific Counts in the complaints, Plaintiffs now purport to seek *all* forms of declaratory and injunctive relief noted above under *each* of their Counts. (Joint [Proposed] Final Pretrial Order, ECF No. 296, at 9:9–11:17.)

**III. The Plans.**

21. UBH serves as the plan administrator for behavioral health benefits for United Healthcare insurance plans, non-UnitedHealthcare insurance plans, and self-funded employer plans. (*See* Trial Tr. 841:23–842:6 (Dehlin).)

22. Barry Dehlin, UnitedHealthcare's Director of Product Strategy, testified that with respect to behavioral health benefits covered by the plans in evidence, the plan sponsor delegated its authority to UBH to interpret the plans and administer those benefits. (*See, e.g.*, Trial Tr. 844:24–845:3, 848:8–849:17 (Dehlin); Trial Ex. 225-34 (sample Certificate of Coverage).)

23. UBH administers behavioral health benefits for thousands of different healthcare benefit plans, including over a thousand different plans applicable to the Class members during

the Class Period. (Trial Tr. 837:21–838:7 (Dehlin); *see also* Trial Tr. 709:8–16 (Triana).)

24. The plans vary in numerous ways and are typically effective for one year. (Trial Tr. 838:8–9, 843:24–844:1 (Dehlin).)

25. Plans can be fully-insured or self-insured. These types of plans differ in who is responsible for paying benefits for covered health services. (Trial Tr. 838:10–20 (Dehlin).)

26. For a fully-insured plan, covered health services are defined, and exclusions, limitations, and definitions are specified in the Certificate of Coverage ("**COC**"). (Trial Tr. 839:11–21 (Dehlin); *see, e.g.*, Trial. Tr. 850:12–19 (Dehlin); Trial Ex. 225-0032 (sample plan).)

27. For a self-insured plan, covered health services are defined, and exclusions, limitations, and definitions are specified in a Summary Plan Description ("**SPD**"). (Trial Tr. 839:22–840:3 (Dehlin); *see, e.g.*, Trial Tr. 858:14–16 (Dehlin); Trial Ex. 2014-0164 (sample plan).)

28. To understand whether a health service is covered under a plan, one would need to review the definition of covered services under the plan, and all relevant exclusions, limitations, and definitions, some of which may be contained in riders or amendments. (*See, e.g.*, Trial. Tr. 850:12–19 (Dehlin); *see also id.* at 851:17–856:22 (detailing, step-by-step, what COC provisions need to be referenced to determine what benefits a plan covers).)

29. Plaintiffs' experts both admitted that they did not review any of the plans. (Trial Tr. 196:4-23 (Fishman); Trial Tr. 660:2–12 (Plakun).)

30. The parties' Stipulation Concerning Per-Member-Per-Month Rates sets forth the total number of benefit decisions at issue, broken down between self-funded and fully-insured plans. (Trial Ex. 711, at ¶¶ M & N.) Those raw numbers reflect that 62 percent of the class members were covered under self-funded plans and 38 percent of the class members were covered under fully-insured plans.

31. For a fully-insured plan, the plan sponsor (typically an employer) pays a premium to the insurer for providing healthcare benefits to the employer's employees. (Trial Tr. 840:4–9 (Dehlin).) The amount of the premium is designed to cover the anticipated cost of paying benefits due to plan members, administrative costs, and a small amount of profit. (Trial Tr. 841:7–17

(Dehlin).) For UnitedHealthcare plans, UnitedHealthcare periodically reviews and, if needed, adjusts the premiums it charges to its customers to account for changes in the anticipated cost of providing benefits or administering the fully-insured benefit plan. (Trial Tr. 841:18–21 (Dehlin).)

32. If benefits owed to beneficiaries under a fully-insured plan exceed the expected cost of coverage, the employer does not pay the extra cost, the insurer does. (Trial Tr. 840:10–13 (Dehlin).)

33. UBH and its affiliates mitigated any structural conflict of interest with respect to members of fully-insured plans by charging a fee that attempted to account for the cost of potential claims payouts. (Trial Tr. 840:4-841:21 (Dehlin).)

34. Alternatively, an employer can choose to self-insure, where the employer pays for the actual cost of covered healthcare benefits incurred by the plan members, and pays an administrative fee to UnitedHealthcare or UBH to administer those benefits. (Trial Tr. 841:22–842:6 (Dehlin).)

35. For a self-funded (or self-insured) plan, if the actual cost of benefits exceeds the expected cost, the plan sponsor (employer) pays the additional amounts. (Trial Tr. 841:22–842:6 (Dehlin).)

36. The evidence at trial established that UBH did not act under a structural conflict of interest as to the majority of the class members because those class members were enrolled in self-funded plans for which the plan sponsor, not UBH, paid all claims. (Trial Ex. 711, at ¶¶ M & N.)

37. Plan sponsors (typically employers) decide what benefits they will offer to plan members (typically their employees and their dependents) by either purchasing a fully-insured plan or designing and offering a self-insured plan. (Trial Tr. 842:7–22, 857:5–9 (Dehlin).)

38. For both fully-insured and self-insured plans, UBH's role and responsibility in administering the plan benefits is to apply the terms of the plans. (Trial Tr. 908:18-909:2 (Dehlin).)

39. Each class member's plan covers only those healthcare services defined as covered health services by the plan documents and not otherwise excluded or limited by other terms of the

plan. (*See, e.g.*, Trial Tr. 845:23-25 (Dehlin); Trial Ex. 225-0032 (sample plan).)

40. The plans do not pay for all health services, and vary in the scope of covered benefits. (*See, e.g.*, Trial Tr. 842:7–9; 845:1–22, 858:7-859:19 (Dehlin); Trial Ex. 225-0032 (sample plan); Trial Ex. 2014-0164.)

41. The class members' plans vary in how they define covered health services. (Trial Tr. 856:23–857:1 (Dehlin); *see, e.g.*, Trial Tr. 869:8–14 (Dehlin) (noting differing definitions of covered mental health services); Trial Ex. 225-0102 (sample plan); Trial Tr. 870:3–871:2 (Dehlin); Trial Ex. 233-0047 to -48 (sample plan) (discussing different definition of covered mental health services); Trial Tr. 872:16–873:15 (Dehlin); Trial Ex. 1539-0053 (sample plan) (discussing different definition of covered mental health services).)

42. Many plans expressly exclude from coverage "services which are not consistent with [UBH's] level of care guidelines or best practices as modified from time to time." (Trial Ex. 225-0106 to -107 (sample plan); Trial Tr. 878:21–879:10 (Dehlin); *see also* Trial Ex. 1647-0063 (excluding services that are "not consistent with Optum's Level of Care Guidelines or best practices as modified from time to time"); Trial Ex. 1653 (summarizing similar plan exclusions in other class members' plans).)

43. Many plans, either in addition to, or in lieu of the LOCG exclusion, define "Covered Health Services" by referring to UBH's "clinical protocols that describe the scientific evidence and prevailing medical standards and clinical guidelines supporting our determinations regarding specific services in the definition for Covered Health Services." (*See* Trial Ex. 225-0090 to -91(sample plan); Trial Ex. 1653 (summarizing similar references in other plans).) This is a direct reference to UBH's guidelines, which describe the behavioral health benefits "covered in the plan." (Trial Tr. 854:3–10 (Dehlin).)

44. Some plans include exclusions or limitations that directly relate to Plaintiffs' criticisms of the guidelines. For example, the plan at Exhibit 2023 provides that "Behavioral Health Services [Are] Not Covered" if they "extend[] beyond the period necessary for <u>short-term evaluation, diagnosis, treatment or crisis intervention</u>." (Trial Ex. 2023-0043 (emphasis added); Trial Tr. 883:7 –884:11 (Dehlin).) This exclusion appears in the same section as the exclusion for

services that are "not consistent with generally accepted standards of medical practice," upon which Plaintiffs rely, but is not mentioned in Plaintiffs' summary exhibit of relevant plan provisions. (*Compare* Trial Ex. 2023-0043 (plan section titled "Behavioral Health Services Not Covered," reflecting both exclusions) *with* Trial Ex. 892-0018 (Plaintiffs' summary exhibit of plan terms identifying exclusions in same section of plan).)

45. Under that same plan, outpatient "therapeutic services, including intensive outpatient therapy" are only available if they are for "short-term individual, family [or] group" treatment. (Trial Ex. 2023-0042.)

46. One class representative's plan, Exhibit 233, likewise limits outpatient treatment, "including intensive outpatient therapy" to "short-term individual, family and group therapeutic services" and limits residential treatment to "Residential Crisis Services." (Trial Ex. 233-0047; Trial Tr. 870:9–872:3 (Dehlin).)

47. For these plans and ones with similar provisions, testimony from Plaintiffs' expert, Dr. Plakun, that intensive outpatient treatment is "not at all limited to crisis stabilization" is not accurate. (Trial Tr. 486:9–10 (Plakun); *see also* ECF No. 392, at 21: 3–10 (citing testimony).) These plans <u>explicitly</u> <u>limit</u> intensive outpatient coverage to "short-term" treatment or "crisis intervention.." (Trial Tr. 660:2–12 (Plakun).)

48. The plan at Exhibit 2014 similarly limits coverage for residential treatment to "short-term intervention[s] to stabilize the presenting problem within a reasonable period of time" (Trial Ex. 2014-0168; Trial Tr. 873:23–875:7 (Dehlin).)

49. The plan at Exhibit 1539 provides that "[a]dmission to a residential treatment center is not intended for use solely as a long-term solution or to maintain the stabilization acquired during treatment in a residential facility or program." (Trial Ex. 1539-0053; Trial Tr. 872:4 – 873:15 (Dehlin).)

50. The plan at Exhibit 2011 "does not provide long-term care coverage" for *any* facility-based treatment, including residential care (whether for medical or behavioral health services). (Trial Ex. 2011-0081.)

51. Some plans limit coverage to treatment that is medically necessary, and these class

members' plans vary in how they define "medically necessary" treatment. (*Compare* Trial Tr. 860:8–862:9 (Dehlin); Trial Ex. 1555-0138-139 (sample plan), *with* Trial Tr. 862:23–864:20 (Dehlin); Trial Ex. 1622-0085 (sample plan).)

52. The class members' plans also vary in how they define coverage for treatment at specific levels of care. (*See, e.g.*, Trial Tr. 867:19–869:7 (Dehlin); Trial Ex. 225-0097 to -98 (sample plan) (requiring active participation and direction by a physician, full-time residence and participation by the patient, and a written specific and detailed program for a program to be covered as a residential treatment facility); Trial Tr. 873:16–875:7 (Dehlin); Trial Ex. 2014-0168 (sample plan) (discussing plan requirements for residential treatment center, including active treatment and 24-hour supervision, structure, and treatment).)

53. Many plans only cover residential treatment if it is provided "under the active participation and direction of a physician." (Trial Tr. 868:6–19 (Dehlin) (discussing the plan at Trial Ex. 225).) "Physician," typically a defined term in the plan, is sometimes explicitly limited to individuals holding specific medical degrees or licenses. (Trial Ex. 239-0105–06.)

54. For example, another named Plaintiff's plan at Exhibit 239 limits coverage for residential treatment to treatment that occurs "under the active participation and direction of a Physician," and defines "Physician" as a "legally qualified" individual holding one of eight specifically-defined medical degrees. (Trial Ex. 239-0105–06.)

55. The plan at Exhibit 2014 limits coverage for residential treatment to services that will "stabilize the presenting problem within a reasonable period of time." (Trial Ex. 2014-0168; Trial Tr. 873:23–875:7 (Dehlin).)

56. Class members' plans also vary in defining exclusions from coverage. (Trial Tr. 880:7–12 Dehlin) (discussing variance in exclusions between Trial Ex. 225 and other plans); *see also* Trial Tr. 876:1–6 (Dehlin) (discussing nine different specific exclusions applicable to one plan); and Trial Tr. 880:23–882:19 (contrasting sample plan at Trial Ex. 1548-0030, which excludes services or supplies that do not result in outcomes demonstrably better than other available treatment alternatives that are less intensive or more cost effective with sample plan at Trial Ex. 225-106 which does not).)

57. The plan at Exhibit 1548 excludes coverage for behavioral health services if they "[t]ypically do not result in outcomes demonstrably better than alternatives that are less intensive or more cost effective." (Trial Ex. 1548-0030; Trial Tr. 880:23 – 883:2 (Dehlin).)

58. And the plan at Exhibit 2014 covers only services that are "the most cost-effective method and yield a similar outcome to other available alternatives." (Trial Ex. 2014-0164).

59. Likewise, the plan at Exhibit 2023 only provides coverage for treatment if it is "[r]endered in the most cost-efficient manner and type of setting appropriate for the delivery of the service or supply." (Trial Ex. 2023-0041.)

60. As Mr. Dehlin explained, when assessing benefit requests for members of these plans, UBH is "pretty much required" to consider the cost-effectiveness of a requested treatment compared to other alternatives. (Trial Tr. 858:7–859:19 (Dehlin).)

61. Every plan in evidence specifically excludes coverage for "custodial care" and defines that term. (Trial Ex. 1654 (UBH's summary exhibit summarizing custodial care definitions and exclusions in class members' plans); Trial Tr. 895:20 – 897:6 (Dehlin) (explaining Trial Ex. 1654).)

62. At least 49 of the 111 plans in evidence exclude services that are provided for the "primary purpose of meeting the personal needs of the patient or maintaining a level of function . . . as opposed to improving that function to an extent that might allow for a more independent existence." (Ex. 1654-0001 to -09, 31 (summarizing plan exclusions using the quoted language or substantially similar language).)

63. Another 32 plans similarly exclude services "which do not seek to cure" or "are provided during periods when the medical condition . . . is not changing" or when the member "has reached the maximum level of physical or mental function possible. . . ." (Trial Ex. 1654-0010 to -14, 16 (summarizing plan exclusions with the quoted language or similar language).)

**A. The Plans Do Not Condition Coverage Solely On Generally Accepted Standards Of Care.**

64. Each Class member's plan covers only those healthcare services defined as covered health services by the plan documents and not otherwise excluded or limited by other



CROWELL & MORING LLP
ATTORNEYS AT LAW

terms of the plan. (*See, e.g.*, Trial Tr. 845:23–25 (Dehlin); Trial Ex. 225-0032 (sample plan).)

65. While the Class members' plans generally require as one condition of coverage that treatment be consistent with generally accepted standards of care (Trial Exs. 892, 893), the plans do not cover all treatment that falls within generally accepted standards of care. (Trial Tr. 845:4–6, 855:11–19 (Dehlin) (there is no "requirement that the plans cover all treatment that falls within the scope of generally accepted standards of care."); Trial Ex. 225-0032 (sample plan).)

66. If an exclusion or limitation applies, or if the treatment is not included within the scope of covered health services, treatment is not covered "even if the treatment would otherwise be consistent with generally accepted standards of care." (Trial Tr. 876:7–15 (Dehlin).)

67. The Class members' plans do not necessarily pay for all medical treatment that a treating provider may recommend, or that a treating provider believes is medically necessary. (Trial Tr. 845:17–22 (Dehlin); Trial Ex. 225-0032 (sample plan).)

68. To understand what is covered under any class member's plan, one must read the definition of covered services (both general and specific) together with all relevant exclusions, limitations, and definitions. (*See, e.g.*, Trial. Tr. 850:12-19 (Dehlin); *see also* Trial Tr. 851:17-856:22 (Dehlin) (detailing, step-by-step, the Certificate of Coverage provisions that must be referenced to determine what benefits a plan provides).)

**B. The Plans Grant UBH Discretion To Interpret Plan Terms And Determine Whether Benefits Are Available For Specific Health Services.**

69. UBH offered a summary exhibit extracting relevant portions of each plan admitted into evidence, including provisions in each plan delegating authority to UBH to determine benefits and interpret plan terms, which was admitted into evidence. (Trial Ex. 1653.)

70. UBH is designated as the "mental health substance use disorder designee" for all of the plans in evidence (Trial Tr. 914:20–915:3 (Dehlin)), and through that delegation, the plan sponsor gives UBH the authority and discretion to interpret plan terms related to behavioral health benefits. (*See, e.g.*, *id.*, at 844:24–845:3, 847:9–848:23, 870:3–871:14, 879:15–17; *see also* Trial Ex. 1653.)

71. In addition, UnitedHealthcare and UBH frequently write the entire plan, which

they then offer as a "product" to employers for their adoption. (Trial Tr. 834:23 – 836:21, 842:7–843:6, 857:5 – 9 (Dehlin).)

72. UBH played a settlor role in crafting plan language for UnitedHealthcare plans. (Trial Tr. 842:23-843:6 (Dehlin).)

73. Plaintiffs do not identify any plan in evidence for which UBH lacks discretion to interpret plan terms.

74. These plans explicitly grant the plan administrator the discretion to interpret the plan's unique terms, including exclusions, limitations, and definitions, and to determine whether benefits are available under the plan. (*See, e.g.*, Trial Ex. 225-0034 (sample plan); Trial Tr. 847:16–848:17 (Dehlin); *see also, e.g.*, Trial Tr. 848:12–17 (Dehlin); Trial Ex. 225-0034 (sample plan); *see also* Trial Tr. 848:18–849:17 (Dehlin) (identifying numerous places where UBH is granted discretion in sample plan); Trial Tr. 877:9–11, 878:1–6, 879:15–17 (Dehlin) (discussing discretion in the context of an exclusion); Trial Ex. 225-0107 (sample plan).)

75. Each class member's plan also gives UBH discretion to make factual determinations relating to benefits. (*See, e.g.*, Trial Tr. 848:18–20 (Dehlin); Trial Ex. 225-0034.)

**C. Many Plans Incorporate The Level Of Care Guidelines By Reference**

76. Many plans incorporate the guidelines as plan terms. (*See, e.g.*, Trial Tr. 854:3–20 (Dehlin).)

77. Many plans expressly exclude from coverage "services which are not consistent with [UBH's] level of care guidelines or best practices as modified from time to time." Where the same language appears in certain CDGs, Plaintiffs argue that those CDGs incorporate the LOCGs by reference. (ECF No. 392, at 5:16–20 (Plaintiffs arguing that the CDG exclusion for services that "are not consistent with . . . [UBH's] level of care guidelines as modified from time to time" is sufficient to incorporate the LOCGs by reference); Trial Ex. 880 at 9:2–5 (same).)

78. Many plans define "Covered Health Services" by referring to UBH's "clinical protocols that describe the scientific evidence and prevailing medical standards and clinical guidelines supporting our determinations regarding specific services." Plaintiffs argue that virtually identical language in certain CDGs is sufficient to incorporate the LOCGs into those

documents. (*See* ECF No. 392, at 6:1-5 (Plaintiffs arguing that the "language with a statement that UBH 'maintains clinical protocols that include the Level of Care Guidelines which describe the scientific evidence, prevailing medical standards and clinical guidelines supporting our determinations regarding treatment" is sufficient to incorporate the LOCGs by reference); Trial Ex. 880 at 9:10–15 (same).)

79. The plans expressly anticipate and confer on UBH the authority to "modify" its guidelines "from time to time." (*See e.g.*, Trial Ex. 225-106 to -107 (sample plan).)

80. Regardless of UBH's authority to modify plan terms, each plan incorporates the UBH guidelines in effect on the plan's effective date.

## IV. The Guidelines.

### A. UBH Creates Level of Care Guidelines and Coverage Determination Guidelines To Ensure Consistency in Coverage Determinations.

81. To facilitate the exercise of its discretion to make coverage determinations under the plans and to inform conversations with providers about proposed treatment for UBH members, UBH developed and used Level of Care Guidelines ("**LOCGs**") and Coverage Determination Guidelines ("**CDGs**"). (Trial Tr. 297:21–298:12 (Niewenhous).)

82. The LOCGs and CDGs are intended to help standardize coverage determinations, promote evidence-based and medically necessary practices, and support members' recovery, resiliency, and well-being. (Trial Exs. 264-0002 (Care Advocacy Policy setting forth UBH policy, revised August 2014), 265-0002 (Care Advocacy Policy setting forth UBH policy, revised August 2015); *see also* Trial Tr. 937:15–17, 938:18–20 (Martorana); Trial Tr. 1405:12–18 (Allchin) ("[W]e expect services to be within generally accepted standards of practice that are backed by credible research and not considered experimental, and are consistent with [UBH's] best practice guidelines."); Trial Tr. 447:4-14 (Niewenhous); *see also* Trial Tr. 961:15-18 (Martorana) ( "[We] [w]ant to make sure that [members are] getting treatment that's evidence based as opposed to things that aren't evidence based which may or may not help them").)

83. LOCGs and CDGs are organized differently and are used for different sets of plans. (Trial Tr. 939:4–6, 939:23–940:3 (Martorana).)

84. Every iteration of the LOCGs at issue in this case expounds the principle that behavioral health services covered under the plans should be evidence-based. (Trial Exs. 1-0003 (2011), 2-0003 (2012), 3-0003 (2013), 4-0002 (2014), 5-0004 (2015), 6-0004 (January 2016), 7-0004 (June 2016), 8-0002 (2017).)

85. UBH's CDGs also are intended to promote access to treatment that is evidence-based and consistent with the member's benefit plan. (Trial Tr. 447:4-14 (Niewenhous); *see also* Trial Tr. 961:15-18 (Martorana).)

86. UBH's focus on promoting evidence-based treatment is consistent with generally accepted standards of care. For example, AACAP's Principles of Care for Treatment of Children and Adolescents with Mental Illnesses in Residential Treatment Centers provides: "The best intervention for serious mental health issues that cannot be treated in the child's home environment is a facility that has a multidisciplinary treatment team providing safe, evidence-based care that is medically monitored." (Trial Ex. 693-0003; Trial Tr. 1428:23-1430:5 (Allchin) (describing importance of evidence-based care); *see also* Trial Ex. 662-0294 (ASAM Criteria) (requiring Level 3.7 facilities to include "[e]vidence-based practices.").)

87. To ensure the guidelines promoted evidence-based treatment and were consistent with generally accepted standards of care, UBH relied on input from clinical staff, providers, and members; standards of practice from governmental sources; and national guidelines, consensus statements, and other published scientific evidence. (Trial Tr. 961:19-962:23 (Martorana) (discussing sources of generally accepted standards of care as discussed in the Introduction to the 2017 LOCGs); Trial Exs. 8-0002 (2017 LOCGs), 264-0002 (Care Advocacy Policy setting forth UBH policy).)

88. Because there are many sources that articulate standards of care, UBH created a hierarchy of evidence. The hierarchy of evidence includes governmental sources (such as the Centers for Medicare and Medicaid Services ("**CMS**") Medicare Benefit Policy Manual and National Coverage Decisions), national guidelines and consensus statements, clinical position papers of professional specialty societies when their statements are based upon referenced clinical evidence, graded reviews of the literature, and well-designed research that has been published in

peer-reviewed journals. (Trial Ex. 264-0003; Trial Tr. 309:24-310:6, 310:7-312:8 (Niewenhous); Trial Ex. 1661at 39:12-41:12 (Urban); *see, e.g.*, Trial Ex. 281-0002 to -03 (discussing creation of hierarchy of evidence for CDGs in November 2010).)

**1. Level of Care Guidelines.**

89. LOCGs are used for plans that explicitly provide coverage for services that are "medically necessary" (subject to specific exclusions), or that explicitly provide that services which are not "medically necessary" are excluded from coverage. (Trial Tr. 939:23–940:2 (Martorana).)

90. While the language, formatting and structure varied from year to year during the class period, the LOCGs generally consisted of an introductory section, a "Common Criteria" section that applied to all levels of care, and criteria specific to each particular level of care for both mental health and substance use disorders. (*See generally* Trial Exs. 1–8.)

91. The levels of care addressed in UBH's LOCGs correspond to different treatment settings, arranged on the following continuum from least restrictive to most restrictive: outpatient treatment in an ambulatory setting (such as visiting a psychologist once a week at her office for therapy); intensive outpatient treatment ("**IOP**"), which also occurs in an ambulatory treatment setting, but with a higher frequency of treatment than outpatient treatment; partial hospitalization, which is treatment in an ambulatory setting for 20 or more hours of treatment per week and can occur at a hospital or in an outpatient setting, but the patient does not stay overnight; 24-hour residential treatment at a hospital or residential treatment center; and finally, inpatient treatment at a hospital. (*See* Trial Tr. 934:24–936:11, 937:2–9 (Martorana).)

92. The introductory section for every year's LOCGs contains "Guiding Principles"—a statement encapsulating UBH's approach to member care. (*See* Trial Exs. 1-0002 to -03 (2011), 2-0002 to -03 (2012), 3-0003 to -04 (2013), 4-0003 to -04 (2014), 5-0004 to -05 (2015), 6-0004 to -05 (January 2016), 7-0004 to -05 (June 2016), 8-0002 to -03 (2017); Trial Tr. 962:24–963:4 (Martorana) (discussing 2017 LOCGs).)

93. From 2011 through 2013, the LOCGs were organized around four Guiding Principles: (1) care should promote the member's recovery, (2) care should be accessible, (3) care

should be appropriate, and (4) care should be effective. (See Trial Exs. 1-0002 to -03 (2011), 2-0002 to -03 (2012), 3-0003 to -04 (2013). )

94. Since 2014, the LOCGs' "Guiding Principles" explain that UBH uses utilization management and the LOCGs to "authorize services the provider can offer to meet the member's immediate needs and preferences, and support the members' broader recovery, resiliency, and wellbeing goals." (*See* Trial Exs. 4-0003 (2014), 5-0004 (2015), 6-0004 (January 2016), 7-0004 (June 2016), 8-0003 (2017); Trial Tr. 963:1-964:8 (Martorana) (discussing 2017 LOCGs).) The introductory section to each LOCG explains that "[e]ngagement, evidence-based practices, as well as recovery, resiliency, and wellbeing are integral to" UBH's Guiding Principles. (*Id.*)

95. Since 2011, the LOCGs have included Common Criteria that apply to all levels of care. The Common Criteria include admission criteria and continued service criteria in all years, and discharge criteria starting in 2014. (*See* Trial Exs. 1-0005 to -08, 1-0078 to -79 (2011), 2-0006 to -09, 2-0082 (2012), 3-0007 to -11, 3-0089 (2013), 4-0007 to -12 (2014), 5-0008 to -14 (2015), 6-0009 to -15 (January 2016), 7-0009 to -15 (June 2016), 8-0006 to -09 (2017).)

96. The Common Admission Criteria apply when a member first seeks treatment and requests coverage for a particular level of care. (Trial Tr. 966:22-967:5 (Martorana).)

97. The Common Continued Service Criteria apply when determining whether a member's continuing treatment at a particular level of care continues to be covered under the plan. (Trial Tr. 967:6–8 (Martorana).)

98. The Common Discharge Criteria apply when determining whether a member's plan no longer covers the member's treatment at a particular level of care, such as when the member can be safely, efficiently, and effectively treated in a lower, less restrictive level of care or when treatment is no longer needed. (Trial Tr. 967:9–11 (Martorana).)

99. The LOCGs also describe the clinical information that the UBH reviewer gathers from the member's provider and uses to inform the evaluation of a whether benefits are available under the guidelines and terms of the member's benefit plan. In the 2011, 2012, and 2013 LOCGs, this list was included in the Common Criteria. (*See* Trial. Exs. 1-0005 (2011), 2-0006 (2012), 3-0007 (2013); Trial Tr. 1406:20–1407:14 (Allchin).) Beginning in 2014, this list of

criteria was aggregated into the "Clinical Best Practices" section. (*See* Trial Exs. 4-0007 to -12 (2014), 5-0010 to -13 (2015), 6-0011 to -13 (January 2016), 7-0011 to -13 (June 2016), 8-0007 (2017).)

100. The LOCGs in virtually all of the relevant years provided that services must be "[c]onsistent with [UBH's] best practice guidelines." (Trial Exs. 2-0007 (2012), 3-0009 (2013), 4-0008 (2014), 5-0008 (2015), 6-0009 (Jan. 2016), 7-0009 (June 2016), 8-0007 (2017); Trial Tr. 1405:22–1406:3 (Allchin).)

101. And, beginning in 2014, the Continued Service Criteria also explicitly provided that the Clinical Best Practices criteria are to be used as part of treatment planning. (*See* Trial Exs. 4-0008 (2014), 5-0009 (2015), 6-0010 (Jan. 2016), 7-0010 (June 2016), 8-0007 (2017); *see also* Trial Tr. 1072:8–21, 1073:11–14, 1074:12–15 (Martorana).)

102. The information collected through the Clinical Best Practices section is not just used by a member's provider to craft a treatment plan; it is also used by UBH when evaluating a request for coverage. (Trial Tr. 981:6–10 (Martorana) (discussing the 2017 LOCGs); *see also* Trial Tr. 997:11-21 (Martorana) (discussing why and how the information in the Clinical Best Practices is considered by Care Advocates and Peer Reviewers).) UBH's evaluation of a request for coverage considers the information addressed in the Clinical Best Practices section, including but not limited to the member's chief complaint, history of the presenting illness, mental status, current level of functioning, use of alcohol, tobacco, or drugs, co-occurring behavioral health and physical conditions, history of behavioral health services, history of trauma, medical history and current physical health status, developmental history, pertinent current and historical life information, and barriers to care, among other information gathered from the member and/or his provider. (Trial Tr. 1070:6–10 (Martorana); Trial Ex. 8-008.)

**2. Coverage Determination Guidelines.**

103. The CDGs are "a set of guidelines that standardize the interpretation and application of the terms of the benefit plan." (Trial Tr. 718:11–15; Trial Ex. 259-0013.)

104. CDGs are used for plans that do not have language specifically covering "medically necessary" services, or specifically excluding from coverage services that are not

"medically necessary." (Trial Tr. 939:23–940:3 (Martorana).)

105. For plans where the CDGs are used, if there is a conflict between a plan's terms and the CDG, the plan terms prevail. (Trial Tr. 939:14-19, 1128:3-8 (Martorana).)

106. CDGs are organized according to medical conditions—for example, there is a CDG for posttraumatic stress disorder, another CDG for major depression, and another for bipolar disorder. (Trial Tr. 939:4–10 (Martorana).) In addition, there are CDGs specific to coverage for custodial care. (Trial Exs. 10, 47, 84, 108, 148, 195, 221.)

107. The parties stipulated to the list of CDGs Plaintiffs are challenging in this case. (*See* Trial Ex. 880 (stipulation attaching chart listing challenged guidelines).)

108. Plaintiffs introduced 224 different guidelines into evidence. (Trial Exs. 1–224.)

109. Plaintiffs offered testimony about only 15 of those 224 guidelines: 8 LOCGs (Trial Exs. 1–8), and 7 Custodial Care CDGs. (Trial Exs. 10, 47, 84, 108, 148, 195, 221).

110. Other than the seven CDGs specific to custodial care, "Plaintiffs challenge these CDGs *only to the extent they incorporate the Level of Care Guidelines*." (ECF No. 392, at 5:6–7 (emphasis added).)

111. Plaintiffs offered no testimony about the remaining 209 diagnosis-specific CDGs.

**a. The CDGs Did Not Incorporate the Level of Care Guidelines *In Toto***

112. Plaintiffs contend that each of the 209 diagnosis-specific CDGs in evidence incorporates at least one (but sometimes more than one) LOCG by at least one (but sometimes more than one) of eight different theories of incorporation, which are described in the parties' "Stipulations of Fact."(*See See* ECF No. 392, at 5:2–6:19; Trial Ex. 880.)

113. However, during the Class Period, none of the CDGs included all of the language from the LOCGs and most of the CDGs did not include any of the language from the LOCGs. (Trial Tr. 940:4–7 (Martorana); *see also* Trial Tr. 1444:4-19 (Allchin); *See* Trial Ex. 880-0008 to -10, ¶¶ 30(a)–(h).)

114. The parties identified eight categories reflecting how LOCGs were referenced in the CDGs. UBH did *not* stipulate that any of the CDGs actually "incorporates" any of the LOCGs in full. UBH merely agreed that: (a) certain language appears in certain CDGs, and (b)

*Plaintiffs contend* that language is sufficient to incorporate the LOCGs. (*See* Trial Ex. 880, 1:2–2:8.)

115. The categories reflecting how LOCGs were referenced in the CDGs include:

| **Category** | **Relevant Language** |
|---|---|
| A | CDG refers to plan exclusion for services that are "not consistent with . . . [UBH's] level of care guidelines as modified from time to time" or an exclusion for services that is similar to it. |
| B | UBH "maintains that treatment . . . should be consistent with its level of care guidelines . . . ." |
| C | UBH "maintains clinical protocols that include the Level of Care Guidelines which describe the scientific evidence, prevailing medical standards and clinical guidelines supporting our determinations regarding treatment…[that are] available…upon request." |
| D | UBH "maintains clinical protocols that describe the scientific evidence, prevailing medical standards and clinical guidelines supporting our determinations regarding [treatment/specific services] . . . [that are] available . . . upon request," but this language does not include the words, "Level of Care Guidelines." |
| E | CDG cites a Level of Care Guideline as support in a specific paragraph or paragraphs. |
| F | CDG contains language that is similar to the "Common Criteria" and/or language relating to various levels of care from a specific Level of Care Guideline. |
| G | CDG contains all of the provisions of the "Common Criteria and Clinical Best Practices for All Levels of Care" section of UBH's 2015 and 2016 Level of Care Guidelines. |
| H | CDG includes a section entitled "Level of Care Guidelines," with a hyperlink to the Level of Care Guidelines, which states: |

| | |
|---|---|
| | Optum/OptumHealthBehavioral Solutions of California Level of Care Guidelines are available at: https://www.providerexpress.com/ content/opeprovexpr/us/en/clinical-resources/guidelinespolicies/locg.html. The Level of Care Guidelines are a set of objective and evidence-based behavioral health guidelines used to standardize coverage determinations, promote evidence-based practices, and support members' recovery, resiliency, and wellbeing. |

(*See* Trial Ex. 880-0008 to -10, ¶¶ 30(a)–(h); Ex. 880-0012 to -20.)

116. UBH's doctors who are responsible for adopting the CDGs, construing the CDGs, and training other UBH reviewers on how to use the CDGs uniformly testified that the CDGs *did not* fully incorporate the LOCGs from 2011 through 2017. (Trial Tr. 793:6–18 (Triana); Trial Tr. 940:4-7 (Martorana); Trial Tr. 1444:4-19 (Allchin).)

117. Unlike the LOCGs, CDGs are used for plans that do not have a medical necessity term (Trial Tr. 939:23-940:3 (Martorana)), and are organized according to medical conditions. (Trial Tr. 939:4-10 (Martorana).)

118. The CDGs are distinct from the LOCGs both in purpose and structure, and the unrefuted evidence shows that UBH clinicians do not refer to the LOCGs when applying the CDGs. (Trial Tr. 1725:20–22 (Triana).)

119. Dr. Triana, a practicing psychiatrist and the Senior Vice President of Behavioral Medical Operations, chaired the BPAC committee responsible for approving every CDG and was responsible for overseeing all of UBH's Peer Reviewers. He testified that, except where the LOCG was copied and pasted into the LOCG, UBH's Peer Reviewers are not "allowed to open up the Level of Care Guidelines and apply them in a CDG benefit determination." (Trial Tr. 697:21-699:14, 1725:15–22 (Triana).)

120. This is true "even if the CDG made a reference to the level of care guideline." (Trial Tr. at 1725:15-22 (Triana).)

121. Throughout the class period, for every year from 2011 through 2017, UBH's

clinicians were *not permitted* to apply the criteria of an LOCG to a CDG benefit decision.

122. There is no evidence in the record that the LOCG cross-references Plaintiffs point to were actually used to make a single benefit determination for any member for whom a CDG was used.

123. As discussed in Section III(C), above, the language Plaintiffs rely on in their incorporation Categories A and C, and D also appears in many of the class members' plans.

124. The unrefuted evidence demonstrates that UBH's policy requires CDG benefit determinations to be based on criteria found in the CDG and the peer reviewers' clinical judgment, not language separately found in the LOCGs. (Trial Tr. 1725:3–22 (Triana).)

125. Certain CDGs, in certain years, did contain certain portions of the LOCGs "copied and pasted into the Coverage Determination Guidelines." (Trial Tr. 1725:9–12 (Triana).)

126. In total, 29 of the 209 diagnosis-specific CDGs in evidence "contain[] all of the provisions of the 'Common Criteria and Clinical Best Practices for All Levels of Care' of UBH's 2015 and 2016 Level of Care Guidelines." (Trial Ex. 880-0010 (describing Plaintiffs' Guideline "Category G").)

127. The 29 CDGs in category "G" were in effect in 2015, 2016 and for parts of 2017 (not 2011-2014). (Trial Exs. 151, 156, 159–169, 185, 188–190, 196–206, and 208. Trial Ex. 880-0012 to -20 at Ex. A.)

128. These 29 CDGs are the only CDGs in evidence that even *arguably* would allow for the application of LOCG criteria under UBH's unrefuted policy governing the use of an LOCG in a CDG benefit decision. (*See* ECF No. 392, at 5:9–6:5 (discussing Plaintiff's various "incorporation" categories, and identifying "Category G" as the only category for which the language in a CDG is "identical" to the language in an LOCG); Trial Ex. 880-0008–10 (same); Trial Ex. 880-0012 – 20 (identifying 29 CDGs in "Category G").)

129. In their "Category F," Plaintiffs contend that certain CDGs contain language that is "similar to the 'Common Criteria' and/or language relating to various levels of care from specific Level of Care Guidelines." (Trial Ex. 880-0009.) But Plaintiffs fail to explain which specific criteria are "similar" to the LOCGs, whether the other levels of care with "similar" language are

the levels of care at issue in this case, whether that "similar" language is actually similar to the specific provisions Plaintiffs' experts criticized and, if so, how their experts' opinions apply to that similar-but-not-identical language. Category F does not even specify whether the language in those CDGs is similar to language in the Common Criteria or an unspecified level of care in the LOCG.

130. Even where the language from the Common Criteria of the LOCGs appears verbatim in those 29 CDGs, Plaintiffs failed to offer any evidence about: (a) how that language is used in the context of each CDG; (b) how that language interacts with other language in the CDGs that may either enhance or diminish its significance in that specific CDG; or (c) that those criteria are inconsistent with generally accepted standards of care for the treatment of the diagnosis that is the subject of that CDG.

131. As UBH's Manager of Clinical Guidelines, Loretta Urban, testified, even when the CDGs did incorporate level of care criteria, the CDGs include other "nuances . . . that speak about level of care." (Trial Ex. 1661, at 223:10–15 (Urban).) These CDGs include "callouts and conditions . . . that would account for other variations from the Level of Care Guidelines that would need to be taking into account for that specific condition." (*Id.*, at 222:25–223:8.)

132. Plaintiffs offered no analysis about any of those 29 CDGs, and their experts did not discuss them.

133. Plaintiffs failed to meet their burden to prove that each of the CDGs incorporated the LOCGs *in toto*.

**b. The CDGs Were Designed to Describe The Coverage Under Certain Plans.**

134. The evidence does not establish that UBH owed class members a fiduciary obligation to develop CDGs that were consistent with generally accepted standards of care *to the exclusion of other plan terms*.

135. The CDGs are designed to *describe coverage* according to the full terms of a member's benefit plan.

136. Throughout the class period, UBH's Guideline Applicability Tool directed Care

Advocates and Peer Reviewers to utilize the CDGs "[w]hen determinations are *based on the terms of the benefit plan*." (*See* Trial Ex. 450-0005; *see also* Trial Tr., 388:23–389:4 (Niewenhous) (emphasis added).)

137. Every CDG indicates on its face the UnitedHealthcare Certificate of Coverage or Summary Plan Description templates to which it applies, states in one way or another that the purpose of the CDG is to "provide[] assistance in interpreting behavioral health benefit plans that are managed by Optum" and that "the enrollee specific benefit document must be referenced" before applying the CDG, and that the CDG does not apply where the plan terms do not align with the CDG's coverage criteria. (*See*, *e.g.*, Trial Ex. 11-0002–03 (2010 CDG for Residential Rehabilitation of Substance Use Disorders); Trial Ex. 120-0002 (2014 CDG for Treatment of Bulimia Nervosa); Trial Ex. 224-0002, -05 (2017 CDG for Trauma- and Stress-Related Disorders).)

138. While UBH sought to incorporate generally accepted standards into the CDGs (Trial Tr. 298:19–21 (Niewenhous)), each CDG was expressly intended to describe the full extent of benefit coverage available under class members' plans, even if the scope of that coverage was more limited than generally accepted standards of care. (*See, e.g.*, Trial Ex. 167-0003, 04 (providing that treatment must be a "Covered Service" as defined in the member's benefit plan and "[n]ot otherwise excluded the plan"); Trial Tr. 855:11–19 (Dehlin) (there is no "requirement that the plans cover all treatment that falls within the scope of generally accepted standards of care", and plans can "limit or exclude benefits even where the treatment is consistent with . . . prevailing medical standards").)

139. Plaintiffs offered no evidence that any CDG was an unreasonable interpretation of coverage under any class members' plan.

**c. The Custodial Care CDGs Are Based on Specific Plan Language.**

140. It is consistent with generally accepted standards of care to exclude services that are solely or primarily for the purpose of custodial care. (Trial Tr. 560:8-15 (Plakun).)

141. Each CDG states on its face that it is based on specific benefit plan documents, and that it applies only where the definition of custodial care in the CDG is consistent with the

definition of custodial care in the member's plan. (Trial Exs. 47-0002, 84-0002, 108-0002, 148-0002, 195-0002, 221-0002.)

142. The definition of "custodial care" reflected in UBH's Custodial Care CDGs either tracks the plan language verbatim or reasonably interprets the plan language of the majority of the plans in evidence. (Ex. 1654 at 455:24 – 456:19 (Niewenhous) ("Q: And this [Custodial Care] CDG is interpreting that plan language [relating to "custodial care"]? A: That is correct, yes.").)

143. Like the CDGs, the definition of "custodial care" in the LOCGs is derived from plan language defining "custodial care," not by general reference to "generally accepted standards of care." (Trial Tr. at 1707:11 – 20 (Triana) ("the source of" the definition of custodial care in the LOCGs "was the plan language"); *accord* Trial Ex. 1260-0003 (guideline feedback chart noting proposed changes to definition of custodial care with comment from Mr. Niewenhous that UBH "cannot change a definition of custodial care" because definition is derived from plans).)

144. The unrefuted evidence shows that any conflict between plan language and guideline language is resolved in favor of the plan language. This policy is reflected on the face of every Custodial Care CDG at issue, all of which caution that the terms of an individual member's plan "may differ greatly from the standard benefit plans upon which [the Custodial Care CDG] is based," and "[i]n the event that . . . there is a conflict between this document and the [member's plan], the *enrollee's specific benefit document supersedes these guidelines*." (Trial Ex. 10-0002 (emphasis added); *accord* Trial Exs. 47-0002, 84-0002, 108-0002, 148-0002, 195-0002, 221-0002.); Trial Tr. at 457:11–13 (Niewenhous) (if the CDG is inconsistent with a member's individual plan, "UBH should not apply the definition in [the] CDG.").)

145. Plaintiffs' reliance on sample member 3262 for an as-applied attack on the Custodial Care CDGs is particularly suspect because that member's benefit request was actually *approved* on appeal *using the same Custodial Care CDG*. (Trial Ex. 899-0010 to -11 (appeal decision for sample member 3262 overturning initial benefit denial); Trial Ex. 1655-0001 (summary exhibit re member appeals); Trial Tr. at 1540:13 – 1544:1 (Bridge) (sample member 3262 was approved for benefits using the Custodial Care CDG and benefits were authorized).)

146. Sample member 3262 further highlights that Plaintiffs have not met their burden of

proving on a classwide basis that class members' requests for benefits were even denied. Other class members received the benefits they requested on appeal. (Trial Ex. 1655; Trial Tr. at 1484:10–17, 1502:10–12, 1503:18– 1505:4 (Bridge) (testifying that the effect of an overturn on appeal would be that benefits were authorized and discussing numerous sample class members whose benefit denials were overturned on appeal).)

147. Plaintiffs offered no evidence at trial to rebut that the guidelines state on their face that they are only used where the definition of custodial care in the CDG is consistent with the definition in the member's plan.

### B. UBH Developed The Guidelines Using A Process That Exceeded National Accreditation Standards.

#### 1. The Guidelines Were Reviewed And Approved Annually By UBH Psychiatrists And Psychologists Based On The Evidence Base and External Feedback.

148. Throughout the class period, UBH reviewed its guidelines annually to reflect the most current evidence in the field. (Trial Tr. 1688:5–15 (Triana); Trial Ex. 1658 at 84:07–18 (Beaty).)

149. As a result, the guidelines changed from year to year, sometimes adding or removing language, including much of the language challenged by Plaintiffs in this case.

150. Plaintiffs' expert, Dr. Fishman, agreed that the guidelines changed over the class period and in fact improved in some ways from year-to-year. (Trial Tr. 107:5-9 (Fishman).)

151. For the LOCGs, the review process involved four discrete stages: solicitation of internal and external input, drafting of new guidelines pursuant to this input and other research, revision of the drafts by a working group, and, finally, committee approval.

152. The first stage of the guideline creation process typically started in June of the preceding year. (Trial Tr. 937:18-22 (Martorana).)

153. Dr. Martorana, a UBH Senior Behavioral Medical Director and board-certified psychiatrist with over 35 years of experience including 17 years in clinical practice, explained that at that time, UBH distributed its guidelines to internal and external behavioral health professionals and professional societies to solicit suggestions for updates to the guidelines. (Trial

Tr. 937:22-938:2 (Martorana).) The guidelines were sent out to approximately 40 internal staff, more than 50 external providers and numerous provider specialty groups to solicit suggestions for updates to the guidelines. (Trial Tr. 937:22-938:1, 938:3-8 (Martorana); Trial Tr. 1689:16–1692:12 (Triana); Trial Ex. 1235; Trial Ex. 1657 at 20:08–20:24 (Robinson-Beale).)

154. Second, masters-level social workers (Jerry Niewenhous and Loretta Urban in 2011-2016, and Erik Rockswold in 2017) tracked and reviewed the feedback from the internal and external clinicians and created working drafts of the revised LOCGs based on the feedback as well as research they conducted over the year. (Trial Tr. 1696:8-14 (Triana); Trial Ex. 1661 at 15:19-24, 42:5-43:2 (Urban); Trial Ex. 904 at 18:20-24 (Rockswold).)

155. In addition to using the feedback as a source of information for their drafts, Mr. Niewenhous, Ms. Urban and Mr. Rockswold also conducted research throughout the year to track changing practice modalities. This research included review of governmental sources, national guidelines and consensus statements, clinical position papers, graded reviews of the literature, and well-designed research published in peer-reviewed journals. (Trial Tr. 309:24-310:6 (Niewenhous).) UBH's hierarchy of clinical evidence dictated the weight to be given to these sources. (Trial Tr. 309:24-310:6, 310:7-312:8 (Niewenhous); *see, e.g.*, Trial Ex. 281-0002 (discussing hierarchy of evidence).)

156. Third, the feedback received from internal and external clinicians and professional societies and working drafts of updated guidelines were submitted to the LOCG Work Group for review and discussion. The LOCG Work Group over the relevant years included UBH's Chief Medical Officers, Dr. Robinson-Beale, Dr. Bonfield, and Dr. Bruce Bobbitt; senior clinicians, Dr. Lorenzo Triana, Dr. Pete Brock, and Dr. Andrew Martorana; as well as Jerry Niewenhous. The LOCG Work Group met to review each of the comments received and discussed potential changes to the LOCGs. (Trial Tr. 1696:25–1697:5 (Triana).)

157. Finally, the LOCG Work Group submitted proposed revised LOCGs to the Behavioral Policy and Analytics Committee (from 2011-2016) or the Utilization Management Committee (2017) for review and approval. (Trial Tr. 697:21-698:12, 742:17-22 (Triana).)

158. BPAC had multiple responsibilities in addition to review and approval of the

guidelines, and was composed of numerous medical doctors, social workers, and psychologists, as well as employees from UBH's legal, finance, regulatory and affordability departments. (Trial Tr. 703:8-16, 787:24-788:9, 1708:17-1709:8 (Triana); Trial Ex. 1657 at 202:19-203:02 (Robinson-Beale).)

159. In 2016, the BPAC's responsibilities were transitioned to the Utilization Management Committee ("UMC"). (Trial Tr. 697:25-698:11 (Triana).)

160. UBH's CDG creation process also had multiple steps.

161. First, Loretta Urban, a masters-level social worker, conducted annual research to develop and update working drafts of the CDGs. (Trial Ex. 1661 at 12:08-14 (Urban).)

162. Second, the working drafts were circulated to subject matter experts who provided feedback. (Trial Ex. 1661 at 42:12-19 (Urban).)

163. Third, the drafts were circulated to the Coverage Determination Committee, which was composed of co-chairs Mr. Niewenhous and his supervisor, and other masters and doctoral-level clinicians at UBH. The Coverage Determination Committee was responsible for reviewing and providing input on draft CDGs. (Trial Tr. 337:14–23, 414:9–12 (Niewenhous); Trial Ex. 307-0002.)

164. Finally, the CDGs were submitted to the BPAC (2011-2016) or the Utilization Management Committee (2017) for review and approval. (Trial Tr. 337:21-23, 338:5-6 (Niewenhous); Trial Tr. 697:25-698:16 (Triana); Trial Tr. 1821:3-011 (Niewenhous); Trial Ex. 1657 at 201:11-202:6 (Robinson-Beale).)

165. The internal reviewers providing input to the guidelines consisted of behavioral health professionals with at least a masters-level education, including several board-certified psychiatrists. (Trial Tr. 1689:22-1690:1 (Triana).) A number of internal commentators were also board-certified specialists in areas such as addiction medicine. (*See*, *e.g.*, Trial Ex. 1235.)

166. UBH also sought comments from both external clinicians and from professional societies. The external clinicians were selected from UBH's provider network. (Trial Tr. 1691:10-16, 1692:8-11 (Triana).)

167. Commentary from professional societies came from two sources. First, a number

of professional societies were part of UBH's Behavioral Specialty Advisory Council ("BSAC"). (Trial Tr. 744:6-744:11, 1691:25-1692:5 (Triana).) Members of the BSAC included "the American Psychiatric Association, the American Psychological Association, the National Association of Social Workers, National Association of Psychiatric Health Systems, ASAM, and several others." (Trial Tr. 1692:2-5 (Triana).)

168. Additionally, Dr. Rhonda Robinson-Beale, UBH's Chief Medical Officer for External Affairs from 2011 to 2014, was responsible for liaising with external organizations, including subspecialty organizations, consumer organizations and governmental organizations, in order to elicit feedback on the guidelines. (Trial Ex. 1657 at 12:11-13:17, 16:04-17:12, 17:13-16, 31:02-31:15 (Robinson-Beale).)

169. Dr. Robinson-Beale, a licensed psychiatrist who practiced for over 18 years, testified that she worked with provider organizations and sub-specialty organizations (such as the American Psychiatric Association and the National Association of Social Work) to develop evidence-based responses to new issues that arose in the medical field, and as part of that process, she obtained and incorporated feedback from these organizations into UBH's guidelines and other utilization management practices and policies. (Trial Ex. 1657 at 16:04-17:12, 17:13-16, 23:13–24:06, 31:02-31:15, 40:07-17, 68:01-14 (Robinson-Beale).)

170. Dr. Robinson-Beale also brought to the BPAC information from professional organizations, consumer groups, and practitioners to help inform the BPAC's decisions regarding the content of guidelines. (Trial Ex. 1657 at 201:11-20 (Robinson-Beale).) The BPAC considered this information seriously and used it to help inform their decision-making regarding guidelines. (Trial Ex. 1657 at 201:21-202:12 (Robinson-Beale).)

171. At times, UBH also hired external consultants.

172. As an example, following the release of a new version of the ASAM criteria in 2013, Dr. Robinson-Beale engaged one of the authors, Gerald Shulman, to review UBH's LOCGs and CDGs to identify differences between the ASAM criteria and UBH guidelines and to create a crosswalk detailing the differences. (Trial Ex. 1657 at 144:15-145:22, 166:25-167:09, 167:13-168:12, 186:15-25, 216:25-220:07 (Robinson-Beale); *see also* Trial Ex. 407-0002.)

173. Plaintiffs' expert, Dr. Fishman, agreed that Mr. Shulman is "a thoughtful person" "who has a strong understanding of treatment placement guidelines." (Trial Tr. 175:15-24 (Fishman).)

174. Mr. Shulman conducted an initial review of the LOCGs and CDGs specific to substance use and communicated to UBH that he was "impressed." After further review, Mr. Shulman communicated to UBH: "After getting more involved with them, my respect for the work you have done has grown. I believe that you have found the optimal balance between the best clinical care and cost savings." (Trial Ex. 1033-0002 (email from Mr. Shulman to Dr. Robinson-Beale and Dr. Alam); Trial Ex. 1657 at 172:19–173:14 (Robinson-Beale) (discussing same).)

175. Mr. Shulman also provided a redlined version of the LOCGs and CDGs applicable to substance use treatment, where he noted places where he believed these guidelines veered from ASAM. (Trial Ex. 1657, at 182:01–186:10 (Beale); *see generally* Trial Ex. 412 (redlined version of the guidelines).)

176. Mr. Shulman's review included the following guideline provisions discussed in this case.

- The 2013 LOCG's Introduction and Guiding Principles (Trial Ex. 1033-0064 to -67);
- The 2013 LOCG's Common Criteria (Trial Ex. 1033-0059 to -63);
- The 2013 LOCG's Continued Service Criteria (Trial Ex. 1033-0068 to -69);
- The 2013 LOCG's Intensive Outpatient Program Criteria for Substance Use Disorders (Trial Ex. 1033-0078 to -82); and
- The 2013 LOCG's Residential Rehabilitation Criteria for Substance Use Disorders (Trial Ex. 1033-0104 to -07).

177. UBH considered Mr. Shulman's comments and incorporated some of his suggestions. Dr. Robinson-Beale and her colleague Dr. Alam reviewed Mr. Shulman's work, including his redlined comments and proposed edits to the UBH guidelines. Based on that review, they understood that for those provisions where Mr. Shulman suggested no modifications - including numerous provisions and phrases Plaintiffs challenge like "presenting problems,"

"current condition," "less intensive" level of care, "acute symptoms," improvement, "custodial care" and "active treatment" - it was Mr. Shulman's opinion that those provisions were consistent with the ASAM criteria. (*See* Trial Ex. 1657 at 179:5-181:25 (Robinson-Beale); Trial Tr. 1629:7-18 (Alam); *see also* Trial Ex. 412).)

178. Mr. Shulman suggested minimal edits to the Common Criteria and intensive outpatient criteria (Trial Ex. 412-0048 to -52.), and did not suggest any changes to the criterion that co-occurring conditions can be "safely managed." (Trial Ex. 412-0068.)

179. Mr. Shulman's suggested edits to the admission criteria for residential rehabilitation largely affirmed that UBH's criteria were appropriate for ASAM Level 3.7, and Mr. Shulman suggested no substantive changes to UBH's definition of "custodial care" and "active treatment" in the residential rehabilitation criteria. (Trial Ex. 412-0093 to -96.)

180. He also emphasized that "imminent danger" is a requirement for ASAM Levels 3.3 and 3.5. (Trial Ex. 412-0100.)

181. Among all the guidelines he reviewed, Mr. Shulman proposed the most substantive changes to UBH's 2013 CDG for Substance use disorder treatment, which Plaintiffs do not challenge apart from its alleged incorporation of the LOCGs. (Trial Ex. 412-0015 to -45.)

182. Despite offering detailed feedback for many guideline provisions, Mr. Shulman did not criticize the vast majority of the language challenged by Plaintiffs in this case. Among others, Mr. Shulman did not criticize the following language:

**In the Common Criteria:**

- "The member's chief complaint, presenting problem, and the events which precipitated the request for a service at this particular point (i.e., the "Why Now")," (Trial Ex. 412-0048);
- "The member's current condition can be most efficiently and effectively treated in the proposed level of care," (Trial Ex. 412-0049);
- "The member's current condition cannot be effectively and safely treated in a lower level of care," (Mr. Shulman did suggest changing "lower" to "less intensive," which UBH did implement the following year. Plaintiff do not challenge either form of that language.)

(Trial Ex. 412-0049; *see also* Trial Ex. 3-0008 and 4-0007);

- "There must be a reasonable expectation that essential and appropriate services will improve the member's presenting problems within a reasonable period of time. Improvement of the member's condition is indicated by the reduction or control of the acute symptoms that necessitated treatment in a level of care. Improvement in this context is measured by weighing the effectiveness of treatment against the evidence that the member's condition will deteriorate if treatment is discontinued in the current level of care. Improvement must also be understood within the framework of the member's broader recovery/resiliency goals," (Trial Ex. 412-0049);
- "The goal of treatment is to improve the member's presenting symptoms to the point that treatment in the current level of care is no longer required," (Trial Ex. 412-0050);
- "Treatment is not primarily for the purpose of providing respite for the family, increasing the member's social activity, or for addressing antisocial behavior or legal problems, but is for the active treatment of a behavioral health condition," (although Mr. Shulman did suggest *adding* homelessness to this list, which would make it *more* restrictive), (Trial Ex. 412-0049);
- "Interventions needed to address co-occurring behavioral health or medical conditions," (Trial Ex. 412-0049).

**In the Intensive Outpatient Program Criteria for Substance Use Disorders:**

- The member's co-occurring medical, mental health or substance use conditions can be safely managed in an intensive outpatient program, (Trial Ex. 412-0068);
- "The member or his/her family/social support system understands and can comply with the requirements of an IOP, or the member is likely to participate in treatment with the structure and supervision afforded by an IOP," (Trial Ex. 412-0068).

**In the Residential Rehabilitation Criteria for Substance Use Disorders:**

- "The member continues to use alcohol or drugs, and the member's functioning has deteriorated to the point that the member cannot be safely treated in a less restrictive level of care."

(Trial Ex. 412-0093; *see also* Trial Ex. 1657 at 174:19–181:25 (Beale) (discussing Mr. Shulman's report).)

### 2. The Guidelines Were Accredited By Two Different National Accrediting Bodies.

183. The National Committee for Quality Assurance ("**NCQA**") and URAC (formerly known as the Utilization Review Accreditation Commission) are the two leading organizations that accredit utilization management processes for major health plans and for freestanding health utilization management organizations. (Trial Tr. 1766:6-8 (Goddard).)

184. Together, NCQA and URAC "dominate the field" and represent the "gold standard" for such accreditation in the industry. (Trial Tr: 1762:9-19 and 1766:2-8 (Goddard).)

185. URAC is governed by a large, diverse board of directors composed of stakeholders that include the American Medical Association, consumer organizations, regulators, and behavioral health provider organizations such as the American Psychiatric Association. (Trial Tr. 1766:24-1767:13 (Goddard).) This diversity of input and governance is designed to accentuate the credibility of URAC's accreditation standards. (Trial Tr. 1767:14-20 (Goddard).)

186. To earn accreditation, both URAC and NCQA impose "substantial" requirements that health insurers must meet in developing their medical necessity guidelines, including consultation with actively practicing providers with relevant medical knowledge, consideration of evidence-based treatment, an annual review process (and update if appropriate) and approval by a clinical director. (Trial Tr. 1768:20-1769:4, 1770:6–1771:7 (Goddard); *see also* Trial Exs. 1012-0154 (URAC Health Utilization Management, Version 7.0, HUM 1 Review Criteria); 1011-0007 (NCQA UM 2 Clinical Criteria for UM Decisions).)

187. UBH employee John Beaty was responsible for UBH's accreditation with NCQA and URAC during the entire class period. (Trial Ex. 1658 at 12:04–12:08 (Beaty).)

188. Mr. Beaty confirmed that UBH complied with the relevant standards and received accreditation for the LOCGs from both NCQA and URAC during the entire class period. (Trial Ex. 1658 at 83:22-85:07, 87:3-88:14 (Beaty) (URAC accreditation every three years since 1995); (NCQA accreditation since 2003).)

189. Dr. Goddard reviewed UBH's process for creating and updating its LOCGs, and testified that UBH's process for the LOCGs (including provisions of the LOCGs contained in the CDGs) was consistent with best practices in the field for the entire period, and not only satisfied, but exceeded, the requirements set forth by URAC and NCQA. (Trial Tr. 1770:2-5, 1773:18-1774:12 (Goddard).)

190. Plaintiffs offered no evidence to refute Mr. Beaty's and Dr. Goddard's testimony that UBH's guideline development process satisfied and exceeded the nationally recognized standards of URAC and NCQA.

191. UBH's process for creating the guidelines was "reasoned and principled," was undertaken in good faith, and was a reasonable exercise of UBH's discretion and role with respect to the plans it administers.

### C. The Guideline Creation and Review Process Was Not Influenced By Improper Financial Considerations.

192. Plaintiffs offered no evidence that UBH allowed financial considerations to influence the specific LOCG or CDG criteria they challenge in this case.

#### 1. Benefit Expenses Did Not Influence the Content of the Challenged Guidelines.

193. Evidence that UBH prepared financial forecasts, tracked performance against those forecasts, and noted monthly benefit expense trends and costs does not prove that the content of the LOCGs or CDGs challenged in this case were influenced by considerations of finance or benefit expenses. Such activity is consistent with standard business activities and not evidence of bad intent.

194. Evidence that Dr. Triana's 2012's performance evaluation states "as a result of significant focus on maintaining UM activities as the CAC's transitioned to CAOM, OBHS is projected to outperform the budgeted BenEx targets for 2012" does not demonstrate that the content of the guidelines was influenced by financial considerations. (Trial Ex. 850-0003.) (ECF No. 392, at 68:6–8, citing Trial Ex. 850.) A "CAC" is a regional "Care Advocacy Center." (Trial Tr. 1804:11-15 (Niewenhous).) As the performance evaluation elsewhere notes, Dr. Triana's role

in the transition was related to medical director staffing, not revisions to the guidelines. The performance evaluation reflects that Dr. Triana "[p]rovided leadership and guidance to the medical director and clinical staff as they transitioned from the traditional CAC staffing model to the integrated CAOM staffing model." (Trial Ex. 850-0002.) The fact that Dr. Triana was given high marks for helping maintain clinical staffing levels during an administrative transition is irrelevant to the guidelines challenged in this case.

195. The evidence demonstrates that UBH did not take finances and benefit expenses into account when creating and updating the LOCGs and CDGs. The multiple UBH employees involved in the creation of the LOCGs and CDGs testified that finances and benefit expenses were not considered when deciding on the guideline language at issue in this case. (*See*, *infra*, ¶¶ 171-179.)

196. The BPAC met about 180 times between 2011 and 2016. (Trial Tr. 786:11-15 (Triana).)

197. Dr. Triana, who was the Senior Vice President of Behavioral Medical Operations and chaired the BPAC, only recalled three instances where benefit expense was discussed in any context at a BPAC meeting, none of which has any bearing on issues in this trial. (Trial Tr. 698:22-699:3, 786:11-15 (Triana).)

198. The three times Dr. Triana recalled were: (1) an instance involving "the potential adoption of the Milliman Guidelines"; (2) the development of a CDG for Transcranial Magnetic Stimulation ("TMS"); and (3) the "development of a CDG for lab services." (Trial Tr. 786:16-23 (Triana).) None of these guidelines are at issue in this case (*see* Trial Ex. 880), and Plaintiffs offered no evidence regarding the Milliman Guidelines or the CDG for lab services. The TMS guideline is discussed in more detail below.

199. At trial, Plaintiffs identified only *one* instance nearly eight years ago when the BPAC discussed average length of stay ("ALOS"). Plaintiffs did not offer the document into evidence or present any evidence about the *context* in which ALOS came up at that 2010 BPAC meeting. (Trial Tr. 1753:12–1756:18 (Triana); *see also* Trial Tr. 787:3-13 (Triana) (testifying that he could not remember any other instances when ALOS was discussed at a BPAC meeting).)

200. UBH's former Chief Medical Officer Rhonda Robinson-Beale, who served on both the BPAC and the LOCG Work Group, similarly testified that she could not remember a single time when a BPAC member rejected a recommendation to change the LOCGs based on its potential impact on benefit expense, and she was never involved in any discussions about how changes to the LOCGs would impact benefit expense. (Trial Ex. 1657 at 202:07-18, 210:14-211:02 (Robinson-Beale); *see also id.* at 105:15-21; Trial Tr. 1696:25–1697:5 (Triana).)

201. Dr. Irvin "Pete" Brock, UBH's former Senior Vice President of Affordability, a licensed psychiatrist with over 30 years of clinical experience as a practicing psychiatrist who served on both the BPAC and the LOCG Work Group, also was not aware of a single instance in which the "affordability group proposed and operationalized" any initiative "related to reducing benefit expense through changes in the level of care guidelines." (Ex. 1660 at 13:6–25:1, 268:23–269:5 (Brock).)

202. Plaintiffs offered no evidence that Dr. Brock's presence or participation on the BPAC related to the control of benefit expense.

203. Former employee Erik Rockswold, who was involved with updating the LOCGs in 2017, testified that he had *never* been asked or participated in any conversation about whether or how any change to the LOCGs would affect UBH's expenses, profits, or other metrics like ALOS. (Trial Ex. 904 at 221:03-18, 222:01-06, 222:22-225:19 (Rockswold).)

204. While Fred Motz, from the finance department, served as a non-voting member of the BPAC for a time, he rarely attended meetings or contributed to the discussion. (Trial Tr. 787:24-788:9; 1719:18–21, 1745:15 – 1746:1 (Triana); *see also* Ex. 1657 at 206:19–203:2 (Robinson-Beale).)

205. Plaintiffs note that Dr. Brock's successor, Nisha Patterson, sits on the Utilization Management Committee. (ECF No. 392. at 67:21–24.) As Dr. Martorana testified, the Utilization Management Committee has broader responsibility than the BPAC and is responsible for overseeing a host of "utilization management issues" beyond just approving the guidelines. (Trial Tr. 928:2–7 (Martorana); *see also* Trial Ex. 552 (August 2016 UM Committee meeting minutes noting numerous items of business, including issues of accreditation, provider contracting, and

audits).)

206. Plaintiffs offered no evidence about the nature of Ms. Patterson's role on the Utilization Management Committee, let alone that Ms. Patterson had any role in developing any of the guidelines at issue.

207. While Plaintiffs contend that "another affordability representative, Michael Powell, was also on the BPAC through at least 2015" (ECF No. 392, at 67:22–23), they again fail to offer any evidence of Mr. Powell's role on the BPAC or that he played any role in developing the guidelines. (Trial Ex. 332-0002, 368-0002, 423-0002, 482-0002, 519-0002.)

208. UBH had no financial incentive to promulgate guidelines that are more restrictive than generally accepted standards of care, because as Dr. Brock explained, in the world of medicine, "quality is inversely related to cost." (Trial Ex. 1660 at 34:13–17 (Brock).)

209. Promulgating overly-restrictive guidelines that denied or prematurely ended effective treatment "actually would be more expensive" in the long-run because, in the aggregate, restricting access to effective treatment would result in *higher* readmissions, *longer* lengths of stay, and *higher* overall benefit expense. (Trial Ex. 1660 at 218:6-22 (Brock).)

210. Dr. Plakun made the same point when he testified that denying treatment that is necessary to effectively treat a member's underlying chronic conditions leads to increased readmission rates. (Trial Tr. 491:22–492:14 (Plakun).)

**2. The "Three Vignettes" Plaintiffs Identify As Evidence Of A Conflict Of Interest Are Irrelevant.**

211. Plaintiffs point to three instances that they claim prove UBH improperly considered financial impact when developing the guidelines. (ECF No. 392 at 68:13-72:26.)

212. First, Plaintiffs cite a 2016 request to defer changes to a specific guideline relating to applied behavioral analysis ("ABA") for the treatment of autism spectrum disorder to prove guideline creation was influenced by financial considerations. (ECF No. 392, at 69:3–17.)

213. In December 2016, UBH's Head of Behavioral Health noted that proposed changes to the ABA guidelines could have a significant "financial impact," and asked to delay the change until it could be made in conjunction with the annual pricing cycle with UBH's

customers. (Trial Ex. 812-0001.)

214. This evidence is irrelevant because the ABA guideline is not challenged in this case. In addition, this evidence demonstrates that UBH made a change to an unrelated guideline even though the change could have a "significant financial impact," and the only question from a financial perspective was when the change should be effective. There is no evidence that any similar timing considerations ever factored into the development, promulgation, or application of the guidelines Plaintiffs challenge.

215. Second, Plaintiffs point to UBH's consideration of coverage for TMS in 2013 and 2014. (ECF No. 392, at 69:18–70:18.) Like ABA, the TMS guideline is not at issue in this case.

216. Until 2013, UBH considered TMS to be an unproven technology for treatment of treatment-resistant depression ("TRD"), and, therefore, excluded from coverage. (Trial Tr. at 766:9-23-767:1 (Triana).)

217. Starting in 2013, new scientific evidence emerged, and UBH reexamined whether TMS should be considered proven for TRD. (*Id.*, at 766:24-767:21 (Triana).) Although UBH's financial analysis demonstrated that adding TMS as a covered benefit would increase benefit expense, UBH determined that TMS was proven for certain indications of TRD and decided to cover it, meaning that UBH also had to develop a new guideline. (*Id.*, at 767:12-21, 805:18-806:6 (Triana).)

218. Around that same time, a few self-funded health plans decided to add TMS as a covered benefit, and UBH began approving benefits for members of those plans. (*Id.* at 805:23-806:4 (Triana).)

219. In November 2013, UBH's Clinical Policy Committee recommended against expanding the TMS benefit beyond the few self-funded customers that had specifically added it, because there was "no evidence of an enduring treatment effect," meaning a "return on investment could not be confirmed." (Trial Ex. 749-0005.)

220. However, UBH moved forward with adding the benefit across all of its commercial plans. (Trial Ex. 758-0003.) UBH first expanded the TMS benefit to its fully-insured plans, and later added the benefit to the rest of its self-funded plans that had not asked

specifically for TMS coverage. (Trial Tr. 806:1-6 (Triana).)

221. Despite this evidence, Plaintiffs still contend UBH decided to "approve TMS only when someone else . . . would be on the hook for the expense." (ECF No. 392, at 70:5–7.) The evidence reveals *exactly the opposite*. With the exception of the handful of self-funded plans that initially asked for TMS, UBH expanded TMS to the plans where UBH "would be on the hook" *first*. UBH then expanded the benefit to the self-funded plans that had neither asked for nor anticipated the extra expense. (Trial Tr. 805:22-806:13 (Triana).)

222. Third, Plaintiffs point to three occasions over the course of the class period – in 2012, 2014, and 2016 – in which UBH considered switching to the ASAM criteria for level of care placement decisions related to the treatment of substance use disorders. (Trial Tr. 802:14-16 (Triana); Trial Ex. 430; Trial Ex. 524.)

223. As one part of that analysis, UBH tried to determine whether such a change would have an impact on benefit expense. (Trial Tr. 802:14-803:4 (Triana).)

224. UBH was unable to estimate the potential impact on benefit expense, which was among the reasons UBH decided not to adopt the ASAM criteria. (Trial Tr. 777:17 – 778:1 (Triana); Trial Ex. 548-0034.)

225. Dr. Triana explained that the *uncertainty* of whether such a "national level" change would impact benefit expense was itself problematic. (Trial Tr. 803:10-21 (Triana).) For self-funded employers, the uncertainty could result in unforeseen and unbudgeted costs that would come out of the pool of available funds for the employer to pay benefits (*Id.* at 803:22–804:1 (Triana)), while fully-insured customers could see their premiums increase. (*Id.* at 804:2-12 (Triana).)

226. Dr. Martorana explained that the main advantage to ASAM was the possibility that UBH and "out of network providers" (who are not as familiar with UBH's guidelines) would be able to "speak the same language" during a peer review. (Trial Tr. 958:24–959:9 (Martorana).)

227. No one at UBH recommended a switch on the ground that UBH's guidelines were inconsistent with ASAM or generally accepted standards of care. The doctors who supported a switch to ASAM, including addiction specialists like Drs. Alam and Triana, all thought that, like

ASAM, UBH's guidelines were consistent with generally accepted standards of care. Dr. Alam is board-certified in psychiatry and addiction medicine and directs two substance abuse treatment facilities. (Trial Tr. 959:10-25 (Martorana); Trial Tr. 1568:18-1569:9, 1570:18-25, 1576:6-9 (Alam); Trial Tr. 1725:23-1726:1 (Triana); *see also* Ex. 1657 at 186:21–187:5 (Robinson-Beale) (Ms. Robinson-Beal understood that UBH's Guidelines were consistent with ASAM).)

228. This conclusion was supported by the limited financial analysis UBH did have, which "did not identify a significant benex risk" (Trial Ex. 548-0003), as well as the clinical prediction by UBH's substance use experts that, at minimum, a switch to ASAM would have "no impact" on utilization and might even *reduce* benefit expense. (Trial Tr. 1660:19–1661:3 (Alam).)

229. The three instances raised by Plaintiffs are the only instances relating to benefit expenses and financial issues Plaintiffs could identify over years of discovery covering a six-year class period.

230. None of the evidence proffered by Plaintiffs relating to benefit expenses and financial issues supports a finding that they influenced the content of the LOCGs and CDGs challenged in this case.

231. Plaintiffs offered no evidence that in the over six-year class period, benefit expense ever came up in connection with the LOCGs or the CDGs *at issue in this case*.

232. Plaintiffs failed to satisfy their burden to prove that UBH's process for creating and updating the guidelines at issue in this case were influenced by financial motives.

**D. UBH's Clinicians Use Clinical Judgment In Applying the Guidelines, Without Any Consideration Of The Financial Impact Of Their Coverage Decisions.**

233. UBH's Utilization Management Committee creates a document called the Utilization Management Program Description ("UMPD") that fully sets forth the process by which UBH evaluates claims for healthcare benefit coverage, consistent with NCQA's and URAC's accreditation requirements. (Trial Tr. 941:3-11 (Martorana), Trial Tr. 712:25-713:6 (Triana).)

234. Clinical judgment has "the biggest role" in making coverage determination

decisions, and the "the guidelines augment . . . clinical judgment." (Trial Tr. 795:12-23 (Triana), 1580:24-25 (Alam); *see also* Trial Tr. 731:18-732:1 (Triana).)

235. Financial considerations play no role in coverage determinations. UBH distributes an Affirmative Statement Regarding Financial Incentives to all clinical staff informing them that they will not be financially rewarded for denying coverage or making coverage decisions that result in underutilization. (Trial Tr. 950:7–951:1 (Martorana).)

236. UBH does not set targets for the number of or percentage of denied benefit requests, and UBH's Peer Reviewers are neither compensated nor evaluated based on the number of requests they deny or authorize. (Trial Tr. 951:2–12 (Martorana).)

237. UBH has established a multi-level review process that ensures that only a medical doctor or Ph.D.-level psychologist can *deny* benefits based on the guidelines, and only after seeking direct input from the member's treating provider.

238. The first level of review is performed by "Care Advocates," clinicians with a master's degree or higher relating to behavioral health. (Trial Tr. 942:5-8 (Martorana).)

239. When a member requests coverage for treatment, a Care Advocate gathers clinical information from the provider (including the information listed in the LOCGs' Clinical Best Practices section, as discussed below), and assesses that information against the terms of the member's benefit plan and the appropriate LOCG or CDG (depending on the plan) to determine whether coverage should be authorized. (Trial Tr. 942:12-16 (Martorana).)

240. UBH doctors are available in regularly scheduled "rounds" to assist the Care Advocates in assessing a case and authorizing coverage. (Trial Tr. 943:21-944:6 (Martorana).)

241. Using the guidelines, UBH Care Advocates ***authorize coverage in 90 percent or more of cases***. (Trial Tr. 942:24-943:1 and 943:6-7 (Martorana).)

242. A Care Advocate cannot deny coverage. If the Care Advocate believes the services are not covered, the case is referred to a UBH physician, or Peer Reviewer, for a peer-to-peer review with the provider. (Trial Tr. 942:16-943:10-11 (Martorana).)

243. Before the provider interaction, the UBH Peer Reviewer will review all the clinical information that the Care Advocate collected, as well as any prior medical history if available.

(Trial Tr. 945:1-8 (Martorana).)

244. The peer-to-peer review is a dynamic conversation between the UBH Peer Reviewer and the member's provider.

245. Among other things, the peer-to-peer review allows the treating physician to provide new information that would support coverage. (Trial Tr. 945:22-946:21 (Martorana).)

246. Frequently, the Peer Reviewer authorizes coverage based on that conversation. (Trial Tr. 946:18-21, 947:11-21 (Martorana).) If the Peer Reviewer determines coverage is not provided under the members' plan and the guidelines, the Peer Reviewer will inform the provider, and in almost every case, offer coverage for an alternative level of care that the Peer Reviewer concludes is a better match for the member's current needs and is provided under the member's plan and guidelines. (Trial Tr. 947:22-948:18 (Martorana); Trial Tr. 1379:13-21 (Allchin).)

247. If the provider or member rejects the alternative level of care, UBH sends a written non-coverage determination letter to both the provider and the member notifying them of the decision and the member's appeal rights under the plan. (Trial Tr. 948:3-6 (Martorana).) The alternative level of care offered remains available to the member, as long as it is medically necessary. (Trial Tr. 948:17-19 (Martorana).)

248. In making coverage determinations, UBH clinicians not only can—but must—use their clinical judgment and then apply that judgment to the facts and the UBH guidelines. (Trial Tr. 949:17-19 (Martorana).)

249. On their face, the guidelines are clear that they are not to be followed blindly, but used as a tool to "augment – but not replace – sound clinical judgment," taking into account the unique circumstances and needs of the member:

> The Level of Care Guidelines are used flexibly, and are intended to augment – but not replace – sound clinical judgment. Use is informed by the unique aspects of the case, the member's benefit plan, services the provider can offer to meet the member's immediate needs and preferences, alternatives that exist in the service system to meet those needs, and member's broader recovery, resiliency, and well-being goals.

(Trial Tr. 964:12-19 (Martorana) (discussing 2017 LOCGs' Use and Limitations section, Trial Ex. 8-0004); *see also* Trial Exs. 1-0004; 2-0004; 3-0005; 4-0006; 5-0007; 6-0007; 7-0007.)

250. Each Peer Reviewer exercises her or his individual judgment just as she or he would in her or his own practice, with the goal of understanding the member in their totality. (Trial Tr. 965:7-9 (Martorana).)

251. A Peer Reviewer's clinical judgment can lead the Peer Reviewer to grant coverage even where the guidelines do not provide for coverage. (Trial Tr. 949:20-22 (Martorana).)

252. The guidelines expressly provide this power to UBH physicians:

> Exceptions may be made to the Level of Care Guidelines such as when there is a superceding [sic] contractual requirement or regulation or when a medical director authorizes a case-specific exception from using evidence-based treatment when the member's condition has not responded to treatment as anticipated.

(Trial Ex. 8-0004 (2017 LOCGs' Use and Limitation section); *see also* Trial Exs. 1-0004, 2-0005, 3-0005, 4-0006, 5-0007, 6-0007, 7-0007; *see also* Trial Tr. 965:23-966:8 (Martorana).)

253. This is not a theoretical power. Peer Reviewers not only can but do depart from the guidelines and authorize coverage when their clinical judgment suggests it is warranted. (*See, e.g.*, Trial Tr. 1404:25-1405:2 (Allchin); *see also* Trial Tr. 966:6-7 and 949:23-25 (Martorana.)

254. Dr. Martorana clarified that while Peer Reviewers can depart from the guidelines to allow coverage, they cannot depart from the guidelines to deny coverage. (Trial Tr. 950:1-3 (Martorana).)

255. The LOCGs are written by clinicians, for clinicians who are instructed to use the guidelines through the lens of their clinical judgment. UBH regularly checked to ensure that its reviewers consistently understood the guidelines by measuring "inter-rater reliability" and found that UBH's clinicians consistently interpret the LOCGs in the same way as Drs. Martorana, Allchin, and Alam explained. (Trial Tr. 735:10–736:13 (Triana) ("Q: . . . And would you agree that the results of the IRR process indicate that UBH's clinicians are and have been applying the LOCGs consistently? A: Yes.") As a result of this consistent interpretation, UBH authorizes more than 90 percent of all requests for benefits without even requiring a peer review. (Trial Tr.

943:6–7 (Martorana).)

256. This process of making coverage decisions is insulated from consideration of UBH's own financial interests. (*See* Trial Tr. 950:4-951:12 (Martorana).)

257. UBH's **UMPD** sets forth some of the policies UBH has in place to ensure that there is no improper influence from financial considerations:

> [UBH] distributes an affirmative statement to its clinical personnel, its members, and practitioners and facilities in the [UBH] clinical network regarding its incentives to encourage appropriate utilization, and to discourage under-utilization. The statement consists of the following components.
>
> • Utilization Management decision-making is based only on appropriateness of care and service, and the existence of benefit coverage.
>
> • [UBH] does not specifically reward practitioners or other individuals for issuing noncoverage decisions.
>
> • Financial incentives for Utilization Management decision-makers do not encourage decisions that result in under-utilization.

(Trial Ex. 1186-0039 (2016 UMPD); *see also* Trial Exs 256-0048 (2011 UMPD), 257-0049 (2012 UMPD), 258-0044 (2013 UMPD), 259-0045 (2014 UMPD), 260-0038 (2015 UMPD), 262-0076 (2017 UMPD).)

258. Further, UBH's function in administering a plan was not affected by whether a member's plan is fully-insured or self-insured—in either case, UBH examined the relevant defined benefits and focused on adjudicating those benefits regardless whether UBH would be responsible to pay for the benefit expenses or whether those expenses would be borne by its customers. (Trial Tr. 840:14-18 (Dehlin).)

259. Whether and what extra costs UBH or its affiliates might bear as a result of a coverage decision did not come into play when UBH administered benefits. (Trial Tr. 840:19-841:6 (Dehlin).)

## V. The Guidelines Are Consistent With Generally Accepted Standards of Care.

### A. There Is No Single Set of Generally Accepted Standards Of Care.

260. The parties agree that "generally accepted standards of care" reflect national consensus within the behavioral health community as to what constitutes appropriate treatment. (*See* ECF No. 392 at 12:10-11; Trial Tr. 957:22-958:9 (Martorana).)

261. The parties also agree that there is no single set of criteria that defines generally accepted standards of care. (*See* ECF No. 392 at 12:13-14; Trial Tr. 71:11-20 (Fishman); Trial Tr. 958:3-9 (Martorana).)

262. There can be more than one source of generally accepted standards of care—some examples include peer-reviewed studies in peer-reviewed journals, consensus guidelines from professional organizations, and guidelines and materials distributed by the federal and state government. (Trial Tr. 958:3-9 (Martorana); *see also* Trial Tr. 420:12-14 (Niewenhous) (noting that authors of local coverage determination documents do not always agree on what the generally accepted standard of care is).)

263. At trial, Plaintiffs' and UBH's experts identified more than a dozen resources that contribute to the formation of or articulation of generally accepted standards of care. (Trial Tr. 1152:6-12 (Simpatico), 1375:21-1376:1 (Allchin), 1377:24-1378:4 (Allchin), 1378:17-19 (Allchin), 1575:25-1576:2 (Alam).)

264. The experts in this case identified all of the following as sources or articulations of generally accepted standards of care:

- the American Academy of Child and Adolescent Psychiatry("**AACAP**");
- The American Psychiatric Association's ("**APA**") Clinical Practice Guidelines;
- The American Society of Addiction Medicine Criteria ("**ASAM**");
- the Commission on Accreditation and Rehabilitation Facilities ("**CARF**");
- the Center for Medicaid and Medicare Services ("**CMS**");
- the Center for Substance Abuse Treatment ("**CSAT**"), a SAMHSA subagency;
- The American Association of Community Psychiatrist's ("**AACP**") Level of Care Utilization System ("**LOCUS**");

- The AACAP's Child Adolescent Services Intensity Instrument ("**CASII**");
- LOCADTR;
- the Substance Abuse Mental Health Services Administration ("**SAMHSA**");
- Texas Department of Insurance (**TDI**) guidelines;
- The World Health Organization ("**WHO**"); and
- Peer-reviewed articles.

(Trial Tr. 1375:21-1376:1, (Allchin); Trial Tr. 1575:25-1576:2 (Alam); Trial Tr. 1152:6-12 (Simpatico); Trial Tr. 1377:24-1378:4 (Allchin); Trial Tr. 1378:17-19 (Allchin).)

265. These sources are complementary and often refer to each other. Trial Tr. 1152:12-16 (Simpatico).

266. All of these sources, but no one source alone, inform the generally accepted standard of care. (Trial Tr. 1152:6-16 (Simpatico).)

**B. The Guidelines Require A Comprehensive Assessment Of The Member's Entire Presentation.**

267. The UBH guidelines call for a multi-dimensional assessment of a member's condition and treatment needs, consistent with generally accepted standards of care.

268. Under generally accepted standards of care, multiple medical, behavioral, psychosocial and environmental factors should be considered when evaluating the appropriate level of care for a patient's behavioral health treatment. (*See, e.g.,* Trial Exs. 641-0010 to– -13; 662-0064; 653-0008 to -18).

269. For example, the American Psychiatric Association Practice Guidelines for the Psychiatric Evaluation of Adults lists nine categories of information that should be reviewed and/or documented when assessing a patient: history of present illness, which is defined as the "[r]eason the patient is presenting for evaluation;" psychiatric history; substance use history; medical history; review of systems; family history; personal and social history; examination, including mental status examination; and impression and plan, and they do not call for the assignment of numerical values to the various assessment categories. (Trial Ex. 641-0010 to -13.)

270. In contrast, the LOCUS guidelines, which were advocated by Dr. Plakun, adopt a

more quantitative approach. Specifically, LOCUS calls for evaluation of six parameters: risk of harm; functional status; medical, addictive, and psychiatric co-morbidity; recovery environment; treatment and recovery history; and engagement and recovery status, and they do require the clinician to assign a numerical value to each dimension and to apply these values to an algorithm. (Trial Ex. 653-0004, -0008 to -18.).

271. As LOCUS explains:

> Each evaluation parameter is defined along a scale of one to five. Each score in the scale is defined by one or more criteria, which are designated by separate letters. Only one of these criteria need be met for a score to be assigned to the subject. The evaluator should select the highest score or rating in which at least one of the criteria is met.

(Trial Ex. 653-0007.)

272. Dr. Simpatico, a currently practicing board-certified psychiatrist with over 30 years of experience, was the only witness at trial who had experience applying the LOCUS guidelines. In his experience, the framework of the LOCUS guidelines makes them "largely aspirational" and "overly simplistic and misleading." He did not know a single clinician that employed numerical systems like the one set forth by LOCUS to make treatment decisions. (Trial Tr. 1142:1-19, 1340:1–6, 16–17 (Simpatico).)

273. Dr. Simpatico also testified that the Vermont Department of Mental Health abandoned an attempt to use LOCUS's numerical algorithm because the "placement decisions didn't work . . . ." (*See* Trial Tr. 1340:19–1341:10 (Simpatico).)

274. Dr. Plakun does not use the LOCUS guidelines for assessing the appropriate level of care for his patients, and he limits his use of these guidelines to providing a basis for appeals he submits to insurance companies for patients at his long-term mental health residential facility in Stockbridge, Massachusetts. (Trial Tr. 470:2–3, 503:11–20, 504:15–17 (Plakun).)

275. The ASAM criteria resemble the LOCUS in structure, calling for assessment of six dimensions, and assigning a score in each dimension to determine the appropriate level of care. (Trial Ex. 662-0064; Trial Tr. 1338:24–1339:12 (Simpatico).)

276. Whereas the LOCUS can be used to address both "mental health and addictions," (Trial Ex. 653-0004), the ASAM criteria is tailored to substance use disorders. The six dimensions of the ASAM criteria are not identical to the dimensions in LOCUS. (Trial Ex. 662-0064.)

277. The six dimensions of the ASAM criteria are: acute intoxication and/or withdrawal potential; biomedical conditions and complications; emotional, behavioral, or cognitive conditions and complications; readiness to change; relapse, continued use, or continued problem potential; and recovery/living environment. (Trial Ex. 662-0064)

278. UBH's LOCGs likewise call for a thorough, individualized and holistic consideration of members and their healthcare needs in making coverage decisions. (*See, e.g.*, Trial Tr. 964:12-965:9 (Martorana) ("Well, we think it's important as we—as is present in our Best Practices Guidelines, to have a complete and thorough understanding of the totality of a member who's presenting themselves for treatment.").)

279. The LOCGs list a multitude of factors to be used in determining the appropriate level of care based on individualized information obtained from the treating provider.

280. For example, the Common Criteria of the 2011 LOCGs required UBH clinicians, before making a coverage determination, to obtain the following information from the treating provider: the member's chief complaint; a description of the member's condition; the precipitant for treatment; the member's current and past medical and psychiatric histories, including the history of substance use; the member's family, vocational/educational and social histories; findings of the mental status examination; and findings of the physical examination when appropriate. (Trial Ex. 1-0005.)

281. The 2011 Common Criteria also instruct that when the UBH clinician is assessing the treatment plan to determine whether the treatment is medically necessary and covered under the health benefit plan, they should consider: the member's age and level of development; the member's preferences, strengths, broader recovery goals and readiness for change; risks including barriers to care; past response to treatment; the member's understanding of his/her condition, its treatment and self-care; the role that the member's family/social supports should play in treatment

with the member's permission; interventions needed to address co-occurring behavioral health or medical conditions; interventions that will promote the member's participation in care, promote informed decision making, and support the member's broader recovery goals; and involvement of the member's family/social supports in treatment and discharge planning. (Trial Ex. 1-0006.)

282. In subsequent years, the list of mental, behavioral, psychosocial and environmental factors to be considered by the UBH clinician when making individualized coverage decisions grew. (Trial Exs. 2-0006, -0007 to -08; 3-0007, -0008 to -09; 4-0007 to -12; 5-0010 to -12; 6-0011 to -13; 7-0011 to -13; 8-0007 to -08.)

283. For example, the Clinical Best Practices section of the Common Criteria in the 2016 LOCGs call for UBH clinicians to consider the following individualized factors for each coverage decision: the member's chief complaint; the history of the presenting illness; the "why now" factors leading to the request for service; the member's mental status; the members current level of functioning; urgent needs including those related to the risk of harm to self, others, or property; the member's use of alcohol, tobacco, or drugs; co-occurring behavioral health and physical conditions; the history of behavioral health services; the history of trauma; the member's medical history and current physical health status; the member's developmental history; pertinent current and historical life information including the member's age, gender, sexual orientation, culture, spiritual beliefs, educational history, employment history, living situation, legal involvement, family history, relationships with family and other natural resources; the member's strengths, barriers to care; the member's instructions for treatment, or appointment of a representative to make decisions about treatment; and the member's broader recovery, resiliency and wellbeing goals. (Trial Exs. 6-0011 to -12, 7-0011 to -12.)

284. The 2016 Best Practices in the Common Criteria also provide for consideration of the treatment plan, which addresses multiple factors including the short and long-term goals of treatment, how the member's family and other natural resources will participate in treatment when clinically indicated, and interventions that will enhance the member's recovery, resiliency and wellbeing. (Trial Ex. 6-0012.)

285. Plaintiffs' expert, Dr. Fishman, agrees that factors set forth in the Clinical Best

Practices are "a good list of material to be included in a data set" about a patient that is consistent with generally accepted standards of care. (Trial Tr. 185:2-14 (Fishman).)

286. As Dr. Martorana explained at trial, the LOCGs call for UBH's reviewers to use the information collected through the Clinical Best Practices sections in determining an appropriate level of care. (Trial Tr. 981:6–10 (Martorana) (discussing the 2017 LOCG); *see also* Trial Tr. 997:11-21 (Martorana) (same).)

287. Dr. Fishman's reading of the LOCGs is consistent with this testimony that the LOCGs call for the use of the information collected through the Clinical Best Practices sections in determining an appropriate level of care. (Trial Tr. 185:9-14, 186:10-14, 191:3-5, 210:11-211:7 (Fishman).)

288. UBH's doctors use that information "to understand the member in their totality . . . as [they] make [their] clinical judgments." (Trial Tr. 965:7–8 (Martorana).)

289. As a member progresses through treatment, the LOCGs allow for the consideration of conditions that are new and different from the member's original presentation. For example, during trial, Dr. Martorana provided the real example of a member who required reassessment when prescribed antidepressants unexpectedly triggered a manic episode. (Trial Tr. 992:6–16 (Martorana).) Under the LOCGs, such events trigger a reevaluation of the member's placement in a particular level of care. (Trial. Tr. 992:4–6 (Martorana).)

290. UBH's individualized and holistic approach to assessing the appropriate level of care for a member is the same approach UBH doctors would take with patients they were treating in their own private practice. (Trial Tr. 965:8-9 (Martorana).)

291. The Common Criteria reflect broader "principles" that "cut across all different levels of care." (Trial Tr. 966:19-25 (Martorana).) Most of those principles are undisputed, like the notions that treatment must be effective, must keep the member safe, and must be consistent with generally accepted standards of care. (Trial Ex. 1-0005 to -07; Trial Ex. 2-0006 to -08; Trial Ex. 3-0007 to -11; Trial Ex. 4-0007 to -12; Trial Ex. 5-0008 to -09; Trial Ex. 6-0009 to -10; Trial Ex. 7-0009 to -10; Trial Ex. 8-0006 to -07.)

292. The structure employed by the LOCGs is consistent with generally accepted

standards of care, and is used in both the CMS guidelines and the Texas TDI guidelines.

293. Like the LOCGs, CMS' guidelines for outpatient hospital psychiatric services (Medicare Benefit Policy Manual § 70.1) begin by articulating several "Coverage Criteria," which all "services must meet" for coverage. (Trial Ex. 656-0025 to -27.) Like the LOCGs, these mandatory coverage criteria include requirements of "Physician Supervision and Evaluation" and a "Reasonable Expectation of Improvement." (Trial Ex. 656-0026 to -27.) These mandatory criteria also provide that "[s]ervices are noncovered" if "stability can be maintained without further treatment or with less intensive treatment." (*Id.*) CMS's Medicare Benefit Policy Manual employs a similar structure for partial hospitalization services. (Trial Ex. 656-0031.)

294. Partial hospitalization is an ambulatory or outpatient treatment setting that falls between intensive outpatient treatment and residential treatment on the level of care continuum. (Trial Tr. 449:19–450:21 (Plakun) (partial hospitalization "is less intensive than residential"); *see also* Trial Tr. 90:16 – 91:9 (Fishman) (explaining that partial hospitalization is ASAM Level 2.5); Trial Tr. 934:24–935:24 (Martorana) (describing levels of care).)

295. Texas' TDI guidelines employ a similar structure, detailing a host of mandatory admission criteria, followed by separate continued service criteria and discharge criteria for each level of care. (Trial Ex. 661-00011 to -28.)

**C. The Guidelines Seek To Match Patients At The Least Restrictive Level Of Care That Is Both Safe And Effective To Treat The Member.**

296. The LOCGs provide coverage for members in the least restrictive level of care that is safe and effective for that member's individual needs, which is consistent with generally accepted standards of care.

297. The concept of "[t]he least restrictive level of care is a time honored and important aspect of the provision of treatment."). (Trial Tr. 511:5–6 (Plakun).)

298. Dr. Plakun expressed his opinion that "least restrictive" should refer to minimizing restrictions on the patient's ability to exercise "choice about the nature of the treatment," rather than restrictions on the patient's autonomy and civil rights, but this testimony was inconsistent with the ASAM criteria, APA guidelines and CMS. (Trial Exs. 634-0022 (APA Practice

Guidelines for the Treatment of Patients with Substance Use Disorders); 639-0016 (APA Practice Guideline for the Treatment of Patients with Major Depressive Disorder); 662-0374 (ASAM criteria); 1507-0017 (CMS' Local Coverage Determination for a Psychiatric Partial Hospitalization Program); Trial Tr. 511:16-18.)

299. Both Plaintiffs' and UBH's experts agree: patients should be placed into the least restrictive level of care that is appropriate for their treatment. (Trial Tr. 968:18-24 (Martorana); Trial Tr. 1392:19-24 (Allchin); Trial Tr. 511:5–8 (Plakun); Trial Tr. 161:24-162:4 (Fishman) (acknowledging that the "least restrictive" treatment setting principle is a "generally standard approach" and "an important principle").)

300. Under generally accepted standards of care: "If there are certain signs or symptoms or criteria that are disproportionately influential in the selection of a particular level of care, such that they determine, as a practical matter, the most restrictive level of care because of the intensity of those symptoms, the goal would be to ameliorate those symptoms to the point where it was no longer necessary to stay at that level of care and ideally to move to a less restrictive level of care." (Trial Tr. 1229:11-19 (Simpatico).)

301. This is an important, foundational, well-established principle that cuts across all manner of treatment and all levels of care. (Trial Tr. 968:18-24 (Martorana).)

302. The notion that patients should be treated in the least restrictive setting that is safe and effective is reflected throughout the sources Plaintiffs cite as evidence of the generally accepted standards in the behavioral health community.

303. For example, the APA's Practice Guideline for the Treatment of Patients with Substance Use Disorders, 2nd edition, which applies to all levels of care, provides that "[i]ndividuals should be treated in the least restrictive setting that is likely to prove safe and effective." (Trial Ex. 634-0022; Trial Tr. 969:6-970:8 (Martorana).)

304. Similarly, the APA's Practice Guideline for the Treatment of Patients with Major Depressive Disorder, 3rd Edition, provides that "[t]he psychiatrist should determine the least restrictive setting for treatment that will be most likely not only to address the patient's safety, but also to promote improvement in the patient's condition." (Trial Ex. 639-0016; Trial Tr. 970:18-

971:20 (Martorana).)

305. Many other APA guidelines include similar language, including the guidelines for obsessive compulsive disorder and bipolar disorder. (Trial Tr. 971:21-23 (Martorana).)

306. ASAM also specifically provides: “Referral to the ‘least intensive level of care that is effective’ or to the ‘least restrictive environment for care’ is generally the norm for members of the general public.” (*See* Trial Ex. 662-0374) (ASAM criteria).).

307. The Centers for Medicare & Medicaid Services’ Local Coverage Determination for a psychiatric partial hospitalization program has admissions criteria that refer to the principle as well: “In general, patients should be treated in the least intensive and restrictive setting which meets the needs of their illness.” (Trial Ex. 1507-0017; *see* Trial Tr. 1016:12-1017:2 (Martorana) (discussing same provision).)

308. The concept of providing the least restrictive appropriate level of care takes on increased significance with children and adolescents, because of the importance of school and family structure. (Trial Tr. 1392:25-1393:9 (Allchin).)

309. For example, children removed from a family setting to a very restrictive level of care may view the switch as rejection by the parents. (Trial Tr. 1393:10-18 (Allchin).)

310. The AACAP’s Principles of Care for Treatment of Children and Adolescents with Mental Illnesses in Residential Treatment Centers provides that:

> The best place for children and adolescents is at home with their families. A child or adolescent with mental illness should be treated in the safest and least restrictive environment and needed services should be “wrapped-around” to provide more intensive home or community-based services.

(Trial Ex. 693-0002; *see* Trial Tr. 1426:22-1428:8 (Allchin); *see also* Trial Ex. 693-0005 (“The primary treatment goal is to return the child or adolescent to the community in order to resume the family, social, and educational functions that contribute to normal development.”).)

311. Plaintiffs’ experts agree that under generally accepted standards of care, “[p]eople generally are moving downward through the continuum of care as their

treatment progresses." (Trial Tr. 471:18-19 (Plakun); Trial Tr. 115:1-2 (Fishman) (patients should be safely transitioned between levels of care as provided in discharge criterion in 2015 LOCGs); Trial Ex. 5-0009 (2015 LOCGs).)

312. In fact, Dr. Fishman testified that he had no objection to a provision in the 2013 Common Criteria requiring that the "member's current condition cannot be effectively and safely treated in a lower level of care even when [the] treatment plan is modified." (Trial Tr. 232:12-20 (Fishman) (discussing criteria at Trial Ex. 3-0006).)

313. UBH's LOCGs appropriately promote coverage for treatment that is at the least restrictive level of care that is safe and effective based on an individualized assessment of the member with transitions between levels of care when appropriate based on changing needs. (Trial Exs. 1-0005, 2-0006, 3-0008, 4-0007, 5-0008, 6-0009, 7-0009, 8-0007.)

314. The Common Admission Criteria in the 2011, 2012, and 2013 LOCGs provided in relevant part: "The member's current condition cannot be effectively and safely treated in a lower level of care even when the treatment plan is modified, attempts to enhance the member's motivation have been made, or referrals to community resources or peer supports have been made." (Trial Exs. 1-0005 (2011), 2-0006 (2012), 3-0008 (2013).)

315. The 2014, 2015, 2016, and 2017 LOCGs included similar language. (*See* Trial Exs. 4-0007 (2014), 5-0008 (2015), 6-0009 (Jan. 2016), 7-0009 (June 2016), 8-0007 (2017).) For example, the 2017 LOCGs' Common Admission Criteria provides that "The member's current condition cannot be safely, efficiently, and effectively assessed and/or treated in a less intensive level of care." (Trial Ex. 8-0007 (2017).)

316. The principle of placing patients in the least restrictive, effective level of care is further reinforced any time a member switches to a different level of care, as she or he must then be again analyzed under these Common Admission Criteria. Trial Tr. 992:21-993:3 (Martorana).

317. Beginning in 2014, the LOCGs also reflected this principle in the LOCGs' introductory "Guiding Principles" section, providing that, among other things, the LOCGs are "used to promote access to the most appropriate and available and least restrictive level of care."

(Trial Ex. 4-0003.) This reaffirmation continued through the 2015, 2016, and 2017 LOCGs. (Trial Exs. 5-0005 (2015), 6-0005 (Jan. 2016), 7-0005 (June 2016), 8-0003 (2017).)

318. Since 2011, the principle of placing patients in the least restrictive, effective level of care has also been included in the LOCGs' Common Continued Service Criteria. The Continued Service Criteria mandate that the Common Admissions Criteria for a member's current level of care—including the above-mentioned least-restrictive-level-of-care requirement—continue to be met. (*See* Trial Exs. 1-0078 (2011), 2-0082 (2012), 3-0089 (2013), 4-0007 (2014), 5-0009 (2015), 6-0010 (Jan. 2016), 7-0010 (June 2016), 8-0007 (2017).) This requires at the time of admission, continued service review, and discharge an evaluation of whether the member can be safely, efficiently and effectively treated in the proposed level of care, or in the case of a discharge decision, at a lower level of care.

319. UBH's clinicians (including Peer Reviewers and Care Advocates) apply the principle of least restrictive level of care set forth in the LOCGS whenever they admit a member to a new level care, by "think[ing] through the process [and] understanding everything they know about the patient and [] the treatment plan they're proposing[.] [T]he question is . . . can this safely, effectively, and efficiently occur in a less restrictive level of care[?]" (Trial Tr. 968:5-11 (Martorana).)

320. Ultimately, effective treatment is an individualized determination of what treatment is appropriate for each member. (Trial Tr. 979:25–980:2 (Martorana); *see also* Trial Tr. 983:12-15, 991:5-8, 992:17-21 (Martorana) (discussing individualized nature of care).)

321. The evidence does not demonstrate that the LOCGs push members to a lower level of care where the lower level of care is less effective or unsafe.

322. The evidence does not demonstrate that the LOCGs provide that UBH's clinicians err toward the less expensive level of care, where the services cannot be safely, efficiently and effectively provided in the less intensive level of care.

323. The LOCGs are clear on their face that treatment is covered where the member can be safely, efficiently, and effectively assessed and/or treated at the proposed level of care and the member cannot be safely, efficiently and effectively treated at a lower level of care. (Trial Exs 6-

0009, 7-0009, 8-0007; Trial Tr. 967:12-968:24 (Martorana) (discussing these provisions and the importance of the least restrictive principle); *see also* Trial Tr. 1072:8-21, 1072:22-1073:5 (Martorana).)

324. The LOCGs do not provide that coverage ends as soon as it is safe to transition the member to a lower level of care, without regard to whether treatment at that level of care would be effective. (Trial Exs. 1-0005, 2-0006, 3-0008, 4-0007, 5-0008, 6-0009, 7-0009, 8-0007.)

325. This is reflected in the Admission Criteria, Continued Service Criteria and Discharge Criteria. For example, the 2011 Continued Service Criteria require that the "member continues to meet the criteria for the current level of care." (Trial Ex. 1-0078.) This requires that every review, at all levels of care and at all points in the course of treatment, include an evaluation of whether the member can be safely, efficiently and effectively treated in the proposed level of care, or in the case of a discharge decision, at a lower level of care. (*See* Trial Exs. 1-0005, 2-0006, 3-0008, 4-0007, 5-0008, 6-0009, 7-0009, 8-0007*; see also* Trial Tr. 992:17–993:2 (Martorana) (explaining that guidelines contain a "feedback loop" which requires reassessment of whether the member can be safely, effectively and efficiently treated in the proposed level of care each time there is a proposed transition in the level of care, including discharge).)

326. Plaintiffs introduced no evidence at trial proving general acceptance of their position that treatment should be provided in the "*most* effective" level of care without consideration of restrictiveness, intensity, efficiency or safety. The generally accepted sources quoted above reject that notion in favor of the least restrictive level of care that is safe and effective.

**D. The Guidelines Account For Both Acute And Chronic Conditions Consistent With Generally Accepted Standards of Care.**

327. The evidence at trial demonstrated that the LOCGs provide for UBH's clinicians to consider and evaluate both the acute and chronic symptoms and conditions of a member in assessing level of care consistent with generally accepted standards of care.

**1. Both Acute And Chronic Conditions and Symptoms Should Be Assessed and Considered in Determining the Appropriate Level of Care.**

328. Under generally accepted standards of care, clinicians should assess and consider acute conditions and symptoms when determining the appropriate level of care for a patient. (Trial Tr. 80:2-24 (Fishman); Trial Tr. 1010:11-1011:1 (Martorana).)

329. In the medical profession, the words "acuity" and "acute" refer to either severity of a patient's symptoms or temporal issue of how recently a particular symptom (of any severity) has manifested. (Trial Tr. 80:2-24 (Fishman (discussing use of "acute" in the ASAM Criteria (Trial Ex. 662)); Trial Tr. 1309:1-16 (Simpatico).)

330. This "severity" concept of acuity is reflected in Dimension One of the ASAM criteria, which asks whether the patient is suffering from "acute intoxication." Dr. Fishman explained that "acute" in that context refers to the severity of the patients' active intoxication and the likelihood of severe withdrawal symptoms, which, "although unusual, in some cases would be life threatening." (Trial Tr. 80:2–24 (Fishman).)

331. This concept of acuity is also reflected in terms like "acute inpatient" care, which is the highest and most intensive level of care, and is oriented toward the "most medically dangerous, most intensive needs." (Trial Tr. 85:22–86:12 (Fishman).)

332. In other instances, the term "acute" refers not to the severity of the patient's condition, but to the temporal question of *how recently* a particular symptom manifested or changed. (Trial Tr. 1010:11 – 1011:1 (Martorana) (describing CMS guideline discussing conditions that are both "severe" and "acute in nature"); Trial Tr. 1012:12 – 1013:1 (same); Trial Tr. 1309:1 – 16 (Simpatico) ("'acute' in this context refers to a departure from a baseline in a timely manner that represent an actionable departure from a clinical baseline"); *see also* Ex. 1657 at 134:5-16 (Robinson-Beale) (concept of acuity in the LOCGs can refer to "changes in symptoms, intensity of symptoms, or the appearance of new symptoms"); *see also* CMS Medicare Benefit Policy Manual for Partial Hospitalization (Trial Ex. 656-0029–33); Trial Tr. 1010:8-1012:25 (Martorana) (emphasis added) (the purpose of the intermediate PHP level of care is to treat the patient's "serious presenting psychiatric symptoms" and is characterized by patients with

"an acute onset or decompensation of a covered . . . mental health disorder . . . .").)

333. Both parties' experts agree that under generally accepted standards of care, both the severity and the temporal aspects of acuity are relevant to level of care placement decisions.

334. With respect to severity, for example, Dr. Fishman testified that primacy of patient safety is the reason the ASAM criteria includes "acute intoxication" as the first dimension of patient assessment. (Trial Tr. 80:10–24 (Fishman).)

335. The notion that "the patient's safety is the paramount thing" is reflected throughout the LOCGs. (Trial Tr. 1387:24–1388:25 (Allchin).)

336. The experts also agreed that under generally accepted standards of care, the *temporal* aspect of "acute symptoms" – that is, what has changed in the member's condition – "should and must be considered" in making appropriate patient placement decisions. (Trial Tr. 164:17–165:25 (Fishman) (testifying that such an assessment is "so important" and "a vital clinical concern"); *see also* Trial Tr. 491:15–19 (Plakun); Trial Tr. 1044:19–25 (Martorana); Trial Tr. 1401:1–19 (Allchin).)

337. Dr. Simpatico explained that this temporal aspect of acuity is so important because "generally speaking, someone will come to the attention of a behavioral healthcare provider either because there's been a departure from a baseline -- that is a change in their actual presentation -- or their circumstances may have changed." (Trial Tr. 1210:2–24 (Simpatico).; *see also* Trial Tr. 1058:18-25 (Martorana); Trial Tr. 1303:12-15 (Simpatico) (describing acute changes as "a departure from baseline . . . such that it likely is the basis for which someone comes to the attention for seeking care or changing ongoing care.").)

338. Dr. Fishman agreed that "patients usually seek treatment because of something new." (Trial Tr. 192:17-21 (Fishman).)

339. Like severity, assessing the temporal notion of acuity is especially important for higher levels of care. Since residential treatment is a high-intensity 24-hour level of care, there is a significant need to understand and address any new change that puts a member in this type of setting. As illustration, Dr. Martorana explained that if one reason a child is suddenly presenting for treatment is due to an abusive living situation, understanding that fact will indicate that an

outpatient treatment setting is "not going to be a good place for them to . . . conduct treatment, so you put them in a residential setting," instead. (Trial Tr. 1006:15-1007:2 (Martorana).)

340. The CMS Medicare Benefit Policy Manual for the partial hospitalization (PHP) repeatedly references acuity in its discussion of the eligibility of a patient for levels of care:

> The patients also require a comprehensive, structured, multimodal treatment requiring medical supervision and coordination, provided under an individualized plan of care, because of a mental disorder which severely interferes with multiple areas of daily life, including social, vocational, and/or educational functioning. Such dysfunction generally is of an acute nature.
>
> . . .
>
> Where partial hospitalization is used to shorten an inpatient stay and transition the patient to a less intense level of care, there must be evidence of the need for the acute, intense, structured combination of services provided by a PHP.

(Trial Ex. 656-0030; Trial Tr. 1012:12-1013:1 (Martorana) (further discussing acuity in the Medicare Benefit Policy Manual).)

341. Partial hospitalization is an *outpatient* level of care where the patient lives at home and visits the provider on an outpatient basis for 20 or more hours per week. (Trial Tr. 935:11–15 (Martorana).) Its level of restrictiveness and intensity fall below residential treatment and above intensive outpatient treatment – i.e., treatment at the partial hospitalization level of care is less restrictive than for residential treatment. (Trial Tr. 449:19–450:21 (Plakun) (partial hospitalization "is less intensive than residential"); *see also* Trial Tr. 90:16 – 91:9 (Fishman) (explaining that partial hospitalization is ASAM Level 2.5); Trial Tr. 934:24–935:24 (Martorana) (describing levels of care).)

342. Considering and even focusing on acute needs does not preclude consideration of chronic conditions. (Trial Tr. 1422:22–1423:2 (Allchin); Trial Tr. 1599:15-20 (Alam); *see also* Trial Tr. 972:2 – 21 (Martorana).)

343. This is because "many mental illnesses are by definition chronic mental illnesses" (Trial Tr. 1192:17–25 (Simpatico)), and the intensity of chronic illnesses tend to "wax[] and

wan[e]" over time. (Trial Tr. 92:2–13 (Fishman); *see also* Trial Tr. 1599:21 – 1600:1 (Alam) ("Most of what we treat now, whether it's substance use disorders or mental health conditions, they are chronic conditions.").)

344. Most commonly, the symptom for which a patient seeks treatment, though "episodic" in nature, is really just an "exacerbation" of an underlying chronic illness. (Trial Tr. 1604:24 – 1605:1 (Alam).)

345. Temporal acuity and chronicity are interconnected concepts in behavioral health treatment and not mutually exclusive: "When you talk about acute symptoms, you're really referring to the acute changes of a chronic condition." (Trial Tr. 1599:15-20 (Alam).)

346. Even when used in the context of severity, acuity and chronicity are not mutually exclusive, and are often related. (Trial Tr. 662:24 – 663:2 (Plakun) (many people suffer from "chronic and severe mental illness.").)

**2. The LOCGs Call For Assessment and Coverage of Treatment for Chronic Conditions And Symptoms.**

347. UBH's guidelines consider both acute and chronic conditions, including the goals of treating both chronic and acute conditions. (Trial Ex. 1657 at 126:21-129:08, 129:17-130:14 (Robinson-Beale).)

348. At trial, the Court heard testimony from six board-certified psychiatrists who were involved in conceiving, writing, reviewing, approving, and interpreting UBH's guidelines. All six confirmed that UBH's guidelines direct Peer Reviewers and Care Advocates to consider both acute *and* chronic conditions and symptoms when making coverage decisions . (Trial Ex. 1657 at 126:21–129:08, 129:17–130:14 (Robinson-Beale); Trial Tr. 988:6–13, 1044:19–25 (Martorana); Trial Tr. 1396:22–1397:19 (Allchin); Trial Tr. 1599:9–20, 1604:19–1605:1 (Alam); *see also* Trial Tr. 1725:23 – 1726:11 (Triana) (opining that the LOCGs were consistent with generally accepted standards of care); Trial Ex. 1659 at 214:4–11 (Bonfield) (explaining that the "why now" factors in the LOCGs are designed to address the "root cause" of a member's illness so that the member "doesn't have to keep presenting over and over," and are "relevant for people who do not have severe symptomology").)

349. This unrefuted testimony is consistent with the plain language of the LOCGs and reflects a reasonable interpretation of plan terms and of generally accepted standards of care.

350. To determine level of care placement, the LOCGs for each year assess the member's "current condition." (*See, e.g.*, Trial Exs. 1-0005 (2011), 2-0006 (2012), 3-0006 (2013), 4-0007 (2014), 5-0008 (2015), 6-0009 (Jan. 2016), 7-0009 (June 2016), 8-0007 (2017).)

351. UBH's doctors explained that the "current condition" includes chronic conditions, as it refers to *all* of the symptoms and ailments that the member is bringing to treatment. (Trial Tr. 972:2–21; 1031:3–11, and 1031:12–20 (Martorana); Trial Tr. 1387:8–14 (Allchin).)

352. The LOCGs then direct UBH's clinicians to determine whether the proposed level of care will effectively treat the member's "current condition," which would include any chronic condition that the member brings into treatment. (Trial Exs. 1-0005, 2-0006 and 3-0008; Trial Tr. 1057:12-1058:17 (regarding 2014 LOCGs at Trial Ex. 4-0007), 1067:25-1068:12 (regarding 2015 LOCGs at Trial Ex. 5-0008), 1072:22-1073:3 (regarding January 2016 LOCGs at Trial Ex. 6-0009),1074:2-8 (regarding June 2016 LOCGs at Trial Ex. 7-0009); and 972:2–11 (regarding 2017 LOCGS at Trial Ex. 8-0007) (Martorana) (member's current condition refers to the set of symptoms that the member brings to the proposed treatment, including everything that is going on with them that has brought them to the point of seeking a particular level of care).)

353. The 2011-2013 LOCGs Common Criteria state: "The member's *current condition* can be most efficiently and effectively treated in the proposed level of care"; and "The member's *current condition* cannot be effectively and safely treated in a lower level of care even when the treatment plan is modified, attempts to enhance the member's motivation have been made, or referrals to community resources or peer supports have been made." (Trial Exs. 1-0005, 2-0006 and 3-0008 (emphasis added).)

354. From 2015 through 2017, the LOCGs similarly directed reviewers to determine whether the member's "current condition can be safely, efficiently, and effectively assessed and/or treated in the proposed level of care." (Trial Exs. 5-0008, 6-0009, 7-0009, 8-0007.)

355. The 2014 LOCGs imposed a similar directive, but phrased it in a different way. (Trial Ex. 4-0007 (requiring consideration of whether "the member's current condition cannot be

safely, efficiently and effectively assessed and/or treated in a less intensive setting") *and* Trial Tr. at 1402:20 – 1403:4 (Allchin) (testifying that language identical to that which appears in the 2014 LOCGs regarding effective treatment of the member's current condition is "the flip side of the coin" of the 2015-2017 language cited above).)

356. In addition to this language in the 2014 Common Criteria, the requirement that "the member's current condition can be safely, efficiently, and effectively assessed and or treated in this setting" separately appeared in the admission criteria for outpatient treatment of mental health conditions and substance use disorders. (Trial Ex. 4-0035, -67.)

357. If the proposed level of care will not *effectively treat* the member's "current condition," including any chronic or ongoing illness, UBH's clinical reviewers are directed to offer coverage at a level of care that is more likely to provide safe and effective treatment, even if that results in a higher level of care. (Trial Exs. 1-0005, 2-0006, 3-0008, 4-0007, 5-0008, 6-0009, 7-0009, 8-0007 (2011-2017 LOCGs requiring effective treatment as condition for coverage); Trial Ex. 1186-0011 (2016 Utilization Management Program Descriptions requiring all benefit denials to include "a statement of alternative services that would be available and authorized"); Trial Tr. 947:22 – 948:10 (Martorana) (same); Trial Tr. 1379:13–1380:12 (Allchin) (same, and noting the alternative level authorized would be "the most appropriate least restrictive environment at that point that would prove safe and effective" which might result in authorization for "a higher level of care"); *see also* Trial Tr. 967:12–968:17 (Martorana) (discussing requirement that "current condition can be safely, efficiently, and effectively" treated and noting that failure to satisfy that criterion could result in higher level of care); Trial Tr. 975:7–14 (Martorana) (discussing same).)

358. Numerous other provisions in the LOCGs require consideration of a member's chronic conditions and symptoms to determine the appropriate level of care.

359. For example, beginning in 2013, the LOCGs directed UBH's clinicians to consider "why now" factors or factors "leading to" or "precipitating" admission. (*See*, *e.g.*, Trial Exs. 3-0007, 4-0007, 5-0008, 6-0009, 7-0009, 8-0013, 8-0026, 8-0032, 8-0035.)

360. UBH's current and former clinicians all explained that, as used in the LOCGs,

terms such as these direct UBH's clinicians to consider "all the considerations that have led this member to this point in time seeking treatment," including "chronic conditions if they exist in the patient" seeking treatment. (Trial Tr. 1000:8–1001:12, 1003:3–8 (Martorana); *see also* Trial Tr. 1396:22–1397:6 (Allchin) (concept of "why now" "includes not only acute issues but chronic issues"); Ex. 1657 at 128:10 – 129:8 (Robinson-Beale) (explaining that the "concept of why now" takes into account "the different goals of chronic care versus acute care" because "for chronic illnesses, you need to understand the total pieces that are going on, and be able to address those"); Trial Tr. 1577:20 – 22 (Alam) ("why now" concept is "not limited to acute factors"); Ex. 1659 at 214:4–15 (Bonfield) ("the purpose of the Why Now? factors is to understand the root cause for why the person is presenting for treatment . . . so that that root cause can be addressed and resolved and the person doesn't have to keep presenting over and over").)

361. Other language in UBH's guidelines calls for consideration of chronic conditions and symptoms, as well.

362. From 2011 through 2014, the preamble to the IOP criteria emphasized that, in addition to traditional IOP, lower-intensity, longer-term IOP treatment may be appropriate for "members who are recovering from severe and persistent mental health conditions." (Trial Exs. 1-0018, 1-0042, 2-0020, 2-0047, 3-0022, 3-0052, 4-0027, 4-0059.)

363. From 2015 through 2017, the preamble to the IOP criteria noted that IOP is for patients with "moderate signs and symptoms" (i.e., not severe signs and symptoms), and the purposes of IOP include "monitor[ing] and maintain[ing] stability" for the member's condition. (Trial Exs. 5-0030, 5-0055, 6-0032, 6-0062, 7-0032, 7-0062, 8-0014, 8-0032.)

364. The preamble to the IOP criteria specific to substance use disorders from 2015 through 2017 went on to state that another purpose of IOP is to "assist members with gaining the knowledge and life skills needed to prevent recurrence of a substance related disorder. (*Id.*)

365. Each iteration of the LOCGs during the class period also required UBH clinicians to account for chronic symptoms and conditions through the Clinical Best Practices section addressing patient evaluation and treatment planning. (Trial Exs. 1-0005, 2-0006, 3-0007, 4-0007 to -08, 5-0010 to -11, 6-0011 to -12, 7-0011 to -12, 8-0007 to -08.)

366. Dr. Martorana explained that UBH expects treating clinicians to “take into account all the chronic aspects of a member's condition, if they exist, as part of designing the treatment plan.” (Trial Tr. 988:5–13 (Martorana).)

367. The reason UBH collects this information from the provider and requires a treatment plan that adequately accounts for chronic conditions is to ensure those factors are also “considered [by UBH] when evaluating whether a request for authorization should be authorized or denied.” (Trial Tr. 981:6–10 (Martorana).)

368. Dr. Fishman agreed that the LOCGs specifically include factors that speak to chronicity. (Trial Tr. 189:16-20 (Fishman).)

369. For example, addressing the 2015 LOCG Clinical Best Practices section, Dr. Fishman acknowledged that the section lists many factors that relate to chronicity, including the history of behavioral health services, the history of trauma, the member’s medical history and current physical health status, the member’s developmental history, the member’s pertinent current and historical life information, the member’s age, the member’s gender, the member’s educational history, and the member’s living situation. (Trial Tr. 189:16-190:14 (Fishman).)

370. Similar provisions appear in every year of the LOCGs, and Plaintiffs concede that these factors represent a “fairly exhaustive laundry list” of considerations for making appropriate level of care decisions. (ECF No. 392, at 46:14–17.)

371. These provisions addressing a member’s chronic conditions reflect one of the LOCGs’ ”Guiding Principles.” In every year since 2011, one of the “Guiding Principles” set forth in the LOCGs is the goal that care should promote the member’s overall recovery, resiliency, and well-being. (Trial Exs. 1-0002, 2-0002, 3-0003, 4-0003, 5-0004, 6-0004, 7-0004, 8-0002.)

372. This principle emphasizes the need to “treat[] the member as a whole, not just as a symptom or two,” and promote treatment that will ensure a member’s long-term ability to cope with his or her illness. (Trial Tr. 985:4–20 (Martorana).)

373. The patient-centric emphasis on recovery, resiliency, and well-being throughout the guidelines speaks directly to the generally accepted standard that appropriate behavioral

health treatment (including decisions about the level of care) should advance "the [member's] ability to bounce back from intermittent exacerbations of a chronic mental illness" and should prepare the member for "possible future exacerbations or of remitting relapsing signs and symptoms of their mental illness" over the long-term. (Trial Tr. 1283:23 – 1284:22 (Simpatico); *see also* Trial Tr. 1417:16–1420:11 (Allchin).)

**3. Guideline Language Referring To The "Why Now" Factors and "Acute Changes" Are Not Unreasonable Interpretations Of Generally Accepted Standards of Care.**

374. "Acute changes" and "why now" do not appear in many of the LOCGs guidelines Plaintiffs challenge in this case.

375. In 2011, the Common Criteria did not reference "acute changes" at all, and the phrase appears only in the definition of "improvement" in the 2012 and 2013 LOCGs. (Trial Exs. 1-0005–07; 2-0006–09; 3-0007–11; Trial Tr. 1058:8–14 (Martorana).)

376. Likewise, neither the 2011 nor 2012 LOCGs use the phrase "why now," and the 2013 LOCGs use the term "why now" only in a limited way that Plaintiffs do not challenge (ECF No. 395 at 19-26.)

377. The reference to "why now" in connection with "acute changes" first appeared in the 2014 LOCGs, and carried over into what became § 1.4 of the 2015 and 2016 LOCGs (with a minor punctuation variation), providing that as one condition of admission:

> The member's current condition cannot be safely, efficiently, and effectively assessed and/or treated in a less intensive setting due to acute changes in the member's signs and symptoms and/or psychosocial and environmental factors (*i.e.*, the "why now" factors leading to admission).

(Trial Exs. 4-0007, 5-0008, 6-0009, 7-0009.)

378. In 2015 and 2016, "acute changes" and "why now" also appeared in a parallel provision of the Common Criteria (§ 1.5), which read:

> The member's current condition can be safely, efficiently, and effectively assessed and/or treated in the proposed level of care.

> Assessment and/or treatment of acute changes in the members signs and symptoms and/or psychosocial and environmental factors (i.e., the "why now factors" leading to admission) require the intensity of services provided in the proposed level of care.

(Trial Exs. 5-0008, 6-0009, 7-0009.)

379. Neither "acute changes" nor "why now" appear in the 2017 LOCG Common Criteria. (*See* Trial Tr. 1006:15–18, 107:3–108:14 (Martorana).)

380. As part of its annual review process and in response to external feedback, the language "acute changes" was removed from the 2017 Common Criteria and the criteria specific to Intensive Outpatient and Outpatient Guidelines. (Trial Tr. 1007:3-1008:14 (Martorana).)

381. This change was made in response to comments made by CSWA (Clinical Social Workers Association), an organization focused on outpatient treatment only, that had expressed some concern regarding the applicability of the phrase "acute changes" to the outpatient context. (Trial Tr. 1007:3–19 (Martorana).)

382. While UBH's clinicians disagreed because the LOCGs account for the maintenance of function as an appropriate aim of treatment, they nevertheless removed the "acute changes" language for the outpatient levels of care to be responsive to the organization's comments. (Trial Tr. 1006:15-1007:2, 1008:2–9 (Martorana).)

383. In light of the intensive nature of 24-hour residential treatment, UBH's clinicians decided that it was appropriate to leave the "acute changes" language in the criteria for residential treatment because UBH "want[s] to understand what happened . . . what was the new change that happened that needs to be addressed that puts them into a 24-hour setting." (Trial Tr. at 1006:19–1007:2 (Martorana).)

384. The "acute changes" language in the 2014, 2015, and 2016 Admission Criteria does not preclude consideration of a member's chronic conditions or mandate that there be a crisis for coverage to be approved. (Trial Tr. 1058:15-17, 1068:3-12, 1069:10-14, 1074:5-8 (Martorana).)

385. The evidence from the psychiatrists who created and used the guidelines

demonstrates that "acute changes" refers to recent changes in the members' condition, which may or may not include severe symptoms or symptoms of underlying chronic conditions. (*See, infra*, Section V(D)(1) at ¶¶ 329, 332-339; Trial Tr. 1057:21-1058:1, 1068:3-12, 1074:5-8 ("acute changes" refers to recent differences from the patient's normal baseline condition) (Martorana).)

386. On its face, the "changes" necessary to satisfy this condition can be *either* changes in the member's "signs and symptoms" *or* changes in the member's "psychosocial and environmental factors." (Trial Exs. 4-0007, 5-0008, 6-0009, 7-0009.)

387. And in many cases, "[i]t's talking about the acute changes… of a chronic condition." (Trial Tr. 1604:14–1605:1 (Alam); *see also* Trial Tr. 1599:15-20.)

388. "Acute change" does not equate to "crisis." "Acute changes" expressly includes changes to the member's psychosocial and environmental factors, and that supports a holistic understanding of the patient that accounts for not only changes to symptoms, but recent changes to things like "where the person lives and whether they can support themselves" or "relationships and family and education." (Trial Tr. 1058:2-7 (Martorana).)

389. For someone with a chronic illness, changes to any number of psychosocial or environmental factors "could change the backdrop against which someone is maintained in a chronic condition possibly causing acute changes" without any "acute crisis." (Trial Tr. 1303:15–1304:2 (Simpatico).)

390. "Sometimes it's external motivation" that constitutes the "acute change" leading the member to seek treatment. (Trial Tr. 1396:22–1397:16 (Allchin).)

391. Plaintiffs' expert agreed. Dr. Fishman admitted for someone who is "just chronically miserable" and "just sick and tired of being sick and tired," the decision to seek treatment "now and not yesterday" is itself "the acute change" that constitutes the "Why Now." (Trial Tr. 192:17 –193:10 (Fishman).)

392. UBH's percipient witnesses testified about why UBH incorporated the "why now" language into the guidelines and what it means on its face and in practice. UBH's former Chief Medical Officer, Dr. William Bonfield, a psychiatrist licensed for over 30 years who spent several years running a clinical practice, testified that adding "why now" was his idea, and that the "why

now" concept is designed to look beyond "symptom severity" and address the "root cause" of a member's condition. (Trial Ex. 1659, at 9:24-10:21, 11:14-16, 12:17-12:20, 14:08-14:15, 15:04-15:06; and 176:21-177:09 (Bonfield).)

393. UBH's former Chief Medical Officer for External Affairs, Dr. Rhonda Robinson-Beale, affirmed that the purpose of adding "Why Now" was to take a more "holistic approach" that is "about evaluating the whole patient . . . not just the symptoms." (Trial Ex. 1657 at 207:24–208:8 (Robinson-Beale); *see also* Trial Tr. 1054:11 – 17 (Martorana).)

394. While Plaintiffs contend that the "Why Now" concept cannot be as broad as all of the percipient witnesses say because the Clinical Best Practices Section of the 2014, 2015, and 2016 LOCGs makes reference to "Why Now" factors in addition to numerous clinical, psychosocial, and environmental factors that would otherwise be subsumed within the concept of "Why Now," that conclusion is not supported by the evidence. (*See* ECF No. 392 at 36:9-20.)

395. As Dr. Alam testified, sometimes points in the LOCGs "are redundant because [UBH's] frontline," utilizes a "multidisciplinary team." (Trial Tr. 1601:11–1602:1 (Alam). The LOCGs are practical documents written by clinicians for daily use by thousands of clinicians across the country with varying levels of experience and they are written accordingly. (Trial Tr. 1388:19-25 (Allchin); Trial Tr. 1600:14-1602:13 (Alam).)]

396. Plaintiffs' overly-simplified reading of "why now" and the kinds of "acute changes" that warrant coverage under the LOCGs is contrary to the weight of the testimony and to the text of §§ 1.4 and 1.5 themselves.

397. The LOCGs' use of phrases like "why now" and "acute changes" is consistent with generally accepted standards of care.

398. The evidence does not support Plaintiffs' assertion that the LOCGs mandate acuity and "thus negate consideration of what is required to effectively treat the member's underlying condition and any chronic symptoms." (*See* ECF No. 392 at 32:23-25.)

**4. It Is Consistent With Generally Accepted Standards of Care To Expect that Treatment Will Improve Presenting Problems Within a Reasonable Period of Time.**

399. "Presenting problems," as that term is used in the improvement provision from 2011 through 2017, refers to the issues, complaints, and conditions that a member presents for treatment. (Trial Tr. 982:3-6, 1069:22-23 (Martorana); *see also* Trial Tr. 1073:6-10 (Martorana).)

400. The concept of "presenting problems" is intended to convey "the totality of . . . what the member is presenting" including any "co-morbidity or chronic [behavioral health] or chronic medical issues" that "will impact [] how you treat this person effectively." (Trial Tr. 983:1 – 8 (Martorana).)

401. Under generally accepted standards of care, "the goal of treatment is to make people better." (Trial Tr. 1229:4–11 (Simpatico).)

402. Plaintiffs offered no evidence about the meaning of the words "presenting" or "problem," except Dr. Fishman's testimony that "language like 'presenting problems'" is similar to the concept of "Why Now." (*See* ECF No. 392, at 33:4, *citing* Trial Tr. 99:1 – 4 (Fishman) (discussing "presenting problems"); Trial Tr. 269:20 – 24 (Fishman) (discussing phrase "factors that precipitated admission" in the preamble to the 2017 outpatient criteria).)

403. The concept of "Why Now" described by Dr. Bonfield and Dr. Robinson-Beale is consistent with Dr. Martorana's testimony that the phrase "presenting problems" is designed to focus the reader on improvement in "the totality" of the member's condition, including any chronic, underlying, or co-morbid conditions the member brings into treatment. (Trial Tr. 983:1–8 (Martorana); *see also* Trial Tr. 1396:22–1397:6 (Allchin) (describing "Why Now" as "why is this person presenting for some behavioral health or substance abuse intervention at this time," which includes "not only acute issues, but chronic issues, as well").)

404. The language and structure of the remainder of UBH's definition of improvement confirms that "presenting problems" is much broader than acute crisis. (*See generally* Trial Tr. 983:1–8 (Martorana).)

405. In 2011, the LOCGs did not use the phrase "acute symptoms" at all, instead defining improvement as follows:

> There must be a reasonable expectation that essential and appropriate services will improve the member's presenting problems within a reasonable period of time. "Improvement" in this context is measured by weighing the effectiveness of treatment against the evidence that the member's condition will deteriorate if treatment is discontinued in the current level of care. Improvement must also be understood within the framework of the member's broader recovery goals.

(Trial Ex. 1-0005.)

406. In the 2012 LOCGs, the definition of improvement was changed to add the following bolded language:

> There must be a reasonable expectation that essential and appropriate services will improve the member's presenting problems within a reasonable period of time. **Improvement of the member's condition is indicated by the reduction or control of the acute symptoms that necessitated treatment in a level of care**. Improvement in this context is measured by weighing the effectiveness of treatment against the evidence that the member's condition will deteriorate if treatment is discontinued in the current level of care. Improvement must also be understood within the framework of the member's broader recovery goals.

(Trial Ex. 2-0007.)

407. The revised definition of improvement in 2012 "defines *two ways* that you can assess improvement." (Trial Tr. 982:7–20 (Martorana).)

408. If a member is presenting with severe or "acute symptoms," improvement can be measured, in part, by either reduction or control of the member's symptoms. (*Id.*; Trial Exs. 2-0007, 3-0008, 4-0009, 5-0008, 6-0010, 7-0010, 8-0007; *see also* Trial Tr. 80:10–24, 105:8 – 12 (Fishman).)

409. But since 2011, the LOCGs have *also* emphasized that improvement should be "measured by weighing the effectiveness of treatment against the evidence that the member's

condition will deteriorate if treatment is discontinued in the current level of care," which must be understood within the framework of the member's long-term recovery, resiliency and wellbeing. (Trial Exs. 2-0007, 3-0008, 4-0009 to -10 , 5-0008 to -09 , 6-0010, 7-0010, 8-0007; Trial Tr. 982:16 – 18 (Martorana) ("and then, also, you can consider improvement in someone by looking at and considering whether if you took this level of care away would they then deteriorate."); *see also* Trial Tr. 1185:25–1186:13 (Simpatico).)

410. In 2014, UBH reformatted its definition of improvement in the LOCGs to make it more clear that both articulations of improvement simply reflect the broader concept that treatment should improve the member's condition.

411. In 2014, and continuing through 2016, the LOCGs defined improvement as follows:

> 1.8. There is a reasonable expectation that services will improve the member's presenting problems within a reasonable period of time.
>
> 1.8.1 Improvement of the member's condition is indicated by the reduction or control of the acute signs and symptoms that necessitated treatment in a level of care.
>
> 1.8.2 Improvement in this context is measured by weighing the effectiveness of treatment against evidence that the member's signs and symptoms will deteriorate if treatment in the current level of care ends. Improvement must also be understood within the broader framework of the member's broader recovery, resiliency and wellbeing.

(Trial Exs. 4-0009, 5-0008 to -09, 6-0010, 7-0010, 8-0007.) (The 2014 LOCGs use identical language with an identical structure, but use a bullet-point format as opposed to the numbered format in the 2015 and 2016 LOCGs. (Trial Ex. 4-0009.))

412. In 2017, UBH made this even more evident by removing the word "acute" from the definition of improvement altogether. (Trial Ex. 8-0007; Trial Tr. 1006:15–1008:14 (Martorana) (explaining that references to acuity were removed from the 2017 LOCGs).)

413. This reformatting reflects that treatment is effective if it reduces or controls a patient's acute symptoms *or* prevents the member's overall condition from deteriorating further

because both forms of improvement are essential to ensure the member's long-term recovery, resiliency, and wellbeing. (Trial Tr. 982:7–983:20, 984:2–985:20 (Martorana).)

414. "In this context" in section 1.8.2 refers to the requirement in section 1.8 that treatment should improve the member's presenting problems, not the "acute symptoms" described in section 1.8.1. (Trial Tr. 984:2–11 (Martorana).) Dr. Martorana's testimony is confirmed by the structure of § 1.8 itself.

415. As Dr. Martorana and Dr. Simpatico both explained, this is just another way of articulating the generally accepted principle that that treatment should be effective. (Trial Tr. 983:9–15 (Martorana); Trial Tr. 1311:20 –1312:17 (Simpatico).)

416. Plaintiffs point to a single set of meeting minutes from 2010 in which UBH's Coverage Determination Committee asked for a clarification in the Custodial Care CDG to contend that "the reasonable expectation of improvement in the patient's condition is improvement in the patient's *acute* condition." (ECF No. 392, at 34:2–16, citing Trial Ex. 307-0002.)

417. To the extent this "clarification" was eventually incorporated into the LOCGs, the evidence shows it was added to reflect that improvement in the member's acute condition is one, but not the only, "indication" of improvement.

418. If "presenting problems" were synonymous with "acute symptoms," there would be no need to separately identify "acute symptoms" in the definition of improvement. More importantly, "improvement" as measured by the prevention of deterioration "must also be understood within the broader framework of the member's recovery, resiliency and wellbeing." (Trial Exs. 4-0010, 5-0008 to -09 , 6-0010, 7-0010, 8-0007; *see also* Trial Exs. 1-0005, 2-0007, 3-0008 (using similar language).)

419. Defining this measure of improvement in the context of a member's recovery, resiliency, and wellbeing significantly expands improvement beyond the control or reduction of acute symptoms, and speaks directly to chronicity. (Trial Tr. 1283:23–1284:24, 1309:1–1310:9 (Simpatico); Trial Tr. 1417:16–1420:11 (Allchin); *see also* Trial Tr. 985:4–20 (Martorana).)

420. In addition, the LOCGs do not set any "deadline within which a patient must

demonstrate improvement." (*See* ECF No. 393 at ¶ 356. (Plaintiffs admit that the "Guidelines do not specify how long a 'reasonable period of time' is.").)

421. A "reasonable amount of time" inherently depends on the individual circumstances of each patient. There is no "set period of time" in which a member must improve because "[i]t's part of the clinical judgment that the reviewer is applying." (Trial Tr. 983:9 – 984:1 (Martorana); *see also* Trial Tr. 1413:23 – 1414:2 (Allchin) (explaining that "what is a reasonable period of time" for children and adolescents "tends to be a much more expanded look than it would be with an adult").)

422. Dr. Fishman conceded that he is not "looking for an unreasonable period of time." Trial Tr. 110:3–4 (Fishman).

423. Consistent with generally accepted standards, the requirement that improvement should occur in a reasonable period means that patients should not languish indefinitely in treatment that is not actually going to help them get or stay healthy. (Trial Tr. 1184:25–1185:24, (Simpatico).)

#### 5. Coverage Does Not End When An "Acute Crisis" Has Passed.

424. The evidence does not support Plaintiffs' claim that once "acute" symptoms have been addressed, coverage ends. (*See* ECF No. 392 at 37:7-11.)

425. The Continued Service Criteria and Discharge Criteria provide that if a member no longer meets the criteria for a given level of care, the member should be discharged to a higher level of care, a lower level of care, or discharged from treatment, as clinically appropriate. (Trial Exs. 1-0078 to -79, 2-0082, 3-0089, 4-0007 to -09, 5-0009 to -10, 6-0010to -11, 7-0010to -11, 8-0007.)

426. That is consistent with generally accepted standards of care. For example, the CMS Medicare Benefit Policy Manual for "*Outpatient* Hospital Psychiatric Services" provides that "[s]ervices are noncovered" if "stability can be maintained without further treatment or with less intensive treatment." (Trial Ex. 656-0026 to -27 (emphasis added).)

427. The Continued Service and Discharge Criteria work in tandem with the admission criteria to create a "feedback loop" that ensures the member is placed in the least restrictive level

of care that is safe and effective. Dr. Martorana explained this feedback loop: "if we're going to say that someone needs a less restrictive level of care, then they'd have to meet the guidelines all over again for that" lower level of care. That necessarily requires the reviewer to determine whether the member can be "safely, effectively, and efficiently treated in that other level of care" as part of the admission criteria for the lower level of care. If "the answer is no" – *i.e.*, the lower level of care is not going to be safe *and* effective *and* efficient to treat the member's current condition – that itself is evidence that the Discharge Criteria are not satisfied and that "they would need the higher level of care." (Trial Tr. 992:17–993:3 and 994:10–995:2 (Martorana).)

428. This feedback loop does not mean that the member must continue to suffer from the *same* condition for which they initially sought treatment. Dr. Martorana explained that the interrelation between the Continued Service and Discharge Criteria on the one hand and the Admission Criteria on the other hand applies equally to new conditions or symptoms that are "brought on by the treatment or unmasked by the treatment." (Trial Tr. 992:1–16 (Martorana).)

429. The new or newly-identified condition would itself constitute "acute changes" in the member's presentation, which could independently satisfy the Admission Criteria (and in turn the Continued Service Criteria) and support continued coverage at the higher level of care.

430. Even when the Discharge Criteria do apply, resulting in a non-coverage determination, that does not mean *all* coverage ends. It is uncontroverted that "[i]n almost every case an alternative level of care that's available to the member is offered." (Trial Tr. 947:22–948:10 (Martorana) (same); Trial Tr. 1369:4–1370:1, 1379:13–1380:12 (Allchin) (same); *see also* Trial Ex. 1186-0011 (2016 Utilization Management Program providing that a Peer Reviewer is required to offer "a statement of alternative services that would be available and authorized.").)

431. In their Proposed Findings of Fact, Plaintiffs selectively excerpt portions of non-coverage determination letters for 27 of the 104 sample class members where the word "acute" is used. (*See* ECF No. 393, at ¶ 387.) This is not classwide proof that coverage ends after an "acute crisis" and only emphasizes the individualized nature of every benefit decision.

432. The usage and significance of the word "acute" varies throughout these letters. Plaintiffs selective list of letters omits numerous other letters that make no mention of Plaintiffs'

challenged criteria like acuity, “why now,” improvement, custodial care, or active treatment. (See, e.g., Trial Exs. 1295-0001 to -03, 1365-0001 to -02; 1392-0002 to -03.)

433. Numerous letters also demonstrate that UBH expressly considered co-occurring behavioral health or medical conditions that would require treatment at a higher level of care. (See Trial Exs. 240-0005, 1287-0002, 1319-0001.)

434. Plaintiffs also fail to divulge that in each of the 27 letters they identify, UBH authorized services in an alternative level of care.

435. UBH’s clinicians did not ignore the chronic nature of these members’ conditions; they assessed a wide range of individualized circumstances, including whether there was an “acute” crisis or the requested services were required to prevent “acute” deterioration or exacerbation, and determined that the services could be provided safely and effectively at a less intensive level of care or lesser frequency. (*See e.g.*, Trial Ex. 1296-0002 Redacted

Trial Ex. 1299-0002 Redacted

;Trial Ex. 1312-0002 Redacted

436. Plaintiffs also failed to establish that their critique of the Common Service Criteria and the Discharge Criteria applies to all of the LOCGs at issue.

437. For example, the 2011, 2012, and 2013 LOCGs do not contain any Discharge

Criteria, and the Continued Service Criteria in those years do not contain any references to "Why Now" factors, "acute changes," "acute symptoms," or "presenting problems." (Trial Exs. 1-0078 to -79, 2-0082, 3-0088.)

438. Although the 2017 LOCGs do include both Continued Service Criteria and Discharge Criteria, those criteria lack any reference to "Why Now" factors, "acute changes," or "acute symptoms." (Trial Ex. 8-0007.)

**E. The Guidelines Account For Co-Occurring Behavioral And Mental Health Conditions.**

439. Consistent with generally accepted standards of care, the LOCGs call for the evaluation of whether a member's co-occurring behavioral and medical conditions can be safely and effectively treated at the requested level of care.

440. While the language and organization evolved throughout the class period, co-occurring conditions have been explicitly addressed in the LOCGs each year. (Trial Exs. 1-0006, 2-0008, 3-0009, 4-0008, 5-0008, 6-0009, 7-0009, 8-0007.)

441. Section 2(d) of the Common Criteria in the 2011 LOCGs required UBH's clinicians to consider "[t]he member's current and past medical and psychiatric histories including the history of substance use." (Trial Ex. 1-0005.; Trial Tr. 1030:4-10 (Martorana).)

442. The 2012 and 2013 LOCGs similarly required Peer Reviewers and Care Advocates to account for "the member's psychiatric and medical history including current and past use of alcohol and drugs, and history of treatment" in determining the appropriate level of care covered under the member's plan. (Trial Exs. 2-0006, 3-0007; Trial Tr. 1041:10-12 (Martorana). )

443. And between 2011 and 2013, the Common Criteria explicitly directed UBH's clinicians to ensure that the proposed treatment (including the proposed level of care) included any "interventions needed to address co-occurring behavioral health or medical conditions." (Trial Exs. 1-0006, 2-0008, 3-0009.)

444. Neither of Plaintiffs' experts criticized these provisions, nor did they suggest that UBH's consideration of "[t]he member's current and past medical and psychiatric histories" is not aligned with generally accepted standards of care.

445. Beginning in 2014, the Clinical Best Practices section of the LOCGs became even more explicit in its requirement that reviewers consider co-occurring disorders.

446. In 2014, the LOCGs required that all UBH reviewers assess whether the proposed treatment plan (which includes the proposed level of care) adequately addressed "the member's psychiatric and medical histories including this histories of substance use, abuse and trauma," as well as "risk factors including . . . risk stemming from co-occurring behavioral health or medical conditions." (Trial Ex. 4-0007, -08.)

447. And from 2015 through 2017, the LOCGs required consideration of "[c]o-occurring behavioral health and physical conditions," along with "[t]he member's medical history and current physical health status," and "[t]he member's developmental history." (Trial Exs. 5-00010, 6-0011, 7-0011, 8-0008.)

448. Many other sections of the LOCGs also address the role of co-occurring conditions in determining the appropriate level of care.

449. For example, in every year of the class period, the LOCGs' Continued Service Criteria directed UBH clinicians to give ongoing consideration to all of the factors relating to co-occurring medical or behavioral health conditions that were considered at the time of admission. (Trial Exs. 1-0078, 2-0081, 3-0089, 4-0007, 5-0009, 6-0010, 7-0010, 8-0007.)

450. This ongoing consideration includes not only any co-occurring conditions identified at the time of admission, but also "consideration of new symptoms" or "conditions that cropped up in the course of treatment." (Trial Tr. 992:1–993:3; 1070:21-1071:6 (Martorana).)

451. If those newly-identified symptoms or conditions indicate that additional treatment is clinically appropriate, the Continued Service Criteria direct UBH's clinicians to keep the member in the current level of care, or as appropriate transition to a higher level of care. (Trial Tr. 992:1–993:3; 1070:21-1071:6 (Martorana).)

452. Additionally, from 2011 through 2017, the preamble to each of the LOCGs for intensive outpatient treatment (both mental health and substance use) emphasized that IOP "can specialize in the treatment of co-occurring mental health and substance use disorders." (Trial Exs. 1-0018, 1-0042, 2-0020, 2-0047, 3-0022, 3-0052, 4-0027, 4-0059, 5-0030, 5-0055, 6-0032, 6-

0062, 7-0032, 7-0062, 8-0014, 8-0032; Trial Tr. 1003:9-23, 1022:21-1023:7 (Martorana).)

453. All of these provisions in the 2011-2017 LOCGs direct UBH's clinicians to account for a member's co-occurring disorders in making level of care determinations.

454. Plaintiffs admit that the Clinical Best Practices represent a "fairly exhaustive laundry list" of considerations for making appropriate level of care decisions. (ECF No. 392, at 46:14–17.)

455. The purpose of the "exhaustive laundry list" in the LOCGs is to ensure that all of this information is "considered [by UBH] when evaluating whether a request for authorization should be authorized or denied." (Trial Tr. 981:6–10 (Martorana).)

456. The evidence reveals that the Clinical Best Practices sections of the LOCGs are essential to the UBH clinicians' exercise of clinical judgment under the guidelines.

457. The Clinical Best Practices are designed to ensure that providers "make an appropriate diagnosis and an appropriate treatment plan, which they communicate to" UBH. (Trial Tr. 997:11–19 (Martorana).)

458. In every year from 2011 through 2017, the Common Criteria directed UBH's clinicians to determine whether "the member's *current condition* can be most efficiently *and effectively* treated at the proposed level of care." (Trial Exs. 1-0005, 2-0006, 3-0008 (using the quoted language) (emphasis added); Trial Exs. 5-0008, 6-0009, 7-0009 (using substantially similar language in section 1.5 of the Common Criteria); *see also* 4-0007 (requiring consideration of whether "the member's current condition cannot be safely, efficiently and effectively assessed and/or treated in a less intensive setting").)

459. UBH's clinicians testified that a member's "*current condition* includes everything they bring to the table for treatment," including any co-occurring or co-morbid conditions. (Trial Tr., 977: 8 -16 (Martorana); Trial Tr. 1387:8 – 14 (Allchin).)

460. Dr. Martorana explained that the general requirement that the member's "current condition" can be effectively treated in the proposed level of care *encompasses* co-occurring conditions, including "whether the co-occurring problem is such that it requires a higher intensity of service." (Trial Tr. 975:3–14 (Martorana).)

461. Dr. Allchin, a board-certified child psychiatrist with over 30 years of experience, including 22 years of clinical practice, concurred, explaining that if a member's "co-occurring conditions warrant or could warrant a more intensive level of care to effectively treat the member," the Common Criteria direct UBH's clinicians to authorize that higher level of care. (Trial Tr. 975:3–14 (Martorana); Trial Tr. 1354:14-1355:17, 1387:24-1388:2 (Allchin).)

462. Beginning in 2015, UBH added a new criterion (Section 1.6) that also required UBH's clinicians to consider whether "[c]o-occurring behavioral health and medical conditions can be safely managed." (Trial Exs. 5-0008, 6-0009, 7-009, 8-0007; Trial Tr. 972:22-973:14 (Martorana) (discussing same provision); *see also* Trial Tr. 1069:15-23; 1072:8-21, 1072:22-1073:5, 1074:5-8 (Martorana).)

463. Dr. Fishman conceded it is "fine" for Section 1.6 to exclude coverage if a co-morbid condition cannot be safely treated at that level of care, but opined that Section 1.6 would somehow preclude access to a higher level of care if the lower level of care was clinically inappropriate. (Trial Tr. 108:2–109:1 (Fishman).)

464. Dr. Fishman's opinion on this issue is refuted by both the structure of Section 1.6 and the testimony of UBH's clinicians who approved and practically construe that Section.

465. Dr. Allchin testified that Section 1.6 is additive of the preexisting requirement that the proposed level of care can "safely, effectively, and efficiently" address the member's "current condition." (Trial Tr. 1387:24–1388:25 (Allchin); *see also* Trial Tr. 977:17–978:20 (Martorana).)

466. The "safely managed" requirement of Section 1.6 of the 2015-2017 Common Criteria (and similar language appearing in level-of-care specific portions of earlier LOCGs) is intended "as a failsafe way to make sure [Care Advocates] look at the medical conditions" because "the patient's safety is the paramount thing." (Trial Tr. 1387:24–1388:25 (Allchin) (explaining that Care Advocates, who are not medical doctors, "don't necessarily automatically think of some of the medical issues involved," in their first-level review of a benefit request.).)

467. Dr. Fishman conceded that this emphasis on member safety is entirely appropriate. (Trial Tr. 107:20-22 (Fishman) ("[I] would want co-occurring psychiatric problems, mental health problems, or co-occurring medical conditions to be able to be safely managed in this level of

care”).)

468. Section 1.6’s “safely managed” requirement also recognizes that, under certain circumstances, it may be clinically appropriate to authorize behavioral health treatment for a particular condition *even if* that treatment cannot equally address every co-occurring condition the member may have. Dr. Allchin illustrated this point: if a member requests treatment at a residential facility staffed by clinicians that specialize in treating eating disorders, it may not be reasonable to expect the facility to “effectively treat” the member’s co-occurring need for drug detoxification. (Trial Tr. 1387:24–1388:25 (Allchin).) But even if the facility is not capable of treating the member’s co-occurring condition, it may still be appropriate and effective treatment for her eating disorder as long as the facility can safely manage any severe withdrawal symptoms. (*Id.*) Likewise if the member suffered from a co-occurring diagnosis of uncontrolled diabetes. (*See id.*, at 1388:5–10.)

469. Admission Criterion 1.6 requires, at minimum, that the facility be capable of “safely managing” the co-occurring condition during treatment because the “patient’s safety is considered paramount.” (Trial Tr. 1387:24-1388:25 (Allchin).)

470. Plaintiffs point to an email with an isolated question by Lynn Wetherbee, Mr. Niewenhous’ then-supervisor, about whether there were any words missing from Section 1.6 as evidence that UBH understood the LOCGs did not account for the effective treatment of co-occurring conditions. (*See* ECF No. 392 at 42:10-26.)

471. Plaintiffs did not call Ms. Wetherbee to testify about her comment nor did they introduce any testimony from Ms. Wetherbee’s deposition. And the only testimony Plaintiffs elicited from Mr. Niewenhous on this issue was the fact that the words they read appear on the page. (Trial Tr. 1818:9–1820:20 (Niewenhous).)

472. Throughout the class period, the LOCGs also explicitly mandated consideration of co-occurring conditions in the admission criteria for residential treatment of substance use disorders.

473. From 2011 through 2013, the LOCG for residential treatment of substance use disorders directed that if “a serious co-occurring medical condition” exists which “cannot be

safely treated in a lower level of care" or if the member's use of alcohol or drugs would "exacerbate a co-occurring medical condition," this could justify residential treatment. (Trial Exs. 1-0056, 2-0062, 3-0067; *see also* Trial Tr. 1589:11-1590:6 (Alam).)

474. From 2014 through 2017, the residential rehabilitation LOCGs for substance use continued to account for co-occurring conditions, providing that residential rehabilitation may be appropriate if "[a] co-occurring mental health condition is stabilizing, but the remaining signs and symptoms are likely to undermine treatment in a less intensive setting." (Trial Exs. 4-0078, 5-0081, 6-0090, 7-0091, 8-0035.)

475. Under either formulation, the existence of a co-occurring mental health disorder, and the need to treat that condition, may be sufficient to authorize residential treatment for a substance use disorder, even if the severity of the member's substance use disorder standing alone would not normally require residential care.

476. The plain language in the guidelines and the testimony of UBH's board-certified psychiatrists who explained what that guidelines mean in practice establish that the guidelines call for the consideration of co-morbidities in assessing the safe and effective level of care for treatment.

### F. The Guidelines Account For Treatment That Is Necessary To Prevent Deterioration Or Maintain A Level Of Functioning.

477. The LOCGs do not preclude coverage for treatment that is necessary to prevent deterioration or maintain a level of functioning. The LOCGs take these factors into account when assessing coverage for continuing treatment.

478. It is generally accepted that a primary goal of behavioral health treatment is to improve the patient's condition to a point where he or she can be appropriately transitioned to a less restrictive level of care. (Trial Tr. 1035:3-20 (Martorana).)

479. This goal is expressed in multiple sources that Plaintiffs agree reflect generally accepted standards of care. (*See, e.g.*, Trial Ex. 1507-0010 (CMS Local Coverage Determination: Psychiatric Partial Hospitalization Program Guideline stating that "[t]reatment goals should be . . . to restore the individual patient to a higher level of functioning that would permit discharge from

the program . . . .”).)

480. Generally accepted standards of care, as set forth by CMS, also provide that “control of symptoms and maintenance of a functional level to avoid further deterioration or hospitalization is an acceptable expectation of improvement.” (Trial Ex. 656-0026 (Medicare Benefit Policy Manual, Chapter 6, Hospital Services Covered under Part B).)

481. As discussed in Section V(D)(4), ¶¶ 405-414, in every year from 2011 to 2017, the LOCGs similarly describe improvement as “the reduction *or* control” of symptoms, which plainly contemplates not only improvement in symptoms (“reduction”) but also maintaining a level of function and avoiding deterioration (“control”). (Trial Exs. 2-0007; 3-0008; 4-0009–10; 5-0009; 6-0010; 7-0010; 8-0007); Trial Tr. 982:7-25, 1042:20-1043:1, 1044:5-18; 1056:4-11, 1060:4-1061:1 (Martorana).)

482. Plaintiffs point to language in the 2011 Continued Service Criteria stating that there should be “clear and compelling evidence” that treatment is necessary to prevent deterioration as evidence that the definition of improvement in the LOCGs was inconsistent with generally accepted standards of care. (ECF No. 392, at 44:12.) Plaintiffs’ experts criticized this phrase, but Dr. Fishman conceded it is “not really a medical term” and “it would be hard to know what that would exactly mean in a clinical treatment context . . . .” (Trial Tr. 137:3–9 (Fishman); *see also* Trial Tr. 1239:2–3 (Simpatico).)

483. While Plaintiffs’ experts guessed about how the language might “result in over-restrictiveness” (Trial Tr. 137:14–15 (Fishman)), Dr. Martorana’s unrefuted testimony is that UBH’s clinicians did not interpret this non-medical language in the “overly-restrictive” way Plaintiffs’ experts speculate. (Trial Tr. 1040:5–10 (Martorana).) This language appeared only in the Continued Service Criteria of the 2011 LOCGs, which were used for only a small percentage of class members.

484. Dr. Martorana explained that the concept of preventing deterioration reflected in UBH’s definition of improvement “would incorporate maintenance” (Trial Tr. 982:21–25 (Martorana)), and, as discussed above, must be understood within the broader framework of the member’s recovery, resiliency, and wellbeing, not merely an acute crisis. (*See, infra,* Section

V(D)(4), ¶¶ 405 to 415 (containing detailed discussion of §1.8.2 definition of improvement).)

485. UBH's understanding that recovery, resiliency, and wellbeing look beyond an acute crisis was supported by their reliance on Mr. Shulman's work. Mr. Shulman told UBH that recovery and resiliency are "very important" and he "agree[d] whole heartedly" with UBH's focus on recovery and resiliency because those concepts are broader "merely stabilization . . . ." (Trial Ex. 412-0053.)

486. LOCG provisions specific to certain levels of care also explicitly provide for the consideration of deterioration and maintenance of functioning in determining coverage. (*See, e.g.*, Trial Exs. 1-0019, 1-0026, 8-0014, Trial Tr. 1260:3-14, 1262:16-1263:22 (Simpatico).)

487. Likewise, the 2011 and 2012 intensive outpatient criteria provide that intensive outpatient treatment may be appropriate if "the member's mental health condition is likely to worsen" or the member "is unlikely to remain sober" without the structure and support of an intensive outpatient program." (Trial Ex. 1-0018, -42; Trial Ex. 2-0020, -47.)

488. From 2014 through 2017, this same concept was reflected in the preamble to the intensive outpatient criteria for mental health and substance use disorders, which stated that one purpose of IOP is to "monitor and maintain stability . . . ." (Trial Ex. 4-0027, -59; Trial Ex. 5-0030, -55; Trial Ex. 6-0032, -62; Trial Ex. 7-0032, -62; Trial Ex. 8-0014, 32.)

489. These provisions highlight the emphasis UBH places on the prevention of deterioration, and they correspond directly to the Medicare Benefit Policy Manual's reference to "maintenance of a functional level." (Trial Tr. 987:15-19, 1032:18–1035:2, 1034:6–10 (Martorana); Trial Tr. 1415:5–1416:19 (Allchin).)

490. For example, the 2011 LOCGs state that treatment for mental health conditions may be appropriate at a residential treatment center if "[t]here is an imminent risk of deterioration in the member's functioning due to the presence of severe, multiple and complex psychosocial stressors that are significant enough to undermine treatment at a lower level of care." (Trial Ex. 1-0026.)

491. Plaintiffs ignore these provisions when critiquing UBH's definition of improvement. (ECF No. 392 at 56:20–57:3.)

492. Dr. Fishman complimented Section 1.8.2 of the Common Criteria in the 2015 LOCGs because "it says that improvement in this context is measured by considering prevention of deterioration." (Trial Tr. 110:19–21 (Fishman).)

493. By allowing for treatment designed to prevent deterioration, the UBH LOCGs, like the Medicare Benefit Policy Manual, do not demand that a member continually improve. (Trial Tr. 985:21-23, 1034:22-1035:2 (Martorana), 1228:10-12 (Simpatico), 1420:3-11 (Allchin).)

494. Plaintiffs did not offer evidence that the LOCGs *require* that services would cause a patient to continually progress toward recovery.

495. Plaintiffs did not offer evidence that the LOCGs preclude coverage for services to prevent deterioration or maintain a level of functioning.

**G. The Guidelines Account For the Member's Motivation to Recover.**

496. Consistent with generally accepted standards of care, the UBH guidelines account for the Member's motivation to recover.

497. Under generally accepted standards of care, a patient's willingness and ability to participate in treatment should be considered when assessing the medical necessity of that treatment.

498. For example, the Medicare Benefit Policy Manual provides that the following is a "reasonable and necessary" basis to deny coverage for partial hospitalization services: "Patients who cannot, or refuse, to participate (due to their behavioral or cognitive status) with active treatment of their mental disorder (except for a brief admission necessary for diagnostic purposes), or who cannot tolerate the intensity of a PHP." (Trial Ex. 656-0033; *see* Trial Tr. 1013:2-22 (Martorana) (discussing this language).)

499. A lack of motivation or participation on the part of the patient can ideally be addressed by a change to the treatment plan. (Trial Tr. 995:21-996:21 (Martorana).)

500. However, if after a period of stabilization and after necessary adjustments to the treatment plan are made, a patient still fails to participate in treatment, discharge is appropriate. (Trial Tr. 996:13-21 (Martorana) (noting that treatment in which patient does not participate fails to "address[ ] the patient's condition or their suffering.").)

501. Dr. Fishman's testimony that a patient's lack of motivation should *never* serve as a basis for discharge, and may even justify moving the patient involuntarily to a *higher* level of care contradicts guidance from CMS and finds no support in the evidence or in sources of generally accepted standards of care. (Trial Tr. 115:15-17 (Fishman); ECF No. 392 at 50:8-28.)

502. UBH's approach to patient motivation is consistent with, if not more liberal than, guidance from CMS.

503. UBH does not require members "to be motivated at the door . . . ." (*See* Trial Tr. 116:1-3 (Fishman).)

504. Rather, the express language of the LOCGs recognizes that members need both a period of stabilization and motivational support before a clinician can determine whether the member is actively engaging in treatment.

505. For example, the Continued Service Criteria in the 2011 LOCGs instruct UBH clinicians to consider whether a member "is reasonably likely [to adhere to treatment] after an initial period of stabilization and/or *motivational support*." (Trial Ex. 1-0078 (emphasis added; Trial Tr. 1038:5-20 (Martorana) (discussing same).)

506. Furthermore, the LOCGs do not treat a member's unwillingness to participate in treatment as an automatic trigger leading to discharge. Rather, it is treated as a single non-dispositive factor that UBH clinician's may consider when determining whether discharge is appropriate. (*See, e.g.,* Trial Exs. 4-0007–0008, 5-0009–0010, 8-0007; *also* Trial Tr. 995:21–996:21, 1064:25–1065:7, 1071:13–20 (Martorana).)

**H. The Guidelines Account For The Unique Needs Of Children And Adolescents.**

507. Consistent with generally accepted standards of care, the LOCGs account for numerous factors designed to address the behavioral health and development of children and adolescents.

508. Generally accepted standards of care recognize that children and adolescents have unique mental health and substance abuse treatment needs. (Trial Tr. 1383:2–1384:15, 1385:11–21 (Allchin).)

509. Dr. Allchin was the only board-certified child and adolescent psychiatrist to testify

at trial. (Trial Tr. 1354:18-25 (Allchin).)

510. Plaintiffs' experts—neither of whom are experts in child and adolescent psychiatry—did not offer any testimony on what constitutes generally accepted standards of care for children and adolescents. (*See* ECF No. 392 at 51:7-52:1; also Trial Tr. 658:18–25 (Plakun) (admitting that he does not treat children and adolescents and is not an expert in child and adolescent psychiatry), Trial Tr. 62:20–23 (Fishman) (noting that he has treated only adolescents and young adults in the field of addiction medicine).)

511. As explained by Dr. Allchin, treatment plans for children and adolescents may need to give heightened attention to social and environmental factors such as the child's relationship with her family and her performance in school. (Trial Tr. 1383:5–23(Allchin).)

512. Such factors may impact the appropriate level of care for a child or adolescent because removal of the child or adolescent from the family or community can often have detrimental effects. (Trial Tr. 1393:3–15 (Allchin); *see also* Trial Tr. 1393:10-12 (Allchin).)

513. In addition to giving greater emphasis to a child's or adolescent's relationship with his or her family and the available community resources, factors such as developmental history and sexual orientation may, for example, have a unique impact on the treatment needs of children and adolescents. (Trial Tr. 1409:12–1410:15 (Allchin).)

514. Despite these unique considerations, it is not necessary that clinical guidelines include wholly separate criteria for children and adolescents, and many do not. For example, the ASAM and CALOCUS criteria include separate diagnostic and dimensional admission criteria for adolescents (Trial Tr. 1450:3–5 (Allchin); *see also* Trial Ex. 662-0024.) However, other sources reflecting generally accepted standards of care, such as the TDI guidelines (applicable in Texas) and LOCADTR (applicable in New York), do not have separate criteria for children and adolescents. (Trial Tr. 1378:2–7, 1378:20–22 (Allchin).)

515. UBH's LOCGs address the unique needs of children and adolescents both in their overall criteria applicable to all members and through the Clinical Best Practices sections, which specifically direct UBH clinicians to take into account factors especially pertinent to children and adolescents when making coverage determinations. (Trial Tr. 1376:16–22, 1385:22–1386:4.

(Allchin).)

516. These factors include the member's age, the member's developmental history; history of trauma; physical health history and status (including whether they are pre- or post-pubertal); the member's living situation; the member's family history; the member's relationship with family, friends, and others; barriers to care; spiritual history; education history; and sexual orientation. (*See, e.g.,* Trial Ex. 6-0011 to -13.)

517. In some instances, the LOCGs do explicitly differentiate between child and adolescent treatment protocols and adult treatment protocols for particular levels of care.

518. For example, the 2017 LOCG on Intensive Outpatient treatment provides different minimum hours of treatment for adults and children/adolescents to account for the unique needs of children and adolescents, including their shorter attention spans and school and homework schedules. (Trial Ex. 8-0014 (defining intensive outpatient treatment as "[a] structured program that maintains hours of service for at least 9 hours per week for adults and 6 hours per week for children/adolescents."); Trial Tr. 1003:24–1004:13 (Martorana).)

519. Dr. Allchin explained how UBH clinicians address these factors specifically when making coverage decisions for children or adolescents:

> When we look at developmental history, we try to view things with children in sort of three different spheres. We look at intellectual functioning, social functioning, emotional functioning; and then try to make, independently of those, with their chronological age, are they at chronicle age? Higher? Lower? Is it universal? In other words, are they one year behind in all of them, or are they perhaps only one year behind in one and the other two are appropriate?
>
> And then we also try to take into effect from a developmental issue if they're delayed, is it delayed and appropriate or delayed and unusual? And what I mean by that is if you had an 11-year-old who has social skills that are, let's say, closer to an 8-year-old, if you could close your eyes and

envision that person as an 8-year-old, would they be appropriate for that person? Or are there things like, for instance, people who do hand flapping in front of their eyes, which we would consider to be not only delayed but not appropriate for any age?

(Trial Tr. 1409:12–1410:5 (Allchin); *see also* Trial Tr. 1446:7–16 (Allchin) (noting that children and adolescents can be different from adults when considering developmental stage and first manifestation of mental health and substance use problems).)

520. Dr. Allchin also explained the unique factors considered when assessing the sexual orientation of a child or adolescent:

> We also look at things like -- obviously it mentions age, but also things like sexual orientation where we look at issues that if a child -- an adolescent is coming out, for instance, for the first time, it has an essentially different aspect than somebody who has been perhaps comfortable with their sexual orientation for some time. Part of that is dependent on they're living in a family structure and the family may or may not be happy, let's say, or understand from either a cultural and/or religious belief. And we know that in that age group, suicide risk factors are much higher.

(Trial Tr. 1410:6–15 (Allchin).)

521. Dr. Allchin further explained the unique factors considered when assessing a member's family when the member is a child or adolescent: "And relationships with family and other natural resources are going to be significantly, I view, more important in a child and adolescent population than an adult." (Trial Tr. 1410:22–24 (Allchin).)

522. Dr. Allchin also testified that UBH provides training to its clinicians to ensure they take these nuanced considerations into account when dealing with children and adolescents. (Trial Tr. 1373:7–11 (Allchin); *see also* Trial Tr. 1381:17–21 (Dr. Allchin and other UBH child and adolescent specialists discuss such developmentally-related issues with Care Advocates).)

523. Additionally, approximately twenty percent of UBH's Peer Reviewers are, like Dr. Allchin, specialists in treating children and adolescents. (Trial Tr. 1380:13-21 (Allchin).)

524. These specialists focus their work on child and adolescent coverage decisions and

are readily available to consult with other Peer Reviewers and Care Advocates during twice-weekly "child rounds" and through direct outreach. (Trial Tr. 1380:22–1381:16 (Allchin).)

525. UBH's LOCGs, on their face and as they are understood and applied by its trained clinicians, account for the unique needs of children and adolescents in behavioral health treatment consistent with generally accepted standards of care.

**I. The Definitions Of Custodial Care And Active Treatment In UBH's Custodial Care CDG Are Consistent With the Plans And Generally Accepted Standards Of Care.**

526. As detailed in part III(D), *infra*, the Custodial Care CDGs are based on specific plan language.

527. It is consistent with generally accepted standards of care to exclude services that are solely or primarily for the purpose of custodial care. (Trial Tr. 560:8-15 (Plakun).)

528. Plaintiffs, however, contend that UBH's Custodial Care CDGs include an *overly broad* definition of "custodial care" and an *overly restrictive* definition of its flip-side, "active treatment." (*See* ECF No. 392 at 52:2-8.)

529. UBH's definitions of the "custodial care" and "active treatment" terms are consistent with generally accepted standards of care and do not work to deny, or shorten, treatment at residential facilities. (ECF No. 392 at 52-56).

530. Language in Chapter 16 of the Medicare Benefit Policy Manual, which Plaintiffs rely upon, is not relevant to this case because it is not tailored to treatment for behavioral health conditions. (Trial Ex. 654-0004.) All of the examples in Chapter 16 of the Medicare Benefit Policy Manual involve patients receiving *medical* care in an inpatient hospital setting. Trial Ex. 654-0030.

531. In contrast, when discussing inpatient psychiatric hospital services, Chapter 2 of the Medicare Benefit Policy Manual makes no mention of custodial care and instead evaluates the appropriateness of treatment based on whether treatment is considered "active treatment." (*See* Trial Ex. 655-0004 (noting that inpatient psychiatric facilities "are required to admit only those patients whose admission to the unit is required for *active treatment*"); *also* 655-0006 (noting that recertification of a patient is appropriate only if "the patient continues to need, on a daily basis,

active treatment"); *also* 655-0007 (noting that "[p]ayment for IPF services is to be made only for 'active treatment' that can reasonably be expected to improve the patient's condition").)

532. Similarly, the UBH guidelines provide that treatment in a 24-hour care center "is not for the purpose of providing custodial care, *but is for the active treatment of a behavioral health condition*." (Trial Exs. 10-0003, 47-0003.)

533. UBH's definition of "custodial care" is consistent with how Chapter 2 of the Medicare Benefit Policy Manual defines "active treatment" and with generally accepted standards of care.

534. The Custodial Care CDG in effect in 2011 does not define "custodial care."

535. In the Custodial Care CDGs in effect in 2012-2014, UBH defined custodial care as treatment in an inpatient or residential setting consisting of "clinical or non-clinical services that do not seek to cure, or which are provided during periods when the member's behavioral health condition is not changing." (Trial Exs. 47-0003, 84-0003, 108-0003.)

536. This definition was revised in 2015 to define custodial care as including treatment "for the primary purpose of meeting the personal needs of the patient or maintaining a level of function… as opposed to improving that function to an extent that might allow for a more independent existence." (Trial Exs. 148-008, 195-003, 221-003.)

537. At least 49 of the 111 plans in evidence exclude services that are provided for the "primary purpose of meeting the personal needs of the patient or maintaining a level of function . . . as opposed to improving that function to an extent that might allow for a more independent existence." (Trial Ex. 1654-0001 to -09, 31 (summarizing plan exclusions using the quoted language or substantially similar language).)

538. Another 32 plans similarly exclude services "which do not seek to cure" or "are provided during periods when the medical condition . . . is not changing" or when the member "has reached the maximum level of physical or mental function possible. . . ." (Trial Ex. 1654-0010 to -14, 16 (summarizing plan exclusions with the quoted language or similar language).)

539. The phrase "clinical or non-clinical services" in the 2012-2014 Custodial Care CDGs is not overly broad as compared to Chapter 2 of the Medicare Benefit Policy Manual. (*See*

ECF No. 393 at ¶¶ 511 and 516.)

540. Chapter 2 of the Medicare Benefit Policy Manual contains the following instruction:

> The fact that a patient is under the supervision of a physician does not necessarily mean the patient is getting active treatment. For example, *medical supervision* of a patient may be necessary to assure the early detection of significant changes in his/her condition; however, in the absence of a specific program of therapy designed to effect improvement; a finding that the patient is receiving active treatment would be precluded.

(Trial Ex. 655-0007 (emphasis added).)

541. As the CMS instruction emphasizes, under generally accepted standards of care clinical services (including active clinical supervision) can constitute custodial care in the absence of active treatment.

542. Plaintiffs also criticize UBH's definition of "active treatment" in the Custodial Care CDGs. (ECF No. 392 at 54-56.)

543. In the 2011-2015 Custodial Care CDGs, UBH's defined "active treatment" as the following treatment:

- Supervised and evaluated by a physician;
- Provided under an individualized treatment or diagnostic plan;
- Reasonably expected to improve the member's condition or for the purpose of diagnosis;
- Unable to be provided in a less restrictive setting; and
- Focused on interventions that are based on generally accepted standard medical practice and are known to address the critical presenting problem(s), psychosocial issues and stabilize the member's condition to the extent that they can be safely treated in a lower level of care.

(Trial Exs. 10-0003 (2010), 47-0003 (2011), 84-0003 (2013), 108-0003 (2014), and 148-0003 (2015).)

544. In the 2016 and 2017 Custodial Care CDGs, UBH removed these last two bullets, though the concept that active treatment "cannot be managed in a less restrictive setting" remained elsewhere in the guidelines. (Trial Exs. 195-0003 (2016) and 221-0003 (2017).)

545. The first three bullets in UBH's active treatment definition are obtained from CMS. (*See* Trial Ex. 735-0104 (CMS Benefit Policy Manual, Chapter 2, 30.2.2.1, 2014);Trial Tr. 352:21-23 (Niewenhous).)

546. UBH's definition of "active treatment" is consistent with generally accepted standards of care even though it includes two additional requirements beyond those explicitly listed in Section 30.2.2 of Chapter 2 of the Medicare Benefit Policy Manual.

547. The first additional requirement is that treatment must be "[u]nable to be provided in a less restrictive setting." (Trial Ex. 10-0003.)

548. This requirement tracks language in numerous CMS guidelines, including the guidelines for "Medicare Benefit Policy Manual for outpatient hospital psychiatric services § 70.1, which provides that "[s]ervices are noncovered" if "stability can be maintained without further treatment or with less intensive treatment." (Trial Ex. 656-0026-27; *see also* Trial Ex. 665-0004 (Medicare inpatient guidelines providing 24-hour care should be limited to "only those patients whose admission to the unit is required for active treatment, of an intensity that can be provided appropriately only in an inpatient hospital setting."); Trial Ex. 1507-0017 (CMS partial hospitalization guidelines, providing: "In general, patients should be treated in the least intensive and restrictive setting which meets the needs of their illness.").)

549. Matching the patient to the least restrictive level of care where treatment can be safe and effective is consistent with generally accepted standards of care.

550. UBH also includes the requirement that treatment be "[f]ocused on interventions that are based on generally accepted standard medical practice and are known to address the critical presenting problem(s), psychosocial issues and stabilize the patient's condition to the extent that they can be safely treated in a lower level of care." (Trial Ex. 10-0003.)

551. This requirement is fully consistent with CMS guidance for even lower levels of care than residential treatment. For example, the Medicare Benefit Policy Manual for partial

hospitalization provides that the purpose of the partial hospitalization is to treat the patient's "serious *presenting* psychiatric symptoms" and is characterized by patients with "an *acute* onset or decompensation of a covered . . . mental health disorder. . . ." (Trial Ex. 656-0029 to -33 (CMS Medicare Benefit Policy Manual for partial hospitalization).)

552. Dr. Martorana explained that because Medicare does not cover residential treatment, CMS guidelines for partial hospitalization and inpatient treatment are the closest analogues to residential treatment. (Trial Tr. 936:18–937:9 (Martorana).)

553. Plaintiffs attempt to cast partial hospitalization as somehow more intensive than residential treatment. (ECF No. 392 at 22:14–23:6.) But as Dr. Plakun acknowledged, partial hospitalization is "lower than residential or inpatient" on the "continuum of care." (Trial Tr. 488:3–11 (Plakun).)

554. The only evidence Plaintiffs presented to challenge the final point from "active treatment" in the 2011-2015 custodial care CDGs was a hypothetical from their expert, Dr. Plakun, in which a rape victim undergoes treatment after attempting suicide. (*See* ECF No. 393 at ¶ 532 (citing Trial Tr. 520:10-19 (Plakun)).)

555. According to Dr. Plakun, this requirement would limit treatment to only "the issues that led to the acute suicide attempt" and would prevent the patient from being treated for the underlying issues stemming from the rape. (Trial Tr. 520:13-19 (Plakun).)

556. Plaintiffs offer no evidence to support Dr. Plakun's guess as to how this provision is applied.

557. In direct contrast, Dr. Martorana testified that the phrase "presenting problem" requires clinicians to conduct a thorough evaluation of a member seeking treatment:

> ["Presenting problems" is] the totality of the – what the member is presenting when you consider treatment planning. So they may come in and say, you know, I'm depressed. But then if it's depression that's on top of, you know, co-morbidity or chronic depression or chronic medical issue, then all that will impact on how you treat this person effectively.

558. The requirement to address the "presenting problems" demands that the provider

address the underlying trauma of Dr. Plakun's hypothetical patient.

559. UBH was not obligated to write custodial care CDGs that were identical to CMS' definition of "custodial care" and "active treatment."

560. UBH's CDGs define custodial care and active treatment consistent with both the plans and generally accepted standards of care.

**J. The Feedback UBH Received On Its Guidelines Demonstrates That UBH's Interpretation Of Generally Accepted Standards Of Care Is Reasonable.**

561. UBH annually solicited feedback on its guidelines from a host of external clinicians and professional societies, including specifically asking whether there were any "criteria that should be added or deleted" from the LOCGs. (Trial Ex. 1114-0001.)

562. UBH reasonably expected that these clinicians would identify "if there was something in the [LOCGs] that was inconsistent with generally accepted standards of care . . . ." (Trial Tr. 1757:14–20 (Triana).)

563. Dr. Triana, a member of the LOCG Work Group who reviewed this feedback throughout the class period, explained that it was "very important" to UBH's understanding that its "guidelines are consistent with generally accepted standards of medical practice." (Trial Tr. 1726:12–20 (Triana); *see also id.*, at 1695:15 – 24.)

564. Over the years, UBH received hundreds of comments on the LOCGs. Some of that feedback was negative, some was neutral, and much of it was positive. (Trial Tr. 1702:23–1703:1, 1726:12–20 (Triana). *See* Trial Exs. 1252 (Feedback on 2011 LOCGs), 1253 (2012); 1254 (2013), 408 (2014), 516 (2016).)

565. Plaintiffs identify a few critical comments over the years (ECF No. 392, at 84:18–85:5), but ignore the numerous comments from providers and professional societies complementing the clinical soundness of the LOCGs. (*See*, *e.g.*, Trial Exs. 1252-0002 (2011 comment that "As a whole, this document seems clear, comprehensive and well thought out"); 1253-0010 (2012 comment that "UBH should be praised for providing these guidelines and following them"); 408-0004 (2014 comment that "I have reviewed the guidelines and cannot find anything at all to recommend!"); 516-0005 (2016 comment that the LOCGs were "Well written,

detailed, comprehensive.").)

566. When the "why now" language appeared in the 2014 LOCGs, Dr. Bernstein, a non-UBH psychologist who focused on outpatient treatment, commented that the "idea of 'why now' … is less clear for more chronic people who seem to be going through one crisis after another." (Trial Tr. 741:3–16, 797:16-798:1 (Triana); Trial Ex. 408-0008).) But after a year using the guidelines in his outpatient practice as an in-network provider for UBH, Dr. Bernstein expressed no concerns about the "why now" language at all. Dr. Bernstein told UBH that the 2015 LOCGs with the same "why now" language were "clear, exhaustive, and seem to offer adequate support for making decisions" for his patients. (Trial Tr. 1705: 16–1706:8 (Triana) (discussing feedback on 2015 LOCGs).

567. In 2016, Dr. Bernstein again expressed no concerns about the use of "why now," stating that the LOCGs were "more complete and better thought out than many such documents I have read" and "offer adequate support for making decisions about care when facilities or practitioners are available." (Trial Ex. 516-0005; *see also* Trial Tr. 798:4-:18 (Triana).)

568. While a handful of clinicians expressed concerns that are similar to some (but not all) of Plaintiffs' criticisms in this case, those comments were neither widespread nor consistent.

569. Indeed, UBH also received feedback that directly contradicted Plaintiffs' critiques. For example, in their comments on the 2011 LOCGs, the American Psychological Association recommended *adding* a criterion that "stabilizing individuals and transitioning them to a less intensive level of care" should be the goal of treatment. (Trial Ex. 1252-0003.)

570. The external feedback reflects that reasonable medically-trained minds can disagree about whether UBH's guidelines, or specific aspects of them, are consistent with generally accepted standards of care and therefore the decision to develop, adopt and use them was not unreasonable.

**K. Plaintiffs Did Not Offer Classwide Proof As To Each of The Plaintiffs' Critiques In Each of The Years of the Class Period.**

571. The language of the guidelines changed from year to year, and often the language Plaintiffs criticize only appeared in certain guidelines.

572. The LOCGs varied significantly over the class period. There were both substantive and formatting variations, such as the organization of the Guiding Principles and Three Pillars, the organization and contents of the Clinical Best Practices section, and exclusion of some of the key language Plaintiffs challenge.

573. The "why now" and "acute changes" language Plaintiffs attack did not appear in the LOCGs until 2014, and was gone after 2016.

574. Also, the guidelines addressed co-occurring conditions differently in 2011-2013 than in later years.

575. Plaintiffs also failed to establish that their critique of the Continued Service Criteria and the Discharge Criteria applies equally to all of the LOCGs at issue. For example, 2011, 2012, and 2013 LOCGs do not contain any Discharge Criteria, and the Continued Service Criteria in those years do not contain any references to "why now" factors, "acute changes," "acute symptoms," or "presenting problems." (Trial Exs. 1-0078–79, 2-0082, 3-0088.) Although the 2017 LOCGs do include both Continued Service Criteria and Discharge Criteria, those criteria lack any reference to "why now" factors, "acute changes," or "acute symptoms." (Trial Ex. 8-0007.).

576. Plaintiffs did not offer classwide proof that each of their critiques apply equally to each of the eight years of LOCGs at issue.

**L. The LOCGs in 2011-2017 Are A Reasonable Interpretation of Generally Accepted Standards of Care.**

577. The 2011 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to each of Plaintiffs' eight specific critiques:

i. The 2011 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they provided for a multi-dimensional assessment of each member;

ii. The 2011 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they provided that treatment should be provided in the least restrictive or least intensive

level of care that will provide safe and effective treatment for the member's condition;

iii. The 2011 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they accounted for both acute and chronic behavioral health conditions and symptoms;

iv. The 2011 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they accounted for the effective treatment of co-occurring behavioral health and medical conditions;

v. The 2011 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they accounted for treatment designed to maintain a member's level of function or prevent deterioration, and with respect to the way they articulated the concept of improvement;

vi. The 2011 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they accounted for a member's lack of motivation to engage in treatment where the member had the capacity to benefit from treatment;

vii. The 2011 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they accounted for the needs of children and adolescents;

viii. The 2011 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they expressed the concepts of custodial care, active treatment, and improvement.

578. The 2012 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to each of Plaintiffs' eight specific critiques;

i. The 2012 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they provided for a multi-dimensional assessment of each member;

ii. The 2012 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they provided that treatment should be provided in the least restrictive or least intensive level of care that will provide safe and effective treatment for the member's condition;

iii. The 2012 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they accounted for both acute and chronic behavioral health conditions and symptoms;

iv. The 2012 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they accounted for the effective treatment of co-occurring behavioral health and medical conditions;

v. The 2012 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they accounted for treatment designed to maintain a member's level of function or prevent deterioration, and with respect to the way they articulated the concept of improvement;

vi. The 2012 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they accounted for a member's lack of motivation to engage in treatment where the member had the capacity to benefit from treatment;

vii. The 2012 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they accounted for the needs of children and adolescents;

viii. The 2012 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they expressed the concepts of custodial care, active treatment, and improvement.

579. The 2013 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to each of Plaintiffs' eight specific critiques;

i. The 2013 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they provided for a multi-dimensional assessment of each member;

ii. The 2013 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they provided that treatment should be provided in the least restrictive or least intensive level of care that will provide safe and effective treatment for the member's condition;

iii. The 2013 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they accounted for both acute and chronic behavioral health conditions and symptoms;

iv. The 2013 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they accounted for the effective treatment of co-occurring behavioral health and medical conditions;

v. The 2013 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they accounted for treatment designed to maintain a member's level of function or prevent deterioration, and with respect to the way they articulated the concept of improvement;

vi. The 2013 LOCGs constituted a reasonable interpretation of generally

accepted standards of care with respect to the ways in which they accounted for a member's lack of motivation to engage in treatment where the member had the capacity to benefit from treatment;

vii. The 2013 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they accounted for the needs of children and adolescents;

viii. The 2013 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they expressed the concepts of custodial care, active treatment, and improvement.

580. The 2014 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to each of Plaintiffs' eight specific critiques;

i. The 2014 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they provided for a multi-dimensional assessment of each member;

ii. The 2014 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they provided that treatment should be provided in the least restrictive or least intensive level of care that will provide safe and effective treatment for the member's condition;

iii. The 2014 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they accounted for both acute and chronic behavioral health conditions and symptoms;

iv. The 2014 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they accounted for the effective treatment of co-occurring behavioral health and medical conditions;

v. The 2014 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they accounted for treatment designed to maintain a member's level of function or prevent deterioration, and with respect to the way they articulated the concept of improvement;

vi. The 2014 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they accounted for a member's lack of motivation to engage in treatment where the member had the capacity to benefit from treatment;

vii. The 2014 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they accounted for the needs of children and adolescents;

viii. The 2014 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they expressed the concepts of custodial care, active treatment, and improvement.

581. The 2015 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to each of Plaintiffs' eight specific critiques;

i. The 2015 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they provided for a multi-dimensional assessment of each member;

ii. The 2015 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they provided that treatment should be provided in the least restrictive or least intensive level of care that will provide safe and effective treatment for the member's condition;

iii. The 2015 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they

accounted for both acute and chronic behavioral health conditions and symptoms;

iv. The 2015 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they accounted for the effective treatment of co-occurring behavioral health and medical conditions;

v. The 2015 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they accounted for treatment designed to maintain a member's level of function or prevent deterioration, and with respect to the way they articulated the concept of improvement;

vi. The 2015 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they accounted for a member's lack of motivation to engage in treatment where the member had the capacity to benefit from treatment;

vii. The 2015 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they accounted for the needs of children and adolescents;

viii. The 2015 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they expressed the concepts of custodial care, active treatment, and improvement.

582. The 2016 LOCGs as adopted in January of 2016 constituted a reasonable interpretation of generally accepted standards of care with respect to each of Plaintiffs' eight specific critiques;

i. The 2016 LOCGs as adopted in January of 2016 constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they provided  for a multi-dimensional assessment of each

member;

ii. The 2016 LOCGs as adopted in January of 2016 constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they provided that treatment should be provided in the least restrictive or least intensive level of care that will provide safe and effective treatment for the member's condition;

iii. The 2016 LOCGs as adopted in January of 2016 constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they accounted for both acute and chronic behavioral health conditions and symptoms;

iv. The 2016 LOCGs as adopted in January of 2016 constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they accounted for the effective treatment of co-occurring behavioral health and medical conditions;

v. The 2016 LOCGs as adopted in January of 2016 constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they accounted for treatment designed to maintain a member's level of function or prevent deterioration, and with respect to the way they articulated the concept of improvement;

vi. The 2016 LOCGs as adopted in January of 2016 constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they accounted for a member's lack of motivation to engage in treatment where the member had the capacity to benefit from treatment;

vii. The 2016 LOCGs as adopted in January of 2016 constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they accounted for the needs of children and adolescents;

viii. The 2016 LOCGs as adopted in January of 2016 constituted a reasonable interpretation of generally accepted standards of care with respect to the

ways in which they expressed the concepts of custodial care, active treatment, and improvement.

583. The 2016 LOCGs as revised in June of 2016 constituted a reasonable interpretation of generally accepted standards of care with respect to each of Plaintiffs' eight specific critiques;

i. The 2016 LOCGs as revised in June of 2016 constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they provided for a multi-dimensional assessment of each member;

ii. The 2016 LOCGs as revised in June of 2016 constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they provided that treatment should be provided in the least restrictive or least intensive level of care that will provide safe and effective treatment for the member's condition;

iii. The 2016 LOCGs as revised in June of 2016 constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they accounted for both acute and chronic behavioral health conditions and symptoms;

iv. The 2016 LOCGs as revised in June of 2016 constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they accounted for the effective treatment of co-occurring behavioral health and medical conditions;

v. The 2016 LOCGs as revised in June of 2016 constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they accounted for treatment designed to maintain a member's level of function or prevent deterioration, and with respect to the way they articulated the concept of improvement;

vi. The 2016 LOCGs as revised in June of 2016 constituted a reasonable

interpretation of generally accepted standards of care with respect to the ways in which they accounted for a member's lack of motivation to engage in treatment where the member had the capacity to benefit from treatment;

vii. The 2016 LOCGs as revised in June of 2016 constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they accounted for the needs of children and adolescents;

viii. The 2016 LOCGs as revised in June of 2016 constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they expressed the concepts of custodial care, active treatment, and improvement.

584. The 2017 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to each of Plaintiffs' eight specific critiques;

i. The 2017 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they provided for a multi-dimensional assessment of each member;

ii. The 2017 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they provided that treatment should be provided in the least restrictive or least intensive level of care that will provide safe and effective treatment for the member's condition;

iii. The 2017 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they accounted for both acute and chronic behavioral health conditions and symptoms;

iv. The 2017 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they accounted for the effective treatment of co-occurring behavioral health and medical conditions;

v. The 2017 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they accounted for treatment designed to maintain a member's level of function or prevent deterioration, and with respect to the way they articulated the concept of improvement;

vi. The 2017 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they accounted for a member's lack of motivation to engage in treatment where the member had the capacity to benefit from treatment;

vii. The 2017 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they accounted for the needs of children and adolescents;

viii. The 2017 LOCGs constituted a reasonable interpretation of generally accepted standards of care with respect to the ways in which they expressed the concepts of custodial care, active treatment, and improvement.

585. In every year from 2011 through 2017, the LOCGs in their totality constituted a reasonable interpretation of generally accepted standards of care:

i. The 2011 LOCGs constituted a reasonable interpretation of generally accepted standards of care;

ii. The 2012 LOCGs constituted a reasonable interpretation of generally accepted standards of care;

iii. The 2013 LOCGs constituted a reasonable interpretation of generally accepted standards of care;

iv. The 2014 LOCGs constituted a reasonable interpretation of generally accepted standards of care;

v. The 2015 LOCGs constituted a reasonable interpretation of generally accepted standards of care;

vi. The 2016 LOCGs as adopted in January of 2016 constituted a reasonable interpretation of generally accepted standards of care;

vii. The 2016 LOCGs as revised in June of 2016 constituted a reasonable interpretation of generally accepted standards of care;

viii. The 2017 LOCGs constituted a reasonable interpretation of generally accepted standards of care.

586. In every year from 2011 through 2017, the LOCGs in their totality constituted a reasonable interpretation of class members' plans:

i. The 2011 LOCGs constituted a reasonable interpretation of class members' plans;

ii. The 2012 LOCGs constituted a reasonable interpretation of class members' plans;

iii. The 2013 LOCGs constituted a reasonable interpretation of class members' plans;

iv. The 2014 LOCGs constituted a reasonable interpretation of class members' plans;

v. The 2015 LOCGs constituted a reasonable interpretation of class members' plans;

vi. The 2016 LOCGs as adopted in January of 2016 constituted a reasonable interpretation of class members' plans;

vii. The 2016 LOCGs as revised in June of 2016 constituted a reasonable interpretation of class members' plans;

viii. The 2017 LOCGs constituted a reasonable interpretation of class members' plans.

**M. UBH's Guidelines Are Consistent With Plan Terms And Generally Accepted Standards Of Care For Residential Treatment for Substance Use.**

587. The LOCGs are clinically consistent with the ASAM criteria. (Trial Tr. 1138:4-8 (Martorana).)

588. The ASAM criteria subdivide residential treatment into four levels of intensity. (Trial Ex. 662-0196.) Other external guidelines, such as LOCUS, APA guidelines, and TDI do not subdivide residential treatment into different levels.

589. The ASAM levels range from Level 3.1, which the ASAM criteria defines as "clinically managed low-intensity residential services," to Level 3.7, defined as "medically monitored intensive inpatient services." (Trial Ex. 662-0196.)

590. At Level 3.7, patients require "24-hour medical monitoring but not intensive treatment." (Trial Ex. 662-0196.) Medical staff is responsible for supervising and directing all treatment; however, they are not required to deliver all care. (Trial Tr. 87:7-11 (Fishman).)

591. Plaintiffs' own expert acknowledged that the requirements for residential treatment set forth in UBH's LOCGs are consistent with the requirements imposed by the ASAM criteria for Level 3.7 treatment. At trial, Dr. Fishman listed a number of homologous provisions, including:

- Consideration of whether the member is in immediate or imminent danger of relapse, (*See* Trial Tr. 125:24-126:1 (Fishman) (noting that the requirement that "the member [be] in immediate or imminent danger of relapse . . . [is] a permissive requirement for 3.7"); *also, e.g.,* Trial Ex. 5-0081 (listing "imminent or current risk of relapse" as a criteria for residential treatment));
- The requirement that a member have his or her treatment plan updated every five days, (Trial Tr. 143:11-144:2 (Fishman); Trial Ex. 1-0057);
- The requirement that a psychologist or addictionologist perform a comprehensive evaluation of the member, (Trial Tr. 142:24-143:1 (Fishman), *see also* Trial Tr. 1249:16-1250:1 (Simpatico)); and
- The requirement that "subsequent psychiatric evaluations and consultations are available 24 hours a day" and that "[v]isits with the treating psychiatrist addictionologist occur at least two times per week." (Trial Ex. 2-0063; Trial Tr. 223:12-14 (Fishman).)

592. Furthermore, in 2013, UBH hired one of the authors of the ASAM criteria, Mr.

Jerry Shulman, to assess whether its residential rehabilitation criteria was consistent with ASAM Level 3.7. (Trial Tr. 1634:18-20 (Alam).)

593. Mr. Shulman confirmed that UBH's criteria correspond to Level 3.7 of the ASAM criteria. (Trial Tr. 1641:19-1642:09 (Alam); Trial Ex. 412-0093.)

594. On the other end of the ASAM spectrum, Level 3.1 residential treatment consists of low-intensity, clinically-managed residential treatment. (Trial Ex. 662-0196; Trial Tr. 89:18-90:11 (Fishman).)

595. This level of treatment is colloquially referred to as a "halfway house" or sometimes as "drug-free housing." (Trial Tr. 168:8-11 (Fishman), 1024:9-23 (Martorana).)

596. UBH does not use the residential treatment criteria in its LOCGs to make coverage determinations for treatment in sober living homes or half way houses. (Trial Tr. 406:12-25 (Niewenhous), 1024:9-12, 1137:25-1138:3 (Martorana).)

597. Instead, UBH uses separate guidelines called "sober living" and "supervised living" guidelines for Level 3.1 of the ASAM criteria. Trial Tr. 406:12-25 (Niewenhous), 1024:9-12, 1137:25-1138:3 (Martorana).)

598. Plaintiffs' only rebuttal to the evidence that ASAM Level 3.1 is addressed under UBH's sober living and supervised living guidelines is to point to a section of the ASAM criteria stating that "Level 3.1 is not intended to describe or include sober houses, boarding houses, or group homes *where treatment services are not provided*." (ECF No. 392, at 22 n. 18, quoting Trial Ex. 662-0245 (emphasis added).)

599. But Plaintiffs offered no evidence that UBH's sober living or supervised living guidelines are limited to facilities where treatment services are not provided.

600. In fact, Plaintiffs offered no testimony about these guidelines whatsoever, and offered no expert opinion that UBH's sober living and supervised living guidelines are inconsistent with generally accepted standards of care or fail to encompass ASAM Level 3.1.

601. Plaintiffs do not challenge sober living and supervised living guidelines in this case. (*See* ECF No. 296-3 at 4 (defining "Request for Coverage" as "a request for insurance coverage . . . for outpatient, intensive outpatient or residential treatment for mental health

conditions or substance use disorders"); Trial Ex. 880-0003 (same); Trial Ex. 896-0002 (same).)

602. Plaintiffs offered no evidence that any class member sought coverage, much less was denied coverage, for treatment at a Level 3.1 facility.

603. Furthermore, many plans simply exclude from coverage treatment in sober living homes or halfway houses. (Trial Tr. 1024:4-8 (Martorana).)

604. Because it is either (a) not a covered benefit; and/or (b) not the subject of the guidelines at issue in this case, Plaintiffs reliance on Level 3.1 as a basis for critiquing UBH's residential treatment guidelines is misplaced.

605. The ASAM criteria also describe Level 3.3, Clinically Managed Population-Specific High-Intensity Residential Services for individuals with cognitive and functional limitations. Plaintiffs offered no evidence that any class members sought coverage for treatment at a Level 3.3 facility, and Plaintiffs' experts did not opine as to this level of care.

606. ASAM Level 3.5 consists of clinically-managed, high-intensity residential services. (Trial Ex. 662-0196; Trial Tr. 87:17-88:21 (Fishman); Trial Tr. 1574:9-15 (Alam).)

607. This level of care differs from Level 3.7 because it includes treatment centers in which medical staff may not be available and treatment is directed, supervised, and delivered by other health professionals, such as therapists and counselors. (Trial Tr. 87:17-88:21 (Fishman); Trial Ex. 662-0196.)

608. Many UBH plans exclude treatment at Level 3.5 facilities because the plans require the active participation or direction of a physician for a treatment center to be considered a residential facility. (Trial Ex. 225-0098, Trial Tr. 867:19-868:19 (Dehlin)); *see* Section III at ¶¶ 52-54, *infra*.)

609. Plaintiffs offered no evidence that any class member sought coverage, much less was denied coverage, for treatment at a Level 3.5 facility.

610. Plaintiffs offered no evidence that any class member sought coverage for treatment at a Level 3.3 facility, and Plaintiffs' experts did not opine as to this level of care.

611. Plaintiffs did not offer individual or classwide proof that UBH's Guidelines for residential substance use disorder are inconsistent with plan terms and generally accepted standards of care.

## VI. Plaintiffs Failed To Offer Classwide Proof That Any Of The "Flaws" Their Experts Identified In The Guidelines Was Relevant To Or Affected Class Members' Benefit Decisions.

612. Plaintiffs failed to offer classwide proof that any of the "flaws" their experts identified in the guidelines was relevant to or affected class members' benefit decisions.

613. Plaintiffs failed to offer proof on a classwide basis that they were actually entitled to benefits under their view of the plan terms properly construed.

614. Plaintiffs did not prove that their criticisms of the guidelines were connected to the class members' benefit determinations.

615. UBH's guidelines, some of which exceed 100 pages, consist of countless individual provisions, only a handful of which Plaintiffs challenge. Plaintiffs' experts concede that many, if not most, of the provisions in the guidelines are unobjectionable, focusing on certain words and phrases that they contend are problematic. Plaintiffs did not prove, on a classwide basis that the specific "flaws" caused any benefit decision.

616. Plaintiffs do not challenge the unique content of any of the 209 diagnosis-specific CDGs in this case, despite the fact that thousands of class members had their benefit decisions reviewed according to a CDG.

617. While Plaintiffs contend that each of the CDGs incorporates some portion of the LOCGs by several different theories, a majority of the CDGs at issue do not include the substantive provisions of the LOCGs or any of the specific "flaws" Plaintiffs allege. *See* Section IV(A)(2)(a), *supra*.

618. Nor did the Plaintiffs' experts dispute any of the unique condition-specific criteria found in any one of the CDGs beyond the Custodial Care CDGs.

619. Plaintiffs offered no evidence showing that for the thousands of class members who were denied coverage according to a CDG, the UBH reviewer relied on the language of the LOCGs in reaching those decisions.

620. Plaintiffs have not established that the flaws they identified in the guidelines caused UBH to make adverse benefit decisions for members.

**VII. Plaintiffs Fail to Prove They Have Article III Standing To Bring Their Claims.**

621. Plaintiffs failed to establish an actual or imminent threat of future harm based on UBH's use of its current guidelines, because they have not demonstrated that they are likely to be denied coverage based on the challenged guidelines criteria in the future. Even as to those Plaintiffs who are still plan participants, the mere fact that they sought and were denied benefits in the past does not on its own support a finding that they are likely to seek and wrongfully be denied benefits again in the future.

622. Plaintiffs did not show that they would have been entitled to benefits under their plan construction and did not establish any causal connection between the asserted flaws in the guidelines and the denial of benefits. They did not demonstrate an actual, concrete and particularized injury that is "fairly traceable to the challenged conduct of the defendant."

**VIII. Plaintiffs Did Not Prove Facts Supporting a Violation of State Law for the State Mandate Class.**

623. State and federal law sometimes mandate the use of guidelines other than UBH's guidelines.

624. UBH created, used, and updated a Guideline Applicability Tool to enable UBH employees to determine which guideline applies in a given scenario. (Trial Tr. 386:18-387:5, 390:4-6 (Niewenhous); *see, e.g.,* Trial Exs. 450 (May 2014), 268 (October 2014 version), 270 (January 2015 batch), 271 (March 2015), 272 (May 2015), 273 (September 2015); 274 (January 2016), 275 (May 2016), 276 (July 2016), 277 (August 2016); 278 (January 2017).)

625. These Guideline Applicability Tools were prepared by UBH employees Jerry Niewenhous and Loretta Urban. (Trial Tr. 391:17-19 (Niewenhous).)

**A. Texas**

626. Throughout the relevant class period, Texas law required health plan administrators to apply criteria issued by the Texas Department of Insurance (known as the TDI or TCADA criteria) when making medical necessity determinations for members receiving or

seeking substance use disorder treatment from providers in Texas. *See* 28 Tex. Admin. Code § 3.8003.

627. The evidence does not demonstrate that UBH failed to use Texas Department of Insurance ("TDI") Criteria with respect to any coverage determinations for Class members receiving or seeking substance use disorder treatment from providers in Texas.

628. The only evidence Plaintiffs proffered to support their Texas claim is a single email from Jerry Niewenhous to Carolyn Regan in 2015 setting out bulleted notes for "Our Next 1:1" meeting. Trial Ex. 493. In that email, Mr. Niewenhous notes a "[q]uestion from Houston about whether the TCADA guidelines apply or the CDGs. Former required by State reg. latter thought to apply because of Parity. Houston has been using the CDGs" and indicates that he is meeting with others "later this week" to discuss. (Trial Ex. 493-0002.)

629. Plaintiffs offered and elicited no evidence about what this single email means, what "Houston" referred to, or how it related, if at all, to plans governed by Texas law.

630. Plaintiffs also offered no evidence of how long "Houston" was allegedly using the CDGs in Texas.

631. Dr. Fishman admits he did not investigate whether UBH uses the TDI guidelines in Texas, and offered no opinion on whether UBH used proper guidelines under Texas law. (Trial Tr. 200:5-201:6 (Fishman).)

632. Plaintiffs offered no evidence that any UBH Peer Reviewer actually failed to apply the Texas guidelines in connection with *any* State Mandate class member's benefit request, much less all of them.

633. UBH clinicians have been using TDI Criteria continuously since as early as 2002, before the beginning of the class period. (Trial Tr. 951:21-952:2 (Martorana); Trial Tr. 1377:21-1378:1 (Allchin); Trial Tr. 430:5-431:3 (Niewenhous).)

634. Throughout the class period, UBH's Guideline Applicability Tool, used by UBH's Care Advocates and Peer Reviewers to determine which guidelines to apply to a member's benefit request, consistently shows that Texas guidelines are to be applied to coverage requests for substance use disorder treatment in Texas under plans governed by Texas law. (*See* Trial Tr.

389:5-20 and 394:2-7 (Niewenhous); Trial Tr. 430:12-431:3 (Niewenhous); Trial Exs. 450 (May 2014), 268 (October 2014 version), 270 (January 2015 batch), 271 (March 2015), 272 (May 2015), 273 (September 2015), 274 (January 2016), 275 (May 2016), 276 (July 2016), 277 (August 2016), 278 (January 2017).)

635. Plaintiffs offered no evidence that any UBH Peer Reviewer actually failed to apply the Texas guidelines in connection with *any* State Mandate class member's benefit request, much less all of them.

**B. Illinois**

636. Effective August 18, 2011, Illinois law provided that "medical necessity determinations for substance use disorders shall be made in accordance with appropriate patient placement criteria established by the American Society of Addiction Medicine." 215 Ill. Comp. Stat. § 5/370c(b)(3) (eff. Aug. 18, 2011) (applicable to patients who are residents of or employed in Illinois).

637. UBH assessed this change in the law, and determined that because its guidelines are "in accordance with" ASAM criteria, it was appropriate to continue to use UBH's guidelines in Illinois. (Trial Ex. 353.)

638. In 2015, the Illinois legislature amended the statute to provide that plan administrators must actually use the ASAM criteria, adding "[n]o additional criteria may be used to make medical necessity determinations for substance use disorders." 215 Ill. Comp. Stat. 5/370c(b)(3).

639. In 2015, the Illinois Department of Insurance assembled a working group to address treatment and coverage of substance use disorders. The group noted that the original version of the law did not require the use of ASAM, leading to a lack of uniformity in utilization review practices: "Sometimes providers use ASAM guidelines while payers use other guidelines. The combination of systems and approaches to obtain information regarding medical necessity leads to confusion." Ill. Dept. of Ins. Working Group re Treatment and Coverage of Substance Abuse Disorders and Mental Illness Annual Report at 2, *available at* https://insurance.illinois.gov/newsrls/2017/01/MHSUDWGRptToGA_Jan2017.pdf

640. The working group suggested that "[i]ncreased transparency may help decrease misunderstanding" and recommended that Illinois providers and payers "continue to work to find a consistent set of criteria so needed services can be provided." *Id.*

641. Consistent with the working group's recommendation to adopt a uniform set of guidelines, the Illinois Senate, in enacting the 2015 amendment, explained that the amended law was meant to "specify" that insurers must use ASAM. *See* Ill. Senate Tr., 2015 Reg. Sess. No. 52.

642. Illinois Governor Bruce Rauner initially vetoed the 2015 amendment because it would eliminate payers' ability to apply other guidelines. *See* Ill. Gen. Assembly re Full Text of HB0001, Governor's Message, at *available at* http://www.ilga.gov/legislation/fulltext.asp?DocName=09900HB0001gms&GA=99&SessionId=88&DocTypeId=HB&LegID=83490&DocNum=0001&GAID=13&Session= (vetoing amendment because it "removes utilization controls" other than ASAM and may hinder the state's "ability to contain rising costs").

643. It is undisputed that UBH adopted ASAM in Illinois after the statute was amended in 2015. (Trial Tr. 951:13-20 (Martorana); Trial Tr. 1375:13-20 (Allchin); Trial Tr. 392:2-14 (reflecting that UBH has used ASAM guidelines for substance use coverage decisions in Illinois, since January of 2016).)

**C. Rhode Island**

644. Since July 10, 2015, Rhode Island law required that health plan administrators "rely upon" ASAM criteria "when developing coverage for levels of care for substance use disorder treatment." 27 R.I. Gen. Laws § 27-38.2-1(g).

645. This law, which is limited to services provided by in-network providers (*id.* § 27-38.4), does not require UBH to adopt or use the ASAM criteria. It simply requires that UBH "rely upon" those criteria in developing its own guidelines.

646. The undisputed evidence shows UBH relied upon ASAM criteria in developing its own guidelines. (*See, e.g.*, Trial Exs. 5-0013, 6-0015, 7-0015, 7-0093, 8-0009 (ASAM Criteria listed as reference for development of 2015-2017 LOCGs); Trial Exs. 3-0002, 4-0002, 5-0004

and 6-0004, 7-0004, 8-0002 (2013-2017 LOCGs relying on ASAM's definition of recovery); *see also* Section IV(B)(1) at ¶¶ 172-182, *infra,* (discussing UBH's reliance on Mr. Shulman's comparison of UBH guidelines to ASAM Criteria).)

647. Plaintiffs have not satisfied their burden of classwide proof on their claims based on violation of Rhode Island law.

**D. Connecticut**

648. Beginning in 2013, Connecticut law required that health plan administrators either (a) use the ASAM criteria in making medical necessity determinations for substance use disorder treatment in that state, or (b) "demonstrate[]" that the administrator's own guidelines are "consistent with the most recent ASAM criteria" by "creat[ing] and maintain[ing] a document in an easily accessible location" on the administrator's web site that "compare[s] each aspect of such clinical review criteria with the [ASAM] criteria" and citing the evidence base for any deviations from the ASAM criteria. Former Conn. Gen. Stat. § 38a-591c(a)(3), superseded by amendment, 2016 Conn. Legis. Serv. P.A. 16-175 (S.B. 372).

649. Connecticut amended the statute Effective January 1, 2017 to remove the crosswalk requirement. Conn. Gen. Stat. § 38a-591c(a)(3) Plaintiffs offered no evidence regarding UBH's compliance with Connecticut law after January 1, 2017.

650. UBH chose the latter option under the Connecticut statute. UBH created a crosswalk disclosing ways in which its guidelines deviate from ASAM, which it posted publicly and submitted to the Connecticut Insurance Department. (Trial Exs. 402 (2013 crosswalk), 506 (2015 crosswalk); Trial Tr. 398:16-22, 399:14-400:11 (Niewenhous).)

651. During the class period, UBH met twice with the Connecticut Department of Insurance to review the crosswalk and answer any questions the regulators may have. The Insurance Department did not find any deficiencies with UBH's guidelines or crosswalk, and did not instruct UBH to use ASAM criteria rather than its own guidelines. (Trial Tr. 446:5-22 (Niewenhous).)

652. With respect to ASAM Level 3.1, the crosswalk contained an error indicating that UBH's residential rehabilitation criteria include criteria that are consistent with coverage at

ASAM Level 3.1. (*See* Trial Tr. 406:7-25; 408:9-17; 410:23-411:11 (Niewenhous).) As discussed above, the uncontroverted evidence shows that ASAM Level 3.1 is governed by UBH's sober living guidelines. UBH did not discover this error until Mr. Niewenhous was reviewing the crosswalk in preparation for trial in this case. (Trial Tr. 461:2-21 (Niewenhous).)

653. Plaintiffs offered no evidence that this error in a submission to the Connecticut Department of Insurance for a level of care that was never sought by any of the class members in this case was intentional or in bad faith.

654. The evidence does not demonstrate that UBH's guidelines with respect to substance use disorders were inconsistent with ASAM criteria for any coverage determinations for Class members whose plans were subject to Connecticut law.

**IX. Class Members Failed To Exhaust Their Administrative Remedies.**

655. The uncontroverted evidence also shows that some of the class members failed to exhaust their available administrative remedies.

656. UBH members generally have the right to appeal adverse benefit determinations, although the plans vary in the specific terms that govern appeals. (Trial Tr. 839:6-8 (Dehlin).)

657. If the Peer Reviewer determines that coverage is not provided for under the guidelines, the Peer Reviewer will provide information including the last covered day for relevant current treatment and the ability to appeal. (Trial Tr. 947:22-948:2 (Martorana).)

658. Many plans provide multiple levels of internal appeal, and often an option to appeal an adverse benefit determination denial to a third-party not related to UBH or to a state insurance agency. (Trial Tr. 948:25-949:6 (Martorana).)

659. Plaintiffs did not offer evidence at trial showing that UBH breached a duty of loyalty or care to the class members by allowing financial considerations to influence the content of the guidelines challenged in this case.

660. The plans required members to exhaust the administrative remedies available to them. (*See, e.g.,* Trial Exs. 1535-0057 (plan for class member 659 prohibiting legal action "until you have completed all of the steps in the appeal process"); 1557-0084 (same for class member 6600); 1583-0085 (same for class member 12605); 1633-0090 (same for class member 7292);

1635-0080 (same for class member 0080).)

661. There is no dispute that a substantial number of class members failed to exhaust those remedies. (*See* Trial Ex. 1655-0002,-03, -06 (summary exhibit showing that class members 659, 6600, 12605, 7292 and 8242 did not file administrative appeals).)

662. UBH witness Frances Bridge testified at length about the class members who were part of the agreed sample selected in this case. This subset of class members includes members who appealed their adverse benefit decisions, and those who did not. Some successfully overturned their initial adverse benefit decisions (and were paid the benefits they sought), rendering their claims here moot. Many others failed to exhaust their available administrative remedies. (Trial Ex. 1655; Trial Tr. 839:6-8 (Dehlin).).

663. This evidence was uncontroverted, and the class members' claims are barred to the extent they did not exhaust their administrative remedies under their plans.

664. Ms. Bridge confirmed that the administrative appeals process resulted in the approval and payment of benefits for numerous class members. (Trial Tr. 1504:8-1505:4 (Bridge).)

665. With respect to class members who did not exhaust their administrative remedies, Plaintiffs offered no evidence to demonstrate that an appeal would have been futile.

## [PROPOSED] CONCLUSIONS OF LAW

## I. STANDARD OF REVIEW

### A. The Abuse Of Discretion Standard Applies To Acts Of Plan Interpretation.

1. When an ERISA plan delegates interpretive authority to the plan administrator, courts review disputes over the administrator's construction and application of plan terms for abuse of discretion. *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008); *Firestone Tire & Rubber C. v. Bruch*, 489 U.S. 101, 111, 115 (1989).[1]

[1] Courts sometimes use the term "arbitrary and capricious" to describe this deferential standard of review, but as the Ninth Circuit has explained, in this context that is a "distinction without a difference." *Taft v. Equitable Life Assur. Soc.*, 9 F.3d 1469, 1471 n.2 (9th Cir. 1993), *overruled on other grounds in Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 872 n.2 (9th Cir. 2008).

2. The abuse of discretion standard of review "has a particular significance in the context of ERISA" because "[t]he abuse of discretion standard in ERISA cases protects important values. . . ." *Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 323, 326 (4th Cir. 2008).

3. Deference to the plan administrator protects access to plan benefits by encouraging employers to offer benefits in the first place. "[D]eference [to plan administrators] protects these interests and, by permitting an employer to grant primary interpretive authority over an ERISA plan to the plan administrator, preserves the 'careful balancing' on which ERISA is based." *Conkright v. Frommert*, 559 U.S. 506, 517 (2010).

4. A "cavalier approach to the deference owed ERISA fiduciaries who contract for it would likely disserve that purpose, whatever the call on our compassion in a particular case, for the fact is that the price of greater coverage would almost certainly be lower benefits levels and lower levels of plan formation." *Evans*, 514 F.3d at 326 (internal quotations and edits omitted).

5. For this reason, the fiduciary duties imposed by ERISA, including the duty to act "solely in the interest of plan participants and . . . for the exclusive purpose of . . . providing benefits to plan participants and their beneficiaries" (29 U.S.C. § 1104(a)(1)) do "not require . . . that a fiduciary resolve every issue of interpretation in favor of the plan beneficiaries." *O'Neil v. Plan Ret. for Salaried Emps. of RKO General, Inc.*, 37 F.3d 55, 61 (2d Cir. 1994); *see also Wright v. Or. Metallurgical Corp.*, 360 F.3d 1090, 1100 (9th Cir. 2004) (quotation omitted) (omission in original) ("The duty to act in accordance with the plan document does not . . . require a fiduciary to resolve every issue of interpretation in favor of plan beneficiaries.").

6. "[A] fiduciary obligation . . . does not necessarily favor payment over nonpayment," because "[t]he common law of trusts recognizes the need to preserve assets to satisfy future, as well as present, claims and requires a trustee to take impartial account of the interests of all beneficiaries." *Varity Corp. v. Howe*, 516 U.S. 489, 514 (1996).

7. In other words, a fiduciary does not breach any duty by reasonably interpreting and applying plan terms.

8. Under the abuse of discretion standard, it is not enough for Plaintiffs' experts to

disagree with the guidelines at issue in this case, or to say they would have chosen different words. A "mere tally of experts is insufficient to demonstrate that an ERISA fiduciary has abused its discretion, for even a single persuasive medical opinion may constitute substantial evidence upon which a plan administrator may rely in adjudicating a claim." *Boyd v. Bert Bell/Pete Rozelle NFL Players Ret. Plan*, 410 F.3d 1173, 1179 (9th Cir. 2005); *see Hinman v. John Alden Life Ins. Co.*, No. 08-CV-1070-PK, 2010 WL 466155, at *7 (D. Or. Feb. 8, 2010) (same); *see also Williby v. Aetna Life Ins. Co.*, 867 F.3d 1129, 1138 (9th Cir. 2017) (quotation omitted) ("[T]he existence of a single persuasive medical opinion supporting the administrator's decision can be sufficient to affirm").

9. Under the abuse of discretion standard, "the plan administrator's interpretation of the plan will not be disturbed if reasonable" and made in good faith. *Conkright* 559 U.S. at 521 (quotation omitted); *MacDonald v. Pan Am. World Airways, Inc.*, 859 F.2d 742, 744 (9th Cir. 1988) (quotation omitted) (an ERISA administrator's "decision is not arbitrary or capricious if it is based on a reasonable interpretation of the plan's terms and was made in good faith").

10. In determining whether the administrator's interpretation is reasonable, "[t]he court must look to the plain language of the [plan]." *Moyle v. Liberty Mut. Ret. Ben. Plan*, 823 F.3d 948, 958 (9th Cir. 2016) (quotation omitted).

11. The question is not "whose interpretation of the plan documents is most persuasive, but whether the administrator's interpretation is unreasonable." *Moyle*, 823 F.3d at 958 (quotation and alterations omitted); *see also Lafferty v. Providence Health Plans*, 436 F. App'x 780, 781 (9th Cir. 2011) (quotation omitted) ("Reasonableness does not mean that [the Court] would make the same decision" in interpreting the plan terms).

12. "Even if the provisions of the plan are susceptible to more than one reasonable interpretation, the Court must give way to the trustee's interpretation." *Cator v. Herrgott & Wilson, Inc.*, 609 F. Supp. 12, 18 (N.D. Cal. 1984).

13. The Court may not merely substitute its view, or the views of Plaintiffs' experts or treating providers, for UBH's view. *Cator*, 609 F. Supp. at 18; *accord Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003) ("[C]ourts have no warrant to require administrators

automatically to accord special weight to the opinions of a claimant's physician").

14. Rather, the test for an abuse of discretion is whether UBH's interpretation of the plan terms, as reflected in its guidelines, was "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Lafferty*, 436 F. App'x at 781, *quoting Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011).

15. "In the ERISA context, even decisions directly contrary to evidence in the record do not necessarily amount to an abuse of discretion." *Taft*, 9 F.3d at 1473.

16. "An ERISA administrator abuses its discretion only if it (1) renders a decision without explanation, (2) construes provisions of the plan in a way that conflicts with plain language of the plan or (3) relies on erroneous findings of facts." *Boyd*, 410 F.3d at 1178.

17. Plaintiffs do not contend that UBH abused its discretion because it "rendered a decision without explanation" or that it "relie[d] on erroneous findings of fact" as to the class; rather, Plaintiffs' claims assert that UBH abused its discretion by construing provisions of the plans in a way that conflicted with the plain language of the plans.

18. To determine whether UBH construed provisions of the plans in a way that conflicts with the language of the plans, the question is not whether the Court "would make the same decision." *Lafferty*, 436 Fed. App'x at 781 (internal quotation marks omitted) ("Reasonableness does not mean that [the Court] would make the same decision" in interpreting the plan terms).

19. Moreover, the question is not whether the administrator's construction represents a reasonable interpretation of a single term, read in isolation, but whether the administrator's construction is a reasonable interpretation of the plan taken as a whole. *Barnett v. S. Cal.Edison Co. Long Term Disability plan,* 633 F. App'x 872, 874 (9th Cir. 2015) (no abuse of discretion where administrator construed plan by reading "two sentences together in a manner that did not . . . conflict[] with the plain language of the plan"); *Otto v. Employee Ret. Income Plan - Hourly W.*, No. LACV1405426JAK (PLA), 2015 WL 12516690, at *19 (C.D. Cal. Mar. 13, 2015) (finding no abuse of discretion where "the administrator's interpretation is consistent with the goals of the plan"), *aff'd sub nom. Otto v. Employee Ret. Income Plan*, 667 F. App'x 660 (9th Cir. 2016);

*Boesel v. Chase Manhattan Bank, N.A.*, 62 F. Supp. 2d 1015, 1029 (W.D.N.Y. 1999) (claims that an ERISA plan administrator improperly interpreted plan terms do "not turn upon one section of the plan viewed in isolation, but rather, upon an interpretation of the plan as a whole.")

**B. The Abuse Of Discretion Standard Applies Even In The Face Of A Conflict Of Interest.**

20. Plaintiffs contend that the Court should view UBH's conduct "with skepticism" because UBH operated under a structural conflict of interest when it developed the guidelines and applied them in reviewing class members' benefit requests.

21. To prove that UBH operated under a structural conflict of interest, Plaintiffs must prove that UBH acted in the "dual role of administering and funding an ERISA plan." *Burke v. Pitney Bowes Inc. Long-Term Disability Plan*, 544 F.3d 1016, 1024 (9th Cir. 2008).

22. Although UBH operated in this "dual role" for the minority of the class members, the fact that UBH did not have a structural conflict of interest with respect to the other 62 percent of class members significantly mitigates any conflict of interest. *See Metro Life Ins.*, 554 U.S. at 117.

23. The fact that UBH charged a fee that attempted to account for the cost of potential claims payouts for its fully insured plans mitigates any conflict of interest. *Metro. Life Ins.,* 554 U.S. at 114.

24. "[T]he conflict question is less clear where (as here) the plan administrator is not the employer itself but rather a professional insurance company . . . because the insurance company typically charges a fee that attempts to account for the cost of claims payouts, with the result that paying an individual claim does not come to the same extent from the company's own pocket." *Metro Life Ins.*, 554 U.S. at 114.

25. While the law "treats insurance company administrators and employers alike in respect to the *existence* of a conflict," courts "can nonetheless take account of the" inherently reduced nature of the conflict "so far as it treats those, or similar, circumstances as diminishing the *significance or severity* of the conflict in individual cases." *Id.* at 114.

26. In any event, the mere existence of a structural conflict of interest does not alter

the applicable standard of review. When "the terms of a plan grant discretionary authority to the plan administrator, a deferential standard of review remains appropriate even in the face of a conflict," *Conkright*, 559 U.S. at 512, including where the same entity that makes coverage decisions also pays the benefits. *Metro. Life Ins.*, 554 U.S. at 112,115–16; *see also Cox v. Standard Ins. Co.*, 585 F.3d 295, 299 (6th Cir. 2009); Rest. (Third) of Trusts § 50 notes to cmts. a & b (2003) ("[E]ven when a possibility of conflict of interests is present, a court will decline to intervene without a showing of abuse.").

27. Courts simply weigh the conflict "as a factor in determining whether there is an abuse of discretion." *Firestone*, 489 U.S. at 115 (quotation omitted). That exercise "requires a case-by-case balance." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 968 (9th Cir. 2006).

28. Even where there is a moderate or significant conflict of interest, courts apply a reasonableness standard; a mere tally of experts is insufficient to demonstrate that a fiduciary abused its discretion. *Hinman*, 2010 WL 466155 at *6.

29. The "deference to be given to the administrator doesn't change unless the plaintiff shows that the administrator was, in fact, influenced by the conflict of interest." *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 83 (2d Cir. 2009); *accord Hinshaw v. Unum Life Ins. Co. of Am.*, 677 Fed. App'x 433, 434 (9th Cir. 2017) (summary judgment proper where plaintiff failed to demonstrate "whether the administrator's conflict of interest impacted its decision").

30. A conflict "should prove less important (perhaps to the vanishing point)" where the circumstances indicate that the conflict did *not* influence the administrator's decision. *Glenn*, 554 U.S. at 117.

31. Thus, even if UBH was operating in a "dual role" as both the administrator and funder of a subset of plans, that is but one factor for the Court to consider in its abuse of discretion analysis, and even then only to the extent Plaintiffs have proven that the conflict actually influenced UBH's decision with respect to the specific guidelines at issue. *Hobson*, 574 F.3d at 83; *Fortlage v. Heller Ehrman LLP.,* No. C-08-3406 VRW, 2009 WL 6391364, at *23 (N.D. Cal. Dec. 18, 2009); *accord Metro. Life Ins.,*554 U.S. at 117; *Abatie*, 458 F.3d at 968 ("The level of skepticism with which a court views a conflicted administrator's decision may be low if a

structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history.”).

32. To inject a level of “skepticism” into the Court’s deferential review, Plaintiffs bore the burden of proving a causal connection between the financial incentives they allege and the criteria they challenge. *Hobson.*, 574 F.3d at 83; *Fortlage*, 2009 WL 6391364, at *23; *accord Metro. Life Ins.,* 554 U.S. at 117; *Abatie*, 458 F.3d at 968.

33. Plaintiffs did not carry their burden of proving a causal connection between the financial incentives they allege and the criteria they challenge.

34. Instead, UBH’s good faith in creating, adopting, and using the guidelines through a clinically-driven process that exceeded national accreditation standards supports the conclusion that UBH acted reasonably in creating, adopting, and using the guidelines. *See Champion v. Black & Decker (U.S.), Inc.*, 550 F.3d 353, 359 (4th Cir. 2008) (factors for assessing abuse of discretion include “whether the decision-making process was reasoned and principled” and “any external standard relevant to the exercise of discretion”); *McDaniel v. Chevron Corp.*, 203 F.3d 1099, 1113 (9th Cir. 2000) (“plan administrator’s decision to deny benefits must be upheld under the abuse of discretion standard if it is based upon a reasonable interpretation of the plan’s terms and if it was made in good faith”).

35. Accordingly, the Court reviews UBH’s conduct with low or minimal skepticism in determining whether UBH abused its discretion. *Hobson*, 574 F.3d at 83; *Hinshaw*, 677 Fed. App’x at 434; *Fortlage*, 2009 WL 6391364, at *23; *accord Metro. Life Ins.,* 554 U.S. at 117; *Abatie*, 458 F.3d at 968.

**C. The Abuse Of Discretion Standard Apples To All Of Plaintiffs’ Claims.**

36. Plaintiffs assert that “[t]his case revolves around one central question: are UBH’s Level of Care Guidelines and Coverage Determination Guidelines, on their face, more restrictive than generally accepted standards of care?” (ECF No. 392, at 1:1–4.)

37. “Generally accepted standards of care” (or similar phrases such as “generally accepted standards of medical practice”) is a phrase found in class members plans, not an independent obligation under ERISA.

38. In other words, each of Plaintiffs' claims depends on the "central question" of whether UBH's guidelines are consistent with class members' plan terms taken as a whole.

39. Where, as here, the plan conveys discretion to interpret plan terms, "[a]ny dispute over the precise terms of the plan" is reviewed for abuse of discretion. *Aetna Health Inc. v. Davila*, 542 U.S. 200, 210 (2004) (*Firestone* rule applies to all disputes over plan terms); *see Varity* 516 U.S. at 514–15; *Tibble v. Edison Int'l*, 729 F.3d 1110, 1129 (9th Cir. 2013) *rev'd on other grounds*, 135 S. Ct. 1823 (2015) ("As to issues of plan interpretation that do not implicate ERISA's statutory duties, they are subject to *Firestone*" abuse of discretion review); *Firestone*, 489 U.S. at 111, 115.

40. Accordingly, each of Plaintiffs claims is subject to review for abuse of discretion.

**1. Plaintiffs Concede That The Abuse Of Discretion Standard Applies To Counts II and IV For Wrongful Denial Of Benefits.**

41. Plaintiffs concede that abuse of discretion is the appropriate standard of review for "Claim Two" for wrongful denial of benefits (Counts II and IV). (Oct. 5, 2017 Hrg. Tr., at 18:2–4; Trial Tr. 1846:3–4 (Closing Argument); ECF No. 392, at 75:10–16.); *see also Varity Corp.*, 516 U.S. at 512; *Tibble*, 729 F.3d at 1129; *Schultz v. Stoner*, 308 F. Supp. 2d 289, 303 (S.D.N.Y. 2004) (applying abuse of discretion standard to § 1132(a)(3) claim relating to interpretation of plan terms).

42. UBH's denial of benefits for each of the class members must be upheld if it was based upon a reasonable interpretation of the terms of that class member's plan, read as a whole. *Conkright*, 559 U.S. at 521; *Moyle*, 823 F.3d at 958.

**2. The Abuse Of Discretion Standard Applies To Count I Under § 1132(a)(1)(B) Because Claims For "Breach Of Fiduciary Duty" Under § 1132(a)(1)(B) Must Relate To Plan Interpretation.**

43. Plaintiffs bring Count I for breach of fiduciary duty under 29 U.S.C. § 1132(a)(1)(B).

44. Plaintiffs aver that UBH violated three supposedly-distinct fiduciary duties: (i) "a duty of *loyalty*;" (ii) "a duty of *care*;" and (iii) "a duty to *comply with plan terms*." (ECF No. 392, at 73:7–14 (emphasis in original).)

45. The duties of care and loyalty are set out in 29 U.S.C. § 1104, which is a different section of ERISA.

46. Plaintiffs agree that Count I is subject to review for abuse of discretion to the extent Count I alleges a breach of the duty to comply with plan terms, but they argue that "[t]he abuse of discretion standard does not apply to UBH's breaches of its duties of loyalty and care…." (ECF No. 392, at 73:15–16, 74:3–4.)

47. A claim for breach of the duty of loyalty or care that is divorced from interpretation of the plan terms is not cognizable under 29 U.S.C. § 1132(a)(1)(B).

48. Section 1132(a)(1)(B) only authorizes a beneficiary to bring claims "to recover benefits due to him *under the terms of his plan*, to enforce his rights *under the terms of the plan*, or to clarify his rights to future benefits *under the terms of the plan*." *See Varity Corp.*, 516 U.S. at 512 (section 1132(a)(1)(B) "provides a remedy for breaches of fiduciary duty *with respect to the interpretation of plan documents and the payment of claims*") (emphasis added).

49. There is no claim for breach of fiduciary duty under § 1132(a)(1)(B) *independent* from the terms of class members' plans, and § 1132(a)(1)(B) does not allow Plaintiffs to enforce § 1104's separate statutory duties. *Virtue v. Int'l Bhd. of Teamsters Ret. & Family Prot. Plan*, 886 F. Supp. 2d 32, 36 (D.D.C. 2012) ("while § 1132(a)(1)(B) allows enforcement of the 'terms of the plan,' it does not allow enforcement of ERISA provisions"). Plaintiffs cite no authority allowing such a claim.

50. Because § 1132(a)(1)(B) is limited to claims relating to the interpretation of plan terms and benefits, which Plaintiffs admit are subject to review for abuse of discretion, the abuse of discretion standard applies to all claims asserted under that section, including Count I. *Tibble*, 729 F.3d at 1129 ("As to issues of plan interpretation that do not implicate ERISA's statutory duties, they are subject to *Firestone*" abuse of discretion review); *see also Zhu v. Fujitsu Grp. 401(K) Plan*, No. C-03-1148RMW, 2003 WL 24030329, at *2 (N.D. Cal. Sept. 9, 2003) ("A claim for breach of fiduciary duty is actually a claim for benefits when a resolution of the claim rests upon an interpretation and application of an ERISA regulated plan").

51. Count I is subject to review under the abuse of discretion standard.

**3. The Abuse of Discretion Standard Applies to Count III Under § 1132(a)(3).**

52. Plaintiffs bring Count III for breach of fiduciary duty under 29 U.S.C. § 1132(a)(3).

53. Plaintiffs assert Count III along with Count I as part of a joint "Claim One." (ECF No. 392, at 73:8.)

54. Like Count I, Plaintiffs agree that Count III is subject to review for abuse of discretion to the extent Count I alleges a breach of the duty to comply with plan terms, but argue that a *de novo* standard of review applies to the extent Count III alleges breaches of the duties of loyalty and care. (ECF No. 392, at 73:15–16, 74:3–4.)

55. "[A] section [1132](a)(3) challenge . . . predicated on a plan interpretation . . . does not nullify the terms of the plan granting the administrator the right and responsibility, in the first instance, to interpret the plan provisions . . . ." *Schultz*, 308 F. Supp. 2d at 303 (applying abuse of discretion standard to § 1132(a)(3) fiduciary breach claim relating to interpretation of plan terms).

56. Accordingly, if the breaches of the duties of loyalty and care that Plaintiffs allege "are predicated on a plan interpretation," the abuse of discretion standard applies. *Schultz*, 308 F. Supp. 2d at 303; s*ee also Tibble*, 729 F.3d at 1129.

57. Count III is indistinguishable from the other Counts, which are subject to review for abuse of discretion.

58. As with all of Plaintiffs' claims, the "central issue" in Count III is whether UBH's guidelines are consistent with the plan language providing that, as one precondition of coverage, treatment must be consistent with "generally accepted standards of care."

59. Whether brought under section (a)(1)(B) or section (a)(3), and whether labeled a claim for benefits or a breach of fiduciary duty, that same discretionary act is subject to a single standard of review: abuse of discretion. *Varity Corp*., 516 U.S. at 514–15 (when basis for claim is that administrator misconstrued plan terms, abuse of discretion standard does not change simply because fiduciary-breach claim is pleaded under § 1132(a)(3)); *Lees v. Munich Reinsurance Am., Inc*., No. 14-2532 (MAS) (TJB) 2016 WL 164611, at *4 (D. N.J. Jan. 13, 2016) ("[E]ven if

Plaintiff asserted his claim for . . . breach of fiduciary duty theory under § 1132(a)(3), the same arbitrary and capricious standard that the Court applied to Plaintiff[']s § 1132(a)(1) claim . . . would apply").

60. The Ninth Circuit has held "that the *Firestone* framework can govern issues of plan interpretation, even when they arise outside the benefits context" – *i.e.*, outside of section (a)(1)(B). *Tibble*, 729 F.3d at 1129.

61. Parts of a plan cannot "be assigned one meaning when litigated under section 1132(a)(1)(B) and another meaning when litigated" as a breach of fiduciary duty because such a rule would create "uniformity problems." *Id.* at 1129; *see also Tussey v. ABB, Inc.*, 746 F.3d 327, 355 (8th Cir. 2014) (applying abuse of discretion standard to claims that administrator breached duties of loyalty and care because "[l]ike most circuits to address the issue, we see no compelling reason to limit *Firestone* deference to benefit claims").

62. Unless the terms of the plan are themselves unlawful, there is no breach of ERISA's duty of loyalty where the plan administrator "complied with the plan's lawful terms" because "ERISA does no more than protect the benefits which are due to an employee under a plan." *Wright*, 360 F.3d at 1100.

63. Plaintiffs try to distinguish their duty of loyalty and duty of care arguments from acts of plan interpretation by arguing that the process by which UBH developed its guidelines is itself a breach of those duties, without regard to the content of the guidelines. (ECF No. 392, 82:11–85:16.)

64. Plaintiffs never pled such claims, and those claims were not certified for class action treatment by the Court.

65. More importantly, the case Plaintiffs cite in support of this proposition, *Leber v. Citigroup 401(k) Plan Inv. Comm.*, No. 07-CV-9329 (SHS), 2017 WL 5664850, at *10 (S.D.N.Y. Nov. 27, 2017), demonstrates why Plaintiffs' process-based claims are indistinguishable from UBH's discretionary act of plan interpretation.

66. "[A] prerequisite to establishing liability for any fiduciary breach" is a showing "that the fiduciary breaches actually caused losses" to the plan or its members. *Leber*, 2017 WL

5664850 at *10.

67. Even if UBH's process for developing the guidelines constituted a stand-alone breach of UBH's fiduciary duties of loyalty or care, there is no injury to the class stemming from UBH's process for developing the guidelines other than the resulting content of the guidelines, which Plaintiffs admit reflects an act of plan interpretation. (Trial Tr. at 1833:16-20 (Closing Argument); ECF No. 392, at 78:21–24.)

68. Plaintiffs' assertions about the duty of loyalty and the duty of care are adequately addressed by the factors for assessing whether UBH abused its discretion, which include appropriate consideration of a conflict of interest, if any. *See Korotynska v. Metro. Life Ins. Co.*, 474 F.3d 101, 106 (4th Cir. 2006) (alleged breaches of fiduciary duties were adequately addressed by the traditional factors for assessing abuse of discretion, including conflict of interest).

69. As with all their claims, Count III challenges UBH's interpretation of class members' plan language relating to "generally accepted standards of care," and is subject to review under the abuse of discretion standard.

## II. PLAINTIFFS' BURDEN OF PROOF AT TRIAL

70. To satisfy their burden on both Counts I and II under 29 U.S.C. § 1132(a)(1)(B) and Counts III and IV under 29 U.S.C. § 1132(a)(3), Plaintiffs bore the burden to prove on a classwide basis and by a preponderance of the evidence each of the following elements:

i. UBH owed a fiduciary duty to all class members under their ERISA plans to develop and apply guidelines that are solely consistent with generally accepted standards of care, without regard to plan exclusions and other terms that govern what healthcare services are covered under the plans;

ii. UBH abused its discretion in interpreting the plans by developing and using guidelines that were more restrictive than generally accepted standards of care;

iii. UBH's abuse of discretion in interpreting the plans caused damage to the class members; and

iv. Plaintiffs are entitled to the relief sought.

*Brosted v. Unum Life Ins. Co. of Am.*, 421 F.3d 459, 465 (7th Cir. 2005); *see also Romberio v.*

*Unumprovident Corp.*, 385 F. App'x 423, 429 (6th Cir. 2009); *Hein v. F.D.I.C.*, 88 F.3d 210, 224 (3d Cir. 1996); *Graddy v. Blue Cross BlueShield of Tenn., Inc.*, No. 4:09-CV-84, 2010 WL 670081, at *8 (E.D. Tenn. Feb. 19, 2010); *Corenco Corp. v. Schiavone & Sons, Inc.*, 362 F. Supp. 939, 944 (S.D.N.Y. 1973); *Bd. of Trustees of Bay Area Roofers Health & Welfare Tr. Fund v. Westech Roofing*, No. 12-CV-05655-JCS, 2014 WL 4383062, at *3 (N.D. Cal. Sept. 4, 2014).

71. In addition, with respect to Counts III and IV brought under 29 U.S.C. § 1132(a)(3), even if Plaintiffs could prove the above elements, no relief is available under these counts if adequate remedies are available under § 1132(a)(1)(B). *Moyle*, 823 F.3d at 959.

72. Plaintiffs bore the burden to prove each of the elements of their claims "at trial through evidence . . . common to the class rather than individual to its members." *Stockwell v. City & Cty. of S. F.*, No. C 08-5180 PJH, 2015 WL 2173852, at *6 (N.D. Cal. May 8, 2015) (quotation omitted).

73. "Plaintiffs' class action was certified on the basis that Plaintiffs would establish at trial by common evidence" the elements of their claims as to all of "the absent class members." *Dilts v. Penske Logistics, LLC*, No. 08-CV-318-CAB BLM, 2014 WL 305039, at *3 (S.D. Cal. Jan. 21, 2014). If "[t]hat evidence did not materialize," Plaintiffs are not entitled to a class-wide judgment. *Id.*

74. The common evidence that is necessary to support a classwide determination is evidence that applies "to the class as a whole." *Cruz v. Dollar Tree Stores, Inc.*, No. 07-2050 SC, 2011 WL 2682967, at *7 (N.D. Cal. July 8, 2011).

75. Evidence will not support a classwide determination "where plaintiffs have provided no reliable means of extrapolating that [evidence] to the class as a whole." *Cruz*, 2011 WL 2682967, at *5, citing *Marlo v. United Parcel Service* ("*Marlo II*"), 639 F.3d 942 (9th Cir. 2011).

76. Anecdotal evidence about an unrepresentative sample of class members, plans, or benefit decisions "can't support an inference about the [circumstances] of thousands" of class members. *Espencheid v. DirectSat USA, LLC*, 705 F.3d 770, 775 (7th Cir. 2013).

77. Instead, "[c]ommon proof of some kind is necessary to support [a] class-wide

determination." *Marlo v. United Parcel Serv., Inc.* ("*Marlo I*"), 251 F.R.D. 476, 483, 488 (C.D. Cal. 2008).

78. The "existence of a policy," even a common policy, "does not necessarily establish" classwide proof of liability if "the policy may have accurately" applied to some individuals, but not others. *Marlo II*, 639 F.3d at 948.

79. To satisfy their burden of proof, Plaintiffs must show that UBH's interpretation of each class member's health benefit plan, as reflected in the guidelines, is illogical, implausible, or unsupported by the factual record. *Lafferty*, 436 F. App'x at 781.

## III. THE GUIDELINES ARE INCORPORATED INTO AND REFLECT PLAN TERMS, AND ARE NOT SUBJECT TO CHALLENGE AS A FIDUCIARY ACT

80. As discussed above, each of Plaintiffs' claims include the threshold burden to prove that UBH acted as a fiduciary and not as a settlor when it created the guidelines and used them to determine whether class members were entitled to benefits under the terms of their ERISA plans. *Brosted*, 421 F.3d at 465 (ERISA plaintiff bears the burden of establishing "that the defendants are plan fiduciaries").

81. Plaintiffs did not satisfy their burden to prove on an individual or classwide basis that UBH's development and adoption of the guidelines are fiduciary acts subject to judicial review under ERISA.

82. "ERISA does not create any substantive entitlement to employer-provided benefits." *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995).

83. "Employers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans." *Curtiss-Wright*, 514 U.S. at 78.

84. Because the plan sponsor has the exclusive right to determine whether to offer benefits at all, and, if offered, what the terms of that plan will be, a challenge to the plan's terms "is not a cognizable complaint under ERISA . . . ." *Curtiss-Wright*, 514 U.S. at 78.[2]

85. As discussed in the Court's Findings of Fact, many class members' plan

[2] Other state or federal laws may prescribe what services must be covered in a health benefit plan, but Plaintiffs state no claims based on those laws in this case.

documents reference UBH's guidelines using language that both parties agree is sufficient to incorporate the guidelines by reference.

86. Plaintiffs' construction of such plans – which dismisses out of hand plan language excluding treatment that is inconsistent with UBH's LOCGs and focuses exclusively on separate plan language relating to generally accepted standards of care – would render this distinct plan exclusion either superfluous or meaningless, which is an impermissible construction under ERISA. *Gilliam v. Nev. Power Co.*, 488 F.3d 1189, 1194 (9th Cir. 2007).

87. The conclusion that the LOCGs and CDGs are incorporated into such plans by reference is supported by *Jones v. Kodak Medical Assistance Plan*, 169 F.3d 1287, 1289–90 (10th Cir. 1999).

88. In *Jones*, two plan beneficiaries sued under ERISA after the plan administrator denied their claims for inpatient treatment for substance use disorder based on the administrator's internally-developed admission criteria. *Jones,* 169 F.3d at 1289–90. The trial court granted summary judgment in favor of the plan, in part, because "the criteria upon which the Plan Administrator based his decision were part of the Plan and thus could not be reviewed." *Id*. at 1289. The Tenth Circuit affirmed, holding that "the Plan Summary expressly authorized [the administrator] to determine eligibility for substance abuse treatment according to its own criteria," and this was sufficient to incorporate those criteria into the terms of the plan. *Id*. at 1292. The "criteria did not need to be listed in plan documents to constitute part of the plan." *Id.*

89. Here, the language incorporating the LOCGs into the plans is even stronger than in *Jones*.

90. The plans do not merely "authorize [UBH] to determine eligibility . . . according to its own criteria"; they specifically refer to UBH's "level of care guidelines" and exclude coverage for treatment that is not consistent with those guidelines.

91. Plaintiffs offered no proof of any plan without the incorporation language. Even if Plaintiffs had identified some plans that lacked the incorporation language, evidence relating to a handful of unrepresentative plans is not common proof sufficient to support a classwide determination that the guidelines represent a fiduciary act rather than an act of plan design.

*Brosted*, 421 F.3d at 465 (ERISA plaintiff bears the burden of establishing "that the defendants are plan fiduciaries"); *Stockwell*, 2015 WL 2173852, at *6 (class action plaintiff bears the burden of proving her claims "at trial through evidence . . . common to the class rather than individual to its members").

92. Evidence relating to a handful of plans is not sufficient to support a classwide judgment as to all of the plans. *Marlo II*, 639 F.3d at 948; *Cruz*, 2011 WL 2682967, at *4, 7; *see also Espencheid*, 705 F.3d at 775 ("What can't support an inference about the [circumstances] of thousands of [class members] is evidence of the experience of a small, unrepresentative sample of them"); *Dilts*, 2014 WL 305039, at *3 (decertifying class after trial because common proof "did not materialize").

93. Also, unlike in *Jones*, Plaintiffs *agree* that the precise language is sufficient to incorporate UBH's LOCGs in their entirety. Thus, UBH's guidelines at issue here are "shielded from judicial review." *See Jones*, 169 F.3d at 1292; *see also Curtiss-Wright*, 514 U.S. at 78 (critique of plan terms "is not a cognizable complaint under ERISA").

94. The question is not whether UBH was the sponsor of the class members' plans, but whether the plans, by design and as adopted, incorporate UBH's guidelines.

95. Where the plan sponsor has elected to incorporate as plan terms UBH's guidelines "as amended from time to time," UBH cannot violate ERISA by promulgating or applying those guidelines, as the plan requires. *See Wright*, 360 F.3d at 1100 (no breach of ERISA duty of loyalty where plan administrator "complied with the plan's lawful terms" because "ERISA does no more than protect the benefits which are due to an employee under a plan"); 29 U.S.C. § 1104(a)(1)(D) (imposing fiduciary duty to comply with plan terms).

96. Whether a plan term adopted by the settlor can be subject to challenge does not depend on who wrote the provision or who the plaintiff chose to sue. A plan term is subject to challenge under ERISA regardless of whether an insurance company or the plan's settlor wrote the language in the first place. *Curtiss-Wright*, 514 U.S. at 78.

97. The settlor's act of adopting a plan term is an act of plan design, and, once adopted, the plan term is not subject to challenge under ERISA. *Curtiss-Wright*, 514 U.S. at 78.

98. Where a plan incorporates UBH's guidelines as plan terms, the act of creating or modifying those guidelines is itself a settlor function, which the plan sponsor has delegated to UBH. *See Jones*, 169 F.3d at 1292 (holding that third-party benefits administrator performs a settlor function in drafting medical necessity criteria).

99. The plan sponsor is "free under ERISA, for any reason at any time, to adopt" terms of coverage. *Curtiss-Wright*, 514 U.S. at 78.

100. Whether the plan sponsor incorporated the LOCGs by reference or physically attached UBH's guidelines as an addendum to the plan, they have the same legal effect as terms of the plan. *See Shroyer v. New Cingular Wireless Servs., Inc.*, No. CV 06-1792-R FMOX, 2006 WL 5444358, at *1 (C.D. Cal. May 26, 2006), *rev'd on other grounds*, 498 F.3d 976 (9th Cir. 2007) (document incorporated into agreement by reference has same effect "as if the terms and conditions had been printed within the body of the agreements").

101. Plaintiffs' citation to *Pacific Shores Hospital v. United Behavioral Health* underscores that ERISA allows a plan sponsor to incorporate UBH's LOCGs as terms of the plan. In *Pacific Shores*, the Ninth Circuit described UBH's LOCGs as "plan documents" and treated them accordingly, reviewing UBH's application of the inpatient and continued service criteria to the specific facts of the plaintiffs' case for abuse of discretion. *Pacific Shores Hosp.*, 764 F.3d at 1042.

102. Whether UBH can amend a plan during the plan's effective term is irrelevant to whether the plan incorporates UBH's guidelines in effect on the plan's effective date.

103. Moreover, the plans expressly anticipate and confer on UBH the authority to "modify" its guidelines "from time to time." *See e.g.*, Trial Ex. 225-106-107; *see also Curtiss-Wright*, 514 U.S. at 85 (holding plan language that company "reserves the right at any time to amend the plan" is sufficient to state a valid amendment procedure, and the authority to amend plan terms may be delegated).

104. As UBH's guidelines are terms of the plans, UBH's guidelines are adopted and incorporated by the settlors of class members' plans.

105. Even if UBH's modification of its guidelines after a plan's effective date did not

constitute an amendment under the terms of that plan, UBH's use of a modified guideline is not an abuse of discretion if the modified guideline is consistent with the guideline adopted by the plan settlor in the first instance. *Wright*, 360 F.3d at 1100.

106. Plaintiffs did not satisfy their burden to prove on an individual or classwide basis that UBH used a guideline different from the guideline adopted by a plan sponsor in the terms of the plan or, if so, that the guideline used in such a benefit determination constituted an unreasonable interpretation of the guideline adopted by the plan's sponsor.

107. UBH's development and use of a Custodial Care CDG is not subject to challenge under ERISA, and is not an abuse of discretion, if that CDG is consistent with the definition of "custodial care" as defined and adopted by the plan settlor in the first instance. *Wright*, 360 F.3d at 1100.

## IV. TO THE EXTENT UBH'S PROMULGATION AND APPLICATION OF THE GUIDELINES IS A FIDUCIARY ACT IN WHOLE OR IN PART, PLAINTIFFS DID NOT PROVE THAT UBH ABUSED ITS DISCRETION IN CONSTRUING THE PLAN TERMS

### A. Plaintiffs Did Not Satisfy Their Burden to Prove On An Individual Or Classwide Basis That The Guidelines Are An Unreasonable Interpretation Of The Terms Of The Class Members' Plans.

108. At trial, Plaintiffs bore the burden to prove that UBH's guidelines amounted to an unreasonable interpretation of class members' plans, read as whole. *Webb v. The Hartford Fin. Servs. Grp., Inc.*, 608 F. Supp. 2d 1218, 1224 (C.D. Cal. 2009).

109. To satisfy their burden of proof on each of their claims, Plaintiffs were required to offer classwide proof that the guidelines, in fact, restricted coverage in violation of the terms of class members' plans as a whole. *Compare Saffle v. Sierra Pac. Power Co. Bargaining Unit Long Term Disability Income Plan*, 85 F.3d 455 458 (9th Cir. 1996) (remanding to plan administrator to determine plaintiffs' eligibility for coverage only after first determining the proper scope of coverage under plaintiffs' plan).

110. A plaintiff may not use ERISA to "rewrite the Plan to include covering . . . something it clearly excludes." *Pergosky v. Life Ins. Co. of N. Am.*, No. CIV.A. 01-4059, 2003 WL 1544582, at *7 (E.D. Pa. Mar. 24, 2003) (holding court could not "expand coverage beyond

the provisions of the ERISA group Plan").

111. Plaintiffs did not satisfy their burden to prove on a classwide basis that the guidelines were inconsistent with class members' plans read as a whole, including relevant terms, definitions, and exclusions.

112. Plaintiffs failed to satisfy this burden as individual plaintiffs, and they also failed to satisfy this burden classwide with evidence that is common to the class as a whole. *Stockwell*, 2015 WL 2173852 at *6; *Marlo I*, 251 F.R.D. at 488.

113. Plaintiffs did not satisfy their burden to prove on an individual or classwide basis that UBH abused its discretion in interpreting class members' plans with respect to the specific aspects of the guidelines that plaintiffs criticize from 2011 to 2017.

114. Plaintiffs did not satisfy their burden to prove on an individual or classwide basis that UBH abused its discretion to interpret class members' plans and the benefits available thereunder in creating, adopting, and using its guidelines from 2011 to 2017.

**B. Plaintiffs Did Not Prove That UBH's Guidelines Are An Unreasonable Interpretation of Generally Accepted Standards Of Care.**

115. Because there is no single source or definition of generally accepted standards of care, UBH's interpretation of that phrase must be affirmed if it was reasonable. *Moyle* 823 F.3d 958.

116. If "reasonable people can disagree" about the proper interpretation of generally accepted standards of care, UBH "cannot be characterized as acting arbitrarily for disagreeing with a plaintiff." *Webb* 608 F. Supp. 2d at 1227; *Boyd*, 410 F.3d at 1179 (a "mere tally of experts is insufficient to demonstrate that an ERISA fiduciary has abused its discretion, for even a single persuasive medical opinion may constitute substantial evidence upon which a plan administrator may rely.").

117. Even if the court concluded that UBH's construction of generally accepted standards of care was incorrect, an incorrect construction is not unreasonable unless it was "clearly erroneous." *Voight v. Metro. Life Ins. Co.*, 28 F. Supp. 2d 569, 580 (C.D. Cal. 1998) ("Reasonable minds might also disagree, but it was not so clearly erroneous as to constitute an

abuse of discretion."); *see also Taft*, 9 F.3d at 1473 ("In the ERISA context, even decisions directly contrary to evidence in the record do not necessarily amount to an abuse of discretion.").

**1. Plaintiffs Did Not Satisfy Their Burden To Prove That UBH's LOCGs Are An Unreasonable Interpretation of Generally Accepted Standards Of Care.**

118. Plaintiffs did not satisfy their burden to prove that UBH's 2011 LOCGs are an unreasonable interpretation of generally accepted standards of care.

119. Plaintiffs did not satisfy their burden to prove that UBH's 2012 LOCGs are an unreasonable interpretation of generally accepted standards of care.

120. Plaintiffs did not satisfy their burden to prove that UBH's 2013 LOCGs are an unreasonable interpretation of generally accepted standards of care.

121. Plaintiffs did not satisfy their burden to prove that UBH's 2014 LOCGs are an unreasonable interpretation of generally accepted standards of care.

122. Plaintiffs did not satisfy their burden to prove that UBH's 2015 LOCGs are an unreasonable interpretation of generally accepted standards of care.

123. Plaintiffs did not satisfy their burden to prove that UBH's 2016 LOCGs as adopted in January 2016 are an unreasonable interpretation of generally accepted standards of care.

124. Plaintiffs did not satisfy their burden to prove that UBH's 2016 LOCGs as amended in June 2016 are an unreasonable interpretation of generally accepted standards of care.

125. Plaintiffs did not satisfy their burden to prove that UBH's 2017 LOCGs are an unreasonable interpretation of generally accepted standards of care.

**2. Plaintiffs Did Not Satisfy Their Burden To Prove That UBH's Custodial Care CDGs Are An Unreasonable Interpretation of Generally Accepted Standards Of Care And The Terms Of Class Member's Plans.**

126. Plaintiffs did not satisfy their burden to prove on an individual or classwide basis that UBH's Custodial Care CDGs constituted an unreasonable interpretation of the term "custodial care" as defined in class members' plans from 2011 to 2017.

127. Plaintiffs did not satisfy their burden to prove on an individual or classwide basis that UBH's Custodial Care CDGs constituted an unreasonable interpretation of generally

accepted standards of care with respect to the ways in which they expressed the concepts of custodial care, active treatment, and improvement from 2011 to 2017.

128. Plaintiffs did not satisfy their burden to prove on an individual or classwide basis that UBH abused its discretion to interpret class members' plans and the benefits available thereunder in creating, adopting, and using its Custodial Care CDGs from 2011 to 2017.

### C. Plaintiffs Failed To Offer Classwide Proof That UBH's Guidelines Are Inconsistent With Plan Terms And Generally Accepted Standards Of Care For Residential Treatment Of Substance Use Disorders.

129. Plaintiffs did not satisfy their burden to prove on an individual or classwide basis that UBH's guidelines are inconsistent with the ASAM criteria or generally accepted standards of care with respect to the way the guidelines account for substance use treatment at a residential treatment facility from 2011 to 2017.

130. Plaintiffs did not satisfy their burden to prove on an individual or classwide basis that coverage for treatment at ASAM levels 3.5, 3.3 and 3.1 was available under class members plans from 2011 to 2017.

131. Plaintiffs did not satisfy their burden to establish that any class member sought benefits for treatment at an ASAM Level 3.5 facility.

132. Plaintiffs did not satisfy their burden to establish that any class member sought benefits for treatment at an ASAM Level 3.3 facility.

133. Plaintiffs did not satisfy their burden to establish that any class member sought benefits for treatment at an ASAM Level 3.1 facility.

134. Plaintiffs did not satisfy their burden to prove on an individual or classwide basis that UBH abused its discretion to interpret class members' plans and the benefits available thereunder with respect to residential treatment of substance use disorders in its LOCGs or CDGs from 2011 to 2017.

### D. Plaintiffs Failed To Offer Classwide Proof That Their Critiques Apply Equally To Each Of The Level Of Care Guidelines At Issue In Each Year In The Class Period.

135. The "existence of a policy," even a common policy, "does not necessarily establish" classwide proof of liability if "the policy may have accurately" applied to some

individuals, but not others. *Marlo II*, 639 F.3d at 948.

136. Plaintiffs did not satisfy their burden to demonstrate with common proof that their criticisms of the guidelines apply equally to all class members and to all plans, and Plaintiffs are not entitled to a classwide judgment. *Marlo I*, 251 F.R.D. at 488 ("Common proof of some kind is necessary to support [a] classwide determination.").

## V. PLAINTIFFS FAILED TO SATISFY THEIR BURDEN OF CLASSWIDE PROOF WITH RESPECT TO THE CDGS

137. Plaintiffs did not satisfy their burden to prove that the CDGs incorporated any portion of the LOCGs with respect to seven of their eight theories of incorporation:

i. Plaintiffs did not satisfy their burden to establish that CDGs in their "Category A" incorporated the LOCGs or that UBH applied any criteria from the LOCGs to any class members' benefit decision using a CDG in "Category A";

ii. Plaintiffs did not satisfy their burden to establish that CDGs in their "Category B" incorporated the LOCGs or that UBH applied any criteria from the LOCGs to any class members' benefit decision using a CDG in "Category B";

iii. Plaintiffs did not satisfy their burden to establish that CDGs in their "Category C" incorporated the LOCGs or that UBH applied any criteria from the LOCGs to any class members' benefit decision using a CDG in "Category C";

iv. Plaintiffs did not satisfy their burden to establish that CDGs in their "Category D" incorporated the LOCGs or that UBH applied any criteria from the LOCGs to any class members' benefit decision using a CDG in "Category D";

v. Plaintiffs did not satisfy their burden to establish that CDGs in their "Category E" incorporated the LOCGs or that UBH applied any criteria from the LOCGs to any class members' benefit decision using a CDG in "Category E";

vi. Plaintiffs did not satisfy their burden to establish that CDGs in their "Category F" incorporated the LOCGs or that UBH applied any criteria from the LOCGs to any class members' benefit decision using a CDG in "Category F";

vii. Plaintiffs did not satisfy their burden to establish that CDGs in their "Category

H" incorporated the LOCGs or that UBH applied any criteria from the LOCGs to any class members' benefit decision using a CDG in "Category H";

138. With the exception of the 29 diagnosis-specific CDGs in Plaintiffs' "Category G," Plaintiffs did not satisfy their burden to establish that each of the CDGs at issue incorporated UBH's LOCGs, either in whole or in part.

139. For the 29 CDGs in Plaintiffs' "Category G," Plaintiffs did not satisfy their burden to prove that their critiques to the corresponding portion of the corresponding year of the LOCGs that is included verbatim in each CDG are equally applicable to the CDG in light of: (a) how that language is used in the context of each CDG; (b) how that language interacts with other language in the CDGs that may either enhance or diminish its significance in that specific CDG; or (c) generally accepted standards of care for the treatment of the diagnosis that is the subject of that CDG.

140. Plaintiffs did not satisfy their burden to prove on an individual or classwide basis that each of the 224 CDGs they challenge in this case is intended to construe the phrase generally accepted standards of care, as opposed to the full extent of coverage available under a member's health benefit plan.

141. Plaintiffs did not satisfy their burden to prove on an individual or classwide basis that each of the 224 CDGs at issue is an unreasonable interpretation of the full extent of coverage available under the terms of each class members' plan from 2011 to 2017.

142. Plaintiffs did not satisfy their burden to prove on an individual or classwide basis that UBH abused its discretion to interpret class members' plans and the benefits available thereunder in creating, adopting, and using its CDGs from 2011 to 2017.

## VI. PLAINTIFFS FAILED TO OFFER CLASSWIDE PROOF THAT ANY OF THE CRITICISMS THEIR EXPERTS IDENTIFIED IN THE GUIDELINES WAS RELEVANT TO OR AFFECTED CLASS MEMBERS' BENEFIT DECISIONS

143. Whether styled as a claim for breach of fiduciary duty or improper denial of benefits, Plaintiffs' claims under Counts I and II (or alternatively Counts III and IV) require proof that UBH's alleged abuse of discretion in interpreting the plans caused class members harm. *See, e.g.*, *Romberio*, 385 F. App'x at 429 (emphasis omitted) ("Absent a showing that benefits were

wrongfully denied, there can be no causal link between an alleged breach and a denial of benefits"); *Patel-Puri v. Metro. Life Ins.* Co., No. C-05-0455 MMC, 2008 WL 2609711, at *5 n.12 (N.D. Cal. June 27, 2008) ("A showing of injury is, of course, also required to obtain equitable relief" under section (a)(3)); *Payne v. POMCO Grp.*, . 10 Civ. 7285 (BSJ), 2011 WL 4576545, at *2 (S.D.N.Y. Sept. 30, 2011) (claims for arbitrary and capricious denial of benefits "rest[] upon three elements, namely that 1) the plan at issue is an employee benefit plan covered by ERISA, 2) the plaintiff is covered by this plan, and 3) the plaintiff was wrongfully denied benefits under the plan."); *Biba v. Wells Fargo & Co.*, No. C09-3249 MEJ, 2010 WL 4942559, at *7 (N.D. Cal. Nov. 10, 2010) (similar).

144. Causation is an independent element of Plaintiffs' claims, distinct from the element of breach. *Brosted*, 421 F.3d at 465 ("To state a claim for breach of fiduciary duty under ERISA, the plaintiff must establish: (1) that the defendants are plan fiduciaries; (2) that the defendants breached their fiduciary duties; and (3) that the breach caused harm to the plaintiff.").

145. Absent classwide evidence that UBH's alleged unreasonable interpretation of the plans caused tangible harm to class members, Plaintiffs cannot prevail at trial. *Graddy*, 2010 WL 670081, at *8; *see also Skinner v. Northrop Grumman Ret. Plan B*, 673 F.3d 1162, 1167 (9th Cir. 2012) ("Appellants argue that the 'harm' of being deprived of their statutory right [under ERISA] is a compensable harm, but we disagree.").

146. Plaintiffs did not satisfy their burden to prove on an individual or classwide basis that they were actually entitled to benefits under their view of the plan terms properly construed. *See*, *e.g.*, *Romberio*, 385 F. App'x at 429; *Hein v. F.D.I.C.*, 88 F.3d 210, 224 (3d Cir. 1996); *Carrier v. Aetna Life Ins. Co.*, 116 F. Supp. 3d 1067, 1079 (C.D. Cal. 2015); *Biba*, 2010 WL 4942559 at *7.

147. Plaintiffs also offered no evidence connecting their criticisms of the guidelines with the class members' benefit determinations. Nor could they, for the "harm" Plaintiffs allege is not capable of classwide proof. "Where, as here, the alleged breach purportedly results in the wrongful denial or termination of a participant's benefits, the existence of a causal link between the breach and the harm is particularly dependent upon the equities of the participant's claim" and

inherently "depends on a number of factors peculiar to the claimant's case." *Romberio*, 386 F. App'x at 429.

148. It is not enough for Plaintiffs to show that UBH applied a guideline to class members' benefit decisions to satisfy their burden of establishing harm on a classwide basis.

149. Plaintiffs did not satisfy their burden to prove on an individual or classwide basis that the specific "flaws" they identify in the guidelines were consequential to any benefit decision.

150. A class member was not harmed if UBH "applied" and denied benefits based on a portion of the guidelines that is indisputably consistent with generally accepted standards of care, was otherwise consistent with the class member's plan, or which Plaintiffs do not challenge.

151. This failure of proof is even greater with respect to the approximately half of the class members whose benefit decisions referenced a CDG because Plaintiffs did not establish with classwide proof that the majority of the CDGs at issue include the substantive provisions of the LOCGs or any of the specific "flaws" Plaintiffs allege.

## VII. PLAINTIFFS FAILED TO PROVE THAT THEY HAVE ARTICLE III STANDING TO BRING THEIR CLAIMS

152. As the Supreme Court has explained, "the irreducible constitutional minimum of standing contains three elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

153. "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

154. A plaintiff "must demonstrate standing separately for each form of relief sought," including injunctive relief. *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000).

155. It is well-established that "[t]he actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing." *Warth v. Seldin*, 422 U.S. 490, 500 (1975).

156. Some courts have relied on that authority to hold that "when plan participants seek

injunctive relief for violations of ERISA's disclosure or fiduciary requirements, they can demonstrate Article III standing by showing a violation of ERISA and need not prove actual injury." *Wells v. Cal. Physicians' Serv.*, No. C05-01229 CRB ,2007 WL 926490, at *3 (N.D. Cal. Mar. 26, 2007); *see Slack v. Int'l Union of Operating Engineers*, No. C-13-5001 EMC, 2014 WL 4090383, at *12 (N.D. Cal. Aug. 19, 2014) (ERISA confers statutory standing to seek injunctive relief under § 1132(a)(3) and a plaintiff need not experience an actual loss to have Article III standing to assert such a claim).

157. But while a plaintiff may in some circumstances be permitted to sue for an injunction to remedy a breach of fiduciary duty under § 1132(a)(3) without demonstrating any individual harm, a plaintiff does *not* have Article III standing to sue under § 1132(a)(1)(B) absent a showing of individualized harm. This is so because "ERISA § [1132](a)(1)(B) does not *create* a claim (*i.e.,* a statutory injury) which otherwise would not exist; it merely provides that claims for employee benefits, which . . . previously would have been presented under common law theories such as breach of contract, are preempted." *Slack*, 2014 WL 4090383, at *13 (quoting *Spinedex Physical Thereapy, USA, Inc. v. United Healthcare of Arizona, Inc.*, No. CV-08-004457-PHX-ROS , 2012 WL 8147128, at *2 n.3 (D. Ariz. Oct. 24, 2012)).

158. Thus, when dealing with claims under ERISA § 1132(a)(1)(B), "normal standing rules should apply." *Spinedex*, 2012 WL 8147128 at *2 n.3.

159. This principle applies regardless of whether the plaintiff seeks retrospective or prospective relief. For example, in *Meidl v. Aetna, Inc.*, No. 15-CV- 1319(JCH), 2017 WL 1831916 (D. Conn. May 4, 2017), the court concluded that the plaintiff lacked standing "to pursue an order permanently enjoining the defendants from treating TMS as experimental or investigational, which is a form of prospective injunctive relief," because he had "not established a likelihood that the defendants will deny hi[s] TMS claims in the future" and had testified in his deposition that "he ha[d] no plans to seek TMS again." *Id.* at *4.

160. Plaintiffs here have similarly failed to establish an actual or imminent threat of future harm based on UBH's use of its current guidelines, because they have not demonstrated that they are likely to be denied coverage based on the challenged guidelines criteria in the future.

Even as to those plaintiffs who are still plan participants (and not all of the plaintiffs are), the mere fact that they sought and were denied benefits in the past does not on its own support a finding that they are likely to seek and wrongfully be denied benefits again in the future.

161. To have standing to seek reprocessing, which is a retrospective remedy, a plaintiff must establish that he has suffered "an injury in fact, in the form of a deprivation of the health insurance benefits to which . . . he was entitled" and that "there is a causal connection between this injury and the conduct complained of" — here, UBH's alleged application of guidelines that deviated from plan terms. *Id.* at *6.

162. Plaintiffs have neither shown that they would have been entitled to benefits under their plan construction or even attempted to establish some causal connection between the asserted flaws in the guidelines and the denial of benefits, and they have therefore failed to demonstrate an actual, concrete and particularized injury that is "fairly traceable to the challenged conduct of the defendant." *Spokeo*, 136 S. Ct. at 1547.

163. The mere possibility that plaintiffs *might have* been wrongfully denied benefits as a result of UBH's application of the guidelines is insufficient to establish Article III standing for retrospective relief.

## VIII. PLAINTIFFS ARE NOT ENTITLED TO FINDINGS OF LIABILITY ON COUNTS III AND IV UNDER § 1132(A)(3) BECAUSE THOSE CLAIMS ARE DUPLICATIVE OF COUNTS I AND II

164. "Equitable relief under § 1132(a)(3) is not available if § 1132(a)(1)(B) provides an adequate remedy." *Moyle*, 823 F.3d at 959.

165. "[R]elief under § [1132](a)(3) is contingent on a showing that the claimant could not avail himself or herself of an adequate remedy pursuant to § [1132](a)(1)(B)." *Rochow v. Life Ins. Co. of N. Am.*, 780 F.3d 364, 372 (6th Cir. 2015) (en banc); *see Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1475 (9th Cir. 1997), *overruled on other grounds by Lacey v. Maricopa Cty.*, 693 F.3d 896 (9th Cir. 2012).

166. This is not a question of which remedies the Court should allow. Because § 1132(a)(1)(B) "specifically provides a remedy for breaches of fiduciary duty with respect to the interpretation of plan documents and the payment of claims," *Varity*, 516 U.S. at 512, Plaintiffs'

remedies under § 1132(a)(1)(B) are adequate. *See Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 146–47 (1985) (declaratory relief and prospective injunction clarifying rights to future benefits available under (a)(1)(B)); *Saffle*, 85 F.3d at 460–61 (reprocessing available under (a)(1)(B)).

167. This is so even if Plaintiffs fail to prove their claims under section (a)(1)(B) because the "availability of an adequate remedy under the law for *Varity* purposes does not mean, nor does it guarantee, an adjudication in one's favor." *Katz v. Comprehensive Plan of Grp. Ins.*, 197 F.3d 1084, 1089 (11th Cir. 1999); *see Rochow*, 780 F.3d at 372 (*Varity* rule operates "irrespective of the degree of success obtained on a claim for recovery of benefits under § [1132](a)(1)(B)"); *Tolson v. Avondale Indus.*, 141 F.3d 604, 610 (5th Cir. 1998) (same).

## IX. PLAINTIFFS DID NOT CARRY THEIR BURDEN WITH RESPECT TO THE STATE MANDATE CLASS

### A. Plaintiffs Did Not Prove UBH Violated Texas Law.

168. Throughout the relevant class period, Texas law required health plan administrators to apply criteria issued by the Texas Department of Insurance (known as the TDI or TCADA criteria) when making medical necessity determinations for members receiving or seeking substance use disorder treatment from providers in Texas. *See* 28 Tex. Admin. Code § 3.8003 (2017).

169. Plaintiffs did not satisfy their burden to prove on an individual or classwide basis that any UBH Peer Reviewer actually failed to apply the Texas guidelines in connection with *any* State Mandate Class Member's benefit request, much less all of them.

170. Plaintiffs did not satisfy their burden to prove on an individual or classwide basis that UBH violated Texas law.

171. Plaintiffs did not satisfy their burden to prove on an individual or classwide basis that UBH breached its fiduciary duties or wrongfully denied benefits to Texas members of the State Mandate Class.

### B. Plaintiffs Did Not Prove UBH Violated Illinois Law.

172. Effective August 18, 2011, Illinois law provided that "medical necessity

determinations for substance use disorders shall be made in accordance with appropriate patient placement criteria established by the American Society of Addiction Medicine." 215 Ill. Comp. Stat. § 5/370c(b)(3) (eff. Aug. 18, 2011) (applicable to patients who are residents of or employed in Illinois).

173. In 2015, the Illinois legislature amended the statute to provide that plan administrators must actually use the ASAM criteria, adding "[n]o additional criteria may be used to make medical necessity determinations for substance use disorders." 215 Ill. Comp. Stat. 5/370c(b)(3).

174. The legislative history of 215 Ill. Comp. Stat. § 5/370c(b)(3) demonstrates that, prior to the 2015 amendment, Illinois law did not require UBH to use the ASAM criteria.

175. In 2015, the Illinois Department of Insurance assembled a working group to address treatment and coverage of substance use disorders. The group noted that the original version of the law did not require the use of ASAM, leading to a lack of uniformity in utilization review practices: "Sometimes providers use ASAM guidelines while payers use other guidelines. The combination of systems and approaches to obtain information regarding medical necessity leads to confusion." Ill. Dept. of Ins. Working Group re Treatment and Coverage of Substance Abuse Disorders and Mental Illness Annual Report at 2, *available at* https://insurance.illinois.gov/newsrls/2017/01/MHSUDWGRptToGA_Jan2017.pdf.

176. The working group suggested that "[i]ncreased transparency may help decrease misunderstanding" and recommended that Illinois providers and payers "continue to work to find a consistent set of criteria so needed services can be provided." *Id.*

177. Consistent with the working group's recommendation to adopt a uniform set of guidelines, the Illinois Senate, in enacting the 2015 amendment, explained that the amended law was meant to "specify" that insurers must use ASAM. *See* Ill. Senate Tr., 2015 Reg. Sess. No. 52.

178. Illinois Governor Bruce Rauner initially vetoed the 2015 amendment because it would eliminate payers' ability to apply other guidelines. *See* Ill. Gen. Assembly re Full Text of HB0001, Governor's Message, a*vailable at* http://www.ilga.gov/legislation/fulltext.asp?DocName=09900HB0001gms&GA=99&SessionId=

88&DocTypeId=HB&LegID=83490&DocNum=0001&GAID=13&Session= (vetoing amendment because it "removes utilization controls" other than ASAM and may hinder the state's "ability to contain rising costs").

179. Plaintiffs did not satisfy their burden to prove on an individual or classwide basis that UBH breached its fiduciary duties or wrongfully denied benefits to Illinois members of the State Mandate Class.

**C. Plaintiffs Did Not Prove UBH Violated Rhode Island Law.**

180. Since July 10, 2015, Rhode Island law required that health plan administrators "rely upon" ASAM criteria "when developing coverage for levels of care for substance use disorder treatment." 27 R.I. Gen. Laws § 27-38.2-1(g).

181. This law is limited to services provided by in-network providers. 27 R.I. Gen. Laws § 27-38.4.

182. Rhode Island law does not require UBH to use the ASAM criteria. Rather, Rhode Island law requires that UBH "rely upon" those criteria in developing its own guidelines. 27 R.I. Gen. Laws § 27-38.2-1(g).

183. Plaintiffs did not satisfy their burden to prove on an individual or classwide basis that UBH failed to "rely upon" the ASAM criteria when UBH developed its guidelines.

184. Plaintiffs also did not establish that any class member sought benefits for treatment from an in-network provider in Rhode Island.

185. Plaintiffs have not satisfied their burden of classwide proof on their claims based on violation of Rhode Island law.

186. Plaintiffs did not satisfy their burden to prove on an individual or classwide basis that UBH breached its fiduciary duties or wrongfully denied benefits to Rhode Island members of the State Mandate Class.

**D. Plaintiffs Did Not Prove UBH Violated Connecticut Law.**

187. Beginning in 2013, Connecticut law required that health plan administrators either (a) use the ASAM criteria in making medical necessity determinations for substance use disorder treatment in that state, or (b) "demonstrate[]" that the administrator's own guidelines are

"consistent with the most recent ASAM criteria." Conn. Gen. Stat. § 38a-591c.

188. Plaintiffs did not establish that UBH failed to "demonstrate" that UBH's guidelines "are consistent with the most recent ASAM criteria" under Connecticut law.

189. Plaintiffs have not satisfied their burden of classwide proof on their claims based on violation of Connecticut law.

190. Plaintiffs did not satisfy their burden to prove on an individual or classwide basis that UBH breached its fiduciary duties or wrongfully denied benefits to Connecticut members of the State Mandate Class.

## X. PLAINTIFFS' COUNTS

### A. Count I for Breach of Fiduciary Duty Under 29 U.S.C. § 1132(a)(1)(B)

191. The Court hereby incorporates paragraphs 1 through 190 above.

192. For the reasons stated more fully above, Plaintiffs did not satisfy their burden of individual or classwide proof to establish all of the elements of Count I for Breach of Fiduciary Duty under 29 U.S.C. § 1132(a)(1)(B).

193. UBH is entitled to judgment in its favor on Count I.

### B. Count II for Improper Denial of Benefits Under 29 U.S.C. § 1132(a)(1)(B)

194. The Court hereby incorporates paragraphs 1 through 190 above.

195. For the reasons stated more fully above, Plaintiffs did not satisfy their burden of individual or classwide proof to establish all of the elements of Count II for Improper Denial of Benefits under 29 U.S.C. § 1132(a)(1)(B).

196. UBH is entitled to judgment in its favor on Count II.

### C. Count III for Breach of Fiduciary Duty Under 29 U.S.C. § 1132(a)(3)

197. The Court hereby incorporates paragraphs 1 through 190 above.

198. For the reasons stated more fully above, Plaintiffs did not satisfy their burden of individual or classwide proof to establish all of the elements of Count III for Breach of Fiduciary Duty under 29 U.S.C. § 1132(a)(3).

199. UBH is entitled to judgment in its favor on Count III.

### D. Count IV for Improper Denial of Benefits Under 29 U.S.C. § 1132(a)(3)

200. The Court hereby incorporates paragraphs 1 through 190 above.

201. For the reasons stated more fully above, Plaintiffs did not satisfy their burden of individual or classwide proof to establish all of the elements of Count IV for Improper Denial of Benefits under 29 U.S.C. § 1132(a)(3).

202. UBH is entitled to judgment in its favor on Count IV.

## XI. UBH'S AFFIRMATIVE DEFENSE OF FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES

203. Before a plaintiff may bring suit under ERISA to enforce a right conferred by a benefit plan, the plaintiff must exhaust his or her available administrative remedies irrespective of whether the plaintiff's claims are characterized as a breach of fiduciary duty or denial of benefits. *Amato v. Bernard*, 618 F.2d 559, 566--67 (9th Cir. 1980); *see also Stephens v. Pension Ben. Guar. Corp.*, 755 F.3d 959, 966 n.7 (D.C. Cir. 2014) (a plaintiff cannot "avoid the exhaustion requirement by recharacterizing a claim for benefits as a claim for breach of fiduciary duty" because all "plan-based claims" require exhaustion); *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011) (under the Rules Enabling Act "a class cannot be certified on the premise that [a defendant] will not be entitled to litigate its statutory defenses to individual claims.").

204. The Ninth Circuit has made clear that a claimant cannot attach a "'statutory violation' sticker to his or her [denial of benefits] claim and then . . . use that label as an asserted justification" for failure to exhaust. *Diaz v. United Agr. Employee Welfare Ben. Plan and Tr.*, 50 F.3d 1478, 1484 (9th Cir. 1995); *Stephens*, 755 F.3d at 996 n.7 (D.C. Cir. 2014).

205. Plaintiffs' reliance on the class certification decision in *Des Roches v. California Physicians' Services* 320 F.R.D. 486 (N.D. Cal. 2017) is unavailing.

206. In *Des Roches*, the defendants argued that failure of absent class members to exhaust their administrative remedies would "present individual issues that defeat commonality" and preclude class certification. 320 F.R.D. at 500. Relying on an overly broad interpretation of a Seventh Circuit opinion (*In re Household Int'l Tax Reduction Plan*, 441 F.3d 500 (7th Cir. 2006)), the district court held that "unnamed class members in an ERISA class action need not

exhaust their administrative remedies." *Des Roches*, 320 F.R.D. at 501.

207. However, the Seventh Circuit in *In re Household* announced a much more restricted holding, stating only that a district court judge has the *discretion* to waive the exhaustion requirement for the purposes of granting class certification in instances when the plan document itself *does not* require exhaustion of internal remedies. *In re Household*, 441 F.3d at 502.

208. This case is distinguishable because, as discussed in the Court's Findings of Fact, class members' plans did require members to exhaust the administrative remedies available to them as a precondition to bringing legal action. Plaintiffs point to no case law holding that judicial discretion is capable of overriding the express terms of a plan.

209. "[A]pplying federal common law doctrines to alter ERISA plans is inappropriate where the terms of an ERISA plan are clear and unambiguous." *Zurich Am. Ins. Co. v. O'Hara*, 604 F.3d 1232, 1237 (11th Cir. 2010)*; see also Burke v. PriceWaterHouseCoopers LLP Long Term Disability Plan*, 572 F.3d 76, 81 (2d Cir. 2009) (enforcing plan-based limitation on filing suit because courts cannot "rewrite" ERISA plans, and plan administrator had an enforceable "expectation based on a term in [the] plan").

210. Furthermore, waiver of exhaustion is not automatic simply because a plaintiff seeks class relief. Plaintiffs bear the burden of proving an exception to the exhaustion requirement applies. *Casatelli v. Horizon Blue Cross Blue Shield of New Jersey*, No. 2:09-cv-6101 (SDW)(MCA), 2010 WL 3724526, at *6 (D.N.J. Sept. 13, 2010).

211. Before exercising its judicial discretion to waive exhaustion, a court must examine "whether some useful purpose would be served by requiring any of the unnamed class members to have exhausted their internal remedies." *In re Household*, 441 F.3d at 502.

212. Plaintiffs have not satisfied their burden to prove that requiring exhaustion would have served no useful purpose.

213. In this instance, exhaustion would have resulted in a more sharply defined class limited to individuals who adhered to the express requirements of their plans, and proceeded with each level of appellate review, which might have resulted in authorization of benefits without

filing suit.

214. Nor have Plaintiffs satisfied their burden to prove that requiring class members' compliance with the administrative remedies afforded to them under their plans would have been futile. *Casatelli*, 2010 WL 3724526 at *6 ("The party invoking the futility exception to the requirement of administrative exhaustion bears the burden of proof.").

215. "In order to come under the futility exception to the exhaustion requirement a plaintiff must show that it is certain that her claim will be denied on appeal, not merely that she doubts that an appeal will result in a different decision." *In re WellPoint, Inc. Out-of-Network "UCR" Rates Litig*., No. MDL092074PSGFFMX, 2013 WL 12130034, at *20 (C.D. Cal. July 19, 2013) (*see also Churchill v. Cigna Corp.*, No. CIV.A. 10-6911, 2011 WL 3563489, at *7 (E.D. Pa. Aug. 12, 2011) ("In the class action context, it is impossible to adduce clear evidence of futility…, since the class action device precludes consideration of individual circumstances").

216. Plaintiffs did not satisfy their burden to establish on a classwide basis that class members' appeals certainly would have been denied, if they had filed them.

217. Furthermore, unlike in *Barnes v. AT&T Pension Benefit Plan*—the only case on which Plaintiffs rely for support—the dispute in this case does not involve the interpretation, and universal application, of a single term or phrase. 270 F.R.D. 488, 491–92 (N.D. Cal. 2010). Rather, this case involves clinicians exercising their clinical judgment, and this application of clinical judgment means members are entitled to an individualized interpretation of the coverage criteria at each stage of the review process.

218. UBH satisfied its burden of proof with respect to its affirmative defense based on failure to exhaust administrative remedies, and Plaintiffs failed to satisfy their burden to prove that an exception to the exhaustion requirement applies. UBH is entitled to judgment in its favor on its affirmative defense that class members failed to exhaust their administrative remedies.

Dated: January 22, 2018

**CROWELL & MORING LLP**

*/s/ Jennifer S. Romano*

Jennifer S. Romano

Attorneys for UNITED BEHAVIORAL HEALTH