PSYCH-APPEAL, INC.
Meiram Bendat (Cal. Bar No. 198884)
8560 West Sunset Boulevard, Suite 500
West Hollywood, CA 90069
Tel: (310) 598-3690, x.101
Fax: (888) 975-1957
mbendat@psych-appeal.com

ZUCKERMAN SPAEDER LLP
D. Brian Hufford (admitted *pro hac vice*)
Jason S. Cowart (admitted *pro hac vice*)
485 Madison Avenue, 10th Floor
New York, NY 10022
Tel: (212) 704-9600
Fax: (212) 704-4256
dbhufford@zuckerman.com
jcowart@zuckerman.com

*Attorneys for Plaintiffs and the Classes*
*(Additional Counsel on Signature Page)*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| DAVID AND NATASHA WIT, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED BEHAVIORAL HEALTH (operating as OPTUMHEALTH BEHAVIORAL SOLUTIONS),<br><br>Defendant. | Case No. 3:14-CV-02346-JCS<br>Action Filed: May 21, 2014<br><br><br><br>**PLAINTIFFS' POST-TRIAL REPLY BRIEF** |
| GARY ALEXANDER, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED BEHAVIORAL HEALTH (operating as OPTUMHEALTH BEHAVIORAL SOLUTIONS),<br><br>Defendant. | Case No. 3:14-CV-05337-JCS<br>Action Filed: December 4, 2014<br><br><br>Trial Date:       October 16, 2017<br>Time:             8:30 A.M.<br>Judge:           Hon. Joseph C. Spero<br>Courtroom:     G |

# TABLE OF CONTENTS

PAGE

I.   Standard of Review .................................................................................. 1

    A.   An ERISA Fiduciary Abuses its Discretion By Adopting Any Unreasonable Interpretation of Plan Terms. ................................................................ 1

    B.   UBH's Conflict Of Interest Requires Evaluating Its Arguments With A Healthy Dose of Skepticism. ................................................................ 3

    C.   UBH's Breaches of Its Duties of Care and Loyalty Should Be Reviewed Under A De Novo Standard. ................................................................ 5

II.  Elements of the Claims ........................................................................... 7

III. Plaintiffs Proved By A Preponderance of the Evidence that UBH Was A Fiduciary. ........ 10

    A.   UBH is an ERISA Fiduciary Because it Admittedly Exercised Discretion Respecting the Management of Class Members' Plans. .......................... 10

    B.   A Preponderance of the Evidence Proves that UBH was Not Acting in a "Settlor" Capacity When it Developed its Guidelines ............................ 11

IV.  Plaintiffs Proved By A Preponderance of the Evidence That UBH's Guidelines Are Unreasonable. ................................................................................. 19

    A.   UBH's Witnesses Were Not Credible ................................................. 21

    B.   The Clinical Best Practices Section Does Not Cure any of the Defects Plaintiffs Have Identified in the Coverage Criteria. .......................................... 23

    C.   UBH Offers No Meritorious Defense of the Guideline Criteria as Written ............... 26

        1.   The Guidelines Overemphasize Acuity. .......................................... 26

            (a)   The Plain Language of the Guidelines Over-Emphasizes Acuity at the Expense of Other Considerations. .............................................. 27

            (b)   The Inapposite Language on which UBH Relies Does Not Alter the Guidelines' Coverage Criteria. ................................................... 34

            (c)   Imaginary Criteria Do Not Trump the Guidelines' Actual Language. ..... 37

        2.   The Guidelines Fail To Provide For Effective Treatment and Consideration Of Co-Occurring Conditions. ....................................................... 39

        3.   Drive to Lower Levels & Failure to Err on Side of Caution ............................ 43

        4.   Mandatory Prerequisites, Rather than Multi-Dimensional Assessment ............ 44

5.   UBH's Criteria For Prevention of Deterioration and Maintenance of Function Are Overly Restrictive. ........................................................ 45

6.   The Guidelines Fail To Cover Treatment If A Patient's Motivation To Recover Flags, Even Temporarily. ................................................... 49

7.   Lack of Criteria Addressing the Needs of Children and Adolescents ............. 52

8.   Overbroad Definition of Custodial Care and Overly Narrow View of Improvement and Active Treatment. ................................................ 53

     (a)   Custodial Care ........................................................... 53

     (b)   Active Treatment ........................................................ 55

     (c)   Improvement ............................................................. 57

9.   UBH's Residential Treatment Guidelines Violate Generally Accepted Standards of Care And ASAM. ........................................................ 57

D.   A Preponderance Of The Evidence Shows That UBH's Employees Applied The Guidelines As Written ................................................................. 60

V.    Plaintiffs Proved By A Preponderance Of The Evidence That UBH'S Guidelines Were Infected By Its Conflict of Interest And That UBH Breached Its Duty of Loyalty. ........... 67

VI.   A Preponderance Of The Evidence Established That UBH Breached Its Duty of Care. .... 69

VII.  Because UBH'S CDGs Incorporated the Level of Care Guidelines, the CDGs Are Improperly Restrictive As Well. ........................................................... 70

VIII. UBH Violated The State Laws of Illinois, Connecticut, Rhode Island, And Texas. ........... 73

IX.   Plaintiffs and Class Members Have Satisfied Any Exhaustion Requirement. ................... 78

X.    Conclusion ............................................................................. 83

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abatie v. Alta Health & Life Ins. Co.*,
   458 F.3d 955 (9th Cir. 2006) .................................................................. 3, 4, 9, 66

*Barnes v. AT&T Pension Benefit Plan—Nonbargained Program*,
   270 F.R.D. 488 (N.D. Cal. 2010) ................................................................. 77-78

*Barnett v. S. California Edison Co. Long Term Disability Plan*,
   633 F. App'x 872 (9th Cir. 2015) ...................................................................... 2

*Bechtol v. Marsh & McLennan Companies, Inc.*,
   No. C07-1246MJP, 2008 WL 238588 (W.D. Wash. Jan. 28, 2008) ...................... 80

*Boesel v. Chase Manhattan Bank, N.A.*,
   62 F. Supp. 2d 1015 (W.D.N.Y. 1999) ................................................................. 3

*Brosted v. Unum Life Ins. Co. of Am.*,
   421 F.3d 459 (7th Cir. 2005) ............................................................................ 11

*Casatelli v. Horizon Blue Cross Blue Shield of New Jersey*,
   No. 2:09-cv-6101(SDW)(MCA), 2010 WL 3724526 (D.N.J. Sept. 13, 2010) ....... 78

*Central States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*,
   472 U.S. 559 (1985) ......................................................................................... 16

*Chavez v. Bank of Am. Corp.*,
   No. C-10-0653 JCS, 2012 WL 1594272 (N.D. Cal. May 4, 2012) .......................... 7

*Churchill v. Cigna Corp.*,
   No. 10-6911, 2011 WL 3563489 (E.D. Pa. Aug. 12, 2011) ................................. 78

*Craft v. Health Care Serv. Corp.*,
   No. 14 C 5853, 2016 WL 1270433 (N.D. Ill. Mar. 31, 2016) ............................... 59

*Curtiss-Wright Corp. v. Schoonejongen*,
   514 U.S. 73 (1995) .......................................................................................... 12

*Des Roches v. California Physicians' Serv.*,
   320 F.R.D. 486 (N.D. Cal. 2017) ...................................................................... 79

*Diaz v. United Agr. Employee Welfare Ben. Plan & Tr.*,
   50 F.3d 1478 (9th Cir. 1995) ........................................................................... 77

*Egert v. Conn. Gen. Life Ins. Co.*,
   900 F.2d 1032 (7th Cir. 1990) .......................................................................... 19

*Gilliam v. Nevada Power Co.*, 488 F.3d 1189 (9th Cir. 2007) ........................................................ 2

*Glista v. Unum Life Ins. Co. of Am.*,
    378 F.3d 113 (1st Cir. 2004) ........................................................................................... 19

*Harlick v. Blue Shield of California*,
    686 F.3d 699 (9th Cir. 2012), *cert. denied*, 568 U.S. 1212 (2013) ................................... 9, 58

*Hobson v. Metro. Life Ins. Co.*,
    574 F.3d 75 (2d Cir. 2009) ............................................................................................... 4

*In re Household Int'l Tax Reduction Plan*,
    441 F.3d 500 (7th Cir. 2006) ...................................................................................... 79, 81

*In re WellPoint, Inc. Out-of-Network "UCR" Rates Litig.*,
    No. MDL 09-2074(FFMx), 2013 WL 12130034 (C.D. Cal. July 19, 2013) ............................ 78

*Johnson v. Couturier*,
    572 F.3d 1067 (9th Cir. 2009) ......................................................................................... 16

*Jones v. Aetna Life Ins. Co.*,
    856 F.3d 541 (8th Cir. 2017) ............................................................................................. 5

*Jones v. Kodak Med. Assistance Plan*,
    169 F.3d 1287 (10th Cir. 1999) .................................................................................. 12, 17

*King v. Blue Cross & Blue Shield of Illinois*,
    871 F.3d 730 (9th Cir. 2017) ........................................................................................ 5, 10

*Lafferty v. Providence Health Plans*,
    436 F. App'x 780 (9th Cir. 2011) ....................................................................................... 1

*Metro. Life Ins. Co. v. Glenn (MetLife)*,
    554 U.S. 105 (2008) ............................................................................................... 3, 4, 66

*Mullins v. Conn. General Life Ins. Co.*,
    880 F. Supp. 2d 713 (E.D. Va. 2010) .................................................................................. 19

*New York State Psychiatric Ass'n, Inc. v. UnitedHealth Grp.*,
    798 F.3d 125 (2d Cir. 2015) ............................................................................................. 59

*Otto v. Employee Ret. Income Plan – Hourly W.*,
    No. LA CV14-05426 JAK (PLAx), 2015 WL 12516690 (C.D. Cal. Mar. 13, 2015) ............... 3

*Pac. Shores Hosp. v. United Behavioral Health*,
    764 F.3d 1030 (9th Cir. 2014) .................................................................................. 2, 13, 18

*Paese v. Hartford Life & Acc. Ins. Co.*,
    449 F.3d 435 (2d Cir. 2006) ............................................................................................. 80

*Saffle v. Sierra Pac. Power Bargaining Unit Long Term Income Plan*,
  85 F.3d 455 (9th Cir. 1996) ........................................................................... 1, 2

*Satterfield v. Simon & Schuster, Inc.*,
  569 F.3d 946 (9th Cir. 2009) ............................................................................. 26

*Schultz v. Stoner*,
  308 F. Supp. 2d 289 (S.D.N.Y. 2004) .................................................................. 6

*Shroyer v. New Cingular Wireless Servs., Inc.*,
  No. CV 06-1792-R FMO, 2006 WL 5444358 (C.D. Cal. May 26, 2006) ............................. 13

*Spinedex Physical Therapy USA Inc. v. United Healthcare of Arizona, Inc.*,
  770 F.3d 1282 (9th Cir. 2014) ...................................................................... 77, 81

*Spinedex Physical Therapy USA Inc. v. United Healthcare of Arizona, Inc.*,
  No. CV 08-457-PHX-ROS, 2008 WL 7154677 (D. Ariz. July 9, 2008) ............................ 77

*Stephan v. Unum Life Ins. Co. of Am.*,
  697 F.3d 917 (9th Cir. 2012) .................................................................. 4, 66, 67

*Tibble v. Edison Int'l*,
  729 F.3d 1110 (9th Cir. 2013) ............................................................................ 6

*United States v. Flores*,
  729 F.3d 910 (9th Cir. 2013) ............................................................................ 26

*UNUM Life Ins. Co. of Am. v. Ward*,
  526 U.S. 358 (1999) ...................................................................................... 12

*Virtue v. Int'l Bhd. of Teamsters Ret. & Family Prot. Plan*,
  886 F. Supp. 2d 32 (D.D.C. 2012) ........................................................................ 5

*Wit v. United Behavioral Health*,
  No. 14-cv-02346-JCS, 2017 WL 3478775 (N.D. Cal. Aug. 14, 2017) .............................. 80

*Wright v. Oregon Metallurgical Corp.*,
  360 F.3d 1090 (9th Cir. 2004) .......................................................................... 12

**Statutes**

215 Ill. Comp. Stat. § 5/370c(b)(3) (effective Aug. 18, 2011) ............................... 72

27 R.I. Gen. Laws Ann. § 27-38.2-4 (2015) ................................................................ 75

28 Tex. Admin. Code § 3.8011(1991) ........................................................................ 75

29 U.S.C. § 1002 .................................................................................... 10, 13

29 U.S.C. § 1021 ................................................................................... 18

29 U.S.C. § 1022 ................................................................................... 18

29 U.S.C. § 1024 ................................................................................... 18

29 U.S.C. § 1104 ................................................................................ 5, 68

29 U.S.C. § 1132) ............................................................................... 2, 12

29 U.S.C. § 1133 ................................................................................... 60

29 U.S.C. § 1185a .............................................................................. 12, 58

42 U.S.C. § 1395c .................................................................................. 50

**Other Authorities**

*Letter from Bruce Rauner, Governor of Ill., to Members of the Ill. House of Representatives,*
   *99th Gen. Assembly* (Apr. 24, 2015),
   http://www.ilga.gov/legislation/fulltext.asp?DocName=09900HB0001gms&GA=99&SessionI
   d=88&DocTypeId=HB&LegID=83490&DocNum=0001&GAID=13&Session= ................. 73

Medicare Publication No. 05-10026 (Jan. 2017) ................................................. 50

MERRIAM–WEBSTER, *Acute* ...................................................................... 28

MERRIAM-WEBSTER, *Presenting* ................................................................. 31

OXFORD ENGLISH DICTIONARY, *Precipitate* ...................................................... 33

OXFORD ENGLISH DICTIONARY, *Presenting* ....................................................... 31

OXFORD ENGLISH DICTIONARY, *Acute* ............................................................ 28

OXFORD ENGLISH DICTIONARY, *Lead* ............................................................. 33

STEDMAN'S MEDICAL DICTIONARY, *Acute* (Westlaw 2014) .......................................... 28

STEDMAN'S MEDICAL DICTIONARY, *Present* (Westlaw 2014) ........................................ 31

STEDMAN'S MEDICAL DICTIONARY, *Presenting Symptom* (Westlaw 2014) ............................. 31

**Rules**

Fed. R. Civ. P. 15(b)(2) ........................................................................ 60

**Regulations**

29 C.F.R. § 2560.503-1 ...................................................................... 60, 80

1

29 C.F.R. § 2590.712(c)(4)(ii)(H) ................................................................................ 58

2

65 Fed. Reg. 70255-56 (Nov. 21, 2000) ...................................................................... 80

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UBH's "defense" is really just a collection of discrete and inconsistent arguments that are all predicated on gross misrepresentations of fact and law. At the center of most of these arguments is UBH's contention that the Guidelines do not actually mean what they say. But this is based entirely on the self-serving trial testimony of UBH's own employees, which a preponderance of the trial evidence proved was a lie. UBH offered no *contemporaneous* evidence to support it, and it was flatly contradicted by the Guidelines' plain meaning and all the contemporaneous evidence introduced by Plaintiffs.

The Court should find for Plaintiffs on all counts.

## I.     STANDARD OF REVIEW

### A.     An ERISA Fiduciary Abuses its Discretion By Adopting Any Unreasonable Interpretation of Plan Terms.

UBH does not dispute that where a claims administrator like UBH has denied coverage based on an interpretation of the plan that "conflicts with the plain language of the plan," or is otherwise "unreasonable," it has abused its discretion. *See Saffle v. Sierra Pac. Power Bargaining Unit Long Term Income Plan*, 85 F.3d 455, 458 (9th Cir. 1996). Yet UBH never cites or discusses *Saffle*, even when arguing about what the standard means. Instead, UBH suggests that something more than an unreasonable interpretation of plan terms is required. It is not.

UBH cites the Ninth Circuit's unpublished decision in *Lafferty v. Providence Health Plans*, 436 F. App'x 780, 781 (9th Cir. 2011), for example, in which the panel held that the plaintiff had to prove that denial was "illogical," or "implausible," or "directly contrary to evidence in the record." Def. Post-Trial Br. ("UBH Br.") at 8:3-5. But *Lafferty* did not overrule or modify the abuse-of-discretion standard as described in *Saffle*. Instead, it simply used different words to describe that standard in the context of a different type of claim – *i.e.*, a claim challenging the administrator's analysis of the patient's underlying medical records. *See Lafferty*, 436 F. App'x at 781 (concluding there were "facts in the record" for the district court's finding that interarterial chemotherapy with blood brain barrier disruption was an "experimental" therapy for the plaintiff's "rare, malignant brain tumor").

1    Unlike in *Lafferty*, here Plaintiffs allege that UBH denied Class Members' claims based

2   on overly restrictive Guidelines that conflicted with, and were an unreasonable interpretation of,

3   a plan term. Under *Saffle*, this requires the Court to determine whether those Guidelines

4   "conflict[] with the plain language of the plan[s]." 85 F.3d at 458. That is the standard of review

5   on Plaintiffs' Claim Two (Counts II and IV) as well as Claim One (Counts I and III) insofar as

6   UBH's breaches of fiduciary duty arose from its failure to comply with plan terms, *i.e.*, to

7   conduct itself "in accordance with the documents and instruments governing the plan," 29 U.S.C.

8   § 1132(a)(1)(B). *See* Pls. Post-Trial Br. ("Pls.' Br.") at 73-75.

9    UBH also argues that determining whether it abused its discretion requires reviewing

10   every provision in every class member's 100-plus-page benefit booklet. *See, e.g.*, UBH Br. at

11   41:16-20. Not true. As discussed below, only one term in each plan is relevant here: when UBH

12   denied Plaintiffs' claims pursuant to its Guidelines, it was applying the plan term conditioning

13   coverage on treatment being consistent with generally accepted standards of care. *See* § II, *infra*;

14   *see also* Pls.' Br. at 9:12-10:2; Exs. 892-894.

15    For these reasons, the cases UBH cites for its "plan taken as a whole" argument do not

16   help it. In UBH's principal case, *Barnett v. S. California Edison Co. Long Term Disability Plan*,

17   633 F. App'x 872 (9th Cir. 2015) (unreported), multiple plan terms formed the basis for the

18   denial, and *those* terms, when "taken together . . . injected some ambiguity into the Plan." It was

19   that ambiguity that permitted, indeed required, the administrator to "read[] the two sentences

20   together," and when they were read together, the administrator's interpretation did not "conflict[]

21   with the plain language of the plan." *Id.* at 874 (quoting *Pac. Shores Hosp. v. United Behavioral

22   Health*, 764 F.3d 1030, 1042 (9th Cir. 2014)) (alteration omitted). Similarly, in *Gilliam v.

23   Nevada Power Co.*, 488 F.3d 1189 (9th Cir. 2007), the question was whether the plaintiff's

24   severance payment, *i.e.*, her payment "for her voluntary termination of employment," constituted

25   "wages and salary" for "service." *Id.* at 1195-96. The court obviously had to take into account

26

27

28

how the plan defined and used those terms, because the basis for the denial was that severance pay was not "wages and salary" under the plan. *Id.* at 1191.[1]

In short, if UBH construed a plan term in an unreasonable way, it abused its discretion.

**B.     UBH's Conflict Of Interest Requires Evaluating Its Arguments With A Healthy Dose of Skepticism.**

It is settled law that where an administrator has a structural conflict of interest, that conflict must be weighed "as a factor" in determining whether the administrator abused its discretion, and the weight given to that factor increases where there is evidence that the conflict impacted the administrator's decision-making. *Metro. Life Ins. Co. v. Glenn (MetLife)*, 554 U.S. 105, 115 (2008); *Abatie v. Alta Health & Life. Ins. Co.*, 458 F.3d 955, 968 (9th Cir. 2006). Plaintiffs proved that UBH has a structural conflict that directly impacted its decision-making. *See* Pls.' Br. at 66:7-72:26. Although UBH concedes that it had a structural conflict vis-à-vis its fully insured plans (UBH Br. at 10:1) – which constitute the bulk of its business by revenue[2] – it makes three counter-arguments. Each fails.

**First**, UBH says that even if it labored under a conflict of interest as to its fully-insured business, it was not conflicted as to beneficiaries of self-funded plans. UBH Br. at 9:22-24. But the bulk of UBH's business is fully-insured, and UBH undisputedly applies the same Guidelines

---

[1] Nor is UBH's argument helped by *Otto v. Employee Ret. Income Plan – Hourly W.*, No. LA CV14-05426 JAK (PLAx), 2015 WL 12516690, at *19 (C.D. Cal. Mar. 13, 2015), or *Boesel v. Chase Manhattan Bank, N.A.*, 62 F. Supp. 2d 1015, 1029 (W.D.N.Y. 1999), cited in UBH's brief at 9:5-14. In *Otto*, the court focused on two specific provisions of the plan, related to the calculation of accrued benefits for employees who work past the age of 70½. 2015 WL 12516690, at *19. The portion of the opinion UBH cites simply explains that provisions capping benefits after age 70½ are not inconsistent with the "purpose of the Plan," which was to provide "periodic income after retirement." *Id.* Similarly, in *Boesel*, the "context" the court referred to was a specific plan provision that included the phrase "[n]otwithstanding anything contained in this Section 7," the meaning of which directly implicated the meaning of the provision at issue, namely whether a portion of that Section 7 changed the "date upon which benefits [were] to be computed." 62 F. Supp. 2d at 1032.

[2] UBH asserts that, based on the number of class members, as opposed to total revenues, members of fully insured plans account for "38 percent" of the benefit decisions at issue in this case. UBH Br. at 9 n.5. It does not deny, however, the percentage of its total revenue attributable to its administration of fully-insured plans. Compare Pls.' Br. at 76:19-20 & Pls.' Post-Trial Proposed Findings of Fact ("Pls.' PFF") at ¶ 626 (citing Ex. 711).

1  regardless of whether a plan is fully-insured or self-funded, meaning that its conflict vis-à-vis

2  fully-insured plans also impacted its administration of self-funded plans. In any event, UBH does

3  not even dispute that it had a self-serving incentive to minimize benefit expenses for fully-

4  insured plans. *See* Pls.' Br. at 66:17-19 (citing Trial Transcript ("Tr.") 803:10-804:20 (Triana);

5  Tr. 1899:11-21 (Rutherford)). *See also MetLife* 554 U.S. at 114 (administrator's structural

6  conflict extends to its administration of self-funded plans because an "employer choosing an

7  administrator . . . may be more interested in an insurance company with low rates than in one

8  with accurate claims processing.").

9      **Second**, UBH asserts that even though it had a structural conflict, the Court should apply

10  no "skepticism" because that conflict did not "influence[]" the content of its Guidelines. UBH

11  Br. at 10-11. This fails as a matter of law because, under *MetLife*, once a conflict is established,

12  the question is not *whether* the Court should apply skepticism (it must) but *how much* weight to

13  give to that skepticism. *Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917, 929 (9th Cir. 2012).

14  That question turns on "the *likelihood* that the conflict impacted [its] decisionmaking." *Id.* at 929

15  (emphasis added). *See also Abatie*, 458 F.3d at 967 (explaining that the question turns on "the

16  nature [and] extent" of "any conflict of interest" and its "effect" on "the decision-making

17  process" at issue).[3] UBH's argument also fails as a matter of fact because the trial evidence

18  easily makes it "likely" that UBH's financial considerations "impacted" its Guidelines, from its

19  repeated rejection of the ASAM Criteria for purely financial reasons, to its appointment of

20  personnel on the BPAC whose primary professional responsibilities were to minimize benefit

21  expense and maximize the company's bottom line. *See* Pls.' Br. at 76-78; § V, *infra*.

22      **Third**, UBH takes a quote from *MetLife* out of context to argue that because UBH

23  periodically adjusts its premiums for fully-insured groups, this somehow "mitigated any

24  structural conflict." UBH Br. at 10:1-3 (citing Tr. 840:4-841:21 (Dehlin)). This is highly

25  misleading. In *MetLife*, the Supreme Court hypothesized that "*Metlife would*" make this type of

26

27  [3] Insofar as the Second Circuit may have taken a slightly different approach, as reflected in
   *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 83 (2d Cir. 2009) (cited in UBH Br. at 10:23), that

28  is not the law of this Circuit, as reflected in cases such as *Stephan*, 697 F.3d at 929.

argument, 554 U.S. at 114, but the Supreme Court did not adopt it. Rather, it held that although

there might be some "differences" between an administrator's incentives with respect to self-

funded and fully-insured plans, "*for ERISA purposes a conflict exists*" in both situations. *Id.*

(emphasis added).[4]

### C.    UBH's Breaches of Its Duties of Care and Loyalty Should Be Reviewed Under A De Novo Standard.

Plaintiffs have explained why, as to UBH's breach of its duties of loyalty and care, the

abuse of discretion standard should not apply. *See* Pls.' Br. at 74:3-75:6. UBH devotes nearly

five pages to arguing why it disagrees. UBH Br. at 12:1-16:9.[5] The question is largely academic,

because Plaintiffs prevail on each of their claims regardless of the standard of review. *See* Pls.'

Br. at 79:16-23. In any event, the Ninth Circuit has recently made it clear that fiduciary duty

claims like those asserted here are not subject to the abuse of discretion standard. *King v. Blue

Cross & Blue Shield of Illinois*, 871 F.3d 730 (9th Cir. 2017). In *King*, the plan was ambiguous

as to whether a lifetime benefit maximum applied to medical claims; Blue Cross construed the

plan as imposing a $500,000 cap. *Id.* at 734-35, 738. The Ninth Circuit held that *regardless of*

---

[4] Common sense also disproves UBH/MetLife's argument. Sure, its actuaries try to estimate the likely benefit expense for a given fully-insured plan's members in a given year in order to determine what premium to charge to the plan/plan's members, but this exercise does not "mitigate" UBH's subsequent financial incentive to deny claims. Regardless of how much a fully insured plan's members pay in premiums, UBH always has an incentive to minimize its claims payouts because every dollar spent on claims is one more dollar in expenses and one less dollar in profits.

[5] UBH also argues that if Plaintiffs' fiduciary duty claims are cognizable, they arise only under 29 U.S.C. § 1132(a)(3), not subsection (a)(1)(B). UBH Br. 12:27-13:1. (UBH does not dispute that the claims are cognizable under (a)(3), nor could it. *See, e.g.*, *Jones v. Aetna Life Ins. Co.*, 856 F.3d 541, 547 (8th Cir. 2017) (holding that a fiduciary duty claim that asserts a "different theor[y] of liability" from a denial-of-benefits claim under (a)(1)(B) is cognizable under (a)(3)).) But subsection (a)(1)(B) authorizes a participant or beneficiary to sue, among other things, "to enforce his rights under the terms of the plan." An administrator making discretionary decisions under a plan is subject to overriding fiduciary duties, 29 U.S.C. § 1104(a)(1), which qualify as "rights" to which beneficiaries are entitled "under the terms of the plan." *See King*, 871 F.3d at 746-47 (reversing grant of summary judgment to defendants on fiduciary duty claims under (a)(1)(B) and (a)(3)). UBH's reliance on *Virtue v. Int'l Bhd. of Teamsters Ret. & Family Prot. Plan*, 886 F. Supp. 2d 32, 36 (D.D.C. 2012), is misplaced because the question in *Virtue* was whether the court was authorized under (a)(1)(B) to "*change* the 'terms of the plan,' not to '*enforce*' them." *Id.* at 35 (emphasis in original). Here Plaintiffs do not seek to change the terms of any plan.

whether that interpretation was an abuse of discretion, the defendants were liable for breaching their fiduciary duties if, for example, they "made misrepresentations to Mrs. King about the lifetime benefit maximum." *Id*. at 744. This claim was subject to no judicial deference. *Id*. ("Because we conclude that the defendants' notice of the amendment to the lifetime benefit maximum violates ERISA, *we do not address* . . . whether UPS abused its discretion as Plan Administrator by interpreting the Retiree Plan to include a $500,000 lifetime benefit maximum.") (emphasis added). As in *King*, although UBH's fiduciary act of developing the Guidelines was ultimately related to its fiduciary act of denying Class Members' claims, these two fiduciary acts are independent of one another and only the latter is subject to judicial deference. UBH's violations of its duties of care and loyalty thus implicate conduct that is *not* coextensive with the conduct that rendered the denials wrongful. *See* Pls.' Br. at 74:11-75:6; *see also King*, 871 F.3d at 746-47.

UBH relies on *Tibble v. Edison Int'l*, 729 F.3d 1110, 1129 (9th Cir. 2013). *See* UBH Br. at 14 n.6. But *King* post-dates *Tibble*, and the fiduciary duty claims raised in *King* – which the Ninth Circuit held were not "disguised" claims for benefits – are analogous to Plaintiffs' duty of care and loyalty claims. UBH also cites *Schultz v. Stoner*, 308 F. Supp. 2d 289, 302 (S.D.N.Y. 2004), but as UBH concedes, the fiduciary duty claim at issue in *Schultz* "relat[ed] to interpretation of plan terms." UBH Br. at 13:28; *see Schultz*, 308 F. Supp. 2d at 303 (holding only that the abuse of discretion standard applies to fiduciary breach actions that "implicat[e] the propriety of interpretations of benefit eligibility provisions").[6]

---

[6] UBH's reliance on *Lees v. Munich Reinsurance Am. Inc.*, No. 14-2532 (MAS)(TJB), 2016 WL 164611, at *4 (D.N.J. Jan. 13, 2016), and *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1100 (9th Cir. 2004), also fails. In *Lees*, not only did the plaintiff not allege any breach of a duty of care or loyalty; he did not even allege a breach of fiduciary duty claim under § 1132(a)(3) at all. 2016 WL 164611, at *2 (noting that Count One, the fiduciary duty count, was pled only under § 1132(a)(2)). As for *Wright*, the plaintiffs' "exclusive purpose claim" failed not only because it was "derivative of their prudence claim," which failed legally and factually, but if accepted would have required the defendants to "deviate from [plan] terms." 360 F.3d at 1099-1100. Here, insisting that UBH comply with its duties of loyalty and care obviously would not require it to violate plan terms. Moreover, the premise of the holding in *Wright* was that the plan – an employee stock ownership plan (an "ESOP") – either (a) did not have a fiduciary "duty to diversify" the plan's holdings or (b) was entitled to a "presumption" of prudence. *Id.* at 1098. The Supreme Court rejected both approaches in *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct.

## II.     ELEMENTS OF THE CLAIMS

The Court has repeatedly rejected UBH's arguments about the elements of Plaintiffs' claims. Its prior rulings are the law of the case. *See, e.g., Chavez v. Bank of Am. Corp.*, No. C-10-0653 JCS, 2012 WL 1594272, at *5 (N.D. Cal. May 4, 2012) (citing cases) (law of the case doctrine is "designed to protect both the court and the litigants from repeated reargument of issues already decided."). It should reject UBH's arguments again.

First, despite acknowledging that the Court has previously rejected its argument that Plaintiffs must prove that they were entitled to benefits, UBH Br. 99:16-20, UBH re-casts that argument several more times. For example, UBH's contention that Plaintiffs must prove either "damage," *id.* at 16:19, or "tangible harm," *id.* at 99:11-15, are no more than alternative ways of arguing that the *only* type of injury cognizable under ERISA is the loss of benefits owed. The Court, however, has previously held (correctly) that "intangible harms" like "the denial of [Plaintiffs'] rights to Guidelines that were developed for their benefit and to a fair adjudication of their claims" are cognizable under ERISA. *See Wit* ECF No. 286 (Order Granting in Part and Denying in Part UBH's Motion for Summary Judgment) ("Summary Judgment Order") at 24-25; *see also Wit* ECF No. 181 (Order Denying Mot. for Leave to File Mot. for Reconsideration or for an Order Certifying the Court's Order Granting Class Certification for Interlocutory Appeal) at 5:14-21.

Similarly, UBH argues that Plaintiffs have to prove that no other plan exclusions or limitations would justify its denials of the Class Members' requests for coverage:

> [Plaintiffs must prove that] UBH owed a fiduciary duty to all class members under their ERISA plans to develop and apply guidelines that are solely consistent with generally accepted standards of care, ***without regard to plan exclusions and other terms that govern what healthcare services are covered under the plans***.

UBH Br. 16:13-16 (emphasis added). UBH urges that, in order to challenge UBH's development and use of its Guidelines, Plaintiffs *also* had to prove, plan-by-plan, provision-by-provision,

---

2459, 2467 (2014). As for UBH's citation to *Korotynska v. Metro. Life Ins. Co.*, 474 F.3d 101 (4th Cir. 2006), the question on appeal was only whether the plaintiff's (a)(3) claim was "redressable" under (a)(1)(B) – a remedy issue that is not before this Court now, at the liability phase. *See* Pls.' Br. at 86 n.57.

"what was actually covered or not covered." *Id.* at 42:5-6; *see also id.* at 41:13-20. This is just

another way of trying to require Plaintiffs establish that, but for the Guideline defects, each

Class Member would have been entitled to benefits. No matter how many ways UBH restates

this argument, that is just not what this case is about, as this Court has repeatedly held. *See*, *e.g.*,

*Wit* ECF No. 174 (Class Cert. Order) at 30:28-31:11, 33:17-26; *Wit* ECF No. 286 (Summary

Judgment Order) at 29:16-28; Pretrial Conf. Tr. 11:10-12 ("I'm not going to get into – the

benefits would have been denied anyways had the guidelines been the way the plaintiffs want

them to be. We're not going to try that question."); Tr. 1879:8-1880:5 (discussing irrelevance to

Plaintiffs' claims of the fact that "to decide, ultimately, what the coverage is" for any particular

individual, it is necessary to review the plan in full); *see also* Tr. 1888:3-1889:5 (UBH counsel

unable to respond to the Court's summary of Plaintiffs' legal theory and question about why the

individual plan language for the custodial care exclusion is relevant).

Plaintiffs proved by a preponderance of the evidence that the Level of Care Guidelines

contain UBH's interpretation of the provisions in *every* plan that make compliance with

generally accepted standards of care a condition of coverage. Indeed, UBH's counsel *admitted* at

trial that one condition of coverage under every plan is "that the treatment at issue be consistent

with the generally accepted standards of care" and that "the generally accepted standards of care

in terms of level of treatment are defined by UBH in its Level of Care Guidelines." Tr. 1876:10-

25; *see also* UBH Br. 41:9-10. Ample trial evidence supported these admissions. *See* Pls. Brief at

8:10-12:7 (describing evidence).[7] If the Guidelines fell short of generally accepted standards,

then they were also inconsistent with all the Class Members' plans.[8]

---

[7] On the other hand, there was no evidence that in the course of developing the Guidelines, UBH's employees reviewed any plan exclusions, or that the purpose of the Guidelines is to implement any plan provisions other than the generally-accepted-standards requirement.

[8] Thus, the evidence of the Guidelines' many defects *is* common proof that they were inconsistent with all the Class Members' plans. UBH's arguments to the contrary are actually decertification arguments that are not presently before the Court. *See*, *e.g.*, UBH Br. at 20 n.11; 45:21-46:19; UBH Br. at 93:10-94:8. The Court clearly instructed the parties to brief liability first, and to defer arguments about decertification until a later time. Tr. 1932:1-14. Plaintiffs therefore do not respond substantively herein to UBH's premature arguments, but expressly reserve all counter-arguments.

1   UBH's citation to a smattering of *other* plan provisions, UBH Br. 42:22-45:20, is thus

2   irrelevant. There is no evidence that UBH denied any Class Member's plan based on the

3   limitations and exclusions it now invokes in defense of the Guidelines.[9] Under controlling Ninth

4   Circuit law, UBH may not assert in litigation "a reason for denial of benefits that it had not given

5   during the administrative process." *Harlick v. Blue Shield of California*, 686 F.3d 699, 719-20

6   (9th Cir. 2012), *cert. denied*, 568 U.S. 1212 (2013). *See also Abatie*, 458 F.3d at 974 ("An

7   administrator must provide a plan participant with adequate notice of the reasons for denial.").[10]

8       For similar reasons, UBH's assertion that Plaintiffs had to do more to "connect[]" each

9   Guideline flaw to each individual class member's benefit determination, UBH Br. 99:21-100:13,

10  also fails. The Court has repeatedly rejected this argument precisely because Plaintiffs challenge

11  a commonly-applied standard based on grounds applicable to the class as a whole. *See Wit* ECF

12  No. 174 (Order Granting Mot. for Class Certification) ("Class Cert. Order") at 31:2-5; *Wit* ECF

13  No. 286 (Summary Judgment Order) at 22-23. These legal holdings were vindicated by the

14  overwhelming evidence presented by Plaintiffs at trial, demonstrating that the Guidelines suffer

15  from holistic structural and substantive defects that made it impossible for them to be applied in

16  a manner that was consistent with generally accepted standards of care. *See* Pls.' Br. 32-72 and

17  evidence cited therein; Consolidated Claims Chart and evidence cited therein; § IV.C, *infra*.

18  Indeed, UBH failed to offer any evidence of any Class Member denial that was immune from

19  those defects.

20

21  [9] If UBH denied coverage pursuant to a plan exclusion or limitation, it was required to cite that
    plan provision in its denial letter. *See, e.g.*, *Abatie*, 458 F.3d at 974. Yet UBH makes no effort to

22  tie the plans it cites to the corresponding denial letters, presumably to disguise the reality that
    none of the letters reflects that the denial was pursuant to the exclusion in question. *See* Ex. A

23  hereto (chart matching the Trial Exhibit numbers for the denial letters corresponding to the
    exclusions cited by UBH and quoting the denial rationales); *see also* Ex. 894 (chart of all denial

24  rationales). Instead, the letters' denial rationales cite only the Guidelines. *Id*.

25  [10] UBH's argument in this regard is particularly unpersuasive given that *none* of the exclusions it
    cites appears in *all* of the Class Members' plans. Thus, UBH's evidence-free assertion is, in

26  effect, that it developed the Guidelines based on the most restrictive requirements found in any
    plan and then used those Guidelines to deny all Class Members' claims under all plans. If this is

27  UBH's defense, it only underscores UBH's willingness to disregard its fiduciary duties and

28  arbitrarily deny claims without regard to plan terms.

Finally, the Court has also previously expressly rejected UBH's Article III argument, UBH Br. 100:25-102:27. *See* Wit ECF No. 286 (Summary Judgment Order) at 19, 23-25. That ruling (like the Court's ruling on causation) is the law of the case. Plaintiffs will not re-argue it.[11]

The Court should reject each of UBH's eleventh-hour attempts to move the goalposts.

## III. PLAINTIFFS PROVED BY A PREPONDERANCE OF THE EVIDENCE THAT UBH WAS A FIDUCIARY.

### A. UBH is an ERISA Fiduciary Because it Admittedly Exercised Discretion Respecting the Management of Class Members' Plans.

UBH admits that, with respect to each class member's plan, UBH had "discretionary authority to determine benefits and construe the plan's terms." UBH Br. 5:16-17. UBH also admits that it *exercised* that discretion when it "constru[ed] plan terms and benefits, including terms relating to 'generally accepted standards of care.'" UBH Br. at 5:18-19. UBH even devotes more than 10 pages of its brief to arguing that its development and use of the Guidelines should be subject to an abuse of discretion standard because, it argues, both were "act[s] of plan interpretation." UBH Br. at 5:10-16:9. These concessions should not be surprising: the evidence is irrefutable. *See* Pls.' Br. at 9:12-10:2, 78:13-79:1.

Yet, despite all this evidence and its own admissions, UBH nevertheless also argues that it was *not* acting as a fiduciary when it developed the Guidelines. *See, e.g.*, UBH Br. at 20:14-15 (asserting that argument UBH was a fiduciary has "no merit"). In making this unsupportable claim, UBH ***never even mentions*** the ERISA provision defining "fiduciary," which states that an ERISA fiduciary is any person who "exercises any discretionary authority or discretionary control respecting management of [a] plan" or "has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A). Interpreting plan language and making coverage determinations are quintessential fiduciary acts in the ERISA context. *See, e.g.*, *King*, 871 F.3d at 745. If – as UBH not only admits, but argues vociferously –

---

[11] To the extent it remains necessary to preserve arguments for appeal, Plaintiffs incorporate by reference herein their arguments in opposition to UBH's summary judgment motion. *See Wit* ECF No. 260 (Pls. Mem. of P. & A. in Opp. to Def. United Behavioral Health's Mot. for Summary Judgment).

1    its development and application of the Guidelines were discretionary "act[s] of plan

2    interpretation," then UBH was a fiduciary under ERISA and owed fiduciary duties with respect

3    to those discretionary acts.[12]

4    **B.    A Preponderance of the Evidence Proves that UBH was Not Acting in a
            "Settlor" Capacity When it Developed its Guidelines**

5         UBH claims it was not a fiduciary when it developed its Guidelines because it was

6    supposedly "acting" as a "settlor" instead, and, therefore, its development and use of its

7    Guidelines is ***immune from judicial review.*** UBH Br. at 17:24-22:28.[13] Despite disavowing

8    before trial such a radical new interpretation of ERISA and its protections, UBH has now taken

9    its "settlor" theory to its illogical extreme, demonstrating just how untenable it is.

10        To start with, there is no legal support for the proposition that a third-party

11   administrator[14] could *ever* step into the role of "settlor" of one of the plans it administers and

12   _____

13   [12] That does not mean, however, that UBH is entitled to deference (*i.e.*, abuse of discretion
     review) as to Plaintiffs' duty of loyalty and duty of care claims. UBH was exercising discretion
14   when it drafted its Guidelines, but it was not interpreting plan terms when, for example, it placed
     high-level finance personnel on BPAC, the committee that was charged developing *clinical*
15   coverage criteria.

16   [13] UBH claims that *Plaintiffs* bore the burden of disproving its "settlor function" defense. UBH
     Br. at 17:26-28. UBH cites just one case to support this proposition: *Brosted v. Unum Life Ins.*
17   *Co. of Am.*, 421 F.3d 459 (7th Cir. 2005) (cited at UBH Br. at 17:28, 20:23-25). But *Brosted*
     merely states that the elements of a breach of fiduciary duty claim under ERISA include
18   establishing that the defendant was a fiduciary. 421 F.3d at 465. It does not so much as mention
     "settlors" or posit that a plan administrator might be able to act in some capacity that could make
19   it immune from liability despite the fact that it exercised discretionary authority with respect to
     plan management. As explained in this section, there is no legal authority for the proposition that
20   a plan administrator could *ever* step into a "settlor" role or borrow an employer's immunity from
     liability for setting plan terms. *Brosted* does not support the creation of a new element requiring
21   ERISA plaintiffs to disprove a theory that has no legal foundation.

22   [14] The evidence admitted at trial proves UBH is not the named "plan administrator" for any class
     member's plan. *See* Ex. A hereto (chart of pincites to relevant Trial Exhibit pages). Rather, it is,
23   admittedly, only the "mental health and substance use disorder designee" of United Healthcare
     Insurance Company ("UHIC"), which is either identified as the plan administrator or a "claims
24   administrator." *See, e.g.*, UBH Br. at 5:23-26; Tr. 840:14-24 (Dehlin); Tr. 847:2-4 (Dehlin); Ex.
     A hereto. That means UHIC has delegated to UBH limited authority to administer *only* the
25   behavioral health benefits offered by the plans. *See, e.g.*, Tr. 849:9-17 (Dehlin); *see also* Tr.
     916:20-917:2 (Dehlin) (UBH is a claims administrator whose job is to administer the plans as
26   written). Even where UBH contracts directly with plans (rather than being designated by UHIC),
     it administers *only* the mental-health and substance use disorder benefits. *See* Tr. 836:16-21
27   (Dehlin).

28

thereby enjoy whatever "immunity" attaches to *ex ante* decisions about plan design.[15] When this Court rejected UBH's "settlor" argument at the motion to dismiss stage, it rightly expressed skepticism about the legal viability of UBH's theory: "[w]hile a plan can act as a settlor, setting the terms of coverage and determining the scope of the plan, it is less clear that a third-party administrator can play that role." *Alexander* ECF No. 42 (Order Denying UBH's Mot. To Dismiss Pursuant to Rule 12(B)(6)) at 14:13-14. UBH still cites no legal authority supporting that proposition.[16] Nor could it: the statutory language makes clear that *only* the employer or

---

[15] UBH is flat wrong when it asserts that "plan terms are immune from judicial review under ERISA." UBH Br. at 18:5-11; *see also* UBH Br. at 1:15. While employers are generally free to determine what benefits to offer under a plan, they are *not* free to include plan terms that violate federal or state laws, including ERISA itself and the Parity Act, which is incorporated into ERISA. *See*, *e.g.*, 29 U.S.C. 1132(a)(3)(A) (cause of action to enjoin any "act or practice which violates any provision of this subchapter"); 29 U.S.C. § 1185a (Parity Act provisions of subchapter I); *UNUM Life Ins. Co. of Am. v. Ward*, 526 U.S. 358, 376 (1999) (state laws mandating insurance contract terms apply to ERISA plans). UBH bases its argument to the contrary on one case, which it misleadingly mis-quotes. UBH Br. at 18:10-11 (citing *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995)). The Supreme Court did not hold that "a challenge to the plan's terms 'is not a cognizable complaint under ERISA. . .'" *Id.* (quoting *Curtiss-Wright*, 514 U.S. at 78); *see also* UBH Br. at 20:12-13 (same); *id.* at 21 n.12. What the Court actually stated was: "that Curtiss–Wright amended its plan to deprive respondents of health benefits is not a cognizable complaint under ERISA; the only cognizable claim is that the company did not do so in a permissible manner." 514 U.S. at 78. The Court merely restated the proposition that employers cannot be sued for deciding not to offer benefits; it did *not* hold, as UBH falsely asserts, that the terms of a plan an employer *does* adopt are wholly immune from judicial review.

[16] None of UBH's cases even considers whether a third-party plan administrator could become a "settlor" of a plan. In *Curtiss-Wright*, for example, the defendant was the plan sponsor. 514 U.S. at 75. In *Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287 (10th Cir. 1999) (cited by UBH at, *inter alia*, UBH Br. at 19:19-20:13), the defendant was the plan itself. *See* 169 F.3d at 1289. Moreover, contrary to UBH's assertion, UBH Br. at 21:16-19, *Jones* did not hold that the third-party administrator performed a "settlor function" (in fact, the decision does not even contain the word "settlor"), or that the plan sponsor in that case delegated any such authority to the administrator. All that case held is that the plan sponsor could not be sued for expressly incorporating a given set of criteria into the plan. 169 F.3d at 1292.

In *Wright*, the Court treated the plan administrator as a fiduciary, but found it fairly complied with the plan as written. *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1100 (9th Cir. 2004) (cited at UBH Br. 21:13). There was no suggestion in that case that any "plan terms" had been incorporated by reference or that the plan administrator could escape its fiduciary duties by dint of any such incorporation. And the Court in *Pacific Shores* explicitly held that "UBH owed a fiduciary duty to [the patient] under ERISA," though it also concluded that "[t]he unhappy fact is that UBH acted as a fiduciary in name only, abusing the discretion with which it had been

1  employee organization that established or maintained the employee benefit plan is the plan

2  sponsor. *See* 29 U.S.C. § 1002(16)(B). While a plan sponsor can take on other roles – like plan

3  administrator (if no administrator is otherwise designated in the plan), 29 U.S.C.

4  § 1002(16)(A)(ii), and fiduciary (if it exercises any discretion with respect to plan

5  administration), 29 U.S.C. § 1002(21)(A)(i) – the converse is *not* true. Nothing in ERISA

6  suggests that UBH, as a limited-purpose third-party plan administrator, could become or "act as"

7  a plan sponsor of the plans it administers – let alone that it could thereby obtain a generalized

8  grant of immunity from liability.

9         UBH's argument also fails because the trial evidence disproved it. First, the Guidelines

10  themselves do not claim to be plan terms. *See*, *e.g.*, Ex. 1-0002 ("The Level of Care Guidelines

11  provide objective and evidence-based admission and continuing-stay criteria . . ." and "are

12  intended to standardize care advocacy decisions . . ."); Ex. 2-0002 (same); Ex. 3-0002 (same);

13  *see also* Ex. 4-0002 (similar); Ex. 5-0004 (similar); Ex. 6-0004 (similar); Ex. 7-0004 (similar);

14  Ex. 8-0002 (similar). Since 2014, the Introduction section even explicitly *distinguishes* between

15  plan terms and the Guidelines. *See*, *e.g.*, Ex. 4-0006 ("Use [of the LOCGs] is informed by . . . the

16  member's benefit plan . . ."); Ex. 5-0007 (same); Ex. 6-0007 (same); Ex. 7-0007 (same); Ex. 8-

17  0004 (same).[17]

18         Second, UBH's Utilization Management Program Descriptions ("UMPDs") also

19  distinguish between the Guidelines and the plans. *See*, *e.g.*, Ex. 258-0018 (2013 UMPD) (peer

20  ───────────────────────────────

21  entrusted." *Pac. Shores Hosp. v. United Behavioral Health*, 764 F.3d 1030, 1044 (9th Cir. 2014)
    (cited at UBH Br. 22:11-18). The question of whether UBH's Guidelines were incorporated into

22  the plan was not presented in that case. *See* n.22, *infra*.

23  Finally, *Shroyer v. New Cingular Wireless Servs., Inc.,* No. CV 06-1792-R FMO, 2006 WL
    5444358, at *1 (C.D. Cal. May 26, 2006) was not even an ERISA case and has no bearing on

24  questions of ERISA fiduciary status or how to interpret words in an ERISA plan. And in any
    event, there the agreements "explicitly incorporated" a specific set of terms and conditions that

25  were provided to the contracting party "in a separate booklet." *Id.*

26  [17] Moreover, in 2014, when UBH first added a definition of "medically necessary" to the
    Guidelines' Introduction, it also included a footnote stating that "[t]he definition of medical

27  necessity may vary by health plan. . . ." Ex. 4-0005 n.4; *see also* Ex. 5-0006 n.4; Ex. 6-0006 n.3;
    Ex. 7-0006 n.3; Ex. 8-0004 n.3. If UBH's Guidelines were really terms of the plans UBH

28  administers, that footnote would make no sense.

reviewer must review the case "against," among other things, both "the pertinent Level of Care Guidelines . . ." *and* "the member's benefit plan . . ."); Ex. 259-0019 (2014 UMPD) (same); Ex. 260-0010 (2015 UMPD) (same); Ex. 1186-0010 (2016 UMPD) (same); Ex. 262-0013 (2017 UMPD) (same); Ex. 257-0020 (2012 UMPD template) (same). *See also* Ex. 258-0022 (care advocate bases review on, *inter alia*, both "the Level of Care Guidelines" *and* the "benefit plan provisions . . ."); Ex. 259-0017 (care advocates determine coverage based on, *inter alia*, the member's "benefit coverage" *and* the "protocols outlined in the Level of Care Guidelines …"); Ex. 260-0008 (same); Ex. 1186-0008 (same); Ex. 262-0011 (same); Ex. 257-0018 (2012 UMPD template) (same)**;** Ex. 258-0027 (for external appeal, UBH must forward to independent review organization both the LOCG rationale *and* the "[r]elevant benefit contract language"); Ex. 259-0026 (same); Ex. 260-0018 (same); Ex. 1186-0018 (same); Ex. 262-0020 (same); Ex. 257-0033 (same). The UMPDs make clear that the Level of Care Guidelines are a set of "clinically-based indicators developed to assist Care Advocacy personnel with making benefit decisions . . ." but do not state, or even hint, that the Guidelines are plan terms. Ex. 259-0013; Ex. 258-0012 (same); Ex. 257-0011 (same); *see also* Ex. 258-0045 ("The Level of Care Guidelines . . . are tools that assist Care Advocates . . ."); Ex. 259-0045 (same); Ex. 260-0038 (same); Ex. 1186-0040 (same) Ex. 262-0041 (same); Ex. 257-0049 (same).

Third, the trial evidence established that UBH is *solely* responsible for developing and approving its annual revisions to the Guidelines[18] – but if the Guidelines were plan terms, any changes to them would have to comply with the amendment process stated in each plan. *See generally* Ex. A hereto (chart providing pincites to Trial Exhibit pages reflecting the amendment process for each plan). At a minimum, one would expect UBH to correspond with the plan or plan sponsor about the way in which the plans' terms were being changed. Yet, there is no

---

[18] *See* Pls.' Br. § IV.E (describing process); UBH Br. at 26:13-28:17 & n.20 (same); Ex. 258-0045 (2013 Utilization Management Program Description ("UMPD") asserting LOCGs "were developed by Optum Personnel with input from Optum clinical personnel, licensed practitioners, consumers, and regulators" but not referencing any plan or plan sponsor); Ex. 259-0045 (same for 2014 UMPD); Ex. 260-0038 (same for 2015 UPMD); Ex. 1186-0040 (same for 2016 UMPD); Ex. 262-0041 (same for 2017 UMPD); 257-0049 (same for 2012 UMPD template).

1   evidence UBH ever did so, with respect to *any* plan or plan sponsor. There is no evidence that

2   UBH ever consulted with a plan sponsor about the Guidelines; sought a plan sponsor's input or

3   approval for the Guidelines; obtained a signature from a plan sponsor on the Guidelines; or

4   otherwise involved any plan sponsor in any way in the annual Guideline revision process. Nor is

5   there any evidence that the Guidelines were ever attached to any plan as a rider or amendment –

6   even though most plans are effective from January to December, while UBH revised and re-

7   issued its Level of Care Guidelines each March (for the 2011, 2012, 2013 and 2017 LOCGs) or

8   mid- to late-January (for the 2014, 2015 and 2016 LOCGs), *see* Ex. 880-0012 to -0019  and thus,

9   if the Guidelines were plan terms, each new version would be an amendment to the plans. *Not*

10  *one* of the plan documents – which were admitted at trial in the form in which UBH produced

11  them – includes the Guidelines as an attachment.

12          Nor is there any evidence that any plan or plan sponsor ever delegated any amendment or

13  plan drafting authority to UBH. UBH contends that some plans' acknowledgment that the "level

14  of care guidelines" might be "modified from time to time" accomplishes such a delegation. UBH

15  Br. at 22:3-4. But that interpretation cannot be squared with the aforementioned evidence, or the

16  amendment process explicitly set forth elsewhere in the plans, which invariably specifies that

17  someone *other than UBH* has the exclusive authority to amend the plan. *See* Ex. A hereto.

18  Especially in light of ERISA's mandate that summary plan descriptions must be "written in a

19  manner calculated to be understood by the average plan participant" and must be "sufficiently

20  accurate and comprehensive to reasonably apprise such participants and beneficiaries of their

21  rights and obligations under the plan," 29 U.S.C. § 1022(a), the plans' reference to guidelines

22  being "modified from time to time" does not suggest that those guidelines are plan terms. It

23  suggests that the Guidelines are interpretations of a requirement that *is* clearly set forth in the

24  plans – consistency with generally accepted standards of care – and merely advises beneficiaries

25  that the administrator's interpretation of this term may change as those standards evolve.

26          Ignoring all of the facts just discussed, UBH nevertheless contends that the Guidelines

27  were incorporated into the plans by two snippets of plan language. First is the "Guideline

28  Exclusion," which excludes coverage for "services which are not consistent with [UBH's] level

1   of care guidelines or best practices as modified from time to time," UBH Br. at 18:20-23

2   (bracketed change in original). Second is a portion of some plans' definition of Covered Services

3   that says "[w]e maintain clinical protocols that describe the scientific evidence, prevailing

4   medical standards and clinical guidelines supporting our determinations. . . ." *See*, *e.g.*, Ex. 225

5   (cited at UBH Br. 19:7-11). More importantly, neither phrase comes close to transforming

6   UBH's Guidelines from internal guidance on plan interpretation into terms of every class

7   member's plan promulgated by the plan's sponsor.[19]

8           As an initial matter, UBH concedes that each of its plans provides coverage for mental

9   health and substance use disorder treatment and that such treatment must be consistent with

10  generally accepted standards. Against that backdrop, it is unreasonable to read the two snippets

11  of plan language that UBH relies upon as meaning that the referenced "guidelines" or

12  "protocols" are free-standing coverage requirements that are unconnected to other plan terms.

13  The Guideline exclusion, for example, provides no information as to what the referenced

14  guidelines/protocols should or should not be based upon, or what they should or should not

15  include. UBH argues that the Court should interpret this provision to mean that the plans gave

16  UBH unilateral control over what mental health and substance use coverage to provide, but this

17  interpretation renders entirely meaningless the plans' affirmative grant of coverage and the

18  requirement that covered treatment be consistent with generally accepted standards of care. This

19  is even truer with respect to UBH's proffered interpretation of the Covered Services definition.

20          Plaintiffs' proffered interpretation of these provisions, in contrast, gives meaning to all

21  plan terms relevant to this case: the plans affirmatively provided coverage for mental health and

22  substance use disorder treatment, they conditioned that coverage on consistency with "generally

---

23  [19] The Court owes no deference to UBH's "made for litigation" interpretation of these plan

24  provisions or its argument that it was not a fiduciary; even UBH does not suggest that. To the
    contrary, the Supreme Court has long held that "trust documents must generally be construed in

25  light of ERISA's policies," and that "trust documents cannot excuse trustees from their duties
    under ERISA." *Central States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S.

26  559, 568 (1985). The Ninth Circuit, moreover, construes ERISA fiduciary status "liberally,
    consistent with ERISA's policies and objectives." *Johnson v. Couturier*, 572 F.3d 1067, 1076

27  (9th Cir. 2009). Taken together, these longstanding principles argue against adopting UBH's
    expansive and self-serving interpretation of the plan snippets.

28

accepted standards," they left it to their claims administrator to interpret these plan terms in a manner that was consistent with its fiduciary obligations and to promulgate protocols/guidelines that reflect that interpretation, and then (as a "belt and suspenders" approach to plan construction) they excluded any claims that failed to satisfy those protocols/guidelines.

Even if the snippets UBH cites are read without regard to other plan terms, UBH's interpretation is still untenable. Neither phrase explicitly purports to incorporate *anything*, let alone a specific, fixed set of existing criteria.[20] Quite the contrary: the snippets are clear that the unspecified "guidelines" or "protocols" may be "modified" or "revised" "from time to time." *See, e.g.* Exs. 225-0056, 1647-0063 (cited at UBH Br. 18:22, 19:10). This language, on its face, disavows incorporation of a particular set of criteria, suggesting instead a type of document that is constantly subject to change.[21]

---

[20] In many cases – including one of the two plans UBH cites – the snippets do not even clearly refer to *UBH*, let alone any specific iteration of UBH's Level of Care Guidelines. The Alexander plan (Ex. 225) mentions the "Mental Health/Substance Use Disorder Designee's" guidelines, but it never identifies UBH as the designee. Ex. 225-0056 & -0096. And while that plan's covered services definition refers to "clinical protocols," it says that "we" maintain them – and defines "we" as UHIC, not UBH. 225-0031 & -0091.

UBH faults *Plaintiffs* for supposedly failing to offer proof of "any plan without the incorporation language." UBH Br. at 20:8-9 & n.11. But in fact, *no* plan contained sufficient "incorporation language" to transform any version of the Level of Care Guidelines into plan terms, and UBH does not point to any that do. Nor is there any legal authority for the proposition that incorporation would relieve UBH of its fiduciary duties in any event.

[21] *Jones v. Kodak Med. Assistance Plan,* 169 F.3d 1287 (10th Cir. 1999), on which UBH principally relies, is distinguishable. UBH Br. at 19:19-20:13. There, the summary plan description expressly identified a specific administrator, American Psychmanagement ("APM"), and, the Court held, the plan "expressly authorized APM to determine eligibility for substance abuse treatment according to its own criteria," *id.* at 1292, apparently finding that the plan sufficiently referred to a given set of existing criteria to make them part of the plan. (This court, on the other hand, previously found that the very language on which UBH still relies is insufficient to incorporate the Guidelines into the plans, *see Alexander* ECF No. 42 at 14:22-15:13). There was no indication in *Jones* that the plan contemplated that the APM criteria could be modified at any time, in the third-party administrator's sole discretion. Here, the situation is exactly the opposite of *Jones.*

In any event, *Jones* has never been cited within the Ninth Circuit, other than this Court's decision distinguishing it, and it is neither binding nor persuasive authority for the reasons set forth in Plaintiffs' opposition to UBH's motion to dismiss the *Alexander* complaint, *Alexander* ECF No. 30, and in the Court's order denying UBH's motion, *Alexander* ECF No. 42.

1    Instead of addressing any of these outcome-determinative considerations, UBH resorts to

2    misdirection by asserting that Plaintiffs somehow "conced[ed]" UBH's settlor defense because

3    Plaintiffs cited the same phrases within UBH's CDGs as among UBH's methods of

4    incorporating the LOCGs into the CDGs. UBH Br. at 18:15-19:18.[22] What UBH fails to

5    recognize, however, is that context matters. Plaintiffs' argument about LOCG incorporation into

6    the CDGs is that a simple cross-reference from one internal corporate policy document to

7    another is sufficient to prove that UBH directed its own employees to look to the LOCGs for

8    UBH's level-of-care criteria (especially when the CDGs otherwise lack level-of-care criteria).

9    *See* § VII, *infra*. The same is not true with respect to what is, or is not, an ERISA plan term.

10   Unlike internal corporate policies, ERISA plans are highly regulated and plan administrators are

11   required to promulgate a summary plan description that is "sufficiently accurate and

12   comprehensive to reasonably apprise such participants and beneficiaries of their rights and

13   obligations under the plan." 29 U.S.C. § 1022(a); *see also id*. §§ 1021(a) & 1024.

14   At the end of the day, UBH's settlor argument should be rejected because it (like so many

15   of UBH's defenses) is a post-hoc rationale that is inconsistent with ERISA and the

16   contemporaneous trial evidence. UBH is not, and could not be, a plan sponsor. The trial evidence

17   demonstrates that at all times prior to this lawsuit, UBH considered the Guidelines to be

18   interpretations of plan terms, not plan terms themselves. Moreover, UBH's interpretation of the

19   Guideline exclusion and Covered Services language as giving it the power to write and alter plan

20   terms is unreasonable in light of the plans' other provisions and fails on its own terms. Put

21

22   _____

     [22] UBH also relies on the equally baseless assertion that because the Ninth Circuit once called its

23   Guidelines "plan documents," that means they are necessarily "plan terms." UBH Br. at 22:11-
     15 (citing *Pacific Shores*, 764 F.3d at 1042). But the plaintiff in *Pacific Shores* did not challenge

24   the Guidelines and UBH did not argue that the Guidelines were plan terms. Thus, the Court did
     not even analyze, let alone decide, whether UBH's Guidelines had been incorporated into the

25   plan at issue. Because the incorporation issue was not presented to it, the Ninth Circuit's
     description of the Guidelines as "plan documents" is no more than *dicta* and cannot be read as a

26   holding that the Guidelines are terms of *any* plan, and certainly not *all* plans. While the case
     certainly stands for the fact that UBH faithlessly failed to apply its inpatient hospitalization

27   criteria appropriately, it is utterly inapposite to the issue of whether the Guidelines are "terms" of
     the class members' plans.

28

simply, nothing in ERISA or the plans suggest that UBH – a limited-purpose designee of a third-party plan administrator – possesses the unfettered, unreviewable power to write and alter the terms of every plan it administers regardless of anything else the plan document provides. UBH advances this argument even though it once disavowed it, and even though it and its own witness called the notion "absurd." *See Wit* ECF 266 (UBH's Mot. for Summary Judgment) at 13:18-19 ("UBH does not contend that its guidelines are immune from challenge under these plans."); *id.* at 13:24-14:8 (describing as "unsubstantiated hyperbole" and an "absurd hypothetical" Plaintiffs' point that UBH's argument means that the Guidelines could say anything, including, for example, that mental health services are not covered).[23] The Court should not embrace this absurd interpretation now, for the same reasons it rejected the notion back in 2014:

> Finally, the Court agrees with Plaintiffs that were *Jones* [*v. Kodak Med. Assistance Plan*] read so broadly as to hold that such open-ended references to guidelines are sufficient, as a matter of law, to convert a fiduciary act on the part of an administrator into an act that is immune from judicial review, the broad protections that have been afforded under ERISA with respect to fiduciary acts would be significantly undermined. Further, such a result could not be squared with the many cases in which courts have found that the creation of internal guidelines by plan administrators involves an exercise of discretion and therefore constitutes a fiduciary act. *See, e.g., Egert v. Conn. Gen. Life Ins. Co.*, 900 F.2d 1032, 1036 (7th Cir. 1990); *Glista v. Unum Life Ins. Co. of Am.*, 378 F.3d 113, 124 (1st Cir. 2004); *Mullins v. Conn. General Life Ins. Co.*, 880 F. Supp. 2d 713, 719 (E.D. Va. 2010).

*Alexander* ECF 42 at 15.

## IV.   PLAINTIFFS PROVED BY A PREPONDERANCE OF THE EVIDENCE THAT UBH'S GUIDELINES ARE UNREASONABLE.

UBH concedes that each of the class members' plans requires, as a condition of coverage, that the prescribed services be consistent with generally accepted standards of care. UBH Br. at

---

[23] Mr. Dehlin continued to disavow this position even at trial. When asked whether the Guideline Exclusion permits UBH "to create and apply any guidelines it wants even if they're absurd," Mr. Dehlin stated unequivocally: "No. Their guidelines have to be consistent with the details and the intent of the plan." Tr. 879:11-14. Mr. Dehlin's answer, which tellingly distinguishes between UBH's Guidelines and "the plan," would make no sense if the Guidelines were plan terms immune from review.

41:9-10.[24] A preponderance of the evidence proves that the Guidelines constitute UBH's effort to interpret and apply those plan terms, across the board, to all its members. *See* Pls.' Br. at 9-12; § II, *infra*. Thus, to be an appropriate exercise of UBH's discretion – that is, to be reasonable – the Guidelines must in fact be consistent with generally accepted standards of care.

A preponderance of the evidence at trial established that the Guidelines are substantively more restrictive than generally accepted standards of care. *See generally* Pls.' Br. at §§ II.F & G. UBH seeks to cast doubt on the "relevance" or classwide applicability of the Guideline defects at issue by characterizing Plaintiffs' critiques as superficial or exceedingly narrow in scope, as though Plaintiffs only nitpick a word here and there. *See, e.g.,* UBH Br. at 39:12-14 (describing Plaintiffs' arguments as "hyper-technical" and "legalistic"); *see also id.* at 3:8-9, 7:10-12, 49:7-9, 81:21, 100:6-10.[25] In reality, Plaintiffs have identified multiple, pervasive, substantive flaws that permeate both the Guidelines' common criteria and the additional, level of care-specific, criteria. *See generally* Consolidated Claims Chart. There are so many ways in which the criteria are more restrictive than generally accepted standards of care, and there are so many provisions that are impacted by at least one, and often several, defects that it would have been impossible for UBH to issue a proper denial to any class member in this case under the Guidelines as written. And

[24] Specifically, UBH states that it is "generally true" that "class members' plans in one way or another preclude coverage for treatment that is not consistent with generally accepted standards of care." UBH Br. at 41:9-10 (emphasis omitted). Despite using the hedge word "generally," UBH does not identify a single plan that does *not* condition coverage on treatment bring consistent with generally accepted standards of care or dispute Plaintiffs' Summary Exhibits 892 and 893, which demonstrate that all the plans in evidence contain this threshold requirement.

[25] UBH's assertions that some of the Guidelines "exceed 100 pages" and Plaintiffs only challenge some sections, UBH Br. at 100:6-7, are particularly disingenuous. As UBH well knows, the class in this case is defined to include only individuals who requested coverage for specified levels of care. Plaintiffs challenge *all portions* of the Guidelines that contained coverage criteria applicable to those requests – the common criteria and the level of care-specific sections. The only sections of the Guidelines that Plaintiffs do *not* challenge are those solely applicable to levels of care not at issue in this case (*e.g.*, inpatient hospitalization, partial hospitalization, etc.). Plaintiffs do not specifically challenge the "best practices" sections, but those sections are not coverage criteria in and of themselves. Rather, they explain how to determine whether a single coverage criterion has been satisfied: the requirement that services must be consistent with UBH's "best practice guidelines." *See, e.g.,* Ex. 5-0008 (§ 1.7.3). As discussed below, the "best practices" sections do not cure the other defects Plaintiffs identify. *See* § IV.B, *infra*.

every one of the flaws points in the same direction: toward restricting coverage, not extending it

UBH has never even explained how it could possibly apply the Guidelines as written without

implicating the Guidelines defects. It certainly did not offer any evidence suggesting that even

one of the denials at issue here was immune from those defects.[26]

A preponderance of the evidence proves that UBH's development and use of its

pervasively defective Guidelines harmed all Class Members. UBH's arguments to the contrary

are meritless, as explained below.

### A.    UBH's Witnesses Were Not Credible

UBH's post-trial brief makes clear that its defense is predicated almost entirely on the

trial testimony of its employees and its retained expert. When weighing the evidence, therefore,

the Court will necessarily have to decide how credible those witnesses were. In doing so,

Plaintiffs submit that the Court should take into account just how often those witnesses'

testimony was illogical and internally inconsistent; just how often those witnesses waffled or

found themselves unable to answer the Court's questions; and just how often those witnesses

were caught prevaricating or even outright lying. To cite just a few of the many examples:

---

[26] UBH repeatedly boasts that its care advocates purportedly "authorize coverage in 90 percent or more of the cases." UBH Br. at 37:13-14; *see also id.* at 2:8-10. The Court should not draw the inference UBH seems to be suggesting: that the supposedly high approval rate (supported only by a self-serving statement elicited from Dr. Martorana on direct, Tr. 943:6-7) proves that UBH's Guidelines are not overly-restrictive. Dr. Martorana provides no information about what, exactly, the care advocates are purportedly approving, or why, or how the approvals relate, if at all, to the class members' denials. For example, what proportion of claims approved by care advocates are for the levels of care at issue in this case, versus some other level of care? How many are approvals of the first day or two of treatment, which is later cut off prematurely under UBH's continued service criteria? (The latter question is particularly salient given UBH's exceedingly low average lengths of stay ("ALOS") for residential treatment. *Compare* Ex. 570 (reflecting ALOS of 23.7 to 29 days for mental health treatment and from 11.6 to 14.1 days for substance use disorder treatment) *with* Tr. 599:3-8 (Plakun) (describing a National Association of Psychiatric Health Systems study, Ex. 640-0021, finding that the average length of stay in residential treatment facilities was 108 days) *and* Tr. 159:10-160:7 (Fishman) (explaining that average lengths of stay for residential SUD treatment at the highest level, 3.7, is 1-4 weeks; for level 3.5 is 4-12 weeks; and for level 3.1 is "typically measured in months and might . . . be 6 to 12 months for some patients"). There is simply not enough information in Dr. Martorana's statement to support any factual inference.

- Dr. Triana, the head of UBH's clinical operations, falsely denied that UBH is required to include in its written notifications all the reasons for an adverse benefit determination, Tr. 729:8-10, even though he testified to the contrary at his deposition, Tr. 730:3-19, and only admitted the truth after being pressed, at length, by the Court. Tr. 790:17-792:24.

- Mr. Niewenhous, the UBH employee primarily responsible for UBH's Guidelines for most of the class period, testified that UBH's definition of "custodial care" comes from a Certificate of Coverage present in "some" plans, but then refused to admit that UBH administers at least some plans without that language, evasively claiming not to have "looked at all the – every single one of the plans that UBH administers." Tr. 456:11-457:4. Even after the Court admonished him not to "play games," Mr. Niewenhous claimed not to know the answer. Tr. 457:5-8.

- Mr. Niewenhous was also an author of the "deviations grid" that UBH submitted to Connecticut regulators to justify their refusal to use the ASAM Criteria. Tr. 399:6-21. At trial, Mr. Niewenhous claimed it "dawned on" him only as he prepared to testify at trial that the grid contained an "error" insofar as it stated that UBH's residential rehabilitation guidelines contained criteria for ASAM level 3.1, Tr. 461:2-18, but he was questioned about that very issue at deposition, and at that time defended the grid as accurate. Tr. 464:9-466:3. The story Mr. Niewenhous told at trial was an obvious pretext; despite supposedly "realizing" that the grid contained an "error," Mr. Niewenhous took no steps to correct it, and did not even discuss it with anyone, other than to prepare his trial testimony. Tr. 460:22-464:8; 466:4-7.

- Dr. Martorana, a member of the BPAC and UBH's company representative throughout the trial, testified extensively on direct examination that certain words and phrases encompassed all aspects of a patient's circumstances, but when pressed by the Court about why UBH used different words in different provisions, he had no answers. Tr. 975:977:5 (in response to Court's questions, stating "I did not actually pick these words" and "[w]e didn't think it through in the way you're thinking it through now."); Tr. 995:12-18 ("I don't know for a fact why that's not there.").

- Dr. Alam testified that the plans UBH administered did not cover lower levels of residential treatment, and admitted that he told UBH's consultant, Mr. Shulman, as much "possibly" in a phone conversation shortly after he was retained. Tr. 1639:16-1640:10. Dr. Alam then later changed his story to assert that he only told Mr. Shulman UBH has no such *criteria*, and that Mr. Shulman's opinion was only that UBH should re-label its criteria, Tr. 1646:11-18, but also asserted that UBH *does* have such criteria 1645:19-1646:6, then finally admitted that "it can be argued" that UBH has *no* such criteria. Tr. 1647:4-7. Dr. Alam was also forced to admit that he "overstated" a footnote in his expert report, which falsely claimed UBH contracts with "few, if any," providers offering lower-intensity residential treatment, after he testified that UBH does specifically contract with such facilities. Tr. 1575:10-21; Tr. 1642:21-1644:10.

- Dr. Allchin testified that UBH's Guidelines are no more than mere "suggestions," Tr. 1403:24-25, but quickly retracted his testimony when questioned by the Court. Tr. 1404:18-23. He insisted that paragraph 1.4 of the 2016 Guidelines includes co-occurring conditions, even though he admitted that "[s]ometimes, without prompts," UBH's staff "don't naturally think of those co-occurring conditions as being in 1.4." Tr. 1388:19-1390:13. In response to the Court's questions about his reasoning, Dr. Allchin could only answer, "I didn't write the guidelines." Tr. 1389:16-21. Dr. Allchin – a child and adolescent psychiatrist – also testified that he uses the ASAM Criteria, but was apparently unaware that ASAM contains separate diagnostic and admission criteria for adults and adolescents. *Compare* Tr. 1375:6-1376:8 *with* Tr. 1448:19-1450:5.

- Throughout his testimony, Dr. Simpatico, UBH's sole retained expert, defended the Guidelines as being consistent with generally accepted standards, and even called one provision (which calls for co-occurring conditions to be "safely managed") "overkill," Tr. 1178:20-1180:19. Yet, as the Court noted, Dr. Simpatico arrived at his opinion by repeatedly reading the generally accepted standards *into* the Guidelines despite having no textual support for doing so. *See*, *e.g.*, Tr. 1180:22-1182:15, 1239:2-20. When confronted with the Guidelines' actual language, Dr. Simpatico repeatedly asserted that words do not mean what they say. *See*, *e.g.*, Tr. 1237:18-1240:6 (insisting "clear and compelling" means "reasonable likelihood"); Tr. 1054:8-17 ("why now" means "whole person"); Tr. 1179:12-22 ("safely managed" is no different from "safely, effectively, and efficiently treated"). He finally admitted, in response to questions from the Court, that he would not use the Guidelines in his own work (nor would "[a]ny practitioner worth his salt") because he could not reconcile them with generally accepted standards. Tr. 1241:3-1243:12. Dr. Simpatico thus put the lie to his own testimony.

To top off all of this misleading, circular, self-serving testimony, one of UBH's key defenses in the case is, effectively, an argument that it lied to all of the Class Members, *see* § IV.D, *supra* – demonstrating just how little UBH values honesty and scrupulous attention to its fiduciary duties. The Court should give the testimony of UBH's witnesses the scant weight it deserves.

## B.   The Clinical Best Practices Section Does Not Cure any of the Defects Plaintiffs Have Identified in the Coverage Criteria.

Based largely on its employees' incredible testimony, UBH argues that the "clinical best practices" section of the Guidelines cures every single defect Plaintiffs identified in the Guidelines' actual coverage criteria. *See*, *e.g.*, UBH Br. at 50:21-53:9; 62:20-63:17; 74:23-76:12; 84:17-85:3. The Guidelines themselves rebut this argument for two reasons.

1    First, the Guidelines impose numerous mandatory criteria for coverage; assuring that

2    services are consistent with UBH's "best practices" is just one of them.[27] UBH conceded at trial

3    that all of the coverage criteria have to be met.

4    Second, none of the *other* mandatory coverage criteria turns on the factors listed in the

5    best practices section. That section says simply that it is a "best practice" for "[t]he provider [to]

6    collect[] information from the member and other sources" to complete an initial evaluation on

7    which to base a treatment plan, and that the provider should take a long list of information into

8    account. *See*, *e.g.*, Ex. 5-0010 to 0011 (¶ 4.1.2). It does *not* say, however, that UBH's employees

9    should use those factors for any purpose (other than verifying that the provider completed an

10   initial evaluation), let alone that they should base coverage determinations on them. To the

11   contrary, the "best practices" provisions only say that the *provider* should collect and evaluate

12   the listed information. Ex. 1-0005 (¶ 2) ("***The provider*** completes an initial evaluation which

13   includes the following: …") (emphasis added); Ex. 2-0006 (¶ 2) (same); Ex. 3-0007 (¶ 2) ("***The***

14   ***provider*** collects information from the member and, when appropriate, other sources to complete

15   an initial evaluation of the following: …") (emphasis added); Ex. 4-0007 (first bullet in column

16   headed "Evaluation & Treatment Planning," under "Clinical Best Practices") ("***The provider***

17   collects information from the member and other sources, and completes an initial evaluation of

18   the following: …") (emphasis added); Ex. 5-0010 (¶ 4.1.2) (same); Ex. 6-0011 (¶ 4.1.2) (same);

19   Ex. 7-0011 (¶ 4.1.2) (same); Ex. 8-0008 (first black bullet on page) (same).[28]

20

21   [27] From 2011 to 2013, UBH did not separate the best practices requirements into a separate
     section, but the Guidelines on their face draw a clear distinction between findings regarding the

22   member's eligibility and need for treatment, *see*, *e.g.*, Ex. 1-0005 to -0006 (¶¶ 1, 3-9) and steps
     the provider should be taking as a matter of good medical practice, *see*, *e.g.*, Ex. 1-0005 to -0008

23   (¶¶ 2, 10-13). Starting in 2014, UBH separated the provisions into distinct sections, even visually
     dividing them by a thick black line. *See* Ex. 4-0007 to -0012 (distinct sections headed "Level of

24   Care Criteria" and "Clinical Best Practices"). UBH maintained the separation in subsequent
     years through its numbering system. *See*, *e.g.*, Ex. 5-0008 to -0013 (¶¶ 1, 2 and 3 and sub-

25   paragraphs contain "criteria," while ¶ 4 and its sub-paragraphs contain "Clinical Best
     Practices.").

26
     [28] Even if the Court infers that the best way for UBH to verify that the provider has conducted a
27   thorough evaluation is to ask for each item on the list, all that means is that UBH can tick off
     "consistent with best practices" on the admission criteria. It is not a fair inference, from the
28   Guidelines' plain language, that UBH uses the information for any other purpose, and it is

Nowhere do the Guidelines say that UBH's employees should consider the listed factors when determining whether to approve coverage.[29] Nowhere do the Guidelines say that a UBH employee's "clinical judgment" about those factors means that the member need not meet each of the common admission, continued service, and discharge criteria and all the additional criteria applicable to the proposed level of care. Nowhere do the Guidelines say that if the provider complies with UBH's best practices, coverage must be approved – and UBH has expressly disavowed any argument that members could be covered without meeting all of the admission and continued stay criteria. *See, e.g.,* Tr. 285:23-286:17 (UBH counsel disavowing contention that common criteria are optional); UBH Br. at 49:21-22 (admitting that the LOCGs contain criteria that "should all be met."); Tr. 1458:6-11 (Allchin) (admitting that even if provider collects all the information called for in the best practices section, "[t]here's still no coverage under UBH's guidelines unless all of the admission criteria in the common criteria. . . are met.").

As UBH is quick to point out, Plaintiffs' experts acknowledged that the laundry list of factors in the best practices section encompasses much of the information that, under generally accepted standards of care, providers should weigh when making level-of-care decisions. *See, e.g.,* UBH Br. at 63:8-17 (citing Fishman testimony about the clinical best practices section but misleadingly suggesting that it pertains to "the LOCGs" as a whole). If UBH's Guidelines consisted *only* of the best practices section and provided that coverage decisions would be made by weighing those factors according to the reviewer's clinical judgment, Plaintiffs surely would

---

especially not fair to infer that UBH uses the information in ways that vary from the stated admission, continued service, and discharge criteria.

UBH cites no Guideline language that actually directs UBH's decision-makers to take the factors listed in the best practices section into account when making coverage decisions, instead citing generally to the list of factors the Guidelines say a *provider* should consider, *see, e.g.,* UBH Br. 51:2-52:14, 74:23-26, 75:2-13, 84:21-85:1 and otherwise relying entirely on its own employees' self-serving trial testimony that, rather than applying the Guidelines as written, they somehow "address" the listed factors when making coverage decisions. *See, e.g.,* UBH Br. at 50:21-51:2; 52:17-28; 63:2-8; 74:26-75:2; 76:8-10; 84:17-85:3. But a preponderance of the evidence proves that UBH does apply the Guidelines as written. *See* § IV.D, *infra.*

[29] The mere fact that *one* criterion requires services to be consistent with UBH's "best practices" is a far cry from importing the entire contents of the best practices section into each one of the other coverage criteria.

not have asserted the claim raised in this case. But the way the Guidelines are *actually* written only underscores that, although UBH well knew what was generally accepted, it chose to base its coverage decisions on a much narrower set of criteria. Far from curing the Guidelines' pervasive defects, the best practices section only highlights them.

### C.   UBH Offers No Meritorious Defense of the Guideline Criteria as Written

At trial, Plaintiffs proved that UBH's Guidelines are pervasively overly-restrictive and consequently fall far short of generally accepted standards of care, for at least eight interconnected reasons. *See* Pls.' Br. at §§ II.F & G. In response, UBH argues over and over again that the Guidelines do not mean what they say and implies that the Court has some obligation to give special weight to UBH's employees' uncorroborated testimony about what the Guidelines supposedly mean. *See, e.g.*, UBH Br. at 1:25-2:8, 39:17-20, 49:6-16, 60:8-20, 66:21-25 & n.46, 74:17-20.[30] But, as demonstrated in detail below, these employees' self-serving testimony is not believable. It was belied not only by the plain meaning of the words used in the Guidelines and all of the contemporaneous evidence about what those words mean, but also by the contemporaneous evidence that, in practice, UBH's employees applied the Guidelines as written. The Court should reject the UBH employees' revisionist interpretation of the Guidelines for what it is: a dishonest attempt to distract from the many, many ways the criteria UBH formally adopted and required its reviewers to apply fall short of generally accepted standards of care.

### 1.   The Guidelines Overemphasize Acuity.

UBH made no attempt to prove (nor could it) that, under generally accepted standards of care, level-of-care determinations should turn on the presence or absence of acute changes or

---

[30] UBH cites no legal authority for this proposition, and Plaintiffs are aware of none. Even if UBH is entitled to ERISA deference on whether its interpretation of the plan terms was *reasonable*, it is not entitled to deference on the question of *what* its interpretation *was*. In resolving that factual issue, the Court should give the words in the Guidelines their ordinary meaning. *See, e.g., Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 955 (9th Cir. 2009) (where term was not "defined in the contract . . . we look to its plain and ordinary meaning"); *United States v. Flores*, 729 F.3d 910, 914 (9th Cir. 2013) ("In determining the 'plain meaning' of a word, we may consult dictionary definitions, which we trust to capture the common contemporary understandings of the word.").

acute symptoms. UBH made no attempt to establish (nor could it) that treatment focused solely on acute symptoms would be effective or consistent with generally accepted standards. Instead, UBH contends that its Guidelines do not *actually* overemphasize acute factors, notwithstanding their plain language. It does so by (1) arguing that words in the Guidelines do not mean what they say; (2) directing the Court to inapposite language; and (3) imagining Guideline provisions that do not exist. None of UBH's arguments has merit.

> (a)    The Plain Language of the Guidelines Over-Emphasizes Acuity at the Expense of Other Considerations.

Plaintiffs identified multiple criteria in each year that require a member to be suffering from acute symptoms in order for UBH to approve coverage. *See generally Wit* ECF No. 395 (Pls. Claims Chart: Challenged UBH Guideline Provisions (Corrected)) (entries identifying "acuity" as a reason provision is flawed); Pls.' Br. at 32-39 (explaining how those provisions over-emphasize acuity and why such over-emphasis conflicts with generally accepted standards). Those criteria use a handful of words and phrases that, on their face, focus the UBH decision-maker on the immediate crisis for which the member sought treatment, including: "acute" and "acute changes"; "why now factors"; "presenting" symptoms, problems, or condition; and factors "leading to" or "precipitating" admission. *Id*. In response, based solely on its own witnesses' uncorroborated trial testimony, UBH contends that all those criteria – ***even the word "acute" itself*** – refer to *both* acute *and* chronic factors and call for decision-makers to weigh the totality of facts and circumstances about the patient.[31] The plain meaning of the words UBH chose to use in its coverage criteria, and all of the contemporaneous evidence, belie this argument.

*"Acute," "Acute Changes"*: The word "acute" normally connotes rapid onset and short duration, as well as severity. *See* UBH Br. at 58:3-60:5.[32] Despite acknowledging the usual

---

[31] For UBH's position on the meaning of "acute changes," *see* UBH Br. at 61:7-8, 64:24-66:20, 73:10-74:9; as to "acute symptoms," *see id.* at 69:5-71:4; as to "presenting problems," *see id.* at 68:7-69:13; as to "factors precipitating admission," and "factors leading to admission," *see id.* at 62:6-7; as to "why now factors," *see id.* and 64:24-67:9.

[32] UBH contends that "acute" means *either* "recent" *or* "severe," depending on context. *See* UBH Br. at 58:3-60:5. This spin does not make the word "acute" ambiguous. Even if the Court

meaning of the word, UBH disputes that "acute change" refers to a crisis, *id.* at 66:8, and argues that "focusing on[] acute needs does not preclude consideration of chronic conditions." *Id.* at 59:17-18.[33] But common sense – and the very first definition of "acute" in the Oxford English Dictionary – belie both of those claims:

> a. Of a disease, symptom, etc.: ***coming quickly to a crisis*** or conclusion; of rapid onset and short duration; of recent or sudden onset; ***contrasted with chronic*** . . . . In similar contexts: severe; critical.[34]

The Merriam-Webster Dictionary's definition similarly begins:

> (1) : characterized by ***sharpness or severity*** ◦ *acute pain* (2) : having a ***sudden onset, sharp rise, and short course*** ◦ *acute disease* (3) : being, providing, or requiring short-term medical care (as for serious illness or traumatic injury) ◦ *acute hospitals* ◦ *an acute patient*.[35]

Stedman's Medical Dictionary likewise defines "acute" as:

> 1. Referring to a health effect, usually of ***rapid onset, brief, not prolonged***; sometimes loosely used to mean ***severe***.
>
> 2. Referring to exposure, brief, intense, short-term; sometimes specifically referring to brief exposure of high intensity.

*Stedman's Medical Dictionary* 10070 (Westlaw 2014) (emphasis added). The Court should give the word "acute" its ordinary meaning whenever it appears in the Guidelines. *See generally* Consolidated Claims Chart.

---

applies only one part of the word's definition at a time, the Guidelines' constant focus on acute symptoms and acute changes over-emphasizes recent exacerbations in a patient's symptoms and downplays (or ignores) the need to identify and effectively treat underlying illnesses and chronic conditions.

[33] Contrary to UBH's assertion, UBH Br. at 59:17-18, Plaintiffs do not argue that considering acuity necessarily *precludes* a person from *also* considering chronicity. Plaintiffs argue, instead, that criteria that explicitly condition coverage on acute factors do not allow for coverage based solely on chronic issues, or otherwise in the absence of an acute crisis.

[34] *Acute*, OXFORD ENGLISH DICTIONARY, http://www.oed.com.nyli.idm.oclc.org/view/Entry/2031?rskey=aPO4Ll&result=1&isAdvanced=false#eid (last visited Jan. 30, 2018) (emphasis added).

[35] *Acute*, Merriam–Webster, https://www.merriam-webster.com/dictionary/acute?src=search-dict-box (last visited Jan. 29, 2018) (emphasis added).

Apart from its employees' self-serving testimony, UBH offered no evidence suggesting that UBH actually intended the word "acute," as used in the Guidelines, to include its opposite. To the contrary, even UBH admits that the reason it left the phrase "acute" in the residential treatment criteria in 2017, despite removing it from the common criteria, was to ensure that UBH would continue to base coverage decisions for RTC on "'what was the *new change* that happened that needs to be addressed *that puts them into a 24-hour setting*.'" UBH Br. at 65:25-27 n. 45 (quoting Tr. 1006:19-1007:2 (Martorana)) (emphasis added). Similarly, Mr. Niewenhous – the UBH employee primarily responsible for the Guidelines for most of the class period – explained at trial that his 2015 description of UBH's approach as an "Acute Care UM Model" referred to the fact that in UBH's "commercial business[,] the services focus on the *reasons why somebody came into treatment at that point*." Tr. 303:4-305:3 (Niewenhous) (testifying about Ex. 512-0007). Explaining a 2016 email in which he stated, "[o]ur guidelines are used to authorize services. Presumption is that services are acute," Ex. 522-0002. Mr. Niewenhous also testified that the commercial services UBH administers "are aimed at bringing about a change in *what somebody comes into treatment for*" – but just until the patient can safely step down. Tr. 314:24-315:15 (emphasis added). *See also* Ex. 522-0002 (Niewenhous noting that "services for severely and persistently ill members that are intended to endure[] don't play to an acute care UR model.").[36]

"'*Why Now' Factors*": The phrase "'why now' factors" is also unambiguous, because the Guidelines define it: "acute changes in the member's signs and symptoms and/or psychosocial and environmental factors (*i.e.*, the 'why now' factors leading to admission)." Ex. 4-0007 (second bullet in "Admission" column under "Level of Care Criteria"); *see also* Ex. 5-

---

[36] Dr. Triana and his boss, Keith Keytel, likewise discussed 2014 email exchange the fact that UBH's "[c]ommercial interpretation and application [of COCs and SPDs] historically has been on . . . crisis stabilization/ short term [treatment] and that is not consistent with 'long term care/ placement." Ex. 755-0002. As Dr. Triana noted if the senior leadership team decided to "cover" long term care, UBH would have to develop *new* level of care guidelines capable of accounting for such treatment. *Id.* This evidence of UBH's focus only on short term, crisis stabilization care is entirely consistent with the plain language of UBH's Guidelines, giving "acute" its ordinary meaning.

0008 (¶ 1.4); Ex. 6-0009 (¶ 1.4); Ex. 7-0009 (¶ 1.4). Applying the ordinary meaning of "acute," the Guidelines, on their face, thus define "'why now' factors" as "[recent, severe] changes in the member's signs and symptoms and/or psychosocial and environmental factors."

UBH does not even attempt to dispute (nor could it) that, from 2014 to 2016, coverage under the Guidelines hinged on the "'why now' factors." Instead, UBH again relies on its own employees' post-hoc testimony that the phrase has a number of different meanings, from "root cause" to "holistic view" to "whole patient." *See* UBH Br. at 62:6-19, 67:1-9. But as explained above, that testimony is just not credible in the face of the unambiguous plain language of the Guidelines. Taking the Guidelines as written, UBH offers *no opposition* to Plaintiffs' argument that the pervasive focus on "'why now' factors" over-emphasizes acuity in violation of generally accepted standards of care.[37]

***"Presenting" symptoms, conditions, and problems***: Various Guideline criteria use the word "presenting," to modify either "symptoms," "problem(s)," or "condition." *See*, *e.g.*, Ex.1-0005 (¶ 6) (coverage requires expectation that services "will improve the member's presenting problems within a reasonable period of time"); Ex.1-0006 (¶ 7) ("The goal of treatment is to improve the member's presenting symptoms …"); *id*. (¶ 10) ("The treatment plan stems from the

---

[37] Even if the Court somehow read the Guidelines' straightforward definition of "'why now' factors" as ambiguous, a preponderance of the evidence demonstrates that it means the "acute changes…" and not, as UBH contends, the "root cause" or "holistic approach" or "whole patient." Dr. William Bonfield, who introduced the phrase, testified that he borrowed it from the "crisis intervention literature." Ex. 1659-0006 (Bonfield Dep.) at 206:10-15. In 2014, when UBH first revised the Guidelines to focus almost exclusively on "why now," providers raised questions about the term and, for example, how it applies to "chronic people who are going through one crisis after another." Ex. 408-0008. As one provider pointed out, the term was "as much a statement of when not to treat as how to treat appropriately. This is especially true for more chronic cases…." *Id*. In response to these concerns, the Level of Care Guidelines Workgroup stated that the term should have a clear definition and noted that "[t]he 'why now' is the immediate cause for the member's distress and the member's motivation for seeking treatment at the current point in time." *Id*. This definition is entirely consistent with the way the term is actually defined on the face of the Guidelines, demonstrating that the words should be given their ordinary meaning. Exhibit 408 is contemporary evidence of what the people writing and approving the Guidelines intended the term "why now" to mean, and it is far more persuasive than the tortured interpretations those same people offered at trial.

1  member's presenting condition . . .").[38] According to UBH, these phrases encompass not only the

2  immediate reason the member is seeking treatment, but also everything about the member and

3  his or her history that has preceded the request for care. UBH Br. at 68:7-15 (discussing

4  "presenting problems"). UBH's all-encompassing interpretation of "presenting" is vastly more

5  expansive than the ordinary meaning of the word and, again, is just not credible. The Oxford

6  English Dictionary, for example, defines "presenting" in the medical context as "[d]esignating a

7  symptom or complaint for which a patient seeks medical attention."[39] Merriam-Webster's

8  definition is similar:

9  
10      of, relating to, or being a symptom, condition, or sign which is observed or detected upon initial examination of a patient or which the patient discloses to the physician.[40]

11  Stedman's Medical Dictionary agrees, defining "presenting symptom" as:

12  
13      the complaint offered by the patient as the main reason for seeking medical care; usually synonymous with chief complaint.

14  *Stedman's Medical Dictionary* 874490 (Westlaw 2014).[41] Applying the ordinary meaning of the

15  words, the Guidelines' references to "presenting" symptoms, problems, or conditions refer to the

16  patient's main reason for seeking treatment. "Presenting" symptoms, problems and conditions

17  are thus distinct from the patient's complete history, and – contrary to UBH's expansive post-hoc

18  interpretation – the phrases, on their face, do not include symptoms or conditions that are not

19  

20  ---

[38] These provisions appear in other years as well. *See, e.g.*, Ex. 2-0007 (¶¶ 6, 7, 10); Ex. 3-0008

21  (¶¶ 7, 8, 11); Ex. 4-0009 (black bullet in "Admission" column under "Level of Care Criteria") ("presenting problems"); Ex. 5-0008 (¶ 1.8) (same); Ex. 6-0010 (¶ 1.8) (same); Ex. 7-0010

22  (¶ 1.8) (same); Ex. 8-0007 (fifth black bullet on page) (same).

23  [39] *Presenting*, Oxford English Dictionary, http://www.oed.com.nyli.idm.oclc.org/view/Entry/150707?rskey=vp1IpS&result=3&isAdvanced

24  =false#eid (last visited Feb. 2, 2018) (definition 3).

25  [40] *Medical Definition of Presenting*, Merriam-Webster, https://www.merriam-webster.com/medical/presenting (last visited Jan. 29, 2018).

26  [41] The phrases "presenting problem" and "presenting condition" do not appear in Stedman's, nor

27  does the word "presenting." Stedman's defines "present," in relevant part, as "[t]o appear for examination or treatment, said of a patient." *Stedman's Medical Dictionary* 719270 (Westlaw

28  2014).

1  "manifest" at the time the member seeks treatment, including chronic conditions with enduring

2  symptoms that may not be florid at the time.

3  Reading the words as written, Guideline criteria that make improving the member's

4  "presenting symptoms" into "*[t]he* goal of treatment" (as opposed to "*a* goal") necessarily limit

5  the scope of treatment to addressing only the member's most immediate complaint upon seeking

6  treatment.[42] *See* Ex. 1-0006 (¶ 7); Ex. 2-0007 (¶ 7); Ex. 3-0008 (¶ 8).[43] Criteria mandating that

7  the treatment plan must "stem[] from the member's presenting condition" and that require an

8  expectation that the "presenting problems" will improve in a "reasonable period of time" are

9  likewise overly narrow. *See* Ex. 1-0005 to -0006 (¶¶ 6, 10); Ex. 2-0007 (¶¶ 6, 10); Ex. 3-0008

10  (¶¶ 7, 11); Ex. 4-0009 (first black bullet in "Admission" column under "Level of Care Criteria");

11  Ex. 5-0008 (¶ 1.8); Ex. 6-0010 (¶ 1.8); Ex. 7-0010 (¶ 1.8); Ex. 8-0007 (fifth black bullet). And

12  mandating *all* of these criteria at once unquestionably results in coverage criteria that are overly

13  focused on acute factors and insufficiently attentive to chronic conditions.

14  ***"Factors leading to admission," "factors precipitating admission":*** With the advent of

15  the "why now" factors, UBH also added these two phrases, which appear throughout the

16  Guidelines, always following "why now." *See, e.g.*, Ex. 4-0007 (second bullet in "Admission"

17  column under "Level of Care Criteria") (conditioning coverage on a finding that member cannot

18  be treated in a lower level of care due to "the 'why now' factors leading to admission"); *id.* (first

19  sub-bullet in "Discharge" column under "Level of Care Criteria") (coverage ends if "[t]he 'why

20  now' factors which led to admission have been addressed to the extent" that the member can

21  safely step down). Especially in light of the explicit definition of "why now factors," in the

---

[42] Those criteria become even narrower because UBH calls for treating those immediate concerns *only* to the point that the current level of care is "no longer required" – rather than "so long as the current level of care is most effective." *See* § IV.C.3, *infra*.

[43] UBH removed this provision from the Guidelines in 2014. Instead, from 2014-2016, the "best practices" section specified that "[t]reatment focuses on addressing the 'why now factors'" until the member can be stepped down, and that the treatment plan must be "directly related to the why now factors." *See* Ex. 4-0010 (first bullet in "Evaluation & Treatment Planning" column of "Clinical Best Practices"); 4-0011 (second bullet in "Evaluation & Treatment Planning" column of "Clinical Best Practices"); Ex. 5-0011 (¶ 4.1.4.3, ¶ 4.1.7); Ex. 6-0012 to -0013 (¶ 4.1.4.3, ¶ 4.1.7); Ex. 7-0012 to -0013 (¶ 4.1.4.3, ¶ 4.1.7).

common criteria, the factors "leading to" or "precipitating" admission from 2014-2016 plainly are the "acute changes."

  After the Court certified the classes in this case, UBH removed the phrase "why now" from its 2017 Guidelines, leaving the terms "factors leading to admission" and "factors precipitating admission" in place.[44] The Guidelines define the latter term as "changes in the member's signs and symptoms, psychosocial and environmental factors, or level of functioning." *See*, *e.g.*, Ex. 8-0013 to -0014 (preamble to mental health outpatient section).[45] Although not quite as blatant as the prior references to "***acute*** changes," the 2017 Guidelines thus still condition coverage on *changes* that *precipitate* admission to treatment – thus necessarily limiting the scope of coverage to the member's immediate, chief complaint. Again, UBH offers no justification for such narrow criteria, but instead only argues that the language does not mean what it says. According to UBH's witnesses, what factors "leading to" or "precipitating" admission really means is "all the considerations that have led this member to this point in time seeking treatment, including 'chronic conditions if they exist in the patient.'" UBH Br. 62:5-11. But this self-serving post-hoc definition lacks any contemporaneous evidentiary support, and cannot be squared with the Guidelines' own definition of the phrase or the ordinary meaning of the words.

---

[44] In its Opposition, UBH lumps these two phrases together with "why now," effectively conceding that – whatever their definition – they mean the same thing. UBH Br. at 62:6-19.

[45] The ordinary meanings of "leading to" and "precipitating" are virtually interchangeable, though "precipitating" has a more urgent connotation. According to the Oxford English Dictionary, for example, "to lead to" means "to have as a result or consequence." *Lead*, <u>Oxford English Dictionary</u>, <u>http://www.oed.com.nyli.idm.oclc.org/viewdictionaryentry/Entry/106586</u> (definition 6(c)) (last visited Feb. 2, 2018). "To precipitate" in the sense of "bringing about" means "to cause (an event or series of events) to happen quickly, suddenly, or unexpectedly; to hasten the occurrence of," but the word "[n]ow also more generally" means "to bring about, cause to happen." *Precipitate*, Oxford English Dictionary, <u>http://www.oed.com.nyli.idm.oclc.org/view/Entry/149644?rskey=YYCAv8&result=3&isAdvanced=false#eid</u> (definition 3(a)) (last visited Feb. 2, 2018).

(b)     The Inapposite Language on which UBH Relies Does Not Alter the Guidelines' Coverage Criteria.

Unable to argue away the Guideline criteria that explicitly condition coverage on acute factors, UBH points to *other* Guideline provisions that it says direct its employees to consider chronic factors *as well*, namely (1) the clinical best practices section, UBH Br. at 62:20-63:17; (2) language from the preamble to the Intensive Outpatient ("IOP") section, *id.* at 62 n.44; (3) language from the Guidelines' Introduction section, *id.* at 63:18-64:4; and (4) provisions that refer to the member's "current condition," *id.* at 60:21-62:3. None of these Guideline provisions, however, actually permits coverage for treatment of chronic conditions in the absence of acuity – nor do any of these provisions render inoperative the acute-focused criteria on which Plaintiffs' argument relies.

First, as explained above, the Guidelines do not, anywhere, direct UBH employees to do *anything* with the information from the provider's initial evaluation, let alone to rely solely on that information and ignore the actual admission, continued service, and discharge criteria. *See* § IV.B, *supra*. Second, as for the preamble to the IOP section, which acknowledges that IOP may be appropriate for individuals with persistent conditions and/or who have moderate symptoms, UBH Br. at 62 n.44, UBH does not suggest – nor could it – that the preamble contains coverage criteria. UBH does not even contend that the language on which it relies defines terms used within the coverage criteria. All the preamble proves is that UBH recognizes, at least with respect to IOP, that acuity is not an inherent requirement for *treatment* in that level of care – but it has nevertheless made it a requirement for *coverage* at all levels of care. Third, the Introduction section also contains no coverage criteria, and UBH has never suggested (nor could it) that the Introduction voids the Common Criteria or the level of care-specific criteria, or somehow otherwise converts mandatory criteria into permissive factors that need not all be satisfied.[46] Even if it really was UBH's goal to promote member "recovery, resiliency and well-

---

[46] To the contrary, both the contemporaneous evidence and Mr. Niewenhous's trial testimony make clear that the "statement of principles" in the Guidelines' introduction was "never turned into measurable criteria." Tr. 315:16-316:20; *see also* Ex. 522-0002 (Feb. 2016 email stating that UBH's "Clinical Vision" was never "operationalized," in part because the "[m]anagement level staff was "focused on [profit and loss]" and did not "see the [v]ision as relevant").

being" rather than its own bottom line (an assertion Plaintiffs disproved at trial, *see* Pls.' Br. at 66-72 & § V, *infra*), UBH's noble intentions still would not change the strict requirements in the coverage criteria it actually wrote and applied in denying Class members' claims.[47]

Fourth, UBH's reliance on the phrase, "current condition," is both misleading and misplaced.[48] As reflected in their Post-Trial Brief and Claim Chart, Plaintiffs' acuity argument is not based on the "current condition" references; nor does the inclusion of that phrase in a few places operate to broaden the other acute-focused criteria on which Plaintiffs' argument *does* rely. *See* Pls.' Br. § II.G.1; *see also generally* Consolidated Claims Chart.

UBH's "current condition" argument is thus completely irrelevant to the 2011-2013 Guidelines, where the acuity argument is based on different provisions with different language. *Compare* UBH Br. at 61:3-14 (citing Ex. 1-0005 (¶¶ 4-5)) *with* Consol. Claims Chart at #s 2, 3, 5, 6, 8.[49] As for 2014-2016, UBH fails to address critical revisions to the Guideline language that further entrenched the Guidelines' already-existing focus on acuity. In 2014, UBH *removed* a paragraph that had called for verifying that the member's "current condition" could be "most effectively and efficiently treated in the proposed level of care." *See* Ex. 4-0007- to -0010 (Level of Care Criteria).[50] At the same time, UBH *added* language to a second paragraph, such that the

---

[47] The phrase appears only once within the coverage criterion at issue in this case, in the criterion requiring a reasonable expectation of improvement. As discussed below, however, that phrase does not alter the definition of improvement or otherwise bring the criterion within generally accepted standards of care. *See* § IV.5, *infra*.

[48] The Guidelines do not define "current" or "condition." They do distinguish between "condition" and "current condition," indicating that "current" is an adjective modifying "condition." *Compare*, *e.g.*, Ex. 1-0005 (¶ 3) (requiring that the "member's condition and proposed services" be covered under the plan) *with id*. (¶ 4) (requiring a finding that the "member's current condition can be most efficiently and effectively treated in the proposed level of care."). They also specify, with respect to the patient's medical history, that the provider should evaluate both "current" and "past" histories, thus distinguishing "current" from "past." *See*, *e.g.*, *id*. (¶ 2(d)). Thus, as written, the phrase "current condition" is limited in time to the member's condition at the present moment. In any event, because the phrase is inapposite to Plaintiffs' arguments, the Court need not attempt to precisely define it.

[49] The "#" sign refers to the first column in the Consolidated Claims Chart, which contains a sequential numbered list of the challenged provisions, from 1 to 233.

[50] In 2015 and 2016, UBH added a new criterion calling for assessment of whether the member's "current condition can be safely, efficiently and effectively" treated in the proposed level of care

*only* question it posed became whether "acute changes" were driving the member's need for treatment. In 2011-2013, that paragraph stated:

> The member's current condition cannot be effectively and safely treated in a lower level of care even when the treatment plan is modified, attempts to enhance the member's motivation have been made, or referrals to community resources or peer supports have been made.

Ex. 1-0005 (¶ 5); *see also* Ex. 2-0006 (¶ 5), Ex. 3-0008 (¶ 6). In 2014-2016, the requirement became:

> The member's current condition cannot be safely, efficiently, and effectively assessed and/or treated in a less intensive setting **due to acute changes in the member's signs and symptoms and/or psychosocial and environmental factors (i.e., the "why now" factors leading to admission)**.

Ex. 4-0007 (second bullet in "Admission" column under "Level of Care Criteria") (emphasis added); *see also* Ex. 5-0008 (¶ 1.4); Ex. 6-0009 (¶ 1.4); Ex. 7-0009 (¶ 1.4). Thus, it does not matter whether the phrase "current condition" encompasses all aspects of a member's history – because on the face of this provision, coverage depends upon a finding that the *reason* the current condition cannot be treated in a lower level of care is the "acute changes" (*i.e.*, "why now factors"). No matter how fulsome the phrase "current condition" is, the focus of the *provision* is squarely on one question: whether there have been "acute changes" that require treatment at that level of care. There is no way to read that explicit requirement as mere surplusage.

UBH's "current condition" argument also fails with respect to the 2017 Guidelines. In 2017, after this Court certified the Classes, UBH removed the express reference to "acute changes" from the common criteria, such that the admission criterion discussed in n. 51, above, now reads:

> The member's current condition can be safely, efficiently and effectively assessed and/or treated in the proposed level of care. *Assessment and/or treatment of the factors leading to admission require the intensity of services provided in the proposed level of care*.

---

– it never again referred to "most effective" treatment – but the new version of this criterion explicitly demanded a finding that "*acute changes* in the member's signs and symptoms and/or psychosocial and environmental factors (i.e., the 'why now' factors leading to admission) require the intensity of services provided in the proposed level of care." Ex. 5-0008 (¶ 1.5) (emphasis added); *see also* Ex. 6-0009 (¶ 1.5); Ex. 7-0009 (¶ 1.5).

Ex. 8-0007 (2nd black bullet) (emphasis added). UBH admitted at trial, however, that its

revisions did not change the meaning of the Guidelines. *See, e.g.*, Tr. 1913:8-20 (UBH counsel

admitting it is "[t]rue" that UBH was "still focusing on the same things" under the 2017

Guidelines as it did when the Guidelines said "why now"); Tr. 1008:2-14 (Martorana) (removing

the word "acute" from common criteria "didn't make a that much difference one way or another

in terms of, you know, what we were going to authorize and cover.").

On the face of this provision, coverage still cannot be approved just because the member

needs it to treat his or her "current condition." Now, the member has to prove (among other

things) that treatment of "the factors leading to admission" require that level of care. As

explained above, the "factors leading to admission," on the face of the 2017 Guidelines, refer to

the immediate changes that caused the member to seek treatment; the admission criteria,

therefore, mandate a finding that addressing *those changes* requires the proposed level of care. If

there are no changes, or if those changes have been addressed, the 2017 Guidelines cannot be

satisfied. Plaintiffs do not, however, base their acuity argument on the preceding sentence, which

contains the reference to the member's "current condition." As in the previous years' Guidelines,

even if the Court reads that phrase just as broadly as UBH urges, it does not change the acuity

requirement or make it consistent with generally accepted standards.

        (c)     Imaginary Criteria Do Not Trump the Guidelines' Actual Language.

UBH next seeks to escape the Guidelines' actual language by referring to two Guideline

provisions that simply do not exist. The Court obviously should not be fooled and should

evaluate the criteria UBH actually wrote – not the criteria UBH now *wishes* it wrote.

First, UBH invents a "feedback loop" that appears nowhere on the face of the Guidelines.

According to UBH, the Court need not be troubled by the fact that the discharge criteria call for

UBH to discontinue coverage if (among other reasons) the "acute changes" have been

sufficiently stabilized that it is safe to step the member down, without regard to whether the

lower level of care would be effective for the member. UBH does not contend that considering

*only* safety and *not* effectiveness is consistent with generally accepted standards of care. Instead,

UBH argues that an imaginary "feedback loop" means that coverage cannot be discontinued unless the member meets the admission criteria for the lower level of care (including the requirement that services be effective at that level of care). The trouble with this argument is that there are absolutely no Guideline criteria creating such a "feedback loop." To the contrary, the Discharge Criteria are completely clear: the member is to be discharged when "[t]he continued stay criteria are no longer met," and one example is when the "why now" factors have been stabilized enough that the member can *safely* step down. There is not one word suggesting that the patient should only be discharged if he or she would meet the admission criteria for the lower level of care.

UBH couples its phantom-feedback-loop argument with a claim that "[i]f the proposed level of care will not *effectively treat* the member's 'current condition,' including any chronic or ongoing illness," the Guidelines instruct UBH employees to "offer coverage at a level of care that is more likely to provide safe and effective treatment, even if that results in a higher level of care." UBH Br. at 61:15-18. Again, UBH just invents this supposed provision out of whole cloth – or rather, extrapolates it from the fact that one admission criterion requires, as UBH puts it, "effective treatment as a condition for coverage." UBH Br. at 61:19. What the Guidelines *actually* do, however, is set forth a number of criteria, of which effectiveness is just one, which a member must meet for UBH to approve coverage. If the member does not meet all the mandatory criteria, the request for coverage is denied. *See*, *e.g.* Tr. 1103:22-1104:6 (Martorana) (admitting that even where denial letter identifies that an alternative level of care exists, the "claim for the proposed level of care is still denied."). Nothing on the face of the Guidelines says otherwise.[51]

---

[51] Even if UBH's phantom-provisions argument is really an argument about how the Guidelines are *applied* in practice, it still fails. As discussed below, a preponderance of the evidence demonstrates that UBH applies the Guidelines as written. *See* § IV.D, *infra*. UBH's reliance on the fact that its denial letters identify an "alternative" level of care is particularly misplaced in light of the facts established at trial. As Dr. Martorana explained, UBH routinely tries to convince members' doctors to accept a *lower* level of care than they have prescribed, at which the UBH peer reviewer thinks the member *could* satisfy UBH's criteria. Tr. 946:6-10; Tr. 948:7-18. If the doctor goes along with UBH's proposal, *no denial is issued*. *Id.* But the member first has to meet the Guideline criteria at the "alternative" level of care. Tr. 1104:7-16 (Martorana).

2.     **The Guidelines Fail To Provide For Effective Treatment and
Consideration Of Co-Occurring Conditions.**

As Plaintiffs explained, in each year, UBH's coverage criteria (1) omitted criteria for

matching patients with the level of care necessary to <u>effectively treat</u> co-occurring behavioral

health conditions and (2) omitted criteria to ensure that patients with co-occurring conditions that

<u>complicate or aggravate</u> the member's primary condition be placed in more intensive levels of

care as necessary. Pls.' Br. at 40. While the Guidelines instruct that it is a "best practice" for

*providers* to collect information about co-occurring disorders, all the coverage criteria require is

that co-occurring conditions can be "safely managed." *See, e.g.*, Ex. 5-0008 (¶ 1.6). This is in

stark contrast to generally accepted criteria such as LOCUS and ASAM, which incorporate a

comprehensive approach to co-occurring conditions in matching patients with the most

appropriate level of care. *See* Pls.' Br. at 17:25-19:24.

It is not surprising, of course, that UBH takes such a skimpy approach to co-occurring

conditions. Patients with multiple co-occurring disorders generally require more intensive

treatment, especially because at least one of such patients' disorders will generally be a chronic

one. *See, e.g.*, Tr. 483:21-484:15 (Plakun). Narrowing its reviewers' focus to a single disorder –

and thus necessarily limiting the pathways to coverage – is an effective way to protect the

company's bottom line.

UBH's principal defense is to resort yet again to its "best practices" provisions, arguing

that those references mean that co-occurring conditions were "explicitly addressed in the

LOCGs." UBH Br. at 74:21-79:13. But as discussed above, the fact that a provider collects

information about co-occurring conditions does not mean UBH's Guidelines direct UBH

_____

And if the doctor does not go along, then UBH does deny coverage. Tr. 948:17-18 1103:22-
1104:6 (Martorana). UBH implies that its peer reviewers also sometimes direct members to
higher levels of care, UBH Br. at 61:16-18, but the only evidence it offered of when that actually
occurs is if "there is not an opening at a facility that UBH is offering as an alternative for a child
or adolescent, or the facility is too far." Tr. 1380:4-7 (Allchin). But all of this misses the point:
even if (contrary to fact) UBH convinced every member to accept a lower level of care than
prescribed, and thus never issued a single denial, that would not mean its Guidelines were a
reasonable interpretation of generally accepted standards of care. It would just mean that a lot of
people seeking coverage for mental health and substance use disorder treatment decided to take
what they could get rather that fighting a giant like UBH.

decision-makers to take effective treatment of them into account in deciding whether to approve coverage. *See* § IV.B, *supra*. To the contrary, the fact that UBH takes a broader approach to co-occurring conditions when it tells providers how to assess their patients is proof that UBH understands that co-occurring conditions must be treated and can aggravate each other, but has purposefully omitted appropriate standards when deciding whether to approve *coverage* of such treatment.[52]

UBH next argues that its criteria concerning a patient's "current condition" *implicitly* mean that co-occurring conditions must be effectively treated and may complicate or exacerbate a patient's condition. *See* UBH Br. at 76:22-23 ("the general requirement that the member's 'current condition' can be effectively treated in the proposed level of care *encompasses* co-occurring conditions"). (UBH thus all but concedes that it is *not* enough to "safely manage" a patient's co-occurring conditions.) According to UBH, when it added the criterion in 2015 that co-occurring conditions "can be safely managed," this was merely a redundancy, a "failsafe" – or, as Dr. Simpatico put it, "overkill," Tr.1180:16 – because care advocates "don't necessarily automatically think of some of the medical issues involved." UBH Br 77:12-18 (citing Tr. 1387:24-1388:25 (Allchin)).

This argument (like so many others) is too clever by half, because it runs headlong into the plain language of the Guidelines. Take the 2015 Guidelines for example:

> 1.4. The member's **current condition cannot be safely, efficiently, and effectively assessed** and/or treated in a less intensive level of care due to acute changes in the member's signs and symptoms and/or psychosocial and environmental factors (i.e., the "why now" factors leading to admission). . . .
>
> AND
>
> 1.5. The member's **current condition can be safely, efficiently, and effectively assessed** and/or treated in the proposed level of care. Assessment and/or treatment of acute changes in the member's signs and symptoms and/or psychosocial and

---

[52] At trial, UBH relied on another argument to distract from these facial deficiencies: "That's not how it's trained." Tr. 978:12 (Martorana). UBH has since abandoned that argument, and for good reason: the question here is whether the Guidelines are in fact overly restrictive and, in any event, there is no evidence in the record that UBH personnel are in fact "trained" to ignore the Guidelines and instead apply a comprehensive approach to co-occurring disorders.

environmental factors (i.e., the "why now" factors leading to admission) require the intensity of services provided in the proposed level of care.

AND

1.6. **Co-occurring behavioral health and medical conditions can be safely managed**.

Ex. 5-0008 (emphases added). As written, "[c]urrent condition" cannot simply be read as including co-occurring conditions. UBH chose to use two different terms in immediately successive criteria; it is not reasonable to infer that the two terms mean exactly the same thing. UBH essentially asks the Court to find that paragraph 1.4, for example, really requires a finding that "[t]he member's current condition **and co-occurring behavioral health conditions and co-occurring medical conditions** cannot be safely, efficiently, and effectively assessed and/or treated in a less intensive level of care. . .." That is not what the Guidelines say and the UBH witnesses' trial testimony to the contrary is not believable.

Nor can paragraph 1.6 fairly be read as mere "overkill" or meaningless surplusage – the requirement it imposes ("safe management") is different in character from the prior paragraphs ("safely, efficiently, and effectively assess[] and/or treat[]"). As the Court put it at trial in explaining why these provisions are "troubl[ing]," Tr. 1179:13, on the face of the Guidelines they have different meanings. The Guidelines instruct that a patient's "current condition" should be "[e]ffectively treated," but "[w]hen they get to co-occurring conditions, they say they only have to be safely managed." Tr. 1179:12-19. *See also* Tr. 976:16-21 ("THE COURT: . . . "[Y]ou're telling the medical director or the care advocate that with respect to the current condition they have to find something that's effective; but with respect to the co-occurring behavioral health and medical conditions all they have to do is find something that can be safely managed."). None of UBH's witnesses offered a coherent reason why the criteria were written differently if they were intended to mean the same thing.

Dr. Simpatico conceded that he would not have written the Guidelines the way UBH did. Tr. 1179:23-1180:1. He advocated that these differences should be seen as merely "styl[istic]," Tr. 1183:6, and that fixing these coverage criteria would be mere "editorial improvements." Tr. 1180:22-23. But the only way he was able to reconcile the language of the Guidelines with

1  generally accepted standards of care on the treatment of co-occurring conditions, is by "*reading*

2  *into* the guidelines [the] generally accepted standard of care," and ignoring what is actually "in

3  the Guidelines." Tr. 1181:10-15 (emphasis added).

4      Moreover, if criterion 1.6 were merely a redundant "failsafe," with the same meaning as

5  the first part of paragraphs 1.4 and 1.5, then by UBH's reasoning it would also need a separate

6  provision stating that a patient's *primary* condition should be "safely managed." There is no such

7  provision. Dr. Allchin's alternative explanation, that paragraph 1.6 is needed to remind care

8  advocates to consider safety with respect to medical conditions in particular, Tr. 1387:24-

9  1388:25 (cited at UBH Br. 77:12-17), is also baseless – the provision refers to "safely managing"

10  both "behavioral" *and* "medical" co-occurring conditions, demonstrating that Dr. Allchin's

11  theory is just another post-hoc rationalization. In any event, it is absurd for UBH to cite the

12  incompetence of its personnel to justify its inclusion of paragraph 1.6, but then to argue that the

13  same reviewers would naturally understand that paragraphs 1.4 through 1.6 should be read

14  differently than their plain language suggests.[53]

15      Indeed, the fact that UBH even makes the latter argument is further proof that the Court

16  should reject UBH's primary defense: that the Guidelines are mere suggestions, which are not

17  applied as written, and that the Court should trust UBH's personnel to apply infallible "clinical

18  judgment." Even UBH concedes that its personnel *need* clear, explicit Guidelines because they

19  might not otherwise know what criteria to apply. The lack of criteria appropriately providing for

20  effective treatment of co-occurring conditions, and the criteria explicitly calling for just "safe

___

[53] UBH also lodges a fallback argument, that even if the Common Criteria are improperly restrictive for co-occurring conditions, the criteria for residential treatment of substance use disorders in 2011-13 are saved because one criterion applied if the patient is "at risk of exacerbating a serious co-occurring **medical** condition, **and** cannot be safely treated in a lower level of care." *E.g.*, Ex. 1-00056 (cited in UBH Br. at 78:12-20) (emphases added). But that criterion not only is, again, focused on whether the co-occurring condition can be "safely" treated – not effectively treated – but even then is limited to co-occurring *medical* conditions. UBH makes a similar fallback argument as to the SUD residential criteria in 2014-17 (*see* UBH Br. at 78:20-79:5), but the criterion it cites, *e.g.* Ex. 4-0078 ("A co-occurring mental health condition is stabilizing . . .") is simply identified as an "example" of a circumstance in which "why now" factors "suggest that there is imminent or current risk of relapse." Ex. 4-0078.

1    management," thus, should be read as written and not re-interpreted to match UBH's supposed

2    intent.

3           **3.     Drive to Lower Levels & Failure to Err on Side of Caution**

4           As Plaintiffs proved, it is a core principle of generally accepted standards of care that

5    patients be placed at the level of care that will be the most effective for treating their conditions

6    and co-occurring conditions, whether acute or chronic. *See* Pls.' Br. at 20:1-24:4. A corollary is

7    that if there is ambiguity in which of two levels of care will be most effective for a given patient

8    at a given time, practitioners should err on the side of caution, *i.e.*, on the side of higher levels of

9    care. *See id.* at 24:6-23. UBH's Guidelines violate those core principles in several ways,

10   including by ending coverage so long as the patient can be *safely* be transitioned to a lower level

11   of care – regardless of whether that level of care will be as *effective*. *Id.* at 43:10-45:5.

12          UBH's principal retort, as it was at trial, is to incant that its Guidelines provide coverage

13   for members in "the least restrictive level of care that is safe *and effective*." UBH Br. at 54:10-

14   11, 55:5-6, 56:15 (emphasis added). No matter how many times UBH says that, however, it

15   doesn't change the actual criteria or structure of the Guidelines. *See, e.g.*, Ex. 4-0007 (requiring

16   that coverage end when the patient's "acute changes" have "been addressed to the extent that the

17   member can be *safely* transitioned to a less intensive level of care.") (emphasis added). *See also*

18   Pls.' Br. at 44:8-21 (citing other examples). Thus it was not surprising that when Mr.

19   Niewenhous testified, he repeatedly described UBH's standard as based purely on whether

20   discharge would be "safe." *See, e.g.*, Tr. 303:18-304:3, 315:6-15, 321:8-15, 342:15-343:8

21   (Niewenhous). UBH argues in the alternative that its admission criteria salvage its defective

22   discharge criteria because "at all point in the course of treatment" the patient must also have

23   satisfied the admission criteria, including criteria (in some years) that the *current* level of care

24   must be "safe[], efficient[], and effective[]." UBH Br. 57:4 (citing, *e.g.*, Ex. 4-0007 (#1.5)). But,

25   again, that is not what the Guidelines say. If a patient can be "safely" transitioned to a lower

26   level of care, the Guidelines instruct that coverage end at the present level of care, *see, e.g.*, Ex.

27   4-0007 – regardless of whether the present (higher) level of care is "effective[]," and with no

28   determination of which level of care would be the *most* effective for treating the patient.

1

### 4.   Mandatory Prerequisites, Rather than Multi-Dimensional Assessment

UBH admits that generally accepted standards of care call for level-of-care determinations to be made based upon thorough and individualized consideration of multiple factors. UBH Br. at 50:2-4.[54] UBH claims that the Guidelines meet this standard because the "clinical best practices" section lists a "multitude of factors to be used in determining the appropriate level of care based on individualized information obtained from the treating provider." UBH Br. at 51:2-4; *see also id.* at 51-52 (discussing factors listed in clinical best practices section). As discussed above, however, the Guidelines do not direct UBH decision-makers to use the information from the provider's initial evaluation for any purpose (other than, perhaps, to confirm that the provider performed a sufficient evaluation). By relying solely on the clinical best practices section, UBH thus fails to address the true flaw in the Guidelines: the fact that the admissions criteria, continued service criteria, and discharge criteria impose *additional* mandatory requirements besides satisfaction of best practices, and each of them must be met for coverage. The imposition of these mandatory criteria means that coverage decisions come down to the presence or absence of a single factor – such as "acute changes" – rather than a patient-centered balancing of many interacting factors.

UBH simply has no answer to this criticism other than to assert that, in practice, its decision-makers do collect and use the information from the provider's evaluation. UBH Br. at 52:17-24.[55] Even assuming this were true,[56] it still begs the question: what do they use the

---

[54] UBH attaches the caveat that generally accepted standards do not require these factors "to be evaluated in a formulaic way." UBH Br. at 50:4-5. Plaintiffs make no such claim, although Plaintiffs agree with UBH's observation that the ASAM Criteria and the LOCUS both set forth objective, systematic approaches that help to ensure proper consideration of the many relevant dimensions. *Id.* at 50:6-20. CALOCUS and the CASII do so as well. *See* Exs. 644 & 645.

[55] UBH also makes the odd assertion that the Common Criteria merely articulate "broader 'principles' that 'cut across different levels of care.'" UBH Br. at 53:9-10 (citing Martorana testimony). To the extent UBH is now contending that the admission, continued stay, or discharge criteria are not mandatory requirements for coverage, that issue is well settled by UBH's own admissions at trial. *See, e.g.,* Tr. 285:12 - 286:17.

[56] As discussed below, the Court should not consider as-applied evidence, but even if it did, the preponderance of such evidence demonstrates that UBH applied its Guidelines as written. *See* § IV.D, *infra.*

1  information for? Based on the face of the Guidelines, they still have to decide whether the other

2  criteria have been satisfied: and it is *those* criteria that narrow the basis for the coverage

3  determination to a set of mandatory prerequisites such that coverage turns on acuity.

4          UBH's citations to the CMS Manual and Texas Department of Insurance ("TDI") criteria,

5  UBH Br. at 53:19-54:4, are equally unavailing, and rest primarily on a mischaracterization of

6  Plaintiffs' argument.[57] Plaintiffs do not contend that it is inappropriate to have *any* mandatory

7  coverage criteria. Rather, Plaintiffs contend that the mandatory criteria in UBH's Guidelines

8  overly constrict the analysis such that they do not permit level-of-care determinations to be made

9  pursuant to the multi-faceted assessment required by generally accepted standards of care. UBH

10 has no answer to this critique.

        **5.      UBH's Criteria For Prevention of Deterioration and Maintenance of
                  Function Are Overly Restrictive.**

13         Under generally accepted standards of care, treatment must "be designed" not only to

14 reduce or control a patient's psychiatric symptoms, but also to (a) "prevent relapse or

15 hospitalization" and (b) "improve or maintain the patient's level of functioning." Ex. 656-0026

16 (CMS Manual). *See* Pls.' Br. at 27-28. UBH's Guidelines are improperly restrictive in both

17 realms, effectively precluding coverage for treatment needed to prevent deterioration or maintain

18 a level of functioning. *See* Pls.' Br. at 47:1-50:28. UBH claims to be "baffl[ed]" by this critique,

19 UBH Br. 79:17, but its internal documents reveal that UBH purposefully transmogrified CMS's

---

[57] UBH's citation to the TDI criteria is particularly confusing, as the TDI Criteria explicitly require consideration of multiple dimensions, including: (1) "Category 1: medical functioning," (2) "Category 2: family, social, or academic dysfunction and logistic impairments," (3) "Category 3: emotional/behavioral status," (4) "Category 4: recent chemical substance use," (5) "Category 5: maturation level," and (6) "Category 6: development status." Ex. 661-0011 to -0013. The CMS Manual, on the other hand, includes fewer mandatory criteria, which are written broadly enough to accommodate a multi-faceted assessment of the individual patient. *See* Ex. 656-0026 ("coverage criteria" requiring that services must be (1) provided under an "individualized written plan of treatment. . ."; (2) "supervised and periodically evaluated by a physician. . ." and (3) "for the purpose of diagnostic study or the services must reasonably be expected to improve the patient's condition," where "improvement" includes not only reduction of symptoms but also maintenance of function). *See also* § IV.C.5, *infra*, discussing the breadth of CMS improvement standard. In contrast, UBH's Guidelines are written so that only one factor really matters: acuity.

improvement and maintenance standards, converting standards tailored to chronic, long-term

conditions into one focused narrowly on alleviation of acute symptoms, Pls.' Br. at 52-57 – while

simultaneously citing other parts of the CMS Manual as if to suggest that its Guidelines had

actually adopted CMS's standards. *See, e.g.*, Ex. 10-0008 (citing CMS Chapters 2 and 16, but not

Chapter 6).

Despite this evidence, UBH argues that its improvement criteria were consistent with

generally accepted standards of care because they "defined the concept of improvement to

account for both [1] 'reduction or control' of acute symptoms and [2] the prevention of

deterioration in the member's condition." UBH Br. 80:5-12. But as discussed previously,

reduction or control of acute symptoms is only the tip of the iceberg for determining, for

example, whether a patient needs continued service at a given level of care, or needs a higher

level of care. *See* Pls.' Br. at § II.F.1. Even UBH does not disagree with that. UBH Br. 50:2-4.

As for "prevention of deterioration in the member's condition," *id.* at 80:7, UBH relies on

testimony from Dr. Martorana that its criteria relating to improvement "would incorporate

maintenance." *Id.* at 80:8-10 (citing Tr. 982:21-25). This is a reprise of UBH's argument that the

improvement criteria provide that "treatment is effective if it reduces or controls a patient's acute

symptoms *or* prevents the member's overall condition from deteriorating further because both

forms of improvement are essential to ensure the member's long-term recovery, resiliency, and

wellbeing." UBH Br. 70:24-71:2.

Yet again, UBH's post-hoc theory cannot be reconciled with the actual language of the

Guidelines. Section 1.8 in 2015, for example, provides as follows:

> 1.8.   There is a reasonable expectation that services will improve the member's presenting problems within a reasonable period of time.
>
> 1.8.1.   **Improvement** of the member's condition **is indicated by the reduction or control of the acute signs and symptoms** that necessitated treatment in a level of care.
>
> 1.8.2.   Improvement in this context **is measured by weighing the effectiveness of treatment against evidence that the member's signs and symptoms will deteriorate** if treatment in the current level of care ends. Improvement must also be understood **within the broader framework** of the member's recovery, resiliency and wellbeing.

Ex. 5-0008 to -0009 (emphases added).

Under the plain language of that criterion, (a) there must be a "reasonable expectation that services will improve the member's presenting problems within a reasonable period of time"; (b) "[i]mprovement" <u>means</u> "reduction or control of the acute signs and symptoms that necessitated treatment in a level of care"; and (c) in measuring whether a person has improved, or is likely to improved, within the meaning of the Guideline (*i.e.*, in terms of "reduction or control of . . . acute signs and symptoms"), UBH will measure "the effectiveness of treatment against evidence that the member's signs and symptoms will deteriorate," and will do so "within the broader framework of the member's recovery, resiliency and wellbeing." In other words, because the Guidelines define "improvement" as "reduction or control of the acute signs and symptoms that necessitated treatment in a level of care," that is the *sine qua non* to show "improvement" under UBH's Guidelines from 2012 to 2016.[58]

UBH urges the Court to read this criterion very differently. It argues that because 1.8.1 and 1.8.2 are "[]formatted" as sub-bullets of 1.8, they should be seen as two *alternative* formulations of what constitutes "improvement." UBH Br. at 70:8-71:2. But there is no plausible way to read 1.8.1 and 1.8.2 as two alternative definitions of improvement. Nothing in 1.8.2 – including the last phrase regarding how improvement should be "understood" – remotely suggests that a patient should be seen as "improving" without showing "reduction or control of . . . acute signs and symptoms." UBH's theory is made all the more unbelievable because the

---

[58] As Plaintiffs have explained, UBH's improvement criteria in 2011 and 2017 are flawed in other ways. In 2017, the provision still defines improvement as reduction or control of "the signs and symptoms *that necessitated treatment in a level of care*," thus keeping the criterion just as narrowly focused on stabilizing the symptoms that drove the patient to seek help as it was in prior years. Ex. 8-0007 (first sub-bullet under fifth bullet on page) (emphasis added). *See also* Tr. 267:2-9 (Fishman) & 553:21-23 (Plakun) (explaining that 2017 Guidelines maintained impermissible focus on factors "leading to admission."). As for 2011, the Continued Service criteria required that a patient show a "*significant* likelihood of deterioration" and "*clear and compelling* evidence that continued treatment at this level of care is required to prevent *acute* deterioration or exacerbation." Ex. 1-0078 (emphases added). As to the "clear and compelling evidence" requirement, UBH's sole defense is that the phrase is not a "medical term." But that is hardly a defense; it is a concession like that of Dr. Simpatico, who admitted that "clear and compelling" is an "impossible metric" that he "would not be following" if he were instructed to use UBH's Guidelines. Tr. 1241:22-1242:10.

Guidelines throughout make clear that "reduction or control of the acute signs and symptoms" and "acute changes" are the *sine qua non* of coverage for admission or continued service.

The only way UBH's theory could begin to make sense is if 1.8 were revised along the following lines:

> 1.8.   There is a reasonable expectation that services will improve the member's condition, and co-occurring conditions presenting problems within a reasonable period of time.
>
> 1.8.1.   Improvement of the member's condition is may, as one alternative, be indicated by the reduction or control of the acute signs and symptoms that may have (or may not have) necessitated treatment in a level of care.
>
> 1.8.2   In the alternative, regardless of whether a patient is suffering from acute signs and symptoms, a patient, such as one suffering from long-term, chronic conditions, satisfies this criterion by showing a reasonable expectation that services will improve his or her level of functioning, or will help the patient maintain a functional level – even if no further significant increase in functional level is expected. Improvement in this context is measured by weighing the effectiveness of treatment against evidence that the member's signs and symptoms will deteriorate if treatment in the current level of care ends. Improvement, including maintenance of function for patients with long-term, chronic conditions, must also be understood within the broader framework of the member's recovery, resiliency and wellbeing.

*Compare with* Ex. 656-0026 (CMS Manual). Suffice it to say that those hypothetical revisions – which, if adopted, would only begin to cure the Guidelines' various flaws – cannot be read as synonymous with the way the Guidelines are actually written.

The Court need go no further than the text of the criteria to conclude that UBH's Guidelines do limit "improvement" to reduction or control of "acute signs and symptoms," to the exclusion of chronic conditions; do not permit coverage to maintain a functional level; and exclude coverage to prevent deterioration of anything other than "acute signs and symptoms." But even if the Court were to consider extrinsic evidence of what 1.8 and its subparts mean, the *contemporaneous* evidence is undisputed: in July 2010, UBH added what the official minutes of the Coverage Determination Committee called a "clarification" that "reasonable expectation of

improvement in the patient's condition is improvement in the patient's <u>acute</u> condition" (Ex. 307-0002) <u>(emphasis in original)</u>; a "clarification" that was incorporated into the CDG for Custodial Care in July 2010 (Ex. 10-0003) and into the LOCG Common Criteria in 2012 (Ex. 2-0007). *See* Tr. 340:9-341:18 (Niewenhous).

Thus, to argue that its Guidelines would permit coverage of treatment to prevent deterioration, UBH must explain away *both* the plain language of the Guidelines *and* that contemporaneous evidence. The Court should easily reject UBH's feeble effort to defend those Common Criteria, premised entirely on five lines of self-serving testimony by Dr. Martorana. *See* UBH Br. at 80:8-12 (citing Tr. 982:21-25).[59]

### 6.    The Guidelines Fail To Cover Treatment If A Patient's Motivation To Recover Flags, Even Temporarily.

From 2014 through 2017, UBH's common Discharge Criteria provide the following as an "example" of a circumstance in which "[t]he continued stay criteria are no longer met": "The member is unwilling or unable to participate in treatment, and involuntary treatment or guardianship is not being pursued." Ex. 4-0008 (second bullet in "Discharge" column under "Level of Care Criteria"); Ex. 5-0010 (¶ 3.1.5); Ex. 6-0011 (¶ 3.1.5); Ex. 7-0011 (¶ 3.1.5); Ex. 8-0007 (fifth sub-bullet under "Common Discharge Criteria for All Levels of Care"). But as Dr. Fishman explained, it is "not appropriate or consistent with generally accepted standards of care to discharge a person from treatment for lack of motivation or for unwillingness to participate."

---

[59] As a fallback, UBH cites to (1) specific additional criteria for residential treatment of mental health conditions in 2011 and intensive outpatient treatment in 2011 and 2012, and (2) language in the "preamble" to intensive outpatient treatment sections in 2014-17, to argue that UBH's guidelines "correspond directly to the Medicare Benefit Policy Manual's reference to 'maintenance of a functional level.'" UBH Br. at 80:15-81:13 (citations omitted). But level-of-care-specific criteria cannot cure overly restrictive Common Criteria, which every patient undisputedly must meet for admission and continued service. And in any event, UBH cites even those criteria out of context. The 2011 IOP language UBH cites ("likely to worsen" or "unable to remain sober") applies only to patients who have a "living situation" that is "non-supportive" and/or "unstable"; and even there services as a further *restriction* on the circumstances in which a patient's recovery environment will be considered to indicate a need for further treatment. Ex. 1-0018 (#4); Ex. 1-0042 (#6). Moreover, none of the provisions UBH identifies even refer to maintenance of a functional level let alone stating that it would be sufficient for coverage; instead, they state the opposite. *See, e.g.*, Ex. 4-0027 (IOP preamble stating that the purpose of IOP services is to "increase functioning").

1    Tr. 115:15-22 (Fishman). To the contrary, a patient's demonstration of "lack of motivation or

2    reluctance or even frank opposition to treatment" is often a sign that the person needs to receive

3    continued treatment or be transferred a higher level of care – not be discharged. A lack of

4    willingness to "participate in treatment," without more, should not be a basis to unilaterally

5    discharge the patient from a level of care. *See* Pls.' Br. at 50.

6         UBH responds with two arguments. **First**, it tries to turn this common sense notion on its

7    head, mischaracterizing Dr. Fishman's testimony and suggesting that Plaintiffs are advocating

8    for "converting treatment into a form of punishment by requiring patients in more intensive

9    levels of care to be held against their will." UBH Br. at 82:21-22. But that is the *opposite* of

10   Plaintiffs' and Dr. Fishman's point. *See*, *e.g.*, Tr. 116:6-22 (Fishman testimony that generally

11   accepted standards do *not* call for forcing patients to undergo treatment, but do provide for

12   motivational enhancement treatment). Plaintiffs argue that, under generally accepted standards of

13   care, a patient's lack of motivation *alone* should not be a basis for discharge. Only if there is no

14   hope that *further* treatment, or *more* intensive interventions, would restore the patient's

15   motivation to recover, would discharge potentially be appropriate. *See*, *e.g.*, Ex. 662-0105

16   (ASAM Criteria) (explaining that a patient should receive continued treatment at a level of care

17   "needs high-intensity engagement or motivational strategies to try to engage him or her in

18   treatment"). It is UBH, not Plaintiffs, who seems to believe that unmotivated patients should

19   only receive treatment if they have been involuntarily committed.[60]

20        **Second**, UBH argues that its "approach to patient motivation is consistent with, if not

21   more liberal than, guidance from CMS," relying on a section of the CMS Manual on partial

22   hospitalization. UBH Br. at 82:25-26. This is yet another post-hoc rationale; neither the

23   challenged portions of the Guidelines nor the denial letters cite to CMS's partial hospitalization

24

25   ---
     [60] It is also important to remember the context in which UBH evaluates motivation: when a
26   patient *voluntarily requests continued coverage* for a prescribed service but UBH believes it is
     time for discharge. These are *not* involuntarily committed patients; if they truly did not want to
27   be treated, they would leave. This criterion thus serves no purpose other than to enable UBH to
     deny coverage by second-guessing the provider's assessment that the patient is still capable of
28   benefitting from treatment.

1    guidance. Moreover, as discussed in greater detail below, partial hospitalization is fundamentally

2    different from the levels of care at issue here. *See* § IV.C.8, *infra*. As a short-term, acute level of

3    care, partial hospitalization is not generally the place to work with patients to improve their

4    motivation to recover – unlike the levels of care that *are* at issue here. *See* Pls.' Br. at 20-23, 50.

5    The Medicare guidance also applies only to treatment of adults, not adolescents, 42 U.S.C.

6    § 1395c; Medicare Publication No. 05-10026 (Jan. 2017) at 6-7, and adolescents often are in

7    particular need of motivational support. Ex. 662-0105 (ASAM Criteria under Risk Rating 4A).

8         Thus, UBH criteria requiring discharge as soon as the patient becomes "unwilling or

9    unable to participate in treatment" are more restrictive than generally accepted standards of care.

10        In other years, UBH took a slightly different approach if a patient expressed less than full

11   willingness to participate in treatment. In 2011, for example, for continued service a patient had

12   to be "actively participating in treatment" or be "reasonably likely to adhere after an initial

13   period of stabilization and/or motivational support." Ex. 1-0078. Criteria like those at least

14   acknowledge that sometimes patients need "motivational support," but even in those years UBH

15   only allowed coverage for such treatment during "an initial period." As Dr. Fishman explained,

16   although "there is acknowledgment made that there might be an initial period of stabilization" in

17   which the patient might need "stabilization and/or motivational support," that criterion "directs

18   the user to some kind of brevity"; once that "initial period of stabilization" is over, the criterion

19   instructs, as Dr. Fishman put it, "we're done with this and we're done with stabilizing and we're

20   done with motivational support." Tr. 135:21-136:6 (Fishman). But that is not how patients'

21   motivation to recover is considered under generally accepted standards of care. As Dr. Fishman

22   explained, "what I think is more consistent with generally accepted standards of care" is that "we

23   keep at it," continuously providing "motivational enhancement" by "trying to persuade a person

24   to do incrementally better at adherence over time." Tr. 136:7-11 (Fishman). It is expected that

25   patients will take "[t]hree steps forward, two steps back," and "[t]o expect something different,

26   some kind of unilinear direct pathway to recovery without some opposition, without some

27

28

problems and participation, without problems and adherence, I think is unrealistic." Tr. 136:11-15 (Fishman).[61]

### 7.   Lack of Criteria Addressing the Needs of Children and Adolescents

Although UBH concedes that appropriate level-of-care criteria should address the unique needs of children and adolescents, UBH Br. at 83-84, UBH does not contend that its Guidelines actually contain any such criteria.[62] (Nor could it; on their face, the Guidelines are devoid of criteria tailored to youngsters.) Instead, UBH points (again) to the clinical best practices section, which lists factors providers should evaluate when treating any patient. UBH Br. at 84:17-85:3.[63] But, as discussed above, the Guidelines' admission, continued stay, and discharge criteria ignore almost all of the factors listed in the best practices section. *See* § IV.B, *supra*. Nor do the Guidelines – anywhere, including in the best practices section – provide that the considerations governing level-of-care determinations for children and adolescents are different from those applicable to adults. They certainly do not instruct decision-makers to apply the coverage criteria differently when the member is a child or adolescent.

---

[61] Similar problems arise with criteria such as this one, for IOP treatment: "The member and/or his/her family/social support system understands and can comply with the requirements of an IOP, or the member is likely to participate in treatment with the structure and supervision afforded by an IOP." Ex. 2-0020. *See, e.g.*, Tr. 146:20-147:9 (Fishman) ("I'm all in favor of trying to bring to bear support in the family or other aspects of the recovery environment. But to make it a requirement that a family or other aspects of the social support system can understand and comply is not reasonable. . . . And the alternative is here stated that the member is likely to participate. [But] [a]t the outset, they may not be likely to adhere to the level that we want, and that may take time. And that may be the focus of motivational enhancement treatments rather than expecting them at the door to participate in treatment.").

[62] UBH knocks down a straw man by arguing that generally accepted standards do not require "wholly separate" criteria for children and adolescents. UBH Br. at 84:8-16. Plaintiffs' argument is not a formalistic assertion that UBH must have two distinct documents (though, of course, like the LOCUS and CALOCUS, the creation of distinct instruments would help clarify ways in which young people differ from adults). Plaintiffs' critique is not about *where* the criteria are found, but the utter lack of *any* criteria that would permit UBH to make level-of-care determinations for children according to different standards than it applies to adults.

[63] UBH also claims that "UBH's LOCGs address the unique needs of children and adolescents. . . in their overall criteria applicable to all members." UBH Br. at 84:17-18. But not even Dr. Allchin said that – he pointed *only* to UBH's best practices section each time he was asked to identify LOCG criteria that pertained to children and adolescents. *See* Tr. 1376:16-22, 1385:22-1386:4 (cited in UBH Br. at 84:20).

Indeed, UBH could only identify a single instance in which the Guidelines acknowledge *any* difference between children and adults, and it is not even within any coverage criteria: UBH points to the 2017 definition of the "Intensive Outpatient Treatment" level of care. UBH Br. at 85 n.60. According to UBH, for adults, IOP is at least 9 hours per week, while for children, it's at least 6 hours. But drawing a slight distinction in hours thresholds when defining one level of care hardly amounts to the development of a complete and adequate set of coverage criteria addressing young patients' needs.

### 8. Overbroad Definition of Custodial Care and Overly Narrow View of Improvement and Active Treatment.

In its Guidelines for residential treatment (both its LOCGs and Custodial Care CDG), UBH further enshrined its short-term, acute-focused model by adopting an excessively broad definition of "custodial care" and overly narrow definitions of "improvement" and "active treatment" in its LOCGs and Custodial Care CDG. UBH's arguments to defend these restrictive, interrelated criteria fall flat.

#### (a) Custodial Care

UBH's Guidelines expand the concept of "custodial" care beyond recognition – in a way that conflicts with generally accepted standards of care, and the way even the most restrictive UBH plan defines the term – by defining it to exclude coverage for (1) services by skilled personnel such as psychiatrists, and (2) services whenever a patient's condition is unchanging, even if treatment is necessary, for example, to improve or maintain a level of functioning. *See* Pls.' Br. at 53:17-54:20. UBH's two arguments to the contrary fail.[64]

**First**, UBH argues that Chapter 16 of the Medicare Manual, which contains Medicare's definition of "Custodial Care" (Ex. 654-0029 to -0030) is not "tailored to treatment for behavioral health conditions." UBH Br. at 86:5. UBH's argument seems to be that Medicare's definition of "custodial" reflects only generally accepted standards of medical care, not

---

[64] UBH has no response to the undisputable points, noted in Plaintiffs' brief, that only two claims sample members were denied coverage based on one of UBH's Custodial Care CDGs, and that the definition of custodial care in the CDGs is not reflected in *any* of the plans UBH administers, including the plans of the two members whose denials cite the CDGs. *See* Pls.' Br. at 58:8-17.

1   behavioral health care. *Id.* at 86:2-18. But there was no evidence at trial that "custodial" means

2   something different in those two contexts; *none* of the witnesses drew any such distinction,

3   whether in discussing Chapter 16 or otherwise. And Chapter 16, entitled "General Exclusions

4   from Coverage," by its own terms applies across the board, to medical and behavioral health

5   treatment. And UBH itself cites Chapter 16 as part of the purported "evidence base" for its

6   Custodial Care CDG. *See, e.g.*, Ex. 84-0008.[65]

7        **Second**, as to the first prong of Plaintiffs' critique only, UBH argues that "clinical

8   services (including active clinical supervision) can constitute custodial care in the absence of

9   active treatment." UBH Br. at 87:10-11. Not so. If a patient needs "clinical" services, those

10  services are *not* "custodial" under generally accepted standards of care. Only *non*-clinical

11  services are properly considered "custodial," as reflected in the CMS criteria. *See* Ex. 654-0029

12  (defining custodial care as services that "assist an individual in the activities of daily living" and

13  "essentially is personal care that *does not* require the continuing attention of trained medical or

14  paramedical personnel") Tr. 519:18-22 ("The generally accepted standard for custodial treatment

15  is that's not really treatment at all. It's taking care of activities of daily living, toileting, dressing,

16  the kinds of things that a person doesn't need to be in a level of care for help with.") (Plakun).

17  UBH misleadingly cites a provision in the psychiatric inpatient chapter of the CMS Manual on

18  active treatment that being "under the supervision of a physician" does not necessarily make the

19  treatment "active." Trial Ex. 655-0007. But the quotation UBH cites is referring to *non*-clinical

20  services – precisely the *opposite* of the type of services that UBH's Guidelines define (and

21  exclude from coverage) as "custodial."

22

23

24  ───────────────

[65] Moreover, Chapter 2, for psychiatric inpatient treatment, does expressly incorporate the
25  exclusion for custodial care, and states that just because a patient is receiving "custodial care"
    does not mean he or she is not receiving "active treatment." Ex. 655-0008 ("The program's
26  definition of active treatment does not automatically exclude from coverage services rendered to
    patients who have conditions that ordinarily result in progressive physical and/or mental
27  deterioration. Although patients with such diagnosis will most commonly be receiving custodial
    care, they may also receive services that meet the program's definition of active treatment.").
28

(b)   <u>Active Treatment</u>

As Plaintiffs explained, the Guidelines' definition of active treatment imposes two additional requirements beyond those listed in Section 30.2.2 of Chapter 2 of the Medicare Benefit Policy Manual, namely that the treatment is (1) "[u]nable to be provided in a less restrictive setting," and (2) "known to address the critical presenting problem(s), psychosocial issues and stabilize the patient's condition to the extent that they can be safely treated in a lower level of care." Pls.' Br. 55:9-56:18; Exs. 10-0003; 47-0003; 84-0003; 108-0003; 148-0003.

As to the first requirement, that treatment be "[u]nable to be provided in a less restrictive setting," the sole source UBH cites to defend the criterion is telling: it is the last sentence of CMS's improvement definition, and UBH removed the middle of the sentence to completely change its meaning. This is the full paragraph; the bold words in the last sentence are what UBH contends justifies the "least restrictive setting" requirement:

> Some patients may undergo a course of treatment that increases their level of functioning, but then reach a point where further significant increase is not expected. Such claims are not automatically considered noncovered because conditions have stabilized, or because treatment is now primarily for the purpose of maintaining present level of functioning. Rather, coverage depends on whether the criteria discussed above are met. **Services are noncovered** only where the evidence clearly establishes that the criteria are not met; for example, that **stability can be maintained without further treatment or with less intensive treatment**.

Ex. 656-0026 to -0027 (bold words cited by UBH Br. at 87:20-21). The last sentence is describing a limited exception to coverage, which applies "***only where*** the evidence ***clearly establishes***," for example, "that stability can be maintained without further treatment or with less intensive treatment." *Id*. (emphasis added). UBH borrows a few words out of context from that limited exception and makes them the driving principle of its active treatment definition.

Similarly, the partial hospitalization guideline UBH cites makes clear that the proper question is not whether treatment *can* be provided in a less restrictive setting, but rather whether treatment in a less restrictive setting would be *effective* for treating the patient's illness. UBH Br. at 87:25-88:1 ("In general, patients should be treated in the least intensive and restrictive setting *which meets the needs of their illness*.") (citing Ex. 1507-0017) (emphasis added).

1     The second additional requirement further constricts what UBH considers "active"

2   treatment by limiting it to treatment aimed at "address[ing] the critical presenting problem(s)"

3   and "stabiliz[ing] the patient's condition to the extent that they can be safely treated in a lower

4   level of care." *E.g.*, Ex. 10-0003; *see also* Pls.' Br. 55:16-19 (citing others). UBH argues this

5   limitation is appropriate when applied to *residential treatment* because the Medicare Benefit

6   Policy Manual describes *partial hospitalization* as appropriate for patients suffering from "an

7   *acute* onset or decompensation of a . . . mental disorder." UBH Br. 88:9-13 (quoting Ex. 656-

8   0030) (emphasis by UBH). In so doing, UBH concedes, as it must, that its Guidelines limit RTC

9   coverage to treatment of *acute* signs and symptoms. But as Dr. Plakun explained at trial, partial

10   hospitalization is *appropriately* considered an acute level of care because it is "a hospital-like

11   program focused on crisis intervention . . . in a way that's similar to the way inpatient

12   hospitals are and usually limited in duration with an eye, again, toward stabilizing the crisis."

13   Residential treatment, by contrast, is for "work[ing] on the [patient's] underlying problems" and

14   helping "get someone to the position where they can use [outpatient] sessions over time and

15   function adaptively between sessions over time so that they can struggle with achieving

16   recovery, having a life that's the best life they can have." Tr. 488:5-16, 510:15-25 (Plakun). The

17   CMS Manual itself makes clear that PHP is for patients who (1) have been "discharged from an

18   inpatient hospital treatment program" but no longer need inpatient hospitalization or (2) "in the

19   absence of partial hospitalization, would be at reasonable risk of requiring inpatient

20   hospitalization." Ex. 656-0030. *See also* Ex. 656-0030 ("[T]here must be evidence of the need

21   for the *acute*, *intense*, structured combination of services provided by a PHP.") (emphasis

22   added); Ex. 656-0029 (explaining that PHP "closely resembles that of a highly structured, *short-*

23   *term hospital inpatient* program") (emphasis added).[66]

24   _____

25   [66] UBH tries to justify its current near-exclusive reliance on CMS's partial hospitalization
      guidance on the ground that CMS does not cover residential treatment and "partial

26   hospitalization and inpatient treatment are the closest analogues to residential treatment." UBH
      Br. at 88:24-28 (n.62). But UBH's custodial care guidelines only apply to levels of care

27   providing 24-hour services (*i.e.*, inpatient hospitalization and residential treatment), not to
      outpatient levels of care including partial hospitalization. *See, e.g.*, Ex. 10-0003 ("United

28   Behavioral Health maintains that treatment of a behavioral health condition in an *acute inpatient*

(c)   Improvement

UBH's Guidelines with respect to custodial care and active treatment further improperly restrict coverage by requiring that treatment be "[r]easonably expected **to improve** the patient's condition or for the purpose of diagnosis," and then define "improvement" as "reduction or control of the acute symptoms that necessitated hospitalization or residential treatment." Ex. 10-0003; *see* Pls.' Br. at 56:20-57:3. In seeking to defend its custodial care/active treatment criteria (UBH Br. at 91:1-93:9), UBH does not even mention that these criteria boil down to limiting residential treatment to anything other than "reduction or control of the acute symptoms that necessitated hospitalization or residential treatment." This is not surprising, of course; there is no way to reconcile such criteria with generally accepted standards of care.

**9.   UBH's Residential Treatment Guidelines Violate Generally Accepted Standards of Care And ASAM.**

One of the many ways UBH's Guidelines violate generally accepted standards of care and the ASAM Criteria is that its Guidelines for residential treatment bear no resemblance to ASAM Criteria for most forms of residential treatment. *See, e.g.*, Pls.' Br. at 62:23-63:9. As Dr. Fishman explained, UBH's residential treatment Guidelines are deficient in many ways, but are *most* deficient when it comes to lower and medium-intensity residential treatment programs, which ASAM categorizes as levels 3.1, 3.3 and 3.5. *See, e.g.*, Tr. 167:21-168:21, 225:8-14 (Fishman).[67] UBH does not dispute that its Common Criteria and residential treatment guidelines

_____

*unit or RTC is not for the purpose of providing custodial care.") (emphasis added); Ex. 221-0002 (2017 CDG for "Custodial Care (Inpatient and Residential Services)"). Surely for that reason, UBH never cited the CMS partial hospitalization chapter when it developed and adopted its custodial care Guidelines or the RTC-specific sections of the LOCGs. *See, e.g.*, Ex. 221-0006 (reference section of current Custodial Care CDG, citing only Chapters 2 and 16 of the CMS Manual); Ex. 6-0044 to -0045, -0092. UBH *did*, however, cite the ASAM Criteria and the LOCUS, both of which contain criteria specifically applicable to residential treatment. *See, e.g.* Ex. 6-0044, -0092. As Plaintiffs have shown, UBH's criteria were much more restrictive than either of those directly-on-point, generally accepted sources.*

[67] Neither Dr. Fishman nor Mr. Jerry Shulman opined, as UBH seems to suggest, that its Guidelines "are consistent with . . . ASAM" when applied to high-intensity residential programs, categorized as 3.7 under ASAM. *Cf.* UBH Br. at 91:12 & 91:27-92:1. Rather, Dr. Fishman's testimony was that some specific criteria, such as that treatment be "[s]upervised and evaluated by a physician," would be appropriate for a 3.7-type program, but not for other residential programs. *E.g.*, Tr. 234:25-235:3 (discussing #6(a) Ex. 3-0069). And Mr. Shulman found UBH's

1   are more restrictive than generally accepted standards of care and ASAM for levels 3.1, 3.3 and

2   3.5. *See* UBH Br. at 91:1-93:9. Instead, it argues that Plaintiffs should not be entitled to relief as

3   to sub-3.7 levels of residential treatment for three reasons.

4         **First**, UBH argues that its Residential Rehabilitation guidelines for substance use

5   disorders need not contain criteria for residential treatment other than short-term, high-intensity

6   residential treatment because there is a separate section of the LOCGs for "sober living"

7   programs. UBH Br. at 92:7-19.[68] This argument fails for one simple reason: "sober living" is not

8   residential *treatment* at all. Even the lowest intensity residential treatment programs provide at

9   least five hours per week of treatment, Ex. 662-0244, but sober living programs are just that:

10  programs that provide housing for people whose ordinary living situation would make it difficult

11  for them to remain sober. Ex. 662-0245 (ASAM Criteria); Tr. 257:7-258:3 (Fishman). UBH's

12  2014 Guidelines made this clear, noting: "Sober Living Arrangement is not a form of treatment."

13  Ex. 4-0092. Some patients in sober living programs might *also* obtain outpatient or intensive

14  outpatient treatment while enrolled in a sober living facility (indeed, in some years, UBH

15  required them to), but in that case the *treatment* occurs elsewhere and would be subject to UBH's

16  OP or IOP guidelines, not its RTC criteria. *See, e.g.*, Tr. 258:1-3 ("There are people in outpatient

17  care who might have boardinghouse, what we call, recovery resident support, but that's a

18  different thing [from residential treatment]."); Ex. 4-0092 (describing sober living as an "adjunct

19  to ambulatory treatment"); Ex. 5-102 (same); Ex. 6-0113 (same); Ex. 7-0114 (same); Ex. 8-0052

20  (same); Ex. 1-0069 to -0070 (¶¶ 1, 4) (requiring member to participate in ambulatory treatment

21  and calling for sober living facility to *contact* the '[p]roviders who are involved with the

22

23

24

25  _____

26  residential treatment criterion to be irreparably flawed for all residential levels. *See* Pls.' Br. at
    62:8-10.

27  [68] This argument, of course, does not apply to residential services for *mental health* conditions,
    for which UBH does not even claim to have criteria that would allow coverage for lower

28  intensity treatment.

1   member's treatment" within 48 hours of admission); *see also* Ex. 2-0075 to -0076 (same); Ex. 3-

2   0080 to -0081 (same).[69]

3          **Second**, UBH argues that some plans exclude coverage of residential treatment, or limit

4   residential treatment to "crisis" or "short-term" services. *See* UBH Br. at 43:5-13. This argument

5   has no bearing for several reasons. As an initial matter, UBH has identified no Class Members

6   who were denied coverage on the basis of such an exclusion, and there are none. UBH is

7   therefore barred from asserting the exclusions in this litigation to justify its denials. *See Harlick*,

8   686 F.3d at 719-20. Indeed, these exclusions are a perfect example of why the Ninth Circuit, and

9   regulations implementing ERISA, require the administrator to notify the member of all the

10  reasons for its denial: because the exclusions and limitations are illegal under the Parity Act,

11  UBH could have been sued under ERISA for enforcing them.[70] *See, e.g.*, *New York State*

12  *Psychiatric Ass'n, Inc. v. UnitedHealth Grp.*, 798 F.3d 125, 133 (2d Cir. 2015); *Craft v. Health*

13  *Care Serv. Corp.*, No. 14 C 5853, 2016 WL 1270433, at *10 (N.D. Ill. Mar. 31, 2016).

14  Accepting UBH's argument would be tantamount to permitting UBH to use its violation of the

15  DOL claims regulation to immunize a *sub rosa* violation of the Parity Act and ERISA.

16         **Third**, as to level 3.5 residential SUD treatment specifically, UBH argues that its failure

17  to have coverage criteria in its Guidelines for that level of care should be excused because

18  "[m]any" plans purportedly "require the active participation or direction of a physician for a

19  treatment center to be considered a residential facility." UBH Br. at 93:4-6. But UBH identifies

---

[69] For these same reasons, the fact that some plans might exclude coverage of sober living facilities, *cf.* UBH Br. at 92:14-15, is irrelevant to whether UBH's residential treatment guidelines are improperly restrictive.

[70] Several of the exclusions UBH identifies violate the Parity Act because they apply only to mental health and/or substance use disorder coverage. 29 U.S.C. § 1185a(3)(A)(ii) (prohibiting, *inter alia*, "separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits"); 29 C.F.R. § 2590.712(c)(4)(ii)(H) ("[r]estrictions based on . . . facility type . . . that limit the scope or duration of benefits for services provided under the plan" violate the Parity Act). For example, UBH cites several exclusions that purport to limit coverage for behavioral health treatment but do not apply to medical or surgical conditions under those plans. *See* UBH Br. at 42:21-45:9; *compare, e.g.*, Ex. 2023-0043 (purporting to restrict behavioral health treatment "beyond the period necessary for short-term evaluation diagnosis, treatment or crisis intervention") (cited at UBH Br. 42:22-25) *with* Ex. 2023-0021 (Extended Care/Skilled Nursing benefit, with no such restriction).

only two plans in support of its argument: Ex. 225-0097 (Alexander plan) and Ex. 239-0106

(Muir plan). *See* UBH Br. 93:4-7 & 44:16-25. It does not even attempt to show (nor could it) that

such restrictions appear in *all* Class Members' plans. As a procedural matter, because the

argument goes to only a couple of plans, the argument would only be properly raised, if at all, in

a class decertification motion. Even if the Court were to consider the argument, it fails on its own

terms. The Alexander plan explicitly states that "*[a]ny health care provider acting within the*

*scope of his or her license* will be considered on the same basis as a Physician." Ex. 225-0097

(emphasis added). And the restriction in the Muir plan is invalid under the Parity Act because the

plan explicitly permits Skilled Nursing Facilities to be operated "under the supervision" of *either*

a Physician *or* a registered graduate nurse. Ex. 239-0107. In any event, UBH did not deny

coverage to either Muir or Alexander based on their plans' definitions of "residential treatment

facilities." *See* Ex. 226 (Alexander denial letters); Ex. 240 (Muir denial letter). This is just

another post-hoc rationale that was never the basis for a class member's denial.

### D. A Preponderance Of The Evidence Shows That UBH's Employees Applied The Guidelines As Written

In response to the overwhelming evidence that UBH's Guidelines fell well short of

generally accepted standards of care and therefore conflicted with the terms of all the Class

Members' plans, UBH presented a largely as-applied defense, based almost exclusively on the

unsubstantiated testimony of its own employees to the effect that, in practice, UBH does not

really apply the Guidelines as written.

The Court should disregard UBH's as-applied evidence, for one key reason: UBH told

the Class Members that it denied their claims pursuant to the Guidelines. This is true of all class

members, *by definition. See* Pls.' PFFs at ¶ 95. And the evidence at trial proves that in every

class member's denial letter, UBH cited its Guidelines as the basis for the denial. *See* Ex. 894

(summary exhibit quoting denial rationales). Not one letter disclosed that UBH was really

applying *different* criteria or no criteria at all. UBH's denial letters were required to accurately

state all of the reasons for the denial – according to federal regulations binding on UBH as an

ERISA claims administrator, *see* 29 U.S.C. § 1133; 29 C.F.R. § 2560.503- 1(g)(1)(iii), as well as

UBH's own internal policies. *See, e.g.*, Ex. 258-0020; 259-0020; Ex. 260-0011; Ex. 1186-0011; Ex. 262-0014; 257-0021. And – after being questioned by the Court – even the head of UBH's clinical operations, Dr. Triana, reluctantly admitted at trial that all of the reasons for the denial are required to be included in the letter. Tr. 729:8-10, 740:3-17, 790:17-792:24 (Triana).

UBH's as-applied defense, if true, would mean that UBH lied in every one of those denial letters. If UBH's decision-makers *really* applied no criteria or used different criteria than are set forth on the face of the Guidelines identified in the letters – which UBH posted on its website and made available to members upon request, Ex. 265-0004 – then the letters not only do not fairly identify the reason for the denial, but intentionally misled members about UBH's denial rationale. That would violate ERISA regulations and would constitute a breach of fiduciary duty in and of itself. UBH should not be allowed to defend against one ERISA violation by claiming it committed a different violation.[71]

In any case, UBH did not offer a shred of contemporaneous evidence even hinting that UBH instructs or trains its employees to disregard the Guidelines' plain language about when coverage should be granted. There was not one powerpoint presentation, email, letter, training guide, internal policy document, job aid, or memorandum to that effect. UBH's entire argument is predicated on its own employees' self-serving testimony.

A typical example is UBH's totally unsubstantiated argument that its Guidelines contain appropriate criteria for making level of care determinations for children and adolescents. *See* § IV.C.7, *supra*. Unable to identify any *actual* Guideline criteria that address young patients' unique needs, UBH attempts to assure the Court that it trains its Peer Reviewers and Care Advocates to ignore the Guidelines' plain language and instead "take these nuanced considerations into account when dealing with children and adolescents." UBH Br. at 85:4-5. The only evidence UBH offers on this point, however, is this testimony:

---

[71] If the Court's factual findings reflect that UBH did systematically lie to its members, Plaintiffs intend to seek leave to amend their Complaints to conform them to the evidence. *See* Fed. R. Civ. P. 15(b)(2) (issues tried by parties' express or implied consent "must be treated in all respects as if raised in the pleadings" and party may move "at any time, even after judgment" to amend pleadings to conform to the evidence).

1  Q. And are you familiar with whether or not care advocates are trained to obtain
   information about children and adolescents in a particular way?

2  A. I think we – we train them to understand that there are nuances of children and
   adolescents that need to be focused on.

3  Tr. 1373:7-11 (Allchin) (cited at UBH Br. at 85:5). Dr. Allchin, who went on to testify that he

4  only "occasionally" participates in such training, Tr. 1373:12-13, explained that care advocates

5  are instructed to collect various information. Tr. 1373:17-1374:13. But he never testified that

6  UBH employees are trained to take the information "into account" in some way that varies from

7  the face of the Guidelines. Nor is there even a scrap of contemporaneous evidence that UBH

8  actually trains its employees to disregard the Guidelines or to apply them differently when

9  adjudicating a child or adolescent's request for coverage.[72]

10      UBH's evidence was equally wanting with respect to all its assertions that its reviewers

11 really ignore the Guidelines. Plaintiffs, on the other hand, offered comprehensive

12 contemporaneous evidence demonstrating that UBH *does* apply its Guidelines as written. The

13 Guidelines themselves state that they are "used to standardize coverage determinations. . . ." Ex.

14 4-0002; Ex. 5-0004; Ex. 6-0004; Ex. 7-0004; Ex. 8-0002 (LOCGs are "used by medical necessity

15 plans to standardize coverage determinations").[73] *See also* Ex. 1-0002 (LOCGs are "intended to

16 standardize care advocacy decisions…"); Ex. 2-0002 (same); Ex. 3-0002 (same).

17

18

19

---

20 [72] UBH also asserts that about 20% of UBH's Peer Reviewers are "specialists in treating children
   and adolescents." UBH Br. at 85:6-10. There is no evidence suggesting any Care Advocates have

21 any such specialties. Nor is there any evidence to suggest that *only* the "specialist" Peer
   Reviewers issue coverage denials with respect to young people. To the contrary, the evidence

22 demonstrates that UBH has no such policy. For example, Plaintiff Alexander's minor son was
   denied coverage by a Peer Reviewer who was a "Licensed Psychiatrist" but not a

23 child/adolescent specialist. Ex. 226-0004. Likewise, the Peer Reviewer who denied coverage to
   Plaintiff Holdnak's minor daughter was a "Board Certified Psychiatrist," but not a child

24 psychiatrist. *See* Ex. 236-0004, -0027. The mere fact that UBH has some child psychiatrists on
   its staff cannot make up for the fact that it lacks any coverage criteria instructing its decision-

25 makers to treat children and adolescents differently than adults.

26 [73] The evidence at trial was that UBH cites the LOCGs when a plan contains the phrase "medical

27 necessity." Tr. 939:23-940:3 (Martorana). There was no evidence offered at trial that the plans
   themselves use the LOCGs for any purpose, and of course, it is UBH, not the plans, who issues

28 coverage determinations.

UBH's Utilization Management Program Descriptions, which describe UBH's policies and practices with respect to utilization management, similarly provide that the Level of Care Guidelines "are clinically-based indicators developed to assist Care Advocacy personnel with making benefit decisions about appropriate levels of care for individual members." Ex. 258-0012 (2013 UMPD); *see also* 259-0013 (2014 UMPD); 257-0011 (2012 UMPD template). According to the UMPD, care advocates are to escalate cases to a peer reviewer whenever they do "not appear to ***meet the criteria*** outlined" in the applicable UBH Guideline. [74] Ex. 258-0018 (2013 UMPD) (emphasis added); *see also* 259-0019 (2014 UMPD); Ex. 260-0010 (2015 UMPD); Ex. 1186-0010 (2016 UMPD); Ex. 262-0013 (2017 UMPD); Ex. 257-0019 (2012 UMPD template); *see also* Tr. 728:18-22 (when UBH issues a denial for lack of medical necessity, "it means that a peer reviewer concluded that the case did not meet the criteria in UBH's LOCGs"); Tr. 72823-729:2 (clinical coverage determination denying benefits means the case did not meet the criteria in the applicable CDGs). The peer reviewer then collects information about the member and, according to the UMPD:

> The role of the Peer Reviewer is to exercise clinical judgment in reviewing the relevant information and to ***review the case against the pertinent Level of Care Guidelines [or] Coverage Determination Guidelines, . . .*** the member's benefit plan, available community resources and individual member need.

258-0018 (2013 UMPD) (emphasis added); *see also* 259-0019 (2014 UMPD); Ex. 260-0010 (2015 UPMD); Ex. 1186-0010 (2016 UMPD); Ex. 262-0013 (2017 UMPD); 257-0020 (2012 UMPD template). The UMPD continues:

> ***A Peer Reviewer makes all <u>clinical</u> denials based on the criteria outlined in the Level of Care Guidelines [or] Coverage Determination Guidelines***, . . . the member's benefit plan, available community resources, and individual member need.

---

[74] The UMPDs provide that UBH employees will apply either the "Level of Care Guidelines, Coverage Determination Guidelines, Psychological and Neuropsychological Testing Guidelines, or other clinical guidelines required by contract or regulation." *See, e.g.*, Ex. 259-0019 (2014 UMPD). In this case, only the first two types of UBH Guidelines are relevant, as reflected in the class definition.

Ex. 258-0019 (2013 UMPD) (underlining in original, bold italics added); 259-0019 (2014

UMPD); Ex. 260-0010 (2015 UMPD); Ex. 1186-0010 (2016 UMPD); Ex. 262-0013 (2017

UMPD); 257-0020 (2012 UMPD template).

Lest there be any doubt, when discussing the required contents of a written notification of

denial, the UMPD reiterates that UBH's employees are supposed to base their coverage decisions

on the Guidelines:

> In the case of denial based on clinical considerations, ***the rationale is to cite the
> Level of Care Guidelines [or] the Coverage Determination Guidelines, . . .*** as
> appropriate, ***on which the denial was based*** with the rationale written in language
> that is easily understandable to the member and that addresses the member's
> specific clinical presentation.

Ex. 258-0020 (2013 UMPD) (emphasis added); 259-0020 (2014 UMPD); Ex. 260-0011 (2015

UMPD); Ex. 1186-0011 (2016 UMPD); Ex. 262-0014 (2017 UMPD); 257-0021 (2012 UMPD

template).

It was not enough for UBH just to require its Peer Reviewers to make coverage

determinations pursuant to the Guidelines. UBH also took great pains to make sure that they

applied the Guideline criteria in a consistent manner. UBH tested the "inter rater reliability" (or

"IRR") of its Care Advocates and Peer Reviewers by conducting monthly audits of thousands of

case files and verifying, among other things, that the auditor agreed with the clinical staff

member's "LOCG/CDG determination based on available clinical information." *See, e.g.*, Ex.

299-0011 (describing methodology for 2013 audit).[75] Every year, UBH exceeded its goal of 90%

agreement – in fact, in most years, the rate of inter-rater reliability was closer to 100%. *See* Tr.

739:2-7 (Triana testimony that UBH's rate of IRR in 2011 was over 90%); Ex. 343-0004 (95.3%

IRR in 2012); Ex. 299-0002 (96.8% IRR in 2013); Ex. 300-0002 (98% IRR in 2014); Ex. 301-

0002 (98.8% IRR in 2015); Ex. 302-0003 (98.6% IRR in 2016). The *only* inference that can

reasonably be drawn from UBH's inter-rater reliability process – and its near-perfect rates of

IRR – is that UBH's personnel do apply the criteria as written. The Court recognized as much at

trial. *See* Tr. at 1243:2-1244:3 (In response to Simpatico testimony that clinicians "naturally

---

[75] UBH further conducted "calibration audits" to make sure the auditors were applying the audit
tools consistently. Ex. 299-00013.

1    gravitate" toward generally accepted standards of care rather than "looking at" clinical

2    guidelines, the Court observed, "Well, but then you won't get an IRR that's 98 percent.").[76]

3           Finally, as noted above, the class members' denial letters – all of which represent to the

4    member that UBH based its denials of coverage on the Guidelines, *see* Ex. 894 – also disprove

5    UBH's assertion that it ignored them (unless the Court finds that UBH lied to each Class

6    member).

7           In the face of this overwhelming evidence, UBH can only point to the post-hoc testimony

8    of its own employees, who claimed that UBH's reviewers make coverage decisions according to

9    their "clinical judgment," and not the "words on the page." *See*, *e.g.*, UBH Br. at 36:25-37:1

10   (citing testimony from Triana and Alam); *id.* at 38:10-23 (arguing Guidelines are "not to be

11   followed blindly" and citing Martorana testimony).[77] But especially in light of the documents

12   

---

13   [76] UBH makes the incredible assertion that what UBH is checking through the IRR process is

14   whether its reviewers interpreted the Guidelines the same way UBH's employees portrayed them at trial – *i.e.*, as only secondary to the reviewer's unfettered "clinical judgment." UBH Br. 39:10-

15   14; *see also id.* 36:27-27:1, 38:21-24. The IRR reports belie that argument. *See*, *e.g.*, Ex. 302-0008 (in order to "measure the consistency with which staff apply our clinical guidelines,"

16   auditor in IRR process "evaluates if he/she would have made the same decision as the clinical staff based on the information documented in the note ***using the relevant LOCG or CDG***")

17   (emphasis added). So does the testimony on which UBH relies, in which Dr. Triana (the head of UBH's clinical operations) admitted that the results of UBH's IRR processes indicate that

18   "UBH's clinicians are and have been applying the LOCGs consistently." Tr. 735:10-736:13

19   (Triana) (cited by UBH at 39:14-16).

20   [77] UBH also mischaracterizes its own employees' testimony to imply that reviewers regularly "depart" from the Guidelines to authorize coverage. UBH Br. 38:24-39:9. Drs. Martorana and

21   Allchin did not say a word about how *often* this occurs. In fact, Dr. Martorana testified only that such an exception "can" or "could" happen. Tr. 949:20-950:3; 965:23-966:8. Dr. Allchin merely

22   noted that it has happened at some unspecified time in the past. Tr. 1404:25-1405:2. The Guidelines themselves make clear that such "departures" are the *exception*, not the rule, and for

23   that reason, must be "carefully thought out, documented and approved by the responsible level of management." Ex. 1-0004; Ex. 2-0005; Ex. 3-0006; Ex. 4-0006; Ex. 5-0007; Ex. 6-0008; Ex. 7-

24   0008; Ex. 8-0004; Tr. 1103:3-21 (Martorana) (Medical Directors may approve their own departures, but exceptions must always be "carefully thought out" and "documented in the

25   record"); Tr. 1404:2-7 (Allchin) (exceptions only appropriate where reviewer can "describe what it is that is specific about this individual that would make you consider working around what

26   would be generally considered the guidelines in question."). On balance, this evidence does not

27   support an inference that UBH's reviewers ignored the Guidelines; instead, it only proves that the Guidelines do provide the required criteria, which can only be overridden in exceptional

28   circumstances. In any case, as even UBH concedes, UBH Br. 39:26-28, reviewers are *never*

just discussed, that testimony is not credible at all. And when they were not giving their rehearsed testimony on direct, several of UBH's employees even admitted that UBH's reviewers are required to, trained to, and do use the Guidelines. *See*, *e.g.*, Tr. 1442:13-1443:24 (Allchin); Tr. 1100:20-24, 1128:8-10 (Martorana); Tr. 728:13-22, 732:7-23 (Triana). UBH's witnesses made no attempt to explain how UBH attained such high marks for inter-rater reliability if reviewers were simply applying their unfettered judgment to each member's entire clinical presentation. They did not explain why UBH's Utilization Management Program Description – which UBH submits when seeking accreditation – says that UBH *does* use the Guidelines to make coverage determinations. Nor did UBH's employees explain why UBH told members its determinations were based on the Guidelines if that was not true.

* * *

At the end of the day, UBH's arguments about what the Guidelines "mean" only serve to highlight just how unbelievable its witnesses' testimony was and how unreasonable its Guideline criteria are. According to UBH, for example, it used words like "acute changes," "why now factors," "presenting problems," and factors "leading to" and "precipitating admission" to direct its employees to consider both acute and chronic conditions and symptoms and to make coverage determinations according to a "holistic" view of the whole patient. A few of the words the Guidelines undisputedly do ***not*** use are "chronic," "holistic," "whole patient" and "root cause."

But even if the Court finds the plain language of the Guidelines ambiguous (which it is not), and even if the Court credits UBH's assertions that the words mean the opposite of their usual definitions (which it should not), it must still ask itself: are these Guidelines, as written by UBH, a reasonable interpretation of generally accepted standards of care? For example, if UBH really intended to write Guidelines that provide coverage not only to stabilize the acute symptoms that prompted a member to seek treatment, but also to provide effective treatment for the member's underlying illness, was it reasonable to adopt multiple, mandatory criteria that

allowed to issue a denial that departs from the Guidelines. Thus, by definition, UBH used its Guidelines to deny coverage to every person in the Class.

refer to acuity and none that even mentions chronicity? If UBH really intended to ensure that co-occurring conditions would be effectively treated, was it reasonable to explicitly require, instead, only "safe management" of them? If UBH really intended its reviewers to apply different level-of-care criteria to children and adolescents, was it reasonable to create one set of criteria for all patients and to say nothing in them about youngsters' unique needs? The answer to these questions – and all the others raised by UBH's restrictive criteria – is a resounding "no."

## V.   PLAINTIFFS PROVED BY A PREPONDERANCE OF THE EVIDENCE THAT UBH'S GUIDELINES WERE INFECTED BY ITS CONFLICT OF INTEREST AND THAT UBH BREACHED ITS DUTY OF LOYALTY.

As a fiduciary, UBH was required to discharge its duties with respect to the Class Members' plans "solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1)(A)(i).[78] Moreover, because UBH undisputedly labored under a conflict of interest, the Court must weigh "the nature [and] extent" of the conflict, *Abatie*, 458 F.3d at 967, and "the likelihood that the conflict impacted [its] decisionmaking," *Stephan*, 697 F.3d at 929, "as a factor" in determining whether UBH abused its discretion. *MetLife*, 554 U.S. at 115.

Plaintiffs have explained the many ways UBH not only allowed financial considerations to infect its clinical Guidelines, but even *designed* its Guideline development process – a process that was supposed to simply distill generally accepted standards of care into coverage criteria – to effectively convert its Guidelines into finely tuned tools for maximizing the company's bottom line. *See* Pls.' Br. at 66:6-72:26. These facts demonstrate both that UBH breached its duty of loyalty, and that its denials of coverage should be viewed with skepticism.

UBH's principal response is that its "attempt[s] to control costs" do not "impl[y] nefarious intent," because "every UBH witness who testified about the guideline development

---

[78] Admitting that its decision not to adopt the ASAM Criteria was driven by financial considerations, UBH Br. 35:6-20, UBH argues that ERISA's reference to "defraying reasonable expenses of administering the plan, 29 U.S.C. § 1104(a)(1)(A)(ii), makes it UBH's *job* to "consider[] the potential impact on employers and the pool of benefits those employers provide. . ." UBH Br. 35:18-20. Subsection (a)(1)(A)(ii), however, is limited to the plan's *administrative* expenses, and cannot be read as a mandate to try to minimize the *benefit expense* paid out for services covered under a plan. Nor does that provision override the prior paragraph or otherwise permit UBH to administer plans – even in part – in its own, or its customers' financial interests.

1  process confirmed that clinical considerations, not financial considerations, drove the

2  development of the criteria." UBH Br. at 31:1-10. There is one critical word in that sentence:

3  "drove." UBH argues only that those considerations did not "drive" the process. It does not

4  contend that its Guideline development process was insulated from financial considerations, or

5  that its conflict of interest did not "impact[]" the process (*see Stephan*, 697 F.3d at 929). Nor

6  could it, given the wealth of evidence to the contrary. *See, e.g.*, Tr. 1897:14-20 ("THE COURT:

7  That's the one I think you have the biggest problem with [.] . . . [Y]ou made a decision not to

8  adopt [the ASAM Criteria] on several occasions. . . . [Y]ou clearly decided not to adopt them –

9  or at least your concern in whether to adopt them was driven in part by money."). For that reason

10  alone, a finding that UBH's conflict of interest impacted its Guideline process is inescapable.

11      UBH tries to minimize that impact by arguing that it "has no financial incentive to

12  promulgate guidelines that are more restrictive than generally accepted standards of care"

13  because "in the aggregate, restrictive access to effective treatment results in higher readmissions,

14  longer lengths of stay, and higher overall benefit expense." UBH Br. at 33:1-11 (citing Ex. 1660

15  (Brock dep.) at 34:13-17 & 218:5-22). But there is no evidence in the record that UBH would in

16  fact save money "in the aggregate" by having generous Guidelines (and there is no evidence that

17  UBH's guidelines are generous, either). The two brief deposition answers UBH cites collapse

18  under the weight of the argument. UBH did not even attempt to prove at trial that it analyzes

19  readmissions for, say, patients discharged from residential treatment, let alone that it shapes its

20  Guidelines to minimize such readmissions. To the contrary, the weight of the evidence

21  established that for any given patient, UBH has a potent incentive to deny as much of a patient's

22  prescribed treatment as possible.

23      UBH also tries to minimize the evidence related to metrics such as average length of stay

24  as innocuous "attempt[s] to control costs," UBH Br. at 31:1. But it is not the *fact* that UBH

25  compiles detailed targets and tracking measures that matters to the conflict of interest analysis,

26  but the *way* it allowed those targets and measures to impact the Guidelines development process.

27  UBH ensured that the personnel responsible for the Guidelines were fully and regularly briefed

28  on those metrics, and that high-level executives responsible for UBH's Affordability and Finance

departments were represented on the committees responsible for the Guidelines' content. *See* Pls.' Br. at 67:18-68:12. To that, all UBH has to say is that Dr. Brock (Affordability) had previously been a practicing psychiatrist, and that Mr. Motz (Finance) rarely "contributed to the discussion." UBH Br. at 32:19-25. But UBH does not deny that they were on the BPAC in their Affordability and Finance capacities, and that the BPAC and its successor, the UMC, were responsible for approving every iteration of the LOCGs during the class period.[79] And Dr. Brock's testimony made clear that he saw it as UBH's mission to pursue the "Triple Aims," one of which is to "keep healthcare affordable," in part by managing benefit expense. Ex. 1660-0003 (Brock Tr. 13:19-15:21); Ex. 1660-0004 (Brock Tr. 36:22-37:21) ("We would do things because. . . we thought that it would be a good outcome for both members and the quality and consequentially the cost of care."). However laudable the goal of lowering healthcare costs, UBH should have insulated its Guideline process from personnel with *any* incentive to reduce benefit expense.

## VI.    A PREPONDERANCE OF THE EVIDENCE ESTABLISHED THAT UBH BREACHED ITS DUTY OF CARE.

Plaintiffs detailed the various ways in which UBH breached its fiduciary duty to act "with . . . care, skill, prudence, and diligence," 29 U.S.C. § 1104(a)(1)(B) – from how its Guideline-development process was not designed to ensure the Guidelines were consistent with generally accepted standards, to it deliberate manipulation of the evidence on which it purported

---

[79] UBH also does not meaningfully dispute that Dr. Triana, who chaired the BPAC and then the UMC, was both regularly informed about cost-related metrics but also personally evaluated based on whether the company met its benefit expense targets. *See* Pls.' Br. at 68 and evidence cited therein. UBH tries to cabin Dr. Triana's role to "maintain[ing] clinical staffing levels," as though he was a human resources employee. UBH Br. at 31 n.22. In fact, Dr. Triana has been UBH's Senior Vice president of Behavioral Medical Operations since 2010, and all senior medical directors and clinical operations report directly to him. Tr. 698:20-699:23. And, what his evaluation actually says is that he "[p]rovided leadership and guidance to the medical director and clinical staff" as they transitioned from one model to another, that it was because of his "significant focus on maintaining [utilization management] activities" during the transition that UBH was "projected to outperform the budgeted BenEx targets for 2012." Ex. 850-0002 to -0003. Even if UBH's characterization of Dr. Triana's role were accurate (which it is not), UBH offers no answer to the fact that the evaluation proves that (a) UBH had an "overall" benefit expense target; (b) UBH evaluated the performance of its BPAC chairman, in part, according to whether that target was achieved.

1   to rely for tis criteria, to its blatant disregard of input from experts like Gerald Shulman. *See* Pls.'

2   Br. at 47:11-48:12; 83:22-85:16. UBH offers no direct response to any of that evidence. In fact,

3   the phrase "duty of care" appears in UBH's brief only twice (UBH Br. at 12:16 & 16:3), both

4   times only to argue that the claim should be subject to abuse of discretion review – not to explain

5   why it did not breach that fiduciary duty. UBH does identify some evidence about the process by

6   which it adopted its Guidelines: that it had a "review process" with "four discrete stages" (*id.* at

7   26:13), that it hired "external consultants" such as Mr. Shulman (*id.* at 27:9-16), and that it was

8   accredited by URAC and NCQA (*id.* at 28:18-30:7). But the process was fatally flawed for all

9   the reasons Plaintiffs explained. Pls.' Br. at 83:22-85:16. The only *relevant* feedback that UBH

10  received confirms its failure to act prudently (*id.* at 84:7-85:11); and the fact that it was

11  accredited says nothing about whether its Guideline development process was designed to

12  prudently ensure that the Guidelines are consistent with generally accepted standards of care,

13  which it was not (*id.* at 83:26-85:16).

**VII.     BECAUSE UBH'S CDGS INCORPORATED THE LEVEL OF CARE
14         GUIDELINES, THE CDGS ARE IMPROPERLY RESTRICTIVE AS WELL.**
15

16          The Court need not decide now whether the diagnosis-specific Coverage Determination

17  Guidelines listed on Exhibit 880 incorporate the level of care criteria in the LOCGs. That

18  question is more appropriate for the remedy stage or upon deciding UBH's promised

19  decertification motion, because it only affects which class members will be entitled to

20  reprocessing or other remedies. *See* Pls.' Br. at 5 n.7. If the Court does reach the question now,

21  however, Plaintiffs have explained the various ways UBH incorporated the level of care criteria

22  in its LOCGs into its CDGs throughout the Class Period. *See* Pls.' Br. at 5:9-6:19; Pls.' PFFs at

23  ¶¶ 145-165.

24          As to the 13 CDGs in **Category H** – the CDGs with hyperlinks directly to the LOCGs

25  themselves, *e.g.*, Ex. 214-0006 – UBH offers no argument. Thus it is undisputed that those

26  CDGs incorporate the level of care criteria in the LOCGs.

27

28

1    There are 41 CDGs in **Category G**: those that contain level of care criteria that are

2  identical to the criteria in the LOCGs.[80] As to these, UBH's argument is that Plaintiffs have not

3  proven "(a) how that language is used in the context of each CDG; (b) how that language

4  interacts with other language in the CDGs that may either enhance or diminish its significance in

5  that specific CDG; or (c) that those criteria are inconsistent with generally accepted standards of

6  care for the treatment of the diagnosis that is the subject of that CDG." UBH Br. at 96:13-97:2.

7  But the ways the LOCGs are flawed are not diagnosis-specific; the flaws go to fundamental

8  concepts in how patients with mental health and substance use disorders should be matched to

9  levels of care. Thus the "context" in the diagnosis-specific CDGs is irrelevant, just as is whether

10  the criteria are flawed specifically in the context of "treatment of the diagnos[e]s" that are the

11  subject of the CDGs. Nor has UBH suggested how criteria that over-emphasize acuity, fail to

12  appropriately consider co-morbid conditions, or exhibit the other defects Plaintiffs have

13  identified could possibly be *consistent* with generally accepted standards of care in the context of

14  any particular diagnosis. There was no evidence whatsoever at trial of such a purportedly

15  disparate impact. And as for the "significance" of a particular flaw "in [a] specific CDG," these

16  are criteria the parties have stipulated are identical; and if by "significance" UBH means whether

17  curing the flaw in those criteria would have changed whether the member was entitled to

18  benefits, that is not Plaintiffs' burden for the reasons explained above. *See* § II, *supra*.

19    As to five of the other incorporation categories – **Categories A, B, C, D, and E** – these

20  are CDGs with one or more (usually multiple) references to the LOCGs, such as stating that the

21  plans exclude services that are "not consistent with . . . [UBH's] level of care guidelines as

22  modified from time to time." UBH's sole argument as to these categories is that even if the

23  CDGs do "cross-reference" the LOCGs, UBH's employees do not actually "refer to the LOCGs

24  when applying th[ose] CDGs." UBH Br. at 95:17. *See also* UBH's PFFs ¶¶ 112-133 (not raising

25  any other arguments). Many of these CDGs have no level of care criteria of their own; the only

26

27  [80] There are 29 listed in the parties' stipulation. As noted in Plaintiffs' Proposed Findings of Fact,
there are 12 more that should have been included in Category G. Pls.' PFF ¶ 159 n.8. UBH does

28  not dispute that those 12 additional CDGs are properly analyzed as part of Category G.

criteria for determining whether services at the prescribed level of care are consistent with generally accepted standards are thus contained in the LOCGs that are cross-referenced, often repeatedly, throughout the CDGs. Thus, boiled down, UBH's argument is that its personnel regularly flout the plain language of its own CDGs, which the Court should not credit for the reasons explained above. *See* § IV.A, *supra*.

As to **Category F**, UBH and the Plaintiffs described these CDGs as ones that "contain[] language that is similar to the 'Common Criteria' and/or language relating to various levels of care from a specific Level of Care Guideline." Ex. 880-0009 (¶ 30(f)). UBH argues that Plaintiffs "fail to explain," for example, "which specific criteria are 'similar' to the LOCGs." UBH Br. 96 n.70. But Plaintiffs did explain that, at paragraph 159 of their Proposed Findings. In any event, the Court need only reach the question of whether Category F constitutes an effective "incorporation" if it rejects multiple of the other categories; as Plaintiffs noted, each of the CDGs in Category F falls into at least two other incorporation categories too; there are no CDGs that fall *only* into Category F. *See* Pls.' PFF ¶ 159.

Finally, UBH argues that even if the CDGs incorporated the level of care criteria in the LOCGs, the Court should not conclude that the CDGs were required to be consistent with generally accepted standards of care. UBH Br. at 97:14-98:19. In other words, UBH argues that even if, when it applied LOCGs, it was applying the common plan term that conditioned coverage on treatment being consistent with generally accepted standards of care, its CDGs were created to interpret *all* terms of *every* plan UBH administers, including all variations in coverage, exclusions, etc., and therefore the CDGs were not shown to be "[in]consistent with generally accepted standards of care *to the exclusion of other plan terms*." *Id.* at 97:16-17 (emphasis in original). It is undisputed, however, that the CDGs were developed to be used across the board for all plans that did not contain the phrase "medically necessary" – *regardless* of whatever other terms those plans might contain. Tr. 1075:5-11, 1131:3-11 (Martorana). Indeed, UBH itself relies on language in the CDGs stating that, if plan language conflicts with the CDG, plan language controls. *See, e.g.*, UBH Br. at 98:4-6. Thus, UBH itself concedes that the CDGs do *not* purport to reflect *all* plan terms. Instead, the CDGs on their face are intended to capture the relevant plan

term that undisputedly *is* uniform across the class: the term conditioning coverage on treatment being consistent with generally accepted standards of care. Moreover, the CDGs generally are diagnosis-specific, but UBH points to no evidence suggesting that any of the plans, let alone all of them, call for unique considerations in the context of each of the dozens of diagnoses for which UBH has CDGs. And many of the CDGs contain the identical level-of-care criteria that Plaintiffs have challenged in the Level of Care Guidelines, and others contain *no* level-of-care criteria, but *do* contain multiple cross-references to the Level of Care Guidelines; it is hard to fathom what plan term(s) those criteria are meant to capture other than the terms related to generally accepted standards of care.

In short, regardless of whether UBH applied a Level of Care Guideline or Coverage Determination Guideline, any resulting denial is wrongful because a preponderance of the evidence proved that the Level of Care Guidelines were applied in either event and that they are more restrictive than generally accepted standards of care.

## VIII.    UBH VIOLATED THE STATE LAWS OF ILLINOIS, CONNECTICUT, RHODE ISLAND, AND TEXAS.

UBH does not dispute that it had a duty to comply with state law, and that a violation of the law of Illinois, Connecticut, Rhode Island, or Texas would violate the plan and thus ERISA.

**Illinois**. Starting August 18, 2011, Illinois law required UBH to make all "[m]edical necessity determinations for substance use disorders . . . in accordance with appropriate patient placement criteria established by the American Society of Addiction Medicine." 215 Ill. Comp. Stat. § 5/370c(b)(3); *see* Pls.' Br. at 80:4-81:10. UBH undisputedly did not make medical necessity determinations "in accordance with" criteria "established by" ASAM. But it still argues that it did not violate Illinois law, for three reasons.

First, it argues the statute did not require UBH to use the ASAM Criteria, but instead permitted UBH to use its own Guidelines if *those* criteria were "in accordance with" ASAM's Criteria. UBH Br. at 105:18-20. But the plain language of the statute refutes that interpretation. The phrase "established by [ASAM]" plainly modifies the word "criteria." The criteria that had

1 to be used in Illinois *were* the criteria that had been "established by" ASAM. As Plaintiffs

2 explained, this plain meaning of the statute was confirmed in 2015 when Illinois legislature

3 amended the statute by adding this sentence: "No additional criteria may be used to make

4 medical necessity determinations for substance use disorders." 215 Ill. Comp. Stat. 5/370c(b)(3).

5 Tellingly, the legislature did not amend any of the *other* language in the statute, including the

6 critical language that UBH now argues did *not* require it to use the actual ASAM Criteria. *See*

7 Pls.' Br. at 80:23-81:5.

8        Second, UBH argues that even if the Court were to conclude that UBH's use of its own

9 Guidelines violated the 2011 statute, that violation did not run afoul of ERISA because some

10 *other* payors had also interpreted the 2011 statute to not require the use of the ASAM Criteria.

11 UBH Br. at 106:6-12. The Court need not reach that argument because UBH's Guidelines have

12 never been "in accordance with" ASAM, if what UBH means by that is that its Guidelines were

13 no more restrictive than ASAM's. In any event, UBH relies on an "Annual Report" issued by the

14 Illinois Department of Insurance in January 2017. *See* UBH Br. at 106 n.74. UBH did not offer

15 the report as evidence at trial, or even include it on its trial exhibit list, and so the report should

16 be disregarded. Nor did UBH offer any other evidence at trial that anyone other than UBH

17 interpreted the 2011 statute to not require the use of the ASAM Criteria. But even if the Court

18 were to consider the January 2017 report, all UBH can cite is an oblique reference in minutes of

19 an "initial meeting" in December 2015 stating, "Sometimes providers use ASAM guidelines

20 while payers use other guidelines." The report does not identify any such payers, and does not

21 even state whether the unnamed "payers" administered plans governed by Illinois law.

22        Third, UBH argues that its interpretation of the 2011 law was "reasonable" because, it

23 asserts, "Illinois Governor Bruce Rauner initially vetoed the 2015 amendment because it would

24 eliminate payers' ability to apply other guidelines." UBH Br. at 106:16-19 & n.75. UBH's

25 implication seems to be that Governor Rauner interpreted the 2011 statute as permitting payors

26 to use guidelines other than ASAM's. But upon inspection this suggestion collapses just as

27 readily, because not only did UBH not offer the "Governor's Message" as evidence at trial, the

28 portions of the letter UBH cites explicitly relate to the administration of Medicaid programs in

1   Illinois – it has *nothing to do* with the Illinois statute mandating the use of ASAM Criteria.[81]

2      **Connecticut**. UBH concedes that it has never used the ASAM Criteria in Connecticut,

3   but argues that it satisfied Connecticut law by creating a "crosswalk" that, it contends,

4   "disclos[ed] ways in which its guidelines deviate from ASAM." UBH Br. 107:25-108:1. But

5   there are many, many ways UBH's Guidelines were in fact more restrictive than the ASAM

6   Criteria. The only pertinent "deviation" that UBH disclosed to the Connecticut Department of

7   Insurance was that its Guidelines "do not identify 3 separate levels of Residential Treatment" and

8   that "ASAM Levels III.1, III.3 & III.5 are considered 'Residential Rehabilitation'" under UBH's

9   Guidelines. Exs. 402-0005, 506-0005. Therefore, if UBH's Guidelines are more restrictive than

10  ASAM in *any* of the ways Plaintiffs have identified, UBH violated the Connecticut law.

11     Moreover, as to the "deviation" that UBH did disclose, UBH still violated the statute

12  because the disclosure was a lie. As UBH conceded at trial, its Residential Rehabilitation

13  guidelines do *not* cover all levels of residential treatment. UBH conceded that Level 3.1 is not

14  covered by its Residential Rehabilitation criteria, and the evidence established that UBH's

15  Guidelines are inappropriate for *any* level of residential treatment, especially Levels 3.3 and 3.5.

16  *See* Pls.' Br. at 61:9-63:9; § IV.C.9, *supra*.

17     **Rhode Island**. Rhode Island requires payors to "rely upon the criteria of the American

18  Society of Addiction Medicine when developing coverage for levels of care for substance-use

19  disorder treatment." 27 R.I. GEN. LAWS § 27-38.2-1.

20     First, UBH argues it did "rely upon" the ASAM Criteria in developing its Guidelines,

21  because it listed the ASAM Criteria "as a reference" in its 2015-17 LOCGs, and "rel[ied] on

22  ASAM's definition of recovery" in its 2013-17 LOCGs. But especially given all the ways UBH's

23  Guidelines are fundamentally more restrictive than the ASAM Criteria, simply listing the ASAM

24  Criteria as a reference does not mean UBH actually "relied upon" those Criteria. And the

25  "definition of recovery" UBH refers to is in a footnote in the *introduction* to the LOCGs in those

26  ────────────────

27  [81] Letter from Bruce Rauner, Governor of Ill., to Members of the Ill. House of Representatives, 99th Gen. Assembly (Apr. 24, 2015),

28  http://www.ilga.gov/legislation/fulltext.asp?DocName=09900HB0001gms&GA=99&SessionId=88&DocTypeId=HB&LegID=83490&DocNum=0001&GAID=13&Session=.

1   years, which simply states, "The American Society of Addiction Medicine defines 'recovery' as

2   a process of overcoming both physical and psychological dependence on a psychoactive

3   substance, with a commitment to sobriety, and also refers to the overall goal of helping a patient

4   to achieve overall health and well-being." *See, e.g.*, Ex. 3-0002 n.4. The fact that UBH cannot

5   find anything in its actual *coverage criteria* to cite for the proposition that it "relied on" the

6   ASAM Criteria in developing its Guidelines is telling.

7        Second, UBH argues that the requirement to "rely upon" the ASAM Criteria is "limited

8   to services provided by in-network providers." UBH Br. 107:4-5. The statute UBH cites (27 R.I.

9   Gen. Laws § 27-38.4) does not exist. A separate subsection (§ 27-38.2-4), entitled "Network

10  coverage," does state, "The health care benefits outlined in this chapter apply only to services

11  delivered within the health insurer's provider network." 27 R.I. Gen. Laws Ann. § 27-38.2-4. In

12  context, the "benefits" referred to are the benefits that a group health plan is required to provide

13  under the state's Parity Act. *See id.* § 27-38.2-1(a) ("A group health plan and an individual or

14  group health insurance plan *shall provide coverage* for the treatment of mental health and

15  substance-use disorders under the same terms and conditions as that coverage is provided for

16  other illnesses and diseases.") (emphasis added). In other words, the section it seems UBH

17  intended to cite simply states that although plans must "provide coverage" for mental health and

18  substance use disorders in parity with medical/surgical coverage, the statute does not require

19  insurers to broaden their provider networks. That provision cannot reasonably be read to have

20  any relevance to the statute at issue here, which requires UBH to "rely upon" the ASAM Criteria

21  when making coverage decisions.

22       Third, UBH argues that *if* the statute only requires that UBH use ASAM if a member is

23  seeking coverage of in-network services, Plaintiffs have not "establish[ed] that any class member

24  sought benefits for treatment at an in-network provider in Rhode Island." UBH Br. at 107:12-13.

25  But it is undisputed that UBH applies its Guidelines across the board; it does not have separate

26  LOCGs and CDGs for in-network and out-of-network services. At most, if UBH's statutory

27  argument is accepted, this would simply require a tweak to the class definition before the court

28  enters judgment on the Rhode Island portion of the State Mandate class.

**Texas**. UBH was required by Texas law to decide Texas-law-governed SUD claims using the criteria issued by the Texas Department of Insurance ("TDI"). 28 Tex. Admin. Code § 3.8011. UBH does not dispute that *if* it applied any criteria other than the TDI criteria to such a claim, it violated Texas law. *See* UBH Br. at 104:4-8. Its sole argument is that there was insufficient evidence at trial that it *did* apply its own Guidelines, rather than TDI guidelines, to requests for coverage governed by the Texas law. The Court need not detain long on UBH's argument because, as the Court put it at the pretrial conference, "If you have to look at the denial letters, then you look at the denial letters." Transcript of Pretrial Conference (Oct. 5, 2017) ("PTC Tr.") at 13:20-22. Any member of the Texas portion of the State Mandate class whose denial letter states that UBH applied one of its Guidelines is entitled to relief, including reprocessing. Moreover, there is more than enough evidence to require UBH to engage in that process. First, there is the May 26, 2015 email where Mr. Niewenhous concedes that "Houston has been using the CDGs" instead of "the TCADA guidelines." Ex. 493-0002. UBH argues the Court cannot conclude what "Houston" refers to, UBH Br. at 104:19-22, but multiple other exhibits explain that Houston is one of UBH's so-called Care Advocacy Centers. *See, e.g.*, Ex. 299-0005, Ex. 343-0004, Ex. 783-0041, Ex. 720-0026 to -0028 (Length of Stay Frequency Table for the Houston Care Advocacy Center). Second, the class list itself (Ex. 255) shows that UBH regularly applied its LOCGs and CDGs when, as UBH puts it, "making medical necessity determinations for members receiving or seeking substance use disorder treatment from providers in Texas." UBH Br. at 104:6-7. The spreadsheet can easily be filtered to show denials for residential treatment (Loc_Desc column in LINX, Loc Desc in ARTT) for substance-use disorders (Srvc_Typ_Desc in LINX, Service Type in ARTT), under Texas-governed plans (Gov St 1 Cd or Situs_St_Cd in LINX, State or State Of Governance in ARTT) that are fully insured (Fund_Desc in LINX, Funding in ARTT). Many of the facilities whose treatment the class members sought coverage of are Texas providers.[82] And on the LINX spreadsheets, UBH even

---

[82] *E.g.*, Texas West Oaks Hospital (Unique ID 8494), Serenity Foundation of TX (Unique ID 12264), Texas Neuro Rehab Center (Unique IDs 9569, 9592, 9606), Texas Hlth Springwood Beh Hlth Hosp HEB (Unique IDs 5970, 9234, 10164), Sunspire Health Texas (Unique IDs 1452,

states that it applied its own Guidelines to these members' claims (Guid_Desc and Guid_Sbcatgy_Desc). This evidence is more than sufficient to establish that UBH applied its own Guidelines to at least some members' substance use treatment in Texas.

## IX.   PLAINTIFFS AND CLASS MEMBERS HAVE SATISFIED ANY EXHAUSTION REQUIREMENT.

As to Plaintiffs' duty of care and duty of loyalty claims, UBH does not dispute that, so long as such statutory claims are not are "'disguised' claim[s] for benefits," there is no exhaustion requirement. *See* UBH Br. at 109:18-26. That is because "as a general rule, exhaustion is not required for statutory claims." *Spinedex Physical Therapy USA Inc. v. United Healthcare of Arizona, Inc.*, 770 F.3d 1282, 1294 (9th Cir. 2014). UBH argues that Plaintiffs have merely "attach[ed] a statutory violation sticker" to their denial of benefits claim. UBH Br. at 109:21 (quoting *Diaz v. United Agr. Employee Welfare Ben. Plan & Tr.*, 50 F.3d 1478, 1484 (9th Cir. 1995)) (internal quotation marks and citation omitted). Not so. In *Spinedex*, for example, the Ninth Circuit held that the individual plaintiff's fiduciary duty claim was not a "'disguised' claim for benefits, and he need not have exhausted." 770 F.3d at 1294. That claim alleged that United, among other things, "[f]ail[ed] to implement and apply administrative processes and safeguards designed to ensure and to verify that claim determinations are made in accordance with the plan documents" (similar to Plaintiffs' duty of care claim) and engaging in self-dealing (similar to Plaintiffs' duty of loyalty claim). Second Amended Complaint, *Spinedex Physical Therapy USA Inc. v. United Healthcare of Arizona, Inc.*, No. CV 08-457-PHX-ROS, 2008 WL 7154677, at *¶¶ 106-33 (D. Ariz. July 9, 2008). As in *Spinedex*, Plaintiffs' duty of loyalty and duty of care claims are factually and logically independent of their claims for wrongful denial of benefits, because they relate to conduct that occurred regardless of whether UBH subsequently denied any claims. Indeed, UBH's argument to the contrary is based on its faulty premise that ERISA only provides remedies to the extent a plaintiff was entitled to benefits, which the Court has rejected repeatedly. *See* § II, *supra*.

2830, 13625), SOBA Texas LLC (Unique IDs 1422, 1448, 1621), and Austin Recovery Inc. (Unique IDs 1427, 1442, 1467, 1544, 2059, 2169, 2833, 3142, 5811, 13094).

1    As to Plaintiffs' denial of benefits counts (Claim Two), Plaintiffs have satisfied any

2    exhaustion requirement because (a) exhaustion would be futile and (b) in any event, named

3    plaintiffs' internal appeals satisfied any exhaustion requirement.

4    **First**, even if the Court were to conclude that absent class members are required to have

5    exhausted internal appeals (which they were not, *see infra* pp. 80-82), any such appeals would be

6    futile. UBH does not dispute that every time a class member appealed a denial, UBH applied the

7    very Guidelines that Plaintiffs challenge in this case. Nor could UBH dispute that fact: its own

8    witness conceded as much as to every Plaintiff and claims sample member, Tr. 1518:3-1538:21

9    (Bridge), and its UPMDs establish that a UBH appeal reviewer is required to "base his/er

10   decision on" the Guidelines, among other things. *See* Ex. 258-0015; Ex. 259-0016 (same); 257-

11   0015 (same); *see also* Ex. 258-0024 (notification of appeal decision required to cite Guidelines);

12   Ex. 259-0024 (same); Ex. 260-0015 (same); Ex. 1186-0015 (same); Ex. 262-0018 (same); Ex.

13   257-0028 (same). Where a claims administrator "maintains that it has and will continue to

14   interpret the plan as it did for [the named plaintiff]," it would be futile "[f]or class members to

15   exhaust their claims. Pls.' Br. at 90:7-12 (quoting *Barnes v. AT&T Pension Benefit Plan—

16   Nonbargained Program*, 270 F.R.D. 488, 494 (N.D. Cal. 2010)). UBH contends that this

17   evidence is insufficient because UBH's appeal process sometimes overturned initial denials.

18   UBH Br. at 111:19. This is a *non-sequitur* and misses the point of the futility analysis. Although

19   it is true that UBH sometimes changed its mind about whether the Guidelines had been satisfied,

20   there is no evidence that UBH ever applied different criteria on appeal to determine whether, in

21   UBH's view, the prescribed treatment was consistent with generally accepted standards of care.

22   That is the relevant question for futility purposes.

23   Against this backdrop, it is not surprising that none of the three decisions UBH cites in

24   support of its exhaustion defense involved a challenge to a uniform set of standards, like UBH's

25   Guidelines, that were applied when adjudicating internal appeals. Indeed, the Court in one of

26   them expressly held that "[a] plaintiff *can* demonstrate futility by pointing to a similarly situated

27   plaintiff who exhausted administrative remedies to no avail" and thus the plaintiffs "adequately

28   pleaded" futility "in light of the experiences of 'Subscriber X' and Dr. Peck." *In re WellPoint,*

1    *Inc. Out-of-Network "UCR" Rates Litig.*, No. MDL 09-2074(FFMx), 2013 WL 12130034, at

2    *20 (C.D. Cal. July 19, 2013) (emphasis added). *See also Casatelli v. Horizon Blue Cross Blue*

3    *Shield of New Jersey*, No. 2:09-cv-6101(SDW)(MCA), 2010 WL 3724526, at *6 (D.N.J. Sept.

4    13, 2010) (also cited by UBH) ("Plaintiffs' invocation of the futility exception rests entirely upon

5    the affidavit of Maree Casatelli . . . and attached spreadsheets and exhibits indicating the appeals

6    statuses of a random sample of claims.").[83]

7        UBH also argues that *Barnes* is distinguishable because "the dispute in this case does not

8    involve the interpretation, and universal application, of a single term or phrase" but rather

9    "clinicians exercising their clinical judgment." UBH Br. at 112:1-4. But that argument fails for

10   the same reasons that so many of UBH's other arguments fail: the trial evidence established that

11   its Guidelines reflect UBH's interpretation of generally accepted standards of care, a condition of

12   coverage found in all plans. *See* Pls.' Br. at 9:12-12:7; § II, *supra*.

13       **Second**, even if exhaustion were not futile, here only the named Plaintiffs are required to

14   have exhausted administrative remedies, given the nature of Plaintiffs' claims. As Judge Koh

15   explained recently, "unnamed class members in an ERISA class action need not exhaust their

16   administrative remedies." *Des Roches v. California Physicians' Serv.*, 320 F.R.D. 486, 500 (N.D.

17   Cal. 2017). *See* Pls.' Br. at 89:7-90:2. UBH's response is to (a) criticize Judge Koh as having

18   misinterpreted *In re Household Int'l Tax Reduction Plan*, 441 F.3d 500 (7th Cir. 2006), and (b)

19   argue that *In re Household* is distinguishable. *See* UBH Br. at 110:5-11. As to the first argument,

20   the Seventh Circuit's holding could not have been more clear: in an ERISA class action, where a

21   named plaintiff has "exhaust[ed] his administrative remedies before suing, the class members

22   need not also do so if, as will usually be the case (for otherwise class treatment would be

23   inappropriate), their claims are very similar to those of the named plaintiff," *In re Household* at

24

25

26   [83] UBH's last case, *Churchill v. Cigna Corp.*, No. 10-6911, 2011 WL 3563489 (E.D. Pa. Aug.
     12, 2011), did not involve exhaustion of internal appeals at all, but rather whether a subclass of
27   putative class members should be excused from having made any claims at all. *Id.* at *7. There is
     no dispute that every Plaintiff and class member here made requests for coverage that UBH
28   denied.

501, and explained in detail why.[84] Judge Koh got it exactly right.

As to UBH's second argument, it claims that unlike in *In re Household*, some of the plans UBH administers expressly "prohibit[] legal action 'until [the member has] completed all of the steps in the appeal process" and that the Court cannot "override" that requirement. UBH Br. at 110:12-16 (quoting Exs. 1535-0057, 1557-0084, 1583-0085, 1633-0090 and 1635-0080); 110:26-111:4. As an initial matter, failure-to-exhaust is an affirmative defense, and as such can be waived. *See* Pls.' Br. 88:16-19 (citing cases); *see also Paese v. Hartford Life & Acc. Ins. Co.*, 449 F.3d 435, 439 (2d Cir. 2006). UBH identifies only five plans in support of its failure-to-exhaust argument, and so any argument as to other plans is waived.

Even as to the five plans UBH identifies, it omits critical language in the relevant provision: each purports to only apply to lawsuits to recover "reimbursement," Exs. 1535-0057, 1557-0084, 1583-0085, 1633-0090, 1635-0080, which this case does not, as the Court has held. *See, e.g.*, *Wit v. United Behavioral Health*, No. 14-cv-02346-JCS, 2017 WL 3478775, at *12 (N.D. Cal. Aug. 14, 2017).

In any event, a plan limitation on a beneficiary's right to sue is enforceable only if the administrator brought the limitation provision to the attention of the beneficiary in the letter denying coverage. *See, e.g.*, *Bechtol v. Marsh & McLennan Companies, Inc.*, No. C07-1246MJP, 2008 WL 238588, at *4 (W.D. Wash. Jan. 28, 2008) (barring the defendant's failure-to-exhaust defense because its denial letter "fail[ed] to inform Mr. Bechtol of the review procedure and of

---

[84] "Exhaustion of nonjudicial remedies, whether administrative or, in an ERISA case, the arbitral-like internal remedies prescribed by the ERISA plan, furthers the goals of minimizing the number of frivolous lawsuits, promoting non-adversarial dispute resolution, and decreasing the cost and time necessary for claim settlement . . . enables the compilation of a complete record." *In re Household*, 320 F.R.D. at 501. "These purposes determine how much exhaustion to require in a class action." *Id.* "If the complaint or subsequent filings adequately identify the class members' claims and demonstrate that they are indeed very similar to those of the named plaintiff, the defendant knows what he is facing and can make efforts to settle the full array of claims," and "requiring exhaustion by the individual class members would merely produce an avalanche of duplicative proceedings and accidental forfeitures, and so is not required." *Id.* at 501-02. "This is emphatically the case when dealing with class actions under ERISA, where, there being no statutory requirement of exhaustion, the district court has discretion to require no exhaustion by anyone." *Id.* at 502.

his right to bring a civil action," which "effectively denied Mr. Bechtol 'access to the

administrative review process mandated by [ERISA].'") (quoting 65 Fed. Reg. 70255-56 (Nov.

21, 2000)). Yet UBH does not even identify the denial letters in the record corresponding to

those plans, let alone establish that the letters satisfied the ERISA claims regulation with respect

to those plans' exhaustion requirements. That is no surprise – three of those denial letters say

nothing about this purported requirement and UBH did not even produce the other two letters in

discovery. *See* Ex. 1286-0001 to -0002 (Unique ID 659, corresponding to plan at Ex. 1535-

0057); Ex. 1303-0001 to -0002 (Unique ID 6600, corresponding to plan at Ex.1557-0084); Ex.

1327-0009 to -0014 (Unique ID 12605, corresponding to plan at Ex. 1583-0085); Exs. 1375-

0001 to -0003 & 1377-0001 to -0002 (case notes excerpts, because no denial letters were

produced for Unique IDs 7292 and 8242, *see* Ex. 894-0018 at n.2).

Moreover, the ERISA claims regulation sets forth a number of specific requirements for

denial letters. The five letters UBH identifies fail the regulation not only by omitting any

disclosure of the plan term UBH now cites, *i.e.*, that internal appeals are a prerequisite to suit, but

also by failing to disclose the right to sue at all. *See* 29 C.F.R. § 2560.503–1(j) (requiring "a

statement of the claimant's right to bring an action under section 502(a) of the Act"). Thus, even

if exhaustion were required as to those five class members – or any class member, for that matter

– they must be deemed to have exhausted administrative remedies. *Spinedex*, 770 F.3d at 1299

("Where United's failure to comply with claims procedures went beyond mere de minimis

violations, patients' claims must be deemed exhausted.").

Finally, in focusing its argument on *In re Household*, UBH ignores numerous other

courts that have concurred that class-member-by-class-member exhaustion is not necessary in

circumstances like those here. *See* Pls.' Br. at 89 n.59 (citing cases). UBH does not address any

of those cases, none of which limits its holding in any relevant way. In short, UBH's argument

that absent class members must have exhausted administrative remedies fails on the facts and the

law.

## X.    CONCLUSION

The Plaintiffs proved, by a preponderance of the evidence, that UBH breached its fiduciary duties in developing and using its overly-restrictive Guidelines and that it wrongfully denied the class members' requests for coverage pursuant to those pervasively flawed criteria. The Court should hold UBH liable for its violations of ERISA and proceed to the remedy phase of the case.

Dated:  February 12, 2018                       ZUCKERMAN SPAEDER LLP

                                                */s/ Caroline E. Reynolds*
                                                Caroline E. Reynolds
                                                Jason S. Cowart
                                                Carl S. Kravitz
                                                Aitan D. Goelman
                                                Adam B. Abelson

                                                PSYCH-APPEAL, INC.
                                                Meiram Bendat

                                                *Attorneys for Class Plaintiffs*