1   PSYCH-APPEAL, INC.
    Meiram Bendat (Cal. Bar No. 198884)
2   8560 West Sunset Boulevard, Suite 500
    West Hollywood, CA 90069
3   Tel: (310) 598-3690, x.101
    Fax: (888) 975-1957
4   mbendat@psych-appeal.com

5
    ZUCKERMAN SPAEDER LLP
6   D. Brian Hufford (admitted *pro hac vice*)
    Jason S. Cowart (admitted *pro hac vice*)
7   485 Madison Avenue, 10th Floor
    New York, NY 10022
8   Tel: (212) 704-9600
    Fax: (212) 704-4256
9   dbhufford@zuckerman.com
    jcowart@zuckerman.com
10

11  *Attorneys for Plaintiffs and the Classes*
    *(Additional Counsel on Signature Page)*
12

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| 15  DAVID AND NATASHA WIT, *et al.*, | Case No. 3:14-CV-02346-JCS |
| 16       Plaintiffs, | Action Filed: May 21, 2014 |
| 17       v. | |
| 18  UNITED BEHAVIORAL HEALTH | **PLAINTIFFS' REPLY IN SUPPORT OF** |
| 19  (operating as OPTUMHEALTH | **THEIR REQUEST FOR REMEDIES** |
|     BEHAVIORAL SOLUTIONS), | |
| 20       Defendant. | |
| 21 | |
| 22  GARY ALEXANDER, *et al.*, | Case No. 3:14-CV-05337-JCS |
| 23       Plaintiffs, | Action Filed: December 4, 2014 |
| 24       v. | |
| 25  UNITED BEHAVIORAL HEALTH | **REDACTED VERSION OF DOCUMENT** |
|     (operating as OPTUMHEALTH | **SOUGHT TO BE SEALED** |
| 26  BEHAVIORAL SOLUTIONS), | |
| 27       Defendant. | |
| 28 | |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................... 1

II.   UBH MISREPRESENTS ERISA'S REMEDIAL REGIME. .......................... 2

    A.    If § (a)(1)(B) Does Not Provide Some of the Remedies Plaintiffs Request, the Court Must Look to § (a)(3). ............................................................. 3

    B.    The Court's Duty is to Order the Remedy that is Most Advantageous to the Class Members. ................................................................................... 7

III.  UBH'S ARGUMENTS ABOUT THE MERITS AND CLASS CERITFICATION ONLY DISTRACT FROM THE COURT'S REAL TASK AT THIS PHASE OF THE CASE. ............ 10

    A.    The Court Should Disregard Arguments that Mischaracterize Plaintiffs' Claims and the Injuries Plaintiffs Seek to Remedy. ............................... 11

    B.    The Court Should Disregard Merits Arguments that Contradict the Evidence at Trial. ................................................................................... 13

    C.    The Court Should Disregard Arguments About Whether the Class Was Properly Certified. ................................................................................ 17

        1.    Class Members Whose Denials Were Reversed on Appeal Are Entitled to Reprocessing. ................................................................... 18

        2.    Texas Members of the State Mandate Class Are Entitled to Reprocessing. ............................................................................... 20

        3.    Class Members Who Did Not Receive the Services for which UBH Denied Coverage Are Entitled to Reprocessing. .................................. 21

        4.    The Court Should Disregard UBH's New Arguments About Whether the Class is Ascertainable. ...................................................... 25

    D.    The Court Should Disregard Arguments UBH Has Long Since Waived. ............ 27

    E.    The Court Should Disregard UBH's Post-Trial, Post-Discovery Assertions About Changes it Claims to Have Made to its Guidelines ................................. 29

IV.   UBH HAS ALREADY EXERCISED – AND ABUSED – ITS DISCRETION AND IS NOT ENTITLED TO A SECOND BITE AT THE APPLE. ............................................ 32

    A.    UBH Already Exercised its Discretion with Respect to the Meaning of the Class Members' Plans, and the Court Found that UBH Abused that Discretion. ............................................................................................. 32

    B.    UBH Already Exercised its Discretion to Determine that No Other Exclusions or Limitations Apply to the Class Members' Requests for Coverage. ............................................................................................... 36

    C.    UBH Claims it Already Exercised its Discretion by Adopting the Very Criteria Plaintiffs ask the Court to Order. ................................................... 39

V.    UBH'S SELF-SERVING ARGUMENTS FOR CRIPPLING THE REPROCESSING REMEDY HAVE NO MERIT ........................................................................................ 41

    A.    UBH Offers No Valid Justification for Erecting New Obstacles to Class Members' Ability to Obtain Retrospective Relief. ................................................. 42

    B.    UBH Offers No Valid Reason Why Class Members Should Be Barred from Submitting Additional Information About their Requests for Coverage. ............. 46

        1.    The Court Should Permit Class Members and their Providers to Submit Additional Clinical Information, and UBH Should Make an Effort to Obtain Missing Information. ...................................................... 46

        2.    The Court Should Permit Class Members to Submit Evidence of Services Received Post-Denial ................................................................. 48

    C.    UBH Should Pay Pre- and Post-Judgment Interest if it Determines a Class Member is Entitled to Benefits. ............................................................................ 52

    D.    UBH is Correct that the Reprocessing Order Should Not Be Limited to Trial Exhibit 255 ............................................................................................................. 53

    E.    UBH Should be Held to Tight Interim and Final Deadlines. ............................... 54

VI.   PLAINTIFFS ARE ENTITLED TO DECLARATORY RELIEF. ................................... 56

VII.  THE PROSPECTIVE INJUNCTIVE RELIEF PLAINTIFFS REQUEST IS APPROPRIATE AND ESSENTIAL TO PROVIDE AN ADEQUATE REMEDY ................... 61

    A.    A Preponderance of the Evidence Proves that the Class Members Are Threatened with Future Irreparable Harm. ......................................................... 61

        1.    UBH Cannot Escape a Finding of Irreparable Harm by Voluntarily Abandoning its Guidelines .......................................................................... 61

        2.    UBH's Suggestion that the Class Members' Plans Have Materially Changed is Demonstrably False ...................................................................... 66

        3.    UBH Must be Constrained to Apply the ASAM Criteria Faithfully. ......... 68

    B.    The Requested Permanent Injunction Need Not Include an Expiration Date. ..... 71

    C.    The Requested Injunction is Not Impermissibly Vague, and Even if it Were, the Court Can Make it More Specific ................................................................... 72

    D.    The Other Features of the Injunctive Relief Plaintiffs Request Are Essential to Make the Remedy Effective. ............................................................................. 74

        1.    Training and Structural Changes ................................................................... 74

        2.    Disclosures .................................................................................................... 77

VIII. THE COURT SHOULD RETAIN JURISDICTION. ...................................................... 78

IX.   THE COURT SHOULD APPOINT ONE OR MORE SPECIAL MASTERS. ................. 78

X.    CONCLUSION ................................................................................................................. 81

ii

1

## TABLE OF AUTHORITIES

2

**Page(s)**

**Cases**

3

*A.F. v. Providence Health Plan,*
4      157 F. Supp. 3d 899 (D. Or. 2016) ............................................................ 51

5

*Aetna Health Inc. v. Davila,*
6      542 U.S. 200 (2004)................................................................. 4, 21, 22

7

*Apache Survival Coal. v. United States,*
      21 F.3d 895 (9th Cir. 1994) ...................................................................... 5

8

*Ballas v. Anthem Blue Cross Life & Health Ins. Co.,*
9      Case No. CV 12-00604 MMM (FFMx), 2013 WL 12119569 (C.D. Cal. Apr. 29, 2013) ....... 52

10

*Bast v. Prudential Ins. Co. of Am.,*
      150 F.3d 1003 (9th Cir. 1998) ................................................................... 4
11

12

*Bellanger v. Health Plan of Nev., Inc.,*
      814 F. Supp. 914 (D. Nev. 1992)............................................................... 67

13

*Berman v. Microchip Tech. Inc.,*
14      No. 17-CV-01864-HSG, 2018 WL 732667 (N.D. Cal. Feb. 6, 2018)............................ 59

15

*Bilbrey ex rel. Bilbrey v. Brown,*
      738 F.2d 1462 (9th Cir. 1984) ................................................................... 57
16

17

*Bowman v. U.S. West, Inc.,*
      Civil No. 95-1923-FR, 1997 WL 118437 (D. Or. Mar. 10, 1997) ........................... 70

18

*Briseno v. ConAgra Foods, Inc.,*
19      844 F.3d 1121 (9th Cir. 2017) .................................................................. 26

20

*Caplan v. CNA Short Term Disability Plan,*
      479 F. Supp. 2d 1108 (N.D. Cal. 2007)........................................................ 6
21

22

*Cator v. Herrgott & Wilson, Inc.,*
      609 F. Supp. 12 (N.D. Cal. 1984) ............................................................. 33

23

*Chappel v. Lab. Corp. of Am.,*
24      232 F.3d 719 (9th Cir. 2000) .................................................................. 50

25

*Chorosevic v. MetLife Choices,*
      No. 4:05-CV-2394 CAS, 2009 WL 723357 (E.D. Mo. Mar. 17, 2009) ....................... 5
26

27

*CIGNA Corp. v. Amara,*
      563 U.S. 421 (2011)........................................................................ passim

28

*Conkright v. Frommert,*
    559 U.S. 506 (2010) ............................................................................ 33, 34, 35, 70

*Craft v. Health Care Serv. Corp.,*
    Case No. 14 C 5853, 2016 WL 1270433 (N.D. Ill. Mar. 31, 2016) ........................... 5

*Dailey v. Blue Cross & Blue Shield of Kansas City,*
    No. 17-01036-CV-W-ODS, 2019 WL 539119 (W.D. Mo. Feb. 11, 2019) ............................ 42

*DeMaria v. Horizon Healthcare Servs., Inc.,*
    No. 11-7298 (WJM), 2015 WL 3460997 (D.N.J. June 1, 2015) ........................ 27, 28

*Des Roches v. Cal. Physicians' Serv.,*
    320 F.R.D. 486 (N.D. Cal. 2017) ................................................................ 19, 50, 65

*Dirienzo v. Dunbar Armored, Inc.,*
    No. 09CV2745 DMS (JMA), 2010 WL 11591907 (S.D. Cal. May 12, 2010) ...................... 59

*Donovan v. Mazzola,*
    716 F.2d 1226 (9th Cir. 1983) ................................................................ passim

*Duarte v. Aetna Life Ins. Co.,*
    No. SACV 13-00492-JLS (RNBx), 2014 WL 1672855 (C.D. Cal. Apr. 24, 2014) ................ 47

*Dupree v. Holman Prof'l Counseling Ctrs.,*
    572 F.3d 1094 (9th Cir. 2009) ...................................................................... 68

*Durham v. Health Net,*
    C-94-3575 MHP, 1995 WL 429252 (N.D. Cal. June 22, 1995) ........................ 21, 42

*E.E.O.C. v. Hacienda Hotel,*
    881 F.2d 1504 (9th Cir. 1989) ...................................................................... 63

*EEOC v. Prospect Airport Services, Inc.,*
    No. 2:05-CV-01125-KJD, 2012 WL 3042693 (D. Nev. July 25, 2012) ........................ 80

*England v. Marriott Int'l, Inc.,*
    764 F. Supp. 2d 761 (D. Md. 2011) .................................................................. 6

*F.E.C. v. Furgatch,*
    869 F.2d 1256 (9th Cir. 1989) ................................................................ 62, 74

*F.T.C. v. Accusearch Inc.,*
    570 F.3d 1187 (10th Cir. 2009) ................................................................ 61, 64

*Fairview Health Servs. v. Ellerbe Becket Co. Emp. Med. Plan,*
    Civil File No. 06-2585 (MJD/AJB), 2007 WL 978089 (D. Minn. Mar. 28, 2007) .................. 5

iv

*Firestone Tire & Rubber Co. v. Bruch*,
    489 U.S. 101 (1989) .......................................................................................... 9, 57

*Flom v. Holly Corp.*,
    276 F. App'x 615 (9th Cir. 2008) ............................................................................ 50

*Forsyth v. Humana, Inc.*,
    114 F.3d 1467 (9th Cir. 1997) ................................................................................... 6

*Fotta v. Trs. of United Mine Workers of Am., Health & Ret. Fund of 1974*,
    165 F.3d 209 (3d Cir. 1998) .................................................................................... 53

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ................................................................................................ 63

*Frommert v. Conkright*,
    738 F.3d 522 (2d Cir. 2013) .................................................................................... 34

*Gabriel v. Alaska Elec. Pension Fund*,
    773 F.3d 945 (9th Cir. 2014) ......................................................................... 3, 41, 49

*Gilliam v. Nev. Power Co.*,
    488 F.3d 1189 (9th Cir. 2007) ................................................................................ 68

*Giordano v. Thomson*,
    564 F.3d 163 (2d Cir. 2009) .................................................................................... 17

*Goldie's Bookstore, Inc. v. Superior Court of State of Cal.*,
    739 F.2d 466 (9th Cir. 1984) .................................................................................. 67

*Gorbacheva v. Abbott Labs. Extended Disability Plan*,
    309 F. Supp. 3d 756 (N.D. Cal. 2018) .................................................................... 50

*Great-W. Life & Annuity Ins. Co. v. Knudson*,
    534 U.S. 204 (2002) .................................................................................................. 5

*Guenther v. Lockheed Martin Corp.*,
    Case No. 5:11-cv-00380-EJD, 2017 WL 976939 (N.D. Cal. Mar. 14, 2017) ......................... 19

*Hamann v. Independence Blue Cross*,
    543 F. App'x 355 (5th Cir. 2013) ..................................................................... 21, 42

*Hancock v. Montgomery Ward Long Term Disability Tr.*,
    787 F.2d 1302 (9th Cir. 1986) ........................................................................... 33, 47

*Harlick v. Blue Shield of Cal.*,
    686 F.3d 699 (9th Cir. 2012) ....................................................................... 36, 37, 38

v

*Heimeshoff v. Hartford Life & Acc. Ins. Co.*,
   571 U.S. 99 (2013) ............................................................................................. 19

*Hopi Tribe v. Navajo Tribe*,
   46 F.3d 908 (9th Cir. 1995) ................................................................................ 53

*Huffman v. Prudential Ins. Co. of Am.*,
   No. 2:10-cv-05135, 2016 WL 5724293 (E.D. Pa. Sept. 30, 2016) ...................... 68

*Jansen v. Greyhound Corp.*,
   692 F. Supp. 1029 (N.D. Iowa 1987) ................................................................ 80

*Kamar v. RadioShack Corp.*,
   375 F. App'x 734 (9th Cir. 2010) ...................................................................... 21

*Krauss v. Oxford Health Plans, Inc.*,
   517 F.3d 614 (2d Cir. 2008) .............................................................................. 17

*La Buy v. Howes Leather Co.*,
   352 U.S. 249 (1957) ............................................................................................ 79

*LaMantia v. Voluntary Plan Adm'rs, Inc.*,
   401 F.3d 1114 (9th Cir. 2005) ............................................................................ 49

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*,
   941 F.2d 970 (9th Cir. 1991) .............................................................................. 13

*Lancaster v. U.S. Shoe Corp.*,
   934 F. Supp. 1137 (N.D. Cal. 1996) .................................................................. 78

*Long v. U.S. I.R.S.*,
   693 F.2d 907 (9th Cir. 1982) .............................................................................. 65

*Magee v. Metro. Life Ins. Co.*,
   632 F. Supp. 2d 308 (S.D.N.Y. 2009) ................................................................ 51

*Marcus v. Bowen*,
   No. 85 C 453, 1989 WL 39709 (N.D. Ill. Apr. 18, 1989) .................................. 45

*Marie v. Moser*,
   196 F. Supp. 3d 1202 (D. Kan. 2016) ................................................................ 64

*Martinez v. Beverly Hills Hotel & Bungalows Emp. Benefit Tr. Emp. Welfare Plan*,
   No. 2:09-CV-01222-SVW-PLA, 2015 WL 12843760 (C.D. Cal. Oct. 29, 2015) ................. 38

*Martinez v. Beverly Hills Hotel*,
   695 F. Supp. 2d 1085 (C.D. Cal. 2010) .............................................................. 3

*Mass. Mut. Life Ins. Co. v. Russell*,
    473 U.S. 134 (1985)........................................................................... 3, 9

*Mathews v. Chevron Corp.*,
    362 F.3d 1172 (9th Cir. 2004) ............................................ 41, 49, 51, 76

*May v. May*,
    167 U.S. 310 (1897)............................................................................... 79

*McCormack v. Herzog*,
    788 F.3d 1017 (9th Cir. 2015) ............................................................... 63

*McElmurry v. U.S. Bank Nat'l Ass'n*,
    495 F.3d 1136 (9th Cir. 2007).............................................................. 44

*McGlasson v. Long Term Disability Coverage*,
    161 F. Supp. 3d 836 (D. Ariz. 2016) ...................................................... 6

*Metro. Life Ins. Co. v. Glenn*,
    554 U.S. 105 (2008) ........................................................................ 33, 58

*Miller v. United Welfare Fund*,
    72 F. 3d 1066 (2d Cir. 1995) ................................................................. 51

*Moyle v. Liberty Mut. Ret. Benefit Plan*,
    823 F.3d 948 (9th Cir. 2016) ............................................................ 6, 33

*New Hampshire v. Maine*,
    532 U.S. 742 (2001)............................................................................... 11

*New York, S. & W. R. Co. v. Follmer*,
    254 F.2d 510 (3d Cir. 1958) ................................................................. 79

*Orantes-Hernandez v. Thornburgh*,
    919 F.2d 549 (9th Cir. 1990) ................................................................ 74

*Pakovich v. Verizon LTD Plan*,
    653 F.3d 488 (7th Cir. 2011) ................................................................ 43

*Pannebecker v. Liberty Life Assurance Co. of Bos.*,
    542 F.3d 1213 (9th Cir. 2008) ............................................................. 22

*Pitts v. Terrible Herbst, Inc.*,
    653 F.3d 1081 (9th Cir. 2011) .............................................................. 28

*Potter v. Blue Cross Blue Shield of Mich.*,
    No. 10-CV-14981, 2013 WL 12183410 (E.D. Mich. Nov. 4, 2013)........................ 45

vii

*Puccio v. Standard Ins. Co.*,
  80 F. Supp. 3d 1034 (N.D. Cal. 2015) ................................................................... 50

*Rivera v. Benefit Tr. Life Ins. Co.*,
  921 F.2d 692 (7th Cir. 1991) ................................................................................. 53

*Robertson v. Standard Ins. Co.*,
  No. 3:14-cv-01572-HZ, 2015 WL 13682034 (D. Or. Nov. 13, 2015) .................... 53

*Robertson v. Standard Ins. Co.*,
  No. 3:14-CV-01572-HZ, 2017 WL 3319114 (D. Or. Aug. 3, 2017) ......................... 4

*Rolland v. Celluci*,
  198 F. Supp. 2d 25 (D. Mass. 2002) ...................................................................... 80

*Rush Prudential HMO, Inc. v. Moran*,
  536 U.S. 355 (2002) ................................................................................................. 4

*S.E.C. v. Koracorp Indus., Inc.*,
  575 F.2d 692 (9th Cir. 1978) ............................................................................ 62, 63

*S.E.C. v. Murphy*,
  626 F.2d 633 (9th Cir. 1980) ................................................................................. 62

*Saffle v. Sierra Pac. Power Co. Barg. Unit Long Term Disability Income Plan*,
  85 F.3d 455 (9th Cir. 1996) .............................................................................. 16, 22

*Sage v. Automation, Inc. Pension Plan & Tr.*,
  845 F.2d 885 (10th Cir. 1988) ................................................................................ 17

*Schmidt v. Lessard*,
  414 U.S. 473 (1974) ............................................................................................... 74

*Shannon v. Jack Eckerd Corp.*,
  113 F.3d 208 (11th Cir. 1997) ................................................................................ 51

*Shaw v. McFarland Clinic, P.C.*,
  231 F. Supp. 2d 924 (S.D. Iowa 2002) ................................................................... 52

*Silk v. Metro. Life Ins. Co.*,
  310 F. App'x 138 (9th Cir. 2009) ........................................................................... 43

*Skinner v. Northrop Grumman Ret. Plan B*,
  673 F.3d 1162 (9th Cir. 2012) .......................................................................... 41, 52

*Slayman v. FedEx Ground Package Sys., Inc.*,
  765 F.3d 1033 (9th Cir. 2014) ................................................................................ 28

*Spinedex Physical Therapy USA Inc. v. United Healthcare of Ariz., Inc.*,
770 F.3d 1282 (9th Cir. 2014) ............................................................ 19, 27

*Tolson v. Avondale Indus., Inc.*,
141 F.3d 604 (5th Cir. 1998) ...................................................................... 59

*U.S. Airways, Inc. v. McCutchen*,
569 U.S. 88 (2013) ...................................................................................... 10

*United States v. Laerdal Mfg. Corp.*,
73 F.3d 852 (9th Cir. 1995) .................................................................. 62, 63

*United States v. Or. State Med. Soc'y*,
343 U.S. 326 (1952) .................................................................................... 62

*United States v. Parke, Davis & Co.*,
362 U.S. 29 (1960) ...................................................................................... 62

*United States v. W. T. Grant Co.*,
345 U.S. 629 (1953) .................................................................................... 61

*United States v. Washington*,
759 F.2d 1353 (9th Cir. 1985) .................................................................... 57

*Varity Corp. v. Howe*,
516 U.S. 489 (1996) ............................................................................ passim

*Williams v. Bank of Am.*,
No. 2:12-CV-2513 JAM AC PS, 2013 WL 1907529 (E.D. Cal. May 7, 2013) ...................... 58

**Statutes**

29 U.S.C. § 1104 .................................................................................. passim

29 U.S.C. § 1104(a)(1) ................................................................................ 76

29 U.S.C. § 1104(a)(1)(A)(i) ....................................................................... 76

29 U.S.C. § 1109 ................................................................................ 8, 9, 79

29 U.S.C. § 1132(a)(1)(B) .................................................................... passim

29 U.S.C. § 1132(a)(2) ............................................................................. 8, 9

29 U.S.C. § 1132(a)(3) ........................................................................ passim

29 U.S.C. § 1132(a)(3)(A) ......................................................................... 5, 8

29 U.S.C. § 1132(a)(3)(B) ......................................................................... 5, 8

ix

29 U.S.C. § 1133(2) ..................................................................................................... 17

**Other Authorities**

29 C.F.R. § 2560.503-1 ...................................................................................... 36, 47, 55

John Bronsteen, Class Action Settlements: An Opt-in Proposal, 2005 U. Ill. L. Rev. 903
(2005) ....................................................................................................................... 46

Scott Dodson, An Opt-in Option for Class Actions, 115 Mich. L. Rev. 171 (2016)................... 46

**Rules**

Fed. R. Civ. P. 23(b)(3) ..................................................................................................... 11

Fed. R. Civ. P. 23(c)(1)(C) .......................................................................................... 21, 60

Fed. R. Civ. P. 52(c) ......................................................................................................... 12

Fed. R. Civ. P. 53(a)(1)(C) ......................................................................................... 79, 80

Fed. R. Civ. P. 60(b)(5).............................................................................................. 66, 72

## I.       INTRODUCTION

In their opening remedies brief, Plaintiffs laid out a combination of remedies that are necessary to fully redress UBH's egregious breaches of fiduciary duty and abuses of discretion. The remedies Plaintiffs propose are appropriate to the facts of this case and authorized by the statutory text of ERISA and controlling Supreme Court and Ninth Circuit case law.  In response, UBH throws out every imaginable argument, no matter how inapposite, foreclosed or internally inconsistent, in a transparent attempt to preserve its options for appeal. It challenges the Court's liability ruling, objects to class certification, seeks to resurrect long-waived arguments, belatedly offers new evidence it failed to introduce at trial, asserts new facts with no evidence, and in general argues as though *it* is the victim here, rather than the more than 50,000 class members harmed by UBH's faithless conduct. All the while, UBH ignores the devastating conclusions reached by the Court in its post-trial findings, and disregards or distorts the controlling legal authority in favor of a hodge-podge of cases, often from district courts and usually from inapposite contexts. Case in point: UBH cites *Varity Corp. v. Howe*, 516 U.S. 489 (1996), the Supreme Court's seminal case explicating the expansive safety net provided by 29 U.S.C. § 1132(a)(3), just once in its entire 57-page brief. It touches on *CIGNA Corp. v. Amara*, 563 U.S. 421 (2011), which expanded on *Varity* by clarifying that § (a)(3) makes the full scope of the Court's equitable powers available to remedy an ERISA fiduciary's breach, a measly three times. UBH does not mention 29 U.S.C. § 1104, which defines the fiduciary duties UBH has been found liable of breaching, even once.

One thing is clear from UBH's brief: UBH still does not acknowledge that it did anything wrong and therefore cannot be trusted to act faithfully in the future.  It does not believe the class members are entitled to any remedy at all – indeed, it asks the Court to deny remedies *in their entirety*. UBH's Resp. to Pls.' Remedies Br., *Wit* ECF No. 428-4 (June 14, 2019) ("Opp.") at

57:13.  At the same time, UBH demands that the Court defer to UBH's discretion and delegate to

UBH the responsibility for overseeing its own compliance with whatever remedies the Court

does order.  UBH is a faithless fiduciary, through and through. An appropriate and adequate

remedy in this case cannot be left to UBH's discretion or imagined good faith. For the reasons

Plaintiffs set forth in their opening brief and explain further below, therefore, Plaintiffs

respectfully request that the Court order the remedies Plaintiffs have proposed. *See*, *e.g.*, Ex. A.

## II.    UBH MISREPRESENTS ERISA'S REMEDIAL REGIME.

UBH contends that the remedies available under ERISA §§ (a)(1)(B) and (a)(3) should be

strictly construed, are extremely limited, cannot ever intrude on the administrator's unfettered

"right" to exercise discretion, and cannot be used in combination. *See*, *e.g.*, Opp. at 7:2-8:12

(arguing that only limited relief is available to Plaintiffs under § 1132(a)(1)(B)); Opp. at 8:13-

10:2 (arguing that Plaintiffs have no remedy under § 1132(a)(3) because a remedy exists under

§ (a)(1)(B)); Opp. at 39:26-41:12 (arguing that the Court lacks the legal authority to "usurp"

UBH's discretion even after finding UBH abused that discretion). UBH has it exactly wrong.

ERISA actually works in entirely the opposite way: the statute makes UBH a fiduciary that owes

enforceable duties to plan participants, authorizes expansive remedies under § (a)(1)(B), and

requires the Court to utilize the full range of its traditional equitable powers under § (a)(3) when

necessary to provide adequate relief for a fiduciary's breach. *See*, *e.g.*, *Varity*, 516 U.S. at 512

(§ 1132(a)(3) acts as a "safety net" to provide "appropriate equitable relief for injuries caused by

violations that [§ 1132] does not elsewhere adequately remedy"); *Amara*, 563 U.S. at 439-40 (in

addition to the relief provided by § 1132(a)(1)(B), § 1132(a)(3) authorizes any equitable relief

necessary to redress violations of ERISA). The relief Plaintiffs seek therefore falls squarely

within the Court's authority.

**A.    If § (a)(1)(B) Does Not Provide Some of the Remedies Plaintiffs Request, the Court Must Look to § (a)(3).**

The analysis underlying UBH's brief is nothing more than an overly complicated legal sleight of hand. Based upon mischaracterizations of ERISA and its caselaw, UBH begins its brief by contending that all of the remedies sought in this case are "available under § 1132(a)(1)(B)," that Plaintiffs "are limited to the relief provided" under that section (albeit, per UBH, to only *some* of the types of relief available under that section[1]) and that ***all*** relief under § 1132(a)(3) therefore "is unavailable as a matter of law." Opp. at 8:23-9:8. From there, UBH argues that most or all class members are not actually entitled to any relief under § (a)(1)(B), ignores § (a)(3) throughout the remainder of its brief, and ultimately concludes that the Court should order ***no remedy at all***. *See* Opp. at 57:12-13 (requesting that the Court deny Plaintiffs' requested remedies "in their entirety").[2]  But UBH's entire brief is supported by a foundation of sand.

---

[1] UBH argues that because Plaintiffs do not seek an *award* of benefits from the Court, they are not entitled to ***any relief at all*** under the "recovery of benefits" prong of § 1132(a)(1)(B). Opp. at 7:13-8:4. UBH is wrong in arguing that the only form of relief available under (a)(1)(B)'s "recovery of benefits" clause is an award of benefits by the Court; the numerous cases remanding § (a)(1)(B) benefit claims prove the opposite. *See, e.g.*, *Martinez v. Beverly Hills Hotel*, 695 F. Supp. 2d 1085, 1116 (C.D. Cal. 2010) (remanding claim for benefits brought under § (a)(1)(B)). The clause allowing plan members to "enforce" their rights under their plans also surely authorizes courts to order reprocessing. But even if a remand could only be ordered under § (a)(1)(B) to "recover benefits due," § (a)(3) is not so limited, and as shown herein, the Court must apply that section if it finds that form of relief unavailable under § (a)(1)(B).

[2] UBH tries to support this approach by extrapolating from two strands of cases, neither of which applies here.  ***First***, UBH cites cases denying ERISA plaintiffs a cause of action for extra-contractual damages because Congress's omission of such a remedy was not accidental. *See, e.g.*, *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 148 (1985) (holding that ERISA did not provide a cause of action for extra-contractual damages for fiduciary's untimely processing of benefit claims); *Gabriel v. Alaska Elec. Pension Fund*, 773 F.3d 945, 952, 964 (9th Cir. 2014) (vacating district court's ruling that plaintiff "was actually seeking compensatory damages" and remanding for a determination consistent with *Amara* as to whether plaintiff was entitled to surcharge).  But just as courts cannot read an extra-contractual damages remedy into ERISA, they cannot read § (a)(3)'s equitable remedies out of it, and none of UBH's cases purports to do so.

***Second***, UBH misapplies several preemption cases, in which courts found or acknowledged that state causes of action can be preempted by ERISA even if that regrettably leaves a plaintiff

Both the plain language of ERISA and the case law interpreting it make clear how the Court should proceed in this case, where Plaintiffs not only alleged, but proved at trial, claims under *both* §§ 1132(a)(1)(B) and (a)(3) and seek exclusively equitable relief that is demonstrably available under ERISA.  <u>First</u>, the Court should determine whether § (a)(1)(B) provides an adequate remedy for UBH's misconduct – not in the abstract as UBH urges, but based on the facts of this case. *See, e.g.*, *Varity*, 516 U.S. at 512 (explaining that § (a)(3) acts "as a safety net" in case § 1132(a) "does not elsewhere adequately remedy" a violation of ERISA); *accord Robertson v. Standard Ins. Co.*, No. 3:14-CV-01572-HZ, 2017 WL 3319114, at *4 (D. Or. Aug. 3, 2017) (cited by UBH at Opp. at 9:3-8) (recognizing an ERISA plaintiff could proceed with an § (a)(3) claim if "the remedy afforded by Congress under § 1132(a)(1)(B) is . . . shown to be inadequate").[3]  The Supreme Court's discussion in *Varity* does not remotely suggest that an "adequate" § (a)(1)(B) remedy in this case would be one that only partially addresses UBH's misconduct, let alone that it would be appropriate in this case to order no remedy at all.  Rather, as the Court explained, since Congress intended ERISA to provide plan members with "broad remedies for redressing or preventing violations" of the statute, "it is hard to imagine why Congress would want to immunize breaches of fiduciary obligation that harm individuals by denying injured beneficiaries a remedy." 516 U.S. at 512-13; *see also, e.g.*, *Amara*, 563 U.S. at 440 (noting that equity "suffers not a right to be without a remedy") (quotations omitted).

---

without a remedy. *See, e.g.*, *Aetna Health Inc. v. Davila*, 542 U.S. 200, 204-05 (2004); *Bast v. Prudential Ins. Co. of Am.*, 150 F.3d 1003, 1009-10 (9th Cir. 1998); *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 387 (2002). None of those cases holds, or even suggests, that a plaintiff who *has* a valid cause of action under ERISA – and proved a fiduciary's liability at trial – could possibly be denied a remedy.

[3] In *Robertson*, the Court dismissed the § (a)(3) claim because the plaintiff had already received all of the benefits she was due, along with attorneys' fees and costs and prejudgment interest. 2017 WL 3319114, at *3-4. Because the only injury alleged was "the failure to pay her benefits," once the defendant had "remedied that injury," the plaintiff's claim for disgorgement would have given her a double recovery. *Id.* at *4. That case does not support UBH's position that the mere possibility of relief under § (a)(1)(B), even if inadequate in reality, precludes § (a)(3) relief.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Second, if § 1132(a)(1)(B), standing alone, does not provide adequate relief to the class, the Court must look to § (a)(3) and answer one important question: is there other relief that is traditionally available in equity that can redress the injury? *See Amara*, 563 U.S. at 439 ("We have interpreted the term 'appropriate equitable relief' in [§ 1132(a)(3)] as referring to those categories of relief that, traditionally speaking . . . were typically available in equity.") (quotation marks omitted). If so, the Court should order that other relief as well.

Significantly, UBH does not dispute (nor could it) that declaratory judgments and injunctive relief were both traditionally available in courts of equity, and therefore are forms of relief available under § 1132(a)(3).  *See, e.g.*, 29 U.S.C. § 1132(a)(3)(A) (explicitly authorizing suit "to enjoin any act or practice which violates" ERISA); 29 U.S.C. § 1132(a)(3)(B) (allowing "other appropriate equitable relief . . . to redress [ERISA] violations"); *Amara*, 563 U.S. at 439-40 ("affirmative and negative injunctions obviously" fall within the category of appropriate equitable relief available under § (a)(3)); *Apache Survival Coal. v. United States*, 21 F.3d 895, 905 n.12 (9th Cir. 1994) (declaratory judgments are equitable in nature). UBH also agrees that a remand for reprocessing is a form of injunctive relief, Opp. at 16:6, a remedy explicitly authorized under 29 U.S.C. §1132(a)(3)(A). Nevertheless, UBH contends that "[r]eprocessing is not available under § 1132(a)(3)." Opp. at 16:15-21. The handful of district court cases UBH cites for this categorical proposition contain no such holding.[4] Nor could any such holding be

---

[4] *Chorosevic* and *Fairview Health*, which pre-date *Amara* by several years, both concluded that the plaintiff's § (a)(3) claim was really a claim for benefits "expressed in equitable language," and thus precluded under the Supreme Court's reasoning in *Great-West*.  *Chorosevic v. MetLife Choices*, No. 4:05-CV-2394 CAS, 2009 WL 723357, at *11 (E.D. Mo. Mar. 17, 2009) (citing *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210-12 (2002)); *see also Fairview Health Servs. v. Ellerbe Becket Co. Emp. Med. Plan*, Civil File No. 06-2585 (MJD/AJB), 2007 WL 978089, at *6 (D. Minn. Mar. 28, 2007) (same). The court in *Craft*, in turn, relied on *Chorosevic, Fairview Health*, and *Great-West* in concluding, on a motion to dismiss, that the plaintiffs' § (a)(3) claim was duplicative of their § (a)(1)(B) claim. *Craft v. Health Care Serv. Corp.*, Case No. 14 C 5853, 2016 WL 1270433, at *6 (N.D. Ill. Mar. 31, 2016).  None of those cases, however, purported to rule, as a general proposition, on whether a reprocessing order

squared with the Supreme Court's reasoning in *Amara* – the controlling authority here.  After

*Amara*, there can be no question that reprocessing – insofar as it "closely resembles" injunctive

relief – is available under § (a)(3).

Moreover, if necessary to fully redress UBH's misconduct, the Court can and should

avail itself of the remedies offered by both § (a)(1)(B) and § (a)(3).  ERISA permits relief under

both sections "so long as there is no double recovery." *Moyle v. Liberty Mut. Ret. Benefit Plan*,

823 F.3d 948, 961 (9th Cir. 2016) (citing *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1475 (9th Cir.

1997)). *See also, e.g.*, *McGlasson v. Long Term Disability Coverage*, 161 F. Supp. 3d 836, 844

(D. Ariz. 2016) (court must ask whether § (a)(1)(B) "fully compensates the plan participant for

his injury, thereby rendering any other remedy duplicative, or whether an ***additional*** equitable

remedy is appropriate to make the plan participant whole") (emphasis added); *Caplan v. CNA*

*Short Term Disability Plan*, 479 F. Supp. 2d 1108, 1112-13 (N.D. Cal. 2007) (allowing claims

under both subsections because "the equitable relief Plaintiff seeks under section 1132(a)(3), . . .

may be different than the relief available under section 1132(a)(1)(B), and such relief might not

be available to Plaintiff under the section 1132(a)(1)(B) claim ***alone***") (emphasis added);

*England v. Marriott Int'l, Inc.*, 764 F. Supp. 2d 761, 780 (D. Md. 2011) (allowing combined

remedy under § (a)(3) and § (a)(1)(B), first for "reformation," then "for recalculation and

distribution of benefits"). As the Ninth Circuit pointed out in *Moyle*, the Supreme Court has

made clear the two sections can act in combination, by holding in *Amara* that "once the plan was

reformed under § 1132(a)(3) to reflect the terms of the old plan, it could be enforced under

§ 1132(a)(1)(B)." *Moyle*, 823 F.3d at 960.  Thus, there is no prohibition on combining relief

under § (a)(1)(B) with relief under § (a)(3) where those provisions support different aspects of a

remedial regime.

---

could *ever* be appropriate equitable relief under § (a)(3).

In any event, UBH's contention that the relief Plaintiffs request is improperly "duplicative," Opp. at 9:10, is clearly wrong. The prohibition on "double recovery" refers to money, and precludes a plaintiff from obtaining benefits under § (a)(1)(B) and then also obtaining the value of those benefits as make-whole relief under § (a)(3). The concept has no relevance to the non-monetary equitable relief that Plaintiffs seek for UBH's egregious ERISA violations. That type of relief can be ordered under § (a)(1)(B), § (a)(3), or both – without ever becoming improperly "duplicative."

**B.     The Court's Duty is to Order the Remedy that is Most Advantageous to the Class Members.**

As Plaintiffs observed in their opening brief, the question now before the Court is how to provide an adequate and appropriate remedy to the class – i.e., how the Court will fulfill its "'duty to enforce the remedy which is most advantageous to the participants.'" Pls.' Opening Remedies Brief, *Wit* ECF No. 426 (May 3, 2019) ("Pls.' Br.") at 1:21-3:11 (quoting *Donovan v. Mazzola*, 716 F.2d 1226, 1235 (9th Cir. 1983)) (quotation omitted).  UBH accuses Plaintiffs of "brazenly ignor[ing]" ERISA's remedial scheme because Plaintiffs pointed to the breadth of the Court's discretion in fashioning appropriate remedies for violations of the statute. *See* Opp. at 6:6; *see also id.* at 2:11-16.[5]  But Plaintiffs' brief demonstrated, right up front, that each of the forms of relief Plaintiffs seek is available under ERISA §§ 1132(a)(1)(B) and (a)(3).  Pls.' Br. at 2:12-3:11; *see also id.* at 5:14-6:9 (declaratory relief); 9:23-10:1 & n.7 (remand); 21:22-22:8

---

[5] UBH also attributes to Plaintiffs a quote that appears nowhere in Plaintiffs' brief, claiming Plaintiffs ask the Court to "disregard [ERISA] and the terms of the ERISA plans at issue and instead exercise its 'general discretion' to fashion remedies in this case." Opp. at 2:12-14 (purporting to quote Plaintiffs' Opening Brief at 1). Plaintiffs said nothing of the sort. Recognizing that ERISA empowers the Court to exercise its broad equitable authority to remedy violations is a far cry from "disregard[ing]" or "ignor[ing]" the statute. And at no point did Plaintiffs suggest that the remedies Plaintiffs seek are grounded in the Court's "general discretion" rather than in ERISA's explicit authority, as interpreted by the Supreme Court and the Ninth Circuit. *See generally* Pls.' Br., *Wit*. ECF No. 426.

7

(injunctive relief).[6]  Far from "ignoring" ERISA's remedial scheme, Plaintiffs' arguments are comfortably within it.[7]

UBH's real grievance is with Plaintiffs' citation to *Donovan*, in which the Ninth Circuit explained how the traditional law of trusts applies when a court is fashioning remedies for fiduciary breaches under ERISA. *See* Opp. at 6:6-17 (attempting to distinguish *Donovan*).  But *Donovan* remains good law, and UBH does not, and could not, argue otherwise.  Instead, as part of its effort to pervert the ERISA remedial regime into a fiduciary-protection statute, UBH claims *Donovan* is off-point because it involved a suit by the Secretary of Labor under § 1132(a)(2), rather than a suit by a plan member under § (a)(3). *Id.* That, however, is a distinction without a difference. While an action under § 1132(a)(2) seeking the relief specified in 29 U.S.C. § 1109 is *one* way to challenge an administrator's breach of fiduciary duty, it is not the *only* one. As the Supreme Court held in *Varity*, plan participants and beneficiaries – like the

---

[6] As the Court knows, Plaintiffs asserted both of their claims in this case under **both** 29 U.S.C. § 1132(a)(1)(B) **and** § (a)(3). In relevant part, § 1132(a)(1)(B) provides a cause of action for participants and beneficiaries to "enforce [their] rights under the terms of [their] plan[s], or to clarify [their] rights to future benefits under the terms of [their] plan[s]." 29 U.S.C. § 1132(a)(1)(B).  Section 1132(a)(3)(A) allows a plan member to sue to "enjoin any act or practice which violates" ERISA or the member's plan, while § (a)(3)(B) provides for "other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of [ERISA] or the terms of the plan."  29 U.S.C. § 1132(a)(3).

Section 1132(a)(1)(B) also provides an action for participants to "recover benefits due . . . under the terms of [the] plan." Plaintiffs do not seek an award of benefits from the Court under this clause. UBH pounces on this fact and asserts that Plaintiffs "dropped *any* request for payment of plan benefits." Opp. at 7:14-15 (emphasis added).  This is simply incorrect. Plaintiffs are not asking *this Court* to determine or award benefits. But as UBH has well known from the start, payment of benefits is obviously one possible outcome of reprocessing. *See, e.g.*, Opp. at 7:16-8:3 (citing Plaintiffs' arguments, which make clear that the determination of whether particular class members are owed benefits will be made by UBH on reprocessing, not by the Court). If, after reprocessing, UBH determines that a class member is owed benefits, UBH must pay that class member pursuant to the terms of his or her plan.  That result flows inexorably from a remand for reprocessing, whether that relief is ordered under § (a)(1)(B) or § (a)(3).

[7] UBH even admits that these forms of relief are available under § (a)(1)(B), Opp. at 8:23-25, which makes the cases it cites – holding that remedies for ERISA violations are limited to those enumerated in the statute – entirely inapposite. *See* Opp. at 5:11-6:5 and cases cited therein.

1   class members here – can challenge an administrator's breach of fiduciary duty through an action

2   under § 1132(a)(3) seeking "other appropriate equitable relief." *See, e.g.*, *Varity*, 516 U.S. at 510.

3   Sections (a)(2) and (a)(3) thus provide alternative avenues for enforcing the fiduciary duties

4   ERISA imposes on plan administrators, depending on who was injured (the plan or the

5   participants). *Both* of those provisions enforce the fiduciary duties set forth in 29 U.S.C. § 1104.

6   *See id.* at 510-13; *see also* FFCL at 99-104 (¶¶ 193-206) (finding UBH breached the duties set

7   forth in § 1104.  And *both* of those provisions are derived from, and meant to build on,

8   traditional trust law principles. *See, e.g.*, *Varity*, 516 U.S. at 496-97 (fiduciary duties enshrined in

9   under ERISA "draw much of their content from the common law of trusts," except insofar as

10  Congress determined "that the common law of trusts did not offer completely satisfactory

11  protection"); *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110 (1989) ("ERISA abounds

12  with the language and terminology of trust law."); *Amara*, 563 U.S. at 439 (noting that "ERISA

13  typically treats" a plan fiduciary "as a trustee"). For that reason, when the Ninth Circuit instructs

14  that, under traditional trust law, courts "have a duty to enforce the remedy which is most

15  advantageous to the participants," *Donovan*, 716 F.2d at 1235 (quotation omitted), that

16  admonition is just as applicable to remedies ordered under § (a)(3) as under § (a)(2).[8]

17

18

19       UBH's further effort to artificially limit the Court's equitable authority under § (a)(3), by

20

---

21  [8] UBH's argument to the contrary relies heavily on the Supreme Court's decision in *Russell*,
    which observes that § 1132(a)(2) is "'the enforcement provision for' § 1109." Opp. at 6:14-25.

22  Plaintiffs, of course, are not seeking to enforce § 1109. Rather, they seek to do what the plaintiffs
    in *Varity* did, where the Supreme Court expressly distinguished *Russell* and held that it "does not

23  control, either implicitly or explicitly, the outcome" of a case in which plan participants seek to
    remedy, through § 1132(a)(3), their own injuries resulting from an ERISA fiduciary's breach of

24  fiduciary duty.  516 U.S. at 510.  Nothing in *Russell* "abrogated" *Donovan's* description of a
    court's duties under traditional trust law, as UBH claims, Opp. at 6:23-25, while later Supreme

25  Court authority makes clear that those traditional equitable principles apply in the context of
    § (a)(3) claims. *See, e.g.*, *Varity*, 516 U.S. at 512; *Amara*, 563 U.S. at 439 (because ERISA treats

26  plan fiduciaries as trustees, a suit by a plan beneficiary against the fiduciary "is the kind of
    lawsuit that, before the merger of law and equity" could only have been brought "in a court of

27  equity, not a court of law").

28

arguing the remedies available under that provision can only be used to enforce the terms of the plan as written, Opp. at 9:15-10:2, is also misguided. UBH relies on *McCutchen*, but ignores the fact that the Supreme Court explicitly limited its analysis in that case to the "kind of suit" in which a plan administrator sues under § (a)(3) specifically to enforce the terms of a plan. *See U.S. Airways, Inc. v. McCutchen*, 569 U.S. 88, 91 (2013).  The Court found that the administrator in that case was seeking to enforce an "equitable lien by agreement," *id.* at 98, in which "[t]he agreement itself becomes the measure of the parties' equities," *id.* at 100.  But § (a)(3), on its face, is not limited to violations of plan terms, but also gives participants equitable remedies when *ERISA itself* is violated, which necessarily includes equitable remedies to redress the type of egregious fiduciary breaches found by the Court in this case. 29 U.S.C. §§ 1132(a)(3), 1104. Moreover, in *Amara*, the Supreme Court held that a participant could obtain a reformation remedy under § (a)(3) and resulting benefits under § (a)(1)(B) even though payment of benefits was obviously inconsistent with the written terms of the un-reformed plan.  It did so because that form of relief was both equitable and appropriate to redress the defendant's misconduct. *Amara*, 563 U.S. at 440.[9] In any event, here, Plaintiffs seek to enforce both ERISA and the plan terms, since the plans all required UBH to evaluate whether services complied with generally accepted standards of care according to criteria that were themselves consistent with those standards.

### III.   UBH'S ARGUMENTS ABOUT THE MERITS AND CLASS CERITFICATION ONLY DISTRACT FROM THE COURT'S REAL TASK AT THIS PHASE OF THE CASE.

UBH spends most of its brief trying to pick off subsets of class members, claiming that

---

[9] UBH argues that reformation is unavailable here because Plaintiffs "did not bring a claim for plan reformation." Opp. at 9:18-21.  But neither did the plaintiffs in *Amara*, and the Supreme Court found that relief appropriate anyway.  *See* Third Am. Class Action Compl. for Declaratory and Injunctive Relief Under ERISA, ECF No. 165, *Amara v. Cigna Corp.*, No. 3:01-CV-2361 (MRK) (D. Conn. Feb. 17, 2006) at 18 (prayer for relief seeking declaratory and injunctive relief, along with "such other equitable and remedial relief as the Court deems appropriate. . . ."); *Amara*, 563 U.S. at 440 ("[W]hat the District Court did here may be regarded as the reformation of the terms of the plan . . . .").

1   for one reason or another, they are not entitled to relief – despite being members of a certified

2   class that proved UBH liable on the merits at trial.[10] UBH's tactic is completely improper.

3   Arguments about whether UBH is really liable to all the class members, about whether all the

4   class members were really injured in the same way, and about whether UBH has some defense it

5   could have raised (but did not) as to some class members are all beside the point now. The Court

6   currently has before it a certified class of more than 50,000 individuals who, the Court has found,

7   were injured by UBH's breaches of fiduciary duty and arbitrary and capricious benefit denials,

8   and the Court must figure out the best remedy for those people. UBH can appeal the Court's

9   class certification and liability rulings. But right now the parties, and the Court, should take those

10   rulings as a given and focus on the task at hand. All of UBH's arguments discussed in this

11   section fail to do so, and should be rejected for that reason alone. None of UBH's specious

12   arguments has any merit in any event.

### A.    The Court Should Disregard Arguments that Mischaracterize Plaintiffs' Claims and the Injuries Plaintiffs Seek to Remedy.

16      A familiar theme runs throughout most of UBH's opposition: UBH starts nearly every

---

[10] UBH also makes numerous caustic comments about Plaintiffs' "strategic choices" in this matter, as though Plaintiffs somehow erred or engaged in misconduct by bringing these claims on a class basis. *See, e.g.*, Opp. at 1:19-23; 14:9-15:8 & n.10; 20:2-5.  These attacks are unwarranted and have no basis in fact.  As Plaintiffs have explained elsewhere, Plaintiffs did not "discard" any claims, nor did Plaintiffs' counsel have any authority to discard absent class members' claims that were never certified. And as much as UBH might wish it were so, Plaintiffs did not deprive the class members of entitlement to relief in this case by seeking reprocessing instead of an award of benefits.  As shown herein, reprocessing *is* significant and appropriate relief that is available under ERISA.

UBH's citation to *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001), in its attack on Plaintiffs' legal strategy, Opp. at 15:6, is particularly befuddling. UBH does not explain what contention Plaintiffs are purportedly making now that is "contradictory" to an argument on which Plaintiffs previously prevailed. From context, it appears that UBH is drawing a distinction between Plaintiffs' request for the reprocessing remedy and an argument Plaintiffs made in connection with the class notice.  But Plaintiffs' positions are not contradictory.  Reprocessing is a sort of individualized remedy, in the sense that UBH will reprocess each denial separately. Just as a court could order individualized damages following certification under Rule 23(b)(3), the Court can order reprocessing here. That it benefits class members individually does not undermine its character as class-wide relief.

argument from the premise that only class members who were *actually owed* benefits suffered

any injury from UBH's misconduct, have any claim under ERISA, or could "conceivably benefit

from reprocessing." *See, e.g.*, Opp. at 4:7-11; *id*. at 20:6-8; *id*. at 35 n.26. Because of this

misguided focus, UBH argues that only a remedy that leads to payment of benefits can constitute

"actual relief" in this case. Opp. at 25:16.  Everything else, in UBH's view, is not just

unnecessary but legally barred.  *See, e.g.*, Opp. at 20:24-21:13 (arguing that only class members

who submitted post-service claims for benefits are "legally eligible for reprocessing"); Opp. at

23:13-14 (arguing that class members should be required to affirm additional facts because

Plaintiffs did not prove "that each class member was entitled to benefits that were wrongfully

denied. . .").

       The Court has consistently rejected UBH's myopic view of ERISA and the Plaintiffs'

claims.[11] It should do so again. This case is not about a mere accidental failure to pay benefits

due; nor is it a case about UBH's innocent misapplication of an appropriate standard. As the

Court found, UBH injured the class members in a much more nefarious way: by developing self-

serving and pervasively flawed Guidelines that restricted the scope of coverage available under

the class members' plans, and then denying coverage pursuant to those excessively restrictive

criteria.  *See* FFCL at 104 (¶ 204); *see also id*. at 42-88 (¶¶ 82-167).  *That* was the misconduct by

which UBH breached its fiduciary duties to the class. *See* FFCL at 99-104 (¶¶ 193-206).  *That*

---

[11] *See, e.g.*, Order Granting Mot. for Class Cert., *Wit* ECF No. 174 (Sept. 19, 2016) at 31-33, 54-
55; Order Denying Mot. for Leave to File Mot. for Recons., *Wit* ECF No. 181 (Oct. 12, 2016) at
5; Order re Joint Mot. for Approval of Notice Plan and [to] Amend Class Definitions, *Wit* ECF
No. 224 (Mar. 9, 2017) at 6; Order Granting in Part & Denying In Part UBH's Mot. for
Summary Judgment, *Wit* ECF No. 286 (Aug. 14, 2017) at 24-25; Trial Tr. at 1879:20-22 ("I
decided early on that they don't have to show that there's actually coverage for any particular
person. . ."); FFCL at 104 ¶ 204; Hr'g. Tr. (Mar. 29, 2019) at 11:7-11 (UBH would not be
allowed to file a Rule 52(c) motion "on the issue that we decided over and over again about
whether or not the plaintiffs had to prove that they would actually have. . . obtained the
benefits. . .  I've decided that already.); *id.* at 15:24-16:18 (permitting oral Rule 52(c) motion,
and denying it on the record "for the reasons stated in the previous rulings.").

1    misconduct is the reason UBH's denials of the class members' requests for coverage were

2    arbitrary and capricious. *Id*. at 105-06 (¶¶ 207-16). The class members were all injured in the

3    same way by *that* misconduct. *Id*. at 104 (¶204). Plaintiffs proved *that* misconduct at trial; and

4    *that* misconduct is what Plaintiffs seek to remedy with their proposed order.[12]

5         Despite the Court's repeated elucidation of these issues, UBH still refuses to litigate the

6    claims that Plaintiffs actually brought – and proved at trial. But UBH's refusal to face reality just

7    means that most of its arguments have no relevance to this case. None support its contention that

8    the class members should get no remedy at all.

9

10        **B.    The Court Should Disregard Merits Arguments that Contradict the
              Evidence at Trial.**

11        In support of its contention that reprocessing will not "benefit every member of the

12   certified classes," UBH recycles a merits-related argument from its Motion for Class

13   Decertification – i.e., that because limited portions of the LOCGs were either not challenged or

14   were found to be consistent with generally accepted standards of care, Plaintiffs did not prove

15   that UBH used "a wrong standard" with respect to every class member. Opp. at 11:17-14:8

16   (quotation omitted).[13] The Court should disregard this procedurally improper attack on the

17   Court's liability ruling. In any case, UBH is wrong, as Plaintiffs explained in response to the

18   Decertification motion:

19

20        Plaintiffs proved at trial that, in every year of the Class Period, the LOCGs'
         Common Criteria—the mandatory criteria all class members had to satisfy ***in full***

21

22   _____

23   [12] For the same reasons, UBH's reliance on cases about "tailoring" injunctive relief to the
     specific harm alleged is misplaced. *See, e.g.*, Opp. at 10:14-21, 27:28-29:3 (citing, *inter alia,*
24   *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991)). It is only by
     misconstruing the "harm alleged" that UBH is able to argue that the reprocessing injunction is a
25   bad fit. Viewing Plaintiffs' claims accurately, it is clear that the reprocessing remedy is
     appropriately tailored to redress the harm for which the Court found UBH liable.

26   [13] UBH also asserts that it is "undisputed that some class members were denied benefits based on
     criteria that are unchallenged." Opp. at 2:23-24.  That is absolutely untrue: there is no proof that
27   any class member's request for coverage was denied based solely on an "unchallenged"
     provision of the Guidelines, and Plaintiffs do dispute UBH's unproven assertion.

28

in order to obtain coverage, FFCL at 21-22 ¶¶ 43-44—were "riddled with requirements that provided for narrower coverage than is consistent with generally accepted standards of care." FFCL at 93 ¶ 183. Given that the mandatory, threshold criteria for coverage were holistically and fatally flawed, the weight of the evidence proved that all class members were subjected to improper criteria, as the Court found. FFCL at 19 ¶ 37; 21-22 ¶ 43. The presence of some discrete criterion that may not have been flawed (or was not challenged) does not change this critical fact.

Pls.' Opp'n to Def. UBH's Mot. for Class Decertification, *Wit* ECF No. 431 (June 14, 2019) (hereafter, "Decert. Opp'n") at 10 (footnotes omitted). UBH thinks the Court should have required Plaintiffs to tie each denial to a single corresponding criterion within the LOCGs, but that is not how UBH used the Guidelines or cited them in its denial letters. *See* Trial Ex. 894 (chart of UBH's denial letter citations to its Guidelines); FFCL at 21-22 (¶¶ 43-44) (holding that *all* mandatory criteria needed to be satisfied for UBH to approve coverage). Because UBH chose to cite the Guidelines as a whole, rather than specifying the particular criteria driving each denial, it cannot escape liability – or reprocessing – by arguing now that its denials were really based on something other than the pervasively restrictive criteria it cited in its letters and which the Court found to be inconsistent with generally accepted standards of care.

As it did before, UBH selects a couple of isolated phrases from the LOCGs that were not specifically discussed at trial, and contends that requests for coverage denied based *solely* on either criterion would not run afoul of the Court's ruling in this case.  Opp. at 12:1-18.[14]  This untimely argument is based on rank speculation that any such denials actually exist.  UBH did not offer this theory at trial or present any evidence of any denial based solely on either of the LOCG phrases it now highlights. Neither of the denials UBH cites (for the first time) in its Opposition explicitly mentions those criteria, either.  *See* Opp. at 13:7-18 (citing Trial Exs. 2018-

---

[14] UBH's string cite, Opp. at 12:5, misleadingly suggests that both phrases appear in the Guidelines in all years.  In fact, the first phrase appears in the Guidelines only in 2011-2013. *See* Trial Ex. 4-0008 (no requirement in 2014 LOCGs that "member's current condition can be most efficiently and effectively treated in the proposed level of care"); Trial Ex. 5-0008 (same in 2015); Trial Ex. 6-0009 (same in January 2016); Trial Ex. 7-0009 (same in June 2016); Trial Ex. 8-0007 (same in 2017). The second phrase appears from 2012-forward, but not in 2011.  *See* Trial Ex. 1-0005. As shown below, UBH evidently sought to obscure the fact that later Guidelines did not contain the first phrase, so that it could suggest that that criterion drove the denial of coverage for Member ID 6254.

0004 & Trial Ex. 1383).[15] Indeed, while UBH's discussion of Trial Ex. 2018 is designed to give

the misimpression that the denial was based on a criterion requiring that "[t]he member's current

condition can be most efficiently and effectively treated in the proposed level of care," *compare*

Opp. at 12:2-3 *with* Opp. at 13:9-10 (quoting denial letter's assertion that services were ███

█████████████, by the time UBH actually denied coverage to Member ID 6254, that

criterion had been ***removed*** from the LOCGs.  *See* Trial Ex. 2018-0003 (denial issued on May 8,

2015); Trial Ex. 5-0008-10 (2015 LOCG Common Criteria, which do not contain the

requirement that the "member's current condition can be most efficiently and effectively treated

in the proposed level of care"); Trial Ex. 880 ¶ 14.[16] Trial Exhibit 2018 does not support UBH's

argument.

     Nor does the denial of coverage to Member ID 9836. Under Plaintiffs' theory of the case,

that CDG-based denial is arbitrary and capricious if the Court finds that either of the two CDGs

cited by UBH incorporates the 2014 Level of Care Guidelines.  *See* Trial Ex. 1383 (Jan. 24, 2014

denial citing ███████████████████████████████████████████

████████████████████████████). Both of those CDGs instruct that coverage is

excluded if services are "not consistent with . . . [UBH's] level of care guidelines as modified

from time to time" and both direct the reviewer to UBH's Level of Care Guidelines for the

"scientific evidence, prevailing medical standards and clinical guidelines supporting our

---

[15] In fact, those two denials are a perfect example of UBH's uniformly high-level approach: the
more specific of the two letters references "██████████████████████████████████" thus
explicitly sweeping in all of the common criteria the Court found inconsistent with generally
accepted standards. *See* Trial Ex. 2018-0004. The other letter simply cites two CDGs by title.
*See* Trial Ex. 1383-0002.

[16] Furthermore, had UBH brought this denial up at trial, Plaintiffs would have pointed out that
the Peer Reviewer's analysis demonstrates that the *reason* the Peer Reviewer believed ████████
███████████████████████████████████████████████████
██████████████████" Trial Ex. 2018-0004.  But as the Court found, one of the ways UBH's
Guidelines deviated from generally accepted standards of care in 2014 through 2017 was that
UBH precluded coverage based on a lack of motivation.  *See* FFCL at 65-67 (¶¶ 125-128). Thus,
contrary to UBH's assertion, Opp. at 13:11-13, this denial *was* demonstrably based on one of the
criteria the Court found to be an abuse of discretion.  This denial provides no support for UBH's
contention that the defects Plaintiffs identified did not "impact" class members' denials.

determinations regarding treatment." Trial Ex. 880-0009 (¶¶ 30(a), (c)); Trial Ex. 880-0015

(stipulation as to language appearing in Trial Exs. 89 and 101).  The CDG for █████████

████████████ moreover, repeatedly cites the 2013 LOCGs.  *See, e.g.*, Trial Ex. 101-0016-

17; Trial Ex. 880-0009 (¶ 30(e)). In fact, that CDG contains some Level of Care Criteria that are

nearly identical to criteria the Court found defective in the corresponding LOCG. *Compare, e.g.*,

Trial Ex. 101-0016 (requiring finding that "[i]t is likely" that treatment "in the proposed level of

care will improve the member's presenting problems within a reasonable period of time") *with*

FFCL at 44-47 (¶¶ 85-90) (finding "presenting problems" requirement restricted coverage to

"treatment necessary to alleviate the patient's most immediate symptoms"); Trial Ex. 880-0009

(¶ 30(f)).[17] And while UBH has consistently (albeit incorrectly) insisted that there is no proof its

Peer Reviewers obeyed the CDGs' instructions to cross-reference the LOCGs, Member ID

9836's case provides direct evidence that they did.  The Case Notes created by the Peer

Reviewer who denied coverage state, "█████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████" *See* Ex. B hereto (case

notes for Member ID 9836) at 15; *see also id.* at 14 (████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████).[18]

---

[17] The denial letter's citation of ███████████████████████████████ does not
undermine Plaintiffs' claim – rather, it underscores the need for reprocessing. The denial letter
cites two CDGs, both of which incorporate an LOCG the Court has found inconsistent with
generally accepted standards of care. If the Court finds UBH's use of the CDGs to be wrongful
as well, it will be up to UBH to apply the appropriate criteria, as ordered by the Court, to the
clinical facts to determine whether coverage should have been approved. *See, e.g.*, *Saffle v.
Sierra Pac. Power Co. Barg. Unit Long Term Disability Income Plan*, 85 F.3d 455, 461 (9th Cir.
1996) ("[R]emand for reevaluation of the merits of a claim is the correct course to follow when
an ERISA plan administrator . . . misconstrued the Plan and applied a wrong standard to a
benefits determination.").

[18] UBH's effort to inject individualized clinical issues into the case now, long after trial, is
manifestly unfair and violates the parties' agreement, stipulated on the record at the Pretrial
Conference, that "neither party [would] offer evidence of the medical or claim review history of
any claim member, including. . . the claim sample members" because such evidence was not
relevant. Pretrial Conf. Tr. (Oct. 5, 2017) at 52:11-20. *See also id.* at 54:22-55:18 (reiterating
stipulation on the record, including agreement by UBH's counsel). For that reason, if the Court

1    The evidence showed that UBH's Guidelines were holistically more restrictive than

2    generally accepted standards of care, and that there is not a single class member (much less a

3    material number of them) whose claim was denied for reasons that had nothing to do with that

4    restrictiveness. Especially given that UBH's denial letters uniformly cite the Guidelines as a

5    whole, it would be particularly inequitable to allow UBH to capitalize on its own lack of

6    precision in those letters by denying reprocessing to all the members of the class. UBH's wholly

7    unsupported argument does not come close to precluding liability (as the Court has already

8    found), and it does not justify denying a remedy to any member of the class, either.[19]

       **C.    The Court Should Disregard Arguments About Whether the Class Was
9           Properly Certified.**

10       The Court gave UBH a chance to move to decertify the classes, which UBH took. *See*

11   United Behavioral Health's Notice of Mot. and Mot. for Class Decertification, *Wit* ECF No. 425

12   (May 3, 2019) ("Decert. Mot.").[20]  As Plaintiffs explained, UBH failed to meet its burden of

13   proof on that motion. *See generally* Decert. Opp'n, *Wit* ECF No. 431, at 5.  Nevertheless, many

14   of UBH's arguments in opposition to remedies now try to attack the propriety of relief for

15

16   _____

17   considers UBH's belated argument, not offered at trial or in post-trial briefing, that this
     member's individualized clinical information undermines Plaintiffs' claims, it should likewise
18   consider Plaintiffs' countervailing evidence.

19   [19] The fact that Plaintiffs overwhelmingly proved their claims at trial also makes UBH's citation,
     Opp. at 14 n.9, to a trio of cases all seeking remand for a "full and fair review" under § 1133(2) –
20   ***not*** § 1132(a) – in which the plaintiffs ***lost*** on the merits, particularly disingenuous. *See
     Giordano v. Thomson*, 564 F.3d 163, 168 & n.3 (2d Cir. 2009) (request for full and fair review
21   under § 1133(2) would be futile where plaintiff lost on the merits of his claims); *Krauss v.
     Oxford Health Plans, Inc.*, 517 F.3d 614, 630 (2d Cir. 2008) (remand under §1133(2) to remedy
22   nondisclosures would be futile where "the relevant information has been finally disclosed" and
     the "benefits determination, even if not properly explained at the time . . . was, as a substantive
23   matter, an appropriate implementation" of the plan); *Sage v. Automation, Inc. Pension Plan &
     Tr.*, 845 F.2d 885, 895 (10th Cir. 1988) (remand to remedy violations of § 1133(2) not warranted
24   where "[t]he merits of the partial termination issue have been correctly resolved"). These cases
     are all inapposite.
25

26   [20] The Court explicitly limited UBH to a total of 30 pages of briefing on the decertification
     motion. *Wit* ECF No. 423 (Apr. 1, 2019) (minute order specifying that no brief in connection
27   with the decertification motion could exceed 15 pages).  UBH has evaded that order by packing
     additional decertification arguments into its opposition to Plaintiffs' remedies brief. Plaintiffs
28   object to this gambit.

particular subsets of the certified classes. As noted above, this is both off-point and improper. The Court certified three classes in this case and found UBH liable to each class; the Court's task now is to decide what relief those classes – as a *whole* – are entitled to receive, not to pick the classes apart and individually determine which class member is entitled to which remedies. In any case, all of UBH's arguments lack merit.

### 1. Class Members Whose Denials Were Reversed on Appeal Are Entitled to Reprocessing.

UBH first recycles its decertification argument that class members whose denials were reversed after an administrative appeal purportedly were never injured, have no ERISA claim, and cannot obtain any relief. *Compare*, *e.g.*, Opp. at 27:3-28:15 (arguing that class members whose denials were reversed on appeal are not entitled to any relief) *with* Decert. Mot., *Wit* ECF No. 425 at 3:5-4:7 (arguing that such appeals justify decertification of the entire class).[21] This is incorrect because, as explained above, the injury this suit aims to redress is the development of self-serving, restrictive criteria that narrowed the scope of coverage available under the class members' plans and the use of those criteria to deny coverage. UBH's subsequent payment of benefits to a tiny minority of class members[22] *pursuant* to its self-serving Guidelines does not undo or render meaningless the ERISA violation at the heart of this suit: the development and use of the pervasively flawed criteria.

The only new gloss UBH offers on this argument is its contention that these class members' claims never "accrued" because the wrongful denials were not "final." *See* Opp. at

---

[21] Rather than repeating it in full here, Plaintiffs incorporate by reference their prior response to this argument. *See generally* Decert. Opp'n, *Wit* ECF No. 431.

[22] As Plaintiffs explained in response to UBH's Motion for Class Decertification, the evidence demonstrates that this argument applies *at most* to fewer than 3% of the class members. *See* Decert. Opp'n, *Wit* ECF No. 431, at 3 & n.2. Thus, even if UBH's argument were accepted, that would only mean that reprocessing unnecessary for the less than 3% of class members who *may* have received a full reversal of the benefit denial on appeal. But that would still leave over 97% of the class entitled to the reprocessing remedy.

27:27-28. But this argument, which invokes the administrative exhaustion requirement for ERISA claims, ignores the fact that exhaustion is not required for breach of fiduciary duty claims. *See, e.g.*, *Guenther v. Lockheed Martin Corp.*, Case No. 5:11-cv-00380-EJD, 2017 WL 976939, at *4 n.1 (N.D. Cal. Mar. 14, 2017); *Spinedex Physical Therapy USA Inc. v. United Healthcare of Ariz., Inc.*, 770 F.3d 1282, 1294 (9th Cir. 2014).  UBH also ignores the fact that, in an ERISA class action, only the class representatives need to exhaust. *See, e.g.*, *Des Roches v. Cal. Physicians' Serv.*, 320 F.R.D. 486, 500 (N.D. Cal. 2017).  The Court found after trial that the Named Plaintiffs exhausted their administrative remedies, thus satisfying this requirement on behalf of the class.  FFCL at 97 (¶ 190).[23]  Moreover, UBH *also* ignores the fact that the Court found exhaustion would have been futile in this case, because UBH *always* applies its Guidelines – including during administrative appeals.  FFCL at 97-98 (¶ 191).[24]

Plaintiffs' claims challenge the criteria UBH used to make its initial adverse benefit determinations, and its violation of the class members' plans and their ERISA rights was complete the moment it issued those denials.  As a result, the tiny minority of class members who eventually obtained some coverage after an administrative appeal had already been injured in the same way as the rest of the class, and they are entitled to the same court-ordered relief as any other class member. Even if reprocessing does not result in those class members receiving any additional benefits, they are still entitled to know the truth about their claims after faithful application of criteria that comply with their plans.

[23] UBH's reliance on *Heimeshoff* for this point is thus misplaced. Opp. at 27:27-28:3 (citing *Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 105 (2013)). That case was not a class action, and the question at issue was whether the sole plaintiff had failed to meet the statute of limitations applicable to her § 1132(a)(1)(B) claim for benefits due.  The Court observed that such a claim "does not accrue until the plan issues a final denial," 571 U.S. at 105, but did not make any effort to explicate, in full, the jurisprudence relating to administrative exhaustion, including the futility doctrine, let alone how exhaustion applies in the context of a class action. *Heimeshoff* is inapposite.

[24] As Plaintiffs have shown, UBH also followed this pattern with respect to the Claim Sample appeals it reversed.  *See* Decert. Opp'n, *Wit* ECF No. 431, at 4-5 & n.3.

### 2. Texas Members of the State Mandate Class Are Entitled to Reprocessing.

UBH also recycles from its decertification motion the argument that class members whose plans were governed by Texas law and who received substance use disorder treatment in Texas (the "Texas Members") should be excised from the *Wit* State Mandate Class. *Compare* Opp. at 28:17-29:3 (arguing that Texas Members of the State Mandate Class are not entitled to relief) *with* Decert. Mot., *Wit* ECF No. 425 at 14-15 (arguing that Texas Members should be carved out of the State Mandate Class).[25] As Plaintiffs have explained, UBH is flat wrong when it asserts that the State Mandate Class includes "individuals whose requests for benefits were properly reviewed using the TDI Criteria." Opp. at 28:19-20.[26]  ***By definition***, the State Mandate Class includes only individuals who were denied coverage "based upon UBH's Level of Care Guidelines or UBH's Coverage Determination Guidelines, and not upon the level-of-care criteria mandated by the applicable state law." *See* FFCL at 8-9 ¶ 13.[27] Thus, anyone whose request for coverage was properly reviewed under the TDI Criteria is explicitly excluded from the class.

UBH offers no reason to conclude that Texas Members should be refused a remedy for

---

[25] Plaintiffs incorporate by reference their prior response to UBH's arguments about the Texas Members. *See* Decert. Opp'n, *Wit* ECF No. 431, at 13-15.

[26] Nor did the Court so find, as UBH now implies. Opp. at 28:18-22. The Court cited evidence demonstrating that UBH *knew* it was supposed to apply the TDI criteria, and evidence demonstrating that UBH's Houston Care Advocacy Center was nevertheless applying UBH's own criteria. FFCL at 87-88 (¶¶ 165-167). The Court made no findings as to whether Trial Exhibit 255 (the "Class List") includes individuals who are not members of the State Mandate Class. Even assuming that the Class List currently reflects denials that do not meet the class definition, that fact would not impact the actual class definition; the Court's findings on liability; the class's entitlement to a remedy; or the Court's authority to order relief to the class. *See, e.g.,* Decert. Opp'n, *Wit* ECF No. 431, at 14-15 (explaining the difference between the class definition and the "Class List"). All it would mean is that the parties should work together to correct the Class List if needed.

[27] UBH also contends in a footnote that Plaintiffs failed to prove liability with regard to the Texas Members.  *See* Opp. at 29 n.20.  The Court found Plaintiffs proved "by a preponderance of the evidence that during the class period UBH violated Texas law by applying its own Guidelines to claims for benefits that should have been decided under TDI Criteria." FFCL at 88:16-19. A footnote in UBH's remedies brief is not the place to challenge that finding.

1  UBH's violations of ERISA and Texas law.[28]

2      **3.  Class Members Who Did Not Receive the Services for which UBH
           Denied Coverage Are Entitled to Reprocessing.**

3

4      UBH also argues that any class member who did not, post-denial, go on to obtain the

5  treatment for which she requested (and was denied) coverage is not "legally eligible for

6  reprocessing." Opp. at 20:12-21:13. UBH contends that, because such members cannot obtain

7  *benefits* through reprocessing, they are not entitled to reprocessing *at all*. *Id*. UBH cites no legal

8  authority to support this argument,[29] which, in effect, reduces the reprocessing remedy to a proxy

9

10  [28] UBH tosses into a footnote yet another argument it failed to include in its decertification
11  motion: that amending the class definition to exclude the members UBH has argued should not
   be in the class would transform the class into an impermissible "fail-safe" class.  Opp. at 29 n.21.
12  This is just wrong.  A fail-safe class is one in which the "class itself is defined in a way that
   precludes membership unless the liability of the defendant is established." *Kamar v. RadioShack*
13  *Corp.*, 375 F. App'x 734, 736 (9th Cir. 2010). For example, a failsafe class definition here might
   be, "any member to whom UBH wrongfully denied coverage." By contrast, the class definitions
14  ordered by the Court do not turn on a finding of liability, but rather on objective facts like the
   date of the denial of coverage; the level of care for which coverage was requested; and what
15  Guidelines UBH used in denying coverage. Amending the class definitions based on further
   objective facts (like whether a class member obtained coverage following an appeal or whether
16  the class member received substance use disorder services in Texas and sought coverage under a
   plan governed by Texas law) would not turn the class into a fail-safe class. The fact that UBH
17  has already been found liable is immaterial; the Court can amend the class definition at any time.
18  *See* Fed. R. Civ. P. 23(c)(1)(C).

19  [29] The cases on which UBH primarily relies, Opp. at 20:24-21:3, do not support its argument.
   They merely hold that plan participants cannot recover, through an action under § 1132(a)(1)(B),
20  the value of services they never received, because such recovery would amount to compensatory
   damages. *See Durham v. Health Net*, C-94-3575 MHP, 1995 WL 429252, at *1 (N.D. Cal. June
21  22, 1995) (characterizing Plaintiffs' request for value of services not received as prayer for
   "compensatory or restitutionary damages"); *Hamann v. Independence Blue Cross*, 543 F. App'x
22  355, 357 (5th Cir. 2013) (§ 1132(a)(1)(B) "does not permit the recovery of extracontractual
   damages or damages based on undue delay . . ."). These cases are inapposite because Plaintiffs
23  are not seeking damages.  The only payments Plaintiffs' proposed remedies order contemplates
24  is payment of benefits actually owed to members who received services and met the coverage
   criteria UBH is ordered to apply on remand, plus interest. *See* Ex. A (revised proposed order) at
25  § III.D.2.c.ii & III.E.

26  The *Davila* case also is not on point. *See* Opp. at 21 n.15 (citing, *inter alia*, *Aetna Health Inc. v.
   Davila*, 542 U.S. 200 (2004)). There, the Supreme Court applied ERISA preemption to uphold
27  removal of a case in which the plaintiffs challenged a denial of benefits, but only asserted state
   law claims for damages. *Davila*, 542 U.S. at 214. While the Court identified two ways the
28  plaintiffs could have sought relief under § 1132(a)(1)(B) (by paying out of pocket and seeking an

for benefits.

UBH's argument is a non-starter. For one thing, it is a brand new decertification argument – effectively asking the Court to create a subclass that will receive no retrospective relief – which UBH failed to raise in its motion to decertify, and on which UBH does not carry its burden of proof in any event. More fundamentally, UBH's argument misconstrues the full scope of the injury Plaintiffs seek to redress through reprocessing. Again, UBH injured every member of the class in the same way: by developing Guidelines that restricted the scope of available coverage under their plans and denying coverage pursuant to those pervasively flawed, self-serving criteria. This is true regardless of what came later – whether the member received the services and incurred expense, or forwent the services and suffered the consequences.  The injury at issue in *this* case was complete when UBH issued its denial.  And because that injury resulted from UBH applying the wrong standard to reach its determination, the appropriate remedy is remand for application of the correct standard to the clinical facts. *Saffle*, 85 F.3d at 461 ("[R]emand for reevaluation of the merits of a claim is the correct course to follow when an ERISA plan administrator, with discretion to apply a plan, has misconstrued the Plan and applied a wrong standard to a benefits determination."); *Pannebecker v. Liberty Life Assurance Co. of Bos.*, 542 F.3d 1213, 1221 (9th Cir. 2008) (describing reprocessing under *Saffle* as "remand to the administrator to apply the terms correctly in the first instance").[30]

---

award of benefits, or by seeking injunctive relief requiring coverage), the Court gave no indication that those options define the outer limits of that provision. *Id.* at 211-12. And the Court explicitly held that the scope of § 1132(a)(3) was not before it because the plaintiffs had refused to amend the complaint to assert any ERISA claims. *Id.* at 221 n.7. *Davila* thus provides no guidance on the appropriateness of a remand in this case.

[30] UBH also argues that class members who later obtained services at a *different* level of care "cannot possibly obtain benefits through reprocessing." *See* Opp. at 21 n.15. This is a red herring. Plaintiffs seek reprocessing of the denials at issue in this case (i.e., denials that meet the class definition), not denials of coverage at other levels of care. Even if, following UBH's denial of coverage, a class member did obtain services at a different level of care, for which UBH *also* denied coverage, that second denial is not part of the case unless it otherwise meets the class

UBH baldly declares that class members can only "even conceivably benefit from reprocessing" if they stand to recover benefits. Opp. at 20:5-9.[31] But UBH offers neither evidence nor legal authority to support its self-servingly narrow concept of what members stand to gain by enforcing their rights under ERISA to fair administration of their plans by a faithful fiduciary. After all, ERISA does not even guarantee *benefits* to any particular class member. What ERISA guarantees is fairness: the statute imposes on administrators like UBH fiduciary duties to administer plans *solely* in the interests of the participants and beneficiaries, and to do so prudently, loyally, and by exercising due care. *See* 29 U.S.C. § 1104. *That* is what UBH owes the class members, and *that* is what the Court should seek to restore to the class members through reprocessing.

UBH argues as though reprocessing is meaningless unless the class member gets paid. Plaintiffs disagree. Whether they ultimately obtain benefits or not, all class members can obtain something important through reprocessing: the truth. The truth about what their plans actually cover, and about whether the services their provider prescribed were, in fact, medically necessary and/or clinically appropriate and therefore should have been covered. And the class members can use that information in a number of ways that are consistent with ERISA's purpose – whether to support a complaint to a regulator or legislator; to pursue a new legal action against UBH or the class member's employer or plan to obtain different, individualized relief; to convince their employer to change administrators; or even just to have closure and peace of mind.

---

definition. (For example, if UBH denied coverage for residential treatment pursuant to its Guidelines, and then also denied coverage for intensive outpatient treatment pursuant to its Guidelines, *both* denials would meet the class criteria). But just as UBH must not be permitted to avoid reprocessing its improper denials by arguing that it later approved coverage for treatment at some other level of care, Plaintiffs do not seek to permit class members to re-open denials of coverage for levels of care not at issue in this case.

[31] UBH also asserts that Plaintiffs "concede" this point.  Opp. at 21:7-8. Quite the contrary: Plaintiffs recognize that some class members may not *obtain benefits* after reprocessing, but Plaintiffs still believe those class members *will benefit* from reprocessing, as explained above.

Moreover, it is not just the class members who need to know whether UBH got it wrong in their individual cases. UBH itself needs that information.  As UBH admitted at trial, decisions about coverage should turn, at least in part, on a patient's prior treatment and coverage history. *See, e.g.*, Trial Tr. at 724:14-21 (Dr. Triana admitting that it is important that UBH's electronic records are accurate and complete with respect to services it previously approved); *id.* at 945 (Dr. Martorana testifying that preparation for Peer Review includes studying the patient's "clinical chart"); *id*. at 964:22-25 (Dr. Martorana admitting that "it's important. . . to have a complete and thorough understanding of the totality of a member who's presenting themselves for treatment"). Moreover, generally accepted standards of care require UBH to know whether a patient received the care she needed in the past, because that information is relevant to determining the care she should receive in the present.  *See, e.g.*, Trial Tr. at 77:2-9 (Dr. Fishman testifying that the ASAM Criteria help organize a "broad comprehensive history" on a patient, including information about "their past history"); Trial Tr. at 501:4-22 (Dr. Plakun testifying that one of the dimensions considered under the LOCUS is "the treatment and recovery history"); Trial Ex. 656-0028 (CMS Guidance stating that factors affecting the outcome of treatment include "prior history"); Trial Ex. 641-0010 (APA Practice Guideline for the Psychiatric Evaluation of Adults guidance that "psychiatric history" includes "[p]ast psychiatric treatment"); Trial Ex. 644-0006 (CALOCUS dimension "Resiliency and Treatment History" measures, inter alia, "the extent to which the child or adolescent and his/her family have responded favorably to past treatment"). Right now, none of the class members' records are either accurate *or* complete, because the adverse determinations they reflect were based on the wrong standard.  Where, as here, members were denied coverage based on UBH's use of its improper and overly restrictive internal Guidelines (and thus, often, could not obtain treatment because they were unable to pay out-of-pocket for the services UBH improperly refused to cover), the fact that UBH's medical necessity

determination was based on an invalid standard will be an important part of the class members'

clinical histories going forward. [32]

UBH's open disdain for all of the non-monetary reasons why reprocessing is important

relief for all class members demonstrates that UBH still does not understand its role as a

fiduciary. As discussed further below, *see* § VII.D.1, *infra*, UBH just cannot fathom that its job

was (and remains) to act honestly, diligently, carefully, and *solely* in the interests of the plan

participants and beneficiaries for the *exclusive* purpose of providing benefits to them. Nor can

UBH seem to grasp that, having betrayed the class members' trust so thoroughly (especially in

the context of pre-service requests for coverage of behavioral health services), UBH must now

restore to them, as much as is presently possible, everything that they have lost – not just

benefits, but the diligent, careful and faithful processing of their claims pursuant to the plan

terms. Class members deserve to know, and UBH needs to know, which requests for coverage

were, in fact, consistent with generally accepted standards of case and which were not.

### 4. The Court Should Disregard UBH's New Arguments About Whether the Class is Ascertainable.

In support of its argument that UBH should only be required to reprocess claims of class

members who "affirm" certain "minimum facts" that UBH wrongly considers prerequisites to

reprocessing, UBH injects a back-door decertification argument related to ascertainability –

despite not making any such argument in its decertification motion. Specifically, UBH argues

that because "records of claims for payment . . . are stored in separate 'claims databases' that are

not connected to the coverage database that was used to create Trial Exhibit 255," without

---

[32] For example, Plaintiffs offered evidence at trial that, according to clinical studies, "undermatching" – or providing treatment to a patient at a lower level of care than is recommended by the ASAM Criteria – consistently leads to worse outcomes for the patient. *See* Trial Tr. 75:23-76:8 (Dr. Fishman). In light of that fact, going forward, UBH's clinicians will need to know whether a class member was previously undermatched in order to accurately assess the class member's prior reaction to treatment, level of motivation, level of resiliency, and so on.

putting the burden on class members to come forward with certain information, there would be

no way to "identify which class members are entitled to reprocessing." Opp. at 24 n.16.

First, any questions about the burden for establishing UBH's "minimum facts" are beside

the point, because none of those "facts" are prerequisites for reprocessing, as discussed above.

*See* § III.A, *supra*. Simply put, UBH wrongfully denied class members' requests for coverage,

and whether class members' medical providers issued invoices to them, or whether class

members had secondary insurance, etc., has no bearing on whether UBH must reprocess the class

members' wrongfully denied claims.

Second, UBH forfeited any such ascertainability argument by failing to raise it in its

opposition to Plaintiffs' certification motion or even in its recent decertification motion, perhaps

because UBH knew it is a losing argument. *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121,

1133 (9th Cir. 2017) ("[T]he language of Rule 23 neither provides nor implies that

demonstrating an administratively feasible way to identify class members is a prerequisite to

class certification.").

Third, even if one or more of the post-denial "facts" were relevant to determining which

class members' denials must be reprocessed, UBH's new evidence in support – a declaration

from Heather M. Bowden, a claims processing employee at UBH – should not be considered

because the trial record is closed. *See* Pretrial Conf. Tr. (Oct. 5, 2017) at 9:12-22 (directing

parties to submit all evidence, including evidence relevant to remedies, at trial). UBH was free to

call Ms. Bowden if her testimony were relevant to merits or remedy; she has been in her position

since 2015. *Wit* ECF No. 429-1 at ¶ 1.

Fourth, even if some of the "facts" UBH identifies are important – such as whether a

participant sought coverage for residential as opposed to inpatient treatment (i.e., whether the

participant meets the class definition) – at most, the Bowden Declaration suggests that pulling

together that information would require some "manual" work on UBH's part, because its

"claims" databases, which contain "claims for the actual payment of substance use and mental

health benefits," are not "electronically linked" with UBH's "ABD Systems," which "store

information regarding clinical benefit determinations." *Wit* ECF No. 429-1 at ¶¶ 3-4. Even if so,

1  that inconvenience is no reason to deny class members the core remedy conferred by ERISA:

2  reprocessing.

3        **D.**        **The Court Should Disregard Arguments UBH Has Long Since Waived.**

4        UBH offers yet another new decertification argument in disguise: its suggestion that

5  some class members may lack capacity to sue because they may have assigned some or all of

6  their ERISA rights to their providers. Opp. 24:19-25:8 ("[I]f a class member assigned his or her

7  rights to benefits under the ERISA plan to a provider, that member has no right to reprocessing,

8  which must be sought, if at all, by the provider to whom benefits were assigned.") (citing

9  *Spinedex*, 770 F.3d at 1293, and *DeMaria v. Horizon Healthcare Servs., Inc.*, No. 11-7298

10  (WJM), 2015 WL 3460997, at *5-9 (D.N.J. June 1, 2015)) .

11        The Court should disregard this argument for three independent reasons. <u>First</u>, the

12  argument goes to whether the class should have been certified as defined. Thus, UBH waived it

13  by not raising it in opposition to Plaintiffs' certification motion or even in its recent

14  decertification motion. <u>Second</u>, there is no evidence in the trial record to support the argument.

15  Although providers often request that patients sign a document that entitles the provider to direct

16  payment from an insurer, there is no evidence that a single class member formally assigned any

17  of the ERISA rights at issue here or gave up their own right to sue UBH for violating its

18  fiduciary duties. This is a fatal deficiency because, among other reasons, the Ninth Circuit

19  narrowly construes assignments. *See, e.g.*, *Spinedex*, 770 F.3d at 1293 (holding that although two

20  patient plaintiffs had assigned "the right to seek payment of benefits directly from their Plans,"

21  they had not assigned "their claims for breach of fiduciary duty"). In fact, the only evidence in

22  the record demonstrates that UBH's plans purport to bar assignments. *See, e.g.*, Trial Ex. 225-

23  073 (provision of Plaintiff Alexander plan purporting to bar such assignments).

24        <u>Third</u>, even if some class members assigned their rights to file lawsuits challenging the

25  precise denials at issue here, those assignments at most might affect who has a right to collect

26  benefit payments, not whether the claims should be reprocessed. Plaintiffs are not seeking an

27  order requiring payment of benefits to particular people – which also renders inapposite the

28  language in *Spinedex* that UBH relies on about "the right to seek payment of benefits," 770 F.3d

at 1293.[33] And although Plaintiffs believe that many claims will be deemed covered if UBH conducts reprocessing appropriately and in good faith, UBH is free to send any resulting benefits to a provider holding an assignment. Indeed, the Court could even specify in its remedies order that insofar as a class member has assigned his or her rights to pursue remedies for wrongful denials, any payments made through reprocessing should be directed to the applicable provider(s).[34]

In short, UBH's forfeited assignment argument should be disregarded; the mere possibility that some class members assigned to their providers the right to obtain benefit payments is irrelevant here.[35]

---

[33] *DeMaria*, the other case UBH cites, is inapposite for the additional reasons that (1) the named plaintiffs and class representatives there were providers only, and thus the question whether patients themselves would have *also* had standing was not presented; (2) by definition, the class included only patients who had signed a CMS Form 1500 and thereby "authorize[d] payment of medical benefits to the undersigned physician or supplier for services described below"; and (3) "[t]he preponderance of the evidence indicate[d] that Horizon accepted all Form 1500 assignments." 2015 WL 3460997, at *7-8.

[34] Similarly, if the Court shares UBH's belated concern about whether class members have assigned their rights to benefits, this concern can easily be addressed by modifying the class definition to include not only plan members, but also the valid assignees of such members.

[35] UBH's Article III standing argument, Opp. at 43 n.35, is equally baseless. As the Ninth Circuit has explained, "[w]hen evaluating [standing], we must look at the facts as they exist at the time the complaint was filed." *Slayman v. FedEx Ground Package Sys., Inc.*, 765 F.3d 1033, 1047 (9th Cir. 2014). All of the Named Plaintiffs were members of plans administered by UBH when their respective Complaints were filed. *See* FFCL at 2 ¶ 2("Each of the named Plaintiffs was at all relevant times a beneficiary of an ERISA-governed health benefit plan for which UBH acted as a claims administrator."); *see also* Wit Compl., *Wit* ECF No. 39, ¶¶ 39 (Wit), 52 (Holdnak), 116 (Pfeifer), 134 (Muir), 156 (Flanzraich); Tillitt Compl., *Wit* ECF No. 123, ¶ 1; Alexander Compl., *Alexander* ECF No. 1, ¶¶ 49 (Alexander), 76 (Klein), 94 (Haffner); Driscoll Compl., *Alexander* ECF No. 87, ¶ 1. Moreover, it is immaterial whether all of the Named Plaintiffs remain members of a plan administered by UBH. "If the district court certifies a class before the plaintiff's claim becomes moot, mooting the putative class representative's claim will not moot the class action." *Slayman*, 765 F.3d at 1048 (quotations omitted); *see also Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1090 (9th Cir. 2011) (explaining that mooting class representative's claim does not moot a class action because "upon certification the class 'acquire[s] a legal status separate from the interest asserted by [the class representative]'"). There was no dispute that, at the time the Court certified the classes, at least one representative for each class was a member of a plan administered by UBH—and that fact is sufficient to enable the class to seek prospective relief, even if some Named Plaintiffs subsequently changed administrators. In any case, as UBH well knows, Michael Driscoll, David Haffner, Cecilia Holdnak, Brian Muir, and Linda Tillitt all remain members of plans UBH administers. Brandt Pfeifer's company switched insurers, but

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**E.      The Court Should Disregard UBH's Post-Trial, Post-Discovery Assertions About Changes it Claims to Have Made to its Guidelines**

Without offering any proof whatsoever – not even a self-serving declaration – UBH claims to have voluntarily adopted as its clinical coverage criteria the ASAM Criteria, the Level of Care Utilization System ("LOCUS") and the Child and Adolescent Level of Care Utilization System ("CALOCUS").  *See* Opp. at 3:12-13 & n.1; 42:1-3. [36]  While Plaintiffs applaud UBH's concession that it should be using those standards, Plaintiffs urge the Court to disregard or at least heavily discount UBH's factual claims, for at least two important reasons.

<u>First</u>, the Court directed the parties to submit all evidence, including evidence relevant to remedies, at trial.  Pretrial Conf. Tr. (Oct. 5, 2017) at 9:12-22; *id.* at 21:2-3 ("[A]s I said, I want the evidence on remedy to come [in at] trial."). [37]  There was good reason for this requirement: the Court required all evidence to be offered through a witness who could explain its significance and whose testimony could be tested through cross-examination. Especially in light of the

---

only after the Court certified the State Mandate Class. Having laid in the weeds on this argument until after trial, UBH cannot fault Plaintiffs for failing to prove at trial facts that are beyond dispute, which easily could have been established by a stipulation.

[36] The Declaration of Kristin Clark mentions UBH's "adoption" of the ASAM Criteria, but only in passing. *See Wit* ECF No. 429-2 (Clark Decl.) at 2 ¶ 9. Ms. Clark is silent as to the supposed plan to adopt LOCUS, CALOCUS, and/or CASII.  The only other "proof" UBH offers is a 2018 announcement from its website about its plans to adopt the ASAM Criteria in 2019. *See* Opp. at 42 n.33. UBH offers no evidence at all about its current practices.

[37] In light of this admonition, it is particularly odd for UBH to criticize Plaintiffs for not mentioning these purported post-trial developments in their opening remedies brief. *See* Opp. at 5 n.2; *id.* at 42:6-8. As a threshold matter, UBH's opposition brief is the first time Plaintiffs have ever heard that UBH plans to "adopt" LOCUS, CALOCUS and/or CASII ; UBH's counsel did not so much as mention this in any meet-and-confer, and there is no other way Plaintiffs could have learned of this purported intention. Nor have Plaintiffs had any opportunity to obtain any discovery at all on any of UBH's post-trial Guideline changes, including adoption of the ASAM Criteria. UBH's counsel mentioned that UBH adopted those criteria, but Plaintiffs do not know whether or to what extent UBH is *actually* using them, let alone whether UBH is faithfully applying them in full. Moreover, in the parties' meet-and-confer, UBH refused to agree to anything at all – including use of the ASAM Criteria for reprocessing or going forward. UBH would certainly have objected had Plaintiffs simply asserted in their remedies brief, without referring to any trial evidence, that the Court should order UBH to use the ASAM Criteria because UBH has already adopted them. Now UBH complains because Plaintiffs relied *solely* on trial evidence to show that the Court should order UBH to use those criteria.

PLS.' REPLY IN SUPP. OF REQ. FOR REMEDIES
CASE NOS. 3:14-CV-02346-JCS; 3:14-CV-05337-JCS

1    evidence offered at trial of UBH's proven track record of selectively applying only portions of

2    the generally accepted standards it cites (including the ASAM Criteria and guidance from

3    CMS)[38] the Court should not simply accept that UBH has "adopted" new clinical criteria without

4    thoroughly testing that proposition and understanding, in full, with the benefit of expert

5    testimony if necessary, whether and how UBH's practices have purportedly changed.

6        Second, several of the arguments UBH asserts in opposition to Plaintiffs' proposed

7    remedies raise serious cause for concern about whether UBH is, in fact, faithfully applying the

8    ASAM Criteria.  For example, UBH asserts (without citing any evidence) that the "class

9    members' plans do not uniformly provide coverage for" the lower levels of ASAM residential

10   treatment. Opp. at 19:7-17.[39] But this assertion – that the plans it administers "do not cover"

11   lower intensity residential services consistent with ASAM levels 3.1, 3.3, and 3.5 – is

12   disconcertingly familiar to Plaintiffs.  This is exactly what Dr. Alam told UBH's consultant, Mr.

13   Shulman, when Mr. Shulman observed that UBH's criteria for residential treatment aligned only

14   with the *most* restrictive level of residential care under ASAM (level 3.7). *See* FFCL at 80 ¶ 152.

15   At the same time, UBH was misrepresenting to its regulators in Connecticut that its Guidelines

16   *did* include criteria for the lower intensities of residential treatment. *See* FFCL at 80-81 (¶¶ 153-

17   54).  If it were true that its plans simply did not provide coverage at those lower levels of service

18   intensity, UBH would surely have said so, rather than deliberately misrepresenting its criteria.

19   ────────────────

20   [38] *See, e.g.*, FFCL at 45-46 (62-64 (¶¶ 118-22) (finding that "UBH modified the language used in
     the CMS Manual to provide for more limited coverage. . ."); *id*. at 79-80 (¶ 152) (finding that
21   UBH's Guidelines for residential treatment of substance use disorders omit any criteria for
     lower-intensity residential services that would correspond to ASAM levels 3.1, 3.3, and 3.5).

22   [39] UBH misleadingly suggests that the Court "acknowledged" that "class members' plans do not
     uniformly provide coverage" for lower-intensity residential treatment. Opp. at 19:11-14. The
23   Court did not make any such finding, however.  What the Court found was that UBH's evidence
     was not "sufficient to establish that any class member's Plan excludes treatment at level 3.1,"
24   FFCL at 82 ¶ 155, and that UBH's "responses as to levels 3.3 and 3.5 are similarly
     unconvincing," *id*. ¶ 156. Although the Court noted that these arguments "might be relevant to
25   remedies," UBH makes no effort in its remedies brief to prove that its plans exclude coverage for
     the lower levels of residential treatment.

UBH has never offered evidence to support its assertion that the written terms of the plans it administers exclude coverage for lower-intensity residential treatment; and it certainly has not proven that they *all* do.[40]  Yet UBH effectively read that non-existent exclusion into *all* of its plans in order to justify its overly-restrictive criteria.  And, if its opposition brief is any indication, UBH is *still* doing *exactly the same thing* – except now, it is reading in an exclusion to justify applying only *part* of the ASAM Criteria, rather than faithfully applying all of those criteria.[41]  This state of affairs cries out for a strong remedial order, including the appointment of Special Masters.

    For these reasons, the Court should not accept at face value UBH's untested and unproven assertion that it has mended its ways.  All evidence in the record is to the contrary, and it demonstrates why it is so important for the Court to grant all the remedies requested.

---

[40] The evidence UBH cited in post-trial briefing did not prove this allegation. There, UBH pointed to a single plan and argued that its definition of Residential Treatment limited coverage to ASAM level 3.7 because the definition required the active participation and direction of a "Physician."  *See* UBH's Post-Trial Br. at 93 (citing Trial Ex. 225-0097).  But the definition of "Physician" on the same page of that plan states that "any health care provider acting within the scope of his or her license will be considered on the same basis as a Physician." Trial Ex. 225-0097.  This clearly means that, under this plan, residential treatment can be "clinically" rather than "medically" managed – meaning that the definition of residential treatment does *not* limit coverage to only ASAM Level 3.7. Moreover, the same plan explicitly covers a category of treatment it calls "Transitional Care," which includes Sober Living and Halfway Houses, two examples of level 3.1 residential treatment.  Trial Ex. 225-0099; *see also* Trial Tr. at 167:21-168:21, 257:7-258:3 (Dr. Fishman explaining that level 3.1 may refer to halfway houses in which there is a clinical component); FFCL at 82 ¶ 156.  Trial Exhibit 225, therefore, clearly does not limit coverage to services provided at the 3.7 level, as UBH contends, nor is there even a shred of evidence in the record of ***any*** plan that restricts residential treatment coverage so as to justify UBH's partial application of the ASAM Criteria.

[41] If a plan really did exclude coverage for treatment at a particular level of care, then UBH would deny coverage *pursuant to the plan exclusion*, not pursuant to the ASAM Criteria. UBH has a whole separate category of denial, "Not a Covered Benefit," which refers to situations "where the specific service or type of care being requested is not covered under the benefits." Trial Ex. 903-0005 (Bridge testimony at 66:17-19).  And of course, the denial letter would be required to state that the rationale for the exclusion is that the plan does not cover the particular type of treatment requested.  Instead, UBH's argument suggests that UBH is now ignoring the portions of the ASAM Criteria that relate to lower-intensity residential treatment, just as it did when developing its own highly restrictive Guidelines.

## IV.    UBH HAS ALREADY EXERCISED – AND ABUSED – ITS DISCRETION AND IS NOT ENTITLED TO A SECOND BITE AT THE APPLE.

UBH argues strenuously that affording the class members a remedy in this case would somehow "usurp" UBH's discretion. *See, e.g.*, Opp. at 2:17, 3:9, 3:17, 4:17-19,  39:17-41:12. But this argument fails to acknowledge the procedural posture of this case, in which the Court has already found that UBH *abused* its discretion, and is now required to remedy that abuse. In remanding the class members' adverse benefit determinations, the Court need not re-open the very application of discretion on which it found UBH liable (i.e., UBH's unreasonable interpretation of what the term "generally accepted standards of care" means); nor are there any grounds for the Court to re-open UBH's discretionary decisions about exclusions and limitations that were not the basis of the denials at issue and have no relevance in this case.

### A.    UBH Already Exercised its Discretion with Respect to the Meaning of the Class Members' Plans, and the Court Found that UBH Abused that Discretion.

UBH insists that it ought to have a second chance to exercise its discretion with respect to the meaning of "generally accepted standards of care" for making level-of-care decisions for mental health and substance use disorder treatment.[42] Opp. at 39:19-41:12. None of its arguments in favor of a second bite at the apple have any merit.

The Court has already found that UBH abused its discretion when interpreting the plan terms that required services to comply with generally accepted standards of care.  FFCL at 106 (¶ 212); *see also id.* at 42-88 (¶¶ 82-167). UBH brushes off this finding, and then relies primarily on cases addressing how a court should review a fiduciary's exercise of discretion in the first

---

[42] Of course, on remand, UBH will have the discretion to apply the class members' clinical facts to the criteria the Court orders UBH to use. It must exercise that discretion solely in the interests of the plan members and for the exclusive purpose of providing benefits to them. 29 U.S.C. § 1104.  It must not exercise that discretion in its own interest, or even in the interest of the plans it considers its customers. *Id.*

1    instance, *before* any such finding.  *See* Opp. at 40:15-25.[43] Those cases are all inapposite – UBH

2    is not writing on a blank slate. It must come to grips with the Court's abuse of discretion

3    findings.

4        UBH argues that the Court's findings somehow "do[] not change" UBH's entitlement to

5    the unfettered exercise of discretion going forward, Opp. at 41:1-12, but this is nonsensical and

6    the only other case UBH cites, *Conkright*, refutes its argument. *See Conkright v. Frommert*, 559

7    U.S. 506 (2010).  *Conkright* involved a situation in which the fiduciary had made a "single

8    honest mistake" in interpreting a plan term that had multiple reasonable interpretations.  *Id*. at

9    513; *see also id.* at 514 (describing administrator's error as "one good-faith mistake"); *id*. at 518

10   (reiterating that the administrator made "a single honest mistake"). The Court suggested

11   repeatedly, however, that it would not come to the same conclusion if "there is reason to believe

12   that [the administrator] will not exercise [its] discretion fairly." *Id*. at 514; *see also id.* at 515

13   (emphasizing that there had been no finding that the administrator "had acted in bad faith or

14   would not fairly exercise his discretion" going forward).  As the Court explained,

15

16           Multiple erroneous interpretations of the same plan provision, *even if issued in*
             *good faith*, might well support a finding that a plan administrator is too
17           incompetent to exercise his discretion fairly . . . .

18   *Id*. at 521 (emphasis added).

19       This case is infinitely more egregious than *Conkright*.  First, contrary to UBH's

20

21

22   _____

     [43] *See Hancock v. Montgomery Ward Long Term Disability Tr.*, 787 F.2d 1302, 1307-08 (9th Cir.

23   1986) (noting that a court will not substitute its judgment where a plan provision is "susceptible
     to more than one interpretation," but also explaining that "application of plan provisions clearly
24   in conflict with the plain language of the plan, should be found to be arbitrary and capricious");
     *Cator v. Herrgott & Wilson, Inc.*, 609 F. Supp. 12, 18 (N.D. Cal. 1984) ("if the provisions of the
25   Plan are susceptible to more than one reasonable interpretation, the Court must give way to the
     trustee's interpretation"); *Moyle*, 823 F.3d at 958 (noting that operative question is whether the
26   "administrator's interpretation is unreasonable"); *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105,
     117 (2008) (ERISA administrator's conflict of interest given more weight when there is evidence
27   that it affected administrator's decision making). The Court has already taken the approach
     prescribed by these cases, and found that UBH's interpretation was unreasonable and self-
28   serving. FFCL at 101-04 (¶ 199-203).

argument, Opp. at 40:11-18, there are not "multiple reasonable interpretations" of the "generally accepted standards of care," nor did the Court so find. The Court set forth, in detailed factual findings supported by testimony from **both sides'** experts, what the generally accepted standards of care are. *See* FFCL at 27-42 (¶¶ 57-81). The evidentiary record and the Court's findings foreclose any possibility that some other interpretation of "generally accepted standards" could be reasonable. The fact that the Court noted that those standards are reflected in multiple *sources* does not mean that those sources offer different versions of the standards – rather, all the sources the Court cited are in accord on what the standards are. *See* FFCL at 27 (¶ 57). Only UBH's Guidelines were out of step.

Second, even assuming there might be some other reasonable interpretation of this plan term, UBH did not offer any evidence at trial of what that reasonable interpretation might be (and it still offers none).  The only evidence at trial was undisputed evidence as to what the generally accepted standards are and undisputed evidence that the criteria Plaintiffs have asked the Court to order UBH to use are consistent with those standards. Indeed, UBH itself concedes that those criteria constitute a reasonable interpretation of the plan terms at issue. *See* Opp. at 40 n.30 (claiming to have "adopted" the ASAM Criteria, LOCUS and CALOCUS in the exercise of its discretion).  In contrast, in *Conkright*, the administrator came forward with an alternate, potentially reasonable interpretation of the plan term. *See* 559 U.S. at 511.[44]  UBH offers no alternative here: only the interpretation Plaintiffs ask the Court to fix in place.

Third, and perhaps most importantly, unlike the situation in *Conkright*, this Court did not find that UBH's adoption of an unreasonable interpretation of the plan terms at issue was a "single honest mistake." Rather, the Court found that UBH's adoption of its overly-restrictive criteria was a deliberate choice driven by UBH's financial self-interest. *See* FFCL at 90-96

---

[44] It is worth noting that, on remand, the Second Circuit also found that this alternate interpretation was unreasonable. *See Frommert v. Conkright*, 738 F.3d 522, 530 (2d Cir. 2013).

(¶¶ 174-89). The evidence showed that UBH intentionally manipulated and misrepresented its evidence base to justify interpreting the standards as narrowly as possible. *See, e.g.*, FFCL at 62-64 (¶¶ 118-220); *id.* at 45-46 (¶88) (describing evidence that "UBH knowingly and purposefully drafted its Guidelines to limit coverage to acute signs and symptoms"). The evidence showed that UBH misled its regulators and lied to its own consultants to try to cover up what it was doing. *See, e.g.*, FFCL at 80-81 (¶¶ 152-54). The evidence showed that this misconduct went on for year after year, throughout the six-year Class Period, affecting more than 50,000 class members covered under "thousands" of plans. *See, e.g.*, FFCL at 95 ¶188-89 (finding that on "numerous occasions" spanning from 2012 to 2016, UBH "refused to replace its standard Guidelines with ASAM Criteria," rejecting the recommendations of its own clinicians, "because it could not be sure that use of the ASAM Criteria would not increase BenEx"); FFCL at 42 ¶ 82 (finding UBH's Guidelines excessively emphasized acuity "in every version of the Guidelines in the class period"); Trial Ex. 255 (list reflecting at least 67,000 denials meeting the class definition). It is hard to imagine a situation less like the "one good faith mistake" at issue in *Conkright*. Based on the record in this case, it is not just appropriate, but *required* for the Court to correct UBH's interpretation of the generally-accepted-standards plan terms.

As the Supreme Court explained in *Conkright*, "[u]nder trust law, a trustee may be stripped of deference when he does not exercise his discretion honestly and fairly." 559 U.S. at 521 (quotations omitted); *see also id.* at 514 (noting that, according to a "leading treatise," a court "will strip a trustee of his discretion when there is reason to believe that he will not exercise that discretion fairly"). UBH has given the Court every reason to believe that it will not fairly interpret the plan terms requiring it to determine whether services are consistent with generally accepted standards. It must be stripped of its discretion to interpret those plan terms.[45]

---

[45] Obviously, UBH will still have discretion, going forward, to interpret all the *other* terms of the

**B.**     **UBH Already Exercised its Discretion to Determine that No Other Exclusions or Limitations Apply to the Class Members' Requests for Coverage.**

UBH also maintains that the Court must give UBH a chance to try to identify new grounds[46] to deny coverage to the class members, invoking both the discretion delegated to it by the plans and its obligation not to approve coverage contrary to plan terms. *See* Opp. at 31:13-33:14. But UBH skips right over the fact that it has *already decided* that no other exclusions or limitations apply to the class members' requests for coverage. *See, e.g.*, FFCL at 23 (¶ 48) (*first step in claims administration process is to "determine whether there is an administrative (i.e., non-clinical) basis to deny the request, such as a contractual exclusion for a particular form of treatment or a certain condition"). Moreover, it is easy to tell what UBH determined about those other exclusions and limitations. Both ERISA and UBH's own policies required UBH to list in the denial letter *all* of the reasons for denying coverage. *See* FFCL at 24 ¶ 50; *see also* Trial Tr. at 729:3-10, 731:1-4, 791:8-792:24 (Dr. Triana initially denying, then admitting that the denial letter is "intended to summarize all of the reasons for the denial"). 29 C.F.R. § 2560.503-1(g)(1)(i) (denial letter must "set forth, in a manner calculated to be understood by the claimant . . . [t]he specific reason or reasons for the adverse determination [and] [r]eference to the specific plan provisions on which the determination is based"). Thus, if some other exclusion or limitation also applied, the class member's denial letter would say so – in which case, Plaintiffs would have no objection to UBH continuing to enforce that plan provision (provided it does not

---

class members' plans.

[46] UBH argues strenuously that "nothing in *Harlick* would preclude UBH from denying benefits on any ground previously identified by UBH." Opp. at 32:19-33:3 (citing *Harlick v. Blue Shield of Cal.*, 686 F.3d 699, 719 (9th Cir. 2012)). Plaintiffs agree, which is why Plaintiffs asked the Court to preclude UBH from asserting only "***new*** grounds for denying coverage ***that it did not assert when it denied the claim***." Pls.' Br. at 15:24-25 (emphasis added). Plaintiffs recognize that, unlike their brief, their original proposed order was not specific enough on this issue; the revised proposed order submitted with this Reply corrects that inadvertent error. *See* Ex. A hereto at § III.C(i).

otherwise violate ERISA).[47] By the same token, if the denial letter does *not* reference any plan exclusion or limitation, and is based only on the Guidelines, UBH necessarily already decided no exclusions or limitations apply. Those decisions were not at issue in this case, and UBH does not offer any evidence that UBH abused its discretion when it interpreted and applied those other plan terms.  The Court can best respect UBH's discretion, therefore, by leaving undisturbed UBH's decisions that other exclusions and limitations have no bearing on class members' claims.

Even if it were true that UBH abused its discretion and/or failed to use due care with respect to some of the denials by failing properly to apply other exclusions or limitations, only the plans would potentially be injured if, as a result, UBH approved coverage that it otherwise might have excluded – not the class members, and certainly not UBH. If they have reason to do so, the plans can pursue their own actions against UBH. There is no justification, however, for this Court to effectively order relief to the plans for a fiduciary breach not alleged or proven in this case.  Looking at it a different way, there is also no reason for the Court to help UBH avoid the liability it may have to the plans if reprocessing leads to some *other* fiduciary breach being exposed.

In any case, *Harlick* itself demonstrates that, even if an administrator made a mistake about whether a person was entitled to coverage, the plan can still be ordered to pay benefits if

---

[47] As Plaintiffs have pointed out, UBH has never offered any evidence that it *did* cite other exclusions or limitations in denying any class member's claim. The only way to know if UBH, in fact, cited multiple reasons for any given denial is to look at the relevant denial letter. UBH will do that anyway when it reprocesses the claims. For that reason, UBH's complaint that it should not even have to reprocess any claim it denied on multiple grounds, Opp. at 33 n.24, is somewhat beside the point. The first step in reprocessing any denial will be to look at the original denial letter and the reasons previously cited for denying coverage; if UBH did, in fact, cite an enforceable (i.e., not illegal) exclusion, Plaintiffs agree the "reprocessing" ends there, and UBH's written notification to the class member only needs to inform that class member why the prior denial still stands. UBH will have to undertake the same task whether the Court calls it "ascertaining class membership" or "reprocessing." But especially since there is absolutely no evidence that UBH ever actually cited other exclusions in the class members' denial letters, Plaintiffs do not agree that the mere theoretical possibility justifies limiting the reprocessing order.

the administrator waived an argument by failing to raise it during the administrative appeals process. *See Harlick*, 686 F.3d at 721. The *Martinez* case, on which UBH relies, is not to the contrary. *See* Opp. at 33:11-14 (citing *Martinez v. Beverly Hills Hotel & Bungalows Emp. Benefit Tr. Emp. Welfare Plan*, No. 2:09-CV-01222-SVW-PLA, 2015 WL 12843760, at *6 (C.D. Cal. Oct. 29, 2015)). There, the court merely found that, if coverage is approved, the plan's financial terms and conditions apply as usual. The court reasoned that *Harlick* did not require an administrator, when denying coverage, to also explain how the financial terms and limitations would have applied if the claim had been approved. 2015 WL 12843760, at *6 (distinguishing between "entitlement to benefits (liability) and measurement of those benefits (calculation)"). But holding that, after being reversed by a court, an administrator can apply financial terms is quite different from holding that, on remand, an administrator can revive plan exclusions it previously failed to apply (or decided not to apply), and thereby waived. The Martinez case, therefore, does not support UBH's request for an across-the-board re-opening of the entirety of its discretionary decisions. [48]

UBH also offers no evidence whatsoever to support its speculation that supplemental clinical information submitted by the class members about their original requests for coverage could possibly justify the application of an exclusion or limitation UBH previously decided not to apply. UBH posits, for example, that new clinical facts might reveal that the requested level of care is "experimental," Opp. at 33 n.25, but it offers absolutely no explanation of how that could even happen. The levels of care at issue in this case – residential treatment, intensive outpatient treatment, and outpatient treatment – are widely prescribed and approved even by UBH, and there is no evidence UBH has ever found one of those levels of care to be "experimental," let

---

[48] Plaintiffs do not object to UBH applying deductible and co-insurance requirements in accordance with the class members' plans (where applicable). These are the only types of "limitations" on coverage that could conceivably become applicable only after a class member submits information about services obtained following a pre-service denial.

alone that such a determination could ever be based on clinical facts individual to particular

person, as opposed to scientific evidence generally applicable to the treatment in question. *Cf.,*

*e.g.*, Trial Ex. 225-0094 (defining Experimental or Investigational Service(s)).

Finally, UBH argues that because the proposed reprocessing order contemplates that the

class members will have an opportunity to appeal if UBH again denies the request for coverage,

UBH "must be permitted" to re-open all of its other decisions, even if they were not at issue in

this case.  Opp. at 32:10-18.  UBH's conclusion does not follow from the premise, however.  The

fact that the class members must be afforded ERISA appeal rights[49] with respect to the limited

decision UBH will be making on reprocessing (in case, on reprocessing, UBH misapplies the

generally accepted standards, miscalculates the benefits due to a class member, or makes some

other error), does not justify disturbing UBH's other discretionary decisions that are not at issue

in this case.[50]

### C.   UBH Claims it Already Exercised its Discretion by Adopting the Very Criteria Plaintiffs ask the Court to Order.

UBH also argues – without a hint of irony – that the Court *must* remand to UBH to

determine what criteria reflect a reasonable interpretation of the generally accepted standards of

care, Opp. at 18:12-19:4, even though the Court already made this finding at trial, FFCL at 27-29

(¶¶ 57-60), and even though UBH claims that it also ***already made that very determination*** and

that it came to the same conclusion as Plaintiffs and the Court. Opp. at 42:1-6. Even if the Court

---

[49] UBH mistakenly reads Plaintiffs' proposed order as requiring that all class members be granted a right of external appeal.  Opp. at 32 n.23. This was not Plaintiffs' intent; rather, Plaintiffs merely wish to ensure that all class members are afforded all rights of administrative appeal they otherwise would have had, up to and including external appeal where applicable. Plaintiffs suggest revisions to the proposed order to clarify the issue.  *See* Ex. A hereto at §§ III.D.1.a-b.

[50] Given UBH's extreme pattern of fiduciary violations found by the Court after trial, it is certainly not unreasonable for Plaintiffs to be wary of how UBH may reprocess the claims, which is precisely why (a) a Special Master is required and (b) class members should be entitled to pursue ERISA appeals of any new adverse benefit determinations issued after the reprocessing.

owed UBH a chance to "exercise" its discretion to reach the same conclusion as the Court did after trial – which it does not – UBH claims that it has done so, and admits that it should use (for reprocessing, *and* in its business going forward) the criteria Plaintiffs ask the Court to order it to use. *See* Opp. at 3:12-13 & n.1, 42:1-6.  UBH's demand that the Court nevertheless build into the schedule a "remand" to allow UBH to retrace its steps and re-adopt this decision is, frankly, inexplicable.

Equally inexplicable is the fact that, despite claiming that only UBH should have the discretion to interpret the plan terms requiring services to meet generally accepted standards, UBH now takes umbrage at the fact that Plaintiffs did not propose line edits to UBH's Guidelines as they existed at the end of the Class Period. Opp. at 40:1-9.[51]  Yet UBH claims to have replaced those Guidelines, now at least twice over (when UBH adopted its "2019 LOCGs" and when UBH decided to abandon its Guidelines in favor of the ASAM Criteria, LOCUS and CALOCUS).  Opp. at 41:19-42:8 & n.32. UBH does not explain what purpose line-edits would serve at this point.  UBH also ignores the fact that, at the Court's direction after trial, Plaintiffs painstakingly identified each and every provision in the LOCGs and Custodial Care Guidelines that Plaintiffs were challenging, and the reason for each challenge.  *See* Consolidated Claims Chart: UBH Guideline Provisions Challenged by Plaintiffs, *Wit* ECF No. 404-2 (Feb. 12, 2018) (chart showing Plaintiffs' arguments, UBH's responses, and Plaintiffs' reply as to each and every challenged criterion). The Court then made findings as to each and every challenge, agreeing

---

[51] UBH grouses that Plaintiffs supposedly broke a "promise" to submit line edits to the Court, citing a portion of the Joint Pretrial Order. Opp. at 41 n.31.  But in the very same paragraph of the Joint Pretrial Order, Plaintiffs stated two alternative remedies: *either* Plaintiffs would ask the Court to order UBH to use specific existing criteria (which Plaintiffs have now done) ***OR*** Plaintiffs would propose line-edits.  Joint Proposed Pretrial Order, *Wit* ECF No. 296 (Sept. 6, 2017) at 9-10. UBH cannot seriously suggest Plaintiffs broke a promise to the Court by electing the first of two options Plaintiffs clearly and transparently proposed prior to trial, particularly where the option Plaintiffs selected is the only one that makes sense based on the evidence offered at trial and the Court's post-trial findings.

1   with Plaintiffs on all but 6 items. *Compare*, FFCL at 42-78 (¶¶ 82-149) *with id.* at 57 n.14; 67

2   (¶ 129).  The Court, further, found that the Guidelines' over-emphasis on acuity was "pervasive,"

3   FFCL at 42 ¶ 82, and that the Guidelines were holistically "riddled with requirements that

4   provided for narrower coverage than is consistent with generally accepted standards of care."

5   FFCL at 19 ¶ 37; 21-22 ¶ 43; 93 ¶ 183. UBH's Guidelines cannot be salvaged, and UBH's

6   demand that Plaintiffs undertake a pointless effort to fix Guidelines that even UBH has

7   apparently abandoned is no more than a transparent attempt to build in additional delay.

8   **V.    UBH'S SELF-SERVING ARGUMENTS FOR CRIPPLING THE
        REPROCESSING REMEDY HAVE NO MERIT**

9

10            Under ERISA, relief for a breach of fiduciary duty is designed to return the plaintiff to

11   the position he or she would have been in had the administrator not breached.  *See, e.g.*, *Skinner*

12   *v. Northrop Grumman Ret. Plan B*, 673 F.3d 1162, 1167 (9th Cir. 2012) (ERISA calls for the

13   Court to "put the beneficiary in the position he or she would have attained" but for the

14   fiduciary's breach.); *Mathews v. Chevron Corp.*, 362 F.3d 1172, 1186 (9th Cir. 2004); *Gabriel*,

15   773 F.3d at 962 (explaining that "[t]he remedy [in *Mathews*] was 'appropriate equitable relief'

16   because it operated merely to provide the participants with the benefits they would have. . .

17   received but for the breach"). If UBH had not breached its fiduciary duties, and had applied

18   appropriate criteria from the outset, it would have had to collect, record, and use a much broader

19   set of clinical facts; many class members' claims would not have been denied on a pre-service

20   basis, such that information about the services actually received would have been made part of

21   UBH's clinical file; and UBH would have worked directly with the class member's provider to

22   obtain the necessary information to evaluate medical necessity, without the class member having

23   to submit a post-service claim.  In order to return the class members to the position they would

24   have been in absent UBH's breach, therefore, reprocessing has to provide the maximum

25   opportunities for completing the class members' clinical records, while imposing the minimum

26

27

28

possible burdens on the class members themselves. All of UBH's arguments are designed to do

the opposite – making it hard for the class members to participate in or benefit from the

reprocessing relief. As such, those arguments have no place in a discussion about the remedy that

is "most advantageous" to the class. *Donovan*, 716 F.2d at 1235.

### A.   UBH Offers No Valid Justification for Erecting New Obstacles to Class Members' Ability to Obtain Retrospective Relief.

UBH contends that the Court should impose an affirmative opt-in requirement on class

members before ordering UBH to reprocess their claims. Opp. at 23:11-26:24. According to

UBH, class members should be required to respond to a notice by "affirm[ing]" facts that, in

UBH's view, "qualify them for the reprocessing remedy." Opp. at 24:1-7.  UBH is wrong for

multiple reasons.

First, the facts UBH wants class members to "affirm" all go only to the class member's

entitlement to receive *benefits*.  *See, e.g.*, Opp. at 23:13-18 (arguing that affirmation is needed

because Plaintiffs did not prove "that each class member was entitled to benefits that were

wrongfully denied. . .").  As such, those facts are not elements of Plaintiffs' claims. *See* § III.A,

*supra.* Nor are any of the facts UBH cites part of the Class Definition. *Compare* Opp. at 24:1-7

*with* FFCL at 8-9 ¶ 13. Since none of those facts is relevant to class membership or liability, it

would be entirely inappropriate for the Court to condition class members' *relief* on any of those

facts, either.[52]  All members of the certified classes thus "qualify" for the reprocessing remedy.

---

[52] For the same reasons, the cases UBH cites are inapposite. In each one, the plaintiff sought payment of benefits for services he or she did not actually receive. *See Durham*, 1995 WL 429252 (pre-*Amara* individual case seeking award of benefits for treatment the member did not receive after denial); *Hamann*, 543 F. App'x at 356-57 (where member died before receiving treatment, family could not obtain through § 1132(a)(1)(B) the value of the benefits he would have received had coverage been approved); *Dailey v. Blue Cross & Blue Shield of Kansas City*, No. 17-01036-CV-W-ODS, 2019 WL 539119, at *7 (W.D. Mo. Feb. 11, 2019) ("Plaintiff is not entitled to payment for benefits not received – i.e., the cost of receiving care at a lower level care facility from which Plaintiff did not seek any treatment."). Plaintiffs do not seek any payment of benefits for services not actually received, so there is no reason to require *every* class member to make an "affirmation" about whether they did or did not receive services. Under Plaintiffs'

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>Second</u>, UBH is wrong when it argues that a class member's claim would be moot if he or she obtained some benefits after UBH's denial, whether from some other insurer or through an administrative appeal.[53] Opp. at 24:5-15. As explained above, those class members were still injured by UBH when it breached its fiduciary duties by using its improper Guidelines to deny their requests for benefits, and the subsequent receipt of money from some other source does not redress the injury at issue in this case. *See* § III.A, *supra*.[54] The same is true if a class member went on to obtain the services without being billed by his or her provider, Opp. at 24:15-19; the original injury (the narrowing of the scope of coverage under the class member's plan) remains un-remedied even if the hypothetical class member was able to obtain services without incurring expense.[55]

<u>Third</u>, UBH is also off base when it raises the specter of assignments, which merely call

---

proposed order, class members who wish to seek benefits for the services they did receive will submit evidence of those services.

[53] There is absolutely no evidence in the record that any class member obtained benefits from some other insurer for the services UBH refused to cover. Opp. at 24:5-10. The Court should reject UBH's rank speculation on this issue. UBH cites to a single class member's plan, *id*. at 24:13-15), but offers no evidence that the class member had other, primary insurance.

Nor should the Court draw any conclusions from UBH's alleged lack of records sufficient to allow it to apply any coordination of benefits provisions on reprocessing. *See* Opp. at 24 n.16. Even if the Court considers UBH's belated declaration (which it should not, *see* § III.E, *supra*) all that evidence shows is that UBH does not maintain the records it needs to be able to apply all of the terms of its members' plans.  The Court should not reward UBH for its lack of due care.

[54] Because UBH mischaracterizes both the injury this case seeks to remedy, and the remedy requested, its "mootness" cases – in which the plaintiffs sought an award of benefits that had already been paid to them – are also inapposite.  *See* Opp. at 24:11-13, 28:2-8; *Silk v. Metro. Life Ins. Co.*, 310 F. App'x 138, 139 (9th Cir. 2009) (in case seeking award of benefits, payment of benefits mooted the claim "to such benefits"); *Pakovich v. Verizon LTD Plan*, 653 F.3d 488, 492 (7th Cir. 2011) (holding that the plaintiffs "benefit claim became moot when the Plan paid it in full"). No class member has already obtained the relief requested herein.

[55] Again, UBH offers no evidence at all that any class member received services for which he or she was never billed. UBH cites a single denial letter stating ██████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████ " Opp. at 24:16-19 (citing Trial Ex. 1286-0002), but UBH does not offer any evidence at all about what happened to that member afterward.

1    for UBH to pay out-of-network providers directly, rather than sending benefits to the plan

2    member.[56] If UBH had timely raised this argument (which it did not, *see* § III.D, *supra*),

3    Plaintiffs would have pointed out at trial that, to the extent the class members' plans permit

4    assignments at all, [57] they require UBH's consent.[58] Thus, if an enforceable assignment exists,

5    UBH necessarily already has it in its own records, and any benefits due can be paid to the

6    provider as per UBH's usual procedures. If UBH does not have one in its records, there is no

7    need to demand that the class member affirm that none exists.

8         <u>Finally</u>, the Court should reject UBH's invitation to convert this class action, at this late

9    date, to an opt-in class action. For one thing, Rule 23 does not even provide for opt-in classes.

10   *See, e.g.*, *McElmurry v. U.S. Bank Nat'l Ass'n*, 495 F.3d 1136, 1139 (9th Cir. 2007) (contrasting

11   collective actions with class actions because "once the district court certifies a class under Rule

12   23, all class members are bound by the judgment unless they opt *out* of the suit") (original

13   emphasis). For another, the Class Notice previously approved by the Court informed the class

14   members that, if they did not opt out, they would be bound by the judgment and permitted to

15   participate in any relief the classes obtained:

16        As a class member, you will be bound by any judgment or settlement, whether
17        favorable or unfavorable, in this lawsuit. Thus, **as a class member, you will be
         able to participate in any relief obtained in the case**. . . . If you do not ask to be

18   ──────────────────

19   [56] As noted above, UBH's remedies brief is *way* too late to raise this issue for the first time. *See*
     § III.D, *supra*.

20   [57] Many class members' plans contain anti-assignment clauses making clear that, even if UBH
     normally pays providers directly, it has no obligation to do so.  *See, e.g.*, Trial Ex. 243-0082
21   (reserving discretion as to whether to honor provider assignments); Trial Ex. 231-0114 (same);
     Trial Ex. 235-0148 (provision entitled "No Assignment of Benefits"); *id* at -0154 ("Any attempt
22   to effect [an assignment of Benefits payable under the Plan] will be void");

23   [58] *See, e.g.*, Trial Ex. 225-0073 ("You may not assign your Benefits under the Policy to a non-
     Network provider without our consent."); Trial Ex. 227-0075 (same); Trial Ex. 231-0128 (same);
24   Trial Ex. 233-0078 (same); Trial Ex. 231-0119 ("Any benefits under this Certificate are not
     assignable by any Member without Our written consent."); Trial Ex. 237-0086 (same);  Trial Ex.
25   231-0114 (assignment requires provider to submit a completed claim form);  Trial Ex. 239-0058
     (requiring written authorization for direct payment to provider); Trial Ex. 241-0046 (same).

1    excluded from the Class now, you will not have the right to seek exclusion later,
     such as at the time of settlement or judgment.

2    Notice of Pendency – Wit Guideline Class, *Wit* ECF No. 235-1 (Mar. 31, 2017) at 3 (emphasis

3    added); *see also Wit* ECF No. 235-2 at 3 (form of notice to *Wit* State Mandate Class); *Wit* ECF

4    No. 235-3 at 3 (form of notice to *Alexander* Guidelines Class).  Having assured the class

5    members of their ability to participate in the class's relief and admonished them that they would

6    not be permitted to opt out after the deadline, it would be particularly inequitable for the Court to

7    impose an opt-in procedure on the class members and deny them relief if they fail to meet the

8    new requirement.

9         Nor should the Court be drawn in by UBH's blasé assurance that responding to the notice

10   would not be burdensome for the class. Opp. at 25:9-26:14 & n.17. That is not the point.  Here,

11   all class members are entitled to reprocessing for the reasons discussed above, so there is no need

12   to weed out any class members by limiting the relief to those who affirmatively respond with

13   information indicating that they are entitled to such benefits.[59]  It is not hard to understand why

14   UBH wants to impose an "affirmation" requirement on the class members: even if class members

15   only had to affirm criteria that were actually relevant, requiring class members to "opt in" will

---

[59] For that reason, UBH's reliance on *Marcus v. Bowen* is misplaced. Opp. at 25:12-19 (citing
*Marcus v. Bowen*, No. 85 C 453, 1989 WL 39709, at *1 (N.D. Ill. Apr. 18, 1989)). There, the
whole point of requiring class members to request a redetermination was specifically to weed out
class members who would be unlikely to qualify for the relief the Court ordered.  1989 WL
39709, at *5 ("[W]e do not expect an unwieldly number of cases requiring payments under this
order. The effort required to find those claimants and pay them their entitlement does not warrant
a redetermination of every possible claimant . . . ."). Here, all class members are entitled to
reprocessing *as their remedy.*

*Potter v. Blue Cross Blue Shield of Mich.*, No. 10-CV-14981, 2013 WL 12183410 (E.D. Mich.
Nov. 4, 2013), is also distinguishable. Opp. at 25:20-26:14. There, the court permitted the
administrator to solicit additional information from the class members because it agreed that the
administrator did not have information in its files that was necessary to determine class
membership. 2013 WL 12183410, at *3. Here, there is no dispute that UBH's files contain all the
requisite information needed to determine class membership based on the Class Definitions
ordered by the Court.

almost certainly dramatically shrink the number of class members who end up obtaining relief. *See, e.g.*, John Bronsteen, Class Action Settlements: An Opt-in Proposal, 2005 U. Ill. L. Rev. 903, 909 (2005) ("[P]eople simply do not reply to notice letters . . . ."); Scott Dodson, An Opt-in Option for Class Actions, 115 Mich. L. Rev. 171, 184–85 (2016) (noting that, according to a 1974 study, "an opt-in mechanism would result in class sizes from around 40-70% smaller than opt-out classes"). Particularly where no additional information is needed to determine whether class members should obtain a reprocessing remedy, the Court should not grant UBH's self-serving request.

### B. UBH Offers No Valid Reason Why Class Members Should Be Barred from Submitting Additional Information About their Requests for Coverage.

UBH insists that reprocessing must be limited to the existing administrative record, Opp. at 29:5-31:10, but none of its arguments justify proceeding in such a deliberately blind manner.[60]

### 1. The Court Should Permit Class Members and their Providers to Submit Additional Clinical Information, and UBH Should Make an Effort to Obtain Missing Information.

UBH first argues that there is no evidence that its clinical records are incomplete, as its clinicians were supposed to collect a wide variety of information. Opp. at 30:1-15.  What the record actually proves, however, is that the *rules of decision* under UBH's criteria turned on a considerably narrower range of facts than under generally accepted standards, FFCL at 78 (¶ 149); *see also id*. at 42-78 (¶¶ 82-149), creating persuasive circumstantial evidence that UBH's clinicians did not always collect or record all of the facts needed to render a decision under different, generally accepted criteria. This risk is sufficiently serious that it makes sense to permit class members to supplement the record with additional information.

---

[60] It is truly ironic – or perhaps just a reflection of UBH's continued pattern of self-serving behavior – that on one hand UBH argues that it should be entitled to search out new and previously unidentified bases for denials during reprocessing, while on the other hand it wants to prevent class members from submitting additional evidence in support of their claims. UBH should remember that we are only here because the Court has already found UBH to have breached its fiduciary duties under ERISA.

1   UBH purports to invoke a "rule" that reprocessing must be "based on the medical

2   evidence previously submitted," citing the *Duarte* case on which Plaintiffs relied. Opp. at 29:9-

3   13 (citing *Duarte v. Aetna Life Ins. Co.*, No. SACV 13-00492-JLS (RNBx), 2014 WL 1672855,

4   at *10 (C.D. Cal. Apr. 24, 2014)).  But UBH should have kept reading: the *Duarte* court

5   remanded for re-evaluation based on the existing record, but also directed the administrator to

6   "support its decision . . . with detailed findings" and "appropriate medical evidence including . . .

7   a more recent MRI, and any other clinical tests Aetna deems appropriate." 2014 WL 1672855, at

8   *10.  Far from stating a rule that would preclude supplementing the record, *Duarte* stands for the

9   proposition that on remand, the administrator has a duty to ensure that its decision is supported

10  by appropriate evidence, even if that means collecting new evidence.

11  UBH also claims (without support) to have the "discretion" to decide whether to

12  supplement the record in the event that facts are missing. Opp. at 30 n.22. There is no legal

13  authority for this proposition; to the contrary, an administrator's decisions must be based on

14  "substantial evidence," *see, e.g.*, *Hancock*, 787 F. 2d at 1307, so UBH cannot simply choose to

15  make a determination on an incomplete record. If necessary information is missing, the claims

16  regulation requires UBH to notify the participant of what information to submit to perfect the

17  claim. 29 C.F.R. § 2560.503-1(f)(2)(iii)(A) & (B) (if claimant has not provided necessary

18  information, administrator's notice to claimant must "specifically describe the required

19  information"); 29 C.F.R. § 2560.503-1(g)(iii) (adverse benefit determination must include "a

20  description of any additional material or information necessary for the claimant to perfect the

21  claim and an explanation of why such material or information is necessary"). Thus, even if UBH

22  did have discretion to refuse to consider additional evidence (which it does not), it would clearly

23  be an abuse of that discretion to refuse to supplement the record with necessary information and

24  then to deny coverage on the grounds that UBH lacks sufficient information to make a decision.

The Court's reprocessing order must preclude such an inequitable outcome, which would allow UBH to benefit, at the class members' expense, from its own failure to collect the necessary information.

UBH also contends that it should not have to make any effort to obtain facts missing from the record due to its own failure to collect the information the first time around, on the theory that "the law and the class members' plans place the onus . . . on the member, not UBH." Opp. at 30:18-25. But UBH forgets that its own Utilization Management Program Description adopts a different policy, requiring a Care Advocate to "make at least two (2) attempts to gather needed information" *before* initiating the process of denying a claim for lack of information.  *See, e.g.*, Trial Ex. 260-0013.  UBH does not point to any reason why that same requirement should not apply here, especially when the class members are not at fault for any information being omitted from UBH's records.

### 2.    The Court Should Permit Class Members to Submit Evidence of Services Received Post-Denial

UBH also takes issue with the idea of allowing class members to submit documentation of services they received at the requested level of care *after* UBH's denial of coverage (e.g., after a pre-service denial), on the theory that this documentation would amount to "new" claims that are "untimely." *See* Opp. at 21:16-23:9. If accepted, UBH's position would create a manifest injustice: class members who were denied coverage on a pre-authorization (i.e., pre-service) basis under UBH's self-serving and excessively restrictive standard, who went on to obtain covered services, but who were not sophisticated (or stubborn) enough to nonetheless submit a futile post-service claim for benefits (which UBH would have administratively denied due to a lack of pre-certification anyway), would now be left without any means to obtain the benefits they would have been owed if not for UBH's misconduct.

Thankfully, the Court need not tolerate such unfairness. Appropriate equitable relief

1  under § (a)(3) includes an order directing UBH to deem the submission of this evidence timely –

2  for example, by modifying its records to reflect that the claims were submitted earlier. That is

3  exactly what the Ninth Circuit held in *Mathews*: there, the district court ordered the plan

4  administrator to "modify the plan records" to reflect that the plaintiffs "were involuntarily

5  discharged as of the date of their separations" so that the plaintiffs would be eligible for a

6  particular plan benefit.  362 F.3d at 1186.  The Ninth Circuit upheld the order, reasoning that it

7  "simply put[] [the plaintiffs] in the position they would have been had [the administrator] not

8  breached its fiduciary duty . . . ." *Id.*; *see also Gabriel*, 773 F.3d at 962 (explaining that "[t]he

9  remedy [in *Mathews*] was 'appropriate equitable relief' because it operated merely to provide the

10  participants with the benefits they would have . . .  received but for the breach"). Likewise, here,

11  an order requiring UBH to modify its records to reflect that the claims were timely submitted

12  would merely put these class members in the position they would have been in if UBH had not

13  improperly denied their pre-service requests, by giving them an opportunity to seek coverage for

14  the services they actually received.[61]

15  
16           As the Court observed in *Mathews*, this relief is similar to the order upheld in *Varity*.

17  There, the defendant deceived employees into leaving one benefit plan and joining another plan

18  associated with a newly-formed subsidiary that had taken on the parent company's money-losing

19  divisions. The new subsidiary promptly went into receivership, and those employees who had

20  voluntarily switched plans lost their benefits. *Varity*, 516 U.S. at 494. The Court agreed that

21  defendant's actions in inducing employees to switch plans violated the defendant's fiduciary

22  
23  
24  _____

[61] Lest UBH object, this remedy does not involve reformation of the plans.  Plaintiffs do not ask
25  the Court to remove the time limits otherwise contained in the plans.  Rather, Plaintiffs ask the
   Court to direct UBH to modify its records to deem the "new" claims timely filed. The remedy
26  does not entitle any class member to benefits for which they were not eligible or did not have
   coverage; it merely affords them an opportunity to have all of their claims fairly determined.
27  *See, e.g.*, *LaMantia v. Voluntary Plan Adm'rs, Inc.*, 401 F.3d 1114, 1120 (9th Cir. 2005) ("the
   only impact on Lucent's ERISA plan is the extension of time to make application for certain
28  benefits. No variation in the terms of benefits or their application is implicated.").

duties under ERISA. *Id.* at 506. As "appropriate equitable relief" under § (a)(3), the lower court "order[ed] that [defendant] reinstate its former employees into its own plan (which had continued to provide benefits to employees of [defendant's] profitable divisions)." *Id.* at 495. That remedy was affirmed by the Court of Appeals and then the Supreme Court. *Id.* at 492.

Moreover, courts regularly waive timeliness requirements when appropriate based on the defendant's conduct, under both § (a)(3) and even § (a)(1)(B). *See, e.g.*, *Chappel v. Lab. Corp. of Am.*, 232 F.3d 719, 727 (9th Cir. 2000) ("In cases of inadequate notice, the usual remedy is to allow the plaintiff to file a late appeal and to construe it as timely.").[62] *See also Des Roches*, 320 F.R.D. at 505 (class members must "have the opportunity to have his or her claim reprocessed under criteria that conform to generally accepted standards" – including their claims for preauthorization – and then an "***opportunity to seek*** 'actual benefits' ***after*** reprocessing.") (emphasis added); *Flom v. Holly Corp.*, 276 F. App'x 615, 617 (9th Cir. 2008) ("As a result of the remand, MetLife was required to allow [plaintiff] to submit additional information and to consider that information in evaluating his claim for benefits."); *Gorbacheva v. Abbott Labs. Extended Disability Plan*, 309 F. Supp. 3d 756, 763 (N.D. Cal. 2018) ("Following the remand, Plaintiff's counsel submitted 869 pages of new medical records . . . ."); *Puccio v. Standard Ins. Co.*, 80 F. Supp. 3d 1034, 1042 (N.D. Cal. 2015) ("Plaintiff's claim is remanded to the plan administrator for reconsideration of plaintiff's entitlement to LTD benefits. The plan administrator shall allow plaintiff to supplement her file with any additional medical records necessary to evaluate her disability."); *Magee v. Metro. Life Ins. Co.*, 632 F. Supp. 2d 308,

---

[62] In *Chappel*, the Ninth Circuit addressed a situation where the defendant-fiduciary failed to inform the plaintiff of a mandatory arbitration clause, and the time limit for seeking such arbitration. The court held that, if the plaintiff proved the fiduciary "failed to provide timely and effective notification of his right to arbitration and the time in which he had to act to preserve that right," then the plaintiff would be entitled to "to file an out-of-time demand for arbitration." 232 F.3d at 727. Here, the Court has already found that UBH breached its fiduciary duties. Analogizing to *Chappel*, this Court – even if it accepts the premises of UBH's argument – can clearly permit the submission of "out-of-time demand[s]" for benefits.

1   321 (S.D.N.Y. 2009) (quoting *Miller v. United Welfare Fund*, 72 F. 3d 1066, 1071 (2d Cir.

2   1995)); *Shannon v. Jack Eckerd Corp.*, 113 F.3d 208, 210 (11th Cir. 1997).

3        UBH's sole authority, *A.F. v. Providence Health Plan*, does not help UBH's cause. That

4   case considered the issue of claim-submission solely under § 1132(a)(1)(B).  *See* 157 F. Supp. 3d

5   899, 910-912 (D. Or. 2016). Contrary to UBH's misleading description of *A.F.*, the court did not

6   categorically reject the possibility that relief in an ERISA case can include requiring the

7   administrator to adjudicate post-service claims that were not submitted in the wake of a wrongful

8   preservice denial. Rather, the court found on summary judgment that (1) the plaintiffs were owed

9   reimbursement for the submitted claims; and (2) there was a material dispute as to whether other

10  claims had been submitted. The *A.F.* plaintiffs sought the payment of benefits, and it makes

11  sense that, in a suit asking the Court to award the benefits, those requests must be submitted to

12  the administrator before they can be brought before the court. But *A.F.* had no occasion to

13  consider how a reprocessing injunction should work, because that was not the sought-after relief.

14  Even more importantly, *A.F.* did not address – even as a theoretical matter – whether injunctive

15  relief under § 1132(a)(3) could extend to un-submitted or late-submitted benefit claims.[63]

16       Those questions *are* addressed by cases like *Varity* and *Mathews*, which authorize the

17  Court to order UBH to consider this additional information. Here, UBH violated its fiduciary

18  duties by denying preauthorization to class members based on flawed guidelines – improperly

19  asserting that those members' services would not be covered under their plans. As a result, the

20  class members forewent submitting claims for benefits that, to any reasonable person, would

21  have been a complete waste of time. *See Ballas v. Anthem Blue Cross Life & Health Ins. Co.*,

---

[63] UBH also briefly references *Amara*. *See* Opp. 23:6. It is true that *Amara* found that the lower court was incorrect to issue a remedy that essentially "alter[ed]" plan terms ***under § 1132(a)(1)(B)***. 563 U.S. at 436. But the remainder of that decision described how the lower court could achieve the same result ***under § 1132(a)(3)***, even though it would mean that the plan would end up paying claims that were not authorized by the un-reformed plan's terms. *Id.* at 438-42. *Amara* actually supports Plaintiffs' position.

Case No. CV 12-00604 MMM (FFMx), 2013 WL 12119569, at *11 (C.D. Cal. Apr. 29, 2013) ("[Plaintiff] must first prove that [the challenged policy] is invalid *before he can submit a claim for reimbursement*.") (emphasis added). Indeed, UBH would simply have denied them based on the lack of preauthorization if they were submitted. Now, after class members have been induced to forego an opportunity to submit such claims for benefits, UBH asks this Court to deny them "[any] remedy at all," *Varity*, 516 U.S. at 515, with respect to those claims. Nothing in ERISA's statutory text or case law supports this inequitable result. This Court can and should exercise its "broad and flexible" equitable remedial powers under § (a)(3) to fashion the remedy "most advantageous" to the beneficiaries that UBH has wronged. *Donovan*, 716 F.2d at 1235. Again, ERISA calls for the Court to "put the beneficiary in the position he or she would have attained" but for UBH's breach. *Skinner*, 673 F.3d at 1167. This restoration of rights can only be achieved by allowing a class member whose preauthorization claim was wrongfully denied to submit benefit claims for services he or she subsequently received.

Supplementation is especially needed when, as here, the administrator's misconduct stymies development of the administrative record for subsequent claims. Whether the issue is framed as "new claims" (as UBH tries to do here) or simply submission of new information, the bottom line is the same: the claimant gets to take steps that would otherwise be untimely. After all, ERISA is meant to protect beneficiaries – *not* to allow faithless fiduciaries like UBH to hoodwink them into forfeiting rights. *See also Shaw v. McFarland Clinic, P.C.*, 231 F. Supp. 2d 924, 929-31, 942 (S.D. Iowa 2002) (awarding plaintiff *benefits* for administrator's improper denial of preauthorization; no suggestion that the plaintiff submitted post-service claims).

### C.   UBH Should Pay Pre- and Post-Judgment Interest if it Determines a Class Member is Entitled to Benefits.

As Plaintiffs explained, pre- and post-judgment interest is "presumptively" available to victims of federal law violations, *Rivera v. Benefit Tr. Life Ins. Co.*, 921 F.2d 692, 696 (7th Cir.

1  1991) – including in the ERISA context, in which permitting a claims administrator to pocket

2  interest earned on wrongfully withheld benefit payments would be anathema to the remedies and

3  policies of ERISA. *Fotta v. Trs. of United Mine Workers of Am., Health & Ret. Fund of 1974*,

4  165 F.3d 209, 212 (3d Cir. 1998). UBH's sole argument for why class members who are

5  revealed through reprocessing to be owed wrongfully withheld benefit payments is that the Court

6  will not be *ordering* payment of benefits, but rather reprocessing. That is a non-sequitur. A

7  plaintiff or class member's entitlement to prejudgment interest turns on whether he or she has

8  been denied "the time value of money," *Rivera*, 921 F.2d at 696 – which, as to class members for

9  whom reprocessing results in an entitlement to payment of benefits, UBH does not dispute – not

10 whether the payment obligation arises from an order to pay benefits or a remand order to

11 determine whether benefit payments are owed. *See also, e.g.*, *Robertson v. Standard Ins. Co.*,

12 No. 3:14-cv-01572-HZ, 2015 WL 13682034, at *2 (D. Or. Nov. 13, 2015) (in ERISA case,

13 ordering payment of prejudgment interest because "[m]oney has a time value, and prejudgment

14 interest is therefore necessary in the ordinary case to compensate a plaintiff fully for a loss

15 suffered at time t and not compensated until t + 1") (quoting *Hopi Tribe v. Navajo Tribe*, 46 F.3d

16 908, 922 (9th Cir. 1995)) (internal citations omitted). If class members obtain new benefits as a

17 result of the reprocessing remedy, which would be ordered to address UBH's fiduciary duty

18 violations, an award of interest on the improperly withheld benefits would be entirely appropriate

19 and consistent with the fundamental purpose of ERISA.

20       **D.**    **UBH is Correct that the Reprocessing Order Should Not Be Limited to Trial Exhibit 255**

21       UBH argues that Plaintiffs' proposed reprocessing order is "overbroad" because it calls

22 for UBH to reprocess each denial on Trial Exhibit 255 (the "Class List"), which UBH claims

23 contains an unspecified number of denials that do not meet the criteria for membership in the

24 class. Opp. at 28:24-29:1. Although UBH's argument about Texas Members of the State

25 Mandate Class is incorrect, *see* § III.C.2, *supra*, UBH inadvertently raises a valid point. Because

26 class membership is dictated not by the Class List, but by the Class Definition, the reprocessing

27

28

53

order should reflect the latter.  *See* Decert. Opp'n, *Wit* ECF No. 431, at 14-15 (explaining the difference between the Class List and the Class Definition). That is, UBH should be required to reprocess all denials meeting the Class Definition, regardless of whether the denial is currently listed on the Class List.  *See* Ex. A hereto (redlined version of Plaintiffs' proposed remedial order).

When UBH produced the data from which the Class List was generated, UBH represented that it contained "a complete list of adverse benefit determinations" that "correspond to the type of clinical denials at issue in this litigation." See Trial Ex. 897-0002, -0005 (¶¶ 7, 9, 19). The parties further stipulated that the Class List offered into evidence at trial as Trial Exhibit 255 represented the parties' good-faith effort to identify adverse benefit determinations meeting various criteria, *see generally* Trial Ex. 896, which correspond to the elements of the Class Definitions. *See* FFCL at 8-9 (¶ 13).  Since the trial, however, the parties have agreed that some class members' denials were inadvertently omitted from the list, and the parties are continuing to evaluate whether other denials have been omitted. It is also reasonable to assume that, among the more than 67,000 denials listed on Trial Exhibit 255, there may be a small number that do not, in fact, meet the applicable Class Definition.  In fact, the parties stipulated that 170 of the denials reflected in Trial Exhibit 255 were erroneously included and do not meet the class criteria. *See* Trial Ex. 896-0004 (¶ 5). Any errors on Trial Exhibit 255, of course, do not undermine the class's entitlement to relief, nor do they suggest the class is not ascertainable.  But these facts do support tailoring the reprocessing order to cover the specific denials that meet the Class Definition, rather than relying solely on the contents of Trial Exhibit 255.

> **E.     UBH Should be Held to Tight Interim and Final Deadlines.**

Finally, UBH strongly objects to the deadlines Plaintiffs set forth in their proposed order, arguing that reprocessing all of the class members' claims will take "8,375 full-time equivalent days" to complete, and that UBH would need 280 reviewers to finish within 30 days.  Opp. at

37:9-12.  As a threshold matter, UBH's complaints about the burden or difficulty associated with reprocessing 67,000 requests for coverage, Opp. at 36:20-37:20,  should be directed at itself, not Plaintiffs; the reason there are so many improperly denied coverage requests is because UBH consistently elevated its own self-interest over its members' interests throughout the six-year Class Period. The fact that UBH now must devote resources to remedying its egregious fiduciary breaches is the natural result of the Court's findings and is entirely consistent with ERISA.

In any case, UBH's argument as to the time it will take to complete reprocessing is not supported in the record. Dr. Martorana testified that a "medical necessity review" involving a phone call with the member's provider typically takes 30 minutes to complete, including "writ[ing] it up." Trial Tr. 1101:8-11.  He also testified that UBH's peer reviewers "need to do about eight peer reviews per day." *Id*. at 1101:5-7. This, of course, evidences a quota requirement, but it does not necessarily indicate that a peer reviewer *could not* conduct more than eight reviews in a day.  If each review takes 30 minutes, then it ought to be possible to complete closer to 14-16 reviews in a normal 8-hour workday. Nor is this testimony elucidating as to how long it usually takes UBH to complete a *post-service* review, which consists largely of reviewing documents rather than speaking with anyone on the phone.

Plaintiffs' proposed 30-day deadline for completing a reprocessing review is derived directly from the ERISA claims regulation, which requires an administrator to make a determination on a post-service claim within 30 days.  29 C.F.R. § 2560.503-1(f)(2)(iii)(B). Plaintiffs do not object to allowing slightly longer overall timeframes, so long as UBH is required to proceed diligently.[64]  Plaintiffs have proposed revisions to the reprocessing deadlines

---

[64] UBH's argument that it requires a delay of some unknown length to "adopt" criteria it purportedly has already decided to adopt, Opp. at 35:16-36:19, raises serious doubt about whether UBH will move forward expeditiously. In any case, the Court should not buy in to UBH's claims that state regulators' notice or approval requirements justify postponing the remedies in this case. As UBH admits, whatever process if was required to follow after

in their proposed order.  *See* Ex. A at §§ III.a.3, VI.2. If the Court imposes only an aggregate

deadline for completion of all reprocessing, Plaintiffs request that the Court require additional

interim reporting so that Plaintiffs can take prompt action if UBH fails to progress with

reprocessing in a timely manner.  Plaintiffs do not agree, however, that the Court should issue a

remedies order that contains no deadlines at all.  The class members have waited years for this

case to be completed, and UBH must be required to move swiftly once the remedy is ordered,

particularly in light of the Court's findings after trial, which show that UBH – to put it mildly –

can hardly be trusted to act in good faith.

## VI.    PLAINTIFFS ARE ENTITLED TO DECLARATORY RELIEF.

UBH asks the Court to deny, wholesale, Plaintiffs' request for declaratory relief, Opp. at

54-55, but neither of its rationales has any merit.

First, UBH cites no legal authority for its contention that the proposed declarations are

improper simply because they are drawn from the Court's Findings of Fact and Conclusions of

Law.  Opp. at 54:10-20.[65] The declarations do not fail to "'clarify[] and settl[e] the legal relations

---

"adopting" the ASAM Criteria is already complete. *See Wit* ECF No. 429-2 (Clark Decl.) at 2 ¶ 9 (complaining that one regulator took four months to confirm UBH's adoption of the ASAM Criteria). Even if the same process also takes four months with respect to UBH's use of LOCUS and CALOCUS, the process is apparently already underway. *See* Opp. at 35:18 (asserting that UBH already approved use of those criteria). In any case, UBH offers no reason why it could not move forward in the many states that do *not* require prior approval of its clinical criteria.

[65] None of UBH's cases contains any such holding. *See* Opp. at 54:10-20 and cases cited therein. UBH's citation to *Hurd* as though it enunciates such a rule is particularly disingenuous.  There, the district court granted summary judgment for the defendant on the plaintiff's request for declaratory relief, reasoning that a declaration would "require findings of fact and law identical to those necessary to support a damages claim." *Hurd v. Garcia*, 454 F. Supp. 2d 1032, 1054 (S.D. Cal. 2006). But the court was not stating a general rule against declarations that summarize separate findings; rather, the court had just granted summary judgment on all of the plaintiffs' claims for damages, *id*. at 1045, 1047, 1050-51, 1053, and was merely pointing out that the plaintiff in that case was equally unable to prove his claim for declaratory relief. Neither *Washington* nor *Bilbrey* supports UBH's position, either.  *See United States v. Washington*, 759 F.2d 1353, 1356-57 (9th Cir. 1985) (upholding portion of declaratory relief; vacating declarations that were "imprecise in definition and uncertain in dimension" and amounted to a "general admonition" to comply with an existing treaty); *Bilbrey ex rel. Bilbrey v. Brown*, 738

in issue . . . [or] afford relief from the uncertainty and controversy faced by the parties,'" *id.* 54:7-10 (quoting *Washington*, 759 F.2d at 1356-57), nor are they "duplicative," *id.* 54:15, just because the Court set forth its reasoning in a separate opinion issued before final judgment.[66]  In fact, that is exactly what happened in *Washington*: the district court granted the plaintiff's motion for summary judgment on its requests for declaratory relief, then directed the parties to "file a proposed order consistent with the factual findings and legal conclusions stated in its opinion." *See* 759 F.2d at 1356. The Ninth Circuit *upheld* one of the two resulting declarations, finding that "declaratory judgment on the issue clarifies and settles the legal relations of the parties and affords relief from a precise dispute identified in the proceedings." *Id.* at 1357-58.  Yet UBH now cites a nearly identical procedural posture as a reason to deny declaratory relief. The Court should reject that baseless argument.

Second, UBH claims that declaratory relief under § (a)(1)(B) is "inherently forward-looking," and "must 'clarify [class members'] rights to future benefits. . .'" Opp. at 54:21-56:2. Although UBH clearly concedes that declaratory relief is available under § (a)(1)(B), it provides no explanation for why such relief would be limited only to the clause on "clarifying rights to future benefits," and not also be available pursuant to the clause on "enforcing rights under the terms of the plan."  Nor does UBH cite any authority that supports its argument.[67]

---

F.2d 1462, 1470 (9th Cir. 1984) (reversing district court's denial of declaratory relief and finding district court's conclusion that declaration would "serve no useful purpose" was incorrect because district court had "look[ed] entirely upon the [defendant's] point of view and not at the propriety of the relief to which the [plaintiffs] were entitled.").

[66] UBH's other argument in this vein, that the declarations would "require findings of fact and law identical to those necessary to support the Court's existing FFCL," Opp. at 54:14-20, is circular and makes no sense. The Findings of Fact and Conclusions of Law support the declaratory relief; there is no need to make those findings again.

[67] *Firestone* does not say that declaratory relief under § (a)(1)(B) is limited to one clause. *See* 499 U.S. at 108 (observing in *dicta* that declaratory relief is available "to obtain a declaratory judgment of future entitlement to benefits" but not purporting to address the full scope of declaratory relief available under the statute).  And the *Williams* case is not even an ERISA case, making it inapposite. *See Williams v. Bank of Am.*, No. 2:12-CV-2513 JAM AC PS, 2013 WL

Without discussing any of the declarations Plaintiffs actually request, UBH argues that because the declarations are drawn from the Court's findings, which UBH says addressed "*past* plan terms and *past* UBH conduct," the declarations have no relevance to the class members' rights to future benefits.  Opp. at 54:21-55:16.  But the declarations set forth the Court's findings with respect to the generally accepted standards of care for making level of care placements, thus clarifying the meaning of a term found in *all* the class members' plans throughout a period spanning at least six years. Ex. A hereto (revised proposed order) at §§ I.5-7. UBH preposterously faults Plaintiffs for failing to introduce, at trial, evidence proving that their plans continue until today to condition coverage on generally accepted standards, Opp. at 55:12-13, even though the relevant documents did not exist during the trial, and even though UBH knows that its plans continue to contain these terms. This is why UBH did not submit a declaration claiming that none of the class members' plans now condition coverage on such standards; it is easily proven that they do. *See, e.g.*, Ex. C hereto (2019 Driscoll Plan) at 124, 130-31 (Covered Health Services "must be. . . in accordance with Generally Accepted Standards of Medical Practice"); Ex. D hereto (2019 Holdnak Plan) at 152-3, 158 (same); Ex. E hereto (2019 Muir Plan) at 72, 77 (same); Ex. G hereto (2019 Tillitt Plan) at 129, 136 (same).[68]

In addition, insofar as the declarations the Plaintiffs request refer to UBH's "past" conduct, they set forth a six-year "history of biased claims administration." *See Glenn*, 554 U.S. at 117. As such, the declarations will be relevant to the court's determination of the appropriate standard of review in future cases brought by class members against UBH. *Id*. In that sense, the declarations are forward-looking even though they refer to past conduct.

---

1907529, at *5 (E.D. Cal. May 7, 2013).

[68] UBH can hardly complain about Plaintiffs' submission of this evidence, which (unlike the new declarations UBH submitted with its brief) was not available to Plaintiffs at the time of trial. UBH should not be permitted to affirmatively mislead the Court about matters within its knowledge (like the terms of the class members' plans), and preclude Plaintiffs from submitting evidence showing the Court the truth.

Even if Plaintiffs could not obtain this kind of "backward-looking" declaratory relief under § (a)(1)(B), that relief is plainly available under § (a)(3).  UBH does not argue (nor could it) that a court of equity lacked the power to issue declaratory relief merely because the relief was "backward looking." Instead, UBH again applies the whipsaw, arguing that although (according to its overly-restrictive reading) Plaintiffs cannot obtain declaratory relief under § (a)(1)(B), Plaintiffs are also barred from obtaining relief under § (a)(3) merely because the former provision "allows for declaratory relief." Opp. at 54 n.38.[69]  That argument is untenable for the reasons explained above.  *See* § II.A, *supra*.

UBH also objects on the ground that two of Plaintiffs' proposed declarations do not accurately capture the Court's findings.  *See* Opp. at 56:3-23.  Plaintiffs respond to UBH's arguments as follows:

*Declaration #20*: UBH contends that this proposed declaration misstates the Court's findings.  Plaintiffs agree that it is more accurate to use the phrase "during the Class Period" rather than "throughout the Class Period" to describe the timeframe in which the Court found UBH violated Texas law. *See* Ex. A hereto at § I.20 (redlined proposed order).

Plaintiffs do not agree, however, that the declaration otherwise incorrectly summarizes the Court's findings.  UBH argues that the Court did not hold that Texas law prohibited UBH

---

[69] UBH's cases, relegated to a footnote, Opp. at 54-55 n.38, do not support such a rule.  In *Berman*, the court concluded that the requested declarations were all available under § (a)(1)(B) and thus were duplicative. *Berman v. Microchip Tech. Inc.*, No. 17-CV-01864-HSG, 2018 WL 732667, at *11 (N.D. Cal. Feb. 6, 2018).  In *Tolson,* the court denied the plaintiff's § (a)(1)(B) claim on the merits because the plan administrator had appropriately interpreted the plan. *Tolson v. Avondale Indus., Inc.*, 141 F.3d 604, 609 (5th Cir. 1998).  The court then dismissed the plaintiff's § (a)(3) claim because it was based on the same faulty allegations. *Id*. at 610. In *Dirienzo*, the court rejected the plaintiff's attempt to restate an § (a)(1)(B) claim for benefits as an § (a)(3) claim in order to avoid the administrative exhaustion requirement. *Dirienzo v. Dunbar Armored, Inc.*, No. 09CV2745 DMS (JMA), 2010 WL 11591907, at *3 (S.D. Cal. May 12, 2010). None of those courts considered a situation in which a plaintiff who had succeeded at trial sought a form of relief that might not be available under § (a)(1)(B), but could be awarded under § (a)(3).

from using its own Guidelines "in addition to the TDI Criteria." Opp. at 56:15-16. UBH is

wrong: the Court held that "insurance companies were required to apply criteria issued by the

Texas Department of Insurance. . . in making medical necessity determinations. . ." FFCL at 87

¶ 165 – and in so holding, the Court quoted, almost verbatim, UBH's own Post-Trial Brief.  *See*

*Wit* ECF No. 400 at 104:4-8.[70] There is absolutely no basis for UBH's contention that the Court's

ruling contained a massive unstated exception that would allow UBH to use its own self-serving,

restrictive Guidelines "alongside" the prescribed criteria. Moreover, UBH did not even raise this

purported defense at trial or in post-trial briefing, thereby waiving it.

　　*Declaration #22*: UBH also points out that this declaration did not account for the Court's

finding with respect to the date on which UBH ceased the violations of Illinois law at issue in

this case.  Opp. at 56:17-21.  That portion of the Plaintiffs' proposed order cited the dates

reflected in the Class Definitions ordered by the Court, FFCL at 8-9 (¶ 13), and inadvertently did

not reference the January 2016 change. Plaintiffs agree that the declaration should reflect an end

date of January 1, 2016 for plans governed by Illinois law. *See* Ex. A hereto at § I.22.b.[71]

---

[70] Moreover, the trial evidence demonstrates that UBH well understood this requirement –
throughout the Class Period, UBH's "Guideline Applicability Tool" uniformly admits that
UBH's clinicians were required to use the TDI criteria *instead of* UBH's own Guidelines. *See*
Trial Ex. 450-0005-06 (listing Texas criteria as "Criteria that Supersedes Optum's Standard
Criteria" for commercial plans); Trial Ex. 268-0002-03 (same); Trial Ex. 269-0003-04 (same);
Trial Ex. 270-0002-03 (same); Trial Ex. 271-0002-04 (same); Trial Ex. 272-0002-04 (same);
Trial Ex. 273 at -0002, -0004 (same); Trial Ex. 274 at 0002, -0004 (same); Trial Ex. 275 at -
0002, -0004 (same); Trial Ex. 276 at -0002, -0004 (same); Trial Ex. 277 at -0002, -0004 (same);
Trial Ex. 278 at -0002, -0004 (same); *see also* FFCL at 87 ¶ 166 (citing Guideline Applicability
Tools); Trial Tr. at 951:24-952:2 (Dr. Martorana testifying that "Texas has its own guidelines
that they've created and mandate for use.").

[71] Plaintiffs further note that the Class Definition should be amended to reflect the accurate end
date with respect to such denials.  *See generally* Rule 23(c)(1)(C) (court can amend class
definition at any time). By agreeing to the revised end date, of course, Plaintiffs do not purport to
know whether UBH is *faithfully* applying the ASAM Criteria; as noted, UBH's arguments here
suggest that it is not. *See* § III.E, *supra*.

## VII.   THE PROSPECTIVE INJUNCTIVE RELIEF PLAINTIFFS REQUEST IS APPROPRIATE AND ESSENTIAL TO PROVIDE AN ADEQUATE REMEDY

In opposing Plaintiffs' request for prospective injunctive relief, UBH is silent as to the "inadequacy of legal remedies," "balance of hardships" and "public interest" elements of permanent injunctive relief, effectively conceding that all of those factors favor granting this remedy. *See generally* Pls.' Br. at 22-27 (laying out evidence in support of each element). Instead, UBH tries (and fails) to refute the evidence as to the threat of irreparable harm – based largely on its own recent decision to supposedly abandon its faulty criteria – and asserts various arguments about the "remedial fit" between its wrongdoing and the requested injunctive relief. None of UBH's arguments has merit.

### A.   A Preponderance of the Evidence Proves that the Class Members Are Threatened with Future Irreparable Harm.

UBH argues that Plaintiffs cannot establish irreparable injury without also proving "a threat of future harm." Opp. at 41:13-19.  Because UBH recently decided to change its Guidelines, UBH contends, there is no threat of future harm and no injunction can issue.  *Id.* at 41:20-44:6. UBH cannot deprive the class members of relief that easily, however.

#### 1.   UBH Cannot Escape a Finding of Irreparable Harm by Voluntarily Abandoning its Guidelines.

UBH cannot defeat Plaintiffs' entitlement to forward-looking injunctive relief through voluntary (purported) adoption – after trial and outside the record – of Plaintiffs' proposed criteria. It is black-letter law that a "court's power to grant injunctive relief survives the discontinuance of the illegal conduct." *F.T.C. v. Accusearch Inc.*, 570 F.3d 1187, 1201 (10th Cir. 2009) (quoting *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953)). The Court's "discretion is necessarily broad" and should take into account "the bona fides of the expressed intent to comply, the effectiveness of the discontinuance and, in some cases, the character of the past violations." *W. T. Grant*, 345 U.S. at 633. *See also United States v. Laerdal Mfg. Corp.*, 73

61

F.3d 852, 854-55 (9th Cir. 1995) (courts consider "the degree of scienter involved; the isolated or recurrent nature of the infraction; the defendant's recognition of the wrongful nature of his conduct; the extent to which the defendant's professional and personal characteristics might enable or tempt him to commit future violations; and the sincerity of any assurances against future violations") (quoting *F.E.C. v. Furgatch*, 869 F.2d 1256, 1263 n.5 (9th Cir. 1989)); *United States v. Parke, Davis & Co.*, 362 U.S. 29, 48 (1960) ("A trial court's wide discretion in fashioning remedies is not to be exercised to deny relief altogether by lightly inferring an abandonment of the unlawful activities from a cessation which seems timed to anticipate suit."); *United States v. Or. State Med. Soc'y*, 343 U.S. 326, 333 (1952) ("It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption.").[72]

Here, the Court held that, for at least six years, UBH consistently and thoroughly elevated its self-interest above those of plan beneficiaries in developing and using its overly-restrictive guidelines. It is difficult to imagine a more egregious example of a fiduciary breach. Only after years of litigation, burdensome discovery, extensive motions practice, a bench trial in which UBH's witnesses tried to mislead the Court, and an opinion that excoriated its conduct, does UBH now claim to have voluntarily adopted the guidelines Plaintiffs have proposed – while continuing to insist that it did nothing wrong (and suspiciously trying to retain the flexibility to shift away from the new criteria in the future). *See S.E.C. v. Koracorp Indus., Inc.*, 575 F.2d 692, 698 (9th Cir. 1978) (while "[p]romises of reformation and acts of contrition are relevant in

---

[72] Indeed, an injunction may issue even where a defendant *unintentionally* violated legal obligations, and states an intent not to do so again. *See S.E.C. v. Murphy*, 626 F.2d 633, 656 (9th Cir. 1980) ("[Defendant] stated that he took all precautions he thought reasonable to keep from violating the registration requirements. Nevertheless, the court found that he did violate them. The fact that he violated the requirements once when he did not intend to do so is sufficient to justify the conclusion that he might do so again, even if the court believed he was sincere in his protestations to the contrary."). Here, where the Court found UBH egregiously violated its ERISA fiduciary duties, the coercive force of a court order is even more necessary.

deciding whether an injunction shall issue," "neither is conclusive or even necessarily

persuasive, ***especially if no evidence of remorse surfaces until the violator is caught***")

(emphasis added). Simply put, UBH's past and current behavior easily evidences future risk

serious enough to support the grant of an injunction.[73] *See Laerdal*, 73 F.3d at 856 (defendant's

"intransigent insistence on its own blamelessness also manifests itself in hostility toward the"

applicable regulatory regime, and "repeated self-justification is sufficient to show a likelihood of

future violation"); *id.* at 857 ("The court was not in error in questioning [defendant's] credibility

with respect to reforms introduced under protest or after the violation was discovered; moreover,

past illegal conduct gives rise to an inference that future violations may occur.") (citing

*Koracorp Indus.*, 575 F.2d at 698); *cf. E.E.O.C. v. Hacienda Hotel*, 881 F.2d 1504, 1519 (9th

Cir. 1989) (noting in EEOC context that "[a]n employer that takes curative actions only after it

has been sued fails to provide sufficient assurances that it will not repeat the violation to justify

denying an injunction") (overruled on other grounds). There is nothing about UBH's conduct

that suggests it can be trusted.[74]

---

[73] There is a distinction between (1) the question of "mootness" and (2) the Court's consideration of an injunction as part of its broad remedial discretion. UBH does not appear to argue the mootness of injunctive relief, nor could it. *See McCormack v. Herzog*, 788 F.3d 1017, 1025 (9th Cir. 2015) ("[A] defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.") (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000)).

[74] Indeed, while UBH touts its voluntary adoption of the ASAM Criteria, LOCUS, and CALOCUS, UBH has simultaneously re-adopted its defective Custodial Care CDGs – as recently as May 20, 2019, just *after* Plaintiffs filed their opening remedies brief. *See* United Behavioral Health, Coverage Determination Guideline: Custodial Care (Inpatient & Residential Services) (May 20, 2019), *available at* https://www.providerexpress.com/content/dam/ope-provexpr/us/pdfs/clinResourcesMain/guidelines/cdg/custodialCare.pdf.

Just like the Custodial Care CDGs in effect during the class period, which the Court found to be an unreasonable interpretation of the class members' plans, the current version still cites to United's generic 2011 Certificate of Coverage as the basis for defining "custodial care" to include services that are for the primary purpose of "maintaining a level of function (even if the specific services are considered to be skilled services), as opposed to improving that function,"

1    Courts have found a threat of irreparable injury based on far less persuasive facts. In

2  *Accusearch*, the Tenth Circuit affirmed the lower court's grant of injunctive relief, even though

3  (1) the defendant had discontinued the challenged conduct before the lawsuit was filed; and (2)

4  during the course of the litigation, Congress had enacted a criminal statute prohibiting the

5  discontinued conduct. 570 F.3d at 1202. The district court's finding that "because Accusearch

6  remained in the information brokerage business it had the capacity to engage in similar unfair

7  acts or practices in the future" was sufficient to support the injunction. *Id.* (quotations and

8  alterations omitted).  As here, "a district court is best situated to judge the sincerity of a litigant's

9

10  contrition." *Id.*

11    Similarly, in *Marie v. Moser*, the district court granted a permanent injunction to ensure a

12  government agency would comply with the Supreme Court's ruling in *Obergefell*, despite the

13  defendants' promised compliance with that decision. 196 F. Supp. 3d 1202, 1213 (D. Kan.

14  2016). It did so because it "share[d] plaintiffs' concern" about "whether defendants will comply

15  voluntarily with *Obergefell* without the judicial oversight that an injunction permits." *Id.* at 1218.

16  It explicitly did so because it wanted to avoid "same-sex married persons from having to . . .

17  initiate a separate lawsuit and incur expenses to secure" the legal rights that the Supreme Court

18  already promised. *Id.* It was concerned about defendants' "continuing resistance to *Obergefell*'s

19  broad mandate"; while it recognized defendants might "provide the voluntary compliance with

20  *Obergefell* that they promise," it did not want to subject plaintiffs' "rights to such uncertainty,"

21

22

23  and it still defines "improvement" as "the reduction or control of the acute symptoms that
necessitated hospitalization or residential treatment." *See id.* at 2, 4.  The Guideline also still
24  references CMS' inpatient hospitalization standards – even with respect to residential treatment.
*Id.* at 3.  Either UBH has learned nothing from the Court's extensive findings on why its
25  Custodial Care Guidelines were inconsistent with generally accepted standards and the class
members' plans – or it just does not care.  *See* FFCL at 68-77 (¶¶ 133-148) (discussing defects in
26  Custodial Care CDGs); *id.* at 45-46 (¶ 88) (finding that "UBH knowingly and purposefully
drafted its Guidelines to limit coverage to acute signs and symptoms"); *id.* at 61-63 (¶¶ 117-123
27  (discussing UBH's deliberate manipulation of the CMS Guideline to justify restrictive
improvement criteria).

28

1    and found that "defendants' assurances of future compliance [did] not provide the reliability that

2    those rights deserve." *Id.* at 1218, 1220. Because the defendants "asserted arguments which

3    indicate[d] that future disputes over the rights, protections, obligations, or benefits" at issue,

4    there was a continuing "risk of . . . constitutional deprivations without injunctive relief" giving

5    rise to "irreparable harm." *Id.* at 1220.

6          In *Long v. U.S. I.R.S.*, likewise, the Ninth Circuit held that the district court erred in

7    failing to consider "the possibility of recurrence" and the "character of past violations" when

8    assessing whether future irreparable harm was likely. 693 F.2d 907, 910 (9th Cir. 1982). When

9    those factors were considered, the Ninth Circuit found, it was clear that injunctive relief was

10   appropriate "to prevent the prolonged delays and repeated litigation over disclosure of the same

11   type of documents in the future." *Id.*  The Ninth Circuit was particularly concerned that, while

12   the IRS had voluntarily complied with its disclosure obligations, "[i]t made it clear that by

13   voluntarily releasing the documents, it retained the right to claim that similar documents were

14   exempt [from disclosure] in the future."  *Id.* This holding applies with even more force here.

15   UBH claims it has voluntarily adopted the ASAM Criteria, LOCUS, and CALOCUS, but insists

16   it retains the discretion to adopt a different interpretation of generally accepted standards of care,

17   and thus to adopt different criteria, in the future. As the *Long* court observed, this is, in itself, an

18   indication that the misconduct "will recur in the future." *Id.*[75]

19

20

21

22

---

23   [75] UBH's reliance on *Des Roches* for the proposition that its recent voluntary compliance
     immunizes it against Court intervention is misplaced.  Opp. at 42:9-43:2 (citing *Des Roches*, 320
24   F.R.D. at 510-11).  That opinion resolved a motion for class certification, well before trial, and
     there was no evidence in the record relating to the likelihood that the defendant would re-offend.
25   Here, by contrast, there is a voluminous record demonstrating UBH's years-long practice of
     placing its own financial self-interest before the interests of its members, deliberate manipulation
26   of its own evidence base to justify its restrictive Guidelines, lying to regulators and its own
     consultant to hide its conduct, seeking to mislead the Court, and consistent refusal to concede
27   that any of the foregoing conduct was wrongful.  This case, in short, could not be more different
     than the posture in *Des Roches*.

28

**2.   UBH's Suggestion that the Class Members' Plans Have Materially Changed is Demonstrably False.**

UBH next asserts that the Court should not order prospective injunctive relief because there is supposedly "no evidence that any plan in evidence is still in effect or that the plan language will remain unchanged in perpetuity." Opp. at 43:10-11.  Obviously, the record from the 2017 trial does not contain *direct* evidence as to the status or wording of the class members' plans in 2019. But it contains circumstantial evidence: the class contains more than 50,000 class members, who were participants and beneficiaries in thousands of plans. *See, e.g.*, Trial Tr. at 709 (Triana testimony that there are "thousands" of plans involved in this case); *see also id*. at 837:21-838:7 (United offers "too many [plans] to count," numbering in the "tens of thousands," and UBH administers behavioral benefits for "the vast majority" of them). There is no factual basis for concluding that every one of those thousands of plans terminated in the last two years.[76]

As for UBH's contention that Plaintiffs have to show that the class members' plan language will "remain unchanged in perpetuity," that is not what the law requires. To establish a threat of irreparable harm, a plaintiff does not have to show that he will *always* face that threat – just that he faces it when the Court issues the injunction. *Cf., e.g.*, Fed. R. Civ. P. 60(b)(5) (providing for relief from court order if "applying it prospectively is no longer equitable").  To the extent UBH intended to suggest that the operative plan language (for all class members) has *already* changed, there is no evidence whatsoever of that fact or that any such changes are

---

[76] Unlike UBH, Plaintiffs have respected the Court's admonition that all evidence, including evidence related to remedies, was to be introduced at trial. Pretrial Conf. Tr. (Oct. 5, 2017) at 9:12-22; *id*. at 21:2-3.  If the Court for any reason believes additional evidence is needed to prove that class members' plans remain in effect, Plaintiffs can, of course, provide it. Named Plaintiffs Michael Driscoll, Cecilia Holdnak, David Haffner, Brian Muir, and Linda Tillitt all remain members of plans administered by UBH, and can submit their insurance cards upon request. Indeed, since UBH clearly possesses these records, it ought to stipulate to the fact that most, if not all, class members' plans remain in effect, rather than trying to trap Plaintiffs in a supposed "failure" to submit evidence that was plainly not available at the time of trial – but which also should not at all be in dispute.

material to the issues before the Court.  Instead, the evidence at trial proved that the plans

uniformly contained the same requirement throughout the six-year class period, FFCL at 25

(¶53), thereby supporting an inference that the plans still contain the same requirement today

(especially in the absence of any evidence to the contrary).[77]  This is not speculation: the Court

can make this finding on a preponderance of the evidence, *all* of which favors Plaintiffs.[78]

Finally, UBH argues that the Court cannot issue prospective injunctive relief on the

theory that it cannot "predetermine the proper construction" of the phrase "generally accepted

standards of care" outside the context of future plans. Opp. at 43:17-44:6 & n.36.  UBH's

argument is based on the faulty premise that courts cannot review or construe any term of an

ERISA plan without reading and applying every plan term at the same time. That is not how

ERISA plan construction works – nor is it how UBH operates. As the Court found at trial, UBH

uses its Guidelines to interpret and apply a single plan term – the generally accepted standards

requirement – *across all plans*.  FFCL at 19-20 (¶¶ 38-39), 22 (¶45). UBH does *not* review every

single term of every single plan every time it "interprets" the generally accepted standards

requirement; rather, it adopts one standardized construction and uses it across the board for all

---

[77] Again, UBH is transparently trying to capitalize on the fact that the trial took place two years
ago and "catch" Plaintiffs without evidence of a fact that should not even be in dispute. But this
tactic is, frankly, dishonest.  UBH, as the administrator of the plans, knows the relevant plan
terms have not changed, which is why it does not submit any evidence of any plan that does not
require, as one condition of coverage, that services be consistent with generally accepted
standards.  If the Court deems additional evidence on this issue to be necessary, Plaintiffs
respectfully submit the 2019 plans of Michael Driscoll, Cecilia Holdnak, Brian Muir, and Linda
Tillitt (which were not available at the time of trial). *See* Exs. C-F.

[78] In *Goldie's Bookstore*, by contrast, there were not even any factual allegations to support the
district court's finding of irreparable harm. *See Goldie's Bookstore, Inc. v. Superior Court of
State of Cal.*, 739 F.2d 466 (9th Cir. 1984) (cited by UBH at Opp. 43:16-17). And contrary to
UBH's misleading description, Opp. at 43 n.35, the court in *Bellanger* did not hold that a
plaintiff seeking an injunction under ERISA must *always* allege and prove the "unlikely series of
events" described therein. *Bellanger v. Health Plan of Nev., Inc.*, 814 F. Supp. 914, 917 (D. Nev.
1992). Rather, the court was explaining that because of the facts giving rise to that individual
plaintiff's cause of action, it would be difficult for him to show irreparable harm in that case. *Id.*
This class action, in which Plaintiffs proved at trial an unbroken course of conduct extending
over more than six years, presents a much different factual picture.

1    commercial plans, without looking at the "context" of each individual plan. *Id.*

2        UBH's cases do not require construction of every single plan term together, either. *See*

3    Opp. at 43:17-44:6 and cases cited therein. As Plaintiffs have explained, while those courts

4    mentioned the "context" of plan language, what they *did* was to focus on the specific plan terms

5    that were actually relevant to the questions at hand in the particular case – just as the Court has

6    done here. *See Gilliam v. Nev. Power Co.*, 488 F.3d 1189, 1195-97 (9th Cir. 2007) (limiting

7    discussion to relevant plan terms only); *Dupree v. Holman Prof'l Counseling Ctrs.*, 572 F.3d

8    1094, 1098-99 (9th Cir. 2009) (same).[79]  Nothing in those cases suggests that a court is bound in

9    every case to review and examine every single term in a plan, no matter how irrelevant to the

10   questions at issue in the case, as UBH urges here.

11       Nor should the Court credit UBH's speculation that a plan sponsor could write a plan that

12   re-defines "generally accepted standards of care" to mean something *other* than "generally

13   accepted standards of care." Opp. at 44 n.36. There is no evidence of any plan actually being

14   written in such a nonsensical manner, nor does UBH offer even a theory as to why a plan would

15   do so.  If that were ever to occur, UBH could apply to the Court for relief from the injunction

16   with respect to that plan. But the Court's decision about how to provide a remedy for *this* class,

17   with the plans at issue *here*, should not turn on unsupported speculation about what some

18   unorthodox plan might do in the future.

19           **3.  UBH Must be Constrained to Apply the ASAM Criteria Faithfully.**

20       UBH also takes issue with the fact that Plaintiffs' requested injunction includes the

---

[79] The *Huffman* case, cited in UBH's footnote, Opp. at 44 n.36, is equally inapposite. The question in that case was whether common issues would predominate where the only way to establish a violation required analysis of multiple ambiguous, and potentially conflicting, provisions in various documents, as well as individualized questions about whether the beneficiary chose to receive benefits in a particular manner. *See Huffman v. Prudential Ins. Co. of Am.*, No. 2:10-cv-05135, 2016 WL 5724293, at *6-8 (E.D. Pa. Sept. 30, 2016). That case does not suggest that a Court is unable to construe a particular plan term without reviewing every other provision in the plan.

following specific instruction on application of the ASAM Criteria:

> Faithful application of the ASAM Criteria to requests for coverage of residential treatment requires consideration of the criteria applicable to each of the sub-levels of residential treatment identified in the ASAM Criteria (i.e., Levels 3.1, 3.3, 3.5, and 3.7).

Opp. at 44:7-45:5; *see also Wit* ECF No. 426-1 at 11.  According to UBH, such an instruction would require UBH to *approve* coverage for residential treatment based on the criteria for the lower sub-levels of care (3.1, 3.3, or 3.5) even if a plan explicitly excludes coverage for those levels of care. The proposed injunction does not require UBH to approve coverage for anyone. Instead, the proposed injunction would merely require UBH to *consider* the criteria applicable to each sub-level when determining whether services are consistent with generally accepted standards of care. It does not purport to prohibit UBH, in the future, from applying any enforceable exclusions that exclude coverage for one or more of those sub-levels. But notably, UBH has never offered any evidence of any plan that actually excludes lower-intensity residential treatment, nor has UBH offered any evidence that it ever denied coverage based on any such plan term. Instead, UBH has an established track record of simply interpreting its plans *as though* they exclude those sub-levels – in other words, UBH *reads* an exclusion for the lower levels of intensity *into* any plan that covers residential treatment, in order to justify its own restrictive criteria. *See* § III.E, *supra*.

UBH bristles at the notion that it should consider whether its members meet ASAM's less-restrictive criteria for the lower intensities of residential treatment, arguing that it has an obligation "to only use the ASAM Criteria to approve benefits that are actually covered under the terms of the plans as written." Opp. at 44:14-15.  This argument is eerily similar to the justifications UBH previously offered for writing Guidelines that were so restrictive even UBH's own consultant found they were equivalent to the most restrictive sub-level under the ASAM Criteria (level 3.7).  As noted above, UBH told its consultant that its plans do not cover the lower

1   sub-levels of care, but it has never offered any evidence in this case to prove that assertion. *See*

2   § III.E, *supra*.  Now, following a devastating trial verdict, UBH has the gall to come before this

3   Court and object to an injunction instructing it to faithfully apply the ASAM Criteria based on

4   the same false premise and the same imaginary exclusion that reflected its breach of duty – while

5   *also* asking this Court to refrain from issuing an injunction at all because UBH has supposedly

6   voluntarily "adopted" the ASAM Criteria. UBH's arguments are head-spinning and incoherent.

7        UBH cites its supposed "duty" to "preserve limited plan assets" and prevent "windfalls"

8   as though that justifies interpreting "residential treatment" under all of its plans to exclude sub-

9   levels of intensity otherwise available under generally accepted standards of care – even in the

10  absence of any explicit exclusion of coverage for those lower intensities. Opp. at 44:16-17 (citing

11  *Conkright*, 559 U.S. at 520).[80] But this argument just betrays, once again, UBH's lack of

12  understanding of the fiduciary duties it owes its members. ERISA imposes on UBH a fiduciary

13  duty to administer plans "solely in the interest of the participants and beneficiaries" and "for the

14  exclusive purpose of . . . providing benefits to participants and their beneficiaries," and to do so

15  "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104.

16  Nothing in ERISA suggests that a plan fiduciary has any discretion to interpret the plan *with the*

17  *goal of restricting coverage* so that it can preserve plan assets – which is exactly what UBH is

18  suggesting when it argues that approving coverage for the lower intensities of residential

19  treatment would amount to a "windfall" that would not "preserve limited plan assets." Receiving

---

[80] *Conkright* is not at all on point. The question in that case was "how to avoid paying respondents the same benefits twice" under their pension plan. 559 U.S. at 510. No part of the Court's discussion in that case would allow an administrator to adopt a gloss on a plan term that simply interprets out of existence coverage that otherwise exists, out of a desire to "preserve limited plan assets." The same is true with respect to the *Bowman* case, where the court rejected an injunction that was "in direct conflict with the express terms of the plan." *Bowman v. U.S. West, Inc.*, Civil No. 95-1923-FR, 1997 WL 118437, at *6 (D. Or. Mar. 10, 1997). That case also cannot be read to support UBH's contention that it should take pains to construe coverage as narrowly as possible.

1    coverage consistent with plan terms is not a windfall, even though limited plan assets must be

2    used to pay those benefits. That is what welfare benefit plans are for.

3        UBH cannot faithfully apply the ASAM Criteria to determine whether a service is

4    consistent with generally accepted standards of care while continuing to ignore the criteria for

5    the less-intensive sublevels of residential treatment (3.1, 3.3 and 3.5).  The fact that UBH

6    remains intent on doing so makes the need for an injunction, and the other remedies Plaintiffs

7    seek (including appointment of a Special Master), all the more clear.

8        **B.    The Requested Permanent Injunction Need Not Include an Expiration
9             Date.**

10       UBH's main objection to the prospective relief Plaintiffs seek seems to be that the

11   proposed permanent injunction did not include an end date, after which UBH would be free to

12   adopt different criteria than those specified by the Court.  *See, e.g.*, Opp. at 39:20, 40:5, 40:18.

13   The reason for this is simple: contrary to UBH's unsupported contention, Opp. at 19 n.14, there

14   is no evidence that the generally accepted standards of care at issue here change constantly or

15   quickly. To the contrary, for example, there is no dispute in this case that *both* the 2001 edition

16   and the 2013 edition of the ASAM Criteria reflect the generally accepted standards the Court

17   articulated.  *See, e.g.*, FFCL at 28-29 (¶ 58). The same is true with respect to the 2010 and the

18   2016 editions of the LOCUS. *See* FFCL at 29 (¶ 59) (2010 edition); Opp. at 19 n.14 (agreeing to

19   use the 2016 edition of the LOCUS).  And despite UBH's current protestations that generally

20   accepted standards are really a fast-moving target, the January 2017 version of UBH's own

21   Guidelines cited the 2013 version of the ASAM Criteria and the ***2010*** versions of LOCUS and

22   CALOCUS.  *Compare, e.g.*, Trial Ex. 8-0009.  If the standards that matter in this case really

23   materially changed from year to year as much as UBH contends, UBH would not be able to rely

24   on the same sources year after year.

25       The standards the Court articulated in its Findings of Fact are not brand-new

developments in the field of behavioral health treatment. The evidence in the record reflects, instead, that standards of practice become generally accepted only *after* they have been widely adopted over a long period of time – and it is those time-tested standards that are at issue in this case. *See, e.g.*, FFCL at 27 ¶ 57 ("[G]enerally accepted standards of care are the standards that have achieved widespread acceptance among behavioral health professionals"); Trial Tr. at 67:18-68:14 (Dr. Fishman describing the process by which the ASAM Criteria were developed); *id.* at 69:15-71:1 (Dr. Fishman describing broad acceptance of the ASAM Criteria in the field of substance use disorder treatment); Trial Tr. at 499:22-500:3 (Dr. Plakun testifying that the LOCUS was developed in the 1990s). Plaintiffs ask the Court to require UBH to use criteria that reflect standards on which there is broad consensus.  If, at some future time, UBH believes that the then-current editions of the ASAM Criteria, LOCUS, CALOCUS, and/or CASII cease to reflect the generally accepted standards of care, UBH can apply to the Court for relief from the injunction and submit evidence to demonstrate that the criteria are not keeping up. *See, e.g.*, Fed. R. Civ. P. 60(b)(5). But setting a pre-determined end date now would be entirely speculative and inappropriate, while giving UBH free reign to return to its fiduciary violations as soon as the end date is reached.

### C. The Requested Injunction is Not Impermissibly Vague, and Even if it Were, the Court Can Make it More Specific

UBH next objects to one of Plaintiffs' proposed injunctions on the ground that it is not sufficiently specific.  Opp. at 45:6-46:21. The proposed injunction would prohibit UBH from:

> Using any Guidelines that include substantively the same coverage criteria as the Guidelines listed on Exhibit A to this Order when making coverage-related determinations as to whether services are consistent with generally accepted standards of care.

*Wit* ECF No. 426-1 at 11. UBH complains that the injunction, as written, sweeps in portions of its Guidelines that were not at issue in the case, and also asserts that it cannot understand the meaning of the term "include" or "substantively the same coverage criteria" in the context of the

injunction. UBH is wrong.

The point of this injunction is merely to preclude UBH from repackaging the overly-restrictive coverage criteria the Court found to be unreasonable and riddled with flaws in the guise of a newly-published document.  As the trial evidence demonstrated, UBH has a practice of re-issuing its Guidelines each year, sometimes in a slightly different format.  The goal of this injunction is to prohibit UBH from simply re-issuing the 2017 Level of Care Guidelines, for example, with a new date and a few cosmetic changes, and claiming it does not violate the first injunction because it is not the very same Guideline as the one UBH is prohibited from using. This is not a speculative concern.  After trial, UBH admittedly re-issued its own Guidelines twice, before purportedly abandoning them. Opp. at 41:19-42:6. It would do the class no good to enjoin the use of an iteration of the Guidelines UBH has already retired, while leaving UBH free to put the very same objectionable criteria into a new document. Plaintiffs would not object to a narrower version of the injunction, so long as it restrains UBH from engaging in such repackaging. Plaintiffs have proposed a possible revision to the injunction that aims to address any of UBH's legitimate concerns with the first proposal. *See* Ex. A (revised proposed order) at § IV.A.2.

UBH incorrectly suggests that the Court cannot order a narrower injunction than Plaintiffs proposed in their opening brief. Opp. at 45:21-46:1 (arguing that Plaintiffs' "failure" to propose a narrow enough injunction "is fatal to their request for this relief"). This is nonsense. Even in the cases UBH cites, where an injunction was found impermissibly vague on appeal, the courts remanded with instructions to issue a narrower injunction – they did not deny all relief.[81]

---

[81] This type of "gotcha" argument underscores the problem with UBH's failure to confer with Plaintiffs in good faith.  Plaintiffs sent UBH proposed injunctions that are very similar to those in Plaintiffs' proposed order.  Yet UBH never mentioned any vagueness objection so that the parties could discuss, in good faith, language that would be sufficiently narrow. Having held this argument back rather than engaging with Plaintiffs as the Court directed, UBH cannot complain

*See, e.g.*, *Schmidt v. Lessard*, 414 U.S. 473, 477 (1974) (vacating injunction and remanding to the district court for further proceedings); *Furgatch*, 869 F.2d at 1263-64.  For example, in *Furgatch*, while the Ninth Circuit found the injunction, as entered, to be too broad to provide "fair notice" of the conduct enjoined, it did not hold that all injunctive relief would be denied for that reason.  Rather, the Court remanded to the District Court "for a statement of the precise conduct prohibited by the injunction." 869 F.2d at 1264. Obviously, here, the Court has not even entered any injunction and is still free to consider various ways to craft an injunction that meets all the requirements of Rule 65.

*Plaintiffs* do not fashion the remedy – the Court does.  And "[o]nce plaintiffs establish they are entitled to injunctive relief, the district court has broad discretion in fashioning a remedy."  *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 558 (9th Cir. 1990). The Ninth Circuit has instructed the Court to fashion a remedy that is the most advantageous to the class members. *See Donovan*, 716 F.2d at 1235.  That remedy must enjoin UBH from applying the same faulty criteria the Court has invalidated in this case, even in the form of a different document.

### D.     The Other Features of the Injunctive Relief Plaintiffs Request Are Essential to Make the Remedy Effective.

#### 1.   Training and Structural Changes

UBH objects strongly to being ordered to develop and implement training programs to ensure that all relevant personnel fully understand their fiduciary duties and the generally-accepted criteria the Court orders UBH to apply, and to make structural changes to prevent its financial interests from infecting its decision-making in the future. Opp. at 46:23-51:5.  UBH does not dispute that these steps are appropriate.  Rather, UBH has a problem with the Court ordering UBH to take them – because of course, that would make the obligations enforceable by

if Plaintiffs now offer a revised version of this injunction.

*Plaintiffs*, rather than merely relying on UBH's (non-existent) good faith to ensure they occur. [82]

As a threshold matter, these additional implementing steps should not be construed as wholly separate injunctions. Rather, they are part and parcel of any injunction the Court enters requiring UBH to change its Guidelines going forward. They are also essential precursors to an appropriate reprocessing remedy.  UBH contends that there is no evidence that UBH will not properly train its personnel, but the trial record is replete with evidence that UBH deliberately misled its personnel for years by instructing them that its self-serving, pervasively flawed Guidelines were consistent with generally accepted standards of care.  And UBH's arguments in opposition to remedies strongly suggest that, while it claims to have "adopted" the ASAM Criteria, UBH is only partially implementing them, further underscoring the need for judicial oversight.

UBH's arguments here, and at trial, also underscore that it continues to fundamentally misunderstand its role as a fiduciary.  As it has before, UBH emphasizes that it has a duty to "preserve limited plan assets" and "prevent [] windfalls for particular employees." Opp. at 17:3-4; 44:16-17. It stresses its duty not to pay benefits contrary to plan terms, e.g., Opp. at 21:18-22:10, and crows about its "right" to exercise its discretion as though that discretion inures to UBH's own benefit. Opp. at 16:4. Never once does UBH even cite § 1104, which imposes fiduciary duties on UBH.  In fact, the only fiduciary duty UBH even acknowledges is its duty to administer the plan according to the plan terms – and then, only when arguing that it should not be ordered to pay benefits in violation of a plan (a remedy Plaintiffs do not even request).  *See* Opp. at 18:7-11, 32:15-16, 44:14-45:5.  And even now, after reading the Court's findings of fact and conclusions of law, UBH is still talking about its "affordability department" and its crusade

---

[82] In light of the Court's post-trial findings, combining "UBH" with "good faith" is somewhat of an oxymoron. Indeed, the evidence strongly supports the inference that UBH will not proceed in good faith, which is precisely why the relief Plaintiffs seek is required.

1    to ferret out "wasteful and abusive treatment practices." Opp. at 50:14-51:5.  UBH's job is to

2    interpret written plan terms in a manner that complies with its fiduciary duties to plan members.

3    It is not UBH's job, and is in fact a violation of ERISA, for UBH to independently (i.e., without

4    regard to plan terms) decide what should and should not be covered by the plans it administers.

5    UBH argues as though it owes a duty – to its employer customers, the healthcare system

6    as a whole, or even itself – to protect plan assets *from* the plan participants and beneficiaries,

7    which it portrays as bad actors who are seeking "windfalls" by requesting coverage for their

8    behavioral health treatment. UBH refuses to acknowledge that, under ERISA, UBH owes

9    fiduciary duties *to* the participants and beneficiaries of the plans.  In fact, the Ninth Circuit has

10   emphasized that the duty to "discharge its duties with respect to a plan solely in the interests of

11   the participants and beneficiaries," 29 U.S.C. § 1104(a)(1), is "the *core obligation* of an ERISA

12   fiduciary." *Mathews*, 362 F.3d at 1180 (emphasis added) (quotations omitted).  Moreover, UBH

13   should be administering the plans "for the *exclusive purpose* of . . . providing benefits to

14   participants and their beneficiaries." 29 U.S.C. § 1104(a)(1)(A)(i). Obviously UBH should not

15   squander plan asserts, but neither should it construe coverage as narrowly as possible in order to

16   eke out benefits as sparingly as possible.

17   UBH's disingenuous contention that it withholds benefits from plan members in order to

18   improve their "health outcomes," Opp. at 50:17-18, is directly contradicted by the evidentiary

19   record in this case (and its suggestion that the treatment recommended by the class member's

20   providers is "wasteful and abusive," Opp. at 50:16, has no evidentiary support whatsoever.).  As

21   the Court has found, UBH drafted extremely restrictive Guidelines not to preserve the class

22   members' health, but to protect UBH's own bottom line, FFCL at 90-96 (¶¶ 174-189). The fact

23   that UBH is still dishonestly claiming that its actions were justified – indeed, required – by

24   UBH's distorted understanding of its fiduciary duties, is more than enough evidence that UBH

76

1    must be ordered to re-train its personnel on what its fiduciary duties *really* are, and to adopt

2    structural changes to insulate clinical decisions from its quest to maximize profits.

3                              **2.  Disclosures**

4           Finally, UBH protests any requirement that it disclose its wrongdoing to its "customers"

5    (the plan sponsors) or to its regulators. UBH points out that the Court's decision is publicly

6    available, but that does not guarantee that a plan sponsor or regulator has necessarily learned

7    about it.  UBH also claims that the injunction is not necessary to prevent an irreparable injury,

8    but like the training and structural-change requirements discussed above, the disclosure

9    requirement is intended to implement the injunction requiring UBH to change its Guidelines

10   going forward. That relief would be seriously undermined unless UBH informs its plan sponsors

11   – the settlors of the plans for which UBH serves as fiduciary – about why it is being ordered to

12   change its Guidelines and the extent of its fiduciary breaches, which were carried out in the plan

13   sponsors' name. The evidence at trial made clear that the plan sponsors play no role in UBH's

14   Guideline-development process, *see, e.g.*, FFCL at 88-90 (¶¶ 168-73),[83] and it is entirely

15   consistent with ERISA to require UBH to inform its plan-sponsor customers about what it did in

16   their name. Such information would clearly assist a plan sponsor in deciding whether to re-hire

17   UBH as a claims administrator and/or whether it has any legal claims against UBH in light of the

18   Court's findings.

19          It is equally important for UBH to disclose its misconduct to its regulators, especially the

20   regulators in states that mandate the use of particular medical-necessity criteria.  The trial

21   evidence established that UBH has a history of lying to at least one state regulator.  Absent a

---

[83] *See also* Ex. 258-0045 (2013 Utilization Management Program Description ("UMPD") asserting LOCGs "were developed by Optum Personnel with input from Optum clinical personnel, licensed practitioners, consumers, and regulators" but not referencing any plan or plan sponsor); Ex. 259-0045 (same for 2014 UMPD); Ex. 260-0038 (same for 2015 UPMD); Ex. 1186-0040 (same for 2016 UMPD); Ex. 262-0041 (same for 2017 UMPD); 257-0049 (same for 2012 UMPD template).

1    disclosure, that regulator and others will not necessarily know what UBH has been ordered to do

2    and why. UBH itself takes pains to inform the Court that it has an obligation to notify as many as

3    25 different state regulators of what its clinical criteria are, and that it must obtain prior approval

4    from some states (though UBH does not identify the states or state the number with any

5    precision). *See generally Wit* ECF No. 429-2 (Clark Decl.). UBH's own argument, therefore,

6    suggests that UBH's licensure in at least some states depended, in part, on representations it has

7    made about its clinical criteria. A corrective disclosure is thus entirely appropriate to ensure that

8    all state regulators know that UBH has been ordered to change its clinical criteria, and why.

9    Some regulators may seek to take further action against UBH, and some may not; either way,

10   they should be informed of the Court's findings.

11

12   **VIII.   THE COURT SHOULD RETAIN JURISDICTION.**

13           UBH seems to suggest that the Court could only retain jurisdiction over the remedial

14   process if Plaintiffs had sought monetary relief, *see* Opp. at 56:25-57:4, but it cites no authority

15   for that position.  The *Lancaster* case states no such limitation.  *See Lancaster v. U.S. Shoe

16   Corp.*, 934 F. Supp. 1137 (N.D. Cal. 1996).  In this case, reprocessing is class-wide relief that

17   must be carried out pursuant to the Court's instructions.  As such, if there is a dispute about

18   whether UBH is honoring the Court's remedies order, that dispute can be most efficiently

19   resolved by either the Court itself or a Special Master appointed by the Court, rather than

20   requiring the parties to file a brand-new lawsuit or to seek to re-open a case the Court has closed.

21   Retaining jurisdiction will ensure the Court's ability to exercise oversight as efficiently as

22   possible.

23

24   **IX.     THE COURT SHOULD APPOINT ONE OR MORE SPECIAL MASTERS.**

25           There is no dispute that Rule 53 authorizes the appointment of masters to "address" any

26   "posttrial matters that cannot be effectively and timely addressed" by the trial court. Fed. R. Civ.

P. 53(a)(1)(C). As the Court has found, UBH has been violating its duties to its members and beneficiaries, year after year, by adopting and applying brazenly over-restrictive Guidelines, all while laboring under a serious conflict of interest. Yet when it comes to the remedies phase, UBH has the gall to essentially argue, "Just trust us. We'll get it right this time." Appointment of one or more special masters is absolutely necessary to ensure UBH's compliance with the reprocessing and prospective relief aspects of the Court's remedies order. Indeed, UBH does not even acknowledge that appointment of special masters would be a much *less* drastic remedy than one that would naturally and permissibly flow from UBH's violations: prohibiting it from acting as fiduciary to the class members' plans. *See* Pls.' Br. at 28:19-29:9.[84]

UBH's other efforts to avoid Special Master oversight fare no better. UBH argues that such an appointment should be "the exception" and that masters are unnecessary because "there are no complicated questions of fact" to resolve. Opp. at 52. But the half-century-old case UBH cites was based on a long-discarded version of Rule 53, which itself at that time expressly stated that any "reference to a master" in a non-jury case "shall be the exception and not the rule" and required a "showing that some exceptional condition requires it." *La Buy v. Howes Leather Co.*, 352 U.S. 249, 254 (1957) (cited in *New York, S. & W. R. Co. v. Follmer*, 254 F.2d 510, 511 (3d Cir. 1958)). Rule 53 is far more permissive now, requiring only a showing that the "pretrial and

---

[84] UBH misunderstands Plaintiffs' point with respect to the remedy of removal of a fiduciary. Opp. at 7 n.3. Plaintiffs did not request that remedy in this case. Plaintiffs' point is merely that because removing UBH is a form of equitable relief within the Court's authority under the statute (and one that the facts here would clearly justify), the lesser remedy of appointing a Special Master to supervise UBH's implementation of the reprocessing relief is necessarily also available. In any case, UBH is incorrect when it suggests that a fiduciary can only be removed pursuant to § 1109. As the Supreme Court observed in *Varity*, while § 1109 provides a mechanism for remedies against a fiduciary who harms a plan, § 1132(a)(3) provides a cause of action against a fiduciary who harms an individual. Because a court of equity could traditionally remove a trustee, that remedy remains available to individuals asserting a claim under § (a)(3). *See, e.g.*, *May v. May*, 167 U.S. 310, 320 (1897) ("The power of a court of equity to remove a trustee, and to substitute another in his place, is incidental to its paramount duty to see that trusts are properly executed . . . .").

posttrial matters" referred to a special master "cannot be effectively and timely addressed by an available district judge or magistrate judge of the district." Fed. R. Civ. P. 53(a)(1)(C).[85]

UBH next argues that UBH "is a sophisticated entity capable of managing its own compliance," *id.* at 53:8-9, and that it should be given another chance to try to show that it can comply with its duties under the law. *Id.* at 52:21-22. Similarly, UBH argues that the special masters should not include "psychiatrists with expertise in mental health and substance use disorder treatment" because UBH has its own psychiatrists and UBH should be permitted to "exercise its discretion." *Id.* at 53:17-21. There is no way to square those pleas with the Court's thorough findings of UBH's many fundamental breaches of its fiduciary duties and ERISA. As discussed above, UBH cannot use the cloak of "discretion" to avoid any constraints or oversight of the measures necessary to remedy UBH's years-long breaches of fiduciary duty. *See* § IV, *supra*. Indeed, UBH proves the point by its citations to *Rolland v. Celluci*, 198 F. Supp. 2d 25 (D. Mass. 2002), and *EEOC v. Prospect Airport Services, Inc.*, No. 2:05-CV-01125-KJD, 2012 WL 3042693 (D. Nev. July 25, 2012). *See* Opp. at 53:8-16. In *Rolland*, the parties had settled their dispute, and the defendants had expressly *agreed* to a "comprehensive" set of remedial measures related to providing treatment to disabled residents of Massachusetts nursing homes. 198 F. Supp. 2d at 45. In *Prospect Airport*, the defendant had settled the case in part, and even during the proceedings had "taken substantial efforts to ensure compliance with the sexual harassment provisions of Title VII." 2012 WL 3042693 at *1. Here, UBH has just spent 57 pages arguing for why the Court should not impose *any* remedies for its violations of ERISA and

---

[85] UBH's extended discussion of *Jansen v. Greyhound Corp.*, 692 F. Supp. 1029 (N.D. Iowa 1987), does nothing to support UBH's resistance to appointment of a special master. *See* Opp. at 52-53. The only task for which a special master was requested in *Jansen* was calculation of damages, but that was a "routine" matter of applying a straightforward formula using "computer programs available to [defendant's] third party administrator." *Jansen*, 692 F. Supp. at 1044. The oversight functions for which one or more special masters are necessary here are obviously not ones that can be accomplished by a "computer program[]."

1   the class members' plans, despite having been found after a trial on the merits to be a faithless

2   fiduciary.

3          That leaves UBH's tepid fallback argument that "[i]f the Court is inclined to appoint one

4   or more special masters, the appointment should be governed by Rule 53." Opp. at 53 n.37. On

5   that obvious point, Plaintiffs agree. The Court's remedies order should instruct the parties to

6   propose candidates and a proposed appointment order consistent with the Special Master(s)'

7   responsibilities, as set forth in Plaintiffs' proposed remedies order.

8   **X.      CONCLUSION**

9          For the reasons stated herein, Plaintiffs respectfully request that the Court enter the

10  proposed order attached hereto as Exhibit A.

11

12  Dated: July 10, 2019                    ZUCKERMAN SPAEDER LLP

13
                                           */s/ Caroline E. Reynolds*
14                                         Caroline E. Reynolds
                                           Carl S. Kravitz
15                                         Aitan D. Goelman
                                           Jason S. Cowart
16                                         Adam B. Abelson

17                                         PSYCH-APPEAL, INC.
                                           Meiram Bendat
18
                                           *Attorneys for Class Plaintiffs*
19

20

21

22

23

24

25

26

27

28