PSYCH-APPEAL, INC.
Meiram Bendat (Cal. Bar No. 198884)
8560 West Sunset Boulevard, Suite 500
West Hollywood, CA 90069
Tel: (310) 598-3690, x.101
Fax: (888) 975-1957
mbendat@psych-appeal.com

ZUCKERMAN SPAEDER LLP
D. Brian Hufford (admitted *pro hac vice*)
Jason S. Cowart (admitted *pro hac vice*)
485 Madison Avenue, 10th Floor
New York, NY 10022
Tel: (212) 704-9600
Fax: (212) 704-4256
dbhufford@zuckerman.com
jcowart@zuckerman.com

*Attorneys for Plaintiffs and the Classes*
*(Additional Counsel on Signature Page)*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| DAVID AND NATASHA WIT, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED BEHAVIORAL HEALTH (operating as OPTUMHEALTH BEHAVIORAL SOLUTIONS),<br><br>Defendant. | Case No. 3:14-CV-02346-JCS<br>Action Filed: May 21, 2014<br><br>**PLAINTIFFS' RESPONSE TO UBH'S SUPPLEMENTAL REMEDIES BRIEF** |
| GARY ALEXANDER, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED BEHAVIORAL HEALTH (operating as OPTUMHEALTH BEHAVIORAL SOLUTIONS),<br><br>Defendant. | Case No. 3:14-CV-05337-JCS<br>Action Filed: December 4, 2014<br><br>**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED** |

# TABLE OF CONTENTS

**Page**


I. Topic 2: Res Judicata/Summary of Other Cases ... 1

II. Topic 4: What Exclusions May Be Invoked by UBH in Reprocessing ... 6

III. Topic 6: Status of UBH's Guideline Changes ... 14

1. The ASAM Criteria ... 15
2. LOCUS ... 19
3. Custodial Care Guideline ... 20
4. Continued Use of the Coverage Determination Guidelines ... 21

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abatie v. Alta Health & Life Ins. Co.*,
458 F.3d 955 (9th Cir. 2006) .... 7

*Akootchook v. United States*,
271 F.3d 1160 (9th Cir. 2001) .... 2, 3

*Amato v. Bernard*,
618 F.2d 559 (9th Cir. 1980) .... 10

*Cameron v. Tomes*,
990 F.2d 14 (1st Cir. 1993) .... 3

*Cooper v. Fed. Reserve Bank of Richmond*,
467 U.S. 867 (1984) .... 2

*Donovan v. Mazzola*,
716 F.2d 1226 (9th Cir. 1983) .... 7

*Duarte v. Aetna Life Ins. Co.*,
No. SACV 13-00492-JLS (RNBx), 2014 WL 1672855 (C.D. Cal. Apr. 24, 2014) .... 13

*FEC v. Akins*,
524 U.S. 11 (1998) .... 12

*Gabriel v. Alaska Elec. Pension Fund*,
773 F.3d 945 (9th Cir. 2014) .... 12

*Glista v. Unum Life Ins. Co. of Am.*,
378 F.3d 113 (1st Cir. 2004) .... 7, 10, 14

*Hackett v. Xerox Corp. Long-Term Disability Income Plan*,
315 F.3d 771 (7th Cir. 2003) .... 11, 12

*Harlick v. Blue Shield of Cal.*,
686 F.3d 699 (9th Cir. 2012) .... *passim*

*Hatfield v. Blue Cross & Blue Shield of Mass., Inc.*,
162 F. Supp. 3d 24 (D. Mass. 2016) .... 10

*Holmberg v. Armbrecht*,
327 U.S. 392 (1946) .... 7

*Jebian v. Hewlett-Packard Co. Emp. Benefits Org. Income Prot. Plan*,
349 F.3d 1098 (9th Cir. 2003) .... 6

*L.P. ex rel. J.P. v. BCBSM, Inc.*,
No. 18-cv-1241 (MJD/DTS), 2020 WL 981186 (D. Minn. Jan. 17, 2020), *report and recommendation adopted over defendant's objections*, 2020 WL 980171 (Feb. 28, 2020) ..... 11

*Lavery v. Restoration Hardware Long Term Disability Benefits Plan*,
937 F.3d 71 (1st Cir. 2019) ..... 9

*Marolt v. Alliant Techsys., Inc.*,
146 F.3d 617 (8th Cir. 1998) ..... 6

*Miller v. Am. Airlines, Inc.*,
632 F.3d 837 (3d Cir. 2011) ..... 11, 12

*Mpoyo v. Litton Electro-Optical Sys.*,
430 F.3d 985 (9th Cir. 2005) ..... 2, 3

*Novella v. Westchester Cty.*,
661 F.3d 128 (2d Cir. 2011) ..... 6

*Pakovich v. Verizon LTD Plan*,
653 F.3d 488 (7th Cir. 2011) ..... 5

*Saffle v. Sierra Pac. Power Co. Bargaining Unit Long Term Disability Income Plan*,
85 F.3d 455 (9th Cir. 1996) ..... 12

*Silk v. Metro. Life Ins. Co.*,
310 F. App'x 138 (9th Cir. 2009) ..... 5

*Spinedex Physical Therapy USA Inc. v. United Healthcare of Ariz., Inc.*,
770 F.3d 1282 (9th Cir. 2014) ..... 6, 7

*Spradley v. Owens-Ill. Hourly Emps. Welfare Benefit Plan*,
686 F.3d 1135 (10th Cir. 2012) ..... 7, 8

*Withrow v. Halsey*,
655 F.3d 1032 (9th Cir. 2011) ..... 4

**Statutes**

29 U.S.C. § 1104 ..... 9

29 U.S.C. § 1113 ..... 4

29 U.S.C. § 1132(a)(1)(B) ..... 4

29 U.S.C. § 1133 ..... 10

**Other Authorities**

7AA Charles Alan Wright & Arthur R. Miller,
*Federal Practice and Procedure* § 1789 (3d ed.) ........ 3

Tobias Barrington Wolff,
*Preclusion in Class Action Litigation*, 105 Colum. L. Rev. 717 (2005) ........ 3

**Regulations**

29 C.F.R. § 2560.503-1 ........ 10, 19

On March 24, 2020, the Court requested additional briefing and information on six topics relating to Plaintiffs' pending request for remedies. Order re Further Remedies Proceedings (Mar. 24, 2020), *Wit* ECF No. 448 ("Order"). Pursuant to the briefing schedule ordered by the Court, *see Wit* ECF No. 450, Plaintiffs submit the following brief on Topics 2, 4 and 6, which responds to UBH's brief on the same Topics. *See* Def.'s Opening Suppl. Remedies Br. (May 15, 2020), *Wit* ECF No. 451 ("Def.'s Br.").

## I. Topic 2: Res Judicata/Summary of Other Cases

Perhaps UBH's most vehement and consistent plea in this case is its feigned interest in protecting class members against a parade of "due process" horribles that UBH claims this Court has wrought through its class certification and liability orders. UBH's failed 26(f) petition, for example, portended that "an almost certain consequence" of this Court's certification order would be to "hurt" swaths of class members who would otherwise bring "individual benefits claims based on an allegedly improper application of the existing guidelines" but who now would be "precluded from asserting" such claims. Def.'s Pet. for Leave to Appeal Order Granting Mot. for Class Certification Pursuant to Fed. R. Civ. P. 23(f) at 12, *Wit v. United Behavioral Health*, No. 16-80164 (9th Cir. Oct. 26, 2016), ECF No. 1-2. Presumably in light of those pleas, the Court requested briefing on the "res judicata effect of a judgment in this action on class members," including "a summary of cases nationwide that involve members of the classes that have been certified in this action." Order at 2.

UBH's "summary," *Wit* ECF No. 451-1, and its accompanying response to the Court's other Topic 2 inquiries, Def.'s Br. at 2–7, demonstrate that UBH's prophesies of preclusion peril were illusory. This is true as a matter of law; the only claims litigated here for purposes of res judicata are those based on UBH's adoption and application of overly restrictive Guidelines. It is also true as a matter of fact; the vast majority of class members are exclusively depending on this case for any relief. Indeed, it is for this reason that UBH—before addressing the Court's actual res judicata questions—spends pages asserting that "**irrespective** of *res judicata*," Article III will prevent a class member whose denied claim is reprocessed from pursuing any and all other claims or remedies related to that denial. Def.'s Br. at 3, 4, 6, 7 (emphasis added). This

argument, which UBH raised for the first time well after trial in its reply in support of class decertification, *Wit* ECF No. 432-4 at 11, is non-responsive to the Court's res judicata questions. It is also wrong as a matter of law, and irrelevant to any questions remaining in this case for the Court to resolve.

The Court ordered the parties to address the "implications of the remedies it awards for all class members with respect to the potential preclusive effect of the judgment that will be entered in this case." Order at 2. As the Court previously held, correctly, the only causes of action "actually litigated" in this case, *see Akootchook v. United States*, 271 F.3d 1160, 1165 n.24 (9th Cir. 2001), are those based on UBH's adoption and application of overly restrictive Guidelines. UBH's res judicata arguments are just as misplaced now as they were when the Court rejected them before: "UBH's argument that the alleged narrowing of Plaintiffs' claims will result in manifest injustice to absent class members is unpersuasive given that under the doctrine of *res judicata* adjudication of claims that are common to a class does not preclude subsequent litigation of *individual* claims that were not pursued by the class." *Wit* ECF No. 181 at 5 (citing *Akootchook*, 271 F.3d at 1164). The only preclusive effect of the judgment will be to bar class members from asserting the same claims asserted here: that UBH's internal guidelines were overly restrictive and contrary to generally accepted standards of care, such that any denials based on those guidelines were arbitrary and capricious and must be reversed. Class members would not be precluded from bringing individual cases asserting any other claims. *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 879–81 (1984). The only "conduct" the (un)lawfulness of which this Court has "actually adjudicate[d]," *id.* at 881, is UBH's adoption and application of its pervasively over-restrictive Guidelines.

UBH cites a new case, *Mpoyo v. Litton Electro-Optical Sys.*, 430 F.3d 985, 987 (9th Cir. 2005), but it does nothing to support UBH's theory that "[a] judgment in this action would bar *any* claims [by *any* class member] challenging the same benefit determinations at issue in this case." Def.'s Br. at 3. *Mpoyo* was an individual case, not a class action, where a plaintiff brought successive lawsuits challenging the same conduct—the employer's "conduct while Mpoyo was an employee and specifically from the events leading to his termination"—just under different

statutes: Title VII in the first action, the Fair Labor Standards Act and the Family and Medical Leave Act in the second. 430 F.3d at 987. The court, applying the standard res judicata analysis, held that the latter claims were precluded, but even that was a close call because, for example, "[t]he three different Acts arguably address different particular rights" and some "evidence supporting the two actions would likely be distinct." *Id.*

In the miniscule number of cases purportedly brought by class members here, discussed below, the analysis likely would not be as close a call, especially because, although "a class action judgment . . . binds the class members as to matters actually litigated," it "does not resolve any claim based on individual circumstances that was not addressed in the class action." *Akootchook*, 271 F.3d at 1165 n.24 (quoting *Cameron v. Tomes*, 990 F.2d 14, 17 (1st Cir. 1993)). Although a court rendering a judgment generally "cannot predetermine the binding effect of its own judgment," 7AA Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1789 (3d ed.), it can "constrain the preclusive effects of [its] own judgments," such as by making clear at class certification which claims would be pursued on a class-wide basis, as the Court has done here. *See* Tobias Barrington Wolff, *Preclusion in Class Action Litigation*, 105 Colum. L. Rev. 717, 768 & n.152 (2005). As Plaintiffs explained when UBH first raised its preclusion peril theory, "UBH has not identified a single case, in any jurisdiction, where a court held that res judicata barred a claim that had not been certified in a prior class action." Pls.' Opp'n to Mot. for Leave to File Mot. for Reconsideration at 16 (Oct. 11, 2016), *Wit* ECF No. 179. In the three and a half years since, UBH still has not found one case that supports this argument.

UBH's "summary" further confirms the fallacy of UBH's prediction that swaths of class members would bring, or be interested in bringing, individual cases based on theories that would be precluded by a judgment in this case. Not only did just 139 out of over 60,000 class members opt out of the classes here—a statistic that alone demonstrates that the potential for "harm" was illusory—but with three years having passed since the close of the class period, UBH's report identifies only seventeen cases brought by people UBH identifies as "members of the certified classes." Def.'s Br. at 7.

Unfortunately, Plaintiffs have been unable to assess UBH's assertions as to most of the cases identified on the list, because most of the identified cases are captioned only with the plaintiffs' pseudonyms, and UBH did not respond to a request to tie the individuals on its Exhibit A to the class list or opt-out list until 4:51pm ET on the date this filing was due. UBH's email stated, "We cannot share confidential PHI of the plaintiffs in those separate suits, who are represented by their own counsel and who have elected not to disclose their names in their public filings. However, we can confirm that each of the named plaintiffs in those actions appears on the class list." Plaintiffs remain unable to assess that last-second representation as well. UBH's core assertion in its brief that each of the individuals listed is a "member[] of the certified classes," however, is suspect. Right off the bat, UBH concedes two of them are *not* class members—numbers 2 and 3 (under "Relevant Class(es)" labeled as "None"), *Wit* ECF No. 451-1 at 1. Plaintiffs in thirteen of the remaining fifteen cases are represented by law firms (Kantor & Kantor, LLP; Brian S. King, P.C., and DL Law Group) that also represented individuals who expressly opted out of the classes in this case (the only exceptions being numbers 1 and 13 on UBH's list). It is highly unlikely that such firms would bring cases, challenging the same denials on the same grounds as this case, on behalf of individuals who did *not* opt out. And of course, if such individuals did opt out, then UBH's arguments ring completely hollow, because they will not be bound by this Court's judgments. *See* Pls.' Suppl. Remedies Br. at 4 (May 15, 2020), *Wit* ECF No. 452.

The Court also asked about the need for additional "guidance to class members with respect to the effect of the Court's judgment on their rights to bring (or proceed with) individual claims in other courts." Order at 2. Plaintiffs do not believe any further guidance is necessary. The courts in the small number of cases UBH has identified will and should decide in the first instance whether this Court's judgment has any actual preclusive effect. Anyone who opted out who was interested in bringing an individual case surely would have done so by now. *See* 29 U.S.C. § 1113 (3-year limitations period for most ERISA breach-of-fiduciary-duty claims); *Withrow v. Halsey*, 655 F.3d 1032, 1036 (9th Cir. 2011) (discussing limitations periods for § 1132(a)(1)(B) claims). And the Court has already explained the applicable preclusion

considerations to class members, guidance that would appropriately be included again in any notice sent to class members regarding remedies, including regarding reprocessing:

> If you fall within the definition of the class set forth above, you are a class member. As a class member, you will be bound by any judgment or settlement, whether favorable or unfavorable, in this lawsuit. Thus, as a class member, you will be able to participate in any relief obtained in the case. Irrespective of whether the Plaintiffs win or lose, you will not be able to bring individual legal claims against UBH challenging UBH's Guidelines on the ground that they are inconsistent with generally accepted standards of care or challenging UBH's denial of your claim for benefits for residential treatment of a mental illness or substance use disorder on the ground that UBH's use of its Guidelines rendered its decision arbitrary and capricious, nor will you be able to obtain any relief in connection with such claims other than the relief obtained by the Class. You will also be bound if an unfavorable judgment is rendered in favor of UBH.

*E.g.*, *Wit* ECF No. 279-1 at 3.

UBH's "mootness" arguments are not just non-responsive, they are also misguided. Just as courts generally cannot "predetermine" the binding effect of their judgments, *see* p. 3, *supra*, it would be even more inappropriate for this Court to instruct other courts on the ways in which its remedies will, or will not, "moot" individual claims asserted by class members that may or may not be related to UBH's initial denials, because the mootness rules are fact-specific, as illustrated by the cases UBH itself cites. *See Pakovich v. Verizon LTD Plan*, 653 F.3d 488, 492 (7th Cir. 2011) ("Pakovich's benefit claim became moot when the Plan paid it in full, but . . . the district court retained equitable jurisdiction to adjudicate her fee claim."); *Silk v. Metro. Life Ins. Co.*, 310 F. App'x 138, 139–40 (9th Cir. 2009) ("MetLife's payment of 'own occupation' LTD benefits to Silk moots his claim to such benefits. . . . [T]he district court, nonetheless, had jurisdiction to award attorneys fees."). If, for example, UBH agrees to make full payment on a claim following Court-ordered reprocessing, as in *Pakovich* and *Silk*, it may well "moot" in whole or in part such class member's individual lawsuit seeking the exact same payment, but that question is best resolved by the court handling that individual lawsuit. The possibility that some requests for relief might be mooted is certainly not a reason to revisit class certification or to limit the remedies the Court orders in this case.

## II. Topic 4: What Exclusions May Be Invoked by UBH in Reprocessing

On the question of "whether UBH should be allowed to deny benefits during reprocessing based on exclusions it did not invoke when it originally denied class members' claims," the Court has inquired "whether *Spinedex Physical Therapy USA Inc. v. United Healthcare of Arizona, Inc.*, 770 F.3d 1282, 1297 (9th Cir. 2014) suggests a middle ground whereby UBH would be limited to denying benefits based on exclusions that were not originally invoked only where the basis for invoking the exclusion was not 'known or reasonably knowable.'" Order at 3.

Although the Court's broad power under ERISA to fashion an appropriate remedy likely does not legally preclude such a "middle ground," nothing about the facts or circumstances in this case warrants it. In this case, it would be highly inequitable and inconsistent with ERISA to allow UBH to identify new, previously unidentified reasons to deny class members' claims during reprocessing. UBH should be limited to reevaluation of the reasons for denial it originally asserted.

As an initial matter, *Spinedex* endorses the longstanding ERISA principle, reiterated in *Harlick*, that an ERISA plan administrator cannot ordinarily assert a new reason for denial in court that was not identified during the administrative process. *Spinedex*, 770 F.3d at 1296 ("[A]n administrator may not hold in reserve a known or reasonably knowable reason for denying a claim, and give that reason for the first time when the claimant challenges a benefits denial in court.") (citing *Harlick v. Blue Shield of Cal.*, 686 F.3d 699, 719–20 (9th Cir. 2012)); *see also Harlick*, 686 F.3d at 719–20 ("[A] court will not allow an ERISA plan administrator to assert a reason for denial of benefits that it had not given during the administrative process.").[1]

[1] The rule against post hoc rationales stems from the proper functioning of the ERISA claims process. It is, essentially, an anti-sandbagging rule. *See, e.g.*, *Jebian v. Hewlett-Packard Co. Emp. Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1104 (9th Cir. 2003) ("Our refusal to subject claimants to that eventuality parallels the general rule that 'an agency's order must be upheld, if at all, on the same basis articulated in the order by the agency itself,' not a subsequent rationale articulated by counsel."); *Marolt v. Alliant Techsys., Inc.*, 146 F.3d 617, 620 (8th Cir. 1998) (sandbagging not allowed because failure to provide rationale is "contrary to the ERISA statute, federal regulations, and this court's longstanding precedent"); *Novella v. Westchester Cty.*, 661 F.3d 128, 143 (2d Cir. 2011) ("To permit [an administrator] to assert this newly coined

*Spinedex* addressed that ERISA principle, however, in a rather unique context: examining whether an administrator should be estopped from relying in court on an anti-assignment clause to attack a provider's capacity to bring suit under ERISA. *See* 770 F.3d at 1296–97 ("Defendants therefore did not waive their objection to the assignment in the district court when it became clear, for the first time, that Spinedex was claiming as an assignee."). The question of assignment was (and is) important only in the context of litigation; there is thus no expectation that it would even arise in the course of administrative review. Allowing the insurer to challenge the assignment in litigation, when it was raised for the first time, therefore, did not thwart the purposes of the administrative process. *Spinedex* does not create any exception to *Harlick*'s prohibition on "sandbagging" beneficiaries with post hoc denial rationales.

Plaintiffs submit that *Spinedex*'s only relevance to this case is for the general proposition that ERISA requires a court to use its broad equitable powers to fashion a remedy based on the facts and circumstances of the case before it. In *Spinedex*, that meant refusing to prohibit the defendant from asserting an anti-assignment clause defense in litigation, where that defense had no relevance to the administrative process. Here, that means limiting reprocessing to the reasons for denial that UBH previously offered.

As Plaintiffs have repeatedly emphasized, equity "eschews mechanical rules; it depends on flexibility." *Holmberg v. Armbrecht*, 327 U.S. 392, 396 (1946). And this Court must "enforce the remedy which is *most advantageous to the participants* and most conducive to effectuating the purposes of the trust." *Donovan v. Mazzola*, 716 F.2d 1226, 1235 (9th Cir. 1983) (emphasis added). The Court clearly has the power to limit reprocessing in the manner Plaintiffs have requested. *See, e.g.*, *Glista v. Unum Life Ins. Co. of Am.*, 378 F.3d 113, 132 (1st Cir. 2004) ("'[A]ppropriate equitable relief' [can hold an administrator] to the basis that it articulated in its

---

rationale in litigation despite their failure to rely upon it during the internal Fund proceedings that preceded this lawsuit would subvert some of the chief purposes of ERISA exhaustion[.]"); *Spradley v. Owens-Ill. Hourly Emps. Welfare Benefit Plan*, 686 F.3d 1135, 1140–41 (10th Cir. 2012) ("A plan administrator may not 'treat the administrative process as a trial run and offer a post hoc rationale in district court.'"). Similar rules also apply to plan beneficiaries. *See Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 969–73 (9th Cir. 2006).

internal claims review process for denying benefits . . . ."); *Spradley*, 686 F.3d at 1142 ("[W]e have rejected the sole basis upon which the administrator grounded its denial of Plaintiff's plausible claim for benefits, and we will not permit the administrator to rely on new grounds for denial in this litigation *or in further administrative proceedings*.") (emphasis added); *Harlick*, 686 F.3d at 721 (ordering benefits and refusing to remand to allow plan administrator to rely upon new denial rationales).

Limiting the scope of UBH's authority in reprocessing, in this case, is imperative because of the nature and scope of UBH's knowing misconduct, the near certainty that UBH will seek to improperly exploit any leeway the Court might give, and the severe prejudice that class members will suffer if UBH is given free rein during reprocessing.

The Court already found that—for years—UBH promulgated guidelines for medical necessity that placed "excessive emphasis on addressing acute symptoms and stabilizing crises while ignoring the effective treatment of members' underlying conditions." FFCL ¶ 82 (Feb. 28, 2019), *Wit* ECF No. 413 (footnote omitted). It found that "[o]ne of the most troubling aspects" of UBH's guidelines was their wholesale failure to distinguish between adults and children. *Id.* ¶ 130. It found that UBH's approach to claims determination violated the laws of multiple states, and that UBH essentially lied to regulators. *See id.* ¶¶ 157–67. It found that UBH's decisions were "fundamentally flawed" because they were "tainted by UBH's financial interests." *Id.* ¶ 174. On top of all that, at trial, UBH put on witnesses with "serious credibility problems" to defend its pervasively flawed criteria. *Id.* ¶ 25.

Based on these facts, the Court found that UBH had "a structural conflict of interest throughout the class period" when it came to developing its guidelines and determining the class members' claims. *Id.* ¶ 202. UBH failed to insulate the people who created the Guidelines from financial considerations. *Id.* UBH breached "its duty of loyalty, its duty of due care, and its duty to comply with plan terms." *Id.* ¶ 203. "UBH's breach of fiduciary duty" denied the class members "their right to fair adjudication of their claims for coverage based on Guidelines that were developed solely for their benefit." *Id.* ¶ 204.

These deeply-ingrained tendencies will not disappear once reprocessing begins. In fact, as discussed below, UBH continues to try to mislead the Court and shirk its fiduciary duties through its current arguments. *See* § III, *infra*. UBH's litigation position reveals exactly why strict guardrails must be placed on UBH during reprocessing. UBH insists that it should be able to deny class members' claims for any reason—whether that reason was previously asserted, whether it was not, or whether it could have been—because UBH must be allowed to save money for the plans. Def.'s Br. at 8:8–13. But "preserv[ing] limited plan assets" or "prevent[ing] . . . windfalls," *id.*, are not (and never have been) ERISA fiduciary duties.[2] Instead, a fiduciary like UBH must "discharge [its] duties with respect to a plan solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of . . . providing benefits to participants and their beneficiaries." 29 U.S.C. § 1104(a). UBH's continued failure to understand this fundamental ERISA principle lies at the heart of this case, and supports a remand order that limits reprocessing to previously-identified denial rationales.

Other case-specific considerations further support this conclusion. Because UBH's malfeasance was so systemic and long-standing, the class includes members whose claims were originally determined as far back as 2011, nine years ago. Permitting post hoc denial rationales during reprocessing would severely prejudice class members, among other reasons, due to the passage of time—and this is just as true in the post-litigation context as in the litigation context (perhaps even more so). *Cf. Lavery v. Restoration Hardware Long Term Disability Benefits Plan*, 937 F.3d 71, 84–85 (1st Cir. 2019) (recognizing that adducing evidence or documentation of disability for past few years was "impossible": "presumably one of the reasons why [the insurer] reserves the right to deny claims that are not promptly brought to its attention"). Records that may have been ready at hand in the past, to counter whatever basis UBH now seeks to assert, may now be gone.

[2] UBH appears to be misapplying the ERISA provision that specifies that fiduciaries also must act to "defray[] reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A)(ii). This language self-evidently calls for fiduciaries to avoid unnecessary *administrative* costs—not to act with a goal of reducing benefit payments to participants.

Moreover, UBH is wrong that the concerns around sandbagging disappear once litigation concludes and reprocessing begins. They magnify. For one thing, ERISA expressly mandates certain procedural protections for the processing of benefit claims. 29 U.S.C. § 1133 (mandating "full and fair review"). That includes the administrator's obligation, from the outset, to "set[] forth the specific reasons for [a] denial." 29 U.S.C. § 1133; *see also* 29 C.F.R. § 2560.503-1(g). Note that "reasons" is plural: "not just one reason, if there was more than one." *Harlick*, 686 F.3d at 720.

For another thing, in recognition of the fact that ERISA provides a robust mechanism for administrative review, the Ninth Circuit (like other circuits) has held that, ordinarily, a claimant must exhaust her administrative remedies before coming to court. *Amato v. Bernard*, 618 F.2d 559, 566–68 (9th Cir. 1980). A primary purpose of exhaustion is to sharpen the issues for judicial review, so as to lessen the burden on courts in reviewing ERISA benefit determinations. *See, e.g.*, *id.* at 568. Those judicial efficiency concerns also call for limiting UBH's authority during reprocessing in this case. As UBH's conduct and briefs make crystal clear, anything less will almost certainly lead to new litigation over new denial rationales that should have been addressed long ago. It is just as offensive to the ERISA claims regulations *and* the exhaustion doctrine (if not more so) to allow an administrator to raise new arguments on remand as it is to do so during litigation.

Only one case from UBH's cited authority, Def.'s Br. at 10–11, actually addresses the issue at hand: *Hatfield v. Blue Cross & Blue Shield of Massachusetts, Inc.*, 162 F. Supp. 3d 24, 43 (D. Mass. 2016). And UBH conveniently omits the portion of *Hatfield* that contradicts its argument: "[Plaintiff] argues that the remand should be limited to the question of medical necessity and that the contractual limitations on coverage which were not raised in the initial administrative review cannot now be raised upon remand. ***I may have the power to limit the scope of the remand in this way.***" *Id.* (emphasis added) (citing *Glista*, 378 F.3d at 131 (ERISA "encompasses an array of possible responses when the plan administrator relies in litigation on a reason not articulated to the claimant.")). While the court in *Hatfield* may have found limited-

scope remand inappropriate under the facts of that case, the facts here demonstrate that UBH's review on remand should be limited.

Meanwhile, the court in *L.P.* squarely adopted the position Plaintiffs propose here:

> The only way to ensure both the Parity Act and the non-offending language of the Plan are fully enforced is to remand and allow L.P. and J.P. to resubmit the claims, appropriately coded, and allow BCBSM to reprocess the claims consistent with this Recommendation. . . . The recommended remand does not give BCBSM the right to consider medical necessity for the first time. During oral arguments, BCBSM requested remand, if the Court found a Parity Act violation, to reach the question of medical necessity. BCBSM failed to offer that as a basis for its decision during the administrative review, despite having an 'antecedent duty . . . to provide [L.P.] with notice and review' of its grounds for denial. ***This Court will not entertain this attempt at benefits denial ping-pong, in which BCBSM attempts to find other, apparently post hoc, grounds that L.P. was not given the chance to exhaust during her mandatory administrative appeal.***

*L.P. ex rel. J.P. v. BCBSM, Inc.*, No. 18-cv-1241 (MJD/DTS), 2020 WL 981186, at *10 & n.7 (D. Minn. Jan. 17, 2020) (emphasis added) (citation omitted), *report and recommendation adopted over defendant's objections*, 2020 WL 980171 (Feb. 28, 2020). Even more importantly, it did so in a case in which the defendant's misconduct was much less egregious than UBH's.

UBH contends that reprocessing must be a return to the "*status quo* prior to the denial." Def.'s Br. at 10:5.[3] Not so: the Court's duty in equity is to fashion a remedy that redresses the

---

[3] UBH's invocation of *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771 (7th Cir. 2003), *see* Def.'s Br. at 10, is grievously misleading. That plaintiff had been paid long-term disability benefits for over ten years. 315 F.3d at 773. Then the defendant finally found a doctor who would say plaintiff could return to work, so it terminated his benefits. *Id.* The Seventh Circuit found that "the termination procedures were arbitrary and capricious," *id.* at 775, but was faced with a conundrum: for the period between the improper termination and the court's decision (a span of several years) should the court order plaintiff to receive "back" benefits? Or should it remand to the administrator without such an order, in which case the plaintiff would only receive "back" benefits if he prevailed on remand? *See id.* at 775–76. It was against this backdrop that the Seventh Circuit assessed what the *status quo* would be, and it drew a distinction between an improper *initial* denial of benefits and an improper *discontinuation* of benefits. *Id.* In the former situation, the claimant is not receiving benefits at the time of the administrator's improper act; in the latter, he is. And so, the Seventh Circuit ordered retroactive reinstatement of benefits. *Id.* at 776–77. This same analysis applies to the *Miller* decision cited by UBH. *See Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 856–57 (3d Cir. 2011).

Properly understood, *Hackett* and *Miller*—cases dealing with ongoing long-term disability benefits—have little applicability here, because the class is not asking the court to order the payment of benefits. If anything, the decisions support Plaintiffs' position: the courts were obviously concerned with ensuring the beneficiary is in the best possible position, without

harm done to the class members and protects the class from UBH's well-established predilection for elevating its self-interest over its fiduciary duties. A class member must be restored to "the position he or she would have attained but for the trustee's breach," *Gabriel v. Alaska Elec. Pension Fund*, 773 F.3d 945, 958 (9th Cir. 2014); *see also* Pls.' Remedies Reply at 41:11–18 (July 10, 2019), *Wit* ECF No. 434-4, not a position where UBH may backtrack on its prior favorable determinations, retaliate, or secure its own windfall. Here, placing class members in that "but for" position means that a faithful fiduciary should conduct a *medical necessity determination* under permissible clinical guidelines. Again, *that* is the "procedure[] that [Plaintiffs] sought in the first place" and have sought throughout this litigation. Def.'s Br. at 10:4–7 (quoting *Hackett*);[4] *see also Saffle v. Sierra Pac. Power Co. Bargaining Unit Long Term Disability Income Plan*, 85 F.3d 455, 461 (9th Cir. 1996) ("[We] remand for the district court to remand to the Committee to act within a reasonable period of time on Saffle's application for long-term disability benefits *under a standard for 'total disability'* that is consistent with this opinion.") (emphasis added); *Miller*, 632 F.3d at 856 ("it is appropriate to remand to the

---

the administrator benefiting from its improper conduct. That meant the beneficiary could possibly receive multiple years' worth of benefit payments, even if the administrator ultimately correctly determined he was ineligible through proper procedures. Again, this shows the fallacy of UBH's "windfall" theory. If UBH is truly concerned, it can explain to its employer-customers that it had to disburse additional benefits because it did not do its job properly the first time around. Such employer-customers could then seek relief from UBH as they see fit.

[4] Plaintiffs have not made any "contrary argument" before, *cf.* Def.'s Br. at 11:19–26; 10 n.2. The fact that under the Administrative Procedures Act an agency whose decision is vacated may "reach the same result for a different reason," *see* Pls.' Opp'n to UBH's Mot. Summ. J. at 19:5–14 (June 16, 2017), *Wit* ECF No. 261 (citing *FEC v. Akins*, 524 U.S. 11, 25 (1998)), says nothing about whether an ERISA fiduciary can sandbag its beneficiaries. And treating a new denial during reprocessing as an "initial adverse benefit determination"—to make clear that ERISA procedural protections, such as times for appeal, will apply—says nothing about the scope of review upon remand. Plaintiffs have always urged the Court to order UBH to make a new clinical decision under appropriate level of care criteria—and that is all. *See, e.g.*, Pls.' Proposed Remedies Order at 8:27–9:8 (July 10, 2019), *Wit* ECF No. 435-1 (specifying that UBH's determination on remand should "include . . . citations to the clinical evidence and the specific provisions of the applicable criteria" on which it is based); Pls.' Remedies Reply at 39:7–14 (July 10, 2019), *Wit* ECF No. 434-4 ("[T]he class members must be afforded ERISA appeal rights with respect to the limited decision UBH will be making on reprocessing []in case, on reprocessing, UBH misapplies the generally accepted standards, miscalculates the benefits due to a class member, or makes some other error[] . . . .").

administrator for full consideration of *whether the claimant is disabled*") (emphasis added) (cited in Def.'s Br. at 10:9 and incompletely quoted in Def.'s Br. at 4:25–26); *Duarte v. Aetna Life Ins. Co.*, No. SACV 13-00492-JLS (RNBx), 2014 WL 1672855, at *11 (C.D. Cal. Apr. 24, 2014) ("The determination of LTD benefits is remanded to Aetna so that it can re-review *Plaintiff's medical evidence* and determine, in good faith, whether she qualifies for LTD benefits.") (emphasis added) (cited and incompletely quoted in Def.'s Br. at 11:12–15).

UBH also (gallingly) argues that there will be a "windfall" to beneficiaries that would "undermine the terms of the plans" if UBH is not allowed free rein to deny claims on any possible basis during reprocessing. Def.'s Br. at 8:6–10. Even accepting UBH's exaggerated rhetoric—and entirely ignoring the harm UBH has already done to the class members and the need for the rules of reprocessing to redress that harm—those same concerns existed in *Harlick*. There, the administrator denied the beneficiary's claim on the basis that her plan did not cover residential care. 686 F.3d at 706. The Ninth Circuit found that California's Mental Health Parity Act mandated such coverage, and therefore the administrator's original basis for denial could not stand. *Id.* at 710–11. So the administrator argued "it should be allowed to reopen its administrative process in order to determine whether Harlick's residential care was medically necessary." *Id.* at 719. The Court said no: "Blue Shield had discretion to determine whether treatment was medically necessary during the administrative review process of Harlick's claim. But Blue Shield had to tell Harlick the 'specific *reasons* for the denial'—not just one reason, if there was more than one—and provide a '*full* and fair review' of the denial." *Id.* at 720. So it found the "defense" to be "forfeited" and ordered payment *regardless* of whether the treatment was medically necessary. *Id.* at 721 ("But we need not decide that question [of medical necessity]."). The Ninth Circuit fully understood that its decision could result in coverage of services that an administrator, writing on a blank slate, might properly have found were not medically necessary. UBH does not explain how its professed (and newfound) concern for strictly upholding plan terms can be squared with the result in *Harlick*. After all, courts have applied a waiver doctrine to order benefits to be paid *notwithstanding* a limitation of coverage in the plan that the administrator did not "articulate[] to the insured during the claims review

process." *See, e.g.*, *Glista*, 378 F.3d at 131 (citing cases). If it is not impermissible for a court to order payment of benefits based in part on a finding that an administrator waived reliance on a plan term during the administrative process, it is not improper for this Court—especially in light of the facts and circumstances of this case—to limit UBH to a reevaluation of medical necessity or other bases for denial that it actually asserted in the class members' denial letters.

The Plaintiffs do, however, share UBH's concerns about the workability of a "middle ground" that turns on whether the newly invoked exclusion was previously "known or reasonably knowable." *See* Def.'s Br. at 12–13. Put bluntly, allowing UBH to invoke new reasons for denial during reprocessing on this basis would open a Pandora's Box. The record establishes that UBH will improperly exploit any leeway the Court gives. As a practical matter, it is hard for Plaintiffs to come up with any reason for denial that was *not* known or previously knowable—and UBH has not identified any examples—so the safety valve the Court posits will simply serve as fodder for UBH to bog down the reprocessing regime with "fact-intensive, individualized analysis." Def.'s Br. at 12.[5]

Because both parties agree that the "middle ground" is unworkable, and for the other reasons discussed above, the Court should limit UBH's scope of review on remand to reevaluation only of those grounds for denial that UBH originally asserted.

### III. Topic 6: Status of UBH's Guideline Changes

In its remedies brief, UBH represented to the Court that UBH had already "adopted" the ASAM Criteria, LOCUS, and CALOCUS for use in determining mental health and substance use benefits. *See, e.g.*, UBH's Resp. to Pls.' Remedies Br. ("UBH's Remedies Resp.") at 42 (June 14, 2019), *Wit* ECF No. 428-4. In light of those representations, the Court asked UBH for a report on what guidelines UBH is currently using in every State, "including any anticipated

[5] UBH's concerns about the scope of re-review of *clinical* information are misplaced. By definition, medical necessity was an original basis for denial, and no one is advocating an approach that would cabin UBH's ability to take full stock of the administrative record to re-determine medical necessity. Indeed, Plaintiffs have argued that class members should have an opportunity to submit additional clinical evidence (to redress UBH's application of overly restrictive (acute-focused) guidelines that rendered that evidence irrelevant (e.g., evidence of chronicity)), with the clear expectation that UBH will consider that evidence on remand.

changes and the status of any regulatory or licensing approvals that it has sought or is in the process of obtaining." Order at 4. The Court specifically directed UBH to note "any limitations on UBH's use" of those third-party criteria "in any State." *Id*.

UBH's report—and the facts that Plaintiffs know UBH left out—are deeply disturbing. They underscore the need for extensive injunctive relief for the class members, including the appointment of a monitor with sufficient authority to ensure that UBH follows the Court's order. Just as Plaintiffs proved at trial, there is every reason to believe that UBH continues to manipulate the standards to keep its focus on acuity and evade its responsibility to use criteria that are consistent with generally accepted standards. As the evidence to date clearly demonstrates, the Court simply cannot trust UBH to do the right thing on its own. The Court must bind UBH with an order, and that order must include the appointment of a monitor empowered to oversee UBH's implementation of the Court-ordered criteria. UBH has argued against the appointment of a monitor, claiming that UBH would not "seek to subvert any future order of the Court," UBH's Remedies Resp. at 52, and that as a "sophisticated entity," UBH is "capable of managing its own compliance." *Id*. at 53. Unfortunately, its report demonstrates just the opposite, and proves that UBH's representations about what it is, and is not, doing cannot be trusted.[6]

**1. <u>The ASAM Criteria</u>**

UBH's blatant misrepresentations concerning its purported use of the ASAM Criteria provides a telling example. UBH relies on Dr. Lorenzo Triana, who testified as an expert for UBH at trial, to represent that UBH "currently uses the ASAM Criteria for medical necessity determinations of substance use disorder benefits under ERISA-governed plans in all 50 states" except New York, which requires the use of its own criteria. Def.'s Br. at 15; *see also* Triana

[6] Although the Court invited UBH to submit the report, Plaintiffs do not believe it is appropriate for the Court to accept any representations made therein without Plaintiffs being afforded an opportunity to obtain discovery about those representations. Plaintiffs happen to have become aware of certain facts that undermine the veracity of UBH's assertions, but by no means have Plaintiffs had a full and fair opportunity to learn about what is really going on at UBH at this time. Given that UBH has proven itself to be a faithless fiduciary, that is precisely why a strong remedies order, including a monitor to oversee implementation of that order, is warranted.

Decl. ¶ 4 (May 15, 2020), *Wit* ECF No. 451-2. Interpreting the Court's question about limitations as narrowly as possible, UBH also assures the Court "there is no U.S. state or territory in which UBH's ability to use the ASAM . . . criteria is currently limited or inhibited due to a required regulatory approval." Def.'s Br. at 15 & n.5; *see also* Clark Decl. ¶ 8 (May 15, 2020), *Wit* ECF No. 451-4.

What Dr. Triana and UBH do *not* tell the Court is that while UBH may have "adopted" the ASAM Criteria effective January 2019, UBH *also* adopted a "Behavioral Clinical Policy" that fundamentally rewrites ASAM to continue UBH's over-emphasis on acuity. *See* Bendat Decl., ¶ 2 & Bendat Ex. 1 (Nov. 18, 2019 UBH policy entitled, "Behavioral Clinical Policy: American Society of Addiction Medicine (ASAM) Level of Care 3.1 and 3.3 Coverage Criteria"). According to this "clinical" policy, "Level 3.1 services at this time are not a covered benefit." Bendat Ex. 1 at 2. Likewise, it specifies that "Level 3.3 services are . . . excluded from the substance use disorder residential benefit." *Id.* UBH does not cite a single plan document to justify those assertions.[7] Instead, the only "reference" UBH cites for this purportedly "clinical" conclusion is the ASAM Criteria itself. *Id.* at 3. Plaintiffs' expert Dr. Marc Fishman, however, explains that the ASAM Criteria do *not* support UBH's decision to exclude coverage for all Level 3.1 and 3.3 services. *See* Fishman Decl. ¶ 6.[8] Quite the contrary; by eliminating coverage for low-intensity residential services, UBH's policy rejects "a vital element of the ASAM Criteria." *Id.* ¶ 7. According to Dr. Fishman, "[c]linically-managed levels of residential care

[7] This omission is even more perplexing given that, four days after adopting this Behavioral Clinical Policy, UBH submitted a brief to this Court claiming that it does not cover Level 3.1 services because "the plan" supposedly excludes them. UBH's Opp'n to Pls.' Mot. Submit Newly-Discovered Evid. at 4 (Nov. 22, 2019), *Wit* ECF No. 447.

[8] Dr. Fishman also testified at trial that ASAM Levels 3.1 and 3.3 are generally accepted levels of care that play an integral role in the continuum of care. *See, e.g.*, Trial Tr. 86:13–87:5 (describing residential rehabilitation generally); 88:22–89:11 (describing Level 3.3); 89:18–90:11 (describing Level 3.1, "clinically-managed low-intensity residential" treatment, as a "vital component of the continuum of care in residential treatment"); 120:20–25 (testifying that UBH's Guidelines did not "do adequate justice to including criteria that consider the lower levels of care – 3.5, 3.3 and especially 3.1"); 168:9–168:21 (explaining that halfway houses, which provide Level 3.1 services, are a common, widely used level of care); 257:3–258:3 (house with no therapeutic care does not qualify as Level 3.1 under the ASAM Criteria).

(Levels 3.5, 3.3, and 3.1) are integral and essential components of a full continuum of care for [substance use disorder] treatment." *Id.* ¶ 9. The levels refer to service intensity, not setting, and those services can be provided by any licensed residential treatment center. *Id.* ¶¶ 11–13. Thus, it is inaccurate to equate Levels 3.1 and 3.3 to settings in which no treatment is provided, like sober houses, boarding houses and the like. *Id.* ¶ 13.

In other words, while UBH has represented to this Court—and to its own members—that it is now "using" the ASAM Criteria, as Plaintiffs have requested, it is selectively using portions it likes, and ignoring entire swaths of the continuum of care prescribed by *The ASAM Criteria*. UBH *still* refuses to cover low-intensity residential treatment (ASAM Level 3.1), and longer-term high intensity residential treatment for certain populations with cognitive impairments (ASAM Level 3.3), across-the-board, regardless of the language of any particular plan, based on spurious "clinical" justifications.[9] Thus, through yet another internal policy, UBH appears to have fundamentally contorted the ASAM Criteria to accomplish the very same goal this Court held constituted an abuse of discretion during the entire class period, by confining it to cover only more acute conditions. The Behavioral Clinical Policy reveals that UBH is "using" the ASAM Criteria in name only.

Dr. Triana and UBH also deliberately conceal that UBH is systematically reducing its members' access to low-intensity residential treatment for substance use disorders by deeming all services at ASAM Level 3.1 to be ineligible for coverage—notwithstanding the facility's licensure, the terms of the member's specific plan, or whether the services being provided are medically necessary for the patient pursuant to the ASAM Criteria. Plaintiffs sought to bring this fact to the Court's attention in November 2019, submitting a declaration and correspondence demonstrating UBH's facility-level policy with respect to a facility called The Lakes Treatment Center, which is licensed under California law to provide services at ASAM Levels 3.1 and 3.5, among others. *See* Pls.' Admin. Mot. to Submit Newly-Discovered Evid. in Supp. of Mot. for

[9] The policy seems to suggest that there is a lack of evidence to support the efficacy of Level 3.1 services. *See* Bendat Ex. 1 at 2. But again, the only reference UBH cites for this conclusion is the ASAM Criteria, which clearly supports the use of low-intensity residential treatment when clinically appropriate. *See*, *e.g.*, Trial Ex. 662 at 662-0243; *see also*, *e.g.*, Fishman Decl. ¶ 13.

Remedies (Nov. 18, 2019), *Wit* ECF No. 444. UBH strongly opposed the submission of the new evidence, arguing that it was irrelevant because, according to UBH, none of the plans it administers currently provides coverage for lower-intensity residential treatment. UBH's Opp'n at 2 (Nov. 22, 2019), *Wit* ECF No. 447.[10] UBH's response, however, missed the point: even if a particular plan does, in fact, exclude lower-intensity residential services or services at a particular type of facility, a proper coverage denial would cite *that exclusion* from that member's plan (thereby giving the member an opportunity to challenge whether UBH has properly applied the exclusion). What UBH cannot do is black-ball a properly-licensed *facility* or a level of care in its entirety, without regard to plan provisions, in an effort to restrict the ASAM Criteria solely to more intensive levels of care—a goal demonstrated by UBH's adoption of its Behavioral Clinical Policy and its failure to mention that significant limitation to this Court.

A full factual record on UBH's present policies, therefore, would almost certainly show that UBH is continuing to apply only the parts of the ASAM Criteria that correspond to the most intensive treatment, which is appropriate only when symptoms are more acute, and reading out of existence the parts of ASAM that show residential treatment can be appropriate for less acute, more chronic presentations. This tactic is *exactly* how UBH manipulated the ASAM Criteria and misled the Connecticut Department of Insurance in 2013, as Plaintiffs established at trial. It is also *exactly* the argument UBH made to this Court in attempting to show that its Guidelines were equivalent to the ASAM Criteria, which this Court correctly—and emphatically—rejected. *See* Pls.' Remedies Reply at 30–31 (July 10, 2019), *Wit* ECF No. 434-4. In other words, nothing has

---

[10] UBH pointed to four of the Named Plaintiffs' 2019 plans to support this contention, but as usual, it misread the applicable plan language in its own favor. The plans in question exclude "transitional housing," defined as housing only, *without* treatment services; they do not exclude residential treatment services, provided by a licensed facility, that happen to be low-intensity. *See* Driscoll Plan (*Wit* ECF No. 435-3) at 142–43 & 145; Holdnak Plan (*Wit* ECF No. 435-4) at 162–63 & 165; Muir Plan (*Wit* ECF No. 435-5) at 81, 82–83, 84; Tillitt Plan (*Wit* ECF No. 435-6) at 142–43, 151. As Dr. Fishman explains, "both level 3.3 and level 3.1 are defined as treatment levels of care, where professional treatment services are provided as part of the requirements of their standing and certification. Level 3.1 is not intended to describe or include sober houses, boarding houses or group homes where treatment services are not provided . . . ." Fishman Decl. ¶ 20.

really changed—and nothing will, unless UBH is bound by a Court order and kept honest by a monitor.

**2. LOCUS**

Dr. Triana also claims that UBH adopted the LOCUS, effective January 31, 2020, to make medical necessity determinations for adults with mental illnesses. But just like UBH's deliberately incomplete implementation of the ASAM Criteria, there is also substantial reason to doubt that UBH has faithfully implemented LOCUS or properly trained its personnel on how to apply the criteria, as the case of Jane Brown (a pseudonym) starkly illustrates. Jane Brown is an 18-year-old woman with an eating disorder and severe, treatment refractory major depression. *See* Bendat Decl. ¶ 3 & Bendat Ex. 2 at 3 (excerpts from UBH case notes for Jane Brown). On April 6, 2020, a UBH Peer Reviewer denied coverage to Jane for further residential treatment, purportedly based on LOCUS, but without performing an analysis of the six LOCUS dimensions.[11] Bendat Ex. 2 at 14–17, 24–28. Even more troubling, the Peer Reviewer issued the denial even though the last LOCUS analysis in the case file (performed just three days earlier by a Licensed Clinical Social Worker) ***established that residential treatment was warranted***. Bendat Ex. 2 at 7 (noting LOCUS score corresponding to "Medically Monitored Residential Services").[12] In other words, UBH denied coverage for residential treatment, citing LOCUS, even though Jane's LOCUS score showed that residential treatment was medically necessary.

---

[11] ERISA's claims regulation and UBH's accrediting organizations require the clinical analysis to be performed by a reviewer with the same licensure as the treating physician (in this case, a psychiatrist). *See, e.g.*, 29 C.F.R. § 2560.503-1(h)(3)(iii); *see also* Trial Ex. 1011 at 1011-0014.

[12] [redacted]

UBH then compounded its error by upholding the denial on appeal, again without performing any new LOCUS analysis. *See* Bendat Ex. 2 at 19–23, 29–32. At a minimum, cases like this one put the lie to UBH's contention that it would offer effective training absent an injunction and proper supervision by a monitor. UBH's Remedies Resp. at 47.

### 3. <u>Custodial Care Guideline</u>

The Court also asked UBH to address Plaintiffs' contention that UBH re-adopted its Custodial Care CDG in 2019. Order at 4. UBH admits, as it must, that it did so—even after it read this Court's Findings of Fact and Conclusions of Law, which conclusively found that that CDG was inconsistent with generally accepted standards of care. *See* FFCL ¶¶ 135–145; *see also* Hr'g. Tr. at 11:13–21 (Mar. 29, 2019), *Wit* ECF No. 424. Left to its own devices, UBH chose to stick with the same flawed, manipulated standard. UBH's only response is that the fields in its claims database do not reflect that its reviewers have cited the Custodial Care CDG in any denials since the Court's ruling. Def.'s Br. at 16. But UBH itself has argued that it is "impossible" to tell from those database fields alone whether any other criteria were used in a given denial. *See, e.g.*, UBH's Remedies Resp. at 29 n.20 (arguing data alone do not settle whether UBH cited TDI criteria in addition to the listed UBH Guideline). And in any event, UBH does not, and cannot, assure the Court that none of its employees referenced the CDG when applying UBH's other Guidelines, which included concepts defined in the Custodial Care CDG. The evidence supports the opposite conclusion: UBH re-adopted the CDG for a reason. It did not intend for its employees to ignore the CDG, and there is no reason to expect that they would do so.

In a familiar move, UBH seeks to skirt a potential Court order by declaring that it just so happens to be retiring the guideline—coincidentally, immediately after the Court inquired about it. Def.'s Br. at 16. The Court should not be fooled. UBH's decision to re-affirm a Guideline this Court had, mere months earlier, clearly found to be inconsistent with generally accepted standards of care, only deciding to retire it when caught red-handed, demonstrates that UBH cannot be trusted to just "do the right thing" all on its own. Indeed, Plaintiffs suggest that the

opposite is true; UBH can be "trusted" to do the wrong thing, in the absence of clear and effective oversight.

### 4. <u>Continued Use of the Coverage Determination Guidelines</u>

UBH's report and supporting declarations very carefully specify that UBH uses the ASAM Criteria, LOCUS, CASII, and ESCII "in determining the medical necessity of covered mental health benefits." *See, e.g.*, Clark Decl. ¶¶ 3–6; Triana Decl. ¶¶ 4–6, 10, 12. But UBH also admits that it is *still* using its Coverage Determination Guidelines for an unspecified, purportedly "limited" number of self-funded plans, based on the assertion that those plans "do not condition coverage on a determination of medical necessity." Def.'s Br. at 16; Triana Decl. ¶ 13. But as Plaintiffs proved at trial, even plans without an express medical necessity provision require UBH to determine whether services are consistent with generally accepted standards of care. *See, e.g.*, Trial Ex. 892; FFCL ¶ 53 (finding that "[e]very class member's health benefit plan includes, as one condition of coverage, a requirement that the requested treatment must be consistent with generally accepted standards of care"). UBH uses its CDGs to make those clinical determinations. *See, e.g.*, FFCL ¶ 38 (decisions under CDGs are clinical decisions, as opposed to "[a] nonauthorization that is based upon the member's benefit coverage and does not require clinical decision-making"). For that reason, "the CDGs are supposed to reflect generally accepted standards of care." FFCL ¶ 45.

At present, UBH's CDGs fall well short of that standard. Its substance use disorder CDG does reference the ASAM Criteria, *see* Bendat Ex. 4 at 3–4, 10, but as discussed above, UBH has distorted ASAM through its Behavioral Clinical Policy.[13] UBH's mental-health related CDGs, on the other hand, do not even mention LOCUS or CASII, and do not purport to have incorporated those criteria. *See generally, e.g.*, Bendat Ex. 5.

Thus, even though the Court's post-trial ruling made clear that UBH must use clinical standards that comport with generally accepted standards of care in administering *all* of its plans,

---

[13] This CDG also warns that UBH "reserves the right, in its sole discretion, to modify its clinical criteria as necessary . . . ," Bendat Ex. 4 at 1, making clear that just because the CDG *now* (partially) includes a source consistent with generally accepted standards of care, that could change on a dime—especially if the Court exempts UBH's CDGs from its remedies ruling.

UBH is relying on a meaningless distinction in an effort to unilaterally exempt some class members from any remedy.[14]

* * *

Finally, UBH assures the Court that it currently has no "plans" to discontinue or change its use of the criteria it has currently adopted. Def.'s Br. at 15; Triana Decl. ¶ 10. But UBH has already demonstrated both how easily it can jettison a set of guidelines (as its sudden, mid-year decision to retire its Custodial Care CDG makes clear), and that it is perfectly willing to adopt criteria it knows to be inconsistent with generally accepted standards (again, like its Custodial Care CDG), and to manipulate third-party criteria to suit its own ends (as it has done with the ASAM Criteria). If UBH is free to exercise its discretion in the self-serving manner it has done so far in this case, and if no one is watching to ensure its compliance, UBH surely will take whatever steps it can get away with to continue business as usual. A strong, detailed injunction and a monitor with substantial resources and authority are essential to ensure that the class members in this case will receive an adequate remedy for what this Court found to be UBH's repeated, widespread and material violations of its fiduciary duties under ERISA.

Dated: June 15, 2020

ZUCKERMAN SPAEDER LLP

*<u>/s/ Caroline E. Reynolds</u>*
Caroline E. Reynolds

PSYCH-APPEAL, INC.
Meiram Bendat

*Attorneys for Class Plaintiffs*

---

[14] UBH also fails to note that it has removed from the CDGs all of the previously-existing cross-references to its Level of Care Guidelines (which have now been "retired")—further confirming that the CDGs in effect during the Class Period all incorporated the level of care criteria in the LOCGs.