Pages 1 - 132

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Joseph C. Spero, Magistrate Judge

DAVID AND NATASHA WIT, et al.,    )
                                  )
          Plaintiffs,             )
                                  )
  VS.                             )    NO. C 14-02346 JCS
                                  )
UNITEDHEALTHCARE INSURANCE        )
COMPANY, et al.,                  )
                                  )
          Defendants.             )
_____  )
GARY ALEXANDER, on his own        )
behalf and on behalf of his       )
beneficiary son, Jordan           )
Alexander, and all others         )
similarly situated; et al.,       )
                                  )
          Plaintiffs,             )
                                  )
  VS.                             )    NO. C 14-05337 JCS
                                  )
UNITED BEHAVIORAL HEALTH          )
(operating as OptumHealth         )
Behavioral Solutions),            )
                                  )
          Defendant.              )
_____  )

                         San Francisco, California
                         Wednesday, September 2, 2020

              **TRANSCRIPT OF PROCEEDINGS BY ZOOM WEBINAR**


              **(APPEARANCES CONTINUED ON NEXT PAGE)**



Reported By:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

```
 1   APPEARANCES BY ZOOM WEBINAR:

 2   For Plaintiffs:
                        ZUCKERMAN SPAEDER LLP
 3                      1800 M Street, N.W. - Suite 1000
                        Washington, D.C.  20036
 4              BY:  CAROLINE E. REYNOLDS, ATTORNEY AT LAW
                     CARL S. KRAVITZ, ATTORNEY AT LAW
 5
                        ZUCKERMAN SPAEDER LLP
 6                      100 East Pratt Street - Suite 2440
                        Baltimore, Maryland  21202
 7              BY:  ADAM ABELSON, ATTORNEY AT LAW

 8                      ZUCKERMAN SPAEDER LLP
                        485 Madison Avenue - 10th Floor
 9                      New York, New York  10022
                BY:  JASON S. COWART, ATTORNEY AT LAW
10                   D. BRIAN HUFFORD, ATTORNEY AT LAW

11                      PSYCH-APPEAL, INC.
                        8560 West Sunset Boulevard - Suite 500
12                      West Hollywood, California  90069
                BY:  MEIRAM BENDAT, ATTORNEY AT LAW
13
     For Defendants:
14                      CROWELL & MORING LLP
                        515 South Flower Street - 40th Floor
15                      Los Angeles, California  90071
                BY:  JENNIFER S. ROMANO, ATTORNEY AT LAW
16
                        CROWELL & MORING LLP
17                      1001 Pennsylvania Avenue, N.W.
                        Washington, D.C.  20004
18              BY:  APRIL N. ROSS, ATTORNEY AT LAW

19

20

21

22

23

24

25
```

```
 1   Wednesday - September 2, 2020                    9:30 a.m.

 2                    P R O C E E D I N G S

 3                        ---oOo---

 4        THE CLERK:  Okay.  So court is in session with The

 5   Honorable Joseph C. Spero presiding.

 6        I do have one housekeeping announcement I do need to make,

 7   and that's just to let you know that persons granted remote

 8   access to court proceedings are reminded of the general

 9   prohibition against photographing, recording, and

10   rebroadcasting of court proceedings, including those held by

11   telephone or videoconference.  See General Order 58 at

12   paragraph 3:

13             "Any recording of a court proceeding held by video or

14        teleconference, including," quote/unquote, "screen shots

15        or other visual copying of a hearing, is absolutely

16        prohibited.  Violation of these prohibitions may result in

17        sanctions, including removal of court-issued media

18        credentials, restricted entry to future hearings, or any

19        other sanctions deemed necessary by the court."

20        Today our court reporter is Jo Ann Bryce.

21        And we are calling Case Number 14-cv-2346, Wit vs.

22   UnitedHealthcare Insurance Company, and the related case

23   14-cv-5337, Alexander, et al., versus United Behavioral Health.

24        We'll take appearances first from plaintiff and then from

25   the defendant.
```

1          **MS. REYNOLDS:**  Thank you.

2      Good morning, Your Honor.  This is Caroline Reynolds from

3  Zuckerman Spaeder on behalf of the plaintiffs, and appearing

4  with me today are my partners Adam Abelson and Jason Cowart.

5  And I also wanted to let the Court know that also in appearance

6  today among the participants, although not speaking, are Brian

7  Hufford, Carl Kravitz, and our co-counsel Meiram Bendat.

8          **THE COURT:**  All right.  Good morning.

9          **MS. REYNOLDS:**  Good morning.

10         **MS. ROMANO:**  Good morning, Your Honor.  Jennifer

11  Romano for defendant United Behavioral Health, and with me

12  appearing today is my partner April Ross.

13         **THE COURT:**  Good morning, everyone.  Thank you.

14     And I just wanted to give you a little bit of a timetable

15  for the day.  So we're going to start and we're going to go --

16  I have criminal duties to attend to at various points during

17  the day so I'm going to drop off and come back on.  The first

18  of those drop-offs will be at 10:30.  The second one will be at

19  about 12:00 or 12:15, I don't know exactly when; but for

20  10:30 I'm going to drop off and do criminal matters and I'll

21  leave the meeting.  I hope to come back into the meeting in

22  about a half an hour, but if you'll bear with me, it sometimes

23  takes longer than that.

24     What I want to do today is address first issues related to

25  class certification, class list, and noticed issues; and then

1   after those issues are done, talk about remedies issues.

2        So, everyone, any thoughts or comments about that schedule

3   or the drop-offs or anything?

4              **MS. REYNOLDS:**  No, Your Honor.  Thank you.

5              **THE COURT:**  Okay.  So on class certification, I have a

6   number of issues, but the first group issues has to do with

7   whether or not it was right to certify all of the things we are

8   doing in the remedy phase under all three sections of

9   Rule 23(b).

10       You know, having reread *Dukes* and the cases that followed

11  it, I'm a little concerned that we should reanalyze some parts

12  of the certification based on the remedies that are requested,

13  and my thinking is that dec. relief and injunctive relief as

14  requested are mandatory and divisible, that probably are (b)(2)

15  remedies, although I could be convinced that they might also

16  fall under (b)(1), and those kind of things don't require any

17  notice or opt-out, et cetera, et cetera; but the reprocessing

18  and then what we originally had and don't have anymore, the

19  surcharge remedies are not quite so easily put into that

20  bucket.  You know, I understand the argument on why it might

21  be, but I'm concerned that someone might second-guess that down

22  the line, which would be quite unfortunate.

23       And since it grants relief to specified individuals and

24  that relief, as applied to those individuals, is quite

25  individual, even if it can be described in a generic fashion,

1   it should be analyzed under (b)(3), including the right to

2   notice and opt out, which of course we gave everyone.

3       So that's my tentative thought, and I have a series of

4   questions and I'll just go through those questions, and then

5   I'll hear from everybody on these series of issues.

6       The first question is:  On dec. relief, it strikes me that

7   all of the dec. relief is mandatory, but the only agreement I

8   could discern from the, you know, mandatory and not -- and

9   general, not individual, the only agreement that I could get

10  from the briefs is that forward-looking dec. relief was

11  appropriate.

12      So I wanted to get everyone's thoughts on whether or not

13  dec. relief, even if it's looking backwards, in other words,

14  you know, we know what that's going to say, UBH violated plans

15  by applying the -- by having these guidelines, is that a

16  mandatory remedy?  And if so, should it be considered under

17  (b)(1) or (b)(2)?

18      You know, if it's not mandatory, then do I need to specify

19  in the remedy or the certification order what part is not

20  mandatory and link it to another subsection of 23(b)?  And then

21  do I need to allow opt-outs any more than I already have?

22      If I decide that dec. relief and injunctive or both under

23  (b)(1) or (b)(2) -- and I'm really interested in your thoughts

24  about which one -- and (b)(3) is applicable to reprocessing,

25  how do I implement that?

1     Is there a reason why I should do an amendment to the

2   class certification order?  You know, sort of decertify the

3   reprocessing remedy with respect to (b)(1) and (b)(2), keep it

4   certified as to (b)(3), decertify the dec. relief and

5   injunctive as to (b)(3) but keep it as to (b)(1) and (b)(2); or

6   can I just say in the remedies order what subsection applies to

7   which one?

8     Are there any important distinctions?  The only

9   distinctions I could think about have to do with the way

10  *res judicata* works down the road, and so I'm interested in

11  whether or not there's some issue on that that I need to pay

12  attention to so that it might be more important to put it in a

13  decertification kind of order rather than a -- I mean, for the

14  actual what's happening in this case, what happens to the class

15  in this case, none of this seems to make any difference, but

16  I'm concerned about spin-off effects down the road in other

17  cases and whether or not I got it right so the Court of Appeals

18  will think I got it right.

19     If I decide to do what I'm talking about and make --

20  decertify and make it clear that the declaratory relief and the

21  injunctive relief remedies are mandatory, can I -- what do I do

22  about opt-outs?  Can I make it clear that no one gets to opt

23  out of those remedies now, even though I allowed opt-outs

24  before, and give notice to those folks, 139 of them or whatever

25  they are, you know, "I'm sorry, yes, you got to opt out out of

the reprocessing remedy but actually as to the others I've

reconsidered and it's a mandatory class"?

     And then does any of that matter?  I mean, what's the

impact of even saying that to anyone?  You know, so I -- if I'm

just declaring that UBH violated the law in these following

ways and is enjoined to use the following standards for the

future, I'm not sure what the impact is on these people who

opted out of making this distinction other than the possible, I

think somewhat unforeseeable, questions about *res judicata* and

that the *res judicata* impact of the (b)(1) and (b)(2) classes

are dramatically less than the *res judicata* with respect to

(b)(3) class judgments.

     You know, my instinct is that none of them would keep

opt-outs from litigating whether or not their claims were

wrongfully denied even if I kept them in on the (b)(1) and

(b)(2) classes, but I'd like to hear your thoughts on that.

     Lastly, what is the impact on the class list of linking

certain subsections of 23(b) to certain remedies?  Do we

have -- I guess we have -- my instinct is we have very similar

remedies, the same class list for all of them for the two

groups except that the opt-outs for reprocessing wouldn't be

included in the opt-outs.  Or maybe there's other differences

that you might be able to think about because you've thought

about this more than I have.

     So that's my thought.  My tentative thought is to divide

1    it up in terms of certification.

2          Okay.  So let me hear, just for no particular reason, from

3    the plaintiff and then the defendant.

4                MS. REYNOLDS:  Thank you, Your Honor.

5          And I'll start and then with respect to the questions

6    about *res judicata*, my colleague Mr. Abelson will speak to

7    those specific issues.

8          So, Your Honor, the plaintiffs believe that it would be a

9    mistake to at this point in the case begin decertifying the

10   class in relation to specific remedies; and, you know, we set

11   this out in our supplemental briefing, but the place I'd really

12   like to start is with Rule 23(b)(3).

13         And a class that is certified under Rule 23(b)(3) is

14   unquestionably able to obtain from the court injunctive relief,

15   forward-looking injunctive relief, declaratory relief, and

16   reprocessing.  So there are no remedies that the plaintiffs are

17   asking for in this case that would be unavailable to a (b)(3)

18   class.  So decertifying the (b)(3) class for portions of that

19   relief doesn't make any sense.  We think it would be confusing.

20   It would be unfair to the people who have opted out, and --

21               THE COURT:  How is it unfair?

22               MS. REYNOLDS:  -- it would be wrong.

23               THE COURT:  How is it unfair?

24               MS. REYNOLDS:  Well, we sent them a notice that was

25   approved by the Court that told them that they would not be

1    bound by the remedies in this case and that they could opt out

2    in full.

3        Now, we don't know what they did in reliance on that

4    notice.  We have not seen any evidence that people filed their

5    own lawsuits, but we really don't know whether they did or

6    didn't, but they took whatever action they were going to take

7    in reliance on a notice that very clearly told them they could

8    opt out.  That will --

9        **THE COURT:**  Well, that's a different question from the

10   one you were just talking about, though.  That's the question

11   of whether or not if I'm just going to certify the dec. relief

12   and injunctive relief under (b)(1) and (b)(2) and not under

13   (b)(3), I can make it a mandatory class.  I mean, that's a

14   separate question from the issue of is it fair to them that

15   they're certified under one section or another, I think.

16       **MS. REYNOLDS:**  I understand what you're saying,

17   Your Honor.  I think the point I was trying to make is that if

18   the Court says that the classes are decertified for purposes of

19   certain relief, then they would necessarily be -- I assume that

20   the reason would be that the Court would not be allowing those

21   opt-outs to be honored.  So --

22       **THE COURT:**  And what's the implication of not allowing

23   those opt-outs to be honored?  I mean, it's hard to imagine any

24   implication for these people.  I understand the sort of

25   confusion issue.  I'm not -- I'm not terribly -- I mean, we can

 1   probably make that -- it's only 139 people.  It's a very

 2   limited group.  We can figure out what to say to them, but my

 3   question is:  What actually happens to them that's bad?

 4          **MS. REYNOLDS:**  Well, I mean, if you -- this requires a

 5   couple of assumptions, and I think some of them I can get to

 6   when I talk about (b)(1) and (b)(2) and Mr. Abelson will

 7   address them with respect to *res judicata*.  But, you know, if

 8   you tell them that their claims are mandatory, perhaps it will

 9   have some impact on their ability to bring a case in the

10   future.

11          I don't -- I think this is -- I do want to say,

12   Your Honor, you made this point and I think it's absolutely

13   right, we're talking about 139 people out of 163,000-plus

14   notices that went out.  So this is a little bit -- I don't want

15   to let the tail wag the dog.  This is a very, very small group

16   of people, and I want to stay focused on the class that has

17   been certified, and I think it would be wrong to suggest that

18   this class that has been certified under (b)(3) is somehow not

19   entitled to some or portions of the remedies that have been

20   requested.

21          And if the --

22          **THE COURT:**  What if it wasn't just certified under

23   (b)(3), that the way we did it is all of the remedies were

24   certified under all of the subsections?  You don't think

25   there's a risk that a judge looking at it three years from now

1    in the Court of Appeals is going to say, "Well, that's clearly

2    wrong and we have to reverse the whole thing because you can't

3    get one of those remedies at least under (b)(1) and (b)(2)?

4    Even though you certified everything under all three, that

5    that's not what *Dukes* permits.  *Dukes* permits -- *Dukes* says you

6    cannot do it under this subsection or that subsection, and you

7    have to do it all over again.

8        **MS. REYNOLDS:**  With respect, Your Honor, I think that

9    outcome seems remote.  The Court made findings that the class

10   met the requirements of certification under all three sections.

11   If the Court of Appeals at some point thinks that it was

12   incorrect to certify the injunctive class under (b)(3), the

13   remedy for that isn't to go back and decertify the (b)(2)

14   class.  It's just to decertify the (b)(3) portion.

15       So it seems to me that if this is a class that

16   unquestionably meets every possible way of being certified

17   under Rule 23 and the class is entitled to the relief, I think

18   trying to slice it and dice it in such a way actually risks

19   creating error where there actually isn't any to begin with.

20       **THE COURT:**  I mean, my concern would be different than

21   the one that you're concerned about.  My concern would be that

22   they would say it is obvious that the reprocessing claim can't

23   be certified under (b)(1) and (b)(2), and that they will say

24   "Since the judge did not make any distinction between the

25   three, he made findings under (b)(3) but he also certified it

 1   under (b)(1) and (b)(2), we need that" -- I mean, you know,

 2   it's sort of -- it's a wonderful little lawyer's argument about

 3   things on the head of a pin until we get to *res judicata*; but

 4   because of the implications for *res judicata*, or whatever else

 5   they can think of, isn't there some risk that they say that was

 6   clearly wrong?

 7           **MS. REYNOLDS:**  But, again, I think if the Court finds

 8   that the (b)(1) and (b)(2) portions of the Court's class

 9   certification order were wrong, I don't see why that would lead

10   them to then reverse the (b)(3) findings.

11       And the Court made separate findings as to the class, that

12   they were -- that the class met the requirements under each of

13   the rules separately; and so if a portion turns out ultimately

14   to have been wrong, I don't see why that would lead to reversal

15   of the portion that was correct.

16       And I think, you know, in the Court's order certainly the

17   Court could make clear that the Court finds that this remedy is

18   available to a class certified under this rule and this rule

19   and this rule and, you know, make clear what the Court is

20   finding about what is available to the class members.  But I

21   don't see why even if that's ultimately wrong, say the court

22   says, "Well, I think declaratory judgment relief is available

23   to any of these three types of classes," if the court

24   ultimately finds that -- the Circuit finds that to be

25   incorrect, I would think they would reverse only the portion

1    that is incorrect and not the entire decision.

2             THE COURT:  One would hope.

3             MS. REYNOLDS:  There doesn't seem to be a basis for

4    reversing a decision that was correct and was supported by

5    findings and set forth in the Court's orders just because there

6    was a mistake on a different issue.

7         And, Your Honor, before turning it over to Mr. Abelson to

8    address *res judicata*, I just wanted to make the point that if

9    the Court agrees with me that all of these forms of relief

10   could be granted to a (b)(3) class, then the mere fact that an

11   opt-out was permitted in this class in this case shouldn't

12   drive a decision that those forms of relief can't be awarded to

13   a (b)(1) or (b)(2) class because, you know, opt-outs are

14   mandatory for (b)(3) classes.

15        So if a (b)(3) class could get an injunction and people

16   would have to be allowed to opt-out of that injunction under

17   (b)(3), then it stands to reason that allowing opt-outs isn't

18   prohibited when an injunction is provided under one of the

19   other two parts of Rule 23(b).

20        So I think Your Honor, I'm sure, will let me know if I

21   missed anything, but right now I think I'd like to turn it to

22   Mr. Abelson to address your questions about *res judicata*.

23             THE COURT:  Okay.

24             MR. ABELSON:  Good morning, Your Honor.

25        So to address those questions, so one aspect of

1    Your Honor's questions, as I understood them, was the question

2    of whether making distinctions here and certifying under

3    certain remedies -- tying certain remedies to certain

4    subsections of Rule 23 will have any differing effects with

5    respect to *res judicata*; and if so, should that inform the

6    analysis, at the risk of rephrasing or expressing how I

7    understood what the question is to be on the table.

8         So a couple of points.  First, I do think this is purely

9    hypothetical so, as the Court put it, it is somewhat

10   unforeseeable to know whether these issues would arise in

11   subsequent cases or pending cases.

12        **THE COURT:**  Well, it's not hypothetical.  People have

13   filed lawsuits.  The judges have forestalled the decision on

14   the *res judicata* effect, but they will, they will address it,

15   and I guarantee UBH will raise it.  And so the question for my

16   mind is -- so I still think it's -- I think this one is -- this

17   is the core of the question about how I address the

18   distinctions between (b)(1) and (b)(2) and (b)(3).

19        **MR. ABELSON:**  Right.  And I've looked at those cases,

20   it's a subset of the 15 on UBH's list, and some courts have

21   stayed those actions pending a remedies decision or judgment in

22   this case and, I agree, have punted for now on the question of

23   what the *res judicata* effect is.

24        But our position has been and remains the same, that once

25   those courts reach -- that small number of courts reach this

1  question, the conclusion will be -- the preclusive effect is

2  what we've said it is, which is only as to the claims that have

3  been certified in this case.  Those are the claims that were

4  brought and could have been brought in the course of this class

5  action.

6      And it is possible that an argument could be made that in

7  that subset of cases that there's a distinction with respect to

8  preclusion as to the different sections; but, frankly, I do

9  think that is hypothetical, that --

10      **THE COURT:**  Well, bear with me because none of us are

11  going to know.  So let's assume it's an actual problem.  What

12  is the -- what about that distinction?  Is there a distinction

13  for *res judicata* effect if I certify or state in the remedies,

14  if that's the right way I should do it -- or maybe there's a

15  difference between the two -- that these remedies are under

16  this section and these remedies are under that section?

17      **MR. ABELSON:**  There are cases where I'm aware that

18  that distinction has been made.  I've looked at the

19  complaint -- we've looked at the complaints filed in those

20  cases.  The claims are different, and so I guess that's why I

21  think once the courts actually get to reaching the question,

22  they're not going to get to these distinctions because off the

23  bat these are different claims.

24      **THE COURT:**  Okay.

25      **MR. ABELSON:**  To the extent they overlap, the courts

1    can read the district court's opinion and look at the

2    prevailing law and whatever that jurisdiction is on the

3    *res judicata* standard.

4           **THE COURT:**  Well, okay.  Yes, they could if you win.

5    If they disagree with you, what is the difference in the

6    *res judicata* effect of doing it the way that you want me to do

7    as to the way that I've suggested?

8           So I'm not really asking about the "if you win" question.

9    Isn't there a better argument that, for example, people are

10   barred from bringing their own claims if they don't opt out for

11   wrongful denial of benefits on whatever grounds, grounds other

12   than the grounds that were raised here, if it's a (b)(3) class

13   rather than a (b)(1) or (b)(2) class?

14          Isn't that a better argument under the -- I mean, I think

15   it's a wrong-headed argument too but it's going to be raised.

16   It's already been raised.  Why would I -- and I clearly have

17   not adjudicated those other things.  So is there a way to

18   protect against that, make it clear what I'm doing at least so

19   that the courts that follow can -- and I don't know if "protect

20   against" is the wrong word, but make it clear what I'm doing so

21   that they will understand the *res judicata* effect as flowing

22   from the particular subsections of (b)(1) and (b)(2)?

23          **MR. ABELSON:**  So, first of all, I think the Court has

24   already done what is appropriate to do to constrain the

25   preclusive effect of its judgments by certifying the claims

1   that it certified because that's, you know, the authority that

2   we've cited before.  Although you can't prejudge this question,

3   the way to constrain the preclusive effects, to the extent the

4   Court can, is by defining the class claims to align with what

5   the class claims are.

6        I guess that's -- and there are -- I'm aware of the cases

7   that suggest that the preclusive effect of a (b)(1) -- of a

8   judgment where there was not an opt-out may have less

9   preclusive effect, but I just don't think those distinctions

10  will matter here.  And, in any event, it's those courts that

11  will be much better positioned to opine on what those

12  distinctions may be in, again, the very small number of cases

13  that this even could come up in.

14       And then I guess the other question related to

15  *res judicata* -- not *res judicata*, the class list that I

16  understood the Court to raise was the impact on the class list

17  of linking remedies to particular subsections of the rule.

18       First of all, as the Court knows, it's the class

19  definition that controls who is or is not in the class, not

20  necessarily the list itself.  The parties obviously have taken

21  good faith efforts to come up with a good list.  So I guess

22  that's one point.

23       And my other point would be, we do think it's a reliable

24  list.  There are some issues on the margins that were the

25  subject of the supplemental briefing, but I don't think any of

1   that should be affected by this distinction.

2        **THE COURT:**  Well, okay.  So, you know, that doesn't

3   answer my questions.  Neither of those things answer my

4   questions.  I mean, I must say they really don't.

5        So let's assume you're wrong about I've already done what

6   I need to do to define what this case is about for purposes of

7   *res judicata*.  Let's just pretend that that doesn't work.

8   Okay.  Pretend that doesn't work.  Is there any -- what happens

9   in terms of *res judicata* effect, number one, if I do what I

10  suggested, either in a decertification order or in a remedies

11  order?  And is there any meaningful distinction?  That's

12  question one.

13       Question two is:  What does the class list look like if I

14  do that?  The class list because we're fighting about the class

15  list.  Are there any -- do we have two class lists then?  Are

16  they different?  And presumably they're different or not.  So

17  that's the second question.

18       But the first question is -- you know, and I understand.

19  I don't want -- I understand your argument about *res judicata*,

20  and maybe in the end I'm comfortable with it.  If I'm not, and

21  it may be a combination of I'm not comfortable with it because

22  I can't -- I don't want to -- I want to make things clear for

23  other courts or I want to do this for reasons related to *Dukes*,

24  not related to *res judicata*, but bear with me and answer the

25  question the way I put it.  Thanks.

1      **MR. ABELSON:**  Sure.  So I don't -- in terms of

2  constraining -- taking further steps, I suppose, to further

3  constrain or make clear what the preclusive effect is, sure,

4  there's nothing precluding the Court, no good reason not to

5  articulate what I think we're both articulating, which is that

6  the preclusive effect, regardless of the section that this is

7  certified under, is limited to if a plaintiff in such other

8  case were to challenge a denial on the same grounds that we

9  have challenged the denials in this case.  That would be

10  helpful to such other court.

11      **THE COURT:**  Well, is it helpful to say I'm certifying

12  this remedy under (b)(1) and (b)(2) and this other remedy under

13  (b)(3)?

14      **MR. ABELSON:**  I don't think so.  I don't think that

15  would be necessary or provide any meaningful distinction.

16      **THE COURT:**  Okay.

17      **MR. ABELSON:**  And then as to the class list, currently

18  what we've referred to as the class list I believe does not

19  include the opt-outs.  So I suppose if the Court were to go the

20  route of drawing a distinction and want lists that correspond

21  to both, I suppose those could be added back in.  We know who

22  those people are.

23      I don't know if that answers the Court's question.

24      **THE COURT:**  Okay.  I think it does.

25      **MS. REYNOLDS:**  And, Your Honor, if I may just --

1        **THE COURT:**  Yes.

2        **MS. REYNOLDS:**  -- make one additional point on the

3   class list issue.

4        The presence or absence of the opt-outs is really the only

5   difference that this slicing and dicing would have on the class

6   list.  So meaning that the classes for all of the remedies,

7   whether it's under (b)(1), (b)(2), or (b)(3), they're all the

8   same.  The classes are identical and had this -- you know, as

9   the Court previously found, had all the same claims and the

10  same harm and common issues, and so forth, and so that's why

11  they look exactly the same.  And the only question is whether

12  the Court is going to deem the 139 opt-outs as ineffective.

13  And if it does so, as Mr. Abelson said, it's a very simple

14  matter of just putting those names back on the list.

15       **THE COURT:**  Okay.

16       **MS. REYNOLDS:**  But, again, I think they'd have to be

17  put on -- I guess they'd be put on just the (b)(1) and (b)(2)

18  lists.

19       **THE COURT:**  Right.  No, of course, and in your view,

20  is there any practical distinction for those folks of being or

21  not being part of those mandatory classes?

22       **MS. REYNOLDS:**  I really don't think so, Your Honor.

23  The point that we made in our briefing is that, you know, with

24  respect to injunctive relief, the result on nonparties to this

25  case results from the way UBH operates its business.  It

1   doesn't have, you know, many, many, many sets of criteria.  It

2   has one, and so people who aren't part of this case are going

3   to be subjected to those criteria the same as the class

4   members; and that, in our view, doesn't undermine the

5   appropriateness of that relief under (b)(1) and (b)(2).  It

6   doesn't make it less mandatory for the class.

7            THE COURT:  Okay.

8        All right.  Let me hear from Ms. Romano.

9            MS. ROMANO:  Yes.  Thank you, Your Honor.  Can you

10  hear me okay?

11           THE COURT:  Yes, I can.

12           MS. ROMANO:  Okay.  Great.

13       What the Court is suggesting it's inclined to do is

14  largely aligned with many of the arguments made by United

15  Behavioral Health in the supplemental briefing.  I will start

16  by saying that UBH has also brought a motion for

17  decertification on the ground of failure of class-wide proof

18  with respect to (b)(1), (b)(2), or (b)(3) class certification.

19       But assuming that the Court is not going to be

20  decertifying the classes in their entirety, to address

21  Your Honor's question with respect to whether there should be

22  some additional order or ruling tying these specific remedies

23  to (b)(1), (b)(2), or (b)(3), yes, UBH agrees that that is

24  appropriate and, in fact, that it is compelled by Rule 23 such

25  that the declaratory relief and prospective injunctive relief

1    should be tied to (b)(1) or (b)(2) and such that the

2    reprocessing relief, if it is ordered, should be tied to a

3    (b)(3) class.

4         With respect to the right method to do that --

5              THE COURT:  Right.

6         MS. ROMANO:  -- we would suggest that it is through a

7    decertification or amendment to the class certification order.

8    For clarification purposes so that it is particularly clear for

9    future courts or the Ninth Circuit, that would be the

10   appropriate and most clear way to address these issues.

11             THE COURT:  So why is that?  Ms. Reynolds suggests

12   that I just put in whatever I want to, and she didn't have an

13   objection to my putting in the remedies order that we are

14   limiting -- we're giving the reprocessing remedy pursuant to

15   (b)(3) and the other two remedies pursuant to (b)(1) and

16   (b)(2).

17             MS. ROMANO:  Your Honor, how that was worded, it may

18   be effective for these purposes as well; but the point here is

19   that it is not just that, the remedies are being issued

20   pursuant to (b)(1) or (b)(2) or (b)(3).  The point is that the

21   Court, I would assume here, would be holding and ruling that

22   the class is only certifiable with respect to declaratory

23   relief or prospective injunctive relief under (b)(1) or (b)(2)

24   and only certifiable under (b)(3) with respect to reprocessing.

25        So a clarification just with respect to remedies would not

address that fully.  It would be done through the full class
certification order and decertification of what is currently in
place.

     **THE COURT:**  And why do I need to do that rather than
just say I'm -- why do I need to do that?

     **MS. ROMANO:**  Because plaintiffs have not proven
entitlement to Rule 23 certification with respect to
declaratory relief or prospective injunctive relief under the
(b)(3), and they have not satisfied the requirements for class
certification for the other two remedies under reprocessing
under (b)(1) and (b)(2).  So it goes more to the remedies.  It
goes to whether the criteria for Rule 23 were met in the first
place.

     **THE COURT:**  Well, I'm not sure that's all right, but
it is -- the genesis of my question is the latter, is the issue
about whether or not the reprocessing remedy was properly
certified under (b)(1) and (b)(2).  And, you know, I guess the
distinction is what Ms. Reynolds says is, "Well, assuming
you're wrong, it's still certified under (b)(3) so it really
doesn't matter."

     **MS. ROMANO:**  Well, it does matter, Your Honor, because
what they are seeking -- the type of relief they're seeking for
declaratory relief and prospective injunctive relief is
incompatible with opting out.  It's incompatible with what
(b)(3) provides for.  It is relief that would be subject to

 1  certification under (b)(1) and (b)(2), and it should -- the

 2  order -- the class certification order should reflect that.

 3       **THE COURT:**  But why does it matter?  I mean, what's

 4  the practical -- what's the legal distinction?  What happens?

 5  I'm just thinking down the road I'm trying to figure out

 6  whether there's anything that actually happens either because

 7  we might be subject to reversal in a way that matters, not just

 8  they're going to say "You shouldn't have certified under (b)(1)

 9  and (b)(2) but, okay, you did it under (b)(3) so we'll leave it

10  alone," in a way that matters, or in some practical

11  distinction.

12       **MS. ROMANO:**  The most clear way it matters is with

13  respect to the opt-outs and whether there is an ability under

14  Rule 23 to opt out at all, and the mandatory remedies of the

15  prospective injunctive relief and declaratory relief are not

16  subject to an opt-out and, therefore, it matters that it's

17  under (b)(1) or (b)(2).

18       Of course the reprocessing is an individualized relief and

19  it is not relief that would be available under (b)(1) or

20  (b)(2).  It is subject to the notice in the opt-out, which did

21  happen and, therefore, that is why it matters.

22       **THE COURT:**  Well, but what is that?  So why does it

23  matter then?  Why does that matter?

24       So, for example, I allowed someone to opt out of the dec.

25  relief and the injunction.  I've done that.  Who cares?  I'm

```
 1   still going to issue the injunction.  The injunction will say
 2   "UBH, thou shalt do this."  It's not going to be identified for
 3   particulars.
 4        I'm still going to issue the dec. relief.  The dec. relief
 5   is still going to be generic.  You know, you applied, you
 6   created guidelines that are inconsistent with the terms of UBH
 7   plans that have a medical necessity component.  I mean, I
 8   wonder what the distinction is in fact for the folks who opted
 9   out of opting out of dec. relief and injunctive relief.  Is
10   there any distinction?  Is there anything that is different
11   with respect to them because they got to opt out of that?
12        They opt out of the reprocessing remedy, they don't get
13   reprocessed; but the other one, (b)(1) and (b)(2), I don't
14   understand what actually happens to them that's different.
15        MS. ROMANO:  Well, I mean, it does get to the
16   preclusive effect in subsequent cases, and we can't predict
17   what will happen in the existing individual cases or future
18   cases that could be filed; but individuals who met the
19   definition of the class should not be able to sue to seek
20   relief that would be inconsistent with the declaratory relief
21   or prospective injunctive relief that the Court may order.
22        THE COURT:  Okay.
23        MS. ROMANO:  Under (b)(1) and (b)(2), they should not
24   be able to opt out of a relief under Dukes; and Rule 23(b), the
25   point of it is to sort out who is in the class -- to determine
```

 1   who is in the class, and so it is important to know and to

 2   identify who is in the (b)(1)/(b)(2) class, that would include

 3   everybody, you can't opt out from it, and who is in the (b)(3)

 4   class, who would be entitled to reprocessing.

 5            **THE COURT:**  Okay.  Let me write this down.  Hang on a

 6   second.

 7                    (Pause in proceedings.)

 8            **THE COURT:**  So your point is they shouldn't be able to

 9   seek relief that is inconsistent with what I order in those

10   what should be, in your view, mandatory classes?

11            **MS. ROMANO:**  Yes.

12            **THE COURT:**  And, I mean, it's another question, and I

13   guess I want to kick it back to Ms. Reynolds or Mr. Abelson

14   after you respond to it, and that is, aren't I still allowed to

15   allow opt-outs in (b)(1) and (b)(2) classes?  Aren't I still

16   allowed to?

17            **MS. ROMANO:**  No.

18            **THE COURT:**  No.  I mean, there's no case that says I

19   can't ever do it.  There are cases that say you can.  I'm just

20   wondering why you think I can't anymore.

21            **MS. ROMANO:**  Your Honor, plaintiffs didn't cite to any

22   cases saying that you can; and, in fact, there are many cases

23   that specifically cite to Rule 23(b) and (b)(1) and (b)(2) and

24   say that those are mandatory classes.

25            **THE COURT:**  Well, but there have been cases over the

1    years that have allowed opt-outs in those circumstances and

2    there are many of them.  I'm just wondering why I can't do it

3    now.  I mean, and this is an argument about what *Dukes* means as

4    far as I'm concerned.

5          **MS. ROMANO:**  It is, Your Honor, and it's defendants'

6    position that under *Dukes*, the (b)(1) and (b)(2) classes are

7    mandatory classes.  The relief associated with them is

8    incompatible with opt-outs and they are mandatory classes.

9          **THE COURT:**  If you don't mind, I want to kick it back

10   to Ms. Reynolds for a second and then I'll come back to you on

11   that issue.

12        This is about whether or not there's any viability to what

13   I used in the opt-outs for (b)(1) and (b)(2)s.  The cases in

14   which there were (b)(1) and (b)(2) opt-outs allowed were cases

15   in which it appeared to me, at least from the description and

16   the literature, would no longer be permitted under *Dukes*; that

17   is to say, they actually involved individualized payments of

18   back pay or things like that.  I'm wondering whether or not

19   there's any viability at all after *Dukes* to an opt-out; and if

20   there is, why this is the case that it would happen.

21        So, for example, in the prior cases that allowed opt-outs

22   under (b)(1) and (b)(2), the distinction was, "Well, there are

23   some individualized issues here with regards to back pay so

24   we're going to give these people what they would otherwise have

25   if it were certified under another subsection.  We're going to

 1   give them a right to opt out."

 2        My reason given in my original certification order for

 3   allowing opt-outs was a little thinner than that.  It was,

 4   well, it's administratively inconvenient to draw that

 5   distinction, or it would be confusing to the class if I drew

 6   that distinction.  I'm not sure that passes muster anymore now

 7   that I've thought about the way *Dukes* limited the playing field

 8   or even under the original test.  I'm a little concerned that

 9   my -- is that allowing opt-outs on that basis wouldn't pass

10   muster, and so that's my question for you.

11        So you're muted, Ms. Reynolds.

12        **MS. REYNOLDS:**  Sorry.  Thank you, Your Honor.

13        *Dukes* was not addressing the question that the Court asks.

14   So *Dukes* was really addressing the issue of whether or not

15   plaintiffs can shoehorn individual relief into a case under

16   (b)(1) and (b)(2).

17        This is really the opposite case -- right? -- where we

18   have certification under all three that's appropriate, and the

19   question is:  Allowing some folks to opt out of the case, does

20   that somehow undermine the purposes of (b)(1) and (b)(2) or

21   undermine the appropriateness of certifying under those?  And

22   there's nothing in *Dukes* that holds that that would be the

23   case.

24        So the prior cases, the pre-*Dukes* cases in which courts

25   allowed opt-outs, again, I think it was getting to this issue

1    about if there's a monetary award at issue, then plaintiffs

2    have to be given due process rights to opt out and that's why

3    they get shunted to (b)(3), which has a mandatory opt-out

4    right.  But there's nothing in *Dukes* or any case law or the

5    rule itself that says that the Court does not have the

6    discretion in an appropriate case to permit (b)(1) and (b)(2)

7    class members to opt out.

8         And I would submit that this case is such an appropriate

9    case because the Court has made all the findings that each and

10   every person who's a member of this class is entitled to each

11   form of relief.  I mean, the Court's class certification order

12   addressed all the forms of relief under each of the three

13   subsections of 23(b).  So since these class members could get

14   the same relief no matter what subsection they're under,

15   there's no reason to preclude them from opting out.  I think --

16        **THE COURT:**  Well, let me give you a hypothetical.

17        **MS. REYNOLDS:**  Okay.

18        **THE COURT:**  You've requested and I'm inclined to order

19   UBH to apply very specific guidelines for these guys:  The ASAM

20   guidelines, the LOCUS guidelines.  If someone's opted out, they

21   could get an order saying "Don't apply those guidelines.  Apply

22   something different."  Apply, you know, whatever it is, some

23   other guideline that they think is more consistent with their

24   plans, and some judge might agree with them if they've opted

25   out.  They wouldn't be bound by my order.

I mean, and there are a number of things in there that are like that.  Your request that I issue an injunction that there be certain kinds of training, well, a judge might say "Don't do this kind of training.  Do that kind of training."  That there be a new restructuring of some parts of the corporate structure of UBH, a judge might say in response, "Well, no, no.  I don't want it structured that way.  I insist that someone from the Utilization Committee be on the Guidelines Drafting Committee."

You know, so my question is, you know, one can envision, especially with respect to injunctive relief, and perhaps with respect to declaratory relief, a situation where at least the possibility exists that a judge would issue some order inconsistent with, and directly contrary to perhaps, what I'm talking about.

And so that is the heart of the question here about whether or not there should be opt-outs and I don't understand, number one, why.  I mean, we allowed opt-outs pre-*Dukes*.  We would need to allow opt-outs post-*Dukes* one would think in financial cases, in monetary cases because of the due process concern.  That's not this case.  That's not why we allowed the opt-outs from all of the remedies.  This is we need some other reason to do it.

So those are my two questions.  Isn't it possible there could be injunctive relief inconsistent with what I'm doing that these opt-outs would then be entitled to?  And, second --

 1  and isn't that a danger?

 2       And, second, why -- I need a better -- I need a good

 3  justification for why I'm allowing opting out from sections

 4  that by their terms do not permit opt-outs.  We can fight about

 5  that, but what I'm concerned about is if you read *Dukes* and if

 6  you have that majority or, heaven forbid, some other majority,

 7  it could easily say, "Listen, Congress put opt-outs in this

 8  section and they didn't put opt-outs in this section so you

 9  can't have opt-outs in this section."  I could see them easily

10  saying that.

11       But I want to have at least some good reason why we have

12  some discretion because if they allow some discretion, it's

13  going to have to be for some good reason.

14       So those are my two issues.

15       **MS. REYNOLDS:**  Thank you, Your Honor.

16       So the hypotheticals that Your Honor posed about the entry

17  of injunctions that are actually incompatible, that is

18  specifically directed to (b)(1)(A) where the class is properly

19  certified if there's a risk of inconsistent findings that

20  would -- inconsistent adjudications that would result in

21  incompatible -- not just different but incompatible standards

22  of conduct.

23       And even if a subsequent court were to adjudicate a case

24  brought by one of these 139 people -- which, by the way, the 15

25  cases or 17 cases that have been identified by UBH are cases in

 1   which UBH contends those people are not opt-outs and that's

 2   different from whether or not the opt-outs have brought any

 3   cases, and we don't know whether they have.  And I will just

 4   also note that, you know, with the passage of time, the

 5   statutes of limitations are running.  This issue is becoming

 6   less of a problem by the day.

 7        Let's assume that there were some --

 8        **THE COURT:**  So whatever you're going to do, wrap it up

 9   in the next two minutes because I'm going to get off and take a

10   break.  Go ahead.

11        **MS. REYNOLDS:**  Okay.  Well, I just wanted to make the

12   point that that doesn't make those people who opted out any

13   different from any other nonclass member.

14        And as the Court is aware, for example, there's another

15   putative class action pending for people whose claims were

16   denied the day after the class period ended in this case.

17   Those people are able to seek whatever relief they desire and

18   the Court will order what it orders, and there's a possibility

19   that it might be incompatible.  We think very unlikely since

20   we're the same plaintiffs' counsel but maybe, and that doesn't

21   make the certification in this case improper and it doesn't

22   mean that the injunction is any less mandatory for this class.

23        **THE COURT:**  Well, I'm going to cut you off there

24   because I've got to go back into criminal and I'll come back to

25   this, but I'm going to leave you with the following question:

 1  Why do I care what a nonclass member does?

 2      The question posed by (b)(1) and (b)(2), and (b)(2)

 3  especially, is whether or not the company would be subject to

 4  inconsistent adjudications.  If there's an inconsistent

 5  adjudication that I can cut off with respect to class members,

 6  isn't that something I'm required to do under that unless I

 7  have a particularly good reason?

 8      And then we have to get to the particularly good reason,

 9  but I've got to get on a criminal calendar so I'm going to

10  leave this Zoom.  You're all welcome to stay.  In fact, I

11  encourage you to please stay, and I probably will be back in a

12  half hour to 40 minutes, and just stay within earshot of your

13  computers if you would.  And I apologize for this.  It was

14  unavoidable.  This came up last night after close of business.

15  Okay?

16      All right.  I'll be back.  Thank you.

17                  (Recess taken at 10:28 a.m.)

18              (Proceedings resumed at 11:18 a.m.)

19      **THE COURT:**  All right.  We'll be back in session.

20  Sorry it took so long.

21      Let me get my materials in front of me.

22      **THE CLERK:**  Sorry.  I lost my Internet connection

23  briefly.

24      **THE COURT:**  Welcome back.  So we're back in session.

25      So I think I left Ms. Reynolds with a question.

**MS. REYNOLDS:**  Yes, with a couple of questions,
Your Honor.

So you asked why should you care about what nonclass
members do and whether you're required to cut off any
inconsistent cases.  And in answer to the first question, the
reason the Court should care is that there's no difference
between a nonclass member and someone who's opted out of the
class.

All classes, including (b)(1)/(b)(2) classes, are defined
in such a way as to include some people and exclude others.
And, you know, in this case a perfect example are people who
have non-ERISA plans.  So there are plenty of people who had
their claims denied under UBH's guidelines during the class
period, and the only reason they're not part of our class is
because their plan was not governed by ERISA.  And it's
possible that those people -- it was always a risk that those
people might seek incompatible relief, but that possibility
doesn't preclude class certification.

And whether or not class certification under (b)(1)(A) is
appropriate, it's just that the risk is identified and the
point of class certification in that circumstance is to try to
mitigate that risk, which the Court has done in this case by
certifying the class.

And the fact that there are some folks out there who now
fall outside the class doesn't mean that the class is not

1    entitled to injunctive relief.  And you see that in, for

2    example, the *Melendres* case that we cited and other cases where

3    there's a class that has been defined, they've obtained an

4    injunction, and the injunction by its nature is going to affect

5    their people.

6         So in *Melendres*, the class was a class of Latino drivers

7    who passed through a particular county and there was injunctive

8    relief designed to prevent racial profiling, and that

9    injunctive relief was going to benefit, you know, other drivers

10   who are not Latino, like Black drivers, for example.  And that

11   fact didn't make that injunction nonmandatory.  It didn't make

12   it inappropriate for a (b)(1) class.

13        And the Court asked whether it's required to cut off all

14   inconsistent cases, and I think that those examples show why

15   the answer to that is emphatically no.  The Court's job is not

16   to cut off all inconsistent --

17        **THE COURT:**  Well, it wasn't quite that.  All

18   inconsistent cases that could be filed by class members seeking

19   relief inconsistent with the adjudications under (b)(1) and

20   (b)(2).

21        **MS. REYNOLDS:**  Right, but the people who are members

22   of the class can't bring an inconsistent case.  There are

23   people who never really became class members because they opted

24   out.

25        **THE COURT:**  No, no, no, no.  That prejudges the

 1    question.

 2         **MS. REYNOLDS:**  Fine.  But they have been -- they

 3    believe that they have opted out but other than the fact that

 4    they were originally within the class definition, they're no

 5    differently situated than anybody else who was never part of

 6    this case at all but could still seek an incompatible

 7    injunction.

 8         **THE COURT:**  Well, but that doesn't answer the second

 9    question, which is:  Doesn't (b)(1)/(b)(2) require me with

10    respect to class members not to allow opt-outs in order to cut

11    off the possibility that a class member before opt-outs would

12    file something that is inconsistent with the adjudication that

13    I made?

14         **MS. REYNOLDS:**  I mean, the rule doesn't say that.  The

15    rule allows certification when there is a risk.  The risk was

16    identified.  The case was properly certified.

17         And I think in this case, you know, the Court made a

18    determination to manage the class action in this way, and it

19    didn't create some unmanageable risk of incompatible cases.

20    It's a very small number of people.  And, you know, there's

21    no -- UBH hasn't cited any case at all in which anyone has ever

22    actually filed a case trying to get incompatible relief with

23    the injunctions that the plaintiffs are seeking here.  So, you

24    know, we're not aware of any and UBH hasn't identified any.

25         So by permitting opt-outs, the Court hasn't undermined the

1   purposes of the (b)(1)(A) certification here, and so we don't

2   see that as a problem.

3           **THE COURT:**  Okay.  All right.  I'll go back to

4   Ms. Reynolds -- Ms. Romano.  Sorry.

5           **MS. ROMANO:**  Yes.  Thank you, Your Honor.

6       What plaintiffs are arguing here is that the declaratory

7   relief they're seeking and the prospective injunctive relief

8   they are seeking, they're not mandatory remedies and that

9   opt-outs are appropriate, and that essentially means they're

10  not suitable for certification under (b)(1) or (b)(2).

11          Plaintiffs have also argued that that relief, both the

12  declaratory relief and the prospective injunctive relief, is

13  suitable relief under (b)(3).  And so if all of that is true,

14  what that means is that all of the relief being sought in this

15  case -- reprocessing, prospective injunctive relief, and

16  declaratory relief -- should be certified under (b)(3) and

17  that's how this should be resolved.

18      And of course we're not waiving the arguments that no

19  certification was appropriate here; but if plaintiffs' position

20  is taken as accurate, then this should be a (b)(3) class.

21          **THE COURT:**  Okay.  So let's move on to the next topic

22  area, Texas.  I'm worried about Texas for lots of reasons, but

23  my current worry about Texas is about whether and how to

24  decertify the Texas members of the state mandate class.

25      What I'm worried about is that we had so little evidence

1    at trial.  We had enough to conclude that for somebody in the

2    class, maybe some multiple somebodies, UBH was violating Texas

3    state law; but what we didn't have is enough to show anything

4    about when and for whom UBH followed the forbidden practices

5    even, I think arguably, where -- but we had the reference to

6    Houston but I'm not sure that that completely defines it --

7    and, therefore, for which class members they violated the law.

8         With respect to the others, you know, peak bits of the

9    class, either of this mandate class or the other classes, it's

10   clear that with respect to every member of the class, they

11   violated the law because in all of those instances, there was a

12   denial that was based on a CDG or whatever it was that I found

13   was incompatible with the plans.

14        This one is not quite so -- is nowhere -- the evidence was

15   quite thin, and I am contemplating decertifying the state

16   mandate class with respect to the extent it alleges a violation

17   of the Texas state law for the reprocessing remedy because of

18   that problem.

19        And the question is whether or not in deciding that (b)(3)

20   question on reprocessing, which is how I approach this because

21   I think that I may or may not be right that I have to adjust my

22   thinking and do a decertification on the other aspects of other

23   pieces of the classes, the reprocessing remedy is a (b)(3)

24   remedy.  And I can't -- I'm worried about the predomination

25   issue when you can't tell who's in the class and whether or not

1    they were certified -- were properly -- whether the Texas state

2    rules were properly applied or not without going into each

3    individual denial letter and making a call based on the

4    language of that denial letter.  And I've got to tell you, the

5    only example I've got is not a great example for that

6    predomination issue.

7        And so I'm not -- I can't -- I'm worried that I really

8    can't reach a conclusion that now that we've had the evidence

9    that we've had, that class issue is predominant to the

10   reprocessing remedy because I can't even tell who's in the

11   class.

12       On the other hand, it is clear that for some class members

13   in some locations for some time during the class period, UBH

14   violated Texas law, and so I wouldn't decertify this to the

15   dec. relief or the injunction, but I'm tempted to do it with

16   respect to the reprocessing remedy because, you know, you're

17   going to go in, you're going to get all these individual

18   letters.  We're going to have to go through the letters.  I

19   already know from the letters that I've seen that there's going

20   to be a fight about whether or not the letter means it was just

21   or was it not just adjudicated, is it adjudicated under the

22   Texas statute or was it also adjudicated under the CDG or was

23   it also -- or what does that mean.  So my concern is that those

24   individual issues will predominate.

25       My questions are as follows:  If I do that, I assume I

 1   have to give notice to the Texas members because the tolling of

 2   their statute of limitations issue with respect to whatever the

 3   issues are with respect to the reprocessing would cease once I

 4   decertified after they got notice.

 5        And then my other questions are:  What are the

 6   implications for decertifying as under just the (b)(3) class as

 7   opposed to decertifying under all the subsections, decertifying

 8   all Texas members of the mandated class?  Maybe there's no

 9   difference, frankly, as a practical matter, although I guess I

10   would not be making any findings as to Texas if I did that.

11        And this also raises the *res judicata* implication.  If I

12   decertify the (b)(3) remedy with respect to all of these

13   members who were insured in Texas and got treatment in Texas,

14   will they still be able to bring individual actions?  I assume

15   if I just do it under (b)(3), I assume they'll be able to bring

16   individual actions for nonpayment of benefits.  And so that's a

17   question.

18        And then the final question is:  I assume that under

19   either approach, whether I decertified it entirely or I

20   decertify it only as to the (b)(3) remedy of reprocessing, that

21   we don't have to review the denial letters to see which claims

22   were denied under the CDG or the LOCG as opposed to under the

23   Texas state guidelines.

24        So those are my questions on Texas, and I'm going to start

25   with the plaintiff again.

1          **MS. REYNOLDS:**  Your Honor, I will get to your

2     questions.

3          **THE COURT:**  Oh, good.

4          **MS. REYNOLDS:**  First, I do want to say that we don't

5     think that there is a basis for decertifying the portion of the

6     state mandate class that applies to the Texas members.

7          The Court found that all of those members had presented a

8     common question, which is exactly the same as all the other

9     state mandate class members, and the Court found that UBH did

10    violate it -- did violate its duties with respect to these.

11         **THE COURT:**  But it's not -- actually now we have the

12    evidence, and so we know that for somebody they did but we

13    don't know who or where or when.

14         **MS. REYNOLDS:**  What you're talking about, Your Honor,

15    is really an ascertainability question.

16         **THE COURT:**  No.  I think it's a predominance question.

17         **UNIDENTIFIED SPEAKER:**  The recording has -- this

18    meeting is being recorded.

19         **THE COURT:**  Sorry.

20         **MS. REYNOLDS:**  No worries.

21         The question is -- or the concern that Your Honor has is

22    that there may be letters that cite both types of guidelines.

23    Is that the issue?  That the --

24         **THE COURT:**  Well, first of all, that there's no

25    evidence as to -- there's no evidence in trial on who and where

1   and when.

2          **MS. REYNOLDS:**  Right.

3          **THE COURT:**  There's none.

4          **MS. REYNOLDS:**  Your Honor, I respectfully disagree

5   with that.  The class list that the parties stipulated to

6   includes about I think it's something like 760 people where the

7   guideline cited is the LOCG, and these are people whose plans

8   are governed by Texas law.  They're in the state mandate class.

9          **THE COURT:**  Well, but we know because of the nature of

10  those denial letters that some of those people might have been

11  denied on the basis of the LOCG and not the state-mandated

12  rules and that may not be the case with respect to others, and

13  so we're going to have to go through.

14          And what I don't understand is why we can do that now.

15  Why is that -- isn't that a part of -- now that I know more

16  about what the evidence is, isn't that part of the

17  certification question?  That is to say, if you have to do that

18  and you can't tell -- I mean, with respect to the others, it's

19  pretty simple because there's no competing guideline that they

20  have to work under.

21          **MS. REYNOLDS:**  Uh-huh.

22          **THE COURT:**  With respect to the state mandate classes,

23  it's not so simple.  And with respect to Texas as opposed to

24  the others, it's even less clear because we'd have to go

25  through and make that determination, and there is no evidence

1   at trial other than sort of the class list, these are the

2   letters that cited.  We don't know what they did with respect

3   to whether or not they also cited the Texas guidelines.  In

4   fact, we know that one did.

5          **MS. REYNOLDS:**  Right.  Your Honor, the class

6   definition states that people are within the class if UBH

7   denied their claim in whole or in part based on its guidelines.

8   And so if they're citing both, they clearly fall within that

9   class definition, and it's not -- the Texas law doesn't say

10  "ours plus another."  It identifies criteria that are supposed

11  to be used.  But if this is a --

12         **THE COURT:**  So what does that mean?  What does that

13  mean?  I mean, does that mean I should reprocess them even

14  though just because the letter says both and it technically

15  fits within the class definition?  But what it means is that

16  you're asking for that class to get a reprocessing remedy, all

17  of them, even if by citing both it means that actually it was

18  entirely consistent with the Texas rules, even if the fact that

19  they cited an LOCG; and that's all that it matters, is that it

20  was cited.  That's how you made the distinction.  You took the

21  letters that actually cited it, but it may turn out that, well,

22  in this case it's cited but actually they apply to only the

23  Texas guidelines.  I mean, that's my concern.

24         **MS. REYNOLDS:**  But, Your Honor, these notices are

25  not -- they have legal significance.  Under ERISA they're

1   supposed to state the reason and the basis for the denial.   If

2   they state in their letter that they base the denial on the

3   Level of Care Guidelines, the Court can take that as evidence

4   that that's what they did.

5           **THE COURT:**  It's a piece of evidence.  There's also

6   evidence earlier in the same letters that recite the Texas

7   guidelines.  So, I mean, you know, that's my concern, is we're

8   getting into -- I guarantee you if you have to dig out 800

9   letters, there will be a fight about 700 of them.  There will

10  be a fight about 700 of them.

11          **MS. REYNOLDS:**  We think that people who had their

12  claims adjudicated in whole or in part under these excessively

13  restrictive guidelines are entitled to reprocessing.  If the

14  Court is concerned that some letters cite both and the Court

15  thinks that that's not sufficient to prove our claim, which we

16  think it is, at a minimum the Court ought to keep in the class

17  people whose letter only cites the UBH guideline because the

18  only evidence in the case is that that is incompatible with the

19  law.

20          There is absolutely evidence that UBH did this, that UBH

21  wronged people by using its own guideline and not the Texas

22  guidelines.  There is no evidence to the contrary except one

23  letter that cites both, which we think still violates the

24  statute.

25          But the Court -- there's no reason to excise from the

1  class people whose claims were only decided under the Texas

2  guideline.  And it's true that in every case, UBH will have to

3  pull out the class letter.  That's just confirming class

4  membership.  It's the first step in --

5          THE COURT:  I'm not worried about the burden of

6  pulling out the class letters.  I'm not.

7          MS. REYNOLDS:  I understand the Court is trying to

8  avoid a dispute about whether citing both violates the statute.

9  I think there the question is whether the Court should make a

10  finding that that is not a violation of the law.  I mean, the

11  letter will cite it or not cite it.  I mean, it's subjective

12  and it's easy to tell what reasons were given.

13          THE COURT:  Are there -- you haven't seen these

14  letters?

15          MS. REYNOLDS:  No.  They've not been produced.

16          THE COURT:  Okay.

17          MS. REYNOLDS:  There was no --

18          THE COURT:  So the question, Ms. Romano, when we get

19  to you, is:  Are there letters in these 800 that say both?  Are

20  there letters that say just --

21          UNIDENTIFIED SPEAKER:  The recording has stopped.

22          THE COURT:  Oh, for some reason Karen keeps -- oh,

23  hang on a second.

24                  (Discussion held off the record.)

25          THE COURT:  Karen has dropped off, but we've got our

1    court reporter.

2         Jo Ann, I'm going to start recording this again so we get

3    a little bit of a -- we don't get too much --

4              **UNIDENTIFIED SPEAKER:**  This meeting is being recorded.

5              **THE COURT:**  All right.  I'm sorry.  I didn't mean to

6    interrupt.

7         So the question for Ms. Romano when we get back to her,

8    not yet, is whether or not there are letters that just cite --

9    that don't cite to Texas law among the 800; that they don't

10   cite the Texas guidelines, that they only cite -- I mean, they

11   all cite an LOCG or a CDG or something, and the question is

12   whether any of those do not cite the Texas guidelines.  That's

13   the question.

14        Hang on a second.

15                        (Pause in proceedings.)

16             **THE COURT:**  Okay.  Go ahead.  Ms. Reynolds, you had

17   other --

18             **MS. REYNOLDS:**  I do.

19        Okay.  So the other questions, the questions that the

20   Court asked was if the Court decertifies a portion of the state

21   mandate class, does the Court have to give notice.  I believe

22   so.  I think it's important to let people know that the tolling

23   has ended and that if they want to act in their individual

24   interest, they would need to do so.

25        I do think the Court should only decertify that portion of

1    the case that relates to reprocessing if that's what the Court

2    is inclined to do.  As noted, there is -- the only evidence in

3    the record is that UBH did, in fact, violate its duties with

4    respect to some members of -- some Texas members of the state

5    mandate class and, therefore, that class is entitled to

6    go-forward injunctive relief and a declaration, and so I think

7    that would only call for a partial decertification.

8         I think that's -- I think that --

9              THE COURT:  The other question is:  If we do that, do

10   we not have to review the denial letters, the 800 denial

11   letters?

12             MS. REYNOLDS:  If we decertify a portion of the case?

13             THE COURT:  If I decertify the (b)(3) portion of the

14   case so that --

15             MS. REYNOLDS:  I think that's -- I think that's

16   probably correct.  I don't think there's any reason why it

17   would be necessary to review the denial letters in that case.

18             THE COURT:  Okay.  Ms. Romano.

19             MS. ROMANO:  Yes.  Thank you, Your Honor.

20        I do want to clarify one point with respect to the Texas

21   members, and by "Texas members" I'm specifically talking about

22   those who fall into that category of being subject to the Texas

23   Department of Insurance guidelines fully insured plans

24   substance use services in Texas.

25        There is no evidence of any class member who was denied

1  authorization or coverage that was subject to the Texas

2  Department of Insurance guidelines and where the Texas

3  Department of Insurance guidelines were not used.  So it's not

4  just that we don't know the who or the when; we don't know the

5  if.

6      We saw there was an e-mail introduced into evidence where

7  no individual is identified.  We don't know if the denials

8  actually happened, if any did, where Texas guidelines applied

9  and weren't used.  We don't know if it was overturned on

10 appeal.  We don't have the evidence of any class member fitting

11 this description, and there is no named plaintiff who was

12 subject to the Texas Department of Insurance guidelines either.

13     And so for that reason, there is a failure of proof here,

14 individual proof and class-wide proof, to establish liability

15 with respect to the Texas guidelines.

16     **THE COURT:**  Yeah, okay.  Well, I obviously already

17 rejected that line of argument, but let's move on to the

18 question of decertification.

19     **MS. ROMANO:**  So if we are talking about

20 decertification, the decertification with respect to the Texas

21 class or the Texas members should be across the board with

22 respect to all remedies -- prospective injunctive relief,

23 declaratory relief, and the reprocessing -- because of failure

24 of class-wide proof to support all three types of remedies.

25     **THE COURT:**  Okay.

1      **MS. ROMANO:**  With respect to Your Honor's question

2   relating to the letters --

3      **THE COURT:**  Yeah.

4      **MS. ROMANO:**  -- I have not reviewed all the letters.

5   We have not pulled all the letters.  I do not have -- I am not

6   aware of any letter where the Texas guidelines were supposed to

7   be applied and where the Texas guidelines are not cited, but I

8   have not reviewed them all so I cannot say that across the

9   board with respect to all of them.

10      **THE COURT:**  Okay.

11      **MS. ROMANO:**  With respect to the question of if the

12   Court decertifies the Texas members either specifically for

13   reprocessing or decertifies the claims across the board should

14   a notice go out to those class members, yes, but it would be

15   defendant's position that this is not a decertification issue,

16   this is a failure of proof.  So the judgment should be granted

17   in favor of defendant on the Texas issue.

18      **THE COURT:**  Okay.

19      All right.  The next question is whether and how to --

20   hang on a second.

21                  (Pause in proceedings.)

22      **THE COURT:**  I mean, so just to go back to one point,

23   nobody believes on either side, I assume, that the dec. relief

24   portion of this requires an opt-out; that is to say, you know,

25   just taking the dec. relief as what the plaintiffs have

1  requested, which is mostly -- which is retrospective, it's

2  somewhat perspective, it depends on how you look at those

3  terms, I take it none of you believe that class members had to

4  be permitted to opt out any portion of the dec. relief.

5         MS. REYNOLDS:  Your Honor, no, the plaintiffs do not

6  believe an opt-out is required for declaratory relief unless

7  it's ordered only under (b)(3) because (b)(3) requires

8  opt-outs.

9         THE COURT:  Right.  But as to this dec. relief that

10  you have requested --

11         MS. REYNOLDS:  It's not -- you're right.  It's not

12  because of declaratory relief.  It's the only reason the

13  opt-out was permitted -- was required in this case was because

14  the court certified a (b)(3) class.

15         THE COURT:  Fine.  But if it was just certified under

16  (b)(1) and (b)(2), you would say it's not required --

17         MS. REYNOLDS:  That's right.

18         THE COURT:  -- as to the relief you've requested?

19         MS. REYNOLDS:  Correct.

20         THE COURT:  Okay.  And you don't disagree with that,

21  Ms. Romano, I assume?

22         MS. ROMANO:  We have many objections to the

23  declaratory relief sought but if the Court certifies it under

24  (b)(1) and (b)(2) only, then opting out would not be permitted.

25         THE COURT:  Right.  Got it.

1      So as to class members who received their benefits on

2  appeal, I've got to figure out what to do with those folks.   I

3  assume that if you received your benefits on appeal, we have an

4  Article III standing issue as to those people because they

5  received their benefits.   Paying close attention to standing at

6  the remedy phase as full directs, it would seem that that's an

7  issue.

8      It also seems to me that there's a typicality problem if

9  they -- you know, the rest of the class didn't receive benefits

10  but these people did, it would seem to me that we need to

11  decertify as to the class members who received their benefits

12  on appeal.

13      And the question is:  As to what?  Is it all three?  Is it

14  both the dec. relief and the injunctive relief and the

15  reprocessing?  That's my inclination.  And I assume -- and the

16  question is that these people should get notice if there's a

17  decertification.  So we'll start with plaintiff again.

18          **MS. REYNOLDS:**  Right.  So limiting now to the people

19  whose denials -- who appealed their denials and the denials

20  were reversed.  Well, as an initial matter, Your Honor, we

21  don't agree that those people were not injured.  We don't agree

22  that those people lacked Article III standing.  They were

23  subjected to these wrongful guidelines.  They did have a

24  wrongful denial and, at a minimum, they're entitled to

25  injunctive relief going forward and declaratory relief; right?

1    The reason their claims were denied was because even UBH

2    found that they were sick enough to need the treatment under

3    its restrictive guidelines.  So it doesn't -- the fact that

4    they got some coverage through the appeal process doesn't undo

5    the original -- or the use of these bad criteria and it doesn't

6    mean they're protected in the future, and that's why injunctive

7    relief is needed for that class.

8    I think we tend to agree that doing a full reprocess for

9    those folks isn't necessary because UBH has already reached a

10   conclusion that shows that its original denial is wrong; but we

11   do think that at a minimum UBH should confirm that those people

12   did, in fact, get everything that they were asking for and not

13   just a portion.  Sometimes a person asks for relief or coverage

14   for a certain number of days and then if UBH overturns it, they

15   may overturn it for only a portion of that time.

16   **THE COURT:**  Okay.

17   **MS. REYNOLDS:**  And if the Court, you know, determines

18   that it's going to decertify this class in part, you know,

19   again, I think it would be only as to the reprocessing or part

20   of the reprocessing and not to the other forms of relief.  And,

21   yes, we think that notice should be provided to anyone who is

22   removed from a class.

23   **THE COURT:**  Hang on a second.  Let me look at

24   something.  I wanted to check one thing.

25                         (Pause in proceedings.)

```
 1              THE COURT:  So how have these people been identified
 2      so far?
 3              MS. REYNOLDS:  The people whose claims were reversed
 4      on appeal?
 5              THE COURT:  Right.
 6              MS. REYNOLDS:  I believe that they can be identified
 7      in UBH's claims databases.
 8              THE COURT:  Okay.
 9         Okay.  Let me hear from Ms. Romano on this group.
10              MS. ROMANO:  Yes, Your Honor.
11         For individuals who appealed and received the benefits
12      that they were seeking --
13              THE COURT:  So when you say that, do you mean received
14      all of the benefits they were seeking?
15              MS. ROMANO:  Yes, Your Honor.
16              THE COURT:  Okay.
17              MS. ROMANO:  -- they suffered no concrete injury
18      caused by the conduct at issue in this case and, therefore,
19      should not be part of a certified class with respect to any of
20      the remedies at issue.
21              THE COURT:  Okay.  And how do you -- and have you
22      identified the folks who've had their -- received all of what
23      they were seeking on appeal of the denial?
24              MS. ROMANO:  I'm going to defer to my partner,
25      Ms. Ross, on the class issues --
```

1          THE COURT:  Okay.

2          MS. ROMANO:  -- class list issues.

3          THE COURT:  So I can't hear you, Ms. Ross, for some

4     reason.

5          MS. ROSS:  Can you hear me now?

6          THE COURT:  Yes.

7          MS. ROSS:  Okay.  Excellent.  Thank you.

8      So with respect to identifying all of the members who had

9     their benefits paid on appeal, we haven't gone through that

10     exercise.  As Ms. Reynolds notes, UBH does have claims

11     databases, appeal databases, and initial denial databases, and

12     it would be an exercise that would involve some

13     cross-referencing between those to identify that group of

14     people.  We haven't done that exercise yet.

15      I believe the evidence in the record from trial from

16     Ms. Bridge is that the overturn rate on appeal is

17     approximately, I believe, 30 percent.  I may be off on that,

18     but I think it's about 30 percent.  So we would anticipate that

19     it would be a considerable number of people within the class

20     who would fall into this category.

21          THE COURT:  Okay.  Yeah, it sounded like you estimated

22     at some point that there was about 3 percent of the class.

23          MS. ROSS:  Yes.  I think we estimated that based on

24     the sample that we did and where we looked at a number of

25     claims that were underlying here in the case and looked at the

1   outcome of each of those.  We did not look to the

2   administrative record in each one of the class members' records

3   that were part of the case.

4           **THE COURT:**  Okay.  All right.

5      Okay.  The next question that has been raised, we talked

6   about and you've spoken about in your supplement is whether and

7   how to decertify with respect to class members who fall within

8   the class definition based on their denial at the

9   administrative appeal level or whether to add them to the class

10  list.

11      You made up a class list based on, I guess, initial denial

12  letters and so for some reason these folks -- for that reason,

13  these folks were left off and never got notice.

14      I'm a little concerned that we're sort of boxed in now by

15  that, that due process, and Rule 23 because of due process

16  requires a notice that's reasonably expected to meet these

17  people before you bind them to anything, that the method of

18  notice that we used was not reasonably expected to meet these

19  people -- get to these people.  It's not like it was an ad on

20  the Internet or in a newspaper when we had newspapers that

21  somebody might read or somebody might not read.  We left them

22  off the list deliberately because of the way we -- because of

23  attributes of their claim, as to the timing of when they were

24  denied.

25      It seems to me it's very hard to argue that the due

1  process standard was met by that because they couldn't

2  reasonably be expected to get notice from this.  And that if

3  they weren't, I'm not sure that I can do anything about it now;

4  that is to say, I'm not sure that I feel comfortable binding

5  them to the rulings of this Court, leaving aside whether it's a

6  good ruling or a bad ruling or in favor of them or against

7  them, because of that lack of notice.

8       It seems to me it is probably too late to give them notice

9  now and give them a chance to opt out because of the problem

10 that I've already made substantive rulings largely in their

11 favor.  I've made some rulings against them, but I'm not sure

12 that -- you know, and somebody might view those rulings with

13 favor or disfavor; but the fact that they have the rulings and

14 it's this one-way *collateral estoppel* problem, I'm not sure

15 that I could -- I'm pretty sure I couldn't give them a right to

16 opt out now, but what I could do is decertify them so they're

17 not bound by any of this.

18      And so that's the question.  That's what I'm thinking of

19 doing as to those folks.

20      And then the other questions I have on this group is how

21 to identify them.  If I decertify with respect to them, do I

22 need to give them notice even though I didn't give them notice

23 in the first place?  I don't know.  Probably not.

24      And does this have any impact on -- or should it have any

25 impact with respect to the (b)(1) and (b)(2) remedies?  They

1   were part of the (b)(1) and (b)(2) class.  They were not

2   entitled -- strictly speaking, you don't have to give them a

3   right to either notice or opt out under the (b)(1) and (b)(2)

4   remedies so I'm wondering if I should keep them in for that

5   purpose.  I don't even have to come up with a class list for

6   that purpose.

7        So that's my questions as to that.  Let's start with

8   Ms. Reynolds.

9        **MS. REYNOLDS:**  I'm going to defer to Mr. Abelson on

10  this issue.

11       **MR. ABELSON:**  Your Honor, so as to these questions, a

12  few points.

13       First of all, Your Honor referenced to leaving them off

14  deliberately.  I understand the context but just to make clear,

15  the interrogatory that we issued that initiated this process

16  didn't seek information about benefit claims that were denied

17  and for which -- and referred to the final denial.  Certainly

18  the parties went back and forth and that is what it is, and we

19  agreed that they were not included.

20       **THE COURT:**  And we all agreed on the way it was done.

21  You agreed.  They agreed.

22       **MR. ABELSON:**  Yes.

23       **THE COURT:**  It's not like it's a question.  Regardless

24  of what your original question was, your ultimate answer was a

25  method that would leave off anyone whose denial was on appeal.

1          **MR. ABELSON:**  We did.  I mean, just to be clear, we

2    didn't understand at the time, and not to point fingers, but we

3    didn't understand at the time that the field that refers to the

4    basis for denial in the database doesn't change if there is an

5    appeal on the basis of denial changes.

6          **THE COURT:**  Okay.  Whatever.

7          **MR. ABELSON:**  We didn't understand that information,

8    so --

9          **THE COURT:**  I'm sure you didn't deliberately seek to

10   exclude these people.  I understand that.  You didn't know they

11   were there.

12         **MR. ABELSON:**  In terms of due process, I understand

13   the concern, that we see the due process analysis is for the

14   class overall.  We do think that we took reasonable efforts to

15   notice the class.

16         And a related issue is to the extent that what is

17   motivating the Court's concern is a preclusion or *res judicata*

18   issue, in this hypothetical scenario that one of these people

19   files a case and raises an issue, they can certainly argue that

20   they didn't get notice and that the notice in this case wasn't

21   reasonably calculated to give them notice.  So I do think this

22   is an issue that could be -- maybe most appropriately would be

23   decided by such a hypothetical court.

24         In terms of the --

25         **THE COURT:**  So where's the case that says that it is

1  reasonable notice to the class as a whole?  I mean, first of

2  all, that's the first question.  Where is the case that says

3  it's got to be reasonable notice to the class as a whole even

4  if it in hindsight specifically excludes by its method some

5  class of people that are within the class?

6          MR. ABELSON:  I can't cite a case on that.  I'm

7  thinking mainly of just the language of Rule 23.

8          THE COURT:  It says "reasonable notice to the class."

9          MR. ABELSON:  The best notice that is practicable

10  under the circumstances.

11          THE COURT:  Well, the best notice as practicable under

12  the circumstances would be to give them actual notice just like

13  we did to the rest of the class.

14          MR. ABELSON:  Right.  And that, I think, is mainly a

15  question for UBH.  My understanding is that they think it is

16  not practicable to go through those appeal letters and identify

17  one way or the other -- to identify whether the basis on appeal

18  was different than on appeal -- than the basis on -- the

19  initial basis.

20      And also another relevant point, I think, is that

21  notice -- just to be clear, notice was accomplished in a number

22  of ways.  One was sending notice to individual people.  Another

23  was through the website to anyone.  And we know that, because

24  we've gotten a lot of calls, a lot of people were paying

25  attention to this on their way to the website and contacted us

1   even if they were not class members.

2        I think the last piece of the Court's -- the last question

3   was with respect to if the Court decides to, I suppose,

4   decertify with respect to the (b)(3) portion --

5             THE COURT:  Yeah.

6             MR. ABELSON:  -- if that's the way the Court goes,

7   what would be the implications with respect to (b)(1) and

8   (b)(2), and I would say there should be no consequence.

9   They're entitled to injunctive and declaratory relief just like

10  anybody else.

11            THE COURT:  They're entitled to -- well, so you think

12  I can, despite the fact -- because they're not entitled to

13  notice on (b)(1) and (b)(2), even if they have to have a notice

14  required under (b)(3), I can bind them to the first part?

15            MR. ABELSON:  (b)(1) and (b)(2) don't require notice

16  and so if the Court's concern arises from notice but otherwise

17  UBH is liable, then I suppose there's no issue.

18            THE COURT:  So I wouldn't have to go about finding

19  them?

20            MR. ABELSON:  I think that's right.

21            THE COURT:  Okay.

22            MR. ABELSON:  I mean, and I guess I'll just add that

23  our understanding from UBH is that this is not a sizable

24  population, the number of people.  Our understanding is that

25  the basis for denial rarely changes from administrative to

1  clinical guideline based.  We know there are some, three who

2  happen to have contacted us, but our position would be that

3  they are class members.  UBH should just look at the appeal

4  denial letters and identify those folks, especially if it's the

5  case, as they suggest, that this is a small population.

6      THE COURT:  Well, they'd have to look through all the

7  denial letters for appeals of the entire class to figure that

8  out; right?

9      MR. ABELSON:  Well, not necessarily.  There are some

10  types of administrative denials -- there's some types of

11  administrative denials that I think would be more likely than

12  others to end up with a guideline-based denial on appeal.

13      So, for example, lack of information is one way that

14  commonly an initial denial is coded.  For example, my

15  understanding is that if the peer reviewer can't reach the

16  doctor and that if they do reach the doctor and make a

17  determination with clinical evidence, then they convert the

18  denial to guideline base.  So it may be that that is the form

19  of the administrative denial that would be the most likely or

20  we would conclude is most likely to lead to such an appeal

21  denial.

22      THE COURT:  Let me hear from Ms. Romano on this

23  question.

24      MS. ROMANO:  And Ms. Ross is going to be handling

25  these issues.

1          **THE COURT:**  Ms. Ross.  I'm sorry.

2          **MS. ROSS:**  Thank you, Your Honor.  Can you hear me

3     now?  I don't have enough --

4          **THE COURT:**  Yes.  Yes.

5          **MS. ROSS:**  Okay.  Excellent.

6          With respect to these folks, as Your Honor says, this is

7     something that has come up very, very late in the game, well

8     after the class list was decided, well after we negotiated and

9     stipulated that list and everyone agreed to the process used to

10    create it.  Both parties understood throughout the process that

11    the database that was used to create that list was the initial

12    adverse benefit determination data from the initial

13    determinations, and both parties agreed to that.

14         So as you note, Your Honor, the parties made no effort to

15    notice the group of people that you are talking about.  And I

16    would agree with you that consistent with due process, they did

17    not receive notice that would meet the requirements of due

18    process and, therefore, did not have a meaningful opportunity

19    to opt out of the class.

20         We would also agree with you, Your Honor, that it is too

21    late to allow an opt-out right now after substantive rulings

22    have been made in the case and that to do so would violate the

23    rule against one-way intervention and prejudice UBH were that

24    to be allowed.

25         With respect to your sort of particular questions about if

1   we were to decertify as to these people, how would we do that,

2   do they need notice and what would that look like, since there

3   was no notice issued to this group in the first place, we don't

4   believe it would be necessary to provide them with notice at

5   this stage.

6        Another way to go about this, Your Honor, would be to

7   amend the class certification order in order to amend the class

8   definition so that it was clear that the class that was

9   certified here relates to the initial denials of benefits

10  rather than sweeping in this -- questionably sweeping in this

11  group of people that was never contemplated to be subject to

12  notice in the case.

13       With respect to how to identify them, I think Mr. Abelson

14  has hit on this, frankly, in his own explanation of it.  It is

15  a very individualized question.  There are different scenarios

16  that could give rise to an administrative denial being

17  converted to a clinical appeal; and, in particular, we'd be

18  looking at things like eligibility determinations that were

19  then reviewed and found not to be correct and then there was a

20  clinical appeal.

21       There could be, as Mr. Abelson notes, situations where

22  information that was required to be provided by the member

23  during a particular time window was not provided and, as a

24  result, the denial issued on an administrative basis; but if

25  there was later an appeal in certain situations, that appeal

1   may have been reviewed on a clinical basis.  But the only way

2   to determine whether, in fact, that is the case for any

3   particular administrative denial would be to look at the

4   individual records for that denial and to look to see whether

5   there was an appeal and to look to see whether that appeal was

6   addressed on a clinical basis.

7        Mr. Abelson suggests that there may be buckets within the

8   administrative denials that are more likely to lead to

9   something else but I think, Your Honor, that just emphasizes

10  the individuality of this question and the inability to do this

11  on a class-wide basis.  I would also note that there is no

12  proof in the record with respect to any of these people,

13  certainly no common proof.

14       So as both a practical matter and a matter of

15  constitutional due process and Rule 23, we would agree with

16  Your Honor's inclination that these people are not in the

17  class, notice was not given to them, and they should not be in

18  it.

19       In terms of how to, then, carve them out is either

20  decertification with respect to that population or, you know,

21  basically the same effect would be modifying the class

22  definition to be clear that people whose clinical determination

23  was only on an appeal are not included in the class.

24           **THE COURT:**  What about the (b)(2)/(b)(3) issue?

25           **MS. ROSS:**  Well, what we heard from Ms. Reynolds

1   earlier was that class members should be able to opt out of all

2   of the remedies, which would essentially render them all (b)(3)

3   remedies.  If that's the case, then they need to be included.

4        **THE COURT:**  That's a nonsense response.  I'm not going

5   to have you pick up on some stray remark.  It just doesn't help

6   me in this decision.  I want to know whether or not I can --

7        **MS. ROSS:**  Fair enough.  No, if, in fact, what

8   Your Honor is inclined to do is to separate the remedies so

9   that certain remedies are issued under (b)(1) and (b)(2) and

10  others under (b)(3), then with respect to the mandatory

11  remedies of (b)(1) and (b)(2), if the class definition is

12  changed, those people would not be part of that but it wouldn't

13  be necessary to do that because the opt-out issue and the due

14  process and late intervention issues would not be in play with

15  respect to mandatory remedies.

16       **THE COURT:**  So I'm forced to ask this question,

17  although I'm not sure I want to ask it or I think I know the

18  answer, but the question is this:  You think it's not practical

19  to give these people notice?  I mean, that's what you're

20  saying.  I mean, doesn't that mean that "We did the best we

21  could in the initial -- they're in the class definition.  We

22  did the best we could noticing the class.  It's not practical

23  to give these few people the kind of notice we give everyone

24  else.  There was a website created, but we couldn't do any --

25  we gave the best practical notice under the circumstances --

1   practicable notice under the circumstances so the

2   constitutional due process is satisfied"?

3         MS. ROSS:  Respectfully, Your Honor, I would say

4   that's a little bit revisionist in that I think the parties

5   both agree that there was not an effort made to give notice to

6   these people.

7         THE COURT:  That's not the test.  I'm not revising.

8   The question is:  If I'm going to say that it was a due

9   process -- we didn't comply with the due process rights of

10  these folks so we couldn't be binding them to my determinations

11  against them or for them, if we're going to do that, the test

12  is whether or not we gave the best practicable notice to them

13  in the circumstances.  We gave whatever notice we gave for

14  whatever reason we gave it.  Fine.  That notice was given.

15  Didn't you just make the argument that goes to showing that

16  that was the best practical notice we could have given?

17        MS. ROSS:  I don't think that's necessarily correct,

18  Your Honor, because, frankly, the parties never attempted to

19  notice these people.  So perhaps there would have been a better

20  way to do it if we had tried to do it.

21        THE COURT:  Like what?  Like what?

22        MS. ROSS:  I mean, like I said, we haven't tried.  We

23  do know that there are serious challenges in the databases in

24  terms of being able to identify them; that to identify them is

25  an individualized inquiry that would require us to go page by

1   page through administrative records for each one of the

2   administrative denials where we know the vast majority are not

3   going to produce a class member because they're going to be

4   administrative in terms of how they were handled, but that we

5   can't connect those to the clinical denial database in an

6   automated way that would allow us to identify them.

7           THE COURT:  Okay.

8       All right.  So we're going to stop again.  This time we're

9   going to stop for one hour and then I've got a couple follow-up

10  questions, and then we're going to turn to remedies issues.

11      Okay?  All right.  Thank you-all.

12          ALL:  Thank you, Your Honor.

13          THE CLERK:  Court stands in temporary recess.

14              (Luncheon recess taken at 12:16 p.m.)

15  **Afternoon Session**                               **1:14 p.m.**

16          THE CLERK:  Okay.  We are resuming Case

17  Number 14-cv-2346, Wit vs. UnitedHealthcare, and the related

18  case 14-cv-5337, Alexander vs. United Behavioral Health.

19          THE COURT:  All right.  Everyone's here.

20      So I had a couple of questions I wanted to ask before we

21  turn to remedies.  So we're going to take -- well, this isn't

22  really a question.  We're going to take the 170 individuals

23  whose denials were administrative off the class lists.  I think

24  that's stipulated to at the trial.  We don't have to go any

25  further into that.

1    The correction of the end date for the Illinois portion of

2  the Wit state mandate class, am I correct that the end date

3  should be changed from June 1, 2017, to January 1, 2016, to

4  reflect the Court's finding UBH started using ASAM Illinois on

5  that date?

6        **MS. REYNOLDS:**  I believe that's correct, Your Honor.

7  We agree that it should be corrected.

8        **THE COURT:**  Okay.

9        **MS. ROMANO:**  Your Honor, we agree as well.  I will ask

10  my colleagues to check and make sure that those dates are

11  accurate.  I'll correct them by the end of the hearing if they

12  are not, but otherwise we would agree.

13        **THE COURT:**  Okay.  And so the current number of

14  notices that have been sent, I've seen a couple of different

15  numbers, and opt-outs, am I right there are 139 opt-outs out of

16  63,292 notices that were sent?

17        **MS. REYNOLDS:**  Yes, that's correct.  You may have seen

18  a different number for opt-outs because some people opted out

19  even though they were never actually class members so they've

20  been weeded out.

21        **THE COURT:**  Okay.  Great.

22    So there's been some discussion about, and I don't really

23  want to get into the merits that this question underlines, but

24  I think it's pretty clear now that at least some of the named

25  plaintiffs are still covered under UBH's plans that have a

1   medical necessity requirement.  Does UBH agree with that?

2          MS. ROMANO:  Yes, there are at least a few.

3          THE COURT:  Okay.  And then the last question is:  If

4   I do one of these things where I decertify as to certain

5   subsets of the classes and I can't -- what happens is I give

6   notice?  And my recollection, does everyone agree and stipulate

7   that the tolling that's applicable to those people continues

8   until they receive that notice?

9          MS. REYNOLDS:  I believe that's correct.  I'm going to

10  ask my colleagues to speak up if they disagree with me.

11         THE COURT:  It's really a question for Ms. Romano too.

12         MS. ROMANO:  Yes, Your Honor.

13      I would want to confirm that on the case law before I

14  confirm that on the record.

15         THE COURT:  Well, we could stipulate to it right now.

16         MS. ROMANO:  I am not prepared to, Your Honor, because

17  I would want to confirm that in the case law first.

18         THE COURT:  Well, regardless of whether it's case law,

19  will everyone agree that -- will UBH agree that those people's

20  claims that might -- for which they might lose tolling because

21  there's a decertification, that tolling will continue until,

22  you know, a reasonable time after the notice is sent?

23      The reason I'm asking that is because, you know, it's

24  about what we do first.  If you-all want to draft the notice

25  now and I'll just include it as part of my order, I can do

1    that, but this seems a much more rational way of doing it.

2         **MS. ROMANO:**  Yes, Your Honor.  I am not in a position

3    to stipulate to that right now.

4         **THE COURT:**  Great.  Then you probably -- let me ask

5    the next question.  Let's see...

6      Okay.  I don't have any questions on this, but I certainly

7    will let you argue about it if you want.  I'm not inclined to

8    let UBH deny claims on reprocessing for reasons not previously

9    included in their stated reasons for denial in their first

10    administrative attack at this.  I think that the -- I don't --

11    I think it's pretty clear we have authority to do it, to limit

12    the reprocessing remedy.  No case says we can't, and there's a

13    couple of cases that say we can do it.  And the *LP* case, for

14    all your what I thought was pretty clever ways to try to

15    distinguish it, is on all fours, although it's just a district

16    court case.  The court clearly stated in connection with a

17    remand for reprocessing that it would not allow the medical

18    necessity ground to be raised even though the defendant wanted

19    to raise it.  So I think it's pretty clear we have the scope to

20    do it and I would do it.

21         **MS. ROMANO:**  Your Honor, can I be heard on that

22    briefly?

23         **THE COURT:**  Yes.  Sure.

24         **MS. ROMANO:**  Thank you very much.

25      First of all, defendant disagrees with respect to whether

1   there's any authority that does support it, and Your Honor

2   noted the distinguishing of the *LP* case.  And, in fact, the

3   bulk of the cases that plaintiffs cite all relate to raising

4   new issues during the litigation and not during reprocessing,

5   and this really gets to the nature of the reprocessing remedy.

6   It's a full remand back to the administrator to reprocess the

7   claims, which is highly distinguishable from the *Harlick* case,

8   the *Spinedex* case, which really were focused on sandbagging and

9   litigation after the administrative record was closed.  Here

10  the administrative record will be reopened.  That's the nature

11  of the reprocessing.

12      And the other very important issue to note here is that

13  the class list is based on individuals who were denied requests

14  for authorization for treatment.  This is typically at the

15  preservice stage.  So before a member has received any services

16  at all, there was some request made by the provider or the

17  member asking for authorization for coverage for the services,

18  and the class members here are triggered to be on the class

19  list because there was a denial of coverage based on one of the

20  guidelines that are challenged here.

21      But there may be many reasons why one may be ultimately

22  denied benefits.  Whether it is eligibility or whether it is

23  the licensing of the provider doesn't satisfy coverage

24  requirements; and if those were not mentioned, were not raised

25  in the original denial, UBH should still have the discretion,

1   as it is given under the plan, to evaluate that and include

2   that in the reprocessing remedy.

3        This is particularly the case -- and I don't know whether

4   plaintiffs dispute this at all -- that if a claim comes in

5   later, so if the authorization is denied but a claim for

6   payment comes in later after services are provided, there are

7   many reasons why that claim may be processed in a certain way.

8   It could be denied for payment because the services don't match

9   what was authorized.  It may be denied because of eligibility,

10  licensing, coding issues, or paid in a certain way based on the

11  plan with co-payments and other member responsibility, and so

12  those are all the variety of reasons that could come into play

13  when it comes to reprocessing and paying claims and UBH should

14  not be precluded from raising any of those based on the

15  discretion granted under the plans.

16        **THE COURT:**  Ms. Reynolds.

17        **MS. REYNOLDS:**  Yes.

18      Your Honor, Ms. Romano has done a nice job of summarizing

19  various grounds on which claims can be denied, but the fact

20  remains that UBH had a duty to identify all of the reasons for

21  denying a claim when it did it the first time around.

22        **THE COURT:**  What about the ones it couldn't?  So, for

23  example, it was they won't pay the whole claim because it's --

24  and we'll get to this later, but I'm not really concerned about

25  substantive grounds or administrative grounds for denying

 1   claims because I think she's wrong.

 2       What I think is the nub of the issue that I think we're

 3   going to have to grapple with is there may be reasons why

 4   someone shouldn't be paid what they're asking for.  So it may

 5   be that they took -- they went to -- does it matter that they

 6   got a different level of care than what they applied for?  Or

 7   does it matter that they went and they did it to someone who's

 8   not in the network, out of network?  They pay different amounts

 9   for out of network.

10       So there's lots of different reasons that have to do with

11   is there -- you know, maybe the co-pays fall in the same

12   bucket, but there's a bucket of things that have to do with how

13   much is paid more than they do, although the different level of

14   care is a complex one.  But what do you do about those?

15           **MS. REYNOLDS:**  Well, actually I think those are two

16   different issues.

17           **THE COURT:**  Okay.

18           **MS. REYNOLDS:**  So as Ms. Romano stated, when someone

19   seeks preauthorization, they're seeking it for a specific level

20   of care with a specific provider.  So it's not just kind of in

21   a vacuum.  So if they then go and get a different level of

22   care, that's really a different request for coverage, and I

23   don't think that those other levels of care are really even at

24   issue in this case.

25           **THE COURT:**  No, but I can see it in reprocessing.

It's going to come up that they came -- they went -- they
couldn't get level of care A because it wasn't covered.  They
said no.  So they went and got level of care B, which is
cheaper, but they did it anyway.

            **MS. REYNOLDS:**  Correct.

            **THE COURT:**  Or they got level care C, whatever it was,
because it was somewhere else and they just decided to pay for
it.

            **MS. REYNOLDS:**  So --

            **THE COURT:**  What about that?

            **MS. REYNOLDS:**  Sorry.  I don't mean to interrupt,
Your Honor.

            **THE COURT:**  That's all right.

            **MS. REYNOLDS:**  So the thing that is being reprocessed
here is UBH's clinical determination about whether the services
that were requested are consistent with generally accepted
standards of care.  If someone went off and did something
different, I don't think that that's really at issue; right?
UBH is going to decide whether its original determination was
right or wrong.  If they then didn't go on to get the services
that they requested, they got something different and either
got coverage or didn't get coverage for it, that's really a
different issue.  Or if they couldn't afford to get anything --

            **THE COURT:**  What's the answer to that?

            **MS. REYNOLDS:**  What's that?

1          THE COURT:  What's the answer to that issue then?

2          MS. REYNOLDS:  No, I'm sorry.  They should have sought

3    coverage for that other level of care at the time.

4          THE COURT:  I see.  Okay.  So that will be --

5          MS. REYNOLDS:  I just mean it's not at issue in this

6    case.

7          THE COURT:  Well, it might be at issue in this case.

8    We don't know.

9          MS. REYNOLDS:  Yes, but if they were denied; right?

10   If it's one of the covered -- one of the levels of care that's

11   part of the case.  So if they were denied RTC and then

12   subsequently denied --

13         THE COURT:  I'm not making myself clear.

14         MS. REYNOLDS:  Okay.

15         THE COURT:  If someone was denied a particular request

16   for a level of care to which they were entitled -- okay -- and

17   on reprocessing it -- and then we go into reprocessing, it

18   turns out they got something different than what they asked

19   for, they went out and got something different, you're saying

20   UBH does not have to reimburse for that?

21         MS. REYNOLDS:  No, I don't -- I don't believe so.  I

22   mean, I think the question is whether they --

23         THE COURT:  "I don't believe so."  What does that

24   mean?  You don't believe that UBH has to reimburse for anything

25   other than the exact care that they should have approved?

1          **MS. REYNOLDS:**  Right.

2          **THE COURT:**  Okay.

3          **MS. REYNOLDS:**  And I'm being cautioned -- I received a

4    note.  I just want to make clear that the parties have a

5    difference of opinion about how ASAM applies, and I just want

6    to be clear that if someone sought coverage for substance use

7    treatment and they were denied because UBH was using a standard

8    for a higher level of care but what they were receiving was --

9    what they were asking for and sought and received was a lower

10   level under ASAM, that that's not exactly the same situation as

11   what Your Honor was just speaking about.

12         **THE COURT:**  No.  Because in that case they were denied

13   a level of care that you say, using ASAM or using the

14   appropriate standard, they should have been approved for.

15         **MS. REYNOLDS:**  Yes.  Yes, exactly.

16         **THE COURT:**  But if they went out and got something

17   that is different than what they applied for, they don't get

18   reimbursed for that?

19         **MS. REYNOLDS:**  No.  We haven't asked that they get

20   that relief.  I think this is about whether they get the relief

21   that they originally requested -- or the benefits, excuse me,

22   that they originally requested.

23         **THE COURT:**  Yeah, I know.  We don't want to call it

24   something that makes it more complicated to argue against

25   Ms. Romano's (b)(3) argument.  But whatever it is, at the end

1   of the day, because I don't know that it matters very much for

2   the (b)(3) argument, but at the end of the day you don't expect

3   UBH to pay for anything other than the level of care than what

4   was applied for?

5           **MS. REYNOLDS:**  Correct.

6       And then with respect to Ms. Romano's reference to -- or I

7   guess actually this was something Your Honor brought up,

8   whether or not something's in or out of network, co-pays,

9   co-insurance, things like that, that we anticipate would be

10  processed in the normal course.

11      So, you know, the goal here is to put the beneficiaries

12  back in the position that they would have been in but for the

13  breach, which means they're at the end of the claims

14  administration process.  The only thing left is this medical

15  necessity decision; and if it goes their way, then UBH

16  processes the claims, which means they calculate the amount of

17  benefits.  And I think that would just occur as normal, and

18  they would either get the in- or out-of-network rate that they

19  were entitled to.

20          **THE COURT:**  So just to make sure I understand what

21  you're saying, look at your proposed order --

22          **MS. REYNOLDS:**  Okay.

23          **THE COURT:**  -- and tell me where it makes it clear

24  that that's what's going to happen because I'm a little

25  concerned that it doesn't.  It's Section II of subdivision D, I

 1   think, and I'm not sure that it makes it clear either that

 2   you're only calculating benefits that are due for the requested

 3   services that were actually paid for and received even though

 4   they were denied; right?  So it only applies to people who

 5   actually went out and got it.

 6          **MS. REYNOLDS:**  Uh-huh.

 7          **THE COURT:**  That's not clear to me, number one.

 8       And, number two, this second piece that you're talking --

 9   and that it's only as to the -- for what was originally

10   requested.

11       And, number two, it doesn't seem to me particularly clear

12   that they can't -- you know, that they can't say, "Well, this

13   was an out of network so it's this amount" when the approval

14   would have been somebody in network or the approval would have

15   been somebody in network but you would have still had a $2,000

16   co-pay or whatever it is.  It's not very clear in this how they

17   get to do that.

18          **MS. REYNOLDS:**  Well, I mean, I guess that's what's

19   intended in Section II.C where we say "UBH will then calculate

20   the amount of benefits a class member is owed under the terms

21   of the applicable plan in effect at the time the request for

22   coverage was originally received."  Meaning that UBH --

23          **THE COURT:**  Okay.

24          **MS. REYNOLDS:**  And then the next paragraph says that

25   it would be "UBH shall include coverage for all services

1   received by the class member at the requested level of care."

2          THE COURT:  So you --

3          MS. REYNOLDS:  I think -- I'm sorry?

4          THE COURT:  So built in the applicable plan and

5   received by the class members, is that what you say --

6          MS. REYNOLDS:  Correct.

7          THE COURT:  -- means those things?

8          MS. REYNOLDS:  Yeah, the terms of the applicable plan

9   would indicate, you know, the amount of co-insurance, any

10  co-pay.  There are different rates of coverage for in and out

11  of network so those things are set forth in the plan.

12      And then, yes, the paragraph, the subparagraph after that

13  where it says that it would be coverage for all services

14  received by the class member at the requested level of care.

15         THE COURT:  So let me just make sure why that doesn't

16  include other reasons for denying.

17      I mean, it's just -- because it's otherwise forbidden

18  under some section of this?

19         MS. REYNOLDS:  Right.  I mean, that's under C where

20  it's talking about no retaliation that we talk about not

21  denying on any other ground.

22         THE COURT:  Well, but then --

23         MS. REYNOLDS:  I mean, calculating the amount of a

24  benefit is not the same thing as applying an exclusion or

25  denying coverage.  So if someone, you know, hadn't met their

1   deductible or something, that just goes into the calculation of

2   what the benefit is.

3           **THE COURT:**  Right.

4           **MS. ROMANO:**  But, Your Honor, if I can be heard on

5   that issue.  It's not so simple or clear-cut, and let me just

6   give you maybe a couple of examples.

7       If a member requests authorization for coverage at the

8   preservice time, that is not a guarantee of benefits.  That

9   does not guarantee any benefits will be paid.  In fact, letters

10  going to members that authorize treatment say that.  And

11  there's many reasons why when the member eventually gets the

12  services that the services would not be covered at all under

13  the plan.

14          **THE COURT:**  Okay.  Well, so ignore that for the moment

15  because I'm not buying that argument at all.

16      What I'm interested in is the things that I'm still going

17  to let you do and to make sure you can still do them.  For

18  example, what we've been talking about is exactly that, to make

19  sure that nobody looks at this order and says, "Well, I

20  can't" -- I mean, you know it and I know it and we're looking

21  at it and I guess we're the people who matter, but I would like

22  the order to be a little clearer on what it means that you can

23  deny -- I mean, I guess what you're saying is in D under

24  retaliation it says specifically -- C, it says you can't deny a

25  request on other than medical necessity except for exclusions

1   previously cited.  You can't deny requests.

2       Well, so then I get what you're saying is that does not

3   mean that you can't say, "Well, I'm going to only pay

4   25 percent because that's what we pay for out of network."

5           **MS. REYNOLDS:**  Correct.

6           **THE COURT:**  Okay.  I appreciate that's not what you

7   meant but that is -- I mean, it's not an exclusion from

8   coverage but it's a payment term.  I'm just wondering how we

9   capture it so that -- you know, and there will probably be more

10  than one of those kinds of payment terms -- how we capture

11  UBH's ability to do that sort of thing because I don't know

12  what the waterfront is.

13      I mean, I understand the sort of exclusions from coverage:

14  "We won't pay for someone who ultimately figured out is not

15  certified in the area."  Or "We won't pay for" -- those I

16  think -- you know, I'm prepared to lay those at UBH's feet and

17  they should have said them and they didn't, and I'm not going

18  to get into them.  But the payment, what's going to actually

19  get paid based on the person's out-of-network or how much was

20  left on the co-pay that year, or whatever it is, or whether

21  they've reached their maximum, you know, that stuff seems to me

22  of a different type.

23          **MS. REYNOLDS:**  Your Honor --

24          **THE COURT:**  Yeah.

25          **MS. REYNOLDS:**  -- could we propose some additional

1  language?  I think that it's probably something that can be

2  clarified with a couple of additional sentences in that

3  paragraph if it's approved.

4         **THE COURT:**  Right.  I'd also like you to propose a

5  different language with respect to that they're only entitled

6  to seek the benefits -- payment for the benefits that they

7  actually applied for.

8         **MS. REYNOLDS:**  Okay.

9         **THE COURT:**  Okay.  Yes, Ms. Romano.

10        **MS. ROMANO:**  Yes.  If I can present one example.  If a

11 member sought authorization for coverage in December and then

12 got the treatment in January and was no longer covered under a

13 plan that's administered by United in January.  The claim comes

14 in in January.  The member is not covered under a plan

15 administered by United at that point in time.  That is a

16 specific example of a situation where United should be entitled

17 to exercise its discretion or, frankly, that's nondiscretionary

18 under the plan.  If the member is not covered, the member is

19 not covered.

20        **THE COURT:**  Yeah, but it didn't happen that way.  It

21 didn't happen that way because you wrongfully denied it in the

22 first place, and so this person is left scrambling.  And I

23 don't know why it didn't come in January, February, or

24 December.  Maybe it didn't because you denied it.

25        But, in any event, I'm willing to lay that at the feet of

     1    UBH.   They're going to have to live with that.   I don't think
     2    it's any kind of a windfall.   I don't think it's any kind of a
     3    windfall any more than the usual rule that you can't raise in
     4    the litigation things you didn't raise in the administrative
     5    level in the first place.   It's the same sort of thing.   You
     6    had to identify what you were doing.   This is a very similar
     7    sort of thing.
     8         You couldn't -- if you had done it properly in the first
     9    place -- that's another reason why I don't want to get into it
    10    because I don't want you raising things like this that I think
    11    are maybe your fault that it's in January and not in December,
    12    but we'll never know because you turned it down and did it in
    13    the first place.   I think that you have to live with the
    14    consequences and pay for the damage that's caused -- not pay
    15    for the damage that's caused, but allow reprocessing and grant
    16    claims where that's the circumstance.   I mean, that's a
    17    circumstance where I'm not particularly troubled by it,
    18    frankly.
    19         So let me just -- let's see, I don't think -- I have not
    20    seen any evidence of any plans that actually prohibit interest
    21    for wrongful denial of benefits and none of the examples
    22    provided by UBH do that.   I'm highly inclined to include, as
    23    part of the instructions on reprocessing, to include interest
    24    on benefits that these people have now had to wait years and
    25    years for, and the only question in my mind is what interest

1   rate to be used.

2        Some of these plans have interest rates.  Some of these

3   plans don't maybe.  Maybe they all have interest rates in some

4   portion of the plans.  I just don't know what the right

5   interest rate is.

6        **MR. ABELSON:**  Your Honor, if I may.

7        **THE COURT:**  Yeah.

8        **MR. ABELSON:**  On this we agree there's no plan that

9   we've seen that UBH has pointed to that prohibits interest.

10  We've also not seen and UBH has not pointed to any plan that

11  sets a rate of interest -- that has a plan term regarding

12  interest that is relevant here.  So there's one, for example,

13  related to if a -- in context clearly talking about interest

14  charged by a provider because of late payment.  UBH won't cover

15  that.  That's just not what we're talking about here.

16       So in the absence of evidence --

17       **THE COURT:**  But weren't there some plans that I

18  thought Ms. Romano put some in where there were times when

19  interest would be paid and there was an interest term?  Am I

20  misremembering, or are there no plans that actually have any

21  interest rates that they award?

22       **MR. ABELSON:**  So there was one plan, it is Trial

23  Exhibit 1542, a Gucci plan, that made a reference -- if I may

24  just refresh myself on the specific terms.

25       It referred to if requests for payment were made that

1   included all required information which are not paid within the

2   time frames, they are due overdue payment of simple interest at

3   a rate of 12 percent.  So in context, that seemed to clearly be

4   referring to times when a claim was approved by UBH and paid --

5   it was just paid late.

6       But this is not what we're talking about here.  This was a

7   wrongfully denied -- these are all wrongfully denied claims.

8   So the default -- under the *Blankenship* case from the

9   Ninth Circuit, Section 1961 is the applicable rate unless UBH

10  can point to evidence to the contrary.

11          **THE COURT:**  They might like that interest rate.  It's

12  about a quarter of a percent right now and likely to stay that

13  way for the foreseeable future, rather than using something

14  that they were going to pay on late payments of promised

15  benefits.  I don't know.

16      Do you have a view on this, Ms. Romano?

17          **MS. ROMANO:**  Simply, Your Honor, the positions we

18  included in our briefing, which is that there's no money

19  judgment issuing so pre- or post-judgment interest isn't

20  appropriate here and it should be done pursuant to the plan.

21      We also did identify one plan with language that we

22  contend did support the argument that no interest would apply,

23  but we understand Your Honor has reviewed that and has

24  disagreed with that position.

25          **THE COURT:**  Okay.  So the injunction and then

reprocessing.

The injunction.  My plan would be to issue an injunction
and appoint a special master who would be a special master
regarding compliance with my remedies order.

The injunction would prohibit the use of criteria for
medical necessity obviously that deviate from the generally
accepted standards of care, but I think I'm inclined to require
the use of ASAM, LOCUS, and CASII, as well as -- to the extent
not inconsistent with state law, and then the state-mandated
criteria.

I would appoint a special master to, in addition to
monitoring the reprocessing, oversee compliance with the
injunctive relief, including monitoring the guidelines that are
used by UBH to make necessity determinations, although I don't
think I'm going to include in his duties other than the
incidental.  We may have to look at this, but he's not required
to monitor their application of the guidelines to individual
cases.

I don't think that's what this case is about.  This is
about the development of the guidelines.  There may be some
incidental need to see some of that just to make sure the
guidelines mean what they say and are used in the proper way,
that sort of thing, but I think the application of guidelines
to individual cases or the application of the guidelines is
really not the focus here.  It is making sure the guidelines

1  that are used are consistent with generally accepted medical

2  standards.

3      I would require the development of a training program

4  under the supervision of the special master.  And so I need --

5  I have a series of questions that arise from this in addition

6  to any comments you might want to make about those thoughts.

7      Why do I need to address future guidelines at all other

8  than to say "Use these"?  That's question number one.

9      Question number two is:  What version of these am I going

10 to be requiring that they use?  The most recent version?  I

11 mean, it's an injunction so if it comes to the point where

12 somebody thinks that this is not generally accepted standard of

13 care because the people who write ASAM have gone off the rails,

14 they're supposed to come back and see me.  But that's my

15 question about that, which version.

16     Then plaintiff made a minor -- made a change on the

17 sentence that required -- it was IV.A.2, there was a sentence

18 prohibiting guidelines that have substantively the same

19 coverage criteria, and changed it in great detail, and I'd like

20 some comments from UBH on whether or not that helps or there's

21 any objections to that language other than obviously having

22 that section in there at all.

23     I'm not inclined to order changes in business practices

24 and corporate structure.  First of all, I'm not sure I need it.

25 And this is the question:  If all I'm doing is ordering them to

1    instead of making their own guidelines use ASAM, LOCUS, and

2    CASII, you know, that's the -- then why do I have to do that?

3    If there's no creation of guidelines, then maybe we don't have

4    to concern ourselves with that.

5         I'm also concerned that -- the concern at trial was a

6    conflict of interest in creating guidelines.  The evidence was

7    that there were inappropriate financial considerations taken

8    into consideration in designing the guidelines.  I didn't

9    really take evidence on all of the implications of having a

10   particular corporate structure, and so I'm a little concerned

11   about, with my very limited picture, ordering that kind of

12   remedy.

13        One of the things that I would have to do -- and then the

14   last question is:  How long does the injunction last?  Because

15   I want this -- I don't know what the answer to that question

16   is.

17        So that's my preliminary thoughts on the injunction.  Why

18   don't I hear from Ms. Romano first on that.

19        **MS. ROMANO:**  Sure, Your Honor.

20        I think I will start, then, with the requirement to use

21   the certain guidelines; and as has been briefed in the

22   declarations as well, UBH is currently using the guidelines

23   that plaintiffs did propose.  I appreciate there's an issue

24   with respect to ASAM levels and I suspect we'll be getting into

25   that in a bit; but, you know, on its face, ASAM, LOCUS, and

1    CALOCUS, or CASII I guess is being used --

2              THE COURT:  Right.

3              MS. ROMANO:  -- so those are the guidelines being

4    used.  And the way I understand what Your Honor has just said

5    is he would be inclined to order that those guidelines be used.

6         The issue of course that UBH has raised is its discretion

7    to use guidelines that conform with the plan.  It has no

8    current intent to change the use of the guidelines that I just

9    outlined.  However, it should have discretion to be able to

10   make those changes over time whether it be to add another

11   guideline, like the AACAP guidelines, which were also offered

12   into evidence and supported by the experts as being consistent

13   with generally accepted standards of care, or to consider other

14   guidelines, third-party guidelines or not third-party

15   guidelines.  So that is the issue there with respect to the

16   guidelines.

17             THE COURT:  Well, so I'm not sure what that means.  So

18   you're using these now because you have plans that have medical

19   necessity terms and that they use these guidelines to determine

20   what is the generally accepted standard of care consistent with

21   the plans.  So what are you envisioning in the future might

22   happen?

23             MS. ROMANO:  I'm actually not envisioning that

24   anything might happen in that there is no intention to change

25   that at all.  The concern here is some perpetual injunctive

1    relief, and I appreciate Your Honor also asked about how long,

2    but it is a concern with respect to the fact that there is

3    discretion conferred to the administrator to administer the

4    plans.  There is not one sole standard of what's generally

5    accepted standards of care and there should be some discretion

6    conferred on UBH to use another set of guidelines if it desires

7    at some point in time if it is consistent with the plan.

8          THE COURT:  So you're not -- okay.  I mean, obviously

9    if a plan excises the generally accepted standard of care, then

10   these guidelines don't apply anyways, but you're talking about

11   development along the road that might cause some other -- well,

12   okay.  I mean, you know, part of that is you can come back to

13   me and the other part is how long I think is a key piece of

14   that.  It's -- okay.  I understand that issue.  Go ahead.

15         MS. ROMANO:  And with respect to the specific

16   guidelines, just to make sure I have this accurate on the

17   record, what UBH is using is the ASAM guidelines --

18         THE COURT:  Right.

19         MS. ROMANO:  -- and then LOCUS for adults --

20         THE COURT:  Right.

21         MS. ROMANO:  -- CASII for ages 6 through 18, and

22   that's C-A-S-I-I --

23         THE COURT:  Uh-huh.

24         MS. ROMANO:  -- and then ECSII -- I'll call that

25   ECSII, I don't know if that's the accurate way of pronouncing

```
 1   it -- that's for very young children of 0 to 5.

 2          THE COURT:  Maybe I could get some insight from the

 3   plaintiffs on that, on ECSII, and what they think of it when we

 4   get to them.

 5      Okay.  Go ahead.  I think -- did you have any other

 6   comments on -- I guess that was a really the main question.

 7          MS. ROMANO:  Your Honor, I actually did not get down

 8   fully the provision the Court was referring to with respect to

 9   I thought it was Section IV.A.2.

10          THE COURT:  That's correct.  It's IV.A.2.  Let me get

11   it in front of me too so we can take a look at it together.

12          MS. REYNOLDS:  And this is from the version that was

13   attached to plaintiffs' latest reply, so it's the --

14          THE COURT:  Yeah.  It's the latest version that they

15   put forth --

16          MS. ROMANO:  Which is the date of this one or the --

17   I'm worried that it may not match what I have in front of me.

18          THE COURT:  Right.  Well, you'll know because it's a

19   very different provision.  The one that they're -- they changed

20   IV.A.2 from being one short sentence to being a very long

21   sentence.

22          MS. ROMANO:  Yes, I do see.  It's the redlined

23   version?

24          THE COURT:  Yes.

25          MS. ROMANO:  Yes, it did address some of the issues
```

1   that defendants had with respect to the prospective injunctive

2   relief, but not all of them; and specifically the phrase

3   "regardless of whether any such criterion is expressed in

4   facially different language" --

5           THE COURT:  Yes.

6           MS. ROMANO:  -- "except that UBH is not enjoined from

7   various other provisions" --

8           THE COURT:  Right.

9           MS. ROMANO:  -- and that is overly vague.

10       And, in addition, more broadly, there are some situations

11   where this prospective injunctive relief would bar or preclude

12   provisions that experts testified, including plaintiffs'

13   experts testified, were consistent with generally accepted

14   standards of care at trial.

15          THE COURT:  Well, okay.

16          MS. REYNOLDS:  Your Honor --

17          THE COURT:  Yes.

18          MS. REYNOLDS:  -- if I may jump in.

19       I mean, the goal here was to reflect the Court's findings

20   that all of the claims -- all of the criteria that were listed

21   on the plaintiffs' claims chart were inconsistent with

22   generally accepted standards of care except for these very few

23   criteria that the Court found that that hadn't been proven.  So

24   those are the only ones that the Court made a finding that

25   those specific provisions of those common criteria in those

 1    years were acceptable.  So that's why it's written in this way.

 2         **THE COURT:**  No, I appreciate that.

 3         So what is the example, Ms. Romano, of something that I

 4    either didn't make a finding on or I found was consistent with

 5    generally accepted standards of care that would be prohibited

 6    by this description?

 7         **MS. ROMANO:**  Yeah.  So there is a provision in the

 8    guidelines relating to co-occurring conditions, and in the

 9    guidelines it referred to ensuring that it was safe to treat

10    co-occurring conditions at a level of care.  And the Court

11    found that to be inconsistent with generally accepted standards

12    of care because it did not also reference that it would be

13    effective, safe and effective.

14         **THE COURT:**  Right.

15         **MS. ROMANO:**  Under this proposed injunctive relief, if

16    UBH uses a guideline that speaks about the safety of treating

17    co-occurring conditions, that would be barred.  And, in fact,

18    the evidence is that, yes, safety is something to be considered

19    with respect to co-occurring conditions but so is

20    effectiveness.

21         **THE COURT:**  Uh-huh.  Ms. Reynolds [sic], I'm not

22    entirely sure I understood that.  So what you're saying is that

23    because I found safety standing alone without also coupling it

24    to effectiveness violated generally accepted standards of

25    care -- well, I guess I don't understand what you're talking

1    about because this just says you can't use the criteria that

2    you used before that I found violate the standard of care.

3            **MS. ROMANO:**  We have understood it to say both you

4    can't use the criteria you used before but you also can't use

5    something that is expressed in facially different ways.

6            And so the criteria I was just suggesting relating to

7    co-occurring conditions and whether it's effective -- excuse

8    me -- safe, you could have a facially different way of saying

9    that in a different guideline and that would be precluded under

10   this paragraph even though safety is something that should be

11   considered with respect to the services.

12           **THE COURT:**  Well, what it says is you can't use what

13   you used before and you can't use what you used before by

14   changing language.  That's what it says.

15           Okay.  I understand the concern, though.  I understand the

16   concern, though.

17           So I'm being reminded to try to pin you-all down on the

18   question of whether or not -- I mean, these are a couple of

19   questions.  First is, the declaratory relief, I'm still -- is

20   it prospective?  Is it retrospective?  Is it both?  And is

21   it -- if it is one or the other, should it be considered

22   mandatory or not mandatory, or should people be allowed to opt

23   out of any portion of the dec. relief that's requested by the

24   plaintiff because of its prospective or retrospective views --

25   impact?  That's the question.

1          **MS. REYNOLDS:**  Your Honor, if I --

2          **THE COURT:**  Yes.  Sure.

3          **MS. REYNOLDS:**  -- can jump in first, I guess.

4      We've argued that the declaratory relief is -- that it is

5   forward looking.  The idea of entering into a declaratory

6   judgment is to put in the form of a judgment the Court's, you

7   know, interpretation of these key plan terms, like what does

8   the "generally accepted standards of care" term mean, and to

9   lay out other important findings from the findings of fact that

10  make clear, for example, that UBH has a history of biased

11  claims administration, which will be important in the future.

12      So in that sense, the Court is memorializing its findings

13  in the form of a judgment, but that judgment is meant to carry

14  through to the future and govern the parties' interactions in

15  that sense, and so it's pretty standard declaratory relief.

16      In terms of whether it's mandatory or not, I mean, you

17  know, plaintiffs' position is that the Court -- you know, in

18  the sense that it applies to all of the class members equally,

19  then it is mandatory.  We don't think that opt-outs are

20  prohibited but if the Court were to have a (b)(1)/(b)(2) class

21  that didn't have opt-outs, so we think it's perfectly

22  appropriate to enter the declaratory relief there.

23          **THE COURT:**  Okay.

24      Ms. Romano, did you want to speak to that?

25          **MS. ROMANO:**  Yes.  With respect to declaratory relief,

1    it must be a declaration of future rights or it's not

2    appropriate declaratory relief.  Numerous cases we cited in the

3    briefing, but the purpose of declaratory relief is to set

4    controversies at rest before because harm -- not to remedy

5    harms that have already occurred.  So --

6        **THE COURT:**  But that makes no sense.  I mean, you get

7    to declaratory judgment questions about whether conduct in the

8    past violated a particular standard, and that's a perfectly

9    appropriate declaratory relief.  You get it in patent cases all

10   the time.  You know, and so I don't -- you know, I don't know

11   that it makes sense that it has to be strictly just -- so you

12   can't have a declaratory relief that says UBH violated their

13   duties under the plans in the past?  I can't say that in a

14   declaratory relief?

15       **MS. ROMANO:**  It would be our position that that is not

16   appropriate for a declaratory relief.  They are conclusions of

17   law or findings of fact that the Court has issued, but that it

18   would not be appropriately part of declaratory relief.

19       **THE COURT:**  Okay.  Got it.

20       All right.  Yes, go ahead.

21       **MS. ROMANO:**  Can I back up to one additional issue on

22   injunctive relief if I may?

23       **THE COURT:**  Yes.  Back up.

24       **MS. ROMANO:**  We wanted to also be clear with respect

25   to the prospective injunctive relief relating to the use of

```
 1   certain guidelines that it not preclude administration of plans
 2   that specify other guidelines.
 3        So, for example, in New York LOCADTR Guidelines apply.
 4   There may be plans now or in the future that specifically say
 5   LOCADTR -- and it's L-O-C-A-D-T-R, I believe -- that if a plan
 6   says "Use LOCADTR to determine medical necessity," that UBH
 7   should not be precluded from applying the guidelines that are
 8   identified in the plan.
 9             THE COURT:  Okay.
10             MS. REYNOLDS:  And, Your Honor, could the plaintiffs
11   be heard on the injunctive relief issues that you raised?
12             THE COURT:  No.  You're next.  I wanted you to talk
13   about the injunctive relief issues and take what Ms. Romano was
14   talking about.  I'm particularly interested in that last issue
15   and the ECSII plan.
16             MS. REYNOLDS:  ECSII.
17             THE COURT:  Right.
18             MS. REYNOLDS:  And I'm going to turn it over to
19   Mr. Cowart to respond on those issues.
20             MR. COWART:  Thank you, Your Honor.
21        So, first, when it comes to prospective remedies, you
22   know, I think it's important to make an observation about what
23   we're trying to remedy, which is breaches of fiduciary duty.
24        And the remedies that we've proposed, they work in concert
25   with one another.  So as we start talking about individual
```

1   prospective remedies, you know, what I keep wondering in

2   listening to the dialogue is:   I can answer that question if I

3   knew what you were going to do on the rest of the prospective

4   remedies.  So let me give you an example of that.

5        When it comes to the go forward trying to tie United's

6   hands on what guidelines -- what they're not allowed to use, I

7   think Your Honor made the observation, which is right, that if

8   Your Honor just orders them to use specified guidelines, it

9   obviates in many ways to prohibit them from using other

10  guidelines because it's implicit in what you've done.  So

11  plaintiffs take that and at a theoretical level we don't

12  disagree with that.

13       But the one remedy that it sounds like you're not inclined

14  to grant is the corporate structural reforms and if I

15  understood correctly, the rationale that was leading you into

16  that direction was that, essentially, what's the point.  These

17  committees aren't going to be doing anything and, therefore,

18  they're not going to be drafting guidelines so who cares

19  whether they know something about finance or not.

20       And I guess on one level I'd respond to that and say,

21  well, if that's the case, then these committees won't exist

22  and, hence, that part of the injunction is largely a nullity.

23       But our concern is that these committees are going to

24  continue to exist, and I would point to the battle that you see

25  in the briefing over what is UBH doing with ASAM today, what's

happening.  And we have some anecdotal evidence about that.  We
certainly haven't been able to engage in any discovery, but it
seems to us that what is happening is that UBH is saying to the
world they are using ASAM but that they are, in fact, not, that
they are manipulating it in ways that are somewhat opaque to us
but they are not actually doing it.

And so, again, to harken back to where I began, the point
for us is we're trying to remedy what we see as the most
egregious breach of fiduciary duty in the health insurance
context, you know, arguably in history, at least when it comes
to coverage, whether there's coverage or not.  There have been
other scandals that related to how much people get paid, but
this is probably the most egregious one when it comes to
coverage decisions.  And so each of these remedies, these
go-forward remedies, the corporate structure reform, I would
sort of try to put it back on UBH and say it this way:  What is
the -- you know, *MetLife* makes it very clear that having these
kinds of firewalls is what a faithful fiduciary would do and
the statute, ERISA, makes it very clear that UBH has a duty of
loyalty.

So I guess my reaction to this is:  It was that failure
that caused what happened or at least led to what happened.  I
mean, the Court saw the evidence -- the ASAM story, the
manipulations, the Finance Department making decisions -- and
to us it is just such a natural remedy to exactly what we

1  proved at trial.  That was the genesis in many ways of the

2  illegality and, hence, that should be central to the Court's

3  remedial regime or at least a part of it.

4          **THE COURT:**  Do you want to answer my questions?

5          **MR. COWART:**  Sorry, Your Honor.

6      On the guideline that you mentioned, I want to pass the

7  baton back to Caroline.  I'm sorry.

8          **THE COURT:**  Okay.

9          **MS. REYNOLDS:**  The plaintiffs have no objection to UBH

10 using ECSII, assuming I'm pronouncing that correctly.

11         **THE COURT:**  It's E-C?

12         **MS. REYNOLDS:**  E-C-S-I-I.  It's early childhood --

13         **THE COURT:**  Yeah.  ECSII probably.

14         **MS. REYNOLDS:**  Oh, did I --

15         **THE COURT:**  E-C-S-I-I.

16         **MR. COWART:**  I believe it's pronounced ECSII.

17         **THE COURT:**  Oh, ECSII.  That's how the moniker is

18 pronounced.

19     But which -- so let me -- there are two things I want you

20 to address from the plaintiffs' perspective.  One is:  Which

21 versions of these?  Right?  There's a version that was

22 yesterday, there's a version that's today, and there's a

23 version that's tomorrow.

24         **MS. REYNOLDS:**  I mean, we think the Court should order

25 UBH to use the most current version.  It makes the most sense

1  to use whatever is in effect at the time rather than sort of

2  freezing it.  They do get updated from time to time but it's

3  not that different.

4       **THE COURT:**  Ms. Romano, do you have -- I take it you

5  have no problem with ECSII, since you're using, it being added?

6       **MS. ROMANO:**  That's correct, Your Honor, and our

7  client is using the current versions of those guidelines that I

8  had conveyed earlier.

9       **THE COURT:**  Okay.

10     Okay.  Ms. Reynolds, what about Ms. Romano's points that

11  things change and that we shouldn't prohibit them from

12  developing other guidelines, as time goes on we're using other

13  guidelines other than these, if they are consistent with

14  generally accepted standards of care?

15       **MS. REYNOLDS:**  Well, Your Honor, I think the evidence

16  at trial showed that generally accepted standards of care form

17  over a long period of time and they're not rapidly changing;

18  but if at some future point UBH believes that these criteria

19  are no longer consistent with generally accepted standards, it

20  can certainly return to the court.

21     Our concern with leaving it open to UBH to simply use any

22  other criteria that they want is that it really opens the door

23  to exactly the kind of problem where you see UBH using or maybe

24  paying lip service to TDI criteria but using their own

25  descriptive criteria alongside.

1     And, you know, Ms. Romano's reference to third-party

2  criteria was especially troubling because some of the

3  third-party criteria out there are extremely restrictive; and

4  the mere fact that it's a third-party creating them and selling

5  them that's not, you know, a physician specialty association

6  that's doing it to aid in the practice of patients but, rather,

7  it's a company that's selling it for utilization management

8  purposes, I mean, that would completely undermine the

9  effectiveness of the Court's order.

10     So we do think the order should be permanent, and if --

11       **THE COURT:**  Permanent?  Forever.

12       **MS. REYNOLDS:**  -- UBH wants to seek relief after that,

13  they can come back to the Court.

14       **THE COURT:**  Forever.  A 50-year injunction.  Is that

15  really what you want?  That's quite a reach.

16       **MS. REYNOLDS:**  Well, I think that it makes sense for

17  them to be able to come back to the court.  That's always

18  within --

19       **THE COURT:**  Oh, they can always come back to the court

20  but, you know, we have a certain problem at a certain point in

21  time with respect to certain standards.  We're remedying that.

22  I don't like keeping people under court supervision for an

23  indefinite period of time.  I don't like it.

24     You know, the first injunction that I ever had to

25  supervise I inherited and it was, you know, 40 years old and it

1   was like talking apples and oranges when you looked at the

2   situation 40 years later.   And I also think that, you know,

3   judges should be circumspect about these things even when they

4   exercise this kind of authority.

5          **MS. REYNOLDS:**  Let me turn it to Jason who had

6   something to say.

7              **THE COURT:**  Yes.  Go ahead.

8          **MR. COWART:**  Your Honor, you know, again we take the

9   Court's point.  I think for us there is potentially a middle

10  ground here, which is some number of years, perhaps five years,

11  an injunction that will last five years, at which point the

12  parties can go back into court along with the special master,

13  and UBH can explain why they reformed their ways and they

14  should now be trusted perhaps to develop their own guidelines

15  or whatever else; and we can say whatever -- you know, to the

16  extent that we have anything that might be helpful to the Court

17  and the special master presumably at that point could be very

18  helpful to the Court, and the Court can decide at that point

19  whether to extend the injunction, change it.

20         And to circle back to something we were talking about a

21  moment ago.  For example, if the Court were to order the use of

22  specified guidelines for a period again, let's say, of five

23  years, that does somewhat render, you know, committees like the

24  BPAC committee somewhat meaningless perhaps.  And so I could

25  imagine an injunctive regime that essentially ties UBH's hands

1    for a number of years; and then perhaps upon a good enough

2    showing says, "Okay.  Maybe you have reformed your ways.  I'm

3    going to let you, you know, develop your own guidelines or say

4    some choices about guidelines, but you're going to do that with

5    a firewall," the kind of *MetLife* firewall that the

6    Supreme Court has talked about.

7        Again, it's that holistic -- I guess where I'd ask you

8    just to think about issues, think about each of these

9    injunctions, is that when we -- and, admittedly, we sought a

10   fulsome panoply of injunctive relief that we thought if all

11   ordered, you know, completely would accomplish what we think

12   needs to be accomplished.

13       There may be a lesser way to accomplish that, but we would

14   ask you just to bear in mind how these different pieces fit

15   together.  Training matters a lot, matters whatever guidelines

16   they're using.  The corporate governance reforms to your point,

17   maybe those matter more if and when UBH proves that it's able

18   to make -- that it should be able to make some of its own

19   guideline-related decisions.

20       **THE COURT:**  You know, I just -- I'm not quite sure how

21   that works so walk me through it again.  You do it -- you have

22   a target date or you don't have a target date?

23       **MR. COWART:**  Sure.  Sure.  You say "Five" -- you know,

24   let's imagine it's today.  You say "Five years from

25   September 2nd, for the next five years you're going to use

1  these criteria and you don't need a BPAC because you're just

2  using these criteria.  And at the conclusion of that five years

3  you're going to come back and I'm going to get a report from

4  the special master and the plaintiffs and UBH, and then, you

5  know, I'm going to make a decision at that point whether I

6  should continue to tie UBH's hands vis-a-vis the use of these

7  specified criteria or if I should open it up a bit more."

8         **THE COURT:**  Hmm.

9         **MR. COWART:**  I mean, you know, again we take the point

10  that permanent is a long time and the world -- you know, 100

11  years from now there's no doubt the world is going to look

12  totally different.  You know, even as I'm saying it, I put out

13  there five years but, to be honest with you, this misconduct --

14  we can go back to the actual evidence of the trial -- right? --

15  which is what all these remedies are supposed to be reflecting.

16  The evidence at trial was for the better part of a decade UBH

17  knowingly and intentionally, I mean, I can't come up with

18  better adjectives and adverbs, but they egregiously breached

19  their duties.  They completely -- it's not like they ignored

20  their fiduciary duties; they just didn't care about them.

21         And in light of that track record, five years, to be

22  honest with you, probably isn't long enough.  Maybe it ought to

23  be ten.  In the end it's your discretion but, you know, I think

24  it's got to be a long time before UBH gets the power again to

25  on its own, without anybody watching, make decisions about what

1   generally accepted standards look like.

2           THE COURT:  So, Ms. Romano, I'd like you to talk about

3   length of time.

4           I can't hear you.  There you go.

5           MS. ROMANO:  Excuse me.

6           Certainly not forever.  It would not be appropriate to

7   issue an injunction that lasted forever and any injunction

8   relating to the guidelines that should be used should include

9   an ability to come into the court and address potential

10  changes, and we understand Your Honor has recognized that as

11  well.

12          UBH would argue that five years is a very long time and

13  the evidence would not support five years but doesn't have a

14  position on a specific time that would be reasonable.

15          THE COURT:  Okay.  That's very trusting of you.

16          Reprocessing.  Okay.  So the first set of questions I had

17  we already talked about, and you're going to try to give me

18  some better language that allows them to pay only

19  out-of-network amounts for an out-of-network provider or, you

20  know, pay only the -- if there's a cap on how much they pay for

21  a particular benefit or whatever the plans are.

22          So on assignees, the proposed order envisions that the

23  benefit would be paid to the class member or the class member's

24  assignee.  How do you envision that coming to light and being

25  handled?

**MS. REYNOLDS:**  So really what's at issue here is directions to pay.  So when someone seeks coverage or seeks medical services, a lot of times you sign something that says "I authorize you to submit my insurance claim on my behalf and to receive the payment."  That's a direction to pay.  It gets submitted to the insurance company that way, and the insurance company has its own, you know, forms and things that get filled out and then the provider receives the payment.  This happens all the time.  UBH already does this all the time with providers.

And what we expect is that if someone submitted an authorization with a direction to pay, that that would then -- that the direction to pay, if it's effective, would be honored as usual.  If a claim was submitted without a direction to pay or if someone paid out of pocket themselves, then there's no issue of a direction to pay.

There's no evidence in the record about any assignments that are an assignment of an actual claim where someone else stands in the shoes of the person, and so we don't think that the -- but if there is one, UBH has to approve it.  The evidence is that its plans, by and large, prohibit assignments; but if the plan allows it, then UBH approves the assignment. Again, it would have a record of the fact that it approved the assignment, and we have no problem with that being honored if there is, in fact, something on their --

1          **THE COURT:**  Well, but what we're talking about is

2    denied claims, though.  So they didn't -- claims were denied

3    and the person went out and got the services and somehow

4    somebody paid for them, like -- you know, I don't know.

5    Whoever it was.  Maybe it was another secondary insurance

6    carrier or it was something like that.  You know, it's -- I

7    mean, I know the way my insurance works.  At some point I have

8    secondary insurance and I have primary insurance just because

9    I'm old, and there might be a direction to pay that they don't

10   have because UBH denied the claim and somebody else paid for

11   it, but that somebody else might be entitled to whatever this

12   benefit is.  So I'm wondering what do you do about that.

13         **MS. REYNOLDS:**  I mean, I think what the Court is

14   positing is that a class member might have a contractual

15   obligation to turn the money over to someone else, and --

16         **THE COURT:**  I don't know.  I don't know what form it

17   takes.  That's why I said it so vaguely.

18         **MS. REYNOLDS:**  I mean, I think the problem is that

19   there isn't any evidence in the record about this, and the

20   evidence is if someone -- I mean, if in reprocessing someone's

21   gone out of pocket, they're going to submit the evidence of

22   what they paid --

23         **THE COURT:**  Uh-huh.

24         **MS. REYNOLDS:**  -- and the benefit will be calculated,

25   and I think at that time the benefits are paid to the member.

1   And if they owe some contractual obligation to repay someone

2   else, like their doctor or another insurance company, I think

3   that's the class member's job to follow through on that.

4         **THE COURT:**  So what did you envision when you put in,

5   in the proposed order -- let me just get it in front of me.

6         **MS. REYNOLDS:**  "Or their assignees"?

7         **THE COURT:**  Yeah, "or their assignees."

8         **MS. REYNOLDS:**  Right.  Well, UBH was saying that it

9   has -- that assignments are an issue, and we proposed that only

10  if there's an assignment in their records that they've

11  already -- that UBH has already accepted, that's the -- the

12  evidence is that if someone wants to have an assignment, UBH

13  has to approve it before it's effective.  So if UBH has done

14  that, then we're perfectly fine with them honoring that

15  assignment; but if there's no evidence of that, I think, you

16  know, the payment would go to the member.

17        Mr. Cowart, do you want to step in?

18        **MR. COWART:**  Yes.  Sorry.  Sorry, Your Honor.  If I

19  can just jump in on this.

20        You know, again, the animating idea of reprocessing is

21  putting class members or these ERISA beneficiaries back in the

22  position they would have been but for the breach.

23        **THE COURT:**  Uh-huh.

24        **MR. COWART:**  And so to the extent we have a pending

25  claim that was pending in front of UBH, it had made all the

1    prior decisions about it, you know, all the administrative

2    reasons that might be able to guide it, this person is

3    literally on the 1 inch line, the only thing that's left to

4    have happen is the GASC determinations -- sorry, general

5    accepted standards of care -- we've been in this litigation too

6    long -- that decision was made improperly and then there was

7    the subsequent "how much money do we have to pay" decision,

8    which we talked about all day, and now we're just in the last

9    thing that never happened, which is the benefit payment.

10        But, again, I walk you through that just to remind the

11   Court that in the end we're trying to put these people back in

12   the position they would have been in.  And so the point here on

13   who to pay is our default position is UBH should pay whoever it

14   would have paid had it paid the claim in the first instance.

15   That's just sort of the animating notion of what we drafted.

16   We may not have drafted it in the best language possible but

17   that was the idea.

18        **THE COURT:**  Okay.  Ms. Romano, do you have a problem

19   with the language "or the class member's assignee" in this

20   order?

21        **MS. ROMANO:**  Yes, we do, Your Honor.  The members of

22   the class are members of the health plans.  They are not the

23   providers or other third-party insurance companies.  They are

24   the members of the health plan.  So those are the folks that

25   would be and could be entitled to reprocessing or relief in

1   this case.

2        The fact is that the plans vary in terms of what they

3   permit with respect to assignment or what they require with

4   respect to assignment.  There are named plaintiffs in the case

5   whose assignment provisions do not require some sort of

6   preapproval as suggested.  It really varies in terms of whether

7   or not UBH would have an evidence or record of assignment.

8   That's particularly the case for the situation where it was

9   just a preservice request for coverage, no claim has come in.

10  There would be in most cases no record of any assignment

11  particularly in that situation.

12       So to include in the order that reprocessing still occurs

13  when the only payment that would be made through reprocessing

14  should go to a provider is not appropriate.  The providers are

15  not members of the class.  Some of them have their own cases

16  pending right now.  They did not have notice or right to opt

17  out with respect to the reprocessing here, and that is one of

18  the reasons for UBH's proposal in the briefing of some sort of

19  notice that goes out to class members with a "check-the-box,"

20  "did you pay," "did you assign it" type of request to identify

21  who is entitled to reprocessing and who can benefit from

22  reprocessing among the members of the class.

23       **THE COURT:**  Yeah.  I'm not going to do that.  That

24  will just mean that there will be no reprocessing.

25       The question for you is whether or not you want this order

1  to say you pay to the class members or it gives you more

2  flexibility on who to pay.  That's the question.  If UBH

3  doesn't want the flexibility to pay anyone other than the class

4  members, I guess that's okay.

5      **MS. ROMANO:**  UBH should be able to exercise its

6  discretion conferred under the plan to administer the benefits,

7  and that would include assessing a situation like an

8  assignment.

9      **THE COURT:**  So how would you capture that instead of

10  saying "UBH shall pay to the class member or the class member's

11  assignee"?  How would you figure out -- what would you say?

12  What language would you suggest in that regard?

13      **MS. ROMANO:**  I'd like to consult with our client in

14  terms of the language they would use with respect to processing

15  claims and then propose that back to the plaintiffs and the

16  Court.

17      **THE COURT:**  Okay.  Great.  That will be very helpful.

18  Thank you.

19      Where were we?

20                  (Pause in proceedings.)

21      **THE COURT:**  Here's an interesting question.  No, I'm

22  not going to do that.

23      I mean, I wrestle a little bit with whether or not I

24  should let people at some point opt out of the reprocessing

25  process again because it can be an annoying process.  I mean,

1   you know, these people have gone through a lot and most of

2   which doesn't have to do with the payment or nonpayment of

3   their claim, and they may or may not want to be bothered by

4   whatever correspondence, et cetera, happens when there's a

5   reprocessing and tells them they can submit additional records,

6   et cetera, et cetera.  I mean, these are people who, you know,

7   if they're like some of the named plaintiffs in these classes

8   caring for their extremely challenged children for a long

9   period of time, they've got a lot going on and they may or may

10  not be really interested in this whole bit.

11       They had an opportunity to opt out and maybe that's

12  enough, and I probably am satisfied that that's enough, but I

13  sometimes wrestle with maybe there's some point in this process

14  where we should tell people if they want to just stop the

15  process of reprocessing, they can stop the process of

16  reprocessing.  I don't know if anyone has any thoughts about

17  that.

18            **MR. COWART:**  Your Honor, this is Jason Cowart.  Pardon

19  me for jumping in, but you offered the floor.

20            **THE COURT:**  Sure.

21            **MR. COWART:**  You know, I think plaintiffs' reaction to

22  that is -- I mean, I share the -- I think in the main class

23  members, especially if reprocessing is they're ordered to do it

24  and the class members in general don't have to be involved, I

25  think that kind of accomplishes the Court's objective of not

 1    adding to these people's burden.  If they're asked to submit

 2    additional information, they can obviously decide not to if

 3    they want.

 4         But I think the plaintiffs would not oppose some mechanism

 5    by which class members can communicate that they don't want

 6    their claim to be reprocessed for some reason.  I mean, you

 7    know, in the end -- you know, in the end reprocessing is

 8    designed to provide class members with a remedy and if the

 9    class members don't, you know, want it, you know, I don't know

10    that we have kind of a philosophical or theoretical objection

11    to some mechanism like that.

12              THE COURT:  Yes?

13              MS. ROMANO:  Your Honor, if I can comment on this

14    issue as well.

15         It would be improper to permit them to opt out of the

16    class such that they could then pursue other claims.  There

17    would be no preclusion *res judicata* from this case and that

18    could be one way to --

19              THE COURT:  I agree.  I agree.

20              MS. ROMANO:  Okay.

21              THE COURT:  I'm not -- what I'm talking about is that

22    they can give an instruction to "Please don't reprocess my

23    claim," something like that.

24              MR. COWART:  But just to be clear, we would oppose

25    vehemently any suggestion the class members have to opt

1    themselves into the reprocessing.

2              **THE COURT:**  No, I'm not doing that.

3              **MR. COWART:**  Thank you, Your Honor.

4              **MS. ROMANO:**  So if individuals -- well, I guess,

5    Your Honor, this goes to whether notice is going out to

6    individuals at all.  I know that each side had different

7    proposals with respect to notice so it doesn't seem like there

8    would be -- I guess it will depend, Your Honor, on whether

9    there is going to be some notice going out to members at all.

10   If there were, would it be okay if some individuals said, "No,

11   thank you" on reprocessing but still continued to be bound by

12   all of the issues in the case and decisions in the case, that

13   would probably be okay but I think it depends on whether notice

14   is going out at all.

15             **THE COURT:**  Okay.  Time for reprocessing.  That's the

16   last thing on my list.  So I'm happy to talk about whatever

17   else you'd like to talk about, but that's the last thing on my

18   list.

19        I mean, I guess it's -- I've taken long enough to get this

20   hearing together that the state regulatory approvals have

21   probably already gone through, but I want to figure out a

22   reasonable time period.  You know, I envision there being, you

23   know, monthly reports of progress to the special master on it

24   or something like that, but what's a reasonable time period to

25   accomplish 60,000 reprocessings?  Whatever the number,

1    60-something thousand reprocessings.  What I'm thinking about

2    is a year with at least quarterly reports, maybe more often, to

3    the special master on progress.

4           **MS. ROMANO:**  Your Honor, can I ask a question about

5    that?

6           **THE COURT:**  Yeah.

7           **MS. ROMANO:**  The way that plaintiffs had proposed the

8    time frame, which was far shorter, but it was giving the class

9    members a particular amount of time to submit new information

10   and then 90 days after that to complete the reprocessing.  And

11   so while it had an outside range I think of nine months, it was

12   a 90-day period from the moment additional information needed

13   to be submitted up to the time of decisions, which was a very

14   short time.

15       So when Your Honor speaks of a year, I'm curious how the

16   other aspects of a reprocessing order, which we have not spoken

17   about yet today, would interplay with that.

18           **THE COURT:**  Yeah, that's a very good question.  Let me

19   get it in front of me so I can...

20       So the class members can submit things within 90 days of

21   the class notice.  That's the proposal by the plaintiffs.  And

22   then they had a period of time to complete the review of up to

23   another total of six months, I think, on top of that.

24       I guess I hadn't thought about this in that level of

25   detail, but I think what I was thinking about is completing the

1   whole process in a year.  So if it's 90 days to complete the

2   administrative record, then it's another nine months to

3   complete the reprocessing.

4       Any thoughts on that?

5           MS. ROMANO:  Can I ask another question, Your Honor?

6           THE COURT:  Oh, good.  Yes.

7           MS. ROMANO:  When we're speaking about reprocessing,

8   is it the Court's intent to be ordering reprocessing for all

9   67,000?  I guess there will be some that are reduced out

10  because of the appeals issues perhaps or some other categories.

11          THE COURT:  Still pretty close to that number, yes.

12  That's what I'm thinking about.  For purposes of this analysis,

13  how long, you should assume that.

14          MS. ROMANO:  And that would include people who didn't

15  receive any of the services?

16          THE COURT:  Well, yeah.  We don't know that yet,

17  though, and I'm not going to make people make a claim.  Because

18  I think if we do make them make a claim, that we will have a

19  tiny little group who are willing to go through the process of

20  even making the claim, and I don't want the -- I don't think

21  that's appropriate.

22      So the question is:  You're going to do 60-something

23  thousand.  Can you do it in nine months?

24          MS. ROMANO:  I don't believe so, Your Honor.  As we

25  set forth in the papers, it's over 8,000 full-time equivalent

```
 1   days to complete.  I would certainly want to work with our

 2   client to identify the who.  These are clinicians --

 3              THE COURT:  Sure.

 4              MS. ROMANO:  -- that would need to be identified for

 5   this.  Resources at the company at least are not currently

 6   available because they have the other types of reviews they do

 7   of this sort.  So if we could have some time to confer with our

 8   client to work through what that process would be understanding

 9   the scope issues that we've just discussed, we would appreciate

10   that.

11              MS. REYNOLDS:  And --

12              THE COURT:  Ms. Reynolds, yeah.

13              MS. REYNOLDS:  -- Your Honor, plaintiffs have

14   obviously proposed a shorter period of time, and one of the

15   things we're really mindful of is that these class members have

16   been waiting a really long time for a remedy, some of them nine

17   years.  They're eager to get their claims reprocessed and bring

18   this to a conclusion for them.

19        We think that, you know, UBH and its parent company,

20   they've just announced record-breaking profits.  They're

21   certainly in a position to hire people to assist with this

22   process.  That's happened before, for example, in the *UNUM*

23   regulatory settlement where they reassessed over 200,000

24   claims, they created a division specifically for the

25   reassessments.
```

```
 1        So they can be required to staff up, essentially, to get
 2   this done, and we think that the Court's proposal of a year is
 3   generous.  We don't think additional time will be appropriate
 4   and we think that if there's some problem with getting it done,
 5   that's why there's a special master to assist in identifying
 6   that this just isn't possible and it can be revisited at that
 7   time.
 8        But I think on the front end, you know, we think the Court
 9   should put a deadline in place, we think it should not be
10   overly long, and the Court should require UBH to get to it.
11            THE COURT:  What else should we talk about?
12        MR. ABELSON:  Your Honor, if I may, right before the
13   last break you were addressing with Ms. Ross the appeal
14   denials, and I just wonder if I could have one minute to
15   respond to some items if you're ready.
16            THE COURT:  Okay.  Sure.
17        MR. ABELSON:  So these are the folks who were denied
18   administratively initially and then on appeal were denied under
19   the guidelines so they're class members.  Just a few quick
20   points.
21        First of all, I think it's now undisputed that the notice
22   was the best notice practicable and that there's no due process
23   violation.  And, in fact, the folks who have contacted us,
24   these are people who are such people and they want to remain in
25   the class.  They don't want to be kicked out.
```

1      And then the due process analysis is really a preclusion

2   analysis and in the event there are people who are such appeal

3   guideline denials only and are unlike the people who have

4   contacted us and don't want to be bound, they could raise in

5   such case that they think the notice -- that their due process

6   rights were not protected and that they should have gotten

7   notice and that they shouldn't be bound.  And that happens all

8   the time, that happens with some frequency that courts will

9   look at this and say, "Okay.  You didn't get the notice.  I'm

10  not going to hold you bound."

11     And so we think they should be included -- these people

12  should be included in the reprocessing.  UBH says that it's

13  going to be difficult to identify who they are.  Ms. Ross said

14  that this would require a page-by-page review of the appeal

15  records.  It's just, frankly, one document.  It's the appeal

16  denial letter that we're talking about, and they either refer

17  to the guidelines as a basis for denial or they don't.  And so

18  it will be some burden on UBH to do that but, frankly, if

19  there's a burden associated with it, UBH should have raised

20  this earlier.  They're clearly within the class definition.

21         **THE COURT:**  Well, no, they shouldn't have raised it

22  earlier.  You agreed to the procedure so that's just -- and I

23  also don't understand how what you just said isn't inconsistent

24  with your due process argument.  It's so easy to figure out

25  exactly who these people are who were denied on an

administrative basis in the first instance and then -- this is

those people -- right? -- denied administratively to begin with

and then denied on a clinical ground on appeal.  If it's so

easy for them to find them, then there's an easy way to give

notice.  What do you mean?

**MR. ABELSON:**  I see them as two different questions.

There's the due process is sort of a baseline fairness issue

and it's the best notice practicable.  We have to meet that.

We have met that.

**THE COURT:**  No, but you haven't met that.  That's the

argument.  The argument is if it's so easy to find these

people, you should have found them because all you did as far

as figuring out how to give these particular people -- you

didn't do anything to try to figure out how to give these

particular people notice.  They were excluded because you

didn't pay any attention to them because you didn't know they

existed.

And then -- but you could have found them, apparently you

say easily, and then you could just send them a notice.

Instead, they have to rely by word of mouth and figure out that

there's a website and call you.

So my question is:  Why -- you know, if it's so easy, then

it's a due process violation.

**MR. ABELSON:**  I want to be clear, I don't -- I'm not

saying it's easy.  I think it's possible.  In terms of

1  fairness, the people were aware of it.  From their perspective,

2  it would be unfair to kick them out of the class.

3       THE COURT:  We're not talking about fairness.  We're

4  talking about the due process requirement in order to have

5  somebody bound by a judgment --

6       MR. ABELSON:  Right.

7       THE COURT:  -- and the Rule 23 rules about an order to

8  have somebody bound by a judgment, and the question is whether

9  or not that has been met.  And it strikes me that that's a --

10  that is a challenge here because I actually think you're

11  probably right, they could figure out who these people are.

12  There would be some effort but not a crazy effort, and they

13  could look at the appeal denial letters and match it up during

14  the period in time to the class list and say, "Oh, we've got

15  these extras."

16      But I'm not -- but I don't know.  I just -- I don't -- you

17  know, Ms. Romano says it's very complicated and difficult to

18  do.  You seem to think it's easy.  I think that you're all

19  arguing at cross-purposes at this point because if it's easy,

20  there's a due process violation.  If it's really difficult,

21  there isn't.  So I just don't know -- I'm not -- so I'm a

22  little confused as to how you want to deal with this.

23      MR. COWART:  Your Honor, if I could be heard on this.

24      I think the position we're trying to articulate in

25  different ways is that let's -- for purposes of this

conversation, let's assume that these people have a great due
process argument that they should not be bound, they didn't get
notice.

I think the question in front of the Court really is what
to do about that now.  And the way I see it, the Court has two
choices.  Right now it could kick those people out of the
class, sort of preemptively almost assume that those people
because they didn't get notice, they don't want to be in the
class and so they're out.  Or the Court could leave them in the
class, not decertify them, and we've made a record now for the
last several hours about all the possible due process problems
with the notice regime and the extent to which it got to them;
and if they feel like their due process rights were violated
and they have a problem with being bound, and we've also talked
about the narrow sense in which they're going to be bound by
anything here, but, nonetheless, if they felt like their due
process rights were violated and they wanted to bring an
action, they could do that.  And to us, that's the natural
forum in which they should assert the concerns that you
articulate.

I think we take the point that, Your Honor, you are
custodian to these class members.  You are their fiduciary
right now and we get the concern for the extent to which they
did or didn't get notice and everything else we've been talking
about; but to us, the answer here is to let them -- let sort of

1   the situation play out because if you kick them out of the

2   class now, what is effectively happening, I think, is you are

3   allowing UBH to narrow the scope of the class based on an

4   argument about absent class members' due process rights, and

5   that right -- just saying it that way, I think it points to at

6   least the concerns we have about that approach; right?

7        UBH is saying, "Oh, the notice wasn't good enough.  They

8   didn't get the notice."  The answer to that for us is, keep

9   them in the class and they just have an argument, those

10  individual people, down the line if they don't want -- if they

11  want to contend they weren't bound, they've probably got a

12  decent argument on that.  But to do what Your Honor seems to be

13  suggesting, i.e., kick them out of the class now, we think if

14  we could do a poll, the vast majority of these people would

15  say, "No way.  This is all I've got."

16       **THE COURT:**  Is it only their due process rights that

17  are at stake?

18       **MR. COWART:**  Well, there's the -- I think so.  I mean,

19  I can't --

20       **THE COURT:**  I mean, the notice -- the best practicable

21  notice, is that just about the due process rights of the

22  prospective class members or is it about both sides' due

23  process rights?

24       **MR. COWART:**  I think it impacts UBH's due process

25  rights only in the sense of preclusion.  I think my colleague

1   Mr. Abelson is right about that, that the notice requirement

2   flows from due process because --

3           **THE COURT:**  That's my point.

4           **MR. COWART:**  Yes.  I think it's connected to the

5   preclusion.

6           **THE COURT:**  So that they are precluded, for example,

7   from arguing something with respect to these people's claims.

8   UBH is precluded from arguing, for example, that the guidelines

9   are consistent with generally accepted medical practice,

10  they're precluded, because I've ruled that way in this case and

11  it's binding in something that anything affecting these

12  whatever number of people this is.

13      So it has to do with both sides' due process rights.  I

14  mean --

15          **MR. COWART:**  Yes.

16          **THE COURT:**  And so that isn't -- while you're saying,

17  great, that's -- well, does your remedy -- your remedy may work

18  for the class members.  Does it work for UBH?  Can they argue

19  in a subsequent lawsuit that they shouldn't be bound by this

20  judgment because of the notice provision?

21          **MR. COWART:**  No, that's exactly it.  They can't argue

22  that.  What's their standing to argue that?  They can't assert

23  someone else's due process rights.

24          **THE COURT:**  No, but that's my point, is their due

25  process rights are at stake too.

1        **MR. COWART:**  So let's stay with that then, you're

2   right.  So let's stay with their due process right.  Their due

3   process right was they have a right to a class certification

4   proceeding.  These people were included in the class -- in the

5   definition of the class.  UBH -- you know, any kind of reliance

6   interest UBH has, the reliance interest is on the class

7   certification order, and that order had them in the class.  So

8   they --

9        **THE COURT:**  No, but, see, so your answer is that the

10  notice provisions are only -- it's only one side's due process

11  rights implicated by the notice.

12       **MR. COWART:**  Well, it's both but only in the limited

13  sense that I think I'm trying to agree with the Court that it

14  becomes UBH's interest because of the preclusion connection on

15  the plan member's side.

16       **THE COURT:**  Okay.  Do you want to add anything to

17  this, Ms. Romano?

18       **MS. ROSS:**  Your Honor, if I can just make one point.

19       **THE COURT:**  Ms. Ross.  I'm sorry.

20       **MS. ROSS:**  Yes.  Sorry, Your Honor.  If I can just

21  make one point on that last point Mr. Cowart was making with

22  respect to the due process issues.  And I think this goes back

23  to what we talked about and we've really responded to most of

24  what Mr. Abelson said in our earlier discussion on this, and I

25  don't need to repeat what we said there.

1   But with respect to due process part of the purpose of

2   giving the notice to class members is to protect the due

3   process rights of both parties to allow for class members to

4   make a decision about whether to bind themselves to the class

5   and to the outcome of whatever the class claims may be before

6   there are substantive rulings in the case.  And now we're sort

7   of talking about the people who never got that notice, and we

8   disagree with Mr. Abelson's representation that the parties

9   agree that that this was the best notice practicable as to this

10  group of people.

11          THE COURT:  Right.

12          MS. ROSS:  We certainly agree to that as to the

13  others.

14      But, you know, no effort was made by either party, and

15  everyone agreed to the process to do this and maybe we could

16  have found a way to do that if we had tried to do it, you know,

17  four or five years ago, but to allow them now to sort of be in

18  the class without having protected that right to opt out before

19  Your Honor made substantive decisions in the case we think

20  would be a violation of due process as to UBH.

21          THE COURT:  Yeah.  I mean, it's sort of like the same

22  problem that you have with allowing opt-outs after substantive

23  decisions are made.  To allow someone to come in after

24  substantive decisions have been made and make an election, I'm

25  not going to raise the notice issue.  I think I can't really.

1    I think I have to decide -- I don't think that remedy works.

2         The remedy is there of course, but I think that I have to

3    make the decision now as to whether the best practicable notice

4    was -- a reasonably practicable notice was -- or it's

5    reasonably calculated to give -- the actual notice was given

6    and not rely on something that might happen down the road,

7    which effectively would give them, if they convince the judge

8    of that, an option to opt out of a decision that they might not

9    like where you say Ms. Romano could not, UBH could not.

10   Ms. Ross is, I think, making that point.  So I'm concerned

11   about that.

12        All right.  Well, I understand that issue.

13        Anything else you want to talk about?

14        **MS. REYNOLDS:**  Your Honor, could you set a time frame

15   for the additional --

16        **THE COURT:**  Yes.  Provisions?

17        **MS. REYNOLDS:**  -- provisions that you would like?  And

18   if we may request that it be as brief as possible.

19        **THE COURT:**  Yes.  Yes.  It's going to be short.

20        So you've each promised me things in terms of additional

21   suggested language.  Two weeks from today.  No briefing.  Just

22   language.

23        **MS. REYNOLDS:**  A joint filing?

24        **THE COURT:**  No, no.  You're going to suggest

25   something.  They're going to suggest something.  Hopefully

1    you'll meet and confer with each other on it before it comes

2    in, but just suggest some language and then I'll make a

3    decision on it.

4               **MS. REYNOLDS:**  All right.

5               **THE COURT:**  Okay.  What else?

6               **MS. REYNOLDS:**  Your Honor, have you -- do you intend

7    to set a schedule for submission of names for a special master?

8    Is that something that will be in your order or would you like

9    to get that started sooner?

10              **THE COURT:**  So here's what I'm -- I mean, ultimately

11   what I'm going to do is I'm going to have a special master and

12   I'm going to ask you-all to meet and confer and draft an order

13   to appoint the special master, which will include how the

14   person gets appointed and all of the things that are required

15   by Rule 56 or whatever it is.

16       And, you know, there's some of it that you won't agree on,

17   like the scope of some of the responsibilities, but I'm hoping

18   that you can agree on most things so that I can do that, but

19   that special master appointment will be part of it.

20       And if you want to start, you're welcome to start meeting

21   and conferring because I am going to have the parties address,

22   you know, the standard of review and all the 53(b) matters and

23   53(g) matters and all the, you know, timetables for reports,

24   et cetera, et cetera, and that kind of thing.  So I think you

25   should meet and confer and start that because it's certainly

1  going to be in the remedies order that I'm going to appoint one

2  and ask the parties to prepare that.

3      And the other -- yeah.  I don't know what that's going to

4  be.  One second.

5                    (Pause in proceedings.)

6          THE COURT:  Okay.  All right.  Great.

7          MS. ROMANO:  Your Honor, just to follow-up.  Just in

8  light of the discussions on the various remedies and what that

9  order is likely to look like today, UBH does intend to seek a

10 stay pending appeal and would request a provisional stay so

11 that it will be able to get in a motion to stay, have it

12 decided by this court or the Ninth Circuit if necessary.

13         THE COURT:  You're welcome to make the motion.  I will

14 not be staying my order at all in its initial phase.  You can

15 make -- you have to make a motion in front of me to stay it of

16 course so you can get to the Ninth Circuit, and I invite you to

17 do that; but my current intention is not to have any stay

18 unless I'm convinced otherwise.  So I wouldn't put in a

19 provisional stay.  You know, you may convince the Ninth Circuit

20 otherwise.  That's all well and good, and I assume this is

21 bound for the Circuit no matter what, but I have no intention

22 of issuing a stay with respect to this matter at this point in

23 the case.  You know, maybe you'll convince me once you file the

24 motion, but at this point in the case I'm not going to do it.

25     Okay.  Thank you-all.

1          MS. REYNOLDS:  Thank you, Your Honor.

2          MS. ROMANO:  Thank you, Your Honor.

3          MS. ROSS:  Thank you.

4          THE COURT:  Thanks.

5          MR. COWART:  Thank you, Your Honor.

6              (Proceedings adjourned at 2:57 p.m.)

7                   ---oOo---

8

9

10                CERTIFICATE OF REPORTER

11      I certify that the foregoing is a correct transcript

12  from the record of proceedings in the above-entitled matter.

13

14  DATE:   Sunday, September 6, 2020

15

16

17

18  _____

19     Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                U.S. Court Reporter

20

21

22

23

24

25