PSYCH-APPEAL, INC.
Meiram Bendat (Cal. Bar No. 198884)
8560 West Sunset Boulevard, Suite 500
West Hollywood, CA 90069
Tel: (310) 598-3690, x.101
Fax: (888) 975-1957
mbendat@psych-appeal.com

ZUCKERMAN SPAEDER LLP
D. Brian Hufford (admitted *pro hac vice*)
Jason S. Cowart (admitted *pro hac vice*)
485 Madison Avenue, 10th Floor
New York, NY 10022
Tel: (212) 704-9600
Fax: (212) 704-4256
dbhufford@zuckerman.com
jcowart@zuckerman.com

*Attorneys for Plaintiffs and the Classes*
*(Additional Counsel on Signature Page)*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| DAVID AND NATASHA WIT, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED BEHAVIORAL HEALTH (operating as OPTUMHEALTH BEHAVIORAL SOLUTIONS),<br><br>Defendant. | Case No. 3:14-CV-02346-JCS<br>Action Filed: May 21, 2014<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR A PARTIAL STAY OF REMEDIES ORDER PENDING APPEAL** |
| GARY ALEXANDER, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED BEHAVIORAL HEALTH (operating as OPTUMHEALTH BEHAVIORAL SOLUTIONS),<br><br>Defendant. | Case No. 3:14-CV-05337-JCS<br>Action Filed: December 4, 2014 |

## TABLE OF CONTENTS

Page

Introduction .......... 1

Argument .......... 1

I. UBH Has Not Shown A Likelihood of Reversal on Appeal .......... 2

A. Plaintiffs Proved, and the Court Found, Causation as to All Class Members .......... 3

1. Plaintiffs Proved that UBH's Misconduct Caused the Harm Alleged .......... 3

2. UBH's Article III Argument Fails for Similar Reasons .......... 8

B. The Court Applied The Correct Standard of Review .......... 9

II. UBH Will Not Be Irreparably Harmed Absent a Stay .......... 15

A. UBH's Request To Stay Check Issuance Is Premature .......... 15

B. The Administrative Costs of Reprocessing Do Not Constitute Irreparable "Business Changes" .......... 16

III. Plaintiffs and the Class Would Be Prejudiced By A Stay .......... 19

IV. The Public Interest Weighs Heavily Against a Stay .......... 20

Conclusion .......... 25

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abatie v. Alta Health & Life Ins. Co.*,
458 F.3d 955 (9th Cir. 2006) .......... 5

*Al Otro Lado v. Wolf*,
952 F.3d 999 (9th Cir. 2020) .......... *passim*

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
559 F.3d 1046 (9th Cir. 2009) .......... 18

*Bain v. Oxford Health Ins. Inc.*,
No. 15-CV-03305-EMC, 2020 WL 808236 (N.D. Cal. Feb. 14, 2020) .......... 24

*Bearchild v. Cobban*,
947 F.3d 1130 (9th Cir. 2020) .......... 12

*California v. Azar*,
911 F.3d 558 (9th Cir. 2018) .......... 18

*Canseco v. Constr. Laborers Pension Tr. for S. Cal.*,
93 F.3d 600 (9th Cir. 1996) .......... 6

*Carrier v. Aetna Life Ins. Co.*,
116 F. Supp. 3d 1067 (C.D. Cal. 2015) .......... 5

*Chu v. CFTC*,
823 F.3d 1245 (9th Cir. 2016) .......... 13

*Doe #1 v. Trump*,
957 F.3d 1050 (9th Cir. 2020) .......... 1, 2, 15, 17

*F.T.C. v. Qualcomm Inc.*,
935 F.3d 752 (9th Cir. 2019) .......... 18

*Firestone Tire & Rubber Co. v. Bruch*,
489 U.S. 101 (1989) .......... 10

*Hernandez v. Sessions*,
872 F.3d 976 (9th Cir. 2017) .......... 18

*Hill v. Emp. Benefits Admin. Comm. of Mueller Grp. LLC*,
971 F.3d 1321 (11th Cir. 2020) .......... 5

*hiQ Labs, Inc. v. LinkedIn Corp.*,
938 F.3d 985 (9th Cir. 2019) .......... 17

*In re Genesis Health Ventures, Inc.*,
367 B.R. 516 (Bankr. D. Del. 2007) .......... 20

*Jamie F. v. UnitedHealthcare Ins. Co.*,
No. 19-CV-1111-YGR, 2020 WL 4249200 (N.D. Cal. July 23, 2020) .......... 24

*John Doe Co. v. Consumer Fin. Prot. Bureau*,
235 F. Supp. 3d 194 (D.D.C. 2017) .......... 19

*King v. Blue Cross & Blue Shield of Ill.*,
871 F.3d 730 (9th Cir. 2017) .......... 11

*Leiva-Perez v. Holder*,
640 F.3d 962 (9th Cir. 2011) .......... 2

*Mahroom v. Best W. Int'l, Inc.*,
No. C 07-2351 JF (HRL), 2009 WL 248262 (N.D. Cal. Feb. 2, 2009) .......... 19

*McCartha v. Nat'l City Corp.*,
419 F.3d 437 (6th Cir. 2005) .......... 8

*Meidl v. Aetna, Inc.*,
346 F. Supp. 3d 223 (D. Conn. 2018) .......... 6

*Metro. Life Ins. Co. v. Glenn*,
554 U.S. 105 (2008) .......... 10

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 1, 2, 19

*Romberio v. Unumprovident Corp.*,
385 F. App'x 423 (6th Cir. 2009) .......... 4

*S.B. v. Oxford Health Ins., Inc.*,
419 F. Supp. 3d 344 (D. Conn. 2019) .......... 24

*Saffle v. Sierra Pac. Power Co. Bargaining Unit Long Term Disability Income Plan*,
85 F.3d 455 (9th Cir. 1996) .......... 4, 5, 6, 12

*Snow v. Standard Ins. Co.*,
87 F.3d 327 (9th Cir. 1996) .......... 12, 13

*Steiner v. Apple Comput., Inc.*,
No. C 007-04486 SBA, 2008 WL 1925197 (N.D. Cal. Apr. 29, 2008) .......... 19

*Thole v. U. S. Bank N.A.*,
140 S. Ct. 1615 (2020) .......... 9

*United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Industry, AFL-CIO v. Barr*,
Civ. A. No. 90-2342, 1991 WL 241890 (D.D.C. Oct. 29, 1991) .......... 19

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*,
559 F.2d 841 (D.C. Cir. 1977) .......... 19

*Washington v. Trump*,
847 F.3d 1151 (9th Cir. 2017) .......... 2

*Williby v. Aetna Life Ins. Co.*,
867 F.3d 1129 (9th Cir. 2017) .......... 11

**Statutes**

29 U.S.C. § 1001 .......... 21

29 U.S.C. § 1132 .......... 21

29 U.S.C. § 1132(a)(1)(B) .......... 4, 5, 6

29 U.S.C. § 1132(a)(3) .......... 5, 6

29 U.S.C. § 1133 .......... 21

29 U.S.C. § 1185a .......... 21

**Other Authorities**

S.B. 855, 2019-2020 Reg. Sess. (Cal. 2020) .......... 22

**Treatises**

11A Charles Alan Wright & Arthur R. Miller,
Federal Practice and Procedure § 2948.4 (3d ed.) .......... 21

**Regulations**

29 C.F.R. § 2560.503-1 .......... 21

## INTRODUCTION

Defendant United Behavioral Health (UBH) has filed a limited motion to stay pending appeal, ECF No. 506 ("Mot."). It does not seek a stay as to the Court's declaratory judgment (ECF No. 491 at 85:17-89:27, § I), or the Court's injunction prohibiting it from using its own Guidelines or other guidelines suffering from comparable flaws (*id.* at 95:17-96:1, § IV.A); or the injunction mandating that, for ten years, it make all coverage-related determinations under ERISA-governed plans about whether services are consistent with generally accepted standards of care according to the specified guidelines (ASAM, LOCUS, CASII, and ECSII) and the requirements of applicable state law (*id.* at 96:3-97:2, § IV.B.1); or the Court-ordered training of its personnel about those guidelines (*id.* at 97:13-21, § IV.B.2.b & .c); or the Court-ordered training of its personnel, in addition to its reprocessing personnel, regarding "what it means to be an ERISA fiduciary and to administer benefit plans solely in the interests of participants and beneficiaries, as well as the need to comply with plan terms" (*id.* at 97:22-27 & 98:5-13, § IV.B.3.b & .c); or the appointment of a Special Master to oversee these corporate reforms and report on them every 60 days (*id.* at 98:14-22 & 99:3-6 § V & VI.3). In addition, insofar as UBH's motion requests, among other things, a stay as to issuance of *payment* to class members who UBH determines to be entitled to benefit payments after reprocessing (*id.* at 93:15-95:3, §§ III.D.2 & III.E), such request is premature, as explained below.

Thus, the only question before the Court is whether UBH should be allowed to delay even determining *whether*, under the same criteria UBH accepts as the basis for reviewing new claims while the appeal is pending, the prior requests of class members for coverage should have been approved. The answer is no.

## ARGUMENT

A party seeking a stay pending appeal must "ma[k]e a strong showing" of a "likelihood of success on the merits" and that the movant "will be irreparably injured absent a stay." *Doe #1 v. Trump*, 957 F.3d 1050, 1058 (9th Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 426 (2009)). These two factors are "the most critical" for establishing entitlement to a stay pending appeal. *Id.* (citing *Nken*, 556 U.S. at 434). If these two factors "are satisfied," the court also

considers "the public interest" and whether a stay will "substantially injure other parties." *Id.* "The party requesting a stay bears the burden of showing that the circumstances justify" delaying execution of a judgment. *Nken*, 556 U.S. at 433-34. The reason a movant seeking a stay bears such a heavy burden is that "[a] stay is an 'intrusion into the ordinary processes of administration and judicial review,' and accordingly 'is not a matter of right, even if irreparable injury might otherwise result to the appellant.'" *Id.* at 427 (citations omitted).[1] UBH has come nowhere close to making the strong showing necessary to obtain its requested partial stay pending appeal.

## I. UBH HAS NOT SHOWN A LIKELIHOOD OF REVERSAL ON APPEAL.

UBH has not met, and cannot meet, "the high standard of showing a strong likelihood of success on the merits." *Doe #1*, 957 F.3d at 1062. Although a movant seeking a stay pending appeal need not make a full-blown "demonstrat[ion] that it is more likely that not that [it] will win on the merits," it must at minimum show a "reasonable probability" that the Court of Appeals will reverse. *Leiva-Perez*, 640 F.3d at 966, 967. *See also id.* at 968 (explaining that other "formulations," including the "serious legal questions" standard that UBH highlights, *see* Mot. at 4:24, are "essentially interchangeable"). None of UBH's arguments establishes a "reasonable probability" that the Court of Appeals will conclude that any of the Court's findings of fact are

---

[1] UBH is wrong in suggesting that all four factors "are balanced, so that a stronger showing of one element may offset a weaker showing of another." Mot. 4:14-16 (citing *Leiva-Perez v. Holder*, 640 F.3d 962, 964 (9th Cir. 2011)). A party seeking a stay pending appeal *must* make a "strong" showing of likelihood of success and also show that the party "will" be irreparably injured absent a stay. *See Nken*, 556 U.S. at 434 ("The first two factors of the traditional standard are the most critical."); *Leiva-Perez*, 640 F.3d at 965 ("[I]f the [movant] has not made a certain threshold showing regarding irreparable harm . . . then a stay may not issue, regardless of the petitioner's proof regarding the other stay factors."); *Washington v. Trump*, 847 F.3d 1151, 1164 (9th Cir. 2017) (denying stay because "the Government has failed to clear each of the first two critical steps"). To the extent courts permit any "sliding scale" analysis, it is only that a very strong likelihood of success on appeal—i.e., a great probability that the order will be reversed—can make up for a weaker showing of irreparable injury. *Al Otro Lado v. Wolf*, 952 F.3d 999, 1010 (9th Cir. 2020) ("Where, as here, the showing of irreparable harm is weak at best, the [movant] must make a commensurately strong showing of a likelihood of success on the merits to prevail under the sliding scale approach."). But UBH does not claim, and could not show, that its likelihood of success is great enough to warrant discounting the complete absence of a showing of irreparable injury.

clearly erroneous, or will take any other action that would result in the class not obtaining reprocessing.

### A. Plaintiffs Proved, and the Court Found, Causation as to All Class Members.

UBH's causation argument fails because, as it has done throughout this case, UBH continues to mischaracterize Plaintiffs' claims and the Court's findings, misstate the law, and misrepresent the facts. Plaintiffs have responded to these arguments over and over again, and the Court has rejected them each time.[2] The arguments are no better now, and UBH's refusal to give them up does not mean they present "thorny legal issues." Mot. at 10:7 (quotations omitted). UBH's arguments are meritless and do not establish a strong likelihood of success on appeal.

#### 1. <u>Plaintiffs Proved that UBH's Misconduct Caused the Harm Alleged.</u>

As the Court is well aware, Plaintiffs alleged and proved at trial that each class member's plan included, as one essential requirement for coverage, that services must be consistent with generally accepted standards of care, Findings of Fact and Conclusions of Law, ECF No. 418 ("FFCL") ¶¶ 53, 211; that UBH developed its Guidelines to standardize its interpretation of those plan terms across all of the commercial plans it administered, FFCL ¶¶ 39, 55, 197; that the Guidelines were wholly and pervasively more restrictive than the generally accepted standards of care and ASAM and violated the state laws of Illinois, Connecticut, Rhode Island and Texas, FFCL ¶¶ 82-167; and that UBH denied coverage to each of the class members based, in whole or in part, upon the Guidelines, FFCL ¶¶ 204, 214.

Those facts gave rise to two distinct claims. First, Plaintiffs proved that UBH breached its duties of loyalty, prudence and care when it adopted its excessively restrictive Guidelines as its standard interpretation of plans' generally accepted standards of care requirement, for the express purpose of making it easier to deny coverage and thereby reduce its "benefit expense"

---

[2] This is the same argument UBH has made repeatedly before. ECF No. 149 at 30-32; ECF No. 177 at 10-11; ECF No. 248 at 10-12, 15-16; ECF No. 400 at 99-102; ECF No. 425 at 9-10. Plaintiffs have repeatedly explained why UBH is wrong. *See, e.g.*, ECF No. 153 at 17-18; ECF No. 179 at 11-13; ECF No. 260-3 at 10-19; ECF No. 404 at 7-8. And the Court has correctly rejected the argument each time. ECF No. 174 at 31-33, 54-55; ECF No. 181 at 5; ECF No. 286 at 24-25; FFCL ¶ 204; ECF No. 490 at 11-13.

and otherwise "mitigate" the impact of the Mental Health Parity and Addiction Equity Act. *See* FFCL ¶¶ 182, 193-206. In so doing, UBH narrowed the scope of the coverage otherwise available under the class members' plans, rendering them less valuable. *See, e.g.*, FFCL ¶¶ 82, 106, 124, 134 n.16, 145, 183. Each class member suffered that injury, which was directly caused by UBH's selfish misconduct. *See* FFCL ¶¶ 203-04.

Second, Plaintiffs proved at trial that, because UBH denied coverage to the class members pursuant to Guidelines that were wholly inconsistent with the generally accepted standards required by the plans, UBH's denials were unreasonable and UBH abused its discretion. *See* FFCL ¶¶ 207-16. It is black-letter ERISA law that a benefit denial pursuant to a misinterpretation of the plan is a sufficient injury to warrant the default remedy: remand to the administrator to apply the plan correctly. *See, e.g.*, *Saffle v. Sierra Pac. Power Co. Bargaining Unit Long Term Disability Income Plan*, 85 F.3d 455, 456, 460-61 (9th Cir. 1996). And again, each class member suffered this injury, which was directly caused by UBH's application of its plan-violating Guidelines to deny coverage. *See* FFCL ¶¶ 211-214.

Thus, UBH's repeated refrain that the Court did not require Plaintiffs to show a "causal link" between the misconduct they alleged and the injuries they suffered—*see, e.g.*, Mot. at 5:27-6:6, 7:11-14, 8:1, 10:6-7, 11:16-19—is just false.[3] UBH justifies its position by continuing to insist that the only way to prove causation in *any* case under 29 U.S.C. § 1132(a)(1)(B) is by first demonstrating actual entitlement to benefits. *See, e.g.*, Mot. at 7:14-28.[4] But UBH still fails to

---

[3] UBH relies on the *Romberio* case in arguing that the Court "relieved" plaintiffs of this requirement, Mot. at 8:8-11 (quoting *Romberio v. Unumprovident Corp.*, 385 F. App'x 423, 429 (6th Cir. 2009)). But *Romberio* merely stands for the proposition that there must be "[a] causal connection between the alleged breach and the alleged harm . . . ." *Id*. at 429. Nothing in *Romberio* suggests that the only type of harm cognizable under ERISA is the loss of money that plaintiff can prove would otherwise have been paid; and therefore, *Romberio* does not support UBH's refusal to acknowledge the causal link Plaintiffs did prove.

[4] UBH's myopic focus on whether benefits are "due" also utterly ignores the "enforcing plan terms" and "clarifying benefits" prongs of § 1132(a)(1)(B). UBH does not even attempt to argue (nor could it) that claims under those portions of the statute require a plaintiff to demonstrate actual entitlement to benefits. Thus, the Court's rulings would stand even if UBH were right about the "recover benefits due" prong—which, of course, it is not.

cite any case establishing such a requirement.[5] And *Saffle* directly refutes UBH's argument. There, the Ninth Circuit held that not only did the plan's erroneous interpretation of plan terms entitle the plaintiff to remand for application of the correct standard, but also that it was *error* for the district court to reach the question of whether the plaintiff was actually entitled to benefits under the corrected interpretation of the plan. 85 F.3d at 459-60. Entitlement to benefits *could not* have been an element of the plaintiff's claim if it was reversible error for the district court to reach the entitlement-to-benefits question where, as here, the administrator had applied an improper standard in interpreting plan terms.

UBH tries to escape *Saffle*'s plain meaning by arguing that it really means that remand is only warranted if the Court is already "assure[d]" that "the plaintiff would be 'entitled to the benefits for which she applied' if the specific questions that required remand were resolved in her favor." Mot. at 8:17-20 (quoting *Saffle*, 85 F.3d at 457). If that were true, a remand remedy would *never* make sense. The default remedy for a plan misinterpretation would be an award of benefits. But the Ninth Circuit has unequivocally held exactly the opposite:

> [W] hen, as here, the administrator construes a plan provision erroneously, the court *should not* itself decide whether benefits should be awarded but rather should remand to the administrator for it to make that decision under the plan, properly construed.

---

[5] *Abatie* and *Carrier* contain no such holding, contrary to UBH's misleading citations. *See* Mot. at 7:20-25 (quoting *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 977 (9th Cir. 2006), *Carrier v. Aetna Life Ins. Co.*, 116 F. Supp. 3d 1067, 1079 (C.D. Cal. 2015)). UBH quotes a snippet from a concurrence in *Abatie* observing that rather than focusing on standard of review, "[t]he focus should be on whether the claimant is entitled to the claimed benefits." 458 F.3d at 977. That *dicta* did not even purport to address the elements of an (a)(1)(B) claim. UBH's partial quotation from *Carrier* is even more egregious. The full quotation states, "[b]ecause the standard of review is *de novo*, Plaintiff bears [the] burden of proving entitlement to benefits." 116 F. Supp. 3d at 1079. *Carrier* was plainly addressing burden of proof, rather than the elements of a claim, as the portion of the sentence elided by UBH makes clear. *Hill*, likewise, involved a court engaged in *de novo* review. *Hill v. Emp. Benefits Admin. Comm. of Mueller Grp. LLC*, 971 F.3d 1321, 1323 (11th Cir. 2020) (cited by UBH, Mot. at 8:6-10, 9:12-14). After concluding that the plaintiffs were not entitled to "Special Early Retirement" benefits because they were not laid off and their plant never shut down, the court also denied equitable relief under § 1132(a)(3). In so doing, the Court observed that "[t]he essence of the employees' claims . . . is that they were entitled to SER benefits but wrongfully denied them," and that § 1132(a)(1)(B) "provides the remedy" for such a claim. 971 F.3d at 1332. The Court did not purport to address the *elements* of any claim, but only the availability of equitable relief in that case.

*Saffle*, 85 F.3d at 456 (emphasis added). Lest there be any confusion, the Court went on:

> We now make it explicit, that *remand for reevaluation of the merits of a claim is the correct course to follow* when an ERISA plan administrator, with discretion to apply a plan, has misconstrued the Plan and applied a wrong standard to a benefits determination.

*Id*. at 461 (emphasis added). At no point did the Ninth Circuit hold or suggest that its ruling turned on the fact that it was "assured" that the plaintiff would be awarded benefits on remand.[6] The whole point of remand is to allow the administrator to make that determination.[7]

Nor does UBH offer any reason why the default remedy in such circumstances should be unavailable in a class action. UBH reiterates its argument that Plaintiffs cannot "abridge, enlarge, or modify" any substantive rights by obtaining class certification. Mot. at 8:1-11. But it is UBH, not Plaintiffs, who is trying to "abridge" the class members' right to relief under ERISA—based solely on the fact that this ERISA case is a certified class action. *Saffle* makes clear that if a court finds that the administrator mis-interpreted the plan, the default remedy is remand to the administrator for application of the corrected standard; thus, the Court has not ordered any relief for the class that would be unavailable to an individual. UBH offers no legal basis for eliminating the class members' right to a remand merely because UBH's plan violations were proven in a class action rather than through more than 66,000 individual actions.

UBH's arguments about the sufficiency of the trial evidence are also meritless. For example, UBH claims that causation fails because the class members "cannot prove that UBH

---

[6] Bafflingly, UBH also relies on a Ninth Circuit case holding that "'remand is inappropriate' where 'no factual determinations remain to be made' and 'reevaluation of the merits of [the] claim' is not required." Mot. at 9:2-4 (citing *Canseco v. Constr. Laborers Pension Tr. for S. Cal.*, 93 F.3d 600, 609 (9th Cir. 1996)). But here, because UBH denied coverage pursuant to its plan-violating Guidelines, factual determinations under the appropriate standards *do* remain to be made and reevaluation of the merits of the claims *is* required. That is exactly what *Saffle* dictates that the *administrator* must do—not the Court.

[7] This is also why UBH's new theory that a remand for reprocessing constitutes legal damages instead of equitable relief, Mot. at 11:1-10, is nonsensical. *Saffle* dictates that because UBH mis-interpreted the plans, the Court should not award benefits (i.e., legal relief) to the class members, but should remand the denials to UBH for further fact-finding and the administrative steps flowing from those findings. Plaintiffs have previously explained, and the Court has found, that such relief is available under both §§ 1132(a)(1)(B) and (a)(3). Remedies Order, ECF No. 491 at 42-44; *Meidl v. Aetna, Inc.*, 346 F. Supp. 3d 223 (D. Conn. 2018) (reprocessing order is a form of injunctive relief).

applied the guideline provisions that Plaintiffs challenged at trial." Mot. at 6:7-10. This is wrong for multiple reasons. First, Plaintiffs proved that the Guidelines, *in toto*, were structurally and substantively more restrictive than generally accepted standards. The Court found multiple, overlapping, mutually-reinforcing, mandatory Guideline provisions to be in conflict with such standards. Based on how the Guidelines were written, the evidence showed that there was no way for UBH to issue a Guideline-based denial that was consistent with generally accepted standards. Indeed, UBH's own expert said as much. Trial Tr. 1241:15-1243:1 (Simpatico). Second, because UBH chose to issue denials that cited to the Guidelines as a whole, rather than to specific provisions of the Guidelines, the Court properly inferred that UBH applied all of the Guideline provisions, including the scores of provisions the Court found were incompatible with the plans. *See, e.g.*, FFCL ¶ 51. UBH's objections to the Court's findings as to CDG-based denials, Mot. at 6:13-18, are meritless for the same reason.[8]

UBH also complains that some denials were based in part on another reason, in addition to the Guidelines, pointing to a single example from the claims sample. Mot. at 6:19-26. But the Court has already ordered that, if a denial letter explicitly cites to an additional ground for denial, other than the Guidelines, UBH may continue to rely on that ground and need not reverse its denial. Remedies Order, ECF No. 491 at 92:16-17. The existence of a different reason for a

---

[8] UBH slips into a declaration a new factual argument highlighting two denial letters, which it claims "paraphrase" portions of the CDGs other than the language that incorporates the LOCGs. *See* Ross Decl. ¶¶ 5-6 (citing Trial Exs. 1381-0002 and 1383-0002). Aside from the fact that UBH has plainly forfeited this argument, the evidence does not support it. With respect to the first letter, the only portions of the CDG it "paraphrases" do not even apply to the services it is denying. *See* Trial Ex. 89-0003 to -0004 (Extended Outpatient Sessions CDG) listing four "non-routine" circumstances in which extended sessions may be "indicated"); *compare* Trial Ex. 89-0005 (CPT Code **90837** applies to 60 minute psychotherapy sessions; CPT Code **90839** applies to "psychotherapy for crisis") *with* Trial Ex. 1381-0001 to -0002 (denying coverage for CPT Code 90837 but paraphrasing portions of CDG applicable to CPT Code 90839 and stating coverage unavailable because "[y]ou are not in crisis."). UBH cannot rely on its incorrect "paraphrasing" of the Extended Sessions CDG to escape the fact that it also cited that CDG, as well as the CDGs for Generalized Anxiety Disorder and Post-Traumatic Stress Disorder, in their entirety. In short, this denial letter does not prove that any "independent" ground for denial exists that necessarily excludes reliance on the criteria Plaintiffs challenged at trial. The second letter suffers from the same problem. *Compare* Trial Ex. 89-0003 to -0004 (listing grounds for non-routine extended sessions) with Trial Ex. 1383-0002 to -0003 (inaccurately summarizing CDG).

denial, however, does not excuse UBH's breach of fiduciary duty in developing its self-serving Guidelines, nor does it make the Guideline-based denial any more reasonable. All it does is remove the need for full reprocessing once the additional ground for denial is identified in the denial letter—exactly the outcome the Court ordered.[9]

UBH also argues that some class members did not go on to receive the requested services after coverage was denied, and therefore will not be owed benefits after reprocessing no matter what the outcome is. Mot. at 6:27-7:3.[10] But that fact has nothing to do with whether those class members suffered injuries caused by UBH's misconduct—i.e., the reduction in value of their plan coverage, and the wrongful denial of benefits based on UBH's mis-reading of their plans. The Court correctly found that they did, just like all the other class members.

**2. <u>UBH's Article III Argument Fails for Similar Reasons.</u>**

UBH's meritless Article III standing argument also flows directly from its refusal to acknowledge that Plaintiffs did plead and prove that every class member was injured by UBH's misconduct. *See* § I.A.1, *supra*. The fact that Plaintiffs proved their claims through common evidence does not mean that Plaintiffs did not prove everyone was injured—it simply means that,

---

[9] Remand for this limited purpose, therefore, is not " useless," as UBH's citation to *McCartha* suggests. Mot. at 8:25-9:2 (citing *McCartha v. Nat'l City Corp.*, 419 F.3d 437, 446-47 (6th Cir. 2005)). It is necessary because the letters are UBH's only record of whether any independent ground even exists. Nor does *McCartha* hold that the existence of an independent reason for denial eliminates the wrongfulness of the illegal reason; it merely finds that, because the evidence before the court in that case established that the independent reason was valid, remand was not necessary to determine whether to uphold the denial. *Id*.

[10] In support of its argument that "at least 36%" of the claim sample members fall in this group, UBH offers a new declaration from a witness who did not testify at trial. Mot. at 7:1-3 (citing Edwards Decl. ¶ 8). Ms. Edwards concludes that 61 of the sample members (64%) had subsequent denials of coverage for services at the same level of care as the denials at issue in this case. Edwards Decl. ¶¶ 8(c) (same level of care, different provider name), 8(d) (same level of care and same provider name). But nothing in the declaration supports any conclusion about whether the other sample members obtained such services following UBH's illegal denials. For example, UBH's records do not reflect whether members received services but were deterred from submitting another claim because coverage had already been denied. In any case, this evidence is irrelevant. As explained above, class members were injured by UBH's violations whether they subsequently received the services or not.

if Plaintiffs had brought more than 60,000 individual cases, the proof at trial would have been the same in each and every one of them.

UBH's attempt to capitalize on *Thole* to support its argument also fails. *See* Mot. at 9:5-20 (citing *Thole v. U. S. Bank N.A.*, 140 S. Ct. 1615, 1618 (2020)). The *Thole* plaintiffs not only had not been injured by the alleged breach of duty, they *could not* be—because they were members of a defined benefit plan that was fully funded, such that their benefits were fixed and would not fluctuate based on the plan fiduciaries' investment decisions. 140 S. Ct. at 1618-19. By contrast, here, each of the Named Plaintiffs and each of the class members—by definition—was wrongfully denied benefits pursuant to UBH's plan-violating guidelines. FFCL ¶¶ 13, 204, 214. And, contrary to UBH's suggestion, Mot. at 9:15-20, the wrongfulness of the denials is "fairly traceable" to UBH's misconduct: indeed, UBH deliberately created Guidelines that were more restrictive than generally accepted standards.

### B. The Court Applied The Correct Standard of Review.

UBH offers four arguments for the notion that the Court applied an incorrect standard of review. Each either has been rejected by this Court, sometimes multiple times, or was never raised before and therefore has been forfeited; and each is meritless in any event.

**First**, UBH raises again its theory that exclusions in its plans of services "not consistent with [UBH's] level of care guidelines" (the "Guideline Exclusion") mean it has unfettered discretion to adopt Guidelines that say whatever UBH wants them to say. *See* Mot. 12:18-24; FFCL ¶ 55 (rejecting this theory). Of course, UBH does not come out and say that, but that is the necessary upshot of the argument that UBH cannot have abused its discretion in adopting Guidelines when "[m]any of UBH's plans contain separate exclusions for treatment inconsistent with . . . UBH's guidelines . . . ." Mot. 12:20-22. In attempting to use this losing argument to obtain a stay, UBH argues that, although the Court rejected UBH's reliance on the Guideline Exclusion in the course of applying the abuse of discretion standard of review, the Court did not really mean it, and instead "its decision does not reflect the requisite deference." Mot. 12:12-13. The Court engaged in precisely the correct mode of analysis to conclude that Guideline Exclusion does not immunize UBH's conduct. In rejecting this argument multiple times before,

including based on the full trial record, the Court explained, correctly, that "the Guidelines themselves do not purport to be plan terms"; instead they purport to be "objective criteria for making standardized decisions about coverage"; they "are developed internally by UBH without input from Plan sponsors"; and the plans do not (and cannot) "delegat[e] to UBH . . . authority to amend the Plans without the express approval of Plan sponsors," which would "fl[y] in the face of ERISA." FFCL ¶¶ 55-56.[11]

**Second**, UBH argues that even though it *in fact* labored under a structural conflict of interest with respect to its fully-insured plans and *in fact* allowed financial considerations to infect its development of its clinical Guidelines across the board (factual findings that UBH does not challenge)—and thus the Court appropriately "viewed UBH's interpretations with 'significant skepticism'" due to its conflict of interest—the Court should somehow have cabined its "skepticism" to the portion of the Class covered by fully-insured plans. Mot. 13:12-22. But this argument flips *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008), on its head. Under *Glenn*, and *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), before it, a "conflict must be weighed as a 'factor in determining whether there is an abuse of discretion.'" 554 U.S.at 111 (quoting *Firestone*, 489 U.S. at 115). That is precisely what this Court did. More than 27,000 of the Class members were members of fully-insured plans. FFCL ¶ 175 (citing Trial Ex. 711). For those plans, UBH "has an incentive to keep benefit costs down for customers who purchase such plans." FFCL ¶ 176. And those "financial incentives . . . have, in fact, infected the Guideline development process," FFCL ¶ 180, *see also id.* ¶¶ 181-83, a finding of fact buttressed

[11] Tellingly, UBH does not cite any of the Court's post-trial findings of fact or conclusions of law rejecting UBH's Guideline Exclusion argument. Instead, it cites a phrase, out of context, from the Court's 2016 class certification order to suggest that the Court imposed the burden of proof on UBH. Mot. 13:3-4 (citing ECF No. 174 at 33). What the Court actually said was this: "To the extent it is undisputed that all Named Plaintiffs' and Sample Plaintiffs' insurance plans incorporated generally accepted standards, UBH has pointed to nothing in any plan that would suggest that the 'guidelines exception' would permit insurance plans to adopt rules that are inconsistent with those standards." ECF No. 174 at 33:21-24. The Court was simply saying, in fewer words, what it expanded on in its Findings of Fact and Conclusions of Law: that the Guideline Exclusion does not and cannot mean what UBH in this litigation says it means, and that the evidence uniformly contradicts UBH's position.

by other evidence that UBH's "financial self-interest was a critical consideration in deciding what criteria would be used to make coverage decisions and when Guidelines would be revised." *Id.* ¶ 184. *See also id.* ¶¶ 185-189 (describing that evidence). The Court then appropriately took that evidence into account—as one factor among many—in reaching its conclusion that UBH abused its discretion in promulgating Guidelines it applied across-the-board to fully insured plans and self-insured plans alike. *See* FFCL ¶ 202 ("The evidence introduced at trial supports the conclusion that significant skepticism is warranted in determining whether UBH abused its discretion when it adopted the Guidelines that are challenged in this case.").[12]

**Third**, UBH argues that it can only have abused its discretion if its "interpretation of generally accepted standards" was unsupported by "substantial evidence," a standard UBH contends the Court did not apply, instead applying a "preponderance of the evidence" standard.[13] Mot. 13:23-26. This is misleading word-play: it jumbles the different ways a claims administrator can abuse its discretion; it conflates standards of review and burdens of proof; and it misstates what this Court actually did in its Findings of Fact and Conclusions of Law. And in

---

[12] The case UBH cites for the proposition that "self-funded plans present no conflict of interest justifying skeptical review," *Williby v. Aetna Life Ins. Co.*, 867 F.3d 1129, 1138 (9th Cir. 2017), Mot. 13:17-18, has no bearing on the analysis for the reasons explained above. Moreover, the *Williby* panel's concern was that in that single-plaintiff case, where Aetna had no conflict of interest, the district court had cited to a case where the administrator *did* have a conflict of interest, which left the panel "unable to say with the requisite level of certainty that [the district court] applied the correct standard." 867 F.3d at 1139. Here, the Court correctly described the role of a conflict of interest in deciding whether a claim administrator abused its discretion, *see, e.g.*, FFCL ¶¶ 200-201, and painstakingly explained why the trial evidence supported its conclusion that "significant skepticism is warranted in determining whether UBH abused its discretion." FFCL ¶ 202.

[13] Plaintiffs maintain that, as to UBH's breach of its duties of loyalty and care, the abuse of discretion standard does not apply at all; the standard of review is *de novo*. *See* Pls.' Opening Post-Trial Br., ECF No. 391-3 at 74:3-75:9; Pls.' Post-Trial Reply Br., ECF No. 404 at 5:5-6:20; *King v. Blue Cross & Blue Shield of Ill.*, 871 F.3d 730, 744 (9th Cir. 2017) ("Because we conclude that the defendants' notice of the amendment to the lifetime benefit maximum violates ERISA, we do not address . . . whether UPS abused its discretion as Plan Administrator by interpreting the Retiree Plan to include a $500,000 lifetime benefit maximum . . . ."). The Court need not decide this issue, of course, as UBH is liable in any event. *See* FFCL ¶ 199. But it is yet another reason UBH's standard of review arguments are not only wrong but amount to nothing, let alone a strong showing of a likelihood of reversal.

addition to being too little, the argument is too late; UBH never argued at trial or afterward that even if they violated plan terms its Guidelines should be upheld based on "substantial evidence." Thus, if the Court of Appeals considers this issue at all, it will apply plain error review, reversing only if "(1) there is error; (2) the error is plain or obvious; . . . (3) the error affects the moving party's substantial rights (i.e., the error must be prejudicial)," and (4) the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Bearchild v. Cobban*, 947 F.3d 1130, 1153 (9th Cir. 2020). *See also id.* at 1154 ("[T]he plain error standard of review in the civil context is even stricter than the plain error standard applied in criminal cases.").

As set forth in the case on which UBH relies, *Snow v. Standard Ins. Co.*, 87 F.3d 327 (9th Cir. 1996), there are (at least) three ways an ERISA plan administrator can abuse its discretion: by making a decision "without any explanation"; "in a way that conflicts with the plain language of the plan"; or "based on clearly erroneous findings of fact." *Id.* at 331-32. *Snow* involved the third type of alleged abuse of discretion; the plaintiff's claim was that Standard Insurance had erred in finding that the clinical evidence did not support a finding that she was disabled due to Chronic Fatigue Immune Dysfunction Syndrome. *Id.* at 329. When applying the abuse of discretion standard in that context, courts generally will not find an abuse of such *factual* discretion if there is "substantial evidence to support the decision." *Id.* at 332. What rendered UBH's adoption and use of the Guidelines an abuse of discretion was that it applied the wrong standards, not that it found the wrong clinical facts. *See, e.g.*, FFCL ¶¶ 82-149.

After all, where a claims administrator like UBH has denied coverage based on an interpretation of the plan that "conflicts with the plain language of the plan," or is otherwise "unreasonable," it has abused its discretion. *Saffle*, 85 F.3d at 458. In other words, in the language of *Snow*, the primary way UBH abused its discretion was that its Guidelines "conflict[ed] with the plain language of the plan[s]," not that it, for example, made "clearly erroneous findings of fact" in concluding that its Guidelines were not satisfied. *See Snow*, 87 F.3d at 331-32. By focusing myopically on how courts apply the abuse of discretion standard in

the clearly-erroneous-findings-of-fact context, UBH misses the Court's fundamental holding as to the central reason it found UBH abused its discretion in adopting and applying its Guidelines.

The problems with UBH's "substantial evidence" argument go further: it conflates standards of review (e.g., abuse of discretion) with burdens of proof (e.g., preponderance of the evidence). UBH juxtaposes the Court's reference to "preponderance of the evidence" and *Snow*'s and *Chu*'s "substantial evidence" standard ("more than a mere scintilla but less than a preponderance," *Chu v. CFTC*, 823 F.3d 1245, 1250 (9th Cir. 2016), *see* Mot. 13:23-28), apparently to suggest that there is an inconsistency between the two. There is none. When the Court found, by a "preponderance of the evidence," that UBH "breached its fiduciary duty by violating its duty of loyalty, its duty of care, and its duty to comply with plan terms by adopting Guidelines that are unreasonable and do not reflect generally accepted standards of care," FFCL ¶ 203 (Breach of Fiduciary Duty Claim), and, also by a "preponderance of the evidence," that "UBH's Guidelines were unreasonable and an abuse of discretion because they were more restrictive than generally accepted standards of care," FFCL ¶ 212 (Denial of Benefits Claim)—based in part on findings about what "standards are generally accepted," *id.* ¶¶ 70-81, and that the Guidelines pervasively and significantly violate those standards, *id.* ¶¶ 82-156—it was making findings of fact that were necessary to determine *whether* UBH had abused its discretion. The preponderance standard was the right way to assess the strength of the evidence relevant to the mixed question of law and fact.

Perhaps UBH's confusion arises because, in an ordinary civil case, at the trial level a court does not apply a standard of "review" because it is not "reviewing" a decision made by another court (or agency, etc.); the question whether a party is entitled to relief at the trial court level is purely a question of the burden of *proof*, i.e., whether the evidence establishes the elements of a cause of action. Only on appeal, where an appellate court is reviewing decisions of the trial court, does a standard of "review" ordinarily come into play. In the ERISA context, where a plan confers discretion on the claims administrator, a trial court applies *both* a standard of review (abuse of discretion) *and* a burden of proof (preponderance of the evidence). Of course, most courts do not go to the trouble of articulating the dual nature of the inquiry, but in

every case where a claims administrator is found to have abused its discretion, the technically accurate way to state such courts' holding is that such plaintiffs have proven, by a preponderance of the evidence, that the claims administrator abused its discretion.

Finally, UBH's "preponderance"/"substantial evidence" argument is purely academic because regardless of which lens one uses to assess UBH's adoption and application of its Guidelines—as inconsistent with the plain language of the plans, or as interpretations unsupported by substantial evidence—the Court's conclusion that UBH abused its discretion was the only one that could possibly have followed from the trial evidence. There is *no* evidence in the record, let alone "substantial" evidence, that the Guidelines were consistent with generally accepted standards of care, from the Guidelines' "excessive emphasis on addressing acute symptoms and stabilizing crises while ignoring the effective treatment of members' underlying conditions," FFCL ¶ 82, to their instruction that "coverage decisions should be based only on whether treatment of the *current* condition," as opposed to also other co-occurring conditions, "is likely to be effective at that level of care," FFCL ¶ 107, from their incessant push toward lower levels of care regardless of the likely effectiveness of such treatment, FFCL ¶ 110, to their myopic definition of "improvement" as "reduction or control of the acute symptoms that necessitated treatment in a level of care," FFCL ¶ 117.

Indeed, the only evidence UBH even references is the fact that it "solicited hundreds of comments on its guidelines" from "external clinicians and professional societies." Mot. 14:1. But the evidence proved that UBH did not even ask them whether the Guidelines were consistent with generally accepted standards of care, nor was there any evidence that any of them volunteered such an opinion. FFCL ¶ 171. *See also, e.g.*, Trial Ex. 1114 (sample of the half-page, 4-question request for "input" in exchange for $150). Instead, the evidence established that UBH knew how to draft coverage criteria consistent with, for example, CMS's improvement standard—but that it only attempted to do so with respect to Medicare Advantage plans. *See, e.g.*, Trial Ex. 445-0008 & Trial Tr. 371:24-372:2 (Niewenhous). On the commercial side of the business, UBH deliberately manipulated the applicable standards and constricted coverage to reflect something unrecognizable to *all* of the practitioners who testified at trial (other than those

on UBH's payroll, who were not credible in any event, *see* FFCL ¶¶ 29-35). Even UBH's own retained expert—its only one—admitted that there is no evidentiary basis for the Guidelines. Trial Tr. 1241:15-1243:1 (Simpatico) ("I would not be looking at these documents to make clinical judgments about . . . whether or not to discharge someone to another level of care. . . . I would be not following these as a script. . . . In meeting generally accepted standards of care . . . I would be reading the APA Clinical Practice Guidelines or I would be reading the ASAM Criteria or I would be reading the LOCUS.").

In short, the Court properly applied the abuse-of-discretion standard of review, appropriately taking into account UBH's conflict of interest. UBH has not shown and cannot show any likelihood of success on the merits.

**II. UBH WILL NOT BE IRREPARABLY HARMED ABSENT A STAY.**

For the reasons stated above, UBH has not and cannot make any showing, let alone a "strong" showing, that the Court of Appeals is likely to reverse any aspect of this Court's conclusions of law or remedies order. But even if it could, and had made such a showing, its request for a stay is doomed by its failure to show any irreparable injury, let alone that such injury is truly "irreparable" and "is likely to occur during the period before the appeal is decided," *Doe #1*, 957 F.3d at 1059, and that "a stay is *necessary* to avoid *likely* irreparable injury to the applicant while the appeal is pending," *Al Otro Lado*, 952 F.3d at 1007 (emphases added).

**A. UBH's Request To Stay Check Issuance Is Premature.**

UBH's principal claim of irreparable injury is that, if it wins on appeal, it may be hard to recover payments made to individual class members after reprocessing their prior claims (under the same standards it will apply to new claims). Mot. 18:4-8. Of course, there is no serious likelihood of reversal or "modifi[cation]" of reprocessing; what UBH is complaining about is having to do now what it should have done originally: adjudicate the class members' requests for coverage using reasonable criteria. The weakness of UBH's likelihood of success argument with regard to the validity of the Guidelines, and its decision not to seek to stay the application of different standards to new claims, show that there is little risk of reversal necessitating

repayment. Even so, insofar as UBH's concern is limited to actual payment, it does not justify delaying reprocessing.

A series of steps must occur between now and issuance of the first payments to class members: the Court must interview and select a special master and resolve disputes over the appointment order and enter such order; the special master must hire any necessary staff; UBH must prepare a training protocol for its reprocessing personnel and obtain the special master's approval of the protocol; UBH must hire new medical directors, peer reviewers, nurses, masters-level clinicians and administrative staff, and train them; UBH must build and roll out a portal for class members to complete their administrative records; and class members must be notified of their right to supplement their administrative records. Only after all those steps are complete will reprocessing actually begin. Once all that has occurred, if the Ninth Circuit has not yet ruled on UBH's appeal, Plaintiffs propose that the parties should meet and confer about whether to seek an extension of the deadlines relating to check issuance. While it will undoubtedly take some time for the Court of Appeals to adjudicate the appeal, there is no need to decide on such a modification to the Remedies Order now. And because such modification is premature and can be accomplished later, UBH's hypothetical "recoupment" scenario presents no basis for a finding of irreparable injury.

**B. The Administrative Costs of Reprocessing Do Not Constitute Irreparable "Business Changes."**

That leaves UBH's argument that completing reprocessing itself, even without issuing payments to class members, will "require substantial business changes at significant, irreparable cost." Mot. 15:19-20 (capitalizations omitted). UBH's argument is that reprocessing will be expensive and will require "divert[ing] existing resources," and UBH desires not to incur those costs or divert those resources until affirmance by the Court of Appeals. Mot. 15:19-25.

As an initial matter, the Court should disregard UBH's complaint about having to divert existing resources away from adjudicating "present-day coverage requests." Mot. 16:17-18. UBH should be *prohibited* from diverting any such resources. The Court surely did not intend that UBH could cause slow-downs in fulfilling its fiduciary duties to adjudicate current claims in

order to remedy its past violations with respect to class members' prior claims. UBH seems to acknowledge as much, in its estimates of the resources necessary to accomplish reprocessing. But if the additional staff UBH intends to hire are insufficient, such that existing staff will also need to be *diverted* from "present-day coverage requests, most of which are time-sensitive," then it must simply hire more such additional personnel.

Thus, the administrative "cost" question presented by UBH's motion is very narrow: would it be "irreparable" for UBH to have to hire additional staff, and pay their salaries, in order to determine which of the class members' requests for coverage should have been covered? The question answers itself, because "the harm asserted by [UBH] is purely monetary, and 'monetary injury is not normally considered irreparable.'" *Doe #1*, 957 F.3d at 1060 (quoting *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 993 (9th Cir. 2019)). Monetary costs can only be considered "irreparable" where, for example, the costs are so immense that they "threat[en]" to "drive[] [the enjoined company] out of business." *hiQ Labs, Inc.*, 938 F.3d at 993. The administrative costs of reviewing the class members' records and assessing them under appropriate guidelines simply is not irreparable. Indeed, UBH's argument is perverse; it certainly would not contend irreparable harm in the context of an individual ERISA case, and yet it argues that because of the sheer scale of its wrongdoing here, it would be irreparably harmed by having to conduct reprocessing—all while being part of a company with record-setting second-quarter 2020 net income of $6.64 billion resulting from "savings from surgeries, hospital stays and doctor visits canceled amid the coronavirus pandemic."[14] If the administrative costs of complying with an injunction could constitute irreparable injury warranting a stay, there would surely be legion cases saying so. UBH cites none.

In any event, UBH's irreparable harm argument is squarely precluded by *Al Otro Lado*, 952 F.3d at 1008. In *Al Otro Lado*, the government appealed a preliminary injunction barring it from applying a rule that required asylum applicants to have applied for asylum in another

---

[14] Anna Wilde Mathews and Dave Sebastian, *UnitedHealth's Profits Surge Amid Health-Care Cancellations*, Wall St. J. (last updated July 15, 2020, 12:16 PM EST), https://www.wsj.com/articles/unitedhealth-groups-second-quarter-profit-rose-11594809964.

country, such as Mexico, that they passed through on their way to the southern border. 952 F.3d at 1002. The government argued that it would be irreparably harmed without a stay because "identifying class members" would be burdensome: immigration officials would have to "spend an additional estimated 15 to 30 minutes per person asking as many as 30 additional questions during each credible fear screening interview," which the Deputy Chief of the Asylum Division of the Department of Homeland Security contended "would have a significant negative impact on credible fear processing times overall." *Id.* at 1007. The Ninth Circuit rejected that "irreparable harm" theory. "We are dubious that taking the time necessary to make fairly simple factual determinations for a few months constitutes the sort of irreparable harm that can support the grant of a stay pending appeal." *Id.* at 1008. "The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended . . . are not enough." *Id.* at 1008. So too when it comes to "diversion" of a movant's "time, resources, and personnel" from other matters, even if "pressing." *Id.* at 1008 (quoting *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017)). Such "diversion of resources" is simply not irreparable. *Id.*

Temporarily paying more people to do the same kind of claims processing UBH has always done and under the same standards it will apply to new claims is not a change in the structure of UBH's business. That is why the cases UBH cites are inapposite. For example, in UBH's principal case, *F.T.C. v. Qualcomm Inc.*, 935 F.3d 752 (9th Cir. 2019), the injunction from which Qualcomm appealed required it to "enter new contractual relationships and renegotiate existing ones on a large scale"—"fundamental business changes" that could not "be easily undone." *Id.* at 756. As for *American Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009), not only did the appellant truckers show a high likelihood of proving that the challenged concession agreements for the Port of Los Angeles were unconstitutional, *id.* at 1057, but also showed a high likelihood that complying with the "likely unconstitutional Concession agreements" would "likely be fatal" to their businesses. *Id.* at 1058. And in UBH's only other Ninth Circuit case, *California v. Azar*, 911 F.3d 558 (9th Cir. 2018) (*see* Mot. 16:5-6), the district court had found that permitting the challenged regulations, related to contraceptive

coverage, to become effective would have created widespread, irrevocable consequences for the plaintiff states, a finding the Ninth Circuit did not find clearly erroneous. 911 F.3d at 581.[15]

In short, the cost of conducting reprocessing is not irreparable injury—and certainly does not constitute irreparable injury so substantial, such as destruction of UBH's business, so as to outweigh the utter lack of any showing of a likelihood of success on the merits.

## III. PLAINTIFFS AND THE CLASS WOULD BE PREJUDICED BY A STAY.

"Because [UBH] has not satisfied the first two factors, [the Court] need not dwell on the final two factors—harm to the opposing party and the public interest." *Al Otro Lado*, 952 F.3d at 1014 (citations and internal quotation marks omitted). In any event, "issuance of the stay *will* substantially injure" the Plaintiff classes, *see Nken*, 556 U.S. at 434 (emphasis added), because every month of additional delay harms Plaintiffs. Yes, the specific requests for coverage that will be reprocessed were for treatment in 2017 or earlier. But a substantial portion of the class likely has ongoing needs for coverage. After all, most mental health and substance use disorders are chronic conditions. *See, e.g.*, FFCL ¶ 71. And as the Court found, every class member, regardless of whether he or she ended up paying out of pocket for the treatment for which UBH denied coverage, was harmed by the denial and will benefit in concrete ways from reprocessing:

> The harm that UBH caused by applying overly restrictive guidelines to make coverage determinations goes beyond the money spent by class members who could afford to obtain the treatment that UBH refused to cover. Rather, it was the unfair adjudication of claims that was experienced by all of the class members (and for some deprived them of much-needed treatment that should have been covered by

---

[15] The same fundamental distinguishing features, and others, characterize each of the other cases UBH cites too. *See Mahroom v. Best W. Int'l, Inc.*, No. C 07-2351 JF (HRL), 2009 WL 248262, at *3 (N.D. Cal. Feb. 2, 2009) (not a stay-pending-appeal case, and in any event, the plaintiffs showed irreparable harm because their loss of certain Best Western franchise benefits "could prove fatal" to their business); *Steiner v. Apple Comput., Inc.*, No. C 007-04486 SBA, 2008 WL 1925197, at *3, 5 (N.D. Cal. Apr. 29, 2008) (plaintiff *conceded* irreparable injury, and where issue on appeal was enforceability of arbitration clause, being forced to litigate would effectively moot that issue); *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977) ("destruction" of plaintiff's business would result "in the absence of a stay"); *John Doe Co. v. Consumer Fin. Prot. Bureau*, 235 F. Supp. 3d 194, 206 (D.D.C. 2017) (public disclosure of company's name would be irreversible). And *United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Industry, AFL-CIO v. Barr*, Civ. A. No. 90-2342, 1991 WL 241890 (D.D.C. Oct. 29, 1991), is not only inapposite, *see id.* at *1, 2, but also is incompatible with *Al Otro Lado*.

> their health plans). Conversely, the potential benefits of reprocessing to class members is not limited to monetary reimbursement for treatment that class members had to pay for themselves. A fair determination of class members' claims will also allow them to correct the "record" so that they can, if appropriate, pursue other remedies. A proper adjudication as to past requests for services will also benefit some class members who did not obtain the treatment for which they requested coverage because UBH takes into account past treatment and coverage decisions in making further coverage determinations, as UBH's witnesses conceded at trial. Thus, a reversal of UBH's past denial as a result of reprocessing may help class members to obtain coverage for future treatment.

Remedies Order, ECF No. 491 at 45:13-25. Every month of additional delay in reprocessing strips the class members of the benefits that will flow from determinations that their requests for coverage should have been approved in the first place.

UBH's principal response is to contend that because it took so long for UBH to get caught, another year or two will not make things "significantly" worse. *See* Mot. 19:26-28 ("Given that so much time has already elapsed, it is doubtful that Plaintiffs will be prejudiced significantly by another delay, provided that it is not lengthy.") (quoting *In re Genesis Health Ventures, Inc.*, 367 B.R. 516, 522 (Bankr. D. Del. 2007)). But the Court need not put an amortized per capita dollar figure on the monthly harm to each class member. The point is that the harm to class members from further delay is real, and certainly weighs in Plaintiffs' favor, not UBH's.

## IV. THE PUBLIC INTEREST WEIGHS HEAVILY AGAINST A STAY.

UBH makes two arguments for the notion that the public interest favors a stay. First, it argues that it will have to "redirect behavioral health resources, which could ultimately impact the provision of health care services to many Americans." Mot. 20:10-12. But again, UBH cannot be permitted to threaten new, *current* harm to its members in order to avoid remedying harm it previously caused to the class members. *See* § II.B, *supra*. The Court should order UBH to ensure that implementation of the reprocessing order will not cause such a result. Second, UBH argues that "self-funded employer benefit plans . . . may need to make payments on some reprocessed claims" that "may ultimately be reversed on appeal," and may pass through those costs to members "in the form of reduced benefits, higher premiums, or in other ways." Mot. 20:21-25. But again, a stay of actual issuance of checks is premature.

The public interest—as opposed to UBH's interests—weighs strongly against a stay. The best place to look for where the public interest lies is ERISA and the duties it creates. Congress made explicit its interest in ensuring that ERISA is enforced, and in ensuring adequate and timely coverage of treatment for mental illness and substance use disorders. *See, e.g.*, 29 U.S.C. §§ 1001(a)-(b) (Congressional findings declaring, *inter alia*, that "the continued well-being and security of millions of employees and their dependents are directly affected by these plans; that they are affected with a national public interest" and that it is "the policy of this chapter to protect interstate commerce and the interests of participants in employee benefit plans and their beneficiaries, . . . by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts."); *id.* at § 1132 (ERISA enforcement provisions); *id.* at § 1133 (full and fair review of claims); *id*. at § 1185a (Parity Act); 29 C.F.R. § 2560.503-1(f) (specifying claim adjudication deadlines). *See also* 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2948.4, Grounds for Granting or Denying a Preliminary Injunction—Public Interest (3d ed.) ("The public interest . . . may be declared in the form of a statute."). Against that backdrop, and precisely because UBH wrongfully denied the claims at issue so many years ago, the public has a strong interest in seeing the reprocessing remedy enforced as quickly as possible.

The public interest in immediate reprocessing is also reflected in the widespread attention this case has garnered in the media and the endorsements this Court's decisions have received from the relevant professional organizations. One CNN legal observer called it "one of the most important and most thorough rulings ever issued against an insurance company, at the federal level, on mental health issues."[16] Former U.S. Representative Patrick J. Kennedy, a chief sponsor and lead author of MHPAEA and a tireless champion of its enforcement, captured this sentiment in his characterization of the Court's liability decision as "the *Brown v. Board of Education* for

---

[16] Wayne Drash, *In scathing ruling, judge rips insurer for putting 'bottom line' over patients' health*, CNN (last updated Mar. 6, 2019, 3:04 PM ET), https://www.cnn.com/2019/03/06/health/unitedhealthcare-ruling-mental-health-treatment/index.html.

the mental health movement." *Id.* Dr. Paul S. Appelbaum, former president of the American Psychiatric Association and current Professor of Psychiatry, Medicine & Law at Columbia University, called the case "the most successful effort to date to hold insurers accountable for actions that result in unequal coverage for mental and substance use disorders" which "could serve as a model for other plaintiffs trying to make the promise of parity a reality."[17] The American Medical Association, the National Association for Behavioral Healthcare, the Medical Director Institute of the National Council for Behavioral Health, the Eating Disorders Coalition, and the Clinical Social Work Association all have issued statements highlighting the case's significance to their members and constituents.[18]

Legislators and regulators also have relied upon the Court's factual findings and conclusions of law. California Senate Bill No. 855, signed into law by Governor Newsom on September 25, 2020, created a universal standard for state-regulated healthcare plans based on "the eight generally accepted standards of mental health and substance use disorder care" articulated by this Court. *See* S.B. 855, 2019-2020 Reg. Sess. § 1(l) (Cal. 2020). Similarly, the United States Department of Labor cited the Court's decision in proposing an update to its mental health parity self-compliance tool.[19] As approved, the revised tool warns insurance plan administrators that a

---

[17] Paul S. Appelbaum, M.D. and Joseph Parks, M.D., *Holding Insurers Accountable for Parity in Coverage of Mental Health Treatment*, Psychiatric Serv. 71:202-204 (Feb. 2020), https://ps.psychiatryonline.org/doi/pdf/10.1176/appi.ps.201900513.

[18] Am. Med. Ass'n, *ARC Issue Brief: Wit v. United Behavioral Health, Ruling highlights pervasive violations denying patients adequate care for mental illness and substance use disorder* (2019), https://www.end-opioid-epidemic.org/wp-content/uploads/2019/06/ARC-Issue-Brief-Wit-v-United-Behav-Health-March-2019-FINAL.pdf; Nat'l Ass'n for Behavioral Healthcare, *NABH Applauds Landmark Behavioral Healthcare Coverage Ruling* (Mar. 5, 2019), https://www.nabh.org/nabh-applauds-landmark-behavioral-healthcare-coverage-ruling-2/; Nat'l Council for Behavioral Health, *Position Statement on Generally Accepted Standards of Care for Behavioral Health* (Aug. 19, 2019), https://www.thenationalcouncil.org/wp-content/uploads/2019/08/MDI-Wit-v-UBH-Position-Statement.pdf; *Eating Disorders Coalition Applauds Decision in Wit v. UnitedHealthcare Insurance Company* (Mar. 8, 2019), http://eatingdisorderscoalition.org.s208556.gridserver.com/couch/uploads/file/edc-ubh-court-decision-statement-3-8-19-final.pdf; Clinical Social Work Ass'n, *Implications of the UBH Decision for LCSWs*, https://www.clinicalsocialworkassociation.org/ubh-decision.

[19] U.S. Dep't of Labor, *Proposed Updates to 2020 MHPAEA Self-Compliance Tool: Request for Comments* (2020), https://www.dol.gov/sites/dolgov/files/EBSA/laws-and-

parity-compliant plan could still violate MHPAEA if it utilizes internal guidelines that are more restrictive than coverage provided for in the plan documents.[20] *See also* Joseph Laska *et al.*, *Takeaways From Calif.'s New Health Insurance Rules*, Law360 (Oct. 14, 2020, 5:29 PM EDT)[21] ("S.B. 855 establishes detailed, uniform standards for evaluating the medical necessity of MH/SUD services that are explicitly modeled on rulings in *Wit v. United Behavioral Health*, an ongoing trial-level federal lawsuit in the U.S. District Court for the Northern District of California."). Senator Ron Wyden of Oregon recently issued a formal request for information to UnitedHealth Group regarding "concerns that have been raised regarding UnitedHealth's administration of mental health and SUD benefits."[22] He described in detail this Court's findings of fact and conclusions of law, the Court's remedies order, and other scrutiny UBH has received including from regulators. *Id.* Senator Wyden issued a series of inquiries to UnitedHealth, and he explained, "it is critically important to have a clearer understanding of how UnitedHealth administers such benefits to ensure that Oregonians and Americans across the country are able to receive the mental health and SUD services they need." *Id.*

In addition, two market conduct examinations of UnitedHealthcare companies recently completed by state regulators in Illinois and Rhode Island have found those companies committing the same abuses that Plaintiffs proved in this case. Illinois regulators determined that UnitedHealthcare "failed to use only American Society of Addiction Medicine criteria to make medical necessity determinations for substance use disorders" in violation of state law,[23] and

---

regulations/laws/mental-health-parity/compliance-assistance-guide-appendix-a-mhpaea-proposed-updates.pdf.

[20] *See* U.S. Dep't of Labor, *Self-Compliance Tool for the MHPAEA*, https://www.dol.gov/sites/dolgov/files/EBSA/laws-and-regulations/laws/mental-health-parity/self-compliance-tool.pdf.

[21] https://www.law360.com/articles/1319452/takeaways-from-calif-s-new-health-insurance-rules.

[22] Letter from Senator Ron Wyden to David S. Wichmann (Nov. 18, 2020), https://www.finance.senate.gov/imo/media/doc/111920%20United%20Healthcare%20Letter.pdf.

[23] Ill. Dep't of Ins., *Market Conduct Examination Report* at 11 (Oct. 8, 2020), https://insurance.illinois.gov/MarketconductExam/LandH/2020/HEALTH-EXAM-10-08-2020-United-Health-Care-Rpt.pdf.

Rhode Island examiners found a host of violations, including that UBH used inappropriate clinical review criteria, such as its "why now" concept, to make coverage decisions.[24]

The Court's decision also has had a major impact on the legal landscape. Several courts have relied on this Court's analysis of the UBH Guidelines and the generally accepted standards of care in other cases involving coverage denials by UBH. *See Jamie F. v. UnitedHealthcare Ins. Co.*, No. 19-CV-1111-YGR, 2020 WL 4249200, at *9 (N.D. Cal. July 23, 2020) (citing the "sweeping, comprehensive review by the court in the *Wit* class action"); *Bain v. Oxford Health Ins. Inc.*, No. 15-CV-03305-EMC, 2020 WL 808236, at *10 (N.D. Cal. Feb. 14, 2020) (giving collateral estoppel effect to "Judge Spero's finding in *Wit* on the substantial conflict of interest and its impact on the scope of review"). Another District Court reached a similar conclusion in remanding a UBH coverage determination that denied a plaintiff residential treatment for an eating disorder. *See S.B. v. Oxford Health Ins., Inc.*, 419 F. Supp. 3d 344, 368 (D. Conn. 2019) ("Oxford is directed to reconsider the evidence, applying the appropriate definition of medical necessity, which, under the terms of the Plan, is not exclusively focused on the 'why now' factors that precipitate admission, but rather on whether the services in question are necessary to effectively treat the underlying condition.").

The public interest, as reflected in ERISA itself and the public's response to this litigation, weighs strongly against a stay of reprocessing.

---

[24] R.I. Office of Health Ins. Comm'r, *Examination Report of UnitedHealthcare Ins. Co., and UnitedHealthcare of New England, Inc.* (Mar. 20, 2020), http://www.ohic.ri.gov/documents/2020/March/United/UHC MCE_033020_WEBSITE.pdf.

## CONCLUSION

The Court should deny UBH's motion to stay pending appeal.

Dated: December 4, 2020

ZUCKERMAN SPAEDER LLP

/s/ Caroline E. Reynolds
Caroline E. Reynolds (admitted *pro hac vice*)
Adam B. Abelson (admitted *pro hac vice*)
D. Brian Hufford (admitted *pro hac vice*)
Jason S. Cowart (admitted *pro hac vice*)

PSYCH-APPEAL, INC.
Meiram Bendat (Cal. Bar No. 198884)

*Counsel for Plaintiffs and the Classes*