# EXHIBIT 8

# ARBITRATION ADVISORY

# 2016-02

# ANALYSIS OF POTENTIAL BILL PADDING AND OTHER BILLING ISSUES

## Replaces and Supersedes Arbitration Advisory 2003-01

## March 25, 2016

Points of view or opinions expressed in this document are those of the Committee on Mandatory Fee Arbitration. They have not been adopted or endorsed by the State Bar's Board of Trustees and do not constitute the official position or policy of the State Bar of California.

### QUESTION PRESENTED

When a lawyer's fee bill overstates the amount of time spent for work performed, it is called "bill padding." If a client alleges that a lawyer's bills are not accurate or truthful, how can an arbitrator assess the evidence, including the fee bills, for possible bill padding? This advisory explores the question of how an arbitrator may assess the evidence to identify bill padding.[1]

### INTRODUCTION

Most hourly fee bills are a collection of time entries itemizing work performed in the privacy of a lawyer's office. Therefore, it is difficult to verify the accuracy of the time entries. Accordingly, arbitrators should do at least four things:

A. Evaluate the process by which the fee bill was prepared and the specificity of the time entries;
B. Evaluate the staffing used on the matter;
C. Evaluate the work performed against the time billed, and
D. Look for certain patterns in the descriptions of the work performed, including the time entries.

### DISCUSSION

[1] Rules and observations about determining reasonable attorney's fees in general are addressed in other Arbitration Advisories. This advisory focuses on a subset of that topic: when too much time is alleged to have been recorded for the individual units of work performed. In the event that an arbitrator encounters bill padding, he/she may refer to our other arbitration advisories for assistance in determining an appropriate charge under the circumstances.

**A. Evaluate the process by which the fee bill was prepared and the specificity of the time entries**

In order to understand the likely areas to look for bill padding, it is useful to consider the historical background of professional fees charged by a lawyer [*See* American Bar Association Commission on Billable Hours Report (August, 2002), referred to hereinafter as "ABA Report" (See http://www.abanet.org)]. Prior to the 1960s, the majority of lawyers billed clients in flat sums or fixed amounts - often at the conclusion of the matter. This required some estimating and discretion on the part of the lawyer. A lawyer's fee bill often read something like this:

"Fee for services rendered, $ 750.00."

Clients sometimes paid their bills six months or a year after receipt of the fee bill, which reflected services performed long before the fee bill was even sent.

In Gisbrecht v. Barnhart, 535 U.S. 789 (2002), the Supreme Court wrote:

> ". . . . An American Bar Association (ABA) report, published in 1958, observed that attorneys' earnings had failed to keep pace with the rate of inflation; the report urged attorneys to record the hours spent on each case in order to ensure that fees ultimately charged afforded reasonable compensation for counsels' efforts. (*citation omitted).*
>
> Hourly records initially provided only an internal accounting check. See Honest Hour 19. The fees actually charged might be determined under any number of methods: the annual retainer, the fee-for-service method, the "eyeball" method under which the attorney estimated an annual fee for regular clients, or the contingent-fee method, recognized by this Court in Stanton v. Embrey, 93 U. S. 548, 556 (1877), and formally approved by the ABA in 1908. See Honest Hour [W. Ross, The Honest Hour: The Ethics of Time-Based Billing by Attorneys (1996),13-19]. As it became standard accounting practice to record hours spent on a client's matter, attorneys increasingly realized that billing by hours devoted to a case was administratively convenient; moreover, as an objective measure of a lawyer's labor, hourly billing was readily impartable to the client. Id., at 18. By the early 1970's, the practice of hourly billing had become widespread. *See id.*, at 19, 21."

**1. Evaluate the process by which the fee bill was prepared**

In the now-standard chronological fee bill used by lawyers, almost all time is (or should be) itemized by day and by timekeeper. If a lawyer or other timekeeper does several things in one day on a particular matter then he or she must decide how to best describe this work and how much time to record for that work. An arbitrator's review of fee bills should include an assessment of the method and timing used to prepare the bills in order to form an understanding regarding the accuracy of the data shown by the fee bills.

Some lawyers still use word processing programs to generate fee bills. Others use specialized billing software programs. Many billing software programs in use today have a timer feature that allows the user to input “start” and “stop” commands for one or more matters. The billing software program then automatically calculates the elapsed time for each task in the same manner as a stopwatch. If the evidence at the arbitration reveals that lawyers properly utilized the timer feature that is a factor tending toward accuracy.

While it is almost universally acknowledged that contemporaneous records are the best practice, many times the press of business is such that a day or two (or more) passes without the lawyer recording his/her time. Sometimes a month may pass without any entries. In rare cases, a year or more may pass before a lawyer goes through his/her case file and attempts to re-create what transpired in the case since its inception. It is generally at the point when a fee bill needs to be generated that the lawyer is faced with the need to reconstruct what happened a day or two or a month ago (or a year ago) with great precision. If the lawyer is able to prepare the fee bills using information from notes he/she made contemporaneous with the tasks actually performed, that is a factor tending towards accuracy. But if the reconstruction is done by the lawyer going through his or her file and then ascribing a time entry to each e-mail, letter, document and calendar entry in the file, then it is much less likely that the time entries are truly accurate. While the corresponding fee bills may appear to be very precise, with exact times noted for each specific and itemized activity, the appearance of accuracy may be deceptive and the time recorded should be assessed by the arbitrator. Under such circumstances, it may be appropriate to put the burden of providing evidence/facts to support the accuracy of the time entries onto the lawyer.

The arbitrator should also examine who recorded the entries and created the fee bills. The original time entries are generally recorded by the lawyer or other person who performed the task. However, in some firms, a support person, such as a secretary, paralegal, or billing clerk, records the time entries ultimately charged to the client. Variations for this practice abound. In some firms, lawyers hand-write their entries on paper and some other person inputs them in the billing software. In other firms, a billing clerk may go through the case file on a periodic basis and record a time entry for every scrap of paper in that file. For instance, if the file contains a letter from opposing counsel, the billing clerk may charge the client an agreed-upon minimum charge irrespective of whether the lawyer actually reviewed that letter and how long it took. Suffice it to say, the arbitrator may consider evidence of who actually recorded the time entries [and when they were recorded] to assess the accuracy of the corresponding fee bills.

It is customary for larger law firms to have a draft of the fee bill, commonly referred to as a “pre-bill,” reviewed by the partner or lawyer in charge of billing on the matter. The billing partner may not have actually worked on the file, but is otherwise in control of the relationship with the client. If pre-bills are utilized, the billing partner should scrutinize and edit the time entries in the “pre-bills” to ensure that they are accurate. The recorded time entries may be increased or decreased in an exercise called “billing judgment” by the billing partner. However, any evidence that the pre-bills were adjusted upwards should be examined carefully, as it may indicate that the client is being charged more time than actually expended by his/her lawyer. Absent clearly defined and explained terms in the written fee agreement allowing such upward adjustments, the increased time may be evidence of bill padding. For example,

increasing a time entry to a contractually agreed-upon minimum charge may be appropriate, as would an increase to reflect time inadvertently omitted by the lawyer. On the other hand, increasing a time charge for the sake of inflating the fee bill is not. If an arbitrator encounters such circumstances, the lawyer should bear the burden to clarify and substantiate such increased time entries.

The pre-bills may not be carefully reviewed by the billing partner for a number of reasons, including the fact that most billing partners are very busy and do not have or want to allocate the time to check each pre-bill carefully, the entries may be for a lawyer who is not readily available, or the billing partner may have a huge stack of pre-bills to go through and only a short time to do so since the firm wants to "get the bills out". Consequently, arbitrators should consider facts and evidence concerning the pre-bill process, including whether the lawyer(s) that actually worked on the matter also verified the accuracy of the fee bills, and whether the pre-bill process increased or decreased the accuracy and transparency of the fee bills ultimately delivered to the client for payment.

**2. Evaluate the specificity of the time entries**

Many lawyers no longer physically handwrite what they do on paper time-sheets but contemporaneously input a description of their tasks directly into their computers. These types of entries can usually be identified because they are often longer and more detailed. For example, if a fee bill reads: "meeting with client to discuss the elements of the separate statement of facts and the source of evidence for each element (1.8); research new opinion on the presumptions and burden of proof under Festo and progeny (2.5)" [Example 1], this is likely (but not necessarily) something directly inputted into the billing software program by the lawyer. On the other hand, the briefer description for the same work of: "meeting with client re MSJ and research burden of proof (4.3)" [Example 2] is probably something initially written in longhand and then later inputted into the billing software program.

Arbitrators should be aware that regardless of the method of time keeping or billing used, it is not the format of the fee bill but the information provided which is important. Accordingly, the arbitrator's primary focus should be on analyzing those facts that tend to demonstrate the accuracy, or inaccuracy, of the information contained in the fee bills. When examining the fee bills it is very important to remember that in the vast majority of cases each time entry in a fee bill is merely an estimate of how much time was required for the task performed that is being described in a summary fashion. Therefore, the longer the time period between when the task was performed and the corresponding time entry is recorded, the greater the probability that the time entry may lack accuracy.

If, in Example 1 above, the client is certain that the meeting required only 30 minutes (with no travel time), then perhaps one could question the entry of 1.8 hours. But how can one prove that the time for, say, a specific letter was really 12 minutes rather than 30?[2] If the time is

[2] It is just about impossible to be certain that any one single time entry is wrong or faked or padded. "The 'perfect crime' [is the] padding of bills…" [William G. Ross, The Honest Hour: The Ethics of Time Based Billing by Attorneys (1996)].

block-billed and one does not even know how much time is being claimed for the letter, then what? In such cases, look at the totality of the evidence.

**B. Evaluate the staffing used on the matter**

The staffing of a legal matter by a lawyer presents the potential for bill padding that an arbitrator may consider. The main staffing issues that should be assessed include: (1) Did multiple lawyers work on the same task simultaneously? and (2) Was the task performed by the proper lawyer?

**1. Did multiple lawyers work on the same task simultaneously?**

A recurring complaint by clients concerns charges for tasks involving more than one lawyer, paralegal, or support staff from the same firm at the same time. This typically occurs when a client is charged for multiple lawyers attending a court hearing or deposition, or where two or more lawyers participate in a meeting or telephone call. Generally, the determination of whether the matter was overstaffed is a question of fact the arbitrator must resolve. In a mandatory fee arbitration it is appropriate to place the burden of proof on the lawyer to demonstrate that the disputed matters/tasks were properly staffed and not attempts to inflate time charged to a client.

Issues that may affect this factual determination may include the complexity or significance of the case, the litigious nature of the parties, the amount in controversy, client consultation in advance, the client's awareness and lack of objection, or any other fact tending to demonstrate whether it was appropriate for more than one lawyer or support staff to participate in a disputed task.

In some firms, newly admitted lawyers sometimes accompany their supervising lawyer to depositions or court hearings for training purposes. In most instances, the client should not be charged solely for training time.

It is also generally accepted that the more timekeepers on a case, the higher the bill will be. Pay particular attention to time recorded by newer associates who record time on the matter only briefly, such as one or two months, particularly if accompanied by entries reflecting the associate recorded "get up to speed" activities, such as "review file." Such entries by a transient biller may not be an appropriate charge/expense to impose on a client.

**2. Was the task performed by the proper lawyer/person?**

In some cases, a client may complain that some necessary task was performed by a senior lawyer charging a much higher hourly rate, when it could have been completed by a cheaper associate or support staff. For instance, in a commercial real estate lease dispute, the firm's main real estate partner, charging $700.00-plus per hour, personally drives to the commercial site to deliver the keys to the complaining landlord. Even assuming that it was necessary for a licensed lawyer to deliver the keys, the issue becomes why it was done by the most expensive lawyer in the firm. Was it because some circumstance actually required that specific high-priced lawyer to undertake that task, or was it an inadvertent or intentional attempt to pad the client's bill. The

client may also challenge delegation of tasks to inexperienced lawyers/staff with resulting inefficiencies. In examining such complaints, arbitrators should consider all of the circumstances relevant to the issue, as well as the custom in the community and the terms of the written fee agreement.

**C. Evaluate some or all of the work produced against the hours claimed**

Arbitrators may consider evidence and facts concerning the actual tasks/work performed by the lawyer, including an analysis of the major items of work performed. How many hours were recorded for this work? How many timekeepers were involved? What did they do? Did they duplicate each other's work? Was some of this "training" time for new lawyers? [3]

Major tasks. It may be appropriate for an arbitrator to review and assess the fee bills to determine how much cumulative time was recorded by the lawyer [or lawyers] to complete a major task. Major tasks may include specific motions, appellate briefs, and transactional documents. An arbitrator may need to quantify the cumulative time first. This task will require the arbitrator to go through the fee bills and essentially group separate billing entries. For example, an arbitrator may have to group all of the entries that refer to the preparation of a specific document, like a demurrer. The arbitrator would then cumulate all of the billing entries referring to or concerning the demurrer, including the review of the complaint and file, conducting legal research, telephone conferences and other communications regarding the demurrer or the sufficiency of the complaint, and then the time entries for the drafting, revising and finalizing and filing the demurrer.

Once the cumulative time to complete a major task is obtained, then the arbitrator may look at the actual work product [or demurrer in foregoing example] to see if the time falls into a range that appears reasonable. This can be hard to do without some experience in the particular legal area involved. But, in the above example, if the fee bills reveal that a lawyer recorded 25-plus hours to research, draft, and file the demurrer, the arbitrator should review the actual demurrer to determine if the time recorded is reasonable. If the evidence reveals that the demurrer is a four page boilerplate document attacking the sufficiency of a fraud claim lacking specificity, then the arbitrator may put the burden on the lawyer to explain why it took so long to prepare such a simple document. On the other hand, if the evidence reveals a 20-page masterpiece artfully advocating novel concepts of law, then that may be evidence tending towards accuracy and reasonableness.

While a times-by-task assessment can be hard to assemble, sometimes the fee bills themselves will have guides to that information within them if the lawyer or law firm utilizes

---

[3] Arbitrators may also consider whether the client was given an estimate or a budget. An "estimate" is not binding. On the other hand, a budget typically involves a more detailed forecast and is supposed to be reasonably accurate (subject to disclosed caveats and assumptions). Moreover, a budget should be revised if circumstances change and the client should be promptly notified of the revision(s). Accordingly, if an estimate or budget was given, it may be reviewed to determine whether the disputed tasks were contemplated and explained to the client.

task-based billing codes like the "Uniform Task-Based Management System" published by the American Bar Association (ABA Task Codes).[4] Task-based billing codes are in fairly wide use but are not standard and there is some debate over their usefulness. For example, one may know that certain hours were recorded for "L240 - Motions For Judgment" but not how many hours were shown for a specific Motion for Summary Adjudication. Where such codes are not used, the arbitrator may wish to ask the lawyer to provide evidence of the cumulative time expended on major tasks. For instance, in Example 1 on page 4, Section A(2) *supra*, assuming that the lawyer utilized the ABA Task Codes, the time billed for meeting with the client to prepare the statement of facts would show the codes "L240" / "A106" in or right after the descriptions of the activities and the totals for these things would (or could) appear on the bill. Once the ABA Task Codes key is in hand, this will help to break down the time and fees into broad tasks, which may be useful information. Once it is known that a motion for summary judgment required many hours of several timekeepers' time, an arbitrator can then come to a conclusion or ask for an explanation of whether or not the time spent on this particular task is reasonable.

Documents. There often is a good deal of time shown for "reviewing documents" ("L320 - Document Production") in many litigation matters. First, ascertain how many document pages were produced or reviewed. This is sometimes stated in terms of "boxes" which is a standard file storage box normally holding anywhere from 2,000 to 3,500 pages of documents, depending on how tightly the documents are packed. Some courts and commentators mention 2,500 as the average number of pages per box. Assess how many timekeepers reviewed the documents and how long it took. Were summaries of the document reviews created? Were relevant documents culled? Were relevant documents scanned and tagged? If the foregoing tasks were not done, did it then result in multiple lawyers having to review the same documents? Arbitrators must assess all evidence and facts regarding whether the lawyer's document review was efficient and judicious rather than inadvertent or intentional bill padding.

Also, the propriety of tasks must be considered within the context performed. For instance, it may be entirely reasonable for a lawyer to charge a client eight-plus hours to carefully review a 100-page prospectus in a federal securities case involving claims of securities fraud and misrepresentation. On the other hand, it may not be appropriate for a lawyer to charge a client eight-plus hours to review the same 100-page prospectus if the claims in the subject lawsuit are unrelated to the contents of the prospectus [like the wrongful termination of a broker or analyst involved in the securities offering].

Lastly, the arbitrator may consider evidence or facts concerning the timeliness of the client's objection or complaint concerning any fee bill, including when and if the client objected or made inquiries upon receiving the now contested fee bill, and whether the fee agreement

[4] The ABA Task Codes assign litigation time within five groups: case assessment, pre-trial, discovery, trial and appeal. There are also 11 optional Activities Codes (such as "A106 - Communication (with client)" which may be used within each of the five groups in the Litigation Code Set. The various ABA Task Codes may be accessed at www.americanbar.org/groups/litigation/resources/uniform_task_based_management_system.html

contained an agreement that the client would reasonably or promptly notify the lawyer if there were questions or objections to the fee bills or time entries.

**D. Consider the format and content of the fee bills**

**1. High minimum increments**

Many fee agreements state that the lawyer shall bill in minimum increments of .10 hour [or six minutes]. When properly disclosed to a client, such a term may provide support or justify charging that client at least .10 hour for any single task irrespective of how long the task took. Consequently, if the lawyer participates in a phone call regarding the case with opposing counsel that lasts less than two or three minutes, pursuant to the terms of the written fee agreement, the lawyer may be justified in billing .10 hour.

On the other hand, some lawyers still bill in minimum increments of .25 hours or greater. Consequently, they may charge .25 hours for any compensable task, irrespective of how long the task actually takes. Assume that such a lawyer charges $300/hour. Assume further that on any given day, that lawyer completes at least four separate compensable tasks, each task taking less than 3 minutes each to complete. Billing in increments of .25 hours means that the client would be billed $300 for the four tasks [4 x .25 hours x $300/hour = $300]. However, in this example, the client is being charged $300 for less than 12 minutes of actual work, essentially requiring the client to pay an effective hourly rate greater than $1,500.

Courts and fee arbitrators view high incremental charges with suspicion as they may constitute an unreasonable or unconscionable fee, particularly where application of high incremental charges results in overstating the fees owed by a client. *Your Bill: A Behind the Scene look at a Legal Audit*, Mekler Bulger Tilson Marick & Pearson Legal Audit Group, 1, 2 (March 2007) (high incremental charges artificially inflate fees). Relevant factors an arbitrator may consider in this regard include the terms of the written fee agreement, the frequency with which apparent minimum billing entries appeared on the bills, and whether there is evidence that the lawyer was judicious in not employing the high minimum billing entries for brief activities either by (1) not recording such activities, (2) aggregating them with other related activities, or (3) "no charged" the entry.

**2. Billing all tasks separately**

Like high minimum increments, billing every task separately may artificially inflate time entries. For example, it does not take more than a few seconds to read most routine documents or correspondence. If a lawyer reads a group of documents or correspondence in a minute or two and then records a minimum time entry for each such document/correspondence, this may artificially increase the time billed to the client.

**3. Large whole number time entries**

If the bills show time entries in whole numbers, especially large time entries such as 8.0, 9.0, or 10.0, these are probably estimates rather than actual time spent and should be scrutinized,

[except where the event involved trial, mediation, day-long deposition, or other inherently extended activity].

**4. Block billing**

Block billing is the practice of assigning one time charge to multiple separate tasks. An extreme example would be a fee bill mailed to a client at the end of the case with a single entry for 200 hours for "work on case" without identifying, among other things, the various individual tasks performed, who performed them, and when. A more subtle example would be a 3.6 hour charge for "review client's e-mail, retrieve file, call with DR re same, and prepare/send reply." In the foregoing example, a client would be unable to determine how much time any one of the listed tasks actually took. More importantly, this type of block billing is prone to hide accountability and prevents a client from discerning which of the listed tasks are compensable and which are not. For instance, in the foregoing example, what if the lawyer [charging $300/hour] decided to personally make a 3-hour drive to and from an off-site storage facility to retrieve the file rather than sending his secretary [whom he pays $15/hour]? In such an instance, the itemized tasks actually took the lawyer 3.6 hours to complete, but in most instances, the 3 hours the lawyer spent retrieving the file may not be compensable. By utilizing block-billing, the client's [and arbitrator's] ability to assess the accuracy [and propriety] of the 3.6 hour charge is impeded.

Block billing may also inadvertently or intentionally inflate the actual time a lawyer takes to complete the listed tasks. For example, if a lawyer bills a client 8.0 hours on a given day to "prepare for trial," that block of time would most likely include, among other things, time for coffee and restroom breaks, personal calls and non-compensable administrative/managerial tasks. Since block billing has the potential of, among other things, camouflaging non-compensable tasks, many judges, fee arbitrators, and commentators regard its persistent and egregious use with suspicion, and some consider the practice a violation of Business and Profession Code §6148(b).

The basic rule is that courts [and arbitrators] have wide discretion to require additional evidence to support the accuracy of block-billed entries. In a mandatory fee arbitration, it is the lawyer's burden to provide such additional support, which may include testimony and documentary evidence. After consideration of such additional support, or lack thereof, arbitrators may assign a reasonable percentage to the block billed entries, disregard them altogether, or determine that other evidence is sufficient to substantiate the hours aside from the block billed entries. The court in *Heritage Pacific Financial v. Monroy*, (2013) 215 Cal.App.4th 972, 1010 held "trial courts retain discretion to penalize block billing when the practice prevents them from discerning which tasks are compensable and which are not." Previously, the court in *Bell v. Vista Unified School Dist*., (2001) 82 Cal.App.4th 672, 689, held that "the trial court should exercise its discretion in assigning a reasonable percentage to the entries, or simply cast them aside" if counsel "cannot further define his billing entries …." In a much harsher tone, the court in *Christian Research Institute v. Alnor*, (2008) 165 Cal.App.4th 1315, 1329 held:

> Similarly, counsel may not submit a plethora of noncompensable, vague, block-billed attorney time entries and expect particularized, individual deletions as the

> only consequence. The trial court could reasonably conclude counsel made no effort to prune the fee request to comply with the law. Counsel erred grievously by attempting to transfer that responsibility onto the trial court. The trial court could reasonably conclude counsel's disregard for the law undercut the credibility of their fee request and, as officers of the court, warranted a severe reaction.

If a lawyer uses block-billing, it may be appropriate for the arbitrator to place on the lawyer the burden of proving that all of the time entries that were block billed are actually compensable and appropriate.

In our prior version of this arbitration advisory titled "Detecting Attorney Bill Padding" (Arbitration Advisory 2003-01)(January 29, 2003), at section C 4 on page 7, the State Bar's Committee on Mandatory Fee Arbitration ["Committee"] opined that block billing "hides accountability and may increase time by 10% to 30%." However, the arbitrator's discretion is not limited to the 10% to 30% range. Rather, as noted above, an arbitrator may consider all evidence to determine the propriety of any block billed entry and may conclude, upon due consideration of all such evidence, that the entire time billed is appropriate or some portion is not.

### 5. Standardized work descriptions and lack of detail

If an arbitrator encounters the exact same phrases used again and again in the fee bills, it is likely that some routine has set in. This may allow some "down time" to find its way into the fee bills. An entry such as "review documents produced by opposition, 7.5 hours" is typical.

Furthermore, generalized time entries such as "research issues", "review file", "attention to file", "discovery", "prepare for trial", "trial prep", and other similar general statements are not specific enough to let the client know what was done. If a lawyer uses such non-specific task descriptions, it may be appropriate for the arbitrator to place on the lawyer the burden of clarifying what was actually done to assess whether the generalized time entries are actually compensable and appropriate.

### 6. Wrong times

Sometimes a client knows that a specific task took less time than was billed. For example, a lawyer charges four hours to attend a deposition in his office, but the corresponding deposition transcript confirms that the deposition started at 10 am and finished at 11 am. A fee bill may charge a client for the lawyer attending an in-person meeting with the client in his Los Angeles office, but the client was out of the country on that day. The lawyer may charge an hour to prepare a letter to the client, but cannot produce the letter at the arbitration. In each instance, the arbitrator should examine all of the evidence presented by the parties to determine whether the disputed task was actually performed and if so, that it took the time recorded in the fee bills. Demonstrably false or inaccurate entries, unless explained, may justify the arbitrator viewing with distrust other disputed billings or time entries.

**7. Timeliness of invoices**

As noted above, if too much time has elapsed between the disputed task and generating the fee bill, the times shown might be estimates or best guesses of the time involved. On the other hand, it is possible that the timekeeper recorded his or her time contemporaneously but did not generate the fee bill for some reason. The lawyer should clarify why the fee bills were not timely delivered. The arbitrator may also examine the fee agreement to determine if the lawyer committed to delivering periodic billing, and other factors such as (1) whether delayed billing came during a period of substantial activity, (2) whether the fee bill was a surprise to the client, (3) whether the claimed fee exceeds estimates or budgets, and (4) whether there were legitimate reasons that prevented the lawyer from timely delivering a fee bill to the client.

**8. Experts and outside investigators**

Lawyers sometimes retain expert witnesses, consultants, investigators and other third-party professionals to assist a client. These third-party professionals typically forward their bills to the lawyer for payment. Sometimes the lawyer pays such third party bills directly and then subsequently sends the client an invoice for the advanced costs. Other times, the lawyer forwards the third party bill directly to the client for payment. Whatever the process used, it is imperative that such third party bills state what was done with adequate detail to allow a client to decipher what was done and how much is being charged. If the lawyer advanced payment for such third party bills, representations and proof that these charges were actually paid should also be produced.

**9. Overhead items**

A lawyer’s hourly fee should include consideration for overhead items like rent, support staff wages, telephone service, internet fees, office supplies, library charges, seminars, continuing legal education charges, malpractice insurance and a whole host of expenses a lawyer will incur every day to keep his/her practice operating. Consideration for such expenses explains why lawyers in located in urban cities, like downtown Los Angeles and San Francisco, may generally charge higher hourly rates than their colleagues who rent much less expensive office space in the suburbs and outlying farming communities. Since overhead expenses are a cost of doing business, and should be reflected in the professionals’ hourly rates, they should not be passed on to the client unless the client has clearly agreed otherwise in the fee agreement. (*See* American Bar Association Standing Committee on Ethics and Professional Responsibility, Formal Opinion 93-379, *Billing for Professional Fees, Disbursements, and Other Expenses*, (December 6, 1993).

**10. Ministerial, administrative and secretarial tasks**

As noted above, a lawyer’s hourly fee should include consideration for support staff wages. Accordingly, it may be inappropriate to allow a lawyer to also charge a client his/her hourly rate for doing secretarial work. For instance, the vast majority of lawyers are able to prepare judicial form interrogatories in less than 5-10 minutes. Their assistants or secretaries then prepare the actual hard document, prepare and attach the proof of service, generate the

stamped envelope and then serves it on the opposing party. Typically, the only service the client should be charged for is the lawyer's 5-10 minutes to determine what boxes to check off on the form interrogatories. But arbitrators will inevitably encounter situations where the lawyer also charges the client the time spent preparing the proof of service and mailing. It is not uncommon to encounter fee bills that charge clients up to an hour for a simple task like preparing and serving form interrogatories. Arbitrators will also encounter situations where lawyers personally type their own correspondence, motions and other documents. This is typically not a problem, unless of course, the lawyer can only type 10-20 word a minute. In such circumstances, the arbitrator should consider the lawyer's typing proficiency, whether support staff is available for such tasks, and whether the hourly fee agreed-upon by the client includes consideration of support staff wages.

Also, operating a law practice requires substantial efforts on the part of the lawyers wholly unrelated to representing clients. This includes dozens of administrative, managerial, and ministerial tasks lawyers must perform every day. In the vast majority of cases, it is inappropriate to seek to charge a client for such non-legal tasks.

**11. Paralegals**

The use of paralegals and unlicensed legal assistants is wide-spread and completely appropriate if disclosed to the client. Guideline 8 of the 2004 update of the ABA Model Guidelines for the Utilization of Paralegal Services states that: "A lawyer may include a charge for the work performed by a paralegal in setting a charge and/or billing for legal services." Courts have addressed and accepted the theory that paralegal fees are appropriately billed and recovered by lawyers under various prevailing party attorney fee recovery statutes. *Missouri v. Jenkins* (1989) 491 U.S. 274; *Richlin Security Service Co. v. Chertoff* (2008) 553 U.S. 571; and *Guinn v. Dotson* (1994) 23 Cal. App. 4th 262. In California, paralegal fees are only compensable if in total compliance with Business and Profession Code §6450. This requires that the paralegal actually qualifies as a paralegal and the type of work/tasks he/she purports to perform is compensable.

Surprisingly, many lawyers do not realize that some tasks performed by a paralegal are not compensable. The test to determine whether a task performed by a paralegal is compensable is not predicated on the person that performs it, but rather on the nature of the task itself. Business and Profession Code §6450 (a) states:

> (a) "Paralegal" means a person who holds himself or herself out to be a paralegal, who is qualified by education, training, or work experience, who either contracts with or is employed by an attorney, law firm, corporation, governmental agency, or other entity, and **who performs substantial legal work under the direction and supervision of an active member of the State Bar of California**, as defined in Section 6060, or an attorney practicing law in the federal courts of this state, that has been specifically delegated by the attorney to him or her. **Tasks performed by a paralegal include, but are not limited to, case planning, development, and management; legal research; interviewing clients; fact gathering and retrieving information; drafting and analyzing legal**

> **documents; collecting, compiling, and utilizing technical information to make an independent decision and recommendation to the supervising attorney; and representing clients before a state or federal administrative agency if that representation is permitted by statute, court rule, or administrative rule or regulation**.

(Emphasis added).

Furthermore, Business and Profession Code §6454 states that the "terms "paralegal," "legal assistant," "attorney assistant," "freelance paralegal," "independent paralegal," and "contract paralegal" are synonymous for purposes of this chapter. Consequently, billing a client for a paralegal or legal assistant's ministerial, administrative, or secretarial duties may be improper, particularly if not disclosed in the fee agreement and explained to the client. However, even if the lawyer disclosed the use of a paralegal or unlicensed legal assistant for ministerial, administrative or secretarial tasks in the fee agreement, the arbitrator may assess whether the consequent fees agreed upon were unconscionable at the time the fee agreement was entered into pursuant to Rule 4-200 of the Rules of Professional Conduct.

Lastly, it is imperative to remember that it is improper for a paralegal to establish the fees charged to the client for the paralegal's services. Business and Professions Code §6450 (b)(8). This prohibition may prove to be a minefield for lawyers utilizing their paralegals to act as calendar clerks, office managers, supervisors or administrators who control and prepare the lawyer's/firm's fee bills.

**12. Canned Briefs-Recycled Work**

Even newly admitted lawyers have access to a library or cache of canned briefs and template documents they may utilize in their practice. These include, but are not limited to, canned or standardized pleadings, motions, discovery requests, and transactional documents like trusts and leases. These canned or standardized documents may have been created by the lawyer or some third source. The issue becomes whether it is appropriate for the lawyer to bill a client any premium for the creation of the original document, or may the lawyer only bill for the revisions made to the canned or standardized document.

As a threshold matter, the ABA long ago opined that:

> In addressing the hypothetical regarding...recycled work product, it is helpful to consider these questions, not from the perspective of what a client could be forced to pay, but rather from the perspective of what the lawyer actually earned.... A lawyer who is able to reuse old work product has not re-earned the hours previously billed and compensated when the work product was first generated. Rather than looking to profit from ... the luck of being asked the identical question twice, the lawyer who has agreed to bill solely on the basis of time spent is obliged to pass the benefits of these economies on to the client. The practice of billing several clients for the same time or work product, since it results in the

> earning of an unreasonable fee, therefore is contrary to the mandate of the Model Rules. Model Rule 1.5.

(American Bar Association Standing Committee on Ethics and Professional Responsibility, Formal Opinion 93-379, *Billing for Professional Fees, Disbursements, and Other Expenses*, (December 6, 1993); *See also Ethics and Time-Based Billing*, Michael Downey, Law Practice Today, ABA Law Practice Management Section, (January 2006) (Over-billing occurs when "billing the client who received the recycled work product time already billed to another client when that work product was originally created."); *See also, The Moral Compass of the American Lawyer*, Richard Zitrin and Carol Langford, (1999 Ballantine Books)(examples of cases in which lawyers were prosecuted and convicted of bill padding practices including billing multiple clients simultaneously and for recycled work product).

Similarly, the authors of the well-regarded Rutter Guide, caution:

> Attorneys who prepare standardized documents for clients (e.g., wills, partnership agreements) often keep forms of those documents on their computers to use as "templates" that can be revised and customized to suit each client. Absent clear disclosure to the client, attorneys billing on an hourly basis cannot properly add additional hours to a client's bill when revising such an "in-house" form to reflect the time spent preparing the original (template) form. [Orange County Bar Ass'n Form.Opn. 99–001]

*California Practice Guide: Professional Responsibility*, Paul W. Vapnek, Mark L. Tuft, Ellen R. Peck and Justice Howard B. Wiener (Ret.), Chapter 5. Attorney Fees And Fee Agreements, Paragraph 5-945 (2012).

Given the foregoing, in the event a lawyer seeks to charge a client a "premium" for the use of recycled work, the arbitrator should determine if that "premium" was properly stated and disclosed in the written fee agreement. (State Bar of California Committee on Mandatory Fee Arbitration, Arbitration Advisory 1998-03, *Determination of a "Reasonable" Fee*, pages 15-16 (Updated March 20, 2015). If it is not, it may be evidence of bill padding.

**13. Billing multiple clients for the same time**

An arbitrator may encounter situations where the lawyer simultaneously worked on matters of several clients. For example, a lawyer charges two clients the full five hours it took him to attend two court hearings for the two separate clients on the same morning in the same court. The issue is whether each client can be properly billed for the full five hours. Generally, billing multiple clients for the same time raises questions of potential impropriety. The answer typically depends on whether the terms of the fee agreements actually disclosed and explained the manner of billing to the all of the affected clients and the fee agreements of every affected client is fair and reasonable. (*See* American Bar Association Standing Committee on Ethics and Professional Responsibility, Formal Opinion 93-379, *Billing for Professional Fees, Disbursements, and Other Expenses*, (December 6, 1993); State Bar of California Standing Committee on Professional Responsibility and Conduct, Formal Opinion No. 1996-147).

Therefore, if a lawyer seeks to bill the same time to more than one client simultaneously, that arrangement must be fair, reasonable, fully disclosed in the written fee agreements of all affected clients, and fully explained to each client. If it is not, then it may be evidence of bill padding. Additionally, the arbitrator must ensure that, irrespective of how much time the lawyer ultimately bills to any one client for such a collective task, the resulting fees are not unconscionable pursuant to Rule 4-200 of the Rules of Professional Conduct.

### 14. Ghost Billing

"Ghost billing" occurs when a lawyer bills for work or task(s) performed by another person. Variations abound. For example, a paralegal or associate prepares a motion, but the partner in charge bills the time as his/her own. Or a non-employee contract attorney attends a status conference, but the lawyer of record bills the time as his/her own. Ghost billing should be scrutinized as it may constitute (1) a deceptive practice, (2) a violation of Business and Professions Code Section 6148(b), (3) bill padding, and (4) an attempt to collect an unconscionable fee or cost in violation of Rule 4-200 of the Rules of Professional Conduct.

### 15. Contract Attorneys

Another recurring complaint in fee disputes concerns charges for the use of contract attorneys. Lawyers use contract attorneys for a myriad of purposes, including court appearances, conducting legal research, drafting motions or appeals briefs, etc. The resulting complaints typically concern how much the client is ultimately charged for these tasks. The ABA has opined that, if properly disclosed, it is appropriate for the lawyer to mark-up the cost [or add a profit] for work performed by contract attorneys. (*See* American Bar Association Standing Committee on Ethics and Professional Responsibility Formal Opinion 00-420, Surcharge to client for use of a contract attorney (November 29, 2000)). However, disputes result when a lawyer chooses to use a "contract attorney" and then bills for the work performed as a fee at the lawyer's hourly rate, when, in fact, the lawyer is paying the contract attorney a lesser rate.[5]

Anticipated use of contract attorneys should be addressed in the written fee agreement. The written fee agreement should state whether the contract lawyer is billed out as a cost or their time is charged as a fee at indicated rates along with the time of the lawyer's or law firm's other timekeepers (partners and associates). (*See* State Bar of California Standing Committee on Professional Responsibility and Conduct, Formal Opinion No. 2004-165; and The Professionalism and Ethics Committee of the Orange County Bar Association, Formal Opinion 2014-1). Absent such disclosure, the client should only be charged the out-of-pocket cost of the contract attorney.

---

[5] There are numerous other non-billing, ethical considerations that are triggered by the use of contract lawyers. As COPRAC concluded in its Opinion 2004-165: Contract attorney services, and individual lawyers providing contract legal services to lawyers, may provide cost-effective alternatives to consumers of legal services. In using these services, those lawyers hiring the contract attorneys must comply with the ethical rules concerning the disclosure to the client of significant developments in the representation. Both those lawyers doing the hiring and those lawyers who are hired must comply with the ethical rules concerning competence, confidentiality, advertising, and conflicts of interest that apply to their respective roles in any such arrangement.

For example, assume that a lawyer [a solo practitioner], charging her client $300/hour, is unable to attend a status conference. She engages a contract attorney to attend a status conference. The contract attorney then delivers an invoice to the lawyer indicating that it took him 1½ hours to attend the status conference and the cost to the lawyer is $100, which the lawyer pays. Generally, given the foregoing facts, the client should only be charged the $100 paid to the contract attorney. If the lawyer seeks to charge the client some other amount, more than $100 or $450 (1½ hours it took to attend the status conference multiplied by her $300/hour rate), it must be clearly disclosed in the written fee agreement. If it is not, then it may be evidence of bill padding.

However, there are circumstances where the facts are not so clear-cut. For example, some law firms [including large multi-national law firms], occasionally find it necessary to hire groups of contract attorneys to conduct special assignments, like document reviews in large cases involving hundreds of thousands, if not millions, of hard and digital documents. In addition to the hourly rate for the contract attorneys, such law firms also incur office and transportation [and other] costs associated with using the contract attorneys. For example, the law firm may have to allocate a portion of their office space, or rent some additional office space, for the contract attorneys to do their work. In such cases, assuming that the use and charge of the contract attorneys are properly disclosed in the written fee agreement, it may be appropriate for the law firm to charge a premium for the use of the contract attorneys. If there is no such disclosure, in addition to the contract attorney's actual hourly rate, the law firm may also be able to properly charge the client for the associated costs described above. Of course, in such circumstances, it is the law firm's obligation to bear the burden of proof to quantify the associated costs chargeable to the client.

The arbitrator should consider the terms of the written fee agreement and whether the client agreed to pay for contract attorneys at some rate other than the actual cost to the lawyer. In the vast majority of written fee agreements, the term "attorney" or "lawyer" is typically defined to mean only the lawyer and/or law firm hired by the client. While a reasonable extension of this definition may include the defined lawyer's employee associates and partners, it does not necessarily include non-employee contract attorneys to which the client has no relationship. Accordingly, the arbitrator should assess those facts regarding whether the client agreed or acknowledged the use and expense of contract attorneys.

## CONCLUSION

The vast majority of lawyers are honest and their bills are reliable statements of the work and time billed to the client. However, if a client claims to have been over-billed, the arbitrator should, at the very least, (1) evaluate the specificity of the time entries and the process by which the fee bill was prepared, (2) evaluate the staffing used on the matter, (3) evaluate the work performed against the time billed, and (4) look for certain patterns in the descriptions of the work performed, including the time entries, to assess the accuracy and propriety of the time charged to the client.