# EXHIBIT 19

03-01

ARBITRATION ADVISORY
03-01

DETECTING ATTORNEY BILL PADDING
January 29, 2003

Points of view or opinions expressed in this document are those of the Committee on Mandatory Fee Arbitration. They have not been adopted or endorsed by the State Bar's Board of Governors and do not constitute the official position or policy of the State Bar of California.

QUESTION PRESENTED:

When an attorney's invoice overstates the amount of time required for work performed, it is called bill "padding." If a lawyer charges for services on an hourly basis how can an arbitrator evaluate the invoices for possible bill padding? This advisory explores the question of how an arbitrator may identify bill padding and determine a reasonable fee in such circumstances.

INTRODUCTION

Most bills are a collection of a great many estimates of time spent for work performed in the privacy of a lawyer's office. Accordingly, it is usually true that one cannot challenge most of these estimates with mathematical precision. Overall, arbitrators should look at three things:

A. Evaluate the team/staffing used on the matter,

B. Evaluate the work performed against the time billed, and

C. Look for certain patterns in the form of the work descriptions.

DISCUSSION

Rules and observations about determining reasonable attorney's fees in general are addressed in Arbitration Advisories 95-02 (June 9, 1995) and 98-03 (June 23, 1998). This advisory focuses on a subset of that topic: when too much time is recorded for the individual units of work performed, generally known as bill "padding". In order to understand the likely areas to look for such problems, it is useful to consider the historical background of attorney's professional fees [See American Bar Association Commission on Billable Hours Report (August, 2002) referred to hereinafter as "ABA Report" (See http://www.abanet.org/].

Historically, lawyers routinely billed clients in flat sums or fixed amounts - often at the conclusion of the matter. This required some estimating and discretion on the part of counsel. A bill often read something like this: "Fee for services rendered, $ 750.00."

Clients sometimes paid their bills six months or a year after receipt of the invoice, which reflected services performed long before it was sent.

In Gisbrecht v. Barnhart [Gisbrecht v. Barnhart, 535 U.S. 789 (2002)] the Supreme Court wrote:

> ". . . . An American Bar Association (ABA) report, published in 1958, observed that attorneys' earnings had failed to keep pace with the rate of inflation; the report urged attorneys to record the hours spent on each case in order to ensure that fees ultimately charged afforded reasonable compensation for counsels' efforts. See Special Committee on Economics of Law Practice, The 1958 Lawyer and His 1938 Dollar 9-10 (reprint 1959).
>
> Hourly records initially provided only an internal accounting check. See Honest Hour 19. The fees actually charged might be determined under any number of methods: the annual retainer, the fee-for-service method, the "eyeball" method under which the attorney estimated an annual fee for regular clients, or the contingent-fee method, recognized by this Court in Stanton v. Embrey, 93 U. S. 548, 556 (1877), and formally approved by the ABA in 1908. See Honest Hour [W. Ross, The Honest Hour: The Ethics of Time-Based Billing by Attorneys (1996),13-19]. As it became standard accounting practice to record hours spent on a client's matter, attorneys increasingly realized that billing by hours devoted to a case was administratively convenient; moreover, as an objective measure of a lawyer's labor, hourly billing was readily impartable to the client. Id., at 18. By the early 1970's, the practice of hourly billing had become widespread. See id., at 19, 21."

Over the decades, federal and state courts have developed vast experience in evaluating requests for fees calculated on the basis of units of time at hourly rates. This process is called the "lodestar" method. The number of hours reasonably devoted to each case is multiplied by an amount determined to be a reasonable hourly rate. The time involved in many lodestar matters is often hundreds, perhaps thousands of hours of time, and evaluating such a request can be a vexing, complicated process even for courts experienced in such matters. Once the lodestar amount is determined it is presumed thereafter to be the reasonable fee, although the amount can sometimes be adjusted upwards or downwards for 12 reasons or factors [See Kerr v. Screen Extras Guild, Inc. 526 F.2d 67, 70 (9th Cir. 1975)]. This advisory is not concerned with these adjustments but with evaluating the lodestar for fees for services which have been rendered by a law firm to its client on an hourly basis and with a specific focus on whether or not there has been "padding" or "heavy pencil" time estimates in the bill.

In the now-standard chronological legal bill, almost all time is (or can be, if requested) shown by day and by timekeeper. If a lawyer or other timekeeper does several things in one day on a particular matter then he or she must decide how to describe this work and how much time to enter for the work. This can be done for the batch of things done as a total or for each element within the batch. The use of only one total time is called "block billing" or "lumping" and it is not a favored practice. Many sophisticated users of legal services and many courts specifically prohibit block billing, and in evaluating the appropriateness of charges for legal services it may be appropriate - even essential in some cases - to write off time and fees to account for this practice.

An arbitrator's review of legal bills should include an inquiry into the method and timing used to prepare the bills in order to form an opinion as to the accuracy of the data shown by the bills. Some attorneys, particularly solo practitioners and very small firms, still use word processing programs to generate bills but most mid-size and larger firms use billing programs for this function. Many time and billing software programs in use today have a timer feature that allows one to input "start" and "stop" commands for one or more matters. The program then automatically calculates the elapsed time for each procedure in the same manner as a stopwatch. This feature is cumbersome and very rarely used by timekeepers, due in part to the nature of the way timekeepers devote their time to various matters during a typical day. Telephone calls, voice-mails, e-mails, faxes, couriers, mail, colleagues, sudden inspiration, etc., interrupt and require instant attention to another matter. Sometimes two or more things are happening at the same time, and there is no way to have a timekeeper keep track of these events and the time involved for each event will have to be estimated and written or entered manually for each task.

Many lawyers no longer write out what they do by hand on paper time sheets but input their work descriptions directly into computers. These can usually be identified because they are often longer and more detailed. For example, if an entry in an invoice reads: "meeting with client to discuss the elements of the separate statement of facts and the source of evidence for each element (1.8); research new opinion on the presumptions and burden of proof under Festo and progeny (2.5)" [Example 1], this is likely (but not necessarily) something actually entered into the program by the lawyer. On the other hand, the briefer description for the same work of: "meeting with client re MSJ; research burden of proof (4.3)" [Example 2] is probably something written in longhand and then transcribed into the billing program. Some lawyers still do not use billing programs but generate their bills by word processing programs or even on hand-written slips of carbon paper designed for this use. It is not the format of the bill but the information provided which is important. Full and complete hand-written descriptions are fine, but these are now very rare.

While it is almost universally acknowledged that contemporaneous records are the best practice, many times the press of business is such that a day or two (or more) goes by without the timekeeper entering any times. Sometimes a month may pass without any entries. Rarely years go by without any entries! At some point a bill needs to be generated and the timekeeper is faced with the need to reconstruct what happened a day or two or a month ago (or a year ago) with great precision. The time will be turned in or reconstructed and the invoices may appear to be very precise, with exact times noted for each activity, but this surface appearance of accuracy is deceptive and the time recorded is subject to re-evaluation by the arbitrator. When reading the bill it is very important to remember that in the vast majority of cases each time entry in a lawyer's bill is merely an estimate of how much time was required for the work performed that is being described in a summary fashion.

Since the entry for time spent is done by the individual timekeeper with no one watching, and because the ascribing of time is sometimes a very subjective thing which must be done with some care, it is up to the timekeeper to exercise judgment in making these estimates. Once the time is entered it is not final, however. It is customary for larger law firms to have a draft of the bill circulated to the partner in charge of billing on the matter. These are often called "pre-bills" which are edited for errors and the time is written up or down in an exercise of what is called "billing judgment" by the billing partner (who may or may not be the lawyer actually working on the file) who originated the case for the firm. Pre-bills have the raw data and often have cumulative totals as well. After the pre-bill is revised it becomes the invoice. The client may or may not ever know about this process. The final bill may or may not have some entries that read "no charge". Following this process, the final bill is sent out to the client, with or without an explanatory letter. Many times the pre-bills are not carefully reviewed by the billing partner for a number of reasons, including the fact that most billing partners are very busy and do not have or want to allocate the time to check each bill carefully, the entries may be for timekeepers who are not readily available, and the billing partner may have a huge stack of pre-bills to go through and only a short time to do so since the firm wants to "get the bills out".

It is just about impossible to be certain that any one single time entry is wrong or faked or padded. "The ‘perfect crime' [is the] padding of bills…" [W. Ross, the Honest Hour: The Ethics of Time Based Billing by Attorneys 2 (1996)]. If, in Example 1 above, the client is certain that the meeting required only 30 minutes (with no travel time), then perhaps one could question the entry of 1.8 hours. But how can one prove that the time for, say, a specific letter was really 12 minutes rather than 30? If the time is block-billed and one does not even know how much time is being claimed for the letter, then what? Look at the totality of the data and consider the following three methods.

THE THREE APPROACHES TO IDENTIFYING PADDING

Assuming that one is presented with a group of invoices that seem to be (or are claimed to be) too high, and assuming that one suspects that some irregularity might be present, how can one evaluate these invoices for padding? There are three ways: (1) examine the staffing; (2) quantify and evaluate the reasonableness of the time spent on specific tasks or for major specific items; and (3) look at the format of the bills.

A. Examine Staffing. Invoices should indicate the names of the timekeepers.

It is customary to show the hours and fees billed by timekeepers by invoice and sometimes also cumulatively for the life of the matter. Examine these invoices and make a list of timekeepers and their hours per invoice. Do many come and go from invoice to invoice? If there are many timekeepers on a matter then one should focus on the ones who are more likely to have been using what is called a "heavy pencil" in recording their time. Who in the firm is the most likely to pad the bill?

The least experienced lawyers are called "associates". They are employees of the firm and are paid a salary and sometimes a bonus for billing high hours in a year. Many firms pay bonuses if associates bill about 2,000 to 2,420 hours in a year. Try to ascertain the plan in effect for the particular case and be aware that some firms will allow an associate to elect a particular plan. Base salary is tied to a certain minimum, and an associate may get a bonus for meeting specified "billables". New associates are often not efficient but they need to record as many hours as they can to meet their targets. The matters they work on are usually ones where they have no direct relationship with the client. New associates are most likely to be under great pressure to bill very high hours. If they have not developed the discipline to record their times daily, some time may go by before the associate enters the work description and time. Some will give in to the temptation to guess and to exaggerate in order to meet the demands on them, anticipating that it will be at least a month and maybe longer before anyone questions the time. Be observant for elastic phrases to describe what they did in a way which is easy to justify or at least hard to disprove. Phrases such as "review documents produced by counsel, 8.0 hours", "discovery, 6.0 hours", "prepare for trial 9.0 hours", etc., should trigger suspicion. Scrutinize newer associates' times first. The fewer the years of practice, the higher the probability of padding. The ABA Commission on Billable Hours Report recognizes that hourly billing penalizes efficient and productive lawyers and "may allow, indeed may encourage, profligate work habits" [ABA Commission on Billable Hours Report (August, 2002), at pages 6 - 8].

It is also generally accepted that the more timekeepers on a case, the higher the bill will be. Pay particular attention to time recorded by newer associates who record time on the matter only briefly, such as one or two months.

B. Measure some or all of the work produced by the law firm against the hours claimed. Evaluate this for a range of reasonableness.

What were the major items of work performed? How many hours were recorded for this work? How many timekeepers were involved? What did they do? Did they duplicate each other's work? Was some of this "training" time for new lawyers? Was the client given an estimate or a budget? An "estimate" is not binding. A budget is supposed to be accurate and binding but subject to revision if circumstances change and the client is promptly informed.

Major tasks. One may need to quantify the time first. It may be possible to calculate how much time was billed for certain major tasks and then to look at the work product to see if the time falls into a range that appears reasonable. This can be hard to do without some experience in the particular legal area involved.

While the times-by-task can be hard to assemble, sometimes the bills themselves will have guides to that information within them if the firm employs what are called the "Uniform Task-Based Management System" (or Codes) published by the American Bar Association. Task-based billing codes are in fairly wide use but are not standard and there is some debate over their usefulness. For example, one may know that certain hours were recorded for "L240 - Motions For Judgment" but not how many hours were shown for a specific Motion for Summary Adjudication.

The ABA Task Codes assign litigation time within 5 groups: case assessment, pre-trial, discovery, trial and appeal. There are also 11 optional Activities Codes (such as "A106 - Communication (with client)" which may be used within each of these 5 groups in the Litigation Code Set.

In Example 1 above, for example, the time billed for meeting with the client to prepare the statement of facts would show the codes "L240" / "A106" in or right after the descriptions of the activities and the totals for these things would (or could) appear on the bill. Once the ABA key is in hand, this will help to break down the time and fees into broad tasks, which may be useful information. Once it is known that a motion for summary judgment required many hours of several timekeepers' time, one can then come to a conclusion or ask for an explanation of whether or not the time spent on this particular task is reasonable.

Documents. There often is a good deal of time shown for "reviewing documents" ("L320 - Document Production") in many litigation matters. First, ascertain how many document pages were produced or reviewed. This is sometimes stated in terms of "boxes" which is a standard file storage box normally holding anywhere from 2,000 to 3,500 pages of documents, depending on how tightly they are packed. Some courts and commentators mention 2,500 as the average number of pages per box. Ask how many timekeepers reviewed the documents and how long did it took. A general rule of thumb commonly used by experts in billing analysis is that it will take a lawyer about 8 hours to review a box of relevant documents. It might also require a paralegal's help at about 4 hours per box. This can vary widely depending on the type of documents and their importance and repetitiveness.

C. Examine the format of the invoices for patterns that suggest padding.

1. Formula billing

Every single piece of paper gets a time entry as it wends its way past the timekeeper to its destination. It does not take more than a few seconds to read most routine correspondence. If the timekeeper reads a group of documents in a minute or two and then records a minimum time for each document, this may ultimately increase the time by several hours. Look for multiple timekeepers reading the same documents.

2. High minimum increments

The standard minimum is 1/10th of an hour or 6 minutes. If a higher minimum is used, such as .25 or .5, this probably increases the time by 15% to 25%. Some courts have criticized the use of a .25 or 1/4 hour minimum as being too high.

3. Time estimates

If the bills show hours in even numbers such as 8.0, 9.0, or 10.0, these are probably estimates rather than actual time spent and should be investigated.

4. Block billing

If one amount of time is shown for working on more than one discrete task, this is called "block billing" or "lumping" time. This is almost never allowed by federal courts. The practice hides accountability and may increase time by 10% to 30%. The larger the "block", the more care should be exercised.

5. Standardized work descriptions

If one sees the exact same phrases used again and again in the bills, it is likely that some routine has set in and this allows some "down time" to find it way into the bills. An entry such as "review documents produced by opposition, 7.5 hours" is typical.

6. Lack of detail

"Research issues", "attention to file", "discovery", "prepare for trial", and similar statements are not specific enough to let the reader know what was done.

7. Wrong times

Sometimes a client knows that certain things took less time than was billed such as the meeting in Example 1, above. Perhaps other meetings were for known times or can be checked. Deposition transcripts usually have start and end times and can be checked against billing invoices.

8. Timeliness of invoices

Was the invoice prepared at or near the time when the services were provided? As noted above, if too much time has elapsed between the event and generating the invoice, the times shown might be estimates or best guesses of the time involved. On the other hand, it is possible that the timekeeper recorded his or her time contemporaneously but did not generate the invoice for some reason. The responsible attorney should be questioned about this.

9. Experts and outside investigators

Outside vendors such as experts or investigators should submit invoices that set out what they did with adequate detail. Representations or proof that these charges have actually been paid should also be produced.

10. Computer Assisted Legal Research ("CALR")

Firms such as Lexis-Nexis and Westlaw may offer "pro-forma" invoices which are not the actual charges to the firm. The actual net amounts paid by the firm should be determined.

11. Overhead items

Some charges such as telephone, facsimile, internet fees, extranet costs, office supplies, library charges, seminars, continuing legal education charges, and perhaps even basic CALR are really part of the cost of doing business and should be reflected in the professionals' hourly rates. These should not be passed on to the client unless the client has clearly agreed otherwise.

CONCLUSION

The vast majority of lawyers are honest and their bills are reliable statements of what was done. However, the economic pressure on lawyers and firms is enormous, continuous, and irrefutable. Some few timekeepers will pad the bill by inserting extra hours from time to time, and the cumulative effect of this practice can be very significant. Arbitrators should examine each case appropriately by: (1) examining the staffing, (2) quantifying and evaluating the time spent on major items of work, and (3) evaluating the form or pattern of the invoices for padding.

*© 2009 The State Bar of California*