1    PSYCH-APPEAL, INC.
     Meiram Bendat (Cal. Bar No. 198884)
2    7 West Figueroa Street, Suite 300
     PMB# 300059
3    Santa Barbara, CA 93101
     Tel: (310) 598-3690, x.101
4    Fax: (888) 975-1957
     mbendat@psych-appeal.com
5
     ZUCKERMAN SPAEDER LLP
6    D. Brian Hufford (admitted *pro hac vice*)
     Jason S. Cowart (admitted *pro hac vice*)
7    485 Madison Avenue, 10th Floor
     New York, NY 10022
8    Tel: (212) 704-9600
     Fax: (212) 704-4256
9    dbhufford@zuckerman.com
     jcowart@zuckerman.com
10
11   *Attorneys for Plaintiffs and the Classes*
     *(Additional Counsel on Signature Page)*

12

13                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF CALIFORNIA
14                      SAN FRANCISCO DIVISION

15   DAVID AND NATASHA WIT, et al.,        Case No. 3:14-CV-02346-JCS
                                           Related Case No. 3:14-CV-05337-JCS
16               Plaintiffs,

17        v.                               **PLAINTIFFS' OPENING BRIEF ON
                                           BREACH OF FIDUCIARY DUTY CLAIMS**
18   UNITED BEHAVIORAL HEALTH,

19               Defendant.

20   GARY ALEXANDER, et al.,

21               Plaintiffs,               Hearing Date: July 30, 2025
                                           Hearing Time: 9:30 AM
22        v.                               Judge: Joseph C. Spero

23   UNITED BEHAVIORAL HEALTH,

24               Defendant.

25

26          **REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

27

28

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ iii

BACKGROUND ............................................................................................................... 2

I.  The Breach of Fiduciary Duty Claim ........................................................................ 2

    A.  UBH Developed the Guidelines, In Its Role as a Fiduciary, to Interpret the Plans' GASC Requirement ...................................................................... 4

    B.  UBH Had a Strong Financial Interest in Minimizing Benefit Expense. ............... 6

    C.  UBH Purposely Designed its Guidelines to be a "Utilization Management" Tool for Minimizing Benefit Expense. ........................................ 7

    D.  UBH Ensured that its Financial Interests Influenced the Development of its Clinical Guidelines. ...................................................................... 9

    E.  UBH Deliberately Made its Guidelines More Restrictive Than GASC. ............... 11

        1.  UBH Knew What the Generally Accepted Standards of Care Were. .................................................................................... 11

        2.  UBH Ignored GASC and Manipulated its Own Evidence Base to Make its Guidelines Much more Restrictive. ........................ 13

        3.  The Guidelines UBH Created Were Substantially More Restrictive than GASC, Thereby Narrowing the Scope of Coverage Available Under the Plans. .......................................... 15

    F.  Even Though UBH Knew its Guidelines Were Excessively Restrictive, It Repeatedly Misrepresented them as Being Consistent with GASC. ................. 16

II.  Exhaustion ............................................................................................................. 18

ARGUMENT ................................................................................................................... 18

I.  UBH's Breach of its Fiduciary Duties in Developing the Guidelines was Distinct from How it Applied the Guidelines to Make Particular Coverage Determinations. ...................................................................................................... 18

    A.  UBH Breached its Fiduciary Duty of Loyalty. ................................................. 19

    B.  UBH Breached its Fiduciary Duty of Care. ..................................................... 20

C.     UBH Breached its Fiduciary Duty to Comply with Plan Terms........................... 22

D.     These Breaches of Fiduciary Duty Do Not Depend on Any Misunderstanding that the Plans Covered *All* Treatment that was Consistent with GASC. ......................................................................................... 23

II.    Plaintiffs' Statutory Breach of Fiduciary Duty Claim Is Not Subject to Exhaustion.......................................................................................................................... 24

A.     *Diaz* and *Spinedex* Demonstrate the Narrow Application of the "Disguised Benefits Claim" Label. ......................................................................... 25

B.     Plaintiffs' Breach of Fiduciary Duty Claim Falls Squarely Within the Rule that Exhaustion is Not Required for Claims Arising Under the Statute............................................................................................................................... 29

CONCLUSION ............................................................................................................................. 29

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Amaro v. Cont'l Can Co.*,
  724 F.2d 747 (9th Cir. 1984)..................................................................... 25

*Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*,
  472 U.S. 559 (1985) ........................................................................ 18, 22

*Diaz v. United Agric. Emp. Welfare Benefit Plan & Trust*,
  50 F.3d 1478 (9th Cir. 1995)................................................................ 25, 26

*Drinkwater v. Metro. Life Ins. Co.*,
  846 F.2d 821 (1st Cir. 1988) ...................................................................... 27

*Fallick v. Nationwide Mut. Ins. Co.*,
  162 F.3d 410, 419 (6th Cir. 1998)............................................................... 28

*Fujikawa v. Gushiken*,
  823 F.2d 1341 (9th Cir. 1987)..................................................................... 24

*Graphic Commc'ns Union, Dist. Council No. 2, AFL–CIO v. GCIU–Employer Ret. Ben. Plan*,
  917 F.2d 1184 (9th Cir. 1990)..................................................................... 25

*Guenther v. Lockheed Martin Corp.*,
  972 F.3d 1043 (9th Cir. 2020)..................................................................... 24

*Hall v. City of Los Angeles*,
  697 F.3d 1059 (9th Cir. 2012)....................................................................... 3

*Harrow v. Prudential Ins. Co.*,
  279 F.3d 244 (3d Cir. 2002)........................................................................ 27

*Hill v. Blue Cross & Blue Shield of Michigan*,
  409 F.3d 710, 717-18 (6th Cir. 2005) .......................................................... 28

*Horan v. Kaiser Steel Ret. Plan*,
  947 F.2d 1412 (9th Cir.1991)...................................................................... 24

*Howard v. Shay*,
  100 F.3d 1484 (9th Cir.1996)...................................................................... 19

*Hughes v. Nw. Univ.*,
  595 U.S. 170 (2022) ................................................................................... 20

*Pac. Shores Hosp. v. United Behav. Health*,
  764 F.3d 1030 (9th Cir. 2014)..................................................................... 24

*Pegram v. Herdrich*,
    530 U.S. 211 (2000) ................................................................................. 19

*Peralta v. Hisp. Bus., Inc.*,
    419 F.3d 1064 (9th Cir. 2005) .................................................................. 19

*Smith v. Sydnor*,
    184 F.3d 356 (4th Cir. 1999) .................................................................... 27

*Spinedex Physical Therapy USA Inc. v. United Healthcare of Ariz., Inc.*,
    770 F.3d 1282 (9th Cir. 2014) ........................................................ 24, 25, 26

*Spinedex Physical Therapy, U.S.A., Inc. v. United Healthcare of Ariz., Inc.*,
    No. 2:08-cv-00457-ROS, ECF No. 38 (D. Ariz. July 9, 2008) ................... 26

*Steigleman v. Symetra Life Ins. Co.*,
    No. 23-4082, 2025 WL 602175 (9th Cir. Feb. 25, 2025) ........................... 3

*United Behavioral Health v. U.S. Dist. Ct.*,
    No. 24-242, 2024 WL 4036574 (9th Cir. Sept. 4, 2024) ............................ 1

*Varity Corp. v. Howe*,
    516 U.S. 489 (1996) ................................................................................. 20

*Wit v. United Behavioral Health*,
    79 F. 4th 1068 (9th Cir. 2023) .......................................................... passim

*Wit v. United Behavioral Health*,
    No. 14-cv-02346-JCS, 2019 WL 1033730 (N.D. Cal. Mar. 5, 2019) ......... 2

**STATUTES**

29 CFR § 2560.503-1(g)(v)(B) ...................................................................... 13

29 U.S.C. § 1104(a)(1) ................................................................................. 19

29 U.S.C. § 1104(a)(1)(A)(i) ......................................................................... 20

29 U.S.C. § 1104(a)(1)(B) ............................................................................ 20

29 U.S.C. § 1104(a)(1)(D) ............................................................................ 22

29 U.S.C. § 1185a(a)(3)(A)(ii) ....................................................................... 8

**OTHER AUTHORITIES**

George G. Bogert, et al., *The Law of Trusts and Trustees* § 543 (3d ed. Jul. 2024 update) .... 19, 20

1   The Ninth Circuit reversed the judgment on Plaintiffs' breach of fiduciary duty claim only "[t]o
2   the extent" it was "based on the district court's erroneous interpretation of the Plans," and remanded
3   "for the district court to answer the threshold question of whether Plaintiffs' fiduciary duty claim
4   is subject to the exhaustion requirement." *Wit v. United Behavioral Health*, 79 F. 4th 1068, 1089-
5   90 (9th Cir. 2023) ("*Wit III*"); *see also United Behavioral Health v. U.S. Dist. Ct.*, No. 24-242,
6   2024 WL 4036574, *2 (9th Cir. Sept. 4, 2024) ("*Wit IV*"). The mandate thus poses two initial
7   questions: (1) Was the Court's conclusion that UBH breached its fiduciary duties in designing the
8   Guidelines to serve its own financial interests "based on" an "erroneous interpretation" that the
9   Plans required coverage of all treatment that was consistent with generally accepted standards of
10  care? and (2) Was the Plaintiffs' claim that UBH breached its fiduciary duties by developing and
11  promulgating its self-serving Guidelines just a "disguised claim for benefits" subject to plan
12  exhaustion requirements? The answer to both questions is a straightforward "no."

13      First, the Court's rulings on UBH's breaches of fiduciary duty did not depend in any way
14  on a mistaken view that UBH was required to cover all services that were consistent with generally
15  accepted standards of care ("GASC"), regardless of other exclusions or limitations in a particular
16  plan. Instead, the rulings depend on the Court's findings that while the Plans also contain many
17  other requirements, they undisputedly *all* include a requirement that services must be consistent
18  with GASC to be covered (i.e., the "GASC Requirement"); that UBH developed its Guidelines to
19  interpret and implement the GASC Requirement, not other Plan terms; that UBH's Guidelines
20  purport to be derived from GASC; and that, in creating the Guidelines, UBH acted in its own self-
21  interest, without due care, and intentionally designed Guidelines that distorted GASC to the Plan
22  beneficiaries' detriment. Acknowledging that other Plan terms also bear on whether a particular
23  benefit claim is covered does not undermine those findings in the least.

24      Moreover, UBH's development of its self-interested Guidelines was distinct from its
25  subsequent application of those Guidelines to deny coverage in specific cases. Whether UBH
26  breached its fiduciary duties when it deliberately designed its Guidelines to minimize benefit
27  expense and thereby increase its own profit is thus also distinct from the question of whether UBH's
28  application of the Guidelines to deny particular requests for coverage was or was not proper. Thus,

PLS.' OPENING BRIEF ON
FIDUCIARY DUTY CLAIMS
CASE NOS. 3:14-CV-02346-JCS, 3:14-CV-05337-JCS

even if the Court erred in interpreting the Plans when it entered judgement on the Class's wrongful denial of benefits claim,[1] that error has no bearing on whether UBH breached its fiduciary duties in developing erroneous standards to measure GASC.

Second, under well-established authority in this Circuit, no exhaustion requirement applies to the Plaintiffs' statutory claim for breach of fiduciary duty, which challenges UBH's "systemic" misconduct in creating its excessively narrow Guidelines, and not UBH's application of the Guidelines to deny coverage in any particular case.

This Court's post-trial rulings relating to the breach of fiduciary duty claim remain valid.

## **BACKGROUND**

## I. **The Breach of Fiduciary Duty Claim**

In its post-trial Findings of Fact and Conclusions of Law ("FFCL"), ECF No. 413 (Feb. 28, 2019),[2] the Court ruled that "UBH has breached its fiduciary duty by violating its duty of loyalty, its duty of due care, and its duty to comply with plan terms by adopting Guidelines that are unreasonable and do not reflect generally accepted standards of care." *Id.* ¶ 203. The only concern the Ninth Circuit raised with respect to this conclusion was the extent to which it may have been "intertwined with an incorrect interpretation of the Plans." *Wit III*, 79 F.4th at 1088 n.7. In particular, the Ninth Circuit did "not disturb" the Court's findings "that financial incentives infected UBH's Guideline development process and that UBH developed the Guidelines with a view toward its own interests." *Id.* Thus, to the extent the Court found that UBH breached its fiduciary duties by placing its financial interests over the interests of its beneficiaries, disregarding and distorting the standards it purported to be implementing, and lying about the nature of its Guidelines, these

---

[1] Citing a "conflicting" record, the Ninth Circuit did not rule in *Wit III* on whether this Court did misinterpret the Plans "to require coverage for all care consistent with GASC." 79 F.4th at 1088. Plaintiffs continue to believe that the Court did not have any such misunderstanding. Even if the Court *had* made such a mistake in ruling on the denial of benefits claim, however, it did not impact its findings on breach of fiduciary duty.

[2] The redacted version of the Court's FFCL, ECF No. 418 (March 5, 2019), has been published on Westlaw. *See Wit v. United Behavioral Health*, No. 14-cv-02346-JCS, 2019 WL 1033730 (N.D. Cal. Mar. 5, 2019). However, since Plaintiffs rely in part on findings that were redacted from that version, Plaintiffs cite herein to the sealed version of the FFCL (ECF No. 413).

holdings—which are untethered to any plan interpretation, erroneous or not—remain valid under the Ninth Circuit's decision.

This Court also found that Plaintiffs established that they were harmed by UBH's fiduciary breaches, specifying that the injury resulted from "denial of [Plaintiffs'] right to fair adjudication of their claims for coverage based on Guidelines that were developed solely for their benefit." *Id.* ¶ 204. The Ninth Circuit upheld that determination as a basis for standing:

> Under the fiduciary duties section of ERISA, a fiduciary has a duty to administer plans "solely in the interest of the participants and beneficiaries. . . with . . . care, skill, prudence, and diligence," and "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a). Plaintiffs alleged that UBH administered their Plans in UBH's financial self-interest and in conflict with Plan terms. This presents a material risk of harm to Plaintiffs' ERISA-defined right to have their contractual benefits interpreted and administered in their best interest and in accordance with their Plan terms. Their alleged harm further includes the risk that their claims will be administered under a set of Guidelines that impermissibly narrows the scope of their benefits and also includes the present harm of not knowing the scope of the coverage their Plans provide. The latter implicates Plaintiffs' ability to make informed decisions about the need to purchase alternative coverage and the ability to know whether they are paying for unnecessary coverage.

*Wit III,* 79 F.4th at 1082-83.

The Court's factual findings as to UBH's breach of fiduciary duty, summarized below, were fully supported by the trial record.[3] The Court may, of course, make ***additional*** findings of fact on open issues within the scope of remand. *See, e.g., Steigleman v. Symetra Life Ins. Co.*, No. 23-4082, 2025 WL 602175, at *1 (9th Cir. Feb. 25, 2025) (citing, *inter alia*, *Hall v. City of Los Angeles*, 697 F.3d 1059, 1067 (9th Cir. 2012)). For the sake of clarity, Plaintiffs attach a set of proposed Supplemental Findings of Fact, with citations to the trial record, specifically addressing the remand issues. *See generally* Plaintiffs' Proposed Supp. Findings of Fact ("PSFF").

---

[3] UBH did not argue on appeal that any of this Court's extensive post-trial findings of fact were clearly erroneous, nor did the Ninth Circuit overturn ***any*** of those factual findings. Accordingly, the factual findings in the Court's post-trial Findings of Fact and Conclusions of Law ("FFCL"), ECF No. 413 (February 28, 2019), and its Further Findings of Fact and Conclusions of Law ("Further FFCL"), ECF No. 469 (August 6, 2020), are binding on the parties and the Court.

PLS.' OPENING BRIEF ON
FIDUCIARY DUTY CLAIMS
CASE NOS. 3:14-CV-02346-JCS, 3:14-CV-05337-JCS

**A.    UBH Developed the Guidelines, In Its Role as a Fiduciary, to Interpret the Plans' GASC Requirement.**

This Court found, and the Ninth Circuit affirmed, that "[e]very class member's health benefit plan includes, as one condition of coverage, a requirement that the requested treatment must be consistent with generally accepted standards of care." FFCL ¶ 53 (citing Trial Ex. 892 (Plaintiffs' summary of plan terms for Claim Sample); Trial Tr. 674:5-675:7 (Duh)). *See also Wit III*, 79 F.4th at 1077 ("The Plans provide that a precondition for coverage is that treatment be consistent with GASC.").[4] For ease of reference, Plaintiffs refer to this uniformly applicable coverage precondition as the plans' "GASC Requirement."

UBH developed and used its Guidelines to standardize its clinical reviewers' interpretation and application of the plans' GASC Requirement. *See, e.g.*, FFCL ¶¶ 39, 197. Thus, "[t]he Guidelines applied across Plans and were not customized based on specific plan terms." *Wit III*, 79 F.4th at 1077; *see also* FFCL ¶¶ 36, 38-39. Level of Care Guidelines ("LOCGs"), specifically, set forth UBH's standard criteria for determining—purportedly in accordance with generally accepted standards of care—the clinically appropriate level of care for a given patient. FFCL ¶ 39 (finding that UBH used its LOCGs to "establish criteria consistent with generally accepted standards for determining the appropriate level of care") (citing, *inter alia*, Tr. 1876:22-25 (UBH admission that "the generally accepted standards of care in terms of level of treatment are defined by UBH in its Level of Care Guidelines.")); Further FFCL ¶¶ 219-223 & 225 (finding that the CDGs incorporated the LOCGs); *Wit III*, 79 F.4th at 1088 ("To the extent the district court concluded that the challenged portions of the Guidelines represented UBH's *implementation* of the GASC requirement, we find no clear error."). For that reason, Mr. Gerard ("Gerry") Niewenhous, who was primarily responsible for UBH's Guidelines from 2003 to mid-2016, conceded at trial that ***both*** the LOCGs and the CDGs were "supposed to reflect generally accepted standards of care." Tr. 297:4-

---

[4] As the Court also found, it makes no difference whether the GASC Requirement was framed as a precondition for coverage or as an exclusion from coverage (or both). FFCL ¶ 53. The fact remains that, under every Plan, UBH had to make a determination about whether otherwise-covered services were consistent with GASC before it could approve coverage. *Id.*

298:24; FFCL ¶ 39. *See also Wit III*, 79 F.4th at 1085 (noting UBH did not challenge on appeal the finding that "the Level of Care Guidelines represented UBH's interpretation of GASC").

As such, it is indisputable that the **only** reason UBH developed its Level of Care Guidelines was to standardize how its reviewers determined whether the services for which coverage was requested, at the requested level of care, satisfied the GASC Requirement. In particular, there was **no** evidence offered at trial that suggested UBH used the LOCGs to implement Plan terms **other** than the GASC Requirement, especially not terms that might vary from plan to plan.[5] Copious contemporaneous evidence proved the contrary. For one thing, as the Court found, the Guidelines themselves assert that they are "'objective,' 'evidence-based' and 'derived from generally accepted standards of behavioral practice.'" FFCL ¶ 39 (citing Guidelines). They **do not** say that they are "plan coverage criteria" or that they are "derived from" or otherwise intended to interpret and apply any terms of the Plans UBH administers **other than** the GASC Requirement.[6]

UBH's claims administration process also made clear that UBH only analyzed whether the GASC Requirement was satisfied for a given claim **after** it determined whether the claim satisfied all **other** Plan terms. As this Court found, the first step in UBH's claims administration process was for a "Care Advocate" to "determine whether there is an administrative (i.e., non-clinical) basis to deny the request, such as a contractual exclusion for a particular form of treatment or a certain condition." FFCL ¶ 48. Those decisions were **not** based on UBH's clinical Guidelines. *Id*. Instead, determination of those other questions had to be completed "prior to" application of the clinical Guidelines. PSFF ¶ 4-7; *see also Wit III*, 79 F.4th at 1077 ("UBH employed two different processes to determine whether a requested service was covered. First, where the requested service was subject to a Plan exclusion, UBH issued an administrative denial. Administrative denials did not

---

[5] And of course, there also was no evidence whatsoever to suggest that UBH used the Guidelines to implement **all** terms of any Plan, let alone all Plans—which would, effectively, mean the Guidelines **replaced** the Plan documents. But as this Court has already found, UBH's Utilization Management Program Description "consistently treated the Guidelines as being distinct from the Plans" and instructed UBH's reviewers to apply **both** the Guidelines **and** the Plans. FFCL ¶ 55.

[6] *See generally generally* Trial Ex. 1 (2011 LOCGs); Trial Ex. 2 (2012 LOCGs); Trial Ex. 3 (2013 LOCGs); Trial Ex. 4 (2014 LOCGs); Trial Ex. 5 (2015 LOCGs); Trial Ex. 6 (Jan. 2016 LOCGs); Trial Ex. 7 (June 2016 LOCGs); Trial Ex. 8 (2017 LOCGs).

involve clinical reviews and are not at issue in this appeal.").[7] ***Only if*** all the other preconditions for coverage were satisfied would UBH then proceed to the last step before approval: clinical review of the coverage request under UBH's clinical guidelines to determine whether the GASC Requirement was satisfied. FFCL ¶¶ 48-49; *Wit III*, 79 F.4th at 1077 ("Second, for those claims not administratively denied, UBH conducted a clinical review. . . . To assist with these clinical coverage determinations, UBH developed internal guidelines used by UBH's clinicians.").

### B.    UBH Had a Strong Financial Interest in Minimizing Benefit Expense.

As this Court previously found, UBH had a strong financial interest in minimizing "benefit expense"—i.e., the cost of paying the benefits due for any covered services that UBH authorizes under a plan. *See, e.g.*, FFCL ¶¶ 174-189, 202.

UBH administers fully-insured and self-funded plans. When UBH approves services under fully-insured plans, UBH itself pays the resulting benefit expenses out of the fees (i.e., the premiums) it receives from the plan sponsors. FFCL ¶ 52 (citing Trial Ex. 711-0003 to -0004 (Stipulation Concerning Per-Member Per-Month Rates) ¶¶ M, N). As a result, every dollar of benefit expense UBH authorizes under a fully-insured plan directly "reduces UBH's profit." FFCL ¶ 176 (citing Trial Tr. 840:6-14 (Dehlin)).

As for self-funded plans, UBH charges the plans fees for its administrative services, and uses plan assets, rather than its own assets, to pay benefits. FFCL ¶ 52 (citing Trial Ex. 711-0003 to -0004) (Stipulation Concerning Per-Member-Per-Month Rates) ¶¶ M, N). UBH nevertheless "has an incentive to keep benefit costs down for customers who purchase such plans." FFCL ¶ 176 (citing Trial Tr. 803:12-21 (Triana)).[8] Additionally, as this Court previously found:

---

[7] To be sure, the Guideline criteria ***mention*** a handful of administrative coverage prerequisites. *See, e.g.*, Trial Ex. 1-0005 ("The member is eligible for benefits."); Trial Ex. 5-0008 ("The member's condition and proposed services are covered by the benefit plan"). But UBH's UMPDs make clear that UBH personnel did not use the ***Guidelines*** to make those administrative determinations, *see* PSFF ¶¶ 4-7, and there was absolutely no trial evidence indicating otherwise.

[8] As Triana testified, because the Plans—not the plan participants and beneficiaries—are UBH's "customers," it was "important" for UBH to be able to explain to the Plans the "cost implications" of any Guideline changes UBH might consider making. Trial Tr. 803:12-21 (Triana); FFCL ¶ 176.

FFCL ¶ 175 (citing Trial Ex. 255 (Class List) and Trial Ex. 711-0014 (stipulation regarding per-member-per-month rates)). UBH, therefore, had powerful "financial incentives to keep benefit expense down." FFCL ¶ 177; *see also id.* ¶ 179 ("While the incentives related to fully insured and self-funded plans are not identical, with respect to both types of plan UBH [had] a financial interest in keeping benefit expense down.").

Because of how important its "management" of benefit expense was to its financial goals, "UBH regularly prepare[d] detailed financial forecasts that include[d] projections of expected benefit expense and benefit expense targets it want[ed] to achieve." FFCL ¶ 177 (citing Trial Ex. 1660 (Brock Dep.) at 216:1-219-:9). The company "also track[ed] its performance in relation to those benefit expense forecasts and targets, noting monthly trends and taking action to address benefit expenses that exceed[ed] its projections." *Id.* (citing Trial Ex. 745; Trial Ex. 783-0009). One metric UBH tracked with particular care was "Average Length of Stay," or "ALOS," because "[a]s ALOS increases, the cost of associated benefits increases." FFCL ¶ 178 (citing Trial Tr. 761:12-21 (Triana). For that reason, UBH not only carefully monitored ALOS each month, it also "set[] ALOS targets for each level of care." *Id.* (citing Trial Ex. 783-0031 to -0038; Trial Ex. 745; Trial Tr. 759:15-760:17 (Triana); Trial Ex. 720:0015).

### C.     UBH Purposely Designed its Guidelines to be a "Utilization Management" Tool for Minimizing Benefit Expense.

As this Court held, "UBH's Guidelines have a direct impact on benefit expense and therefore [were] closely tied to the financial incentives discussed above." FFCL ¶ 179. For that reason—for its own business purposes and entirely untethered to the written terms of any Plan—UBH adopted an "Acute Care Utilization Management Model" as the foundation for its clinical Guidelines. FFCL ¶ 84 (citing Trial Tr. 303:4-305:3 (Niewenhous) (testifying about Trial Ex. 512-0007)). Indeed, "internal UBH communications" admitted at trial made it "crystal clear that the

*primary focus* of the Guideline development process . . . was the implementation of a 'utilization management' model that keeps benefit expenses down by placing a heavy emphasis on crisis stabilization and an insufficient emphasis on the effective treatment of co-occurring and chronic conditions." FFCL ¶ 33 (emphasis added). As Gerard Niewenhous (the Guidelines' primary drafter throughout most of the Class Period) explained in a 2016 email, UBH's "acute care" model was premised on a "[p]resumption" that "services are acute," which necessarily curtailed coverage of "services for severely and persistently ill members that are intended to endure." FFCL ¶ 84 (citing Trial Ex. 522-0002). In other words, it was by *design* that UBH's Guidelines placed "excessive emphasis on addressing acute symptoms and stabilizing crises while ignoring the effective treatment of members' underlying conditions." FFCL ¶ 82 (footnote omitted); *see also id*. ¶¶ 83-106.

As the Court further found, "the record is replete with evidence that UBH's Guidelines were viewed as an important tool for meeting utilization management targets" and for "keeping 'benex' down." FFCL ¶ 182. UBH's response to the passage of the Mental Health Parity and Addiction Equity Act ("MHPAEA") and its implementing regulations demonstrates this point. MHPAEA prohibits ERISA plans from imposing discriminatory financial requirements and treatment limitations on behavioral health coverage. 29 U.S.C. § 1185a(a)(3)(A)(ii). UBH realized that these new prohibitions would cause benefit expense to rise, because plans—including the fully-insured plans UBH offered—would be required to cover behavioral health treatments that were previously excluded under discriminatory exclusions and limitations. PSFF ¶¶ 10-11. Rather than seeking to comply with the law, as a faithful fiduciary would have done, UBH instead sought to circumvent it, by developing "mitigation strategies" to counteract the increases in benefit expense UBH expected to result from MHPAEA compliance. *Id*. ¶ 12. In other words, UBH sought to find other ways to limit coverage to offset the amount that expenses would rise if UBH were forced to comply with MHPAEA. Among the strategies UBH put into action was to "use . . . concurrent review" (i.e., clinical review pursuant to the Guidelines) to curtail the duration of treatment and thereby "mitigate[e]" the impact of MHPAEA's "[r]emoval of day and visit limits" on behavioral health care. Trial Ex. 768-0009; PSFF ¶ 13. Similarly, to "mitigate" the fact that, under MHPAEA, plans

could no longer require prior authorization for many behavioral health services, UBH decided to develop "robust" CDGs—incorporating the LOCGs' restrictive level of care criteria—to use for "plans [without] medical necessity requirements" and to train reviewers on "use of the CDGs to help control costs and appropriately issue [denials] when required." Trial Ex. 768-0011; PSFF ¶ 14. Even years after the statute and implementing regulations first went into effect, UBH continued to cite the need for these "mitigation strategies" to keep a lid on benefit expense—i.e., by denying coverage for services that otherwise would be covered under the MPHAEA-compliant plan terms, thereby avoiding close to $30 million in benefit expense annually. Trial Ex. 768-0011; PSFF ¶¶ 15-16; *see also* FFCL ¶ 182 (finding UBH viewed its Guidelines "as an important tool for," among other things, "'mitigating' the impact of the 2008 Parity Act").

### D. UBH Ensured that its Financial Interests Influenced the Development of its Clinical Guidelines.

UBH's "financial incentives" did, "in fact, infect[] the Guideline development process." FFCL ¶ 180; *see also id.* ¶ 174 ("[T]he process UBH use[d] to develop its Guidelines" was "fundamentally flawed because it [was] tainted by UBH's financial interests."). "[I]nstead of insulating its Guideline developers from these financial pressures," UBH "placed representatives of its Finance and Affordability Departments in key roles in the Guidelines development process throughout the class period." *Id.* ¶ 180.[9] In addition, "UBH provided detailed relevant financial briefings to other members of those committees who were ***not*** members of Finance or Affordability," including monthly updates on UBH's "performance related to benefit expense

---

[9] As the Court found, "Peter Brock, the head of UBH's Affordability Department, and Fred Motz, from UBH's Finance Department, were both members of the BPAC, the committee responsible for approving the LOCGs and CDGs," "[a]nother Affordability representative, Michael Powell, was also on the BPAC through at least 2015," and "Brock's successor as head of the Affordability Department, Nisha Patterson, became a member of the Utilization Management Committee ('UMC'), which replaced the BPAC in 2016." FFCL ¶ 180 (citing Trial Tr. 703:3-16 (Triana); Trial Ex. 482-0002 (BPAC minutes dated January 20, 2015 showing members); Trial Ex. 482-0002; Trial Ex. 552-0002).

targets." *Id*. ¶ 181.[10] As a result, "the committee members were intimately familiar[] with the financial implications of their decisions in creating and revising the Guidelines." *Id*. ¶ 182.[11]

Lest the Guideline drafters lose sight of their "primary focus" on minimizing benefit expense, *id*. at ¶ 33, UBH management was quick to remind them what was most important. As the Court found, three examples of decisions UBH made during the Class Period demonstrated "that its financial self-interest was a critical consideration in deciding what criteria would be used to make coverage decisions and when Guidelines would be revised." *Id*. ¶ 184.

In one instance, "UBH's CEO, Martha Temple, overruled the recommendation" of UBH's Utilization Management Committee to broaden coverage of Applied Behavioral Analysis to treat autism, "cautioning UBH staff, '[w]e need to be more mindful of the business implications of guideline change recommendations.'" *Id*. ¶ 185. In another case, UBH reluctantly had to admit that Transcranial Magnetic Stimulation, which had been approved by the FDA, was no longer "experimental and investigational," but tried to avoid the increased benefit expense for that treatment by approving it only for self-funded plans, and not for fully-insured plans. After UBH's legal department vetoed that blatantly self-serving move and it was time to draft clinical Guidelines for TMS, Niewenhous's boss instructed him that UBH would "need to manage [the TMS benefit] very tightly." *Id*. ¶ 186 (quoting Trial Ex. 758-0003).

---

[10] For example, the Court found that "Dr. Triana, Chair of the BPAC and then the UMC, and committee member Dr. Martorana, were both briefed in detail on a monthly basis on UBH's financial metrics and its performance related to benefit expense targets." FFCL ¶ 181 (citing Trial Ex. 783 (example of monthly business review sent to Drs. Triana and Martorana); Trial Ex. 720 (ALOS report sent to Dr. Triana); Trial Ex. 745 (email discussion of "June close" sent to Dr. Triana); Trial Tr. 755:5-17 (Triana); Tr. 1122:20-1123:9 (Martorana)). The same "reports were also sent to committee members from Finance and Affordability." *Id*. (citing Trial Ex. 783 (December 2014 email also sent to, *inter alia*, BPAC members Margaret Brennecke, Peter Brock, James Davis, and Nisha Patterson); Trial Ex. 482 (January 2015 minutes showing BPAC members); Trial Ex. 745 (July 2013 email also sent to, *inter alia*, BPAC members Michael Powell, Peter Brock, Brett Hart, James Davis, and future BPAC members Patterson and Motz); Trial Ex. 368 (March 2013 minutes showing BPAC members)).

[11] For that reason, the Court found that the post-hoc testimony of UBH's witnesses seeking to downplay these influences did "not show that financial considerations did not play a role in the development of UBH's Guidelines." FFCL ¶ 182.

The "most telling example of the emphasis UBH placed on financial considerations in its decision making with respect to the Guidelines" was "UBH's decision ***not*** to adopt the ASAM Criteria for making substance use disorder coverage determinations." *Id*. ¶ 187 (emphasis added). As the Court found, UBH repeatedly "considered adopting the ASAM Criteria as its standard clinical coverage criteria for substance use disorders in lieu of the LOCGs and CDGs." *Id*. ¶ 188 (citing evidence). Each time, the "SUDs Team"—the psychiatrists who specialized in addiction medicine and served as UBH's internal subject-matter experts on substance use disorders, i.e., the UBH employees most qualified to make such a decision—recommended adopting the ASAM Criteria. *Id*. (citing evidence). Yet "[d]espite the clear consensus among UBH's addiction specialists that the ASAM Criteria were preferable to UBH's own Guidelines from a clinical standpoint, UBH consistently refused to replace its standard Guidelines with ASAM Criteria without first obtaining approval from the Finance Department." *Id*. ¶ 189 (citing evidence). But Finance would not give the "green light" for the change "because 'a meaningful and valid BenEx modeling of the impact of a move to ASAM [C]riteria . . . [was] not possible due to the paucity of robust and relevant data.'" *Id*. (quoting Trial Ex. 548-0034) (original emphasis); *see also id*. ¶ 202 (finding "UBH's refusal to adopt the ASAM Criteria was not based on any clinical justification" and that "[t]he ***only*** reason UBH declined to adopt the ASAM Criteria was that its Finance Department wouldn't sign off on the change.") (original emphasis). In short, "UBH's Finance Department had veto power with respect to the Guidelines and used it to prohibit even a change in the Guidelines that all of its clinicians had recommended." *Id*. ¶ 202.

**E.      UBH Deliberately Made its Guidelines More Restrictive Than GASC.**

**1.      UBH Knew What the Generally Accepted Standards of Care Were.**

UBH fully understood what generally accepted standards of care required for matching a patient to the appropriate level of care. Indeed, all of the experts who testified at trial—including four of UBH's own Medical Directors—agreed that "the following standards are generally accepted in the field of mental health and substance use disorder treatment and placement," FFCL ¶ 70:

- "[E]ffective treatment requires treatment of the individual's underlying condition and is not limited to alleviation of the individual's current symptoms." FFCL § II.H.3.a., ¶ 71;

- "[E]ffective treatment requires treatment of co-occuring behavioral health disorders and/or medical conditions in a coordinated manner that considers the interactions of the disorders and conditions and their implications for determining the appropriate level of care." FFCL § II.H.3.b., ¶ 72;

- "[P]atients should receive treatment for mental health and substance use disorders at the least intensive and restrictive level of care that is safe and effective." FFCL § II.H.3.c., ¶ 73;

- "[W]hen there is ambiguity as to the appropriate level of care, the practitioner should err on the side of caution by placing the patient in a higher level of care." FFCL § II.H.3.d., ¶ 74;

- "[E]ffective treatment of mental health and substance use disorders includes services needed to maintain functioning or prevent deterioration." FFCL § II.H.3.e., ¶ 75;

- "[T]he appropriate duration of treatment for behavioral health disorders is based on the individual needs of the patient; there is no specific limit on the duration of such treatment." FFCL § II.H.3.f., ¶ 76;

- "[T]he unique needs of children and adolescents must be taken into account when making level of care decisions involving their treatment for mental health or substance use disorders." FFCL § II.H.3.g., ¶¶ 77-78; and

- "[T]he determination of the appropriate level of care for patients with mental health and/or substance use disorders should be made on the basis of a multidimensional assessment that takes into account a wide variety of information about the patient." FFCL § II.H.3.h., ¶ 79-81.

In addition, both sides' testifying experts agreed on a list of resources that accurately reflect those generally accepted standards, including the ASAM Criteria, LOCUS, CALOCUS, CASII, and portions of the CMS Manual. FFCL ¶¶ 57-61. The Guidelines even cited those very resources as part of their evidence base. PSFF ¶ 17. Yet, as the Court found, the Guidelines repeatedly misquote, mischaracterize, and misstate the standards those sources articulate, distorting them into overly restrictive acute-based Guideline criteria that were blatantly inconsistent with GASC. *See* FFCL ¶¶ 82-156; *see also* § I.E.2-3, *infra*.

### 2.    UBH Ignored GASC and Manipulated its Own Evidence Base to Make its Guidelines Much more Restrictive.

How could a behavioral health benefit administrator, with clinical staff that was thoroughly familiar with generally accepted standards of care, come up with criteria that were so much more restrictive than GASC? Easily, it turns out: by not even trying to accurately reflect GASC.

To start with, because the Guidelines were developed as part of UBH's effort to create an "acute care" model, it is not at all surprising that those Guidelines were much more restrictive and acute-focused than GASC. This also explains why UBH chose to give unlicensed "[i]ndividuals with degrees in social work" the primary responsibility for researching and drafting its Guidelines, FFCL ¶¶ 84, 169—even the criteria for levels of care (like Residential Treatment) for which only a psychiatrist was authorized to issue a denial, PSFF ¶ 18, and even though UBH had numerous psychiatrists and Ph.D.-level psychologists on its staff. PSFF ¶ 19-21.[12]

UBH staff sought input from various "stakeholders" on whether the Guidelines were "easy to use" and whether "criteria should be added or deleted," but, critically, did not ask for input on whether the Guidelines were actually consistent with GASC at all. FFCL ¶ 171. When UBH nevertheless received feedback pointing out ways the Guidelines were inconsistent with GASC, the drafting team deliberately ignored and buried such criticism. PSFF ¶¶ 23-24. After Niewenhous and his team revised the Guidelines each year, the Guidelines were then submitted to the committees discussed above, which were strongly influenced by UBH's Finance and Affordability departments. *See* § I.D, *supra*. In other words, *no* part of UBH's Guideline development process was designed to ensure that the Guidelines would accurately reflect GASC.

---

[12] UBH's use of unlicensed social workers who were not qualified to provide the treatment that was being addressed in the Guidelines is striking, given that the ERISA claims procedure regulations stress the importance of applying proper judgment by qualified personnel. For example, when a denial is issued that "is based on a medical necessity . . . exclusion or limit," which applies to all Class members here, an ERISA fiduciary must provide "an explanation of the scientific or clinical judgment for the determination." 29 CFR § 2560.503-1(g)(v)(B). Moreover, on appeal of such a denial, the ERISA fiduciary must "consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment." *Id.* at § 2560.503-1(h)(3)(iii). Here, UBH did not even use qualified personnel to research and draft its Guidelines, demonstrating an intent to avoid application of proper standards to ensure it could develop criteria that would save money be being more restrictive than GASC.

To the contrary, motivated by UBH's financial interests, the Guidelines' drafters deliberately manipulated standards "borrowed" from GASC sources, like the CMS Manual, "to provide for more limited coverage" than GASC-compliant standards would allow for otherwise covered services. FFCL ¶ 118. For example, despite "borrowing bits and pieces of the standard set forth" in the CMS Manual for its "Improvement Criteria," UBH "modified the language" in ways that "focused on acuity and precluded coverage of treatment services aimed at maintenance." FFCL ¶ 118; *see also id.* ¶¶ 119-123 (explaining the modifications). Similarly, UBH knew full well that the CMS Manual's "specific, narrow definition" of "custodial care" was consistent with GASC, FFCL ¶ 133, but UBH broadened the definition so that "even 'skilled services' may be excluded from coverage on the basis that they are custodial,'" in clear violation of GASC. *Id.* ¶ 134; *see also id.* ¶¶ 136-137. And even though UBH "borrow[ed] the concept of 'active care'" from CMS, it "expand[ed] the concept beyond the definition used in the CMS Manual by including additional requirements that are focused on pushing patients to lower levels of care and terminating coverage as soon as the patient's acute symptoms have been addressed, regardless whether treatment at a lower level of care is likely to be effective." FFCL ¶¶ 134 *see also id.* ¶¶ 138-143. "In sum, UBH's concepts of custodial care, active treatment, and improvement are intertwined" in the Guidelines "to preclude coverage of services that would not be considered custodial under generally accepted standards of care." FFCL ¶ 145.

Perhaps the most glaring example of UBH's deliberate distortion of GASC standards is the fact that, even though UBH's Guidelines consistently cite and purport to rely on the ASAM Criteria, PSFF ¶ 17, the Guidelines contain **no criteria** that would allow for coverage of the lower-intensity, clinically-managed levels of residential treatment, which the ASAM Criteria define as ASAM Levels 3.1, 3.3, and 3.5. FFCL ¶¶ 64-66, 152-54. Instead, UBH intentionally designed its criteria to require **anyone** seeking coverage for residential treatment of a substance use disorder to meet criteria for the **highest**-intensity level of residential care (ASAM Level 3.7). *See, e.g.*, FFCL ¶ 153. In other words, **UBH's Guidelines just eliminated three of four generally accepted levels of residential treatment**. UBH's disregard for its own purported "evidence base" was on full display when Jerry Shulman, whom UBH hired as a consultant to "compare UBH's Guidelines with [the]

ASAM Criteria and propose revisions to bring them into line with ASAM," *id*. ¶ 151, asked about the Guidelines' omission of any criteria for ASAM Levels 3.1, 3.3, and 3.5. *Id.* ¶ 152. Rather than revising the Guidelines to correct that glaring omission, UBH lied to Mr. Schulman, telling him that the plans' written terms did not provide coverage for lower-intensity residential treatment. *Id.* The Plans, however, contain no such limitation. *See*, *e.g.*, FFCL ¶¶ 155-56.[13]

### 3. The Guidelines UBH Created Were Substantially More Restrictive than GASC, Thereby Narrowing the Scope of Coverage Available Under the Plans.

Having set out deliberately to create clinical Guidelines that protected its financial interest in minimizing benefit expense by embracing its "Acute Care UM Model," UBH was wildly successful: the resulting Guidelines "were riddled with requirements that provided for narrower coverage than is consistent with generally accepted standards of care." FFCL ¶ 183; *see also Wit III*, 79 F.4th at 1080 (adopting finding). As the Court's detailed factual findings established, "in every version of the Guidelines in the class period, and at every level of care that is at issue in this case," the Guidelines placed "excessive emphasis on addressing acute symptoms and stabilizing crises while ignoring the effective treatment of members' underlying conditions." FFCL ¶ 82; *see also id.* ¶¶ 83-106. The Court also found that, throughout the Class Period, the Guidelines:

- Failed to "address the effective treatment of co-occurring conditions," FFCL § II.H.4.b., ¶¶ 107-109;

- Failed to "err on the side of caution in favor of higher levels of care when there is ambiguity" and "push[ed] patients to lower levels of care where such a transition is safe even if the lower level of care is likely to be less effective," FFCL § II.H.4.c., ¶¶ 110-116;

- "[P]reclud[ed] coverage for treatment to maintain level of function," FFCL § II.H.4.d., ¶¶ 117-124;

- "[P]reclud[ed] coverage based on lack of motivation," FFCL § II.H.4.e., ¶¶ 125-129;

- Failed "to address the unique needs of children and adolescents," FFCL § II.H.4.f, ¶¶ 130-132;

---

[13] As discussed below, UBH told the opposite lie to Connecticut regulators, representing that its Guidelines *did* contain criteria for ASAM Levels 3.1, 3.3, and 3.5, even though it knew they did not. FFCL ¶ 153.

- Used "an overly broad definition of 'custodial care,'" "coupled with an overly narrow definition of 'active' treatment and 'improvement,'" FFCL § II.H.4.g., ¶¶ 133-148;

- "[I]nstruct[ed] clinicians to collect a wide array of information under their Best Practices provisions but [did] not allow for adequate consideration of this information in the rules and requirements that govern coverage determinations," FFCL ¶ 149; and

- Among a "multitude" of deviations from the ASAM Criteria, the Guidelines "simply [did] not provide criteria for coverage of services" at ASAM Levels 3.1, 3.3., and 3.5. FFCL ¶ 152; *see also id.* ¶ 150-156.

*See also Wit III*, 79 F.4th at 1085 (noting UBH did not challenge on appeal this Court's "detailed findings illustrating that many provisions of the Level of Care Guidelines were more restrictive than GASC."); *id.* at 1088 n.6 (rejecting UBH's argument that "it did not abuse its discretion because substantial evidence supports the challenged portions of UBH's Guidelines" and holding "that it was not error for the district court to rule that UBH abused its discretion because the challenged portions of the Guidelines did not *accurately* reflect GASC.").

Just as UBH intended, the net effect of all these deviations from generally accepted standards of care was to dramatically narrow the scope of coverage otherwise available under the Plans, so as to save money for UBH and its clients, notwithstanding the adverse impact on its insureds. *See*, *e.g.*, FFCL ¶¶ 82, 89, 106, 117, 124, 154, 183.

### F.   Even Though UBH Knew its Guidelines Were Excessively Restrictive, It Repeatedly Misrepresented them as Being Consistent with GASC.

UBH knew exactly what it was doing when it developed Guidelines to use as a tool to minimize benefit expense. But it did not want plan members, sponsors, regulators, or providers to know that was what the Guidelines were really for. ***So, UBH lied***.

UBH lied in its outward-facing documents, like the Guidelines themselves, consistently misrepresenting the Guidelines as "'objective,' 'evidence based,' and 'derived from generally accepted standards of behavioral health practice.'" FFCL ¶ 39 (quoting selected LOCGs). As noted above, UBH also lied to its own consultant about whether its Guidelines needed to include criteria for ASAM Levels 3.1, 3.3, and 3.5. FFCL ¶ 152. Then UBH turned around and lied to others,

including Connecticut regulators, falsely asserting that the Guidelines *did* contain criteria for those levels, to evade Connecticut's state-law mandate requiring payor to use criteria "consistent with" the ASAM Criteria. FFCL ¶¶ 153, 162. As a result, at least until Plaintiffs brought this case, UBH got away with violating Connecticut law (among others) by using Guidelines that clearly were *not* consistent with the ASAM Criteria.

UBH's witnesses even lied to this Court about whether the Guidelines are consistent with GASC, leading the Court to reject post-hoc testimony from *each* of UBH's witnesses as not credible and contrary to the evidence. *See*, *e.g.*, FFCL ¶¶ 25-35 (overall credibility findings); *id.* ¶ 37 ("testimony of some UBH witnesses that Peer Reviewers can deviate from the Guidelines based on their clinical judgment was not credible"); *id.* ¶ 84 (testimony by UBH witnesses that the word "acute" includes "chronic" was not credible); id. ¶ 85 (Martorana's "testimony that 'presenting problems' includes the 'totality' of the member's condition, including chronic and co-morbid conditions" was not credible); *id.* ¶¶ 92-94 (rejecting as not credible the testimony of UBH witnesses Bonfield, Martorana, Allchin, and Robinson-Beale suggesting that the "why now" concept in UBH's Guidelines "encompasses not only 'acute changes' but also the patient's underlying chronic condition."); *id.* ¶ 104 (rejecting as not credible Allchin's testimony that "coverage at a higher level of care will not be discontinued unless the member satisfies the admissions criteria at a lower level of care."); *id.* ¶ 108 (rejecting as not credible the testimony of UBH witnesses Martorana, Simpatico, and Allchin that the Guidelines provide for effective treatment of co-occurring conditions because "the term 'current condition' encompasses co-occurring conditions."); *id.* ¶ 113 (rejecting as not credible Martorana's testimony that "a patient would not be discharged under the Guidelines unless treatment at the lower level was both safe *and* effective."); *id.* ¶ 123 (rejecting as not credible Martorana's testimony that "the Improvement Criteria set forth two separate definitions of improvement"); *id.* ¶ 153 (Robinson-Beale's testimony that the Guidelines covered ASAM Levels 3.1, 3.3. and 3.5 "was not credible"); *id.* ¶ 167 (testimony by Neiwenhous, Martorana, and Allchin "that UBH applied the TDI Criteria" was "not credible").

1    In short, "[t]o conceal its misconduct, UBH lied to state regulators and UBH executives

2    with responsibility for drafting and implementing the guidelines and deliberately attempted to

3    mislead the Court at trial in this matter." Remedies Order, ECF No. 491 (Nov. 3, 2020) at 1. It is

4    hard to imagine a more compelling example of breach of fiduciary duty under ERISA.

5    **II.    Exhaustion**

6    Although it is common ground that statutory ERISA claims are not subject to contractual

7    exhaustion provisions in a plan, UBH argued on appeal that Plaintiffs' breach of fiduciary duty

8    claim was a "disguised benefit claim" (i.e., not a real statutory claim) and, as such, it ***was*** subject

9    to the Plans' exhaustion requirements. *Id.*; *see also* App. ECF No. 69 at 30. Because this Court had

10   not addressed the latter issue, the Ninth Circuit remanded for this Court "to answer the threshold

11   question of whether Plaintiffs' fiduciary duty claim is subject to the exhaustion requirement." *Wit*

12   *III*, 79 F.4th at 1090. If so, the Circuit further directed the Court to "determine if that requirement

13   was satisfied or otherwise excused." *Id.* at 1089.[14]

14   <center>**ARGUMENT**</center>

15   **I.    UBH's Breach of its Fiduciary Duties in Developing the Guidelines was**

16   **Distinct from How it Applied the Guidelines to Make Particular**
     **Coverage Determinations.**

17   ERISA imposes on fiduciaries like UBH "strict standards" of conduct derived from the

18   common law of trusts, including "most prominently, a standard of loyalty and a standard of care."

19   *Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 570 (1985).

20   Specifically, the statute provides, in relevant part, that:

21

22

23   ────────────────

     [14] The Court found—and UBH did not dispute—that all named Plaintiffs exhausted their

24   administrative remedies. FFCL ¶ 190; *see also id.* ¶¶ 3-6, 8-12 (citing named Plaintiffs' appeal
     denial letters stating "All internal appeals through UBH have been exhausted"). Moreover,

25   evidence at trial established that UBH applied the Guidelines not only when making the initial
     coverage determinations but also to decide appeals. *Id.* ¶ 191 (citing Utilization Management

26   Program Descriptions that required the appeal reviewer to base their decision on the Guidelines and
     the notification of appeal decision to cite the Guidelines). Because UBH required the application

27   of the Guidelines to the review of appeals, the Court found that exhausting administrative remedies
     would be futile. *Id.*

28

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; . . . [and]

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with [ERISA].

29 U.S.C. § 1104(a)(1). These ERISA fiduciary duties are "the highest known to the law." *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir.1996) (citations omitted).

As noted above, this Court previously ruled that UBH breached all three of these fiduciary duties. FFCL ¶ 203. Those rulings remain valid and are not undermined by the Ninth Circuit's reasoning in *Wit III*.

### A.    UBH Breached its Fiduciary Duty of Loyalty.

Under ERISA, UBH's "core obligation" was to "'discharge [its] duties with respect to a plan solely in the interest of the participants and beneficiaries.'" *Peralta v. Hisp. Bus., Inc.*, 419 F.3d 1064, 1071 (9th Cir. 2005) (quoting 29 U.S.C. § 1104(a)(1)). The duty of loyalty required UBH to act with "an eye single toward [the] beneficiaries' interests." *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000) (quotation omitted). *See also*, *e.g.*, George G. Bogert, et al., *The Law of Trusts and Trustees* § 543 (3d ed. Jul. 2024 update) ("Perhaps the most fundamental duty of a trustee is the trustee's duty of loyalty to the beneficiaries, . . . sometimes stated as the rule of undivided loyalty. The trustee must administer the trust with complete loyalty to the interests of the beneficiary, without consideration of the personal interests of the trustee or the interests of third persons.").

Not only did UBH fail to meet ERISA's exacting loyalty standard, but it did exactly the opposite, acting with an "eye single" toward its *own* interest in creating acute-focused Guidelines that would serve as a tool for minimizing benefit expense. *See* Bkgnd. §§ I.B-E, *supra*. Indeed, UBH deliberately acted to the plan members' *detriment* by designing its Guidelines to dramatically narrow the scope of coverage otherwise available under the Plans, *see* Bkgnd. §§ I.E.3, *supra*,

rather than for the "exclusive purpose" of "providing benefits" to the plan members, as ERISA requires. 29 U.S.C. § 1104(a)(1)(A)(i). As the Court previously found, "the evidence at trial established that the emphasis on cost-cutting that was embedded in UBH's Guideline development process actually tainted the process, causing UBH to make decisions about Guidelines based as much or more on its own bottom line as on the interests of plan members." FFCL ¶ 202; *see also id*. ¶ 33 (finding the evidence made it "crystal clear that the primary focus of the Guideline development process" was "the implementation of a 'utilization management' model that keeps benefit expenses down"). UBH's relentless prioritization of its own financial interests over the interests of the plan participants and beneficiaries breached its fiduciary duty of loyalty.

UBH further violated its duty of loyalty by misrepresenting its Guidelines as though they faithfully reflected GASC to hide its deliberate narrowing of the scope of coverage. *See* Bkgnd. § I.F. The duty of loyalty requires honesty: a fiduciary must "deal fairly" with the beneficiaries and "disclose all relevant facts." Bogert, The Law of Trusts and Trustees § 543; *see also id*. ("Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior.") (quotation marks omitted). As the Supreme Court has held, "[t]o participate knowingly and significantly in deceiving a plan's beneficiaries in order to save the employer money at the beneficiaries' expense is not to act 'solely in the interest of the participants and beneficiaries.'" *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996). Yet that is precisely what UBH did here.

**B.     UBH Breached its Fiduciary Duty of Care.**

ERISA also requires fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). Application of that standard is necessarily "context specific." *Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022).

Here, the "enterprise" in question was UBH's development of the clinical criteria it would use to determine if the services for which coverage was requested, at the requested level of care, were consistent with GASC. *See* Bkgnd. § I.A, *supra*; *see also*, *e.g.*, Trial Tr. at 1876:22-25 (UBH

admission that it used its LOCGs, at least ostensibly, to "define[]" the "generally accepted standards of care in terms of level of treatment."). UBH knew exactly what the generally accepted standards for such determinations were—it even cited resources accurately reflecting those standards as the "evidence base" for its own Guidelines. *See* Bkgnd. § I.E.1, *supra*. Yet, rather than simply using any of those readily-available resources, UBH came up with its own set of criteria that—according to the trial testimony of UBH's ***own retained expert***—no "practitioner[s] worth their salt" would use to make clinical judgments consistent with generally accepted standards of care. Trial Tr. (Simpatico) 1241:15-1243:1.

UBH did so by handing off development of its clinical criteria to unqualified personnel who alternately ignored and manipulated the evidence base on which they purported to rely; giving non-clinical staff in its Finance Department veto power over the substance of the clinical Guidelines; designing a process for soliciting input on its draft Guidelines that would ensure reviewers did not assess whether the Guidelines were actually consistent with generally accepted standards; ignoring comments from reviewers who nevertheless identified substantive problems with the Guideline criteria; ignoring the substantive concerns raised by its own paid consultant about its substance-use disorder criteria; and rejecting the recommendations of its own internal subject-matter experts who sought to adopt the generally-accepted ASAM Criteria because they were clinically superior to UBH's internally-developed criteria. *See* Bkgnd. § I.D, I.E.2, *supra*.

Consider, by contrast, how the ASAM Criteria were developed. *See generally* PSFF ¶¶ 25-33. To start with, the criteria were created by the American Society of Addiction Medicine ("ASAM"), which is "the professional society that represents addiction medicine for the United States." Trial Tr. (Fishman) at 65:3-15. Made up of 3,000 to 4,000 "addiction medicine practitioners," primarily physicians, ASAM "advocates for patients. . . works on policy matters. . . works on treatment matters," and "establish[es] the state-of-the-art consensus for how to treat persons with substance use disorder." *Id*. at 65:8-21. Dr. Marc Fishman, one of the editors of the second and third editions, explained that the ASAM Criteria developed over the course of "two or three decades." *Id*. at 65:24-66:2; 67:2-9. Early editions of the criteria sought to "coalesce" the "existing body of work" that articulated GASC into a single set of "Patient Placement Criteria." *Id*.

at 67:20-25. In the late 1990s, ASAM began work on a revised second edition, which was finally published in 2001. *Id*. at 67:2-5; *see also* Trial Ex. 642-0380. Those revised criteria were drafted by a large team of addiction medicine specialists, including six editors, a 10-person Steering Committee, and dozens of contributors organized as "work groups" focused on discrete subject areas. *See*, e.g., Trial Ex. 642-0006, -0380-0388. After the work groups developed "first drafts," the "draft material was subjected to an exhaustive field review," and the Steering Committee incorporated the field reviewers' "comments and suggestions" into the draft. Trial Ex. 642-380. The final draft was then "submitted to review by a group of experts from the field and the leadership" of ASAM. *Id*. As Dr. Fishman explained at trial, the process of developing the revised criteria included:

> gathering stakeholders, getting input from a broad variety of consensus-developing practitioners, payors, policymakers, researchers, trying to bring that material together, drafting a variety of materials, reviewing that back and forth with drafts over hundreds or thousands of hours of meetings and conference calls. Then, for each edition, putting that out to field review to an even broader group of stakeholders to get feedback about did it meet certain criteria for acceptability, for validity.

Trial Tr. (Fishman) at 68:2-11. The third edition of the ASAM Criteria was developed through a similarly exhaustive process, eventually being published more than a decade later, in 2013. *See*, *e.g.*, Trial Ex. 662-0009-10, -0012, 0476-0485. Furthermore, a separate, "large body of research" has developed "that empirically validates the ASAM [C]riteria." Trial Tr. (Fishman) at 68:12-13; *see also id*. at 73:8-75:16.

The evidence clearly demonstrated that UBH's internal Guideline development process bore no resemblance to the kind of careful, skilled, diligent approach a prudent fiduciary would pursue to create clinical criteria to implement GASC.

## C. UBH Breached its Fiduciary Duty to Comply with Plan Terms.

ERISA also demanded that UBH carry out its responsibilities with respect to Plan administration "in accordance with the documents and instruments governing" the Plans. 29 U.S.C. § 1104(a)(1)(D). As this Court previously held, UBH created its Guidelines to standardize its interpretation and application of the Plans' universal GASC Requirement, *see* Bkgnd. § I.A, but in

1  carrying out that responsibility, UBH breached "its duty to comply with plan terms by adopting

2  Guidelines that are unreasonable and do not reflect generally accepted standards of care." FFCL

3  ¶ 203. The Ninth Circuit affirmed these rulings, holding that it was not error for this Court to find

4  "that the challenged portions of the Guidelines represented UBH's *implementation* of the GASC

5  requirement" and that "it was not error for the district court to rule that UBH abused its discretion

6  because the challenged portions of the Guidelines did not *accurately* reflect GASC." *Wit III*, 79

7  F.4th at 1088 & n.6 (emphasis in original).

8
9
> **D.  These Breaches of Fiduciary Duty Do Not Depend on Any Misunderstanding that the Plans Covered *All* Treatment that was Consistent with GASC.**

10  This Court should make clear that its breach of fiduciary duty rulings do not depend, in any

11  way, on any misconception that the Class members' Plans "require coverage for all care consistent

12  with GASC," which is the sole question left by the Ninth Circuit with regard to this Court's ruling

13  on the merits of the breach of fiduciary duty claim. *Wit III*, 79 F.4th at 1088. To be crystal clear: as

14  both this Court and the Ninth Circuit have acknowledged, Plaintiffs ***do not claim***, and have never

15  claimed, that the Plans require coverage of all treatments that are consistent with GASC. *See*, *e.g.*,

16  FFCL ¶ 53; *Wit III*, 79 F.4th at 1077.

17  It is also undisputed, however, that the Plans ***do*** contain a GASC Requirement, which

18  "mandated that a treatment be consistent with GASC" in order to be covered (or not excluded). *Wit*

19  *III*, 79 F.4th at 1088. "The Plans contain additional conditions and exclusions," *id.* at 1077, but

20  even if all of those other Plan terms were satisfied, UBH still could not authorize coverage unless

21  it ***also*** decided that, under GASC, services at the requested level of care were clinically appropriate

22  for the member.[15] UBH created its Guidelines specifically for that determination—that is, to

23  standardize how its reviewers would measure the requested services against GASC—but it

24  breached its fiduciary duties by drawing the GASC line in the wrong place, for its own purposes.

25
26
---

[15] In practice, as this Court found, UBH undertook the GASC assessment under its Guidelines ***only if*** the service was otherwise covered after application of all of the Plan's other conditions and exclusions. FFCL ¶¶ 48-49; *see also* PSFF ¶¶ 4-7.

UBH used its Guidelines to implement the GASC Requirement, across-the-board, for all Plans, even when *other* Plan terms varied. In developing the Guidelines, however, UBH prioritized its own financial interests over the interests of the plan members and, rather than making any effort to accurately encapsulate GASC, it ignored and manipulated the very standards on which it claimed to be relying, knowingly shaped the Guidelines into a tool for minimizing benefit expense, and then lied to everyone in an attempt to hide what was really going on. Irrespective of any other Plan terms, when UBH intentionally created excessively narrow clinical criteria for the express purpose of imposing UBH's "Acute Care UM Model" on the Plans, it subjected all Class members to a new limitation on the scope of coverage that was previously available under their Plans. All of this misconduct, moreover, occurred *before* UBH *applied* the Guidelines to the Class members and issued the denials Plaintiffs challenged in their wrongful denial of benefits claim.

As a result, even if the Court had predicated its conclusion that UBH's Guideline-based denials were wrongful on a misunderstanding that the Plans required coverage of all treatment that was consistent with GASC (and Plaintiffs do not believe it did), that would still have no bearing on UBH's breaches in developing the Guidelines to serve as its GASC standard.

## II.    Plaintiffs' Statutory Breach of Fiduciary Duty Claim Is Not Subject to Exhaustion.

Once the Court finds, as it should, that its conclusion that UBH breached its fiduciary duties remains in effect following the Ninth Circuit's decision in *Wit III*, the only remaining question is whether exhaustion is required for Plaintiffs' fiduciary duty claims. It is not.

The black-letter law in this Circuit holds that "exhaustion is not required for statutory breach of fiduciary duty claims" under ERISA. *Wit III*, 79 F.4th at 1089. *See also*, *e.g.*, *Spinedex Physical Therapy USA Inc. v. United Healthcare of Ariz., Inc.*, 770 F.3d 1282, 1294 (9th Cir. 2014); *Guenther v. Lockheed Martin Corp.*, 972 F.3d 1043, 1052 (9th Cir. 2020); *Horan v. Kaiser Steel Ret. Plan*, 947 F.2d 1412, 1416 n. 1 (9th Cir.1991), *overruled on other grounds as recognized by Pac. Shores Hosp. v. United Behav. Health*, 764 F.3d 1030, 1041 (9th Cir. 2014); *Fujikawa v. Gushiken*, 823 F.2d 1341, 1345 (9th Cir. 1987). Unlike plan-based claims, statutory claims require "only interpretation of ERISA," which "'is a task for the judiciary.'" *Graphic Commc'ns Union,*

1  *Dist. Council No. 2, AFL–CIO v. GCIU–Employer Ret. Ben. Plan*, 917 F.2d 1184, 1187 (9th Cir.

2  1990) (quoting *Amaro v. Cont'l Can Co.*, 724 F.2d 747, 751 (9th Cir. 1984)).

3         Plan exhaustion requirements apply, however, if a plaintiff's nominally-statutory claim is

4  really a "disguised claim for benefits." *Wit III*, 79 F.4th at 1089 (citing *Spinedex*, 770 F.3d at 1294;

5  *Diaz v. United Agric. Emp. Welfare Benefit Plan & Trust*, 50 F.3d 1478, 1483 (9th Cir. 1995)).

6  This simply means that courts will not elevate form over substance: an ERISA plaintiff cannot

7  avoid an otherwise-applicable plan exhaustion requirement by simply "attach[ing] a 'statutory

8  violation' sticker to his or her claim." *Diaz*, 50 F.3d at 1484. In this Circuit and others, therefore,

9  courts distinguish between individual claims for monetary relief based on an improper denial of a

10 particular claim for benefits, as in *Diaz*, and claims seeking equitable relief based on a general

11 practice that violates the statute, as in *Spinedex*. Plan exhaustion requirements apply to the former,

12 but not the latter.

13     A.    *Diaz* **and** *Spinedex* **Demonstrate the Narrow Application of the**
              **"Disguised Benefits Claim" Label.**
14

15         *Diaz* explains the rationale for subjecting "disguised benefits claims" to plan exhaustion

16 requirements and illustrates the limited scope of that exception. In that case, Mario Diaz was laid

17 off by his employer. 50 F.3d at 1482. He was later rehired, but because the plan failed to send

18 timely notice of COBRA coverage after the layoff (in violation of statutory requirements), there

19 was a brief gap in Diaz's coverage. *Id*. During the period when his coverage had lapsed, Diaz's

20 daughter was diagnosed with leukemia. After Diaz was re-enrolled, the plan denied coverage for

21 his daughter's treatment based on the plan's exclusion of coverage for pre-existing conditions. *Id*.

22 Without exhausting his administrative remedies under the plan, Diaz filed a lawsuit seeking

23 payment of his benefits claims. *Id*.

24         Although one of Diaz's arguments for disregarding the plan's pre-existing condition

25 exclusion was that the plan had violated the ***statutory*** COBRA notice provision, that did not

26 transform Diaz's claim for benefits under his plan into a statutory claim. *Id*. at 1483. Diaz's

27 statutory argument about notice would do him no good unless, on the facts, the court interpreted

28 the pre-existing condition exclusion as inapplicable to coverage that Diaz contended would have

been effective at the time of diagnosis had proper notice been given. In other words, the statutory COBRA violation did not entitle Diaz to the relief he was seeking with regard to the denial of his claim for benefits; the district court still could not have granted any relief to Diaz without agreeing with him about how the plan terms applied to the facts of his case, thus implicating the rationale for exhaustion of plan-based claims. *Id*. at 1483.

By contrast, in *Spinedex*, the Ninth Circuit rejected a defendant's attempt to characterize a statutory breach of fiduciary duty claim as a "disguised benefits claim" and held that exhaustion was ***not*** required. 770 F.3d at 1294. In that case, United had denied or underpaid benefit claims submitted by Spinedex Physical Therapy USA for certain treatment services it provided to its patients, and Spinedex and its patients, together, filed suit alleging improper denial of benefits and breach of fiduciary duty. 770 F.3d at 1288.[16] In their Second Amended Complaint, the plaintiffs alleged that United breached its fiduciary duties by "engag[ing] in systematic violations" of ERISA that deprived the plaintiffs of a fair process, *see* Exhibit 1 at 36; *see also id.* at 35-42 (Count I), and by engaging in prohibited transactions in violation of ERISA Section 406, 29 U.S.C. § 1106. *Id*. at 42-44 (Count II). Separately, the plaintiffs asserted a claim for benefits due under Section 1132(a)(1)(B). *Id*. at 44-45 (Count IV).

The *Spinedex* court had no difficulty rejecting United's attempt to recast the breach of fiduciary duty claim as a "disguised claim for benefits," emphasizing that the "statutory violations" alleged in that case "were willful and systematic," and that the plaintiff "sought injunctive relief that clearly will benefit the Plans." *Id.* (quotations omitted). This holding is directly on point here, where UBH similarly committed "statutory violations" that "were willful and systematic," by adopting, as its standard clinical criteria for interpreting and applying the GASC Requirement, Guidelines that it deliberately designed to be overly restrictive and inconsistent with GASC solely to benefit itself, and at the expense of its insureds, and then lied about it to everyone. Injunctive

---

[16] *See also* Second Am. Class Action Compl. For Violations of the Employee Retirement Income Security Act of 1974, *Spinedex Physical Therapy, U.S.A., Inc. v. United Healthcare of Ariz., Inc.*, No. 2:08-cv-00457-ROS, ECF No. 38 (D. Ariz. July 9, 2008) (the "Spinedex SAC"). For the Court's convenience, the Second Amended Complaint is attached to this brief as Exhibit 1.

relief to force UBH to interpret and apply the GASC Requirement using criteria that comply with GASC, and to compel UBH to alter its Guideline-development process to eliminate the improper influence of its financial personnel over clinical judgments, for example, is appropriate for redressing the statutory violations in a manner benefiting all the beneficiaries of the plans. Both the specifics of the fiduciary breaches Plaintiffs proved, and the nature of the relief Plaintiffs seek, are separate and apart from any claim for benefits and neither is tied to the application of any plan terms to the facts of any particular benefit determination. Exhaustion does not apply to Plaintiffs' fiduciary duty claims in this action.

Decisions from other Circuits similarly distinguish between claims genuinely seeking redress for statutory violations and individual claims for monetary relief based on coverage of a particular claim for benefits under a plan. For example, in *Drinkwater v. Metro. Life Ins. Co*., 846 F.2d 821 (1st Cir. 1988), the First Circuit required exhaustion of a claim for compensatory damages based on the plaintiff's asserted eligibility for higher disability benefits under a new plan than he was being paid under an older plan, where the administrator found that a "recurrence of preexisting condition" provision meant that the plaintiff was not entitled to benefits under the new plan. *Id*. at 823. As in *Diaz*, Drinkwater's claim for monetary relief depended on whether, on the facts of his case, the new plan's pre-existing condition term applied, and not on any distinct statutory violation. *Id*.

Similarly, in *Harrow v. Prudential Ins. Co.*, 279 F.3d 244, 254 (3d Cir. 2002), the breach of fiduciary duty claim was "actually premised on the plan administrators' failure to furnish plaintiff with insurance coverage" for a prescription drug, and "not conduct amounting to a statutory breach of fiduciary duty." *Id*. at 254. The court reasoned that permitting plaintiffs to "bypass[] the exhaustion requirement" by "recasting a benefits claim in statutory terms" would render the exhaustion doctrine "'meaningless.'" *Id*. (quoting *Drinkwater*, 846 F.2d at 826). Citing *Diaz*, the court rejected that artifice and upheld dismissal of the claim. *Id.* at 255.

In *Smith v. Sydnor*, 184 F.3d 356, 362 (4th Cir. 1999), by contrast, the Fourth Circuit reversed the district court's dismissal of the plaintiff's breach of fiduciary duty claims for failure to exhaust. Distinguishing *Drinkwater* and cases following it, the court held that there was "no such

'artful pleading'" in Smith's allegations of self-dealing and imprudent plan management by the plan administrators—conduct that lowered the value of his 401(k) plan. 184 F.3d at 362-63. Moreover, unlike the plaintiffs in *Drinkwater* and its progeny, Smith was seeking an equitable remedy (disgorgement of profits) that would benefit all plan members, as well as himself individually. *Id*. at 363.

Two Sixth Circuit cases are also instructive. In *Fallick v. Nationwide Mut. Ins. Co.*, the court held that exhaustion was not required because the plaintiff was not only contesting the insurer's treatment of his own claim, but its across-the-board methodology for determining reasonable and customary charges, and the insurer had "never demonstrated that it would alter or even consider altering its underlying methodology." 162 F.3d 410, 419 (6th Cir. 1998). Although the decision in *Fallick* was based on the futility of exhaustion rather than because the claim was statutory, the court in *Hill v. Blue Cross & Blue Shield of Michigan* relied on *Fallick* in rejecting the defendant's argument that the plaintiff's claims "were merely repackaged claims for individual benefits and did not constitute actual fiduciary-duty claims." *Hill*, 409 F.3d 710, 717-18 (6th Cir. 2005). The Sixth Circuit ruled that the claims in *Hill* were not disguised claims for benefits because the plaintiffs challenged the insurer's "methodology for handling all of the Program's emergency-medical-treatment claims," something that could **only** be remedied by plan-wide injunctive relief, not "an award of benefits to a particular Program participant based on an improperly denied claim." 409 F.3d at 718. Accordingly, the court reversed the dismissal of the statutory claims as unexhausted claims for benefits. *Id*.

While this Court is not bound by out-of-Circuit decisions, the line drawn by all these cases is consistent with the Ninth Circuit's ruling in *Spinedex*. A plaintiff seeking monetary relief for a particular improper benefit denial cannot avoid exhaustion by characterizing the wrongful denial as a breach of fiduciary duty, because the right to that relief still depends on an interpretation of the plan. That simply does not apply here.

1
2

**B.    Plaintiffs' Breach of Fiduciary Duty Claim Falls Squarely Within the Rule that Exhaustion is Not Required for Claims Arising Under the Statute.**

3

4

The breach of fiduciary duty claims Plaintiffs assert in this case fall well within the usual

5

rule for statutory claims. UBH's breaches of fiduciary duty were generalized and systematic,

6

tainting its development of the standard criteria it intended to use to make clinical decisions under

7

*all* of its ERISA plans. Moreover, because Plaintiffs proved that UBH breached its fiduciary duties

8

in the context of its Guideline development process, the breaches occurred prior to, and separate

9

from, any subsequent *application* of the Guidelines to a given claim. And Plaintiffs seek equitable

10

remedies that will inure to the benefit of *all* plan members, not just to any particular individual.

11

This case could not be more different from *Diaz*, but instead falls squarely under *Spinedex*. The

12

plans' exhaustion requirements do not apply to the Plaintiffs' breach of fiduciary duty claims.[17]

**<u>CONCLUSION</u>**

13

14

In summary, Plaintiffs respectfully request that the Court enter the additional factual

15

findings in Plaintiffs' Proposed Supplemental Findings of Fact; enter an order clarifying that the

16

Court's ruling that UBH breached its fiduciary duties does not in any way depend on any

17

misinterpretation of the Plans; and issue a ruling finding that Plaintiffs' breach of fiduciary duty

18

claims are not subject to any plan exhaustion requirements.

19

20

21

22

23

24

25

26

27

28

---

[17] If, despite the clear authority to the contrary, the Court were to find that plan exhaustion requirements apply to the Class members' breach of fiduciary duty claim (which it should not), the Ninth Circuit has directed that the Court "must then determine if that requirement was satisfied or otherwise excused." *Wit III*, 79 F.4th at 1089. In that event, Plaintiffs will request the opportunity to demonstrate in further briefing that the Court was correct in ruling that "any exhaustion required of class members is excused" because the named Plaintiffs' exhaustion satisfied "the purposes of UBH's internal grievance procedure" and because "exhaustion would have been futile," FFCL ¶¶ 190-92, and that the absent class members' exhaustion should be excused for additional reasons as well.

-29-

1    Dated: March 21, 2025                    Respectfully submitted,

2                                            ZUCKERMAN SPAEDER LLP

3                                            /s/ Caroline E. Reynolds
4                                            Caroline E. Reynolds
                                             D. Brian Hufford
5                                            Jason S. Cowart
                                             Joshua Mathew
6

7                                            PSYCH-APPEAL, INC.
                                             Meiram Bendat
8

9                                            *Attorneys for Plaintiffs and the Classes*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28